**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

UNITED STATES OF AMERICA,

       *Plaintiff*,

v.                                      Case No. 2:21-cv-14205-KAM

BENJAMIN K. SHARFI, in his personal and
fiduciary capacity as trustee of the Benjamin
Sharfi 2002 Trust, and NESHAFARM, INC.,

       *Defendants*.

_____/

**<u>DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>**

Pursuant to Federal Rule of Civil Procedure 56, Defendants Benjamin Sharfi, in his personal and fiduciary capacity as trustee of the Benjamin Sharfi 2002 Trust, and Neshafarm, Inc. ("Defendants") move for summary judgment on the claims in Plaintiff United States of America's (the "Government") Amended Complaint (ECF No. 21). In support of this Motion, Defendants concurrently file a Statement of Material Facts pursuant to Local Rule 56.1. *See* ("Facts").

This is a Clean Water Act case, in which the Government alleges that Defendants did work in wetlands on their ten-acre farm without a permit from the U.S. Army Corps of Engineers (the "Corps").   The central issue in this case is whether the Defendants even needed a Clean Water Act permit.  The Clean Water Act requires permits for discharges into the "navigable waters," which are defined as "the waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7). Not all wetlands are part of "the waters of the United States": Clean Water Act jurisdiction extends only to wetlands that have a "significant nexus" with traditional navigable waters. *United States v. Robison*, 505 F.3d 1208, 1222 (11th Cir. 2007) (following opinion of Justice Kennedy in *Rapanos v. United States*, 547 U.S. 715, 780 (2006)).  This means that in order to fall within the Clean Water Act's permitting jurisdiction, a wetland along with similarly situated wetlands must significantly affect the integrity of downstream navigable waters. If a wetland's effect on water quality in the navigable waters is speculative or insubstantial, then there is no significant nexus. *Robison,* 505 F.3d at 1218 (citing *Rapanos*, 547 U.S. at 780).

In this case, Defendants' property is located miles away from any traditional navigable water.  The Government's evidence of "significant nexus" is mostly that there is an intermittent hydrological connection from wetlands on the property through man-made ditches that lead to tidally-influenced portions of a stream named Bessey Creek, more than 4 miles away. The Government has no evidence of how those wetlands actually affect the downstream tidal waters,

and can only speculate how the Defendants' wetlands affect water quality there.  Whatever the effect those wetlands have, it is insubstantial because they make up only a minuscule portion of the overall watershed. As a result, the Government does not have sufficient evidence to carry its burden of proof that the Defendants' wetlands significantly affect navigable waters and, thus, cannot demonstrate that the wetlands are subject to the Corps' permitting jurisdiction under the Clean Water Act.

I.      **K**EY **F**ACTS

        A.      The Defendants' Site

        The Defendants' property at issue in this case is a 9.92-acre parcel in a rural area of Palm City, Florida (the "Site"). Facts at ¶ 1. It is undisputed that there are shallow wetlands on a portion of the Site, but the parties dispute the acreage and boundaries of the wetlands. *Id*. at ¶ 4.

        The Site is located miles away from the nearest traditional navigable water. *Id*. at ¶ 5. The closest traditional navigable water is a tidally-influenced portion of Bessey Creek. *Id*. Bessey Creek flows into the St. Lucie River and is part of the broader St. Lucie Estuary. *Id*. at ¶ 6. The figure below shows the location of the Site relative to Bessey Creek and the St. Lucie River.  (Facts, Ex. 11, Fig. I.1).



The wetlands on the Site are connected hydrologically to the navigable waters, if at all, through a series of ditches. Facts at ¶¶ 7–20.  There is a manmade ditch that is located on the western boundary of the Site (the "North-South Ditch"). *Id*. at ¶ 7. The North-South Ditch has a berm next to it that separates it from wetlands on the Site. *Id*. at ¶ 9.  There is water in the North-South Ditch after it rains, but the ditch is dry for much of the year. *Id*. at ¶¶ 39, 43.

The North-South Ditch runs north approximately 1,600 feet from the Site to another manmade ditch (the "East-West Ditch"). *Id*. at ¶¶ 12–13. The Government calls this East-West Ditch "Bessey Creek," but does not dispute that it was artificially excavated. *Id*. at ¶ 13.  The portion of the East-West Ditch near the Site has water flow for part of the year and is dry at other times. *Id*. at ¶ 40.  The East-West Ditch extends several miles west to east, and connects to a natural branch of Bessey Creek more than 2 miles east of the Site. *Id*. at ¶ 17.  From the point where it meets the East-West Ditch, Bessey Creek runs east beneath the Florida Turnpike and becomes tidally-influenced approximately 4.5 miles east of the Site. *Id*. at ¶¶ 18–19.

B.     Corps Enforcement at the Defendants' Site

Although not material to this motion, Defendants provide the following background about the facts leading up to this litigation.  Defendants purchased the Site in 2017. *Id*. at ¶ 1. In 2018, Defendants engaged in activities so that the property could be used for agricultural purposes. *Id*. at ¶ 3. Defendants fenced and left in place approximately one acre of wetlands on the Site. *Id*. at ¶ 4.

In January 2018, an enforcement officer from the Corps contacted Defendants and told them that they needed a federal Clean Water Act permit to do work in their wetlands. The Clean Water Act regulates discharges of dredged and fill material into "the waters of the United States," and the Corps was responsible for issuing that type of Clean Water Act permit in Florida at the time. There are significant financial implications to Clean Water Act regulation of wetlands, because, as one study found, "the average applicant for an individual permit 'spends 788 days and $271,596 in completing the process' without 'counting costs of mitigation or design changes.'" *U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.,* 578 U.S. 590, 594–95 (2016) (quoting *Rapanos,* 547 U.S. at 721).

At the Corps' direction, Defendants submitted a permit application in February 2018. Defendants also hired a consultant to delineate the boundaries of wetlands for the South Florida Water Management District ("SFWMD"), which also regulates activities in wetlands under Florida law (not the Clean Water Act).

In April 2018, SFWMD employees visited the Site to verify the wetland delineation line identified by the environmental consultant, and observed that Defendants had engaged in some work prior to receiving a permit. Five days later, the Corps sent Defendants a cease-and-desist

letter stating that wetlands on the Site were subject to their permitting jurisdiction and threatening Defendants with civil and criminal enforcement.

Eventually, Defendants entered into a consent order with the SFWMD that required Defendants to restore some wetlands and get an after-the-fact permit under Florida law. Defendants, however, refused to get a federal permit from the Corps because they concluded that the Site's wetlands are not subject to regulation under the Clean Water Act.   As a result, the Government filed this action in 2021.

       C.      <u>The Government's Investigation of Significant Nexus</u>

In the administrative process before filing this lawsuit, the Government did not conduct any investigation into whether wetlands on the Site significantly affect traditional navigable waters. *Id.* at ¶ 99. When the Corps first told Defendants that they needed a permit in 2018, agency staff only looked to determine whether there were wetlands on the Site and whether there was a potential hydrological connection between those wetlands and navigable waters. *Id.* at ¶ 100.

In this litigation, the Government hired experts to investigate the issue of Clean Water Act jurisdiction. *Id.* at ¶ 101.  All of the Government's evidence relating to the issue of "significant nexus" comes from those experts. *Id.*  The Government expert who will offer opinions about whether wetlands on the Site have a significant nexus to downstream navigable waters and are part of "the waters of the United States," is Michael Wylie, a retired employee of the U.S. Environmental Protection Agency ("EPA").  *Id.* at ¶ 102.

The Government experts primarily investigated the Site itself and nearby areas to identify and delineate the boundary of wetlands and determine whether there is a potential hydrological connection to the tidally-influenced waters of Bessey Creek and the St. Lucie Estuary. *Id.* at ¶ 21. Regarding the hydrological connection between the Site and downstream navigable waters, the

Government's hydrologist identified what he believes is the "primary flow path" that water from the Site *would* travel via the North-South Ditch on the way to the East-West Ditch. *Id*. at ¶ 16. The Government did not conduct any tracer studies to track water on the Site to determine whether water from the Site *actually* reaches the ditches or the tidal area of Bessey Creek. *Id*. at ¶ 26. The Government experts also did not attempt to measure the amount of water flowing in the North-South Ditch and, therefore, do not know how much water from that ditch or the Site even reaches the tidal area of Bessey Creek and St. Lucie Estuary. *Id*. at ¶¶ 29, 31. The only evidence the Government has on the volume of flows is from a location in the East-West Ditch 2.5 miles downstream, which includes water from sources other than the Site and North-South Ditch. *Id*. at ¶ 44.

The Government experts did not collect any water quality data. *Id*. at ¶ 47. While they identified nitrogen and phosphorus as the relevant pollutants (both are nutrients) to the St. Lucie Estuary, they never took samples to determine how much nitrogen and phosphorus are *actually present* in water at the Site or in the nearby ditches. *Id*. at ¶ 48. As a result, they do not know how much nitrogen and phosphorus from the Site and nearby areas *actually* reaches the navigable waters miles away. *Id*. at ¶ 49.

The Government experts saw leaf litter in water in the North-South and East-West Ditches, which they identified as a helpful source of carbon (energy) to the downstream aquatic ecosystem, but made no attempt to quantify the amount of carbon originating from the Site and similarly situated wetlands that reach the navigable waters. *Id*. at ¶¶ 76–79. They saw some sand in the ditches, and identified that as a sign that wetlands at the Site and similarly situated wetlands were trapping sediment before it reaches navigable waters, but they do not know how much sediment is trapped by those wetlands. *Id*. at ¶¶ 71–75. They also identified plants and animals on Defendants'

Site and nearby areas, concluding that these areas serve as habitat, but they did not determine how the Site compared to other similar habitats. *Id.* at ¶¶ 76–81.

The Government experts undertook no investigations of the Site's and similarly situated wetlands' relative importance to downstream navigable waters. *Id.* at ¶ 47. They have no evidence of the percentage of water in the tidal area of Bessey Creek or the St. Lucie Estuary coming from the Site or similarly situated wetlands, *id.* at ¶ 33; no evidence of the relative contribution of nitrogen or phosphorus to those waters, *id.* at ¶ 50; no evidence of the relative contribution of the Site and similarly situated wetlands to carbon, sediment trapping, or habitat of the downstream navigable waters. *Id.* at ¶ 70–81. Despite this lack of evidence, the Government's expert, Michael Wylie, offers the opinion that there is a significant effect. *Id.* at ¶ 102.

The Defendants, on the other hand, hired two experts to testify regarding whether there is a significant nexus between the Site and navigable waters, Dr. Michael Dennis and Professor Jerald Ault. Both experts testified that the evidence does not demonstrate that the Site and similarly situated wetlands have any significant effect on the tidal portions of Bessey Creek and the St. Lucie Estuary. Most relevant to this motion, Professor Ault gathered facts regarding the relative importance of the Site and nearby areas on downstream traditional navigable waters. *Id.* at ¶¶ 82–86. Using publicly available data from government agencies, he determined that the Defendants' Site and nearby areas around the North-South Ditch constitute less than 1 percent of the total watershed of Bessey Creek and an even smaller percentage of the watershed of the St. Lucie Estuary. *Id.* at ¶ 84. Also, making conservative assumptions based on the public data, Prof. Ault determined that the Site and nearby areas necessarily contribute less than 1 percent of the total nitrogen and phosphorus discharges to the tidal portions of Bessey Creek and the St. Lucie Estuary. *Id.* at ¶ 86.

7

## II.   SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id*. at 322–23. The "mere scintilla of evidence in support of the [nonmovant's] position," however, is "insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

An expert opinion regarding that element of proof, without adequate evidence to support the opinion, is not enough to defeat summary judgment.  "When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict." *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993). Accordingly, "a party may not avoid summary judgment solely on the basis of an expert's opinion that fails to provide specific facts from the record to support its conclusory allegations." *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985).

## III.   KEY LEGAL STANDARD – CLEAN WATER ACT

The Government has the burden of proving each element of its Clean Water Act claim. *See Hicks v. Ferrero*, 285 Fed. Appx. 585, 588 (11th Cir. 2008). A Clean Water Act claim has the

following elements: (1) a "discharge," (2) of a "pollutant," (3) "from a point source," (4) to the "navigable waters," (5) without a Clean Water Act permit. 33 U.S.C. §§ 1311(a), 1362(12), 1365(a)(1)–(f); *Parker v. Scrap Metal Processors*, 386 F.3d 993, 1008 (11th Cir. 2004); *Friends of the Everglades v. SFWMD*, 570 F.3d 1210, 1216 (11th Cir. 2009).

The central issue in this case is element four—whether wetlands on the Site are "navigable waters." The Clean Water Act defines the "navigable waters" as "the waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7).

The scope of "the waters of the United States" has been the subject of much confusion over the past several decades. For years, the Corps and the EPA treated virtually all wetlands as part of "the waters of the United States," based on regulations promulgated in the 1980s. *Sackett v. Env't Prot. Agency,* 566 U.S. 120, 133 (2012) (Alito, J., concurring). In 2001, the Supreme Court ruled that the Corps could not assert jurisdiction over isolated waters as part of "the waters of the United States" based on their use by migratory birds. *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs,* 531 U.S. 159, 172–74 (2001). Then, in 2006, the Supreme Court issued a fractured decision that limited the Corps' jurisdiction over "wetlands, which lie near ditches or man-made drains that eventually empty into traditional navigable waters." *Rapanos v. United States,* 547 U.S. 715, 729 (2006). No one opinion was joined by the majority of the justices, but the Eleventh Circuit has ruled that the controlling opinion was written by Justice Kennedy, which requires that wetlands have a "significant nexus" with traditional navigable waters in order to be part of "the waters of the United States." *Robison,* 505 F.3d at 1222.

Since the *Rapanos* decision, the agencies have flip-flopped on new regulations defining the scope of "the waters of the United States." The Obama and Trump Administrations each issued new regulations that were subsequently vacated, and the Biden Administration is currently

proposing its own regulation that has not yet been finalized.  *See* Proposed Rule, Revised Definition of "Waters of the US," 86 Fed. Reg. 69,372, 69,373 (Dec. 7, 2021) (describing history of rulemakings).  However, the Supreme Court recently granted certiorari in a case to decide the proper test for determining whether wetlands are part of "the waters of the United States."  *Sackett v. Env't Prot. Agency,* 8 F.4th1075 (9th Cir. 2021), *certiorari granted,* 142 S.Ct. 896 (Mem) (Jan. 24, 2022).  The *Sackett* case is the first case scheduled for oral argument in the Supreme Court's October Term, and many legal experts expect the Supreme Court to once again restrict the scope of Clean Water Act jurisdiction.

Until the Supreme Court issues its new ruling, the governing rule for determining whether wetlands on Defendants' Site are part of "the waters of the United States" is Justice Kennedy's "significant nexus" test from *Rapanos*.  Under that test, the Government must prove that the Site's wetlands, "either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.'  When, in contrast, wetlands' effects on water quality are speculative or insubstantial, they fall outside the zone fairly encompassed by the statutory term 'navigable waters.'"  *Robison,* 505 F.3d at 1218 (quoting *Rapanos,* 547 U.S. at 780).

The focus of the "significant nexus" test is on the <u>effects</u> of the wetland on downstream navigable waters.  To be regulated by the Clean Water Act, a particular wetland must "significantly affect" the chemical, physical and biological integrity of downstream navigable waters.  *Id.*  The word "affect" means "to produce an effect on [or] to influence in some way." *Affect*, Black's Law Dictionary (11th ed. 2019).  The word "significantly" means "in a sufficiently great or important way as to be worthy of attention." *Significantly*, Oxford English Dictionary (Version 11.7. 712 (2020)).  Justice Kennedy indicated that jurisdictional wetlands should be "integral parts of the

aquatic environment" that perform functions for navigable waters that are "critical" and "important." *Rapanos,* 547 U.S. at 779–82.  This means that the Government must prove not only that the wetland causes an effect on the chemical, physical and biological integrity of the traditional navigable waters, but also that those effects are significant, i.e., the impacts affect the integrity of those waters by a relatively great amount or high degree.  *Precon Devel. Corp. v. U.S. Army Corps of Eng'rs,* 633 F.3d 278, 294 (4th Cir. 2011).  This is a case-by-case analysis, so the proof must relate to the "particular wetland" and not to the importance of wetlands in general.  *Rapanos,* 547 U.S. at 782.

The Eleventh Circuit has twice reversed lower court decisions in Clean Water Act cases where the Government presented evidence of a hydrological connection between a water at issue and downstream navigable waters, but failed to present evidence of a significant effect on those downstream waters.  In *Robison,* the Eleventh Circuit found that the Government failed to satisfy its burden where it presented no evidence "about the possible chemical, physical, or biological effect that Avondale Creek [the water in question] may have on the Black Warrior River [the traditional navigable water]," and "no evidence [was] presented of any actual harm suffered by the Black Warrior River."  505 F.3d at 1222–23.  In *United States v. Coleman,* the Eleventh Circuit reversed where the government proffered that the defendant dumped diesel fuel in a creek that was a tributary of a traditional navigable water but provided no "basis for finding that the fuel entered water that 'significantly affects' the 'chemical, physical and biological integrity' of a navigable water." 833 Fed. Appx. 810, 812–13 (11th Cir. 2020).

Other courts have found  no "significant nexus" where the Corps failed to present evidence that the wetlands in question caused significant effects on downstream waters.  In *Precon*, the Fourth Circuit held that the Corps had failed to demonstrate a significant nexus where "there is no

documentation in the record that would allow us to review its assertion that the functions those wetlands perform are 'significant' for the Northwest River [the navigable water in question]." 633 F.3d at 295. In *Orchard Hill Bldg. Co. v. U.S. Army Corps of Engineers,* the Seventh Circuit found that the Corps had failed to demonstrate a significant nexus where it could not show how the wetlands in question, which made up 2.7% of all the wetlands in the watershed of a tributary to a navigable water, could cause significant effects in the downstream navigable river. 893 F.3d 1017, 1024–26 (7th Cir. 2018). Other district courts have similarly found no "significant nexus" where there was no proof that a water or wetland caused significant effects in the navigable waters downstream. *See, e.g., Jones Creek Invs. LLC v. Columbia Cnty., Ga.,* 98 F.Supp.3d 1279, 1307–08 (S.D. Ga. 2015); *Lewis v. United States,* 2020 WL 4798496, *7–9 (E.D. La. 2020).

## IV.  THE COURT SHOULD ENTER SUMMARY JUDGMENT FOR DEFENDANTS BECAUSE THE GOVERNMENT CANNOT CARRY ITS BURDEN OF PROOF THAT THERE IS A "SIGNIFICANT NEXUS"

The Court should enter summary judgment on the Government's Clean Water Act claim because the wetlands on Defendants' Site are not part of "the waters of the United States" subject to the Corps' permitting jurisdiction.  The Government lacks any evidence that wetlands on the Site and similarly situated wetlands have a significant effect on downstream navigable waters.  In reality, if anything, the only evidence in the record proves the opposite based on Dr. Ault's observations.  Thus, the Government cannot carry its burden of proof on this issue, so the Court should enter summary judgment in favor of Defendants.

### A.  The Government Has Insufficient Evidence of the Effects of Site Wetlands on Downstream Navigable Waters to Demonstrate a Significant Nexus

The Court should enter summary judgment because the Government cannot carry its burden of proof that the particular wetlands at issue in this case have a significant effect on the tidally-influenced area of Bessey Creek or the St. Lucie Estuary.  The Government only has

evidence that there is some sort of hydrological connection between the Site and navigable waters, and that wetlands in general serve functions for downstream waters in general. The Government cannot say how much wetlands on the Site and similarly situated wetlands affect the tidal waters of Bessey Creek or the St. Lucie Estuary, or that those effects are significant in the context of other contributors to the watershed. The Eleventh Circuit and other courts have found that this type of evidence is insufficient to demonstrate a "significant nexus." *See, e.g., Robison,* 505 F.3d at 1222.

The Government has focused on whether there is a hydrological connection between the Site and the tidal waters of Bessey Creek. The Government's evidence is almost entirely about the route that water could flow from the Site to those downstream waters. The Government never conducted a tracer dye study to track water from the Site to determine whether it *actually* enters the ditches, and if so, whether it reaches the tidal waters miles away. The Government also never measured the water volume or rate of flow in the North-South Ditch, the "primary flow path," or the East-West Ditch near the Site, so it does not know how much water flows from the Site to the tidal waters of Bessey Creek, if any at all.

This evidence falls short of the basic threshold of proof regarding the existence and magnitude of the hydrological connection. Justice Kennedy stated that the "volume of flow (either annually or on average)" is a factor in determining whether there is significant nexus and indicated that the Clean Water Act does not allow for "regulation of drains, ditches and streams remote from any navigable-in-fact water and carrying only minor water volumes toward it." *Rapanos,* 547 U.S. at 781. The Eleventh Circuit in *Robison* cited as reasons supporting its decision the Government's failure to conduct tracer tests or measure the flow and volume of water reaching the navigable waters. *Robison,* 505 F.3d at 1211–12; *see also Precon,* 633 F.3d at 294 (indicating that the lack of measurements of actual flow undercut the Corps' claim of significant effect). If

the Government cannot demonstrate how much water travels from the Site to navigable waters "either annually or on average," then it likewise cannot establish that the Site contributes more than "minor volumes of water" to the navigable waters. *Rapanos,* 547 U.S. at 781.

More importantly, this evidence of a hydrological connection does not establish that wetlands on the Site have any specific effect on navigable waters. If the Government does not know how much water from the Site and similarly situated wetlands even reaches the tidal area of Bessey Creek and the St. Lucie Estuary, if any at all, then it cannot identify the percentage of inflow to the downstream tidal waters that comes from those wetlands, or how that compares to other sources of inflows.

The Government also lacks evidence of other effects of the Site's wetlands on downstream navigable waters. The Government has some minimal evidence that wetlands on the Site and nearby areas contribute carbon matter in the form of leaf litter to downstream waters, but the Government's experts did not collect data of the amount of such carbon matter, how that contribution compares to other sources of carbon matter to the tidal waters, or how the Site's carbon matter actually affects the downstream waters. The Government also claims that wetlands on the Site reduce sedimentation of downstream navigable waters, but the Government's experts also cannot say by how much sedimentation is reduced, how that compares to other location's trapping of sediment, and what specific effects that causes in the tidal waters. Next, the Government asserts that wetlands on the Site affect biology of aquatic ecosystems in tidally-influenced waters downstream, but there is no evidence of a single aquatic species that lives in those downstream tidal waters being present on the Site and no evidence of the relative importance of this Site on conditions in the tidal waters.

The only evidence the Government puts forth regarding the effect of wetlands in the Bessey Creek watershed is generic and broad statements by the Government's experts that wetlands in general are good for downstream waters in general. These statements are not evidence specific to the wetlands that are the subject of this case. The "significant nexus" test requires a case-by-case demonstration of the effects of particular wetlands. *Rapanos,* 547 U.S. at 783. General statements that wetlands are important do not establish that the specific wetlands at issue in this case have significant effects on traditional navigable waters. If such broad statements were sufficient, then all wetlands would be deemed to have significant effects on navigable waters, making all wetlands federally regulated, but the law is that wetlands are *not* presumed to be jurisdictional. *Cf. Sackett,* 566 U.S. at 133 (Alito, J., concurring) (noting that the Supreme Court has rejected the agencies' "boundless view" of their jurisdictional authority).

The Government's evidence in this case is similar to the evidence that the Eleventh Circuit has twice held to be insufficient to establish significant effects. In *Robison*, the court considered a criminal case arising out of allegations that defendants discharged chemical waste into "a perennial stream with 'continuous uninterrupted flow'" that eventually reached a navigable river miles away. 505 F.3d at 1211–12. The Eleventh Circuit reversed the defendants' convictions because the Government had failed to establish a significant nexus between that stream and the downstream navigable water. *Id*. at 1222–24. Quoting Justice Kennedy, the court held that "a mere hydrological connection" with the downstream traditional navigable water is not enough to establish a significant nexus. *Id*. at 1222. Specifically, there, "[t]he government did not produce any evidence . . . about the possible chemical, physical and biological effects" on the downstream navigable water, nor did it present evidence of any actual harm suffered by the downstream waters. *Id*. at 1223.

In *Coleman*, the Eleventh Circuit considered a case in which the defendant was convicted of violating the Clean Water Act by dumping diesel fuel that entered a creek that eventually flowed into a traditional navigable water. 833 Fed. Appx. at 811. The court reversed the conviction on grounds that the Government had not presented sufficient evidence to establish that the creek was part of "the waters of the United States." *Id*. at 813.  Citing *Robison*, the court once again held that a "mere hydrologic connection" is not enough and the Government had to provide evidence that the creek significantly affected the chemical, physical and biological integrity of downstream waters, which it had failed to do. *Id*.

Other courts have found that the lack of evidence of significant downstream effects meant there is no significant nexus.  In *Precon,* the Fourth Circuit held that evidence that wetlands "trap sediment and nitrogen and perform flood control functions" did not establish that the wetlands in question caused significant effects in the specific navigable river downstream. 633 F.3d at 295.  In *Jones Creek Investors,* the plaintiffs claimed that the defendants' activities increased sedimentation downstream in the Savannah River, but the district court held that evidence of sedimentation upstream was not sufficient to prove that the defendants' activities actually caused sedimentation in the Savannah River or that such sedimentation significantly affected the chemical, physical and biological integrity of the river. 98 F.Supp.3d at 1307.  The similar lack of proof offered by the Government in the current case means that it cannot establish a significant nexus and, as a result, summary judgment should be entered in favor of Defendants.

**B.      The Effects of the Site Wetlands on Downstream Water Quality Are Speculative, Which Means that the Site Cannot Have a Significant Effect on Downstream Waters.**

The Court should enter summary judgment because the Government has nothing more than speculation about how wetlands on the Site affect downstream water quality.  Proof of water

quality effects are critical to a demonstration of significant nexus because "[w]hen . . . wetlands' effects on water quality are speculative . . ., they fall outside the zone fairly encompassed by the statutory term 'navigable waters.'" *Rapanos*, 547 U.S. at 780.

The Government has no evidence of the amount of pollutants, if any, that might be in water flowing from the Site and similarly situated wetlands. The Government's experts never collected water quality data from the Site, the North-South Ditch, or the East-West Ditch.   The Government's *theory* is that nitrogen and phosphorous is in the water that flows from the Site and nearby areas, but the Government's experts never took samples to confirm that theory.   The Government does not know the concentration or load of those pollutants in waters at the Site, in the North-South Ditch, or in the East-West Ditch near the Site, if there is any at all.   The Government does not know the percentage of those pollutants present in the tidal waters downstream that come from the Site and similarly situated wetlands.   The Government does not even know how much of those pollutants from the Site and similarly situated wetlands reach the traditional navigable waters, if any do at all.

The Government's water quality evidence is limited to data collected at a monitoring station (named "SLT-9") operated by the SFWMD in the tidal section of Bessey Creek, approximately 4.5 miles east of  the Site.  That monitoring station shows concentrations of phosphorus and nitrogen that exceed the water quality standard for that body of water (which is identified as a "TMDL").  However, the Government does not know how much of the phosphorus and nitrogen at SLT-9 comes from the East-West Ditch (of which the Site is a small part of the watershed). Facts at ¶ 60. The Government's witness, Mr. Wylie, acknowledges that there are other sources of those pollutants that could affect water quality at that monitoring station. *Id.* at ¶ 61. Not surprisingly, Mr. Wylie testified that he does not know whether water from the East-West

Ditch is causing the impairment of water quality there. *Id*. at ¶ 62. The following deposition exchange indicates the speculative nature of the Government's evidence:

> BY MR. McALILEY [counsel for Defendants]
>
> Q:  Okay.  So as far as you know, you could stop all of the phosphorus and nitrogen that's going down the east/west ditch and you would still be over the concentrations in the TMDL at SLT-9, right?
>
> > MR. ADKINS [counsel for the Government]:   Objection; *calls for speculation*.
>
> THE WITNESS [Michael Wylie]:  No sir, *I can't say that because I have no basis for making that yes or no*."

[Wylie Tr. 233:10-16, attached as Ex. 3 to the Facts, (emphasis added).]

The Government's evidence is clearly insufficient to establish a significant effect caused by the Site in the tidal areas of Bessey Creek and the St. Lucie Estuary.  If the Government cannot say how much pollutants travel from the Site and similarly situated wetlands to downstream tidal waters, then it can only speculate as to how the Site might affect downstream water quality.  The Government admits that it does not know whether flows from the East-West Ditch cause downstream water quality exceedances, or whether removing all pollutants from the East-West Ditch would end those exceedances.  This evidence is clearly insufficient to establish a significant nexus. *Rapanos*, 547 U.S. at 780 ("When . . . wetlands' effects on water quality are speculative . . ., they fall outside the zone fairly encompassed by the statutory term 'navigable waters.'").

### C.     The Effects of the Site Wetlands on Downstream Water Quality are Insubstantial, Which Means that it Cannot Have a Significant Effect on Downstream Waters.

The Court also should enter summary judgment because the undisputed evidence indicates that the effects of the Site and similarly situated wetlands on navigable waters is insubstantial. "When … wetlands' effects on water quality are … insubstantial, they fall outside the zone fairly encompassed by the statutory term 'navigable waters.'" *Robison,* 505 F.3d at 1218 (quoting *Rapanos,* 547 U.S. at 780).

Even if the Government had produced evidence that the Site affected downstream waters, the undisputed facts indicate that the area of the Site and similarly situated wetlands is so small that the effects cannot be significant.

The Site is located at least 4.5 miles away from the tidally-influenced section of Bessey Creek.  The Site and similarly situated wetlands make up only a miniscule proportion of the overall watershed.  The Bessey Creek watershed covers at least 12,000 acres, and the watershed of the St. Lucie Estuary covers more than 537,000 acres.  Similarly situated wetlands are those adjacent to the same reach of tributary, which the agencies' own guidance for applying the "significant nexus" test indicates is a tributary before it reaches a larger (higher order) tributary.  Assuming for purposes of argument the Government's claim that there are 5.97 acres of wetlands on the Site (a number which Defendants believe overstates the actual acreage), and coupling it with the 13 acres of similarly situated wetlands adjacent to the North-South Ditch and the "primary flow path" identified by the Government, these wetlands in total make up less than one percent of the overall watershed of Bessey Creek and the St. Lucie Estuary.

The potential contribution of water, potential pollutants, carbon and other factors from the Site and similarly situated wetlands is tiny.  If one assumes that water flows are evenly distributed across the watershed, then the Site will contribute less than 1 percent of total flows to the St. Lucie Estuary and the tidally-influenced portion of Bessey Creek.  Similar assumptions mean that the Site and similarly situated wetlands contribute less than 1 percent of nitrogen and phosphorous to the St. Lucie Estuary and Bessey Creek. These contributions of water and pollutants are de minimis, if quantifiable at all.

These percentages overstate the potential water quality effects of the Site and similarly situated wetlands. The source of pollutants in the Bessey Creek watershed are well understood—

septic tanks and agricultural activities—and those land uses are mostly located away from the Site and similarly situated wetlands. In addition, there is a water quality treatment facility located between the Site and tidally-influenced waters that removes most of the nitrogen and phosphorous from water in the East-West Ditch. This means that the Site and similarly situated wetlands contribute less pollutants than their percentage of the watershed would even suggest.

The Seventh Circuit recently held that a group of wetlands constituting a similar small percentage of a watershed could not have a significant effect on downstream navigable waters. In *Orchard Hill Building Co.*, the court noted that the wetlands in question made up only 2.7% of the watershed of a tributary to a navigable water. 893 F.3d at 1025. The small proportion of the watershed made up of the wetlands necessarily meant that the relative effects on the downstream navigable waters were insubstantial, and the court held there had not been a sufficient demonstration of significant nexus. *Id.*

Thus, the undisputed evidence demonstrates that the Site has an insubstantial effect on water quality. The Court should enter summary judgment in favor of the Defendants.

## CONCLUSION

For the foregoing reasons, this Court should grant Defendants' Motion for Summary Judgment against the Government on the Government's Clean Water Act claim.

## REQUEST FOR HEARING

Pursuant to Local Rule 7.1(b)(2), Defendants request an oral argument on this Motion as they believe that a hearing will assist the Court in its consideration of the arguments raised herein. Defendants request one hour for oral argument.

Dated:  August 10, 2022

Respectfully submitted,

/s/  Michael G. Zilber
T. Neal McAliley
Florida Bar No. 172091
nmcaliley@carltonfields.com
Michael G. Zilber
Florida Bar No. 1019146
mzilber@carltonfields.com
CARLTON FIELDS, P.A.
2 MiamiCentral
700 NW 1st Avenue, Suite 1200
Miami, Florida 33136
Tel: (305) 530-0050
Fax: (305) 530-0055
*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on August 10, 2022, I electronically filed the foregoing with the Clerk

of the Court using CM/ECF.

/s/ Michael G. Zilber
Michael G. Zilber

## SERVICE LIST

*United States of America vs. NeshaFarm, Inc., et al.*
**United States District Court, Southern District of Florida**
**Case No.: 2:21-cv-14205-KAM**

| | |
|---|---|
| BRANDON N. ADKINS<br>Bar ID: A5502752<br>ANDREW DOYLE<br>FL Bar No.: 84948<br>JEFFREY HUGHES<br>Bar ID: A5502897<br>United States Department of Justice<br>Environment & Natural Resources Division<br>PO Box 7611<br>Washington, DC 2004<br>Tel: (202) 616-9174 (Adkins)<br>Tel: (415) 744-6469 (Doyle)<br>Fax: (202) 514-8865 | CHRISTOPHER F. HAMILTON<br>FL Bar No.: 98527<br>chamilton@sharfiholding.com<br>JOSHUA D. MIRON<br>FL Bar No.: 644811<br>jmiron@sharfiholding.com<br>Sharfi Holdings, Inc.<br>3731 NE Pineapple Avenue<br>2nd Floor<br>Jensen Beach, FL 34957<br>Tel: 813-416-2352<br><br>*Attorneys for Defendants* |

Brandon.Adkins@usdoj.gov
Andrew.Doyle@usdoj.gov


JUAN ANTONIO GONZALEZ
Acting United States Attorney

DEXTER LEE
FL Bar No.: 936693
Assistant United States Attorney
Southern District of Florida
99 N.E. 4th Street
Miami, FL 33132
Tel: (305) 931-9320
Fax: (305) 530-7679
DLee@usa.doj.gov

*Attorneys for Plaintiff, United States of America*