# EXHIBIT 2

**Page 1**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

FORT PIERCE DIVISION

CASE No.: 2:21-cv-14205-KAM

UNITED STATES OF AMERICA,

    Plaintiff,

-vs-

BENJAMIN K. SHARFI, in his personal and

fiduciary capacity as trustee of the Benjamin

Sharfi 2002 Trust, and NESHAFARM, INC.,

    Defendants.

_____

REMOTE VIDEOTAPED DEPOSITION OF

BENJAMIN K. SHARFI

Thursday, June 9, 2022

9:06 - 5:49 p.m.

Reported By:

Wendy Beath Anderson, RDR, CRR, CRC

Notary Public, State of Florida

Esquire Deposition Services

West Palm Beach Office  Job #J8302685

**Page 2**

1  APPEARANCES:
2  On behalf of the Plaintiff:
3      BRANDON N. ADKINS, ESQUIRE
    UNITED STATES DEPARTMENT OF JUSTICE
4      ENVIRONMENT & NATURAL RESOURCES DIVISION
    P.O. BOX 7611
5      Washington DC 20004
    Brandon.Adkins@usdoj.gov
6
7  On behalf of the Defendants:
8      T. NEAL MCALILEY, ESQUIRE
    CARLTON, FIELDS, P.A.
9      2 Miami Central
    700 N.W. 1st Avenue, Suite 1200
10      Miami, Florida 33136
    nmcaliley@carltonfields.com
11
12      and
13      CHRISTOPHER F. HAMILTON, ESQUIRE
    JOSHUA D. MIRON, ESQUIRE
14      SHARFI HOLDINGS, INC.
    3731 NE Pineapple Avenue, 2nd Floor
15      Jensen Beach, Florida 34957
    chamilton@sharfiholding.com
16      jmiron@sharfiholding.com
17
18  On behalf of the U.S. Army Corps of Engineers:
19      WILLIAM J. MOORE, III, ESQUIRE
    U.S. ARMY CORPS OF ENGINEERS
20      701 San Marco Boulevard
    Jacksonville, Florida 32207
21      william.j.moore@usace.army.mil
22  ALSO PRESENT:
23      GEORGE ELLIS, REMOTE VIDEOGRAPHER
24
25

**Page 3**

1      - - -
2      I N D E X
3      - - -
4
5  WITNESS:    DIRECT  CROSS  REDIRECT  RECROSS
6
    BENJAMIN K. SHARFI
7
    BY MR. ADKINS:    6
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 4**

1
2      - - -
3      E X H I B I T S
4      - - -
5  DEPOSITION    DESCRIPTION    PAGE
6  EXHIBIT 9    AERIAL IMAGE    12
    EXHIBIT 234    AERIAL IMAGE    108
7  EXHIBIT 235    AERIAL IMAGE    110
    EXHIBIT 236    AERIAL IMAGE    132
8  EXHIBIT 237    AMENDED ANSWERS AND    140
    OBJECTIONS TO
9      INTERROGATORIES
    EXHIBIT 224    E-MAIL    146
10  EXHIBIT 227    E-MAIL    154
    EXHIBIT 226    APPLICATION FOR ARMY CORPS  158
11      PERMIT
    EXHIBIT 228    E-MAIL    164
12  EXHIBIT 12    PHOTOGRAPHS    167
    EXHIBIT 238    LETTER    179
13  EXHIBIT 24    PHOTOGRAPHS    187
    EXHIBIT 57    PHOTOGRAPHS    199
14  EXHIBIT 229    E-MAIL    216
    EXHIBIT 230    AERIAL IMAGE    238
15  EXHIBIT 69    AERIAL IMAGE    240
    EXHIBIT 239    SCREEN SHOTS OF FACEBOOK  258
16      POSTS
17
18
19
20
21
22
23
24
25

BENJAMIN K. SHARFI
USA vs BENJAMIN K. SHARFI

June 09, 2022
5–8

Page 5

1    P R O C E E D I N G S
2    - - -
3    Deposition taken before Wendy Beath Anderson,
4    Registered Diplomate Reporter and Notary Public in and
5    for the State of Florida at Large, in the above cause.
6    - - -
7    THE VIDEOGRAPHER:  We are now on the record.
8    The time is 9:06 a.m. eastern standard time on
9    June 9th, 2022.  This begins the videoconference
10   deposition of Benjamin K. Sharfi taken in the
11   matter of the United States of America vs. Benjamin
12   K. Sharfi in his personal and fiduciary capacity as
13   trustee of the Benjamin Sharfi 2002 Trust and
14   NeshaFarm, Incorporated.  This is filed in the
15   United States District Court for the Southern
16   District of Florida, Fort Pierce Division.  The
17   case number is 2:21-CV-14205-KAM.
18   My name is George Ellis and I am your remote
19   videographer.  Our court reporter today is Wendy
20   Anderson.  We are both representing Esquire
21   Deposition Solutions.
22   Counsel, will you please state your name and
23   whom you represent, after which the court reporter
24   will swear in the witness.
25   MR. ADKINS:  Good morning.  This is Brandon

Page 6

1    Adkins of the United States Department of Justice
2    and I represent the plaintiff in this matter.  I'm
3    joined today on the phone by my colleague, Andrew
4    Doyle, also with the United States Department of
5    Justice, and from the United States Army Corps of
6    Engineers, William J. Moore.
7    MR. MIRON:  Good morning.  Joshua Miron on
8    behalf of the defendants, together with Christopher
9    Hamilton and Neal McAliley.
10   Thereupon,
11   (BENJAMIN K. SHARFI)
12   having been first duly sworn or affirmed, was examined
13   and testified as follows:
14   THE WITNESS:  I do.
15   DIRECT EXAMINATION
16   BY MR. ADKINS:
17   Q.   Good morning.  Would you please state your
18   name and address for the record.
19   A.   Benjamin K. Sharfi, 8350 -- 9685 Whirlaway
20   Street, Rancho Cucamonga, California and in
21   California -- in Florida, 73 North Sewalls Point,
22   Stuart, Florida 34996.
23   Q.   Good morning, Mr. Sharfi.  It's nice to see
24   you again.
25   A.   I'm sorry?

Page 7

1    Q.   It's nice to see you again.  Are you
2    represented by counsel today?
3    A.   Yes, sir.
4    Q.   Who is your counsel?
5    A.   Mr. Miron.
6    Q.   So we're taking this deposition via Zoom,
7    correct?
8    A.   Yes.
9    Q.   Okay.  And I'm not in the room with you today;
10   is that right?
11   A.   No.
12   Q.   Okay.  Who's in the room with you today?
13   A.   We have Mr. Miron, Neal and Chris.
14   Q.   Okay.  And that's Neal McAliley and
15   Christopher Hamilton?
16   A.   Yes, sir.
17   Q.   Okay.  Is anyone else in the room with you
18   today?
19   A.   No.
20   Q.   Do you have any -- do you have any computers
21   or phones in front of you?
22   A.   Yes, I do.
23   Q.   Okay.  What do you have in front of you?
24   A.   My laptop and my phone.
25   Q.   Okay.  What, if any, programs are operating

Page 8

1    currently on your laptop?
2    A.   They've been shut down.
3    Q.   Okay.  Are there any programs operating on
4    your laptop?
5    A.   No, sir.
6    Q.   Is your laptop open or closed?
7    A.   It's open.  I'm clearly talking to you.
8    Q.   Okay.  So you're commuting with us on Zoom
9    using your laptop?
10   A.   Yes, sir.
11   Q.   Okay.  Is the Zoom program running on your
12   laptop?
13   A.   Yes.  That's how I'm talking to you.
14   Q.   Okay.  Other than the Zoom program, is there
15   any other programs that are operating on your laptop
16   currently?
17   A.   There are many programs running in the
18   background in order for the computer to work, but no
19   application is open.
20   Q.   Okay.  Very good.  So because I'm not in the
21   room with you, I'd just ask that you don't communicate
22   with your counsel at any time that's not reflected on
23   the record today.
24   Does that make sense to you?
25   A.   Doesn't make sense to me, but I understand

BENJAMIN K. SHARFI
USA vs BENJAMIN K. SHARFI

June 09, 2022
9–12

Page 9

1  your point.
2      Q.  Okay.  And you'll agree not to communicate
3  with your counsel or anyone else outside of this
4  deposition in a way that's not reflected on the record
5  today?
6      A.  Yes, sir.
7      Q.  Okay.  Thank you very much.
8          So I'll be asking you questions throughout the
9  deposition to which you are to provide full and complete
10  answers.  Now, you understand that you've given an oath
11  to tell the truth?  Do you understand that?
12     A.  Yes, I do.
13     Q.  And although we are not in a courtroom and we
14  don't have a judge present here today, you're under the
15  same obligation to tell the truth as if we were in a
16  courtroom and a judge was present.
17         Do you understand that?
18     A.  Yes, sir.
19     Q.  And you understand that your failure to tell
20  the truth today would be considered perjury.
21         Do you understand that?
22     A.  Yes, I do.
23     Q.  So to help make the court reporter's job
24  easier, I'd ask that you wait until I'm done asking you
25  a question before providing your response and I'll do

Page 10

1  the same.  I'll wait until you're done completing your
2  response before I ask you another question.
3          Does that make sense?
4      A.  Yes, it does.
5      Q.  The court reporter can only record the words
6  that we are writing down -- or that you are saying and I
7  am saying.  So to the extent you can, please try to
8  remember not to give a head nod or a head shake in
9  response to a question, but rather, to give a verbal
10  answer.
11         Does that make sense?
12     A.  Yes, sir.
13     Q.  Have you ever been deposed before?
14     A.  Yes, sir.
15     Q.  On how many occasions have you been deposed?
16     A.  I've been in depositions 20 to 25 different
17  times.
18     Q.  On how many of those occasions were you the
19  witness providing testimony at the deposition?
20     A.  Maybe four or five.
21     Q.  When's the most recent time you were deposed?
22     A.  Within the last two years.
23     Q.  And when was the most distant time you were
24  deposed?
25     A.  Over 30 years.

Page 11

1      Q.  Okay.  So over the course of the last 30
2  years, you've been deposed four or five times?
3      A.  Yes, sir.
4      Q.  What was the nature -- well, let me ask you
5  this.  Was the nature of any of those depositions an
6  environmental case?
7      A.  No, sir.
8      Q.  Okay.  Are you on any drugs or medications
9  that would affect your memory or ability to provide
10  truthful testimony today?
11     A.  No, sir.
12     Q.  Did you bring any documents with you?
13     A.  No.
14     Q.  Now, you understand this case concerns
15  allegations that you and NeshaFarm filled jurisdictional
16  wetlands without authorization in violation of the Clean
17  Water Act at a property located in Martin County,
18  correct?
19     A.  I understand that it's about that topic.
20     Q.  Right.  I appreciate you don't agree with
21  those allegations, but you understand that's what this
22  case concerns, correct?
23     A.  I understand that that's the case.
24     Q.  And the parcel of property where the alleged
25  violations took place has a parcel ID of

Page 12

1  17-38-40-000-38-00000-0.  Do you understand that to be
2  the property where the alleged violations took place?
3      A.  I have no reason to disbelieve those numbers,
4  but clearly, you don't expect me to know those numbers.
5      Q.  Well, I was hoping maybe you -- have you
6  reviewed the amended complaint in this case?
7      A.  Not recently.
8      Q.  Okay.  Well, you know, just so we can be clear
9  about our terminology, I'll go ahead and show you a
10  document that I have been showing others.  Let me see if
11  I can pull this up.
12         (Deposition Exhibit No. 9 was previously
13  marked and identified for the record.)
14  BY MR. ADKINS:
15     Q.  I'm showing you a document that's previously
16  been marked DX9 and this is an aerial image of NeshaFarm
17  and other properties, correct?
18         MR. MIRON:  Objection.  Vague.
19         THE WITNESS:  Please ask your questions in
20     such fashion that it's clear and not ambiguous,
21     please.
22  BY MR. ADKINS:
23     Q.  Okay.  Do you understand the term NeshaFarm?
24     A.  It's the name of my farm.
25     Q.  Okay.  And your farm is located in Martin

BENJAMIN K. SHARFI
USA vs BENJAMIN K. SHARFI

June 09, 2022
13–16

Page 13

1 County, correct?
2     A.   My farm is located in Martin County.
3     Q.   So yes?
4     A.   Yes.
5     Q.   Okay.  Is property owned -- is property of
6 your farm, NeshaFarm, depicted in DX9?
7     A.   DX9?  I'm not sure I understand.
8         MR. MIRON:  On that --
9 BY MR. ADKINS:
10     Q.   Oh, sure.  This exhibit is called DX9.  Do you
11 see that in the top right corner?
12     A.   Oh, yes, I do.
13     Q.   You see there's a red highlighted square?
14     A.   Yes, I do.
15     Q.   Is that red highlighted square the parcel of
16 property where the alleged violations in this case took
17 place?
18     A.   I'm sorry, you broke up.
19         MR. MIRON:  Yeah, Brandon, you cut out.  You
20     broke up.
21         MR. ADKINS:  Thanks for letting me know.
22 BY MR. ADKINS:
23     Q.   Is the red highlighted square the property
24 where the alleged violations took place in this case?
25     A.   Yes, sir.

Page 14

1     Q.   Okay.  So I'm going to refer to that area
2 that's highlighted here as the site.  Will you
3 understand that?
4     A.   Yes, sir, the red highlight, not where you
5 have your cursor.
6     Q.   Yes, very good.  Only the red highlighted
7 square I will refer to as the site.
8     A.   We'll refer to that now as the site, correct.
9     Q.   Yes, sir.  Now, the property to the south of
10 the site and to the west of that property is part of
11 NeshaFarm, is it not?
12     A.   The property to the south is part of
13 NeshaFarm, correct.
14     Q.   Okay.  And is the property to the west of the
15 property to the south of the site also part of
16 NeshaFarm?
17     A.   The part to the south and west of the red
18 marked area is also part of NeshaFarm.
19     Q.   Very good.  So when I refer to NeshaFarm, I
20 will be referring to these three parcels that we just
21 identified, which are the site, the parcel to the south
22 of the site and then the parcel to the south and west of
23 the site.
24         Will you understand that?
25     A.   Yes, sir.

Page 15

1     Q.   Okay.  Very good.  Now, are you familiar with
2 the site?
3     A.   Yes, sir.
4     Q.   When did you first become familiar with the
5 site?
6     A.   2013, '14, around that area.
7     Q.   How did you become familiar with the site in
8 2013 or '14?
9     A.   A friend of a friend recommended for me to go
10 see the southwest of the area that we described.  So for
11 sake of simplicity and not mistaking south and west and
12 north, let's just make the establishment of some terms.
13         The southwest of orange property, red
14 property, let's call that Site 1.  The one to the east
15 of it, call that Site 2, and then the one to the north
16 of it, the red marked area that you have, let's call
17 that Site 3.  Because these were three different parcels
18 acquired different times, so we don't refer to them for
19 a very long sentence and can be mistaken, let's just say
20 Site 1, Site 2 and Site 3.  Would that be okay?
21     Q.   No, it's not.  So we're going to call the red
22 area the site.  I see you've gotten up.
23         MR. MIRON:  No, it's -- it's habit.  When
24     nobody moves around the lights go off.  When he
25     was --

Page 16

1         MR. ADKINS:  Energy conservation time.
2         MR. MIRON:  We'll let Chris do it.
3         MR. ADKINS:  I understand.  I thought I had
4     offended you already.
5 BY MR. ADKINS:
6     Q.   So let's refer to the property that is
7 highlighted red on DX9 as the site.  I don't want to
8 call the Property 1 and -- or Site 1 and Site 2 as
9 Site 1 and Site 2 because it could be confusing if we're
10 referring to those as Site 1, 2 and 3.  So if you will
11 allow, what you described as Site 1, can we call that
12 Property 1?
13     A.   That's fine, Property 1, Property 2 and site.
14     Q.   Yes.  Does that work for you?
15     A.   Okay.  I'm good with that.
16     Q.   That's great.  So you said a friend of a
17 friend told you about Property 1.  When is it -- when
18 was the first time you had seen the site?
19     A.   To the best of my recollections, it was around
20 2013.  Could be '14.
21     Q.   Okay.  How did you see the site in 2013 or
22 2014?
23     A.   How?
24     Q.   Yeah, how?
25     A.   With my eyes.

BENJAMIN K. SHARFI
USA vs BENJAMIN K. SHARFI

June 09, 2022
17–20

Page 17

1   Q.   Okay.  So you were personally there?
2   A.   Yes, sir.
3   Q.   Okay.  From where did you see the site in 2013
4   or 2014?
5   A.   From where?
6   Q.   From where?
7   A.   From inside the site.
8   Q.   Okay.  So you were standing on the site in
9   2013 or 2014?
10   A.   Yes.  I went to visit it personally.
11   Q.   Okay.  How did you get there?
12   A.   With a car.
13   Q.   Okay.  Did you walk on to the site?
14   A.   I drove to the site and walked around the
15   site.
16   Q.   Okay.  And can you describe for me where you
17   parked and how you walked on to the site?
18       MR. MIRON:  Brandon, forgive me for a moment,
19   if I may.  Remember, you've already identified
20   Property 1, Property 2 and the site.  So I just
21   want to make sure your testimony is clear.
22       THE WITNESS:  Right.  I'm talking about
23   Property 1.
24       MR. MIRON:  I knew that.
25       MR. ADKINS:  Oh, okay.

Page 18

1       THE WITNESS:  That's what you were talking
2   about, Property 1, if I recall.
3       MR. MIRON:  No, Brandon keeps referring to the
4   site, the red box.
5       THE WITNESS:  Oh, I'm sorry.  The site is the
6   third property.  Okay, got it.  Then I'm sorry,
7   strike that, please.
8   BY MR. ADKINS:
9   Q.   Okay.  I have an idea.  I think we'll go about
10   this a little bit of a different way and we'll establish
11   a chronology first and maybe that will help, okay?
12   A.   Okay.
13   Q.   Do you know who currently owns the site that
14   is the third property?
15   A.   I own the site.
16   Q.   Okay.  You, Mr. Sharfi, personally own the
17   site?
18   A.   It's owned through my trust.
19   Q.   And NeshaFarm, Incorporated does not own the
20   site currently?
21   A.   NeshaFarm is also owned by the -- by myself
22   and the trust.  To me, myself and the trust, since the
23   trust is mine, they're synonymous.
24       MR. MIRON:  Brandon, while you're looking for
25   something --

Page 19

1       MR. ADKINS:  What's up, Josh?
2       MR. MIRON:  I'm sorry to interrupt you.  I
3   knew I would interrupt you one time.  It might as
4   well be now.
5       One of the things I forgot to mention is
6   Mr. Sharfi suffered an injury when he was -- kind
7   of a difficult catastrophic injury a little less
8   than six months ago and he's recovered.  He's fine,
9   but it just may require him a little more breaks
10   more than usual.  He's got a back problem.  The
11   injury caused him major problems to his back.  So
12   he can't sit for an extended period of time.
13       So I just want to let you know now, he may
14   need just a minute or two just to stretch out,
15   stretch out his back every 15 minutes, every half
16   hour, depending on how he feels, okay?
17       MR. ADKINS:  Understood.  Thanks for letting
18   me know.
19   BY MR. ADKINS:
20   Q.   Mr. Sharfi, I'm sorry to hear about your
21   injury.  If at any point you're uncomfortable, you want
22   to take a break, just let me know.  I'd just ask that
23   you don't take a break before completing your answer to
24   a question that's pending, but let me know and I'll find
25   a good time to take a break.  So we can take as many

Page 20

1   breaks as you need, all right?
2   A.   Thank you, sir.
3       MR. MIRON:  Thanks, Brandon.
4       MR. ADKINS:  You bet.
5   BY MR. ADKINS:
6   Q.   Okay.  So Mr. Sharfi, I'm going to show you a
7   document that is entitled "Defendant Benjamin Sharfi's
8   Answer and Affirmative Defenses to Amended Complaint."
9   It's -- has a case caption of this case.  This is your
10   answer to the amended complaint.  I'm going to scroll
11   down to Paragraph 22.
12       Do you see Paragraph 22 on your screen?
13   A.   Yes, I do.
14   Q.   It says, "Admitted that on or about
15   January 14, 2019, a quit claim deed was entered
16   transferring ownership of the site from Benjamin Sharfi
17   2002 trust to NeshaFarm, Inc., otherwise denied."
18       Did I read that correctly?
19   A.   Correct.
20   Q.   Okay.  So the ownership of the site was
21   transferred by quit claim deed to NeshaFarm,
22   Incorporated on or about January 14, 2019, correct?
23   A.   As so it indicates, yes.
24   Q.   And so my question now is, is NeshaFarm,
25   Incorporated the current owner of the site?

BENJAMIN K. SHARFI                                          June 09, 2022
USA vs BENJAMIN K. SHARFI                                        21–24

Page 21

1      A.   Yes.
2      Q.   And NeshaFarm acquired the site on or about
3   January 14, 2019, as far as you know?
4      A.   According to this document, which I have no
5   reason to not believe it, yes.
6      Q.   Okay.  Well, this is your answer to the
7   amended complaint.  Do you have reason to doubt anything
8   in your answer?
9      A.   No, sir.
10     Q.   Okay.  Now, you, as the trustee of the
11  Benjamin Sharfi 2002 trust, purchased the site on or
12  about April 24, 2017; is that correct?
13     A.   Yes, sir.
14     Q.   Are you aware of any other owners or ownership
15  interest in the site other than the Benjamin Sharfi 2002
16  trust and NeshaFarm, Incorporated?
17     A.   No, sir.
18     Q.   What is NeshaFarm, Incorporated?
19     A.   It's an incorporation of a farm.
20     Q.   Are you an executive officer of NeshaFarm,
21  Incorporated?
22     A.   Yes.
23     Q.   What is your title?
24     A.   CEO.
25     Q.   Okay.  Have you always been the CEO of

Page 22

1   NeshaFarm, Incorporated?
2      A.   Since it was incorporated, yes.
3      Q.   When was NeshaFarm incorporated?
4      A.   I couldn't tell you the date.  Those would be
5   dates of record.
6      Q.   Do you recall the year in which NeshaFarm was
7   incorporated?
8      A.   No, sir.
9      Q.   Was it before or after 2017?
10     A.   I couldn't tell you that.
11     Q.   Have you held any other positions in
12  NeshaFarm, Incorporated other than CEO?
13     A.   Yes.  The fieldworker, cleaning the cow shit
14  and the horse shit and the landscape and whatever
15  requires in a farm.
16     Q.   Are there any other executive officers of
17  NeshaFarm, Incorporated?
18     A.   Not that I know, sir.
19     Q.   Are you familiar with the name Kevin Kryzda?
20     A.   Yes, sir.
21     Q.   Is Kevin Kryzda the president of NeshaFarm?
22     A.   He is the president of all my Florida-based
23  corporations, including NeshaFarm.
24     Q.   And would the president of NeshaFarm be
25  considered a corporate officer of NeshaFarm?

Page 23

1      A.   Those would be a corporate legal issues which
2   I really don't get involved, but he would be the
3   president.  I don't know if that makes him an officer or
4   an employee.  That requires a legal conclusion, which
5   I'm not qualified to answer.
6      Q.   Okay.  Do you understand what a president of a
7   company is?
8      A.   Yes, I do.
9      Q.   And you're the CEO of NeshaFarm, correct?
10     A.   Yes, sir.
11     Q.   So you know who the president of NeshaFarm is,
12  right?
13     A.   I'm sorry?
14     Q.   You know who the president of NeshaFarm is,
15  correct?
16     A.   Yes.
17          MR. MIRON:  Objection.  Asked and answered.
18  BY MR. ADKINS:
19     Q.   When I asked if you knew of any other
20  corporate officers of NeshaFarm, you said you didn't
21  know.
22     A.   True.  The point being here, sir, I'm not sure
23  being a president of a corporation, that makes him an
24  officer.  That's a legal structural question which I'm
25  not sure I can answer that.

Page 24

1      Q.   Okay.  You said that Mr. Kryzda is involved in
2   other Florida companies of yours.  What other companies?
3      A.   He would be included in Byte Services, Inc.
4   He would also be the president of Plus One Air.  And
5   those are primarily the two that comes to mind right
6   now.
7      Q.   For how long has Mr. Kryzda been the president
8   of NeshaFarm?
9      A.   I couldn't tell you the date, but several
10  years.
11     Q.   Did you hire him in that position?
12     A.   I'm sorry?
13     Q.   Did you hire Mr. Kryzda in that position?
14     A.   Yes, sir.
15     Q.   What are Mr. Kryzda's responsibilities as the
16  president of NeshaFarm, Inc.?
17     A.   To manage and staff the companies and deal
18  with the staffing and day-to-day issues and management
19  of the staff.
20     Q.   Does Mr. Kryzda have any other
21  responsibilities as president of NeshaFarm, Inc.?
22     A.   I believe I mentioned that he is the top man
23  responsible for all activities that occurs on the site.
24     Q.   And when you say he's the top man, what do you
25  mean?

Page 25

1    A.  He's the president of NeshaFarm, Inc.
2    Q.  And so does he -- is he responsible for all
3  activities regarding NeshaFarm, Inc.?
4        MR. MIRON:  Objection.  Asked and answered.
5        THE WITNESS:  As the president of the company,
6    he's responsible for all activities that occur
7    under him.
8  BY MR. ADKINS:
9    Q.  To whom does Mr. Kryzda report as the
10  president of NeshaFarm?
11   A.  Myself.
12   Q.  Does he report -- does Mr. Kryzda report to
13  anyone other than you, Mr. Sharfi, as president of
14  NeshaFarm?
15   A.  No, sir.
16   Q.  What are Mr. Kryzda's responsibilities in
17  connection with Byte Services, Inc.?
18   A.  Same.  Responsible for the staffing and
19  management of the staff and organizational issues.
20   Q.  What kind of business is Byte Services?
21   A.  Provides construction services and
22  maintenance, property maintenance.
23   Q.  What do you mean by "construction services"?
24   A.  Construction of a variety of different
25  structures for a variety of different applications,

Page 26

1  whether it be horse arenas to residential remodeling or
2  any of those type of applications.
3    Q.  Are these services offered to the public?
4    A.  Yes, sir.
5    Q.  About how frequently does Byte Services
6  perform construction services for members of the public?
7    A.  I couldn't tell you the frequency.
8    Q.  More than half of its business?  Less than
9  half?
10       MR. MIRON:  Objection.  Asked and answered.
11       THE WITNESS:  I couldn't tell you more
12   specific than that.
13  BY MR. ADKINS:
14   Q.  Are you the CEO of Byte Services?
15   A.  Yes, sir.
16   Q.  But you can't tell me whether or not Byte
17  Services offers services to the public more than half or
18  less than half of its business?
19       MR. MIRON:  Objection.  Asked and answered.
20       THE WITNESS:  You asked that question.  Yes, I
21   could not tell you if it's 50 percent, 40 percent,
22   20 percent.  Year to year, month to month it can
23   vary.
24  BY MR. ADKINS:
25   Q.  Can you identify for me any customers of Byte

Page 27

1  Services?
2    A.  Can I identify them by name?  Not really.  I
3  don't get involved on that low level.
4    Q.  Is there any other way you can identify a
5  customer of Byte Services other than by name?
6    A.  I'm sorry?
7    Q.  Is there any other way you could identify a
8  customer of Byte Services other than by name?
9    A.  I don't get involved with that on that level,
10  sir.  But I can tell you we have remodeled multiple
11  homes and we've turned around and sold and we've done
12  other services for residential, commercial and other
13  sites, and I couldn't tell you which names.
14   Q.  Who's owned the homes that Byte Services has
15  remodeled?
16   A.  I'm sorry, one more time, please.
17   Q.  Who was the owner of the homes that Byte
18  Services remodeled?
19   A.  People.  I couldn't tell you who.
20   Q.  In his capacity as president of Byte Services,
21  to whom does Mr. Kryzda report?
22   A.  To myself.
23   Q.  Do you know who Mr. Kryzda supervises at Byte
24  Services?
25   A.  I couldn't tell you the name of all of them,

Page 28

1  but I know -- I've seen most of them.  I don't get
2  involved that much with Byte Services.
3    Q.  What names do you recall?
4    A.  Again, you're asking me for speculation under
5  what umbrella these individuals are and I don't want to
6  speculate.
7    Q.  Well, I asked if you recalled any of the names
8  of individuals that Mr. Kryzda supervises as president
9  of Byte Services.  You said you know most of them.
10   A.  I know most of them, but I couldn't tell you
11  whether they're working for BSI or they're employed by
12  NeshaFarm or they're employed by Plus One Air.
13   Q.  Okay.  So why don't you tell me the names of
14  any employees that Mr. Kryzda supervises in the capacity
15  of president of any of those companies.
16   A.  The IT person would be Howard Harris.  One of
17  the people would be John Guy.  He is also IT in
18  electronics and security, et cetera.  Other people in
19  that area would be a gentleman named Wheezy, Wizey, and
20  I don't know his last name.  Other people that I would
21  know would be Matthew.  I don't know his last name.
22  He's an electrician.  Other people would be Joe.  I
23  don't know his last name either.
24       Those are a few that come in mind, sir.
25   Q.  Okay.  Other than Howard Harris, John Guy,

Page 29

1  Wheezy, Matthew and Joe, do you recall the names of
2  anyone else that Mr. Kryzda supervises?
3      A.  I really can't think of it right off the bat.
4  This is not something I get involved with daily, weekly
5  or even monthly.
6      Q.  Do you know the names of any employees who
7  work at NeshaFarm?
8      A.  Yes, I do know a few of them.
9      Q.  Who do you recall?
10     A.  At what point of time, sir?
11     Q.  Why don't we start current.
12     A.  Current?  I know a gentleman named Joe,
13  carpenter.  That's not his last name.  I don't know what
14  his last name is.
15     Q.  Joe is a carpenter by trade?
16     A.  Pardon me?
17     Q.  Joe is a carpenter by trade?
18     A.  He builds stuff.  So I don't know his trade.
19  But and then we have Sam, the electrician, and he's an
20  electrician.  I know a gentleman named Nguyen and he is
21  the current on-site manager.  I know a lady named Susan;
22  she is the caretaker of the animals.  And we know, I
23  believe, Fabiola and Moe.  They are the greenhouse
24  experts.  And those are a few that come to mind.  And
25  there are a lot of other individuals that are the

Page 30

1  fieldworkers.
2      Q.  Okay.  So those are the names of current
3  employees of NeshaFarm that you recall.  Do you recall
4  the names of any employees who no longer work at
5  NeshaFarm?
6      A.  Sure.  Chuck or Charles Berlusconi.  He was
7  the previous manager.  A gentleman named Tom, Thomas.
8  He was -- did a lot of the plumbing and pumps and
9  irrigation stuff, and I don't know his last name.  Other
10  people, Angela, again, I don't know her last name
11  either.  She was responsible for the animals, caretaking
12  of the animals, and a guy named Shorty, I don't know his
13  real name.  And there was another construction guy.
14  Again, I don't remember his name.
15        So I'm not very good with names at that level.
16  Appreciate that I interface with these people three to
17  five times a year, at best.  So it's not a daily
18  occurrence that I have.
19     Q.  When did Mr. Berlusconi start working at the
20  site?
21     A.  I couldn't remember the date.  I couldn't
22  tell.  Those are date of record that we establish and
23  we've given them to you.
24     Q.  What do you mean by that?
25     A.  The information that was collected through HR

Page 31

1  that was provided through the attorneys to you.  I'm not
2  going to speculate on dates that I cannot be sure of.
3      Q.  So there was information collected from HR
4  that you believe was provided to the government in this
5  case?
6      A.  Correct.  I believe you deposed
7  Mr. Berlusconi, so you should have those words.
8      Q.  What does the information that was collected
9  by HR consist of?
10     A.  I'm sorry, one more time.
11     Q.  What did the information collected by HR which
12  you believe was provided to the government, consist of?
13     A.  I don't know.  You're asking me to speculate
14  on something I've never seen.
15     Q.  How do you know that there was information
16  collected from HR and provided to the government?
17     A.  Because you asked just about every question,
18  including the color of underwear I was wearing, and I
19  replied to you and it was given to you.  Whatever
20  information you requested, it was provided to you.
21     Q.  Okay.  Do you recall what Mr. Berlusconi's
22  responsibilities were as the previous manager?
23     A.  His primary responsibility and his trade
24  knowledge was an electrician.  In fact, his nickname was
25  Chuck the electrician and he was put into the farm to

Page 32

1  clean up the power issue and work with FPL to provide
2  electrical power services to the facility and distribute
3  it safely to the different sites requiring that kind of
4  power and provide electrical infrastructure for the
5  site.  That was his primary responsibility.
6      Q.  Did Mr. Berlusconi have any other
7  responsibilities?
8      A.  Because he was the most senior resident that
9  was on the site, he was given time to time other tasks
10  and responsibilities to do different variety of work on
11  the site.
12     Q.  What other tasks was Mr. Berlusconi given to
13  do on the site?
14     A.  Just day-to-day management of the individuals.
15     Q.  Did Mr. Berlusconi have any other
16  responsibilities other than day-to-day management of the
17  individuals and the electrical work that you described?
18     A.  No, sir.
19     Q.  Did you hear my question?
20     A.  Yes, I did.  Any specific tasks that I would
21  categorize he was responsible for A or B or C, no, just
22  day-to-day management of the site, and the primary
23  responsibility was the electrical infrastructure.
24     Q.  Was he involved in any of the land-clearing
25  activities at the site?

BENJAMIN K. SHARFI                                          June 09, 2022
USA vs BENJAMIN K. SHARFI                                         33–36

Page 33

1    A.  I don't know what you mean by land clearing,
2  sir.
3    Q.  Vegetation removal.
4    A.  That's not land clearing.  Land clearing has a
5  definition that it's not consistent with that.  He was
6  responsible to manage day-to-day activities of the
7  sites.
8    Q.  Was Mr. Berlusconi involved in any other
9  land-clearing removal at the site?
10      MR. MIRON:  Sorry, Brandon.  In order to have
11  a clear record, when you're saying "site," are you
12  only referring to the red triangle or the entire --
13      THE WITNESS:  I'm talking about Property 1, 2
14  and 3.
15      MR. MIRON:  I thought so.  Just I'm not -- I'm
16  sorry, Brandon.  I don't mean to throw you off.  To
17  the extent it makes a difference to you, his
18  reference to the site has not been consistent with
19  the way that you otherwise defined it early on.  So
20  his testimony up to this point has been
21  property-wide, which would include Sites 1 --
22  excuse me, Property 1, 2 and Site 3.
23      I'm not sure what that does to you, if that
24  has a problem with your questions, but I just want
25  to be clear.

Page 34

1      THE WITNESS:  Correct.  My bad.
2      MR. MIRON:  Mr. Sharfi is concerned, his
3  reference to site is property as a whole.
4      THE WITNESS:  Correct.  Thank you for
5  clarifying that, Mr. Miron.
6  BY MR. ADKINS:
7    Q.  Is there any way you want to clarify your
8  testimony up to now with that understanding?
9    A.  Mr. Berlusconi's responsibility was as a
10  representative of NeshaFarm.  He was responsible for all
11  those activities I mentioned under NeshaFarm.
12    Q.  Was he employed by Byte Services at that time?
13    A.  I couldn't tell you whether it was Byte
14  Services or NeshaFarm, but initial time -- initially
15  when I hired him as an electrician, it was for BSI, Byte
16  Services.  And when he transitioned to the farm, I
17  couldn't tell you that.
18    Q.  Was Mr. Berlusconi involved in any vegetation
19  removal at the site?
20    A.  Him personally, no, was not the person that
21  was in the field removing vegetations or weed, but he
22  oversaw activities on all these three sites.
23    Q.  Okay.  Just a reminder again, when I say "the
24  site," I'm referring to that third property, right?
25    A.  Correct.

Page 35

1    Q.  Right.  So what do you mean he oversaw the
2  activities, the vegetation removal activities at the
3  site?
4    A.  If there was work that had to be done on the
5  site, he would be responsible to hire the individuals
6  and supervise their work.
7    Q.  And you say "would" in the conditional sense.
8  Did Mr. Berlusconi hire individuals to perform
9  vegetation removal at the site?
10    A.  Yes, sir.
11    Q.  When?
12    A.  Since the day of acquisition.
13    Q.  What was the nature of the vegetation removal
14  activities?
15    A.  The site was acquired in addition to the two,
16  what we call Property 1 and Property 2, to allow
17  additional grazing for the livestock, and there were
18  certain species of vine and vegetations that are -- I
19  was told is very detrimental to livestock; it can kill
20  horses and goats and sheep.  And so our first order of
21  business was to identify these poisonous vegetations and
22  remove them before we were able to graze any animals.
23      Sorry about the very long answer, but that's
24  the best I can answer to you.
25    Q.  You said that land clearing has a precise

Page 36

1  definition that is distinct from vegetation removal.
2  How do you define land clearing?
3    A.  Land clearing is where you go clear every
4  tree, species, every, everything on the site.  And we
5  never, ever done that on any of the sites,
6  Property 1, 2, or what you call the site.
7    Q.  From where do you derive your definition of
8  land clearing?
9    A.  Martin County.
10    Q.  What about Martin County?
11    A.  Martin County has a definition of what that is
12  and you obtain special permits to do that.
13    Q.  Okay.  And you said you've never land cleared
14  on the site; is that correct?
15    A.  We never done any site clearing that removed
16  every species of trees and vegetations by the definition
17  of what we call land clearing.  No, we have not done so.
18    Q.  Is that because there's some species of trees
19  that remain on the site?
20    A.  Because of -- since that day I acquired
21  Property 1, Property 2 or what you call the site, my
22  marching orders to Mr. Kryzda and to Mr. Berlusconi, and
23  just about any other individual that I had the
24  opportunity to meet in person, the marching order's been
25  very clear; that we preserve every living tree

BENJAMIN K. SHARFI                                              June 09, 2022
USA vs BENJAMIN K. SHARFI                                           37–40

Page 37

1  regardless of what specie it is, whether it's considered
2  junction specie or otherwise, as long as it's not
3  detrimental to the livestock.  And we preserve every
4  feature of the sites.
5        I bought those sites because I love the
6  nature, and disrupting that was not something I wanted
7  to do in any way or form.
8     Q.  So in your definition of land clearing, if you
9  removed half of the vegetation on the property, would
10  that be considered land clearing?
11     A.  That's a very vague question.  I'm not sure I
12  understand the question to answer it the way I should.
13     Q.  Well, you said land clearing is when one
14  clears every tree species, everything on a site?
15     A.  This would be a legal question.
16        MR. MIRON:  He didn't ask a question.
17        THE WITNESS:  I'm sorry.  Please go ahead.
18  BY MR. ADKINS:
19     Q.  So how much clearing has to take place for it
20  to be considered land clearing?
21        MR. MIRON:  Objection.  Asked and answered.
22        THE WITNESS:  To my knowledge, these are legal
23      issues and questions that I rely on my legal staff
24      and Mr. Kryzda to reply.
25

Page 38

1  BY MR. ADKINS:
2     Q.  Okay.  Well, you told me you had an
3  understanding of what land clearing means.
4     A.  Correct.
5     Q.  So in your understanding --
6     A.  My understanding through my staff that that's
7  what it is.
8     Q.  Okay.  So if I were to -- in your
9  understanding, if I were to clear a property of all of
10  its vegetation, say, for a handful of trees, you
11  wouldn't consider that to be land clearing?
12        MR. MIRON:  Objection.  Asked and answered.
13        THE WITNESS:  No, I would not consider that
14      land clearing.
15  BY MR. ADKINS:
16     Q.  Okay.  Now, you said your marching orders were
17  to preserve every living tree regardless of species, if
18  not detrimental to livestock?
19     A.  Correct.
20     Q.  Is it your opinion that you have done that on
21  the site?
22     A.  Absolutely.
23     Q.  What living trees have you preserved on the
24  site?
25     A.  Every living tree.  I'm not a botanist, but

Page 39

1  every tree.  I believe you visited the site and you saw
2  trees that they're not even an inch in diameter, we
3  preserved randomly everywhere that we could.  And you've
4  seen it for yourself and other people that have been on
5  the site, that we took extreme care to preserve every
6  trees.
7        I'm in the business of planting.  I planted
8  over a thousand trees in that site, over 1,000 to be
9  exact or 11-, 1200 trees.  I'm in the business of
10  creating life, making life, growing life, creating
11  nature.  That's why I bought the site.  And I intend to
12  preserve it and grow it and make it more beautiful.
13  Removing trees and living of any critter, of any animal
14  that God put on this planet is not my job and it will
15  not be to remove them.
16     Q.  So when you say "the site," are you referring
17  to NeshaFarm or the property at issue in this case?
18     A.  I am referring to Property 1, Property 2 and
19  the site.
20     Q.  Okay.  And how many trees have you planted on
21  the site?
22     A.  In excess of 6-, 700 trees, 600 trees.
23     Q.  Do 6- or 700 trees exist on the site today?
24     A.  Yes, sir.
25     Q.  What are the circumstances when vegetation

Page 40

1  would be detrimental to livestock?
2     A.  I'm not sure I understand the question, sir.
3     Q.  Well, you said that you instructed your staff
4  to preserve every living tree regardless of species if
5  not detrimental to livestock?
6     A.  Correct.
7     Q.  When would a species be detrimental to
8  livestock?
9     A.  Species would be that if the animals graze on
10  it or eat its fruit or its dropping, that it can kill
11  them.
12     Q.  Are there any tree species that are
13  detrimental to livestock?
14     A.  I'm not --
15        MR. MIRON:  Objection.  Vague.
16        THE WITNESS:  I'm not sure I understand the
17      question or I'm qualified to answer that.
18  BY MR. ADKINS:
19     Q.  In your -- are you aware of any tree species
20  that are detrimental to livestock?
21     A.  I know certain trees, but I couldn't tell you
22  by name, that they have a fruit that they drop and if
23  animals or goats eat them, they get colic and they do
24  die from it.
25     Q.  Are you aware of any trees ever existing on

BENJAMIN K. SHARFI
USA vs BENJAMIN K. SHARFI

June 09, 2022
41—44

Page 41

1  the site that would be detrimental to livestock?
2      A.  Again, my marching orders were to identify
3  what those are and prevent from such reoccurrence.
4      Q.  So yes or no, are you aware of any trees that
5  ever existed on the site that are detrimental to
6  livestock?
7      A.  I'm not aware of it.  I couldn't say yes, I
8  could not say no.
9      Q.  So is it true, then, that every tree that's
10 been removed from the site since you purchased the site
11 in April 2017 has either not been living or was
12 detrimental to livestock?
13     A.  Ask that question again, please.
14     Q.  Is it true that every tree that has been
15 removed at the site has either been not living or else
16 detrimental to livestock?
17     A.  To be more exact, I'm not aware that we
18 removed any trees that were removed, period.
19 Unfortunately, we had to remove multiple pine trees that
20 they got some sort of a disease that is, I guess, very
21 common in south Florida, some beetle, that it flies and
22 bores itself into the bark of the trees and eats the
23 tree from inside out.  Very unfortunate that us, among
24 many other people around the NeshaFarm, for that matter,
25 in south Florida -- and in fact, if you fly over the

Page 42

1  Everglades, you see that all over the place, that these
2  beetles bore themself.  And we were told as soon as we
3  noticed them into the trees, into the bark, that we were
4  educated by botanist to immediately remove them and
5  dispose of the tree and its remnants immediately before
6  it travels to other sites.
7          So the unfortunate part is a lot of the pine
8  trees got this disease and some of the other
9  shrubberies, and they were removed off the site.  But we
10 were able to preserve many numbers of them.
11     Q.  Okay.  So some of the pines were removed that
12 were diseased by this invasive beetle; is that correct?
13     A.  Correct.
14     Q.  Okay.  Before you said -- before you were
15 talking about the pines, you also said you're not aware
16 of the removal of any trees on the site.  So those
17 things don't make sense to me.  Can you explain?
18     A.  No, it does make sense.  I'm not sure that
19 there are -- a lot of these trees that we have, they
20 grow a fungus on them.  And this fungus, that it grows
21 on the bark and that's what's detrimental to a lot of
22 the animals, and they were removed off the trees.  And
23 in some cases, if the tree was able -- was not able to
24 be saved, they were removed.  But I -- personally, I
25 don't know of that happened.

Page 43

1      Q.  Okay.
2      A.  I do -- actually, I do recall that on
3  Property 1, yeah, Property 1 right in front of my house,
4  there was the most beautiful, beautiful --
5      Q.  Mr. Sharfi, I haven't asked you a question and
6  I'm not asking about Property 1 in this case.
7      A.  Oh, okay.
8      Q.  Let's focus on the site because I want to get
9  everyone out of here as quickly as we can.
10     A.  I'm sorry, go ahead.  Ask me.
11     Q.  So the -- other than trees that were removed
12 because they were diseased, are you aware of the removal
13 of any other trees on the site that were living?
14     A.  No, sir.
15     Q.  Are you aware of the removal of any trees on
16 the site that were not living?
17     A.  That were not what?
18     Q.  Not living?
19     A.  Not direct knowledge.
20     Q.  Okay.  So to your awareness, to your knowledge
21 as you sit here today, the only trees that were removed
22 from the site were trees that were affected by the
23 invasive beetle or that had a fungus on the bark?
24     A.  Or were dead.
25     Q.  Or were dead, okay.  But you're not aware of

Page 44

1  any trees that were dead and removed, correct?
2      A.  Oh, no, I am aware of trees that were dead and
3  they were removed.
4      Q.  Okay.  So other than trees that were dead,
5  trees that were diseased, are you aware of any other
6  trees that were removed from the site from after the
7  time that you purchased it?
8      A.  No, sir.
9      Q.  Okay.  How were the trees that were dead
10 removed?
11     A.  Chainsaw.
12     Q.  Can you be more descript?
13     A.  You go boom, took, took, took, with a chainsaw
14 (indicating) make a V cut, make sure it falls in the
15 right direction and it falls and then you cut into
16 smaller pieces and then you pile them and you put them
17 if a trash bin and remove them.  Do you want more
18 detail, what kind of oil we use or gas?
19     Q.  Were the stumps removed from any of those
20 trees?
21     A.  No.
22     Q.  So the stumps are still in the ground at the
23 site today?
24     A.  They were grinded after -- if the trees were
25 small enough to be able to remove the stump to be pulled

BENJAMIN K. SHARFI
USA vs BENJAMIN K. SHARFI

June 09, 2022
45–48

Page 45

1  out by light equipment, they were removed, but the
2  bigger trees that will be invasive if we removed them
3  out of the ground, they would be cut down and grinded,
4  grind the stump.
5      Q.  What was done with the chips from the stump?
6      A.  Spread or taken out.  We have a compost pile
7  that we create and we put it all on compost pile and
8  along with the manure and horse poop and animal poop and
9  we compost it and cure it over a period of six months to
10  a year and then we use it as a fertilizer for trees and
11  shrubs.
12      Q.  When you said "spread," were any of the chips
13  from the grinding the stumps of the trees spread on the
14  site?
15      A.  Not that I can say for sure.
16      Q.  Okay.  Did you observe the removal of any dead
17  trees on the site personally?
18      A.  Yes, I did.
19      Q.  Okay.  Do you recall about when?
20      A.  No.
21      Q.  Do you recall removing -- observing the
22  removal of any trees in 2017?
23      A.  Again, I couldn't tell you the year, but I did
24  observe the people that -- removing these
25  beetle-infested pine trees.

Page 46

1      Q.  Do you recall where on the site you recall
2  observing the removal of trees?
3      A.  They were random, all over.
4      Q.  Can you be more descript?
5      A.  No.
6      Q.  Do you recall one location?
7      A.  I recall several of them along the east side,
8  north side, west side, again, randomly all over the
9  site.
10      Q.  Okay.  And you said in some instances the
11  stump was pulled out using small equipment.  What do you
12  mean by that?
13      A.  If they roots were able to be hand-dug and
14  then moved out and pulled out, be it with a tractor or a
15  chain, we would do that, but if it was a very big stump,
16  that it will disrupt the ground, meaning 3 to 5 inches
17  or bigger in diameter, that would be left inside.
18      Q.  Where do you get that number, 3 to 5 inches?
19      A.  In diameter of the trunk of the tree.  If it's
20  a healthy tree, it's 3 to 5 inches in diameter.  They're
21  pretty hard to remove without disrupting the grounds.
22      Q.  How do you know that?
23      A.  I've seen the guys struggle, and sometimes I
24  spent over a day trying to dig up with hand tools around
25  a tree and with axe and shovels to try to isolate the

Page 47

1  root to pull it out.
2      Q.  And what kind of tractor was used to pull out
3  trees on the site?
4      A.  It's a -- I don't know what kind, but it's a
5  very small, like 15-, 20-horsepower small tractor that
6  you saw it on the site when you were there.
7      Q.  Is it a tractor owned by NeshaFarm?
8      A.  Yes, sir.
9      Q.  Were any third-party contractors hired to
10  perform this work?
11      A.  Yes, sir.
12      Q.  Who?
13      A.  The bigger job was assigned to a company
14  called Second Nature, a gentleman named Billy.  I don't
15  know his last name.  And I met with him with
16  Mr. Berlusconi on the job site and where we instructed
17  him that what the marching orders are, to preserve every
18  tree that possible we can, and also the trees that are
19  healthy, to prune them, stake them and fertilize all the
20  trees and to take care of all the existing trees.  So he
21  was hired to do both of these tasks.
22      Q.  Did Second Nature use any equipment to remove
23  trees on the site?
24      A.  I believe most of them.  The removal that they
25  did were by climbing the trees and pruning them and

Page 48

1  cutting them, and they did have a Bobcat that had a
2  contraption in the front that it's like a very big
3  grinder, and they used that to grind the stump below
4  grade.
5      Q.  Do you recall any other equipment that Second
6  Nature used to remove trees on the site?
7      MR. MIRON:  Objection.  Vague.
8      THE WITNESS:  The other equipment that I
9      recall that they brought was scissor lift to be
10      able to prune the trees.
11  BY MR. ADKINS:
12      Q.  Do you recall when Second Nature was
13  performing these activities on the site?
14      A.  No, sir.  Those would be matter of records
15  that you already have.
16      Q.  Again, why do you think I already have these
17  records?
18      A.  Because you subpoenaed them and they were
19  provided to you.
20      Q.  Okay.  You said that there are also diseased
21  trees removed from the site?
22      A.  I'm sorry, one more time.
23      Q.  You said that there were also diseased trees
24  removed from the site in addition to dead trees.  Were
25  the diseased trees removed in a way different from

BENJAMIN K. SHARFI
USA vs BENJAMIN K. SHARFI

June 09, 2022
49–52

Page 49

1  chainsaw and grinding or pulling out the stump that
2  you've already described?
3     A.  No, sir.
4     Q.  Do you know of any instances where machines
5  were used to push over trees?
6     A.  No, sir.
7     Q.  You don't recall Second Nature pushing over
8  any trees on the site?
9        MR. MIRON:  Objection.  Asked and answered.
10       THE WITNESS:  The recollections that I have, I
11  already described them to you.  Please appreciate I
12  was not on the job site daily or even weekly or
13  sometimes even monthly.
14       I don't know how you guys do this all day
15  long, but I develop a new respect for you guys.
16  BY MR. ADKINS:
17    Q.  I'm not sure what's harder, this or walking
18  around in the field.
19    A.  No, I'm okay.  I'm stretching in my chair for
20  right now.  It's -- parabolically, it gets worse.  So go
21  ahead and proceed.
22    Q.  Okay.  So let's go back.  We went down this
23  line after talking about Mr. Berlusconi's
24  responsibilities and we were talking about vegetation
25  and land clearing.  Do you recall any other

Page 50

1  responsibilities that Mr. Berlusconi had with respect to
2  work he performed at the site that we defined?
3     A.  Please ask that question again, leave the term
4  "land clearing" out of it, because anything with the
5  land clearing, I would say no.
6     Q.  Other than what you've described so far, do
7  you recall any other responsibilities that
8  Mr. Berlusconi had with respect to the site that we
9  defined?
10    A.  Again, as I mentioned, he was the day-to-day
11  on-site representative of the company.  So any of those
12  day-to-day activities that came to him, he was
13  responsible for.  So what it is day to day, not being
14  there, I cannot tell you what they would be.
15    Q.  Okay.  Are you familiar with a person by the
16  name of Emily Kirkpatrick?
17    A.  Yes, I am.
18    Q.  Who is Ms. Kirkpatrick?
19    A.  She was a secretary at Byte Services, Inc. and
20  responsible for doing all the purchasing and material
21  acquisitions and scheduling and work scheduling at BSI.
22    Q.  And BSI is Byte Services, Incorporated?
23    A.  Correct.
24    Q.  Okay.  Does Ms. Kirkpatrick still work at Byte
25  Services, Incorporated?

Page 51

1     A.  No, sir.
2     Q.  When did she leave?
3     A.  Oh, I couldn't speculate.  A few years ago.
4     Q.  Why did Ms. Kirkpatrick leave?
5     A.  I don't know.
6     Q.  And does Mr. Berlusconi still work for you?
7     A.  No, sir.
8     Q.  How come?
9     A.  He was terminated from his position a few
10  years ago.
11    Q.  Why?
12    A.  His work practices were not to par to my
13  standards.
14    Q.  Was Mr. Berlusconi terminated for any reason
15  relating to activities that occurred at the site that we
16  defined?
17    A.  No, sir.
18    Q.  Was Mr. Berlusconi terminated for any reason
19  relevant to the allegations in this case?
20    A.  No, sir.
21    Q.  Have you ever talked to Mr. Berlusconi about
22  the allegations that you and NeshaFarm filled wetlands
23  at the site?
24    A.  No, sir.
25    Q.  What about Ms. Kirkpatrick, have you ever

Page 52

1  talked to her about those allegations?
2     A.  No, sir.
3     Q.  Have you ever talked to Mr. Kryzda about the
4  allegations of alleged filling of wetlands on the site?
5        MR. MIRON:  To the extent those communications
6  you had with Mr. Kryzda were with counsel, either
7  myself, Neal or Chris, then I don't want you to
8  disclose the content of that communication.  But if
9  you had a separate communication with Kevin that
10  was outside an attorney, including Jefferson Knight
11  or any attorney, right, if anybody at Gunster,
12  Yoakley, Greg Munson, Robert Raynes, if you talked
13  to him separate and apart from those individuals,
14  then you're welcome to respond.
15       THE WITNESS:  Most 98 percent of our
16  conversation was in regards to legal issues and
17  matters with the six, seven, eight, nine, ten
18  attorneys that we have on this case, and every once
19  in a while we would have a discussion, but not in
20  very great depth about the -- these issues.
21  BY MR. ADKINS:
22    Q.  Okay.  On how many occasions did you have
23  conversations with Mr. Kryzda outside of your
24  conversations with counsel regarding the issues in this
25  case?

BENJAMIN K. SHARFI
USA vs BENJAMIN K. SHARFI

June 09, 2022
53–56

Page 53

1    A.  I couldn't give you a number, sir.

2    Q.  More than five times?

3        MR. MIRON:  Objection.  Asked and answered.

4        THE WITNESS:  I couldn't give you a number.

5    It would be more than ten and less than fifty.

6  BY MR. ADKINS:

7    Q.  When is the most recent time you had a

8  discussion with Mr. Kryzda about this case outside of

9  your conversations with counsel?

10   A.  Not at all in the recent months.

11   Q.  Okay.  Do you recall the most recent occasion?

12   A.  No.

13   Q.  Do you recall anything about what you

14  discussed with Mr. Kryzda?

15   A.  No.

16   Q.  Well, you know the discussion was about the

17  allegations in this case, right?

18   A.  Yes, sir.

19   Q.  What was it about the allegations in this case

20  that you discussed with Mr. Kryzda?

21       MR. MIRON:  Objection.  Asked and answered.

22       THE WITNESS:  Permission to speak freely, sir?

23  BY MR. ADKINS:

24   Q.  Well, look, Mr. Sharfi, you're under oath, so

25  I asked you a question.  I'd like to have an answer.

Page 54

1    A.  No.

2    Q.  So the question was:  You recall having

3  conversations with Mr. Kryzda about the allegations in

4  this case that were separate from your conversations

5  with counsel.  What was it about the allegations of this

6  case that you discussed with Mr. Kryzda?

7    A.  Okay.  How Mr. Pempek, that has a personal

8  agenda against me and against the company and the lies

9  that he's fabricated over and over and harassments that

10  he has gone through to threaten and to clearly lie, not

11  just twist the truth, and how he has taken a personal

12  war against Mr. Sharfi, and he is using government

13  resources to fight a personal war.

14   Q.  Do you recall discussing with Mr. Kryzda

15  anything else about the allegations of this case?

16   A.  No, sir.

17   Q.  Okay.  When you say Mr. Pempek, are you

18  referring to John Pempek of the United States Army Corps

19  of Engineers?

20   A.  Yes, sir, at this time he's with Army Corps of

21  Engineers, prior to that in 2016, where this issue

22  started with him, he was with South Florida Water

23  Management.

24   Q.  And you say he has a personal agenda against

25  you and the company.  What company are you referring to?

Page 55

1    A.  NeshaFarm.

2    Q.  Why do you believe Mr. Pempek has a personal

3  agenda against you and NeshaFarm?

4    A.  He said so.

5    Q.  Exactly what did Mr. Pempek say?

6    A.  In our meeting in 2016 where he was

7  embarrassed in front of his peers by fabricating lies

8  and he was caught in the middle of a lie and his boss

9  intervened and the conversation got very heated that he

10  was lying and we described his lies and exposed his

11  lies.

12       And when the meeting was over, I was waiting

13  by the front door for my attorney to come and he walks

14  by me and he smirked at me and he said, You have no idea

15  what you're up against.  You'll see the end of this.

16  You're underestimating what's going to happen to you.

17       And he was very threatful, personal directly

18  looking at me saying that.

19       And further, he went through next four years

20  seeking every property that I own, sent threatening

21  letters, e-mailing, twisting the truth, including topics

22  that I'm out to kill him and spreading rumors and lies

23  about me and the company and got you guys convinced to

24  go on this witch hunt that you're after.  These were

25  words coming directly out of his mouth in the site.

Page 56

1    Q.  In the site, what do you mean by the site?

2    A.  At the South Florida Water Management

3  District.  And also when he came on my site as a guest

4  invited, he was very threatening.  And every opportunity

5  when there was no people looking at him, he's facing

6  down and he is slurring all kind of words and accusation

7  that he'll get me, you'll see what I'm up to against.

8       It's clearly that in all his e-mails and

9  communications and harassments throughout the years that

10  he's been after me.  And my response to him was at that

11  time we'll see when this is over which one of us keeps

12  our job, me or you.

13   Q.  When you say when you invited him on the site,

14  is that in May of 2018?

15   A.  I couldn't tell you the date, but he was

16  invited on the site; correct.

17   Q.  Was that the inspection that was done together

18  with the South Florida Water Management District?

19   A.  He was, I believe, at South Florida Water at

20  that time.  I don't know his -- which shirt he was

21  wearing at that time.

22   Q.  Okay.  Do you remember the approximate year

23  when that interaction happened on the site?

24   A.  I believe around '18, 2018.  I couldn't be

25  sure.

BENJAMIN K. SHARFI
USA vs BENJAMIN K. SHARFI

June 09, 2022
57–60

Page 57

1    Q.  Okay.  Are there any other reasons why you
2  believe Mr. Pempek has a personal agenda against you?
3    A.  Yes.  Threatening phone calls, threatened my
4  marina business, threatened my Army contract business,
5  threatened General Micro Systems business, threatened my
6  newly acquired community center that I'm calling and
7  reaching out to individuals within my organization
8  outside of the people that he should be working with and
9  sending them threatening letters and text messages and
10  e-mails.  And there are at least six, seven of them that
11  are recorded on the record.
12    Q.  Okay.  And who are those people outside of
13  your organization that Mr. Pempek reached out to?
14    A.  He reached out to one of my workers named --
15  he's a reverend, Reverend John Hook, John Hook, and I
16  believe he reached out to other people that -- around
17  the community that I heard through second and third
18  party.  So they will not be valid.
19    Q.  They wouldn't be valid?  Why is that?
20    A.  Because I couldn't be -- point at exactly who
21  those people would be.  But he has a made a personal
22  agenda to go after me, and he has.
23    Q.  Other than Reverend John Hook, are there any
24  other people that Mr. Pempek reached out to outside of
25  your organization?

Page 58

1    A.  I don't want to speculate, but I can think of
2  one or two other people, but I don't want to speculate
3  until we become more clear with those topics.  And the
4  day of reckoning with Mr. Pempek will come, all those
5  people will come out and be exposed.
6    Q.  What are the two names that you are
7  speculating about?
8    A.  I'm sorry?
9    Q.  What are the two names that you are
10  speculating about?
11    A.  I don't really want to bring them in because
12  I'm not sure.
13    Q.  Who do you have in mind?
14    A.  No one, not that I can say with any kind of
15  certainty, and you asked me not to speculate, so I
16  won't.
17    Q.  I did not ask you not to speculate.  I
18  actually said who are you speculating about?
19    A.  I was told by my counsel not to speculate.
20  Answer only what I do know.
21    Q.  Okay.  Well, you said that you had two people
22  in mind that you believe Mr. Pempek reached out to.  Who
23  are those two people in your mind?
24    A.  I can't be sure of that.
25    Q.  So are you refusing to answer this question

Page 59

1  under oath?
2    A.  Yes.
3      MR. MIRON:  Hold on.  Excuse me.  Objection.
4    Asked and answered.  His response was he's not
5    sure.  That's his answer.
6      THE WITNESS:  That's my answer, sir.
7      MR. ADKINS:  His testimony was he had two
8    people in mind.
9  BY MR. ADKINS:
10    Q.  Who are the two people you've had in mind?
11      MR. MIRON:  Objection.  Asked and answered,
12    and also misstates the characterization of the
13    testimony.
14      THE WITNESS:  Thank you.
15  BY MR. ADKINS:
16    Q.  So you're not going to answer?
17    A.  I already answered.
18    Q.  So you're going to refuse to provide the two
19  names that you have in mind?
20      MR. MIRON:  Objection.  Again, now you're
21    being the argumentative.  It misstates the
22    characterization of the testimony and it's already
23    been asked and answered now four times.
24  BY MR. ADKINS:
25    Q.  Okay.  So other than the Reverend John Hook

Page 60

1  and the two people that you're not going to disclose on
2  the record today, are there any other people that you
3  understand Mr. Pempek reached out to outside of your
4  organization?
5      MR. MIRON:  Again, objection.  Argumentative.
6    It was asked and answered.
7      THE WITNESS:  I believe I answered what I know
8    for sure already.
9  BY MR. ADKINS:
10    Q.  And there's no one else?
11    A.  Not at this time.
12    Q.  Okay.  Now, you said some of those
13  conversations were recorded on the record.  What do you
14  mean by that?
15    A.  They're documented via e-mails that he has
16  sent and messages that he has sent.
17    Q.  Do you have copies of those e-mails?
18    A.  Yes, sir.
19    Q.  Have you produced them in this case?
20    A.  Yeah, I produced them.
21    Q.  Okay.  Now, you said that Mr. Pempek has made
22  threatening calls?
23    A.  Yes, sir.
24    Q.  When did that happen?
25    A.  Several times.  I would say at least eight to

BENJAMIN K. SHARFI
USA vs BENJAMIN K. SHARFI

June 09, 2022
61–64

Page 61

1 ten different phone calls that he called on my cell
2 phone to threaten me and make me be aware that "I am
3 looking at you. I've got my eyes on you."
4    Q.  Okay.  What exactly did Mr. Pempek say?
5    A.  That he has the power to withhold my permit
6 from Army Corps of Engineers for my arena and he will do
7 so; that he will -- has a lot of contacts in the -- as
8 the Army and he knew about my contracts with Army; that
9 he would be -- would put them in jeopardy.  And he has
10 threatened me that he will impact and withdraw my
11 security clearances.  And he knows that well without my
12 security clearances, basically I'm out of a job.
13        And he has threatened me on the new site that
14 I acquired many years later after this incident that he
15 took tremendous due diligence to go through to find out
16 who was the owners and how that -- and was able to trace
17 it back to me.  And he made it clear that he knows and
18 that he is flying over and he's keeping track of our
19 work and site through multiple flights that he's doing,
20 and once again, the terms that "you have no idea what
21 you're up against."
22        And those are the kind of personal threats he
23 has made on phone calls and via e-mail and other means
24 of communications.
25    Q.  Okay.

Page 62

1    A.  And in person, of course.
2    Q.  And so you said there were eight to ten calls
3 where Mr. Pempek threatened you.  Do you recall when any
4 of those calls took place?
5    A.  They all started after the 2016 timeline
6 where -- our first encounter where he was embarrassed in
7 front of his peers in group of 15, 20 people in South
8 Florida Water Management District conference room and he
9 looked like an idiot in front of everybody, and that's
10 where his personal agenda started.
11    Q.  Were any of the calls with respect to the site
12 that we defined in this case?
13    A.  I'm sorry.
14    Q.  Were any of those calls relating to the site
15 that we defined in this case?
16    A.  Yes, sir.
17    Q.  Okay.  When did Mr. Pempek first call you with
18 respect to the site in this case?
19    A.  It pretty much started right after the
20 acquisition of the site.  He let me know that he's
21 looking at me and he has got his eyes on us and he is
22 going to make my life miserable, as he has.
23    Q.  Are those quotes that you're saying?
24    A.  Yes, sir.
25    Q.  So Mr. Pempek said he has his eyes on you and

Page 63

1 he will make your life miserable for you?
2    A.  Yes, sir.
3    Q.  Mr. Pempek said those words to you,
4 Mr. Sharfi?
5    A.  Those words directly, that I have no clue what
6 I'm up against, over and over.  Those are his terms.
7    Q.  Is that what he said or did he say he was
8 going to make your life miserable?
9    A.  He said that as well.  "I'll make sure that
10 you know" -- he made it very clear that he's looking at
11 me and looking at every activity that we are doing.
12    Q.  Okay.  Did you record any of those phone
13 calls?
14    A.  No.
15    Q.  Did you take notes about any of those phone
16 calls?
17    A.  No.
18    Q.  Okay.  Do you have any other written
19 memorialization of those phone calls from Mr. Pempek?
20    A.  I have communicated all those calls to my
21 attorneys and I notified them and they are aware of
22 those conversations.
23    Q.  Okay.  And so the first call started around
24 late 2017; is that right?
25    A.  First phone call start after the meeting in

Page 64

1 South Florida Water Management, whatever date that was,
2 '16 or '17.
3    Q.  How about the first phone call that related to
4 the site that we defined in this case?
5    A.  Not that long after I bought it.
6    Q.  Okay.  So sometime in 2017, would you say?
7    A.  Whenever I bought it.  I couldn't again give
8 you the chronological time line, but those are a matter
9 of record, sir.
10    Q.  Did you ever make any complaints to the Army
11 Corps about Mr. Pempek's conduct?
12    A.  I made my notes and comments to my attorneys
13 and what they've done with that is really not something
14 that I would be informed of.
15    Q.  When did you make those notes and comments?
16    A.  Every time he called.
17    Q.  How long after he called did you make a note?
18    A.  Within hours.  I remember the one specific
19 incident that -- with Mr. Jefferson that it was involved
20 and I told Mr. Jefferson and his response was, Well, you
21 knew it was going to happen.
22        MR. MIRON:  Well, hold on.  Thank you.
23        THE WITNESS:  I'm sorry.  I'm not supposed to
24 say what he said.
25

BENJAMIN K. SHARFI
USA vs BENJAMIN K. SHARFI

June 09, 2022
65–68

Page 65

1  BY MR. ADKINS:
2      Q.  Counsel is interrupting you because I'm not
3  asking about what Mr. Jefferson said to you and I don't
4  want you to disclose the nature of any of the advice you
5  received.
6          MR. MIRON:  Right.  So I'm sorry, Brandon,
7      just give me a second.  Thank you for that.
8          So just to be clear, I don't want you to
9      testify as to anything that you told an attorney,
10     including Mr. Knight, Jefferson Knight, or whatever
11     he told you.
12         THE WITNESS:  Thank you, sir.  Thank you for
13     clarifying that.  Go ahead, I'm sorry.
14  BY MR. ADKINS:
15     Q.  So when Mr. Pempek first called you with
16  respect to the site sometime in 2017, did you make a
17  note of your phone call with him within hours of having
18  that phone call?
19     A.  You mean a handwritten note?
20     Q.  Any kind of note.
21     A.  No, sir.
22     Q.  Okay.
23     A.  Mental note.
24     Q.  Okay.  So you said you made notes of
25  Mr. Pempek's phone calls and I said how long after the

Page 66

1  calls and you said usually within hours?
2      A.  Correct.
3      Q.  Okay.  Did you ever make any handwritten notes
4  after phone calls with Mr. Pempek?
5      A.  No, sir.
6      Q.  Okay.  And you never reported any of his
7  conduct to the United States Army Corps of Engineers?
8      A.  I believe you asked that question twice and
9  the answer was no.
10     Q.  Is there a reason why you didn't?
11     A.  It's illegal.
12     Q.  It's illegal to report the conduct that you're
13  saying Mr. Pempek engaged in to the United States Army
14  Corps of Engineers?
15     A.  My understanding of it, sir, it's illegal to
16  record any conversation without consultant of the other
17  individual.
18     Q.  I didn't say anything about recording.  I said
19  did you report.
20     A.  Report?  I'm sorry, I thought you said record.
21     Q.  Yes.  Sorry.  Did you report --
22         MR. MIRON:  Your answer was correct.  But what
23     he was saying was report.
24         THE WITNESS:  Report, the answer is yes, I did
25     report those conversations to my attorneys.

Page 67

1  BY MR. ADKINS:
2      Q.  Okay.  But you did not report those
3  conversations to the United States Army Corps of
4  Engineers?
5      A.  I avoided any direct communication with the
6  Corps.
7      Q.  Okay.  Well, you did not -- you did not report
8  any of the phone calls that you received from Mr. Pempek
9  that you're characterizing as threatening to the United
10  States Army Corps of Engineers; is that correct?
11     A.  I did not.
12         MR. ADKINS:  Okay.  I think this would be a
13     good point to take a quick break.
14         THE WITNESS:  Okay.
15         MR. ADKINS:  We can go off the record.
16         THE VIDEOGRAPHER:  Okay.  We're going off the
17     record.  The time is 10:36.
18         (A break was had.)
19         THE VIDEOGRAPHER:  We are back on the record.
20     The time is 10:51.
21  BY MR. ADKINS:
22     Q.  Before you purchased the site in 2017, did you
23  do any research regarding the site?
24     A.  Please define "research."
25     Q.  Did you get an appraisal?

Page 68

1      A.  No.
2      Q.  Did you hire a real estate agent?
3      A.  It came through a real estate agent.
4      Q.  How do you mean it came through a real estate
5  agent?
6      A.  I was informed that the lot was for sale
7  through a real estate agent.
8      Q.  Was that the seller's agent?
9      A.  I don't know.
10     Q.  What was the name of the real estate agent
11  that you learned the lot was for sale?
12     A.  I don't know.
13     Q.  Did you involve a real estate agent in the
14  transaction to purchase the site?
15     A.  Please --
16         MR. MIRON:  Object.
17         THE WITNESS:  -- ask that one more time.  I
18     didn't understand what you're asking.
19         MR. MIRON:  Objection.  Vague.
20  BY MR. ADKINS:
21     Q.  Did you hire a real estate agent in connection
22  with the purchase of the site?
23     A.  As I mentioned, a real estate agent approached
24  me that the site was available and we worked through
25  them, he and a she, to acquire the site.  So they wrote

BENJAMIN K. SHARFI
USA vs BENJAMIN K. SHARFI

June 09, 2022
69–72

Page 69

1   up the proposals, the offers, et cetera.

2       Q.   Okay.  Do you know who the real estate agents

3   that you worked with represented?

4       A.   I believe you asked that and I said I do not

5   remember.

6       Q.   Did the sellers have a real estate agent?

7       A.   Again --

8           MR. MIRON:  Objection.  Asked and answered.

9           THE WITNESS:  -- you asked that and I said no.

10          MR. MIRON:  Just give me a second to object if

11  I need to, okay?

12          Objection.  Asked and answered.

13  BY MR. ADKINS:

14      Q.   Is the answer you know or you don't know?

15      A.   I don't know.

16          MR. MIRON:  Can you restate the question?

17  BY MR. ADKINS:

18      Q.   Did you have any contact with the prior owners

19  of the site?

20      A.   No.

21          MR. MIRON:  Objection.  Vague.

22  BY MR. ADKINS:

23      Q.   And you purchased the site on behalf of the

24  Benjamin Sharfi 2000 trust, correct?

25      A.   Whatever the records would show it was

Page 70

1   purchased through the -- whatever the records.  I have

2   no reason to believe that the records are inaccurate.

3       Q.   Was the purchase price $300,000?

4       A.   I do not remember, but whatever the records

5   show, that would be the case.

6       Q.   Do you recall negotiating over the price paid

7   for the site?

8       A.   I don't recall that, sir.

9       Q.   Do you recall more than one offer was made to

10  purchase the site?

11          MR. MIRON:  Objection.  Asked and answered.

12          THE WITNESS:  I do not recall.

13  BY MR. ADKINS:

14      Q.   Why did you decide to purchase the site in

15  2017?

16      A.   It was a natural expansion to the site and we

17  needed additional grazing land for the livestock.

18      Q.   When you say "natural expansion of the site,"

19  do you mean expansion of NeshaFarm?

20      A.   An expansion of NeshaFarm, correct.

21      Q.   Okay.  So, and other than needing additional

22  grazing land for the livestock, did you have any other

23  reason for purchasing the site?

24      A.   No.

25      Q.   Do you have a personal residence on NeshaFarm?

Page 71

1       A.   Yes.

2       Q.   Is that on Property 1?

3       A.   It's on Property 1.

4       Q.   How often do you spend time at your residence

5   on NeshaFarm?

6       A.   It varies.  Sometimes I can spend over a

7   month, month and a half at a time, or multiple months,

8   and sometimes I'm not there over a month or two.  It's

9   just as time allows and schedule allows.

10      Q.   Has the frequency by which you spend time at

11  NeshaFarm changed since 2017?

12      A.   It certainly changed during Covid years.  I

13  spent most of my time during Covid at the farm.

14      Q.   Before roughly March 2020, you spent less time

15  at the farm; is that correct?

16      A.   Certainly less time than during Covid.

17      Q.   So in the period 2017 to roughly March 2020,

18  about how many nights a month would you say you spent at

19  NeshaFarm?

20      A.   I couldn't tell you, but as I recall, in

21  December of 2020, when I had an injury and I spent most

22  of my time from November, December of 2020 in my -- at

23  my farm until -- especially today.

24      Q.   Do you consider NeshaFarm to be your primary

25  residence?

Page 72

1       A.   I think "primary" has a very strange

2   definition.  It's my primary residence when I'm there.

3       Q.   In terms of where you spent more of your time,

4   is there any other location where you spend more time in

5   an average year than at NeshaFarm?

6       A.   No.

7       Q.   Would it be fair to say that you spent the

8   majority of your nights at NeshaFarm?

9       A.   As I mentioned, during different times of the

10  year, I spend my time different locations.

11      Q.   Okay.  And there's no other location where you

12  spend more time than NeshaFarm, correct?

13          MR. MIRON:  Objection.  Asked and answered.

14          THE WITNESS:  Again, I'm trying to be as clear

15  as I can without being tricky about it.  Depending

16  upon the time of the year and what's happening at

17  that time of my life.  Sometimes I would be in

18  California, sometimes I would be in Sewalls point

19  and sometimes I would be at my farm.  I don't keep

20  a chronological calendar in how many days I spend

21  here, how many days.  But during Covid until very

22  recently that I was not very functional and mobile,

23  I spent most of my time at the farm.  I spend most

24  of my time in Florida.

25

BENJAMIN K. SHARFI                                    June 09, 2022
USA vs BENJAMIN K. SHARFI                                    73–76

Page 73

1  BY MR. ADKINS:
2      Q.  Are you a Florida resident?
3      A.  Yes, sir.
4      Q.  Do you have a Florida driver's license?
5      A.  Yes, sir.
6      Q.  Do you have a homestead exemption?
7      A.  I'm sure that the legal counsel and financial
8  planners that I have, they have done whatever they need
9  to do.  I couldn't tell you what the -- which homes are
10 homesteaded or that.  Those would be financial advisers
11 would make those decisions.
12     Q.  Do you know which of your homes is
13 homesteaded?
14     A.  No.
15     Q.  Do you know if more than one home is
16 homesteaded?
17         MR. MIRON:  Objection.  Asked and answered.
18         THE WITNESS:  I don't know which ones are and
19 are not.  I really don't.
20 BY MR. ADKINS:
21     Q.  Okay.  Have conditions at the site changed
22 since you've purchased it in April 2017?
23         MR. MIRON:  Objection.  Vague.
24         THE WITNESS:  Has the condition -- can you
25 please explain what you mean by changed?

Page 74

1  BY MR. ADKINS:
2      Q.  Do you know what the word "changed" means?
3      A.  There is hourly change on the site.
4      Q.  Okay.
5      A.  Not created by me, necessarily.
6      Q.  So by --
7      A.  Grass grows, trees grow, cows poop and cows
8  get cleaned, lawns get mowed.  So those changes
9  constantly.  If you want to define to what areas
10 specific, I'd happy to answer specific questions, sir.
11     Q.  Was there a perimeter fence on the site when
12 you purchased it in 2017?
13     A.  Correct.  The first rule of business was to
14 secure the perimeter of the site in order to establish a
15 secure, safe haven for the animals so -- against
16 predators and for them either come in or leave and to
17 establish the outer perimeter to secure the animals.
18     Q.  When -- was a perimeter fence installed at the
19 site after you purchased it?
20     A.  Correct.
21     Q.  Who directed the installation of a perimeter
22 fence at the site?
23     A.  The marching orders would have come from me to
24 Kevin and from Kevin to the right staff to do the job.
25     Q.  Did Byte Services or NeshaFarm staff perform

Page 75

1  the installation of the perimeter fence?
2      A.  NeshaFarm or BSI, we do not possess such
3  talent to do that.  So I doubt that it was us.
4      Q.  Did a contractor install the perimeter fence?
5      A.  Yes.
6      Q.  Do you know who authorized that contractor?
7      A.  No.
8      Q.  Do you know how the contractor was paid?
9      A.  With money.
10     Q.  Okay.  Do you know what entity paid the
11 contractor?
12     A.  No.
13     Q.  Okay.  Do you know how the perimeter fence was
14 constructed by the contractor?
15     A.  Carefully.  I'm not sure how they put the post
16 in.  The first order of business was to obtain a
17 perimeter survey and we hire a survey company.  I don't
18 know the name, but those would be in the records.  And
19 they surveyed the site and they put their flag post and
20 flagpoles and there were multiple inconsistencies with
21 the existing three-wire cattle fence that was on the
22 site versus the surveyor's result.  We talked to the
23 neighbors about those inconsistencies and we installed
24 the perimeter fence.
25     Q.  Did the inconsistencies that you're describing

Page 76

1  have to do with the property lines?
2      A.  Correct.
3      Q.  You said there was a three-wire cattle fence
4  at the site.  Was that something you installed or
5  something that was existing on the site when you
6  purchased it?
7      A.  The site was being used for cattle prior us
8  purchasing that and often their cattle would even come
9  in through the fence that was broken up and we would put
10 them back.
11         So it was a very old, wooden, with a
12 three-barbed-wire fence that it was very poorly
13 installed and we just decided to do it right to secure
14 the animals.
15     Q.  Were there any -- sorry, I see you're taking a
16 drink of water.  I'll give you a second.
17     A.  I can hear.  I don't drink with my mouth.
18         MR. MIRON:  Ears.
19         THE WITNESS:  I mean with my ears.
20 BY MR. ADKINS:
21     Q.  You don't hear with your mouth.  I hope you're
22 drinking with your mouth.
23         So were there any roads or paths on the site
24 when you purchased it in April of 2017?
25     A.  I'm sorry, you're breaking up.

BENJAMIN K. SHARFI                                          June 09, 2022
USA vs BENJAMIN K. SHARFI                                        77—80

Page 77

1     Q.  Were there any roads or paths on the site when
2  you purchased it in April of 2017?
3     A.  There were clearly multiple paths around the
4  perimeter and some through the interior where cattle and
5  other equipment that dug and put the fence and the ditch
6  was there.  So there was definitely some path in there.
7     Q.  What would you -- how would you describe the
8  tread of the path that existed at the site in
9  April 2017?
10       MR. MIRON:  Object to form.
11       THE WITNESS:  The tread?  I don't understand.
12  BY MR. ADKINS:
13     Q.  Yeah, the tread --
14       MR. MIRON:  I'm sorry, I'm going to object
15     that it's vague.  But I think you need to be a
16     little more specific.
17       THE WITNESS:  What's a tread?
18       MR. MIRON:  He'll explain it to you.
19  BY MR. ADKINS:
20     Q.  The tread being the surface of the path.
21     A.  The what?
22     Q.  The surface.
23       MR. MIRON:  Surface of the path.
24       THE WITNESS:  The surface of the path.  Can
25     you ask the question again?

Page 78

1  BY MR. ADKINS:
2     Q.  Can you describe the surface of the path at
3  the site as it existed when you purchased it?
4     A.  A lot of it was dirt and weeds and a lot of
5  cow poop, and there were multiple hunting towers that
6  were put in there.
7       THE WITNESS:  And let me have my charger,
8     please.
9       MR. MIRON:  Give me one second, Brandon.
10       THE WITNESS:  You had enough juice.  Give me
11     my juice back.
12       I'm sorry, go ahead.  I just got the
13     20 percent warning.
14  BY MR. ADKINS:
15     Q.  How wide were the paths on the site when you
16  purchased it in April 2017?
17     A.  One more time, please.
18     Q.  How wide were the paths on the site when you
19  purchased it in 2017?
20     A.  The paths were 8, 10 to 12 feet wide in some
21  places, and especially along the west side of the
22  property -- excuse me, site, as you mentioned, and
23  that's where they dug the trench.  And a lot of the dirt
24  that they dug the trench was pulled out on the site and
25  a road of -- ability to be able to drive certainly the

Page 79

1  machinery that dug that trench was there.
2     Q.  Were any of the paths that existed on the site
3  before you purchased it made up of gravel?
4     A.  Gravel meaning specific type of sand?  Dirt?
5  I'm not sure what the definition of gravel would be.
6     Q.  Well, I wouldn't call sand or dirt gravel.
7  Were any of the paths made out of stone?
8     A.  There were some kind of rock on some of the
9  banks that were put there.  I don't recall to what
10  extent, though.
11     Q.  That's the bank of the ditch on the west
12  boundary of the site?
13     A.  Yes, sir.
14     Q.  Are there any roads or paths that exist on the
15  site today?
16     A.  Yes, sir.
17     Q.  Can you describe them, please?
18     A.  There is a perimeter road that goes west,
19  north and east of the property and that was put there to
20  able -- to be able to put the fence and secure and clean
21  up on a very frequent basis the vegetation growth that
22  comes into.
23     Q.  Are there any other roads or paths on the site
24  as it exists today?
25     A.  There is one additional rock-based path that

Page 80

1  is to the west of the riding arena on the northeast
2  corner of site.
3     Q.  Okay.  First with respect to the perimeter
4  road, how was that road constructed?
5     A.  I really couldn't tell you the details how
6  people construct road.  That would not be my area of
7  expertise or knowledge.
8     Q.  Was the perimeter road installed at your
9  direction?
10       MR. MIRON:  Objection.  Vague.
11       THE WITNESS:  My direction to the staff was to
12     secure the perimeter of the site and to install
13     proper type of fencing to ensure that predators
14     such as alligators and other critters will not
15     enter to the site and make whatever safety
16     precautions necessary to do.  So that would be my
17     directives.  How that directives are achieved is
18     not my areas of expertise of how to build a road.
19  BY MR. ADKINS:
20     Q.  Did anyone ever tell you that they would need
21  to construct a perimeter road in order to put your
22  directives into place?
23     A.  The person in charge, Mr. Kryzda, with his 35
24  years plus in the county and his knowledge, he would be
25  responsible to obtain whatever permits will be necessary

BENJAMIN K. SHARFI                                    June 09, 2022
USA vs BENJAMIN K. SHARFI                                    81–84

Page 81

1  and regulatory issues to do the job correctly and
2  properly.
3      Q.  I get that.  My question is just the road
4  exists on the site now.  It didn't when you bought it in
5  2017.  Who is responsible for giving the direction to
6  construct that road?
7      A.  It would be me, sir.
8      Q.  Do you know --
9      A.  With one clarification.  That is not to
10  install the road, rather than to put the perimeter fence
11  and do what's necessary to be able to maintain and keep
12  up with the fence.
13      Q.  Okay.  And when did you -- when did you become
14  aware that installing a perimeter fence to protect the
15  site and the livestock would require installation of a
16  road?
17      A.  Really never occurred to me that -- to me,
18  they were synonymous topic, that you -- in order for the
19  equipment to get there to put the posts and the poles
20  and the fences, that it will require a path to get
21  through.  And it was a gravel-based path.
22      Q.  And so the road as it exists today is a
23  gravel-based road; is that right?
24      A.  I would rather call it a path rather than a
25  road because I think when you paint a picture of a road

Page 82

1  and a street, it's like a traffic kind of a thing.  This
2  is barely wide enough to be able to take any farm
3  equipment around to the perimeters and be able to take
4  the horses and their feed and cattle around the
5  perimeter.
6      Q.  It's not a public road, right?
7      A.  No, sir.
8      Q.  Can you drive a truck on the road?
9      A.  Yes, sir, you could, but some areas you have
10  to be very careful not to scratch the side of your car.
11      Q.  What would you scratch the side of your car
12  on?
13      A.  The post and the fence.
14      Q.  So you said the road was made up of gravel?
15      A.  Correct.
16      Q.  How did the gravel get to the site to make up
17  that road?
18      A.  Brought in by the people who built the road.
19      Q.  Who built the road?
20      A.  I'm not sure.  One of the contractors that
21  were hired and I'm sure you have records of those.
22      Q.  Why are you sure I have records of those?
23      A.  Because you subpoenaed everything including
24  the color of shirt I was wearing.  I gave you all that
25  information.

Page 83

1      Q.  Okay.  And you don't recall the name of the
2  contractor who constructed the road at the site?
3      A.  No, sir.
4      Q.  Do you know how gravel was brought in to the
5  site?
6      A.  No, sir.
7      Q.  Was it brought in by dump truck?
8          MR. MIRON:  Objection.  Asked and answered.
9          THE WITNESS:  It wasn't flown in by airplane,
10      if that's what you're asking.  It had to be brought
11      in by a truck.
12  BY MR. ADKINS:
13      Q.  Okay.  Have you ever observed anyone bringing
14  gravel to the site to construct the road?
15      A.  Not that I recall.  I have seen trucks that
16  have brought sand and other materials into the --
17  potting soil and road base here and there, but that's
18  the best of my recollection, sir.
19      Q.  When you purchased the site in April 2017,
20  were there any buildings on the property?
21      A.  I would not call them buildings, but there
22  were multiple structures that they were used for the
23  cattle.
24      Q.  Could you describe what you mean by multiple
25  structures?

Page 84

1      A.  Tin roof, post fence that the cattle would be
2  sheltered in.
3      Q.  About how many of these structures existed on
4  the site when you bought it?
5      A.  Oh, I couldn't tell you, but it would be more
6  than two, at least two.
7      Q.  About how big were they?
8      A.  Fifteen to 20 feet by 15, 20 feet, something
9  of those sizes.
10      Q.  Okay.  Have they been removed?
11      A.  Yes, sir.
12      Q.  Did you ask someone to remove them?
13      A.  Not specifically to their directives to
14  remove, rather than to make the place safe for the
15  livestock.
16      Q.  How is a cattle shelter not safe for
17  livestock?
18      A.  I'm sorry, one more time.
19      Q.  How is a cattle structure not safe for
20  livestock?
21      A.  Barbed wires, nails exposed, structures are
22  flimsy, they cannot secure an animal, the gaps and
23  openings between the posts are too big.  Multiple
24  reasons why structure is not safe.
25      Q.  Okay.  Were these structures unsafe for

BENJAMIN K. SHARFI
USA vs BENJAMIN K. SHARFI

June 09, 2022
85–88

Page 85

1 livestock?
2      A.   Let's define livestock, as what you mean by
3 "livestock."
4           The previous owners, they had primarily cows
5 and what -- the site may be good for a cow is not good
6 for a sheep or a goat or a horse or llamas or other
7 livestock that we have.
8      Q.   So the structures that existed on the site
9 when you purchased it weren't safe for the livestock
10 that you intended to use the site for?
11      A.   Including the cows, correct.
12      Q.   Okay.  Are there any buildings on the site
13 today?
14      A.   There is one riding arena on the site.
15      Q.   Okay.  And that's in the northeast corner?
16      A.   It is in the northeast corner, yes, sir.
17      Q.   Did you direct the construction of the riding
18 arena?
19      A.   Yes, sir.
20      Q.   Did you have any input on where the riding
21 arena would be located on the site?
22      A.   Yes, sir.
23      Q.   What input did you offer?
24      A.   I'm sorry, what was the question?
25      Q.   What was your input?

Page 86

1      A.   Do me a favor.  You speak very fast and your
2 words, with the echo and the sound and my hearing, kind
3 of blend into each other.  So for the sake of saving
4 time, if you slow down a little bit, it would be easier
5 for both of us.
6           I'm sorry.  Please proceed.
7      Q.   Are you hearing an echo on your side?
8      A.   Your words, the way that -- the rate that they
9 come in, I cannot process it as fast as you put them out
10 there, so...
11           MR. MIRON:  There's just -- an ever so slight
12      delay between the -- because of Zoom.  I made the
13      speaker -- it's an external speaker -- much louder.
14      So hopefully it will be better.
15 BY MR. ADKINS:
16      Q.   Okay.  So I had asked if you had provided any
17 input on the location that the riding arena was placed
18 on the site.  I understood your testimony to be yes.
19 And my next question was:  What was your input?
20      A.   The purpose of the riding arena was in
21 twofolds.  A, and most importantly, to be a structure
22 where it would be strong enough to withstand hurricanes,
23 and we would use that as our hurricane hole for all the
24 animals, and to be assured that it's high enough above
25 flood levels that potentially could be there so the

Page 87

1 livestock would be able to survive the hurricanes.
2           So we picked the area that was most protected
3 and made most sense, since the northeast has another
4 house in front of it, and it would be most protected
5 from the winds and also would be in one of the highest
6 elevations of the site to be able to provide the
7 protection for the animals.  And further, to have the
8 site segmented such that multiple livestock like horses
9 and sheep and the goats and the llamas and birds
10 would be able to coexist for an undefined period of time
11 for their protection.
12           So number-one reason for the riding arena was
13 a shelter, hurricane hole, for the livestock.
14           And the second objective, which was much later
15 came in use, is to be used as a riding arena for the
16 days that riding in the outdoor arena that we have was
17 not possible.
18           Sorry about the very long answer.  I just want
19 to make sure that when I'm talking about the arena, you
20 understand what the purpose of the arena is.
21      Q.   Were there ever plans to construct the riding
22 arena in the southwest corner of the site?
23      A.   No.
24      Q.   Okay.  Would it have been feasible to
25 construct the riding arena in the southwest corner of

Page 88

1 the site?
2           MR. MIRON:  Objection.  Vague.
3           THE WITNESS:  Thought never occurred to us to
4      build it there.
5 BY MR. ADKINS:
6      Q.   Okay.
7      A.   Possible.  Anything is possible.  You're not
8 clearly asking me the laws of possibility.  I live in
9 the world of law of probabilities, sir.  I'm a scientist
10 and engineer, not a lawyer.  World of reality, anything
11 is possible.
12      Q.   Maybe you misunderstood my question.  I asked
13 if it was feasible.
14      A.   Feasible and possible are synonymous.
15           MR. MIRON:  Same objection.
16 BY MR. ADKINS:
17      Q.   Okay.  So there was never any plans to locate
18 the riding arena at any other part of the site?
19      A.   No, sir.
20      Q.   Okay.  Are there any other buildings on the
21 site other than the riding arena?
22      A.   No, sir.
23      Q.   Is there a pole barn in the northwest corner
24 of the site?
25      A.   It's on the -- there are horse stalls on one

BENJAMIN K. SHARFI                                              June 09, 2022
USA vs BENJAMIN K. SHARFI                                         89–92

Page 89

1  location.  There is a toolshed on the north center of
2  the site.
3       Q.  Okay.  Are the horse stalls in the northwest
4  quadrant of the site?
5       A.  The horse stalls are on the northwest quarter
6  of the site; yes.
7       Q.  Were the toolshed and the horse stalls
8  constructed at your direction?
9       A.  Yes.
10      Q.  How were the horse stalls constructed?
11      A.  Very carefully, to be able to withstand the
12  hellacious winds that we get.  The direction of the wind
13  were in consideration.  And I mean, when I say "very
14  carefully," I'm not saying this sarcastically.  Rather
15  than, again, I'm an engineer and so every engineering
16  parameter in a decision-making comes in place.
17          So wind direction, the angle, sun, wind, all
18  those topics came in place.
19      Q.  Who constructed the horse shed?
20      A.  Who constructed the what?
21      Q.  Who constructed the horse shed?
22          MR. MIRON:  Objection.  Misstates testimony.
23  I think he said, Brandon, horse stall, not shed.
24          MR. ADKINS:  Horse stall, thank you.
25          MR. MIRON:  You're welcome.

Page 90

1          THE WITNESS:  I'm not sure who built the horse
2  stalls.
3  BY MR. ADKINS:
4       Q.  Do you know whether a contractor or an
5  employee of NeshaFarm?
6       A.  I don't believe that the NeshaFarm employees
7  have that kind of talent.  So I would suspect that
8  would be outside workforce.
9       Q.  Okay.  And then with respect to the toolshed,
10  do you know who constructed the toolshed?
11      A.  Parts of it we did and then parts of it was
12  done by an outside contractor.
13      Q.  Okay.  With respect to the -- you know, I want
14  to call it a horse shed, but I'm going to say horse
15  stall so I don't trigger an objection.
16          With respect to the horse stall, that area is
17  enclosed with a smaller fence, correct?
18      A.  One more time, please.
19      Q.  I want to go back to the northwest quadrant
20  where the horse stall is located.
21      A.  Okay.
22      Q.  Okay.  The area where the horse stall exists
23  on the site is also enclosed with a small fence; is that
24  correct?
25      A.  It has a horse rail guard around the perimeter

Page 91

1  so the horses do not leave the site and create damages
2  or including bodily harm to workers.
3       Q.  Okay.  Are there any materials that are on the
4  ground within that enclosure that were put there for the
5  horses?
6          MR. MIRON:  Objection.  Vague.
7          THE WITNESS:  Please explain materials.
8  BY MR. ADKINS:
9       Q.  Any earthen material, dirt, soil, anything
10  like that.
11      A.  The horse barns, as you may know -- may not
12  know -- it's a constant work and rework and more work
13  and additional work of cleaning and bringing sand, the
14  sand compresses, the wood chip compresses.  You clean.
15  So there is wood chips that is put there, sand that is
16  put there in order to make sure that the horses are kept
17  dry, hooves, and given adequate protection or they
18  develop severe diseases of foot, which basically makes
19  the horse not well.
20          So yes, there was -- all the above were put in
21  the site, in the horse stalls.
22      Q.  Other than the horse stall, the toolshed and
23  the riding arena, are there any other buildings on the
24  site that exists today?
25      A.  No buildings, other buildings exist today and

Page 92

1  I would not characterize the equipment barn as a
2  building.  It's a fully exposed on all four sides and it
3  just has a tin roof to cover the equipment.  So the
4  riding arena, I would call it a structure and perhaps
5  the horse stalls I may call it a structure, building,
6  but that would be the only two buildings.
7       Q.  Would you call it an improvement?
8       A.  Would you call it what?
9       Q.  An improvement?
10          MR. MIRON:  Objection.  Vague.
11          THE WITNESS:  Would I call it improvement?
12  Yes, I would call it an improvement.
13  BY MR. ADKINS:
14      Q.  Okay.
15      A.  Improvement to the livestock and to be able to
16  do the job to keep the animals alive.
17      Q.  Okay.  Are there any ponds on the site as it
18  exists today?
19          MR. MIRON:  Objection; form.  Vague.
20          THE WITNESS:  There are two watering holes for
21  the animals.  I don't call them ponds or lakes.
22  These are made for watering holes for the
23  agricultural purposes; that their purpose is for
24  the livestock to be able to go in to drink, and
25  more importantly, to cool off during the hot summer

BENJAMIN K. SHARFI
USA vs BENJAMIN K. SHARFI

June 09, 2022
93—96

Page 93

1 months.
2 BY MR. ADKINS:
3     Q.  Were those two watering holes, as you've
4 described them, did they exist on the site when you
5 purchased it in April 2017?
6     A.  One of them in a smaller capacity than it is
7 now was existing there where the previous owner used for
8 watering hole.  We cleaned it up and widened it up after
9 the fact; yes.
10     Q.  The two watering holes, one is shaped like a
11 peanut, correct?
12     A.  Correct.
13     Q.  And that peanut-shaped watering hole is in the
14 southwest corner of the site?
15     A.  It is in the southwest corner of the site,
16 correct.
17     Q.  The second watering hole has a ring of cypress
18 trees planted within it; is that correct?
19     A.  Correct.
20     Q.  Okay.  And that watering hole is still in the
21 southwest quadrant, but maybe closer to the center of
22 the site; is that accurate?
23     A.  Correct.
24     Q.  Okay.  The watering hole that you say existed
25 in part in 2017, are you referring to the one shaped

Page 94

1 leak a peanut or the one that currently has cypress
2 trees in it?
3     A.  The one that had has cypress trees in it.
4     Q.  Okay.  And when you say it was smaller
5 capacity, what do you mean?
6     A.  It was dug very poorly and slopes of it was
7 too steep for livestock to go in.  And there has to be a
8 fairly gradual slope for the livestock to go in and out,
9 and so we tried to improve on that slightly.
10     Q.  Okay.  How did you try to improve on that?
11     A.  How what?
12     Q.  How did you try to improve on the steepness of
13 the slope?
14     A.  By cleaning it up with some handmade
15 equipment.  You can't really bring heavy machinery
16 there, but we brought some load equipment there to clean
17 that up.  Honestly, I don't know much about it because I
18 was not involved and I'm not that familiar with that
19 job.
20     Q.  Did you direct the job?
21     A.  It was recommended by my staff that we need to
22 add additional watering hole and animals were getting in
23 and couldn't get out; that they needed to improve on
24 them.  And I gave them the authorization to proceed.
25     Q.  And you said the work was done using hand

Page 95

1 equipment; is that correct?
2     A.  Again, I did -- the times that I saw it,
3 mostly I saw people with hand equipment that they were
4 doing it, but I'm not sure whatever they did, I was not
5 privy to that level.
6     Q.  Okay.  Were there any instances where you saw
7 anyone using anything other than hand equipment to
8 modify the slope of the watering hole that currently has
9 cypress trees in it?
10     A.  No, sir.  In fact, at the time that this
11 project was started, I was in California and on business
12 for a very pretty long time, and when I came back a
13 month and a half or two months later, that's when I
14 first saw the actual product.
15     Q.  Do you know about when the project started and
16 ended?
17     A.  No.
18     Q.  Do you know when you were in California for
19 about a month and a half on this occasion?
20     A.  No, no.
21     Q.  Do you recall the year?
22     A.  I would say, again, with certain, around 2019
23 or '20.  I couldn't be that more precise than that.
24     Q.  Okay.  Did any other ponds or watering holes
25 exist on the site when you purchased it in April 2017,

Page 96

1 other than what we've discussed -- I'm sorry.  I
2 misstated when you purchased this.  No, I didn't.  Did
3 any -- scratch the question.
4         Did any other ponds or watering holes exist on
5 the site when you purchased it other than what you've
6 described so far?
7     A.  Well, clearly, the wetlands that were there
8 when we identified where the wetland was, the first rule
9 of business before we done any of these work, that was
10 instructed to the staff that we were clearly aware that
11 we're being observed in every aspect by Mr. Pempek.  So
12 in order not to give any more reasons to witch hunt us,
13 to be very, very careful as to what they do and how they
14 do and to border the entire wetland area and all the
15 vegetation, to protect it and post signs and make sure
16 that no worker or animal or livestock in any way or form
17 can disrupt the areas of the wetland.
18     Q.  Okay.  So when you said clearly, the wetlands
19 were there, do you mean it was clear that there were
20 wetlands on the site when you purchased it in
21 April 2017?
22     A.  Yes, sir.
23     Q.  And what did you understand to be the location
24 of the wetlands when you purchased it in April 2017?
25     A.  The wetlands are very clear in definition

BENJAMIN K. SHARFI                                                    June 09, 2022
USA vs BENJAMIN K. SHARFI                                             97–100

Page 97

1  where they are.  The kind of trees and vegetations and
2  the water sitting there, and that's in the center, the
3  south center of the site, what you call.
4      Q.  Okay.  Were there any other areas on the site
5  that you believed it was clear wetlands existed?
6      A.  No, sir.
7      Q.  Okay.  And we talked at length that some trees
8  have been removed since you purchased the site in
9  April 2017, correct?
10         MR. MIRON:  Objection.  Vague.  Misstates
11     testimony.
12         THE WITNESS:  I've answered whatever questions
13     you asked, sir.
14  BY MR. ADKINS:
15     Q.  Trees have been removed from the site since
16  you purchased it in 2017, correct?
17     A.  We discussed certain type of trees was
18  removed; yes, sir.
19     Q.  And just so we're clear, those trees were
20  removed at your direction; is that right?
21     A.  No, sir.
22     Q.  Whose direction?
23     A.  The trees were removed because they were
24  diseased or they were suggested to be removed.  And my
25  direction to the staff was to make sure that we follow

Page 98

1  the botanist and the environmentalist people that we
2  hired and follow their directions.
3         So it was not specifically move this tree or
4  that tree or that tree or et cetera, rather than to
5  provide the services that were required to assure a
6  healthy forest and that we do not lose additional trees
7  that can also endanger people and human falling on them.
8      Q.  You didn't provide specific direction on what
9  tree to remove and what tree to keep, right?
10     A.  Correct.
11     Q.  But you put in motion the process of removing
12  diseased trees and dead trees that we had discussed; is
13  that right?
14         MR. MIRON:  Objection.  Vague.
15         THE WITNESS:  No.  My direction was not
16     tree-specific targeted.  My directives are as to
17     what needs to be done in order to protect and
18     preserve the nature and the site and make it safe.
19         You're making it sound that I go on a
20     day-to-day, you do this, you do that, or work this
21     or move this tree or this shrub or cut this grass
22     or milk this cow.  That's not one of my roles, sir.
23     As a CEO of the company, I have a chain of command
24     to have my directions executed to the standards
25     that I like.

Page 99

1  BY MR. ADKINS:
2      Q.  I'm not trying to make it seem like you did
3  anything.  I'm just asking, I want to know who's
4  responsible for the removal of the trees on the site.
5         So who is ultimately responsible for that?
6         MR. MIRON:  Objection.  Vague?
7         THE WITNESS:  I can tell you what my
8     responsibility was, is to hire the staff and the
9     directives that I give them to do the job.
10  BY MR. ADKINS:
11     Q.  Did any land clearing occur on the site after
12  you purchased it in April 2017?
13         MR. MIRON:  Objection.  Vague.  It's also
14     asked and answered.
15         THE WITNESS:  I very carefully answered your
16     question and you can try a second or third or
17     fourth or fifth or a tenth time.  When you used the
18     word "land clearing," I said very clearly, we did
19     not land clear anywhere.
20  BY MR. ADKINS:
21     Q.  Okay.
22     A.  But you can ask again.  It's your time.
23     Q.  Did any grading occur at the site?
24         MR. MIRON:  Objection.  Vague.
25         THE WITNESS:  Any grading?  The roads

Page 100

1  certainly has to be on an ongoing basis where we
2  have tremendous amount of rain or equipment moving
3  that needs to be regraded and which is basically
4  dragging a piece of equipment on the road and
5  flattening it again.  But the site itself does not
6  require much grading.  It's pretty flat.
7  BY MR. ADKINS:
8      Q.  Was it like that when you purchased it in
9  2017?
10     A.  Along the ditch, which is on the west side of
11  the site, I keep referring to my notes so I don't -- to
12  the west side of the site, there was a significant
13  amount of dirt that was dug up out on the canal and that
14  water ditch, or the canal is something in order of 4 to
15  5 feet deep and something in the order of 8 to 10 feet
16  wide and 660 feet long.
17         So if you do the math of the amount of dirt
18  that was excavated from there and all of it was pulled
19  out and banged up along the side of the road to my
20  property so it was clear, I feel like the vegetation,
21  all of it was done from this side of the west -- what do
22  you call, the site.
23         So there was a big heap of dirt and debris and
24  other stuff that they dug out of the canal and that they
25  pulled on the site.  So we did use equipment to spread

BENJAMIN K. SHARFI
USA vs BENJAMIN K. SHARFI

June 09, 2022
101–104

Page 101

1 that area and clean that up and remove it out to
2 different locations.
3    Q.  What equipment did you use to do that?
4    A.  I couldn't tell you that, what equipment
5 specifically, but I know it was a task that took a very
6 long time to do.
7    Q.  Was a tractor used?
8       MR. MIRON:  Objection.  Asked and answered.
9       THE WITNESS:  Again, I was not daily on the
10 job site to tell you how, what, but I would assume
11 that some equipment were used.
12       MR. MIRON:  Please don't assume.
13 BY MR. ADKINS:
14    Q.  When you say "different locations," do you
15 know what locations on the site the material was moved
16 to?
17    A.  No, sir.  Actually, yeah, sorry, I recall --
18 may I?
19    Q.  Please.
20    A.  Some of it was moved to where we call the tree
21 farm, and if you look at the area where we call the tree
22 farm where all the trees are, we piled it up up there
23 for the trees.
24    Q.  Why did you move it to the tree farm?
25    A.  We needed the soil there for the trees and

Page 102

1 instead of throwing it away or hauled away, it's what
2 better use of it.
3    Q.  Was soil not in the location where the tree
4 farm is located?
5    A.  There was.
6    Q.  So why did you need soil?
7    A.  We wanted to raise it more.  It was a good
8 place to keep that top soil over there for the trees.
9 That's what was recommended and I approved that
10 recommendation.
11    Q.  Why was it recommended to raise that area
12 more?
13    A.  It's better for the trees.
14    Q.  How so?
15    A.  I couldn't tell you.  I'm not a tree person.
16 I know trees.  It was recommended they put railroad ties
17 around the perimeter and then they put the dirt inside
18 these railroad ties.
19    Q.  Do you recall when that project took place?
20    A.  No.
21       MR. MIRON:  Brandon, would it be okay to take
22 a break maybe around 12:00?  Is that okay with you,
23 12:00?
24       THE WITNESS:  Yeah, we can take it around
25 12:00, but I do require a little bit -- I do want

Page 103

1 to have at least one hour of a lunch break.
2       MR. MIRON:  Yeah, no, you're okay.
3       THE WITNESS:  I don't eat like you guys peanut
4 butter and jelly and cookies.  We eat like normal
5 people.
6       MR. MIRON:  We're going to let you eat.  I
7 just thought 12:00 was a good time.  A, number one,
8 I wouldn't mind a restroom break, but I could hold
9 it for 11 minutes.
10       THE WITNESS:  It's okay.
11       MR. MIRON:  Is that okay with you, Brandon?
12       MR. ADKINS:  It's okay with me.
13       MR. MIRON:  Okay.
14       MR. ADKINS:  Okay.  Great.
15       THE WITNESS:  And we'll come back at 1:00.
16       MR. MIRON:  Yeah, let's let him finish --
17 he'll go until 12:00.
18 BY MR. ADKINS:
19    Q.  Do you know when, when this project occurred,
20 the movement of material from the ditch area to the tree
21 farm?
22    A.  Didn't you just ask that?  I said no, but
23 maybe there was a miscommunication.
24    Q.  I might be misremembering because of the --
25    A.  It's okay.  No, sir, I don't recall.

Page 104

1    Q.  Okay.  And do you know whether all of the
2 material that had been removed from the ditch and that
3 was piled up along the boundary of the ditch and the
4 site on the western side, was all of that material
5 brought to the tree farm or was any of it brought
6 anywhere else on the site?
7    A.  I could not tell you where else it went, but I
8 know that that area where we call the tree farm is a
9 pretty large area and it was put there.  I couldn't tell
10 you past that where else.
11    Q.  Okay.  Do you know who used equipment to
12 spread that material around the site?
13    A.  No, sir.
14    Q.  Do you know who used equipment to spread that
15 material?
16       MR. MIRON:  He said no.
17       THE WITNESS:  I said no.
18 BY MR. ADKINS:
19    Q.  Oh, you said no, okay, sorry.
20    A.  No, sir.
21    Q.  Okay.  Other than -- let me step back.
22       The material that was removed from the ditch
23 that you described on the western side of the site, that
24 was removed before you purchased the site, correct?
25    A.  Correct, that's been a problem many years

BENJAMIN K. SHARFI
USA vs BENJAMIN K. SHARFI

June 09, 2022
105—108

Page 105

1  before I purchased the site.
2      Q.  So I'll refer to the material that has been
3  removed from the ditch as spoil material.  Will you
4  understand that?
5      A.  Spoil?
6      Q.  Yes.
7      A.  S-P-O-I-L?
8      Q.  Yes, sir.
9      A.  Okay.
10     Q.  Other than spreading spoil material to
11  different locations on the site, are you aware of any
12  other grading that occurred at the site after you
13  purchased it in 2017?
14     MR. MIRON:  Objection.
15     THE WITNESS:  Correction, sir.
16     MR. MIRON:  Objection.  Asked and answered.
17     THE WITNESS:  Yeah, but --
18     MR. MIRON:  Also vague.
19     THE WITNESS:  Yeah, no, you also said spread
20  all over the place.  I said no, I said to the best
21  of my knowledge it was put only on the tree farm
22  area.  They were not spread.  They were moved and
23  replaced.
24     So be very careful with your words.  I'm
25  paying attention to your words, word selection and

Page 106

1  your entrapment.
2  BY MR. ADKINS:
3      Q.  Well, your testimony was you used equipment to
4  spread around different locations?
5      A.  Specifically to the tree location.
6      Q.  Okay.  So other than that, were there any
7  other instances where you graded parts of the site since
8  you purchased it in April 2017?
9      MR. MIRON:  Objection.  It's vague and asked
10  and answered, sorry.
11     THE WITNESS:  Again, to the best of my
12  knowledge, you got what I know what we had done.
13  BY MR. ADKINS:
14     Q.  Okay.  Were any paths ever created within the
15  interior of the site?
16     A.  Pads?
17     Q.  P-A-T-H-S?
18     MR. MIRON:  Paths, paths, P-A-T-H-S.
19     THE WITNESS:  Paths, oh, path.
20     MR. MIRON:  I thought he said calves.
21     THE WITNESS:  I thought he said pads, as in
22  like concrete pads.
23     Yes, there is one path that is created for
24  case of emergency to -- for hurricane purposes
25  around the riding arena, and that goes to the west

Page 107

1  of the riding arena.  And also a path was created
2  for the compost piles and the compost preservation
3  site, which is by the pole barn and its purpose is
4  to be able to bring the small tractors to mix and
5  make compost and remove compost and bag the
6  compost; that we bag them and we let them sit in
7  bags for period of six months to a year before
8  fermented for use.
9      So those are the only other paths that I know
10  on the site.
11  BY MR. ADKINS:
12     Q.  And in between when you purchased the site in
13  2017 and today, have any other paths existed on the
14  site?
15     A.  Huh?
16     Q.  So your answer seemed to suggest that today
17  you've described the paths that exist --
18     A.  Correct.
19     Q.  -- around the compost area, around the horse
20  arena and then the road that runs along the western,
21  northern and eastern boundaries of the site?
22     A.  Correct.
23     Q.  At any time in between when you purchased the
24  site and today, had any other paths existed within the
25  middle of the site?

Page 108

1      A.  Yes, as I mentioned from -- there were
2  multiple -- "multiple" meaning at least five to ten --
3  paths that they were on the site that were put for the
4  cattle and the cattle feeding and previous people that
5  were on the site and the cattle used.  Cattle like to
6  use the same path over and over.
7      Q.  So I'm going to show you a document here.
8      MR. ADKINS:  This is a document that we will
9  mark DX224.
10     MR. MIRON:  What's the number, Brandon?
11     MR. ADKINS:  224.
12     (Deposition Exhibit No. 234 was identified for
13  the record.)
14  BY MR. ADKINS:
15     Q.  And it has a label, "The Site 220."
16     A.  Yes.
17     Q.  Mr. Sharfi, I'll represent to you that this
18  document reflects aerial imagery from 2020.
19     MR. MIRON:  Brandon, so my trustee colleagues
20  indicated to me they think that you're on 234, not
21  224.  Just check and make sure.
22     MR. ADKINS:  We are at 234.  I'm so glad we
23  said that.  That would have been a mess.  I trust
24  your colleagues.  So we'll mark this as 234.  Thank
25  you.

BENJAMIN K. SHARFI
USA vs BENJAMIN K. SHARFI

June 09, 2022
109–112

Page 109

1  BY MR. ADKINS:
2      Q.  Okay.  So I'm going to represent to you,
3  Mr. Sharfi, that this is an aerial image from 220,
4  aerial imagery of the site.
5          Now, do you see the -- what looks to be like
6  paths running through the interior of the site --
7      A.  Correct.
8      Q.  -- in this image?
9          Okay.  Now, some of those paths don't exist
10  today, correct?
11      A.  I think they are still there and are being
12  driven, but they are covered with -- they've got growth
13  and vegetations and weeds that is over there.  I believe
14  those are still our primary path we use to get around,
15  but they're covered in -- we left natural grass and
16  material surrounding to grow on there.  Those are still
17  there and they were there when we actually bought the
18  site.
19          If you look at aerials before that, those are
20  some of the cow paths, especially the one going all the
21  way up north and coming down.  Those paths are -- were
22  in existence.
23      Q.  Okay.  Let me show you an older aerial, then.
24          MR. ADKINS:  We'll mark this as DX235.
25

Page 110

1          (Deposition Exhibit No. 235 was identified for
2  the record.)
3  BY MR. ADKINS:
4      Q.  And this is the same view but this is based
5  on, I'll represent to you, imagery from 2018, so about a
6  year after you purchased the site.
7          Do you see any of the paths that you saw in
8  the 2020 imagery --
9      A.  Yes, I do.
10      Q.  -- and Exhibit 235?
11      A.  Yes, I do.
12      Q.  Okay.  Can you describe them for me?
13      A.  Yes.  Certainly the upper perimeter road, the
14  north road, the west road, and that's where, again, it
15  shows where I told you about the survey was wrong; that
16  the surveyors was -- we had to move the fence on to the
17  east side, northeast side.  And if you look at very
18  closely at the -- you can see the natural path and it
19  grows where the tree lines -- I wish I could be able to
20  point it, but you can see that there are actually --
21  once you remove the -- you can see there's a clear path
22  exactly over -- if you overlay the other one, you'll see
23  exactly what I'm talking about, that it goes under.
24      Q.  Okay.  So I'll go to DX234.
25      A.  Yeah, overlay them, if you can.  There you

Page 111

1  can.  Now you can see that the tree lines, they stop and
2  go.  The one going from the north to perimeter of the
3  wetland, that clearly existed there on both sides and
4  the perimeter on the east side clearly existed and the
5  perimeter on the west side clearly exist.
6      Q.  Okay.  So other than the perimeter roads, is
7  it also your testimony that the paths you see in the
8  2020 imagery also existed on the site in the 2018
9  imagery?
10      A.  I'm saying that the one going from the north
11  into the wetland, that existed, and then the road
12  that -- around the cypress lake, in that area at the
13  watering hole, is -- we made that to be able to access
14  that, but once the work was done it grew back up to its
15  natural state.
16      Q.  Was -- did anyone at NeshaFarm or BSI do any
17  work to maintain or improve the paths within the
18  interior of the site that you see in DX234?
19      A.  No.  My desires and wish were not to have path
20  in the interior.  That would distract the beautiful,
21  natural space.  So once the work that I had done, it was
22  instructed to let the natural vegetation grow through
23  all those sites and have all the exits to the site to be
24  done through the perimeter road.
25      Q.  And --

Page 112

1      A.  And not -- not allow anybody driving trucks or
2  any equipment through it, just to preserve the natural
3  land.
4      Q.  Okay.  So the rectangular area in the
5  southwest corner of DX234?
6      A.  Southwest corner?  Okay.  I don't see a
7  rectangular structure.
8      Q.  Okay, no structure, but there is a path that
9  includes the western boundary road, the southern
10  boundary road and then two paths within the interior of
11  the site that form a 90-degree angle, making a
12  rectangle.  Do you see that?
13      A.  Yes, I do.
14      Q.  Okay.  Did the paths on the northern and the
15  eastern portion of that rectangle exist when you
16  purchased the site?
17      A.  No, sir.
18      Q.  So those were constructed or created at some
19  time after you purchased, correct?
20      A.  They were not constructed.  A lot of paths,
21  they created a path by people simply driving on them and
22  the more you drive, the more impacted and the more it
23  does.  I saw that and I did not like the idea that we
24  are creating all this path for lazy people that didn't
25  want to drive around the perimeter, and I did not like

BENJAMIN K. SHARFI                                          June 09, 2022
USA vs BENJAMIN K. SHARFI                                   113–116

Page 113

1 having this place Swiss-cheesed up with these paths that
2 these cars or golf carts that they do drive all over.
3 So I instructed that all those to be eliminated and no
4 one drive anywhere on the site and to let the natural
5 path to get covered back up and use the perimeter road
6 only to access whatever they need to access.
7     Q.   And do you know whether or not any road-based
8 gravel or dirt was set down to create the path on the
9 north and the eastern portion of that rectangular area
10 that we've identified in this exhibit?
11     A.   I cannot say, but based on the coloring, I
12 would say no, but I cannot say either way yes or no.
13     Q.   What is it about the coloring that makes you
14 say that?
15     A.   The coloring of the roads, you can tell that
16 they're more brown than pure white road base.
17     Q.   Does the area I'm referring to, the rectangle,
18 look lighter than --
19     A.   Parts of it is that I can see that, but again,
20 I couldn't tell you the composition of that dirt, but
21 you clearly can tell the other roads are different
22 color, significantly different color.  And all those
23 have been filled back up with the natural vegetation.
24     Q.   Do you see Cypress Lake in DX234?
25     A.   Yes, I do.

Page 114

1     Q.   Okay.  And do you see the circular path to the
2 north of cypress -- I called this Cypress Lake.  I'll
3 call it Cypress Pond.
4     A.   No, that's a good name.  That's what we call
5 it.
6     Q.   Oh, I thought it was a watering hole.
7     A.   It is -- lake sounds sexier on maps.
8     Q.   Okay.  So north of Cypress Lake, do you see
9 the circular path?
10     A.   I see the path around there, yes, sir.
11     Q.   Did that circular path exist when you
12 purchased the site in April 2017?
13     A.   I couldn't say that, whether it did or did
14 not.  But as I mentioned, you can see that there's a
15 clear line of vegetation that surrounds on the north
16 side of it and the south side of it.  So that path
17 was -- is a natural path that people use to get around.
18     Q.   And do you know what is within the circle, the
19 circular path?
20         MR. MIRON:  Objection.  Vague.
21         THE WITNESS:  No, sir.
22 BY MR. ADKINS:
23     Q.   Okay.  And then do you also see the other
24 watering hole in the southwest corner of DX234?
25     A.   Yes, sir.

Page 115

1     Q.   Okay.  And that feature is smaller than it is
2 today, correct?
3     A.   The feature on the site today is larger than
4 the one you're showing in this picture; correct.
5     Q.   And it's larger today because part of that
6 water feature was further excavated; is that correct?
7     A.   It was enlarged because multiple animals we
8 were keeping there, the water was -- because of its
9 volume of water that it contained during summer months,
10 when we have a significant amount of evaporation and the
11 organic materials that collects in there from their poop
12 and other site, it contaminates the water and becomes
13 very poisonous.  And there is some sort of a disease
14 that I forget the name of it, that the water carries.
15 And our environmentalist people highly recommended to
16 enlarge it to at least twice the size in order to
17 prevent this heavy concentration of these chemicals,
18 which, again, I don't know the name of it, that is a
19 bacteria.
20         And in fact, the year that we did that, we had
21 to post signs all around the watering holes and to make
22 sure people that have any kind of cuts or any kind of
23 skin irritations that do not enter the water and we kept
24 the animals out.  It was a very dangerous situation.
25         And after that we decided that listen to the

Page 116

1 professionals and enlarged that to be able to prevent
2 that.  And so far that has been adequate.
3     Q.   And that's called Peanut Lake; is that
4 correct?
5     A.   Correct.  It's, again, a watering hole.  Just
6 for the record, it's not a lake.  You know, it's --
7     Q.   Understood.
8     A.   -- a watering hole.
9     Q.   So how was Peanut Lake enlarged?
10     A.   We hired a subcontractor to do that with the
11 tools that they had.  I was not on the site.  In fact,
12 again, I remember when I came back, it was done very
13 nicely and I was very happy with the results.
14     Q.   Do you recall when that happened?
15     A.   No, I really don't.  I would say clearly after
16 2020.
17     Q.   Okay.  And do you recall what happened with
18 the material that was removed to enlarge Peanut Lake?
19     A.   I couldn't tell you with any specific what was
20 done with that, whether it was hauled away or reused,
21 any of the sites.  I could not tell you that.
22         MR. ADKINS:  Okay.  Why don't we go off the
23 record.
24         MR. MIRON:  Okay.
25         THE VIDEOGRAPHER:  We are going off the

BENJAMIN K. SHARFI
USA vs BENJAMIN K. SHARFI

June 09, 2022
117–120

Page 117

1  record. The time is 12:08.
2      (A break was had.)
3      THE VIDEOGRAPHER: We are back on the record.
4   The time is 1:09.
5  BY MR. ADKINS:
6   Q. Okay. Mr. Sharfi, we are back from lunch.
7  Did you have a nice lunch?
8   A. Yes, sir. Thank you.
9   Q. Good. Since you purchased the site in
10  April 2017, has work been performed to clear the ditch
11  that runs along the western boundary of the site?
12      MR. MIRON: Objection; form. Vague.
13      THE WITNESS: To clear? Would you please
14   specify what you mean by "clear," sir?
15  BY MR. ADKINS:
16   Q. So remove vegetation, to remove debris, to
17  remove soil, anything of that nature.
18   A. We had a very wet season in, I don't know the
19  year, '19 or '20. I don't recall the year. And the
20  ditch, we noticed that it is not flowing at all. We
21  looked at the ditch and we send people to look at it and
22  the report was that it's very clogged with overgrowth
23  and debris from adjacent farmer and to the west of the
24  site and also to the north. We attempted to contact
25  them multiple occasions to do so and we were not able to

Page 118

1  have a one-to-one dialogue. And Mr. Kryzda was tasked
2  with a -- tasked to obtain what permits is needed and
3  coordinate the removal of these dropped trees and
4  dropped leaves that were massive and they were clogging
5  it.
6      So we went through the county, best of my
7  recollection, and we obtained the approvals to clear the
8  ditch, as you called it, that runs to the west of the
9  property and further north.
10      We contacted the people to the north and --
11  about this issue and they were also suggested that we
12  are welcome to help to clean whatever we needed to do so
13  and to proceed.
14      So in a long answer, that's the sequence of
15  events, sir.
16   Q. So was the ditch ever cleaned or cleared?
17   A. Yes.
18   Q. When?
19      MR. MIRON: Objection. Asked and answered.
20      THE WITNESS: As I said --
21  BY MR. ADKINS:
22   Q. Do you know when, Mr. Sharfi?
23      MR. MIRON: Objection.
24      THE WITNESS: As I said, I do not remember.
25      MR. MIRON: Give me a second.

Page 119

1      THE WITNESS: I'm sorry.
2      MR. MIRON: I know it's natural for you to
3   immediately respond.
4  BY MR. ADKINS:
5   Q. So when you said what I call a ditch, what
6  would you call that conveyance on the western boundary
7  of the site?
8   A. Ditch.
9   Q. Okay. And when you said you sent people to
10  look at the ditch, do you mean you sent people to the
11  property to the north of the site?
12   A. Yes. Obtained approval from Mr. David
13  Goodfellow or Goodfriend. I forget his last name,
14  Goodfellow or Goodfriend. Goodfriend, as I recall, and
15  I personally spoke with him multiple times in the
16  previous years and his attorneys and we discussed that
17  and he give us the permission to do so.
18   Q. Do you recall when that was?
19   A. I'm sorry?
20   Q. Do you recall when that was?
21      MR. MIRON: Do you recall when that was?
22      THE WITNESS: No, sir. Throughout the years
23   since 2015 I've been in touch with Mr. Goodfellow
24   many times.
25

Page 120

1  BY MR. ADKINS:
2   Q. And who were the people that you sent to look
3  at the ditch?
4   A. I was not. I just let Chuck know to go ahead
5  and find out what the issues are and resolve it.
6   Q. Can you describe what was done to clear the
7  ditch?
8   A. Because its very awkward placement, they
9  brought in -- I remember on the site they brought in one
10  of those, I don't know what the proper name is. It has
11  a long reach to be able to go over the fence to remove
12  the debris. I think they call it backhoe, or I'm not
13  sure of the proper equipment name.
14   Q. Do you know who brought a backhoe on to the
15  site?
16   A. No. It was not ours. We don't have such
17  equipment.
18   Q. It was a contractor?
19   A. Yes, sir.
20   Q. Do you know the name of the contractor?
21   A. No, sir.
22   Q. Who hired the contractor?
23   A. Very likely, Mr. Chuck.
24   Q. Okay. All right. Do you know what was done
25  with the material that was removed from the ditch using

BENJAMIN K. SHARFI
USA vs BENJAMIN K. SHARFI

June 09, 2022
121–124

Page 121

1 a backhoe?
2     A.  Yes.  It was, we paid to be hauled away
3 because it was very contaminated materials.  It was
4 hauled away.
5     Q.  What do you mean by "contaminated"?
6     A.  Contaminated with debris, cans, metal trash,
7 plastic bottles, just trash.
8     Q.  Do you know anything else about the
9 consistency of what was removed from the ditch?
10     A.  No, sir.
11     Q.  Was any of the material that was removed from
12 the ditch left on site?
13     A.  Not to the best of my knowledge.
14     Q.  Was the backhoe used to do any other work on
15 the site?
16     A.  Not that I'm aware of.
17     Q.  Other than this instance where a backhoe was
18 used by a contractor to remove material from the ditch,
19 are there any other instances that you recall where the
20 ditch along the western boundary of the site was cleaned
21 or cleared?
22     A.  We maintain it, but -- without any need for
23 such equipment.  So if we see the adjacent farmer, that
24 he has a lot of bamboo that get fallen into the debris
25 that blocks it, we manually go and remove the fallen

Page 122

1 bamboos or branches or any other debris that goes.  So
2 we try to maintain it free for water flow to the best of
3 our ability without use of heavy equipment.
4     Q.  And you said that you noticed the ditch was
5 not flowing during a wet season?
6     A.  Correct.
7     Q.  How did you make that determination?
8     A.  Water not flowing.  I'm not sure how else
9 would I describe it.  Water is not flowing.
10     Q.  Okay.  And that's something that you observed
11 personally?
12     A.  Yes.
13     Q.  Okay.
14     A.  It was brought to my attention and I met with
15 Chuck and he explained the situation, and that's when I
16 authorized him to do what he needs to do to make the
17 water flow and he coordinated with the neighbors to the
18 west and to the north.
19     Q.  Have you ever observed the ditch along the
20 western boundary of the site without water in it?
21     A.  Most time of the year it has no water in it.
22     Q.  Most time of the year?
23     A.  Most time of the year, yes.
24     Q.  So about how many months out of the year would
25 you say there isn't water in the ditch?

Page 123

1     A.  The ditch represents the water table.
2 Whatever the water table is, the ditch is at that
3 elevation.  So the ditch itself, it essentially
4 represents the water table.
5        So if the water table is high, the ditch will
6 be full.  If the water table -- and I remind you that in
7 Martin County the water table most year is 3 to 5 feet
8 below grade.  So we have a very high water table.  So
9 during the dryer parts of the year, the ditch has no
10 water in it.
11     Q.  Okay.  My question was:  How many months of
12 the year does the ditch not have water in it?
13     A.  Depends on the year, sir.  There are times
14 like several years ago even during dry season, we had
15 tremendous amount of rain, and there are seasons like
16 this last year we had hardly any rain.  So it really
17 varies.  But I would say roughly at least four to six
18 months out of the year it's dry.
19     Q.  And what do you mean when you say "it's dry"?
20     A.  The water --
21        MR. MIRON:  Objection.  Objection.  Vague.
22        MR. ADKINS:  What's the objection?
23        MR. MIRON:  Vague.
24        MR. ADKINS:  I'm asking him what he meant by
25     dry.  How is that vague?

Page 124

1        MR. MIRON:  Is there some other defined, some
2     other definition of dry other than not wet?
3 BY MR. ADKINS:
4     Q.  Mr. Sharfi, what did you mean by four to six
5 months of the year the ditch is dry?
6     A.  This is wet.
7     Q.  Okay.
8     A.  This is dry.
9     Q.  Okay.  So four to six months of the year did
10 you observe any standing water in the ditch?
11        MR. MIRON:  Objection; form.  I'm sorry,
12     vague.
13        THE WITNESS:  Most winter month the ditch,
14     unless we have unpredictable storms, it's dry and
15     if it does get wet, it represents the water table.
16     So whatever the water table would be, which in most
17     cases, as I mentioned multiple times, around 4 to
18     5 feet below grade.  So any time that the water
19     table is below 4 to 5 feet, it's dry.
20 BY MR. ADKINS:
21     Q.  Are you a hydrologist, Mr. Sharfi?
22     A.  I'm an engineer, sir.
23     Q.  Okay.  And what kind of engineer are you?
24     A.  I have multiple engineering talents,
25 electrical, mechanical, structural, and as well as

BENJAMIN K. SHARFI

June 09, 2022

USA vs BENJAMIN K. SHARFI

125-128

Page 125

1  metallurgy.

2     Q.  Okay.  And what is the basis for your belief

3  that water in the ditch represents a water table?

4     A.  Extensive amount of personal self-education,

5  speaking to neighbors, people and digging a hole for a

6  tree and finding water just about anywhere that I dig to

7  plant a tree up to 3 feet to 5 feet of it, I'll find

8  water and the water seems to be exact and we measured it

9  multiple times.  Same as the watering hole and same as

10  in Site 1 and Site 2 water holes.

11        So the water table for all the water

12  structures are the same, including whenever you dig a

13  hole for a tree, you'll find that same water table.  But

14  does not require a degree in anything else except common

15  sense and knowledge.

16     Q.  Okay.  Are there any drainage connections

17  between the two ponds on the site?

18     MR. MIRON:  Objection.  Vague.

19     THE WITNESS:  Please explain that between the

20  two sites and what do you mean, "drainage"?

21  BY MR. ADKINS:

22     Q.  Well, maybe I'll start more generally.  Are

23  there any underground pipes anywhere on the site?

24     A.  Yes.

25     Q.  Where?

Page 126

1     A.  There is a pipe at two wells that were dug in

2  the site.  One on the west side on the middle of the

3  property and another well is dug in the northeast

4  section of the property, and waters are piped into hoses

5  for watering the animals and giving water to the

6  livestock and including the horse arena, including the

7  stalls and the pens in the horse arena and on the west

8  side of the property where the goats and the sheep

9  graze.

10        And in the later years with assistance from

11  Mr. Kryzda and other professionals that we hired, we

12  established the storm water level and we put in there

13  storm pipe drainage so when the water table at the

14  watering holes get above certain elevation, what they

15  consider to be storm level, they get used to go into the

16  ditch.

17     Q.  Any other underground pipes on the site?

18     A.  There could be electrical pipes, water pipes.

19  And those are the only ones that I can recall that

20  are -- as of this time.

21     Q.  Do you remember pointing out an irrigation

22  pipe to me on the site when I was there with you in

23  2021?

24     A.  I'm sorry?

25     Q.  Do you remember pointing out an irrigation

Page 127

1  pipe to me when I was there with you in 2021?

2     A.  No.  We do not -- that site, what we call

3  Site 1, is not -- that does not have irrigation piping

4  systems in it.  Oh.  I'm sorry.  We do have one

5  additional pipe that it goes from the well into the

6  watering hole for situations where the watering hole

7  gets extremely low and we put water into it for the

8  animals to graze.

9     Q.  You're starting to say --

10     MR. MIRON:  I'm sorry, Brandon.  You were cut

11  out.

12  BY MR. ADKINS:

13     Q.  You were starting to say Site 1, it sounded

14  like in one of your answers.  I'm --

15     A.  At the site.

16     Q.  Okay.

17     A.  At the site we do not have irrigation systems

18  or pumps or everything is done manually aboveground with

19  hoses.

20     Q.  And so there's no underground pipes in the

21  northern area of the pipe towards the middle?

22     A.  I mentioned to you the pipes that we have

23  there, sir.

24     Q.  Okay.  Are there any pipes that lead into the

25  ditch or swale that runs along the northern boundary of

Page 128

1  the site?

2     A.  There is a pipe that runs from the gutters

3  that rains into a box and that box, it goes to the north

4  side of the property into the ditch.

5     Q.  Are there any mechanisms used to collect

6  surface water in the enclosed area on the northern

7  quadrant of the site?

8     MR. MIRON:  Objection.  Vague.

9     THE WITNESS:  I am trying to repeat the

10  question myself, see if I understand it.  If

11  there's any mechanism to collect surface water on

12  the site?  No, sir.

13  BY MR. ADKINS:

14     Q.  Okay.  Are there any drain boxes in the

15  northwest quadrant of the site?

16     A.  There is a concrete box for drainage that was

17  put in the road, but it's not going anywhere.  It's not

18  connected anywhere.  It was one of those not fully

19  thought-out project by Mr. Berlusconi; that it was put

20  in there for the roof drainage.  But unfortunately,

21  water does not drain uphill.  And for wherever he put

22  that box and where the ditch is, the ditch is higher

23  elevation.  So there is no water flow.

24     Q.  Okay.  So you mentioned that there are pipes

25  that connect the watering holes to the ditch.  Did I

BENJAMIN K. SHARFI
USA vs BENJAMIN K. SHARFI

June 09, 2022
129–132

Page 129

1 understand that correctly?
2      MR. MIRON:  Objection.  I think that misstates
3   the testimony.
4      THE WITNESS:  There are what they call control
5   elevation level of pipe that was installed by
6   people that they do this for living in order to
7   prevent -- to maintain the flood level.
8 BY MR. ADKINS:
9    Q.  Who installed the control elevation pipe?
10   A.  I'm not sure, sir.
11   Q.  Who directed the installation of the control
12  elevation pipe?
13   A.  Mr. Berlusconi.
14   Q.  Okay.  When was it installed?
15   A.  I think the last year or so.
16   Q.  Okay.  Is there a control elevation pipe in
17  each of the ponds on the site?
18   A.  Yes, sir.
19   Q.  Okay.  Can you --
20   A.  At the site or you're talking about
21  Property 112 and 3?
22   Q.  The site.  The site that we've defined.
23   A.  Yes, the site as well as the others.
24   Q.  Okay.  Well, I just want to ask about the
25  site.

Page 130

1    A.  Yes, sir.
2    Q.  So can you explain to me -- maybe we can do
3   the Peanut Lake first.
4    A.  Mm-hmm.
5    Q.  Can you explain where the control elevation
6   pipe is installed in Peanut Lake?
7    A.  I believe you were there and I saw you
8   personally taking pictures of it.  So you know exactly
9   where they are.  I saw you taking pictures of it.  You
10  have pictures of it.
11   Q.  I don't believe --
12   A.  I was standing right in front of you and you
13  were taking pictures and your crew was taking pictures.
14      (Reporter interruption.)
15 BY MR. ADKINS:
16   Q.  Can you explain to me where in Peanut Lake the
17  control elevation pipe is installed?
18   A.  It's closest to the west portion of Peanut
19  Lake.
20   Q.  Can you describe for me where the control
21  elevation pipe leads to?
22   A.  The control elevation pipe leads into the
23  ditch.
24   Q.  How does the control elevation pipe work?
25      MR. MIRON:  Objection.  Vague.

Page 131

1      THE WITNESS:  I'm not sure that I'm qualified
2   to answer that.
3 BY MR. ADKINS:
4    Q.  Do you know how it works?
5      MR. MIRON:  Objection.
6      THE WITNESS:  No, sir.
7      MR. MIRON:  Asked and answered.
8 BY MR. ADKINS:
9    Q.  So you just went at length to describe that
10  there's a control elevation pipe that's used to control
11  storm water elevation, but you can't tell me how it
12  works?
13      MR. MIRON:  Objection.  Argumentative and
14   asked and answered.
15      THE WITNESS:  That's not my profession.  We
16   hired the professionals that they do this all
17   throughout Martin County and they come with the
18   right equipment and they establish what that
19   elevation level is.  And the theory behind it, I
20   guess when the water gets too high, it goes through
21   the pipe.  Otherwise it doesn't.
22 BY MR. ADKINS:
23   Q.  Okay.  And is there anything that someone
24  mechanically has to do to ensure that water goes through
25  the pipe?

Page 132

1    A.  No, sir.
2    Q.  Is there a control elevation pipe installed in
3   Cypress Lake?
4    A.  Yes, sir.
5    Q.  Where is that pipe located?
6    A.  Again, closest to most western portion of the
7   Cypress Lake.
8    Q.  Where does the control elevation pipe that's
9   installed in Cypress Lake lead to?
10   A.  Also to the ditch.
11   Q.  And do you know how the control elevation pipe
12  in Cypress Lake works?
13   A.  No, sir.
14   Q.  Is there any kind of piping in the southern
15  area of the depressional wetland feature that exists on
16  the site?
17      MR. MIRON:  Objection.  Vague.
18      THE WITNESS:  If you would be kind enough to
19   show me on a map where you mean, I can try to
20   answer that to you, sir.
21 BY MR. ADKINS:
22   Q.  Okay.  I'm happy to do that.
23      (Deposition Exhibit No. 236 was identified for
24  the record.)
25

BENJAMIN K. SHARFI
USA vs BENJAMIN K. SHARFI

June 09, 2022
133–136

Page 133

1  BY MR. ADKINS:
2      Q.  So we will mark this DX236 and it is a map of
3  the site that we've been describing with a red and black
4  line around the boundaries of the site, roughly.
5      A.  Yes, sir.
6      Q.  Do you see the map that we will mark as DX236
7  on your screen?
8      A.  Yes, I do.
9      Q.  Okay.  Great.  So I'm going to zoom in for
10  you, Mr. Sharfi, on the wetland feature on the site that
11  is surrounded by a fence.
12          Do you see that?
13      A.  Yes, sir.
14      Q.  Okay.  Are there any pipes leading into or out
15  of that wetland feature?
16      A.  No.
17      Q.  Okay.
18      A.  Not that I'm aware of that -- not that I'm
19  aware of, no.
20      Q.  Okay.  So I want to just circle something here
21  for you temporarily so you can see it on my screen.
22      A.  Mm-hmm.
23      Q.  On your screen, I should say.
24          Are you aware whether there's any kind of
25  piping anywhere on the wetland?

Page 134

1      A.  No, sir.
2      Q.  Okay.  And that's in the southern area of the
3  wetland feature on the site that we're looking at?
4      A.  Correct.
5      Q.  Okay.  Do you see on the northern part of the
6  wetland feature an area that seems to be connected to
7  Cypress Lake?
8      A.  Yes, sir.
9      Q.  What is that?
10          MR. MIRON:  Objection.  Vague.
11          THE WITNESS:  Connection between Point A to
12      Point B?  I'm not sure what you're asking.
13          MR. MIRON:  Objection.  Vague.
14  BY MR. ADKINS:
15      Q.  Is it a ditch, any kind of feature that's
16  being used to convey water?
17      A.  No, sir.  Those are the natural slopes and
18  elevations that are maintained.
19      Q.  Was there an intention to have water flow
20  from Cypress Lake into the wetland feature?
21      A.  Not that I recall, no.
22      Q.  Do you know whether it does?
23      A.  No.
24      Q.  How frequently does water flow from Peanut
25  Lake into the ditch on the western boundary of the site

Page 135

1  through the control elevation pipe?
2      A.  I have not seen it go there, that I recall at
3  all.  It happens probably when it's a very high rains
4  and I'm not on site looking at it.
5      Q.  How frequently does water flow from the
6  control elevation pipe in Cypress Lake to the ditch on
7  the western boundary of the site?
8      A.  Same answer, sir.  I have not personally
9  observed it.
10      Q.  Since you purchased the site in April 2017,
11  the site's been sodded, correct?
12          MR. MIRON:  Objection.  Vague.
13          THE WITNESS:  No, sir.
14  BY MR. ADKINS:
15      Q.  It has not been sodded?
16      A.  There have been sod put in different
17  locations, but the site has not been sodded.
18      Q.  Okay.  What locations on the site have been
19  sodded since you purchased it in April 2017?
20      A.  The primary areas that were sodded is on the
21  banks and slopes of the watering holes to prevent
22  erosion of the dirt going back into the watering hole,
23  and that would be the majority of the sod that was used
24  in any other area that we had erosion issues.
25      Q.  Okay.  Why don't we look back at what's been

Page 136

1  marked as DX236.  Do you see that on your screen?
2      A.  Yes, sir.
3      Q.  Okay.  So I'm looking at the southwest
4  quadrant of the site where the two ponds are located.
5          Do you see that?
6      A.  Yes, I do.
7      Q.  Was the part that has been sodded at the site
8  within the southwest quadrant of the site?
9      A.  Was that a question?
10      Q.  Yeah.  Is that where you're describing these
11  ponds on the southwest quadrant of the site the areas
12  around those ponds were sodded?  Is that your testimony?
13      A.  Correct.
14      Q.  Okay.  And is it your testimony that only the
15  banks of those ponds were sodded?
16      A.  My testimony is banks and any other area that
17  we had fast erosion that the natural grass did not have
18  a chance to grow.
19      Q.  Okay.  Other than the two ponds, is there any
20  part of the southwest quadrant that is not sodded?
21      A.  Any other part of the southwest that was not
22  or was sodded?
23      Q.  Was not.
24      A.  As I mentioned, most of it is natural growth
25  there and I couldn't tell you exactly how much of it,

BENJAMIN K. SHARFI                                    June 09, 2022
USA vs BENJAMIN K. SHARFI                                    137–140

Page 137

1  but the material that is growing is not exactly sod.
2  It's basically weed that has been mowed, gets mowed
3  often.
4      Q.  Do you know what bahiagrass is?
5      A.  No, sir.
6      Q.  Okay.  So you're not aware of whether it's
7  bahiagrass that's growing on the site?
8      A.  No.  I'm not a grass expert.
9      Q.  So when you say "natural growth," is it your
10  testimony that the plant life that's growing is
11  carryover from before you purchased the site?
12      A.  No, sir.  What I'm saying is take any areas
13  that we have, if you keep it short and mow it, then
14  these ground-based grass, weed, whatever grows naturally
15  and we do every once in a while seed the area as well to
16  help the growth.
17      Q.  Okay.  What about in the southeast quadrant of
18  the site, you didn't sod within that wetland feature,
19  right?
20      A.  No, sir.  It was a fence and it was clear
21  marching orders to stay out of it.  In fact, that's a
22  great point you're bringing out.
23      Q.  Why don't you wait for a question, Mr. Sharfi.
24  I haven't asked you a question yet.
25      A.  Well, I'm just trying to tell you that the

Page 138

1  point I'm making is the color in the grass inside the
2  fenced area is exactly the same as outside.
3      Q.  Okay.  So are there any other parts of the
4  southeast quadrant of the site that were sodded?
5      A.  No, sir.
6      Q.  Okay.  And then I'm going to scroll up to the
7  northeast quadrant of the site.
8          Do you see that?
9      A.  Yes, I do.
10      Q.  Were any parts of the northeast quadrant of
11  the site sodded?
12      A.  Well, it was sodded or seeded for the special
13  kind of grass so the horses and animals can graze on it.
14      Q.  Where would that be?
15      A.  In the stall area where the horses, in that
16  area where they hang out.
17      Q.  Oh, is that in the northwest quadrant of the
18  site?
19      A.  Yes, sir.
20      Q.  Okay.  Got it.  And do you know whether it was
21  seeded or was it sodded?
22      A.  I couldn't tell you that.
23      Q.  Okay.
24      A.  We tried to use mostly seeds for obvious
25  reasons.  It's a lot more economical and they grow

Page 139

1  naturally much quicker.
2      Q.  In the northeast quadrant of the site, was any
3  portion of the northeast quadrant sodded?
4      A.  There was a small portion of it right in front
5  of the arena that we sodded, but unfortunately, because
6  of lack of irrigation, it all died.  So it only grows
7  natural vegetation.  And as I mentioned, there is no
8  irrigation system anywhere.  So during certain time of
9  the year, it all looks brown and dead and certain parts
10  of the year, they look nice and pretty and clean.
11      Q.  Are you familiar with a company called Eddie
12  Huggins Land Grading Company?
13      A.  Yes, I am.
14      Q.  Did the Eddie Huggins Land Grading Company do
15  any work at the site that we defined at your deposition
16  today?
17      A.  Eddie Huggins has done a lot of work for me
18  throughout the years at all the different sites, so I
19  can't tell you whether it's done there or what.  But if
20  there was grading in areas where we needed heavy
21  machinery, he would be the first person we would call.
22      Q.  Was any grading needed on the site,
23  Mr. Sharfi?
24      A.  No, sir.  Oh, one more person that in my
25  previous conversation you asked.  There was also another

Page 140

1  gentleman that used to work there and he had a blue
2  tractor that did some of the grading work, and his name
3  was Curtis.  And I don't know Curtis, and unfortunately,
4  the gentleman passed away.  Very good man.
5      Q.  Is Curtis Bell the person you're thinking of?
6      A.  I don't know his last name.
7      Q.  Okay.  We'll call him Curtis then.
8      A.  Curtis.
9      Q.  Did Curtis do any work on the site that we
10  defined?
11      A.  I don't recall him specifically on the site,
12  but he would be one of the guys that we hired his
13  services frequently to do any of the tractor work.
14      Q.  Are you aware of any other companies that did
15  tractor work at the site?
16      A.  The only companies that I would know would be
17  when the arena was built, it was a gentleman named John
18  White.  I don't recall the name of his company.  And
19  other people would be Tom, irrigation and pump guy that
20  he worked there quite a bit, and the Eddie Huggins
21  Company.  Those are the ones that come to mind, sir.
22      Q.  So I'm going to show you a document that we'll
23  mark 237.
24          (Deposition Exhibit No. 237 was identified for
25  the record.)

BENJAMIN K. SHARFI
USA vs BENJAMIN K. SHARFI

June 09, 2022
141–144

Page 141

1 BY MR. ADKINS:
2    Q.  And this is "Defendant Benjamin K. Sharfi's
3 Amended Answers and Objections to Plaintiff United
4 States of America's Interrogatories."
5      Do you see that document, Mr. Sharfi?
6    A.  Yes, sir.
7    Q.  I'm going to scroll to the end of this
8 document here and there's a verification page.
9      Do you see that?
10   A.  Yes, sir.
11   Q.  Is that your signature?
12   A.  Yes, sir.
13   Q.  And you signed this before a Notary public,
14 correct?
15   A.  Yes, sir.
16   Q.  Is your Notary public your assistant?
17   A.  She is my executive assistant.
18   Q.  Okay.  I thought the name looked familiar.
19      So I'm going to take you to your response to
20 the United States first interrogatory and the
21 interrogatory says, "Describe with maximum available
22 precision, including dates, all activities involving the
23 use of mechanized equipment that took place at the site
24 between January 1, 2017 and the present, excluding
25 activities that did not result in the discernable

Page 142

1 movement of earthen material, for example, merely
2 driving a vehicle or mowing."
3      Do you see that?
4   A.  Yes.
5   Q.  In response you wrote, "Defendant is of the
6 information and belief that mechanized equipment, likely
7 consisting of certain mechanical equipment such as a
8 bulldozer, was used by the Eddie Huggins Land Grading
9 Company, LLC, on the southwest corner of the site in or
10 around March and April 2018."
11      Do you see that?
12   A.  Yes, I do.
13   Q.  Okay.  Do you stand by this statement?
14   A.  This information was collected through a set
15 of questions between myself and the attorneys.  I
16 provided them whatever information I've had and they
17 wrote it to best knowledge what I provided them.  So
18 that's the best knowledge we collectively came up with.
19   Q.  Well, just a minute ago I thought I heard you
20 testify that the Eddie Huggins Land Grading Company
21 didn't do work on the site?
22   A.  I'm sorry?  One more time.
23      MR. MIRON:  Objection.  Mischaracterizes his
24 testimony.
25      THE WITNESS:  I said very clearly that

Page 143

1 Mr. Huggins has done a lot of work for me on all my
2 job sites and he would be the first person who
3 would refer to any land work and grading work or
4 equipment that is necessary.  He is the largest
5 individual in this area, and we use his services
6 and his expertise to do the work.
7 BY MR. ADKINS:
8    Q.  Why was the Eddie Huggins Land Grading Company
9 using a bulldozer on the southwest corner of the site in
10 March or April 2018?
11   A.  I believe that would be a question for
12 Mr. Eddie Huggins.  Frankly, if you asked me what a
13 bulldozer looks like versus a backhoe versus a grader or
14 whatever, I couldn't identify who is what or what is
15 what.  That's not my expertise, sir.
16   Q.  Okay.  Well, you wrote this in response to our
17 interrogatory.
18   A.  My attorneys wrote that in response to your
19 interrogatory and I agreed with it.
20   Q.  And you signed a verification of this
21 statement?
22   A.  Yes, sir.
23   Q.  Okay.  And so is it your belief that a
24 bulldozer was operating in the southwest corner of the
25 site in March or April of 2018?

Page 144

1      MR. MIRON:  Objection.  Asked and answered.
2      THE WITNESS:  As I mentioned very clearly, I'm
3 not sure I would know what a bulldozer looks like.
4 BY MR. ADKINS:
5    Q.  Okay.  And you don't know why a bulldozer was
6 operating on your property in March or April of 2018?
7      MR. MIRON:  Objection.  Asked and answered.
8      THE WITNESS:  No, sir.
9 BY MR. ADKINS:
10   Q.  Who would know other than Mr. Huggins?
11   A.  Mr. Huggins.
12   Q.  Does NeshaFarm have any organic
13 certifications?
14   A.  I'm not sure.  We know we have an organic farm
15 and we use absolutely zero pesticides and chemicals to
16 grow our vegetables and our food, and we are extremely
17 environmentally conscious and we use all the best
18 practices of organic growth.  Whether we went through
19 any kind of certification or not, I couldn't say that we
20 have, nor it matters to me.
21   Q.  Do you know whether NeshaFarm uses any
22 pesticides or chemicals at the site?
23   A.  I just answered.  My answer is no, we do not.
24 I am not authorized to use any chemicals or pesticides,
25 including things like ant killers, we use diatomaceous

BENJAMIN K. SHARFI
USA vs BENJAMIN K. SHARFI

June 09, 2022
145–148

Page 145

1 earth instead of any poisonous material.

2     Q.   Your answer was that you don't use pesticides
3 or chemicals to grow your food?

4     A.   Correct.

5     Q.   Do you grow any food on the site?

6     A.   Yes, we do.

7     Q.   Okay.  What food do you grow?

8     A.   I'm sorry, not on the site.  We do at the
9 farm.

10    Q.   And so do you know whether or not any
11 pesticides or chemicals are used at the site?

12    A.   No, sir, we don't.

13    Q.   Mr. Sharfi, when did you first learn that
14 there was a potential problem with work being conducted
15 in wetlands at the site?

16    MR. MIRON:  Objection.  Vague.

17    THE WITNESS:  When Mr. Pempek kept hunting me
18 and harassing me over and over and with his threats
19 that he was -- including the e-mails that he sent.
20 And he sends a friendly notice that we are here to
21 help you and please contact me immediately to help
22 you, and then within 48 hours, he serves on us a
23 cease and desist and charging us with criminal
24 activities on the site and citing the case laws of
25 how many tens and hundreds of thousand dollars it's

Page 146

1     going to cost me, that's when we decided that this
2     guy is not going to go away and lawyer up and be
3     prepared for him.

4 BY MR. ADKINS:

5     Q.   Okay.  So when did you first learn that there
6 was a potential problem with work in wetlands on the
7 site?

8     A.   When --

9     MR. MIRON:  Objection.  Vague, asked and
10 answered.

11    THE WITNESS:  As I mentioned, when
12 Mr. Pempek -- and you have those e-mails on the
13 record.

14 BY MR. ADKINS:

15    Q.   Okay.  Well, why don't we look at one.

16    (Deposition Exhibit No. 224 was previously
17 marked and identified for the record.)

18 BY MR. ADKINS:

19    Q.   So I'm showing you a document that's already
20 been marked Exhibit 224.  This is an e-mail from
21 Mr. Kryzda to Mr. Pempek blind copying you.

22    Do you see that document?

23    A.   Yes, sir.

24    Q.   Okay.  Mr. Kryzda writes here, "The purpose of
25 this message is to ask your guidance in the appropriate

Page 147

1 actions that may be necessary to undertake minor
2 improvements to a newly acquired parcel in western
3 Martin County.  By way of introduction, I work for
4 Mr. Sharfi who spoke with you and asked me to contact
5 you."

6     Does this refresh your recollection when you
7 first learned that there may be problems with work in
8 wetlands on the site?

9     MR. MIRON:  Objection.  Asked and answered.
10 Mr. Sharfi didn't indicate he needed his memory
11 refreshed.

12    THE WITNESS:  According to this e-mail, it's
13 around January of 2018 and this letter did not come
14 from me and it was -- came from Mr. Kryzda, that he
15 was tasked with the task of do whatever is
16 necessary to obtain whatever permits are required
17 to stay within the guidance of the law and so we
18 can get Mr. Pempek's personal agenda off my list.

19 BY MR. ADKINS:

20    Q.   Did you speak to Mr. Pempek before Mr. Kryzda
21 sent this e-mail?

22    A.   As I mentioned, I spoke to Mr. Pempek multiple
23 times that he always called me.  I've never called him
24 once and he always called me and e-mailed me to harass
25 me.

Page 148

1     Q.   Okay.  Just focusing on conversations you had
2 with him with respect to the site, what did Mr. Pempek
3 say to you when he called you with respect to the site?

4     A.   Harassing me and threatening me and being very
5 abusive of his powers.

6     Q.   Do you recall what he actually said that was
7 harassing or abusive of his powers?

8     A.   Yes, threatened me with criminal activities
9 and, quote/unquote, I'm underestimating his powers.

10    Q.   So when Mr. Pempek called you before
11 Mr. Kryzda sent this e-mail, he threatened you with
12 criminal penalties?

13    A.   I cannot tell you the timing, but I've had
14 this conversation with him multiple times.

15    Q.   Okay.  Do you recall anything else Mr. Pempek
16 said to you that was threatening or harassing?

17    A.   Frankly, I didn't give a damn what he had to
18 say.

19    Q.   Why is that?

20    A.   Because he is an idiot, power hungry and he's
21 going after me personally, and nothing that he said
22 followed in any kind of a logic.  And he pretends to be
23 a scientist and following scientific technologies and
24 he's not.

25    Q.   Okay.  Any other reason you didn't care?

BENJAMIN K. SHARFI                                          June 09, 2022
USA vs BENJAMIN K. SHARFI                                   149–152

Page 149

1    A.  It's just noise, sir, as he is today.
2    Q.  So how long did the conversation last that
3  precipitated this -- scratch the question.
4        How long did the conversation with Mr. Pempek
5  last that precipitated Mr. Kryzda's e-mail?
6    A.  I have no idea.
7    Q.  Was it more than five minutes?
8    A.  The times he spoke with me?
9    Q.  Well, Mr. Kryzda wrote that Mr. Sharfi spoke
10  with Mr. Pempek "and asked me to contact you." So I'm
11  referring to that phone call you had with Mr. Pempek
12  before this e-mail.  How long did that phone call last?
13    A.  I'm not reading that in this.  Can you
14  highlight where he's talking about that he talked to me?
15    Q.  So I'm going to highlight that sentence.  It
16  says, "By way of introduction I work for Mr. Sharfi who
17  spoke with you and asked me to contact you."
18    A.  Right.
19    Q.  So how long --
20    A.  On my conversations with him I would give him
21  more than a minute or two.  He's not worthy of my time.
22    Q.  Understood.  In that minute or two, do you
23  recall what Mr. Pempek said to you?
24    A.  I just recited categorically his message been
25  all the same; that one way or another, he's going to do

Page 150

1  me.  Always personal threat, not about the company, not
2  about the farm, not about the environment, not about
3  wetland, not about any kind of activities, rather than
4  he's going to get me and I'm underestimating his powers.
5    Q.  Okay.  What did you say to Mr. Pempek in
6  response to that?
7    A.  Pretty much drop dead.
8    Q.  Okay.  And after that, did you instruct
9  Mr. Kryzda to get in touch with Mr. Pempek?
10    A.  I passed this information to my attorneys
11  and --
12        MR. MIRON:  Do not tell him what conversations
13    you had with your counsel.
14        THE WITNESS:  No, that's fine.  I remember
15    that.  I won't make that mistake again.  I had this
16    conversation with my attorneys and my attorneys
17    instructed to take whatever action that was proper
18    and that was it.
19  BY MR. ADKINS:
20    Q.  Okay.  And so then you instructed Mr. Kryzda
21  to reach out to Mr. Pempek via e-mail?
22    A.  I'm not sure that that directive would come
23  directly from me or the attorneys.
24    Q.  Okay.  Well, Mr. Kryzda wrote, "By way of
25  introduction I work for Mr. Sharfi who spoke with you

Page 151

1  and asked me to contact you."
2        So is it true or not, Mr. Kryzda -- you asked
3  Mr. Kryzda to contact Mr. Pempek?
4    A.  I don't recall that specifically of asking him
5  to do so.
6    Q.  Okay.  And you said before this, you first
7  reached out to your attorneys; is that correct?
8    A.  We've reached to our attorneys all the way
9  back in 2016, sir.
10    Q.  Okay.  So in between that conversation you had
11  with Mr. Pempek referred to in this e-mail and when
12  Mr. Kryzda sent the e-mail to Mr. Pempek, did you
13  contact any of your attorneys?
14    A.  I contacted my attorneys on a very frequent
15  basis on this topic.
16    Q.  That's not what I asked you.
17    A.  That's the best answer I can give you.
18    Q.  So you don't remember whether you contacted
19  them after having that phone call with Mr. Pempek but
20  before Mr. Kryzda wrote this e-mail?
21        MR. MIRON:  Objection.  That misstates the
22    testimony.
23        THE WITNESS:  I said very clearly, after every
24    conversation that I've had with him, I documented
25    the conversation to my attorneys and let them take

Page 152

1    the best course of action that they seemed
2    appropriate.
3  BY MR. ADKINS:
4    Q.  Okay.  And Mr. Kryzda in this e-mail is asking
5  for "guidance in the appropriate actions that may be
6  necessary to undertake minor improvements to a newly
7  acquired parcel in western Martin County."
8        Do you see that?
9    A.  Yes, sir.
10    Q.  Did you ask Mr. Kryzda to reach out to
11  Mr. Pempek for guidance?
12    A.  You asked me that question and I answered it
13  to you.  I don't recall the specific conversation that I
14  had with him, but the task was given to him to reach out
15  to Mr. Pempek to resolve this issue.
16    Q.  Okay.  Mr. Kryzda referred to "Minor clearing
17  and milling is underway in order to mobilize equipment
18  to construct a fence."
19        Do you see that?
20    A.  Yes, sir.
21    Q.  Do you know what Mr. Kryzda meant when he
22  wrote "minor clearing and milling is underway"?
23    A.  I believe --
24        MR. MIRON:  Objection -- objection.
25    Speculation.

BENJAMIN K. SHARFI
USA vs BENJAMIN K. SHARFI

June 09, 2022
153–156

Page 153

1    THE WITNESS:  I believe it's very clear what
2    he wrote.  Minor filling underway in order to
3    mobilize equipment to construct a fence.  I don't
4    know how else you want me to read that.
5    BY MR. ADKINS:
6    Q.  Was it true that minor clearing and minor
7    filling was underway at the site to construct a fence at
8    the site?
9    A.  If Mr. Kryzda said so, I have no reason to
10   disbelieve it.
11   Q.  Okay.  Do you know?
12   A.  No.
13   Q.  Do you know whether Mr. Kryzda had any phone
14   conversations with Mr. Pempek after this e-mail?
15   A.  No, sir.
16   Q.  Do you recall what you -- do you recall having
17   any conversations with Mr. Kryzda around this time
18   regarding your phone conversations with Mr. Pempek?
19       MR. MIRON:  To the extent you had these
20       conversations with Mr. Kryzda outside of counsel.
21       THE WITNESS:  No, sir.  It's always been with
22       presence of counsel to discuss the strategy of how
23       to approach this situation.
24   BY MR. ADKINS:
25   Q.  Okay.  And when you asked Mr. Kryzda to reach

Page 154

1    out to Mr. Pempek before this e-mail, did you mention
2    anything about what Mr. Pempek said on the phone to you?
3    A.  In our meetings with the attorneys, Mr. Kryzda
4    was also present and so he was aware of the
5    conversations and the nature of conversations.
6    Q.  And when you asked Mr. Kryzda to write
7    the e-mail that he eventually wrote to Mr. Pempek that
8    I'm showing you on the screen right now, was an attorney
9    there?
10   A.  Was my attorney where?
11   Q.  Present.
12   A.  At the time that I discussed that, very
13   likely.  I can't recall the exact timing, but all this
14   conversations that in regards to Mr. Pempek, we always
15   kept legal counsel in the loop.
16       (Deposition Exhibit No. 227 was previously
17   marked and identified for the record.)
18   BY MR. ADKINS:
19   Q.  I'm showing you a document that's been marked
20   DX227.  This is an e-mail from Mr. Kryzda to you on
21   February 5, 2018.
22       Do you see that?
23   A.  Yes, I do.
24   Q.  And so in this document Mr. Kryzda wrote,
25   "Please review the attached application requested by

Page 155

1    John Pempek."
2    Do you see that?
3       MR. MIRON:  Brandon, excuse me for a moment.
4    To the extent you're going to ask him any questions
5    that fall below that particular e-mail, do me a
6    favor, like the courtesy you provided Mr. Kryzda,
7    will you move all the way down so he can see the
8    entire e-mail?
9       MR. ADKINS:  Oh, yeah.
10      MR. MIRON:  But to the same extent, if you're
11      only going to ask him about that one, you know,
12      section, then that's fine too.
13      MR. ADKINS:  Yeah.
14   BY MR. ADKINS:
15   Q.  Why don't we do this, so you can see the whole
16   document, Mr. Sharfi, before I ask you questions about
17   it.  So, you know, you see page 1, the e-mail right now?
18      MR. MIRON:  What I want you to do is just take
19      your time, once you've had an opportunity to review
20      it --
21   BY MR. ADKINS:
22   Q.  I'll show you the page 2.  This the first page
23   of an application --
24      MR. MIRON:  Mr. Adkins, give me second.  I'm
25      trying to instruct my client.  He's talking over

Page 156

1    me.  You're talking over me.  Just give me one
2    moment.
3       The point is, once you've had an opportunity
4    to review the page, let him know and he'll move on
5    to the next page, okay?  I want you to --
6       THE WITNESS:  You want me to read the whole
7    thing?
8       MR. MIRON:  No.  You do what you feel is
9    necessary in order to make yourself comfortable
10      with the document, okay.
11      THE WITNESS:  I don't know this document.  I
12      have never seen --
13      MR. MIRON:  Mr. Sharfi, there isn't any
14      questions yet.  I just want you to take a look at
15      it so when he asks you if you're familiar with it,
16      you know what the entirety of the document is.
17      THE WITNESS:  I'm looking at it, sir.
18      MR. MIRON:  Thank you.
19      THE WITNESS:  It's very small -- clearly,
20      you're not expecting me to be able to read that.
21   BY MR. ADKINS:
22   Q.  I'm not expecting you to read it.  I'm not
23   going to ask you specific questions about anything that
24   you haven't had a chance to read.
25   A.  Okay.

BENJAMIN K. SHARFI                                          June 09, 2022
USA vs BENJAMIN K. SHARFI                                        157—160

Page 157

1    Q.  So here's the permit application that was
2  attached to the e-mail.
3        MR. MIRON:  Can you enlarge it, please?
4  Brandon, can you enlarge it, please?  It's very
5  small on our side.
6  BY MR. ADKINS:
7    Q.  Okay.  When I get to this part of it, I'll
8  enlarge it for you.
9        Okay.  So first we're going to look at the
10  e-mail.
11    A.  Okay.
12    Q.  And Mr. Kryzda wrote, "Please review the
13  attached application requested by John Pempek.  You can
14  make any changes you wish."
15        Do you recall receiving this e-mail,
16  Mr. Sharfi?
17    A.  No.
18    Q.  No, you don't?
19    A.  No, I don't.
20    Q.  Okay.  Do you recall signing an application
21  for permit that was submitted to the United States Army
22  Corps of Engineers?
23    A.  I don't recall, but if Mr. Kryzda asked me to
24  sign any document that he felt that I needed to sign, I
25  would sign it for him.

Page 158

1    Q.  Okay.  Do you recall having any conversations
2  with Mr. Kryzda about this draft permit application?
3    A.  No, sir.
4    Q.  Do you recall whether or not you signed a
5  permit application?
6    A.  No, sir.  I sign over 20,000 documents a
7  month.  So I will not recall one over the other one.
8        (Deposition Exhibit No. 226 was previously
9  marked and identified for the record.)
10  BY MR. ADKINS:
11    Q.  Okay.  I'm showing you DX226, application for
12  Department of the Army permit.  I'm going to scroll to
13  the third page of this document.  I'm going to zoom in
14  here so you can see.  This is what appears to be your
15  electronic signature on February 12th, 2018.
16        Do you see that?
17    A.  I don't see my signature, but...
18    Q.  So there's a demarcation here that says
19  "digitally signed by Ben Sharfi, date, 2018.02.12."
20        Do you see that?
21    A.  Correct, I see that.
22    Q.  Okay.  Do you have any reason to think that's
23  not your electronic signature?
24    A.  I really have -- I'm not saying anyone forged
25  it, but I don't recall signing that.

Page 159

1    Q.  Okay.  And so there's another electronic
2  signature for you on page 1.  I'm going to zoom in on
3  it.  Can you see Box 11 of the application, Mr. Sharfi?
4    A.  Yes, I do.
5    Q.  It says, "I hereby authorize Kevin Kryzda to
6  act in my behalf as my agent in the processing of this
7  application and to furnish, upon request, supplemental
8  information in support of this permit application."
9        Did I read that correctly?
10    A.  Yes.
11    Q.  And then there's, again, above signature of
12  applicant, it says "Benjamin Sharfi" and then "Digitally
13  signed by Ben Sharfi, date, 2018.02.12."
14        Do you see that?
15    A.  Yes.
16    Q.  Do you have any reason to believe this is not
17  your electronic signature?
18    A.  No, I have no reason to believe it's not.
19    Q.  Okay.
20    A.  Mr. Kryzda is my authorized agent and we
21  agreed for him to do -- take whatever action was
22  necessary to do things as was requested.
23    Q.  Okay.  And you don't recall reviewing this
24  permit application?
25    A.  No, sir.

Page 160

1    Q.  Okay.  So you don't recall making any changes
2  to it?
3    A.  No, sir.
4    Q.  Okay.  In Box 5 it says, "Applicant's name,"
5  and then it lists your name, Benjamin K. Sharfi, company
6  NeshaFarm.
7        Do you know why the company listed is
8  NeshaFarm?
9    A.  No, I don't.
10    Q.  NeshaFarm didn't own the site at the time this
11  application was submitted, correct?
12    A.  I couldn't tell you the chronological order,
13  sir.
14    Q.  Okay.  I thought we established that at the
15  top of your deposition.
16    A.  If we established that, the record speaks for
17  itself.
18    Q.  Do you know why NeshaFarm would be listed if
19  it wasn't the owner of the site at the time?
20        MR. MIRON:  Objection.  Asked and answered.
21        THE WITNESS:  I'm not sure what that question
22  is.  Whatever he put on that application, the best
23  of his knowledge, he did the best knowledge that he
24  had and he did what he was asked to do.
25

BENJAMIN K. SHARFI
USA vs BENJAMIN K. SHARFI

June 09, 2022
161–164

Page 161

1  BY MR. ADKINS:
2      Q.  Okay.  So I'm going to take you to Box 19
3  "Project Purpose."  This is a long paragraph so I'm
4  going to skip ahead in the paragraph, but if you want to
5  read the whole thing, that's fine, but I just don't want
6  to read the whole thing into the record.
7          At the end of this paragraph it says, "And C,
8  to construct clear and level a small area on the
9  southwestern corner of the new 10-acre parcel in order
10  to erect a 100-foot by 175-foot metal frame and metal
11  roof structure to provide covered shelter for grazing
12  animals."
13         Do you see that?
14     A.  Yes, sir.
15     Q.  Is that describing the riding arena that you
16  testified is installed in the northeastern corner of the
17  site currently?
18     A.  Correct, and I believe it's an error on his
19  part.  It's not the southwestern corner.  It's the
20  northeastern corner.
21     Q.  Okay.  So it was never intended that that
22  structure was installed in the southwestern corner?
23     A.  Never.
24     Q.  Okay.
25     A.  Oh, now I understand why you asked.  I

Page 162

1  understand.
2      MR. MIRON:  See.
3      THE WITNESS:  Yeah, I get it.  I get it.  It's
4  clearly mistaking it's north.  He's looking the
5  other way.
6  BY MR. ADKINS:
7      Q.  Are you surprised that there's a reason for
8  some of my questions?
9      A.  No, because when you asked earlier about if
10  there were any thoughts to put the riding arena in any
11  other location, I said no, and you seemed surprised.  So
12  now I understand the source for your surprise.
13     Q.  And it says, "To construct clear and level a
14  small area on the southwestern corner."
15         Was -- is it true that a small area on the
16  southwestern corner was clear and level?
17     A.  No, sir.  He's clearly mistaking the northeast
18  and the southwest.
19     Q.  Okay.
20     A.  Because north is my -- or north is my left.
21     Q.  In Box 24 it says, "Is any portion of the work
22  already complete?"  And the box is checked yes and
23  there's a description, "The fence along the east and
24  most of the north property lines."
25         Do you see that?

Page 163

1      A.  Yes, sir.
2      Q.  Are you aware of whether any other work had
3  been ongoing or completed at the time this application
4  was submitted?
5      A.  No, sir.
6      Q.  Okay.  No additional vegetation clearing,
7  anything like that?
8      A.  We talked about that multiple times.  This is
9  the timeline that he has, and as I testified, whatever
10  he wrote is to be true.  Obviously, not about the
11  northeast and southeast, but at that time there was no
12  additional work.  If he says so, I believe him.
13     Q.  Are you familiar with Danna Small?
14     A.  I'm familiar with the name, sir.
15     Q.  What do you know of Danna Small?
16     A.  I've never met the lady.  Never talked with
17  her, never met with her, never spoke on the phone in any
18  way, form.  I don't know if she was in this room, what
19  she would look like.
20     Q.  Okay.  Do you know anything else of Danna
21  Small?
22     A.  Mr. Kryzda, in order for him to fulfill his
23  duties and obligations to the Army Corps and South
24  Florida Water Management and the county, and he required
25  to do, as I recall the term was, to PAMP, to P-A-M-P or

Page 164

1  close enough, and he required to hire an
2  environmentalist to do the job and I believe he had
3  previous relationship with her or worked with her in the
4  past and he took the course to retain her to do the job.
5      Q.  Did you approve hiring Ms. Small?
6      A.  I was not approved or disapproved.
7          (Deposition Exhibit No. 228 was previously
8  marked and identified for the record.)
9  BY MR. ADKINS:
10     Q.  I'm showing you a document that's been marked
11  DX228, which is an e-mail from Kevin Kryzda to you on
12  April 4, 2018.
13         Do you see that?
14     A.  Yes, I do.
15     Q.  Okay.  So I'm going to scroll down a little
16  bit so you can see the entirety of this e-mail.
17  Mr. Kryzda was forwarding to you an e-mail from Danna
18  Small on April 3, 2018.
19         Do you see that e-mail on your screen?
20     A.  Yes, I do.
21     Q.  And then attached to this e-mail there's an
22  invoice dated 4/3/18 from DLS Environmental Services.
23         Do you see that?
24     A.  Yes, I do.
25     Q.  And there's another proposal letter on DLS

BENJAMIN K. SHARFI
USA vs BENJAMIN K. SHARFI

June 09, 2022
165–168

Page 165

1   Environmental Services letterhead dated April 3, 2018,
2   regarding professional consulting services.
3       Do you see this second attachment?
4   A.  Yes, I do.
5   Q.  So I'll take you back up to Mr. Kryzda's
6   e-mail.  You said, "I am requesting two approvals, one
7   to pay DLS 955 for services rendered towards a
8   vegetative assessment of the new 10-acre and approval of
9   Danna's DLS proposal for assistance in completing the
10  Army Corps permit requirements."
11      Did I read that correctly?
12  A.  Yes, sir.
13  Q.  Mr. Kryzda was asking for approval from you to
14  pay DLS for services rendered towards the vegetative
15  assessment at the site and to approve DLS's proposal for
16  assisting with the Army Corps permit application; is
17  that correct?
18  A.  It was to -- correct, and the county and as
19  well as South Florida Water Management, my understanding
20  this work had to be done to generate these documents
21  that Mr. Kryzda required to generate and she was the
22  person who provided those services.
23  Q.  Okay.  Why was Mr. Kryzda seeking your
24  approval?
25  A.  Any financial expenditure over a few hundred

Page 166

1   dollars, it's customary that they run it by me for my
2   approval.
3   Q.  Okay.  Do you recall approving these two
4   items?
5   A.  I don't recall approving or disapproving.
6   Very likely I approved it.  It's let Kevin do the job he
7   needs to do.
8   Q.  Did you have any phone calls with Mr. Kryzda
9   about DLS's proposal for assistance in completing the
10  Army Corps permit requirements?
11  A.  To be honest, this is the first time I'm
12  looking at this proposal.
13  Q.  When you approve or disapprove a request like
14  this, would it be done through e-mail?  Phone call?
15  Some other way?
16  A.  It can be phone call or some other means.  It
17  just depends on the circumstances.
18  Q.  So going down to Ms. Small's e-mail to
19  Mr. Kryzda.
20  A.  Mm-hmm.
21  Q.  Okay.  So Ms. Small said, "Also, I received
22  notification from the SFWMD that the site meeting will
23  be 9 on 4/9 -- will be 9:00 on 4/9, so I assume I will
24  contact Chuck to let us in the gate.  Are you planning
25  on being there?  Might not be a bad idea since we're

Page 167

1   going to be dealing with a bump due to the wetland
2   impacts which have already occurred."
3       Do you see that?
4   A.  Yes, I do.
5   Q.  Okay.  Do you recall having any conversations
6   with Mr. Kryzda about wetland impacts that had already
7   occurred at the site?
8   A.  No, sir.
9   Q.  Okay.  And Mr. Kryzda forwarded this e-mail to
10  you, but you don't remember reading it?
11  A.  No, I don't.
12  Q.  Okay.  Do you remember having any other
13  conversations with anyone about wetland impacts that had
14  already occurred at the site?
15  A.  No, sir.  The only conversation that we've had
16  frequently was between myself, Mr. Kryzda and the
17  attorneys.
18      (Deposition Exhibit No. 12 was previously
19  marked and identified for the record.)
20  BY MR. ADKINS:
21  Q.  So I'm going to show you a document that's
22  previously been marked DX 12.  This is a ten-page
23  document, Mr. Sharfi, so I'll just scroll through it for
24  you.  This is DX12, Bates-stamped DLS 1.  This is the
25  second page, DLS 2?

Page 168

1   A.  Mm-hmm.
2   Q.  The third page, DLS 3; fourth page, DLS 4;
3   fifth page, DLS 5, DLS 6, DLS 7, DLS 8?
4   A.  Okay.
5   Q.  DLS 9, DLS 10.
6   A.  I see that.
7   Q.  So you laughed at DLS 7.  Why is that?
8   A.  I laugh at all of them.
9   Q.  Okay.  What about DLS 7?
10  A.  Especially that one.
11  Q.  What's funny about this one?
12  A.  It's not my site.
13  Q.  Yeah, this isn't the site, is it?
14  A.  Not at all.  Most of them are not.
15  Q.  Why do you think this one's not the site?
16  A.  Those trees are growing there, I don't have
17  them in my site.  That debris of pile and trash in the
18  front is not mine.  The fence in the background, I have
19  no idea what that is and it doesn't look anything
20  familiar, sir.
21  Q.  Okay.  Does anything look familiar in DLS 8?
22  A.  No, sir.  That's also not my site.
23  Q.  DLS 9?
24  A.  So is this one.  It's not on my site.
25  Q.  And DLS 10?

BENJAMIN K. SHARFI
USA vs BENJAMIN K. SHARFI

June 09, 2022
169–172

Page 169

1    A.  I don't have none of those trees there are on
2  my site; no, sir.
3    Q.  So let me go back up to the first page.  So
4  we're looking at DLS 1 now, correct?
5    A.  Correct.
6    Q.  Is this a picture of the site?
7    A.  I can't be sure.  I'm looking up close.  What
8  is that structure in the back and that telephone pole?
9  I don't have such wires, that I recall, on my site.
10    Q.  Do you want me to zoom in on the picture for
11  you?
12    A.  Sure.
13    Q.  Okay.  I've now zoomed in on the top left area
14  of the picture.  Do you recognize that structure in the
15  background?
16    A.  No, not really.  I don't remember having two
17  doors like that side by side that I have anywhere on the
18  site, anywhere on my facilities.
19    Q.  Okay.  Do you recognize any other part of the
20  structure?
21    A.  No, sir.
22    Q.  Okay.
23    A.  At the bottom you have that metal fence gate,
24  whatever that looks like, that looks like it's coming
25  from the telephone pole.  That definitely does not look

Page 170

1  familiar.
2    Q.  That's not a branch from the debris pile?
3    A.  Oh, it looks like a metal fence to me.
4    Q.  What about this fence?  I'm scrolling over to
5  the right side of the picture now.  Do you see the fence
6  in the background?
7    A.  Yes, I do.
8    Q.  Does that look familiar to you?
9    A.  It's a similar fence that me and everybody
10  else in Martin County builds.  It's a cattle fence.  But
11  I don't recognize the trees behind it.  I don't remember
12  having any of those kind of trees behind, that tall of
13  trees on my property, sir.  That looks like a 30-,
14  40-feet trees that you're looking at and I don't recall
15  from my fence that there is anything that size.  And on
16  that side I have mostly bamboo side, if I'm looking at
17  the ditch.
18    Q.  Well, I'll tell you, this picture was taken
19  around March 2018, so --
20    A.  Yeah.
21    Q.  -- it's about four years ago.
22    A.  Yeah, the trees do not get smaller.
23    Q.  Okay.  At any point have you ever seen the
24  site with similar conditions to what's depicted in this
25  picture?

Page 171

1    A.  No, sir.
2    Q.  Okay.  The -- you see the foreground dirt and
3  what looks --
4    A.  I see foreground.  I see foreground.
5    Q.  Okay.  Do you see the pile of vegetation and
6  dirt also in the foreground there?
7    A.  I don't see a pile of vegetation, sir.  I see
8  a tree, a root.
9    Q.  Okay.  Have you ever seen anything like that
10  on the site?
11    A.  When they remove the -- some of the old
12  diseased trees, I have seen the size of root ball trees
13  like that.
14    Q.  Okay.  What was done with the dirt material
15  that was removed -- that was with the root ball?
16    MR. MIRON:  Objection.  Speculation.
17    THE WITNESS:  I don't know.
18    MR. MIRON:  Also assumes facts not in
19  evidence.  Mischaracterizes his testimony.
20    THE WITNESS:  I've never seen any parts of my
21  site with that condition and I don't know what was
22  done with it, so...
23  BY MR. ADKINS:
24    Q.  But you have seen on the site, when diseased
25  trees were removed, root piles like this?

Page 172

1    A.  No, sir, not on the site.  I have seen it
2  previously on my previous homes in other locations.
3    Q.  Okay.
4    A.  At what we call Property 1 or Property 2.
5    Q.  Okay.  Got it.  And just to confirm, you've
6  never seen anything that looks like it at the site?
7    MR. MIRON:  Objection.  Asked and answered.
8    THE WITNESS:  No, sir.
9  BY MR. ADKINS:
10    Q.  Okay.
11    A.  As we already established, these pictures are
12  not even on my site, so...
13    Q.  So DLS 3, do you see that on your screen?
14    A.  I do.
15    Q.  Okay.  Does any part of this picture look like
16  a site to you?
17    A.  No, sir.
18    Q.  Okay.  Do you believe this is the site?
19    A.  I don't.
20    Q.  Okay.  Do you see the piece of equipment in
21  the top right corner of this picture?
22    A.  Yes, I do.
23    Q.  Do you recognize what that is?
24    A.  It looks like a tractor of some sort.
25    Q.  Okay.  Have you ever seen anything like that

BENJAMIN K. SHARFI
USA vs BENJAMIN K. SHARFI

June 09, 2022
173–176

Page 173

1 operating on the site?

2    A.  No.  I've seen a red one, but I've never seen

3 that one.

4    Q.  Okay.

5    A.  That's why I'm saying -- now, I do not have

6 any trees of that tall in my site.

7    Q.  You don't now or you never did?

8    A.  I'm sorry, you broke up, sir.

9    Q.  You don't have trees that are that tall now or

10 you never did?

11    A.  I never did.

12    Q.  Okay.

13    A.  This looks like a 20- to 25-feet -- foot trees

14 and there is no -- nothing on the site that I know of

15 anything that tall, except the pine trees, and these are

16 not clearly pine trees.

17    Q.  So DLS 4 I'm showing you, do you recognize any

18 part of this picture as being the site?

19    A.  No, sir.

20    Q.  How about this road in the foreground?

21       MR. MIRON:  Objection.  Asked and answered.

22       THE WITNESS:  Definitely no, and I don't know

23    that person either.

24 BY MR. ADKINS:

25    Q.  Okay.  Picture 5, DLS 5, do you recognize

Page 174

1 anything here as being the site?

2    A.  Nothing that I look at that it gives me any

3 point of reference that it would be on my place, on

4 Site 1, what you call on the site.

5    Q.  Okay.

6    A.  There's no point of reference for me to

7 establish that.

8    Q.  Okay.  And DLS 6, do you recognize anything in

9 this picture as being the site?

10    A.  Again, I do not recall seeing any trees of

11 this size.  And that looks like an oak tree to me that

12 is on the left.  The property that where we call site,

13 the site, has any oak trees or ever had any oak trees of

14 that size.  I wish it did.

15    Q.  Okay.  We looked at this last one here.

16    A.  Clearly, this is not my site.

17    Q.  Okay.  So I'm now showing you a document that

18 we will mark as DX --

19       THE WITNESS:  Can we take a break?

20       MR. MIRON:  Yeah, absolutely.

21       MR. ADKINS:  Want to take a break?

22       MR. MIRON:  Mr. Adkins, do you mind?

23       MR. ADKINS:  Yeah, let's go off the record.

24    This is a good time.

25       THE VIDEOGRAPHER:  Off the record.  The time

Page 175

1    is 2:32.

2       (A break was had.)

3       THE VIDEOGRAPHER:  We are back on the record.

4    The time is 2:47.

5 BY MR. ADKINS:

6    Q.  With respect to those control elevation pipes,

7 Mr. Sharfi, we were talking about, did I understand

8 correctly that Mr. Berlusconi had those installed in the

9 last year or so?

10    A.  No, sir.  You did not hear me correctly.

11    Q.  Okay.  When about were they installed?

12    A.  Within the last year or so.

13    Q.  Okay.  So the control elevation pipes were

14 installed within the last year or so; is that correct?

15    A.  Yes, sir.

16    Q.  Okay.  And did Mr. Berlusconi have anything to

17 do with their installation?

18    A.  No, sir.

19    Q.  Okay.  Who oversaw the installation of those

20 pipes?

21    A.  Not me.  I saw the end results, but not during

22 the process.

23    Q.  Do you know who oversaw the process?

24    A.  It would be under -- the work directly or

25 indirectly under Mr. Kryzda's direction.

Page 176

1    Q.  Okay.  Would you have authorized the work to

2 install those pipes?

3    A.  You asked me that question multiple times and

4 I said yes, any expenditure that gets over there, I

5 authorize at the end of the day.

6    Q.  For any of the work that was conducted at the

7 site that you authorized, were there ever any instances

8 where the work wasn't performed to your satisfaction?

9    A.  Multiple times.

10    Q.  Can you explain those to me?

11    A.  They were not performed to my satisfaction.

12    Q.  Okay.  What projects in particular?

13    A.  Electrical work that the electrical junction

14 boxes would be underground rather than above water flood

15 level; improper bending pipes and electrical lines that

16 can create hazard; taking routes for the roads that I

17 mentioned that they were using for feeding the cattle

18 that's driving all across the site.  And I did not like

19 the idea that they were being lazy instead of driving

20 around and walking the rest it, they were creating

21 paths.  So I asked them to correct those.

22       Other areas, some of the fence that was

23 installed around the perimeter, the wire was not

24 stretched and they were loose, which would allow

25 critters to able to bore under to come in.  The safety

BENJAMIN K. SHARFI
USA vs BENJAMIN K. SHARFI

June 09, 2022
177–180

Page 177

1 that was used for the shock wires around the perimeter,
2 they were done in such a way that a human could touch it
3 and it could be damaged. And I asked them to make
4 lightbulbs that come on red and are visible so no one
5 accidentally touches them, including my dogs.
6        I can go on and on. I'm a perfectionist when
7 it comes to doing anything, so not too many things are
8 done to my satisfaction the first time or many times a
9 second or third time.
10     Q.   And in those instances, have you had people
11 redo the work until it was done to your satisfaction?
12     A.   Absolutely.
13     Q.   Okay. Is there any outstanding work --
14     A.   I'm sorry, go ahead.
15     Q.   Is there any outstanding work on the site that
16 has not been done to your satisfaction at this point?
17     A.   You broke up the last. Any part of the work
18 that was done, after that I missed you.
19     Q.   Is there any outstanding work on the site that
20 has not been done to your satisfaction at this point?
21     A.   Yes. Some of the concrete work that was --
22 I'm sorry, not on what you call the site. Sorry --
23 that's on the Parcel 1 or Property 2, no, nothing on
24 that site.
25        I'm trying to remember, be more specific.

Page 178

1 Actually, yes, as I mentioned, we just brought new --
2 FPL brought new power service to the site in recent
3 months and then they -- and we brought new power to the
4 riding arena. And so in case of emergency in hurricane,
5 we have the ability to shelter the animals. And
6 further, we put an external generator to be able to
7 power the arena in case of a hurricane. And a pad that
8 was poured to put the generator is too low to the grade
9 that can be saturated in a heavy condition and the hole
10 that they put through the site was not -- was done very
11 poorly, and I asked them to take those and redo. And
12 that's pending as we speak.
13     Q.   Any other work pending that hasn't been done
14 to your satisfaction at the site?
15     A.   Correct, these are pending work that they have
16 to correct at the site.
17     Q.   And is that -- anything else?
18     A.   This is one of the things I can tell you.
19     Q.   Okay. Can you recall any other pending work
20 that has not been done yet to your satisfaction at the
21 site?
22     A.   Recently the fencing around the wetland has
23 been aging and old and some of the screws are falling
24 and they are being exposed and I've asked them to
25 resecure the fence and resecure the site.

Page 179

1     Q.   Anything else?
2     A.   Yes, the eastern southeast stalls, the fence
3 is really dangerous for the animals that in case of a
4 panic, they can jump and hurt themselves. So I've asked
5 them to raise that fence up slightly. That's all that
6 comes to mind. Neal -- I'm sorry, it's one of those
7 things that --
8        THE WITNESS:  You're Neal.
9        It's one of those things that every time I
10 drive there, walk around there, I see things and
11 make mental notes to have them corrected.
12        (Deposition Exhibit No. 238 was identified for
13 the record.)
14 BY MR. ADKINS:
15     Q.   So let me show you another document here,
16 which we will mark as DX238. This is a March 17, 2018,
17 letter to NeshaFarm, care of Benjamin Sharfi, managing
18 member on U.S. Army Corps letterhead, and it has a Bates
19 Stamp USACE00000004 through 8.
20        So I'm showing you the first page of the
21 document, Mr. Sharfi, the letter. This the second --
22     A.   I can't read that. If you're asking me to
23 read it, I can't. If you'll slow down and zoom in.
24     Q.   I'm not asking you to read it just yet.
25     A.   Okay.

Page 180

1     Q.   The second page is with a signature from Kelly
2 Egan.
3     A.   I don't know Kelly Egan.
4     Q.   And this is the attachment. It says,
5 "Applicant, NeshaFarm, complete list summary, request
6 for additional information."
7        Do you see --
8     A.   Again, I can't read it. I can read the title.
9        MR. MIRON:  Mr. Adkins, you provided this
10 courtesy to Kevin yesterday. I'd ask you to
11 provide Mr. Sharfi the same courtesy. Your intent
12 is to ask him questions about this particular
13 document, and I understand you don't want him to
14 read it at this point, but you need to give him an
15 opportunity to review it no differently than he
16 would if he was in person.
17        So if you would, please, enlarge it so that he
18 can read it if he needs to and then he'll indicate
19 to you when he's done reviewing it, okay?
20        MR. ADKINS:  If there are particular
21 provisions that I need him to read, we'll go
22 through that, but right --
23        MR. MIRON:  No, no, no. I'm not asking -- no,
24 sir. That's not the way this is going to work.
25 He's entitled to review the document and be

BENJAMIN K. SHARFI
USA vs BENJAMIN K. SHARFI

June 09, 2022
181–184

Page 181

1  familiar with the document before you ask him
2  questions about it.  That's a professional courtesy
3  and appropriate under the circumstances.  So just
4  him -- I'm not suggesting that he needs to -- at
5  least give him an opportunity to look at it and
6  then he'll let you know whether or not he wants to
7  read it in full.
8      THE WITNESS:  You zoomed up and down three or
9  four times as we talked about it.
10  BY MR. ADKINS:
11      Q.  I'll start at the top.  Okay.  Here's the top.
12      A.  So let me know -- ask the question about the
13  area and let me read it and I will be able to come --
14  answer any questions you have, sir.
15      Q.  I haven't even asked a question yet, but you
16  guys are now talking about scrolling through the
17  document.
18      A.  Well, why would you show me a document you
19  don't want me to read?
20      Q.  Why don't we keep moving.  I haven't asked you
21  to read it.  I haven't asked you a question yet, okay?
22      A.  All right.
23      Q.  I'm showing you the top of the document,
24  Mr. Sharfi.  Do you see that?
25      A.  Okay.  I read the first paragraph.

Page 182

1      Q.  Okay.  Well, let me ask you, are you familiar
2  with this letter?
3      A.  No.
4      Q.  So you don't recall ever getting this letter?
5      MR. MIRON:  Mr. Adkins, that's the whole
6  point.  I want him the opportunity to look at in
7  total so that he can either say it with some sense
8  as to whether or not he's familiar with it or not.
9  So that's why I've requested you to let him read it
10  or at least look at it in such a manner so that he
11  can read it.
12  BY MR. ADKINS:
13      Q.  Are you able to read the rest of this first
14  page here, Mr. Sharfi?
15      A.  Yes, sir.
16      Q.  Okay.
17      A.  Do me a favor.  Don't scroll that fast.  I'm
18  not that fast of a reader, sir.  I don't speed-read.
19  I'm an engineer.  I read things for with meanings.  So
20  if you go up a little bit, I kind of missed the whole --
21  there you go.  Thank you.
22      Okay.  I have read that part.  Thank you, sir.
23  I see the signature.  Kelly Egan I don't know.
24      MR. MIRON:  Mr. Sharfi, please don't testify
25  while you're reading it.  Just -- he's giving you

Page 183

1  the courtesy to review it.
2      THE WITNESS:  Thank you.  I appreciate it.
3  Sorry, sir.
4  BY MR. ADKINS:
5      Q.  You want to take a look at the attachment too?
6      MR. MIRON:  Yes.
7      THE WITNESS:  You can go up a little bit.
8  Okay.  I'm good all the way through 6.  Don't do
9  that, you're going to give me an epileptic reaction
10  here.  Go ahead, go up now, I'm on 9.  Okay, I'm
11  good all the way through 9, sir.
12      Okay.  Okay.  Okay, I'm good.
13  BY MR. ADKINS:
14      Q.  Okay.  That's the end.
15      A.  Okay, hallelujah.
16      Q.  So I'm going to take you to page stamped
17  USA0006.
18      A.  Okay.
19      Q.  I'm going to read for you under Description
20  and Narratives, "1, while the application states the
21  proposed project is for a fence, it appears that the
22  proposed works may also include clearing of lands and
23  the addition of structure in potential jurisdictional
24  wetlands."
25      Do you see that?

Page 184

1      A.  Yes, I do.
2      Q.  Okay.  Now, the application here is referring
3  to your application to the United States Army Corps of
4  Engineers; is that right?
5      A.  You're asking me to make an assumption.  I
6  read this, but I have no understanding how this
7  correlates to what.
8      Q.  Okay.  So let's look up here.  I'm at the
9  letter now on page 1.  This correspondence is in
10  reference to your permit application received on
11  February 23, 2018, requesting Department of Army
12  authorization to impact waters of the United States in
13  association with installation of a fence.
14      Do you see that?
15      A.  Yes, sir.
16      Q.  Okay.  So going back down to page 6, is it
17  true that the application that you submitted included
18  proposed works that exceeded installation of a fence?
19      A.  The information that was submitted is a matter
20  of record itself.  It doesn't need my validation or this
21  validation.  Whatever the application Mr. Kryzda filled
22  and sent, it's black and white, states what it was.
23      Q.  Was it your intent at the time that the
24  application was submitted to perform works in wetlands
25  on the site that exceeded the installation of a fence?

BENJAMIN K. SHARFI
USA vs BENJAMIN K. SHARFI

June 09, 2022
185–188

Page 185

1    A.  My intention has never, sir, never been to
2    disrupt any wetland in any way or form.  From day one,
3    the clear marching orders came down from myself in
4    person to all workers, including subcontractors, to do
5    not disrupt any, any areas that is designated wetland
6    and fenced off.  Stay the hell out of it and do not
7    disrupt it.
8    Q.  Okay.  On page 1, you see in Ms. Egan's letter
9    it says, "You are cautioned that work performed below
10   the mean high waterline or ordinary high waterline in
11   waters of the United States or the discharge of dredged
12   or fill material into adjacent wetlands without a
13   Department of Army permit could subject you to
14   enforcement action"?  Do you see that?
15   A.  I see the text.
16   Q.  Do you recall reading that when you received
17   this letter?
18   A.  No, sir, and I disagree with that statement.
19       MR. MIRON:  Stop.
20   BY MR. ADKINS:
21   Q.  Would you disagree --
22       MR. MIRON:  Give me a second.  Objection.
23   Assumes facts not in evidence.  It's also
24   speculative.
25

Page 186

1    BY MR. ADKINS:
2    Q.  What don't you disagree with in that sentence?
3    A.  That there's never been adjacent and
4    speculation of what the wetland is without being on it,
5    without being established where the wetlands are and
6    what the waterline is.  And the mean high water has a
7    very, very careful specific meaning that requires many
8    months, if not a year, year and a half, to predict.
9    That the Army Corps, no one has been able to go out
10   there and establish such words, mean high waterline.
11   This is a very specific knowledge.  And in order to
12   obtain that, you need to monitor it, observe it over
13   long periods of time to determine what that is.  And
14   adjacent to wetlands and waterlines, all this is pure
15   speculation.  It's a bunch of crap.
16   Q.  Are you familiar with the reports that your
17   expert team submitted in this case?
18   A.  I'm not sure which reports you may suggest.
19   Q.  Are you familiar with any of the reports?
20   A.  I have seen at one time or another all
21   reports.
22   Q.  Are you familiar with Dr. Dennis' report?
23   A.  Whose report?
24   Q.  Dr. Dennis.
25   A.  No, sir.  I don't know the name, but if you

Page 187

1    showed me the report, I could tell you whether I've seen
2    it or not.
3    Q.  Okay.  Mr. Sharfi, were you present when the
4    South Florida Water Management District visited the site
5    to verify Danna Small's wetland delineation on the site?
6    A.  I was in one of the meetings that Mr. Pempek
7    and a few other people that we invited, as well as
8    attorney, to come to see that we are not disrupting any
9    waters or wetlands, and I was on that one specific time
10   on the site; yes.
11   Q.  Okay.  Were you present when just the South
12   Florida Water Management District was on the site with
13   Ms. Small to verify her wetland delineation?
14   A.  As I mentioned to you, I have never seen
15   Ms. Small and never met with her and I never had any
16   person-to-person or phone or text or e-mail exchanged
17   directly between me and her.
18       (Deposition Exhibit No. 24 was previously
19   marked and identified for the record.)
20   BY MR. ADKINS:
21   Q.  I'm now showing you on the screen DX24 and I'm
22   going to take you to the second page, which is DLS 79.
23   And I'll represent to you this is a picture that
24   Ms. Small took of the site in April 2018.
25       Do you recognize this image as being the site?

Page 188

1    A.  No, sir.
2    Q.  Do you recognize any of the equipment depicted
3    in DLS 79?
4    A.  They do not belong to me, sir.
5    Q.  I didn't ask if they belong to you.  Do you
6    recognize them?
7    A.  No, sir.
8    Q.  So you've never seen any equipment that looks
9    like the equipment shown in DLS 79; is that right?
10       MR. MIRON:  Objection.  Asked and answered.
11       THE WITNESS:  No, sir, I don't.
12   BY MR. ADKINS:
13   Q.  Okay.  I'm going to take you to DLS 81.  Do
14   you see that image?
15   A.  Yes, I do.
16   Q.  Do you see what appears to be white pipes in
17   the foreground?
18   A.  Yes, I do, sir.
19   Q.  Do you know what those are?
20   A.  Pipes.
21   Q.  Okay.  Have you ever seen pipes like that at
22   the site?
23   A.  Not that I recall, sir.
24   Q.  Do you know whether pipes like that are
25   installed at the site?

BENJAMIN K. SHARFI
USA vs BENJAMIN K. SHARFI

June 09, 2022
189–192

Page 189

1   A.  Not that I know, sir.

2   Q.  Okay.  And then again, do you see the piece of

3   equipment in the left side of this picture?

4   A.  The yellow?

5   Q.  Yes.

6   A.  Yes, I do.

7   Q.  Do you know what that is?

8   A.  No, I don't.

9   Q.  Okay.

10   A.  I'm not sure anyone can.

11   Q.  Why is that?

12   A.  It's an image of unrecognizable image.

13   Q.  Is it because the image you're seeing is not

14   clear?

15   A.  It's clear, but you don't have the resolution

16   to be able to identify any person, man or woman or

17   otherwise.

18   Q.  Oh, okay, but can you identify what kind of

19   equipment it is?

20   A.  No.  It's a yellow equipment.

21   Q.  So I'm showing you DLS 83.  Do you see that?

22   A.  Yes, I do.

23   Q.  Okay.  Do you recognize what's depicted in

24   DLS 83?

25   A.  I see the ditch and so it's a ditch and I'm

Page 190

1   presuming it's the one on the west side of the property.

2   Q.  Okay.  Do you see what appears to be a blue

3   dumpster on the right side of this image?

4   A.  I see a blue thing up there, yes, sir.

5   Q.  Do you know what that is?

6   A.  You just said it was a dumpster.

7   Q.  Okay.  Have you ever seen a dumpster that

8   looks like that on the site?

9   A.  We have dumpsters often on the site for the

10   debris that we tried to get rid of; yes.

11   Q.  Do you know who --

12   A.  That one particular one, no.  That particular

13   site with that particular picture, no.

14   Q.  Do you know names of any contractors who have

15   had dumpsters on the site?

16   A.  All of them that worked over there.

17   Q.  Any particular names?

18   A.  No.  I know that Mr. White had dumpsters and I

19   know, what's his name from Second Nature, Billy, I don't

20   know his last name, he brought dumpster and -- that they

21   paid for, brought it and emptied and cleaned.  So it

22   would not be contracted under me, sir.

23   Q.  All right.  Do you see the standup trees

24   besides the dumpster in this image?

25   A.  Can you zoom in a little bit?  Yes, I do.

Page 191

1   They look like pine trees.

2   Q.  Are those trees still on the site?

3   A.  Unfortunately, no.  There aren't many of the

4   pine trees on that side, on that whole side of the road,

5   we were able to preserve.  A good portion of them, but

6   unfortunately, many of them died from that disease that

7   I told you about.  I wish that wasn't the case, but some

8   of them are still there, sir.

9   Q.  Okay.  When were those trees removed?

10   A.  They were not -- they were removed because

11   they were either dead or they were diseased.

12   Q.  And when was that?

13   A.  During the time they were dead or diseased.

14   Q.  Okay.  Did the trees in this image show any

15   visible signs of being dead or diseased?

16   MR. MIRON:  Objection.  Speculation.

17   THE WITNESS:  The picture is not really clear

18   enough, crisp enough, but if I look at the one tree

19   to the left of it, I see a lot of yellow branches

20   on the pine tree, which that's the first sign of

21   death.

22   BY MR. ADKINS:

23   Q.  And you see that in this image that I'm

24   showing you right now?

25   A.  Yes, it seems like it.  If you zoom in to

Page 192

1   right there, you probably can see the color better.

2   Q.  Do you see the dark material that is flowing

3   into the road on the right edge of this picture?

4   A.  Let me reduce.

5   MR. MIRON:  He's going to show you.

6   THE WITNESS:  Oh, no.  The banner was next to

7   it.  I see dirt, yes.

8   BY MR. ADKINS:

9   Q.  Okay.  Why is that dirt darker in color than

10   the road?

11   A.  Because the road is a coquina rock that was

12   brought for the base and the rest of the dirt is natural

13   dirt.

14   Q.  Okay.  Did that area of the site where the

15   soil is dark in color in this image, was it typically

16   wet?

17   A.  As I mentioned this topic before of wet or

18   dry, the water table establishes how much rain you have

19   and how much -- because of the picture to the left where

20   you see the water table is clearly high enough, it

21   means that this was taken during a high wet season and

22   rains.  So consequently, the soil is wet, as the ditch

23   is wet.  And you can tell by the color of the grass and

24   all around it being very wet.

25   Q.  Did you ever have any flooding issues in the

BENJAMIN K. SHARFI
USA vs BENJAMIN K. SHARFI

June 09, 2022
193–196

Page 193

1  southwest area of the site?
2      A.   There are times when you have a lot of rain in
3  a very short period of time before the ground has a
4  chance to absorb it.  I would not call it flooding,
5  rather than I would say it takes time for the water
6  table to recede.
7      Q.   How much time would it typically take?
8      MR. MIRON:  Objection.  Speculation.
9      THE WITNESS:  It all depends on the ground
10     water saturation, how much rain we had before in
11     the weeks before and the time of the year.
12  BY MR. ADKINS:
13     Q.   When you purchase --
14     A.   For example, for example, with all this
15  hellacious rain that we had in the last four days, five
16  days, there's not an inch of water sitting anywhere
17  because the ground is very, very dry and the water table
18  is very low.  We had 7 to 8 to 9 inches of rain within
19  24 hours and ground was able to soak it up very quickly.
20     Q.   Have you brought any fill material to the
21  site?
22     MR. MIRON:  Objection.  Vague.
23     THE WITNESS:  You asked the question and I
24     answered what kind of material was brought for the
25     road and what kind of a material was brought for

Page 194

1  the horses and what kind of material was brought
2  for the cows and what kind of material was brought
3  for the riding arena and what kind of material was
4  brought for the road around the riding arena.
5  BY MR. ADKINS:
6      Q.   Have you ever brought any fill material for
7  use in the southwest area of the site?
8      MR. MIRON:  Objection.  Vague.
9      THE WITNESS:  No, sir, not specifically for
10     that application.
11  BY MR. ADKINS:
12     Q.   For any other application?
13     A.   No, sir.
14     MR. MIRON:  Objection.  Vague.  You've got to
15     give me an opportunity to object.
16     THE WITNESS:  I'm sorry.
17     MR. MIRON:  Thank you.
18     THE WITNESS:  Go ahead.
19     In the southwest area, it was brought for the
20     horse stalls.
21  BY MR. ADKINS:
22     Q.   And what was the material brought for the
23  horse stalls in the southwest area?
24     MR. MIRON:  Objection.  Asked and answered.
25     THE WITNESS:  Again, sand and wood shaving.

Page 195

1  BY MR. ADKINS:
2      Q.   Do you know how much sand was brought for the
3  horse stalls?
4      A.   One more time, please.
5      Q.   Do you know how much sand was brought for the
6  horse stalls?
7      A.   No.
8      Q.   And the horse stalls are in the northwest
9  corner; is that correct?
10     A.   No, sir.  There's also horse stalls in the
11  southwest corners.
12     Q.   Okay.  So sand was brought for use in the
13  horse stalls in the southwest corner; is that correct?
14     A.   Brought there as well, correct.
15     Q.   Okay.  How frequently do you replenish the
16  sand in the horse stalls in the southwest corner?
17     A.   It's, again, a matter of rain, matter of how
18  much the horses been able to work the area and the
19  availability to move them around to pasture to pasture.
20  There are one, two, three horse stalls in the southwest
21  corner, as you mentioned, and one is -- two of them are
22  double and one of them is a longer one and once a year,
23  twice a year and/or whatever frequency is required to
24  keep the horses' hooves dry.
25     Q.   Where does the sand come from?

Page 196

1      A.   I'm sorry?
2      Q.   Where does the sand come from?
3      A.   From God.  I don't know.  You mean what quarry
4  it comes from?
5      Q.   How does the sand get to the site, Mr. Sharfi?
6      A.   They make a phone call and sand arrives.
7      Q.   Okay.  Who brings the sand to the site?
8      A.   Somebody that has the tools to bring the sand.
9  I'm really not sure what you're asking.  They're not
10  flying it in, if that's what you're asking.
11     Q.   How is the sand delivered to the site?
12     A.   Via vehicles.
13     Q.   What kind of vehicles?
14     A.   Sometimes in pickup trucks and sometimes in a
15  pickup truck and trailer, sometimes maybe small trucks
16  that can maneuver this short tight spaces.
17     Q.   Is sand ever delivered in dump trucks?
18     A.   There are the trailers that we have and the
19  trucks that we use are small, very small trucks that
20  they have the capability to dump sand; correct.
21     Q.   Okay.
22     A.   But they're not these large trucks that you're
23  familiar with.  They are much smaller scale.
24     Q.   Where is the sand typically dumped when you
25  replenish it for the horse stalls in the southwest

BENJAMIN K. SHARFI
USA vs BENJAMIN K. SHARFI

June 09, 2022
197–200

Page 197

1  corner of the site?
2      A.  It's dumped actually on the Property 2 because
3  Property 1 is not -- doesn't have the infrastructure for
4  larger trucks, and then we tractor it with a smaller
5  scoop, you know, much smaller tractors a little bit at a
6  time into each stall.
7      Q.  And you don't recall the names of any
8  companies that have delivered sand to the site?
9      A.  I remember one guy named Tony.  I don't know
10  the name of his company.  Nice guy, nice gentleman.
11  Very cordial.  And he's always available to bring
12  whatever sand that we needed or wood shaving for the
13  animals.
14      Q.  Do you know whether or not Eddie Huggins Land
15  Grading Company has ever delivered sand or earthen
16  material for any use at the site?
17      A.  At the site categorically, when we billed the
18  arena, there was a lot of sand and clay that was brought
19  for the arena.  Whether it was Mr. Huggins under the
20  directives of Mr. White or that I don't know, but there
21  was sand and clay was delivered to the northeast where
22  the riding arena is.
23      Q.  Any other places where any earthen material
24  was delivered at the site?
25      A.  As I mentioned, the material that was

Page 198

1  delivered multiple times is that white stuff that you
2  see on the picture that is a form of crushed coquina
3  rock that is used because it's stable around the post.
4      Q.  Is where -- in instances where coquina rock
5  has been delivered to the site, where has it been left?
6      A.  I'm sorry, I didn't understand that question
7  at all.
8      Q.  In instances where coquina rock was delivered
9  to the site, where was it left?
10      A.  The equipment that brings that, they cannot do
11  the circle, so they would dump it either on the road,
12  which is dirt road on the east side of Property 2 or on
13  the center of property 2.  They will dump it there and
14  then it will be manually moved to the areas that is
15  required with much smaller machinery.
16      Q.  And are you aware of any instances where
17  coquina rock or any other earthen material was dumped on
18  the road on the site?
19      A.  Again, if they did, they can go only so much
20  in before they have to back out, and that would only be
21  on the east side, not on the west side.  There is no
22  access on the west side.
23      Q.  And that's because the trucks won't be able to
24  make the turn on the corner of the site?
25      A.  They will not be able to make the turns or

Page 199

1  they will even fit through the road.
2      (Deposition Exhibit No. 57 was previously
3  marked and identified for the record.)
4  BY MR. ADKINS:
5      Q.  So I'm now showing you DX57.  Do you see that
6  on your screen?
7      A.  Yes.
8      Q.  Okay.  I want to show you the picture on the
9  first page which is stamped USACE14.
10      Do you see that picture?
11      A.  Yes, I do.
12      Q.  Do you recognize this image as being at the
13  site?
14      A.  No, sir.
15      Q.  Do you see the piece of equipment in the
16  background?
17      A.  It seems like the same equipment you showed me
18  earlier, the yellow and black tractor.
19      Q.  Okay.  So this is a photo exhibit from the
20  South Florida Water Management District and this picture
21  was taken on the site April 25, 2018.  Is there a reason
22  why you don't recognize the site?
23      MR. MIRON:  Objection.  Asked and answered.
24      THE WITNESS:  It looks like, clearly, from all
25  the other pictures that you show, that many of them

Page 200

1  are not on my site; they were not taken on my site.
2  So I have no reason to believe that any of these
3  pictures are of my site or not my site.
4  So I look at this, I see dirt and -- a sandy
5  dirt, to be more clear.  I see a lot of sand in it.
6  So -- and I also see a machine, a tractor with what
7  looks like yellow and black.
8  BY MR. ADKINS:
9      Q.  I'm taking you to the second page here.
10      A.  Mm-hmm.
11      Q.  It's just taking a little while to load.
12      Okay.  Do you see this image?
13      A.  Yes, sir.
14      Q.  Okay.  Do you see what looks like to be an
15  orange piece of equipment on the top left area of this
16  picture?
17      A.  I would depict more like yellow, but go ahead.
18      Q.  Okay.  Do you recognize that equipment?
19      A.  No, sir.
20      Q.  Okay.  So I'm taking you to page 18, USACE18.
21  Do you see that image?
22      A.  Yes, sir.
23      Q.  Do you see the piece of equipment depicted in
24  this picture?
25      A.  Yes, the Hitachi equipment.

BENJAMIN K. SHARFI
USA vs BENJAMIN K. SHARFI

June 09, 2022
201—204

Page 201

1    Q.  Yes.
2    A.  The Hitachi tractor.
3    Q.  Have you ever seen that before?
4    A.  No.
5    Q.  Now, when we were talking about clearing on
6  the ditch on the western boundary of the site, I thought
7  I heard you say you might have seen a backhoe that was
8  orange?
9    A.  I saw a piece of equipment that looks similar
10  to that, but I think the one that they brought there was
11  bigger than this to be able to reach over the -- or it
12  could be this.  So again, I don't have a scale, so
13  you're asking me to speculate and I don't know one from
14  another.
15    Q.  But this picture here doesn't look like the
16  backhoe you had in mind?
17       MR. MIRON:  Objection.  It misstates the
18  testimony.
19       THE WITNESS:  As I mentioned, I'm not a
20  tractor kind of a guy, so I couldn't tell you from
21  one brand to another brand, but I've seen similar
22  piece of machinery clear the ditch.
23  BY MR. ADKINS:
24    Q.  Okay.  And do you have any idea what this
25  orange piece of equipment is doing on the site?

Page 202

1       MR. MIRON:  Objection.
2       THE WITNESS:  No, sir.
3  BY MR. ADKINS:
4    Q.  Are you surprised to see a picture like this
5  then?
6       MR. MIRON:  You have to give me an
7  opportunity.
8       THE WITNESS:  I'm sorry, sir.  Speak up
9  faster.
10       MR. MIRON:  I'm doing my best, Mr. Sharfi.
11  Objection.  Speculation.
12  BY MR. ADKINS:
13    Q.  Are you surprised to see a picture of this
14  piece of equipment at your site?
15       MR. MIRON:  Objection.  Argumentative.
16       THE WITNESS:  No.
17  BY MR. ADKINS:
18    Q.  Why not?
19    A.  What?  What?
20    Q.  Why not?
21    A.  It's a farm.  You have equipment in farm.  You
22  hire people to do job.  They bring equipment and then
23  whatever equipment they see fit.  Why would I be
24  surprised to see a tractor in a farm?
25    Q.  Well, do you know what that tractor's doing on

Page 203

1  your farm?
2       MR. MIRON:  Objection.  Asked and answered.
3       THE WITNESS:  Working.
4  BY MR. ADKINS:
5    Q.  Okay.  What is it working to do?
6       MR. MIRON:  Objection.  Asked and answered,
7  speculative.
8       THE WITNESS:  Not being sarcastic, and I'm not
9  trying to start anything, sir.  No, I don't.
10  That's not my area of expertise.  That's not what I
11  do and I'm not familiar with this equipment.  You
12  keep asking me the same question.  I'm trying to be
13  very cordial and to keep this very civilized
14  manner.  But no, I do not know and I'm not
15  surprised to see a tractor in a farm no more than
16  I'm surprised to see a cow in a farm.  Cows belong
17  in a farm.  Tractors belong in a farm and workers
18  belong in a farm.
19  BY MR. ADKINS:
20    Q.  Do you know whether or not this tractor is in
21  an area that's been delineated as a wetland on the site?
22       MR. MIRON:  Objection.  Speculation.
23       THE WITNESS:  Where this tractor is that looks
24  like it is, there is no wetland there, has not been
25  wetland there, will not be wetland there.  We did

Page 204

1  not disrupt any areas which you defined wetland.
2  Wetlands have a very clear signature and trees and
3  vegetations and they are bordered and signs to keep
4  out and keep all animals and humans out.
5  BY MR. ADKINS:
6    Q.  Are you aware that Ms. Small contacted
7  Mr. Kryzda in March 2018 and strongly recommended that
8  work in areas that she delineated as a wetland should
9  stop?
10       MR. MIRON:  Objection.  It mischaracterizes
11  the nature of the testimony.
12       THE WITNESS:  Categorically, I'm not aware of
13  any of the communication that Mr. Kryzda and
14  Ms. Small have had.  As I mentioned, I have never
15  talked to her, seen her, been on a site with her in
16  any way or form.  So I'm not privy to the
17  communication that they've had between them.
18  BY MR. ADKINS:
19    Q.  So you know I deposed Ms. Small in this case?
20  Do you understand that?
21    A.  I'm sure you did.
22    Q.  Do you know anything about that deposition?
23    A.  No more than my counsel told me.
24    Q.  Okay.  So your counsel told you about
25  Ms. Small's deposition?

BENJAMIN K. SHARFI
USA vs BENJAMIN K. SHARFI

June 09, 2022
205–208

Page 205

1     MR. MIRON:  Objection.  I'm going to instruct
2  him not to answer.
3     THE WITNESS:  I'm --
4     MR. MIRON:  I instructed you not to answer.
5     THE WITNESS:  Yes.  I'm not answering.
6  BY MR. ADKINS:
7     Q.  So I'll tell you Ms. Small testified at her
8  deposition that when she was on the site in March 2018,
9  she observed work occurring in an area that she had
10  delineated as a wetland and then she called Mr. Kryzda
11  while he was still at the site and she strongly
12  recommended that the work stop.  That was Ms. Small's
13  testimony.
14     A.  Okay.
15     MR. MIRON:  There's not a question there,
16  Mr. Sharfi.
17  BY MR. ADKINS:
18     Q.  Did Mr. Kryzda get in touch with you after
19  Ms. Small contacted him?
20     MR. MIRON:  Objection.  Vague.
21     THE WITNESS:  We did not have any specific
22  conversation in regards to that visit.
23  BY MR. ADKINS:
24     Q.  So you never had a conversation with
25  Mr. Kryzda about Ms. Small's recommendation that work

Page 206

1  stop in an area that she delineated as a wetland?
2     A.  I've never had a personal conversation with
3  Mr. Kryzda in regards to that, that my attorneys were
4  not present.
5     Q.  Okay.  Did you have any conversation with
6  Mr. Kryzda in 2018 with or without your attorneys
7  present regarding Ms. Small's recommendation that work
8  stop in an area that she delineated as a wetland?
9     MR. MIRON:  And to the extent that it was with
10  counsel, obviously, again, you understand not to
11  testify as to the contents of that discussion.
12     THE WITNESS:  Correct.  I've had conversations
13  with the attorneys, which remains privileged.
14  BY MR. ADKINS:
15     Q.  Okay.  I don't want you to disclose the
16  subject or topics of what you talked about just yet,
17  tell me what they said, but when did the conversations
18  occur with counsel and Mr. Kryzda where you discussed
19  Ms. Small's recommendation to stop work in an area that
20  she delineated as a wetland?
21     A.  I cannot tell you the hour, the date or the
22  month, but as the topic arose, needed my attention,
23  there would be -- meetings would be set up and we would
24  have these conversations in group meetings.
25     Q.  Okay.  Did you have any conversations around

Page 207

1  March 2018 with Mr. Kryzda, with or without counsel,
2  regarding Ms. Small's strong recommendation that work
3  stop in wetlands on the site?
4     MR. MIRON:  Objection.  Asked and answered.
5     THE WITNESS:  You just asked that question.
6  Ask the court reporter to repeat it and then she
7  will give you the answer.
8  BY MR. ADKINS:
9     Q.  Okay.  I asked the question and you said other
10  than conversations I've had with counsel, no.  And so
11  now I'm asking you in 2018, did you ever have a
12  conversation with Mr. Kryzda about Ms. Small's
13  recommendation that work in wetlands stop with the
14  presence of counsel?
15     MR. MIRON:  Objection.  Asked and answered and
16  also misstates the characterization of his earlier
17  testimony.
18     THE WITNESS:  All the conversations that were
19  the topic as the wetland issues were always in a
20  group sessions between Mr. Kryzda, the attorneys
21  and myself, and they would have this dialogue and
22  this conversation and inform me what I needed to
23  know.
24  BY MR. ADKINS:
25     Q.  And you're aware that I deposed Mr. Kryzda

Page 208

1  yesterday?
2     A.  Yes, sir.
3     Q.  Okay.  Have you talked to Mr. Kryzda about his
4  deposition?
5     MR. MIRON:  Outside -- to the extent that you
6  had conversations with Mr. Kryzda outside the
7  confines of myself or your counsel, then you can
8  answer.
9     THE WITNESS:  No, we did not.
10  BY MR. ADKINS:
11     Q.  Okay.  Did you meet with Mr. Kryzda yesterday?
12     A.  Myself and my attorneys and Mr. Kryzda, we
13  enjoyed a wonderful dinner together last night.
14     Q.  Okay.  How much time did you spend with
15  Mr. Kryzda yesterday?
16     A.  Dinner with a clear agenda that we have to be
17  back at quarter to 9 to watch the Celtics game.
18     Q.  How much time would that be?
19     A.  Couple hours, maybe.
20     Q.  Okay.  So Mr. Kryzda testified that he did
21  have a conversation with you regarding Ms. Small's
22  concern over works at wetlands at the site.
23     A.  Okay.  I don't recall.
24     MR. MIRON:  There's not a question there.
25

BENJAMIN K. SHARFI
USA vs BENJAMIN K. SHARFI

June 09, 2022
209—212

**Page 209**

1  BY MR. ADKINS:
2      Q.  So is Mr. Kryzda being honest with me when he
3  said that?
4      A.  Mister --
5      MR. MIRON:  Objection.  Argumentative.
6      THE WITNESS:  Mr. Kryzda is one of the finest,
7  kindest, straightforward man I've ever known in my
8  life.  I trust him with my life.  I trust him with
9  my children's life.  I trust him in every business
10  segment.  Mr. Kryzda is one of a kind, honest,
11  straightforward shooting man with extreme moral
12  values and guidelines.  That's why he's the
13  president of my company and I respect him.
14  Whatever he said to the best of his knowledge to be
15  always true.
16  BY MR. ADKINS:
17      Q.  You're passionate about protecting nature on
18  the site; isn't that right?
19      A.  My prime directives, if you are Star Wars or
20  Star Trek, my prime directive is to preserve nature and
21  grow nature.  Live long and prosper.
22      Q.  And so if an environmental --
23      A.  You have to have a sense of humor here a
24  little bit, no?
25      Q.  If an environmental consultant that you hired

**Page 210**

1  advised that work in areas that she delineated as a
2  wetland should stop, you would take that seriously,
3  right?
4      A.  Of course.
5      Q.  In fact, you might -- that might be a
6  conversation that you tend to remember; wouldn't you
7  agree?
8      MR. MIRON:  Objection.  Speculative.
9      THE WITNESS:  As I mentioned, I never had the
10  opportunity to meet with Ms. Danna Small.  I've
11  learned since these proceedings so much more about
12  her and her credentials than I knew at the time.  I
13  did not bother to read her credentials.  I did not
14  look at her previous work or her delineation, as
15  you put it.
16      MR. MIRON:  I would just like to caution you,
17  to the extent that you learned information that you
18  derived as a result of conversations with counsel,
19  please don't discuss it, okay?
20      THE WITNESS:  Fine.  Thank you.
21  And so Ms. Small is -- did the job that
22  Mr. Kryzda requested and when the information was
23  presented to us, we asked to meet with her to
24  discuss these additional topics, and that's when
25  you bulldozed us with all your threats and all your

**Page 211**

1  NOVs and criminal acts and all the crap that you
2  threw on us.  So that basically stopped all the
3  conversations on that and we focused more trying to
4  deal with you.
5      Between the time give us the ability to
6  talk to her and look at it and the time that you
7  filed is not even 48 hours.  And by no means the
8  reasonability, sir, giving somebody 48 hours, which
9  is 24 hours a period of a weekend, is considered a
10  reasonable time for us to react.  I don't believe
11  you have one person that would say that's
12  reasonable time.
13  BY MR. ADKINS:
14      Q.  Okay.  Has your view of Ms. Small changed
15  since you hired her in 2018?
16      A.  Have my views of Ms. Danna Small changed?  Yes
17  and no.  It has validated Mr. Kryzda's ability to
18  select --
19      THE WITNESS:  Is that rain?
20      MR. MIRON:  Yes.
21      THE WITNESS:  Wow -- Mr. Kryzda's ability to
22  hire topnotch people to do the work.
23  BY MR. ADKINS:
24      Q.  Okay.  So after -- well, let me ask this.  Do
25  you recall at any point giving any instruction to

**Page 212**

1  discontinue work in an area that Ms. Small delineated as
2  a wetland?
3      A.  Not that I recall any specific time the
4  conversations between the attorneys and myself that
5  we've had that would remain private.
6      Q.  Okay.  But you never advised anyone working at
7  NeshaFarm to stop work in the area that Ms. Small
8  delineated as a wetland; is that correct?
9      A.  I did not see the delineation, much less react
10  on it.
11      Q.  Do you know how the consulting relationship
12  with Ms. Small ended?
13      A.  No, sir.
14      Q.  So at her deposition she testified that her
15  consulting relationship ended because she was concerned
16  that activities continued regardless of her
17  recommendations and that she did not get the sense that
18  her recommendations were being taken seriously.
19      MR. MIRON:  There's not a question there.
20  BY MR. ADKINS:
21      Q.  Were Ms. Small's recommendations being taken
22  seriously?
23      A.  I don't know whether recommendations were,
24  sir.  As I mentioned, I did not look at her delineation.
25  It was not the topic that I personally would be involved

BENJAMIN K. SHARFI                                          June 09, 2022
USA vs BENJAMIN K. SHARFI                                   213–216

Page 213

1  with.  Mr. Kryzda and the attorneys, myself and they
2  were involved and they looked at all the options and
3  possibilities and they need to do the job they get paid
4  for.
5      Q.  Do you believe Mr. Kryzda was taking
6  Ms. Small's recommendation seriously?
7      A.  I believe that's a question for Mr. Kryzda.
8      Q.  Okay.  Well, hearing now, as you say for the
9  first time, that Ms. Small strongly recommended that
10  work in wetlands stop, do you believe Mr. Kryzda was
11  taking that recommendation seriously?
12         MR. MIRON:  Objection.  Speculation, assumes
13      facts not in evidence.
14         THE WITNESS:  You're asking me what's in
15      Mr. Kryzda's mind.  I'm not sure that I'm
16      qualified.
17  BY MR. ADKINS:
18      Q.  Well, you're saying that Mr. Kryzda never told
19  you about this recommendation.  Would you have liked to
20  have known?
21         MR. MIRON:  Objection.  Speculation.
22         THE WITNESS:  Mr. Kryzda, in our group
23      sessions, meetings that we've had, he expressed
24      what they had to be and I listened to the counsel
25      and I listened to the advice that was given and

Page 214

1      followed it.
2         And I need to be clear, crystal clear.  I am
3      in a very strong opinion that only work that was
4      done was outside of any wetland area.  The wetland
5      area that we believe is wetland and the consultants
6      believe is a wetland has been bordered, fenced and
7      signs to stay out.  So those areas in the southwest
8      corner, there is not a single sign of maple trees
9      or any kind of a growth.  And the only growth that
10      was over there that was removed, as you can tell
11      from your own pictures, sir, they were non-wetland
12      vegetation that were there, like palmettos and
13      other kind of shrubs that are not native to
14      wetland.
15  BY MR. ADKINS:
16      Q.  Is the area that Ms. Small delineated as a
17  wetland demarcated in any way on the site currently?
18      A.  Parts of it are, sir.
19      Q.  And parts of it are not?
20      A.  And parts of it are not.
21      Q.  When did any signs indicating the presentation
22  of a wetland on the site, when were those signs posted?
23      A.  Immediately after we acquired the site.
24      Q.  And do you have any pictures of those signs?
25      A.  You have photographs of it that you showed me

Page 215

1  earlier that you can see wooden fence all around the
2  wetlands and on those posts there are signs.  If you
3  zoom in on a few of them, you'll see every fifth or
4  sixth post there is a sign that says "Do Not Enter."
5      Q.  After Ms. Small delineated a wetland on the
6  site, did you make any efforts to protect the area that
7  she delineated?
8      A.  No, sir.  By then you already decided to throw
9  the book at us and send Mr. Pempek and the crew and the
10  Army Battalion 212 and 214 after us to -- for these.  So
11  at that time we were in self-preservation mode and
12  self-defense mode.
13      Q.  Is there any other reason why you didn't
14  demarcate the area that Ms. Small delineated as a
15  wetland on the site?
16      A.  Never got a --
17         MR. MIRON:  Objection.  Asked and answered.
18         THE WITNESS:  Never got a chance to read it
19      and the areas that we looked at that had those
20      demarcations, we marked it and preserved it.
21  BY MR. ADKINS:
22      Q.  Okay.  So the only reason you had for not
23  protecting the other areas that Ms. Small delineated as
24  a wetland was because the Army Corps of Engineers was
25  pursuing an enforcement action against you?

Page 216

1         MR. MIRON:  Objection; form.  Vague, asked and
2      answered and argumentative.
3         THE WITNESS:  Areas that we believed was
4      wetland that showed signs of wetland and we were
5      protected from day one with or without Ms. Small's
6      recommendation.
7         Can we take a pee break?
8         MR. MIRON:  Mr. Adkins, Mr. Sharfi asked if we
9      could take a restroom break.
10         MR. ADKINS:  Sure.
11         MR. MIRON:  Five minutes.
12         MR. ADKINS:  Yeah.
13         THE WITNESS:  Five minutes would be more than
14      adequate, sir.
15         MR. MIRON:  Thank you.
16         THE VIDEOGRAPHER:  Off the record.  The time
17      is 3:48.
18         (Off the record.)
19         THE VIDEOGRAPHER:  We are back on the record.
20      The time is 3:59.
21         (Deposition Exhibit No. 229 was previously
22      marked and identified for the record.)
23  BY MR. ADKINS:
24      Q.  Mr. Sharfi, I'm showing you a document that's
25  previously been marked DX229.  This is an e-mail from

BENJAMIN K. SHARFI
USA vs BENJAMIN K. SHARFI

June 09, 2022
217–220

Page 217

1  you to John Pempek copying others on April 30, 2018.
2  I'll give you a moment to read through this.  Why don't
3  you let me know when you want me to scroll down, okay?
4      A.  Yes, and I'm done with this part.
5      Q.  I'm going to scroll through your signature
6  line just to get to the next e-mail, okay?
7      A.  Mm-hmm.  Okay.  Yes, sir.  Okay.
8      Q.  All right.  I think we're at the end here.
9      A.  You mean the beginning?  The end is the
10  beginning, right?
11      Q.  Are you familiar with this document,
12  Mr. Sharfi?
13      A.  I have seen these e-mails; yes, sir.
14      Q.  Okay.  Do you remember this e-mail chain back
15  in 2018?
16      A.  Yes, sir.
17      Q.  There was some high tensions, you might say,
18  going on in this e-mail.  Would you agree with that?
19      A.  I believe the high tensions started in 2016.
20      Q.  Okay.
21      A.  It's just one more example of the harassments
22  that we're talking about.
23      Q.  So Mr. Pempek from the Army Corps sent an
24  e-mail on April 30, 7:10 a.m., assuming that's eastern,
25  attaching a letter stating in his e-mail the "United

Page 218

1  States Army Corps of Engineers believes that you have
2  started filling jurisdictional wetlands without the
3  benefit of a permit."
4      Do you see that?
5      A.  Yes, sir.
6      Q.  Okay.  And so Mr. Pempek was sending the -- an
7  electronic copy of the cease and desist letter.  Do you
8  remember that?
9      A.  I recall receiving it.  I don't know if that
10  was the same day or what have you, but yes, I received
11  it about the same time.
12      Q.  Okay.  And you responded, "I will respond to
13  this letter properly, but the short of it is we have
14  not."
15      Do you see that?
16      A.  Yes, sir.
17      Q.  And then you said, "We have" -- I think you
18  meant planted -- "few trees and cleaned the vines that
19  were killing the trees."
20      Do you see that?
21      A.  Yes, sir.
22      Q.  Okay.  Did you do anything else at the site at
23  this point other than planting a few trees and clean the
24  vines that were killing the trees?
25      MR. MIRON:  Objection.  Vague.

Page 219

1      THE WITNESS:  The site being the entire
2  10-acre lot, there was a lot of work that has been
3  done on the 10-acre site.
4  BY MR. ADKINS:
5      Q.  And as of April 30, 2018, you had done more
6  work than just planting a few trees and cleaning the
7  vines that were killing the trees at the site, correct?
8      A.  At the site, meaning, again, the full 10-acre
9  site, we -- outside the wetland area and
10  non-jurisdictional area, we did the work that the
11  farmers need to do to keep up with their site.
12      Q.  Well, you removed trees within the area that
13  Ms. Small delineated as a wetland, correct?
14      A.  No, sir.
15      MR. MIRON:  Objection.  Speculation.
16  BY MR. ADKINS:
17      Q.  So as of April 30th, 2018, you hadn't removed
18  any trees in the area that Ms. Small delineated as a
19  wetland?
20      A.  Sir, you asked that question.  I answered it
21  as crystal clear.  Just to be, again, on the record, if
22  you observe the photos and observed that, there were no
23  trees in outside areas that we needed the work,
24  specifically the area where you call the southwest
25  corner.  The only thing that was removed is ground

Page 220

1  shrubberies and materials that can be hazardous to our
2  animals.
3      If you look very carefully everywhere around
4  there, there is not a single tree with aerial or
5  otherwise you will see that they were there.  My job is
6  to preserve every tree of any species that is not
7  harmful.  The only shrubberies that were removed that
8  they are allowed to be removed and we did not touch any
9  trees.
10      Q.  A perimeter road was created at the site at
11  the time you wrote this e-mail, correct?
12      A.  I'm sorry, we what?
13      Q.  A perimeter road had been constructed around
14  the site at the time you wrote this e-mail; is that
15  correct?
16      A.  The perimeter road, I believe, like I said,
17  that was one of the first line items to put the fence
18  up.  So it was done I'm sure prior, but although I
19  couldn't be a hundred percent sure that it was done over
20  the entire area, finished or not.
21      Q.  Okay.  Sorry.  Let me go back to your e-mail.
22  You wrote, "We are very sensitive to thus" -- I think
23  you meant this -- "issue and very much aware of the
24  wetland locations."
25      Do you see that?

BENJAMIN K. SHARFI
USA vs BENJAMIN K. SHARFI

June 09, 2022
221-224

Page 221

1   A.  Yes, sir.
2   Q.  As of April 30, 2018, where did you understand
3  the wetland locations to be on the site?
4   A.  You asked that many times and I said the areas
5  that we believed was a wetland was immediately fenced
6  and bordered and signs to keep out.  That area was not
7  part of the wetland in the southwest corner.  It's
8  something like 12 to 18 inches higher ground and that's
9  where we did the work.
10   Q.  Are you aware that as of the time you wrote
11  this e-mail, Ms. Small -- Ms. Small's delineation had
12  been verified by the water management district?
13   A.  Was that a question?
14   Q.  Yeah.  Were you aware of that?
15   A.  I was not aware of the timeline and what
16  Ms. Small did or has been doing.
17   Q.  Do you accept the accuracy of Ms. Small's
18  wetland delineation?
19   A.  No more than you do.
20   Q.  Okay.  What do you believe I do?
21       MR. MIRON:  Object to form.
22       THE WITNESS:  You believe that 10 acres is
23  wetland.
24       MR. MIRON:  Objection.  Vague.
25

Page 222

1  BY MR. ADKINS:
2   Q.  So do you believe Ms. Small's wetland
3  delineation is accurate?
4   A.  I believe her wetland delineation is
5  inaccurate, not accurate.
6   Q.  Is there a reason why you believe it's
7  inaccurate?
8   A.  Yes.
9   Q.  What is it?
10   A.  The areas that she marked as being wetland,
11  they are not.  They do not have any wetland trees like
12  the maples, like the cypress.  And it's 12 to 18 inches
13  higher than the site from the wetland and no water from
14  the wetland could ever reach that site.  And there was
15  no vegetation, trees.  In fact, the trees, the
16  shrubberies that were there like the palmettos, best of
17  my knowledge and the expert knowledge that we've
18  obtained, they do not grow in wetland.
19   Q.  Is there any other reason why you believe
20  Ms. Small's wetland delineation of the site is
21  inaccurate?
22   A.  Besides my belief or my knowledge, no.
23   Q.  Okay.  So you invited the Army Corps on the
24  site to see for themselves the work that was being done;
25  is that correct?

Page 223

1   A.  Correct.
2   Q.  And Mr. Pempek wrote back, again, on April 30,
3  "I look forward to the opportunity to meet you on site."
4       Do you see that?
5   A.  Yes, sir.
6   Q.  Okay.  I'm going to move up to the top e-mail
7  in the chain here.  And you wrote back, "Look forward to
8  showing you what we are doing.  We are not affecting
9  water rights or anything like that.  I think by now I've
10  demonstrated my willingness to preserve and improve
11  nature in every way possible."
12       Do you see that?
13   A.  Yes, sir.
14   Q.  And you wrote, "You have my personal word on
15  this issue, that we will work all the way with the Corps
16  and any other agencies."
17       Did I read that correctly?
18   A.  Absolutely.
19   Q.  What did you mean when you wrote "We will work
20  all the way with the Corps and any other agencies"?
21   A.  We have been the willing and able to work with
22  all agencies, state, local, county, and in this case,
23  the federal government, to do the right things, to
24  obtain whatever is necessary to do the job right, to
25  preserve whatever area is claimed to be wetland.  And

Page 224

1  whatever has been determined to be a wetland, we will do
2  everything possible to beautify it, as we've done in the
3  parcel to the south of us.
4   Q.  Okay.
5   A.  Which was quoted by a top person in Martin
6  County, an environmentalist, when he visited the site --
7  I forgot his name -- and his two other people on the
8  site, quote/unquote, This is the best wetland preserve
9  area in Martin County.  Thank you, Mr. Sharfi, for the
10  work that you have done in here.  We truly appreciate
11  that.
12       And that's the reputation we have in Martin
13  County.
14   Q.  Have you worked all the way with the Corps to
15  preserve the area that Ms. Small delineated as a
16  wetland?
17   A.  No, sir.  The Corps has nothing to do with
18  this.  We never believe, and to date we do not believe,
19  that the Corps has any jurisdiction over those
20  territories.
21   Q.  And have you worked all the way with the water
22  management district to preserve the area that Ms. Small
23  delineated as a wetland?
24   A.  We have worked with South Florida Water
25  Management District and the county to create the PAMP

BENJAMIN K. SHARFI
USA vs BENJAMIN K. SHARFI

June 09, 2022
225–228

Page 225

1  and the preservation area with assistance from one of
2  the top environmentalists in this area, Mr. Toby
3  Overdorf, and that we worked with him to plant, to
4  create better wetland, to remove the undesirable species
5  that are harmful to the wetlands and to plant the kind
6  of material to beautify the wetlands.
7        And Mr. Overdorf and the people we hired to
8  listen to their advice, we're going to follow them.  And
9  the South Florida Water Management District, ourself and
10  the county are very happy with the results and we are
11  working toward wrapping up our Phase 2 of our project.
12     Q.  Mr. Kryzda testified that after receiving the
13  C&D, he had a conversation with you about what you
14  wanted to do and he told me that you said you would not
15  stop work on your property.
16       MR. MIRON:  Brandon, I'm going to object based
17    on vagueness, but the reason I'm objecting is
18    because you used the term C&D and Mr. Sharfi looked
19    at me with a blank stare.  I suggest you not say
20    C&D.
21       MR. ADKINS:  Okay.
22       THE WITNESS:  I don't understand C&D.  I
23    understand A, B, C and D.
24  BY MR. ADKINS:
25     Q.  I appreciate you clarifying.  So by C&D, I

Page 226

1  mean the cease and desist letter from the Army Corps of
2  Engineers.
3       MR. MIRON:  You want to restate --
4       THE WITNESS:  Go ahead and ask your question
5    again, sorry.
6  BY MR. ADKINS:
7     Q.  Mr. Kryzda testified after receiving the cease
8  and desist letter from the Army Corps of Engineers, he
9  had a conversation with you about what you wanted to do
10  next and he told me that you said you would not work --
11  stop work on your property.
12        Is that an accurate statement?
13     A.  I will not stop work on what you call the
14  site.  The site is an entire 10 acres and only very
15  small portion of it is a wetland, and we never worked in
16  the wetland areas.  And we continued our work on the
17  remaining areas that are upland, including building the
18  arena and other facilities has nothing to do with
19  wetland and preservation or C&D.
20     Q.  Okay.  And --
21     A.  See I'm quick, C&D.
22     Q.  That was very good.  And so just to be clear,
23  you intended to continue work in the area -- in some of
24  the area that Ms. Small delineated as a wetland, but
25  which you believe is not a wetland; is that correct?

Page 227

1     A.  No, sir.
2       MR. MIRON:  Objection.  That mischaracterizes
3    the nature of his testimony.
4       THE WITNESS:  No, sir.  The area that she
5    suggested that it was questionable, we decided to
6    give her the benefit of the doubt and until we have
7    the chance to clarified, we did not do anything
8    additional work in those questionable areas, but we
9    preserved all the wetlands.  And the work that was
10    proceeded was on the north side of the property
11    east and west and the center.
12  BY MR. ADKINS:
13     Q.  There was a part of Ms. Small's delineation
14  that you considered to be questionable?
15     A.  Yes, sir.
16     Q.  What part?
17     A.  That the wetland went all the way to the
18  southwest corner.
19     Q.  Okay.  And what did you do to -- well, scratch
20  that question.
21        You realize the water management district
22  verified that delineation at your request, correct?
23     A.  No, sir.
24     Q.  You're not aware of that?
25     A.  No, sir.

Page 228

1     Q.  Okay.  Are you aware of wetland locations on
2  your site?
3       MR. MIRON:  So Brandon, you cut out.
4  BY MR. ADKINS:
5     Q.  Well, you said to the Army Corps that you're
6  very sensitive to this issue and very much aware of the
7  wetland locations, and at that point the water
8  management district had verified Ms. Small's wetland
9  delineation at the site.
10       MR. MIRON:  There's not a question.
11  BY MR. ADKINS:
12     Q.  Is it still questionable, Ms. Small's
13  delineation, after the water management district
14  verified it?
15     A.  Are you asking me a question, sir?
16     Q.  Yeah.  Did you still consider it to be
17  questionable after the water management district
18  verified Ms. Small's wetland delineation?
19     A.  I don't believe the South Florida Water
20  Management ever validated or we ever got to a point to
21  have a discussion as to where the wetlands were.  As we
22  were in the process of setting these meetings, you
23  dropped a bomb on us and that's where the attention went
24  to deal with the outstanding C&D issues.
25       MR. MIRON:  To the extent there are any

BENJAMIN K. SHARFI
USA vs BENJAMIN K. SHARFI

June 09, 2022
229–232

Page 229

1 discussions that you had with counsel specifically
2 as it relates to any actions you took after the
3 cease and desist letter, please don't discuss
4 those.
5 BY MR. ADKINS:
6    Q.  So you were present when the water management
7 district and the Army Corps of Engineers inspected the
8 site in May 2018, correct?
9    A.  I would not call it an inspection, sir.  It
10 was they were invited as guests for me to come and show
11 them what we have.  They did not get a court order.
12 They did not mandate it.  It was for them to come as my
13 guest to see it for themselves.
14    Q.  Okay.  Is there any other way -- is there any
15 other reason why you couldn't characterize it as an
16 inspection?
17       MR. MIRON:  Objection.  Asked and answered.
18       THE WITNESS:  Yes.
19 BY MR. ADKINS:
20    Q.  What?
21    A.  Inspection would be what you have to go
22 through, bring army of engineers and army of scientists
23 and army of scientists into the site and get court
24 orders, et cetera.  It's what I would call an
25 inspection.  The other one was by invitation, not by

Page 230

1 court order.
2    Q.  Okay.  Do you recall when the visit in May of
3 2018 began?
4    A.  No, sir.
5    Q.  Do you recall how long it lasted?
6    A.  I believe only half a day, as I recall.  It
7 was not long.
8    Q.  Was Mr. Pempek present?
9    A.  Yes, sir.
10    Q.  Okay.  Do you recall whether anyone else from
11 the Army Corps of Engineers was present?
12    A.  There were other people present.  I would not
13 know who they were, whether they were from South Florida
14 or Army Corps or the county or the state.  I do not
15 know.
16    Q.  Okay.  Do you recall any of the names of any
17 of the other people who were present that day?
18    A.  No.
19    Q.  Was -- did you have a lawyer present?
20    A.  I believe Mr. Jefferson was there.
21    Q.  Is that Mr. Jefferson Knight?
22    A.  Yes, sir.
23    Q.  Okay.  Was Mr. Kryzda present?
24    A.  I don't know.
25    Q.  Was Mr. Berlusconi present?

Page 231

1    A.  I don't know.
2    Q.  Do you recall any specific conversations that
3 occurred during the site visit in May 2018?
4    A.  Yes, where Mr. Pempek was on the site and I
5 was walking with him, having a very cordial
6 conversation, trying to demonstrate to him that we are
7 good people and we are conservation people.  He bends
8 down to pick up some leaves and shrubs and he goes back
9 into the attitude "What you're doing here is wrong and
10 you will pay the price."  That's when I left him and I
11 departed myself from him and I told my attorneys what he
12 just said.
13    Q.  Okay.  So --
14    A.  Once again, he was giving me personal threats
15 and that's where my cordiality with him stopped.
16    Q.  So Mr. Pempek said, "What you are doing here
17 is wrong and you are going to pay the price"?
18    A.  Correct, something along that nature.  Exactly
19 the choice of words, I don't know, but it was very
20 threatening voice with his head down so nobody else can
21 hear him, but I was definitely within the earshot and he
22 was talking to me.
23    Q.  Okay.  Was anyone else within earshot of that
24 conversation?
25    A.  No, sir.  Mr. Pempek very carefully crafted

Page 232

1 that scenery that everybody was ahead of us and he bent
2 down to pick a -- to quote/unquote, to pick up some
3 shrubbery.  While everybody else passed, he put his head
4 down and gave me that speech and with the very piercing
5 looking over his right shoulder at me and saying that.
6    Q.  Did you respond to Mr. Pempek when he said
7 that?
8    A.  Yes, I did.
9    Q.  What did you say?
10    A.  Go to hell.
11    Q.  Okay.  Did anyone else hear that?
12    A.  No.
13    Q.  Did you respond in any other way, Mr. Sharfi?
14    A.  No, sir.  That's when, again, he confirmed to
15 me that he was not there as friend, as he was invited.
16 He was here to collect ammunitions to see how he can
17 justify his position.  This is one of those cases that
18 you make a decision, then try to find evidence to
19 justify your decision.  And it was clear what he was
20 after.
21    Q.  Do you recall any other specific conversations
22 from the May 2018 site visit?
23    A.  There might have been a couple of other
24 exchanges that he keeps flexing his muscles at me that
25 how big and strong he is, but the gist of it was exactly

BENJAMIN K. SHARFI
USA vs BENJAMIN K. SHARFI

June 09, 2022
233–236

Page 233

1   that.
2       Q.   Do you think anyone else who was present that
3   day overheard this conversation you had with Mr. Pempek?
4       A.   You asked that question and I said no because
5   he was very carefully crafting the situation by
6   pretending he's picking leaves or grass from the ground
7   and looking over the right shoulder at me and saying
8   that with a very piercing eyes, like I'm going to get
9   you.
10      Q.   Do you remember where you were on the property
11  when he said this?
12      A.   I remember to -- within 5 meters of that
13  space, in the center just outside the wetland.
14      Q.   Okay.  So you were on the site?
15      A.   I'm sorry?
16      Q.   You were on the site that we've been referring
17  to?
18      A.   Of course.  How else would he look over his
19  shoulder at me?
20      Q.   Okay.  Well, I just wanted to make sure you
21  weren't on a different part of NeshaFarm.
22      A.   I said he very craftily, he bent over to pick
23  leaves and when he gave me the speech without anybody
24  else hearing.  I believe I'm speaking English as clear
25  as I possibly can.

Page 234

1       Q.   Okay.  And was this to the east, west, north
2   or south of the wetland area on the site?
3       A.   It was to the west of the wetland area between
4   the corner of the site and the wetland.
5       Q.   Okay.  Did anyone from the water management
6   district or the Army Corps dig any holes while they were
7   on the site?
8       A.   They dig any poles?
9       Q.   Dig any holes, H-O-L-E-S.
10      A.   Holes.  I don't recall if they did or did not,
11  but we certainly did not object for them to do what they
12  wanted to do.
13      Q.   Did anyone ask to dig any holes while they
14  were on the site?
15      A.   Not that I recall.
16      Q.   Okay.  And if they would have asked you, you
17  would have allowed them to?
18      A.   I invited them.
19      Q.   Well, you said you --
20      A.   Yes.
21      Q.   -- invited them as guests, not to do an
22  inspection?
23      A.   If they would have asked, if they did, I would
24  not object to it.
25      Q.   Okay.

Page 235

1       A.   We have nothing to hide.  We have an open
2   book, open policy.  They're more than welcome to come
3   look at it, except when the Army Corps throws his
4   muscles around and tries to threaten us with lawsuits
5   and all that.  That's when we close our friendship and
6   doors and we go through the legal channels.  Otherwise,
7   we welcome anybody that wants to come visit the
8   beautiful creation that we have been able to create in
9   Martin County, and one of the finest wetland properties
10  in Martin County.
11      Q.   At any point did you say during the May 2018
12  site visit that you invited the Corps or the water
13  management district to get their blessing, not to
14  request permission for filling your wetland?
15      A.   What?  I didn't understand the question.  Get
16  their blessing, permission, what?
17      Q.   At any point while the Army Corps or the water
18  management district visited the site, did you say that
19  you invited them on to your property to get their
20  blessing, not to request permission for filling your
21  wetland?
22      A.   No such conversations.
23      Q.   Okay.
24      A.   The e-mail that I sent to Mr. Pempek said what
25  I had to say, that you're more than welcome, we invite

Page 236

1   you to come look at it for yourself.
2       Q.   At any point during the May 2018 site
3   inspection, did you say that the Florida Department of
4   Environmental Protection or Martin County would ignore
5   ongoing work on the site because they realized that your
6   intentions are for the greater good?
7       A.   No.
8       Q.   Did you ever say anything like that?
9       A.   No, sir.
10      Q.   Okay.  Did you ever say, during the May 2018
11  site visit, that you have a loaded gun and you're
12  prepared to shoot?
13      A.   This conversation was brought up to the -- I
14  don't recall the exact statement, but I assure you that
15  I do not have guns of any sort and I've never shot.  If
16  I said that words, that means we are prepared to fight
17  through the proper channels and we are financially
18  capable, as you should have noticed that by now, that we
19  are planning to fight for what we believe in.  I'm sure
20  you noticed that by now.
21          So that metaphor, if it's taken out of
22  context, which has not been that.  But no, sir, I do not
23  believe in guns.  I don't carry guns.  I don't believe
24  that anyone else carry guns on the site.
25      Q.   Did you ever give any indication that you

BENJAMIN K. SHARFI
USA vs BENJAMIN K. SHARFI

June 09, 2022
237–240

Page 237

1  would not do additional work on the site until
2  submitting additional information to the Corps?
3      A.  I didn't understand the question.
4          MR. MIRON:  Objection.  Vague.
5  BY MR. ADKINS:
6      Q.  Did you ever give any indication during the
7  May 2018 site visit that you would not do additional
8  work on the site?
9      A.  No, sir.  The site being the 10-acre property,
10  I would never say I'm not going to work at my farm.
11  That's like saying I'm not going to go take a shower.
12  This is a ridiculous that such statement was said.  I
13  did say that we will not work in the wetlands and we did
14  not work in the wetlands and we fenced the wetlands
15  completely.  Working on the site, it's 10-acre lot, sir,
16  and I'm not working 10-acre lots to care for animals, to
17  water them and clean behind them.  That's a ridiculous
18  statement.
19      Q.  Okay.  So do you recall making any
20  representations during the May 2018 site visit that you
21  would not do any additional work or any work in the
22  wetland on the site?
23      A.  I have made a commitment to him in writing and
24  otherwise and to my staff that we will stay out of the
25  entire area that is fenced and considered wetland and we

Page 238

1  will not disrupt it, and we will hire the right
2  appropriate people to help us to beautify the wetland as
3  to which parts of the vegetations can be removed or
4  replanted and the flowers and the trees that can be
5  planted in that area, which we did.
6          But yet, Mr. Pempek misrepresents me in his
7  e-mail that you just showed and said you promised me
8  you're not going to work on the site.  I told him very
9  clearly, no, I never promised you I'm not going to work
10  on the site.  I told you I'm not going to work on the
11  wetland, and I did not.  And I'm going to sustain my
12  promise.
13          But once again, he twists the truth and
14  misrepresents the truth, as he did with the issue of the
15  gun and loaded gun, which appeared that I was about to
16  shoot him or some crazy ass like that.
17          Again, he's going time after time after time
18  after time misrepresenting me as a mean, bad guy to
19  create this image of me that I'm some cowboy going
20  around and shooting people and what have you.
21          (Deposition Exhibit No. 230 was previously
22  marked and identified for the record.)
23  BY MR. ADKINS:
24      Q.  I'm sharing a document that's been marked
25  DX230.  Do you see DX230 on your screen, Mr. Sharfi?

Page 239

1      A.  Yes, sir, I do.
2      Q.  So this document has a date stamp on the
3  bottom right of August 22, 2018.
4      A.  Yes, I see.
5      Q.  Do you see that?
6          Okay.  Do you recognize what's -- what
7  property is depicted in DX230?
8      A.  Based on those greenhouse and the bamboos
9  that's on the side of the property, that looks like the
10  property to my west and we're looking at what we call
11  previously the ditch.
12      Q.  Okay.  Does it appear like there's water in
13  the ditch currently?
14      A.  I can't tell.
15      Q.  Okay.  Do you see these piles along what
16  appears to be a road?
17      A.  Yes, I see some sand.
18      Q.  Okay.  How do you know that's sand?
19      A.  Based on the nature and the color and brown
20  and white colors.
21      Q.  Do you know why piles would be appearing on
22  the site around August 2018?
23      A.  No.
24      Q.  Okay.  Have you ever seen piles in this area
25  of the site before?

Page 240

1      A.  Not that I recall.
2      Q.  Okay.  Do you know how those piles would have
3  gotten there?
4      A.  No, sir.
5      Q.  Okay.
6      A.  But these piles look very small, bucket of
7  sand that are brought in for that area.  It's -- from
8  the volume that I'm looking at, that's few pickup truck
9  loads of sand.
10          (Deposition Exhibit No. 69 was previously
11  marked and identified for the record.)
12  BY MR. ADKINS:
13      Q.  I'm now showing you a document that's
14  previously been marked DX69.
15      A.  I see.
16      Q.  Do you see DX69?
17      A.  Yes, sir.
18      Q.  Do you recognize the property depicted in this
19  document?
20      A.  It's the same property as before.
21      Q.  Okay.  So this is the site that we're looking
22  at, or at least part of it?
23      A.  Yes, sir.
24      Q.  Okay.  I want to zoom in on what is the
25  northwest corner of the site.

BENJAMIN K. SHARFI
USA vs BENJAMIN K. SHARFI

June 09, 2022
241–244

Page 241

1      Do you see that?
2      A.  Yes, I do cursor.
3      Q.  Okay.  Do you see what appears to be a path
4  running through the center of the site?
5      A.  Yes, I do.
6      Q.  Was that path there when you purchased the
7  site in April 2017?
8      A.  That's what I said before, and if you look at
9  the -- the way it's curved, it's a naturally made path.
10  That is not by human.  It was made because it was the
11  natural path between trees that people drove back and
12  forth.
13      Q.  Do you see the area which is the northwest
14  corner of the site?
15      A.  Northwest corner of the site, yes, I see.
16      Q.  Do you see what appears to be standing water
17  in the northwest corner of the site?
18      MR. MIRON:  Objection.  Vague.
19      THE WITNESS:  What I see there is this is when
20  we started erecting the horse arena in the upland
21  of the site, and as you create that, water runoff
22  from that site goes someplace and in that case went
23  there.  But those are not natural waters or
24  wetlands in any way or form.
25

Page 242

1  BY MR. ADKINS:
2      Q.  Would you agree it's standing water?
3      A.  I'm saying --
4      MR. MIRON:  Objection.  Vague.
5      THE WITNESS:  -- if you look at the tire mark,
6  tread marks and the way the water's been running,
7  you can clearly see that water runs from the
8  upland, it goes into that area that it's there.  So
9  it's rainwater that is staying there.  And if I had
10  to bet, this picture is in July/August time period.
11  BY MR. ADKINS:
12      Q.  It's November 2018, actually.
13      A.  That would be about the wetland -- wet time
14  season; correct.
15      Q.  Remember when we were talking about the
16  Cypress Lake and that it existed in some form in
17  April 2017?
18      A.  Correct.
19      Q.  Okay.  Do you see that feature in this
20  picture?
21      A.  Yes, sir.  Yes, sir.
22      Q.  Where is it?
23      A.  It's where the Cypress Lake is.  Where you see
24  that it looks, in fact, more like a peanut shape that is
25  right over there and just to the west of that cluster of

Page 243

1  the trees where you see the space right there.
2      Q.  Okay.  And looking --
3      A.  You can see water standing there.  You can see
4  there's still water there, right there.  Above a little
5  bit.  Little more.  Above your cursor.  No, too far,
6  down, down, down.  Right around there, all that area.
7      Q.  And you see standing water there?
8      A.  Yes, sir.
9      Q.  So on the southwest corner of the site, has
10  this area been sodded at this point?
11      A.  No, sir.
12      Q.  Okay.  Why is it green?
13      A.  I'm sorry, what?
14      MR. MIRON:  Objection.  Speculation.
15  BY MR. ADKINS:
16      Q.  Why is the area in the southwest part of the
17  site green?
18      MR. MIRON:  Objection.  Speculation.
19      THE WITNESS:  I'm not sure I understand the
20  question.
21  BY MR. ADKINS:
22      Q.  Do you see the southwest part of the site
23  that's with a rectangle, that looks look a rectangle?
24      A.  Yes, I do.
25      Q.  Okay.  Does that area within the rectangle

Page 244

1  appear green to you?
2      A.  That area, one more time.
3      Q.  Does the area appear green to you?
4      A.  The area appears parts of it green, parts of
5  it brown, part of it dark brown and part of it other
6  colors.  I see lots of different colors.
7      Q.  The parts that are green, do you know why that
8  would be?
9      A.  Yes.
10      MR. MIRON:  Objection.  Speculation.
11      THE WITNESS:  Yes.  Weed and grass grows
12  anywhere.
13  BY MR. ADKINS:
14      Q.  Are any parts of the area in the southwest
15  part of the site wet?
16      MR. MIRON:  Objection.  Speculation.
17      THE WITNESS:  Not that I can see, but if you
18  look at the northeast corner, that looks like a
19  little discoloration and no grass there.  So that
20  might be wet.
21  BY MR. ADKINS:
22      Q.  Okay.
23      A.  And also -- again, it's very hard to say what
24  I'm looking at.  It's very difficult to tell with this
25  resolution of pictures what you're looking at.  But if

BENJAMIN K. SHARFI                                      June 09, 2022
USA vs BENJAMIN K. SHARFI                                  245–248

Page 245

1  you look at the water level on the other two properties,
2  how high the water is all the way to the grass and
3  above, so if you look at the picture on both of the
4  properties you can see that the water level is very
5  high. It's actually to the grass level. So it tells
6  you that this was taken during a very severe wet time of
7  the year. And you can tell also in the color of the
8  water that these are all fresh rainwater.
9      Q.  So based on what you're seeing in DX69, you
10  would believe is an area -- this is a time of year
11  that's wetter than usual?
12      A.  As I mentioned, look at the water level. If
13  you move your cursor to the left, north, go up, no, no,
14  too far. There in that water, do you see how high that
15  water is? That's all the way to the rim.
16      Q.  So you're looking at a pond on what we call
17  Property 2?
18      A.  Correct. And also if you look at the -- to
19  the west of that where that other water feature is,
20  where the horse -- correct, you can also see that water
21  all the way full to the rim, and it's that brownish gray
22  color which is -- depicts freshwater rain, that very
23  severe rain, that water goes into this lake, fills it
24  up. So you can clearly tell that this was picture taken
25  at the moment of the most severe high waterlines.

Page 246

1      Q.  And that's the pond directly south of the
2  southwest corner of the site?
3      A.  Correct.
4      Q.  Are you familiar with a person by the name of
5  Christopher Watkins?
6      A.  Yes, sir.
7      Q.  Does Mr. Watkins work for you?
8      A.  Yes, sir.
9      Q.  In what capacity?
10      A.  Captain, boat captain.
11      Q.  Does Mr. Watkins do any other work for you?
12      A.  Mr. Watkins does whatever's requested of him,
13  including washing cars, maintaining cars and servicing
14  cars, a variety of different tasks.
15      Q.  Other than a boat captain and washing cars and
16  maintaining cars, what other tasks does Mr. Watkins do
17  for you?
18      A.  Whatever tasks I've requested of him that's
19  within his expertise of doing.
20      Q.  Okay. Do you have any other examples?
21      A.  Nothing in particular comes to mind.
22      Q.  What kind of task would be within Mr. Watkins'
23  expertise?
24      A.  Whatever we would ask him that he felt
25  comfortable doing.

Page 247

1      Q.  Have you ever discussed this case with
2  Mr. Watkins?
3      A.  No, sir.
4      Q.  When's the last time you had any contact with
5  Mr. Watkins?
6      A.  Yesterday.
7      Q.  And you didn't discuss this case with him
8  then?
9      A.  No. We discussed going fishing tomorrow. And
10  what would be the sea conditions and the fishing
11  conditions.
12      Q.  And have you ever asked Mr. Watkins to take
13  photos or videos of the site?
14      A.  I have asked him to takes pictures and videos
15  of Site 1, Site 2 -- I mean Property 1, Property 2 and
16  what we call the site.
17      Q.  On how many occasions have you asked
18  Mr. Watkins to take pictures or a video of the site?
19      A.  I believe once or twice, maybe three that -- I
20  can't recall more than that.
21      Q.  When was the first time you asked Mr. Watkins
22  to take photos or videos of the site?
23      A.  After my encounter with Mr. Pempek in 2016 and
24  his threats in regards to the southern property, that,
25  quote/unquote, anonymous individual reported us doing

Page 248

1  work, which is completely another fabricated lie and no
2  one ever done that. And my attorneys, after the meeting
3  that we had -- I'm sorry.
4      MR. MIRON:  It's okay. I'm going -- to the
5      extent that you directed Mr. Watkins as a result of
6      counsel or any discussions you had with counsel, I
7      do not want you to obviously discuss those.
8      THE WITNESS:  Then we have not had any
9      discussions outside of the counsel in regards to
10      any of those sites.
11  BY MR. ADKINS:
12      Q.  So my question was:  When was the first time
13  you asked Mr. Watkins to take pictures or videos of the
14  site? I'm not sure I got my answer yet.
15      MR. MIRON:  You did. Objection. Asked and
16      answered.
17      THE WITNESS:  It was right after the 2016
18      encounter with Mr. Pempek.
19  BY MR. ADKINS:
20      Q.  So you first asked Mr. Watkins to take
21  pictures of the site, which you had not owned yet, in
22  2016?
23      A.  No, sir. That's the first time I've
24  instructed him to take pictures of the Property 1, 2 and
25  the entire area.

BENJAMIN K. SHARFI                                           June 09, 2022
USA vs BENJAMIN K. SHARFI                                    249—252

Page 249

1    Q.  Okay.  When was the first time you asked
2  Mr. Watkins to take any pictures of the site?
3    A.  I couldn't tell you the date, but it would be
4  about the time that Mr. Pempek continued his harassments
5  on the site and with directions from counsel, we asked
6  him to take pictures at that time.
7    Q.  So that would have been around late 2017,
8  early 2018?
9    A.  Whatever that timeline would be.  Those are --
10  those dates are a matter of record.
11    Q.  Okay.  Do you remember we looked at Deposition
12  Exhibit 224, which I'm now showing you?
13    A.  Yes, sir, I remember this.
14    Q.  And the date of this e-mail was January 17th,
15  2018?
16    A.  Yes, sir.
17    Q.  Okay.  And you remember we talked about you
18  speaking with Mr. Pempek before Mr. Kryzda sent this
19  e-mail?
20    A.  Yes, sir.
21    Q.  Okay.  So you first spoke to Mr. Pempek about
22  the site around late 2017/early 2018; is that right?
23    A.  I'm not sure that would be the first time that
24  he called or texted, but those are the earliest records
25  that you have.

Page 250

1    Q.  Okay.  Do you remember having any calls or
2  texts with Mr. Pempek before early 2017?
3    A.  I could not say chronologically whether before
4  or after.
5    Q.  Okay.  And why did you ask Mr. Pempek to take
6  pictures of the site?
7    A.  I did not ask him to take pictures of the
8  site.
9    Q.  I'm so sorry.  I had a brain lapse.  Why did
10  you ask Mr. Watkins to take pictures and videos of the
11  site?
12        MR. MIRON:  Mr. Adkins, I'm going to object.
13      That's attorney-client privilege.  You're not
14      entitled to know the answer as to why.
15  BY MR. ADKINS:
16    Q.  Okay.  Were you directed by counsel to ask
17  Mr. Watkins to take pictures of the site?
18    A.  Yes, sir.
19    Q.  Yes?
20    A.  Yes.
21    Q.  Okay.  And were you directed by counsel to ask
22  Mr. Watkins to take pictures of the site on every
23  occasion that Mr. Watkins took pictures of the site?
24    A.  Yes, sir.
25    Q.  Who among your counsel directed you to ask

Page 251

1  Mr. Watkins to take pictures of the site?
2    A.  Mr. Miron, Mr. Bob Raynes, Mister -- forgive
3  me, one of the other attorneys.  I have so many
4  attorneys, but it was driven by Mr. Miron to me through
5  the counsel.  He's the head counsel, so everything comes
6  through him.
7    Q.  So I want to focus now on pictures that
8  Mr. Watkins took of the site between 2017 and 2019,
9  before Mr. Miron became general counsel, okay?  Do you
10  understand?
11    A.  Okay.
12    Q.  So with that limitation in mind, do you
13  remember the names of the counsel that directed you to
14  ask Mr. Watkins to take pictures or videos of the site?
15    A.  Prior to Mr. Miron, my head counsel was
16  Mr. Jefferson Knight.
17    Q.  And Mr. Knight directed you to ask Mr. Watkins
18  to take pictures or videos of the site between 2017 and
19  2019?
20    A.  Yes, sir.
21    Q.  Did any other lawyers direct you to ask
22  Mr. Watkins to take pictures of the site during 2017 to
23  2019?
24    A.  My communication with any other lawyers except
25  Mr. Miron and Mr. Jefferson are very few and in between,

Page 252

1  and I could not tell you when and how.
2    Q.  Do you recall when Mr. Knight asked you to ask
3  Mr. Watkins to take pictures of the site between 2017
4  and 2019?
5        MR. MIRON:  Hold on one second, Brandon,
6      please.  Brandon, I think that you're getting into
7      a situation where you're kind of treading into
8      attorney-client privilege and the communications.
9      To the extent as to when they were directed, you
10      clearly asked him did counsel direct him.  The
11      answer is yes.  I don't think you're entitled to
12      know any more than that.
13        MR. ADKINS:  I'm not entitled to know when
14      that communication occurred?
15        MR. MIRON:  I think you've already established
16      the answer.  So to the extent that it was obviously
17      before me, you asked him, he indicated it was
18      Mr. Knight.  So at this point, you have a time
19      frame.  You said -- and Chris is reminding me, 2017
20      to 2019.
21        MR. ADKINS:  So are you going to instruct him
22      not to answer?
23        MR. MIRON:  Ask the question again.
24  BY MR. ADKINS:
25    Q.  Okay.  Among the times where you were directed

BENJAMIN K. SHARFI                                          June 09, 2022
USA vs BENJAMIN K. SHARFI                                       253–256

Page 253

1  by counsel, by Mr. Knight, to ask Mr. Watkins to take
2  pictures or videos of the site, do you recall when
3  Mr. Knight gave you that direction?
4       A.  No, sir.
5       MR. MIRON:  To the extent that you remember.
6       THE WITNESS:  I don't remember.  As I
7  mentioned before, time, chronologically calendar
8  hours and time is very vague for me.  Whatever it
9  is, it's matter of records and records, and if you
10      have those pictures, there's a date stamp on every
11      picture.  So I have no reason to believe they've
12      been altered.
13  BY MR. ADKINS:
14      Q.  Did Mr. Watkins provide pictures and videos
15  that he took of the site to you?
16      A.  Did he what?
17      Q.  Did Mr. Watkins provide pictures or videos
18  that he took of the site to you?
19      A.  Yes, sir.
20      Q.  Did he provide them to anyone else?
21      A.  No, sir, not that I know.
22      Q.  What did you do with the pictures?
23      A.  The pictures were on SD cards and I kept them
24  on SD card and loaded them on my computer, and that was
25  the end of it.

Page 254

1       Q.  Did you ever provide them to counsel?
2       A.  Did I ever what?
3       Q.  Did you ever provide them to counsel?
4       A.  Yes.
5       Q.  Okay.  Did you ever provide them to
6  Mr. Knight?
7       A.  I don't know it would be to Mr. Knight or to
8  some of the people he would have asked me to deliver
9  them to.  Mr. Knight was not a computer kind of guy.
10      Q.  Did Mr. Knight ever ask you to provide
11  pictures or videos to anyone other than your counsel?
12      A.  You're asking me what me and Mr. Knight talked
13  about and you're not privy to that.
14      MR. MIRON:  Yeah, Brandon -- thank you -- I'm
15      letting you go to some degree to satisfy whatever
16      concerns or issues you think you might have
17      relative to this subject, but now you're asking for
18      direct communications between Mr. Knight and
19      Mr. Sharfi and I'm not going to allow him to
20      testify to those things.
21  BY MR. ADKINS:
22      Q.  Okay.  Did you ever provide the pictures or
23  videos to anyone other than your counsel?
24      A.  No.
25      Q.  Is that a no?

Page 255

1       A.  No.
2       Q.  Okay.  Have you ever posted any of the
3  pictures or videos to social media?
4       A.  Of which pictures?
5       Q.  Any of the pictures that Mr. Watkins took of
6  the site.
7       A.  Not that I remember or recall.
8       Q.  Okay.  So did you or did you not ever post any
9  of the pictures that Mr. Watkins took of the site to
10  social media?
11      MR. MIRON:  Objection.  Asked and answered.
12      THE WITNESS:  I have not posted, as to best of
13      my knowledge, any of the pictures or videos that
14      were taken on behalf for the case into social
15      media.
16  BY MR. ADKINS:
17      Q.  Okay.  And have you posted any of the pictures
18  or videos that Mr. Knight asked you to ask Mr. Watkins
19  to take of the site?
20      A.  No.
21      MR. MIRON:  I'm sorry.  You've got to give me
22      a chance.
23      THE WITNESS:  Well, wake up, buddy.
24      MR. MIRON:  I assure you, I'm more than well
25      awake.

Page 256

1  BY MR. ADKINS:
2       Q.  Have you ever posted any of the pictures or
3  videos that Mr. Watkins took of the site based on
4  direction of counsel to -- on the internet in any other
5  way?
6       MR. MIRON:  Objection.  Asked and answered.
7       THE WITNESS:  Do I answer?
8       MR. MIRON:  If you could.
9       THE WITNESS:  No.
10  BY MR. ADKINS:
11      Q.  Mr. Sharfi, are you on Facebook?
12      A.  Yes, sir.
13      Q.  What's your user name on Facebook?
14      A.  Benjamin Sharfi.
15      Q.  Do you recall posting on Facebook before the
16  United States expert team inspected your site in
17  October 2021?
18      A.  Yes, sir.
19      Q.  What do you recall you posted?
20      A.  Exposing the ridiculousness of U.S. Army Corps
21  and taxpayers' money as how they're wasteful and
22  harassing farmers all around Martin County by bringing
23  army of people to dig in holes and removing soils and
24  doing us what they wish like a bunch of cowboys with no
25  respect or disregard to the farmer.  And we invited the

BENJAMIN K. SHARFI
USA vs BENJAMIN K. SHARFI

June 09, 2022
257–260

Page 257

1  TV channels and had multiple interviews with TV channels
2  to discuss this ridiculous government overreach and the
3  personal issues of Mr. Pempek that has created and you
4  guys have bought into his bunch of baloney and crap that
5  we are destroying it.  And I've invited them to come to
6  the site to look at the site, look at the beautiful
7  creation that we have created and how beautiful of a
8  site we have created for decades and years to come for
9  people to come and enjoy this beautiful site and the
10  nature we have created.
11          The media and all the social media followers
12  and many hundreds and thousands of them approved of it.
13  We get weekly posts on our sites, on NeshaFarm sites,
14  and how many thousands of people are supportive of our
15  task and have offered financial assistance, which we,
16  thank God, do not require at this time.  And people from
17  literally all over the country and the support from the
18  local media, the local farmers and other people around
19  me has been phenomenal and, frankly, been the source of
20  energy for me to continue this fight against you guys
21  for this ridiculous accusations that we are
22  contaminating the waters of United States 14 miles away
23  and not that we are contaminating them, we're
24  contaminating them major way that is disrupting the
25  waters, which is ridiculous.

Page 258

1          (Deposition Exhibit No. 239 was identified for
2  the record.)
3  BY MR. ADKINS:
4      Q.  I'm sharing my screen again with you,
5  Mr. Sharfi.
6      A.  Mm-hmm.
7      Q.  And this is a screen shot of what appears to
8  be your Facebook messages.
9          Do you see that?
10      A.  Yes, sir, uh-huh.
11      Q.  This is a two-page document, so I will just
12  scroll through this real slowly so you can read through
13  it, okay?
14      A.  Uh-huh.  Yes, you can tell by the comments the
15  support that I get from so many people.
16      Q.  Okay.  So at the top, Benny Sharfi wrote
17  "Please make this post go viral.  Find out who this dude
18  is and what is his issue with me.  It's clearly
19  personal.  Lost a fishing tournament?  Or his wife or GF
20  left him for me?  LOL."
21          Do you see that?
22      A.  I see and I still wonder what is his beef with
23  me, whether it was a fishing tournament that I was
24  invited, for my fishing tournaments that I hold that he
25  lost to me or -- it's clearly a personal agenda he's

Page 259

1  got.
2      Q.  Did you write that post?
3      A.  Yes, sir.
4      Q.  Okay.  And I'm scrolling down.  It says,
5  "Benny Sharfi:  Do you know or anyone knows this guy,
6  Jonathan Pempek?  He is in Palm Beach area.  Expose him.
7  What's his issue" --
8      A.  Yes.
9      Q.  -- "with me or the farm?"
10          Do you see that?
11      A.  Yes, sir.
12      Q.  Okay.  Did you write that?
13      A.  Yes, I did.
14      Q.  What did you mean by "expose him"?
15      A.  Expose his agenda.
16      Q.  Okay.  Why did you say he is in Palm Beach
17  area?
18      A.  Because I know he's in the Palm Beach area.
19      Q.  Did you want to expose where he was located?
20      A.  No, not to expose his residence, rather to
21  expose his agenda.
22      Q.  Okay.  You wanted to expose where he lived,
23  didn't you?
24          MR. MIRON:  Objection.  Argumentative, asked
25  and answered.

Page 260

1          THE WITNESS:  Not interested where he lives.
2  We know where he lives.  You can just look at the
3  name and it tells you where he lives.  We know
4  where he lives.
5  BY MR. ADKINS:
6      Q.  So when you said "expose him," you only meant
7  to expose his agenda; is that right?
8      A.  Yes, sir, correct.
9      Q.  You didn't mean anything else by that?
10      A.  No, sir.
11      Q.  Okay.  You see some of these comments, one
12  from Susan Menchaca.  Do you know who that is?
13      A.  Yes.
14      Q.  And she wrote, "Benny Sharfi, he's from Hobe
15  Sound."
16      A.  Okay.  Hobe Sound, close enough.  Palm Beach,
17  Hobe Sound.
18      Q.  Okay.  Do you think --
19      A.  Couple miles apart.
20      Q.  Okay.  So below that you wrote, "Susan
21  Menchaca, is he in FB?"
22          Do you see that?
23      A.  Yes, sir.
24      Q.  Is "FB" Facebook?
25      A.  Yes, sir.

BENJAMIN K. SHARFI                                    June 09, 2022
USA vs BENJAMIN K. SHARFI                                 261–264

Page 261

1     Q.  What were you asking there?
2     A.  Does he have an account on Facebook so we can
3   try to find out who the hell this guy is and what's his
4   personal beef with me and the farm.
5     Q.  Okay.  And then Susan Menchaca says, "Benny
6   Sharfi, yes, but won't friend me."
7        Do you see that?
8     A.  Yes.
9     Q.  And then your next post is "Post his front
10  page.  Screen shot."
11       Do you see that?
12    A.  Mm-hmm.
13    Q.  What did you mean by that?
14    A.  To see his name and his -- when you go on
15  Facebook, you have your front profile.
16    Q.  Why did you want to see Mr. Pempek's Facebook
17  profile?
18    A.  I wanted to see who he is and what his agenda,
19  try to expose him.  And I'm still after that mission and
20  we will expose him and the lawsuit that's going to come
21  after it.  This is not, by no means, as he mentioned,
22  over.
23    Q.  What, if anything, did you do to prepare for
24  today's deposition?
25    A.  I slept, I ate, I showered, and I showed up.

Page 262

1        MR. MIRON:  To the extent you had any
2   conversations --
3   BY MR. ADKINS:
4     Q.  Did you meet with counsel at any point?
5        MR. MIRON:  To the extent you had any
6   conversations with counsel, as you did, obviously,
7   I don't want you to communicate.
8        THE WITNESS:  I'm in constant communication
9   with counsel before.
10       MR. MIRON:  I don't want you to communicate
11  what we discussed, what I showed you, nothing of
12  that nature.
13       THE WITNESS:  Yeah.
14  BY MR. ADKINS:
15    Q.  Without saying anything about the topics you
16  discussed, did you have any meetings with counsel to
17  prepare for today's deposition?
18    A.  Yes.
19    Q.  Okay.
20    A.  We also talked about the Celtics and we also
21  talked about the golden state and the lousy dinner.
22       MR. MIRON:  We don't want to run the risk of
23  any waiver.
24  BY MR. ADKINS:
25    Q.  On how many occasions did you meet with

Page 263

1   counsel to prepare for today's deposition?
2     A.  How many what?
3     Q.  On how many occasions did you meet with
4   counsel to prepare for today's deposition?
5     A.  I believe two.
6     Q.  When was the first occasion?
7     A.  Today is Thursday?  I believe it was -- first
8   one was Tuesday or Monday.  Both of them were this week.
9     Q.  You know, I'm sorry to be so disjointed here,
10  but I realized I did not state for the record that we
11  were going to mark your Facebook post as an exhibit.  So
12  apologies.  We're going to mark your post as DX239,
13  okay?
14    A.  Friend me on Facebook and you can see it
15  yourself.
16    MR. MIRON:  What was the exhibit number,
17  Brandon?
18    MR. ADKINS:  DX239.
19    MR. MIRON:  Thank you.
20    THE WITNESS:  I've got nothing to be ashamed
21  or embarrassed about it.  Friend me on Facebook.
22  I'll friend you.
23  BY MR. ADKINS:
24    Q.  Okay.  So you said there were two occasions
25  and you'll have to remind me, was the first on Tuesday

Page 264

1   or -- or Tuesday or Monday this week?
2     A.  Both of them were this week.
3     Q.  Okay.  So did you meet with counsel on Tuesday
4   or Monday this week?
5     A.  Honestly, I couldn't tell you.  As I mentioned
6   to you, chronologically, I am impaired, but both were
7   this week.
8     Q.  Who was present?
9     A.  Chris, Neal and Mr. Miron.
10    Q.  Anyone else?
11    A.  No.
12    Q.  And you met again with Mr. Miron,
13  Mr. Hamilton, Mr. McAliley and Mr. Kryzda yesterday; is
14  that correct?
15    A.  We had dinner together.
16    Q.  Okay.  Did you do anything else -- did you
17  meet with your counsel on any other occasions to prepare
18  for today's deposition?
19    A.  (Witness shakes head.)
20    Q.  Okay.  By the way, how long was your meeting
21  on Monday this week?
22    MR. MIRON:  Just to be clear, Brandon, he
23  didn't testify it was Monday.
24  BY MR. ADKINS:
25    Q.  Oh, I'm sorry.  Monday or Tuesday?

BENJAMIN K. SHARFI
USA vs BENJAMIN K. SHARFI

June 09, 2022
265—268

Page 265

1    A.  Again, it was either Monday or Tuesday and
2  yesterday.  A couple hours I would say at best, two,
3  three hours.
4    Q.  And, you know, excluding dinner yesterday, for
5  how long did you meet with counsel to prepare for
6  today's deposition?
7    A.  I don't think we really discussed, outside
8  dinner, any deposition related items.
9    Q.  Other than with your counsel, have you had any
10 written or oral communications with anyone about your
11 deposition today?
12       MR. MIRON:  Except the lawyers.
13       THE WITNESS:  Except the lawyers?
14 BY MR. ADKINS:
15   Q.  Other than with your counsel.
16   A.  No, sir.
17   Q.  Okay.
18   A.  Maybe my son.  I mentioned that I'm going to
19 have a deposition taken, but nothing, any detail besides
20 the deposition --
21   Q.  Okay.
22   A.  -- or case or anything like that.  That's the
23 only other person that knows I'm here today for
24 deposition, and, of course, my secretary.
25   Q.  Okay.  Have you had any substantive

Page 266

1  discussions with your secretary regarding your
2  deposition?
3    A.  No.
4    Q.  Okay.  Other than with your counsel, have you
5  had any discussions with anyone else regarding this
6  litigation?
7    A.  Regarding this litigation in general or about
8  today?
9    Q.  Regarding this litigation in general.
10   A.  I've discussed it with as many as hundreds and
11 thousands, tens of thousands of people possibly I can,
12 through Facebook, through social media, through the
13 media, newspapers, press releases and every aspect that
14 I can to expose U.S. Army and taxpayers' money has been
15 wastefully spent on a witch hunt by one individual.  And
16 I intend to do significantly more on that topic.
17       What you're doing is wrong, sir, and I'm going
18 to expose it, very wrong, abusive of power, abusive of
19 standards for an American person that I came to the
20 United States at the age of 13 with no father, no mother
21 and managed to go through high school and college and
22 grow a business, employ the people and create the
23 beautiful, wonderful creation that I created all
24 single-handed on hard work.  And having the federal
25 government have the Chutzpah to come out there to my

Page 267

1  site and dig to find a case, create a case and expose it
2  to go through this extent that never in the history of
3  recorded history that we are aware of that has ever
4  occurred to anyone else except Mr. Sharfi.  I'm not sure
5  I feel privileged or a target, but this crap will stop
6  and it will be exposed.
7        And I have contacted every government agency,
8  including the president of United States, and have
9  talked to Mr. Biden through communications and every
10 senator, every Congressman, every person that I possibly
11 can to demonstrate abusive power that you're doing and
12 what you're doing to the taxpayers and the work base of
13 Martin County.  It's wrong and I intend to expose your
14 game and what you're going through with Mr. Pempek and
15 the lies that he's spreading.
16        So how many people?  As many people as --
17 highest places that I can reach and I intend to continue
18 that all the way.
19        I came to this country alone with zero money
20 for escaping religious prosecution only to be prosecuted
21 by you, sir, pretending to be environmentalist and
22 you're protecting the environment.  Shame on you.  Shame
23 on you, sir.  No sense of dignity and no sense of
24 self-respect.
25   Q.  I don't want to interrupt, so I want to let

Page 268

1  you finish.
2    A.  I'm finished, just the beginning of the
3  finish.
4        By the time this is over, all these
5  transcripts and all these accusations and all these
6  ridiculous waste of taxpayers' money going after witch
7  hunt for fraction of 1 acre of proposed wetland that was
8  impacted 14 miles away and we destroyed the waters of
9  United States of America, I wonder out of a thousand
10 people going to sit in that jury, going to be sitting,
11 listening to this case, if you can find one person that
12 would agree with your case.  And we intend to take that
13 all the way up to the Supreme Court, if we have to.
14 This is not the end sir, by no means.
15   Q.  Is there anything else that you wanted to say?
16   A.  That what you're doing is wrong, very wrong to
17 every taxpayer, including myself, every farmer around
18 the country and every person that works hard, very hard
19 and employs many people, giving 401K, health, mental,
20 dental, eye and every possible insurance capable that
21 these people never had in their life.  You're trying to
22 take food away from their mouth and I will not let that
23 happen, sir.  I will fight you to the end, as I have.
24 What you're doing, sir, is wrong.  And don't tell me
25 you're doing your job.

BENJAMIN K. SHARFI                                    June 09, 2022
USA vs BENJAMIN K. SHARFI                                  269–272

Page 269

1    Q.  Anything else that you want to say --
2    A.  Adolf Eichmann, at the age of ten I was in
3  Ramla, not Rumallah, Ramla in Israel.  That he was put
4  on a tower and he was hung in public.  I was ten years
5  old with my grandfather, that he escaped Birkenau
6  concentration camp, and he took me out there to watch
7  him because he was one of the people responsible for
8  killing 6 million Jews, and in the center before his
9  last statement that they asked him with a rope around
10  his neck, and I'm standing right below the tower
11  watching him, and he goes -- asked him if there's any
12  last thing you would like to say, and he says, "I was
13  doing my job."  And he hung by the rope in the public,
14  and I saw that with my own eyes.
15       So you're doing your own job.  You will be
16  hung as well, not by the rope, rather by the justice
17  system that you proclaim you're protecting.  You're not
18  doing your job, sir.  You're protecting your job.
19  You're creating a job.
20    Q.  So Mister --
21    A.  I'm appalled and everyone else in my circle is
22  appalled by your actions.
23    Q.  Okay.  I don't know if there's anything that I
24  can say that's going to make you feel better.  I think
25  we're going to have a disagreement on the legal issues

Page 270

1  in this case, but I want you to know I'm trying to
2  proceed in the most respectful way I can.
3    A.  You are not, sir.  You are not, sir.  Pretend
4  that you are an environmentalist or you give a damn.
5  You don't give a damn.  You have never given a damn.
6  You're on a witch hunt.  You're trying to prosecute a
7  taxpayer, hard-working person that employs many hundreds
8  of people that are having a great life and you're trying
9  to take food away from their mouth to put in your
10  personal pocket for your personal benefit, and that is
11  wrong and shame on you.
12    Q.  Mr. Sharfi, do you want to continue with the
13  deposition or would you like to take a break?
14    A.  I would like to take a break.
15       MR. ADKINS:  Okay.  Why don't we go off the
16  record.
17       THE VIDEOGRAPHER:  We are going off the
18  record.  The time is 5:13.
19       (A break was had.)
20       THE VIDEOGRAPHER:  We are back on the record.
21  The time is 5:25.
22  BY MR. ADKINS:
23    Q.  Mr. Sharfi, I want to show you the document
24  that we marked as Exhibit 236 again.  Do you see that on
25  your screen?

Page 271

1    A.  Yes, sir.
2    Q.  This should be a map of the site.  Do you see
3  that?
4    A.  It's a photograph.
5       MR. MIRON:  I wouldn't characterize it as a
6  map.
7       MR. ADKINS:  Thank you.
8  BY MR. ADKINS:
9    Q.  An aerial photograph?
10    A.  It's an aerial photograph of the site.
11    Q.  Okay.  And can you see on DX236 the fenced-off
12  that is -- that you consider to be a wetland on the
13  site?
14    A.  Yes, sir.
15    Q.  Okay.  The location of that fence, when was
16  that determined?
17       MR. MIRON:  Objection.  Vague.
18       THE WITNESS:  What time or how?  I'm not sure
19  I understood the question, sir.
20  BY MR. ADKINS:
21    Q.  Well, the question first was when.  I am
22  interested in how.  But my first question is, you know,
23  when did you determine where the line should be, where
24  the fence is currently placed?
25    A.  As soon as we were able to get into the site

Page 272

1  and where we noticed a center depression where the water
2  was sitting and collecting and the vegetation, that it's
3  in the wetland vegetation, like the elm trees and the
4  maple trees and a lot of the flowers and materials that
5  is there.
6       So with the help that I got from staff, we
7  were able to fence that immediately so accidentally in
8  any way or form we will not impact that site.
9    Q.  When you say it was fenced immediately, did
10  that happen within a year of purchasing the site?
11    A.  I believe so, yes, sir.
12    Q.  And so who exactly determined where the fence
13  should be placed?
14    A.  Myself primarily and with the aid of a person
15  that I worked with in the past, I don't remember his
16  name, and we were immediately able to fence these areas
17  and protect it.
18       Also, I would consider myself fairly, fairly
19  knowledgeable on this topic after the 2016 encounters
20  that I had with Mr. Pempek.  I've studied, read the
21  South Florida Water Management and the wetland
22  delineation books from cover to cover, hard copy and
23  soft copy, and the vegetations, myself, Mr. Kryzda and
24  some of the other help that we had from the county, we
25  were able to clearly establish where those wetlands are.

BENJAMIN K. SHARFI
USA vs BENJAMIN K. SHARFI

June 09, 2022
273—276

Page 273

1    Q. Was Mr. Kryzda working for you when you
2  determined where the wetlands are on the site?
3    A. Yes, sir.
4    Q. Okay. So Mr. Kryzda didn't start working for
5  you until 2018, correct?
6    A. Him and I had other working relationship prior
7  that he joined us full-time.
8    Q. Okay. But he became the CIO of your companies
9  in Florida in January 2018, correct?
10    A. I believe he is the CIO, was one of them, and
11  also the president of the companies.
12    Q. Okay. Was Mr. Kryzda working for you when you
13  determined the line of where the wetland on the site
14  exists?
15    A. I don't truly recall the timeline when he was
16  or when he was not, but I value Mr. Kryzda's opinion and
17  his help tremendously. So whether he worked for me or
18  not, I would have been in touch with him on this topic.
19    Q. Yeah, I'm more so asking because it could be
20  relevant to when you --
21    A. I couldn't help you as to the when timeline.
22  There's records of photographs that you've taken and
23  flown by hundreds of times and taken pictures. Look at
24  the pictures where they were took and look at the time
25  he joined the company and you draw the conclusion.

Page 274

1    Q. Okay. And you said that you had someone who
2  used to work with you help identify the area that you
3  believe is a wetland on the site?
4    A. Yes. I don't recall whether she's still in
5  the state or not. It was a very nice lady that helped
6  me with the southern portion of the property and I
7  honestly don't remember her name. But she was a great
8  friend and frequently visited the site.
9    Q. Do you remember her first name?
10    A. No, I really don't.
11    Q. How do you know this person?
12    A. She was helping us through the first issue on
13  the lower parcel in 2016.
14    Q. Is she an environmental consultant?
15    A. I believe so. Very knowledgeable lady.
16    Q. Did she visit the site at any point?
17    A. Yes. She walked the perimeter of the site
18  with me.
19    Q. Did she walk any portion of the area that you
20  had fenced off as a wetland on the site?
21    A. I can't recall that. I'm sorry, go ahead.
22    Q. Go ahead.
23    A. Again, I would take the responsibility for
24  where that fence exactly went 100 percent on me
25  determining where that is or where it should be with the

Page 275

1  knowledge that I obtained through the help of people
2  that I talked with.
3    Q. And did you analyze the soils of the area
4  within the fence that you've determined is a wetland?
5    A. No, sir.
6    Q. Did you dig any holes to see what was going on
7  underground in the area that you determined was a
8  wetland on the site?
9    A. I believe you just asked that.
10    Q. Well, I asked if you analyzed any soils, you
11  said no. What I'm asking now, did you dig any holes?
12    A. No, sir.
13    Q. Do you recall what hydrologic indicators you
14  observed in that area to lead you to the conclusion that
15  it was a wetland?
16    MR. MIRON: Objection. Vague.
17    THE WITNESS: That's a term that has, in the
18  book, about six to eight to ten pages of definition
19  and I'm not sure I'm qualified to describe to you
20  what those definitions are. Those are very
21  meaningful statements.
22  BY MR. ADKINS:
23    Q. Okay. Would you agree one would need to be
24  qualified on those -- on the meaning of those statements
25  to identify a wetland?

Page 276

1    MR. MIRON: Objection. Argumentative.
2    THE WITNESS: No, I don't.
3  BY MR. ADKINS:
4    Q. Why is that?
5    A. Why is what, sir?
6    Q. Why does one not need to be qualified to
7  understand hydrologic indicators in order to delineate a
8  wetland?
9    MR. MIRON: Objection. Argumentative.
10    THE WITNESS: The entire concept that South
11  Florida Water Management and these people use as to
12  establish the hydrology, as your people did, you
13  have done on the site, it's very antiscientific,
14  wrong. It has nothing to do with science. They
15  dig a hole, they take sample of dirt and they
16  compare it like you would in a pool test. They
17  look at the colors. And I have pictures of you and
18  your staff on the site with everybody with this
19  color chart and comparing soil samples to this
20  color chart. That's not science, sir.
21    Science is based on measuring and looking and
22  being able to repeat an experiment over and over
23  with the same result.
24    I am a scientist, and in the previous time I
25  have taken soils, I have studied it and I've had

BENJAMIN K. SHARFI
USA vs BENJAMIN K. SHARFI

June 09, 2022
277–280

Page 277

1   done -- not on that site, on other sites -- and to
2   do an analysis via mass spectrometer that I was
3   able to borrow time on and I've looked at it and
4   understood what those are.
5        And when you are comparing soil to a color
6   sample, and if you've been in the Army, which I
7   hope you have, and you have looked at these things,
8   color is what I see and what you see are very
9   multiple shades of the same color, we see and we
10  disagree in color, just like we did earlier; what
11  you call orange I called yellow or vice versa.  And
12  depending whether you have a cup of coffee or not
13  or what you have there for breakfast or lunch, in
14  the light those colors change significantly.
15       So I'm categorically -- and that's where our
16  biggest argument in conversations was in 2016 with
17  Mr. Pempek; that he asserted himself as a
18  scientist.  And I told him you are not a scientist.
19  Please do not represent yourself as scientist.
20  This is not science.  This is witchcraft.
21  Witchcraft is not science.
22       Science is based on knowledge.  Science is
23  based on chemical reactions, things that are based
24  on composition that you can repeat.  And none of
25  those are being followed.  And this is a -- in

Page 278

1   fact, the gentleman that wrote the book for you
2   guys, I've had multiple conversations with him on
3   this topic, a gentleman named Orrin Reedy and also
4   a very good friend, that he educated me on this
5   topic many months and every book that I was able to
6   obtain.
7        And by the way, if you look that name on the
8   cover or of the books that you guys use as your
9   Bible, that's written and composed by him and he is
10  a scientist.  So I learned from a scientist what
11  science is and the science hydrology.
12       So those goons that you brought to the site
13  that they're looking at the soil samples digging
14  holes and looking at color charts and every one of
15  them, I assure you, came up with a different
16  conclusion.
17       So to answer your question in a very long way,
18  I have no respect for what you call science and
19  those scientists.
20  BY MR. ADKINS:
21  Q.   Did you make -- do anything to compare the
22  soil types within and outside the area that you fenced
23  off?
24  A.   We have taken multiple soil samples on the
25  property and outside the properties that we talked about

Page 279

1   and they look identical and the wetland area is
2   clearly -- you can tell by the muck and by the lower
3   water table and the decomposition of organic materials
4   that are sitting there, that it's a wetland, and the
5   type of trees that grow there.
6        Pine trees do not grow in wetland.  Oak trees
7   do not grow in wetlands.  In fact, they die very
8   quickly.  And I feel like the surrounding areas
9   including where Ms. Small indicated that are wetlands,
10  that's where the source of my disagreement.  Because
11  there were oak trees there and oak trees and pine trees
12  that show no hydrology signs being in wetland were
13  growing there.
14       So that was our topic where we were hoping to
15  have this dialogue with Ms. Small and your staff, but
16  you never gave us a chance to really come to a table
17  from scientist to scientist, engineer to engineer,
18  environmentalist to what you call yourself
19  environmentalist to come to a resolution, unlike the
20  South Florida Water Management, who decided to sit with
21  us and talk with us and with the aid of Mr. Toby and
22  other people we worked with to come up with a plan to
23  resolve this.
24       As I mentioned to you many times through the
25  day, with channels we are willing to do whatever it

Page 280

1   takes to preserve the land.
2   Q.   I really just want to get through this
3   deposition and get everyone home.  And I'm going to let
4   you talk if you want to talk because that's your right,
5   but I've got a few other questions that I need to ask
6   you, and if you go off on these topics that aren't
7   relevant to my question, I'm not going to be able to
8   finish.  So I'd just please kindly ask you to --
9   A.   I don't mean -- go ahead finish, and if I say
10  shoot, you're not going to say I pointed a gun at you
11  now, right?
12  Q.   I understood --
13  A.   I'll answer your question, sir.
14  Q.   I understood that you didn't dig any holes
15  within the area that you've fenced off as a wetland and
16  now I'm hearing that you said that you dug -- you've
17  looked at a lot of the soils on the site and that the
18  wetland soils within that fenced-off area are different.
19       So can you set me straight on that?
20  A.   No, sir.  I said I've dug holes on what we
21  call Property 1 and Property 2.
22  Q.   Okay.  So before you determined where to place
23  the fence to protect the wetland on the site, you hadn't
24  dug any holes; is that right?
25  A.   Correct.

BENJAMIN K. SHARFI
USA vs BENJAMIN K. SHARFI

June 09, 2022
281–284

Page 281

1    Q.   And you noticed that there was a center
2  depression where water was collecting; is that right?
3    A.   Correct.
4    Q.   Can you describe what you observed?
5    A.   Center of depression that the water sits there
6  throughout most of the year and during the dry season it
7  dries out completely, but then when the water comes
8  down, it collects back in that site.
9    Q.   Okay.  How did you determine where to put the
10 fence based on the center of depression where water
11 collects?
12   A.   Where the vegetations and the elevation comes
13 significantly higher that no longer part of the
14 depression and water does not sit there.
15   Q.   And you said you saw wetland vegetation in the
16 area, including elm and maple trees and flowers?
17   A.   In the wetland area where it's fenced off,
18 yes, sir.
19   Q.   Why is it that elm and maple trees suggest
20 there was a wetland there?
21   A.   Based on the studying that I have done, in
22 order for red maple and cypress to grow, they require a
23 significant amount of water.  They need to be in a high
24 water area.  And that whole area is covered with
25 beautiful red maples.

Page 282

1    Q.   Okay.  Do you --
2    A.   And outside of that area, you have pine trees
3  and you have oak trees and you have other trees that
4  they are not native to wetlands.
5    Q.   Did you consult reference guides or vegetation
6  lists in determining where to place the fence?
7    A.   Yes, sir.
8    Q.   What materials did you consult?
9    A.   I basically read every book that Mr. Reedy
10 recommended to me, including his book and also wetland
11 books, and I've read many, many, many, many hours of
12 personal research.  And as a scientist, I know how to do
13 research.
14   Q.   Did you consult any of those books while you
15 were determining what part of the site was a wetland?
16   A.   If I have any questions that I was not clear,
17 I would talk to them; yes, sir.
18   Q.   You would talk to the books or you would talk
19 to Mr. Reedy?
20   A.   In person to him and other people within the
21 county that are knowledgeable of this topic.
22   Q.   When you were determining where to place the
23 fence around the wetland on the site, did you have any
24 conversations with Mr. Reedy or anyone at the county?
25   A.   No.

Page 283

1    Q.   And did you consult any books when you were
2  determining whether vegetation in and around the area
3  that you marked as a wetland on the site was wetland
4  vegetation?
5    A.   I'm not sure how you consult a book.  That's
6  called research.  I did my research and established what
7  grows.  And myself and Mr. Kryzda, which is very
8  familiar with this topic and been a native area and
9  among some of his other friends, we together fenced the
10 area off and marked where it should be fenced.
11   Q.   Okay.  What other of Mr. Kryzda's friends
12 helped you?
13   A.   I don't remember the name.  People that he --
14 were very knowledgeable that he had occasionally brought
15 to the farm.
16   Q.   Okay.  Before I heard you say you took full
17 responsibility for where the fence was located?
18   A.   Yes, sir.
19   Q.   Okay.  Is that still true?
20   A.   Yes, sir.
21   Q.   Okay.  What did Mr. Kryzda's friends tell you,
22 if anything, about where wetlands were located on the
23 site?
24   A.   They agreed with me.  They were happy that I'm
25 preserving this area.

Page 284

1    Q.   Okay.  You mentioned that you had a friend
2  whose name you couldn't remember that you consulted
3  with.  Was that Linda Petz?
4    A.   I can't remember her name.  It was a
5  red-haired lady, very nice, older lady and very sweet
6  lady.  She could name every flower, every shrub, every
7  green, every blade of grass.
8    Q.   Okay.  Has Orrin Reedy ever been to the site?
9    A.   Orrin Reedy has been to Site 1 and Site 2 and
10 I believe at one time, in what you call the site.
11 Property 1, Property 2 and what you call the site.
12   Q.   Was that before or after you placed a fence
13 around what you believe are wetlands on the site?
14   A.   I couldn't tell you the chronological order,
15 sir.
16   Q.   Mr. Sharfi, have you ever taken any courses in
17 wetland delineation?
18   A.   No formal classes.  A lot of self-education.
19   Q.   Right.  And so you don't have any formal
20 degrees in environmental science or anything like that,
21 do you?
22   A.   No, sir, nor I have in farming.  I'm a pretty
23 damn good farmer.
24   Q.   Okay.  Have you ever been convicted of a
25 crime, Mr. Sharfi?

BENJAMIN K. SHARFI
USA vs BENJAMIN K. SHARFI

June 09, 2022
285–288

| Page 285 | | Page 287 |
|---|---|---|

**Page 285**

1    A.  Not that I know.  No, sir, I've not been
2  convicted of a crime.
3    Q.  Okay.  Have you ever been the subject of an
4  investigation that could result in an adverse action
5  being taken against you?
6    A.  No, sir.
7    Q.  Have you ever been subject to any kind of
8  disciplinary action?
9    A.  No, sir, not that I recall.
10    Q.  And then have you -- have you ever reported
11  Mr. Pempek's conduct to any government agency?
12    A.  I believe you asked that question and I said
13  no.
14    Q.  Okay.  I thought I asked just about the Corps,
15  but, you know, I figured I'd ask just to be sure.
16    And would you like an opportunity to review
17  your transcript --
18    MR. MIRON:  Yes.
19  BY MR. ADKINS:
20    Q.  -- of today's deposition?
21    MR. MIRON:  Thank you, Brandon.  Yeah, we'll
22  read.
23    MR. ADKINS:  Okay.  I pass the witness.
24    MR. MIRON:  I have nothing.  Thank you,
25  Brandon.

**Page 287**

1    DEPOSITION ERRATA SHEET
2  Our Assignment No.  USA vs. Sharfi, et al.
3  Case Caption:  J8302685
4
5    DECLARATION UNDER PENALTY OF PERJURY
6
7    I declare under penalty of perjury that I have
8  read the entire transcript of my Deposition taken in the
9  captioned matter or the same has been read to me, and
10  the same is true and accurate, save and except for
11  changes and/or corrections, if any, as indicated by me
12  on the DEPOSITION ERRATA SHEET hereof, with the
13  understanding that I offer these changes as if still
14  under oath.
15
16    Signed on this _____ day of _____, 20__.
17
18    _____
19    BENJAMIN K. SHARFI
20
21
22
23
24
25

**Page 286**

1    MR. ADKINS:  Okay.  We can go off.
2    THE VIDEOGRAPHER:  Just one moment.
3    This now concludes the videoconference
4  deposition of Benjamin K. Sharfi.  At this time we
5  ask all participants to stay connected briefly to
6  provide your video and transcript orders to the
7  court reporter.
8    Mr. Adkins, do you need a copy of this
9  transcript and video at this time?
10    MR. ADKINS:  Just the transcript, please.
11    THE VIDEOGRAPHER:  Okay.  Thank you.
12  Mr. Miron?
13    MR. MIRON:  Not at the moment.
14    THE VIDEOGRAPHER:  Any other orders at this
15  time?  If not, we'll go off the record on June 9th,
16  2022, at 5:49.
17    (Deposition was concluded at 5:49 p.m.)
18
19
20
21
22
23
24
25

**Page 288**

1    DEPOSITION ERRATA SHEET
2  Page No._____Line No._____Change to:_____
3    _____
4  Reason for change:_____
5  Page No._____Line No._____Change to:_____
6    _____
7  Reason for change:_____
8  Page No._____Line No._____Change to:_____
9    _____
10  Reason for change:_____
11  Page No._____Line No._____Change to:_____
12    _____
13  Reason for change:_____
14  Page No._____Line No._____Change to:_____
15    _____
16  Reason for change:_____
17  Page No._____Line No._____Change to:_____
18    _____
19  Reason for change:_____
20  Page No._____Line No._____Change to:_____
21    _____
22  Reason for change:_____
23
24  SIGNATURE:_____DATE:_____
25    BENJAMIN K. SHARFI    Job# J8302685

BENJAMIN K. SHARFI
USA vs BENJAMIN K. SHARFI

June 09, 2022
289–291

**Page 289**

1   DEPOSITION ERRATA SHEET

2   Page No._____Line No._____Change to:_____

3   _____

4   Reason for change:_____

5   Page No._____Line No._____Change to:_____

6   _____

7   Reason for change:_____

8   Page No._____Line No._____Change to:_____

9   _____

10  Reason for change:_____

11  Page No._____Line No._____Change to:_____

12  _____

13  Reason for change:_____

14  Page No._____Line No._____Change to:_____

15  _____

16  Reason for change:_____

17  Page No._____Line No._____Change to:_____

18  _____

19  Reason for change:_____

20  Page No._____Line No._____Change to:_____

21  _____

22  Reason for change:_____

23

24  SIGNATURE:_____DATE:_____

25      BENJAMIN K. SHARFI    JOB # J8302685

**Page 290**

1   CERTIFICATE OF OATH

2   STATE OF FLORIDA

3   COUNTY OF PALM BEACH

4

5       I, the undersigned authority, certify that BENJAMIN

6   K. SHARFI personally appeared before me and was duly

7   sworn on the 9th day of June, 2022.

8

9       Witness my hand and official seal this 12th day of

10  June, 2022.

11

12

13

14

15      _____

        Wendy Beath Anderson, RDR, CRR, CRC

16      Notary Public State of Florida

        My Commission Expires:  9/23/2025

17      My Commission No.:  HH 178324

18      Job #J8302685

19

20

21

22

23

24

25

**Page 291**

1   CERTIFICATE OF REPORTER

2   STATE OF FLORIDA

3   COUNTY OF PALM BEACH

4

5       I, Wendy Beath Anderson, Certified Realtime
    Reporter and Notary Public in and for the State of

6   Florida at Large, do hereby certify that I was
    authorized to and did stenographically report said

7   deposition of BENJAMIN K. SHARFI; that a review of the
    transcript was requested; and that the foregoing

8   transcript is a true record of my stenographic notes.

9       I FURTHER CERTIFY that I am not a relative,
    employee, or attorney, or counsel of any of the parties,

10  nor am I a relative or employee of any of the parties'
    attorney or counsel connected with the action, nor am I

11  financially interested in the action.

12      The foregoing certification of this transcript
    does not apply to any reproduction of the same by any

13  means unless under the direct control and/or  direction
    of the certifying reporter.

14

15

        Dated this 12th day of June, 2022.

16

17

18      _____

19      Wendy Beath Anderson, RDR, CRR, CRC

20      Job #J8302685

21

22

23

24

25