# EXHIBIT 3

**Page 1**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

FORT PIERCE DIVISION

CASE No.: 2:21-cv-14205-KAM

UNITED STATES OF AMERICA,

     Plaintiff,

-vs-

BENJAMIN K. SHARFI, in his personal and

fiduciary capacity as trustee of the Benjamin

Sharfi 2002 Trust, and NESHAFARM, INC.,

     Defendants.

_____

REMOTE VIDEOTAPED DEPOSITION OF

MICHAEL M. WYLIE, M.S.

Monday, April 4, 2022

9:00 - 6:22 p.m.

Reported By:

Wendy Beath Anderson, RDR, CRR, CRC

Notary Public, State of Florida

Esquire Deposition Services

West Palm Beach Office   Job #J8094615

**Page 2**

1   APPEARANCES:
2   On behalf of the Plaintiff:
3       BRANDON N. ADKINS, ESQUIRE
        UNITED STATES DEPARTMENT OF JUSTICE
4       ENVIRONMENT & NATURAL RESOURCES DIVISION
        P.O. BOX 7611
5       Washington DC 20004
        Brandon.Adkins@usdoj.gov
6
7   On behalf of the Defendants:
8       T. NEAL MCALILEY, ESQUIRE
        CARLTON, FIELDS, P.A.
9       2 Miami Central
        700 N.W. 1st Avenue, Suite 1200
10      Miami, Florida 33136
        nmcaliley@carltonfields.com
11
12      and
13      CHRISTOPHER F. HAMILTON, ESQUIRE
        JOSHUA D. MYRON, ESQUIRE
14      SHARFI HOLDINGS, INC.
        3731 NE Pineapple Avenue, 2nd Floor
15      Jensen Beach, Florida 34957
        chamilton@sharfiholding.com
16      jmyron@sharfiholding.com
17
18  On behalf of the U.S. Army Corps of Engineers:
19      WILLIAM J. MOORE, III, ESQUIRE
        U.S. ARMY CORPS OF ENGINEERS
20      701 San Marco Boulevard
        Jacksonville, Florida 32207
21      william.j.moore@usace.army.mil
22  ALSO PRESENT:
23      KENNETH SARSONY, REMOTE VIDEOGRAPHER
24
25

**Page 3**

- - -

I N D E X

- - -

WITNESS:          DIRECT    CROSS    REDIRECT    RECROSS

MICHAEL M. WYLIE, M.S.

BY MR. MCALILEY:    5
BY MR. ADKINS:              309
BY MR. MCALILEY:                        320

- - -

E X H I B I T S

- - -

DEPOSITION              DESCRIPTION                 PAGE

EXHIBIT 80         CURRICULUM VITAE                27
EXHIBIT 81         CHRONOLOGY OF ACTIVITIES       312
                   ON THE SITE
EXHIBIT 82         PHOTOGRAPH BATES               314
                   USAEXPERTS_0000425
EXHIBIT 83         CLEAN WATER ACT                317
                   JURISDICTION

**Page 4**

P R O C E E D I N G S

    - - -

    Deposition taken before Wendy Beath Anderson,
Registered Diplomate Reporter and Notary Public in and
for the State of Florida at Large, in the above cause.

    - - -

    THE VIDEOGRAPHER:  This is File 1 to the
videotaped Zoom deposition of Michael Wylie in the
matter of United States of America vs. Benjamin K.
Sharfi, et al., being heard before the U.S.
District Court, Southern District of Florida, Fort
Pierce Division, Case No. 2:21-cv-14205.

    This deposition is being held via Zoom
conferencing with all parties appearing remotely,
except Attorney Brandon Adkins, Attorney William
Moore, III and the witness, Mike Wylie, are in the
same room, and this is being done on April 4th,
2022.  The time is approximately 9:00 a.m. Eastern
Daylight Time.

    The court reporter is Wendy Anderson.  My name
is Kenneth S. Sarsony, the videographer.

    Counsel, please introduce yourself and
affiliations and then the witness will be sworn.

    MR. MCALILEY:  This is Neal McAliley at the
law firm of Carlton Fields representing the



MICHAEL M. WYLIE, M.S.
USA vs BENJAMIN K. SHARFI

April 04, 2022
5–8

Page 5

1  defendants in this case, and I will be taking the
2  deposition today.
3      MR. HAMILTON:  Good morning.  This is
4  Christopher Hamilton here on behalf of the
5  defendants.  And just to add real quick, Mr. Myron,
6  Joshua Myron, will be jumping on and off throughout
7  the day.  He's also with the defendants.
8      MR. ADKINS:  Good morning.  This is Brandon
9  Adkins of the United States Department of Justice
10  representing the United States.
11      MR. MOORE:  This is William Moore with the
12  U.S. Army Corps of Engineers, office counsel.
13      THE VIDEOGRAPHER:  Thank you, Counsel.  You
14  may begin.
15      MR. MCALILEY:  Thank you.
16  Thereupon,
17      (MICHAEL M. WYLIE, M.S.)
18  having been first duly sworn or affirmed, was examined
19  and testified as follows:
20      THE WITNESS:  Yes, it will be.
21          DIRECT EXAMINATION
22  BY MR. MCALILEY:
23      Q.  Good morning, sir.  Could you state your name
24  for the record and spell your last name.
25      A.  Yes.  Good morning.  Michael M. Wylie,

Page 6

1  W-Y-L-I-E.
2      Q.  Okay.  So Mr. Wylie, before we get into the
3  substance of the questions, I just want to go over a few
4  set of basic ground rules with you.  You've had your
5  deposition taken before; is that correct?
6      A.  That's correct.
7      Q.  And you understand that you've just sworn an
8  oath to tell the truth?
9      A.  Yes, yes, I have.
10      Q.  And you also understand that there is a court
11  reporter and a videographer taking down everything that
12  is said in the proceeding today?
13      A.  Yes, I understand.
14      Q.  As I -- as the court reporter did before the
15  videoconference, we went on the record, I just want to
16  repeat a few things.  You know, this is a deposition
17  that is being done over a remote platform, Zoom.  You
18  understand that, right?
19      A.  Yes, I understand.
20      Q.  And just because it's on Zoom doesn't mean
21  that it's any different than any other deposition that
22  you've done, right?
23      A.  Yes, I understand.
24      Q.  Are -- so I want to understand -- so normally
25  when we do a deposition, all the lawyers and witness are

Page 7

1  in the same room and here where you have your lawyers in
2  the room there with you, but the rest of us are all
3  remote.
4      So I want to -- I want to affirm the
5  importance of when you are -- in your testimony, when we
6  are asking questions and answers, you should not speak
7  to your lawyers off the video or off the audio.  The
8  reason being is that we should have a full record of
9  what is said.  Obviously, on breaks you're going to, you
10  know, find out where the coffee is with them or whatever
11  it may be, but I just want to be clear that you don't
12  communicate separately with your counsel while we're in
13  the questioning here, except to the extent that it's on
14  the video and on the audio.
15      Is that fair?
16      A.  Yes, I understand.
17      Q.  What do you have in front of you, sir?
18      A.  I have a laptop computer.
19      Q.  Do you have any documents in front of you?
20      A.  I have a -- the expert report with appendices
21  and photos and whatnot for any reference during the
22  deposition.
23      Q.  Okay.  Do you have --
24      A.  And a banana.
25      Q.  Well, I have my coffee here, so I can relate.

Page 8

1      Okay.  Well, I would just -- I would -- okay.
2  And the last thing I just want to repeat in terms of
3  clarity is the following:  As the court reporter just
4  said, it's really important that we not talk over each
5  other.  So I'm going to do my best to try to take pauses
6  before I ask you questions, again, like a follow-up
7  question, to let you finish.
8      If I manage to speak over you at some point,
9  I'm going to apologize in advance.  It's part of the
10  challenge of doing depositions over a remote platform.
11  But I'd ask that you do the same thing for me, we both
12  just try to make the reporter's job easier and not talk
13  over each other.
14      Does that seem fair?
15      A.  Yes, I understand.  We'll both try to do our
16  best.
17      Q.  And also, remember when you testify, you need
18  to give an audible answer with a word.  So uh-uhs and
19  uh-huhs are hard to understand when you read them on a
20  transcript.  So if I ask you at points a question like
21  is that a yes, is that a no, please understand that's
22  just because I'm trying to make a clear record.
23      A.  I understand.
24      Q.  Okay.  Mr. Wylie, what is your date of birth?
25      A.  January 14th, 1955.



MICHAEL M. WYLIE, M.S.
USA vs BENJAMIN K. SHARFI

April 04, 2022
9–12

Page 9

1   Q.   What is your address?
2   A.   100 Willowcrest Court, Roswell, Georgia,
3   30075.
4   Q.   And is Roswell, Georgia a suburb of Atlanta?
5   A.   Yes, it is.
6   Q.   So you live in Georgia, right?
7   A.   Correct.
8   Q.   How long have you lived in Georgia?
9   A.   Approximately 32 years.
10   Q.   And where are you from before that?
11   A.   I moved from Biloxi, Mississippi to Atlanta.
12   Q.   I'm just curious, where did you grow up?
13   A.   I grew up in Mississippi and the Panhandle of
14   Florida.
15   Q.   Okay.  So when was the last time you lived in
16   Florida?
17   A.   I attended the University of West Florida for
18   finishing grad -- finishing undergrad and grad school,
19   then I moved from Pensacola, oh, gosh, probably 1989,
20   early 1990.
21   Q.   Okay.  So it's been about 32 years?
22   A.   Correct.
23   Q.   Prior to this case, have you ever -- well, let
24   me move on to something else here.
25       Have you ever conducted any scientific

Page 10

1   investigations in the Martin County area?
2   A.   I have worked when I was employed by the
3   United States Environmental Protection Agency -- I have
4   reviewed permit requests from the Corps of Engineers in
5   the '90s when I was employed by the U.S. Environmental
6   Protection Agency.
7   Q.   Okay.  But am I right that you haven't done
8   any scientific investigations in the Martin County,
9   Florida area before?
10   A.   If you could please explain to me what a
11   scientific investigation is, I could better respond to
12   your question.
13   Q.   You don't know what a scientific investigation
14   is?
15   A.   I don't know what you think a scientific
16   investigation --
17   Q.   Have you ever conducted a scientific study in
18   Martin County?
19   A.   I have reviewed wetland impacts; I've reviewed
20   wetland mitigation; I've reviewed facility assessments
21   as part of -- as my role at USPCA, reviewing Corps
22   permits.  So there was science involved with that.
23   Q.   So when you said you reviewed those wetland
24   impact mitigations, do you mean you reviewed documents
25   that somebody supplied to you regarding projects in

Page 11

1   Martin County, Florida?
2   A.   I reviewed projects and I also reviewed
3   on-the-ground impacts, reviewed on-the-ground mitigation
4   options and the functions of wetlands to advise the
5   Corps as a representative of EPA for permit review.
6   Q.   So when you said you reviewed on the ground,
7   did you do field visits of which you did investigations
8   of conditions on the ground in Martin County?
9   A.   That's correct.
10   Q.   Okay.  How many times did you do that in
11   Martin County?
12   A.   No more than twice.
13   Q.   Twice total in your career?
14   A.   Until this latest investigation, correct.
15   Q.   Okay.  What did you do to prepare for the
16   deposition here today?
17   A.   I reviewed the expert report that we
18   submitted.  I reviewed documents that I had prepared.
19   Reviewed, just in general, everything that I utilized to
20   come up with my opinion in this matter.
21   Q.   And sir, did you have occasion since Friday
22   afternoon to speak with the counsel for the plaintiff in
23   this case in preparation for the deposition?
24   A.   Yes, I have.
25   Q.   Okay.  And how long did you speak with them

Page 12

1   for?
2   A.   We probably spoke for six or seven hours.
3   Q.   So did you go over the questions that I asked
4   Dr. Nutter on Friday?
5       MR. ADKINS:  Objection.  Objection.  This
6   calls for -- I think we're starting to get into
7   substance of prep with the witness.  I think, you
8   know, if you want to answer generally, that's okay,
9   but getting into a lot of information here is going
10   to start penetrating into privileged information.
11       MR. MCALILEY:  So Mr. Adkins, for the record,
12   you're not asserting an attorney-client
13   relationship with Mr. Wylie, are you?
14       MR. ADKINS:  Could you say that again, Neal?
15       MR. MCALILEY:  You're not asserting an
16   attorney-client relationship with Mr. Wylie, are
17   you?
18       MR. ADKINS:  Well, he's a testifying expert
19   for the United States and conversations that we've
20   had with Mr. Wylie in preparation for this would be
21   covered by the attorney-client privilege.
22       MR. MCALILEY:  Okay.  Let me ask some
23   foundational questions of the witness.
24   BY MR. MCALILEY:
25   Q.   Mr. Wylie, are you represented in your



Page 13

1  individual capacity as a -- by a lawyer in this
2  proceeding?
3      A.  No, I'm not.
4      Q.  Okay.  And you've work for the EPA for most of
5  your career, but you're no longer a federal employee,
6  are you?
7      A.  That's correct.
8      Q.  Okay.  Do you believe that Mr. Adkins
9  represents you personally?
10     A.  No, I don't.
11         MR. MCALILEY:  So Mr. Adkins, why don't we
12     talk about -- I'll move on from the topic here.
13     Why don't we talk about this off the record at the
14     next break.  I'm happy to work with you on a common
15     understanding how we're going to do this.  I want a
16     clear record, but we don't need to spend time on
17     this now.
18  BY MR. MCALILEY:
19     Q.  Okay.  So Mr. Wylie, am I right that you have
20  been retained by the government to provide expert
21  testimony in this case?
22     A.  That's correct, sir, yes.
23     Q.  And on what topics do you expect to provide
24  expert testimony?
25     A.  The tasks that I was retained by the

Page 14

1  Department of Justice was to conduct site visits to
2  determine if wetlands existed on the site, to determine
3  what those wetlands were connected to to downstream
4  waters, to conduct as many site visits as we could
5  conduct to prove up our opinions, and then to provide a
6  deposition or an expert report based on my opinions.
7      Q.  Okay.  Thank you.  Mr. Wylie, what is -- I'm
8  just trying to narrow it into what specific topics are
9  you going to testify on in this case.  Not so much what
10  work you were asked to do, but what are the topics in
11  which you're going to be providing expert testimony?
12         MR. ADKINS:  Objection.
13         THE WITNESS:  My testimony looks at whether
14     there were wetlands on the site prior to the
15     disturbance, were there wetlands on the site after
16     the disturbance.  I'm also going to testify to the
17     jurisdictional status of those wetlands in
18     accordance with the applicable regulations in
19     whatever court cases that I reviewed.
20         So basically what I will report on is
21     wetlands, the fieldwork that I accomplished, my
22     opinions on that fieldwork, if those were
23     jurisdictional wetlands, and then analysis of those
24     waters of the United States.
25

Page 15

1  BY MR. MCALILEY:
2      Q.  Okay.  Are there any other topics in which you
3  expect to give expert testimony at the trial in this
4  case?
5      A.  No, I think -- my testimony will be
6  encompassed in those principal items.
7      Q.  All right.  So you're aware that in federal
8  court, expert witnesses who are retained have to provide
9  reports that state your opinions?
10     A.  Yes, sir, I am.
11     Q.  And you helped prepare a report for this case
12  that summarizes your opinions, right?
13     A.  Yes, sir, I did.
14     Q.  Okay.  What I'd like to do is put a document
15  on the screen, and this is Deposition Exhibit No. 72,
16  which is -- we're using the same numbers as before.  So
17  we used this on Friday.  I'll put this up on the screen.
18         Sir, can you see on the screen a document
19  that's entitled "U.S. Department of Justice Expert Team
20  Report"?
21     A.  Yes, sir, I can.
22     Q.  You can see kind of on the top left it
23  indicates there's 102 pages of it.  Does this appear to
24  be a copy of the expert report that you helped prepare
25  in this case?

Page 16

1      A.  Yes, sir, it is.
2      Q.  At various points today we'll go through
3  specific sections of it, but I just want to put it up
4  here so we can acknowledge it.
5         Are all of your opinions in this case
6  contained in this report, which I've marked as
7  Deposition Exhibit 72?
8      A.  Yes, sir, they are.
9      Q.  Do you have any opinions that are not
10  contained in this report?
11     A.  No, sir, I do not.
12     Q.  Okay.  So the report has various appendices,
13  figures, et cetera.  Am I right it has a set of figures
14  sort of attached as a separate appendix to the document?
15     A.  Yes, sir, they are.
16     Q.  Okay.  I'm going to show you now another
17  exhibit on the screen which I've previously marked as
18  Deposition Exhibit 73.
19         Does this appear to be a set of the figures
20  for your expert report?
21     A.  Yes, sir, they are.
22     Q.  Is the information in the figures accurate to
23  the best of your knowledge?
24     A.  Yes, sir.
25     Q.  Okay.  Let me stop sharing that.  Now I'd like



MICHAEL M. WYLIE, M.S.
USA vs BENJAMIN K. SHARFI

April 04, 2022
17–20

Page 17

1  to go to another document which I have previously
2  labeled Deposition Exhibit No. 74.  Do you see on the
3  screen what appears to be tables starting with Table
4  II.A.1?
5      A.  Yes, I see that.
6      Q.  And so am I right that the tables for the
7  expert report are sort of contained as a separate PDF
8  file?
9      A.  Yes, sir.  Yeah, I believe they are.
10     Q.  Okay.  Does this appear to be a copy of the
11  tables that go with your expert report?
12     A.  Yes, sir, it's a copy that's included in the
13  report.
14     Q.  Is the information in the table accurate, to
15  the best of your knowledge?
16     A.  Yes, sir, it is.
17     Q.  Okay.  Let me -- I'm sorry.
18         Okay.  So the -- I just want to make sure I'm
19  understanding the tables and the figures.  Am I right
20  that the figures and tables and photographs are labeled
21  with the system that matches the sections of the report?
22     A.  Yes, sir, we tried to do that.  There could be
23  some inadvertent errors.  Typically when that happens
24  when we put together a large report like this, that we
25  submit errata that may be inadvertent errors with

Page 18

1  labeling.
2      Q.  Okay.  But so for instance, let me go back
3  here to Deposition Exhibit Number -- this is 73, which
4  is the figures.  If I go and -- so I put this up on the
5  screen and I look at the first figure here and it says
6  in the bottom, Figure II.A.1.  Am I right that by that
7  nomenclature this figure goes with Section II.A.1?
8      A.  Yes, sir, it does.
9      Q.  So if I want to ask a witness about a figure,
10  the person who wrote that section of the report should
11  be able to tell me something about that figure, right?
12     A.  Yes, sir, that's correct.
13     Q.  Okay.  Let me stop sharing this.
14         So Mr. Wylie, am I right that the government
15  has retained five individuals to give expert opinions
16  related to wetlands on the defendants' property?
17     A.  Yes, sir, that's correct.
18     Q.  And you're one of the five, right?
19     A.  That's correct.
20     Q.  Am I right that the other individuals are
21  Lyndon Lee, Wade Nutter, Kai Coshow Rains and Scott
22  Stewart?
23     A.  That's correct.
24     Q.  Why are there five different expert witnesses
25  on the subject of wetlands --

Page 19

1          MR. ADKINS:  Objection.
2  BY MR. MCALILEY:
3      Q.  -- for the plaintiff?
4      A.  Mr. McAliley, each expert, myself included,
5  brings knowledge and relevance to the site and we were
6  hired to look at specific matters related to this -- to
7  the Sharfi site and then compile a report based on our
8  experience or field investigation and general knowledge
9  of the site.
10     Q.  Okay.  So am I right in understanding that
11  each person has separate expertise that is relevant to
12  the issue of wetlands on the defendants' site?
13     A.  Yes, sir, that's correct.  Even though we all
14  have worked in wetlands and have an ability to cross
15  over our expertises, the government hired us to each do
16  a separate analysis for the preparation of an expert
17  report.
18     Q.  Okay.  Are you relying upon the expertise of
19  others of the experts who helped write the report with
20  regard to their areas of expertise?
21     A.  Yes, sir, I am.
22     Q.  So for instance, you're aware that I took
23  Dr. Wade Nutter's deposition on Friday, right?
24     A.  Yes, sir, I am.
25     Q.  Dr. Nutter is a Ph.D. hydrologist, correct?

Page 20

1      A.  That's correct.
2      Q.  So am I right that you are relying upon the
3  hydrological opinions of Dr. Nutter in developing your
4  opinions?
5      A.  I'm sorry, could you repeat that?  There was
6  some background noise.
7      Q.  No problem.  Am I right that you are relying
8  upon the hydrological expertise of Dr. Nutter in forming
9  your opinions with regard to the scope of wetlands and
10  whether they are subject to clean water jurisdiction?
11     A.  Yes, sir, that's correct.
12     Q.  Okay.  And so Ms. Rains is a plant ecologist,
13  right?
14     A.  Yes, sir, she is.
15     Q.  So am I right that you're relying on
16  Ms. Rains', or Dr. Rains' opinions with regard to plant
17  ecology in developing your opinions?
18     A.  Well, not only on that, but also plant
19  identification too, you know, in association with plant
20  ecology.
21     Q.  And Dr. Stewart is a soil scientist, right?
22     A.  Yes, sir, that's correct.
23     Q.  And so are you relying upon Dr. Stewart's
24  opinions with regard to soil science in the development
25  of your opinions?



MICHAEL M. WYLIE, M.S.                                    April 04, 2022
USA vs BENJAMIN K. SHARFI                                      21–24

Page 21
1    A.  Yes, sir, I am.
2    Q.  What is Dr. Lee's area of expertise?
3    A.  Dr. Lee's area of expertise is, he's a
4  functional assessment ecologist that looks at bigger
5  pictures.  He also understands wetlands.  And Dr. Lee's
6  opinions looked at impacts, impact assessment,
7  mitigation, and I relied upon those opinions of
8  Dr. Lee's.
9    Q.  Okay.  So to save us time, then, from -- in
10  the deposition today, am I right, then, that on -- to
11  the extent that Dr. Nutter has conclusions on matters of
12  hydrology, you would be deferring to Dr. Nutter on those
13  issues when it comes to your opinions?
14    A.  Yes, sir, I would.
15    Q.  Okay.  So why did all of you prepare a single
16  report together?
17    MR. ADKINS:  Objection; foundation.
18    THE WITNESS:  We were all hired independently
19    to come up with our opinions on various aspects of
20    wetlands, wetlands ecology, existence of wetlands,
21    the three factors of wetlands, impact assessment.
22    So what we did is all the experts weighed in on
23    their expertise and then compiled a report complete
24    with figures, tables, and the results and opinions
25    of our field investigations from our knowledge and

Page 22
1    information that we gathered during the course of
2    our investigation.
3  BY MR. MCALILEY:
4    Q.  So am I right, Mr. Wylie, that you only wrote
5  portions of the report?
6    A.  That's correct, sir.
7    Q.  And other experts wrote other portions of the
8  report, right?
9    A.  That's correct.
10    Q.  Are you going to be giving opinions based upon
11  sections of the report that you did not write?
12    A.  No, sir, I will not be.
13    Q.  And am I right if I want to understand which
14  portions of the report contain your opinions, I look in
15  the table of contents and I can see there's a key that
16  has the initials of each expert next to the sections
17  that they wrote?
18    A.  Yes, sir, that's correct.
19    Q.  Thank you.  Okay.  I'd like to put back up on
20  the screen the report here.  By the way, I've learned
21  that it's good to take your time when you go and you put
22  up the documents on Zoom.  It just makes it -- so if I'm
23  a little slow, it's just to avoid the technical glitches
24  here.
25    So can you see, sir, that I have page 1 of the

Page 23
1  expert report up on the screen, Deposition Exhibit
2  No. 72?
3    A.  Yes, I do, and I'm going to expand it a little
4  bit so my eyes can see it better.
5    Q.  I'll try to expand it here too.
6    MR. ADKINS:  Right.  So Mr. Wylie, you won't
7    be able to expand the document.
8    MR. MCALILEY:  Yeah, I apologize for this
9    here.  Let me see if this will do it.  If you give
10    me -- tell you what.  Let me stop sharing for a
11    minute.  Hold on.  When I share the documents on
12    the screen, one thing that Zoom does, it puts a
13    little banner at the top and sometimes the controls
14    that will let you zoom in are beneath the banner.
15    So let me -- I just stopped sharing the screen so I
16    can zoom it in so you can see it better.  So let me
17    start out -- let me go and reshare the document.
18    Okay.  Is that better?  Can you see it better
19    now?
20    THE WITNESS:  Yes, it is.
21  BY MR. MCALILEY:
22    Q.  Sorry about that.
23    Okay.  So we're at page 1 of your expert
24  report, right?
25    A.  Yes, sir.  I -- yes, sir.

Page 24
1    Q.  And you see that on, in Section B it says,
2  "The DOJ expert technical team members and their roles
3  are as follows," and it lists the five experts and it
4  has a statement next to each person's name?
5    A.  Yes, sir, I do.
6    Q.  Does that list of roles on this page of the
7  expert report accurately state the topics regarding
8  which each individual expert will testify at trial?
9    A.  Yes, sir, it is.
10    Q.  So next to your name it says "Wetland Science,
11  Regulatory."
12    Do you see that?
13    A.  Yes, sir, I do.
14    Q.  Are those the topics on which you are going to
15  be providing testimony at trial?
16    A.  Yes, sir, it is.
17    Q.  What does "wetland science" mean?
18    A.  Wetland science is the study of functional
19  assessment.  It's also how wetlands interact in the
20  ecosystem with adjacent tributaries.  It's the three
21  factors of a wetland in how they interact to form a
22  wetland, the difference between wetlands and uplands
23  and -- but that's basically what wetland science is.
24    Q.  Mr. Wylie, at the trial are you going to
25  testify about the functions served by the wetlands on



MICHAEL M. WYLIE, M.S.
USA vs BENJAMIN K. SHARFI

April 04, 2022
25–28

Page 25

1   the site, or is that going to be a topic that's covered
2   by Dr. Lee?
3       A.   That will be a topic covered by Dr. Lee.
4       Q.   Okay.  Are you going to testify at the trial
5   about the delineation of the wetland line on the site,
6   or is that going to be a subject of testimony of
7   Dr. Lee?
8       A.   That will be a testimony by me after
9   considering the other experts' opinions on the three
10  factors associated with calling a wetland a
11  jurisdictional wetland under applicable regulations in
12  court cases.
13      Q.   Okay.  So you're going to be the witness at
14  trial who says here's the proper line of where the
15  wetlands are located on the site, right?
16          MR. ADKINS:  Objection.
17          THE WITNESS:  Yes, sir, I will.
18  BY MR. MCALILEY:
19      Q.   Are you going to be testifying about potential
20  mitigation for wetland impacts on the site?
21      A.   No, sir, I will not.
22      Q.   Is that Dr. Lee?
23      A.   Yes, sir.
24      Q.   Okay.  If I go back to Deposition Exhibit 72,
25  page 1 of the report, do you see it also says one of

Page 26

1   your roles is, quote/unquote, regulatory?  Do you see
2   that?
3       A.   Yes, sir, I do.  And can I increase the
4   volume?
5       Q.   Sure.  Am I not being clear enough?  Is it
6   hard to hear me?
7       A.   Well, I'm just going to increase the volume a
8   little bit, that's all.  I do that by -- it's up here.
9   That might be too loud, but we'll see.
10          Okay.  I'm sorry, sir.  Please continue.
11      Q.   No problem.  Is -- what do you mean by
12  "regulatory" as one of your roles in this case?
13      A.   Yes, sir.  I built upon my little bit over 29
14  years with the U.S. Environmental Protection Agency,
15  where I was -- where my tasks were to look at to
16  interpret the Clean Water Act, regulatory matters, which
17  involves jurisdiction, enforcement matters and policy
18  decisions.
19          So the regulatory expertise is basically my
20  career at the U.S. Environmental Protection Agency.
21      Q.   Okay.  So am I right that you're going to be
22  giving opinions with regard to whether the wetlands on
23  the site are part of the waters of the United States?
24      A.   That's correct.
25      Q.   And am I right that you are also going to be

Page 27

1   giving opinions as to whether there is a significant
2   nexus between the wetlands on the site and downstream
3   traditional navigable waters?
4       A.   That's correct.
5       Q.   And am I right that you're also going to be
6   giving testimony with regard to the proper application
7   of the 1987 Army Corps of Engineers Wetland Manual?
8       A.   That's correct.
9       Q.   Okay.  I'm going to take down this exhibit.
10  And what I'd like to do now is turn to your credentials,
11  sir.  I'm going to now put up on the screen what I've
12  marked as Deposition Exhibit No. 80.
13          MR. MCALILEY:  Mr. Adkins, I think that's the
14      next number.
15          (Deposition Exhibit No. 80 was identified for
16      the record.)
17  BY MR. MCALILEY:
18      Q.   Can you see your CV on the screen, Mr. Wylie?
19      A.   Yes, sir, I can.
20      Q.   Okay.  So this is a four-page curriculum
21  vitae.  I'm scrolling through it.  Does this appear to
22  be a true and correct copy of your current CV?
23      A.   Yes, sir, it appears to be.
24      Q.   Okay.  Does that provide a complete
25  description of your qualifications to testify as an

Page 28

1   expert in this proceeding?
2       A.   Yes, sir, it does.
3       Q.   So am I right that you received your bachelor
4   degree from the University of West Florida in 1986?
5       A.   Yes, sir, that's correct.
6       Q.   And you got a master's degree in coastal zone
7   studies at the University of West Florida in 1989; is
8   that right?
9       A.   Yes, sir, that's correct.
10      Q.   You don't have a Ph.D., do you?
11      A.   No, sir, I do not.
12      Q.   Do you have any formal postgraduate training?
13      A.   If you could -- as going to a college and
14  taking -- maybe you could explain what you mean by that.
15      Q.   That's fair enough.  Fair enough.
16          Have you ever done any postgraduate education
17  at a college or university?
18      A.   No, sir, I have not.
19      Q.   You have -- you did engage in training of
20  various types at the EPA over the course of your career,
21  though; is that right?
22      A.   Yes, sir, that's correct.
23      Q.   All right.  Okay.  So on Deposition
24  Exhibit 80, on the first page it has a section that says
25  "Expertise."



MICHAEL M. WYLIE, M.S.
USA vs BENJAMIN K. SHARFI

April 04, 2022
29–32

Page 29

1    Do you see that?
2    A.  Yes, sir, I do.
3    Q.  And it identifies three areas of expertise and
4  I want to walk through each one of them.  The first is
5  "Delineation of the waters of the United States
6  including wetlands."
7    Do you see that?
8    A.  Yes, sir, I do.
9    Q.  And so -- and by the way, you prepared this
10  curriculum vitae yourself, right?
11    A.  Yes, sir, I did.
12    Q.  So you believe you have expertise in the
13  delineation of waters of the United States, including
14  wetlands, right?
15    A.  Yes, sir, I do.
16    Q.  What are the waters of the United States?
17    A.  The waters of the United States, if you would
18  like me to do my -- go over my recollection of that, I'd
19  be happy to talk about what the definition is of waters
20  of the United States.
21    Q.  Well, Mr. Wylie, I just -- you've listed this
22  on your resume as one of your areas of expertise.  I'm
23  just asking, what are the waters of the United States?
24    A.  The waters of the United States are the
25  traditional navigable waters.  They're also impoundments

Page 30

1  of traditional navigable waters.  Traditional navigable
2  waters are described as waters that have been used, are
3  currently in use, reasonably can be made to be used in
4  the course of interstate or -- interstate or foreign
5  commerce, and then they include the ebb and flow of the
6  tide.  That's one part of the waters of the United
7  States.
8    There's several other parts of the United
9  States.  They include impoundments of the waters of
10  United States.  They include tributaries of traditional
11  navigable waters or impoundments of traditional
12  navigable waters.  Waters of the United States include
13  wetlands that are adjacent or abutting traditional
14  navigable waters.  Territorial seas are traditional
15  navigable waters, and in the current regime, wetlands
16  that are not relatively permanent or seasonally
17  relatively permanent that are adjacent to tributaries of
18  traditional navigable waters that have a significant
19  nexus to the chemical, physical or biological integrity
20  of downstream traditional navigable waters.
21    That pretty well sums up what waters of the
22  United States are.
23    Q.  So the waters of the United States are the
24  waters that are regulated under the Federal Clean Water
25  Act?

Page 31

1    A.  Yes, sir, that's correct.
2    Q.  Am I right that -- so some wetlands are
3  regulated under the Federal Clean Water Act, right?
4    A.  Wetlands are regulated under the Clean Water
5  Act.  Not all wetlands are regulated under the Clean
6  Water Act; correct.
7    Q.  So there are some wetlands that are not part
8  of the waters of the United States, right?
9    A.  That's correct.
10    Q.  And there are some wetlands in Martin County,
11  Florida, that are not part of the waters of the United
12  States, right?
13    A.  I assume they are, but I did not find wetlands
14  during my time doing field investigations that would not
15  be considered jurisdictional wetlands in Martin County.
16    Q.  Okay.  So as part of your work in this case,
17  you identified all the wetlands in the South Florida
18  Water Management District's Basin 4, right?
19    A.  If I could elaborate on that.  What we --
20  Basin 4 was a study area that we used to initiate our
21  fieldwork and figure out where are we going to conduct
22  our field investigations.  And we used the study area in
23  Basin 4 to define what that study area would be.
24    The study area is approximately a little over
25  11,000 acres.  So I did not traverse the entirety of the

Page 32

1  11,000 acres.  We went to, or at least I went to 34
2  separate sites where I made wetlands determinations,
3  which only one of those sites was not a wetland; it was
4  an upland.  So it wasn't defined as a wetland or a
5  non-jurisdictional wetland, as your question referred
6  to.
7    So during our investigation of Basin 4, I did
8  not visit every wetland that existed within that
9  footprint.
10    Q.  Okay.  Sir, I think you misunderstood my
11  question.  My question was:  You, in the report,
12  identify 1,064 acres of wetlands in Basin 4, correct?
13    A.  Yes, I did.
14    Q.  And it's your position that all of those
15  wetlands in Basin 4 are part of the waters of the United
16  States?
17    A.  Yes, they are.
18    Q.  Not all of those wetlands have surface water
19  connections to downstream traditional navigable waters,
20  do they?
21    A.  That I can't tell you for certain.  I don't
22  know if they all have surface connections, but they
23  certainly -- they are adjacent to tributaries that are
24  all connected to downstream traditional navigable
25  waters.  The reason why I can't is because I didn't



MICHAEL M. WYLIE, M.S.
USA vs BENJAMIN K. SHARFI

April 04, 2022
33–36

Page 33

1  visit every one of them.
2      Q.   Okay.  But you -- am I right, you assumed for
3  purposes of your report that all 1,064 acres of wetlands
4  in Basin 4 that you identified are part of the waters of
5  the United States?
6      A.   I assumed that based on preliminary
7  investigations, by aerial photography, by using NWI
8  maps, by using hydric soil areas and also by conducting
9  extensive wetland determinations over 34 sites inside
10  the Basin 4 or our study area.
11      Q.   So am I right as you sit here today, you're
12  not aware of any specific wetlands in Martin County,
13  Florida that you do not believe is part of the waters of
14  the United States?
15      MR. ADKINS:  Objection.
16      THE WITNESS:  No, sir, I can't subscribe to
17      that question that there are not any wetlands that
18      are not jurisdictional in Martin County, Florida.
19  BY MR. MCALILEY:
20      Q.   Okay.  I want to make sure I understand your
21  answer.
22      Have you -- have you identified any specific
23  wetlands in Martin County, Florida that you think is not
24  part of the waters of the United States?
25      A.   No, sir, I have not identified that.

Page 34

1      Q.   Okay.  Let's go back to your resume,
2  Deposition Exhibit 80.  I see your second area of
3  expertise is the 1987 Corps of Engineers Wetland
4  Delineation Manual and Regional Supplements.  Am I right
5  that the 1987 Corps of Engineers Wetland Delineation
6  Manual is the manual by which wetlands under the Clean
7  Water Act are identified?
8      A.   Yes, sir.
9      Q.   And am I right that the Regional Supplements
10  supplement the 1987 Wetland Manual?
11      A.   Yes, sir, that's correct.
12      Q.   Am I right that the Regional Supplements do
13  not change the entire 1987 manual but may address
14  certain aspects of it as relate to Florida?
15      A.   Yes, sir, that's correct.
16      Q.   Okay.  Let me go to the third area of
17  expertise.  Quote, Interpreting and enforcing Section
18  404 of the Clean Water Act, end quote.
19      Did I read that right?
20      A.   Yes, sir.
21      Q.   So what is it?  Am I right that Section 404 of
22  the Clean Water Act is the section of the law that
23  authorizes the issuance of permits for the discharge of
24  dredged and fill material into the waters of the United
25  States?

Page 35

1      A.   Yes, sir, it is.
2      Q.   What do you mean that you are an expert in
3  interpreting Section 404 of the Clean Water Act?
4      A.   During the course of my EPA career, I took
5  part in many delineations of wetlands -- I'm sorry --
6  determinations of wetlands in the eight states in
7  Region 4 EPA.  I also took part in policy
8  interpretations, looked at -- I interpreted Section 404
9  of the Clean Water Act, which is agriculture,
10  silviculture, ranching, and those interpretations led to
11  my career probably doing mostly enforcement actions
12  throughout the southeast and other areas too where I was
13  hired or helped, assisted other EPA regions in defining
14  violations of the Clean Water Act.
15      So my role basically was to look at a site,
16  look at a particular instance say in the agricultural
17  field and then make a determination if that agricultural
18  field, in consultation with my attorneys, was a proper
19  404F interpretation or was it an exempt activity, was it
20  an isolated wetland, was it an adjacent wetland.
21      So anything to do with the regulations, the
22  interpretations of policy and applicable case law
23  outside of legal interpretations, that that was my role
24  as an enforcement expert for the Environmental
25  Protection Agency.

Page 36

1      Q.   Sir, when you say you were an enforcement
2  expert means that your role was to enforce Section 404
3  of the Clean Water Act; is that right?
4      A.   To interpret if the alleged violations were
5  actual violations and didn't have any other policy
6  implications or legal implications where there wouldn't
7  be a discharge of dredge fill material so there wouldn't
8  be a violation.
9      Q.   But you were always involved in bringing
10  matters against individuals claiming that they had
11  violated the Clean Water Act, Section 404; is that fair?
12      A.   Yes, sir, that's fair.
13      Q.   You haven't done any work actually
14  representing property owners, have you, defending
15  against an enforcement action by the government?
16      A.   No, sir, I have not.
17      Q.   So let's ago back to your expertise in
18  interpreting the Clean Water Act.
19      So Mr. Wylie, you're not a lawyer, are you?
20      A.   No, sir, I'm not.
21      Q.   You didn't go to law school, did you?
22      A.   No, sir, I did not.
23      Q.   You've never been a member of the bar in any
24  jurisdiction, have you?
25      A.   No, sir, I have not.



MICHAEL M. WYLIE, M.S.
USA vs BENJAMIN K. SHARFI

April 04, 2022
37–40

Page 37

1    Q.   You were not involved in the drafting of the
2   Clean Water Act, were you?
3    A.   No, sir, I was not.
4    Q.   So you were born in 1955; is that right?
5    A.   Correct.
6    Q.   So I guess you were 17 years old when the
7   Clean Water Act was passed?
8    A.   Yes, sir, that's correct.
9    Q.   You have no personal knowledge of Congress'
10   intent, legislative intent, regarding the Clean Water
11   Act, do you?
12    A.   I've just read the documentation of what the
13   intent of certain senators, representatives were when
14   they were drafting the act and some of the background
15   information, but --
16    Q.   No personal --
17    A.   I haven't --
18    Q.   Sorry.
19    A.   I have no personal --
20    Q.   I broke the rule.  I talked over you.  I
21   thought you were done.  I apologize.  You could finish
22   if you'd like.
23    A.   Yeah.  In other words, I've just read about
24   statements made on the record by senators and
25   representatives when they're drafting the Clean Water

Page 38

1   Act, but I certainly at 17 did not carry the weight of a
2   citizen from Mississippi or Florida to influence the
3   Clean Water Act.
4    Q.   Am I right that you never worked in EPA
5   headquarters?
6    A.   Define "work."
7    Q.   Well, you've always been -- in your service at
8   EPA, you're always part of EPA Region 4, right?
9    A.   Yes, sir.
10    Q.   And Region 4 is the region of EPA that covers
11   the southeastern states, right?
12    A.   Yes, sir, that's correct.
13    Q.   You were never part of any of the EPA
14   headquarters units, were you?
15    A.   No, sir, I was not.
16    Q.   Did you ever work on teams that promulgated
17   regulations at EPA interpreting the term "the waters of
18   the United States"?
19    A.   I have taken part in policy discussions and
20   then critiquing and reviewing regulations in the --
21   before the pre Obama Rule, or the Clean Water Act Rule
22   of 2015.
23    Q.   Okay.  To understand that correctly, so were
24   you assigned to a team or group in EPA whose job it was
25   to develop regulations defining the term the waters of

Page 39

1   the United States?
2    A.   No, sir, I was not.
3    Q.   Okay.  But you had discussions with people
4   regarding -- while the 2015 so-called Obama Rule was
5   being developed, right?
6    A.   Yes, sir, that's correct.
7    Q.   Okay.  The Obama -- the 2015 regulation
8   defining the waters of the United States never came into
9   effect in Florida, right?
10    A.   I don't recall.  I know they were in effect
11   for three weeks before they were enjoined.  I think they
12   were, you know, in effect for three weeks in many parts
13   of the United States.  I don't recall if it was in --
14   not in Florida.
15    Q.   Okay.  The 2015 regulation defining the waters
16   of the United States has been rescinded, right?
17    A.   Yes, sir, that's correct.
18    Q.   And have you done any other work in the
19   development of other regulations defining the waters of
20   the United States?
21    A.   No, sir, I have not.
22    Q.   So you're not going to claim expertise on
23   legal matters, are you?
24    A.   No, sir, I'm not.
25    Q.   Are you going to be offering opinions

Page 40

1   regarding the proper interpretation of the Clean Water
2   Act?
3        MR. ADKINS:  Objection.
4        THE WITNESS:  Yes, sir, I am.
5   BY MR. MCALILEY:
6    Q.   What opinions are you going to offer about the
7   proper interpretation of the Clean Water Act?
8    A.   Well, I'm going to offer opinions that based
9   on my experience on the site and my prior knowledge of
10   what a wetland is, that there were wetlands that existed
11   on the Sharfi site pre disturbance and post disturbance,
12   and also that those wetlands and the connections worked
13   to downstream traditional navigable waters.
14        That -- and that also there were tributaries
15   in the area that transferred water to other tributaries
16   of traditional navigable waters and that those wetlands
17   and waters had a significant nexus to -- that
18   significantly affected the integrity of the biological,
19   chemical and physical characteristics of downstream
20   traditional navigable waters.  I'll express those
21   opinions.
22    Q.   You may have misunderstood my question, or
23   maybe I asked a bad question.  My question is actually
24   more specific.
25        Are you going to be giving opinions regarding



Page 41

1 how to properly interpret the law, specifically the
2 Clean Water Act?
3     A. I will be giving opinions based on my
4 knowledge and understanding of the regulations, what my
5 fieldwork and what my interpretation of those factors
6 are to declare that the wetlands on the Sharfi site are
7 waters of the United States.
8     Q. So Mr. Wylie, to understand your answer, I
9 understood you to just say that you're going to be
10 offering opinions that applies the laws to the facts of
11 the lawsuit, but you're not going to be offering
12 opinions about what the law is.
13         Is that a fair characterization of what you
14 just said?
15     A. My opinions will be my knowledge, my
16 understanding, my fieldwork and what my knowledge of the
17 applicable laws and regulations are and why that guides
18 my opinion that these are wetlands that are waters of
19 the United States.
20     Q. You're not a hydrologist, are you?
21     A. No, sir, I'm not.
22     Q. You have no degree in hydrology, right?
23     A. Yes, sir, that's correct.
24     Q. And your statement of expertise in your CV,
25 Deposition Exhibit No. 80, does not identify hydrology

Page 42

1 as one of your areas of expertise, right?
2     A. Yes, sir, that's correct.
3     Q. So you're relying completely on Dr. Nutter's
4 opinions with regard to the hydrology issues in the
5 case, right?
6     MR. ADKINS: Objection.
7     THE WITNESS: Yes, sir.
8 BY MR. MCALILEY:
9     Q. You only have one publication; am I right?
10     A. I'm sorry, I didn't --
11     Q. You only have one publication over the course
12 of your career; isn't that right?
13     A. Yes, sir.
14     Q. And it's on your -- let me see if I can find
15 it here. It's on the fourth page of your resume. It
16 looks like you wrote a chapter in a book on Mississippi
17 coastal wetland resources; is that right?
18     A. Yes, sir. In the role of EPA, in looking at
19 those, protecting those general wetland enforcements to
20 Clean Water Act in Mississippi coastal wetlands, yes,
21 mm-hmm.
22     Q. Okay. So the publication basically discussed
23 the role of EPA as it relates to Mississippi's coastal
24 wetlands?
25     A. Yes, that's fair, mm-hmm.

Page 43

1     Q. Am I right that you never published any
2 scientific research papers?
3     A. Yes, sir, that's correct.
4     Q. Am I right that you've never published any
5 paper that was subject to scientific peer-review?
6     A. Yes, sir, that's correct.
7     Q. In 1990 you worked as a staff scientist for
8 the Mississippi Bureau of Marine Resources; is that
9 right?
10     A. Yes, sir, I did.
11     Q. And you worked there for approximately a year?
12     A. A little bit less, yes, sir, uh-huh.
13     Q. And that was right out of college?
14     A. It was within a year after I got out of grad
15 school; yes.
16     Q. Okay. After you got your master's at the
17 University of West Florida, right?
18     A. Yes, sir, that's correct.
19     Q. And am I right that since 1990, you've never
20 engaged in any scientific research?
21     MR. ADKINS: Objection.
22     THE WITNESS: I have not engaged since that
23     time in peer-reviewed scientific papers that I
24     authored or published in a journey -- in a journal.
25     I have taken part in multiple projects where I was

Page 44

1 part of teams or led teams that looked at wetlands,
2 looked at the different jurisdictional aspects of
3 wetlands under different actionable manuals or
4 proposed manuals.
5     So I've been taken part in a lot of trainings
6 and investigated wetland science, but I have not
7 published papers in pursuit of that. Most of that
8 training and prior knowledge was in pursuit of
9 becoming better and more proficient at my job as an
10 interpreter and enforcer of Clean Water Act and how
11 to apply the 1987 manual in the coastal plain
12 supplements.
13 BY MR. MCALILEY:
14     Q. So Mr. Wylie, you worked at EPA Region 4 from
15 1991 to 2020; is that right?
16     A. Yes, sir, that's correct.
17     Q. That was 29 years of government service,
18 right?
19     A. Yes, sir.
20     Q. And you're -- and during that time, am I
21 correct that you were always responsible for wetland
22 permitting and wetland enforcement matters?
23     A. No, sir. If I could further explain, if you'd
24 like me to explain that.
25     Q. Okay. Well, let me break this down just to



MICHAEL M. WYLIE, M.S.
USA vs BENJAMIN K. SHARFI

April 04, 2022
45—48

Page 45

1 speed this along.
2      So if I look at your resume here, it says,
3 "from 1991 to "1998" -- I'm on page 2 of your resume --
4 "Clean Water Act, Section 404, project manager in the
5 states of Mississippi and Florida, U.S. EPA Region 4."
6      Did I read that right?
7   A.  Yes, sir.
8   Q.  So you were -- and Section 404 is the section
9 of the Clean Water Act that governs the issuance of
10 permits to discharge dredged and fill material, right?
11   A.  Yes, sir.  We provided reviews to the Corps on
12 the 404.B.1 guidelines and application for issuance of
13 permits, whether they should be -- how they should be
14 mitigated, if the wetlands were jurisdictional, high
15 quality, low quality.  Those were the comments that I
16 provided to my superiors, which then signed letters and
17 sent to the Corps about a particular permit.
18   Q.  Okay.  So from 1991 to 1998, your job was
19 essentially to look into matters related to the
20 permitting program from Section 404 and enforcement of
21 the requirements of Section 404?
22      MR. ADKINS:  Objection.
23      THE WITNESS:  Yes, sir, that was my primary
24   role, to -- it was basically 50/50.
25

Page 46

1 BY MR. MCALILEY:
2   Q.  You never -- by the way, when you were at EPA,
3 you never had the title of scientist, did you?
4   A.  No, sir, I did not.
5   Q.  I see from 1998 to 2009, you were a regional
6 wetland enforcement expert for EPA Region 4; is that
7 right?
8   A.  Yes, sir, that's correct.
9   Q.  Was that your title, regional wetland
10 enforcement expert?
11   A.  Yes, sir.  It went with a promotion and I was
12 the team leader for the enforcement group in Atlanta
13 from 1998 to 2009.
14   Q.  I just want to understand your title.  Was
15 your title, actually have the word "expert" in it, your
16 job title?
17   A.  Yes, sir.
18   Q.  Okay.  And so was your -- a team leader of
19 enforcement of wetland violations, this would involve
20 gathering information about alleged violations of
21 Section 404; is that right?
22   A.  Yes, sir, it would.
23   Q.  You were the person at EPA in charge of
24 putting together a case against somebody for allegedly
25 violating Clean Water Act, Section 404, right?

Page 47

1   A.  I was one of a group that did that; yes.
2   Q.  Basically in a way you were a law enforcement
3 officer, right?
4      MR. ADKINS:  Objection.
5      THE WITNESS:  No, sir.  I did not have
6 agricultural ability where someone would -- if it
7 was a criminal violation, we couldn't -- we were
8 not -- most of the work that I did was
9 administrative context, which we asked people to
10 cease discharging and restore the site, but those
11 cease and desist order sent by EPA in an
12 administrative context could only be -- if someone
13 blew us off, we would have to enforce those by
14 sending that cease and desist or that restore the
15 site to the Department of Justice and then work
16 with the Department of Justice in the civil
17 proceeding, much like this, where a judge would
18 make a decision about the action and what the final
19 remedy or penalty would be.
20 BY MR. MCALILEY:
21   Q.  So you never worked as a law enforcement
22 officer, then, right?
23   A.  No, sir, I did not.
24   Q.  I see that from 2009 to 2020 on your resume it
25 says you're a national wetlands enforcement expert, EPA

Page 48

1 Region 4.
2      Did I read that right on your resume?
3   A.  Yes, sir.
4   Q.  Am I right that that was the same job except
5 for you had handled matters outside of Region 4 as well
6 as in Region 4?
7   A.  Yes, sir, it was.  It went with another
8 promotion and the title went with the promotion.
9   Q.  Why did you leave EPA?
10   A.  I was 65 and I had spent almost 29 years and a
11 month with the government, and I had always promised
12 myself at 65 I would go do something else.
13   Q.  Good for you.  I've made those promises to
14 myself as well.
15      Okay.  So since EPA, since you retired from
16 EPA in 2020, who has been your employer?
17   A.  I've been employed by the U.S. Department of
18 Justice first in April of 2020 in the throws of the
19 pandemic to further resolve the Brenda Massey
20 enforcement case in south Mississippi.  I've spent
21 several field days there, written several memorandum and
22 we're trying to finalize that case.  It's trying to be
23 finalized under a consent decree that Ms. Massy signed.
24      I also was hired by the Eastern Resource Group
25 as a subcontractor to assist EPA in fieldwork in



MICHAEL M. WYLIE, M.S.
USA vs BENJAMIN K. SHARFI

April 04, 2022
49–52

Page 49

1  March 2021. EPA is -- with my leaving and with some new
2  employees, they didn't have the proper expertise, so
3  they reached out to me to see if I would assist them in
4  fieldwork. I'm still employed by the Eastern Resource
5  Group on contractual money to EPA.
6      And then most recently, I was employed by the
7  Department of Justice in April '21 to assist in the
8  resolution of the Mr. Sharfi and Neshafarm case.
9      (Reporter interruption.)
10     THE WITNESS: It's Brenda Massey, M-A-S-S-E-Y.
11  It's located in George County, Mississippi.
12  BY MR. MCALILEY:
13     Q. All right. So Mr. Wylie, so the Brenda Massey
14  case, you have been engaged by the Department of Justice
15  to be a Section 404 expert; is that right?
16     A. Yes, sir, that's correct.
17     Q. Okay. And then the case that you said you
18  were a subcontractor on, was that the case concerning
19  Deseret Cattle and Timber Company?
20     A. Yes, sir, that's correct.
21     Q. So am I right that EPA has hired a consulting
22  firm, Eastern Research Group, Inc., and that that
23  consultant to EPA, in turn, hired you as a
24  subconsultant?
25     A. Yes, sir, that's correct.

Page 50

1      Q. So you were working for EPA in that case,
2  right?
3      A. Well, technically I'm working for Eastern
4  Resource Group, but I am a subcontractor to Eastern
5  Resource Group in assisting EPA in the resolution. I
6  don't know if that's a technical whatever. I don't know
7  if it's a tax problem in the middle of tax season.
8      So I want to make sure I don't get that messed
9  up, but I work with EPA employees and assist them as
10  directed in -- on the Deseret Cattle and Timber
11  Company's site.
12     Q. Okay. So, but let me make sure I understand
13  this. Are you an employee of Eastern Research Group,
14  Inc., or have they hired your LLC to provide services?
15     A. I'm a subcontractor to Eastern Research Group.
16  So I am not an employee of that firm.
17     Q. Okay. And what I see on your resume, it says
18  under "Current Employment," it also refers you're
19  employed by DOJ, Department of Justice, regarding the
20  Brenda Massey case and employed by the Department of
21  Justice in this case. You don't mean that you're
22  literally an employee of the Department of Justice,
23  right?
24     A. I'm sorry, I am not. I'm contracted; yes.
25     Q. Right. So your employer is Wetland

Page 51

1  Resolutions, LLC?
2      A. Yes, sir, it is.
3      Q. So you get a W-2 from Wetland Resolutions,
4  LLC?
5      A. I don't get a W-2 because I am an LLC, so I'm
6  a passthrough company.
7      Q. I see. And Wetland Resolutions, LLC is your
8  LLC; that basically is you working on as a consultant on
9  cases, right?
10     A. That's correct.
11     Q. Okay. By the way, when you just -- you just
12  said you were engaged by the Department of Justice to
13  assist in the resolution of this case. Haven't you been
14  engaged actually to be an expert witness for the
15  plaintiff in the case?
16     A. Yes, I have.
17     Q. Okay. How many times have you served as an
18  expert witness in a wetlands case?
19     A. I've served as an expert witness only in
20  criminal cases, criminal proceedings that the Department
21  of Justice took against individuals.
22     In the Freedman Farms case in North Carolina,
23  in the Straub, Donald Straub case in Florida, and the
24  Big Hill Acres, Robert Lucas case in south Mississippi,
25  and I served as an expert witness on a case in south

Page 52

1  Mississippi for an engineer that was in the sentencing
2  phase of the trial. So I was entered as an expert there
3  to expound upon the issues that this engineer was
4  charged with and convicted, and then I reported or
5  testified about the seriousness of the problems and
6  whatnot which went towards the sentencing of this
7  individual.
8      Q. All right. So am I right that you've served
9  as an expert witness in four wetland cases prior to this
10  one?
11     A. Yes, sir, that's correct.
12     Q. Okay. And are all the cases in which you have
13  served as an expert witness listed in your resume
14  starting on page -- starting on page 3?
15     A. Yes, sir.
16     Q. So I see on your resume there's a section that
17  says "Government Jurisdictional Work," and then another
18  section that's called "Federal Court Experience." So
19  is -- am I right that the federal court experience that
20  you just described where you testified is -- are those
21  cases you've listed here at the bottom of page 3 and the
22  top of page 4?
23     A. Yes, sir, that's correct.
24     Q. And could you -- what did the cases referenced
25  under Government Jurisdictional Work refer to?



MICHAEL M. WYLIE, M.S.
USA vs BENJAMIN K. SHARFI

April 04, 2022
53–56

Page 53

1    A.   As working for EPA at the time, I assisted
2   various Corps districts when they reached out for EPA
3   for help in jurisdictional analyses, whether involved in
4   court cases or they were involved in -- where
5   jurisdictions were appealed.
6        So I assisted the Charleston district in a
7   case where the jurisdiction was in question.  So I've
8   spent field time, discussed things with their attorneys.
9   For the South Carolina Coastal Construction League vs.
10  the U.S. Army Corps of Engineers, on the Spectre case,
11  it was a jurisdictional call.  I assisted the Corps
12  there, Charleston district, in a wetland -- making sure
13  it was a jurisdictional wetland.  There was some
14  question about that.
15       The Deerfield Plantation case, it was the
16  Corps was sued over a jurisdictional analysis on the
17  Deerfield Plantation case.  I assisted the Charleston
18  district again in what waters were -- tributaries and
19  wetlands were waters of the United States.  Coxco
20  Realty, I was myself and another person were -- assisted
21  the Louisville district.  It was a court case against
22  Coxco Realty that these were waters of the United
23  States.  It was right after Rapanos, and the Court
24  didn't have a whole heck of a lot of expertise in
25  Rapanos-ship.  We provided that.

Page 54

1        U.S. vs. Acquest Transit, I -- it was a
2   criminal case in Buffalo District, New York.  I was
3   tasked by the Department of Justice to do a wetland
4   jurisdiction on the Acquest Transit case to perform
5   significant nexus analysis.  That case was settled.
6   It's, I think, still in civil proceedings even now.
7        The U.S. Conde case was another criminal
8   enforcement case where I was tasked to do a wetland
9   jurisdiction and testify, if need be, in Georgia.  I
10  completed a report and documented my findings.  That
11  case was settled before trial.
12       Q.   Okay.  So am I right, then, the government
13  jurisdictional work on your resume, Deposition
14  Exhibit 80, represents cases in which you worked as an
15  expert, but where you did not actually testify in
16  federal court?
17       A.   Yes, sir, that's correct.
18       Q.   Did you have your deposition taken in these
19  cases listed under Government Jurisdictional Work?
20       A.   No, sir, I did not.
21       Q.   Are there any other cases other than those
22  listed on the resume here, which is Deposition
23  Exhibit 80, which where you have given deposition
24  testimony as an expert witness on the matter -- on the
25  subject matter of wetlands?

Page 55

1    A.   No, sir, I have not.
2    Q.   So how many times have you had your deposition
3   taken?
4    A.   I think three.
5    Q.   Okay.  Has a court ever not accepted you as an
6   expert witness?
7    A.   No, sir, they have not.
8    Q.   What are the subject matter on which you've
9   been accepted as an expert witness?
10   A.   Basically Clean Water Act jurisdiction and
11  jurisdictional analysis, what is waters of the United
12  States.
13   Q.   Have you always testified on behalf of the
14  government?
15   A.   Yes, sir, that's correct.
16   Q.   So you've always testified on the side of the
17  government in wetland disputes; do I have that right?
18   A.   That's correct.  I was employed by the
19  government.  So that was the only way I could testify.
20   Q.   And how many cases have you testified that the
21  wetland in question was part of the waters of the United
22  States?
23   A.   Four cases.
24   Q.   And in every case it was your testimony that
25  the waters were part of the waters of the United States;

Page 56

1   is that right?
2    A.   Yes, sir, that's correct.
3    Q.   You never testified that a wetland is not part
4   of the waters of the United States, have you?
5        MR. ADKINS:  Objection.
6        THE WITNESS:  No, sir, I have not.
7   BY MR. MCALILEY:
8    Q.   Thank you.  Mr. Wylie, we've been going about
9   an hour and 18 minutes.  Maybe we could take a short
10  five-minute break to stretch our legs?
11   A.   Yes, sir, that would be great.
12   Q.   That would be great.
13       THE VIDEOGRAPHER:  Okay.  We're going off the
14  record.  The time is approximately 10:19 a.m.
15       (A break was had.)
16       THE VIDEOGRAPHER:  We are back on the record.
17  The time is approximately 10:30 a.m.  Thank you.
18  BY MR. MCALILEY:
19   Q.   All right.  Mr. Wylie, what I'd like to do now
20  is turn to your report and the section that I believe
21  that you wrote.  I'm going to pull up on the screen
22  Deposition Exhibit 72.
23       Can you see what looks to be page 16 of your
24  expert report?
25   A.   Yes, sir.



MICHAEL M. WYLIE, M.S.
USA vs BENJAMIN K. SHARFI

April 04, 2022
57—60

Page 57

1    MR. ADKINS:  I'm sorry to interrupt you, but
2  it just -- something sounds a little different with
3  the sound.
4    MR. MCALILEY:  Okay.  Does that help at all?
5    MR. ADKINS:  Yeah, that seemed to be more
6  clear.
7    MR. MCALILEY:  I have papers laying around on
8  my desk here, so maybe it's sitting on a microphone
9  or something.
10    MR. ADKINS:  That's much better.
11    MR. MCALILEY:  Great.  Thank you.  Thank you
12  for telling me.
13    MR. ADKINS:  Yep.  Sorry to interrupt.
14    MR. MCALILEY:  No problem.
15  BY MR. MCALILEY:
16    Q.  So Mr. Wylie, am I right that you wrote
17  Section IV.A.1 of the report?
18    A.  Yes, sir.
19    Q.  And, okay.  Am I right that Section IV.A.1
20  describes the background materials that the DOJ expert
21  team reviewed in forming its opinions?
22    A.  Yes, sir.
23    Q.  Are all of the documents and background
24  materials that were reviewed by the DOJ expert team
25  identified in Section IV.A.1?

Page 58

1    A.  Yes, sir.  However, they're -- I think they're
2  in a couple of other areas too, some of the other
3  documents.  It could be -- I know we have some other
4  documents at the end of this report.  So I apologize if
5  they didn't all get included in this one section, but we
6  relied on all the documents listed in the entire report;
7  yes.
8    Q.  I see.  So at the end of the report, there's a
9  section that has like the citation references as well as
10  a list of materials considered; is that right?
11    A.  Yes, sir, that's correct.
12    Q.  Okay.  So between that list of literature
13  cited and other references in the back of the report and
14  the documents that are identified in Section IV.A.1,
15  does that encompass all the materials that the DOJ
16  expert team reviewed in forming its opinion in this
17  case?
18    A.  Besides our not -- prior knowledge and ability
19  to interpret that, yes, that is -- yes, the answer is
20  yes.
21    Q.  Thank you.  To your knowledge, has the
22  government turned over all the materials in discovery
23  that were considered by the DOJ expert team in forming
24  its opinions?
25    A.  Yes, sir.

Page 59

1    Q.  Okay.  So I want to now turn to a different
2  section of the report, which is Section -- page 2, I'm
3  scrolling up here, Section II.B, "Study Area."
4    Do you see that on the screen?
5    A.  Yes, sir, I do.
6    Q.  So this is a section of the report that you
7  wrote, right?
8    A.  Yes, sir, it is.
9    Q.  So you're going to be the person who's going
10  to testify about the statements that are made in this
11  section, right?
12    A.  That's correct, yes, sir.
13    Q.  Okay.  So I want to just -- I'll do this just
14  to make this a little clearer.  I'm going to highlight a
15  phrase and just read along here.  You see the second
16  sentence says, quote, To this end, we established an
17  approximately 11,049-acre study area in the vicinity of
18  the Bessey Creek watershed.
19    Do you see that?
20    A.  Yes, sir, I do.
21    Q.  What do you mean by a study area?
22    A.  A study area, this harkens back to my EPA
23  employment.  After the advent of the Rapanos decision
24  and Rapanos guidance, what we had to figure out was how
25  we were going to apply that opinion into normal

Page 60

1  regulatory vernacular.  So at EPA -- and I was one of
2  the people, if not the prime, that came up with a term
3  called the study area.  And what we used for this study
4  area was the so-called site, whether it was an
5  enforcement action or permit review or whatnot, that was
6  included in a study area which typically involves a
7  watershed, and we applied Justice Kennedy's significant
8  nexus analysis.
9    So the watershed, the Bessey Creek watershed,
10  or most of it, probably not exactly all of it, but as
11  much as Basin 4 that we could fit in there, this
12  11,049-acre -- which is approximate -- is the so-called
13  study area that -- so that we could use that to
14  interpret the significant nexus analysis.
15    Q.  Okay.  So Mr. Wylie, the study area typically
16  is the watershed for the site?
17    A.  In this instance, it's a -- not the entire
18  watershed, but it's the vast majority of it.
19    Q.  Okay.  You believe the site drains to Bessey
20  Creek, right?
21    A.  Sir, one more time, I'm sorry.
22    Q.  You believe the site drains to Bessey Creek,
23  correct?
24    A.  Yes, sir, that's correct.
25    Q.  So the site is in the Bessey Creek watershed?



Page 61

1    A.  Yes, sir.

2    Q.  You said this concept of the study area, that
3  you came up with that name; is that right?

4    A.  Yes, sir, that's correct.

5    Q.  Is the term "study area," for purposes of
6  applying the decision in Rapanos vs. United States, is
7  that contained in any regulation, to your knowledge?

8    A.  Not exactly nomenclature as study area, no,
9  sir.

10    Q.  Is it contained in any guidance to apply the
11  Rapanos decision?

12    A.  It's similarly situated lands in the region,
13  is a reasonable facsimile of the study area.

14    Q.  Okay.  So you think study area, it means the
15  same thing as similarly situated lands for purposes of
16  the Rapanos decision?

17    A.  Yes, sir.  That's what I came up with to guide
18  my folks and to discuss with Corps folks in the
19  southeast as we were trying to come up with a way to
20  define waters of the United States after that guidance
21  in that decision.

22    Q.  So the similarly situated lands are all
23  wetlands in the watershed?  Am I understanding that
24  right?

25    A.  The best that we can look at on onsite

Page 62

1  resources that we can, on 11,000 acres in this study
2  area, certainly -- or none of us certainly covered every
3  one of those areas.  We used established protocols like
4  the NWI map, hydric soil charts, NAD plus charts, USGS
5  charts.  We used local resources here in this instance,
6  which is the South Florida Water Management basin area,
7  very discrete.  It encompassed the site and the
8  traditional navigable waters we were flowing to.

9    Q.  So Mr. Wylie, maybe you didn't understand my
10  question.  My question was simply, you believe the
11  similarly situated lands are all the lands in the
12  watershed, right?

13    A.  For this study area, yes, sir.

14    Q.  In general, do you think in determining what
15  the similarly situated lands are for purposes of the
16  Rapanos analysis, it is all lands in the watershed?

17    A.  Well, first of all, Mr. McAliley, the
18  watershed, it depends upon what size watershed a study
19  area encompasses.  The larger the watershed, let's -- if
20  you were including the St. Lucie River and if you looked
21  for the watershed for the St. Lucie River, then Bessey
22  Creek would be just a component of that watershed.  So
23  watersheds vary in size and scope and scale.

24    In this instance, what I tried to do here was
25  limit the scale of that to include the site tributaries,

Page 63

1  adjacent wetlands or abutting wetlands that all flow to
2  a traditional navigable water that could be established
3  given time, resources and complexity, and then do the
4  fieldwork and finish the report.

5    So everything kind of involves around the
6  scale and the size and the scope of a particular
7  watershed.

8    Q.  Yeah, so Mr. Wylie, I don't think you answered
9  my question.  It's a very simple question.

10    In determining what the similarly situated
11  lands are of a wetland site, you believe the similarly
12  situated lands are all lands in the watershed that the
13  site is a part of.  Am I understanding that right?

14    A.  My study area is a portion of the Bessey Creek
15  watershed, so the similarly situated lands that I
16  considered were included in that study area which is a
17  part of that -- most of Bessey Creek watershed.

18    Q.  Okay.  But just in general, you think that in
19  figuring out the similarly situated lands, you look at
20  all lands in the watershed, right?

21    A.  No.  I thought I just told you that a study
22  area can be a component of a watershed.  It doesn't have
23  to be the entire watershed because you have to define a
24  watershed.  And a watershed could be much -- too big to
25  even get an angle on, get a handle on to conduct

Page 64

1  fieldwork and whatnot.

2    So in this instance, we chose -- or I chose a
3  study area that was Basin 4.

4    Q.  Okay.  How did you come to identify Basin 4 as
5  your study area?

6    A.  What -- how I chose it was we were reviewing
7  background material, we were looking at watershed
8  approaches for significant nexus analysis for just where
9  the site was, how it flows, where the wetlands are.  And
10  in reviewing sites on the Web, we found -- I found
11  Basin 4 would be a good approximation of Bessey Creek's
12  watershed and felt like it was an appropriate study
13  area.

14    Q.  So you think Basin 4 is a good approximation
15  of the Bessey Creek watershed; is that right?

16    MR. ADKINS:  Objection.

17    THE WITNESS:  For the purposes of my study,
18    yes.

19  BY MR. MCALILEY:

20    Q.  Okay.  What percentage of the Bessey Creek
21  watershed is contained in Basin 4?

22    A.  I think it's a hundred percent.

23    Q.  Oh, so you think the entire Bessey Creek
24  watershed is contained within Basin 4?

25    A.  No, sir.  The entirety of the Bessey Creek



Page 65

1  watershed in this study area is in Basin 4.
2     Q.  I don't understand.  What percentage of the
3  Bessey Creek watershed is in the boundaries of water --
4  of South Florida Water Management's Basin 4?
5     A.  Okay.  Now I understand your question.
6        There's a couple of -- I think there's another
7  creek called Danforth or something that goes into Bessey
8  Creek.  So there's -- it's more than 50 percent.  I
9  don't know the exact number.  So I can't exactly tell
10  you, but it's more than half of Bessey Creek's watershed
11  is in Basin 4.
12     Q.  You think Danforth Creek flows into Bessey
13  Creek; is that right?
14     A.  I think it does.
15     Q.  You're not a local to Martin County, are you?
16     A.  No, sir, I'm not.
17     Q.  Okay.  So let me exit out of Exhibit 72 and go
18  to a different exhibit here.  I'm now going to what was
19  previously marked Deposition Exhibit 73, which is the
20  figures, and I'm calling up Figure II.B.1, the SFWMD
21  Basin 4 selected as the study area.
22        Can you see that?
23     A.  Yes, sir.
24     Q.  So am I right that on this figure, Basin 4 is
25  all the area within the red line?

Page 66

1     A.  As defined by the South Florida Water
2  Management, yes, sir.
3     Q.  So your study area is every location within
4  the boundaries of that red line on Figure II.B.1, right?
5     A.  That was my study area and I think we went
6  outside of it just a tad on the Florida DOT site which
7  was south of Martin Highway near the interstate.  I
8  think that was one of our wetland points.  But there
9  were wetlands that were still connected to the Basin 4.
10  So my study area, that was the only area that we were
11  outside of Basin 4.
12     Q.  Okay.  Mr. Wylie, I appreciate you trying to
13  be very clear.  I would just say I didn't ask whether
14  you had done work outside of Basin 4.  I simply was
15  asking where the study area is.  And I'm only saying
16  this to you because this is going to be a long day and
17  I'm just trying to move through the materials.  So my
18  question was actually that simple.
19        Okay.  So as I look at this Figure II.B.1, am
20  I right that Basin 4 includes areas of the Bessey Creek
21  watershed east of the Florida Turnpike?
22     A.  Yes, sir.
23     Q.  And those areas are highly urbanized, aren't
24  they?
25     A.  Yes, sir.

Page 67

1     Q.  Am I right that east of the Florida Turnpike
2  is where Bessey Creek still has the form of a natural
3  stream?
4     A.  Yes, sir.
5     Q.  And that's where the title portions of Bessey
6  Creek are located, correct?
7        MR. ADKINS:  Objection; vague.
8        THE WITNESS:  The title portions of Bessey
9     Creek are east of the Florida Turnpike; correct.
10  BY MR. MCALILEY:
11     Q.  Am I correct that you've identified in your
12  report the close -- the furthest upstream location for
13  this tidal influence of Bessey Creek, is where the S.W.
14  Murphy Road crosses over the creek?
15     A.  Yes, you are right that we identified that.
16  However, that is not the furthest extent of the reach of
17  the ebb and flow.  That's where we feel the most
18  comfortable and the easiest to make that declaration
19  there.  The reason why is a lot of areas upstream of
20  that were on private property.  We couldn't get on
21  those.  So we made a decision to use Murphy Bridge
22  Road -- Murphy Road Bridge as an area that was certainly
23  at TNW, but we feel like the ebb and flow of the tide
24  goes further upstream.
25     Q.  Okay.  Mr. Wylie, I'm going back to Deposition

Page 68

1  Exhibit 72.  This is the top -- the bottom of the
2  page 36.  Do you see it there where it says, quote, the
3  DOJ expert team determined that the closest TNW to the
4  site is the tidally influenced region of Bessey Creek
5  that flows under S.W. Murphy Road Bridge, approximately
6  4.5 miles from the site?
7        Do you see that?
8     A.  Yes, sir.
9     Q.  Did you write that?
10     A.  Yes, sir.
11     Q.  Is that a true and correct statement?
12     A.  Yes, sir, it is.
13     Q.  Okay.  And you believe that traditional
14  navigable waters are all waters that are influenced by
15  the ebb and flow of the tide, correct?
16     A.  Yes, sir, they are.
17     Q.  All right.  So you have not identified any
18  location upstream of the S.W. Murphy Road Bridge that is
19  subject to the ebb and flow of the tide, right?
20     A.  I have not personally, no, sir, I have not.
21     Q.  Let's go back to the figure here.
22        MR. ADKINS:  I want to -- I think the
23     microphone might be covered.
24        MR. MCALILEY:  Hard to hear me again?  Is that
25     better?



Page 69

1      MR. ADKINS: Yes.
2      MR. MCALILEY: Okay, good. Thank you. You
3   know, I could shift to my phone instead of the
4   computer, but I'm just concerned that would be
5   worse. If it continues to be a problem, we might
6   experiment at one of the breaks where I'll shift
7   over to the phone. But Mr. Adkins, let me just try
8   to keep the microphone clear here.
9      MR. ADKINS: I think this sounds great. I
10  don't think you need it.
11     MR. MCALILEY: Okay, thank you.
12  BY MR. MCALILEY:
13     Q.  Okay.  So Mr. Wylie, I just put back up
14  Deposition Exhibit 73, Figure II.B.1.  You can see that?
15     A.  Yes, sir, I can.
16     Q.  You would agree with me tidally influenced
17  portions of Bessey Creek are part of the broader
18  St. Lucie Estuary, right?
19     A.  Please repeat that question.
20     Q.  Would you agree with me that the tidally
21  influenced portions of Bessey Creek are part of the
22  greater St. Lucie Estuary?
23     A.  I think the greater St. Lucie Estuary
24  influences Bessey Creek and Bessey Creek is a tributary
25  to the greater St. Lucie Estuary.

Page 70

1      Q.  Okay.  But my question is more specific.  I'm
2   just referring to the lower portions of Bessey Creek
3   where it's a natural stream that has the -- that has a
4   tidal influence to it.  That portion of Bessey Creek,
5   would you agree with me, is the part of the St. Lucie
6   Estuary, right?
7      A.  Well, there's a C23 Canal in between there
8   that before Bessey Creek runs into the St. Lucie
9   Estuary, but I would say that the tidal waters from the
10  St. Lucie Estuary influence Bessey Creek.
11     Q.  Okay.  So you don't think the tidal waters of
12  Bessey Creek are part of the estuary?
13     MR. ADKINS: Objection.
14     THE WITNESS: They're not included in the
15  estuary, per se.  They are a separate tributary of
16  that.  If I would call that a separate tributary of
17  that estuary, I would agree to that, but these
18  tributaries, C23 canal is a tributary, Danforth
19  Creek is a tributary, the North Fork, the St. Lucie
20  River is a tributary.  So these are all influenced
21  by tidal waters.  But as far as the delineation of
22  the estuary, I wouldn't say that Bessey Creek is
23  inside the estuary.
24  BY MR. MCALILEY:
25     Q.  Okay.  So you think the estuary just includes

Page 71

1   like the St. Lucie River, the actual river itself?
2      A.  Well, it depends upon your nomenclature.
3   Bessey Creek is a tributary of that estuary.  I don't
4   know if we're having a semantics problem.  But the tidal
5   waters of the Atlantic Ocean in the estuary influence,
6   certainly influence Bessey Creek.
7      Q.  Are you aware that government agencies have
8   come up with various plans to protect and restore the
9   St. Lucie Estuary?
10     A.  Yes, sir, I am.
11     Q.  Have you -- you've not been involved in the
12  development of those plans, have you?
13     A.  No, sir, I have not.
14     Q.  Have you read any of those plans in connection
15  with this case?
16     A.  Yes, sir, I have.
17     Q.  Which ones have you read?
18     A.  I've read -- let's see.  I know I've read some
19  material involved with the South Florida Water
20  Management District.  I've read some material involved
21  with the Corps of Engineers.  That's -- I don't believe
22  I remember anything exclusively from the Florida
23  Department of Environmental Protection, but every one of
24  those documents that I read talks about the impairment
25  of the estuary and some of the tributaries leading

Page 72

1   through it.
2      Q.  So my question, though, is which documents
3   have you read?  So which specific plan can you recall
4   prepared by government agencies for the protection of
5   the St. Lucie Estuary have you read?
6      A.  I don't recall the exact name.  I'm sorry.
7      Q.  So you don't know the names of the plans for
8   the protection of the St. Lucie Estuary, right?
9      A.  I don't recall those names, correct.
10     Q.  And you don't know the name of the Army Corps
11  of Engineers project related to the restoration of that
12  area, right?
13     A.  I don't recall the name right now, correct.
14     Q.  All right.  And are -- and so you're not aware
15  that the government agencies treat all of these tidally
16  influenced creeks and rivers and area of the St. Lucie
17  River as part of one single broad estuary; is that fair
18  to say?
19     A.  Yes, sir, that's fair to say.
20     Q.  Okay.  So let's go back to the figure
21  here, II.B.1.  So Basin 4 also includes areas west of
22  the Florida Turnpike, right?
23     MR. ADKINS: Objection.
24     THE WITNESS: Yes, sir.
25



Page 73

1  BY MR. MCALILEY:
2     Q.  And you would agree with me that the area of
3  Basin 4 west of the Turnpike is much less urbanized,
4  right?
5     A.  Yes, sir.
6     Q.  Those areas are all freshwater areas, aren't
7  they?
8        MR. ADKINS:  Objection.
9        THE WITNESS:  Yes, to the best of my
10    reckoning, we only saw fresh water influenced in
11    those areas.
12  BY MR. MCALILEY:
13    Q.  S.W. Murphy Road crosses Bessey Creek east of
14  the Turnpike, right?
15    A.  That's correct, sir.
16    Q.  Are you able to draw for me a map that would
17  show the boundaries of the overall Bessey Creek
18  watershed?
19    A.  No, sir, I am not, based on this map.
20    Q.  Okay.  Are you aware that the South Florida
21  Water Management District publishes maps showing
22  boundaries of the basins in each county?
23    A.  I'm specifically aware of Martin County
24  because I utilized their site for this basin.  Yes, sir,
25  I'm aware of that and I used the resource.

Page 74

1     Q.  What I'd like to do is show you what was
2  previously marked as Deposition Exhibit No. 77.
3        Are you able, sir, to see the drainage basins
4  for Martin County Florida map for the South Florida
5  Water Management District?
6     A.  Yes, sir, I am.
7     Q.  Is this something that you reviewed in forming
8  your opinions in this case?
9     A.  Yes, sir.
10    Q.  Okay.  You know, I'm still having this trouble
11  of -- I'm going to stop sharing for a minute and zoom
12  back in and I'll come back in.  I've got to figure out
13  how to get my controls to work better here on my -- let
14  me go -- I'm zooming in here now On deposition Exhibit
15  No. 77.
16        Can you see that, sir?
17    A.  Yes, sir.
18    Q.  So the Water Management District basin map
19  shows the actual natural course of Bessey Creek, right?
20    A.  It shows Bessey Creek.  There's three
21  tributaries -- well, there's three tributaries and
22  there's a Bessey Creek that's named on the top of it of
23  the three tributaries.  Yes, sir, that's what I see.
24    Q.  Okay.  Do you believe that Bessey Creek is
25  actually just the top arm of the creek shown on

Page 75

1  Deposition Exhibit 77?
2     A.  No, sir, I don't.
3     Q.  Okay.  So am I right that Bessey Creek has
4  more than one branch to it?
5     A.  Bessey Creek, the headwaters have been
6  excavated 60, 70 years ago of Bessey Creek, which goes
7  all the way to -- goes from the Martin County landfill
8  through Boat Ramp Road, through Citrus Road until it
9  runs into more of a natural flow way for Bessey Creek,
10  but that entire area was part of its watershed.
11    Q.  No, sir, you didn't listen to my question.  My
12  question was:  There's more than one branch of Bessey
13  Creek, correct?
14    A.  There is one area named Bessey Creek on this
15  picture.  Bessey Creek, as far as I'm concerned, has
16  several tributaries to it.  It has an improved section
17  west of the Turnpike and it has more of a, if you will,
18  a natural section that's more east of the Turnpike, even
19  though it's been improved near some of the golf courses
20  and whatnot.
21        So there are several tributaries that are
22  named that make up the Bessey Creek watershed improved
23  and natural.  So there are more than one tributary that
24  makes up Bessey Creek.
25    Q.  So, sir, the South Florida Water Management

Page 76

1  District on its basin map that you relied upon
2  identifying your subject -- your study area indicates
3  that there is at least three branches to the natural
4  Bessey Creek; is that fair to say?
5        MR. ADKINS:  Objection.
6        THE WITNESS:  That's on this map; yes, sir.
7  BY MR. MCALILEY:
8     Q.  This is the map that you used to identify your
9  study area, correct?
10    A.  That's correct, uh-huh.
11    Q.  Okay.  Am I right that there are -- that the
12  site on this map is located on the western portion of
13  Basin 4?
14    A.  Yes, sir, that's correct.
15    Q.  And it's to the left of the word "B" in basin,
16  right?
17    A.  Yes, sir, that's correct.
18    Q.  And you would agree with me that this map of
19  the Water Management District does not show any of the
20  natural branches of Bessey Creek going into that area of
21  Basin 4, right?
22    A.  Yes, sir, that's correct.
23    Q.  And you would agree with me that there are --
24  that there is -- there are two branches of Bessey Creek
25  in the C23 basin, right?



MICHAEL M. WYLIE, M.S.
USA vs BENJAMIN K. SHARFI

April 04, 2022
77—80

Page 77

1    A.   There are two -- there are two tributaries
2   located in the C23 basin that flow to Bessey Creek; yes.
3    Q.   And the Water Management District map
4   indicates that those are part of Bessey Creek, right?
5    MR. ADKINS:  Objection.
6    THE WITNESS:  These tributaries are in the --
7    on the Bessey Creek watershed; yes, I agree.
8   BY MR. MCALILEY:
9    Q.   Sir, the Water Management District map
10   identifies -- has the words "Bessey Creek" next to the
11   branch of the creek that goes into the C23 basin, right?
12   A.   Yes, it does.
13   Q.   So the Water Management District map is
14   showing tributaries of Bessey Creek going into the C23
15   basin, right?
16   A.   They come out of the C23 basin.  They flow out
17   of it.
18   Q.   Okay.  Sir, you live in Georgia, right?
19   A.   Yes, sir.
20   Q.   Okay.  You're not local to south Florida, are
21   you?
22   A.   No, sir, I'm not.
23   Q.   The South Florida Water Management District is
24   the State of Florida agency that is responsible for
25   managing the water resources of Florida in south

Page 78

1   Florida; isn't that right?
2    A.   Yes, sir, that's correct.
3    Q.   You would agree with me that the South Florida
4   Water Management District has greater knowledge and
5   expertise on the watersheds of south Florida than you,
6   right?
7    MR. ADKINS:  Objection.
8    THE WITNESS:  Oh, yes, sir, I totally agree.
9   BY MR. MCALILEY:
10   Q.   Okay.  And you've relied upon this map in
11   developing your opinions, correct?
12   A.   I relied upon this map and other maps; yes,
13   sir, mm-hmm.
14   Q.   Okay.  And so you would agree with me, though,
15   this map does not show any natural arm of Bessey Creek
16   in the western portion of Basin 4 to the left of the
17   letter B, right?
18   A.   Yes, there's no tributary present there on
19   this map; yes, sir.
20   Q.   Thank you.  Let's go back to the figures.
21   So what I'd like to do now is go to some more
22   figures that are supporting Section II.B of the report.
23   So I'm going back to Deposition Exhibit 73,
24   Figure II.B.2.
25   Can you see that on the screen?

Page 79

1    A.   Yes, sir, I can.
2    Q.   Okay.  And I also -- just to reference it now,
3   I'm also going to be asking you questions about the next
4   figure, which is Figure II.B.3.
5   Do you see that?
6    A.   Yes, sir, I do.
7    Q.   These are two figures or figures that go with
8   the section of the report that you wrote, right?
9    A.   Yes, sir, that's correct.
10   Q.   So let's go to Figure II.B.2.  Am I right
11   that -- this figure uses a base map from the U.S.
12   Geological Survey?
13   A.   Yes, sir, that's correct.
14   Q.   Do you know the date of that base map from
15   USGS that was used to create Figure II.B.2?
16   A.   No, sir, I don't.
17   Q.   And am I correct that this figure also
18   overlays on top of it information from the National
19   Hydrography dataset?
20   A.   That's correct, yes, sir.
21   Q.   And the National Hydrography dataset is
22   maintained by the U.S. Geological Survey too, right?
23   A.   That's correct.
24   Q.   Do you consider these materials from the U.S.
25   Geological Survey to be materials that are reliable for

Page 80

1   purposes of forming opinions?
2    A.   I consider these materials as planning tools;
3   that we consult them, we think they're a reasonable
4   facsimile.  However, we go out and make sure we
5   ground-truth as much of these areas as we can before,
6   especially before I formed an opinion based on these
7   maps.
8    Q.   So you don't think that these materials from
9   U.S. Geological Surveys are reliable sources of
10   information?
11   A.   No, sir, I didn't say that.  I said they're
12   very good tools to plan field investigations.  They're
13   typically reliable, but I would make sure before I
14   formed an opinion to go out and field-proof, field-check
15   as much as I could and also look at aerial photographs
16   to marry up the data that's shown on a topo map because
17   they're periodically updated.  You could see the pink up
18   in the upper left-hand corner.  That's a revision, a
19   recent revision to the topo map.
20   So there are revisions that go on and I would
21   augment this map with aerial photography and field
22   investigation.
23   Q.   You've never worked at the U.S. Geological
24   Survey, right?
25   A.   No, sir, I have not.



MICHAEL M. WYLIE, M.S.
USA vs BENJAMIN K. SHARFI

April 04, 2022
81–84

Page 81

1   Q.   You were not involved in the preparation of
2   the U.S. Geological Survey's topographical map for
3   Martin County, were you?
4   A.   No, sir, I was not.
5   Q.   You also weren't involved in their preparation
6   of the National Hydrography dataset information for
7   Martin County, right?
8   A.   Yes, sir, that's correct.
9   Q.   And you would agree with me that the U.S.
10  Geological Survey is the primary agency in the federal
11  government whose job it is to map the geography of
12  America?
13      MR. ADKINS:  Objection.
14      THE WITNESS:  Yes, sir, I believe so.
15  BY MR. MCALILEY:
16  Q.   Okay.  Thank you.  So as I -- so when I look
17  at this -- at this Figure II.B.2, am I right that you
18  have shown on this figure the site that is the subject
19  of this case?
20  A.   Yes, sir.
21  Q.   That is the box that has, I think it's a red
22  and black border to it?
23  A.   Yes, that's correct.
24  Q.   And this figure also shows the Countess Joy
25  property -- it's a polygon.  I think it's orange --

Page 82

1   that's directly north of it.
2       Do you see that?
3   A.   Yes, sir, it's yellow, uh-huh.
4   Q.   Yellow?
5   A.   And the red is on the west side.
6   Q.   Okay.  And the red polygon is the Countess Joy
7   West property, correct?
8   A.   Yes, sir, that's correct.
9   Q.   All right.  And just so we get our -- we're on
10  the same page of the nomenclature, there is on --
11  extending from the west side of the site north through
12  the Countess Joy property, there's a light blue line.
13      Do you see that?
14  A.   Yes, sir, I do.
15  Q.   Is that what we're calling the north/south
16  ditch?
17  A.   That's correct.
18  Q.   Okay.  So when I say "north/south ditch" in
19  the deposition today, that's what I'm referring to.
20      And at the north side of the Countess Joy
21  property, you see that there's a linear feature in the
22  same light blue color that goes roughly east to west.
23      Do you see that?
24  A.   This north of the site, north --
25  Q.   No.  It borders on the northern edge of the

Page 83

1   Countess Joy property.
2   A.   Yes, sir, I see that.
3   Q.   Okay.  And I see that you have -- further to
4   the east on this image, there's a box that says "Bessey
5   Creek" that points to that line.
6       Do you see that?
7   A.   Yes, sir, I do.
8   Q.   So in your report, when you refer to "Bessey
9   Creek," are you referring to that linear feature north
10  of the site?
11  A.   That's the headwaters of Bessey Creek and
12  that's the improved part of Bessey Creek that flows down
13  to the C23 basin canal; correct.
14  Q.   My question was:  In your report when you
15  refer to Bessey Creek, are you referring to that linear
16  feature that is north of the site as Bessey Creek?
17      MR. ADKINS:  Objection.
18      THE WITNESS:  In the context of the site in
19      the Countess Joy site, that is Bessey Creek.  In
20      the context of Bessey Creek TNW, that is not Bessey
21      Creek traditional navigable waters.
22  BY MR. MCALILEY:
23  Q.   Okay.  The Bessey Creek traditional navigable
24  waters is the tidally influenced portion that is east of
25  the Turnpike, right?

Page 84

1   A.   Yes, sir, that's correct.
2   Q.   Okay.  On this Figure II.B.2, am I correct
3   that the USGS map does not have the name Bessey Creek
4   next to that linear feature that is going east/west,
5   that borders on the northern border of the Countess Joy
6   property?
7   A.   Yes, sir, you're correct.
8   Q.   And am I also correct that the National
9   Hydrography dataset does not put the name Bessey Creek
10  on that linear feature that borders on the north side of
11  the Countess Joy property?
12  A.   Yes, sir, you're correct.
13  Q.   So in fact, the National Hydrography dataset
14  labels that linear feature as a canal/ditch, correct?
15      MR. ADKINS:  Objection.
16      THE WITNESS:  Yes, sir, you're correct.
17  BY MR. MCALILEY:
18  Q.   And the National Hydrography dataset has a
19  different definition for stream/river; is that right?
20  A.   Yes, sir, you're correct.
21  Q.   All right.  That's a darker blue color, isn't
22  it?
23  A.   Yes, sir.
24  Q.   All right.  And so the National Hydrography
25  dataset does not identify that linear feature as a



MICHAEL M. WYLIE, M.S.
USA vs BENJAMIN K. SHARFI

April 04, 2022
85–88

Page 85

1  stream or river, right?
2      A.  It does just past -- just past -- just to the
3  right of the Bessey Creek where you could see where it
4  starts going dark blue.  So it will identify it as a
5  stream or river there.  I think it identifies it there
6  as a canal/ditch because it was the improved part of the
7  Bessey Creek watershed.
8      Q.  Okay.  So am I right on Figure II.B.2, the
9  stream/river portion of that waterway is on the extreme
10  right side of the figure?
11      A.  Yes, sir, and it leads on to C23 canal,
12  uh-huh.
13      Q.  And that is where -- okay.  That is what the
14  National Hydrography dataset indicates is a
15  stream/river, correct?
16      A.  Yes, sir, on this map; yes.
17      Q.  And west of that point, the National
18  Hydrography dataset indicates that water body as a
19  canal/ditch, right?
20      A.  That's correct, sir, mm-hmm.
21      Q.  So you've talked several times about the
22  improvement of Bessey Creek.  When was that -- okay.
23  Hold on.  Before I go there, let me just say for
24  purposes of clarity, I'm going to refer to that water
25  body, that east/west ditch -- canal/ditch that is

Page 86

1  located north of the site and that borders on the
2  Countess Joy property as the east/west ditch.  Just to
3  be clear, when I refer to Bessey Creek, I'm going to
4  be referring to the natural portions of Bessey Creek
5  further downstream.  So I'm just going to say that so
6  you understand my questions and we at least have our
7  nomenclature understood.
8          So when was the east/west ditch excavated?
9      A.  I believe it was in the '40s.  I'm not exactly
10  sure, but it was quite a while ago.
11      Q.  Okay.  You don't know exactly when it was
12  excavated, do you?
13          MR. ADKINS:  Objection.
14          THE WITNESS:  We've looked at photographs from
15      the -- aerial photographs from the '40s and it was
16      still -- it was -- it existed then.  So it was
17      sometime before the '40s.
18  BY MR. MCALILEY:
19      Q.  All right.  So prior to the 1940s, is that
20  your understanding?
21      A.  Or during the '40s.  It's because, you know,
22  there's a discrete date when it was.  It could be the
23  day before, for gosh sake.  So it was sometime in the
24  '40s.  Let's say mid '40s or before.
25      Q.  What is the earliest aerial photograph that

Page 87

1  you have seen of the vicinity of the site?
2      A.  I'm sorry, sir, I didn't catch your question.
3      Q.  What is the earliest date of aerial
4  photographs that you've seen at the site?
5      A.  I think it was in the 1940s, sometime.  I
6  don't know exactly the date, but I just remember 1940s.
7      Q.  And in that earliest photograph that you saw,
8  the east/west ditch was present in the photograph,
9  right?
10      A.  That's correct, sir.
11      Q.  So you don't know what the conditions looked
12  like in the specific location of the east/west ditch
13  prior to its construction, do you?
14      A.  Okay.  I -- we do know what the vicinity of
15  the aerial looked like.  We could see flow paths.  We
16  could see old remnant channels.  We could see wetland
17  areas.  Just typically headwater systems exhibit these
18  things, these -- these distinct aerial signatures.
19          So the -- that photo and also a photo in the
20  1960s show wetland signatures; they show flow paths;
21  they show the improved part of Bessey Creek at that
22  time.
23      Q.  Sir, that was not my question.  My question
24  is, have you seen any photograph that showed conditions
25  in that area before the east/west ditch was excavated?

Page 88

1      A.  No, sir, I have not.
2      Q.  So you don't know what it looked like before
3  the east/west ditch was excavated, correct?
4          MR. ADKINS:  Objection.
5          THE WITNESS:  Yes, sir, I know -- we know what
6      headwater systems looked like.  We know what the
7      surrounding area around the canal looked like.  So
8      we saw that in the nineteen -- or I saw that in the
9      1940s photo.  So it looked like a headwater system
10      to me with an improved portion of Bessey Creek that
11      was excavated to just pass -- I think it's just
12      past Citrus Road or -- yeah, right up to Citrus
13      Road, I think, Citrus Avenue.
14  BY MR. MCALILEY:
15      Q.  Okay.  So Mr. Wylie, you were born in 1955,
16  right?
17      A.  Yes, sir.
18      Q.  You grew up in Mississippi, right?
19          MR. ADKINS:  Objection.
20          THE WITNESS:  Yes, sir.
21  BY MR. MCALILEY:
22      Q.  All right.  You have no personal knowledge
23  about what it looked like in that area before the
24  east/west ditch was excavated, correct?
25          MR. ADKINS:  Objection.



MICHAEL M. WYLIE, M.S.
USA vs BENJAMIN K. SHARFI

April 04, 2022
89–92

Page 89

1    THE WITNESS:  That's correct, sir.
2  BY MR. MCALILEY:
3    Q.  And you've never seen a photograph of what
4  that area looked like before the east/west ditch was
5  excavated, right?
6    A.  No, sir, I have not.
7    Q.  Are you aware of any wetland delineation that
8  was ever conducted of the area where the east/west ditch
9  is located today before it was excavated?
10    A.  No, sir.  That was before the Clean Water Act.
11    Q.  Okay.  And were you -- have you seen any map
12  that shows the natural branches of Bessey Creek
13  independent of the ditch system?
14    MR. ADKINS:  Objection.
15    THE WITNESS:  Yes, sir.  In the '40s photo and
16  I think it's the '66 photo, we can certainly see
17    flow paths.  We can see wetland signatures.  We can
18    see where water flows and where wetlands exist.
19    So those signatures are evident and easily
20    observable.
21  BY MR. MCALILEY:
22    Q.  Sir, my question was not what you were
23  inferring from photographs that were taken decades after
24  the east/west ditch was excavated.  So I just want to be
25  clear, that's not what I'm asking.

Page 90

1    What I'm asking is, have you ever seen a map
2  that was created that showed the natural tributaries of
3  Bessey Creek prior to the time the east/west ditch was
4  excavated?
5    MR. ADKINS:  Objection; asked and answered.
6    THE WITNESS:  No, sir, I have not.
7  BY MR. MCALILEY:
8    Q.  Okay.  And in fact, the South Florida Water
9  Management District map that we just looked at shows no
10  natural branch of Bessey Creek in the area of the
11  east/west ditch; isn't that right?
12    MR. ADKINS:  Objection.
13    THE WITNESS:  Yes, sir, that's correct.
14  BY MR. MCALILEY:
15    Q.  Okay.  Is it your testimony that you believe
16  that the east/west ditch channelized an existing natural
17  stream?
18    A.  It's my opinion that it channelized flow ways.
19  It could have possibly channelized tributaries that were
20  back then.  I don't have evidence of that.  But it
21  certainly channelized all the flow from the Martin
22  County landfill passed the -- to Citrus Avenue.
23    Q.  Sir, did I hear you right?  You just said you
24  have no evidence that the east/west ditch channelized a
25  natural stream?

Page 91

1    MR. ADKINS:  Objection.
2    THE WITNESS:  No, sir, I do not have any
3    evidence of that.
4  BY MR. MCALILEY:
5    Q.  Okay.  Is it your opinion that the entire
6  length of the east/west ditch is located in what once
7  were wetlands?
8    A.  No, sir.
9    Q.  So portions of the east/west ditch were
10  located in uplands, right?
11    A.  That's correct.
12    Q.  You would agree with me that straight line
13  features don't occur with any frequency in nature when
14  it comes to tributaries, right?
15    A.  Yes, sir, I would agree with you.
16    Q.  Okay.  So that east/west ditch is an excavated
17  canal, isn't it?
18    MR. ADKINS:  Objection; vague.
19    THE WITNESS:  Yes, I think it's an excavated
20    headwater system of Bessey Creek further downstream
21    that channelizes all the flow and tried to improve
22    the area for agriculture or development.
23  BY MR. MCALILEY:
24    Q.  Okay.  You're aware -- I know you're not from
25  here, Mr. Wylie, but you're aware in the history of

Page 92

1  Florida, there are a lot of drainage ditches that were
2  excavated at points in the 19th and 20th centuries,
3  right?
4    A.  Yes, sir, I am.
5    Q.  And drainage ditches weren't just excavated in
6  areas where there is wetlands or streams.  They were
7  excavated in all sorts of places that people wanted to
8  drain, right?
9    MR. ADKINS:  Objection.
10    THE WITNESS:  No, sir, you won't want to drain
11    in an upland.  You would drain through an upland to
12    drain a wetland to carry water off.  So most of the
13    areas in south Florida, to my knowledge, were
14    excavated in wetlands.  There could be some uplands
15    through there.  Certainly there were in this
16    instance.  But you have to get the water off.  So
17    that's why you go through uplands.
18    But very few ditches, I think, were excavated
19    in uplands because I don't know where you would
20    want to drain the water off since there's not any
21    there.
22  BY MR. MCALILEY:
23    Q.  Okay.  You would agree with me that you lack
24  expertise in the history of the drainage systems and
25  their construction in south Florida, right?



MICHAEL M. WYLIE, M.S.
USA vs BENJAMIN K. SHARFI

April 04, 2022
93—96

Page 93

1        MR. ADKINS:  Objection.
2        THE WITNESS:  I am familiar, but I am not
3    expert in the restoration systems and the drainage
4    systems in south Florida; that's correct.
5 BY MR. MCALILEY:
6    Q.  So you're not going to be offering expert
7 opinions as to the history of the drainage ditch systems
8 in south Florida, are you?
9        MR. ADKINS:  Objection.
10       THE WITNESS:  No, sir, I'm not, and any
11   hydrology issues I would defer to Dr. Nutter.
12 BY MR. MCALILEY:
13   Q.  Okay.  When I go back to Figure II.B.2, am I
14 right that USGS topographical maps will show water
15 features on them?
16   A.  They show certain water features, yes, sir.
17 They may not be updated, but they show water features or
18 they try to interpret that and show water features; yes.
19   Q.  And Figure II.B.2 on the left end of the
20 east/west ditch shows a marsh area with little like
21 plant-like symbols, right?
22   A.  Yes, sir, that's correct.
23   Q.  And a marsh is a type of wetland, right?
24       MR. ADKINS:  Objection.
25       THE WITNESS:  Yes, sir, it's a type of

Page 94

1    wetland.
2 BY MR. MCALILEY:
3    Q.  And the USGS maps also show ponds and
4 intermittent ponds, right?
5    A.  They show ponds and they show depressional
6 wetlands in some of these areas that are depicted as
7 ponds that they show different aquatic features; yes.
8    Q.  So if I -- okay.  Let's look at Figure II.B.2.
9 There's an Inset A, which is -- well, there's an inset
10 on the lower right side.  That's a zoomed-in view of the
11 site, right?
12   A.  Yes, sir, it is.
13   Q.  And you see on the USGS base map there are
14 these oval features here that are on the Countess Joy
15 East property.
16       Do you see those?
17   A.  Yes, sir, I do.
18   Q.  What do you understand those to depict on the
19 USGS map?
20   A.  Well, I've had the opportunity to field-check
21 them and those are depressional wetland areas that pond
22 water.
23   Q.  Okay.  How -- what is -- how does USGS Map
24 refer to these in its legend?
25   A.  I don't recall.  I'm sorry, Mr. McAliley.

Page 95

1    Q.  Those are -- because there's a dash line
2 around the perimeter of them, those are intermittent
3 ponds, right, according to USGS?
4        MR. ADKINS:  Objection.
5        THE WITNESS:  I don't -- I don't recall.  I
6    know dash lines and streams are intermittent
7    streams, but these, when we were there, held water
8    the entire time.  So I don't know really what
9    "intermittent" would mean to USGS or to your
10   question.
11 BY MR. MCALILEY:
12   Q.  All right.  Well, so you've been on the site
13 in the referenced areas on three occasions; is that
14 right?
15   A.  Yes, sir, I have.
16   Q.  Okay.  You've been there in August of 2021; is
17 that right?
18   A.  Yes, sir, I have.
19   Q.  You were there in September of 2021?
20   A.  Yes, sir, I was.
21   Q.  And you were there in October of 2021, right?
22   A.  Yes, sir, I was.
23   Q.  Those are the only three times you've been to
24 the site and to the Countess Joy property, correct?
25   A.  Yes, sir, that's correct.

Page 96

1    Q.  That's at the end of the wet season locally in
2 south Florida, isn't it?
3        MR. ADKINS:  Objection.
4        THE WITNESS:  Which month?
5 BY MR. MCALILEY:
6    Q.  August, September and October of 2021.
7    A.  August is right in the middle of it.
8        MR. ADKINS:  Objection.
9        THE WITNESS:  Oh, sorry.  August is right in
10   the middle of it.  September is still in it and
11   October is going out of it.
12 BY MR. MCALILEY:
13   Q.  Oh, you think the wet season ends in October?
14   A.  That's what my understanding is, from May to
15 October.
16   Q.  Okay.  You would agree with me that in the wet
17 season, at the end of the wet season, that's when the
18 water levels are highest in south Florida, right?
19       MR. ADKINS:  Objection.
20       THE WITNESS:  No, not necessarily.  The reason
21   why is because after that we could have hurricanes,
22   so and they could be even higher.
23 BY MR. MCALILEY:
24   Q.  Okay.  Besides hurricanes, putting aside
25 hurricanes, would you agree with me water levels are



MICHAEL M. WYLIE, M.S.
USA vs BENJAMIN K. SHARFI

April 04, 2022
97–100

Page 97

1  highest in south Florida typically in the wet season and
2  especially at the end of the wet season?
3        MR. ADKINS:  Objection.
4        THE WITNESS:  Given normal rainfall, which we
5    did not experience in October or September.  It was
6    below normal, incipient drought conditions when we
7    visited the sites.
8  BY MR. MCALILEY:
9    Q.  So is the answer that water levels are
10  typically highest at -- during the wet season?  Is that
11  right?
12       MR. ADKINS:  Objection; asked and answered.
13       THE WITNESS:  If antecedent rainfall is normal
14   for those times, then yes, that's typically the
15   highest level of rain or surface water or
16   depressional water in these areas; yes.
17  BY MR. MCALILEY:
18   Q.  You were at the site in the reference areas
19  during the wet time of the year, right?
20   A.  Yes, sir, that's correct.
21   Q.  You were not there in the dry season, were
22  you?
23   A.  No, sir, we were not.
24   Q.  So you only saw wet season conditions,
25  correct?

Page 98

1        MR. ADKINS:  Objection.
2        THE WITNESS:  No, that's not correct.  We saw
3    October was a wet month from rainfall.  The
4    September and October were both below normal
5    rainfall.  So those were abnormal conditions for
6    the site.
7  BY MR. MCALILEY:
8    Q.  All right.  On the USGS -- on Figure II.B.2,
9  USGS Map has a green color around the site.  Do you
10  understand that to be a symbol for vegetation?
11   A.  Yes, I think it's forested or vegetation or
12  something like that; yes, I do.
13   Q.  Okay.  So you would agree with me that the
14  USGS base map that you used to create your II.B.2, does
15  not show any wetlands along the length of the
16  north/south ditch?
17       MR. ADKINS:  Objection.
18       THE WITNESS:  Yes, sir.
19  BY MR. MCALILEY:
20   Q.  And you would also agree with me that USGS
21  base map that is -- that you used to create
22  Figure II.B.2, does not show any wetlands along the
23  length of the east/west ditch, at least in the area
24  north of the site, right?
25       MR. ADKINS:  Objection.

Page 99

1        THE WITNESS:  Yes, sir, that's correct,
2    because the interpretation that goes into these
3    features would be very difficult to pick up a wet
4    pasture, which is a cow pasture there.  These are
5    wet pine flatwoods, typically wet pine flatwoods do
6    not show up with the swamp hashing that we saw on
7    the area near the Martin County landfill.
8        So the -- you know, the issue is, is that what
9    is USGS trying to portray?  In this instance, it
10   would be very difficult to portray wetlands on a
11   wet pasture when you don't see the signature of
12   that wetlands.  That's not their goal.  That's --
13   they can only do certain things off site because
14   most of these things are done off site from aerial
15   images and whatnot.
16       So it's very easy to not put swamp symbols --
17  BY MR. MCALILEY:
18   Q.  Sir, you've never worked -- I'm sorry.  You've
19  never worked at the USGS, right?
20   A.  That's correct.
21   Q.  Did you speak with anybody at USGS who
22  prepared this base map that you used in Figure II.B.2?
23   A.  No, sir, I did not.
24   Q.  So you don't know what they saw or didn't see
25  when they prepared this map; isn't that right?

Page 100

1    A.  I see what they portrayed this map as and what
2  their goals and aims were for portraying this map.
3    Q.  Okay.  Have you ever talked to anybody at the
4  USGS about their goals and aims for preparing this map
5  for Martin County?
6    A.  No, sir, I have not.
7    Q.  So you don't know what their goals and aims
8  were for creating this map for Martin County, do you?
9        MR. ADKINS:  Objection.
10       THE WITNESS:  Yes, sir.  Their goals and aims
11   were to show hydrographic features, show new
12   features, swamp features that stand out, they could
13   easily distinguish.  It would be very difficult to
14   portray every area that had -- that was a pasture
15   or had pine trees on it as a wetland for the
16   purposes of this USGS map.
17  BY MR. MCALILEY:
18   Q.  How do you know what their goals and aims were
19  if you never talked to them and you never worked there?
20   A.  Well, since I don't see -- since I was on the
21  site and I determined wetlands through this area in
22  Countess Joy East, there were clearly wetlands in at
23  least eight separate instances here.  There was surface
24  water.  There was de-ponded water all throughout August.
25  There was water through it through September, water up



MICHAEL M. WYLIE, M.S.
USA vs BENJAMIN K. SHARFI

April 04, 2022
101–104

Page 101

1  in the upper part of the 12-inch borehole, 16-inch
2  borehole.
3      So for USGS, goals and aims weren't to
4  identify wetlands in those areas or they probably would
5  have.
6      Q.  You don't know what their goals and aims were
7  if you've never worked there and you've never talked to
8  them.  You're simply -- you're assuming what their goals
9  and aims were; isn't that fair?
10      MR. ADKINS:  Objection; argumentative.
11      THE WITNESS:  It is fair.  I was responding to
12      your characterization that there's -- why aren't
13      there wetlands in these pasture areas.
14  BY MR. MCALILEY:
15      Q.  No, my -- sir, I would just ask you to listen
16  to my questions.  They're very -- I'm trying to make
17  them simple because you're answering a lot of questions
18  that I'm not asking and we're going to be here all day
19  and I want to finish today and not have to continue on
20  after today.  And so I need you to listen to the
21  question and answer the questions so we can move through
22  it.
23      So am I right, Mr. Wylie, that on
24  Figure II.B.2 the USGS base map shows the wetlands that
25  are on the Countess Joy property have no surface water

Page 102

1  connection to each other?
2      MR. ADKINS:  Objection; vague.
3  BY MR. MCALILEY:
4      Q.  I'm asking what's shown on the map from the
5  USGS.  That's the question.
6      MR. ADKINS:  Same objection.
7      THE WITNESS:  I -- the -- would you please --
8      please, one more time with the question and I'll
9      try to answer it.
10  BY MR. MCALILEY:
11      Q.  Okay.  I'm asking you on Figure II.B.2, am I
12  correct the USGS map that you used to create this figure
13  does not show any surface water connection between the
14  wetlands identified on the Countess Joy property?
15      MR. ADKINS:  Same objection.
16      THE WITNESS:  That's correct.
17  BY MR. MCALILEY:
18      Q.  Thank you.  And is it your opinion that
19  virtually all of the Countess Joy East property is a
20  wetland?
21      A.  No, sir.  There are uplands there.  You can
22  see the west of the north/south ditch.  You can see a
23  contour line that's 25 feet.  Those are uplands.  We did
24  a wetland determination along that line.  It was clearly
25  uplands.  There's other uplands that are on the eastern

Page 103

1  section that are identified, that are much more easier
2  to identify from an aerial photograph and also from the
3  inspection that we did.
4      So the -- this map is a tool that we use and
5  we augment this map with aerial photography, with hydric
6  soils.  If you overlaid the hydric soils on this map you
7  would clearly see that there's many more wetland or
8  potential wetland areas that we confirmed on the site.
9  So for this map and for the USGS, that was their
10  portrayal, and we used this to show the improved reach
11  of Bessey Creek ditches and some depressional wetlands.
12      So that was the goal of using this figure.
13      Q.  Thank you, Mr. Wylie, but again, I think
14  you've answered a different question that I asked.  I
15  simply asked, do you think that the Countess Joy
16  property is all wetlands?  And I think you've answered
17  that.  The answer is no, right?
18      A.  Yes, sir, that's correct.
19      Q.  Okay.  What percentage of the Countess Joy
20  property do you believe constitutes wetlands?
21      MR. ADKINS:  Objection; vague.
22      THE WITNESS:  I -- my goal on the site was to
23      do determinations at several points, which I did,
24      and accompanied by soil scientists, hydrologists
25      and vegetation experts.  So we did determinations.

Page 104

1  They're totally different than delineations, which
2  we then set a line up and make a polygon in.
3      That was not our goal here.  Our goal was to
4  find flow paths, find connections, ensure that what
5  we were looking at met the definitions of what a
6  wetland is under the '87 manual and regional
7  supplements, and then confirm their connections to
8  Bessey Creek, which we did.
9  BY MR. MCALILEY:
10      Q.  Okay.  So is the answer more than half of the
11  Countess Joy property you believe is a wetland?
12      A.  I -- it would be -- I'd be remiss in giving
13  you a number that there's extensive areas of wetlands on
14  the Countess Joy East and West site.
15      Q.  So you can't tell me how many acres of the
16  Countess Joy property consists of wetlands, right?
17      A.  I can't give you an exact number.  Typically
18  we give approximations, but I can't give you an exact
19  number.
20      Q.  Okay.  You can't give me an approximation of
21  the number of acres of wetlands in the Countess Joy
22  property, right?
23      A.  That wasn't our goal.
24      Q.  So the answer is no, you can't give me an
25  approximation of the number of wetlands on the Countess



MICHAEL M. WYLIE, M.S.
USA vs BENJAMIN K. SHARFI

April 04, 2022
105–108

Page 105

1  Joy site, right?
2      A.  That's correct.
3      Q.  Okay.  And you did not delineate any wetlands
4  on the Countess Joy site, right?
5      MR. ADKINS:  Objection.
6      THE WITNESS:  Yes, sir, that's correct.
7  BY MR. MCALILEY:
8      Q.  So there's no map that you have created or
9  other members of the DOJ team have created that shows
10  the boundaries of wetlands on the Countess Joy site,
11  right?
12      A.  We identified wetlands at points across the
13  east and west boundary, and we've also connected those
14  points up with flow paths that Dr. Nutter performed and
15  we married those up with hydric soil maps, aerial
16  photography and on-site inspections.
17      So we feel comfortable and I feel comfortable
18  that the wetlands go from the Sharfi site through the
19  Countess Joy East site and abut the improved section of
20  Bessey Creek.
21      Q.  Okay.  Hold on.  So a moment ago you told me
22  that you have not delineated wetlands on the Countess
23  Joy site.
24      Was that a correct statement, sir?
25      A.  Yes, sir, that's correct.

Page 106

1      Q.  So there is no map that I can look at that
2  will show me the boundaries of where the wetlands are on
3  the Countess Joy site, in your opinion; is that right?
4      A.  I have not drawn a polygon along the wetlands
5  on the Countess Joy site; correct.
6      Q.  Okay.  Did I hear you just say that you
7  believe it is wetlands all the way from the north
8  boundary of the site all the way up to the east/west
9  ditch?
10      A.  Yes, sir, I do.
11      Q.  Okay.  So is that entire area that is on
12  Figure II.B.2 that is directly north of the site going
13  up the north/south ditch to the east/west ditch, do you
14  believe that entire area is wetland?
15      A.  No, sir, I don't.
16      Q.  Okay.  So, but you do believe that there are
17  wetlands that go all the way from the site up to the
18  east/west ditch; is that right?
19      A.  Yes, sir, I do.
20      Q.  And do those wetlands follow the flow path
21  that Dr. Nutter identified?
22      MR. ADKINS:  Objection; vague.
23      THE WITNESS:  Yes, sir, they do.
24  BY MR. MCALILEY:
25      Q.  Okay.  By the way -- well, never mind.

Page 107

1      Let's go to the next figure here,
2  Figure II.B.3.  So this is the same map but overlaid on
3  this is the National Wetland Inventory information
4  regarding wetlands.
5      Do you see that?
6      A.  Yes, sir, I do.
7      Q.  And the National Wetland Inventory is a source
8  of information that you have used in preparing your
9  opinions in this case, right?
10      A.  Yes, sir, I did.
11      Q.  And you determined the acreage of the
12  similarly situated wetlands by taking information from
13  the National Wetland Inventory for Basin 4, right?
14      A.  I used that approximation; yes, sir.
15      Q.  Okay.  So am I right that on this National
16  Wetland Inventory map overlay, Figure II.B.3, it
17  indicates that the north/south ditch is not located in
18  wetlands?
19      A.  Yes, sir, that's true, uh-huh.
20      Q.  And am I right that the National Wetland
21  Inventory database does not show a contiguous wetland
22  complex that includes the site and connects up to the
23  east/west ditch?
24      MR. ADKINS:  Objection.
25      THE WITNESS:  Yes, sir, that's correct.

Page 108

1  BY MR. MCALILEY:
2      Q.  And the National Wetland Inventory database
3  does not show that the east/west ditch north of the site
4  is located in wetlands, right?
5      A.  That's correct, yes, sir.
6      Q.  Okay.  So let me exit out of this and let's go
7  back to your report.
8      Okay.  Can you see the report up on the
9  screen?  This is page 2, Section II.B, Study Area.
10      A.  Yes, sir.
11      Q.  Okay.  And so I had highlighted previously
12  that you had established approximately an 11,049-acre
13  study area, which is Basin 4, right?
14      A.  Yes, sir.
15      Q.  Okay.  So I'm going to get rid of this
16  highlighting and just to make it easier to read, I'm
17  going to highlight the next sentence here.
18      So the third sentence says, quote, This study
19  area included the site wetlands and approximately
20  1,064 acres of similarly situated wetland areas within
21  the Bessey Creek watershed that were mapped by the U.S.
22  Fish and Wildlife Service's National Wetlands Inventory,
23  Figure II.B.1, did I read that right?
24      A.  Yes, sir.
25      Q.  So am I understanding this correctly, that



MICHAEL M. WYLIE, M.S.
USA vs BENJAMIN K. SHARFI

April 04, 2022
109–112

Page 109

1  when you calculated the acreage of the similarly
2  situated wetlands, you looked at Basin 4 and you counted
3  up all the acres of wetlands that had been mapped by the
4  National Wetland Inventory in Basin 4?
5      A.  We used the approximation that the U.S. Fish
6  and Wildlife came up with their wetland polygons; yes.
7      Q.  Right.  So the 1,064 acres represents all of
8  the wetlands in Basin 4 that had been mapped in the
9  National Wetland Inventory, fair?
10     A.  Yes.
11     Q.  Okay.  Did you manually count up the acreage
12  when you came up with that number or was there some
13  program that you could run on the National Wetland
14  Inventory, you know, website, that will --
15     A.  Yeah, I wish it were that easy.  We used
16  ArcGIS Pro and then the polygons that U.S. Fish and
17  Wildlife used.  They were added together in this area.
18  So even though we had to cut off some of them, they
19  were, you know, half of them or whatnot.  It would have
20  been outside the bounds of the study creek.  So this is
21  the area that the U.S. Fish and Wildlife identified that
22  met the criteria for aerial interpretation of wetlands
23  in this area.
24     Q.  Yeah, but my question was, is you had to go in
25  and manually count up the acres of wetlands that were in

Page 110

1  the National Wetland Inventory, within the boundaries of
2  Basin 4, right?
3      A.  Yes, sir, I did.
4      Q.  Okay.  So I want to exit out of the report and
5  I'm going to go back again to the figures.
6          So I'm back here to Figure II.B.3, which is
7  the National Wetland Inventory wetlands shown in the
8  vicinity of the site.  If I look in the upper right-hand
9  corner of Figure II.B.3, there's a legend for NWI
10  wetland type.
11         Do you see that?
12     A.  Yes, sir.
13     Q.  Did you include all those wetland types when
14  you calculated the total number of similarly situated
15  wetlands in Basin 4?
16     A.  Yes, sir.
17     Q.  Okay.  So you included all freshwater emergent
18  wetlands?
19     A.  Well, they're not all included because you can
20  see in the area where there's a depressional pond that's
21  before you and it doesn't -- it isn't the aqua blue -- I
22  mean, it is the aqua blue.  It's not the greenish blue.
23  So certainly, we didn't include that because the Fish
24  and Wildlife service didn't identify it as clear as day
25  on photos as a depressional wetland.

Page 111

1      So what we did is we included what the Fish
2  and Wild -- what Fish had identified as clearly
3  identifiable wetlands through their photo interpretation
4  and through their work at that day and time when they
5  looked at these signatures.
6      Q.  Okay.  My question was simpler.  I'm just --
7  because I went on the National Wetland Inventory website
8  and there's different types of wetlands and I'm just
9  trying to figure out how you did the math to come up
10  with 1,064 acres in Basin 4.
11         So my question is simply the types of wetlands
12  that you included, do those include all of the types
13  that you have in the legend here on Figure II.B.3?
14     A.  Yes, sir, I believe so.  There could be some
15  different ones down to the distal end, the end of it.
16  They're not portrayed on here because that's not what we
17  want to portray in this exhibit.  It was the NHD dataset
18  that was near the site.  So we could have used other
19  wetlands that were down there, but it's not -- the only
20  thing on this exhibit is the five types of wetlands that
21  NWI listed.
22     Q.  Okay.  Is there any figure that you've
23  prepared that shows all of the National Wetland
24  Inventory wetlands for Basin 4 that you have included in
25  the -- in your list or your tally of similarly situated

Page 112

1  wetlands?
2      A.  I don't know.  I don't recall.  Probably what
3  I've done is I've looked at that because I came up with
4  that figure, and this certainly doesn't portray all the
5  figures.  So it may be someplace.  It may be one of the
6  figures.  So I'm not -- besides this, I can't recall.
7      Q.  Okay.  So thank you.  Okay.  So your
8  1,064 acres of similarly situated wetlands includes
9  wetlands both east and west of the Florida Turnpike,
10  right?
11     A.  Yes, sir, that's correct.
12     Q.  You would agree with me that the eastern
13  boundary of Basin 4 is approximately 6 miles away from
14  the site, right?
15     A.  Approximately, yes, sir, mm-hmm.
16     Q.  Approximately.  I mean --
17     A.  Yeah.
18     Q.  -- I haven't gone out to figure out exactly
19  how -- you know, down to the foot.
20     A.  Sure.
21     Q.  So in your calculation of similarly situated
22  wetlands, you included wetlands on the eastern side of
23  Basin 4, right?
24     A.  No, sir, we used the entirety of Basin 4.
25     Q.  Right.  So what I mean the eastern side of



MICHAEL M. WYLIE, M.S.
USA vs BENJAMIN K. SHARFI

April 04, 2022
113—116

Page 113

1  Basin 4, I'm meaning within the boundaries of Basin 4,
2  but on the eastern side of Basin 4.
3      A.  I don't understand the question.  I used all
4  the wetlands that were listed by the Fish and Wildlife
5  in Basin 4, which would be from C23 Canal back to --
6  where Basin 4 ended on the west.
7      Q.  Okay.  So -- all right.  But you would agree
8  that you've included among the similarly situated
9  wetlands, wetlands that are located miles away from the
10  site, right?
11      A.  Yes, sir.
12      Q.  And you have included in your tally of
13  similarly situated wetlands, freshwater wetlands, right?
14      A.  Yes, sir.
15      Q.  And you've also included estuarian and marine
16  wetlands on the east side of Basin 4, right?
17      A.  Yes.
18      Q.  And you've included mangrove wetlands along
19  the tidal portions of Bessey Creek, right?
20      A.  Yes, sir, I think some of those are included.
21      Q.  Right.  So you've included wetlands that are
22  located downstream of the S.W. Murphy Road Bridge,
23  right?
24      A.  Yes, sir, because in Basin 4, then it was
25  included in the tally.

Page 114

1      Q.  So your list of wetlands that were included,
2  some of them have surface water connections to Bessey
3  Creek, don't they?
4      A.  That I made that determination, yes, sir, they
5  do, uh-huh.
6      Q.  And some of the wetlands that you've included
7  in the list of similarly situated wetlands have no
8  surface water connection to Bessey Creek, to the best of
9  your knowledge, right?
10      A.  All the wetlands that I included in the study
11  area are adjacent to tributaries that flowed to it or
12  are -- have connections to Bessey Creek improved area
13  and Bessey Creek one way or the other.  The problem is
14  it's very hard to portray on USGS and NWI those
15  connections.  You have to do them by inspection and
16  investigation.
17      Q.  Okay.  But hold on a second.  My question was:
18  You have included some wetlands in your similarly
19  situated wetlands that to your knowledge do not have a
20  surface water connection to Bessey Creek.  Would you
21  agree with that?
22      A.  That's correct.
23      Q.  Okay.  Surface water connection is the key.
24  And you did not go and visit all of these wetlands in
25  Basin 4.  They were mapped in the National Wetland

Page 115

1  Inventory, right?
2      A.  That's correct.  It was on private property
3  and we couldn't access a lot of those areas.
4      Q.  But you are assuming all of these wetlands
5  have a groundwater connection at least to Bessey Creek;
6  is that fair to say?
7      MR. ADKINS:  Objection.
8      THE WITNESS:  No, sir.  They were adjacent to
9  tributaries that were adjacent to -- that were
10  tributary to Bessey Creek or they were actually
11  adjacent or they were abutting Bessey Creek.  They
12  all flowed in the watershed.  All wetlands in a
13  watershed eventually feed the main tributary, which
14  would be Bessey Creek in this instance.
15  BY MR. MCALILEY:
16      Q.  So let me just get some language straight
17  here.  When you say "abut," am I correct that means it's
18  touching at least on one side?  Sir, did you hear me?
19  Maybe it cut out or something.
20      A.  I'm sorry, if you asked me a question, please.
21      Q.  Oh, I did.  Oh, I did.  I'm sorry.  I thought
22  you were pondering it.  Sorry, maybe I had a
23  communication glitch here on my side.
24      So I just know, Mr. Wylie, I just want to make
25  sure I get the nomenclature right, that I'm

Page 116

1  understanding your testimony.  You just used the words
2  "abut" and the word "adjacent" and I just want to
3  understand the meaning of those words.  Can you start
4  with the word abut?  Would you agree with me that the
5  word abut means the wetland is touching on at least one
6  side another body of water?
7      A.  Surface water and shallow subsurface
8  connections, yes, mm-hmm.
9      Q.  Oh, so you think about means that you can have
10  waters that are connected to groundwater connections and
11  that makes them abutting to a tributary?
12      A.  I didn't say groundwater.  I said shallow
13  subsurface connections which are in the upper part where
14  there are wetlands that -- they're identified wetlands
15  that go to a water body where you can't tell the
16  difference between the water body and the wetland.
17  That's what a shallow subsurface connection is.  A
18  surface connection would be the water washing from the
19  wetland into the creek or the creek washing into the
20  wetland.  So that would be a surface connection.
21      But certainly, you have wetlands that don't
22  have surface connection that abut a stream or a
23  tributary because they are jurisdictional wetlands that
24  abut that water body.
25      Q.  I'm just trying to get the word straight.  So



MICHAEL M. WYLIE, M.S.
USA vs BENJAMIN K. SHARFI

April 04, 2022
117–120

Page 117

1  I'm just trying to understand what you mean here.  So
2  when you refer to the subsurface, you mean below the
3  ground, the ground surface, right?
4      A.  Yes, sir, in the upper part, in the upper
5  12 inches, which is the hydrology standard for what a
6  wetland is.
7      Q.  Okay.  I'm just asking, so subsurface means
8  below the ground surface, in the shallow zone of the
9  ground, right?
10     A.  Yes, sir.
11     Q.  All right.  So you think a wetland can abut a
12 tributary if there is a -- if the hydrologic connection
13 is beneath the ground in a shallow zone?  Am I
14 understanding you right?
15     A.  Yes, sir.
16     Q.  Okay.  Is the term abut defined in the
17 regulations defining the waters of the U.S.?
18     A.  No, sir.  It's defined in the regulations that
19 it is part of the term "adjacent."  So it's included in
20 the adjacently rubric along with contiguous and
21 bordering.
22     Q.  Yeah, but hold on.  So let me just be -- let
23 me understand this.
24         Is there a specific definition of the word
25 abut in any of the regulations that define the scope of

Page 118

1  the waters of the United States?
2      A.  Not current outside of the term adjacent.
3      Q.  Okay.  Has there ever been a regulation that
4  has defined the waters of the United States that has a
5  specific definition of the word abut?
6      A.  No, sir, it's not.
7      Q.  Are you sure about that?
8      A.  It's included in the adjacency regulation.
9  Adjacent regulations are considered contiguous, abutting
10 or neighboring.
11     Q.  Okay.  Okay.  So let me get that straight.  An
12 adjacent wetland is one that is contiguous, abutting or
13 neighboring?
14     A.  That's correct.
15     Q.  Okay.  So, so -- okay.  So let's go back to
16 the list of similarly situated wetlands that you've
17 identified.
18         Is it your testimony that all of those
19 wetlands have either a surface water connection to
20 Bessey Creek or have a shallow groundwater connection in
21 the first 12 inches of soil to Bessey Creek?
22     A.  Some of the wetlands that are identified in
23 there are adjacent to ditches which are tributaries that
24 go to Bessey Creek.  So they're adjacent to that.  Some
25 of the wetlands there are -- have a connection to Bessey

Page 119

1  Creek.  There may be forms of long -- if you can see
2  some of these areas on here, we haven't looked at the
3  National -- the NRCS's hydric soil list.
4          So when you marry all of those together, you
5  kind of get a better idea of how many wetlands are there
6  and you see the connections on there.  When you look at
7  a USGS map, it certainly underscores -- or in NWI,
8  typically you don't see wetlands as extensively as they
9  are identified through their aerial photography
10 interpretation.
11         So the wetlands that -- in the study area are
12 either abutting or have a shallow surface connection or
13 are adjacent to tributaries that confluence with Bessey
14 Creek.
15     Q.  Are there any wetlands in Basin 4 which are
16 hydrologically isolated?
17     A.  During my investigations of that, I did not
18 see an isolated wetland and it really wasn't -- it
19 really wasn't my goal.  We wouldn't have included
20 isolated wetlands in similarly situated because they're
21 not part of our -- not part of our analysis when we
22 talked about the other wetlands that were 1,064 acres.
23     Q.  Okay.  So you're assuming that all of the
24 wetlands in Basin 4 mapped by the National Wetland
25 Inventory are not isolated, right?

Page 120

1          MR. ADKINS:  Objection.
2          THE WITNESS:  That's one of my assumptions;
3  yes.  We certainly looked at this.  We married it
4  up with other information that we had.  There could
5  be some that are isolated.  We didn't feel like it
6  would be, but I think any time we're looking at
7  projections that are somebody else's work, we do --
8  we use the best analysis that we can and then we
9  confirm that in the field as best as we can.
10         So --
11 BY MR. MCALILEY:
12     Q.  Well, you would agree with me that the
13 National Wetland Inventory shows numerous wetland
14 features in Basin 4 that do not appear to have a
15 hydrological connection to Bessey Creek, right?
16     A.  Oh, yes, sir.
17     Q.  So, and you didn't go to all of these wetland
18 features when you identified your list of similarly
19 situated wetlands, did you?
20     A.  No, sir, we couldn't.  It was on -- most of it
21 was on private property.
22     Q.  Okay.  So the National Wetland Inventory is
23 showing features that appear to be isolated, but you are
24 assuming for purposes of your tally of similarly
25 situated wetlands that they're not isolated; is that



MICHAEL M. WYLIE, M.S.
USA vs BENJAMIN K. SHARFI

April 04, 2022
121–124

Page 121

1  fair to say?

2      MR. ADKINS:  Objection.

3      THE WITNESS:  Yes, sir, that's fair to say.

4  BY MR. MCALILEY:

5      Q.  Okay.  By the way, have you included -- well,
let me rephrase this.  It's correct that you have
included wetlands in your list of similarly situated
wetlands that do not drain to Bessey Creek, but rather,
drain to the St. Lucie River; isn't that right?

10      A.  No, sir.  That's not my understanding.

11      Q.  Okay.  Let me show you, let's go here to
Figure II.B.1.  This is your figure that shows the
boundaries of Basin 4.  Do you see there's a portion of
Basin 4 on its eastern edge that borders on the North
Fork -- or actually, the St. Lucie River in general?  Do
you see that?

17      A.  Yes, sir.

18      Q.  Do you see that out here, you see there's like
a pattern here where it looks like there's canals by
houses in the north of that area, but right below it
there's an area that looks like vegetation there?  Do
you see that eastern part?

23      A.  Yeah, if looks like vegetation, uh-huh.

24      Q.  Mm-hmm.  I mean, this is -- that's a wetland,
isn't it?

Page 122

1      A.  I think it appears to be.

2      Q.  I mean, that's -- if you go to the National
Wetland Inventory site, it indicates that's an -- that's
an esturean marine wetland, right?

5      A.  Yes, mm-hmm.

6      Q.  That connects directly to the St. Lucie River,
doesn't it?

8      A.  It appears to be, yes, uh-huh.

9      Q.  Okay.  So you've included that in your tally
of similarly situated wetlands for this case, right?

11      A.  Boy, I think so.  I would have to look at a
map again to do that, but that's -- that could be.
However, this was the basin area map that we used from
the South Florida Water Management District.  So yes,
this is Basin 4.

16      Q.  Okay.  So Mr. Wylie, how many acres of
wetlands are there in the area that is drained by what
I've been calling the east/west ditch?  So this would
be -- I'll go back here to Figure -- we'll go to
Figure II.B.2.  East/west ditch is this area north of
the site, that's featured north of the site and the
east/west ditch, it ends right around this hybrid
wetland treatment facility, right?

24      A.  Yes, sir.

25      Q.  Okay.  So how many acres of wetlands are there

Page 123

1  in the area that is served by the east/west ditch?

2      A.  I -- that was not my goal in this.  It was --
we were looking at similarly situated wetlands in the --
that are part of the study area and then compare those
to the TNW portion of Bessey Creek, not the improved
portion of Bessey Creek.  So that wasn't my goal.

7      Q.  So you don't know how many wetlands are in the
area served by the east/west ditch, do you?

9      A.  No, sir, I do not right now.

10      Q.  And how many acres of wetlands are there in
the Countess Joy East property, if you know?  Can you
give me even a ballpark?

13      A.  I'm sorry, sir.  That wasn't -- that wasn't
our goal.

15      Q.  Okay.  So you can't tell me how many acres of
wetlands there are in the Countess Joy property, right?

17      A.  I made a determination, I made a determination
at many points along the eastern side that wetlands
exist and we saw plenty of areas that were fresh land
wetlands which are portrayed on this.  So one could
probably infer that there were probably more than half.
But if you look at the -- at the 25-foot contour line,
anything west of that and south of that, we didn't find
those to be wetlands because they had -- they were too
high.

Page 124

1      And most everything else in there was wet
except some areas in the south.  I think the southeast
portion was a little bit higher too, it looked like.
But that's not an area that we went.  I mean, that was
just from my inference.  So that was the defining line
and then the wetlands flow path continued to the west
through 84th Avenue ditch into Bessey Creek.

8      Q.  Okay.  So you can't tell how many acres of
wetlands are in the Countess Joy East property, right?
You can't give me a number?

11      A.  No, sir, I cannot.

12      Q.  Okay.  How many acres of wetlands are there
that are adjacent to the flow path that Dr. Nutter
identified from the -- from the site up to the east/west
ditch?

16      A.  I cannot give you that exact acreage of that
because that was not my goal.

18      Q.  Okay.  So you don't know, right?

19      A.  I do not know the approximate acreage of
wetlands in Dr. Nutter's flow path.  That was not the
mission.  It was to establish adjacent wetlands to the
site.

23      Q.  Okay.  I'd like to go to the report now.  I'm
trying to get to a logical breaking point here.  I'm
going to exit out of the figures and go back to the



MICHAEL M. WYLIE, M.S.
USA vs BENJAMIN K. SHARFI

April 04, 2022
125–128

Page 125

1  report.
2      Okay.  I just put up Deposition Exhibit 72,
3  page 4.  Can you see that on the screen, sir?
4      A.  Yes, I can.
5      Q.  So this section is on "Federal Emergency
6  Management Agency (FEMA) Flood Hazard Zone."  You wrote
7  this section, right?
8      A.  Yes, sir.
9      Q.  Okay.  And you indicate that the site and
10  nearby areas is in a FEMA Flood Hazard Zone AE on the
11  FEMA map, right?
12      A.  Yes, sir.  I reviewed that information and
13  that's what it was mapped as; yes.
14      Q.  Okay.  So if a property is in the Zone AE,
15  that implies -- well, hold on.  Well, let me just say
16  this differently.  Let me ask this differently.
17      The last sentence says quote, The 1 percent
18  annual chance flood hazard zone implies that there is on
19  average a 1 percent chance of a 100-year flood occurring
20  in any year on the site, end quote.
21      Did I read that correctly?
22      A.  Yes, sir, you did.
23      Q.  You wrote those words, right?
24      A.  That's the definition of the 100-year
25  floodplain; yes.  I took that from the -- from FEMA.

Page 126

1      Q.  That's a true and accurate statement, right?
2      A.  Yes, sir.
3      Q.  What is the purpose for which FEMA prepares
4  its flood maps?
5      A.  Well, I think it's severalfold.  One of them
6  is to inform potential --
7      THE VIDEOGRAPHER:  Sorry about that.  That
8  just got -- we're still recording.
9      MR. MCALILEY:  Okay.  Thank you.
10      THE WITNESS:  I think it's severalfold that
11  FEMA does that.  They inform landowners and
12  potential landowners that the area that they're
13  maybe going to buy or purchase or whatnot is
14  included in a potential flood hazard zone.  Second,
15  the banks use FEMA flood hazard zones I think to --
16  well, I know to require certain insurances like
17  flood insurance.
18      So if you purchase a home, you know, in a
19  100-year floodplain, you need to purchase flood
20  insurance and/or many banks or maybe all banks, I'm
21  not exactly positive, but most banks won't give you
22  a loan.
23      So it's informative.  The FEMA flood zones
24  also change because they have to be updated because
25  people building in the floodplain cause it to

Page 127

1  change and it may become bigger or smaller.
2      So that's my understanding of flood hazard
3  zones.
4  BY MR. MCALILEY:
5      Q.  Is -- I'm going to go back to the figures here
6  so we can look at our FEMA map.  So I'm now showing
7  Figure II.C.3.1.  Is this the FEMA national flood hazard
8  flood zones for the Basin 4 study area?
9      A.  Yes, sir.  That's the depiction that we
10  portrayed.
11      Q.  Am I right that when you prepared this figure,
12  you just showed the flood zones for the Basin 4 study
13  area, correct?
14      A.  Yes, sir.  That was the only -- that was part
15  of our analysis and we cut this out of the areas outside
16  of Basin 4.
17      Q.  Okay.  So if there's no color outside of
18  Basin 4, it doesn't mean there was no flood hazard
19  there.  It just means you didn't map it on the screen,
20  right?
21      A.  That's correct.  We just cut this out and
22  portrayed it as the study area.
23      Q.  Am I right that flooding under the FEMA maps
24  mean that there is a chance that water will exceed the
25  base flood elevation?

Page 128

1      A.  Could you ask that again? because you're kind
2  of mixing things.
3      Q.  Well, what is -- FEMA defines what a flood is,
4  right, for purposes of their maps?
5      A.  Yes.
6      Q.  And a flood is when water gets above the base
7  flood elevation for a given site, right?
8      A.  Yes.
9      Q.  What is the base flood elevation for the site?
10      A.  I don't know that.
11      Q.  So there's -- according to this FEMA map,
12  there's a 1 percent chance on any given year that the
13  site will flood.  Am I understanding that correctly?
14      A.  It could be on any given day.  It's just a
15  1 percent.  That's an average of days over so many
16  years, but like any statistics, that 1 percent chance
17  could happen seven days in a row twice a year, once
18  every 100 years, once every 50 years.
19      Q.  Hold on.  That FEMA map doesn't map a
20  percentage chance of a flood on a daily basis.  It maps
21  the percentage on an annual basis, correct?
22      A.  That doesn't mean on an annual basis that you
23  could have five floods in a row.
24      Q.  That wasn't my question, sir.  Sir, my
25  question was just simpler than that.  FEMA, when they



MICHAEL M. WYLIE, M.S.
USA vs BENJAMIN K. SHARFI

April 04, 2022
129–132

Page 129

1  calculate the percentage chance of a flood, they
2  calculate it on an annual basis, not a daily basis,
3  right?
4      A.  Correct.
5      Q.  Okay.  I just have one last figure let me go
6  through.
7          So on -- I'm in Exhibit 73.  I'm now showing
8  Figure III.A.1, depiction of a tree-like or dendritic
9  stream channel pattern and stream order.
10          Do you see that?
11      A.  Yes, sir.
12      Q.  This is a concept in hydrology about
13  identifying the stream channel pattern and order, right?
14      A.  Yes, sir.
15      Q.  And then so is this -- there is -- are you
16  relying upon Dr. Nutter's opinions with regard to the
17  stream orders in the site and vicinity for purposes of
18  your opinion?
19      A.  Yes, I am.
20      Q.  Okay.  So are you aware that Dr. Nutter
21  testified that he believes the east/west ditch is a
22  second order stream?
23          MR. ADKINS:  Objection; misstates testimony.
24          THE WITNESS:  I think I recall that.
25

Page 130

1  BY MR. MCALILEY:
2      Q.  Okay.  And are you aware that -- and do you
3  have any reason to disagree with that?
4      A.  No, sir, I don't.
5      Q.  All right.  And are you aware that Dr. Nutter
6  testified on Friday that the north/south ditch is a
7  first-order stream?
8      A.  Well, I wasn't there, but...
9      Q.  Did anybody tell you that?
10      A.  When we were out, I think it was all assumed
11  and discussed, but it's just a one -- a one-order --
12  first-order stream.
13      Q.  Okay.  Do you have any reason to disagree with
14  Dr. Nutter's opinion that the north/south ditch is a
15  first-order stream?
16      A.  Well, no, sir, I don't.
17      Q.  Okay.  Because the north/south ditch is
18  smaller than the east/west ditch, right?
19      A.  Yes, sir, it is.
20      Q.  And there's multiple smaller ditches that feed
21  into the east/west ditch and give the larger flow that's
22  in the east/west ditch, right?
23      A.  That's correct.
24          MR. MCALILEY:  Okay.  I'm at a logical
25  breaking point right now.  I'd be happy to just

Page 131

1  make this a short break and then just do lunch a
2  little bit later.  I'm also happy if you want to do
3  a short lunch now, to do that now.  But what's your
4  pleasure, sir?
5          THE WITNESS:  I would love to do a short lunch
6  now, if that's okay.
7          MR. MCALILEY:  Okay.  That's absolutely fine.
8  My -- you know, we've got a lot of ground to cover.
9  So would it be okay if we just took like a
10  half-hour lunch break?  Would that work for you?
11          THE WITNESS:  Sure.
12          MR. MCALILEY:  Okay.  Does that work for
13  everybody else?
14          MR. ADKINS:  Yes.
15          MR. MCALILEY:  All right.  Well, thank you
16  very much.  So I have 12:19.  So let's -- we'll be
17  back at like 12:50, I guess.
18          THE VIDEOGRAPHER:  We're going off the record.
19  The time is approximately 12:19 p.m., and this ends
20  File 1.
21          (A break was had.)
22          THE VIDEOGRAPHER:  We are back on the record
23  with File 2 of the video Zoom deposition of Michael
24  Wylie.  We are on the record and the time is
25  approximately 12:57 p.m.  Thank you.

Page 132

1          MR. MCALILEY:  Good afternoon.  I'm sorry to
2  be slightly late here, Mr. Wylie.  Before we start
3  with questions with you, I'll just put it on the
4  record here, or we can discuss this -- or if you
5  want at the next break, Brandon, you and I discuss
6  it, but the issue of my questions of the witness
7  regarding conversations with DOJ counsel in
8  preparation for the deposition.
9          It's my understanding you're asserting sounds
10  like a work product objection; that your
11  discussions with your expert are -- and the
12  substance of them are subject to work product and I
13  shouldn't go into that.  I don't know that I agree
14  with that, but I'm willing to follow the same
15  rule -- I'm willing to follow that approach and not
16  inquire into discussions with experts if you'll
17  follow the same for us, so we're just on an even
18  playing field.  And I think that would just
19  simplify things today.
20          MR. ADKINS:  I think that's fine.  I -- you
21  know, what I would go to, Counsel, is
22  Rule 26(b)(4)(C) and the types of communications
23  with a retained expert who's required to prepare a
24  report and the narrow, I guess, categories of
25  information that are not subject to work product



MICHAEL M. WYLIE, M.S.
USA vs BENJAMIN K. SHARFI

April 04, 2022
133–136

Page 133

1 protection.  So, and I'll tell you I just pulled it
2 up.  It's the -- you know, communications that are
3 within the exception to this rule are "Relate to
4 compensation for the expert's study or testimony."
5 Obviously, you know, we haven't objected to any
6 questions on our experts -- our retained expert's
7 compensation.  "Identifying facts or data that the
8 party's attorney provided and that the expert
9 considered in forming opinions to be expressed, or
10 communications that identify assumptions that the
11 party's attorney provided and that the expert
12 relied on in forming the opinions to be expressed."
13    So I think, you know, subject to those narrow
14 exceptions, we're in total agreement with you and
15 we wouldn't --
16    MR. MCALILEY:  Oh, I apologize, I'll do that
17 with this witness and also with other experts on
18 the government's side and you'll do that with us,
19 and I think that would simplify things just from
20 the case going forward, I think.
21    So -- well, look, we can come back to this
22 maybe a little bit later.  Let me go back and look
23 at the rule here again that you just cited here,
24 but I just thought that I would try to close a
25 wall.

Page 134

1    MR. ADKINS:  So are we in agreement or is that
2 you want to think about it more?
3    MR. MCALILEY:  So look, I think that -- I
4 think what's going on, I think it's the concept of
5 work product, which is what's relevant here and
6 especially like the opinion work product of
7 counsel, right?  So I think that's definitely true
8 when we deal with retained experts.  I think that's
9 true with other experts, too.  So, you know, like
10 non-testifying experts.
11    So I don't see a difference in that and I
12 would think that we should just apply this across
13 the board.  Maybe that's a distinction that's a
14 difference in the case, but let's just -- so maybe
15 what I need to do, let me go back and look at the
16 rule again and we could talk about this maybe at
17 the next break or something.
18    MR. ADKINS:  All right.  Do you mind if we go
19 off the record for one moment?
20    MR. MCALILEY:  Sure.
21    THE VIDEOGRAPHER:  Okay.  We're going off the
22 record.  The time is approximately 1 p.m.
23    (Off the record.)
24    THE VIDEOGRAPHER:  We are back on the record.
25 The time is approximately 1:01 p.m.  Thank you.

Page 135

1 BY MR. MCALILEY:
2    Q.  All right.  Mr. Wylie, one question I forgot
3 to ask in your credentials, is how much you're getting
4 paid per hour for your testimony in this case?
5    A.  I'm getting paid $250 per hour for normal
6 course of work.  For depositions in a court case, 375.
7    Q.  Okay.  Thank you.  So let's go back to the
8 report now, DOJ Exhibit -- I mean, I'm sorry, Depo
9 Exhibit 72.  I'm going back here.  This is on page 2
10 again.  I just want to close out a few points here.  Can
11 you see that on your screen?
12    A.  Yes, sir.
13    Q.  Okay.  So in the paragraph regarding study
14 area, I've highlighted a couple of sentences here I just
15 wanted to ask you about.  So the first one says, "the
16 DOJ expert team will provide evidence that the site
17 wetlands directly abut and have regular surface and
18 shallow subsurface hydrologic connections to Bessey
19 Creek."
20       Do you see that?
21    A.  Yes, sir.
22    Q.  Okay.  So as a starting point, am I right that
23 you're going to rely on expert's opinions regarding
24 whether and the extent and the nature of the surface and
25 shallow subsurface hydrologic connections to Bessey

Page 136

1 Creek?
2    A.  The two first words didn't come clear.  I
3 heard the rest of it.
4    Q.  I'll ask it again.
5       Am I right that you're going to rely on
6 Dr. Nutter's opinions with regard to the nature of the
7 regular surface and shallow subsurface hydrologic
8 connections to Bessey Creek?
9    A.  I think what will happen is it will be myself
10 and him.  He will talk about hydrologic connections and
11 I will talk about actual connections as they relate to
12 jurisdictional wetlands.  So it's kind of a marrying
13 discussion I think there.
14    Q.  So, but you're relying upon Dr. Nutter's
15 opinions on matters of hydrology, right?
16    A.  Yes, I am.
17    Q.  And then you're taking his conclusions with
18 regard to hydrology and then you're applying that as you
19 understand it to the standard for determining whether,
20 you know, the site has wetlands and whether they're part
21 of the waters due west, right?
22    A.  That's correct, yes.
23    Q.  But you're not going to have your own sort of
24 separate opinions as to whether -- as to, for instance,
25 the nature and the frequency and the details of the



MICHAEL M. WYLIE, M.S.
USA vs BENJAMIN K. SHARFI

April 04, 2022
137–140

Page 137

1 surface and shallow subsurface hydrologic connections
2 between the site and Bessey Creek, right?
3    A.  No.  I'll be relying on Dr. Nutter for that,
4 besides the observations that I had during my fieldwork.
5    Q.  Okay.  So there's -- so in that sentence it
6 says that "The DOJ expert team will provide evidence
7 that the site wetlands directly abut Bessey Creek."
8       Do you see those words?
9    A.  And have regular surface and shallow
10 subsurface hydrologic connections to Bessey Creek; yeah.
11    Q.  Right, I'm focused on the statement here that
12 "the site wetlands directly abut Bessey Creek."  I just
13 want to focus on that.
14       So is it your belief that the wetlands on the
15 site directly abut the east/west ditch?
16    A.  Yes.
17    Q.  Okay.  And you would agree with me that the
18 east/west ditch is 1,600 feet away from the northern
19 boundary of the site, right?
20    A.  Approximately, yes.
21    Q.  And so you think -- and that's a quarter mile
22 away, right, approximately?
23    A.  Yes, it is.
24    Q.  So you think the wetlands a quarter mile away
25 from a tributary can directly abut that tributary?

Page 138

1    A.  The wetlands are contiguous to that tributary;
2 yes.  They run from the site through the Countess Joy
3 East track and then have -- they abut Bessey Creek.
4    Q.  Okay.  So you think the site wetlands, the
5 wetlands on the site directly abut the east/west ditch
6 located at its closest spot, 1600 feet away, right?
7    A.  It may be a little further than that because
8 it's -- our abutting areas that we mapped out and
9 observed were a little bit further to the west.  There
10 was two sites there.  So the abutting wetland portion
11 were, I think, on W6, W7, where the wetland
12 determination forms and also pictures taken, the east --
13 the 1600 feet is talking about the north/south ditch and
14 how it runs into Bessey Creek.
15    Q.  So I asked you this before lunch.  Are you
16 aware that the regulations defining the waters of the
17 U.S. had a definition of abut in them in the Navigable
18 Water Protection Rule?
19    A.  If I did, I don't really -- I discount that
20 because it's not in use now.
21    Q.  That wasn't my question.  My question was:
22 Are you aware that the regulations in the Navigable
23 Waters Protection Rule had a definition of the word
24 abut?
25    A.  If I was aware, I've forgotten, or discounted

Page 139

1 it.
2    Q.  Wait, wait.  Did you discount it or did you
3 forget?
4    A.  I think I forgot it, is probably a better
5 characterization; yes.
6    Q.  Okay.  The definition -- by the way, the
7 Navigable Waters Protection Rule was in effect when the
8 plaintiff filed this lawsuit, right?
9    A.  No.  I think it was -- I think it was before,
10 but I'm sorry, I've forgotten the exact date when the
11 lawsuit was filed.
12    Q.  You started working on this matter in April of
13 2021, right?
14    A.  That's correct.
15    Q.  You started working on this matter before the
16 complaint was filed in the case, correct?
17    A.  That's correct.
18    Q.  Okay.  In April of 2021, the Navigable Water
19 Protection Rule was in effect, right?
20       MR. ADKINS:  Objection; foundation.
21       THE WITNESS:  Yes, I think it was.
22 BY MR. MCALILEY:
23    Q.  Okay.  And you're aware -- and the Navigable
24 Water Protection Rule was vacated by a judge in Arizona,
25 right?

Page 140

1    A.  Yes.
2    Q.  You're aware that that decision to vacate the
3 rule is on appeal, right?
4    A.  No, I'm not aware of it currently.
5    Q.  Okay.  So the Navigable Water Protection Rule
6 defined the term abut to mean, quote, to touch on at
7 least one point or side, end quote.
8       Is that a reasonable definition of the word
9 abut in your mind?
10    A.  Yes.
11    Q.  Okay.  So it is your testimony that the
12 wetlands on the site touch the east/west ditch on at
13 least one point or side?
14    A.  Wetlands are a continuum from the site to the
15 southern part of east/west ditch.
16    Q.  And once again, we talked about this over
17 lunch, but I just want to confirm.  You've never
18 actually gone out and delineated the boundaries of the
19 wetlands on the Countess Joy site that's between the
20 site and the east/west ditch, right?
21    A.  That's correct.
22    Q.  So I just have to trust you that they all
23 connect, even though you haven't delineated the lines of
24 where the wetlands are located, right?
25       MR. ADKINS:  Objection; misstates testimony.



MICHAEL M. WYLIE, M.S.
USA vs BENJAMIN K. SHARFI

April 04, 2022
141–144

Page 141

1    THE WITNESS:  That's my opinion; yes.
2  BY MR. MCALILEY:
3    Q.  Do you think the wetlands on the site abutted
4  the north/south ditch prior to the site development work
5  by the defendants?
6    A.  Yes, I do.
7    Q.  Okay.  What is the basis of that opinion?
8    A.  Reviewing aerial photography, reviewing NWI
9  maps, reviewing some of the depositions currently taken
10  that there was water that overflowed from that site
11  over, and also the two site investigations that I
12  performed with the team, expert team on the Sharfi site.
13    Q.  Okay.  Let me just walk through that.  You --
14  the first time you were on the site was in August of
15  2021, correct?
16    A.  Yes, sir.
17    Q.  So you had never been on the property prior to
18  then, correct?
19    A.  Yes, sir, that's correct.
20    Q.  The defendants engaged in their site
21  activities in approximately 2018, right?
22    A.  I think that's -- that's a reasonable starting
23  time, yes, for that track; yes.
24    Q.  Well, isn't that what's alleged in the amended
25  complaint?

Page 142

1    A.  Yes, sir, it was.
2    Q.  Okay.  So you first went on the site
3  three-and-a-half years after the work was done by the
4  defendants on the site; is that fair to say?
5    A.  That's fair to say.
6    Q.  And it's your opinion that the defendants
7  basically changed the site significantly so there's no
8  longer the same amount of wetlands as there was before.
9  Do I have that right?
10    A.  Yes, that's correct.
11    Q.  So you have no personal knowledge of whether
12  the wetlands on the site abutted the north/south ditch
13  before the work was done, correct?
14    MR. ADKINS:  Objection.
15    THE WITNESS:  I do not have any personal
16  knowledge besides what I've done outside of what --
17  in my earlier response.
18  BY MR. MCALILEY:
19    Q.  Okay.  So the basis for your belief that the
20  wetlands on the site abutted the north/south ditch, I'm
21  going to go through them.
22    You said aerial photographs.  Which aerial
23  photographs are you referring to that you believe show
24  that the wetlands on the site prior to defendants'
25  activities abutted the north/south ditch?

Page 143

1    A.  We have an exhibit or figures that show the
2  different time frames.  If you would like to turn to
3  those.  It's in the expert report.
4    Q.  Okay.  Is it the figure with like some of the
5  historical photographs right next to each other?
6    A.  Yes, sir, it was.
7    Q.  All right.  Let's go to that.
8    Okay.  I'm going to now put up on the screen
9  what has been previously marked as Deposition Exhibit
10  No. 73, which is the figures and I've gone to
11  Figure V.D.1.a.2.
12    Go you see that on the screen, sir?
13    A.  Yes, sir, I do.
14    Q.  Is this the figure that you're referring to
15  that you believe indicates that the -- that wetlands on
16  the site abutted the north/south ditch?
17    A.  It's one of the figures, yes, sir, uh-huh.
18    Q.  Okay.  Can you tell me what about this figure,
19  these aerial photographs indicate to you wetlands on the
20  site abutted the north/south ditch?
21    A.  Well, if you'll observe the left-hand 1966
22  photo, wetlands there basically run to the red black
23  line which is where the ditch is.  Wetlands up at the
24  top on the northwest side, which we identified in the
25  field and across the line, abut north/south ditch.  So

Page 144

1  we feel like that area there showed abutment.  We also
2  feel like if you look at the 2016 photo, you can see the
3  wetland line that abuts the north/south ditch on the
4  lower left-hand side, southwest side.
5    And then we think the wetlands then -- and
6  also on the top part on the northwest side abut and then
7  they go across the -- to the north and become part of
8  the continuum of Countess Joy East and West.
9    Q.  Okay.  So Mr. Wylie, you would agree with me
10  that in order for the wetland to abut the ditch, it
11  needs to at least touch on one side the ditch, right?
12    A.  Yes, sir.
13    Q.  And am I right it needs to touch at the
14  surface?
15    A.  Or shallow subsurface, yes, sir.
16    Q.  Oh, so you can have -- so there could have
17  been an area -- in your opinion, there could have been
18  an area next to the ditch where there was a berm next to
19  the ditch that was put up when it was excavated however
20  many decades ago that separated the wetland from the
21  ditch, but if there was groundwater that could have
22  moved through the dirt at times underneath that berm,
23  you think that would be sufficient for it to abut; is
24  that right?
25    A.  They could abut in the context that they would



MICHAEL M. WYLIE, M.S.
USA vs BENJAMIN K. SHARFI

April 04, 2022
145–148

Page 145

1  be termed adjacent. To abut, you know, in the classic
2  term as you're using it in the navigable protection
3  water system, that the berm would sever that, but there
4  may be subsurface flow underneath the berm. And there's
5  also a pipe that we identified that appeared to be
6  coming out from, I think it's Cypress Pond that
7  intersects the -- goes from Cypress Pond to north/south
8  ditch.
9        We also viewed some Lidar photos that showed
10  low elevations in these same areas that we feel were
11  abutting wetlands, especially on the southwest side.
12    Q. Okay. So again, I think you answered more
13  than what I was asking. I had a simpler question. I'm
14  not asking whether you think the wetlands on the site
15  were adjacent to the north/south ditch. I'm asking
16  whether they abut it.
17        So you would agree with me that if there was a
18  berm on the side of the ditch that separated the ditch
19  from the wetlands at the surface, that that would mean
20  that the wetland does not abut. It could have been
21  adjacent, but it wouldn't abut.
22        Would you agree with that?
23    A. Yes, I would agree with that.
24    Q. Okay. And so you would agree with me that in
25  the aerial photographs here, on Figure V.D.1.a.2, it's

Page 146

1  not at a fine enough scale to make out whether there are
2  berms next to the ditch by the site.
3        Do you agree with that?
4    A. The problem with that is the black and red
5  line covers that area. So it's a little hard to see.
6  We viewed this photograph without the site enclosure and
7  felt like that there was abutting wetlands there.
8    Q. Okay. Do you know at what altitude these
9  aerial photographs were taken?
10    A. No, sir, I don't.
11    Q. The 1966 photo looks like it was taken from a
12  plane thousands of feet in the air; wouldn't you agree?
13        MR. ADKINS: Objection.
14        THE WITNESS: I'm sorry, Mr. McAliley. I
15    don't really know what that distance is above the
16    ground.
17  BY MR. MCALILEY:
18    Q. All right. That's your picture that you used,
19  but you can't tell me at what altitude it was?
20    A. When we made our determination, we zoomed in
21  on it. So we were able to see the features much easier
22  than looking at the furthest extent of the photo.
23    Q. Okay. So is there any figure in the report
24  that shows the aerial photograph prior to the work in
25  2018 that you believe shows that there was no berm or

Page 147

1  upland area that separated the north/south ditch from
2  the wetlands on the site?
3    A. Is there another figure here, A.3 or anything?
4    Q. I'll look for it. There's this one.
5    A. There we go.
6        Okay. You can -- if you look on here, there's
7  no berm down in the southwest side of the site. In
8  fact, that depressional wetland goes all the way across.
9  It appears in this photo that the berm starts up at the
10  top, the northwest side and stops and everything else
11  below that, I don't see a berm on the southwest side.
12    Q. Okay. So that's how you're reading this
13  photograph, right?
14    A. Yes.
15    Q. And for the record, we're looking at Figure
16  V.D.1.a.1. So this was taken in 1966, correct?
17    A. Yes, sir, it was.
18    Q. And the defendants engaged in their site work
19  starting in approximately 2018; is that right?
20    A. Yes, sir.
21    Q. So that was 42 years later. Am I doing my
22  math right, or is it 52 years later?
23    A. Fifty-two years, yeah.
24    Q. I'm showing my age here, right. So do you
25  know whether there is a berm on the edge of that ditch

Page 148

1  when the defendants purchased the property in 2017?
2    A. I did not note one in looking at photos in
3  2018. It was fairly overgrown then. So we couldn't
4  discern a berm, especially on the southwest side. And
5  that was before defendants -- Mr. Sharfi or defendants,
6  I guess it's Neshafarm too, built the road around the
7  site which would have obliterated the road or the berm.
8    Q. Well, hold on. You weren't there when they
9  built the road, right?
10    A. No, sir, I was not.
11    Q. You would have no knowledge of whether it
12  obliterated a berm or did anything else unless you were
13  there, right?
14        MR. ADKINS: Objection.
15        THE WITNESS: Well, typically, berms are not
16    flat tabletops 10 feet wide and raised up in nice
17    rectangular fashions. They have ups and downs and
18    mounds and different vegetation growing out of
19    them. The road, as I saw it several -- in August
20    and in September was very flat and was raised and
21    formed an encapsulation around the site.
22  BY MR. MCALILEY:
23    Q. So when you went to the site in August 2021,
24  the wetland on the site did not abut the north/south
25  ditch, right, because there was this elevated roadway



MICHAEL M. WYLIE, M.S.                                        April 04, 2022
USA vs BENJAMIN K. SHARFI                                     149–152

Page 149

1 between the wetlands and the ditch; is that fair?
2     A.  Yes, sir, that's the way I viewed it.
3     Q.  Would you agree with me that the best
4 witnesses to -- who would know whether, in fact, the
5 wetland on the site abutted the north/south ditch are
6 people who physically saw the site before the work was
7 done?
8     MR. ADKINS:  Objection.
9     THE WITNESS:  They would be valuable
10    witnesses, and especially if you married up any
11    kind of testimony with photographs and -- well,
12    with photographs and with offsite data like hydric
13    soil data, NWI data and whatnot, they would be very
14    valuable.
15 BY MR. MCALILEY:
16    Q.  They would be the best witnesses, wouldn't
17 they, to say whether, in fact, there was some kind of
18 berm between the wetland and the ditch, right, because
19 they would have seen it whether it existed or not,
20 right?
21    MR. ADKINS:  Objection.  Objection; compound.
22    THE WITNESS:  Well, the problem with someone
23    like that is you have to know if they know what a
24    berm is.
25

Page 150

1 BY MR. MCALILEY:
2     Q.  Oh, so a regular person might not know what a
3 berm is?
4     A.  Yes, sir.
5     Q.  Okay.  Thank you.
6     Okay.  So let's go back to the report and
7 let's go back to -- we're back on page 2.
8     So there is the -- the last sentence of the
9 first paragraph says, quote, We will also show that if
10 either taken alone or in combination with the
11 approximately 1,064 acres of similarly situated wetlands
12 in the study area mapped by NWI, wetlands on the site
13 have a significant effect on maintaining the chemical,
14 physical and biological integrity of Bessey Creek, a
15 tidally influenced perennial stream at its distal end
16 and the TNWs of the St. Lucie River, St. Lucie Inlet and
17 the nearshore waters of the Atlantic Ocean.
18     Did I read that right?
19     A.  Yes, sir.
20     Q.  Okay.  What does it mean -- what do you mean
21 by "significant effect"?
22     A.  A significant effect means that the -- would
23 you like me to discuss it in terms of Rapanos?
24     Q.  You wrote the words significant effect.  I'm
25 asking what it means.

Page 151

1     A.  Significant effect means a -- showing a
2 wetland performs a function that can be observed or
3 relied upon or taken a photo of that shows together
4 either by itself or with the other wetlands in the study
5 area, when they perform similar functions, has an effect
6 that we can describe that is not insignificant on a
7 traditional navigable water.
8     Q.  Okay.  How do you determine that the effect is
9 significant or insignificant?
10    A.  What happens when I go to a site, you know, I
11 want to show a particular function and if that site is
12 part of a larger group of wetlands that perform a
13 similar function to a traditional navigable water, then
14 we observe that, we make records of that and then we
15 compare that to whether it's an adverse or a beneficial
16 function that would affect, say, water quality in a TNW
17 or would affect physical processes like a flow,
18 navigation or would provide, say, organic carbon that
19 fuels the ecology of the aquatic environment there.
20    So those are the steps that we go through to
21 document what a significant effect would be.  And
22 certainly, the more wetlands you have that perform these
23 kinds of functions, then you have a discussion that you
24 can deem significant.
25    Q.  I see.  So the more wetlands that are

Page 152

1 similarly situated means it's easier to show that
2 there's a significant effect?
3     A.  That's one reason.  But one -- a wetland, say
4 a wetland all by himself -- by itself could also be
5 deemed significant.
6     Q.  Okay.  So, but how do you figure out whether
7 an effect is significant or insignificant?  What do I
8 have to look at to determine the difference between a
9 significant and an insignificant effect?
10    A.  Well, as I said before, we gather evidence.
11 We look at the traditional navigable water and see what
12 its problems are, what its health is.  Is it impacted by
13 septic tanks?  Does it have no flow or low flow?  Is it
14 drought affected in?  Does it have a riparian forest?
15 Does it have a high-nutrient load to it.
16    And then what we do is we back up in the
17 watershed to see what wetlands do, because they perform
18 many functions which I've described in my report.  And
19 then we look at those functions and we say how this
20 would help or be a detriment.  Say wetlands that got
21 cleared and filled like the Sharfi site, if there wasn't
22 any silk fence, if there wasn't any areas like that,
23 sediment may just run off and go in the north/south
24 ditch, right to Bessey Creek and then further impact
25 water quality because there's sediment which really



MICHAEL M. WYLIE, M.S.
USA vs BENJAMIN K. SHARFI

April 04, 2022
153–156

Page 153

1 attaches a lot of phosphorus to it.
2      So it could further impact a creek that's
3 already on DPE's 303(d) list.
4      Q.   Mr. Wylie, is it your testimony that if the
5 wetlands have any effect on the downstream of
6 traditional navigable waters, those effects are
7 significant effects?
8      A.   No, it's not.
9      Q.   Okay.  So how do you figure out if an effect
10 is significant or not?  Is it like you just know it when
11 you see it, or is there a like -- is there a bright line
12 or --
13      A.   Well, as I discussed in my report, in the
14 portions of the report that I'm responsible for, we
15 found many similarly situated wetlands that perform
16 functions that we documented.  We took pictures of them.
17 We showed their ability to sequester nutrients to cycle
18 nutrients, to cycle -- to provide plant and animal
19 community support, to sequester septic tank discharges,
20 which the east side of the Turnpike, the entire area
21 there is septic tanks.
22      So we have things that wetlands do.  We also
23 proved wetlands were reduced on the site by taking
24 Alpha-alpha-Dipyridyl tests which shows that the
25 wetlands were in a reduced phase and in a reduced phase

Page 154

1 nitrogen is removed from the system.  Nitrogen is
2 removed from the cowpies we saw, the phosphorus and also
3 from all the septic tanks that we saw that are there
4 that was confirmed by the Martin County.
5      So all these effects, then, as they get
6 multiplied by numerous similarly situated wetlands,
7 hundreds of acres, then provide functions that
8 measurably affect a downstream water body.  We're not
9 talking about a hundred miles away.  We're talking about
10 several miles away with wetlands that perform similar
11 functions that just not I say, that plenty people in the
12 scientific community and the rest of the expert team
13 showed to prove up a significant effect on Bessey Creek
14 at its TNW state.
15      Q.   Mr. Wylie, am I right that it's your opinion
16 that if the wetland has a measurable effect on a
17 downstream traditional navigable water, that means the
18 effect is significant?
19      A.   If it's a measurable effect, are you talking
20 about quantifiable or talking about --
21      Q.   I'm using your words.  I'm using your words.
22 You gave me a long answer that didn't answer my
23 question, so I'm just trying to narrow in trying to
24 figure out what's a significant effect.
25      So your words were if it is a measurable

Page 155

1 effect from the downstream traditional navigable waters,
2 you think the effect is significant; is that right?
3      A.   Well, when I was talking about the measurable
4 effect, I was talking about the acreage of wetlands.
5 The greater the acres of wetlands, obviously, the more
6 opportunity for functions in the watershed to protect a
7 downstream water body.  So that's the measurable, is
8 more of an acreage effect.
9      We also have to demonstrate on each wetland we
10 go to, which we did, which we did and Dr. Lee did about
11 what the functions of each one of these wetlands
12 perform.  We showed reduced conditions which certainly
13 have chemical inferences to an impaired water body that
14 it could flow into or abut to.
15      Q.   So Mr. Wylie, again, you're not answering my
16 question.  I'm just trying to narrow in on something
17 very specific so I can move on.  It sounds like it's
18 sort of subjective as to whether an effect is
19 significant or not on the downstream traditional
20 navigable waters.
21      Is that fair to say?
22      MR. ADKINS:  Objection; asked and answered.
23 Misstates testimony.
24      THE WITNESS:  No, it's not.
25

Page 156

1 BY MR. MCALILEY:
2      Q.   Okay.  Well, what is the objective standard by
3 which you determine whether an effect is significant or
4 not?
5      A.   As I described in my expert report, the
6 functions, the five functions I've discussed we showed
7 occur in the landscape.  The TNW is an impaired water
8 body for some of the functions that the wetlands allow
9 to not proceed, like reducing the amount of nitrogen,
10 reducing the amount of phosphorus, which these are
11 already documented as water quality impacts to this
12 water body at the TNW site also lowered, low DO.
13      So when we go to each one of these wetlands,
14 we document these functions, along with Dr. Lee, and
15 then we look at the totality of those functions on the
16 acreage of wetlands and see if they're -- see if they
17 are performing those functions.
18      And then we looked at the literature, which
19 we've quoted many times throughout this report, that
20 shows evidence of these things in peer-reviewed
21 journals, and then we show those on the site and we
22 discuss them and we talk about them.
23      And after that we make an opinion that says
24 that the totality of these wetlands or a wetland all by
25 itself, if it shows such a significant effect to a TNW,



MICHAEL M. WYLIE, M.S.
USA vs BENJAMIN K. SHARFI

April 04, 2022
157–160

Page 157

1  then we make that opinion and then we write the report
2  up and discuss it.
3      Q.  So you can't give me any objective standard
4  just that generally applies for the determining whether
5  the effects of a wetland on a downstream traditionally
6  navigable water is significant or not; is that fair to
7  say?
8      MR. ADKINS:  Objection; misstates testimony.
9      THE WITNESS:  Well, I thought I've already
10     discussed all that.
11  BY MR. MCALILEY:
12     Q.  You haven't given the answer, sir.  I just
13  want the answer.  You're answering a lot of other
14  questions I've asked.  So I'm just trying to figure out
15  what's the standard for determining whether an effect is
16  significant or insignificant.
17      So can you tell me an objective standard that
18  identifies the difference between a significant effect
19  and an insignificant effect?
20     MR. ADKINS:  Objection.
21     THE WITNESS:  Objective standards are what
22  wetlands do in times of drought or in the non-rainy
23  season is, wetlands send lateral flow to Bessey
24  Creek.  Therefore, it flows.  If the wetlands
25  weren't there sequestering and storing water, there

Page 158

1  wouldn't be any flow there.
2      So if there's no flow, that's a very
3  significant effect.  If the -- if wetlands didn't
4  sequester storm water septic tank effluent and
5  other critters like cowpies, there's tons of
6  cowpies out there, to sequester those when wetlands
7  are reduced, they change nitrogen to forms that are
8  available for vegetable uptake and also they
9  release nitrogen in the air because wetlands do
10  that instead of releasing it to water bodies.
11      So therefore, the downstream water body would
12  be potentially more polluted without the functions
13  performed by wetlands in removing nitrogen.
14      The same goes for phosphorous.  The same goes
15  for sediment.  We reviewed on the site adjacent to
16  Bessey Creek sediment being trapped behind the
17  berms in wetlands in the depressional areas.  We
18  reviewed water being stored on the site and stored
19  in the depressional areas where it's released to
20  depress flood events, also provide, which I
21  discussed before, water in terms of drought.  So
22  the aquatic flora and fauna of the TNW would
23  therefore be able to live.
24      All these functions that we talk about, when
25  taken as a whole, then perform significant

Page 159

1  affectations on the chemical, physical and
2  biological systems that we're talking about.
3  BY MR. MCALILEY:
4      Q.  Sir, I just want to say, I want to get this
5  deposition done today.  I think you just gave an answer
6  that I don't think answered my question that went on
7  for, I'm going to guess, a few pages of the transcript.
8  I will go as late as we need to do today to get this
9  done, and I would just ask you to focus on the question
10  in giving your answers because you're answering
11  questions I'm not asking.
12      Let me just ask one last question right now.
13      Am I right that you've conducted no
14  quantitative analysis of how the wetlands and
15  significant -- in similarly situated wetlands
16  significantly effect the downstream traditional
17  navigable waters?  Is that fair to say?
18     MR. ADKINS:  Objection.
19     THE WITNESS:  That's correct, besides the
20     acreage of the wetlands in the study area.
21  BY MR. MCALILEY:
22     Q.  Okay.  Thank you.  So if I go back here to
23  your report on page 2, it says that We will show that
24  the wetland -- I'll go to one of the wetlands you're
25  looking at -- have a significant effect on, et cetera,

Page 160

1  et cetera, Bessey Creek, a tidally influenced perennial
2  stream at its distal end, and the TNWs of the St. Lucie
3  River, St. Lucie Inlet and nearshore waters of the
4  Atlantic Ocean.
5      Do you see where I just read at the bottom of
6  the first paragraph?
7      A.  Yes, sir.
8      Q.  So you believe that the site in similarly
9  situated wetlands has a significant effect on
10  maintaining the chemical, physical and biological
11  integrity of the St. Lucie River; is that right?
12      A.  Bessey Creek is a tributary of it and the more
13  functions that Bessey Creek positively functions as with
14  less nutrients, with better water quality, less
15  sediment, then the St. Lucie River receives better
16  input, which helps its eco system.
17      Q.  Sir, my question was simpler.  So it sounds
18  like you've confirmed it, which is you are going to
19  prove that there is a significant effect of the wetlands
20  on the St. Lucie River, right?
21      A.  We proved it on the Bessey Creek, but Bessey
22  Creek is a tributary.  So therefore, it has -- it will
23  provide appropriate water quality, Fish and Wildlife
24  resources and chemical resources to the St. Lucie River.
25      Q.  Okay.  So is Bessey -- is the Bessey Creek the



MICHAEL M. WYLIE, M.S.                                      April 04, 2022
USA vs BENJAMIN K. SHARFI                                   161–164

Page 161

1 traditional navigable waters for purposes of your
2 significant nexus analysis, or is it the tributary to
3 the traditional navigable water?
4     A.  Bessey Creek is the traditional navigable
5 water.
6     Q.  Okay.  So you're going to prove that there --
7 and the traditional navigable water of Bessey Creek, am
8 I right, is the portion of Bessey Creek that is tidally
9 influenced that's downstream of the S.W. Murphy Road
10 Bridge?
11    A.  It's also upstream.  It's not all downstream.
12 So we think there's -- there were certainly tidally
13 influenced waters upstream of the Murphy Road Bridge
14 too.
15    Q.  Okay, sir.  We went over this before lunch.
16 Nowhere in your report have you identified any area
17 upstream of the S.W. Murphey Road Bridge that is tidally
18 influenced, right?
19    A.  I did not identify that area exactly.  That is
20 where we felt most comfortable making that declaration,
21 because there was a fence there.  Everything north of
22 that was private property and couldn't access that.
23    Q.  Okay.  So if I want -- so if the traditional
24 navigable water, at least one of them, is Bessey Creek
25 where it's tidally influenced, right, the tributary that

Page 162

1 leads into the traditional navigable water is the
2 portions of the creek and/or ditch system that are not
3 tidally influenced.  Would you agree with that?
4     A.  Yes, I would.
5     Q.  Okay.  So if I want to figure out what is the
6 tributary to the traditional navigable water, right,
7 which is Bessey Creek, I would want to look at the areas
8 that are upstream, so to speak, of the tidally
9 influenced portions of the creek, right?
10    A.  That's correct.
11    Q.  Okay.  Now, as I look here on page 2, though,
12 I also see you made the statement here, "We will show
13 the wetlands had a significant effect on the TNW of the
14 St. Lucie River, St. Lucie Inlet and nearshore waters of
15 the Atlantic Ocean."
16       Do you see those words of the last line of
17 that paragraph?
18    A.  Yes, sir.
19    Q.  So are you going to show that the wetlands on
20 the site and similarly situated wetlands have a
21 significant effect on the St. Lucie River, yes or no?
22    A.  We can make that -- we can show a discussion
23 of that; yes.
24    Q.  All right.  But that's what you're going to
25 show at the trial, right?  Because that's what your

Page 163

1 report says, correct?
2     A.  We are going to discuss Bessey Creek as a TNW
3 and we can show that St. Lucie River as a TNW
4 maintains -- is being maintained by Bessey Creek
5 upstream and tidally influenced to St. Lucie River as a
6 TNW.  Yes, we can make that discussion; yes.
7     Q.  Okay.  Well, I'm just trying to figure out --
8 I'm not asking what you can do.  I'm asking what you're
9 going to do at the trial.  Because we're doing this
10 deposition so I can get ready for the trial.  So you are
11 going to at trial prove that there is a significant
12 effect from the site and similarly situated wetlands on
13 the St. Lucie River, right?
14    A.  Right.
15    Q.  And you're also going to show a significant
16 effect on those wetlands on the St. Lucie Inlet, right?
17    A.  That's correct.
18    Q.  And you're also going to show that there's a
19 significant effect from the wetlands on the site and
20 similarly situated wetlands on the nearshore waters of
21 the Atlantic Ocean, correct?
22    A.  That's correct.
23    Q.  Okay.  Thank you.  So am I right that in
24 figuring out significant nexus, the proper methodology
25 is you identify the traditional navigable waters that

Page 164

1 are downstream, you identify the wetland and similarly
2 situated wetlands to it and then you look at those
3 collection of wetlands and you ask yourself do those
4 have a significant effect on the identified traditional
5 navigable waters?  Is that the right methodology?
6     A.  That's pretty close, yes.
7     Q.  All right.  Let me move down the document here
8 a little bit.  What I would like to do is go further
9 down the report and back here, on Depo Exhibit 72.  I'm
10 on page 18 and this is a section of the report that you
11 wrote about the overview of the structure of reference
12 systems, how they are used, and selection of reference
13 areas and location.
14       Do you see that?
15    A.  Yes, sir.
16    Q.  Okay.  So let me -- let me just step back for
17 a minute.  How many acres again are in Basin 4 total?
18    A.  A little over 11,000.
19    Q.  11,049 acres?
20    A.  Yes, sir, that's a good -- that's the
21 approximation that we used.
22    Q.  Okay.  Am I right that the Countess Joy
23 property has 300 acres on it?
24    A.  The Countess Joy property that we accessed has
25 approximately 300 acres.  There's also Countess Joy



MICHAEL M. WYLIE, M.S.
USA vs BENJAMIN K. SHARFI

April 04, 2022
165–168

Page 165

1  property that's north of the east/south or Bessey Creek.
2  So we only utilized the areas that we showed on some of
3  the figures with the boxes around them.
4      Q.  Okay.  The Countess Joy West property is
5  hydrologically separated from the Countess Joy East
6  property by 84th Avenue, with the exception of the
7  east/west ditch itself, right?
8      A.  No, sir.  There's a culvert just north of the
9  entrance to the, I guess the north side of the Sharfi
10  site and I forgot the name of the little road.  There's
11  a little dirt road right there where water goes
12  underneath 84, from the west side of 84th Avenue back to
13  the east side of 84th Avenue, then joins the ditch there
14  and flows south to Bessey Creek and meets the flow path
15  from the site.
16      Q.  Okay.  So if I want to get into the details of
17  the hydrology, I should look to Dr. Nutter, right?
18      A.  That's correct.  You asked me that it wasn't
19  connected.
20      Q.  I'm just trying to shortcut at this point.  So
21  okay.  So the Countess Joy East property has
22  approximately 300 acres on it, right?
23      A.  On the eastern/western portions that we used
24  for our analysis, for our reference areas, yes.
25      Q.  Okay.  And there's 11,049 acres in all of

Page 166

1  Basin 4, right?
2      A.  Yes.
3      Q.  So you would agree with me that 300 acres,
4  approximately 2.7 percent of the total acreage of
5  Basin 4?
6      A.  I think so.  1 percent would be 110 acres.  So
7  but yes, sir, that's pretty close.
8      Q.  Okay.  On page 18 of your report, there's a
9  sentence here, "Water flow, both surface and subsurface,
10  from the site has an approximately 1600 feet flow path
11  through the Countess Joy East property to Bessey Creek."
12      Do you see those words?
13      A.  Yes, sir.
14      Q.  Is that a true and correct statement?
15      A.  Yes, give or take a hundred feet or so.  It's
16  fairly close.
17      Q.  Okay.  And you're relying on the opinions of
18  Dr. Nutter regarding the hydrological connections
19  between the site and the east/west ditch, right?
20      A.  Yes, I am.
21      Q.  Okay.  So am I correct that you have no data
22  that quantifies the amount of water that flows on the
23  surface from the site to the east/west ditch each year?
24      MR. ADKINS:  Objection; vague.
25      THE WITNESS:  I do not have any quantifiable

Page 167

1  data.  I would refer that to Dr. Nutter to respond
2  to that question.  That was not my goal on this --
3  the site visits.
4  BY MR. MCALILEY:
5      Q.  Okay.  And am I right that you don't know how
6  much water has flowed from wetlands on the site to
7  east/west ditch at the surface in any particular year?
8      A.  That's correct.
9      Q.  And you have no data that quantifies the
10  amount of water that flows subsurface from the site to
11  the east/west ditch each year, right?
12      A.  That's correct.
13      Q.  So you don't know how much water flows
14  subsurface from the site to the east/west ditch each
15  year, right?
16      MR. ADKINS:  Objection.
17      THE WITNESS:  No, I know it does, but I
18  don't -- no, I don't have a quantifiable amount.
19  BY MR. MCALILEY:
20      Q.  You never conducted a trace or dye study of
21  water from the Sharfi site, did you?
22      A.  No, sir.  I just observed the north/south
23  ditch intersecting with the east/west, as you call it
24  the east/west ditch, or Bessey Creek as we call it, and
25  water flowing from the north/south ditch to intersect

Page 168

1  with Bessey Creek in August and September.
2      Q.  Okay.  You don't know the rate at which water
3  flows subsurface from the site to the east/west ditch,
4  do you?
5      A.  No, sir, I don't.
6      Q.  You have no data indicating whether water
7  flows from the site to the east/west ditch have changed
8  since the defendants engaged in their activities, do
9  you?
10      MR. ADKINS:  Objection; vague.
11      THE WITNESS:  No, I have no quantifiable data.
12  I can -- I can discuss that the functions of that
13  site have been disrupted.  The site's been cleared.
14  BY MR. MCALILEY:
15      Q.  Sir, my question was whether you have data.  I
16  know you have a lot of thoughts.  I'm just -- I'm trying
17  to narrow in on things so we can get through this.
18      So just to confirm, you have no data
19  indicating whether water flows from the site to the
20  east/west ditch have changed since the defendants
21  engaged in activities, right?
22      MR. ADKINS:  Same objection.
23      THE WITNESS:  I would rely on Dr. Nutter for
24  that data.
25



MICHAEL M. WYLIE, M.S.
USA vs BENJAMIN K. SHARFI

April 04, 2022
169–172

Page 169

1   BY MR. MCALILEY:
2       Q.  You have no data, though, Mr. Wylie, do you?
3       A.  No, I have no data.
4       Q.  Thank you.  You have no data about the amount
5   of water that has flowed at the surface from the
6   Countess Joy property to the east/west ditch each year,
7   do you?
8           MR. ADKINS:  Objection; vague.
9           THE WITNESS:  No, I do not.
10  BY MR. MCALILEY:
11      Q.  And you don't have data about the amount of
12  subsurface flow from the Countess Joy property to the
13  east/west ditch that occurs each year, right?
14          MR. ADKINS:  Objection.
15          THE WITNESS:  That's correct.
16  BY MR. MCALILEY:
17      Q.  It's your opinion, based on the report,
18  Mr. Wylie, that water from the site flows at the surface
19  along the length of the north/south ditch until it
20  reaches the east/west ditch that you call Bessey Creek,
21  right?
22      A.  At certain times of the year it flows
23  continuously.
24      Q.  Okay.  But it's your testimony that water
25  flows directly up the north/south ditch from the site to

Page 170

1   the east/west ditch, correct?
2       A.  Correct.
3       Q.  Okay.  And would you rely upon Dr. Nutter's
4   opinions on where specifically the flow path is between
5   the site and the east/west ditch?
6           MR. ADKINS:  Objection; vague.
7           THE WITNESS:  Yes, I would.
8   BY MR. MCALILEY:
9       Q.  Okay.  I want to show you a -- let's go to the
10  exhibits -- go to the figures here.  Okay, sir, I'm back
11  to Deposition Exhibit 73.  I'm at figure V.D.1.a.4.  Can
12  you see that on the screen, sir?
13      A.  Yes, sir, I can.
14      Q.  And this is Dr. Nutter's figure that shows
15  where he sees the principal flow path from the site to
16  the east/west ditch, right?
17          MR. ADKINS:  Objection; misstates testimony.
18          THE WITNESS:  It's one flow path; yes, sir.
19  BY MR. MCALILEY:
20      Q.  Well, did you prepare this figure?
21      A.  No, I did not.
22      Q.  Did Dr. Nutter prepare this figure?
23      A.  I believe Dr. Nutter prepared this figure.
24      Q.  And Dr. Nutter is the Ph.D. hydrologist on the
25  DOJ expert team, right?

Page 171

1       A.  Correct.
2       Q.  And you're relying upon the hydrological
3   opinions of Dr. Nutter in forming your opinions, right?
4       A.  Yes, I am.
5       Q.  Okay.  Dr. Nutter does not identify as the
6   principal flow path the north/south ditch going all the
7   way from the site straight up to the east/west ditch,
8   does he?
9       A.  Well, it appears to me if you follow the blue
10  lines and the arrows, that that's the flow of water and
11  the water is flowing across Countess Joy East to the
12  ditch on the east side of 84th Avenue which intersects
13  with Bessey Creek.  That's what it appears to me.  It
14  feels like it appears to me to be a really readily
15  understood flow path.
16          Also, the triangles at six and four, at those
17  points we established wetlands that had -- that abutted
18  Bessey Creek.  So the water spilled -- the wetlands were
19  abutting at those two locations too.  And we also -- we
20  saw water at the -- at No. 6 and above that flowing over
21  a small berm into it.  We saw water flowing at four from
22  the wetlands into a small area into Bessey Creek.
23          So we observed basically the main flow path
24  which Dr. Nutter has and then there's two other
25  ancillary flow paths at six and four.

Page 172

1       Q.  Okay.  But you did not observe a flow path
2   when you went out there straight up the north/south
3   ditch, straight to the east/west ditch, did you?
4       A.  Yes, I did.  In August I walked that ditch and
5   I also had pictures as an exhibit, if you'd like to look
6   at it, that shows the intersection or the confluence of
7   north/south ditch flowing into and from the site, which
8   I documented into Bessey Creek.
9       Q.  So why doesn't Dr. Nutter show that flow path
10  on this figure?
11          MR. ADKINS:  Objection; foundation.
12          THE WITNESS:  I can't respond or don't know
13      that.  Probably because this was a continuous flow
14      path and the north/south ditch, we did not see a
15      continuous flow during the month of October.  I saw
16      mud in the ditch about where Dr. Nutter's jog to
17      the left is.  So it wasn't a continuous flow path
18      through the north/south ditch to Bessey Creek
19      during October, but it was -- I saw flow in the
20      ditch in August when I was there and also in
21      September when I was there.
22  BY MR. MCALILEY:
23      Q.  By the way, I asked you a little while ago
24  whether you have any quantitative analysis of
25  significant nexus and the answer was No.  I just want to



MICHAEL M. WYLIE, M.S.
USA vs BENJAMIN K. SHARFI

April 04, 2022
173–176

Page 173

1  ask you the follow-up.
2      You don't think you need quantifiable
3  information with regard to the effects of the site and
4  similarly situated wetlands in order to determine that
5  there's a significant nexus with downstream waters.  Do
6  I have that right?
7      A.  Yes, that's correct.
8      Q.  Okay.  All right.  Let's go back to the
9  figures here.  Let me show the prior figure here,
10  Figure V.D.1.a.3.
11      Have you seen this figure before?
12      A.  Yes, sir, I have.
13      Q.  And I want to point out the caption.  Do you
14  see in the caption of this figure?  It says, quote, All
15  discharge locations are currently evident or verified
16  during the expert team field visits, end quote.
17      Do you see where I read that?
18      A.  Yes, sir.
19      Q.  Did I read that right?
20      A.  Yes, sir.
21      Q.  Is that a true and correct statement?
22      A.  Yes, sir.
23      Q.  Am I right that ovals 3 and 4 identify the
24  connections between the site and what you all are
25  calling Bessey Creek and I'm calling the east/west

Page 174

1  ditch?
2      A.  That's correct.
3      Q.  Am I correct that there is no oval at the
4  intersection between the north/south ditch and the
5  east/west ditch on this figure?
6      A.  That's correct.
7      Q.  Thank you.  Okay.  Let's go back to the
8  report.
9      A.  Can I interrupt for just a second?  I'm
10  wondering if I could get someone to get me some water.
11      MR. MCALILEY:  Well, you want to take a
12  five-minute break?  That's fine.  You want to take
13  a five-minute break?  I could use a coffee break
14  too.
15      THE WITNESS:  Okay.  How about a five-minute
16  break?
17      MR. MCALILEY:  Any time you want a break,
18  that's fine.
19      THE WITNESS:  Thank you.
20      THE VIDEOGRAPHER:  We're going off the record.
21  The time is approximately 2:03 p.m.
22      (A break was had.)
23      THE VIDEOGRAPHER:  We are back on the record.
24  The time is approximately 2:08 p.m.  Thank you.
25

Page 175

1  BY MR. MCALILEY:
2      Q.  Okay.  All right.  So Mr. Wylie, let's go back
3  to the report.  I want to go to page 27 of the report.
4  I'm going to put it up on the screen.  This is shown as,
5  I think there is Section, I think it's 4.C.1 -- maybe
6  it's 5.C.1 on page 27.
7      Do you see that on the screen?
8      A.  Yes, sir, I do.
9      Q.  Is this a section that you wrote?
10      A.  Yes, sir, it is.
11      Q.  And so, let me just go through some of the
12  statements here.  In Paragraph 2, you see in the second
13  sentence it says, "To accomplish this phase of work, we
14  considered and relied upon the following standard
15  definitions, manuals, guidance and mapping products
16  related to the Clean Water Act and U.S. EPA and Army
17  Corps Regulations, end quote.
18      Did I read that right?
19      A.  Yes, sir.
20      Q.  Okay.  So is it a true and correct statement
21  that you considered and relied upon the materials listed
22  in this section, in the numbered paragraphs?
23      A.  Yes, sir.
24      Q.  You would agree with me that to determine
25  whether the site wetlands are part of the waters of the

Page 176

1  United States, you have to follow the standard
2  definitions, manuals, guidance and mapping products?
3      A.  Yes, sir.
4      Q.  So let's just go through them.
5      So No. 1, "Memorandum for the Record, June 8,
6  2021, Review of U.S. Army Corps of Engineers ORM2 Permit
7  and Jurisdictional Determination Data to Assess Effects
8  of the Navigable Waters Protection Rule," can you tell
9  me what that documents is?
10      A.  Yes, sir.  It was a memo from the Corps that
11  talked about of the issues involved with calling
12  wetlands under the Navigable Protection Water Rule.
13  From my recollection of it, it -- the Corps reported
14  that jurisdiction went down, the number of waters and
15  wetlands went down, and that that was -- that was the
16  import of the memo, was that there was a -- you know, a
17  different way to call jurisdictional waters.
18      Q.  Okay.  Would you agree with me that there are
19  fewer wetlands that were part of the waters of the
20  United States under the Navigable Waters Protection Rule
21  as compared to the regulations that were enacted in the
22  1980s?
23      A.  Using this memo and my understanding of the
24  NAV rule, I would say that's a fair statement.
25      Q.  Okay.  Let's go to No. 2 on this list,



MICHAEL M. WYLIE, M.S.
USA vs BENJAMIN K. SHARFI

April 04, 2022
177–180

Page 177

1   "June 9th, 2021, Memo:  EPA Army Announce Intent to
2   Revise Definition of WOTUS."
3        Can you tell me what this is?
4        A.  Yes, sir.  That was -- that followed up on the
5   memorandum on one of the reasons why they're going to
6   revise WOTUS, because they felt like the Navigable
7   Protection Water Rule took a lot of wetlands or took a
8   lot of waters out of jurisdiction from before and they
9   also announced that they were going to write a new rule.
10       Q.  Okay.  No. 3, "Definitions of waters of United
11  States provided at 33 C.F.R. Part 328, 1987 and 2020,"
12  what is this?
13       A.  Yes, sir.  That is the definition of waters in
14  '87 and up through the Navigable Protection Water Rule,
15  which was in 2020.  So the regulation changed between
16  those two times.  So I reviewed -- and other parts of
17  the team reviewed both those definitions.
18       Q.  Okay.  So if I wanted to understand the scope
19  of the waters of the United States, I should look at the
20  1987 and the 2020 regulations at 33 C.F.R. Part 328,
21  right?
22       MR. ADKINS:  Objection; misstates testimony.
23       THE WITNESS:  Well, the 2020 regulation is
24  invalid now.  So you can certainly look at it, but
25  it was a part and parcel of the Navigable

Page 178

1   Protection Waters Rule, which is -- the EPA and the
2   Corps no longer follow.
3   BY MR. MCALILEY:
4        Q.  You said in your report this is one of the
5   documents that you considered and relied upon, right?
6        A.  Yes, sir.
7        Q.  And you also give an opinion in your report as
8   to whether the wetlands on the site are part of the
9   waters of the United States under the Navigable Water
10  Protection Rule, right?
11       A.  I did, yes, sir.
12       Q.  But you, in fact, did rely upon the 2020
13  regulations in part rendering your opinions in this
14  case, correct?
15       A.  Yes, sir, to voice my opinion on that the
16  Sharfi site would have been jurisdictional under any law
17  or regulation.
18       Q.  Let's go to No. 4., "Clean Water Act
19  Jurisdiction Following the U.S. Supreme Court's Decision
20  in Rapanos vs. United States and Carabell vs. United
21  States," and then it has a website.
22       Can you tell me what this is?
23       A.  Yes, sir.  It was a memorandum that basically
24  the Rapanos guidance put out by a joint memorandum by
25  the Corps and EPA that guided field staff and attorneys

Page 179

1   in what was a water of the United States after this
2   court decision and also discussed the methodologies and
3   what a traditional navigable water was.
4        Q.  Okay.  So am I right this guidance establishes
5   the methodology for determining whether there is a
6   significant nexus?
7        A.  It was guidance and some courts treat guidance
8   differently.  But certainly, it was what we employed in
9   doing our day-to-day jobs when I was working at the
10  agency and the Corps, and the Corps did the same thing.
11       Q.  Okay.  So you're saying this is not a
12  regulation, it's a guidance, right?
13       A.  That's exactly correct; yes.
14       Q.  However, that guidance contains the two
15  agencies' best interpretation of how to apply the 1987
16  definition of the waters of the United States in light
17  of the Rapanos decision, right?
18       MR. ADKINS:  Objection.
19       THE WITNESS:  Yes, sir, I think that's a fair
20  statement.
21  BY MR. MCALILEY:
22       Q.  And you -- and this -- and that -- when did
23  that guidance come out?
24       A.  Two thousand -- it first came out in 2007 and
25  it was revised in 2008.

Page 180

1        Q.  Okay.  So if I just take the 2008 guidance,
2   you applied that in your work for 12 years when you were
3   at EPA, right?
4        A.  I used that guidance and applicable case law,
5   depending upon which circuit I was in.  Eleventh Circuit
6   has a different standard than the Fifth Circuit and the
7   Fourth Circuit, which I worked in.  So the Eleventh
8   Circuit we have to depend more on the Kennedy test
9   versus the Scalia test, or either test in other
10  circuits.
11       Q.  Okay.  Mr. Wylie, that 2008 Rapanos guidance
12  provides a methodology for determining whether a wetland
13  has a significant nexus to a downstream traditional
14  navigable water, right?
15       A.  It provided guidance on how we do our job in
16  claiming waters of the United States; right.
17       Q.  And that guidance has a methodology for
18  applying the significant nexus test, which Justice
19  Kennedy did in the Rapanos case, right?
20       A.  That's correct.
21       Q.  And you applied that guidance for at least 12
22  years when you worked at EPA, right?
23       A.  Yes, I did.
24       Q.  And you believe that that guidance is the best
25  way to apply the Rapanos case in the light of -- in the



MICHAEL M. WYLIE, M.S.
USA vs BENJAMIN K. SHARFI

April 04, 2022
181–184

Page 181

1  context of the 1987 regulations, defining waters of the
2  U.S., correct?
3      A.   If -- if the situation calls for a significant
4  nexus, it's the best pathways.  There's other ways of
5  defining waters of the United States that you do not
6  have to use Rapanos guidance because the '87 regs define
7  those without the need for a significant nexus.  But
8  yes, if I -- if I had to use a significant nexus to make
9  a waters of the United States call, I would follow this
10  guidance.
11      Q.   All right.  So this guidance establishes the
12  proper way to establish significant nexus -- I'm just
13  focusing on the significant nexus piece -- under Justice
14  Kennedy's opinion in Rapanos, right?
15      A.   Correct.
16      Q.   When you testified as a prosecution witness in
17  the United States vs. Straub, am I right that you
18  followed the 2008 Rapanos guidance in forming your
19  opinions that the wetlands in that case were waters of
20  the U.S.?
21      A.   Yes, I did.
22      Q.   By the way, did the jury acquit the defendant?
23      A.   Yes, they did.
24      Q.   The jury found it was not waters of the U.S.,
25  right?

Page 182

1          MR. ADKINS:  Objection; foundation.
2          THE WITNESS:  I don't know if the jury found
3      that.  They just didn't convict Mr. Straub.  I
4      think there was more than one count.  I'm sorry.
5      I'm sorry.  I don't remember everything.  That was
6      in 2010.
7  BY MR. MCALILEY:
8      Q.   Fair enough.  I don't remember everything
9  either.
10          So, okay.  So, and you would agree with me, by
11  the way, that Florida is in the boundaries of the
12  Eleventh Federal Judicial Circuit, right?
13      A.   Yes, sir, I would.
14      Q.   And so in the Eleventh Circuit, the test is
15  the significant nexus test for determining whether an
16  adjacent wetland is part of the waters of the United
17  States, correct?
18      A.   Yes, sir.
19      Q.   Okay.  So all right.  Let's look at this list
20  a little more.  No. 5, this is on page 27 of the report,
21  "Environmental Laboratory 1987, Corps of Engineers
22  Wetland Delineation Manual," is this the Wetland
23  Delineation Manual that we talked about earlier?
24      A.   Yes, sir, it is.
25      Q.   Okay.  So this is the manual that you and

Page 183

1  Dr. Lee followed in delineating -- determining whether
2  or not wetlands were present at the site in delineating
3  the boundaries?
4      A.   We used those, we used this manual until the
5  supplement replaced the parts that the coastal plains --
6  Atlantic and coastal plains supplement replaces certain
7  parts of the Wetland Delineation Manual and supplements
8  other parts, and then we used those two documents where
9  they applied.
10      Q.   Okay.  As I look down this list of other
11  materials you looked at, am I right that to go down this
12  list, these are all sort of more technical publications
13  that relate to some specific aspect of a wetland
14  characteristic:  Hydric soils, maps, you know, legals,
15  things of that nature?
16      A.   They're technical discussions on what is a
17  hydric soil.  It may revise it.  It may give different
18  indicators, yes, that's -- they're technical indicators.
19      Q.   Okay.  Do any of these other documents on the
20  list on pages 27 and 28 and 29 of the -- of your report
21  address the issue about whether -- address the issue of
22  how you determine whether a wetland has a significant
23  nexus to a downstream traditional navigable water
24  specifically?
25      A.   No, sir, only the Rapanos guidance.

Page 184

1      Q.   Okay.  Thank you.  So let me get another
2  document for a minute.
3      A.   It's warming up in here, isn't it?
4  Mr. McAliley, we may adjust the thermostat a little bit?
5      Q.   Sure.
6      A.   I'm sorry, I haven't worn a tie and a coat in
7  a while.
8      Q.   I was joking about this with one of my
9  relatives last night or yesterday.  It's how times have
10  changed, huh?
11      A.   Yes, sir.
12      Q.   All right.  All right.  Are you ready for me
13  to keep going?
14      A.   Yes, sir.
15      Q.   All right.  Let's go back to the report here.
16  So now I'm on page 30.  This is section entitled,
17  "Characterization/Delineation of the Geographic Extent
18  of Waters/Wetlands on the Site Prior to Disturbance."
19          Do you see that?
20      A.   Yes, sir, I do.
21      Q.   Is this the section that you cowrote with
22  Dr. Lee?
23      A.   Yes, sir.  Yes, sir, it is.
24      Q.   Okay.  So at the bottom of this first page, I
25  want to focus on this.  Do you see where it says -- I'll



Page 185

1  read this -- the last full paragraph.  Quote, After this
2  review, the DOJ expert team conducted on-site
3  investigations of the site's wetland status in September
4  and October of 2021.  If we found wetlands on the site,
5  our primary objective was to assess whether the wetlands
6  were WOTUS.  The DOJ expert team had two options to
7  assess the status of wetlands on the site.
8       A:  Determine if wetlands on the site were
9  adjacent to a tributary of a TNW, and you site to the
10  pre-2015 EPA regulations, or B:  Determine if the
11  wetlands on the site either taken alone or in
12  combination with other similarly situated wetlands
13  (similarly situated wetlands refer to all wetlands
14  adjacent to the same tributary, in this instance, Bessey
15  Creek) in the study area have a substantial effect
16  maintaining the chemical, physical or biological
17  integrity of a TNW.
18       So let me center that.
19       Did I read that right, sir?
20  A.  Yes, sir.
21  Q.  Okay.  So let me just -- as I see the two
22  options to determine the status of the wetlands on the
23  site, am I correct that "b" is the significant nexus
24  test?
25  A.  Yes, sir.

Page 186

1  Q.  Okay.  That is the test that is applicable in
2  Florida, right?
3  A.  In the Eleventh Circuit, yes, sir.
4  Q.  All right.  So Option A is you simply -- a
5  wetland is jurisdictional if it's simply adjacent to a
6  TNW without reference to whether there's a significant
7  nexus, right?
8  A.  Yes, sir, that's correct; yes.
9  Q.  Option A doesn't apply in the state of
10  Florida, right?
11       MR. ADKINS:  Same objection.
12       THE WITNESS:  There's always a determination
13  that you make that we say that these are
14  jurisdictional according to these regulations and
15  whatnot.  I think one has to discuss that and also
16  put in -- or also discuss a significant nexus.
17       So I always, even if I'm in a circuit -- and
18  it's usually the Eleventh -- that we talk that if a
19  wetland is adjacent or abutting a tributary TNW or
20  abuts a TNW, then it is jurisdictional.  We always
21  make that argument.  So I think that's why I put
22  that in, or Dr. Lee and I put that in.
23  BY MR. MCALILEY:
24  Q.  Okay.  But you would agree with me that it's
25  not enough in this case for the wetlands on the site to

Page 187

1  be adjacent to a tributary to a downstream traditional
2  navigable water?  In order for the wetlands on site to
3  be part of the waters of the United States, there needs
4  to be a significant nexus; is that fair to say?
5       MR. ADKINS:  Objection.
6       THE WITNESS:  That's correct.
7  BY MR. MCALILEY:
8  Q.  Okay.  All right.  So I want to -- I'd like
9  to -- so I want to look in the Subparagraph B on
10  page 30, where you have a parenthesis.  It says,
11  "Similarly situated wetlands refer to all wetlands
12  adjacent to the same tributary, in this instance, Bessey
13  Creek."
14       Did I read that correctly?
15  A.  Yes, sir.
16  Q.  So you -- am I right that the rationale that
17  you had for picking the similarly situated wetlands that
18  are identified in your report is because you believe
19  they're adjacent to Bessey Creek, right?
20  A.  Yes, sir.
21  Q.  And when you're saying Bessey Creek here,
22  you're referring to the entire length of what you're
23  calling Bessey Creek, the tidal area at the eastern end
24  all the way up to ditch network to the western end,
25  right?

Page 188

1  A.  In my study area, yes, sir.
2  Q.  Right.  So -- okay.  So that's the basis by
3  which you have identified the similarly situated
4  wetlands that you've quantified at 1,064 acres, right?
5  A.  That's correct.
6  Q.  And you agree with me that some of those
7  wetlands are not actually adjacent to Bessey Creek
8  because some I pointed out before lunch are actually
9  abutting the St. Lucie River, right?
10  A.  That's correct.
11  Q.  So I want to -- let me -- let me go out of --
12  let me go to the figures here again.  I just put up on
13  the screen Deposition Exhibit 73, Figure V.D.1.a.5.  Can
14  you see it on the screen?
15  A.  Yes, sir, I can.
16  Q.  So this figure is entitled "Perennial Flow
17  From the Site Wetlands to the Atlantic Ocean."
18       Is that -- so does this figure show perennial
19  flow from the site wetlands to the Atlantic Ocean?
20  A.  What the figure shows is perennial flow in
21  Bessey Creek to the ocean.
22  Q.  Okay.  But the blue line shows the pathway of
23  flow, right?
24  A.  Yes.
25  Q.  The blue line goes all the way to the site.



MICHAEL M. WYLIE, M.S.
USA vs BENJAMIN K. SHARFI

April 04, 2022
189–192

Page 189

1 It leaves the east/west ditch and then it goes to the
2 site, right?
3    A. Oh, okay. I'm sorry. It was so small because
4 of that. Yes, mm-hmm.
5    Q. I wish I could figure out how to shrink the
6 top. So sorry about this. Do you want me to try to --
7 hold on. Let me exit out of this and I'll zoom in. I
8 apologize.
9    A. Yeah, I misunderstood. It was so small, I
10 missed the site.
11    Q. Don't worry about it. Okay. So I just put it
12 up again. I've zoomed in more. Can you see it better?
13    A. Yes.
14    Q. Okay. So you would agree with me that the
15 blue line represents the pathway by which you know
16 there is flow from the site out to the Atlantic Ocean,
17 right?
18    A. Yes, sir, we do. Yes, and I do too.
19    Q. Would you agree with me "perennial" means year
20 round?
21    A. Well, perennial can be year round and it can
22 be 90 percent of the time. There's also times of
23 droughts. But perennial means it's flowing almost all
24 the time.
25    Q. Okay. So you think that water's flowing from

Page 190

1 the site almost all the time through down the ditch
2 network to Bessey Creek and then out to the Atlantic
3 Ocean, right?
4    A. What we think is there's a flow path of either
5 surficial or shallow subsurface from the site through
6 this designated flow path to 84th Avenue and then down
7 the eastern side of 84th Avenue to Bessey Creek through
8 the improved area all the way through to the Atlantic
9 Ocean; yes, we do.
10    Q. By the way, when I look at this flow path near
11 the site, that seems clear that this flow path is
12 following that pathway that Dr. Nutter identified where
13 the water would go from the site up the north/south
14 ditch and then cut over to the west across the pasture
15 land to the 84th Avenue ditch.
16    Is that the right way to interpret the lines
17 right near the site?
18    A. Yes, sir.
19    Q. So you think that the subsurface flow path
20 nearest the subsurface flow path, right? When there's a
21 subsurface flow, it's following the same path from the
22 site over to the 84th Avenue ditch, which then connects
23 to the east/west ditch, right?
24    A. That's one path and I think it also -- there's
25 directional flow that goes where we saw A.5 and A -- I

Page 191

1 think it was A.7. We observed subsurface and surface
2 flow at those two wetland locations.
3    So it's a -- the groundwater is -- well, I'm
4 not going to get into -- I won't get -- I'm sorry, I
5 won't get into Dr. Nutter's analysis, but I concur that
6 this is one way. And I think that there's also shallow
7 subsurface and surface flow observed at two other
8 locations abutting Bessey Creek.
9    Q. When you -- when the monitoring wells are put
10 in by the DOJ expert team, you simply measure the
11 elevation of the water in the monitoring well, right?
12    MR. ADKINS: Objection; foundation.
13    THE WITNESS: I believe that's right, but once
14 again, I would defer to Dr. Nutter.
15 BY MR. MCALILEY:
16    Q. As far as you know, there were no groundwater
17 flow meters installed in the monitoring wells, were
18 there?
19    MR. ADKINS: Objection.
20    THE WITNESS: No, sir, I don't -- I don't
21 remember a discussion about that at all.
22 BY MR. MCALILEY:
23    Q. And nobody ever went out and calculated a
24 hydraulic gradient for the groundwater in the vicinity
25 of the site and the Countess Joy East property, right?

Page 192

1    A. If I could clarify, was groundwater gradient
2 measured?
3    Q. Yeah, or calculated. So nobody went out to
4 calculate what the groundwater gradient is in the
5 vicinity of the site, right?
6    A. I'm sorry, the best way I could answer it is I
7 know they did elevational, surface elevations and they
8 may have married up some of the groundwater elevations
9 with the surface elevations. There was a fall, a very
10 narrow fall down towards Bessey Creek, but that's the
11 best way I could answer it. I'm not -- the answer is
12 no, I don't know of any.
13    Q. Okay. How much water from the site makes it
14 to the Atlantic Ocean each year?
15    A. I'm not -- I don't -- I don't know an answer
16 to that.
17    Q. Okay. How much water from the site makes it
18 to the St. Lucie Inlet each year?
19    A. I don't know an answer to that.
20    Q. How much water from the site makes it to the
21 North Fork of the St. Lucie River each year?
22    A. I don't know the answer to that.
23    Q. Okay. Let me exit out of this document.
24    Let's go back to the report. So I'm on the
25 report. I'm on page 30 and again, I'm going back to



MICHAEL M. WYLIE, M.S.
USA vs BENJAMIN K. SHARFI

April 04, 2022
193–196

Page 193

1 this phrase here where it says at the bottom,
2 Subparagraph B, "Similarly situated wetlands refer to
3 all wetlands adjacent to the same tributary, in this
4 instance, Bessey Creek."
5     Okay.  Do you see where I just read that?
6   A.  Yes, sir.
7   Q.  So Bessey Creek is the tributary to the
8 traditional navigable waters, right?
9   A.  It's the main tributary to the -- to Bessey
10 Creek TNW; yes.
11   Q.  Okay.  So when you're referring to Bessey
12 Creek in this sentence, are you referring to the tidal
13 areas of Bessey Creek, or are you referring to the
14 upstream areas of Bessey Creek that are not tidally
15 influenced?
16   A.  Yeah, that's where our definitions kind of
17 cross.  When -- when we say Bessey Creek here, I'm not
18 talking about the tidal -- the TNW part of it.  It's all
19 the wetlands that are too tributary -- let me strike
20 that.
21     It's all the wetlands that are adjacent to
22 Bessey Creek as a tributary and Bessey Creek as a TNW.
23 That's the similarly situated wetlands.
24   Q.  Okay.  So hold on.  I'm not following.  I'm
25 just trying to understand what we're talking about when

Page 194

1 we say Bessey Creek here.  So when you're saying Bessey
2 Creek on page 30, in this context you mean the tributary
3 of Bessey Creek you're referring to is both the tidally
4 influenced portion of Bessey Creek and the upstream
5 portions that are in the ditch network; is that right?
6   A.  Yes, sir.
7   Q.  Okay.  So in this case, so the tributary -- so
8 the TNWs in this meaning, it includes the tidally
9 influenced portion of Bessey Creek, right?
10   A.  Yes, sir.
11   Q.  So is Bessey Creek both a tributary and a
12 traditional navigable waters for purposes of your
13 analysis?
14   A.  Yes, sir.
15   Q.  How can it be both?
16   A.  Because one -- because one of them fits the
17 definition of what a traditional navigable waters is.
18 It's influenced by the ebb and flow of the tide.  Above
19 that where it's not influenced by the ebb and flow of
20 the tide, it wouldn't be considered a TNW.
21   Q.  Okay.  I understand the part where the ditch
22 is upstream of the tidally influenced portions of the
23 creek can be a tributary.  I understand that.  What I'm
24 trying to follow is why you believe that the tidally
25 influenced portions of Bessey Creek, which you said a

Page 195

1 minute ago, I thought, was a traditional navigable
2 water, how that could be both a traditional navigable
3 water and a tributary to the traditional navigable
4 water?
5   A.  Well, TNW Bessey Creek still has adjacent
6 wetlands.  They still form -- they are part of the study
7 order.  They're still part of my total of wetlands.
8 They don't quit functions just because they're adjacent
9 to a TNW.  But the -- what we -- what we have to prove
10 and what I think I've proved in this document, and also
11 the expert team is, is the functions of wetlands over a
12 thousand acres -- or hundreds of acres of them in the
13 study area perform specific functions that immeasurably
14 affect the integrity of Bessey Creek chemically,
15 physically and biologically.
16     So if you have to subtract wetlands from
17 Bessey Creek where it's -- in the analysis that you
18 would choose, there's very few of them.  There's not
19 that many.  There's not the hundreds of acres, or
20 they're upstream of this.  So -- but since we're using a
21 study area and we're using Bessey Creek as a TNW, we
22 included all the wetlands because it was very difficult
23 to say where Bessey Creek became tidally influenced
24 exactly because we could not access that part of Bessey
25 Creek because of private property.

Page 196

1   Q.  Sir, your estimation of the similarly situated
2 wetlands includes wetlands that are not adjacent to the
3 ditch network that actually flow into the tidal portions
4 of Bessey Creek, right?
5   A.  There's wetlands that are adjacent to ditches
6 like the north/south ditch that flow into Bessey Creek.
7 There are wetlands that if we look on the figure again,
8 you can see where wetlands are in the study area where
9 they're listed.  They're part of a watershed.  And when
10 this watershed generates flow, it all goes towards
11 Bessey Creek.  It doesn't go away from it, except, I
12 guess, in the one area that was mischaracterized in the
13 St. Lucie Estuary.  But everything else flows to there
14 eventually:  Overland flow, surface flow, tributary.
15     So that's why we considered these areas
16 similarly situated because they're on similar soils,
17 they had similar structure and function.  And we noted
18 them on aerials and NWI and hydric soil maps.
19   Q.  Okay.  Mr. Wylie, I'm going to move down in
20 the report here to page 35.  I'm still in Deposition
21 Exhibit 72.  Am I right that this Section C.1, "DOJ
22 Expert Team Peer Review of Previous Delineations,"
23 that's a section that you wrote?
24   A.  Yes, sir.
25   Q.  So you're going to testify about the



MICHAEL M. WYLIE, M.S.
USA vs BENJAMIN K. SHARFI

April 04, 2022
197—200

Page 197

1  delineation of wetlands on the site, right?
2      A.  I'm going to testify about the Small report
3  and the EDC report and their findings; yes, sir.
4      Q.  Okay.  So let's talk about that.  So Danna
5  Small delineated wetlands on the site in March and April
6  of 2018; isn't that right?
7      A.  Yes, sir, that's correct.
8      Q.  That was before most of the work was done on
9  the site, correct?
10      A.  That's correct.
11      Q.  And EDC, which is Tobin Overdorf, delineated
12  wetlands sometime prior to 2020; is that right?
13      A.  Yes, sir, that's correct.
14      Q.  You and your team members did not go out to
15  delineate wetlands on the site until August of 2021,
16  right?
17      A.  Yes, sir, that's correct.
18      Q.  Right.  So Ms. Small and Mr. Overdorf saw
19  conditions on the site before most of the activities
20  that occurred, right?
21      A.  That's correct, and they ignored other
22  conditions; yes.
23      Q.  Well, you say that they ignored other
24  conditions.  I'm just curious, have you ever talked with
25  Ms. Small?

Page 198

1      A.  I've read her deposition.
2      Q.  Okay.  So you've never spoken to Ms. Small,
3  right?
4      A.  No, sir, I did not.
5      Q.  She didn't say she ignored anything, did she?
6      A.  I'm sorry, I didn't catch your question.
7      Q.  She didn't say that she ignored anything, did
8  she, in her deposition?
9      A.  Yes, sir.  She said that she didn't look
10  underneath the roads that were incapsulating the site.
11      Q.  Okay.  She didn't use the word
12  "incapsulating," did she?  That's your word.
13      A.  Yes, sir.  It was the roads, the road network
14  that was a rectangle around the site.
15      Q.  Other than the roads, there's nothing she
16  didn't look at, right?
17      A.  She didn't go to the northwest portion.  She
18  said it was too heavy to dig holes through the overall
19  climbing fern.
20      Q.  Okay.  So if I want to know what Ms. Small had
21  to say, the best person is to ask Ms. Small and look at
22  her transcript, right?
23          MR. ADKINS:  Objection.
24          THE WITNESS:  Yes, sir, I guess so.
25

Page 199

1  BY MR. MCALILEY:
2      Q.  Okay.  You weren't even there at the
3  deposition, were you?
4      A.  No, sir, I was not.
5      Q.  Okay.  Wouldn't you agree that Ms. Small was
6  able to see most of the site in its predevelopment
7  condition?
8      A.  Yes, sir.  I would say she saw the site before
9  many of the impacts occurred.
10      Q.  Before most of the impacts occurred, right?
11          MR. ADKINS:  Objection.
12          THE WITNESS:  I think I -- yes, sir, I think
13      that's a good characterization.
14  BY MR. MCALILEY:
15      Q.  Okay.  And when you went to the site, all of
16  the impacts had occurred by then, right?
17      A.  Yes, sir.
18      Q.  Okay.  And you're aware that the South Florida
19  Water Management took personnel to the site to meet with
20  Small in 2018 to verify her wetland delineation line,
21  right?
22      A.  Yes, sir, I'm aware of that.
23      Q.  Okay.  And you're aware that the Water
24  Management District accepted Ms. Small's wetland
25  delineation line, correct?

Page 200

1          MR. ADKINS:  Objection.
2          THE WITNESS:  I'm not aware of that.  I read
3      documentation that it was a preliminary
4      jurisdictional line and then I read additional
5      documentation that there was a violation on the
6      site.  So I don't -- I'm having a hard time
7      fathoming how you can send a letter to Ms. Small
8      and accept something and then the next week send a
9      letter to the landowner that says there is a
10      violation.  I don't understand that.  I don't get
11      the significance of accepting a preliminary
12      jurisdiction when it possibly may be a violation.
13  BY MR. MCALILEY:
14      Q.  Okay.  But the Water Management District did
15  send a letter to Ms. Small accepting her wetland
16  delineation, right?
17      A.  That's correct.
18          MR. ADKINS:  Objection.
19  BY MR. MCALILEY:
20      Q.  Okay.  So am I right that Ms. Small and the
21  Water Management District identified approximately
22  3 acres of wetlands on the site?
23      A.  Yes, sir.  Yes, sir, I think that's correct.
24      Q.  And am I right that you think that there's
25  actually 6 acres of wetlands on the site?



MICHAEL M. WYLIE, M.S.
USA vs BENJAMIN K. SHARFI

April 04, 2022
201–204

1    A.  A little bit less, yes, sir, 5.97.
2    Q.  Okay.  So you think Ms. Small and the Water
3  Management District missed half the wetlands on the
4  site?  Is that your testimony?
5    A.  Yes, sir.
6    Q.  And you have this opinion, even though you
7  only went to the site three-and-a-half years after the
8  work was done and the site was significantly changed,
9  right?
10       MR. ADKINS:  Objection.
11       THE WITNESS:  Yes, sir, that's correct.
12  BY MR. MCALILEY:
13    Q.  Okay.  I'd like to go down in the report here
14  to Section 2, "The DOJ Technical Team Determination of
15  the Aerial Extent of Waters/Wetlands on the Site."  This
16  is the section you wrote as well, right?
17    A.  Yes, sir, I did.
18    Q.  I want to go to page 36.  I want to highlight
19  a phrase here.  I highlighted it just so we could see it
20  a little better.
21       All right.  So in the first full paragraph
22  there's a sentence that says, quote, the DOJ expert team
23  concluded the north/south ditch is a seasonally
24  permanent (flows at least three months a year) tributary
25  with direct surface hydrologic connections to Bessey

1  Creek, and it cites to two figures or a few figures.
2       Do you see that that sentence?
3    A.  Yes, sir, I do.
4    Q.  Did I read that right?
5    A.  Yes, you did.
6    Q.  What does "seasonally permanent" mean?
7    A.  That means it flows seasonally.  There's four
8  seasons in a year, divided by four -- divide 12 months
9  by four and you get three.  It's in the Rapanos guidance
10  and it's also in the Rapanos opinion from Justice
11  Scalia.
12    Q.  Okay.  By Justice Scalia, is that what you
13  said?
14    A.  Yes, sir.
15    Q.  Okay.  So does Justice Scalia's test apply in
16  Florida?
17    A.  No, sir.  He was describing what seasonally --
18  what seasonal rivers are jurisdictional.
19    Q.  Is the term seasonally permanent used in the
20  Rapanos decision by any of the justices?
21       MR. ADKINS:  Objection.
22       THE WITNESS:  It's in a footnote.
23    Mr. Scalia -- Justice Scalia said that seasonal
24    rivers are waters.
25

1  BY MR. MCALILEY:
2    Q.  Okay.  But does he -- but does he use the
3  phrase "seasonally permanent"?
4       MR. ADKINS:  Objection.
5       THE WITNESS:  No, sir.  That was in the
6    Rapanos guidance on how EPA and the Corps were
7    trying to interpret the Rapanos Carabell decision.
8  BY MR. MCALILEY:
9    Q.  Okay.  So if I want to look for the word
10  seasonally permanent, I should look in the 2008 Rapanos
11  guidance to find that phrase?
12    A.  Yes, sir.
13    Q.  Okay.  And it's defined in there?
14    A.  Yes, sir.
15    Q.  Okay.  By the way, are you aware of any
16  wetland delineation that was done in the area of the
17  north/south ditch before that ditch was originally
18  excavated?
19    A.  No, sir.
20    Q.  Okay.  I'm going to take out the highlighting
21  here on page 36 and highlight another sentence.  So the
22  last sentence in the second paragraph says, However, the
23  DOJ expert team determined that the north/south ditch
24  was excavated in wetlands that extended from the site
25  through the Countess Joy East property to Bessey Creek,

1  end quote.
2       Did I read that right?
3    A.  Yes, sir.
4    Q.  Okay is that -- so is it your opinion that the
5  north/south ditch was located entirely in wetlands that
6  existed prior to the time the ditch was excavated?
7    A.  There's a possibility that at Bessey Creek
8  where there's an intersection there, that the Bessey
9  Creek berms would not be considered wetlands, but that's
10  a side cast when the Bessey Creek improved area was done
11  many decades ago.
12       So that is -- that area there may be -- may be
13  uplands there because it's a berm, but the vast majority
14  of the north/south ditch is excavated in wetlands, is my
15  opinion.
16    Q.  Okay.  Would you agree with me that it's
17  possible that the north/south ditch, at least in part,
18  was excavated in uplands?
19    A.  There could be areas on the north/south ditch.
20  I didn't make a wetland determination on both sides the
21  entire way through.  But yes, there could be portions of
22  it excavated in wetlands.  The majority of it certainly
23  is excavated in wetlands.
24    Q.  Let me move down here in the report.  Let me
25  try to cover ground that I haven't already covered.



MICHAEL M. WYLIE, M.S.
USA vs BENJAMIN K. SHARFI

April 04, 2022
205—208

Page 205

1    So I want to turn here to page 37 of the
2  report, "Land Uses and Impaired Water Wetland in Bessey
3  Creek." It's at the bottom of page 37.
4        Do you see that?
5    A.  Yes, sir, I do.
6    Q.  This a section that you wrote?
7    A.  Yes, sir, I did.
8    Q.  Are you going to testify about the topics
9  addressed in this section is?
10   A.  If asked, I will; yes, sir.
11   Q.  That's your intention as you sit here today,
12  right?
13   A.  Yes, sir, it is.
14   Q.  Okay.  So it says in the second sentence of
15  this section, quote, The Florida Department of
16  Environmental Protection has classified Bessey Creek as
17  a Class III water with applicable water quality, and it
18  goes on.
19        Did I read that right?
20   A.  Yes, sir.
21   Q.  So are you aware that almost all waters in
22  Florida are classified as Class III waters?
23   A.  Yes, sir, I am.
24   Q.  The next sentence says, "Water quality in
25  Bessey Creek is highly degraded."

Page 206

1        Do you see that?
2    A.  Yes, sir.
3    Q.  What's the basis for that statement?
4    A.  FDEP lodged Bessey Creek on its 303(d) list in
5  1998 for depressed oxygen levels, high biological oxygen
6  demand, nutrient impairment, and coliform impairment
7  from septic tanks.  It was placed on the 303(d) list,
8  the Clean Water Act 303(d) list.  A TMDL, total maximum
9  daily load, was calculated for that for Bessey Creek in
10  2008.
11        EPA, upon reviewing that TMDL -- I'm sorry,
12  the TMDL listed that they needed to reduce inputs of
13  total nitrogen and total phosphorus into the system.
14  And EPA upon reviewing that document disagreed with the
15  water quality data that DEP provided them and wrote
16  their own TMDL for Bessey Creek that included reduction
17  of high levels of coliform, so there was a -- they wrote
18  their own TMDL, which is the Clean Water Act Allows EPA,
19  so to overrule state programs when they don't agree with
20  the data.
21        I also reviewed data from the hybrid
22  wetland -- let me see if I can get this right --
23  treatment, a treatment facility near Boat Ramp Road.
24  And in there -- this treatment facility is basically
25  constructed to remove phosphorus in the system because

Page 207

1  that's one of the biggest problems in Florida, is large
2  amounts of phosphorus.
3        The treatment data -- or the water quality
4  data, along with the flow data, which their flow data in
5  2015 showed perennial waters, perennial flow through
6  that point, the data showed that up to that intake point
7  for the HWTT facility -- we'll make that easy for you,
8  Ms. Anderson -- then that flow data showed elevated
9  total nitrogen and total phosphorus levels in excess of
10  the TMDL that DEP wrote for Bessey Creek in 2008.
11        After treating the water through the intake to
12  this H -- WHTT facility, the water came out much better
13  on the other side and then it flowed through there down
14  towards a South Florida Water Management District
15  monitoring station that reviewed the monitoring data
16  from 2019 to 2021 where the total phosphorus data was
17  well above the total maximum daily load for total
18  phosphorus.
19        So at that point, which is the P&W point that
20  we feel comfortable calling, that there was elevated
21  phosphorus in excess of the TMDL that was written 12
22  years before.
23        Also, that data on dissolved oxygens showed
24  two-thirds of the data in the last two years from '21 to
25  '20, that two-thirds of that data showed levels of DO

Page 208

1  that was less than five parts per thousand, which
2  typically stresses the heck of aquatic life.  If it
3  stays depressed below five parts per thousand for long,
4  aquatic life will either vacate or die.
5        I also considered septic tank usage in the
6  area.  I talked to Mark Woodruff.  I think it's there in
7  your report.  And Mr. Woodruff told me that the area
8  east of I guess the Turnpike, that there's no -- it's
9  all septic tanks and that there wasn't any -- into the
10  future there really wasn't any plans to lay down septic
11  tank lines so folks could hook up to it, at least in the
12  five- or six- or ten-year plan.  And I've included a
13  figure that shows that, sorry you, it's a very busy
14  feature, but it's a big -- it's the Martin County site.
15        I also looked at -- that we talked before
16  about it was -- this area was predominantly in the
17  40-year floodplain.  So it has an opportunity to flood
18  more than other areas, which then surficial flow would
19  carry nutrients like septic tank discharges to Bessey
20  Creek, further impairing it.
21        And by putting those -- all these observations
22  and research together, I believe that Bessey Creek is --
23  it still remains highly degraded.
24   Q.  Okay.  Thank you.  So you covered a lot of
25  ground here, so let me -- I'm going to try to go through



MICHAEL M. WYLIE, M.S.
USA vs BENJAMIN K. SHARFI

April 04, 2022
209–212

Page 209

1  this bit by bit.
2      So let's start out with water quality data
3  around the vicinity of the site.  Am I right that you
4  have no water quality data with regard to surface water
5  that leaves the site?
6      MR. ADKINS:  Objection; vague.
7      THE WITNESS:  No, sir, I do not.
8  BY MR. MCALILEY:
9      Q.  Okay.  So you don't have groundwater data or
10  surface water data about water that leaves the site and
11  flows to the east/west ditch, right?
12      MR. ADKINS:  Objection.
13      THE WITNESS:  We observed flow data, but there
14      are observations of flow.
15  BY MR. MCALILEY:
16      Q.  All right.  You have no actual quantitative
17  data documenting the rate of flow or value of flow at
18  the surface from the site to the east/west ditch, right?
19      A.  No.  We didn't feel like we needed it.
20      Q.  Okay.  And the inflow for the hybrid wetland
21  treatment technology facility, I agree with you, it's a
22  confusing acronym, that is located a mile or two
23  downstream on the east/west ditch from the site, right?
24      A.  Yes, sir, that's correct.  That's approximate,
25  yeah.

Page 210

1      Q.  Okay.  And between the area of the east/west
2  ditch near the site and the inflow for the hybrid
3  treatment -- wetland treatment facility, there are other
4  ditches that add flow to the east/west ditch, correct?
5      A.  Yes, sir.
6      Q.  So am I right that you don't know how much of
7  the flow in the east/west ditch that is -- that is
8  measured at the hybrid wetland treatment facility is in
9  the east/west ditch at the point where it passes by the
10  site?
11      A.  No, sir.  That doesn't make sense that you
12  would be able to tell 2 miles away what the flow would
13  be 2 miles upstream.
14      Q.  Right.
15      A.  I don't know.
16      Q.  Right.  So all that hybrid wetland treatment
17  facility data simply shows you what the flow is at the
18  facility not up by the site, right?
19      MR. ADKINS:  Objection.
20      THE WITNESS:  Well, it shows it in total.  The
21      flow by the site at the -- at Bessey Creek
22      impoundment.  It's a cumulative amount of flow
23      that's measured and it's also lateral flow from
24      wetlands that feed into the creek, so...
25

Page 211

1  BY MR. MCALILEY:
2      Q.  So, but you would agree with me the data of
3  flow that's at the hybrid wetland treatment facility
4  shows the flow at the facility, it doesn't show the flow
5  at the east/west ditch by the site, right?
6      MR. ADKINS:  Objection.
7      THE WITNESS:  It shows the cumulative flow
8      from all the wetlands and all the tributaries and
9      all the ditches from Martin County landfill past
10      the site to Boat Ramp Road.
11  BY MR. MCALILEY:
12      Q.  Okay.  I'll go back to this.  How much water
13  flows in the east/west ditch by the site down toward the
14  hybrid wetland treatment facility?
15      A.  All I know is a perennial flow.
16      Q.  All right.  So you don't know how much is
17  flowing in the east/west ditch by the site, right?
18      A.  I do not know cubic feet per second or volumes
19  of water that flows by the -- in Bessey Creek improved
20  area north of the site.
21      Q.  So therefore, you don't know what percentage
22  of the flow that's measured at the hybrid wetland
23  treatment facility a couple miles downstream comes from
24  the area by the site, right?
25      A.  No, sir, I don't.

Page 212

1      Q.  Thank you.  You would agree with me that the
2  measurement of water quality at the hybrid wetland
3  treatment facility is a measurement taken a couple of
4  miles downstream at the entrance to that facility,
5  right?
6      MR. ADKINS:  Objection.
7      THE WITNESS:  Yes, sir, I agree.
8  BY MR. MCALILEY:
9      Q.  So that data does not tell you what the water
10  quality is in the east/west ditch near the site,
11  correct?
12      A.  I really don't know how to answer that.  I
13  would say that the water -- no, the answer is no.
14      Q.  Right.  So okay.  So your data from the hybrid
15  wetland treatment facility doesn't tell you what the
16  water quality is in the east/west ditch near the site,
17  correct?
18      MR. ADKINS:  Objection; misstates testimony.
19      THE WITNESS:  I would certainly think that
20      it's a harbinger of what that water is.  It could
21      be affectable by the flows that go into it before
22      it meets the HWTT, but I can't imagine it would be
23      that much different, but I would defer to
24      Dr. Nutter if there was any quantities that you
25      wanted calculated.



MICHAEL M. WYLIE, M.S.
USA vs BENJAMIN K. SHARFI

April 04, 2022
213—216

Page 213

BY MR. MCALILEY:
1  BY MR. MCALILEY:
2     Q.  Okay.  Are you aware that Dr. Nutter testified
3  that he has no data with regard to total phosphorus
4  levels in the east/west ditch near the site?  Are you
5  aware of that?
6     A.  No, sir, I'm not.
7     Q.  Okay.  Do you have any reason to disagree with
8  that?
9     A.  No, sir, I don't.
10    Q.  Okay.  So you're aware of no data about total
11 phosphorus levels in the east/west ditch near the site,
12 right?
13        MR. ADKINS:  Objection; misstates testimony.
14        THE WITNESS:  That's correct, yes, sir.
15 BY MR. MCALILEY:
16    Q.  You are aware of no data on total nitrogen
17 levels in the east/west ditch near the site, right?
18        MR. ADKINS:  Objection.
19        THE WITNESS:  Only at the intake area at HWTT;
20 yes.
21 BY MR. MCALILEY:
22    Q.  Which is located a couple of miles downstream,
23 right?
24    A.  Yes, sir.
25    Q.  Okay.  And you also have no data about fecal

Page 214

1  coliform levels in the east/west ditch near the site,
2  right?
3        MR. ADKINS:  Objection.
4        THE WITNESS:  Yes, sir, that's correct.
5  BY MR. MCALILEY:
6     Q.  Okay.  And you also have no data regarding
7  dissolved oxygen levels in the east/west ditch near the
8  site, right?
9        MR. ADKINS:  Objection.
10       THE WITNESS:  Yes, sir, that's correct.
11 BY MR. MCALILEY:
12    Q.  Am I right that the hybrid wetland treatment
13 technology facility is designed to treat most of the
14 water that flows down the east/west ditch with the
15 exception of high flood events?
16    A.  There's a limit to, I think -- I apologize
17 because I forget all the permit conditions of this, of
18 the plant, but they can't draw water out past a certain
19 amount, which would take the -- impair the Class III
20 water quality or the applicable water quality standards
21 and also upset anything else in the aquatic environment.
22       So I have discussed something and I had
23 forgotten the back -- the second part of your question.
24    Q.  Okay.  Well, let me just try to move on to my
25 next question.

Page 215

1     The hybrid wetland treatment facility is
2  designed to treat -- designed to pump up to 20 CFS of
3  water from the east/west ditch, right?
4     A.  I think that's the right number; yes.
5     Q.  Okay.  And the east/west ditch almost always
6  had a lower flow than 20 CFS, right?
7     A.  I don't -- I don't recall the data of that.
8  You'd probably better talk to -- you'd be better off
9  talking to Dr. Nutter about that.
10    Q.  Okay.  Is the data in your report at all?
11    A.  I don't think so.  Well, the -- I think the
12 permit was -- I looked at the permit, but I don't recall
13 exactly the -- anything besides the 20 CFS withdrawal.
14    Q.  Is the -- would you agree that the hybrid
15 wetland treatment facility treats most of the water
16 flowing down the east/west ditch at least in a normal
17 year?
18    A.  I can't really respond to that because I don't
19 know.
20    Q.  Okay.  Are you aware that the hybrid wetland
21 treatment technology facility treats water through a
22 combination of chemical treatment and submerged aquatic
23 vegetation?
24    A.  Yes, sir, I am.
25    Q.  Okay.  And chemical treatment is alum

Page 216

1  treatment where alum is added to the water and it
2  precipitates out particles in the water that could have
3  nutrients and other pollutants; isn't that right?
4     A.  That's correct.
5     Q.  And a submerged aquatic vegetation basically
6  means the water flows through aquatic plants and the
7  plants suck up nitrogen and phosphorus, right?
8     A.  That's correct.
9     Q.  The HWTT removes approximately 90 percent of
10 the total phosphorus from the inflow compared to the
11 outflow, right?
12    A.  I don't know the exact number, but I know it
13 removed a large percentage of it; yes.
14    Q.  It removes almost all the total phosphorus,
15 doesn't it?
16    A.  I don't -- I know I put numbers in my -- if
17 you could move down to that, I think I have some numbers
18 there.  But it may be in the functions.
19    Q.  Okay.  So I'm now on page 41 of your report.
20 So, and the second paragraph is a paragraph that you
21 wrote that addresses the hybrid wetland chemical
22 treatment treatment plant.  Let's start off with, am I
23 right that you wrote your report about the effects of
24 the hybrid wetland treatment facility using data from
25 2015 and 2016, but not later?



Page 217

1     A.   I tried to find data that could -- I couldn't
2   find it.  I tried to call them, left them messages.  I
3   didn't get returned phone calls.  I wanted to see --
4   tried to follow up on additional data and I...
5     Q.   Okay.  By the way, you're aware that total
6   phosphorus is the limiting nutrient for aquatic
7   ecosystems in Florida, right?
8     A.   That's correct.
9     Q.   Okay.  In this paragraph you indicate, you
10  say, and I'll highlight this, this is a few sentences
11  down in the middle of the paragraph, "In FDEP's 2008
12  TMDL for Bessey Creek, FDEP established a nutrient
13  endpoint for total phosphorus at 0.081 mg/l and for
14  total nitrogen at 0.72 mg/l."
15       Did I read that right?
16    A.   Yes, sir.
17    Q.   When you say it's a nutrient endpoint, that is
18  the limit on the concentration of total nitrogen and
19  total phosphorus that they want in Bessey Creek to
20  protect the Class III waters in the creek, right?
21       MR. ADKINS:  Objection.
22       THE WITNESS:  Yes, that was the limited
23    established of the TMDL.
24  BY MR. MCALILEY:
25    Q.   Okay.  If I look at the -- at the previous

Page 218

1   sentences, the second sentence says, "WT's," which I
2   guess is the Watershed Technologies, Inc., "monitoring
3   results for total phosphorus for the June 2015 to
4   July 2016 period resulted in an inflow mean of 0.196
5   mg/l and an outflow mean of 0.029mg/l."
6        Did I read that right?
7     A.   Yes, sir.
8     Q.   Did I read that correctly?
9     A.   Yes, sir.
10    Q.   Okay.  So when you refer to the inflow mean,
11  that's the mean concentration of total phosphorus at the
12  inflow pumps into the facility?
13    A.   Yes, sir.
14    Q.   And the outflow mean refers to the
15  post-treated water, the finished water when it goes back
16  into Bessey Creek?
17    A.   That's the best way I understand it.  I
18  believe that's correct.
19    Q.   So you're not sure exactly what this means?
20    A.   Well, I've seen the outflow pipe and I'm
21  reporting on what the permit conditions are.  I've seen
22  inflow pipe and outflow pipe.  So that is my assumption;
23  that the -- they test the water when they release it and
24  that was -- at that time period, that was the mean of
25  the samples, or the samples that were tested.

Page 219

1     Q.   Okay.  So am I right that the outflow mean
2   total phosphorus of 0.029 mg/l is lower than the TMDL
3   that you have in the same paragraph, which
4   is 0.081 mg/l?
5     A.   Yes, sir, it's at the pipe.  It's not in
6   Bessey Creek because Bessey Creek still flows, so the
7   amount of water going out of the outflow there then goes
8   back into Bessey Creek, which is still impaired because
9   if you'll look at the inflow in 2015 and 2016, it was
10  almost .2 mg/l.  So all that is looking at the end of
11  the pipe.  It's not looking at Bessey Creek.  It's
12  mixing with Bessey Creek.
13    Q.   Is it your testimony that the TMDL set for
14  Bessey Creek under Clean Water Act Section 303(d)
15  applies to the east/west ditch?
16    A.   Yes, sir.
17    Q.   Okay.  So when the impaired water list is put
18  together, every water is given a water body
19  identification number, isn't it?
20    A.   Yes, sir.
21    Q.   And that's called -- people call it a WBID for
22  short, correct?
23       MR. ADKINS:  I'm sorry, what was the word you
24    said, Counsel?
25       MR. MCALILEY:  I'm sorry, WBID, WBID,

Page 220

1   W-I-B-I-D.
2        THE WITNESS:  Is there a question associated
3    with that?
4   BY MR. MCALILEY:
5     Q.   Yeah.  Would you agree, am I correct that
6   people commonly call the water body, the water body
7   identification numbers for the water bodies in Florida,
8   they call them WBIDs?
9     A.   Yes, in Florida, it's called a WBID, yes.
10    Q.   Okay.  So what is the WBID number for Bessey
11  Creek that the TMDL applies to?
12    A.   Oh, gosh.  I don't remember.  I'm sorry, sir.
13    Q.   What is the boundaries of the WBID for Bessey
14  Creek that you're referring to here that the TMDL
15  applies to?
16    A.   I can't tell you that right now.  I just don't
17  have that information in front of me.
18    Q.   So you don't know whether the WBID that
19  corresponds to the TMDL that you identified actually
20  includes the area west of the Turnpike, upstream of the
21  hybrid wetland treatment facility, right?
22       MR. ADKINS:  Objection; misstates testimony.
23       THE WITNESS:  As I sit here right now not, but
24    I thought it did, I -- but as I sit here right now,
25    I don't, I don't recall.



MICHAEL M. WYLIE, M.S.
USA vs BENJAMIN K. SHARFI

April 04, 2022
221–224

Page 221

BY MR. MCALILEY:

Q. Okay. When you said that the Bessey Creek downstream of the hybrid wetland treatment facility is exceeding the TMDL concentration, you're referring to the data from the South Florida Water Management District's monitoring station that's designated SLT-9, right?

A. That's correct.

Q. How far down stream of the hybrid wetland treatment facility is SLT-9?

A. I think it's another mile and a half or so.

Q. Okay. So, and between the hybrid wetland treatment facility and SLT-9, there's other sources of inflow into the ditch and Bessey Creek, right?

A. Yes, sir. There's a golf course. There's residents -- there's residential areas. There's roads. There's remaining amount of Bessey Creek flow that didn't get sucked into the HWTT.

Q. The SLT-9 is east of the Florida Turnpike, right?

A. Yes, sir.

Q. It's in the midst of all of those septic tanks you were referring to earlier, right?

A. I think that there's some -- there's not -- I don't think it's zero septic tanks there, but I believe

Page 222

that there are some hookups there that people have used to hook up, I think. But the area where there is no septic tank, I'm sorry, where it's a hundred percent septic tank as informed me by Mr. Woodruff, is east of the Turnpike.

Q. Right, right. So the place where all the septic tanks are that don't have a sewer system is east of the Turnpike, right?

A. Yes, sir. I think there probably are some west, but then again, I don't know that answer.

Q. Yeah, but east of the Turnpike, the whole area is urbanized, isn't it, in Basin 4?

A. The whole area is what.

Q. Urbanized?

A. East of the area, yes, sir. I think that's a fairly good characterization.

Q. Okay. And you testified a moment ago that pollution from septic tanks is a big problem for water quality in Martin County, right?

A. Yes, sir.

Q. Okay. So the data from SLT-9 could be reflecting effects of the septic tanks in the urban areas around it, correct?

A. I'm sure it's part of it; yes, sir.

Q. Okay. And, but we do know that the water that

Page 223

flows down the east/west ditch after it's treated in the hybrid wetland treatment facility meets the TMDL concentrations, right?

A. No, sir, only at the pipe. There's still the remaining flow that hasn't been sucked up into the plant to be treated because they have to leave a minimum flow or they could only take so much flow out of the creek at one time to treat it. So there's still a percentage of flow in Bessey Creek that is not treated. I think it's Citrus Avenue, where it flows under Citrus Avenue and that's where the outflow of the HWTT is.

Q. Okay. You don't know the percentage of flow from the east/west ditch that is treated by the HWTT, do you?

A. It varies on the flow at that point in how much the facility is permitted to take out.

Q. Okay. But my question -- you didn't answer the question. The question is, you don't know what percentage of the flow in the east/west ditch is treated in the HWTT facility, right?

MR. ADKINS: Objection.

THE WITNESS: No, sir, I don't know the exact percentage.

BY MR. MCALILEY:

Q. Okay. And the HWTT facility is designed to

Page 224

treat most of the water in the east/west ditch, isn't it?

MR. ADKINS: Objection.

THE WITNESS: I'm sorry, sir, I don't -- I don't know.

BY MR. MCALILEY:

Q. Okay. Did I hear you right, that Mr. Woodruff from the Martin County Department of Utilities told you that there are no plans by Martin County at the moment to take or to convert the septic systems east of the Turnpike in the Bessey Creek watershed onto a sewer system?

A. Yes, sir. That was the gist of our conversation and I think that was back in two thousand -- I think 2021. I think I've got that -- I've got it characterized. I don't remember the exact date, but he said that there was no plans to do that at least in the next five years. It could be longer.

Q. By the way, SLT-9 is in a tidally influenced portion of Bessey Creek, right?

A. Yes, sir.

Q. And in a tidally influenced area it means that the water levels can rise and fall with the tides, right?

A. Yes, sir.



MICHAEL M. WYLIE, M.S.
USA vs BENJAMIN K. SHARFI

April 04, 2022
225–228

Page 225

1    Q.  Would you agree with me that salt water is
2    heavier, more dense than fresh water?
3    A.  Yes, sir.
4    Q.  It's common in an estuary for there to be a
5    lens of water with fresher water on the top and saltier
6    water at the bottom?
7    A.  Yes, sir.
8    Q.  So there could be salt water that comes up
9    from the St. Lucie River up the Bessey Creek in the
10   tidally influenced areas, correct?
11   A.  That's possible, yes, sir.
12   Q.  And if there are -- if there are excessive
13   nutrient levels in the water in the St. Lucie River,
14   that could actually be going upstream in the tidal areas
15   in the Bessey Creek; is that right?
16   MR. ADKINS:  Objection.
17   THE WITNESS:  Yes, sir, anything's possible.
18   BY MR. MCALILEY:
19   Q.  Right.  And you haven't gone out to try to
20   figure out how much of the nutrients at SLT-9 actually
21   originate from the east/west ditch in the vicinity of
22   the site, right?
23   A.  No, sir, I just reported what the South
24   Florida Water Management District's data analysis was.
25   Q.  As far as you are aware, all the nitrogen and

Page 226

1    phosphorus could be removed from the east/west ditch and
2    you would still have exceedences of the TMDL at SLT-9 as
3    a result of septic tanks or tidal flow or other factors,
4    right?
5    A.  I don't know the answer to that question, I'm
6    sorry.
7    Q.  Okay.  So it's possible, though, right, that
8    you could take out all the phosphorus and all the
9    nitrogen from the area served by the east/west ditch and
10   you would still have exceedences of the TMDL at SLT-9,
11   right?  As far as you know, it's possible?
12   MR. ADKINS:  Objection; speculation.
13   THE WITNESS:  You're asking me to -- if frogs
14   had wings.  I really don't -- I don't know that,
15   how that situation would play out.  Anything's
16   possible.  I just -- I can't speculate if I don't
17   really know what to -- I don't know the numbers.  I
18   don't -- all I can -- all I've reported on and base
19   my opinions on is the actual data supplied by state
20   agencies responsible for it.
21   BY MR. MCALILEY:
22   Q.  Okay.  So you agree with me then that it's
23   speculation in the absence of data that nutrients coming
24   down the east/west ditch cause the exceedence of the
25   TMDL at SLT-9, you just don't know that one way or the

Page 227

1    other, do you?
2    A.  All I can base my opinions and information on
3    is what we've seen on the site, what's there, talking to
4    county officials, looking at the data as it was
5    generated, looking at state data that says that -- and
6    EPA data that says -- that states that Bessey Creek is
7    an impaired water body.
8    So it's not only my opinion, it's the opinion
9    of the state and a federal agency.
10   Q.  Okay.  But that -- sir, you didn't answer my
11   question again and I'm just trying to, like, cut through
12   this.
13   You would agree that in the absence of data,
14   it would be speculation to say that nutrients from the
15   east/west ditch are causing the exceedence of TMDL at
16   SLT-9, right?
17   MR. ADKINS:  Objection; asked and answered.
18   THE WITNESS:  I think any of the nutrients
19   from the east/west ditch have a cumulative effect
20   in repairing water bodies at -- where it was
21   generated.
22   THE COURT REPORTER:  Can you repeat your
23   answer for me, please?
24   THE WITNESS:  Yes, ma'am.
25   I believe that impaired water flowing past the

Page 228

1    site through the Bessey Creek improved area past
2    the HWTT plant to SLT-9 is a cumulative effect of
3    all the water quality impacts resulting from
4    agriculture, development, septic tanks and that's
5    what I base my opinion on and the data that I
6    reviewed.
7    BY MR. MCALILEY:
8    Q.  Okay.  But you're speculating on what the
9    effects are specifically in the absence of data, right?
10   MR. ADKINS:  Same objection.
11   THE WITNESS:  Well, I'm not really speculating
12   because the state data shows that it's impaired.
13   I'm just basing my opinion on their factual data
14   that they report to the public.
15   BY MR. MCALILEY:
16   Q.  So Mr. Wylie, so your opinion here is based in
17   part on the fact that you believe that the area served
18   by the east/west ditch has been designated as impaired
19   by Florida DEP, right?
20   A.  Yes, sir, I am.
21   Q.  So if that area was not designated as impaired
22   by Florida DEP, that would undercut your opinion,
23   wouldn't it?
24   MR. ADKINS:  Objection.
25   THE WITNESS:  It could possibly change it.  I



MICHAEL M. WYLIE, M.S.
USA vs BENJAMIN K. SHARFI

April 04, 2022
229–232

Page 229

1    don't see how it would make that much of a
2    difference, though, because the water has to come
3    from someplace and that's the majority of the flow
4    that comes from that area.  So --
5    BY MR. MCALILEY:
6    Q.  Well, hold on.  Hold on, stop.  You just said
7    the majority of flow comes from the area of the
8    east/west ditch.  Tell me what percentage of the flow at
9    SLT-9 comes from the east/west ditch.
10   A.  I do not know the percentage of the flow, but
11   it appears to me that --
12   Q.  You're speculating that it's the major source
13   of flow, right?
14        MR. ADKINS:  Let him finish his response.
15        THE WITNESS:  I've followed Bessey Creek down
16   from the site a number of feet.  I've also visited
17   the HWTT plant.  I've looked at flow on Citrus
18   Avenue.  I looked at flow coming out of the HWTT.
19   I've looked at flow on pictures that Dr. Nutter
20   took I think at St. Andrews Avenue, where we saw
21   extensive sedimentation in the creek, and I've also
22   looked at flow at where SLT-9 is on Murphy Bridge
23   Road, and it appears to me that after reviewing
24   aerial photos, looking at documents, looking at
25   USGS maps and whatnot, that that's the largest part

Page 230

1    of the watershed.
2         So that's where most of the water will come
3    from, in that area from Martin County landfill to
4    the SLT-9 bridge or monitoring station.
5    BY MR. MCALILEY:
6    Q.  Okay.  You've only been out to the area three
7    times, right?
8    A.  Yes, sir, that's correct.
9    Q.  Okay.  So all these statements about you going
10   and seeing things were just based on three visits when
11   you came in town from Georgia, right?
12   A.  That's correct.
13   Q.  Okay.  So let me just back up and get some
14   other data.
15        How much water, total flows of water go out of
16   Bessey Creek each year into the North Fork of the
17   St. Lucie River?
18   A.  I cannot address that.
19   Q.  You don't know, right?
20   A.  That's correct.
21   Q.  How much total phosphorus in terms of
22   expressed in either load or concentration flows out of
23   Bessey Creek into the North Fork of the St. Lucie River
24   each year?
25   A.  I can't -- I do not know that number.

Page 231

1    Q.  And you also don't know how much total
2    nitrogen flows out of Bessey Creek into the North Fork
3    of the St. Lucie River each year, right?
4    A.  Yes, sir, that's correct.
5    Q.  And you can't tell me how much water flows by
6    SLT-9, which is that Water Management District
7    monitoring station, right?
8    A.  There may be a hydro station there or a gauged
9    data.  You would have to ask Dr. Nutter that.  I didn't
10   look to see a gauged data there.  If there was one, I
11   would have assumed Dr. Nutter would have addressed that.
12   Q.  Okay.  So you can't tell me the total flow at
13   SLT-9, can you?
14   A.  No, sir, I can't.
15   Q.  Okay.  So you can't tell me -- or let's keep
16   backing up.  What is the total flow of water that flows
17   in the east/west ditch above the HWTT facility?
18   A.  The total flow is measured by the permit
19   conditions.  So HWTT data and the only data that we saw
20   was average annual flows.  So I think we have a figure
21   or a table that describes that and they've used X number
22   of years to get that flow.  So what I would assume is
23   that table will tell -- will address that amount of flow
24   there at HWTT input.
25        So I forget which figure that is, sir.  You

Page 232

1    may be able to find that.
2    Q.  Okay.  So let's go back to SLT-9.  That's in
3    the tidal section of Bessey Creek, right?
4    A.  Yes, sir.
5    Q.  So water comes up and downstream with the
6    tide, right?
7    A.  Yes, sir, it rises and falls, yes.
8    Q.  Right, but there's -- water will actually go
9    upstream like in high tide and will go up to SLT-9,
10   right?
11   A.  It goes up some degree upstream, yes, sir.
12   Q.  Okay.  So when you're looking at water levels
13   SLT-9, some of that water came from the St. Lucie River
14   downstream, right?
15        MR. ADKINS:  Objection.
16        THE WITNESS:  It's possible that it did; yes.
17   BY MR. MCALILEY:
18   Q.  Okay.  So you can't tell me how much of the
19   water at SLT-9 came from the east/west ditch, right?
20        MR. ADKINS:  Objection.
21        THE WITNESS:  No, sir, I can't do that right
22   now.
23   BY MR. MCALILEY:
24   Q.  And you can't tell me what percentage of the
25   phosphorus and nitrogen detected at SLT-9 came from the



MICHAEL M. WYLIE, M.S.
USA vs BENJAMIN K. SHARFI

April 04, 2022
233–236

Page 233

1 east/west ditch, right?
2     A.  That's correct.
3     Q.  And you can't tell me then whether it's most
4 of the nitrogen and phosphorus at SLT-9 or almost none
5 of the phosphorus and nitrogen at SLT-9 came from the
6 east/west ditch, right?
7         MR. ADKINS:  Objection.
8         THE WITNESS:  No, sir, I can't.
9 BY MR. MCALILEY:
10     Q.  Okay.  So as far as you know, you could stop
11 all of the phosphorus and nitrogen that's going down the
12 east/west ditch and you would still be over the
13 concentrations in the TMDL at SLT-9, right?
14         MR. ADKINS:  Objection; calls for speculation.
15         THE WITNESS:  No, sir, I can't say that
16     because I have no basis for making that yes or no.
17 BY MR. MCALILEY:
18     Q.  Right.  So it's pure speculation to say what
19 the effect -- whether the phosphorus and nitrogen that's
20 in the east/west ditch is causing the exceedence of the
21 TMDL at SLT-9, right?
22         MR. ADKINS:  Objection; misstates testimony.
23         THE WITNESS:  No, sir, I don't think it's pure
24     speculation.  I think there's flow that comes up
25     upstream before there, and the reason why is

Page 234

1     because there's flow upstream all the way to the
2     Martin County landfill.  So it would be absurd to
3     think that flow from the St. Lucie River went all
4     the way to the Martin County landfill, because it
5     doesn't.
6 BY MR. MCALILEY:
7     Q.  Hold on.  That's not what I'm saying.  I'm not
8 saying that the tidal waters go up to the St. Lucie
9 landfill.  I'm asking about the SLT-9, which is the
10 monitoring station that you're looking at the data
11 that's east of the Turnpike tidal waters.
12         So my question is this:  If you don't know
13 what percentage of the phosphorus and nitrogen detected
14 at SLT-9 comes from the east/west ditch, you can't tell
15 me that that -- that the east/west ditch is the cause of
16 the impairment at SLT-9, right?
17         MR. ADKINS:  Objection; misstates testimony.
18         THE WITNESS:  And I can also say that I don't
19     know if it's from the St. Lucie River either.
20 BY MR. MCALILEY:
21     Q.  Right.  You don't know one way or the other,
22 right?
23         MR. ADKINS:  Objection.
24         THE WITNESS:  Correct.
25

Page 235

1 BY MR. MCALILEY:
2     Q.  When is the last time you looked at the
3 impaired water list for the St. Lucie Estuary?  You
4 mentioned a few times that 1998 there was -- that it
5 was -- the Bessey Creek was identified as an impaired
6 water body.  When is the last time you looked at its
7 status?
8     A.  Probably in the last couple of months.
9     Q.  By the way, am I right that you have no data
10 indicating how water quality has changed since the
11 defendants engaged in their activity on site?
12         MR. ADKINS:  Objection; vague.
13         THE WITNESS:  I'm sorry, sir, I didn't
14     understand the question.
15 BY MR. MCALILEY:
16     Q.  Okay.  You have no -- no data indicating how
17 the quality of the water in the east/west ditch has
18 changed since the defendants engaged in the activities
19 on the site, right?
20         MR. ADKINS:  Objection.
21         THE WITNESS:  No, sir, I don't.
22 BY MR. MCALILEY:
23     Q.  So, okay.  So you can't tell me how the water
24 quality has changed as a result of the defendants'
25 activities at the site, right?

Page 236

1         MR. ADKINS:  Objection, vague.
2         THE WITNESS:  Yes, sir, I cannot tell you
3     that.
4 BY MR. MCALILEY:
5     Q.  Okay.  Let me go back to the report here.  So
6 I'm right now -- we jumped ahead a little bit here so
7 I'm on page 40 here, which is the section on nutrient
8 cycling.  So why don't I just -- maybe it's just the
9 easiest thing if I just stay in this section.  Let me
10 back up a little bit in a minute.
11         Sometimes it makes it go fast when I jump
12 around in my notes, but hopefully I'll have to sort it
13 out to make sure I'm not too repetitive here.
14         So if I look at the section on page 40, you
15 cite a few papers in here about the effects of nutrient
16 cycling in wetlands.  Like for instance, at the end of
17 the first paragraph, you cite to Mitsch and Gosselink,
18 2015.
19         Do you see that?
20     A.  Yes, sir.
21     Q.  Am I right that these papers are general
22 references, they're not specific to water quality in
23 Bessey Creek or Martin County, Florida?
24     A.  Well, that refers to removal of elements and
25 compounds, basically, where surface water or storm water



MICHAEL M. WYLIE, M.S.
USA vs BENJAMIN K. SHARFI

April 04, 2022
237–240

Page 237

1  carries heavy metals, pesticides and herbicides. But
2  this particular book is kind of a wetlands Bible. These
3  two guys, two authors have been around the block a lot
4  and it's a general discussion of what wetlands do, how
5  they perform, what their functions are. It has a wealth
6  of other cited information about wetlands in this
7  instance, this paragraph, nutrient cycling.
8      Q. Okay. But my point is that these are just
9  general reference works about wetlands in general.
10  These are not scientific paper about functions of
11  wetlands in Martin County, Florida, specifically, right?
12      A. Yes, sir, yes, sir.
13      Q. Okay. All right. On page 40, second
14  paragraph, I want to highlight a sentence here, quote,
15  We noted that depressional wetlands in the study area
16  received untreated storm water flows from pastures,
17  roadside ditches and essential areas with septic tanks,
18  and it cites to a figure.
19      Did I read that right?
20      A. Yes, sir.
21      Q. Am I right that the figure that you cite is
22  actually a photograph showing standing water in a field
23  at the Countess Joy property?
24      A. Yes, sir, I think that's correct.
25      Q. Okay. So am I right, there's no roadside

Page 238

1  ditches or residential areas in the Countess Joy
2  property?
3      A. No, sir, I think this one figure just showed
4  depressional wetlands. There's other depressional
5  wetlands. There's depressional wetlands on the right
6  side of the eastern ditch on Highway 84, or I'm sorry,
7  84th Avenue that the roadside ditch flows right into it.
8      Q. Let me find the --
9      A. So that particular figure was one example of a
10  depressional wetland performing nutrient cycling from
11  these impacts.
12      Q. Okay. So I'm going back to this Deposition
13  Exhibit 73, the figures. This is Figure V.C.6.b.1.
14  This is the figure that's cited in that section of the
15  report, right?
16      A. Yes, sir. It's one of the depressional
17  wetlands that we feel performs these functions.
18      Q. Okay. So in the report you say that you
19  observed storm water coming from roadside ditches in
20  residential areas with septic tanks, and then you cite
21  this photo. There's -- in this photo, there are no
22  roadside ditches or residential areas for septic tanks,
23  right?
24      A. No, sir. This is one example. This is
25  receiving surface flow down. This is basically in the

Page 239

1  flow path from the site in the -- obviously, the Sharfi
2  site is on septic tanks, all the adjacent properties
3  are. So that's the septic tank flow path.
4      We also have depressional wetlands here that
5  are adjacent to 84th Avenue where we have a well there
6  and the roadside ditches and the depressional wetland
7  intersect and continue the flow path down to Bessey
8  Creek.
9      We observed -- observed in August at least
10  that there were surface water and storm water because it
11  was above normal rainfall that was -- storm water was
12  being transported across the site, which was an
13  agricultural site, plenty of cows there and a lot of
14  cowpies. That was the storm water being transported.
15  It would be tracked in areas like this, depressional
16  wetland along that flow path diagram you showed that
17  Dr. Nutter prepared.
18      Q. How many septic tanks are there on the site?
19      A. We were only -- well, I don't know.
20      Q. How many septic tanks are there within a
21  quarter mile of the site?
22      A. I would say there's at least one per every
23  residence, and then on the Sharfi site there's several
24  outbuildings and several different buildings. There's
25  probably more than one at the Sharfi site.

Page 240

1      Q. Do you know that or are you guessing?
2      A. Well, I would think that people would have to
3  use the bathroom in more than one place because it's a
4  30-acre site. So I know for a fact that we were able to
5  use the facilities in an area where there's a
6  kitchenette on the -- on one of the 10-acre sites to the
7  east, which was not his residence. It was, I guess, a
8  meeting place for workers or whatnot. So there was a --
9  there was a toilet there with an associated septic tank.
10  So I would assume there's a minimum of two on
11  Mr. Sharfi's site, maybe more.
12      Q. You did not specifically determine that
13  there's septic tanks. You're just assuming because
14  there's buildings there with toilets that there's septic
15  tanks, right?
16      MR. ADKINS: Objection; misstates the
17  testimony.
18      THE WITNESS: I'm relying upon the county
19  expert at the water authority, Mark Woodruff, on
20  his --
21  BY MR. MCALILEY:
22      Q. Mark Woodruff told you there were septic tanks
23  on the property.
24      A. Excuse me?
25      Q. Did Mark Woodruff tell you there were septic



Page 241

1 tanks in the Sharfi property?
2     A.   Mr. Woodruff told me that all the facilities
3 east of the Turnpike were on septic tanks.
4     Q.   Okay.  East of the Turnpike all of the
5 properties were on septic, right?
6     A.   He said there was no hookups or -- and this
7 was back when I interviewed him.  If there's been some
8 since then, that supersedes that telephone discussion.
9     Q.   Mr. Wylie, the Sharfi site, the site is west
10 of the Turnpike, isn't it?
11    A.   I'm sorry, I meant west of the Turnpike.  I
12 apologize.
13    Q.   All right.
14    A.   Thank you.
15    Q.   All right.  Let's go back to the report here.
16       So I'm back here in the report, Deposition
17 Exhibit 72.  I'm on page 40 and it looks like the third
18 paragraph.  Do you see there's a sentence I've
19 highlighted, quote, The DOJ expert team's fieldwork
20 documented hundreds of acres of wetlands in the study
21 area trapping and storing storm water runoff from cattle
22 pastures and residential/commercial septic tanks, end
23 quote.
24       Do you see that sentence?
25    A.   Yes, sir.  Yes, I do.

Page 242

1     Q.   Did I read it correctly?
2     A.   Yes, sir.
3     Q.   Is that a true and correct statement?
4     A.   Yes, sir.
5     Q.   The primary place where the DOJ expert team
6 conducted fieldwork was the site on the Countess Joy
7 property, correct?
8     A.   Yes, sir.
9     Q.   Is it a true statement that you documented
10 wetlands that were storing storm water runoff from
11 residential/commercial septic tanks on the site in the
12 Countess Joy property?
13    A.   Yes, sir.  There were residents that were
14 north and down the flow path from Countess Joy East.
15 There were residents on the -- residences in areas on
16 the Countess Joy site.  The west site was
17 predominantly -- of course, it was predominantly cattle.
18 There wasn't anything residential there.  But we did
19 note them on the 300-acre site, which was Countess Joy
20 East and West, in the Sharfi site and adjacent
21 neighbors, there's a nursery just to the west of him,
22 which is a commercial site and -- so that's what I was
23 referring to in that sentence.
24    Q.   Okay.  So you're going to testify at trial
25 that you saw water from septic tanks in wetlands on the

Page 243

1 site and the Countess Joy property?
2       MR. ADKINS:  Objection.
3       THE WITNESS:  What we saw was we saw water on
4    the surface and in depressions that -- in August
5    and they were all -- and the movement of storm
6    water and surface flow was towards the Bessey
7    Creek.
8 BY MR. MCALILEY:
9     Q.   Okay.  But you've written here that you saw
10 storm water runoff from residential/commercial septic
11 tanks out there.  Are you telling me that you visibly
12 saw water from septic tanks out on the surface and
13 wetlands on the site and the Countess Joy property?
14       MR. ADKINS:  Objection; misstates.
15       MR. MCALILEY:  I'm not misstating the
16    statement, Mr. Adkins.  Let him answer the
17    question.
18       THE WITNESS:  What we said we documented in
19    wetlands trapping and storing storm water runoff
20    from cattle pastures and residential and commercial
21    septic tanks.  That's what the statement says.
22 BY MR. MCALILEY:
23    Q.   Okay.
24    A.   So that was storm water runoff.  We saw it
25 from cattle pastures on the east and the west and we saw

Page 244

1 storm water runoff from the Sharfi site, which is a
2 residential and commercial site that has septic tanks as
3 far as Mr. Woodruff has informed me, and also his
4 neighbors.  So all that runoff then runs towards Bessey
5 Creek.
6     Q.   How did you know that the -- how did you know
7 that the water that you saw out on those wetlands on the
8 Countess Joy property was water that had come from a
9 septic tank?
10    A.   Septic tanks don't function very well when you
11 have high water levels.  So organic material floats on
12 top of water level.  I had a case about that.  And then
13 what happens is that waste is carried high in the
14 groundwater or even to the surface water.  So any
15 subsurface flow that carries high nutrient levels would
16 then flow towards the flow path which goes towards --
17 that Dr. Nutter outlined before or to some of the
18 adjacent ditches.
19       So that's what I'm referring to in that
20 statement.
21    Q.   How did you document that there was water from
22 septic tanks in the wetlands and the Countess Joy
23 property?  That's what your sentence says.  Your
24 fieldwork documented that.  How did you document that it
25 was water from septic tanks?



MICHAEL M. WYLIE, M.S.
USA vs BENJAMIN K. SHARFI

April 04, 2022
245–248

Page 245

1       MR. ADKINS:  Objection.
2       THE WITNESS:  I thought I just told you that
3    septic tanks don't work very well when you have --
4    BY MR. MCALILEY:
5       Q.  I'm asking for the documentation, Mr. Wylie.
6    What's the documentation that that water came from
7    septic tanks?
8       MR. ADKINS:  Objection.
9       THE WITNESS:  Drain fields that have high
10      water tables, therefore, have incomplete treatment
11      of septic waste.  So then they become part of the
12      surface water and groundwater and subsurface flow,
13      which we observed in August over the entire wetland
14      area on the Countess Joy East site, which flowed
15      into 84th Avenue ditch and it flowed through the
16      north/south ditch to Bessey Creek.
17   BY MR. MCALILEY:
18      Q.  You all didn't take any water quality samples
19   in your fieldwork, did you?
20      A.  No, sir, we didn't feel like we had to.
21      Q.  Okay.  So you don't actually have any data
22   showing that the water in those wetlands in the Countess
23   Joy property came from a septic tank, right?
24      MR. ADKINS:  Objection.
25      THE WITNESS:  That's correct.

Page 246

1    BY MR. MCALILEY:
2       Q.  Did it smell like sewage?
3       A.  Well, I saw plenty of cowpies around there
4    that were under water, near water, being flowed by
5    water, but I didn't get the -- a septic tank smell, that
6    I recall.
7       Q.  The truth is you never documented the presence
8    of storm water runoff from septic tanks on the site or
9    on the Countess Joy property, right?
10      A.  We documented storm water flow from areas that
11   contained septic tanks that have incomplete treatment as
12   the scientific paper that I cited in Martin County and
13   that was -- we document what wetlands do when confronted
14   with excess nutrients.  They uptake them; they cycle
15   them; they treat them and make them different species.
16      We also saw storm water and surface water
17   runoff on the site during the two days of the August
18   site inspection.  So the deduction is, is that from the
19   scientific literature and that we know, is that
20   there's no central sewage system.  That septic tanks
21   were there; that commercial areas were there; and that
22   water was flowing across the site and into depressional
23   wetlands and being treated by the wetlands along the
24   path.
25      Q.  Have you attempted to calculate the number of

Page 247

1    septic tanks in different portions of Basin 4?
2       A.  No, sir, I couldn't find that information.
3    That's why I talked to Mr. Woodruff.  He didn't have
4    that information because he said that a lot of people
5    were reluctant to give up that information when there
6    was a central sewage system there because it cost X
7    number of thousands of dollars to hook up.
8       So even if you have central sewage pipes laid
9    out, that doesn't mean that all the folks down the road
10   are hooked up because they may choose not to.  They may
11   not want to put the money out, but Mr. Woodruff did tell
12   me that if your septic tank fails, they would not grant
13   you in this area another septic tank permit if there was
14   a central sewage hookup available.
15      Q.  Mr. Wylie, what percentage of nutrients in
16   Bessey Creek come from septic tanks and what percentage
17   come from agriculture?
18      A.  I can't respond to that question because I
19   don't know it.
20      Q.  Okay.  You mentioned a few times that you saw
21   cowpies and cow manure out in the Countess Joy East
22   property, right?
23      A.  Yes, sir, I did.
24      Q.  You saw those cowpies out in areas that you
25   believe are wetlands, right?

Page 248

1       A.  Yes, sir, that's correct.
2       Q.  So you can have -- so agriculture can occur in
3    wetlands, right, if you include cattle grazing as
4    agriculture?
5       A.  Yes, sir, pasture, grass; yes, sir.
6       Q.  So, and in fact, you know, those wetlands, if
7    they are wetlands, are a good place to graze cattle
8    because it's available, open land, right?  It's not all
9    full of houses or commercial development.  There's
10   actually room for the cows, right?
11      MR. ADKINS:  Objection.
12      THE WITNESS:  Not necessarily.  The landowner
13      that we -- or the manager that we talked to,
14      Dwayne, I forget his last name, but Dwayne was
15      complaining that they only allow so many head of
16      cattle in really wet areas because of the
17      propensity for cows to disseminate their waste into
18      these areas.  He particularly complained about the
19      western side because there were so many more
20      wetlands, that he could only put so many cows out
21      on the site.
22      So having wetlands and having cow pastures is
23      not a bed of roses in Florida.
24   BY MR. MCALILEY:
25      Q.  So, but cattle can defecate in wetlands if



MICHAEL M. WYLIE, M.S.
USA vs BENJAMIN K. SHARFI

April 04, 2022
249–252

Page 249

1  they're where they're being grazed, right?
2      A.  Yes, sir, that's correct.
3      Q.  I notice here on page 40, I will -- you make a
4  statement here that "The wetlands in the area of the
5  site in similarly situated wetlands are essentially
6  trapping nutrients that would otherwise flow downstream
7  and nutrients that originate from septic tanks or
8  agriculture," right?
9      A.  Yes, sir, that's what we believe.
10     Q.   How much nutrients are trapped each year by
11  the wetlands at the site in the Countess Joy property?
12     A.  Well, not enough because the HWTT shows that
13  there's still excess phosphorus nutrients and nitrogen
14  species being captured at their intake because they do
15  water quality studies.
16     Q.  So you don't know how much phosphorus and
17  nitrogen is being trapped by wetlands in the east/west
18  ditch basin, do you?
19     A.  No, sir, I don't.
20     Q.  And by the way, as far as you know, the
21  nutrients could be originating in a landfill at the west
22  end of the east/west ditch, right?
23         MR. ADKINS:  Objection.
24         THE WITNESS:  There's a possibility that some
25     could come from there, but I would think -- I think

Page 250

1      the BMPs and whatnot that the landfill puts in
2      place tries to prevent those kind of activities
3      from occurring.
4  BY MR. MCALILEY:
5      Q.  You have no data, do you, about how much
6  nutrients come from the landfill, right?
7      A.  No, sir, I don't.
8      Q.  So that's speculation when you say that you
9  don't think the landfill is a significant source of
10  nutrients, right?
11         MR. ADKINS:  Objection.
12         THE WITNESS:  It's a belief I think if they
13     have any permits or if they have any operating
14     conditions that they try to limit that.  So I think
15     that's more than pure speculation.  I think that's
16     what is their duty to do.
17  BY MR. MCALILEY:
18     Q.  Let's go back to page 40 here in this
19  paragraph.  There's a sentence about how "In 2011,
20  Martin County addressed elevated nutrient loads in
21  Bessey Creek and the St. Lucie Estuary through an
22  ordinance preventing the application of fertilizers
23  containing nitrogen and phosphorus between June 1 and
24  September 30th."
25         Do you see that sentence I've highlighted?

Page 251

1      A.  Yes, I do.
2      Q.  You wrote that, right?
3      A.  Yes, sir, I did.
4      Q.  Okay.  The Martin County fertilizer ordinance
5  applies in the entire county, doesn't it?
6      A.  Yes, sir, I believe so.
7      Q.  Okay.  So that ordinance was not written
8  specifically for the area in the Bessey Creek watershed,
9  was it?
10     A.  I think they talked specifically -- I'm sorry,
11  when I was researching this, there was this specific
12  discussion about Martin County, about Bessey Creek
13  because it was on the 303(d) list for elevated
14  phosphorus and nutrients.  So it specifically talked
15  about Bessey Creek.
16     Q.  The fertilizer ordinance doesn't just apply in
17  the Bessey Creek watershed, does it?
18     A.  No, sir.  It's throughout Martin County.
19     Q.  Okay.  And by the way, that ordinance doesn't
20  apply just to wetland areas, does it?
21     A.  No, sir, I don't -- no, I think it applies to
22  any plan applications.
23     Q.  Okay.  So that ordinance also applies to
24  upland areas, right?
25     A.  Yes, sir, it appears that it did.

Page 252

1      (Reporter interruption.)
2         MR. MCALILEY:  Absolutely.  Let's take a
3  break.
4         THE VIDEOGRAPHER:  We're going off the record.
5  The time is approximately 4:03 p.m.
6         (A break was had.)
7         THE VIDEOGRAPHER:  We are back on the record.
8  The time is approximately 4:10 p.m.  Thank you.
9  BY MR. MCALILEY:
10     Q.  Okay.  Mr. Wylie, I want to go over a couple
11  of figures on this issue about water quality.  So I'm
12  going to put up on the screen Deposition Exhibit 73.
13  This is the figures.  I'm going to start with
14  Figure V.C.4.1, which is entitled "Land use by LULC for
15  Basin 4 study area."
16         Do you see that on the screen?
17     A.  Yes, sir, I do.
18     Q.  Am I right that LULC stands for land use land
19  classification?
20     A.  Land cover.
21     Q.  Land cover?
22     A.  Yes, probably the same thing.
23     Q.  And this is put together by the South Florida
24  Water Management District, right?
25     A.  Yes, sir, it is.



MICHAEL M. WYLIE, M.S.
USA vs BENJAMIN K. SHARFI

April 04, 2022
253–256

Page 253

1    Q.  So this figure shows general categories of
2  land use in different portions of Basin 4, correct?
3    A.  Yes, sir.
4    Q.  And am I right that this figure shows that
5  virtually the entire area of Region 4 east of the
6  Florida Turnpike has an urban land use classification?
7    A.  Yes, sir, it does.
8    Q.  Am I right the least urbanized of Basin 4 is
9  basically in the western end of Basin 4, which is where
10  the site is located?
11    A.  Yes, sir, outside of the ag land up to the
12  northeast.
13    Q.  Okay.  And am I right that -- so the ag land
14  is shown in yellow, is that right, that yellow?
15    A.  Yes, sir, that's correct.
16    Q.  Okay.  Am I right that the great majority of
17  the ag land in Basin 4 is located on the other side of
18  the east/west ditch?
19    A.  Yes, sir.
20    Q.  There's only -- there's a small area of ag
21  land in the vicinity of the site, but it's a small
22  percentage of the overall ag land in Basin 4, correct?
23    A.  Correct.
24    Q.  Okay.  Let's go down to Figure V.C.4.2, which
25  is entitled "Martin County Septic to Sewer Conversion

Page 254

1  Program."  Is this the figure you mentioned earlier that
2  basically shows where Martin County is trying to convert
3  houses that are on septic tanks and put them on sewer
4  systems?
5    A.  Yes, sir.  I apologize, it's very busy.
6    Q.  No apologies required.  It's a government
7  report.  They're always busy.
8        So am I right the point of this is to show
9  that there is -- the urban areas in Basin 4 are not
10  scheduled to be converted to sewer systems any time
11  soon?
12    A.  Yes, sir, that's what Mr. Woodruff reported to
13  me.
14    Q.  Okay.  And let me go down to Figure V.C.4.3,
15  which is entitled "Cropland at Pasture Land for Basin
16  Study Area."
17        Is this simply the similar land use
18  information as the previous figure, but it just isolates
19  out the agricultural lands?
20    A.  Yes, sir, that's correct.
21    Q.  And this indicates that most of the
22  agricultural lands in Basin 4 are located away from the
23  site and the Countess Joy property?
24    A.  Yes, sir.  Yes, sir, but they still reside
25  within Basin 4 and abut the east/west improved area of

Page 255

1  Bessey Creek.
2    Q.  Okay.  Hold on.  So this large yellow area
3  that's in the northwest part of Basin 4 in Figure
4  V.C.4.3, that does not actually touch the east/west
5  ditch, does it?
6    A.  No, sir, I'm sorry, it's just above it.  I
7  apologize.  That was a mischaracterization.
8    Q.  Okay.  Thank you.  So based on these
9  figures -- well, let me step back.
10        So it's in the report that the two main causes
11  of water quality problems in Basin 4 are septic tanks
12  and agriculture, right?
13    A.  Yes, sir.  That was basically reported by the
14  Environmental Protection Agency when they did the TMDL
15  in 2009.
16    Q.  Okay.  Most of the septic tanks are located
17  away from the area of the east/west ditch.  There's some
18  in the area of the east/west ditch, but most of them are
19  east of the Turnpike; is that fair to say?
20    A.  Yes, sir, I think that's a fair statement.
21    Q.  And most of the agricultural areas are away
22  from the zone of the east/west ditch, right?  There's
23  some in the Countess Joy property area, but most of it
24  is not along the east/west ditch, right?
25    A.  I think that as usual, this is a watershed of

Page 256

1  Bessey Creek, so everything eventually flows to Bessey
2  Creek.  So it's part of the -- of the issue of where
3  water flows and that's the study area.
4    Q.  Okay.  I'm not suggesting that these
5  agricultural areas are not in Basin 4.  I'm simply --
6  I'm just confirming that the agricultural areas in
7  Basin 4 are almost entirely located away from the
8  east/west ditch, right?
9        MR. ADKINS:  Objection.
10        THE WITNESS:  A large percentage of them are
11  not immediately adjacent to the east/west ditch;
12  yes, sir.
13  BY MR. MCALILEY:
14    Q.  Well, wouldn't you agree with me the
15  agricultural area shown on Figure 5.C.4.3 that is near
16  the site clearly represents less than 10 percent of the
17  total agricultural area in Basin 4 as shown on this
18  figure?
19    A.  Yeah, on the figure and there's, obviously,
20  agricultural land that's east of 84th Avenue that's not
21  depicted on this map because that's Countess Joy West.
22  So there's -- that's not there.
23        So as usual, when we use these depictions of
24  data, there's -- they can be accurate, they can be
25  inaccurate.  What we try and do is marry them up.  I



MICHAEL M. WYLIE, M.S.
USA vs BENJAMIN K. SHARFI

April 04, 2022
257–260

Page 257

1  used this depiction to show an approximation of cropland
2  and pasture that I feel is impairing Bessey Creek, not
3  only myself, but the Environmental Protection Agency and
4  also when DEP did its TMDL.
5       Q.  Okay.  I understand that this -- I understand
6  your point that the Countess West -- Countess Joy West
7  property is not shown as agricultural lands, but by the
8  same token, there can be other agricultural areas away
9  from the site that are not shown in yellow on this
10  figure either, right?
11      A.  Yes, sir, there could be some, yes, sir.
12      Q.  So this is just to give a sense of scale and
13  approximate location of the agricultural lands, right?
14      A.  That's fair, yes.
15      Q.  Okay.  So you would agree with me that the
16  overwhelming market of the agricultural lands in Basin 4
17  are located more than a mile away from the site?
18      A.  Let's see -- 1600 feet to -- I think it's --
19  well, it touches a half a mile away because remember,
20  we're 1600 feet from east/west -- from the Bessey Creek
21  improved area and it's really not that far.  So let's
22  say less than a mile.  I would agree to that.
23      Q.  On Figure V.C.4.3, there is a distance legend
24  on the lower right-hand corner, right?
25      A.  Yes, sir, mm-hmm.

Page 258

1       Q.  And you see what a mile is in the distance,
2  right?
3       A.  Yes, sir.
4       Q.  And if you were to take that, the mile and you
5  were to put it on the northern most edge of the site,
6  most of the agricultural areas, the great majority of
7  the agricultural areas would be further away, right?
8       A.  Yes, sir, the great portion of it.  I was just
9  saying that the polygon touched probably less than a
10  mile away; yes.
11      Q.  Okay.  I think that's -- let me exit out of
12  this.  Let's go back to the report.  So I'm going back
13  to the report.  It's the same section that I was asking
14  you questions about before.
15           On page 41, top paragraph I've highlighted the
16  last sentence of this paragraph.  It says, quote,
17  However, our observations of current and historic land
18  use in the study area indicates that nutrients and
19  pathogens continue to impair TNW Bessey Creek's water
20  quality in spite of functioning wetlands in the study
21  area, end quote.
22           Did I read that right?
23      A.  Yes, sir, you did.
24      Q.  Is that a true and correct statement?
25      A.  Yes, sir.

Page 259

1       Q.  So the wetlands in Basin 4 are not preventing
2  the impairment of Bessey Creek with nutrients and
3  pathogens, right?
4       A.  No, sir.  I don't feel that they totally
5  cleanse the area on their own.
6       Q.  And you don't know, you can't give me any kind
7  of estimate of the amount of nutrients and pathogens
8  that were removed by the wetlands in Basin 4, right?
9       A.  No, sir.  We didn't -- that wasn't the goal of
10  our investigation.
11      Q.  Okay.  I'd like to -- I jumped ahead just
12  because of where our discussion was.  Let me go -- let
13  me move back in the report.  Let's go here to -- so I'm
14  going to the bottom of page 38.  You see that there's a
15  section here titled little A, "Surface and Subsurface
16  Water Storage and Exchange Processes in Wetlands on the
17  Site and in Similarly Situated Wetlands Are Important in
18  Maintaining the Chemical, Physical and Biological
19  Integrity of Downstream TNWs."
20           Do you see that section?
21      A.  Yes, sir, I do.
22      Q.  And you wrote that section, right?
23      A.  I did.
24      Q.  Okay.  So the first paragraph of the section
25  makes general statements that about how wetlands store

Page 260

1  and release water on a short- and long-term basis and et
2  cetera.
3           Do you see that, that paragraph?
4       A.  Yes, sir, I do.
5       Q.  So these are -- these are general functions
6  served by wetlands, right?
7       A.  That's correct.  Well, they're actual -- yes,
8  they're general functions.
9       Q.  So all wetlands serve these functions,
10  correct?
11      A.  No, I could -- I wouldn't say that all
12  wetlands.  Some wetlands are so degraded that they
13  probably don't or they do -- they have functions -- they
14  function at a different degree than other wetlands do.
15  That's why the depressional wetlands would store more
16  than a storm water and a level wetland because it would
17  continue to flow over.  So there's degrees of function.
18      Q.  You and the DOJ team have not gone out to
19  evaluate the functional quality of all the wetlands in
20  Basin 4 that you treat as similarly situated wetlands,
21  right?
22      A.  No, sir.  Dr. Lee worked on that and I'm sure
23  you'll get an opportunity to discuss that with him.
24  He's -- he did a functional analysis on multiple wetland
25  sites where we did -- we performed wetland



MICHAEL M. WYLIE, M.S.
USA vs BENJAMIN K. SHARFI

April 04, 2022
261–264

Page 261

1 determinations.

2     Q.  So there's nothing special about wetlands on
3 the site with regard to water storage, is there? What I
4 mean by nothing special, there's nothing -- that
5 function is no different than the function that most
6 other wetlands serve, correct?

7     A.  Well, it's really hard to answer yes or no on
8 that, but I can characterize that.

9     A depressional wetland stores more than a
10 wetland that's just flat on a -- flat like a pine
11 flatwood. The wetlands are important here, especially
12 because of Bessey Creek's impaired water quality.

13     So would the wetlands be more important here
14 to Bessey Creek than the run-of-the-mill depressional
15 wetland in a very high-quality tributary? I would argue
16 that the wetlands here are much more important for
17 nutrient cycling, to store sediments or any herbicides,
18 pesticides, manure, cows. So I think they are more
19 important to this system or this study area than more of
20 a high-quality wetland where then you get into your
21 run-of-the-mill wetland functions.

22     Q.  You have no data that supports that statement,
23 do you?

24     MR. ADKINS: Objection. Vague.

25     THE WITNESS: The only data I have is that I

Page 262

1 know that the water quality is impaired in Bessey
2     Creek and wetlands serve functions to maintain the
3     biological, chemical and physical functions
4     associated with wet -- with traditional navigable
5     waters.

6 BY MR. MCALILEY:

7     Q.  Other than that, you have no data that
8 indicates the wetlands on the site and the Countess Joy
9 property provide better water storage and release
10 functions than a typical wetland, right?

11     MR. ADKINS: Objection.

12     THE WITNESS: No, sir, I don't.

13 BY MR. MCALILEY:

14     Q.  Okay. So this paragraph cites Figures V.C.2.1
15 and V.C.2.8 as supporting the assertion that wetlands
16 store water and then release it for seasonal low flows.
17 So let me go to those two figures.

18     Okay. I just put up Deposition Exhibit 73.
19 This is Figure V.C.2.1. It's entitled "DOJ Expert Team
20 Wetland Delineation."

21     Do you see that?

22     A.  Yes, sir.

23     Q.  This is one of the figures that you cited in
24 your report for the proposition that wetlands on the
25 site store water, attenuate floods and provide base

Page 263

1 flow, right?

2     A.  That's what it says in the expert report.
3 Yes, sir, I did that. Whether it was named wrong --
4 incorrectly, that's possible.

5     Q.  Okay. So this figure doesn't actually show
6 how wetlands on the site store flood waters or release
7 them in base flow, right?

8     A.  No, sir. I think it's the wetland delineation
9 of the present site.

10     Q.  Okay. Let me keep going down. There's
11 another figure that's cited in the report. Which one is
12 it -- it's five -- sorry, I lose track of all -- I think
13 this is it, V.C.2.8. Yeah, so the report also cites
14 five -- Figure V.C.2.8 as supporting the proposition
15 that wetlands on the site and on the Countess Joy
16 property attenuate flood waters and provide base flow.
17 This is a photograph, it looks like, of wetlands next to
18 the north/south ditch.

19     How does this photograph demonstrate that the
20 wetlands in the area of the site attenuate flooding?

21     A.  I'm sorry. I think it's pretty evident that
22 this was in August when we had heavy rainfall, above
23 normal rainfall. And what's happening is this is the
24 flow path that Dr. Nutter depicted in the figure we were
25 looking at where it takes a left turn to the west and

Page 264

1 goes over to the 84th Avenue ditch.

2     Here you can see on the north/south ditch, and
3 we observed flow out of the ditch towards the west and
4 84th Avenue and through to the north to the confluence
5 with Bessey Creek.

6     So what this is doing is we observed flow in
7 both areas to the west and to the north. And it's
8 storing water because this flow of water is then going
9 back to surface water and also depressional wetlands off
10 to the west that we looked at earlier.

11     So it's storing water. It's preventing flood
12 events because it goes straight to Bessey Creek in two
13 different directions at least. And then what these
14 depressional wetlands do when they're full of water, as
15 time goes on and we get out of the rainy season or
16 whatnot, surficial flow through subsurface flow to
17 Bessey Creek to maintain water quality flow regime and
18 also navigation downstream.

19     Q.  Mr. Wylie, so you're telling me that this
20 photo shows the wetlands capturing flood flows and
21 attenuating it; is that right?

22     A.  Yes, sir.

23     Q.  And this was taken in August of 2021?

24     A.  Yes, sir, I think it was August 23rd, I think
25 it is.



MICHAEL M. WYLIE, M.S.
USA vs BENJAMIN K. SHARFI

April 04, 2022
265–268

Page 265

1    Q.  Did you testify earlier that this was
2  equivalent of the dry season because there was a
3  drought?
4    A.  Not in August.  In September and in October
5  were below rainfall.  In August we used the Corps'
6  APT -- ATP tool.  There was above-normal rainfall and
7  this is where, obviously, we saw water going north into
8  the west out of the north/south ditch.
9    Q.  Let me leave the figures here.  Let's go back
10  to the report.  I'm back in Deposition Exhibit No. 72 on
11  page 39 and the -- in the second full paragraph, and in
12  this paragraph you write that "The DOJ expert team found
13  water in the soils on the site," correct?
14    A.  Yes, we found watered soil surface.
15    Q.  And so am I understanding this correctly, but
16  the fact that you're finding water -- a high water
17  table, water in the soils, is a sign that wetlands on
18  the site are, you know, holding flood waters, preventing
19  a fast runoff so there will be a base flow?  Am I
20  understanding that right?
21    A.  In the dry season.
22    Q.  Okay.  But that's the significance of the fact
23  that you found a high water table in soils on the site?
24  Am I understanding that right?
25    A.  Well, what the significance of that during the

Page 266

1  rainy season, which August is the rainy season, is that
2  the wetlands store precipitation, surface water and
3  groundwater in anticipation of the -- if you want to
4  give -- anthropomorphize wetlands in the dry season,
5  then the shallow subsurface flow flows through in
6  groundwater to Bessey Creek maintaining its flow volume
7  and rate in navigation.
8      So what that picture was portraying is it was
9  storing excess rainwater from -- during the growing
10  season -- I mean during the rainy season.
11    Q.  Okay.  So the DOJ expert team's investigations
12  on the site where you looked, you took these -- you put
13  wells on the site, you took soil samples, you found
14  evidence that at the site it was storing water from, you
15  know, rainfall so it wouldn't flood in the short-term
16  and, rather, it would release it was base flow.
17      Am I understanding this correctly?
18    A.  Yes, that's correct it ameliorates flow
19  downstream.  It reduces flood peeks.  And that's a
20  function of surface and subsurface flow of what a
21  wetland does.
22    Q.  Okay.  So basically, wetlands store water by
23  letting rainwater percolate into the ground where you
24  have a high water table and it could flow out more
25  slowly, you know, eventually out to the east/west ditch.

Page 267

1    Q.  Do I have that right?
2    A.  That's what we observed on the site; yes.
3    Q.  Okay.  So when you went on the site in 2021,
4  it's your opinion that most of the site the wetlands had
5  been filled, right?
6    A.  I'm sorry, I didn't get the very last
7  sentence.
8    Q.  It's your opinion that when you went out in
9  2021, most of the wetlands in the site had been filled,
10  correct?
11    A.  That's correct, yes, sir.
12    Q.  So you found, even though the wetlands no
13  longer existed, in your opinion, across most of the
14  site, you still found water in the soil that was being
15  stored there from rainfall so it would be released out
16  for base flow in the dry season, right?
17    A.  The water that we found was in the wetland
18  that was the reserve wetland.  So if there had been fill
19  added, which we think there has been some scraping or
20  whatnot, it still wasn't too far away from the original
21  soil surface.  So one would expect a depressional
22  wetland like that would still have a high water table.
23  We also found a high water table on the site near
24  Cypress Lake where it was scraped out to lower the
25  ground and then layered with sod and filled with sod.

Page 268

1      So in that area it appeared it was -- that it
2  was scraped lower and then filled.  So those kind of
3  lower areas outside of the vast majority of the site,
4  one would expect we would find a high water table at
5  those areas, especially in August when you had
6  above-normal rainfall.
7    Q.  Okay.  Mr. Wylie, let me find the sentence
8  here.  Let me read you aloud page 39.  This is the first
9  full paragraph.  Quote, During the August 2021
10  investigation of the Countess Joy site, we find water at
11  the soil surface or within 3 inches of the soil surface
12  at the eight wetland locations we sampled, right?
13    A.  Yes, sir, that's correct.
14    Q.  Okay.  And you also found -- in the first
15  sentence, "We found soil saturation within 12 inches of
16  the ground surface at several locations on the site,"
17  right?
18    A.  Yes, sir, that's correct.
19    Q.  These observations are sufficient to meet the
20  mandatory criteria for hydrology articulated in the
21  manual and the regional supplements.
22      Did I read that correct?
23    A.  Yes, sir, that's correct.
24    Q.  But you found saturated soils in the areas of
25  the site where you believe they were all wetlands before



MICHAEL M. WYLIE, M.S.
USA vs BENJAMIN K. SHARFI

April 04, 2022
269–272

Page 269

1  the defendants --
2      (Reporter interruption.)
3      MR. MCALILEY:  No problem.
4  BY MR. MCALILEY:
5      Q.   You found saturated soils in the areas of the
6  site that you believe constitutes the 6 acres of
7  wetlands, right?
8      A.   We found soil saturation in several locations
9  that we believe were inside the wetland delineation, but
10  that doesn't mean that the soils were hydric.  And
11  these -- both these areas, or three of these areas, I
12  forget exactly how many there were, were filled with
13  either sod and the associated material attached to that
14  sod, land cleared.
15      So just because it had saturation doesn't mean
16  that there were present wetlands, but we feel like that
17  they were former wetlands.
18      Q.   Okay.  But the point is, there's still -- you
19  still have the site holding water from the rainfall,
20  right?  It's in the ground where it can be released over
21  time, right?
22      A.   There were just a couple locations that we
23  found here and the other areas were depressional
24  wetlands which hadn't been mechanically land cleared,
25  shaped to runoff surface water or storm water.  And

Page 270

1  there's also -- we think there might have been some
2  piping involved, I think.
3      Q.   So Mr. Wylie, in the area -- you've delineated
4  6 acres of wetlands on the site, right?
5      A.   Yes, sir, approximately.
6      Q.   In order for there to be a wetland under that
7  1987 wetland manual, there needs to be hydric soils,
8  there needs to be saturated soils and there needs to be
9  wetland vegetation under normal circumstances, right?
10      A.   Yes, sir.
11      Q.   Okay.  So you found hydric soils at all of
12  these locations on the site when you went and took your
13  samples in August and September of 2021, right?
14      A.   In September and October of 2021.
15      Q.   Okay.  So you found the hydric soil there in
16  the 6 acres.  You also found that the soils were
17  saturated with water, right?
18      A.   I would defer to Dr. Stewart on any soil
19  characterizations, and if we found soil saturation, I'm
20  sure Dr. Nutter would -- could report that.  But
21  regardless of those issues, what we found was deposition
22  of dredge and fill material in these areas.
23      So even if it was a wetland, which we were
24  only be able to establish in some of the depressional
25  areas, there were impact to these sites even with the

Page 271

1  soil saturation.
2      Q.   Hold on.  I'm not asking about that.  What I'm
3  asking about is the conditions that you found, right?
4  On page 39 you wrote the words We found soil saturation
5  within 12 inches of the ground surface at several
6  locations on the site, end quote.
7      Is that a true and correct statement, sir?
8      A.   Yes, sir, it is.
9      Q.   Okay.  So you could not reach the conclusion
10  that you had 6 acres of wetlands on the site unless you
11  found soil saturation in the area of the 6 acres, right?
12      MR. ADKINS:  Objection.
13      THE WITNESS:  No, sir, that's not true.
14  BY MR. MCALILEY:
15      Q.   Oh, okay.  So -- okay.  So let me -- okay.  So
16  you think you can find a wetland even if there's not
17  wetland hydrology?
18      MR. ADKINS:  Objection.
19      THE WITNESS:  Oh, yes, sir.  It could be
20  totally removed by underground pipes.  It could be
21  filled 5 feet up.  The soil could be so rolled and
22  picked apart, porosity of the soil, it just falls
23  right through.
24      When we were there, we had below-average
25  rainfall in September and October.  That's always

Page 272

1  an issue to think about.  So just because we found
2  soil saturation in two or three sites, it really
3  doesn't mean that there was other wetlands there,
4  or if we found no saturation there it doesn't mean
5  it.  There were so many impacts on the site.
6  BY MR. MCALILEY:
7      Q.   Water can still percolate into the soil on the
8  site, right?
9      A.   Water can still percolate with soil on the
10  site?  Yes, it can.
11      Q.   And Mr. Wylie, did the defendants pave the
12  site?
13      A.   What Mr. Sharfi did was, he enclosed the site
14  and raised the site with the road around it.  He moved
15  massive amounts of material around.  He excavated ponds,
16  scraped the material around from the -- from my reading
17  of the depositions, there were roads constructed to the
18  site.
19      I saw that of Mr. Berlusconi, his deposition,
20  I saw -- the site was totally land cleared.  We saw
21  areas of muck on the site, areas of water.  The several
22  photos that I reviewed from the 2018 South Florida Water
23  Management District flyover found large amounts of sandy
24  material, land-cleared material and water still evident
25  on site and then large amounts of land clearing.



MICHAEL M. WYLIE, M.S.
USA vs BENJAMIN K. SHARFI

April 04, 2022
273–276

Page 273

1    So the entire site was manipulated, which put
2  us into the atypical situation that we used to try to
3  determine the wetlands prior to impacts.
4    Q.  Mr. Wylie, you didn't answer my question.  Am
5  I right that you saw no evidence that the defendants
6  paved any portion of the site?
7    A.  The constructed roads -- what is your
8  definition of paved?  Because I have to understand what
9  you mean.
10    Q.  Okay.  You don't understand what pavement for
11  a road is?
12    A.  They certainly put rock, crush material and
13  coquina shell, or something firm.
14    Q.  Sir, do you think gravel road is a paved road?
15    A.  I did not see a total graveled road there.
16  There was a lot of crush rock and smoothing and scraping
17  to where it became a calcium carbonate area, where it
18  was flat.
19    Q.  Sir, why is this so hard?  You didn't see any
20  asphalt on the ground on the site, did you?
21    A.  If you had asked me did I see any asphalt or
22  concrete, I would have said no.
23    Q.  Most people think -- when you think about a
24  paved road, they think there's asphalt or concrete,
25  right?

Page 274

1       MR. ADKINS:  Objection.
2       THE WITNESS:  I don't answer for most people.
3    I answer for myself, sir.
4  BY MR. MCALILEY:
5    Q.  Okay.  So you don't think asphalt and concrete
6  is what you mean when somebody says is the road paved?
7    A.  Yes, sir, I could think that, but on this
8  site, the road acted as a paved road.
9    Q.  Okay.  Did you do any percolation tests for
10  the road to see the extent to which water would
11  percolate into the road, into the road base and into the
12  ground?
13    A.  No, sir, I didn't.
14    Q.  How much did the wetlands on the site reduce
15  flooding in the east/west ditch before the defendants
16  engaged in their activities?
17    A.  They functioned to do the same thing that we
18  discussed before.  There were -- there was a lot of
19  friction on the site.  So any rainwater would fall
20  straight down and it wouldn't flow very heavily because
21  it was heavily vegetated.
22    Q.  The question is how much?  How much did it
23  reduce flooding?
24    A.  I did not quantify how much the site was
25  before because I never saw the site before it was

Page 275

1  impacted.
2    Q.  Okay.  How much -- how much has the
3  defendants' work on the site -- I'm asking you to
4  quantify it -- has it increased flooding in the
5  east/west creek?
6    A.  We did not quantify that.  That was not our
7  goal for this investigation.
8    Q.  When was the last flood in the area served by
9  the east/west ditch?
10    A.  I read some previous information about it.  I
11  think there was a large hurricane with associated rains.
12  I think it was in the mid-2000s or something like that.
13    Q.  How high were the flood waters?
14    A.  Sir, I just read an account of it.  I
15  didn't -- it was in the newspaper while I was
16  researching background information for my opinions, and
17  that was not reported on.
18    Q.  So you don't know, right?
19    A.  No, sir, I don't.
20    Q.  And how much flood water was held in all the
21  wetlands in Basin 4 during that last flood event; do you
22  know?
23    A.  No, sir, I don't.
24    Q.  Am I right that the defendants' activities on
25  the site basically created essentially a ring around the

Page 276

1  site due to the construction of the roadway at the
2  perimeter?
3       (Reporter interruption.)
4  BY MR. MCALILEY:
5    Q.  Am I right that you believe, Mr. Wylie, that
6  the defendants' activities have created like an elevated
7  ring around the perimeter of the site due to the
8  construction of the perimeter road?
9    A.  I believe that the road on most sections of
10  it, I don't think it's so much on the western -- on the
11  eastern section of the road, but I believe the elevation
12  has been raised on portions of the southern section of
13  the site, the western section of the site and portions
14  of the northern section of the site.
15    Q.  Okay.  Let's go to the report and let's see
16  what you wrote.
17       Okay.  I'm still on Deposition Exhibit No. 72
18  and at the bottom of the page 69, see there's a section
19  with a heading "2, Indirect (Secondary) Impacts to
20  Waters/Wetlands"?  Do you see that?
21    A.  Yes, sir.
22    Q.  This is a section of the report that you
23  wrote; isn't that right?
24    A.  Yes, sir.
25    Q.  Are the statements contained in this section



MICHAEL M. WYLIE, M.S.
USA vs BENJAMIN K. SHARFI

April 04, 2022
277–280

Page 277

1  true and correct statements to the best of your
2  knowledge?
3     A.  Yes, sir.
4     Q.  I'm going to read the first two sentences of
5  Section B, quote, The site disturbances, including land
6  leveling, filling and draining wetlands have
7  disconnected the surface and subsurface flow paths to
8  adjacent wetlands and waters. The elevated roadbeds
9  prevent the flow of surface water to the north/south
10  ditch and the Countess Joy wetlands north of the site.
11     Did I read that correctly?
12     A.  Yes.
13     Q.  Is that a true and correct statement?
14     A.  Yes, sir. That's my opinion.
15     Q.  So the defendants' site work reduced the
16  amount of runoff on the site, right?
17     A.  Yes, sir. The roads block that to some
18  degree.
19     Q.  So the defendants' activities have reduced
20  flood flows to the downstream water, haven't they?
21     A.  Yes, sir, you could say that. And they've
22  also -- he's also excavated ponds that contain water
23  which reduced flood flows too, but they were associated
24  impacts to wetlands.
25     Q.  Okay. And water still percolates into the

Page 278

1  ground on the site, right?
2     A.  Yes, sir.
3     Q.  Okay. And when -- the primary way that
4  pollutants can flow from the site to off street --
5  offsite waters like the east/west ditch is through storm
6  water, correct?
7     A.  Before or after impacts?
8     Q.  Just in general. In general, the primary way
9  that water running -- leaving a site will carry
10  pollutants with it is through storm water that flows off
11  the site, right?
12     A.  Yes, sir.
13     Q.  So if the defendants' activities now prevent
14  the flow of surface water from the site to the
15  north/south ditch and the Countess Joy wetlands north of
16  the site, that means that there is no longer pollutants
17  and storm water running off the site, correct?
18     A.  That's a possibility, but it was done without
19  the benefit of an Army Corps of Engineers permit.
20     Q.  Okay. Hold on. I'm not asking about permits
21  here. I'm asking about the facts about the water.
22     So it's more than a possibility. If there's
23  no surface water runoff from the site, that means that
24  it's not carrying any pollutants with it off the site,
25  correct?

Page 279

1     A.  Well, it would be okay, too, if you built a
2  10-foot barrier on the site, it wouldn't run off either.
3  What we're talking about is the actions were illegal
4  impacts without the advent of a permit. And that's fine
5  if it prevents the flow, but the actions were done
6  without the use of a permit.
7     Q.  So the answer is you agree with me that if
8  there's no storm water going off the site, that means
9  there's no pollutants being carried off the site either,
10  right?
11     MR. ADKINS: Objection; misstates testimony.
12     THE WITNESS: No, sir, there's not. There's
13  runoff in the roads from near the ditch. There's
14  runoff from the roads near the small ditch on the
15  northern part of the site. So there's -- that
16  would happen. There's also --
17  BY MR. MCALILEY:
18     Q.  It did that before --
19     MR. ADKINS: Let him finish.
20     THE WITNESS: There's also runoff from the
21  animals from their manure and from when they
22  urinate, which goes down to -- flows down to the
23  site, flows to the ponds and the ponds appear to be
24  connected to north/south ditch. So that's one
25  avenue.

Page 280

1     If the site undergoes large amounts of
2  rainfall so it floods, it would go off -- you would
3  have storm water flow there.
4     So I don't think I would characterize the site
5  as immune to storm water runoff. It depends upon
6  the circumstances and it depends on the flow from
7  the ponds to the north/south ditch.
8  BY MR. MCALILEY:
9     Q.  So Mr. Wylie, the sentence you wrote in the
10  report on page 70, quote, The elevated roadbeds prevent
11  the flow of surface water to the north/south ditch and
12  the Countess Joy wetlands north of the site, end quote,
13  that's a false statement?
14     A.  No, sir.
15     Q.  Okay. Do you stand by that statement, sir?
16     A.  Yes, sir.
17     Q.  Let me go back up here. What percentage of
18  the base flow from groundwater to Bessey Creek comes
19  from the site and the Countess Joy properties?
20     A.  I don't have that answer, sir.
21     Q.  What's the total volume of base water to
22  Bessey Creek each year from all sources?
23     A.  I didn't -- could you repeat that one more
24  time.
25     Q.  Yeah. What is the total volume of base flow



MICHAEL M. WYLIE, M.S.
USA vs BENJAMIN K. SHARFI

April 04, 2022
281–284

Page 281

1  to Bessey Creek each year from all sources?
2      A.   I don't have that number.  I think Dr. Nutter
3  would be the one to ask about that.
4      Q.   Okay.  On page 39, the last paragraph, let me
5  highlight here.  This paragraph says, quote, During
6  south Florida's dry season, the site, the Countess Joy
7  and West -- East and West properties and many acres of
8  wetlands in the study area provide shallow subsurface
9  flow to Bessey Creek, which maintains base flows to the
10  creek.  These base flows are important, as they sustain
11  the structure and integrity of aquatic floral and faunal
12  communities and boat navigation in downstream reaches of
13  Bessey Creek.
14      Did I read that right?
15      A.   Yes, sir.
16      Q.   What did you mean by aquatic floral and faunal
17  communities?
18      A.   Well, structures of an adjacent wetland,
19  structure of riparian zones, structure of the actual
20  creek as it flows here in Bessey Creek improved area,
21  it's a straight flow, but as it gets across -- as Bessey
22  Creek flows across Citrus Avenue, it becomes more
23  sinuous.  So that's a structure of the creek.
24      So you want to have base flows that continue
25  to make Bessey Creek flow as it's supposed to.

Page 282

1  integrity of the aquatic floral and faunal community is
2  that wetlands require water, aquatic life like fish.  We
3  observed a mullet and gar fish and alligators.  Without
4  base flows during the dry reason, the alligators
5  wouldn't certainly inhabit that, neither would the fish.
6  That's why base flow is important, because it's usually
7  the lowest amount of flow that maintains the integrity
8  of a perennial stream.
9      Q.   Got it.  Okay.  So you can't tell me how much
10  base flows from the areas served from the east/west
11  ditch affect water levels in the downstream areas of
12  Bessey Creek, right?
13      A.   That's correct, sir.
14      Q.   Okay.  And you also can't tell me how much
15  base flows from the east/west ditch affects boat
16  navigation in the downstream reaches of Bessey Creek,
17  correct?
18      A.   It augments it, but I can't tell you how much;
19  no, sir.
20      Q.   Okay.  Am I right that that boats navigate in
21  Bessey Creek only in the tidal areas east of the
22  Turnpike?
23      A.   You know, I've looked at photographs, aerial
24  photographs, and I see boat docks above, certainly well
25  above the Murphy Road Bridge and also back towards

Page 283

1  upstream in Bessey Creek.  But I really don't know the
2  depths there.  And if someone has a dock and I could see
3  a boat, then I assume that they can navigate there,
4  because they've got the boat and they built a boat dock.
5      So those are just observations from reviewing
6  aerial photographs.
7      Q.   Let me keep moving down here.  I think we've
8  already talked about nutrients.  Go to "Carbon
9  Production and Export Processes," Section C on page 41.
10  This is a section that you wrote as well, right?
11      A.   Yes, sir, that's correct.
12      Q.   The papers that you cited in the -- in this
13  section in that first paragraph are all generally
14  reference papers about carbon production export related
15  to wetlands, right?  They're not specific to Bessey
16  Creek or Martin County, right?
17      A.   Yes, sir, that's correct.
18      Q.   Okay.  And am I right that when you refer to
19  carbon or energy sources, that's another way of saying
20  nutrients?
21      A.   No, sir.  Carbon's different than a nutrient.
22  The nutrients are phosphorus, nitrogen, copper.  That
23  would be more of a nutrient.  Carbon is, they're
24  utilized to build protein and whatnot.  So they're a
25  different kind of --

Page 284

1      Q.   Sir, am I right that you want carbon export?
2  That's a good thing?
3      A.   Yes, sir.  Carbon export is a function of
4  wetlands that's important to downstream waters.
5      Q.   Okay.  And I'm looking at the section of your
6  report that carbon export comes from decaying vegetation
7  matter?
8      A.   Yes, sir, it can.
9      Q.   So I think you use examples in here about the
10  next page here, you refer to leaf litter and wood as
11  being broken down and that's a source of carbon export?
12      A.   Yes, sir, that's correct.
13      Q.   So you would agree with me that trees can live
14  on both uplands and wetlands, right?
15      A.   Yes, sir, that's correct.
16      Q.   So do you have any data from the site or the
17  Countess Joy property showing that the wetlands there
18  produce more leaf litter and wood than upland areas?
19      A.   No, sir, I do not.  You could probably ask
20  Dr. Rains that question.  She could probably respond to
21  that better.
22      Q.   Okay.  The last sentence says, quote -- this
23  is on page 44 -- These carbon energy sources are
24  essential for the maintenance of the structure and
25  functioning of Bessey Creek's aquatic resources.



MICHAEL M. WYLIE, M.S.
USA vs BENJAMIN K. SHARFI

April 04, 2022
285–288

Page 285

1    Did I read that right?
2    A.  Yes, sir.
3    Q.  How much of the carbon or energy sources in
4  Bessey Creek come from wetlands as opposed to trees and
5  plants located on uplands near tributaries?
6    A.  I don't know the answer to that.  You could
7  probably ask Dr. Rains.  She would know certainly about
8  wetland vegetation and the carbon export much more than
9  I would versus the upland carbon export.
10    Q.  How much of the carbon or energy sources in
11  Bessey Creek come from the east/west ditch?
12    A.  I don't have an answer for that, sir.
13    Q.  Am I right that as the hybrid wetland
14  treatment facility, the way it treats the water is that
15  it precipitates out particles through an alum treatment
16  process?
17    A.  I've read how it functions and I think that's
18  correct.
19    Q.  Would you agree with me that chemical
20  treatment process that precipitates out particles could
21  also take out the particles of decomposing leaves and
22  wood as the carbon energy source, right?
23    MR. ADKINS:  Objection; foundation.
24    THE WITNESS:  Wow, I don't -- I really don't
25  know how to respond to that.  I don't know the

Page 286

1    answer to that.
2  BY MR. MCALILEY:
3    Q.  Okay.  You just don't know, right?
4    A.  That's correct.
5    Q.  Okay.  Let's go down to the next section here.
6  "Wetland Sediment Trapping," you wrote this section too,
7  right?
8    A.  Yes, sir, I did.
9    Q.  Okay.  So the paper on the end of the first
10  paragraph, this, again, is on page 42, Johnson 1991,
11  that's a general reference about the sediment trapping
12  qualities of wetlands.  That's not a specific study
13  related to Bessey Creek or Martin County, right?
14    A.  Yes, sir, that's correct.
15    Q.  How much sedimentation occurs in Bessey Creek
16  each year?
17    A.  I don't know the answer to that question.
18    Q.  How much sedimentation occurs in the east/west
19  ditch each year?
20    A.  I don't know the answer to that question
21  except that I've observed sedimentation in a photograph
22  that Dr. Nutter took and also I observed sedimentation,
23  heavy sedimentation, near Citrus Avenue at the outflow
24  of the HWTT.
25    Q.  Okay.  How much sediment is trapped in the

Page 287

1  Countess Joy property each year?
2    A.  I don't have an answer to that, sir.
3    Q.  And am I right that you have no data
4  indicating how the amount of sediment has changed since
5  the defendants engaged in their activities on the site?
6    MR. ADKINS:  Objection; vague.
7    THE WITNESS:  The sediments in Bessey Creek?
8  BY MR. MCALILEY:
9    Q.  Yeah.
10    MR. ADKINS:  Same objection.
11    THE WITNESS:  No, sir, I don't have an answer
12    to that question.
13  BY MR. MCALILEY:
14    Q.  Okay.  So we're on page 42.  I want to draw
15  your attention to the last sentence of this section.
16  Quote, As Bessey Creek continues to exhibit P levels
17  that exceed its 2009 TMDL targets, individual wetlands
18  on the site (taken alone) and similarly situated
19  wetlands in the Bessey Creek watershed that trap
20  sediment are critical in helping to reduce the amount of
21  P impairing water quality in Bessey Creek and in
22  downstream TNWs.
23    Did I read that right?
24    A.  Yes, sir.
25    Q.  Okay.  So it is your opinion that the wetlands

Page 288

1  on the site, the six acres of wetlands that you have
2  delineated taken alone are critical in helping to reduce
3  the amount of phosphorus impairing water quality in
4  Bessey Creek and downstream traditional navigable
5  waters; is that correct?
6    A.  Yes, sir, I am, because of the amount of
7  animals that surrounded the site even before impacts
8  happened.  I think Doctor -- or Mr. Sharfi has
9  greenhouses.  He has many animals that utilize the
10  20 acres north of that.  So they're a significant source
11  of phosphorus.
12    Q.  Okay.  How much phosphorus was trapped by the
13  wetlands on the site before the defendants engaged in
14  their activities?
15    A.  All I can tell you is wetlands function to
16  trap and transform phosphorus to inearth forms that are
17  held up in sediments in depressional wetlands.
18    Q.  You can't tell me how much phosphorus is
19  trapped on the six acres of wetlands you delineated on
20  the defendant's site before the work was done?
21    A.  No, sir.  That wasn't the goal of our
22  investigation.
23    Q.  So you can't tell me how much sediment -- if
24  you can't tell me how much sediment and phosphorus is
25  trapped on the site, how can you conclude that it was



MICHAEL M. WYLIE, M.S.
USA vs BENJAMIN K. SHARFI

April 04, 2022
289–292

Page 289

1  critical in helping to reduce the amount of phosphorus
2  impairing water quality in Bessey Creek and downstream
3  TNWs?
4     A.  Well, the reason why it's critical is because
5  Bessey Creek is impaired for phosphorus and also
6  wetlands and also additional loadings of animals, septic
7  tanks, which are known to have nitrogen and phosphorus
8  impacts and coliform impacts.  So any time you lose
9  wetlands and their ability to function as a nutrient
10  cycling, it is important to an impaired water body.
11     Q.  So your opinion about the critical function of
12  wetlands on the site and trapping phosphorus is based in
13  large part upon the fact that Bessey Creek has been
14  listed as impaired for phosphorus.
15     Am I understanding that correctly?
16     A.  That's how -- that's one important function of
17  the wetlands on the site, was to track phosphorus.
18     Q.  I'm just trying to get at the basis of your
19  opinion.  And a key element of your opinion here is that
20  the wetlands on the site were critical to helping to
21  reduce phosphorus in Bessey Creek because Bessey Creek
22  is impaired for phosphorus; is that right?
23     A.  The wetlands were important because it was
24  surrounded by animals that, quite frankly, defecate and
25  urinate around a flow that that storm water would carry

Page 290

1  that through the site, through the north/south ditch and
2  across the Countess Joy East and West.  So they were
3  important because they were the first line of defense,
4  easier to say to store and basically tie up phosphorus
5  before it got to Bessey Creek.
6     Q.  Let's go to the next section here, "E:
7  Maintenance of Plant and Faunal Communities on the Site
8  and in Similarly Situated Wetlands are Important in
9  Maintaining the Biological Integrity of Downstream
10  Traditional Navigable Waters."
11     Did you write that section?
12     A.  Yes, sir.
13     Q.  The downstream traditional navigable waters
14  are an esturean ecosystem, right?
15     A.  They are an esturean and they're also Bessey
16  Creek, which is a more of a fresh water ebb and flow
17  tide system above the Murphy Road Bridge.  So it's a
18  combination of fresh esturean and whatnot in traditional
19  navigable waters.
20     Q.  Hold on.  You focused on the traditional
21  navigable waters.  Didn't you testify earlier the areas
22  of Bessey Creek that are traditional navigable waters
23  are those areas that are subject to the tide, influence
24  of the tide?
25     A.  Yes, sir, I do.

Page 291

1     Q.  Okay.  So, and an estuary is a place where
2  salt water and fresh water meets and mixes, right?
3     A.  Yes, sir.
4     Q.  And that an estuary of normal for the relative
5  salinity for the water to change the --
6     (Reporter interruption.)
7     MR. MCALILEY:  I'm sorry.
8  BY MR. MCALILEY:
9     Q.  So it's normal for the salinity levels in an
10  estuary to vary over the course of a year, right?
11     A.  Yes, sir.
12     Q.  So there's times when the salinity levels in
13  the tidal areas of Bessey Creek are higher and there's
14  times when the salinity areas in the areas of Bessey
15  Creek are lower; is that fair?
16     A.  Yes, sir.  And there's also times when it's
17  totally fresh water, but it's at least in the upper
18  part, because of a low tidal range, heavy rainfall
19  upstream.  In fact, some of the material I've read about
20  the estuaries, it turns just about totally fresh upon
21  very heavy rainfall.
22     So that would be all fresh water and no
23  salinity changes until that water fleshed out of the
24  system.
25     Q.  Okay.

Page 292

1     A.  The issue about Bessey Creek at Murphy Road
2  Bridge is, is that what we -- we felt very comfortable
3  there and we wanted to -- put a marker on that spot, but I
4  think you got -- what my testimony and my opinion is, is
5  it is that upstream of that, there's still range of --
6  to the ebb and flow of the tide, which is there's a TNW.
7     So we used this and felt comfortable here, but
8  that is not the final area where the TNW would be
9  defined.
10     Q.  The St. Lucie Estuary sometimes goes
11  completely fresh.  Is that your testimony just now?
12     A.  That's the -- some of the information that
13  I've read, is that at least the North Fork of it goes --
14  because there's so much fresh water pouring into it,
15  it's very difficult for some of the critters to live
16  because you go from esturean to different salt regimes
17  and they have a very hard time living in those kind of
18  situations.
19     Q.  So it's a bad thing when the St. Lucie Estuary
20  goes completely fresh.  Just the critters aren't ready
21  for it, basically, and it's hard for them to live in the
22  estuary when it goes completely fresh; is that right?
23     A.  What's interesting, the St. Lucie Estuary is
24  manmade and it used to be a fresh water river until
25  there was an opening cut in.  So what's happening is you



MICHAEL M. WYLIE, M.S.
USA vs BENJAMIN K. SHARFI

April 04, 2022
293–296

Page 293

1  have -- over decades, you've had critters, wetlands,
2  sediments that have adapted to this different salt/fresh
3  regime and then you have big insults, as with hurricanes
4  or large rainstorms and whatnot, that changes the
5  salinety regime and impairs the critters that live
6  there.
7      Q.  Okay.  But it's an estuary now, though.  I
8  know historically it was fresh water.  But it was the
9  Army Corps of Engineers that dug the inlet, St. Lucie
10  Inlet, wasn't it?
11      A.  Gosh, I really -- I don't know exactly that
12  answer.
13      Q.  Well, the St. Lucie Inlet and the South Fork
14  of the St. Lucie River are a part of the Okeechobee
15  waterway, aren't they?
16      A.  I don't know the answer.
17      MR. ADKINS:  Objection; foundation.
18  BY MR. MCALILEY:
19      Q.  Okay.  And okay.  Are you aware that the Army
20  Corps of Engineers manages the water control structures
21  that let water out of Lake Okeechobee into the St. Lucie
22  River?
23      A.  I'm aware that they maintain structures around
24  Lake Okeechobee.  Yes, I don't know about the St. Lucie
25  River, but I do know they maintain structures around

Page 294

1  Lake Okeechobee.
2      Q.  Are you aware that the total phosphorus levels
3  and total nitrogen levels in water in Lake Okeechobee is
4  very high?
5      A.  Yes, sir, I am.
6      Q.  Are you aware that approximately every three
7  or four years the Corps of Engineers opens up the gates
8  and has massive releases of fresh water from the lake
9  into the St. Lucie River?
10      A.  I'm aware that they do release water and it
11  has large impacts on downstream waters.
12      Q.  Okay.  And you're aware that when the Corps of
13  Engineers does that, the primary source of phosphorus
14  and nitrogen in the St. Lucie Estuary is the water the
15  Corps is letting out from Lake Okeechobee?
16      A.  I don't know that answer, but I would
17  generally agree with your -- with that assumption.
18      Q.  Would you agree with me that there is a much
19  larger effect on the water quality in the St. Lucie
20  River from the Corps of Engineers' own actions letting
21  water out of the lake than there are from any activities
22  that Mr. Sharfi did on his property?
23      MR. ADKINS:  Objection; no foundation.
24      THE WITNESS:  Would you like me to answer that
25  question?

Page 295

1  BY MR. MCALILEY:
2      Q.  That's why I asked it.
3      A.  Okay.  I would generally agree with that
4  question.
5      Q.  Okay.  Let's go back here to the --
6      MR. ADKINS:  Before we continue, can I get --
7  what's your running time?  Do we have it?  What is
8  our running time?
9      MR. MCALILEY:  I think we still have time.  I
10  think I have until around 6.
11      MR. ADKINS:  No.  I mean how much tape time
12  have we used?
13      THE VIDEOGRAPHER:  As of 5:00, we were at
14  6:58.  So now let's add to the -- 18 -- minus 16
15  minutes to that.  So that's seven hours, 16
16  minutes.
17      MR. ADKINS:  So we've gone now beyond a
18  deposition at seven hours one day.  You know,
19  Counsel, do you have an estimate about how much
20  longer you might need?
21      MR. MCALILEY:  I told you, I may need to
22  finish by 6.  I have to tell you, I've asked a lot
23  of questions and they could have been answered with
24  a yes or no and I got two pages of an answer.  So I
25  can't control all of this.

Page 296

1      MR. ADKINS:  I totally understand.  I'm not
2  saying we're going to cut the deposition right now.
3  I was just curious whether -- if you have an
4  estimate, maybe we can work with you on this.
5      MR. MCALILEY:  I'll be done by 6.  I'm trying
6  to get done sooner than that.
7      MR. ADKINS:  Okay.
8  BY MR. MCALILEY:
9      Q.  Okay.  So Mr. Wylie, let's talk about the
10  planned flora and faunal communities here.  What animals
11  travel between the site and the Countess Joy properties
12  and the esturean waters of Bessey Creek?
13      A.  I would say fish, certainly fish.  We saw fish
14  in the north/south ditch.  And these fish, when the
15  water levels are high, are transported to Bessey Creek
16  and then they can migrate up and down.
17      Certainly, birds utilize that area, where we
18  saw many species of birds that utilize -- that are
19  things like white Ibis, we saw redtail hawks.  We saw
20  wood storks.  I'm sorry, not wood storks, sandhill
21  cranes.  I didn't see a wood stork.  Scratch that.  I --
22  so the -- typically, it's fish.
23      We saw an alligator that could easily go from
24  the north/south ditch down to waters that are
25  traditional navigable waters that are affected by the



MICHAEL M. WYLIE, M.S.                                    April 04, 2022
USA vs BENJAMIN K. SHARFI                                      297–300

Page 297

1  ebb and flow of the tide.
2        So those are the kind of critters that I'm
3  talking about.
4      Q.   Okay.  So you believe that fish from the
5  traditionally -- the tidally influenced areas to Bessey
6  Creek swim all the way up to the site?  Is that your
7  testimony?
8      A.   Once again, the tidally influenced areas don't
9  mean salt.  They are very fresh too if they're still
10  influenced.  In fact, their vegetation changes at the
11  head of every salt wedge that typically peters out with
12  elevation inflow and then it becomes affected by the ebb
13  and flow of the tide, but it's fresh water or very low
14  amounts of salinety.
15        So fish can do that.  That's possible.
16  Certainly birds do it.  Alligators will do it.
17      Q.   Okay.  Let's put aside the birds and the
18  gators.  The fish, so it's your testimony that you
19  believe fish swim from the tidally influenced waters of
20  Bessey Creek all the way up to the site?
21      A.   Sure.
22      Q.   Right?
23      A.   Sure.  I think so mullet would and gar fish.
24  We saw those.
25      Q.   You saw gar fish in the east/west ditch?

Page 298

1      A.   Yes.
2      Q.   Did you see gar fish in the north/south ditch?
3      A.   No, I didn't.
4      Q.   Did you see mullet in the north/south ditch?
5      A.   No, I didn't.
6      Q.   The north/south ditch is dry for most of the
7  year, isn't it?
8      A.   It is not dry, but it doesn't have a surface
9  connection for certain parts of the year.
10      Q.   Okay.  And fish don't swim through
11  groundwater, do they?
12      A.   No, sir, the last time I checked they did not.
13      Q.   Okay.  All right.  You said that birds travel
14  between the site and the downstream esturean waters and
15  you listed Ibis, hawks and cranes.  Did I get the list
16  right?
17      A.   Yes, sir, I noted those.
18      Q.   Those are migratory birds, aren't they?
19      A.   No, sir.
20      Q.   And Ibis is not a migratory bird?
21      A.   A white Ibis I thought was a native of south
22  Florida.
23      Q.   Doesn't -- okay.  Sir, doesn't a migratory
24  bird simply mean a bird that lives one part of its life
25  in one area and then it goes to another area for a

Page 299

1  different part of its life, either seasonally or over
2  its lifespan?
3      A.   Yes, sir.  I guess that would be -- I'm not an
4  expert on birds, but I'm just telling you what I
5  reported.  But Ibis, I thought Ibis inhabited south
6  Florida all the time.  I don't know where they roost, if
7  that's what you're talking about, or go up to
8  Antarctica, like a turn, but...
9      Q.   I see.  So Mr. Wylie, you think a migratory
10  bird is a bird that has to travel like across
11  continents?
12      A.   Typically, migratory birds move significant
13  distances because they're either breeding or they're
14  moving with food and they're leaving colder areas, and
15  then they go back to colder areas when they warm up.  So
16  typically, what migratory birds do is they move with the
17  seasons to utilize food sources or living conditions.
18      Q.   Is part of your opinion that the wetlands on
19  the site are part of the waters of the United States
20  based on the fact that the wetlands are used by
21  migratory birds?
22      A.   No, sir, it's not.
23      Q.   Okay.  But you mentioned birds here.  Cranes,
24  you would agree with me that those are migratory birds,
25  right?

Page 300

1      A.   Cranes, I said -- I said sandhill cranes.  You
2  know, interestingly, yes, they are.  Although I'm sure
3  some of them stay here all the time like they do others.
4  Yes, they are migratory birds.
5      Q.   Put it this way:  There's a federal law called
6  the Migratory Bird Protection Act, isn't there?
7      A.   Yes, sir.
8      Q.   Okay.  Sandhill crane is protected under the
9  Migratory Bird Protection Act, isn't it?
10        MR. ADKINS:  Objection; foundation.
11        THE WITNESS:  Yes, sir.  If it's a migratory
12    bird, yes, sir, I guess it is.
13  BY MR. MCALILEY:
14      Q.   Is the Ibis protected under the Migratory Bird
15  Protection Act?
16        MR. ADKINS:  Objection; foundation.
17        THE WITNESS:  I don't know the answer to that.
18  BY MR. MCALILEY:
19      Q.   So part of your testimony here, your opinion,
20  that the wetlands have an important -- the wetlands on
21  the site are important to the biological integrity of
22  the downstream waters, is the presence of birds on the
23  site; is that right?
24      A.   Birds are one of the faunal communities and
25  they -- it's important, these birds inhabit wetlands in



MICHAEL M. WYLIE, M.S.
USA vs BENJAMIN K. SHARFI

April 04, 2022
301—304

Page 301

1  similarly situated areas and they also inhabit the areas
2  near the traditional navigable waters of Bessey Creek,
3  same as the -- the same as the redtail hawk, which is
4  not a migratory bird.
5      Q.   Did you see any alligators in the north/south
6  ditch?
7      A.   I did not.  One of our team saw it and
8  reported to me.
9      Q.   Am I right you believe all wetlands provide
10  habitat for plants and animals?
11      A.   The last three words kind of faded out.
12      Q.   Do you believe that all wetlands provide
13  important habitat for plants and animals?
14      A.   There is no yes or no answer to that, but what
15  wetlands do is they provide functions that animals or
16  plants exploit and they're very important for those
17  plants or animals to grow there, but not all wetlands
18  function the same.  Not all wetlands grow cypress trees.
19  Not all wetlands grow pine trees.  Not all wetlands
20  provide feeding opportunities for sandhill cranes.
21      So each wetland functions differently in the
22  landscape and then plants and animals take care -- take
23  advantage of those opportunities to flourish in those
24  wetlands.
25      Q.   Okay.  Can you tell me why the functions

Page 302

1  provided by wetlands on the site have a significant
2  effect on the downstream aquatic ecosystem?  What I
3  mean -- when I say "downstream aquatic ecosystem," I'm
4  referring to the biologic integrity of the ecosystem in
5  the traditional navigable waters.
6      A.   Sure.  The -- and I think we discussed this
7  before.  The site in combination with other similarly
8  situated wetlands, we talked about carbon export, the
9  structure and function of an intact wetland that drops
10  leaves.  We have cavities for animals to exploit for
11  nesting and loafing and whatnot, and we have wood
12  export.  We also have wetland plants assist in trapping
13  and uptaking nutrients.
14      So those are functions of an instability
15  wetland that, therefore, then prevent phosphorus and
16  nitrogen from entering a potential water body.  They
17  prevent sediment from impacting a potential water body.
18  They provide carbon export which fuels the bottom of the
19  ecosystem for downstream with particulate in dissolved
20  organic matter which fuels the smallest critters like
21  zooplankton, plankton, which then -- small minnows,
22  large minnows, gators, turtles.  That's the structure
23  and function.  So it has to start someplace.
24      And what a watershed does then, it's a funnel
25  for everything downstream because that's where

Page 303

1  everything flows.  And that's what all the functions of
2  these wetlands, intact wetlands that function
3  appropriately -- and they don't all function the same.
4  So that's what I mean by the site.  And similarly
5  situated wetlands in the region are extremely important
6  to maintain the biological integrity of downstream
7  waters.
8      Q.   Can you tell me how much of the biological
9  function, the wetlands on the site and the Countess Joy
10  property provide to the downstream traditional navigable
11  waters compared to other wetlands in Basin 4?
12      A.   You're going to have to be more specific
13  because often wetlands are --
14      Q.   Okay.  Let me break it down.  Let me ask it
15  differently.
16      What proportion of the biological function
17  that's provided by wetlands to the traditional navigable
18  waters at Bessey Creek are provided by the wetlands
19  adjacent to the east/west ditch?
20      A.   To the biological functions of that?  Are you
21  looking for a quantitative amount?
22      Q.   Yeah, yeah.
23      A.   Well, sir, the best way I could respond to
24  that would be look at the -- and why we use a watershed
25  approach or study area, we have a watershed that we

Page 304

1  defined as 11,000 -- a little over 11,000 acres and a
2  very underestimated amount of wetlands we think are in
3  this watershed are almost 10 percent of that.
4      So the functions that I've articulated in my
5  expert report are significant because they provide
6  certain functions that improve the biological,
7  structural and functioning of the TNWs.  And we
8  talked --
9      Q.   So that 10 percent number you just gave me,
10  Mr. Wylie, that is -- 10 percent of the overall
11  watershed is wetlands, if you follow the National
12  Wetland Inventory mapping, right?
13      A.   Yes, and we think that's an understatement.
14      Q.   Okay.  So, but my question is, is -- but you
15  don't know how many acres of wetlands there are adjacent
16  to the east/west ditch, right?
17      A.   There's hundreds of acres.
18      Q.   But you haven't calculated this -- I asked you
19  this before lunch -- right?
20      A.   No, sir, we haven't calculated it exactly.  In
21  the east/west ditch you were referring to, I guess,
22  Citrus Avenue West.
23      Q.   Everything upstream of the hybrid wetland
24  treatment facility, you have not calculated the number
25  of wetlands adjacent to the east/west ditch upstream of



MICHAEL M. WYLIE, M.S.
USA vs BENJAMIN K. SHARFI

April 04, 2022
305–308

Page 305

1  that location, right?

2      A.  That's correct, sir.

3      Q.  So you can't tell me what percentage of

4  wetlands of the overall basin are adjacent to the

5  east/west ditch, right?

6      A.  No, I can't.

7      Q.  So you can't tell me what percentage of the

8  biological functions provided by all wetlands to Bessey

9  Creek is provided by wetlands adjacent to the east/west

10  ditch, right?

11      MR. ADKINS:  Objection; misstates testimony.

12      THE WITNESS:  I think we talked about what the

13      wetlands do, but I can't quantify number of

14      acreages, but all I can respond to that is we

15      observe functions that occur in wetlands that are

16      adjacent to the north/south ditch, as you call it,

17      or Bessey Creek as we refer to it.

18  BY MR. MCALILEY:

19      Q.  Yeah, but you can't even estimate the

20  proportion of biological functions to the downstream TNW

21  that is provided by wetlands adjacent to the east/west

22  ditch, right?

23      A.  No, sir.  That wasn't the goal of our

24  investigation.

25      Q.  Okay.  All right.  I think I just have a

Page 306

1  couple of questions left and then I'll take a break and

2  maybe I'm done, which I'm sure would be good news to

3  everybody.

4      Okay.  I want to go back here to the report,

5  now on page 71.  So this is the section of the report in

6  which you talk about what are the secondary effects of

7  the defendants' activities on the site and this is in

8  Section D, "Changes in the Rate, Timing and Quality of

9  Carbon Export Offsite."

10      This is a section that you wrote, right?

11      A.  Yes, sir, it is.

12      Q.  Okay.  Do you stand by the conclusions that

13  you stated in this section of the report?

14      A.  Yes, sir, I do.

15      Q.  Okay.  I'm going to draw your attention here

16  to the sentence that, looks like it's the third

17  sentence, "When applying this principle, the partially

18  filled and drained wetlands on the site become a net

19  carbon exporter instead of sequestering carbon."

20      Do you see that language?

21      A.  Yes, sir.

22      Q.  Did you write that?

23      A.  Yes, sir.

24      Q.  So the defendants' activities on the site have

25  caused the site to become a net carbon exporter instead

Page 307

1  of sequestering carbon?

2      A.  Yes, sir.

3      Q.  Okay.  So the amount of carbon export has

4  increased as a result of the defendants' activities,

5  right?

6      A.  They -- yeah, that's a good question.  The net

7  carbon exporter is after the Wright and Reddy paper,

8  which talked about drainage in wetlands and what

9  happened is organic material that was like in the form

10  of muck or whatnot starts decomposing, and what happens

11  then is carbon is exported instead of stored with carbon

12  building up in the soil.

13      So partially drained and partially filled and

14  drained wetlands then start losing soil, which is muck

15  because they don't have water covering them anymore and

16  they can't continue to be that.  So they become a carbon

17  exporter for the site instead of retaining carbon in

18  sequestration.

19      Q.  Okay.  So the defendants' activities increased

20  the export of carbon from the site, right?

21      A.  In the muck zones, yes, sir.

22      Q.  Well, it doesn't just say that in this report,

23  right?  This section of the report, it simply says it

24  has become the net carbon exporter instead of

25  sequestering carbon, right?

Page 308

1  A.  That was my statement; yes.

2      MR. MCALILEY:  So why don't we stop.  If we

3  could have a ten-minute break, I just need to make

4  sure I haven't missed anything because I bounced

5  around a lot.  I appreciate your patience here.

6      And Brandon, what I'm also going to do is

7  circle up on my end to try to close up those other

8  items we were doing off the record on scheduling

9  and, you know, the work product, things like that.

10  So hopefully I could get all that stuff wrapped up

11  now.

12      THE VIDEOGRAPHER:  Okay.  We're going off the

13  record.  The time is approximately 5:37 p.m.

14      (A break was had.)

15      THE VIDEOGRAPHER:  We are back on the record.

16  The time is approximately 5:54 -- make that

17  5:55 p.m.  Thank you.

18      MR. MCALILEY:  Okay.  Mr. Wylie, I probably

19  have a few more hours of questions for you.

20  However, it's been a long day and I think at this

21  point it would be better if I stopped.  So I want

22  to just thank you for your patience and your good

23  humor and day of questioning and I turn over the

24  witness to your counsel.

25      THE WITNESS:  Yes, sir, thank you.



MICHAEL M. WYLIE, M.S.
USA vs BENJAMIN K. SHARFI

April 04, 2022
309–312

Page 309

1       CROSS (MICHAEL M. WYLIE, M.S.)
2   BY MR. ADKINS:
3       Q.   Thank you.  Okay.  So Mr. Wylie, my name is
4   Brandon Adkins.  As you know, I represent the plaintiff,
5   the United States in this case.  It's my turn to ask you
6   some questions.  I'm going to try to make this
7   relatively brief, okay?
8       A.   Okay.
9       Q.   First, let me show you a document that has
10  been marked Deposition Exhibit 73.
11          Okay.  So these are the figures that were --
12  that accompanied the United States DOJ expert team
13  report.
14          Are you familiar with this document?
15      A.   Yes, I am.
16      Q.   Okay.  Let me take you down to Figure II.B.1.
17  Do you see Figure II.B.1 on your screen, Mr. Wylie?
18      A.   Yes, I do.
19      Q.   Now, this is the South Florida Water
20  Management District Basin 4 outline; is that correct?
21      A.   Yes, sir, it is.
22      Q.   Now, do you remember answering some questions
23  earlier today about the 1,064 acres of wetlands in your
24  study area?
25      A.   Yes, I do.

Page 310

1       Q.   And do you recall in your testimony saying
2   that some of the wetlands mapped by NWI within Basin 4
3   are isolated?
4       A.   I remember talking about the isolated, but if
5   you could give me some more context.
6       Q.   Let me see if I can ask -- let me ask a
7   question differently.
8           I heard you to say that some of the wetlands
9   within Basin 4 that were mapped by NWI are isolated.  Is
10  that what you meant or could you explain what you meant
11  by "isolated"?
12      A.   Well, isolated wetlands can certainly appear
13  on NWI charts because they're just visual observations
14  from interpretations of aerial photographs.  Certainly,
15  they could be an isolated wetland.  They could be an
16  isolated cypress dome.  They're all over Florida.  There
17  are isolated wetlands all over Florida.
18          In this instance, I think I testified that
19  there could be isolated wetlands on there, but the areas
20  that we were talking about on the NWI chart were small
21  depressional wetlands.  And the depressional wetlands I
22  saw were all connected as part of pine flatwoods,
23  greater pine flatwood flow ways that we saw on the
24  Countess Joy East and West site.
25      Q.   Do you have any reason to think that the

Page 311

1   wetlands on the NWI map in Basin 4 lack a hydrologic
2   connection to Bessey Creek?
3       A.   No, I don't; no.
4       Q.   You similarly identified an area in the
5   northeast portion of Basin 4 and this area is near the
6   St. Lucie River.
7           Do you recall that testimony?
8       A.   Yes.  Yes, I do; yes.
9       Q.   And you recall testifying that there were some
10  wetlands that NWI mapped in that northeast portion of
11  Basin 4 that were -- that flowed into the St. Lucie; is
12  that correct?
13      A.   Yes.  I discussed that with Mr. McAliley.
14      Q.   Now, what effect, if any, does the existence
15  of wetlands in your study area at that portion that
16  we're talking about in the northeast corner, what effect
17  would that have on the conclusions that you're offering
18  in this case?
19      A.   It would be negligent.
20      Q.   Why is that?
21      A.   First of all, the flow path is -- it appears
22  to be away from Bessey Creek.  It was included as part
23  of estranged area Basin 4.  So these wetlands really,
24  the functions that they would possess wouldn't really
25  affect any of the characterizations I used for

Page 312

1   significant nexus for Bessey Creek where it's TNW.
2       Q.   Okay.  I'm going to show you another document.
3   This is -- well, I'm showing you a document that I have
4   marked Deposition Exhibit 81.
5           (Deposition Exhibit No. 81 was marked for
6   identification.)
7   BY MR. ADKINS:
8       Q.   At the top of this document is "Appendix 5,
9   Chronology of Activities on the Site."
10          Do you see this?
11      A.   Yes, I do.
12      Q.   It says "Photograph 5-1, 1966 Partially
13  Cleared for Pasture/Agricultural Production."
14          Do you see that?
15      A.   Yes.
16      Q.   Do you recognize this appendix as one that was
17  attached to the expert report that the DOJ expert team
18  submitted?
19      A.   Yes, I do.
20      Q.   Do you recall being asked some questions
21  during your deposition whether you had photographs in
22  your report that you believe support that wetlands on
23  the site abut the north/south ditch?
24      A.   Yes, I do.
25      Q.   Do you know whether any of those photographs



MICHAEL M. WYLIE, M.S.
USA vs BENJAMIN K. SHARFI

April 04, 2022
313–316

Page 313

1  that you had in mind are in this appendix?
2      A.   Yes, they are.
3      Q.   Let's look at the first photograph here.  What
4  is this a photograph -- oh, I'm sorry.  Okay.  I'm going
5  back to Photograph 5-1, 1966.  Does this photograph have
6  any relevance to that conclusion that we discussed
7  earlier in deposition?
8      A.   It's very important; yes.
9      Q.   Why is that?
10     A.   In the southwest corner you see the wetland
11  that is basically abutting any future location of the
12  north/south ditch.  I can't really observe a ditch
13  imprint here until we get up to the northwest portion
14  and you can see side casts.  It's typically when folks
15  excavate a ditch, they throw side casts and you could
16  see that in the northwest portion.
17          When you go down to the southwest portion, I
18  see no evidence of ditch.  I'm not saying it's not
19  there, but there's no evidence of it.  And there's a
20  large depressional wetland right there that certainly
21  goes right to the edge of the Sharfi property.
22     Q.   So when you say this picture is important,
23  does this picture support your conclusion that wetlands
24  on the site abut the north/south ditch prior to
25  disturbances by defendants?

Page 314

1      A.   Yeah, the way I would characterize it is the
2  ditch was excavated through this area of wetlands on the
3  southwest side.
4      Q.   I'm moving to the second page of Appendix 5.
5  This is Photograph 5-2, 1995.  Do you see the picture
6  I'm looking at here?
7      A.   Yes, I do.
8      Q.   Okay.  Does this picture have any relevance to
9  your conclusion that wetlands on the site abut the
10  north/south ditch prior to defendants' activities?
11     A.   Yes, it does.  It's a very similar picture
12  except it's, you know, obviously 30 years later almost
13  and the wetlands cross the Sharfi property line.
14     Q.   Let's go to the next photograph.  This is
15  Photograph 5-3, 2005.  Do you see that photograph?
16     A.   Yes, I do.
17     Q.   Does this Photograph 5-3, 2005 have any
18  relevance to your conclusion that wetlands on the site
19  abut the north/south ditch prior to the defendants'
20  activities?
21     A.   It's the same conclusion that the wetlands on
22  the southwest side run to the next property, which is
23  the greenhouse property.
24          (Deposition Exhibit No. 82 was identified for
25  the record.)

Page 315

1  BY MR. ADKINS:
2      Q.   I'm now showing you a document that's been
3  marked Deposition Exhibit 82.  This has been
4  Bates-stamped USAExperts_0000425.
5          Are you familiar with this document,
6  Mr. Wylie?
7      A.   Yes, I am.  I took the picture.
8      Q.   Okay.  Do you recall where you took this
9  picture from?
10     A.   I took it from the west bank of the
11  north/south ditch.
12     Q.   Were you on the Countess Joy referenced
13  property when you took this picture?
14     A.   That's correct.
15     Q.   What is this picture depicting?
16     A.   Bessey Creek is the water body to the left.
17  It's flowing away from us and where I've put the dutch
18  auger, that's the confluence of north/south ditch in
19  Bessey Creek.
20     Q.   Okay.  So there are three, I'll say images on
21  this document; is that right?
22     A.   That's correct.
23     Q.   And there's a photograph at the top and two
24  images on the bottom; is that correct?
25     A.   That's correct.

Page 316

1      Q.   Okay.  And the photograph in the top you say
2  there's a dutch auger.  Is that the metallic implement
3  that is -- it appears to be in some standing water?
4      A.   It's like a T-bar on top and then an auger on
5  the bottom.  It's underneath the water.
6      Q.   Okay.  To the right of that picture, what --
7  is that -- what are we seeing here?  What is the water
8  to the right of that dutch auger?
9      A.   That's the north/south ditch flowing from the
10  picture from right to left into Bessey Creek.
11     Q.   And on the left side of the dutch auger, is
12  that a water body we see?
13     A.   That's Bessey Creek.
14     Q.   Do you recall about what date you took this
15  picture?
16     A.   I think it's August the 23rd, 2021.
17     Q.   Does the picture depicted on Deposition
18  Exhibit 82, does this accurately reflect your
19  observations of the north/south ditch of Bessey Creek
20  that day?
21     A.   Yes, it does.
22     Q.   Did you rely on your observations in forming
23  your opinions in this case?
24     A.   Yes, I did.
25



MICHAEL M. WYLIE, M.S.
USA vs BENJAMIN K. SHARFI

April 04, 2022
317–320

Page 317

1    (Deposition Exhibit No. 83 was marked for
2  identification.)
3  BY MR. ADKINS:
4    Q.  Okay.  I'm now showing you a document that's
5  been marked deposition Exhibit 83.  At the top of this
6  document it reads "Clean Water Act Jurisdiction
7  Following the U.S. Supreme Court's Decision in Rapanos
8  vs. United States and Carabell vs. United States."
9      Have you ever seen a document like this
10  before?
11    A.  Yes, many times.
12    Q.  What is this, Mr. Wylie?
13    A.  The colloquialism is the Rapanos guidance for
14  the EPA and the Corps and consultants to consult
15  other -- determining if certain wetlands are waters of
16  the United States.
17    Q.  How are you familiar with this document?
18    A.  Well, I have employed it as an -- I employed
19  it in the field.  I've also used it in court cases as an
20  expert witness for the government.  I've taught Rapanos
21  guidance to eight Corps districts.  I've spent weeks
22  with them in the field, discussing it in courtroom, in
23  classrooms and field.  I've taught hundreds of EPA
24  employees this document and how I interpret it along
25  with other attorneys.

Page 318

1      So I'm pretty familiar with this document.
2    Q.  Do you recall being asked questions at your
3  deposition today about the term in your report
4  seasonally permitted?
5    A.  Yes.
6    Q.  And your reports states that your conclusion
7  that the north/south ditch is a seasonally permitted
8  waterway.
9      Do you recall that?
10    A.  A seasonally permitted tributary, yes.
11    Q.  Okay.  And you said during your deposition
12  today that the term seasonally permitted is used in
13  Rapanos guidance, in fact, it's in that guidance.
14      Do you recall that testimony?
15    A.  Yes, I do.
16    Q.  Okay.  I want to take you to page 1 of this
17  document.  I'm going to try to zoom in here.  Do you see
18  the boxes there's a summary of key points?
19    A.  Yes, sir, I do.
20    Q.  Okay.  I'm going to highlight the third bolded
21  in that box.  It says, "Non-navigable tributaries of
22  traditional navigable waters that are relatively
23  permanent where the tributaries typically flow year
24  round or have continuous flow at least seasonally (e.g.,
25  typically three months.)"

Page 319

1      Did I read that correctly?
2    A.  Yes, sir, you did.
3    Q.  What does this mean, Mr. Wylie?
4    A.  It means a tributary, of course non-navigable
5  tributary, that flows three months out of -- it flows at
6  least continuously three months out of 12 out of a year,
7  where agencies assert jurisdiction in their waters of
8  the United States.
9    Q.  Is it your opinion that the north/south ditch
10  fits this definition that we have just referred to?
11    A.  Yes.  It's my opinion that the north/south
12  ditch is a non-navigable relatively permanent tributary
13  of Bessey Creek.
14    Q.  So when you said that the north/south ditch is
15  seasonally permanent, were you referring to the word
16  permanent and seasonally that are in this definition in
17  the third bullet we've discussed?
18    A.  Yes, sir, I was.
19      MR. ADKINS:  Okay.  I have no further
20  questions for the witness.  Thank you very much for
21  your time.
22      MR. MCALILEY:  Okay.  Mr. Wylie, I have a few
23  questions on account of Exhibit No. 81.  So let me
24  share my screen here.
25

Page 320

1      REDIRECT (MICHAEL M. WYLIE, M.S.)
2  BY MR. MCALILEY:
3    Q.  Can you see Deposition Exhibit 81, which is
4  Appendix 5, aerial photographs?
5    A.  Yes, sir, I can.
6    Q.  Okay.  So on the first page of this document,
7  which shows a photo from 1966, am I correct that the
8  square that makes up most of the photograph that is
9  labeled "Sharfi property," that entire square is what
10  we're calling the site today?
11    A.  Yes, sir, I believe so.  Yes, sir.
12    Q.  Okay.  If I go to -- I believe you were shown
13  the next photograph, No. 2.  Am I right that this
14  also -- that square represents the entire, that whole
15  square is what we're calling the site, right?
16    A.  Yes, sir.  That's our best approximation of
17  it.  It's the best job that we could go downstream.
18  That's the approximate limits of the site.
19    Q.  So basically you had to -- you got an aerial
20  photograph and then you had to try to assign where you
21  thought the property lines were and then you imposed on
22  the photograph the black lines, right?
23    A.  No, sir.  The person I think who did this
24  photograph, Tony Grecco, probably used or used the
25  property lines from Martin County Tax Assessor's Office.



MICHAEL M. WYLIE, M.S.
USA vs BENJAMIN K. SHARFI

April 04, 2022
321–324

Page 321

1  So it was a little bit -- it's a little more accurate
2  than just us putting lines down.
3      Q.  Okay.  Let's go to the third page.  Again,
4  Exhibit 81.  So am I right the square, that box that
5  shows here is, again, what you believe to be the site,
6  right?
7      A.  Yes, sir, given how we had to transpose that
8  and that, yes, sir, we believe that's the approximate
9  limits.
10     Q.  Okay.  Let me go back to the second page.
11 What is that arrow in the middle of the photograph?
12     A.  Let me see.  It says it's open water in the
13 southeast corner where the blue arrow is pointing.
14     Q.  Okay.  So that is part of the wetlands on the
15 site?
16     A.  Yes, sir, it is.
17     Q.  Okay.  Let me go to -- let's go to page 6,
18 which is Figure 5-1, 2016 Contours.  Am I right that
19 these are topography contours generated by Lidar by
20 Martin County?
21     A.  Yes, sir, I think so.  They were on Martin
22 County's website; yes.
23     Q.  And this figure shows the contour elevations
24 with different elevations on the site with each line
25 representing a foot.

Page 322

1      Do I have that right?
2      A.  Yes, sir, you have that right.
3      Q.  And are the elevations and feet expressed in
4  feet above sea level, NAV 88?
5      A.  I don't know that, sir.  I'm sorry.
6      Q.  Would you agree with me that when you look at
7  this Lidar image, the higher the number shown on the
8  contour, the higher the elevation?
9      A.  Yes, sir, given constraints of vegetative
10 growth, canopy coverage, one of Lidar's big issues is
11 that if you have heavy canopy coverage or even heavy
12 coverage of old world climbing fern or whatnot and it
13 sometimes can't get through it.  So you get artificially
14 higher numbers.
15     Q.  Okay.  You would agree with me that according
16 to this Lidar image, the highest elevations on the site
17 were along the north/south ditch on the left side?
18     A.  That's what it's portrayed about midway up, I
19 think the 27 is the higher one.  Yes, sir, that's what
20 it's portrayed on this depiction.
21     Q.  So in general, this Lidar image shows this
22 elevation is higher along the north/south ditch than it
23 is to the areas slightly further to the east where the
24 elevation starts to drop off; is that fair?
25     A.  In certain sections of the site, yes, sir, it

Page 323

1  is higher there.
2      Q.  Well, I mean, let's -- for instance, if I go
3  to the top, the northern west corner of the site, I see
4  elevations of 24 right around the north/south ditch and
5  to the right it says 23.
6      Do you see that?
7      A.  Yes, sir, I do.
8      Q.  So slightly higher near the north/south ditch
9  on the northwest side than it is to the areas
10 immediately to the east, right?
11     A.  No, sir.  I see 24.  I see 22 north.  That
12 could be the north/south ditch leaving the site because
13 it's lower, but what you have to do is you have to look
14 at these contours and polygons.  They're like
15 icosahedrons.
16     So in certain areas they are.  The problem
17 with what your question is, is that these 23s could be
18 ponds.  The 22 could be ponds.  You also have to look at
19 the aerial photographs.
20     So I see the 27s.  I see the 26 area, but also
21 see a 24 area next to it and 23 in between that.  So
22 what I see that's depicted along the north/south ditch
23 is a series of higher points and obviously much lower
24 points that the ditch bisects.
25     Q.  All right.  So Mr. Wylie, though, you would

Page 324

1  agree with me this Lidar image in general shows the line
2  of the highest elevation on the site along the east/west
3  ditch, right?  It varies slightly depending upon where
4  on the west side of the site you look, but in general,
5  the highest elevations are along the ditch, right?
6      MR. ADKINS:  Objection.
7      THE WITNESS:  In certain sections of the
8      ditch, yes, they are.
9  BY MR. ADKINS:
10     Q.  In most of the ditch, right?
11     MR. ADKINS:  Objection; vague.
12     THE WITNESS:  No, I don't agree with that at
13     all.
14 BY MR. MCALILEY:
15     Q.  Am I right, those higher elevations, are those
16 yellow?  Orange?  I'm colorblind.  I have trouble with
17 that, but there's a different color?
18     A.  They're green.
19     Q.  So you don't think the green represents most
20 of the length of the western side of the property?
21     A.  No, sir, I don't.
22     Q.  Okay.  This was done in 2016, correct?
23     A.  Yes, sir.
24     Q.  And the defendants purchased the site in 2017,
25 right?



MICHAEL M. WYLIE, M.S.
USA vs BENJAMIN K. SHARFI

April 04, 2022
325–328

Page 325

1    A. Yes, sir, I think so.
2    Q. The work was done on the site in 2018. That's
3  the allegations in the complaint, right?
4    A. That's when it commenced.
5    Q. Okay. So this would represent conditions when
6  the defendants first got the property better than a
7  photograph from 1966, right?
8    MR. ADKINS: Objection.
9    THE WITNESS: No, sir. No, sir, not at all.
10   There's constraints with vegetation, with forested
11   systems when you're bouncing these Lidar waves down
12   through it. So everything has to be evaluated not
13   only through Lidar, which is a very valuable tool.
14   I totally agree with you, but we have to evaluate
15   it in terms of aerial photography overlays and also
16   what we found on the site. But I do agree with you
17   that certain sections of the area on the Sharfi
18   site are higher than other areas.
19 BY MR. MCALILEY:
20   Q. So Mr. Wylie, so you're telling me that an
21  aerial photograph taken 50 years before this Lidar image
22  is a more accurate depiction of the elevations on the
23  site at the time the defendant purchased it in 2017? Is
24  that really your testimony?
25   A. My testimony is that the original elevations

Page 326

1  of the site may have been changed since the photo was
2  taken in 1966.
3    Q. Okay. Fair enough. Is this --
4    A. And --
5    Q. Is this photograph part of your report of this
6  Lidar image?
7    A. Yes, sir.
8    Q. And so didn't you guys use the Lidar images
9  from Martin County in creating the, figure
10  showing the primary flow path in the side of the
11  east/west ditch?
12   A. It was a tool that we used and considered in
13  combination with our on-site investigations and other
14  depictions and aerial photographs.
15   Q. Are you now telling me that Lidar is an
16  unreliable tool?
17   A. No, sir, I'm not.
18   MR. MCALILEY: Okay. All right. I have no
19  further questions.
20   MR. ADKINS: No questions from me.
21   THE VIDEOGRAPHER: Okay. We're going to read
22  or waive?
23   MR. ADKINS: Yeah, we'll read.
24   THE VIDEOGRAPHER: Okay. You want to go ahead
25  and take down the share screen and get us off, or

Page 327

1  do you want to do the orders on record, Wendy?
2    MR. MCALILEY: Oh, there you go. I'm sorry.
3  I was thinking Brandon was doing it. I'm off the
4  screen.
5    THE VIDEOGRAPHER: Okay. Let me get us off
6  and then we can do the orders.
7    Having heard the approval of all attorneys to
8  go off the record at this time, this concludes
9  File 2 of the video Zoom deposition of Michael
10  Wylie. We are going off the record. The time is
11  6:22 p.m., and hold on. There we go.
12   Orders, transcript first and then video.
13  We'll start with you, Neal.
14   MR. MCALILEY: Yes.
15   THE VIDEOGRAPHER: Both?
16   MR. MCALILEY: And the video, yes.
17   MR. ADKINS: I'll take just the transcript at
18  this point. No video, please.
19   THE VIDEOGRAPHER: Okay.
20   MR. ADKINS: Thank you.
21   THE VIDEOGRAPHER: You can order it any time
22  from Esquire. And William, or actually, Chris
23  would be the other one. He's with you too?
24   MR. MCALILEY: Yeah, I'm covering it for him.
25  He doesn't need to separately order it.

Page 328

1  THE VIDEOGRAPHER: Okay. All right.
2  (Witness excused.)
3  (Deposition was concluded at 6:22 p.m.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



MICHAEL M. WYLIE, M.S.
USA vs BENJAMIN K. SHARFI

April 04, 2022
329–332

---

Page 329

DEPOSITION ERRATA SHEET

1
2  Our Assignment No.  J8094615
3  Case Caption:  USA vs. Sharfi, et al.
4
5      DECLARATION UNDER PENALTY OF PERJURY
6
7      I declare under penalty of perjury that I have
8  read the entire transcript of my Deposition taken in the
9  captioned matter or the same has been read to me, and
10 the same is true and accurate, save and except for
11 changes and/or corrections, if any, as indicated by me
12 on the DEPOSITION ERRATA SHEET hereof, with the
13 understanding that I offer these changes as if still
14 under oath.
15
16     Signed on this _____ day of _____, 20__.
17
18     _____
19     MICHAEL M. WYLIE, M.S.
20
21
22
23
24
25

---

Page 330

DEPOSITION ERRATA SHEET

1
2  Page No._____Line No._____Change to:_____
3  _____
4  Reason for change:_____
5  Page No._____Line No._____Change to:_____
6  _____
7  Reason for change:_____
8  Page No._____Line No._____Change to:_____
9  _____
10 Reason for change:_____
11 Page No._____Line No._____Change to:_____
12 _____
13 Reason for change:_____
14 Page No._____Line No._____Change to:_____
15 _____
16 Reason for change:_____
17 Page No._____Line No._____Change to:_____
18 _____
19 Reason for change:_____
20 Page No._____Line No._____Change to:_____
21 _____
22 Reason for change:_____
23
24 SIGNATURE:_____DATE:_____
25     MICHAEL M. WYLIE, M.S. Job# J8094615

---

Page 331

DEPOSITION ERRATA SHEET

1
2  Page No._____Line No._____Change to:_____
3  _____
4  Reason for change:_____
5  Page No._____Line No._____Change to:_____
6  _____
7  Reason for change:_____
8  Page No._____Line No._____Change to:_____
9  _____
10 Reason for change:_____
11 Page No._____Line No._____Change to:_____
12 _____
13 Reason for change:_____
14 Page No._____Line No._____Change to:_____
15 _____
16 Reason for change:_____
17 Page No._____Line No._____Change to:_____
18 _____
19 Reason for change:_____
20 Page No._____Line No._____Change to:_____
21 _____
22 Reason for change:_____
23
24 SIGNATURE:_____DATE:_____
25     MICHAEL M. WYLIE, M.S. JOB # J8094615

---

Page 332

CERTIFICATE OF OATH

1
2  STATE OF FLORIDA
3  COUNTY OF PALM BEACH
4
5      I, the undersigned authority, certify that Michael
6  M. Wylie, M.S. personally appeared before me and was
7  duly sworn on the 4th day of April, 2022.
8
9      Witness my hand and official seal this 13th day of
10 April, 2022.
11
12
13
14
15
16     Wendy Beath Anderson, RDR, CRR, CRC
       Notary Public State of Florida
17     My Commission Expires:  9/23/2025
18     My Commission No.:  HH 178324
       Job #J8094615
19
20
21
22
23
24
25



MICHAEL M. WYLIE, M.S.
USA vs BENJAMIN K. SHARFI

April 04, 2022
333

Page 333

```
1                    CERTIFICATE OF REPORTER
2     STATE OF FLORIDA
3     COUNTY OF PALM BEACH
4
5          I, Wendy Beath Anderson, Certified Realtime
      Reporter and Notary Public in and for the State of
6     Florida at Large, do hereby certify that I was
      authorized to and did stenographically report said
7     deposition of MICHAEL M. WYLIE, M.S.; that a review of
      the transcript was requested; and that the foregoing
8     transcript is a true record of my stenographic notes.
9          I FURTHER CERTIFY that I am not a relative,
      employee, or attorney, or counsel of any of the parties,
10    nor am I a relative or employee of any of the parties'
      attorney or counsel connected with the action, nor am I
11    financially interested in the action.
12         The foregoing certification of this transcript
      does not apply to any reproduction of the same by any
13    means unless under the direct control and/or direction
      of the certifying reporter.
14
15
           Dated this 13th day of April, 2022.
16
17
18
           Wendy Beath Anderson, RDR, CRR, CRC
19
           Job #J8094615
20
21
22
23
24
25
```



**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

UNITED STATES OF AMERICA,

        *Plaintiff*,

        v.

BENJAMIN K. SHARFI, in his personal and
fiduciary capacity as trustee of the Benjamin
Sharfi 2002 Trust, and NESHAFARM, INC.

        *Defendants*.

Case No. 2:21-cv-14205-KAM

## ERRATA FOR DEPOSITION OF MICHAEL M. WYLIE

    I, Michael M. Wylie, have read the transcript of my deposition taken on April 4, 2022, in

the above-captioned case and, pursuant to Federal Rule of Civil Procedure 30(e)(1), list the

following changes to the transcript and the reasons for making them:

| Page | Line | Reads | Should Read | Reasons For Change |
|------|------|-------|-------------|--------------------|
| 12 | 9 | information | detail | Mistranscribed |
| 47 | 6 | agricultural | arresting | Mistranscribed |
| 65 | 14 | I think it does | It does not | Correction |
| 84 | 19 | definition | designation | Mistranscribed |
| 98 | 3 | October | August | Correction |
| 100 | 24 | De-ponded | ponded | Mistranscribed |
| 118 | 9 | regulations | wetlands | Mistranscribed |
| 118 | 25 | Some | Some --- most | Mistranscribed |
| 152 | 22 | silk | silt | Mistranscribed |
| 153 | 3 | DPE | DEP | Mistranscribed |
| 158 | 21 | terms | times | Mistranscribed |
| 179 | 25 | in 2008 | in December 2008 | Mistranscribed |
| 186 | 19 | tributary TNM | tributary of a TNW | Mistranscribed |
| 195 | 7 | order | area | Mistranscribed |
| 203 | 22 | However | "However | Mistranscribed |
| 207 | 19 | P&W | TNW | Mistranscribed |
| 210 | 22 | impoundment | improved | Mistranscribed |
| 227 | 20 | repairing | impairing | Mistranscribed |

| 237 | 17 | essential | residential | Mistranscribed |
|-----|-----|-----------|-------------|----------------|
| 238 | 5-6 | on the right side | right beside | Mistranscribed |
| 242 | 14 | north | south | Correction |
| 267 | 18 | reserve | preserve | Mistranscribed |
| 288 | 16 | inearth | inert | Mistranscribed |
| 289 | 17 | track | trap | Mistranscribed |
| 290 | 14 | esturean | estuarine | Mistranscribed |
| 290 | 15 | esturean | estuarine | Mistranscribed |
| 290 | 18 | esturean | estuarine | Mistranscribed |
| 292 | 16 | esturean | estuarine | Mistranscribed |
| 296 | 12 | esturean | estuarine | Mistranscribed |
| 298 | 14 | esturean | estuarine | Mistranscribed |
| 318 | 7 | permitted | permanent | Mistranscribed |
| 318 | 10 | permitted | permanent | Mistranscribed |

Executed on May 13, 2022, in Roswell, Georgia.

Michael M. Wylie