# EXHIBIT 5

RICHARD CREECH
USA vs SHARFI

May 24, 2022
1–4

Page 1

```
 1        UNITED STATES DISTRICT COURT
          SOUTHERN DISTRICT OF FLORIDA
 2
             CASE NO. 2:21-cv-14205-KAM
 3
     UNITED STATES OF AMERICA,
 4
            Plaintiff,
 5
     vs.
 6
     BENJAMIN K. SHARFI, in his
 7    personal and fiduciary
      capacity as trustee of the
 8    Benjamin Sharfi 2002 Trust,
      and NESHAFARM, INC.,
 9
            Defendants.
10   _____/
11
12
13      VIDEOTAPED DEPOSITION OF RICHARD CREECH
14
15           TUESDAY, MAY 24, 2022
             9:00 A.M. - 5:22 P.M.
16
17         VIA ZOOM VIDEOCONFERENCE
                   - - -
18
19
20
21
22
23   Reported By:
     Jack Finz
24   Notary Public, State of Florida
     West Palm Beach Office #J8348161
25
```

Page 2

```
 1   APPEARANCES:
 2   On behalf of the Plaintiff:
        JEFFREY HUGHES, ESQUIRE
 3      BRANDON N. ADKINS, ESQUIRE
        UNITED STATES DEPARTMENT OF JUSTICE
 4      ENVIRONMENT & NATURAL RESOURCE DIVISION
        P.O. Box 761
 5      Washington, D.C. 20044
        202-616-9174
 6      jeffrey.hughes@usdoj.gov
        brandon.adkins@usdoj.gov
 7
 8   On behalf of the Defendants:
        NEAL McALILEY, ESQUIRE
 9      CARLTON FIELDS, P.A.
        MiamiCentral
10      700 NW 1st Avenue, Suite 1200
        Miami, Florida 33136-4118
11      305-530-0050
        nmcaliley@carltonfields.com
12
             -and-
13
        CHRIS HAMILTON, ESQUIRE
14      House Counsel for Sharfi Holdings
        805 NE Indian River Drive
15      Jensen Beach, FL 34957
16
17   ALSO PRESENT:
18      MICHAEL WYLIE
        Wetland Resources, LLC
19
     NICHOLAS ALLEN, Videographer
20
21
22
23
24
25
```

Page 3

```
 1               - - -
                I N D E X
 2               - - -
 3
 4   WITNESS:     DIRECT  CROSS  REDIRECT  RECROSS
 5   RICHARD CREECH
 6   BY: MR. HUGHES   5      257
     BY: MR. HAMILTON        253
 7
 8
 9
10               - - -
11            E X H I B I T S
12
     DEFENDANTS'       DESCRIPTION        PAGE
13
     EXHIBIT 170  Document entitled "Palm City    79
14       Drainage Map," Bates stamped
         SHARFIEXPERTS 93
15   EXHIBIT 172  Aerial entitled "Martin    104
         County Soils Map," Bates
16       stamped SHARFIEXPERTS 94
     EXHIBIT 173  Written document entitled   119
17       "Oldsmar Fine Sand
         Information," Bates stamped
18       SHARFIEXPERTS 95
     EXHIBIT 174  Written document entitled   123
19       "Malabar Sand Information,"
         Bates stamped SHARFIEXPERTS
20       96
     EXHIBIT 175  Document entitled "Basinger   126
21       Fine Sand Information,"
         Bates stamped SHARFIEXPERTS
22       97
     EXHIBIT 176  Document entitled "Holopaw    130
23       Fine Sand Information,"
         Bates stamped SHARFIEXPERTS
24       98
     EXHIBIT 177  Aerial of Figure III.D.1    133
25       USDA NRCS soil map units
```

Page 4

```
 1   EXHIBIT 178  Document entitled "1948    142
         Geodetic Survey," Bates
 2       stamped SHARFIEXPERTS 82
     EXHIBIT 179  USGS quad map for Palm City   150
 3       region dated 1950, Bates
         stamped SHARFIEXPERTS 83
 4   EXHIBIT 171  Aerial entitled "1940    155
         Aerial," Bates stamped
 5       SHARFIEXPERT 81
     EXHIBIT 179  Survey by the Bureau of Land   169
 6       Management, Bates stamped
         SHARFIEXPERTS 402
 7   EXHIBIT 180  Aerial photo entitled    216
         "1952(a) Aerial," Bates
 8       stamped SHARFIEXPERTS 84
     EXHIBIT 181  Aerial entitled "1952(b)   224
 9       Aerial," Bates stamped
         SHARFIEXPERTS 85
10   EXHIBIT 182  Aerial entitled "1952(c)   228
         Aerial," Bates stamped
11       SHARFIEXPERTS 86
     EXHIBIT 183  Aerial entitled "1958(a)   230
12       Aerial," Bates stamped
         SHARFIEXPERTS 87
13   EXHIBIT 184  Aerial entitled "Exhibit   232
         H-1958(b) Aerial," Bates
14       stamped SHARFIEXPERTS 88
     EXHIBIT 185  Aerial entitled "1970    233
15       Aerial," Bates stamped
         SHARFIEXPERTS 89
16   EXHIBIT 186  Aerial entitled "1981(a)   234
         Aerial," Bates stamped
17       SHARFIEXPERTS 90
     EXHIBIT 187  Aerial entitled "1981(b)   235
18       Aerial," Bates stamped
         SHARFIEXPERTS 91
19   EXHIBIT 188  Reproduction from the    237
         Department of Justice's
20       expert team's report,
         "Figure iii.C.1.1," Bates
21       stamped SHARFIEXPERTS 92
     EXHIBIT 169  Report dated April 7, 2022   238
22       by Richard Creech, Bates
         stamped SHARFIEXPERTS 78
23       through 80
24
25
```

RICHARD CREECH
USA vs SHARFI

May 24, 2022
5–8

Page 5

1              P R O C E E D I N G S
2                      - - -
3           Deposition taken before JACK FINZ,
4   Notary Public in and for the State of Florida at
5   Large, in the above cause.
6           THE VIDEOGRAPHER:  Good morning.  We are
7   now on the record, and the time is 9:01 a.m.
8   Eastern Standard Time on May 24, 2022.
9           This begins the videoconference
10  deposition of Richard Creech, taken in the
11  matter of the United States of America versus
12  Benjamin K. Sharfi, filed in the United
13  States District Court, Southern District of
14  Florida, Case No. 2:21-cv-14205-KAM.
15          My name is Nicholas Allen.  I'm your
16  remote videographer today.  The court reporter is
17  Jack Finz.  We are representing Esquire
18  Deposition Solutions.
19          As a courtesy, will everybody who is not
20  speaking please mute your audio and please
21  remember to unmute your audio when you are
22  ready to speak.
23          Will everyone present identify themselves
24  and state who you represent, after which the
25  court reporter will swear in the witness, and

Page 6

1   we will start with the noticing attorney.
2           MR. HUGHES:  My name is Jeffrey Hughes,
3   on behalf of the United States.
4           MR. ADKINS:  My name is Brandon Adkins of
5   the United States Department of Justice for
6   the United States.
7           MR. HAMILTON:  Good morning.  This is
8   Christopher Hamilton, here on behalf of the
9   defendants.  I may also be joined by my
10  colleague, Joshua Myron, who is the general
11  counsel for the defendants.  At some point I
12  will let you make the introduction.
13          MR. McALILEY:  Good morning.  This is
14  Neal McAliley at the law firm of Carlton
15  Fields, representing the defendants.
16                      - - -
17  Thereupon,
18             RICHARD CREECH
19  having been first duly sworn, was examined and
20  testified as follows:
21          THE WITNESS:  Yes, sir.
22          DIRECT EXAMINATION
23  BY MR. HUGHES:
24      Q.   Could you please state your name for the
25  record?

Page 7

1       A.   Richard Thomas Creech.
2       Q.   Good morning, Mr. Creech.  My name is
3   Jeffrey Hughes.  I'm an attorney with the U.S.
4   Department of Justice.  I represent the United
5   States in this matter.
6           When were you born?
7       A.   April 25, 1961.
8       Q.   Have you ever been deposed before?
9       A.   Yes, I have.
10      Q.   How many times?
11      A.   Roughly a dozen or so.
12      Q.   And when is the last time you were deposed?
13      A.   Approximately six months ago.
14      Q.   What was that deposition taken in?
15      A.   That deposition, I believe, was for
16  Sebastian River Improvement District.
17      Q.   Is that the party that you testified on
18  behalf of?
19      A.   Yes.
20      Q.   Do you know the full name of that case?
21      A.   It's on my resume that I provided.
22      Q.   In that case, what was the subject of your
23  testimony?
24      A.   Essentially as a civil engineering expert
25  on behalf of the client with respect to a lateral

Page 8

1   D ditch that was a ditch that was in question
2   between the two property owners.
3       Q.   And what about the lateral D ditch did you
4   testify about?
5       A.   Essentially, how it was constructed, the
6   drainage capacity, the jurisdictional boundaries,
7   and various another items that the counsel had
8   asked about.
9       Q.   Was this in state or federal court?
10      A.   State court.
11      Q.   And do you know if you were qualified as an
12  expert in that case?
13      A.   It did not go to trial, was settled, but
14  I believe I was qualified as an expert with
15  respect to the testimony.
16      Q.   And what do you mean by that?
17      A.   They brought me in as an expert in civil
18  engineering.
19      Q.   You said you testified about jurisdictional
20  boundaries with respect to this lateral B ditch; is
21  that correct?
22      A.   That's correct.
23      Q.   What with respect do jurisdictional
24  boundaries did you testify about in that case?
25      A.   Sebastian River District is a 298

RICHARD CREECH
USA vs SHARFI

May 24, 2022
9–12

Page 9

1  district within the State of Florida, and there
2  are jurisdictional boundaries with respect to
3  permitting and ownership.
4      Q.   Jurisdictional boundaries under what
5  statute, if you know?
6      A.   Under the 298 district, with respect to
7  the drainage district's ability to permit or be
8  involved in the ability for the adjacent property
9  owners to utilize that ditch.
10     Q.   What is a 298 district?
11     A.   A 298 district is a Florida Statute
12  that's created essentially for the ability or the
13  benefit of certain property owners to form a
14  drainage district under their own jurisdiction and
15  control and can set certain requirements or
16  parameters for the operation of that district.
17     Q.   Did you testify that Sebastian River
18  Improvement District had jurisdiction with respect
19  to that lateral B ditch?
20     A.   I testified that the Sebastian River
21  Improvement District had ownership of it and had
22  jurisdiction with respect to what was discharged
23  into it with respect to its capacity, along with
24  their ability to provide permitting with respect
25  to connections to that ditch.

Page 10

1      Q.   And which is to say that it was your
2  testimony that Sebastian River Improvement District
3  had authority to issue or withhold permits with
4  respect to that lateral B ditch?
5      A.   Hold or issue or potentially mediate or
6  issue permits with respect to the discharge of
7  that ditch, because they had the ownership and
8  they had it under an easement since 1942.
9      Q.   What is a lateral B ditch?
10     A.   A lateral B ditch essentially is a ditch
11  that supports the Sebastian River Improvement
12  District with respect to various items of its
13  intent.  Its intent, the original intent, was a
14  bar ditch to create a berm or a dike to separate
15  the limits of the Sebastian River from the
16  adjacent property owners, appraise the ownership
17  and jurisdiction of the Sebastian River
18  Improvement District and the adjacent owners.
19        Additionally, that ditch was provided to
20  intercept drainage from adjacent properties and
21  discharge it to the Sebastian River, St. Sebastian
22  River to the north.
23     Q.   And do you know in what court that case was
24  pending?
25     A.   Yes.  Riviera Beach, which is, I believe,

Page 11

1  the 11th District, potentially, or 17th District.
2  It's in the resume.
3      Q.   And where is the lateral B ditch at issue
4  in that case located?
5      A.   It's located approximately near the City
6  of Fellsmere city limits, just north and south --
7  actually south of I believe it's 510 in Indian
8  River County.
9      Q.   So it sounds like you have been deposed
10  before, and perhaps you know the rules or are
11  familiar with the rules, but we can go over a few
12  groundrules to make sure we are on the same page.
13  Okay?
14     A.   Sure.
15     Q.   So I will be asking you questions and I ask
16  that you provide full and complete answers to my
17  questions.
18        If you don't understand any question that I
19  ask you, please let me know before you respond and I
20  will explain or rephrase the question.
21        Is that fair?
22     A.   Yes, sir.
23     Q.   You have taken an oath to tell the truth
24  today?
25     A.   I did.

Page 12

1      Q.   And you understand that even though we are
2  not in a courtroom and there is no judge here, you
3  have the same obligation to tell the truth as if you
4  were testifying in a courtroom before a judge?
5      A.   As always, yes.
6      Q.   A court reporter is recording everything
7  that we say here.  Because the court reporter has to
8  that down only our words, please answer each
9  question with a verbal response and not a nod or a
10  shake of the head.
11        Is that fair?  I'm sorry, I didn't hear that.
12     A.   Fair, yes.
13     Q.   And I appreciate a verbal answer, so it
14  calls for a yes or no rather uh-huh or uh-uh.
15        Is that fair?
16     A.   Yes, sir.
17     Q.   And to make the court reporter's job
18  easier, it is important that we don't talk over each
19  other, so I ask that you wait until I finish my
20  question before giving your answer, and I will wait
21  until you are done with your answer to ask my next
22  question.
23        Is that fair?
24     A.   Yes.
25     Q.   Are you represented by counsel today?

RICHARD CREECH
USA vs SHARFI

May 24, 2022
13–16

Page 13

1    A.  I believe I have Mr. McAliley there in
2  the background, but I don't have personal counsel,
3  no.
4    Q.  Do you understand that Mr. Hamilton and Mr.
5  McAliley are counsel for the defendants in this
6  matter?
7    A.  I understand that, yes.
8    Q.  So defendants' counsel may object at times
9  in the deposition today.  Unless you are instructed
10  not to answer, you can go ahead and answer my
11  question after the objection is stated for the
12  record.
13      Is that fair?
14    A.  Understood.
15    Q.  Do you have any computer programs open?
16    A.  Right now I have my report open on my
17  computer, yes.
18    Q.  Anything else?
19    A.  No.
20    Q.  Do you have any Internet browsers open on
21  your computer?
22    A.  No.  My WIFI is not connected.
23    Q.  Do you have any other documents besides
24  your report in front of you?
25    A.  No.  I only have the report with me.

Page 14

1    Q.  I just ask that you not do any research or
2  look anything up on the Internet on your computer
3  unless it is a document that we are reviewing today.
4      Is that fair?
5    A.  Understood.
6    Q.  Can you hear me okay?
7    A.  Yes, I can.
8    Q.  Please let me know at any time if you can't
9  hear me and I will make an adjustment.
10      And you understand that we are here today
11  in connection with a suit brought by the United
12  States against Benjamin Sharfi and Neshafarm,
13  alleging Clean Water Act violations; correct?
14    A.  I understand that, yes.
15    Q.  And can we refer to that suit as "this
16  matter"?
17    A.  Yes, you can.
18    Q.  And you understand that at issue in this
19  matter is a roughly 9.92 acre site in unincorporated
20  Martin County, Florida, with an address of 8227
21  Southwest Martin Highway, Palm City, Florida?
22    A.  That's how I understand it, yes.
23    Q.  And can we refer to that property as "the
24  site" today?
25    A.  Yes, you can.

Page 15

1    Q.  And you prepared a report in this matter?
2    A.  Yes, I did.
3    Q.  And in your report you referred to a
4  document that you called a DOJ expert report;
5  correct?
6    A.  That's correct.
7    Q.  And when you referred to the DOJ expert
8  report, does that refer, to your knowledge, to the
9  expert report dated February 18, 2022, prepared by
10  Linden Lee, Wayne Nutter, Todd Stewart and Mike
11  Wylie?
12    A.  As I understand it, yes.
13    Q.  I am going to call that document the DOJ
14  team expert report.
15      Is that fair?
16    A.  Yes.
17    Q.  And you referred in your report to a ditch
18  oriented in a north-south direction that extends
19  from the site; correct?
20    A.  That's correct.
21    Q.  And if I refer to that ditch as the
22  north-south ditch today, will you understand that?
23    A.  I understand what you are saying, yes.
24    Q.  And you also referred to in your report to
25  an east-west oriented ditch located north of the

Page 16

1  site identified as Bessey Creek in the DOJ expert
2  report?
3    A.  Yes.
4    Q.  And if I call that the excavated portion of
5  Bessey Creek, will you understand what I'm saying?
6    A.  Yes, I will.
7    Q.  And if at any time you need to take a
8  break, just let me know.  I just ask that we not
9  take a break while a question is pending.
10    A.  Okay.
11    Q.  What did you do to prepare for today's
12  deposition?
13    A.  Essentially, reviewed my report, reviewed
14  all the aerials that I prepared, and spent a little
15  time with the attorneys.
16    Q.  Without telling me what you discussed with
17  the attorneys, who did you meet with?
18    A.  Mr. McAliley and Mr. Hamilton.
19    Q.  And when did you meet with Mr. McAliley --
20  withdrawn.
21      Did you meet with them together or
22  separately?
23    A.  With Mr. McAliley on Friday separately,
24  and Mr. Hamilton and Mr. McAliley yesterday together.
25    Q.  And on Friday, where did you meet Mr.

RICHARD CREECH
USA vs SHARFI

May 24, 2022
17–20

Page 17

1  McAliley?
2    A.  Internet.
3    Q.  Is that over Zoom or some equivalent program?
4    A.  Some equivalent product.  I don't remember
5  which one.
6    Q.  And how long did you meet with Mr. McAliley
7  on Friday?
8    A.  Couple of hours.
9    Q.  And when you met with Mr. McAliley and Mr.
10  Hamilton yesterday, where did you meet?
11    A.  Again, over an Internet product.
12    Q.  And for how long did you meet with Mr.
13  McAliley and Mr. Hamilton?
14    A.  Roughly about an hour and a half.
15    Q.  And did you review any documents in
16  preparation for your deposition, aside from your
17  report and the aerials that you referred to earlier?
18    A.  Yesterday I reviewed the testimony of Mr.
19  Wiley, I believe, Mr. Nutter, and the expert
20  reports of -- I don't recollect the names of them,
21  but they represent Mr. McAliley.
22    Q.  I'm sorry, they represent Mr. McAliley?
23    A.  Well, they represent the plaintiffs -- or
24  the defendant, I guess.  The defendant on this
25  one.  I'm sorry.

Page 18

1    Q.  And do you recall the subject of those
2  expert reports?
3    A.  Yes.  One of them dealt with water quality
4  and the other one dealt with hydrology and wetlands.
5    Q.  And the report dealing with water quality,
6  did you cite that in your report?
7    A.  No, I did not.
8    Q.  And the report about hydrology and
9  wetlands, did you cite that in your report?
10    A.  No, I did not.
11    Q.  In what fields do you believe that you are
12  an expert?
13    A.  Ask that again.  I didn't quite hear it.
14    Q.  No problem.
15        In what fields do you believe you are an
16  expert?
17    A.  Civil engineering and land surveying.
18    Q.  What is the basis of your expertise in
19  civil engineering?
20    A.  My roughly 40 years of experience in
21  engineering, civil engineering, and construction,
22  and my educational background, Bachelor of Science
23  in civil engineering from Carnegie Mellon University.
24    Q.  What is your educational background after
25  high school?

Page 19

1    A.  Bachelor of Science in civil engineering
2  from Carnegie Mellon University, graduated in
3  1983, and I have a master's degree in dispute
4  resolution and negotiations from Creighton
5  University, graduated in 2016.
6    Q.  What does your experience in civil
7  engineering consist of?
8    A.  It consists of many aspects of civil
9  engineering, from environmental systems to site
10  development, to entitlement, permitting, to
11  surface water drainage, water resources, and
12  everything from residential to municipal type
13  projects, including transportation, parks and
14  recreation, institutions, universities, educational
15  facilities, and commercial developments and
16  residential developments.
17    Q.  You said environmental site development; is
18  that correct?
19    A.  Environmental systems and site development.
20    Q.  What do you mean by environmental systems?
21    A.  As part of my aspects of being a civil
22  engineer, I deal with existing scenarios such as
23  wetlands, riverine systems, incorporating them
24  into South Florida management systems, drainage
25  systems.

Page 20

1        Also water and wastewater and how they
2  are impacted as a result of site development in
3  nearby conditions.
4        I'm also, with respect to environmental
5  systems, we are to incorporate wetlands and other
6  types of environmental systems into our design in
7  many cases nowadays, so I've become quite versed
8  in those types of environmental systems and how
9  they are impacted or how they can be enhanced.
10    Q.  And what work have you done with wetlands
11  in your civil engineering career?
12    A.  Starting early in my career I did wetland
13  jurisdictionals that included South Florida Water
14  Management District, municipalities, Florida
15  Department of Environmental Protection and the
16  Army Corps of Engineers.  Continuing on, I
17  incorporated those wetland systems in the South
18  Florida management systems, rehydration, mitigation,
19  and the improvement of environmental networks, and
20  permitting of those infrastructures through those
21  various agencies.
22    Q.  You said you did wetland jurisdictionals;
23  is that correct?
24    A.  That's correct.
25    Q.  And what do you mean by that?

RICHARD CREECH
USA vs SHARFI

May 24, 2022
21–24

Page 21

1    A.  Essentially, in the early eighties and
2  nineties, the agencies started to regulate wetland
3  systems, so I had to go out and aid the regulatory
4  agencies in determining the wetland limits, such
5  that those could be avoided or mitigated.  I was
6  well-versed in vegetation, hydrology and soils to
7  allow me to be the engineer that went with those
8  agencies to identify those wetlands and stake them
9  out and survey them.
10    Q.  You said agencies started to regulate
11  wetlands.  Which agencies are you referring to?
12    A.  South Florida Water Management District,
13  St. Johns Water Management District, Southwest
14  Florida Water Management District, Suwannee River
15  Water Management District, Florida Department of
16  Environmental Protection and the Army Corps of
17  Engineers, including the Department of Natural
18  Resources in the State of Florida.
19    Q.  And you said that you aided agencies in
20  determining wetland limits.  Is that correct?
21    A.  That's correct.
22    Q.  And did you ever aid the Army Corps of
23  Engineers in determining wetlands limits?
24    A.  Yes, I did.
25    Q.  And what did that work consist of?

Page 22

1    A.  Be more specific, counsellor.
2    Q.  How did you aid the Army Corps of Engineers
3  in determining wetland limits?
4    A.  I provided them their requested information,
5  that may have included aerial photographs, soil
6  information, vegetation limits, survey information,
7  topography of the site, and then going on site
8  with them to ascertain those limits.
9    Q.  And so you said that you would --
10  withdrawn.
11      How many times did you do this work with
12  the Army Corps of Engineers?
13    A.  Over my career, probably 50 to a hundred
14  times.
15    Q.  Do you recall the last time you did work
16  with the Army Corps of Engineers, aiding them in
17  determining wetland limits?
18    A.  Physically on site, probably in the mid
19  nineties, 1990s.
20    Q.  You said physically on site.  Have you done
21  it in some other ways since the mid nineties?
22    A.  Essentially provided them information
23  with respect to the permit applications, and
24  reviewing their comments.  So we have typically
25  ongoing permitting with the Army Corps of Engineers

Page 23

1  and other agencies.
2    Q.  And who is "we"?
3    A.  I'm sorry?
4    Q.  You said "we typically have ongoing
5  permitting with the Army Corps of Engineers."
6    A.  Me and my staff.
7    Q.  And so you said you provided them requested
8  information.  What information do you provide to the
9  Army Corps of Engineers when aiding them in
10  determining wetland limits?
11    A.  That can vary depending on the reviewer.
12  However, we will provide them jurisdictional
13  information from other agencies, soils information,
14  geotechnical information, aerial photographs,
15  photos of the site, and surveys information.
16    Q.  And since you have done this work in the
17  mid nineties, does someone on your team or connected
18  with a project actually visit the site when you are
19  aiding the Army Corps of Engineers in determining
20  wetland limits?
21    A.  On occasion, yes.
22    Q.  And who is that person?
23    A.  That person would be most likely Kaitlin
24  McMan, or myself.
25    Q.  Is that Kaitlin with a C or a K?

Page 24

1    A.  K.
2    Q.  And McMan, two N's or one?
3    A.  One.
4    Q.  And does Ms. McMan work for you?
5    A.  She is an independent contractor, yes.
6    Q.  And do you know what Ms. McMan's background
7  is?
8    A.  She's a civil engineer with an engineering
9  intern certificate.
10    Q.  You said in the nineties and prior you
11  would provide vegetation information?  Is that
12  correct?
13    A.  I don't believe I said education information,
14  no.
15    Q.  Excuse me.  Vegetation information.
16    A.  Restate that again, counsellor, please.
17    Q.  All right.
18      I believe you testified that in your work,
19  assisting the Army Corps of Engineers in determining
20  wetland limits, you provided them with vegetation
21  information?
22    A.  That's correct.
23    Q.  And what was that vegetation information?
24    A.  Usually we would send out an environmental
25  professional nowadays to do a site inventory and

RICHARD CREECH                                          May 24, 2022
USA vs SHARFI                                               25–28

Page 25

1   provide them a copy of that.
2       Q.   So someone will go to the site and test the
3   soils on that site?
4           MR. HAMILTON:  Object to form.
5       A.   They test the soils or to a physical
6   inspection of the vegetation and inspect the soils.
7       Q.   Is that a particular person that you use or
8   has it varied over the years?
9       A.   It's varied over the years.
10      Q.   Who, if anyone, do you currently use to do
11  that work?
12      A.   Currently I use a gentleman named Drew
13  Gatewood.
14      Q.   And what is Mr. Gatewood's background?
15      A.   He's a biologist.
16      Q.   So we discussed you would provide vegetation
17  information, you would provide soil information.
18  Any other information that you would provide to the
19  Army Corps of Engineers when aiding them in
20  determining wetland limits?
21      A.   At times we will provide geotechnical
22  information.
23      Q.   And what is that geotechnical information?
24      A.   Essentially borings of the site, and an
25  inventory of the soils as per the professional

Page 26

1   geologist provides in his report.
2       Q.   And how do you obtain the borings of the
3   site?
4       A.   Various ways.  We use a truck-mounted
5   drilling machinery or hand augered.
6       Q.   And who performs that work in the projects
7   that you work on?
8       A.   Various technicians.
9       Q.   Do you know what their background is?
10      A.   Most of the geotechnical firms I work
11  with either have a civil engineering background or
12  degree, or a professional hydrogeologist
13  background, and relevant education, or they have
14  highly specialized training in soil mechanics as
15  far as the technical, or a technician.
16      Q.   With respect to a project, you or someone
17  on your behalf would perform an inventory of soils;
18  is that correct?
19      A.   At times, yes.
20      Q.   What does that work consist of?
21      A.   Usually the same process, reviewing the
22  Soil Conservation Service maps, providing some
23  augers or having machinery perform some type of
24  excavation so that we know what's out there.
25      Q.   So we discussed vegetation, soil, and

Page 27

1   geotechnical information are materials you may
2   provide when working with the Army Corps of
3   Engineers to determine wetland limits.  Anything
4   else?
5       A.   Not that I can recollect right now.
6       Q.   And you also mentioned that you believe you
7   are an expert in land surveying; is that correct?
8       A.   That's correct.
9       Q.   And what is land surveying?
10      A.   Land surveying can represent many fields.
11  So it can represent boundary surveys, it can
12  represent topographic surveys, it can represent
13  construction layout, as-built surveying.  It also
14  represents specific purpose type surveys.
15          It can also represent government land
16  boundary retracement.  It can also represent
17  essentially consulting or interpreting titles or
18  legal descriptions.
19          It can also involve aerial photography
20  and the interpretation of the aerial photography.
21  It can also include location of any types of
22  infrastructure or vegetation.
23      Q.   And what, if any, of those elements of land
24  surveying do you believe that you are an expert in?
25      A.   All of them.

Page 28

1       Q.   And what in your background, education or
2   experience qualifies you, in your opinion, as an
3   expert in land surveying?
4       A.   My professional license and my over 40
5   years of experience in the field and in the office.
6       Q.   Do you consider yourself to be an expert in
7   soils?
8       A.   I believe I have an expertise in soils, yes.
9       Q.   And what is the basis of that expertise in
10  soils?
11      A.   My education and my 40 years of experience in
12  dealing with civil engineering and soil granulars
13  and utilizing soils in my construction and design.
14      Q.   You said education.  What courses have you
15  taken with respect to soils?
16      A.   Part of the basic curriculum in civil
17  engineering, you take soil mechanics, foundations
18  engineering, and some other elementary courses I
19  can't recollect.
20      Q.   Is it fair to say that you took the
21  required courses in soils for civil engineering?
22      A.   Yes.
23      Q.   You said your experience also gives you
24  expertise in soils.  What, in your opinion and your
25  experience, gives you an expertise in soils?

RICHARD CREECH
USA vs SHARFI

May 24, 2022
29–32

Page 29

1    A.   40 years of civil engineering design,
2  which has a huge soil component.  I've also been a
3  consultant on various mining type projects,
4  highway type projects, drainage type projects,
5  environmental systems type projects, in which
6  soils is a huge challenge or design parameter that
7  needs to be addressed.
8        Just about every civil engineering project
9  out there has a soils component.
10   Q.   You said civil engineering design.  What is
11  that?
12   A.   Civil engineering design could be many
13  faceted types of design, from structural
14  engineering to surface water management systems,
15  to foundation design, to entitlement processes,
16  and chemical, water and wastewater environmental
17  systems.
18   Q.   And what work have you done with soils in
19  your career with respect to your civil engineering
20  design work?
21   A.   Counsellor, you need to limit that
22  question, because I've done quite a bit with soils
23  throughout my career.
24   Q.   With respect to civil engineering design?
25   A.   Yes.

Page 30

1   Q.   And are you unable to list the work you
2  have done with respect to civil engineering design
3  in soils?
4   A.   It would be a very robust list, counselor.
5  I can narrow it down, if you like.
6   Q.   How would you narrow it down?
7   A.   Only based on types of projects.
8   Q.   You said you do work with surface water
9  management; is that correct?
10   A.   That's correct.
11   Q.   What work with soils have you done in your
12  surface water management work?
13   A.   We identify the soils and how they behave
14  in a drainage or surface water management capacity.
15  Those types of systems, because the soils are so
16  varied and react differently to rainfall or drainage,
17  so you have to evaluate them systematically and
18  site-specifically.
19   Q.   And how do you evaluate soils site-
20  specifically?
21   A.   Site-specifically, essentially, send the
22  geotechnical person out there to do borings.  They
23  come back with a recommendation.  I utilize my
24  professional opinion and my experience to
25  determine how those soils behave in a surface

Page 31

1  water management capacity.
2   Q.   And what process and methodology do you use
3  to evaluate the -- withdrawn.
4        You said you send a geotechnical person to
5  do site borings.  Is that correct?
6   A.   That's correct.
7   Q.   And when that geotechnical person obtains
8  the site borings, what do you do with that
9  information?
10   A.   Evaluate it for its integrity and its
11  accuracy, in my understanding of the soils on
12  site, and compare it against various other types
13  of data that would influence my opinion or
14  decision-making in the design.
15        We'll identify depths of water table,
16  we'll identify the soil strata, we'll identify
17  what type of soil storage or how the soils will
18  behave under those conditions.
19   Q.   And you said you evaluate -- would you
20  evaluate the borings themselves or something else?
21   A.   We would evaluate the borings and we
22  evaluate the geotechnical's recommendations and
23  opinions.
24   Q.   You said you will evaluate those borings
25  against various other types of data; is that correct?

Page 32

1   A.   That's correct.
2   Q.   And what are those other types of data?
3   A.   Types of data are on site and ground
4  truthing or observations on my part, soil
5  conservation survey, mapping of whatever area I'm
6  working in, compared against anecdotal information
7  from the municipality.  And I'll compare it
8  against other types of projects that I visually
9  have observed and in how they perform under those
10  conditions.
11   Q.   You said you will identify depths of the
12  water table; is that correct?
13   A.   That's correct.
14   Q.   And how do you do that work?
15   A.   Actually take the geotechnical information,
16  because it is very site-specific and very
17  date-specific, and compare it against those other
18  parameters I talked about and other resources.
19   Q.   And how does that geotechnical information
20  inform your soil evaluation?
21   A.   They essentially provide background
22  information as to the types of soil, the types of
23  density of soil, and where that soil occurs in the
24  strata and topography.
25   Q.   And we discussed your work aiding agencies

RICHARD CREECH                                        May 24, 2022
USA vs SHARFI                                                33–36

Page 33

1   to determine wetland limits earlier; is that correct?
2      A.  That's correct.
3      Q.  And would you use the processes that you
4   have just described in connection with your work
5   aiding agencies in making wetland limit
6   determinations?
7      A.  If appropriate, yes.
8      Q.  When is it not appropriate to use the
9   techniques you just described?
10     A.  When there are external circumstances
11  that are influencing the site-specific area that
12  may not be consistent with what historically
13  someone may have understood.
14     Q.  What external circumstances would those
15  include?
16     A.  External circumstances that may include
17  there is a pump system that may be nearby that is
18  representing a citrus grove.
19     Q.  And so how would that influence the
20  techniques you would use to assist an agency in
21  determining a wetland limitation?
22     A.  That would be numerous, counsellor, and
23  it would be very site specific.  I couldn't answer
24  that.
25     Q.  So you would agree with me that evaluation

Page 34

1   of soils requires site-specific techniques?
2         MR. HAMILTON:  Object to form.
3      A.  Not necessarily, no.
4         MR. HAMILTON:  Just for the record, if
5   anybody is objecting, it will just be me.
6   I'm handling the deposition.
7      Q.  You described several, I'll call them sort
8   of subcomponents of your civil engineering design
9   work, and we have been discussing surface water
10  management.  But does your work with wetlands
11  implicate any of the other subcategories of your
12  civil engineering design work?
13     A.  Yes, it does.
14     Q.  And what are those?
15     A.  Hydrology becomes a big part of it.  Again,
16  soils always plays a part.
17     Q.  I'm sorry, by subcategories, that was a bad
18  question, by subcategories I mean you described
19  structural engineering surface water management,
20  entitlement processes, and other types of work
21  falling within civil engineering design.  Do any of
22  those types or other types of civil engineering
23  design work implicate wetlands?
24     A.  It has, yes.
25     Q.  Which ones?

Page 35

1      A.  All of them.
2      Q.  Does the work you do with respect to soils
3   in civil engineering design depend on the type of
4   project?
5      A.  Yes, it does.
6      Q.  And how does your work with soil vary
7   depending on the type of project?
8      A.  Can you restate the question?  I think --
9   I don't understand the question.
10     Q.  Of course.
11         You said that different aspects of your
12  civil engineering design work touch on wetlands.  Is
13  that correct?
14     A.  That's correct.
15     Q.  And we discussed the means by which you
16  would evaluate soils in wetlands, at least with
17  respect to surface water management.  Is that
18  correct?
19     A.  Correct.
20     Q.  And do those techniques -- do you use those
21  techniques that we discussed with respect to all
22  aspects of your wetland work in your civil
23  engineering design work?
24     A.  Usually, yes.
25     Q.  Do the techniques you use change depending

Page 36

1   on whether you are doing surface water -- withdrawn.
2         Do the techniques you use to evaluate soil,
3   or and analyze soil, differ if you're doing a
4   surface water management project as opposed to an
5   entitlement projects?
6      A.  Yes.
7      Q.  How so?
8      A.  The entitlement process may have
9   different requirements or requests with respect to
10  what the agency or municipality might be looking
11  for.
12     Q.  And what kind of different requirements or
13  requests are you referring to?
14     A.  Let's take an example of a mine.  We may
15  go down 20, 30, 40 feet, versus, you know, in a
16  more traditional South Florida management system
17  we may only go six or eight feet.
18     Q.  And do you find that your work in mines
19  implicates wetlands?
20     A.  Yes.
21     Q.  Any other different requirements or requests
22  in your environmental entitlement processes work
23  that distinguishes it from your surface water
24  management work with respect to wetlands?
25     A.  I don't understand the question.  Can you

RICHARD CREECH                                        May 24, 2022
USA vs SHARFI                                           37–40

Page 37

1   restate it?
2   Q.  It was a bad question.
3       We have been discussing the techniques that
4   you used to analyze or evaluate soils in surface
5   water management projects, and I asked how does that
6   work differ from entitlement processes.  Is that
7   fair?
8   A.  That's fair.
9   Q.  And you said that the entitlement processes
10  may include additional requirements or requests.
11  A.  That's true.
12  Q.  Any other way that the soil analysis or
13  evaluation differs from surface water management
14  projects to entitlement projects?
15  A.  Various agencies require different types
16  of processes or analysis, so it can be varied
17  across-the-board depending on the municipality or
18  agency or the entitlement process.
19      So it can't be just one thing.  That's
20  the beauty of engineering is it's problem solving,
21  it's not in a box.  So my experience takes us out
22  of the box and allows us to be much more robust in
23  what we're trying to accomplish.
24  Q.  And would you say that the work that we
25  have described earlier, that you undertake to

Page 38

1   evaluate or analyze soils, is the baseline and
2   agencies may require more processes or something
3   else?
4   A.  That's a fair statement.
5   Q.  Setting aside your education, do you have
6   any training in soils?
7   A.  Other than an occasional seminar from
8   time to time, and 40 years of experience of
9   barefooting around a lot of the properties, that's
10  what I can recollect at this time.
11  Q.  What seminars have you taken?
12  A.  In the last 40 years, counsellor, there's
13  been a lot, so that really can't be very specific.
14  A lot of continuing education requirements by the
15  State of Florida requires me to take various
16  technical seminars that include aspects of my
17  engineering practice, or survey practice.
18  Q.  So those seminars are courses that you take
19  to stay current with your continuing education
20  requirements?
21  A.  Yes, sir.
22  Q.  And those are continuing education
23  requirements from the State of Florida?
24  A.  Most of them are, yes.
25  Q.  Do you teach any courses regarding soils?

Page 39

1   A.  Not recently, no.
2   Q.  Have you ever?
3   A.  I've been a guest lecturer at various
4   times at Florida Engineering Society meetings and
5   high schools and colleges.
6   Q.  Regarding soils?
7   A.  Yes.
8   Q.  And what in particular have you guest
9   taught regarding soils?
10  A.  How they impact construction in civil
11  engineering projects.
12  Q.  Have you taught classes related to wetland
13  soils?
14  A.  Not specifically, no.
15  Q.  Do you know who are the well-recognized
16  experts in the field of soils?
17  A.  There are a lot of recognized experts in
18  the field of soils.
19  Q.  Who are they, to your knowledge?
20  A.  They are too numerous to mention, and I
21  can't really recollect any names off the top of my
22  head right now.
23  Q.  Do you consider yourself to be a
24  well-recognized expert in the field of soils?
25  A.  A well-recognized civil engineer, which

Page 40

1   has that aspect of soils expertise.
2   Q.  Are there publications that are
3   authoritative in the field of soils?
4   A.  There are a lot of technical journals out
5   there that consider themselves expert in soils.
6   Q.  What are those?
7   A.  There are a lot of them, but I can't
8   recollect any of the names of them right now.
9   Q.  What about textbooks or technical books?
10  A.  As recognized in the university system,
11  there are plenty of soils and foundation type of
12  textbooks out there that are utilized throughout
13  the university systems.  I can't think of the
14  specific name right now.
15  Q.  Are you familiar with the Natural Resources
16  Conservation Service?
17  A.  Yes, I am.
18  Q.  And what is that?
19  A.  Essentially, it has many functions.
20  Essentially, you know, it does, I believe, wetland
21  mapping and soils and investigation and produces
22  various maps.
23  Q.  Do you use those maps in your work?
24  A.  Yes, I do.
25  Q.  Do you find them reliable?

RICHARD CREECH
USA vs SHARFI

May 24, 2022
41—44

Page 41

1    A.  Yes, I do.
2    Q.  Are you familiar with the -- if I call the
3    Natural Resources Conservation Service the NRCS,
4    will you know what I'm talking about?
5    A.  Yes, I do.
6    Q.  Are you familiar with the NRCS's Hydric
7    Soil List?
8    A.  Yes, I am.
9    Q.  Have you used it before?
10    A.  At times, yes.
11    Q.  For what purpose?
12    A.  Identifying hydric type soils.  That's
13    what it's published for.
14    Q.  And do you find it reliable?
15    A.  Yes.
16    Q.  Have you used the hydric soil list for
17    Martin County before?
18    A.  I believe I have, yes.
19    Q.  Do you read any publications to stay
20    abreast of developments in the field of soils?
21    A.  Not routinely, no.
22    Q.  Do you have any experience classifying
23    soils?
24    A.  Can you define "classifying soils,"
25    counsellor?

Page 42

1    Q.  Distinguishing types of soils from each
2    other.
3    A.  At times, yes.
4    Q.  And what is that experience?
5    A.  In my process of performing civil
6    engineering, I need to have that expertise in
7    which to determine what types of soils are out
8    there, whether they are, you know, capable of
9    providing me what I need for civil engineering or
10    construction.
11    Q.  What do you do to distinguish soils?
12    A.  Look at various components that you,
13    know, might be published or recognized out there.
14    The NRCS is one of them.  The Soils Conservation
15    Survey of Martin County is another.  Geotechnical
16    on site observation.  You know, and taking a look
17    at what historically has been done in the past.
18    Q.  Do you have any experience determining
19    whether a soil was hydric?
20    A.  I don't quite understand the question,
21    counsellor.
22    Q.  Which part did you not understand?  Or
23    which part was confusing?
24    A.  You asked about classifying hydric soils.
25    I mean, the NRCS has already classified hydric

Page 43

1    soils.  So what would I be doing trying to
2    reclassify something that has already been
3    published by the federal government.
4    Q.  So if you determine that you have
5    identified, or one of your assistants or contractors
6    has determined what a particular type of soil is,
7    you would rely on the NCRS's hydric soil list to
8    determine if it was hydric?
9    A.  That would be one of the resources I
10    would utilize, yes.
11    Q.  And how do you determine what a particular
12    soil is?
13    A.  A lot of times it depends on what is in
14    the soil.  I mean, it can be organics, it could be
15    silts, it could be sands, it could be clays.  It
16    could be a lot of things out there that are
17    contained within the soil.
18        So soil is soil.  So it's just different
19    parameters and properties that the soil may
20    provide to me as a civil engineer is what's important.
21    Q.  And so what analysis do you undertake to
22    determine, you know, what a particular soil sample,
23    or what kind of soil a particular soil sample is?
24    A.  A lot of time I leave that up to the
25    geotechnical engineers to do because they have the

Page 44

1    resources and the equipment to do it.
2    Q.  Is it fair to say that as you sit here
3    today you can't recall any specific seminars that
4    you have taken on soils?
5        MR. HAMILTON:  Object to form.
6    A.  Not today, no, sir.  I can look it up on
7    my continuing education list at a later date, but
8    right now I can't recognize any.
9    Q.  Do you consider yourself to be an expert in
10    vegetation?
11    A.  I have some expertise in vegetation, yes.
12    Q.  And what do you believe that expertise to
13    be?
14    A.  As a land surveyor, you know, I've been
15    asked to identify vegetation through the years,
16    and so there's a certain intuitive and anecdotal
17    knowledge that I have in 40 years of practicing
18    surveying and engineering that gives me that
19    opportunity to try to identify various types of
20    vegetation and where they exist.
21    Q.  And do you have experience identifying
22    wetland vegetation?
23    A.  Yes, I do.
24    Q.  And what process do you use to identify
25    vegetation?

RICHARD CREECH
USA vs SHARFI

May 24, 2022
45–48

Page 45

1    A.   There's a standard list of types of
2  vegetation out there.  There's photographs, on-site
3  observation of what is on site, and compare the
4  notes to the picture to understanding what's out
5  there.  And having grown up in Florida, and
6  surveyed, you know, there's a substantial amount
7  of vegetation that's very well known.  It's already
8  known.
9    Q.   How did your process in identifying
10  wetlands vegetation differ from the process you just
11  described?
12    A.   Wetlands vegetation follows a very similar
13  path of what I just described.
14    Q.   Is identifying vegetation, in your opinion,
15  important to identifying the limits of a wetland?
16    A.   It's one of the parameters in identifying
17  wetlands.  It is not necessarily the sole indicator
18  of a wetland.
19    Q.   But is it an important indicator of the
20  limits of a wetland?
21    A.   I would say it's one of the indicators.
22  I wouldn't necessarily call it the important one.
23    Q.   I asked a different question.  Is it an
24  important element of determining the limits of a
25  wetland?

Page 46

1    A.   It is one of the three aspects of
2  determining a wetland.  Yes, it is important.
3    Q.   And what are the other two?
4    A.   Soils and hydrology.
5    Q.   What does your experience in identifying
6  vegetation consist of?
7    A.   You broke up a little bit, counsellor.
8    Q.   My apologies.
9       What does your experience identifying
10  vegetation consist of?
11    A.   Previous experience I mentioned of doing
12  jurisdictional wetland identification with the
13  various agencies.
14    Q.   And when you are assisting an agency with a
15  wetland limits determination, you include either --
16  you include in the information you submit to them
17  vegetation information?
18    A.   That's correct.
19    Q.   Do you have any training in vegetation?
20    A.   Other than my 40 years of experience and
21  anecdotal information that's provided by the
22  agencies, and being on site, that's my experience.
23    Q.   Have you taken any classes with respect to
24  vegetation?
25    A.   Yeah.  I've taken a couple wetland

Page 47

1  vegetation and jurisdictional types of seminars
2  through the years.
3    Q.   And what were those wetland vegetation
4  seminars?
5    A.   I don't remember the specific names, but
6  they were provided by, I believe, either the
7  Florida Department of Environmental Protection or
8  their various sister agencies.
9    Q.   One of the sister agencies of the State of
10  Florida?
11    A.   Right.  South Florida Water Management
12  District, St. Johns Water Management District, and
13  the various management districts.
14    Q.   Do you remember when you took those classes?
15    A.   It might be well over ten years ago.
16    Q.   Are there any well-recognized experts in
17  the fields of wetland vegetation, to your knowledge?
18    A.   I'm sure there are.  I can't recollect
19  any of those names right now.
20    Q.   Are there any publications that are
21  authoritative in the field of wetland vegetation?
22    A.   I'm not aware of any of them that
23  specifically deal with wetland vegetation.  I'm
24  aware that there are some journals out there that
25  describe environment systems and wetlands.

Page 48

1    Q.   What about technical books?
2    A.   There are fauna and biological books that
3  are out there.  I can't recollect the names, but I
4  may have some of them in my library.
5    Q.   Do you read any publications to stay
6  abreast of developments in the field of vegetation?
7    A.   Of any vegetation or --
8    Q.   Any vegetation.
9    A.   Other than normal technical journals,
10  that's about the extent of my review.
11    Q.   What are those technical journals?
12    A.   AFCE, Florida Engineering Society
13  Journal, and various publications as issued by the
14  Florida Department of Environmental Protection and
15  the water management districts.
16    Q.   Are there any other reasons that you have
17  not already stated on the record to support why you
18  believe you have an expertise in vegetation?
19    A.   Only what I've listed or mentioned, that
20  I can think of at this time.
21    Q.   Just going back to our last topic, are
22  there any reasons that you have not stated on the
23  record to support why you believe you may have an
24  expertise in soils?
25    A.   What I've mentioned so far as my expertise,

RICHARD CREECH
USA vs SHARFI

May 24, 2022
49—52

Page 49

1   and that's about what I can recollect at this time.
2       Q.   Do you consider yourself to be an expert in
3   hydrology?
4       A.   Yes, I do.
5       Q.   And what is the basis of that expertise?
6       A.   The educational background as a civil
7   engineer, and my 40 years of practicing engineering
8   with respect to hydrology.
9       Q.   Have you taken any classes regarding
10  hydrology?
11      A.   During my career at Carnegie Mellon, yes,
12  of course.
13      Q.   And what are those?
14      A.   Water resources, chemical systems.  We
15  are going back a while.  I couldn't recollect all
16  of them, but there are probably a half dozen of
17  them.
18      Q.   Would those be required classes in
19  hydrology to graduate with a degree in civil
20  engineering at Carnegie Mellon?
21      A.   Among them would be, yes.
22      Q.   Were there others that were not?
23      A.   Yes.
24      Q.   Do you recall what those were?
25      A.   They were electives, of the six courses I

Page 50

1   mentioned that I can't recollect the names of.
2       Q.   Do you have any other training in
3   hydrology, other than your education and work
4   experience?
5       A.   That sums it up, for the most part.
6       Q.   What is your work experience with hydrology?
7       A.   Various projects in which design the, you
8   know, water resource hydrology of the project,
9   both in a pre-development and post-development
10  condition, all over the State of Florida, and
11  parts of North Carolina and South Carolina and
12  Georgia.
13      Q.   I'm sorry.  You said various projects in
14  which you worked with water resources.  What was the
15  next word?
16      A.   Water resources and hydrology.
17      Q.   And what does that work consist of?
18      A.   Work consists of everything from
19  large-scale commercial projects to large-scale
20  residential developments, to major institutional
21  projects in the State of Florida, transportation
22  projects, recreational projects, municipal
23  community redevelopment areas, master plans,
24  master studies of drain systems and hydrology,
25  hydrological systems and hydrology.

Page 51

1       Q.   And what hydrological work do you do on
2   those projects?
3       A.   Those projects, essentially we do
4   pre-development analysis as to the quantity of
5   water that's being generated, where it's flowing,
6   how it's flowing.  We also at times do water
7   quality analysis as to what type of discharge is
8   occurring.  All of that involves things we have
9   mentioned before, the wetlands and soils.
10          And subsequently, as part of the
11  developed condition, and designing the
12  infrastructure and the post-development discharges
13  and flows and hydrology that's going to be
14  necessary for that development to exist.
15      Q.   How do you conduct your pre-development
16  hydrology analysis?
17      A.   There's many steps to that, but a
18  simplified version is prepare a topographic
19  survey, a boundary survey, geotechnical and
20  geographical information, including many resources.
21          Essentially, apply professional judgment
22  as to where and how the water is behaving, run it
23  through various models, calibrate those models to
24  existing conditions, and then essentially produce
25  a report that identifies the pre-development

Page 52

1   condition and its hydrology.
2       Q.   Is that worksite-specific?
3       A.   Most of the time, yes, it is.
4       Q.   When is it not site-specific?
5       A.   When you're dealing with a small scenario
6   of maybe just sizing a small pipe in a parking lot.
7       Q.   And the work that you described just now,
8   is that work that you personally do or does someone
9   do it on your behalf?
10      A.   I personally performed that work for the
11  last 40 years.
12      Q.   And what information do you rely on --
13  withdrawn.
14          You mentioned topographic notes?
15      A.   That's correct.
16      Q.   How do you prepare those?
17      A.   A surveyor will essentially identify what
18  datum we're working in.  Nowadays we're working in
19  Unit 88.  We'll identify published benchmarks that
20  is issued by either state or federal or local
21  agencies.  We will compare that data and datum to
22  various other datums to make sure that it's of
23  good quality.
24          We will go out and either ground truth it
25  with men on the ground shooting elevations, by

RICHARD CREECH                                          May 24, 2022
USA vs SHARFI                                                  53–56

Page 53

1  running a bench around the site to create a
2  network on which to base those elevations on.
3        We'll either do transects or we'll do
4  spot shots.  Earlier in my career we used a plane
5  table, much like the Army Corps did to produce the
6  USGS maps.
7        And then we will essentially plot those
8  on the map and identify vegetation, contours,
9  various infrastructure, such as pipes, ditches,
10  other things that may influence the topography,
11  and issue a map.
12        Nowadays, in today's technological world,
13  we do it either via LiDar or aerial mapping, and
14  then we will essentially shoot it aerially and
15  produce a map that way, based on the benchmark
16  datum that has been identified.
17    Q.  Is that all work that you do yourself?
18    A.  At times, yes.
19    Q.  And at times someone does it on your behalf?
20    A.  One time I had numerous survey crews that
21  were doing that on behalf of my license.
22    Q.  Is that what's important to getting an
23  accurate pre-development picture of hydrology on a
24  particular site?
25    A.  Yes, it is.

Page 54

1    Q.  And then you said you do post-development
2  analysis as well?
3    A.  That's correct.
4    Q.  And what does that consist of?
5    A.  Essentially the same technique, just
6  identifying the improvements that will be on site,
7  including the pervious areas, others types of
8  infrastructure that may be relevant to aid in
9  providing drainage or South Florida management of
10  the developed site.
11    Q.  And is that site-specific work?
12    A.  Yes.
13    Q.  And is all that work important to
14  conducting a post-development analysis with respect
15  to hydrology?
16    A.  That is correct.
17    Q.  Have you done work with respect to hydrology
18  in wetlands?
19    A.  Yes, I have.
20    Q.  And what work have you done with respect to
21  hydrology in wetlands?
22    A.  In my 40-year career, every project I've
23  worked on has wetlands involvement.
24    Q.  And does the work that you described in the
25  pre- and post-development analysis differ with

Page 55

1  respect to wetlands when you do hydrology analysis?
2    A.  No.  We include the wetlands in that
3  analysis.
4    Q.  And you would agree with me that hydrology
5  analysis is an important element of determining
6  wetland limits?
7    A.  I would agree with that.
8    Q.  Earlier you said that -- I think you said
9  that vegetation is not the most important parameter
10  of determining wetland limits.  Do you recall that?
11    A.  Yes, I do.
12    Q.  Do you believe there is a most important
13  element of determining wetland limits?
14    A.  I do not.
15    Q.  In your opinion, vegetation, hydrology and
16  soils are equally important?
17    A.  Yes, they are.
18    Q.  When you worked on assisting agencies with
19  determining wetland limits, have you prepared
20  wetland determination data forms?
21    A.  Say that again.
22    Q.  Have you used wetland determination data
23  forms?
24    A.  Yes, I have.
25    Q.  Do you typically use wetland determination

Page 56

1  data forms when determining the limits of wetlands?
2    A.  Most of the time, yes.
3    Q.  Is that an important component of determining
4  wetland limits?
5    A.  It's one of the components of determining
6  wetlands, yes.
7    Q.  When you have worked assisting in
8  determining wetland limits, have you reviewed
9  regional climate data?
10    A.  Not typically, no.
11    Q.  When you have assisted in determining
12  wetland limits, have you installed wellpoints?
13    A.  At times, yes.
14    Q.  But other times you haven't?
15    A.  That's correct.
16    Q.  Why would you use or not use wellpoints in
17  assisting an agency in determining wetland
18  limitations?
19    A.  When there is debate as to where that
20  limit may exist, so we are looking for accurate
21  data in which to debate one way or the other as to
22  the limits of it.
23    Q.  But if the limit is uncontroversial, you
24  won't use wellpoints?
25    A.  It's a typical process, yes.

RICHARD CREECH                                          May 24, 2022
USA vs SHARFI                                              57—60

Page 57

1    Q.  It is typical not to use wellpoints if it's
2  uncontroversial?
3    A.  That's correct.
4    Q.  Do you ever review what potential species
5  might be in a wetland when you review or when you
6  assist in determining wetland limitations?
7    A.  At times, yes.
8    Q.  What list do you use when you do that work?
9    A.  We will utilize the FDEP list of
10  threatened or endangered species and their various
11  habitats that they may occupy.
12    Q.  Do you ever review a list of potential
13  species in assisting you to determine in your mind
14  where the wetland limit might be?
15    A.  At times.
16    Q.  Is it still that threatened and endangered
17  species list or is there another one?
18    A.  There are various lists out there right
19  now, but that's one I typically use.
20    Q.  Do you recall using any others?
21    A.  Not at this time, no.
22    Q.  Do you know what the National Wetland
23  Inventory is?
24    A.  Yes, I do.
25    Q.  What is that?

Page 58

1    A.  Essentially it's a federal document
2  mapping wetlands that the federal government has
3  identified through the years of processes.
4    Q.  If I refer to those maps as NWI maps, you
5  will know what I mean?
6    A.  Yes, I will.
7    Q.  Do you use NWI maps in your work in wetlands?
8    A.  Yes.
9    Q.  Have you ever been subject to disciplinary
10  action?
11    A.  No, I have not.
12    Q.  Do you teach any courses on hydrology?
13    A.  Not that I recollect, other than, like I
14  mentioned before, guest lecturer, speaker, at
15  various classes.
16    Q.  Do you recall what the subject of those
17  guest lectures were?
18    A.  Yeah.  They talk about Florida hydrology
19  and how the development impacts certain levels of
20  hydrology.
21    Q.  Do you recall the last time you gave a
22  guest lecture?
23    A.  It might have been Purdue University,
24  roughly 15, 20 years ago.
25    Q.  Have you taught any classes about vegetation?

Page 59

1    A.  No, not that I recollect.
2    Q.  Are you aware of any well-recognized
3  experts in the field of hydrology?
4    A.  Again, there are many experts in the
5  field of hydrology.  I can recognize Fran
6  McMichael from Carnegie Mellon University, Cliff
7  Davidson, Syracuse University, Mr. Wanielista from
8  the University of Central Florida.  I believe Dick
9  Luthy is still out at Stanford University.
10    Q.  Are there any publications, by which I mean
11  journals, magazines or books, that are authoritative
12  in the field of hydrology?
13    A.  Yes, there are.
14    Q.  What are those?
15    A.  The ASCE journals typically produce
16  articles referring to hydrology and hydraulics.
17    Q.  Anything else, to your recollection?
18    A.  There are various another ones.  The
19  Association of Erosion Control produce journals
20  and magazines routinely on a discussion of
21  construction hydrology.
22    Q.  Do you read any publications to stay
23  abreast of developments in the field of hydrology?
24    A.  Yes, I do.
25    Q.  What are those?

Page 60

1    A.  The various publications that come out of
2  ASCE, the FPS Journal, and the water management
3  districts and Florida DEP technical circulations
4  that occur from time to time.
5    Q.  Are there any other reasons that we have
6  not already discussed to support why you believe you
7  have an expertise in hydrology?
8    A.  Those are the ones I can recollect at this
9  time.
10      MR. HUGHES:  Off the record.
11      THE VIDEOGRAPHER:  We are now going off
12  the record, and the time is 10:23 a.m.
13      (A recess was taken.)
14      THE VIDEOGRAPHER:  We are now going back
15  on the record, and the time is 10:38 a.m.
16  BY MR. HUGHES:
17    Q.  Mr. Creech, as we discussed earlier, you've
18  provided a report in this matter?
19    A.  Yes, I did.
20    Q.  And that report lists the opinions and
21  conclusions you have reached in this case; is that
22  correct?
23    A.  That is correct.
24    Q.  And are all of your opinions and conclusions
25  you reached in this case in that report?

RICHARD CREECH
USA vs SHARFI

May 24, 2022
61—64

Page 61

1   A.   The opinions I've been asked to provide,
2   yes, sir, are in there.
3   Q.   Are there opinions that you have not been
4   asked to provide that you have with respect to this
5   matter?
6   A.   I'm not sure, counsellor, when we get
7   into trial, or you may ask me some opinions.
8   These are the opinions I was asked to provide, so
9   I provided them.  I have opinions about the
10  weather.  I have lots of opinions.
11  Q.   As you sit here today, can you think of any
12  opinions that you have about this case that are not
13  contained in your report?
14  A.   Like I said, these are the ones I have
15  been asked to be provided, so that's what the
16  report reflects.
17  Q.   Is that a yes, that the report contains all
18  of the opinions that you have with respect to this
19  case?
20  A.   At this time, yes.
21  Q.   Do you expect to have additional opinions
22  with respect to this case?
23  A.   I don't know what people are going to ask
24  me in court, counsellor, or in trial, or anything
25  like that.  So, you know, I don't know what else

Page 62

1   to tell you.  This is what I was asked to opine on
2   and that's what I provided an opinion for.
3   Q.   Please identify each opinion and conclusion
4   that you have reached in this case.
5   A.   Sure.  What I'm looking at is the
6   rebuttal report prepared by me, Richard Creech,
7   professional engineer and professional land
8   surveyor.
9        As identified in item 3, the first
10  paragraph, I basically opine that, you know, the
11  ditches addressed in the DOJ expert report were
12  part of the works of the Palm City Drainage or
13  Reclamation Plan of the 1920s, and was constructed
14  to provide drainage of the area of the small farms
15  to cultivate livestock and crops, and they were
16  served by the ditches that were reflected in the
17  DOJ expert report.
18       Secondly, the ditches were excavated in
19  most part in pine flatwood uplands and were
20  constructed again to remove runoff from
21  precipitation that fell on the lands, and convey
22  that runoff to a positive outfall such that those
23  small farms could provide livestock and crops to
24  be cultivated as expected during that time period.
25       Lastly, you know, the DOJ expert report

Page 63

1   failed to acknowledge that these ditches were not
2   constructed as a relocation of a tributary of
3   Bessey Creek or within a tributary and were not
4   constructed to drain wetlands, but were part of an
5   overall drainage improvement project for this
6   region in Martin County.
7        The expert report also fails to recognize
8   that the intermittent flow is a result of
9   precipitation and the ensuing runoff of that
10  precipitation.
11       And, lastly, the expert report fails to
12  acknowledge, again, that these ditches, as a
13  result of the construction in the thirties and
14  forties, and, you know, the expectation of the
15  termination of the natural tributary of Bessey
16  Creek, roughly stops at the Boat Ramp Road area,
17  that this ditch was constructed in uplands, and,
18  again, to facilitate runoff from, you know,
19  precipitation or rainfall events to a positive
20  outfall for the development of those farms, as
21  platted in Palm City Farms, in Martin County or
22  Palm Beach and Martin County.
23  Q.   Are there any other opinions or conclusions
24  that you have reached and will offer in this case
25  that you have not just listed?

Page 64

1   A.   One of the other opinions that I probably
2   failed to put on the report is that the Bureau of
3   Land Management, who did the original survey of
4   the State of Florida, 1845 to 1847, also recognizes
5   that the termination of the Bessey Creek, the
6   natural portion of the Bessey Creek, terminates at
7   the northwest section of Section 15 of the Palm
8   City Farms District.
9   Q.   And you agree with me that that opinion is
10  not in your expert report?
11  A.   That's correct.
12  Q.   So I count approximately six opinions.  We
13  will go through each.
14       You said that the ditches addressed were
15  part of the works of the Palm City Drainage District
16  to provide drainage.  Is that correct?
17  A.   That's correct.
18  Q.   And what facts have you relied on in
19  forming that opinion?
20  A.   The Map of Reclamation, as published in
21  1920, in the Martin County public records.  The
22  legislature approved the creation of the Palm City
23  Drainage District back in the early twenties, such
24  that it could purchase bonds and thus begin those
25  works of providing drainage for those small farms,

RICHARD CREECH                                    May 24, 2022
USA vs SHARFI                                          65–68

Page 65

1  which I believe that that did occur, and the
2  construction began in probably the mid to late
3  twenties.
4     Q.  And what is the basis of your statement
5  that the legislature approved the creation of Palm
6  City Drainage District so that it could provide
7  drainage for small farms?
8     A.  The time period at that point -- well,
9  actually, can you break down that question for me?
10  You have about three questions in there.
11     Q.  No problem.
12        You said that the legislature approved the
13  creation of the Palm City Drainage District; is that
14  correct?
15     A.  That's correct.
16     Q.  And what is your basis for that statement?
17     A.  The Florida Legislature Book identifies
18  it in the annals of the Florida legislature.
19     Q.  What is the Florida Legislature Book?
20     A.  The Florida Legislature Book is
21  essentially a continual annul of the legislations
22  that the Florida legislation approved, I think
23  from 1875 to 1940-something.
24     Q.  Is that a document that you relied on in
25  forming your opinions?

Page 66

1     A.  Yes, I did.
2     Q.  And is that a document that you cited in
3  your expert report, to your knowledge?
4     A.  Yes, I did.
5     Q.  And where is that?
6     A.  In the first paragraph of the item
7  labeled number 3, essentially three sentences
8  down, it essentially states, "This was a State of
9  Florida recognized program for reclamation as
10  provided for the Regular Session of 1921, under
11  the Special Acts as adopted by the legislature of
12  Florida during its 18th regular session, and
13  adopted as Chapter 8008 of the laws of Florida.
14  The Palm City Drainage District was initiated by
15  the State and allowed the district to have taxing
16  and bonding authority to construct the proposed
17  reclamation project."
18     Q.  It's your position that that includes a
19  citation to the Florida Legislature Book?
20     A.  That's correct.
21     Q.  And then you said that the legislature
22  approved the creation of Palm City Drainage District
23  so it could provide for the drainage to small farms;
24  is that correct?
25     A.  That's correct.

Page 67

1     Q.  What is the basis of that?
2     A.  My experience in dealing with those types
3  of districts through the years.
4     Q.  And when you say your experience in dealing
5  with those types of districts, what do you mean by
6  that?
7     A.  As I mentioned previously, the 298
8  districts were created by the Florida legislature
9  to provide for drainage of these types of areas.
10        It's fairly commonly not known that those
11  works took place in the late eighties to the
12  1950s, essentially culminating in the Central and
13  South Florida Flood Control District works that
14  essentially drains South Florida.
15        So this was one of many that were
16  approved during that time period.  And as I've
17  worked in quite a few 298 districts, they have
18  very similar language with respect to the
19  legislature that was approved.
20     Q.  You said the eighties to the fifties?
21     A.  1880s to the 1950s, yes.
22     Q.  And the 298 program, does that refer to a
23  particular Florida Statute?
24     A.  I believe it does, yes.
25     Q.  Do you know what that statute is?

Page 68

1     A.  Not off the top of my head what specific
2  statute it is.
3     Q.  Do you know generally what statute that is?
4     A.  Generally, it's the Florida Statute that
5  deals with, you know, what they call 298 districts, I
6  would suspect.  I don't remember off the top of my
7  head what the actual Florida Statute number is,
8  because it changes from time to time.  But it's
9  available in the public record.
10     Q.  And do you know when that statute providing
11  for 298 districts was passed?
12     A.  Not off the top of my head, no.
13     Q.  Do you know if it was in the 19th century
14  or in the 20th century?
15     A.  I believe it was in the early 1900s.
16     Q.  And where are the 298 districts that you
17  have worked with in your career located?
18     A.  In the State of Florida.
19     Q.  Where in the State of Florida?
20     A.  Basically, Palm Beach County, Martin
21  County, St. Lucie County, Indian River County, and
22  Brevard County.
23     Q.  Can you name the 298 districts that you
24  have worked in in your career?
25     A.  I'll try.  Lake Worth Drainage District --

RICHARD CREECH
USA vs SHARFI

May 24, 2022
69–72

Page 69

1    Q.   Make sure to slow down for the record.
2    A.   That's what I'm going to do.
3         Lake Worth Drainage District, Palm Beach
4    Drainage District, the Northern Palm Beach
5    Improvement Control District, Palm City Farms, the
6    Fort Pierce Farms Water Control District,
7    Sebastian River Improvement District.  And there
8    are others that I can't recollect off the top of
9    my head right now.
10   Q.   As you sit here today, those are the ones
11   you can remember?
12   A.   Those are the ones I can remember off the
13   top of my head, yes.  More time, I could look at
14   files and I could give you a more accurate depiction.
15   Q.   So you said that it was your experience
16   with these types of districts that forms the basis
17   of your opinion that the Palm City Drainage District
18   was created to provide drainage for small farms; is
19   that correct?
20   A.   That's correct.
21   Q.   And so you said that you have worked with
22   several 298 districts.  Is that correct?
23   A.   That's correct.
24   Q.   And so what about that experience informs
25   your opinion that the legislature approved the

Page 70

1    creation of the Palm Beach Drainage District to
2    provide drainage for small farms?
3    A.   My experience has been that these districts
4    were to provide drainage for agriculture expansion
5    of the State of Florida.  A lot of historically
6    accurate books are out there that talk about the
7    draining of Florida and the creation of these
8    districts.
9         My personal and professional experience
10   has been that they create these drainage ditches
11   pretty much like we spoke of earlier.  The
12   Sebastian River Improvement District created a
13   lateral ditch to allow for drainage of off site
14   properties to a legal positive outfall.  It has
15   been my experience that that has been traditionally
16   and historically an accurate understanding of it.
17        As a civil engineer, I have to routinely
18   understand historically how and why things were
19   constructed, such that I can provide professional
20   guidance or opinions for construction improvements
21   to facilitate either the ultimate outcome of the
22   drainage district or facilitate new improvements
23   of those districts.
24        So in the minutes and annals of some of
25   these districts that I have worked within, it's

Page 71

1    talked about why they built these laterals and why
2    they created these drainage ditches.  It was for
3    the expansion of settled land.
4         So that's essentially why I believe that
5    this drainage district is no different than the
6    Lake Worth Drainage District or the St. Lucie
7    County Farms District.
8    Q.   You said that there are books that describe
9    the draining of South Florida.  Is that correct?
10   A.   That's correct.
11   Q.   Did you rely on any such books in forming
12   your opinions in this case?
13   A.   No, I did not.
14   Q.   Which books are you referring to?
15   A.   Land and the Water, Water and the Land
16   would be the one I recollect off the top of my
17   head.  There are various other ones, but that's
18   probably the most systematic and accurate book out
19   there that talks about the legislature and how
20   these districts were created.
21   Q.   And you said that in certain districts the
22   legislature stated its intention to provide drainage
23   for small farms; is that correct?
24   A.   In some of those districts, yes.
25   Q.   Do you know if that's true for the Palm

Page 72

1    City Drainage District?
2    A.   I don't recollect.  I don't remember,
3    counsellor.  I can't remember.
4    Q.   Did you rely on the statute creating the
5    Palm City Drainage District in forming your opinion
6    that it was formed, that the Palm City Drainage
7    District was formed to provide drainage for small
8    farms?
9    A.   Yes.
10   Q.   But is it your testimony that you don't
11   know if that statute states the purpose of the Palm
12   City Drainage District?
13   A.   At this time I can't recollect.  By the
14   evidence of the 1920 Reclamation Plan as recorded
15   in Martin County records, tying in the legal
16   description of that drainage district, I would
17   suspect that that document is one in part the same
18   as the Palm City Drainage District that was created
19   by the legislature.
20   Q.   But sitting here today, you don't know?
21   A.   Right now, I can't recollect.
22   Q.   You said that your experience informed your
23   opinion about the purpose of the Palm City Drainage
24   District.  Do you have firsthand knowledge of the
25   creation of the Palm City Drainage District?

RICHARD CREECH                                    May 24, 2022
USA vs SHARFI                                           73–76

Page 73

1    A.  Can you define firsthand knowledge?
2    Q.  Were you present for the creation of the
3   Palm City Drainage District?
4    A.  As I testified earlier, I was born in
5   1961, so, no, I would not have been around.
6       MR. HAMILTON:  Just to point out for the
7   record, it appears Mike Wylie has joined.  I
8   don't know if he has been on all along.  I
9   just noticed that.
10      MR. HUGHES:  Yes, he has been here.
11   Q.  And so when you refer to your experience,
12   you are referring to reading that statement of
13   legislative purpose for other drainage districts in
14   the State of Florida; is that correct?
15   A.  One of the bases of my opinion, yes.
16   Q.  And you have worked in other drainage
17   districts as well?
18   A.  That's correct.
19   Q.  And how does your work in other drainage
20   districts inform your opinion about the purpose for
21   the building of the Palm City Drainage District?
22   A.  As I mentioned previously, in working in
23   those districts, a lot of these lateral ditches
24   were created in or about the same time as the Palm
25   Beach Drainage District.  They were -- in

Page 74

1   reviewing minutes for the years, you know, money
2   was spent to excavate these laterals out of those
3   drainage districts.  They expended funds.  They
4   had budgets to provide for excavation of ditches
5   of very similar types.
6       And that, you know, they went on to
7   maintain those ditches throughout, until such time
8   as the county or municipality took over the
9   maintenance of those drainage ditches, of which
10   the county or municipality historically would have
11   taken them over through the Public Works
12   Department, which is out there to maintain
13   transportation, utilities and drainage systems.
14   Q.  So would you agree with me that your
15   understanding of the purpose for the creation of
16   other drainage ditches is principally based on
17   historical documents?
18   A.  That's correct.  And my opinion, obviously,
19   of my working with the drainage districts in the
20   past.
21   Q.  Can you explain how your experience working
22   with drainage ditches has informed your opinion
23   about why the Palm City Drainage District was formed
24   in the early part of the 20th century?
25   A.  Actually, I said drainage districts,

Page 75

1   counsellor, not ditches.
2       In working with drainage districts, I had
3   very similar legislation and very similar charters
4   as what I would have expected to see in the Palm
5   City Drainage District, and had very similar
6   reclamation plans and designs to provide for those
7   drainage systems.
8   Q.  So your understanding of the purpose of the
9   Palm City Drainage District is based on historical
10   documents and also legislative documents related to
11   other drainage districts?
12   A.  That's correct.  And the Reclamation Plan
13   of the Palm City Drainage District being designed
14   and approved and adopted in or about the time that
15   this went to the legislature in 1921.
16   Q.  And that's a document that you cited in
17   your report?
18   A.  Yes.
19   Q.  Any other basis for your opinion about the
20   purpose of the creation of the Palm City Drainage
21   District other than what we just discussed?
22   A.  At this time, no, sir.
23   Q.  When you say not at this time, do you mean
24   that you have in the past had other bases or that
25   you may have other bases in the future?

Page 76

1   A.  No, you may ask me another question about
2   the opinion of the Palm City Drainage District.
3   Q.  Let's look at a document.
4       Can you see that document?
5   A.  Yes, I can.
6   Q.  For the record, this is SHARFIEXPERT 93
7   Bates stamp.
8       MR. HAMILTON:  I think we have it here.
9   Q.  It's entitled Exhibit M, Palm City Drainage
10   Map.
11       Did I read that correctly?
12   A.  I have the exhibit in front of me.
13   Q.  Did I read that correctly?  It is
14   SHARFIEXPERT 93, Exhibit M, Palm City Drainage Map?
15   A.  That's correct.  Actually there's multiple
16   zeros in front of it.
17   Q.  For your and mine and the court reporter's
18   convenience, I will just use the non-zero numbers
19   for the remainder of the day.
20   A.  That's fine.  That works for me.  A lot
21   of times, counsellor, I got to read all the
22   documents.  I wanted you to clarify that for me.
23   Thanks.
24   Q.  Understood.
25       What is this document?

RICHARD CREECH                                        May 24, 2022
USA vs SHARFI                                             77–80

Page 77

1    A.   This document is a map that was recorded
2    in the Martin County public records and represents
3    the Palm City Farms platted area, as recorded in
4    the Martin County public records in plat book and
5    page.  This document represents various laterals
6    and outlet ditches that are to be constructed as
7    part of the Reclamation Plan of 1920 for the Palm
8    City Farms Drainage District.
9    Q.   Where did you get this document?
10   A.   From the Martin County Public Works --
11   actually the Martin County Clerk's Office.  I'm
12   sorry.
13   Q.   You said it includes platted areas.  Is
14   that correct?
15   A.   That's correct.
16   Q.   And what are those?
17   A.   Well, starting with the base map, you
18   know, this is a certain township and range that
19   was surveyed by the federal government back in
20   1845, and you see the large numbers there
21   representative of the sections or the subdivision
22   of that section or township and range.
23        Going further deeper into the
24   subdivision, there are ten-acre platted tracks
25   that are represented in the Palm City Farms plat,

Page 78

1    that was originally in Palm Beach County but then
2    now is in Martin, and represents the backbone
3    drainage system overlaid on top of that.
4        So essentially it was a large-scale plat
5    of ten-acre farms out in the western or mid -- you
6    know, fairly western section of Martin County.
7    Q.   When you say large-scale plat, are you
8    referring to these larger numbers that overlay boxes
9    containing smaller boxes of -- withdrawn.
10       When you say larger-scale plat, are you
11   referring to these larger numbers that are
12   overlaying a series of boxes?
13   A.   That's a part of it.  A large-scale plat,
14   this represents several hundreds of acres, and so
15   the scale is fairly small, but it also represents
16   the plat of that section of township and range,
17   which is the sections within that section, or that
18   range and township, and those are the larger
19   numbers, and within those larger sections are
20   smaller tracts, roughly ten acres in size.
21   Q.   And so if we look at the box with 17
22   written on it, at the very top, going from left to
23   right -- withdrawn.
24       MR. HUGHES:  Let's mark this document as
25   DX 170.

Page 79

1        (DEFENDANTS' EXHIBIT 170, Document
2        entitled "Palm City Drainage Map," Bates
3        stamped SHARFIEXPERTS 93, was marked for
4        identification, as of today's date.)
5    Q.   On DX 170, if you see the boxes in 17,
6    moving from left to right, it says 8, 7, 6, 5, 4,
7    all the way to 1.  Is that correct?
8    A.   That is correct.
9    Q.   And each one of those numbers from 8 to 1
10   represents, to your knowledge, a ten-acre tract?
11   A.   Approximately a ten-acre tract.  The
12   sections are not perfectly square, so it would be
13   approximately ten acres.
14   Q.   And how does this document inform your
15   opinion about the purpose of the Palm City Drainage
16   District?
17   A.   In my experience, it would represent,
18   starting at the lowest potential, it represents
19   natural streams or tributaries that would be
20   essentially outfalls for drainage laterals.
21       A term of art in the industry is laterals
22   or canals or ditches, laterals being a smaller
23   drainage tile network that would drain into canals
24   or larger ditches, that would drain into what
25   would be considered to be legal positive or

Page 80

1    positive outfalls to tidal water bodies such that
2    the area could be drained.
3        So sometimes, in my experience in other
4    drainage districts that are more rectangular,
5    sometimes they are much more arbitrary, depending
6    on the topography of the site.
7        But this is pretty typical of a drainage
8    district's reclamation plan of laterals, ditches,
9    canals, to drain small farms so they could be
10   cultivated into either pasture or crops or be
11   utilized for livestock.
12   Q.   Do you know when this map was created?
13   A.   1920.
14   Q.   And at that time was this an accurate
15   reflection of the water and basins in the Palm City
16   Drainage District?
17   A.   In 1920, I doubt that they were constructed
18   at 1920.  As I testified earlier, they did not
19   have legislative authority to tax or create bonds
20   to pay for this infrastructure.
21       After 1921, the Florida legislature
22   approved that district and approved that bonding
23   and taxing authority, taxes would have been levied
24   and bonds would have been issued for the
25   construction of those improvements, to the extent

RICHARD CREECH
USA vs SHARFI

May 24, 2022
81–84

Page 81

1   that they had the financial wherewithal to do them.
2       In my experience, they have been done in
3   phases at times.
4     Q.   And when you say based on your experience,
5   you're talking about your experience working with
6   other 298 districts?
7     A.   And working within this Palm City Drainage
8   District in current times.
9     Q.   And how does your experience working in the
10  Palm City Drainage District inform your opinion
11  regarding this map?
12    A.   You know, Martin County Public Works
13  Department and Martin County took over this
14  drainage district in roughly 1943 when the
15  drainage district was abolished by the legislature.
16      My working with Martin County, they have
17  come in at times and either extended or modified
18  or tried to comply with these drainage areas, or
19  drainage ditches or laterals, to facilitate
20  drainage in those areas.  So it's a widely
21  recognized map inside Martin County at this time.
22    Q.   When you say at this time, what time are
23  you referring to?
24    A.   Modern day, today.
25    Q.   Have you used this map in your work?

Page 82

1     A.   Yes, I have.
2     Q.   For what purpose?
3     A.   For maps or stormwater planning, and
4   estimating basins for pipe sizing at certain
5   junctures.
6     Q.   And why do you use this map for that work?
7     A.   Essentially, it shows the laterals and
8   the conveyances, what is coming into it.  So it
9   gives me an overall perspective of the master
10  drainage system of the Palm City drainage area.
11    Q.   Even though at the time this map was
12  developed this did not reflect conditions on the
13  ground in the Palm City Drainage District?
14    A.   No, but, counsellor, after reviewing this
15  map and putting it on the ground, either
16  surveying-wise or by aerial photography, it
17  accurately reflects what has been constructed
18  during the 1920s and '30s.
19    Q.   And how have you verified your opinion that
20  this accurately reflects what was built in the first
21  half of the 20th century?
22    A.   As part of previous projects, and just my
23  knowledge, and working in Martin County, surveying
24  or engineering, I have had the opportunity or
25  ability to utilize historical aerials in creating,

Page 83

1   as you've mentioned earlier, in testifying,
2   hydrology or hydrologic maps that would contain
3   basins.  So that's where that experience would
4   come from, and knowing that that was on the ground.
5       The earliest aerial photograph that I can
6   represent accurately was 1940, and many of these
7   canals, ditches and laterals weren't in existence
8   at that time.
9     Q.   And which, if any, of these canals, ditches
10  or laterals have you verified?
11    A.   All of them.
12    Q.   And can you identify for me on DX 170 the
13  canals, ditches and laterals?
14    A.   They are all represented by that map.
15  There are some additional canals or ditches that
16  have been constructed since this map has been
17  created.  But through my 40th and through my
18  lifetime of living in Martin County, I have either
19  surveyed or witnessed all of these laterals at one
20  point in my career.
21    Q.   Through their entire length?
22    A.   Substantially.  I wouldn't say the entire
23  length.  At times there was no need to go through
24  the entire length.  But I have substantially
25  walked many of these laterals in surveying or

Page 84

1   engineering.
2     Q.   In your opinion, the plats on this map here
3   are accurate?
4     A.   To the scale they are drawn, yes, they
5   are accurate.
6     Q.   Does each plat on this map represent a
7   distinct piece of property?
8     A.   In modern times, no, because a lot of
9   these have been broken up into five-acre tracts
10  for essentially lots with each of those tracts or
11  parcels.
12      So to answer your question specifically,
13  no, they do not represent a distinct partial or a
14  piece of property.  They represent a ten-acre
15  tract that has been platted as part of the Palm
16  City Farms plat.
17    Q.   Do you know when these parcels may have
18  been split up into five-acre parcels?
19    A.   Over the last 70 years they have been
20  broken up into five-acre tracts.
21    Q.   So that's since approximately 1952?
22    A.   That's when Martin County really started
23  to grow.  There were various home sites in and
24  around the Palm City Farms area.  The transportation
25  networks were fairly limited at that time.  So

RICHARD CREECH                                        May 24, 2022
USA vs SHARFI                                          85–88

Page 85

1  Martin County began to grow in the 1950s, and
2  Martin County's code allows for lot splits of
3  record prior to 1972.  So a lot of them have been
4  broken up into five-acre tracts since that time.
5      Q.  And is it your opinion that the laterals,
6  canals and ditches represented on this map were
7  constructed sometime after 1920 but before 1950?
8      A.  That is correct.
9      Q.  And we zoom in to the larger plats 18, 17
10 and 16.  Do you see this line that crosses 16, 17
11 and 18 that is identified as Bessey Creek Outlet
12 Canal No. 1?
13     A.  Yes, I do.
14     Q.  And do you have an opinion as to what this
15 Bessey Creek Outlet Canal No. 1 represents?
16     A.  Represents a larger lateral or canal that
17 was constructed -- at that time was to be
18 constructed as a major outfall for the western
19 properties of Section 15, 16, 17 and 18, and
20 potentially the lower sections for those.
21     Q.  And you would agree with me that in the
22 larger plat 17, the Bessey Creek Outlet Canal No. 1
23 does not follow the plat lines?
24     A.  I would agree with that.
25     Q.  Is it your opinion that Bessey Creek Outlet

Page 86

1  Canal No. 1 represents a straight line?
2      A.  Yes, it represents a straight line.
3      Q.  Through the length represented here?
4      A.  There's various straight line segments.
5  There's a straight line segment that comes out
6  where the Bessey Creek is natural, in Section 15,
7  around tract No. 10.
8          There it goes essentially west, or
9  westerly, for a period, and then goes Straight
10 Path, and then goes southwesterly on Straight
11 Path, and then goes essentially northwesterly on
12 Straight Path, and then ultimately in Section 18
13 has a somewhat of a curved linear representation.
14     Q.  And you would agree with me that this
15 changes direction, as you just described, more than
16 once between larger plat 15 and 18?
17     A.  Yes, I do.
18     Q.  Can you identify what we have referred to
19 as the site on this map?
20     A.  Yes, it's within Section 17, roughly just
21 where west of 17 is located.
22     Q.  Do you know the plat number?
23     A.  I believe there are tracts 27, 37, 38 and
24 25, if I recollect correctly.
25     Q.  You said 27, 38, 37 and 25?

Page 87

1      A.  Correct.  I believe that's the general
2  location.
3      Q.  I think we agreed earlier that this site
4  refers to a 9.92 acre plot of land?
5      A.  That's correct.  I'm sorry, I was referring
6  to the cleared area, the represented area.  So,
7  yes, that would be approximately tract 37, I believe.
8      Q.  And what is your basis for that belief?
9      A.  The legal description that was provided,
10 or the research that I looked up previously.
11     Q.  And can you identify what we have been
12 calling the north-south ditch on this map?
13     A.  The north-south ditch I believe is just
14 east of that lateral, the north-south lateral --
15 no, just west of the north-south lateral.
16     Q.  Is it identified on this map, the
17 north-south ditch, to your knowledge?
18     A.  There are various north-south ditches in
19 and around that vicinity.
20     Q.  What we have been referring to as the
21 north-south ditch, can you identify it on this map?
22     A.  I believe it to be just west -- it's not
23 on the map, is what I can recollect.  Let me take
24 a look at the aerial.  Hold on.  Just a minute.
25     Q.  What document are you looking at?

Page 88

1      A.  I am going to be looking at just one of
2  the general aerials.
3      Q.  Do you have an exhibit number on that?
4      A.  I am just going to be clear.  I will get
5  it in a minute.
6      Q.  You know what, we will undoubtedly get to
7  that document.  If you can identify it later, let me
8  know.  But you do not believe that the north-south
9  ditch is represented on this map; is that correct?
10         MR. HAMILTON:  Object to form.
11     A.  That's what I'm validating or verifying,
12 counsellor.  I believe it's the ditch that is
13 bisecting like 1 and 7.
14     Q.  What is listed here as lateral, it looks to
15 me, 58?  Did I read that correctly?
16     A.  Correct.
17     Q.  And what document did you refer to to come
18 to that conclusion?
19     A.  I didn't.  I was just going off of my
20 recollection.  And if we look at it, it would be
21 Exhibit F of my aerial is the one I generally went
22 to to identify the lateral ditches.
23     Q.  And so by looking at Exhibit F, you believe
24 that lateral 58 represents the north-south ditch?
25     A.  Yes.

RICHARD CREECH
USA vs SHARFI

May 24, 2022
89–92

Page 89

1   Q.   And when you said your recollection, what
2   did you recall?
3   A.   Just that it bisected the section, and it
4   was in the middle of the section line.  I was just
5   making sure that that was what I recollected.
6   Q.   And which plat did you say -- withdrawn.
7       You said you believe that the plat 37 and
8   the larger plat 17 represented the site, as we've
9   been calling it?
10  A.   I believe so, yes.
11  Q.   And so it is your belief that the
12  north-south ditch runs to the east of the site?
13  A.   There are two ditches out there, so I
14  refer to both of them as north-south.
15  Q.   The ditch that we have been referring to is
16  north-south?
17  A.   Right.
18  Q.   It is your belief that that ditch runs to
19  the east of the site?
20      MR. HAMILTON:  Object to form.
21      Can you zoom in on this exhibit?  It's
22  kind of hard to see.
23  A.   Actually it runs on the west side of the
24  site, in fact.  There's multiple ditches out there
25  that I witnessed and saw, so I was just trying to

Page 90

1   recognize which one it was.
2   Q.   And why do you say that the north-south
3   ditch, as we have been discussing it, runs on the
4   west side of the site?
5   A.   Because there's four sites out there, and
6   to identify the site, you know, the exhibits
7   represented that it's on the west side of the
8   property, that the government has called the
9   north-south ditch.
10  Q.   But we have agreed to refer to the site as
11  the 9.92-acre parcel at issue in this case; correct?
12  A.   That's correct.
13  Q.   And the water conveyance that runs from the
14  site from south to north is the north-south ditch;
15  correct?
16      MR. HAMILTON:  Object to form.
17  A.   That's correct.
18  Q.   And so which plat in the larger plat 17 do
19  you believe represents the site as we have been
20  referring to it?
21  A.   Counsellor, can I take a break?  I'm
22  getting a little tired right here.  I want to just
23  validate.
24  Q.   I would ask that you answer the question.
25  A.   Can you repeat the question?

Page 91

1   Q.   Yes.
2       In the larger plat 17, what of smaller
3   plats do you believe represents the site?
4   A.   It would be tract 36, I believe.
5       MR. HUGHES:  Off the record.
6       THE VIDEOGRAPHER:  We are now going off
7   the record, and the time is 11:27 a.m.
8       (A recess was taken.)
9       THE VIDEOGRAPHER:  We are now going back
10  on the record, and the time is 11:33 a.m.
11  BY MR. HUGHES:
12  Q.   Mr. Creech, we are just back from a short
13  break.  Did you review any documents during that
14  break?
15  A.   Yes, I did.
16  Q.   What was that?
17  A.   My Exhibit L, that reflects the 9.96
18  acres, the site, and the Palm City drainage map
19  exhibit.
20  Q.   And when you say the Palm City drainage
21  map, is that what we have been referring to as DX
22  170?
23  A.   Yes, sir.
24  Q.   Did you come to any conclusion based on
25  your review of these documents?

Page 92

1   A.   Yes.  The question with respect to
2   whether the north-south ditch was depicted on the
3   DX 170 exhibit, the answer is no.  And the site is
4   to the east of that ditch.
5   Q.   So the north-south ditch, to your
6   knowledge, is not represented on the Palm City
7   Drainage District map, DX 170?
8   A.   Not the north-south ditch as described in
9   the DOJ expert report.
10  Q.   And as we have been using it today; correct?
11  A.   Correct.
12  Q.   I am going to show you DX 170 again quickly.
13      Can you see that?
14  A.   Yes, I can.
15  Q.   I am going to zoom in.  Is the line that is
16  marked as the Bessey Creek Outlet Canal No. 1, does
17  that, in your opinion, represent what we have been
18  calling the excavated portion of Bessey Creek?
19  A.   That would be an accurate depiction, yes.
20  Q.   Is that a yes?
21  A.   Yes.
22  Q.   Still talking about your opinion that the
23  legislature approved the creation of the Palm City
24  Drainage District to provide drainage for small
25  farms, did you make any assumptions in formulating

RICHARD CREECH                                    May 24, 2022
USA vs SHARFI                                        93–96

Page 93

1  this opinion?
2     A.  Not to my recollection, no.
3     Q.  We discussed DX 170.  Are there any other
4  documents that you reviewed that form the basis or
5  that inform your opinion?
6     A.  The aerials as presented in my report,
7  and the USGS maps of 1948 and '50.
8     Q.  The aerials and USGS maps, are those
9  documents that were attached to your report as
10  Exhibits A through K?
11     A.  Yes, sir.
12     Q.  And how did those aerials inform your
13  opinion as to the purpose of the Palm City Drainage
14  District?
15     A.  The aerials presented to me were
16  essentially factual evidence that the ditches had
17  been constructed in general compliance with the
18  Reclamation Plan as presented in 1920.
19     Q.  Did you select those aerials?
20     A.  Yes, I did.
21     Q.  You said they were presented to you?  What
22  did you mean by that?
23     A.  No.  They were essentially my documents.
24  The aerial presented to me that these ditches were
25  in existence and were constructed in general

Page 94

1  compliance with the Reclamation Plan.
2     So maybe as a grammatical challenge, but
3  they were mine.  They are my aerials.  They showed
4  me that they have been built.
5     As an engineer, I round to the nearest
6  letter, counsellor.
7     Q.  Are there other documents or information
8  that you would have liked to have reviewed when
9  forming this opinion but did not?
10     MR. HAMILTON:  Object to form.
11     A.  Sure.  I would have loved to have seen
12  the minutes from the 1921 legislature at that
13  time, just to provide more fundamental knowledge
14  of what was discussed, along with the
15  legislature's abolishment of the district and why
16  they did it.
17     Also, I would like to review the Martin
18  County Commission minutes, accepting maintenance
19  and the delivery of those drainage systems to the
20  county.
21     Q.  Are there any other bases for your opinion
22  that we have not yet discussed?
23     A.  Not that I can recollect, no.
24     Q.  And I believe your opinion, this first
25  opinion that we're discussing was in full that, in

Page 95

1  your words, in sum and substance in your words, the
2  ditches addressed in the DOJ team expert report were
3  part of the works of the Palm City Drainage
4  District.  Is that correct?
5     A.  That's correct.
6     Q.  And by the ditches, you mean what we have
7  been calling the north-south ditch and the excavated
8  portion of Bessey Creek?
9     A.  As I testified earlier, while the lateral
10  and secondary ditches would have been constructed
11  later, they were not part of this Reclamation
12  Plan, but in my experience those secondary lateral
13  ditches would have fallen after the main backbone
14  system would have been provided, most likely
15  constructed by the individual landowners or
16  constructed by the county.
17     Q.  But you don't know?
18     A.  Regarding the specific north-south ditch,
19  I don't know who constructed it, no.
20     Q.  And you don't know when it was constructed?
21     A.  In the aerials it appears it's been
22  constructed around 1950.
23     Q.  And you don't have personal knowledge of
24  why the north-south ditch was constructed; correct?
25     A.  I wasn't there, no.

Page 96

1     Q.  And then you said your next opinion was
2  that, in sum and substance, the ditches referred to
3  in the DOJ expert report were excavated in pine
4  flatlands to handle runoff and make the land
5  suitable for livestock and crops; is that correct?
6     A.  That's correct.
7     Q.  And what facts have you relied on in
8  reaching this opinion?
9     A.  The facts of the SCS or Soil Conservation
10  Survey of Martin County, which I have found to be
11  relatively or very accurate with respect to the
12  vegetation and soils that would have been in place
13  historically, as a published document in cooperation
14  with the federal government.
15     Additionally, the USGS maps indicate that
16  these are forested areas.  I found the USGS maps
17  to be extremely accurate through the years, and
18  have been updated routinely.  So these are facts
19  that I would rely upon in my professional
20  endeavors in design or in determining what the
21  site characteristics were like.
22     Q.  Any other facts that you relied on in
23  forming this opinion?
24     A.  Not that I can recollect, no.
25     Q.  You mentioned the SCS soil survey for

RICHARD CREECH                                      May 24, 2022
USA vs SHARFI                                       97—100

Page 97

1   Martin County; is that correct?
2       A.  That's correct.
3       Q.  What is that document?
4       A.  The document is an inventory and a discussion
5   of the soil characteristics of Martin County that
6   has maps and published information as to the soil
7   types.
8       Q.  And do you know how the information in
9   those maps is collected?
10      A.  Yes, I do.
11      Q.  How is it collected, to your knowledge?
12      A.  There were various representatives, one
13  of them being Sam McCullough, that went out and
14  ground truthed all of the areas in Martin County,
15  mostly augering down or providing geotechnical
16  mechanisms to auger down to identify soil profiles.
17  They utilized aerial photography and vegetation to
18  help them determine what soils were in the area.
19  Then they compiled that information, did a quality
20  check, and then published the Soil Conservation
21  Survey in Martin County.
22      Q.  And when was that published?
23      A.  Approximately 1971.
24      Q.  You mentioned Sam McCullough.  Who is that?
25      A.  Sam McCullough was the primary author and

Page 98

1   field rep of the Soil Conservation Survey and was
2   the one that mapped and did the exploration.
3       Q.  How do you know how the Soil Conservation
4   Survey was prepared?
5       A.  Interviews and personal knowledge, and
6   field visits with Sam McCullough himself.
7       Q.  Interviews with whom?
8       A.  Sam McCullough, the author, and various
9   other Soil Conservation Survey officers that
10  followed him.
11      Q.  And you said personal knowledge.  What do
12  you mean by that?
13      A.  Personal knowledge, I mean that Sam
14  McCullough would meet me on site and identify
15  areas that he had mapped, and would actually
16  follow the same process in determining, in concert
17  with me, in determining what soils were on site
18  for a specific project.
19      Q.  Where was that work that you performed with
20  Sam McCullough?
21      A.  Various locations in Martin County.
22      Q.  Do you recall any of them?
23      A.  One of them being north of St. Lucie
24  River, on US 1.  Another one being west of town
25  near I-95 before I-95 existed.  Another one being

Page 99

1   in the Palm City Farms Gomez grant or Hanson grant
2   area.  Those are the three that come to recollection
3   pretty quickly.
4       Q.  Do you recall any others?
5       A.  There were others.  I just can't recall
6   which ones they were.
7       Q.  Do you know the SCS -- first of all, what
8   is SCS?
9       A.  Soil Conservation Survey.
10      Q.  Who publishes the SCS?
11      A.  The Department of Agriculture, if I
12  remember correctly.
13      Q.  Of the State of Florida?
14      A.  Of the State of Florida.
15      Q.  Do you know if it's been updated since it
16  was published?
17      A.  Not that I'm aware of.
18      Q.  Do you know if the individual or
19  individuals who put together the SCS ran through
20  every plat in Martin County?
21      A.  I don't have personal knowledge of what
22  plats they visited.  I only know that they pretty
23  much walked the entire county doing soil surveys.
24  I don't know what plats they visited specifically.
25  But I'm sure that they visited quite a bit of the

Page 100

1   Palm City Farms plat.
2       Q.  And what's your basis for that belief?
3       A.  Because the Soil Conservation Survey
4   issued the map, and understanding how Sam
5   identified all of those sites, and soils.
6       Q.  So you discussed the SCS and the USGS maps.
7   Did you rely on any other facts in forming your
8   opinion that a north-south ditch and the excavated
9   portion of Bessey Creek were excavated in pine
10  flatwoods?
11      A.  I felt that that was sufficient enough,
12  along with my experience and engineering
13  experience, to formulate that opinion.
14      Q.  And how did your experience form that
15  opinion?
16      A.  Having surveyed a substantial portion of
17  Martin County personally and physically, and
18  having grown up there through the years,
19  identifying projects and helping people develop
20  their property.
21      Q.  Have you surveyed the area around the
22  north-south ditch?
23      A.  Not specifically the north-south ditch,
24  but I have surveyed areas just to the east of it.
25      Q.  And have you surveyed the excavated portion

RICHARD CREECH
USA vs SHARFI

May 24, 2022
101–104

Page 101

1  of Bessey Creek?
2    A.  Some portions of it, but not the entire
3  length.
4    Q.  Do you know what portions you have surveyed?
5    A.  Some various portions just east of Boat
6  Ramp Road, and various portions going easterly of
7  Boat Ramp Road and several portions westerly of
8  Boat Ramp Road.
9    Q.  These are portions westerly of Boat Ramp
10  Road?
11    A.  Correct.
12    Q.  Were these different projects or the same
13  projects?
14    A.  They were different projects.
15    Q.  Was it two projects or more than two
16  projects?
17    A.  More than two projects.
18    Q.  How many, to your recollection?
19    A.  Say a half dozen to ten, maybe.
20    Q.  You don't recall the exact number?
21    A.  Not the exact number.  I mean, I've
22  surveyed probably close to 10,000 parcels in
23  Martin County, so it's kind of tough to remember
24  them all.
25    Q.  Understood.

Page 102

1       When was the last time you surveyed the
2  excavated portion of Bessey Creek?
3    A.  Recollect, probably about 20 years ago.
4    Q.  And how, if at all, does any surveying work
5  you have done in the excavated portion of Bessey
6  Creek inform your opinion that the excavated portion
7  of Bessey Creek was excavated in pine flatwoods?
8    A.  By physical representation of various
9  vegetation that was on site in and around the
10  excavated portion of the ditch, along with the
11  presence of negative pasture grasses, various
12  other types of upland vegetation.
13    Q.  And so it's based on the vegetation you
14  recall seeing on site?
15    A.  As far as the question referring to my
16  surveying observation or experience, yes.
17    Q.  Correct.  With respect to your experience,
18  yes.  Withdrawn.
19       What, if any, vegetation-related work do
20  you recall doing in the excavated portion of Bessey
21  Creek?
22       MR. HAMILTON:  Form.
23    A.  Can you restate that?  It was a little
24  awkward.
25    Q.  Sure.

Page 103

1       You said that you saw vegetation on site at
2  or near the excavated portion of Bessey Creek.  Is
3  that correct?
4    A.  That's correct.
5    Q.  And what work did you do with respect to
6  that vegetation?
7    A.  My recollection is that most of the
8  surveying I did in and around that time period, we
9  identified vegetation as a normal course of action
10  in preparing our surveys.
11       As a normal course of action in
12  performing our surveys, we would normally identify
13  or locate certain levels of vegetation, some of
14  them being wetland sluice, some of them being
15  cabbage palm hammocks, sawpalmetto areas, and
16  slash pine pasture areas.
17    Q.  So you just described your normal course of
18  action.  Do you recall whether you did any similar
19  work in the excavated portion of Bessey Creek when
20  you surveyed areas around it?
21    A.  I remember one specific survey, I located
22  the sawpalmetto areas and slash pine areas to get
23  a tree location of those areas.
24    Q.  And where did you locate those areas?
25    A.  On the five-acre tract that I surveyed,

Page 104

1  if I remember correctly.
2    Q.  And do you recall what that five-acre tract
3  was?
4    A.  Probably 600, 700 feet west of Boat Ramp
5  Road.  You're really stretching me here, counsellor,
6  make me reach back into the archives.
7    Q.  You attached to your report excerpts of the
8  Martin County SCS; is that correct?
9    A.  Yes, I attached certain aspects of the
10  SCS handbook, whatever you want to call it.
11    Q.  I am going to share my screen.
12       So can you see that?
13    A.  Yes, I can.
14       MR. HUGHES:  Let's mark this as DX 172.
15       (DEFENDANTS' EXHIBIT 172, Aerial entitled
16  "Martin County Soils Map," Bates stamped
17  SHARFIEXPERTS 94, was marked for
18  identification, as of today's date.)
19    Q.  This is, I believe, Exhibit N to your
20  report.  Is that correct?
21    A.  That's correct.
22    Q.  And this is the Martin County Soils Map; is
23  that correct?
24    A.  That's correct.  Of that vicinity, of
25  that area and vicinity, correct.

RICHARD CREECH
USA vs SHARFI

May 24, 2022
105–108

Page 105

1   Q.  What is this document?

2   A.  That document is a graphical representation

3   of the soil survey's location of certain soil types.

4   Q.  Do you know what these numbers are on this

5   document?

6   A.  Not all of them without looking.  I mean,

7   there's roughly 70 numbers.  I don't know it by

8   heart.

9   Q.  Do you know what these numbers refer to?

10  A.  Yes.  They represent a different type of

11  soil that SCS has mapped.

12  Q.  And how did this document inform your

13  opinion that the excavated portion of Bessey Creek

14  and north-south ditch were excavated in pine

15  flatwoods?

16  A.  If you look at the soil types in which

17  the ditch has been excavated, they represent

18  upland type soils that represent vegetation of

19  pine flatwoods, sawpalmetto, waxmyrtles, various

20  other uplands vegetation.  This is represented in

21  the description of each of those soil types that

22  traverse the ditch.

23     So that was the basis of my initial

24  investigation into whether it was uplands, or

25  mostly uplands, and what type of vegetation or

Page 106

1   soil may have existed at that time.

2   Q.  When you say the ditch, which ditch are you

3   referring to?

4   A.  The east-west or Bessey Creek excavated

5   ditch.

6   Q.  And can you identify that on this map?

7   A.  Yes.  It is in the lower half of the map,

8   essentially centered.  It is essentially a straight,

9   you know, linear type of ditch that runs in that

10  bottom one-third.

11  Q.  And can you identify the numbers

12  represented on the map that it runs through?

13  A.  Yes.

14  Q.  What are those?

15  A.  They are -- if you could zoom in, that

16  would be helpful.

17  Q.  Absolutely.

18  A.  A little bit more.  The older I've gotten,

19  the less and less I can see or hear.

20     That's fine.  The soils are predominantly

21  52, 55 and 66 for the majority of the ditch

22  construction, with some variants of 19 and 21.

23  Q.  And do you know what soil is represented by

24  52?

25  A.  52 is represented by, just to make sure

Page 107

1   I'm accurate, Malabar sand, if I'm correct.

2     MR. HAMILTON:  Can you just zoom in, like

3   move it over to make sure he has got all the

4   areas?

5   Q.  Does that change your opinion?

6   A.  No.

7   Q.  Do you know what 55 represents?

8   A.  55 represents Basinger fine sand.

9   Q.  And what about 66?

10  A.  66 is represented by Holopaw fine sand.

11  It's a town just west of -- or actually south of

12  Osceola County.

13  Q.  What about 19?

14  A.  19 is represented by -- I don't necessarily

15  have 19.  But 19 is representative of a

16  depressional type soil.

17  Q.  Do you know if that depressional type soil

18  is hydric?

19  A.  I would believe it is, yes.

20  Q.  When do you believe this map was created?

21  A.  1970-'71.

22  Q.  And can you identify the north-south ditch

23  on this map?

24  A.  Yes, you can.  If you zoom in.  It's

25  essentially in that southwest quadrant.  Run up

Page 108

1   north a little bit.

2     It is essentially -- if you see the

3   sanitary landfill and the road leading to it, the

4   north-south ditch is approximately one ditch over

5   to the east of that one.

6   Q.  Is it this right here that is running at

7   this point through 66, and then connects with this

8   other line in the area marked 55?

9   A.  Yes.  That represents the DOJ expert's

10  north-south ditch.

11  Q.  And how do you know that that represents

12  the north-south ditch?

13  A.  Because it essentially corresponds to their

14  aerials and their identification.

15  Q.  And it's your testimony that 66 represents

16  Holopaw fine sand; is that correct?

17  A.  That's correct.

18  Q.  And that 55 represents Basinger fine sand?

19  A.  That's correct.

20  Q.  The north-south ditch runs through 66 and

21  55; is that correct?

22  A.  And 52.

23  Q.  Where does it run through 52?

24  A.  On the east side.

25  Q.  The north-south ditch?

RICHARD CREECH                                    May 24, 2022
USA vs SHARFI                                     109–112

Page 109

1    A.  No not the north-south ditch, the
2  east-west ditch.
3    Q.  The north-south ditch runs through 66 and
4  55; correct?
5    A.  Okay, I misunderstood.
6    Q.  But that's correct?
7    A.  Yes.
8    Q.  Can you identify the site on this map?
9    A.  Yes.  It's essentially located in the
10  vicinity of soils identified as 40, the general
11  vicinity.
12    Q.  40 below following what we have identified
13  as north-south ditch?
14    A.  Correct.
15    Q.  South to 40?
16    A.  Correct.
17    Q.  Do you know what 40 represents?
18    A.  I believe it represents a depressional
19  type of sand or soil.
20    Q.  And do you know if that depressional type
21  of sand or soil is hydric?
22    A.  Not as I sit here today, no.
23    Q.  Do you have a belief that that depressional
24  soil is hydric?
25    A.  Without looking at the legend of the Soil

Page 110

1  Conservation Survey, and looking at the information,
2  I really couldn't answer that.
3    Q.  And so how does this document inform your
4  belief that the excavated portion of Bessey Creek
5  was excavated in uplands?
6    A.  If you look at the soils, look at the
7  aerial photograph, and you look at the soil
8  classifications as described by SCS, the predominant
9  vegetation of this area would be pine flatwoods.
10    Q.  And do you believe that pine flatwoods are
11  uplands?
12    A.  Yes, I do.
13    Q.  And what's the basis of that belief?
14    A.  40 years of civil engineering experience,
15  and regulatory agency interventions and site
16  entitlement processes, along with on-site
17  observations.
18    Q.  How does your 40 years of experience inform
19  your belief that pine flatwoods are uplands?
20    A.  If they were not uplands, they would
21  not -- what's happening there?
22    MR. HUGHES:  Can we go off the record for
23  a minute.
24    THE VIDEOGRAPHER:  We are now going off
25  the record.  The time is 12:07 p.m.)

Page 111

1    (Discussion off the record.)
2    THE VIDEOGRAPHER:  We are now going back
3  on the record, and the time is 12:08 p.m.
4  BY MR. HUGHES:
5    Q.  You were just telling me about how your
6  experience as a civil engineer informed your belief
7  that pine flatwoods are wetlands.  Excuse me,
8  withdrawn.
9    You were just informing me about how your
10  experience as a civil engineer informs your belief
11  that pine flatwoods are uplands.
12    MR. HAMILTON:  Objection to form.
13    A.  Could you restate the question for me,
14  counsellor?
15    Q.  How does your experience as a civil
16  engineer inform your belief that pine flatwoods are
17  uplands?
18    MR. HAMILTON:  Object to form.
19    A.  In performing my civil engineering
20  duties, as we mentioned, I testified earlier, we
21  must look at the hydrology, how the systems
22  perform, environmental systems.
23    A lot of times with ground truthing or
24  identifying the property, you know, information,
25  you are looking for developable pieces of

Page 112

1  property.  Pine flatwoods and uplands tend to be
2  relatively obvious as developed areas.
3    The wetlands, on the other hand, are
4  relatively obvious when in the field and ground
5  truthing as to the vegetation, water, how it's
6  hydrologically performing and how they're connected.
7    So my experience has indicated that pine,
8  sawpalmetto, waxmyrtle, all of those types of
9  soils that represent uplands, are a much more
10  developable tract of property and land, and that
11  wetlands are poorer to develop because of the
12  behavior of the soils.
13    And then, on top of that, the developed
14  properties through my career have -- the
15  developers have specifically chosen those types of
16  property in uplands because of the expense of
17  construction.
18    So in dealing with the agencies and
19  dealing with constructability in components of
20  civil engineering, and dealing with hydrology, the
21  uplands are relatively obvious when you're out in
22  the field and watching how the system behaves.
23    So that's pretty much how, in my experience,
24  it has directed me to understand what is an upland
25  area and what is a wetland or inundated, saturated

RICHARD CREECH
USA vs SHARFI

May 24, 2022
113—116

Page 113

1   area that may create problems for development or
2   crop, you know, harvesting or growth.
3       That's the long answer to the short
4   question.  Sorry.
5       Q.  No problem.  There's a lot in that answer,
6   as you just indicated, so I'm going to try to break
7   it down a little bit.
8       You said, correct me if I'm wrong, that you
9   believe hydrology is different between pine
10  flatwoods and other wetlands; is that correct?
11      A.  That's a fair statement.
12      Q.  How does the hydrology differ, to your
13  understanding?
14      A.  Hydrology differs because of topographic
15  features, soil features.  Wetlands can gather
16  water, and because of the topography or because of
17  the underlying soils have less permeability, and
18  the pine flatwoods at times would drain to those
19  isolated areas.
20      The hydrology during excessive rainfall
21  events, the soil becomes saturated due to heavy
22  rainfall, and then begins to traverse over top of
23  land, at, you know, a very shallow depth.
24      So where those shallower depths are
25  realized is more upland, and the wetlands are more

Page 114

1   of stormwater attenuation type facilities that
2   become more of storage areas, until such time as
3   they exceed their capacity and then start to, what
4   I call, walk across the uplands to get to the
5   other side.
6       Q.  You said shallow depths.  What do you mean
7   by that?
8       A.  Shallow depths, it's a two-dimensional
9   type of flow across large expanses of land,
10  uplands.  So the shallow depths would be anywhere
11  from an inch or two inches to, in some areas,
12  because in some areas it may be as much as a half
13  a foot.
14      Florida in a lot of regions falls
15  topographically at about a half a foot per mile,
16  so the flow would be fairly shallow and
17  slow-moving once the wetland areas had been
18  exceeded and the upland areas started to receive
19  that inundation to be transported to tidal water
20  bodies.
21      Q.  Sorry, shallow depths of what?
22      A.  Shallow depths of, you know, the sheet flow.
23      Q.  Is that surface water?
24      A.  It's runoff from precipitation.
25      Q.  And you said that part of your belief that

Page 115

1   pine flatwoods are uplands derives from the water
2   properties that have been developed in the state; is
3   that correct?
4       A.  No, it's not.  Uplands -- my intent was
5   that developers and agricultural interests, and
6   people that utilize land in Florida, recognize
7   that the upland portions are much more developable
8   because they do not have the constraints of, let's
9   say, hydric soils or inundation of waters within
10  less desirable developed areas like wetlands.
11      Q.  And how does that inform your opinion that
12  pine flatwoods are uplands?
13      A.  It helps form the opinion because the
14  upland areas through the years have been pine
15  flatwoods, from an agricultural standpoint and
16  from a development standpoint.
17      Just experience-wise, most people don't
18  develop in wetlands.  And in this case the small
19  farms, the evidence of a citrus grove being in and
20  around this area, would lead me to believe that
21  these were pine flatwoods or uplands.
22      Q.  And you said that -- can I have the answer
23  read back.
24      (The requested portion of record was read.)
25      Q.  You said that in your experience upland

Page 116

1   areas have been pine flatwoods.  What do you mean by
2   that?
3       A.  There are various upland areas in the
4   State of Florida.  You have the coastal ridge,
5   which has a different vegetation and different
6   topography.  The majority of the uplands in Martin
7   County in this area are pine flatwoods because of
8   the shallow sloping nature of the topography, and
9   the soil conditions there would not lead them to
10  grow anything other than pine flatwoods,
11  sawpalmetto, you know, waxmyrtle, or slash pine.
12      Q.  Is it fair to say that it is your belief
13  that pine flatwoods are uplands because there has
14  been development in them?
15      MR. HAMILTON:  Object to form.
16      A.  That would be one fact that I would draw
17  an opinion about, yes.  They have been developed.
18  Historically, pine flatwoods or uplands in this
19  area have been the predominant favorite to be
20  developed as a result of cost or ease of
21  development or drainage or hydrology.
22      Q.  You have said historically pine flatwoods
23  have been uplands.  What do you mean by that?
24      A.  As I mentioned, in this area, historically,
25  the uplands are pine flatwoods.  In other areas of

RICHARD CREECH
USA vs SHARFI

May 24, 2022
117–120

Page 117

1  Martin County, in the Coastal Ridge, they are of
2  different vegetation and have different topography,
3  so they are recognized as an a different type of
4  upland.
5       In this general vicinity, because of the
6  sloping slow nature of the fall, of topography,
7  pine flatwoods prefer these higher elevation type
8  areas of knolls and better soil conditions and
9  better water management than in the wetland areas.
10      So that's why the pine flatwoods, the
11 sawpalmetto, the waxmyrtles, all grow in these
12 types of soil conditions because they are
13 typically higher elevation, better hydrology, and
14 have a better mortality rate than being in hydric
15 soils or wetlands.
16  Q.  Part of the basis of your belief that pine
17 flatwoods are uplands is that the soils are not
18 hydric; is that correct?
19  A.  That's one aspect of it, yes.
20  Q.  And the other aspect is the history of
21 development area?  Is that fair?
22      MR. HAMILTON:  Object to form.
23  A.  That's another one, yes.
24  Q.  And another one is your belief that the
25 hydrology differs between pine flatwoods and wetland

Page 118

1  types?  Is that fair?
2  A.  That the hydrology and topography differ
3  from wetlands areas, yes.
4  Q.  Any other reason you believe that pine
5  flatwoods are uplands?
6  A.  Just my six generation native Florida
7  sense that pine flatwoods, sawpalmetto and
8  waxmyrtle are uplands.
9  Q.  You referenced the agencies in forming part
10 of the basis of your belief that pine flatwoods are
11 uplands; is that correct?
12  A.  That's correct.
13  Q.  What agencies are those?
14  A.  Martin County, or various other
15 municipalities, South Florida Water Management
16 District, FDEP, are the main ones that I dealt
17 with with respect to uplands and the
18 differentiation of uplands and wetlands.
19  Q.  And what about your interactions with these
20 municipalities or agencies has led you to believe
21 that pine flatwoods are uplands?
22  A.  In my previous experience of doing wetland
23 delineations, the wetland delineations have
24 different vegetation, predominant or dominant
25 vegetation, than the upland portions that are

Page 119

1  outside of the wetlands statement.
2      It's getting a little close to lunch.
3  I'm starting to get a little hungry.  Are you
4  coming to a good stopping point or what?
5      MR. HUGHES:  Let me finish this line of
6  questioning, and then we can break for lunch,
7  maybe 40 minutes or so.
8      Let me show you another document.
9      Do you recognize this document?
10  A.  Yes, I do.
11      MR. HUGHES:  Let's mark this DX 173.
12      (DEFENDANTS' EXHIBIT 173, Written
13  document entitled "Oldsmar Fine Sand
14  Information," Bates stamped SHARFIEXPERTS 95,
15  was marked for identification, as of today's
16  date.)
17  Q.  And this is a document Bates stamped
18 SHARFIEXPERTS 95, and it appears to be Exhibit O to
19 your report, Oldsmar Fine Sand Information; is that
20 correct?
21  A.  That is correct.
22  Q.  Is this a document that you relied on in
23 determining that the excavated portion of Bessey
24 Creek was excavated in uplands?
25  A.  One of the documents I relied upon, yes.

Page 120

1  Q.  And is this one of the documents that you
2  relied upon in coming to the conclusion that the
3  north-south ditch is uplands?
4  A.  It's one of the documents that I
5  determined that it was in an upland area, yes.
6  Q.  And what about this document, DX 173,
7  informed your opinion that the excavated portion of
8  Bessey Creek and the north-south ditch are excavated
9  in uplands?
10  A.  As it's described there in front of you,
11 I don't want to have to read it all, but, you
12 know, this soil essentially exists in broad areas
13 of flatwoods, which we've already testified or
14 I've testified my understanding of pine flatwoods.
15      Additionally, they talk about, you know,
16 later down in the text that the predominant
17 vegetation, you know, is natural vegetation
18 considering South Florida slash pine, scattered
19 cabbage palms, sawpalmetto, and waxmyrtle, which I
20 kind of consider it as predominant uplands species,
21 as they list it that way, and that under natural
22 conditions citrus trees can't grow because of
23 obviously high groundwater table, but a
24 well-designed drain system can remove excess water
25 to allow for those development of trees.

RICHARD CREECH
USA vs SHARFI

May 24, 2022
121–124

Page 121

1    So, to me, it tells me that this could be
2  an agricultural area with good water management,
3  and, you know, the forefathers of the Palm City
4  Drainage District also recognized that by putting
5  in a major lateral to allow for this agricultural
6  area to thrive.
7    Q.   When you say a major lateral, what are you
8  referring to?
9    A.   The east-west Bessey Creek excavated
10  ditch, and the north-south ditch as reported in
11  the DOJ expert report.
12    Q.   You believe that this document supports
13  your belief that the north-south ditch and excavated
14  portions of Bessey Creek are constructed on uplands
15  because it says here it is in broad areas in the
16  flatwoods, it may be used for citrus or improved
17  pasture grasses, and in South Florida it contains
18  slash pine scattered cabbage palm, sawpalmetto and
19  waxmyrtle; is that correct?
20    A.   No, it's not.  It's the entire document
21  and the space that it occupies is what leads me to
22  believe that it's upland.  All I did was read
23  certain parts of it that stood out to me as a good
24  indicator that, you know, this was upland and
25  forested area since before the ditch was built.

Page 122

1    Q.   Any other elements of this page, or this
2  document, DX 173, indicate to you that the
3  north-south ditch and excavated portion of Bessey
4  Creek are constructed in uplands?
5    A.   If you go down a little further -- the
6  water table and all the things that are mentioned
7  in there, too.  But if you go down to the bottom
8  of the page, you can say that this area has a
9  medium potential for pine trees.  So pine trees,
10  in my opinion, at least the cultivation of them on
11  a commercial level, which this is talking about,
12  would not have been recommended in a wetlands area.
13    Q.   And what is your basis for that opinion?
14    A.   My agricultural clients that I have
15  represented back early in my career.
16    Q.   What part of your career was that?
17    A.   From graduation until I stopped doing
18  agricultural work about 15, 20 years ago.
19    Q.   We discussed hydric soil earlier.  Is there
20  a phrase that you use to describe a soil that is not
21  hydric?
22    A.   Upland.
23    Q.   Does this document, DX 173, anywhere
24  suggest that Oldsmar fine sand is an upland?
25    A.   The body of the text, yes.  It all

Page 123

1  mentions everything that I have known and grown to
2  understand is upland soils, and upland vegetation.
3    Q.   Does DX 173 use the word "uplands" at any
4  point?
5    A.   No.  It uses flatwoods.
6    Q.   You're referring to this sentence, "It is
7  in broad areas in the flatwoods"?
8    A.   Correct.
9    Q.   I will take this down.
10    I am showing you what we will mark as DX
11  174.  This is Bates stamped SHARFIEXPERTS 96, and it
12  is titled again, I believe, as an exhibit to your
13  expert report, Exhibit P, "Malabar Sand
14  Information."  Is that correct?
15    A.   That's correct.
16    (DEFENDANTS' EXHIBIT 174, Written
17  document entitled "Malabar Sand Information,"
18  Bates stamped SHARFIEXPERTS 96, was marked
19  for identification, as of today's date.)
20    Q.   And this is a description -- or what is
21  this document?
22    A.   That is the text description of Malabar
23  sand as identified in soil conservation terms.
24    Q.   And how does this document inform your
25  opinion that the excavated portion of Bessey Creek

Page 124

1  and the north-south ditch were excavated in uplands?
2    A.   Again, it talks about lower areas of
3  flatwoods.  It then goes down and talks about the
4  main vegetation, natural vegetation consisting of
5  Florida slash pine, cabbage palm, waxmyrtle,
6  sawpalmetto, and under natural conditions this
7  could support crops, but with a well-designed
8  water control system.
9    Q.   Does anything else in this document support
10  that opinion of yours?
11    A.   Yes, all of it.
12    Q.   What else other than what you just testified
13  to?
14    MR. HAMILTON:  Object to form.
15    A.   The potential is medium for soil for pine
16  trees.  Pine trees can have upland species, also.  And
17  that the primary vegetation is pine trees.  And
18  cabbage palms and sawpalmetto and waxmyrtle.  And
19  that the depth of the water table is below, you
20  know, the natural topography.  It's not above the
21  natural topography.
22    Q.   Is it your opinion that if the water table
23  is below the natural topography, it is an upland?
24    MR. HAMILTON:  Object to form.
25    A.   Most of the time, yes.

RICHARD CREECH
USA vs SHARFI

May 24, 2022
125–128

Page 125

1    Q.   Is there anything else about this document
2  that informs your opinion that the excavated portion
3  of Bessey Creek and the north-south ditch are
4  excavated in uplands?
5    A.   I've already answered that, counsellor.
6  The entire document speaks for itself as far as
7  uplands.
8    Q.   I agree that the document speaks for
9  itself, but I'm asking about what about this
10  document informs your opinion.
11       MR. HAMILTON:  Object to form.
12    A.   All of it.  All of the text, in my
13  opinion, represents an uplands type of soil.
14    Q.   This document, DX 174, says it is in broad
15  low areas of flatwoods, and -- how do you pronounce
16  that word?
17    A.   Sluice.
18    Q.   What are sluice?
19    A.   Sluice could be construed as wetland
20  areas, yes.
21    Q.   What are sluice?
22    A.   Sluice are essentially hydrologic
23  connections between other types of wetland areas,
24  in my opinion.
25    Q.   And so is it fair to say that, according to

Page 126

1  this document, Malabar sand can be found in wetland
2  areas in Florida?
3       MR. HAMILTON:  Object to form.
4    A.   They can be found in those transitional
5  areas between wetlands, in my opinion, mainly
6  sluice, which as I mentioned are hydrologic
7  connections during heavy rainfall as a means to
8  transport water between those two wetlands.
9    Q.   Just a couple more documents and then we
10  can take a break.
11       Do you recognize this document?
12    A.   Yes, I do.
13    Q.   What is it?
14    A.   That is the text version of the soil
15  description for Basinger fine sand that is found
16  in the SCS document.
17       MR. HUGHES:  Mark this DX 175.  And it
18    has Bates SHARFIEXPERTS 97, and it is marked
19    Exhibit Q, Basinger Fine Sand Information.
20       (DEFENDANTS' EXHIBIT 175, Document
21    entitled "Basinger Fine Sand Information,"
22    Bates stamped SHARFIEXPERTS 97, was marked
23    for identification, as of today's date.)
24    Q.   Is this a document you relied on in forming
25  your opinion that the excavated portion of Bessey

Page 127

1  Creek and the north-south ditch were excavated in
2  uplands?
3    A.   Yes.
4    Q.   And what portion of this document informs
5  that opinion?
6    A.   Essentially, it discusses that these are
7  drainageways or, again, hydrologic connections in
8  the flatwoods, that it has a depth water table
9  below the surface of the natural ground, that the
10  primary vegetation is slash pine and sawpalmetto
11  and waxmyrtle again, and that, you know, under
12  some conditions with water management they can
13  enhance crop production and seek mortality.
14       And if you go further down, it has a
15  potential, but it's low, for longleaf and slash
16  pine, but those grasses can -- or those trees can
17  survive along with a lot of the pasture grasses
18  that are out there in the agricultural industry.
19    Q.   It says here that "the potential is low on
20  this soil for longleaf and slash pine.  A water
21  control system to remove the excess surface water is
22  necessary if the potential productivity is to be
23  realized."
24       Did I read that correctly?
25    A.   Yes, that, you know, a water control

Page 128

1  systems would be necessary to remove excess runoff
2  from high rainfall events.  That's why the ditch
3  is there.
4    Q.   Does this document say runoff from high
5  rainfall events?
6       MR. HAMILTON:  Object to form.
7    A.   Not specifically, no.
8    Q.   And so it is suggested there is excess
9  surface water on this soil of Basinger fine sand; is
10  that correct?
11    A.   Actually, surface water is a condition of
12  runoff.  I mean, that's what we call it.  And so
13  excess surface water is runoff from precipitation.
14  So that's why we put in drainage infrastructure,
15  is to wick away the surface water or the runoff
16  from precipitating events.
17    Q.   Is it your opinion that this reference to
18  excess surface water is a reference to -- withdrawn.
19       Does excess surface water always mean
20  runoff from precipitation?
21    A.   In my opinion, yes.
22    Q.   Do you know if that's how this document is
23  using the term excess surface water?
24    A.   I believe it is.
25    Q.   And what's the basis for that opinion?

RICHARD CREECH
USA vs SHARFI

Page 129

1    A.  My experience in excess surface water,
2   excess water is from precipitation.  For example,
3   it hadn't rained in several months, and so there
4   has not been any surface water to be found across
5   either parking lots or grass areas.  So that is my
6   opinion with respect to surface waters.
7        Water is generated by precipitation in
8   Florida, and precipitation, and when the soil
9   column fills up, then that is excess surface water
10  from precipitation.
11   Q.  Would you agree that wetlands contain
12  surface water?
13   A.  I would agree -- yes, I agree, they
14  contain runoff from precipitation.
15   Q.  Is it your opinion that the only surface
16  water on wetlands is runoff from precipitation?
17       MR. HAMILTON:  Object to form.
18   A.  In my opinion, that's where the surface
19  water comes from, yes.
20   Q.  And with respect to DX 175, it refers to
21  Basinger fine sand is in sluice; correct?
22   A.  It also includes sluice.  It is not
23  specifically identified as always being in sluice
24  or always being a drainageway.
25   Q.  Does anything else about this document

Page 130

1   inform your opinion that pine flatwoods are in
2   uplands?
3    A.  Other than the document itself.  That's
4   what I formed my opinion on, based on the past
5   three documents.
6    Q.  And do you know if Basinger fine sand is
7   included on the NRCS's hydric soils list?
8    A.  Without checking, I do not know.
9    Q.  In forming your opinion, did you check
10  whether Basinger fine sand is included on the NRCS's
11  hydric soils list?
12   A.  Not that I recollect, no.
13   Q.  Do you recognize this document?
14   A.  Yes, I do.
15   Q.  And what is this?
16   A.  As mentioned before, it's the text
17  version of the soil described as Holopaw fine
18  sand, within the SCS document.
19   Q.  And it is a document Bates stamped
20  SHARFIEXPERTS 98, and I believe is an attachment to
21  your report, Exhibit R, Holopaw Fine Sand
22  Information; is that correct?
23   A.  That's correct.
24       MR. HUGHES:  We will mark this DX 176.
25       (DEFENDANTS' EXHIBIT 176, Document

Page 131

1   entitled "Holopaw Fine Sand Information,"
2   Bates stamped SHARFIEXPERTS 98, was marked
3   for identification, as of today's date.)
4    Q.  Did this document inform your opinion that
5   the north-south ditch and excavated portion of
6   Bessey Creek were excavated in upland?
7    A.  Yes, it did.
8    Q.  And what about this document informed that
9   opinion?
10   A.  Again, this is a flatwoods, pine
11  flatwoods type of soil, and that it is listed
12  there as basically flat areas or poorly defined
13  drainageways, again the hydrology of the pine
14  flatwoods area.  And its predominant vegetation is
15  slash pine, cabbage palm, sawpalmetto and
16  waxmyrtle, and that it can support pine trees as a
17  medium, you know, potential for pine trees and
18  other types of pasture grasses.
19   Q.  Do you see here in this paragraph it says,
20  "Under natural conditions this soil has very severe
21  limitations for cultivated crops because of wetness
22  and other soil factors."
23       Did I read that correctly?
24   A.  Yes, you did.
25   Q.  And does anything else about this document

Page 132

1   inform your opinion that we have been discussing?
2    A.  Other than what's in the text, no.
3    Q.  Does this document say that Holopaw fine
4   sand is upland explicitly in it?
5    A.  It does not explicitly say that it is upland.
6    Q.  And do you know if the NRCS's Hydric Soil
7   List considers Holopaw sand upland -- withdrawn.
8        Do you know if the NRCS's Hydric Soil List
9   considers Holopaw fine sand hydric?
10   A.  Not to my recollection.
11   Q.  You don't recall or it does not consider,
12  or the NRCS Hydric Soil List does not consider
13  Holopaw fine sand hydric?
14   A.  I just don't remember, counsel.
15   Q.  Did you review the NRCS's classification of
16  Holopaw fine sand on its Hydric Soils List?
17   A.  I don't remember.  I looked at a lot of
18  documents.  I don't remember.
19   Q.  But all the documents you looked at are
20  listed in your report; is that correct?
21   A.  All that of them that I used to form my
22  opinion are in my report, yes.
23   Q.  Let's look at one more document and then we
24  will break for lunch.
25       Did you review the -- I believe you

RICHARD CREECH
USA vs SHARFI

May 24, 2022
133–136

Page 133

1 testified earlier that you reviewed the DOJ team
2 expert report in preparing your opinion.  Is that
3 correct?
4    A.  That's correct.
5    Q.  And did you review the figures attached to
6 the DOJ team expert report?
7    A.  I believe I did.
8       MR. HUGHES:  We will mark this as DX 177.
9       (DEFENDANTS' EXHIBIT 177, Aerial of
10    Figure III.D.1 USDA NRCS soil map units, was
11    marked for identification, as of today's date.)
12    Q.  This is a document, DX 177, Figure iii.D.1
13 USDA NRCS soil map units in the vicinity of the
14 site, reference area, other reference plots.
15       Do you recognize this document?
16    A.  Yes, I do.
17    Q.  Do you see the black and red box in this
18 document, about a little under halfway down the
19 page, at the bottom half of the page?
20    A.  If we could move the cursor to it, it
21 would be easier.
22       MR. HAMILTON:  Zoom in a little bit, too,
23    please.
24    A.  Yes, I see it now.
25    Q.  And do you understand, based on this key on

Page 134

1 the right side of the document, DX 177, that this
2 refers to what we have been calling the site?
3    A.  Yes.
4    Q.  And can you identify the north-south ditch
5 on this document?
6    A.  Yes.  It extends northerly from the
7 northwest corner of the subject site.
8    Q.  And does the north-south ditch, based on
9 this document, run through this light blue area
10 that's contained within the black and red box and
11 also spills outside the black and red box?
12    A.  I believe it does.
13    Q.  And do you know, does that light blue area
14 correspond, to your knowledge, to Sanibel muck,
15 according to the key on the right side?
16    A.  If that's what's indicated on that
17 exhibit, yes.
18    Q.  And do you know if Sanibel muck is a hydric
19 soil?
20    A.  I believe it is.
21    Q.  And do you see, above the black and red
22 square there is a yellowish-orange, we'll call it
23 parallelogram?
24    A.  Yes.
25    Q.  And do you see that yellowish shading

Page 135

1 within the parallelogram?
2    A.  Yes, I do.
3    Q.  Do you know what soil that corresponds to
4 in the key over here?
5    A.  I can't say.  You have to zoom in.  Or
6 you can just provide it to me.
7    Q.  Does it appear to correspond to Holopaw
8 fine sand?
9       MR. HAMILTON:  Object to form.
10    A.  It appears to match that color, yes.
11       MR. HUGHES:  Off the record.
12       THE VIDEOGRAPHER:  We are now going off
13    the record, and the time is 12:48 p.m.
14       (Luncheon recess:  12:49 p.m.)

Page 136

1    A F T E R N O O N   S E S S I O N
2       THE VIDEOGRAPHER:  We are now going back
3    on the record, and the time is 1:35 p.m.
4       CONTINUED DIRECT EXAMINATION
5 BY MR. HUGHES:
6    Q.  Mr. Creech, we are back from a short break.
7       Did you review any documents during the
8 break?
9    A.  No.
10    Q.  In your testimony just now you said that
11 the presence of waxmyrtle, slash pine and cabbage
12 palm in the soils we discussed helped, among other
13 things, to inform your opinion that pine flatwoods
14 are uplands; is that correct?
15    A.  Fair statement, yes.
16    Q.  Do you know if slash pine is considered a
17 facultative wetland plant?
18    A.  Yes.
19    Q.  And do you know if cabbage palm is
20 considered a facultative plant?
21    A.  At times.
22    Q.  And when you say at times, what do you mean?
23    A.  Given certain circumstances, a lot of
24 things can grow in hydric soils and grow in upland
25 soils.  So just about every plant in Florida, in

RICHARD CREECH                                            May 24, 2022
USA vs SHARFI                                                 137–140

Page 137

1  my opinion, is a species that can represent either
2  one of them from time to time.
3     Q.  And is it your opinion that facultative
4  plants grow in uplands in Florida?
5     A.  Yes.
6     Q.  And do you know if waxmyrtle is considered
7  a facultative plant?
8     A.  That one I don't recollect.  But I would
9  suspect so.
10    Q.  The SCS documents that we just looked at,
11 would you agree that they discuss the need for
12 drainage from the soils to make them suitable for
13 farming?
14    A.  I wouldn't make it a wholesale statement.
15 I would say that it would help improve the
16 situation for crop, you know, cultivation, or
17 livestock.  Any type of drainage is always a good
18 signal providing a better situation than not
19 having drainage.
20       I mean, consider a time when we have a
21 major hurricane here.  If we don't have drainage,
22 it's going to be flooded.  If we've got drainage,
23 then it provides much better conditions for
24 health, safety and welfare of the public and
25 whatever crops or livestock we may have out there.

Page 138

1     Q.  I am going to show you document 175 again.
2  So this is, again, DX 175, Basinger fine sand.
3        Would you agree that this document says
4  that, "Under natural conditions, this soil," meaning
5  Basinger fine sand, "has very severe limitations for
6  cultivated crops because of wetness and sandy
7  texture"?
8     A.  I mean, there's a lot of places that have
9  limitations of cultivated crops, sandy texture,
10 and take the coastal regions in Florida, I mean,
11 they have a real hard time growing crops in those
12 sandy soil, also.
13       So, yes, there's a lot of soils in
14 Florida that have some limitation or even severe
15 limitations at times.  It doesn't mean wholesale
16 soil that has been identified falls under that
17 condition.  It just means at times or under
18 certain natural conditions it may crop up from
19 time to time.
20    Q.  But this document says that, "Under natural
21 conditions, this soil has very severe limitations
22 for cultivated crops because of wetness and sandy
23 texture"; correct?
24    A.  That's a fair statement.
25    Q.  It also says, "The number of adaptive crops

Page 139

1  is limited unless management is very intensive";
2  correct?
3     A.  Correct.
4     Q.  And is it your opinion that pine flatwoods
5  can never be wetlands?
6     A.  Ask that question again.  I'm sorry.
7     Q.  Is it your opinion that pine flatwoods can
8  never be wetlands?
9     A.  No.  That's a naive position.  Pine
10 flatwoods, you know, can have some wetland qualities
11 and sometimes they can't.  I'm not saying that all
12 pine flatwoods are pine uplands or I'm not saying
13 that all wetlands are completely wet and saturated.
14    Q.  How would you distinguish pine flatwoods
15 that are wetlands from pine flatwoods that are
16 uplands?
17    A.  Typically, the way I've done it in the
18 past is an overarching vegetative indicator along
19 with routine saturated conditions, or normal
20 saturated conditions that lay within the pine
21 flatwoods.
22       But to say that wholesale wetlands, you
23 know, it's a case by case scenario.  So to make a
24 broad determination that you just requested would
25 be almost impossible, sitting here today.

Page 140

1     Q.  And so whether a pine flatwood is uplands
2  or wetland is a site-specific analysis?
3     A.  It could be, yes.
4     Q.  When is it not?
5     A.  Hopefully when it's well drained.
6     Q.  Is it the draining that -- withdrawn.
7        Can you expand on that?
8     A.  As you talked about that there could be
9  conditions where wetlands can exist within pine
10 flatwoods.  That very well could be the case if,
11 you know, if there's no drainage.
12       If there's drainage, then that weepy, you
13 know, wetness could be exported out, and the
14 behavior of the vegetation in the soils will start
15 to change and become more upland-like.
16    Q.  And so do you have experience in your work
17 as a civil engineer of ditches in Florida that have
18 drained wetlands to turn them into uplands?
19    A.  I would probably say a significant portion of
20 South Florida, Miami-Dade County and Broward
21 County, that is the case.
22    Q.  You said in determining whether pine
23 flatwoods were wetlands or uplands, you would look
24 at the overarching vegetation indicator.  What do
25 you mean by that?

Page 141

1    A.   As you know, well, you may not know, but
2  Florida is a severe climactic area.  They have
3  long periods of draught, long periods of wetness,
4  hurricane, high level of tropical storm events
5  with high levels of rain, and flooding.  So those
6  regimes can change depending on some of the
7  climactic conditions that may happen.
8        For example, in 2004, we had three
9  hurricanes hit South Florida and just about
10  everything was saturated and flooded.  So that
11  would be a different scenario then what is
12  happening now, which is a normal rainfall event,
13  where we're seeing dryer conditions in uplands
14  behaving with those types of vegetations and
15  really expanding the vegetative community, where
16  in those hurricane type, you know, situations the
17  vegetation may die off because of, you know, root
18  saturation.
19    Q.   And so is it your testimony that the
20  climactic conditions impact to what extent a piece
21  of land may be upland or wetland?
22    A.   Yeah.  It's been my experience that that
23  can happen.
24    Q.   And that the boundary between upland and
25  wetland can change over time?

Page 142

1    A.   Yes, depending on the environmental
2  conditions and physical infrastructure conditions.
3    Q.   So we are continuing our discussion of your
4  opinion that the north-south ditch and the excavated
5  portion of Bessey Creek are ditches excavated in
6  pine flatwood uplands.  You mentioned that as part
7  of the basis of your opinion was the SCS, which we
8  looked at, and then you said the USGS maps; is that
9  correct?
10    A.   That's correct.
11    Q.   And you attached two USGS maps to your
12  expert report; is that correct?
13    A.   That's correct.
14    Q.   So let's look at DX 178.
15        (DEFENDANTS' EXHIBIT 178, Document
16    entitled "1948 Geodetic Survey," Bates
17    stamped SHARFIEXPERTS 82, was marked for
18    identification, as of today's date.)
19    Q.   Do you recognize this document?
20    A.   Yes.  I like the color, it's green.
21    Q.   What is it?
22    A.   It is the USGS map of 1948, and it was
23  produced by the federal government.
24    Q.   And this document has a Bates stamp of
25  SHARFIEXPERTS 82 and had added to it a legend that

Page 143

1  says Exhibit B, "1948 Geodetic Survey"; is that
2  correct?
3    A.   That's correct.
4    Q.   And how did this document inform your
5  opinion that the excavated portion of Bessey Creek
6  and the north-south ditch were excavated in pine
7  flatwood uplands?
8    A.   Well, the USGS map, as you can notice on
9  probably the western side, has identified
10  wetlands.  In my experience, the USGS maps were
11  field verified and ground truthed.
12        So I find them to be supremely accurate
13  from an historical perspective and even a recent
14  perspective with regard to wetlands, vegetation,
15  clearing, development, tributaries and
16  improvements that have happened through the years.
17  So that's why I rely upon them in my professional
18  world and also in my personal world.
19    Q.   Where do you believe this map shows wetland?
20    A.   Essentially, if you look on the west
21  one-third of the map, there are long narrow areas
22  that are hatched differently, that are identified
23  as wetlands in the USGS.  And then the USGS also
24  notes tributaries and rivers.  You know, South
25  Florida St. Lucie would be considered a wetland,

Page 144

1  or the waters of the U.S., for obvious reasons.
2        But it also shows a legend or some type
3  of hatching that shows a marsh type of area, very
4  much like Bessey Creek coming out of the northeast
5  and going into the southwest portion of the map.
6    Q.   Is it these sort of northeast-southwest
7  running bodies that you believe are wetlands?
8    A.   Yes, along with the isolated wetlands and
9  the various adjacent eastern sections.
10    Q.   And what is the basis for your belief that
11  these represent wetlands?
12    A.   My years of experience working with USGS
13  and how the maps were created.
14    Q.   Is there a legend on this map suggesting
15  that these bodies are wetlands?
16    A.   I didn't include it on that, but probably
17  just an oversight on my part by not including a
18  legend, but there are legends that show ditches,
19  water bodies, wetlands, that are identified in the
20  USGS website.
21    Q.   And in your professional work, do you use
22  the USGS maps from the forties?
23    A.   At times, yes.
24    Q.   For what purpose?
25    A.   To determine historical basins or historical

RICHARD CREECH
USA vs SHARFI

May 24, 2022
145–148

Page 145

1  flows in master planning of stormwater systems.
2  There were several stormwater fits or retrofits in
3  Martin County.  It was to include the historical
4  areas of runoff and topography.
5      Again, the quad maps, as these are
6  referred to as a term of art in the industry,
7  additionally shows topographic information on a
8  broad spectrum so that you can start to identify
9  stormwater basins for those tributaries, ditches
10  or laterals.
11      Q.   But you don't have any personal experience
12  with how this map was created; is that correct?
13      A.   Personal experience, on that specific map,
14  no.
15      Q.   Do you have any other knowledge of how this
16  map was created?
17      A.   Yes.
18      Q.   And what is that?
19      A.   Originally the, you know, Corps of
20  Engineers or USGS, Geological Survey, I have known
21  men that for chief of parties that did some of
22  these out in the western portions that were
23  unmapped, and how they surveyed it.
24      These are also based on the government
25  land surveys produced by the federal government

Page 146

1  for the various states, and my self-study of land
2  surveying and techniques in which the Army Corps,
3  USGS, produced these maps.
4      You know, they used a plain table
5  analogy, pretty much what I learned on when I was
6  a youngster on a field crew, to locate all of
7  these improvements throughout their mapping cycle.
8  So I had a pretty hands-on experience on how the
9  Corps or the USGS put these maps together and how
10  they located a lot of these things.
11      The survey data historically comes from
12  the original government land surveys that the BLA
13  produced over the last decade, or over the last
14  century or so.
15      Q.   And you said you spoke to individuals who
16  worked on USGS maps.  Have you ever spoken to an
17  individual who worked on this USGS map?
18      A.   Not that I recollect, no.
19      Q.   You said a couple of times the Corps or
20  USGS.  Is it your understanding the Corps had a role
21  in preparing this map?
22      A.   If I recollect correctly, the Army Corps
23  is the governing agency that USGS produces these
24  maps under.
25      Q.   So it's your understanding that USGS is

Page 147

1  subagency of the Army Corps of Engineers?
2      A.   That's my recollection that -- it may be
3  wrong, but that's my recollection.
4      Q.   And so you said you used this map to inform
5  your opinion, DX 178, because of these sort of
6  hatched northeast running southwest identified
7  features in the map.  Did anything else in this map
8  inform your opinion that the north-south ditch and
9  the excavated portion of Bessey Creek were
10  constructed in uplands?
11      A.   As you notice, the map is green, and on
12  that map specifically the colors have changed
13  through the years, but on that map specifically
14  green would have represented upland forest, or
15  forested areas.  So if I was to expect wetlands,
16  which there are wetlands nearby those ditches,
17  they would be mapped accordingly on this map.
18      So I'm not saying that those ditches
19  were, what's the word, exclusively constructed in
20  uplands.  Just saying a significant portion or a
21  majority of it was constructed in uplands, and it
22  may have caused wetlands as we see on this map.
23      As you mentioned earlier in the testimony
24  that the one in the northwest quadrant here in
25  Section 18 was hydric soil, so I believe that

Page 148

1  would be constructed in a wetland.  The rest of it
2  would be constructed in uplands.
3      Additionally, you know, the fork or the
4  Bessey Creek, where they enter the ditch would
5  have been constructed in a wetland, I'm sure.
6  Where the north or east-west ditch intersects the
7  creek would have obviously been constructed in a
8  wetland area.
9      Q.   And what is your basis for that statement?
10      A.   Understanding that that tributary, and
11  where the tributary is shown in Bessey Creek, they
12  are in Section 15, would have in today's world, in
13  today's jurisdictional standards, would have been
14  probably identified as a wetland, just based on my
15  experience.
16      Q.   And can you identify the north-south ditch
17  in this map?
18      A.   If we go to Section 17, there to the west
19  of the map, the north-south ditch is not the ditch
20  adjacent to No. 17, but to the west of the number
21  17, that parallels that -- essentially parallels
22  that contour, as identified.
23      Q.   And is the white space, or what is your
24  understanding of where the white space is in the
25  line that you identified as the north-south ditch

RICHARD CREECH
USA vs SHARFI

May 24, 2022
149–152

Page 149

1  runs through?
2      A.  The white space can represent several
3  things, or a couple of things.  One, it represents
4  cleared pasture land or grass area, or just a
5  cleared area that may be under construction.
6      Q.  Is there a legend or other key to this
7  document that explains that?
8      A.  I believe so, yes.
9      Q.  It is just not attached to this document?
10     A.  Not attached to this document.
11     Q.  Same answer with respect to your belief
12  that the green represents forest?
13     A.  Correct.
14     Q.  Setting aside your opinion that we have
15  been discussing, does this map relate to any of your
16  other opinions that you plan to offer in this case?
17  And this map is DX 178.
18     A.  Right.
19         It also represents that the ditches were
20  in existence prior to 1948, and that it also
21  represents accurately the existence of the ditches
22  in conformance with the Palm City Reclamation Plan.
23     Q.  But you agree with me that the north-south
24  ditch was not present on the Palm City Reclamation
25  Plan; correct?

Page 150

1      A.  I believe we have already stated that, yes.
2      Q.  Does this document support any other
3  opinions that you intend to offer in this case?
4      A.  Not that I can recollect at this time, no.
5      Q.  Do you recognize this document?
6      A.  Yes, I do.
7      Q.  And what is it?
8      A.  It is the 1950 geodetic, or USGS quad map
9  for the Palm City region, showing additionally as
10  Exhibit B in my report.
11     Q.  This is a document Bates stamped
12  SHARFIEXPERTS 83.
13         (DEFENDANTS' EXHIBIT 179, USGS quad map
14     for Palm City region dated 1950, Bates
15     stamped SHARFIEXPERTS 83, as of today's date.)
16     Q.  And how does this document inform your
17  opinion that the excavated portion of Bessey Creek
18  and the north-south ditch were excavated in uplands?
19     A.  As previously stated, the USGS maps I
20  find are extremely accurate in portraying what's
21  out on site.  Again, this is a different colored
22  map.  That's probably why I probably showed it in
23  the report.  The yellow represents a forested
24  area, the white areas represent cleared space, and
25  the urban areas are shown as urban areas.

Page 151

1      It also shows additional wetlands.  One
2  of the other things I never saw on this map was
3  the USGS has mapped additional wetlands since 1948.
4  So it's showing, at least in my opinion, that the
5  USGS is out ground truthing or using some other
6  technology or information to provide additional
7  documentation of wetlands out on site and upland
8  forested areas.
9      And, again, it represents that the Palm
10  City Reclamation areas has been built in
11  substantial compliance with the plan of 1920.
12     Q.  Does this document support any other
13  opinions in your report?  Withdrawn.
14     Does this document inform any other
15  opinions in your report?
16     A.  Restate that.  I'm sorry.
17     Q.  Does this document, DX 179, inform any
18  additional opinions in your report?
19     A.  Not that I believe, no.
20     Q.  And so with respect to your opinion that
21  the ditches -- withdrawn.
22     With respect to your opinion that the
23  excavated portion of Bessey Creek and the
24  north-south ditch were excavated in pine flatwood
25  uplands, your said that your opinion is informed by

Page 152

1  the SCS, by the USGS maps.  Anything else?  Did
2  anything else inform that opinion?
3      A.  That's pretty vague.  Can you narrow that
4  down for me, counsellor?
5      Q.  Sure.
6      You said one of your opinions is that the
7  excavated portion of Bessey Creek and the
8  north-south ditch were excavated in pine flatwood
9  uplands.  And when I asked you what informed that
10  opinion, you said the SCS documents that we looked
11  at, the USGS maps that we just looked at.  And I'm
12  asking is there anything else that informed that
13  opinion.
14     A.  I think, if I remember correctly, I also
15  said my experience.  It's been my experience that
16  we talked about before in the drainage districts
17  and 298 districts that ditches are constructed for
18  a purpose.
19     So in light of this, it would be my
20  expectation that the ditch was constructed in
21  uplands because it's easier to construct in
22  uplands than it is in marsh, muck areas, boggy
23  areas, because of expense and hardship on
24  equipment and men.
25     Secondly, if it was constructed on the

RICHARD CREECH
USA vs SHARFI

May 24, 2022
153–156

Page 153

1   north end of the boundary of the drainage district,
2   it would only serve a portion of the drainage
3   district.  So, in my experience, the ditches would
4   be constructed interior to the drainage district
5   so that it would serve all of the farms to the
6   north and farms to the south, for an outlet.
7        And then thirdly is, you know, the
8   ability to construct in the 1920s and '30s would
9   have essentially directed them to either lines of
10  convenience for constructing a ditch of that size,
11  and serving or avoiding things that would cost
12  them time and money and energy.  Or what I've seen
13  in the past is boundary disputes where they won't
14  allow them to come on the property to either build
15  a road or construct a ditch, so they have to go
16  around certain properties they don't have
17  permission to construct infrastructure on.
18       So that would lead me to believe that the
19  ditch would have been constructed in uplands and
20  not in wetlands, because it would have been dryer
21  and easier to construct a ditch, and topographically
22  it would probably serve the same purpose because
23  the slope out there is very mild.
24   Q.   When you say the ditch, which conveyance
25  are you referring to?

Page 154

1   A.   Upland.
2    Q.   So is it fair to say that you have
3   experience with other drainage districts and your
4   generalized experience with respect to the excavated
5   portion of Bessey Creek and the north-south ditch?
6    A.   That's based on my opinion, yes, it comes
7   from my experience.
8    Q.   Is that correct?
9    A.   Yes.
10   Q.   What is the basis of your opinion that the
11  excavated portion of Bessey Creek was constructed in
12  the 1920s and the 1930s?
13   A.   As we went over earlier, the invention of
14  the pumps in the drainage district in 1921, and
15  the Reclamation Plan in 1920, would go hand in
16  hand in identifying the works that were going to
17  be necessary.  The majority of the drainage
18  districts of that time would have begun
19  construction soon after they would have been able
20  to get taxing authority or bonding.
21       What makes me believe it was constructed
22  in the twenties and thirties is exactly that, it
23  was approved in 1921, got the funding, started
24  building, and those improvements were relatively
25  substantially complete by the 1940 aerial that I

Page 155

1   used in my report.  So that would have basically
2   said that all of them were constructed prior to
3   1940.
4    Q.   And you said that 1940 aerial in your
5   report -- let's take a look at that.
6        (DEFENDANTS' EXHIBIT 171, Aerial entitled
7   "1940 Aerial," Bates stamped SHARFIEXPERT 81
8   was marked for identification, as of today's
9   date.)
10   Q.   Is this the document you are referring to?
11   A.   Yes.
12   Q.   And this is a document Bates stamped
13  SHARFIEXPERTS 81, entitled Exhibit A, "1940 Aerial."
14  Is that correct?
15   A.   That's correct.
16   Q.   And how does this document inform your
17  opinion that the Palm City Drainage District
18  substantially excavated ditches according to the
19  plan of the reclamation map by 1940?
20   A.   If you zoom in onto the eastern one-half
21  of the map, you will notice that that lateral
22  ditch, Bessey Creek outlet for the east-west
23  ditch, it is very evident that it's been constructed.
24   Q.   Where do you see that on this map?
25   A.   Keep going north.  And keep going north.

Page 156

1   Actually, you are too far west.  Go east.
2        If you look just below or above that
3   panel that says 310, I believe, right above it,
4   about one-third into the section is a ditch, as
5   represented by the aerial, with the spoil material
6   being on typically one or both sides, and then
7   that runs east and west, and then there are a
8   series of ditches that run north and south that
9   connect to it within that section.
10   Q.   And this is in a square marked, to the best
11  of my knowledge, CJF2 07; is that correct?
12   A.   That's a portion of the ditch, correct.
13   Q.   And what is it that you see in this
14  document that indicates to you that there is a ditch
15  there?
16   A.   There's a linear progression, and my
17  usual experience of looking at historical aerials,
18  this is a signature or a mark of excavated linear
19  ditch, going east and west, and also ditches
20  running north and south, down to what is a
21  roadway, which is now known as Martin Highway.
22   Q.   Can you see Martin Highway on this map?
23   A.   Yes.  If you at panels into at CJF 311
24  and look right above it, you will see a very
25  linear east-west line.  That's a signature of a

RICHARD CREECH
USA vs SHARFI

May 24, 2022
157–160

Page 157

1  road on an aerial.
2     Q.  When you say a signature, what do you mean?
3     A.  It's what's indicated to me, and when you
4  look at an aerial, what a road would look like on
5  an aerial.  So they call it a signature.  It's
6  very much like you see an airport on an aerial map
7  that's a signature of an airport.  Very much like
8  you see a linear ditch, that's a signature of a
9  ditch.
10     Q.  You're saying that a ditch is a signature
11  of a ditch?
12     A.  Yes.  It has very distinct, you know,
13  line work, it has a lot of times spoils areas
14  adjacent to it that tend to pop out at you when
15  you looked at them enough.
16     Q.  Can you see spoil areas in this image?
17     A.  I believe you can, yes.
18     Q.  Where is that?
19     A.  The spoil areas are intermittent along
20  the lateral east-west ditch, for Bessey Creek
21  excavated ditch, as you call it, and you can see
22  that the lines are somewhat interrupted, but you
23  can see a ditch and some spoil areas in and around
24  it when you zoom in a little bit.  But when you
25  zoom in, you lose the clarity and you lose a little

Page 158

1  bit of the focus from looking at it from afar.
2     Q.  It is your opinion you can see the
3  excavated portion of Bessey Creek in this
4  photograph; correct?
5     A.  Yes.
6     Q.  And can you identify the north-south ditch
7  in this photograph?
8     A.  I believe it to be a small signature, but
9  I don't believe it to be that prominent.  You
10  know, there are various lateral ditches running
11  north and south, and that south ditch may be a
12  shallow swale in this aerial.
13     Q.  So you can't tell if the north-south ditch
14  is on this aerial?
15     A.  I believe it might be, but I'm not wholly
16  sure that it's there as a ditch.
17     Q.  Would it be there in some other form?
18     A.  Yes, you can see a little bit of spoil
19  area in that area where there might have been some
20  construction, but I'm not sure it's really
21  formalized as a ditch yet.
22     Q.  Would you agree with me that there are
23  lighter and darker areas of this document, DX 171?
24     A.  I believe there's a lot of different
25  lighter and darker areas, that go from gray to

Page 159

1  dark, yes.
2     Q.  But there are quite dark areas running
3  west-east and northwest-southeast; is that correct?
4     A.  Also agree that they run north and south
5  directly, and they may at times go east or west.
6     Q.  What is your understanding of what those
7  darker areas are on this map?
8     A.  Those darker areas I would suspect are,
9  you know, basically areas of inundation.  There
10  may have been a heavy rainfall year that year, so
11  there's most likely standing water in those areas.
12  So it would be typically the signature of an
13  historical wetland maybe.
14     Q.  And would you agree with me that DX 171
15  shows significant, or shows more historical wetlands
16  than the USGS maps we just looked at?
17     A.  I haven't been asked to provide an opinion
18  on that, so I really couldn't say one way or the
19  other.
20     Q.  Well, you have seen both now; correct?
21     A.  Yes, I have.
22     Q.  And you don't have an opinion as to whether
23  this DX 171 shows more historical wetlands than the
24  USGS maps that we just looked at?
25     A.  I think this shows historical wetlands.

Page 160

1  I think the USGS shows historical wetlands as they
2  delineated them or observed them in the field.
3        So as you pointed out earlier, I wasn't
4  around in 1940, so I couldn't tell you whether
5  it's an historical wetland or these are just flooded
6  areas.  So I don't really understand the question.
7     Q.  You identified these darker areas on DX 171
8  as historical wetlands, and you identified certain
9  features on the USGS maps for which we don't have a
10  key as wetlands.  And I'm just asking you, does this
11  document, DX 171, appear to show more historical
12  wetlands than the USGS maps that we just looked at?
13     A.  I would admit that they have a signature
14  of more wetland type areas out there than, yes,
15  the USGS maps.
16     Q.  And the USGS maps both postdated this
17  aerial; is that correct?
18     A.  Postdated it in 1948, that's correct.
19     Q.  And one was a few years later than that?
20     A.  1950.
21     Q.  Do you know how this document, DX 171, was
22  constructed?
23     A.  I don't know for sure, but in my
24  experience they basically have taken photographic
25  panels and stapled them together in Tallahassee.

RICHARD CREECH                                          May 24, 2022
USA vs SHARFI                                           161–164

Page 161

1    Q.   You testified about the equipment that you
2  believe was used to excavate water conveyances in
3  the 1920s and '30s.  Do you recall that?
4    A.   Yes.
5    Q.   What is your opinion as to the equipment
6  that was used in 1920s and '30s to excavate water
7  conveyances?
8    A.   Traditionally or typically it would have
9  been a diesel-powered, what resembles a backhoe
10  today, but it would have been an excavator with
11  about a two-yard bucket, I would believe.
12    Q.   And what is the basis for your belief that
13  that was the equipment that was used to execute
14  water conveyances in the twenties and thirties?
15    A.   Historical research, conversations with
16  old contractors.  You know, government people that
17  were constructing those types of ditches, maybe
18  not in the 1920s and '30s, but at a later date.
19    Q.   You said historical research.  What
20  historical research have you done on this topic?
21    A.   You know, as a Floridian, I'm always
22  interested in construction, and, you know,
23  representing a lot of these agencies or drainage
24  ditches or the municipalities, I got to get a
25  feeling of how these things were constructed, and

Page 162

1  why they were constructed, you know, the
2  difficulties they went through to get equipment
3  out there or get it done, why it was in a certain
4  width.
5       So through the years I've gone back and
6  read either archival information or looked at
7  photographs of some of the drainage districts when
8  they were being constructed.
9       So it would be pretty typical of that
10  time period, wherever we were constructing,
11  because construction equipment evolves over time,
12  but typically it evolves in blocks, five to ten
13  years.  And so that would be the historical
14  research.
15    Q.   You say archival information and photographs?
16    A.   Right.
17    Q.   What archival information supports that
18  opinion?
19    A.   There are field books and field reports
20  from time to time that you come across in files.
21  You know, in these files of these drainage
22  districts or files in the water management
23  districts or files in survey information.
24       So there would be that type of information.
25  It wasn't a formal archival type of thing.  It's

Page 163

1  more just through my experience of dealing with
2  water management and constructed environments
3  through the years.
4    Q.   Your opinion about the type of equipment
5  that was used in the 1920s and 1930s is based on
6  your experience dealing with water management
7  districts over the years?
8    A.   To some degree, yes.
9    Q.   Can you explain that?
10    A.   Well, a lot of the water management
11  districts kept photo documentation on some of the
12  things they have done through the years.  For
13  example, if you go down to the South Florida Water
14  Management District there's pictures on the wall
15  of things being excavated.
16       So there's routine observations of
17  photographs and things that these people keep on
18  file, maybe not so much today because everything
19  is digital, but in the paper files that I reviewed
20  back early in my career, this would have been
21  pretty normal.
22    Q.   And have you reviewed any field books or
23  historical information or photographs with respect
24  to the Martin County area that informed your opinion
25  about the equipment used in the 1920s and '30s to

Page 164

1  construct water conveyances?
2    A.   I'm sure I have.  I just can't recollect
3  off the top of my head where or what they were.
4       Actually, I can, hold on.  Let me think
5  about that for a minute.
6       Let's take the St. Lucie Canal, for
7  example, that I mention in my report.  There were
8  archival pictures and ongoing pictures of that
9  being constructed or dredged from about 1914 until
10  the 1920s or '30s.
11       And then there were photographs of I
12  believe laterals that were part of that construction.
13  They were constructed by that very similar type of
14  equipment.
15    Q.   And so do you believe that the -- is it
16  your opinion that the equipment used to excavate
17  water conveyances, the water conveyances at issue in
18  this case, the excavated portion of Bessey Creek and
19  the north-south ditch would be similar to the
20  equipment used to excavate the St. Lucie, did you
21  say canal?
22    A.   No, because the St. Lucie Canal was
23  dredged.  What I talked about was the laterals
24  that potentially tied into it.  You know, that
25  were sort of agricultural areas.  So it would have

RICHARD CREECH
USA vs SHARFI

May 24, 2022
165–168

Page 165

1  been constructed in or around similar time frames.
2    Q.  So the lateral canals constructed to
3  connect to the St. Lucie Canal you believe would use
4  the same equipment as the equipment used to
5  construct ditches in the Palm City Farms area in the
6  1920s and '30s?
7    A.  Yes, that's my opinion.
8    Q.  Is the St. Lucie Canal a relatively
9  straight water conveyance?
10   A.  Yes, it is.
11   Q.  But have you spoken to any contractors
12 about the equipment used to excavate water
13 conveyances in the 1920s and '30s who, in fact,
14 excavated those water conveyances?
15   A.  I don't recollect talking to anyone
16 specifically about the Bessey Creek ditch and how
17 it was constructed.  But earlier in my career I
18 had various contractors that were mentors that
19 would explain and tell me how something was
20 constructed.  So it was information that served me
21 well throughout my career as to why something was
22 where it was at.
23   Q.  And do you know what the basis was for
24 those individuals' opinions about the equipment used
25 to execute water conveyances in the 1920s and '30s?

Page 166

1    A.  I don't understand the question, counsellor.
2    Q.  You said you spoke to people who you
3  understood had knowledge of the equipment used to
4  construct water conveyances in the 1920s and '30s.
5  Is that correct?
6    A.  That's correct.
7    Q.  And what do you understand to be the basis
8  of their knowledge for the equipment that they used
9  to construct water conveyances in the 1920s and
10 '30s?
11   A.  Some of them, I believe, had personal
12 knowledge and operated those types of equipment,
13 so they may have done it on other types of
14 drainage districts or other types of municipal
15 improvements that were very similar to that time
16 period.
17   Q.  You said similar to the time period.  Is
18 that in the '20s and '30s or sometime later?
19   A.  More like the '30s and '40s.
20   Q.  Did you say the St. Lucie Canal was built
21 starting in 1914?
22   A.  I believe that was the year they broke
23 ground.
24   Q.  So with respect to your opinion that the
25 excavated portion of Bessey Creek and the

Page 167

1  north-south ditch were constructed in pine flatwood
2  uplands, we talked about now your experience, your
3  use of SCS and USGS maps.  Is there anything else
4  that you relied on to inform that opinion?
5    A.  Not that I can recollect right now.
6      MR. HUGHES:  Off the record.
7      THE VIDEOGRAPHER:  We are now going off
8    the record, and the time is 2:24 p.m.
9      (A recess was taken.)
10     THE VIDEOGRAPHER:  We are now going back
11   on the record, and the time is 2:36 p.m.
12 BY MR. HUGHES:
13   Q.  Mr. Creech, going through the opinions that
14 you identified that you formed about this matter,
15 the next one you said is that, I believe, that the
16 excavated portion of Bessey Creek is not in a
17 tributary or a relocation of a tributary.  Is that
18 correct?
19   A.  That's correct.
20   Q.  And what facts informs that opinion?
21   A.  Essentially, the Bessey Creek tributary,
22 as identified both on the USGS and the government
23 survey of 1845, indicate the Bessey Creek's fork
24 terminates at the northwest corner of Section 15
25 of that township.

Page 168

1    Q.  You said that township?
2    A.  Correct.  Section 15, I think it's range
3  or 41 east, or township 41 east or 41 south, is
4  the overall township that the federal government
5  surveys, in which the parcelized land for sale on
6  behalf of the state.
7      So Section 15, as you noticed on the map
8  of the Palm City Drainage District, Section 17 is
9  where the parcel lies, or the site.  Section 15 is
10 roughly two sections over.  And all of the federal
11 government information that I have available to me
12 indicates that the terminus of Bessey Creek's fork
13 terminates roughly at the northwest corner of
14 Section 15.
15   Q.  And you said that information is a federal
16 government document from 1845 and the USGS maps that
17 we looked at earlier?
18   A.  That's correct.
19   Q.  Did you mention that when we discussed the
20 USGS maps earlier?
21   A.  I believe I did.  I may have.  I believe
22 I did.
23   Q.  Can you see this document?
24   A.  Yes, I can.
25     MR. HUGHES:  And it is document Bates

RICHARD CREECH                                          May 24, 2022
USA vs SHARFI                                             169–172

Page 169

1  stamped SHARFIEXPERTS 402, and we will call
2  it DX 179.
3      (DEFENDANTS' EXHIBIT 179, Survey by the
4  Bureau of Land Management, Bates stamped
5  SHARFIEXPERTS 402, was marked for
6  identification, as of today's date.)
7  Q.  Do you recognize this document?
8  A.  Yes.
9  Q.  What is it?
10  A.  It's the government survey as performed
11  by the Bureau of Land Management, Federal
12  Government, Township 38 south, range 40 east,
13  which encompasses the Palm City Drainage District
14  and Bessey Creek.
15  Q.  And how can you tell that?
16  A.  One, you know, it's identified at the top
17  of the page, as to T, representing township, and
18  then the number 38 south, which is south of the
19  prime meridian or the origin of the survey, which
20  is located in Tallahassee.  And then the range is
21  R, identified as R, and then a number, it's 40
22  east, which is east of that prime meridian, the
23  origin of the survey.
24      So it's also noted in the right-hand side
25  of the map that this is a survey, and approved by

Page 170

1  the -- I believe it's the Secretary of Interior or
2  the Undersecretary of Interior of, that would have
3  been the Bureau of Land Management, basic
4  supervisor of the survey, and who surveyed it and
5  who signed and sealed it.
6  Q.  And this is what you are referring to,
7  where it says "surveyed in the 2 quarter of the year
8  1845 by George --" I don't know what that --
9  A.  Government surveyor.  GS, government
10  surveyor.
11  Q.  And it is your opinion that this document
12  refers to Martin County?
13  A.  Yes, it does.
14  Q.  And how do you know that?
15  A.  Because I'm a professional land surveyor,
16  and that section, township and range, or sections,
17  townships and ranges, exist within Martin County.
18  Q.  And what do you understand this document to
19  show?
20  A.  This document is a subdivision of that
21  township and range that includes 36 sections of
22  land, approximately 640 acres each.  As part of
23  the instructions to the surveyor, he is to locate
24  essentially water bodies, rivers, streams, and at
25  times locate large marsh areas or areas that would

Page 171

1  impact the value of the property, as this map
2  would be utilized by the State of Florida to sell
3  land patents to people that were interested in
4  buying land in this township.
5  Q.  You said this shows water bodies, marshes.
6  Any other natural features?
7  A.  At times -- this one doesn't show it, but
8  many of the surveys of this kind I have reviewed
9  also shows significant marshes, large marshes,
10  lakes, like in the central part of the state.
11      They also show prime timberlands, they
12  always show prime farmlands.  They also can show
13  some significant topographic features.  It depends
14  on the instructions that were given to the
15  surveyor, and, you know, whether the surveyor had
16  the resources or were basically part of his scope.
17      In this case the surveyor would have
18  obviously been told to locate all water bodies,
19  streams, that were significant.
20  Q.  And what's your basis for that?
21  A.  As a professional land surveyor doing
22  retracement surveys since I was a young man.
23  Q.  And your experience doing retracement
24  surveys gives you insight into the scope of a
25  `Bureau of Land Management survey document from

Page 172

1  1845?
2  A.  Actually, yes, it does.  And here's the
3  essential aspects of land surveying.  I am to walk
4  in the footsteps of the original surveyor.
5      This is part of the government's
6  direction in doing these types of surveys or
7  retracements, is I am to recreate what the
8  original surveyor did and put what he did on the
9  ground if I do not find a corner or if it's
10  obliterated or has been destroyed.
11  Q.  And what is the basis for your belief that
12  the surveyor of this document was instructed to find
13  major water bodies?
14  A.  It was a -- in my review of field notes
15  in the past, and directions to the government
16  surveyor, that was a requirement of the surveyor,
17  was to locate any significant water bodies,
18  rivers, streams, that could affect any of those
19  parcels as it would result in either devaluing or
20  increasing the value of the land package.
21  Q.  So it is your understanding that that's
22  generally how land surveying took place in 1845?
23  A.  No, that's how it took place.
24  Q.  And you know that based on your review of
25  field notes?

RICHARD CREECH                                          May 24, 2022
USA vs SHARFI                                              173–176

Page 173

1    A.  Based on my professional license and
2   based on my review of government surveys for the
3   last 30, 40 years.
4    Q.  And what is your understanding of a
5   significant water body?
6    A.  In this case it would have most definitely
7   dealt with either navigable or streams that were
8   difficult to cross or served large land masses as
9   far as drainage outfalls.
10   Q.  Do you know if this survey, in fact,
11  contains all significant water bodies in this region?
12   A.  That's a big question of "all."  I have
13  not surveyed this entire township, so I couldn't
14  really opine upon that.
15   Q.  So you don't have an opinion as to whether
16  this document shows all significant water bodies
17  within the scope of this land area?
18   A.  My opinion would be that the instructions
19  to the surveyor would have been to locate those,
20  and that the surveyor in 1845 did locate them.
21   Q.  So it is your belief that this does contain
22  all significant water bodies within this land area?
23      MR. HAMILTON:  Object to form.
24   A.  As they existed in 1845, and in the opinion
25  of the registered government surveyor, yes.

Page 174

1    Q.  You didn't cite this document in your
2   report; is that correct?
3    A.  That's correct.
4    Q.  Do you know if there are any lakes or other
5   elements of water in this land area?
6    A.  If you scroll out a little bit, the
7   surveyor does reflect certain water bodies he came
8   across, marshes, prairies, hammocks, bay-heads,
9   that he felt were significant along the lines of
10  traverse that he was surveying.  But he did not
11  locate any large lakes or large, you know, wetland
12  bodies.  That wasn't even a term of art at that
13  time.
14      If you look to the west, you'll see where
15  he has labeled along some of section lines, you
16  know, bay-head, or bay, whatever it is, you know,
17  they had different terminologies.  So that would
18  indicate to me that if I was surveying Section 13,
19  or let's say 18, for example, or Section 19, and I
20  was surveying the Efly of Section 19 and I came
21  across that bay, then I was in the right area and
22  that I was surveying the correct line, if I came
23  across it at or about the location that he shows
24  on the survey map.
25   Q.  And what do you understand that reference

Page 175

1   to bay, it looks like gall, to mean?
2    A.  If would be a deeper -- you know, in
3   today's term of art, it would have been a deeper
4   wetland.  It contained a vegetation of sweet bays
5   or some type of bay-head.
6       You know, surveyors, as we already went
7   through earlier, sometimes an obligation of
8   identifying vegetation, and identifying certain
9   features of the property.  In this case, in 1845,
10  that's so noted.
11   Q.  What do you understand by the denotation of
12  prairies on this document DX 1789?
13   A.  Prairies were essentially a term of art
14  in surveying for a number of years, until wetlands
15  took over, but it would be a shallow prairie,
16  possibly a wetland, possibly a flow-way, that the
17  surveyor recognized he had a different topography
18  and different vegetation.
19   Q.  And do you believe that all of what George
20  Houston would call prairies that are in this area
21  are identified on this map?
22   A.  I would say where he located them along
23  the section line identifies they are there.  He
24  did not, as probably part of his scope, go
25  internal to the sections to survey them.  So I

Page 176

1   would not say that they are shown throughout the
2   map.
3    Q.  Is there anything else about this document
4   that informs your opinion that the excavated portion
5   of Bessey Creek is not located in a tributary of
6   Bessey Creek or a redirected to a tributary of
7   Bessey Creek?
8    A.  I think the map speaks for itself, and
9   the tributaries have been identified and shown,
10  based on a government surveyor, based on a
11  government survey, that historically was done in
12  1845.  So this was the existing conditions at that
13  time.
14      So are there any other opinions?  Not
15  that I can, you know, reflect on right now.
16  There's a lot on this map that, you know, a lot of
17  things can be opined upon.
18   Q.  In your work as a surveyor, you don't just
19  rely on mid-19th century surveys; is that correct?
20   A.  Yes, I do, as a matter of fact, because
21  that is what the surveyor is responsible for.  In
22  doing retracement surveys, I am to walk in the
23  footsteps of the surveyor, the original surveyor,
24  and that is because after the original surveyor
25  issues this map, that land was sold in whatever

Page 177

1  condition it was.  It wasn't maybe one section of
2  5,280 feet, it was one section of 4,000 feet, and
3  that person bought that land and bought that
4  property.
5      So I, as the surveyor, must understand
6  what the surveyor did, what he located, where he
7  put that corner, and recreate that survey if I
8  cannot find evidence that it exists today.  With
9  the best available evidence and documentation,
10  this is where I would start.
11     Q.  My question is a little bit different.  You
12  don't rely exclusively on survey done in the 19th
13  century; is that correct?
14     A.  Not exclusively.  There is a lot of evidence
15  out there, but this would be a very significant
16  piece of that evidence.
17     Q.  And, in fact, there are significant
18  technological improvements in this work since the
19  mid-19th century; correct?
20     A.  If I understand your question correctly,
21  there have been technological improvements, but
22  that is to improve our ability to measure and turn
23  angles, but not to walk in the original footsteps
24  or put that surveyor on the ground today.  It is
25  to aid us to do that, but it does not change the

Page 178

1  survey any way or form.
2      Q.  Do you feel that aerial photography is
3  useful in your surveying work?
4      A.  Yes.  I use it routinely.
5      Q.  And does that help you identify features in
6  the land that you are surveying?
7      A.  Yes.
8      Q.  What about LiDar data?
9      A.  Same.  I would use LiDar.  As a matter of
10  fact, and we would use -- the DOT work LiDar in
11  water management district work for LiDar for years.
12     Q.  And that also helps you identify features
13  in the areas you are surveying?
14     A.  At the time of the survey, yes.
15     Q.  And then the other documents that you said
16  that you relied on in forming your opinion that the
17  excavated portion of Bessey Creek is not within a
18  tributary of Bessey Creek or a redirected tributary
19  of Bessey Creek, is the USGS maps; is that correct?
20     A.  USGS maps, yes.  And the Soil Conservation
21  Survey information that's provided in the report.
22     Q.  In the report, do you mean in the SCS report
23  or in your report?
24     A.  In my report.
25     Q.  This is DX 178.  We have already looked at

Page 179

1  this document.  Is that correct?
2      A.  Yes, that's correct.
3      Q.  How does this document inform your opinion
4  that the excavated portion of Bessey Creek is within
5  a tributary or redirected tributary of Bessey Creek?
6      A.  But the question is how does this map
7  help me form my opinion as to where the tributary
8  of Bessey Creek lies when it was constructed.  If
9  you go back to the survey as the USGS maps are
10  based on a lot of times the original survey done
11  by the GOO or the BOM.
12     And if you look at this map, and in
13  Section 15 you can see that the USGS also shows a
14  tributary going to that northwest corner of
15  Section 15 and terminating, and then subsequently
16  there's a series of ditches that are picked up.
17  But nowhere in the evidence or the mapping does it
18  show that the tributary of Bessey Creek is a
19  linear or even remotely in the vicinity of the
20  east-west ditch or the Bessey Creek excavated
21  ditch area.
22     Tributaries, natural tributaries, are
23  typically not linear.  They are, you know, various
24  formations that are cut out of the sand or the
25  rock as a result of heavy rainfall events and

Page 180

1  erosion.  So I would not expect, based on this map
2  and the accuracy of the USGS, that followed behind
3  them for years, that they do not show a tributary
4  going further west than Section 15.  And I believe
5  that to be the case.
6      Q.  Where do you see that tributary of Bessey
7  Creek petering out in Section 15?
8      A.  If you look at the contour there just to
9  the northwest of Section 15, that's where that
10  contour ends.  The contour, which is that magenta
11  or red line that goes up into that northwest
12  corner of Section 15.
13     That is pretty typical of how USGS would
14  reflect a creek or tributary petering out, and
15  just becoming part of the landscape.  Very much
16  like it does in Section 14, and I've had
17  experience with the Danforth, and I've had
18  experiences down south in the Hanson Grant area,
19  Map Creek, where I actually mapped that, and it
20  actually petered out almost within very good
21  accuracy of where the USGS map showed it.
22     Q.  When you say magenta line, is it this line
23  that runs directly into the corner, the top left
24  corner of Section 15?
25     A.  That's correct, and then circles back

RICHARD CREECH
USA vs SHARFI

May 24, 2022
181–184

Page 181

1 around to the southeast.
2    Q.   And if we follow it, it goes below and
3 touches this darker line right here; is that correct?
4    A.   Yes, that is correct.
5    Q.   And it then goes southeast from that; is
6 that correct?
7    A.   That's correct.
8    Q.   And where does that magenta line link up
9 with Bessey Creek, in your opinion?
10    A.   Well, that is Bessey Creek.
11    Q.   This line right here is Bessey Creek?
12    A.   That is Bessey Creek, the natural fork of
13 it.
14    Q.   And what, in your opinion, is this blue
15 line that runs north of that what we'll call the
16 magenta line?
17    A.   That is the center line or the thread of
18 the creek.
19    Q.   And so this is also Bessey Creek, that blue
20 line?
21    A.   That's correct.
22    Q.   And that blue line goes right into the
23 thick line that extends into Section 15; is that
24 correct?
25    A.   That blue line intersects with the ditch

Page 182

1 that's labeled there, yes.
2    Q.   And what do you understand this thicker
3 line that runs from 15 and then east, at least to
4 18, to represent?
5    A.   That is a significant ditch or lateral,
6 just by the thickness of it on the map.
7    Q.   And do you understand that ditch to be the
8 excavated portion of Bessey Creek?
9    A.   That is the excavated portion of what
10 you're calling Bessey Creek, yes.
11    Q.   And you would agree with me that this
12 portion of Bessey Creek, the blue line, runs
13 directly into that ditch; is that correct?
14    A.   No.  I would disagree with that.  That's
15 just a mapping episode of the map or just showing
16 that it connects to that ditch.  So I would argue
17 that Bessey Creek, the natural portion of it,
18 continues to the northwest corner of Section 15,
19 as represented by the topographic contour line
20 that exists there.
21    Q.   But there are two portions of Bessey
22 Creek -- withdrawn.
23         In your opinion, there are two portions of
24 Bessey Creek right here?
25         MR. HAMILTON:  Object to form.

Page 183

1    A.   No, there's the top of bank which would
2 represent, in my opinion, the contour line.  That
3 would be the top of bank of Bessey Creek, in my
4 experience, in dealing with these maps.  And the
5 thread of the creek would be the blue line.
6    Q.   When you say the thread of the creek, what
7 to you mean by that?
8    A.   The center line of the creek, you know,
9 where the actual water line would exist.
10    Q.   And what does the magenta line represent
11 below?
12    A.   That right there to me would represent a
13 top of bank or change in significant topography.
14 So that would be the top of Bessey Creek.
15    Q.   So you would agree with me that in this
16 document the blue line meets the thicker line, or
17 what we have been calling the excavated portion of
18 Bessey Creek?
19         MR. HAMILTON:  Object to form.
20    A.   At that intersection of where the ditch
21 is and where the thread of the natural creek
22 begin, that's the intersection.
23    Q.   And so what is it about this that informs --
24 withdrawn.
25         What is it about this map in Section 15 of

Page 184

1 DX 178 that informs your opinion that the excavated
2 portion of Bessey Creek is not within a tributary of
3 Bessey Creek or a redirection of Bessey Creek?
4         MR. HAMILTON:  Object to form.
5    A.   As I mentioned previously, that contour
6 line, in my opinion, and my experience in dealing
7 with these maps, is the top of bank of Bessey
8 Creek, and that contour line continues through
9 that intersection to the northwest corner of
10 Section 15.  That would be a signature on that map
11 of where Bessey Creek naturally exists.
12    Q.   And that magenta line then runs, as you
13 said, somewhat southeast from there?  Is that
14 correct?
15    A.   That is correct.
16    Q.   That runs northeast?
17    A.   Northwest.
18    Q.   Northwest, excuse me.  You're right.
19         And then runs through the top of the map?
20    A.   Right.
21    Q.   And what does that represent to you?
22    A.   That represents, you know, essentially --
23 you know, it's a topographic line.  It would
24 represent probably to me, you know, essentially
25 the external limits of Danforth -- not Danforth,

RICHARD CREECH
USA vs SHARFI

May 24, 2022
185–188

Page 185

1 but Bessey Creek.  Everything east of that would
2 flow into the Bessey Creek basin.  Everything west
3 of that would have to be analyzed.
4      If it did not have a ditch or something
5 associated with it, the flows may be indeterminate
6 may be going south, they may be going east, they
7 may be going north a little bit.
8      So that right there just says that the
9 Bessey Creek, top of bank, is at that contour, and
10 everything northeast of that is what represents
11 the natural tributaries of Bessey Creek.
12      Q.   And so northeast of this point where the
13 blue line meets the thicker line in Section 15, it
14 is your opinion that the extension of this magenta
15 line northeast, through the end of the map,
16 represents the scope of the natural tributary of
17 Bessey Creek?
18      MR. HAMILTON:  Object to form.  Did you
19 mean northwest or northeast?
20      MR. HUGHES:  Northwest, excuse me.  Let
21 me do that again.
22      Q.   It's your opinion that this magenta line
23 that runs northwest from the intersection of the
24 blue line and the thicker line and goes through the
25 top of the map represents the natural tributary of

Page 186

1 Bessey Creek?
2      A.   The natural tributaries.  If you notice
3 there, there are various forks.  So I would
4 anticipate that that would be the approximate
5 limits, or the limits of where the tributaries
6 would most likely terminate.
7      And if you look at the original government
8 survey, that's probably consistent with the survey.
9      Q.   This line terminates, as we discussed, at
10 the top of the map; correct?
11      A.   That contour, yes.
12      Q.   And that wasn't shown on the government map
13 we just looked at, DX 179; is that correct?
14      A.   That contour was not shown, that's
15 correct.
16      Q.   Is there anything else about this document
17 that informs your opinion that the excavated portion
18 of Bessey Creek is not a relocation of a tributary
19 of Bessey Creek not in a tributary of Bessey Creek?
20      A.   You know, the linear nature of the
21 east-west ditch or the Bessey Creek excavated
22 ditch is linear, and I don't see any other types
23 of connections that would allow me to believe or
24 form an opinion that that tributary extended due
25 west from that point.

Page 187

1      Q.   I think you said two different things
2 there.  One, that it's a straight line, and, two,
3 that you don't see anything that suggests that it
4 extends due west.  Is that correct?
5      A.   That is a fair statement.
6      Q.   Is it possible to redirect a natural water
7 conveyance into a straight line?
8      A.   The St. Lucie Canal is a perfect example
9 of it, yes.
10      Q.   Is there anything else about this document
11 that informs your opinion that the excavated portion
12 of Bessey Creek was not a relocation of a tributary
13 or not in the tributary?
14      A.   Other than there is not a series of
15 linear wetlands that are in around that ditch that
16 would look like the other tributaries of Bessey
17 Creek to the east, leads me to believe, and my
18 opinion is, that there is no tributary at Bessey
19 Creek west of that intersection.  And that's the
20 best of my recollection on my opinions for right now.
21      Q.   Is that your opinion or do you have other
22 opinions?
23      A.   I have lots of other opinions, counsel.
24 But on this map, that's my opinion.
25      Q.   This is DX 179.  We looked at this document

Page 188

1 before; correct?
2      A.   Correct.
3      Q.   What about this document, DX 179, informs
4 your opinion that the excavated portion of Bessey
5 Creek is not a relocation of a tributary of Bessey
6 Creek or not in a tributary of Bessey Creek?
7      A.   Similar opinions and comments that I had
8 previously on previous exhibits.
9      Q.   Is there anything different about this map
10 with respect to that opinion as opposed to the
11 previous exhibit, DX 178?
12      A.   The only thing I can offer here is that
13 now the wetlands are shown as previously indicated
14 in testimony, and that that flow is indicating
15 that the flow is predominantly to the south, not
16 to Bessey Creek.
17      Q.   Can you expand on that?
18      A.   Notice how the wetlands on the western
19 portion of it go south, from northwest to southeast?
20 In certain parts of Martin County out here, the
21 flow is from northwest to southeast, to basically
22 what was the historical St. Lucie River, which is
23 now the St. Lucie Canal.  That's because it is
24 separated by the green ridge to the west, which
25 is, remember we talked about coastal sand ridges,

RICHARD CREECH
USA vs SHARFI

May 24, 2022
189–192

Page 189

1  there's a coastal sand ridge just to the west.
2      A similar weather network appears now
3  above Sections 17, 18 and 16, and they are aligned
4  to the south.  So that would lead me to believe at
5  this time those were flowing to the south.
6      Q.   That these wetlands were flowing to the
7  south?
8      A.   Correct, and there is not a tributary or
9  a line of wetlands that would indicate that there
10  is an extension of Bessey Creek into that area.
11     Q.   How does the orientation of the wetlands
12  inform your view as to whether or not there is a
13  tributary of Bessey Creek in that area of 16, 17 and
14  18?
15     A.   It's been my experience, and surveying in
16  that area, you know, the topography as shown on
17  this map essentially falls at a half a foot per
18  mile.  At times there are small ridges that
19  provide barriers from it going over land to the
20  east, except in extreme conditions.
21         Here, looking at this map, I would see
22  that they are flowing southerly, because there's
23  topography that indicates those wetlands are being
24  driven to the south, very much like the other ones
25  to the southwest.

Page 190

1      Q.   And what is that topography you see?
2      A.   It's not really showing that well on this
3  map, because it's, you know, only in five-foot
4  increments, but just, you know, my experience and
5  knowledge of the area would point in that direction.
6      Q.   So with respect to your opinion that the
7  excavated portion of Bessey Creek is not a
8  relocation of a tributary of Bessey Creek or not in
9  a tributary of Bessey Creek, we discussed the USGS
10  maps, the survey from 1845, and then you mentioned
11  the SCS report.  Is that correct?
12     A.   That's correct.
13     Q.   And how does that inform your opinion as to
14  whether the excavated portion of Bessey Creek -- how
15  does that inform that opinion?
16     A.   Actually, if you look at the historical
17  tributaries of Bessey Creek, they have a different
18  soil profile or parameter.  That is not
19  necessarily extended beyond the intersection of
20  the east-west Bessey Creek excavated area.  It
21  only represents the natural tributaries.
22     Q.   What are the soil differences between the
23  excavated portion of Bessey Creek and the portion to
24  the east?
25     A.   If you could pull up the SCS map, Exhibit

Page 191

1  N, I believe, then I can further clarify it.
2      Q.   This is our DX 172.  Is this the document
3  you're referring to?
4      A.   That's correct.
5      Q.   All right.
6      A.   If you zoom in near the Turnpike, which
7  is to the east, and Bessey Creek.
8      Q.   Tell me where.
9      A.   Go south a little bit.
10         Notice the soils there, where it comes
11  under the Turnpike, represent a different soil
12  type.  That's what I would expect to see if
13  there's a tributary continuing on that was
14  sufficient.
15     Q.   You would expect to see soil types of 61
16  and 51 extending west?
17     A.   Correct.
18     Q.   Is it your understanding that this line
19  running east -- withdrawn.
20         Do you understand this straight line that
21  crosses 16 and 15 to be what we have been calling,
22  what I have been calling the excavated portion of
23  Bessey Creek?
24     A.   Yes.
25     Q.   And do you understand this curvier line

Page 192

1  extending east in 15, from roughly northwest to
2  southeast, do you understand that to be a tributary
3  of Bessey Creek?
4      A.   I believe so.
5      Q.   And that appears to be located in soils --
6  do you know what soils that tributary of Bessey
7  Creek is located in?
8      A.   I don't remember, counsellor.  I would
9  expect -- sometimes those areas are too small to
10  map, at least in my experience, so they may not
11  have mapped it due to the difficulty to get into
12  the tributary or get near it or it may have been
13  too small, or it may have just been a deep excavated
14  or eroded area of that soil.
15         But, you know, a natural tributary, I
16  would expect to see those soil types continue on.
17     Q.   What soil types do you see mapped here?
18  Even though you don't know the name, what number do
19  you see?
20     A.   51 and 61 are really good representations
21  of the tributary.
22     Q.   But with respect to this tributary
23  extending southeast of the excavated portion of
24  Bessey Creek, what are the soil numbers associated
25  or that that tributary flows to?

RICHARD CREECH
USA vs SHARFI

May 24, 2022
193–196

Page 193

1    A.   Surrounding them are 63.

2    Q.   Is it your opinion that the soil type
3    surrounding Bessey Creek remains the same for its
4    length?

5    A.   I don't understand the question.

6    Q.   Well, you said that this portion on the
7    right-hand side of DX 172 shows soil type 61 and 51
8    surrounding Bessey Creek.  Is that correct?

9    A.   That's correct.

10   Q.   And you expect that the soil type
11   surrounding Bessey Creek remains 51 and 61 for its
12   entire length from here to the east?

13   A.   I would expect it to be in small
14   quantities, but, yes, it would be a part of that
15   tributary until it petered out.

16   Q.   So you would expect Bessey Creek to be in
17   sort of 61 and 51 from this section until it ends to
18   the east?

19   A.   It would be an expectation, yes.

20   Q.   Do you know?

21   A.   I don't know.

22   Q.   You said that smaller tributaries may be
23   too hard to map.  Is that correct?

24   A.   Variable being mapped as far as where
25   their location is, but soil sometimes may be too

Page 194

1    small to map or too obscure.

2    Q.   Is there any other portion of this document
3    that informs your opinion that the excavated portion
4    of Bessey Creek is not a relocation of a tributary
5    or located in a tributary of Bessey Creek?

6    A.   Not that it's already been testified
7    against, that I can recollect at this time.

8    Q.   So we discussed the USGS maps, the SCS map,
9    the USGS maps, and the -- withdrawn.

10        We discussed the USGS maps, the 1845
11   survey, the SCS report, and your experience as
12   informing your opinion that the excavated portion of
13   Bessey Creek is not a relocation of a tributary of
14   Bessey Creek or in a tributary of Bessey Creek.

15        Did anything else inform that opinion?

16   A.   Not that I can recollect right now, counsel.

17   Q.   And then, next, I believe you said that it
18   is your opinion that the excavated portion of Bessey
19   Creek and the north-south ditch contain intermittent
20   flow; is that correct?

21   A.   Intermittent is -- it depends on the
22   definition.  I know the Corps has a different
23   definition of what intermittent might be for the
24   South Florida region.  But it flows on occasion,
25   and right now it's dry.

Page 195

1    Q.   What is your definition of intermittent?

2    A.   Intermittent to me would mean like during
3    the rainy season, when we get a lot of
4    precipitation and runoff, it's going to flow.  I
5    mean, it's got a higher potential than Bessey
6    Creek, so it's going to -- essentially its surface
7    running off it's going to end up in the creek or
8    in the ditch, and then out to the creek, and then
9    out to the St. Lucie River and out to the ocean.

10        That happens, you know, like I said,
11   during the wet season, which might be mid-June to
12   October, maybe November sometimes.  The rest of
13   the year it's dry, unless we have a huge tropical
14   system or a front come down that dumps a lot of
15   precipitation on the ground.

16   Q.   So you understand or you use intermittent
17   to mean that high water events may have water in the
18   wet season and be dry in the dry season?

19   A.   Correct.

20   Q.   And you said it's dry now.  Are you talking
21   about the weather in Florida, or South Florida, or
22   are you talking about the excavated portion of
23   Bessey Creek and/or the north-south ditch?

24        MR. HAMILTON:  Objection to form.

25   A.   Florida can have, you know, various

Page 196

1    storms isolated through it.  To say an average
2    rainfall is an average rainfall is a misnomer.
3    You can have heavy rains in St. Lucie County that
4    send them way over the average and you can have
5    less than average rains in Martin County and send
6    them below the normal rainfall.

7        So when I say wet season and dry season,
8    it's a holistic term for all of South Florida,
9    that typically in June to October, lots of
10   precipitation, lots of thunderstorms, lots of
11   tropical systems that create a lot of runoff and a
12   lot of rainfall.  And during the other times of
13   the year very limited rain, and the water table
14   recedes, and there's no flow in a lot of ditches
15   or tributaries.

16   Q.   So my question is a little bit different.
17   My question is you had said in your previous answer
18   that it's dry right now.  Were you referring to the
19   weather in Florida or to flow, if any, in the
20   excavated portion of Bessey Creek and/or the
21   north-south ditch?

22        MR. HAMILTON:  Objection, form.

23   A.   Actually, both.

24   Q.   When was the last time you visited the
25   north-south ditch -- withdrawn.  Have you ever

RICHARD CREECH
USA vs SHARFI

May 24, 2022
197–200

Page 197

1  visited the north-south ditch?
2    A.  Yes, I have.
3    Q.  When was that?
4    A.  Multiple times.
5    Q.  About how many times?
6    A.  In the last two months, three months,
7  four, five times.
8    Q.  And what was the occasion for visiting the
9  north-south ditch?
10    A.  I was engaged to become an expert in this
11  case, and doing what prudent engineers do, I went
12  to the site, and I went there multiple times for
13  multiple visual inspections, and the latest was
14  yesterday.
15    Q.  Did you mention visiting the site in your
16  report?
17    A.  No, I do not.
18    Q.  Did you rely on any visits to the site in
19  forming your opinions in your report?
20    A.  Can you be more specific?
21    Q.  You said that you visited the site several
22  times in the past few months.  Is that correct?
23    A.  That's correct.
24    Q.  And did any of those visits inform the
25  opinions contained in your report?

Page 198

1    A.  The opinions are based on the information
2  that was in the report.  It also provided me --
3  the site visit provided me, you know, where the
4  ditch was, how it was behaving.  And of course it
5  influences my opinion as to the ditch being
6  intermittent, as I've seen it dry and I've seen it
7  wet.  So that's probably why I went out there.
8    Q.  So is it your testimony that your visits to
9  the site informed your opinion that the north-south
10  ditch and the excavated portion of Bessey Creek have
11  intermittent flow?
12    A.  Yes.
13        MR. HAMILTON:  Objection to form.
14    Q.  You just didn't disclose that in your
15  report?
16    A.  I didn't find it relevant in what I was
17  finding at the time.
18    Q.  When you were preparing this report, did
19  you understand that you were needed to disclose the
20  bases of your opinions?
21    A.  Yes.
22    Q.  You said in the past few months you have
23  been to the north-south ditch five times; is that
24  correct?
25    A.  That's correct.

Page 199

1    Q.  Starting when?
2    A.  Most likely starting in the end of
3  February, and ending yesterday.
4    Q.  And you said you made five visits?
5    A.  Yes.
6    Q.  When were those visits, approximately?
7    A.  Once about every two to three weeks, when
8  it was convenient.
9    Q.  And how many times since April 7 have you
10  visited the north-south ditch?
11    A.  Twice.
12    Q.  And where along the north-south ditch did
13  you visit the north-south ditch?
14    A.  Essentially 4th Avenue, various, you
15  know, walking and looking at the ditch, and then
16  Boat Ramp Road and Citrus Boulevard.
17    Q.  Is it your opinion that the north-south
18  ditch flows to the Boat Ramp Road?
19        MR. HAMILTON:  Objection, form.
20    A.  The north-south ditch flows to Boat Ramp
21  Road?
22    Q.  Yes.
23    A.  I believe that's the general flow and
24  direction of all the runoff from that area, yes.
25    Q.  You said you visited the north-south ditch

Page 200

1  at 4th Avenue, Boat Ramp Road, and what else?
2    A.  Bessey Creek ditch.
3    Q.  And have you visited the north-south ditch?
4    A.  Yes.
5    Q.  And when was that?
6    A.  Yesterday.
7    Q.  Any other times?
8    A.  Not that I recollect, other than maybe
9  incidentally with the east-west ditch.
10    Q.  So the first time you had ever visited the
11  north-south ditch was yesterday?
12    A.  That's my recollection, yes.
13    Q.  So that visit didn't inform any of the
14  opinions in your report; is that correct?
15    A.  That's correct.
16    Q.  What, if anything, did you do -- where
17  along the north-south ditch did you visit yesterday?
18    A.  The southern end.
19    Q.  Where is that located?
20    A.  At the northwest corner of the subject
21  property.
22    Q.  It's your opinion that that is the southern
23  end of the north-south ditch, that it terminates
24  there?
25    A.  A ditch formally, yes.  There's a swale,

RICHARD CREECH
USA vs SHARFI

May 24, 2022
201–204

Page 201

1  I think, attached to it, but, yes, that's the
2  formal ditch.
3      Q.   Did you leave the site when you visited the
4  north-south ditch yesterday?
5      A.   Yes.
6      Q.   I guess, I'm sorry, withdrawn.
7          Did you follow the north-south ditch off of
8  the property yesterday?
9      A.   No.  Only a portion of it.
10     Q.   You only saw a portion of it; is that
11 correct?
12     A.   That's correct.
13     Q.   And what did you do yesterday at the
14 north-south ditch?
15     A.   Essentially rode the job, looked down at
16 the ditch, and observed that it looked like most
17 of the ditches in and around that area.
18     Q.   Did you take any soil samples?
19     A.   No, I did not.
20     Q.   Did you fill out any wetland determination
21 forms?
22     A.   No, I did not.
23     Q.   Did you take any vegetative samples?
24     A.   No, I did not.
25     Q.   Did you compare any vegetation that you saw

Page 202

1  to the two lists of -- withdrawn.
2          Did you identify any vegetation yesterday?
3      A.   Yes.  I saw various types of vegetation.
4      Q.   And what did you see in and around the
5  north-south ditch yet?
6      A.   Exotics come up on vegetation, some
7  wetland vegetation.
8      Q.   What upland vegetation did you see?
9      A.   I saw some pine trees nearby, and some
10 cabbage palms.
11     Q.   Do you know what type of palm trees?
12     A.   Cabbage.
13     Q.   What kind of pine trees, excuse me?
14     A.   Pine trees?  Typically slash pines, to my
15 recollection.
16     Q.   Do you recall what wetland vegetation you
17 saw yesterday?
18     A.   Mostly likely I think it was arrowhead or
19 pickleweed inside the bottom of the ditch.
20     Q.   Did you take any photos when you visited
21 the north-south ditch yesterday?
22     A.   No.
23     Q.   Did you install any wellpoints yesterday in
24 that ditch?
25     A.   No, I did not.

Page 203

1      Q.   Did you obtain any relative hydrology when
2  you visited the north-south ditch yesterday?
3      A.   That it was dry.
4      Q.   Did you measure the groundwater, where the
5  water table lay?
6      A.   I didn't measure it, no.
7      Q.   So you said you visited the excavated
8  portion of Bessey Creek approximately five times
9  since the end of February.  Is that correct?
10     A.   That's correct.
11     Q.   Did you take any photographs of the
12 excavated portion of Bessey Creek during those
13 visits?
14     A.   Not that I recollect.
15     Q.   Did you install any wellpoints in the
16 excavated portion of Bessey Creek during your visits
17 since the end of February?
18     A.   No.
19     Q.   Did you take any soil samples when you
20 visited the excavated portion of Bessey Creek since
21 the end of February?
22     A.   No.
23     Q.   Did you obtain any relative hydrology in
24 the excavated portion of Bessey Creek in your visits
25 since February?

Page 204

1      A.   Yes.
2      Q.   What did you obtain?
3      A.   Visual observation in February that there
4  was some modest flow and it was, you know,
5  somewhat wet, with a low level of depth, and then
6  subsequently by March-April and it becomes
7  significantly dryer, and by May there was no flow
8  and dry, except at Boat Ramp Road where there was
9  standing water with no flow.
10     Q.   But before May was there flow in the
11 excavated portion of Bessey Creek when you visited
12 since the end of February?
13     A.   No, there was no flow.
14     Q.   Was there water in it?
15     A.   There was standing water at Boat Ramp Road.
16     Q.   You said that there was no flow in May, but
17 there was flow in the end of February; is that
18 correct?
19     A.   That's my recollection, yes.
20     Q.   Was there flow the other times you visited
21 prior to May?
22     A.   Not that I could recognize, no.
23     Q.   Have you visited the excavated portion of
24 Bessey Creek prior to the end of February?
25     A.   Yes.

RICHARD CREECH
USA vs SHARFI

May 24, 2022
205—208

Page 205

1    Q. When was that?

2    A. Year ago, two years ago.

3    Q. What did you do at that time?

4    A. I was interested in seeing the new culvert

5 that had been put in on Boat Ramp Road, and we had

6 a tornado that had come through.

7    Q. And so you went there just to look at the

8 culvert?

9    A. Yes, check out the damage from the tornado.

10    Q. Did you do anything else on that visit?

11    A. I don't know. I think I may have made a

12 stop and had a cocktail somewhere.

13    Q. Prior to that, had you ever been to the

14 excavated portion of Bessey Creek?

15    A. Yes.

16    Q. When was that?

17    A. As I mentioned earlier in testimony, when

18 I did some surveys along that excavated portion.

19    Q. Were those surveys all at the Boat Ramp

20 Road area?

21    A. Yes. That is my recollection.

22    Q. Is your testimony that the water in the

23 excavated portion of Bessey Creek is entirely

24 runoff?

25    A. Can you rephrase that question?

Page 206

1    Q. Yes.

2       Is it your testimony that the flow, when

3 there is flow in Bessey Creek -- withdrawn.

4       Is it your testimony that during the wet

5 season any flow in the excavated portion of Bessey

6 Creek is stormwater runoff?

7    A. Yes. That would be a significant portion

8 of it.

9    Q. What else does that water consist of?

10    A. Probably the expert team probably would

11 have noticed if they had been out at significant

12 portions of that ditch, there were various people

13 pumping water out of their ponds or using it as an

14 outfall. So some of those flows probably are

15 from, you know, pump situations, pump scenarios,

16 you know, other types of inflows that are not

17 runoff-based.

18       So there's artificial -- I believe

19 there's some artificial flows that are coming in

20 that are not necessarily precipitated-based.

21    Q. And so is it your testimony that during the

22 wet season any flow in the excavated portion of

23 Bessey Creek is either stormwater runoff or

24 artifical outflow?

25    A. That's what creates the runoff and the

Page 207

1 flow, yes.

2    Q. So it is your testimony that any flow in

3 the excavated portion of Bessey Creek is either

4 artifical or stormwater runoff?

5       MR. HAMILTON: Object to form.

6    A. Yes. I believe that that's what happens.

7 It rains, and runoff happens, and either via

8 groundwater movement or via some form of movement,

9 and that's where the water comes from, other than

10 from other sources pumping water into it.

11    Q. Does groundwater contribute to the flow of

12 the excavated portion of Bessey Creek?

13    A. The groundwater is elevated by virtue of

14 precipitation, so, yes, groundwater is part of the

15 flow.

16    Q. And do you consider groundwater contributed

17 to the flow of Bessey Creek to be stormwater runoff?

18    A. Yes.

19    Q. You said that there's artificial water

20 pumped into the excavated portion of Bessey Creek.

21 Is that correct?

22    A. I believe there are some residential

23 pumps out there. I have not witnessed them in a

24 long time, but, you know, a number of years ago I

25 visited them.

Page 208

1    Q. And where did you witness those?

2    A. Along that, what is it, six miles or

3 three miles of ditch, in various places. There

4 was also people using Boat Ramp Road as a

5 pump-out. So there's various places that there's

6 water that's being artificially introduced that's

7 not necessarily natural runoff.

8    Q. And when was the last time that you saw

9 that?

10    A. Oh, gosh. Over ten years ago, probably.

11    Q. Do you recall specifically where?

12    A. No, I don't.

13    Q. And is it your testimony that any flow in

14 the north-south ditch is entirely stormwater runoff?

15    A. That would be my expectation, yes.

16    Q. And what is the basis of that expectation?

17    A. Experience. I mean, it's agricultural,

18 it's graded. There was a citrus grove there, so I

19 would expect the citrus grove would have graded it

20 to the north-south ditch for outflow. So I don't

21 necessarily recognize or recollect seeing any pump

22 systems on the north-south ditch, that I saw.

23    Q. When you say experience, it's experience

24 you had with other drainage systems in Florida?

25    A. Yes.

RICHARD CREECH
USA vs SHARFI

May 24, 2022
209–212

Page 209

1    Q.  So you are generalizing from your
2  experience with other drainage systems to this
3  drainage system?
4        MR. HAMILTON:  Object to form.
5    A.  Yes.
6    Q.  You are generalizing from your experience
7  with other drainage systems to the north-south
8  ditch?
9        MR. HAMILTON:  Object to form.
10   A.  Without any other source of information
11 other than the DOJ expert report and my report,
12 and visiting the site, I did not recognize any
13 other sources of water to be utilized other than
14 runoff in the north-south ditch.
15   Q.  Is that a yes?
16   A.  Yes.
17   Q.  And what is the basis for your opinion that
18 any flow in the excavated portion of Bessey Creek is
19 either stormwater runoff or artificially pumped-in
20 water?
21   A.  My experience in, you know, drainage
22 systems, South Florida management systems, and
23 other types of facilities, such as the Bessey
24 Creek excavated ditch.
25   Q.  And so you are generalizing from your

Page 210

1  experience with other drainage systems to the
2  excavated portion of Bessey Creek?
3    A.  What you're asking is if I've seen actual
4  runoff come off of all those properties on the
5  east-west ditch?
6        No, I have not seen all the runoff from
7  all of the properties on the east-west ditch.  So
8  I have to generalize that, yes, based on my
9  experience in doing stormwater management,
10 drainage, in similar types of facilities and
11 infrastructures, that is where the water is coming
12 from.
13   Q.  I think I'm asking something slightly
14 different.  Not limited to whether you have just
15 seen water flowing off of the pump of the abutting
16 property into the excavated portion of Bessey Creek,
17 but whether your opinion is based on generalizing
18 from drainage systems to the excavated portion of
19 Bessey Creek?
20   A.  I don't know any other way to do it other
21 than to generalize that, and that would be my
22 opinion.
23       MR. HUGHES:  Can we go off the record.
24       THE VIDEOGRAPHER:  We are now going off
25  the record, and the time is 3:45 p.m.

Page 211

1        (A recess was taken.)
2        THE VIDEOGRAPHER:  We are now going back
3  on the record, and the time is 3:57 p.m.
4  BY MR. HUGHES:
5    Q.  Mr. Creech, in your testimony just now
6  about your visit to the site yesterday, did you
7  mention that you saw a swale?
8    A.  I saw various swales across the property.
9    Q.  Where are those located?
10   A.  One just to the immediate north of what
11 we call the subject site, and I believe it drains
12 into the north-south ditch.  It drains various
13 things, you know, from gardens, that kind of
14 stuff, and then there's maybe some swales in and
15 around the site that are directing runoff into
16 ponds.
17       Without doing a though study, it was just
18 a cursory observation.
19   Q.  What, if anything, did you observe about
20 the swale that you mentioned seeing on the north
21 side of the subject property?
22   A.  If I remember it correctly, it had some
23 gardens that were directly discharging into it.
24 It had some exotics, some rip-rap, and it was
25 relatively improved.

Page 212

1    Q.  When you say gardens discharging into it,
2  what does that mean?
3    A.  Nurseries, you know, tomato plants,
4  vegetables, maybe some greenhouses.  You know,
5  agricultural uses.
6    Q.  And what were these agricultural uses
7  discharging?
8    A.  They weren't discharging anything at this
9  time.
10   Q.  So what forms the basis of your belief that
11 the gardens do discharge into this swale?
12   A.  Experience, and it looked like the grading
13 went in that direction.  So given that there's no
14 other, at least in my opinion, everything was
15 oriented north and south, so I would suspect from
16 looking at the property that anything graded to at
17 least drain to that part -- that's been graded to
18 drain to that swale.
19   Q.  I'm sorry, I think I maybe just missed
20 that.  What had been graded to drain to that swale?
21   A.  A portion of the property, going all over
22 the property and getting detailed survey
23 information, I would suspect that a portion of the
24 property was graded to drain to that swale.
25 Otherwise why would you have a swale exist.

RICHARD CREECH                                          May 24, 2022
USA vs SHARFI                                                213—216

Page 213

1    Q.   Do you know if the swale is artificial?
2    A.   I'm pretty sure it's artifical, yeah.
3    Q.   Do you know when it was constructed?
4    A.   Not specifically, no.
5    Q.   You said you believe that the site was
6    graded; is that correct?
7    A.   That's correct.
8         MR. HAMILTON:  Object to form.
9    Q.   And do you know when that grading took
10   place?
11   A.   Not specifically.  I could look at the
12   aerials.  But probably in the last ten years.
13   Q.   When you say grading, what do you mean by
14   that?
15   A.   I mean to improve the land or change the
16   topography of the land, such that precipitation
17   will run off into a certain direction.
18   Q.   When you visited the north-south ditch
19   yesterday, who, if anyone, was with you?
20   A.   Chris Hamilton was with me.
21   Q.   Anybody else?
22   A.   No.
23   Q.   What about the approximately five times you
24   visited the excavated portion of Bessey Creek since
25   late February?

Page 214

1    A.   I was by myself.  Well, I had my grandson
2    with me one day, if I remember right.
3    Q.   Have you ever followed the entirety of the
4    excavated portion of Bessey Creek?
5    A.   No.
6    Q.   Have you ever followed the entirety of
7    Bessey Creek east of Boat Ramp Road?
8    A.   East of Boat Ramp Road?  Not that portion,
9    no.  I have walked several portions east of the
10   Turnpike, yeah.  Not east of Boat Ramp Road.
11   Maybe 50, 60 feet inside.  I don't remember.  It's
12   been a while.
13   Q.   Do you recall the last time you did?
14   A.   When did I do the culverts?  Probably in
15   the nineties, and the other significant portion
16   east of the Turnpike would have been in the
17   seventies and eighties.
18   Q.   Do you recall the specific dates that you
19   visited the excavated portions of Bessey Creek since
20   the end of February?
21   A.   Without looking at my timesheets, no.
22   Q.   Would your timesheets say?
23   A.   Probably.  I probably went to pick up a
24   couple of them, because I live out that way, so I
25   probably would have -- I either did it on the way

Page 215

1    to work or on the way home.
2    Q.   You said you went and visited a culvert, I
3    believe you said near Boat Ramp Road.
4    A.   Yes.  It's actually the culvert that the
5    Bessey Creek excavated area crosses under Boat
6    Ramp Road.
7    Q.   Do you recall when that was, what time of
8    year that was?
9    A.   It was a dry period.  There wasn't much
10   flow in water, or wasn't any flow, actually.
11   Q.   Do you recall one way or the other?
12   A.   Yes, it was probably March, April.  It
13   was during the dry season.
14   Q.   Do you recall whether there was flow at the
15   time?
16   A.   I wasn't really looking specifically at
17   it, but there wasn't a lot of water in it.  I was
18   looking forward to seeing a lot of water and a lot
19   of flow, and there wasn't.
20   Q.   Do you have any pictures of the excavated
21   portion of Bessey Creek at all?
22   A.   I'd have to check my photo album.  I
23   might.  I don't recollect having any.
24   Q.   Setting aside any drafts of your expert
25   report, have you taken any notes in connection with

Page 216

1    this matter?
2    A.   No.  I typically keep it all in my head.
3    Q.   Let me show you a document that I'm going
4    to call DX 180.
5         (DEFENDANTS' EXHIBIT 180, Aerial photo
6    entitled "1952(a) Aerial," Bates stamped
7    SHARFIEXPERTS 84, was marked for
8    identification, as of today's date.)
9    Q.   Can you see that okay?
10   A.   Um-hum.
11   Q.   Do you know what this is?
12   A.   Yes, it's an aerial photograph of the
13   general vicinity of Palm City and Palm City Farms.
14   Q.   This is a document Bates stamped
15   SHARFIEXPERTS 84, and it is Exhibit D to your
16   report, "1952 (a) Aerial."  Is that correct?
17   A.   That's correct.
18   Q.   And what does this -- how, if at all, does
19   this document inform any of the opinions in your
20   report?
21   A.   I think it's a continuation of my
22   original opinion, just further documents, you
23   know, the development of the area.  The
24   photography gets a lot better with resolution.  It
25   identifies the Bessey Creek ditch more

RICHARD CREECH
USA vs SHARFI

May 24, 2022
217–220

Page 217

1    specifically, and just starts to show general
2    development of the area.  So it's a continuation
3    of my previous testimony.
4      Q.  Is there anything in this document, DX 180,
5    that informs your opinion, that is distinct from
6    earlier aerials or maps that we looked at?
7      A.  Not that I can recollect.
8         Oh, there is one thing.  Go ahead and
9    zoom in where the ditch intersects the natural
10   tributary.
11     Q.  Where do you understand that to be?
12     A.  Right there.  And I believe that -- no,
13   it's not this one.  Okay.
14        One of the aerials, you know, indicates
15   something to me that I may want to bring up, but
16   this one doesn't.
17     Q.  It is a little hard to see, but maybe
18   DUF-7-105 in this document; is that correct?
19     A.  That's correct.
20     Q.  And at the bottom of that square with that
21   number, you can see what appears to be the excavated
22   portion of Bessey Creek?  Is that correct?
23     A.  The what portion of Bessey Creek?
24     Q.  The excavated portion.
25     A.  Yes, where it intersects the natural

Page 218

1    tributary.
2      Q.  And it is your testimony that the natural
3    tributary is this darker line to the right; is that
4    correct?
5      A.  That's correct.
6      Q.  And in this document, can you see that --
7    is there any evidence of the natural tributary, or
8    what you call the natural tributary of Bessey Creek,
9    extending to the northwest?
10     A.  Yes.  Actually, this is the aerial I
11   wanted to mention.  There is a small portion of
12   the excavated area that extends the tributary, but
13   it comes through basically, you know, that section
14   prior to where it goes into a linear system, and
15   you can see the tributary going up into northwest
16   corner of section 5, and where that intersection
17   takes place.  So it identifies, because of the
18   photograph's quality, of where that tributary
19   subsequently ends.
20     Q.  And where do you see what you called the
21   natural tributary of Bessey Creek ending?
22     A.  At the northwest corner of section 5.  If
23   you take that curved linear section and take it up
24   to where that road and ditch basically are
25   extended along the section line, it's right at

Page 219

1    that corner.
2      Q.  It is your testimony that this darker line
3    in the box that appears to be DQF-7-95 -- is that
4    correct?
5      A.  Yeah, I know what you're talking about.
6      Q.  Is it your testimony that that dark line in
7    this bottom left extends to the northwest?
8      A.  Actually it extends to the west, in that
9    curved linear piece, in that 105 panel, and then
10   at that intersection of the X-rated area it continues
11   to the northwest.
12     Q.  So that would be in sort of the left third
13   of the 105 panel, it's your opinion that what you
14   call the natural portion of Bessey Creek is
15   extending to the northwest along here?
16     A.  Yes, where your cursor is now is, I
17   believe, the termination of that tributary.
18     Q.  Have you ever been to the location where
19   the excavated portion of Bessey Creek meets what you
20   call the natural portion of Bessey Creek?
21     A.  Not that specific intersection, no.  I've
22   been around it, but I've never been in the ditch
23   or the creek at that location, no.
24     Q.  Earlier, when you laid out your opinions,
25   in addition to the ones we discussed already, you

Page 220

1    mentioned construction in the earlier part of the
2    20th century, what you called ditches, expectation
3    that Bessey Creek terminates in or around Boat Ramp
4    Road, and an opinion that the BLM document that we
5    looked at earlier from 1845 shows where Bessey Creek
6    terminates.  Is that correct?
7      A.  Yes.  I believe the BLM Management Survey
8    of 1845 accurately depicts where the termination
9    of that fork of Bessey Creek exists.
10     Q.  Did we discuss both of those opinions over
11   the course of your testimony today?
12     A.  I believe we did.  I recollected that.
13     Q.  Are there any bases of those opinions that
14   we have not yet addressed?
15     A.  Can you repeat what you understand my
16   opinions to be?
17     Q.  First, construction processes in the early
18   part of the 20th century, and, two, that Bessey
19   Creek terminates in or around Boat Ramp Road.
20     A.  Generally speaking, yes.  You asked me
21   details about my opinions, but I provided opinions
22   on both of those subjects during the testimony.
23     Q.  I'm sorry, I just missed that answer.
24     A.  Essentially I provided opinions generally
25   on those topics.  You didn't specifically state my

RICHARD CREECH                                      May 24, 2022
USA vs SHARFI                                       221–224

Page 221

1  opinions, but I would say generally I talked about
2  those and provided opinions.
3      Q.   How would you specifically describe those
4  opinions?
5      A.   When I talked about construction in the
6  early 20th century I was very specific about
7  equipment, methods, means, financial commitments,
8  the legislature, and typically the time frames
9  that those would take place.
10     Q.   Understood.  You're saying that I was
11  general in my description of your opinions?  Is that
12  fair?
13     A.   That's fair.
14     Q.   Earlier in your testimony did we discuss
15  all of the bases of your opinion about construction,
16  processes in the early 20th century of what you
17  called ditches?
18     A.   That's a fair statement.
19     Q.   And have we discussed all of the bases of
20  your opinion that Bessey Creek stops in or around
21  Boat Ramp Road?
22     A.   In the general vicinity of Boat Ramp
23  Road.  That's a good generalization of it, as I
24  can reflect it.
25     Q.   So we discussed the following opinions:

Page 222

1  That the ditches -- withdrawn.
2      We discussed your opinion that the
3  north-south ditch and the excavated portion of
4  Bessey Creek were constructed pursuant to the plan
5  of the Palm City Drainage District to provide land
6  for agriculture.  Is that correct?
7      A.   Land for agricultural and single-family
8  development.  You know, future residential
9  development.
10     Q.   Was that the purpose at the time the Palm
11  City Drainage District began excavating water
12  conveyances in the early part of the 20th century?
13     A.   That would not have been a primary
14  objective, no.
15     Q.   And then next we discussed that your
16  opinion that the north-south ditch and the excavated
17  portion of Bessey Creek are excavated in pine
18  flatwood uplands; is that correct?
19     A.   That's a fair statement.
20     Q.   And we discussed your opinion that the
21  excavated portion of Bessey Creek is not a
22  relocation of a tributary of Bessey Creek or not in
23  a tributary of Bessey Creek.  Is that fair?
24     A.   That's fair.
25     Q.   And we discussed your opinion that the

Page 223

1  north-south ditch and the excavated portion of
2  Bessey Creek have intermittent flow, as you defined
3  it; is that fair?
4      A.   That's a fair statement.
5      Q.   And then taking all of those together, are
6  there are other opinions -- withdrawn.
7      Taking all of those together, have we
8  explored all the bases of those opinions?
9      A.   All that I can reflect on and in my
10  report and I can recollect today, yes.
11     Q.   Do you have any other opinions that you
12  intend to offer in this matter?
13     A.   I really don't know what other opinions
14  might be offered, if asked, at trial or by you
15  later.
16     Q.   But you have not to date offered any other
17  opinions?  Is that fair?
18     A.   To date, no, I have not provided any
19  other opinions.
20     Q.   In this matter.  I'm sure you've provided
21  other opinions.
22     A.   I was trying to save that one for you.
23  Yes, exactly.
24     Q.   Do you recognize this document?
25     A.   Yes.

Page 224

1      Q.   What is this?
2      A.   It's the 1952 aerial in my Exhibit E in
3  the report.
4      Q.   And this is a document Bates stamped
5  SHARFIEXPERTS 85.  We will mark this as DX 181.
6      (DEFENDANTS' EXHIBIT 181, Aerial entitled
7  "1952(b) Aerial," Bates stamped SHARFIEXPERTS
8  85, was marked for identification, as of
9  today's date.)
10     Q.   Does this inform your opinions in your
11  report?
12     A.   Yes.  These are just a continuation of
13  the other opinions and plus the opinions that I've
14  provided in testimony today.  If you notice, this
15  is about the time that the north-south ditch
16  becomes more apparent.
17     Q.   And where do you see that?
18     A.   In that western portion of the property.
19     Q.   Can you count how many lines over from the
20  far left side it is?
21     A.   From the far left side, there's one
22  ditch, and then the next ditch is basically the
23  access to the dump, 480 4th Avenue, and then the
24  next one I believe to be the western-southern
25  ditch, if I'm correct.

RICHARD CREECH
USA vs SHARFI

May 24, 2022
225–228

Page 225

1   Q.   The northern-southern ditch?
2   A.   Well, the north-south ditch, yes, the
3   west side of the property.
4   Q.   To the best of what you have identified as
5   the north-south ditch, do you know what these darker
6   portions in that parcel are?
7   A.   Most likely they would represent wet
8   prairies or some type of wetland.  I even believe
9   the USGS identifies some of those wetlands on
10  their map.
11  Q.   You said it furthered your opinions that
12  you offered today.  What, if anything, about this
13  map furthers your opinions?
14  A.   It continues to show the northwest
15  extension of Bessey Creek to the northwest
16  section, corner of Section 15.
17      Actually, I believe a ditch has been
18  improved around that time period as it becomes
19  much more defined.  Their photography is getting
20  more refined, also.  And it continues to show that
21  the ditch is being utilized for drainage of runoff
22  and surface waters by the addition of additional
23  ditches coming from the north.
24  Q.   And in this rightmost portion sectioned off
25  of this document, DX 181, there is the portion you

Page 226

1   have identified to the northwest as a natural
2   portion of Bessey Creek.  Have you ever walked that
3   portion?
4   A.   I've walked portions of it, yes, but not
5   the entire portion, no.
6   Q.   Do you recall when?
7   A.   Five years ago, when they were doing
8   Citrus Boulevard.  I think Citrus Boulevard is
9   five.  I don't know, I might lose track of them.
10  And then much earlier.  I think I was trying to
11  locate that section corner and doing a boundary
12  survey in Section 15.
13  Q.   And what, if anything, did you do when you
14  visited what you have identified as the natural
15  portion of Bessey Creek to the northwest of Section
16  15 in the past?
17  A.   I just observed that it was a deeper
18  section of that area and had vegetation that
19  represented more of a creek or tributary of Bessey
20  Creek.
21  Q.   And what vegetation did you observe there?
22  A.   If I remember correctly, there's some
23  live oaks, where some of the coastal sands might
24  have been washed up, some palmettos, and some
25  maybe limited aquatic vegetation in and around the

Page 227

1   banks.  And I'm going back a while, guys, so it's
2   vague.
3   Q.   Are you familiar with the Army Corps of
4   Engineers Regional Supplement?
5   A.   I believe they have regional supplements
6   routinely.  But which one are you referring to?
7   Q.   For the local GU regional supplement.
8   A.   You'd have to be more specific or provide
9   me a copy of it.  But I'm aware of regional
10  supplements.
11  Q.   Have you ever used the Corps' regional
12  supplements in your work?
13  A.   In the past, I may have.  Recently, I
14  can't recollect that I have.
15  Q.   Which ones?
16  A.   You're going back a ways, counsellor.  I
17  don't remember.
18  Q.   Have you ever used the Army Corps of
19  Engineers' Natural Plant List?
20  A.   From time to time, yes.
21  Q.   Did you find it to be a reliable document?
22  A.   In most circumstances, I have
23  differences of opinion as to what they constitute
24  as a wetland vegetation or a wetland plant.  But
25  that's my opinion.

Page 228

1   Q.   And what do you base your disagreement with
2   the Army Corps of Engineers Natural Plant List?
3   A.   Just my field reconnaissance and doing
4   prior, you know, wetland inventories and
5   jurisdictions.
6   Q.   So your experience with your civil
7   engineering work?
8   A.   Yes.
9   Q.   I am showing you a document that we will
10  mark DX 182.
11      (DEFENDANTS' EXHIBIT 182, Aerial entitled
12  "1952(c) Aerial," Bates stamped SHARFIEXPERTS
13  86, was marked for identification, as of
14  today's date.)
15  Q.   Do you recognize this document?
16  A.   Yes, I do.
17  Q.   What is it?
18  A.   Again, it's an aerial from the 1950s,
19  representing a lower portion of the area of Bessey
20  Creek excavated ditch.
21  Q.   This is a document Bates stamped
22  SHARFIEXPERTS 86 and it's Exhibit F to your report,
23  "1952 (c) Aerial."
24      How, if at all, did this document inform
25  opinion in your report?

RICHARD CREECH                                    May 24, 2022
USA vs SHARFI                                          229–232

Page 229

1    A.   It essentially, again, identifies additional
2    lateral ditches that were constructed that tied
3    into the east-west ditch or the Bessey Creek
4    excavated ditch.
5         The other reason I looked at this was,
6    one, the laterals began to extend beyond Martin
7    Highway to the south.  So I was attempting to
8    ascertain whether these ditches drained to the
9    south or did the ditches drain to the north.
10        So I really didn't come to any conclusion.  I
11   just, you know, wanted to identify the subject
12   site is on this aerial, and that these laterals
13   were a continuation to the south.
14   Q.   And where would you identify the subject
15   site on this aerial?
16   A.   Again, counting over from the west side,
17   you've got the first ditch road, which is the, I
18   think, access to the dump, and that the
19   north-south ditch would be the next one over.  And
20   the site would be to the east of that.
21   Q.   Is there anything else about that document
22   that informed your opinion?
23   A.   Not that I recollect.
24   Q.   Do you recognize this document?
25   A.   Yes, I do.

Page 230

1    Q.   And what is it?
2    A.   It's one of my exhibits from my report,
3    Exhibit G, essentially a 1958 aerial of the
4    subject site.
5         MR. HUGHES:  We will mark this as DX
6    Exhibit 183.
7         (DEFENDANTS' EXHIBIT 183, Aerial entitled
8    "1958(a) Aerial," Bates stamped SHARFIEXPERTS
9    87, was marked for identification, as of
10   today's date.)
11   Q.   Did you rely on this document in forming
12   your opinions in your report?
13   A.   It's a continuation of my opinions in one
14   of the documents I've already testified about.
15   Q.   Is there anything about this exhibit that
16   is different, to your mind, or shows something
17   different than the earlier aerials that we looked
18   at?
19   A.   Not that I recollect, no.
20   Q.   Did this document inform your opinions in
21   any other way?
22   A.   No, other than just showing the development
23   of the area that's taken place, and that the ditch
24   still existed in 1958.
25   Q.   Where do you obtain these aerials?

Page 231

1    A.   Those aerials came from the University of
2    Florida archives, I think it's Smathers Aerial
3    Archives.
4    Q.   And how do you know this one is from 1958?
5    A.   They have a series of fly zones, or fly
6    dates, and that's how they are filed and archived.
7    This one here was 1958.  Normally they put it at
8    the top of the aerial.  And so they are all
9    identified as the 1958, or '52, or 1940, and they
10   are packaged in that box so that you can access
11   them.
12        Also, each of those panels have individual
13   larger-scale drawings that are part of the fly
14   zones.  Some of them have been destroyed or lost,
15   but most of them are still intact.
16   Q.   Do you recognize this document?
17   A.   Yes, I do.
18   Q.   What is it?
19   A.   It's another sequence of aerials of 1958,
20   that I mentioned earlier.  This is an aerial that
21   represents one of the panels that was on the
22   previous exhibit, that further shows the connection
23   of the natural tributary to the excavated portion
24   of Bessey Creek ditch.
25        MR. HUGHES:  We will mark this as DX 184.

Page 232

1        (DEFENDANTS' EXHIBIT 184, Aerial entitled
2    "Exhibit H-1958(b) Aerial," Bates stamped
3    SHARFIEXPERTS 88, was marked for
4    identification, as of today's date.)
5    Q.   How does this document inform your
6    opinions, if at all?
7    A.   It continues to provide me further evidence
8    of my previous opinions.
9    Q.   And is there anything that this document
10   provides that is different from the earlier aerials
11   that we have looked at?
12   A.   Not that I recollect, no.
13   Q.   And does this document, DX 184, inform your
14   opinion in your report in any other way?
15   A.   Not that I recollect, no.
16   Q.   Do you recognize this document?
17   A.   Yes, I do.
18        MR. HUGHES:  We will mark this DX 185.
19        (DEFENDANTS' EXHIBIT 185, Aerial entitled
20   "1970 Aerial," Bates stamped SHARFIEXPERTS 89
21   was marked for identification, as of today's
22   date.)
23   Q.   What is this document?
24   A.   This is a -- this is Exhibit I of my
25   report.  It is a larger scale 1970s aerial of the

RICHARD CREECH
USA vs SHARFI

May 24, 2022
233–236

Page 233

1  general vicinity of the site.
2      Q.   How, if at all, did this document inform
3  the opinions contained in your report?
4      A.   Continuation to support my testimony
5  previously.
6      Q.   Does this document show anything different
7  from the earlier aerials that we have looked that
8  informed your report, the opinions in your report?
9      A.   It may.  You can zoom in onto the project
10  site area, if you like.  Essentially, again,
11  coming from the west, you're starting to notice
12  that some of the area has started to become
13  developed.
14          If you look in and around where the DOJ
15  experts reviewed I think similar wetlands, what
16  they call it, or trying to find areas that were
17  similar, you can notice that there's now rows of a
18  historical citrus grove that is draining into the
19  ditch.
20          So this was typical of the time period of
21  where citrus groves were constructed in basically
22  higher topography or uplands and then drained into
23  lateral ditches, very much as the Bessey Creek
24  excavated ditch, furthering the evidence that
25  these constructed infrastructure was provided for

Page 234

1  small farms and agricultural interests.
2      Q.   And where on this document, DX 185, do you
3  see evidence of citrus groves?
4      A.   If you zoom in further, on that basically
5  that 40-acre parcel right there.  If you look to
6  the north of the ditch, you will see furrows, and
7  the spacing is consistent with my experience in
8  designing citrus groves.
9      Q.   Anything else about this document, DX 185,
10  inform your opinions in this case?
11      A.   Not that I recollect, no.  That was the
12  only thing.
13      Q.   Do you recognize this document?
14      A.   Yes, I do.
15          MR. HUGHES:  We will mark this DX 186.
16          (DEFENDANTS' EXHIBIT 186, Aerial entitled
17      "1981(a) Aerial," Bates stamped SHARFIEXPERTS
18      90, was marked for identification, as of
19      today's date.)
20      Q.   What is this document?
21      A.   This is, again, a larger scale aerial of
22  the Palm City-Stuart area, labeled as Exhibit J
23  from 1981 of my report.
24      Q.   And how, if at all, does this document
25  inform your opinions contained in your report?

Page 235

1      A.   It essentially just further provides
2  evidence of Bessey Creek and the development in
3  and around Bessey Creek.  It was more, you know,
4  for my benefit of the C-23 Canal being constructed
5  and being much more developed in that general
6  vicinity.  The subdivisions being generally
7  developed east of the Turnpike, and the western
8  portion of the Turnpike remained fairly agricultural
9  or some residential communities.
10      Q.   Anything else about this document inform
11  your opinions in your report?
12      A.   Not that I recollect, no.  It's really
13  just anecdotal information for the region.
14      Q.   Do you recognize this document?
15      A.   Yes, I do.
16          MR. HUGHES:  We will mark it DX 187.
17          (DEFENDANTS' EXHIBIT 187, Aerial entitled
18      "1981(b) Aerial," Bates stamped SHARFIEXPERTS
19      91, was marked for identification, as of
20      today's date.)
21      Q.   What is this document?
22      A.   This document is Exhibit K of my report,
23  again, the larger scale of the 1981 aerial.  This
24  one here is more aligned with the subject site,
25  and the excavated ditch of Bessey Creek and then

Page 236

1  the north-south ditch.
2      Q.   How, if at all, did this document inform
3  your opinions contained in your report?
4      A.   If you zoom into the site, which is in
5  the relative center, north part of the aerial --
6  keep going.  The Martin Highway is the main road
7  running through there, and then we're just north
8  of that.
9          This aerial shows the various activities
10  taking place in and around the project site.  It
11  still shows the ditch being open and notorious.
12  And I believe there's remnants of a citrus grove,
13  I believe on the south side of the ditch now, and
14  the south ditch is not necessarily prominent, but
15  it's there, the north-south ditch.
16          So just showing how the area is evolving
17  and the ditches are still there and still
18  functioning.
19      Q.   And you mentioned multiple times as we've
20  been looking at these aerials that they showed a
21  development of the area.  How does the development
22  of the area, if at all, inform the opinions in your
23  report?
24      A.   It essentially shows that the purpose of
25  the drainage infrastructure is allowing this

RICHARD CREECH                                          May 24, 2022
USA vs SHARFI                                              237–240

Page 237

1  construction to occur, and can continue to occur,
2  and that the function of the Palm City Reclamation
3  Plan for Palm City Drainage District is achieving
4  its goals that was set about in the 1920s.
5      Q.  Is there anything else about this document,
6  DX 187, that informs the opinions in your report?
7      A.  Not that I recollect, no.
8      Q.  Do you recognize this document?
9      A.  Yes, I do.
10         MR. HUGHES:  We will mark this DX Exhibit
11  188.
12         (DEFENDANTS' EXHIBIT 188, Reproduction
13      from the Department of Justice's expert
14      team's report, "Figure iii.C.1.1," Bates
15      stamped SHARFIEXPERTS 92 was marked for
16      identification, as of today's date.)
17      Q.  What is this document?
18      A.  The document is labeled Exhibit L in my
19  report, which is essentially a generic reproduction
20  of the Department of Justice's expert team's
21  report, showing various tributaries, ditches, and
22  the subject site.
23      Q.  And is this a copy or a reproduction of
24  Figure iii.C.1.1 in the DOJ's team expert report?
25      A.  That's correct.

Page 238

1      Q.  And did this document inform the opinion
2  contained in your report?
3      A.  It really had no basis on the opinions,
4  other than it provided me and the reader the
5  location of the subject site, and the ditches that
6  were being referred to in the report.
7      Q.  Did this document inform anything else
8  about the opinions contained in your report?
9      A.  Not that I recollect.
10      Q.  Do you recognize this document?
11      A.  Yes.
12         MR. HUGHES:  We will mark this DX 169.
13         (DEFENDANTS' EXHIBIT 169, Report dated
14      April 7, 2022 by Richard Creech, Bates
15      stamped SHARFIEXPERTS 78 through 80, was
16      marked for identification, as of today's date.)
17      Q.  What is this document?
18      A.  That is the report that I issued on April
19  7, 2022.
20      Q.  And if we scroll down to the second page,
21  what appears to be the second full paragraph, it
22  says, "As part of this undertaking, based on my
23  experience, the construction of these types of
24  ditches were established along convenient lines of
25  site, such as trails, limited vegetation, cleared

Page 239

1  paths, or along boundaries, sectional tract lines,
2  or established platted property lines."
3      Q.  Did I read that correctly?
4      A.  Yes.
5      Q.  And by this undertaking, are you referring
6  to your opinion that the excavated portion of Bessey
7  Creek and the north-south ditch were excavated
8  pursuant to the Palm City Drainage District's
9  Reclamation Project?
10      A.  That's correct.
11      Q.  And do you know if the excavated portion of
12  Bessey Creek was constructed along convenient lines
13  of site?
14      A.  Do I know?
15      Q.  Yes.
16      A.  I wasn't there, counsellor, so I don't
17  know.  All I can do is refer to my specialized
18  experience and knowledge of how most of the
19  ditches or all of the ditches have been
20  constructed in a lot of drainage districts.
21         And this would be a drainage district
22  that would be fairly common and constructed in
23  those common techniques at that time period.
24      Q.  And your basis for that is your knowledge
25  of how other drainage districts were constructed

Page 240

1  based on reviewing statutes or speaking with
2  contractors?
3      A.  Among other things.  For example, in the
4  reviews of aerials in Palm City at that time,
5  there were convenient lines of site, there were
6  hammocks that needed to be avoided, that would
7  have escalated the cost of some of these ditches.
8         So it's more than just, oh, I talked to a
9  few people.  It is really just my knowledge of how
10  drainage districts were created, how they were
11  constructed, and my surveying knowledge of how
12  some of these things may have been staked to avoid
13  an expense, and maybe it was more convenient
14  topographically.
15         So there's a lot of knowledge that goes
16  into that opinion other than just those two things.
17      Q.  You referred to aerials.  You haven't
18  identified any aerials that provide a basis to state
19  that the construction of the excavated portion of
20  Bessey Creek was constructed along convenient lines
21  of site; correct?
22      A.  No, I have not.
23      Q.  And we have established that the excavated
24  portion of Bessey Creek was not excavated along
25  boundaries, sectional tract lines or established

RICHARD CREECH
USA vs SHARFI

May 24, 2022
241–244

Page 241

1 private property lines; correct?
2    A.  I can't say that one way or the other.
3 There may have been a property line that I have
4 not researched that would have been a legal
5 description that would have given up a portion of
6 those lots that may have identified the linear
7 portion of that ditch.
8        There's other investigations that can
9 take place to determine why that ditch is where
10 it's at.  But a lot of times those ditches were
11 built conveniently and along topographic lines to
12 collect, you know, rock.
13       So it's hard to say.  But it would fall
14 into some of those categories.
15    Q.  But you haven't reviewed those documents or
16 conducted those analyses, have you?
17    A.  No, I have not.
18    Q.  And further down in this same paragraph,
19 second full paragraph on page 2 of your report, you
20 write, "It would have been atypical for these
21 drainage ditches to be constructed along historical
22 creek or river tributary lines or paths, as this
23 would not serve the lot owners' needs conveniently."
24       Did I read that correctly?
25    A.  Yes.

Page 242

1    Q.  How do you define atypical?
2    A.  Atypical is not the normal process.  It
3 doesn't mean that it wouldn't happen.  It's just
4 that it would be inconvenient or costly to go down
5 that rabbit role of constructing in problematic
6 mucky type areas that would cost more money and
7 cost time.
8    Q.  On the next page you write, "The Soil
9 Survey provides a good indicator that these ditches
10 were constructed in uplands, albeit many agencies
11 and municipalities remark that these 'could be'
12 hydric soils, the soils largely reflect pine
13 flatwoods or upland areas."
14       Did I read that correctly?
15    A.  Yes.
16    Q.  What soils are you referring to in this
17 sentence?
18    A.  As you and I discussed and testified
19 earlier, and you've brought out that a couple of
20 the soils may have been, or are, as part of the
21 NCR identified as hydric soils.
22       You know, this is a relatively new, at
23 least in my career, identification, as hydric and
24 nonhydric, or upland and wetland versus, you know,
25 swamp and pine flatwoods.

Page 243

1        So I'm recognizing as an expert that,
2 yeah, there might be hydric soils out there that
3 may have existed at the time that meet the
4 definition of hydric soils today.  But my
5 experience, the majority of that ditch line was
6 constructed in upland.
7    Q.  I think you said that the categorization of
8 soils as hydric or uplands is a recent innovation;
9 is that correct?
10    A.  Yes.
11    Q.  When did that take place, if you know?
12    A.  On a regulatory level, I would suspect
13 that, in my recollection, probably about 20 years
14 ago, 25 years ago.
15    Q.  What agencies and municipalities are you
16 referring to in this sentence that remarks that
17 these soils could be hydric?
18    A.  The ones I've mentioned in the past, the
19 municipalities of Martin County, more specific
20 because the site line is in Martin County, but a
21 lot of the municipalities and counties in the
22 state have adopted certain parameters that
23 regulatory has issued for hydric soils.
24       The South Florida Water Management
25 District has issued, the Army Corps has issued,

Page 244

1 and the Florida Department of Environmental
2 Protection, have issued guidances and guidelines
3 with respect to what a hydric soil might be.
4    Q.  Do you have an agreement to be compensated
5 for rendering an expert opinion in this case?
6    A.  Of course.
7    Q.  And what is that?
8    A.  It's on a time and materials basis, and I
9 get $250 an hour.
10    Q.  Is that the same amount that you receive
11 for testimony?
12    A.  Yes.
13    Q.  Do you know how much you have been paid in
14 relation to this action to date?
15    A.  Approximately, I'd say, $12,000 or $13,000.
16    Q.  And do you understand that you will be
17 compensated for testifying today?
18    A.  That's my hope and prayer, yes.
19    Q.  And do you intend to testify at trial in
20 this case?
21    A.  If I'm requested to, yes.
22    Q.  And do you expect to be compensated for
23 that testimony as well?
24    A.  I believe I will.
25    Q.  Are you familiar with a company called 100

RICHARD CREECH
USA vs SHARFI

May 24, 2022
245–248

Page 245

1  Acre Woods Penn, LLC?
2  A.  Yes.
3  Q.  What is that?
4  A.  That's my LLC for a hundred acres that I
5  own in North Central Pennsylvania for hunting and
6  recreation.
7  Q.  Are you familiar with Wade Trim?
8  A.  Yes.
9  Q.  What or who is Wade Trim?
10  A.  Wade Trim is an engineering firm that's
11  located with various offices throughout the
12  country, but mostly Michigan is their headquarters.
13  Q.  Do you have a relationship with Wade Trim?
14  A.  From time to time.
15  Q.  And what is that relationship?
16  A.  Originally I worked for them for roughly
17  about 18 months, helping them develop their
18  southeastern offices in Texas and the southeast,
19  and then from time to time they ask me to join
20  their teams or on certain requests for proposals.
21  Q.  And do you work with them as an employee of
22  Wade Trim or as a consultant?
23  A.  As a consultant.
24  Q.  Are you familiar with the Bowman Consulting
25  Group?

Page 246

1  A.  Yes.
2  Q.  What is that?
3  A.  That is the firm that purchased my
4  original firm back in 2013.  They are also an
5  engineering and survey firm throughout the country
6  that performs, you know, civil engineering and
7  surveying, including all of the functions I
8  mentioned earlier in my testimony.
9  Q.  And what was the firm that Bowman
10  Consulting Group bought from you?
11  A.  They bought Creech Engineers, Inc.
12  Q.  Did you start Creech Engineers, Inc.?
13  A.  Yes, August 1988.
14  Q.  Did you ever work for an entity with a
15  similar name before that?
16  A.  My father, Creech & Associates.
17  Q.  Are you familiar with CFB, LLC?
18  A.  Yes.  It's a company that's owned by me
19  and my daughters for real estate holdings.
20  Q.  And are you familiar with a company called
21  Native Born Properties?
22  A.  Yes.
23  Q.  What is that?
24  A.  That is a defunct corporation now, but it
25  was for real estate holdings for my Tallahassee

Page 247

1  office.
2  Q.  Has your expert opinion ever been rejected
3  in a legal proceeding?
4  A.  No, sir.
5  MR. HUGHES:  Off the record.
6  THE VIDEOGRAPHER:  We are now going off
7  the record, and the time is 4:53 p.m.
8  (A recess was taken.)
9  THE VIDEOGRAPHER:  We are now going on
10  the record, and the time is 5:07 p.m.
11  BY MR. HUGHES:
12  Q.  When did you sell Creech Engineers to
13  Bowman Consulting Group?
14  MR. HAMILTON:  Object to relevance of
15  that, but go ahead.
16  A.  2013.
17  Q.  Did Creech Engineers ever do any work for
18  Martin County in or around Manatee Creek?
19  A.  Yes.
20  Q.  What was that work?
21  A.  Stormwater retrofit.
22  Q.  And what did that consist of?
23  A.  Pretty much everything I talked about
24  earlier in my testimony, along with constructing
25  or designing a stormwater retrofit to improve the

Page 248

1  water quality of two DOT ditches, lateral ditches
2  that discharged into the Manatee -- well, basically,
3  the Indian River Lagoon.
4  Q.  Where did that work take place?
5  A.  Say it again.
6  Q.  Where did that work take place?
7  A.  Martin County.
8  Q.  East side, west side, north, south?
9  A.  Essentially, east, just south of Port
10  Salerno.  South Central.
11  Q.  Did a crew on that project damage a
12  wetland?
13  A.  On Manatee?  No.
14  Q.  Do you know if a crew on any projects you
15  worked on have ever damaged a wetland?
16  MR. HAMILTON:  Object to form.
17  A.  I worked on a lot of projects with a
18  wetland, you know, where impacts have happened
19  accidentally.  I can't think of anything that my
20  company or my crews have ever done.
21  Q.  What about Martin County crews under the
22  direction of Creech Engineers?
23  MR. HAMILTON:  Object to form.
24  A.  I don't direct any Martin County crews
25  there, because, you know, they direct themselves.

RICHARD CREECH
USA vs SHARFI

May 24, 2022
249–252

Page 249

1 You know, the County doesn't allow the engineer to
2 direct.  It's not in my scope to direct Martin
3 County crews.
4    Q.  Do you know if EPA ever determined that
5 work done in connection with your stormwater
6 retrofit in or around Manatee Creek constituted a
7 Clean Water Act violation?
8       MR. HAMILTON:  Object to form.
9    A.  The Work I've done has violated --
10    Q.  Has work connected to your stormwater
11 retrofit in or around Manatee Creek caused you a
12 Clear Water violation?
13       MR. HAMILTON:  Object to form.
14    A.  Creech Engineers and me personally have
15 not any involvement in a violation of the Clean
16 Water Act.  I know in a case where Martin County
17 had on done some limited clearing, you know, on
18 their own cognizance, had created an impact on
19 Eastford Creek in the Port Salerno area of Martin
20 County, in which I led the team to do the
21 restoration and the mitigation.
22    Q.  Where was that work located?
23    A.  Martin County.
24    Q.  Along what water body?
25    A.  Eastford Creek.

Page 250

1    Q.  I think I asked previously a slightly
2 different question, which was, do you know if work
3 done in connection to the stormwater retrofit that
4 you did in or around Manatee Creek resulted in what
5 EPA determined was a Clean Water Act violation?
6       MR. HAMILTON:  Object to form.
7    A.  Actually, when you opened up the
8 conversation and the questioning, you talked about
9 the stormwater retrofit at Manatee Creek.  So,
10 counsel, what's your question?
11    Q.  My question is, you said that the work that
12 you have done in or around Manatee Creek was a
13 stormwater retrofit; is that correct?
14    A.  Yes, for Manatee Creek.
15    Q.  Do you know if work done in connection with
16 the stormwater retrofit in or around Manatee Creek,
17 that EPA determined that that work constituted a
18 Clean Water Act violation?
19       MR. HAMILTON:  Object to form, asked and
20 answered, lack of foundation, compound.  I
21 can go on.  But go ahead.
22       MR. HUGHES:  You just need to say "Form."
23    A.  In the Manatee Creek area, no, that didn't
24 occur.
25    Q.  You don't recall ever waiving a fee of

Page 251

1 almost $50,000 in connection with work done in or
2 around Manatee Creek?
3       MR. HAMILTON:  Object to form.
4    A.  I recollect waiving a fee for work that
5 was done on Eastford Creek, with is a different
6 branch and is not part of Manatee Creek.
7    Q.  And so you waived the fee in connection for
8 work done in connection to Eastford Creek; is that
9 correct?
10       MR. HAMILTON:  Object to form.
11    A.  Yes.
12    Q.  And why did you do that?
13    A.  As part of a team approach to helping the
14 county, you know, repair what damages they had
15 provided.
16    Q.  And so is it your testimony that the County
17 damaged a wetland and as a result of that you waived
18 your fee in connection with that project?
19       MR. HAMILTON:  Object to form.
20    A.  Yes, the County damaged the wetland, and
21 as part of our participation in the project, we
22 waived whatever remaining fee we had associated
23 with the project so that they could help pay for it.
24    Q.  Do you know if EPA determined that the
25 damage done in Eastford Creek constituted a Clean

Page 252

1 Water Act violation?
2       MR. HAMILTON:  Object to form.
3    A.  I'm not aware of that, no.
4    Q.  Do you know if the county paid a fine in
5 connection to the damage to the wetland in or around
6 Eastford Creek?
7       MR. HAMILTON:  Object to form.
8    A.  My recollection is yes, we did pay a fine.
9    Q.  Do you know how much?
10    A.  I don't remember.
11    Q.  Do you know if the County paid for
12 restoration in or around Eastford Creek at that time?
13       MR. HAMILTON:  Object to form.
14    A.  Yes.  I helped them prepare the permit
15 applications, and design.
16    Q.  It's your testimony that you waived your
17 fee in connection with the work you did at Eastford
18 Creek as part of a team approach?  Is that what you
19 said?
20       MR. HAMILTON:  Object to form.
21    A.  Yes.
22    Q.  What do you mean by that?
23    A.  That we were all out on the project.  The
24 County, as they do from time to time, came to me
25 and said, and other consultants and said, "Look,

RICHARD CREECH
USA vs SHARFI

May 24, 2022
253–256

Page 253

1  you need to help participate because you are part
2  of the team."  And I said, with some debate, I
3  agreed to it.
4      Q.  And you at that point you had been engaged
5  to work on the project at Eastford Creek?
6          MR. HAMILTON:  Object to form.
7      A.  At that time I was engaged in doing
8  survey work behind the county crew for a flood
9  study for FEMA and Martin County.
10     Q.  And did you or anyone at Creech Engineers
11 direct the crew to engage in the clearing declaring
12 an issue at Eastford Creek?
13         MR. HAMILTON:  Object to form.
14     A.  No.
15         MR. HUGHES:  Mr. Creech, I have no
16 further questions at this time.  I thank you
17 very much.
18         CROSS EXAMINATION
19 BY MR. HAMILTON:
20     Q.  Mr. Creech, again, just for the record, my
21 name is Chris Hamilton.  I represent the defendants
22 in this matter.  I just have two or three, I think,
23 maybe a handful of followup questions for you.  I
24 know your wife is waiting for you, and it's been a
25 long day.

Page 254

1        So earlier Mr. Hughes asked you about, he
2  discussed a swale that you observed when you were
3  out on the property.  And when I say the property, I
4  mean the site yesterday.  Do you recall that line of
5  questioning?
6      A.  Yes.
7      Q.  When I say site, just, again, I know Mr.
8  Hughes has said it, but I'm talking specifically
9  about the 9.92-acre northeast portion of the farm.
10 Does that make sense?
11     A.  Yes.
12     Q.  So when you talked about the swale, it
13 wasn't clear, at least to me, specifically where you
14 were talking about.  So were you talking about the
15 north-south ditch that Mr. Hughes has been
16 discussing with you today?
17     A.  No.  It was a swale that went east-west.
18     Q.  And would you agree that generally that
19 east-west --
20        So you know that Neshafarm is comprised of
21 three parcels; correct?
22        MR HUGHES:  Objection to form.
23     A.  Correct.
24     Q.  And they are each just under ten acres?
25     A.  Roughly, yes.

Page 255

1      Q.  And the east-west portion that you are
2  talking about, is that north of the southwest parcel
3  or the northeast parcel?
4      A.  That is north of the southwest parcel.
5      Q.  And did you make any observations at all
6  whether that east-west ditch connects to the
7  north-south ditch that we have been discussing
8  today?
9      A.  Yes.
10     Q.  And what is that?
11     A.  It does connect.
12     Q.  So when you were talking about grading --
13 let me back up.  You discussed some grading and
14 observing some greenhouses, and I think you said
15 tomatoes growing.  Do you recall that?
16     A.  Yes.
17     Q.  Were you talking about anything on
18 Neshafarm or another property?
19     A.  No, it was on the off-site parcel to the
20 north of Neshafarms.
21     Q.  When you say to the north, are you talking
22 about north of the southwest parcel?
23     A.  That's correct.
24     Q.  So that would be the parcel west of the
25 site.

Page 256

1          MR. HUGHES:  Objection.
2      A.  Correct.
3      Q.  Let me back up, just for clarity, since
4  there is an objection.
5          The property that's to the north of the
6  southwest parcel, is it west of the site?
7      A.  Yes.
8      Q.  So when you were talking and making
9  observations about grading, was that of the site or
10 of the neighboring property?
11     A.  The neighboring property.
12     Q.  So when you had that discussion with Mr.
13 Hughes, you were referencing things that were done
14 on the neighboring property, not on the site?
15     A.  That's correct.
16         MR. HAMILTON:  Just give me like two
17 minutes, Mr. Hughes, but I think I'm probably
18 done.  Let me just check my notes.
19         MR. HUGHES:  No problem.
20         THE VIDEOGRAPHER:  We are now going off
21 the record, and the time is 5:19 p.m.
22         (A recess was taken.)
23         THE VIDEOGRAPHER:  We are now going back
24 on the record, and the time is 5:20 p.m.
25         MR. HAMILTON:  Mr. Creech, thank you for

RICHARD CREECH
USA vs SHARFI

May 24, 2022
257–260

Page 257

1  your time.  We have no further questions for
2  you.
3       Mr. Hughes may have a followup or may
4  not, but otherwise, I think we are done.  You
5  will have the option whether you want to read
6  or waive the signing of the transcript.
7       THE WITNESS:  I prefer to read.
8       MR. HUGHES:  I just have one followup,
9  not much more.
10       REDIRECT EXAMINATION
11  BY MR. HUGHES:
12    Q.  Mr. Creech, when we refer to the site,
13  we're referring to the 9.92-acre parcel at issue in
14  this case.  You understand that?
15    A.  That's my understanding, yes.
16    Q.  When you visited the site -- and you just
17  visited the site yesterday?
18    A.  That's correct.
19    Q.  When you visited the site yesterday, did
20  you observe a swale north of, or at the northern
21  edge of the site?
22    A.  The northern edge of the site?
23    Q.  North of or along the northern edge of the
24  site.
25    A.  I don't recollect seeing one.  Not that

Page 258

1  there's one.  I just don't know, sorry.
2       MR. HUGHES:  No further questions.
3       THE VIDEOGRAPHER:  Is there an order for
4  the video, Mr. Hamilton?
5       MR. HAMILTON:  We will not order the
6  video at this time, no.  And we're not going
7  to order the transcript unless Mr. Hughes
8  wants it.
9       MR. HUGHES:  I expect I will, but I will
10  follow up shortly.
11       MR. HAMILTON:  If he orders, we will
12  probably take a copy.
13       THE VIDEOGRAPHER:  This concludes today's
14  testimony given by Richard Creech.  We are
15  now going off the record.  It's Tuesday, May
16  24 of 2022, and the time is 5:22 p.m.
17    (Witness excused.)
18    (Deposition was concluded.)
19
20
21
22
23
24
25

Page 259

1
2
3  Assignment No: #J8348161
4  United States of America
5  vs.
6  Benjamin K. Sharfi, et al.
7       DECLARATION UNDER PENALTY OF PERJURY
8
9       I declare under penalty of perjury that I have
10  read the entire transcript of my deposition/examination
11  under oath taken in the captioned matter or the same
12  has been read to me, and the same is true and accurate,
13  save and except for changes and/or corrections, if any,
14  as indicated by me on the DEPOSITION ERRATA SHEET
15  hereof, with the understanding that I offer these
16  changes as if still under oath.
17
18       Signed on the _____ day of _____,
19  20___.
20
21       _____
22       RICHARD CREECH
23
24
25

Page 260

1       DEPOSITION ERRATA SHEET
2
3  Page No._____Line No._____Change to: _____
4  _____
5  Reason for change: _____
6  Page No._____Line No._____Change to: _____
7  _____
8  Reason for change: _____
9  Page No._____Line No._____Change to: _____
10  _____
11  Reason for change: _____
12  Page No._____Line No._____Change to: _____
13  _____
14  Reason for change: _____
15  Page No._____Line No._____Change to: _____
16  _____
17  Reason for change: _____
18  Page No._____Line No._____Change to: _____
19  _____
20  Reason for change: _____
21  Page No._____Line No._____Change to: _____
22  _____
23  Reason for change: _____
24  SIGNATURE:_____DATE:_____
25       RICHARD CREECH #J8348161

RICHARD CREECH
USA vs SHARFI

May 24, 2022
261–263

Page 261

1         DEPOSITION ERRATA SHEET

2

3  Page No.____Line No.____Change to: _____

4  _____

5  Reason for change: _____

6  Page No.____Line No.____Change to: _____

7  _____

8  Reason for change: _____

9  Page No.____Line No.____Change to: _____

10  _____

11  Reason for change: _____

12  Page No.____Line No.____Change to: _____

13  _____

14  Reason for change: _____

15  Page No.____Line No.____Change to: _____

16  _____

17  Reason for change: _____

18  Page No.____Line No.____Change to: _____

19  _____

20  Reason for change: _____

21  Page No.____Line No.____Change to: _____

22  _____

23  Reason for change: _____

24  SIGNATURE:_____DATE:_____

25      RICHARD CREECH  #J8348161

Page 263

1        REPORTER'S CERTIFICATE

2

3      I, JACK FINZ, Notary Public in and for the
   State of Florida at Large, do hereby certify that I

4  was authorized to and did report said deposition in
  stenotype; and that the foregoing pages are a true and

5  correct transcription of my shorthand notes of said
  deposition.

6

7      I further certify that said deposition was
  taken at the time and place hereinabove set forth and
  that the taking of said deposition was commenced and

8  completed as hereinabove set out.

9      I further certify that I am not an
  attorney or counsel of any of the parties, nor am I a

10  relative or employee of any attorney or counsel of
  party connected with the action, nor am I financially

11  interested in the action.

12      The foregoing certification of this
  transcript does not apply to any reproduction of the

13  same by any means unless under the direct control
  and/or direction of the certifying reporter.

14

     DATED this 26th day of June, 2022.

15

16     _____

17    JACK FINZ
     #J8348161

18

19

20

21

22

23

24

25

Page 262

1    C E R T I F I C A T E  O F  O A T H

2

3

4  STATE OF FLORIDA,

5  COUNTY OF PALM BEACH

6

7      I, the undersigned authority and Notary

8  Public certify that RICHARD CREECH personally appeared

9  before me and was duly sworn on May 24, 2022.

10

11      Sworn to before me this 24th day of May,

12  2022.

13

14

15

16

17    _____
      Jack Finz

18      Notary Public - State of Florida
    Commission No:  HH 051759

19     Commission Expires:  October 15, 2024
    #8348161

20

21

22

23

24

25