# EXHIBIT 9



**BDA**
ENVIRONMENTAL CONSULTANTS

**2021040-10.1**

**UNITED STATES V. BENJAMIN K. SHARFI AND
NESHAFARM INC.
CASE NO. 2:21-CV-14205-KAM**

**ANALYSIS AND REBUTTAL TO U.S. DEPARTMENT OF
JUSTICE
EXPERT TEAM REPORT, FEBRUARY 18, 2022**

Prepared by:

W. Michael Dennis, Ph.D.
President
Breedlove, Dennis & Associates, Inc.
330 West Canton Avenue
Winter Park, Florida  32789

April 8, 2022

Submitted by:

W. Michael Dennis, Ph.D.
President

129048180.1

BREEDLOVE, DENNIS & ASSOCIATES, INC.

☑ 330 W. Canton Ave. ~ Winter Park, FL 32789-3195       ☐ 30 East Liberty St. ~ Brooksvil[...]
Phone: 407-677-1882 ~ Fax: 407-657-7008                Phone: 352-799-9488 ~ Fax: [...]

**194**

SHARFIEXPERTS0000101

**TABLE OF CONTENTS**

LIST OF FIGURES .................................................................................................... i

1.0    INTRODUCTION ......................................................................................... 1

2.0    REVIEW OF DOJ EXPERT TEAM REPORT STUDY AREA ........................ 4

     2.1    Study Area ........................................................................................... 4
     2.2    Review of Existing Data Sources ........................................................ 4

3.0    ANALYSIS OF PRIOR AND CURRENT LAND USES ................................ 6

     3.1    Historic Patterns of Land Use ............................................................. 6
     3.2    Current Land Use ................................................................................. 6

4.0    ANALYSIS OF WETLANDS AND WATER FEATURES .......................... 16

     4.1    Overview ............................................................................................ 16
     4.2    The Natural Reach of Bessey Creek and Connecting Ditch System ... 16
     4.3    North-South Ditches .......................................................................... 19
     4.4    Other Ditches Near the 9.92-Acre Site .............................................. 21
     4.5    Stream Order ...................................................................................... 21
     4.6    DOJ Expert Team Report Continuous Flow Pathway ........................ 23
     4.7    Field Survey of DOJ Expert Team Report Primary Flow Pathway .... 25

5.0    WETLANDS AND WATERS OF THE UNITED STATES - DEFINITIONS ........ 38

6.0    RAPANOS GUIDANCE ............................................................................. 41

7.0    REVIEW OF AREAS OF ALLEGED IMPACTS TO WATERS OF THE UNITED STATES .. 43

     7.1    9.92-Acre Site ................................................................................... 43

          7.1.1    U.S. Department of Justice Expert Team Report Delineation ........... 43
          7.1.2    DLS Environmental Delineation ....................................................... 43
          7.1.3    EDC Wetland Delineation ................................................................. 45
          7.1.4    Analysis of Extent of Onsite Wetlands ............................................. 45

     7.2    Analysis of the "waters of the United States" .................................... 49

          7.2.1    Traditional Navigable Waters ............................................................ 49
          7.2.2    Relatively Permanent Non-navigable Tributaries of Traditional Navigable Waters and Wetlands with a Continuous Surface Connection with such Tributaries ...... 50
          7.2.3    Analysis of the Adjacent Wetlands and Non-navigable Tributaries That Are Not Relatively Permanent .............................................................. 54

129048180.1

SHARFIEXPERTS0000102

7.3    Fact-Specific Analysis of Significant Nexus with Traditionally Navigable Waters......... 60

      7.3.1   Physical Characteristics ......................................................................... 63
      7.3.2   Chemical Characteristics ........................................................................ 65
      7.3.3   Biological Characteristics ....................................................................... 68

8.0    CONCLUSIONS ....................................................................................................... 70

9.0    REFERENCES ......................................................................................................... 71

APPENDIX 1    AMENDED COMPLAINT

APPENDIX 2    DOJ EXPERT TEAM REPORT FEBRUARY 18, 2022

APPENDIX 3    TOPOGRAPHIC SURVEY OF DITCHES AND DOJ EXPERT REPORT PRIMARY FLOW PATHWAY

APPENDIX 4    SITE INSPECTION PHOTOGRAPHS

APPENDIX 5    CLEAN WATER ACT JURISDICTION FOLLOWING THE U.S. SUPREME COURT'S DECISION IN RAPANOS V. UNITED STATES & CARABELLE V. UNITED STATES GUIDANCE MEMORANDUM DECEMBER 2, 2008

APPENDIX 6    BENJAMIN SHARFI 2002 TRUST INFORMAL JD APPLICATION NO. 180402-436 INFORMAL WETLAND DETERMINATION NO. 100235-P ISSUED 26 APRIL 2018

APPENDIX 7    PRESERVE AREA MANAGEMENT PLAN/ABBREVIATED PRESERVE AREA MANAGEMENT PLAN PREPARED BY EDC

APPENDIX 8    UNITED STATES OF AMERICA, PLAINTIFF-APPELLEE-CROSS APPELLANT V. CHARLES BARRY ROBISON, DEFENDANT, MCWANE, INC., DEFENDANT-APPELLANT, JAMES DELK, MICHAEL DEVINE, DEFFENDANTS-APPELLANTS-CROSS APPELLEES (CASE NO. 05-17019)

APPENDIX 9    CURRICULUM VITAE FOR DR. W. MICHAEL DENNIS

SHARFIEXPERTS0000103

## LIST OF FIGURES

Figure 1      Figure V.D.1.a.5 Perennial flow from the Site wetlands to the Atlantic Ocean (from the DOJ Expert Team Report) ...........................................................................................................................3

Figure 2      Figure II.B.1. SFWMD Basin 4 selected as Study Area (from the DOJ Expert Team Report).5

Figure 3      1950 Aerial Photograph of the 9.92-Acre Site Study Area, Martin County, Florida ................7

Figure 4      1969 Aerial Photograph of the 9.92-Acre Site Study Area, Martin County, Florida ...............8

Figure 5      1980 Aerial Photograph of the 9.92-Acre Site Study Area, Martin County, Florida ...............9

Figure 6      1994 Aerial Photograph of the 9.92-Acre Site Study Area, Martin County, Florida ..............10

Figure 7      1999 Aerial Photograph of the 9.92-Acre Site Study Area, Martin County, Florida ..............11

Figure 8      1920 Map of Canal Reclamation Plan for Palm City Drainage District for the 9.92-Acre Site Study Area, Martin County, Florida .......................................................................................12

Figure 9      National Hydrography Database (NHD) Map of the 9.92-Acre Site Study Area, Martin County, Florida ........................................................................................................................13

Figure 10     2021 Aerial Photograph of the 9.92-Acre Site Study Area, Martin County, Florida ..............14

Figure 11     USGS 1956 Topographic Quadrangle Map of the 9.92-Acre Site Study Area, Martin County, Florida .......................................................................................................................17

Figure 12     USGS 1984 Topographic Quadrangle Map of the 9.92-Acre Site Study Area, Martin County, Florida .......................................................................................................................18

Figure 13     SFWMD Drainage Basin Map for Martin County for the 9.92-Acre Site Study Area, Martin County, Florida ........................................................................................................................20

Figure 14     Ditches and Surface Flow Pathway for the 9.92-Acre Site Study Area, Martin County, Florida ........................................................................................................................22

Figure 16     Elevation Survey Data for the 9.92-Acre Site Study Area, Martin County, Florida ..............28

Figure 17     Figure V.G.1.b.1. from the DOJ Expert Team Report.............................................................44

Figure 18     Exhibit G included in DOJ Expert Team Report as Figure V.C.1.1.b.....................................46

Figure 19     Figure V.C.1.1.a. from the DOJ Expert Team Report .............................................................48

Figure 20     USFWS National Wetlands Inventory Map of the 9.92-Acre Site Study Area, Martin County, Florida ........................................................................................................................51

SHARFIEXPERTS0000104

Figure 21    FLUCFCS Map of the 9.92-Acre Site Study Area, Martin County, Florida ...........................52

Figure 22    NRCS Soils Map of the 9.92-Acre Site Study Area, Martin County, Florida ........................57

Figure 23    Study Area and Similarly Situated Wetlands for the 9.92-Acre Site Study Area, Martin
             County, Florida ......................................................................................................................62

129048180.1

SHARFIEXPERTS0000105

## 1.0    INTRODUCTION

The United States of America ("United States") by the authority of the Attorney General of the United States and at the request of the Secretary of the Army, acting through the United States Army Corps of Engineers has filed a civil enforcement action under the Clean Water Act (CWA) against Benjamin K. Sharfi and NeshaFarm, Inc. alleging unauthorized impacts to Section 404 waters (Amended Complaint, Appendix 1).  In support of the action, the United States Department of Justice, Environment and Natural Resources Division (DOJ), filed an expert team report (DOJ Expert Team Report, Appendix 2) on February 18, 2022 prepared by Lyndon C. Lee Ph.D., PWS, Wade L. Nutter, Ph.D. PH, Kai Coshow Rains, Ph.D., PWS, Scott R. Stewart, Ph.D., CPSS and Mike Wylie, M.S.

Breedlove, Dennis & Associates, Inc. (BDA) was retained by counsel for the Defendants to review the historical and current site conditions; the alleged violations; and analyze the data and conclusions presented in the DOJ Expert Team Report.  My curriculum vitae is included as Appendix 9.

As stated in the DOJ Expert Team Report, the objective of the DOJ Expert Team Report is to provide:

1. "An analysis of the area of Waters of the U.S. including wetlands delineated on the Site, as that term is defined in the Amended Complaint and described below.
2. Analyses of impacts to waters/wetlands area and functioning due to mechanical clearing of vegetation and associated redistribution of soils, changes in the bottom elevation of wetlands, and decreases in the areal extent of wetlands, soil excavations, filling, road construction, and other earthwork which involved discharges of dredged and/or fill material to waters of the United States.
3. Provide recommendations for mitigation of impacts, including options for on-site restoration and off-site mitigation."

129048180.1

1

SHARFIEXPERTS0000106

Based on our review of the data and arguments presented in the DOJ Expert Team Report, the DOJ team failed to demonstrate that wetlands on the subject 9.92-acre Site are regulated "waters of the United States" (WOTUS). The onsite wetlands do not abut a Traditional Navigable Water (TNW), and are therefore not adjacent wetlands to a TNW. Further, there is no perennial or continuous non-navigable hydrologic connection from the wetland on the 9.92-acre Site to a TNW as alleged in the DOJ Expert Team Report (Figure 1). The DOJ Expert Team Report failed to present any specific or detailed evidence of actual effects of discharges from the wetlands on the 9.92-acre Site, alone or in combination with similarly situated wetlands, to the physical, chemical, or biological integrity of the downstream TNW of the St. Lucie Estuary, which extends upstream to the limits of tidal influence in Bessey Creek, that are more than speculative or insubstantial. The DOJ Expert Team Report also fails to demonstrate that any effects of the wetlands are significant to the downstream TNWs.

Review of the various wetland delineations performed on the 9.92-acre Site indicate that the informal wetland delineation performed by Ms. Danna Small and inspected by and approved by the South Florida Water Management District (SFWMD) is the most supported wetland delineation on the 9.92-acre Site prior to site clearing activities.

This analysis and rebuttal report further addresses the DOJ Expert Team Report's failure to establish that there are WOTUS on the 9.92-acre Site.

129048180.1

SHARFIEXPERTS0000107



Figure V.D.1.a.5  Perennial flow from the Site wetlands to the Atlantic Ocean.

Figure 1

SHARFIEXPERTS0000108

## 2.0    REVIEW OF DOJ EXPERT TEAM REPORT STUDY AREA

### 2.1    Study Area

As depicted on Figure II.B.1 in the DOJ Expert Team Report, SFWMD Basin 4 was selected as the Study Area (Figure 2). This Study Area is described as approximately 11,049 acres in the vicinity of the Bessey Creek Watershed, containing 1,064 acres of wetlands mapped by the U.S. Fish and Wildlife Service's National Wetland Inventory.

### 2.2    Review of Existing Data Sources

Existing published data sources were obtained and reviewed to evaluate the physical characteristics of the Study Area, and placed in ArcReader Published Map File (PMF). The Figures included in this report represent the extent of the published data analyzed. The data was analyzed and reviewed at various scales appropriate for the specific analysis by overlaying the different data layers at different scales and combinations to facilitate an in-depth analysis. Examples of this in-depth analysis are presented in this report. The following is a list of data sources analyzed:

- U.S. Geological Survey (USGS) Topographic Maps
- USGS National Hydrography Dataset (NHD)
- Aerial Photography
- Natural Resources Conservation Service Soil Surveys
- U.S. Fish and Wildlife Service (USFWS) National Wetland Inventory (NWI) Map
- South Florida Water Management District (SFWMD) Land Cover Map
- SFWMD Drainage Basins Map
- Martin County LiDAR generated 1 Foot Contour Map
- Historic Drainage Maps

129048180.1

4

SHARFIEXPERTS0000109

SHARFIEXPERTS0000110



Figure II.B.I. The SFWMD Basin 4 selected as the Study Area.

Figure 2

## 3.0   ANALYSIS OF PRIOR AND CURRENT LAND USES

### 3.1   Historic Patterns of Land Use

As can be seen on the historical aerial photography of the Study Area, the pattern of land use transitions from more to less intense use going from east to west; and over time (Figures 3-7). Prominent physical features on the east portion of the Study Area are Bessey Creek and its tributaries surrounded by low density development in the 1950 aerial photography (Figure 3). Extending through the central portion of the Study Area is the east-west Canal Ditch which connects to a tributary of Bessey Creek in Section 15 Township 38S Range 40E. This east-west Canal Ditch (a term taken from the USGS NHD Source) was a key element of the Palm City Drainage District Plan from the 1920s (See Figure 8). This Canal Ditch is a straight-line east-west ditch cutting through predominantly upland rangeland. This upland rangeland included isolated depressional marshes and forested swamp types. Some agricultural uses can be seen in the western central portion of the Study Area in the historical aerial photographs. These rangeland and agricultural usages are facilitated by the regularly-spaced north-south ditches likely located along property lines (also mapped as Canal Ditch in USGS NHD Figure 9) which connect to the east-west Canal Ditch. A few east-west and north-south roads are seen in the southern portion of the Study Area.

### 3.2   Current Land Use

As in seen in the current aerial photography (Figure 10), the area of Basin 4 east of the Florida Turnpike is virtually built out with predominantly residential development and some commercial uses. Less intense residential land uses and commercial uses continues westward in the southern portion of the Basin. The northwestern portion of the Basin west of the Florida Turnpike remains largely agriculture except for the Martin County Solid Waste Transfer and Landfill facility in the extreme northwest portion of the Basin. Section 18 Township 38S Range 40E and the southern, western, and northern portion of Section 17

6

SHARFIEXPERTS0000111



**Legend**

☐ 9.92-Acre Site Boundary

▣ Study Area - SFWMD Basin 4 (11,049 ac)

Source: Project boundary from FGDL state-wide parcel database, 2019. Basin 4 boundary from SFWMD Arc Hydro Enhanced
Database (AHED), 2022.   USGS 1950 aerial photograhy, position approximated by BDA.

0   3,000   6,000
Feet
1 inch = 6,000 feet

**FIGURE 3**
**1950 AERIAL PHOTOGRAPH OF THE 9.92-ACRE SITE STUDY AREA,**
**MARTIN COUNTY, FLORIDA.**

BDA
BREEDLOVE, DENNIS
& ASSOCIATES, INC.
Environmental Consultants
330 W. Canton Ave., Winter Park, FL 32789 • 407-677-1882.

BN • 4/5/2022 • P:\ATG\2021040\Permit_Use\ReportGraphics_202203\ARCGIS\1950Aerial_Basin4_A.mxd

SHARFIEXPERTS0000112



**Legend**

☐ 9.92-Acre Site Boundary
▮▮ Study Area - SFWMD Basin 4 (11,049 ac)

Source: Project boundary from FGDL state-wide parcel database, 2019. Basin 4 boundary from SFWMD Arc Hydro Enhanced Database (AHED), 2022. USGS 1969 aerial photograhy, position approximated by BDA.

0   3,000   6,000 Feet
1 inch = 6,000 feet

**FIGURE 4**
**1969 AERIAL PHOTOGRAPH OF THE 9.92-ACRE SITE STUDY AREA, MARTIN COUNTY, FLORIDA.**

**BDA** BREEDLOVE, DENNIS & ASSOCIATES, INC.
Environmental Consultants
330 W. Canton Ave., Winter Park, FL 32789 • 407-677-1882

BN • 4/5/2022 • P:\ATG\20210040\Permit_Use\ReportGraphics_202203\ARCGIS\1969Aerial_Basin4_A.mxd

SHARFIEXPERTS0000113



**Legend**

9.92-Acre Site Boundary

Study Area - SFWMD Basin 4 (11,049 ac)

Source: Project boundary from FGDL state-wide parcel database, 2019. Basin 4 boundary from SFWMD Arc Hydro Enhanced Database (AHED), 2022. USGS 1980 aerial photograhy, position approximated by BDA.

0        3,000        6,000
Feet
1 inch = 6,000 feet

**FIGURE 5**
**1980 AERIAL PHOTOGRAPH OF THE 9.92-ACRE SITE STUDY AREA,**
**MARTIN COUNTY, FLORIDA.**

BDA
BREEDLOVE, DENNIS
& ASSOCIATES, INC.
Environmental Consultants
330 W. Canton Ave., Winter Park, FL 32789 • 407-677-1882

BN • 4/5/2022 • P:\ATG\2021040\Permit_Use\ReportGraphics_202203\ARCGIS\1980Aerial_Basin4_A.mxd

SHARFIEXPERTS0000114



Legend

☐ 9.92-Acre Site Boundary
☐ Study Area - SFWMD Basin 4 (11,049 ac)

Source: Project boundary from FGDL state-wide parcel database, 2019. Basin 4 boundary from SFWMD Arc Hydro Enhanced Database (AHED), 2022.  USGS 1994 DOQQ Aerial Photography.

0    3,000    6,000
                 Feet
1 inch = 6,000 feet

**FIGURE 6**
**1994 AERIAL PHOTOGRAPH OF THE 9.92-ACRE SITE STUDY AREA,**
**MARTIN COUNTY, FLORIDA.**

BDA  BREEDLOVE, DENNIS & ASSOCIATES, INC.
Environmental Consultants
330 W. Canton Ave., Winter Park, FL 32789 • 407-677-1882

BN • 4/5/2022 • P:\ATGl2021040\Permit_Use\ReportGraphics_202203\ARCGIS\1994Aerial_Basin4_A.mxd

SHARFIEXPERTS0000115



**Legend**

- 9.92-Acre Site Boundary
- Study Area - SFWMD Basin 4 (11,049 ac)

Source: Project boundary from FGDL state-wide parcel database, 2019. Basin 4 boundary from SFWMD Arc Hydro Enhanced Database (AHED), 2022. USGS 1999 DOQQ Aerial Photography.

0    3,000    6,000
Feet
1 inch = 6,000 feet

**FIGURE 7**
**1999 AERIAL PHOTOGRAPH OF THE 9.92-ACRE SITE STUDY AREA, MARTIN COUNTY, FLORIDA.**

BDA
BREEDLOVE, DENNIS & ASSOCIATES, INC.
Environmental Consultants
330 W. Canton Ave., Winter Park, FL 32789 • 407-677-1882

BN • 4/5/2022 • P:\ATG\2021040\Permit_Use\ReportGraphics_202203\ARCGIS\1999Aerial_Basin4_A.mxd

SHARFIEXPERTS0000116



Legend

☐ 9.92-Acre Site Boundary
☐ Study Area - SFWMD Basin 4 (11,049 ac)

Source: Project boundary from FGDL state-wide parcel database, 2019. Basin 4 boundary from SFWMD Arc Hydro Enhanced Database (AHED), 2022. 1920 Canal Reclamation Plan map position approximated by BDA. ArcGIS Online World Imagery, © ESRI, 2021/2/15

0    3,000    6,000
Feet
1 inch = 6,000 feet

**FIGURE 8**
**1920 MAP OF CANAL RECLAMATION PLAN FOR PALM CITY DRAINAGE DISTRICT**
**FOR THE 9.92-ACRE SITE STUDY AREA, MARTIN COUNTY, FLORIDA.**

BDA
BREEDLOVE, DENNIS
& ASSOCIATES, INC.
Environmental Consultants
330 W. Canton Ave., Winter Park, FL 32789 • 407-677-1882

BN • 4/5/2022 • P:\ATG\2021040\Permit_Use\ReportGraphics_202203\ARCGIS\1920CanalReclamation_Basin4_A.mxd

SHARFIEXPERTS0000117



**Legend**

- 9.92-Acre Site Boundary
- Study Area - SFWMD Basin 4 (11,049 ac)
- HUC 12 Watershed Boundary

**NHD Waterbodies**
- LakePond
- Reservoir
- SwampMarsh

**NHD Flowlines**
- → Artificial Path
- → Canal Ditch
- → Connector
- → Stream/River

Source: Project boundary from FGDL state-wide parcel database, 2019. Basin 4 boundary from SFWMD Arc Hydro Enhanced Database (AHED), 2022. U.S. Department of the Interior, USGS The National Map - National Hydrography Dataset (NHD), 2014. ArcGIS Online World Imagery, © ESRI, 2021/2/15.

0   3,000   6,000 Feet
1 inch = 6,000 feet

**FIGURE 9**
**NATIONAL HYDROGRAPHY DATASET (NHD) MAP OF THE 9.92-ACRE SITE STUDY AREA, MARTIN COUNTY, FLORIDA.**

BDA
BREEDLOVE, DENNIS & ASSOCIATES, INC.
Environmental Consultants
330 W. Canton Ave., Winter Park, FL 32789 • 407-677-1882

BN • 4/5/2022 • P:\ATG\2021040\Permit_Use\ReportGraphics_202203\ARCGIS\NHD_Basin4_A.mxd

SHARFIEXPERTS0000118



**Legend**

9.92-Acre Site Boundary

Study Area - SFWMD Basin 4 (11,049 ac)

Source: Project boundary from FGDL state-wide parcel database, 2019. Basin 4 boundary from SFWMD Arc Hydro Enhanced Database (AHED), 2022. ArcGIS Online World Imagery, © ESRI, 2021/2/15.

0   3,000   6,000 Feet
1 inch = 6,000 feet

**FIGURE 10**
**2021 AERIAL PHOTOGRAPH OF THE 9.92-ACRE SITE STUDY AREA,**
**MARTIN COUNTY, FLORIDA.**

BDA
BREEDLOVE, DENNIS
& ASSOCIATES, INC.
Environmental Consultants
330 W. Canton Ave., Winter Park, FL 32789 • 407-677-1882

BN • 4/5/2022 • P:\ATG\2021040\Permit_Use\ReportGraphics_202203\ARCGIS\2021Aerial_Basin4_A.mxd

SHARFIEXPERTS0000119

Township 38S Range 40E also remain largely agricultural pastureland.  The 9.92-acre Site, subject to this litigation sits in an approximately 40-acre land use area of nursery and farm uses.

15

SHARFIEXPERTS0000120

## 4.0    Analysis of Wetlands and Water Features

**4.1    Overview**

The Plaintiff alleges in the Amended Complaint and further explains in the DOJ Expert Team Report that the 9.92-acre Site contains approximately 5 to 6 acres of wetlands (approximately 5.97 acres cited in the DOJ Expert Team Report). The Amended Complaint alleges that these wetlands on site, are part of a larger contiguous wetland complex which borders and abuts Bessey Creek; and that Bessey Creek flows into the confluence of the C-23 canal and the North Fork of the St. Lucie River. The factual basis of these allegations are reviewed below in light of the CWA definition of WOTUS.

**4.2    The Natural Reach of Bessey Creek and Connecting Ditch System**

Bessey Creek is a natural tributary to the North Fork of the St. Lucie River. The various USGS 7.5-minute Topographic Maps going back to 1948 depict this. Currently the C-23 Canal and Bessey Creek merge and flow together into the North Fork of the St. Lucie River (Figures 11 and 12). The natural connection of Bessey Creek to the North Fork of the St. Lucie River before construction of the C-23 Canal can be seen on the 1950 aerial photography (Figure 3). The various maps and aerials show several branches to Bessey Creek and adjacent wetlands, most of which are east of the Florida Turnpike. One of these branches extends west of the Turnpike and connects to a man-made upland cut east-west Canal Ditch extending from this connection in Section 15 Township 38S Range 40E west to the Martin County Solid Waste Transfer and Landfill Facility. This ditch extends west from the connection to Bessey Creek for approximately 2,200 feet, then turns south on an approximate 45° angle approximately 1,000 feet before extending westward in a straight line of approximately 10,300 feet in Section 18 Township 38S Range 40E. This series of straight-line ditches were constructed through uplands based on the mapping features depicted in these topographic maps; and do not follow any sinuous creek channels, or depressional topographic features. This straight-line ditch is also clearly seen on the series of historical aerials (Figures 3-7).

129048180.1

16

SHARFIEXPERTS0000121



Legend

□ 9.92-Acre Site Boundary
▫ Study Area - SFWMD Basin 4 (11,049 ac)

Source: Project boundary from FGDL state-wide parcel database, 2019. Basin 4 boundary from SFWMD Arc Hydro Enhanced
Database (AHED), 2022. USGS 1:24000-scale Quadrangle for Palm City (1956 Ed.) and Indian Town NW (1955 Ed.), Florida.

0    3,000    6,000
Feet
1 inch = 6,000 feet

**FIGURE 11**
USGS 1956 TOPOGRAPHIC QUADRANGLE MAP OF THE 9.92-ACRE SITE
STUDY AREA, MARTIN COUNTY, FLORIDA.

BDA  BREEDLOVE, DENNIS
& ASSOCIATES, INC.
Environmental Consultants
330 W. Canton Ave., Winter Park, FL 32789 • 407-677-1882

BN • 4/5/2022 • P:\ATG\2021040\Permit_Use\ReportGraphics_202203\ARCGIS\1956Topo_Basin4_A.mxd

SHARFIEXPERTS0000122



**FIGURE 12**
USGS 1984 TOPOGRAPHIC QUADRANGLE MAP OF THE 9.92-ACRE SITE
STUDY AREA, MARTIN COUNTY, FLORIDA.

Legend

9.92-Acre Site Boundary

Study Area - SFWMD Basin 4 (11,049 ac)

Source: Project boundary from FGDL state-wide parcel database, 2019. Basin 4 boundary from SFWMD Arc Hydro Enhanced Database (AHED), 2022. USGS 1:24000-scale Quadrangle for Palm City (1984 Ed.) and Indian Town NW (1983 Ed.), Florida.

BDA
BREEDLOVE, DENNIS & ASSOCIATES, INC.
Environmental Consultants
330 W. Canton Ave., Winter Park, FL 32789 • 407-677-1882

BN • 4/5/2022 • P:\ATG\2021040\Permit_Use\ReportGraphics_202203\ARCGIS\1984Topo_Basin4_A.mxd

SHARFIEXPERTS0000123

On page 8 of the DOJ Expert Team Report the statement is made that "The NHD designations include the excavated channel referred to in this Expert Report as the excavated Bessey Creek and many of the primary and secondary drainage ditches discharging to excavated Bessey Creek. The excavated reach of Bessey Creek will hereafter be referred to as Bessey Creek in this Expert Report."

In reviewing the USGS NHD data, Bessey Creek is identified as a stream/river according to the legend to the point, as shown on the USGS topographic maps where this straight-line upland cut ditch begins. The NHD data flowlines legend label the straight-line feature as a Canal Ditch (Figure 9). There is a distinct point where Bessey Creek ends and the excavated Canal Ditch begins. The excavated Canal Ditch runs straight through predominantly nonhydric upland soils including Waveland and Immokalee fine sands, and Malabar fine sand before crossing predominantly hydric soils west of the 9.92-acre Site. There are no topographic features, soils indications, wetland or vegetative signatures that the straight-line Canal Ditch was a channelization of Bessey Creek. The 1920 Map of the General Reclamation Plan of the Palm City Drainage District labels this east-west Canal Ditch as "Bessie Creek Outlet Canal No.1" (Figure 8). The SFWMD Map of Drainage Basins for Martin County also shows the tributaries of Bessey Creek ending and not extending as a straight-line Canal Ditch near the 9.92-acre Site (Figure 13).

## 4.3    North-South Ditches

The east-west Canal Ditch is intersected by periodically-spaced north-south ditches. The series of north-south ditches are spaced approximately 1,300 feet apart beginning in Section 16 Township 38S Range 40E and continuing to Section 18 Township 38S Range 40E. As with the east-west Canal Ditch, the north-south interval ditches were constructed in uplands as mapped in the USGS topographic maps going back to at least 1948. The north-south ditches are also evident in the 1950 aerial (Figure 3). They are mapped in the

129048180.1

SHARFIEXPERTS0000124



**Legend**

▢ 9.92-Acre Site Boundary
▢ Study Area - SFWMD Basin 4 (11,049 ac)

Source: Project boundary from FGDL state-wide parcel database, 2019. SFWMD drainage basin map for Martin County; position approximated by BDA, 2021. Basin 4 boundary from SFWMD Arc Hydro Enhanced Database (AHED), 2022. ArcGIS Online World Imagery, © ESRI, 2021/2/15.

**FIGURE 13**
**SFWMD DRAINAGE BASIN MAP FOR MARTIN COUNTY FOR THE 9.92-ACRE SITE STUDY AREA, MARTIN COUNTY, FLORIDA.**

BN • 4/5/2022 • P:\ATG\2021040\Permit_Use\ReportGraphics_202203\ARCGIS\SFWMDDrainageBasinMap_Basin4_A.mxd

SHARFIEXPERTS0000125

USGS NHD as Canal Ditch (Figure 9). One of these north-south Canal Ditches borders the west side of the 9.92-acre Site.

**4.4     Other Ditches Near the 9.92-Acre Site**

Review of 2021 aerial photography (Figure 10) shows this north-south Canal Ditch on the west side of the 9.92-acre Site extending west through the nursery facilities from the southwest corner of the 9.92-acre Site. There is also a ditch on the northern edge of the 9.92-acre Site that begins as a shallow swale at the northeast corner of the parcel and then develops into a small ditch entering the north-south Canal Ditch at the northwest corner of the 9.92-acre site (swale/ditch) (Figure 14). There is another north-south Canal Ditch approximately 660 feet east of the northeast corner of the 9.92-acre Site. Moving up the north-south Canal Ditch on the western side of the 9.92-acre Site approximately 300 feet is a small ditch connecting west to a wetland area (southern west ditch). Continuing up the north-south Canal Ditch is another ditch extending west to another wetland (northern west ditch). There is a roadside ditch along the east side of 84th Avenue west of the 9.92-acre Site which connects to the main east-west Canal Ditch which connects to Bessey Creek several miles to the east.

**4.5     Stream Order**

Applying the stream order analysis as discussed in the DOJ Expert Team Report and depicted on Figure III.A.1 of that report; the north-south Canal Ditch on the western boundary of the 9.92-acre Site would be a 1st order "stream." Likewise, the swale/ditch on the northern boundary of the 9.92-acre Site would also be a 1st order "stream." The north-south Canal Ditch continuing from this junction of the two 1st order "streams" would be a 2nd order "stream." The two westerly ditches connecting to the north-south 2nd order "stream" would be connecting 1st order "streams" connecting to the 2nd order north-south Canal Ditch.

21

129048180.1

SHARFIEXPERTS0000126



**Legend**

9.92-Acre Site Boundary

Continuous Flow Pathway - DOJ Expert Report (Feb. 2022)

Lidar Elevation
- 18.5 - 19
- 19.0 - 19.5
- 19.5 - 20
- 20.0 - 20.5
- 20.5 - 21
- 21.0 - 21.5
- 21.5 - 22
- 22.0 - 22.5
- 22.5 - 23
- 23.0 - 23.5
- 23.5 - 24
- 24.0 - 24.5
- 24.5 - 25
- 25.0 - 25.5
- 25.5 - 26
- 26.0 - 26.5
- 26.5 - 27
- 27.0 - 27.5
- 27.5 - 28
- 28.0 - 28.5
- 28.5 - 29
- 29.0 - 29.5
- 29.5 - 30

Source: Project boundary from FGDL state-wide parcel database, 2019. Martin County Lidar elevation data, 2016. Surface flow pathway from February 2022 DOJ Expert Report figure V.D.1.a.4, position approximated by BDA, ArcGIS Online World Imagery, © ESRI, 2021/2/15.

0    200    400 Feet

1 inch = 400 feet

**FIGURE 14**
**DITCHES AND SURFACE FLOW PATHWAY FOR THE 9.92-ACRE SITE STUDY AREA, MARTIN COUNTY, FLORIDA.**

BDA
BREEDLOVE, DENNIS & ASSOCIATES, INC.
Environmental Consultants
330 W. Canton Ave., Winter Park, FL 32789 • 407-677-1882

BN • 4/6/2022 • P:\ATG\2021040\Permit_Use\ReportGraphics_202203\ARCGIS\DitchesandFlowPath_A.mxd

SHARFIEXPERTS0000127

The north-south 2nd order ditch continues north and connects to the east-west Canal Ditch which the DOJ Expert Team Report labels as a 3rd order "stream."

In depositions, DOJ experts Dr. Wade Nutter and Mr. Michael Wylie testified about stream order.  They testified that the reference in the DOJ Expert Team Report to Bessey Creek as a 3rd order stream was a reference to the natural Bessey Creek further east.  Dr. Nutter and Mr. Wylie testified that the east-west Canal Ditch near the 9.92 acre Site is a 2nd order tributary, and the north-south Canal Ditch that borders the Site was a 1st order tributary.  Although they assigned a different order to the east-west and north-south Canal Ditches than I have, they agree that the north-south Canal Ditch is a lower order tributary than the east-west Canal Ditch.

### 4.6     DOJ Expert Team Report Continuous Flow Pathway

Beginning on page 44 through page 46, the DOJ Expert Team Report describes a "primary flow pathway" from the bed and bank terminus of the north-south ditch to the 84th Avenue roadside ditch connecting to the east-west Canal Ditch (Figure 15; DOJ Expert Team Report Figure V.D.1.a.4).  The report states "Over the years, either by cattle breaking down the banks or mechanical disturbance, or both, the N/S Ditch lost its bed and bank features about 550 feet from the Site's north boundary and thus allowed water to spread out across wetland depressions, flats, and undulating microtopography with the dominant flow direction to the northwest and west."  Other than the portion of the more northern westerly ditch connecting to the wetland to the west (northern west ditch in Figure 14), this "primary flow pathway" has no discernable channelized features with a bed and bank, or Ordinary High Water Line (OHWL) indicators as it continues northwest to the 84th Avenue roadside ditch.  This flow way is reported to be 50-75 feet wide in some locations and flows through upland pastures and depressional wetland features.  This "continuous flow pathway" was

129048180.1

SHARFIEXPERTS0000128



V.D.1.a.4. The 2019 Martin County LiDAR showing the field located primary surface flow path from the Site through the N/S Ditch and a continuum of wetlands, depressions, and micro-topographic features. Wetland waterflow is to the 84th Avenue roadside ditch and then to Bessey Creek. The roadside ditch and Bessey Creek are perennially flowing streams.

Figure 15

categorized as containing perennial flow, as described on page 45 and depicted in DOJ Expert Team Report Figure V.D.1.a.5 (Figure 1).

## 4.7    Field Survey of DOJ Expert Team Report Primary Flow Pathway

A site inspection of the DOJ Expert Team Report "primary flow pathway" was conducted March 10, 2022. During that site inspection I directed a team of professional land surveyors from Karner Surveying, Inc. in conducting a topographic survey of the "primary flow pathway" represented on Figure V.D.1.a.4 of the DOJ Expert Team Report (Figure 15; DOJ Expert Team Report Figure V.D.1.a.4). Previously, during a site inspection of December 3, 2021, I directed the Karner Surveying team in conducting a topographic survey of the north-south Canal Ditch, the east-west swale/ditch, the two westerly ditches connecting wetlands to the north-south Canal Ditch and the east-west Canal Ditch which connects to Bessey Creek. The results of these surveys are depicted in Appendix 3.

These topographic surveys and cross sections depict the ground elevation of the bottom of the physical ditches with notes on location of slope and water features. The surveys extending from the northern west ditch across upland pasture and depressional wetlands to the 84th Avenue roadside ditch depict the topography and ground elevations of the "primary flow pathway" where no topographic features indicating a flow way are present.

This "primary flow pathway" was discussed in the DOJ Expert Team Report, where it was stated "The primary pathway from the northern boundary of the Site was the N/S Ditch flowing north towards Bessey Creek. Over the years, either by cattle breaking down the banks or mechanical disturbance, or both, the N/S Ditch lost its bed and bank features about 550 feet from the Site's north boundary and thus allowed water to spread out across wetland depressions, flats, and undulating microtopography with the dominant

129048180.1

SHARFIEXPERTS0000130

flow direction to the northwest and west.  During wetter periods there is a flow component directly to Bessey Creek, as observed during the August 2021 reconnaissance.  The defined channel of the N/S Ditch ends about 800 feet from Bessey Creek."

In my site inspection in December 2021 and March 2022, high spots in the north-south Canal Ditch were noted, often in areas of cattle crossing paths.

As can be seen on these surveys in Appendix 3 and summarized on Figure 16, the bottom of the north-south Canal Ditch on the western border of the 9.92-acre Site is at 19.534 and 19.302 feet, North American Vertical Datum (NAVD), 1988.  These lower elevations likely reflect the maintenance of the ditches in this reach.  These are the lowest elevations in the north-south Canal Ditch until the extreme northern end.  In the northern third of the north-south Canal Ditch, elevations rise slightly and there are blockages which restrict water flow.  The north-south Canal Ditch eventually joins the east-west Canal Ditch at an elevation of 18.914, 18.64 and 18.627 feet, NAVD88 right at the point of junction.

The elevations of the bottom of the ditch extending from the northwest corner of the 9.92-acre Site moving from south to north are generally 20+ to 21+ feet, NAVD88.

The elevations in the eastward swale/ditch on the northern boundary of the 9.92-acre Site decreases from 21.727 to 21.163 feet, NAVD88 where it intersects the north-south Canal Ditch.

The southern west ditch elevations connecting to the west wetland are 21.456 to 21.089 feet, NAVD88, as the ditch enters the wetland.  The normal wet season pool elevation of the southern west wetland based on biological indicators of wet season normal pool elevations (e.g., swollen lenticels and lichen lines) is

26

SHARFIEXPERTS0000131

approximately 21.92 feet, NAVD88. Since the ditch elevations are lower than the normal pool of the wetland, when present, water likely flows from the wetland through the southern west ditch to the north-south Canal Ditch.

The ditch bottom elevation in the more northern west ditch is 20.9 feet, NAVD88 near its eastern extent, increasing to 21.1 to 21.2 feet, NAVD88 as it enters the wetland. The normal wet season pool elevation of the wetland connected by this northern west ditch to the north-south Canal Ditch, based on lichen lines, is 22.5 feet, NAVD88. Since the ditch elevations are lower than the normal pool of the wetland, when present, water likely flows from the wetland through the northern west ditch to the north-south Canal Ditch.

A series of topographic points generally perpendicular to the "primary flow pathway" as depicted on Figure 15 were surveyed to document the actual ground elevations where no channel feature, nor perennial water, was present. The elevations of these cross sections are depicted on Figure 16, composite map sheets. The ground elevation increases moving from east to west across the pasture (cross-section 14-17 in Appendix 3), decreasing near 84th Avenue (cross-section 13 in Appendix 3).

During my March 10, 2022 site inspection I walked or inspected all of the ditches on the west and north side of the 9.92-acre Site. The north-south Canal Ditch, the southern west ditch, the northern west ditch and the east-west Canal Ditch at the intersection with the north-south Canal Ditch. All of these Canal Ditches, or ditches, were dry. Except for the north-south Canal Ditch on the west side of the 9.92-acre Site extending to the north to a point where the ditch bottom was at 21.621 feet, NAVD88, the entire

SHARFIEXPERTS0000132



**FIGURE 16**
ELEVATION SURVEY DATA FOR THE 9.92-ACRE SITE STUDY AREA,
MARTIN COUNTY, FLORIDA.



**FIGURE 16 (DETAIL 1 OF 8)**
**ELEVATION SURVEY DATA FOR THE 9.92-ACRE SITE STUDY AREA,**
**MARTIN COUNTY, FLORIDA.**

SHARFIEXPERTS0000134



**FIGURE 16 (DETAIL 2 OF 8)**
**ELEVATION SURVEY DATA FOR THE 9.92-ACRE SITE STUDY AREA,**
**MARTIN COUNTY, FLORIDA.**

BN • 4/6/2022 • P:\ATG\2021040\Permit_Use\ReportGraphics_202203\ARCGIS\ElevationSurvey_Series_A.mxd

SHARFIEXPERTS0000135



**Legend**

Continuous Flow Pathway - DOJ Expert Report (Feb. 2022)
Reference Staff Gage - DOJ Expert Report (Feb. 2022)
Surveyed Elevation Points (Karner Surveying, Mar. 2022)
Lowest Point in Cross Section (Karner Surveying, Dec. 2021)
Surveyed Hydroperiod Stations (Karner Surveying, Mar. 2022)
Surveyed Hydroperiod Stations (Karner Surveying, Dec. 2021)

Source: Project boundary from FGDL state-wide parcel database, 2019. Basin 4 boundary from SFWMD Arc Hydro Enhanced Database (AHED), 2022. ArcGIS Online World Imagery, © ESRI, 2021/2/15.

0    50    100
Feet
1 inch = 100 feet

**FIGURE 16 (DETAIL 3 OF 8)**
**ELEVATION SURVEY DATA FOR THE 9.92-ACRE SITE STUDY AREA,**
**MARTIN COUNTY, FLORIDA.**

**BDA** BREEDLOVE, DENNIS & ASSOCIATES, INC.
Environmental Consultants
330 W. Canton Ave., Winter Park, FL 32789 • 407-677-1882

BN • 4/6/2022 • P:\ATC\2021040\Permit_Use\ReportGraphics_202203\ARCGIS\ElevationSurvey_Series_A.mxd

SHARFIEXPERTS0000136



**Legend**

- Continuous Flow Pathway - DOJ Expert Report (Feb. 2022)
- Reference Staff Gage - DOJ Expert Report (Feb. 2022)
- Surveyed Elevation Points (Karner Surveying, Mar. 2022)
- Lowest Point in Cross Section (Karner Surveying, Dec. 2021)
- Surveyed Hydroperiod Stations (Karner Surveying, Mar. 2022)
- Surveyed Hydroperiod Stations (Karner Surveying, Dec. 2021)

Source: Project boundary from FGDL state-wide parcel database, 2019. Basin 4 boundary from SFWMD Arc Hydro Enhanced Database (AHED), 2022. ArcGIS Online World Imagery. © ESRI, 2021/2/15.

0    50    100 Feet
1 inch = 100 feet

**FIGURE 16 (DETAIL 4 OF 8)**
**ELEVATION SURVEY DATA FOR THE 9.92-ACRE SITE STUDY AREA,**
**MARTIN COUNTY, FLORIDA.**

BDA
BREEDLOVE, DENNIS
& ASSOCIATES, INC.
Environmental Consultants
330 W. Canton Ave., Winter Park, FL 32789 • 407-677-1882

BN • 4/6/2022 • P:\ATG\2021040\Permit_Use\ReportGraphics_202203\ARCGIS\ElevationSurvey_Series_A.mxd

SHARFIEXPERTS0000137



**FIGURE 16 (DETAIL 5 OF 8)**
ELEVATION SURVEY DATA FOR THE 9.92-ACRE SITE STUDY AREA,
MARTIN COUNTY, FLORIDA.

SHARFIEXPERTS0000138



**Legend**

- Continuous Flow Pathway - DOJ Expert Report (Feb. 2022)
- Reference Staff Gage - DOJ Expert Report (Feb. 2022)
- Surveyed Elevation Points (Karner Surveying, Mar. 2022)
- Lowest Point in Cross Section (Karner Surveying, Dec. 2021)
- Surveyed Hydroperiod Stations (Karner Surveying, Mar. 2022)
- Surveyed Hydroperiod Stations (Karner Surveying, Dec. 2021)

Source: Project boundary from FGDL state-wide parcel database, 2019. Basin 4 boundary from SFWMD Arc Hydro Enhanced Database (AHED), 2022. ArcGIS Online World Imagery, © ESRI, 2021/2/15.

0   50   100 Feet
1 inch = 100 feet

**FIGURE 16 (DETAIL 6 OF 8)**
**ELEVATION SURVEY DATA FOR THE 9.92-ACRE SITE STUDY AREA,**
**MARTIN COUNTY, FLORIDA.**

BDA BREEDLOVE, DENNIS & ASSOCIATES, INC.
Environmental Consultants
330 W. Canton Ave., Winter Park, FL 32789 • 407-677-1882

BN • 4/6/2022 • P:\ATG\2021040\Permit_Use\ReportGraphics_202203\ARCGIS\ElevationSurvey_Series_A.mxd

SHARFIEXPERTS0000139



**Legend**

➤ Continuous Flow Pathway - DOJ Expert Report (Feb. 2022)

▦ Reference Staff Gage - DOJ Expert Report (Feb. 2022)

🔺 Surveyed Elevation Points (Karner Surveying, Mar. 2022)

▼ Lowest Point in Cross Section (Karner Surveying, Dec. 2021)

● Surveyed Hydroperiod Stations (Karner Surveying, Mar. 2022)

● Surveyed Hydroperiod Stations (Karner Surveying, Dec. 2021)

Source: Project boundary from FGDL state-wide parcel database, 2019. Basin 4 boundary from SFWMD Arc Hydro Enhanced Database (AHED), 2022. ArcGIS Online World Imagery, © ESRI, 2021/2/15.

0    50    100
Feet
1 inch = 100 feet

**FIGURE 16 (DETAIL 7 OF 8)**
**ELEVATION SURVEY DATA FOR THE 9.92-ACRE SITE STUDY AREA,**
**MARTIN COUNTY, FLORIDA.**

BDA
BREEDLOVE, DENNIS & ASSOCIATES, INC.
Environmental Consultants
330 W. Canton Ave., Winter Park, FL 32789 • 407-677-1882

BN • 4/6/2022 • P:\ATG\2021040\Permit_Use\ReportGraphics_202203\ARCGIS\ElevationSurvey_Series_A.mxd

SHARFIEXPERTS0000140



**FIGURE 16 (DETAIL 8 OF 8)**
**ELEVATION SURVEY DATA FOR THE 9.92-ACRE SITE STUDY AREA,**
**MARTIN COUNTY, FLORIDA.**

BN • 4/6/2022 • P:\ATG\2021040\Permit_Use\ReportGraphics_202203\ARCGIS\ElevationSurvey_Series_A.mxd

SHARFIEXPERTS0000141

north-south Canal Ditch was dry. I also walked the "primary flow pathway" identified in the DOJ Expert Team Report, which was completely dry with no standing or flowing water. Based on the dryness of the soils in the bottom of the dry Canal Ditches and the DOJ "primary flow pathway" pasture area, it was evident that the areas had been dry for months which was borne out by my previous December 2021 site inspection at many of the same Canal Ditches and ditch areas. The east-west Canal Ditch lacked standing or flowing waters but was moist and muddy.

Photographs I took during my inspection are included as Appendix 4.

It is recognized that March is in the dry season in South Florida. However, even in the wet season flow from the 9.92-acre Site extending north up to the north-south Canal Ditch or west through the "primary flow pathway," any hydrological connection would be controlled by high points in the Canal Ditch and the natural ground elevations of the upland pastures.

129048180.1

SHARFIEXPERTS0000142

## 5.0    WETLANDS AND WATERS OF THE UNITED STATES - DEFINITIONS

The Clean Water Act of 1972 was enacted by Congress to "Restore and maintain the chemical, physical and biological integrity of the Nation's waters." The Clean Water Act regulates discharges into the "navigable waters," which are defined in the statute to include the "waters of the United States." Waters of the United States are defined in 33 CFR 328.3(a) as:

1.  All waters which are currently used, or were used in the past or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide

2.  All interstate waters including interstate wetlands

3.  All other waters such as intrastate lakes, rivers, streams, mudflats, sandflats, wetland, sloughs, prairie potholes, wet meadows, playa lakes, or natural ponds, the use, degradation or destruction of which could affect interstate or foreign commerce

4.  All impoundments of waters otherwise defined as waters of the U.S. under the definition

5.  Tributaries of waters

6.  The territorial seas

7.  Wetlands adjacent to waters (other than waters that are themselves wetlands)

Wetlands are defined by the Department of the Army, Corps of Engineers (ACOE) (33 CFR 328.3(b)) and the U.S. Environmental Protection Agency (EPA) (40 CFR 230.3(t)) as:

Those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation

38

129048180.1

SHARFIEXPERTS0000143

typically adapted for life in saturated soils conditions.  Wetlands generally include swamps, marshes, bogs, and similar areas.

In 1987, the ACOE developed its wetland delineation manual.  This manual addressed methodology for identifying and delineating wetlands.  A three-part test was described, with a positive test for vegetation, hydrology, and soils required to meet the test of meeting the definition in the CWA.

1. Hydrophytic Vegetation
   a. Morphological, physiological, and/or reproductive adaptation allows vegetation to grow, effectively compete, reproduce, and/or persist in anaerobic soil conditions.
2. Hydric Soils
   a. Soil that is saturated, flooded, or ponded long enough during growing season to develop anaerobic conditions in the upper surface soil horizons.
3. Hydrology
   a. It is essential to establish that a wetland area is periodically inundated or has saturated soils during the growing season.

In 2010 a Regional Supplement was issued by the ACOE to provide additional guidance in identifying and delineating wetlands.  Both the 1987 Manual and the 2010 Regional Supplement give guidance on how to address atypical delineation situations.

Once a wetland is identified, it must be shown to be a WOTUS for there to be a federal jurisdiction.  Not all wetlands are  part of the "waters of the United States."

39

129048180.1

SHARFIEXPERTS0000144

The EPA and ACOE issued a jurisdictional guidance memorandum on December 2, 2008 in "Clean Water Act Jurisdiction following the U.S. Supreme Court's decision in Rapanos v. United States & Carabell v. United States" (Appendix 5).

The DOJ Expert Team Report also opines that the 9.92-acre Site wetland would be a WOTUS under the now-vacated Navigable Waters Protection Rule, and also under a proposed 2021 rule that would define the "waters of the United States."

My evaluation of the DOJ Expert Team Report identifying wetlands, wetland impacts, and jurisdictional implications on the 9.92-acre Site applies the CWA regulatory definitions, relevant factual findings, the Rapanos Supreme Court Decision, other relevant court decisions (Appendix 8), and the 2008 Rapanos Guidance.

For there to be unauthorized activities as alleged in the Amended Complaint, the areas where activities occurred must be (1) wetlands; (2) they must be a jurisdictional WOTUS; and (3) the activity must be one that is prohibited except as may be authorized by permit.

40

SHARFIEXPERTS0000145

## 6.0    RAPANOS GUIDANCE

On June 19, 2006, the Supreme Court of the United States decided the consolidated cases Rapanos v. United States and Carabell v. United States in what is generally referred to as the Rapanos Case. The Rapanos Case was a split decision case with Justice Scalia announcing the judgement of the Court and an opinion. Justice Kennedy filed an opinion concurring with this judgement, and Justice Stevens filed a dissenting opinion. In 2007, the U.S. Eleventh Circuit Court of Appeals decided in United States v. Robison that the test announced in Justice Kennedy's opinion provides the governing rule of the Rapanos Case. Given these various opinions, the EPA and ACOE issued a June 6, 2007 Memorandum, and then subsequently issued a December 2, 2008 Guidance Memorandum (Appendix 5). The Rapanos Guidance addresses jurisdiction under the tests provided in both Justice Kennedy's and Justice Scalia's opinions. The language in the Supreme Court decision and the December 2, 2008 Guidance memorandum guided the analysis as presented in this rebuttal of WOTUS jurisdiction in this case.

129048180.1

SHARFIEXPERTS0000146

The following Summary of Key Points is taken from the December 2, 2008 Guidance Memorandum:

**Summary of Key Points**

The agencies will assert jurisdiction over the following waters:
- Traditional navigable waters
- Wetlands adjacent to traditional navigable waters
- Non-navigable tributaries of traditional navigable waters that are relatively permanent where the tributaries typically flow year-round or have continuous flow at least seasonally (e.g., typically three months)
- Wetlands that directly abut such tributaries

The agencies will decide jurisdiction over the following waters based on a fact-specific analysis to determine whether they have a significant nexus with a traditional navigable water:
- Non-navigable tributaries that are not relatively permanent
- Wetlands adjacent to non-navigable tributaries that are not relatively permanent
- Wetlands adjacent to but that do not directly abut a relatively permanent non-navigable tributary

The agencies generally will not assert jurisdiction over the following features:
- Swales or erosional features (e.g., gullies, small washes characterized by low volume, infrequent, or short duration flow)
- Ditches (including roadside ditches) excavated wholly in and draining only uplands and that do not carry a relatively permanent flow of water

The agencies will apply the significant nexus standard as follows:
- A significant nexus analysis will assess the flow characteristics and functions of the tributary itself and the functions performed by all wetlands adjacent to the tributary to determine if they significantly affect the chemical, physical and biological integrity of downstream traditional navigable waters
- Significant nexus includes consideration of hydrologic and ecologic factors

129048180.1

SHARFIEXPERTS0000147

### 7.0    REVIEW OF AREAS OF ALLEGED IMPACTS TO WATERS OF THE UNITED STATES

#### 7.1    9.92-Acre Site

As part of this analysis and rebuttal, I conducted site inspections of the approximately 9.92-acre Site on September 12-14, 2021; December 3, 2021, accompanied by Mr. James Weber of BDA; and March 10, 2022 to review existing site conditions.  Prior to the site inspections, I reviewed existing databases as outlined in Section 2.0 of this report.  Additionally, I reviewed the reports and wetland delineations by DLS Environmental Services, Inc. (DLS Environmental), Engineering Design and Construction, Inc. (EDC), and the determination presented in the DOJ Expert Team Report.  Each of these prior wetland delineations will be discussed below.

#### 7.1.1   U.S. Department of Justice Expert Team Report Delineation

The DOJ Expert Team reported approximately 5.97 acres of wetlands located on the site before "mechanical clearing of vegetation and associated redistribution of soils, filling, excavating, land levelling and road and construction activities began" (Figure 17: DOJ Expert Team Report Figure V.G.1.b.1).  This determination was purported to be based on "interpretation of standard mapping, aerial photography, remote sensing, resources, reviews of previous delineations on the site, field inspection reports, monitoring of the site and reference area water levels and three field investigations of the site and surrounding areas conducted in August, September, and October 2021."

#### 7.1.2   DLS Environmental Delineation

In March 2018, a wetland delineation was performed by DLS Environmental.  This wetland delineation was submitted to the SFWMD with a request for an informal determination of jurisdictional wetland and other surface water boundaries on the Benjamin Sharfi 2002 Trust 9.92-acre parcel.  A joint site inspection

43

129048180.1



Figure V.G.1.b.1. Expert Team's estimated area of fill within the delineated wetland area. Area of fill is 5.97 ac less the 0.79 ac of remnant depression wetland, or 5.18 wetland acres filled.

Figure 17

SHARFIEXPERTS0000149

of the parcel by the SFWMD and DLS Environmental was conducted on April 25, 2018; and based on the DLS Environmental request and joint site inspection, Ms. Barbara Conmy, Section Leader, SFWMD issued an informal wetland determination pursuant to Section 373.421(6) and Section 7.3 of the Environmental Resource Permit Application Handbook, Vol. 1. This Informal Wetland Determination No. 43-100235-P and the attached Exhibit 2 map are presented here as Appendix 6.

### 7.1.3   EDC Wetland Delineation

As an element of the Consent Order entered into by the SFWMD and NeshaFarm, Inc., NeshaFarm, Inc. agreed to engage in wetland mitigation on the 9.92-acre Site, based on a map delineating wetlands attached as Exhibit G to the Consent Order and included in the DOJ Expert Team Report as Figure V.C.1.1.b. (Figure 18.)

In addition, EDC presented a report to Martin County entitled "Preserve Area Management Plan/Abbreviated Preserve Area Management Plan" that included another wetland map dated February 24, 2020 (Appendix 7).

### 7.1.4   Analysis of Extent of Onsite Wetlands

Based on documents currently available, there appear to be four wetland delineations that have been conducted on the property between 2018 and 2021. It should be noted that the only delineation that was conducted before most of the site clearing activities occurred is the delineation performed by DLS Environmental on March 18, 2018 which was submitted in an application to the SFWMD for an informal wetland determination on April 2, 2018. This informal wetland delineation was reviewed and jointly inspected by DLS Environmental and the SFWMD on April 25, 2018.

129048180.1

SHARFIEXPERTS0000150

SHARFIEXPERTS0000151



Figure V.C.1.1.b. EDC wetland delineation of the Site (FDAS 00000001) (Note N Is to the bottom of the figure.)

Figure 18

An Informal Wetland Jurisdictional Determination was issued by the SFWMD on April 26, 2018. This is the only delineated, site inspected and verified Agency delineation that was conducted while the Site was largely intact.

All four wetland delineations of the 9.92-acre Site identified wetlands on the subject property. All four delineations differ as to the exact configuration of the wetlands and acreage of the wetlands.

I have reviewed the four delineations and also current and historical aerials of the parcel and surrounding area. Based on photointerpretation of the historical aerials, and groundtruthing of other similar wetlands to confirm photographic signatures, I have evaluated the extent of wetlands on the subject parcel.

My analysis is further informed based on information from the recent deposition of Ms. Small of DLS Environmental Services. In that deposition, Ms. Small further explained the details of her wetland delineation. As explained above it is documented through correspondence that she requested an informal wetland delineation from the SFWMD in March 2018. A photointerpreted FLUCFCS map was submitted in that application depicting a mixed hardwood wetland (617) on the southwest portion of the 9.92-acre Site. Following the April 25, 2018 joint site inspection with Ms. Danna Small and two SFWMD reviewers where the final delineation was agreed upon in the field, Ms. Small coordinated with a registered professional land surveyor who physically surveyed the SFWMD-approved wetland boundary flags (Figure 19: DOJ Expert Team Report Figure V.C.1.1.a.). This survey shows the 3.55-acre wetland being separated from the north-south Canal Ditch by a dirt driveway. In her deposition she clarified that she inspected the entire 9.92-acre Site.

47

129048180.1

SHARFIEXPERTS0000152

SHARFIEXPERTS0000153



Figure V.C.1.i.a.   Survey of DL Small, Inc. wetland delineation of the Site (DLS0000069).

Figure 19

Given that the DLS Environmental Services wetland survey was conducted prior to the subsequent land clearing; was a flagged line, inspected and approved in the field by two SFWMD reviewers; and was surveyed by a professional land surveyor, I find this survey the most supported by standard wetland delineation practices and the most reliable for this site.

## 7.2    Analysis of the "waters of the United States"

This analysis of WOTUS is based on the identification of waters in the CWA and its regulations; the Riverside Bayview Homes, Solid Waste Agency of Northern Cook County (SWANNC), and Rapanos Supreme Court decisions; the Robison Eleventh Circuit decision; and the December 2, 2008 Guidance Memorandum.

### 7.2.1   Traditional Navigable Waters

The analysis of the extent of WOTUS begins with determination of TNW as described in 33 C.F.R. § 328.3(a)(1). These are enumerated in Footnote 20 of the Guidance Memorandum:

[20]  33 C.F.R. § 328.3(a)(1); 40 C.F.R. § 230.3(s)(1). The "(a)(1)" waters include all of the "navigable waters of the United States," defined in 33 C.F.R. Part 329 and by numerous decisions of the federal courts, plus all other waters that are navigable-in-fact (e.g., the Great Salt Lake, UT and Lake Minnetonka MN). For purposes of CWA jurisdiction and this guidance, waters will be considered traditional navigable waters if:

- They are subject to Section 9 or 10 of the Rivers and Harbors Act, or
- A federal court has determined that the water body is navigable-in-fact under federal law, or
- They are waters currently being used for commercial navigation, including commercial water-borne recreation (e.g., boat rentals, guided fishing trips, water ski tournaments, etc.), or
- They have historically been used for commercial navigation, including commercial water-borne recreation; or
- They are susceptible to being used in the future for commercial navigation, including commercial water-borne recreation. Susceptibility for future use may be determined by examining a number of factors, including the physical characteristics and capacity of the water (e.g., size, depth, and flow velocity, etc.) to be used in commercial navigation, including commercial recreational navigation, and the likelihood of future commercial navigation or commercial water-borne recreation. Evidence of future commercial navigation use, including commercial water-borne recreation (e.g., development plans, plans for water dependent events, etc.), must be clearly documented. Susceptibility to future commercial navigation, including commercial water-borne recreation, will not be supported when the evidence is insubstantial or speculative. Use of average flow statistics may not accurately represent streams with "flashy" flow characteristics. In such circumstances, daily gage data is more representative of flow characteristics.

49

SHARFIEXPERTS0000154

Applying this definition to the current case, this would include the North Fork of the St. Lucie River and Bessey Creek upstream to the extent of tidal influence and navigation.

The DOJ Expert Team Report states "Bessey Creek becomes tidally influenced upstream from its junction with the St. Lucie River. Consequently, the tidally influenced downstream reach of Bessey Creek is a TNW approximately 4.5 miles downstream from the Site. From its junction with Bessey Creek, the St. Lucie River then flows east and then southeast for approximately 10.9 miles. It joins the TNWs of St. Lucie Inlet and the Atlantic Ocean." The DOJ Expert Team Report clarifies that "The DOJ Expert Team determined that the closest TNW to the Site is the tidally influenced reach of Bessey Creek that flows under SW Murphy Road Bridge, approximately 4.5 miles from the Site (latitude 27.1903° north and longitude 80.2977° west)". I reviewed various data to determine the downstream extent of the TNW including the USFWS NWI data indicating the extent of estuarine versus freshwater systems (Figure 20), SFWMD FLUCFCS data (Figure 21), and aerial imagery (Figures 3-7, and 10). For the purposes of this WOTUS analysis, I accept the DOJ Expert Team's identification of the SW Murphy Road Bridge as the closest extent of the TNW to the Site. I do not agree that it is 4.5 miles from the Site. I have estimated it to be approximately 5.75 miles from the DLS Environmental Services delineated wetland, up the north-south Canal Ditch, to the east-west Canal-Ditch, to the freshwater portion of Bessey Creek extending to the SW Murphy Road Bridge. If the DOJ Expert's "continuous flow pathway" is utilized, the distance increases to approximately 6.25 miles.

## 7.2.2   Relatively Permanent Non-navigable Tributaries of Traditional Navigable Waters and Wetlands with a Continuous Surface Connection with such Tributaries

Extending upstream from the identified TNW, Bessey Creek continues as a freshwater non-navigable tributary. This would include the natural portions of Bessey Creek, and also would include the excavated man-made east-west Canal Ditch. This east-west Canal Ditch does not have permanent standing or flowing

50

129048180.1



**Legend**

- 9.92-Acre Site Boundary
- Study Area - SFWMD Basin 4 (11,049 ac)

**NWI - National Wetlands Inventory (USFWS)**

- Estuarine and Marine Deepwater
- Estuarine and Marine Wetland
- Freshwater Emergent Wetland
- Freshwater Forested/Shrub Wetland
- Freshwater Pond
- Lake
- Riverine

0 3,000 6,000 Feet
1 inch = 6,000 feet

Source: Project boundary from FGDL state-wide parcel database, 2019. Basin 4 boundary from SFWMD Arc Hydro Enhanced Database (AHED), 2022. U.S. Fish & Wildlife Service (USFWS), National Wetlands Inventory (NWI) data: Feb. 1971 to Dec. 1992. ArcGIS Online World Imagery, © ESRI, 2021/2/15.

**FIGURE 20**
**U.S. FISH & WILDLIFE SERVICE (USFWS) NATIONAL WETLANDS INVENTORY (NWI) MAP OF THE 9.92-ACRE SITE STUDY AREA, MARTIN COUNTY, FLORIDA.**

BDA BREEDLOVE, DENNIS & ASSOCIATES, INC. Environmental Consultants
330 W. Canton Ave., Winter Park, FL 32789 • 407-677-1882

BN • 4/6/2022 • P:\ATG\2021040\Permit_Use\ReportGraphics_202203\ARCGIS\NWI_Basin4_A.mxd



**Legend**

- 9.92-Acre Site Boundary
- Study Area - SFWMD Basin 4 (11,049 ac)

**Level 1 Land Cover Classification**

- 1 - Urban And Built Up
- 2 - Agriculture
- 3 - Upland Nonforested
- 4 - Upland Forests
- 5 - Water
- 6 - Wetlands
- 7 - Barren Land
- 8 - Transportation, Communication And Utilities

0 3,000 6,000 Feet
1 inch = 6,000 feet

Source: Project boundary from FGDL state-wide parcel database, 2019. Basin 4 boundary from SFWMD Arc Hydro Enhanced Database (AHED), 2022. SFWMD Land Use and Land Cover, 2014-16. ArcGIS Online World Imagery, © ESRI, 2021/2/15.

**FIGURE 21**
**FLORIDA LAND USE, COVER AND FORMS CLASSIFICATION SYSTEM (FLUCFCS) MAP OF THE 9.92-ACRE SITE STUDY AREA, MARTIN COUNTY, FLORIDA.**

BDA BREEDLOVE, DENNIS & ASSOCIATES, INC. Environmental Consultants
330 W. Canton Ave., Winter Park, FL 32789 • 407-677-1882

BN • 4/5/2022 • P:\ATG\2021040\Permit_Use\ReportGraphics_202203\ARCGIS\FLUCFCS_Basin4_A.mxd

water, at least in the reach north of the 9.92-acre Site. It was documented to be dry and without standing or flowing water from the point of connection of the north-south Canal Ditch to just east of the 84th Avenue culverts, where a pool of water existed. Beyond this pool to the north-south Canal Ditch intersection there was no contiguous standing or flowing water for most of its length at my site inspection of March 10, 2022 (Appendix 4).

However, studies associated with the Hybrid Wetland Treatment Technology facility at Bessey Creek illustrate that even though the east-west Canal Ditch does not flow year-round or have continuous flow, it does have at least seasonal flow and is therefore treated here to be a non-navigable, relatively permanent tributary.

Applying the Scalia Opinion of the Rapanos Decision, even if the east-west Canal Ditch is arguably a relatively permanent water, clearly neither the north-south Canal Ditch nor the DOJ Expert Team Report's "primary flow pathway" would be a relatively permanent water.

As previously discussed in the DOJ Expert Team Report, the "primary flow pathway" diverts to the north and west from the north-south Canal Ditch due to blockages and loss of channel and bed and bank features. Justice Scalia ruled that WOTUS "includes only those relatively permanent standing or continuously flowing bodies of water 'forming geographic features' that are described in ordinary parlance as 'streams[,]… oceans, rivers [and] lakes.'" in the Webster's New International Dictionary 2882 (2nd ed.), and "does not include channels through which water flows intermittently or ephemerally, or channels that periodically provide drainage for rainfall."

129048180.1

SHARFIEXPERTS0000158

The DOJ Expert Team Report describes the northern portion of the north-south Canal Ditch as lacking a channel and bed and bank features; also that the "primary flow pathway" to the northwest lacks any defined channel features. Therefore, with the connection up the north-south Canal Ditch on the "primary flow pathway" would not pass the Scalia test for relatively permanent standing or continuously flowing bodies of water, "forming geographic features."

In considering the Navigable Waters Protection Rule (NWPR), the exclusion of man-made ditches would limit WOTUS to the natural portions of Bessey Creek. The east-west Canal Ditch and north-south Canal Ditch are man-made ditches and thus excluded from designation of WOTUS.

### 7.2.3 Analysis of the Adjacent Wetlands and Non-navigable Tributaries That Are Not Relatively Permanent

Following Justice Kennedy's opinion in Rapanos, any adjacent wetland to non-navigable tributaries must have a significant nexus to a TNW to be considered jurisdictional WOTUS. Wetlands have the requisite significant nexus if the wetlands alone or in combination with similarly situated lands in the region significantly affect the chemical, physical, and biological integrity of other covered waters understood as navigable in the traditional sense. Justice Kennedy goes on to add "when in contrast, these effects on water quality are speculative or insubstantial, they fall outside the zone fairly encompassed by the term navigable waters," i.e., they would not be jurisdictional WOTUS.

The Amended Complaint, paragraph 26 states "the wetlands on the Site were part of a larger contiguous wetland complex." Amended Complaint, paragraph 40 states "Defendants isolated wetlands at the Site from the larger contiguous wetland complex of which the wetlands at the Site had been a part." The DOJ Expert Team Report does not delineate any wetlands on the areas off the 9.92-acre Site, so it does not

54

129048180.1

SHARFIEXPERTS0000159

document that wetlands on the Site are contiguous with any offsite wetland. The common meaning of "contiguous" is "touching, in contact," and nothing in the report shows wetlands on the 9.92-acre Site touching wetlands offsite.

A review of various data sources does not corroborate the assertion that the wetlands on the 9.92-acre Site were part of a "larger contiguous wetland complex." A review of historical USGS 7.5-minute Topographic Maps going back to 1948 depict the north-south and east-west Canal Ditches and a few small, isolated, intermittent lake/ponds in the area, none of which are depicted on the 9.92-acre Site (Figures 11 and 12). The 9.92-acre Parcel is consistently mapped as woodland or non-vegetated uplands. The USGS NHD also does not depict any NHD waterbodies mapped within the 9.92-acre Site but does show a few small, isolated, SwampMarsh polygons to the north or LakePond polygons to the south (Figure 9). The USFWS NWI depicts an isolated Freshwater Forested/Shrub Wetland on the 9.92-acre Site (Figure 20). This wetland polygon is similar to the SFWMD-approved wetland delineation by Ms. Small. The USFWS NWI also depicts the north-south and east-west ditches as Riverine polygons, and several isolated Freshwater Emergent Wetland polygons in the area. There is a mapped wetland complex that extends to within approximately 800 feet northwest of the 9.92-acre Site, but my March 2022 site review of the northeastern extent of this mapped wetland confirmed the majority of the NWI mapped Freshwater Emergent Wetland is upland pasture with scattered isolated depressional wetlands. The SFWMD Florida Land Use, Cover and Forms Classification System (FLUCFCS) dataset depicts an isolated Mixed Wetland Hardwoods wetland within the 9.92-acre Site (Figure 21), slightly similar to the NWI wetland polygon. The SFWMD FLUCFCS dataset does not map the ditches, but does map several scattered, isolated Freshwater Marshes and Wet Prairie polygons. There is a mapped wetland complex approximately 1,300 feet west of the 9.92-acre Site, but unlike the NWI dataset, this wetland complex does not extend east. The DOJ Expert Team Report states "conditions on the Site changed from consisting of a mosaic of intact and interconnected

55

SHARFIEXPERTS0000160

forested and scrub/shrub wetlands on hydric organic soils." The NRCS mapped soils on the 9.92-acre Site include approximately 3.6 acres of Sanibel muck in the southwest corner (Figure 22). This area is consistent with the approximate extent of the SFWMD-approved wetland delineation by Ms. Small. Sanibel muck is a "hydric organic" soil as the DOJ Expert Team Report states. However, the majority of the site is mapped as mineral soils, not organic. Holopaw fine sand, 0 to 2 percent slopes is mapped as approximately 2.4 acres of the northwest and southeast portion of the Site. It is considered a predominantly hydric mineral soil, with a hydric rating of

56

SHARFIEXPERTS0000161



**Soil Symbol (Martin)**

- 2 - Lawnwood and Myakka fine sands
- 4 - Waveland and Immokalee fine sands
- 5 - Waveland and Lawnwood fine sands, depressional
- 6 - Paola and St. Lucie sands, 0 to 8 percent slopes
- 13 - Placid and Basinger fine sands, depressional
- 16 - Oldsmar fine sand, 0 to 2 percent slopes
- 17 - Wabasso sand, 0 to 2 percent slopes
- 19 - Winder sand, depressional
- 21 - Pineda and Riviera fine sands
- 22 - Okeelanta muck, depressional, 0 to 1 percent slopes
- 23 - Urban land
- 27 - Arents, organic substratum, 0 to 5 percent slopes
- 30 - Bessie muck
- 35 - Salerno sand
- 36 - Arents, 0 to 2 percent slopes

- 38 - Floridana fine sand, depressional
- 40 - Sanibel muck
- 42 - Hallandale sand
- 49 - Riviera fine sand, depressional, 0 to 1 percent slopes
- 52 - Malabar fine sand, high, 0 to 2 percent slopes
- 53 - Udorthents, 0 to 35 percent slopes
- 55 - Basinger fine sand, 0 to 2 percent slopes
- 56 - Wabasso and Oldsmar fine sands, depressional
- 57 - Chobee muck, depressional, 0 to 1 percent slopes
- 58 - Gator and Tequesta mucks
- 61 - Hobe fine sand, 0 to 5 percent slopes
- 63 - Nettles sand
- 66 - Holopaw fine sand, 0 to 2 percent slopes
- 67 - Kesson sand, tidal
- 73 - Samsula muck, frequently ponded, 0 to 1 percent slopes
- 99 - Water

**Legend**

- 9.92-Acre Site Boundary
- Study Area - SFWMD Basin 4 (11,049 ac)

Source: Project boundary from FGDL state-wide parcel database, 2019. Basin 4 boundary from SFWMD Arc Hydro Enhanced Database (AHED), 2022. USDA, NRCS, SSURGO database for Martin County, FL. V. 2.2. pub. 2015. ArcGIS Online World Imagery. © ESRI, 2021/2015.

0   3,000   6,000
Feet
1 inch = 6,000 feet

**FIGURE 22**
NATURAL RESOURCES CONSERVATION SERVICE (NRCS) SOILS MAP OF THE
9.92-ACRE SITE STUDY AREA, MARTIN COUNTY, FLORIDA.

BDA  BREEDLOVE, DENNIS
& ASSOCIATES, INC.
Environmental Consultants
330 W. Canton Ave., Winter Park, FL 32789 · 407-677-1882

BN · 4/5/2022 · P:\ATC\2021040\Permit_Use\ReportGraphics_202203\ARCGIS\Soils_Basin4_A.mxd

SHARFIEXPERTS0000162

96% under natural conditions. The SFWMD-approved wetland delineation by Ms. Small excluded the majority of this map unit as upland on the Site, while the DOJ Expert Team included a portion of these mapped soils. Oldsmar fine sand, 0 to 2 percent slopes is mapped as approximately 3.9 acres in the northeast portion of the Site. It is considered a predominantly nonhydric mineral soil, with a hydric rating of 12%. Both Ms. Small and the DOJ Expert Team excluded the majority of the Oldsmar fine sand map unit as upland on the 9.92-acre Site. Finally, I reviewed historical aerial photography back to 1950 which show the landscape with isolated wetlands, rather than a "large contiguous wetland complex". Therefore, taking all data reviewed under consideration, I do not conclude that the wetland on the 9.92-acre Site was part of a "larger contiguous wetland complex," but rather was historically an isolated wetland.

In this case, the Plaintiff alleges that the wetlands on the 9.92-acre Site directly abut and have regular surface and shallow subsurface hydrological connections to Bessey Creek and have a significant effect on the chemical, physical, and biological integrity of the tidally influenced portion of Bessey Creek, a TNW.

Figure 1 shows, by the blue line, the general flow path to the downstream tidal TNW of Bessey Creek as described in the DOJ Expert Report.

This purported significant nexus is evaluated below.

Key points in the significant nexus analysis as set forth in the 2008 Rapanos Guidance are outlined below:

129048180.1

SHARFIEXPERTS0000163

## Key Points

- The agencies will assert jurisdiction over non-navigable, not relatively permanent tributaries and their adjacent wetlands where such tributaries and wetlands have a significant nexus to a traditional navigable water.
- A significant nexus analysis will assess the flow characteristics and functions of the tributary itself and the functions performed by any wetlands adjacent to the tributary to determine if they significantly affect the chemical, physical and biological integrity of downstream traditional navigable waters.
- "Similarly situated" wetlands include all wetlands adjacent to the same tributary.
- Significant nexus includes consideration of hydrologic factors including the following:
  - volume, duration, and frequency of flow, including consideration of certain physical characteristics of the tributary
  - proximity to the traditional navigable water
  - size of the watershed
  - average annual rainfall
  - average annual winter snow pack
- Significant nexus also includes consideration of ecologic factors including the following:
  - potential of tributaries to carry pollutants and flood waters to traditional navigable waters
  - provision of aquatic habitat that supports a traditional navigable water
  - potential of wetlands to trap and filter pollutants or store flood waters
  - maintenance of water quality in traditional navigable waters
- The following geographic features generally are not jurisdictional waters:
  - swales or erosional features (e.g. gullies, small washes characterized by low volume, infrequent, or short duration flow)
  - ditches (including roadside ditches) excavated wholly in and draining only uplands and that do not carry a relatively permanent flow of water

59

SHARFIEXPERTS0000164

### 7.3     Fact-Specific Analysis of Significant Nexus with Traditionally Navigable Waters

Following the 2008 Guidance Memorandum and the Justice Kennedy Opinion in Rapanos, a tributary "…is the entire reach of the stream that is of the same order (i.e., from the point of confluence, where two lower order streams meet to form a tributary, downstream to the point such tributary enters a higher order stream)." Stream order was discussed in Section 4.5. In this fact-specific analysis it has been demonstrated that two 1st order "streams" intersect at the northwest corner of the parcel. Therefore, this 2nd order "stream" which is intersected downstream by two additional 1st order "streams" eventually discharges into the east-west Canal Ditch, which is a "higher order stream." The 9.92-acre Site onsite wetland is adjacent to the north-south Canal Ditch in the sense it is contiguous, neighboring or bordering, but it does not abut the north-south Canal Ditch, which is a non-navigable, not relatively permanent tributary. This point is demonstrated in the wetland determination by Ms. Small (Figure 19) and as testified to in her recent deposition where she affirms that at the time of her agency-reviewed site inspection the onsite wetland was separated by a field road and did not abut the north-south Canal Ditch. This was further confirmed in the deposition of Mr. Charles Berluconi, who confirmed there was a berm between the north-south Canal Ditch and the southwest corner and that he only saw the ditch overlap the berm on one occasion, that being during or after a hurricane. Additionally, the Martin County LiDAR shows higher elevations along the site adjacent to the north-south Canal Ditch (Figure 14).

Reviewing the lands drained by the north-south Canal Ditch or the "primary flow pathway," similarly situated lands and wetlands lie north of the 9.92-acre Site and border the north-south Canal Ditch or the "primary flow pathway." These are relatively flat lands with similar soil types, vegetation and land uses as agricultural range lands. Interspersed are depressional marsh and shrub wetlands which were historically isolated but now some of which are hydrologically connected by man-made upland cut ditches. It is these lands that were reviewed as Reference Areas in the DOJ Expert Team Report. The DOJ Expert Report

129048180.1

SHARFIEXPERTS0000165

indicates there are approximately 300 acres in the Countess Joy East property between the 9.92 acre Site and the east-west Canal Ditch. Only wetlands adjacent to the north-south Canal Ditch or potentially the "primary flow pathway" would be similarly situated wetlands. These are the similarly situated lands that should be evaluated in the significant nexus test as defined in the Kennedy Rapanos Decision and consistent with the Rapanos Guidance. These similarly situated lands and their wetlands are depicted on Figure 23. This is an approximately 103-acre area in total. Within this area is the mapped DLS Environmental Services delineation of the wetland on the site; and wetlands on the remainder of the area using the NWI database, as was used by the DOJ Expert Team for their Study Area analysis. Based on the NWI mapping and the DLS Environmental Services wetland delineation, these areas are separate and isolated from one another except for man-made ditch connections to the north-south Canal Ditch.

The DOJ Expert Team Report defines an 11,049-acre Study Area in the vicinity of the Bessey Creek watershed. Within this Study Area, the DOJ Expert Team references 1,064 acres of "similarly situated wetland areas" mapped by NWI. This determination of an 11,049-acre Study Area with 1,064 acres of "similarly situated wetlands" is overly broad, is inconsistent with the Rapanos Guidance, and does not take into account the type, location, or landscape setting of the wetlands. As has been discussed, the wetlands and Bessey Creek tributaries and adjacent wetlands, based on the NWI map, east of the Turnpike are primarily tidally influenced saltwater estuarine systems. The tributaries west of the Turnpike are primarily freshwater and man-made Canal Ditches. Some of the wetlands west of the Turnpike are freshwater emergent wetlands, some freshwater forested/shrub wetlands, freshwater ponds and freshwater Canal Ditches. Additionally, these various wetland types occur in different landscape settings. The wetlands and tributaries east of the Turnpike are in a highly developed urban setting. The wetlands in the southeastern portion of the Study Area west of the Turnpike are in commercial or less dense residential lands; the wetlands north of the east-west Canal Ditch are predominately open rangeland or in agricultural uses with

61

129048180.1

SHARFIEXPERTS0000166



**Legend**

- ☐ Study Area (102.68 ac)
- ☐ 9.92-Acre Site Boundary
- ☐ DLS Environmental Services, Inc. Wetland (3.55 ac)
- ☐ NWI Wetlands (off-site) (9.05 ac)
- ☐ NWI Riverine (off-site) (0.73 ac)

Source: Project boundary from FGDL state-wide parcel database. U.S. Fish & Wildlife Service (USFWS). National Wetlands Inventory (NWI) data, Feb. 1971 to Dec. 1992. DLS Environmental Services, Inc. wetland survey from February 2022 DOJ Expert Report. position approximated by BDA. ArcGIS Online World Imagery. © ESRI, 2021/2/15.

0    175    350 Feet
1 inch = 350 feet

**FIGURE 23**
**STUDY AREA AND SIMILARLY SITUATED WETLANDS FOR THE 9.92-ACRE SITE, MARTIN COUNTY, FLORIDA**

**BDA** BREEDLOVE, DENNIS & ASSOCIATES, INC.
Environmental Consultants
330 W. Canton Ave., Winter Park, FL 32789 • 407-677-1882

BN • 4/7/2022 • P:\ATG\2021040\Permit_Use\ReportGraphics_202203\ARCGIS\SimilarlySituatedWetlands_A.mxd

SHARFIEXPERTS0000167

predominantly man-made drainage features, and in the far west part of this northern area is the Martin County Facility; the area in the southwest portion of the Study Area is mostly forested with freshwater emergent and forested/shrub wetlands. The area in proximity to the 9.92-acre Site is a mix of nursery, farm, and cattle rangeland. These are the areas referred to in the DOJ Expert Team Report as reference wetlands.

It is these reference wetland areas that are more appropriately characterized as similar based on soil types, vegetation types, hydrology, land use and location distally located from the reviewed TNW. The area within this broader DOJ Expert Team reference area are the better refined similarly situated lands and wetlands.

### 7.3.1   Physical Characteristics

In considering the significant nexus hydrological factors were considered. The DOJ Expert Team Report does not indicate how much water flows from the 9.92-acre Site or the similarly situated wetlands to downstream TNWs, or total flows from all sources to those TNWs. Without this information, one cannot analyze the hydrological effects on downstream TNWs r conclude that those effects are significants. The statements in the DOJ Expert Team Report about how wetlands have benefits in general does not establish that the specific wetlands at issue in this case have a significant nexus to TNWs downstream of the Site.

It is apparent that, in absolute terms, the 9.92-acre Site wetlands and similarly situated wetlands make little contribution to water flows to downstream TNWs. The north-south Canal Ditch was originally constructed as a drainage feature to facilitate overall drainage of the area, especially in terms of more rapid drainage following rainstorm events and to reduce the water table. Southern Florida has abundant rainfall that is unevenly distributed throughout the year. This results in a wet season and dry season. The DOJ Expert Team Report states on page 6 that "about 60% of the annual precipitation occurs in the 5 month period June

63

129048180.1

SHARFIEXPERTS0000168

through October, about 20% in March through May and the remaining 20% in November through February." During the dry period (40% of the time, based on the DOJ Expert Team Report), the north-south Canal Ditch typically goes dry or has no flow. This dry condition was observed during my December 2021 and March 2022 site inspections. During the wet season, flow can occur in this north-south Canal Ditch when the rainfall amounts are sufficient to fill the ditch. It should be pointed out that these ditches are small, only a few feet wide and only $1\pm$ foot deep (Appendix 3). This means that the 9.92-acre Site wetlands and similarly situated wetlands likely contribute flow only a few months out of the year, and typically the flow volumes would be quite small.

The relative scale in the watershed of the 9.92-acre Site and similarly situated wetlands indicates that the hydrological effects on downstream TNWs are insignificant. Given the small size ($103\pm$ acres) of the watershed on this north-south Canal Ditch to the overall Bessey Creek Study Area of 11,049 acres as identified in the DOJ Expert Team Report, the contribution of flow from this north-south Canal Ditch represents only 0.93% of the Basin. Similarly, any flood-attenuation effect of the 9.92-acre Site wetlands and similarly situated wetlands would be proportionate to their scale in the overall watershed. Combining this small, seasonal flow with the approximately 5.75-6.25 miles distance to the tidally influenced TNW of Bessey Creek, the overall hydrological contribution is de minimis and any significant nexus to the total volume in the tidally influenced Bessey Creek would be speculative and insubstantial. Given the lack of physical hydrological connection to the 3.55-acre wetland on the 9.92-acre Site, its effect on the TNW would also be insubstantial. If one looks at the effect on the overall St. Lucie Estuary, of which the tidal portion of Bessey Creek is a part, the contribution is even more insignificant.

129048180.1

SHARFIEXPERTS0000169

### 7.3.2   Chemical Characteristics

In addition to hydrological factors, chemical considerations must be evaluated.  These, however, rest on the degree of hydrological connection and the opportunity to contribute positively or detract negatively.

Like with the issue of hydrological effects, the DOJ Expert Team Report does not identify the type or amount of pollutants that travel from (or are trapped in) the 9.92-acre Site wetlands and similarly situated wetlands to downstream TNWs.  The DOJ Expert Team gathered no water quality data in their site investigations, and therefore  does not demonstrate the absolute effect of the 9.92-acre Site wetlands and similarly situated wetlands on downstream water quality.  The DOJ Expert Team Report also does not identify the total amount of relevant pollutants entering the downstream TNWs from all sources, which means that it cannot demonstrate that the contribution of pollutants from 9.92-acre Site wetlands and similarly situated wetlands is significant to those TNWs in the context of other pollution sources.  The DOJ Expert Team Report discussion of water quality is little more than speculation of the effect of the 9.92-acre Site wetlands and similarly situated wetlands on downstream TNWs.

Publicly available studies of water quality in the St. Lucie Estuary indicate that Bessey Creek as a whole is a minor source of pollutants to the estuary.  The St. Lucie Estuary extends upstream to include the tidally influenced portion of Bessey Creek.  The St. Lucie Estuary has been the subject of various studies indicating the deterioration of the Estuary due to high levels of phosphorus and nitrogen.  In 2008, Florida Department of Environmental Protection (FDEP) established Total Maximum Daily Loads for nutrients and dissolved oxygen within the St. Lucie Estuary which was followed by the development of a Basin Management Action Plan (BMAP) for the St. Lucie Estuary in 2013, and its subsequent implementation.  As part of the TMDL development process, a hydrologic model was used to allocate nutrient load reduction requirements by FDEP Waterbody ID (WBID).  Bessey Creek (WBID 3211), located east of the Florida Turnpike, made

65

129048180.1

SHARFIEXPERTS0000170

up 2.45% of the modeled flow within the Basin, with the majority of the flow attributed to the C-24 Canal, C-44 Canal, and C-23 Canal, respectively. The annual average Total Nitrogen (mg/L) load attributed to Bessey Creek was 9.55%, the lowest of all the assessed WBIDs in the Basin. The majority of the Total Nitrogen was attributed to the C-24 Canal, C-23 Canal, and C-44 Canal, respectively. The annual average Total Phosphorus (mg/L) load attributed to Bessey Creek was 9.49%, the second lowest of all the assessed WBIDs in the Basin. The majority of the Total Phosphorus was attributed to the C-23 Canal, C-24 Canal, and South Fork of the St. Lucie River, respectively.

The scale of the Site wetlands and similarly situated wetlands in the context of Basin 4 indicates that their contribution to downstream Total Phosphorus and Total Nitrogen is insubstantial. As indicated above, the 9.92-acre Site and similarly situated wetlands are approximately 0.93% of the overall Basin 4.

In fact, it is clear that the 9.92-acre Site and similarly situated wetlands contribute less Total Phosphorus and Total Nitrogen than other portions of Basin 4. There are several contributing sources of nutrients within SFWMD Basin 4 to the St. Lucie Estuary. East of the Florida Turnpike, within WBID 3211, is dense single family, residential land use which are on septic tanks. Additionally, the Martin County Solid Waste Transfer and Recycling Landfill Facility is essentially the "headwater" of the east-west Canal Ditch. Finally, agricultural runoff west of the Florida Turnpike is also a contributing source of nutrients. The DOJ Expert Report indicates that septic tanks and agricultural activities are the major sources of nutrients in Basin 4, but the Report's own figures show that most of the septic tanks are in the eastern portion of the basin (Figure V.C.4.2) and most of the agricultural areas of the basin are located more than a mile away from the 9.92-acre Site (Figure V.C.4.3). This indicates that the 9.92-acre Site and similarly situated wetlands are less important to the water quality in downstream TNWs than their scale in the basin would suggest.

129048180.1

SHARFIEXPERTS0000171

The importance of the 9.92-acre Site and similarly situated wetlands on downstream water quality is further reduced by the Bessey Creek Hybrid Wetland Treatment Technology facility. In 2014, Martin County permitted the Bessey Creek Hybrid Wetland Treatment Technology Project to improve the water quality, specifically phosphorus, discharging to the St. Lucie Estuary. This facility is located at the eastern end of the east-west Canal Ditch, downstream from the Site. The project began operation in 2015 and remains in operation today. It was designed with a minimum 0.5 cfs and maximum 20 cfs capacity, or 2,420 acre-feet annually, to provide nutrient removal to the 2,675-acre Bessey Creek watershed west of Boat Ramp Avenue. Data from the facility operators indicates that it removes most of the Total Phosphorus and Total Nitrogen from water that is treated, and outflows from the facility meet water quality standards. Even if the Site wetlands and similarly situated wetlands were the source of significant amounts of nutrients (there is no documentation that this is true), then the Hybrid Wetland Treatment Technology facility cleanses the water so that it has no significant effect further downstream. This facility makes the upstream watershed relatively unimportant to the water quality of the downstream TNWs, because it removes or attenuates the water quality effects of those upstream areas.

Given the surrounding land use, which is primarily agricultural, and the extensive discharge from the Martin County Transfer and Wastewater Treatment Facility, the opportunity for chemical influence from the 9.92-acre Site is also insubstantial; additionally, given the placement of the Hybrid Wetland Treatment Technology System located between this 9.92-acre Site and the Bessey Creek TNW, the opportunity for chemical effects is further reduced.

67

129048180.1

SHARFIEXPERTS0000172

### 7.3.3   Biological Characteristics

Effects of the Site wetlands and similarly situated wetlands on the biological integrity of downstream TNWs is also relevant to the significant nexus analysis. The DOJ Expert Team Report provides no evidence of a biological nexus between the 9.92-acre Site and downstream TNWs. The report indicates that a few species of fauna were seen on the 9.92-acre Site and similarly situated wetlands, but does not provide evidence of any biological species, habitat or life cycle connections from the 9.92-acre Site to the downstream tidal waters of Bessey Creek and the St. Lucie Estuary. There also is no evidence that could establish that any biological nexus that does exist between the 9.92-acre Site and downstream TNWs is significant. The DOJ Expert Team Report contains no description of the ecology of the downstream TNWs, issues of concern to those TNWs, or the relative effect of different areas on the integrity of the downstream aquatic ecosystem. One therefore cannot conclude that the effects of wetlands at the 9.92-acre Site and similarly situated wetlands is significant to the biological integrity of the downstream waters, because there is no evidence of context.

The flora and fauna observed on the 9.92-acre Site and similarly situated wetlands plainly have little connection to ecology of the downstream TNWs. The downstream TNWs have an estuarine aquatic ecosystem. The 9.92-acre Site and nearby areas are freshwater areas that are only intermittently wet. There is no indication that the terrestrial freshwater habitat at the 9.92-acre Site and Countess Joy property provides habitat to the aquatic estuarine species of the downstream TNWs.

Even if the habitat types were the same, the distance of the 9.92-acre Site and similarly situated wetlands to the tidally influenced waters downstream would attenuate the biological nexus between the two areas. As indicated above, the Site is located approximately 5.75-6.25 miles away from the nearest tidally influenced water. It would be exceedingly difficult for aquatic flora and fauna to move upstream through

68

129048180.1

SHARFIEXPERTS0000173

intermittent ditches to the 9.92-acre Site and Countess Joy property. This is especially true because the Hybrid Wetland Treatment Technology facility diverts most of the water in the east-west Canal Ditch and chemically treats it before returning the water to the Canal Ditch. In my opinion, this likely has the effect of limiting the exchange of organisms upstream and downstream of that facility. Even if flora and fauna in the aquatic ecosystem of the tidally influenced portions of Bessey Creek do use freshwater wetlands, they would use wetlands much closer to the tidal waters than those in the vicinity of the 9.92-acre Site. Distance factors aside, the 9.92-acre Site and similarly situated wetlands represent 0.93% of the overall watershed, and 1.18% of all wetlands in Basin 4.

The 9.92-acre Site wetlands that were filled amounted to approximately 3.55 acres representing 0.33% of the DOJ Expert Team's identified 1,064 acres of wetlands in the similarly situated lands. These onsite activities have not materially changed the surface or groundwater flow from the site to the east-west Canal Ditch. Any biological processes occurring in the north-south Canal Ditch or the DOJ Expert Team Report "primary flow pathway" continue and remain unaltered.

Given the size of the overall watershed, the limited scope of this contributing area and the lack of any demonstrated ecological connections there is no significant nexus for biological effects on the downstream TNWs that is more than speculative and insubstantial.

69

129048180.1

SHARFIEXPERTS0000174

### 8.0    Conclusions

After review of the data and analysis in the DOJ Expert Team Report, the databases, governmental reports cited, personal site inspections and independent survey data obtained, I do not find that the 9.92-acre Site contains wetlands that meet the Rapanos Supreme Court Decision test to be WOTUS.  Neither the Scalia Opinion nor the Kennedy Opinion are satisfied based on the site-specific data and circumstances presented in this case.  Nor would the NWPR extend WOTUS to include the 9.92-acre Site due to its only hydrologic connection being through man-made ditches which are categorically excluded from WOTUS.  The 9.92-acre Site does not abut a TNW; and the non-navigable, non-permanent hydrological connection does not present any evidence of a significant nexus to the TNW, even considering similarly situated lands to affect the chemical, physical or biological integrity of the downstream TNW.

As Justice Kennedy stated in his Rapanos Opinion, "When, in contrast, wetland's effects on water quality are speculative or insubstantial, they fall outside the zone fairly encompassed by the statutory term 'navigable waters'."

Justice Kennedy further stated that "Under the analysis described earlier, *supra*, at 22-23, 25, mere hydrologic connections should not suffice in all cases; the connection may be too insubstantial for the hydraulic linkage to establish the required nexus with navigable waters as traditionally understood."  The fact-specific nexus analysis demonstrates that any effects of the on-site wetland and the wetlands near the Site on downstream traditional navigable waters are speculative and too insubstantial for there to be a significant nexus.

70

129048180.1

SHARFIEXPERTS0000175

# 9.0 REFERENCES

Parmer, K., K. Laskis, R. McTear, and R. Peets. 2008. TMDL Report Nutrient and Dissolved Oxygen TMDL for the St. Lucie Basin. Florida Department of Environmental Protection, Tallahassee, FL.

South Florida Water Management District. 2014. Individual Environmental Resource Permit Staff Report. Environmental Resource Permit No. 43-01748-P. West Palm Beach, Florida.

St. Lucie River and Estuary Basin Technical Stakeholders. 2013. Basin Management Action Plan for the Implementation of Total Maximum Daily Loads for Nutrients and Dissolved Oxygen by the Florid Department of Environmental Protection in the St. Lucie River and Estuary Basin. Florida Department of Environmental Protection, Tallahassee, FL.

U.S. Army, Corps of Engineers. 2010. Regional Supplement to the Corps of Engineers Wetland Delineation Manual: Atlantic and Gulf Coast Region (Version 2.0). ERDC/EL TR-10-20. U.S. Army, Corps of Engineers, Washington, DC.

U.S. Army, Corps of Engineers. 1987. Corps of Engineers Wetland Delineation Manual. Technical Report Y-87-1. U.S. Army, Corps of Engineers, Vicksburg, MS.

U.S. Environmental Protection Agency and U.S. Army, Corps of Engineers. 2008. Clean Water Act Jurisdiction Following the U.S. Supreme Court's Decision in Rapanos v. United States & Carabell v. United States. Washington, DC.

Watershed Technologies LLC. 2021. Water Hyacinth Monitoring, Reporting and Remediation at the Bessey Creek Hybrid Wetland Treatment Technology Project. SFWMD ERP Permit #43-01748-P. 2020-2021 Annual Report. Satellite Beach, FL.

Watershed Technologies LLC. 2016. Implementation of Hybrid Wetland Treatment Technology in the Northern Everglades Watershed. Prepared for: Florida Department of Agriculture and Consumer Services Contract #022562. Satellite Beach, FL.

129048180.1

SHARFIEXPERTS0000176

# APPENDIX 1

# AMENDED COMPLAINT

129048180.1

SHARFIEXPERTS0000177

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA,

     *Plaintiff,*

     v.

BENJAMIN K. SHARFI, in his personal and
fiduciary capacity as trustee of the Benjamin
Sharfi 2002 Trust, and NESHAFARM, INC.

     *Defendants.*

Case No. 2:21-cv-14205-KAM

### AMENDED COMPLAINT

Plaintiff, United States of America ("United States"), through its undersigned attorneys,
by the authority of the Attorney General of the United States, and at the request of the Secretary
of the Army acting through the United States Army Corps of Engineers ("Corps"), files this
Amended Complaint and alleges as follows:

### NATURE OF THE ACTION

1.     The United States brings this civil enforcement action under sections 309 and 404
of the Clean Water Act ("CWA"), 33 U.S.C. §§ 1319, 1344, against Defendant Benjamin K.
Sharfi ("Sharfi"), in his personal capacity and in his fiduciary capacity as trustee of the Benjamin
Sharfi 2002 Trust ("Sharfi Trust"), and Defendant NeshaFarm, Inc. ("NeshaFarm").

2.     As alleged herein, Defendants discharged pollutants into waters of the United
States without authorization, in violation of CWA section 301(a), 33 U.S.C. § 1311(a).

3.     The United States seeks injunctive relief, civil penalties, and other relief as
requested herein.

## JURISDICTION AND VENUE

4.     This Court has subject-matter jurisdiction pursuant to 33 U.S.C. § 1319(b), (d)

and 28 U.S.C. §§ 1331, 1345.

5.     Venue is proper in the Southern District of Florida pursuant to 33 U.S.C.

§ 1319(b) and 28 U.S.C. §§ 1391(b), (c) and 1395, because Defendants reside or have their

principal place of business within this District, Defendants conduct business in this District, the

waters of the United States into which pollutants were discharged are located in this District, and

the events giving rise to these claims occurred in this District.

## NOTICE

6.     The United States provided notice of the commencement of this action to the

State of Florida pursuant to 33 U.S.C. § 1319(b).

## THE PARTIES

### A.     Plaintiff United States of America

7.     Plaintiff in this action is the United States of America. Authority to bring this

action is vested in the United States Department of Justice pursuant to 28 U.S.C. §§ 516 and 519.

### B.     Defendant Benjamin K. Sharfi

8.     Defendant Sharfi is an individual residing in this District.

9.     Defendant Sharfi is and was, at all times relevant, trustee of the Sharfi Trust.

10.     Defendant Sharfi controls and, at all times relevant, controlled

Defendant NeshaFarm.

11.     Defendant Sharfi personally participated in the CWA violations alleged herein.

2

SHARFIEXPERTS0000179

12. Defendant Sharfi had, at all times relevant, legal authority to access, direct, or conduct work that resulted in the CWA violations alleged herein, as well as the ability to prevent that work from being performed or to stop that work at any time while it was being performed.

13. Defendant Sharfi is and was, at all times relevant, a person responsible for ensuring CWA compliance with respect to the conduct at issue.

14. Defendant Sharfi was, at all times relevant, privy to or personally involved in decision-making related to the CWA violations alleged herein.

C. **Defendant NeshaFarm**

15. Defendant NeshaFarm is a Florida corporation.

16. Defendant NeshaFarm has a principal place of business at 3731 NE Pineapple Avenue, 2nd Floor, Jensen Beach, Florida 34957.

17. Defendant Sharfi is and was, at all times relevant, an executive officer of NeshaFarm.

18. Defendant Sharfi was, at all times relevant, the president of NeshaFarm.

## FACTUAL ALLEGATIONS

A. **Wetlands on the Site**

19. On or about April 24, 2017, Defendant Sharfi, as trustee of the Sharfi Trust, acquired a parcel of real estate in Martin County, Florida, with Parcel Identification Number 17-38-40-000-038-00000-0.

20. For purposes of this Amended Complaint, the parcel of real estate described in Paragraph 19 is the "Site."

21. The Site comprises approximately 9.92 acres.

3

SHARFIEXPERTS0000180

22.     On or about January 14, 2019, the Sharfi Trust sold the Site to Defendant NeshaFarm.

23.     Before the Sharfi Trust sold the Site to Defendant NeshaFarm, and at least as early as about February 2018, Defendant NeshaFarm, by and through its agents, directed activities at the Site, including the conduct that forms the basis of this Amended Complaint.

24.     Prior to the conduct alleged below, approximately five to six acres of the Site were inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and under normal circumstances did support, a prevalence of vegetation typically adapted for life in saturated soil conditions.

25.     The approximately five to six acres of the Site described in Paragraph 24 were wetlands.

26.     Prior to the conduct alleged below, the wetlands on the Site were part of a larger contiguous wetland complex.

27.     The contiguous wetland complex borders and abuts Bessey Creek.

28.     Water flows in Bessey Creek every day of the year, at least during a typical year.

29.     As Bessey Creek flows eastward, it becomes subject to the ebb and flow of the tide.

30.     As Bessey Creek flows eastward, it becomes navigable in fact or could reasonably be so made.

31.     Water from Bessey Creek flows into the confluence of the C-23 canal and the North Fork of the St. Lucie River.

32.     Water flows in the C-23 canal and the North Fork of the St. Lucie River every day of the year, at least during a typical year.

4

SHARFIEXPERTS0000181

33.     The C-23 canal in the area of the confluence with Bessey Creek and the North Fork of the St. Lucie River are subject to the ebb and flow of the tide.

34.     The C-23 canal in the area of the confluence with Bessey Creek and the North Fork of the St. Lucie River are navigable in fact.

35.     The C-23 canal in the area of the confluence with Bessey Creek and the North Fork of the St. Lucie River are used or are susceptible to use in interstate or foreign commerce.

36.     Prior to the conduct alleged below, the wetlands on the Site, when considered alone or in combination with similarly situated lands in the region, significantly affected the chemical, physical, and biological integrity of traditional navigable waters, including Bessey Creek, the C-23 canal, or the North Fork of the St. Lucie River.

**B.     Defendants' Conduct**

37.     On or after April 24, 2017, Defendants or persons acting at their direction, on their behalf, or under their supervision, operated earth-moving equipment and heavy machinery, including, without limitation, a dump truck and backhoe, on wetlands at the Site.

38.     Defendants' operation of the equipment described in Paragraph 37 resulted in the placement of dredged spoil, biological materials, rock, sand, cellar dirt, or other earthen material into wetlands on the Site.

39.     Defendants constructed a road around and through wetlands at the Site.

40.     Defendants isolated wetlands at the Site from the larger contiguous wetland complex of which the wetlands at the Site had been a part.

41.     Defendants or persons acting at their direction, on their behalf, or under their supervision, operated earth-moving equipment on wetlands within the perimeter road that Defendants constructed around and through wetlands at the Site.

5

SHARFIEXPERTS0000182

42.     Defendants' operation of the equipment described in Paragraph 41 resulted in the placement of dredged spoil, biological materials, rock, sand, cellar dirt, or other earthen material into wetlands on the Site within the perimeter road.

43.     Defendants' conduct had the effect of replacing wetlands on the Site with dry land or changing the bottom elevation of wetlands on the Site.

44.     At no time did Defendants or any person on their behalf secure and comply with a permit issued pursuant to 33 U.S.C. § 1344 for the discharge of dredged or fill material into navigable waters at the Site.

## C.     Defendant Sharfi's Authority Over and Involvement with the Alleged CWA Violations

45.     In December 2017, Jonathan Pempek, a Corps enforcement project manager, received an anonymous complaint that Defendant Sharfi had purchased the Site and potentially intended or may have begun to fill wetlands on that property. In early January 2018, Mr. Pempek's review of satellite imagery confirmed that work in wetlands was being performed on the Site.

46.     On or about January 11 or 12, 2018, Mr. Pempek informed Defendant Sharfi by telephone about the anonymous complaint that the Corps received, indicated that wetlands on the Site likely required a Corps permit to fill, and offered to assist Defendant Sharfi with the federal permitting process. Defendant Sharfi explained that he would have Kevin Kryzda, Defendant Sharfi's agent, call Mr. Pempek back regarding the permitting requirements.

47.     On January 19, 2019, Defendant Sharfi's agent Mr. Kryzda emailed Mr. Pempek. A copy of the email is attached as Exhibit 1 (USACE0000513).

48.     In his January 19 email, Mr. Kryzda wrote, "I work for Mr. Sharfi." Mr. Kryzda explained that he was writing "to ask your guidance in the appropriate actions that may be

6

SHARFIEXPERTS0000183

necessary to undertake minor improvements to a newly acquired parcel in western
Martin County."

49.     In his January 19 email, Mr. Kryzda also stated, "Mr. Sharfi wishes to put this
newly acquired property into agricultural use. Our first objective was to secure the property by
fencing it. We checked with the local County authorities who confirmed that this would be a
permissible activity which would not require a permit. Thus, minor clearing and minor filling is
underway in order [to] mobilize equipment to construct the fence. We would like to make some
minor additional improvements by adding a covered are[a] on a portion of the newly fenced
property. The western boundary of this property has a historical drainage ditch which provides
surface water drainage to this new parcel as well as other parcels in the area. We seek guidance
in moving ahead with our plans."

50.     Defendant Sharfi's agent Mr. Kryzda signed the January 19 email, "President" of
"Sharfi Holdings, Inc."

51.     On or about January 22, 2018, Mr. Pempek spoke to Defendant Sharfi's agent
Mr. Kryzda on the telephone. Mr. Pempek explained that any filling of wetlands on the Site
would likely require a permit and described the Corps' permitting process. On this call,
Mr. Pempek encouraged Defendant Sharfi's agent Mr. Kryzda to submit an application to the
Corps and Mr. Kryzda agreed to do so. Mr. Kryzda requested a Corps' permit application form,
which Mr. Pempek provided to Mr. Kryzda by email the same day.

52.     On February 12, 2018, Defendant Sharfi submitted to the Corps a permit
application to construct a fence, erect a "metal frame and metal roof structure," and perform
other work in a ditch that runs along the western boundary of the Site. The application indicated

7

SHARFIEXPERTS0000184

that a portion of the work had already been completed. A copy of Defendant Sharfi's permit

application is attached as Exhibit 2 (USACE0000001).

53. In the "Applicant's Name" section of the permit application, Defendant Sharfi

listed his name as the "Applicant," wrote "Neshafarm" under "Company," and provided his

email address associated with a different corporation, General Micro Systems, Inc.

54. In the "Authorized Agent's Name and Title" section of the permit application,

Defendant Sharfi wrote "Kevin W. Kryzda." Defendant Sharfi wrote "General Micro Systems

East, Inc." under "Company" and provided a General Micro Systems East, Inc. email address for

Mr. Kryzda.

55. Defendant Sharfi expressly authorized Mr. Kryzda to act as his agent and signed a

"Statement of Authorization" to that effect on the first page of the permit application.

56. Defendant Sharfi and his agent Mr. Kryzda signed the permit application on

February 12, 2018.

57. On or about March 17, 2018, the Corps wrote to Defendant Sharfi (in care of

Defendant NeshaFarm) in response to the permit application. A copy of the letter is attached as

Exhibit 3 (USACE0000004).

58. In the letter dated March 17, 2018, the Corps advised Defendant Sharfi that he

provided insufficient information for the Corps to evaluate his permit application and requested

that Defendant Sharfi provide certain identified information within thirty days. Among several

other deficiencies in the permit application, the Corps stated, "While the application states the

proposed project is for a fence, it appears that the proposed works may also include clearing of

lands and the addition of structure [sic] in potential jurisdictional wetlands."

8

59.    Defendant Sharfi and his agent Mr. Kryzda failed to respond in a timely fashion
to the Corps' March 17, 2018 letter. Moreover, no other person or entity purporting to act on
behalf of Defendant Sharfi or Defendant NeshaFarm timely responded to the Corps' March 17,
2018 letter. Accordingly, the Corps withdrew Defendant Sharfi's permit application on
April 19, 2018.

60.    On April 25, 2018, the South Florida Water Management District ("SFWMD")
inspected and took photographs of the Site. A copy of the SFWMD Environmental Resource
Compliance Bureau Supporting Photo Exhibit is attached as Exhibit 4 (USACE0000014).

61.    Around the time of April 25, 2018, the activities that Defendant Sharfi and
Defendant NeshaFarm were undertaking at the Site were far beyond the construction of a
"fence," as Defendant Sharfi had represented in his February 2018 permit application.

62.    In fact, the SFWMD's photographs show significant clearing and earthmoving
and the use of heavy machinery in saturated soils. These disturbed areas were bordered by
obligate wetland vegetation.


*Exhibit 4 (USACE0000018)*


*Exhibit 4 (USACE0000015)*

9

Case 2:21-cv-14205-KAM   Document 111-9   Entered on FLSD Docket 08/10/2022   Page 88 of
Case 2:21-cv-14205-KAM   Document 21   Entered on FLSD Docket 08/18/2021   Page 10 of 60
302

 

*Exhibit 4 (USACE0000016)*          *Exhibit 4 (USACE0000019)*

63.    On April 30, 2018, the Corps issued a cease-and-desist letter to Defendant Sharfi. A copy of the letter is attached as Exhibit 5 (USACE0000030).

64.    In its cease-and-desist letter to Defendant Sharfi, the Corps asserted that Defendant Sharfi was responsible for the discharge of fill material without the required Department of the Army authorization and advised him to cease and desist conducting such activities in waters of the United States pending a resolution. The letter also advised Defendant Sharfi of the legal consequences for engaging in unauthorized activities.

65.    In particular, the April 30, 2018 cease-and-desist letter stated, "The Corps has obtained information from available sources that indicates fill, creating a dirt road, was place[d] around the perimeter of a 10-acre parcel containing a wetland, and that vegetation within the wetland was removed with heavy machinery."

66.    Defendant Sharfi immediately responded by email to the Corps' cease-and-desist letter. Defendant Sharfi emailed his first response to the Corps at approximately 10:28 a.m. A copy of Defendant Sharfi's first email is attached as Exhibit 6 (USACE0000517).

67.    In the email, Defendant Sharfi stated, "I will respond to this letter properly. But the short of it is we have not! We have plan[t]ed a few trees n [sic] clean the vines that were

10

killing trees. I request you to come visit the site yourself and see with your own eyes." Defendant

Sharfi went on, "We are very sensitive to thus [sic] issue and very much aware of the wetland

locations. I hope you will take me on the offer to come visit the site yourself soon."

68.    Defendant Sharfi sent a second email to the Corps at approximately 1:13 p.m.

later that day. A copy of Defendant Sharfi's second email is attached as Exhibit 7

(USACE0000518).

69.    In his second email, Defendant Sharfi stated, "Look forward showing [sic] you

what we are doing. We are NOT affecting water rights or anything like that. I think by now I

have demonstrated my willingness to preserve and improve nature in every way possible. You

have my personal word on this issue that we will work all the way with the Corps and any other

agencies."

70.    On May 4, 2018, Defendant Sharfi's agent Mr. Kryzda emailed the Corps and

attached a "reply" to the April 2018 cease-and-desist letter. A copy of the email and the "reply"

letter are attached as Exhibit 8 (USACE0000526).

71.    The "reply" letter is on Defendant NeshaFarm's letterhead and lists

Defendant Sharfi as "president."

72.    Defendant Sharfi's agent Mr. Kryzda signed the "reply" letter as "President" of

"Sharfi Holdings."

73.    In the letter, Defendant Sharfi's agent Mr. Kryzda described what Defendant

Sharfi would like to do at the Site. In particular, Mr. Kryzda stated, "Please allow me to relate to

you that state [sic] Mr. Sharfi's desire for the property in question." Mr. Kryzda later stated,

"Eventually, Mr. Sharfi would like to make some minor additional improvements by adding a

covered area on a portion of the newly fenced property to provide shade for the grazing

11

SHARFIEXPERTS0000188

animals." Mr. Kryzda also stated, "Mr. Sharfi would want to repair and preserve [a drainage ditch]."

74.     In the letter, Defendant Sharfi's agent Mr. Kryzda also stated that Defendant Sharfi at that time had already undertook certain activities. Mr. Kryzda stated, "Minor clearing and minor filling was [sic] undertaken in order to mobilize equipment to construct the fence." Mr. Kryzda also stated, "We have undertaken removal of some exotic vegetation by hand, planted over 100 trees of native species such Oak and Red Maple [sic] and sodded a small portion of the property to prevent further erosion but have done nothing to the ditch or other parts of the property." Mr. Kryzda closed, "We are very sensitive to this issue and very much aware of the wetland locations."

75.     At Defendant Sharfi's request, the Corps conducted a limited (and supervised, by Defendant Sharfi) inspection of the Site on May 14, 2018. Defendant Sharfi was present together with his agent Mr. Kryzda and his attorney. Mr. Pempek and other representatives from the Corps and the SFWMD were also present.

76.     Defendant Sharfi refused to provide full access to the Site and refused to allow the Corps to conduct in-wetland work and analyze soil conditions, hydrology, or plant communities during the limited inspection (often referred to as point descriptions or data points).

77.     At the time of the inspection, standing water was present on most areas of the Site.

78.     At the time of the inspection, many areas dominated by obligate plant communities were present immediately adjacent to the road around the perimeter of the Site in undisturbed locations, as well as adjacent to other impacted areas of the Site.

12

79.     At the time of the inspection, a surface layer of muck and algal matting was present in locations near the road and appeared to persist through the center of the Site.

80.     At the time of the inspection, there were hydrological indicators in undisturbed areas of the Site, including water marks, elevated lichen lines, muck surface, hydrological plant adaptations, and algal matting.

81.     At the time of the inspection, Defendant Sharfi and Defendant NeshaFarm were constructing a fifteen-to-twenty-five-foot wide road around the Site. Since the inspection, satellite imagery shows that Defendant Sharfi and Defendant NeshaFarm further expanded the road around the Site and placed additional fill within the Site.

82.     At the time of the inspection, there were stockpiles of fill that did not appear in aerial photographs of the Site taken by the SFWMD near the end of April 2018.

83.     At the inspection, Defendant Sharfi stated that he invited the Corps onto his property to get its blessing, not to request its permission for filling his wetland.

84.     At the inspection, Defendant Sharfi represented that he would not conduct additional work at the Site and asked his agent Mr. Kryzda to resubmit a permit application.

85.     Neither Defendant Sharfi nor Defendant NeshaFarm resubmitted a permit application after the May 2018 limited Site inspection.

86.     Defendant Sharfi and Defendant NeshaFarm continued to discharge fill material in waters of the United States at the Site after the May 2018 limited Site inspection.

87.     On November 28, 2018, Mr. Pempek emailed Defendant Sharfi seeking to schedule a formal meeting to discuss Defendant Sharfi's failure to cease unauthorized filling activities on the Site and submission of a permit application. On the same day, Defendant Sharfi responded. A copy of Defendant Sharfi's email is attached as Exhibit 9 (USACE0000533).

13

88.     In his email, Defendant Sharfi stated, "BTW we never did agree that I will stop

working my land! Once again you are misrepresenting the truth! As to other land I own, and will

continue to purchase, I will continue to do under the LAW what I am permitted to do, as we have

all along. . . . No need to meet as far as I am concern [sic]. We have real work to do!"

## CLAIM: DISCHARGE OF POLLUTANTS WITHOUT A PERMIT

89.     The United States repeats the allegations set forth in Paragraphs 1–88.

90.     CWA section 301(a) prohibits any person from discharging a pollutant from a

point source into navigable waters, except in compliance with various sections of the CWA,

including section 404. 33 U.S.C. § 1311(a).

91.     The CWA defines "navigable waters" as "waters of the United States, including

the territorial seas." 33 U.S.C. § 1362(7).

92.     CWA section 404 authorizes the issuance of permits for the discharge of dredged

or fill material into waters of the United States. 33 U.S.C. § 1344.

93.     Defendants violated and will continue to violate CWA section 301(a) by their

unauthorized discharges of dredged or fill material into waters of the United States, including

wetlands, at the Site without a permit.

94.     Defendant Sharfi is a "person" because he is an individual. *See* 33 U.S.C.

§ 1362(5).

95.     Defendant NeshaFarm is a "person" because it is a corporation. *See* 33 U.S.C.

§ 1362(5).

96.     The dredged spoil, biological materials, rock, sand, cellar dirt, or other earthen

material that Defendants discharged or caused to be discharged on wetlands at the Site, as

alleged herein, constitute a "pollutant." *See* 33 U.S.C. § 1362(6).

14

97.     Defendants discharged a pollutant from a "point source," because, among other things, earth-moving equipment and heavy machinery used at the site are "point sources." *See* 33 U.S.C. § 1362(14).

98.     The wetlands on the Site constitute waters of the United States.

99.     The contiguous wetlands complex (which encompassed wetlands on the Site prior to the alleged conduct), Bessey Creek, the C-23 canal, and the North Fork of the St. Lucie River are and were at the time of the alleged discharges waters of the United States.

100.    Defendants violated 33 U.S.C. § 1311(a).

101.    To date, Defendants have allowed pollutants that had been discharged without authorization to remain in waters of the United States.

102.    Defendants remain in violation of 33 U.S.C. § 1311(a).

103.    Defendants are jointly and severally liable for the CWA violations alleged herein.

## PRAYER FOR RELIEF

104.    WHEREFORE, the United States respectfully requests that the Court order the following relief:

  a.    Enjoin Defendants from further discharging pollutants into waters of the United States, except in compliance with the CWA;

  b.    Compel Defendants to restore the impacted waters of the United States;

  c.    Require Defendants to mitigate the impacted waters of the United States;

  d.    Assess and direct Defendants to pay civil penalties;

  e.    Award the United States costs and disbursements in this action; and

  f.    Grant any such other relief as the Court may deem just and proper.

15

SHARFIEXPERTS0000192

Dated: August 18, 2021

Respectfully submitted,

TODD KIM
Assistant Attorney General

*Of Counsel:*

William J. Moore III
(FL Bar No. 0971812)
U.S. Army Corps of Engineers
701 San Marco Boulevard
Jacksonville, FL 32207
Tel: (904) 232-2466
William.J.Moore@usace.army.mil

*/s/ Brandon N. Adkins*
BRANDON N. ADKINS (Bar ID: A5502752)
*/s/ Andrew J. Doyle*
ANDREW J. DOYLE (FL Bar No. 84948)
United States Department of Justice
Environment & Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044
Tel: (202) 616-9174 (Adkins)
Tel: (415) 744-6469 (Doyle)
Fax: (202) 514-8865
Brandon.Adkins@usdoj.gov
Andrew.Doyle@usdoj.gov

JUAN ANTONIO GONZALEZ
Acting United States Attorney

DEXTER LEE (FL Bar No. 936693)
Assistant United States Attorney
Southern District of Florida
99 N.E. 4th Street
Miami, FL 33132
Tel: (305) 961-9320
Fax: (305) 530-7679
DLee@usa.doj.gov

*Attorneys for the United States*

SHARFIEXPERTS0000193

**APPENDIX 2**

**DOJ EXPERT TEAM REPORT**

**FEBRUARY 18, 2022**

129048180.1

SHARFIEXPERTS0000194

# U.S Department of Justice
# Expert Team Report

United States v. Benjamin K. Sharfi and NeshaFarm, Inc.
Case No. 2:21-cv-14205-KAM

### Prepared for

Environment and Natural Resources Division
Environmental Defense Section
U.S. Department of Justice
Washington, D.C.

### Prepared by

Lyndon C. Lee, Ph.D., PWS
Wade L. Nutter, Ph.D., PH
Kai Coshow Rains, Ph.D., PWS
Scott R. Stewart, Ph.D., CPSS
Mike Wylie, M.S.

February 18, 2022

*Expert Team Report United States v. Benjamin K. Sharfi and Neshafarm, Inc.*

SHARFIEXPERTS0000195

i

## SIGNATURE PAGE



Lyndon C. Lee, Ph.D., PWS
Ecosystems Ecology, Wetland and River Science



Wade L. Nutter, Ph.D., PH
Hydrology

Kai Coshow Rains, Ph.D., PWS

Scott R. Stewart, Ph.D., CPSS

Mike Wylie, M.S.

*Expert Team Report United States v. Benjamin K. Sharfi and Neshafarm, Inc.*

SHARFIEXPERTS0000196

**Table of Contents**                                                                                        **Principal Author**

I.  Introduction, Objectives, and Technical Team Background .....................................1
   A. Introduction and Objectives ......................................................................................1        MW/LCL
   B. Technical Team Background.......................................................................................1        LCL
II. Site Location, Study Area, Zoning, Habitat and Other Designations.....................2        LCL
   A. Site Location................................................................................................................2        LCL
   B. Study Area...................................................................................................................2        MW
   C. Zoning, Critical Habitats, and Other Designations .................................................3        MW
      1. Zoning .....................................................................................................................3        MW
      2. Plant and Faunal Habitat Designations ................................................................3        MW
      3. Federal Emergency Management Agency (FEMA) Flood Hazard Zone ..........4        MW
III. Overviews of the Landscape Context(s), Geomorphology, Climate, Hydrology,
   Soil, Vegetation, Faunal Support/Habitat Conditions and Waters/ Wetland
   Ecosystem Structure and Functioning in the Vicinity of the Site.............................5
   A. Landscape Context and Geomorphology ..................................................................5        SRS
   B. Regional and Local Climate ......................................................................................6        SRS
      1. Climate Summary....................................................................................................6        WLN
      2. Climate Data and Climatic Conditions During the Study..................................6        WLN
         a.  WETS Analysis.................................................................................................6        WLN
         b.  Antecedent Precipitation Tool .......................................................................7        WLN
   C. Hydrology Overview – Reference Areas and Site ...................................................7        WLN
      1. Bessey Creek Area Hydrology...............................................................................7        WLN
      2. Hydrologic Connectivity Among Reference Areas, Site Wetlands, and Bessey
         Creek ........................................................................................................................8        WLN
   D. Soils Overview - Reference Areas and Site ...........................................................10        SRS
   E. Vegetation Overview - Reference Areas and Site...................................................12        KCR
   F. Faunal Support/Habitat Overview - Reference Areas and Site.............................13        LCL
      1. Reference Areas ...................................................................................................13        LCL
      2. Site .......................................................................................................................14        LCL
IV. Methods...........................................................................................................................16
   A. Review of Background Materials.............................................................................16        MW
      1. Standard/Public Domain Materials ....................................................................16        MW
      2. Documents and Electronically Stored Information.............................................17        MW
      3. Interviews and Other Contacts ............................................................................17        MW
      4. Federal Employees...............................................................................................17        MW
      5. Local Government ................................................................................................17        MW
      6. Landowners and Managers ..................................................................................17        MW
      7. Dates of Field Visits and Team Members to Reference Areas and Site Vicinity17      WLN
   B. Study Methods..........................................................................................................18
      1. Overview of the Structure of Reference Systems, How They Are Used, and
         Selection of Reference Areas and Locations..................................................18        MW
      2. Reference Area Study Methods ...........................................................................19        WLN

*Expert Team Report United States v. Benjamin K. Sharfi and Neshafarm, Inc.*

| | | | |
|---|---|---|---|
| a. | Hydrology | 19 | WLN |
| b. | Soils | 20 | SRS |
| c. | Vegetation | 21 | KCR |
| | (1) Field Preparation | 21 | KCR |
| | (2) Field Assessment | 22 | KCR |
| | (3) Review of Plant Specimens | 22 | KCR |
| d. | Faunal Support/Habitat | 23 | LCL |
| 3. Site Study Methods | | 23 | WLN |
| a. | Hydrology | 23 | WLN |
| b. | Soils | 24 | SRS |
| c. | Vegetation | 24 | KCR |
| | (1) Sources of Information | 24 | KCR |
| | (2) Field Visits | 24 | KCR |
| d. | Faunal Support/Habitat | 26 | LCL |

C. Review and Refinement of Existing Waters/Wetlands Identifications and
Delineations ... 27

  1. Reference Materials and Procedures Related to the Clean Water Act and
Regulations ... 27 — MW/LCL

  2. Rationale for Using the Atypical Situations Determination of the Geographic
Extent of Water/Wetlands on the Site ... 29 — MW/LCL

  3. Review and Refinement of Prior Delineations on the Site ... 29 — MW/LCL

  4. Site Locations and Cartographic/GIS and LiDAR Products Used to Facilitate
Delineation ... 29 — LCL

  5. Characterization/Delineation of the Geographic Extent of Waters/Wetlands on
the Site Prior to Disturbance ... 30 — MW/LCL

D. Assessment of the Functions of Waters/Wetlands Ecosystems ... 31 — LCL

V. Results ... 34

  A. Summary and Time-Sequence of Mechanical Clearing, Fill Import-Export,
Earthwork and Construction Activities on the Site ... 34 — LCL

  B. Overview of the Types/Classes and Structure of Waters/Wetlands on Reference
Areas and by Inference on the Site Prior to Construction Activities ... 34 — LCL

  C. DOJ Expert Team Determination of the Geographic Extent of Waters of the U.S.
on the Site Prior to Mechanical Clearing of Vegetation, and Earthwork That
Included Excavation and Redistribution of Soils, Imports of Fill Materials, Land
Leveling, and Road and Building Construction ... 35 — MW

  1. DOJ Expert Team Peer Review of Previous Delineations ... 35 — MW

  2. The DOJ Technical Team Determination of the Areal Extent of
Waters/Wetlands on the Site ... 35 — MW

  3. The Upstream Reach of Bessey Creek Proximate to the Site is a Perennially
Flowing Tributary to Downstream TNWs ... 37 — WLN

  4. Land Uses and Impaired Water Quality in Bessey Creek ... 37 — MW

  5. The Site and Countess Joy Wetlands Abut the N/S Ditch ... 38 — MW

*Expert Team Report United States v. Benjamin K. Sharfi and Neshafarm, Inc.*

SHARFIEXPERTS0000198

6. The Site Wetlands and "Similarly Situated" Wetlands in the Bessey Creek Watershed have a Significant Nexus to Downstream TNWs Including Section 10 Reaches of Bessey Creek, the North Fork St. Lucie River and the Nearshore Waters of the Atlantic Ocean ........................................................38    MW

   a. Surface and Subsurface Water Storage and Exchange Processes in Wetlands on the Site and in Similarly Situated Wetlands Are Important in Maintaining the Physical, Chemical, and Biological Integrity of Downstream TNWs ........................................................38    MW

   b. Nutrient Cycling, Storage, and Removal of Elements and Compounds Processes in Wetlands on the Site and in Similarly Situated Wetlands Are Important in Maintaining the Chemical Integrity of Downstream TNWs.40    MW

   c. Carbon Production and Export Processes That Occur in Wetlands on the Site and in Similarly Situated Wetlands Are Important in Maintaining the Chemical and Biological Integrity of Downstream TNWs........................41    MW

   d. Wetland Sediment Trapping and Retention in Wetlands on the Site and in Similarly Situated Wetlands is an Important Process That Helps to Maintain the Physical and Chemical Integrity of Downstream TNWs .....42    MW

   e. Maintenance of Plant and Faunal Communities on the Site and in Similarly Situated Wetlands Are Important in Maintaining the Biological Integrity of Downstream TNWs .................................................42    LCL

7. Summary of WOTUS Determinations........................................................43    MW

D. Summary of Waters/Wetland Ecosystems Conditions on Reference Areas and by Inference, on the Site Prior to and After Mechanical Clearing and Earthwork Activities ........................................................44    WLN

1. Hydrologic Conditions........................................................44    WLN

   a. Summary of Landscape Hydrologic Conditions and Connections Among Reference Area Wetlands and by Inference on the Site, to Downstream Waters - Prior to Mechanical Clearing and Earthwork Activities .............44    WLN

   b. Summary of Landscape Hydrologic Conditions and Connections Among Reference Area Wetlands and by Inference on the Site, to Downstream Waters After Mechanical Clearing and Earthwork Activities ...................46    WLN

2. Hydrologic Studies........................................................46    WLN

3. Soil Conditions........................................................53    SRS

   a. Summary of Soil Conditions in Reference Area Wetlands and by Inference on the Site - Prior to Mechanical Clearing and Earthwork Activities .......53    SRS

   b. Summary of Soil Conditions in Reference Area Wetlands and by Inference on the Site - After Mechanical Clearing and Earthwork Activities...........54    SRS

4. Vegetation Conditions ........................................................55    KCR

   a. Summary of Vegetation Conditions in Reference Area Wetlands and by Inference on the Site - Prior to Mechanical Clearing and Earthwork Activities........................................................55    KCR

      (1) Physical Setting for Vegetation ........................................................55    KCR

      (2) Landscape Structure and Function Influences on Vegetation..........55    KCR

*Expert Team Report United States v. Benjamin K. Sharfi and Neshafarm, Inc.*

v

(3)  Summary of Prior Existing Vegetation at the Site ...........................57   KCR
(4)  Results of the Review of Prior-Existing Vegetation as Depicted on
     Publicly Available Maps and Aerial Imagery ...................................57   KCR
(5)  Results of the Review of Vegetation Descriptions and Photographs
     Made on the Site ........................................................................59   KCR
(6)  Results of Data Collection at Vegetation Reference Areas .............59   KCR
b.  Wetland Forested Mixed Reference Areas ...............................................60   KCR
c.  Freshwater Marsh Reference Area ...........................................................60   KCR
d.  Mixed Shrub / Mixed Wetland Hardwood Reference Areas ....................61   KCR
    (i) Overview of the vegetation documented in Mixed Shrub Wetland
        Reference Areas and in transitions between Mixed Shrub wetlands
        and forested Reference areas: .............................................................61   KCR
    (ii) Vegetation in Reference areas situated at transition zones between
        Mixed Shrub wetlands and forests..........................................................62   KCR
    (iii) Vegetation in Reference Shrub Wetland plots adjacent to the Site ..62   KCR
    (iv) Vegetation in Reference plots representative of late-stage Mixed
        Shrub/ Mixed Wetland Hardwood ...........................................................63   KCR
E. Summary of Vegetation Conditions in Reference Area Wetlands and by
   Inference on the Site - After Mechanical Clearing and Earthwork Activities .....63   KCR
F. Faunal Support/Habitat Conditions ...........................................................64   LCL
    a.  Summary of Faunal Support/Habitat Conditions in Reference Area
        Wetlands and by Inference on the Site - Prior to Mechanical Clearing and
        Earthwork Activities ................................................................................64   LCL
    b.  Summary of Faunal Support/Habitat Conditions in Reference Area
        Wetlands and by Inference on the Site – After Mechanical Clearing and
        Earthwork Activities ................................................................................65   LCL
G. Impact Assessments ........................................................................................66   LCL
    1. Direct Impacts ...........................................................................................66   LCL
    a.  Area of Fill ...............................................................................................66   SRS
    b.  Volume of Fill ...........................................................................................67   SRS
    c.  Summary of the Scale and Scope of Direct Impacts.................................67   LCL
        (1)  The scale and scope of waters/wetlands impacts on the Site are such
             that original conditions that would support the suite of hydrologic,
             biogeochemical, plant community, and faunal support /habitat
             ecosystem functions are not present and not recoverable.................67   LCL
        (2)  In addition to their (geographic) scale and scope, impacts have been
             in place long enough to be considered permanent (See Temporal
             Impacts Section Below in this Expert Report)....................................68   LCL
        (3)  Fundamental alterations to patterns of water flow and circulation and
             removal/substitution of organic (muck) soils with imported mineral
             soil fill materials has caused a permanent and irreversible change of
             state of waters/wetlands physical environmental conditions and

associated hydrologic, biogeochemical, plant community, and faunal support/habitat ecosystem functions on the Site...............................68    LCL

(4)    What remains in the depressional wetland system is hydrologically (physical integrity) and biogeochemically (chemical integrity) degraded...........................................**Error! Bookmark not defined.**    LCL

(5)    What remains in this depressional wetland system is highly degraded with respect to plant community structure and functioning (biological integrity) and faunal support/habitat functions (biological integrity)...................................................69    LCL

2. Indirect (Secondary) Impacts to Waters/Wetlands ...........................69    MW

a.    Alterations to the Timing, Volume, and Rates of Water Discharges Off the Site and Downstream ............................................70    MW

b.    Breaking Surface and Subsurface Hydrologic Connections Among Wetlands on the Site and Off-Site Waters/wetlands................................70    MW

c.    Polluted Stormwater Export to Impaired Waters and TNW's ..................70    MW

d.    Changes in the Rate, Timing, and Quality of Carbon Export Off Site ......71    MW

3. Cumulative Impacts are defined at 40 CFR 230.11(g) as follows – ................71    LCL

4. Temporal Impacts to Water/Wetlands Area and Functions ...........................73    LCL

5. Summary of Direct Impacts to Waters/Wetland Ecosystem Functions...........73    LCL

a.    UMAM Summary of Direct Impacts to Waters/Wetland Ecosystem Functions....................................................73    LCL

b.    Reference Area Conditions ...............................................73    LCL

c.    Site Conditions......................................................74    LCL

d.    Reference and Site Wetland UMAM Score Comparisons.......................75    LCL

H. On-and Off-Site Compensatory Mitigation.........................................75    LCL

1. Overview.......................................................75    LCL

2. On-Site Recommendations and Opinions ...........................................76    LCL

a.    Protect Water Quality ................................................76    LCL

(1)    Install and Maintain Site Wide BMPs ...............................76    LCL

(2)    Manage Ponds.................................................76    LCL

(3)    Separate Clean Roof Water......................................76    LCL

(4)    Manage the Remaining "Forested" Wetland Depression ................77    LCL

3. Off-Site Recommendations and Opinions .......................................77    LCL

VI. Literature Cited & Other References ...............................................79

List of Materials Considered.............................................................84

VII. Appendices ............................................................................86

List of Tables (Tables are in Appendix 3)

Table II.A.1.          Coordinates of the Site corners.

*Expert Team Report United States v. Benjamin K. Sharfi and Neshafarm, Inc.*

Table III.B.2.1.      WETS Table published by the NRCS for Stuart, FL NOAA Station for the period 1971-2000.

Table III.C.1.1      Composited Historical flow in Bessey Creek at the Hybrid Water Treatment Technology facility.

Table IV.B.1.1.      Dates of field visits by team scientists to the Reference Areas and the Site.

Table V.B.1.      Standard Definitions of Wetland Classes Based on Hydrogeomorphic Properties.

TableV.C.6.e.1.      Plant Species List.

**List of Figures (Figures are in Appendix 4)**

Figure II.A.1.      Location of the Defendant's property (Site) east of Palm City, Martin County, Florida.

Figure II.A.2.      Overview of the Site and adjacent Countess Joy East and West reference areas.

Figure II.A.3.      Boundary survey of the Site and description of improvements present conducted November 5, 2018 and updated November 16, 2018 and December 5, 2019.

Figure II.B.1.      The SFWMD Basin 4 selected as the Study Area.

Figure II.B.2.      USGS topographic map and National Hydrography Dataset streams, canals, and ditches in the vicinity of the Site and Reference Areas.

Figure II.B.3.      USGS topographic map, National Hydrography Dataset streams, canals, and ditches, and the USFWS National Wetland Inventory wetlands in the vicinity of the Site and Reference Areas.

Figure II.C.3.1.      FEMA National Flood Hazard flood zones for Basin 4 Study Area.

Figure III.A.1.      Depiction of a tree-like or "dendritic" stream channel pattern and stream order typical of stream ecosystems in the south Florida coastal regions (after R. Lee, Forest Hydrology, 1980).

Figure III.B.2.1.      Location of precipitation stations referenced in the Antecedent Precipitation Tool (APT) used in this study.

Figure III.B.3.1.      Antecedent Precipitation Tool (APT) analysis used in the study. The dates of field visits by Expert Team members are also shown.

*Expert Team Report United States v. Benjamin K. Sharfi and Neshafarm, Inc.*

Figure III.C.1.1.    Location of the N/S Ditch in relation to the Site, Reference Areas, and
                     Bessey Creek. The Hybrid Water Technology Treatment (HWTT)
                     facility that withdraws and returns water to Bessey Creek is also located.

Figure III.C.2.1.    Map submitted by the Defendant's consultants requesting exemption of
                     existing agricultural activity on the Site with arrows showing direction
                     of "Run-off Flow" and "Stream Flow" to Bessey Creek.

Figure III.D.1.      USDA NRCS soil map units in the vicinity of the Site, Reference Area,
                     other Reference Plots.

Figure III.D.2.      USDA NRCS soil map units on the Site.

Figure IV.B.1.1.     Location of all reference plots and proximity to each other for the Site,
                     Countess Joy East and West Reference Areas, Martin County Solid
                     Waste Transfer Station and Landfill, FDOT, and Traiana.

Figure IV.B.1.2.     Location of reference plots at the Countess Joy East and West Reference
                     Areas.

Figure IV.B.2.a.1.   Location of Site and Countess Joy Reference Area water table
                     monitoring wells, surface water gauges, and observed Site drainage pipe
                     outlets

Figure IV.C.3.c.1.   Land use and cover classification system (LULC) in the vicinity of the
                     Site.

Figure IV.D.4.1.     A hillshade elevation comparison of the 2016 and 2019 LiDAR images.

Figure IV.D.5.1.a.   SFWMD Site inspection April 30, 2019 noting Site SW Corner cleared
                     and recently sodded.

Figure IV.D.5.1.b.   SFWMD aerial photo of the Site on October 17, 2018 showing cleared
                     SW corner, grading activity in NW corner, and a linear graded feature in
                     the wooded area between the SW and NW corners.

Figure IV.D.5.2.     DL Small's wetland sample points.

Figure V.C.1.1.a.    Survey of DL Small, Inc. wetland delineation of the Site.

Figure V.C.1.1.b.    EDC wetland delineation of the Site.

Figure V.C.1.1.c.    EDC delineation overlaid on 2021 aerial photograph of the Site.

Figure V.C.2.1.      DOJ Expert Team Wetland Delineation.

*Expert Team Report United States v. Benjamin K. Sharfi and Neshafarm, Inc.*

SHARFIEXPERTS0000203

| | |
|---|---|
| Figure V.C.2.2. | N/S Ditch OHWM (Ordinary High Water Mark) at northwest corner of the site. View is to the south showing portion of the N/S ditch that was cleared by the Defendant. |
| Figure V.C.2.3. | N/S Ditch Confluence with Bessey Creek on Countess Joy East Reference Area . View is to the east. |
| Figure V.C.2.4. | Water in the N/S Ditch on August 23, 2021 on the Countess Joy East Reference Area. Location is about 500 feet north of the Site's northwest corner and view is to the north. |
| Figure V.C.2.5. | Water in the N/S Ditch on September 15, 2021 on the Countess Joy East Reference Area. Location is about 500 feet north of the Site's northwest corner and view is to the north (same location as shown in Figure V.C.2.4 ). |
| Figure V.C.2.6. | Countess Joy East Reference Area wetlands flow into 84th Avenue eastern ditch near R Well 7. View is to the west and 84th Avenue is in the background. |
| Figure V.C.2.7. | Eastern 84th Avenue ditch confluence with Bessey Creek on Countess Joy East Reference Area. Bessey Creek culvert beneath 84th Avenue is to the lower left corner of the photograph. |
| Figure V.C.2.8. | Countess Joy East Reference Area wetlands abut N/S Ditch. Water flows in N/S Ditch south to Bessey Creek at high water levels and west toward 84th Avenue eastern ditch. |
| Figure V.C.2.9. | Countess Joy East Reference Area W7 wetland sampling point abutting Bessey Creek. |
| Figure V.C.2.10. | Countess Joy East Reference Area W5 wetland sampling point abutting Bessey Creek. |
| Figure V.C.2.11. | Countess Joy East Reference Area W6 wetland point abutting Bessey Creek. |
| Figure V.C.2.12. | Bessey Creek is a TNW at SW Murphy Road Bridge latitude 27.1903° north and longitude 80.2977° west. |
| Figure V.C.3.1. | Bessey Creek aquatic vegetation on Countess Joy East Reference Area on September 15, 2021. |
| Figure V.C.4.1. | Land use defined by LULC for Basin 4 Study Area. |

*Expert Team Report United States v. Benjamin K. Sharfi and Neshafarm, Inc.*

SHARFIEXPERTS0000204

Figure V.C.4.2.        Martin County Septic to Sewer Conversion Program.

Figure V.C.4.3.        Cropland and pasture land for Basin Study Area.

Figure V.C.6.1.        Martin County Septic to Sewer Conversion Program.

Figure V.C.6.a.1.      Water table depth at the Site wetland sampling point B5 on October 19, 2021.

Figure V.C.6.a.2.      Water table depth at Countess Joy Reference Area wetland sampling point W1 on August 23, 2021.

Figure V.C.6.a.3.      Martin County Solid Waste Transfer Station and Landfill facility reference area wetland sampling point W16 on October 22, 2021.

Figure V.C.6.a.4.      Traiana Reference Area wetland sampling point W17 on October 22, 2021.

Figure V.C.6.a.5.      FDOT Reference Area wetland sampling point W15 on October 22, 2021.

Figure V.C.6.a.6.      Depressional wetlands NE of Site on Countess Joy East Reference Area.

Figure V.C.6.a.7.      Countess Joy West Reference Area wetland water connection to Bessey Creek.

Figure V.C.6.a.8.      Pipe at Countess Joy West Reference Area north of Bessey Creek discharging water from depressional wetlands flowing to Bessey Creek.

Figure V.C.6.a.9.      Docks in Bessey Creek with mangrove trees in the foreground.

Figure V.C.6.b.1.      Depressional wetlands on Countess Joy East Reference Area trapping and sequestering pollutants and nutrients.

Figure V.C.6.b.2.      Example of potential water quality impact to Bessy Creek with cow manure at Bessey Creek cattle crossing on Countess Joy East Reference Area.

Figure V.C.6 b.3.      Wetlands trapping pollutants; sediment and cattle manure trapped next to Bessey Creek on Countess Joy East Reference Area.

Figure V.C.6.b.4.      Wetland sampling point W2 showing positive alpha, alpha' dipyridyl test on Countess Joy East Reference Area.

Figure V.C.6.c.1.      Observed carbon export to Bessey Creek, Countess Joy West Reference Area.

*Expert Team Report United States v. Benjamin K. Sharfi and Neshafarm, Inc.*

SHARFIEXPERTS0000205

Figure V.C.6.c.2.    Example of carbon export to Bessey Creek on Countess Joy East
                     Reference Area.

Figure V.C.6.c.3.    Example of carbon export to Bessey Creek on Countess Joy East
                     Reference Area.

Figure V.C.6.d.1.    Sedimentation in Bessey Creek at Mallard Creek Trail.

Figure V.C.6.d.2.    Sedimentation in Bessey Creek at Citrus Blvd.

Figure V.C.6.d.3.    Example of wetlands trapping sediments on the Countess Joy West
                     Reference Area.

Figure V.C.6.d.4.    Wetlands trapping sediments near wetland sampling point W7 on
                     Countess Joy East Reference Area.

Figure V.C.6.e.1.    Grass sod discharged into wetlands on the Site.

Figure V.D.1.a.1.    Aerial photo from 1966 showing land modifications for agriculture
                     (likely citrus trees), surface drainage patterns, and sparse woody
                     vegetation.

Figure V.D.1.a.2.    Aerial photo sequence from 1966, 2016, and 2021 showing land use
                     changes on the Site and the Countess Joy East Reference Area.

Figure V.D.1.a.3.    Aerial photo from 1966 showing historical wetland discharge locations
                     and how they have changed with the construction of 84th Avenue. All
                     discharge locations are currently evident and were verified during the
                     Expert Team field visits.

Figure V.D.1.a.4.    The 2019 Martin County LiDAR showing the field located primary
                     surface flow path from the Site through the N/S Ditch and a continuum
                     of wetlands, depressions, and micro-topographic features. Wetland
                     waterflow is to the 84th Avenue roadside ditch and then to Bessey
                     Creek. The roadside ditch and Bessey Creek are perennially flowing
                     streams.

Figure V.D.1.a.5.    Perennial flow from the Site wetlands to the Atlantic Ocean.

Figure V.D.1.b.1.1.  Graphical output of Reference Area water level monitoring wells R
                     Wells 1, 2, and 3.

Figure V.D.1.b.1.2.  Graphical output of Reference Area water level monitoring wells R
                     Wells 4, 5, and 6.

*Expert Team Report United States v. Benjamin K. Sharfi and Neshafarm, Inc.*

Figure V.D.1.b.1.3.     Graphical output of Reference Area water level monitoring wells R Well 7.

Figure V.D.1.b.1.4.     Water level gages in N/S Ditch and Bessey Creek.

Figure V.D.1.b.1.5.     Graphical output of Site water level monitoring wells C1, C4, and A5.

Figure V.D.1.b.1.6.     Graphical output of Site water level monitoring wells C6, A6, and B7.

Figure V.D.3.1.         Prior to impact, lands within the Site were identified as Strategic Habitat Conservation Areas (SHCA) by the Florida Fish and Wildlife Conservation Commission and Florida Natural Areas Inventory.

Figure V.D.3.2.         The SFWMD LULC 2017-2019 map is based on aerial imagery of the Site during impact whereas the SFWMD LULC 2014-2016 map is based on aerial imagery from pre-impact.

Figure V.D.3.3.         Vegetation mapping polygons (SFWMD LULC 2014-2016) and an unmapped Freshwater Marsh inclusion.

Figure V.G.1.b.1.       Expert Team's estimated area of fill within the delineated wetland area. Area of fill is 5.97 ac less the 0.79 ac of remnant depression wetland, or 5.18 wetland acres filled.

## List of Photographs (Photographs are in Appendix 5)

Photograph III.E.1.     Shrub Wetland vegetation present at the Site prior to land clearing. The obligate wetland species, royal fern *(Osmunda spectabilis)* is visible in the foreground.

Photograph III.E.2.     Following land conversion, the central area of the Site is dominated by managed turf where Shrub Wetland vegetation was formerly prevalent.

Photograph III.E.3.     Dead branches in the canopy of a remnant slash pine *(Pinus elliottii)*. Location: NW corner of the Site.

Photograph III.E.4.     Girdled trunks of saplings and small trees. Location: SE corner of the Site.

Photograph III.E.5.     Algal growth in surface water. Location: North side of degraded depressional wetland.

Photograph III.E.6.     Discolored surface water and algal mat. Location: North side of degraded depressional wetland.

*Expert Team Report United States v. Benjamin K. Sharfi and Neshafarm, Inc.*

SHARFIEXPERTS0000207

Photograph III.E.7.    Dead vegetation around base of plants. Location: North edge of degraded depressional wetland, south of sample point B6.

Photograph III.E.8.    Dead foliage on local patch of pickerel weed near site of herbicide application. Location: North edge of degraded depressional wetland, adjacent to location of photo.

Photograph III.E.9.    West shoreline of cypress-lined pond.

Photograph III.E.10.   North shoreline of cypress-lined pond.

Photograph III.E.11.   Manicured turf abruptly meets the water edge.

Photograph IV.C.3.a.1. The Solinst well point and data logger.

Photograph IV.C.3.a.2. A complete well assembly with well point, stick-up pipe with cap, and data logger.

Photograph IV.C.3.a.3. An installed well in the Countless Joy East Reference Area (R Well A4).

Photograph IV.C.3.a.4. Stage gauge installation in Bessey Creek.

Photograph IV.C.4.a.1. Installed well at the Site with the steel cap below the surface before sod replaced.

Photograph IV.C.4.a.2. The jacking apparatus used to remove the wells on the Site.

Photograph IV.C.4.a.3. Site well C4 could not be removed by the jacking method because the riser pipe became detached from the well point and had to be dug out. Soil and sod were replaced after the well was retrieved.

Photograph V.D.1.a.4  PVC pipe with cap at the south boundary of the remnant wetland depression. The pipe invert is at the level of the depression and is extended into fill.

Photograph V.D.3.b.1  A mixed soil profile. Lighter colored material overlays a darker surface horizon and light colored sands are present and mixed with the current surface horizon.

Photograph V.D.3.b.2  A mixed soil profile over a thin surface remnant at approximately 11-12 inches.

*Expert Team Report United States v. Benjamin K. Sharfi and Neshafarm, Inc.*

SHARFIEXPERTS0000208

Photograph V.D.3.b.3   A mixed soil horizon with light colored sands placed over a buried remnant of a surface horizon.

Photograph V.D.3.b.4.   Part of a disturbed soil profile showing buried roots and woody debris.

Photograph V.D.3.b.5.   A light colored sand mixed throughout the soil profile.

Photograph V.D.3.b.6.   A multi-layered profile with sod at the surface over a mixed light-colored sand and beneath that a buried organic horizon. Location is Well C4.

Photograph V.D.4.1.   Royal fern, a wetland obligate species, was photo documented at the Site in 2018.

Photograph V.D.4.2.   Plants re-sprouting after understory vegetation was cleared at the Site.

Photograph V.D.4.3.   Remnant red maple in the NW corner of the Site displaying cambium damage and dead branches.

Photograph V.D.4.4.   Vegetation in Reference plot W11, a Wetland Mixed Forest.

Photograph V.D.4.5.   Vegetation in the upper canopy of Reference plot W11, a Wetland Mixed Forest.

Photograph V.D.4.6.   Sphagnum moss on the ground of Reference plot W11, a Wetland Mixed Forest.

Photograph V.D.4.7.   Vegetation in Reference plot W12, a Wetland Mixed Forest.

Photograph V.D.4.8   Vegetation in a reference Freshwater Marsh located at RWell05.

Photograph V.D.4.9   Vegetation in Reference plot W13, located at the transition between a coniferous forest and a mixed Shrub Wetland.

Photograph V.D.4.10   Vegetation in Reference plot W16, located at the transition between a coniferous forest and mixed Shrub vegetation types.

Photograph V.D.4.11   Vegetation in a Mixed Shrub wetland reference plot (W04) subject to grazing located 320 ft north of the Site.

Photograph V.D.4.12   Vegetation in a Mixed Shrub wetland reference plot (W01) subject to grazing located 50 ft north of the Site.

Photograph V.D.4.13   Vegetation in a Mixed Wetland Hardwood Forest (Reference plot W14), representative of a late seral Mixed Shrub vegetation type.

SHARFIEXPERTS0000209

Photograph V.D.4.14      Dense vegetation in a Mixed Shrub-Mixed Wetland Hardwood wetland
                         (Reference Plot W15).

Photograph V.D.4.15      Vegetation in a Mixed Wetland Hardwood wetland (Reference plot
                         W17) representative of a late seral Mixed Shrub vegetation type.

Photograph V.D.4.16      The abrupt transition between the depressional wetland and managed
                         turf at the Site.

**Appendices**

Appendix 1      List of Acronyms
Appendix 2      Curriculum vitae for DOJ Technical Team Members
Appendix 3      Tables
Appendix 4      Figures
Appendix 5      Photographs
Appendix 6      Wetland Data Forms
Appendix 7      Hydrology and Survey Data
Appendix 8      Soil Descriptions
Appendix 9      Functional Assessment Data Sheets

*Expert Team Report United States v. Benjamin K. Sharfi and Neshafarm, Inc.*

SHARFIEXPERTS0000210

1

## I. Introduction, Objectives, and Technical Team Background

### A. Introduction and Objectives

This Expert Report has been developed to document observations and conclusions of an expert technical team retained by the Environment and Natural Resources Division of the U.S. Department of Justice (DOJ) in the matter of U.S. v BENJAMIN K. SHARFI, in his personal and fiduciary capacity as trustee of the Benjamin Sharfi 2002 Trust, and NESHAFARM, INC., Case No. 2:21-cv-14205-KAM.

The objectives of this Expert Report are to provide-

1. An analysis of the area of Waters of the U.S. including wetlands delineated on the Site, as that term is defined in the Amended Complaint and described below.

2. Analyses of impacts to waters/wetlands area and functioning due to mechanical clearing of vegetation and associated redistribution of soils, changes in the bottom elevation of wetlands, and decreases in the areal extent of wetlands, soil excavations, filling, road construction, and other earthwork which involved discharges of dredged and/or fill material to waters of the United States..

3. Provide recommendations for mitigation of impacts, including options for on-site restoration and off-site mitigation.

### B. Technical Team Background

The DOJ Expert Technical Team members and their roles are as follows:

| | |
|---|---|
| Lyndon C. Lee, Ph.D., PWS | Ecosystems Ecology, Wetland and River Science |
| Wade L. Nutter, Ph.D., PH | Hydrology |
| Kai Coshow Rains, Ph.D., PWS | Plant Ecology and Systematics |
| Scott R. Stewart, Ph.D., CPSS | Soil Science & Geomorphology |
| Mike Wylie, M.S. | Wetland Science, Regulatory |

Assistance in field work was provided by Tony Greco, Drew Miller, and Jackson LaFleur of Nutter & Associates, Inc. Mr. Greco also assisted in preparing maps, figures, and some area calculations. Curriculum Vita for each of the technical team members is included in Appendix 2 of this Expert Report.

The DOJ Expert Team worked closely with one another to collect and analyze data and reach the conclusions and opinions presented in this Expert Report. Principal authors of report sections are given in the Table of Contents.

*Expert Team Report United States v. Benjamin K. Sharfi and Neshafarm, Inc.*

SHARFIEXPERTS0000211

2

## II. Site Location, Study Area, Zoning, Habitat and Other Designations

### A. Site Location

The Site is a 9.92-acre property that is situated east of the city of Palm City, in unincorporated Martin County, Florida (Figure II.A.1 and Figure II.A.2). The Site is located less than two miles east of Interstate 95, approximately 0.35 miles north of southwest Martin Highway, 0.30 miles south of Bessey Creek and 3 miles west of Florida's Turnpike.  The Latitude/Longitude coordinates for the approximate center of the Site are 27.1682° North and 80.3622° West. The Martin County Property Appraiser describes the property as Local Parcel ID: 173840000038000000. Locations of the Site corners are given in Table II.A.1. A boundary survey (FDACS0000017) dated November 5, 2018 by Karner Surveying, Inc., including descriptions of improvements on the Site with survey updates dated November 16, 2018 and December 5, 2019 is presented as Figure II.A.3.

The Site is bounded to the north and west by drainageways that flow west and north to Bessey Creek, which is located 0.30 miles (1,577 feet) north of the Site. Bessey Creek then flows east for approximately 7 miles, where it joins the tidally influenced and Traditional Navigable Waters (TNWs) of the St. Lucie River. Bessey Creek becomes tidally influenced upstream from its junction with the St. Lucie River. Consequently, the tidally influenced downstream reach of Bessey Creek is a TN approximately 4.5 miles downstream from the Site. From its junction with Bessey Creek, the St. Lucie River then flows east and then southeast for approximately 10.9 miles. It joins the TNWs of St. Lucie Inlet and the Atlantic Ocean.

### B. Study Area

One of the objectives of the DOJ Expert Team was to determine if there were wetlands on the Site prior to initiation of Site development activities and if so, whether impacted wetlands on the Site were Waters of the United States (WOTUS). To this end, we established an approximately 11,049-acre Study Area in the vicinity of the Bessey Creek watershed. This Study Area included the Site wetlands and approximately 1,064 acres of similarly situated wetland areas within the Bessey Creek watershed that were mapped by the U.S. Fish and Wildlife Service's (USFWS) National Wetlands Inventory (NWI) (Figure II.B.1). The DOJ Expert Team will provide evidence that there were wetlands on the Site prior to development activities and that the Site wetlands directly abut and have regular surface and shallow subsurface hydrologic connections to Bessey Creek. We will also show that if either taken alone or in combination with the approximately 1,064 acres of similarly situated wetland areas in the Study Area mapped by NWI, wetlands on the Site have a significant effect on maintaining the chemical, physical and biological integrity of Bessey Creek, a tidally influenced perennial stream at its distal end, and the TNWs of the St. Lucie River, St. Lucie Inlet, and the nearshore waters of the Atlantic Ocean.

Figure II.B.2 is a U.S. Geological Survey (USGS) topographic map of the general area showing the minimal local relief and the National Hydrography Database (NHD) drainages (streams, canals, and ditches). The Site is shown with the Bessey Creek connection ditch (designated as

*Expert Team Report United States v. Benjamin K. Sharfi and Neshafarm, Inc.*

3

N/S ditch) on the west side of the Site.  Figure II.B.3 shows the same area as Figure II.B.2 with both the NHD designations and the NWI wetlands distributed throughout the area. NWI wetlands are determined using maps, soil, and vegetation interpretation by the USFWS. They are not used alone to designate WOTUS. however, they are regularly used by wetland professionals as one indicator of the possible extent of WOTUS in an area. This is because the areal extent of NWI wetlands is determined using NWI definitions of wetlands and via photo and other imagery interpretation and limited field verification of hydrologic, hydric soils, and vegetation conditions. Also shown on Figures II.B.2 and II.B.3 is the Reference Area portions of the Study Area. The Reference Areas used to develop this Expert Report are generally contiguous with or very near the Site. Designation and use of Reference Areas are described in greater detail in subsequent chapters of this Expert Report.

### C.  Zoning, Critical Habitats, and Other Designations

#### 1.  Zoning

Martin County has zoned the Site as A-2 for agricultural use and designated the Site for future land use as Agriculture Ranchette.

#### 2.  Plant and Faunal Habitat Designations

The Site is listed on the USFWS website (https://ecos.fws.gov/ecp/report/species-listings-by-current-range-county?fips=) as being within an area where the following species could be affected by activities in the Site's location:

Mammals: Florida Panther - *Puma concolor coryi;* Southeastern Beach Mouse - *Peromyscus polionotus niveiventris*

Birds: Audubon's Crested Caracara - *Polyborus plancus audubonii;* Everglade Snail Kite - *Rostrhamus sociabilis plum;* Florida Grasshopper Sparrow - *Ammodramus savannarum floridanus;* Whooping Crane - *Grus americana;* Wood Stork - *Mycteria americana*

Reptiles: Eastern Indigo Snake - *Drymarchon corais couperi;* Hawksbill Sea Turtle – *Eretmochelys* imbricata*;* Leatherback Sea Turtle - *Dermochelys coriacea;* Loggerhead Sea Turtle - *Caretta caretta*

Insects: Florida Leafwing Butterfly - *Anaea troglodyta floridalis;* Miami Blue Butterfly - *Cyclargus thomasi;* Monarch Butterfly - *Danaus plexippus;*

Plants: Beach Jacquemontia - *Jacquemontia reclinate;* Four-petal Pawpaw - *Asimina tetramera;* Lakela's Mint - Dicerandra *immaculata;* Tiny Polygala - *Polygala smallii*

Lichens: Florida Perforate Cladonia - *Cladonia perforate*

*Expert Team Report United States v. Benjamin K. Sharfi and Neshafarm, Inc.*

SHARFIEXPERTS0000213

4

### 3. Federal Emergency Management Agency (FEMA) Flood Hazard Zone

Figure II.C.3.1 is a map depicting the FEMA Flood Hazard Zones (1% Annual Chance Flood Hazard) for the Site. Bessey Creek and much of its flood plain is included in the AE zone or the 1% Annual Chance Flood Hazard Zone. The 1% Annual Chance Flood Hazard Zone implies that there is, on average, a 1% chance of a 100-year flood occurring in any year on the Site.

SHARFIEXPERTS0000214

5

### III. Overviews of the Landscape Context(s), Geomorphology, Climate, Hydrology, Soil, Vegetation, Faunal Support/Habitat Conditions and Waters/ Wetland Ecosystem Structure and Functioning in the Vicinity of the Site

#### A. Landscape Context and Geomorphology

In Martin County, four major geologic formations occur. They are:

1. The Caloosahatchee Marl is the oldest formation and Pliocene in age. It consists mainly of sand and varying amounts of shells. It underlies the entire survey area and is close enough to the surface to be exposed in the deeper canals.

2. The Fort Thomas formation is of Pleistocene age and consists of interbedded limestone, shells, sand, and marl of brackish and freshwater origin and rests unconformably on the Caloosahatchee Marl and dips from west to east.

3. The Anastasia Formation is also of Pleistocene age. It rests unconformed on the Fort Thomas Formation and consists of sands, shells and discontinuous beds of sandy limestone and sandstone. It underlies most of the survey area and is exposed in places along the ocean shoreline.

4. The Pamlico Sand is late Pleistocene in age and overlies the other three formations. It covers all of the survey area. This is the material in which most of the mineral soils within the Study Area have formed. The current land surface is the Pamlico Sand. In marshes and swamps that occur in the lower elevation areas within the Study Area, there are sites where organic materials have accumulated to depths of one to six feet thick USDA-NRCS, 1981).

All soil types within Martin County formed in materials that overlie and are influenced by the four major geologic formations (Cook, C. Wythe, 1954). For example, the Site and the Reference Areas used to develop this Expert Report are located on Pliocene and/or late Pleistocene age sands, shells, limestone, sandstone, and marl of marine, brackish or freshwater origin. These surfaces are nearly level to gently sloping. Locally, these geomorphic surfaces are referred to as "flatwoods, low lying flatlands, depressional and poorly developed drainage-ways" (U.S. Department of Agriculture (USDA) – Natural Resources Conservation Service (NRCS) 1981, 2018). Modal soils are derived from "poorly and very poorly drained sandy and loamy marine sediments" that developed on late Pleistocene Pamlico Sand geologic strata (USDA-NRCS, 1981, 2018 Rev.).

Microtopographic relief within the upstream (headwater) portions of the Study Area used to be dominated by linked series of flat to gently sloping forested and scrub/shrub wetlands ("Flatwoods"), "low broad flats," and "poorly defined (small) drainage ways and depressional areas" (USDA-NRCS, 2018). Currently, many of these headwater areas in Bessey Creek have

SHARFIEXPERTS0000215

been converted/consolidated into excavated channels and ponds that are part of the Martin County Solid Waste Transfer and Landfill facility. In central and south Florida and when they are not converted to other uses, wet flats and hummock-depression topography is common in headwater landscape positions. These headwater areas usually transition downstream into irregular and then more coherent and smaller (1st order) tree like ("dendritic") perennial and seasonal stream channel networks (Figure III.A.1). Moving downstream from headwater areas, these 1st order stream channel segments or "reaches" connect to larger (2nd order) streams that in turn connect with larger 3rd and 4th orders streams. For example, from the Site, Bessey Creek is a 3rd order stream at a mapping scale of 1:24,000. It flows east for about 5.6 miles to its confluence with the C-23 canal and thence about one mile to its confluence with the North Fork St. Lucie River. The North Fork Saint Lucie River is a 4th order stream channel at a mapping scale of 1:24,000. The North Fork St. Lucie joins the main stem of the St. Lucie River, which flows generally east and then southeast into the Atlantic Ocean via St. Lucie inlet, which is due west of Port Salerno (Refer to Figure II.B.1).

### B. Regional and Local Climate

#### 1. Climate Summary

The climate of Martin County, Florida is characterized by warm to hot summers and mild winters. The climate inland from the coast is subtropical. Summers are typically humid with average daily high temperatures in the low to mid 90 degrees F and nightly low temperatures in the mid 70 degrees F. Mean annual precipitation is about 59 inches, but it ranges from 30 to 80 inches. Storm events are mainly from convective storms. About 60% of the annual precipitation occurs in the 5-month period June through October, about 20% in March through May, and the remaining 20% in November through February. Tropical storms can cause high precipitation events with the greatest activity in August through October. Extended dry periods do occur in any season but are most prevalent in spring and fall.

#### 2. Climate Data and Climatic Conditions During the Study

##### a. WETS Analysis

Mean annual climatic data are summarized for the Study Area in the NRCS "WETS" table (Table III.B.2.1) compiled for the National Oceanographic and Atmospheric Administration (NOAA) station at Stuart, FL. This NOAA station is the nearest one to the Site with the requisite 30 years data to calculate "normal" conditions (normal conditions are based on 30 years data updated each decade). The average growing season length is shown in the WETS Table as the 50% probability value. Growing season dates (bottom of Table III.B.2.1) indicate the growing season is 365 days/year.

### b. Antecedent Precipitation Tool

The DOJ Expert Team relied on local sources of data to analyze precipitation. A useful method for analyzing local data is the Antecedent Precipitation Tool (APT) developed by the U.S. Army Corps of Engineers (USAC) (https://www.epa.gov/wotus/antecedent-precipitation-tool-apt). The APT evaluates climatological parameters to assist in making and documenting various determinations required by policy for the execution of the USACE's Regulatory Program. It is also useful for developing an understanding of conditions observed during field visits because it calculates antecedent precipitation conditions for user specified sites and then compares those conditions to the normal 30-year precipitation.

The APT analysis identified 10 National Oceanic and Atmospheric Administration's (NOAA) Daily Global Historical Climatology Network precipitation gauges in close proximity to the Site. The primary gauge identified by the APT in the NOAA Network is at Stuart, 7.68 miles from the Site. Elevation of the Stuart station is 13.12 feet MSL and the general elevation of the Site is 21 to 22 feet MSL. Locations of the gauges in proximity to the Site are presented in Figure III.B.2.1. The APT output is presented in Figure III.B.3.1 for 2021 with three 30-day assessment periods ending on December 14, 2021, when on-site data collection ended. Figure III.B.3.1 shows the daily rainfall (vertical bars), the range of normal precipitation expected (shaded area) for the 30th and 70th percentile values for the preceding 30 water years (October 1 through September 30), and the rolling 30-day average of the local precipitation computed from the network of nearby stations. Also shown are the dates of study site visits.

The APT analysis shown in Figure III.B.3.1 concludes that during the last 90-days of the study (beginning 2021-9-16 and ending 2021-12-15) the Drought Index indicated an "incipient drought" in mid-November and that the site was "Drier than Normal" based on the Web-WIMP water balance. The APT analysis and outputs will be discussed in greater detail in the Results section of this Expert Report.

### C. Hydrology Overview – Reference Areas and Site

#### 1.   Bessey Creek Area Hydrology

The Site and Reference Area are within the Bessey Creek watershed which is located in the northeast section of Martin County abutting, in part, St. Lucie County to the north. Around the 1940s and 1950s an extensive drainage program was initiated in southeast Florida, including Martin County, to control water levels in the Everglades and Lake Okeechobee and to create suitable land for agriculture (livestock grazing and citrus orchards) and development. Included in the program was development of a drainage network in the Bessey Creek watershed. The mouth of Bessey Creek is in the North Fork of the St. Lucie River, a principal waterway flowing to the St. Lucie River and then to the Atlantic Ocean. The northern and upstream reach of Bessey Creek is now an excavated channel (origin date unknown) that begins at the Martin County Solid Waste Transfer Station and Landfill facility ponds to the west. It flows east for about 5.6 miles to

*Expert Team Report United States v. Benjamin K. Sharfi and Neshafarm, Inc.*

its confluence with the C-23 canal and thence about one mile to its confluence with the North Fork St. Lucie River. The Bessey Creek watershed, for the most part, is in South Florida Water Management District (SFWMD) Basin 4. Figure III.C.1.1 is Basin 4 showing the SFWMD designated channels and the USGS National Hydrography Database (NHD) channels. The NHD designations include the excavated channel referred to in this Expert Report as the excavated Bessey Creek and many of the primary and secondary drainage ditches discharging to excavated Bessey Creek. The excavated reach of Bessey Creek will hereafter be referred to as Bessey Creek in this Expert Report.

Also shown in Figure III.C.1.1 is the location of the Site and the Reference Areas. The N/S ditch in Figure III.C.1.1 on the west boundary of the Site flows north to join Bessey Creek and bisects the Countess Joy East Reference Area. Bessey Creek, abuts the Countess Joy East and West Reference Areas and is a perennially flowing tributary with a permanently wetted bed that is approximately 15 to 20 feet wide and less than three feet deep. Its banks are 2 to 5 feet high and spoil berms from the original excavation of the Bessey Creek channel system are evident along both banks in most places. There are occasional breaks in the banks and narrow channels that allow water to flow through the berms. The main Bessey Creek channel is approximately 1,600 feet (0.3mi) from the northern boundary of the Site.

Based on our field observations and review of historic aerial photographs, it appears there was a ditch similar to the N/S ditch in place where 84th Avenue was constructed. When 84th Avenue was constructed (sometime prior to 1966) on the west boundary of the Countess Joy East Reference Area, roadside ditches were constructed on both sides of 84th Avenue. Several cross culverts were installed beneath 84th Avenue connecting the two ditches. Flow directions and discharges in both ditches is to Bessey Creek (Figure III.C.1.1).

Approximately 2 miles downstream in Bessey Creek from 84th Avenue (Reference Area western boundary) a permit (Permit 43-02681-W) was issued in 2015 by the SFWMD to Martin County to construct a Hybrid Wetland Treatment Technology (HWTT) facility (USACE 0000235). The purpose of the facility was to withdraw and treat Bessey Creek water to remove nutrients before releasing treated waters back to Bessey Creek (Figure III.C.1.1). As part of the permit application a table of monthly daily maximum, daily median, and daily mean flows in cubic feet per second (cfs) for the 4.2 mi$^2$ (2,675 acres) watershed upstream of the HWTT was published and are presented in Table III.C.1.1 The Site and Reference Area are included in the designated watershed. Highest flows are in June through November. These high flows closely follow normal and storm-related precipitation patterns. Mean daily flow is lowest in May and highest in October.

## 2. Hydrologic Connectivity Among Reference Areas, Site Wetlands, and Bessey Creek

As introduced above in this Expert Report, the general Martin County location and specifically the Site and contiguous Reference Areas occurs on "flatwoods, low lying flatlands, depressional

*Expert Team Report United States v. Benjamin K. Sharfi and Neshafarm, Inc.*

SHARFIEXPERTS0000218

and poorly developed drainage-ways" geomorphic surfaces (USDA–NRCS, 1981, 2018). Drainage, both surface and subsurface, in the area is from Martin Highway (County Highway 714) towards Bessey Creek to the north. Water movement occurs via surface and subsurface pathways through a series of interconnected wetlands, shallow depressions, and seasonal surface drainageways.  Surface drainage dominates following rainy periods when the soil becomes saturated to the surface and shifts to subsurface drainage as the surface water recedes below the soil surface. Surface drainage pathways are often defined by patterns of wetland vegetation.

A ditch, referred to as the N/S Ditch in this report (depicted in Figure III.C.1.1), is located on the western boundary of the Site and continues northward into the Countess Joy East Reference Area. It then spreads and flows by several pathways to Bessey Creek. In the defined confines of the N/S Ditch, depths range from several feet and width 6 to 10 feet at the Site/Reference Areas boundary to shallower and wider as distance increases northward through the Reference Areas. Flow from the ditch spreads out from about the midpoint of the Reference Area as the ditch loses its structure across the slightly sloping undulating surface. The flow continues to the 84th Avenue roadside ditch through an abutting wetland to Bessey Creek. During wetter periods surface flow from the N/S Ditch and connected wetlands discharge directly to Bessey Creek.

A shallow ditch on the north side of the Site forms the southern boundary of the Countess Joy East Reference Area and discharges to the N/S Ditch.  This ditch has a thalweg several feet above the N/S Ditch at its confluence. The shallow ditch had evidence of flow (to the west) by reoriented vegetation due to flowing water when observed in August 2021.

Subsurface flow occurs slowly along gradual land surface gradients directly to the ditches as well as along the surface pathways defined by the gradual slope and variations in microtopography. This slow subsurface movement maintains soil saturation near the surface and thereby supports hydrologic, biogeochemical, plant community, and faunal support/habitat wetland ecosystem functions.

In a September 20, 2018 request to the Florida Department of Agriculture and Consumer Services for a binding determination for a permitting exemption of existing agricultural activity on the Site, a map (Figure III.C.2.1) depicting the drainage of the Site was presented (Gunster Law Firm Letter (USACE 0000078/TEMPS 0000995 Exhibit 11(c)). Note that a flow arrow is shown for a ditch connected to the south end of the N/S Ditch at the southwest corner of the Site. This ditch is not shown on USGS maps or the NHD maps, but its presence was verified in the field by the Expert Team and is shown in Figure III.C.2.1. The map, Figure III.C.2.1, shows by arrows, placed by Defendant's consultants, the direction of "Stream Flow" and "Run-off Flow" from the Site to the N/S Ditch and then to Bessey Creek. This flow map corresponds with this Expert Team's conclusion that surface flow does occur to the N/S Ditch and spreads out to several discharge locations directly and indirectly via other ditches to Bessey Creek. These flow pathways, as well as subsurface pathways, and processes will be discussed and demonstrated in the Results Section of this Expert Report.

### D. Soils Overview - Reference Areas and Site

The geomorphic formations described in Section III.A (Landscape Context and Geomorphology) are old enough for substantive soil forming (pedogenic) processes to have occurred. As mentioned, the Pamlico formation covers all the survey area and most of the mineral soils have formed within and upon this formation. NRCS has mapped several soil series on these formations including the Oldsmar and Holopaw fine sands and the Sanibel muck series (Figure III.D.1). The USDA-NRCS soils map for the Site is shown in Figure III.D.2. The Oldsmar and Holopaw fine sands and the Sanibel muck are the three soil series that have been mapped by NRCS on the Site (Figure III.D.2). All three series have an aquic moisture regime and are on the Martin County List of Hydric Soils that is developed and maintained by NRCS.

To infer conditions on the Site before mechanical clearing, grading, earthwork and road construction, a reference system was established. This system consisted of 17 reference locations to the north, northwest, southwest, and south of the Site (see Figure IV.B1.1). The soils located on the Reference Areas within the reference system consist of the same soils found on the Site with additional but similar soil series.

Additionally, many of the micro depressional features within the Reference Areas had the ability to pond water. This is because all Reference Area soils are located on flatwoods, low lying flatlands, drainage ways, and depressional geomorphic surfaces. All waters/wetlands sample locations had indicators of surface and shallow subsurface water present seasonally and hydric soil indicators were met at these locations.

Soils mapped within the Reference Areas include the Holopaw fine sand, Oldsmar fine sand, Sanibel muck, Floridana fine sand, Waveland and Immokalee fine sand, and Riviera fine sand, frequently ponded. All soil mapping units within the reference system are on the local soil survey area (Martin County Area) hydric soils list. However, the Oldsmar fine sand, 0 to 2 percent slope map unit contains predominantly upland soils. The Holopaw, Oldsmar, and Sanibel soil series occur on the Site as well as the Reference Areas.

The NRCS describes the Holopaw as consisting of "deep and very deep, poorly and very poorly drained soil that formed in sandy and loamy marine sediments." Holopaw soils are on nearly level low-lying flats, poorly defined drainageways and depressional areas. Slopes range from 0 to 2 percent. Mean annual precipitation is about 55 inches and the mean annual temperature is about 72 degrees F. Depth to the seasonal high-water table is typically 12 to 40 inches. Flooding frequency and duration are listed as not applicable. Ponding frequency and duration are listed as frequently for very long duration (6 to 9 months) (USDA-NRCS, 10/2018 Rev.). This soil type is mapped over approximately 2.42 acres on the Site.

The Oldsmar series consists of very deep, poorly drained and very poorly drained soils that formed in sandy marine sediments overlying loamy materials. Oldsmar soils are on flatwoods, low broad flats, and depressions on marine terraces. Slopes are linear to concave and range from

*Expert Team Report United States v. Benjamin K. Sharfi and Neshafarm, Inc.*

SHARFIEXPERTS0000220

0 to 2 percent. The mean annual precipitation is about 55 inches, and the mean annual temperature is about 72 degrees F. Depth to seasonal high-water table is 0 to 12 inches of the surface from 1 to 6 months during most years, 12 to 42 inches for the remainder of the year, and it is below 60 inches during extended dry periods. Ponding is 0 to 24 inches in depressional areas for 6 to 9 months or more each year. (USDA-NRCS, 5/2018 Rev.). This soil type is mapped over approximately 3.93 acres on the Site.

The Sanibel series is described as consisting of "very poorly drained sandy soils with organic surfaces. They formed in rapidly permeable marine sediments. The soils occur on nearly level to depressional areas with slopes less than 2 percent." The water table is at depths of less than 10 inches for 6 to 12 months during most years. Water is above the surface for periods of 2 to 6 months during wet seasons. (USDA-NRCS, 12/2019 Rev.). This soil type is mapped over approximately 3.59 acres on the Site.

Floridana series consists of very deep, very poorly drained, slowly to very slowly permeable soils on low broad flats, flood plains, and in depressional areas. They formed in thick beds of sandy and loamy marine sediments. Near the typic location, the mean annual temperature is about 74 degrees F, and the mean annual precipitation is about 55 inches. Slopes range from 0 to 1 percent. Aquic conditions for the Floridana series consist of soils where all horizons between the upper boundary of saturation and a depth of 6 feet are saturated (this condition is known as "endosaturation"). The water table is at depths of less than 10 inches below the surface, and depressional areas are ponded for more than 6 months during most years. Flood plains are flooded for 1 to 3 months during most years (USDA – NRCS, 11/98 Rev.).

The Waveland series consists of very deep, very poorly and poorly drained, very slowly to moderately slowly permeable soils on broad areas of flatwoods and depressions in the Lower Coastal Plain of Peninsular Florida. They formed in sandy marine sediments. Near the typical location, the mean annual temperature is about 72 degrees F, and the mean annual precipitation is about 55 inches. Slopes are dominantly less than 1 percent but range up to 2 percent along the edges of depressions and drainage ways. On the flatwoods, the water table is within a depth of 6 to 18 inches for 1 to 4 months and within a depth of 40 inches for 6 months or more during most years. During extended dry seasons, the water table recedes to depths greater than 40 inches. Depressions are ponded for periods of 6 to 9 months in most years.

The Immokalee series consists of very deep, very poorly and poorly drained soils that formed in sandy marine sediments. Immokalee soils are on flatwoods and low broad flats on marine terraces. Slopes range from 0 to 2 percent. Mean annual precipitation is about 55 inches and the mean annual temperature is about 72 degrees F. Drainage class is poorly drained; very poorly drained in depressional and ponded phases. Saturated hydraulic conductivity (Ksat) is very high or high in the A and E horizons and moderately high and high in the Bh horizon. Permeability is rapid or very rapid in the A and E horizons and moderate or moderately rapid permeability in the Bh horizon. Runoff is negligible to very low. Depth to seasonal high-water table is 6 to 18 inches of the surface for 1 to 4 months during most years, 18 to 36 inches for 2 to 10 months during

*Expert Team Report United States v. Benjamin K. Sharfi and Neshafarm, Inc.*

SHARFIEXPERTS0000221

12

most years, and it is below 60 inches during extended dry periods. Depressional phases are ponded 0 to 12 inches for 6 to 9 months each year.

The Riviera series consists of very deep, poorly drained, very slowly permeable soils on broad, low flats, flatwoods and depressions in the Southern Flatwoods (MLRA 155) and the Southern Florida Lowlands (MLRA 156B). They formed in stratified sandy and loamy marine sediments. Near the typic location the mean annual temperature is about 75 degrees F, and the mean annual precipitation is about 62 inches. Slopes range from 0 to 2 percent. Drainage classes are poorly drained and very poorly drained. Permeability is very slow.

Soils in the Reference Area were intact with only minor disturbances at the surface due to light to moderate grazing. In contrast, soils on the Site were impacted by the use of heavy equipment to redistribute soils by mechanical clearing, excavation, filling, blading, grading, land leveling, and road grading and construction. Additionally, there was the design and placement of surface and shallow subsurface drainage systems and the placement of imported Bahia sod/turf mats. Additionally, water was observed to be present in the remnant wetland depressions, ditches, and streams on, and proximate to, the Site during our field visits to the Site and to the Countess Joy East and West Reference Areas (see Table III.B.1)

### E.  Vegetation Overview - Reference Areas and Site

The Reference Areas and Site are located in the Eastern Florida Flatwoods ecoregion of the Southern Atlantic Coastal Plain where the terrain is generally flat and the water table shallow (Lichtler 1960, Griffith et al. 2012). Under these conditions, small changes in topography, depth to the water table, or soil structure can result in significant variation in the species composition and vegetation structure of plant communities. In Reference Areas, the native landscape structure and function support vegetation types that are typical for this landscape. Second-growth stands of pine flatwoods and mixed pine and hardwood forests are common. Native species dominate the upper canopy though nonnative species such as Brazilian pepper *(Schinus terebinthifolia)*, punktree *(Melaleuca quinquenervia)*, earleaf acacia *(Acacia auriculiformis)*, and Old World climbing fern *(Lygodium microphyllum)* are not uncommon. Typical native tree species include slash pine *(Pinus elliottii)* laurel oak *(Quercus laurifolia)*, cabbage palm *(Sabal palmetto)* and red maple *(Acer rubrum)*. Forests are interspersed with patches of regenerating tree species and shrubs (e.g., wax myrtle *(Morella cerifera)*, saw palmetto *(Serenoa repens)*, and gallberry *(Ilex glabra))*. Forested wetlands, shrub wetlands, and freshwater marshes are frequently observed, particularly in historic interdunal features (Figure V.D.1.a.3).

There was a minimum of four vegetation types on the Site prior to impact, but inclusions of other types may have been present in transition zones between dominant vegetation types. The four prior existing vegetation types identified in this report are: Upland Conifer/Hardwood Forest, Mixed Shrub Wetland, Freshwater Marsh, and Mixed Wetland Forest. The forests consisted of second growth mixtures of slash pine and hardwoods such as red maple, laurel oak, and cabbage palm. Understory forest species included wetland ferns e.g., royal fern *(Osmunda spectabilis)* (Photograph III.E.1) and swamp fern *(Blechnum serrulatum)*, grape *(Vitis* sp.), holly *(Ilex* spp.),

*Expert Team Report United States v. Benjamin K. Sharfi and Neshafarm, Inc.*

13

and patches of saw palmetto. The central shrub/sapling wetland included scattered saplings, Carolina willow (*Salix caroliniana*), wax myrtle, and primrose willow *(Ludwigia peruviana)*. The freshwater marsh included a zone with scattered shrubs before transitioning into emergent vegetation. Graminoid species included sawgrass *(Cladium jamaicense*) and cordgrass *(Spartina bakeri)*.

Currently, the microtopography at the Site has been altered and the vegetation is intensively managed. Site vegetation primarily consists of a vigorous carpet of Bahia grass *(Paspalum notatum)* and common lawn weeds, e.g., three-flower tick trefoil *(Desmodium triflorum)*. Scattered specimen trees are present, primarily cabbage palm, red maple, and slash pine (Photograph III.E.2). Several large slash pines have full canopy; however, bark damage and dead branches are evident in red maple and slash pine in the NW corner of the property (Photograph III.E.3). Similarly, there is a cluster of small trees and saplings in the SE animal fence enclosures that exhibit significant cambium damage on the lower trunk (Photograph III.E.4).

There is a depressional wetland in the south-central portion of the Site (south of plot B6). Native trees are present along the depressional wetland edge. The central portion of the wetland is dominated by pickerel weed (*Pontederia cordata)*, a native ornamental wetland species. Landscape maintenance practices and activities related to animal husbandry and propagation of ornamental plants have resulted in excess nutrients algal growth in this wetland (Photographs III.E.5 and 6). Circles of dead vegetation surrounding the base of trees and adjacent patches of dead pickerel weed foliage are indicative of herbicide use and aerial spread (Photograph III.E.7 and 8).

There are two ornamental ponds on the Site. The northern pond (Cypress Lake) has been planted with bald cypress *(Taxodium distichum)* and the managed turf gradually slopes downwards towards the northern and western shores (Photograph III.E.9 and 10). The southern pond (Peanut Lake) is devoid of vegetation and manicured turf lawn abruptly meets steep pond banks and open water at the shoreline (Photograph III.E.11).

### F. Faunal Support/Habitat Overview - Reference Areas and Site

#### 1. Reference Areas

Section II, C, 2 of this Expert Report presents the USFWS website list of faunal species (e.g., mammals, birds, reptiles, and insects) and plant species that have been documented to occur in the vicinity of the Reference Areas and the Site. This list includes large and wide-ranging carnivores (cougars) and omnivores (bears) as well as a range of mid-size to small mammals, birds, insects, and reptiles with smaller home ranges and various degrees of dependency on the food and cover resources provided by complexes of forested, scrub/shrub, emergent wetlands, and open water habitats that are typical to the Reference Areas.

SHARFIEXPERTS0000223

Throughout the range of Reference Areas used to develop this Expert Report, we observed large, interconnected, and complex mosaics of mixed hardwood forested, scrub/shrub, and emergent wetlands interspersed with ponded hardwood and pine flatwood areas that were usually connected to larger ponded (littoral) or flowing water features. Reference Area forests patches consisted of at least tree, sapling, shrub, and undergrowth layers that included only a few non-native or invasive weed species. Microtopographic relief within Reference Area wetlands was dominated by complexes of small depressions and mounds that were enhanced by large, medium, and small down wood, standing tree snags, cavities in the ground, in old stumps, and at every level in the tree, sapling, and shrub canopy layers. Most of the Reference Area sites had a great deal of interior forest or interior scrub/shrub habitat and interior habitat changes. These types of changes provided abundant hiding, resting, thermal and escape cover resources for faunal species (e.g., woodpeckers, owls) that are specifically adapted to use relatively restricted types of interior habitat changes. Most of the larger wetland complexes also had very little edge habitat, at least around significant portions of their perimeters. They also exhibited high patch contiguity and connectivity to surrounding landscapes.

**2. Site**

Wetlands that remain on the Site after mechanical clearing, earthwork, import and redistribution of fill materials, road construction, and other activities are highly degraded. They are mostly dominated by a Paspalum (Bahia grass) turf/pasture plant community and paddock/barn yard areas. There is one remaining depressional wetland system south of plot B6 that has been filled around most of its perimeter and set up to receive untreated storm water runoff from paddock areas located on its southern and eastern perimeter. The plant community in this wetland is dominated by a highly simplified, thinned red maple "forest" with a very sparse shrub layer and undergrowth that is mowed and weed whacked. In particular, the complex vertical and horizontal plant community structure, species diversity, and associated food and cover resources available to faunal species that are typical of the Reference Area wetlands are not present on the Site. Instead, remaining wetlands do not effectively function to support faunal species because –

1. They exist on imported and leveled fill where patterns of water flow and circulation have been significantly altered or eliminated. Most surface flows are consolidated and directed via shallow swales to catch basins (NW corner) or in the case of the remaining depressional wetlands towards artificial ponds in the center of the Site and near the southwest corner. Some flows from this residual depression are captured in a pipe installed on the southern perimeter. Flows appear to be directed south from the southern perimeter.

2. Former complex patterns of microtopographic depressions and mounds are filled and leveled out.

3. They consist of highly manipulated and one-layer turf/pasture plant communities or (in the case of the remnant depression south of Site Plot B6) a thinned (simplified) tree

*Expert Team Report United States v. Benjamin K. Sharfi and Neshafarm, Inc.*

SHARFIEXPERTS0000224

15

canopy dominated by red maple, a sparse shrub layer, and undergrowth dominated by a combination of a few native species and invasive non-native weeds. Especially in the turf/pasture areas, there is no large wood, there are no snags, no cavities, and no effective resting, hiding, feeding, thermal, or escape cover resources.

4. All of the turf/pasture areas and the remaining and degraded forest patch is completely fenced and fragmented, making these areas inaccessible to most classes of native faunal species that depend on wetlands to complete all or parts of their life cycles – like growth and reproduction. Because it has been thinned and simplified, the remaining forest patch has little to no interior forest changes in habitat structure or conditions. It is virtually all edge habitat which is known to encourage use of the site by edge adapted opportunistic species that displace native, interior forest adapted species. This residual forest patch is also not connected to any intact surrounding waters/wetlands or to upland forest and scrub/shrub communities. The small habitat patch size, lack of interior forest changes, and lack of landscape-scale connections to other natural systems (fragmentation) significantly limits the food and cover resources provided by any of the remaining wetlands on the Site at site specific and landscape scales (Harris, 1984; Gosselink and Lee, 1989; Gosselink et al., 1990).

*Expert Team Report United States v. Benjamin K. Sharfi and Neshafarm, Inc.*

SHARFIEXPERTS0000225

## IV. Methods

### A. Review of Background Materials

#### 1. Standard/Public Domain Materials

Starting in April 2021 and continuing into early 2022, members of the DOJ Expert Team reviewed standard background materials and information regarding the impacted wetlands on the Site and other similarly situated wetlands in the Bessey Creek watershed. The DOJ Expert Team reviewed information regarding pine flatwoods, hardwood dominated wetlands, emergent wetlands and shrub dominated wetlands that occur in the South Florida landscape. With this information, the DOJ Expert Team focused on developing the means and methods to design a study that would document hydrologic conditions, hydrologic connections, and ecosystem functioning on the Site by using a combination of map and remote sensing resources, series of historic and current air photographs, direct observations of conditions on the Site, and direct observation of conditions in a range of nearby "wetland reference" areas in the Bessey Creek watershed. Consistent with standard methods articulated for "Atypical Situations" in the 1987 Corps of Engineers Wetlands Delineation Manual (Manual) (Environmental Laboratory, 1987) and the Atlantic and Gulf Coastal Plain Regional Supplement (Regional Supplement) (USACE 2010), these Reference Areas were selected for comparison to the Site because they had not been disturbed by activities such as mechanical land clearing, discharges of dredged and/or fill material, road and building construction, and placing sod on mechanically cleared and leveled wetlands.

The materials used by the DOJ Expert team included, but were not limited to:

    a. U.S. Geological Survey (USGS) maps.

    b. National Wetland Inventory (NWI) maps.

    c. NRCS soils mapping of soil series and soil properties.

    d. Federal Emergency Management Agency (FEMA) flood hazard and floodplain maps.

    e. ESRI database.

    f. Historic and current LiDAR imagery and aerial photographs of Martin County, Florida.

    g. Imagery from Google Earth Pro.

    h. Florida Department of Environmental Protection records.

    i. South Florida Water Management District records.

    j. U.S. Army Corps of Engineer (Corps) records.

*Expert Team Report United States v. Benjamin K. Sharfi and Neshafarm, Inc.*

SHARFIEXPERTS0000226

17

k. Martin County, Florida Website https://www.martin.fl.us/

l. The Navigable Waters Protection Rule: Definition of "Waters of the United States." 85 Fed. Reg. 22,250 (Apr. 21, 2020)

### 2. Documents and Electronically Stored Information

Starting in April 2021, the DOJ Expert Team reviewed background materials associated with the Site. In addition to the standard materials listed immediately above, the DOJ Expert Team reviewed and considered several types of materials that provided context to evaluate Site conditions. The DOJ Expert Team also reviewed and considered Defendants' interrogatory responses and other discovery materials produced by the parties and third parties to date.

### 3. Interviews and Other Contacts

Dr. Chuck Olson and David McIntosh, Bluefield Ranch Mitigation Bank

Dr. Mark Brown, University of Florida Wetlands Center

### 4. Federal Employees

Dr. Ralph Haugerud, USGS

### 5. Local Government

Mark Woodruff, Martin County Utilities (August 2021 telephone interview)

### 6. Landowners and Managers

Dewaine Hazellief, Tenant rancher on Countess Joy Property

### 7. Dates of Field Visits and Team Members to Reference Areas and Site Vicinity

Expert Team members and dates of visits to the Site and the Reference Areas are presented in Table III.B.1.

*Expert Team Report United States v. Benjamin K. Sharfi and Neshafarm, Inc.*

SHARFIEXPERTS0000227

## B. Study Methods

### 1. Overview of the Structure of Reference Systems, How They Are Used, and Selection of Reference Areas and Locations

In developing this Expert Report, and consistent with "Atypical" protocols articulated in the Manual and Regional Supplement, we selected a range of nearby Reference Areas to represent the physical and biological conditions of the Site prior to disturbance. For example, immediately north of the Site is a privately owned tract of over 300 acres that we will call the Countess Joy East property. Water flow, both surface and subsurface from the Site has an approximately 1,600 feet flow path through the Countess Joy East property to Bessey Creek. A location map of the Site and the Countess Joy East Reference Area with surface hydrologic features is shown in Figure II.B.2.

Using our field observations combined with an extensive review of historical aerial photos, geologic and topographic maps, vegetation surveys and maps, and NRCS soil maps, we determined that the Countess Joy East property was a close physical analog to the Site before the Site was disturbed. For example, compared to the Site, the Countess Joy East property has similar landscape position, a similar array of soil types, similar vegetation, and similar (shared) hydrologic connections to Bessey Creek via a North/South (N/S) ditch that was constructed (pre-1960s) and which borders the western boundary of the Site. It is one of the network of ditches in the vicinity that connects the Site and the Countess Joy East Reference Area to Bessey Creek (Figure II.B.2). The Countess Joy East Reference Area is presently leased and managed for cattle grazing, but a sizable portion of the site is dominated by large patches of intact forested and scrub/shrub wetlands that vary in age from less than 20 years old to approximately 55 years old. The pastures are unimproved, and, but for grazing, no vegetation management is practiced (Pers. Comm. by Dewaine Hazellief, rancher, to M. Wylie and W. Nutter). In the 1950s and 60s part of the Countess Joy East property was used for crop production (possibly citrus) by Palm City Farms as evidenced by remnant crop rows that are visible on aerial photographs from the 1960s. Some of the shallow mounding used for cropping is still evident on a portion of the Countess Joy East property. These features do not impede surface flow from the N/S ditch from the Site to Bessey Creek.

Using the same selection criteria introduced above and after reviewing Martin County's Property Appraiser web site (https://www.pa.martin.fl.us/-code/property-search/), NWI maps and mapped hydric soils (Figure III.D.1), the DOJ Expert Team identified several other properties within the Bessey Creek watershed as Reference Areas. Figure IV.B.1.1 shows the locations of all Reference Area plots in the Countess Joy East and West and three additional off-site Reference Plots referred to as:

a. North of the Site on the Martin County Solid Waste Transfer Station and Landfill Property cited as Reference Plot W16.

*Expert Team Report United States v. Benjamin K. Sharfi and Neshafarm, Inc.*

SHARFIEXPERTS0000228

19

      b. West of the Site and south of Martin Highway (County Road 714)– Florida
         Department of Transportation Property cited as Reference Plot W15

      c. South of the Site, north of Martin Highway – the Traiana Property cited as Reference
         Plot W17.

Figure IV.B.1.2 shows Plot numbers of the 14 Countess Joy East and West Reference Plots.

    **2.   Reference Area Study Methods**
       **a.  Hydrology**

To characterize the hydrology of the Reference Area site a series of shallow ground water wells
were installed downgradient from the Site, along a drainageway towards Bessey Creek and to the
tributary ditch along 84th Avenue to the west.  In addition, three surface water monitoring gauges
were located, one in the N/S Ditch downstream from the Site, and two in Bessey Creek.
Location of the wells and surface water monitoring gauges are shown in Figure IV.B.2.a.1.

Because the soils are generally fine sands and organics subject to sloughing when a hole is
advanced to insert a pipe for a well, the wells were steel pipe driven to appropriate depth in
accordance with USACE protocol (USACE, 2005).  The driven well points are stainless steel
with a fine mesh screen 1.25 feet long and 1-inch in diameter, manufactured by Solinst Canada
Ltd. The well point is attached to a one-inch steel pipe with a reducing coupling and driven with
pounding head provided by the well point manufacturer. Photographs of the well point and
attached pipe assembly are shown in Photographs IV.C.3.a.1 and 2). The wells had a casing
stick-up of about 1.5 feet above ground surface. A photograph of a completed well is shown in
Photograph IV.C.3.a.3.

The three surface water monitoring gauges were positioned several feet from the N/S Ditch bank
and the Bessey Creek bank and were 2-inch PVC standpipes with a 2-foot screen covered by a
cloth sock. The gauges were anchored with two steel fence posts. A photograph of a completed
installation is shown in Photograph IV.C.3.a.4.

Installed in the ground water monitoring wells were Solinst Levelogger 5 water level data
loggers.  The logger electronics are piezoresistive silicon with a Hastelloy sensor. They are
essentially a pressure transducer with an electronic chip for storing logged data and a clock. The
loggers are "launched" using an infra-red data transfer device connected to a USB port on a PC.
The loggers have a 10-year lithium battery life and an internal capacity of 150,000 temperature
and water level data points. The data logging interval can be set from 1/8 sec to 99 hours. The
loggers installed on the Reference Area and the Site were set to read at 30-minute intervals on
the hour and half-hour. To correct the logged water levels in the wells to changes in barometric
pressure, a similar logger was hung on a remote fence on the Reference Area to record
barometric pressure at the same time intervals. Water levels were corrected to barometric

SHARFIEXPERTS0000229

pressure using software provided by Solinst Canada Ltd. The Solinst Levelogger 5s used in this study were new and had not been previously used.

Surface water levels were measured using Onset Corporation "Hobo" pressure transducer/data loggers installed in the 2-inch PVC standpipes described earlier. The Hobos were not used in the ground water wells because they are too large in diameter to fit in the steel pipe. The Hobo water level loggers were programmed using software from the manufacturer, Onset Computer Corporation using a similar procedure described for the Solinst loggers. A Hobo logger was also located near the Solinst barometric logger to record barometric pressure for correction of the logged data.

As a quality control procedure, measurements were made of the distance from the top of well/gauge casing to the water level by hand at the time of logger installation and each time the data were downloaded. Measurement to the water level was made using a Solinst water level electrical contact tape.

Six ground water wells (R Well 1 through R Well 6) and three surface water standpipes and loggers were installed in the Countess Joy East Reference Area on August 23 and 24, 2021. A seventh well (R Well 7) was installed on September 15, 2021. The depth of the well point screen was placed 1.5 to 2 feet below the observed water table for each well. The wells and surface water gauges were removed on December 14, 2021.

As part of the hydrology study, an overview survey was conducted to tie together elevations across the Site with those on the Countess Joy East Reference Area. During the study, a Nikon Total Station Nivo series instrument was used to capture spatial location and elevation information for pertinent site features. Survey locations were corrected based upon the Martin County 84-2 benchmark located on the concrete headwall at the 84th Avenue crossing of Bessey Creek. The primary objective of the survey was to obtain relative elevation differences between prominent landscape features and water level instruments on the Site with those on the Reference Area.

In addition, a Real Time Kinematic (RTK) enabled GNSS receiver was used to geolocate relevant site features. On the Site, a base station for the RTK unit was locally sited to maintain short baseline corrections and obtain an absolute position solution from the National Geodetic Service Online Positioning User Service (NGS OPUS). RTK and survey elevations were compared to evaluate vertical precision across the Site and Countess Joy East Reference Area. Vertical precision between the survey and RTK-derived elevations was determined to be 0.033 ft or less than 0.5 inch.

### b. Soils

Prior to the field waters/wetland delineation effort, existing information relative to the Site was collected and reviewed. Information included, but was not limited to, the U.S. Geological Survey (USGS) 1:24,000 maps, aerial photographs, Soil Survey of Martin County Area (USDA-NRCS,

SHARFIEXPERTS0000230

1981, Web Soil Survey 3.1, 2015), regional climate data, and national and local (county) hydric soils lists. As a result of land use operations across the Site, guidance for the Atypical approach was used and included the examination of soils in Reference Areas that were located generally to the north and south of the Site.

Hydric soils are defined as "soils that formed under conditions of saturation, flooding, or ponding long enough during the growing season to develop anaerobic conditions in the upper part" (National Technical Committee for Hydric Soils [NTCHS], 1994, Federal Register, 1994). Soils at the Site were evaluated for their hydric conditions consistent with criteria articulated in the Regional Supplement, current regulatory guidance, and U.S. Department of Agriculture Natural Resource Conservation Service (USDA-NRCS) guidelines (1996, 1998, 2010, 2012) as well as Martin County Area and state and local soil survey area which are subsets of the national hydric soils lists (USDA-NRCS Home/Soil – Use/Hydric Soils). Technical criteria for identification of hydric soils can be satisfied using a combination of published soils information and field indicators. Field indicators for assessing whether a soil satisfies the hydric soil definition and the technical criteria for hydricsoils are listed in the Field Indicators of Hydric Soils in the United States (USDA-NRCS, 1996,1998, 2010, 2018). Field indicators published in this document are intended to update guidance provided in the Manual.

Soils were excavated and examined by using sharpshooter shovels and Dutch and bucket augers. Soil pits were excavated to approximately 24 to 30 inches. The face of the pit was "cleaned" using a shovel and then examined for hydric soil indicators consistent with the 2018 Regional Supplement and Field Indicators of Hydric soils in the United States. Moist soil colors were determined using the Munsell Soil Color Charts.

### c. Vegetation

Characterization of vegetation structure and composition at reference sites occurred in three phases: Field Preparation, Field Assessment, and Review of Plant Specimens.

#### (1) Field Preparation

Prior to field visits, publicly available photo imagery (e.g., Google Earth) and vegetation maps (e.g., Figure IV.C.3.c.1, SFWMD LULC 2018) were reviewed. In addition, lists of plant species expected to occur in the region were generated and reviewed. These lists were generated using sort and filter tools or reviewing resources otherwise provided on the following websites, accessed August 2021:

   a. Florida Native Plant Society  https://www.fnps.org/plants,

   b. USF Plant Atlas https://florida.plantatlas.usf.edu/Search.aspx,

*Expert Team Report United States v. Benjamin K. Sharfi and Neshafarm, Inc.*

SHARFIEXPERTS0000231

c. National Wetland Plant List
https://cwbiapp.sec.usace.army.mil/nwpl_static/v34/home/home.html

d. Treasure Coast Cooperative Invasive Species Management Area Plant List
https://www.floridainvasives.org/treasure/

e. Center for Aquatic and Invasive Plants https://plants.ifas.ufl.edu/plant-directory/

### (2) Field Assessment

Plant species were recorded at wetland determination plots following methods described in the Regional Supplement. The definitions of strata used at plot sites were as described in the Regional Supplement unless otherwise noted on Wetland Determination Data Forms. Plant species nomenclature follows that provided by the National Wetland Plant List (USACE) unless otherwise noted on Wetland Determination Data Forms. The National Wetland Plant List was the source for the wetland indicator status ratings assigned to plant species. Canopy cover was determined via ocular estimates. The heights of woody species, where noted on data sheets, was estimated visually during site visits. Bole diameters were visually estimated during site visits occurring in August and September 2021 and measured using a diameter tape thereafter. Forest stand age was determined through reference to historical imagery and, where noted on data forms, using an increment borer. Additional plant species incidentally observed between plots e.g., at photo points, were noted as time permitted.

### (3) Review of Plant Specimens

If a plant could not be identified to species at the field site, a specimen was collected and examined the same day it was collected using a Leica EZ4D stereo microscope. If, due to time constraints, the collected specimen could not be examined the same day it was collected, then it was placed in a plant press that day for preservation and subsequent identification using preservation protocols consistent with those published by The Royal Botanic Gardens "Preserving Plant Specimens." https://www.rbgsyd.nsw.gov.au/Science/Plants/Plant-Information/Preserving-plant-specimens.

Taxonomic keys and resources referenced to identify plants recorded at reference sites include:

a. Bradford J, and Rogers, G. "Grasses of Palm Beach and Martin Counties, Florida http://www.floridagrasses.org/Index.html.

b. Florida Department of Environmental Protection. "Plant Identification Resources," 2021. https://floridadep.gov/dear/bioassessment/content/plant-identification-resources.

c. Hall, David. Grasses of Florida. University of Florida, 2019.

*Expert Team Report United States v. Benjamin K. Sharfi and Neshafarm, Inc.*

SHARFIEXPERTS0000232

d. Nelson, G. The Ferns of Florida. Sarasota, FL: Pineapple Press, 2000.

e. ————. The Shrubs and Woody Vines of Florida. Sarasota, FL: Pineapple Press, 1996.

f. Tobe, J, et al., and Florida Dept of Environmental Protection. Florida Wetland   Plants: An Identification Manual (and Companion Taxonomic Key). Gainesville, FL: University   of Florida Press, 1998. https://floridadep.gov/water/submerged- lands-environmental-      resources-coordination/content/wetland-delineation-publications.

g. University of Florida / IFAS / Center for Aquatic & Invasive Plants. "Plant Directory," 2021. https://plants.ifas.ufl.edu/plant-directory/.

h. Wunderlin, R, and B Hansen. Guide to the Vascular Plants of Florida. 2nd ed. University Press of Florida, 2003.

### d.  Faunal Support/Habitat

Prior to field work, we completed background reviews of faunal habitats and potential species that may occur in the Bessie Creek watershed Study Area. In addition to the USFWS list of species provided in section II.C.2 of this Expert Report, we completed web-based searches on the Martin County, Florida Department of Natural Resources, and Florida Fish and Wildlife Conservation Commission websites.

Field work in Reference Areas provided opportunities to directly observe faunal species using various types of habitats, or to observe signs (e.g., tracks, nests, rubs, scat) that various species were in the vicinity. In particular, observations of several classes of faunal species and their activities in Reference Areas were recorded. We also observed and set up to compare the structure and functioning of the array of food and cover resources provided by Reference Area forested, scrub/shrub, and emergent wetland complexes and by the few wetlands that remain on the Site.

### 3.  Site Study Methods

### a.  Hydrology

The Expert Team reviewed historical aerial photography and the few reports available at the time describing recent past and present land use described in permit applications by the Defendant . Also available was a prior delineation conducted by DSL Environmental. On September 13, 2021, with time for on-site study limited to two days of 8 hours each day, the Team set out to learn as much about soils, hydrology, vegetation, and impacts to those factors by construction and soil disturbances conducted at the Site. Based on a series of soil borings and descriptions by the Team soil scientist and observations of water table depths beneath the filled and disturbed surface soil, six water table monitoring wells were installed on September 13 and 14, 2021. The

*Expert Team Report United States v. Benjamin K. Sharfi and Neshafarm, Inc.*

method of installing driven well points and logger instrumentation was the same as described for installations in the Reference Area except that, at the property owner's request, the well points and steel pipe risers were installed such that the top of the pipe cap was at or slightly below ground level. The depth of the well point screen was placed 1.5 to 2 feet below the observed water table for each well. A photograph of an installed well with the steel cap below the surface is shown in Photograph IV.C.4.a.1.

The wells were removed on December 15, 2021, and sod replaced. The jacking method used to remove the wells is shown in Photograph IV.C.4.a.2. One well, C4, could not be removed by the jacking method because the riser pipe became detached from the well point and had to be dug out. A photograph of the removed well and the dug hole is shown in Photograph IV.C.4.a.3. The hole was filled with the removed soil and sod replaced.

### b.  Soils

As with Reference Area soil sampling as discussed in this Expert Report, soils at the Site were excavated and examined by using sharpshooter shovels and Dutch and bucket augers. Soil pits were excavated to approximately 24 to 30 inches. The face of the pit was "cleaned" using a shovel and then examined for hydric soil indicators consistent with the Regional Supplement and Field Indicators of Hydric Soils in the United States. Moist soil colors were determined using the Munsell Soil Color Charts.

### c.  Vegetation

#### (1)   Sources of Information

Naturally occurring trees, shrubs, and groundcover have been replaced by sod at the Site, so the Atypical standard protocols (USACE 1987, Atypical Conditions) were used to infer prior vegetation structure and composition from available resources. Historic and current aerial imagery, documents and photos produced from previous site inspections by onsite observers were reviewed, and publicly available map products produced by state and federal agencies and lists of plants species known to occur in the vicinity of the site. In addition, onsite visits were conducted to reference sites (Section IV.C.2) and the Site.

Publicly available map products were viewed in ArcPro ver 2.9.0 (ESRI) and provided additional details regarding prior conditions at the Site. They include the NWI map, the NRCS Soils Map, and the SFWMD Land Use Land Cover 2014 - 2016 maps. Source information is provided in Section IV.A.

#### (2)   Field Visits

Vegetation data was collected at the Site to document current conditions. Prior to conducting an onsite review of current vegetation structure and compositions at the Site, regional lists of plant

*Expert Team Report United States v. Benjamin K. Sharfi and Neshafarm, Inc.*

species with a high probability of occurrence in a managed environment were consulted. Sort and filter tools or reviewed resources and otherwise provided on the following websites (accessed Oct 2021) were consulted:

a. Center for Aquatic and Invasive Plants https://plants.ifas.ufl.edu/plant-directory/

b. ELPS What's That Weed? Common Florida Lawn Weeds. https://www.epls1.com/whats-that-weed.html

c. Florida Native Plant Society. https://www.fnps.org/plants.

d. Treasure Coast Cooperative Invasive Species Management Area Plant List. https://www.floridainvasives.org/Treasure/Distribution/.

e. University of Florida. IFAS. Center for Aquatic & Invasive Plants. "Plant Directory," https://plants.ifas.ufl.edu/plant-directory/.

f. Wunderlin, R, B Hansen, A Franck, and F Essig. "Atlas of Florida Plants," https://florida.plantatlas.usf.edu/.

g. University of California Extension Integrated Pest Management http://ipm.ucanr.edu/

Plant species were recorded at wetland determination plots following methods described in the Regional Supplement. The definitions of strata used at plot sites were as described in the Regional Supplement unless otherwise noted on Wetland Determination Data Forms. Plant species nomenclature follows that provided by the National Wetland Plant List (USACE) unless otherwise noted on Wetland Determination Data Forms. The National Wetland Plant List was the source for the wetland indicator status ratings assigned to plant species. Canopy cover was determined via ocular estimates. The height of woody species, where noted on data sheets, was estimated visually during site visits. Bole diameters were measured using a diameter tape. Additional plant species incidentally observed between plots e.g., at photo points, were noted as time permitted.

If a plant could not be identified to species at the field site, a specimen was collected. Specimen samples were split while on location at the Site in the presence of the defense legal counsel and provided to Susan, a representative of the defendant.

Specimens were examined the same day they were collected using a Leica EZ4D stereo microscope. If, due to time constraints, the collected specimen could not be examined the same day it was collected, then it was placed in a plant press that day for preservation and subsequent identification using preservation protocols consistent with those published by The Royal Botanic Gardens "Preserving Plant Specimens." https://www.rbgsyd.nsw.gov.au/Science/Plants/Plant-Information/Preserving-plant-specimens.

*Expert Team Report United States v. Benjamin K. Sharfi and Neshafarm, Inc.*

SHARFIEXPERTS0000235

Several additional resources and taxonomic keys were referenced to identify species (websites accessed Oct-Nov 2021). These include:

a. Alexander K and D Sowell 2021. Key Features in Determining the Weeds from the Natives Presentation, Florida Natural Areas Inventory "Native Exotic Workshop" https://www.fnai.org/PDFs/3_Native_Exotic_Workshop_KA_&_DRS_FY21.pdf.

b. Bradford J, and Rogers, G. Grasses of Palm Beach and Martin Counties Florida http://www.floridagrasses.org/Index.html.

c. Florida Department of Environmental Protection. "Plant Identification Resources," https://floridadep.gov/dear/bioassessment/content/plant-identification-resources.

d. Hall, David. Grasses of Florida. University of Florida, 2019.

e. Nelson, G. The Trees of Florida. 1st ed. Sarasota, FL: Pineapple Press, 1994.

f. Tobe, J, et al., and Florida Dept of Environmental Protection. Florida Wetland Plants: An Identification Manual (and Companion Taxonomic Key). Gainesville, FL: University of Florida Press, 1998.

g. Revuelta E. 2017 Invasive Grasses of Florida and Their Native Look-Alikes: A Grass Identification Workshop Presentation, Florida Invasive Species. Council Annual Conference "The Walking Weeds".

h. University of Florida / IFAS / Center for Aquatic & Invasive Plants. "Plant Directory," 2021. https://plants.ifas.ufl.edu/plant-directory/.

i. Wunderlin, R, and B Hansen. Guide to the Vascular Plants of Florida. 2nd ed. University Press of Florida, 2003.

### d. Faunal Support/Habitat

As with field work in Reference Areas, prior to field work on the Site, we completed background reviews of potential species that may occur in the Study Area. In addition to the USFWS list of species provided in section II.C.2 of this Expert Report, we completed web-based searches on the Martin County, Florida Department of Natural Resources, and Florida Fish and Wildlife Conservation Commission websites.

Field work on the Site provided ample opportunities to directly observe the types and distributions of faunal species using various types of habitats, or to observe signs that various species were in the vicinity. In particular, we focused observations of the degree of fragmentation on the Site caused by fencing and cross-fencing, mechanical clearing of

*Expert Team Report United States v. Benjamin K. Sharfi and Neshafarm, Inc.*

vegetation, imports and redistribution of fill, and conversion of any remaining wetlands to much
simplified systems. We also observed and set up to compare the structure and functioning of the
array of food and cover resources provided by the Site to Reference Area forested, scrub/shrub,
and emergent wetland complexes.

C.  **Review and Refinement of Existing Waters/Wetlands Identifications and
    Delineations**

1.  **Reference Materials and Procedures Related to the Clean Water Act and
    Regulations**

As part of our background review and field work, the DOJ Expert Team focused on
identification, reviews, and refinements of existing delineations of WOTUS, including wetlands
on the Site. To accomplish this phase of work, we considered and relied upon the following
standard definitions, manuals, guidance, and mapping products related to the Clean Water Act
and U.S. Environmental Protection Agency (EPA) and USACE regulations.

1.  MEMORANDUM FOR THE RECORD, June 8, 2021. Review of U.S. Army Corps of
    Engineers ORM2 Permit and Jurisdictional Determination Data to Assess Effects of the
    Navigable Waters Protection Rule.

2.  June 9, 2021 Memo: EPA, Army Announce Intent to Revise Definition of WOTUS

3.  Definitions of waters of United States provided at 33 C.F.R Part 328 (1987 and 2020

4.  Clean Water Act Jurisdiction Following the U.S. Supreme Court's Decision in Rapanos v.
    United States & Carabell v. United State. https://www.epa.gov/wotus/rapanos-v-united-
    states-carabell-v-united-states

5.  Environmental Laboratory. (1987). "Corps of Engineers Wetlands Delineation Manual,"
    Technical Report Y-87-1, U.S. Army Engineer Waterways Experiment Station,
    Vicksburg, MS.

6.  Federal Register. July 13, 1994. Changes in Hydric Soils of the United States.
    Washington, D.C. (Hydric soil definition).

7.  Federal Register. September 18, 2002. Hydric Soils of the United States. Washington,
    D.C. (Hydric Soil Criteria).

8.  National Wetlands Inventory mapping of the Study Area.

9.  National Hydrologic Data Base [http://nhd.usgs.gov/]

*Expert Team Report United States v. Benjamin K. Sharfi and Neshafarm, Inc.*

10. Munsell Color. 2000. Munsell Soil Color Charts. Munsell Color, Macbeth Division of Kollmorgen Instruments Corp., New Windsor, NY.

11. U.S. Army Corps of Engineers. 1982. "Clarification of "Normal Circumstances" in the Wetland Definition." Regulatory Guidance Letter No. 82-2.

12. U.S. Army Corps of Engineers. 1986. "Clarification of "Normal Circumstances" in Wetland Definition (33 C.F.R. § 323.2(c)." Regulatory Guidance Letter No. 86-9.

13. U.S. Army Corps of Engineers. 1990. "Clarification of the Phrase "Normal Circumstances" as it pertains to Cropped Wetlands." Regulatory Guidance Letter No. 90-5.

14. U.S. Army Corps of Engineers. 1992. "Clarification and Interpretation of the Manual." 3-92 Memorandum.

15. U.S. Army Corps of Engineers. 2005. Regulatory Guidance Letter 05-05. Ordinary High Water Mark Identification.

16. U.S. Army Corps of Engineers. 2010. Regional Supplement to the Corps of Engineers Wetland Delineation Manual: Atlantic and Gulf Coastal Plain Region (Version 2.0), ed. J. S. Wakeley, R. W. Lichvar, and C. V. Noble. ERDC/EL TR-10-20. Vicksburg, MS: U.S. Army Engineer Research and Development Center.

17. USDA, NRCS. 2018. United States Department of Agriculture, Natural Resources Conservation Service. 2016. Field Indicators of Hydric Soils in the United States, Version 8.2. L.M. Vasilas, G.W. Hurt, and J.F. Berkowitz (eds.). USDA, NRCS, in cooperation with the National Technical Committee for Hydric Soils.

18. U.S. Army Corps of Engineers. 2020. National Plant List, version 3.5. http://wetland-plants.usace.army.mill/. U.S. Army Corps of Engineers, Engineer Research and Development Center, Cold Regions Research and Engineering Laboratory, Hanover, NH.

19. Florida Land Use, Cover and Forms Classification System. 1999. Third Edition. Florida Department of Transportation Surveying and Mapping Office, Geographic Mapping Section. 33 CFR Part 332 – Compensatory Mitigation for Losses of Aquatic Resources

20. Final Revisions to the Clean Water Act Regulatory Definitions of "Fill Material" and "Discharge of Fill Material". https://www.epa.gov/cwa-404/final- revisions-clean-water-act-regulatory-definitions-fill-material-and-discharge-fill

*Expert Team Report United States v. Benjamin K. Sharfi and Neshafarm, Inc.*

SHARFIEXPERTS0000238

21. Memorandum for Record CESAJ-RD-PE May 14, 2018.  Subject: Benjamin Sharfi Wetland Fill – Site History and Meeting 5-14-18.  File Name: 07-Ex. 08 May 14, 2018 Corps Memorandum for Record.pdf.  (TEMP0000954).

## 2.   Rationale for Using the Atypical Situations Determination of the Geographic Extent of Water/Wetlands on the Site

Based upon guidance provided in the Manual and the Regional Supplement, and in Regulatory Guidance Letters 82-2, 86-9, and 90-7, wetlands that have been disturbed through natural and/or anthropogenic alterations of hydrology, soils, and/or vegetation do not necessarily exist under "normal circumstances." Recent disturbances to hydrologic conditions on the Site include on-site activities such as removal, import and redistribution of soils, road construction, and other earthwork activities that have led to consolidation of drainage pathways. Disturbances to native vegetation include disruption and mechanical clearing of native and non-native plant communities via use of earthwork equipment (e.g., track hoes). Due to the combination of site disturbances and their effects on current hydrologic, soil, and vegetation conditions on the Site, the DOJ Technical Team chose to delineate wetlands using an "Atypical Approach" as articulated in the Manual. Consistent with guidance for using the Atypical protocol, we used several areas within the Bessey Creek watershed as our principal reference sites (Figure IV.B.1.2).

## 3.   Review and Refinement of Prior Delineations on the Site

The DOJ Expert Team reviewed two reports by Defendants' consultants Danna Small of DLS Environmental Services, Inc., and Tobin R. Overdorf of Engineering Design and Construction, Inc (EDC). The two reports included on- and off-site investigations and a site evaluation. The only wetland delineations that were conducted on the Site were in March 2018 by Defendant's wetland consultant, Danna Small of DLS Environmental Services, Inc. (DLS 0000069). Ms. Small submitted the wetland delineation to SFWMD in April 2018. Ms. Small delineated approximately 3 acres of wetlands on the southern portion of the Site. In 2020, EDC conducted an environmental assessment of the Site. EDC concluded that wetlands existed on the southern part of the Site (DEF00000294)

## 4.   Site Locations and Cartographic/GIS and LiDAR Products Used to Facilitate Delineation

Publicly available Light Detection and Ranging (LiDAR) datasets produced in 2016 and Pre-release 2019 that covered the Martin County, Florida Study Area were obtained. The 2016 and 2019 (pre-release) LiDAR dataset were considered high resolution and compliant with U.S. Geological Survey National Geospatial Program Lidar Base Specification Version 1.2. The 2016 LiDAR datasets retrieved and reviewed included a 4 feet pixel bare-earth digital elevation model (DEM) and classified LAS point data. The 2019 LiDAR datasets retrieved and reviewed

*Expert Team Report United States v. Benjamin K. Sharfi and Neshafarm, Inc.*

30

included a 2.5 feet pixel bare-earth digital elevation model (DEM) and classified LAS point data. Both datasets used the vertical datum North American Vertical Datum of 1988 (NAV88).

To compare the 2016 and 2019 LiDAR datasets, we used a common method of displaying LiDAR derived elevation models that can emphasize ground surface differences and assist with textural interpretation. The approach is to colorize and blend the elevation model with a derived hillshade product. The hillshade process uses a light source at a defined angle and azimuth to model shading across the ground surface, while the colorized elevation model provides a broader visual display range for elevation values. For the 2016 and 2019 LiDAR data, hillshade values were exaggerated by a factor of 3 to increase the visual difference in this relatively low relief landscape. Processing was performed using the spatial analysis toolset in ESRI ArcGIS Pro. The results of the hillshade comparisons between 2016 and 2019 LiDARs are shown in Figure IV.D.4.1.

### 5.   Characterization/Delineation of the Geographic Extent of Waters/Wetlands on the Site Prior to Disturbance

Prior to two on-site investigations of the Site, the DOJ Expert Team assessed off-site resources and reviewed literature to determine the location of wetlands on the Site preceding disturbance. These resources included the NRCS Web Soil Survey (https://websoilsurvey.nrcs.usda.gov/app/WebSoilSurvey.aspx). The USFWS NWI Map, and the FLUCCS system developed by the Florida Department of Transportation to define land use and land cover. The DOJ Expert Team reviewed multiple years of historical aerial photography and 2016 and 2019 LiDAR photography of the Site and the area surrounding the Site. Refer to Figure IV.D.4.1 for discussion of a hillshade elevation comparison between the 2016 and 2019 LiDAR images.

In April and November 2018, the SFWMD conducted aerial reconnaissance of the Site which the DOJ Expert Team reviewed (Figure IV.D.5.1a and b). Taken together, these off-site resources provided the DOJ Expert Team with a comprehensive overview of the Site pre- and post-disturbance.

After this review, the DOJ Expert Team conducted on-site investigations of the Site's wetland status in September and October 2021. If we found wetlands on the Site, our primary objective was to assess whether the wetlands were WOTUS. The DOJ Expert Team had two options to assess the status of wetlands on the Site:

   (a) Determine if wetlands on the Site were adjacent to a tributary of a TNW (40 CFR 230.3(s) pre-2015 EPA regulations) or,

   (b) Determine if the wetlands on the Site either taken alone or in combination with other similarly situated wetlands (similar situated wetlands refer to all wetlands adjacent to the same tributary, in this instance, Bessey Creek) in the Study Area have a

*Expert Team Report United States v. Benjamin K. Sharfi and Neshafarm, Inc.*

SHARFIEXPERTS0000240

significant effect on maintaining the chemical, physical or biological integrity of a TNW.

As discussed above, the extensive disturbance on the Site led the DOJ Expert Team to examine the Site under the Atypical procedures of the Manual and the Regional Supplement. During September 13 and 14 and October 18 and 19, 2021, Site investigations, the DOJ Expert Team excavated a series of soil pits to determine if hydric soils and/or wetland hydrology could be found at each location. All assessment locations are shown on Figure IV.D.5.2. For reference, the Small wetland assessment points are also shown (Small's wetland datapoints were her GPS locations recorded on the wetland data forms (DLS 0000069).

We installed six shallow ground water wells to document wetland hydrology at various locations on the Site and sampled the vegetative community around each sampling point. The DOJ Expert Team utilized the APT to determine if precipitation was normal for the September and October Site investigations. An Olympus TG-6 camera was used to photograph each soil sampled location and site observations and field notes were recorded in a notebook or on the appropriate Wetland Determination Data Form (wetland data sheet). All wetland sampled locations and points of interest were acquired using RTK survey equipment with sub-meter horizontal accuracy capability. All data were sampled and collected in accordance with the methodologies and procedures of the Manual and Regional Supplement.

## D. Assessment of the Functions of Waters/Wetlands Ecosystems

Assessment of the functioning of waters/wetlands ecosystems on the Site and on Reference properties was initiated early September of 2021. Field work was conducted during the interval October 18-22, 2021. Analyses of field observations took place from late October 2021 to early January 2022. L.C. Lee led assessment efforts with direct inputs of observations of field conditions from W. Nutter (Hydrology), S. Stewart (Soils), K. Coshow Rains (Vegetation/Plant Community), and M. Wylie (General Site Conditions).

In preparation for the field, we reviewed several available functional assessment protocols that could be applicable to the Martin County area. In particular, we considered the old Florida Wetland Rapid Assessment Procedure (WRAP) (Miller and Gunsalus, 1997/99), the "Regional Guidebook for Applying the Hydrogeomorphic Approach to Assessing Wetland Functions of Wet Pine Flats on Mineral Soils in the Atlantic and Gulf Coastal Plains" (R.D. Rheinhardt, et al., 2002), and current online versions of the "Uniform Mitigation Assessment Method: (UMAM) (The Uniform Mitigation Assessment Method (UMAM) | Florida Department of Environmental Protection; http://www.dep.state.fl.us/water/wetlands/erp/forms.htm). Each of these assessment methods were developed to treat wetlands in either Florida (WRAP and UMAM) or in pine flatwood wetlands in the South Atlantic and Gulf Coastal Plains (Rheinhardt, et al., 2002). On review, Martin County and the Site are beyond the specified geographic domain for application of the Rheinhardt, et al. (2002) assessment approach, although they do acknowledge that it may work in south Florida. The Florida WRAP assessment approach was developed and widely used

*Expert Team Report United States v. Benjamin K. Sharfi and Neshafarm, Inc.*

SHARFIEXPERTS0000241

in the 1990's and early 2000's and is still in use today by some practitioners. However, there have been significant advances in assessment approaches for ecosystem functions since the mid-1990's. Many peer reviews of the WRAP approach in Florida and in other states where a WRAP approach has been developed (e.g., California) point to WRAP's lack of a requirement for differentiation among various wetland classes to be assessed (e.g., flats, depressions, rivers, estuaries, slopes are treated the same). This results in a tendency for WRAP logic to treat the suite of physical, chemical, and biological ecosystem functions of all wetland classes in the same way. For example, rivers and forested wetlands are treated almost the same as estuaries. This type of lumping leads to development of central tendencies in results (i.e., default logic goes towards a middle or average solution). Consequently, there is a lack of WRAP model sensitivity and accuracy in identifying minor, and even moderate differences in the functioning of wetland ecosystem conditions when they are compared, for example, pre and post impacts. In Florida, use of WRAP has given way to use of other assessment systems, such as the UMAM approach.

According to training materials provided by the Florida Department of Environmental Protection and the Center for Wetlands at the University of Florida, UMAM was developed –

> "In response to a request by the Florida state legislature in 1999 to "study mitigation options…implemented from 1994 to the present and…consider the effectiveness and costs of the current mitigation options in offsetting adverse effects to wetlands and wetland functions" (Section 373.414(18)(b), F.S., 1999), the Office of Program Policy Analysis and Governmental Accountability (OPPAGA) submitted a report in 2000 (Report No. 99-40) highlighting some of the shortcomings of the current mitigation process. While the State could track the acreage of wetland loss and the acreage of mitigation, the report concluded that this information was not sufficient to ensure the replacement of wetland function resulting from wetland impacts. The recommendation of developing a statewide wetland assessment method became law in 2000. In the past few years, the Florida Department of Environmental Protection (FDEP) and the water management districts (WMDs) have worked closely to develop the Uniform Mitigation Assessment Method (UMAM) rule (Chapter 62-345, F.A.C.), which became effective in February 2004."

The UMAM Training Manual goes on to explain that

> "The UMAM is designed to assess any type of impact and mitigation, including the preservation, enhancement, restoration, and creation of wetlands, as well as the evaluation and use of mitigation banks, and it provides a framework for statewide standardized wetland assessment across community type and assessor. The assessment area is evaluated based on two main parts, a qualitative description and a quantification of the assessment area. For the latter section, sites are evaluated in three categories, scored numerically on a scale from 0 to 10 (where 10 indicates a minimally impaired system). The first category, Location and Landscape Support, examines the ecological context within which the system operates. The second examines the Water Environment,

*Expert Team Report United States v. Benjamin K. Sharfi and Neshafarm, Inc.*

33

including rapid inference of hydrologic alteration and water quality impairment, while the third focuses on Community Structure and more specifically Vegetation and Structural Habitat, for areas with plant cover, and Benthic and Sessile Communities, for areas with a submerged benthic community."

We used the UMAM approach in six representative areas within the Site (Figure IV.B.1.1). We also assessed eight Reference Areas that were distributed across the Countess Joy East Property due north of the Site, the Countess Joy West Property located due west of the Site and the 84th Avenue right-of-way, Martin County Solid Waste Transfer Station and Landfill Property (northwest of the Site), and on Florida Department of Transportation Property south of the Site and south of the Martin Highway right-of-way (Figure IV.B.1.1). Blank examples of our UMAM data sheets are given in Appendix 9.

Before going to each assessment site, we worked as a team to evaluate general background features such as NWI mapping, USGS topographic maps, historic and current aerial photographs, landscape positions, mapped soil types, pathways for water flows and downstream connections, vegetation structure, impediments to movements of faunal species, and potential sources of pollutants. In the field, we picked representative areas for sample plot locations and then ran through, considered, and annotated eight "Attributes" to assess "Location and Landscape Support" conditions, 12 Attributes to assess conditions in the "Water Environment", and 10 Attributes to assess Community Structure (See Table 9.1 in Appendix 9). Results were recorded in the field and then transferred to annotated Qualitative and Quantitative data sheets for each site.

*Expert Team Report United States v. Benjamin K. Sharfi and Neshafarm, Inc.*

SHARFIEXPERTS0000243

## V. Results

### A. Summary and Time-Sequence of Mechanical Clearing, Fill Import-Export, Earthwork and Construction Activities on the Site

Appendix 5 contains an annotated chronological sequence of photographs and figures that document conditions and activities that have taken place on the Site since 1966. To summarize, in 1966, it appears that the Site was part of a large "Palm City Farms" agricultural operation that focused on citrus production and cattle. The chronology of events that took place from 1966 to early 2018 has the Site recovering from the cleared and grazed condition that existed in 1966. Throughout that 52-year period, a mosaic of forested and scrub/shrub vegetation developed on the Site and there are no apparent roads, clearings, or filling activity. From 1966 – 2018 there were incremental changes in the periphery of the Site on adjacent properties, particularly to the west. For example, on the western side of the Site, and starting in the late 1990's, open-air agricultural row crop production slowly gave way to development of an extensive complex of greenhouses. To the south and east, the low density suburban and small farm development that began to occur in the mid to late 1990's began to densify and changed significantly starting around 2006. By 2016, a great deal of clearing and development occurred due south of the Site, the greenhouse complex to the west densified, and the intensity of land clearing and development on properties to the east accelerated. Conditions to the north on the Countess Joy East property remained relatively stable, recovering from the 1966 Palm City Farm management regime and supporting light to moderate livestock grazing.

In early 2018, the first significant incursion into the Site occurred with construction of roads along the eastern and northern perimeters, and a small fill pad/road entry located in the south-central portion of the property. From 2018 and through 2019, 2020, and 2021, accelerated mechanical clearing of vegetation and associated redistribution and redeposition of soils occurred. This mechanical clearing was then followed by excavation and redistribution of soils, staging and export of soils, imports of fill, land leveling, construction of ornamental ponds, internal roads, and various buildings led to the complete conversion of the Site from a forested and scrub/shrub open space to a developed farm/ranchette complex.

### B. Overview of the Types/Classes and Structure of Waters/Wetlands on Reference Areas and by Inference on the Site Prior to Construction Activities

Figure II.B.3 shows waters/wetlands on the Site and in Reference Areas that are mapped by the NWI (U.S. Fish and Wildlife Service - Wetlands Mapper (fws.gov)). Standard NWI definitions for mapped types shown on Figure II.B.3. Originally, NWI classes were developed to use and then improve upon the system for classification of wetlands and deep-water habitats developed by Cowardin et al. (1979). Figure II.B.3 shows a combination of "Palustrine Forested, Broad Leaved Deciduous and Scrub/Shrub, Broad-Leaved Deciduous, Seasonally Flooded wetlands mapped on the Site. The Countess Joy East and West properties are mapped by NWI to include "Emergent, Persistent, Seasonally Saturated" and "Palustrine Emergent, Persistent, Seasonally

SHARFIEXPERTS0000244

Flooded" wetlands. Because they are mapped by a combination of aerial photography and other imagery interpretation combined with limited field verifications, it is important to note that not all mapped NWI wetlands are WOTUS.

Another system for classification of waters/wetlands is the Hydrogeomorphic (HGM) approach developed and honed by Brinson (1993), Brinson et. al. (1995), Smith et. al. (1995), and U.S. EPA (2002). Standard definitions for HGM Classes that were observed or identified on Reference Areas and on the Site (prior to disturbance) are shown in Table V.B.1.

C. **DOJ Expert Team Determination of the Geographic Extent of Waters of the U.S. on the Site Prior to Mechanical Clearing of Vegetation, and Earthwork That Included Excavation and Redistribution of Soils, Imports of Fill Materials, Land Leveling, and Road and Building Construction**

1. **DOJ Expert Team Peer Review of Previous Delineations**

The DOJ Expert Team's review of the Small report (DLS 0000069) and the EDC report (DEF 00000294) found the two Defendants' consultants in agreement that wetlands occurred on the Site. Both Small and EDC determined that less than three acres of wetlands occurred on the Site (Figure V.C.1.1a and Figure VC.1.1b). There are no reference points on the EDC delineation figure and the cardinal direction north is shown to the bottom of the figure. To provide a reference for the EDC delineation it was overlaid on a recent aerial photograph of the Site as shown in Figure V.C.1.1c. EDC found approximately one acre of wetlands on the Site but acknowledged in the 2020 report that "exotic removal activity did cause minor impacts to what a previous South Florida Water Management District (SFWMD) non-binding wetland determination considered a wetland." EDC's reference to "a non-binding wetland determination" was the Small wetland jurisdiction before the Defendant mechanically cleared and filled the southwest corner of the Site. EDC ignored the fill material placed in approximately one acre of wetlands on the southwest corner of the Site (Figure IV.D.5.1a). Although we agree with the Defendant's consultants that jurisdictional wetlands existed on the Site pre- and that some wetlands still exist post-disturbance, it is the DOJ Expert Team's opinion that a much larger area of wetlands occurred on the Site prior to the Defendant's earthwork and development activities. It does not appear from either the Small or EDC report that the entire Site was examined for the presence of jurisdictional wetlands. These areas will be discussed in detail in the next section of this Expert Report.

2. **The DOJ Technical Team Determination of the Areal Extent of Waters/Wetlands on the Site**

The DOJ Expert Team determined that approximately 5.97 acres of wetlands were located on the Site before the mechanical clearing of vegetation and associated redistributions of soils, filling, excavating, land levelling, and road and construction activities began (Figure V.C.2.1). As detailed in the Methods section of this Expert Report, we based this determination on our

*Expert Team Report United States v. Benjamin K. Sharfi and Neshafarm, Inc.*

interpretation of standard mapping, aerial photography, remote sensing, resources, reviews of previous delineations on the site, field inspection reports, monitoring of Site and Reference Area water levels, and three field investigations of the Site and surrounding areas conducted in August, September, and October 2021.

The DOJ Expert Team also determined that prior to mechanical clearing of vegetation, earthwork and development, the Site included wetlands that abut the N/S Ditch. Currently, the Site still includes wetlands that border, neighbor, or are contiguous (i.e., "adjacent") to the N/S Ditch. Our field observations and examinations of aerial photography show that the N/S Ditch was constructed prior to 1966 and that it still exists today (Refer to Figure V.D.1.a.1). It is approximately 12 to 15 feet wide and varies from several inches to over a foot in depth. The N/S Ditch has relatively continuous bed and bank features and an ordinary high-water mark (OHWM) (Figure V.C.2.2). The DOJ Expert Team concluded the N/S Ditch is a seasonally permanent (flows at least three months a year) tributary with direct surface hydrologic connections to Bessey Creek (Figures III.B.2 and 3, and Figure V.C.2.3). For example, we found water flowing in the N/S Ditch to Bessey Creek during the August and September 2021 investigations of the Site and the Countess Joy East site (Figures V.C.2.4 and 5). We did not find water flowing the entire length of the N/S Ditch on the Countess Joy East site during the October 2021 investigation. However, the DOJ Expert Team determined that the N/S Ditch was excavated in wetlands that extended from the Site through the Countess Joy East property to Bessey Creek.

During September and October 2021, the DOJ Expert Team conducted a series of 14 wetland determinations on the adjacent Countess Joy Reference Area. Thirteen of the sampled points were wetlands and one sampled point was uplands (point W10) (Appendix 6).

The DOJ Expert Team determined that the wetlands on the Countess Joy Reference Area:

   a. Are contiguous to the Site (Figure IV.D.5.2).

   b. Abut the roadside ditch along 84th avenue that flows to Bessey Creek (Figures V.C.2 .6 and 7).

   c. Abut N/S Ditch (Figure V.C.2.8).

   d. Abut Bessey Creek (Figures V.C.2.9, 10 and 11)

The DOJ Expert Team determined that the closest TNW to the Site is the tidally influenced reach of Bessey Creek that flows under SW Murphy Road Bridge, approximately 4.5 miles from the Site (latitude 27.1903° north and longitude 80.2977° west) (Figure V.C.2.12). Therefore, we conclude that Bessey Creek, the Site wetlands, and the "similarly situated" wetlands in the Study Area are WOTUS.

*Expert Team Report United States v. Benjamin K. Sharfi and Neshafarm, Inc.*

SHARFIEXPERTS0000246

### 3.    The Upstream Reach of Bessey Creek Proximate to the Site is a Perennially Flowing Tributary to Downstream TNWs

The N/S Ditch makes a surface water connection to Bessey Creek approximately 1,600 feet north of the Site. At this confluence and over the course of three DOJ Expert Team site investigations, we observed that Bessey Creek is a perennially flowing tributary. It has a seasonally wetted bed with a width of approximately 15 to 20 feet and water depths less than three feet. It also has a relatively continuous OHWM except in places where bridges, roads, culverts, and other structures interrupt continuity. Bessey Creek was densely vegetated during our three investigations of the Countess Joy property (Figure V.C.3.1).

Bessey Creek is a perennially flowing tributary to downstream TNWs because it has a very large watershed contributing area. For example, the size of the Bessey Creek Watershed (Study Area) is approximately 11,029 acres. It includes approximately 1,063 acres of wetlands (Figure II.B.1). We derived our estimate of the acreage of wetlands in the Study Area by examining NWI maps of wetlands and NRCS's hydric soils map. The DOJ expert Team considered both the NWI and NRCS approximations of the area of wetlands in the Study Area: NWI with 1,063 acres and NRCS's hydric soils map with 1,630 acres of hydric soils. With the benefit of our field observations throughout the Study Area, it is our opinion that the NWI map underrepresents the acreage of wetlands in the Study Area. This is because during our field work, we found many acres of wetlands on the Countess Joy Reference Area that were listed by NRCS as having hydric soils but were not mapped wetlands by NWI. Nevertheless, we chose to rely on the smaller wetland acreage mapped by NWI in developing this Expert Report.

The headwaters of Bessey Creek are channelized from the Martin County Solid Waste Transfer Station and Landfill facility west to SW Boatramp Avenue. Just east of SW Boatramp Avenue, SFWMD issued a permit to construct a Hybrid Wetland Technology Treatment (HWTT) facility to improve Bessey Creek's water quality (SWFMD 2015 permit). The HWTT facility removes nutrients from Bessey Creek and discharges the treated water back into Bessey Creek near SW Citrus Avenue. Bessey Creek flows 1.7 miles from SW Citrus Avenue east and north through a residential neighborhood and golf course until it joins the tidally influenced reaches of Bessey Creek that are TNWs.

### 4.    Land Uses and Impaired Water Quality in Bessey Creek

Land uses in the Bessey Creek watershed are classified by SFWMD (Figure V.C.4.1) as being approximately 47 percent urban, 19 percent agriculture, and 9.6 percent wetland cover. The Florida Department of Environmental Protection (FDEP) has classified Bessey Creek as a Class III water with applicable water quality (Florida Class Three waters: Fish Consumption, Recreation, Propagation and Maintenance of a Healthy, Well-Balanced Population of Fish and Wildlife). Water quality in Bessey Creek is highly degraded. This is due in part because the vast majority of the Bessey Creek watershed does not have county installed sewers. Residents use septic systems for waste disposal (Pers. Comm. M Woodruff, Martin County Utilities, September

20, 2021) (Figure V.C.4.2). In the Bessey Creek Watershed, extensive agriculture, cattle grazing, and septic tank use have also contributed to water quality degradation (Figure V.C.4.3). In 1998, the FDEP listed Bessey Creek on its 303(d) impaired waters list, citing low dissolved oxygen, high nutrient loads, high biological oxygen demand, and coliform. FDEP attributed Bessey Creek's impaired listing to excessive nutrient loading from agricultural operations and septic tanks in the watershed (EPA 2009).

### 5. The Site and Countess Joy Wetlands Abut the N/S Ditch

The DOJ Expert Team determined that the impacted wetlands on the Site abut the seasonally flowing N/S Ditch that flows into Bessey Creek (Figure V.C.2.1). Not only do the Site wetlands abut the N/S Ditch but they are also connected to hundreds of acres of wetlands associated with the Countess Joy East property that abut the N/S Ditch and Bessey Creek and Countess Joy wetlands abutting N/S Ditch and Bessey Creek (Refer to Figure V.D.1.a.3).

### 6. The Site Wetlands and "Similarly Situated" Wetlands in the Bessey Creek Watershed have a Significant Nexus to Downstream TNWs Including Section 10 Reaches of Bessey Creek, the North Fork St. Lucie River and the Nearshore Waters of the Atlantic Ocean

The Site wetlands considered alone or in combination with "similarly situated" wetlands in the Bessey Creek watershed (Study Area) perform many important functions that significantly affect the structure, functioning, and integrity of downstream TNWs. Like the wetlands that occur on the Site, "similarly situated" wetlands are those that are connected to tributaries that flow to the same waterbody (e.g., Bessey Creek). They occur in similar landscape positions, on similar soil types, and have similar structure and perform similar ecosystem functions in the waterbody's watershed. Examples of these functions include (a) surface and subsurface water storage, (b) nutrient cycling, (c) organic carbon export, (d) particulate removal, and (e) maintenance of plant and faunal communities (Smith et al.,1995, EPA 2015, Vannote et al.,1980). Intact wetland ecosystem functions enable many important societal benefits such as reduced damage from flooding, water quality improvement, and fish and wildlife enhancement (Mitsch and Gosselink, 2000). A short discussion of the importance of intact ecosystem functions in maintaining the physical, chemical, and biological integrity of downstream TNWs follows.

### a. Surface and Subsurface Water Storage and Exchange Processes in Wetlands on the Site and in Similarly Situated Wetlands Are Important in Maintaining the Physical, Chemical, and Biological Integrity of Downstream TNWs

Wetlands store and release water from precipitation, floods, and stormwater inputs on a long-term and short-term basis. Wetlands filter flood and stormwater flows and release flows laterally to adjacent tributaries. They also store incoming flows as groundwater. Groundwater is released to the atmosphere through plant transpiration or by contributing subsurface water flows to

SHARFIEXPERTS0000248

adjacent tributaries, thereby maintaining tributary water levels during seasonal low flows and droughts (Bullock and Acreman 2003) (See Figures V.C.2.1 and V.C.2.8).

Although the forest and scrub/shrub vegetation on the Site was mechanically cleared, and the Site was excavated and filled prior to the DOJ Expert Team's investigation, we found soil saturation within 12 inches of the ground surface at several locations on the Site (FigureV.C.6.a.1) (See section V.D.1.b). These observations are sufficient to meet the mandatory criteria for hydrology articulated in the Manual and the Regional Supplement. During the August 2021 investigation of the Countess Joy site, we found water at the soil surface or within three inches of the soil surface at the eight wetland locations we sampled (Figure V.C.6.a.2). In October 2021, the DOJ Expert Team documented saturated soils in soil pits sampled in Reference Areas. For example, at the Martin County Solid Waste Transfer Station and Landfill site, we observed soils saturated to the surface (Figure V.C.6.a.3). At the Traiana site, we observed a water table within 6.5 inches of the surface (Figure V.C.6.a.4). Soils were saturated within two inches of the surface on the FDOT site (Figure V.C.6.a.5). On the Countess Joy East and West sites, we observed many acres of depressional herbaceous wetlands with varying depths of ponded water up to one foot deep. Above ground water storage of precipitation and surface runoff in wetlands was also noted throughout the Study Area. These observations document the presence of wetland functions critical to flood reduction in Bessey Creek and downstream TNWs (Figure V.C.6.a.6).

Increasing development within the Study Area, combined with relatively flat, low elevation landscapes that are subject to flooding, and close proximity to Atlantic coast hurricane impact zones make the Site and the hundreds of acres of similarly situated wetlands in the Study Area critical areas that help reduce the duration and magnitude of downstream flood events in Bessey Creek (Acreman and Holden 2013). For example, the Site and 36 percent of the Study Area are located within FEMA's 100-yr flood zone (FEMA's 100-yr flood zone designation means that a particular area has a 1% chance of flooding in any given year magnifying the importance of flood storage in the Study Area wetlands (Figure II.C.3.1). Approximately 56 percent of the Study Area consists of residential/commercial and agricultural uses (Figure V.C.6.1). Brody et al. (2007) and Dunne and Leopold (1978) discuss the fact that residential and commercial development results in increases in the proportion of watershed covered by impervious surfaces. Higher proportions of impervious surfaces in a watershed results in (a) increases in the volume of water discharges associated with any particular storm event, (b) accelerate the rate of water deliveries downstream in the watershed, and (c) usually result in the development of higher and more rapidly developing flood peaks.

During South Florida's dry season, the Site, the Countess Joy East and West properties and many acres of wetlands in the Study Area provide shallow subsurface flow to Bessie Creek, which maintains base flows in the creek. These base flows are important, as they sustain the structure and integrity of aquatic floral and faunal communities and boat navigation in downstream reaches of Bessey Creek (Figures V.C.6.a.7, 8 and 9).

SHARFIEXPERTS0000249

**b. Nutrient Cycling, Storage, and Removal of Elements and Compounds Processes in Wetlands on the Site and in Similarly Situated Wetlands Are Important in Maintaining the Chemical Integrity of Downstream TNWs**

Intact nutrient cycling processes are critical to maintaining the structure and stability of plant and faunal communities associated with wetlands. For example, wetlands can store and sometimes transform or remove elements and compounds that are potentially harmful to a wide range of plant and faunal species (e.g., heavy metals, pesticides, and herbicides) (Mitsch and Gosselink, 2015).

During the three investigations of the Site and wetlands in the Study Area, the DOJ Expert Team observed surface water in depressional wetlands, wetland flats and behind Bessey Creek's earthen berms. We noted that depressional wetlands in the Study Area received untreated stormwater flows from pastures, roadside ditches, and residential areas with septic tanks (Figure V.C.6.b.1). We also observed extensive amounts of cattle manure in the same locations, which has significant deleterious impacts on water quality (Figures V.C.6.b.2 and 3). Pollutant sources in the Study Area are transported by stormwater which is known to export nitrogen, phosphorus, and pathogens that continue to adversely impact the water quality of Bessey Creek (Yang and Lusk, 2018).

In 2011, Martin County addressed elevated nutrient loads in Bessey Creek and the St. Lucie Estuary through an ordinance preventing the application of fertilizers containing nitrogen and phosphorus between June 1 and September 30 (Martin County Fertilizer Ordinance, Literature web sources Florida Department of Health Sewage Statistics: http://www.floridahealth.gov/environmental-health/onsite-sewage/ostds-statistics.html). Martin County's fertilizer ordinance highlights Bessey Creek and the St. Lucie Estuary's nutrient impaired waters. The DOJ Expert Team's field work documented hundreds of acres wetlands in the Study Area trapping and storing stormwater runoff from cattle pastures and residential/commercial septic tanks. This trapping reduces the effects of nutrient enriched stormwater flow to downstream TNWs. Thus, it is our opinion that the nutrient processing function of wetlands in the Study Area maintains the integrity and structure of downstream traditional navigable waters.

The Florida Department of Health (FDOH) reports that Martin County permitted over 29,000 septic tanks from 1970 to 2021 (See FDOH Sewage Statistics, Literature web sources Florida Department of Health Sewage Statistics: http://www.floridahealth.gov/environmental-health/onsite-sewage/ostds-statistics.html). Historic septic tank use in Martin County contributed to EPA completing a 2009 TMDL listing for Bessey Creek because Bessey Creek was not supporting Florida's water quality standards for fecal coliform bacteria (EPA 2009).

In South Florida, Meeroff et al. (2008) observed increased wastewater-derived nitrate concentrations in both groundwater and surface water during months when seasonal high-water tables occur, indicating that septic systems were less efficient at removing nitrogen during

*Expert Team Report United States v. Benjamin K. Sharfi and Neshafarm, Inc.*

certain times of the year. However, wetlands often have oxygen-depleted or "reduced" soils exhibiting a unique ability to store, transform, or permanently remove nitrate from saturated soil and groundwater (Seitzinger et al., 2007). The DOJ Expert Team observed this phenomenon in multiple wetland soil pits where we used alpha, alpha'-dipyridyl tests to confirm the presence of reduced soils (Berkowitz et al. 2021) (Figure V.C.6.b.4). However, our observations of current and historic land use in the Study Area indicates that nutrients and pathogens continue to impair TNW Bessy Creek's water quality in spite of functioning wetlands in the Study Area (FDEP Bessey Creek Impairment web source: https://floridadep.gov/dear/watershed-assessment-section/documents/comprehensive-verified-list).

The Watershed Technologies, Inc. (WT) Hybrid Wetland Chemical Treatment Technology (HWTT) plant at SW Boatramp Avenue was completed in 2015. WT's monitoring results for total phosphorus (TP) for the June 2015 to July 2016 period resulted in an inflow mean of 0.196 mg/l and an outflow mean of 0.029 mg/l. Monitored results for total nitrogen (TN) during the same period showed an inflow mean at 1.57 mg/l with an outflow mean at 0.67 mg/l.  WT reported that its monitoring results in the 2014 - 2015 period mirrored its 2015 – 2016 results. In FDEP'S 2008 TMDL for Bessey Creek, FDEP established a nutrient endpoint for TP at 0.081 mg/l and for TN at 0.72 mg/l. Given FDEP's endpoint TP and TN TMDL nutrient goals for Bessey Creek, WT's monitoring results demonstrate that Bessey Creek upstream of the HWTT plant continues to have elevated nutrient levels well above FDEP's water quality standards for Class III waters.

SFWMD has an established water quality monitoring station (SLT-9) at the SW Murphy Road bridge over Bessey Creek. At this location, Bessey Creek is a tidally influenced TNW . SFWMD's recent monitoring results at SLT-9 continue to demonstrate poor water quality in Bessey Creek.  SFWMD monitoring results for TP from August 2019 to October 2021 found 22 out of 35 samples greatly exceeding the FDEP TMDL target goal of 0.081 mg/l for TP. SFWMD sampling results for DO from May 2020 to November 2021 found 13 of 14 samples with DO less than 5 mg/l. Although SFWMD did not report oxygen saturation levels in their sampling efforts, prolonged DO levels below 5 mg/l stress aquatic life (Dowling and Wiley 1986).

### c.  Carbon Production and Export Processes That Occur in Wetlands on the Site and in Similarly Situated Wetlands Are Important in Maintaining the Chemical and Biological Integrity of Downstream TNWs

Wetlands contribute particulate and dissolved organic matter to downstream waters and thereby supply energy to microbial food webs which are an important part of the detrital food web in aquatic ecosystems (Edwards 1987; Edwards and Meyer 1986). Plankton, and invertebrate and vertebrate faunal species utilize these energy sources to cycle energy and biomass to higher (trophic) levels of the aquatic ecosystem, supplying food to fish, birds, and mammals. Our field observations show that the forested and scrub/shrub wetlands that used to exist on the Site and other similarly situated wetlands in the Study Area exported organic matter to Bessey Creek primarily during the rainy season when water flows within the Study Area are present and

SHARFIEXPERTS0000251

strongly interconnected. Wetlands in the Study Area comprise approximately nine percent of the land surface. Hundreds of acres of wetlands in the Study Area produce and transport carbon to Bessey Creek's aquatic flora and fauna.  For example, leaf litter and wood are broken down by bacteria, fungi, and invertebrates and transported to Bessey Creek via overland surface flows and/or via the ditch network in the Study Area (Figure III.C.1.1).  We observed many examples of decomposing leaves and wood in the Study Area. These carbon (energy) sources are essential for maintenance of the structure and functioning of Bessey Creek's aquatic resources (Figures V.C.6.c.1, 2 and 3).

> **d.  Wetland Sediment Trapping and Retention in Wetlands on the Site and in Similarly Situated Wetlands is an Important Process That Helps to Maintain the Physical and Chemical Integrity of Downstream TNWs**

Wetlands can trap and retain sediment that is entrained in overbank flooding and stormwater flows. Sediment deposition in wetlands benefits downstream water quality by reducing the turbidity and suspended solids concentration of surface waters, and by retaining phosphorus (P) and contaminants that are chemically and mechanically attached to sediments (Johnston 1991).

The DOJ Expert team observed several reaches in Bessey Creek with extensive accumulations of sediment in the creek channel system at and below the OHWM (Figures V.C.6.d.1 and 2). We also observed wetlands on Countess Joy East property trapping sediments and preventing mobilization of sediment to Bessey Creek (Figures V.C.6.d.3 and 4). Gilliam (1994) concludes that intact riparian buffers function to remove phosphorus that is attached to sediment, but that they are relatively ineffective in removing dissolved P. As Bessey Creek continues to exhibit P levels that exceed its 2009 TMDL targets, individual wetlands on the Site (taken alone) and similarly situated wetlands in the Bessie Creek watershed that trap sediment, are critical in helping to reduce the amount of P impairing water quality in Bessey Creek and in downstream TNWs.

> **e.  Maintenance of Plant and Faunal Communities on the Site and in Similarly Situated Wetlands Are Important in Maintaining the Biological Integrity of Downstream TNWs**

The DOJ Expert Team observed that impacts to wetlands on the Site have degraded or eliminated the structure and functioning of plant and faunal communities that would have occurred on the Site prior to mechanical clearing of vegetation, earthwork, consolidation drainage, and development.  For example, after mechanical clearing of vegetation and associated redistribution of soils, excavations and export of native soils, imports of fill, land levelling and some construction of roads and buildings, *Paspalum notatum* (Bahia) grass sod and turf mats were installed on most of the pasture areas of the Site (Figure V.C.6.e.1). Discharges of dredged and/or fill material, redistribution of fill, land levelling and placement of grass turf mats prevents the former wetland plant community from re-populating the Site.  The Site is currently occupied

by sheep, horses, and exotic birds and mammals, quite different from the previous animal community.

As discussed in the Faunal Support/Habitat sections of this Expert Report, the DOJ Expert Team observed several species of resident and migratory birds foraging in the ditches transporting water to Bessey Creek, in the depressional wetlands on Countess Joy East and West Reference Areas and on the Site during the August, September and October investigations. These species are listed in the Faunal Support/Habitat Results section of this Expert Report. All of these faunal species rely wholly or in part upon the food and cover resources that are accessible via intact connections among Site and Reference Area similarly situated wetlands, Bessey Creek, and the downstream TNWs of the St. Lucie River to the nearshore waters of the Atlantic Ocean.

The DOJ Expert Team also identified many wetland plants that populated the remaining Site wetlands, the N/S Ditch and its riparian corridor, the wetlands on the Countess Joy East and West Reference Areas  and Bessey Creek and its riparian corridor (Table V.C.6.e.1)

The identified wetlands plants support that the Site wetlands and the interconnected and similarly situated wetlands in the Study Area maintain the vertical and horizontal structure, species diversity, carbon production, retention and export, and food and cover resources for a wide range of faunal species that are characteristic of habitats that occur in Bessey Creek, and which are connected to downstream TNWs of the St. Lucie River and to the nearshore waters of the Atlantic Ocean.

### 7.  Summary of WOTUS Determinations

The DOJ Expert Team's opinion that the Site's wetlands are WOTUS was established from our examination and application of federal regulations and appropriate case law.  Prior to the Defendant's mechanical clearing of vegetation and associated redistribution of soils, excavations and export of native soils, import and deposition of fill, land levelling and some construction of roads and buildings, the Site's wetlands abutted the N/S Ditch. The N/S Ditch is a seasonal, relatively permanent non-navigable tributary of Bessey Creek, which is a TNW at its downstream (distal) and tidally influenced reach. The Site's wetlands are also contiguous to Countess Joy East and West wetlands that abut Bessey Creek.  Therefore, under the pre-2015 and now current regulatory regimes, the Site's wetlands are "adjacent" (bordering, neighboring, and contiguous) wetlands to tributaries of TNWs. Additionally, the Site's wetlands and the similarly situated wetlands that are adjacent to Bessey Creek within the Study Area are WOTUS because, taken alone or in combination, they have a significant effect on maintaining the physical, chemical, and biological integrity of the N/S Ditch, 84th Avenue Ditch, Bessey Creek, and the TNWs of the North Fork of the St. Lucie River and the nearshore waters of the Atlantic Ocean.

The Site would also be WOTUS under the vacated Navigable Waters Protection Rule (NWPR). This is because the Site's wetlands abut the N/S Ditch which the NWPR classifies as an

*Expert Team Report United States v. Benjamin K. Sharfi and Neshafarm, Inc.*

SHARFIEXPERTS0000253

intermittent tributary that contributes surface water flow to the downstream and tidally influenced TNW reach of Bessey Creek. Likewise, the Site's wetlands are contiguous to the Countess Joy East and West wetlands which abut upstream and non-tidally influenced reaches of Bessey Creek, a WOTUS. The NWPR also discussed tributary issues relating to the N/S Ditch. If an intermittently flowing ditch is excavated in adjacent wetlands, and the surface flow eventually reaches a WOTUS, then that ditch is a jurisdictional tributary. Applying the NWPR, the Site's wetlands abut the N/S Ditch which is an intermittent tributary transporting surface water to Bessey Creek, a WOTUS.

The DOJ Expert Team can also confirm the Site's wetlands are WOTUS under the EPA/USACE rule proposed on December 7, 2021. The proposed rule's WOTUS definition (https://www.federalregister.gov/d/2021-25601/p-670) describes wetlands that abut relatively permanent tributaries to §328.3(a)(1), (2), (4), or (6) WOTUS are themselves WOTUS. As described above, the Site's wetlands satisfy the proposed rule's WOTUS definition. Consequently, it is the DOJ Expert Team's opinion that the Site's wetlands are WOTUS under all federal regulations and applicable case law.

> **D. Summary of Waters/Wetland Ecosystems Conditions on Reference Areas and by Inference, on the Site Prior to and After Mechanical Clearing and Earthwork Activities**
>
> > **1. Hydrologic Conditions**
> >
> > > **a. Summary of Landscape Hydrologic Conditions and Connections Among Reference Area Wetlands and by Inference on the Site, to Downstream Waters - Prior to Mechanical Clearing and Earthwork Activities**

In the 1960s there was active agricultural activity in the Countess Joy Reference Area creating rows for planting, possibly citrus trees, as well as some short connecting ditches. The extent of site alteration in the 1960s is shown in the 1966 aerial photo (Figure V.D.1.a.1). The planting rows became less evident in the landscape as shown in the time sequence of aerials from 1966, 2016, and 2021 (Figure V.D.1.a.2). During the walk over in 2021 the mounded soil for planting rows was observed to be largely broken down and not continuous with water ponded in shallow discontinuous depressional areas.

During the initial visit to the Countess Joy East Reference Area on August 23 and 24, 2021, and before installation of the water table monitoring wells, the Expert Team walked the area, examined soils, vegetation, surface topography, and evidence of surface ponding and water flow pathways and connections to ditches and Bessey Creek. During the Expert Team's Countess Joy Reference Area field work on August 23 and 24, 2022, surface flow from the direction of the Site towards Bessey Creek was observed via several pathways. The primary pathway from the northern boundary of the Site was the N/S Ditch, flowing north towards Bessey Creek. Over the years, either by cattle breaking down the banks or mechanical disturbance, or both, the N/S Ditch

lost its bed and bank features about 550 feet from the Site's north boundary and thus allowed water to spread out across wetland depressions, flats, and undulating microtopography with the dominant flow direction to the northwest and west. During wetter periods there is a flow component directly to Bessey Creek as observed during the August 2021 reconnaissance. The defined channel of the N/S Ditch ends about 800 feet from Bessey Creek.

An annotated view of the 1966 aerial photo (Figure V.D.1.a.3) shows wetland signatures similar to the map of NWI wetlands (Figure II.B.3) and a general pathway of disconnected wetlands that at one time flowed to the northwest and connected to Bessey Creek on the Countess Joy West Reference Area (location 2 on aerial). Martin County's 84th Avenue and the parallel ditches interrupted the historical flow pathway (location 1 on aerial) and the intercepted water now flows directly to Bessey Creek.

Following the August 23 and 24, 2021 reconnaissance, Team member Nutter, accompanied by Wylie, walked and flagged the primary flow pathway from the bed and bank terminus of the N/S Ditch on October 20, 2021. The flag locations were located with the RTK survey instrument and are shown in Figure V.D.1.a.4. The flow pathway is generally wide, up to 50 to 75 feet in some locations, and the flags were located where evidence of flow was most prominent. The evidence of flow observed was movement of water, ponded water (flow not always apparent but flow observed into and out of the ponded area), and directionally oriented ground vegetation. The flow path shown in Figure V.D.1.a.4 continues to R Well 7 and then into the 84th Avenue roadside ditch. As will be shown later, R Well 7 water levels are continuous with flow in the ditch to Bessey Creek. The flow path shown in Figure V.D.1.a.4 is also near R Well 5, a location that had long periods of saturation to and above the surface. During the reconnaissance on August 23 and 24, 2021 a direct flow to Bessey Creek was also observed near location R Well 4. This connection is also identified on the annotated 1966 aerial (Figure V.D.1.a 3). Surface flow was observed at this location as well as directionally oriented ground vegetation in August 2021. The flow path shown in Figure V.B.1.a.4 passes through the remnant ditching and agricultural rows evident in the 1966 aerial. However, the current condition of these features in the topography is not distinguishable in the field. Remnant rows are evident in the 2019 LiDAR image shown in Figure V.D.1.a.4 with the field located flow path shown (flow path was field located prior to having the LiDAR images available). Figure V.D.1.a.5 shows the perennial flow channels from the Site through Countess Joy East Reference Area to Bessey Creek and on to the Atlantic Ocean.

Historically, the dominant surface flow direction and pathway was through connected wetlands, depressions, flats, and other microtopographic landforms from the Site and its vicinity through Countess Joy East to Countess Joy West and to Bessey Creek. Subsurface flow, i.e., ground water discharge occurs to the ditches and surface lower elevation features and eventually to Bessey Creek as a contribution to baseflow.

Bessey Creek flows from the 84th Avenue ditch confluence to the confluence with Canal C-23, the North Fork St. Lucie River, and thence to the tidally influenced and TNWs of the St. Lucie

SHARFIEXPERTS0000255

River and the Atlantic Ocean. Bessey Creek becomes tidally influenced at least at the SW
Martin Road Bridge. Construction of a drainage ditch network prior to the 1960s and then the
construction of 84th Avenue ditches cut off the historical flow path to Bessey Creek at 84th
Avenue and directed the flow to Bessey Creek. Connections to the TNWs of the Atlantic Ocean
from this location remain unchanged today.

Our water level gauges in the N/S Ditch, Bessey Creek (2 locations), and the 84th Avenue ditch
(discussed later in this Expert Report) at the point of surface water discharge from the flow
pathway described above demonstrates that the 84th Avenue ditch is a perennially flowing
tributary to perennially flowing Bessey Creek.

The ground water and surface water monitoring stations located in the Countess Joy East
Reference Area are representative of conditions prior to and after land disturbing activities on the
Site. In other words, the conditions observed in the Reference Area during this study are
representative of conditions that would be expected to exist prior to and following land
disturbing activities on the Site.

> **b. Summary of Landscape Hydrologic Conditions and Connections Among
> Reference Area Wetlands and by Inference on the Site, to Downstream
> Waters After Mechanical Clearing and Earthwork Activities**

**2. Hydrologic Studies**

Installation of water table monitoring wells at the East Countess Joy Reference Area and surface
water monitoring gauges in the N/S Ditch and Bessey Creek was described in Section IV.B.2.a
and water table monitoring wells at the Site in Section IV.B.3.a. Monitoring began on the
Reference Area on August 23 and 24, 2021 and on the Site on September 14, 2021.

All monitoring devices were removed on December 14 and 15, 2021. Data for the period from
mid-October, 2021 to removal in mid-December, 2021 from five of the loggers when removed
could not be recovered with the software provided by Solinst, Inc. Four of the wells were on the
Site and one on the Reference Area. The five loggers were returned to Solinst, Inc. for data
recovery and complete recovery was achieved on three of the five. Data from the October
download for the remaining two, both installed on the Site, could not be retrieved by Solinst, Inc.
All water level monitoring data are provided in Excel spreadsheets in Appendix 7.
During the field visit in October a ground and water surface elevation survey was conducted
focused on the Site but carried over and tied into the well locations in the Reference Area. The
survey equipment and process are discussed in Section IV.B.2.a and all the surface data are
presented in Appendix 6 in Excel spreadsheet format.

The APT (Section III.B.3) results presented in Figure III.B.3.1. were used to assess the
precipitation prior to and during the study and its comparison with normal precipitation for the
period. The use and application of the APT was discussed in section III.B.3. Although the APT

*Expert Team Report United States v. Benjamin K. Sharfi and Neshafarm, Inc.*

SHARFIEXPERTS0000256

water balance approach indicated the period would normally be considered the "Wet Season," the Drought Index was an "incipient drought" from mid-September through mid-November when rainfall was below normal. Collectively, during the last 90-days of the study (beginning 2021-9-16 and ending 2021-12-15) (during the period the wells were installed on the Site) the area was considered to be "Drier than Normal." There was only one significant rainfall event during this period in mid-November which drove the Site rainfall index into the Normal Rainfall range (the shaded area in the APT graph).

Locations of the Reference Area wells and surface water gauges (all located in the Countess Joy East area) are shown in Figure IV.B.2.a.1. Graphs of water levels at each location are shown in Figure V.D.1.b.1.1, 2, and 3. Rainfall at the nearest station, Palm City 1.4NW about three miles from the Study Area, is shown as a bar on each of the graphs and begins on August 1, 2021 so antecedent rainfall is visible for two weeks prior to data logging. An exception is R Well 7 which was not installed until mid-September, providing 1.5-months of antecedent rainfall in this case.

The following is a brief discussion of each well's results and its location in the Reference Area. The soil and vegetation descriptions as well as identifying the observed wetland hydrology indicators for each well location are provided in the Wetland Data Forms in Appendix 6.

The Reference Area water level monitoring results follow.

**R Well 1** - This well is located about 85 feet from the northern Site boundary and 140 feet from the N/S Ditch. The location meets the wetland hydrology criteria because there is at least one period with more than 18.5 days of soil saturation (i.e., water table present) above the surface or within the upper one foot of soil.

**R Well 2** - This well is located about 360 feet from the northern Site boundary and 180 feet from the N/S Ditch. The location meets the wetland hydrology criteria because there is at least one period with more than 18.5 days of soil saturation (i.e., water table present) above the surface or within the upper one foot of soil.

**R Well 3** - This well is located about 325 feet from the northern Site boundary and 75 feet from the N/S Ditch. The location meets the wetland hydrology criteria because there is at least one period with more than 18.5 days of soil saturation (i.e., water table present) above the surface or within the upper one foot of soil.

**R Well 4** - This well is located about 1,680 feet from the northwest Site boundary and 80 feet from the bank of Bessey Creek. This well is installed near an observed surface flow area with discharge to Bessey Creek near Bessey Creek connection location 3 in Figure IV.B.2.a.1. The location meets the wetland hydrology criteria because there is at least one period with more than 18.5 days of soil saturation (i.e., water table present) above the surface or within the upper one foot of soil.

**R Well 5** - This well is located about 1,525 feet from the northwest Site boundary and 278 feet from the bank of Bessey Creek. This well is installed at the edge of a depressional area and it on the surveyed flow path from the N/S Ditch to the 84th Avenue ditch (Figure IV.B.2.a.1). The location meets the wetland hydrology criteria because there is at least one period with more than 18.5 days of soil saturation (i.e., water table present) above the surface or within the upper one foot of soil.

**R Well 6** - This well is located about 1,760 feet from the northwest Site boundary and 120 feet from the bank of Bessey Creek. The location meets the wetland hydrology criteria because there is at least one period with more than 18.5 days of soil saturation (i.e., water table present) above the surface or within the upper one foot of soil.

**R Well 7** - This well is located at the confluence of the surveyed flow path (Figure IV.B.2.a.1) and the 84th Avenue ditch. Although located in the wetland, the water levels recorded are representative of the flow in the ditch, a tributary to Bessey Creek. Water levels are immediately responsive to rainfall and slowly decline, much the same as the receding limb of a stream hydrograph. The location meets the wetland hydrology criteria because there is at least one period with more than 18.5 days of soil saturation (i.e., water table present) above the surface or within the upper one foot of soil.

The locations of the surface water gauging locations are shown in Figure IV.B.2.a.1 and graphs of water levels at each location are shown in Figure V.D.1.b.1.4.

**R Staff Gauge 1** - This gauge is located about 95 feet from the northern Site boundary in the N/S Ditch. Water levels in the Ditch during the study period ranged over a depth of 1.25 feet. Water depth in the Ditch increased rapidly in response to rainfall but declined slowly over a period of 5 to 7 or 10 days before the declining water surface slope became very gradual, indicating a gradual inflow from subsurface sources to the Ditch. In other words, if the rise in Ditch water level was only due to rainfall interception on the water surface (channel rainfall) the water levels would decline much more rapidly. Corresponding gradual declines after rainfall in the water table in wells R Well 1, R Well 2, and R Well 3, although due in part to evapotranspiration (surface flow was not observed at these three locations), indicate subsurface water movement to the Ditch along a gradient created by slightly lower water levels in the Ditch.

**R Staff Bessey Up** - This gauge is located near R Well 6 on the bank of Bessey Creek. Water levels at this location are responsive to rainfall inputs as expected with slowly declining recession limbs of the streamflow hydrograph. Although the hydrograph indicates zero water level from about the beginning of November until significant rainfall occurred about 20 days later. The zero-water level is an artifact of logger location next to the creek bank and water depth receded to the stream thalweg. Zero-water level was also indicated at the end of the study period in mid-December because the logger sensor was above the water level. There was about a foot of water in the thalweg and flow was occurring.

*Expert Team Report United States v. Benjamin K. Sharfi and Neshafarm, Inc.*

SHARFIEXPERTS0000258

**R Staff Bessey** - This gauge is downstream of R Staff-Bessey Up near R Well 4. Results and observations for this location are the same as R Staff-Bessey Up.

Collectively, all the Reference Area well locations meet the wetland hydrology criteria articulated in the Manual and Regional) i.e., water table within one foot of the surface for 5 percent (18.5 days) of the growing season (365 days in southeast Florida). Although not necessary for the study of wetland hydrology on the Reference Areas because long periods of saturation occurred even during what was considered a below normal rainfall period (see APT output), longer periods of monitoring are preferred to determine long-term wetland hydrologic conditions with respect to position of the water table. This study period was from mid-August to mid-December 2021 and would normally be conducted over a full year to get a better sample of climatic variability. However, the Reference Area wetlands are extensive, the terrain is low gradient with numerous depressions, flats, and other micro-surface features that wetland hydrology is persistent for long periods of time. The water table monitoring wells were installed on the Site in mid-September, one month after installation on the Reference Area. Thus, direct comparison of parallel results is not possible for the full study period, only from mid-September through mid-December. As discussed in the preamble to the discussion of Reference Area wells, the APT water balance approach indicated the study period would normally be considered the "Wet Season," the Drought Index was an "incipient drought" from mid-September through mid-November when rainfall was below normal. During the approximately 90 days of the Site study (beginning mid-September and ending mid-December) the area was considered to be "Drier than Normal." A rainfall event of 2.55 inches from October 9th through the 10th was the last significant rainfall until a total of 3.40 inches was recorded November 20th through the 22nd. Little rainfall in-between the October and November events led to the APT indication of an "Incipient Drought." The November rainfall event drove the APT rainfall index into the Normal Rainfall range (the shaded area in the APT graph) but only for a short period of time.

Site monitoring wells were installed at six locations on September 14 and removed December 15, 2021. Well locations are shown in Figure IV.B.2.a.1. Graphs of water levels at each location are shown in Figure V.D.1.b.1.5 and 6. Rainfall depicted in the graphs is from the same Palm City station used in the Reference Area analysis. Discussion of water table response in the Site must also consider soil conditions described for each location on the Wetland Data Forms in Appendix 6. Additional considerations must be given to impacts to soil properties due to site disturbance activities including export and import of soils, and the presence of a subsurface infrastructure for drainage, irrigation, and other site conditions such as pond and wetland depression water level manipulation. The presence of such subsurface infrastructure was unknown to the Expert Team at the time of the Site investigation or the time of preparation of this Expert Report. All the well locations at the Site were in closely mowed grass fields subject to some grazing.

There is a shallow ditch outside the fence on the north Site boundary that appears to receive discharge from a series of drop inlet boxes near the horse training facility, maintenance yard, and horse paddock. There is a PVC pipe discharging to the shallow ditch, but its connections are not

*Expert Team Report United States v. Benjamin K. Sharfi and Neshafarm, Inc.*

SHARFIEXPERTS0000259

known to the Expert Team. The invert elevation of the pipe is 21.04 feet and is about 0.82 feet below the surface of the ditch, i.e., the pipe is partially buried, but directionally oriented vegetation indicated that there is a discharge from the pipe. The location of this pipe outlet is shown on Figure IV.B.2.a.1 (Pipe outlet N). The following discussion is focused on the water table dynamics at each well location.

**Well C1** – This well is located south and about 40 feet from the northern Site boundary and 140 feet east of the N/S Ditch in a horse paddock. Well C1 is approximately 125 feet south of R Well 1 on the Reference Area. The water table at each well responded similarly to a rainfall event with nearly the same change in water table rise but R Well 1 declined much more slowly than the water table in C1, i.e., the rate of decline in C1 was more rapid. Still looking at the same November rainfall event the water table at R Well 1 rose to the surface and remained above the surface for several days before declining below the surface. The water table in C1 for the same event rose to within about 0.4 feet of the surface into the disturbed "roiled" soil described at the location. The current ground surface elevation at C1 is 0.6 feet higher than R Well 1. Based on the water table response and persistence for less than 18.5 days of soil saturation (i.e., water table present) above the surface or within the upper one foot of soil this location did not meet the wetland hydrology criteria during the study period.

**Well C4** – This well is located south and about 280 feet from the northern Site boundary and 115 feet east of the N/S Ditch in an open field subject to grazing. The data logger in the well failed sometime after the data were downloaded in mid-October and the subsequent logged data were not recoverable by the logger manufacturer. During the short period from mid-September to mid-October the water table rose in response to two separate rainfall events to within about 0.1- and 0.4-feet of the surface. Based on the water table response and persistence for less than 18.5 days of soil saturation (i.e., water table present) above the surface or within the upper one foot of soil this location did not meet the wetland hydrology criteria during this shortened study period.

**Well A5** – This well is located south and about 550 feet from the northern Site boundary, 550 feet east of the N/S Ditch, and 60 feet north of the large pond in the southwest corner (Peanut Lake) of the Site. The water table response at this location indicates that there is likely a non-natural control impacting subsurface water table dynamics. At the time of well installation on September 14 the initial water table depth was 4.26 feet below the ground surface and continued a gradual and steady rise to 2.11 feet below the surface on December 14. There was only one occasion when there was a water table response from a rainfall event (November 20 through 22) and the water table rose 0.4 feet on the 21st and remained elevated for 5.5 hours before falling back 0.4 feet to the initial depth of 2.41 feet below the surface. (To verify that the logger was recording data properly after it was removed, the logger was placed in a leaky swimming pool with periodic rainfall for a week. The logger responded correctly.) This response is unexplainable given water table dynamics in the other well locations where the water table was at a similar depth. During an elevation survey conducted by the Expert Team (the survey is described elsewhere) conducted on October 19 at 1530 to 1600 hours in the vicinity of well A5, the following elevations were observed:

*Expert Team Report United States v. Benjamin K. Sharfi and Neshafarm, Inc.*

| 1534 hours | Water table elevation Well A5 | 19.84 feet |
| 1534 hours | Water surface elevation in SW pond | 21.26 feet |
| 1609 hours | Water surface elevation in N/S Ditch | 21.26 feet |
| 1609 hours | Invert elevation of outlet pipe in SW pond | 20.75 feet |

The water table elevation at Well A5 is 1.42 feet below the water surface elevation of Peanut Lake and the N/S Ditch. Considering the close proximity of the well to the open water surfaces, one would expect (under normal circumstances) the water table to be higher or at a similar elevation, particularly with no significant rainfall for at least 7 days prior to the survey. The conclusion is that there is some type of subsurface manipulation of ground water, either by a subsurface drainage system or ground water pumping on the Site. Based on the water table response and persistence for less than 18.5 days of soil saturation (i.e., water table present) above the surface or within the upper one foot of soil this location did not meet the wetland hydrology criteria during the study period.

**Well C6** - This well is located south and about 190 feet from the northern Site boundary and 410 feet east of the N/S Ditch. This well has a similar response as well C1 but the magnitude of rise is 0.2- to 0.3-foot less. The water table was near the surface from the November 20 through 22 rain event but receded. Based on the water table response and persistence for less than 18.5 days of soil saturation (i.e., water table present) above the surface or within the upper one foot of soil this location did not meet the wetland hydrology criteria during the study period.

**Well A6** – This well is located south and about 545 feet from the northern Site boundary, 205 feet east of the N/S Ditch, and 100 feet west of the remnant depression wetland. This well is located about 148 feet due east of A5 and also has unusual water table dynamics. After an initial rise in the water table the level remained somewhat constant and had little or response to rainfall events. The exception was the November 20 through 22 event that caused the water table to rise almost a foot to a half-foot below the surface and remain at that level for several days before a rapid decline to the pre-event level. This well location is close enough to the remnant depression that one would expect during low rainfall periods there would be natural, slow subsurface drainage to the depression. With the water table within about 1.5 feet of the surface for most of the study period one would expect evapotranspiration to cause at least a diurnal depletion of soil water resulting in a decline of the water table. Usually, evapotranspiration withdrawals lowering the near surface water table during the day will partially recover during the night leading to a gradual decline in water table elevation over time without rainfall to replenish soil water. The conclusion is that there is likely some type of subsurface manipulation of the water table unknown to the Expert Team at the time this study was conducted. Based on the water table response and persistence for less than 18.5 days of soil saturation (i.e., water table present) above the surface or within the upper one foot of soil this location did not meet the wetland hydrology criteria during the study period.

*Expert Team Report United States v. Benjamin K. Sharfi and Neshafarm, Inc.*

SHARFIEXPERTS0000261

**Well B7 -** This well is located south and about 545 feet from the northern Site boundary and 10 feet north of the remnant depression wetland edge. The data logger in this well failed sometime after the data were downloaded in mid-October and the subsequent logged data were not recoverable by the logger manufacturer. During the short period from mid-September to mid-October the water table remained at relatively constant depth within about 0.8-foot below the surface. The water table at this location did not respond to rainfall events similar to the lack of response in wells A5 and A6, which are all located in the southern portion of the site. This lack of water table response indicates there is manipulation of subsurface water, and in this case surface water as well. There is a PVC pipe in the south end of the remnant depression which could be controlling the depression water level which in turn controls the water table at B7. In other words, there is a direct connection between the surface water in the remnant depression wetland and the water table at B7, which is continuous with the surface water in the wetland. The invert elevation of the discharge pipe at the south end of the remnant depression is 21.07 feet and the ground surface elevation at B7 is 22.12 feet, with the water table steady at about 21.2 feet. The conclusion is that the water level in the remnant depression and the adjacent well location B7 can be controlled by the invert elevation of the discharge pipe. A photograph taken during the Site assessment on October 18, 2021 (Photograph V.D.1.a.4) showed the PVC pipe with a cap. However, the results of our survey and water levels in Well B7 indicate that at times the cap is probably removed, or drainage from the depression is bidirectional through the shallow swale connecting the middle pond (Referred to as Cypress Lake) and drained by pipe or pumping from the Lakes to maintain water levels. The outlet location of the drainage pipe is not known to the Expert Team but is expected to be to the south to adjacent ponds with lower surface elevations or by pumping. This location, despite water table control, meets the wetland hydrology criteria because there are more than 18.5 days of soil saturation (i.e., water table present) within the upper one foot of soil. The location of this outlet pipe is shown on Figure IV.B.2.a.1 as Pipe outlet S.

Two other possible subsurface outlet pipes were identified on the N/S Ditch at in the vicinity of the Peanut Lake and Well A5 where mounds of marl rock had been placed on the N/S Ditch bank but could not be confirmed because they were underwater and not visible. The possible discharge points of these two pipes are shown in Figure IV.B.2.a.1 as Outlet pipe W and in Photograph V.D.1.a.5. One of the discharge locations could be from Peanut Lake but could not be confirmed with the information available.

There is a "Well Pump" identified on the boundary survey (Figure II.A.3) but aquifer depth, screen depth, pumping rate and frequency, zone of influence as well as use of the pumped water is not known. We could therefore not identify if operation of this well had an influence on the water tables measured in this study.

To summarize the findings of the monitoring well investigation in the Reference Area and the Site, all water table monitoring locations in the Countess Joy East Reference Area met the wetland hydrology condition for the length of time the soil is saturated within a foot of the surface. On the other hand, although the Site water table monitoring locations were in a similar

*Expert Team Report United States v. Benjamin K. Sharfi and Neshafarm, Inc.*

SHARFIEXPERTS0000262

topographic continuum with the Reference Area, only one location met the soil saturation criteria. That lone location was next to the remnant depression wetland and met the criteria despite water level control by water level manipulation in the depression. The three wells in the north part of the Site responded to rainfall events in the same manner as the Reference Area wells but the water table did not rise into the upper foot of soil as high or remain as long as in the Reference Area. This result is attributed to disturbance of the upper soil horizon(s) by grading, scraping, filling, mixing, etc. which altered the natural porosity, pore structure, and water retention characteristics of the soil as well as increasing the surface elevation. In addition to mixing the soil horizons with native and possibly non-native soils, the surface was elevated at least two inches by placement of imported sod. In the southern portion of the Site the water table was and continues to be manipulated by some form of subsurface drainage or pumping system that was apparent and greatly altered the pre-disturbance wetland hydrology.

Despite the alteration of water table elevations and water flow dynamics on the Site, drainage remains connected to the north and Bessey Creek via surface and subsurface movement to the N/S Ditch as well as subsurface flow towards the Reference Area wetlands and subsequently to Bessey Creek.

3. **Soil Conditions**

   a. **Summary of Soil Conditions in Reference Area Wetlands and by Inference on the Site - Prior to Mechanical Clearing and Earthwork Activities**

The soils at all waters/wetlands sample locations on the Reference Areas were hydric by meeting the definition of a hydric soil. Additionally, the soils met one or more of the hydric soils indicators listed on the Regional Supplement data sheets. The most common indicator was stripped matrix (S6). In some locations the hydric indicator was met due to saturation at or near the surface coupled with a positive chemical result from $\alpha$–$\alpha$ dipyridyl indicating the presence of ferrous iron and reducing conditions within the upper part of the soil matrix.

Many of the microdepressional features within the reference system had the ability to pond water. All waters/wetlands sample locations had indicators of surface water present seasonally and hydric soil indicators were met at these locations.

All Reference Area soils are located on flatwoods, low lying flatlands, drainage ways, and depressional geomorphic surfaces.

Soils mapped within the reference system include the following –

      (1) Holopaw fine sand,
      (2) Oldsmar, fine sand,
      (3) Sanibel muck,
      (4) Floridana fine sand,

*Expert Team Report United States v. Benjamin K. Sharfi and Neshafarm, Inc.*

SHARFIEXPERTS0000263

(5) Waveland and Immokalee fine sand,
(6) Riviera fine sand, frequently ponded.

All soils within the reference system are on the local soil survey area (Martin County Area) hydric soils list. These soil series are described in detail above in Section III D and given in Appendix 8a.

### b. Summary of Soil Conditions in Reference Area Wetlands and by Inference on the Site - After Mechanical Clearing and Earthwork Activities

In contrast, soils on the Site were impacted by mechanical clearing of vegetation and associated redistribution of soils, excavation of the Site and export of soils, import and deposition of fill, land leveling, and construction of roads and buildings. Additionally, there was the design and placement of surface and shallow subsurface drainage systems and the placement of imported sod. Water was observed to be present in the remnant wetland depressions, swales and streams on, and proximate to, the Site during field visits in August and October 2021. Detailed descriptions of Site soils are given in Appendix 8b.

A few of the observations during the Site soils evaluation are summarized in the next six photographs.

1. Photograph V.D.3.b.1 shows a mixed soil profile. Lighter colored material overlays a darker surface horizon and light-colored sands are present and mixed with the current surface horizon.

2. Photograph V.D.3.b.2 shows a mixed soil profile over a thin surface remnant at approximately 11 to 12 inches.

3. Photograph V.D.3.b.3 shows a mixed soil horizon with light colored sands placed over a buried remnant of a surface horizon.

4. Photograph V.D.3.b.4 shows part of a disturbed profile with buried roots and woody debris.

5. Photograph V.D.3.b.5 shows light colored sands mixed throughout the soil profile.

6. Photograph V.D.3.b.6 shows a multi-layered profile with sod at the surface over a mixed light-colored sand and beneath that a buried organic horizon. This photograph was taken at well location C4 when the well apparatus could not be removed by jacking and had to be dug out.

SHARFIEXPERTS0000264

55

4.  **Vegetation Conditions**

a.  **Summary of Vegetation Conditions in Reference Area Wetlands and by Inference on the Site - Prior to Mechanical Clearing and Earthwork Activities**

(1)  **Physical Setting for Vegetation**

All Reference Areas and the Site are located in the Eastern Florida Flatwoods ecoregion of the Southern Atlantic Coastal Plain. It experiences mild winters and an extended (365 day) growing season (Griffith et al. 2012, USDA 2012). The surficial geology is Pleistocene/Pliocene deposits of shelly sand and clays and, prior to logging, fire suppression, and land use changes, the dominant vegetation type in this region was Pine Flatwoods (Davis 1967, Scott et al. 2001). The regional terrain is flat, generally varying between 15 and 45 ft elevation and the water table is shallow (Lichtler 1960). The combination of a flat landscape and shallow water table routinely results in strong plant community responses to changes in microtopography depth to water tables, or overall site water balance (Araya et al 2011, Diamond et al. 2021). For example, within the Flatwoods region, an increase in land elevation or decline in water table elevations of 3 ft commonly leads to abrupt changes to plant species composition and structure, i.e., from hydric to xeric community types (USFWS MSRP 1999).

(2)  **Landscape Structure and Function Influences on Vegetation**

The Eastern Florida Flatwoods Subregion is derived from Pleistocene/Pliocene lagoons and barrier islands and characterized by poorly drained soils (Griffith et al., 1994). Water tables are often near the ground surface, and subtle microtopography places some areas in hollows below the water table and other areas on hummocks above the water table. Prior to impact, Danna Small documented the presence of hummocks on the Site (Refer to USACE 0000490). We similarly observed microtopographic diversity at reference locations. Since Ms. Small's visit to the Site, activities such as mechanical clearing and associated redistribution of soils (roiling), exports and imports of fill materials, land leveling, road and building construction, consolidation drainage disrupted the native soil structure and leveled the ground surface (Refer to USACE 0000364).

The structure and species composition of plant communities are influenced by landscape attributes such as soil properties and hydrological gradients. The effects of soil properties and hydrologic gradients on vegetation is synergistic. Biogeochemical processes in soils that influence nutrient and oxygen availability to roots are controlled not only by minerology and soil texture, but also by soil pore size and moisture content (Violante and Caporale 2015, Jenny 1941). In natural settings, transitions between neighboring soil types and hydrologic regimes are often gradual, creating additional transition zones which serve as unique habitat patches and increase landscape-level species diversity (Haag and Pfeiffer 2012, Weiher and Keddy 1995).

*Expert Team Report United States v. Benjamin K. Sharfi and Neshafarm, Inc.*

SHARFIEXPERTS0000265

56

Plant roots, even those of species adapted to wetland conditions, require oxygen to perform aerobic respiration and generate energy to support activities such as root growth, tissue repair, and nutrient acquisition (Mitsch and Gosselink 2015). Wetland plants may exhibit a variety of adaptations that facilitate oxygen acquisition in saturated soils, e.g., from highly porous tissues that enhance opportunity for internal gas exchange (i.e., aerenchyma), to enhanced tolerance to byproducts of anaerobic respiration (Nakamura and Naguchi 2020). However, structural components in the landscape, such as soil structure and microtopographic relief, can also be important and influence oxygen delivery to roots in wetland soils (Diamond et al. 2020). Soils with larger pores have greater porosity and are better aerated. High soil porosity is particularly important in saturated soils since oxygen travels much slower through water than it does through air and additional impediments, such as small pore size, will further deplete oxygen levels (Thorbjørn et al. 2008). Soil pore size can be increased naturally by the activity of soil fauna or accumulation of organic material. The organic material serves as a glue between soil mineral particles, facilitating formation of larger aggregates which pack together poorly, creating larger pores (Six et al. 2004). Small changes in elevation, i.e., hummocks and hollows, are commonly observed in Florida wetlands (Gilbert et al. 1995). Higher elevation hummocks can provide roots refuge from saturated soils with lower oxygen levels. Access to unsaturated soils can be critical for seedling recruitment (Myers and Ewel 1990) and microtopographic complexity can increase wetland species diversity by providing habitat for species not otherwise encountered in wetland interiors (Denton and Willis 2008).

The heterogeneous soils and hydrology that existed at the Site prior to impact were reflected in the diverse vegetation structure and species composition of prior existing plant communities. Prior to impact, three soil types intersected on the Site, each with characteristic structural properties and chemical attributes (Section III. D). Similarly, a site-scale hydrologic gradient extended across the Site as evidenced by the documented presence of both uplands and wetlands. Local hydrologic gradients were also present within wetlands as hummock and hollow microtopography (D. Small USACE 0000490). Four distinct vegetation types existed at the Site: two types of mixed species forest (upland and wetland), a shrub/sapling wetland, and a freshwater marsh (Section V. B. 3. c.). Transition zones between soil types and hydrological regimes provided additional transition zones, likely enhancing vegetation structural and species diversity on a small scale (Diamond et al. 2021, Denton and Willis 2008).

The soils and hydrology of the Site have been impacted and simplified and these changes have decreased the potential of the Site to support the diverse vegetation structure and species composition present prior to impact (e.g., Rickman et al. 1965). Mechanical earthwork and redistribution of soils has destroyed native soil structure, collapsing pores and compacting soils. Hummocks and hollows have been levelled, effectively eliminating local vertical hydrologic gradients. The transitions between upland, wetland, and/or open-water body environments at the Site are generally abrupt indicating steep hydrologic gradients and leaving less habitat for transitional vegetation types (e.g., Photograph III.E.11). The current vegetation reflects a prevalence of upland hydrology at the Site. Both dominant species, bahia grass (*Paspalum*

*notatum*) and three-flower tick trefoil (*Desmodium triflorum*), are intolerant of saturated soils (USACOE 2020).

    (3)    **Summary of Prior Existing Vegetation at the Site**

The results of the Reference Area plots review indicate at least four vegetation types existed on the Site prior to mechanical clearing and installation of turfgrass: Mixed Wetland Forest, Mixed Shrub, Upland Mixed Coniferous/Hardwoods, and Freshwater Marsh. Although several invasive plant species were likely present e.g., Old World climbing fern *(Lygodium microphyllum)* and punk tree *(Melaleuca quinquenervia)*, native species were well-represented and diverse. Tree species included a mixture of slash pine *(Pinus elliottii)*, laurel oak *(Quercus laurifolia)*, red maple *(Acer rubrum)*, and cabbage palm *(Sabal palmetto)*. The shrub layer included tree saplings and seedlings in addition to wax myrtle *(Morella cerifera)*, gallberry *(Ilex glabra)*, and dahoon holly *(Ilex cassine)* among others. Representative ground cover species include wetland ferns *(e.g., swamp fern (Blechnum serrulatum)*, chain fern *(Woodwardia* sp.) and royal fern *(Osmunda spectabilis))*, saw palmetto *(Serenoa repens)*, bog buttons *(Lachnocaulon* spp.) and native graminoid species such as cordgrass *(Spartina bakeri)*, wiregrass *(Aristida* sp.*)*, and sawgrass *(Cladium jamaicense)*.

Prior to excavation, imports of soils, and the use of heavy equipment, microhabitat complexity was provided by local elevation gradients (hummocks and hollows); the presence of three soil types, each with different physical and chemical characteristics; and a hydrologic gradient that extended across the Site. This landscape complexity suggests the list of plant species previously supported at the site was extensive. In fact, the habitat value of this Site was considered worthy of designation as a Strategic Habitat Conservation Area by the Florida Fish and Wildlife Conservation Commission and the Florida Natural Area Inventory (Figure V.D.3.1).

Details of the Reference System review results are provided below. They begin with a discussion of the pre-impact vegetation depicted on map products and aerial imagery, followed by a review of descriptions and photographs made by onsite observers, and conclude with a discussion of the insights provided by data collection in Reference areas.

    (4)    **Results of the Review of Prior-Existing Vegetation as Depicted on Publicly Available Maps and Aerial Imagery**

The primary map product we used to characterize the pre-impact vegetation structure and species composition at the Site was the SFWMD Land Use Land Cover (LULC) 2014_2016 map (SFWMD 2018). SFWMD LULC maps depict land use/land cover types and are periodically updated to reflect changing conditions. They are based on photointerpretation of aerial imagery viewed at a scale of 1:7,000 to 1:12,000. Vegetation classification follows the Florida Land Use Cover and Classification System (FLUCCS), a hierarchical vegetation and land use classification system built by the Florida Department of Transportation and subsequently amended and adopted by the Florida Water Management Districts for development of statewide vegetation

*Expert Team Report United States v. Benjamin K. Sharfi and Neshafarm, Inc.*

58

maps (SFWMD 2014). The SFWMD LULC map was updated in 2020, but that update was based on imagery obtained in 2019 during land conversion operations on the Site and does not reflect pre-impact conditions at the Site (Figure V.D.3.2). The SFWMD LULC map representative of pre-existing conditions is the 2014_2016 version that was based on pre-impact aerial imagery obtained in 2016 (Figure V.D.3.2).

The SFWMD LULC map 2014_2016 indicates that, prior to impact, the Site supported vegetation that was diverse both in structure and species composition. This map includes two vegetation types on the Site, Upland Mixed Coniferous/Hardwood Forest and Mixed Shrubs (Figure V.D.3.3). Forest vegetation types have a tree canopy closure of at least 25%, with trees defined as woody species >20 ft tall (SFWMD 2014). Woody plants, including saplings, less than 20 ft tall are considered shrubs. The Mixed Shrub type is a subclass of the "Mixed Wetland Hardwoods" vegetation type and is applied to wetlands dominated by woody shrubs, e.g., willows, as well as saplings of red maple, water oak, or cabbage palm. These vegetation types are notable for having high species diversity in the upper stratum. Co-dominant sapling/shrub species are common in the Mixed Shrub vegetation type and co-dominance is required for all Mixed Forest vegetation types SFWMD 2014). Thus, the SFWMD LULC map 2014-2016 map of the Site indicates the vegetation structure varied across the Site and the species composition of the upper canopy was diverse. However, evidence points to the prior existence of two additional vegetation types, each contributing to overall site diversity and each below the minimum wetland mapping unit of 2 acres (SFWMD 2014).

A small (<0.2 acres) Freshwater Marsh is evident in aerial imagery but is not delineated in the SFWMD LULC map 2014_2016 map (Figure V.D.3.3). Despite its small size, it further exemplifies the considerable vegetation diversity that existed at this site. Similarly, there is an unmapped inclusion of Wetland Forested Mixed vegetation within a large Upland Mixed Coniferous/Hardwood Forest polygon (46 acres) where it overlaps the NW corner of the Site (Figures IV.C.3.c.1 and V.D.3.3). We documented the presence of wetland vegetation, soils, and hydrology at Reference plot W11, located 160 ft away from the NW corner of the property boundary but within the same forest patch and on the same mapped soil type that previously extended into this corner of the Site (Figure V.D.3.3). Data gathered at reference plot W11 suggests the pre-existing forest in this corner fits the definition of a "Wetland Forested Mixed" vegetation type (Appendix 6).

It is not unusual for unmapped wetland inclusions to occur in large upland polygons on SFWMD LULC maps. For example, we found that seven of our reference sites designated as "Upland Forests" in the SFWMD LULC 2014-2016 map met the technical criteria for wetlands articulated in the Manual and Regional Supplement(W5, W6, W7, W11, W13, W16, W17) (Appendix 6). The presence of unmapped wetlands may indicate the presence of a wetland/upland mosaic consisting of wetlands smaller than the minimum mapping unit of 2 acres and/or inaccuracies in the mapping. While the overall mapping accuracy of the SFWMD LULC map is 85% (Kostura 2021), the SFWMD photointerpretation guide acknowledges the difficulty

*Expert Team Report United States v. Benjamin K. Sharfi and Neshafarm, Inc.*

59

of distinguishing forested wetlands from forested uplands, warning, for example, that "Upland Mixed Forests can be easily confused with Mixed Wetland Hardwoods" (SFWMD 2014).

### (5) Results of the Review of Vegetation Descriptions and Photographs Made on the Site

Descriptions and photographs of the vegetation made by onsite observers 2018-2021 provide additional detailed regarding the vegetation structure and species composition at the Site prior to impact. They documented the presence of a mixture of coniferous and deciduous wetland tree species such as slash pine and cabbage palm and red maple. Obligate wetland ferns were observed and photographed in the understory (Photographs V.D.3.1 and III.E.1). Graminoid species, e.g., sawgrass, wiregrass, and cordgrass were also noted. A detailed account follows:

- (a). In 2018, a forested wetland with the wetland obligate fern, royal fern, was photo documented on the Site (Photographs V.D.3.1 and V.D.3.2).

- (b). In wetland delineation forms dated March 2018 (USACE 0000560, USACE 0000557), Ms. Small documented the presence of the following species in mixed shrub wetlands: slash pine, red maple, punk tree, Carolina willow *(Salix caroliniana)*, primrose willow *(Ludwigia peruviana)*, bog buttons *(Lachnocaulon* sp.), and swamp fern.

- (c). During a site visit April 30, 2018, the SFWMD noted the following wetland trees and ferns at the Site (USACE 0000014) red maple, swamp fern, chain fern, and royal fern.

- (d). In 2020, approximately two years after initial land clearing occurred, EDC conducted a wetland functional assessment and documented the presence of the following wetland species: slash pine, cabbage palm, red maple, punk tree, Brazilian pepper *(Schinus terebinthifolia)*, saw grass, Old World climbing fern, cordgrass, and wiregrass (DEF 0000424).

- (e). I visited the Site Oct 18-19, 2021 and noted the presence of remnant specimens of slash pine and red maple, corroborating previously documented occurrences of these species on the Site, though several showed indications of stress (e.g., Photographs V.D.3.3 and III.E.3). I did not observe seedlings or other signs of regeneration. A list of plant species observed during this site visit is available in (Table V.C.6.e.1).

### (6) Results of Data Collection at Vegetation Reference Areas

The list of plant species observed at each reference site described below is provided in individual data sheets (Appendix 6). A combined list of plant species observed during field visits to

*Expert Team Report United States v. Benjamin K. Sharfi and Neshafarm, Inc.*

SHARFIEXPERTS0000269

reference sites is available in Table V.C.6.e.1. Plot locations are depicted in Figures IV.B.1.1, IV.B.1.2.

### b. Wetland Forested Mixed Reference Areas

A forested wetland with a mixture of coniferous and hardwood species in the overstory, i.e., "Wetland Forested Mix" vegetation type occurred in the NW portion of the Site prior to impact (see text above). Reference vegetation data was collected in two Wetland Forested Mix reference plots, W11 and W12.

Plot W11 was located in an approximately 55-year-old stand representative of a patch of forest that, prior to impact, extended into the NW corner of the Site prior to mechanical clearing of vegetation and associated redistribution of soils, excavation of the Site and export of soils, imports of fill, land leveling, and construction of roads and buildings (Figure V.D.3.3). The Plot W11 location was mapped as an "Upland Mixed Coniferous/Hardwood Forest" in the 2014_2016 FLUCCS map (Figure V.D.3.3). However, this forest meets the technical criteria for wetlands articulated in the Manual and Regional Supplement and the vegetation structure and species composition fit the description of a "Wetland Forested Mix" vegetation type (South Florida Water Management District 2014).

The forest canopy is comprised of laurel oak and slash pine with individual canopy cover values of 30 percent and 20 percent, respectively. Representative trunk diameters are 13 inches for pines and 5.5 inches for oaks. A large slash pine cored at this site was determined to be 55 years old. The mid-story canopy is dominated by cabbage palm and supports woody vines e.g., grape (*Vitis* sp.) and Old World climbing fern (Photographs V.D.3.4 and V.D.3. Obligate wetland species such as fringed, yellow-eyed grass (*Xyris fimbriata*) and Virginia chain fern (*Woodwardia virginica*) were observed in the understory. Occasional patches of *Sphagnum* moss, indicative of moist undisturbed soils, are present (Photograph V.D.3.6). All species observed within the plot location were wetland species as per the National Wetland Plant List (Appendix 6).

Plot W12 is located in a 35-year-old stand of slash pine and cabbage palm (Photograph V.D.3.7). The mid-canopy is populated by cabbage palm (20" DBH), scattered stems of punk tree, and wax myrtle. The ground layer is dominated by graminoid species, e.g., carpet grass (*Axonopus fissifolius*), tropical flat sedge (*Cyperus surinamensis*), and an occasional beak sedge (*Rhynchospora nitens*), an obligate wetland species.

### c. Freshwater Marsh Reference Area

We photo documented the vegetation in a freshwater emergent wetland that occurs adjacent to R Well 5, 0.35 miles north of the Site (Figure IV.B.2.a.1). The vegetation is dominated by tussock-forming native grasses, such as sawgrass and beak sedges (*Rhynchospora* spp.) (Photograph

*Expert Team Report United States v. Benjamin K. Sharfi and Neshafarm, Inc.*

V.D.3.8). Scattered patches of pickerelweed *(Pontederia cordata)* and occasional hummocks colonized by woody species were also observed.

### d.  Mixed Shrub / Mixed Wetland Hardwood Reference Areas

The Mixed Shrub type is differentiated from the closely related Mixed Wetland Hardwood vegetation type on the basis of overstory height (SFWMD 2014). If the overstory component exceeding 20 ft in height has a canopy coverage value of less than 25%, then it is Shrub type rather than a Forest type. Species mixtures may otherwise be similar between the two vegetation types and may include coniferous as well as hardwood tree species (SFWMD 2014).

The central portion of the Site was previously mapped as a Mixed Shrub vegetation type. However, the photo signature of this polygon indicates it was variable both in stature and in species composition (Figure V.D.3.3). Additional structural and species diversity would have existed along the borders where this central area transitioned into the other three vegetation types on this Site: Mixed Wetland Forest, Upland Hardwood/Coniferous Forest, and a Freshwater Marsh. Our selection of Reference Areas reflects this diversity.  Reference Areas W13 and W16 were located at transition zones between coniferous or mixed species forests and Mixed Shrub wetlands. Three plots, W1, W2, and W4 serve to characterize understory species potentially occurring in the Site. They were situated within 0.1 m of the northern border of the Site, in pasture Shrub Wetlands (Figure IV.B.1.2). W14, W15, and W17 are representative of late seral Mixed Shrub wetland conditions, i.e., Mixed Wetland Hardwoods, and are characterized by an overstory of mixed hardwood species exceeding 20 ft in height.

### (i) Overview of the vegetation documented in Mixed Shrub Wetland Reference Areas and in transitions between Mixed Shrub wetlands and forested Reference areas:

When trees are present in most of the dominant plant community types in Reference Areas, the common species are cabbage palm, slash pine, red maple, with an occasional laurel oak. Stand age was estimated in several plots by coring pines and maples, the oldest of these was determined to be 39 years, indicating these are young stands.  Saplings and seedlings of slash pine and cabbage palm were often in the understory, and invasive species such as Brazilian pepper and punk tree or earleaf acacia *(Acacia auriculiformis)* were occasionally present, most frequently in plot locations situated close to roads. The shrub stratum frequently includes wax myrtle with gallberry shrubs and occasional laurel oak seedlings. The herb stratum was diverse and variable. Native wetland ferns swamp fern and royal fern were commonly observed in shaded locations while a diverse cover of graminoid and herb species, e.g., bunched beaksedge *(Rhynchospora microcephala)* and carpet grass, was often documented in more exposed locations. Vines, e.g., grape *(Vitis* spp.) laurel greenbrier *(Smilax laurifolia)* and Old World climbing fern were also observed. A detailed account follows.

*Expert Team Report United States v. Benjamin K. Sharfi and Neshafarm, Inc.*

SHARFIEXPERTS0000271

62

### (ii) Vegetation in Reference areas situated at transition zones between Mixed Shrub wetlands and forests.

The W13 Reference plot is located at the transition between an open canopy of slash pine and the edge of a Mixed Shrub wetland (Photograph V.D.3.9). This location was mapped as an "Upland Forest" (Level 1) in the SFWMD LULC 2014_2016 map (SFWMD 2018). However, we found it meets the technical criteria for wetlands articulated in the Manual and Regional Supplement(Appendix 6). The species composition of the groundcover is diverse i.e., 5 graminoid species and 4 herbs/subshrub species were documented within a representative 5-foot square area. Native species are common and include bunched beaksedge, shortbeak beaksedge, carpet grass, fringed yellow eyed grass *(Xyris fimbriata)*, and Florida tickseed *(Coreopsis floridana)*, a Florida endemic obligate wetland species. A sparse cover of non-native species, *e.g.*, Old World climbing fern and earleaf acacia seedlings, was also documented.

The W16 Reference plot is in a location designated as "Upland Forest" (Level 1) in the SFWMD LULC 2014_2016 map (SFWMD 2018). However, we found it meets the technical criteria for wetlands articulated in the Manual and Regional Supplement (Appendix 6). This plot serves to characterize a transition between an open canopy of slash pine (aged 37 years) and laurel oak (saplings) and a Mixed Shrub wetland. Invasive species are present within the plot (Old World climbing fern) and nearby (punk tree). Woody tree species are generally restricted to the southern portion of the plot where tall hummocks provide drier conditions. Standing water and mid-elevation hummocks are more common to the north and are colonized by swamp fern and a mixture of shrubs such as gallberry, dahoon holly, and wax myrtle (Photograph V.D.3.10 USAEXPERTS 0000240). Graminoid species and fringed yellow eyed grass were observed on tussocks and in standing water.

### (iii) Vegetation in Reference Shrub Wetland plots adjacent to the Site

Vegetation was characterized in three grazed shrub wetland plots (plots W1, W2, W4) situated 45 ft – 400ft north of locations on the Site where shrub wetlands occurred prior to impact. The vegetation in those plots can be summarized as follows: There is a sparse overstory of slash pine with evidence of pine regeneration (i.e., saplings and seedlings) in the lower strata (Photograph V.D.3.11). Hummocks and hollows microtopography is common, with hummocks colonized by wax myrtle, vines (grape and Old World climbing fern), wetland ferns (e.g., swamp fern), and an occasional Brazilian pepper (Photograph V.D.3.12). Wax myrtle was frequently observed and covers approximately 15-25% of this area. Between hummocks, standing water and native graminoids such as bunched beaksedge, southern beaksedge *(Rhynchospora macrocarpa)* and carpet grass are often present. The non-native turfgrass, Bahia grass *(Paspalum notatum)*, is occasionally present in the southern portion of this area.

*Expert Team Report United States v. Benjamin K. Sharfi and Neshafarm, Inc.*

### (iv) Vegetation in Reference plots representative of late-stage Mixed Shrub/ Mixed Wetland Hardwood

Reference plot W14 is situated between 84th Avenue and a punk tree swamp. It is representative of a transitional location that has matured into a Wetland Hardwood Forest, a tall variant of the Mixed Shrub type, and includes a tree-sized red maple (aged 39 years) and scattered slash pine (Photograph V.D.3.13). The shrub layer within the plot is diverse, including cabbage palm, earleaf acacia saplings, wax myrtle and shoebutton *(Ardisia elliptica)*. Swamp fern, carpet grass, and stiff spadeleaf *(Centella asiatica)* were documented in the ground layer.

The vegetation at Reference plot W15 includes a tall overstory of the native shrub species, wax myrtle. The trunks are robust, angling over standing water and growing to 4.5" diameter. The understory hosts additional wax myrtle stems as well as Brazilian pepper. Wetland ferns are abundant at the wetland edge where the standing water was shallow. Royal fern, swamp fern and hottentot fern *(Cyclosorus interruptus)* were documented at this location (Photograph V.D.3.14).

Plot W17 was located on the edge of a shrub wetland dominated by punktree in a forest that appears on SFWMD LULC 2014_2016 map as an upland pine forest (SFWMD 2018). However, we found it meets the technical criteria for wetlands articulated in the Manual and Regional Supplement (Appendix 6) and the vegetation structure and species composition of the forested component fits the description of a "Wetland Hardwood Forest" vegetation type (South Florida Water Management District 2014). Cabbage palm and laurel oak are present in the tree overstory and scattered slash pine was observed in the vicinity. The shrub layer is diverse and includes wax myrtle, saw palmetto, dahoon holly, fetterbush *(Lyonia lucida),* and oak seedlings (Photograph V.D.3.15). The ground cover includes pipewort *(Eriocaulon* sp.) and vegetative members of the sedge family (Cyperaceae).

### E.  Summary of Vegetation Conditions in Reference Area Wetlands and by Inference on the Site - After Mechanical Clearing and Earthwork Activities

Prior to impact, three soils types intersected on the Site, each with characteristic physical and chemical properties. A hydrologic gradient extended across the Site as evident by the documented presence of both uplands and wetlands and local high points within wetlands, i.e., hummocks. This heterogeneity was reflected in the structure and species composition of prior existing plant communities. Upland mixed species forest graded into a wetland dominated by mixed shrubs and saplings which in turn transitioned into an emergent wetland and wetland mixed species forest (Figure V.D.3.3). Impacts to the Site include disruptions to soil and hydrologic conditions that have impacted the properties and reduced the size of the transition zones. This has reduced or eliminated the potential of the Site to sustain the diversity of vegetation structure and species composition previously present.

*Expert Team Report United States v. Benjamin K. Sharfi and Neshafarm, Inc.*

SHARFIEXPERTS0000273

With the exception of a few specimen trees, the vegetation previously existing at this site has been removed and replaced by a nonnative turf grass, two ponds, a depressional wetland, and an open grove of small hardwood trees. The diversity in vegetation structure and composition that existed previously has been removed and the predominant vegetation is scattered trees over managed turf (Photograph III.E.2). The ground cover is dominated by an extensive carpet of Bahia grass and common lawn weeds, e.g., three-flower tick trefoil *(Desmodium triflorum)*. An excess of nutrients has generated an algal bloom in the northern end of the depressional wetland where it meets the turf (Photographs III.E.5 and III.E.6). This wetland is dominated by pickerel weed, a native ornamental wetland species.

The shrub layer that was previously common at this Site has been eliminated and is currently represented only by an occasional planted tree less than 20 ft high and by scattered shrubs restricted to the depressional wetland. The overstory trees generally consist of shade trees scattered through the turf and cypress trees installed in one of the ponds. An open canopy of small hardwoods has been installed in the SW corner of the site, however many of these are suffering from cambium damage caused by livestock (Photograph III.E.4). Red maple trees are present in and around the depressional wetland feature, but rings of dead vegetation around red maple trunks on the north border of this wetland indicate they are subjected to applications of chemical herbicide (Photograph III.E.7). Transition zones between turf and ponds or between turf and the depressional wetland are generally abrupt, leaving little opportunity for colonization by wetland vegetation (Photographs V.D.3.16 and III.E.11).

**F. Faunal Support/Habitat Conditions**

   **a. Summary of Faunal Support/Habitat Conditions in Reference Area Wetlands and by Inference on the Site - Prior to Mechanical Clearing and Earthwork Activities**

As introduced in section III, F above, throughout the range of Reference Areas used to develop this Expert Report, we observed large, interconnected and complex mosaics of intact mixed hardwood forested, scrub/shrub, and emergent wetlands interspersed with ponded hardwood and pine flatwood areas that were usually connected to larger ponded (littoral) or flowing water features. Although light to moderate grazing was on-going in most areas, Reference Area forest patches consisted of at least 4 strata and supported by a few weeds. Depression/mound microtopographic relief was present and complex and enhanced by several classes of down wood, standing tree snags, and cavities. Most of the Reference Areas had a great deal of interior forest or scrub/shrub habitat and interior changes within those habitats that provided abundant food and cover resources for a range of faunal species. Most of the larger wetland complexes also had very little edge habitat and exhibited high patch contiguity and connectivity to surrounding landscapes.

SHARFIEXPERTS0000274

During field work to develop this Expert Report, the DOJ Expert Team observed several species of resident and migratory birds in reference areas foraging in the ditches transporting water to Bessey Creek, in the depressional wetlands on Countess Joy area, and on the Site. We directly observed great blue heron (*Ardea herodias*), anhingua (*Anhinga anhinga*), american egret (*Ardea alba*), red-tailed hawk (*Buteo jamaicensis*), little blue heron (*Egretta caerulea*), sandhill crane (*Grus canadensis*) and white ibis (*Eudocimus albus*). In Bessey Creek we observed an alligator (*Alligator mississippiensis),* garfish and mullet. The DOJ Expert Team also observed animal tracks and/or scat in wetlands throughout the Study Area including deer (*Odocoileus virginianus*), coyote *(Canis latrans)*, and feral hog (*Sus scrofa*). Many of the foraging bird species utilize Bessey Creek as a food source and use the forested buffer along Bessey Creek as resting and nesting sites. Before Site impacts, wetlands and similarly situated wetlands in the Study Area supported a variety of birds, amphibians, fish and the American alligator through habitat and food web support.

> **b. Summary of Faunal Support/Habitat Conditions in Reference Area Wetlands and by Inference on the Site – After Mechanical Clearing and Earthwork Activities**

In contrast, wetlands that remain on the Site after mechanical clearing, earthwork, import and redistribution of fill materials, road construction, and other activities are highly degraded. They are mostly dominated by a single strata of Paspalum (Bahia grass) turf/pasture plant community and various paddock/barn yard areas. There is one remaining and degraded depressional wetland system south of plot B6. It has been filled around most of its perimeter and set up to receive untreated storm water runoff from paddock areas that are adjacent to the south and east perimeters of the wetland. The plant community in this wetland is dominated by a highly simplified, thinned red maple "forest" with a very sparse shrub layer and undergrowth that includes Pontederia and other forbs and grasses that are mowed and weed whacked. In particular, the complex vertical and horizontal plant community structure, species diversity, and associated food and cover resources available to faunal species that are typical of reference area wetlands are not present on the Site. Instead, remaining wetlands do not effectively function to support faunal species because –

> a. They exist on imported and leveled fill where patterns of water flow and circulation have been significantly altered or eliminated.
>
> b. Most surface flows are consolidated and directed via shallow swales to constructed drop inlet catch basins (northwest quadrant) or, in the case of the remaining depressional wetland south of B6, flows are directed to artificial ponds in the center of the Site or to a pipe that has been installed on the southern perimeter of the depression. This pipe appears to carry flows to the south. There is evidence from the monitoring wells that there is subsurface drainage in the southeast quadrant of the Site.

SHARFIEXPERTS0000275

c. Former complex patterns of microtopographic depressions and mounds are filled and leveled out.

d. The Site consists of highly manipulated and single layer turf/pasture plant communities or (in the case of the remnant depression south of Plot B6) a thinned (simplified) tree canopy, a sparse shrub layer, and undergrowth dominated by a combination of a few native species and invasive non-native weeds.

e. Especially in the turf/pasture areas, there is no large wood, there are no snags, no cavities, and no effective resting, hiding, feeding, thermal, or escape cover resources.

f. All of the turf/pasture areas and the remaining and degraded forest patch is completely fenced and fragmented, making these areas inaccessible to most classes of native faunal species.

g. Because it has been thinned and simplified, the remaining forest patch has little to no interior forest changes in habitat structure or conditions. It is virtually all edge habitat, which is known to encourage use by edge adapted opportunistic species that displace native, interior forest adapted species.

h. This residual forest patch is not connected to any intact surrounding waters/wetlands or to upland forest and scrub/shrub communities.

i. The small habitat patch size, lack of interior forest changes, and lack of landscape-scale connections to other natural systems (fragmentation) significantly limits the food and cover resources provided by any of the remaining wetlands on the Site at site specific and landscape scales.

### G. Impact Assessments

#### 1. Direct Impacts

##### a. Area of Fill

The DOJ Expert Team determined that 5.97 of wetlands on the Site were directly impacted with discharges of dredged and/or fill material. (Figure V.C.2.1). We reached this opinion after –

(1). Reviewing multiple aerial photographs of the Site prior to and after impacts (Figures of 1966, 2016, 2018, 2019, 2021, Appendix 9, and Figure IV.D.4.1.

(2). Reviewing map resources from NWI (Figure II.B.3, NRCS (Figure III.D.1), FEMA (Figure II.C.3.1) Florida FLUCCS code (Figure V.D.3.3), LiDAR Images (Figure IV.D.4.1, 2016 and 2019 LiDAR).

(3). Reviewing Site investigation data from the USACE, DEP, SFWMD, Martin County, FDACS, Danna Small and EDC.

*Expert Team Report United States v. Benjamin K. Sharfi and Neshafarm, Inc.*

SHARFIEXPERTS0000276

(4). Conducting two Site investigations on September 13 and 14 and October 18 and 19, 2021.

(5). Completing 19 Wetlands Data Sampling Forms on the Site (Appendix 6).

(6). Reviewing data from six water table monitoring wells (Appendix 7)

(7). Reviewing three Atypical Reference Areas and completing three Wetlands Determination Data Forms (Appendix 6).

Figure V.G.1.b.1 shows the area of the Expert Team wetland delineated area of the Site that has had fill deposited. The area of deposited fill includes the two ponds (Cypress Lake and Peanut Lake) because they did not exist prior to impact and the process of construction involved excavation and moving soil.  Photographic evidence indicates that the ponds changed configuration several times during the site development.

### b.  Volume of Fill

We could not determine a volume of dredged and/or fill material discharged over the Site. This is because during our two Site investigations, we excavated soil pits while conducting wetland determinations and found material mixed, roiled, and redistributed down to several feet in the soil profiles.  Soil redistribution and discharges were found as deep as 53 inches in the southwest portion of the Site and soils were mixed on almost every sampled soil pit.  As of this writing, we have no records or documentation of exports or imports of soil/fill material from or to the Site. Therefore, we concluded that a volume of discharged dredged and/or fill material was not possible to calculate based on current information.

However, we know that sod/turf was imported and placed throughout the site. The depth of the turf mat ranged from two to four inches. Assume the minimum thickness of only two inches and consider only at the wetland area and subtract out the area for the two ponds (0.24 acres) and the remnant depression wetland area (0.79 acres) the result is 5.79 acres minus 1.03 acres leaving 4.76 acres with turf placed within waters/wetlands. Given there are 43,560 ft$^2$/acre and 0.167 ft of import/fill equals 34,626 ft$^3$, or 1,282 cu yds of import/fill.

Additionally, if we do the same calculations for the road network and associated through-fill and use the dimensions for the west road up to, and around the northwest corner, to the upland/wetland line there is at least 0.17 ft (assume two inches of road fill) multiplied by the width of the road and then multiplied by the length of the west road to the northwest corner of the road to the upland/wetland line.

### c.  Summary of the Scale and Scope of Direct Impacts

(1)  The combined direct impacts associated with mechanical clearing of vegetation and associated redistributions of soils, export of fill material,

imports of fill and redistributions it, land leveling, road and building construction, and consolidation drainage significantly changed the bottom elevation of WOTUS, changed wetlands to uplands, and functionally and physically isolated any remaining wetlands on the Site from abutting wetlands on the Countess joy Est Reference Area, the N/S Ditch, the Bessey Creek ecosystem, including its downstream TNW reach, and from the TNWs of the St. Lucie River, St. Lucie Inlet, qnd the nearshore waters of the Atlantic Ocean..

(2)  The scale and scope of water/wetlands impacts on the Site are such that original conditions that would support the suite of hydrologic, biogeochemical, plant community, and faunal support/habitat ecosystem functions are not present and not recoverable.

(3)  In addition to their (geographic) scale and scope, impacts have been in place long enough to be considered permanent (See Temporal Impacts Section Below in this Expert Report).

(4)  Fundamental alterations to patterns of water flow and circulation and removal/substitution of organic (much) soils with imported mineral soil fill materials has caused a permanent and irreversible change of state of waters/wetlands physical environmental conditions and associated hydrologic, biogeochemical, plant community, and faunal support/habitat ecosystem functions on the Site.

(a). Specifically, conditions on the Site changed from consisting of a mosaic of interconnect forested and scrub/shrub wet "flats" wetlands on hydric organic and some mineral soils to either uplands or to a structurally and functionally degraded wetland depressional system in the south-central portion of the Site (location vicinity B7, B5, A7, A3), or to ornamental pond features (i.e., Peanut Lake and/or Cypress Lake).

These connections occur because -

(a). Water flows emanating from the paddock/pasture areas to the east (vicinity B8) are now directed (piped) into and the flow through the remaining depression. These flows then go south, through a pipe installed on the southern perimeter of the wetland or they can potentially flow west to the ornamental Cypress Lake (planted cypress) to the west (vicinity B1, B2) via a shallow and nearly level ditch/swale. It is possible that flows in this swale can be bidirectional if the outlet pipe in south end of the remnant depression is plugged. From the central Cypress Lake feature, water appears to be used for irrigation or (we think) it can be shunted west or south via piped flow or a subsurface drainage system to the south and/or west and

eventually to the N/S Ditch that flows north and into Bessie Creek. The choice to manage water in this way has "short circuited" water flow pathways through the original forested and scrub/shrub wetland. The pre-impact wetland on the Site was much larger and had complex microtopography. In pre-disturbance conditions, it effectively slowed water down and spread it out, so that water contact times with soils, vegetation, and microbial processes were possible. This is the water "filtration" function that is typical of low energy flats wetland ecosystems, and which improves water quality. The concept of the short circuit is important because water entering the remaining wetland depression from the eastern paddock/pasture areas is contaminated with manure. Given the way water is managed in this system, there is not sufficient water residence time or wetland area to allow effective treatment. Hence, poor water quality is directed downgradient (south via piped flow) or west into Bessey Creek, which is itself impaired.

(5)   **What remains in this depressional wetland system is highly degraded with respect to plant community structure and functioning (biological integrity) and faunal support/habitat functions (biological integrity).** This is because -

(a).  It consists of a highly manipulated and thinned (simplified) tree canopy dominated by red maple, a sparse shrub layer, and undergrowth dominated by a combination of a few native species and invasive non-native weeds. There is little vertical or horizontal structural complexity, and overall plant species diversity is low/depauperate with a high proportion of non-native and invasive weed species.

(b) The remaining and degraded forest patch is completely fenced and small, making it inaccessible to most classes of native faunal species that depend on wetlands to complete all or parts of their life cycles – like growth and reproduction. Because it has been thinned and simplified, the remaining forest patch has little to no interior forest changes in habitat structure or conditions. It is virtually all edge habitat which is known to encourage use of the Site by edge adapted opportunistic species that displace native, interior forest adapted species. This residual forest patch is also not connected to any surrounding waters/wetlands or upland forest and scrub/shrub communities. The small habitat patch size and lack of interior forest change and landscape-scale connections to other natural systems (fragmentation) significantly limits the food and cover resources provided by this remaining wetland at site specific and landscape scales (Harris, 1984; Gosselink and Lee, 1989; Gosselink et.al., 1990).

2.   **Indirect (Secondary) Impacts to Waters/Wetlands**

SHARFIEXPERTS0000279

70

    a. **Alterations to the Timing, Volume, and Rates of Water Discharges Off the Site and Downstream**

Before mechanical clearing, earthwork, and development impacts on the Site, precipitation-generated surface water flowed over the Site either to the N/S Ditch, to the contiguous wetlands to the north, or it infiltrated to storage layers in the native soils. After Site disturbance, hydrologic manipulation, and elevated road construction, the direction, frequency, magnitude, timing and duration of flows off the Site have been altered. We have not been informed of the exact location or extent of the underground drainage alterations on the Site, but the majority of the Site's wetlands have been eliminated via filling, partially filled, and drained via installation of subsurface drainage infrastructure (See V.D.1.b.1 Hydrology Results). The earthwork, construction and conversion activities directly impact hydrologic processes on the Site and will impact the magnitude, frequency, timing, and duration of flows to Bessey Creek and to downstream TNWs.

    b. **Breaking Surface and Subsurface Hydrologic Connections Among Wetlands on the Site and Off-Site Waters/wetlands**

The Site disturbances including land leveling, filling and draining wetlands have disconnected the surface and subsurface flow paths to adjacent wetlands and waters.  The elevated roadbeds prevent the flow of surface water to the N/S Ditch and the Countess Joy wetlands north of the Site. The modification of the Site's surface and subsurface (natural and constructed buried pipes) flow paths limits the water quality (biogeochemical) functions of the Site. We think that surface and subsurface drains on the Site and the two excavated ponds have direct connections to the N/S Ditch via surface and/or subsurface pathways. Although we have not been informed of the subsurface modifications to the Site, we do know that wetlands have been destroyed and drained which eliminates the Site's prior water quality functions via N/S Ditch to help improve nutrient impaired water quality in Bessey Creek.

    c. **Polluted Stormwater Export to Impaired Waters and TNW's**

The Site disturbances including land leveling, filling and draining wetlands have compromised the Site's water quality functions. The disruption of surface flow impacts the biogeochemical functions associated with the Site's wetlands and downstream water quality (Reddy et al., 2010). The Site's reduced capacity to retain and store surface runoff from surrounding farm animals, residential properties and septic tanks increases the downstream transport of nutrients via N/S Ditch to nutrient impaired Bessey Creek. The DOJ Expert Team observed many species of animals on the Site and surrounding areas owned by the Defendants with animal waste prevalent on the Site. During our investigation of the Site, we observed hand fertilizer and herbicide applications (See Photograph USAEXPERTS 0000167) to portions of the Site.  We observed that some surface water flows carrying pollutants are captured and consolidated by surface water drain/catch basin systems (e.g., in the NW corner of the site) and the two ornamental ponds. These captured waters appear to be transported underground to the north ditch or to the N/S

Ditch.  The Site's disconnected surface flow is disrupting the Site's ability to uptake and cycle nutrients and pollutants. It is our opinion that the combination of consolidation drainage, untreated stormwater that has direct contact with manure, and lack of any meaningful water contact time of water with intact wetlands on the Site make the Site an exporter of pollutants via N/S Ditch to nutrient impaired Bessey Creek.

### d.  Changes in the Rate, Timing, and Quality of Carbon Export Off Site

The significant disturbances to the Site through land clearing, filling, draining, and removing the forested and scrub/shrub wetland plant community have reduced the Site's ability to produce and export carbon.  Wright and Reddy (2001) report that the major effect of drainage in wetland ecosystems occurs below ground, where organic matter decomposition is significantly greater under drained conditions.  When applying this principle, the partially filled and drained wetlands on the Site become a net carbon exporter instead of sequestering carbon. The replacement of the prior wetland community with Bahia sod reduces the amount of slowly decomposing (e.g., refractory wood) and quickly decomposing organic material (e.g., leaves and fine, non-woody plant stems) transported to the N/S Ditch and Bessey Creek and the Countess Joy contiguous wetlands to the north.  The Site disturbances have affected carbon export rates and timing by removing the forest and scrub/shrub wetland plant community and replacing it with Bahia sod. Annual leaf fall and carbon export to Bessey Creek via N/S Ditch is sharply reduced.

### 3.  Cumulative Impacts are defined at 40 CFR 230.11(g) as follows –

"Cumulative impacts are the changes in an aquatic ecosystem that are attributable to the collective effect of a number of individual discharges of dredged or fill material. Although the impact of a particular discharge may constitute a minor change in itself, the cumulative effect of numerous such piecemeal changes can result in a major impairment of the water resources and interfere with the productivity and water quality of existing aquatic ecosystems."

Usually, cumulative impacts to the environment are the result of multiple activities whose individual direct impacts may be relatively minor but in combination with others result in significant environmental impacts that often occur at landscape scales. There are several types of cumulative impacts. For example, the literature offers the following four types (Gosselink and Lee, 1989; Gosselink et al., 1990) –

    a. *Time Crowded and Space Crowded* – where impacts occur in time or space at a frequency or proximity where the impacted system does not have time to recover between events.
    b. *Nibbling (Fragmentation) of Connections* – where several small, seemingly unrelated impacts result collectively in decreases in the patch size and connectivity of functioning ecosystems. This results in the fragmentation of ecosystem structure and functioning.

    c. *Synergistic* – where the additive, multiplicative, and/or non-linear effects of individual impacts are greater than the sum of the parts.

Also in the literature is the concept that with respect to detection and management of cumulative impacts, it is not the magnitude, size, or scope of the impact, but the *direction* (positive or negative) of the impact with respect to antecedent and/or target reference conditions within a watershed or Study Area (Lee and Gosselink, 1988).

On the Site, the combination of mechanical clearing of vegetation and associated redistribution of soils, excavation of the Site and export of soils, import and deposition of fill, land leveling, and construction of roads and buildings consolidation drainage, and conversion of former forested and scrub/shrub vegetation to Bahia pasture/turf or to a thinned and simplified "forested" wetland resulted in the following types of Cumulative Impacts –

    a. *Time Crowded Impacts* – where the construction and conversion activities cited immediately above occurred in quick succession starting in 2018, there was not enough time among events for wetlands on the Site to recover to pre- construction structure and ecosystem functioning.

    b. *Space Crowded Impacts* - where construction and conversion activities cited above occurred in the same areas on the Site, there was not enough space where several types of impacts took place to allow the system to recover its pre-construction structure and ecosystem functioning.

    c. *Fragmentation* of aquatic faunal habitat patch size, patch connectivity, and patch contiguity occurred on the Site with the combination of all construction and conversion activities listed above. With current conditions on the Site there are significant disruptions of the longitudinal connections among essential upstream and downstream components of faunal habitats. Examples of these disruptions include significant and discernable changes in the patterns of water flow and circulation and water residence times within remnant and degraded wetlands on the Site. Current conditions on the Site also isolate, constrict, or eliminate upstream and downstream movement pathways for several classes of aquatic, semi-aquatic species (e.g., fish, frogs, salamanders). It also has the same effect on relatively small waters/wetland and riparian dependent faunal species (e.g., voles, rodents, other small mammals). Changes in the patterns of water flow and circulation, water residence times, and faunal species access to the continuum of habitats and food and cover resources that used to occur between the Site and downstream to Bessie Creek and TNWs of the St. Lucie River system and the near shore waters of the Atlantic Ocean can impair species' ability to complete essential parts of their life cycles such as growth and reproduction.

    d. *Synergistic Impacts* occurred where the impacts of the combination of construction and conversion activities listed above and including consolidation drainage, impoundments of water in ornamental ponds, and major sediment discharges within and among Site waters/wetlands and then to downstream waters/wetlands were greater than the sum of

the parts. Today, the existing farm and associated management protocols continue and maintain consolidation drainage, impoundment of water in ornamental ponds and deep and extensive fill deposits in wetlands. These types of conditions have significant impacts downstream to Bessie Creek and to the TNWs of lower Bessie Creek, the St. Lucie River system, and to the near shore TNWs of the Atlantic Ocean.

### 4.   Temporal Impacts to Water/Wetlands Area and Functions

The initial earthwork, construction, and conversion activities that took place on the Site started in 2018. Since 2018, there has been massive removals/export of fill materials from wetlands on the Site, and imports and redistribution of fill, road and building construction, and consolidation drainage. The combination of these activities eliminated most of the wetlands on the Site. Any wetlands that remain will continue to be highly degraded and function at far less than capacity for many years to come. To summarize, there has been a span of at least 4 years during which the types of direct, indirect, and cumulative impacts discussed immediately above in this Expert Report have been in place. The USACE, EPA Region 6, and the State of Florida consistently view impacts of the type that have occurred on the Site, and which have been in place > 4-5 years duration to be the same as permanent impacts. This is because most aquatic ecosystems fail to recover well or completely after long duration impacts, especially when the scale and scope of the impacts combine to alter fundamental physical environmental conditions (e.g., hydrology and soils) and where the potential for the Site's plant and faunal communities to recover in any way is prevented by on-going management practices

### 5.   Summary of Direct Impacts to Waters/Wetland Ecosystem Functions

#### a.   UMAM Summary of Direct Impacts to Waters/Wetland Ecosystem Functions

Results of the UMAM functional assessments are presented in Appendix 9. It includes annotated Quantitative and Qualitative data sheets for the six Site areas sampled and the eight plots sampled on the Reference Area, Martin County Solid Waste Transfer Station and Landfill Property, and Florida DOT properties. Figure IV.B.1.2 shows the location of all functional assessment areas.

#### b.   Reference Area Conditions

UMAM analyses in reference area wetlands show that the horizontal and vertical structure and hydrologic, biogeochemical, plant community, and faunal support/habitat ecosystem functioning improved with age, increasing patch size and patch connectivity (decreasing fragmentation), and decreasing degrees of livestock grazing. Maximum UMAM scores of 7.5 are documented in a 55-year-old forested wetland complex on the Countess Joy East property due north of the Site

*Expert Team Report United States v. Benjamin K. Sharfi and Neshafarm, Inc.*

SHARFIEXPERTS0000283

(Reference Wetland W 11 in Appendix 9) and a 37-year-old forested wetland due north of the
Martin County Solid Waste Transfer Station and Landfill Property (Reference Wetland W 16 in
Appendix 9). This means that our UMAM analyses show that these two wetlands are slightly
degraded with respect to their landscape contexts, weed coverage, and age, but still functioning
at 75% of their potential capacity.  Mid-range scores were documented on slightly younger
forested and scrub/shrub reference sites on the Countess Joy East and West properties that were
25 -33 years in age, slightly fragmented, moderately grazed, and with modest weed canopy
coverages. Their UMAM scores ranged from 7.0 (functioning at 70% of capacity) for wetlands
W 12, W 13, R Well 2, and R Well 5 to 6.5 (W 14 – 65% of capacity). The low UMAM score of
4.0 (40% of capacity) was developed for wetland W 15, which occurs on organic soils located
within a Florida Department of Transportation (DOT) right-of-way complex (Appendix 9). This
wetland has been surrounded by roads with steep, unstable and eroding road fill side slopes. It
was also logged and appears to be maintained and managed for storm water detention within the
right-of-way. Wax Myrtle and Brazilian Pepper dominate the existing plant community.

    c.  Site Conditions

UMAM functional assessment results for remaining wetlands on the Site show universally low
functioning (e.g., UMAM scores of 1 or at best 2) when compared to fully functioning wetlands,
which would score a 10 (Appendix 9, UMAM Qualitative and Quantitative Data Sheets for the
Site). This means that the Site wetlands are significantly degraded and performing at 10% – 40%
of their capacity.

Low UMAM scores for remaining wetlands on the Site are the result of the combined effects of
the scale and scope of mechanical clearing, earthwork, consolidation drainage, and filling
activities on the Site. There have been significant direct, indirect, and cumulative impacts to any
remaining wetland structure and ecosystem functioning on the Site. Of note is the fact that the
original physical environmental (e.g., soils, hydrology) and biological (e.g., plant community,
faunal habitat) conditions that used to support a suite of hydrologic, biogeochemical, plant
community, and faunal support /habitat ecosystem functions on the Site are not present and not
recoverable. For example,

    (a) Mechanical clearing of well-established and mid seral forested and scrub/shrub
        vegetation coupled with removal of organic (muck) and hydric mineral soils, then
        import and redistributions of fill materials and conversion of the plant community to
        Bahia pasture/turf has resulted in fundamental alterations to patterns of water flow
        and circulation on the Site. These activities have also caused permanent and
        irreversible changes of state of waters/wetlands conditions and associated hydrologic,
        biogeochemical, plant community, and faunal support/habitat ecosystem functions.
        The UMAM Score for these areas is a 1.0 (functioning at 10% capacity).

    (b) As discussed above in the Direct Impacts section of this Expert Report, what remains
        of the depressional wetland system south of B6 (Figure V.C.2.1) is hydrologically

(physical integrity) and biogeochemically (chemical integrity), degraded. Again, the choice to manage water in this way has "short circuited" water flow pathways through the original forested and scrub/shrub wetland and effectively eliminated water filtration functions. Also as discussed in the Direct Impacts section of this Expert Report, the plant community structure and functioning (biological integrity) and faunal support/habitat functions (biological integrity) in the remnant depression are also degraded. What remains in the depressional wetland system south of B6 had a UMAM score of 4.0 (40% capacity).

**d. Reference and Site Wetland UMAM Score Comparisons**

Comparing the differences among reference wetland UMAM scores and Site scores –

a. The maximum UMAM Score changes ("deltas") are from 7.5 (high Reference older forests) to 1 (low Site Score) which is delta -6.5 or 4.0 (high Site Score) for the depressional wetland south of B6 (delta -3.5).

b. Mid-range deltas are 7.0 - 6.5 Reference (for slightly younger forests) to Site low scores of 1 (delta -6.0 to -5.5) or 4.0 for the depressional wetland south of B6 (delta -3 to -2.5).

c. The low delta resulted from comparing the degraded Florida DOT right-of-way wetland (W 15) with a UMAM score of 4.0 to Site wetlands with UMAM scores of 1.0 (-3.0 delta) or 4.0 at the depressional wetland south of B6 (delta = 0).

**H. On-and Off-Site Compensatory Mitigation**

**1. Overview**

The scale and scope of waters/wetlands impacts on the Site are such that original physical environmental conditions that did support the suite of hydrologic, biogeochemical, plant community, and faunal support /habitat wetland ecosystem functions are no longer present and not recoverable. In addition to their (geographic) scale and scope on the Site, impacts have been in place long enough to be considered permanent. For example, our field observations and analyses of current conditions on the Site show that fundamental alterations to patterns of water flow and circulation and removal/substitution of organic soils and hydric mineral soils with imported, leveled, and drained fill materials has caused a permanent and irreversible change of state of waters/wetlands physical environmental conditions and therefore the Site's potential to support functioning wetlands. In the context of the Clean Water Act, mechanical clearing of vegetation and associated redistribution and redeposit of soils, excavation of the Site and export of soils, import and deposition of fill, land leveling, and construction of roads and buildings activities have caused significant and irreversible degradation of the physical, chemical, and biological structure and integrity of wetlands on the Site. Specifically, conditions on the Site changed from consisting of a mosaic of intact and interconnected forested and scrub/shrub wetlands on hydric organic soils to uplands or to (a) structurally and functionally degraded turf/pasture wetlands or to one partially filled, (b) a highly degraded and fragmented forested

wetland depression in the south-central portion of the Site, or (c) to ornamental Cypress Lake features. Therefore, it is our opinion that there are no meaningful environmental benefits that could result from attempts at on-site restoration of the remaining turf/pasture features. Further, there is little upside potential to gain meaningful environmental benefits from restoring the remaining and highly degraded forested wetland or the ornamental Cypress Lake features. There are, however, some on-site management approaches that target improvements in water quality conditions on and flowing off the Site that include use of standard Best Management Practices (BMPs) for storm water.  These are identified immediately below.

   2.   **On-Site Recommendations and Opinions**

   a.  **Protect Water Quality**

   (1)   **Install and Maintain Site Wide BMPs**

Install and maintain a system of Best Management Practices (BMPs) for control of the volume, timing/rate of delivery, kinetic energy, and quality of storm water runoff from pastures/paddocks and other impervious surfaces such as barn and shed yards, exercise and training areas, and maintenance facilities. Components of the system of BMPs should be specifically targeted to manage the volume, timing/rate of delivery, kinetic energy, and quality of all storm water runoff from internal and peripheral roads. These include grading of sloped road surfaces to direct flows inward for treatment to bioswales that are installed parallel the road rights-of-way or are situated in locations within or proximate to the rights-of-way that allow effective road runoff treatment.

   (2)   **Manage Ponds**

Re-grade the perimeters and steep banks of the existing pond features and any steep swale features to a slope of at least 7:1 (Horizontal/Vertical). After flattening the pond banks and side slopes, establish a 50 ft vegetated buffer around the pond measured horizontally outward from the OHWM and around the entire pond perimeter. As necessary, redirect and re-contour any existing shallow swale features to deliver water along long reaches of the buffer, not at distinct points. Use small manifold level spreaders if necessary. Engage as much of the perimeter of the buffer as possible with water delivery from the swale features. Manage water delivery to the ponds to flow slowly and have very low kinetic energy. Fence the buffer, preclude grazing and do not mow the buffer. Plant native trees, shrubs, and undergrowth species in the buffer and allow these plantings to grow so that they develop into an intact plant community around the ponds. The combination of these techniques will slow water down, spread water out, and allow water contact time through the buffer – pond transition. Finally, manage water flows out of the ponds so that the best water quality possible exits the Site.

   (3)   **Separate Clean Roof Water**

Separate, capture and manage roof water runoff – which is relatively clean – to reduce volume of water necessary to treat. Recycle the roof water to other (ranch) uses or direct it to the peripheral ditch system so that it re-enters the Bessie Creek system.

(4) **Manage the Remaining "Forested" Wetland Depression**

(a). Set up a treatment system for any storm water flowing into the wetland from the eastern and southern paddock areas. Decommission the existing southern pipe outlet.

(b). Flatten the filled peripheral side slope areas around the partially filled wetland depression to 7: 1 (Horizontal/Vertical).

(c). Establish a 50 ft buffer around the entire wetland depression, fence it and do not mow, whack, or graze it.

(d). Direct any other inflows to the existing depression as in the Pond section above, engaging as much of the perimeter of the buffer as possible.

(e). Eliminate existing non-native weeds from the wetland and the buffer using an integrated strategy that includes hand removal, tactical whacking of targeted weeds, and spot applications of EPA registered herbicides (as a last resort).

(f). Manage water flows into, through, and exits the buffer and the remaining wetland area to optimize water residence times and treatment opportunities so that the entire system has the opportunity to improve water quality.

(g). Interplant native tree, shrub, and undergrowth species within the thinned and degraded area with the goal of increasing canopy coverage in tree, shrub, and undergrowth layers and thereby increasing vertical and horizontal habitat complexity.

3. **Off-Site Recommendations and Opinions**

As no on-site restoration is really feasible, we recommend purchase of credits from an existing mitigation bank that is within the Martin County service area. For example, the Bluefield Ranch Mitigation Bank is such an entity (Bluefield Ranch Mitigation Bank | St Lucie, Okeechobee, Indian River, Martin Counties Florida)

Anticipating the use of the UMAM approach to calculate mitigation credits sufficient to offset Direct and Indirect impacts associated with development of the Site, we have made the following background assumptions

a. There are 5.97 acres total area of impacted wetlands on the Sharfi Property.

*Expert Team Report United States v. Benjamin K. Sharfi and Neshafarm, Inc.*

SHARFIEXPERTS0000287

b. The size of the residual forested wetland depression is 0.79 acres. It scores 4.0 (functioning at 40% capacity = 0.40) on UMAM.

c. The area of residual wetlands now converted to pasture/Bahia grass/paddocks, etc. but still wetlands = 5.18 acres. They score a UMAM 1.0 (functioning at 10% capacity = 0.10)

d. Our best reference area is the forested and scrub/shrub wetland that is due north of the Defendant's Site. It is approximately 55 years old and scored 7.5 UMAM (functioning at 75% capacity = 0.75).

e. Given "d" above, the "Functional Loss" Deltas due to impacts on the Site are as follows:

(1). 0.79 acres of .40 residual forest – difference to 0.75 (Reference Condition) = -0.35

(2). 5.18 acres of .10 Converted Pasture/Bahia wetland = difference to 0.75 (Reference Conditions) = -0.65

Current UMAM Guidance summarized in Bardi et al., (2004) advises the following -

"To determine the number of mitigation bank credits or amount of regional offsite mitigation needed to offset impacts, when the bank or regional offsite mitigation area is assessed in accordance with this rule, calculate the functional loss (FL) of each impact assessment area.
The total number of credits required is the summation of the calculated functional loss for each impact assessment area. Neither time lag nor risk is applied to determining the number of mitigation bank credits or amount of mitigation necessary to offset impacts when the bank or regional offsite mitigation area has been assessed under this rule."

Incorporating this guidance into our calculations, they are as follows -

Calculation # 1. Mitigation for Residual Forest Impacts: (-0.79 acres x -03.5 delta) =

-2.77 credits

Calculation # 2. Mitigation for Bahia/Pasture Conversion Impacts: (5.18 acres x - 0.65 delta) = -3.37 credits

Calculation # 3. Total Mitigation Debt = -2.77 + - 3.37 = - 6.14 Credits

Calculation # 4. Current costs/credit at the Bluefield Ranch mitigation bank are $250,000. Therefore, - 6.14 Credits x $250,000 = $1,535,000

*Expert Team Report United States v. Benjamin K. Sharfi and Neshafarm, Inc.*

SHARFIEXPERTS0000288

## VI. Literature Cited & Other References

Acreman, M., Holden, J. How Wetlands Affect Floods. *Wetlands* **33**, 773–786 (2013). https://doi.org/10.1007/s13157-013-0473-2

Araya, Yoseph N., Jonathan Silvertown, David J. Gowing, Kevin J. McConway, H. Peter Linder, and Guy Midgley. 2011. "A Fundamental, Eco-Hydrological Basis for Niche Segregation in Plant Communities." New Phytologist 189, no. 1: 253–58. https://doi.org/10.1111/j.1469-8137.2010.03475.x.

Army Engineer Research and Development Center, Vicksburg, MS.

Bardi, E.B., M.T. Brown, K.C., Reiss, and M.J. Cohen. 2004. Uniform Mitigation Assessment Method UMAM Training Manual. Florida Department of Environmental Protection and the Center for Wetlands, University of Florida. Web Links - The Uniform Mitigation Assessment Method (UMAM) | Florida Department of Environmental Protection and http://www.dep.state.fl.us/water/wetlands/erp/forms.htm

Berkowitz, Jacob & Vepraskas, Michael & Vaughan, Karen & Vasilas, Lenore. (2020). Development and application of the Hydric Soil Technical Standard. Soil Science Society of America Journal. 85. 10.1002/saj2.20202.

Brinson MM. 1993. A Hydrogeomorphic classification for wetlands. U.S. Army Corps of Engineers, Washington, DC. Wetlands Research Program Technical Report WRP-DE-4.

Brinson MM, Rheinhardt RD, Hauer FR, Lee LC, Nutter WL, Smith RD, Whigham D. 1995. A guidebook for application of hydrogeomorphic assessments to riverine wetlands. U.S. Army Corps of Engineers, Washington, DC. Wetlands Research Program Technical Report WRP-DE-11.

Brody, Samuel, Highfield, Wesley, Ryu, Hyung-Cheal, Spanel-Weber, Laura. (2007). Examining the Relationship between Wetland Alteration and Watershed Flooding in Texas and Florida. 40. 413-428. 10.1007/s11069-006-9003-3.

Bullock, Andrew & Acreman, Mike. (2003). The Role of Wetlands in the Hydrological Cycle. Hydrology and Earth System Sciences. 7. 10.5194/hess-7-358-2003.

Cooke. C. Wythe, 1945. Geology of Florida. Florida State Dept of Conservation and Florida Geologic Survey. Geologic Bulletin 29 339pp illus.

Cowardin LM, Carter V, Golet FC, LaRoe ET. 1979. Classification of wetlands and deepwater habitats of the United States. U.S. Fish & Wildlife Service Pub. FWS/OBS-79/31, Washington, D.C.

*Expert Team Report United States v. Benjamin K. Sharfi and Neshafarm, Inc.*

Davis, JH. 1967. "General Map of Natural Vegetation of Florida Circular S-178 (Map)." https://ufdc.ufl.edu/UF00000505/00001.

Denton, Shirley R, and Diane Willis. "The Field Identification Guide to Plants Used in the Wetland Assessment Procedure (WAP)," 2008, 64.

Diamond, Jacob S., Joshua M. Epstein, Matthew J. Cohen, Daniel L. McLaughlin, Yu-Hsin Hsueh, Richard F. Keim, and Jamie A. Duberstein. "A Little Relief: Ecological Functions and Autogenesis of Wetland Microtopography." WIREs Water 8, no. 1 (2021): e1493. https://doi.org/10.1002/wat2.1493.

Diamond, Jacob S., Joshua M. Epstein, Matthew J. Cohen, Daniel L. McLaughlin, Yu-Hsin Hsueh, Richard F. Keim, and Jamie A. Duberstein. 2021 "A Little Relief: Ecological Functions and Autogenesis of Wetland Microtopography." WIREs Water 8, no. 1: e1493. https://doi.org/10.1002/wat2.1493.

Dowling, David & Wiley, Michael. (1986). The Effects of Dissolved Oxygen, Temperature, and Low Stream Flow on Fishes: A Literature Review. Aquatic Biology Section Technical Report, Illinois, 1998, 61.

Dunne, Thomas. & Leopold, Luna B. (1978). *Water in environmental planning.* San Francisco: W. H. Freeman, http://www.loc.gov/catdir/enhancements/fy1004/78008013-t.html

Edwards, R. T. (1987). "Sestonic bacteria as a food source for filtering invertebrates in two southeastern blackwater rivers." *Limnology and Oceanography* 32, 221-34.

Edwards, R. T., and Meyer, J. L. (1986). "Production and turnover of planktonic bacteria in two southeastern blackwater streams," *Applied and Environmental Microbiology* 52, 1317-23.

Florida Fish and Wildlife Conservation Commission and Florida Natural Areas Inventory 2021 "Strategic Habitat Conservation Areas dataset" Florida Forever Conservation Data Viewer accessed Jan 9, 2022. https://www.fnai.org/webmaps/FFCNA_Map/index.html Metadata available at https://fnai04.fnai.org:6443/arcgis/rest/services/FFCNA/Strategic_Habitat_Cons_Areas_FFCNA/ImageServer

FNAI 2021 "Preliminary Evaluations of the November 2021 Florida Forever Proposals" https://www.fnai.org/PDFs/FNAI%20Preliminary%20Evaluation%20November%202021%20Florida%20Forever%20Proposals.pdf

Gilliam, J.W. 1994. Riparian Wetlands and Water Quality. *J. Environ. Qual.* 23:896–900.

Gosselink, J. G. and L. C. Lee. 1989. Cumulative impact assessment in bottomland hardwood forests. *Wetlands* Volume 9, Special Issue. Society of Wetland Scientists, Wilmington, N.C. 174 pp.

Gosselink, J. G., L. C. Lee, and T.A. Muir, editors. 1990. Ecological Processes and Cumulative Impacts - Illustrated by Bottomland Hardwood Wetland Ecosystems. Lewis Publishers, Chelsea, Michigan. 708 pp

Griffith, Glenn E, James M Omernik, and Suzanne M Pierson. 2012. "Level III and IV Ecoregions of Florida" US Environmental Protection Agency https://gaftp.epa.gov/EPADataCommons/ORD/Ecoregions/fl/fl_eco_lg.pdf

Haag, Kim, and William Pfeiffer. "Flooded Area and Plant Zonation in Isolated Wetlands in Well Fields in the Northern Tampa Bay Region, Florida, Following Reductions in Groundwater-Withdrawal Rates." Scientific Investigations Report. Scientific Investigations Report. USGS, 2012. https://pubs.usgs.gov/sir/2012/5039/pdf/2012-5039.pdf.

Harris, L. 1984. The Fragmented Forest: Island Biogeographic Theory and the Preservation of Biotic Diversity. University of Chicago Press, Chicago.

https://planthardiness.ars.usda.gov/.

Jenny, Hans. Factors of Soil Formation: A System of Quantitative Pedology. 1994th ed. New York: Dover Publications, 1941. https://www.nrcs.usda.gov/wps/PA_NRCSConsumption/download?cid=nrcseprd1330210&ext=pdf.

Johnston, C. 1991. Sediment and nutrient retention by freshwater wetlands: Effects on surface water quality. Critical Reviews in Environmental Control 21:491-565

Kostura, H.2021 SFWMD GIS IT Geospatial Services Geographer IV. pers comm. 12/29/2021

Lichtler W. 1960. "Geology and Ground-Water Resources of Martin County, Florida." Florida Geological Survey https://doi.org/10.35256/RI23.

Meeroff, Daniel & Bloetscher, Frederick & Bocca, Thais & Morin, Frédéric. (2008). Evaluation of Water Quality Impacts of On-site Treatment and Disposal Systems on Urban Coastal Waters. Water Air and Soil Pollution. 192. 11-24. 10.1007/s11270-008-9630-2.

Miller, R.E, and B.E. Gunsalus. 1997 & Updated 1999. Wetland Rapid Assessment Procedure. Technical Publication Reg. 001. Natural Resource Management Division, Regulation Department, South Florida Management District.

Mitsch, W.J. and J.G. Gosselink (eds).2007. Wetlands. 582 pp.

*Expert Team Report United States v. Benjamin K. Sharfi and Neshafarm, Inc.*

Mitsch, William & Gosselink, James. (2015). Wetlands, 5th edition.

Mitsch, W.J. and Gosselink, J.G. (2000) The Value of Wetlands: Importance of Scale and
Landscape Setting. Ecological Economics, 35, 25-33. http://dx.doi.org/10.1016/S0921-
8009(00)00165-8

Reddy, K. R., R. DeLaune, and C. B. Craft. 2010. Nutrients in wetlands: Implications
to water quality under changing climatic conditions. Final Report submitted to
U.S. Environmental Protection Agency. EPA Contract No. EP-C-09-001.

Rheinhardt, R. D., Rheinhardt, M. C., and Brinson, M. M. (2002). "A regional guidebook for
applying the hydrogeomorphic approach to assessing wetland functions of wet pine flats
on mineral soils in the Atlantic and Gulf coastal plains," ERDC/EL TR-02-9, U.S.

Rickman, W, J Letey, and L H Stolzy. "Compaction affects plant growth." *California
Agriculture*, 1965, 3.

Scott, TM. 2001. "Geologic Map of the State of Florida (Revised)" Florida Geological Survey,
Florida Dept of Environmental Protection https://ufdc.ufl.edu/uf00015087/00001.

Seitzinger S, Harrison JA, Böhlke JK, Bouwman AF, Lowrance R, Peterson B, Tobias C, Van
Drecht G. Denitrification across landscapes and waterscapes: a synthesis. Ecol Appl.
2006 Dec;16(6):2064-90. doi: 10.1890/1051-0761(2006)016[2064:dalawa]2.0.co;2.
PMID: 17205890.

SFWMD. "2014_SFWMD_Photointerpretation_Key," 2014.
https://apps.sfwmd.gov/sfwmd/gsdocs/TPubs/2014_SFWMD_Photointerpretation_Key.p
df.

SFWMD 2018 South Florida Water Management District Land Use and Cover 2014 -
2016[KRI] (FGDC) / Lu_sfwmd_2016." West Palm Beach, FL: South Florida Water
Management District, 2018.
https://www.fgdl.org/metadataexplorer/full_metadata.jsp?docId=%7BC6F760F5-177F-
43AB-AE6A-AB8566603F9C%7D&loggedIn=false.

Smith, R. D., Ammann, A., Bartoldus, C., and Brinson, M. M. (1995). "An approach for
assessing wetland functions using hydrogeomorphic classification, reference wetlands,
and functional indices," Technical Report WRP-DE-9, U.S. Army Engineer Waterways
Experiment Station, Vicksburg, MS.

Soil Survey Staff, Natural Resources Conservation Service, United States Department of
Agriculture. Web Soil Survey. Available online at the following
link: http://websoilsurvey.sc.egov.usda.gov/. Accessed [month/day/year].

Thorbjørn, Anne, Per Moldrup, Helle Blendstrup, Toshiko Komatsu, and Dennis E. Rolston. "A
Gas Diffusivity Model Based on Air-, Solid-, and Water-Phase Resistance in Variably

Saturated Soil." Vadose Zone Journal 7, no. 4 (2008): 1276–86.
https://doi.org/10.2136/vzj2008.0023.

United States Department of Agriculture, Natural Resources Conservation Service. 2018. Field Indicators of Hydric Soils in the United States, Version 8.2. L.M. Vasilas, G.W. Hurt, and J.F. Berkowitz (eds.). USDA, NRCS, in cooperation with the National Technical Committee for Hydric Soils

USACE. 2005.  Technical Standard for Water-Table Monitoring of Potential Wetland Sites. ERDC TN-WRAP-05-2.  June 2005.

USACE 1987.  Corps of Engineers Wetland Delineation Manual.  Technical Report Y-87-1 (http://el.erdc.usace.mil/elpubs/pdf/wlman87.pdf)

USACE 2010.  Regional Supplement to the Corps of Engineers Wetland Delineation Manual: Atlantic and Gulf Coast Region (Version 2.0).  ERDC/EL TR-10-20.

USDA – NRCS 1981, Rev. 2018 and 2019. Soil Survey Staff, Natural Resources Conservation Please Note:
a.  Soil series were cited on Reference Areas and on the Site using the 1981 soil survey for Martin County with updated information from the soil survey link provided above.
b. Soil series from the 1981 survey have been updated and listed in the Official Series Description (OSD) from the USDA-NRCS web site and the revisions are dated as follows:

USDA-NRCS, 1981, 2018
USDA-NRCS, 1981, 2018 Rev.
USDA-NRCS, 1981, 2018 Rev.
USDA –NRCS, 5/2018 Rev.
USDA-NRCS, 1981
USDA – NRCS, 10/2018 Rev.
USDA-NRCS, 12/2019 Rev

USDA. 2012 USDA Plant Hardiness Zone Map. Accessed January 2022.

U.S. EPA. 2002. Methods for Evaluating Wetland Condition: Wetlands Classification. Office of Water, U.S. Environmental Protection Agency, Washington, DC. EPA-822-R-02-017. [Methods for Evaluating Wetland Condition: Wetlands Classification (epa.gov)]

U.S. EPA. Connectivity of Streams and Wetlands to Downstream Waters: A Review and Synthesis of the Scientific Evidence (Final Report). U.S. Environmental Protection Agency, Washington, DC, EPA/600/R-14/475F, 2015.

*Expert Team Report United States v. Benjamin K. Sharfi and Neshafarm, Inc.*

SHARFIEXPERTS0000293

84

U.S. Fish and Wildlife Service, National Wetlands Inventory - Wetlands Mapper (fws.gov)
USFWS South Florida Ecological Services. "South Florida Multi-Species Recovery Plan."
   Accessed January 2022. https://www.fws.gov/verobeach/listedspeciesmsrp.html.

Vannote, R.L., Minshall, G.W. , Sedell, K.W. and Cushing, C.E. 1980: The river continuum
   concept. Canadian Journal of Fisheries and Aquatic Research 37, 130-37.

Violante, A., and A. G. Caporale. "Biogeochemical Processes at Soil-Root Interface." Journal of
   Soil Science and Plant Nutrition 15, no. 2 (June 2015): 422–48.
   https://doi.org/10.4067/S0718-95162015005000038.

Weiher, Evan, and Paul A. Keddy. "The Assembly of Experimental Wetland Plant
   Communities." Oikos 73, no. 3 (1995): 323–35. https://doi.org/10.2307/3545956.

Wright, A. L. and K. R. Reddy. 2001. Heterotrophic microbial activities in Northern
   Everglades Wetland. Soil Sci. Soc. Am. J. 65:1856–1864.

Yang, Yun-Ya & Lusk, Mary. (2018). Nutrients in Urban Stormwater Runoff: Current State of
   the Science and Potential Mitigation Options. Current Pollution Reports. 4.
   10.1007/s40726-018-0087-7.

**List of Materials Considered**

Gilbert, Katherine M., John D. Tobe, Richard W. Cantrell, Maynard E. Sweeley, and James R.
   Cooper. *The Florida Wetlands Delineation Manual*. Dept. of Environmental Protection,
   1995.

Griffith, GE. "Florida Regionalization Project." EPA/Q-95/002 U.S. Environmental Protection
   Agency, Environmental Research Laboratory, 1994.

Mitsch, William J., and James G. Gosselink. *Wetlands*. 5th edition. Hoboken, NJ: Wiley, 2015.

Myers, Ronald L., and John J. Ewel, eds. *Ecosystems of Florida*. Orlando: University of Central
   Florida Press, 1990.

Nakamura, Motoka, and Ko Noguchi. "Tolerant Mechanisms to O2 Deficiency under
   Submergence Conditions in Plants." *Journal of Plant Research* 133, no. 3 (2020): 343–
   71. https://doi.org/10.1007/s10265-020-01176-1.
Six, J, H Bossuyt, S Degryze, and K Denef. "A History of Research on the Link between
   (Micro)Aggregates, Soil Biota, and Soil Organic Matter Dynamics." *Soil and Tillage
   Research*, Advances in Soil Structure Research, 79, no. 1 (September 1, 2004): 7–31.
   https://doi.org/10.1016/j.still.2004.03.008.

*Expert Team Report United States v. Benjamin K. Sharfi and Neshafarm, Inc.*

EPA/USACE November 2021 press conference announcing the vacated Navigable Waters
Protection Rule (NWPR) and implementing the pre-2015 regulatory regime

SHARFIEXPERTS0000295

## VII. Appendices

Appendix 1    List of Acronyms

Appendix 2    Curriculum vitae for DOJ Technical Team Members

Appendix 3    Tables

Appendix 4    Figures

Appendix 5    Photographs

Appendix 6    Wetland Data Sheets

Appendix 7    Hydrologic and Survey Data

Appendix 8    Soil Descriptions

Appendix 9    Functional Assessment Data Sheets

# APPENDIX 3

## TOPOGRAPHIC SURVEY OF DITCHES AND DOJ EXPERT REPORT PRIMARY FLOW PATHWAY

129048180.1

SHARFIEXPERTS0000297



SHARPIEX/PERTS0000296

SHARIFEXPERTS0000296



# APPENDIX 4

## SITE INSPECTION PHOTOGRAPHS

129048180.1

SHARFIEXPERTS0000300



**Legend**

- 9.92-Acre Site Boundary
- Continuous Flow Pathway - DOJ Expert Report (Feb. 2022)
- Photograph Locations

**Lidar Elevation**

| | | | |
|---|---|---|---|
| 18.5 - 19 | 21.0 - 21.5 | 24.0 - 24.5 | 27.0 - 27.5 |
| 19.0 - 19.5 | 21.5 - 22 | 24.5 - 25 | 27.5 - 28 |
| 19.5 - 20 | 22.0 - 22.5 | 25.0 - 25.5 | 28.0 - 28.5 |
| 20.0 - 20.5 | 22.5 - 23 | 25.5 - 26 | 28.5 - 29 |
| 20.5 - 21 | 23.0 - 23.5 | 26.0 - 26.5 | 29.0 - 29.5 |
| | 23.5 - 24 | 26.5 - 27 | 29.5 - 30 |

0 200 400 Feet

1 inch = 400 feet

Source: Project boundary from FGDL state-wide parcel database, 2019. Martin County Lidar elevation data, 2016. Surface flow pathway from February 2022 DOJ Expert Report figure V.D.1.a.4, position approximated by BDA. ArcGIS Online World Imagery, © ESRI, 2021/2/15.

**APPENDIX 4**

**MARCH 10, 2022 SITE INSPECTION PHOTOGRAPH LOCATIONS IN THE VICINITY OF THE 9.92-ACRE SITE, MARTIN COUNTY, FLORIDA**

BDA BREEDLOVE, DENNIS & ASSOCIATES, INC. Environmental Consultants
330 W. Canton Ave., Winter Park, FL 32789 • 407-677-1882

BN • 4/8/2022 • P:\ATG\2021040\Permit_Use\ReportGraphics_202203\ARCGIS\PhotoLocations_A.mxd



**Photo Station 1**
**North-South Canal Ditch Looking South**
**Note: Swale/ditch entering from the east**
**March 10, 2022**

SHARFIEXPERTS0000302



**Photo Station 2**
**North-South Canal Ditch Looking North Just Beyond NW Corner of Site**
Note:  Narrow area of water extending north.  Last point of water in north-south Canal
Ditch approximately 120' north of northwest corner of site.
**March 10, 2022**

SHARFIEXPERTS0000303



**Photo Station 3**
**One of Several Areas Where the North-South Canal Ditch is Crossed by Cattle Trails**
**March 10, 2022**

SHARFIEXPERTS0000304



**Photo Station 4**
**Area where Northern West Ditch Enters North-South Canal Ditch**
**March 10, 2022**

SHARFIEXPERTS0000305



**Photo Station 5**
**North-South Canal Ditch Where it Enters the East-West Canal Ditch**
**March 10, 2022**

SHARFIEXPERTS0000306



**Photo Station 6**
**East-West Canal Ditch Looking West**
**from Area Where North-South Canal Ditch Enters East-West Canal Ditch**
**March 10, 2022**

P:\Admin\Projects\2021040\Report\Report Photos\Photo Pages 040822.docx

SHARFIEXPERTS0000307



**Photo Station 7**
**Cattle Crossing of Northern West Ditch**
**March 10, 2022**

SHARFIEXPERTS0000308



**Photo Station 8**
**Northern West Ditch Looking West**
**Showing Cattle Crossing before Entering Wetland**
**March 10, 2022**

SHARFIEXPERTS0000309



**Photo Station 9**
**Along "Continuous Flow Pathway" through Pasture Area**
**March 10, 2022**

P:\Admin\Projects\2021040\Report\Report Photos\Photo Pages 040822.docx

SHARFIEXPERTS0000310



**Photo Station 10**
**84th Avenue Roadside Ditch Looking North**
**March 10, 2022**

SHARFIEXPERTS0000311

**APPENDIX 5**


**CLEAN WATER ACT JURISDICTION
FOLLOWING THE U.S. SUPREME COURT'S DECISION
IN RAPANOS V. UNITED STATES & CARABELLE V. UNITED STATES**

**GUIDANCE MEMORANDUM
DECEMBER 2, 2008**

129048180.1

SHARFIEXPERTS0000312




### Clean Water Act Jurisdiction
### Following the U.S. Supreme Court's Decision
### in
### Rapanos v. United States & Carabell v. United States

This memorandum[1] provides guidance to EPA regions and U.S. Army Corps of Engineers ["Corps"] districts implementing the Supreme Court's decision in the consolidated cases Rapanos v. United States and Carabell v. United States[2] (herein referred to simply as "Rapanos") which address the jurisdiction over waters of the United States under the Clean Water Act.[3] The chart below summarizes the key points contained in this memorandum. This reference tool is not a substitute for the more complete discussion of issues and guidance furnished throughout the memorandum.

---

#### Summary of Key Points

The agencies will assert jurisdiction over the following waters:
- **Traditional navigable waters**
- **Wetlands adjacent to traditional navigable waters**
- **Non-navigable tributaries of traditional navigable waters that are relatively permanent where the tributaries typically flow year-round or have continuous flow at least seasonally (e.g., typically three months)**
- **Wetlands that directly abut such tributaries**

The agencies will decide jurisdiction over the following waters based on a fact-specific analysis to determine whether they have a significant nexus with a traditional navigable water:
- **Non-navigable tributaries that are not relatively permanent**
- **Wetlands adjacent to non-navigable tributaries that are not relatively permanent**
- **Wetlands adjacent to but that do not directly abut a relatively permanent non-navigable tributary**

The agencies generally will not assert jurisdiction over the following features:
- **Swales or erosional features (e.g., gullies, small washes characterized by low volume, infrequent, or short duration flow)**
- **Ditches (including roadside ditches) excavated wholly in and draining only uplands and that do not carry a relatively permanent flow of water**

The agencies will apply the significant nexus standard as follows:
- **A significant nexus analysis will assess the flow characteristics and functions of the tributary itself and the functions performed by all wetlands adjacent to the tributary to determine if they significantly affect the chemical, physical and biological integrity of downstream traditional navigable waters**
- **Significant nexus includes consideration of hydrologic and ecologic factors**

---

[1] This guidance incorporates revisions to the EPA/Army Memorandum originally issued on June 6, 2007, after careful consideration of public comments received and based on the agencies' experience in implementing the Rapanos decision.

[2] 126 S. Ct. 2208 (2006).

[3] 33 U.S.C. §1251 et seq.

*December 02, 2008*                                                  *Clean Water Act Jurisdiction*

SHARFIEXPERTS0000313

Background

Congress enacted the Clean Water Act ("CWA" or "the Act") "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters."[4] One of the mechanisms adopted by Congress to achieve that purpose is a prohibition on the discharge of any pollutants, including dredged or fill material, into "navigable waters" except in compliance with other specified sections of the Act.[5] In most cases, this means compliance with a permit issued pursuant to CWA §402 or §404. The Act defines the term "discharge of a pollutant" as "any addition of any pollutant to navigable waters from any point source[,]"[6] and provides that "[t]he term 'navigable waters' means the waters of the United States, including the territorial seas[,]." [7]

In Rapanos, the Supreme Court addressed where the Federal government can apply the Clean Water Act, specifically by determining whether a wetland or tributary is a "water of the United States." The justices issued five separate opinions in Rapanos (one plurality opinion, two concurring opinions, and two dissenting opinions), with no single opinion commanding a majority of the Court.

The Rapanos Decision

Four justices, in a plurality opinion authored by Justice Scalia, rejected the argument that the term "waters of the United States" is limited to only those waters that are navigable in the traditional sense and their abutting wetlands.[8] However, the plurality concluded that the agencies' regulatory authority should extend only to "relatively permanent, standing or continuously flowing bodies of water" connected to traditional navigable waters, and to "wetlands with a continuous surface connection to" such relatively permanent waters.[9]

Justice Kennedy did not join the plurality's opinion but instead authored an opinion concurring in the judgment vacating and remanding the cases to the Sixth Circuit Court of Appeals.[10] Justice Kennedy agreed with the plurality that the statutory term "waters of the United States" extends beyond water bodies that are traditionally considered navigable.[11] Justice Kennedy, however, found the plurality's interpretation of the scope of the CWA to be "inconsistent with the Act's text, structure, and purpose[,]" and he instead presented a different standard for evaluating CWA jurisdiction over wetlands and other water bodies.[12] Justice Kennedy concluded that wetlands are "waters

---

[4] 33 U.S.C. § 1251(a).
[5] 33 U.S.C. § 1311(a), §1362(12)(A).
[6] 33 U.S.C. § 1362(12)(A)
[7] 33 U.S.C. § 1362(7). See also 33 C.F.R. § 328.3(a) and 40 C.F.R. § 230.3(s).
[8] Id. at 2220.
[9] Id. at 2225-27.
[10] Id. at 2236-52. While Justice Kennedy concurred in the Court's decision to vacate and remand the cases to the Sixth Circuit, his basis for remand was limited to the question of "whether the specific wetlands at issue possess a significant nexus with navigable waters." 126 S. Ct. at 2252. In contrast, the plurality remanded the cases to determine both "whether the ditches and drains near each wetland are 'waters,'" and "whether the wetlands in question are 'adjacent' to these 'waters' in the sense of possessing a continuous surface connection...." Id. at 2235.
[11] Id. at 2241.
[12] Id. at 2246.

SHARFIEXPERTS0000314

of the United States" "if the wetlands, either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.' When, in contrast, wetlands' effects on water quality are speculative or insubstantial, they fall outside the zone fairly encompassed by the statutory term 'navigable waters.'"[13]

Four justices, in a dissenting opinion authored by Justice Stevens, concluded that EPA's and the Corps' interpretation of "waters of the United States" was a reasonable interpretation of the Clean Water Act.[14]

When there is no majority opinion in a Supreme Court case, controlling legal principles may be derived from those principles espoused by five or more justices.[15] Thus, regulatory jurisdiction under the CWA exists over a water body if either the plurality's or Justice Kennedy's standard is satisfied.[16] Since Rapanos, the United States has filed pleadings in a number of cases interpreting the decision in this manner.

The agencies are issuing this memorandum in recognition of the fact that EPA regions and Corps districts need guidance to ensure that jurisdictional determinations, permitting actions, and other relevant actions are consistent with the decision and supported by the administrative record. Therefore, the agencies have evaluated the Rapanos opinions to identify those waters that are subject to CWA jurisdiction under the reasoning of a majority of the justices. This approach is appropriate for a guidance document. The agencies will continue to monitor implementation of the Rapanos decision in the field and recognize that further consideration of jurisdictional issues, including clarification and definition of key terminology, may be appropriate in the future, either through issuance of additional guidance or through rulemaking.

---

[13] Id. at 2248. Chief Justice Roberts wrote a separate concurring opinion explaining his agreement with the plurality. See 126 S. Ct. at 2235-36.

[14] Id. at 2252-65. Justice Breyer wrote a separate dissenting opinion explaining his agreement with Justice Stevens' dissent. See 126 S. Ct. at 2266.

[15] See Marks v. United States, 430 U.S. 188, 193-94 (1977); Waters v. Churchill, 511 U.S. 661, 685 (1994) (Souter, J., concurring) (analyzing the points of agreement between plurality, concurring, and dissenting opinions to identify the legal "test ... that lower courts should apply," under Marks, as the holding of the Court); cf. League of United Latin American Citizens v. Perry, 126 S. Ct. 2594, 2607 (2006) (analyzing concurring and dissenting opinions in a prior case to identify a legal conclusion of a majority of the Court); Alexander v. Sandoval, 532 U.S. 275, 281-282 (2001) (same).

[16] 126 S. Ct. at 2265 (Stevens, J., dissenting) ("Given that all four justices who have joined this opinion would uphold the Corps' jurisdiction in both of these cases – and in all other cases in which either the plurality's or Justice Kennedy's test is satisfied – on remand each of the judgments should be reinstated if either of those tests is met.") (emphasis in original). The agencies recognize that the Eleventh Circuit, in United States v. McWane, Inc., et al., 505 F.3d 1208 (11th Cir. 2007), has concluded that the Kennedy standard is the sole method of determining CWA jurisdiction in that Circuit. The Supreme Court denied the government's petition for a writ of certiorari on December 1, 2008.

*December 02, 2008*                     3                     *Clean Water Act Jurisdiction*

SHARFIEXPERTS0000315

Agency Guidance[17]

To ensure that jurisdictional determinations, administrative enforcement actions, and other relevant agency actions are consistent with the Rapanos decision, the agencies in this guidance address which waters are subject to CWA § 404 jurisdiction.[18] Specifically, this guidance identifies those waters over which the agencies will assert jurisdiction categorically and on a case-by-case basis, based on the reasoning of the Rapanos opinions.[19] EPA and the Corps will continually assess and review the application of this guidance to ensure nationwide consistency, reliability, and predictability in our administration of the statute.

*1. Traditional Navigable Waters (i.e., "(a)(1) Waters") and Their Adjacent Wetlands*

---

**Key Points**

- The agencies will assert jurisdiction over traditional navigable waters, which includes all the waters described in 33 C.F.R. § 328.3(a)(1), and 40 C.F.R. § 230.3 (s)(1).
- The agencies will assert jurisdiction over wetlands adjacent to traditional navigable waters, including over adjacent wetlands that do not have a continuous surface connection to traditional navigable waters.

---

EPA and the Corps will continue to assert jurisdiction over "[a]ll waters which are currently used, or were used in the past, or may be susceptible to use in interstate or

---

[17] The CWA provisions and regulations described in this document contain legally binding requirements. This guidance does not substitute for those provisions or regulations, nor is it a regulation itself. It does not impose legally binding requirements on EPA, the Corps, or the regulated community, and may not apply to a particular situation depending on the circumstances. Any decisions regarding a particular water will be based on the applicable statutes, regulations, and case law. Therefore, interested persons are free to raise questions about the appropriateness of the application of this guidance to a particular situation, and EPA and/or the Corps will consider whether or not the recommendations or interpretations of this guidance are appropriate in that situation based on the statutes, regulations, and case law.

[18] This guidance focuses only on those provisions of the agencies' regulations at issue in Rapanos -- 33 C.F.R. §§ 328.3(a)(1), (a)(5), and (a)(7); 40 C.F.R. §§ 230.3(s)(1), (s)(5), and (s)(7). This guidance does not address or affect other subparts of the agencies' regulations, or response authorities, relevant to the scope of jurisdiction under the CWA. In addition, because this guidance is issued by both the Corps and EPA, which jointly administer CWA § 404, it does not discuss other provisions of the CWA, including §§ 311 and 402, that differ in certain respects from § 404 but share the definition of "waters of the United States." Indeed, the plurality opinion in Rapanos noted that "... there is no reason to suppose that our construction today significantly affects the enforcement of §1342 ... The Act does not forbid the 'addition of any pollutant *directly* to navigable waters from any point source,' but rather the 'addition of any pollutant *to* navigable waters.'" (emphasis in original) 126 S. Ct. 2208, 2227. EPA is considering whether to provide additional guidance on these and other provisions of the CWA that may be affected by the Rapanos decision.

[19] In 2001, the Supreme Court held that use of "isolated" non-navigable intrastate waters by migratory birds was not by itself a sufficient basis for the exercise of federal regulatory jurisdiction under the CWA. See Solid Waste Agency of Northern Cook County (SWANCC) v. U.S. Army Corps of Engineers, 531 U.S. 159 (2001). This guidance does not address SWANCC, nor does it affect the Joint Memorandum regarding that decision issued by the General Counsels of EPA and the Department of the Army on January 10, 2003. See 68 Fed. Reg. 1991, 1995 (Jan. 15, 2003).

---

SHARFIEXPERTS0000316

foreign commerce, including all waters which are subject to the ebb and flow of the tide."[20] These waters are referred to in this guidance as traditional navigable waters.

The agencies will also continue to assert jurisdiction over wetlands "adjacent" to traditional navigable waters as defined in the agencies' regulations. Under EPA and Corps regulations and as used in this guidance, "adjacent" means "bordering, contiguous, or neighboring." Finding a continuous surface connection is not required to establish adjacency under this definition. The Rapanos decision does not affect the scope of jurisdiction over wetlands that are adjacent to traditional navigable waters because at least five justices agreed that such wetlands are "waters of the United States."[21]

The regulations define "adjacent" as follows: "The term *adjacent* means bordering, contiguous, or neighboring. Wetlands separated from other waters of the United States by man-made dikes or barriers, natural river berms, beach dunes and the like are 'adjacent wetlands.'"[22] Under this definition, the agencies consider wetlands adjacent if one of following three criteria is satisfied. First, there is an unbroken surface or shallow sub-surface connection to jurisdictional waters. This hydrologic connection may be intermittent. Second, they are physically separated from jurisdictional waters by man-made dikes or barriers, natural river berms, beach dunes, and the like. Or third, their proximity to a jurisdictional water is reasonably close, supporting the science-based

---

[20]   33 C.F.R. § 328.3(a)(1); 40 C.F.R. § 230.3(s)(1). The "(a)(1)" waters include all of the "navigable waters of the United States," defined in 33 C.F.R. Part 329 and by numerous decisions of the federal courts, plus all other waters that are navigable-in-fact (e.g., the Great Salt Lake, UT and Lake Minnetonka MN). For purposes of CWA jurisdiction and this guidance, waters will be considered traditional navigable waters if:

- They are subject to Section 9 or 10 of the Rivers and Harbors Act, or
- A federal court has determined that the water body is navigable-in-fact under federal law, or
- They are waters currently being used for commercial navigation, including commercial water-borne recreation (e.g., boat rentals, guided fishing trips, water ski tournaments, etc.), or
- They have historically been used for commercial navigation, including commercial water-borne recreation; or
- They are susceptible to being used in the future for commercial navigation, including commercial water-borne recreation. Susceptibility for future use may be determined by examining a number of factors, including the physical characteristics and capacity of the water (e.g., size, depth, and flow velocity, etc.) to be used in commercial navigation, including commercial recreational navigation, and the likelihood of future commercial navigation or commercial water-borne recreation. Evidence of future commercial navigation use, including commercial water-borne recreation (e.g., development plans, plans for water dependent events, etc.), must be clearly documented. Susceptibility to future commercial navigation, including commercial water-borne recreation, will not be supported when the evidence is insubstantial or speculative. Use of average flow statistics may not accurately represent streams with "flashy" flow characteristics. In such circumstances, daily gage data is more representative of flow characteristics.

[21]   Id. at 2248 (Justice Kennedy, concurring) ("As applied to wetlands adjacent to navigable-in-fact waters, the Corps' conclusive standard for jurisdiction rests upon a reasonable inference of ecologic interconnection, and the assertion of jurisdiction for those wetlands is sustainable under the Act by showing adjacency alone.").

[22]   33 C.F.R. § 328.3(c).

SHARFIEXPERTS0000317

inference that such wetlands have an ecological interconnection with jurisdictional waters.[23] Because of the scientific basis for this inference, determining whether a wetland is reasonably close to a jurisdictional water does not generally require a case-specific demonstration of an ecologic interconnection. In the case of a jurisdictional water and a reasonably close wetland, such implied ecological interconnectivity is neither speculative nor insubstantial. For example, species, such as amphibians or anadramous and catadramous fish, move between such waters for spawning and their life stage requirements. Migratory species, however, shall not be used to support an ecologic interconnection. In assessing whether a wetland is reasonably close to a jurisdictional water, the proximity of the wetland (including all parts of a single wetland that has been divided by road crossings, ditches, berms, etc.) in question will be evaluated and shall not be evaluated together with other wetlands in the area.

## 2. Relatively Permanent Non-navigable Tributaries of Traditional Navigable Waters and Wetlands with a Continuous Surface Connection with Such Tributaries

---

**Key Points**

- The agencies will assert jurisdiction over non-navigable tributaries of traditional navigable waters that are relatively permanent where the tributaries typically flow year-round or have continuous flow at least seasonally (e.g., typically three months).
- The agencies will assert jurisdiction over those adjacent wetlands that have a continuous surface connection to such tributaries (e.g., they are not separated by uplands, a berm, dike, or similar feature.)

---

A non-navigable tributary[24] of a traditional navigable water is a non-navigable water body whose waters flow into a traditional navigable water either directly or indirectly by means of other tributaries. Both the plurality opinion and the dissent would uphold CWA jurisdiction over non-navigable tributaries that are "relatively permanent" – waters that typically (e.g., except due to drought) flow year-round or waters that have a

---

[23] See e.g., United States v. Riverside Bayview Homes, Inc., 474 U.S. 121, 134 (1985) ("...the Corps' ecological judgment about the relationship between waters and their adjacent wetlands provides an adequate basis for a legal judgment that adjacent wetlands may be defined as waters under the Act.").

[24] A tributary includes natural, man-altered, or man-made water bodies that carry flow directly or indirectly into a traditional navigable water. Furthermore, a tributary, for the purposes of this guidance, is the entire reach of the stream that is of the same order (i.e., from the point of confluence, where two lower order streams meet to form the tributary, downstream to the point such tributary enters a higher order stream). The flow characteristics of a particular tributary generally will be evaluated at the farthest downstream limit of such tributary (i.e., the point the tributary enters a higher order stream). However, for purposes of determining whether the tributary is relatively permanent, where data indicates the flow regime at the downstream limit is not representative of the entire tributary (as described above ) (e.g., where data indicates the tributary is relatively permanent at its downstream limit but not for the majority of its length, or vice versa), the flow regime that best characterizes the entire tributary should be used. A primary factor in making this determination is the relative lengths of segments with differing flow regimes. It is reasonable for the agencies to treat the entire tributary in light of the Supreme Court's observation that the phrase "navigable waters" generally refers to "rivers, streams, and other hydrographic features." 126 S. Ct. at 2222 (Justice Scalia, quoting Riverside Bayview, 474 U.S. at 131). The entire reach of a stream is a reasonably identifiable hydrographic feature. The agencies will also use this characterization of tributary when applying the significant nexus standard under Section 3 of this guidance.

SHARFIEXPERTS0000318

continuous flow at least seasonally (e.g., typically three months).[25]   Justice Scalia emphasizes that relatively permanent waters do not include tributaries "whose flow is 'coming and going at intervals ... broken, fitful.'"[26]   Therefore, "relatively permanent" waters do not include ephemeral tributaries which flow only in response to precipitation and intermittent streams which do not typically flow year-round or have continuous flow at least seasonally. However, CWA jurisdiction over these waters will be evaluated under the significant nexus standard described below. The agencies will assert jurisdiction over relatively permanent non-navigable tributaries of traditional navigable waters without a legal obligation to make a significant nexus finding.

In addition, the agencies will assert jurisdiction over those adjacent wetlands that have a continuous surface connection with a relatively permanent, non-navigable tributary, without the legal obligation to make a significant nexus finding. As explained above, the plurality opinion and the dissent agree that such wetlands are jurisdictional.[27] The plurality opinion indicates that "continuous surface connection" is a "physical connection requirement."[28]   Therefore, a continuous surface connection exists between a wetland and a relatively permanent tributary where the wetland directly abuts the tributary (e.g., they are not separated by uplands, a berm, dike, or similar feature).[29]

---

[25]   See 126 S. Ct. at 2221 n. 5 (Justice Scalia, plurality opinion) (explaining that "relatively permanent" does not necessarily exclude waters "that might dry up in extraordinary circumstances such as drought" or "seasonal rivers, which contain continuous flow during some months of the year but no flow during dry months").

[26]   Id. (internal citations omitted)

[27]   Id. at 2226-27 (Justice Scalia, plurality opinion).

[28]   Id. at 2232 n.13 (referring to "our physical-connection requirement" and later stating that Riverside Bayview does not reject "the physical-connection requirement") and 2234 ("Wetlands are 'waters of the United States' if they bear the 'significant nexus' of physical connection, which makes them as a practical matter *indistinguishable* from waters of the United States.") (emphasis in original). See also 126 S. Ct. at 2230 ("adjacent" means "physically abutting") and 2229 (citing to Riverside Bayview as "confirm[ing] that the scope of ambiguity of 'the waters of the United States' is determined by a wetland's *physical connection* to covered waters...") (emphasis in original). A continuous surface connection does not require surface water to be continuously present between the wetland and the tributary. 33 C.F.R. § 328.3(b) and 40 C.F.R. § 232.2 (defining wetlands as "those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support ... a prevalence of vegetation typically adapted for life in saturated soil conditions").

[29]   While all wetlands that meet the agencies' definitions are considered adjacent wetlands, only those adjacent wetlands that have a continuous surface connection because they directly abut the tributary (e.g., they are not separated by uplands, a berm, dike, or similar feature) are considered jurisdictional under the plurality standard.

SHARFIEXPERTS0000319

### 3. *Certain Adjacent Wetlands and Non-navigable Tributaries That Are Not Relatively Permanent*

---

**Key Points**

- The agencies will assert jurisdiction over non-navigable, not relatively permanent tributaries and their adjacent wetlands where such tributaries and wetlands have a significant nexus to a traditional navigable water.
- A significant nexus analysis will assess the flow characteristics and functions of the tributary itself and the functions performed by any wetlands adjacent to the tributary to determine if they significantly affect the chemical, physical and biological integrity of downstream traditional navigable waters.
- "Similarly situated" wetlands include all wetlands adjacent to the same tributary.
- Significant nexus includes consideration of hydrologic factors including the following:
  - volume, duration, and frequency of flow, including consideration of certain physical characteristics of the tributary
  - proximity to the traditional navigable water
  - size of the watershed
  - average annual rainfall
  - average annual winter snow pack
- Significant nexus also includes consideration of ecologic factors including the following:
  - potential of tributaries to carry pollutants and flood waters to traditional navigable waters
  - provision of aquatic habitat that supports a traditional navigable water
  - potential of wetlands to trap and filter pollutants or store flood waters
  - maintenance of water quality in traditional navigable waters
- The following geographic features generally are not jurisdictional waters:
  - swales or erosional features (e.g. gullies, small washes characterized by low volume, infrequent, or short duration flow)
  - ditches (including roadside ditches) excavated wholly in and draining only uplands and that do not carry a relatively permanent flow of water

---

The agencies will assert jurisdiction over the following types of waters when they have a significant nexus with a traditional navigable water: (1) non-navigable tributaries that are not relatively permanent,[30] (2) wetlands adjacent to non-navigable tributaries that are not relatively permanent, and (3) wetlands adjacent to, but not directly abutting, a relatively permanent tributary (e.g., separated from it by uplands, a berm, dike or similar feature).[31] As described below, the agencies will assess the flow characteristics and functions of the tributary itself, together with the functions performed by any wetlands adjacent to that tributary, to determine whether collectively they have a significant nexus with traditional navigable waters.

---

[30] For simplicity, the term "tributary" when used alone in this section refers to non-navigable tributaries that are not relatively permanent.

[31] As described in Section 2 of this guidance, the agencies will assert jurisdiction, without the need for a significant nexus finding, over all wetlands that are both adjacent and have a continuous surface connection to relatively permanent tributaries. See pp. 6-7, supra.

SHARFIEXPERTS0000320

The agencies' assertion of jurisdiction over non-navigable tributaries and adjacent wetlands that have a significant nexus to traditional navigable waters is supported by five justices. Justice Kennedy applied the significant nexus standard to the wetlands at issue in Rapanos and Carabell: "[W]etlands possess the requisite nexus, and thus come within the statutory phrase 'navigable waters,' if the wetlands, either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.'"[32] While Justice Kennedy's opinion discusses the significant nexus standard primarily in the context of wetlands adjacent to non-navigable tributaries,[33] his opinion also addresses Clean Water Act jurisdiction over tributaries themselves. Justice Kennedy states that, based on the Supreme Court's decisions in Riverside Bayview and SWANCC, "the connection between a non-navigable water or wetland may be so close, or potentially so close, that the Corps may deem the water or wetland a 'navigable water' under the Act. … Absent a significant nexus, jurisdiction under the Act is lacking."[34] Thus, Justice Kennedy would limit jurisdiction to those waters that have a significant nexus with traditional navigable waters, although his opinion focuses on the specific factors and functions the agencies should consider in evaluating significant nexus for adjacent wetlands, rather than for tributaries.

In considering how to apply the significant nexus standard, the agencies have focused on the integral relationship between the ecological characteristics of tributaries and those of their adjacent wetlands, which determines in part their contribution to restoring and maintaining the chemical, physical and biological integrity of the Nation's traditional navigable waters. The ecological relationship between tributaries and their adjacent wetlands is well documented in the scientific literature and reflects their physical proximity as well as shared hydrological and biological characteristics. The flow parameters and ecological functions that Justice Kennedy describes as most relevant to an evaluation of significant nexus result from the ecological inter-relationship between tributaries and their adjacent wetlands. For example, the duration, frequency, and volume of flow in a tributary, and subsequently the flow in downstream navigable waters, is directly affected by the presence of adjacent wetlands that hold floodwaters, intercept sheet flow from uplands, and then release waters to tributaries in a more even and constant manner. Wetlands may also help to maintain more consistent water temperature in tributaries, which is important for some aquatic species. Adjacent wetlands trap and hold pollutants that may otherwise reach tributaries (and downstream navigable waters) including sediments, chemicals, and other pollutants. Tributaries and their adjacent wetlands provide habitat (e.g., feeding, nesting, spawning, or rearing young) for many aquatic species that also live in traditional navigable waters.

---

[32] Id. at 2248. When applying the significant nexus standard to tributaries and wetlands, it is important to apply it within the limits of jurisdiction articulated in SWANCC. Justice Kennedy cites SWANCC with approval and asserts that the significant nexus standard, rather than being articulated for the first time in Rapanos, was established in SWANCC. 126 S. Ct. at 2246 (describing SWANCC as "interpreting the Act to require a significant nexus with navigable waters"). It is clear, therefore, that Justice Kennedy did not intend for the significant nexus standard to be applied in a manner that would result in assertion of jurisdiction over waters that he and the other justices determined were not jurisdictional in SWANCC. Nothing in this guidance should be interpreted as providing authority to assert jurisdiction over waters deemed non-jurisdictional by SWANCC.

[33] 126 S. Ct. at 2247-50.

[34] Id. at 2241 (emphasis added).

SHARFIEXPERTS0000321

When performing a significant nexus analysis,[35] the first step is to determine if the tributary has any adjacent wetlands. Where a tributary has no adjacent wetlands, the agencies will consider the flow characteristics and functions of only the tributary itself in determining whether such tributary has a significant effect on the chemical, physical and biological integrity of downstream traditional navigable waters. A tributary, as characterized in Section 2 above, is the entire reach of the stream that is of the same order (i.e., from the point of confluence, where two lower order streams meet to form the tributary, downstream to the point such tributary enters a higher order stream). For purposes of demonstrating a connection to traditional navigable waters, it is appropriate and reasonable to assess the flow characteristics of the tributary at the point at which water is in fact being contributed to a higher order tributary or to a traditional navigable water. If the tributary has adjacent wetlands, the significant nexus evaluation needs to recognize the ecological relationship between tributaries and their adjacent wetlands, and their closely linked role in protecting the chemical, physical, and biological integrity of downstream traditional navigable waters.

Therefore, the agencies will consider the flow and functions of the tributary together with the functions performed by all the wetlands adjacent to that tributary in evaluating whether a significant nexus is present. Similarly, where evaluating significant nexus for an adjacent wetland, the agencies will consider the flow characteristics and functions performed by the tributary to which the wetland is adjacent along with the functions performed by the wetland and all other wetlands adjacent to that tributary. This approach reflects the agencies' interpretation of Justice Kennedy's term "similarly situated" to include all wetlands adjacent to the same tributary. Where it is determined that a tributary and its adjacent wetlands collectively have a significant nexus with traditional navigable waters, the tributary and all of its adjacent wetlands are jurisdictional. Application of the significant nexus standard in this way is reasonable because of its strong scientific foundation – that is, the integral ecological relationship between a tributary and its adjacent wetlands. Interpreting the phrase "similarly situated" to include all wetlands adjacent to the same tributary is reasonable because such wetlands are physically located in a like manner (i.e., lying adjacent to the same tributary).

Principal considerations when evaluating significant nexus include the volume, duration, and frequency of the flow of water in the tributary and the proximity of the tributary to a traditional navigable water. In addition to any available hydrologic information (e.g., gauge data, flood predictions, historic records of water flow, statistical data, personal observations/records, etc.), the agencies may reasonably consider certain physical characteristics of the tributary to characterize its flow, and thus help to inform the determination of whether or not a significant nexus is present between the tributary and downstream traditional navigable waters. Physical indicators of flow may include the presence and characteristics of a reliable ordinary high water mark (OHWM) with a channel defined by bed and banks.[36] Other physical indicators of flow may include

---

[35] In discussing the significant nexus standard, Justice Kennedy stated: "The required nexus must be assessed in terms of the statute's goals and purposes. Congress enacted the [CWA] to 'restore and maintain the chemical, physical, and biological integrity of the Nation's waters' ..." 126 S. Ct. at 2248. Consistent with Justice Kennedy's instruction, EPA and the Corps will apply the significant nexus standard in a manner that restores and maintains any of these three attributes of traditional navigable waters.

[36] See 33 C.F.R. § 328.3(e). The OHWM also serves to define the lateral limit of jurisdiction in a non-navigable tributary where there are no adjacent wetlands. See 33 C.F.R. § 328.4(c). While EPA regions

SHARFIEXPERTS0000322

shelving, wracking, water staining, sediment sorting, and scour.[37]  Consideration will also be given to certain relevant contextual factors that directly influence the hydrology of tributaries including the size of the tributary's watershed, average annual rainfall, average annual winter snow pack, slope, and channel dimensions.

In addition, the agencies will consider other relevant factors, including the functions performed by the tributary together with the functions performed by any adjacent wetlands.  One such factor is the extent to which the tributary and adjacent wetlands have the capacity to carry pollutants (e.g., petroleum wastes, toxic wastes, sediment) or flood waters to traditional navigable waters, or to reduce the amount of pollutants or flood waters that would otherwise enter traditional navigable waters.[38]  The agencies will also evaluate ecological functions performed by the tributary and any adjacent wetlands which affect downstream traditional navigable waters, such as the capacity to transfer nutrients and organic carbon vital to support downstream foodwebs (e.g., macroinvertebrates present in headwater streams convert carbon in leaf litter making it available to species downstream), habitat services such as providing spawning areas for recreationally or commercially important species in downstream waters, and the extent to which the tributary and adjacent wetlands perform functions related to maintenance of downstream water quality such as sediment trapping.

After assessing the flow characteristics and functions of the tributary and its adjacent wetlands, the agencies will evaluate whether the tributary and its adjacent wetlands are likely to have an effect that is more than speculative or insubstantial on the chemical, physical, and biological integrity of a traditional navigable water.  As the distance from the tributary to the navigable water increases, it will become increasingly important to document whether the tributary and its adjacent wetlands have a significant nexus rather than a speculative or insubstantial nexus with a traditional navigable water.

Accordingly, Corps districts and EPA regions shall document in the administrative record the available information regarding whether a tributary and its adjacent wetlands have a significant nexus with a traditional navigable water, including the physical indicators of flow in a particular case and available information regarding the functions of the tributary and any adjacent wetlands.  The agencies will explain their basis for concluding whether or not the tributary and its adjacent wetlands, when considered together, have a more than speculative or insubstantial effect on the chemical, physical, and biological integrity of a traditional navigable water.

Swales or erosional features (e.g., gullies, small washes characterized by low volume, infrequent, or short duration flow) are generally not waters of the United States

---

and Corps districts must exercise judgment to identify the OHWM on a case-by-case basis, the Corps' regulations identify the factors to be applied.  These regulations have recently been further explained in Regulatory Guidance Letter (RGL) 05-05 (Dec. 7, 2005).  The agencies will apply the regulations and the RGL and take other steps as needed to ensure that the OHWM identification factors are applied consistently nationwide.

[37]  See Justice Kennedy's discussion of "physical characteristics," 126 S. Ct. at 2248-2249.

[38]  See, generally, 126 S. Ct. at 2248-53; see also 126 S. Ct. at 2249 ("Just as control over the non-navigable parts of a river may be essential or desirable in the interests of the navigable portions, so may the key to flood control on a navigable stream be found in whole or in part in flood control on its tributaries....") (citing to Oklahoma ex rel. Phillips v. Guy F. Atkinson Co., 313 U.S. 508, 524-25(1941)).

SHARFIEXPERTS0000323

because they are not tributaries or they do not have a significant nexus to downstream traditional navigable waters. In addition, ditches (including roadside ditches) excavated wholly in and draining only uplands and that do not carry a relatively permanent flow of water are generally not waters of the United States because they are not tributaries or they do not have a significant nexus to downstream traditional navigable waters.[39]   Even when not jurisdictional waters subject to CWA §404, these geographic features (e.g., swales, ditches) may still contribute to a surface hydrologic connection between an adjacent wetland and a traditional navigable water. In addition, these geographic features may function as point sources (i.e., "discernible, confined, and discrete conveyances"), such that discharges of pollutants to other waters through these features could be subject to other CWA regulations (e.g., CWA §§ 311 and 402).[40]

Certain ephemeral waters in the arid west are distinguishable from the geographic features described above where such ephemeral waters are tributaries and they have a significant nexus to downstream traditional navigable waters. For example, in some cases these ephemeral tributaries may serve as a transitional area between the upland environment and the traditional navigable waters. During and following precipitation events, ephemeral tributaries collect and transport water and sometimes sediment from the upper reaches of the landscape downstream to the traditional navigable waters. These ephemeral tributaries may provide habitat for wildlife and aquatic organisms in downstream traditional navigable waters. These biological and physical processes may further support nutrient cycling, sediment retention and transport, pollutant trapping and filtration, and improvement of water quality, functions that may significantly affect the chemical, physical, and biological integrity of downstream traditional navigable waters.

<u>Documentation</u>

As described above, the agencies will assert CWA jurisdiction over the following waters without the legal obligation to make a significant nexus determination: traditional navigable waters and wetlands adjacent thereto, non-navigable tributaries that are relatively permanent waters, and wetlands with a continuous surface connection with such tributaries.   The agencies will also decide CWA jurisdiction over other non-navigable tributaries and over other wetlands adjacent to non-navigable tributaries based on a fact-specific analysis to determine whether they have a significant nexus with traditional navigable waters. For purposes of CWA §404 determinations by the Corps, the Corps and EPA are developing a revised form to be used by field regulators for documenting the assertion or declination of CWA jurisdiction.

Corps districts and EPA regions will ensure that the information in the record adequately supports any jurisdictional determination. The record shall, to the maximum extent practicable, explain the rationale for the determination, disclose the data and information relied upon, and, if applicable, explain what data or information received greater or lesser weight, and what professional judgment or assumptions were used in reaching the determination. The Corps districts and EPA regions will also demonstrate and document in the record that a particular water either fits within a class identified above as not requiring a significant nexus determination, or that the water has a

---

[39] <u>See</u> 51 Fed. Reg. 41206, 41217 (Nov. 13, 1986).
[40] 33 U.S.C. § 1362(14).

SHARFIEXPERTS0000324

significant nexus with a traditional navigable water. As a matter of policy, Corps districts and EPA regions will include in the record any available information that documents the existence of a significant nexus between a relatively permanent tributary that is not perennial (and its adjacent wetlands if any) and a traditional navigable water, even though a significant nexus finding is not required as a matter of law.

All pertinent documentation and analyses for a given jurisdictional determination (including the revised form) shall be adequately reflected in the record and clearly demonstrate the basis for asserting or declining CWA jurisdiction.[41] Maps, aerial photography, soil surveys, watershed studies, local development plans, literature citations, and references from studies pertinent to the parameters being reviewed are examples of information that will assist staff in completing accurate jurisdictional determinations. The level of documentation may vary among projects. For example, jurisdictional determinations for complex projects may require additional documentation by the project manager.

Benjamin H. Grumbles
Assistant Administrator for Water
U.S. Environmental Protection Agency

John Paul Woodley, Jr.
Assistant Secretary of the Army
(Civil Works)
Department of the Army

---

[41] For jurisdictional determinations and permitting decisions, such information shall be posted on the appropriate Corps website for public and interagency information.

*December 02, 2008*                    13                    *Clean Water Act Jurisdiction*

SHARFIEXPERTS0000325

APPENDIX 6


**BENJAMIN SHARFI 2002 TRUST**
**INFORMAL JD APPLICATION NO. 180402-436**
**INFORMAL WETLAND DETERMINATION NO. 100235-P**

**ISSUED 26 APRIL 2018**

129048180.1

SHARFIEXPERTS0000326



# SOUTH FLORIDA WATER MANAGEMENT DISTRICT

April 26, 2018

*Delivered via email*

Benjamin Sharfi *
Benjamin Sharfi 2002 Trust
73 N Sewall's Point Rd
Stuart, FL 34996

Subject:  **Benjamin Sharfi 2002 Trust Informal JD**
**Application No. 180402-436**
**Informal Wetland Determination No. 43-100235-P**
**Martin County**

Dear Mr. Sharfi:

The District reviewed your request for an informal determination of the jurisdictional wetland and other surface water boundaries within the subject property, which is located as shown on the attached Exhibit 1. A joint site inspection was conducted on April 25, 2018.

Based on the information provided and the results of the site inspection, jurisdictional wetlands as defined in Chapter 62-340, Florida Administrative Code, exist on the property. Exhibit 2, attached, identifies the boundaries of the property inspected and the approximate landward limits of the mixed hardwood wetlands (Florida Land Use and Cover Classification System code 617).

This correspondence is an informal jurisdictional wetland determination pursuant to Section 373.421(6), Florida Statutes, and Section 7.3 of Environmental Resource Permit Applicant's Handbook Volume I. It does not bind the District, its agents or employees, nor does it convey any legal rights, expressed or implied. Persons obtaining this informal jurisdictional determination are not entitled to rely upon it for purposes of compliance with provision of law or District rules.

Sincerely,

Barbara A Conmy

Barbara Conmy
Section Leader

c:      Danna Small, Dls Environmental Services *

SHARFIEXPERTS0000327

Benjamin Sharfi 2002 Trust Informal JD
Application No. 180402-436 / Permit No. 43-100235-P
Page 2

## Exhibits

The following exhibits to this permit are incorporated by reference. The exhibits can be viewed by clicking on the links below or by visiting the District's ePermitting website (http://my.sfwmd.gov/ePermitting) and searching under this application number 180402-436.

Exhibit 1 - Location Map

Exhibit 2 - Wetlands Map

SHARFIEXPERTS0000328



| Exhibit No: 1 | Exhibit Created On: 2018-04-26 | MARTIN COUNTY, FL |
|---|---|---|

**REGULATION DIVISION**

Project Name: Benjamin Sharfi 2002 Trust Informal JD

0    1,550    3,100
Feet

N

Application

Application Number: 180402-436

South Florida Water Management District

SHARFIEXPERTS0000329



**FLUCFCS CODES:**

HARDWOOD – CONIFER MIXED (434)
MIXED WETLAND HARDWOODS (617)
OTHER SHRUBS AND BRUSH (329)



**D****L****S** **E**nvironmental
**S**ervices, **I**nc.

1901 SW Yellowtail Avenue
Port Saint Lucie, FL  34953

Phone: 772-215-3997   Fax: 772-879-4520
www.dlsenvironmentalservices.com

**FLUCFCS Map**

Benjamin Sharfi 2002 Trust
SW Martin Highway
Palm City, Florida
PCN# 17-38-40-000-038-00000-0

| SCALE: N.T.S. | | | MARCH 2018 | FIGURE 3 |
|---|---|---|---|---|

**EXHIBIT 2**          **APP. NO. 180402-436**          **Page 1 of 1**

SHARFIEXPERTS0000330

**APPENDIX 7**

**PRESERVE AREA MANAGEMENT PLAN/ABBREVIATED PRESERVE AREA MANAGEMENT PLAN**

**PREPARED BY EDC**

129048180.1

SHARFIEXPERTS0000331

# PRESERVE AREA MANAGEMENT PLAN/ ABBREVIATED PRESERVE AREA MANAGEMENT PLAN

## MARTIN COUNTY
## GROWTH MANAGEMENT DEPARTMENT
## ENVIRONMENTAL DIVISION



*Neshafarm, Inc.*
*PO BOX 778*
*JENSEN BEACH FL 34958*

**Approved by/Date :** _____

Revised December 2015

FDACS0000001
SHARFIEXPERTS0000332

# PART I
# ENVIRONMENTAL ASSESSMENT

### Environmental Assessment
### 1000 SE Ranch Road

## I. Existing Conditions

An environmental assessment was performed by EDC, Inc.  Site assessment work was conducted on multiple occasions as part of the development planning process with the most recent field visit conducted in January of 2020.  The assessment was done on the parcel (17-38-40-000-038-00000-0) and natural habitat delineations have been completed.

This property is approximately 9.92 acres and is located north of SR 714, east of SW 84th Avenue and west of SW 78th Avenue, in Palm City, Martin County, Florida. Wetlands are on site near the SW corner and extending east on the parcel (SFWMD Application 180402-436). The Preserve Area covered in this PAMP is shown on the site plan.

Pedestrian transects were completed throughout the property in order to evaluate the area. The property was traversed in an east to west direction, with transects varying from approximately 20-30 feet apart so that all habitat could be observed.  The habitat on site is a mixture of remnant pine flatwoods, agricultural lands, and herbaceous wetlands impacted by exotic, invasive vegetation. Properties surrounding and adjacent to the site are mostly agricultural. The site south of the property is graze land.

### A. Proposed Conditions

The property owner is proposing to construct an agricultural facility on the property. All Martin County upland and wetland preserve areas will be retained in their restored state, free from exotic vegetation, with maintenance and monitoring to be conducted in accordance with this PAMP.

### B. Previous Impacts

This property has a history of dense exotic invasive vegetation that modified the native associations on the property. The exotic invasive vegetation consisted primarily of old world climbing fern (*Lygodium microphyllum*) that formed a dense groundcover, often extending throughout the subcanopy. As part of the previous activity, the landowner removed the material and is currently managing the property free of this invasive material. The removal activity did cause minor impacts to what a previous non-binding wetland determination considered a wetland. Based on reviews of soil surveys, historic aerials, and other resources, EDC, Inc. is currently proposing a modification to the non-binding wetland jurisdictional determination.

## II. Soils

Based on a review of the Florida Department of Environmental Protection Water Data Central, the site is composed of:

<u>Oldsmar Fine Sand, 0 to 2 percent slopes</u> - The Oldsmar series consists of very deep, poorly drained and very poorly drained soils that formed in sandy marine sediments overlying loamy materials. Oldsmar soils are on flatwoods, low broad flats, and depressions on marine terraces. Slopes are

FDACS0000002
SHARFIEXPERTS0000333

linear to concave and range from 0 to 2 percent. The mean annual precipitation is about 1397 millimeters (55 inches) and the mean annual temperature is about 23 degrees C. (72 degrees F).

<u>Sanibel Muck</u> - Sanibel soils occur on broad flats, in depressed areas and in poorly defined drainageways. Gradients are less than 2 percent. These soils have formed in thick beds of sands beneath a thin mantle of organic materials under the influence of a high water table. Near the type location annual precipitation averages about 63 inches and mean annual temperature is about 75 degrees F.

<u>Holopaw Fine Sand, 0 to 2 percent slopes</u> - The Holopaw series consists of deep and very deep, poorly and very poorly drained soil that formed in sandy and loamy marine sediments. Holopaw soils are on nearly level low lying flats, poorly defined drainageways and depressional areas. Slopes range from 0 to 2 percent. Mean annual precipitation is about 1397 millimeters (55 inches) and the mean annual temperature is about 22 degrees C (72 degrees F).

The topography and soil map are provided in Attachment 3.

## III. Existing Habitat/FLUCCS

### A. Wetland Habitat

Identified wetlands are classified as FLUCCS categories:

#641: Herbaceous Wetland

The vegetation observed includes the following:
Yellow-eyed Grass (*Xyris elliottii*)          St. John's Wort (*Hypericum fasciculatum*)
Red Root (*Lachnanthes caroliniana*)

### B. Upland Habitats

Upland portions of the site are comprised of Agricultural and Remnant Pine Flatwoods 411.

Identified uplands are classified as FLUCCS categories:

#4115: Remnant Pine Flatwoods  - the area does not have understory due to the previous impacts of the invasive vegetation. The vegetation observed includes the following:

Slash Pine ( *Pinus elliotii*)                    Bahia grass (*Paspalum notatum*)
Brazilian Pepper (*Schinus terebinthifolius*)    Cabbage Palm (*Sabal palm*)
Live Oak (*Quercus virginiana*)                  Saw Palmetto (*Serenoa repens*)
Old World Climbing Fern (*Lygodium microphyllum*)

## IV. Wildlife Observations

The following species were observed during the site visit:
<u>Reptiles:</u> None
<u>Amphibians:</u> None
<u>Mammals:</u> None
<u>Aves:</u> None

FDACS0000003

SHARFIEXPERTS0000334

Please see Attachments 5, 6, and 7 for additional information related to listed species.



FDACS0000004

SHARFIEXPERTS0000335

## V.  Restoration/Mitigation Planting Plan

### A.  Eradication of Nuisance and Exotic Vegetation
Exotic vegetation is present inside the existing preserve areas on the property. All nuisance and exotic vegetation as listed by the Florida Exotic Pest Plant Council will be eradicated from the preserve area. Exotic vegetation includes both woody and non woody species.

- All Brazilian pepper trees and other woody exotics will be eradicated by cutting of the trunk and treatment of the stump with an appropriately labeled herbicide. All vegetative debris will be removed from preserve areas and disposed of offsite.
- The criterion for completion of the woody exotic eradication will be 100 percent kill. If initial eradication efforts do not achieve this criterion, follow up treatment will be conducted.
- Any debris removed will be handled in accordance with the disposal specifications.

The exotic vegetation present in the preservation area also includes small patches of non-woody species that primarily include old world climbing fern.

- All eradication of non-woody exotic vegetation will be through application of appropriately labeled herbicide.
- The criterion for acceptance of eradication for all non-woody exotic vegetation will be 100 percent kill. If initial eradication efforts do not achieve this criterion, follow up treatment will be conducted.
- The exotic vegetation eradication in the preservation areas will generate vegetative debris that requires disposal. There will be a staging and storage area provided adjacent to the preservation areas on the proposed project site, outside the limits of the preserves.
- Transport of vegetative debris from the preservation area to the staging area will be conducted in a fashion that minimizes the distribution and dispersal of seeds from such debris.
- No cut exotic or nuisance vegetative material will be left in the wetland preservation area.
- All vegetative debris, either whole or chipped/mulched will be hauled off site and disposed of at a landfill or other such appropriately licensed facility.

Herbicides are required for the treatment of all stumps of woody vegetation to prevent re-growth, and for eradication of non-woody exotic and nuisance vegetation.
- All herbicide application activity will be conducted under the supervision of a Florida Agriculture licensed applicator, licensed for application of aquatic herbicides.
- All herbicides applied within the wetland area must be properly labeled for application in wetlands.
- All herbicide applied must include a visible tracer dye in the mix to facilitate observation of treated vegetation.

Please see FLUCCS map provided in Attachment 4.

### B.  Replanting with Native Wetland/Transitional/Upland Vegetation
Any revegetation which might be necessary as a result of exotic vegetation removal, or previous recreational activities shall consist of native plant species representative of the existing native plant community. This will ensure that the Preserve Area maintains native plant communities. Revegetation plans shall be submitted to the Martin County Environmental Planning Administrator for approval prior to implementation.

FDACS0000005

SHARFIEXPERTS0000336

## 1.  *Restoration of Wetland Preserve Area*

Exotic removal schedule for wetland and will be on regular maintenance. The quantities listed are for 0.10 acres of wetland buffer planting (if necessary). The actual quantities and species may vary depending on the size and nature of the area to be planted.

| Common Name | Scientific Name | Size | Quantity | Size |
|---|---|---|---|---|
| Pickerelweed | *Pontederia spp.* | br | 111 | 3' O.C |
| Arrowhead | *Sagittaria lancifolia* | br | 111 | 3' O.C |
| Maidencane | *Panicum hemitomon* | br | 111 | 3' O.C |
| Duck Potato | *Sagittaria lancifolia* | br | 111 | 3' O.C |
| Sawgrass | *Cladium jamaicense* | 3g | 11 | 3' O.C |

## 2.  *Restoration of Wetland Buffer Preserve Area*

The wetland buffer preserve contains a mixture of native vegetation and exotic plant species. Maintenance activities will include the eradication of exotic/nuisance vegetation. If revegetation is required post exotic removal the plant material will consist of similar species currently found within the wetland buffer area. Any revegetation efforts will achieve 80% coverage of native vegetation within 18 months post restoration. The actual plant material quantities will be a site-specific decision. However, the following plant list has been established for the site and is based on observations of the on-site wetland species composition.

The quantities listed are for 0.10 acres of wetland buffer planting (if necessary). The actual quantities and species may vary depending on the size and nature of the area to be planted.

| Common Name | Scientific Name | Size | Quantity | Size |
|---|---|---|---|---|
| Slash Pine | *Pinus ellottii* | 7g | 3 | 10' O.C. |
| Cabbage Palm | *Sabal pametto* | 7g | 3 | 10' O.C |
| Saw Palmetto | *Serenoa repens* | 3g | 5 | 5' O.C |
| Wax Myrtle | *Myrica cerifera* | 3g | 5 | 3' O.C |
| Beauty Berry | *Callicarpa americana* | 3g | 20 | 3' O.C |
| Sand Cordgrass | *Spartina bakeri* | 3g | 15 | 3' O.C |

## VI. Conclusion

The Neshafarm site contains a wetland in the southwest and southeast portion of the site. The intent of this PAMP is to establish preserve areas and a wetland buffer around the above mentioned wetlands. This PAMP will include the parcel (17-38-40-000-038-00000-0) which is located on north of SR 714 in Palm City, FL. The areas will be managed in their restored state as required by this PAMP. Preserve Calculations are as follows: 9.92 acres – XXX ac of wetland = XXX acres. Plus the 50 foot buffer provides XXX ac of restored wetland buffer (upland preserve) provided.

FDACS0000006

SHARFIEXPERTS0000337

**VII. List of Exhibits**
**Attachment 1:  Location Map**
**Attachment 2:  Survey of Current Site**
**Attachment 3:  Topography and Soils Map**
**Attachment 4:  FLUCCS Map**
**Attachment 5:  FFWCC Eagle Nest Locator**
**Attachment 6:  USFWS IPAC Trust Resource List**

**EDC, Inc.**

**Tobin R. Overdorf, MS, MBA**
**Vice President**

# PART II
# CONDITIONS

## A. RECORDING

FDACS0000007
SHARFIEXPERTS0000338

This Preserve Area Management Plan (PAMP) will be recorded by the Martin County Clerk of Courts and labeled with the appropriate O.R. Book and Page Number. One copy of the recorded document will be provided to the Martin County Environmental Planning Administrator within thirty (30) days of the Recording date. This PAMP may be altered or amended only with the agreement of the Martin County Environmental Planning Administrator and the owner/developer and with the approval of the Martin County Board of County Commissioners. If the PAMP is altered or amended, the revised document will be recorded by the Martin County Clerk of Courts and one copy of the revised document will be provided to the Martin County Environmental Planning Administrator within thirty (30) days of the Recording date.

## B. COMPLIANCE

The owner(s) of the lands to be preserved/maintained by this Preserve Area Management Plan (PAMP) and the developer(s) of the property described in this PAMP, their successors and assigns, and their environmental consultants and contractors, will implement and comply with all portions of this PAMP.

## C. MONITORING AND REPORTING

Compliance with the terms of this PAMP includes submittal of Monthly Monitoring Reports on PAMP compliance throughout all phases of project construction and submittal of an Annual Monitoring Report each year for a period of five years following completion of project construction, pursuant to Section 10.17 of the Martin County Land Development Regulations. The owner(s) of the lands to be preserved shall have ultimate responsibility for the submittal of all Monitoring Reports.

Annual monitoring will be conducted by a qualified environmental professional no later than November 30 of each year following issuance of a Certificate of Occupancy for development described in the PAMP. A report presenting the results of the annual monitoring will be submitted by the environmental professional to the Martin County Environmental Planning Administrator within thirty days of the completion of the monitoring. Included in the Annual Monitoring Report will be a list of any violations of the PAMP during the previous year, with recommendations for, and a schedule of, remedial actions and any enhancement activities proposed for the coming year. All Annual Monitoring Reports are due no later than December 31 of the year they are to be submitted. After the first five-year monitoring period, the Preserve Areas may be subject to further monitoring and maintenance to ensure environmental integrity and consistency with the provisions of the Plan. A copy of the suggested template for the Annual Monitoring Report is attached to this PAMP as an Appendix.

## D. TRANSFER OF OWNERSHIP

FDACS0000008
SHARFIEXPERTS0000339

The Martin County Environmental Planning Administrator shall be notified in writing within thirty (30) days of transfer of ownership of any lands preserved by this PAMP. Failure to notify will be considered as a non-compliance with the terms of this PAMP.

## E. SITE PLAN

The Site Plan included as an appendix to this PAMP illustrates all preserve areas, right-of-ways and easements, proposed structures, with distances to on- and off-site upland preserves, wetlands and wetland buffers, proposed final grade of developed area, and location of permanent preserve area signs. Included on the Site Plan will be a summary of the following: total acreage of the Site; acreage of wetland habitats under preservation; acreage of native and common upland habitats under preservation; acreage of upland buffer on-site; acreage of on-site wetland mitigation areas; and total acreage under preservation. The Site Plan will contain the notation: **"PRESERVE AREAS ARE NOT TO BE ALTERED WITHOUT WRITTEN PERMISSION OF THE MARTIN COUNTY BOARD OF COUNTY COMMISSIONERS."**

## F. PRESERVE AREA SURVEYING REQUIREMENTS

All Preserve Areas will be surveyed and marked with permanent monuments at each corner and at other sites necessary for locating the boundary of the Preserve Area. These permanent monuments will be constructed under the supervision of a Registered Land Surveyor and will be shown on the Site Plan. Map coordinates of each Preserve Area will be provided to the Martin County Environmental Planning Administrator in a form compatible for use in the County's GIS mapping system.

## G. PRESERVE AREA SIGNAGE REQUIREMENTS

Preserve Areas will be posted with permanent signs. These signs will be at least 11 x 14 inches in size and will be posted in conspicuous locations along the Preserve Area boundary, at a frequency of no less than one (1) sign per 500 feet. Boundary Markers will be placed at the corners of residential lots abutting Preserve Areas. All signs and boundary markers will be approved by the Martin County Environmental Planning Administrator and will be in place prior to issuance of a building permit for construction on the site. An example of the Preserve Area Sign is appended to this Plan.

## H. SITE CLEARING

The Land Clearing/Erosion Control Plan appended to this PAMP contains information on land clearing to be conducted, existing vegetation to be retained, location of construction barricades around preserve areas, procedures for debris removal and soil stabilization, and location of silt fences. Where clearing of vegetation is proposed (i.e. building envelope, utilities, drainage, road right-of-way, etc.), the developer will ensure that all Preserve Areas and buffers are protected with construction barricades and erosion control devices in accordance with the following guidelines.

FDACS0000009

SHARFIEXPERTS0000340

Construction barricades will be placed at least 10 feet outside of all Upland Preserve Areas, or at the dripline of the canopy trees, whichever is greater. Barricades will be inspected by County Environmental Division staff prior to work approval. Barricades will consist of high-visibility orange safety fence extending from the ground to a height of at least 4 feet and will not be attached to vegetation. Removal of the barricades will be approved only after issuance of a Certificate of Occupancy.

All native vegetation not slated for removal as part of the development plans will be retained in its undisturbed state and will be barricaded at or outside the dripline of the trees. Wetlands will be protected from possible surface water and sediment runoff by the placement of erosion control devices (e.g., silt screens, hay bales or other turbidity control measures) at least 5 feet outside the perimeter of the wetland buffer.

All barricades, silt screens and other erosion control devices will be upright and maintained intact for the duration of construction.

The owner/developer to required to inform all contractors of site clearing requirements. Failure to comply with these requirements will be considered a violation of the Site Plan approval. Work on the project may be stopped until compliance is achieved.

## I.  ACTIVITIES ALLOWED IN PRESERVE AREAS

Property owners are encouraged to enjoy the natural beauty of their Preserve Areas. Although development of Preserve Areas is not allowed, passive uses, such as bird-watching and other non-destructive uses of natural areas are encouraged, as long as they do not affect the hydrology or vegetative cover of a Preserve Area.

## J.  ACTIVITIES PROHIBITED IN PRESERVE AREAS

Activities prohibited in Preserve Areas or easements within Preserve Areas include, but are not limited to: construction; dumping or placing building materials, soil, garbage, trash, or dead vegetation on or above the ground; removal or destruction of native trees, shrubs or other native vegetation; excavation or dredging of soil; diking or fencing; vehicular traffic including use by non-motorized vehicles, recreational vehicles and off-road vehicles; permanent irrigation; trimming, pruning, or fertilization; and any other activities detrimental to drainage, flood control, water conservation, erosion control or fish and wildlife conservation and preservation.

No hazardous material other than fuel for refueling on-site equipment may be stored during construction. On-site fuel tanks may not be located within twenty-five (25) feet of any Preserve Areas and will be removed upon completion of construction work.

Buildings proposed to be located adjacent to Preserve Areas will be set back a minimum of ten (10) feet to allow for construction and maintenance without encroaching into the

Preserve Area. All other structures (e.g. pools, sheds, decks, fences) shall be set back a minimum of five (5) feet from the Preserve Area boundary.

FDACS0000010
SHARFIEXPERTS0000341

Development activities such as the construction of building pads for associated structures, swales, or culverts for surface water management shall not alter the hydrology of adjacent Preserve Areas. Nor shall any activities increase non-point source pollution in Preserve Areas.

Grazing of cattle and horses or other livestock in Preserve Areas, while not prohibited, is discouraged. Over-grazing can result in destruction of habitat, loss of top soils and changes in hydrology of the area as a result of the loss of ground cover material, increased fertilization from animal droppings, and contamination of surface waters. These and other effects of over-grazing will be considered violations of this PAMP and will be addressed as any other PAMP violation.

## K. RESTORATION AND MAINTENANCE ACTIVITIES

Except for approved restoration and maintenance activities, Preserve Areas will be left undisturbed. All maintenance of Preserve Areas will be in accordance with this PAMP. Maintenance and management activities will be performed by or under the supervision of a qualified environmental professional and must be approved by the Martin County Environmental Planning Administrator. A description of all proposed restoration and maintenance activities to be conducted on the site will be included in the Restoration/Mitigation Planting Plan prepared as part of the EA. The following restoration and maintenance activities may be allowed within Preserve Areas with prior written approval from the Environmental Planning Administrator: exotic plant removal; revegetation with native plants; removal of plant material that is dead, diseased, or considered to be a safety hazard; and controlled burns.

**Exotic Plant Removal** - Exotic vegetation shall be removed from Preserve Areas by the least ecologically-damaging method available. Such methods include hand pulling, hand spading, cutting with hand or chain saws and in-situ treatment with appropriate herbicides. No debris, including dead plants, plant clippings or wood scraps, shall be allowed in Preserve Areas. In addition, all dead plant material and exotic plant debris removed from Preserve Areas shall be disposed of in a County-approved recycling facility.

**Revegetation** - Any revegetation which might be necessary as a result of exotic vegetation removal or site construction activities shall consist of native plant species representative of the existing native plant community. This will ensure that the Preserve Areas maintain indigenous plant associations. Revegetation plans shall be included in the Restoration/Mitigation Planting Plan prepared as part of the EA.

All monitoring provisions necessary to assure the survivorship and maintenance responsibility for the reclamation areas of littoral and upland transition zone buffer areas around lakes constructed on the site managed by this PAMP shall be identified in the Restoration/Mitigation Planting Plan included in the EA for this site.

**Vegetation Removal** - Dead or diseased plant material shall be removed from Preserve Areas upon approval by the Martin County Environmental Planning Administrator. Revegetation may

FDACS0000011

SHARFIEXPERTS0000342

be required for any removed plant material. No debris, including dead plants, plant clippings or wood scraps, shall be allowed in Preserve Areas. All dead plant material and debris removed from Preserve Areas shall be disposed of in a County-approved recycling facility.

**Prescribed Burns** - Martin County considers prescribed burns an acceptable habitat management tool. When approved by the Martin County Environmental Planning Administrator, prescribed burns may be conducted by a certified burn manager who will be responsible for obtaining all appropriate permits from State and local agencies.

**Other Restoration and Maintenance Activities** – Alternative and innovative management techniques, which may provide for the long-term viability and habitat value of the Preserve Areas and for protection against imminent threats to public health and safety, may be approved by the Martin County Environmental Planning Administrator.

## L. SITE HYDROLOGY

Previous or potential drainage impacts will be corrected to the extent technically feasible. Water quality and the rate, timing, and volume of run-off shall recreate natural conditions for the benefit of onsite wetlands and other waterbodies. Wetlands and waterbodies on adjacent properties shall be protected from adverse impacts.

## M. PROTECTED SPECIES

If a protected species survey conducted as part of the Environmental Assessment of the project site indicates the presence of protected plant or animal species, the Environmental Assessment will include a Protected Species Management Plan. This Plan will include the results of the protected species survey; a listing and description of protected species occurring on, or utilizing, the site; documentation of the protection status of each species; a map of active and inactive burrows, nests, cavity trees, etc. found as part of the survey; a description of the protective measures being provided for each listed species found on the site; and copies of all correspondence with applicable state and federal agencies regarding the protection of listed species.

## N. INSPECTIONS AND ENFORCEMENT

Martin County is authorized to inspect any County regulated site or appurtenance. Duly authorized representatives of Martin County may, at any time, upon presenting proper identification, enter upon and shall be given access to any premises for the purpose of such inspection. Martin County shall have the right to enforce the provisions of this PAMP through any available administrative or civil proceeding, which may result in penalties. Restoration of habitat and other remedies, such as fines and fees covering staff time, may be required of any person, corporation or other entity found in violation of any of the provisions of this PAMP or of Article 10 of the Martin County Land Development Regulations.

FDACS0000012
SHARFIEXPERTS0000343

# APPENDICES

**Example of Preserve Area Sign**

**Annual Monitoring Report Template**



FDACS0000013
SHARFIEXPERTS0000344



PRESERVE

# AREA

FDACS0000014

SHARFIEXPERTS0000345



PLEASE PROTECT

17470-51323

# MARTIN COUNTY, FLORIDA

## PRESERVE AREA MANAGEMENT PLAN

## ANNUAL MONITORING REPORT FOR (*Year*)

*Annual monitoring shall be conducted at the end of the wet season (usually by November 30) for five years from the date of PAMP approval. A report of the results of each monitoring event shall be submitted by the property owner to the Martin County Environmental Planning Administrator within 30 days of the completion of the monitoring. Monitoring and*

FDACS0000015

SHARFIEXPERTS0000346

*reporting are the responsibility of the property owner. However, a qualified environmental professional may conduct the monitoring, prepare the Annual Monitoring Reports, or submit the Reports.*

*All Annual Monitoring Reports shall contain the following information:*

- **Name and address of current owner of Preserve Area;**

- **Location of Preserve Area** *(site/project location, Martin County Parcel Control Number, section/township/range, etc);*

- **Date PAMP approved;**

- **Documentation of vegetation changes, including encroachment of exotic vegetation;**

- **Fixed-point panoramic photos of all Preserve Areas;**

- **Synopsis of maintenance activities conducted in compliance with the PAMP requirements such as exotic vegetation removal, revegetation, and additional enhancement activities necessary to maintain the Preserve Area;**

- **A timetable for action within 90 days of the report;**

- **A list of all violations of the PAMP; and**

- **Recommendations for remedial actions, with a proposed schedule for the coming year.**

Signature/Date : _____

Typed Name/Title : _____

Company Name (if applicable) : _____

FDACS0000016
SHARFIEXPERTS0000347

Tract 3B 10.04 Acres±
Less Right of Way 9.82 Acres±
Section 17, 38-40
Palm City Farms

FDACS0000018

SHARFIEXPERTS0000349

# Environmental Site Assessment

Neshafarm, Inc.

Palm City, Martin County, FL

## Location Map

2/24/2020

Martin County PAMP

ENGINEERS ⚫ SURVEYORS ⚫ ENVIRONMENTAL

Property Location



SW Martin Hwy

SW Martin Hwy



FDACS0000019

SHARFIEXPERTS0000350

FDACS0000020

SHARFIEXPERTS0000351





## Environmental Site Assessment

Neshafarm, Inc.
Palm City, Martin County, FL

2006 Aerial Map

2/24/2020

Martin County PAMP



Property Location

SW Gate

FDACS0000021

SHARFIEXPERTS0000352



Environmental Site Assessment

Neshafarm, Inc.
Palm City, Martin County, FL

2007 Aerial Map

2/24/2020

Martin County PAMP



ENGINEERS ⊕ SURVEYORS ⊕ ENVIRONMENTAL

Property Location



FDACS0000022

SHARFIEXPERTS0000353





# Environmental Site Assessment

Neshafarm, Inc.
Palm City, Martin County, FL

2009 Aerial Map

2/24/2020

Martin County PAMP

ENGINEERS ✤ SURVEYORS ✤ ENVIRONMENTAL

Property Location

FDACS0000023

SHARFIEXPERTS0000354



## Environmental Site Assessment

Neshafarm, Inc.
Palm City, Martin County, FL

2018 Aerial Map

Martin County PAMP

2/24/2020

Property Location

ENGINEERS • SURVEYORS • ENVIRONMENTAL

FDACS0000024

SHARFIEXPERTS0000355

# Environmental Site Assessment

Neshafarm, Inc.

Palm City, Martin County, FL

## Soil Map

| Martin County PAMP | | 2/24/2020 |
|---|---|---|



ENGINEERS & SURVEYORS & ENVIRONMENTAL

**Martin County, Florida (FL085)**

Martin County, Florida (FL085)

| Map Unit Symbol | Map Unit Name | Acres in AOI | Percent of AOI |
|---|---|---|---|
| 16 | Oldsmar fine sand, 0 to 2 percent slopes | 3.5 | 38.2% |
| 40 | Sanibel muck | 3.5 | 38.5% |
| 66 | Holopaw fine sand, 0 to 2 percent slopes | 2.1 | 23.3% |
| **Totals for Area of Interest** | | **9.1** | **100.0%** |

FDACS0000025

SHARFIEXPERTS0000356



FDACS0000026

SHARFIEXPERTS0000357



# Environmental Site Assessment

Rio Town Center

Jensen Beach, Martin County, FL

FWC Bald Eagle Nest Locator Map

Project: 18-406

2/6/2020

ENGINEERS • SURVEYORS • ENVIRONMENTAL



Property Location

MT020

The Fox Club

 **SOUTH FLORIDA WATER MANAGEMENT DISTRICT**

April 26, 2018

*\* Delivered via email*

Benjamin Sharfi *
Benjamin Sharfi 2002 Trust
73 N Sewall's Point Rd
Stuart, FL 34996

Subject: **Benjamin Sharfi 2002 Trust Informal JD**
**Application No. 180402-436**
**Informal Wetland Determination No. 43-100235-P**
**Martin County**

Dear Mr. Sharfi:

The District reviewed your request for an informal determination of the jurisdictional wetland and other surface water boundaries within the subject property, which is located as shown on the attached Exhibit 1. A joint site inspection was conducted on April 25, 2018.

Based on the information provided and the results of the site inspection, jurisdictional wetlands as defined in Chapter 62-340, Florida Administrative Code, exist on the property. Exhibit 2, attached, identifies the boundaries of the property inspected and the approximate landward limits of the mixed hardwood wetlands (Florida Land Use and Cover Classification System code 617).

This correspondence is an informal jurisdictional wetland determination pursuant to Section 373.421(6), Florida Statutes, and Section 7.3 of Environmental Resource Permit Applicant's Handbook Volume I. It does not bind the District, its agents or employees, nor does it convey any legal rights, expressed or implied. Persons obtaining this informal jurisdictional determination are not entitled to rely upon it for purposes of compliance with provision of law or District rules.

Sincerely,

Barbara A Conmy

Barbara Conmy
Section Leader

c:    Danna Small, Dis Environmental Services *

FDACS0000027
SHARFIEXPERTS0000358

Benjamin Sharfi 2002 Trust Informal JD
Application No. 180402-436 / Permit No. 43-100235-P
Page 2

## Exhibits

The following exhibits to this permit are incorporated by reference. The exhibits can be
viewed by clicking on the links below or by visiting the District's ePermitting
website (http://my.sfwmd.gov/ePermitting) and searching under this application number
180402-436.

Exhibit 1 - Location Map

Exhibit 2 - Wetlands Map

FDACS0000028
SHARFIEXPERTS0000359

2/26/2020                                      IPaC: Explore Location

**IPaC**                                        **U.S. Fish & Wildlife Service**

# IPaC resource list

This report is an automatically generated list of species and other resources such as critical habitat (collectively referred to as *trust resources*) under the U.S. Fish and Wildlife Service's (USFWS) jurisdiction that are known or expected to be on or near the project area referenced below. The list may also include trust resources that occur outside of the project area, but that could potentially be directly or indirectly affected by activities in the project area. However, determining the likelihood and extent of effects a project may have on trust resources typically requires gathering additional site-specific (e.g., vegetation/species surveys) and project-specific (e.g., magnitude and timing of proposed activities) information.

Below is a summary of the project information you provided and contact information for the USFWS office(s) with jurisdiction in the defined project area. Please read the introduction to each section that follows (Endangered Species, Migratory Birds, USFWS Facilities, and NWI Wetlands) for additional information applicable to the trust resources addressed in that section.

## Location

Martin County, Florida



## Local office

South Florida Ecological Services Field Office

📞 (772) 562-3909
📠 (772) 562-4288

1339 20th Street
Vero Beach, FL 32960-3559

http://fws.gov/verobeach

FDACS0000029
SHARFIEXPERTS0000360

# Endangered species

**This resource list is for informational purposes only and does not constitute an analysis of project level impacts.**

The primary information used to generate this list is the known or expected range of each species. Additional areas of influence (AOI) for species are also considered. An AOI includes areas outside of the species range if the species could be indirectly affected by activities in that area (e.g., placing a dam upstream of a fish population, even if that fish does not occur at the dam site, may indirectly impact the species by reducing or eliminating water flow downstream). Because species can move, and site conditions can change, the species on this list are not guaranteed to be found on or near the project area. To fully determine any potential effects to species, additional site-specific and project-specific information is often required.

Section 7 of the Endangered Species Act **requires** Federal agencies to "request of the Secretary information whether any species which is listed or proposed to be listed may be present in the area of such proposed action" for any project that is conducted, permitted, funded, or licensed by any Federal agency. A letter from the local office and a species list which fulfills this requirement can only be obtained by requesting an official species list from either the Regulatory Review section in IPaC (see directions below) or from the local field office directly.

For project evaluations that require USFWS concurrence/review, please return to the IPaC website and request an official species list by doing the following:

1. Draw the project location and click CONTINUE.
2. Click DEFINE PROJECT.
3. Log in (if directed to do so).
4. Provide a name and description for your project.
5. Click REQUEST SPECIES LIST.

Listed species[1] and their critical habitats are managed by the Ecological Services Program of the U.S. Fish and Wildlife Service (USFWS) and the fisheries division of the National Oceanic and Atmospheric Administration (NOAA Fisheries[2]).

Species and critical habitats under the sole responsibility of NOAA Fisheries are **not** shown on this list. Please contact NOAA Fisheries for species under their jurisdiction.

1. Species listed under the Endangered Species Act are threatened or endangered; IPaC also shows species that are candidates, or proposed, for listing. See the listing status page for more information.
2. NOAA Fisheries, also known as the National Marine Fisheries Service (NMFS), is an office of the National Oceanic and Atmospheric Administration within the Department of Commerce.

The following species are potentially affected by activities in this location:

# Mammals

NAME                                                             STATUS

FDACS0000030
SHARFIEXPERTS0000361

Florida Panther  Puma (=Felis) concolor coryi                          Endangered
    No critical habitat has been designated for this species.
    https://ecos.fws.gov/ecp/species/1763

Puma (=mountain Lion)  Puma (=Felis) concolor (all subsp. except      SAT
coryi)
    No critical habitat has been designated for this species.
    https://ecos.fws.gov/ecp/species/6049

Southeastern Beach Mouse  Peromyscus polionotus niveiventris           Threatened
    No critical habitat has been designated for this species.
    https://ecos.fws.gov/ecp/species/3951

# Birds

NAME                                                                  STATUS

Audubon's Crested Caracara  Polyborus plancus audubonii                Threatened
    No critical habitat has been designated for this species.
    https://ecos.fws.gov/ecp/species/8250

Everglade Snail Kite  Rostrhamus sociabilis plumbeus                   Endangered
    There is final critical habitat for this species. Your location is outside
    the critical habitat.
    https://ecos.fws.gov/ecp/species/7713

Florida Grasshopper Sparrow  Ammodramus savannarum                     Endangered
floridanus
    No critical habitat has been designated for this species.
    https://ecos.fws.gov/ecp/species/32

Florida Scrub-jay  Aphelocoma coerulescens                             Threatened
    No critical habitat has been designated for this species.
    https://ecos.fws.gov/ecp/species/6174

Ivory-billed Woodpecker  Campephilus principalis                       Endangered
    No critical habitat has been designated for this species.
    https://ecos.fws.gov/ecp/species/8230

Red Knot  Calidris canutus rufa                                        Threatened
    No critical habitat has been designated for this species.
    https://ecos.fws.gov/ecp/species/1864

Whooping Crane  Grus americana                                         EXPN
    No critical habitat has been designated for this species.
    https://ecos.fws.gov/ecp/species/758

FDACS0000031
SHARFIEXPERTS0000362

**Wood Stork**  Mycteria americana                                        Threatened
   No critical habitat has been designated for this species.
   https://ecos.fws.gov/ecp/species/8477

## Reptiles

NAME                                                                        STATUS

**American Alligator**  Alligator mississippiensis                          SAT
   No critical habitat has been designated for this species.
   https://ecos.fws.gov/ecp/species/776

**Eastern Indigo Snake**  Drymarchon corais couperi                         Threatened
   No critical habitat has been designated for this species.
   https://ecos.fws.gov/ecp/species/646

**Hawksbill Sea Turtle**  Eretmochelys imbricata                            Endangered
   There is final critical habitat for this species. Your location is outside
   the critical habitat.
   https://ecos.fws.gov/ecp/species/3656

**Leatherback Sea Turtle**  Dermochelys coriacea                            Endangered
   There is final critical habitat for this species. Your location is outside
   the critical habitat.
   https://ecos.fws.gov/ecp/species/1493

**Loggerhead Sea Turtle**  Caretta caretta                                  Threatened
   There is final critical habitat for this species. Your location is outside
   the critical habitat.
   https://ecos.fws.gov/ecp/species/1110

## Insects

NAME                                                                        STATUS

**Florida Leafwing Butterfly**  Anaea troglodyta floridalis                 Endangered
   There is final critical habitat for this species. Your location is outside
   the critical habitat.
   https://ecos.fws.gov/ecp/species/6652

**Miami Blue Butterfly**  Cyclargus (=Hemiargus) thomasi                    Endangered
bethunebakeri
   No critical habitat has been designated for this species.
   https://ecos.fws.gov/ecp/species/3797

## Flowering Plants

NAME                                                                        STATUS

FDACS0000032
SHARFIEXPERTS0000363

Beach Jacquemontia  Jacquemontia reclinata                    Endangered
   No critical habitat has been designated for this species.
   https://ecos.fws.gov/ecp/species/1277

Four-petal Pawpaw  Asimina tetramera                          Endangered
   No critical habitat has been designated for this species.
   https://ecos.fws.gov/ecp/species/3461

Lakela's Mint  Dicerandra immaculata                          Endangered
   No critical habitat has been designated for this species.
   https://ecos.fws.gov/ecp/species/6390

Tiny Polygala  Polygala smallii                               Endangered
   No critical habitat has been designated for this species.
   https://ecos.fws.gov/ecp/species/996

## Lichens

NAME                                                          STATUS

Florida Perforate Cladonia  Cladonia perforata               Endangered
   No critical habitat has been designated for this species.
   https://ecos.fws.gov/ecp/species/7516

## Critical habitats

Potential effects to critical habitat(s) in this location must be analyzed along with the endangered
species themselves.

THERE ARE NO CRITICAL HABITATS AT THIS LOCATION.

# Migratory birds

Certain birds are protected under the Migratory Bird Treaty Act[1] and the Bald and Golden Eagle
Protection Act[2].

Any person or organization who plans or conducts activities that may result in impacts to migratory
birds, eagles, and their habitats should follow appropriate regulations and consider implementing
appropriate conservation measures, as described below.

1. The Migratory Birds Treaty Act of 1918.
2. The Bald and Golden Eagle Protection Act of 1940.

Additional information can be found using the following links:

FDACS0000033
SHARFIEXPERTS0000364

- Birds of Conservation Concern http://www.fws.gov/birds/management/managed-species/birds-of-conservation-concern.php
- Measures for avoiding and minimizing impacts to birds http://www.fws.gov/birds/management/project-assessment-tools-and-guidance/conservation-measures.php
- Nationwide conservation measures for birds http://www.fws.gov/migratorybirds/pdf/management/nationwidestandardconservationmeasures.pdf

The birds listed below are birds of particular concern either because they occur on the USFWS Birds of Conservation Concern (BCC) list or warrant special attention in your project location. To learn more about the levels of concern for birds on your list and how this list is generated, see the FAQ below. This is not a list of every bird you may find in this location, nor a guarantee that every bird on this list will be found in your project area. To see exact locations of where birders and the general public have sighted birds in and around your project area, visit the E-bird data mapping tool (Tip: enter your location, desired date range and a species on your list). For projects that occur off the Atlantic Coast, additional maps and models detailing the relative occurrence and abundance of bird species on your list are available. Links to additional information about Atlantic Coast birds, and other important information about your migratory bird list, including how to properly interpret and use your migratory bird report, can be found below.

For guidance on when to schedule activities or implement avoidance and minimization measures to reduce impacts to migratory birds on your list, click on the PROBABILITY OF PRESENCE SUMMARY at the top of your list to see when these birds are most likely to be present and breeding in your project area.

| NAME | BREEDING SEASON (IF A BREEDING SEASON IS INDICATED FOR A BIRD ON YOUR LIST, THE BIRD MAY BREED IN YOUR PROJECT AREA SOMETIME WITHIN THE TIMEFRAME SPECIFIED, WHICH IS A VERY LIBERAL ESTIMATE OF THE DATES INSIDE WHICH THE BIRD BREEDS ACROSS ITS ENTIRE RANGE. "BREEDS ELSEWHERE" INDICATES THAT THE BIRD DOES NOT LIKELY BREED IN YOUR PROJECT AREA.) |
|---|---|
| American Kestrel  Falco sparverius paulus<br>This is a Bird of Conservation Concern (BCC) only in particular Bird Conservation Regions (BCRs) in the continental USA | Breeds Apr 1 to Aug 31 |
| Bald Eagle  Haliaeetus leucocephalus<br>This is not a Bird of Conservation Concern (BCC) in this area, but warrants attention because of the Eagle Act or for potential susceptibilities in offshore areas from certain types of development or activities.<br>https://ecos.fws.gov/ecp/species/1626 | Breeds Sep 1 to Jul 31 |

FDACS0000034
SHARFIEXPERTS0000365

Common Ground-dove  Columbina passerina exigua                  Breeds Feb 1 to Dec 31
   This is a Bird of Conservation Concern (BCC) only in particular Bird
   Conservation Regions (BCRs) in the continental USA

Limpkin  Aramus guarauna                                        Breeds Jan 15 to Aug 31
   This is a Bird of Conservation Concern (BCC) throughout its range in
   the continental USA and Alaska.

Prairie Warbler  Dendroica discolor                             Breeds May 1 to Jul 31
   This is a Bird of Conservation Concern (BCC) throughout its range in
   the continental USA and Alaska.

Swallow-tailed Kite  Elanoides forficatus                       Breeds Mar 10 to Jun 30
   This is a Bird of Conservation Concern (BCC) throughout its range in
   the continental USA and Alaska.
   https://ecos.fws.gov/ecp/species/8938

Yellow Warbler  Dendroica petechia gundlachi                    Breeds May 20 to Aug 10
   This is a Bird of Conservation Concern (BCC) only in particular Bird
   Conservation Regions (BCRs) in the continental USA

# Probability of Presence Summary

The graphs below provide our best understanding of when birds of concern are most likely to be present in your project area. This information can be used to tailor and schedule your project activities to avoid or minimize impacts to birds. Please make sure you read and understand the FAQ "Proper Interpretation and Use of Your Migratory Bird Report" before using or attempting to interpret this report.

### Probability of Presence (■)

Each green bar represents the bird's relative probability of presence in the 10km grid cell(s) your project overlaps during a particular week of the year. (A year is represented as 12 4-week months.) A taller bar indicates a higher probability of species presence. The survey effort (see below) can be used to establish a level of confidence in the presence score. One can have higher confidence in the presence score if the corresponding survey effort is also high.

How is the probability of presence score calculated? The calculation is done in three steps:

1. The probability of presence for each week is calculated as the number of survey events in the week where the species was detected divided by the total number of survey events for that week. For example, if in week 12 there were 20 survey events and the Spotted Towhee was found in 5 of them, the probability of presence of the Spotted Towhee in week 12 is 0.25.
2. To properly present the pattern of presence across the year, the relative probability of presence is calculated. This is the probability of presence divided by the maximum probability of presence across all weeks. For example, imagine the probability of presence in week 20 for the Spotted Towhee is 0.05, and that the probability of presence at week 12 (0.25) is the maximum of any week of the year. The relative probability of presence on week 12 is 0.25/0.25 = 1; at week 20 it is 0.05/0.25 = 0.2.

FDACS0000035
SHARFIEXPERTS0000366

2/26/2020                                        IPaC: Explore Location

3. The relative probability of presence calculated in the previous step undergoes a statistical conversion so that all possible values fall between 0 and 10, inclusive. This is the probability of presence score.

To see a bar's probability of presence score, simply hover your mouse cursor over the bar.

### Breeding Season (●)
Yellow bars denote a very liberal estimate of the time-frame inside which the bird breeds across its entire range. If there are no yellow bars shown for a bird, it does not breed in your project area.

### Survey Effort (|)
Vertical black lines superimposed on probability of presence bars indicate the number of surveys performed for that species in the 10km grid cell(s) your project area overlaps. The number of surveys is expressed as a range, for example, 33 to 64 surveys.

To see a bar's survey effort range, simply hover your mouse cursor over the bar.

### No Data (—)
A week is marked as having no data if there were no survey events for that week.

### Survey Timeframe
Surveys from only the last 10 years are used in order to ensure delivery of currently relevant information. The exception to this is areas off the Atlantic coast, where bird returns are based on all years of available data, since data in these areas is currently much more sparse.



https://ecos.fws.gov/ipac/location/WXEKG5L7BNA7NHS2CX3A2DHFFQ/resources

FDACS0000036
SHARFIEXPERTS0000367

2/26/2020
IPaC: Explore Location



**Limpkin**
BCC Rangewide
(CON) (This is a Bird
of Conservation
Concern (BCC)
throughout its range
in the continental
USA and Alaska.)

**Prairie Warbler**
BCC Rangewide
(CON) (This is a Bird
of Conservation
Concern (BCC)
throughout its range
in the continental
USA and Alaska.)

**Swallow-tailed Kite**
BCC Rangewide
(CON) (This is a Bird
of Conservation
Concern (BCC)
throughout its range
in the continental
USA and Alaska.)

**Yellow Warbler**
BCC - BCR (This is a
Bird of Conservation
Concern (BCC) only in
particular Bird
Conservation Regions
(BCRs) in the
continental USA)

**Tell me more about conservation measures I can implement to avoid or minimize impacts to migratory birds.**

Nationwide Conservation Measures describes measures that can help avoid and minimize impacts to all birds at any location year round. Implementation of these measures is particularly important when birds are most likely to occur in the project area. When birds may be breeding in the area, identifying the locations of any active nests and avoiding their destruction is a very helpful impact minimization measure. To see when birds are most likely to occur and be breeding in your project area, view the Probability of Presence Summary. Additional measures and/or permits may be advisable depending on the type of activity you are conducting and the type of infrastructure or bird species present on your project site.

**What does IPaC use to generate the migratory birds potentially occurring in my specified location?**

The Migratory Bird Resource List is comprised of USFWS Birds of Conservation Concern (BCC) and other species that may warrant special attention in your project location.

The migratory bird list generated for your project is derived from data provided by the Avian Knowledge Network (AKN). The AKN data is based on a growing collection of survey, banding, and citizen science datasets and is queried and filtered to return a list of those birds reported as occurring in the 10km grid cell(s) which your project intersects, and that have been identified as warranting special attention because they are a BCC species in that area, an eagle (Eagle Act requirements may apply), or a species that has a particular vulnerability to offshore activities or development.

Again, the Migratory Bird Resource list includes only a subset of birds that may occur in your project area. It is not representative of all birds that may occur in your project area. To get a list of all birds potentially present in your project area, please visit the AKN Phenology Tool.

**What does IPaC use to generate the probability of presence graphs for the migratory birds potentially occurring in my specified location?**

FDACS0000037
SHARFIEXPERTS0000368

The probability of presence graphs associated with your migratory bird list are based on data provided by the
Avian Knowledge Network (AKN). This data is derived from a growing collection of survey, banding, and citizen
science datasets .

Probability of presence data is continuously being updated as new and better information becomes available. To
learn more about how the probability of presence graphs are produced and how to interpret them, go the
Probability of Presence Summary and then click on the "Tell me about these graphs" link.

### How do I know if a bird is breeding, wintering, migrating or present year-round in my project area?

To see what part of a particular bird's range your project area falls within (i.e. breeding, wintering, migrating or
year-round), you may refer to the following resources: The Cornell Lab of Ornithology All About Birds Bird Guide, or
(if you are unsuccessful in locating the bird of interest there), the Cornell Lab of Ornithology Neotropical Birds
guide. If a bird on your migratory bird species list has a breeding season associated with it, if that bird does occur
in your project area, there may be nests present at some point within the timeframe specified. If "Breeds
elsewhere" is indicated, then the bird likely does not breed in your project area.

### What are the levels of concern for migratory birds?

Migratory birds delivered through IPaC fall into the following distinct categories of concern:

1. "BCC Rangewide" birds are Birds of Conservation Concern (BCC) that are of concern throughout their range
   anywhere within the USA (including Hawaii, the Pacific Islands, Puerto Rico, and the Virgin Islands);
2. "BCC - BCR" birds are BCCs that are of concern only in particular Bird Conservation Regions (BCRs) in the
   continental USA; and
3. "Non-BCC - Vulnerable" birds are not BCC species in your project area, but appear on your list either because
   of the Eagle Act requirements (for eagles) or (for non-eagles) potential susceptibilities in offshore areas from
   certain types of development or activities (e.g. offshore energy development or longline fishing).

Although it is important to try to avoid and minimize impacts to all birds, efforts should be made, in particular, to
avoid and minimize impacts to the birds on this list, especially eagles and BCC species of rangewide concern. For
more information on conservation measures you can implement to help avoid and minimize migratory bird
impacts and requirements for eagles, please see the FAQs for these topics.

### Details about birds that are potentially affected by offshore projects

For additional details about the relative occurrence and abundance of both individual bird species and groups of
bird species within your project area off the Atlantic Coast, please visit the Northeast Ocean Data Portal. The Portal
also offers data and information about other taxa besides birds that may be helpful to you in your project review.
Alternately, you may download the bird model results files underlying the portal maps through the NOAA NCCOS
Integrative Statistical Modeling and Predictive Mapping of Marine Bird Distributions and Abundance on the Atlantic
Outer Continental Shelf project webpage.

Bird tracking data can also provide additional details about occurrence and habitat use throughout the year,
including migration. Models relying on survey data may not include this information. For additional information on
marine bird tracking data, see the Diving Bird Study and the nanotag studies or contact Caleb Spiegel or Pam
Loring.

### What if I have eagles on my list?

If your project has the potential to disturb or kill eagles, you may need to obtain a permit to avoid violating the
Eagle Act should such impacts occur.

### Proper Interpretation and Use of Your Migratory Bird Report

FDACS0000038
SHARFIEXPERTS0000369

The migratory bird list generated is not a list of all birds in your project area, only a subset of birds of priority concern. To learn more about how your list is generated, and see options for identifying what other birds may be in your project area, please see the FAQ "What does IPaC use to generate the migratory birds potentially occurring in my specified location". Please be aware this report provides the "probability of presence" of birds within the 10 km grid cell(s) that overlap your project; not your exact project footprint. On the graphs provided, please also look carefully at the survey effort (indicated by the black vertical bar) and for the existence of the "no data" indicator (a red horizontal bar). A high survey effort is the key component. If the survey effort is high, then the probability of presence score can be viewed as more dependable. In contrast, a low survey effort bar or no data bar means a lack of data and, therefore, a lack of certainty about presence of the species. This list is not perfect; it is simply a starting point for identifying what birds of concern have the potential to be in your project area, when they might be there, and if they might be breeding (which means nests might be present). The list helps you know what to look for to confirm presence, and helps guide you in knowing when to implement conservation measures to avoid or minimize potential impacts from your project activities, should presence be confirmed. To learn more about conservation measures, visit the FAQ "Tell me about conservation measures I can implement to avoid or minimize impacts to migratory birds" at the bottom of your migratory bird trust resources page.

# Facilities

## National Wildlife Refuge lands

Any activity proposed on lands managed by the National Wildlife Refuge system must undergo a 'Compatibility Determination' conducted by the Refuge. Please contact the individual Refuges to discuss any questions or concerns.

THERE ARE NO REFUGE LANDS AT THIS LOCATION.

## Fish hatcheries

THERE ARE NO FISH HATCHERIES AT THIS LOCATION.

# Wetlands in the National Wetlands Inventory

Impacts to NWI wetlands and other aquatic habitats may be subject to regulation under Section 404 of the Clean Water Act, or other State/Federal statutes.

For more information please contact the Regulatory Program of the local U.S. Army Corps of Engineers District.

WETLAND INFORMATION IS NOT AVAILABLE AT THIS TIME
This can happen when the National Wetlands Inventory (NWI) map service is unavailable, or for very large projects that intersect many wetland areas. Try again, or visit the NWI map to view wetlands at this location.

FDACS0000039
SHARFIEXPERTS0000370

2/26/2020                                                                iPaC: Explore Location

## Data limitations

The Service's objective of mapping wetlands and deepwater habitats is to produce reconnaissance level information on the location, type and size of these resources. The maps are prepared from the analysis of high altitude imagery. Wetlands are identified based on vegetation, visible hydrology and geography. A margin of error is inherent in the use of imagery; thus, detailed on-the-ground inspection of any particular site may result in revision of the wetland boundaries or classification established through image analysis.

The accuracy of image interpretation depends on the quality of the imagery, the experience of the image analysts, the amount and quality of the collateral data and the amount of ground truth verification work conducted. Metadata should be consulted to determine the date of the source imagery used and any mapping problems.

Wetlands or other mapped features may have changed since the date of the imagery or field work. There may be occasional differences in polygon boundaries or classifications between the information depicted on the map and the actual conditions on site.

## Data exclusions

Certain wetland habitats are excluded from the National mapping program because of the limitations of aerial imagery as the primary data source used to detect wetlands. These habitats include seagrasses or submerged aquatic vegetation that are found in the intertidal and subtidal zones of estuaries and nearshore coastal waters. Some deepwater reef communities (coral or tuberficid worm reefs) have also been excluded from the inventory. These habitats, because of their depth, go undetected by aerial imagery.

## Data precautions

Federal, state, and local regulatory agencies with jurisdiction over wetlands may define and describe wetlands in a different manner than that used in this inventory. There is no attempt, in either the design or products of this inventory, to define the limits of proprietary jurisdiction of any Federal, state, or local government or to establish the geographical scope of the regulatory programs of government agencies. Persons intending to engage in activities involving modifications within or adjacent to wetland areas should seek the advice of appropriate federal, state, or local agencies concerning specified agency regulatory programs and proprietary jurisdictions that may affect such activities.

NOT FOR CONSULTATION

FDACS0000040

SHARFIEXPERTS0000371

APPENDIX 8

UNITED STATES OF AMERICA, PLAINTIFF-APPELLEE-CROSS APPELLANT

V.

CHARLES BARRY ROBISON, DEFENDANT, MCWANE, INC., DEFENDANT-APPELLANT, JAMES DELK, MICHAEL DEVINE, DEFFENDANTS-APPELLANTS-CROSS APPELLEES

(CASE NO. 05-17019)

129048180.1

SHARFIEXPERTS0000372

U.S. v. Robison, 505 F.3d 1208 (2007)

65 ERC 1385, 21 Fla. L. Weekly Fed. C 96

505 F.3d 1208
United States Court of Appeals,
Eleventh Circuit.

UNITED STATES of America,
Plaintiff–Appellee–Cross–Appellant,

v.

Charles Barry ROBISON, Defendant,
McWane, Inc., Defendant–Appellant,
James Delk, Michael Devine, Defendants–
Appellants–Cross–Appellees.

No. 05–17019.
|
Oct. 24, 2007.

**Synopsis**

**Background:** Defendants were convicted in the United States
District Court for the Northern District of Alabama, No.
04-00199-CR-RBP-RRA, Robert B. Propst, J., for their roles
in a Clean Water Act (CWA) conspiracy, as well as substantive
violations of the CWA. Defendants appealed.

**Holdings:** The Court of Appeals, Hull, Circuit Judge, held
that:

[1] water can only be "navigable" under the CWA if it
possesses a significant nexus to waters that are or were
navigable in fact;

[2] district court's erroneous instruction that a continuous or
intermittent flow into a navigable-in-fact body of water would
be sufficient to bring creek within the reach of the CWA was
not harmless error;

[3] remand for new criminal trial, as opposed to judgments
of acquittal, was appropriate remedy for district court's
erroneous definition of "navigable water;" and

[4] evidence was insufficient to sustain conviction for making
a false statement to the Environmental Protection Agency
(EPA).

Reversed, vacated, and remanded.

West Headnotes (10)

[1]  **Courts** ← Number of judges concurring in
opinion, and opinion by divided court

Under *Rapanos v. United States*, a fractured
opinion from the Supreme Court, test set forth
by Justice Kennedy in a concurring opinion
for the definition of navigable waters under the
Clean Water Act (CWA), specifically, that water
can only be "navigable" under the CWA if it
possesses a significant nexus to waters that are or
were navigable in fact or that could reasonably
be so was the least far-reaching, and thus the
controlling rule of the case. Clean Water Act,
§§ 301(a), 502(7, 12), 33 U.S.C.A. §§ 1311(a),
1362(7, 12).

44 Cases that cite this headnote

[2]  **Courts** ← Number of judges concurring in
opinion, and opinion by divided court

When a fragmented Supreme Court decides a
case and no single rationale explaining the result
enjoys the assent of five Justices, the holding
may be viewed as that position taken by those
Members who concurred in the judgments on the
narrowest grounds.

17 Cases that cite this headnote

[3]  **Environmental Law** ← Waters protected

A water can be considered "navigable" under the
Clean Water Act (CWA) only if it possesses a
"significant nexus" to waters that are or were
navigable in fact or that could reasonably be so
made. Clean Water Act, § 502(7), 33 U.S.C.A. §
1362(7).

21 Cases that cite this headnote

[4]  **Environmental Law** ← Instructions

In criminal proceedings brought pursuant to
the Clean Water Act (CWA), district court's
instruction that a continuous or intermittent flow
into a navigable-in-fact body of water would
be sufficient to bring creek within the reach of

SHARFIEXPERTS0000373

**U.S. v. Robison, 505 F.3d 1208 (2007)**

65 ERC 1385, 21 Fla. L. Weekly Fed. C 96

the CWA did not satisfy governing "significant nexus" test and was erroneous. Clean Water Act. § 502(7), 33 U.S.C.A. § 1362(7).

7 Cases that cite this headnote

[5]  **Criminal Law**  Elements and incidents of offense; definitions

**Criminal Law**  Remand for Determination or Reconsideration of Particular Matters

District court's erroneous instruction that a continuous or intermittent flow into a navigable-in-fact body of water would be sufficient to bring creek within the reach of the Clean Water Act (CWA) was not harmless error, requiring remand in criminal proceedings brought pursuant to the CWA; although expert testified that in his opinion there was a continuous uninterrupted flow between the creek in question and river that was navigable-in-fact water, he did not testify as to any "significant nexus" between creek and the river and the government did not present any evidence about the possible chemical, physical, or biological effect that the creek may have on the river, and, there was also no evidence presented of any actual harm suffered by the river. Clean Water Act, §§ 301(a), 502(7, 12), 33 U.S.C.A. §§ 1311(a), 1362(7, 12).

8 Cases that cite this headnote

[6]  **Criminal Law**  Remand for Determination or Reconsideration of Particular Matters

Remand for a new trial is the appropriate remedy where any insufficiency of evidence is accompanied by trial court error whose effect may have been to deprive the Government of an opportunity or incentive to present evidence that might have supplied the deficiency.

5 Cases that cite this headnote

[7]  **Criminal Law**  Elements and incidents of offense; definitions

**Criminal Law**  Remand for Determination or Reconsideration of Particular Matters

Remand for new criminal trial, as opposed to judgments of acquittal, was appropriate

remedy for district court's erroneous definition of "navigable water" in criminal proceedings brought pursuant to the Clean Water Act (CWA); the district court erroneously defined "navigable water" and made it clear to the parties far in advance of trial that it would continue to use its erroneous definition throughout the case, and, that decision deprived the government of any incentive to present evidence that might have cured any resulting insufficiency. Clean Water Act, §§ 301(a), 502(7, 12), 33 U.S.C.A. §§ 1311(a), 1362(7, 12).

2 Cases that cite this headnote

[8]  **Criminal Law**  Review De Novo

**Criminal Law**  Amendments and rulings as to indictment or pleas

Denials of motions to dismiss the indictment are reviewed for abuse of discretion, but underlying legal errors, including due process claims, are reviewed *de novo*. U.S.C.A. Const.Amend. 5.

8 Cases that cite this headnote

[9]  **Constitutional Law**  Form, requisites, and sufficiency

**Indictments and Charging Instruments**  Conspiracy, racketeering, and money laundering

District court's conduct in striking three of four objects of Clean Water Act (CWA) conspiracy from the indictment at the close of the government's case did not deprive defendants of the due process right to a fair trial; the four objects of the CWA conspiracy were legally proper under prevailing law, and the district court simply determined that the evidence did not support the objects that were ultimately struck, and moreover, the district court stated that substantially all of the evidence relating to the stricken objects of the conspiracy also related to the CWA discharges, and defendants failed to establish that the district court abused its discretion in that evidentiary ruling. U.S.C.A. Const.Amend. 14; Clean Water Act, §§ 301(a), 502(7, 12), 33 U.S.C.A. §§ 1311(a), 1362(7, 12).

SHARFIEXPERTS0000374

U.S. v. Robison, 505 F.3d 1208 (2007)

65 ERC 1385, 21 Fla. L. Weekly Fed. C 96

**[10]    Environmental Law** ← Weight and
sufficiency

Evidence was insufficient to establish that
management representative of defendant
manufacturer in proceedings brought pursuant
to the Clean Water Act (CWA) actually
knew the contents of particular inspection
reports accompanying his certifications to the
Environmental Protection Agency (EPA) or that
representative actually knew that those particular
inspection reports contained false information, as
required to sustain conviction for making a false
statement to the EPA: the representative certified
that other qualified persons had prepared the
documents and advised him of the documents'
accuracy but did not indicate that he had
reviewed the documents or was vouching for the
documents' accuracy, rather, he only certified,
and only had to certify, that others had prepared
the documents, and that based on his inquiry
of those who prepared the documents, the
documents were accurate to the best of his
knowledge. 18 U.S.C.A. § 1001; Clean Water
Act, §§ 301(a), 502(7, 12), 33 U.S.C.A. §§
1311(a), 1362(7, 12).

**Attorneys and Law Firms**

**\*1210** David E. Roth, Jack W. Selden, Bradley, Arant, Rose
& White, LLP, G. Douglas Jones, Watley, Drake & Kallas,
LLP, Christopher James Williams, John Alan Truitt, Fournier
J. Gale, III, Maynard, Cooper & Gale, P.C., Birmingham,
AL, Miguel A. Estrada, Daviid Debold, Gibson, Dunn &
Crutcher, LLP, Washington, DC, Lawrence S. Lustberg,
Kevin McNulty, Gibbons, Del Deo, Dolan, Griffinger &
Vecchione, Newark, NJ, Henry J. DePippo, Nixon Peabody,
LLP, Rochester, NY, for Defendants.

Joyce White Vance, Birmingham, AL, Todd S. Aagaard, U.S.
Dept. of Justice, Washington, DC, for U.S.

Appeals from the United States District Court for the
Northern District of Alabama.

Before EDMONDSON, Chief Judge, HULL, Circuit Judge,
and FORRESTER. \* District Judge.

\*      Honorable J. Owen Forrester, United States District
Judge for the Northern District of Georgia, sitting
by designation.

**Opinion**

**\*1211** HULL, Circuit Judge:

Defendants McWane, Inc. ("McWane"), James Delk
("Delk"), and Michael Devine ("Devine") appeal their
convictions for their roles in a Clean Water Act ("CWA")
conspiracy (Count 1), as well as their convictions for
substantive violations of the CWA (Counts 2, 3, 5, 7–19,
21, and 22).[1] After the defendants' convictions, the United
States Supreme Court addressed how to define "navigable
waters" under the CWA in *Rapanos v. United States*, 547 U.S.
715, 126 S.Ct. 2208, 165 L.Ed.2d 159 (2006). The definition
of "navigable waters" in the jury charge in this case was
erroneous under *Rapanos*, and the government has not shown
that the error was harmless. Accordingly, we must vacate
defendants' CWA convictions and remand the case for a new
trial.

1       Counts 12–19, 21, and 22 of the superseding
indictment only charged McWane and Delk, while
Counts 2, 3, 5, and 7–11 charged McWane, Delk,
and Devine. Before the case was submitted to the
jury, the government dismissed Count 11 as to
Devine.

McWane also appeals its conviction for making a false
statement to the Environmental Protection Agency ("EPA")
(Count 24).[2] Because McWane was entitled to a judgment of
acquittal on that charge, we vacate McWane's conviction on
Count 24 as well.

2       Count 24—the false statement count in the
superseding indictment—was ultimately submitted
to the jury as Count 23. For consistency, we refer
to the false statement count throughout this opinion
as "Count 24."

**I. BACKGROUND**

*A. Defendants*
Defendant McWane is a large manufacturer of cast iron pipe,
flanges, valves, and fire hydrants. McWane has numerous

SHARFIEXPERTS0000375

Case 2:21-cv-14205-KAM Document 111-9 Entered on FLSD Docket 08/10/2022 Page 277 of 302

manufacturing plants. This case concerns McWane's plant in Birmingham, Alabama (hereinafter "the plant" or "McWane's plant").

Defendants Delk and Devine, along with Charles "Barry" Robison and Donald Harbin, worked in management positions at McWane's plant at all relevant times.

Robison was McWane's Vice President of Environmental Affairs. Defendant Delk was the General Manager of the plant. Defendant Devine was the Plant Manager, and he reported to defendant Delk. Harbin was the Maintenance Manager, and he reported to defendant Devine.[3]

[3]    When defendant Delk was hired as the General Manager—in 1998—Harbin was the Plant Manager. Defendant Delk demoted Harbin to the Maintenance Manager and hired defendant Devine to replace Harbin as the Plant Manager.

### B. Avondale Creek

The CWA violations at issue involve McWane's discharge of pollutants into Avondale Creek, which is adjacent to McWane's plant.

Avondale Creek flows into another creek called Village Creek. In turn, Village Creek flows approximately twenty-eight miles into and through Bayview Lake, which was created by damming Village Creek. On the other side of Bayview Lake, Village Creek becomes Locust Fork, and Locust Fork flows approximately twenty miles out of Bayview Lake before it flows into the Black Warrior River.

At trial, the government presented testimony, *inter alia*, from an EPA investigator (Fritz Wagoner) that Avondale Creek is a perennial stream with a "continuous uninterrupted flow" into Village Creek. Wagoner testified that there is "a continuous uninterrupted flow" not only from *1212 Avondale Creek into Village Creek, but also from Village Creek through Bayview Lake and into Locust Fork, and ultimately into the Black Warrior River.

On cross-examination, Wagoner admitted that he did not conduct a "tracer test" to check the flow of Avondale Creek into the Black Warrior River. Wagoner explained that a "tracer test" is a procedure whereby a "concentrated dye" is put into a body of water and tracked to determine "where that water body flows." Wagoner conducted no tests to measure the volume of water discharged from Avondale Creek or between

the bodies of water that connect Avondale Creek and the Black Warrior River. He conceded that the water level in Avondale Creek was so low that he was able to walk through Avondale Creek all the way down to its intersection with Village Creek. Furthermore, Wagoner testified that Village Creek is dammed (creating Bayview Lake) and that the dam runs "all the way across Village Creek." Wagoner's only site visit was in April 2005. This was more than four years after the violations at issue in this case.

The government presented no evidence, through Wagoner or otherwise, of the chemical, physical, or biological effect that Avondale Creek's waters had or might have had on the Black Warrior River. Indeed, the district court observed that there was no evidence of any actual harm or injury to the Black Warrior River.

### C. Defendants' conduct

McWane's plant manufactures eighteen-foot and twenty-foot lengths of pipe. McWane utilizes a great deal of water in its pipe manufacturing processes. The water that runs out of the pipe manufacturing machines is generally referred to as "process wastewater." The evidence at trial established that process wastewater accumulated in large amounts in basements under McWane's "eighteen-foot machine" and "twenty-foot machine." The process wastewater contained various contaminants, including hydraulic oil, excess iron, and trash.

The CWA authorizes the EPA, and states with programs approved by the EPA, to issue permits for the discharge of pollutants, in compliance with the National Pollutant Discharge Elimination Systems ("NPDES"). These permits are known as NPDES permits. The Alabama Department of Environmental Management ("ADEM") administers the NPDES program in Alabama.

McWane obtained an NPDES permit from ADEM that authorized McWane to discharge some process wastewater. Specifically, McWane's NPDES permit allowed it to discharge some treated process wastewater into Avondale Creek, but only from one discharge point at the plant ("DSN001"), and only if other discharge limits and bookkeeping requirements were met. McWane's NPDES permit also allowed it to discharge "storm water runoff from industrial activity" from other discharge points at the plant ("DSN002" through "DSN020"). McWane, however, was not permitted to discharge process wastewater from any point at the plant other than DSN001.

SHARFIEXPERTS0000376

U.S. v. Robison, 505 F.3d 1208 (2007)

65 ERC 1385, 21 Fla. L. Weekly Fed. C 96

At trial, the government established that McWane discharged process wastewater into Avondale Creek from discharge points other than DSN001, in violation of the express provisions of its NPDES permit. Numerous former McWane employees testified that the plant was in disarray by the late 1990s and that process wastewater was all over the plant. Process wastewater overflowed on a regular basis when it was pumped from the eighteen-foot machine and twenty-foot machine basements. The process wastewater would then spill into the storm water runoff discharge *1213 points (DSN002–DSN020) and flow into Avondale Creek.

One McWane employee described the extent of the process wastewater discharges as "[e]nough to drown a small village." Indeed, multiple witnesses testified that process wastewater from McWane's plant was regularly discharged into Avondale Creek. Harbin, for instance, testified that between May 1999 and January 2001, process wastewater was discharged into storm drains fifteen out of every twenty operating days per month. Other witnesses testified that the plant's basements were pumped (which led to the corresponding noncompliant wastewater discharge) every Friday night.

McWane's NPDES permit listed defendant Delk as one of two people with the authority and responsibility to prevent and abate violations of ADEM's regulations. Trial testimony established that defendant Delk was "everybody's boss" at the plant, and that on multiple occasions, defendant Delk ordered McWane employees to pump process wastewater from the basements, despite knowing that the wastewater had nowhere to go but Avondale Creek. Further testimony established that defendant Delk watched as wastewater spilled or was pumped into the center courtyard of the plant, and that Delk once instructed Harbin to falsify a water sample for inspectors.

Likewise, defendant Devine also ordered McWane employees to violate the NPDES permit. One former employee, Troy Venable, testified that he overheard a conversation between defendant Devine and a McWane maintenance foreman in which Devine said that it would be "easier" for McWane to pay off its fines rather than to pay $70,000 to fix one of the sources of the problem. There was also testimony about two separate incidents in which defendant Devine ordered that excess process wastewater be pumped from the basements despite there being no appropriate place to put the water, and told employees that he did not care how the water got out of the plant as long as it was gone.

Additionally, McWane's former safety and personnel director, John Walsh, testified that on one occasion, an ADEM inspector came to inquire about pollutant discharges from the storm water discharge runoff points. According to Walsh, defendant Devine directed him to lie to the ADEM inspector and tell the inspector that the cause of the discharges was McWane's test-flushing of fire hydrants. Walsh testified that he complied with defendant Devine's instructions because he "was told to" and feared that if he did not, he would lose his job.

The EPA inspected the plant in April 2000, and subsequently required McWane to submit plant inspection reports and other documents concerning the plant. McWane responded with two separate document productions, on August 17, 2000, and September 15, 2000. The document productions were accompanied by certifications signed by Robison.

### D. Indictment

In May 2004, a twenty-five count indictment was issued against McWane, Delk, Devine, Robison, and Donald Bills (the plant engineer). The indictment was superseded in July 2004.

Count 1 of the superseding indictment alleged that defendants McWane, Delk, Devine, Robison, and Bills conspired: (1) to knowingly discharge pollutants into the waters of the United States in violation of McWane's NPDES permit and the CWA; (2) to defraud the United States; (3) to knowingly and willfully make false statements; and (4) to obstruct justice. Counts 2–11 alleged that defendants McWane, *1214 Delk, and Devine knowingly caused discharges of pollutants from a storm water outfall (DSN002) into Avondale Creek in each month from May 1999 through February 2000, in violation of McWane's NPDES permit and the CWA. Counts 12–22 accused McWane and Delk (but not Devine) of similar NPDES and CWA violations from March 2000 through January 2001.

Count 23 alleged that McWane, Delk, and Devine knowingly caused discharges of pollutants from the wastewater outfall (DSN001) on May 26, 1999, in violation of the maximum limits allowed by McWane's NPDES permit and the CWA. Count 24 charged McWane and Robison with making false statements to the EPA on or about August 17, 2000, and September 15, 2000. Finally, Count 25 alleged that McWane obstructed justice by providing false and misleading information to the EPA regarding its discharge of wastewater.

SHARFIEXPERTS0000377

**U.S. v. Robison, 505 F.3d 1208 (2007)**

65 ERC 1385, 21 Fla. L. Weekly Fed. C 96

#### E. Trial

A jury trial was held in May and June 2005. At the close of the government's evidence, the district court: (1) dismissed Bills from the case;[4] (2) dismissed Robison from Count 1 (conspiracy), leaving Robison only in Count 24; (3) struck three of the four objects of the conspiracy in Count 1, leaving the sole object of the conspiracy as the knowing discharge of pollutants into the waters of the United States in violation of the NPDES permit and the CWA; and (4) dismissed Counts 23 and 25 in their entirety.

[4]     Bills is not a party to this appeal.

On June 10, 2005, the jury returned guilty verdicts on all remaining counts except Counts 4, 6, and 20. All three appellants here, McWane, Delk, and Devine, were convicted of conspiracy to violate the CWA (Count 1), as well as multiple substantive violations of the CWA. McWane, Delk, and Devine were convicted on Counts 2, 3, 5, and 7–10, and McWane and Delk were also convicted on Counts 11–19, 21, and 22. Additionally, McWane and Robison were convicted of making a false statement to the EPA (Count 24).[5]

[5]     Robison is no longer a party to this appeal. Robison initially filed a notice of appeal in this case, but he dismissed his appeal here as part of his resolution of a separate criminal case in Utah involving McWane's violations of the Clean Air Act. *See United States v. McWane, Inc.*, No. 2:05–cr–00811 (D.Utah Feb. 8, 2006).

#### F. Sentences

On December 5, 2005, the district court sentenced the defendants.

The district court sentenced: (1) Delk to 36 months' probation (including 6 months of nighttime home detention), and a fine of $90,000;[6] (2) Devine to 24 months' probation (including 3 months of nighttime home detention), and a fine of $35,000;[7] and (3) McWane to 60 months' probation and a fine of $5 million.[8]

[6]     Defendant Delk's base offense level was 6. After a 4–level enhancement for Delk's leader/organizer role in the offense and other adjustments, the district court calculated Delk's total offense level to be 16. With a criminal history category of

I, Delk's advisory guidelines range was 21–27 months' imprisonment.

[7]     Defendant Devine's base offense level was 6. After a 3–level enhancement for Devine's manager/supervisor role in the offense and other adjustments, the district court calculated Devine's total offense level to be 15. With a criminal history category of I, Devine's advisory guidelines range was 18–24 months' imprisonment.

[8]     The government cross-appeals the sentences of Delk and Devine. Additionally, Delk and Devine attempt to raise a sentencing issue in their response briefs to the government's cross-appeal. Because we vacate Delk's and Devine's convictions, we do not address any of the parties' sentencing arguments and dismiss the government's cross-appeal without prejudice.

#### *1215 II. DISCUSSION

The parties' disagreement as to what constitutes a "navigable water" under the CWA is at the heart of this appeal.

#### A. Jury instruction on "navigable waters"

The CWA generally prohibits the discharge of pollutants into "navigable waters." *See* 33 U.S.C. §§ 1311(a), 1362(12). Under the CWA, "navigable waters" are defined as "the waters of the United States, including the territorial seas." *Id.* § 1362(7). The parties agree that the definition of "navigable waters" is a key element of the CWA criminal offenses in this case.

Based on the Supreme Court's *Rapanos* decision, defendants contend that Avondale Creek is not a "navigable water" within the meaning of the CWA, and that the district court erroneously instructed the jury as to the definition of the term "navigable waters." The government responds that Avondale Creek's connection with the Black Warrior River and/or Village Creek renders Avondale Creek a "navigable water" within the meaning of the CWA.[9]

[9]     We review the legal correctness of the district court's "navigable waters" jury instruction *de novo*. *United States v. Prather*, 205 F.3d 1265, 1270 (11th Cir.2000). We reject the government's argument that defendants failed to properly

SHARFIEXPERTS0000378

preserve an objection to the "navigable waters" jury instruction. Defendants repeatedly made clear to the district court their position as to the appropriate definition of a "navigable water" under the CWA. *See Farley v. Nationwide Mut. Ins. Co.,* 197 F.3d 1322, 1329 (11th Cir.1999). Thus, our review is *de novo,* not for plain error. Under *de novo* review, if we determine that there was error, we still must consider whether the government has carried its burden to show that the error was harmless. *See* Fed.R.Crim.P. 52(a).

The problem in this case arises because the district court charged the jury that "navigable waters" include "any stream which may eventually flow into a navigable stream or river," and that such stream may be man-made and flow "only intermittently," as follows:

> As to Counts 2 through 22, a "water of the United States" includes any stream which may eventually flow into a navigable stream or river. The Government does not have to prove that the stream into which the discharge is made is itself navigable in fact. What it must prove is that the stream into which the discharge is made may eventually flow directly or indirectly into a navigable stream or river. *The stream into which the discharge is made may be a natural or manmade [stream] and may flow continuously or only intermittently, as long as it may eventually flow directly or indirectly into a navigable stream or river whose use affects interstate commerce.*
>
> A navigable stream or river is defined as one that is used or is susceptible of being used in its ordinary condition, as a highway for interstate commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water.

(Emphasis added.)

The district court's jury charge was based, *inter alia,* on this Court's decision in *United States v. Eidson,* 108 F.3d 1336 (11th Cir.1997). In *Eidson,* we observed: (1) that Congress chose to define broadly the waters covered by the CWA; (2) that it was "well established that Congress intended to regulate the discharge of pollutants **\*1216** into all waters that may eventually lead to waters affecting interstate commerce"; and (3) that courts repeatedly had recognized that tributaries to waters affecting interstate commerce—even when man-made or intermittently flowing—were subject to the CWA. *Eidson,* 108 F.3d at 1341–42.

However, the defendants' trial occurred before *Rapanos,* and the Supreme Court indicated in *Rapanos* that *Eidson*'s "expansive definition" of " 'tributaries' " is no longer good law. *Rapanos,* 126 S.Ct. at 2217 (plurality opinion) (citing, *inter alia, Eidson,* 108 F.3d at 1340–42). Even the government here tacitly concedes that the jury charge given by the district court in this case was erroneous to some extent in light of *Rapanos. See* Resp. Br. of United States, at 24–25. Nevertheless, the government contends that any error in the jury charge was harmless and does not require reversal.

Accordingly, we consider *Rapanos* in detail in order to determine exactly how and to what extent the district court's "navigable waters" instruction was erroneous. We then consider whether the incorrect jury instruction was harmless error.

*B. Rapanos and the proper definition of "navigable waters"*
In *Rapanos,* which involved two consolidated cases, the Supreme Court addressed how the statutory term "navigable waters" should be construed under the CWA. The consolidated cases involved the discharge of pollutants into four separate wetlands. *See Rapanos,* 126 S.Ct. at 2219 (plurality opinion). The wetlands at issue varied in terms of their precise connections to navigable-in-fact bodies of water, but the wetlands were all "near ditches or man-made drains that eventually empt[ied] into traditional navigable waters." *Id.* In the case of three of the four wetlands, it was "not clear whether the connections between the[ ] wetlands and the nearby drains and ditches [were] continuous or intermittent, or whether the nearby drains and ditches contain[ed] continuous or merely occasional flows of water." *Id.* In the case of the fourth wetland, the ditch running alongside the wetland was "separated from it by a 4–foot–wide man-made berm" that was "largely or entirely impermeable to water." *Id.*

In both cases, the Sixth Circuit concluded that the wetlands were covered by the CWA. *Id.* The Supreme Court consolidated the cases and granted certiorari to decide whether the wetlands actually constituted "waters of the United States" under the CWA. *Id.* at 2220.

The entire Supreme Court agreed that the term "navigable waters" encompasses something more than traditionally "navigable-in-fact" waters. *Id.* at 2220 (plurality opinion); *id.* at 2241 (Kennedy, J., concurring); *id.* at 2255 (Stevens, J., dissenting). However, five Justices concluded that remand was necessary for consideration of whether the wetlands at issue were "navigable waters" covered by the CWA, and

SHARFIEXPERTS0000379

U.S. v. Robison, 505 F.3d 1208 (2007)

65 ERC 1385, 21 Fla. L. Weekly Fed. C 96

whether the EPA and the Army Corps of Engineers had impermissibly extended their regulatory authority under the CWA. *Id.* at 2220 (plurality opinion); *id.* at 2235–36 (Roberts, C.J., concurring); *id.* at 2236, 2241, 2251–52 (Kennedy, J., concurring).

Despite agreeing that the remand was necessary for further consideration of whether the wetlands at issue were covered by the CWA, the five-Justice majority fractured with regard to the proper definition of the term "navigable waters." Justice Scalia wrote for a four-Justice plurality, while Justice Kennedy provided the fifth vote for reversal. Justice Stevens dissented, joined by the remaining three **\*1217** Justices. [10]

[10]  Chief Justice Roberts filed a short separate concurrence but also joined Justice Scalia's plurality opinion, along with Justices Thomas and Alito; Justice Breyer filed a short separate dissent but also joined Justice Stevens's dissenting opinion, along with Justices Souter and Ginsburg. Thus, the three "main" opinions in *Rapanos* are Justice Scalia's plurality opinion (four Justices); Justice Kennedy's concurring opinion (one Justice); and Justice Stevens's dissenting opinion (four Justices).

### 1. Justice Scalia's plurality opinion

Although Justice Scalia's plurality opinion recognized that the statutory term " 'navigable waters' includes something more than traditional navigable waters," the plurality also emphasized that "the qualifier 'navigable' is not devoid of significance." *Id.* at 2220 (plurality opinion). According to the plurality, "navigable waters" include only "relatively permanent, standing or continuously flowing bodies of water 'forming geographic features' that are described in ordinary parlance as 'streams[,] ... oceans, rivers, [and] lakes.' " *Id.* at 2225 (alteration in original) (citation omitted). The plurality emphasized that bodies of water such as streams, oceans, rivers, and lakes (i.e., "navigable waters") are "continuously present, fixed bodies of water, as opposed to ordinarily dry channels through which water occasionally or intermittently flows." *Id.* at 2221.

Moreover, while the plurality was of the view that "relatively continuous flow is a *necessary* condition for qualification as a 'water.' " relatively continuous flow, in and of itself, is "not an *adequate* condition" under the plurality's test. *Id.* at 2223 n. 7.

The plurality also applied its test to the specific wetlands at issue in *Rapanos*. Noting that under prior precedent wetlands

"adjacent to" navigable bodies of water were considered "waters of the United States," the plurality stated that "*only* those wetlands with a *continuous surface connection* to bodies that are 'waters of the United States' in their own right, so that there is no clear demarcation between 'waters' and wetlands, are 'adjacent to' such waters and covered by the Act." *Id.* at 2226 (second emphasis added). "Wetlands with only an intermittent, physically remote hydrologic connection to 'waters of the United States' ... lack the necessary connection to covered waters ...." *Id.* To summarize, the plurality's test for "establishing that wetlands ... are covered by the Act requires two findings: First, that the adjacent channel [to the wetland] contains 'a water of the United States,' (i.e., a relatively permanent body of water connected to traditional interstate navigable waters); and second, that the wetland has a continuous surface connection with that water, making it difficult to determine where the 'water' ends and the 'wetland' begins." *Id.* at 2227 (alteration omitted).

The plurality also noted that although it did not reach the issue, there was "no reason to suppose that [its] construction ... [would] significantly affect [ ] the enforcement" of the CWA, in that "lower courts ... have not characterized intermittent channels as 'waters of the United States.' " *Id.* The plurality observed that "from the time of the CWA's enactment, lower courts have held that the discharge into intermittent channels of any pollutant *that naturally washes downstream* likely violates [the CWA], even if the pollutants discharged ... do not emit 'directly into' covered waters, but pass 'through conveyances' in between." *Id.* (citations omitted).

### 2. Justice Kennedy's concurrence

Justice Kennedy supplied the fifth vote for reversal and agreed with the plurality **\*1218** that the Sixth Circuit had failed to apply the proper test as to what constitutes a "navigable water." *See id.* at 2236 (Kennedy, J., concurring) (stating that the Sixth Circuit "recognized the [proper] test's applicability," but failed to apply it correctly). However, Justice Kennedy disagreed with the plurality over the substance of the proper test.

According to Justice Kennedy, the Supreme Court actually established the test for determining whether a "water or wetland" constitutes a "navigable water" under the CWA five years prior to *Rapanos*, in *Solid Waste Agency of Northern Cook County v. United States Army Corps of Engineers*, 531 U.S. 159, 121 S.Ct. 675, 148 L.Ed.2d 576 (2001) ("*SWANCC*"). *See Rapanos*, 126 S.Ct. at 2236 (Kennedy, J.,

SHARFIEXPERTS0000380

U.S. v. Robison, 505 F.3d 1208 (2007)

65 ERC 1385, 21 Fla. L. Weekly Fed. C 96

concurring). Citing *SWANCC*, Justice Kennedy wrote in his *Rapanos* concurrence that the applicable test for determining whether or not a "water or wetland" is "navigable" is the so-called "significant nexus" test. *See id.* at 2236 (Kennedy, J., concurring) (citing *SWANCC*, 531 U.S. at 167, 172, 121 S.Ct. at 680, 683). In Justice Kennedy's view, a "water or wetland" can only be "navigable" under the CWA if it possesses a "'significant nexus' to waters that are or were navigable in fact or that could reasonably be so made." *Id.* [11]

[11]    In reviewing the Supreme Court's prior precedent, Justice Kennedy also noted: "Taken together these cases establish that in some instances ... the connection between a nonnavigable water or wetland and a navigable water may be so close, or potentially so close, that the Corps may deem the water or wetland a 'navigable water' under the Act. In other instances, as exemplified by *SWANCC*, there may be little or no connection. Absent a significant nexus [in these latter instances], jurisdiction under the Act is lacking. Because neither the plurality or the dissent addresses this separate opinion, in my respectful view, is necessary." *Rapanos*, 126 S.Ct. at 2241 (Kennedy, J., concurring).

Because *Rapanos* was a wetlands case, Justice Kennedy's concurrence then focused on when a wetland meets the "significant nexus" test. A wetland meets the "significant nexus" test if, "either alone or in combination with similarly situated lands in the region, [it] significantly affect[s] the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.'" *Id.* at 2248. "When, in contrast, wetlands' effects on water quality are speculative or insubstantial, they fall outside the zone fairly encompassed by the statutory term 'navigable waters.'" *Id.*

Justice Kennedy also emphasized that a "mere hydrologic connection" between a wetland and a navigable-in-fact body of water would not necessarily be sufficiently substantial to meet his "significant nexus" test. *Id.* at 2250–51. According to Justice Kennedy, a "mere hydrologic connection ... may be too insubstantial for the hydrologic linkage to establish the required nexus with navigable waters as traditionally understood." *Id.* at 2251. Under Justice Kennedy's test, the "required nexus must be assessed in terms of the statute's goals and purposes," which are to "'restore and maintain the chemical, physical, and biological integrity of the Nation's waters.'" *Id.* at 2248 (citation omitted).

*3. Justice Stevens's dissent*

Justice Stevens, writing for himself and three other Justices, would have upheld the Army Corps of Engineers' and EPA's broad interpretation of CWA jurisdiction and concluded that the wetlands at issue in *Rapanos* were "navigable waters," i.e. "waters of the United States." *Id.* at 2252 (Stevens, J., dissenting).

As aptly noted by Chief Justice Roberts in his concurrence, neither Justice Scalia's **\*1219** plurality opinion, Justice Kennedy's concurrence, nor Justice Stevens's dissent "command[ed] a majority of the Court on precisely how to read Congress['s] limits on the reach" of the CWA. *Id.* at 2236 (Roberts, C.J., concurring). In addition, Justice Stevens's dissent noted that "while both the plurality and Justice Kennedy agree that there must be a remand for further proceedings, their respective opinions define different tests to be applied on remand." *Id.* at 2265 (Stevens, J., dissenting).

Justice Stevens's dissent then stated that the four Justices joining his opinion would uphold CWA jurisdiction in all cases in which either the plurality's or Justice Kennedy's test is met, as follows:

> Given that all four Justices who have joined this opinion would uphold the Corps' jurisdiction in both of these cases—and in all other cases in which either the plurality's *or* Justice Kennedy's test is satisfied—on remand each of the judgments should be reinstated if *either* of those tests is met.

*Id.* (first emphasis added).

*C. The governing rule of Rapanos*

Given the various opinions, the parties dispute what constitutes the governing definition of "navigable waters" under *Rapanos*. The defendants argue that only Justice Kennedy's concurrence (i.e., the "significant nexus" test) applies. The government responds that if Avondale Creek can be shown to satisfy *either* the plurality's test or Justice Kennedy's test, that is sufficient to sustain CWA jurisdiction in this case.

SHARFIEXPERTS0000381

U.S. v. Robison, 505 F.3d 1208 (2007)

65 ERC 1385, 21 Fla. L. Weekly Fed. C 96

The circuits likewise are split on the question of which *Rapanos* opinion provides the holding. Both the Seventh and the Ninth Circuits concluded that Justice Kennedy's concurrence controls and adopted the "significant nexus" test. *See N. Cal. River Watch v. City of Healdsburg*, 496 F.3d 993, 999–1000 (9th Cir.2007) ("*River Watch II*"); [12] *United States v. Gerke Excavating, Inc.*, 464 F.3d 723, 724–25 (7th Cir.2006), *cert. denied*, —— U.S. ——, 128 S.Ct. 45, 76 U.S.L.W. 3156, 2007 WL 1035893 (U.S. Oct. 1, 2007) (No. 06–1331). The First Circuit, on the other hand, concluded that because the dissenting *Rapanos* Justices would find jurisdiction under either Justice Scalia's plurality test or Justice Kennedy's "significant nexus" test, " 'the United States may elect to prove jurisdiction under either test.' " *United States v. Johnson*, 467 F.3d 56, 64 (1st Cir.2006) (citation omitted), *cert. denied*, —— U.S. ——, 128 S.Ct. 375, 76 U.S.L.W. 3186, 2007 WL 1999079 (U.S. Oct. 9, 2007) (No. 07–9). Because the Ninth Circuit in *River Watch II* expressly adopted the Seventh Circuit's reasoning in *Gerke*, we review *Gerke* in detail, and then *Johnson*.

[12]  The Ninth Circuit's *River Watch* case resulted in two opinions. In *Northern California River Watch v. City of Healdsburg*, 457 F.3d 1023 (9th Cir.2006) ("*River Watch I*"), the issue was whether a rock quarry pit called "Basalt Pond" was subject to the CWA. Basalt Pond contained wetlands that were adjacent to a navigable-in-fact river. Applying Justice Kennedy's test, the Ninth Circuit concluded that "Basalt Pond and its wetlands possess ... a 'significant nexus' to waters that are navigable in fact, because the Pond waters seep directly into the navigable Russian River." *River Watch I*, 457 F.3d at 1025; *see also S.F. Baykeeper v. Cargill Salt Div.*, 481 F.3d 700, 707 (9th Cir.2007) (stating that Justice Kennedy's *Rapanos* concurrence is "controlling").

Subsequently, in August 2007, the Ninth Circuit withdrew *River Watch I* and substituted an opinion that contained some additional explanation as to why Justice Kennedy's *Rapanos* test was "controlling ... for [the *River Watch*] case" as well as for "almost all cases." *River Watch II*, 496 F.3d at 999–1000.

**\*1220**  In *Gerke*, the Seventh Circuit, faced with a Supreme Court remand "in light of *Rapanos*," addressed which *Rapanos* opinion governed the further stages of the case before it. *Gerke*, 464 F.3d at 724–25. Citing *Marks v. United States*, 430 U.S. 188, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977), the Seventh Circuit first noted that when a majority of the Supreme Court agrees only on the result of a case, lower courts "are to follow the narrowest ground to which a majority of the Justices would have assented if forced to choose." *Gerke*, 464 F.3d at 724. The *Gerke* court explained that it found Justice Kennedy's test to be "narrower (so far as reining in federal authority is concerned) ... in most cases, though not in all ...." *Id.* at 724–25.

In support, the *Gerke* court noted that "[t]he plurality Justices [also] thought that Justice Kennedy's ground for reversing was narrower than their own, because they concluded their extensive and in places harsh criticism of the concurrence by saying that 'Justice Kennedy tips a wink at the agency [i.e., the Corps of Engineers], inviting it to try its same expansive reading again.' " *Id.* at 724 (quoting *Rapanos*, 126 S.Ct. at 2234 n. 15 (plurality opinion)). In that regard, the *Gerke* court observed that Justice Kennedy's concurrence "expressly rejected two 'limitations' imposed by the plurality on federal authority over wetlands" under the CWA. *Id.* (citation omitted).

The *Gerke* court surmised that in some wetlands cases Justice Kennedy would vote against finding CWA jurisdiction due to the lack of a "significant nexus," even when the plurality and the dissenting Justices would vote for CWA jurisdiction due to a "surface-water connection" between "wetlands (however remote)" and "a continuously flowing stream (however small)." *Id.* at 725 (quotation marks and citation omitted). However, the *Gerke* court dismissed such instances as "rare" and concluded that, "as a practical matter," Justice Kennedy's concurrence provides "the least common denominator." *Id.*

In contrast, the First Circuit in *Johnson* determined that it would uphold CWA jurisdiction in those cases in which *either* Justice Scalia's test *or* Justice Kennedy's test was satisfied. *Johnson*, 467 F.3d at 64–65. Since—per Justice Stevens's dissent—the four dissenting Justices in *Rapanos* would vote to uphold CWA jurisdiction whenever either of the two tests were met, the First Circuit reasoned that the "simple and pragmatic" way to determine the governing standard was to find CWA jurisdiction in either situation. *Id.* at 64.

The First Circuit acknowledged *Marks*'s language that the holding of a fractured decision "is the position of the Justices 'who *concurred in the judgments* on the narrowest

SHARFIEXPERTS0000382

U.S. v. Robison, 505 F.3d 1208 (2007)

65 ERC 1385, 21 Fla. L. Weekly Fed. C 96

grounds ....' " *Id.* at 65 (quoting *Marks,* 430 U.S. at 193, 97 S.Ct. at 993). The First Circuit nevertheless cited various post-*Marks* cases in which, in the First Circuit's view, the Supreme Court itself had examined not only plurality and concurring opinions, but also dissenting opinions, in order to determine the holding of an earlier, fragmented Supreme Court decision. *See id.* at 65–66. The First Circuit concluded that its approach was therefore "particularly sound given that the Supreme Court itself has moved away from [rigid application of] the *Marks* formula." *Id.* at 65. [13]

[13] According to the First Circuit, " '*Marks* is workable —one opinion can be meaningfully regarded as "narrower" than another—only when one opinion is a logical subset of other, broader opinions.' " *Johnson,* 467 F.3d at 63–64 (quoting *King v. Palmer,* 950 F.2d 771, 781 (D.C.Cir.1991) (en banc)). In the First Circuit's view, the "shortcomings of the *Marks* formulation in applying *Rapanos*" were actually highlighted by *Gerke,* in which the Seventh Circuit observed that there would be some cases in which the plurality's test would be satisfied, but Justice Kennedy's test would not, and vice-versa. *Id.* at 64.

**\*1221** [1]  For the reasons stated below, we join the Seventh and the Ninth Circuits' conclusion that Justice Kennedy's "significant nexus" test provides the governing rule of *Rapanos.*

[2]  *Marks* expressly directs lower courts, including this Court, that "[w]hen a fragmented [Supreme] Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding ... may be viewed as that position taken by those Members *who concurred in the judgments* on the narrowest grounds." *Marks,* 430 U.S. at 193, 97 S.Ct. at 993 (emphasis added) (quotation marks and citation omitted); *see also United States v. Gonzalez–Lauzan,* 437 F.3d 1128, 1136 n. 6 (11th Cir.), *cert. denied,* 549 U.S. 861, 127 S.Ct. 146, 166 L.Ed.2d 106 (2006). The "narrowest grounds" is understood as the "less far-reaching" common ground. *Johnson v. Bd. of Regents,* 263 F.3d 1234, 1247 (11th Cir.2001). We simply cannot avoid the command of *Marks.*

We are controlled by the decisions of the Supreme Court. Dissenters, by definition, have not joined the Court's decision. In our view, *Marks* does *not* direct lower courts interpreting fractured Supreme Court decisions to consider the positions of those who dissented. *See King v. Palmer,* 950 F.2d 771,

783 (D.C.Cir.1991) (en banc) ("[W]e do not think we are free to combine a dissent with a concurrence to form a *Marks* majority."). *Marks* talks about those who "concurred in the judgment[ ]," not those who did not join the judgment. *Marks,* 430 U.S. at 193, 97 S.Ct. at 993. It would be inconsistent with *Marks* to allow the dissenting *Rapanos* Justices to carry the day and impose an "either/or" test, whereby CWA jurisdiction would exist when either Justice Scalia's test or Justice Kennedy's test is satisfied. *See Rapanos,* 126 S.Ct. at 2265 (Stevens, J., dissenting). The fact that the dissenting Justices would uphold CWA jurisdiction under both Justice Scalia's test and Justice Kennedy's test is of no moment under *Marks.* Further, when the Supreme Court's Justices are interpreting their own prior opinions, they can always reconsider them and thus may look more broadly to the rationale in a dissent. We do not have that luxury. [14]

[14] The First Circuit's *Johnson* decision is nevertheless correct on this point: *Marks* does not "translate easily" to *Rapanos. Johnson,* 467 F.3d at 64.

Thus, pursuant to *Marks,* we are left to determine which of the positions taken by the *Rapanos* Justices *concurring in the judgment* is the "narrowest," i.e., the least "far-reaching." *See Marks,* 430 U.S. at 193, 97 S.Ct. at 993; *Bd. of Regents,* 263 F.3d at 1247. The issue becomes whether the definition of "navigable waters" in the plurality or concurring opinions in *Rapanos* was less far-reaching (i.e., less-restrictive of CWA jurisdiction). *See Gerke,* 464 F.3d at 724–25.

Notably, Justice Kennedy's test, at least in wetlands cases such as *Rapanos,* will classify a water as "navigable" more frequently than Justice Scalia's test. *See Gerke,* 464 F.3d at 724–25; *Rapanos,* 126 S.Ct. at 2265 n. 14 (Stevens, J., dissenting); *see also Johnson,* 467 F.3d at 64. This is because Justice Kennedy's concurrence rejected two "limitations" imposed by the plurality's test on the definition of "navigable waters." *Rapanos,* 126 S.Ct. at 2242 (Kennedy, J., concurring). Specifically, Justice Kennedy's concurrence rejected the plurality's requirement that "navigable waters" must be "relatively permanent, standing or flowing bodies of water," and **\*1222** also rejected the plurality's requirement of a "continuous surface connection." *Id.* at 2242–44 (quotation marks and citations omitted). As discussed later, in factual circumstances different from *Rapanos,* Justice Scalia's test may be less restrictive of CWA jurisdiction; however, in determining the governing holding in *Rapanos,* we cannot disconnect the facts in the case from the various opinions and determine which opinion is narrower in the abstract. Thus,

SHARFIEXPERTS0000383

U.S. v. Robison, 505 F.3d 1208 (2007)

65 ERC 1385, 21 Fla. L. Weekly Fed. C 96

pursuant to *Marks*, we adopt Justice Kennedy's "significant nexus" test as the governing definition of "navigable waters" under *Rapanos*. See *Gerke*, 464 F.3d at 725; *River Watch II*, 496 F.3d at 999–1000.

*D. The jury instruction was erroneous and not harmless error*

We next consider whether the district court's jury charge comported with Justice Kennedy's "significant nexus" test. [15]

[15]   The government tacitly concedes that the jury charge did not meet Justice Kennedy's "significant nexus" test. *See* Resp. Br. of United States at 24–25 ("The defendants correctly point out that the [ ] instructions do not precisely meet .... Justice Kennedy's standard ....").

**[3]  [4]**  Again, under Justice Kennedy's concurrence, a water can be considered "navigable" under the CWA only if it possesses a "significant nexus" to waters that "are or were navigable in fact or that could reasonably be so made." *Rapanos*, 126 S.Ct. at 2236 (Kennedy, J., concurring). Moreover, a "mere hydrologic connection" will not necessarily be enough to satisfy the "significant nexus" test. *Id.* at 2250–51. The district court here did not mention the phrase "significant nexus" in its "navigable waters" instruction to the jury or advise the jury to consider the chemical, physical, or biological effect of Avondale Creek on the Black Warrior River. Rather, the district court instructed the jury that a continuous or intermittent flow into a navigable-in-fact body of water would be sufficient to bring Avondale Creek within the reach of the CWA. As such, the instruction did not satisfy Justice Kennedy's "significant nexus" test and was erroneous.

Moreover, the government bears the burden of establishing that the jury charge error was harmless. *See Neder v. United States*, 527 U.S. 1, 15, 119 S.Ct. 1827, 1837, 144 L.Ed.2d 35 (1999) (concluding that "the omission of an element [from a jury instruction] is an error that is subject to harmless-error analysis"); *United States v. Olano*, 507 U.S. 725, 734–35, 113 S.Ct. 1770, 1778, 123 L.Ed.2d 508 (1993) (when a defendant has made a timely objection and harmless-error review applies, the government has the burden of establishing that any error was harmless); *United States v. Mathenia*, 409 F.3d 1289, 1291–92 (11th Cir.2005) (same).

In order to carry its burden, the government must establish that the error did not "affect [defendants'] substantial rights."

Fed.R.Crim.P. 52(a). We have explained that in the case of non-constitutional error, [16] the government can meet this burden by showing that the error "did not affect the verdict, 'or had but very slight effect.' " *United States v. Hornaday*, 392 F.3d 1306, 1315 (11th Cir.2004) (quoting *Kotteakos v. United States*, 328 U.S. 750, 764, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946)). If the government can establish " 'with fair assurance ... that the judgment was not substantially swayed by the **\*1223** error.' the judgment is due to be affirmed even though there was error." *Id.* at 1315–16 (quoting *Kotteakos*, 328 U.S. at 764, 66 S.Ct. at 1248). Nevertheless, "[t]he non-constitutional harmless error standard is not easy for the government to meet. It is as difficult for the government to meet that standard as it is for a defendant to meet the third-prong prejudice standard for plain error review." *Mathenia*, 409 F.3d at 1292.

[16]   We need not reach the question of whether the *Rapanos* error in this case was constitutional or non-constitutional, because, as explained momentarily, we conclude that the *Rapanos* error here was not harmless even under the less demanding harmless-error test for non-constitutional error.

**[5]**  Here, the government failed to satisfy its burden. Although Wagoner (the EPA investigator) testified that in his opinion there is a continuous uninterrupted flow between Avondale Creek and the Black Warrior River, he did not testify as to any "significant nexus" between Avondale Creek and the Black Warrior River. The government did not present any evidence, through Wagoner or otherwise, about the possible chemical, physical, or biological effect that Avondale Creek may have on the Black Warrior River, and there was also no evidence presented of any actual harm suffered by the Black Warrior River. [17] Thus, the government failed to establish that the jury instruction error did not affect the jury's verdict or had but very slight effect, and the district court's "navigable waters" instruction was not harmless error. [18]

[17]   We further note that prior to trial, the district court denied defendants' motion to dismiss the indictment and indicated that it would apply a broad, *Eidson*-based definition of "navigable waters" under which the government would not need to prove that pollutants actually reached a navigable body of water. Defendants thus arguably had no incentive to put on evidence of any lack

SHARFIEXPERTS0000384

of "significant nexus" between Avondale Creek and the Black Warrior River. *See, e.g., O'Connor v. Ohio,* 385 U.S. 92, 93, 87 S.Ct. 252, 253, 17 L.Ed.2d 189 (1966) (declining to penalize criminal defendant for failing to anticipate a new rule of law announced after the defendant's trial).

[18]    Because Avondale Creek is not adjacent to the Black Warrior River, but separated by Village Creek, Bayview Lake, and Locust Fork, there is no claim in this case that the "significant nexus" test could be met by the adjacency of Avondale Creek and the Black Warrior River. *See supra* note 11.

We recognize that the government, attempting to show harmless error, stresses that it presented evidence of a continuous flow between Avondale Creek (a relatively permanent, fixed body of water) and the Black Warrior River (a navigable-in-fact water), and argues that this evidence satisfies Justice Scalia's test. The government also emphasizes that even the Seventh Circuit in *Gerke* noted that there may be some cases in which Justice Kennedy would find no CWA jurisdiction, but Justice Scalia and the dissenting Justices *would,* and that as a practical matter (i.e., counting the *Rapanos* votes), defendants' convictions should be affirmed under Justice Scalia's test.

This case arguably is one in which Justice Scalia's test may actually be more likely to result in CWA jurisdiction than Justice Kennedy's test, despite the fact that Justice Kennedy's test, as applied in *Rapanos,* would treat more waters as within the scope of the CWA. *See Gerke,* 464 F.3d at 725 (recognizing the potential for such cases but classifying them as "rare"). To be sure, the district court's jury instruction was still erroneous even under Justice Scalia's plurality opinion, because the instruction allowed the jury to find that defendants' discharges were into a "navigable water" even if the jury also concluded that Avondale Creek flowed "only intermittently." [19] But under *Justice* **\*1224** *Scalia's* test, that error may well have been harmless, because Wagoner, the EPA investigator, clearly and unambiguously testified that there is a continuous, uninterrupted flow between Avondale Creek and the Black Warrior River. Under Justice Scalia's test, the district court's jury instruction error arguably "did not affect the verdict, 'or had but very slight effect.' " *Hornaday,* 392 F.3d at 1315 (citation omitted). Thus, the decision as to which *Rapanos* test applies may be outcome-determinative in this case, and so it is not surprising that the government advocates a practical, *Johnson*-style approach whereby all

votes—from plurality, concurring, and dissenting Justices—are counted. [20]

[19]    Under Justice Scalia's plurality opinion, a "navigable water" only includes relatively permanent, standing, or continuously flowing "fixed bodies of water, as opposed to ordinarily dry channels through which water occasionally or intermittently flows." *Rapanos,* 126 S.Ct. at 2221–22, 2225.

[20]    We also need not, and do not, determine whether the government in fact established harmless error under Justice Scalia's plurality opinion in *Rapanos,* because, as discussed, it would be inconsistent with *Marks* for us to follow and apply Justice Scalia's opinion. Indeed, defendants point out that Wagoner admitted on cross-examination, *inter alia,* that he did not conduct any "tracer tests" to verify continuous flow between Avondale Creek and the Black Warrior River; that he conducted no tests to measure the volume of discharge from Avondale Creek or between the bodies of water connecting Avondale Creek and the Black Warrior River; and that the water level of Avondale Creek was low enough that he was able to walk its length. Furthermore, defendants had no incentive to present evidence regarding a lack of continuous flow, because the district court clarified prior to trial that its definition of "navigable waters" would include waters with either continuous or intermittent flow. *See also supra* note 17.

Nevertheless, as we have already discussed, *Marks* requires us to adopt the narrowest view of the Justices who concurred in the judgment in *Rapanos.* Thus, Justice Kennedy's test is the test against which we have measured the district court's jury instruction for harmless error. Justice Kennedy's test is also the test that the district court must apply on remand, for the reasons explained. [21]

[21]    We express no opinion as to whether Avondale Creek does or does not actually satisfy Justice Kennedy's test; that is a question for the jury in the first instance.

*E. Other CWA arguments*

Defendants raise several other arguments related to their CWA convictions, all of which lack merit.

SHARFIEXPERTS0000385

U.S. v. Robison, 505 F.3d 1208 (2007)

65 ERC 1385, 21 Fla. L. Weekly Fed. C 96

First, all defendants contend that the district court's "navigable waters" error, discussed *supra*, entitles them to judgments of acquittal, and not merely new trials, because there was insufficient evidence that defendants discharged any process wastewater into a *Rapanos*-defined "navigable water." [22]

> [22]   We review the sufficiency of the evidence *de novo*, drawing all reasonable inferences in favor of the government. *United States v. Hernandez*, 433 F.3d 1328, 1332 (11th Cir.2005), *cert. denied*, 547 U.S. 1047, 126 S.Ct. 1635, 164 L.Ed.2d 346 (2006).

Preliminarily, we observe that on appeal, defendants do *not* contend that there was insufficient evidence that their discharges were into a "navigable water" as that term was *incorrectly* defined for the jury by the district court in the actual trial. Indeed, the government presented sufficient evidence that defendants' discharges were into a "navigable water" as the term was incorrectly defined by the district court, and so acquittal is not warranted on that ground.

**[6]   [7]**   Rather, defendants' contention is that they are entitled to judgments of acquittal based on the district court's *Rapanos* error. This argument, however, ignores our precedent stating that "[r]emand **\*1225** for a new trial is the appropriate remedy where ... [any] insufficiency of evidence is accompanied by trial court error whose effect may have been to deprive the Government of an opportunity or incentive to present evidence that might have supplied the deficiency." *United States v. Sanchez–Corcino*, 85 F.3d 549, 554 n. 4 (11th Cir.1996), *overruled on other grounds by Bryan v. United States*, 524 U.S. 184, 118 S.Ct. 1939, 141 L.Ed.2d 197 (1998). Here, we need not evaluate whether there was insufficient evidence that defendants' discharges were into "navigable waters" as that term is properly defined under *Rapanos*. Instead, it is enough to note that the district court erroneously defined "navigable water" and made it clear to the parties far in advance of trial that it would continue to use its erroneous definition throughout the case. That decision deprived the government of any incentive to present evidence that might have cured any resulting insufficiency or met Justice Kennedy's "significant nexus" test. [23] Thus, under *Sanchez–Corcino*, we conclude that remand for a new trial is the appropriate remedy in this case.

> [23]   *See also supra* note 17.

Second, all defendants contend that there was insufficient evidence that any discharges of process wastewater occurred in specific months, as charged in the indictment, entitling defendants to a judgment of acquittal. However, defendants concede that the government put forth sufficient evidence that five of the charged CWA violations (Counts 2, 14, 16, 21, and 22) occurred as charged in the indictment. Moreover, Harbin testified that between May 1999 and January 2001, process wastewater was discharged into storm drains at least fifteen out of twenty operating days per month, and several former employees testified that pumping regularly occurred on Friday nights.

Third, Delk and McWane argue that there was insufficient evidence that they participated in a CWA conspiracy, and Delk further argues that there was insufficient evidence that he discharged any process wastewater or caused anyone else to discharge wastewater in violation of the CWA. We disagree. For example, Delk was one of two McWane employees designated as having responsibility for McWane's NPDES compliance, and witnesses testified that Delk gave orders to discharge process wastewater and once directed Harbin to falsify a water sample so that McWane could pass an inspection.

**[8]   [9]**   Fourth, we reject Delk's and Devine's argument that they were deprived of their due process rights to a fair trial when the district court struck three of the four objects of the CWA conspiracy from the indictment at the close of the government's case. [24] Delk and Devine primarily rely on *United States v. Adkinson*, 135 F.3d 1363 (11th Cir.1998); however, that case is materially distinguishable. In *Adkinson*, four of the five objects of the conspiracy in the indictment did not state an offense under prevailing law, and the government presented evidence as to those four objects that was not relevant to the fifth object. *Adkinson*, 135 F.3d at 1372. The district court in *Adkinson* only permitted the government to present such evidence because the government assured the district court that the prevailing law would change before the end of the trial; however, the expected change in the law did not occur in **\*1226** time. *Id.* at 1369–70. The district court in *Adkinson* then struck the four legally impermissible objects of the conspiracy *after* the trial, but at that point, the district court had allowed into evidence "[m]ountains of details relevant only tangentially, if at all, to the ultimately charged scheme." *Id.* at 1372. As this Court observed on appeal in *Adkinson*, the district court thus "obviously invited the jury to convict for conduct not, ultimately, even *alleged* to be a crime." *Id.* (emphasis added).

SHARFIEXPERTS0000386

U.S. v. Robison, 505 F.3d 1208 (2007)

65 ERC 1385, 21 Fla. L. Weekly Fed. C 96

24    Denials of motions to dismiss the indictment are reviewed for abuse of discretion. *see United States v. Waldon,* 363 F.3d 1103, 1108 (11th Cir.2004), but underlying legal errors, including due process claims, are reviewed *de novo, see Agan v. Vaughn,* 119 F.3d 1538, 1541 (11th Cir.1997).

In contrast, the four objects of the CWA conspiracy in this case were legally proper under prevailing law, and the district court simply determined that the evidence did not support the objects that were ultimately struck. *Cf. Adkinson,* 135 F.3d at 1373 n. 30 (noting that *Adkinson* was "not a case where perfectly proper charges [were] ultimately found by the court not to be supported by the evidence at trial"). Moreover, the district court stated that substantially all of the evidence relating to the stricken objects of the conspiracy also related to the CWA discharges, and defendants have failed to establish that the district court abused its discretion in that evidentiary ruling. [25]

25    Evidentiary rulings are reviewed for an abuse of discretion. *See United States v. Henderson,* 409 F.3d 1293, 1297 (11th Cir.2005), *cert. denied,* 546 U.S. 1169, 126 S.Ct. 1331, 164 L.Ed.2d 47 (2006).

Finally, we recognize that Devine argues that the government had to prove that Devine knew the terms of McWane's NPDES permit and knowingly violated the permit. We need not determine whether the district court should have required the government to establish that Devine knew the terms of McWane's NPDES permit. Any such error committed by the district court in this regard was harmless, because there was ample evidence presented that Devine *did* in fact know the terms of McWane's NPDES permit.

### F. False statement in Count 24

McWane's last argument is that it is entitled to acquittal on Count 24, the false statement count. Under 18 U.S.C. § 1001, a conviction for making a false statement in a matter within the jurisdiction of the executive branch of the United States requires proof of five elements: "(1) a statement, (2) falsity, (3) materiality, (4) specific intent, and (5) agency jurisdiction." *United States v. Herring,* 916 F.2d 1543, 1546 (11th Cir.1990).

[10]    Count 24 against McWane concerns certifications that Robison signed on McWane's behalf and that McWane submitted to the EPA. There is no dispute that the statements

in the certifications were material. Rather, McWane contends that the government presented insufficient evidence to satisfy elements two (falsity) and four (specific intent). Specifically, McWane contends that what Robison represented in the certifications was not false and that the government presented no evidence that Robison's certifications—as opposed to the underlying plant inspection reports prepared by other persons and submitted with the certifications—were false.

We first review the allegations in Count 24 and then explain why the record supports McWane's argument for several reasons.

First, the language of the certifications, introduced into evidence at trial, is materially different from the charge in Count 24, and thus the certifications themselves do not support that charge. Count 24 charged McWane and Robison with making a false statement to the EPA, in violation of § 1001, as follows:

> *1227    MCWANE, INC. and CHARLES "BARRY" ROBISON, the defendants, in a matter within the jurisdiction of [the EPA] ... did knowingly and willfully make a materially false, fictitious, and fraudulent statement and representation that is, the defendants certified that documents submitted on or about August 17, 2000 and September 15, 2000, to EPA pursuant to a request under the [CWA] .... including "Daily ... and Monthly ... Inspection[ ]" forms, were "true, accurate, and complete," when in truth and fact, as defendants MCWANE and CHARLES "BARRY" ROBISON then well knew and believed, certain "Daily ... and Monthly ... Inspection" forms included in the submission to EPA were false.

In sum, Count 24 alleged that McWane and Robison's certifications falsely represented that the plant inspection reports submitted to the EPA "were 'true, accurate, and complete,' when in truth and fact," McWane and Robison well knew that certain of the submitted documents—plant

SHARFIEXPERTS0000387

U.S. v. Robison, 505 F.3d 1208 (2007)

65 ERC 1385, 21 Fla. L. Weekly Fed. C 96

inspection reports for January 1998 through March 2000—were false. [26]

[26]   We note that prior to trial, the scope of Count 24 was narrowed to encompass only the September 15, 2000 submission.

However, McWane correctly points out that Robison, on McWane's behalf, did *not* certify that he *personally* knew that the attached documents—i.e., the plant inspection reports—were accurate, or even that he had *personally* reviewed the inspection reports. Rather, Robison certified only that the documents were prepared under his direction or supervision in accordance with a system designed to ensure that qualified personnel would properly gather and evaluate the documents, and that based on his inquiry of those persons who were responsible for gathering the documents, to the best of his knowledge, the documents were accurate. Specifically, the certifications in evidence, which Robison signed, state in full:

> I certify under penalty of law that this document and all attachments were prepared under my direction or supervision, in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

In other words, Robison certified that *other qualified persons* had prepared the documents and advised him of the documents' accuracy. Because of the language in the certifications, Robison could truthfully make the representations included in the certifications even if the underlying documents included with the submissions were false.

Second, the government introduced no evidence that the plant inspection reports were prepared or gathered in a manner or a system other than that certified to by Robison. The government also presented no evidence that Robison did not inquire of the persons responsible for gathering the documents, as Robison represented in the certifications. And the government presented no evidence that upon inquiring of such persons, Robison learned from such persons that the documents were not true or accurate. Indeed, the government acknowledged before the district court that it *1228 presented no evidence as to McWane's document-gathering "system" or Robison's "inquiries" of the persons responsible for gathering the documents. Thus, the government failed to prove that any of the statements *actually certified to* by Robison were false.

Third and most notably, McWane points out that the EPA *previously* required a certifying individual to certify that he or she had "personally examined" documents included in submissions, such as the one at issue here, but in 1983, the EPA eliminated the "personal examination" requirement. *Compare* 40 C.F.R. § 122.6(d) (1981) (requiring EPA certifications to state that "under penalty of law ... I have personally examined and am familiar with the information submitted in this document and all attachments"), *with* 48 Fed.Reg. 39,611, 39,613 (Sept. 1, 1983) (eliminating the personal examination requirement). As such, the certifications in this case contained no representation that Robison had personally reviewed the documents in question or that he was vouching for the documents' accuracy based on his personal knowledge of the documents themselves. Rather, Robison only certified—and only had to certify—that others had prepared the documents, and that based on his inquiry of those who prepared the documents, the documents were accurate to the best of his knowledge.

The government responds that, notwithstanding the actual language of the certifications, Robison had personal knowledge of the problems at the plant, the plant inspection reports showed no problems at the plant, and therefore, Robison falsely certified that the inspection reports were accurate. Even assuming without deciding that such offense conduct is adequately encompassed in Count 24, the government still presented no evidence that Robison ever personally reviewed the plant inspection reports or had personal knowledge of the contents of the plant inspection reports, which is needed to show that *his certifications* about the reports were false.

SHARFIEXPERTS0000388

Certainly, the government introduced evidence that some of the plant inspection reports themselves were false. Indeed, Walsh (McWane's former safety and personnel director) testified that he was the employee who prepared the inspection reports at issue and that some of them were false. However, Walsh made clear that Robison was not among the several McWane employees who received copies of the inspection reports in the regular course of McWane's business. [27] Additionally, there were approximately 600 pages of documents attached to the certifications, and those documents included more than just the falsified inspection reports that accompanied the certifications at issue here. [28] The problem with the government's **\*1229** conclusory argument—that the evidence showed that Robison knew the inspection reports he submitted were false—is that Count 24 is a specific intent crime, and the government cannot point to any evidence that Robison *actually knew* the contents of the particular *inspection reports* accompanying the certifications or that Robison *actually knew* that those particular *inspection reports* contained false information. [29]

[27]    We stress that the government does not argue that McWane violated § 1001 by *submitting* false inspection reports to the EPA. Rather, the government concedes that under Count 24, it had to prove that the *certifications* themselves contained false statements. In other words, the government acknowledges that the false statements in the inspection reports, in and of themselves, are insufficient to sustain McWane's false statement conviction. Thus we necessarily focus on the language in the certifications.

[28]    Chetan Gala, an EPA enforcement officer, testified that the post-inspection documents that McWane was required to produce (and that accompanied the certifications at issue in this case) included: (1) information about McWane's CWA permit for the plant; (2) information about entities that provided laboratory services to McWane; (3) McWane's discharge monitoring reports for a five-year period; (4) a diagram of McWane's plant; (5) McWane's "Best Management Practices Plan," "Storm Water Pollution Prevention Plan," and "Spill Prevention Control and Countermeasure Plan," as well as the inspection reports, training records, and corrective action reports accompanying those plans; (6) the

location where McWane's records were stored; (7) a schematic of the production process and related documents; (8) a description of the waste disposal system; and (9) CWA-related inspection reports by ADEM and related correspondence for a five-year period.

[29]    Even Robison's contemporaneous notes fail to help the government, because the notes do not refer to any inspection reports and are not evidence that Robison had reviewed the contents of the particular inspection reports submitted to the EPA.

The government thus failed to establish that Robison's certified statements were knowingly false. At most, the government proved that Robison negligently submitted documents to the EPA, but that is insufficient. *See United States v. Baker*, 626 F.2d 512, 515–16 (5th Cir.1980) [30] (stating that "in order to sustain a § 1001 conviction the government must prove that the defendant knowingly made a false statement with intent to deceive," and further stating that the specific intent requirement of § 1001 excludes "false statements made by inadvertence, mistake, [or] carelessness") (quotation marks omitted).

[30]    In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (*en banc*), this Court adopted as binding precedent all Fifth Circuit decisions rendered prior to October 1, 1981.

Accordingly, we must conclude that McWane is entitled to a judgment of acquittal on Count 24.

### III. CONCLUSION

For the foregoing reasons, defendants' convictions are reversed. The case is remanded for entry of a judgment of acquittal in favor of defendant McWane on the false statement count (Count 24). The case is remanded for a new trial as to all defendants on the CWA conspiracy count (Count 1) and for a new trial as to all defendants charged in the remaining substantive CWA counts (Counts 2, 3, 5, 7–19, 21, and 22).

REVERSED, VACATED, and REMANDED.

**All Citations**

505 F.3d 1208, 65 ERC 1385, 21 Fla. L. Weekly Fed. C 96

SHARFIEXPERTS0000389

**U.S. v. Robison, 505 F.3d 1208 (2007)**

65 ERC 1385, 21 Fla. L. Weekly Fed. C 96

End of Document

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

SHARFIEXPERTS0000390

# APPENDIX 9

# CURRICULUM VITAE FOR DR. W. MICHAEL DENNIS

129048180.1

SHARFIEXPERTS0000391

## W. MICHAEL DENNIS, Ph.D.

**Areas of Specialization:**

Wetland delineation, permitting and mitigation; plant taxonomy and ecology; remote sensing and aerial photointerpretation; threatened and endangered (T&E) species; and wildlife evaluations.

**Experience:**

President, Breedlove, Dennis & Associates, Inc. (BDA), Winter Park, Florida. 1997 to present.

Principal, BDA, Winter Park, Florida. 1984 to present.

Vice President, BDA, Winter Park, Florida. 1983 to 1997.

Senior Scientist, Breedlove & Associates, Inc., Gainesville, Florida. 1981 to 1983.

Projects and responsibilities included development of technical data and management of projects in the following areas:

- Vegetation analysis and wetlands jurisdictional evaluations for land development activities in Alachua, Baker, Bay, Brevard, Broward, Charlotte, Citrus, Clay, Collier, Columbia, Dade, Dixie, Duval, Escambia, Flagler, Franklin, Gadsden, Gilchrist, Hamilton, Hardee, Hendry, Hernando, Highlands, Hillsborough ,Indian River, Jackson, Lake, Lee, Leon, Levy, Liberty, Manatee, Marion, Martin, Monroe, Nassau, Orange, Osceola, Palm Beach, Pasco, Pinellas, Polk, Putnam, Santa Rosa, Sarasota, Seminole, St. Johns, St. Lucie, Sumter, Suwannee, Taylor, Volusia, Wakulla, Walton, and Washington counties in Florida.

- Vegetation mapping of plant communities in Florida, Georgia, South Carolina, Alabama, Tennessee, Virginia, Kentucky, New Jersey, Mississippi, and North Carolina.

- Wetlands evaluations for phosphate, sand, and limerock mining activities.

- Wetland evaluations and permitting for major theme parks is Central Florida.

- Airport permitting.

- Wetland reclamation planning.

- Ordinary high water line determinations: Lake Saunders, Lake County; and Peace River Valley, Alafia River, Lake Kissimmee, Lake Hatchineha, Lake Tohopekaliga, Lake Preston, Lake Myrtle, Lake Joel, and Lake Poinsett.

- Power plant and right-of-way siting.

- Gas transmission line siting and permitting.

- Technical Advisor in administrative and legislative rule making process.

BREEDLOVE, DENNIS & ASSOCIATES, INC.
330 W. CANTON AVENUE / WINTER PARK, FLORIDA  32789 / (407) 677-1882 / FAX (407) 657-7008

O:\ADMADMIN\RESUMES\WMD\WMD  UPDATED 4  7  22 - INCLUDES TWO DEPOS.DOC                     April 7, 2022

SHARFIEXPERTS0000392

W. Michael Dennis, Ph.D.                                                                              Page 2

- Served on Technical Committee advising the Senate Natural Resources Committee on the 1984 Wetlands Legislation.

- Member of the Wildlife Advisory Group appointed by the Department of Community Affairs.

- Member of the Econlockhatchee River Task Force appointed by the St. Johns River Water Management District (SJRWMD).

- Participated in development of Florida Wetland Delineation and Environmental Permitting State Rules during the 1993/1994 Legislative Session.

- Member of the Environmental Constraints and Development Suitability Mapping Project Advisory Committee for Orange County.

- Member of the Technical Advisory Committee for the SJRWMD on the Cumulative Impacts Provision of the SJRWMD's Environmental Resource Permit rules.

- Served as one of five private sector representatives to the Melaleuca Technical Advisory Committee (TAC) to the South Florida Water Management District (1995-1996).

- Member of a SJRWMD appointed committee evaluating the Uniform Mitigation Assessment Method (2011).

- Expert witness testimony—qualified in biology, ecology, wetlands evaluation, and jurisdictional determinations and permitting, botanical indicators of ordinary high water line determinations, terrestrial and wetlands ecology, water quality as pertains to wetlands evaluations, T&E species surveys, and wildlife investigations.

Botanist, Tennessee Valley Authority (TVA), Tennessee.  1976 to 1981.

Responsible for planning, implementing, and presenting studies on the environmental impact of proposed TVA facilities on aquatic macrophyte communities, and ecological and taxonomic studies of aquatic plant species.  Project experience includes:

- Studies of aquatic and wetland plants of the Tennessee Valley.

- Phipps Bend Nuclear Plant environmental report.

- Bellefonte Nuclear Plant environmental report.

- Yellow Creek Nuclear Plant environmental report.

- Future power plant siting studies, Courtland, Westmoreland, and Town Creek sites.

- Pumped storage site evaluation report.

BREEDLOVE, DENNIS & ASSOCIATES, INC.
330 W. CANTON AVENUE / WINTER PARK, FLORIDA  32789 / (407) 677-1882 / FAX (407) 657-7008

O:\ADM\ADMIN\RESUMES\WMD\WMD_UPDATED 4_7_22 - INCLUDES TWO DEPOS.DOC                                    April 7, 2022

SHARFIEXPERTS0000393

W. Michael Dennis, Ph.D.                                                                      Page 3

- Waterthyme (*Hydrilla* sp.) contingency plan for the Tennessee River watershed.

- Aquatic weed control program.

- Study of the vegetation of naturally occurring ponds of the Cumberland Plateau.

- Ecology of mud flat vegetation of Tennessee Valley reservoirs.

- Preparation of a manual of the submersed and floating-leaved plants of the Tennessee Valley.

- Utilization and revegetation of reservoir shorelines.

- Acid rain studies program for assessing impact of acid precipitation on aquatic systems.

- Studies of heavy metals accumulation in aquatic plants, Holston River basin.

- Vegetation study of Towns and Rabun counties, Georgia.

Faculty Associate, University of Tennessee, Knoxville, Tennessee.  1980 to 2017.

Adjunct Professor, University of North Alabama, Florence, Alabama.  1980 to 1981.

Visiting Assistant Professor, University of Tennessee, Knoxville, Tennessee.  1979.

Graduate Teaching Assistant, University of Tennessee, Knoxville, Tennessee.  1973 to 1976.

Research Assistant, University of South Carolina, Columbia, South Carolina.  1973.

- Studied floristic composition and ecological parameters in ponds of the sandhill belt of South Carolina.

Research Assistant, University of South Carolina, Columbia, South Carolina.  1972.

- Studied the flora and ecology of the Santee Swamp.

Teaching Assistant, University of South Carolina, Columbia, South Carolina.  1971-1973.

Medical Laboratory Technician, United States Army.  1969 to 1971.

BREEDLOVE, DENNIS & ASSOCIATES, INC.
330 W. CANTON AVENUE / WINTER PARK, FLORIDA  32789 / (407) 677-1882 / FAX (407) 657-7008

O:\ADMADMIN\RESUMES\WMD\WMD_UPDATED 4_7_22 - INCLUDES TWO DEPOS.DOC                          April 7, 2022

SHARFIEXPERTS0000394

W. Michael Dennis, Ph.D.                                                                    Page 4

**Education:**

      Ph.D.    University of Tennessee, Knoxville, Tennessee, 1976.  Botany.

      M.S.    University of South Carolina, Columbia, South Carolina, 1973.  Biology.

      B.S.    Emory University, Atlanta, Georgia, 1969.  Biology.

      A.A.    Oxford College of Emory University, 1967.

- Habitat Evaluation Procedure (HEP) 150 - Executive HEP Briefing Workshop, 1989.

- HEP 400 - Advanced Recreation Economic Techniques Workshop, 1989.

- EL 305 - Expert Witness Workshop, 1990

- Civil Service Commission Workshop in Environmental Assessment, 1977.

- National Aeronautics and Space Administration Technology Transfer Course, 1976.

- Basic concepts of remote sensing and data handling techniques, as they apply to the analysis of digitally recorded LANDSAT multispectral scanner data and the Earth Resources Laboratory's data analysis system.

**Certifications:**

- Occupational Safety and Health Administration (OSHA) 24-Hour Online Hazardous Waste Operations and Emergency Response (HAZWOPER) Training Course – Certificate No. 1512312156885, Issued December 2015

- Occupational Safety and Health Administration (OSHA) 8-Hour Online HAZWOPER Refresher Course, includes Physical Hazards and Basic PPE – Certificate No. 2011055156885, Issued November 2020

**Associations:**

      Ecological Society of America
      Association of Southeastern Biologists - Past President
      Southern Appalachian Botanical Club
      Society of Wetland Scientists
      American Association for the Advancement of Science
      Association of Florida Community Developers, Environmental & Water Task Force, Chair

**Honors:**

      Distinguished Alumni Award – Oxford College of Emory University, 1987.
      Volunteer Service Award – University of Tennessee, College of Arts & Sciences, 2015

BREEDLOVE, DENNIS & ASSOCIATES, INC.
330 W. CANTON AVENUE / WINTER PARK, FLORIDA  32789 / (407) 677-1882 / FAX (407) 657-7008

O:\ADM\ADMIN\RESUMES\WMD\WMD_UPDATED 4_7_22 - INCLUDES TWO DEPOS.DOC                            April 7, 2022

SHARFIEXPERTS0000395

W. Michael Dennis, Ph.D.                                                                                          Page 5

**Board Memberships:**

Balsam Mountain Preserve Trust (Chairman, 2012) (inactive)
Breedlove, Dennis & Associates, Inc. (Chairman) (active)
BDY Environmental (active)
Chelonian Research Institute (inactive)
Discover Life in America (Vice Chairman, 2012 - 2014); (Honorary Director, 2016) (active)
Oxford College of Emory University Board of Counselors (Vice Chair, 2016 - 2018; Chair, 2019 - 2021) (active)
Spring Island Trust (inactive)
University of Tennessee College of Arts & Sciences Dean's Advisory Board (Vice Chair, 2014 - 2016); (Chair, 2016 - 2018) (active)
University of Tennessee Alumni Board (active)

**Land Management Projects**

Spring Island
Balsam Mountain Preserve
Yeamans Hall Club

**Selected Publications and Presented Papers:**

Bates A.L., **W.M. Dennis** and T.L. Goldsby.  1978.  *Experimental use of diquat in Guntersville Reservoir*. Aquatic Plant Management Society.

Bates, A.L., T.L. Goldsby, and **W.M. Dennis**.  1978.  *A prevention and contingency control plan for Hydrilla*.  Aquatic Plant Management Society.

Bates A.L., **W.M. Dennis**, and T.L. Goldsby.  1978.  *The use of remote sensing for determining effectiveness and planning of aquatic plant control operations in the Tennessee Valley*.  Aquatic Plant Management Society.

Bates, A.L., **W.M. Dennis**, and T.L. Goldsby.  1980.  *Eurasian water-milfoil (Myriophyllum spicatum L.) identification, distribution, and life history*.  Proceeding of the Mississippi Aquatic Weed Workshop, 13 February 1980, Mississippi State University.

Bates A.L., **W.M. Dennis**, and T.L. Goldsby.  1980.  *Prevention and control of Hydrilla*.  Proceedings of the Mississippi Aquatic Weed Workshop, 13 February 1980, Mississippi State University.

Bates, A.L., E. Pickard, and **W.M. Dennis**.  1978.  *Tree plantings:  A diversified management tool for reservoir shorelines*.  Proceedings of the National Symposium on Strategies for protection and Management of Floodplain Wetlands and other Riparian Ecosystems.

Batson, W.T. and **W.M. Dennis**.  1973.  *Record trees of South Carolina*.  South Carolina Wildlife 20(5):12-16.

BREEDLOVE, DENNIS & ASSOCIATES, INC.
330 W. CANTON AVENUE / WINTER PARK, FLORIDA  32789 / (407) 677-1882 / FAX (407) 657-7008

O:\ADMADMIN\RESUMES\WMD\WMD_UPDATED 4_7_22 - INCLUDES TWO DEPOS.DOC                                    April 7, 2022

SHARFIEXPERTS0000396

W. Michael Dennis, Ph.D.                                                      Page 6

Biemer, M.W., **W.M. Dennis**, and B.E. Wofford.  1977.  *Flavonoid chemistry, chromosome number and phylogenetic relationships of Helenium chihuahuensis (Asteraceae)*.  Biochemical Systematics and Ecology 5:23-28.

Breedlove, B.W. and **W.M. Dennis**.  1984.  *The use of Small-format Assessment of Microphyton; collection, use, and meaning of the American Society for Testing and Materials STP 843*.

Breedlove, B.W. and **W.M. Dennis**.  1987.  *Recent changes in and responses to U.S. Army Corps of Engineers 404 permitting*.  Environmental Land Use Law Section Reporter 10(1):22-23.

Carriker, N.E., **W.M. Dennis**, and R.C. Young.  1981.  *Quantification of allochthonous organic input to Cherokee Reservoir:  Implications of hypolimnetic oxygen depletions*.  Proceedings of the International Symposium on Inland Waters and Lake Restoration, September 8-12, 1980, Portland, Maine.

Clewell, A.F., C. Raymond, C.L. Coultas, **W.M.Dennis** and J.P. Kelly.  2009.  Spatially Narrow Wet Prairies. Castanea. June 2009, Vol. 74 No. 2.

**Dennis, W.M.**  1973.  A new record water hickory for South Carolina.  Castanea 38:205.

**Dennis, W.M.**  1974.  A synecological study of the Santee Swamp, Sumter County, South Carolina.  ASB Bulletin 21(2):51.

**Dennis, W.M.**  1976.  Chromosome morphology of *Clematis*, subsection *Viornae*, (Ranunculaceae).  Canadian Journal of Botany 54(10):1135-1139.

**Dennis, W.M.**  1977.  Contributed *Clematis* (in part) to M.C. Johnston and J. Hendrickson, Chihuahuan Desert Flora.

**Dennis, W.M.**  1978.  Contributed Macrophyte section for C.I. Weber (ed.), Office of Water Data Coordination Manual.

**Dennis, W.M.**  1978.  The taxonomic status of *Clematis gattingeri* Small (Ranunculaceae).  Brittonia 30:463-465.

**Dennis, W.M.**  1979.  The new combination *Clematis pitcheri* T. & G. var. *dictyota* (Green) Dennis. Sida 8:194-195.

**Dennis, W.M.**  1980.  *Sarracenia oreophila* (Kearny) Wherry in the Blue Ridge Province of northeastern Georgia. Castanea 45:101-103.

**Dennis, W.M.**  1982.  Contributed *Jamesianthus alabamensis* and *Clematis* Subsection *Viornae* to the National List of Scientific Plant Names.  United States Department of Agriculture Soil Conservation Service-TP-159.

**Dennis, W.M.**  1982.  Ecological notes on *Jamesianthus alabamensis* Blake and Sherff (Asteraceae) and an hypothesis on its endemism. Sida 9(3):210-214.

BREEDLOVE, DENNIS & ASSOCIATES, INC.
330 W. CANTON AVENUE / WINTER PARK, FLORIDA  32789 / (407) 677-1882 / FAX (407) 657-7008

O:\ADMADMIN\RESUMES\WMD\WMD_UPDATED 4_7_22 - INCLUDES TWO DEPOS.DOC                              April 7, 2022

SHARFIEXPERTS0000397

**W. Michael Dennis, Ph.D.**                                                                                   Page 7

Dennis, W.M.   1984.   Aquatic Macrophyton Sampling:   An overview.   Ecological Assessment of Macrophyton:  Collection, use and meaning of data, American Society for Testing and Materials STP 843.

Dennis, W.M. and W.T. Batson. 1974. The floating log and stump communities in the Santee Swamp of South Carolina. Castanea 39:166-170.

Dennis, W.M. and M.W. Bierner. 1980. Distribution of flavonoids and their systematic significance in *Clematis* subsection *Viornae*. Biochemical Systematics and Ecology 8:65-67.

Dennis, W.M. and B.W. Breedlove. 1983. *Wetlands Reclamation: A Drainage Basin Approach.*

Dennis, W.M. and B.W. Breedlove. 1984. *The Assessment of Environmental Regulations on Agriculture Operations in Florida Through the Use of Small and Medium Format Color Infrared Aerial Photography.* Abstract, p. 173.   *Color Aerial Photography in the Plant Sciences and Related Fields.*

Dennis, W.M. and B.W. Breedlove. 1987. *Location of a Court Required Period Specific Ordinary High Water Using Detailed Survey, Tree Aging and Medium Format Color-Infrared Photography.* Presentation at the ASPRS/ACSM 1987 Convention; Baltimore, Maryland.

Dennis, W. M., C.W. Drake and W.B. LaFrenz. 2019. *The City of Lakeland's Northeast Wellfield from Conceptualization to Production.* The Professional Geologist. 56(4): 13-18,41.

Dennis, W.M., P.A. Collier, E.L. Morgan, and P. DePriest. 1981. Habitat notes on the aquatic lichen *Hydrotheria venosa* Russell in Tennessee. Bryologist 84:392-393.

Dennis, W.M., A.M. Evans, and B.E. Wofford. 1979. *Disjunct populations of Isoetes macrospora in southeastern Tennessee.* Amer. Fern J. 69:97-99.

Dennis, W.M. and B.G. Isom. 1984 (ed). *Ecological Assessment of Macrophyton: Collection Use and Meaning of Data.* A symposium sponsored by American Society for Testing and Materials Committee D-19 on Water, Ft. Lauderdale, Florida, 15-16 Jan. 1983. ASTM STP 843 122 p.

Dennis, W.M. and C.S. Keener. 1982. *The subgeneric classification of Clematis (Ranunculaceae) in temperate North America north of Mexico.* Taxon 31(1):37-44.

Dennis, W.M., J.M. Neil, and R.C. Young. 1983. *Productivity of the Aquatic Macrophyte Community of the Holston River: Implications to Hypolimnetic Oxygen Depletion of Cherokee Reservoir TVA/ONR WR-83/12.*

Dennis, W.M., T.S. Patrick, and D.H. Webb.   1981.   *Distribution and naturalization of Cyperus brevifolioides (Cyperaceae) in eastern United States.* Sida 9(2):188-189.

Dennis, W.M. and Shaw, J. 2013. *Taxonomy of Clematis subgenus Viorna and speciation in subsection Viornae* (abstract). Presentation at the Association of Southeastern Biologists 74th Annual Meeting; Charleston, West Virginia

BREEDLOVE, DENNIS & ASSOCIATES, INC.
330 W. CANTON AVENUE / WINTER PARK, FLORIDA  32789 / (407) 677-1882 / FAX (407) 657-7008

O:\ADMADMIN\RESUMES\WMD\WMD_UPDATED 4_7_22 - INCLUDES TWO DEPOS.DOC                                            April 7, 2022

SHARFIEXPERTS0000398

**W. Michael Dennis, Ph.D.**                                                                    Page 8

Dennis, W.M. and D.H. Webb. 1981. Additions to the flora of Tennessee. Sida 9(2):184.

Dennis, W.M. and D.H. Webb. 1981. The distribution of *Pilularia americana* A. Br. in North America, north of Mexico. Sida 9:19-24.

Dennis, W.M., D.H. Webb, and A.L. Bates. 1988. An Analysis of the plant community of mudflats of TVA mainstream reservoirs. pp. 177-198. In: Snyder, D.H. (ed.). Proceedings of the first annual symposium on the natural history of lower Tennessee and Cumberland river valleys. The Center for Field Biology of Land Between the Lakes. Austin Peay State University, Clarksville, Tennessee.

Dennis, W.M., D.H. Webb, and B.E. Wofford. 1977. State records and other recent noteworthy collections of Tennessee plants. II. Castanea 42:190-193.

Dennis, W.M., D.H. Webb, B.E. Wofford, and R. Kral. 1980. State records and other recent noteworthy collections of Tennessee plants. III. Castanea 45:237-242.

Dennis, W.M. and B.E. Wofford. 1976. Evidence for the hybrid origin of *Proserpinaca intermedia* Mackenz (Haloragaceae). ASB Bulletin 23(2):54.

Dennis, W.M. and B.E. Wofford. 1976. State records and other recent noteworthy collections of Tennessee plants. Castanea 41:119-121.

Drake C.W., W.B. LaFrenz, and W.M. Dennis. 2019. *The City of Lakeland's Northeast Wellfield from Conceptualization to Production.* The Professional Geologist. 56(4): 13-18,41.

Shaw, J., M. Montgomery, C. Carpenter and W.M. Dennis. 2013. *A preliminary phylogeny of Clematis subg. Viorna (Ranunculaceae): toward the understanding of the complex biogeographic patterns of this taxon* (abstract). Presentation at the Association of Southeastern Biologists 74th Annual Meeting; Charleston, West Virginia

Tucker, A.O., M.J. Maciarello, B.E. Wofford, and W.M. Dennis. 1997. *Volatile leaf oils of Persea borbonia (L.) Spreng., P. humilisnash, and P. palustris (Raf.) Sarg. (Lauraceae) of North America.* J. Essent, Oil Res. 9: 209-211.

Webb, D.H., H.R. DeSelm, and W.M. Dennis. 1997. Studies of prairie barrens of northwestern Alabama. Castanea 62(3):173-184.


**Expert Witness Testimony and Depositions 2019 - 2021:**

**South Florida Water Management District v Triple A #3, LLC et al.** (Case No. 2017-007932-CA-01)
Circuit Court of 11th Judicial Circuit in and for Miami-Dade County, Florida Circuit Civil Division
Witness for Respondent
Date: July 1, 2019
Type of Testimony: Deposition

SHARFIEXPERTS0000399

W. Michael Dennis, Ph.D.                                                    Page 9

**United States v Mashni et al.** (Case No. 2:18-cv-02288-DCN [d.S.C.])
United States District Court for the District of South Carolina Charleston Division
Witness for Defendant
Date: January29, 2021
Type of Testimony: Deposition

BREEDLOVE, DENNIS & ASSOCIATES, INC.
330 W. CANTON AVENUE / WINTER PARK, FLORIDA  32789 / (407) 677-1882 / FAX (407) 657-7008

O:\ADMADMIN\RESUMES\WMD\WMD  UPDATED 4_7_22 - INCLUDES TWO DEPOS.DOC                    April 7, 2022

SHARFIEXPERTS0000400



# BDA
### ENVIRONMENTAL CONSULTANTS

## SCHEDULE OF PROFESSIONAL FEES

### Effective March 28, 2015

| Position/Service | Hourly Rate ($) |
|---|---|
| Principal | 355.00 |

Expert witness at 125% of schedule fees.

BREEDLOVE, DENNIS & ASSOCIATES, INC.

✉ 330 W. Canton Ave. ~ Winter Park, FL 32789-3195
Phone: 407-677-1882 ~ Fax: 407-657-7008

☐ 30 East Liberty St. ~ Brooksville, FL 34601-2910
Phone: 352-799-9488 — Fax: 352-799-9588

SHARFIEXPERTS0000401