# EXHIBIT 10

**Page 1**

```
 1              UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF FLORIDA
 2
                    CASE NO. 2:21-cv-14205-KAM
 3
 4   UNITED STATES OF AMERICA,
 5        Plaintiff,
     vs.
 6
     BENJAMIN K. SHARFI, in his personal
 7   and fiduciary capacity as trustee of
     The Benjamin Sharfi 2002 Trust, AND
 8   NESHAFARM, INC.,
 9        Defendants.
10   _____/
11
                      VIA ZOOM
12              Miami, Florida 33136
           Friday, 9:01 a.m. to 5:10 P.M.
13              May 27, 2022
14
15
16         DEPOSITION OF W. MICHAEL DENNIS
17
18
19        Taken on behalf of the Plaintiff before
20   Melissa Ostolaza, Notary Public in and for the State
21   of Florida at Large, pursuant to Notice of Taking
22   Deposition in the above cause.
23
24
25
```

**Page 2**

```
 1   ALL APPEARANCES VIA ZOOM:
 2
 3   ATTORNEY FOR PLAINTIFF:
 4   BRANDON N. ADKINS, ESQUIRE
     Brandon.adkins@usdoj.gov
 5   United States Department of Justice Environmental &
     Nautural Resources Division
 6   P.O. Box 7611
     [!ADDRESS-B1]
 7   Washington, D.C. 20044
 8
     ATTORNEY FOR DEFENDANTS:
 9
         NEAL MCALILEY, ESQUIRE
10       Carlton Fields, P.A.
         2 Miami Central
11       700 N.W. 1st Avenue #1200
         Miami, Florida 33136
12
13       SHARFI HOLDINGS, INC.
         CHRISTOPHER F. HAMILTON, ESQUIRE
14       Chamilton@sharfiholding.com
         3690 West Gandy Boulevard
15       Suite 422
         Tampa, Florida 33611
16
17   ALSO PRESENT:
18       William Moore, Esquire Army Corps of Engineers
         Amber Jackson, Army Corps of Engineers
19       Carlos Andreu, Videographer
         Mark Wylie
20       Lyndon Lee
21
22
23
24
25
```

**Page 3**

```
 1                      INDEX
     WITNESS                                    PAGE
 2
 3   W. MICHAEL DENNIS
 4   Direct Examination by MR. ADKINS              5
     Cross-Examination by MR. MCALILEY           243
 5
 6               Exhibits
 7   NUMBER          DESCRIPTION                  PAGE
 8   Exhibit DX193     Rainfall Data              127
     Exhibit DX194     Rebuttal Report            132
 9   Exhibit DX195     Ms. Small Transcript       182
     Exhibit DX196     Site Map                   189
10
```

**Page 4**

```
 1      VIDEOGRAPHER:  Good morning.  We're now on
 2   the record.  The time is now 9:01 a.m. eastern
 3   time on Friday, May 27th, 2022.  This is
 4   beginning of the video tape deposition of Mr. W.
 5   Michael Dennis, taken in the matter of the United
 6   States of America versus Benjamin K. Sharfi.
 7      The Videographer is me, Carlos Andreu, and
 8   the Court Reporter today is Melissa Ostolaza.
 9   We're both representing Esquire Deposition
10   Solutions.
11      Counsel, will you please announce your name
12   and whom you represent, after which the Court
13   Reporter will swear in the witness.  You may
14   proceed.
15      MR. ADKINS:  Good morning, everyone.  This
16   is Brandon Adkins of the United States.  I
17   represent the United States, the Plaintiff in
18   this case.  Also, on the deposition today we have
19   listening in Amber Jackson of the United States
20   Corps of Engineers and two of the United States'
21   expert witnesses, Michael Wylie and Lyndon Lee.
22      MR. MCALILEY:  This is Neal McAliley at the
23   law firm of Carlton Fields representing the
24   Defendants and I'll be defending the deposition
25   here today.
```



W. MICHAEL DENNIS
U.S.A. vs BENJAMIN K. SHARFI

May 27, 2022
5–8

Page 5

1      MR. HAMILTON:  Good morning, this is
2   Christopher Hamilton, here on behalf the
3   defendants, counsel for defendants.  My colleague
4   Joshua Miron may be popping into the deposition
5   as well listening in.  Thank you.
6      MR. MOORE:  And this is William Moore with
7   the Army Corps of Engineers office counsel.
8      VIDEOGRAPHER:  Will the Court Reporter Swear
9   in the witness, please.
10     COUR REPORTER:  Yes, sir.
11     Mr. Dennis, will you please raise your right
12   hand.
13      Do you swear or affirm the testimony you are
14   about to give today will be the truth, the whole
15   truth and nothing but the truth?
16     THE WITNESS:  Yes.
17     COURT REPORTER:  Thank you, sir.
18          DIRECT EXAMINATION
19 BY MR. ADKINS:
20   Q.  Good morning, Dr. Dennis.  Nice to see you.
21   A.  Good morning.
22   Q.  How you feeling today?
23   A.  Doing fine.  Beautiful day in Miami.
24   Q.  I'm doing okay, too.
25      So could I please have you state your full

Page 6

1  name and address for the record, please?
2    A.  William Michael Dennis.  My business address
3  is 330 West Canton Avenue, Winter Park, Florida
4  32789.
5    Q.  Thank you.  Dr. Dennis, we're taking this
6  deposition remotely today, correct?
7    A.  Correct.
8    Q.  And we're using the Zoom platform?
9    A.  That's my understanding.
10   Q.  Is there anyone else in the room with you
11 today?
12   A.  Neal is with -- is here, no one else.
13   Q.  And that's Neal Mcaliley?
14   A.  Yes.
15   Q.  Okay.  Do you have any materials in front of
16 you?
17   A.  Yes, I do.
18   Q.  What do you have?
19   A.  I have my binder with my expert rebuttal
20 report and I also have the notice of taking it.
21   Q.  Notice of this deposition?
22   A.  Yes.
23   Q.  Anything other than your report and the
24 notice of your deposition?
25   A.  No.  My computer, cell phone and glasses.

Page 7

1    Q.  Okay.  Great.  So are there any other
2  electronic devices other than your computer and your
3  cell phone?
4    A.  No.
5    Q.  What programs do you have up and running on
6  your computer?
7    A.  I don't know.
8      MR. MCALILEY:  It looks like he's got Zoom
9   up.  Counsel, he's got Zoom up on his computer.
10  BY MR. ADKINS:
11   Q.  Do you have any e-mail programs or programs
12 that will allow you to communicate with people
13 outside of today's deposition?
14   A.  I do but I -- they're not up.
15   Q.  They're not running on your computer
16 currently?
17   A.  I don't believe so.
18   Q.  Okay.  So, you know, because this is a
19 remote deposition and I'm not in the room with you
20 today, I just ask that you don't communicate with
21 anyone outside of the deposition and in a way that's
22 not reflective verbally on the record.  Does that
23 make sense to you?
24   A.  Understand.
25   Q.  Okay.  And if you'd like to take a break at

Page 8

1  any point in today's deposition, just let me know.
2  We can take here as many breaks as we like.  It's
3  Friday before Memorial Day.  I'm in a empty federal
4  office building right now, so I think everyone is
5  probably itching to get home, but don't hesitate to
6  ask for a break if you like and I'll try to find a
7  logical breaking point in questions, okay?
8    A.  That's fine.
9    Q.  Okay.  Now, Dr. Dennis, you attached your CV
10 to your report as appendix 9, correct?
11   A.  Correct.
12   Q.  And does your CV contain a complete list of
13 qualifications to offer expert testimony in this
14 case?
15   A.  I believe so, yes.
16   Q.  Do you consider yourself to be an expert in
17 hydrology?
18   A.  I'm not a hydrologist.
19   Q.  You're not a certified hydrologist?
20   A.  No.  I'm not a certified hydrologist.  I
21 understand the principles of hydrology and work with
22 hydrology in my day-to-day practice, but I'm not a
23 trained, licensed hydrologist.
24   Q.  And what training, if any, have you received
25 in hydrologist or hydrologic principles?



W. MICHAEL DENNIS
U.S.A. vs BENJAMIN K. SHARFI

May 27, 2022
9—12

Page 9

1    A.  The typical work you would get in
2  undergraduate and graduate degrees in biology,
3  ecology.
4    Q.  Any other training that you've received in
5  hydrology or hydrologic principles other than typical
6  training you would get in undergraduate and graduate
7  degrees in biology or ecology?
8    A.  No.  Other than 45 years working in the
9  field.
10    Q.  Oh, so you have some personal experience or
11  field experience?
12    A.  I have -- I have, well, about 45 years
13  professional experience beyond my educational
14  experience.
15    Q.  Okay.  Let's go back to the training aspect
16  of this.
17       For your undergrad degrees, what training
18  have you received in hydrology or hydrologic
19  principles?
20    A.  There was some discussion of hydrology in
21  some ecology courses I had as an undergraduate.
22    Q.  About how many years ago was that?
23    A.  It was 1968 and '69.
24    Q.  That was in the years 1968 or '69?
25    A.  Yes.

Page 10

1    Q.  It wasn't 68 years ago, right?
2    A.  No, of course not.
3    Q.  And when you say discussions, what do you
4  mean?
5    A.  Well, I had some basic ecology courses in
6  the hydrologic cycle and hydrology where -- you know,
7  were an element of those basic ecology courses they
8  were discussing that day.
9    Q.  About how many courses would you say would
10  you say did you focus on hydrology in these basic
11  ecology courses?
12    A.  I didn't focus on hydrology.  I had ecology
13  courses and they were about that.  They were probably
14  two or three courses.
15    Q.  Two or three ecology courses?
16    A.  As an undergraduate, yes.
17    Q.  And what -- if you could, you know, give a
18  portion or a percentage of those courses that dealt
19  with or discussed hydrology, what would it be?
20    A.  These were basic ecology courses that dealt
21  with primarily plant ecology and the various aspects
22  of the biotic and abiotic community related to that.
23    Q.  How about for your graduate degree, what
24  biology or ecology courses discussed hydrology?
25    A.  Well, I have a master degree in biology at

Page 11

1  the University of South Carolina, and I had several
2  ecology courses there that dealt with principles of
3  ecology.  And as part of that master's degrees, I
4  worked on wet planes swamp, the Santee Swamp in South
5  Carolina and that required me to look at the
6  hydrologic characteristics of that swamp as part of
7  my master's degree.  I also worked on some sand hill
8  ponds in South Carolina and some other ecological
9  studies.  All they had was an element of
10  understanding the hydrologic conditions of the area I
11  was studying.
12    Q.  How many courses in your graduate career
13  have you taken that discussed or dealt with
14  hydrology?
15    A.  I don't recall.
16    Q.  Did you ever take any biology or ecology
17  courses that focused on hydrology?
18    A.  I don't recall ever having a hydrology, per
19  se, course.
20    Q.  Okay.  Have you ever taught any courses in
21  hydrology?
22    A.  No.
23    Q.  Do you know the names of any well-recognized
24  experts in the field of hydrology?
25    A.  Probably if I sat here and thought about it,

Page 12

1  I could come up with some but at this moment, no.
2    Q.  Do you consider yourself to be a
3  well-recognized expert in the field of hydrology?
4    A.  As previously mentioned, I'm not an
5  hydrologist.
6    Q.  So you don't, correct?
7    A.  I'm not a hydrologist.
8    Q.  And you don't recognize yourself as an
9  expert in the field of hydrology?
10    A.  I'm not a hydrologist.  I work with the
11  principles of hydrology and I work with hydrologic
12  considerations in pretty much all of our ecological
13  studies, in a lot of the studies we do, but I would
14  not consider myself a trained professional
15  hydrologist.
16    Q.  Okay.  Are you familiar with any
17  publications that discuss topics relating to
18  hydrology?
19    A.  I've read -- I've read text and papers on
20  hydrology, but I can't remember any particular
21  citations right now.
22    Q.  Was that part of your undergraduate or
23  graduate training?
24    A.  In part and then part of my professional
25  career.



W. MICHAEL DENNIS
U.S.A. vs BENJAMIN K. SHARFI

May 27, 2022
13–16

Page 13

1    Q.   Okay.  When is the last time you read a text
2    on hydrology?
3         MR. MCALILEY:  I'm going to object to the
4    form.
5         THE WITNESS:  I don't recall.
6    BY MR. ADKINS:
7    Q.   Is that because it was a long time ago?
8    A.   It's because I don't recall.  It may have
9    been within the last several years.  I just don't
10   recall.
11   Q.   Do you consider yourself to be an expert in
12   soil science?
13   A.   No.  I'm not a soil scientist either.  I
14   work with soils and I've dealt with soils in the
15   wetland context over the years, but I would not
16   consider myself a professional soil scientist.
17   Q.   And just to confirm, you're not a certified
18   soil scientist, correct?
19   A.   No, I'm not.
20   Q.   Do you consider yourself to be an expert in
21   land surveying?
22   A.   No.
23   Q.   And just to confirm, you're not a licensed
24   surveyor in Florida, correct?
25   A.   Correct.

Page 14

1    Q.   Do you consider yourself to be an expert in
2    photo interpretation?
3    A.   Yes, I believe so.
4    Q.   What experience do you have in photo
5    interpretation?
6    A.   My first real experience with photo
7    interpretation was training in the United States Army
8    where we had courses on aerial photo interpretation.
9    As part of my master's degree, I used aerial
10   photography and studied reflective to the Santee
11   Swamp and its environment and also to a degree some
12   of the sand hill ponds that I worked on in South
13   Carolina.
14        In my -- in my tenure at the Tennessee
15   Valley Authority, I worked, if not daily, regularly
16   with aerial photographs.  Part of my duties was to
17   photo interpret the aquatic and wetland community in
18   the TVA reservoirs and also to evaluate wetlands as
19   part of various TVA projects that were being
20   permitted by that entity at the time.
21        As part of that, I also was the principal
22   photo interpreter on a collaborative contract, I
23   guess is the best way to say it, TVA had on the
24   National Wetland Inventory mapping, so I mapped
25   several panels for that National Wetland Inventory

Page 15

1    process while at TVA.
2         In my -- during my consulting career -- let
3    me go back to TVA.
4         I did -- I did work with UPA remote sensing
5    lab on some remote sensing studies that were on the
6    way at that time, so I did have that on-the-job
7    experience with them.
8         And in my consulting career, I worked almost
9    daily with aerial photography, photo interpreting
10   aerial photography, mapping vegetation, studying
11   aerial photography.
12   Q.   Anything else?
13   A.   That summarizes it.
14   Q.   Great.  Have you ever taken any courses in
15   photo interpretation?
16   A.   No.
17   Q.   What was the answer?
18   A.   No.
19   Q.   Okay.  And have you ever taught any courses
20   in photo interpretation?
21        MR. MCALILEY:  Object to form.
22        THE WITNESS:  No.
23   BY MR. ADKINS:
24   Q.   Are there any -- are there any
25   well-recognized texts in the field of photo

Page 16

1    interpretation?
2    A.   I'm not currently aware of any what you are
3    calling photo interpretation.  There are -- there are
4    classes and there are texts and there are
5    certifications for photogrammetry.  I'm not a
6    photogrammetrist, so I've never had any of those
7    courses and would not consider myself a
8    photogrammetrist.  But I would consider myself expert
9    in aerial photo interpretation.
10   Q.   Could you explain for me the distinction
11   between photo interpretation and photogrammetrist?
12   A.   The way I look at it is photogrammetrists
13   have expertise in using aerial photographs and
14   conducting various analysis of them that deals with
15   precise matters of mapping, you know, elevations and,
16   you know, topography and scaling aerials and the
17   mechanics, pretty much the mechanics of photo
18   interpretation.
19        When I use photo interpretation and say I'm
20   an expert, I'm saying I'm an expert in looking at
21   aerial photographs, reading the photographic
22   signatures and being able to interpret what those are
23   on, you know, black and white, color aerial
24   photographs.
25   Q.   Have you received any formal training in



W. MICHAEL DENNIS
U.S.A. vs BENJAMIN K. SHARFI

May 27, 2022
17—20

Page 17

1 being able to read signatures on black and white or
2 color photographs?
3    A.   The first training I had on that is what I
4 mentioned from the United States Army, so I did have
5 some training on that in various, you know, courses,
6 if you will, that they taught there.
7    Q.   And you spoke at length about your
8 experience in this field.  Did you ever receive any
9 sort of formal training as you were performing photo
10 interpretation throughout your career?
11       MR. MCALILEY:  Object to form.
12       THE WITNESS:  I believe you asked that
13    question before, no.
14 BY MR. ADKINS:
15    Q.   Well, I asked about your experience and you
16 summarized your experience for me but this question
17 is about formal training.
18       MR. MCALILEY:  Object to form.
19 BY MR. ADKINS:
20    Q.   Anything like that?
21    A.   Yeah.  I believe you asked that question,
22 too, and the answer is still no.
23    Q.   Do you consider yourself to be an expert in
24 jurisdictional determinations and permitting?
25    A.   I assume you're talking about wetland

Page 18

1 jurisdiction and determinations and permitting?
2    Q.   I was being more broad but why don't I
3 withdraw the question.  I'll reask.
4       Do you consider yourself to be an expert in
5 jurisdictional determinations and permitting under
6 the federal Clean Water Act?
7    A.   Yes.
8    Q.   And what is the basis for your belief that
9 you are an expert in this field?
10    A.   Well, the Clean Water Act was published in
11 1972 and I began my wetland work in 1971, so I've
12 been working in wetlands the entire length of time
13 that the Clean Water Act had been in place.  I
14 remember when it was proposed and I remember
15 discussions about that at the time.  And since then,
16 I have, in my professional career, been called on to
17 understand and work with the various procedures that
18 have been in place over the years to determine what
19 were wetlands and what were waters of the United
20 States.
21    Q.   Is there any other reasoning you have for
22 considering yourself to be an expert in
23 jurisdictional determinations and permitting under
24 the federal Clean Water Act?
25    A.   Well, I've taught wetland courses at various

Page 19

1 seminars over the years, which I think would lend
2 credence to me being an expert in that area.  And
3 I've also testified in various courts, state, federal
4 courts on wetlands and wetland determinations, and
5 some of those were involving state regulations and
6 some of those were involving federal regulations.
7 And I was accepted as an expert witnesses in those
8 cases.
9    Q.   In the state cases that you've testified in,
10 were you -- did those cases involve wetland
11 determinations under the federal Clean Water Act?
12    A.   Yes.
13    Q.   Okay.  How so?
14    A.   Could you give me a little bit more
15 specifics on the how-so question?
16    Q.   Well, in a -- I'm curious how a state court
17 proceeding related to the federal Clean Water Act?
18    A.   There are occasions in Florida and other
19 states where their state proceedings, it may be
20 administrative proceedings or it may be circuit court
21 proceedings where the question of wetland
22 jurisdiction in various venues come up.  And when
23 that does and they the subject matter is whether
24 certain wetlands are under certain jurisdictions,
25 then it's germane to present testimony in that

Page 20

1 regard.
2    Q.   In cases where you've been accepted as an
3 expert in wetland determinations, did you -- did you
4 delineate a wetland as part of your work in those
5 cases?
6    A.   In some cases, yes.  In some cases, we used
7 other wetland delineations but did not conduct one of
8 my own, per se.
9    Q.   In how many cases that you've testified in
10 have you yourself delineated a wetland?
11    A.   I don't recall.
12    Q.   Is it -- I assume it's at least one,
13 correct?
14    A.   That would be a good assumption, yes.
15    Q.   Okay.  I'm assuming that based on your
16 answer.  So is it more than one?
17    A.   Yes.  It's been a number of cases over the
18 years, and in some of those, I delineated the
19 wetlands and, again, in some of those I was reviewing
20 delineations of others.
21    Q.   Right.  But I want to focus just on the
22 cases in which you testified and in which you,
23 yourself delineated a wetland.  How many of those --
24 how many cases fall into that specific category would
25 you say?



W. MICHAEL DENNIS
U.S.A. vs BENJAMIN K. SHARFI

May 27, 2022
21–24

Page 21

1    A.  I don't recall.

2    Q.  When is the last time you've testified in a
3  case where you were accepted as an expert in wetland
4  determinations and you, yourself delineated the
5  wetland?

6    A.  I'm sorry.  I don't specifically recall.

7    Q.  Don't be sorry.  You know, what you know, is
8  what you know.

9        Was it was it within the last ten years?

10    A.  I think probably so, but I'm trying to
11  remember the specific case instance and I would
12  suspect -- I suspect within the last ten years but I
13  can't recall exactly the case.

14    Q.  Do you remember the names of any of the
15  cases in which you were admitted as an expert in
16  wetland determinations and in which you, yourself
17  delineated a wetland?

18    A.  Probably the first one -- I do remember the
19  first one and that was a case in the Everglades in
20  federal court in I think it was 1982.

21    Q.  Do you remember the name of any of the
22  parties in that case from 1992?

23    A.  1982.

24    Q.  Oh, excuse me, 1982.  Thank you.  Same
25  question?

Page 22

1    A.  No.  It was a case between the United States
2  government and a private land owner, and it had to do
3  with, I believe, an avocado grove in the east
4  Everglades area.

5    Q.  Do you recall any other specific cases in
6  which you were admitted as an expert in wetland
7  determinations and you, yourself conducted the
8  wetland delineation after this case in 1982?

9    A.  I will have to think on that.  I can't
10  recall.

11    Q.  Have you ever worked for the United States
12  Army Corps of Engineers?

13    A.  No.

14    Q.  Have you ever worked for the United States
15  Environmental -- oh, sorry.  You weren't finished?

16    A.  I was in United States Army and -- and part
17  of my training in the United States Army was as a
18  combat engineer.  So there was a time in the army
19  that I guess I could say that I worked for the United
20  States Army Corps of Engineers but with that
21  clarification, other than that, no.

22    Q.  Okay.  And when you were -- when you were
23  working in that capacity, did you do any work related
24  to the Clean Water Act?

25    A.  No.

Page 23

1    Q.  Have you ever worked for the United States
2  Environmental Protection Agency?

3    A.  No.

4    Q.  Have you ever taken the Army Corps Of
5  Engineers training?

6    A.  No.

7    Q.  Have you ever taken any Army Corps of
8  Engineers training courses?

9    A.  Other than in the United States Army, I
10  don't believe so.

11    Q.  Have you ever taken any Army Corps of
12  Engineers training courses relating to the Clean
13  Water Act or jurisdiction thereunder?

14    A.  No.

15    Q.  Have you ever taken any U.S. EPA training
16  courses?

17    A.  Yes.

18    Q.  What courses have you taken?

19    A.  There was -- there was a course or two that
20  I took that are on my resume having to do with expert
21  witness testimony, those kind of things.  They were
22  not -- they were not wetland training EPA courses.

23    Q.  And are you familiar with the 1987 Corps of
24  Engineers Wetlands Delineation Manual?

25    A.  Yes, I am.

Page 24

1    Q.  It's a mouthful so if it's okay with you,
2  can I refer to that as the 1987 manual throughout
3  your deposition today?

4    A.  Yes.

5    Q.  Okay.  Thank you.  What is the purpose of
6  the 1987 manual?

7    A.  To provide guidance on the identification
8  and delineation of wetlands under the federal
9  definition under the Clean Water Act.

10    Q.  And have you received any sort of training
11  on the 1987 manual?

12        MR. MCALILEY:  Object to form.

13        THE WITNESS:  Not -- not formal training
14    that I recall.

15  BY MR. ADKINS:

16    Q.  Have you taken any courses or seminars on
17  the 1987 manual?

18    A.  No.  But I taught courses on it.

19    Q.  Oh, okay.  So you've taught courses on the
20  1987 manual, courses or seminars?

21    A.  Yes.

22    Q.  When is the last time you did that?

23    A.  Last July.

24    Q.  And what was -- what was the location of the
25  course that you taught?



W. MICHAEL DENNIS
U.S.A. vs BENJAMIN K. SHARFI

May 27, 2022
25—28

Page 25

1    A.  Marco Island, Florida.
2    Q.  Was this a course that was organized by an
3  organization?
4    A.  Yes.
5    Q.  What was the organization?
6    A.  I think it may have been sponsored by the
7  Florida Chamber.  This was is the Florida Chamber's
8  Environmental -- what's referred as the Environmental
9  Short Course, and that's a serious of courses that
10  have been conducted once or twice a year since 1984.
11  And I've been a speaker or panel member on those
12  courses giving course work on wetlands, state
13  wetlands, federal wetlands, the evaluation of both of
14  those almost every year.  I've missed one or two
15  years but almost every year since 1984, I believe.
16    Q.  Very good.
17        In your capacity as a speaker or panel
18  member, have you ever prepared or distributed any
19  materials?
20    A.  Yes.
21    Q.  Okay.  Are those -- do you recall what any
22  of those materials were?
23    A.  For most of those years that short course
24  required the participants, the teachers to provide
25  written outlines, and so as part of the course work,

Page 26

1  the course materials for that, those traditional
2  courses, I've prepared materials and submitted them.
3    Q.  Were any materials circulated with the
4  attendees?
5    A.  Yes.  They were they were made available to
6  all the attendees.
7    Q.  Okay.  Other than the courses and seminars
8  that you participated in with the Florida Chamber,
9  are there any other courses or seminars that you
10  taught on the 1987 manual?
11    A.  Over the years I have been asked to be a
12  speaker at various seminars, CLE seminars, and
13  perhaps others.  And as part of those seminars,
14  sometimes the course work was on wetlands and wetland
15  delineation, so it would have been involved in some
16  of those seminars.
17    Q.  Other than the Florida Chamber and the
18  seminars where you've been a speaker, any other
19  instances where you've taught a course or a seminar
20  on the 1987 manual?
21    A.  In part.  Beginning, I believe, in 1979 and
22  most -- most of the year until 2017 or so, I taught a
23  course, a wetland course at the University of
24  Tennessee, and as part of that course, I would talk
25  about the various wetland delineations, the

Page 27

1  delineation methodologies.
2    Q.  Any other instances where you taught a
3  course or seminar on the 1987 manual?
4    A.  I think all of them fall within the general
5  categories of that.  I can't remember all the
6  seminars that I may have given where that was the
7  topic.
8    Q.  Oh, by the way, do you remember any of the
9  organizations that organized courses or seminars that
10  you've described?  We have the Florida Chamber of
11  commerce but do you remember any of the others?
12    A.  I think I mentioned CLE.
13    Q.  Yeah.
14    A.  A legal seminar series.
15    Q.  I'll tell you as someone who's had to sit
16  through those, CLE stands for continuing legal
17  education, and it's a pretty generic term.  There are
18  different organizations that offer CLE courses.  Do
19  you remember what any of the names of those
20  organizations are?
21    A.  No.  I just remember receiving the
22  invitations on those occasions of being a member of
23  the panel.
24    Q.  Okay.  How about the 2010 Regional
25  Supplement to the Corp of Engineers Wetland

Page 28

1  Delineation Manual Atlantic and Gulf Coastal Plane
2  Region, have you ever heard of that document?
3    A.  Yes, I have.
4    Q.  Throughout your deposition, do you mind if I
5  refer to that document as the 2010 regional
6  supplement?
7    A.  That would be fine.
8    Q.  Okay.  Thank you.
9        What is the purpose of the 2010 regional
10  supplement, Dr. Dennis?
11    A.  As I understand it, it's to supplement the
12  data provided in the '87 manual, and those
13  supplements are targeted to different areas in the
14  country.  So it was recognized that the '87 manual
15  perhaps didn't include all of the guidance and nuance
16  that might be needed to provide guidance and
17  delineation on wetlands in all of the United States.
18  So in the 19 -- not 19, 2010, they began publishing
19  the -- the regional supplement.  So it's to provide
20  additional to guidance beyond the '87 manual.
21    Q.  For purposes of today's deposition, I will
22  refer to the site as that term has been defined in
23  the amended complaint, and the site is obviously the
24  property that's at issue in this case, do you
25  understand that today?



W. MICHAEL DENNIS
U.S.A. vs BENJAMIN K. SHARFI

May 27, 2022
29—32

Page 29

1    A.  If you're referring to the 9.2 acre site,
2    then, yes.
3    Q.  Excellent.  Yes, I am.  And that's how it's
4    been defined in the amended complaint.
5        So does the 2010 Atlantic and Coastal Plane
6    Regional Supplement apply to the region in which the
7    site sits?
8    A.  Yes.
9    Q.  Did you receive any training in the 2010
10   regional supplement?
11   A.  No formal seminars or any specific training
12   on it.
13   Q.  Have you attended any course work on the
14   2010 regional supplement?
15   A.  Not that I recall other than, you know,
16   perhaps some of the course seminars or other seminars
17   like that where it may have been discussed.
18   Q.  Okay.  And I asked you about the seminars or
19   course work that you instructed dealing with the 1987
20   manual.  Did any of that course work or the seminars
21   where you've been instructor or panelist deal with
22   the 2010 regional supplement?
23   A.  Yes.  They -- that was mentioned and
24   discussed in some of those seminars.
25   Q.  Have you ever taught any courses or seminars

Page 30

1    that focused on the 2010 regional supplement?
2    A.  I don't recall any that had that as a
3    singular focus of a seminar.
4    Q.  Did you consult the 2010 regional supplement
5    as part of your work in this case?
6    A.  Yes.
7    Q.  Are there any other guidance documents that
8    you considered in forming your opinions in this case
9    other than the 2010 regional supplement?
10   A.  Yes.
11   Q.  What other guidance documents did you
12   consider?
13   A.  The '87 Manual, the 2008 Rapanos guidance
14   document.
15   Q.  Okay.  Other than the 2010 regional
16   supplement, the 1987 Manual, and the 2008 Rapanos
17   guidance document, did you consider any other
18   guidance documents as part of your work in this case?
19   A.  I want to make sure I answer this question
20   correctly.  When you say guidance document, are you
21   using that as a specific term of art or are you
22   asking were there any other documents that I
23   considered as guidance?
24   Q.  I think I see your distinction.  So if I
25   were to say consider guidance documents to be both

Page 31

1    categories that you've identified, are there any
2    other guidance documents that you considered as part
3    of your work in this case other than the 2010
4    regional supplement, the 1987 manual and the 2008
5    Rapanos Guidance?
6    A.  Yes.
7    Q.  Okay.  What other documents did you
8    consider?
9    A.  I considered various court cases, Riverside
10   and Bay Leaf Homes (phonetic), Supreme Court case,
11   the Swank, as it's called, Supreme Court case, the
12   Rapanos Supreme Court case, several circuit cases,
13   Robinson, PreCore.  Primarily those Supreme Court
14   cases.
15   Q.  Any other documents that you considered for
16   guidance or that were guidance documents that you
17   considered as part of your work in this case?
18   A.  Yes.  I should have added, also, the -- you
19   know, the 1972 as amended in '77 Clean Water Act, the
20   various rules on waters of the United States as a
21   background, being considered to a limited degree, the
22   Clean Water Rule, the Water Protection Rule, the
23   recently published, fairly recently published waters
24   of United States rule.  I forget exactly what it's
25   being called right now.  I did review those.

Page 32

1    Q.  Anything else?
2    A.  As primary guidance documents, I think those
3    are the primary ones.
4    Q.  Okay.  Are there any that aren't the primary
5    ones that you considered?
6    A.  No.  No.
7    Q.  Okay.  So the list you gave me would be the
8    complete list of documents that you considered for
9    guidance, or that were guidance documents as part of
10   your work in this case?
11       MR. MCALILEY:  Object to form.  You can
12   answer.
13       THE WITNESS:  Yes.  Now, I'd -- I'll add
14   because I don't know how far afield you want this
15   guidance discussion to go, but I did review
16   hydric soil lists and -- and plant lists and, you
17   know, various other technical materials, but as
18   far as guidance on the specific question of
19   waters in the United States, I think this is
20   pretty much the substance of them.
21   Q.  Okay.  What hydric soil lists did you
22   review?
23   A.  Well, there's several -- there's several
24   hydric soil lists.  There's a hydric soil list and
25   it's published and updated periodically that was part



W. MICHAEL DENNIS
U.S.A. vs BENJAMIN K. SHARFI

May 27, 2022
33–36

Page 33

1   of the background material and part of what's used
2   in -- in looking at the soils for wetland
3   delineations.
4        Other soil -- other soil surveys, Martin
5   County Soil Survey, NRCS Soil Surveys published
6   online.  Those are the types of soil surveys I looked
7   at.
8   Q.   Any other soil lists that you reviewed?
9   A.   No.  I think those are the ones.
10  Q.   And how about the plant lists; what plant
11  lists did you review as part of your work in this
12  case?
13  A.   Well, as part of the information in the '87
14  Manual and 2010 Supplement, and then the Corps
15  updates and publishes the national plant list of
16  wetland plants.  And that's part of the background
17  material that -- that I looked at and reviewed.
18  Q.   How did you review the Corps' national plant
19  list; is that online or do you have a printed copy?
20  A.   I'm sure I have a printed copy because I
21  like to print everything out, but I also reviewed it
22  online.
23  Q.   About how long did you spend reviewing the
24  Corps' national plant list online as part of your
25  work in this case?

Page 34

1   A.   I referred to it, not very long.
2   Q.   More than an hour?
3   A.   No.  I don't think so.
4   Q.   More than a half an hour?
5   A.   Probably.
6   Q.   And you said other technical materials.
7   Other than the soils list that you identified and
8   this plant list, any other technical materials that
9   you considered as guidance as part of your work in
10  this case?
11  A.   Again, we're -- at least I'm struggling with
12  your use of the word guidance.  Listed in -- the
13  rebuttal report are a number of data sources that I
14  used in -- in my analysis, so I would include that
15  list from my rebuttal report as -- as information.
16       I don't know whether that fits into your
17  definition of guidance and what you're trying to call
18  guidance or not, but I did -- the complete list, I
19  want to disclose that I did review those documents.
20  Q.   Great.  I appreciate you doing that.  I
21  would have considered those factual background
22  materials.
23       Any other materials that offer guidance in
24  completing a wetland delineation or jurisdiction
25  under the Clean Water Act that you considered?

Page 35

1   A.   Not that I recall.
2   Q.   I hope you'll excuse me for the -- you know,
3   the impertinence of these questions.  It's something
4   that I ask all expert witnesses, so I'm going to ask
5   you the same.  But I hope you don't take offense to
6   any of them because I don't mean to offend you in any
7   way.
8   A.   No, no offense taken.
9   Q.   Excuse me?
10  A.   No offense taken.
11  Q.   Okay.
12  A.   Oh, I thought you were talking about the
13  questions you've already asked me, if I've taken
14  offense to those.
15  Q.   Those were the softballs, Dr. Dennis.
16  A.   Okay.
17  Q.   Have you ever been subject to disciplinary
18  action?
19  A.   Not since I was a very young child.
20  Q.   Okay.  Are we talking high school or
21  earlier?
22  A.   No, I'm -- I'm talking -- I'm talking about
23  being a young child in a family and your parents
24  saying --
25  Q.   Got it.  How about in your professional

Page 36

1   career; have you ever been subject to disciplinary
2   action?
3   A.   No.
4   Q.   In your academic career after high school,
5   have you ever been subject to disciplinary action?
6   A.   No.
7   Q.   Have you ever been subject to an
8   investigation that could have led to an adverse
9   action being taken against you?
10  A.   Not that I'm aware of.
11  Q.   Have you ever been convicted of a crime?
12  A.   No.
13  Q.   Okay.  How did you first become aware of the
14  site?
15  A.   I was contacted by Chris Hamilton of Shutts
16  & Bowen at the time, and he indicated that he had a
17  client that had a --
18  Q.   Let me stop you.  I -- I -- Chris Hamilton's
19  a lawyer that represents the defendants in this case,
20  correct?
21  A.   Correct.
22  Q.   I don't want -- I don't want to hear about
23  -- well, maybe I would be interested to hear it, but
24  I don't want to ask you any questions about the
25  subject of your communications or the substance of



W. MICHAEL DENNIS
U.S.A. vs BENJAMIN K. SHARFI

May 27, 2022
37—40

Page 37

1  your communications with counsel; okay?
2     A.  Okay.
3     Q.  So you first -- you first heard about the
4  site through -- after counsel reached out to you; is
5  that right?
6     A.  That's correct.
7     Q.  Okay.  Thank you very much.
8        Were you provided any facts or data about
9  the site?
10    A.  Initially, I was provided the complaint and
11 a map, or some sort of description of where the site
12 was.
13    Q.  Do you remember what was represented in the
14 map?
15    A.  The boundaries of the site.
16    Q.  Have you been provided with any other facts
17 or data about the site?
18    A.  Yes.
19    Q.  What facts or data have you been provided
20 about the site?
21    A.  I was provided the various wetland surveys
22 and documents done by Danna Small and also a couple
23 of reports by another environmental consultant that
24 worked on the site.  Those were earlier primary
25 documents on the site that I reviewed.

Page 38

1     Q.  These reports by the other environmental
2  consultant, is that EDC?
3     A.  Correct.
4     Q.  Had you been provided with any other facts
5  or data about the site other than what you've
6  received?
7     A.  Yes.
8     Q.  What are they?
9     A.  I was provided the amended federal
10 complaint.  I was provided the expert report by --
11 for -- for you or DOJ.  I was provided depositions
12 that have been taken in this case, specifically
13 Nutter, Wylie, Rains, Lee.  I was provided the expert
14 report of Creach and Dr. Ott.  I was provided the --
15 some information on the South Florida Water
16 Management District enforcement matter.  Those are
17 the primary documents and reports that I recall being
18 provided.
19    Q.  When you say primary, are there any other
20 facts or data that you've been provided by the site
21 that are not the primary facts or data?
22    A.  Those are the documents that I remember
23 being provided.
24    Q.  What -- what information were you provided
25 by the South Florida Water Management District?

Page 39

1     A.  I was made -- I was made aware that there
2  was a pending enforcement case with South Florida,
3  and I -- I reviewed the final -- what I assume is the
4  final order in that case.  I was not involved in --
5  in that matter for the property owner in any -- in
6  any manner, so I was just made aware of it.
7     Q.  Okay.  You mentioned the depositions of
8  Dr.Netter, Dr. Rains, Dr. Lee and Mr. Wylie.  Were
9  you provided with any other facts or data other than
10 depositions?
11    A.  I think there was one other deposition I was
12 provided that was of the farm manager, whose name
13 escapes me right now.
14    Q.  Mr. Charles Derilseti (phonetic)?
15    A.  Yes, sir, that's right.
16    Q.  Are you aware that Ms. Small was deposed in
17 this case?
18    A.  Yes.
19    Q.  Were you provided with a copy of her
20 deposition --
21    A.  Yes, sir.
22    Q.  -- transcript?
23    A.  Yes.
24    Q.  Any other deposition transcripts that you've
25 considered in this case?

Page 40

1     A.  Not that I recall.
2     Q.  Were you provided with any facts or data
3  about the history of the site?
4     A.  I'm sorry, about what?
5     Q.  The history of the site?
6     A.  No.  I was not provided, that I recall, any
7  written information on the history of the site.  I do
8  recall some discussions about the history of the site
9  with the various attorneys and to a degree Mr. Sharfi
10 about the site.
11    Q.  And would you consider the discussions that
12 you had with counsel and Mr. Sharfi about the history
13 of the site to have conveyed to you facts or data
14 about the site?
15    A.  No.  I would -- I would consider it just
16 general background information.
17    Q.  How would general background information be
18 distinct from facts or data about the site?
19       MR. MCALILEY:  Object to form.
20       THE WITNESS:  Well, I consider facts and
21    data information that's -- that's provided in a
22    format where you can review and test it, analyze
23    it.  General conversations about the site I take
24    as general conversations, but not necessarily
25    facts or data.



W. MICHAEL DENNIS
U.S.A. vs BENJAMIN K. SHARFI

May 27, 2022
41—44

Page 41

1  BY MR. ADKINS:
2      Q.   What did Mr. Sharfi tell you about the
3  history of the site?
4      A.   Just general discussions about him acquiring
5  the site and managing the site.  He was obviously
6  proud of the -- the farm and his operations on the
7  farm and the animals that he had there.  That was --
8  it was general discussions like that.
9      Q.   What did Mr. Sharfi tell you about acquiring
10  the farm?
11      A.   Just that he did.  I don't remember any
12  specifics about the genesis of the acquisition or
13  anything like that.
14      Q.   Did Mr. Sharfi tell you anything about why
15  he acquired the farm?
16      A.   Not that I recall.
17      Q.   Any other general conversations you recall
18  having with Mr. Sharfi about the farm?
19      A.   No, other than he -- he did -- he was on
20  site during I think maybe two of my site inspections,
21  so he visited this and that.  I guess visited is too
22  strong a word.  He -- he was on the site and was
23  around on the site during two of my site inspections.
24  So it was general conversation during that -- during
25  that time.

Page 42

1      Q.   What information regarding the history of
2  the site did the attorneys for Mr. Sharfi give to
3  you?
4          MR. MCALILEY:  I'm going to object to the
5      form.
6          THE WITNESS:  Again, general information
7      about when Mr. Sharfi acquired the site and his
8      operations of the farm.  They informed me of the
9      pending federal complaint and of the pending
10      South Florida enforcement action.
11  BY MR. ADKINS:
12      Q.   Did they provide you any information about
13  the history of the site?
14      A.   Nothing before Mr. Sharfi acquired it, no.
15      Q.   Okay.  And what about after Mr. Sharfi
16  acquired it; did they provide any information about
17  the history of the site?
18      A.   Nothing other than what I've just told you.
19      Q.   Okay.  Have you been provided with any
20  assumptions in this case?
21      A.   With any assumption?
22      Q.   Yes.
23      A.   No.
24      Q.   Have you been asked to assume any facts as
25  part of your work in this case?

Page 43

1      A.   No.
2      Q.   Have you been provided with any facts
3  regarding defendant's activities at the site?
4          MR. MCALILEY:  Object to form.
5          THE WITNESS:  Would you restate that,
6      please.
7  BY MR. ADKINS:
8      Q.   Have you been provided with any facts
9  regarding defendant's activities at the site?
10          MR. MCALILEY:  Object to form.
11          THE WITNESS:  No.
12  BY MR. ADKINS:
13      Q.   Have you been provided with any aerial
14  photographs of the site?  Let me withdraw the
15  question.
16          Other than what's reflected in your rebuttal
17  report, have you been provided with any aerial
18  photographs of the site?
19      A.   There were aerial photographs in the Creach
20  and Ott reports, and there were aerial photographs in
21  the DOJ expert report.
22      Q.   Okay.  Other than the aerial photographs in
23  your and any other expert's reports in this case,
24  have you been provided with any aerial photographs?
25      A.   No.

Page 44

1      Q.   Have you been -- other than what's
2  reflected, if any, in the expert reports in this
3  case, have you been provided with any drone
4  photographs?
5      A.   No.
6      Q.   Other than what's reflected in the expert
7  reports in this case, have you been provided with any
8  ground level photographs?
9      A.   No.
10      Q.   And have you been provided with any videos?
11      A.   No.
12      Q.   Have you ever seen any videos of the site?
13      A.   The only video that might fit into that
14  answer is, I believe, on my first site visit there
15  was a person operating the drone and he -- it wasn't
16  a video.  I didn't see any video of it, but I did see
17  the drone fly over the north-south ditch north of the
18  property.  So if that fits in to what you're asking,
19  yes, but other than that, no.
20      Q.   You're not aware of whether the drone was
21  video recording?
22      A.   I don't know.
23      Q.   Other than the ten photos -- well, other
24  than photos that are in your report and photos that
25  are in any of the expert reports in this case, have



W. MICHAEL DENNIS
U.S.A. vs BENJAMIN K. SHARFI

May 27, 2022
45–48

Page 45

1   you seen any other photos of the site?
2      A.   Yes.
3      Q.   What photos have you seen?
4      A.   Well, there were other photos that I took on
5   my site visits other than the ones that I put in my
6   report, so I've seen those.
7      Q.   Any other photos that you've seen other than
8   what you've taken yourself and what's in the expert
9   reports?
10     A.   No.
11     Q.   How about videos -- oh, excuse me, strike
12   that.  We've -- we've asked about videos.
13          Have you interviewed anyone in connection
14   with this case?
15          MR. MCALILEY:  Object to form.
16          THE WITNESS:  No.
17   BY MR. ADKINS:
18     Q.   Have you read any interviews or statements
19   in connection with this case?
20     A.   I've read the reference to interviews in the
21   expert report, but that's all that I recall about
22   interviews.
23     Q.   In the U.S. expert team's report?
24     A.   Correct.
25     Q.   Is there any other data that you've

Page 46

1   considered or reviewed as part of your work in this
2   case that we haven't discussed yet, or that's not
3   specifically referenced in your rebuttal report?
4      A.   No.  I don't believe so.
5      Q.   Okay.  Dr. Dennis, about how many times --
6   well, how many times have you been to the site?
7      A.   Three times.
8      Q.   Okay.  When was the first time you went to
9   the site?
10     A.   That was in September of 2021.
11     Q.   That visit was between September 12 and 14,
12   2021; is that right?
13     A.   What was the day of the first date you gave
14   me?
15     Q.   12 through 14.
16     A.   Yeah, but was -- was 12 a Sunday or a
17   Monday?
18     Q.   Let me check.
19     A.   To make it easier, I was there on the Sunday
20   before the inspections that started on Monday.  And
21   then I was there for the duration of those
22   inspections during that September time visit.
23     Q.   Sunday -- September 12th, 2021 was a Sunday,
24   so that checks out.
25          Did -- when did you arrive on the site on

Page 47

1   September 12th?
2      A.   It was early to midafternoon.
3      Q.   Did you inspect the site at that time?
4      A.   Yes.
5      Q.   About how long did your inspection take?
6      A.   As I recall, several hours.
7      Q.   Describe what you did on September 12th at
8   the site.
9      A.   Well, I met at the site and discussed the
10   site with Mr. Hamilton and others that were there.  I
11   don't recall exactly who was there.  There -- there
12   were some people coming and going, but principally
13   with Mr. Hamilton.  And I walked the site, became
14   familiar with it, looked at the various site
15   conditions.
16          As I mentioned, there was a gentleman there
17   that -- that flew the drone over the property north
18   of the site, principally the north-south ditch.  So
19   generally, I'm looking at the site, becoming familiar
20   with it.
21     Q.   That site is under ten acres, right?
22     A.   Yes.
23     Q.   And you said you -- you were walking the
24   site and getting familiar with it for several hours;
25   is that right?

Page 48

1      A.   Well, the whole -- the whole discussion of
2   looking at the site, looking at some of the
3   information that I put together, looking at some of
4   the aerial photographs.  Generally, as I recall,
5   the -- the meeting and discussions on that site that
6   day were two, three hours.
7      Q.   Okay.  Did you take any notes when you were
8   on the site?
9      A.   I don't recall taking any notes on the 12th.
10     Q.   Did you -- did you dig any holes when you
11   were on the site on September 12th?
12     A.   No.
13     Q.   Okay.  Did you complete any -- well, do you
14   know what a wetland determination data form is?
15     A.   Yes.
16     Q.   Did you complete any wetland determination
17   data forms on September 12th?
18     A.   No.
19     Q.   Did you take any photographs on
20   September 12th at the site?
21     A.   I don't believe so.
22     Q.   Did you collect any other data about the
23   site on September 12th?
24     A.   No, just general familiarization of it.
25     Q.   Okay.  Did you make any observations about



W. MICHAEL DENNIS
U.S.A. vs BENJAMIN K. SHARFI

May 27, 2022
49–52

Page 49

1  hydrologic features on the site?
2      MR. MCALILEY:  Object to form.
3      THE WITNESS:  Yes.
4  BY MR. ADKINS:
5      Q.   What were those observations?
6      A.   Well, I noted the north-south ditch that was
7  on the western boundary of the site.  I noted a
8  east-west ditch on the northern boundary of the site.
9  I noted a -- the pond in the southwest corner of the
10 site.  I noticed an area of -- of wetland principally
11 in the -- in the southeastern part of the site.
12 Those were the primary areas that are under that
13 question.
14     Q.   What did you observe -- what do you recall
15 observing on September 12 regarding the north-south
16 ditch that runs along the western boundary of the
17 site?
18     A.   I recall that it had water in it.
19     Q.   Did you observe any flow of water in the
20 northwest -- the north-south ditch?
21     A.   I looked at that and if there was -- if
22 there was any flow, it was barely perceptible.
23     Q.   Did you observe any flow in the north-south
24 ditch on September 12th?
25         MR. MCALILEY:  Object to form.

Page 50

1      THE WITNESS:  I thought that's what you just
2  asked me.
3  BY MR. ADKINS:
4      Q.   Well, you kind of answered it in a
5  hypothetical.  You said, you know, "I looked at it
6  and if there was flow, it was barely perceptible."
7      So did you perceive any flow or not?
8      A.   Yeah, I -- yeah, I looked at it and, you
9  know, looking at it from the south to the north, it
10 had standing water in the southern part.  I -- I
11 don't recall any perceptible flow.
12     In the northern part, right when it went off
13 site in the -- the -- the area constricted, there
14 was -- there was some perceptible flow, as I recall,
15 a little bit at that time.
16     Q.   Did you observe any defined bed and bank in
17 the north-south ditch?
18     A.   Well, it's a ditch and it did have a defined
19 bank, you know.  There was defined bank on -- on both
20 sides.
21     Q.   Did you observe an ordinary high water mark
22 in the north-south ditch on September 12th?
23     A.   In what context are you talking about
24 ordinary high water line mark?
25     Q.   Do -- do you understand the term ordinary

Page 51

1  high water mark?
2      A.   I do.
3      Q.   What is an ordinary high water mark?
4      A.   Well, it's -- there's a -- there's a
5  sovereign definition of ordinary high water line, an
6  ordinary high water line mark, and then there's a
7  regulatory definition.  And so I did not observe any
8  ordinary high water line or ordinary high -- ordinary
9  high water mark that I would consider germane to a
10 sovereign lands determination.
11     There was a mark on the bank that indicated
12 about how high the water stands in that bank during
13 wet season, so I did observe that.
14     Q.   And the regulatory definition that you're
15 referring to would apply under the regulations
16 defining Waters of the United States under the Clean
17 Water Act; is that right?
18     A.   Correct.
19     Q.   When you observed water in the north-south
20 ditch on September 12, was it at or below the
21 ordinary high water line?
22     A.   I don't recall.
23     Q.   Was it above the ordinary high water line?
24     A.   I don't recall.
25     Q.   You said you observed a water feature on the

Page 52

1  northern boundary of the site.  Is that the, and I'll
2  quote, "swale, W -- or, excuse me, S-W-A-L-E, slash,
3  ditch" unquote, that you observed?
4      A.   Yes.
5      Q.   Okay.  And you -- you refer to a swale/ditch
6  in your rebuttal report, right?
7      A.   Correct.
8      Q.   Okay.  Did you observe any water in the
9  swale/ditch on September 12th?
10     A.   Yes.  There was -- there was some toward the
11 western end where it intersected with the north-south
12 ditch.
13     Q.   Did you make any observations regarding from
14 where water in the western end of the swale/ditch was
15 coming from?
16     A.   On the 12th, as I recall, I just noted that
17 north -- I mean, that east-west ditch, and they did
18 have some water in the western edge of it.  I didn't
19 conduct a thorough investigation of it that day.
20     Q.   Okay.  Is it possible that the water you
21 observed in the swale/ditch near the intersection
22 with the north-south ditch was backflow from the
23 north-south ditch?
24     A.   I don't believe so.  It didn't strike me
25 that way.



W. MICHAEL DENNIS
U.S.A. vs BENJAMIN K. SHARFI

May 27, 2022
53–56

Page 53

1    Q.   Okay.  Are there any drains or artificial
2    conveyances of water that flow into the swale/ditch?
3        MR. MCALILEY:  Object to form.
4        THE WITNESS:  I don't -- I don't recall.
5    BY MR. ADKINS:
6    Q.   Do you know, sitting here today, whether
7    there are any drains or artificial conveyances of
8    water that flow into the swale/ditch?
9        MR. MCALILEY:  Object to form again.
10       THE WITNESS:  No, I don't recall.
11   BY MR. ADKINS:
12   Q.   Do you have any picture of the water you
13   observed in the western end of the swale/ditch on
14   September 12, 2021?
15   A.   No.
16   Q.   Did you take any notes documenting that you
17   observed water on the western end of the swale/ditch
18   on September 12, 2021?
19   A.   No.
20   Q.   Did you observe an ordinary bed and bank in
21   the swale/ditch on September 12th, 2021?
22   A.   Yes.
23   Q.   Okay.  Can you describe that?
24   A.   Yeah, that -- the reason that I referred to
25   it as a swale/ditch is that on the far eastern edge

Page 54

1    of it at the northeast corner of the site, it's very
2    shallow and -- and flat.  It's more of a swale than
3    it is a prominent ditch.
4        As it proceeds west, the swaliness, if you
5    will, turns more into a pronounced ditch that does
6    have bed and bank and a mark where you can tell that
7    the water would stand in the -- you know, the wetter
8    -- wetter times when there's water in the ditch.
9    Q.   And how many -- what's the length of the
10   swale/ditch that has an ordinary bed and bank -- or,
11   excuse me, strike that question.
12       What is the length of the swale/ditch that
13   has a defined bed and bank?
14       MR. MCALILEY:  Object to form.
15       THE WITNESS:  I didn't measure that, I don't
16       know.  As I said, it's a gradual -- a gradual
17       gradient from being more of a swale on the east
18       and more of a ditch on the west.
19   BY MR. ADKINS:
20   Q.   Okay.  Is it -- is it more or less than half
21   of the length of the northern boundary of the site
22   before the swale/ditch has a defined bed and bank?
23   A.   I didn't measure that, I'm not sure.
24   Q.   Did you observe an ordinary high water mark
25   in the swale/ditch on September 12th?

Page 55

1    A.   Yeah, I just -- I just answered that.  There
2    was a mark on the -- in -- in the ditch area of it
3    and perhaps going up to the swale part of it where
4    you could tell that there was a mark, if you will,
5    where water would typically stand in the wettest
6    times.
7    Q.   And how do you know that?
8    A.   Change in the vegetation, slope,
9    discoloration of the plant material in and adjacent
10   to the ditch.
11   Q.   Other than change of vegetation and slope,
12   discoloration of plant material, are there any other
13   observations you made to support that there's an
14   ordinary high water mark in the swale/ditch?
15   A.   Those are the primary features that would
16   indicate where the water would typically stand in the
17   wetter times in the ditch.
18   Q.   Right.  But my question isn't about the
19   primary features.
20       Are there any other observations you made
21   that would support that the swale/ditch had an
22   ordinary high water mark other than the change in
23   vegetation, slope, and discoloration of plant
24   material that you observed?
25   A.   Not that I recall right now.

Page 56

1    Q.   And what do you mean by change in vegetation
2    or slope?
3    A.   The slope is topography, so there's a change
4    in topography.  And change in vegetation would be
5    where you would have certain vegetation association
6    coming down from the -- from the top of the bank down
7    the sides of the -- of the bank, and then it would
8    stop or change to different vegetation in the ditch.
9    Q.   How did the topography change along that
10   swale/ditch?
11   A.   Well, on the eastern portion of it, the land
12   was pretty flat on either side.  And then there was a
13   slight indentation into that flat land that
14   constituted in -- in my terminology as swale, so
15   there was a slight lowering of elevation.  And then
16   as you proceeded further west, that elevation change
17   and that feature became less flat and was more
18   prominently, and -- and I think probably determined
19   to be a ditch.
20   Q.   Okay.  And with respect to the change in
21   elevation, do you recall -- or, excuse me, strike
22   that.
23       With respect to the change in vegetation, do
24   you recall how the vegetation changed in either type
25   or coloration?



W. MICHAEL DENNIS
U.S.A. vs BENJAMIN K. SHARFI

May 27, 2022
57–60

Page 57

1    A.   Well, in terms of coloration, the -- the
2   vegetation on top of the banks was, you know, green
3   or brown depending on the plant and the life stage
4   that it was in.  And then once you got below that
5   mark that typically would indicate where the water
6   would be when the -- when the ditch was in more of a
7   poor, if you will, condition, then that vegetation
8   changed and there were emergent plants growing to a
9   degree in the -- in the -- in the bottom of the
10  ditch, particularly in the western edge.
11       What was the second part of your question?
12    Q.   No, I think that was the only part.
13       Did you take any photos documenting a change
14  in slope or a change in vegetation in the
15  swale/ditch?
16       MR. MCALILEY:  Object to form.
17       THE WITNESS:  Not on the 12th.
18  BY MR. ADKINS:
19    Q.   Could you repeat your answer; not on the
20  what?
21    A.   No, not on the 12th.
22    Q.   Not on the 12th, thank you.  Okay.
23       So did you take any photos documenting a
24  change in slope and vegetation in the north -- in the
25  swale/ditch on other occasions?

Page 58

1    A.   Yes.
2    Q.   Okay.  On what occasions?
3    A.   I would have to go back and check, but I
4   recall perhaps taking photos of that swale/ditch on
5   the -- at some point in time during that September
6   inspection, and likely again in the subsequent
7   December inspection.
8    Q.   Do you recall taking photos of the change in
9   vegetation and change in slope in the swale/ditch on
10  any other occasions?
11    A.   No.  The only time I would've taken those
12  would've been during one of the three site
13  inspections.  And as I sit here today, I can't
14  remember exactly which dates I took which pictures
15  and that.  I do remember taking some photo
16  documentation of it to, you know, spur my memory.
17    Q.   Okay.  And did that photo documentation
18  inform your opinions in this case?
19    A.   No.
20    Q.   How come?
21    A.   Well, the ditch informed my opinions, but
22  the photographs did not.
23    Q.   Okay.  Does the -- do your observations that
24  there was a change in vegetation and slope in the
25  swale/ditch inform your conclusions on whether that

Page 59

1   feature is a ditch?
2    A.   Yes.
3    Q.   Okay.  And do the photos you took
4   documenting the swale/ditch inform your conclusions
5   that the swale/ditch is a ditch?
6    A.   No. My observations of the ditch informed my
7   opinions.  The photos merely document what was there
8   when I took the photos.
9    Q.   Why did you take photos?
10    A.   So that it would provide me a memory aid, if
11  you will, later on when I was going back through my
12  thoughts about the site inspections, and so I would
13  have some photographs that I could refer back to, to
14  see what the area looked like and refresh my
15  recollection, if you will.
16    Q.   Did you use the photos as a memory aid as
17  you were preparing your expert report in this case?
18    A.   Not specifically, no.
19       Well, say that question again.
20    Q.   Did you use the photos that you took of the
21  swale/ditch as a memory aid while you were preparing
22  your expert report in this case?
23    A.   Probably so, yes.
24    Q.   Okay.  Did you produce those photos,
25  Dr. Dennis?

Page 60

1    A.   I produced representative photos in my
2   rebuttal report.
3    Q.   Okay.  So you produced a representative
4   photo that would document the change in vegetation
5   and slope in the swale/ditch?
6    A.   I would have to look at the photos and see
7   which ones I -- but I don't know whether there's one
8   of the east-west ditch in there or not.  I'd have to
9   go back and look.
10    Q.   The swale/ditch we're talking about, not the
11  -- not excavated Bessey Creek, right?
12    A.   Right.
13       MR. MCALILEY:  Object to form.  Object to
14    characterization as excavated Bessey Creek.
15       MR. ADKINS:  Fair enough.
16  BY MR. ADKINS:
17    Q.   Did you make any observations of soils in
18  the swale/ditch?
19    A.   As a general matter, yes, I did look at the
20  swale/ditch and the characteristics of it in terms of
21  the vegetation, the topography, the -- the soils.  I
22  took no soil samples of it, but I did look at the
23  general -- generally what I could see looking at the
24  soils.
25    Q.   And what did you observe about the soils in



W. MICHAEL DENNIS
U.S.A. vs BENJAMIN K. SHARFI

May 27, 2022
61—64

Page 61

1  the swale/ditch?
2     A.  That they looked like soils that had been
3  excavated for the construction of the swale/ditch.
4     Q.  Why did you come to that conclusion?
5     A.  Well, it was -- it was obvious in my view
6  that the swale/ditch had been man-constructed, and,
7  therefore, what I saw was the result of that
8  construction.
9     Q.  Okay.  Do you know whether the soils in the
10  swale/ditch are hydric?
11     A.  I didn't personally take any soil samples in
12  that ditch.
13     Q.  Do you know of anyone else who's taken soil
14  samples in the swale/ditch?
15     A.  There may have been some soil samples taken
16  as part of the expert teams report, but I'd have to
17  go back and look and see if they had any soil samples
18  taken specifically in the ditch.
19     Q.  And by expert team, you're referring to the
20  -- to the United States expert team?
21     A.  Yes.
22     Q.  Okay.  Other than potential soil samples
23  collected in the U.S. expert teams report, are you
24  aware of anyone else taking soil samples in the
25  swale/ditch?

Page 62

1     A.  I'm not personally aware of any, no.
2     Q.  You said you made observations regarding the
3  vegetation in the swale/ditch.  What do you recall
4  observing about the vegetation in the swale/ditch?
5     A.  Just what I've already testified to, is I
6  could tell that there was vegetation on the ground on
7  either side of it, and that it changed when you
8  got -- you went down the slope of the swale and the
9  slope of the ditch.  And then there was, that I
10  recall, some emergent species in the western edge of
11  the swale/ditch.
12     Q.  And what is an emergent species?
13     A.  Well, plant species that come above the
14  surface of the water.
15     Q.  Are you familiar with the term obligate
16  vegetation?
17     A.  Yes.
18     Q.  What does the term obligate vegetation mean
19  to you?
20     A.  That's typically referred to as in the
21  context of wetlands variations, those species that
22  are almost always in wetlands or waters.  So they're
23  -- you know, in a very high percentage of the time,
24  they're found in wetlands and waters.
25     Q.  Did you observe any obligate vegetation in

Page 63

1  the swale or ditch?
2     A.  I didn't -- I did not -- I didn't catalog
3  the species that were in the ditch or do that
4  determination of whether they were obligate or not.
5     Q.  Okay.  Do you recall making any observations
6  of any vegetation that would indicate the presence of
7  wetlands in the swale/ditch?
8     A.  My recollection is that the -- the plants
9  that were growing in the ditch, at the time my
10  recollection and my thought was that -- that those
11  were wetland -- various wetland type plants in the
12  ditch.
13     Q.  Do you recall any of the species of wetland
14  type plants you observed in the swale/ditch?
15     A.  No, I don't.
16     Q.  Okay.  So you -- you've observed the
17  swale/ditch on more than just September 12th,
18  correct?
19     A.  Yes.
20     Q.  Okay.  Are there any other observations that
21  you've made in any of your visits to the site or to
22  the property to the north of the site regarding the
23  swale/ditch that we haven't talked about yet?
24     A.  Yes.
25     Q.  Okay.  What are they?

Page 64

1     A.  They're -- I instructed the surveyors that I
2  worked with during the -- during the December site
3  visit to take some cross-sections of the swale/ditch.
4  And those cross-sections are in my expert rebuttal
5  report.
6     Q.  Okay.  Did you direct -- excuse me, the
7  surveyors you're referring to, is that Karner Survey?
8     A.  Yes.
9     Q.  Did you direct Karner Survey where to take a
10  cross-section along the swale/ditch?
11     A.  Generally, yes.
12     Q.  Where did you direct Karner Surveying to
13  take a -- well, scratch that question.
14        Why did you -- why did you choose particular
15  locations for Karner Surveying to take a
16  cross-section of the swale/ditch?
17     A.  I wanted to get a characterization of the --
18  the ditch, and I can't remember.  I'd have to look at
19  my report for that.  I had them do one or more
20  cross-sections.  But I do recall directing them to
21  take some representative cross-sections of that ditch
22  so that I would understand the topography of that
23  ditch and the elevations of the ditch.
24     Q.  How specific were your directions to Karner
25  Surveying regarding where they should cross-section



W. MICHAEL DENNIS
U.S.A. vs BENJAMIN K. SHARFI

May 27, 2022
65–68

Page 65

1  the ditch?
2     A.  As I recall, I -- I looked at the
3  swale/ditch with them and walked along it and told
4  them, you know, and pointed to a place and said take
5  a cross-section in this -- in this area right here or
6  that area.  I don't recall specifically finding or
7  putting any monuments in the ground for them to
8  survey there.
9     Q.  So other than the observations of the
10  swale/ditch that we've discussed and your directing
11  Karner Surveying to take cross-sections of the
12  swale/ditch, are there any other observations that
13  you've made throughout the course of your work on
14  this case regarding the swale/ditch that we haven't
15  talked about?
16     A.  Not that I recall.
17     Q.  Have you ever -- you testified that you
18  observed the presence of water near the western
19  confluence of the swale/ditch and the north-south
20  ditch.  Have you ever observed water at any other
21  point in the swale/ditch?
22     A.  My recollection is that during the September
23  site visit, I observed water in the -- in the eastern
24  part of the swale/ditch, some, you know, inch -- a
25  few inches of -- of water.  And then as the ditch

Page 66

1  became more prominent going west, you know, there may
2  have been a few more inches of water in it.
3     Q.  Okay.  I might've misunderstood your
4  testimony before.  I thought that during the
5  September visit, you observed water only around the
6  area where the swale/ditch connects with the
7  north-south ditch.  But it sounds like perhaps you --
8  you observed water throughout the swale/ditch?
9     A.  Good point.  I'm -- I'm trying to -- I may
10  be mix -- mixing my observations from the 12th with
11  other observations during the September visit.  So I
12  think you're probably correct, that I was -- I was
13  right when I first stated I just saw it in the
14  western part because I just generally -- on the 12th,
15  just generally looked at the east-west ditch.  So you
16  -- you're probably right on that.  I may be mixing up
17  other observations during the September visit.
18     Q.  Okay.  So you -- you had testified that you
19  were also at the site inspection on the 13th and 14th
20  that the U.S. expert team conducted; is that correct?
21     A.  Correct.
22     Q.  Okay.  And do you recall observing water in
23  the swale/ditch on the 13th or the 14th of September
24  2021?
25     A.  Yes.  I think that's what I'm recalling now,

Page 67

1  is during that September site visit, some -- some wet
2  bottoms to the swale or saturated soils to the swale
3  at the eastern part, and then as you go west, picking
4  up a little bit of standing water until you got to
5  the western part of it where it intercepted the
6  north-south ditch and there were several inches of
7  standing water at that junction.
8     Q.  You were also on the site in December 2021
9  and March 2022; is that correct?
10     A.  Correct.
11     Q.  Do you recall observing water in the
12  swale/ditch on either of those inspections?
13     A.  I am sure that I saw no water in that ditch
14  in the March site inspection.  It was completely dry.
15  In the -- in the December inspection, I'd have to go
16  back and double check, but my recollection it was
17  generally dry in December also.  There may have been
18  a little bit of water at the intersection with the
19  north-south ditch.
20     And also in March, there may have been just
21  a -- depending on where you break off the north-south
22  ditch from the east-west ditch, there may have been a
23  little bit of standing water at that -- at that
24  junction that came up the east-west ditch.
25     But the east-west ditch in December -- I

Page 68

1  mean March was -- I do recall was completely dry
2  except for right at the intersection with the
3  north-south ditch, maybe a little bit there.
4     And I think it was principally dry -- again,
5  I would have to take a look more on that, but I think
6  it's principally dry in December also.
7     Q.  When you say the east-west ditch, are you
8  referring to the swale/ditch that we've been
9  discussing?
10     A.  Yes, I'm sorry.
11     Q.  I only say it because the east-west ditch
12  has been defined other ways.
13     A.  I understand.  Thank you for clarifying.
14     Q.  Okay.  When you said you would probably
15  double check, what would you double check?
16     A.  I'd probably refer back to my field notes.
17     Q.  Okay.  So did you take any notes documenting
18  the presence of water in the swale/ditch at any
19  point?
20     A.  There -- there would be -- I took -- I took
21  notes during the September visit, not on the 12th,
22  but during the September visit, and then again in the
23  December visit and the March visit.  So those notes
24  would reflect and -- and refresh my recollection.
25     Q.  When is the last time you referred to your



W. MICHAEL DENNIS
U.S.A. vs BENJAMIN K. SHARFI

May 27, 2022
69–72

Page 69

1  field notes in this case?
2     A.  I looked at them briefly yesterday.
3     Q.  How often did you refer to your field notes
4  when preparing your opinions in this case?
5     A.  Occasionally, as -- as I was putting the
6  report together.
7     Q.  Did you take any field notes documenting the
8  slope or change in vegetation along the swale/ditch
9  at any point?
10    A.  I may have.  I may have had -- I may have
11  put a general note in my field notes about here's the
12  swale/ditch and some general note about it.
13    Q.  Do you recall taking any notes regarding the
14  ordinary bed and bank or ordinary high water mark in
15  the swale/ditch at any point?
16    A.  Again, if -- if I did, it would've been in
17  -- in a general description of the swale/ditch.
18    Q.  Is it typical for you in your work to note
19  the presence of an ordinary bed and bank or high
20  water mark?
21    A.  Oftentimes, yes.
22    Q.  So if we looked at your field notes and you
23  didn't note the presence of a bed and bank or
24  ordinary high water mark, would that mean that you
25  didn't make that observation that day?

Page 70

1     A.  No.
2     Q.  Okay.  Why is that?
3     A.  Well, it just would mean that I didn't put
4  it in my notes.
5     Q.  Fair enough.
6        Have you made any determinations regarding
7  the normalcy of precipitation during any of your
8  inspections in this case?
9        MR. MCALILEY:  Object to form.
10       THE WITNESS:  Yes.
11  BY MR. ADKINS:
12    Q.  Okay.  What -- what determinations have you
13  made with respect to the normalcy of precipitation?
14    A.  Well, I reviewed the -- the section in the
15  team expert report on precipitation.  I looked at
16  where rainfall stations were relative to the site,
17  and I read Dr. Ott's discussion of rainfall in his
18  expert report.
19    Q.  Okay.  So would you consider any of that
20  work to have been a determination that you made
21  regarding the normalcy of precipitation?
22       MR. MCALILEY:  Object to form.
23       THE WITNESS:  No.  I would characterize it
24  as my review of information that had been put
25  together presented on that.

Page 71

1  BY MR. ADKINS:
2     Q.  All right.  Do you have any opinions
3  regarding the normalcy of precipitation on the dates
4  that any expert in this case has observed the site or
5  areas around the site?
6        MR. MCALILEY:  Object to form.
7        THE WITNESS:  I'm aware of the statements in
8  the expert team report about precipitation and
9  rainfall conditions and whether it was in drought
10  or not.  I'm familiar with the information that
11  Dr. Ott provided in terms of his analysis of
12  whether it was average or above or below average
13  and which years.
14       I do recall looking at where the -- the
15  nearest rain gauge station was to the site and --
16  and observing that the -- that nearest rain gauge
17  station gave additional indication of what the
18  rainfall might have been on the site in the times
19  of the recent times as opposed to the rainfall
20  tool that was used as used by the court to go
21  over the 30-year average.
22       So the -- the -- the local rain gauge as I
23  recall showed I believe greater precipitation
24  than what was projected with the 30-year average.
25  That's -- that's my recall, my recollection of

Page 72

1  the general rainfall situation, and that in Dr.
2  Ott's report, he, you know, indicated that the
3  rainfall was a little lower in the, I guess, the
4  2000 -- not -- yeah, 2020 time frame, but it was
5  higher above that.  And it was -- it was still in
6  the -- you know, in the range of what would be
7  expected with long term.
8  BY MR. ADKINS:
9     Q.  Okay.  So my question was a little bit
10  different.  It sounds like you've considered, or
11  you've reviewed precipitation information from other
12  expert reports.  But my question is -- well, I'll
13  tell you.
14       I'm trying to understand the scope of your
15  opinions to know whether I need to ask you more
16  questions about that.
17    A.  Okay.
18    Q.  Do you have any opinions regarding the
19  normalcy of precipitation during the time that the
20  experts on both sides in this case had been
21  inspecting the site and areas around the site?
22       MR. MCALILEY:  Object to form.
23       THE WITNESS:  Well, with all the --
24  considering all the information that -- that I
25  reviewed, I would consider the rainfall to be,



Page 73

1  you know, within normal range.  It may have been
2  a little bit higher or a little bit lower at a
3  particular time, depending on when people were
4  out there or what the immediate antecedent
5  rainfall conditions were.  But generally, I -- I
6  -- I found that the -- the rainfall was not a
7  dispositive factor in -- in the analysis.
8      Q.   Other than consulting or reviewing
9  information provided by the U.S. DOJ Expert Team in
10  their expert report and in Dr. Ott's expert report,
11  did you do anything to determine whether antecedent
12  precipitation was in a normal range while the experts
13  were conducting investigations of the site and areas
14  around the site?
15        MR. MCALILEY:  Object to form.
16        THE WITNESS:  I reviewed the information in
17    the team expert report that had precipitation
18    information in it, so I did review that.
19  BY MR. ADKINS:
20      Q.   Okay.  Did you do any separate analysis
21  other than reviewing the work of other experts in
22  this case with respect to whether precipitation was
23  within normal ranges?
24      A.   No, other than what I -- I reviewed and --
25  and considered what I previously testified to, but I

Page 74

1  did not do any other independent chronological
2  studies.
3      Q.   Are you familiar with the Corps' Antecedent
4  Precipitation Tool?
5      A.   I am.
6      Q.   What is the Antecedent Precipitation Tool?
7      A.   Well, it's a -- a procedure that has been
8  developed to look at rainfall over, I believe, a
9  30-year period with various rain gauges.  And that
10  information is put into an analysis to present --
11  present information on what would be, quote, normal
12  circumstances as that applies to the wetland
13  delineation determinations.
14      Q.   And you did not -- you did not analyze the
15  normalcy of precipitation using the Antecedent
16  Precipitation Tool at any point in this case,
17  correct?
18        MR. MCALILEY:  Object to form.
19        THE WITNESS:  No.  I think I said I did look
20    at that and reviewed that.  I did not do a
21    separate independent determination outside of the
22    information that I've described that I looked at.
23      Q.   Right.  And when you say you looked at that,
24  you looked at the Antecedent Precipitation Tool
25  information that was in the U.S. expert team report?

Page 75

1      A.   I did.
2      Q.   Okay.  Are you aware of any other Antecedent
3  Precipitation Tool reports that have been -- that
4  you've reviewed in this case?
5      A.   I think that's a question I've already
6  answered.  But I looked at -- I looked at the
7  antecedent report.  I looked at where the nearest
8  gauge station -- rain stations were.  I considered
9  the information in the antecedent report in relation
10  to the nearest rain gauge stations.
11        And in just understanding rainfall in -- in
12  Florida, South Florida particularly, it can be very
13  spotty.  You can have a main -- main rainstorm event
14  in one area and two miles away, there's not any.  So
15  all of that and the spottiness of the rainfall in --
16  in Florida can effect exactly what's going on in
17  turns of rainfall runoff and that -- that
18  consideration.
19      Q.   The United States expert team served their
20  report in February 2022, right?
21      A.   Yes.
22      Q.   And you inspected the site and the area to
23  the north of the site after the U.S. expert team
24  served their report, correct?
25      A.   Correct.  Yes, yes.

Page 76

1      Q.   Okay.  So and that -- that -- that instance
2  was on March 10, 2022; is that right?
3      A.   I think that's right, yes.
4      Q.   Did you -- did you do anything to -- did you
5  make any attempt to collect data regarding the
6  normalcy of precipitation during your March 2022
7  inspection?
8      A.   No.
9        MR. ADKINS:  So can we go off record.
10        VIDEOGRAPHER:  Going off of video record at
11    11:08 a.m. Stand by.  Recording stopped.
12        (Thereupon, a recess was taken.)
13        VIDEOGRAPHER:  We're back on the record at
14    11:16 a.m. You may proceed.
15  BY MR. ADKINS:
16      Q.   So we talked about September 12th.
17  September 13 and 14 of 2021 were dates that the U.S.
18  DOJ Expert Team were on the site conducting Phase I
19  of their inspection; is that right?
20      A.   Yes.
21      Q.   And you observed the U. S. DOJ expert team
22  inspecting the site on those two days; is that right?
23      A.   Correct.
24      Q.   Okay.  Did you do any independent
25  investigatory work on September 13 or 14 other than



W. MICHAEL DENNIS
U.S.A. vs BENJAMIN K. SHARFI

May 27, 2022
77—80

Page 77

1  observing the U.S. DOJ Expert Team?
2    A.  No.
3    Q.  You didn't analyze any soils?
4    A.  No.
5    Q.  Did you make any observations about
6  vegetation or hydrology on the site?
7    A.  I observed -- I observed what was out there
8  during the inspection.  But I -- I -- I -- my purpose
9  was to observe the expert team's investigation, so I
10  observed that.  And when they would taking a soil
11  pit, I would ask to look at that.  And sometimes I
12  did and sometimes I didn't, but I didn't do any
13  independent work on my own at that point in time.
14    Q.  The next time you were on the site was in
15  December of 2021; is that right?
16    A.  Correct.
17    Q.  Okay.  And just so we can be specific, it
18  was December 3, 2021; is that right?
19    A.  It's in the report.  It was December -- what
20  did you say?
21    Q.  December 3.  The 3rd?
22    A.  I believe that's correct.
23    Q.  Who was with you during your December 2021
24  inspection?
25    A.  Chris Hamilton, Neal, Jim Weber from my

Page 78

1  office, the Karner surveyors.  There may have been
2  some that, you know, came and went that day,
3  but those were the primary -- primary ones that I
4  recall.
5    Q.  You -- you are employed by Breedlove, Dennis
6  & Associates; is that right?
7    A.  Say again?
8    Q.  You are employed by Breedlove, Dennis &
9  Associates; is that right?
10    A.  That's correct.
11    Q.  Was there anyone else on the site other
12  than -- well, scratch that.
13      Is Jim Weber an employee of Breedlove?
14    A.  Yes.
15    Q.  Okay.  Was there anyone else on the site
16  that was employed by Breedlove other than you and Jim
17  Weber?
18    A.  No.
19    Q.  What is Jim Weber's involvement in this
20  case?
21    A.  Jim Weber is one of our long-time
22  experienced field scientists.  And I asked him to
23  accompany me as we did that site inspection.
24    Q.  Generally, what was the nature of Mr.
25  Weber's work on December 3, 2021 site?

Page 79

1    A.  I had him come along to assist me in my --
2  in my review, and also to take some in situ work
3  quality measurements where -- where we can find some
4  water on the site.
5    Q.  Okay.  And who from Karner surveyors was
6  present at the site in December 2021?
7    A.  There was a survey team.  There were about
8  three of them as I recall.  I don't -- I -- I don't
9  recall their names right now.
10    Q.  When did you start your inspection at the
11  site on December 3, 2021?
12    A.  In the morning.  You know, it was not at
13  dawn, but it wasn't late either.  So it was -- it was
14  early -- early morning, 9:00 o'clock or so.
15    Q.  When did you leave the site that day?
16    A.  Late afternoon.
17    Q.  About how many hours would you say you spent
18  inspecting the site on December 3, 2021?
19    A.  It was a full day, so it was probably eight
20  plus or minus hours.
21    Q.  Okay.  Can you describe what you did on the
22  site on December 3, 2021?
23    A.  Yes.  The -- the objective for that site
24  inspection was to inspect the north-south ditch as it
25  proceeded from the northwest corner of the site to

Page 80

1  the east-west ditch north of the site.
2      That was the first time that I had access to
3  that property, and I wanted to inspect the
4  north-south ditch and see what the characteristics
5  that were.  So I inspected it, and I had the
6  surveyors there so they could take some survey
7  measurements and cross-sections, some elevations of
8  the ditch.
9    Q.  When you say -- well, you are -- you're
10  aware that there's a portion of Bessey Creek that is
11  naturally occurring and a portion that is excavated?
12    A.  Yes.
13      MR. MCALILEY:  Object to form.
14  BY MR. ADKINS:
15    Q.  For purposes of the deposition today, I'll
16  refer to the excavated portion of Bessey Creek as the
17  excavated Bessey Creek, all right?
18      MR. MCALILEY:  I'm just -- I'm just going to
19  object to the characterization.  You can call it
20  what you want, but if you're -- if you're
21  referring to the excavated ditch that's north of
22  the site, for clarity, I'll accept that for just
23  clarity of reference.
24      Is that what you're saying?
25      MR. ADKINS:  Well, I want to make sure that



W. MICHAEL DENNIS
U.S.A. vs BENJAMIN K. SHARFI

May 27, 2022
81—84

Page 81

1  there's no confusion because I've heard
2  Dr. Dennis refer to the swale/ditch as the
3  east-west influence, so I want to make sure when
4  we refer to an east-west ditch, that we're
5  talking about the excavated portion of Bessey
6  Creek.  So --
7      MR. MCALILEY:  Is there confusion?  So
8  Bessey Creek, the natural creek is significantly
9  to the east.  That may have been excavated at
10  some point in the past at some other location.
11     MR. ADKINS:  Oh, okay.
12     MR. MCALILEY:  So we're -- so we're
13  referring to the east-west ditch that is the --
14  that -- basically, that excavated shell that's
15  north of the site, yet above the Countess Joy
16  property, I understand what you're saying.
17     MR. ADKINS:  Yes.
18     MR. MCALILEY:  So I just want to make sure
19  we're understanding each other.
20  BY MR. ADKINS:
21     Q.  So, Dr. Dennis, the north-south ditch
22  eventually flows into another excavated ditch; is
23  that right?
24     A.  Yes.
25     Q.  And the north-south ditch flows -- well,

Page 82

1  continues north of the site into a property called
2  the Countess Joy property.
3      Do you -- do you understand that?
4      A.  I do.
5      Q.  Okay.  And the north-south ditch -- well,
6  the excavated ditch that runs east-west into which
7  the north-south ditch flows, we'll refer to as
8  excavated Bessey Creek.
9      Will you understand that?
10     A.  I understand you're calling it that, yes, if
11  that's what you want to refer to it.
12     Q.  Okay.
13     A.  For clarity, again, in my report, I refer to
14  the -- and I -- I misspoke sometimes this morning,
15  but I refer to the swale/ditch as the ditch that goes
16  east-west on the northern part of the site.  And then
17  when I refer to the east-west ditch, I'm talking
18  about the -- the east-west ditch that is four-tenths
19  of a mile or so north of the site that the
20  north-south ditch intersects.
21     Q.  Okay.  So what you've termed the east-west
22  ditch, is that what the U.S. DOJ Expert Team refers
23  to as excavated Bessey Creek?
24     A.  I believe they refer to it as -- I think for
25  purposes, I thought they said that they just referred

Page 83

1  to all that excavated part as Bessey Creek.
2      Q.  Okay.  Well, I was hoping that maybe we
3  could just adopt your term, but I think we need to
4  have some synchronicity here.
5      There is a -- there is an excavated portion
6  of the Bessey Creek that the U.S. DOJ Expert Team
7  refers to as excavated Bessey Creek.
8      Do you understand that?
9      MR. MCALILEY:  I'm just going to object
10  actually.  Your team just calls it Bessey Creek,
11  so they don't say excavated portion of Bessey
12  Creek, so, anyway...
13  BY MR. ADKINS:
14     Q.  Okay.  Well, you know, I don't want to waste
15  anymore time on this.  So why don't we just call the
16  ditch that runs through Countess Joy and that
17  intersects the north-south ditch as the east-west
18  ditch, okay?
19     A.  That'd be good.
20     Q.  All right.  And the ditch that runs -- the
21  swale/ditch that you refer to north of the site
22  directly north and abuts the northern boundary of the
23  site, we're going to call it swale/ditch and not the
24  east-west ditch, right?
25     A.  Correct.

Page 84

1      Q.  Okay.  Fair enough.  So that's great.
2      Now, what did you observe, or what do you
3  recall observing about the north-south ditch during
4  your December 2021 inspection?
5      A.  That the -- the north-south ditch continues
6  from the northwest corner of the site in a straight
7  line north-south -- generally a north-south line to
8  the east-west ditch and intersects it.
9      There were -- and the ditch is of various
10  widths and various depths, generally shallow, and
11  there are various trails or cow trails that go across
12  that north-south ditch.  The banks of that
13  north-south ditch are -- are typically vegetated.
14  The time of my inspection in December, there were
15  portions of that north-south ditch that had standing
16  water, and there were portions of it that were
17  essentially dry that had a damp wet or sometimes
18  saturated soils that -- without standing or flowing
19  water.
20      And so I observed that, and -- and so the
21  purpose was I reviewed the -- the north-south ditch
22  with various aerial photographs and topo maps and so
23  forth.  I needed to physically see it and look at it
24  to help inform my opinions about it.
25      And I -- I wanted to have a survey team



W. MICHAEL DENNIS
U.S.A. vs BENJAMIN K. SHARFI

May 27, 2022
85–88

Page 85

1 there to take various cross-sections of it. So I --
2 I instructed them on taking various cross-sections of
3 it.
4      There was also a wetland on the -- just
5 north of the site on the west side that had a very
6 small ditch constructed between that wetland and the
7 north-south ditch. And then further north was a more
8 prominent longer ditch that went through a west ditch
9 -- I mean a west wetland and connected to the
10 north-south ditch.
11     So I wanted -- I wanted to inspect the
12 characteristics of the ditch, and I wanted the
13 surveyors to capture the cross-sections and
14 elevations of that ditch.
15     Q. Were you also on the Countess Joy property
16 to the north of the site on December 3, 2021?
17     A. Yes.
18     Q. Okay. Great. So I'm going to try to
19 consolidate my questions about -- and Countess Joy as
20 we go along.
21     You said that you were on -- that you
22 conducted your inspection on December 3 for about
23 eight hours. Does that include time that you spent
24 on Countess Joy as well?
25     A. Yeah, the majority of that time was spent on

Page 86

1 Countess Joy.
2     Q. Okay. Great. Go ahead, sorry.
3     A. Yeah, there -- there was -- there was very
4 little time spent on the site. I had that one day to
5 look at the Countess Joy and the north-south ditch,
6 so the vast majority of that time was spent there.
7     Q. Now, you said you wanted to see the
8 north-south ditch in person. Did you collect any
9 data while you conducted your inspection of the
10 north-south ditch in December 2021?
11     A. Yes. I instructed the surveyors, so they
12 took their surveys, and I eventually had that survey
13 data. Jim Weber from Breedlove, Dennis & Associates
14 took some more quality measurements, in situ
15 measurements. I just wanted to get a general
16 characterization of the -- of -- of what water was
17 out there, so he did that.
18     And there also was a wetland on the
19 northeast side of the north-south ditch that I
20 inspected. And I also inspected the ditch on the
21 far -- well, it would -- it would have come up from
22 the east of the -- of the -- of the site. So there's
23 another north-south ditch.
24     I'm not going to call it the north-south
25 ditch. I don't want to be confusing, but there is

Page 87

1 another -- another ditch that was part of the
2 original drainage system out there. I inspected that
3 ditch at that December site inspection.
4     Q. So in terms of data collection, you have the
5 survey data. You said Mr. Weber took some water
6 measurements, and something else that I didn't quite
7 hear. Situ data?
8     Well, maybe I -- I -- I'll help by asking a
9 question.
10     Do you -- what -- what data, if any, did
11 Mr. Weber collect in addition to water quality
12 measurements?
13     A. A general suite of in situ water quality:
14 temperature, pH, conductivity, DO. Just a general
15 suite of in situ water quality data.
16     Q. Okay. And where is the water quality data
17 that Mr. Weber collected currently located?
18     A. In my field notes.
19     Q. Okay. So did Mr. Weber take any water
20 samples with him off the site?
21     A. No.
22     Q. Did anyone who was inspecting the site or
23 the Countess Joy property take any water quality
24 samples off of those properties?
25     A. Not to my knowledge.

Page 88

1     Q. Okay. So how is that you recorded the
2 results or water quality data in your field notes?
3     A. Jim Weber recorded that in his field notes,
4 so he's got -- he has a map of where the -- where the
5 samples were taken and what the readings were.
6     Q. Okay. And what were the -- what were the
7 locations of the samples that Mr. Weber took?
8     A. Generally, they were where we could find
9 standing water during that time period. So there was
10 -- there was some in the north-south ditch. There
11 was some in the east-west ditch. And I'd have to go
12 back and check. There may have been some in those
13 two western -- two western wetlands and then that
14 wetland to the east that -- that I described.
15     Q. When you say you would have to go back and
16 check, what would you have to check?
17     A. I'd -- I need to look at my field notes
18 there, his field notes and just refresh my memory on
19 that.
20     Q. And that -- that's because you don't recall
21 at this deposition exactly where you took water
22 quality samples?
23     A. Well, I -- I recall where we took them,
24 which is what I just described. I don't recall every
25 specific point. I would need to go back and look at



W. MICHAEL DENNIS
U.S.A. vs BENJAMIN K. SHARFI

May 27, 2022
89—92

Page 89

1    the -- at the -- at the map.
2        Q.   Did you take GPS coordinates of the
3    locations where water quality samples were taken?
4        A.   Yes.
5        Q.   Okay.  Did you get the locations by taking
6    your field notes?
7        A.   Yes, they're -- they're recorded.  And we
8    used that to produce the locations where those
9    samples were taken.
10       Q.   All right.  Are the GPS locations where you
11   took water quality samples recorded anywhere else
12   other than your field notes?
13       A.   No.
14       Q.   So if I wanted to see where you took water
15   quality samples, I'd have to look at your field
16   notes; is that right?
17       A.   Yeah, you would -- you -- you would look at
18   his field notes that he took in the field, and then
19   you would look at the transcribed summary of those on
20   a summary sheet and the attached map of the
21   locations.
22       Q.   Where is the transcribed summary sheet and
23   attached map of the locations?
24       A.   That's all clipped together with the field
25   notes from that day.

Page 90

1        Q.   Do you know whether the transcribed summary
2    and attached map of locations that were clipped
3    together with your field notes were produced in this
4    case?
5        A.   To my knowledge, they were not.
6        Q.   Do you know why they were not?
7        A.   Well, I didn't -- I did not use them in the
8    rebuttal report, so I didn't produce them in my
9    rebuttal report because they weren't part of that
10   analysis.  I didn't otherwise produce them because
11   the notice of deposition that I got did not require
12   me to produce any other documents at this time.
13       Q.   Have you ever shared the transcribed summary
14   and attached map of locations that are clipped with
15   your field notes with anyone else?
16       A.   No.  I don't believe so.  Jim Weber and I
17   would have looked at them.  I'm not sure whether I
18   reviewed and discussed that with Dr. Lynette Brown,
19   one of our employees that assisted me in some of this
20   evaluation.
21       Q.   Other than employees of Breedlove, Dennis &
22   Associates, does anyone else have a copy of the
23   transcribed summary and attached map of locations
24   where you took water quality samples?
25       A.   Not that I'm aware of, no.

Page 91

1        Q.   Okay.  Do you recall what the results of the
2    water quality measurements were?
3        A.   They -- they were -- they were more or less
4    what I guess I would have expected.  They -- I did
5    not notice any -- I didn't notice anything in them
6    that would help me further inform my rebuttal report
7    and analysis.
8             I had, at that point in time, only, as far
9    as I knew, the one opportunity to visit that
10   property.  And so I thought we need to take advantage
11   of that and get as much data as I could that I might
12   look at or use in the future.
13       Q.   In your rebuttal report, you criticize the
14   United States expert team for not having hard data
15   regarding water quality; is that right?
16       A.   Yes.  They did not produce any water quality
17   in their report that I saw.
18       Q.   Okay.  And you were totally honest with
19   water quality data when you wrote those words; is
20   that right?
21           MR. MCALILEY:  Object to form.  You have the
22       burden of proof, too.  And plus, it's not in his
23       report as the basis of his report, so I object to
24       the characterization.
25   BY MR. ADKINS:

Page 92

1        Q.   Okay.
2        A.   Please repeat the question.
3        Q.   I said you were criticizing the U.S. DOJ
4    Expert Team for not having hard data regarding water
5    quality as you wrote those words in your report;
6    isn't that correct?
7           MR. MCALILEY:  Object to form.  Same.
8           THE WITNESS:  I commented in my rebuttal
9       report that the expert team report did not
10      produce any water quality data.  I had my water
11      quality data of just in situ information.  I knew
12      about that.  At the time I wrote my rebuttal
13      report, I didn't feel that that information
14      helped me further analyze and provide rebuttal
15      opinions to that of the DOJ team.
16       Q.   When you say the results of the water
17   quality samples were as you expected, what do you
18   mean by that?
19       A.   They were generally of the temperature, pH
20   that you would expect in these type of drainage ditch
21   waters.
22       Q.   And what would you expect the temperature in
23   these types of drainage ditch waters to be?
24       A.   I would expect it to vary, based on the day
25   and the -- and the temperature of the air and time of



W. MICHAEL DENNIS
U.S.A. vs BENJAMIN K. SHARFI

May 27, 2022
93–96

Page 93

1  year.  So it -- when I looked at the data, there was
2  nothing that seemed remarkable to me that would help
3  inform my opinion one way or another on this matter.
4      Q.   Did the temperature data vary in your water
5  quality samples?
6      A.   I'd -- I'd have to go back and look at each
7  -- each point to see what the temperature was at each
8  one of them.
9      Q.   But sitting here today, you don't recall
10  what any of the temperatures were of any of the water
11  quality samples you took?
12      A.   I didn't memorize your water quality data,
13  so, no, I don't.
14      Q.   Okay.  What about pH; what would you have
15  expected the pH in a drainage ditch to be?
16      A.   We can go through all of this, but to help
17  you, I -- I don't have any recollections of specific
18  measurements.
19      Q.   I'm not asking about your recollections.
20  What would you have expected it to be in your
21  professional judgment?
22      A.   The -- which parameter?
23      Q.   pH.
24      A.   pH, I would expect it to be slightly acidic.
25      Q.   Okay.  Why is that?

Page 94

1      A.   Well, that's what you would expect with that
2  type of vegetation and rainfall accumulated water.
3      Q.   Are there any other reasons why you would
4  expect water in a drainage ditch to be slightly
5  acidic?
6      A.   No.  That's just a general statement.
7      Q.   What was it about the vegetation or the type
8  of vegetation that would lead you to expect that
9  water in the ditch would be slightly acidic?
10      A.   Well, there's -- per the dominant trees
11  there are pine trees.
12      Q.   Anything else about the type of vegetation
13  that would lead you to expect the water in the ditch
14  would be slightly acidic?
15      A.   Well, pine flatwood systems are -- are
16  typically recognized to be on the acidic side.
17      Q.   Any other reasons?
18      A.   Those are the primary ones.
19      Q.   When you say rainfall accumulated, what do
20  you mean?
21      A.   There was -- there was no -- the water --
22  the water in the ditches was not flowing, so it
23  was -- it was still and pooled.  And so there was no
24  evident groundwater flow that was feeding the water
25  at that time.  So likely, the water in those ditches

Page 95

1  were as a result of rainfall, at least at that
2  particular point in time.
3      Q.   And why -- why would that lead you to expect
4  that the water would be slightly acidic?
5      A.   Rainfall is typically slightly acidic.
6      Q.   Okay.  And you said you did a DO test.  What
7  does that stand for?
8      A.   Dissolved oxygen.
9      Q.   Okay.  What would you have expected the
10  dissolved oxygen to be in the north-south ditch?
11      A.   They're in stagnant pools.  I would expect
12  it to be low.
13      Q.   Is there a numerical system associated with
14  dissolved oxygen?
15      A.   Yes.
16      Q.   What is it?
17      A.   Well, it's a scale of measurement that is
18  used to depict the amount of oxygen per amount of
19  water.
20      Q.   And how would a DO measurement be expressed?
21      A.   In parts per -- I don't remember right now.
22  It's in -- it's like five or ten or whatever parts
23  per -- it just left me, I don't remember.
24      Q.   Like billion or million or something like
25  that?

Page 96

1      A.   Yeah.
2      Q.   And the parts would be part oxygen per some
3  measure of the sample size?
4      A.   Yes.  It's part per millimeter -- I mean
5  milliliter or something like that.  That's a very
6  basic thing that I should remember as I'm sitting
7  here in a deposition.  I don't recall right now.
8      Q.   Okay.  So you said you would expect DO to be
9  low.  What would be a low DO measurement?
10      A.   Well, certainly, a DO measurement of five
11  would be low.  That's a number that's often cited as
12  being a number that below that, it affects aquatic
13  organisms, could be detrimental.  I think that was
14  discussed in the expert report and also in Dr. Ott's
15  report.
16      Q.   When you say the expert report, which are
17  you referring to?
18      A.   The expert team report.
19      Q.   The DOJ Expert Team?
20      A.   Yes.  It was either in their --- in their
21  report -- I'm sorry.  It was either in that report or
22  Michael Wylie's deposition where he talked about DOs
23  and five being a marker for impacts to the aquatic
24  systems.
25      Q.   Do you -- did you have -- is your view on



W. MICHAEL DENNIS
U.S.A. vs BENJAMIN K. SHARFI

May 27, 2022
97–100

Page 97

1 what a low DO would be informed on Mr. Wylie's
2 deposition testimony?
3    A.  No.  I noted his -- his information on that
4 in his deposition testimony or the team expert
5 report.  I can't remember whether it was in one or
6 both.
7    Q.  Okay.  When you -- when -- when -- well,
8 were you instructing Mr. Weber during the December
9 site inspection?
10   A.  Yes.
11   Q.  So when Mr. Weber took a water quality
12 sample in December 2021, did you have an idea in your
13 head at that time what a low DO would be?
14   A.  No.
15   Q.  No, you have the DO in your head -- oh,
16 sorry.
17   A.  No.  The -- the -- the reason for, again,
18 taking the water quality samples is that at that
19 point, I did not know whether I'd have another chance
20 to be on the site or not.  And I didn't know whether
21 or not information of the in situ measurements would
22 be important in the analysis.  I didn't know what the
23 results were going to be.
24      So I took the opportunity to get that data,
25 just to see if it would be helpful and informative in

Page 98

1 my review of the expert team report.
2    Q.  So did you -- when you took the sample in
3 December 2021, did you have an idea at that time of
4 -- or any expectation at that time of what the DO
5 would be in the creek -- or in the ditch?
6    A.  No.  I didn't go into it with any
7 expectations.  I just went into it with let's take
8 the data and see what it shows.
9    Q.  All right.  And I think you said you
10 measured conductivity, but I might've misheard you.
11      Is that correct?
12   A.  That's correct.
13   Q.  Okay.  What is -- what is conductivity?
14   A.  That's another standard water quality
15 measurement that you can use to characterize the
16 water.  It's -- it's measured in specific
17 conductance, so it's an electrical measurement.  And
18 it is a reflection of, you know, what particles and
19 so forth may be in the -- in the water.  So, you
20 know, pure -- pure water would have very low
21 conductance, and then the more glutens -- not glutens
22 -- the more solutants -- solids you have in there and
23 more organic -- or inorganic, rather, material, you
24 would -- you would expect conductivity to go up.
25   Q.  It's one of the reasons why pure water is

Page 99

1 harder to freeze; isn't that right?
2    A.  Probably, yup.
3    Q.  Okay.  So what was -- what was the result of
4 the conductivity measurement?  Well, let me -- let me
5 reform the question, if you would.
6      Do you recall the results of any of the
7 conductivity measurements that -- that you took on
8 the Countess Joy property?
9    A.  Just in general, I -- I reviewed -- recall
10 them varying.  I don't recall them being absolutely,
11 you know, specific and consistent, so they -- they
12 varied within a fairly narrow range.
13   Q.  Okay.  What was the range?
14   A.  I don't recall.  I just -- no, I don't
15 recall.
16   Q.  Would the range be reflected in your field
17 notes?
18   A.  The data is reflected in the field notes, so
19 that would give you the range.
20   Q.  Are there any other tests of water quality
21 that you took in the -- during the December 2021
22 inspection that we haven't discussed yet?
23   A.  No.  It's just the standard instituted
24 measurements that we've talked about.
25   Q.  Okay.  At any other point in this case, have

Page 100

1 you taken water quality measurements?
2    A.  No.
3    Q.  Okay.  So no water -- no other water quality
4 measurements along Bessey Creek or downstream of
5 Bessey Creek?
6    A.  No.
7    Q.  Any water quality measurements on the site?
8    A.  No.  Other than what was taken that -- that
9 December's site inspection.
10   Q.  Okay.  Okay.  Now, you said you inspected
11 some areas of wetlands on the Countess Joy property
12 in December of 2021, so I want to go back and ask you
13 some questions about that.
14   A.  Okay.
15   Q.  Do you -- like when you inspected other
16 parts of the Countess Joy property, did you take any
17 soil samples?
18   A.  No.
19   Q.  Did you dig any holes?
20   A.  I don't believe so.
21   Q.  Did anyone else who was participating in the
22 inspection take any soil samples?
23   A.  No.
24   Q.  Did anyone else who was participating in the
25 inspection dig any holes?



W. MICHAEL DENNIS
U.S.A. vs BENJAMIN K. SHARFI

May 27, 2022
101–104

Page 101

1    A.  No.
2    Q.  Did you -- did you document the types of
3  soils that were on the Countess Joy property in
4  December 2021?
5    A.  No.
6    Q.  Have you ever documented the types of soils
7  on the Countess Joy property based on personal
8  observation?
9    A.  Yes.
10    Q.  Okay.  When was that?
11    A.  That was in the March site inspection.
12    Q.  Okay.  We'll come back to that.
13    A.  Okay.
14    Q.  Going back to December 2021, did you
15  document any types of vegetation you observed on the
16  Countess Joy property?
17    A.  No, other than, you know, general reference
18  to site conditions.  That would've been the extent of
19  it.
20    Q.  Did anyone else who was participating in the
21  inspection document any vegetation types?
22    A.  No.  It would've just been me.
23    Q.  Did you document any hydrologic features on
24  the Countess Joy property during your December 2021
25  inspection?

Page 102

1    A.  Yes.
2    Q.  Okay.  What did you document?
3    A.  As we've discussed, I documented the
4  north-south ditch.  I documented a wetland that was
5  on the west side of the north-south ditch, not too
6  far above the site.  I documented another wetland on
7  the west end side of the ditch that was connected to
8  the north-south ditch.  Both of those were connected
9  by a manmade ditch to the north-south ditch.
10    And then there was a wetland east of the
11  north-south ditch up toward the east-west ditch, but
12  west of the next north-south drainage ditch.  And I
13  inspected that -- that wetland.
14    Q.  So by my account, that's roughly three
15  different wetlands that you described on the Countess
16  Joy property?
17    A.  Yes.
18    Q.  Did you -- have you ever delineated the
19  areal extent of any wetlands on the Countess Joy
20  property?
21    A.  No.
22    Q.  How did you determine that you were
23  observing a wetland on the Countess Joy property?
24    A.  Well, it had wetland vegetation in it,
25  apparent hydric soils in the wetland; although, I did

Page 103

1  not dig a soil pit to confirm that.  Those three
2  wetlands were in a recognizable topographic
3  depression.
4    They met the -- and they had some -- they
5  had some standing water, not to what the normal pool
6  would be, but they had some standing water in some
7  parts of it, at least on -- at least on one or two.
8  I think there was a little bit of water in all three
9  of those, as I recall.  So if you go back to the '87
10  Manual and the 2010 Supplement and you have
11  vegetation, soils, and hydrologic indicators, that
12  would indicate to me that it was a wetland.
13    Q.  What's the definition of wetland for
14  purposes of the Clean Water Act?
15    A.  What's the definition?
16    Q.  Yes.
17    A.  Wetlands are -- those are areas that are
18  inundated, saturated by water long enough to have
19  anaerobic conditions and support hydrophytic plants.
20    Q.  Okay.  Are you --
21    A.  I'm paraphrasing, but that's generally it.
22    Q.  Fair enough.  So are there -- are you
23  familiar with the three typical characteristics of a
24  wetland being soiled vegetation and hydrology?
25    A.  Yes.

Page 104

1    Q.  Did you -- when you were -- when you were
2  inspecting the Countess Joy property, did you make
3  any efforts to identify parts of the property that
4  satisfied those three criteria of being a wetland?
5    MR. MCALILEY:  Object to form.
6    THE WITNESS:  Well, I identified those three
7    areas which were -- had clear wetland signatures
8    on the aerials that I looked at.  So from those
9    clear wetland signatures and the conditions
10    there, I was trying to -- I was trying to get an
11    idea and an understanding of the wetlands in
12    that -- in that property.
13  BY MR. ADKINS:
14    Q.  Okay.  And is it possible that there were
15  other wetlands on the property that you didn't
16  immediately recognize because of their depressional
17  features and standing water?
18    A.  Yes.  I didn't -- I didn't go out there to
19  delineate wetlands or to identify every area that
20  might be identified as a wetland under the '87
21  Manual.
22    Q.  And just to confirm, you did not complete
23  any wetland determination data forms of the Countess
24  Joy property?
25    A.  No.



W. MICHAEL DENNIS
U.S.A. vs BENJAMIN K. SHARFI

May 27, 2022
105—108

Page 105

1    Q.   Okay.  Did you take any photographs when you
2  were on the Countess Joy property in December 2021?
3    A.   I believe so, yes.
4    Q.   Okay.  Do you recall what you took
5  photographs of?
6    A.   I would have taken photographs of the
7  north-south ditch, those three wetlands.  I recall
8  taking photographs of the -- the hydroperiod nails
9  that I set while on site.  There may have been some
10  just general, you know, site-descriptive photographs.
11    Q.   About how many photographs would you say you
12  took during your December 2021 inspection?
13    A.   I -- I don't recall.
14    Q.   More than 100?
15    A.   No.
16    Q.   Okay.  More than 50?
17    A.   No.
18    Q.   More than 20?
19    A.   Maybe.
20    Q.   Did anyone else who participated in the
21  December 2021 inspection take any photographs?
22    A.   I don't believe so.  I don't recall Jim
23  Weber taking any photographs.  There's a possibility
24  that he did if I asked him to.  You know, "Jim, take
25  a photograph of that," something like that, but I

Page 106

1  don't think so.
2    Q.   Okay.  You said you might have taken a photo
3  of the hydroperiod nails that you put on --
4    A.   Yes.
5    Q.   Can you tell me what that is?
6    A.   What are hydroperiod nails?
7    Q.   Yes, please.
8    A.   Of the two wetlands west of the north-south
9  ditch that were connected by manmade ditches, I
10  looked at some of the woody vegetation in those
11  wetlands, typically along the edge and around those
12  wetlands, and I located a point where there were
13  biological indicators of how high the water stands
14  during the wet season.
15         And that may not be how high it gets if
16  there's a hurricane or something like that, but
17  typically you -- typically, there are biological
18  indicators of lichen lines, moss collars, stains on
19  the bark, you know, physical indicators, biological
20  indicators, then, that you can look at that tell you
21  here's how high the water stands during the wet
22  season.
23         And so I wanted to understand that, so I
24  would -- I took several measurements, put nails in
25  trees and had the surveyors pick up the elevations of

Page 107

1  those hydroperiod nails.
2    Q.   How did you determine where to install a
3  hydroperiod nail?
4    A.   I looked for where there was -- was woody
5  vegetation that was in the wetland that had bark that
6  would be clear in presenting those biological
7  characteristics.  So, for instance, typically, I
8  would look for cypress trees or red maple or wax
9  myrtle, and those are typically some of the trees
10  that I look for to see where those biological
11  indicators are.
12    Q.   The elevations that Karner Surveying took,
13  would those be considered the normal wet season pool
14  elevations that you describe in your report?
15    A.   Yes.
16    Q.   Okay.  So this process of -- of installing
17  nails based on biological indicators, is that
18  according to a particular methodology or scientific
19  field?
20    A.   That is a recognized practice in Florida,
21  recognized and accepted by water management districts
22  and DEP where -- where we are setting those
23  hydroperiod nails that the stormwater engineers then
24  use as one of their criteria for establishing their
25  stormwater system elevations.

Page 108

1    Q.   And have you ever -- have you ever used
2  hydroperiod nails in an enforcement case under the
3  Clean Water Act?
4    A.   Yes.  I've used -- I have used the
5  indicators, the biological indicators of
6  average-normal pool wet season conditions.  I'm
7  trying to recall -- I recall a particular case in
8  which I used those.  I'm trying to remember whether I
9  actually put nails in trees and had those elevations
10  analyzed or whether I just used those in my analysis.
11         But I have used those in -- well, thinking
12  about it now, I have used those in one enforcement
13  case -- two enforcement cases I've used biological
14  indicators of average wet season high.  And I also
15  used that in a report, an analysis that I did for the
16  Department of Justice on a project that I was
17  retained to work on for the Department of Justice.
18    Q.   What was the -- the case name for that?
19    A.   On the Department of Justice?
20    Q.   Yes, sir.
21    A.   I don't recall.  It was out of -- I was
22  retained by the Department of Justice attorneys out
23  of Tampa.  And -- I don't remember the style of the
24  case.  I can find it for you and give it to you, but
25  I don't recall it right now.



W. MICHAEL DENNIS
U.S.A. vs BENJAMIN K. SHARFI

May 27, 2022
109–112

Page 109

1    Q.  Was it a Clean Water Act case?
2    A.  As I recall, it was a dispute between two
3  landowners about water releases, and there was
4  some -- some lands that the federal government was
5  involved in, and they came in as a party to that
6  case.  It was not a 404 enforcement case.
7    Q.  Okay.  So with respect to the north-south
8  ditch in the area of the Countess Joy property, when
9  you were on the site in December 2021, did you
10  observe any bed and bank?
11    A.  I did.  I observed bed and bank in the
12  north-south ditch and in the northern -- the northern
13  ditch that went west into the northwestern wetland,
14  what I call the northwest wetland.  The ditch that
15  was connecting the southwest wetland to the
16  north-south ditch was very flat, and it was clearly
17  an excavated area, but it had been so long, there was
18  not a real prominent bed and bank on that ditch.
19  There was on that northern ditch from the north-south
20  ditch to the west to that northwest wetland.
21    Q.  Do you recall whether you took any pictures
22  in December 2021 of the bed and bank areas of the
23  north-south ditch?
24    A.  Yes.
25    Q.  Okay.  And did you observe any ordinary high

Page 110

1  water line at any point of the north-south ditch on
2  the Countess Joy property?
3    A.  Yes.  I -- I noticed where the -- where on
4  the bed and the banks on the north-south ditch and on
5  the northern western ditch that I referred to, I
6  noticed where there was a mark that I took to
7  indicate the -- you know, the seasonal high water
8  mark in that ditch.
9    Q.  And did you observe any other
10  characteristics in the north-south ditch when you
11  were there in December of 2021?
12    A.  As I previously testified to, there were
13  pools in areas of standing water.  There was not any
14  continuous flowing water that I observed from the
15  site to the east-west ditch.  I did observe water --
16  shallow water in the east-west ditch during that site
17  inspection, and I observed the bed and bank of that
18  east-west ditch and what I would think was the normal
19  wet season elevation of the water in that east-west
20  ditch.
21    Q.  So you said you directed a team of surveyors
22  from Karner Surveying to take various survey points
23  out at the Countess Joy property during this time; is
24  that right?
25    A.  Correct.

Page 111

1    Q.  Were you with the survey team the whole
2  time?
3    A.  I was in the field with the surveyor team
4  the entire time.  I was not with them the entire time
5  they surveyed a cross-section.  I would -- I would
6  give them instructions on where to take
7  cross-sections or how -- how frequently on the
8  north-south ditch I wanted the cross-section.  And
9  then I would go ahead and investigate the rest of the
10  ditch structure on the property.
11    So I didn't stand there with them as they
12  took the cross-sections, but I instructed them on
13  where to take them, and I was in the field with them
14  that entire -- that entire day.
15    Q.  Did you give them any instructions about
16  where to -- well, scratch that.
17    Did you give them any instructions about
18  particular points of the cross-sections?
19    A.  Yes.  In some instances, I told them and
20  pointed out.  For instance, I would point out to
21  them, "Here's what I'm looking at as the normal high
22  water indices point in the ditch."  And I said, "Do
23  you-all see that?"  And they said, "Yup, we see
24  that."  So I said, "All right.  That's a point I want
25  you to capture.  So when you're doing the

Page 112

1  cross-sections, I want you to capture the
2  cross-section elevations of the ditch to fairly
3  represent that.  And then pick up any inflection
4  points in the ditch.  Make sure you get -- you
5  capture all of that in your cross-sections."
6    Q.  For each cross-section that Karner Surveying
7  took, did you point out the ordinary high water line
8  at that cross-section that you wanted them to
9  capture?
10    A.  Not for each one of them.  I did in some
11  instances, and as I work with them, I told them what
12  I was looking for and -- and, you know, what points
13  to capture.  And they appeared to be a seasoned
14  survey crew, so they -- they understood what I was
15  asking them to do.  But I didn't -- I didn't go to
16  them and put a pin flag in every point that I wanted
17  them to take.
18    Q.  Are you aware of whether anyone on the
19  survey team has experience in identifying ordinary
20  high water lines?
21    A.  As I said, they -- they appeared to be an
22  experienced survey crew, so I don't remember using
23  that term with them.  But when I pointed out here's
24  the -- here's the point that I wanted to capture,
25  they appeared to know what I was talking about and --



W. MICHAEL DENNIS
U.S.A. vs BENJAMIN K. SHARFI

May 27, 2022
113–116

Page 113

1  and said, "Yup, we will do that."

2      Q.   And when you say "Here's the point I want
3  you to capture," you were -- you were saying as an
4  example for other cross-sections, right?

5      A.   Right.  Right.  When we started out, I gave
6  them instructions.  I said, "Here's -- here's what
7  we're out here to do," and I directed them.  And then
8  we went to several areas on the second north-south
9  ditch and we looked at it together.  And I said, "All
10  right.  I want to capture from the ground elevation,
11  top of the bank, the slope of the ditch on both
12  sides, and if there are any inflection points in the
13  ditch, I want you to shoot an elevation there."  So
14  they were shooting elevations from the top, any
15  inflection points, the bottom on both sides, so we
16  could fairly represent the -- you know, the structure
17  of each one of those ditches.

18      Q.   And how many instances -- and how many
19  cross-sections would you say you showed them where
20  you wanted to capture the ordinary high water line?

21      A.   I -- on each of the different ditches.  I
22  instructed them on several cross-sections on the
23  north-south ditch.  I instructed them on the two west
24  ditches that connected to the two west wetlands.  And
25  then when we got to the east-west ditch, I spent time

Page 114

1  with them.  And they actually shot a lot of those
2  cross-sections while I was there on the east-west
3  ditch.  So I told them, "Here's -- here's what we're
4  trying to capture and fairly represent."

5      Q.   So do you have an estimate of how many you
6  -- you personally showed them the high water line?

7      A.   Well, I would have on both the -- the
8  east-west -- both of the ditches that connect to the
9  west wetlands, at least three or four locations on
10  the north-south ditch, and at least a couple of
11  locations on the east-west ditch.

12      Q.   And then with respect to the nails that you
13  installed in woody vegetation, did you identify each
14  of the high water lines on the vegetation yourself?

15      A.   Yes.

16      Q.   So are there any other -- did you collect
17  any other data during your December 2021 visit
18  inspection of Countess Joy that we haven't discussed
19  yet?

20      A.   No.  I think we fairly -- fairly covered
21  what my mission was and the data we took on the
22  December site inspection.

23      Q.   Okay.  So the next time you were on the site
24  was March 10, 2022, correct?

25      A.   Yes.

Page 115

1      Q.   Okay.  And did you also inspect the Countess
2  Joy property on March 10th, 2022?

3      A.   I did.

4      Q.   Okay.  So I'll try to work through these
5  together then.

6          When did you first arrive on the site or
7  Countess Joy, whatever was earlier, on March 10,
8  2022?

9      A.   Again, it was, you know, around 9:00 plus or
10  minus, on that day, and we worked pretty much all
11  day.

12      Q.   Okay.  So in other words, about an
13  eight-hour day or so?

14      A.   Yeah, more or less.

15      Q.   I suppose you'd had less daylight in March,
16  right?

17      A.   Actually, that's in December.

18      Q.   Oh, yeah, that's true.  That's a good point.

19          Okay.  So explain to me what did you do in
20  March 2022?

21      A.   In March 2022, I had the benefit of
22  receiving the team expert DOJ report, and so I
23  particularly was interested in inspecting the primary
24  flow way that was described in that.  Primary flow
25  path I guess is the right term.

Page 116

1          So I again met with the surveyors and we
2  spent that day generally looking from the area of the
3  north-south ditch where that northern ditch went to
4  the western -- northwestern wetland that I described
5  earlier.  So basically, that day was spent from that
6  point looking at that ditch connected to that
7  northwestern wetland in more detail, and then in
8  walking out the primary flow path area and taking --
9  looking at that physically in the field, looking at
10  what it looked like.

11          And I was particularly interested in getting
12  typical cross-sections of that primary flow path.  So
13  that was -- that was the -- one of the main missions.
14  The other main mission was to look at -- physically
15  look at all of the ditches on the site, including the
16  ditch/swale, and looking at the entirety.  I walked
17  the entirety of the north-south ditch all the way to
18  the east-west ditch.  And I also inspected the two
19  ditches that connect west to those two wetlands that
20  I've described.  And then I walked with the survey
21  team the primary flow path all the way to 84th street
22  ditch that then went and connected to the east-west
23  ditch.

24      Q.   Did you take any water quality samples?

25      A.   No.



W. MICHAEL DENNIS
U.S.A. vs BENJAMIN K. SHARFI

May 27, 2022
117–120

Page 117

1   Q.  Did anyone present at the inspection take
2  any water quality samples?
3   A.  No.
4   Q.  Who was -- who was present?
5   A.  I think that was myself, the survey team,
6  and Chris Hamilton, I believe.
7   Q.  We were talking about the hydroperiod nails
8  during the -- during the discussion of the December
9  inspection.  Did you install the hydroperiod nails in
10  December, or would it have been March 2022?
11   A.  I put them in in December.
12   Q.  Okay.  So did you use -- did you install any
13  hydroperiod nails in March 2022?
14   A.  No.
15   Q.  Okay.  So when you installed them in
16  December, you weren't aware at that point what the
17  continuous flow pathway that's identified in the U.S.
18  DOJ Expert Team report is?
19   A.  No.  I hadn't received that report, and I --
20  I had no knowledge of that primary flow path at that
21  time.
22   Q.  Okay.  Did you install any hydroperiod nails
23  during the March 2022 inspection?
24   A.  No.
25   Q.  Did you take any soil samples when you were

Page 118

1  on the Countess Joy property in March 2022?
2   A.  I dug one soil pit.  That's the one I
3  referred to when you were asking me earlier.  And
4  what we -- what we did is we followed the -- I'll
5  call it the blue line in the expert team report.
6       Do you know what I'm talking about?
7   Q.  I know what you mean.  The continuous flow
8  pathway?
9   A.  Right.  So we followed the blue line, and at
10  one point, sort of halfway between the north-south
11  ditch and th 84th street ditch, right on the blue
12  pathway, which we had downloaded into a Benza
13  (phonetic) computer system.  So we were -- you know,
14  we were pretty sure we were right on the blue line,
15  you know, plus or minus a few feet.
16       And so we stopped right on the -- on one of
17  the blue lined areas, and I dug a soil pit.  And I
18  went down about -- it was about 1.3 feet, and at that
19  point in time, I hit either a real prominent hardpan
20  or rock, but I couldn't -- I couldn't penetrate below
21  that.
22       And I was mainly looking to see whether or
23  not water would come up in that hole, so I dug the
24  hole and waited there for long enough time to where
25  if there was going to be any water coming up, I would

Page 119

1  observe it.  And there was no water that came up in
2  that hole at all; it was totally dry.
3       So that's -- that's the one area that I dug
4  up a soil -- or did a soil hole pit.
5   Q.  Okay.  And it was about 1.3 feet you'd say?
6   A.  Yes.
7   Q.  How do you -- how did you measure it?
8   A.  With a pocket -- a -- a pocket rod, that's
9  what it's called.  It's a -- it's like a regular
10  measuring device that you use around your house
11  except it's measured off in tenths of a feet, and
12  surveyors sometimes use that.
13   Q.  Yeah, I've read about these.  You've got to
14  be real careful because they're in tenths of a foot,
15  not inches.
16   A.  That's right.
17   Q.  What did you use to dig the hole?
18   A.  I used a sharpshooter shovel, those narrow
19  shovels that soil scientists use.
20   Q.  Okay.  And how -- why -- why did you select
21  that point on the -- the blue line, as you said, to
22  dig a hole?
23   A.  It was in an area that I looked at and just
24  could not find any evidence of it being a flow path
25  or it being a wetland.  There was -- there was

Page 120

1  nothing about the topography.  There was nothing
2  about the vegetation.  I just saw nothing right there
3  that would indicate to me it was right in the middle
4  of a perennially flowing pathway.
5       And so I said, well, I'll just -- I'm not
6  out here to do a total research of the site, but I
7  would like to see if there is any water coming up in
8  that -- in that hole.  Maybe I'm missing something.
9  Maybe there's -- maybe there's water underneath
10  there.  But, again, I went down a foot and a half.
11  The soils were dry.  No water came up in the hole.
12       So for that one point, there was not any
13  water within at least 1.3 feet of the ground surface.
14  That was in March.  It's the dry season.  Understand
15  all that, but still, for that to be a perennial flow
16  way, I would have expected water there.
17   Q.  And you said you didn't notice any
18  vegetation.
19       What do you mean by that?
20   A.  I didn't notice any wetland vegetation in
21  the place where I dug a path.  It was out in the
22  middle of a pasture area where pasture grass is that
23  were not wetland species.  General area around it
24  were pine trees, so it just did not look like a
25  wetland to me.



W. MICHAEL DENNIS
U.S.A. vs BENJAMIN K. SHARFI

May 27, 2022
121–124

Page 121

1    Q.   Did you take any pictures of the hole?
2    A.   I did.
3    Q.   Okay.  And did you produce those pictures?
4    A.   I'd have to look and see.  I don't think so,
5    but I did take a picture of it.
6    Q.   Did you make any observations with respect
7    to the soils where you dug a hole?
8    A.   I did generally.  I didn't -- I didn't go
9    through the whole soil testing procedure, but they
10   were -- they were brownish-orange type soils.
11   Q.   And what did you observe generally about the
12   soils?
13   A.   The color.
14   Q.   And were you able to identify the type of
15   soil that you observed?
16   A.   No.  I didn't -- I didn't -- I didn't do any
17   soil testing.
18   Q.   Are you familiar with the alpha-alpha test?
19   A.   Yes.
20   Q.   Did you do an alpha-alpha test of the
21   excavated soil?
22   A.   No.
23   Q.   Have you done an alpha-alpha test at any
24   other part of the site or at Countess Joy?
25   A.   No.

Page 122

1    Q.   Okay.  Do you have the location of where you
2    dug this hole?
3    A.   Yes.  That's -- that's in my expert report,
4    so it's -- it's got a symbol on there in the expert
5    report on one of the figures.
6    Q.   Okay.  So when you say that you were looking
7    at all the ditches on the site, did you take notes of
8    any of the observations?
9    A.   Yes.
10   Q.   Okay.  And what did you notate?
11   A.   The beginning on the site, the north-south
12   ditch on the site had standing water.  There was
13   standing water in that ditch on the west side of the
14   site.
15   Q.   Okay.
16   A.   The swale/ditch was dry and there was no
17   standing water there in it at all.
18        The water in the north-south ditch extended
19   up the north -- from the -- from the northwest
20   corner, the water extended up, oh, 100 or so feet.
21   And I had the surveyors mark the northernmost point
22   in the north-south ditch that there was standing
23   water.  So we got the survey point of that and the
24   elevation of that point, and that's in the report.
25        I walked up the rest of the entirety of the

Page 123

1    north-south ditch as I was instructing the surveyors,
2    and so during that -- during that day, I walked the
3    rest of the north-south ditch and it was completely
4    dry.  There was no water in the north-south ditch
5    beyond that one point that I just mentioned.  Totally
6    dry.
7         I got all the way to the east-west ditch and
8    I went out into it, and it had no standing water.
9    The soils were wet to damp to saturated, but there
10   was not any standing flowing water in the east-west
11   ditch on that day.
12        I inspected the two other manmade ditches
13   that connect to the north-south ditch in the west
14   wetlands, the two wetlands that we've talked about.
15   Those were both totally dry.  The wetlands on the
16   site, those two west wetlands, were totally dry.
17        The primary flow path from -- from where it
18   departs that northern connecting wetland ditch and
19   starts northwest and then west, the flow path was
20   completely dry.  No standing water, no puddles, no
21   evidence of flow.  It was totally dry.
22        We got to the 84th street -- or Avenue, I
23   can never remember whether it's street or avenue --
24   ditch and it was totally dry until you got to the
25   immediate confluence with the east-west ditch.  At

Page 124

1    the culvert underneath that street on the east-west
2    ditch, there was a pool of standing water.  That pool
3    of standing water did not continue and flow past that
4    immediate pool that was just there in the first less
5    than 100 feet of the road.
6         And I inspected the east-west ditch in some
7    other locations between there and the north-south
8    ditch, and it was -- it was dry.  It -- so I
9    inspected all of the ditches and the primary flow way
10   on that day, and it was all dry.
11        And the surveyors that I had -- I had the
12   surveyors do representative cross-sections of -- we'd
13   already done the north-south ditch, so we didn't do
14   anymore on that, but we did do the cross-sections of
15   the primary flow path, the blue line, and the -- and
16   the 84th street ditch.
17   Q.   When you were making these observations that
18   those ditches were dry and -- were dry, as you say,
19   did you -- did you dig any holes to see what was
20   going on underneath the ground?
21   A.   I dug the one hole that we've talked
22   about --
23   Q.   Any others?
24   A.   -- but I did not -- huh?
25   Q.   Any others?



W. MICHAEL DENNIS
U.S.A. vs BENJAMIN K. SHARFI

May 27, 2022
125–128

Page 125

1    A.  No.
2    Q.  Okay.
3    A.  I dug no other holes.
4    Q.  Why is that?
5    A.  We had -- we had one day to gather all that
6    data, and it was not in my purpose to go out there
7    and do any kind of further analysis, other than to
8    see if I could find any evidence of this primary flow
9    path.  So I can look at the surface and -- and I --
10   there -- there were -- once -- once you get to the
11   western edge of that flow path near 84th Street, the
12   conditions change there and there were some --
13   there's more mucky soils in that location.  And it
14   looked like water would stand in -- in that -- in one
15   area there.  And there was -- there was a dug
16   roadside pit just north of that, that did have some
17   standing water in it.  That was the only water I saw
18   except for that pool that I described in the
19   east-west ditch earlier.
20        So I looked, and -- and I was primarily
21   looking to see if there was some indication that --
22   you know, it may have been dry when I was out there;
23   it was in March.  But was there an indication of
24   stained leaves or was there a bed and bank?  Was
25   there an ordinary high water line?  I looked for all

Page 126

1    of those things and I did not find them.
2    Q.  And where is that that you're saying you did
3    not find them?
4    A.  On the blue line primary flow path.
5    Q.  When you were walking the ditches in the
6    flow path, did you have your sharpshooter shovel with
7    you?
8    A.  Yes.
9    Q.  About how long would it take to dig a hole
10   of approximately 1.3 feet?
11   A.  Depends on the soil, a few minutes.
12   Q.  Okay.  Just to confirm, you haven't made any
13   of your own determinations regarding the normalcy of
14   precipitation at the Countess Joy property during
15   your March 2022 inspection; is that correct?
16   A.  No.
17   Q.  Okay.  And your opinion is that over the
18   course of this period, precipitation was normal, or
19   thereabout normal?
20   A.  It was in the dry season, but I believe it
21   probably was normal.
22   Q.  Okay.  And did -- did -- how, if at all,
23   does the normalcy of precipitation influence your
24   opinions in this case?
25   A.  Well, it's certainly a factor to consider is

Page 127

1    what -- what was the rainfall event, the antecedent
2    rainfall event.  That's all part of the evaluation.
3    Q.  And so when you say it's all part of the
4    evaluation, what do you mean?
5    A.  Just that, it's -- it's -- Florida has a wet
6    season and a dry season, and about 52 to 54 inches of
7    rain distributed during the year.
8        So the -- the information that I had
9    reviewed on rainfall is that Florida is still
10   operating under the wet season/dry season, still
11   having near that average rainfall.  And that's
12   important to talk about average and not normal.
13   Normal -- normal is dry years and wet years.  Average
14   is a numerical number that you can actually measure
15   and calculate.  So understanding the difference
16   between average and normal is -- is a good thing.
17   Q.  So does any of the Corps' guidance make a
18   distinction between average and normal?
19   A.  The Corps data just talks about normal
20   circumstances, so I'm familiar with the term normal
21   in that context.  I'd have to go back and look at it,
22   but I believe to answer you, rainfall, too, deals
23   with averages.
24        (Thereupon, Exhibit DX193 has been marked
25        for identification.)

Page 128

1    BY MR. ADKINS:
2    Q.  I'm going to show you an exhibit that has
3    been marked DX193.  This is the first exhibit we've
4    looked at on Zoom, so are you able to see Exhibit
5    193?
6    A.  I am.
7    Q.  Okay.  So this exhibit is titled "Antecedent
8    Precipitation Versus Normal Range Based on NOAA's
9    Daily Global Historical Climatology Network."
10        Do you see that?
11   A.  Yes.
12   Q.  Are you familiar with what this is?
13   A.  I'm not familiar with this exhibit, but I'm
14   familiar with the tool.
15   Q.  Okay.  And what generally is this tool?
16   A.  Well, this is the Antecedent Precipitation
17   Tool Version 1.0.
18   Q.  Okay.  And you see there are -- there's a
19   box in the lower to midsection of this tool that
20   says, "Coordinates 27.1682, negative 80.3622."
21   A.  Yes.
22   Q.  Do you know what that -- what that means?
23   A.  That generally refers to the lat/long
24   coordinates.
25   Q.  Okay.  Now, I'll represent to you that that



W. MICHAEL DENNIS
U.S.A. vs BENJAMIN K. SHARFI

May 27, 2022
129–132

Page 129

1  -- the coordinates of that box are the lat/long for
2  the site in this case, okay?
3      A.  Those are the coordinates for the site?
4      Q.  Yes, sir.
5      A.  Okay.
6      Q.  Now, based on Exhibit DX193, there was below
7  normal precipitation while you were on the Countess
8  Joy property on March 10, 2022; is that right?
9      MR. MCALILEY:  Object to form.
10     THE WITNESS:  It appears to be.
11  BY MR. ADKINS:
12     Q.  Okay.  And just to clarify, you didn't --
13  you didn't run an antecedent precipitation for your
14  March 2022 inspection before disclosing your report
15  in this case, right?
16     A.  No.
17     Q.  Now, you see there is also a box that says
18  "Drought index PDSI," and the value is mild drought.
19     A.  Yes.
20     Q.  What does that mean, or do you -- do you
21  know what that means?
22     A.  It's a determination of an analysis of
23  drought and a different characterization of it being
24  dryer than normal.
25     Q.  Okay.  So just a few wrap-up questions here

Page 130

1  on this topic, and then --
2      MR. MCALILEY:  Can we look at that last one
3  just one more second.
4      MR. ADKINS:  Of course, yeah.  Do you want
5  to take another look at it?  Okay.
6  BY MR. ADKINS:
7      Q.  So I'm going to put back up on the screen
8  DX193, okay?
9      A.  Okay.
10     Q.  Do you see it?
11     A.  Yes.
12     Q.  Okay.
13     A.  Now, I just had a second to look at it as
14  you flashed it up there.
15     Q.  Sure.
16     A.  And I'm noticing that the precipitation in
17  January and February appears to be more, or higher,
18  and then it does drop off beginning late January to
19  the 1st of March.  But then it's up in March, goes up
20  within the normal range appears to be in.  So if I'm
21  reading that right, that's what it appears to be.  So
22  I think -- I think I need to study this a little bit
23  more, but it looks like that's the pattern that
24  you're seeing there.
25     Q.  And so the area that you're observing the

Page 131

1  30-day average increasing is after the March 10, 2022
2  date reflecting on this exhibit, right?
3      A.  Well, there's a straw -- you know, a clear
4  dip late February it looks like before March, and
5  then the blue line comes on up.  And then in
6  mid-March the blue line jumps up and there was a main
7  rainfall then.  So I'm just -- I'm just reading off
8  what's there because the exhibit is what it is.
9  That's fine, thank you.  Thank you.  I just needed to
10  look at that again.
11     Q.  Of course.  So, Dr. Dennis, have you
12  performed any aerial reconnaissance of the site, the
13  Countess Joy property, or any other surrounding
14  areas?
15     A.  Not specifically.  I would have observed the
16  area as -- as I flew in and out of Stuart airport,
17  but, you know, no specific aerial reconnaissance at
18  this time.
19     Q.  Were you on a commercial jet when you flew
20  in and out of Stuart?
21     A.  No.
22     Q.  Oh, okay.  So you were in a small aircraft?
23     A.  Yes.
24     Q.  Okay.  Did you -- did you fly over the site
25  when you flew in and out of Stuart?

Page 132

1      A.  I don't -- I don't remember specifically
2  flying over it.  I just don't remember.
3      Q.  Okay.  Have you visited any other properties
4  other than the site and the Countess Joy property in
5  connection with your work in this case?
6      A.  No.
7      Q.  And have you -- well, you haven't collected
8  any data from any of the referenced properties that
9  are cited in the U.S. DOJ Expert Team report; is that
10  correct?
11     A.  No.
12     MR. ADKINS:  Okay.  Let's go off the record.
13     VIDEOGRAPHER:  Going off the video record at
14  12:56 p.m. Stand by.
15     (Thereupon, a recess was taken.)
16     (Thereupon, Exhibit DX194 was marked for
17  identification.)
18     VIDEOGRAPHER:  We're back on the video
19  record at 1:32 p.m. You may proceed.
20  BY MR. ADKINS:
21     Q.  Okay.  Welcome back from lunch.  I'm going
22  to share my screen and show you what's been marked as
23  DX194.  This is the rebuttal -- the analysis and
24  rebuttal to U.S. Department of Justice Expert Team
25  Report February 18, 2018, prepared by W. Michael



W. MICHAEL DENNIS
U.S.A. vs BENJAMIN K. SHARFI

May 27, 2022
133–136

Page 133

1  Dennis, Ph.D., and it has Bates stamp in the bottom
2  right corner, SHARFIEXPERTS0000101 through 401.
3      Dr. Dennis, do you recognize Exhibit DX194?
4  A.  Yes, I do.
5  Q.  What is this?
6  A.  This is my analysis and rebuttal report.
7  Q.  You reported --
8      MR. MCALILEY:  Brandon, you just put your
9  Outlook up on the screen, like your in-box and
10  e-mail.
11      MR. ADKINS:  Thanks.  I'll try to -- I'll
12  try to fix this.
13      MR. MCALILEY:  I think what you need to do
14  is you have to go back and identify your report
15  again on Zoom.  So, yeah, stop sharing, and then
16  when you hit share, you make sure you click on
17  the right thing, because I think you accidentally
18  were sharing with the world your e-mail.
19      MR. ADKINS:  Right.
20  BY MR. ADKINS:
21  Q.  Do you see the report again?
22  A.  Yes.
23  Q.  Okay.  Great.  Thank you, Mr. Mcaliley.
24      So you prepared this rebuttal report in this
25  case and served it on April 18, 2022, correct?

Page 134

1  A.  April 8th, yes.
2  Q.  Yes, thank you.  Did anyone assist you in
3  preparing your rebuttal report?
4  A.  Yes.
5  Q.  All right.  Who assisted you?
6  A.  Dr. Babak Negahban, who is our senior GIS
7  analyst; and Dr. Lynette Brown, who is one of our
8  senior scientists; and my assistant, Laura Hellinger,
9  who helped type it up and put the report together.
10  Q.  And this is -- the first name was Dr.
11  Negahban?
12  A.  I'll give the Court Reporter the spelling.
13  It's Babak, B-A-B-A-K, Negahban, N-E-G-H-A-B-A-N, or
14  thereabouts.
15  Q.  Okay.  And Dr. Negahban is a senior GIS
16  analyst, right?
17  A.  Correct.
18  Q.  Okay.  What assistance did Dr. Negahban
19  provide?
20  A.  He -- he pooled all of the various data
21  files, GIS files together and put them in a ArchView
22  format so that I could review them, analyze them.  So
23  he put -- he put all that information together.
24  Q.  Did Dr. Negahban assist you in any way with
25  forming the substance of your opinions in this case?

Page 135

1  A.  No.
2  Q.  And you identified Lynette Brown as a senior
3  scientist; is that right?
4  A.  Yes, Dr. Lynette Brown.
5  Q.  Okay.  And what was Dr. Brown's assistance
6  in this case?
7  A.  She assisted Dr. Negahban and myself in
8  bringing together the GIS files, and she also
9  reviewed the expert team report, and she and I
10  discussed -- and she performed certain research tasks
11  for me, looking at various reports and so forth that
12  were in the public domain.  And I asked here to
13  review the report once I drafted it and provide me
14  any editorial comments or suggestions.
15  Q.  What's Dr. Brown's scientific background?
16  A.  She is a Ph.D. certified soil scientist with
17  her Ph.D. out of the University of Florida.
18  Q.  Okay.  Why -- why did you ask Dr. Brown to
19  render this assistance?
20  A.  I'm sorry, say again?
21  Q.  Why did -- why did you ask Dr. Brown to
22  assist you?
23  A.  Dr. Brown is a very detailed, accomplished
24  scientist, and so she's -- she's worked with me on --
25  well, she works with me daily on projects in the

Page 136

1  company and on some of the litigation matters.  She's
2  got a very good sense of analysis and makes good
3  comments and a very -- a very good person to
4  collaborate with.  So the report was written by me,
5  they're my opinions, but I did have her help in
6  bringing together some of the materials.
7  Q.  Are there any particular topics that you
8  recall collaborating with Dr. Brown about?
9  A.  Being a Ph.D. soil scientist, she was
10  interested in soil analysis, so she looked at that.
11  She also pulled together information on some of the
12  various documents about St. Lucie Estuary and various
13  studies that have been done on that and analysis of
14  the limits of data.
15  Q.  Is it important to have a soil scientist to
16  analyze issues in this case?
17  A.  Her -- her collaboration with me was not
18  focused on the soils as to the soil information.  She
19  did review that, but she more served as an overall
20  scientist/ecologist looking at the information and
21  the data and the opinions.
22  Q.  All right.  Did she offer any criticisms of
23  the soils analysis conducted by the U.S. DOJ Expert
24  Team?
25  A.  Brandon, I'm sorry, I'm getting some



W. MICHAEL DENNIS
U.S.A. vs BENJAMIN K. SHARFI

May 27, 2022
137–140

Page 137

1  feedback anyway.
2      Q.  I'm hearing the same.
3      MR. MCALILEY:  Let's see, your sound is off
4  on your computer, right?
5      THE WITNESS:  Yes.
6      MR. MCALILEY:  Yeah, so our sound is off. We
7  just have one -- we just have one sound here in
8  our room, so maybe it's somebody else.  I can't
9  tell.
10      MR. ADKINS:  Why don't we go off the record
11  for a second.
12      THE VIDEOGRAPHER:  Going off the video
13  record at 1:42 p.m.
14      (Thereupon, a recess was taken.)
15      VIDEOGRAPHER:  We're back on the video
16  record at 1:43 p.m. You may proceed.
17  BY MR. ADKINS:
18      Q.  So the question that I had asked before we
19  went off the record is did Dr. Brown offer any
20  critiques or criticisms of the soils analysis by the
21  U.S. DOJ Expert Team?
22      A.  She reviewed it and she had some comments,
23  and probably would -- if she was here, she would take
24  some exceptions to some of the determinations on the
25  soils. But none of that was -- rose to the level of

Page 138

1  offering or becoming a major point in my opinions.
2      Q.  Does it form any part of your opinion?
3      A.  No.
4      Q.  Did you independently analyze the soils
5  analysis provided by the U.S. DOJ Expert Team?
6      A.  I reviewed it but I didn't spend a great
7  deal of time analyzing it.
8      Q.  Do you have any opinions regarding the soils
9  analysis by the U.S. expert team?
10      A.  No.
11      Q.  Do you have any opinions regarding the --
12  well, let me -- let me start over.
13      You're aware that the U.S. DOJ Expert Team
14  installed several hydrologic wells, both at the site
15  and at the Countess Joy property, correct?
16      A.  Correct.
17      Q.  Did you review the data that was collected
18  by those hydrologic wells?
19      A.  I did.
20      Q.  Okay.  Do you have any opinions regarding
21  the data that was collected by the hydrologic wells?
22      A.  I accept the data as it is.
23      Q.  Okay.  And are you aware that Dr. Nutter
24  formed certain opinions and conclusions based on data
25  in the hydrologic wells.

Page 139

1      Are you aware of that?
2      A.  Yes.
3      Q.  Okay.  Did you review Dr. Nutter's opinions
4  regarding the data in the -- that was collected by
5  the hydrologic wells?
6      A.  I reviewed his deposition where he talked
7  about that, and I reviewed his section of the team
8  expert report where he discussed it.
9      Q.  Do you have any opinions regarding Dr.
10  Nutter's opinions that were formulated based on data
11  collected in the hydrologic wells?
12      A.  Yes.
13      Q.  What are your opinions?
14      A.  I don't find the expert team opinions,
15  Figure 1, correct and accurate depicting a perennial
16  stream from the site to the Atlantic Ocean.  And
17  based on Dr. Nutter's deposition, it appears he
18  doesn't believe that either.
19      Q.  Do you have any other opinions regarding
20  Dr. Nutter's opinions that were formed based on data
21  collected from the hydrologic wells?
22      A.  To the extent that it informs his opinion of
23  the primary flow way, I do.  And as I testified
24  before lunch, I could not find any field data during
25  my inspections to support that flow way being a

Page 140

1  perennial connection.
2      Q.  When you say inspections, you just mean the
3  March 10, 2022 inspection, right?
4      A.  Correct.
5      Q.  Do you have any other opinions regarding
6  Dr. Nutter's opinion, which was based in part on data
7  collected from the hydrologic wells?
8      A.  Those are the primary areas.
9      Q.  Any other nonprimary areas that you can
10  recall?
11      A.  No.
12      Q.  Did -- did you collaborate at all with
13  Dr. Negahban with respect to the substance of any
14  opinions offered by the U.S. DOJ Expert Team in this
15  case?
16      A.  No.
17      Q.  And you said that Dr. Brown had offered
18  editorial comments and suggestions to the draft of
19  your report; is that right?
20      A.  Yes.
21      Q.  Did Dr. Brown write any sentences or
22  paragraphs in your report?
23      A.  I don't think so.  She provided edits on
24  some of them.  If those edits turned out to be a
25  sentence here or there, it may have been, but nothing



Page 141

1  beyond that.
2     Q.  I think we have kind of a vague term on --
3  I've had someone edit my work in a way that
4  completely rewrote it.
5        So what do you mean by edit?
6     A.  Yeah, I understand and appreciate that --
7  that position; I've had the same.
8        When I'm using edit here, I'm talking about
9  editing for typos, for sentences that didn't make any
10  sense, maybe a paragraph or a section that needs some
11  more clarification.  So I'm thinking about those
12  kinds of edits, which she would apprise me of and we
13  would discuss, and then I would go back and -- and
14  make the edits.
15     Q.  Okay.  Did anyone other than you write the
16  initial draft of your report?
17     A.  No.
18     Q.  Other than Dr. Negahban and Dr. Brown, have
19  you consulted with anyone else regarding -- and with
20  the exception of counsel -- have you consulted with
21  anyone else regarding your opinions in this case?
22     A.  No.
23     Q.  Does your April 8, 2022 rebuttal report
24  reflect the full scope of your opinions and the basis
25  and reasons for that in this case?

Page 142

1     A.  Yes.
2     Q.  Does your April 8, 2022 rebuttal report
3  reflect the full scope of the facts and data you
4  considered in forming your opinions in this case?
5     A.  Yes.
6     Q.  Do any of your opinions in this case rely
7  upon the opinions of the other experts that
8  defendants have disposed?
9     A.  I would say that the -- my April 8th report,
10  that the substance of my opinions and what I intend
11  to testify on at the hearing -- I've subsequently had
12  the benefit of reviewing depositions and -- and
13  reports of Creach and Dr. Ott, so to the extent that
14  their reports address topics that I address, then at
15  hearing, would incorporate and rely on any of their
16  opinions that were germane to my opinions and my
17  testimony.
18     Q.  Okay.  Before you served your April 8
19  rebuttal report, had you been aware in any way of the
20  opinions of Dr. Creach and Dr. Ott?
21     A.  No.
22     Q.  And I think I mean Mr. Creach and Dr. Ott.
23  I think I did that wrong, but is the answer still no?
24     A.  Still no.
25     Q.  All right.  Is there anything in your

Page 143

1  rebuttal report that you'd like to correct?
2     A.  There may be a typo here or there that I saw
3  when I reviewed it, but nothing of any substance.
4     Q.  Okay.  Did you delineate wetlands on the
5  site?
6     A.  I'm sorry, say it again.
7     Q.  Did you delineate wetlands on the site?
8     A.  No.
9     Q.  You considered four wetland delineations at
10  the site, one conducted by Ms. Danna Small in March
11  2018, two conducted by EDC, and one conducted by the
12  U.S. expert team in this case; is that right?
13     A.  Correct.
14     Q.  Okay.  Do you know when the EDC delineations
15  were conducted?
16     A.  My recollection is in 2020, perhaps 2019,
17  but 2019 to 2020, I believe.
18     Q.  And when I asked you towards the top of this
19  deposition what sorts of materials you considered,
20  you referred to Ms. Small's delineation.  What
21  exactly of Ms. Small's work did you consider in
22  forming your opinions in this case?
23     A.  I -- I considered her -- well, in the
24  delineation that she submitted to the South Florida
25  Water Management District and had inspected in the

Page 144

1  field by two wetland scientists from the Water
2  Management District that was conducted primarily
3  before any of the subsequent site work was done --
4  may have been a little bit of work done, but not
5  much -- in reviewing all of the wetland delineations
6  on site that had been done on site, I found her
7  delineation to be the most credible and defensible.
8     Q.  Right.  I -- yeah, we'll get there, don't
9  worry.  But I just want to understand exactly what --
10  what of Ms. Small's work that you considered.
11        So the wetland delineation, did you consider
12  any of the wetland delineation data forms that she
13  prepared in this case or for the site?
14     A.  Not specifically.
15     Q.  Generally?
16     A.  I -- I reviewed her survey wetland
17  delineation and focused primarily on -- on it.
18     Q.  And when you say the survey wetland
19  delineation, do you mean the map with the line of
20  where the wetlands exist based on her opinion?
21     A.  Yes.
22     Q.  Did you consider any of Ms. Small's notes
23  from inspections she conducted at the site?
24     A.  I don't believe so.
25     Q.  Did you consider any of the photos that



W. MICHAEL DENNIS
U.S.A. vs BENJAMIN K. SHARFI

May 27, 2022
145–148

Page 145

1  Ms. Small took of the site?

2      A.  I -- I don't -- not specifically.  I don't
3  believe that I focused on any of the materials other
4  than materials that I was provided that she submitted
5  to the South Florida Water Management District.  So
6  to the degree that there was anything submitted in
7  that or her submittal to the Corps of Engineers, I
8  would have considered that in -- in looking at the
9  opinion.

10     Q.  Is there anything else that you remember
11  specifically that you might have considered of
12  Ms. Small's other than what she submitted to the
13  Water Management District?

14     A.  Also, I considered and had benefit of her
15  deposition when I finalized my report, so I -- I -- I
16  was informed by her deposition testimony.

17     Q.  Okay.  And her deposition -- did you review
18  any of the exhibits that she was shown at her
19  deposition?

20     A.  I can't recall.

21     Q.  Okay.  I'm showing you page 54 -- oh, excuse
22  me, what's Bates Stamped as SHARFIEXPERTS154.  I'll
23  show you the bottom page here.  And this is page 49
24  of your report if you want to turn to a copy that you
25  have.

Page 146

1      So I'm going to read from your report here.
2  You state, "Given that the DLS Environmental Services
3  wetlands survey was conducted prior to the subsequent
4  land clearing, where the flag line inspected and
5  approved in the field by two South Florida Water
6  Management District reviewers, it was surveyed by a
7  professional land surveyor, I find this survey the
8  most supported by standard wetland delineation
9  practices and the most reliable for this site."

10     Did I read that correctly?

11     A.  Yes.

12     Q.  Is that an accurate statement of your
13  opinion in this case?

14     A.  Yes, it is.

15     Q.  Now, DLS Environmental Services, that's
16  Ms. Small's consulting company?

17     A.  Yes.

18     Q.  Can you please explain the basis for the
19  opinion that I just read?

20     A.  Yes.

21     Q.  Please do.

22     A.  I do and my company does wetland
23  delineations virtually every day of the week to one
24  degree or another.  And in doing wetland
25  delineations, the process always starts with, you

Page 147

1  know, basic mapping and soils and vegetation
2  information, and make a certain determination
3  before you go to the field about what are wetlands
4  and what aren't.

5      The second part of our standard wetland
6  delineation practice, and I think that this is
7  standard in the industry, is then you go out in the
8  field having the benefit of the topo maps, the
9  vegetation maps, the soil maps, the historical aerial
10  photographs, current aerial photographs, and you go
11  out in the field and you apply the wetland
12  delineation methodologies.  So you either apply the
13  state methodology in Florida, if you are in delegated
14  areas, or you apply the '87 Manual and the 2010
15  Supplement if you're in Corps of Engineers retained
16  waters.

17     And so you go out in the field and ground
18  troop your preliminary further interpreted
19  jurisdictional delineation.  And you look at the
20  vegetation, you get soil tests, you look at the
21  topography, you look at indicators of hydrology, and
22  then in the field you use all of that information to
23  still verify and you flag a wetland line.

24     Once that wetland line is flagged, and we
25  often will flag it and GPS it, then we will send it

Page 148

1  to the regulatory agency, either the Water Management
2  District VP or the Corps or the upper government for
3  their review.  And typically, they will say, "We want
4  to inspect your line in the field."  So they will
5  send one of their wetland scientists, or in this case
6  two of the wetland scientists, out to inspect your
7  line.

8      The wetland line is inspected.  It's either
9  accepted or not accepted.  Usually, what happens is
10  that it's inspected and there'll be a flag here or a
11  flag there that will be some discussion about.  Those
12  flags might be moved a few feet one way or another
13  until -- and the line is inspected until every one
14  comes out of the field, all the agency folks that
15  inspected the line comes out of the field and said,
16  "We have reviewed and inspected your wetland lines
17  and we've verified it."

18     At that point in time, you have an
19  approximate wetland line based on the GPS readings,
20  and -- but you do have a verified site-inspected line
21  from the agencies.  Then, we typically would go to a
22  professional land surveyor, have them go out and pick
23  up the flagged points.  They survey the flagged
24  points, bring them back and provide a survey of the
25  wetland line that is then used in the subsequent



W. MICHAEL DENNIS
U.S.A. vs BENJAMIN K. SHARFI

May 27, 2022
149–152

Page 149

1  permitting.
2      So in this case, it appears that Ms. Small
3  followed that procedure.  That's the procedure that
4  we would have followed.  That's the procedure we
5  follow every day and get accepted by the agencies
6  every day.  And then we move ahead with the various
7  permitting steps based on that.
8      In this instance, we had a site that had
9  essentially, as far as I could tell, one
10 investigation in any depth conducted on it prior to
11 the land clearing activities, and that was by Ms.
12 Small.  And she followed these standard practices.
13     And to me, a key in my opinion on this is
14 that it wasn't just her flagged line, but it was
15 inspected by two of the South Florida reviewers.  And
16 Bobby Conley (phonetic), from South Florida, who's an
17 experienced wetland reviewer, and her staff reviewed
18 it, and then she wrote a letter, saying, "We accept
19 your delineation."
20     So given the fact that that's the only study
21 of a wetland delineation that was done prior to the
22 land clearing in this instance, I find it more
23 credible and defensible in following typical
24 practices of wetland science and wetland delineators
25 than the others.  And the others being the one that

Page 150

1  was produced, a couple of them, a couple of
2  variations, but after some of the operations that
3  occurred or the U.S. team expert opinion based on
4  their review of the '87 Manual and the 2010
5  Supplement and their opinion of where the wetland
6  line was using the information they brought together
7  after the fact.
8      So in considering all of that, I find her
9  analysis as an experienced wetland delineator in
10 Martin County being most credible.
11 Q.  You say in your report standard wetland
12 delineations practices.  Is the process that you just
13 described, doing a photo interpretation of a wetland
14 line, ground trooping it, having it agency verified,
15 and once it's verified, having a survey done of the
16 line, is that what you mean by standard wetlands
17 delineation practices?
18 A.  Yes.
19 Q.  Are there any other reasons why you find
20 Ms. Small's wetland delineation to be more reliable
21 than DEP's delineations or the U.S. Department of
22 Justice Expert Team Report -- or expert team's
23 delineation?
24 A.  Yes, to the degree that in my review of
25 their various aerial photography and data sets, which

Page 151

1  I've listed and outlined in the report, there have
2  been various wetland determinations made on the site.
3  There's a National Wetland Inventory Map, there's the
4  Hydrographic Database Map, there's the State of
5  Florida Flux Map.
6      So I reviewed all those, and those all vary
7  in one degree or another, but the thing that I was
8  the most corroborative in reviewing the whole series
9  of aerial photographs that I did from historic
10 aerials to the more recent, and looking at those
11 aerial photographs and the signatures on those, I can
12 pick out certain signatures that look like, you know,
13 wetland -- the wetland upland signature break.
14     And having looked at some of the wetlands on
15 the Countess Joy side and further interpreting what
16 were -- what I believe are wetlands there, admittedly
17 not having done a wetland delineation up there, but
18 looking at certain points on the ground and the
19 historic aerials, there's a signature that shows up
20 on many of the aerial photographs that pretty much
21 follow the DLS wetland delineation that it -- it
22 illustrates that there is a wetland in the southwest
23 corner.  Depending on the aerial and the date of the
24 aerial, it may vary a little bit, but it -- this
25 delineation seems credible based on looking at those

Page 152

1  various aerials and the photo interpretation and the
2  signatures of those.
3      And also, you know, the soils, you can --
4  you can have hydric soils that are present, but they
5  don't delineate to the extent of a regulated wetland.
6  So there's a distinction there that can be made
7  between hydric soils and -- and the final wetland
8  soil, based on whether they're in a drained or
9  undrained condition and other factors.  But that
10 southwest corner had mucky soils.
11     So all of those things combined seem to
12 corroborate Ms. Small's delineation.  And, again, to
13 me, the most compelling thing is that she actually
14 did that in the field before any of the land clearing
15 occurred, and had it inspected by two South Florida
16 wetland inspectors.
17 Q.  Any other reasons why you find Ms. Small's
18 delineation to be more reliable?
19 A.  No.  That's the substance of my testimony.
20 Q.  Okay.  So you referred to the NWI maps.  Can
21 you explain what those are?
22 A.  National Wetland Inventory.
23 Q.  What does an NWI map show?
24 A.  National Wetland Inventory mapping is done
25 at the national scale, at the -- at the scale of the



W. MICHAEL DENNIS
U.S.A. vs BENJAMIN K. SHARFI

May 27, 2022
153–156

Page 153

1  old PS. And that's the one I testified to earlier I
2  had done some mapping for, for that process, for the
3  NWI process when I was at the Tennessee Valley
4  Authority.
5      So it is a good resource at the scale that
6  it is done and with the level of ground trooping that
7  is done to support those delineations. But I have
8  not found it to be as reliable in Florida, for
9  instance, as some of the other databases. So it's
10  one of the -- it's one of the sources we always look
11  at. And sometimes it's pretty close or right on, but
12  it says on the face of it, it's not to be used as a
13  surrogate for a wetland jurisdictional delineation.
14      Q.  You use the term ground troop in your
15  report. What does that term mean to you?
16      A.  That means going actually in the field,
17  particularly with the aerial photographs in hand, and
18  looking at the signature that you see on the aerial
19  and inspecting the ground to see what the ground
20  condition is like. So aerial interpretation is good
21  and it can be right on, but I'm never totally
22  comfortable with it until I actually go on the ground
23  and inspect the signatures to see if what I'm further
24  interpreting is actually what's occurring on the
25  ground.

Page 154

1      Q.  Have you done any ground trooping on the
2  Countess Joy property?
3      A.  We spent the morning talking about what I
4  had done out there. So I inspected this -- that
5  property. I looked at some areas that appeared on
6  the aerial to be wetlands and inspected those. So to
7  that degree, yes.
8      Q.  So would you consider the work that you did
9  on the Countess Joy property to have been ground
10  trooping?
11      A.  It was ground trooping to a degree. I did
12  not go out on that property to ground troop, you
13  know, the entire site. But it was -- it did give --
14  it did inform me in terms of my analysis of aerial
15  photography.
16      Q.  Did you attempt to ground troop any of the
17  NWI maps on the Countess Joy property?
18      A.  No.
19      Q.  How about on the site; have you tried to
20  ground troop any of the wetlands reflected on the
21  site in the NWI maps?
22      A.  I did not go on the site or the Countess Joy
23  property with the National Wetland Inventory map in
24  hand and do the kind of ground trooping that I just
25  described.

Page 155

1      Q.  So is that no, you did not ground troop the
2  NWI maps on the site?
3      A.  No.
4      Q.  Okay. So how about this hydrographic
5  database map; did you do any ground trooping of the
6  hydrographic database map?
7      A.  No.
8      Q.  And that's true, you did not do any ground
9  trooping of the hydrographic database map on the site
10  or Countess Joy?
11      A.  No.
12      Q.  Did you do any ground trooping of the
13  historic aerial photographs on the site or the
14  Countess Joy property?
15      A.  Yes.
16      Q.  Okay. Can you explain?
17      A.  Yes. When I had access to the site and I
18  had access to the Countess Joy property, I -- and
19  that was after I had gathered all the historic
20  aerials and had that information inhouse. Having
21  access to those properties, then, allowed me to go
22  back and look at the historic aerial photography in a
23  more informed fashion, so there were some questions I
24  had when I was doing the first evaluation about some
25  of the photographic signatures, and I was able to

Page 156

1  clear that up and better understand those signatures
2  once I'd been out on the properties.
3      Q.  And can you be more specific of what you had
4  to clear up?
5      A.  Yeah, on the -- I'll give you one specific
6  example. On the site historic aerials, there's -- in
7  the southwest corner, and if you look at the 1950
8  vintage aerial, those earlier aerials, the southwest
9  corner, you'll see an area sort of an hour-glass
10  shaped real dark area, and then out from that, you'll
11  see some other slightly different shading signatures.
12      And so -- and I looked at that -- those
13  different signatures there and I looked at that on
14  some of the wetlands on the Countess Joy property
15  from the historic aerials to see where those
16  signatures looked consistent and what they -- what
17  they showed.
18      So that was -- that was helpful in
19  determining some of those signatures whether or not,
20  you know, a certain signature line was definitive of
21  a wetland edge or was it another line that was --
22  another signature that was seen. So it was helpful
23  in that regard.
24      Q.  But the example that you're describing --
25  you know, I'm just going to stop sharing my screen.



W. MICHAEL DENNIS
U.S.A. vs BENJAMIN K. SHARFI

May 27, 2022
157–160

Page 157

1      The example that you're describing, you were
2  confirming a ground trooping, a signature that you
3  saw in a 1950s aerial photograph with what you
4  observed on the site in 2022.
5      Am I understanding correctly, or correct me
6  if I'm wrong?
7      A.  Well, the sites changed in 2022 obviously.
8      Q.  Right.
9      A.  So I was looking at in '20 -- in the
10  historic 1950s era and looking at the signatures
11  there.  I could also look at similar areas on the
12  Countess Joy property and looked at the signatures
13  there.  So it -- it gave me an indication, without
14  ground trooping it on the site, because the site had
15  already been altered, of what those signatures were
16  reflecting, so that I could go out and look at a
17  wetland area on the Countess Joy property and see
18  where the extent of the wetlands were and see where
19  that signature was that allowed me to go back to
20  the -- you know, use the same aerial and look at the
21  site and look at the signatures there and give me a
22  better indication of the wetlands then.
23      So that was, again, my -- my -- my opinion
24  still remains that the best determination of the
25  wetlands on the site was the one done by Ms. Small

Page 158

1  for all the reasons I've given.  But you asked what
2  other -- other things that I looked at, and that's
3  some of them.
4      Q.  Are there any other ways that you ground
5  troop on the site or Countess Joy aerial imagery?
6      A.  I'm sorry, say again?
7      Q.  Are there any other ways that you ground
8  troop on the site or the Countess Joy property aerial
9  photography?
10      A.  No.  Look at the aerial photographs and be
11  on the ground with the aerial photographs in hand.
12  Nothing beyond that.
13      Q.  And you referred to some soil maps.  Did you
14  do any ground trooping of any soil maps in connection
15  with this case?
16      A.  No.
17      Q.  In what ways, if any, was Ms. Small's
18  delineation consistent with the 1984 Corps Manual?
19      A.  Which year Corps Manual?  You said '60?
20      Q.  I -- you know, I think I said '84 and I
21  meant '87, so excuse me.
22      A.  Okay.  '87.  Again, Ms. Small went out
23  before a disturbance essentially had happened, found
24  the wetland line, determined it and had it inspected
25  by South Florida.  Except for -- except for certain

Page 159

1  instances over the last 10 or 15 years, for the most
2  part, on most of our projects in Florida, we flag one
3  wetland line.
4      And what we've found is that if you
5  rigorously apply the standard delineation
6  methodologies and you rigorously apply the '87 Manual
7  and 2010 Supplement methodology, you get essentially
8  the same line.  And, you know, the -- where there can
9  be differences sometimes has to do with slash pine
10  and gallberry, and those being not listed on the
11  state list, but listed on the federal list of wetland
12  plants.  So --
13      Q.  Are there specific ways in which Ms. Small's
14  delineation was consistent with the '87 Manual?
15      MR. MCALILEY:  Counsel, I think he wasn't
16  done yet.
17      MR. ADKINS:  I'm sorry.
18      THE WITNESS:  Yeah, I was -- I'll try to --
19  I'll try to get to the -- get to the answer
20  quicker.
21      So I think -- I think she used -- she used
22  wetland delineation methodologies.  She came up
23  with the wetland line.  And whether or not she
24  was, in her mind, going with the '87 Manual in
25  her hand or not, I think is a difference with

Page 160

1  that distinction.
2      As for the support of that, with the
3  delegation of the 404 program through the State
4  of Florida, as part of that delegation and MOAs
5  between the Corps EPA and DEP in Florida now on
6  retained assumed waters, the State methodology is
7  used and not the '87 Manual.
8      So that sort of bears out, you know, what we
9  had been finding in practice over the years.  So
10  I think that -- I think that her delineation is
11  -- is supported, whichever manual she had in her
12  hand when she went out there.  The same line.
13  BY MR. ADKINS:
14      Q.  Okay.  Are there specific ways in which
15  Ms. Small's wetland delineation methodology was
16  consistent with the 1987 Manual that you're aware of?
17      A.  I think the line she came up with is
18  consistent with the wetland that would be determined
19  by the '87 Manual.
20      Q.  Okay.  Well, let me ask it a different way,
21  then.
22      You said she used wetland delineation
23  methodologies.  What were those?
24      A.  My understanding is she used vegetation,
25  soils, and hydrology to determine the wetland



W. MICHAEL DENNIS
U.S.A. vs BENJAMIN K. SHARFI

May 27, 2022
161–164

Page 161

1  boundaries.
2     Q.   What is that understanding based on?
3     A.   Some of the correspondence with the agencies
4  and her deposition.
5     Q.   Do you have any other basis to believe that
6  Ms. Small's delineation was based on vegetation,
7  soils, and hydrology?
8     A.   No, I think that's enough.
9     Q.   And Ms. Small was deposed after you
10  disclosed your opinions in this case, correct?
11     A.   No.  I believe -- I believe I had benefit of
12  her deposition.
13     Q.   That's -- that's -- I think you're correct.
14     A.   Yes.
15     Q.   Okay.  So are there any other ways -- any
16  other wetland delineation methodologies that Ms.
17  Small employed?
18     A.   Not that I'm aware of.
19     Q.   Okay.  And in what ways are considering
20  vegetation, soils, and hydrology, as Ms. Small did,
21  consistent with the 1987 Corps Manual?
22     A.   As I testified, the proof of that is in her
23  wetland delineation and its being inspected and
24  approved by regulatory agency folks.
25     Q.   Okay.  Do you know how she came up with the

Page 162

1  delineation?
2     A.   My understanding, from her correspondence
3  reports and deposition, is she went out in the field,
4  she determined where the wetland line was using
5  vegetation, soils, and hydrology standard methods
6  that she would do.
7        Again, my understanding is she's an
8  experienced wetlands scientist and wetland
9  delineator, working primarily in Martin County,
10  Florida, so she's very experienced in the local
11  conditions and site-specific circumstances.  So she
12  went out and she applied that experience and her
13  expertise and flagged what she believed was the
14  wetland line.
15     Q.   Do you know whether Ms. Small completed any
16  wetland determination data forms?
17     A.   I don't recall.
18     Q.   In what ways, if any, did Ms. Small's
19  delineation differ from the 1987 Corps Manual?
20     A.   Not any that I can tell.
21     Q.   If Ms. Small's wetland delineation differed
22  from the methodology set up in the 1987 Manual, would
23  that affect your opinion that her delineation is the
24  most reliable?
25     A.   If it came to a different conclusion than

Page 163

1  what she came up with her delineation, then perhaps.
2  If you're talking about some ministerial part of the
3  process in the '87 Manual that she may not have
4  dotted an I or crossed a T on, I don't think that
5  matters.
6     Q.   Have you -- in forming your opinions in this
7  case, have you considered whether Ms. Small's
8  delineation was consistent with the '87 Manual at any
9  point?
10     A.   Yes.
11     Q.   Okay.  And have you considered whether the
12  U.S. DOJ expert team's delineation of wetlands on the
13  site was consistent with the 1987 Manual?
14     A.   The delineation that they depicted in their
15  report doesn't appear to be, no.
16     Q.   In what ways?
17     A.   Well, there are areas, particularly in the
18  northwest part of the site, that they delineated as
19  wetlands that Ms. Small did not find to be wetlands
20  and the subsequent site inspections by agencies would
21  not determine to be wetlands.  So I think the team
22  report represents a forensic investigation with the
23  information they had available to look at as to their
24  best opinion on it.
25        But I don't find it is supported as someone

Page 164

1  that was out there on the site before anything was
2  done, went through the normal procedure, was very
3  experienced in doing wetland delineations in Martin
4  County and had been inspected by two agency people
5  and had them approved.
6     Q.   In what ways -- my question was in what ways
7  do you believe the DOJ delineation was not consistent
8  with the '87 Manual?
9        I understand you don't like the result, but
10  in what ways were -- was the methodology used by the
11  U.S. Department of Justice expert team inconsistent
12  with the 1987 Manual?
13     A.   I -- I don't have -- I don't have an opinion
14  on that.  They said they -- they followed the '87
15  Manual and the 2010 Supplement, so I assume that they
16  did.
17     Q.   So you're getting ahead of me.
18        But so for -- for Ms. Small's delineation,
19  have you considered whether her delineation is
20  consistent with the 2010 Regional Supplement?
21     A.   Yes.  That's part and parcel of my
22  evaluation.
23     Q.   In what ways was the methodology that Ms.
24  Small employed consistent with the 2010 Regional
25  Supplement?



W. MICHAEL DENNIS
U.S.A. vs BENJAMIN K. SHARFI

May 27, 2022
165–168

Page 165

1    A.  Again, she -- she followed, best I could
2  tell, standard wetland delineation procedures, which
3  would include anything in the 2010.  The site was not
4  altered in any appreciable way when she conducted it,
5  so that wouldn't have brought in a consideration of
6  altered sites on the 2010 Supplement.
7       So the best information I have before me is
8  that she -- her delineation was consistent with the
9  '87 Manual and the 2010 Supplement.
10    Q.  Okay.  And in what ways, in your opinion,
11  was Ms. Small's delineation not consistent with the
12  2010 Regional Supplement?
13    A.  Again, unless there's some suggestion and
14  guidance about how things should be done and forms
15  should be filled out, those sorts of things, unless
16  it's something like that, which is not germane to
17  getting the right wetland line as part of the
18  process, but at the end of the day, what you're after
19  is the correct delineations.  So I've not had
20  delineations determined incorrect because of a line
21  on a form not being filled out, as long as it was
22  appropriately flagged and identified in the field.
23    Q.  Are you familiar with the term normal
24  circumstances for purposes of wetland delineations
25  under the Clean Water Act?

Page 166

1    A.  I am.
2    Q.  What does the term normal circumstances mean
3  in that context?
4    A.  In this context, it means that the area of
5  inspection and the delineation of the wetland are
6  based on what the normal conditions are for that
7  area.  So it could have a variety of ramifications,
8  but basically, it boils down to was the site, when
9  you found it and you delineated it, were the
10  conditions normal.
11    Q.  Are you familiar with the term atypical
12  situation?
13    A.  Yes.
14    Q.  What does that term mean?
15    A.  In this context, atypical generally refers
16  to where you are attempting to make wetland
17  delineations and the site has been altered.  It could
18  be altered through manmade activities.  It could be
19  altered based on natural perturbations.  But it's
20  where the site has been altered so that your normal
21  process of identifying wetland vegetation, wetland
22  soils, and wetland hydrology cannot be exercised.
23    Q.  When you say altered what does that mean?
24    A.  Changed.  Changed, in this context it's
25  where things are changed so that, again, you can't

Page 167

1  apply the normal methodologies.  If the soils have
2  been so disturbed by some type of mechanical soil
3  disturbance and you don't have the regular soil
4  profile and you can't look at that to make a
5  determination of whether it's a hydric soil or not.
6       Or if you had an area that has been
7  completely cleared and there's no vegetation there,
8  so you've got no way of knowing physically on that
9  particular day what the vegetation was.
10      Or if you've had an area where you've had a
11  hurricane, and the area has been so disturbed that
12  it's changed -- it's changed conditions and you don't
13  have the -- you know, the vegetation, the soils, the
14  hydrology to look at, those would be altered sites
15  where you would have atypical situations, and you
16  would have to exercise other forensic methods to
17  determine what the -- whether there was a wetland
18  there before and where the boundary was.
19    Q.  And why is it meaningful to differentiate
20  between a normal circumstance and an atypical
21  situation?
22    A.  You're trying to get to the truth of the
23  matter of where is there a wetland based on
24  demonstrative wetlands plants, soils, and hydrology.
25  So you don't want to make a determination based on a

Page 168

1  circumstance where the conditions are not, quote,
2  normal that would give you a wrong determination.
3       Likewise, you don't want to make a wrong
4  determination based on having no vegetation,
5  hydrology, and soils to look at to be able to
6  determine whether there was a wetland there before or
7  not.
8       So those are things that you look at and
9  consider.  In the everyday business of delineating
10  wetlands, you go out there and you look for
11  vegetation, soils, and hydrology.  You apply the
12  methodologies and you delineate the wetlands.
13      But occasionally, you'll come up with
14  situations where things are not, quote, normal or the
15  sites have been altered so that it's impossible to do
16  that and you have to use an atypical evaluation.
17    Q.  Would it be appropriate to use an atypical
18  evaluation where there has been the unauthorized
19  discharge of fill?
20    A.  That would be one instance where you would,
21  yes.
22    Q.  And do you consider the construction of a
23  road in a wetland to be the unauthorized discharge of
24  fill?
25       MR. MCALILEY:  Object to form.



W. MICHAEL DENNIS
U.S.A. vs BENJAMIN K. SHARFI

May 27, 2022
169–172

Page 169

1      THE WITNESS:  It depends on whether that
2   wetland is a regulated waters of the United
3   States or not.  If it's a regulated waters of the
4   United States and fill has been put into it
5   without obtaining a permit, then that would be
6   contrary to and a violation of Section 404.
7  BY MR. ADKINS:
8      Q.   What do you consider fill material to be in
9   context of Section 404 and the Clean Water Act?
10     A.   Well, it can be the discharge of dredged or
11  fill material or pollutant.
12     Q.   Anything else?
13     A.   That's basically it.
14     Q.   Can woody debris be fill?
15     A.   It would depend.
16     Q.   On what?
17     A.   Where the woody debris came from and how it
18  got there.  If you had a property and you had a
19  regulated Waters of the United States wetland on it,
20  and you pull a barn down and you took all the woody
21  debris from the barn and you dumped it in the
22  wetlands, then that would probably be the discharge
23  of fill.
24      If you had that same wetland and you had an
25  extreme storm event or a hurricane and you had debris

Page 170

1   scattered through the wetland, that probably would
2   not be.
3      Q.   Can sod be considered fill?
4      A.   Again, it would -- it would depend.  If you
5   had -- if you place sod in a regulated Waters of the
6   United States and that was upland sod, and it changed
7   the elevation of the bottom of the wetland so that
8   you took it out of being in a wetland condition and
9   made it in an upland condition, then -- then it could
10  be.
11     Q.   Are there any other circumstances where
12  placing sod in a wetland would be considered fill?
13     A.   I'm sure there's lots of them.  If you took
14  a pallet of fill -- or of soil -- of sod and you went
15  out and dumped it in a wetland that was a Waters of
16  the United States, then I'd consider that to be a
17  violation.
18     Q.   When conducting a wetland delineation, do
19  you consider it relevant to understand how any land
20  clearing on the site being delineated was conducted?
21     A.   Yes.
22     Q.   And do you consider it relevant to
23  understand what type of equipment was used to clear a
24  site?
25     A.   Yes.

Page 171

1      Q.   Do you consider it relevant to understand
2   whether any clearing disturbed root structures?
3      A.   Yes.
4      Q.   What do you understand about the nature of
5   the earth work activities that occurred at the site
6   since defendants purchased it?
7      MR. MCALILEY:  Object to form.
8      THE WITNESS:  Based on review of aerial
9   photographs before any of the current activities
10  occurred, and looking at historic aerial over the
11  period that this was a site that had gone, you
12  know, different -- different perturbations over
13  the years, then range land that had been raised,
14  had been cleared, vegetation had grown back, so
15  you have a whole history preceding --
16     Q.   I'm just asking after the defendants
17  purchased the site, so around 2017 onward, what do
18  you understand about the nature of their earthwork
19  activities?
20     MR. MCALILEY:  Same objection.
21     THE WITNESS:  It's clear that the site was
22  cleared and that portions of the wetland in the
23  southwest corner had been either excavated or
24  filled.
25  BY MR. ADKINS:

Page 172

1      Q.   Do you have any other understanding about
2   the nature of earthwork activities at the site since
3   2017?
4      A.   It's -- it's apparent that some of the
5   areas, in addition to normal clearing perhaps, have
6   had exotic and nuisance species removed.  I think
7   that's particularly evident in the 8.79 acre wetland
8   area that was -- that's still on the site that was
9   not filled.  Looking at that area and looking at the
10  historic aerials and some of the accounts, my sense
11  is that area probably was, you know, overgrown with
12  Brazilian pepper and primrose willow, some of the
13  more common invasive wetland species.  So it appears
14  that that area has had those weed exotic species
15  removed.  And -- and the area is apparently being
16  maintained to keep those out because in my
17  inspection, I didn't find any of those in there.
18     Q.   Have you ever personally observed any exotic
19  species on the site?
20     A.   I'm sorry, you were breaking up.
21     Q.   Have you ever personally observed any exotic
22  species on the site?
23     A.   Some of the animals are.
24     Q.   How about exotic vegetation?
25     A.   No.



W. MICHAEL DENNIS
U.S.A. vs BENJAMIN K. SHARFI

May 27, 2022
173–176

Page 173

1    Q.   And before you were personally on the site,
2   have you seen -- or at any point in this case have
3   you ever seen any pictures of exotic species --
4   exotic vegetation on the site?
5    A.   Yes.  Some of the photos that are in the
6   record and some of the aerial photographs, you know,
7   depict particularly Japanese climbing fern being very
8   prevalent on the site.  That would be one example.
9    Q.   Have you seen any pictures of Brazilian
10   pepper on the site?
11    A.   I can't recall.
12    Q.   Have you seen any pictures of any other
13   exotic species on the site?
14    A.   I can't -- I can't specifically recall right
15   now.
16    Q.   Okay.  So other than that the area was
17   cleared, that portions of the wetlands in the
18   southwest corner were excavated or filled, and that
19   there apparently were some areas where exotic species
20   were removed, do you have any other understandings
21   about the nature of the earthwork activities at the
22   site?
23    A.   Yes.
24    Q.   Okay.  What are they?
25    A.   Well, there's some -- you know, before --

Page 174

1   before the site was cleared, there were no apparent
2   buildings on the site.  There was a limited amount of
3   roadwork on the site or roads.  There's testimony
4   that there was a road around at least portions of the
5   9.92 acre site.  Right now, there are additional
6   roads that are on the site and there are buildings on
7   the site.  There's some bush shelters on the site and
8   there's -- I think I testified earlier there's a pond
9   that's been dug on the southwest corner of the site.
10    Q.   Okay.  Do you have any other understanding
11   about the nature of earthwork activities at the site?
12    A.   There are some, but those are the primary
13   ones.
14    Q.   Okay.  When you say the site was cleared,
15   can you describe what you mean?
16    A.   In the 2016 and immediately before aerials,
17   the site's vegetated, totally vegetated.  And so
18   after that, you know, subsequent 2000 -- later 2018,
19   '19, '20 time period, that vegetation has been
20   cleared and removed for the most part.
21    Q.   Do you know how the vegetation was cleared
22   and removed?
23    A.   I have no personal knowledge of that.  I saw
24   some of the pictures that had some equipment in it,
25   but I have no personal knowledge about that.

Page 175

1    Q.   What sorts of equipment did you see in
2   pictures?
3    A.   There was -- I don't remember particularly.
4   There were mechanized equipment, you know, perhaps
5   back hoes, bulldozer type equipment.  Mechanized
6   land-clearing equipment was on the property.
7    Q.   Do you know whether, when vegetation was
8   removed from the site, the roots were left intact?
9    A.   No, I don't.
10    Q.   Okay.  Do you have any other understanding
11   about the types of equipment that has been used on
12   the site for earthwork activities since 2017?
13    A.   No.
14    Q.   You said that there was testimony that there
15   were portions -- or that there were roads around
16   portions of the 9.92 acres.  Can you explain what you
17   mean by that?
18    A.   Yes.  I recall deposition testimony of Ms.
19   Small and the property manger, whose name continues
20   to escape me, that there were some roads around the
21   edge of it and some fencing.
22    Q.   As the site exists today, is it -- do you
23   have an opinion on whether it would require a normal
24   or an atypical evaluation?
25        MR. MCALILEY:  Object to form.

Page 176

1        THE WITNESS:  I'm not exactly sure how to
2   answer that.
3   BY MR. ADKINS:
4    Q.   So if you were going to do a delineation of
5   the site --
6        MR. MCALILEY:  He's still answering your
7   question.
8        THE WITNESS:  I'm sorry, I tend to pause.
9   BY MR. ADKINS:
10    Q.   No problem.
11    A.   If -- if there were a site inspection today
12   that let's say of Corps Engineers, and they came out
13   to determine the wetlands on the site today, absent
14   any prior indication of illegal activity, I would
15   expect them to apply the typical wetland delineation
16   methodology.
17        Typically, the Corps, in my experience,
18   unless there is a suspicion that inappropriate
19   illegal activity has occurred, the Corps pretty much
20   takes the site as they find and conducts the site
21   inspection.  So under that scenario, if the site was
22   as it is and there are wetlands out there, they would
23   be delineated based on the typical methodologies.
24    Q.   I'm not asking about what the Corps would
25   do.  I want to know your opinion as a, you know,



Page 177

1   wetlands expert in this case, if you approached the
2   site as it exists today, would you apply an atypical
3   situation?
4       A.  No.  I would -- if I approached it as it was
5   today, I would use the typical delineation
6   methodology.
7       Q.  And what is your reason for that?
8       A.  Because I would -- I would, likewise, take
9   it as it is today and look at existing site
10  conditions.  And I would -- if I had no other reason
11  to believe that there was a reason to use atypical,
12  you can go on the site today.  You can look at soils.
13  You can look at vegetation.  You can look at
14  hydrology.  And you can apply the '87 Manual and the
15  2010 Supplement.  So there are -- you know, the
16  parameters are out there to look at and you can apply
17  that.
18      Q.  One of the things you said your firm
19  typically does when delineating wetlands is to look
20  at aerial photography and maps before going out and
21  being on the property that you're delineating.
22          Would you not see, in the course of that
23  work, so I'll call it desktop review, would you not
24  see that the site had been recently altered?  And if
25  so, doesn't that inform why you should apply the

Page 178

1   atypical methodology?
2       A.  I would be able to tell whether or not the
3   site had been altered or not, but I wouldn't know
4   from the aerials is when it -- well, I could tell
5   when it occurred.  But I wouldn't know under what
6   circumstances it occurred.  Did it occur based on
7   activities of the current owner or the prior owner.
8   Were there any prior permits that allowed and
9   authorized those -- those changes.  Without knowing
10  any of that, you know, you typically look at the site
11  as, you know, as you find it.
12      Q.  And is that consist with the 1987 Manual?
13      A.  Well, the '87 Manual instructs you how to
14  delineate a wetland.  Now, the atypical situation
15  comes in, again, if you don't have vegetation, soils,
16  or hydrology to look at.  So the site, as it is out
17  there now, has all of those.  And so you could be
18  able to look at that and make a determination based
19  on the regular '87 Manual methodologies.
20      Q.  And is the methodology that you're
21  suggesting in this hypothetical situation, would that
22  be a typical -- or would that be consistent with the
23  2010 Regional Supplement?
24      A.  Yes.
25      Q.  Is there any guidance for delineations in

Page 179

1   atypical situations?
2           MR. MCALILEY:  Object to form.
3           THE WITNESS:  Yes.  I believe we discussed
4       this guidance in the '87 Manual and the 2010
5       Supplement.
6   BY MR. ADKINS:
7       Q.  Do you agree that the site was disturbed at
8   the time that Ms. Small delineated a wetland in March
9   2018?
10      A.  To a minor degree, it appears to have been.
11  But based on all of the information and testimony and
12  reports that I've seen, it was -- it was minor and it
13  did not affect the changes for the wetland
14  delineation.  She basically saw it in an unaltered
15  condition.
16      Q.  What do you mean by to a minor --
17          MR. MCALILEY:  Counsel, we're just -- it's
18      3:00.  We've been going for about an hour and a
19      half.  I could use a bladder break at some point,
20      so maybe take a short break, I would appreciate
21      it.
22          MR. ADKINS:  Yeah, let's go off the record.
23      We can go now.
24          VIDEOGRAPHER:  Going off the record at
25      2:59 p.m.

Page 180

1           (Thereupon, a recess was taken.)
2           VIDEOGRAPHER:  We're back on video record at
3       3:10 p.m.
4   BY MR. ADKINS:
5       Q.  Okay.  What do you mean by minor degree?
6       A.  I'm sorry, say again.
7       Q.  Yeah.  You know I'll repeat the basis for
8   this since we just took a break to refresh your
9   memory of how that term was used, but you had
10  testified that at the time that Ms. Small delineated
11  wetlands on the site in March 2018, the disturbance
12  was only to a minor degree, and I want to know what
13  you mean by minor degree?
14      A.  Yeah, my understanding is that perhaps in
15  one portion, in one corner of the property, that it
16  may be -- I seem to remember it being the southwest,
17  but I may be wrong on that, that there -- there had
18  been a piece of equipment brought on site and there
19  maybe had begun some minor -- I use that again -- had
20  been some limited, put it that way, some limited work
21  done on the property when she was on there.
22      Q.  What is your understanding of the limited
23  work that was done on the property at the time she --
24      A.  Yeah, a few -- a few feet or a few tenths of
25  an acre.  I have no measurements on that.  But, you



W. MICHAEL DENNIS
U.S.A. vs BENJAMIN K. SHARFI

May 27, 2022
181–184

Page 181

1 know, my sense it would be, you know, a few
2 hundredths of an acre on the edge of the property.
3    Q.   Is there any other limited work that was
4 undertaken at the time of Ms. Small's delineation
5 that you're aware of?
6    A.   Not that I'm aware of, no.
7    Q.   Now, are you aware that a perimeter road had
8 already been constructed on the site by the time that
9 Ms. Small delineated wetlands there?
10       MR. MCALILEY:  Object to form.
11       THE WITNESS:  I'm aware of testimony that
12    there was a -- and it shows on -- again, on her
13    wetland drawing, a depiction of a dirt road, if
14    you will, on the western boundary of the -- of
15    the site.
16 BY MR. ADKINS:
17    Q.   And you've read Ms. Small's transcript,
18 right, of her -- the deposition she gave in this
19 case?
20    A.   Yes.
21    Q.   Okay.  And you read that Ms. Small referred
22 to a perimeter road on the site?
23    A.   I don't recall specifically.
24    Q.   Okay.  Do you agree that Ms. Small did not
25 assess whether wetlands existed under the road that

Page 182

1 had been constructed on the site by the time she was
2 there in March 2018?
3       MR. MCALILEY:  Object to form.
4       THE WITNESS:  Yeah.  I'm -- I'm not -- I'm
5    not clear on whether she was referring to an
6    existing, long established road along the western
7    boundary or not, or whether this was some sort of
8    new road.  My sense of reading it was that this
9    was a, you know, an older established road along
10    the western boundary.
11       (Thereupon, Exhibit DX195 was marked for
12    identification.)
13       MR. ADKINS:  I'm going to show an exhibit
14    marked DX195.  And Mr. Mcaliley, this is not what
15    I sent to you ahead of time because I was not
16    expecting to show this, but in light of the
17    witness's testimony, I'm going to put this up.
18 BY MR. ADKINS:
19    Q.   So let me go to page 1 of DX195.  It's
20 United States versus Benjamin Sharfi, video-taped
21 deposition of Danna Small dated March 17, 2022.
22       Do you see this exhibit, Dr. Dennis?
23    A.   Yes, sir.
24    Q.   I'm not showing my e-mail screen again, am
25 I?

Page 183

1    A.   No.
2    Q.   So I'm going to take you to page 190, line
3 6, is by Mr. Adkins.  My question then is, "That area
4 that had been cleared for a perimeter road, would
5 that have fallen within the boundary of the wetland
6 that you delineated on the site?"  Mr. Mcaliley:
7 "Object to form."  Answer:  "Okay.  The perimeter
8 road was there when I did the first site visit.  I'm
9 not going to make an assessment on something that was
10 or was not present before I ever step foot on a site.
11 So I did not -- to me, I did not assess what's
12 already there, and I can't speak to what it might
13 have been.  So the perimeter road was not part of
14 what I find."
15       Did I read that correctly?
16    A.   Yes.
17    Q.   But do you still agree that -- or do you
18 agree that a perimeter road was on the site at the
19 time of Ms. Small's delineation?
20       MR. MCALILEY:  Object to form.
21       THE WITNESS:  Yeah, this would indicate that
22    there was.  What I don't have better information
23    on is how long that perimeter road had been
24    there, and whether that was, you know, there when
25    Mr. Sharfi bought the property or not.  I just

Page 184

1 don't have any information on -- on that.
2 BY MR. ADKINS:
3    Q.   You looked at aerial photography of the
4 site, correct?
5    A.   Yes.
6    Q.   And you looked at aerial photography from
7 periods before when the defendant purchased the site?
8    A.   It was all vegetated, but what -- what you
9 -- I could not tell from that is -- is whether or not
10 there was any kind of perimeter road around the
11 parcel or some type of advanced way outer perimeter
12 road on a path or whatever.  I don't -- I don't know.
13 I didn't see a perimeter road as exists there now
14 around the entirety of the site in those -- you know,
15 the earlier aerials.
16    Q.   Do you agree that Ms. Small did not assess
17 whether wetlands existed at the perimeter road that
18 she identified because it was already there when she
19 set foot on the site?
20    A.   I'm sorry, what was the question again?
21    Q.   Do you agree that Ms. Small did not assess
22 whether wetlands existed at the perimeter road that
23 was at the site when she was there because it was
24 already there when she set foot on the site?
25    A.   Yes, that's what she testified -- she --



W. MICHAEL DENNIS
U.S.A. vs BENJAMIN K. SHARFI

May 27, 2022
185–188

Page 185

1 yeah, I would agree with that's what she testified to
2 in her deposition.
3    Q.   Okay.  And are you also aware that Ms. Small
4 later speculated at the time she conducted her
5 delineation that it appeared the perimeter road had
6 been constructed in wetlands?
7        MR. MCALILEY:  Object to form.
8        THE WITNESS:  If I was aware of that, I had
9 forgotten that.
10 BY MR. ADKINS:
11    Q.   Okay.  Well, let's look at page 191.
12    A.   Okay.
13    Q.   Well, we'll start at page 190, excuse me.
14 And line 20 says, Question: "Okay.  So when you
15 delineated a wetland on the site in March 2018, you
16 did not consider one way or the other whether
17 wetlands had existed along the perimeter under the
18 perimeter road; is that right?"  Mr. Mcaliley:
19 "Objection -- object to form."  Answer:  "Incorrect."
20    Now we're on 191, line 1.  By Mr. Adkins:
21 Question: "Okay.  Correct me."  Answer:  "I did
22 speculate that it appeared that road had been
23 constructed on wetlands from everything I could see.
24 However, I'm not there to -- I can't tell for certain
25 because I wasn't there beforehand."

Page 186

1        So my question is are you aware that Ms.
2 Small speculated at the time she conducted her
3 delineation that it appeared the perimeter road had
4 been constructed on wetlands?
5        MR. MCALILEY:  I'm going to just object to
6    form.  Whatever she said or didn't say in her
7    deposition transcript is her testimony, and I'm
8    not quite sure how -- I'm not sure what the
9    question is for Ms. -- for Dr. -- for -- for
10   Dr. Dennis.
11 BY MR. ADKINS:
12   Q.   You can answer, Dr. Dennis.
13   A.   I can read her testimony there, and so I
14 accept her testimony as what her opinion or feelings
15 were at that time.
16   Q.   So don't you agree that at the time of
17 Ms. Small's delineation, normal circumstances were
18 not present at the site?
19       MR. MCALILEY:  Object to form.  Foundation.
20       THE WITNESS:  I would agree that to the
21   extent that activities had occurred on the site
22   before Ms. Small's delineation, that she
23   apparently did not take that into account in
24   terms of her evaluation, and that if -- if indeed
25   those operations had occurred, then, you know, an

Page 187

1 evaluation of that to determine if those were --
2 were wetlands may have been appropriate.
3    BY MR. ADKINS:
4    Q.   You said earlier that you relied on Ms.
5 Small's deposition testimony to form opinions in this
6 case.  Why are you now testing what she's -- doubting
7 what she has to say here, but you accepted other
8 things?
9        MR. MCALILEY:  Objection.  Argumentative.
10   Form.
11       THE WITNESS:  Yeah, I'm -- I'm taking
12   Ms. Small's deposition as it is.  So I'm not
13   second guessing her testimony, and I'm taking the
14   information in her testimony, along with other
15   information and testimony, and evaluating that
16   and rendering my opinion.
17 BY MR. ADKINS:
18   Q.   Do you have any understanding about drains
19 or pipes that defendants installed at the site?
20   A.   I -- I really have not investigated that.
21 I've seen pipes on the site, but I've not really
22 investigated that.
23   Q.   Have you investigated these at all?
24   A.   No.
25   Q.   Okay.  And setting aside what you've

Page 188

1 investigated, do you have any knowledge of drains or
2 pipes that exist at the site?
3    A.   No. Other than observations of seeing, you
4 know, some pipes on the site, that's as far as I can
5 opine.
6    Q.   Okay.  Where have you seen pipes on the
7 site?
8    A.   There's one that I -- one that I recall to
9 be on the southwest corner of the site, and it seems
10 like I recall seeing a pipe coming out into the
11 north-south ditch in that location.
12   Q.   Do you know to what the pipe that you
13 observed in the southwest corner of the site is
14 connected to?
15   A.   I have no direct knowledge of that, no.
16   Q.   Do you have any indirect knowledge of it?
17   A.   No.
18   Q.   Are you aware of whether there are any
19 connections between the excavated pond in the site
20 and any other water features?
21   A.   I don't know.
22   Q.   Have you ever asked?
23   A.   No.
24   Q.   How come?
25   A.   Really wasn't germane to my opinion.



W. MICHAEL DENNIS
U.S.A. vs BENJAMIN K. SHARFI

May 27, 2022
189–192

Page 189

1    (Thereupon, Exhibit DX196 was marked for
2    identification.)
3    BY MR. ADKINS:
4    Q.   I'm showing you a document that's been
5    marked DX196.  It is Bates Stamped DLS113 through
6    117.
7        Do you see DX196, Dr. Dennis?
8    A.   Yes.
9    Q.   Okay.  Are you familiar with this document?
10   A.   I have seen the document, yes.
11   Q.   Is it a document that you considered in
12   forming your opinions in this case?
13   A.   It was part of the DLS documents that were
14   provided.
15   Q.   Okay.  Did you consider it in forming your
16   opinions in this case?
17   A.   As I sit here, I don't remember anything
18   specifically in this document that I was relying on.
19   Q.   I'm showing you page marked DLS114, soils
20   map with sample points.
21       Do you see that?  Do you recognize -- do you
22   see this, Dr. Dennis?
23   A.   Yes, I see it.
24   Q.   Okay.  Do you recognize the image that's
25   reflected on this page?

Page 190

1    A.   Yes, I do.
2    Q.   And this image is depicting the site,
3    correct?
4    A.   Correct.
5    Q.   And overlaid with the site is a soil map; is
6    that right?
7    A.   Yes.
8    Q.   There are three stars on this map.
9        Do you see those?
10   A.   I do.
11   Q.   There is a star for sample site number 1,
12   sample site number 2, and sample site number 3,
13   right?
14   A.   Yes.
15   Q.   Okay.  And those sample sites correspond to
16   wetland determination data forms that Ms. Small
17   completed.
18       Do you understand that?
19   A.   Yes.
20   Q.   Okay.  At sample site 1, do you recall
21   whether or not Ms. Small identified a wetland?
22   A.   That sample area was not within her
23   delineated wetland boundary.
24   Q.   Okay.  And the wetland determination data
25   form, did Ms. Small identify a wetland?

Page 191

1    A.   I don't recall.  I'd have to go back and
2    look at the data form.
3    Q.   And how about for sample site number 2; do
4    you recall whether or not Ms. Small identified a
5    wetland in her wetland determination data form?
6    A.   Yeah, that looks to be -- oh, let me -- no.
7    I'd have to go back to the data form and see what it
8    is.
9    Q.   And sample site 3, do you recall whether or
10   not Ms. Small identified a wetland in her wetland
11   determination data form?
12   A.   Again, I'd have to look at the data forms.
13   Q.   Did you consider the data forms in forming
14   opinions in this case?
15   A.   To a degree, it was part of the data that I
16   reviewed.  With regard to Ms. Small's information,
17   the main thing I relied on was her flag inspected
18   survey wetland line.
19   Q.   And to what degree did you rely upon Ms.
20   Small's wetland determination data forms?
21   A.   Did not rely -- I did not specifically rely
22   on the data forms.
23   Q.   There are two areas in the soil map marked
24   66.
25       Do you see that?  One is in the northwest

Page 192

1    and one is in the southwest corner -- southeast
2    corner.
3    A.   Yes.
4    Q.   Okay.  And there's a ledging on the bottom
5    of this map that says soils, and there's a third line
6    that says, "Holopaw fine sand, 0 to 2 percent slopes
7    (66) hydric."
8        Do you see that?
9    A.   I do.
10   Q.   Based on your reading of this soil map, are
11   the areas marked 66 in the image areas that are
12   mapped Holopaw fine sand, 0 to 2 percent slopes,
13   hydric?
14   A.   It's how their soil map evidently is
15   presented.
16   Q.   Did Ms. Small take any -- are any of the
17   sample sites within an area of this map marked
18   Holopaw fine sand, 0 to 2 percent slopes, hydric?
19   A.   Within the 66 area?
20   Q.   Yes, sir.
21   A.   Based on this soil type map, it says they
22   are.
23   Q.   Okay.  Which ones?
24   A.   The two areas that you pointed out, the
25   southeast and the northwest, have 66 mapped on it.



W. MICHAEL DENNIS
U.S.A. vs BENJAMIN K. SHARFI

May 27, 2022
193–196

Page 193

1    Q.  Oh, I think -- I apologize.  Maybe my
2  question wasn't clear.
3       My question is are any of the sample sites
4  that reflect where Ms. Small completed her wetland
5  determination data form, do any of those fall within
6  an area marked 66 on the soil map?
7    A.  It may be it's close.  They may -- yeah, I
8  think some of the southeast area does.  The northwest
9  area is not in her delineation.
10    Q.  Okay.  Now, I just want to focus on the
11  three wetland determination data forms that she
12  completed, which are notated here, as we established,
13  with red stars.
14       So are any of the areas that Ms. Small
15  completed on wetland determination data form within
16  an area marked Holopaw fine sand, 0 to 2 percent
17  slopes, hydric?
18    A.  No.
19    Q.  Are you aware of whether Ms. Small dug any
20  holes in areas that are marked in the soils map for
21  Holopaw fine sand, 0 to 2 percent slopes, hydric?
22    A.  No.  I'm not aware one way or another.
23    Q.  Do you have an opinion regarding whether
24  defendants filled wetlands on the site in violation
25  of the Clean Water Act?

Page 194

1       MR. MCALILEY:  Object to form.
2       THE WITNESS:  Yes.
3  BY MR. ADKINS:
4    Q.  What is your opinion?
5    A.  That he did not.
6    Q.  And what's the basis for your opinion?
7    A.  That none of the on-site wetlands are
8  regulated waters of the United States.
9    Q.  Do you have an opinion on whether defendants
10  filled wetlands on the site that are not
11  jurisdictional under the Clean Water Act?
12       MR. MCALILEY:  Object to form.
13       THE WITNESS:  Yes.
14  BY MR. ADKINS:
15    Q.  What is your opinion?
16    A.  Yes, I believe that there are wetlands on
17  the site that are not waters of the United States
18  that have been filled.
19    Q.  And is the aerial extent of waters on -- of
20  wetlands on the site that you believe are not waters
21  of the United States that have been filled
22  coterminous with the wetlands that Ms. Small
23  delineated in March 2018?
24       MR. MCALILEY:  Object to form.
25       THE WITNESS:  I'm sorry, I didn't follow

Page 195

1    that question.
2  BY MR. ADKINS:
3    Q.  Yeah, it was kind of complicated.
4       So my question is are the wetlands on the
5  site that you believe were filled, but which are not
6  waters of the United States in your view, are
7  those -- are those wetlands coterminous with the
8  wetlands that Ms. Small delineated in March 2018?
9       MR. MCALILEY:  Object to form.
10       THE WITNESS:  Yes.
11  BY MR. ADKINS:
12    Q.  Do you have any opinion on whether
13  defendants filled wetlands on the site in any other
14  areas outside of where Ms. Small delineated wetlands?
15    A.  Sorry, I'm having a hard time following your
16  question.  Say that one again.
17    Q.  No problem.
18       Do you have an opinion on whether defendants
19  filled wetlands on this site which are not
20  jurisdictional in your view under the Clean Water Act
21  that are outside of the wetlands that Ms. Small
22  delineated in March 2018?
23       MR. MCALILEY:  Object to form.
24       THE WITNESS:  No.
25  BY MR. ADKINS:

Page 196

1    Q.  You don't have an opinion one way or the
2  other?
3    A.  No.  Any wetlands that were on the site that
4  were filled would have been within, in my view,
5  Ms. Small's wetland delineation area.
6    Q.  Okay.  Are you familiar with the term
7  tributary?
8    A.  Yes.
9    Q.  What is a tributary in context with the
10  Clean Water Act?
11    A.  Tributary has been variously defined, but
12  basically, it's a water -- a water conveyance.  It's
13  an area that carries water.
14    Q.  What is the basis for your understanding of
15  what a tributary is?
16    A.  Again, tributary has various rules, has been
17  variously defined, but basically, it's -- it's areas
18  that have typically considered to be areas with --
19  with continuous flow.
20    Q.  Are there any other characteristics of a
21  tributary?
22    A.  Again, based on which of the Waters of the
23  United States rule you're looking at, tributaries, if
24  they're natural tributaries, have a bed and a bank
25  and an ordinary high water line.  They're in a



W. MICHAEL DENNIS
U.S.A. vs BENJAMIN K. SHARFI

May 27, 2022
197–200

Page 197

1  recognized natural topographic feature.
2      Q.   If I were to limit your -- the question to
3  the 1984 Regulations, how would you answer my
4  question?
5          MR. MCALILEY:  Object to form.  I'm not
6  aware of a 1984 Regulation.
7          MR. ADKINS:  Thank you.  The 1986
8  Regulation.
9          THE WITNESS:  I'm not sure.  I'm a little
10  confused with that 1986 Regulation.  You're
11  talking about what the Clean Water Act was in
12  1986?
13  BY MR. ADKINS:
14      Q.   Well, I was trying to limit the confusion
15  because it sounded like you were saying it depends on
16  what regulations we're operating under.
17      A.   Yes.
18      Q.   And so I'm trying to help define that for
19  you.
20      A.   Okay.  Well, tributaries, again, based on
21  various rules, can be either natural tributaries or
22  you can have artificial tributaries.  So ditches
23  under certain of the regulations can be tributaries,
24  and that's the distinction that I was trying to make.
25      Q.   Okay.  And the other features that you

Page 198

1  described, then, like ordinary hard water areas of
2  continuous flow, would those equally apply?
3      A.   Yeah, those would apply to tributaries.
4      Q.   Are you familiar with the term ditch?
5      A.   I am.
6      Q.   You'll notice that you use it a lot in your
7  report.
8          What does the word ditch mean to you?
9      A.   That it was appropriate.
10      Q.   What does the word ditch mean?
11      A.   To me, a ditch is a manmade -- manmade dug
12  out area, typically dug out to convey water.  So it's
13  a -- it's where you take a shovel or a piece of
14  equipment and you go out and you excavate a -- you
15  excavate land so that you create a source for
16  conveying water.
17      Q.   And how does one identify a ditch in the
18  field?
19      A.   Typically, you can identify a ditch based on
20  the configuration of the bed and the bank, whether
21  it's a straight line or not, where it was
22  constructed.  Sometimes, you can ascertain whether
23  it's a ditch or not based on, you know, what it's
24  connecting to and from.
25          Roadsides have ditches to take runoff from

Page 199

1  the roads and convey them away from the roads.
2  Agricultural ditches are there to convey water off of
3  an agricultural area.  So ditches can have various
4  purposes.
5      Q.   Do ditches always have an ordinary high
6  water line in a bed and bank?
7      A.   I'm sorry, what was the first part of that?
8      Q.   Do ditches always have an ordinary high
9  water line in bed and bank?
10      A.   No.  No.  You could have a ditch that is
11  basically constructed in an upland area that only
12  following -- only carries water following the
13  occurrence of rainfall, so it may not have an
14  ordinary high water line or a bed and bank
15  configuration.  It would just be a -- you know, a
16  straight-cut ditch into the surface of the earth.
17      Q.   Are there any flow characteristics that a
18  ditch must have in your view?
19      A.   No.
20      Q.   Okay.  And is there any guidance for
21  identifying ditches under the Clean Water Act and
22  associated regulations?
23          MR. MCALILEY:  Object to form.
24          THE WITNESS:  There's been a lot of -- a lot
25  of discussion about that as to whether or not

Page 200

1  ditches are regulated or not, as you're aware,
2  under national -- natural --
3  BY MR. ADKINS:
4      Q.   The Navigable Waters Protection Rule?
5      A.   Right, right.  It's getting late in the day.
6      Q.   I understand.
7      A.   Ditches were categorically excluded from
8  being waters of the United States, so that can -- you
9  can have that situation.  There's also been
10  discussion about whether upland cut ditches are
11  regulated and provide a connection between wetlands
12  and traditionally navigable waters.  So one of the
13  reasons we're sort of where we are right now is
14  because of ditches in terms of the regulatory rule
15  we're in.
16      Q.   How about if we limit it to the 1986
17  regulations, are there -- is there any guidance that
18  you're aware of that defines ditches or how to
19  identify ditches?
20      A.   You keep saying 1986 regulations.  Are you
21  talking about the 1972 Clean Water Act?
22      Q.   No.  I'm referring to regulations defining
23  Waters of the United States that were -- that were
24  adopted in 1986 but first published in 1987.
25      A.   Okay.



W. MICHAEL DENNIS
U.S.A. vs BENJAMIN K. SHARFI

May 27, 2022
201—204

Page 201

1       MR. MCALILEY:  And I'll object to form.

2       THE WITNESS:  Repeat that question again.

3  BY MR. ADKINS:

4       Q.   Are you aware of any guidance under the 1986

5  regulations that define ditch or how to identify

6  ditches?

7       MR. MCALILEY:  Same objection.

8       THE WITNESS:  I can't recall right now.

9  BY MR. ADKINS:

10      Q.   Okay.  How about in the 1987 Manual, the

11  2010 Regional Supplement, or the Rapanos Guidance;

12  are you aware of any definitions or guidance on how

13  to identify a ditch in those documents?

14      A.   No.

15      Q.   Okay.  Swale, what do you understand a swale

16  to be?

17      A.   A swale typically is defined as a conveyance

18  for water.  And usually the distinction between a

19  ditch and a swale revolves around the slope of the --

20  slope of the banks.  So if it's -- if it's a very

21  shallow slope, it's typically referred to as a swale.

22  More acutely upright slopes is typically referred to

23  as a ditch.

24      Q.   Is a swale a wetland?

25      A.   It could be.

Page 202

1       Q.   Under what conditions?

2       A.   If it has the requisite vegetation, soils,

3  and hydrology.

4       Q.   Can a swale be a tributary?

5       A.   Yes.

6       Q.   And same questions.  Is there any guidance

7  that you're aware of that defines swale in connection

8  with the Clean Water Act?

9       A.   There may be.  I'm not remembering it right

10  now if there is.

11      Q.   Are you familiar with the term perennial?

12      A.   Yes.

13      Q.   What does the word perennial mean?

14      A.   Year-round, continuous, in this context, I

15  believe in this context.  It could have different

16  meanings in botany, for instance, you could have

17  perennial plants, but in this context.

18      Q.   Thank you for that clarification.

19           So how does one identify a perennial stream

20  under the Clean Water Act?

21      A.   Assessing its flow characteristics.

22      Q.   Are you familiar with the assessments of

23  flow characteristics to determining whether

24  tributaries are -- or streams are perennial?

25      A.   Again, you're breaking up on the first part

Page 203

1  of your question.

2       Q.   Okay.  Let me close things down to make sure

3  we're not --

4       A.   No, I think you're just looking down.

5       Q.   Oh, that could be it.

6       A.   I don't think it's the technology.

7       Q.   Are you -- do you have experience in

8  assessing whether streams are perennial based on

9  their flow characteristics?

10      A.   Yes.

11      Q.   And how do you go about assessing whether a

12  stream is perennial based on flow characteristics?

13      A.   I evaluate the stream or the tributary to

14  determine whether it has continuous flow.  Does it

15  have a source of groundwater providing it with

16  continuous flow.  And if it -- if it does and there's

17  a constantly provided groundwater source and it flows

18  year-round, then I would consider that perennial.

19      Q.   And so how do you do that?  How do you make

20  that determination?

21      A.   You can make it based on observations.  You

22  can make it based on staged data -- staged data

23  records.  You can make it based on physical and

24  biological indicators of whether or not it has plants

25  or animals in it that would be dispositive of

Page 204

1  continuous inundation and flow characteristics.

2       Q.   What are some physical and biological

3  indicators?

4       A.   They could be various indicators in the

5  streams that, you know, are small critters, if you

6  will, that you always find in perennial waters

7  bodies.  There's some stoneflies and various, various

8  species that if you're investigating a stream and you

9  find those, it gives you an indication that the

10  stream is perennial.

11      Q.   Any other physical and biological indicators

12  for determining whether a stream is perennial?

13      A.   Yes.  I think I just answered that.

14      Q.   Are there any others than what you said?

15      A.   Oh, yeah, yeah.  You can look at the plant

16  species.  There are certain plants that would

17  typically be found in perennially flowing waters, and

18  you wouldn't find them in other areas.  So there is

19  plant life, animal life, that you could use as

20  indicators to give you some guidance on whether it's

21  perennial or not.

22      Q.   You said there were physical indicators.

23  Would that be something like an ordinary high water

24  line?

25      A.   You would look at an ordinary high water



Page 205

1  line, but the presence of an ordinary high water
2  line -- let me rephrase that.
3      If you have a true ordinary high water line,
4  it's depicting the upper boundaries of perennial
5  flow, then -- then yes.  If you have a mark in a
6  ditch or a stream bed that indicates that water can
7  get up to a certain place at a certain time, it may
8  or may not be.  So it just -- it just depends on the
9  -- the circumstance.
10     You could have a mark in a ditch, for
11  instance, and that could be caused by, you know,
12  several days or a week of standing or pouring water,
13  and then the ditch would be totally dry.
14     Q.  Are there any other physical indicators of
15  perennial flow that you are aware of?
16     A.  I'm sure if we sat here long enough I could
17  think of some more, but those are some examples.
18     Q.  Is the term perennial flow relevant to
19  determining jurisdiction under the Clean Water Act?
20         MR. MCALILEY:  Object to form.
21         THE WITNESS:  Yes.
22  BY MR. ADKINS:
23     Q.  How so?
24     A.  Perennial tributaries are -- are by
25  definition waters of the United States.  So if you

Page 206

1  have a perennial tributary, then that scenario, that
2  would be, you know, identified as a waters of the
3  United States.
4      Q.  And does the tributary have to connect to
5  any particular water body, or are all perennial
6  tributaries waters of the United States?
7      A.  To be a waters of the United States, they
8  have to physically connect to a traditionally
9  navigable water.
10     Q.  What is a traditionally navigable water?
11     A.  The oceans, rivers, tidally influenced
12  creeks and rivers and estuaries, anything that is
13  subject to the ebb and flow of the tide.  Those would
14  all be traditionally navigable waters.
15     Q.  Are you familiar with the term intermittent?
16     A.  Yes.
17     Q.  What does intermittent mean in context of
18  the Clean Water Act?
19     A.  Within sometime flow.  So it could be
20  flowing sometime and then sometime not flowing.
21     Q.  And how does one identify whether a stream
22  is intermittent?
23     A.  Again, looking at the characteristics of it,
24  whether or not it -- it appears to flow only
25  following the occurrence of rainfall, which can be a

Page 207

1  consideration.  You can have intermittent flow
2  following rainfall events.
3      Q.  And how does one tell whether a stream flows
4  only following rainfall events?
5      A.  You can -- you can get that information by
6  looking at if you have any kind of gauging station or
7  gauging information.  You can evaluate whether or not
8  there's any source of water in the ditch or the
9  tributary other than coming from rainwater, rainfall.
10     If you have springs or groundwater fed
11  streams or a ditch even, then that would, again, go
12  back to the perennial definition.  But if you don't
13  have that and you have a stream or a ditch that is
14  sometime flowing with water and you observe that and
15  sometime not, then that's a good indication that it
16  may be intermittent.
17     Q.  And does a stream need to flow a certain
18  number of days or months of the year to be considered
19  intermittent?
20         MR. MCALILEY:  Object to form.
21         THE WITNESS:  Well, there -- there is the --
22     there's difficulty in all of this.  There's not a
23     bright line that says for absolute sure.  So --
24     and it can be reviewed differently in different
25     parts of the country.  You have out West where

Page 208

1  you have snow pack and that melts.  That creates
2  one set of conditions.
3      Here in the Southeast, you have wet season
4  and dry season, so you can have areas that would
5  flow or have water in them following rainfall
6  events and then be slightly dry for long periods
7  of time.
8  BY MR. ADKINS:
9     Q.  Okay.  How about in South Florida, how
10  frequently must a stream flow to be considered
11  intermittent?
12         MR. MCALILEY:  Object to form.
13         THE WITNESS:  Again, I'm not aware of any
14     bright line number on that.
15  BY MR. ADKINS:
16     Q.  Does the 1987 Manual provide any guidance?
17     A.  I'd have to go back and look.  I can't
18  remember right now.
19     Q.  Did you consider whether the 1987 Manual has
20  any guidance on whether a stream is intermittent in
21  connection with your work in this case?
22     A.  I don't -- I don't recall specifically
23  looking at the '87 Manual for that definition.
24     Q.  Does the 2010 Regional Supplement provide
25  any guidance for the frequency by when a stream meets



W. MICHAEL DENNIS
U.S.A. vs BENJAMIN K. SHARFI

May 27, 2022
209–212

Page 209

1  the flow to be considered intermittent?
2      A.  Again, I don't recall right now.
3      Q.  Okay.  In preparing -- in conducting work in
4  this case, did you consider the 2010 Regional
5  Supplement for whether it provided any guidance on
6  how frequently a stream must flow to be considered
7  intermittent?
8      A.  Yeah, I considered the '87 Manual and the
9  2010 Supplement in this analysis.  I just can't
10  remember exactly what provisions in either one of
11  those, you know, may be represented right now.
12      Q.  All right.  Does the Rapanos Guidance
13  provide any guidance for how frequently a stream must
14  flow to be considered intermittent?
15      A.  Yes.  There's provisions in Rapanos that
16  talk about perennial flow, intermittent flow.  So,
17  yes, there's -- I'm sorry, go ahead.
18      Q.  I didn't mean to cut you off.
19          What guidance does the Rapanos Guidance
20  provide for how frequently a stream has to flow to be
21  considered intermittent?
22      A.  Essentially, it is -- if it's not a
23  perennially flowing stream and the flow is
24  intermittent or ephemeral, then -- and my
25  recollection is doesn't need to be any hard and fast

Page 210

1  rules on that.  It just says if they are, then it
2  directs you to an additional test for determining
3  whether or not the stream is a waters of the United
4  States or would provide an avenue to be a stream of
5  the -- a waters of the United States.
6      Q.  Do you recall what that test -- that
7  additional test is?
8      A.  Yes.  Once you get past the determination
9  that you're not in a traditionally navigable water or
10  perennial tributary or in a relatively permanent
11  water, once you get past that and you're not any of
12  those and you have less frequent flows, then the
13  Rapanos Guidance under Kennedy's opinion would
14  suggest that if you're in any of those situations,
15  that you have to conduct a significant nexus
16  evaluation to determine if you have a waters of the
17  United States.
18      Q.  And are you familiar with the term seasonal?
19      A.  Yes.
20      Q.  What does the term seasonal mean to you in
21  the context of the Clean Water Act?
22      A.  Just that it would be -- it would be --
23  seasonal flow would be water in one particular season
24  of the year, you know, flow during the summer or the
25  out West example I gave about snow pack.  That would

Page 211

1  be seasonal flow.
2      Q.  How frequently must that tributary flow to
3  be considered seasonal?
4      A.  Again, I'm not aware of any bright line
5  numbers on that.  It's more conditional.
6      Q.  Other than frequency of flow, are there any
7  other characteristics of flow that would impact a
8  determination on whether a stream is seasonal?
9      A.  I think that the critical determination in
10  that is typically what is causing the flow.  Is it in
11  one particular time of the year, i.e., season, so
12  that's where that definition would fall in, I guess.
13      Q.  Are you aware whether the Rapanos Guidance
14  provides any guidance for determining whether a
15  stream is seasonal?
16      A.  Yes.  I think when you get into seasonal
17  flow, you're -- you're probably into the guidance
18  about conducting significant nexus analysis again.
19      Q.  And you used the term ephemeral.  What does
20  ephemeral mean?
21      A.  Well, ephemeral is even less flow and
22  further upstream, if you will.  So ephemeral flow
23  might be just after rainfall event.  You may have
24  ephemeral flow.  So the -- the whole -- the whole
25  discussion over the last number of years has been

Page 212

1  about just what you're asking about, is how far
2  upstream do you go and it still a waters of the
3  United States.
4          So it's recognizing that there's no -- other
5  than a truly perennially flowing stream, where you
6  can document that, then once you get less and less
7  flow, then there's -- we get into where is the
8  distinction between intermittent and ephemeral and
9  seasonal.  And all of those are conditions in which
10  there's less flow, it's less hydrologic connection,
11  if you will, that could be provided to a
12  traditionally navigable water.
13      Q.  And in your opinion, does any part of the
14  east-west ditch drain wetlands?
15          MR. MCALILEY:  Object to form.
16          THE WITNESS:  There -- yes.  There are areas
17      of wetlands that drain through the east-west
18      ditch.
19  BY MR. ADKINS:
20      Q.  Okay.  Where are those areas of wetlands
21  that drain to the east-west ditch?
22      A.  Well, there are some -- there's some areas
23  in the far western area of the east-west ditch that
24  apparently led to a drain wetlands.  There may be
25  some other smaller areas that are on the edge of the



W. MICHAEL DENNIS
U.S.A. vs BENJAMIN K. SHARFI

May 27, 2022
213–216

Page 213

1  east-west ditch in its entirety that could provide us
2  seasonal drainage of wetlands.
3      Q.   What do you mean by seasonal drainage?
4      A.   That under certain -- certain flow
5  conditions, certain water conditions, the wetland
6  could drain into the east-west ditch.
7      Q.   Okay.  And what are those flow conditions?
8      A.   Where there's enough water to find a way and
9  a path to get to the east-west ditch.
10     Q.   All right.  Is there anything else you mean
11 by certain flow conditions?
12     A.   No.
13     Q.   And so how do you know that there are
14 wetlands that could provide seasonal drainage to the
15 east-west ditch?
16     A.   Well, you can -- you can inspect those.  You
17 can look at aerial photographs and see where there
18 are wetlands that are adjacent to the east-west
19 ditch, physically inspect those to see if there's a
20 place for those wetlands to drain into the east-west
21 ditch.
22     Q.   So you said you can, but did you do?
23     A.   Did I do what?
24     Q.   Did you physically -- did you personally
25 inspect or, you know, view any sort of maps or

Page 214

1  photography or anything like that to confirm whether
2  or not wetlands are draining into the east-west
3  ditch?
4      A.   I reviewed -- I reviewed extensively
5  topographic maps and aerial photographs of the
6  east-west ditch from where it begins from the
7  unchannelized portion of Bessey Creek all the way to
8  the western end, which is in the vicinity of the
9  Martin County Transfer and Waste Treatment Facility.
10 So I looked at that.  I did not -- I did not go walk
11 the entirety of the east-west ditch to inspect
12 those -- those areas.
13     Q.   Other than reviewing topo maps, is there
14 anything else that you've done to form a view that
15 there are wetlands that drain into the east-west
16 ditch?
17     A.   No.  I looked at portions of the east-west
18 ditch, but I didn't look at the entirety of it.
19     Q.   And so when you said seasonal drainage,
20 what's the basis for your opinion that there is
21 seasonal drainage of wetlands to the east-west ditch?
22     A.   Well, when there's -- when there's no water
23 in any of the wetlands that might be adjacent to it,
24 then there wouldn't be any flow from those wetlands
25 into the east-west ditch.

Page 215

1      Q.   So your answer is when there is no water in
2  any of the wetlands that might be adjacent.
3      Do you know whether there is no water in all
4  of the wetlands that might be adjacent to the
5  east-west ditch?
6      MR. MCALILEY:  Object to form.
7      THE WITNESS:  No, I don't know that one way
8  or another.
9  BY MR. ADKINS:
10     Q.   Is there any other basis you have for the
11 opinion that wetlands could provide seasonal drainage
12 to the east-west ditch?
13     A.   No, other than what we've talked about.
14     Q.   And what we've talked about is that you
15 don't -- you actually don't know whether all these
16 wetlands are -- might be adjacent and there's no
17 water in any of them, right?
18     MR. MCALILEY:  Object to form.
19     THE WITNESS:  No.  I think what I was saying
20 was to definitively answer your question, you
21 would need to go and inspect the entirety of the
22 east-west ditch to see whether or not there are
23 any wetlands that are adjacent to it.  Do those
24 wetlands then have an avenue or a conduit into
25 the east-west ditch by some sort of break in the

Page 216

1  berm.
2  Typically, there's this, you know, along the
3  east-west ditch, the store (phonetic) was put on
4  the side, so was there a break in that berm that
5  would allow an adjacent wetland to flow in there
6  or not.
7  So my answer is you would need to look at
8  all that to get at the full answer to your
9  question.
10 BY MR. ADKINS:
11     Q.   Okay.  But you didn't do that in this case
12 at least?
13     A.   No.
14     Q.   And so I take from that that you don't have
15 a basis to say that wetlands are providing seasonal
16 drainage to the east-west ditch.  And so when I say
17 is there any other reason that you have that based on
18 work that you've done in this case, what is your
19 answer?
20     MR. MCALILEY:  Object to form.
21     THE WITNESS:  Yeah, I think -- I think --I
22 think we're both looking at this seasonal
23 statement differently.  I -- I don't -- I don't
24 have information -- let's take seasonal out of my
25 answer just a second.  I don't have information



W. MICHAEL DENNIS
U.S.A. vs BENJAMIN K. SHARFI

May 27, 2022
217—220

Page 217

1    about specific wetland areas that are adjacent to
2    the east-west ditch that would drain into it
3    seasonally or otherwise, so...
4  BY MR. ADKINS:
5      Q.  Do you agree, based on your review of NWI
6  maps and other documents in this case, that there are
7  wetlands that drain into the east-west ditch?
8         MR. MCALILEY:  Object to form.
9         THE WITNESS:  I'd have to look at that more
10   carefully.  And the reason is that the east-west
11   ditch has a lot of more south, basically,
12   oriented ditches that flow into it, and various
13   of those ditches drain into the east-west ditch.
14   And I know of some wetlands that we've discussed
15   already that are connected by ditches to
16   north-south ditch that go into the east-west
17   ditch.  So I'd have to look at all that, but
18   there are some wetlands that, through various
19   ditching, drain into the east-west ditch.
20  BY MR. ADKINS:
21      Q.  I understand.  Do you have an opinion as you
22  sit here today whether the east-west ditch drains any
23  wetlands directly?
24         MR. MCALILEY:  Object to form.
25         THE WITNESS:  If it does, it would be on the

Page 218

1    far western edge of it past the current
2    north-south ditch that goes to the side.  It
3    would be that far northwest, or there may be some
4    occasional areas otherwise, but they would be
5    pretty -- in my estimate, would be pretty much
6    limited to western part of the east-west ditch,
7    generally -- generally along and west of 84th
8    street or Avenue.
9  BY MR. ADKINS:
10      Q.  Do you have an opinion that the east-west
11  ditch drains wetlands, but the wetlands that are
12  drained are generally west of 84th Avenue and maybe
13  some other wetlands east of that area; is that about
14  right?
15      A.  If there are wetlands that drain directly,
16  not through the series of other north-south ditches
17  that go northbound and south of east-west ditch, they
18  are -- they are smaller occasional areas along the
19  course of the east-west ditch.  And then the other
20  area would be further west past the Martin County
21  facilities.
22      Q.  And when you say if there are, why do you
23  use the construction if there are?
24      A.  Because I haven't specifically looked at
25  that.

Page 219

1      Q.  So it would be fair to say you're
2  speculating whether or not there are -- whether or
3  not the east-west ditch drains wetlands?
4      A.  No, I'm not -- I don't think I'm
5  speculating.  I think I'm giving you an opinion of
6  what the various conditions and situations could be.
7  And I don't have any direct knowledge of those, so
8  it's --
9      Q.  Well, what -- what would you call an opinion
10  without any knowledge, if not speculation?
11         MR. MCALILEY:  Object to form.
12         THE WITNESS:  I would agree with you.  An
13   opinion without any knowledge would be pure
14   speculation; I agree with you with that.  I don't
15   think that's what I testified to, that I had no
16   knowledge about it.
17  BY MR. ADKINS:
18      Q.  So what knowledge do you have of whether or
19  not the east-west ditch drains wetlands directly?
20         MR. MCALILEY:  Object to form.
21         THE WITNESS:  Inspection of aerial
22   photographs and USGS topo maps, and limited
23   amount of direct on-the-ground viewing of the
24   east-west ditch from just east of the north-south
25   ditch to the 84th Street ditch.

Page 220

1  BY MR. ADKINS:
2      Q.  Do you have any other basis for your opinion
3  on the subject?
4         MR. MCALILEY:  Object to form.
5         THE WITNESS:  Not that I recall right now.
6  BY MR. ADKINS:
7      Q.  Okay.  So let's -- let's transition to the
8  north-south ditch.  Is any part of the north-south
9  ditch constructed in wetlands?
10         MR. MCALILEY:  Object to form.
11         THE WITNESS:  Based on review of the
12   historic aerials, the north-south ditch is not
13   constructed in wetlands.  It comes down to the
14   side, and as we've discussed, there is a wetland
15   in the southwest corner of the side, and the
16   ditch is adjacent to that.  So that would be the
17   closest instance I would suspect.
18  BY MR. ADKINS:
19      Q.  And your opinion that no part of the
20  north-south ditch was constructed in wetlands is
21  solely based on your review of historic aerials?
22         MR. MCALILEY:  Object to form.
23         THE WITNESS:  Historic aerials, site
24   inspections of the north-south ditch, topographic
25   maps, other wetland database maps.



W. MICHAEL DENNIS
U.S.A. vs BENJAMIN K. SHARFI

May 27, 2022
221–224

Page 221

1  BY MR. ADKINS:
2      Q.  And when you say site inspection at the
3  north-south ditch, you didn't delineate any wetlands
4  on the site or on Countess Joy property, right?
5      A.  Correct.  I did not delineate any.
6      Q.  So how can it be that your site inspection
7  of the north-south ditch formed your view that the
8  north-south ditch was not constructed in wetlands?
9      MR. MCALILEY:  Object to form.
10      THE WITNESS:  Walking the north-south ditch
11  and looking at the -- the vegetation and site
12  conditions, all of it indicates that that
13  north-south ditch historically was constructed in
14  upland areas coming from the east/south ditch
15  south.
16  BY MR. ADKINS:
17      Q.  Are there any wetlands adjacent to the
18  north-south ditch as it currently sits?
19      MR. MCALILEY:  Object to form.
20      THE WITNESS:  The two wetlands that are
21  connected with ditches on the west where I've
22  described.  And, you know, historically, before
23  current activities, the wetland on the site in
24  the southwest corner of the site would have been
25  a neighboring border in that construct or

Page 222

1  adjacent.
2  BY MR. ADKINS:
3      Q.  Does any part of the north-south ditch drain
4  wetlands?
5      MR. MCALILEY:  Object to form.
6      THE WITNESS:  Yes.
7  BY MR. ADKINS:
8      Q.  What parts?
9      A.  Well, those two wetlands on the west and
10  they go by ditches, and my view is that they -- they
11  would drain those two wetland areas in the
12  north-south ditch.  They would then go into the
13  east-west ditch.
14      Q.  Are there any wetlands on the Countess Joy
15  property in your view that are adjacent to the
16  north-south ditch?
17      MR. MCALILEY:  Object to form.
18      THE WITNESS:  Not that I'm aware of.
19  BY MR. ADKINS:
20      Q.  Does the north-south ditch have any berms?
21      A.  In some areas it does, slight -- slight
22  berms, but in its entirety.
23      Q.  Are there any berms in the area that runs
24  along the western boundary of the site?
25      MR. MCALILEY:  Object to form.

Page 223

1      THE WITNESS:  Currently, the western portion
2  of the site has a road along the north-south
3  ditch.
4  BY MR. ADKINS:
5      Q.  So I'm going to show you Deposition Exhibit
6  196 again.  And I'm going to take you to the last
7  page, DLS117, which is a ditch cross-section view.
8      Do you see that?
9      A.  I do.
10      Q.  Okay.  What is this document?
11      A.  This is from DLS's evaluation of the Sharfi
12  property.
13      Q.  All right.  Do you see any berms represented
14  in this cross-section?
15      A.  No.
16      Q.  What does the term similarly situated lands
17  mean to you in context of the Clean Water Act?
18      MR. MCALILEY:  Object to form.
19      THE WITNESS:  Those would be lands that have
20  similar topography, land use, land forms,
21  distance from, in this context, from a
22  traditionally navigable water.
23  BY MR. ADKINS:
24      Q.  I'm showing you Deposition Exhibit 194, and
25  it's page 61 of your report, Bates stamped

Page 224

1  SHARFIEXPERTS166.
2      Do you see that?
3      A.  Yes.
4      Q.  You write in your report, "Only wetlands
5  adjacent to the north-south canal ditch or
6  potentially the primary flow pathway would be
7  similarly situated wetlands.  These are the similarly
8  situated lands that should be evaluated in the
9  significant nexus set as defined in the Kennedy
10  Rapanos decision and consistent with the Rapanos
11  Guidance."
12      Did I read that correctly?
13      A.  Yes.
14      Q.  What's the basis for your opinion?
15      A.  Where did you start reading again?
16      Q.  It's, "Only wetlands adjacent to..."
17      A.  Okay.  I see it.  Thank you.  Yes.  In
18  considering similarly situated wetlands, Rapanos
19  Guidance directs you to look at the -- the tributary
20  and determine whether it or any wetlands that are
21  adjacent to it would have the effect on the
22  downstream traditionally navigable waters.
23      So in this evaluation, since the north-south
24  ditch is the -- is the focus of what I would suggest
25  is the focus of this analysis, then you would look at



W. MICHAEL DENNIS
U.S.A. vs BENJAMIN K. SHARFI

May 27, 2022
225–228

Page 225

1  the north-south ditch and then wetlands in the
2  similar situated lands next to that north-south
3  ditch, and you would evaluate those for the
4  significant nexus determination.
5      Q.   Why is the north-south ditch the focus for
6  this evaluation?
7      A.   Again, looking at the Rapanos Guidance, it
8  directs you to look at stream waters and the
9  -- you know, all -- look at the pertinent reach of
10  the stream, and you look at that stream order as the
11  area for your evaluation.
12      So you're -- you're trying to -- you're
13  trying to get at the analysis of the stream or
14  tributary that's not perennial, it flows less than
15  that, and whether or not that has the ability to have
16  a significant effect on traditionally navigable
17  waters in terms of physical, biological, and chemical
18  properties.
19      And it also requires you to have to look at
20  similarly situated wetlands.  So if you began with
21  looking at the north-south ditch, which is on the
22  west side of the site, and you follow it to the
23  east-west ditch, that north-south ditch is a
24  first-story ditch, and that's where you would begin
25  your investigation, in that reach of the ditch.

Page 226

1      Q.   But you consider the portion of the
2  north-south ditch that runs through Countess Joy's
3  property to be a second-order stream, don't you?
4      A.   No, I don't believe so, if I understand your
5  question.
6      Q.   Okay.  So the entirety of the north-south
7  ditch is a first-order tributary in your view?
8      A.   In my analysis, I took the north-south ditch
9  as the first-order tributary.  Now, in the expert --
10  in the expert report, they indicate that the
11  north-south ditch up to a west ditch then flows
12  through the primary flow way, that we talked about
13  this morning, to 84th Street and then goes into the
14  east-west ditch.
15      So in conducting my analysis trying to get
16  an order of magnitude analysis for the significant
17  nexus test, I considered both the situation where the
18  north-south ditch would be the primary reach, and I
19  also said, well, if that's not right and the primary
20  flow way is the right answer, you know, either one of
21  those would be, you know, the first-order reach.
22      So -- and then -- and then I broadened the
23  evaluation to say, all right, for purposes of
24  argument, I'm -- I'm considering any of the wetlands
25  that are in the similarly situated lands along both

Page 227

1  of those reaches.
2      Q.   Do you consider the swale/ditch to be a
3  first-order stream?
4      A.   Yes.
5      Q.   Okay.  And do you consider the north-south
6  ditch to be a first-order stream?
7      A.   Yes.
8      Q.   Under your methodology, your opinion is that
9  where the swale/ditch and the north-south ditch
10  intersect at the northwest corner of the site, that
11  north-south ditch then becomes a second-order stream,
12  correct?
13      A.   Yeah, that would -- if you follow that
14  logic, yes.
15      Q.   Do you follow that logic?
16      A.   Yeah, I do, I do.  But I'm also -- but I'm
17  also reviewing and providing commentary, analysis,
18  and rebuttal on the -- the team expert report.  So I
19  would consider the strict interpretation of the
20  stream orders to consider the swale/ditch, east-west
21  swale/ditch, and the north-south ditch as being
22  first-order and where they meet second-order.  And
23  then they would go into the east-west ditch, which is
24  a higher order, and you can, you know, discuss what
25  it is.

Page 228

1      It's a higher order than the north-south
2  ditch coming in, so I think the strict interpretation
3  would lead you to the east-west swale/ditch being
4  first-order, the north-south ditch up until that
5  junction being first-order, and then there would a
6  second-order north-south ditch up to the east-west
7  ditch, which is a higher order.
8      But if that analysis is not correct and you
9  don't consider the east-west swale/ditch a first
10  order, if you just discount it and you consider the
11  north-south ditch up to the east-west ditch, then the
12  north-south ditch would be a first-order stream,
13  first-order tributary, under the Rapanos Guidance and
14  the Kennedy analysis, and it would connect to the
15  east-west ditch.
16      And argumentatively, if you don't accept
17  that and you accept the DOJ Expert Team Report that
18  the north-south ditch doesn't continue on to as the
19  primary water course for the east-west ditch and you
20  follow the primary flow pathway, then in that
21  instance, that would be the first order going on into
22  I assume then the 84th street ditch, which would be a
23  first order, and then from there, the 84th street
24  ditch would be a second order going into the
25  east-west ditch.



W. MICHAEL DENNIS
U.S.A. vs BENJAMIN K. SHARFI

May 27, 2022
229–232

Page 229

1    So it depends on how you evaluate all that.
2    And what I was trying to do is I'm just saying it
3    doesn't matter. We can debate first order, second
4    order, but the category of orders is all from lower
5    to higher, and the proper analysis for the site is to
6    consider the north-south ditch, whether it extends
7    all the way to the east-west or through the prior
8    flow way and look at that and similarly situated
9    lands, which I took to be the 130 acres that I
10   described, which is, you know, the drainage area I
11   would suggest for either north-south ditch or the
12   flow way ditch and then look at that in terms of your
13   analysis to determine the appropriate analysis under
14   similarly situated.
15       MR. MCALILEY: Counsel, I need a short
16   break, I'm sorry.
17       MR. ADKINS: Let's go off the record.
18       MR. MCALILEY: Thank you.
19       VIDEOGRAPHER: Going off the video record at
20   4:38 p.m.
21       (Thereupon, a recess was taken.)
22       We're back on the video record at 4:45 p.m.
23   BY MR. ADKINS:
24    Q.   How much flow does the ditch swale
25   contribute to the north-south ditch?

Page 230

1        MR. MCALILEY: Object to form.
2        THE WITNESS: Very little.
3    BY MR. ADKINS:
4     Q.   Does it contribute any?
5        MR. MCALILEY: Object to form.
6        THE WITNESS: Does the north-south ditch
7    contribute to the east-west ditch?
8    BY MR. ADKINS:
9     Q.   No, other way around. Does the -- how much
10   flow does the ditch swale --
11    A.   Oh.
12    Q.   -- contribute to the north-south ditch?
13    A.   Okay. I'm sorry. I --
14    Q.   No problem. So with that understanding,
15   what's your answer?
16    A.   It's still very little.
17    Q.   Now, if it were the case that the United
18   States posits that wetlands on the site are part of a
19   continuous wetland complex that is adjacent to Bessey
20   Creek -- to the east-west ditch, would the amount of
21   similarly situated lands for the Rapanos analysis
22   change in your view?
23       MR. MCALILEY: Object to form.
24       THE WITNESS: No, I don't think so. Because
25   I think the whole question and terminology of

Page 231

1    continuous wetland systems, I read that in the
2    report, but fundamentally, when you get down to
3    it and apply the significant nexus test, the area
4    of the north-south ditch and/or the flow path and
5    the amount of land there, whether it's -- whether
6    it is the 13 something acres or more than that.
7    Fundamentally, when you get to it, that's such a
8    small inconsequential amount of drainage and
9    connection to the traditionally navigable water
10   that any allegation of effect, to use Kennedy's
11   words, would be speculative and inconsequential.
12   BY MR. ADKINS:
13    Q.   That's not my question. Just in terms of
14   how we are identifying similarly situated lands --
15    A.   Yeah.
16    Q.   -- under the hypothetical, if it were true
17   that wetlands on the site were part of a continuous
18   wetland complex that is adjacent to the east-west
19   ditch, under the Rapanos Guidance, you would consider
20   all of the wetlands that are adjacent to the
21   east-west ditch, correct, as similarly situated
22   lands?
23    A.   Are you asking me that the question is that
24   for the entirety of the east-west ditch, all of the
25   lands that connect to it are part of a wetland

Page 232

1    complex and should be considered; is that -- is that
2    the question?
3     Q.   No, no. So I --
4     A.   Help me -- help me out.
5     Q.   I'll try to clarify. So we're just -- you
6    know, we've come to this discussion over the order of
7    the streams.
8        So my hypothetical is if the wetlands on the
9    site are adjacent to the east-west ditch, under the
10   stream order methodology, wouldn't the similarly
11   situated lands be all of the adjacent wetlands to the
12   east-west ditch?
13       MR. MCALILEY: Object to form.
14       THE WITNESS: I'm sorry, I'm trying to --
15   I'm trying to follow your logic. Are you saying
16   that if all of the -- if there are more part of a
17   wetland complex next to the north-south ditch
18   that drains into the east-west ditch?
19   BY MR. ADKINS:
20    Q.   Take the north-south ditch out of it.
21       If wetlands on the site are adjacent to the
22   east-west ditch, under the Rapanos Guidance, you
23   would consider all of the adjacent wetlands to that
24   east-west ditch, that tributary, whatever order it
25   is, to be similarly situated lands; isn't that



W. MICHAEL DENNIS
U.S.A. vs BENJAMIN K. SHARFI

May 27, 2022
233–236

Page 233

1 correct?
2    A.   Hypothetically, if that were true and if --
3 which I find no support for it, but hypothetically,
4 your question, I think Rapanos directs you to
5 consider all of the adjacent wetlands to your subject
6 tributary to be part of the significant nexus status
7 and would be considered similarly situated.
8    Q.   So you agree that would be the analysis,
9 under my hypothetical?
10      MR. MCALILEY:  Object to form.
11      THE WITNESS:  Under your hypothetical.
12 BY MR. ADKINS:
13    Q.   And just to confirm, you didn't delineate
14 any wetlands that are adjacent corresponding to
15 north-south ditch or the east-west ditch on Countess
16 Joy's property, correct?
17    A.   No.  As far as I can tell -- I know I
18 didn't, and as far as I can tell, no one else has
19 done that either.
20    Q.   And now, you agree that the point of that
21 Bessey Creek becomes tidally influenced, correct?
22    A.   Yes.
23    Q.   And the U.S. DOJ Expert Team identified a
24 point of Bessey Creek at which it becomes -- at least
25 at which it becomes tidally influenced, correct?

Page 234

1      Do you recall that?
2    A.   I do.
3    Q.   All right.  And you agree generally with the
4 U.S. DOJ Expert Team that that point that they've
5 identified at Bessey Creek indeed is tidally
6 influenced, correct?
7    A.   Yes.  It's a -- it's a point where the
8 natural portion of Bessey Creek is tidal, and it's
9 generally in the area that the expert team report
10 scratched.
11    Q.   I'm showing you again DX194.  This is page
12 61 of your report, Bates stamped SHARFIEXPERTS166.
13 I've highlighted another sentence that I'm going to
14 read here.
15      "As has been discussed, the wetlands and
16 Bessey Creek tributaries and adjacent wetlands, based
17 on the NWI map, east of the Turnpike are primarily
18 tidally influenced saltwater estuarine systems."
19      Correct?
20    A.   Correct.
21    Q.   I read that correctly I should say?
22    A.   Yes.
23    Q.   Did I read that correctly?
24    A.   Yes.
25    Q.   Okay.  And is that your opinion?

Page 235

1    A.   Yes.
2    Q.   Okay.  What do you mean by primarily?
3    A.   There is other influence, so there's a point
4 in Bessey Creek where it is tidally influenced, and I
5 think that the Bessey Creek typically is functionally
6 different and we have a different system there.
7      Primarily is, I guess, a quibble that I put
8 in there to -- to recognize there could be other
9 contributions there, there could be other factors,
10 but primarily it's -- it's estuarine.
11    Q.   Is it more than 50 percent?
12    A.   No, it's much more than 50 -- where it's
13 tidally influenced, it's tidally influenced.  I'm not
14 quibbling with that.
15    Q.   Okay.  So more than half of the wetlands
16 east of the Florida Turnpike are saltwater estuarine?
17      MR. MCALILEY:  Object to form.
18 BY MR. ADKINS:
19    Q.   Is that what you mean?
20    A.   No.  I think -- I think the -- yeah, the
21 wetlands adjacent to tidal -- to Bessey Creek in the
22 estuarine saltwater part of it would be similarly
23 situated wetlands to Bessey Creek in that context
24 because they would be same land form, the same type
25 of wetlands, and to the extent they're adjacent,

Page 236

1 yeah, they would be similarly situated.
2    Q.   So I'm taking you to page 50 of your report,
3 Bates Stamped SHARFIEXPERTS155, and I've highlighted
4 another sentence that I'll read.
5      "I reviewed various data to determine the
6 downstream extent of the TNW including the USFWS NWI
7 data, indicating the extent of estuarine versus
8 freshwater systems, Figure 20, SFWMD FLUCFCS data,
9 Figure 21, and aerial imagery, Figures 3 through 7
10 and 10."
11      Did I read that correctly?
12    A.   Correct.
13    Q.   Okay.  And when you wrote "as has been
14 discussed" on page 66 of your report, were you
15 referring to this portion of your expert report?
16    A.   I don't know.  I'd have to go back and read
17 that context, but I agree with the statement.
18    Q.   Okay.  And among the sources that you refer
19 to in this statement, the one that shows the extent
20 of estuarine versus freshwater systems is Figure 20;
21 is that correct?
22    A.   Yes.
23    Q.   Let's go to the next page.  I want to take a
24 look at Figure 20.  Okay.  So I'm now at
25 SHARFIEXPERTS 156.



W. MICHAEL DENNIS
U.S.A. vs BENJAMIN K. SHARFI

May 27, 2022
237–240

Page 237

1      And do you see Figure 20 here?
2      A.   I do.
3      Q.   Okay.  And this is a figure that you
4   prepared with your report?
5      A.   Yes.
6      Q.   Now, there are -- there's a legend that
7   identifies different types of wetlands.  And there
8   are two items in this legend that say estuarine and
9   marine deepwater and estuarine and marine wetlands.
10      Do you see that?
11      A.   I do.
12      Q.   Okay.  And there are other colors identified
13   here that include freshwater emergent wetland,
14   freshwater forested/shrub wetland, freshwater pond,
15   lake, riverine.
16      Do you see those?
17      A.   I do.
18      Q.   Okay.  Now, the estuarine and marine
19   deepwater and estuarine and marine wetlands, those
20   would be saltwater systems, correct?
21      A.   Correct.
22      Q.   And then the rest on the right side of the
23   legend, those would be freshwater systems; is that
24   right?
25      A.   Correct.

Page 238

1      Q.   Okay.  So now, let's look at the chart and
2   try to get an idea of these colors here.  I'm going
3   to zoom in, and we see on this photograph that
4   there's an indication for Southwest Murphy Road
5   Bridge.
6      Do you see that?
7      A.   Yes.
8      Q.   All right.  And to the left, there is a --
9   what looks to be a highway.  Is that the Florida
10   Turnpike?
11      A.   Yes.
12      Q.   Okay.  And the Florida Turnpike extends
13   throughout the entirety of this image, right?
14      A.   Correct.
15      Q.   Okay.  Now, to the right of what's marked as
16   Southwest Murphy Road Bridge, do you see some
17   representations of saltwater systems?
18      A.   Yes.
19      Q.   Okay.  And do you see some representations
20   of freshwater systems in that area?
21      A.   Yes.
22      Q.   Okay.  You know, just looking at this map,
23   would you say that the areas that are highlighted
24   east of the Florida Turnpike are primarily saltwater
25   systems?

Page 239

1      A.   Yes.
2      Q.   Okay.  So why don't you show me exactly what
3   would be a saltwater system.  Or you can tell me over
4   the record so we can try to clarify this.
5      A.   Well, any of the -- any of the areas that
6   are colored with a legend of a blue, bright blue
7   color.
8      Q.   Okay.  So I see a spot here that's northeast
9   of Murphy Road Bridge.  Let me see if I can highlight
10   this.
11      Do you see the area that I'm highlighting
12   here?
13      A.   Yes.
14      Q.   Okay.  Would that be a saltwater system?
15      A.   That blue area, yes.
16      Q.   Okay.  Any other parts east of the Florida
17   Turnpike that would be a saltwater system?
18      A.   Well, those areas that left of the legend at
19   the bottom.
20      Q.   Sure.
21      A.   Okay.  Again, we need to -- we need to
22   distinguish that bottom color estuarine and marine
23   wetland.
24      Q.   Right.
25      A.   So that's the color we're looking for up

Page 240

1   there.  So any of the areas that are mapped with that
2   would be.
3      Q.   Okay.  Do you see any other areas other than
4   what I've indicated, that area northeast of the
5   southwest Murphy Road Bridge?
6      A.   I need to go back and look at my map.  That
7   was 20?
8      Q.   Yeah, Figure 20.
9      A.   It looks like there are some other areas to
10   the northeast of that, and then there's an area east
11   of that along the river.
12      Q.   Okay.  So let me see if I can highlight some
13   more here.
14      Is this an area that you've identified as
15   saltwater?
16      A.   Yeah, I think this is that.
17      Q.   Okay.  And then this area by what I believe
18   is the Saint Lucie here that I've highlighted, is
19   this another area of saltwater estuarine?
20      A.   Yeah, in part.
21      Q.   In part?
22      A.   Yeah, and I'm not -- I'm not colorblind.  I
23   know that Leo is and he had trouble with these and --
24   but I'm -- I'm trying to discern these.  I think
25   that's right.



W. MICHAEL DENNIS
U.S.A. vs BENJAMIN K. SHARFI

May 27, 2022
241–244

Page 241

1    Q.   Okay.  So these three areas that you've
2  identified as saltwater estuarine, are they all
3  downstream of where Bessey Creek becomes tidally
4  influenced?
5    A.   Yes.
6    Q.   Okay.  And do you know the acreage of the
7  saltwater estuarine areas identified in this map?
8    A.   No, I don't.
9    Q.   Okay.  Do you know the acreage of the
10  freshwater systems that are identified on the map?
11    A.   No.
12    Q.   Okay.  So I want to take you back very
13  briefly to the South Florida Water Management
14  District's verification of Ms. Small's wetland
15  delineation.
16        Do you understand or have any knowledge of
17  what the Water Management District did to verify Ms.
18  Small's wetland delineation at the site?
19    A.   My understanding is that two South Florida
20  Water Management District wetland science --
21  scientists, employees in their wetland program, came
22  out with Ms. Small and physically inspected the line
23  in the field.
24    Q.   Okay.  Are you aware of whether they took
25  any soil samples during that inspection?

Page 242

1    A.   No, I'm not.
2    Q.   Are you aware of whether they identified any
3  wetland vegetation during their verification?
4    A.   No.  Other than typically in the
5  verification process, the regulatory inspectors look
6  at vegetation, the soils, the hydrology.  They look
7  for indicators of that, and they determine whether or
8  not the flag line appears to be correct or not.
9    Q.   But in this case, you don't know whether
10  they did that specifically; is that right?
11    A.   My understanding is they inspected and
12  approved the line in the field.  Now, exactly how
13  many -- whether they took soil samples or moved the
14  line around and the details of the site inspection
15  I'm not aware.
16    Q.   Okay.  And are you aware of whether they
17  looked for any hydrologic indicators while they
18  verified Ms. Small's wetland delineations?
19    A.   Well, that would've been one of the factors
20  that they always look at, yes.
21    Q.   Okay.  So -- but do you know in this
22  circumstance whether the Water Management District
23  scientists who went out to verify Ms. Small's line
24  did indeed verify that there were hydrologic
25  indicators at the site?

Page 243

1    A.   I don't know specifically whether they broke
2  it down into that and made a specific determination
3  on that.  My sense is they reviewed comprehensively
4  the line using all three factors and using the
5  wetland delineation methodology.
6    Q.   Do you know whether the Water Management
7  District employees who verified Ms. Small's wetland
8  delineation checked whether any other parts of the
9  site contained wetlands?
10    A.   My understanding is they inspected the line
11  and determined that on one side of the line, there
12  was wetlands, on the other side of the line there was
13  uplands.
14    Q.   What is that understanding based on?
15    A.   The way wetland delineation verifications
16  are carried out.
17        MR. ADKINS:  Okay.  We will pass the
18  witness.
19        MR. MCALILEY:  Thank you.  I just have a
20  couple of questions.
21            CROSS-EXAMINATION
22  BY MR. MCALILEY:
23    Q.   Dr. Dennis, do you recall when you were
24  asked questions about whether Danna Small followed
25  the Army Corps of Engineers 1987 Wetland Manual when

Page 244

1  she did her delineation?
2    A.   Yes.
3    Q.   And am I right that you testified that the
4  State of Florida has assumed the Clean Water Act,
5  Section 404 program in many Florida waters; is that
6  right?
7    A.   They assumed it in Florida, and there has
8  been a determination of the fact that that assumption
9  will apply to delegated waters.  The Corps has
10  retained certain waters, Section 10 waters and other
11  identified waters that they would retain jurisdiction
12  over.
13    Q.   What does it mean for the State of Florida
14  to assume the Clean Water Act 404 program?
15    A.   That is in assumption that is provided for
16  in the Clean Water Act.  States can do that.  Florida
17  is only the third one, as I recall, that's done it
18  successfully.  But it's to -- basically, it's to step
19  into the shoes of the Corps and administer the
20  Section 404 program.
21        Now, Section 10 waters and other retained
22  waters can't be delegated.  So that's -- that's the
23  distinction between retained waters and delegated
24  waters.
25    Q.   Is the site that is the subject of this



W. MICHAEL DENNIS
U.S.A. vs BENJAMIN K. SHARFI

May 27, 2022
245–248

Page 245

1 litigation in an area of retained waters or in an
2 area of assumed waters?
3    A.  It would be in an area of assumed waters.
4    Q.  Okay.  So am I right in understanding this
5 means that the Florida Department of Environmental
6 Protection now administers the Clean Water Act 404
7 program in the assumed waters?
8    A.  Correct.
9    Q.  When exactly did the State of Florida assume
10 permitting authority in Section 404 for those assumed
11 waters in the State of Florida?
12       MR. ADKINS:  I'm going to object on
13    foundation.  And this exceeds the scope of
14    direct.
15       MR. MCALILEY:  I disagree, so you can
16    answer.
17       THE WITNESS:  I believe that was in December
18    of 2021.
19 BY MR. MCALILEY:
20    Q.  So six months ago, or a year and a half ago?
21    A.  A year and a half ago.
22       MR. ADKINS:  Same objection.
23 BY MR. MCALILEY:
24    Q.  So year and a half.  All right.
25       In areas of Florida assumed waters, does one

Page 246

1 use the 1987 Wetland Manual from the Army Corps of
2 Engineers?
3    A.  No.
4    Q.  When did the DOJ Expert Team conduct a
5 relevant delineation to the site?
6    A.  In 2021.
7    Q.  Do you have an opinion as to whether it was
8 appropriate for the DOJ team to use the '87 Corps
9 Wetland Manual when they did their delineation in
10 2021?
11    A.  Based on the MOAs and the guidance --
12       MR. ADKINS:  Objection.  Can we just have an
13    objection to this line of questioning?
14       MR. MCALILEY:  Certainly.
15       MR. ADKINS:  Thank you.
16 BY MR. MCALILEY:
17    Q.  Go ahead, Dr. Dennis.
18    A.  So based on the MOAs between the Corps EPA
19 and EP, at the time of delegation then, the State
20 methodology is to be used in all assumed waters.
21       MR. MCALILEY:  Okay.  I have no further
22    questions.  Thank you.
23       MR. ADKINS:  None from me.  Thank you very
24    much for your time, appreciate it.
25       THE WITNESS:  Thank you, sir.  You all have

Page 247

1 a good Memorial Day.
2       MR. ADKINS:  Yeah.  You too.
3       THE VIDEOGRAPHER:  Before we go off the
4    record, does anyone want a video copy of the
5    deposition?
6       MR. MCALILEY:  Not the defendants.
7       MR. ADKINS:  Can we ask Dr. Dennis, would
8    you like an opportunity to read your transcript?
9       THE WITNESS:  Yes.
10       VIDEOGRAPHER:  And Mr. Adkins, that was a no
11    on the video.
12       MR. ADKINS:  No on the video cut, thank you.
13       THE VIDEOGRAPHER:  All right.  Thank you so
14    much.  So this concludes the video conference
15    deposition of Dr. W. Michael Dennis.  We're going
16    off the video record on May 27, 2022, at 5:10
17    p.m. Stand by.
18       MR. MCALILEY:  Okay.  Dr. Dennis will read.
19    Brandon, are you ordering the transcript?
20       MR. ADKINS:   Yes.  I am ordering the
21    transcript.
22       MR. MCALILEY:  Okay.  We will take a copy.
23       (Thereupon, the Deposition concluded at 5:10
24    p.m.)
25

Page 248

```
1              Deposition Errata Sheet.
2
3  Our Assignment No.    8283973
4  Case Caption:  UNITED STATES vs. SHARFI, ET AL
5
6            DECLARATION UNDER PENALTY OF PERJURY
7
8
9        I, W. MICHAEL DENNIS, declare under penalty
10    of perjury that I have read the entire transcript
11    of my Deposition taken in the captioned matter or
12    the same has been read to me, and the same is
13    true and accurate, save and except for changes
14    and/or corrections, if any, as indicated by me on
15    the DEPOSITION ERRATA SHEET hereof, with the
16    understanding that I offer these changes as if
17    still under oath.
18
19
20       Signed on the _____day of _____, 20__.
21
22
23    _____
24    W. MICHAEL DENNIS
25
```



Page 249

```
1              CERTIFICATE OF OATH OF WITNESS
2
3    STATE OF FLORIDA )
                      ) SS:
4    COUNTY OF OSCEOLA)
5
6          I, Melissa Ostolaza, Shorthand Reporter and
7    Notary Public in and for the State of Florida at
8    Large, certify that the witness, W. MICHAEL DENNIS,
9    personally appeared before me VIA ZOOM on
10   May 27, 2022 and was duly sworn by me.
11         WITNESS my hand and official seal this 13th
12   day of June, 2022.
13
14
15               Melissa L Ostolaza
16                    Melissa Ostolaza
                      Notary Public, State of Florida
17                    at Large
18   Notary #HH143465
19   My commission expires:  July 23, 2025
20
21
22
23
24
25
```

Page 250

```
1           REPORTER'S DEPOSITION CERTIFICATE
2          I, Melissa Ostolaza, Shorthand Reporter,
3    certify that I was authorized to and did
4    stenographically report the deposition of W. MICHAEL
5    DENNIS, the witness herein; that a review of the
6    transcript was requested; that the foregoing pages
7    numbered 1 to 247 inclusive is a true and complete
8    record of my stenographic notes of the deposition by
9    said witness; and that this computer-assisted
10   transcript was prepared under my supervision.
11         I further certify that I am not a relative,
12   employee, attorney or counsel of any of the parties,
13   nor am I a relative or employee of any of the
14   parties' attorney or counsel connected with the
15   action.
16
17         DATED this 13th day of June, 2022.
18
19
20               Melissa L Ostolaza
21                    Melissa Ostolaza
                      Notary Public, State of Florida
22                    at Large
     Notary #HH143465
23
     My commission expires:  July 23, 2025
24
25
```

Page 251

```
1
                   DEPOSITION ERRATA SHEET
2
     Page #| Line #| Change              |Reason
3    _____|_____|_____|_____
4    _____|_____|_____|_____
5    _____|_____|_____|_____
6    _____|_____|_____|_____
7    _____|_____|_____|_____
8    _____|_____|_____|_____
9    _____|_____|_____|_____
10   _____|_____|_____|_____
11   _____|_____|_____|_____
12   _____|_____|_____|_____
13   _____|_____|_____|_____
14   _____|_____|_____|_____
15   _____|_____|_____|_____
16   _____|_____|_____|_____
17   _____|_____|_____|_____
18   _____|_____|_____|_____
19   _____|_____|_____|_____
20   _____|_____|_____|_____
21   _____|_____|_____|_____
22
23   SIGNATURE:_____DATE:_____
              W. MICHAEL DENNIS    8283973
24
25
```

Page 252

```
1
                   DEPOSITION ERRATA SHEET
2    Page #| Line #| Change              |Reason
3    _____|_____|_____|_____
4    _____|_____|_____|_____
5    _____|_____|_____|_____
6    _____|_____|_____|_____
7    _____|_____|_____|_____
8    _____|_____|_____|_____
9    _____|_____|_____|_____
10   _____|_____|_____|_____
11   _____|_____|_____|_____
12   _____|_____|_____|_____
13   _____|_____|_____|_____
14   _____|_____|_____|_____
15   _____|_____|_____|_____
16   _____|_____|_____|_____
17   _____|_____|_____|_____
18   _____|_____|_____|_____
19   _____|_____|_____|_____
20   _____|_____|_____|_____
21   _____|_____|_____|_____
22
23   SIGNATURE:_____DATE:_____
              W. MICHAEL DENNIS    8283973
24
25
```

