# EXHIBIT 12

**Page 1**

1        UNITED STATES DISTRICT COURT

             SOUTHERN DISTRICT OF FLORIDA

2            FORT PIERCE DIVISION

3

4   UNITED STATES OF AMERICA,

5           Plaintiff,

6        vs.              CASE NO. 2:21-cv-14205-KAM

7   BENJAMIN K. SHARFI, IN HIS

    PERSONAL AND FIDUCIARY

8   CAPACITY AS TRUSTEE OF THE

    BENJAMIN SHARFI 2002 TRUST,

9   AND NESHAFARM, INC.,

10          Defendants.

11

12

13        VIDEOCONFERENCE DEPOSITION OF

14           SHANNON CURTIS WHITE

15             June 22, 2022

16              9:00 a.m.

17

                 Remote Proceeding

18            Miami, Florida 33136

19

20

21

22

23        Julio Maldonado Fernandez

             Digital Reporter

24        Commission No. GG 320862

25

**Page 2**

1        APPEARANCES OF COUNSEL

2   On behalf of Plaintiff, United States of America:

3      BRANDON N. ADKINS, ESQ.

       ANDREW DOYLE, ESQ.

4      UNITED STATES DEPARTMENT OF JUSTICE

       ENVIRONMENT & NATURAL RESOURCES DIVISION

5      P.O. Box 7611

       Washington, District of Columbia 20004

6      202-616-9174

       415-744-6469

7      brandon.adkins@usdoj.gov

       andrew.doyle@usdoj.gov

8      APPEARED VIA VIDEOCONFERENCE

9      WILLIAM J. MOORE, III, ESQ.

       UNITED STATES ARMY CORPS OF ENGINEERS

10     701 San Marco Boulevard

       Jacksonville, Florida 32207

11     904-232-2264

       william.j.moore@usace.army.mil

12     APPEARED VIA VIDEOCONFERENCE

13  On behalf of Defendants, Benjamin K. Sharfi, in his

    personal and fiduciary capacity as trustee of the

14  Benjamin Sharfi 2002 Trust, and NeshaFarm, Inc.:

15     T. NEAL MCALILEY, ESQ.

       CARLTON FIELDS, P.A.

16     700 Northwest 1st Avenue

       Suite 1200

17     Miami, Florida 33136

       305-530-0050

18     nmcaliley@carltonfields.com

       APPEARED VIA VIDEOCONFERENCE

19

       CHRISTOPHER F. HAMILTON, ESQ.

20     SHARFI HOLDINGS, INC.

       3731 Northeast Pineapple Avenue

21     2nd Floor

       Jensen Beach, Florida 34957

22     813-416-2352

       chamilton@sharfiholding.com

23     APPEARED VIA VIDEOCONFERENCE

24  Also present:

25     Emily Luster, Clerk to U.S. Department of Justice

**Page 3**

1            INDEX OF EXAMINATION

2   EXAMINATION                              PAGE

3   Direct Examination by Mr. McAliley         6

4   Cross-Examination by Mr. Adkins          156

5   Certificate of Oath                      160

6   Certificate of Digital Reporter          161

7   Certificate of Transcriptionist          162

8   Deposition Errata Sheet                  163

9            INDEX OF EXHIBITS

10

11  DEFENDANTS'        DESCRIPTION           PAGE

12  Exhibit 242 Notice of Taking Deposition   10

13  Exhibit 243 Federal Register Notice 1-15-2013  45

14  Exhibit 244 Corps of Engineers Regulations   51

15  Exhibit 245 GAO Report                    66

16  Exhibit 246 Statement of Findings Number 2004-2914 101

17  Exhibit 247 Permit Number 2004-2914      116

18  Exhibit 248 Approved Jurisdictional Determination 128

19  Exhibit 249 Letter 11-9-2018             141

20

21

22

23

24

25

**Page 4**

1        THE REPORTER:  We're going on the record at

2   9:00 a.m.  Hello.  Good morning, everybody.  My name is

3   Julio Fernandez, a Florida State notary public and

4   reporter, and this deposition is being held video --

5   via videoconferencing equipment.

6        The witness and reporter are not in the same

7   room.  The witness will be sworn in remotely pursuant

8   to agreement of all parties.  All parties stipulate

9   that the testimony is being given as if the witness was

10  sworn in-person.

11       Does everyone agree and can you please state

12  your firm, who you represent.

13       MR. MCALILEY:  This Neal McAliley for the

14  defendants, and we agree.

15       MR. ADKINS:  This is Brandon Atkins for the

16  plaintiff, and we agree.

17       THE REPORTER:  No problem.  Who's the -- who's

18  the deponent?

19       MR. ADKINS:  Shannon White --

20       THE REPORTER:  Okay.  Perfect.  Do you have a

21  driver's --

22       MR. ADKINS:  -- of the United States Army

23  Corps of Engineers.

24       THE REPORTER:  No problem.  Do you have a

25  driver license, Ms. White?



SHANNON C. WHITE
UNITED STATES V. SHARFI

June 22, 2022
5–8

Page 5

1    THE WITNESS: Yes.
2    THE REPORTER: If you can put it up in this
3 camera for me. Perfect. Thank you so much. Can you
4 please lift up your right hand to be sworn.
5    SHANNON C. WHITE,
6 having been first duly sworn, testified as follows:
7    THE REPORTER: Thank you so much. You may
8 proceed.
9    MR. MCALILEY: Okay. Do we want to make
10 appearances here? Just -- just for the record, this
11 is -- my name is Neal McAliley. I'm with the law firm
12 of Carlton Fields. I represent the defendants.
13    With me here also -- or not physically with
14 me, but also here on the depo virtually is Chris
15 Hamilton, who is also an attorney for the defendants.
16 And I'm going to be taking the deposition today.
17    MR. ADKINS: My name is Brandon Adkins of the
18 United States Department of Justice. With me today,
19 appearing by phone, is Andrew Doyle, also with the
20 United States Department of Justice.
21    And we have Emily Luster, a clerk in our
22 office, observing this deposition. And we also have
23 William Moore of the United States Army Corps of
24 Engineers. And I will be defending the deposition
25 today.

Page 6

1    DIRECT EXAMINATION
2 BY MR. MCALILEY:
3    Q. Okay. Super. All right. So Ms. White, could
4 you -- could you state your full name for the record
5 and spell your last name for me.
6    A. Full name is Shannon Curtis White. My last
7 name is spelled W-H-I-T-E.
8    Q. And Ms. White, what does -- where do you live?
9    A. I live in Jacksonville, Florida.
10    Q. And what is your work address?
11    A. 701 San Marco Boulevard, Jacksonville, Florida
12 32207.
13    Q. And Ms. White, where do you work?
14    A. I work for the U.S. Army Corps of Engineers,
15 Jacksonville District Regulatory Division.
16    Q. And how long have you worked at the
17 Jacksonville District of the Corps of Engineers
18 Regulatory Division?
19    A. 14-and-a-half years.
20    Q. And do you have a -- do you have a title
21 within the Regulatory Division?
22    A. I'm a project manager.
23    Q. And what does it mean to be a project manager?
24    A. Means -- I real -- in regulatory we have -- we
25 have project managers. It depends what team you're on.

Page 7

1 I'm on the Mitigation Banking Team so I review incoming
2 mitigation banking and in lieu fee projects for folks
3 who are seeking federal approval of those projects.
4    Q. Okay. Just for the record, you said the Army
5 Corps Engineers Jacksonville District. Could you just
6 explain what the Jacksonville District is?
7    A. The Jacksonville District's part of the larger
8 South Atlantic Division. Jacksonville District is its
9 own -- its own entity. We're the largest regulatory
10 division in the country. We have nine offices,
11 including offices in Puerto Rico, in the US Virgin
12 Islands.
13    Q. So is the Jacksonville District -- the -- the
14 District of the Army Corps of Engineers that has
15 responsibility for Peninsula of Florida?
16    A. Correct.
17    Q. Okay. So tell me -- you described for a
18 moment -- a moment ago that you're a project manager
19 and you currently work in the Mitigation Banking Team.
20 Could you describe for me how your personal work
21 relates to the issue of the Clean Water Act
22 jurisdiction?
23    A. Prior to joining the Mitigation Banking Team,
24 I was a project manager for Permitting for
25 11-and-a-half years with the Jacksonville District and

Page 8

1 in that capacity reviewing permit applications for
2 impacts to or work in Section 10, Waters and Impacts
3 to -- wetlands under the 404 of the Clean Water Act.
4    Q. And where did you -- where -- for what part of
5 the state of Florida did you review permit
6 applications?
7    A. The entire state of Florida.
8    Q. Were you in -- in any kind of specialized
9 division or do certain kind of permit applications?
10 Or -- just -- we'll stop there.
11    A. No. All project managers handle all -- all
12 permit actions, whether they're no permit required or
13 general permits, or standard permits.
14    Q. Okay. Let me -- I'll ask a better question.
15    A. Sure.
16    Q. Whenever I worked with folks in the -- in the
17 Corps' Regulatory Division was usually a different
18 office for different parts of the state. And when
19 there's a permit application it's assigned to a
20 specific office. So were you assigned to a specific
21 permitting office within the Jacksonville District?
22    A. I was assigned to multiple permitting offices.
23 I've been assigned to Pensacola, Panama City, Tampa,
24 Jacksonville, Gainesville. And on occasion when
25 workload requires, project managers and other parts of



SHANNON C. WHITE
UNITED STATES V. SHARFI

Page 9

1  the Jacksonville District will take on workload for
2  other offices.  And in that capacity, I've done work
3  for Palm Beach Gardens, Fort Myers, Miami.
4      Q.  Have you ever physically been located in -- in
5  South Florida as part of your work?
6      A.  No.
7      Q.  Okay.  Have you, in the -- in the course of
8  your 14-and-a-half years, at your Army Corps of
9  Engineers, Jacksonville District have you had the
10  opportunity to become familiar with the laws that
11  govern Clean Water Act jurisdiction?
12      A.  Yes.
13      Q.  Have you ever read the major Supreme Court
14  decisions that address the scope of Clean Water Act
15  jurisdiction?
16      A.  Yes.
17      Q.  And have you ever read Guidance Memorandum
18  prepared by the Army Corps of Engineers headquarters
19  regarding how to apply those Supreme Court decisions?
20      A.  Yes.
21      Q.  So for instance, have you read the 2008
22  so-called Rapanos guidance memo before?
23      A.  Yes.
24      Q.  Have you read the 2003 so-called SWANCC
25  guidance memo?

Page 10

1      A.  Yes.
2      Q.  (Audio interruption) testified as an expert
3  witness before regarding this (audio interruption)
4  Water Act?
5      A.  No, I have not.
6      Q.  All right.  What I'd like to do is I'm going
7  to put up some exhibits.  I'm going to put them up on
8  the screen and -- and so it'll just take a minute each
9  time I do it.  So let me start with the first one.
10      So Ms. White, I just put up on the screen what
11  I previously marked as deposition Exhibit 242.  This is
12  defendant's Notice of Taking Deposition.  Do you see
13  that there?
14      (Defendants' Exhibit 242 was marked for
15  identification.)
16      THE WITNESS:  Yes, I can.
17  BY MR. MCALILEY:
18      Q.  Okay.  Let me try to zoom in a little bit, see
19  if that helps some, okay?  That help a little bit to
20  see it?
21      A.  Yes.
22      Q.  Okay.  And you see that this is the notice for
23  today's deposition and it -- and it indicates that
24  the -- that the deponent is the 30B6 designee of the
25  U.S. Army Corps of Engineers as to the matters for

Page 11

1  examination listed below.  Do you see that?
2      A.  Yes.
3      Q.  So do you understand that this is a notice for
4  a deposition not of you personally but a notice for the
5  deposition of the Army Corps of Engineers itself?
6      A.  Yes.
7      Q.  Are you here to testify on behalf of the U.S.
8  Army Corps of Engineers regarding the matters
9  identified in this notice?
10      A.  Yes.
11      Q.  So just to be clear for the -- and this is for
12  the -- the transcript, Ms. White, when I refer to you,
13  unless I specifically say otherwise, I'm referring to
14  the Army Corps of Engineers, just to -- because it can
15  be confusing sometimes when you have an individual
16  person speaking for an organization.
17      On this -- hold on a second.  So in Deposition
18  Exhibit 242, it -- it lists the matters for
19  examination.  So I'm scrolling down, it's the bottom of
20  the first page, and -- and I'll just read it aloud.
21      It's with the -- there's asterisks and it says
22  the 30B6 designee of the United States Army Corps of
23  Engineers pursuant to order granting joint motion for
24  approval of parties stipulation regarding depositions
25  dated June 14, 2022, should be prepared to testify to

Page 12

1  the matters for examination as follows.
2      A, the criteria and factors considered by the
3  U.S. Army Corps of Engineers Jacksonville District in
4  determining whether a wetland is isolated.  B, the U.S.
5  Army Corps of Engineers determinations of Clean Water
6  Act jurisdiction in connection with the following
7  matters.  And it lists three matters: SAJ-2004-2914,
8  SAJ-2014-2167, and SAJ-2015-3711.
9      Did -- did I read that basically, correct?  I
10  know I left out a few words and numbers there, but
11  did -- did I read that basically correctly?
12      A.  Yes.
13      Q.  So you understand that these are the -- these
14  are the matters for the deposition today on which you
15  are going to testify on behalf of the Army Corps of
16  Engineers, right?
17      A.  Yes.
18      Q.  Now, are you aware -- so are you aware that
19  30B6 refers to the section of the -- the Federal Rules
20  of Civil Procedure that several -- that's Federal Rules
21  of Civil Procedure 30B6?
22      A.  Could you ask the question again?  I'm sorry.
23      Q.  You see -- you see on Exhibit 242, there's a
24  reference to the 30B6 designee of the Army Corps?
25      A.  Yes.



SHANNON C. WHITE
UNITED STATES V. SHARFI

June 22, 2022
13–16

Page 13

1    Q.  Do you understand 30B6 refers to a section of
2   the -- of the Federal Rules of Civil Procedure?
3    A.  Yes.
4    Q.  And are you aware that that rule provides that
5   the persons designated to testify for an organization,
6   must testify about information known or reasonably
7   available to the organization?
8    A.  Yes.
9    Q.  So you understand that you're not here to
10  testify just based on your own personal knowledge,
11  right?
12   A.  Yes.
13   Q.  In this case, you testifying about information
14  known or reasonably available to the U.S. Army Corps of
15  Engineers, right?
16   A.  Yes.
17   Q.  So Ms. White, what steps did you take to
18  gather information known or reasonably available to the
19  Army Corps of Engineers regarding the matters for
20  examination on this notice?
21   A.  I reviewed the documents that were provided
22  during -- I believe it's called discovery to -- to you.
23  And I had a meeting with our counsel prior to the
24  deposition.  And also spoke with both project managers
25  involved in the three projects listed below.

Page 14

1    Q.  Okay.  Anything else?
2    A.  I reviewed a few documents, some of our
3   guidance documents, our regulatory JD guidebook from
4   2007, regulatory guidance letters, 0701, 0502, 1601,
5   0802 and the memorandum for agreement between the EPA
6   and the Army Corps of Engineers for determining
7   geographic jurisdiction in section 404.
8    Q.  Is that last memorandum for agreement between
9   the Army Corps and EPA, what's the date of it?
10   A.  1993, I believe.  It was 1998 and I believe it
11  was amended in '93.
12   Q.  Okay.  So that memorandum of agreement
13  predates the so-called SWANCC decision, right?
14   A.  It does.  And -- yes, it does.
15   Q.  Ms. White, you said you spoke with both
16  project managers who worked on specific projects that
17  are listed in the deposition notice.  Who are these
18  project managers?
19   A.  Alisa Zarbo and Virginia King [phonetic].
20   Q.  Do they still work for the Corps?
21   A.  They do.
22   Q.  Okay.  Am I right that you have no personal
23  knowledge of -- of the permitting for those three
24  matters?  Those three specific permits that are -- that
25  are listed in the deposition notice.

Page 15

1    MR. ADKINS:  Objection.  Vague.
2   BY MR. MCALILEY:
3    Q.  So ma'am, when -- when there's an objection by
4   your counsel (audio interruption) you're directed not
5   to answer, you can go ahead and answer.  If you want,
6   you can also ask me to repeat the question or try to,
7   you know, rephrase it if you'd like.
8    A.  Can you rephrase the question?
9    Q.  Sure.  You weren't personally involved in the
10  permitting of those three projects that are listed in
11  the matters for examination, which I've marked as
12  deposition Exhibit 242 were you?
13   A.  No, I was not.
14   Q.  So your knowledge about these specific
15  projects is limited to reviewing documents and speaking
16  with the -- the two individuals that the Corps who
17  actually were involved with these projects, right?
18   A.  That's correct.
19   Q.  How did -- how did you end up as the -- as the
20  representative of the Corps today in this deposition?
21  Do you know?
22   A.  I was asked by Mr. Moore.
23   Q.  Okay.  Do you know why?  Without -- without
24  telling me your conversation with Mr. Moore, I don't
25  want to know your conversation but do you know why you

Page 16

1   were picked?
2    A.  Likely, my -- my background and as a national
3   instructor for a variety of courses pertaining to Army
4   Corps of Engineers Regulatory -- the Regulatory
5   Divisions, experience in the Jacksonville District and
6   experience with approved jurisdictional and preliminary
7   jurisdictional determinations in the state of Florida,
8   I imagine.
9    Q.  Okay.  So tell me about your background as an
10  instructor when it comes to issues related to
11  jurisdiction.
12   A.  So my background as an instructor, I'm on --
13  I'm an instructor for a variety of regional teams for
14  the Army Corps of Engineers.  So we -- we identify and
15  delineate wetlands.  And -- and then we also do
16  jurisdiction.  So for the Atlantic Gulf Coastal Plain,
17  Caribbean Islands, Hawaiian Islands, I'm an instructor
18  for hydric soils.
19      I'm a national instructor for advanced
20  delineation.  I'm a national instructor in the
21  Jacksonville District.  I am a member of the
22  Jurisdictional Determination Project Delivery team.
23  It's a team of senior project managers who assist other
24  project managers in the district with complicated
25  jurisdictional determinations.



SHANNON C. WHITE
UNITED STATES V. SHARFI

June 22, 2022
17—20

Page 17

1   Q.  How did you become an instructor in -- and be
2   a member of the PDT on those issues?  What was it
3   that -- that led you to become a member to do those
4   things?
5       A.  Corps headquarters sent out an e-mail to all
6   regulatory staff soliciting interest in availability to
7   participate in the national training teams.  I
8   submitted my resume and my statement of interest and
9   was selected from a pool of candidates to participate
10  on a variety of those teams.  For the PDT within our
11  district, I was selected by senior leadership.  I -- I
12  did not volunteer.  I was -- I was selected and asked
13  based on past work product, I imagine.
14      Q.  Sort of like today, I bet, right?  So let me
15  (audio interruption) when did you start your -- your
16  work as one of -- let me -- let me rephrase that.  So
17  when approximately was it that you remember getting
18  that e-mail from Corps headquarters that was sent out
19  to the regulatory division, asking for people we'd want
20  to become an instructor?
21      A.  It was 2017.
22      Q.  Okay.  So you've been -- you've been
23  instructor since 2017.  Is that fair to say?
24      A.  Yes.
25      Q.  Did you receive any kind of specialized

Page 18

1   training so that you could -- you could become an
2   instructor?
3       A.  Yes.
4       Q.  And what was that training?
5       A.  My -- my undergraduate and -- and master's
6   programs.  My undergraduate is in marine and coastal
7   resources and soil science.  And my master's is in soil
8   and water science.
9       Q.  Where did you get your undergraduate degree
10  from?
11      A.  North Carolina State University.
12      Q.  What year?
13      A.  2003.
14      Q.  And when did -- you where did you get your
15  master's degree from?
16      A.  The University of Florida.
17      Q.  And when did you receive a your -- your
18  master's from UF?
19      A.  2005.
20      Q.  And -- and am I right that after you graduated
21  the University of Florida, that's when you started
22  working at Army Corps of Engineers?
23      A.  No.  I started working with the St. Johns
24  River Water Management District.  I worked for the
25  Water Management Dic -- District for three-and-a-half

Page 19

1   years before joining the Corps.
2       Q.  Okay.  Have you ever had your deposition taken
3   before?
4       A.  No, I have not.
5       Q.  Okay.  So let's -- why don't we change
6   directions a little bit from sort of the background and
7   why we're here.  Let -- let me just start with some
8   basics related to the Clean Water Act.  So we're
9   absolutely common language and ask you some questions
10  here.  So am I right that the Clean Water Act governs
11  the discharge of pollutants to the "navigable waters?"
12      A.  Which -- which section of the Clean Water Act?
13      Q.  Any section.  The Clean Water -- any section.
14      A.  So for purposes -- okay.
15      Q.  Let me rephrase it.  Maybe I -- maybe I
16  understand what your issue is.  For everything other
17  than discharges subject to the Oil Pollution Act --
18  sections of the Clean Water Act.  Am I right that the
19  Clean Water Act governs discharges of pollutants to the
20  "navigable waters?"
21      A.  Well, there's a difference between navigable
22  waters and waters of the US.
23      Q.  Okay.  What -- what is the difference?
24      A.  So navigable waters are governed under Section
25  10 of the Rivers and Harbors Act.  And waters of the US

Page 20

1   are Clean Water Act.  So waters of the US are variety
2   of different things.  They can be traditionally
3   navigable waters in territory seas, they can be
4   wetlands, they can be tributaries, that can be -- they
5   can be impoundments.
6       Where navigable waters -- well, it's two
7   different -- it's two different jurisdictions.  It's
8   two different -- it's two different rules.
9       Q.  I understand why you're -- let me -- let me be
10  more precise.  I'm not asking you about the Rivers and
11  Harbors Act.  The Rivers and Harbors Act was passed in
12  1899, correct?
13      A.  Yes.
14      Q.  Okay.  The Rivers and Harbors Act only
15  regulates discharges to traditional navigable waters,
16  right?
17      A.  Correct.
18      Q.  Okay.  So my question was about the Clean
19  Water Act.  Clean Water Act was passed in 1972, right?
20      A.  Correct.
21      Q.  Okay.  And so the Clean Water Act, if you look
22  at the actual words in the statute, it prohibits the
23  discharge of pollutants to the navigable waters, except
24  pursuant to a permit; is that right?
25      A.  That's correct.



SHANNON C. WHITE
UNITED STATES V. SHARFI

June 22, 2022
21–24

Page 21

1    Q.  And -- and in the Clean Water Act, the term
2  navigable waters is defined, to me, the waters of the
3  United States including the territorial seas, right?
4    A.  Correct.
5    Q.  So you would agree with me that not all
6  wetlands are part of the waters of the United States,
7  right?
8    A.  That's correct.
9    Q.  So some wetlands are regulated under the Clean
10  Water Act, correct?
11    A.  Yes.
12    Q.  But some wetlands are not regulated under the
13  Clean Water Act, right?
14    A.  That's correct.
15    Q.  And that's true in Martin County, Florida too,
16  by the way.  There's some wetlands in Martin County
17  that are not subject to the Clean Water Act's
18  jurisdiction, right?
19    MR. ADKINS:  Objection.
20    THE WITNESS:  Martin -- thank you.
21  BY MR. MCALILEY:
22    Q.  You can answer the question.
23    A.  Can I answer the question if there has been an
24  objection?
25    Q.  You can, unless your counsel directs you not

Page 22

1  to answer, you can answer the question.  When they
2  object they are doing it for the record.
3    MR. ADKINS:  Well, my -- my objection is that
4  she lacks foundation.  So, I mean, if she knows she can
5  answer, but -- I mean, that hasn't been established
6  yet.
7  BY MR. MCALILEY:
8    Q.  Okay.  So I'm going to -- I'm going to
9  rephrase the question.  How many permit applications
10  have you handled that address properties in Martin
11  County, Florida?
12    A.  One.
13    Q.  Okay.  Am I right that there are -- that the
14  Corps of Engineers does not regulate all wetlands as
15  part of the waters at United States in Martin, Florida?
16    A.  I don't know that that's specific to Martin
17  County.
18    Q.  I'm just asking about Martin County, ma'am.
19    A.  I imagine there are wetlands we regulate and
20  regul -- and wetlands we don't regulate in Martin
21  County.
22    Q.  All right.  So just because something's a
23  wetland in Martin County doesn't mean that the Corps of
24  Engineers regulates it under the Clean Water Act,
25  correct?

Page 23

1    MR. ADKINS:  Objection.  Foundation.  You can
2  answer.
3    THE WITNESS:  Could you restate the question?
4  BY MR. MCALILEY:
5    Q.  Just because something is a wetland in Martin
6  County, Florida, doesn't mean that the Corps of
7  Engineers regulates it under the Clean Water Act
8  correct?
9    A.  Yes.
10    Q.  So am I -- am I right, Ms. White, that the
11  Army Corps of Engineers has promulgated regulations
12  since the 1970s that define the waters of the United
13  States?
14    A.  Yes.
15    Q.  And am I right that the Army Corps of
16  Engineers has promulgated several different sets of
17  regulations, since the 1970s, that define the waters of
18  United States?
19    A.  Yes.
20    Q.  So I just want to go through the basics here
21  so we're on the same page.  Am I right, Ms. White, that
22  the Army Corps of Engineers promulgated a regulation in
23  1986 that defines the waters of the United States?
24    A.  Yes.
25    Q.  And am I right that the Army Corps, during the

Page 24

1  Obama administration, promulgated a new definition of
2  the waters in the US?
3    A.  Yes.
4    Q.  And that regulation from the Obama
5  administration was ultimately vacated, wasn't it?
6    A.  I'm trying to remember.  I don't recall.
7    Q.  Do you think the Obama administration
8  regulation defining the waters of the US is still in
9  effect today?
10    A.  Oh, no.
11    Q.  Okay.  It was -- it was vacated, wasn't it?
12  It's no longer in effect.
13    A.  That's correct.
14    Q.  Am I right that the Army Corps of Engineers
15  during the Trump administration promulgated a new
16  definition of the waters in the US?
17    A.  Yes.
18    Q.  And that Trump administration regulation
19  included fluer -- fewer waters within the definition of
20  the waters of the US as compared to prior regulations.
21  Would that be fair to say?
22    MR. ADKINS:  Objection.  Lacks foundation.
23  Vague.
24  BY MR. MCALILEY:
25    Q.  You can answer.



SHANNON C. WHITE
UNITED STATES V. SHARFI

June 22, 2022

25–28

Page 25

1    A. The navigable waters protection rule under the
2  last administration was different than -- than previous
3  rules.
4    Q. So the navigable water protection rule is the
5  name of the Trump administration's regulation defining
6  the waters of the US, right?
7    A. Correct.
8    Q. And that rule was different than prior
9  regulations defining waters in the United States,
10  right?
11    A. It had differences.  Yes.
12    Q. Okay.  And those differences resulted in fewer
13  waters being regulated as parts of the waters in the
14  United States; isn't that correct?
15    MR. ADKINS:  Objection.  Lacks foundation.
16  BY MR. MCALILEY:
17    Q. Ms. White, there's a -- there's a pending
18  question.  Are you still thinking about -- about how to
19  answer?
20    A. And the question was, did the Navigable Waters
21  Protection Rule result in --
22    Q. Fewer --
23    A. -- fewer waters that are regulated?
24    Q. Yes.
25    A. The answer is it depends.

Page 26

1    MR. ADKINS:  Same objection.
2  BY MR. MCALILEY:
3    Q. Okay.  Now, we're currently in the Biden
4  administration, right?
5    A. Yes.
6    Q. Okay.  Joe Biden is the president, right?
7    A. Yes.
8    Q. Okay.  The Biden administration did a study
9  that determined that the Navigable Waters Protection
10  Rule regulated fewer wetlands and -- and other waters
11  of the United States as compared to other regulations;
12  isn't that right?
13    A. I have not read that report.
14    Q. So you don't know?
15    A. I've not read the report.
16    Q. Okay.  So you're not aware, Ms. White, that
17  it's this administration's position that the Navigable
18  Waters Protection Rule regulated fewer wetlands than
19  prior regulations defining the waters in the US?
20    MR. ADKINS:  Objection.  Asked and answered.
21  Lacks foundation.
22    Ms. White, there is a pending question and if
23  you have an answer, you can answer, not withstanding
24  the objection.
25    THE WITNESS:  Sure.  So the question -- I'm

Page 27

1  sorry, I lost track of the question.
2  BY MR. MCALILEY:
3    Q. Just let the record to reflect that you've
4  been thinking for more than a minute here about the
5  answer.  So Ms. White, you -- you said that you've been
6  working for the Army Corps of Engineers in the
7  Regulatory Divisions for (audio interruption) --
8    THE REPORTER:  I'm sorry, Counsel, you broke
9  up.
10  BY MR. MCALILEY:
11    Q. Yeah.  And Ms. -- Ms. White, you testified
12  that you've been working at the Regulatory Division of
13  the Army Corps of Engineers for 14-and-a-half years; is
14  that right?
15    A. Yes.
16    Q. And during your time in the regulatory
17  division, you had to apply the different regulations
18  that were in effect at different times that would
19  define the waters of the US, correct?
20    A. Yes.
21    Q. So you had to apply the regulation that was
22  adopted in the 1980s, correct?
23    A. I started with the Corps in 2008.
24    Q. Okay.  And in 2008, the regulation that was in
25  effect was the one promulgated by the Army Corps of

Page 28

1  Engineers in 1986, right?
2    A. Yes.
3    Q. Okay.
4    A. And it was also -- go ahead.
5    Q. Okay.  And that regulation, by the way,
6  applies today as well, doesn't it?
7    A. Yes.
8    Q. Okay.  And you were also working in the
9  regulatory division of the Army Corps when the Obama
10  administration's Clean Water Rule wasn't active, right?
11    A. Yes.
12    Q. Okay.  And that was enjoined almost
13  immediately by a court and never came into effect in
14  Florida; isn't that right?
15    A. That's actually --
16    MR. ADKINS:  Objection.  Lacks foundation.
17    THE WITNESS:  That's actually not true.
18  BY MR. MCALILEY:
19    Q. Okay.
20    A. It was in effect in Florida for maybe -- maybe
21  a month, maybe two before.
22    Q. Did you -- did you, Ms. White, in your work in
23  the regulatory division, ever have permit applications
24  during the time of the Obama administration regulation
25  is in effect?



SHANNON C. WHITE
UNITED STATES V. SHARFI

June 22, 2022
29–32

Page 29

1    A. Yes.
2    Q. Okay. After -- and you also worked at the
3  Corps of Engineers in the regulatory division when the
4  Trump administration regulation was in effect. That's
5  the so-called Navigable Waters Protection Rule, right?
6    A. Yes.
7    Q. So -- so Ms. White, you know, from your own
8  experience that the Navigable Waters Protection Rule
9  regulated fewer wetlands in Florida than the prior
10 regulations, don't you?
11       MR. ADKINS: Objection. Lacks foundation.
12 Asked and answered.
13       THE WITNESS: The answer is it depends.
14 Depends on the project site. And it depends to the
15 waters identified in that project site to whether we
16 regulate more or less.
17 BY MR. MCALILEY:
18   Q. So Ms. White, am I right that the Biden
19 administration has proposed a new regulation that would
20 define the waters in the US?
21   A. Yes.
22   Q. That regulation has not yet been finalized,
23 has it?
24   A. It has not.
25   Q. So it's not in effect, is it?

Page 30

1    A. No, it is not.
2    Q. So I'd asked you earlier about Supreme Court
3  decisions so have -- have you -- have you read the
4  Supreme Court case that's named Solid Waste Authority
5  of Northern Cook County versus Army Corps of Engineers
6  that was decided in 2001?
7    A. Yes.
8    Q. So I'm going to -- just -- just for sure, I
9  may refer to that as the SWANCC case, based on the
10 acronym S-W-A-N-C-C. So Ms. White, am I right that --
11 that SWANCC case addressed whether isolated waters are
12 part of the waters the United States, didn't it?
13   A. Yes.
14   Q. And -- and have you read the -- the 2006
15 Supreme Court case that's called Rapanos versus United
16 States?
17   A. I have.
18   Q. And that -- and that Rapanos case addressed
19 whether adjacent wetlands are part of the waters in the
20 United States, right?
21   A. Yes, it does speak to adjacency.
22   Q. All right. So let me -- let me go through
23 some basics here. So is the term adjacent defined in
24 the 1986 Army Corps (audio interruption)?
25   A. Yes.

Page 31

1    Q. What is an adjacent wetland?
2    A. It's a wetland that's abutting, bordering, or
3  neighboring?
4    Q. Am I right, Ms. White, that the Army Corps of
5  Engineers asserts Clean Water Act jurisdiction over
6  most adjacent wetlands?
7    A. It depends.
8    Q. So what does it depend on?
9    A. So under current guidance, if the wetland --
10 it depends -- it depends what the wetland is abutting
11 or adjacent to, whether it's a traditionally navigable
12 water, or a relatively permanent water, or a
13 non-relatively permanent water. And then it also
14 depends how it's adjacent, is it abutting, is it
15 neighboring, or is it bordering? So the answer is, it
16 depends.
17   Q. Okay. I want to focus here on -- let me go
18 through some of these terms you just used. What do you
19 mean by a reasonably permanent water?
20   A. Relatively permanent water.
21   Q. Okay.
22   A. Relatively -- I'm -- I apologize. Relatively
23 permanent water.
24   Q. What does that mean?
25   A. It means a water that has continuous either

Page 32

1  perennial or seasonal flow for at least three months
2  out of the year.
3    Q. What is a non-relatively permanent water?
4    A. Typically in a femoral feature.
5    Q. What does femoral mean?
6    A. Femoral means it's typically precipitation
7  driven. It's a water body that -- that doesn't have
8  continuous or seasonal flow. Maybe only flows a short
9  period of the time through the year.
10   Q. So am I right the word of femoral means that
11 it basically flows after it rains?
12   A. Or after --
13       MR. ADKINS: Objection.
14       THE WITNESS: I'm sorry.
15 BY MR. MCALILEY:
16   Q. Or after what? I didn't -- I didn't hear that
17 last part.
18   A. Precipitation, not just rainfall.
19   Q. Okay. The only precipitation wet get in
20 Florida is rain, right?
21   A. Last I checked, yes.
22   Q. Okay.
23   A. Well, that's not true. It -- I think they
24 had -- they had snow in the Panhandle last year.
25   Q. I'm a South Florida guy and the jury is going



SHANNON C. WHITE
UNITED STATES V. SHARFI

June 22, 2022
33–36

Page 33

1   to be in Fort Pierce, Florida.  To your knowledge, has
2   it ever snowed in Fort Pierce, Florida in the last 50
3   years?
4       A.  Not that I'm aware of.
5       Q.  What does it mean for a wetland to be
6   abutting?
7       A.  Directly touching traditionally navigable
8   water or another -- another water.
9       Q.  Now, what do you mean by directly touching?
10      A.  Hydrologically connected.  So water -- surface
11  water from that wetland directly discharges into
12  another water.
13      Q.  What do you mean by directly discharge?
14      A.  By surface flow.
15      Q.  Okay.  What does it mean to be neighboring?
16      A.  So you have abutting, bordering and
17  neighboring.
18      Q.  Okay.
19      A.  Bordering and -- and neighboring, typically
20  there's some sort of feature that separates the -- the
21  wetland from the water.  It might be in a -- like in a
22  riverine system, you may have an natural levee that
23  forms as -- in the floodplain, as the river comes up
24  and discharges water onto the floodplain.  You may have
25  a river, a natural levee and then back water wetlands.

Page 34

1       If there's just one levee that's been created
2   over time and then you have a wetland on the other
3   side, we would call that bordering.  If there are
4   multiple natural levees, for instance, on the Peace
5   River, we see this that we've had many flood events
6   over time and so you have many natural levees.  And
7   there's wetlands in between each of those levees, but
8   it's all in the floodplain of the Peace River.
9       Then we would consider those other wetlands
10  that are separated by more than one natural feature
11  neighboring.  Typically neighboring wetlands tend to be
12  in the same floodplain of the TNW or the RPW.
13      Q.  Is it your -- is it the Army Corps of
14  Engineers position that all wetlands in the same
15  floodplain are neighboring wetlands?
16      MR. ADKINS:  Objection.  Vague.
17      THE WITNESS:  Could you ask the question in a
18  different way?
19  BY MR. MCALILEY:
20      Q.  Sure.  You've read the Obama administration
21  Clean Water Rule, didn't you?
22      A.  Yes.
23      Q.  That rule says that all wetlands that are in
24  the same floodplain as (audio interruption) are
25  considered to be neighboring and therefore

Page 35

1   jurisdictional, right?
2       A.  Yes.
3       Q.  That regulation was rescinded and is no longer
4   in effect; isn't that true?
5       A.  That is true.
6       Q.  It's not the Army Corps of Engineer's position
7   today that a -- a wetland is neighboring a traditional
8   navigable water, simply based upon the fact that it's
9   located in the same floodplain as that -- as that
10  water, am I right?
11      MR. ADKINS:  Objection.  Vague.
12      THE WITNESS:  When the Army Corps of Engineers
13  is determining adjacency whether it's abutting,
14  bordering, or neighboring we use a variety of resources
15  to make that determination.  Floodplain mapping is just
16  one of those tools that we would use to determine if a
17  wetland is considered adjacent or not.
18  BY MR. MCALILEY:
19      Q.  Okay.  Is -- is the mere fact that a wetland
20  is in the same floodplain as a traditional navigable
21  water enough for the Corps of Engineers to determine
22  that that -- that that wetland is neighboring and
23  therefore is within the Corps' jurisdiction?
24      A.  Every project and every jurisdictional
25  determination that the Corps makes is project specific,

Page 36

1   is site specific.  So the answer is, it depends.
2       Q.  So you're telling me that the mere fact that
3   a -- okay.  Let me -- let me rephrase this.  So every
4   determination about whether a wetland is within the
5   Corps of Engineers Clean Water Act jurisdiction is a --
6   is a site specific determination, right?
7       A.  Yes.
8       MR. ADKINS:  Objection.
9   BY MR. MCALILEY:
10      Q.  You just can't generalize on this, about just
11  say, all wetlands are jurisdictional based on this or
12  that factor.  Is it fair to say?
13      MR. ADKINS:  Objection.  Vague.
14      THE WITNESS:  Can you ask your question in a
15  different way?
16  BY MR. MCALILEY:
17      Q.  Well, I mean, you -- you're not -- you can't
18  say it -- just as a blanket matter, the mere fact
19  that -- let me rephrase this.  You're not -- it -- it's
20  not the Corps of Engineers position that -- that all
21  wetland in the same floodplain as a traditional
22  navigable water are -- are automatically subject to
23  Clean Water Act jurisdiction, right?  You'd have to
24  look at some specific factor in that wetland to make
25  the determination?



SHANNON C. WHITE
UNITED STATES V. SHARFI

June 22, 2022
37—40

Page 37

1     MR. ADKINS:  Objection.  Compound, vague,
2  asked and answered.
3     THE WITNESS:  For each jurisdictional
4  determination that we make, we look at the site, the
5  waters within the site and a variety of other resources
6  to determine jurisdiction.  It's not typically based on
7  one piece of information, it's based on multiple pieces
8  of information that either support a jurisdictional
9  call or don't support a jurisdictional call.
10 BY MR. MCALILEY:
11    Q.  Okay.  So just that one piece of information,
12 the wetland is located in the same floodplain as a
13 traditional navigable waters, would not be enough in
14 every case for the Corps of Engineers to determine that
15 that wetland is jurisdictional; is that fair?
16    MR. ADKINS:  Objection.  Vague.  Incomplete
17 hypothetical.
18    MR. MCALILEY:  Okay.  Stop coaching the
19 witness, sir.  I don't -- I don't need your -- you --
20 you preserve your objection by objecting to form.
21 That's -- that's the local rule in the Southern
22 district of Florida.  Thank you.
23 BY MR. MCALILEY:
24    Q.  Ms. White, you can answer the question.
25    A.  I would say that floodplain mapping is

Page 38

1  certainly one of the components that the Corps looks at
2  but often not the only component in making a
3  jurisdictional determination.
4     Q.  So Ms. White, if I was to show you, let's say
5  a floodplain map in Martin County, Florida and there
6  was a wetland shown on the map that didn't have -- it
7  was located some distance away from a traditional
8  navigable water.
9        And there was no visible evidence on the map
10 that there was a surface connection between that
11 wetland and the traditional navigable water.  But you
12 knew that that wetland was located in the 100-year
13 floodplain.  Would you be able to determine whether or
14 not that wetland was jurisdiction just based on that
15 information?
16    A.  I would not make a jurisdictional
17 determination based on a single piece of information.
18 We would need more information about the site than a
19 floodplain map.
20    Q.  Right.  It wouldn't be reliable to determine
21 jurisdiction just based on looking at a floodplain map,
22 right?  You'd need a lot more information.
23    MR. ADKINS:  Objection.  Vague.
24    THE WITNESS:  It would depend on the type of
25 jurisdictional determination that was being asked for,

Page 39

1  whether it was an approved jurisdictional determination
2  or preliminary jurisdictional determination.  It would
3  also depend on the nature of the project, whether it
4  was a no permit required request, or general permit, or
5  standard permit.
6     So again, the answer depends on what sort of
7  jurisdictional determination is being requested.  And
8  what associated permit action is being asked for as
9  well, if there is -- if it's not a stand alone
10 jurisdictional determination.
11 BY MR. MCALILEY:
12    Q.  Does the Corps of Engineers Jacksonville
13 District apply different criteria for determining
14 whether a wetland is jurisdictional or not, depending
15 upon the type of jurisdictional determination that's
16 being requested?
17    A.  Yes.
18    Q.  Really?  Okay.  So tell me, explain to me
19 how -- explain to me what are the different criteria
20 that the Corps of Engineers applies to determine
21 whether a wetland is jurisdiction depending upon the
22 type of jurisdictional determination requested.
23    A.  So for a preliminary jurisdictional
24 determination It's -- it's non -- it's not an official
25 determination.  It says that there's -- there may or

Page 40

1  may not be -- or there -- there may be waters of the US
2  and so it's -- it's not legally binding.  It doesn't
3  determine jurisdiction.
4     And so an applicant in the state of Florida or
5  anywhere in the country, in fact, under Regal 1601, an
6  applicant can request either a preliminary
7  jurisdictional determination or an approved
8  jurisdictional determination.  And so for preliminary
9  jurisdictional determination, it's not a -- it's not a
10 legally binding jurisdiction.  We're saying there may
11 be waters of the US on your site.
12    An applicant may choose that -- that route
13 because it may be in their best interest to do so.
14 They may say, you know what?  I -- I don't have an
15 issue with you saying these, you know, for purposes of
16 permitting, for instance, you know, I don't have a --
17 an issue with these being waters of the US.  I want to
18 expedite the permitting process where -- I would like
19 to go with the preliminary jurisdictional
20 determination.
21    And so a preliminary jurisdictional
22 determination can be used to determine the limits of
23 waters on a site, you know, delineate those features.
24 But it's not used to assert jurisdiction.  But an
25 applicant can choose that route to -- to expedite



SHANNON C. WHITE
UNITED STATES V. SHARFI

June 22, 2022
41—44

Page 41

1 permitting if they would -- if they would like to, it
2 doesn't preclude them from coming in at any later time
3 and asking for an approved jurisdictional
4 determination, which is a legally binding document.
5      And there's often more supporting
6 documentation depending on the types of waters on the
7 site. So there is a difference. Because of the
8 differences between a preliminary JD and a -- and an
9 approved JD? So the -- so the answer is it depends on
10 what the applicant is -- is requesting from the court.
11     Q. Okay. So let me make sure I understand this.
12 So when somebody seeks a preliminary jurisdictional
13 determination, the court just identifies where the
14 waters are in the site but doesn't include whether
15 those waters are part of the waters of the United
16 States. Is that fair to say?
17     A. Correct. It's not -- it's -- it's a limit of
18 the waters. It's not a jurisdictional -- an official
19 jurisdictional determination of whether or not those
20 waters are waters of the US
21     I will say for permitting, however, even
22 though the preliminary jurisdictional determination
23 does not -- is not the same as an approved
24 jurisdictional determination and it is not legally
25 binding for purposes of permitting and -- and figuring

Page 42

1 out impacts and compensatory mitigation requirements.
2 A PJD does treat all waters on that site as -- as if
3 they were jurisdictional, even though an official
4 determination has not been made.
5     Q. I understand. All right. That -- that's
6 clear to me. So a preliminary jurisdictional
7 determination will basically delineate wetlands on a
8 property and simply assumes that they're part of the
9 waters of the United States, but it doesn't
10 definitively determine that; is that right?
11     A. That's correct.
12     Q. And so an approved jurisdictional
13 determination is where the Corps would take it to the
14 next step and determine not only where the boundaries
15 of the wetlands or on the site but whether those
16 wetlands are part of the waters of the US, right?
17     A. Correct.
18     Q. Okay. Am I -- am I right that the Army Corps
19 of Engineers only asserts Clean Water Act jurisdiction
20 in approved jurisdictional determinations over adjacent
21 wetlands, as opposed to other wetlands?
22     MR. ADKINS: Objection. Vague.
23     THE WITNESS: An approved jurisdictional
24 determination is the only jurisdictional determination
25 where we -- we either assert or don't assert

Page 43

1 jurisdiction over waters of the US.
2 BY MR. MCALILEY:
3     Q. Okay. Let me rephrase that, I think that was
4 an awful question. So I'm trying to understand -- I'm
5 focusing now on wetlands and whether wetlands are part
6 of the waters the United States. Am I right that the
7 Corps of Engineers only asserts jurisdiction over
8 wetlands that are deemed to be adjacent wetlands?
9     A. No.
10     Q. Okay. What wetlands that are not adjacent
11 wetlands does the Corps of Engineers assert
12 jurisdiction over in Florida?
13     A. We can assert jurisdiction over wetlands that
14 are isolated if there is a tie to interstate commerce
15 that we can support and demonstrate.
16     Q. Okay. So Ms. White, isn't it true that in
17 order for a -- the Jacksonville District to assert
18 jurisdiction over a -- an isolated wetland it would
19 need the -- the approval of agency headquarters?
20     A. That's correct.
21     MR. ADKINS: Objection. Vague.
22 BY MR. MCALILEY:
23     Q. How many times have you gotten approval from
24 Corps headquarters to assert jurisdiction over an
25 isolated wetland? You personally.

Page 44

1     MR. ADKINS: Objection. Vague.
2     THE WITNESS: I have not made an isolated
3 call.
4 BY MR. MCALILEY:
5     Q. Okay. You have read the so-called SWANCC
6 guidance that was issued by the Corps headquarters in
7 2003, I believe it is, that it -- that interpreted the
8 SWANCC decision, right?
9     A. Yes, I have.
10     Q. And the SWANCC guidance (audio interruption)
11 that the Corps of Engineers authority to assert
12 jurisdiction over isolated waters based upon their
13 effect on interstate commerce is now in legal question
14 after the Supreme Court decision, right?
15     MR. ADKINS: Objection. Vague.
16     THE WITNESS: I believe that SWANCC decision
17 speaks to things being -- wetlands being a waters of
18 the US being regulated solely on the migratory bird
19 rule. So the use of these features by migratory bird
20 species.
21 BY MR. MCALILEY:
22     Q. Is the SWANCC guidance that was issued by
23 Corps headquarters in 2003 still in effect?
24     A. Yes.
25     Q. Okay. I haven't -- I'm -- I want to show



SHANNON C. WHITE
UNITED STATES V. SHARFI

June 22, 2022
45—48

Page 45

1  you -- I'm going to show it to you.  So we'll mark this
2  as Exhibit 243.
3       (Defendants' Exhibit 243 was marked for
4  identification.)
5  BY MR. MCALILEY:
6       Q.  Can you see on your screen the Federal
7  Register Notice from January 15th of 2013?
8       A.  Yes.
9       Q.  Okay.  And it indicates on there, "Advanced
10  notice of proposed rule making on the Clean Water Act
11  regulatory definition of waters in the United States."
12  Do you see that?
13       A.  Yes, I do.
14       Q.  Are you aware that the -- that the Army Corps
15  of Engineers in EPA published the SWANCC guidance by
16  attaching it to notice in the Federal Register?
17       A.  Yes.
18       Q.  Okay.  I'm going to scroll down.
19       MR. ADKINS:  Will this be an exhibit?
20       MR. MCALILEY:  Yes.  It's 243.
21       MR. ADKINS:  Okay.
22  BY MR. MCALILEY:
23       Q.  So I'm now on Page 1993 of the Federal
24  Register and I've highlighted some language there.  You
25  see -- and I'll read the language aloud.  "SWANCC

Page 46

1  eliminates Clean Water Act jurisdiction over isolated
2  waters that are intrastate, a non-navigable where the
3  sole basis for asserting Clean Water Act jurisdiction
4  is the actual or potential use of the waters as a
5  habitat for mandatory birds across state lines in the
6  migrations."  Did I read that right?
7       A.  Yes.
8       Q.  Is that a true statement in your mind?
9       A.  I don't understand the question.
10       Q.  Do you think that --
11       A.  I mean, it's -- it's a statement.
12       Q.  Is that a correct statement?
13       A.  It's in the Federal Register.  It's -- you
14  read what was stated there.
15       Q.  Okay.  Do you think it's right?  Do you think
16  it's correct?
17       A.  We follow federal regulation.  Our personal
18  opinion has no bearing.
19       Q.  Okay.  So you follow -- you follow the
20  direction in that sentence that I just read, is that
21  fair to say?
22       A.  That's fair.
23       Q.  Okay.  So the Corps of Engineers does not
24  determine whether a wetland is jurisdictional or not
25  based upon actual or potential use of the waters'

Page 47

1  habitat for migratory birds; is that right?
2       A.  That's correct.
3       Q.  Okay.  Look -- look at the next sentence.  It
4  says, and I'll read it aloud.  "SWANCC also calls into
5  question whether CWA jurisdiction or isolated
6  interstate and non-navigable waters could now be
7  predicated on other factors listed in the migratory
8  bird rule or the other rationales of 33 CFR 328.3
9  (a)(3)(i)--(iii)."  Did I read that correctly?
10       A.  You did.
11       Q.  Am I correct, Ms. White, that the provisions
12  of the regulations that are currently in effect, that
13  talk about isolated wetlands being affecting interstate
14  commerce are contained in those sections of the
15  regulation that are cited in this sentence?
16       A.  They are.
17       Q.  Do you have any reason to doubt that this
18  statement is true?
19       A.  Again, not personal.  I -- I have no personal
20  opinion on the matter.
21       Q.  Does the Army Corps of Engineers assert
22  jurisdiction in the Jacksonville District -- let's
23  limit it to the Jacksonville District -- over isolated
24  waters, to your knowledge, after the SWANCC decision in
25  2001, based solely on their potential effects over

Page 48

1  interstate commerce?
2       A.  Under current guidance, we can.
3       Q.  Has it --
4       A.  But that -- but that rational has to be
5  supported and coordinated through headquarters.
6       Q.  To your knowledge, has the Jacksonville
7  District ever actually asserted jurisdiction with
8  approval from headquarters over isolated waters solely
9  based upon their effect on interstate commerce?
10       A.  I'm not sure.
11       Q.  You don't -- you can't think of an example of
12  where that would have -- have happened, right?
13       A.  I am not aware of a decision being made.
14  However, we have 120 regulators in the state of Florida
15  and I am not aware of every action and every JD that
16  has been undertaken.
17       Q.  But you're one of -- you're a national
18  instructor on this topic with the Corps of Engineers,
19  right?
20       A.  A national instructor for wetland
21  identification and delineation, not jurisdictional
22  determinations.
23       Q.  You're on the project delivery team for the
24  Corps for difficult situations of Clean Water Act
25  jurisdiction; isn't that right?



Page 49

1    A. That's correct.  And I've been on that PDT
2  since 2000.
3    Q. And you --
4    A. So previous decisions that were made, I'm
5  not -- I am not privy to or aware of.  So since 2000
6  we -- and keep in mind since 2000, we've also -- we
7  were in navigable waters protection role for a period
8  of time as well.  So during the period of time in which
9  I've been on that JD PDT, I've not seen an isolated
10  call.  That does not mean that there hasn't been one,
11  I'm just not aware.
12    Q. And as we did -- we -- we discussed at the
13  start of deposition, Ms. White, you -- you conducted a
14  reasonable investigation into the facts known to the
15  Army Corps of Engineers on the matters for examination
16  in this deposition, right?
17    A. Yes.
18    Q. And so -- and as -- and as part of your
19  preparation for this deposition, you did not become
20  aware of any instance where the Corps of Engineers
21  asserted jurisdiction over an isolated wetland based
22  upon its potential effects on interstate commerce.  Is
23  that fair to say?
24    A. I did not investigate every approved
25  jurisdictional determination the Jacksonville District

Page 50

1  has done since the Rapanos guidance came into effect.
2    Q. Okay.  But you -- you are not aware of any
3  instance based upon the investigation you did do where
4  the Corps of Engineers asserted jurisdiction over an
5  isolated water in Florida, right?
6    A. Based on the limited scope, I did not -- I am
7  not aware of an isolated call in recent history or with
8  I -- with any of the three projects that are listed in
9  the -- on the list.  Can I -- can I take a -- before
10  you ask another question.  Yeah.  May I ask for --
11    Q. Absolutely.  I could use a break.  Sorry.  I
12  just -- that'd be fine.  You want to take ten minutes?
13  Would that work for you, Ms. White?
14    A. That would be perfect.  Thank you.
15    Q. Okay.
16    THE REPORTER:  Thank you.  Without no
17  objection, we're off record at 10:09 a.m.
18    (A recess was taken.)
19    THE REPORTER:  Please stand by.  Going back on
20  the record at 10:20 a.m.
21  BY MR. MCALILEY:
22    Q. Okay.  All right.  So Ms. White, I was asking
23  you right before the break which -- which types of
24  wetlands the Corps of Engineers asserts jurisdiction
25  over under the Clean Water Act.

Page 51

1    And we just talked about isolated wetlands and
2  whether the Corps of Engineers asserts jurisdiction
3  over isolated wetlands.  Other than isolated wetlands,
4  am I correct with the Corps of Engineers only asserts
5  jurisdiction over wetlands that considers to be
6  adjacent wetlands that's under the Clean Water Act --
7    MR. ADKINS:  Objection.  Objection.  Vague.
8    THE WITNESS:  So the wa -- the Corps can
9  assert jurisdiction over traditionally navigable waters
10  and relatively permanent waters and non-relatively
11  permanent waters, and wetlands that are adjacent and
12  isolated wetlands.
13  BY MR. MCALILEY:
14    Q. All right, let me -- all right.  I want to
15  just put up an exhibit that I'm going to have to mark
16  as Exhibit 244.  This is a copy of the Corps of
17  Engineers Regulations at part -- at -- at 33CFR, part
18  328.
19    (Defendants' Exhibit 244 was marked for
20  identification.)
21  BY MR. MCALILEY:
22    Q. Can you see that on the screen there, ma'am?
23    A. Yes, I can.
24    Q. And do you see what right underneath the table
25  of contents it says, "source." Identifies the Federal

Page 52

1  Register from 1986?
2    A. Yes.
3    Q. So am I right that these are the regulations
4  that are in effect today that govern what the
5  definition are -- are of the waters of the United
6  States?
7    A. Yes.
8    Q. Okay.  So let me -- let's go through your
9  definitions.  You see section 328.3 on the right side?
10  In subsection A it says, "the term waters of the United
11  States means." And has a list.  Okay, let's go
12  through -- so am I right that the only waters over
13  which the Corps of Engineers asserts jurisdiction under
14  the Clean Water Act are waters that are identified in
15  this regulation?
16    A. That's correct.
17    Q. Okay.  Let's start with A1.  "All waters which
18  are currently used or were used in the past or may be
19  susceptible to use in interstate or foreign commerce,
20  including all waters which are subject to the ebb and
21  flow of the tide." Did I read that right?
22    A. Yes.
23    Q. Would you agree to me that this section is
24  commonly referred to as the traditional navigable
25  waters section?



Page 53

1    A. Yes.

2    Q. So these would be waters that -- that you

3  float a boat on, it conduct commerce like with a ship

4  or something, right?

5    A. Yes.

6    Q. Okay. Let's go to number 2.

7    A. Or -- or are tidally influenced.

8    Q. Okay. Or tidally influenced. But you're --

9  you're aware, by the way, Ms. White, that the wetlands

10  at issue in this case are not tidally influenced,

11  right?

12    MR. ADKINS: Objection. Lacks foundation.

13    THE WITNESS: The wetlands in the three

14  jurisdictional determinations that were in the list --

15  BY MR. MCALILEY:

16    Q. No.

17    A. -- are not -- are not fresh -- are not tidally

18  influenced freshwater wetlands.

19    Q. Okay. Well, my question was: Do you know one

20  way or the other whether the wetland at issue in this

21  case, United States versus Sharfi, whether that's a

22  tidally influenced wetland or not?

23    MR. ADKINS: Objection. Scope.

24    THE WITNESS: I -- I'm not sure whether it --

25  it is or isn't.

Page 54

1  BY MR. MCALILEY:

2    Q. Okay. Fair enough. Let's go back to the

3  definition. Okay. So then we go to 328.3 A2. "All

4  interstate waters, including interstate wetlands." Did

5  I read that right?

6    A. Yes.

7    Q. So these would be waters that -- that sit on

8  the border of two states perhaps, right?

9    A. Yeah.

10    Q. So this doesn't refer to waters that are

11  located entirely within the boundaries of one state,

12  correct?

13    A. That's correct.

14    Q. Let's go to 328.3 A3. "All other waters such

15  as interstate lakes, rivers, streams, including

16  intermittent streams, mud flats, sand flats, wetlands,

17  sloughs, prairie potholes, wet meadows, playa lakes or

18  natural ponds. The use, degradation, or destruction of

19  which could affect interstate or foreign commerce,

20  including any such waters." And it has a list, a

21  little -- little I to little 3I. Did I read at least

22  the first part of 328.3 A3 correctly?

23    A. Yes.

24    Q. So this is the -- this is the -- the provision

25  that we just discussed that the Corps could assert

Page 55

1  jurisdiction over isolated wetlands if it -- if it

2  could affect interstate or foreign commerce, right?

3    A. We could assert jurisdiction over intrastate

4  waters, not just wetlands.

5    Q. That's true, but I'm just focused on wetlands.

6    A. Okay.

7    Q. So just focused here on wetlands. This is

8  the -- this is the provision of the regulation that

9  would allow the Corps of Engineers to assert

10  jurisdiction over a wetland that's intrastate based

11  upon its effect on interstate or foreign commerce,

12  right?

13    A. Correct.

14    Q. This is the provision that was addressed by

15  the Supreme Court in the SWANCC decision, correct?

16    A. Yes.

17    Q. Okay. So this is the provision that we just

18  talked about -- about that you -- you're not aware of a

19  single case -- to your knowledge, you -- you, Shannon

20  White, as you sit here today of the Corps of Engineers

21  ever asserting jurisdiction over an isolated intrastate

22  wetland in Florida based on this section, right?

23    A. In the -- in the limited scope that I have,

24  I'm not aware.

25    Q. Okay. Let's keep going down here. So let's

Page 56

1  go to 328.3 A4. Let me zoom in, it might make a little

2  easier to read here. "All impoundments of waters,

3  otherwise define as waters of the United States under

4  the definition." Did I read that correctly?

5    A. Yes.

6    Q. So an impoundment of water would be let's say

7  I have a stream and -- and somebody builds a dam across

8  and it creates a lake behind the dam. That lake would

9  be an example of an impoundment, right?

10    A. If the dam was constructed in a water of the

11  US, yes.

12    Q. Okay. All right. The next one, number 5,

13  this is now 328.3 A5. "Tributaries of waters

14  identified in Paragraphs A1 through 4 of this section."

15  Did I read that, right?

16    A. Yes.

17    Q. What is the definition of a tributary under

18  the 1986 regulation?

19    A. A tributary is a water body that contributes

20  to water bodies further downstream.

21    Q. So I -- right, an example of a tributary would

22  be a river or a stream that flows into a traditional

23  navigable water?

24    A. Yes.

25    Q. Okay. Then we go down 328.3 A6, "the



SHANNON C. WHITE
UNITED STATES V. SHARFI

June 22, 2022
57—60

Page 57

1 territorial seas." Do you see where it says that?
2    A. Yes.
3    Q. What are the territorial seas?
4    A. Territorial seas are from main high water to a
5 certain distance from the shore. It can be variable.
6 Typically it's three miles off of Florida are
7 considered our terito -- territorial seas they're
8 typically out to the continental shelf.
9    Q. Okay. So those are ocean waters, right?
10    A. Correct.
11    Q. Okay. And the definition is -- is technically
12 it's the -- it go -- extends from the baseline along
13 the coast of the United States, going out for limits of
14 territorial jurisdiction, which in the east -- on the
15 East coast of Florida is three miles, on the west coast
16 of Florida is nine miles, right?
17    A. Yep.
18    Q. Okay. Let's go to number 7 and so in 328.3
19 A7, "wetlands, adjacent to waters, other than waters
20 that are themselves wetlands identified in Paragraphs
21 A1 through 6 of this section." Did I read that
22 correctly?
23    A. Yes, you did.
24    Q. So this is the provision that authorizes the
25 Corps of Engineers to assert jurisdiction over

Page 58

1 so-called adjacent wetlands, right?
2    A. Yes.
3    Q. So this section does not say all wetlands. It
4 says wetlands that are adjacent to waters that are
5 otherwise jurisdictional, right?
6    A. Correct.
7    Q. Okay. And then the last subsection here. I'm
8 not going to read, but It's 328.3 A8. "Waters in the
9 United States do not include prior converted cropland."
10 I'm just going to skip that because I believe this
11 section just talks about exclusions. Also talks about
12 waste treatment systems.
13    Okay. So am I right that this list in 33 CFR
14 328.3 A is the list of all the waters that are
15 regulated under the Clean Water Act as waters of the
16 United States?
17    A. Yes.
18    Q. So other than an isolated water that, in
19 theory, Corps headquarters could allow the Jacksonville
20 District to assert jurisdiction over based upon the
21 effect in interstate commerce, the only wetlands that
22 are subject to the Clean Water Act are those that
23 are -- that are wetlands that are adjacent to waters
24 identified in paragraphs A1 through A6, right?
25    A. Yes.

Page 59

1    Q. Okay. So am I right this definition --
2 this -- this regulation does not have a definition of
3 isolated waters?
4    A. It does not.
5    Q. What do you -- what is an isolated water?
6    A. For the purposes of determining jurisdiction?
7    Q. Yes.
8    A. It's that it's -- it's geographically
9 isolated, which means that it's not adjacent to another
10 water. So it's geographically isolated from a
11 traditionally navigable water or a relatively permanent
12 water, or a non-relatively permanent water.
13    Q. Okay. So am I right to understand that the
14 term isolated wetland commonly is used to describe
15 wetlands that are not considered to be adjacent
16 wetlands?
17    MR. ADKINS: Objection. Vague.
18    THE WITNESS: So isolated wetlands it's a
19 matter of -- of where they sit in the landscape and --
20 and their position in the landscape in relation to
21 those traditionally navigable waters, or relatively
22 permanent waters, or non-relatively permanent waters.
23    When we call something isolated, it's -- it's
24 based on geography where it is in -- where that --
25 where that particular, in this case, wetland is in the

Page 60

1 landscape and its relationship to a TNW, or an RPW, or
2 a non-RPW, relatively permanent water, non-relatively
3 permanent water. For purposes of jurisdiction.
4 BY MR. MCALILEY:
5    Q. Right. So -- but Ms. White, just to go
6 through this again, the Corps of Engineers only asserts
7 jurisdiction over wetlands that are adjacent to other
8 waters with the exception of the -- the commerce
9 section that we discussed earlier, right?
10    A. Yeah. If a -- if a wetland is geographically
11 isolated and we do not have a nexus to interstate
12 commerce, and we can't support that then we would call
13 that wetland isolated.
14    Q. All right. So an isolated wetland is a
15 wetland that's not an adjacent wetland, right?
16    A. Yeah. I -- a wet -- an isolated wetland is
17 one that's -- that's geographically isolated in
18 relation to a relatively permanent water or a
19 traditionally navigable water, or non-relatively
20 permanent water.
21    Q. And therefore it is not an adjacent wetland,
22 right? Within the meaning of the regulations here.
23    A. Right.
24    Q. Okay. Does the Army Corps of Engineers
25 Jacksonville District have any criteria that it uses to



SHANNON C. WHITE
UNITED STATES V. SHARFI

June 22, 2022
61–64

Page 61

1  determine whether a wetland is isolated?
2      A.  We have criteria for determining whether
3  waters are jurisdictional or not and in that
4  determination of jurisdiction we may or may not find
5  that a wetland is isolated.  But that's not where you
6  start.
7      Q.  But Ms. White, does the -- does the
8  Jacksonville District have any criteria that
9  specifically addresses determining whether a wetland is
10  isolated or not?
11     A.  We have guidance for determining the
12  jurisdictional status of all waters on a project site,
13  whatever the project site is in question, whether they
14  are jurisdictional or not.  So the answer is -- is yes,
15  we have a procedure for determining the jurisdictional
16  status of waters.
17     Q.  Okay.  But is there -- is there any -- any
18  place in -- in that guidance where those procedures
19  that specifically addresses how the Corps of Engineers
20  goes about determining whether or not a wetland is
21  isolated or adjacent?  That specific question.
22     A.  Well, in our jurisdictional determiner --
23  determination guidance, we have a procedure that we
24  follow to evaluate all waters on a project site.  And
25  if we follow that procedure and determine that a

Page 62

1  wetland is isolated, that -- that's how we -- we do
2  that.
3          But there's a procedure that's followed that
4  evaluates the entire site, and it starts with the
5  closest traditional navigable water and then -- and
6  works downstream, so to speak -- or upstream, so to
7  speak.  So you start with a traditionally navigable
8  water, then you determine if there's any RPW's
9  relatively permanent waters and non-relatively
10  permanent waters.
11          You determine the status of any wetlands on
12  the project site -- actually, the first question is: Is
13  it -- is it actually a wetland by federal definition,
14  does it meet the -- does it meet the definition of a
15  wetland by federal regulation?  That's always the first
16  question.  And then we ask, is it jurisdictional?
17          But in our process, we -- we ultimately will
18  decide if something is geographically isolated or not.
19  But there's procedure that's followed, and that's not
20  the first question to ask.
21     Q.  Right.  What is the name of this procedure
22  that you're referring to?
23     A.  So this is -- it's -- it's -- this is our
24  jurisdictional determination.  This procedure comes
25  from our U.S. Army Corps of Engineers Jurisdictional

Page 63

1  Determination Form Instructional Guidebook.
2      Q.  Okay.
3      A.  And that's the -- and that's the supporting
4  document that is associated with the seven-page
5  Approved Jurisdictional Determination Form that we fill
6  out for all approved jurisdictional determinations.
7      Q.  Okay.  What's the date of this -- of this --
8  this guidebook?
9      A.  It's May 30th of 2007.
10     Q.  So am right that this predates the second
11  Rapanos guidance?
12     A.  The second being when navigable waters
13  protection rule was vacated?
14     Q.  No.  No.  I'll be more clear.  You're aware
15  that the Rapanos decision was issued in 2006, correct?
16     A.  Yes.
17     Q.  And you are also aware that the Army Corps of
18  Engineers issued two different guidance that had to
19  apply the Rapanos decision, right?
20     A.  Yes.
21     Q.  Okay.  One was in 2007 and the other was 2008,
22  right?
23     A.  Yes.
24     Q.  So this -- this instructional guidebook you
25  just referenced predates the second Rapanos guidance

Page 64

1  that's in effect today, right?
2      A.  It does, but it's still applicable.
3      Q.  Okay.  Okay.  So is anywhere in this -- in
4  this instructional guidebook, does it -- does it
5  identify specific facts or factors that the Corps of
6  Engineers must consider in determining whether or not a
7  wetland is geographically isolated?
8      A.  It provides the -- the framework for
9  evaluating a site for jurisdictional determination.  So
10  again, you start with the closest traditionally
11  navigable water or relatively permanent water and
12  you -- and you walk through the process.
13          And so you would -- I don't think I
14  understand.  Can you rephrase the question?  I don't
15  think I understand your question.
16     Q.  Okay.  You know, there's -- there's all sorts
17  of issues associated to jurisdiction that all pile on
18  top of one another.  So I'm just -- I'm -- and I
19  understand that this guide goes through process for
20  evaluating the overall site, the steps that a person
21  has to do with the Corps in order to determine whether
22  there's jurisdiction over a site.
23          And my question for you is just on this very
24  precise issue.  If you have a wetland and the question
25  is: Is it isolated or not, does that guidebook identify



SHANNON C. WHITE
UNITED STATES V. SHARFI

June 22, 2022
65–68

Page 65

1  any specific factors that will -- that will -- that
2  the -- that the Corps has to consider in making that
3  determination of isolation?
4      A.  Well, the guidebook gives some photographic
5  representations of isolated waters, but it also says
6  that whenever we're making an isolated waters call
7  whether we're asserting jurisdiction over isolated
8  waters or not asserting jurisdiction over isolated
9  waters, it speaks to that each review is -- is case
10  specific, site specific.
11      Q.  Okay.  That sounds like one of the key aspects
12  of the Corps procedures.  It doesn't determine whether
13  a wetland is -- is a jurisdictional adjacent wetland
14  without doing a site-specific evaluation of it.  That
15  fair to say?
16      A.  Every approved jurisdictional determination
17  is -- is site specific.
18      Q.  Right.  The Corps just doesn't shoot from the
19  hip and just reach conclusions about wetlands that no
20  one has ever visited before and determine whether
21  they're jurisdictional, right?
22      A.  I would say that our approved jurisdictional
23  determinations are supported with documentation or we
24  make a call whether to assert jurisdiction or not.
25  Now, the level of that documentation may vary from

Page 66

1  project to project.  In fact, the committee guide books
2  speaks to that.  It says that more complex sites may
3  require additional documentation in the administrative
4  record.
5      Q.  Okay.  But the point is is that it's a -- it's
6  a wetland by wetland determinations, whether it's an
7  adjacent wetland or not, right?
8      A.  It's a -- yeah, it's a site-by-site
9  evaluation.
10      Q.  Okay.  Okay.  I'm going to take this down.
11  That's 240 -- 244.  Excuse me.  Okay.  And I'm going to
12  show you now another exhibit, which I'm labeling
13  Exhibit 245.
14      (Defendants' Exhibit 245 was marked for
15  identification.)
16  BY MR. MCALILEY:
17      Q.  So can you see on your screen here, Ms. White,
18  a document that says GAO --
19      A.  Excuse me.
20      Q.  Can you see on the screen, Ma'am, a -- the
21  document that says GAO Report to the Chairman,
22  Subcommittee on Energy Policy, Natural Resources and
23  Regulatory Affairs, Committee on Government Reform,
24  House of Representatives.  And then the title is
25  "Waters and Wetlands, Corps of Engineers Needs To

Page 67

1  Evaluate Its District Office Practices in Determining
2  Jurisdiction." It's dated February of 2004?
3      A.  Yes, I can see that.
4      Q.  Have you ever seen this before?
5      A.  I have not.
6      Q.  Are you familiar with what the GAO is?
7      A.  I -- I know GAO stands for the Government
8  Accounting Office.
9      Q.  Okay.
10      A.  And -- and I'm not familiar beyond that.
11      Q.  Do you know that -- that the GAO is an
12  independent agency that reports directly to Congress?
13      A.  I did know that.
14      Q.  And are you aware that the GAO will conduct
15  investigations of practices in federal agencies and
16  various topics as -- as requested by members of
17  Congress?
18      A.  I'm aware now.
19      Q.  Okay.  Have you ever been -- are you -- have
20  you ever been aware of the GAO doing -- making
21  inquiries about practices in the Jacksonville District
22  before on any topic?
23      A.  I'm not aware.
24      Q.  Okay.  So you would agree with me that
25  February of 2004 is after the Supreme Court issued the

Page 68

1  decision in SWANCC, right?
2      A.  Yes.
3      Q.  Okay.  What I'm going to do is I'm going to
4  scroll down through this document.  A very interesting
5  document, you might want to read this bill.  It's a --
6  okay, I'm going to zoom in a little bit.  I'm now on
7  Page 17.
8      So yeah, I'm on the top of Page 17.  It says,
9  the -- the header is, "Corps district offices using
10  different practices to make jurisdictional
11  determinations." And then the next header below says,
12  "district offices use different factors to identify
13  adjacent wetlands." Do you see that?
14      A.  I do.
15      Q.  So I've highlighted the second sentence in the
16  second paragraph.  I'll read that aloud.
17      "However, when making jurisdictional
18  determinations for wetlands not touching the waters of
19  the United States, districts consider several factors,
20  including hydrologic connections between wetlands and
21  other waters of the United States, the proximity of
22  wetlands to other waters of the United States and the
23  number of barriers separating wetlands from other
24  waters of the United States." Did I read that right?
25      A.  Yes, you did.



SHANNON C. WHITE
UNITED STATES V. SHARFI

June 22, 2022
69–72

Page 69

1    Q. Would you agree with me that those are -- are
2   the three factors that the Corps of Engineers considers
3   in determining whether or not a wetland is adjacent or
4   not? Those factors, again, being hydrologic
5   connections, proximity and the number of barriers.
6       MR. ADKINS: Objection. Misstates the
7   document.
8       THE WITNESS: I would say we -- we certainly
9   consider that, but there may be other factors that are
10   considered on a -- on a case-by-case basis.
11   BY MR. MCALILEY:
12    Q. Okay. What other factors does the Corps of
13   Engineers Jacksonville District consider in determining
14   whether or not a wetland is adjacent?
15    A. We may have monitoring -- surface monitoring
16   data. We may have hydrologic reports from water
17   management districts or other state agencies or other
18   federal agency speaking to the relationship between
19   wetlands and -- and other waters. We may use soil
20   service -- soil survey information, lidar data.
21       There -- there may be, you know, other data
22   that we may use to -- to help make it -- to make a
23   determination. If it's available, we tend to use it to
24   support or to either support a positive jurisdictional
25   call or -- or a negative jurisdictional call, negative

Page 70

1   being we're not asserting jurisdiction positive being
2   method that we are asserting jurisdiction.
3    Q. Okay. So and by the way, you would agree with
4   me that one of the factors the Corps of Engineers does
5   not consider is whether a wetland is used by migratory
6   birds, right?
7    A. Well, that -- that's correct.
8    Q. Okay. So let's go -- so let me go through
9   these additional factors you just identified. The
10   first two are surface water monitoring data and
11   hydrological reports. You would agree with me that
12   both of those types of information could fit under the
13   category of the hydrologic connections between a
14   wetland and other waters of the United States, right?
15    A. Yes.
16    Q. Okay. And when you -- then you also
17   referenced soil surveys and lidar. You would agree
18   with me that those factors go to whether the -- whether
19   the -- the location is a wetland or not, right?
20    A. Both if it's a wetland and it also can speak
21   on -- on hydrology as well.
22    Q. Okay. So other than issues of hydrologic
23   connection, proximity, how close a wetland is to other
24   waters in the United States and the number of barriers
25   between the wetland and other waters in the United

Page 71

1   States. Is there any other factor that the Corps of
2   Engineers considers in determining whether or not a
3   wetland is adjacent?
4       MR. ADKINS: Objection. Asked and answered.
5       THE WITNESS: We also use navigation studies.
6   That's not listed there.
7   BY MR. MCALILEY:
8    Q. Okay. And navigation study is where vessels
9   can navigate on the water?
10    A. Uh-huh.
11    Q. Is that a yes?
12    A. Yes.
13    Q. Okay. By the way, when I say that is when
14   you -- when you see uh-huh on a transcript it's very
15   hard to understand.
16    A. I -- I apologize.
17    Q. Okay. We all do it. We all do it. Okay.
18   You would agree with me, though, a navigation study
19   is -- is not something that's -- that's applicable to
20   a -- a wetland that does not directly abut a
21   traditional navigable water, right?
22    A. Can you ask the question again, please?
23    Q. Yeah. To navigate in a wetland that is --
24   that is -- that does not tradition -- that does not
25   directly abut a traditional navigable water, right?

Page 72

1    A. I imagine it depends on the -- the vessel
2   you're using but to your question, typically we use
3   navigability studies to determine whether or not a
4   water is a traditionally navigable water.
5    Q. It's also relevant to whether there's
6   jurisdiction under Section 10 of the Rivers and Harbors
7   Act, right?
8    A. That's correct.
9    Q. Okay. Let's go back to the report here. I'm
10   going to scroll down. So you see the first section
11   here is hydrologic connections?
12    A. Yes.
13    Q. Let's scroll down here to Page 18. I
14   highlighted the second sentence on Page 18.
15   "Alternatively officials on other districts such as
16   Jacksonville and Philadelphia, stated that they may
17   consider the 100-year floodplain as one of many factors
18   when making jurisdictional determinations for adjacent
19   wetlands, but they do not consider it sufficient
20   evidence on its own." Did I read that right?
21    A. You did.
22    Q. Is that a true statement about the practice in
23   the Jacksonville District?
24    A. And I believe we discussed --
25       MR. ADKINS: Objection. Vague.



SHANNON C. WHITE
UNITED STATES V. SHARFI

June 22, 2022
73–76

Page 73

1  THE WITNESS:  I believe we've discussed this
2  before that when a jurisdictional determination is
3  made, there's numerous pieces of supporting evidence
4  typically that are used to make either -- whether we
5  assert jurisdiction or we don't.
6  BY MR. MCALILEY:
7    Q.  But you agree with me that the fact that a
8  wetland is in the 100-year floodplain is not sufficient
9  evidence on its own to determine that that wetland is
10  an adjacent wetland, right?
11    A.  I would agree.
12    Q.  Okay.  And you don't assume that there's a
13  hydrological connection between a wetland and a
14  traditional navigable water, just based on the fact
15  that it's an a 100-year floodplain, right?
16    A.  If it's not a wetland is not directly abutting
17  traditionally navigable water.  Say it's bordering or
18  neighboring.  Then, in the Jacksonville District we're
19  required to do a significant nexus determination.
20  So --
21    Q.  Okay.  But I'm not --
22    A.  -- but -- but -- let me finish.  So with a
23  significant nexus determination that requires more than
24  a FEMA floodplain map to support that nexus, we have to
25  provide additional information.  So if a wetland is

Page 74

1  directly abutting, a FEMA floodplain map is -- is
2  certainly a good item to have.
3    But if we're bordering or neighboring, we're
4  talking about those components of adjacency, the
5  Jacksonville District's going to do a significant nexus
6  determination, which is going to require a higher level
7  of documentation.  That will -- let may include a FEMA
8  flood map.  But likely it will not only include a FEMA
9  flood map.
10    That being said, it again, it's -- it's
11  project specific in general.  That is -- that is the
12  practice in Jacksonville District.
13    Q.  Ms. White, so I'm actually asking a more
14  precise question.  Not asking about a significant nexus
15  determination.  I'm just asking about the assumption of
16  whether or not there's a hydrologic connection between
17  a wetland and a traditional navigable water.  So just
18  that one -- that one specific issue.
19    You would agree with me that the Corps of
20  Engineers does not assume that there's a hydrological
21  connection between a wetland and a traditional
22  navigable water solely based on its location in the
23  100-year floodplain, right?
24    A.  No.  We would use multiple pieces of
25  information to make the determination if it was

Page 75

1  hydrologically connected or not.
2    Q.  Yeah.  You can't --
3    A.  If that --
4    Q.  I'm sorry.
5    A.  If the information -- if the information
6  existed.
7    Q.  Okay.  But you can't make the determination if
8  there's a hydrologic connection just based upon the
9  fact that a wetland isn't a 100-year floodplain, right?
10  Just that fact alone isn't enough to establish a
11  hydrologic connection.
12    MR. ADKINS:  Objection.
13    THE WITNESS:  Not necessarily.
14  BY MR. MCALILEY:
15    Q.  It's not necessarily sufficient, right?
16    A.  Not necessarily.  But again, project specific.
17    Q.  Okay.  But you would only consider the fact
18  that a wetland is in the 100-year floodplain as relates
19  to the whether there's hydrologic connectivity in the
20  context of a -- of a project specific evaluation.  Is
21  that fair to say?
22    A.  Yes.
23    Q.  All right.  Let's keep going down this.  Okay.
24  Well, hold on.  Before we leave hydrologic connection,
25  what -- what hydrologic factors does the Jacksonville

Page 76

1  District consider in determining whether or not a
2  wetland is -- is isolated or adjacent?
3    A.  You're asking what hydrologic factors we
4  consider to determine if a wetland is either adjacent
5  or isolated.  Do I understand that correctly?  I'm
6  sorry, you cut out just for a second.
7    Q.  I'm sorry.  But that -- that -- you got the
8  question right.
9    A.  Okay.  So when we're determining adjacency or
10  if a wetland's geographically isolated, we're going use
11  all of the information that -- that's available to us.
12  That information has gotten better over time.  We have
13  a lot of resources on our desktop now that -- that we
14  did not have previously.
15    But we're going to use surface water
16  monitoring wells, or monitoring stations, better Water
17  management districts, DEP, USGS all have surface
18  monitoring stations throughout the state of Florida.
19  We'll use that information, particularly when we're
20  talking about demonstrating flow.
21    We will look at aerial imagery, historic and
22  current and look ask evidence of inundation on aerial
23  imagery.  And we'll compare that with rainfall
24  normality to see if wetlands are -- are showing
25  hydrologic connection to TNWs, RPWs, or non-RPWS.



SHANNON C. WHITE
UNITED STATES V. SHARFI

June 22, 2022
77–80

Page 77
1   We'll look at soil service maps.  We'll look
2   at look -- gosh, what else?  We'll look at lidar, we'll
3   look at the National hydrologic data set.  Like I said,
4   any -- any information that's publicly available that
5   can support our call, whether it's a -- a positive
6   assertion of jurisdiction or negative, we're not
7   asserting jurisdiction.
8   We build -- we build the case.  We collect the
9   information and then the information drives the
10  decision.  The Corps is neither an opponent or a
11  proponent of any project.  We just collect the
12  information and if the body of information supports
13  it -- a jurisdictional call that's the call we make.
14  If -- if it doesn't, then we don't make the call.
15  Q.  Right.  So I'm going to -- I'm going to ask
16  you a series of questions and to try to be clear, I'm
17  going to give you a -- set of facts so I'm clear
18  about what I mean.  Let's assume that I have a
19  traditional navigable water and I have some distance
20  away, 500 feet away I have a wetlands.  And so those
21  are what I'm -- so I'm asking these questions and
22  assuming those -- those -- that description.
23  So Ms. White, in order for that wetland to be
24  considered non-isolated, does there need to be a
25  hydrologic connection between that wetland and -- and

Page 78
1   the -- and the creek or river at the surface?
2   MR. ADKINS:  Objection.  This -- this question
3   seems to call for an opinion and Ms. White is not here
4   to provide opinions on jurisdiction.
5   BY MR. MCALILEY:
6   Q.  Okay.  So I'll rephrase it then.  So
7   Ms. White, in order for a wetland to be considered
8   non-isolated, does there need to be a surface water
9   connection between that wetland and a traditional
10  navigable water?
11  A.  For a wetland that's -- for a wetland that's
12  directly abutting, there needs to be hydrologic
13  conductivity between the two systems, so typically
14  we -- we consider that as -- as surface flow.  For
15  things are not directly abutting, we're going to to be
16  looking for, is there a hydrologic connection?
17  Because -- because things that aren't
18  abutting, we're going to need to do a significant nexus
19  determination.  So for a significant nexus
20  determination, we have to show that there's a
21  hydrologic connection, an ecological -- and an
22  ecological.  So biological, chemical, or physical
23  connection to that traditionally navigable water or
24  RPW.
25  So as I mentioned before, if a wetland's not

Page 79
1   adjacent -- is not directly abutting, let me rephrase,
2   it's bordering or neighboring, then there's more
3   information that needs to be provided by the Corps to
4   support an adjacency call in those cases.
5   Q.  Okay.  So --
6   A.  Because we have to -- go ahead.
7   Q.  No, no, I'm sorry.  I didn't mean to cut you
8   off, I thought you had finished.  All right.
9   A.  No.
10  Q.  So just to break this down, if a wetland
11  directly abuts a judicial navigable water, in order for
12  it to be considered abutting, it has to have a surface
13  water connection to the traditional navigable waters,
14  right?
15  A.  Typically surface are -- are -- we -- we can
16  prove shallow subsurface as well if the water table is
17  within 24 inches of the surface.
18  Q.  Okay.  So the Corps is willing to determine
19  that a wetland abuts a traditional navigable water
20  if -- if there's no surface connection and if there's
21  simply the presence of groundwater less than two feet
22  below the ground?  Am I understanding that right?
23  A.  Typically with abutting wetlands, you have a
24  surface connection at some point in the year.  But it
25  may not be continuous.

Page 80
1   Q.  Okay.  But that wasn't my question.  My
2   question just was -- your -- the Corps is willing to
3   determine that a wetland abuts a traditional navigable
4   water solely based upon a groundwater connection?
5   MR. ADKINS:  Objection.  Vague.
6   THE WITNESS:  No, it's not solely based on --
7   on groundwater.  Typically, it's both.
8   BY MR. MCALILEY:
9   Q.  Okay.  So groundwater connections by itself is
10  not enough for the Corps to determine that a wetland
11  abuts are traditional navigable water, right?
12  MR. ADKINS:  Objection.  Vague.
13  THE WITNESS:  It's typically -- it's typically
14  both.  We have many wetlands in Florida where the water
15  in the wetland is not above the ground surface, it's --
16  it's slightly below.  And with the definition of a
17  wetland, if water within 12 inches of the soil surface,
18  except for during the dry season where you can have a
19  water table extending 24 inches.
20  And so if you had a well -- a groundwater
21  monitoring well in the -- in the wetland and then
22  the -- in the adjacent traditional navigable water, or
23  RPW, or non-RPW and you could show that water and
24  wetland is equivalent to the traditional navigable
25  water, then we could call it on that.  But we -- to my



SHANNON C. WHITE
UNITED STATES V. SHARFI

June 22, 2022
81–84

Page 81

1  knowledge, we've never done that on its own. It's
2  always been a combination of the two.
3  BY MR. MCALILEY:
4      Q. So Ms. White, let's step away from wetlands
5  that abut the traditional navigable water or reasonably
6  permanent water. Let's step away to wetlands that are
7  a little further away. That might be in the
8  neighboring category or might be isolated. In order
9  for you to determine -- for the Corps of Engineers to
10  determine that there's a hydrologic connection between
11  that wetland and the regulated water does there need to
12  be a surface connection?
13     A. There typically is.
14     Q. Okay. How much water --
15     A. Now, that being said, it -- it may not be --
16  it may not be a continuous connection. But again,
17  those wetlands that are in, say, the neighboring
18  category in the Jacksonville District, we will have to
19  determine a significant nexus determination.
20         And so we're going to look at the physical,
21  and chemical, and biological properties of those
22  wetlands and anything else that's similarly situated in
23  the landscape and its impact on the receiving water
24  body, whether that's the TNW or the RPW. So typically,
25  there is a -- a hydrologic connection at some point in

Page 82

1  the year and it may not even be every year.
2         But we're going to be doing that significant
3  nexus determination and providing supporting
4  documentation that those wetlands are providing those
5  physical, biological, and chemical factors as well.
6      Q. Okay. So I'm just focused on the hydrologic
7  connection piece, though, because this goes to whether
8  the wetland with the isolated or neighboring. How
9  often during a year must there be a surface
10  hydrological connection between a wetland and a
11  regulated water in order for it to be determine not to
12  be isolated?
13     A. Can you ask your question again?
14     Q. Yeah.
15     A. Please.
16     Q. How frequently must there be a surface water
17  connection between a wetland and a regulated water for
18  that wetland to be considered not isolated?
19     A. So if there's a wetland that's geographically
20  isolated does not have a surface hydrologic connection
21  to, say, a TNW. A wetland that is adjacent, whether
22  it's abutting or not, has a surface hydrologic
23  connection to that TNW. There's not a -- there's not a
24  specific set time that -- that hydrologic connection
25  has to be present for adjacent wetlands.

Page 83

1      Q. Okay. So it could be any amount of time or is
2  there like a -- a certain threshold amount of time if
3  there's a hydrologic connection?
4      A. If there's -- again, I would say a
5  case-by-case basis. Like I said, in Florida we have
6  a -- a variety of different wetland ecosystems and
7  different wetland ecosystems have different hydrologic
8  regimes. And so certain wetlands may very well have a
9  surface connection multiple times a year where others
10  don't.
11     Q. How quickly does water have to travel from a
12  wetland to a regulated water like an RPW or TNW in
13  order for that wetland to be considered non-isolated?
14     A. So again, geographically isolated wetlands are
15  not hydrologically, at least surface hydrologically
16  connected to downstream receiving waters.
17     Q. By the way, in determining whether a wetland
18  is adjacent do you have to ask your -- Corps of
19  Engineers has to determine whether that wetland is
20  adjacent to a tributary. It's not enough to -- to
21  basically say adjacent to another wetland, may be
22  adjacent to another wetland, they may be actually
23  adjacent to a tributary. Do I have that right?
24         MR. ADKINS: Objection.
25         THE WITNESS: So you're asking if you have

Page 84

1  multiple wetlands on a project site and say a tributary
2  on that project site, are you asking -- I'm not sure
3  what you're asking.
4  BY MR. MCALILEY:
5      Q. The question is: Is what is the adjacent --
6  what does the wetland have to be adjacent to in order
7  for it to be an adjacent wetland subject to the Corps
8  of Engineers jurisdiction? Does it need to be adjacent
9  to the TNW or a tributary? Or can it be simply
10  adjacent to another wetland which is -- which is itself
11  maybe adjacent to the TNW or the -- or the tributary?
12     A. For adjacency --
13         MR. ADKINS: Objection.
14         THE WITNESS: -- for adjacency we're looking
15  at adjacent to the TNW, or an RPW, or non-RPW.
16  However, we're also looking for things that aren't
17  directly abutting. Wetlands that are bordering or
18  neighboring we're doing a significant nexus
19  determination. We would also determine a relevant
20  reach in similarly situated wetlands.
21  BY MR. MCALILEY:
22     Q. Let's go back to the -- let's go back to the
23  factors. Again, I'm just focused on determining
24  whether or not a wetland is isolated or not, okay? So
25  let's -- let me -- let me go back to the GAO report,



SHANNON C. WHITE
UNITED STATES V. SHARFI

June 22, 2022
85–88

Page 85

1  which is Exhibit 245 and scroll down.  And you see --
2  there's a next section called proximity, which is the
3  discussion of this factor as to whether a wetland is
4  adjacent or not.
5       And let me read that on Page 19.  I read the
6  third sentence in the first paragraph, "for example,
7  officials from the Jacksonville District said that they
8  regulate almost all wetlands located within 200 feet of
9  other waters of the United States and they generally do
10 not assert jurisdiction beyond that distance.
11 According to these officials, the district set this
12 distance because it needed an approximate distance for
13 enforcement purposes and it gradually became a rule of
14 thumb."
15      Did I read that correctly?
16 A.  You did.
17 Q.  It -- it's -- that describes Jacksonville
18 District practice for many years, doesn't it?
19      MR. ADKINS:  Objection.
20      THE WITNESS:  The scenario described in the
21 text on the screen was -- was a practice in
22 Jacksonville District in the past.  It was not based on
23 any scientific data.
24 BY MR. MCALILEY:
25 Q.  Okay.  So it was the practice of the

Page 86

1  Jacksonville District for years in the past not to
2  assert jurisdiction over wetlands located more than 200
3  feet of other waters of the United States, right?
4       MR. ADKINS:  Objection.
5       THE WITNESS:  At the time of this report in
6  2004, it was -- I believe that that -- that was the
7  case.  It is no longer the case.
8  BY MR. MCALILEY:
9  Q.  When did this --
10 A.  It has happened since my tenure with the
11 Corps.
12 Q.  When did it change?
13 A.  Since 2008.
14 Q.  Okay.  I'm sorry.  When did this change that
15 the Corps of Engineers changed this practice over the
16 distance that a wetland needed to be in order for it
17 to -- to conclude that it was an adjacent wetlands?
18 A.  I do not know when -- what year that changed.
19 I can speak to when I joined the Corps in 2008, this
20 was not the rule of thumb and this was not the
21 guidance.
22 Q.  Okay.  So Ms. White, am I right the Corps of
23 Engineers puts on its website many jurisdictional
24 determinations?
25 A.  I believe we were required to publish all

Page 87

1  approved jurisdictional determinations on our websites.
2  Q.  Am I right -- and so the Corps of Engineers
3  has been doing this for decades, hasn't it?
4       MR. ADKINS:  Objection.  Foundation.
5       THE WITNESS:  Since my tenure with the Corps
6  in 2008, we have been publishing pre-jurisdictional
7  determinations on our website.
8  BY MR. MCALILEY:
9  Q.  You would agree with me that there are many,
10 many examples of jurisdictional determinations on the
11 Corps of Engineers website, where the -- where the
12 Corps would focus on the distance of the water from the
13 regulated waters of the United States and make a
14 determination of isolation based solely on that factor;
15 isn't that right?
16 A.  I do not agree.
17 Q.  You don't agree with that?  Have you ever gone
18 and looked and tried to calculate how many JDs are on
19 the Jacksonville District website in which the Corps
20 does not assert jurisdiction over wetlands more than
21 200 feet away from a regulated waters of the US?
22 A.  No, sir, I do not have time in my general day
23 to do that.
24 Q.  And you didn't do that work in prepping for
25 this depo, did you?

Page 88

1  A.  No, sir, I did not.
2  Q.  So it's your testimony now that the Corps of
3  Engineers does not have any -- any -- well, let me
4  rephrase it.  Does the Corps of Engineers apply any
5  other presumptive distance between a wetland and a
6  regulated waters of the United States in determining
7  whether the wetland is -- is isolated or not?
8  A.  I can't speak to other districts in the Corps
9  of Engineers.
10 Q.  Just the -- just the Jacksonville District.
11 A.  Not that I'm aware of, in current practice.
12 Q.  What is -- what is the furthest distance that
13 a wetland -- that you are aware of in the Jacksonville
14 District, where a wetland is located away from a -- a
15 regulated water of the United States and there's no
16 evidence of a surface water connection where the
17 Jacksonville District has asserted jurisdiction?
18 A.  I don't know the exact distance.  However, I
19 am aware that we have asserted jurisdiction over
20 adjacent wetlands based on a significant nexus
21 determination where it's been -- I don't know the exact
22 distance.  Where it's been greater than that -- that --
23 the 200 feet listed there.
24 Q.  Okay.  Let's go back to the GAO report.  Let's
25 scroll down.  Now, I'm -- I'm at the bottom of Page 19



SHANNON C. WHITE
UNITED STATES V. SHARFI

June 22, 2022
89–92

Page 89

1  of the section of man-made and natural barriers.
2      I'm going to read a lot of sentence that's at
3  the bottom of this page and the top of the next.  It
4  says, "also efficient -- officials from the
5  Jacksonville District said they would generally
6  regulate all wetlands within 200 feet of other waters
7  of the United States, regardless of the number of
8  barriers separating the waters from the wetlands." Did
9  I read that correctly?
10     A.  Yes, you did.
11     Q.  Is that -- is that a -- a true and accurate
12  description of the practice of the Jacksonville
13  District today?
14         MR. ADKINS:  I'm going to object to -- the
15  witness is not familiar with this document nor she'd
16  been afforded an opportunity to review it before
17  offering testimony on its veracity.  So --
18  BY MR. MCALILEY:
19     Q.  You can answer the question.
20         MR. ADKINS:  -- state that objection.
21  BY MR. MCALILEY:
22     Q.  Ma'am, you can answer the question.  Let me be
23  very clear.  I'm asking whether -- I read you this
24  sentence.  This was a report by the GAO to the United
25  States Congress.  It was based on interviews of people

Page 90

1  in your Jacksonville District.
2      And so my question to you is: Is that an
3  accurate statement of the practice today in the
4  Jacksonville District that it will regulate all
5  wetlands within 200 feet of other waters of the United
6  States, regardless of the number of barriers separating
7  the waters in allowance?
8         MR. ADKINS:  Same objection.
9         THE WITNESS:  Current practice in the
10  Jacksonville District does not use an arbitrary
11  200-foot buffer around traditionally navigable waters,
12  or relatively permanent waters, or non-relatively
13  permanent waters.  We use all available resources to
14  make a call whether something has jurisdictional or
15  not.
16  BY MR. MCALILEY:
17     Q.  Okay.  Is distance of a wetland away from a
18  traditional navigable water a relevant factor for the
19  Corps to consider in determining whether or not the
20  wetland is isolated?
21     A.  I believe that a -- a watershed or drainage
22  basin approach that can be supported and documented is
23  a -- is a sound way to determine whether a wetland is
24  adjacent or not.
25     Q.  Okay.  That didn't answer my question.  My

Page 91

1  question is simply: Is the distance of a wetlands from
2  a otherwise regulated waters of the United States a
3  factor that is considered when the Corps determines
4  whether or not the wetland is isolated?
5         MR. ADKINS:  Objection.  Asked and answered.
6         THE WITNESS:  So the question is: Is distance
7  a factor or the factor?
8  BY MR. MCALILEY:
9     Q.  A factor.  Just one factor.  It's not the only
10  factor but is -- is it a factor?
11         MR. ADKINS:  Same objection.
12         THE WITNESS:  I would say we're looking at
13  where the wetland sits in the landscape relative to the
14  traditionally navigable water.  And an arbitrary
15  distance isn't necessarily a factor.
16  BY MR. MCALILEY:
17     Q.  So the Corps of Engineers doesn't even
18  consider the distance a wetland is away from an
19  otherwise regulated water?  In determining whether or
20  not it's isolated?
21         MR. ADKINS:  Objection.  Asked and answered.
22         THE WITNESS:  Where a -- where a wetland sits
23  in the landscape and its relationship to the TNW is
24  what's being considered.
25  BY MR. MCALILEY:

Page 92

1     Q.  And that includes the distance away, right?
2         MR. ADKINS:  Objection.  Asked and answered.
3         THE WITNESS:  It's not necessarily the
4  distance, it's where the wetland sits, where -- where
5  it's in the watershed, what other similarly situated
6  wetlands are there, what's your relevant reach.  That
7  all factors into its relationship to the TNW.  But not
8  necessarily specifically, oh, this wetland is 800 feet
9  away from the TNW, we're not even going to consider it.
10  That's not -- that's not how we evaluate wetlands in
11  their jurisdiction currently.
12  BY MR. MCALILEY:
13     Q.  Okay.  So Ms. White, so it's not even relevant
14  how far away a wetland is from a water that's otherwise
15  regulated.  Is that your testimony?
16         MR. ADKINS:  Objection.  Asked and answered.
17         THE WITNESS:  It's a component, but it's not
18  the only component.
19  BY MR. MCALILEY:
20     Q.  Okay.  That wasn't -- so here's the thing
21  is -- I'm not saying it's whether it's the only
22  component or not.  I'm asking whether it's a component
23  that you consider.  So am -- and I think you just
24  testified the Corps of Engineers, it's not even a
25  component.  The Corps of Engineers doesn't even



Page 93

1  consider how far away a wetland is from an otherwise
2  regulated water in determining whether or not it's
3  isolated.  Am I understanding you right?
4      A.  When we're looking at a wetland that's
5  geographically isolated we are certainly looking at
6  where it is in the landscape and what its relationship
7  is to, say, a TNW.
8      Because if we're making an adjacent call or if
9  we're calling it geographically isolated, typically
10  with something that's geographically isolated --
11  typically with something that's geographically isolated
12  there's not a hydrologic, or biologic, or chemical, or
13  physical connection to that -- that downstream
14  receiving body of water.
15      And so that's what we're looking at.  Rather
16  than, you know, 200 feet of distance or -- or what have
17  you.  We're looking to see, if that geographically
18  isolated water, what we think might be geographically
19  isolated -- is there some sort of hydrologic, or
20  biologic, chemical connection to that -- that other
21  water of the US.  So that's what we're considering.
22      I mean -- I mean, certainly we're, you know,
23  we're looking at aerial photos, so we are noting
24  distance but we're -- we're really keying on if there
25  is that physical, chemical, or biological connection;

Page 94

1  that nexus.  And if there isn't, or we don't have the
2  supporting documentation, then we would likely call a
3  wetland isolated.
4      And then we would have to determine if there
5  was a -- a nexus to interstate commerce or whether or
6  not it was jurisdictional or not.
7      Q.  So, you know, ma'am, you're -- you're -- in
8  answering the question you're going down the road of
9  significant nexus.  I'm not even getting there yet.
10  I'm just trying to figure out whether or not a wetland
11  is -- is isolated or adjacent because you'd only do a
12  significant nexus analysis of an adjacent wetland,
13  right?
14      A.  That's correct.
15      Q.  Okay.  So I'm just focused on this question
16  about whether the wetland was isolated or adjacent.  So
17  you -- you said multiple times, an isolated wetland is
18  one that's geographically isolated; am I right?
19      A.  Correct.
20      Q.  Okay.  And -- and the word geography relates
21  to the location of something on the earth's surface.
22  Is that a fair definition?
23      A.  Yes, it is.
24      Q.  Okay.  So the location of the wetland on the
25  surface of the Earth relevant to the regulated waters

Page 95

1  is a -- is -- is a relevant factor, I'm not saying the
2  only factor, but it is at least a relevant factor; is
3  that fair?
4      A.  Yes.
5      Q.  Okay.  So the Corps does consider the distance
6  of a wetlands from another regulated water as one of
7  different factors in determining whether or not the
8  wetland is isolated, right?
9      MR. ADKINS:  Objection.  Misstates testimony.
10  Asked and answered.
11      THE WITNESS:  So the location of a wetland
12  that's considered geographically isolated, we're going
13  to look at what's in between the wetland and the
14  traditionally navigable water but -- and if there's
15  a -- if there's a hydrologic connection.
16      So depending on the site, distance -- distance
17  from that traditionally navigable water -- I mean,
18  it -- it's considered, but it's -- there's not a --
19  there's not a set --if it's this far, it's definitely
20  isolated.  We're looking at -- we're looking at what
21  separates that wetland from the traditional navigable
22  water and if there is a hydrologic connection or not.
23  BY MR. MCALILEY:
24      Q.  Okay.  Ms. White, I just got a couple of
25  questions more and then maybe we will take a little

Page 96

1  break.
2      A.  Sure.
3      Q.  So we talked earlier about the different
4  procedures the Corps of Engineers follows when it does
5  a preliminary jurisdiction versus an approved
6  jurisdiction -- jurisdictional determination, right?
7      A.  Yes.
8      Q.  And -- and the approved jurisdictional
9  determination is where the Corps of Engineers
10  determines not only whether there are wetlands but
11  whether those wetlands are part of the waters of the
12  United States, correct?
13      A.  Correct.
14      Q.  So for an approved jurisdictional
15  determination, would you agree with me that -- that it
16  is standard practice for the Corps to do a site
17  specific analysis of each project in each wetlands to
18  determine whether or not it's part of the waters of the
19  United States?
20      A.  Yes.
21      Q.  And -- and is it also standard practice for
22  the Corps of Engineers to conduct a site visit to a
23  project site when you're doing an approved
24  jurisdictional determination?
25      A.  It depends.



SHANNON C. WHITE
UNITED STATES V. SHARFI

June 22, 2022
97–100

Page 97

1    MR. ADKINS:  Objection.  Vague.
2    BY MR. MCALILEY:
3    Q.  Okay.  And most of the time, does the Corps
4    conduct a site visit when it's doing an approved
5    jurisdictional determination?  And I'm just talking
6    about Jacksonville District.
7    A.  It -- it depends on the request.  And it
8    depends on the information provided.  And it depends --
9    it depends.  We don't always do site inspections for
10   our approved jurisdictional determinations.
11   Q.  Okay.  But -- but my question is:  Most of the
12   time, does a site inspection happen?  I understand that
13   an individual could say, I don't need you to come out
14   on the site.  But just in the overall number of
15   approved JDs that the Jacksonville District does, is
16   it -- is it true or not that the Corps does site
17   inspections most of the time?
18   A.  I don't know what percentage of time we spend
19   in the field on approved jurisdictional determinations
20   in the Jacksonville District.  I don't know if it's a
21   majority of the time or not.
22   Q.  You've worked in the Corps' Regulatory
23   division of Jacksonville for 14-and-a-half years and
24   you don't know that?  Is that your testimony?
25       MR. ADKINS:  Objection.  Asked and answered.

Page 98

1    Argumentative.
2        THE WITNESS:  As I previously stated, we have
3    over 120 regulators in the Jacksonville District's
4    Regulatory Division.  I'm not privy to the workload or
5    work habits of every district employee in the
6    Jacksonville District.  I can say for my approved
7    jurisdictional determinations that I've done in the
8    past, probably 75 percent of the time I've been in the
9    field.
10       I can speak to my own experience.  I cannot
11   speak to any other regulator in this -- in the district
12   and how they -- and how often or not they are going
13   into the field.
14       MR. MCALILEY:  Okay.  Why don't we take a --
15   maybe a ten-minute break?  Would that work for you,
16   ma'am?
17       THE WITNESS:  Perfect.
18       MR. MCALILEY:  Great.
19       THE REPORTER:  Great.  Without an objection,
20   we're off record at 11:30 a.m.
21       (A recess was taken.)
22       THE REPORTER:  Perfect.  We're going back on
23   record at 11:40 a.m.
24   BY MR. MCALILEY:
25   Q.  Okay.  All right.  So Ms. White, I want to

Page 99

1    turn to those specific projects that were listed on the
2    deposition notice.  So you -- you recall that the
3    deposition notice identified as -- as matters for
4    examination, three specific projects that are listed by
5    the -- the Jacksonville District's permit number,
6    right?
7    A.  Yes.
8    Q.  Okay.  And -- and so let me just go through --
9    through each of them.  So one of the matters for
10   examination is the Army Corps' determination of
11   jurisdiction in connection with SAJ-2004-2914, which
12   I'll call the Tuscawilla project.  Or -- is that one of
13   the -- is that one of the projects that you prepared to
14   testify about today?
15   A.  Yes.
16   Q.  And -- and so tell me what -- what did you do
17   to prepare to testify with regard to that project?
18   A.  I reviewed the documents that were provided
19   and I spoke with the project manager regarding those
20   documents.
21   Q.  And who was the project manager in this
22   project?
23   A.  Alisa Zarbo.
24   Q.  Okay.  So am I right that the -- the Army
25   Corps Jacksonville District, numbers it's project based

Page 100

1    upon the date an application or request was submitted?
2    A.  That's correct.
3    Q.  So -- so for this project, because the number
4    is SAJ-2004-2914, am I right that that -- the
5    application date for this project was 2004?
6    A.  Yes, it would have been during that year.
7    Q.  Okay.  And -- and the SWANCC decision was
8    issued by the Supreme Court in 2001, correct?
9    A.  That's correct.
10   Q.  So this -- so the Army Corps permitted this
11   project after the SWANCC decision, right?
12   A.  Yes.
13   Q.  So in 2004, your Army Corps regulations that
14   were in effect regarding the scope of the waters of the
15   United States was the regulation from the 1980s that
16   I -- that I put up as -- as deposition Exhibit 244;
17   isn't that right?
18   A.  Yes.
19   Q.  So this is the same regulations that are in
20   effect today, right?
21   A.  Yes.
22   Q.  So the Tuscawilla project is located near
23   Bessey Creek in Martin County, isn't it?
24   A.  Yes, it is.
25   Q.  Bessey Creek actually crosses the property,



Page 101

1  doesn't it?
2      A.  I believe it does, yes.
3      Q.  Okay.  So there's two -- I have two exhibits
4  related to this project, both of which were produced in
5  discovery.  So let me start with the first one.  Let me
6  see if I can find it here.
7          So I'm going to share my screen now.  And I
8  putting up on the screen what I've marked as Deposition
9  Exhibit 246, and this is the Statement of Findings for
10  number 2004-2914.
11          (Defendants' Exhibit 246 was marked for
12  identification.)
13  BY MR. MCALILEY:
14      Q.  Do you see that on the first page?
15      A.  Yes, I do.
16      Q.  So -- so this is a form that I -- we -- it was
17  produced to us and I'm just for the record on the lower
18  right-hand corner of this document, it's -- it's a
19  Bates stamp.  The first one is USACE 11795, and it goes
20  all the way down into USACE 11892.  So have you looked
21  at this document here in preparation for the deposition
22  today?
23      A.  Yes, I did.
24      Q.  Okay.  So let me -- and there's a lot of
25  overlap between this -- or there's some overlap between

Page 102

1  this document in the next one exhibit but let's just
2  scroll to have them.  So at Page 2, there's a --
3  there's something that's called checklist for 2002
4  Nationwide Permit review, Nationwide Permit 39.  Do you
5  see that?
6      A.  Yes, I do.
7      Q.  So is this the actual statement of findings of
8  the -- that -- that the project manager put in the file
9  for its determination related to this permit?
10      A.  Yes, it is.
11      Q.  And I see that there's some check marks or Xs
12  in boxes here.  Let me just scroll down a couple of
13  pages.  So now on -- on the bottom and I'm on Page 4.
14  You see it says reviewed by Alisa Zarbo date 7-17-06.
15  Do you see that there on Page 4?
16      A.  Yes.
17      Q.  So it -- would this indicate that Ms. Zarbo
18  was a person who filled out this statement of findings
19  form?
20      A.  Yes, it is.
21      Q.  And Ms. Zarbo works in the Army Corps
22  Regulatory Division, doesn't she?
23      A.  She does.
24      Q.  And so let me zoom up here -- or scroll back
25  up.  And now on Page 2 on the Statement of Findings and

Page 103

1  I just want to focus on Question 3 -- I'm sorry,
2  Question 4.
3          "Does the discharge cause the loss of greater
4  than half of an acre of waters in the US?"  And do you
5  see where the -- the no is there's an X next to it?
6      A.  Yes.
7      Q.  So does this mean that Ms. Zarbo for the Corps
8  determined that this project would not cause the loss
9  of more than a half acre of the waters of the US?
10      A.  To qualify for this particular Nationwide,
11  Nationwide 39, you would -- your impacts would have to
12  be less than a half an acre of impact to waters of the
13  US.  And so she is verifying that on this form.
14      Q.  Okay.  So let's -- so let's scroll down here a
15  little bit past this checklist.  And this document came
16  attached -- by the way, does is -- does the Corps keep
17  copies of its records for each permit and -- and file
18  them away for its records?
19      A.  Yes.
20      Q.  And when it does that does it often combine
21  different documents related to a permit or a JD request
22  and put them together in the same document?
23      A.  Yes.  Particularly on --
24          MR. ADKINS:  Objection.  Foundation.
25  BY MR. MCALILEY:

Page 104

1      Q.  Go ahead.
2      A.  Can you ask the question a different way?
3      Q.  Yeah.  Just -- just when -- when the Corps
4  files its records of different permits that have been
5  issued in jurisdictional determinations, they will
6  often put the various documents in the file together
7  when -- when it -- when it stores the records, right?
8          MR. ADKINS:  Objection.  Foundation.  Vague.
9  BY MR. MCALILEY:
10      Q.  Okay.  Do you know?
11      A.  I can't speak to the file management
12  procedures in the time before my tenure with the Corps,
13  which this project was.
14      Q.  Today, does the Corps when it -- when it files
15  and archives records related to permit decisions, does
16  it put in the file copies of the various documents that
17  were considered by the Corps in making the decisions?
18          MR. ADKINS:  Same objection.
19          THE WITNESS:  Yes.
20  BY MR. MCALILEY:
21      Q.  Just for the record, was that a yes?
22      A.  Yes.
23      Q.  Okay.  So I'm now down on Page 5, you see
24  there's a letter with a headline -- with a header for
25  EW Consultants.



Page 105

1    A. Uh-huh.

2    Q. And it's dated June 14th, 2006, and it's

3  addressed to Ms. Alisa Zarbo, subject, Tuscawilla.  Do

4  you see that there on Page 5?

5    A. Yes, I do.  Would you mind making that -- that

6  document a little bit larger for me, please?

7    Q. That help?

8    A. Thank you.

9    Q. Let me zoom out, we've got too big.  And just

10  to scroll down, so this is a letter to Ms. Zarbo from

11  EW Consultants, I'll come back up in a sec.  And you

12  see a sign there on Page 6, sincerely, EW Consultants,

13  Inc., Paul M. Ezo.  Do you see that?

14    A. Yes, I do.

15    Q. So does this appear to be a letter that was

16  sent to Ms. Zarbo by EW Consultants, Inc., related to

17  the Tuscawilla project?

18    A. It appears so.

19    Q. Okay.  Did you -- and you just -- and you

20  looked at these documents before the deposition today,

21  right?

22    A. Yes, I did.

23    Q. And did you discuss these documents with

24  Ms. Zarbo as you prepare for the deposition?

25    A. I did.

Page 106

1    Q. Did she indicate that this was in fact a copy

2  of a letter that had been submitted to her back when

3  she did her permit decision in 2006?

4    A. I didn't ask specifically about this letter.

5    Q. Did you discuss this letter with Ms. Zarbo?

6    A. I don't believe I did.

7    Q. Okay.  Let's go to the bottom of Page 5 of the

8  PDF, and I have some text here that I've highlighted.

9  It's enough to read this in pieces here.

10    It's the bottom paragraph. "As you may

11  recall, our site visits to the project area concluded

12  that there are indeed additional Corps jurisdictional

13  wetlands areas based on the federal wetland criteria."

14  Let me stop, end quote.  Did I read that correctly?

15    A. Yes.

16    Q. So this indicates that -- that Ms. Zarbo

17  conducted a site visit with Mr. Ezo to the project site

18  before she made a decision, right?

19    A. Yes.

20    Q. Okay.  Let me go down to the -- the third

21  sentence. "Impacts to Corps jurisdictional wetlands as

22  a result of the proposed development, include the

23  filling of 0.18 acres of ditches." Scrolling down to

24  the next page to Page 6. "And 0.25 acres of naturally

25  occurring wetlands for a total impact of 0.43 acres.

Page 107

1  See Figure 1." Did I read that right?

2    A. Yes.

3    Q. So Mr. Ezo indicated that there was 0.43 acres

4  of wetlands on the site that were subject to the Corps'

5  jurisdiction, right?

6    A. Yes.

7    MR. ADKINS:  Objection.

8  BY MR. MCALILEY:

9    Q. And Mr. Ezo -- and -- and by the way, 0.43

10  acres of wetlands and -- within the Corps' jurisdiction

11  is less than half an acre of Corps jurisdictional

12  wetlands, right?

13    A. You're asking if 0.43 acres is less than half

14  an acre?

15    Q. Yeah.

16    A. Yes.

17    Q. I'm a lawyer doing my job.

18    A. Okay.  I just -- I wanted to make sure I heard

19  you correctly.

20    Q. Okay.  So let's -- and then let's go down to

21  the -- the sentence -- the second full sentence on the

22  top of this paragraph on Page 6.

23    "There is a proposed impact to an isolated

24  wetland located in the northwest corner of the project

25  site.  See Figure 2.  This edge of this wetland system

Page 108

1  is 520 feet from Bessey Creek, which is non-tidal in

2  this area of Martin County, while the impacted area is

3  800 feet from the creek.  Therefore, this wetland

4  system does not meet the required distance criteria for

5  Corps connectivity." Did I read that right?

6    A. Yes, you did.

7    Q. So Mr. Ezo told -- wrote to Ms. Zarbo and

8  said, he thought that this was an isolated wetland,

9  right?

10    A. Yes.

11    Q. And that isolated wetland would be outside of

12  the Army Corps' jurisdictional determination --

13  jurisdictional -- let me rephrase this.  That wetland

14  would be outside of the Army Corps' Clean Water Act

15  jurisdiction, right?

16    A. Yes.

17    Q. The only reason given to support this

18  conclusion that the wetland was isolated, was its

19  distance from Bessey Creek, correct?

20    A. That is correct.

21    Q. There's no discussion in this letter about

22  whether there is a hydrological connection between the

23  wetland and Bessey Creek is there?

24    MR. ADKINS:  Objection.  The witness hadn't

25  reviewed the entirety of this letter or at least she



SHANNON C. WHITE
UNITED STATES V. SHARFI

June 22, 2022
109–112

Page 109

1 hasn't testified that she had.
2 BY MR. MCALILEY:
3      Q.  Ma'am, you can answer the question.  You
4 testified a minute ago you looked at this and so like,
5 well, let me leave let me state it for you again.  This
6 letter or the -- only -- this -- there was no
7 discussion in this letter for Mr. Ezo to Ms. Zarbo
8 about whether there was a hydrologic connection between
9 the wetland and Bessey Creek, right?
10      MR. ADKINS:  Objection.  Our practice has been
11 throughout these depositions give the witness an
12 opportunity to review the document when you're asking
13 whether the entirety of the document does or does not
14 say something.  So I would ask that you give this
15 witness the same opportunity I've been giving and that
16 my team's been giving your witnesses.
17      MR. MCALILEY:  You know, Brandon, I'll do it,
18 but I think the witness should ask.
19 BY MR. MCALILEY:
20      Q.  Ma'am, do you want to read this whole letter
21 first?  I'm happy to like scroll through it and let you
22 just read it.
23      A.  I actually have it on my computer.  I can read
24 it.
25      Q.  Okay.  And you looked at this -- you looked at

Page 110

1 this document before the deposition.  You just
2 testified to that, right?
3      A.  I -- I did look at it.  It doesn't mean that
4 I've committed everything in the document to memory.
5      Q.  Do you want to take time to look at this
6 further?  Do you want to read this letter further
7 before I ask more questions?
8      A.  Yes, please.
9      Q.  Go ahead.  So I'm just referring to you the
10 letter from Mr. Ezo to Ms. Zarbo because there's 98
11 pages in this document that have all been stapled
12 together.  So it's Pages 5 and 6 of the PDF.
13      A.  Right.  I have it pulled up.  Thank you.
14 Okay.  I have finished looking at the letter.
15      Q.  Okay.  So let me just ask the question again.
16 So Ms. -- Ms. White, there's no discussion in this
17 letter to Ms. Zarbo about whether there was a
18 hydrologic connection between the wetland and Bessey
19 Creek; isn't that correct?
20      A.  That's correct.
21      Q.  And there's no discussion about whether there
22 were any barriers between this wetland in Bessey Creek,
23 right?
24      A.  That's correct.
25      Q.  And Mr. Ezo indicated the wetland is isolated

Page 111

1 solely based on its distance from Bessey Creek, didn't
2 he?
3      A.  Yes, he did.
4      Q.  So Ms. White, you're aware that this project
5 site and that wetland are located in the 100-year
6 floodplain of Bessey Creek, right?
7      MR. ADKINS:  Objection.  Lacks foundation.
8      THE WITNESS:  I do not recall seeing a FEMA
9 flood map in the documents provided during discovery.
10 BY MR. MCALILEY:
11      Q.  Did you ask Ms. Zarbo whether this wetland was
12 located in the 100-year floodplain?
13      A.  I did not.
14      Q.  You know it's your job if you're testifying
15 for an organization like a government agency that you
16 have to make reasonable inquiry into facts known to the
17 agency, right?
18      A.  Yes.
19      Q.  So let's -- there are other attachments in
20 this -- to this -- this statement of findings file.  Do
21 you recall seeing that there is -- one of the other
22 attachments was a worksheet for the South Florida Water
23 Management District that related to state wetland
24 permitting?
25      A.  Yes.

Page 112

1      Q.  Okay.  Let's go down to that.  Go to Page 17
2 of the PDF.  So you see a Page 16, there's a document
3 that's headed individual environmental resource permit
4 staff report.  Do you see that on the screen?
5      A.  I do.
6      Q.  So an environmental resource permit is a -- is
7 a wetland permit that's issued under Florida law,
8 right?
9      A.  Correct.
10      Q.  So this -- this is -- this is something
11 prepared by the South Florida Water Management District
12 in connection with issuance of a state permit for work
13 on that site, correct?
14      A.  Correct.
15      Q.  Okay.  I want to scroll down here and now I'm
16 on Page 17.  I'm going to go to the third paragraph,
17 Page 17.  You see where it says, "the site is located
18 within the 100-year floodplain of Bessey Creek?"
19      A.  Yes, I do.
20      Q.  Do you have any reason to doubt that that's
21 true?
22      A.  I do not.
23      Q.  Okay.  Let's go back up to page -- back up to
24 the letter from Mr. Ezo.  So on Page 7, he attaches
25 some figures to his -- to his letter.  And I want to



SHANNON C. WHITE
UNITED STATES V. SHARFI

June 22, 2022
113–116

Page 113

1 focus in on -- on Figure 1 which is on Page 7. So
2 could you see that on the screen?
3      THE REPORTER:  I think we lost her.
4      MR. MCALILEY:  Oh, did we lose her?
5      THE REPORTER:  Yes.
6      MR. MCALILEY:  Oh, what?  Hey, yeah.  I'll ask
7 all sorts of questions then, right?  Why don't we wait
8 for just a minute?  Do we want to just go off the
9 record then for a couple of minutes while we --
10      MR. ADKINS:  Yeah.
11      MR. MCALILEY:  I'll stop sharing, maybe
12 there's something to do with the document.  Sometimes I
13 forget it uses bandwidth, so --
14      THE REPORTER:  Without -- without no objection
15 we're off.  No problem.
16      (A recess was taken.)
17      THE REPORTER:  We're going back on record at
18 12:17 p.m.
19 BY MR. MCALILEY:
20      Q.  Okay.  So -- so Ms. White, I think right
21 before we got -- you were disconnected.  I -- I was
22 going to show you the figures in Deposition Exhibit
23 246.  So I'm going to go back to that exhibit.  And let
24 me ask, can you see Deposition Exhibit 246 now?
25      A.  Yes, I can.

Page 114

1      Q.  Okay.  So I'm on Page 7 and you could see I'm
2 on -- I'll zoom in here for a -- a moment here so you
3 can see it a little bit better.  So I'm down on -- you
4 see this is Figure 1.  You can see it in the lower
5 right-hand corner of Page 7?
6      A.  Yes.
7      Q.  So am I right that figure one shows the
8 location of wetlands on the project site in
9 relationship to Bessey Creek?
10      A.  Yes.
11      Q.  And the legend on the lower right identifies
12 whether wetlands are within the Corps' jurisdiction or
13 not, right?
14      A.  Yes.
15      Q.  Okay.  So if I look at these -- there's
16 different -- there's different legends here but for
17 instance, there is -- there is, I think is the third
18 entry in the legend, it is the dotted field there, the
19 box it says, "ACOE wetland preserve and enhance 73
20 acres."  Do you see that?
21      A.  Yes, I do.
22      Q.  So most of the wetlands here on the site are
23 labeled with that dotted -- that dotted field, right?
24      A.  Yes.
25      Q.  And then if I go to the bottom of the legend

Page 115

1 it says, "impacts the SWANCC wetlands." And as a
2 crosshatching, do you see that?
3      A.  Yes, I do.
4      Q.  And you could see north of Bessey Creek,
5 there's two areas here that have that crosshatching,
6 right?
7      A.  Yes.
8      Q.  So would you agree with me that this figure
9 purports to show those wetlands which are not subject
10 to Corps of Engineers jurisdiction, they're so-called
11 SWANCC wetlands?
12      A.  Yes, it does.
13      Q.  Okay.  So then if I -- if I scroll down here
14 at the next page, to Page 8, and I'll zoom out a little
15 bit to make it easier to read here.  So this is -- you
16 see it says, "Figure 2" on the bottom right-hand corner
17 of Page 8?
18      A.  Yes.
19      Q.  And this is a close-up of this wetland north
20 of Bessey Creek that had been labeled as a SWANCC
21 wetland in Figure 1, right?
22      A.  Yes.
23      Q.  So this figure shows the distance of that
24 wetland to Bessey Creek, doesn't it?
25      A.  It does.

Page 116

1      Q.  There's no information on this figure about
2 hydrologic connection between that wetlands and Bessey
3 Creek, is there?
4      A.  There is not.
5      Q.  And there's no information about barriers
6 between the wetland and Bessey Creek, is there?
7      A.  No, there's not.
8      Q.  Okay.  Okay.  So I want to stop sharing this
9 document and we'll go to the next document from the
10 permit file for this project.  See if I can -- okay.
11 So I'm going to -- I'm going to share with you what
12 I've -- I've marked here as Deposition Exhibit 247.
13 And this is a document that we received from the Corps
14 of Engineers and it says "permit" on it, number
15 2004-2914.
16      (Defendants' Exhibit 247 was marked for
17 identification.)
18 BY MR. MCALILEY:
19      Q.  Do you see that?
20      A.  Yes, I see it.
21      Q.  That's the same permit number as the prior
22 exhibit that had the statement findings, right?
23      A.  Yes.
24      Q.  Okay.  I just want to point out that this was
25 produced to us by the government in discovery.  And



SHANNON C. WHITE
UNITED STATES V. SHARFI

June 22, 2022
117–120

Page 117

1 the -- the first page of this document is Bates stamped
2 USACE 11893 and last page is Bates stamped USACE 11914.
3 Go back up to the top. Okay. So on Page 2 of
4 Deposition Exhibit 247, there's a letter on Army Corps
5 letterhead dated July 18, 2006. Do you see that?
6    A. Yes, I do.
7    Q. And it's addressed to Mr. Gregory Fagan
8 regarding SAJ-2004-2914, right?
9    A. Yes. That's correct.
10    Q. And -- and would it be fair to assume that
11 Mr. Pagan and was the property owner or the -- the
12 project proponent?
13    A. He would've been the applicant.
14    Q. Okay. If I go down to the second page of this
15 letter. I'm sorry not the second page. The fifth page
16 of this letter is this is Page 6 of the PDF. You see
17 that there's a -- see a -- a copy sent to EW
18 Consultants, right?
19    A. Yes. Correct.
20    Q. And that would have -- EW Consultants is
21 where -- where Mr. Ezo works, right?
22    A. I believe so.
23    Q. Right. I mean the letter that Mr. Ezo sent
24 that I read to you --
25    A. Yeah.

Page 118

1    Q. -- on Exhibit 246 was on EW Consultants
2 letterhead, right?
3    A. It was. Yes. Right.
4    Q. All right. So we need go back up here. So
5 I'm now on the first page of the letter.
6       I'm going to the first paragraph and there's
7 a -- let me read the second sentence. "A review of the
8 information and drawings provided shows the proposed
9 work consists of filling approximately 0.25 acre of a
10 wetland and 01.8 acre of the jurisdictional ditch to
11 construct a residential development referred to as
12 Tuscawilla." And I'll stop there.
13       Did I read that right?
14    A. Yes, you did.
15    Q. So this sentence indicates that in making the
16 permit decision, Ms. Zarbo reviewed the materials
17 provided by the -- the project applicant, right?
18    A. Yes.
19    Q. And am I right that the acreage of Clean Water
20 Act jurisdictional wetlands identified here is the same
21 acreage that was in Mr. Ezo's letter to Ms. Zarbo?
22    A. Yes.
23    Q. And that acreage does not include that wetland
24 north of Bessey Creek there was labeled as a SWANCC
25 wetland, right?

Page 119

1    A. That's correct.
2    Q. Right. Because that wetland was an isolated
3 wetland, not subject to Corps' jurisdiction, right?
4    A. That -- that's what the figure depicted, yes.
5    Q. And the representatives of the applicant told
6 the Corps it was going to fill that wetland, didn't it?
7    A. Yes.
8    Q. All right. Nothing in this letter says
9 that -- that they couldn't -- that they needed a permit
10 to fill that wetland from the Corps of Engineers at
11 least, right?
12    A. That's correct.
13    Q. So the Corps concluded that that wetland north
14 of Bessey Creek was isolated and therefore outside of
15 its jurisdiction, right?
16    A. Yes.
17    Q. And that was even despite the fact that that
18 wetland is in 100-year floodplain of Bessey Creek,
19 right?
20       MR. ADKINS: Objection. Lacks foundation.
21       THE WITNESS: The GAO report that you had
22 shown previously spoke to this rule of thumb 200 feet
23 that Jacksonville District was using prior to my tenure
24 with the Corps, which is when this decision was made.
25 So likely, the consultant was operating under -- and

Page 120

1 the project manager were operating under that guidance.
2       And so location in the floodplain was
3 irrelevant because it was beyond 200 feet, which is
4 what the Jacksonville District was using at the time.
5 BY MR. MCALILEY:
6    Q. Okay. The law was the same in 2006 as is
7 today, right?
8    A. Yes.
9    Q. Okay. So under the same law in 2006 that
10 exists today, the Corps of Engineers agreed that that
11 wetland North of Bessey Creek was isolated and outside
12 the Corps' jurisdiction, merely based upon its distance
13 from the creek, right?
14       MR. ADKINS: Objection. Vague.
15       THE WITNESS: It appears that they used
16 distance-based information only for this call.
17 BY MR. MCALILEY:
18    Q. Okay. Did you ask that question to Ms. Zarbo
19 when you're preparing for the deposition?
20    A. No, I did not.
21    Q. So -- but you would agree with me that the
22 Corps was affirmatively told that this -- that this
23 site was within the 100-year floodplain but even with
24 that, it still concluded that that one wetland was
25 isolated and outside the Corps' jurisdiction, right?



SHANNON C. WHITE
UNITED STATES V. SHARFI

June 22, 2022
121–124

Page 121

1    A. They did.  And when I spoke with Ms. Zarbo,
2  she indicated that she had looked at historic aerial
3  photos, had conducted a site inspection and determined
4  that that wetland in question was indeed geographically
5  isolated.  So she had supporting information that she
6  used to make that determination in addition to the
7  distance.
8    Q. Okay.  But the only thing in the paper record
9  that supports the determination that it's isolated is
10  the statement of its distance from Bessey Creek, right?
11    MR. ADKINS: Objection.  Vague.
12    THE WITNESS: Ms. Zarbo did not complete
13  and -- and enter into the administrative record the
14  results of her site inspection.
15  BY MR. MCALILEY:
16    Q. That wasn't my question.  So that document she
17  didn't create another document.  So the documents that
18  were created that the Corps archived as -- as part of
19  its official records of the federal agency under the
20  Federal Archive Act do not provide any reason that that
21  wetland would be isolated other than its distance from
22  Bessey Creek, right?
23    MR. ADKINS: Objection.  Asked and answered.
24  Vague.  Calls for a legal conclusion.
25    THE WITNESS: The documents in the file don't

Page 122

1  document the findings of the site inspection.
2  BY MR. MCALILEY:
3    Q. Okay.
4    A. Those findings were discussed with Ms. Zarbo
5  prior to this deposition.
6    Q. Okay.  So Ms. Zarbo went to the site because
7  It's important to go look at the wetland to reliably
8  determining whether or not it's isolated.  That fair to
9  say?
10    MR. ADKINS: Objection.  Vague.
11    THE WITNESS: We go to site visits for a
12  number of reasons.  Usually to verify a wetland
13  delineation, whether it's a wetland by federal
14  regulation or not.  As well as to collect information
15  to support our jurisdictional determination.
16  BY MR. MCALILEY:
17    Q. But it's a -- would you agree with me that
18  a -- a site visit is important in order to make a
19  reliable determination of jurisdiction when it comes to
20  a wetland that's, you know, not directly abutting a,
21  you know, a regulated water?
22    MR. ADKINS: Objection.  Vague.
23    THE WITNESS: Project managers use best
24  professional judgment to determine if a site inspection
25  is needed based on desktop resources and the resources

Page 123

1  provided by the applicant.  Not every project warrants
2  a site inspection.
3  BY MR. MCALILEY:
4    Q. This one did, right?
5    A. This one did.  Ms. Zarbo did complete a site
6  inspection for this project.
7    Q. Okay.  So based on this permit, you would
8  agree with me that this permit decision -- you would
9  agree with me that not all wetlands in the Bessey Creek
10  floodplain are within the Corps' jurisdiction, right?
11    A. I can speak to this project site and this
12  determination.  I can't speak to every wetland in the
13  watershed of Bessey Creek.
14    Q. Okay.  But that wasn't like -- I'm not asking
15  to speak to every wetland.  I'm simply wanting to ask
16  you, you agree with me based on this permanent decision
17  that -- that there's at least some wetlands in the
18  Bessey Creek watershed in the Bessey Creek floodplain
19  that are outside the Corps' jurisdiction, right?
20    A. There's at least two wetlands on this project
21  site that are outside of -- or are considered isolated
22  to Bessey Creek again.  Each AJD is site-specific.  So
23  I can't -- I can't speak to other sites outside of this
24  site that I don't have knowledge on.
25    Q. It wouldn't be -- it wouldn't be accurate to

Page 124

1  simply assume that all other wetlands in the Bessey
2  Creek watershed are within the Corps' jurisdiction
3  without going and looking at the specific circumstances
4  of each wetland, right?
5    A. Can you repeat your question, please?
6    Q. Yeah.  It -- it wouldn't -- it -- it would
7  be -- it would be -- it -- it would not be the
8  appropriate way to -- let me -- let me rephrase this.
9  I mean -- let me -- let me ask this a different way.
10    So we all agree there's at least these two
11  wetlands in the Bessey Creek watershed that are outside
12  the Corps' jurisdiction, right?
13    A. Yes.
14    Q. Okay.  And there's other wetlands in the
15  Bessey Creek 100-year floodplain, aren't there?
16    A. I believe so.
17    Q. Right?  You can't -- it -- it -- you can't
18  just assume that all other wetlands in the Bessey Creek
19  watershed are subjected to -- to the Corps'
20  jurisdiction, can you?  Without doing like a site
21  specific investigations, right?
22    A. You can't -- you can't assume jurisdiction
23  or -- or no jurisdiction without an approved
24  jurisdictional determination.  Now, depending on the
25  site characteristics, depending on the resources we



SHANNON C. WHITE
UNITED STATES V. SHARFI

June 22, 2022
125–128

Page 125

1  have at our -- our disposal and at the direction of our
2  particular field offices, we may or may not do a site
3  inspection.  A site inspection may not be warranted.
4      Q.  But you at a minimum do a -- a -- an analysis
5  of each specific wetland in order to look at what other
6  evidence there was about that wetland to determine
7  whether or not it was within the Corps' jurisdiction,
8  right?
9      A.  Yes.
10     MR. ADKINS:  Objection.  Asked and answered.
11     THE WITNESS:  But that doesn't mean that we
12  would conduct a site inspection on every --
13  BY MR. MCALILEY:
14     Q.  Yeah.  I wasn't asking about a site
15  inspection.
16     A.  -- jurisdiction site.
17     Q.  Yeah.  I wasn't asking about the site
18  inspection.  My only question was a wetland specific
19  determination.
20     A.  So determining if it is the wetland by federal
21  definition was the question?
22     Q.  Yeah.
23     A.  So typically, the consultant would provide a
24  delineation report with mapping and other supporting
25  information.  We would review that in our office.  If

Page 126

1  based on the information that was provided by the
2  consultant or the applicant and our desktop resources,
3  we felt that that delineation was accurate, we may not
4  do a site inspection.
5      If we felt like perhaps there were some areas
6  that were suspect or areas that we think we would need
7  to take a closer look at then we would do that.  But
8  for a determination if it's a wetland or not, we may or
9  may not do a site inspection depending on the -- the
10  information provided and the information that -- that
11  we had at our disposal.
12     Q.  Okay.  So again, I'm not asking about whether
13  it's a wetland or not, right?  Let's just assume it's a
14  wetland.  And I'm not -- I'm not just asking that a
15  site inspection.
16     A.  Sure.
17     Q.  But -- but -- so I'm asking, though, is that
18  you can't reach a conclusion about any individual
19  wetland and whether it is within the Corps'
20  jurisdiction without looking at evidence available to
21  the Corps of Engineers specifically with regard to that
22  wetland and weighing that evidence to determine one way
23  or the other?
24     A.  That's true.  We do use supporting
25  documentation to make our calls.

Page 127

1      Q.  And you just can't assume -- it would be -- it
2  would be incorrect to just assume that all wetlands in
3  the Bessey Creek 100-year floodplain are within the
4  Corps' jurisdiction without doing any site specific --
5  not necessarily a site visit but a site specific
6  investigation of what the facts are, right?
7      MR. ADKINS:  Objection.  Misstates testimony.
8      THE WITNESS:  You would have to review
9  information to specific wetlands within the Bessey
10  Creek watershed to determine whether or not they were
11  jurisdictional or not.
12  BY MR. MCALILEY:
13     Q.  Okay.  Okay.  Let me exit out of this document
14  here.  Let's turn to the next project, Driftwood Kay.
15  So Ms. White, you recall that one of the matters for
16  examination for this deposition is the Army Corps'
17  determination of Clean Water Act jurisdiction, in
18  connection with SAJ-2014-2167, which is a Driftwood Kay
19  project, right?
20     A.  Yes.
21     Q.  And are you prepared to testify about the
22  Corps of Engineers' determinate -- determination of
23  jurisdiction related to that permit number?
24     A.  Yes, I am.
25     Q.  Okay.  And what did you do to prepare to

Page 128

1  testify with regard to this project?
2      A.  I reviewed the document that was provided
3  during discovery and I spoke with the project manager
4  again, Ms. Zarbo.
5      Q.  Okay.  I'd like to show you what I'm marking
6  here as Deposition Exhibit 248.  So this is the
7  Approved Jurisdictional Determination Form for that
8  project number.
9      (Defendants' Exhibit 248 was marked for
10  identification.)
11  BY MR. MCALILEY:
12     Q.  Do you see it on Section 1 the --
13     A.  Yes.
14     Q.  -- 2014-2167 Driftwood Kay?  So is this --
15  have you reviewed this approved jurisdictional
16  determination form?
17     A.  Yes, I have.
18     Q.  Okay.  And -- and this -- this Approved
19  Jurisdictional Determination Form is up on the Army
20  Corps of Engineers website; isn't it?
21     A.  Yes, it is.
22     Q.  And so based on the file number, am I right
23  the -- at least the request for an approved
24  jurisdictional determination would have been made in
25  2014; is that right?



SHANNON C. WHITE
UNITED STATES V. SHARFI

June 22, 2022
129–132

Page 129

1    A.  The permit application or the request for the
2    AJD would've been made in 2014.  However, if you look
3    at the date at the top of the form, it is 2015 when it
4    was completed.
5        Q.  Okay.  That was my next question.  And thank
6    you, you've -- you've -- you skipped ahead.  So in
7    December of 2015, when this form was completed, the
8    regulations that were in effect regarding the scope of
9    the waters of the US are the -- were the regulations
10   from the 1980s, right?
11       A.  Correct.
12       Q.  So those are the same regulations that are in
13   effect today, right?
14       A.  Yes, right.
15       Q.  So I want to go to down on page -- on the
16   first page of this document in Section 1D, "review
17   perform for site evaluation, check all that apply" and
18   you see it says there's an X next to "field
19   determination dates 18 November 2015."  You see that?
20       A.  Yes.
21       Q.  So the Corps conducted a site visit here, too,
22   right?
23       A.  Yes.
24       Q.  Okay.  If I go down here to Section 2, that's
25   the summary of findings, right?

Page 130

1        A.  That's correct.
2        Q.  Okay.  And then there's -- and -- and so 2B is
3    "Clean Water Act Section 404 determination
4    jurisdiction," right?
5        A.  Yes.
6        Q.  You could see under 2B1, there's an X next
7    to -- that there are presence of waters of the US in
8    review area and X is next to wetlands directly abutting
9    RPWs that flow directly or indirectly in the TNWs.  Do
10   you see that?
11       A.  Yes.
12       Q.  So -- so Ms. Zarbo determined that there are
13   some wetlands on the site which are jurisdiction to the
14   Corps, right?
15       A.  Yes.
16       Q.  If I go down here to Section 2B2
17   "non-regulated water wetland."  There's an X next the
18   box, "potentially jurisdictional waters and/or wetlands
19   were assessed within the review area, determined not to
20   be jurisdictional.  Explain."  And then there's a text
21   that I've highlighted.  Can you see that there?
22       A.  Yes, I can.
23       Q.  So the way this form works is that it's a
24   fillable form, right?  Some of the text is already in
25   the form.  And then the Corps project reviewer will

Page 131

1    type it more information that can show up on the final
2    form; is that right?
3        A.  That's correct.
4        Q.  So in this -- am I right that in this section
5    where the text is in bold, that would have been text
6    written by Ms. Zarbo when she filled out the form?
7        A.  That's correct.
8        Q.  Okay.  So let's go through this -- this text
9    here.  I'm going to zoom in a little bit to help.
10   Well, I got to zoom out I think I -- it's going to be
11   hard to read.  So it says, "of the two wetlands on the
12   project site, Wetland number 1, which is located to the
13   roadway, is isolated."  Did I read that right?
14       A.  That's correct.
15       Q.  So Ms. Zarbo determined that this wetland
16   was -- was isolated therefore, not subject to Clean
17   Water Act jurisdictions, right?
18       A.  Yes.
19       Q.  And then I go to the -- the next sentence.
20   "This wetland consists of 2.58 acres and surrounded by
21   native upland pine flatwoods and a road.  Dominant
22   vegetation in the uplands consists of saw Palmetto
23   (Serenoa repens), slash pine (Pinus elliotii) and wax
24   Myrtle (Myrica cerifera)."  Did I read that right?
25       A.  That's correct.

Page 132

1        Q.  By the way, did I pronounce the Latin right or
2    did I get it wrong?
3        A.  You did pretty good.
4        Q.  I never know, right?  That's for the
5    scientists to know, right?  Okay.  So Wetland number 1
6    was surrounded by a road and uplands according to this,
7    right?
8        A.  Yes.
9        Q.  And uplands are non-wetlands, correct?
10       A.  That's correct.
11       Q.  And the uplands here were pine flatwoods,
12   right?
13       A.  Yes.
14       Q.  And pine flatwoods are a type of upland,
15   right?
16       A.  Pine flatwoods -- she denoted on this form
17   that it was upland pine flatwoods.  There are wet pine
18   flatwoods, and mesic pine flatwoods, and upland or
19   zyrik pine flatwoods in the state of Florida.  There's
20   a couple of varieties of pine flatwoods.
21       Q.  Okay.  So the next sentence talks about the
22   vegetation in the uplands.  Am I right that you would
23   write down the vegetation because that would indicate
24   whether or not that there was wetland plants there?
25       A.  We typically do include a description of the



SHANNON C. WHITE
UNITED STATES V. SHARFI

June 22, 2022
133–136

Page 133

1  dominant species found --
2      Q.  Okay.
3      A.  -- in an area.
4      Q.  So I see -- so I see the first one listed in
5  that third sentences is saw palmetto, which is Latin
6  serenoa repens.  That's an upland plant?
7      A.  It is.
8      Q.  The next one is slash pine, pinus elliotii, if
9  I'm pronouncing that right.  Is that an upland plant?
10     A.  Its wetland indicator status is facultative
11 wet.
12     Q.  Okay.  So it could be an upland plant or it
13 could be a wetland plant.  Is that what you're saying?
14     A.  Correct.
15     Q.  How about wax myrtle, myrica --
16     A.  Wax --
17     Q.  -- cerifera, is that a wetlands plant or an
18 upland plant?
19     A.  It's a facultative plant, so it's indicator
20 status is facultative.  So it can be found both in
21 wetlands and uplands.
22     Q.  Let's go down to the next page.  The top of
23 the next page is the same text.  It just goes over to
24 the next page.  And we -- let's just walk through this.
25 Excuse me.  First sentence, "surface water is impounded

Page 134

1  in Wetland 1 due to the road and surrounding uplands,
2  between the two wetlands on the upland pine flatwoods,
3  which are at a higher elevation in the wetlands." So
4  did I read that right?
5      A.  That's correct.
6      Q.  So am I right that this -- because there --
7  the uplands -- well, because there's uplands between
8  the two wetlands, that was a barrier to water flow
9  between the wetlands?
10     A.  I'm sorry.  You cut out just a little bit
11 there.  Could you repeat your question?
12     Q.  All right.  Yes.  So am -- am I right that --
13 that which you -- which you've written the approved
14 jurisdictional determination, is that the -- is that
15 the existence of uplands between the two wetlands in
16 which are at a higher elevation in the wetlands created
17 a barrier to water flow between those two wetlands?
18     A.  That's correct.
19     Q.  The next -- and -- and by the way, if there's
20 a barrier to water flow that can be a factor the Corps
21 would consider in determining whether or not a wetland
22 is isolated, right?
23     A.  Yeah, because geographically isolated wetlands
24 don't have a surface hydrologic connection to a -- a
25 downstream water of the US.

Page 135

1      Q.  Okay.
2      A.  So uplands can act like that barrier.
3      Q.  Okay.  The next sentence says, "Wetland 1 is
4  located at 915 feet north of Wetland 2." Did I read
5  that right?
6      A.  Yes.
7      Q.  So this is 20 -- this is -- what year is this
8  again?  This is 2015 and Ms. Zarbo is -- is referencing
9  the distance of the wetland to other regulated waters
10 of the US, right?
11     A.  She is.
12     Q.  So the reason that she wrote down the distance
13 is because distance is one of the factors that the
14 Corps considers in determining whether a wetland is
15 isolated or not, right?
16     MR. ADKINS:  Objection.  Vague.
17     THE WITNESS:  She wrote the distance to
18 indicate the amount of uplands between Wetland 1 and
19 Wetland 2.
20 BY MR. MCALILEY:
21     Q.  It doesn't say that in that sentence, though,
22 does it?
23     A.  When I asked Ms. Zarbo about that, she
24 answered to that effect.
25     Q.  I see.  So -- so it's your testimony, again

Page 136

1  that even though the GAO found in that report to
2  Congress, the distance between a wetland and regulated
3  water is a factor in determining whether a wetland is
4  isolated or not.  That the distance of Wetland 1 is not
5  relevant to whether it was isolated or not in this
6  instance?
7      A.  Well, Wetlands 2 is not An RPW, or a TNW, or
8  non-RPW.
9      Q.  Okay.
10     A.  So in this case, the distance is talking about
11 the amount of uplands in between the two and that
12 uplands is acting as the geographic barrier.  Because
13 you wouldn't relate the distance of one wetland to
14 another.  You'd be relating it to that TNW, the RPW, or
15 the non-RPW.
16     Q.  Got it.  Okay.  The next sentences says,
17 "south of Wetlands 2 is an offsite ditch that discharge
18 is directly into the South fork of the St. Lucie River.
19 Water within Wetland 1 does not discharge to Wetland 2
20 or the offsite adjacent ditch.  The surface elevation
21 between the wetlands are higher from the two wetlands
22 and consist of uplands." Did I read that right?
23     A.  Yes.
24     Q.  So am I right that this jurisdictional form
25 does not state the basis for this assertion that



Page 137

1  Wetland 1 does not discharge to Wetland 2?  It simply
2  says it is separated by uplands.
3      A.  It does say that it's separated by uplands.
4      Q.  Right.  But it doesn't -- okay.  But -- but it
5  says it's separated by uplands but nowhere does it
6  indicate the basis for the assertion that Wetland 1
7  does not discharge to Wetland 2, other than just to say
8  there's this area of uploads between the two wetlands,
9  right?
10      A.  That's correct.  And typically, the presence
11  of extensive amounts of uplands is enough to say that
12  it's not hydrologically connected.
13      Q.  Okay.  Okay.  So if there's a -- if there's a,
14  you know, an area of uplands between a wetland and a --
15  and a regulated water, that -- if that area of uplands
16  is -- is big enough, that can be a basis to conclude
17  that there's no -- that the wetland's isolated, right?
18      A.  It could be -- it could be used for that.
19  Yes.
20      Q.  Okay.  So if -- if one wants to look at a
21  wetland to determine whether or not it's isolated, it'd
22  be relevant to know whether there are uplands between a
23  wetland and regulated water, right?
24      MR. ADKINS:  Objection.  Vague.
25      THE WITNESS:  It's important to understand all

Page 138

1  aspects of a project site when determining
2  jurisdiction, what type of waters you have, and -- and
3  their distance to TNWs, RPWs, or non-RPWs and whether
4  there -- you know, an area is an upland.  All of that
5  factors into a determination.
6  BY MR. MCALILEY:
7      Q.  There's no mention in this -- in this approved
8  jurisdictional determination of any analysis of
9  groundwater movement between the two wetlands, is
10  there?
11      A.  No, there's not.
12      Q.  It sounds like what she just focused on was
13  the potential for surface water discharges, right?
14      A.  Yes.
15      Q.  The Corps typically doesn't -- doesn't assume
16  that there's a groundwater connection between --
17  between a wetlands and other regulated waters when the
18  wetland's located -- is not abutting the water, right?
19      A.  Abutting or adjacent.
20      Q.  Okay.  But adjacent -- adjacent wetlands can
21  include wetlands that are not directly abutting but are
22  neighboring to a --
23      A.  Right.
24      Q.  -- regulated water, right?
25      A.  Right.

Page 139

1      Q.  And some of those neighboring wetlands, in
2  theory, could be located, you know, a few hundred feet
3  away than the regulated water.  That's your testimony
4  here today, isn't it?
5      A.  They potentially could be depending on the
6  size of the -- the TNW or RPW that they're associated
7  with.  Would -- we spoke a bit about riverine
8  morphology and backwater wetlands that are associated
9  with large river systems.  And so neighboring wetlands
10  may be a bit more of a distance away from that river,
11  but they still receive surface water or there's -- they
12  are connected hydrologically via flood waters.
13      Q.  But the Corps doesn't simply assume that
14  there's a groundwater connection between a wetland and
15  a regulated waters.  It's -- it's looking for -- for
16  evidence of a surface water connection, right?
17      A.  Correct.
18      MR. ADKINS:  Objection.  Compound.
19  BY MR. MCALILEY:
20      Q.  Okay.  So -- let me exit out of this document.
21  Now let's turn to the last of the -- the projects.
22  So do you recall that one of the matters for
23  examination is the Army Corps determination of Clean
24  Water Act jurisdiction in connection with this
25  SAJ-2015-3711, which is the Stevens project?

Page 140

1      A.  Yes.
2      Q.  Now, are you prepared to testify for the
3  agency regarding the permitting for this project?
4      A.  Yes, I am.
5      Q.  What did you do to prepare to testify with
6  regard to this project?
7      A.  I reviewed the documents that were provided
8  during discovery and I spoke with a project manager.
9  Her name is Virginia King.
10      Q.  So the Stevens project involved the proposed
11  construction of a single-family home, right?
12      A.  Yes, it did.
13      Q.  And the -- at least based upon the permit
14  number, the application date was 2015, right?
15      A.  Yes.
16      Q.  So would you agree with me that -- that the
17  same law applied to this project in terms of the scope
18  of the waters of the US that applies today?
19      A.  Yes.
20      Q.  Okay.  Let's go to the last exhibit, which I
21  believe is 249.
22      MR. ADKINS:  I just had -- you're at 248.
23      MR. MCALILEY:  Yeah, so --
24      MR. ADKINS:  Is this one that you made
25  separately?



SHANNON C. WHITE
UNITED STATES V. SHARFI

June 22, 2022
141–144

Page 141

1    MR. MCALILEY:  I'm sorry.  So what -- is -- is
2  249 the right number or is it -- do I -- do I have a
3  different number?
4        MR. ADKINS:  I guess I'm saying the packet I
5  got from you went up to 248.
6        MR. MCALILEY:  Oh, I may have left (audio
7  interruption) sorry.
8        MR. MOORE:  The -- the last exhibit was 247 is
9  what I have.
10       MR. MCALILEY:  Okay.  Guys, I'll resend this
11 one.  And John, I'm sorry.  I -- it looks like I was
12 just pulling, you know, dragging and pulling things off
13 my desktop here.  This is my last exhibit, unless
14 there's some surprises here.
15 BY MR. MCALILEY:
16    Q.  I'm now showing you, Ms. White, what I've
17 marked as Exhibit 249, which is a letter from the Army
18 Corps to Alan Stevens dated November 9, 2018.  Do you
19 see that?
20       (Defendants' Exhibit 249 was marked for
21 identification.)
22       THE WITNESS:  Yes, I do.
23 BY MR. MCALILEY:
24    Q.  Okay.  And I'm going to point out, these are
25 documents that received from the government in the

Page 142

1  case.  They have a Bates number in the lower right-hand
2  corner of the first page is USACE 12902 and then the
3  last page is USACE 12914.  Okay.  So I want to point
4  out that in this document.  Well, first of all, have
5  you looked at these documents in prepping for the depo
6  today?
7     A.  Yes.
8     Q.  So in this -- in this document, there are two
9  letters to Mr. Stevens dated November 9, 2018.  So
10 there is a Page 1, there is a letter to Mr. Stevens.
11 And this one is signed by Virginia King.  And then if I
12 keep going down, now I'm on Page 6 is another one to
13 Mr. Steven's date of November 9th and this one is
14 issued by Alisa Zarbo.  Do you see that?
15    A.  Yes.
16    Q.  Okay.  So did you -- you spoke with Ms. King
17 about this project or both Ms. King and Ms. Zarbo?
18    A.  I spoke to Ms. King.  It is policy in the
19 Jacksonville District.  Ms. King worked for Ms. Zarbo.
20 Ms. Zarbo is the Section Chief of the Palm Beach
21 Gardens Regulatory Office and Regulatory Chiefs and
22 their respective offices sign JD letters for their
23 project managers.  So the signature here is because
24 Ms. Zarbo it -- at that time was Ms. King's supervisor.
25    Q.  Go it.  Because it references Ms. King in the

Page 143

1  last paragraph, the second letter dated November 9,
2  right?
3     A.  Yeah.  It's -- it's a signature delegation
4  authority that we operate under in Regulatory Division.
5     Q.  Okay.
6     A.  Certain documents require higher level of
7  review and signature.
8     Q.  So can you explain to me why there's two
9  letters sent to Mr. Stevens the same day with different
10 signatures from the Corps?
11    A.  For no permanent required, that signature
12 delegation that I spoke of?  No permanent required and
13 general permits can be signed by the project manager
14 who reviews the permit applications.
15       Approved jurisdictional determinations must be
16 signed by a higher level sup -- person, either a senior
17 project manager or a supervisor.  So the first letter
18 is a no permit required for the proposed project.  And
19 the second is the jurisdictional determination letter.
20 So there's two letters because there's two different
21 signature authorities.
22    Q.  Okay.  Okay.  So the first letter, this is on
23 Page 1 of -- of Exhibit 249 and on page -- the second
24 paragraph, it says in the -- in the second sentence,
25 the second paragraph.  It says, "further a permit will

Page 144

1  not be required in accordance with section 404 of the
2  Clean Water Act as it will not involve the discharge of
3  dredged or fill material into waters of the United
4  States." So did I read that correctly?
5     A.  Yes, you did.
6     Q.  So this is the no permit required letter,
7  right?
8     A.  Correct.
9     Q.  And what this is saying is that you don't need
10 a permit because there's -- because your proposed
11 project does not involved a discharge of dredged or
12 fill material into the waters of the US, right?
13    A.  Correct.
14    Q.  Okay.  If I go down, you know, to the -- see
15 that there is -- I'm scrolling down here to Page 6.
16 I'm now on the second November 9, 2018, letter.
17       And I want to read the -- the second sentence
18 of the first paragraph.  "Based on information
19 submitted to the Army Corps of Engineers we have
20 preliminary -- preliminarily determined that there may
21 be waters of the United States, including wetlands on
22 your parcels." And then it gives a parcel ID and the --
23 and the address.
24       And I read that right, at least in part?
25    A.  Yes.



SHANNON C. WHITE
UNITED STATES V. SHARFI

June 22, 2022
145–148

Page 145

1    Q. So this -- this reports that the Corps had
2 determine that under their preliminary jurisdictional
3 determination, that there were -- that there may be
4 waters of the United States on the site, right?
5    A. Yes.
6    Q. So was this an affirmative conclusion that
7 there was, like -- that in fact those wetlands on the
8 site were regulated by the Army Corps of Engineers?
9    A. No. A preliminary jurisdictional
10 determination is -- is not legally binding. An
11 approved -- if we wanted a legally binding official
12 decision from the Corps, they would have had to have
13 requested an approved jurisdictional determination.
14    Q. Is Mr. Stevens, by the way, just the -- the
15 homeowner or the property owner? Do you know?
16    A. I know he's the applicant, I don't -- I don't
17 recall if he was the applicant and the property owner.
18 They can be different.
19    Q. Okay. So I want to -- just want to draw your
20 attention to the next to last paragraph from the bottom
21 of this page. It says, "you're cautioned that work
22 performed in areas which may be waters of the United
23 States is indicating a preliminary JD without a
24 Department of the Army permit could subject you to an
25 enforcement action." Did I read that, right?

Page 146

1    A. Yes.
2    Q. So you -- you -- the Corps told Mr. Stevens
3 that even though you weren't sure whether those are
4 wetlands under the score -- under the scope of the
5 agency's jurisdiction, if he did work in them, he may
6 be the subject -- or could subject him to an
7 enforcement action, right?
8    A. Yes.
9    Q. Let me ask you, is there -- do you think
10 Mr. Stevens understood that even though the Corps of
11 Engineers in this letter was saying there might be
12 waters of the US, it wasn't sure and that this threat
13 of an enforcement action may be without basis?
14    MR. ADKINS: Objection. Lacks foundation.
15 Vague.
16    THE WITNESS: I can't speak to Mr. Stevens
17 understanding of the text of the letter.
18 BY MR. MCALILEY:
19    Q. You would agree with me that the Corps of
20 Engineers cannot bring an enforcement action for
21 violations of the Clean Water Act if the work is in --
22 is in a wetland that's not part of the waters of United
23 States, right?
24    MR. ADKINS: Objection. Vague. Lacks
25 foundation. Outside of the scope.

Page 147

1    THE WITNESS: The Corps would have to
2 determine the -- the jurisdictional status of waters
3 that were impacted without a federal permit before
4 moving forward with an enforcement action.
5 BY MR. MCALILEY:
6    Q. Okay. So if -- if you have a wetland, it's
7 isolated and it's outside of Corps' Clean Water
8 jurisdiction. The agency can't bring an enforcement
9 action against somebody for doing work there, right?
10    MR. ADKINS: Objection. Lacks foundation.
11 Vague.
12    THE WITNESS: An approved determination would
13 have to be made, whether or not that wetland was
14 isolated or not. And remember just because it's
15 isolated, doesn't mean that it's not jurisdictional.
16 So if it's isolated, geographically isolated, and it
17 doesn't have that interstate commerce and the Corps has
18 made an official determination to that effect and there
19 was an impact to that wetland, then no -- no
20 enforcement action would happen.
21    However, an isolated determination can't be
22 made with a preliminary jurisdictional determination,
23 which is what was used in this case. You would have to
24 have an approved jurisdictional determination to make
25 the call, whether or not a wetland was either

Page 148

1 jurisdictional or not.
2 BY MR. MCALILEY:
3    Q. I'm just curious. Can you understand what
4 a -- a homeowner might feel is the letter from the
5 United States Army, it says that they did something
6 called a jurisdictional determination, to the average
7 person you'd think you'd determined a jurisdiction. It
8 says you may have jurisdiction, if you do work there it
9 can be subject to an enforcement action by the Army.
10    Don't you -- don't you -- do you -- do you
11 understand how a homeowner might feel or property owner
12 might feel when they get a letter like this? And --
13 and only to find out that, oh, the Corps hasn't
14 actually determined a jurisdiction and maybe we can't
15 do an enforcement action. You know, I -- just -- I'm
16 really -- I'm just asking you, putting yourselves in
17 the shoes of the homeowner. Doesn't this seem sort of
18 heavy-handed?
19    MR. ADKINS: Objection. Vague. Lacks
20 foundation. Outside the scope of this deposition.
21 BY MR. MCALILEY:
22    Q. Okay. You can answer the question. I'm
23 really just honestly asking you, Shannon White.
24    MR. ADKINS: Same objection. She's here to
25 testify on behalf of the Corps, not as Shannon White.



SHANNON C. WHITE
UNITED STATES V. SHARFI

June 22, 2022
149–152

Page 149

BY MR. MCALILEY:

Q. Okay. Ms. White, speaking for the Corps, can you understand how intimidating a letter like this might be to a property owner to say that if they did work on their property, any area of their property, they might be subject to an enforcement action by the United States Army, when the agency hasn't even actually determine whether it has jurisdiction?

MR. ADKINS: Same objection.

THE WITNESS: The applicant has the option to choose either a preliminary jurisdictional determination or an approved jurisdictional determination. Prior to the Corp completing either of those actions, project managers discuss both of those options with the applicant, explain those options to the applicant and helped the applicant decide what -- which route best suits their needs. So -- I'm done with the answer.

BY MR. MCALILEY:

Q. Ms. White, have you ever -- in your career, done work related to wetlands and the Clean Water Act, where you -- where you work with a represented -- a property owner as opposed to the government?

A. Have I -- have I worked as a -- are you asking if I worked as a consultant?

Page 150

Q. Yeah.

A. Outside the -- no. My only employment has been with the state of Florida and United States Army Corps of Engineers.

Q. Just do -- do you understand that when a property owner gets a letter like this, if not super sophisticated or have a lot of money to hire lawyers., they often just sort of go along with whatever the Corps says because it's just -- this is pretty intimidating.

MR. ADKINS: Objection. Lacks foundation. Outside scope.

THE WITNESS: Corps project managers regularly interact with property owners and consultants and property owners who don't have consultants. We do an inordinate amount of outreach to explain the regulatory program and work with those applicants, whether they have a consultant or not, to help them understand the process.

BY MR. MCALILEY:

Q. Okay. Let's -- let's scroll down in this below this -- this preliminary JD letter. And there's a form here. It starts on Page 8, "preliminary jurisdiction determination form." It says "name and address that person requesting PJD Allen Stevens." It

Page 151

gives the project location. It says, the review determine was an office desk determination and a field determination, so somebody went out to the site, right?

A. Yes.

Q. And it identifies the two areas that may be subject to jurisdiction is a wetland and a drainage ditch. Both of which you're identifying as may be subject to Section 404 of the Clean Water Act, right?

A. Yes.

Q. Okay. And then there's language here and now I'm on Page 9. Am I right that this language in Page 9 -- and I'll zoom out a little bit just to make it easier to scroll through -- is it a standard language that's attached to this preliminary jurisdiction determination form?

A. Yes.

Q. Okay. So then I go down to Page 10 supporting data. This is and there's box is checked to see what data was considered by the person of the Corps and making this preliminary jurisdictional determination, right?

A. Yes.

Q. So it indicates that there is various documents that were considered by the -- by the Corps' staff, correct?

Page 152

A. Yes.

Q. But then if I want to go to like, to see the specific reasons as to why the Corps asserted jurisdiction, the last page, I think it was the last page. The next to last page of this document is the wetland delineation map. Do you see that at the photograph looks like an aerial that somebody has drawn lines around -- around it on -- I'll zoom out so you can see the whole thing here. This is on Page 12.

A. Yes.

Q. Okay. And -- and am I right -- this -- this aerial photograph shows the property boundary in red, a drainage ditch in blue. And then a wetland. And I'm not quite sure of the color because I'm color-blind. Maybe it's green? Orange?

A. It's green.

Q. Okay. So that's the only information on this figure, right?

A. Yes.

Q. Okay. So -- and by the way, the next page, which is the last page, Page 13, it's a site survey, right? It shows the location of the wetland on the site, as well as the proposed location of the house that Mr. Stevens wants to build, right?

A. Yes.



SHANNON C. WHITE
UNITED STATES V. SHARFI

June 22, 2022
153–156

Page 153

1    Q. Okay. Can you tell me, if I go back to Page
2  12, this image, which is the wetland delineation map.
3  What information here tells me why the Corps of
4  Engineers was thinking it had jurisdiction over the
5  wetland on the site?
6    A. It's a preliminary JD. We don't determine
7  jurisdiction with a preliminary JD. Now, we identified
8  a wetland boundary and there's the wetland boundary on
9  that -- on that figure. But this is a preliminary JD.
10  We don't assert jurisdiction with a preliminary JD.
11  It's not an unofficial determination of whether or not
12  waters are or are not federally jurisdictional under
13  Section 10 or section 404.
14    Q. Okay. So this -- this map simply shows where
15  the wetlands and the ditch are located. It doesn't
16  have any information that would indicate whether or not
17  these wetlands were in fact subject to the Corps of
18  Engineers' jurisdiction, right?
19    A. Yeah, that's correct.
20    Q. So I look, for instance, I see that ditch at
21  the bottom of the property near that road. Am I right
22  that that ditch just exists on a project site and it
23  does not extend off the site?
24    A. I did not evaluate the -- the offsite waters
25  for this project.

Page 154

1    Q. Okay. But -- but my question is simpler than
2  this. This -- this document in the Corps file for this
3  project shows a ditch that's disconnected from ditches
4  off-site, right?
5    A. I don't know whether or not --
6    MR. ADKINS: Objection. Foundation.
7    THE WITNESS: -- it appears from this figure
8  that only water features within the project boundary
9  are depicted. It doesn't extend off, but that doesn't
10  mean that it doesn't it's the -- the figure just shows
11  waters within the review area.
12  BY MR. MCALILEY:
13    Q. Well, you would agree with me on that ditch on
14  the left-hand side. That ditch does not extend into
15  that open grassy area, right? Just visually.
16    MR. ADKINS: Objection. Lacks foundation.
17    THE WITNESS: I can't tell from this figure.
18  BY MR. MCALILEY:
19    Q. So actually looking at the information here in
20  this permit and -- in this permit file for this -- this
21  matter, you can't tell whether the Corps of Engineers
22  even has jurisdiction over this property, can you?
23    A. It's preliminary jurisdictional determination.
24  It's not to determine are the federal extent of waters
25  on this property. The proposed project is proposed in

Page 155

1  uplands. And the applicant chose the preliminary
2  jurisdictional determination because they were not
3  planning on impacting any waters on the site. It's a
4  common practice for no permit required in the state of
5  Florida.
6    Q. So even though it says the name of this thing
7  includes the words jurisdictional determination,
8  there's nothing about this that determines whether the
9  Corps has jurisdiction, right?
10    A. Not for a preliminary JD.
11    MR. MCALILEY: Okay. If I could have five
12  minutes to -- to go through my notes, that'd be great.
13  And let me just ask, Brandon and -- well, let's go off
14  the record.
15    THE REPORTER: Without no objection, we're off
16  record at 1:13 p.m.
17    (A recess was taken.)
18    THE REPORTER: We're going back on record at
19  1:22 p.m.
20  BY MR. MCALILEY:
21    Q. Okay. So Ms. White, I just want to clarify
22  something for the record. It looks like I -- I didn't
23  do a good enough job laying the record. I showed you a
24  document which was the approved jurisdictional
25  determination form for the Driftwood Kay site. Do you

Page 156

1  recall me asking questions about that document?
2    A. Yes.
3    MR. MCALILEY: So I've just put it up on the
4  screen so we can all see it here. I don't think I said
5  the document number, the exhibit number. So that
6  exhibit number should have been Deposition Exhibit 248.
7  So just putting that on the record.
8    And with that, I have no further questions.
9  Thank you very much.
10    CROSS-EXAMINATION
11  BY MR. ADKINS:
12    Q. Okay. Ms. White, this is Brandon Adkins of
13  the U.S. Department of Justice for the United States,
14  the plaintiff in this case. And this is now my
15  opportunity to ask you some questions and I'll try to
16  keep this brief as well.
17    So do you recall testifying regarding the
18  meaning of the term "tributary" during your deposition
19  today?
20    A. Yes.
21    Q. Okay. And a tributary, for purposes of Clean
22  Water Act jurisdiction, can be man-made; is that
23  correct?
24    MR. MCALILEY: Object to form.
25    THE WITNESS: Yes.



SHANNON C. WHITE
UNITED STATES V. SHARFI

June 22, 2022
157–160

Page 157

1  BY MR. ADKINS:
2      Q.  And a tributary can also be partially
3  man-made; is that correct?
4          MR. MCALILEY:  Object to form.
5          THE WITNESS:  I'm -- I didn't hear the first
6  part of man-made.
7  BY MR. ADKINS:
8      Q.  A tributary can also be partially man-made; is
9  that correct?
10         MR. MCALILEY:  Object to form.
11         THE WITNESS:  Yes.
12  BY MR. ADKINS:
13     Q.  Okay.  So a tributary does not necessarily
14  have to be naturally occurring to be considered a
15  tributary for purposes of Clean Water Act jurisdiction;
16  is that right?
17         MR. MCALILEY:  Object to form.  You're leading
18  your own witness.  It's an improper question.
19  BY MR. ADKINS:
20     Q.  You can answer.
21     A.  It depends on how the man-made feature was
22  created.  If it was excavated from waters of the US or
23  if it was excavated from uplands draining wholly
24  uplands.
25     Q.  I'm going to attempt to share my screen here

Page 158

1  for a second.  All right.  So I'm now intending to show
2  you deposition Exhibit 244, which is Part 328,
3  "Definitions of waters in the United States Title 33 of
4  the Code of Federal Regulations." Do you see that?
5      A.  Yes.
6      Q.  And this -- do you recall answering some
7  questions with respect to these regulation during your
8  deposition today?
9      A.  Yes.
10     Q.  I'm going to take you to Section 328.3.  All
11  right.  "Definitions." Do you see that on your screen?
12     A.  Yes.
13     Q.  Okay.  Is -- does -- do these regulations
14  define the term adjacent for purposes of the Clean
15  Water Act?
16     A.  No.
17     Q.  Okay.  Well, let me take you down to 328.3
18  Subsection C.
19     A.  Oh, it does.  It's bordering, neighboring,
20  contiguous.
21     Q.  Okay.
22     A.  I didn't see it.  I didn't see it on the
23  screen.
24     Q.  Right.  So it was on -- it was on the next
25  page from what I was showing you; is that right?

Page 159

1      A.  Yeah.
2      Q.  Okay.  Now, Subsection C states, "the term
3  adjacent means bordering, contiguous, or neighboring."
4  Do you see that?
5      A.  Yes.
6      Q.  Okay.  When you used the term "adjacent"
7  throughout your deposition today, did you mean
8  bordering, contiguous, or neighboring?
9      A.  Yes.
10         MR. ADKINS:  No further questions, ma'am.
11  Thank you for your time.
12         MR. MCALILEY:  And I have no follow-up.  So I
13  will -- we'll go off the record.
14         THE REPORTER:  Before going off the record,
15  any parties ordering?
16         MR. MCALILEY:  I'm ordering.  I'm going to
17  order.  The defendant.
18         THE REPORTER:  Plaintiff?
19         MR. ADKINS:  And we'll -- we'd like an
20  opportunity to review the transcript, please.
21         THE REPORTER:  No problem.  Without no
22  objection, we're off record at 1:27 p.m.
23         (The deposition concluded at 1:27 p.m.)
24
25

Page 160

1                  CERTIFICATE OF OATH
2
3  STATE OF FLORIDA
4  COUNTY OF MIAMI-DADE
5
6      I, the undersigned authority, certify that
7  SHANNON CURTIS WHITE personally appeared before me
8  and was duly sworn on June 22, 2022.
9      WITNESS my hand and official seal this
10  7th day of July 2022.
11
12         Julio Maldonado Fernandez
13         Julio Maldonado Fernandez
           Notary Commission Florida/GG 320862
           Commission Expires: April 8, 2023
14
15
   Type of Identification Produced: Driver's License
16
17
18
19
20
21
22
23
24
25



SHANNON C. WHITE
UNITED STATES V. SHARFI

June 22, 2022
161–164

Page 161

```
1              CERTIFICATE OF DIGITAL REPORTER
2
3          I, Julio Maldonado Fernandez, a Digital
4   Reporter and Notary Public within and for the State
5   of Florida, do hereby certify:
6
7          That SHANNON CURTIS WHITE, the witness whose
8   examination is hereinbefore set forth, was first
9   duly sworn by me and that said testimony was
10  accurately captured with annotations by me during
11  the proceeding.
12
13         I further certify that I am not related
14  to any of the parties to this action by blood or
15  marriage and that I am in no way interested in the
16  outcome of this matter.
17
18         IN WITNESS THEREOF, I have hereunto set
19  my hand this 7th day of July 2022.
20
21         _____
           Julio Maldonado Fernandez
22         Notary Commission Florida/GG 320862
           Commission Expires: April 8, 2023
23
24
25
```

Page 162

```
1              CERTIFICATE OF TRANSCRIPTIONIST
2
3
4          I, Donna Lockhart, Legal Transcriptionist,
5   do hereby certify:
6          That the foregoing is a complete and true
7   transcription of the original digital audio recording
8   of the testimony and proceedings captured in the
9   above-entitled matter.  As the transcriptionist, I
10  have reviewed and transcribed the entirety of the
11  original digital audio recording of the proceeding to
12  ensure a verbatim record to the best of my ability.
13         I further certify that I am neither attorney
14  for nor a relative or employee of any of the parties
15  to the action; further, that I am not a relative or
16  employee of any attorney employed by the parties
17  hereto, nor financially or otherwise interested in the
18  outcome of this matter.
19         IN WITNESS THEREOF, I have hereunto set my
20  hand this 7th day of July 2022.
21
22
23         Donna Lockhart
           _____
24         Donna Lockhart
25
```

Page 163

```
1              DEPOSITION ERRATA SHEET
2
3   Assignment No. J8369966
4   Case Caption: UNITED STATES OF AMERICA vs. BENJAMIN K.
    SHARFI, IN HIS PERSONAL AND FIDUCIARY CAPACITY AS
5   TRUSTEE OF THE BENJAMIN SHARFI 2002 TRUST, AND
    NESHAFARM, INC.
6
7          DECLARATION UNDER PENALTY OF PERJURY
8
9          I declare under penalty of perjury that I
10  have read the entire transcript of my deposition
11  taken in the above-captioned matter or the same
12  has been read to me, and the same is true and
13  accurate, save and except for changes and/or
14  corrections, if any, as indicated by me on the
15  DEPOSITION ERRATA SHEET hereof, with the
16  understanding that I offer these changes as if
17  still under oath.
18
      Signed on the _____ day of _____,
19
    20___.
20
21    _____
22    SHANNON CURTIS WHITE
23
24
25
```

Page 164

```
1   DEPOSITION ERRATA SHEET
2   Page No._____Line No._____Change to:_____
3   _____
4   Reason for change:_____
5   Page No._____Line No._____Change to:_____
6   _____
7   Reason for change:_____
8   Page No._____Line No._____Change to:_____
9   _____
10  Reason for change:_____
11  Page No._____Line No._____Change to:_____
12  _____
13  Reason for change:_____
14  Page No._____Line No._____Change to:_____
15  _____
16  Reason for change:_____
17  Page No._____Line No._____Change to:_____
18  _____
19  Reason for change:_____
20  Page No._____Line No._____Change to:_____
21  _____
22  Reason for change:_____
23
24  SIGNATURE:_____DATE:_____
25             SHANNON CURTIS WHITE
```



SHANNON C. WHITE                                          June 22, 2022
UNITED STATES V. SHARFI                                              165

Page 165

```
 1    DEPOSITION ERRATA SHEET
 2    Page No._____Line No._____Change to:_____
 3    _____
 4    Reason for change:_____
 5    Page No._____Line No._____Change to:_____
 6    _____
 7    Reason for change:_____
 8    Page No._____Line No._____Change to:_____
 9    _____
10    Reason for change:_____
11    Page No._____Line No._____Change to:_____
12    _____
13    Reason for change:_____
14    Page No._____Line No._____Change to:_____
15    _____
16    Reason for change:_____
17    Page No._____Line No._____Change to:_____
18    _____
19    Reason for change:_____
20    Page No._____Line No._____Change to:_____
21    _____
22    Reason for change:_____
23
24    SIGNATURE:_____DATE:_____
25              SHANNON CURTIS WHITE
```



### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA,

*Plaintiff*,

v.

BENJAMIN K. SHARFI, in his personal and
fiduciary capacity as trustee of the Benjamin
Sharfi 2002 Trust, and NESHAFARM, INC.

*Defendants*.

Case No. 2:21-cv-14205-KAM

### ERRATA FOR DEPOSITION OF SHANNON CURTIS WHITE
### (DESIGNEE OF UNITED STATES ARMY CORPS OF ENGINEERS)

I, Shannon Curtis White, have read the transcript of my deposition taken on June 22,

2022 in the above-captioned case in which I testified as the designee of the United States Army

Corps of Engineers under Federal Rule of Civil Procedure 30(b)(6) and, pursuant to Federal Rule

of Civil Procedure 30(e)(1), list the following changes to the transcript and the reasons for

making them:

| Page | Line | Reads | Should Read | Reasons For Change |
|------|------|-------|-------------|--------------------|
| 14 | 10 | 1998 | 1989 | mistranscribed |
| 21 | 2 | to me | to be | mistranscribed |
| 32 | 4 | femoral | ephemeral | mistranscribed |
| 32 | 5 | femoral | ephemeral | mistranscribed |
| 32 | 6 | Femoral | Ephemeral | mistranscribed |
| 32 | 10 | femoral | ephemeral | mistranscribed |
| 32 | 19 | wet get | we get | mistranscribed |
| 41 | 10 | court | Corps | mistranscribed |
| 41 | 13 | court | Corps | mistranscribed |
| 46 | 2 | a | and | mistranscribed |
| 49 | 2 | 2000 | 2020 | mistranscribed |
| 49 | 5 | 2000 | 2020 | mistranscribed |
| 49 | 6 | 2000 | 2020 | mistranscribed |
| 63 | 13 | was | that was | mistranscribed |

| 66 | 1 | Committee guide books | Instructional guidebook | mistranscribed |
| 73 | 16 | If it's not a wetland | If a wetland | mistranscribed |
| 74 | 7 | let may | that may | mistranscribed |
| 76 | 16 | better | [This appears to be a mistranscribed but I don't know what word I actually used.] | mistranscribed |
| 77 | 3 | hydrologic | hydrography | mistranscribed |
| 87 | 6 | pre-jurisdictional | jurisdictional | mistranscribed |
| 123 | 16 | permanent | permit | mistranscribed |
| 125 | 1 | direction | discretion | mistranscribed |
| 132 | 19 | zyrik | xeric | mistranscribed |
| 143 | 11 | permanent | permit | mistranscribed |
| 143 | 12 | permanent | permit | mistranscribed |

Executed on August 4, 2022, in Ellenton, Florida.

WHITE.SHANNON.C.1364419771
Digitally signed by WHITE.SHANNON.C.1364419771
Date: 2022.08.04 19:12:26 -04'00'

Shannon Curtis White

2