# EXHIBIT 15

## Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

FORT PIERCE DIVISION

CASE NO. 2:21-CV-14205-KAM

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

BENJAMIN K. SHARFI, in his personal and
fiduciary capacity as trustee of the
Benjamin Sharfi 2002 Trust, and

NESHAFARM, INC.,

    Defendants.

_____/

VIDEOTAPED DEPOSITION OF JONATHAN PEMPEK

Thursday, May 19, 2022

9:21 - 5:20 p.m.

CityPlace Tower

525 Okeechobee Boulevard, Suite 1200

West Palm Beach, Florida 33401

Reported By:

Rachel W. Bridge, RMR, CRR

Esquire Deposition Solutions

Job #J8348394

## Page 2

```
 1  APPEARANCES:
 2  On behalf of the Plaintiff:
 3      JEFFREY HUGHES, ESQUIRE
        BRANDON N. ADKINS, ESQUIRE
 4      U.S. DEPARTMENT OF JUSTICE
        PO Box 7611
 5      Ben Franklin Station
        Washington, DC  20044
 6      Telephone: (202)616-9174
        E-mail:  Jeffrey.Hughes@usdoj.gov
 7               Brandon.Adkins@usdoj.gov
 8  On behalf of the Defendants:
 9      JOSHUA D. MIRON, ESQUIRE
        CHRISTOPHER HAMILTON, ESQUIRE
10      SHARFI HOLDINGS, INC.
        3731 NE Pineapple Avenue
11      2nd Floor
        Jensen Beach, Florida  34957
12      Telephone: 813-416-2352
        E-mail: JMiron@sharfiholding.com
13              chamilton@sharfiholding.com
14
        T. NEAL McALILEY, ESQUIRE
15      CARLTON FIELDS, P.A.
        2 MiamiCentral
16      700 NW 1st Avenue, Suite 1200
        Miami, Florida  33136
17      Email:  nmcaliley@carltonfields.com
18
19  On behalf of the US Army Corps of Engineers,
    Jacksonville District:
20
        WILLIAM MOORE, ESQUIRE
21      Office of Counsel
        701 San Marco Boulevard
22      Jacksonville, Florida  32207
        Telephone:  904-232-2466
23      Email:  William.j.moore@usace.army.mil
24  Also Present:
25      David Zeber, videographer
```

## Page 3

```
 1                       -  -  -
                       I N D E X
 2                       -  -  -
 3  WITNESS:        DIRECT  CROSS  REDIRECT  RECROSS
 4   JONATHAN PEMPEK
 5    By Mr. Miron     6
      By Mr. Adkins              297
 6
 7
 8                       -  -  -
                    E X H I B I T S
 9                       -  -  -
10  DEFENDANT'S  DESCRIPTION                        PAGE
11  Exhibit 124  FDEP Inspection Report 4-19-16      56
12  Exhibit 125  FDEP Inspection Report 4-26-16      70
13  Exhibit 126  FDEP Inspection Report 6-28-16      80
14  Exhibit 127  1-10-18 email from Pempek to Hook   94
15  Exhibit 128  1-10-18 email from Sharfi to Pempek 99
16  Exhibit 129  1-19-18 email from Kryzda to Pempek 103
17  Exhibit 130  1-22-18 email from Pempek to Kryzda 123
18  Exhibit 131  2-12-18 email from Kryzda to Pempek 126
19  Exhibit 132  2-12-18 email from Kryzda to Pempek 130
20  Exhibit 133  2-27-18 email from Kryzda to Pempek 132
21  Exhibit 134  3-17-18 letter to Sharfi from Egan 135
22  Exhibit 135  4-26-18 email from Pempek to Kryzda 136
23  Exhibit 136  4-30-18 email from Halbert to Pempek 154
24
25
```

## Page 4

```
 1                       -  -  -
                    E X H I B I T S
 2                       -  -  -
 3  DEFENDANT'S  DESCRIPTION                        PAGE
 4  Exhibit 137  4-30-18 letter from Sharfi to Wilson 166
 5  Exhibit 138  4-30-18 email from Blythe to Cole   201
 6  Exhibit 139  4-13-18 email from Sharfi to Halbert 202
 7  Exhibit 140  4-30-18 email from Sharfi to Pempek 215
 8  Exhibit 141  4-30-18 letter from Kryzda to Pempek 217
 9  Exhibit 142  5-2-18 letter from Kryzda to Wilson 220
10  Exhibit 143  5-4-18 email from Pempek to Halbert 221
11  Exhibit 144  5-16-18 email from Pempek to Halbert 230
12  Exhibit 145  Photograph USACE 00000037          231
13  Exhibit 146  11-26-18 Addendum to Memo for Record 269
14  Exhibit 147  5-14-18 Memo from Pempek to Knight 278
15  Exhibit 148  11-16-18 email from Pempek to Halbert 280
16  Exhibit 149  11-28-18 email from Pempek to Sharfi 282
17  Exhibit 150  11-28-18 email from Pempek to Hickman 283
18  Exhibit 151  11-30-18 email from Pempek to Sharfi 286
19  Exhibit 152  Spreadsheet of Attendance          291
20  Exhibit 153  10-19-21 email from Oberchain       293
21  Exhibit 154  4-30-18 email from Pempek to Sharfi 297
22
23
24
25
```



JONATHAN PEMPEK
UNITED STATES OF AMERICA V SHARFI

May 19, 2022
5—8

Page 5

1          P R O C E E D I N G S
2                - - -
3        Deposition taken before Rachel W. Bridge,
4   Certified Realtime Reporter and Notary Public in and for
5   the State of Florida at Large, in the above cause.
6                - - -
7        THE VIDEOGRAPHER:  This is the videotape
8   deposition of Jonathan Pempek in the matter
9   of United States of America versus Benjamin J.
10  Sharfi.  This deposition is being held at 525
11  Okeechobee Boulevard, Suite 1200, West Palm Beach,
12  Florida.  Today's date is May 19, 2022.  The time
13  is 9:21 a.m.
14       The court reporter's name is Rachel Bridge
15  with the firm of Esquire Deposition Solutions.  The
16  videographer is David Zeber with the firm of
17  Esquire Deposition Solutions.
18       Would counsel now please introduce themselves.
19       MR. ADKINS:  Brandon Adkins for the United
20  States, and I just want to state on the record that
21  the witness, Mr. Pempek, is wearing a mask today,
22  as he has been ordered to do under Department of
23  Defense guidelines.
24       MR. HUGHES:  Jeffrey Hughes on behalf of the
25  United States.

Page 6

1        MR. MOORE:  William Moore on behalf of the
2   Army Corps of Engineers.
3        MR. MIRON:  Joshua Miron on behalf of the
4   defense.
5        MR. HAMILTON:  Christopher Hamilton on behalf
6   of the defendants.
7        MR. McALILEY:  Neal McAliley on behalf of the
8   defendants.
9   Thereupon,
10           JONATHAN PEMPEK,
11  having been by the undersigned Notary Public first duly
12  sworn, was examined and testified as follows:
13  THE WITNESS: I do.
14           DIRECT EXAMINATION
15  BY MR. MIRON:
16  Q.  Mr. Pempek, good morning.
17  A.  Good morning.
18  Q.  I know we've met each other before.  I just
19  want to go through some kind of ground rules.
20       Have you ever had your deposition taken
21  before?
22  A.  No.
23  Q.  Okay.  So I'll go through all the rules.  So
24  the obvious is that I'm going to ask you questions and
25  then I would ask you to respond to those questions.  To

Page 7

1   the extent that you don't understand one of my
2   questions, it's quite frankly possible it's not as a
3   result of the question, but because of something I did
4   or something I said.  So if you don't understand it,
5   please tell me.  If you do answer the question, I'm
6   going to assume that you understood what I meant and
7   obviously what I was trying to say.
8        At some point counsel, Mr. Adkins might
9   object.  Unless he tells you specifically not to answer,
10  he is objecting for the record and to save his, to make
11  his objections for the record, but you are still
12  required to answer.  Okay?
13  A.  Yes, sir.
14  Q.  If you need a break at any time, please tell
15  me, tell everybody.  It's going to be a long day.  So if
16  you need water or something, please tell us, let us
17  know.
18       Have you taken any medication today that would
19  otherwise impair your ability to accurately and honestly
20  answer the questions?
21  A.  I have not.
22  Q.  And you understand that this deposition
23  obviously is being video recorded and transcribed?
24  A.  Yes.
25  Q.  And you understand that by holding up your

Page 8

1   hand, you swore an oath to tell the truth; correct?
2   A.  Yes, sir.
3   Q.  Again, Jon was mentioned.  Your full name?
4   A.  Jonathan Carl Pempek.
5   Q.  And your address?
6   A.  I work or -- I work at 4400 off of PGA
7   Boulevard.
8        My -- I live in Martin County.
9   Q.  Okay.  So the address you provided was the
10  address with your current employer, which is the Army
11  Corps of Engineers?
12  A.  That's correct, yes.
13  Q.  And your date of birth?
14  A.  January 13, 1982.
15  Q.  Other than counsel, and so I want to be very
16  clear, whether this is an hour, which it won't be, or
17  seven hours, I don't want to know any conversations you
18  had with your counsel, okay?
19       Other than counsel, did you have an
20  opportunity to speak to anyone prior to coming here
21  today about the deposition?
22  A.  As far as that I'm coming to a deposition?
23  Q.  Let's split it up in two ways.  Who did you
24  tell that you were coming to a deposition?
25  A.  My wife.



Page 9

Q. Sure. That's the obvious answer.
And then as far as in preparation for the case today, did you speak to anyone other than your wife relative to this particular matter on this particular day?
A. Let's see, my chief.
Q. Who was that?
A. Bobby Halbert.
Q. Who else?
A. I believe it is, I think, I believe there is knowledge that I'm going to be here today because, of course, I'm not going to be in the office.
So there is our regulatory chief, Shawn Zinzer. I was supposed to meet with him today, but that had to be -- we had a mix-up with the scheduling.
Q. Sure.
A. So I couldn't meet with him. And also office of counsel has somebody that was supposed to be down here as well. I don't recall anybody else. I'm sure other people know I'm here, but specifics --
Q. I'm not going to -- sorry to interrupt.
A. No, I'm sorry. Specific to me telling anybody, I don't recall.
Q. Let me ask the question. You answered it partially I think than what I intended, but again, maybe

Page 10

it's my fault.
I'm not so much interested in who you told that you were going to be here so they were aware of the fact you were going to be here. I want to know in preparation for today relative to the events that transpired relative to this particular matter, did you speak with anybody other than counsel?
A. In the last, ever since I got this date, I haven't spoken to anybody other than counsel about the details of this case.
Q. Okay, great. So the conversation you would have had with Bobby Halbert didn't involve this particular matter, this particular case?
A. He wished me luck. He knew what we were talking about, and he said do the best I could.
Q. Is that the extent of the conversation?
A. I believe so, yes.
Q. You believe so or it was?
A. I don't recall any other particular details, or I'm trying to figure out what exactly you're asking me.
We didn't talk about any of the merits of the case or anything like that. We just, we generally talked about me coming here and being a supportive supervisor and telling me to do the best I could.

Page 11

Q. Okay. When did you have this conversation?
A. On the way over here, I had a conversation with him. He is not feeling well, so I checked in on him.
And we talked about some other things unrelated to the case, and then he wished me luck.
Q. Okay. And prior to having the conversation you had with him on the phone here, when was the last time you spoke to him about this particular matter?
A. We spoke yesterday about an unrelated matter. I don't remember if we -- if we talked about this, it was, again, good luck tomorrow.
Q. Okay. And the other gentleman, Shawn Zinzer?
A. Yeah, he just knows that I'm here. We had no communications about this.
Q. Okay. Did you at any time since the date of the filing -- so let me start, back up a little bit. I keep making an assumption and I'm referring to this matter.
You understand, I believe, and correct me if I'm wrong, you understand that when I refer to this particular matter, I'm referring to the current litigation between Mr. Sharfi, NeshaFarm and the United States Army Corps of Engineers?
A. Yes.

Page 12

Q. And you understand that this particular matter was filed I believe in May of 2021?
A. Uh-huh.
THE REPORTER: Yes?
BY MR. MIRON:
Q. That's one of the rules.
A. I apologize.
Q. No, you don't have to apologize. That was my mistake as well. That's one of the rules. So the rules are I, number one, shouldn't talk over you.
Number two, I should wait for you to answer, but when you do answer, you are obligated to provide a yes or a no, some word other than, as opposed to an uh-huh or uh-uh. It can't be transcribed well.
A. Understood.
Q. That's my fault.
So since the date of the filing of this particular action, which was in May of 2021, have you ever had an opportunity to speak to Samantha Rice about this particular matter?
A. I don't -- I've spoken to her about this particular matter. Since the filing, I don't believe I have.
Q. Okay. How about Gregory Vasquez?
A. I have.



Page 13

1    Q.  What have you spoke to Mr. Vasquez about?
2    A.  He's been keeping me updated on their
3  proceedings and as much as I could.
4        I in general terms talked about our process.
5    Q.  What does that mean, our process?
6    A.  Well, we're still looking into it, you know.
7    Q.  Into what?
8    A.  Into, you know, there's -- it's still an
9  ongoing enforcement case generally.
10    Q.  What's still an ongoing enforcement case?
11    A.  Well, the data collection.  At the time of --
12  since it was filed, we have been gathering data for this
13  particular project.
14    Q.  Who is we?
15    A.  Well, the expert team.
16    Q.  Okay.  So what does that have to do with
17  Gregory Vasquez?
18    A.  He was just asking where we stand, yada, yada,
19  this is what we're doing.  Yada, yada is not a word.
20    Q.  That's okay.  That's for Seinfeld fans.
21    A.  Yeah.  So he wanted to know where we stand,
22  and I said the expert team is in the field collecting
23  data.
24    Q.  When was the last time you spoke to him?
25    A.  The last time I spoke to him was unrelated to

Page 14

1  this.
2    Q.  When was the last time you spoke to him
3  relative to this particular matter where you were
4  exchanging information about data collection?
5        MR. ADKINS:  Objection, misstates the
6  testimony.
7  BY MR. MIRON:
8    Q.  When was the last time that you had a
9  conversation with Mr. Vasquez relative to this
10  particular matter?
11    A.  Maybe three months ago.  Maybe two months ago.
12  He called with an unassociated request.  And then he
13  also, I believe he mentioned that he either was going to
14  be subpoenaed or he had been to talk to you guys.
15        And other than that, we, we didn't really chat
16  about anything according to this case.  No particular
17  details.
18    Q.  So as I mentioned before, I don't want to know
19  the conversations that you've had with counsel, but I'm
20  entitled to ask certain questions.  So can I -- did you
21  have conversations with counsel prior to coming here
22  today?  I don't want to know what about.  I just want to
23  know whether you did.
24    A.  Yeah.
25    Q.  Okay.  When?

Page 15

1    A.  As far as this case?
2    Q.  Yes, sir.  Prior to coming here today in
3  preparation for your deposition, did you have
4  conversations with counsel?
5    A.  I have.
6    Q.  Okay.  When?
7    A.  We had a prep session Monday.
8    Q.  Okay.  Was it via telephone or via in person
9  or on Zoom?
10    A.  It was, it was virtual.
11    Q.  Virtual.  On Zoom or Teams or something of
12  that nature?
13    A.  Yes.
14    Q.  And how long did that last?
15    A.  I don't know, two and a half hours to three
16  hours, something like that.
17    Q.  All right.  So let's start with your
18  educational background.
19    A.  Uh-huh.
20    Q.  I don't like to assume anything, but can I
21  presume that you went to high school?
22    A.  I did.
23    Q.  Graduated from high school?
24    A.  I did.
25    Q.  And did you go to college?

Page 16

1    A.  I did.
2    Q.  Okay.  Where did you go to college?
3    A.  Do you want to know all the schools or just
4  where I graduated from.
5    Q.  No tell me everything.
6    A.  So I went to Life University in Marietta,
7  Georgia.
8    Q.  Life University?
9    A.  Yes, sir.  I went to Kennesaw State
10  University.  I went to University of West Florida.  And
11  I went to Kennesaw State University.
12    Q.  Where did you graduate from?
13    A.  I graduated from the University of West
14  Florida, and I graduated from Kennesaw State University.
15    Q.  Can you explain to me why you would otherwise
16  graduate from both schools, or was it two separate
17  degrees?
18    A.  Two separate degrees.
19    Q.  What degree did you obtain from Kennesaw State
20  University?
21    A.  I did not get a degree from Kennesaw  State.
22  University of West Florida -- maybe I misspoke.
23  University of West Florida is where I graduated.
24    Q.  Okay.  So earlier when you said you graduated
25  from two different colleges or universities, you



JONATHAN PEMPEK
UNITED STATES OF AMERICA V SHARFI

May 19, 2022
17—20

Page 17

1  misspoke.
2       What you meant was ultimately you obtained a
3  single degree from the University of West Florida?
4       A.  No.  I obtained a degree from University of
5  West Florida, and I obtained a degree from Keiser
6  University.
7       Q.  Okay.  What was the degree you obtained from
8  the University of West Florida?
9       A.  Degree in oceanography.
10      Q.  And from Keiser?
11      A.  I got my MBA there, master's of business
12  administration.
13      Q.  What year did you obtain your degree from the
14  University of West Florida?
15      A.  I don't --
16      Q.  I'm older than you and I remember when I
17  got --
18      A.  Yeah.  No, I guess we're going to have other
19  problems.
20          No, I think 2010.
21      Q.  Okay.  And Keiser?
22      A.  2018?
23      Q.  Is Keiser an online-only school?
24      A.  No, I went in person.
25      Q.  But it's an accredited university?

Page 18

1       A.  It is.
2       Q.  Other than your degree in oceanography and
3  your MBA, do you have any other advanced degrees?
4       A.  No.
5       Q.  In your history of employment, have you had
6  any particular specialized training?
7       A.  Yes.  I've had -- are you asking about
8  certificates or are you referring to just classes that
9  I've taken?
10      Q.  Let's do both.  Let's start with classes and
11  then certificates.
12      A.  As far as certificates, any time you get these
13  trainings, they give you some certificate that is
14  meaningless.
15      Q.  Right.
16      A.  However, no, I don't have like a wetland
17  certificate from an accredited university, but I've done
18  dredging fundamentals, Reg 1, 2, 3, which is, half of
19  them are permitting.  Reg 4 is compliance and
20  enforcement.
21          I've done wetland delineation classes.  I'm
22  sure I've done a handful of other ones as well that I'm
23  not recalling.
24      Q.  So these are courses that you would have taken
25  by and through your employment; correct?

Page 19

1       A.  That's correct.
2       Q.  And of those that you just mentioned, which
3  were with what agencies or what departments or what
4  employment?
5       A.  They would have all been with the Army Corps
6  of Engineers.
7       Q.  Okay.  So I know, even though I'm skipping
8  ahead a little bit, I know at one point you were also
9  with the Florida Department of Environmental Protection;
10  correct?
11      A.  That's correct.
12      Q.  So none of these courses would have come
13  during that time?
14      A.  Well, it would have been the same course.  It
15  was a delineation course.  Essentially things are done a
16  little bit differently.  However, it's called the same,
17  so I didn't repeat it, but it's, I did take a
18  delineation course with the DEP as well.
19      Q.  So these are internal courses or classes that
20  the, your employer would have required you to take, or
21  are they voluntary?
22      A.  I don't -- they are generally voluntary.  Sign
23  up.  They ask you what you would like to do.
24          I imagine if you didn't sign up ever, they
25  would tell you you have to do it and it would be

Page 20

1  required, but I haven't got there yet.
2       Q.  So you were voluntarily told to take these
3  courses?
4       A.  No, I asked them if I could take them, but
5  ultimately I'm running out of classes, so I'm going to
6  start being told to take classes that don't pertain that
7  much to my job.
8       Q.  Have you ever had any legal training?
9       A.  No.
10      Q.  So consequently, and forgive the stupid
11  question, you're not a lawyer; correct?
12      A.  Exactly.
13      Q.  So as it stands today relative to your
14  testimony, you're not prepared to provide any legal
15  opinions?
16      A.  No.
17      Q.  Am I correct to assume that you are also not a
18  hydrologist?
19      A.  I am not.
20      Q.  So consequently, you're not prepared to
21  testify relative to the movement of water or the
22  availability or quality of water or anything of that
23  nature relative to what a hydrologist would testify to?
24          MR. ADKINS:  Objection.
25



Page 21

1  BY MR. MIRON:
2      Q.   Let me ask it a different way.  So you just
3  indicated to me that you are not at hydrologist;
4  correct?
5      A.   That's true, yes.
6      Q.   So you're not going to provide any opinions
7  that would otherwise be relevant to a hydrologist;
8  correct?
9          MR. ADKINS:  Objection, vague.
10         THE WITNESS:  I would -- it depends what the
11  question is.  I, I've had -- no, I'm not going to
12  answer as a hydrologist would answer.
13  BY MR. MIRON:
14     Q.   Okay.  Have you in your time in training with
15  either the Army Corps or the Florida Department of
16  Environmental Protection, have you ever studied the
17  movement of water, the quality of water?
18     A.   No.
19     Q.   Have you ever studied chemical properties,
20  biological interactions or the physical processes that
21  govern the water cycle?
22     A.   As far as in my job?
23     Q.   Yes, sir -- no, in the courses you've taken.
24     A.   Yeah, my degree is in oceanography.  That's a
25  big part of it.  As far as my job, no, that's not

Page 22

1  something I typically do.
2      Q.   So again, forgive the silly question.
3      A.   No.
4      Q.   Consequently then you're not an expert in
5  hydrology; correct?
6      A.   Can you define what expert is?
7      Q.   Yes.  Someone who has a specialized knowledge,
8  more so than the common person in a particular subject
9  matter; in this particular circumstance, hydrology.
10  Hydrology is the study of the movement, availability,
11  and quality of water.
12     A.   Yeah, I would leave it to a hydrologist to
13  answer those questions.
14     Q.   So you would agree with me that you're not an
15  expert; correct?
16     A.   Sure, yes.
17     Q.   Do you have any degrees in wetland science?
18     A.   No.
19     Q.   Do you have any degrees that would otherwise
20  relate to wetland science?
21     A.   No.
22     Q.   So consequently you're not an expert in
23  wetland science; correct?
24         MR. ADKINS:  Objection.
25         THE WITNESS:  So --

Page 23

1  BY MR. MIRON:
2      Q.   I'll ask it a different way.  Are you an
3  expert in wetland science?
4          MR. ADKINS:  Objection, vague.
5          THE WITNESS:  So wetland science, if you're
6  defining -- I struggle with the expert thing
7  because I would imagine a hydrologist or wetland
8  scientist would have more expertise in the field
9  than I do, but if you're asking if I have more
10  knowledge than the common person off the street
11  about both of these things, I would say yes, but
12  I'm not here to replace a wetland scientist.
13  BY MR. MIRON:
14     Q.   Okay.  Do you have any specialized training in
15  hydrilic soils?
16     A.   Hydraulic soils?
17     Q.   Is it hydraulic or hydrilic?  I could be
18  wrong.  Is it hydrilic or hydraulic?
19     A.   Hydraulic soils.  If I'm wrong, obviously we
20  know then.
21     Q.   Let's do it both ways.  Are you, any
22  specialized training in hydraulic soils?
23     A.   I do, we do have the wetland delineation
24  trainings, we do have -- again, I went through training
25  to the point where I have more knowledge than the common

Page 24

1  person.
2          Am I a soil scientist?  No.
3      Q.   Okay.  So you indicated earlier, which cuts
4  out a good portion of my outline, that you've never had
5  your deposition taken before; correct?
6      A.   That's correct.
7      Q.   Have you ever testified in a court proceeding
8  before?
9      A.   Yes.
10     Q.   What was that?
11     A.   What was that?
12     Q.   Yes, sir.
13     A.   It was Lozman versus United States.
14     Q.   Spell it.
15     A.   L-o-z-m-a-n.
16     Q.   Okay.  And in what capacity did you testify in
17  that matter, Lozman versus the United States?
18     A.   As a witness.
19     Q.   And what were you, who were you a witness for?
20     A.   United States.
21     Q.   In your capacity as a --
22     A.   Project manager.
23     Q.   With the?
24     A.   Army Corps of Engineers.
25     Q.   And when was that testimony?



JONATHAN PEMPEK

May 19, 2022

UNITED STATES OF AMERICA V SHARFI

25–28

Page 25

1    A.  I don't recall.  Six months ago.
2    Q.  Okay.  And what was the nature of that
3  particular matter?
4    A.  It was unauthorized structures being built in
5  Riviera Beach.
6    Q.  Did it involve the Clean Water Act?
7    A.  No.
8    Q.  Generally speaking, what topics did you
9  testify about?
10    A.  My observations as a project manager.
11    Q.  What were your observations, just generally
12  what were your observations as a project manager?
13    A.  In the case the gentleman installed a large
14  modular -- it was a floating dock.  He constructed a
15  floating dock with a houseboat on top.
16    Q.  Okay.
17    A.  So there was -- and the, what I was testifying
18  to was the site history and whether or not these were
19  jurisdictional to the United States of America and
20  Rivers and Harbors Act.
21    Q.  You just testified that you were testifying as
22  a project manager.  Is that your current title?
23    A.  Yes.
24    Q.  Yes?
25    A.  Yes.

Page 26

1    Q.  Is that the only court proceeding that you've
2  testified in?
3    A.  Yes.
4    Q.  And when I say testified in, I'm talking about
5  obviously in your lifetime; you understand that?  Not
6  necessarily your role as the United States -- not in
7  relation only to your employment with the United States
8  Army Corps of Engineers, but in general in your
9  lifetime.
10    A.  Yeah.  I don't go to court very often.
11    Q.  You're lucky.
12      Again, forgive the silly nature of the
13  question, but can I also assume that you've never served
14  as an expert witness before?
15    A.  That's true, unless -- you mean other than the
16  Lozman?
17    Q.  Let me back up.  Has a court in any
18  circumstance otherwise -- let me back up again.
19      Has counsel in a court proceeding ever
20  proffered you as an expert in any capacity for any topic
21  or any subject matter?
22    A.  I have no idea.
23    Q.  Okay.  Have you ever -- so you also talked
24  earlier mentioned you have never sat for a deposition
25  before.  So consequently, that would make me assume -- I

Page 27

1  don't like to assume, but make me assume that you have
2  also never sat and testified as an expert before; is
3  that correct?
4    A.  I don't know if they characterized me as an
5  expert witness for Lozman.  That's what I was getting
6  at.  I don't know.
7    Q.  Fair enough.
8    A.  You're going to have to ask them.
9    Q.  Fair enough.  Okay, forgive the nature of
10  these questions.  I ask everybody the same ones.  Have
11  you ever been convicted of a crime?
12    A.  No.
13    Q.  Okay.  You hesitated for a second.  Why did
14  you hesitate?
15    A.  I was just -- I have never been convicted of a
16  crime.
17    Q.  Have you ever been arrested?
18    A.  Yes.
19    Q.  For what?
20    A.  Too fast -- ultimately it ended up being too
21  fast for conditions.
22    Q.  So it was, can I characterize that as
23  excessive speeding?
24    A.  I wasn't speeding.
25    Q.  So what was the nature of the circumstances?

Page 28

1    A.  I was doing five under and they said I was
2  still driving too fast for conditions.
3    Q.  And that resulted in your physical arrest?
4    A.  No, that's what -- so my arrest was for
5  something else, but ultimately what, I guess I was
6  charged with was too fast for conditions.
7    Q.  What were you arrested for?
8    A.  What, they said that I was street racing.
9  They said that I had an open container.  They said that
10  I had no proof of insurance, and they said that I -- I
11  think there was something about resisting arrest or
12  something.
13    Q.  What county was this in?
14    A.  It was in Gwinnett County.
15    Q.  Gwinnett County?
16    A.  Yes, sir.
17    Q.  What year?
18    A.  It's been a long time.  2003?
19    Q.  What was the ultimate disposition of all of
20  that?
21    A.  That it was bogus and the court threw all of
22  it out.
23    Q.  When I say ultimate disposition, that means at
24  the end of the day were you, did you plead guilty or
25  were you convicted of any crimes at all?



Page 29

1    A.  I was not convicted of any crimes, no.

2    Q.  Did you withhold adjudication?  Was

3  adjudication withheld relative to any potential charges?

4    A.  I -- I'm not a lawyer.  Again, one more time.

5    Q.  That's okay.  Let me say it this way.  Did you

6  have to pay any fines or penalties as a result of these

7  particular actions?

8    A.  Yeah, I had to get my car out of impound.  I

9  had to, I had lawyer fees.

10    Q.  Did the court charge you with any particular

11  fines or penalties?

12    A.  I don't believe so, no.

13    Q.  Did you spend any time in jail?

14    A.  Until my parents came to get me.

15    Q.  Okay.  Other than that particular incident,

16  those incidents relative to Gwinnett County, have you

17  otherwise been arrested?

18    A.  No.

19    Q.  Have you ever declared bankruptcy?

20    A.  No.

21    Q.  Have you ever been subject to a disciplinary

22  proceeding in any capacity?

23    A.  No.

24    Q.  Do you know if anyone has ever filed a

25  complaint against you in your capacity as a federal or

Page 30

1  state employee?

2    A.  No.

3    Q.  Did you at any time serve in the military?

4    A.  I have.

5    Q.  What military unit?

6    A.  I was in the Navy.

7    Q.  All right.  When were you in the Navy?

8    A.  From 2010 to 2016.

9    Q.  Were you honorably or --

10    A.  I was honorably discharged.

11    Q.  You were honorably discharged?

12    A.  Yes, sir.

13    Q.  Thank you.  Have you ever had a negative

14  performance evaluation while you were in the Navy?

15    A.  No.

16    Q.  Okay, all right.  So we've kind of skipped

17  around a little bit.  Let's go to your work history.

18      You went to the Navy in 2010.  Was it after or

19  before you graduated from -- let me go back to my notes.

20  Let me start it differently.

21      So you went to the Navy in 2010; correct?

22    A.  Yes.

23    Q.  And it also says that you graduated from

24  University of West Florida in 2010 as well; correct?

25    A.  Yeah, the -- and the reason why I wasn't clear

Page 31

1  about it, because I was in the Navy while I was -- I had

2  to finish up a couple of classes.  And there was a, a

3  time where I just needed one class.

4      So I don't remember the exact date I

5  graduated.  That's why it was -- it wasn't like I was

6  sitting in class.  I was just waiting for that one last

7  class to be available.

8    Q.  Understood.

9    A.  But that's accurate, yes, I generally while I

10  was in the military graduated.

11    Q.  Okay.  So the time that you spent in the

12  various schools predated the military; correct?

13    A.  Most of them.  Keiser University I did after

14  with the GI bill, and I started a -- I forgot to mention

15  I went to Nova University as well, and I started a,

16  another degree there that I decided not to pursue.

17    Q.  What degree did you start?

18    A.  I was, I was just getting a second

19  undergraduate degree for biology, and it was because I

20  had to wait to get into, to get into another university.

21  I was going to get my master's.  So while I was waiting,

22  I wasn't going to let the benefits of the GI bill just

23  sit by.

24    Q.  So you were in the Navy from 2010 to 2016.

25  You were honorably discharged and thereafter when you

Page 32

1  got out of the Navy, did you start working?

2    A.  Well, when I got out, I was still going to

3  school, but shortly after that, I, a year or two, I

4  started going, I started employment at DEP.

5    Q.  So would that have been your -- what did you

6  do in the Navy?

7    A.  I was a corpsman.

8    Q.  A corpsman?

9    A.  Yes.

10    Q.  So was the FDEP, was that your first job out

11  of the military?

12    A.  Out of the military it was my first job, but I

13  went into the military late.

14    Q.  So what year did you start the FDEP?

15    A.  I'm not good with years.  It was like '17 or

16  '18.

17    Q.  Okay.

18    A.  No, probably 2016.

19    Q.  Yeah, I had to look.

20    A.  Yeah.

21    Q.  So basically almost --

22    A.  I spent about two years there prior to coming

23  over to the Corps.  So it was 2015, 2016, 2017,

24  somewhere in there.

25    Q.  Okay.  So when you first became employed with



JONATHAN PEMPEK
UNITED STATES OF AMERICA V SHARFI

May 19, 2022
33–36

Page 33

1 the FDEP, what was your initial title?
2     A.  I was compliance enforcement project manager.
3 I don't think they called it a project manager, but
4 essentially the same thing, compliance and assurance.
5     Q.  What is a compliance and assurance
6 enforcement -- let me start again.
7         Is it a compliance and enforcement officer?
8     A.  It was compliance and assurance officer,
9 because enforcement sounded kind of mean.
10     Q.  Okay.  So what were your job duties as a
11 compliance and assurance officer?
12     A.  We would do compliance to permits the state
13 issued, and we would go investigate unauthorized
14 activities.
15     Q.  So prior to 2016, what knowledge or skills did
16 you have that would allow you to become a compliance and
17 assurance officer for the Florida Department of
18 Environmental Protection?
19     A.  I gained those skills when I was working
20 there.
21     Q.  And how would you have otherwise gained those
22 skills while you were working there?
23     A.  On-the-job training.
24     Q.  So the nature, your responsibilities as I
25 think you indicated, was it primarily enforcement?

Page 34

1     A.  It was I would say 50/50, assurance and
2 compliance.
3     Q.  And what's the -- I can understand what
4 compliance is.  Compliance is bringing presumably
5 property owners who are not in -- well, I shouldn't
6 testify.  What does compliance mean?
7     A.  It's just making sure that they are following
8 the terms of, you know, the permit.
9     Q.  So these are individuals or property owners
10 who would have obtained permits from the Florida
11 Department of Environmental Protection?
12     A.  That's correct.
13     Q.  And what kind of permits would they have been?
14     A.  Structures and wetlands, wetland fills and
15 structures.  It's also the State of Florida regulates
16 mangroves and mangrove trimming.
17     Q.  What about wetland fills?
18     A.  Well, we also regulated beaches as well.  I,
19 just my timeline for my employment and everything, it's
20 probably messed up.  Maybe we could go back later and --
21 it's just, as far as when I started everything, I think
22 I'm off by a few months.  So we could circle back later
23 on it, but I'm just --
24     Q.  We just ask you to do the best that you can.
25     A.  Yeah, I'm just thinking that my timeline is a

Page 35

1 little bit off, but ultimately everything is, is in that
2 order.  Just the dates are probably not perfect.
3     Q.  Okay.
4     A.  But yeah, so I'm sorry, can you repeat the
5 last question?
6     Q.  Sure.  We were talking about what a compliance
7 officer does, and you indicated it was to ensure that
8 people complied with permits; correct?
9     A.  That's the compliance aspect.  And then also
10 there's a portion of the population that just builds
11 things without a permit.
12         And we just investigate those, and generally
13 the, the state would do a compliance assistance offer,
14 which we just -- sometimes it was in lieu of a permit.
15 But it was acknowledging, it was used as a deterrent,
16 but also it authorized the structure all at the same
17 time.
18     Q.  You're going to have to forgive me, because I
19 don't have the kind of knowledge you do and what it is
20 that you did, so none of that made too much sense to me.
21     A.  Understood.
22     Q.  Let me start over again.  Not over, but so we
23 talked about compliance; correct?
24     A.  Yes.
25     Q.  And then you separated compliance into

Page 36

1 assurance.  So what is, what would have been your duties
2 relative to being an assurance officer?
3     A.  Yeah, so I -- originally it was compliance
4 enforcement.  Enforcement makes more sense, the word,
5 than assurance.
6         So essentially it was ensuring that people
7 didn't construct unauthorized, fill wetlands or
8 construct unauthorized structures without, without a
9 permit, and citing them when appropriate.
10     Q.  Got it.  That makes sense to me.
11         How often did you come across in your role and
12 responsibilities with the Florida Department of -- let
13 me just say FDEP, is that okay?
14     A.  Understood.
15     Q.  I can't get it right.  How many times in your
16 role with FDEP did you investigate circumstances where
17 individuals or property owners would build something as
18 you referenced without a permit?
19     A.  Quite a bit.
20     Q.  Okay.  Why do you think that is?
21     A.  I, a ton of -- there's a lot of unauthorized
22 structures.  I, I couldn't put a number to it.
23     Q.  Would it be more than 100?
24     A.  Yes.
25     Q.  More than 1000?



JONATHAN PEMPEK
UNITED STATES OF AMERICA V SHARFI

May 19, 2022
37–40

Page 37

1   A.  Are there more than 1000 structures or was I
2   able to respond to over 1000?
3       Q.  No, during your tenure at the Florida
4   Department --
5       A.  I would say it's over 100, probably less than
6   1000 that I physically responded to unauthorized
7   actions.
8       Q.  More or less than 500?
9       A.  I was only there for two years and keeps you
10  pretty busy.  I would say between 100 and 500, if that's
11  good enough.
12      Q.  Just because we're here, 300?
13      A.  I don't know.  We stayed really busy.
14      Q.  Okay.  Who was your direct supervisor at the
15  FDEP?
16      A.  John Renfranz.
17      Q.  What was his title?
18      A.  Supervisor.
19      Q.  And was he your only supervisor at the time
20  when you were with the DEP?
21      A.  I think so.
22      Q.  Once you came to learn that an individual
23  property owner was allegedly building something without
24  a permit, would it have been part of your responsibility
25  to help those individuals come into compliance?

Page 38

1       A.  You're talking about from the state's
2   perspective?
3       Q.  Yes, sir.
4       A.  Yeah, no, I think from -- yes, we would work
5   with people to bring them back into compliance.
6       Q.  Was, from internally, was the goal to seek
7   enforcement or to seek compliance?
8           MR. ADKINS:  Objection, vague.
9           THE WITNESS:  If -- so there are two different
10      things.  You can't have an unauthorized structure
11      and seek compliance from -- you could seek it
12      through a Florida statute or the federal law, but
13      if we're separating, you asked me earlier what
14      compliance and enforcement is.
15          Compliance is specifically to an agreement
16      between us and them for the permit, right?  So, if
17      they didn't put turbidity curtains up, we would say
18      put them up, and a done deal.
19          But if you're asking, if somebody starts
20      building an unauthorized structure, we would work
21      with them to either get it permitted, moved or
22      prior to any enforcement action, yes, that was part
23      of our job.
24          But it depends on how you define it.  If
25      you're saying bringing them back into compliance

Page 39

1       with either Florida statute or federal law, it's
2       kind of a changing idea there.  So depending on how
3       you define it.
4   BY MR. MIRON:
5       Q.  Okay.  So you worked for the FDEP for, we
6   think roughly two years, from 2016 to 2000 --
7       A.  It was about two years, yes.
8       Q.  So is it okay to suggest that it went from
9   2016 to 2018 or roughly therein?
10      A.  I think at the end of the 2017, late 2017 is
11  when I started with the Corps.
12      Q.  That was my next question.
13      A.  Yeah.
14      Q.  So it would be easier for me to ask you that.
15      A.  Yeah.
16          MR. ADKINS:  Wait until he asks you a
17      question.
18          THE WITNESS:  I apologize.
19  BY MR. MIRON:
20      Q.  Thank you, sir.
21          When did you start with the Corps?
22      A.  2017.  I'm trying to work it through my head.
23  I know I butchered the timeline earlier, so I'm trying
24  to get it right.
25      Q.  That's okay.  So you think you started with

Page 40

1   the Corps late 2017?
2       A.  Yes.
3       Q.  And you think you started with FDEP in 2016?
4       A.  It would have been late 2015, 2016.
5       Q.  Okay.  And you're currently employed by the
6   Army Corps of Engineers; correct?
7       A.  That's correct.
8       Q.  Why did you make the change from DEP to the
9   Army Corps?
10      A.  Money.
11      Q.  Okay.  Is it safe to assume that you are
12  making more money at the Army Corps than you were at the
13  DEP?
14      A.  Yes.
15      Q.  What is your current title with the Army
16  Corps?
17      A.  I'm compliance enforcement project manager.
18      Q.  Would this be the same or similar duties as
19  your duties at FDEP?
20      A.  Similar duties.
21      Q.  How long have you had -- well, when you
22  started with the Army Corps, were you a compliance and
23  enforcement manager?
24      A.  I was.
25      Q.  So you've had the same title since you began?



Page 41

1    A.  You mean -- yeah, no, I haven't -- since
2  coming to the Corps, they have not changed my title.
3    Q.  So this is 2022.  So you've been with the
4  Corps roughly five years?
5    A.  A little over four.  Little over four years.
6    Q.  So consequently as an enforcement officer,
7  your job is to deal with situations where someone has
8  not complied with the law; is that correct?
9    A.  As an enforcement project manager, is to
10  identify actions that do not comply with the law, if
11  that was your question.
12    Q.  Sure.
13    A.  And that's specific to the Rivers and Harbors
14  Act and the Clean Water Act, which is similar to DEP as
15  you just asked, but not the same.
16    Q.  So is it, so then your responsibilities
17  relative to being a compliance and enforcement officer,
18  are they limited purely to situations that only involves
19  Rivers and Harbors Act and the Clean Water Act?
20    A.  As a compliance and enforcement officer, my, I
21  have job duties that are unrelated to compliance and
22  enforcement per se, but 99 percent of my job is related
23  to the Rivers and Harbors Act.
24    Q.  What's the other one percent?
25    A.  Well, I inspect dredges, hopper dredges.  And

Page 42

1  I'm sure there is a few other things that I do that are
2  generally unrelated to, to those two programs.
3    Q.  You are not in the permitting section;
4  correct?
5    A.  I write permits, but no, I'm not in the permit
6  section.
7    Q.  What does that mean, you write permits?
8    A.  A lot of these unauthorized activities or even
9  noncompliance get resolved with issuance of
10  after-the-fact permits.
11        They also, we could potentially modify a
12  permit to bring somebody back into compliance if it's a
13  good idea.  We, and I also occasionally help out
14  permitting section with their workload, because I'm a
15  nice guy.
16    Q.  So although you're not in the permitting
17  section, you have had an opportunity to help in the
18  permit process?
19    A.  That's correct.
20    Q.  Okay.  And specifically in relation to
21  after-the-fact permits?
22    A.  I, generally I'm supposed to do more
23  after-the-fact permits than before proposed actions.
24    Q.  Why is that?
25    A.  Because that's my job.  I'm again, lately I've

Page 43

1  been helping out with permitting section, which they
2  are, they have a very high workload, I'm writing --
3  right now I'm writing more permits for proposed actions
4  than after the fact.
5    Q.  What's the purpose of an after-the-fact
6  permit, for those of us who -- studio audience?
7    A.  No matter what, all of our enforcement cases
8  generally are resolved with some sort of authorization.
9  We have to be, we have to be able to justify, umm,
10  either the structure or the discharge of fill material
11  in a document, and that's what the purpose is.  I'm
12  sorry for saying umm again.
13    Q.  Does this go back to what you described
14  earlier as your attempt to help the property owner come
15  into compliance?
16    A.  No, that's, attempts to help the property
17  owner come back into compliance would potentially be a
18  modification of a permit or, you know, we work with
19  property owners quite a bit to try to get them -- a lot
20  of times things are misunderstandings.  They will
21  accidentally push fill into the wrong area.  They forget
22  to put BMPs.
23        We generally give people the benefit of the
24  doubt.  But after-the-fact permit is, it's
25  administrative process to try to account for the

Page 44

1  unauthorized work and to authorize them.
2    Q.  So of all the enforcement actions that you've
3  been involved with, how many of those enforcement
4  actions have resulted in an after-the-fact permit?
5    A.  Quite a few.  I don't know.
6    Q.  If you had to give me a percentage?
7    A.  So it's, for an enforcement actions, I've
8  taken formal enforcement action, nearly every single one
9  of them would ultimately get some sort of
10  after-the-fact permit.
11        The only caveat to that would be now working
12  with the Corps, our first line of defense is not sending
13  anybody an angry letter.  It's to offer voluntary
14  restoration.  Voluntary restoration does not require --
15  as soon as they take care of that action, we're done.
16  And it would not initiate an after-the-fact permit.
17        So that question is very difficult to answer.
18    Q.  When did the Corps' policy about involuntary
19  restitution start?
20    A.  I have no idea.  Ever since I've been here.
21    Q.  So as far as you're concerned, from the day
22  that you started at the Corps, the Corps' position has
23  been to try and bring property owners who are not in
24  compliance or not obtained permits into compliance
25  through a voluntary restoration?



JONATHAN PEMPEK
UNITED STATES OF AMERICA V SHARFI

May 19, 2022
45–48

Page 45

1   A.   Restoration.  Yeah, so if someone fills a
2   wetland, we would ask them to remove all the fill.  And
3   sometimes people are willing to do that and that would
4   be the voluntary restoration action, is to completely
5   restore the impacts.
6       There are situations where it's a, they will
7   remove a portion of it, but then apply for
8   after-the-fact permit for absolutely what they need.  So
9   every situation is unique and different.  And speaking
10  broadly about how we do things is pretty difficult,
11  because it's -- everything is unique.  Depends on, it
12  just depends on the conditions.
13  Q.   But as far as you're concerned, I think your
14  testimony was almost in every single circumstance, in
15  situations where you have brought, where you have sought
16  to bring someone into compliance, almost every -- start
17  over again.
18      Your testimony was that relative to those
19  matters where you were bringing a property owner into
20  compliance, almost in every single circumstance, you
21  would work with them in an effort to, A, bring the
22  property into compliance; correct?
23  A.   Are you talking about compliance with federal
24  law?
25  Q.   Yes, sir.

Page 46

1   A.   Okay.  So with federal law, ever since I've
2   been here, our goal has been to offer voluntary
3   restoration and work with people to come into compliance
4   with the federal law, either Rivers and Harbors Act or
5   Clean Water Act.  It could just be move a floating dock
6   and people are willing to do it.
7       Ultimately if they say no, it's issuance of
8   after-the-fact permit.  So I hope I answer your
9   question, but I'm not sure if I am.
10      MR. MIRON:  Excuse me for a second.  Can we go
11  off the record for a minute?
12      THE VIDEOGRAPHER:  We are off the record.  The
13  time is 10:11 a.m.
14      (Discussion held off the record.)
15      THE VIDEOGRAPHER:  We are on the record.  The
16  time is 10:14 a.m.
17  BY MR. MIRON:
18  Q.   All right.  So I apologize for that again.
19  A.   No problem.
20  Q.   You talked about part of your job
21  responsibilities relative to the processing permit
22  applications.
23      Who is your current supervisor at the Army
24  Corps?
25  A.   Robert Halbert.  He goes by Bobby, just in

Page 47

1   case it's confusing.
2   Q.   Has he been your supervisor since you started
3   at the Corps?
4   A.   He has been my supervisor since I started at
5   the Corps, but we have acting people that take place.
6   So not every single day, but generally ever since I've
7   been there, yes.
8   Q.   Okay.  I mentioned this to you earlier.  You
9   understand that you're testifying today in an action in
10  which the Army Corps of Engineers alleges that my
11  client, Benjamin Sharfi, personally as a trustee as well
12  as his company, NeshaFarm, violated the Clean Water Act
13  by filling wetlands without a permit; correct?
14  A.   That's what I'm here to --
15  Q.   When was the first time that you became aware
16  of Benjamin Sharfi?
17  A.   2015, 2016, when I worked at DEP.
18  Q.   Have you ever met him before?
19  A.   I have.
20  Q.   When?  When was the first time?
21  A.   It was, it was when I first received the
22  complaint.  I don't think the first time I was there he
23  was on site, but it was shortly after I met him while we
24  were doing field work.
25  Q.   And what year was that?

Page 48

1   A.   2015, 2016, something like that.
2   Q.   So what were the circumstances upon which you
3   first became aware of Mr. Sharfi?
4   A.   We received a complaint that wetlands were
5   being filled, and it was my job to respond to the
6   complaint.
7   Q.   And this is in what year?
8   A.   2015, 2016.
9   Q.   Who did you receive that complaint from?
10  A.   It was an anonymous complaint.
11  Q.   Did you receive, did you personally receive
12  the anonymous complaint?
13  A.   I believe I did, yes.
14  Q.   Was it via telephone?
15  A.   Yes.
16  Q.   Did you obtain, did you receive that call
17  through an office telephone?
18  A.   It was my work phone, yes.
19  Q.   Work phone?  And was the call recorded?
20  A.   No, not to my knowledge.
21  Q.   Okay.  Is there any documentation relative to
22  that particular call?
23  A.   If there was, it does not exist anymore.
24  Q.   Why doesn't it exist anymore?
25  A.   Because when I left DEP, I did have a notebook



JONATHAN PEMPEK
UNITED STATES OF AMERICA V SHARFI

May 19, 2022
49–52

Page 49

1  that would take notes of calls, because that was the
2  process back then, but that notebook is long gone.  I
3  have no idea what happened to it.
4      Q.  Did you take it with you?
5      A.  No.  I probably discarded it.
6      Q.  So your testimony is that you believe that
7  someone at the DEP discarded this notebook that you
8  would have kept --
9      A.  Either I did or they did, but no, it was just
10  my notes, and it wasn't a requirement from DEP to do
11  this.  It was something my supervisor wanted to do.  And
12  it was write the number down and what the merit of the
13  complaint was.
14      Q.  Do you have any recollection of who the
15  anonymous complainant was?
16      A.  I have an assumption, but I don't --
17      Q.  Who do you assume it was?
18      A.  I believe it was the neighbor.
19      Q.  Which neighbor?
20      A.  Neighbor to the east.
21      Q.  Do you know the individual's name?
22      A.  I do not.
23      Q.  Did you remember the nature of the telephone
24  call?  What did they say?
25      A.  They said, "Smells like rotten eggs next door.

Page 50

1  I think somebody is working a wetland."
2      Q.  Do you specifically remember them using the
3  term wetland?
4      A.  I believe so.
5      Q.  So once you received that particular
6  complaint, what did you do?
7      A.  I just want to be clear.  My assumption that
8  it's a neighbor was because they said it smells next
9  door.  So that's -- other than that, that's, that just
10  was my belief at the time.
11      Q.  Okay.
12      A.  I'm sorry, what was your next question?
13      Q.  So once you obtained the complaint, then what
14  did you do?
15      A.  I performed a site visit.
16      Q.  Do you remember the date upon which you
17  obtained the complaint?
18      A.  No, but I believe everything is public record.
19  It's in my, my, I guess inspection report from DEP.
20      Q.  Would you have visited the site, or how
21  shortly after you obtained the complaint did you visit
22  the site?
23      A.  It was --
24      MR. ADKINS:  Objection, vague, definition of
25      the site.

Page 51

1      MR. MIRON:  I'm sorry, you're right, I
2  apologize.
3  BY MR. MIRON:
4      Q.  So in 2016, you obtained an anonymous call
5  relative to an allegation that Mr. Sharfi was working in
6  a wetland; correct?
7      A.  That's correct.
8      Q.  Okay.
9      A.  They said they believed he was working in a
10  wetland because they knew the hydrogen sulfide odor and
11  they associated it with a wetland.
12      I don't believe they said that -- I don't
13  remember them saying specifically what he was doing in a
14  wetland, but they thought it was being disturbed next
15  door.
16      Q.  Do you know the address of the particular
17  property that they are referring to?
18      A.  It's the one immediately south of the site, so
19  it depends on what -- I don't know the address of the
20  parcel number, no.  I don't think it -- it did or -- I
21  don't recall it actually having an address.  It was just
22  referred to as a parcel number.
23      Q.  So for a matter of clarifying, just being
24  clear on our testimony, the area that you're talking
25  about, the property you're talking about is not the

Page 52

1  subject site that is relative to or the subject of this
2  particular action; correct?
3      A.  That's correct.
4      Q.  It's a ten-acre parcel directly south of the
5  subject site; correct?
6      A.  Yeah, I don't know if it's perfectly 10 acres,
7  but approximately that.
8      Q.  It's approximately 10 acres?
9      A.  Approximately.
10      Q.  So how long after you obtained the complaint
11  did you perform a site visit of the parcel to the south?
12      A.  It was within that week.
13      Q.  Was it customary for you to obtain, to do site
14  visits within a short period of time of obtaining --
15      A.  At DEP it was.  We had more help.
16      Q.  How many, at that time how many complaints
17  would you receive in a given week?
18      A.  Oh, that's very difficult to answer.  Again,
19  it was, depending on what time of year, it seemed like
20  all the snowbirds came down and wanted to rat out their
21  neighbors.  So we were really busy in the winter.
22      That's just maybe 20 a week.  Sometimes it
23  would be more than that.
24      Q.  And how many of those 20 a week were
25  anonymous?



Page 53

1    A.   The majority of the people want to remain
2    anonymous.
3        Q.   When you were with the DEP, did they have a
4    specific phone number that someone would call in order
5    to provide an anonymous complaint?
6        A.   Yeah, I don't know how to -- I don't know if
7    there was a Tip line.  There could be.
8            Ultimately, we got complaints through the
9    phone, whether they called my phone directly or another
10   project manager, because you could look all that up.
11   You could go on the State of Florida's website and it
12   will say what our, our job is.
13           Then also have our phone numbers, and we have
14   a main line, which was sometimes transferred out without
15   us knowing whether it came from us directly or not.
16           And I do believe they have a complaint line,
17   but I don't, I don't recall how that was used.
18       Q.   So going back to your earlier testimony, the
19   first time you met Mr. Sharfi you believe was not the
20   first time you went to the site to the south, but the
21   second time; correct?
22       A.   No, the first time I went, I don't think he
23   was on site, no.
24       Q.   Okay.  When you did meet him, what was the
25   interaction like?  Was it cordial?  Noncordial?

Page 54

1    A.   I, I don't, I don't recall the first time I
2    met him it being noncordial.  I do -- Mr. Sharfi is a
3    pretty passionate man and he wanted to be there and
4    explain what he was doing, but I don't recall it being
5    uniquely confrontational the first visit.
6        Q.   Okay.  Prior to that, had you ever spoken to
7    him?
8        A.   I don't believe so, no.
9        Q.   You understand or do you understand that --
10   start over again.
11           I identified for you so we could interact as
12   the site, when I refer to the site, I'm referring to the
13   subject site, which is the subject of this particular
14   action.  You understand that?
15       A.   Uh-huh.
16       Q.   And then we started talking about the site to
17   the south.  You understood that; correct?
18       A.   Yes.
19       Q.   And Mr. Sharfi's property as a whole, you
20   understand that he refers to that property as NeshaFarm?
21       A.   I understand.
22       Q.   Nesha is N-e-s-h-a, F-a-r-m.  So when I refer
23   to NeshaFarm, I'm referring to the farm as a whole,
24   okay?
25       A.   Uh-huh.

Page 55

1    Q.   After that initial complaint that you
2    obtained, and then thereafter the initial site visit
3    that you made, was that the first time you had ever been
4    to Mr. Sharfi's property?
5        A.   It is.
6        Q.   Prior to that, had you ever had any reason to
7    visit any other properties within the surrounding area?
8        A.   No, I don't believe so.  I personally hadn't,
9    but I think there was a permitting action for a dock
10   around the same time for DEP, but that was, I had no
11   knowledge of Mr. Sharfi prior to.
12       Q.   So you are saying that you are aware or you
13   believe at some point there was a permitting action that
14   involved Mr. Sharfi?
15       A.   I believe he had a permit in-house for his, a
16   dock that was unassociated, but I, I -- when I received
17   the complaint, I didn't know whose house I was going to.
18   I had never met Mr. Sharfi, no.
19       Q.   When you went to the property, were you aware
20   of the fact that Mr. Sharfi had a permanent house for a
21   dock?
22       A.   No, I didn't know.
23       Q.   When did you become aware of that?
24       A.   I think it was after, afterwards, when we were
25   trying to identify the scope of impacts and the alleged

Page 56

1    violator.
2        Q.   Why was that relevant to you at the time?
3        A.   It wasn't relevant to me.  Just somebody
4    brought it up.
5        Q.   Who brought it up?
6        A.   Probably a project manager or something.  I
7    think there was some issue with the dock where there was
8    some, some challenge in permitting issues with it.
9            I think they, they got through them all, but I
10   think just somebody said they were working on a project
11   or something back then unassociated with the wetland
12   fill.
13       Q.   Were you at any time, during your time at the
14   FDEP, were you at any time involved with the permitting
15   for that particular dock?
16       A.   No.
17        (The document was marked Deposition Exhibit 124
18   for identification.)
19   BY MR. MIRON:
20       Q.   I'm going to show you what will be marked as
21   Exhibit Number 124.  If you would take a minute and tell
22   me whether or not you've ever seen that document before.
23       A.   I have seen this document, yes.
24       Q.   Okay.  What is it?
25       A.   This is my first inspection report of the



JONATHAN PEMPEK
UNITED STATES OF AMERICA V SHARFI

May 19, 2022
57—60

Page 57

1  inspection that we -- I first, after the first
2  complaint.
3      Q.  And does it appear to be a true and correct
4  copy of the inspection report you referenced earlier?
5      A.  It's good enough.  I think it appears to be.
6  I haven't seen this in a long time.
7      Q.  Okay.  And it appears as though at the top it
8  says Florida Department of Environmental Protection,
9  Submerged Lands and Environmental Resource Program;
10  correct?
11      A.  Yes, this is a template.  I just filled out
12  some spaces.
13      Q.  What does that mean you filled out some
14  spaces?
15      A.  This is all provided and then you just, of
16  course, you add, you know, the body and then some photos
17  and you're finished.
18      Q.  It's a fill-in-the-blank document essentially?
19      A.  Yeah, they wanted everything to generally look
20  the same.  So the Submerged Land and Environmental
21  Resource Program Inspection Report, I didn't write that.
22  That was already pregenerated.
23          MR. ADKINS:  I'm sorry to interrupt.  The
24      document that, the copy that that I have has USA
25      620, and it looks a little bit thicker than the

Page 58

1  copy that the witness has.
2          MR. MIRON:  You are right, my assistant
3      screwed up.
4          THE WITNESS:  Do I have the wrong one?
5          MR. MIRON:  Let me see what you've got, sorry.
6          MR. ADKINS:  Sorry to interrupt.
7          MR. MIRON:  No, you are fine.  Thank you for
8      doing that.
9      You've got the right one.
10          MR. ADKINS:  Is it USA640?
11          MR. MIRON:  Yes, thank you.
12          MR. ADKINS:  So USA640 is Deposition 124?
13          MR. MIRON:  124.
14          MR. ADKINS:  Okay.
15          MR. MIRON:  Yes, thank you.
16  BY MR. MIRON:
17      Q.  So we started to discuss the language at the
18  top says Submerged Lands and Environmental Resource
19  Program Inspection Report.
20      That's not accurate information?
21      A.  I'm saying that this was a template that we
22  were given to write our inspection reports on.
23      Q.  Okay.
24      A.  So it's probably accurate.  It's not something
25  I wrote, though.  You've highlighted that.

Page 59

1      Q.  Okay.  So the point you're making is that this
2  was information that was already on the form?
3      A.  Correct.
4      Q.  Got it.  So in this particular circumstance,
5  would the information contained within this document be
6  accurate and truthful?
7      A.  Yes.
8      Q.  Okay.  And so if we look at it, it shows that
9  this particular inspection report was dated 4-19, or
10  April 19 of 2016 at 11:30 a.m.
11      Do you see that?
12      A.  Uh-huh.
13      Q.  And is that, would that have been the date
14  upon which you actually physically inspected the
15  property?
16      A.  That's correct.
17      Q.  Okay.  So you testified earlier that the
18  initial complaint relative to this particular property
19  that's subject of this inspection report came in through
20  a work phone; correct?
21      A.  Yes.
22      Q.  Have you ever used your personal cellphone or
23  obtained -- scratch that.
24      Have you ever received anonymous complaints to
25  your personal cellphone?

Page 60

1      A.  No.
2      Q.  Do you have a personal cellphone?
3      A.  Yes.
4      Q.  Have you ever used your personal cellphone for
5  business-related reasons?
6      A.  To talk to my chief and stuff like that, yes,
7  I have.
8      Q.  Have you ever sent or received email to a
9  personal email address that was --
10      A.  Associated with this project?
11      Q.  Yes, sir.
12      A.  No.
13      Q.  How about associated with -- when you said
14  associated with this project, associated with anything
15  relative to Mr. Sharfi?
16      A.  Yeah, likely these photos came off my personal
17  cellphone.
18      Q.  Okay.
19      A.  And I had to email them myself, because we
20  didn't have, we didn't have our own phones at DEP.
21      But it, it's highly likely that was taken off
22  my, that point location was taken off Google Earth or
23  something similar on my phone.
24      Q.  Okay.  So let's continue.  The project name is
25  Benjamin Sharfi 2002 Trust, backslash, Wetland Dredge



JONATHAN PEMPEK                                              May 19, 2022
UNITED STATES OF AMERICA V SHARFI                           61—64

Page 61

1  and Fill; do you see that.
2      A.  Yeah.
3      Q.  And it has Mr. Sharfi's mailing address.  It
4  says DEP representatives, and that's you, Jonathan
5  Pempek; correct?
6      A.  That's correct.
7      Q.  Does that indicate that you were the only
8  person who was at that particular site inspection?
9      A.  I was the only respondent to the site
10  inspection.
11      Q.  Did anyone stop you from coming on the
12  property to conduct your site inspection?
13      A.  No.
14      Q.  It says the property is located in an isolated
15  wetland at 8027 Southwest 33rd Street, Palm City,
16  Florida?  Do you see that?
17      A.  I do see that.
18      Q.  Is that correct?
19      A.  That it was an isolated wetland?
20      Q.  That's what it says.
21      A.  That is what it says.
22      Q.  Under water body, it also says isolated
23  wetland; correct?
24      A.  That's correct.
25      Q.  So if we look down into the Investigation

Page 62

1  Procedures and Findings Section, it says Compliance
2  Inspector Jonathan Pempek visited the site on April 19,
3  2016; correct?
4      A.  Uh-huh, yeah, that's correct.
5      Q.  Says, "Four large piles of fill and standing
6  water in the ruts of heavy equipment were present in the
7  area that appeared to have a wetland signature on
8  satellite imagery."
9          Do you see that?
10      A.  I do see that.
11      Q.  Was it common for you to -- let me back up.
12          So this inspection report, was this inspection
13  report drafted on the same day upon which you actually
14  conducted the inspection?
15      A.  So this inspection report is not what I
16  initially drafted.  It went for review and it was --
17  there was a lot of things that were removed from it.
18      Q.  Such as?
19      A.  I don't recall.  I do know that they -- I
20  don't recall exactly when, because John Renfranz, he
21  looked over it and he made some changes.
22          And then I don't know if this was published
23  and put into -- was completed.  I drafted the same
24  day, if that's what you're asking, but I don't know when
25  it was actually finalized, because there was a series of

Page 63

1  inspections that occurred afterwards.
2      Q.  Right.  So your testimony is that your
3  supervisor at the time, John Renfranz, would have
4  otherwise edited or removed information from what was
5  your original inspection report?
6      A.  Correct.
7      Q.  And do you know whether or not a copy of that
8  original draft still exists today?
9      A.  I doubt it.
10      Q.  Why do you doubt it?
11      A.  Because it was in the Word document, and
12  everything was edited in the same Word document.
13      Q.  So --
14      A.  So it was -- he took liberty to go ahead and
15  redraft it in the same file.
16      Q.  So therefore, he would have otherwise saved
17  over your version?
18      A.  Correct.
19      Q.  Was that common for the DEP at the time?
20      A.  I don't know.  I don't know what was common
21  for them.  I just, John would put his own twist on a lot
22  of our reports.
23      Q.  So the statement here that the area appeared
24  to have a wetland signature on the satellite imagery, is
25  that something that you would have checked before or

Page 64

1  after you did the actual physical inspection?
2      A.  I always check before.
3      Q.  So before you went to the property, you would
4  have stopped and done what in order to obtain the
5  satellite imagery?
6      A.  I mean even if it's going to Google Earth, we
7  can't respond to every single complaint.  So prior to
8  going out, we want to know if the complaint is even
9  legitimate.  We don't want to just show up if it's just
10  a disgruntled neighbor, which happens more often than
11  not, or more often than you would think.
12      Q.  So then would you conduct some type of due
13  diligence ahead of time?
14      A.  Yes.
15      Q.  And in this particular circumstance, what due
16  diligence would you have done before going out to this
17  particular property, if you recall?
18      A.  I think this one, I know I butchered the
19  timeline, but this is one of my first projects with DEP.
20  So not everything in here is perfect.
21          And I'm acknowledging that now, so -- but
22  nonetheless, I would have just looked, I would have used
23  either Google Earth or some sort of mapping software or,
24  you know, wetland map to see if wetlands were even in
25  the area prior to going out.



Page 65

1    So that's the desktop review portion of it.
2    We don't -- we had more resources then than I do now.
3    We had more, I had more help back then for the area that
4    I was covering.  But we still couldn't respond to every
5    single complaint.  We just had to do a lot of office
6    work before, before going out.
7        Q.   So you had more help when you were with the
8    FDEP than you do now at the Army Corps?
9        A.   Yes, we had a lot more coverage.
10       Q.   Does that limit your ability to do any due
11   diligence relative to your role as a compliance officer
12   with the Army Corps?
13       A.   Yes.  I mean the federal scope is -- ideally
14   we allow municipalities or the state a chance to be the
15   lead enforcement agency.  So to limit our workload,
16   however, not every situation does that work.
17       But yes, we are, we have a lot more work than
18   we could handle right now.
19       Q.   So relative to the subject site today and the
20   action that we're dealing with today, the state
21   enforcement agency is not leading the enforcement; is
22   it?
23       MR. ADKINS:  Objection.
24       THE WITNESS:  The state -- it's my
25   understanding there is, the state has some sort of

Page 66

1    enforcement action, but no, they are not the lead
2    enforcement agency as far as the Army Corps of
3    Engineers is concerned.
4    BY MR. MIRON:
5        Q.   Okay.  Why not?
6        A.   Mr. Sharfi has expressed no interest in
7    acquiring an after-the-fact permit.  And ultimately to
8    resolve this from the federal interest, an
9    after-the-fact permit is required to conclude any
10   enforcement action.
11       Q.   Have you ever suggested to Mr. Sharfi that an
12   after-the-fact permit would resolve this enforcement
13   action?
14       A.   I have.
15       Q.   Did you use those exact terms, an
16   after-the-fact permit?
17       A.   Yes.  And so just to -- I did use the terms
18   after-the-fact permit, but at the time when I mentioned
19   that, the parcel was less developed.
20       So it would have been a combination between
21   some components being after the fact and other
22   components being before the fact.  But now it's a
23   different situation, sitting here now.
24       Q.   So it looks as though, as you said, you
25   verified historical weather resources, revealed no

Page 67

1    precipitation that occurred at the site within 48 hours
2    prior to inspection.  Do you see that?
3        A.   I do.
4        Q.   So that would have been additional due
5    diligence you would have done; correct?
6        A.   That's correct.
7        Q.   And that was before you went to the site?
8        A.   Yes.
9        Q.   Further down it says, "This location included
10   obligate wetland vegetation, including Sagittaria
11   Lancifolia and Xyris."
12       Do you see that?
13       A.   I do.
14       Q.   At the time are you aware of what -- can you
15   pronounce those names for me?
16       A.   Saggitaria and Xyris.
17       Q.   The first word was Sagittaria something.  How
18   do you pronounce that?
19       A.   I don't know.
20       Q.   You don't know?
21       A.   Right.
22       Q.   And then Xyris?
23       A.   Xyris, yes.
24       Q.   At the time that you visited the site, were
25   you familiar with what those types of obligate wetland

Page 68

1    vegetation were?
2        A.   I was.
3        Q.   How so?
4        A.   This wasn't the -- generally, I was going on
5    joint site inspections and trying to learn the ropes,
6    and these, at least Hydrocotyle, Blechnum, Sagittaria,
7    Xyris, they were fairly easy to identify.
8        Q.   What are obligate wetland vegetation?
9        A.   They predominantly grow in a wetland more
10   often than not.
11       Q.   It says it also included FACW species.  What's
12   that?
13       A.   FACW.
14       Q.   FACW?
15       A.   That's how we say it, yeah.
16       Q.   What does that stand for?
17       A.   Wetland species.
18       Q.   What does that mean?
19       A.   More often than not, they are going to grow in
20   a wetland as opposed to an upland.
21       Q.   As of the date of this particular inspection,
22   how long had you been with the FDEP?
23       A.   Probably four months maybe.
24       Q.   It says "The evidence from the site inspection
25   justified a more in-depth assessment at a later date."



Page 69

1      Do you see that?

2    A.  Yeah.

3    Q.  Why is that?

4    A.  Sorry, yes, I do see that.  And because to me,

5  it was apparent that it was highly likely a wetland was

6  being impacted.

7    Q.  But you made a determination at that time that

8  a more in-depth assessment was required?

9    A.  Yes.

10    Q.  Okay.  Says Violation Details.  Do you see

11  that?

12    A.  I do.

13    Q.  Is that information correct and accurate?

14      MR. ADKINS:  Objection, vague.

15  BY MR. MIRON:

16    Q.  Is the information contained within your

17  document number 124 specifically as relates to violation

18  details, is it accurate?

19    A.  I, yes, I believe it to be accurate.  It's

20  unassociated with, with anything in the report, but I

21  believe I recall that he was dredging out a pond

22  immediately adjacent, and that was, that -- I think

23  generally they called it a dredge and fill violation,

24  regardless whether it was specific to dredging or fill,

25  but, you know, terminology is a little bit different now

Page 70

1  at the Corps than it was back then.

2      (The document was marked Deposition Exhibit 125

3  for identification.)

4  BY MR. MIRON:

5    Q.  Let me show you what will be marked as Exhibit

6  Number 125.  It also represents as Bates-stamped USACE

7  620.

8      Do you see that document?

9    A.  I do.

10    Q.  And does this look like an accurate

11  representation of another inspection report that you

12  would have done?

13    A.  I assisted in this report, but I wasn't the

14  only draftee of this report.

15    Q.  Okay.  Can you identify what portions of the

16  report you drafted and you didn't?

17    A.  I cannot.

18    Q.  Is this another situation where your

19  supervisor would have had the opportunity to edit the

20  report?

21    A.  Yes.  I believe Gregory Vasquez had drafted

22  most of this, and I provided some, some assistance.

23  Greg was the senior project -- not senior project, but

24  he was more senior to me at the time during our

25  employment there.

Page 71

1    Q.  Do you know whether Gregory Vasquez has ever

2  been the subject of any disciplinary proceedings?

3    A.  I don't believe so.  He is a pretty stand-up

4  dude.

5    Q.  How long had Greg been with the department?

6    A.  I don't know.  I don't know.

7    Q.  Was it common at that time for you to conduct

8  more than one inspection of the property in question?

9    A.  Yes.

10    Q.  And this particular circumstance is dated

11  4/26/16, again at 11:30 a.m.; correct?

12    A.  That's correct.

13    Q.  And the DEP representatives were yourself, as

14  you mentioned, John Renfranz, who was at that time your

15  supervisor, and Gregory Vasquez, who was, you indicated

16  was also a compliance officer; correct?

17    A.  Correct.

18    Q.  And then it says other representatives.  It

19  says Benjamin Sharfi.  So Mr. Sharfi was there; correct?

20    A.  Yes, I believe this was probably the first

21  time I met him.

22    Q.  Some other individuals, David Hauer, Linda

23  Petz, Paul Schilling and Shawn McCarthy; correct?

24    A.  Yes.  I vaguely remember the people from

25  Martin County being there.

Page 72

1    Q.  Did you have an opportunity to speak to

2  Mr. Sharfi on this particular occasion?

3    A.  I think I did.

4    Q.  Do you recall what you spoke about?

5    A.  No, I don't recall what we spoke about.  It

6  was probably just pleasantries, because I recall Greg

7  and I, we were trying to do the point descriptions while

8  John Renfranz was talking to Mr. Sharfi.

9      So he -- I didn't have much interaction with

10  him other than good morning.

11    Q.  Did anyone stop you from conducting your

12  investigation?

13    A.  No.

14    Q.  Okay.  Prior to April 26 of 2016, did you tell

15  the property owner, Mr. Sharfi or anybody, anyone

16  working for Mr. Sharfi that you were coming back on that

17  particular day?

18    A.  I think it was worked out.  I don't, I don't

19  recall, because again, I, as mentioned, I was a new

20  project manager.  When I showed up for this initial

21  inspection, as you could tell, I said more in-depth site

22  inspection was merited, and that's because I was out of

23  my league.  So this is why these, I recommended a

24  follow-up inspection with these other gentlemen that,

25  that had been around a little bit longer than me.



JONATHAN PEMPEK
UNITED STATES OF AMERICA V SHARFI

May 19, 2022
73–76

Page 73

1    I, I could identify a wetland, but, you know,
2  at the time I was learning.  So this is, this was, I was
3  tagging along for a learning experience at the time.
4    Q.  Understood.  What is a wetland?
5    A.  A wetland is a, we define a wetland as having
6  three characteristics:  Hydric soils, aquatic vegetation
7  or wetland vegetation, and hydrology.  There's a certain
8  type of hydrology to meet the conditions.
9    Q.  What is it?
10    A.  It depends.  There's many different types of
11  hydraulic indicators.
12    Q.  Such as?
13    A.  Hummucks, tussucks, plant morphology or
14  adaptations.  If we have water at the surface, if there
15  is elevated lichen lines, if there is rafting
16  vegetation, if there's water stain marks, if water stain
17  the leaves, if there's water within 12 inches of the
18  surface, if there's muck at the surface.  I mean I sound
19  like Bubba Gump now, but these are all, these are all
20  indicators of hydrology.
21    Q.  So you indicated that you believe that the
22  inspection was coordinated with Mr. Sharfi; correct?
23    A.  I, I believe so, yeah.  I don't see -- he was
24  there and he was waiting for us, I recall.  So, and I
25  believe that was coordinated through his consultant.

Page 74

1    Q.  Okay.
2    A.  And at least Martin County and everybody else,
3  everybody was aware of this site inspection.
4    Q.  So consequently, it would be a fair assumption
5  to suggest that no one refused to allow you to conduct
6  your inspection; correct?
7    A.  That's correct.
8    Q.  Did anybody interfere in any way during your
9  inspection?
10    A.  Mr. Sharfi talked to Mr. Renfranz quite a bit.
11  And he was, we could have used to stop digging holes.
12  So no, generally we still, we still got the site
13  inspection done.
14    Q.  Okay.  So I'm going to go into --
15    THE VIDEOGRAPHER:  Your microphone came off.
16    (Discussion held off the record.)
17  BY MR. MIRON:
18    Q.  I want to go to the body of the inspection
19  report.  Says Events Leading to the Inspection.
20    "Inspector Jonathan Pempek visited the site on
21  the day the complaint was received and observed
22  earthmoving activities occurring in an area suspected to
23  be a wetland prior to these earthmoving activities."
24    Do you see that?
25    A.  I do.

Page 75

1    Q.  Is that an accurate statement?
2    A.  I believe there was still wetlands on site.
3    Q.  Did you observe earthmoving activities?
4    A.  I did.
5    Q.  How so?
6    A.  There was a bulldozer that was actively
7  working at the site when I first arrived.
8    Q.  Would that be something that you think would
9  have been important for you to take a picture of?
10    A.  I think it was a tad bit awkward, because they
11  were actively working, and I just wanted to -- again,
12  being a new guy, didn't want to ruffle any feathers.
13    Q.  I don't understand.
14    A.  Taking photos of people doing work.  It was
15  just, I realized I was out of my league pretty quick
16  when I went there and everything was disturbed.
17    I spoke to a gentleman, I believe -- I don't
18  recall, but I -- there was, there was equipment on site.
19    Q.  Your testimony is that as on April 19th of
20  2016, at that particular site inspection you did, there
21  was equipment actually working in the area that you
22  allege to be a wetland?
23    A.  Yes, I believe that to be the case.  And if
24  they weren't -- yes, I believe there was equipment
25  there.

Page 76

1    Q.  You believe or there was?
2    A.  I don't know.  For some reason, I believe
3  there was equipment on the site, but again, it's been a
4  long time.
5    Q.  So you're not sure?
6    A.  No.
7    Q.  Okay.  And would you agree with me that if
8  there was equipment on site, that you likely would have
9  taken a picture of the equipment?
10    A.  It would have been a good idea, but I
11  didn't -- I vaguely recall there being equipment and not
12  taking a photo of it.
13    Q.  We understand that at the very least there is
14  no picture of that equipment contained within your
15  initial site inspection from April 19th of 2016;
16  correct?
17    A.  I agree with that statement.
18    Q.  And you also would agree that your testimony
19  is that you don't recall at this time whether or not you
20  actually observed earthmoving activities at that time?
21    A.  Yeah, I believe I did, but yeah, I don't
22  without a doubt recall earthmoving equipment being on
23  site that day.
24    I would not, it would not have been included
25  in a follow-up report if I hadn't -- and this was



Page 77

1  written weeks after my initial report, whereas now it's
2  been quite a few years.
3         So, but I would still say that it's highly
4  likely an accurate statement in this follow-up report.
5  Just I don't remember.
6      Q.  It also says that you visited the site on the
7  day the complaint was received.  And this is referring
8  back to the April 19th date; is that a correct and
9  accurate statement?
10     A.  Yeah, I originally asked, I said it was
11 relatively soon.  I thought within the same week, but if
12 it said it was the day of, this is probably more
13 accurate than my memory.
14     Q.  On this particular day relative to this
15 particular inspection, do you recall any earthmoving
16 activities taking place?
17        MR. ADKINS:  Objection, vague.  Could you just
18 clarify if we're talking about 19 or 26?
19        MR. MIRON:  26.
20        MR. ADKINS:  Okay.
21        THE WITNESS:  I -- yes, apparently we did take
22 a photo of equipment.
23        I do remember being on site and found it very
24 interesting that Mr. Sharfi was aware of us being
25 there, but there were dump trucks that were

Page 78

1  actively bringing in loads of dirt.  And they were
2  actively moving the dirt around while we were
3  there.
4  BY MR. MIRON:
5      Q.  So Mr. Sharfi wasn't trying to hide anything
6  from you at that time; is that correct?
7      A.  Yeah, he was continuing with work.
8      Q.  And so relative to this particular inspection
9  on April 26 of 2016, you ultimately made a
10 determination, am I correct, that a third inspection was
11 necessary; correct, in order to determine if the
12 wetlands had been filled?
13     A.  When you say you, I probably did not make that
14 determination.
15     Q.  So it appears as though, if you can look for
16 me on page four of this inspection report, above the
17 language "additional inspection necessary," above that,
18 it says, hyphen, "G. Vasquez."  Do you see that?
19     A.  Uh-huh, yes.
20     Q.  Does that indicate Mr. Vasquez would have
21 drafted this particular report or any portion of this
22 report?
23     A.  Yeah.  No, he definitely drafted a good
24 portion of this report.
25     Q.  Okay.

Page 79

1      A.  But as far as whether additional inspection
2  was necessary, I don't know who that came from.  Again,
3  we would draft reports.  They would go to John Renfranz
4  and he would put his spin on all of them.
5         And I say spin, but I mean everything has
6  their unique formats how they like saying things.  And
7  ultimately it was him and his boss' discretion of
8  whether we're going to continue with enforcement action
9  or continue with additional site inspection.
10     Q.  So this particular circumstance, the
11 determination was made that an additional site
12 inspection was necessary; correct?
13     A.  Somebody made that decision.
14     Q.  So would it be safe to assume that the DEP
15 needed more information before they were able to
16 determine whether or not an enforcement action was going
17 to be necessary?
18     A.  No, I don't think that's safe to assume.
19 That's why we needed a third site inspection.
20     Q.  So in your mind, what was the purpose of that
21 third site inspection?
22     A.  The purpose -- so the DEP identified a
23 regulated water, jurisdictional wetland.  They could not
24 identify the extent with just that one site visit.
25        This was especially challenging because the

Page 80

1  road was very difficult to dig through.  And there was a
2  lot of fill, and we had to use augers, and it was
3  relatively time consuming.
4         So I believe it was not -- I mean it says here
5  that the project is located in jurisdictional wetland
6  class three water with parcel control number -- yada,
7  yada, in Palm City, Martin County.
8         So they identified the water as being
9  jurisdictional, but they -- more time was needed to
10 identify the configuration of the wetland, I guess.
11        (The document was marked Deposition Exhibit 126
12 for identification.)
13 BY MR. MIRON:
14     Q.  Let me show you what we're going to mark
15 Exhibit 126, represents Bates number EPA 30.
16        Do you see that document?
17     A.  I do.
18     Q.  Does it appear to be an accurate
19 representation of an inspection report that you would
20 have drafted?
21     A.  That I drafted?
22     Q.  Yes, sir.
23     A.  I don't know.  Let me look through it.
24     Q.  Please.
25     A.  This would have been drafted by Greg as well.



Page 81

1    Q.  Okay.  Would you have had any involvement in
2  any of it, drafting of any of it?
3    A.  Yeah, I -- yes, I believe I would have had
4  some involvement.  It was mainly data collection for
5  helping with the photos, organizing the pages.  But as
6  far as the majority of this, again, Greg was the more
7  senior to me, so he took the lead on the majority of
8  this.
9    Q.  So the date of this particular inspection was
10  June 28th of 2016 at 10 a.m.; correct?
11    A.  That's correct.
12    Q.  And the individual representatives from the
13  DEP were yourself, Gregory Vasquez, and a gentleman
14  named Edward Kalajainen.
15      And I understand that Edward K was an intern;
16  is that correct?
17    A.  That's correct.
18    Q.  And no one from -- scratch that.
19      Mr. Sharfi wasn't at the inspection, or was he
20  at the inspection?
21    A.  I don't remember.  If it doesn't say he was,
22  he likely was not.
23    Q.  So it says other representatives, NA?
24    A.  Yeah, I would imagine it was just us then.
25    Q.  Did anyone stop you from coming to conduct

Page 82

1  this inspection?
2    A.  I don't think so, no.
3    Q.  Did anyone refuse to allow you to conduct it
4  at all?
5    A.  No.
6    Q.  Okay.  Did you speak to anyone from the
7  property owner at that time?
8    A.  We could have.  I believe -- I don't remember.
9    Q.  Okay.  So if we look, it says Events Leading
10  to the Inspection.  Still has the same language that was
11  in both the first -- excuse me, the same language that
12  was in the second inspection?
13    A.  Yes, copied and paste.
14    Q.  Copied and paste, okay.
15      So in this particular circumstance I
16  understand that both yourself as well as Mr. Vasquez
17  found possible dredge and fill which might have occurred
18  in the 1970s; is that correct?
19    A.  Yes.  So much of that property was wet and,
20  you know, the -- where Mr. Sharfi's main residence was
21  and immediately adjacent to his ponds, it appeared that
22  they had been filled in the 1970s.
23    Q.  Mr. Sharfi's property was not on this
24  particular property directly to the south; is that
25  correct?

Page 83

1    A.  So I say main residence.  I don't believe he
2  lives there, but there's a house at a different
3  location, a different parcel.  That's the one I was
4  referring to.
5      As far as this particular location adjacent to
6  the wetland, there was a a, linear pond, I guess, that
7  was dredged and I think that was closest to, to the
8  wetland.
9      So I think potentially that's what we were
10  referencing.  I'd have to read a little bit more.
11    Q.  The issue is that if the dredge and fill
12  occurred in the seventies, then would Mr. Sharfi have
13  been responsible for those actions if it predated the
14  date upon which he purchased the property?
15    A.  No.  If -- no.  For the Corps and DEP, if he
16  purchased the property and it was filled in the
17  seventies, no, we would ignore that.
18      That's part of our due diligence, and that's
19  why we spend so much time looking through these aerial
20  photos.
21    Q.  Because in this particular circumstance a
22  property owner can only be held responsible for the
23  actions they take and not the prior property owner;
24  correct?
25    A.  Yes.  Also not the right thing to do.

Page 84

1    Q.  What do you mean?
2    A.  You purchase a property and you unknowingly --
3  we take public interest into consideration.  And
4  understanding that there's very few situations where
5  somebody could buy a violation, so all that goes into
6  consideration.
7    Q.  Relative to this particular matter, these
8  particular inspections, was a Notice of Violation ever
9  sent to Mr. Sharfi?
10    A.  I think they called it something else.  I
11  don't recall.  I don't know.
12    Q.  In your opinion, did Mr. Sharfi violate any
13  state regulations by filling in a wetland?
14    A.  Yes.
15    Q.  Okay.  Which?
16    A.  I, I would have to look at the letter.  Let me
17  see if -- I don't recall the Florida statutes.  I
18  haven't had to think about those in a while.
19    Q.  Do you think that you had all the evidence
20  necessary to substantiate your position at that time?
21    A.  Yes.  Yes.
22    Q.  In relation to this particular property, did
23  you ever contact either the EPA or the Army Corps in an
24  effort to have either agency investigate your findings?
25    A.  I wouldn't have contacted the EPA.



Page 85

1 Occasionally we would contact the Army Corps, but I, I
2 don't think we did for this case.
3     Q.   Why not?
4     A.   I don't know.  Again, I wasn't the lead
5 project manager.  And the Army Corps is not, wasn't
6 responsive then.
7          So, you know, we would send a lot of referrals
8 and we wouldn't get anything back.  So I think it was
9 not even acknowledged that we referred something.
10         So we, we got out of the practice of sending
11 them things just because we couldn't get a response.
12    Q.   Was it your opinion at the time that these
13 were state jurisdictional wetlands?
14    A.   Yes.
15    Q.   Consequently, they were not federal
16 jurisdictional wetlands either; correct?
17         MR. ADKINS:  Objection, calls for a legal
18 conclusion.
19         THE WITNESS:  I don't understand the question
20 either.
21 BY MR. MIRON:
22    Q.   Do you believe that the Army Corps of
23 Engineers had jurisdiction over this particular property
24 to the south at the time?
25         MR. ADKINS:  Objection.

Page 86

1          THE WITNESS:  I, I don't know.  We would have
2 to -- I think there was a possibility.
3 BY MR. MIRON:
4     Q.   How so?
5     A.   If this was a contiguous wetland to a, and a
6 water US, we would have to do some additional work to be
7 able to answer that question for you, sir.
8     Q.   Was it?
9     A.   The additional work?
10    Q.   No.  Was it considered a contiguous wetland?
11    A.   I don't know.  Haven't looked into it.
12    Q.   Once a determination was made that the FDEP
13 was not going to issue a violation, then what happened?
14    A.   So most of these communications, I was, I was
15 left out of a significant portion of these
16 communications.
17         And again, I think it was because Gregory
18 Vasquez was a senior PM.  I believe the resolution got a
19 little bit more difficult and straightforward or a
20 little bit more difficult.
21         So it's my understanding that DEP allowed
22 Martin County to be the lead enforcement agency.
23    Q.   Okay.  How did you feel about that?
24    A.   I don't think it's appropriate.  I think the
25 project is unresolved.

Page 87

1     Q.   How so?
2     A.   So Martin County never fully executed their
3 restoration plan.  And because they never executed the
4 restoration plan, the enforcement resolution based on a
5 plan that's never fully executed is unresolved, in my
6 opinion.
7     Q.   So consequently, what does that mean?
8     A.   Just you asked if I think it was fulfilled,
9 and I don't -- you know, just because the state -- if --
10 I just don't think the project was resolved either with
11 Martin County, because it wasn't executed and the state
12 said they were going to be lead enforcement agency and
13 it was never fully executed.
14         So I'm not a -- I don't know.
15    Q.   Would it be your opinion that Mr. Sharfi says
16 he got away with filling state jurisdictional wetlands?
17    A.   I don't know what he got away with.  I do know
18 that he did some restoration work.
19    Q.   But it wasn't satisfactory to you?
20    A.   To me?  I don't know.  I don't know.  So
21 generally, are you asking me personally or the Corps?
22    Q.   You personally.
23    A.   I didn't run the UMAM scores.  I was out of it
24 when they started figuring out -- U-M-A-M scores.
25         So you have to identify the quality of the

Page 88

1 wetland and then you have to compensate with some sort
2 of remedial action, which was the restoration plan.
3         Generally speaking, a pond with cypress trees
4 is not -- the state generally wouldn't allow something
5 like that.
6         But as far as asking me if I'm good with it,
7 all I'm saying is the, the state closed their
8 enforcement case based on a process that was never fully
9 executed.  So I think generally that it's unresolved,
10 but that's -- I work for the Army Corps of Engineers
11 now.
12    Q.   So let's turn our attention to the site, the
13 subject upon which why we're here today.
14         Do you know when Mr. Sharfi first purchased
15 the property?
16    A.   I don't recall.  If I saw my notes, I could
17 tell you.
18         MR. ADKINS:  Could we clarify, the site is the
19 site as in the Amended Complaint?
20         MR. MIRON:  Sure, we mentioned it earlier and
21 I was just getting ready to do it again.
22 BY MR. MIRON:
23    Q.   Just so that we're clear that the site that
24 I'm referring to is the subject of this particular
25 enforcement action in this particular litigation.



JONATHAN PEMPEK
UNITED STATES OF AMERICA V SHARFI

May 19, 2022
89–92

Page 89

1    A.  Understood.
2    Q.  You understand that?
3    A.  I understand, yes.
4    Q.  And do you understand that to be a roughly
5  ten-acre parcel that is north of the site that we just
6  talked about earlier?
7    A.  I do.
8    Q.  So I'm going to refer to it as the site, okay?
9    A.  Okay.
10    Q.  So when did you first become aware of the
11  site?
12    A.  If I had my notes, I could tell you.  I think
13  it was, was it late 2017?  Early 2018.
14    Q.  Okay.  So you referenced your notes.  What
15  kind of notes do you have?
16    A.  I think there is an MFR somewhere around that
17  I documented.
18    Q.  Okay.  Is that, when you say you are referring
19  to your notes, is that what you're referring to?
20    A.  Yeah.
21    Q.  One specific document?
22    A.  Yes.
23    Q.  The MFR?
24    A.  Yes.
25    Q.  So you believe you first became aware of the

Page 90

1  site in 2017?
2    A.  As far as the site, I have been aware of the
3  site for a long time.  You're asking me if I was aware
4  that Mr. Sharfi purchased the site or what are you --
5    Q.  Sure, I'll ask both questions.  So how long
6  have you been aware of the site?
7    A.  I mean I saw the site prior to coming to the
8  Army Corps of Engineers when I was at DEP.  I was aware
9  that there was a site over there.
10       I wasn't aware that he purchased it until a,
11  until I received the complaint.
12    Q.  How were you aware of the site when you were
13  with the FDEP?
14    A.  So when we, when there is a filling action, we
15  have to use adjacent property sometimes to identify what
16  the fill parcel looked like, so we use a reference site.
17       And we used sites to the north and south of
18  the parcel as a reference site.  So I had seen it, but I
19  had never, you know, actually walked on it or anything
20  so I visualized the site in the past.  I had known of
21  the site in the past, but I didn't know that Mr. Sharfi
22  owned it until we received a complaint.
23    Q.  Okay.  But you never, you never walked on the
24  site before?  Actually, prior to you initially becoming
25  aware of the site -- let me scratch that.

Page 91

1       Prior to you becoming aware that Mr. Sharfi
2  purchased the site, you had never walked on it before;
3  correct?
4    A.  Just observations.  And it was, it was
5  difficult to make observations because it was very
6  densely vegetated, but we did go observe the site.
7    Q.  Okay.  So you indicated earlier testimony that
8  you first became aware of the site relative to this
9  particular action when you received a complaint;
10  correct?
11    A.  Yes.
12    Q.  Okay.
13    A.  I became aware that Mr. Sharfi purchased the
14  property after the complaint.
15    Q.  Got it.  And so what was the nature of the
16  complaint?
17    A.  It was Mr. Benjamin Sharfi had this parcel ID
18  number is filling a wetland, or I don't think they said
19  filling a wetland.  I think they said there is large
20  equipment in the wetland, or something along those
21  lines.
22    Q.  And who made this complaint?
23    A.  I don't know.
24    Q.  Was that anonymous as well?
25    A.  It was.

Page 92

1    Q.  Do you have any assumption as to who it might
2  have been?
3    A.  At the time, I thought I knew who it was, but
4  I have distanced myself from that opinion.
5    Q.  At the time who did you think it was?
6    A.  I thought it was Linda Petz, P-e-t-z.
7    Q.  And why do you distance yourself from that
8  now?
9    A.  I heard her voice again and I don't think it
10  was her voice.
11    Q.  So in your mind, you were doing a comparison
12  of the voices and you were comparing the anonymous call
13  to Linda's voice?
14    A.  I thought it was, but I don't know.
15    Q.  How did that -- was it a telephone call or an
16  email that came in?
17    A.  It was a telephone call.
18    Q.  And is that something that you would have --
19  is there a recording of the telephone call?
20    A.  No.
21    Q.  Would it have come in on your office phone or
22  your cellphone?
23    A.  No, it came in the office.  I didn't have a
24  work cellphone at the time.
25    Q.  Okay.  It didn't come in on your personal



JONATHAN PEMPEK
UNITED STATES OF AMERICA V SHARFI

May 19, 2022
93—95

Page 93

1  cellphone?
2      A.  It did not.
3      Q.  So it came in on a telephone call, office
4  call.  Do you know whether or not it was recorded?
5      A.  I don't believe so.  I don't think any of our
6  calls are recorded, but I could be wrong.
7      Q.  Was there any type of documentation of the
8  call itself?
9      A.  I didn't document the call.
10     Q.  So you didn't write down the phone number?
11     A.  No, I did not.
12     Q.  What about the date or time?
13     A.  It was probably three weeks before I reached
14  out to Mr. Hook.  So I have to figure out when I reached
15  out to Mr. Hook and look back.
16     Q.  So at this point now, this is the second
17  anonymous tip that you would have received relative to
18  Mr. Sharfi and alleged violation; correct?
19     A.  Yes, but I don't know who they were, but they
20  were two different people.
21     Q.  Okay.  And how did you make that assumption?
22     A.  One was a man, one was a female.
23     Q.  The first was a man or a female?
24     A.  Man.
25     Q.  And the second was a female?

Page 94

1      A.  Yes.
2          (The document was marked Deposition Exhibit 127
3  for identification.)
4  BY MR. MIRON:
5      Q.  Let me show you what's marked as Exhibit
6  Number 127, Bates-stamped USACE 0001593.
7          Do you see this document?
8      A.  I do.
9      Q.  It purports to be an email from yourself in
10  your capacity as an Army Corps representative to John,
11  John Raymond Hook on January 10 of 2018 at 1:18 p.m.
12          Do you see that?
13     A.  I do, yes.
14     Q.  Does this appear to be a true and correct copy
15  of an email that you would have sent to Mr. Hook?
16     A.  It does.
17     Q.  And in this particular email you are asking
18  Mr. Hook to have Mr. Sharfi contact me.  "This is in
19  regard to his property off Martin Highway."
20          Do you see that?
21     A.  Yeah, we had already spoken about this and I
22  think I sent him an email as a follow-up.
23     Q.  You already spoke to who?
24     A.  Mr. Hook.
25     Q.  How do you know Mr. Hook?

Page 95

1      A.  They asked me to rescind the SPGP for the
2  Buccaneer property.
3      Q.  Not for the Buccaneer, right?
4      A.  SPGP -- well, they were representing the
5  Buccaneer, but the SPGP was for the Sailfish Marina, I
6  apologize.
7      Q.  That's okay.  So Mr. Hook, correct me if I'm
8  wrong, Mr. Hook reached out to you in an effort to try
9  to convince the Corps to rescind --
10     A.  He didn't try to convince the Corps to do
11  anything.  He alleged that the SPGP was, was not
12  accurately issued, and he wanted me to look into it.
13          And that was the -- and we, sometime later we
14  met on site.
15     Q.  How did Mr. Hook get your contact information?
16     A.  You know, I don't know.  I don't remember.
17     Q.  Okay.  Was that SPGP ever rescinded?
18     A.  It was.
19     Q.  Was that part of your role at the Corps at the
20  time?
21     A.  Depends who you ask.
22     Q.  Did you have any involvement at that time
23  relative to the ERP or submerged land lease permit that
24  the Buccaneer Marina was trying to obtain from the
25  Corps?

Page 96

1      A.  No, I had no involvement with any of the
2  permitting actions.  The only thing I had involvement
3  was, I was the one that physically requested, I was the
4  one that requested the SPGP be rescinded.
5      Q.  So in this particular email you ask could you
6  please ask Mr. Sharfi contact me?
7          How did you know that Mr. Hook had a
8  relationship with Mr. Sharfi?
9      A.  Because he worked for Mr. Sharfi.
10     Q.  He specifically told you that?
11     A.  Yes.
12     Q.  So why did you want Mr. Sharfi to contact you?
13     A.  Well, if we could backtrack a tad bit, I
14  received a complaint.  I looked into the complaint and,
15  as always, used Google imageries.
16          I saw that there was a minor discharge of fill
17  material into the wetland as of the -- or what I
18  believed to be a wetland as of the complaint.  And I
19  didn't think much of it.  It wasn't, it wasn't all that
20  significant.
21          However, and because of workload, I really
22  didn't have -- it wasn't, it wasn't a top priority at
23  the time to, to try to get ahold of Mr. Sharfi.  We --
24  but while I was talking to Mr. Hook, it slipped my mind
25  that I might as well try to get out in front of this and



JONATHAN PEMPEK
UNITED STATES OF AMERICA V SHARFI

May 19, 2022
97—100

Page 97

1  help Mr. Sharfi try to get a permit.
2      Q.  Okay.
3      A.  So that was the reason why I asked him to
4  contact me, and it was to say generally I'm here to help
5  you get a permit.
6      Q.  So let's go back for a minute.  Do you
7  remember the date upon which you obtained the complaint?
8      A.  I think I said it was about three weeks
9  before, before I reached out, before I had any
10  involvement with the Buccaneer --
11      Q.  Okay.
12      A.  -- SPGP.
13      Q.  So the date of this particular email was
14  January 10th of 2018.  So that would suggest that you
15  received the complaint roughly three weeks before that?
16      A.  It was something like that.  I didn't, again,
17  I wasn't -- at the time it wasn't, it wasn't a huge
18  priority.  I -- nothing that I saw indicated that I
19  needed to get ahead of this.
20          From aerial images, it looked like fill was
21  almost accidentally pushed into the wetland and it was
22  barely spilling over into his property.  And also from
23  aerial images, it also looked like there could have been
24  a possibility that he was thinning out vegetation, which
25  we don't regulate.

Page 98

1          So in my mind, it wasn't a pressing matter
2  because we had so many other issues going on at the
3  time.
4      Q.  Okay.  So thereafter, did Mr. Hook have, or
5  thereafter did Mr. Sharfi contact you?
6      A.  Yeah, we played a couple rounds of phone tag,
7  but ultimately we spoke.
8      Q.  Okay.  What did you guys talk about?
9      A.  Man, it was a great conversation.  He said
10  thank you.  We talked about San Bernardino and all the
11  fires.  He was out there at the time.  Told him that I
12  spent a lot of time out there, because I was in the
13  military out there.
14          And he -- I don't know, it was, most of it had
15  nothing to do with, with the alleged violation.  I did
16  explain to him, because he kept saying "Thanks for doing
17  this for me," or whatever.
18          I was like "I'm not doing it for you."  And I
19  explained why I rescinded the SPGP and how it was part
20  of my, it was just part of the job.
21          And then I said, "And by the way, we received
22  a complaint.  You know, they said that you purchased the
23  property."  And he told me he did.
24          And I told him that, you know, just "We're
25  here to help.  Just send us in an application."

Page 99

1          And he said he would have -- I don't know if
2  he mentioned Kevin by name, but he said he would have
3  somebody do that, and the gentleman that ultimately was
4  going to do it was Kevin.  And I think he referenced
5  him, but I'm not sure.
6          (The document was marked Deposition Exhibit 128
7  for identification.)
8  BY MR. MIRON:
9      Q.  Real quick just from a housekeeping
10  perspective, I'm going to show you what's been marked as
11  Number 128.  I know you already testified there was some
12  back and forth before you got an opportunity to speak to
13  Mr. Sharfi.
14          This particular document Bates-stamped number
15  512 appears to purport to be an email from Mr. Sharfi to
16  you, copying John Hook and Kevin Kryzda, on January
17  between 2018 at 6:32 p.m. correct?
18      A.  That's correct.
19      Q.  And that would have been 6:32 Pacific time;
20  correct?  Because you indicated Mr. Sharfi was in
21  California.
22      A.  He was in California.  And of course I wasn't
23  in the office at this time checking on my emails.  It
24  was 3:00 for him, 3:30.
25      Q.  So he is basically responding to -- you asked

Page 100

1  Mr. Hook to have him contact you at 1:18 p.m. on the
2  same day and thereafter he is emailing and his response
3  is "Hi, Jonathan, I'm Ben Sharfi.  John Hook asked me to
4  call you.  I just left a message on your voicemail as
5  well.  Looking forward to talking to you."  Correct?
6      A.  Yes, and I believe this was Friday.  It
7  doesn't say the date, but I believe this was Friday, and
8  I may have called him back the following Monday.  And of
9  course I, I waited because I knew he was in California.
10          So I think I waited until afternoon, but I
11  don't remember the exact time of the call or if we made
12  another round of phone tag and he got back to me.  I
13  just remember the conversation.
14      Q.  Okay.  Did you have any other specific
15  conversations with Mr. Sharfi about the fact that you
16  believed that he was taking action or filling a wetland
17  without a permit?
18      A.  I told him that I believe there are wetlands
19  on the property.
20      Q.  What was his response?
21      A.  He, he said he was going to submit a permit
22  application, so he wasn't -- he did not say "No, I do
23  not have wetlands on the property."
24          But he also didn't say "I do have wetlands on
25  the property."  So just -- I mean again, most of the



JONATHAN PEMPEK
UNITED STATES OF AMERICA V SHARFI

May 19, 2022
101–104

Page 101

1 conversation was just, I mean just cordial chat and very
2 little of it was actual business.
3    Q.   At that time had you already made a
4 determination in your mind that the Army Corps of
5 Engineers had jurisdiction over Mr. Sharfi's property?
6    A.   No. I didn't know 100 percent. I thought it
7 was probably likely, and that's, I think that's how I
8 explained it to him. I said, "There is likely
9 jurisdictional wetlands on the property and we're here
10 to help you get a permit."
11    Q.   When did you ultimately make a determination
12 that you believe that the Army Corps had federal
13 jurisdiction over Mr. Sharfi's wetlands?
14    A.   It was probably between -- so everything is an
15 allegation until we can get grounds for it, but we use
16 as many resources as possible to identify jurisdiction
17 without, without being out there.
18    Q.   In this circumstance, what resources?
19    A.   I became more and more confident that there
20 were waters of the United States, but you know, you
21 asked me when I was absolutely sure. I don't -- that
22 came much later.
23    Q.   When?
24    A.   I don't recall the moment. There was a lot of
25 effort put into this over the last four years. And it

Page 102

1 increasingly became -- I guess when I drafted, you know,
2 it's a quasi-jurisdictional determination when, for
3 leadership is when I determined that it's most probably
4 that it's a water the United States.
5    Q.   When did you make that determination?
6    A.   I don't know, I'd have to look at my notes. I
7 don't remember.
8    Q.   Was it during the course of this litigation or
9 before?
10    A.   It was before the course of the litigation.
11 It was to -- we had a brief leadership, before we would
12 ever send it to the Department of Justice of why I think
13 this is a water the United States or why the Corps
14 thinks it's a water the United States.
15    Q.   So your testimony is before you would make a
16 determination as to whether or not there was a federal
17 jurisdiction -- excuse me, scratch that -- that there
18 was efforts to be made prior to sending a recommendation
19 for enforcement, you would have made the determination
20 as to whether or not there was federal jurisdiction;
21 correct?
22    A.   We would have made the argument or we would
23 have outlined the reasons why we believe that it was a
24 water of the United States in any of our memos to
25 leadership so they could adequately determine if it's

Page 103

1 appropriate to send to the Department of Justice.
2         And that, I worked on that. And the more I
3 worked on it, the more obvious, the more likely it
4 became that it was a water the United States in my mind.
5    Q.   Are you okay to continue?
6    A.   No, let's keep rolling. I mean is it seven
7 hours regardless of a break?
8    Q.   No, it's seven total. No, it's seven without
9 the breaks.
10         MR. ADKINS:  Could we take maybe five,
11 restroom break?
12         MR. MIRON:  Sure, if you need to.
13         THE VIDEOGRAPHER:  We're off the record. The
14 time is 11:36 a.m.
15         (A recess was taken.)
16         THE VIDEOGRAPHER:  We are on the record. The
17 time is 11:50 a.m.
18 BY MR. MIRON:
19    Q.   All right. Mr. Pempek, I handed you what's
20 going to be marked as Exhibit 129. It purports to be an
21 email from Kevin Kryzda to yourself dated January 19,
22 2018 at 4:49 p.m.
23         (The document was marked Deposition Exhibit 129
24 for identification.)
25

Page 104

1 BY MR. MIRON:
2    Q.   Do you see that?
3    A.   I do.
4    Q.   Subject is Benjamin Sharfi Property, Western
5 Martin County. Do you see that?
6    A.   Yes.
7    Q.   Does this appear to be an accurate
8 representation of an email that you would have received
9 from Mr. Kryzda?
10    A.   Yeah, yes.
11    Q.   And this is consistent with your testimony
12 earlier in the sense that Mr. Sharfi suggested that
13 someone would be contacting you relative to your
14 suggestion that he should submit a permit application;
15 correct?
16    A.   Yeah. I believe, I believe he did tell me
17 Kevin was going to contact me, so I was waiting for
18 that.
19    Q.   Okay. So is it a correct statement that you,
20 when you received this, you understood that Mr. Kryzda
21 was acting on Mr. Sharfi's behalf; correct?
22    A.   Yes, that's my understanding.
23    Q.   And the body of the email says that "The
24 purpose of this message is to ask your guidance --"
25         Do you see that?



JONATHAN PEMPEK
UNITED STATES OF AMERICA V SHARFI

May 19, 2022
105—108

---

Page 105

1    A. I do.
2    Q. "-- in appropriate actions that may be
3  necessary to undertake minor improvements to a
4  newly-acquired parcel in western Martin County."
5       Do you see that?
6    A. I see that, yes.
7    Q. So obviously in this particular email, number
8  one, Mr. Kryzda is asking for your guidance.
9       Do you see that?
10   A. I do.
11   Q. And is it fair to say that he was asking for
12  your help?
13      MR. ADKINS: Objection.
14  BY MR. MIRON:
15   Q. What did you mean by, what did you believe
16  that Mr. Kryzda meant when he asked for your guidance?
17   A. No, I, I -- yes, I would think that he was
18  asking for my assistance, because I, I told Mr. Sharfi
19  that I'm here to assist him, so it would make sense that
20  he wrote this saying that he wanted my help.
21   Q. And he is clearly telling you in this email
22  that they want to undertake minor improvements to a
23  newly acquired parcel; correct?
24   A. That's, that's it says. He later says what
25  they are there actively doing is also in there.

---

Page 106

1    Q. Got it. We'll get to that.
2       So it says here, "I work for Mr. Sharfi, who
3  spoke with you and asked me to contact you." Correct?
4    A. Yes.
5    Q. "Mr. Sharfi wishes to put his newly acquired
6  parcel into agricultural use." Correct?
7       MR. ADKINS: Objection.
8       THE WITNESS: That's what --
9  BY MR. MIRON:
10   Q. That's what it says; correct?
11   A. That's what it says.
12   Q. "Our first objective was to secure the
13  property by fencing it."
14      Do you see that?
15   A. I do.
16   Q. So at that time did you understand that
17  Mr. Sharfi wanted to fence his property?
18   A. Because this is what -- no. Prior to this,
19  no, I didn't know what he wanted to do.
20      This is the email that -- yes, he told me that
21  they want to fence the property, yes. I'm sorry, you're
22  asking me and yes, this is what I'm learning.
23   Q. Forgive me, it's lawyer. It's not a trick
24  question.
25   A. Okay.

---

Page 107

1    Q. Says, "We checked at the local county
2  authorities who confirmed that this would be a
3  permissible activity which would not require a permit."
4       Do you see that?
5    A. That's -- yes.
6    Q. And then the next line he's telling you,
7  "Thus, minor clearing and minor filling is underway in
8  order to mobilize equipment to construct a fence."
9       Do you see that?
10   A. I do.
11   Q. So going back up above, and forgive me, it
12  says Mr. Kryzda physically told you that the site work
13  was related to agriculture; correct?
14   A. So he said that he wishes to put the
15  newly-acquired property into agriculture use.
16      Yeah, that's what he said.
17   Q. In fact, the site now has livestock on it,
18  doesn't it?
19   A. Yes, there is locations that have livestock on
20  the property on the site.
21   Q. So the first objective was to secure the
22  property by fencing it. We talked about that already.
23      So the fence is located on the perimeter of
24  the site; correct?
25   A. It is. I believe now there are fences within

---

Page 108

1  the site. At the time it was perimeter. We're getting
2  ahead of ourself, but yes, there was fences around and
3  there is -- I'm getting ahead of myself. There is
4  fences around and there is fences within the site.
5    Q. But as far as you're concerned, there is
6  currently a fence that is located on the perimeter of
7  the site; correct?
8    A. Correct.
9    Q. So would you now agree with me in order to
10  mobilize equipment to construct the fence, there would
11  need to be a roadway; correct?
12      MR. ADKINS: Objection.
13  BY MR. MIRON:
14   Q. Let me ask you a different question. Do you
15  know what type of fence has been constructed on the
16  perimeter of the site?
17   A. It's my understanding it's a, from what I saw,
18  it's a fairly large fence, approximately five feet high.
19  It was, instead of a barb wire fence, it has squares
20  like a mesh fence, and the holes I recall being like six
21  by six.
22      And it was described as an electrical fence,
23  but I haven't touched it yet to find out.
24   Q. So just in case you're there, if you ever come
25  back, there is an electrical fence in addition to.

---



JONATHAN PEMPEK
UNITED STATES OF AMERICA V SHARFI

May 19, 2022
109–112

Page 109

1    A.   Okay.

2    Q.   Just don't touch it.

3    A.   Okay, sounds good.

4    Q.   Would you agree with me if I suggested to you
5  that the fence that is located on the perimeter of the
6  site is a post and wire fence?

7    A.   Yeah, I would agree with that.

8    Q.   So the post is a relatively large wooden post,
9  maybe six to eight inches in diameter that is placed in
10  the ground; correct?

11    A.   That's correct.

12    Q.   Are you familiar with how those posts are
13  installed?

14    A.   I am.  I've seen them installed in different
15  ways, but yes.

16    Q.   So to your knowledge, information and belief,
17  you understand that those posts are placed in the ground
18  after an auger digs a hole?

19    A.   I've seen them installed different ways, but
20  shovel, auger, vibratory hammer.  They can pound the
21  posts in.

22        I'm assuming they used, they could have used
23  an auger, yes, that makes sense.

24    Q.   That would be a truck method auger; correct?

25    A.   Or hand.  I don't know, I don't know what they

Page 110

1  used.

2    Q.   But it's certainly possible that they would
3  have used a vehicle-mounted auger to install those
4  fenceposts; correct?

5    A.   It's possible.

6        MR. ADKINS:  Objection.

7        THE WITNESS:  Sorry.

8  BY MR. MIRON:

9    Q.   It's possible, correct?

10    A.   I don't know what they used.

11    Q.   Okay.  So in order to mobilize equipment to
12  construct a fence, there would need to be some type of
13  roadway; correct?

14        MR. ADKINS:  Objection.

15        THE WITNESS:  I -- no, not necessarily.

16  BY MR. MIRON:

17    Q.   Why not?

18    A.   Because there were other options to install a
19  fence that don't include a truck-mounted auger.

20    Q.   Your conversation earlier, your testimony
21  indicated that your recollection of the site, that it
22  was full of -- let me go back and see what you said
23  here -- it was full of vegetation.  Do you recall that?

24    A.   I recall that being the case in 2000 prior to
25  Mr. Sharfi purchasing the property.

Page 111

1    Q.   And when was the next opportunity you had to
2  come or actually what was the first opportunity you had
3  to come to the property?

4    A.   The site?

5    Q.   Yes, sir.  Sorry, thank you for clarifying.

6    A.   So I observed the site in fact when I worked
7  at DEP.  The first opportunity I had to come to the site
8  was, and the first time I went to the site was when
9  Mr. Sharfi invited me.

10    Q.   Which was in May of 2018; correct?

11    A.   I would have to look at the notes.  I don't
12  recall the date.

13    Q.   In this particular circumstance the perimeter
14  road that runs around the perimeter of the site also
15  runs along the perimeter fence as well; is that correct?

16    A.   So the majority of the road is inside the
17  perimeter fence.  It appears that the perimeter fence
18  was either installed through the road or the road was
19  installed and then the fences were installed.  I don't
20  know how the methodology or the timeline.

21    Q.   Understood.  So in this particular email dated
22  January 19th of 2018, Mr. Kryzda is clearly telling you
23  that Mr. Sharfi was doing filling on the site related to
24  his agricultural activities; correct?

25    A.   That's true.

Page 112

1        MR. ADKINS:  Objection.

2  BY MR. MIRON:

3    Q.   Did you understand when you obtained this
4  particular email that Mr. Sharfi was conducting minor
5  clearing and minor filling on his property at that time?

6    A.   I do, did.

7    Q.   And he notified you again back in January of
8  2019 -- excuse me, January 19th of 2018; correct?

9    A.   So what's not captured in this is I
10  immediately called Kevin as opposed to -- and I
11  explained that all filling waters the United States
12  require a permit.  I needed to get a permit.

13        So this is -- yeah, I saw that and it created
14  a, generally a red flag, because it becomes harder to
15  work with, to resolve issues the longer a violation goes
16  on.

17    Q.   You just testified that you called Kevin
18  Kryzda.  Did you send him an email?

19    A.   I don't remember.  I think I probably sent him
20  a follow-up email, which I might be seeing next.

21    Q.   To the extent that a follow-up email does not
22  exist, does that mean --

23    A.   Then I didn't.  Usually if I have a phone
24  conversation, I will send a follow-up email.  But I
25  don't, I don't remember.



Page 113

1   Q.   So at least as far as you're concerned, you do
2   not recall whether or not you ever wrote back to him to
3   tell him, to tell Kevin that he, Mr. Sharfi could not do
4   those activities; did you?
5      A.   No.  I called him and said that these
6   activities require a permit and he needed to apply for a
7   permit.
8      But as far as telling him that -- well, I, I
9   called him saying that it's likely that these activities
10  would require a permit, and he -- it would be
11  advantageous for everybody.
12     Q.   Why -- sorry, I didn't mean to interrupt.
13     A.   Why is it advantageous?
14     Q.   No, no, why was it likely that he needed a
15  permit?
16     A.   Because there was a chance that it was a water
17  of the United States.
18     Q.   At that point you had not made a
19  determination --
20     A.   No, I did not.
21     Q.   I'm sorry, one of the rules -- it's not your
22  fault.  It's both of us.  Let me get the question out.
23     A.   Understood.
24     Q.   And then you can answer it.
25     A.   I apologize.

Page 114

1      Q.   No, don't apologize.
2      So at this point there was no -- you had not
3   made a determination as to whether or not the federal,
4   there was federal jurisdiction over his property;
5   correct?
6      A.   I had not, no.
7      Q.   In fact, if I recall, it was not until
8   April 30th of 2018 that you wrote the defendants to tell
9   them specifically that they could not do those
10  activities; is that correct?
11     A.   Are you talking about the Notice of Violation?
12     Q.   Yes, sir.
13     A.   So the Notice of Violation alleges it's a
14  water of the United States and to stop all.  So I don't
15  think, again, even the C&D, I don't think it's
16  definitive that a -- sometimes we will issue a Notice of
17  Violation without being 100 percent certain that it's a
18  water of the United States.
19     So I don't know if that answers your question.
20     Q.   It does.
21     So in this particular circumstance there was
22  no definitive determination as of April 30th of 2018 as
23  to whether or not there was federal jurisdiction over
24  Mr. Sharfi's property; correct?
25     MR. ADKINS:  Objection, vague.

Page 115

1   BY MR. MIRON:
2      Q.   Sorry.  Let me ask it again.
3      As of April 30th of 2018, there was no
4   definitive determination by the Corps as to whether or
5   not it had federal jurisdiction over the site?
6      A.   That would be accurate.  I think there was
7   enough information to suggest that it was highly likely,
8   and that's been enough to send out the Notice of
9   Violation.
10     Q.   You understand that a Notice of Violation
11  informs Mr. Sharfi that he could be subject to criminal
12  penalties; correct?
13     A.   Yes.
14     Q.   So at this point you were informing Mr. Sharfi
15  and threatening him with criminal penalties on what you
16  believed to be a possibility; correct?
17     MR. ADKINS:  Objection, misstates testimony,
18  argumentative.
19  BY MR. MIRON:
20     Q.   So as of April 30, 2018 -- scratch that.
21     As it relates to your C&D or the cease and
22  desist letter that you referred to, that cease and
23  desist letter, which we'll get to in a few minutes,
24  includes language which tells Mr. Sharfi that you
25  believe that he violated criminal laws; correct?

Page 116

1      A.   Yes.  So all the C&Ds are already drafted.
2   But yes, we will send that out if there's enough
3   information suggesting that either the Rivers and
4   Harbors Act or the Clean Water Act was violated.
5      Q.   But in this particular circumstance, based
6   upon your testimony, it was not definitive; correct?
7      MR. ADKINS:  Objection, vague.
8   BY MR. MIRON:
9      Q.   Based upon your testimony earlier, the
10  determination as to whether or not the federal
11  government had jurisdiction over Mr. Sharfi's site was
12  not definitive; correct?
13     A.   If you're asking if -- so to identify
14  jurisdiction, there is a lot of work that goes into it.
15  We had enough initial data suggesting that it was highly
16  probable it was a water of the United States.
17     Q.   Let's go back to the language, and I'm going
18  to repeat myself just to get myself back on track, but
19  Mr. Kryzda clearly tells you in this particular email
20  that there is minor clearing and filling underway in
21  January of 2018; correct?
22     A.   That's correct.
23     Q.   Okay.  In your role as a compliance officer --
24  that is the right term, compliance officer for the Army
25  Corps?



Page 117

1    A.  Project manager, compliance enforcement,
2  project manager.
3    Q.  Which do you prefer?
4    A.  Doesn't matter.
5    Q.  I have in my notes compliance officer.  I'll
6  just keep going so I don't screw myself up.
7    A.  Let's do it.
8    Q.  All right.  In your role as a compliance
9  officer for the Army Corps, do you understand that
10 property owners know and understand the regulatory
11 process?
12   A.  I do not.
13   Q.  Do you think most residential homeowners are
14 generally aware of what permits may or may not be needed
15 from the Corps and how to obtain them?
16   MR. ADKINS:  Objection.
17   THE WITNESS:  I don't know what most
18 homeowners know and they don't; however, I think, I
19 think it's -- there are, I believe there are some
20 instances where people legitimately don't know they
21 have a requirement to get a permit.
22   Other situations, they are just telling me
23 that because, you know, I mean there's -- I don't
24 know what the general public knows and they don't.
25 I think we could probably do a better job with

Page 118

1    getting the knowledge out, though.
2  BY MR. MIRON:
3    Q.  So when Mr. Kryzda says we seek guidance, and
4  you testified about that, Mr. Kryzda you understood was
5  asking for your help; correct?
6    A.  Yes, I offered my help.
7    Q.  So to the extent that the federal government
8  does not have jurisdiction over at this point and to the
9  extent that the federal government does not have
10 jurisdiction over Mr. Sharfi's site, then he would have
11 no obligation to obtain a permit for the work that he
12 was doing; is that correct?
13   MR. ADKINS:  Objection, vague.
14 BY MR. MIRON:
15   Q.  Let me say it differently.
16   To the extent that the federal government does
17 not have -- excuse me, the Army Corps of Engineers does
18 not have federal jurisdiction over Mr. Sharfi's site at
19 this time, then consequently he would have no obligation
20 to obtain a permit for the work that Mr. Kryzda
21 indicated they were doing; i.e., minor clearing and
22 minor filling; is that correct?
23   MR. ADKINS:  Same objection.
24 BY MR. MIRON:
25   Q.  Go ahead.

Page 119

1    A.  No, that question, I don't know how to answer
2  it, to be honest.  So if, if he was not aware that he
3  needed a permit, is he required to get one, or are you
4  saying if this is indeed not jurisdictional, does he
5  need to get a permit?
6    Q.  Thank you.  If this is indeed not
7  jurisdictional, is he required to obtain a permit from
8  the Army Corps of Engineers for the minor clearing and
9  minor filling that he is conducting?
10   A.  If you are filling a wetland that's not water
11 of the United States, you would not need a permit to
12 fill it.
13   Q.  Thank you, sir.
14   A.  From us, from the federal government.
15   Q.  I understood what you meant.  Thank you.
16   A.  All right.
17   Q.  So up to this point, as of January 19th of
18 2018, what due diligence had you done to determine
19 whether or not the Corps had jurisdiction over at the
20 site?
21   A.  Aerial photography.  Prior to the initial site
22 visit, is that what you --
23   Q.  Yes, sir.  As of January 19th of 2018, what
24 work had you done to determine whether or not the Corps
25 had jurisdiction over the site?

Page 120

1    A.  It was aerial photography.  We have software
2  that shows flow lines, water flow.  We have, we went
3  through historic aerials.  We had -- prior to sending
4  out the C&D, we also had on site observations from the
5  Water Management District.
6    Q.  We'll get to that.  I'm talking about as of
7  January 19th of 2018.
8    A.  I was just -- okay.  It was prior to sending
9  out the C&D, though.
10   Q.  Yes, sir.
11   A.  So prior to sending the C&D out, we used the
12 information from the Water Management District.
13   Q.  Okay.  But getting back to my question, as of
14 January 19th of 2018, what due diligence had you done
15 and what kind of investigation had you done to determine
16 whether or not the Corps had jurisdiction?
17   A.  Well, it's, prior to, prior to this, it was
18 just looking at the site, having knowledge of the
19 location of the site on, you know, virtual resources and
20 having knowledge of the site.
21   And what I told him was it's highly probably
22 it's a water of the United States.  And I, again, I was
23 here to help and I said, "I'll help you get a permit."
24   And everybody seemed like they were willing to
25 do that, so --



Page 121

1     Q.   But you made that determination, based upon
2  your testimony today, aerial photography, some surface
3  water flow, software that you have, and historical,
4  historic aerials; correct?
5     A.   And also my personal knowledge of the site.
6     Q.   What was your -- are you referring to the fact
7  that you once saw the site from a distance?
8     A.   Just that I'm familiar with the area, yes,
9  that I saw in the past that there were wetlands on the
10 site.
11    Q.   Are you now testifying that you knew that
12 there were wetlands on the site based upon some prior
13 review or visual of the site?
14    A.   I saw, when we used that site as a reference,
15 as I previously recognized, there were wetlands
16 jurisdictional in the state that I observed.
17    Q.   You observed jurisdictional wetlands on the
18 subject site at the time that you did your inspection
19 back in 2016 --
20       MR. ADKINS:  Objection.
21 BY MR. MIRON:
22    Q.   -- with the FDEP?
23    A.   So without doing point descriptions, for DEP
24 you only needed two of the three hydric indicators.
25    Q.   Okay.

Page 122

1     A.   And immediately adjacent there was aquatic
2  fauna, flora, hydrology, water that was six,
3  seven inches deep.  It met the requirements of a
4  wetland, but without doing actual dataset, yes, that was
5  my observation.
6     Q.   Okay.
7     A.   It seemed highly probable that that was a
8  wetland.
9     Q.   Other than the research that you just
10 testified to, did you speak to anyone or did you speak
11 to anyone relative to whether or not the Corps had
12 jurisdiction?
13    A.   I don't think so.
14    Q.   Okay.  So you were making these determinations
15 on your own at the time?
16    A.   I didn't make a jurisdictional determination.
17 I just, I told him that it's highly probable that it's a
18 wetland, yes.
19    A.   I do -- I hadn't improved my ability to
20 identify a wetland, a jurisdictional determination since
21 2016, so I felt confident telling him that it would be
22 advantageous for them just to submit a permit
23 application and help get it to the end zone.
24    Q.   But you understand there is a significant
25 difference between what constitutes a federal wetland

Page 123

1  versus a state wetland; correct?
2     A.   Yes, I do.
3     Q.   So therefore, something that constitutes a
4  state wetland doesn't always also constitute a federal
5  wetland; is that correct?
6     A.   Exactly.
7       (The document was marked Deposition Exhibit 130
8  for identification.)
9  BY MR. MIRON:
10    Q.   Let me show you what's marked as Exhibit
11 Number 130, Bates-stamped USACE 1594.  This purports to
12 be an email from yourself to Mr. Kryzda on January 22nd,
13 2018 at 11:50 a.m.  The subject is Benjamin Sharfi
14 Property, Western Martin County.
15       Do you see that?
16    A.   I do.
17    Q.   And this is what looks to be a continuation of
18 the email that we just spoke about on January 19th of
19 2018 between yourself and Mr. Kryzda; correct?
20    A.   That's correct.
21    Q.   So consequently it looks as though three days
22 later Mr. Kryzda -- excuse me, you were sending an email
23 to Mr. Kryzda saying "Thank you for returning my call.
24 Please see attached forms to apply for a USACE permit."
25       Correct?

Page 124

1     A.   That's what it says.
2     Q.   So is it correct that in this particular email
3  you were sending Mr. Kryzda permitting forms?
4     A.   Yes.  We discussed how to appropriately apply
5  for whatever they wanted to do, so I sent them an
6  application.
7     Q.   So your job at the Army Corps was to conduct
8  enforcement; correct?
9     A.   And compliance.
10    Q.   Enforcement and compliance?
11    A.   Yes.
12    Q.   Okay.  But you're not in the permitting
13 section of the Corps; correct?
14    A.   I'm a public servant.  I do it all.
15    Q.   But there was a separate group of individuals
16 at the Corps whose job it is solely to handle permit
17 applications; correct?
18       MR. ADKINS:  Objection.
19       THE WITNESS:  There is a group that, with the
20 Corps that -- we're all regulatory.  I've already
21 told you I write permits.  I write after-the-fact
22 permits.  I write before-the-fact permits.
23       Our job is to assist the public.  But anybody
24 can -- I've sent multiple permit applications to
25 people that have requested it.  So is it solely the



Page 125

1    job to submit, to give, provide information through
2    the permitting section?  No, I would say it's not
3    solely their job.  I would say it's an effort.
4  BY MR. MIRON:
5        Q.   Up to this point, how long had you been with
6  the Corps?
7        A.   I don't know how long, four or five months.
8        Q.   Okay.
9            MR. ADKINS:  So up to the point of the email?
10           MR. MIRON:  Yes.
11           MR. ADKINS:  Okay.
12  BY MR. MIRON:
13       Q.   Is your testimony still the same?
14       A.   I don't know.  Yes, I wasn't there that long.
15       Q.   Were you the only person assigned, for lack of
16  a better term, to Mr. Sharfi's file?
17       A.   Well, yes, because this is my area of
18  responsibility.  But it was probably over four or five
19  months, but it's -- I think I came in August --
20       Q.   Okay.
21       A.   -- of the year prior.
22       Q.   Was this your first case file?
23       A.   No, it was not my first.
24       Q.   I'm sorry, I didn't -- was this your first
25  case file while you were at the Army Corps of Engineers?

Page 126

1        A.   It was not.
2        Q.   Okay.  How many other cases did you have
3  active at this time?
4        A.   I don't, I don't recall, but --
5        Q.   More than five?
6        A.   Yeah, I would say more than five.
7        Q.   More than 30?
8        A.   It depends on what case file you're referring
9  to.  So we, a lot of these things we -- again, we reach
10  out to a person and ask them if they are going to
11  voluntarily restore.  We do a ton of those, and people
12  are generally willing to voluntarily restore the
13  properties and those are not accurately captured.
14           And I have no idea how many of those we've
15  done.  Formal enforcement cases, probably, you know,
16  between five and ten, and --
17       Q.   When you say formal enforcement cases --
18       A.   Like something that was going to be resolved
19  as with a particular enforcement resolution as opposed
20  to they just fix their issues.
21       (The document was marked Deposition Exhibit 131
22  for identification.)
23  BY MR. MIRON:
24       Q.   I'm going to show you what will be marked as
25  Exhibit 131, if you would take a look at that for me.

Page 127

1  This purchase purports to be an email from Mr. Kryzda --
2  forgive me.  This is a series of emails, the first of
3  which is the document we just referenced, which was
4  Exhibit 130.
5            You see at the bottom it starts with that
6  January 19, 2019 email.  Do you see that?  That's an
7  email from Mr. Kryzda to you; correct?
8            I'm sorry, no, start over.
9        A.   Yeah.
10       Q.   I'm not being accurate.  So this is a
11  continuation, of this is a continuation of an email that
12  began at Exhibit Number 129.  And there is, the original
13  email was from, the January 19, 2018 is from Mr. Kryzda
14  to you, sir.  Do you see that at the bottom?
15       A.   Okay, I'm seeing it.
16       Q.   Okay.  And then above that was the last email
17  we just talked about, which is Exhibit 130.
18           And above that is another email from
19  Mr. Kryzda dated February 12th of 2018 to yourself, and
20  it says "Good afternoon.  Just following up to let you
21  know that a permit application will be submitted today
22  and a copy will be sent to you.  Please advise of any
23  further actions we need to take."
24           Do you see that.
25       A.   I do.

Page 128

1        Q.   And this is an email from Mr. Kryzda to
2  yourself; correct?
3        A.   That's, yes, that's correct.
4        Q.   And he's indicating to you that a permit
5  application was going to be filed --
6        A.   That's correct.
7        Q.   -- that particular day; correct?
8            And he also asked you to advise as to whether
9  or not any further actions would need to be taken;
10  correct?
11       A.   Yeah, yes.
12       Q.   And in the email above that, again, same day,
13  2/12/2018, at 2:54 p.m., your response, or excuse me,
14  you responded to that at 2:44 p.m. saying "Thank you."
15           And above that, he responded saying "Have a
16  great day."  Correct?
17       A.   That's accurate.
18       Q.   Do you recall whether or not an application
19  was subsequently obtained by you from Mr. Kryzda?
20       A.   I think, I think I recall him sending it.  I
21  didn't actually look at it because, at least initially
22  because it went to the permitting section.  And as far
23  as I was concerned, they were going to handle it, that
24  deal.
25       Q.   So then your testimony is that when Mr. Kryzda



Page 129

1   provided the permit application, when he would have
2   provided the permit application, it would have gone
3   directly to some other department?
4       A.  So during our phone conversation, I'm sure I
5   explained to him that if he was to send it directly to
6   me, I would have to send it -- we have an in-box for
7   permit applications.
8           And my concern whenever we're dealing with
9   this is somebody is going to send it to the wrong person
10  or particular project manager and it get lost.  And I
11  wanted it to go through the appropriate avenue.
12          So I'm sure what happened is he sent it to the
13  in-box, which it's not on here.  And then he also copied
14  me, but I don't, I don't recall -- I didn't even look at
15  it.  I just assumed that he was doing what he told me he
16  was going to do, which is I, I was pretty excited about
17  it.
18      Q.  Why were you excited about it?
19      A.  I did my job good.
20      Q.  What does that mean?
21      A.  No, this is what we do.  We try to work with
22  people to try to resolve issues.  And whether or not,
23  we're trying to get people to understand the federal
24  laws and to take the appropriate steps and prevent
25  issues before they start.

Page 130

1           And this was I think a perfect example of what
2   we do on a daily basis is work with people to get them
3   past the end zone.
4           And he submitted an application, I thought I
5   was done with this.  So I was happy that in my mind,
6   without looking at it, this was a perfect resolution for
7   us.
8       Q.  So would it be fair to say that you tried to
9   provide, you mean the Corps, tries to provide the
10  individual as much help and guidance as possible because
11  the ultimate goal would be for them to in fact file and
12  obtain a permit; correct?
13          MR. ADKINS:  Objection.
14          THE WITNESS:  That's what we do on a daily
15      basis, yes.
16      (The document was marked Deposition Exhibit 132
17  for identification.)
18  BY MR. MIRON:
19      Q.  Let me show you what's been marked as Exhibit
20  Number 132.  It purports to be an email dated
21  February 12 of 2018 from Mr. Kryzda to an email address
22  styled, titled Application-SP@USACE.Army.ML, and you are
23  copied on that email.  Do you see that?
24      A.  Yes, I do.
25      Q.  Is that the email address you referenced

Page 131

1   earlier about where the permit should be sent to?
2       A.  It is.
3       Q.  The in-box, so to speak?
4       A.  Yes.
5       Q.  In this particular email Mr. Kryzda is saying
6   "Attached please find an application for agricultural
7   activity."
8           Do you see that?
9       A.  I do.
10      Q.  Okay.  And then behind that it appears as
11  though there is an application, it says "For Department
12  of the Army Permit."
13          Do you see that?
14      A.  I do.
15      Q.  Would this be a copy of the permit that
16  Mr. Kryzda would have provided to the Army Corps seeking
17  a permit?
18      A.  Yeah, I provided him the blank copy.  He
19  filled it out and then provided it to this in-box.  I
20  wish I would have opened it, but I didn't.
21      Q.  Why do you wish you would have opened it?
22      A.  No, I, I didn't read any of this.  So I didn't
23  even learn anything about the project until much later
24  or what they were applying for.
25      Q.  How much later?

Page 132

1       A.  I don't remember.
2       Q.  Months?  Years?
3       A.  No, it was relatively quickly, but I, I had
4   never opened, I never opened this.  I just, I was, I
5   thought we were done when he applied for the application
6   or the, when he applied for the permit.
7       Q.  When did you learn that you weren't, quote,
8   unquote, done?
9       A.  It was probably not until the Water Management
10  District performed a site visit.
11          MR. MIRON:  I'm going to show you what's been
12      marked as Number 133.
13      (The document was marked Deposition Exhibit 133
14  for identification.)
15  BY MR. MIRON:
16      Q.  I draw your attention to the center of the
17  page, specifically an email from Mr. Kryzda to you and
18  cc'ing you and sending it to the email address you
19  indicated earlier, the application email address.
20          Do you see that?
21      A.  I do.
22      Q.  Dated February 23rd of 2018 at 4:05 p.m.;
23  correct?
24      A.  Can you -- one more time?
25      Q.  Sorry.



JONATHAN PEMPEK
UNITED STATES OF AMERICA V SHARFI

May 19, 2022
133—136

Page 133

1    A.  Pretty jumbled.
2    Q.  Looking at the section right there.
3    A.  Okay.
4    Q.  And Mr. Kryzda sends this email to the Army
5   Corps' application email address as well as yourself and
6   says "Good afternoon.  Can you tell me the status of
7   your review of this application?"  Correct?
8    A.  That's correct.
9    Q.  And you responded to Mr. Kryzda by suggesting
10  above on the 27th, which was four days later, at
11  11:12 a.m. that the application was received and you
12  should be receiving an email to the project manager
13  assigned in the next two weeks.
14       Do you see that?
15   A.  That's correct.
16   Q.  And the project manager would be somebody in
17  permitting; correct?
18   A.  That's correct.
19   Q.  Do you know how the Army Corps project manager
20  was assigned to this matter?
21   A.  Do I know how they are assigned in the Palm
22  Beach Gardens office?
23   Q.  Yes, sir.
24   A.  Yes, they go into this in-box and then there's
25  an assistant that she distributes them to the project

Page 134

1   managers.
2        I went to go ask her in response to this if
3   she received it, and then I responded to him that we did
4   receive it; however, she, at the time she told me she
5   had not distributed it to the project manager yet.
6        So trying to get him the information he needed
7   with -- because again, this was, in my mind, it was no
8   longer in my hands, but I wanted to try to get an answer
9   for his question.
10   Q.  So to understand the timeline, Mr. Kryzda
11  submitted an application in mid February, but the Army
12  Corps was not going to be able to respond to the
13  application until weeks later; correct?
14   A.  That's what I was told.  Well, I was told that
15  she was going to have it.  So I don't, I don't remember
16  the -- I guess this was Friday.  So we already had a
17  couple of days.
18       It usually takes some time to distribute it to
19  the project manager, but also it's appropriate to give
20  the project manager time to reach out to the applicant
21  as well.  So I didn't want to overpromise and say Monday
22  morning you're going to hear from me.  So maybe he heard
23  sooner, maybe he didn't.
24   MR. MIRON:  Understood.  I'm going to show you
25  what's going to be marked as Number 134.

Page 135

1        (The document was marked Deposition Exhibit 134
2   for identification.)
3   BY MR. MIRON:
4    Q.  Have you ever seen this document before?
5    A.  I believe I've seen it.
6    Q.  What is it?
7    A.  It looks like it's a request for more
8   information.
9    Q.  All right.  It's what we otherwise have
10  referenced as an RAI; correct?
11   A.  Yes, sir.
12   Q.  Dated March 17th of 2018?
13   A.  It is.
14   Q.  In this particular circumstance what's the
15  purpose of this document?
16   A.  I haven't read it, so if you give me some
17  time, I can read it.
18   Q.  Sure, go ahead.
19   A.  Well, the purpose is they need something more
20  to make a permit decision.
21   Q.  So also in this particular document the
22  individual sending it, who in this circumstance was
23  Kelly Egan, was asking that "We request you provide this
24  information within 30 days."
25       Do you see that?

Page 136

1    A.  I do.
2    Q.  Is that standard?
3    MR. ADKINS:  Objection.
4   BY MR. MIRON:
5    Q.  To your knowledge, do you know whether or not
6   that's standard timeframe in a response?
7    A.  I'm not 100 percent sure what the permitting
8   section has as a standard.  I have seen multiple -- so
9   that's an autofill.
10       And I imagine on the complexity or the amount
11  of information required to respond, they could change
12  that, but that question would be more appropriately
13  asked to a permitting section employee.
14   MR. MIRON:  I'm going to show you what we're
15  going to mark as number 135.
16       (The document was marked Deposition Exhibit 135
17  for identification.)
18  BY MR. MIRON:
19   Q.  Take a look at this particular document for
20  me.  Does this appear to be a true and correct copy of
21  an email, at the top, this email you would have sent
22  from you, Mr. Pempek, to Kevin Kryzda, copying your
23  supervisor, Robert Halbert, on April 26, 2018 at
24  5:15 p.m.?
25   A.  Yes.



JONATHAN PEMPEK
UNITED STATES OF AMERICA V SHARFI

May 19, 2022
137–140

Page 137

1    Q.  Do you recall that April 26 was a Thursday?
2    A.  I do not recall that.  Oh, yes, I do, I do.
3    Q.  Okay.  So you were sending this email to
4  Mr. Kryzda on a Thursday afternoon at 5:15 p.m.;
5  correct?
6    A.  That's correct.
7    Q.  Up to this point, you had not been involved in
8  any way with review of the permit application; is that
9  correct?
10    A.  No.  I may or may not have known that -- I
11  don't recall if I knew if she was waiting for additional
12  information.  But generally, no, I had not been involved
13  with the permitting process.
14    Q.  But you do know at some point in March or
15  April of 2018 that the permit application lapsed based
16  upon my client's failure to provide the necessary
17  information within 30 days; correct?
18    A.  I'm not sure.
19    Q.  Okay.
20    A.  I don't know if, I don't know if I found that
21  out after getting information from the Water Management
22  District or before.  I don't know what generated my
23  discussion with Kelly, but we ultimately had that, Kelly
24  Egan.
25    Q.  Ultimately had a discussion about the fact

Page 138

1  that the permit was rescinded?
2    A.  Yeah, because I think I was -- I recall being
3  shocked that it was, not knowing that she withdrew the
4  permit.
5    Q.  Why were you shocked?
6    A.  Because I thought everything was going
7  smoothly.
8    Q.  So what discussions did you have with Kelly
9  that indicated it wasn't going so smoothly?
10    A.  Well, that she withdrew the permit because
11  they didn't respond to RAI.  She told me that.  I just
12  don't remember what day that was or when that occurred.
13    Q.  Did you make any attempts to try and contact
14  Mr. Sharfi or Mr. Kryzda in an effort to follow up as to
15  the request for additional information?
16    A.  No, because I didn't know about it.
17    Q.  So from your perspective, as of January 10th
18  of 2018, you were aware that Mr. Kryzda indicated that
19  Mr. Sharfi was doing some minor filling and minor
20  clearing on the subject property; correct?
21    A.  He indicated he was doing it.  I believe on a
22  phone conversation that was recharacterized as
23  vegetation removal.
24      And the vegetation removal is something we do
25  not regulate, but whether it's mechanical vegetation

Page 139

1  clearing or not, it's a little bit more convoluted, but
2  ultimately, as long as we got him in the permitting
3  process is all that mattered to me.
4    Q.  So what you're suggesting is there was the
5  potential opportunity that the filling that he was
6  doing, the clearing he was doing might not have required
7  a permit; correct?
8    A.  Well, as it was recharacterized, all filling
9  requires, the discharge of fill material into water of
10  the United States requires a permit.
11    Q.  And you were aware that he was doing that back
12  in January; correct?
13    A.  But again, it was recharacterized as
14  vegetation removal.
15    Q.  And it was recharacterized by and through a
16  conversation you had with Mr. Kryzda?
17    A.  Yes, with Mr.-- and so I didn't, I didn't
18  completely understand the scope of the filling until
19  later.
20    Q.  How much later?
21    A.  It was probably the Water Management
22  District's notice.
23    Q.  Okay.  So in this particular email you
24  indicate "In an attempt to provide valuable public
25  service."

Page 140

1      When you referred to valuable public service,
2  what did you mean obviously in your attempt to try to
3  help him obtain a permit?
4    A.  Yeah, I was pretty frustrated.
5    Q.  Why?
6    A.  Because I thought we were trending in the
7  right direction.  And 5:00 in the afternoon I find out
8  that we're not any closer to finding a resolution, and
9  I --
10    Q.  How did you find out that you weren't any
11  closer --
12    A.  There was --
13    Q.  Let me just finish.
14    A.  Sorry.
15    Q.  How did you find out at 5:00 in the afternoon
16  on a Thursday that you were not any closer to a
17  resolution than you thought?
18    A.  Because the Water Management District sent us
19  a report prior to this that showed significant earthwork
20  being done and --
21    Q.  Why, do you know why the district sent you a
22  report?
23    A.  Because generally we work together, we tried
24  to work together on projects.
25    Q.  Had you had conversations with the district



Page 141
1  about Mr. Sharfi, this particular site prior to January
2  of 2018?
3      A.  I believe I may have had a phone conversation.
4      Q.  With whom?
5      A.  Probably Gregory Vasquez.
6      Q.  So as of January of 2018, you had spoken with
7  Mr. Vasquez about the allegations associated with
8  Mr. Sharfi's actions on the site?
9          MR. ADKINS:  Objection.
10         THE WITNESS:  Yeah, there is a chance.  I
11     don't --
12 BY MR. MIRON:
13     Q.  Is there a chance or that you did?
14     A.  It's highly likely that I spoke to him,
15 because he's aware of it.  And ultimately he, Mr. Sharfi
16 would have required a state permit as well.
17         So, you know, we try to coordinate with our,
18 with other agencies to ensure compliance with all
19 programs.
20     Q.  So why specifically did you reach out to
21 Gregory Vasquez?
22     A.  Because he was the project manager --
23     Q.  He was the --
24     A.  -- for compliance and enforcement.  He was the
25 only point of contact I had with the Water Management

Page 142
1  District.
2      Q.  So what was the nature of your initial
3  conversation with him about Mr. Sharfi's, about this
4  particular subject site?
5      A.  I think it was generally a, that he purchased
6  the property to the north and we had a complaint that
7  said that they believe that he was working in wetlands.
8  So --
9      Q.  Was this consistent with what you believed
10 Mr. Sharfi's actions were in the past?
11         MR. ADKINS:  Objection, vague.
12 BY MR. MIRON:
13     Q.  Was this consistent with what you believed
14 Mr. Sharfi's actions were in the past relative to the
15 site to the south?
16         MR. ADKINS:  Objection.
17         THE WITNESS:  I think with -- it seems more
18     and more probable that Mr. Sharfi was going to -- I
19     mean his past behavior was he would fill a wetland
20     and then try to repair them in some modified way
21     that was advantageous.
22 BY MR. MIRON:
23     Q.  Did anyone at any time make a determination
24 relative to the site to the south that he in fact did
25 fill a jurisdictional wetland?

Page 143
1      A.  For the Corps?
2      Q.  No, for the district.
3      A.  Well, yes, if it wasn't jurisdictional, they
4  would have not required any type of a restoration
5  action, I would imagine.
6          I believe it was for the district.  Now this
7  was DEP.  DEP -- I'm getting confused with the two.
8      Q.  That's okay.  I did the same thing yesterday.
9      A.  So DEP is the one that took the reins on that,
10 and the Water Management took it most recent for the
11 site, and I believe it's because of jurisdiction over
12 farmland versus -- maybe not farmland, but they define
13 their regions differently and I don't quite understand
14 it.  Like Water Management District takes communities,
15 where DEP takes individual, individual homeowners and
16 stuff like that.
17     Q.  So in your mind, Mr. Sharfi had essentially
18 filled wetlands once before, and you presumed that it
19 was probable that he was going to be doing it again;
20 correct?
21     A.  I would say that somebody's past actions
22 likely will -- we generally will utilize what occurred
23 in the past to determine if he, if it's likely somebody
24 is going to do that in the future.
25     Q.  So you in this circumstance, upon making a

Page 144
1  determination whether or not the federal -- in making a
2  determination as to whether or not Mr. Sharfi filled,
3  illegally filled wetlands, you considered the fact that
4  you believed he had illegally filled wetlands on the
5  site to the south; correct?
6      A.  Through the state.
7      Q.  Yes.
8      A.  So that's why I gave Greg Gregory Vasquez a
9  heads-up, because he was compliance enforcement for the
10 state.
11     Q.  So essentially Mr. Sharfi was on your radar?
12     A.  No.  I had no idea that he purchased this
13 property or anything like that.  If it wasn't for the
14 fact that we received a complaint, I would have never
15 known.
16     Q.  The anonymous complaint?
17     A.  Yes.
18     Q.  Do you know whether or not Mr. Sharfi or
19 anyone on his behalf ultimately or eventually submitted
20 a response to the RAI?
21     A.  Mr. Sharfi or anybody on his --
22     Q.  Behalf actually filed a response to the RAI?
23     A.  I believe it came late.
24     Q.  But they did file a response; correct?
25     A.  I think so.



Page 145

1    Q. So let's go back to your email if we could,
2  please. It says, "I had correspondence with you," and
3  you meaning Mr. Kryzda, "Mr. Hook, and spoke directly to
4  Mr. Sharfi about the need for both federal and state
5  authorization prior to starting work on Mr. Sharfi's
6  property." Correct?
7    A. That's correct.
8    Q. What did you tell Mr. Hook about the need to
9  obtain federal or state authorization?
10    A. Yeah, this probably, this is not the best
11  email, but --
12    Q. Why?
13    A. Well, because I had limited conversation with
14  Mr. Hook. I probably shouldn't have included him.
15    Q. So you didn't have any conversations with
16  Mr. Hook about the need for Mr. Sharfi to obtain federal
17  or state authorization?
18    A. That was with Mr. Sharfi and Kevin.
19    Q. The discussion you had with Mr. Sharfi, are
20  you referring back to the initial conversation you had
21  back in January?
22    A. That I said it was highly likely that he had
23  jurisdictional wetlands and needed a permit.
24    Q. Yes, that's the conversation you are referring
25  to?

Page 146

1    A. Yes.
2    Q. Between April 26 and January of 2018 when you
3  had the initial conversation with Mr. Sharfi, had you
4  spoken to him any other times?
5    A. I don't think so.
6    Q. So it says, "I have seen information that
7  indicate significant earthwork has begun prior to
8  issuance of either of these permits at the subject
9  location."
10    Do you see that?
11    A. Yes.
12    Q. What was that, what information did you
13  receive at the time that indicated significant earthwork
14  had begun?
15    A. It was the Water Management District's report.
16    Q. What did the report say that gave you the
17  indication that significant earthwork had begun?
18    A. They had, in the photos that characterized the
19  road that went around the wetland that was built, at
20  least whether it characterized it or not or just took
21  photos of it, I was able to observe that.
22    There was, there was machinery actively
23  working, if I recall correctly. And the, I guess the
24  southwest portion of the parcel had already been cleared
25  and there was equipment and material stockpiled.

Page 147

1    Q. So would you agree with me that all of the
2  things that you just testified to were consistent with
3  the email that Mr. Kryzda provided you earlier, which
4  was that they were going to be doing some minor clearing
5  and filling?
6    A. No.
7    Q. Why not?
8    A. The construction of the road was fairly
9  significant, and I wouldn't characterize that as minor
10  filling, and I would not characterize that as minor
11  filling associated with vegetation removal.
12    Q. And do you know, am I correct that part of
13  that permit application was a construction of a road?
14    A. I don't know. I have to go back and look. I
15  don't, I don't see where it says anything about the
16  road.
17    Q. The permit indicates that they are seeking to
18  install a fence around the perimeter; correct?
19    A. Yes.
20    Q. And also to clear a ditch or conveyance that
21  was in disrepair; correct?
22    A. That's correct.
23    Q. Next paragraph, next sentence of that email
24  says "The USACE project manager responsible with
25  reviewing the permit application has recently withdrew

Page 148

1  the application for failure to respond to the RAI."
2    That was consistent; correct?
3    A. That's correct.
4    Q. And "And I would like to give Mr. Sharfi, his
5  consultant or his counsel an opportunity to explain his
6  position." Correct?
7    A. That's correct.
8    Q. Why did you indicate that you would like to
9  give Mr. Sharfi, his consultant or his counsel an
10  opportunity to explain his position?
11    A. Because I recently, after looking through all
12  this, and I told you I should have read this permit
13  earlier, I realized most of this stuff that they applied
14  for was not consistent with what my understanding was,
15  their plan was going to be.
16    I wish I would have read this in hindsight,
17  but most of the stuff that they are requesting is not
18  even jurisdictional, so there's no reason. It's not
19  acknowledging the purpose of the discharge of fill
20  material.
21    At this point I even knew there was a minor
22  discharge of fill adjacent to the road. I figured they
23  were going to clean that up in the permitting
24  application.
25    Q. But so in this particular circumstance, what



JONATHAN PEMPEK
UNITED STATES OF AMERICA V SHARFI

May 19, 2022
149—152

Page 149

1  were you looking for from Mr. Sharfi, his consultant or
2  his counsel?
3      A.  I just wanted to understand what, where -- I
4  thought we had an agreement that he was going to apply
5  for, because everybody has a right to develop a parcel.
6  I mean we just -- I was trying to work with him to get
7  it done.
8          This is a pretty bad email.  It's pretty
9  half-ass, but nonetheless, I thought we were trending
10  towards finding a resolution, and I was frustrated when
11  I wrote this.
12      Q.  I understand.  So it would have been your goal
13  at this point, based upon this last sentence, to try to
14  help Mr. Sharfi come into compliance; correct?
15      A.  One last time.
16      Q.  So you were basically saying to him I'm going
17  to give you one last opportunity to try to come into
18  compliance; correct?
19      A.  Or explain why he doesn't need a permit for
20  any of this.  And I think that at this point I was
21  thinking a face-to-face meeting is probably the best
22  bet.
23      Q.  Why is a face-to-face meeting the best bet?
24      A.  If we could meet on site or face to face, we
25  could understand exactly the scope of work, what he

Page 150

1  needs to do, and develop a path forward, and I just
2  wanted one more opportunity to find a resolution,
3  because there was -- personally, I didn't want to be
4  here today.  I'm not good at this.
5      Q.  Okay.  So that's fair.  At the end of the day,
6  you were trying to get him to come into compliance and
7  you were going to do what you could to help him through
8  that process?
9      A.  Correct.
10      Q.  Understood.  So as we indicated earlier, this
11  particular email was sent out at 5:15 on a Thursday.
12          Did you end up giving Mr. Sharfi an
13  opportunity to respond or did he respond in any way,
14  whether through himself, his consultant or his counsel?
15      A.  I think he did, but I don't recall what it
16  was.
17      Q.  When?
18      A.  I don't remember.
19      Q.  Okay.
20          MR. MIRON:  Excuse me one second.
21          THE WITNESS:  No worries.
22          MR. ADKINS:  Do you want to go off the record
23  for a minute?
24          MR. MIRON:  No, thank you.
25

Page 151

1  BY MR. MIRON:
2      Q.  Let's look at the -- go back to the body of
3  this particular email if you could.  So you indicated
4  that the significant earthwork, you saw information that
5  significant earthwork had begun on the site.
6          You remember that testimony, correct?
7      A.  Yes.
8      Q.  And your testimony was that the information
9  you received came as a result of a memo, I think you
10  testified, from the South Florida Water Management
11  District; correct?
12      A.  Yeah, yes.  And also supplemental that Google
13  Earth images I believe were updated at the time, so I
14  could see the extent of impacts.
15      Q.  So you would have looked at the Google Earth
16  images together with the memo or report from the
17  district?
18      A.  That's correct.
19      Q.  Okay.  So what information did you have as of
20  April 26 of 2018 that the defendants were engaged in
21  activities on the site that required a Federal Clean
22  Water Act permit?
23      A.  There was, again, it was my, my efforts were
24  to try to avoid an issue and tell them that I believe it
25  is waters the United States and wetlands on the

Page 152

1  property.
2          The areas with wetland signatures were filled
3  with the construction of the road.  Not wholly filled,
4  but the road isolated the wetlands in the center.
5      Q.  Do you want to take a second?
6      A.  No, no worries.
7      Q.  Take your time.
8      A.  So anyway, it was accumulation of all these
9  resources that showed that a wetland that was likely
10  jurisdictional had been impacted.
11          And I thought, our understanding is he was
12  going to hold off in developing the parcel until a
13  permit application was submitted.
14      Q.  Understood.
15      A.  Or until it was issued.
16      Q.  So specifically, so far you've testified as
17  to, that you believe that there was a road that was
18  being built and some fill material, so I want to know
19  specifically what it is, what activities that the
20  defendants were engaged in on the site that you believed
21  required a Federal Clean Water Act permit.
22      A.  It was construction of the road.
23      Q.  Okay.
24      A.  And there were stockpile fill pads placed
25  adjacent to the road in locations that seemed highly



JONATHAN PEMPEK
UNITED STATES OF AMERICA V SHARFI

May 19, 2022
153–156

Page 153

1  likely they were wetlands. Those were the areas that
2  specifically where the discharge of fill material
3  occurred.
4      Q.  Do you recall specifically where on the
5  subject site that stockpile of fill material was?
6      A.  I don't recall. I'd have to look at the
7  photos again.
8      Q.  Okay. What information do you have about the
9  effect of wetlands on the site on downstream traditional
10  navigable waters?
11      A.  I don't have any information.
12      Q.  So at the time you did not know what effects,
13  if any, the wetlands on the site would have had on the
14  downstream traditional navigable waters; correct?
15      A.  I mean I think that was covered in the report.
16      Q.  I'm talking about at that time, as of
17  April 26, 2018.
18      A.  Oh, yeah. Nothing.
19      Q.  Okay. And up to that point as of April 26th
20  of 2018, you had never been to the -- you had never
21  stepped foot on the actual site; correct?
22      A.  That's correct.
23      Q.  Other than the Google imagery, did the Corps
24  conduct any surveillance of the subject site up to that
25  point?

Page 154

1      A.  We had not.
2      (The document was marked Deposition Exhibit 136
3  for identification.)
4  BY MR. MIRON:
5      Q.  I'm going to show you what we're going to mark
6  as number 136. Actually, let me have 13 as well.
7      MR. HAMILTON: Do you want it as a composite?
8      MR. MIRON: Let me take this back. Brandon,
9  forgive me, I'm going to make a change.
10      I'm going to make this a Composite exhibit.
11  I'm going to show you what will be a Composite
12  Exhibit 136.
13      MR. ADKINS: Do you want to maybe read the
14  Bates?
15      MR. MIRON: Yes, I'm going to.
16  BY MR. MIRON:
17      Q.  So the first page of this composite exhibit
18  purports to be an email from Robert Halbert to you on
19  April 30th of 2018; and prior to that, an email from you
20  to Mr. Halbert on Friday, April 27th of 2018. And it's
21  Bates USACE 1074.
22      And it references in your email attachment,
23  Sharfi cease and desist pdf, and there is an attachment
24  that is contacted to this email as well. If you can
25  take a look at it for me and tell me if you recognize

Page 155

1  those two documents.
2      A.  Yes, I recognize these.
3      Q.  So let's start with the email. The email is
4  dated Friday, April 27, 2018 at 12:48 p.m. And it's
5  from yourself to Mr. Halbert; correct?
6      A.  That's correct.
7      Q.  Okay. So you sent Mr. Sharfi the email on the
8  26th at 5:15 p.m on Thursday evening, telling him that
9  you wanted to give him an opportunity to explain his
10  position.
11      And then at 12:48 p.m. the next morning, or
12  next afternoon, this is an email that you sent to
13  Mr. Halbert with a copy of a draft cease and decision
14  letter; is that correct?
15      A.  That's correct.
16      Q.  So in your, up to this point, how did you
17  provide Mr. Sharfi with an opportunity to explain?
18      A.  I feel like we're missing an email between
19  these, but I'm not 100 percent sure. I thought there
20  was a response from Mr. Sharfi, but I don't recall what
21  it said.
22      So I -- there's a reason why we got to this
23  point. I just don't remember what it was.
24      Q.  Okay. Well, maybe as we go through, you'll
25  remember.

Page 156

1      A.  Yeah, I can't answer that question right now.
2      Q.  So you wrote to Bobby, Bobby, your supervisor,
3  Mr. Halbert, that says that "Mr. Sharfi has filled
4  wetlands in the past and has the ability and resources
5  to do the work very quickly."
6      Do you see that?
7      A.  I do.
8      Q.  And what wetlands did he fill in the past?
9      A.  It was the ones from the other site.
10      Q.  Okay. So you at this point had made the
11  assumption that Mr. Sharfi did in fact fill wetlands on
12  the site to the south; correct?
13      MR. ADKINS: Objection.
14      THE WITNESS: I made the assumption that he
15      filled wetlands. I made the statement he filled
16      wetlands. I didn't make the statement that they
17      were jurisdictional determinations, so I don't know
18      what the assumption was.
19  BY MR. MIRON:
20      Q.  So how was the fact that he allegedly filled
21  wetlands in the past, why was that relevant to this
22  particular circumstance?
23      A.  Because again, I think somebody is, it was
24  probable -- I don't remember -- there was a statement in
25  the past, Mr. Sharfi said he was, he was going to



JONATHAN PEMPEK
UNITED STATES OF AMERICA V SHARFI

May 19, 2022
157—160

Page 157

1  develop as many parcels as he could.  And he told,  he
2  either told me or Greg or John Renfranz that he was
3  trying to expand his farm.
4       So that was my, my concern is that if we got
5  too far out, you know, this, the resolution was going to
6  be more convoluted, the more filling that occurred.
7       Q.  So you just presumed at the time that
8  Mr. Sharfi was going to continue filling wetlands in
9  violation of the law; correct?
10      A.  I believe I told Bobby, my chief, that I
11  believe he had filled wetlands at the site, because I'm
12  sure I briefed him over a phone conversation.  And I
13  identified the dirt road as one of them.
14      So I don't think I'm presuming that he was
15  going to fill them.  I think I already told him he did
16  potentially fill wetlands, but I -- and I also told him
17  I believe those wetlands to be jurisdictional wetlands.
18      Q.  So at that point in time, as of April 27,
19  2018, you had made a determination that they were
20  jurisdictional wetlands?
21      A.  No.
22      Q.  But notwithstanding the fact that you had not
23  made a determination, you still felt that it was
24  appropriate to send out a cease and desist letter?
25      A.  I did.

Page 158

1       Q.  Did you have the authority to send the cease
2  and desist letter on your own or did you need
3  Mr. Halbert's approval?
4       A.  I'm not that important.  Thank you, guys, but
5  no, I have to have approval.
6       And there is sometimes it even has to, Bobby
7  has to brief other people.  But I don't know if this
8  happened on the case.  You'd have to ask him.
9       Q.  Okay.  So you said you had a phone
10  conversation with Mr. Halbert that was to some degree
11  the same general time as this email; correct?
12      A.  Yeah, try to stay in communication and explain
13  what's going on in our enforcement cases.
14      Q.  What did you tell him?
15      A.  Well, I told him about the Water Management
16  District's report.  I told him that it appeared that
17  there was fill.  There was a road surrounding the
18  wetland that now essentially isolated a wetland and that
19  some of that road went through waters of the United
20  States -- or not waters of the United States, that went
21  through a wetland that I believed to be waters of the
22  United States and Google Earth supports that.
23      Q.  Take your time.
24      A.  Thank you.  I've been talking a lot today.
25      Q.  Was this your, the first cease and desist, the

Page 159

1  first opportunity to draft and send out a cease and
2  delist letter while you were with the Corps?
3       A.  I don't believe so.
4       Q.  No?
5       A.  No.
6       Q.  How many others had you sent out prior to this
7  one?
8       A.  I have no idea.
9       Q.  At this point you had only been working with
10  the Corps for how long?
11      A.  Since August, so --
12      Q.  August of 2017?
13      A.  Yeah, so I don't know, nine months, ten
14  months.
15      Q.  More or less?  So up to that point in time how
16  many other cease and desist letters had you drafted?
17      MR. ADKINS:  Asked and answered.
18      THE WITNESS:  I have no idea.
19  BY MR. MIRON:
20      Q.  You don't know?
21      A.  No.
22      Q.  More than ten?
23      A.  Probably around ten.
24      Q.  And how many of those were for Clean Water Act
25  violations?

Page 160

1       A.  Maybe half.
2       Q.  So five of the ten potentially were cease and
3  desist letters that you drafted for alleged Clean Water
4  Act violations?
5       A.  That's, yes.
6       Q.  Do you recall any of the names of those cases?
7       A.  I do not.  You're asking in my entire AOR?
8       Q.  No, sir, up to that point.
9       Oh, your entire AOR, is that your area?
10      A.  Yes.
11      Q.  Oh, yes, sir.
12      A.  Probably five.  And no, I don't remember the
13  names.
14      Q.  Were any in Martin County?
15      A.  I don't believe so.
16      Q.  And how many of them involved the discharge of
17  fill materials in wetlands?
18      A.  Maybe it would be five of those.  I, I'm just
19  guessing right now.  I would have to look.  I don't
20  know.
21      Q.  In those circumstances, how many alleged acres
22  of wetlands, how many acres of wetlands were alleged to
23  have been filled or discharged with -- filled or
24  discharged?
25      A.  Where?



JONATHAN PEMPEK
UNITED STATES OF AMERICA V SHARFI

May 19, 2022
161–164

Page 161

1   Q.   In these other five matters that you handled.
2   A.   I have no idea.
3   Q.   Have any of them resulted in litigation?
4   A.   No.
5   Q.   They were all resolved through some kind of
6   resolution, settlement or permit?
7   A.   Yes.
8   Q.   So returning to the second page, which is the
9   draft itself, when did you draft this particular
10  document?
11  A.   It was probably the same day.
12  Q.   So it would have been prior to sometime on
13  Friday, April 27, 2018?
14  A.   No, it would probably be the same day that I
15  sent Bobby this email.  So the 30th.
16  Q.   So let me -- I don't believe you are correct,
17  but that's okay.  So let me show you, it says
18  "Mr. Sharfi has filled wetlands in the past and has the
19  ability, resources to do the work very quickly.  I was
20  hoping to get this C&D out today if you have the time to
21  review and sign it."
22      That suggests to me that you were sending him
23  some document to review and sign.  Is that a bad
24  assumption?
25  A.   I was sending the C&D.

Page 162

1   Q.   So you did, you sent him the C&D on Friday,
2   April 27, 2018?  You're getting confused.
3   A.   Yeah, I guess so.  So Friday, I'm sorry, I'm
4   looking at the top.
5      The same day, I likely drafted the C&D the
6   same day I sent him this message.
7   Q.   Okay.  To your knowledge, has Mr. Sharfi ever
8   been sent a Notice of Violation from any agency that he
9   has filled wetlands without a permit other than in this
10  particular case?
11  A.   Any agency?
12  Q.   Yes, sir.
13  A.   I believe Martin County and DEP.  Potentially
14  Water Management has sent him a notice.
15  Q.   In fact, am I correct that no agency has
16  formally determined that Mr. Sharfi has illegally filled
17  wetlands?
18      MR. ADKINS:  Objection.
19      THE WITNESS:  Has any agency --
20  BY MR. MIRON:
21  Q.   Formally determined that Mr. Sharfi has
22  illegally filled wetlands, at least as of April 27,
23  2018?
24  A.   I think at least three have made the
25  allegation that he has.

Page 163

1   Q.   Okay.  The allegation.  How about a formal
2   determination?
3   A.   I don't know the difference.
4      MR. ADKINS:  Objection.
5   BY MR. MIRON:
6   Q.   You don't know the difference between a formal
7   determination and an allegation?
8   A.   Formal determination?
9   Q.   Yes, sir.
10  A.   I think we're here because Army Corps of
11  Engineers believes that wetlands were filled.  So I
12  think that's right now an allegation, but I don't know,
13  I don't know the terminology.
14  Q.   So your statement about Mr. Sharfi filling
15  wetlands in the past, that was your own personal opinion
16  at that time; correct?
17  A.   No.  I think it was well documented that he
18  filled wetlands in the past.
19  Q.   But to what degree was there ever a formal
20  determination that he in fact did that?  Was there any?
21      MR. ADKINS:  Objection.
22      THE WITNESS:  I believe that there was an
23  enforcement case and I believe he, the state told
24  him that he filled wetlands in the past.
25      However, the enforcement resolution was based

Page 164

1   on Martin County's restoration plan.  If he didn't
2   impact wetlands, there would have been no reason
3   for a restoration plan.
4      I guess I don't understand the line of
5   questioning.
6   BY MR. MIRON:
7   Q.   So in this particular email you asked
8   Mr. Halbert to sign and return your cease and desist
9   letter, and you were hoping to get it out that
10  particular day; correct?
11  A.   Did I send this to him on Friday?
12  Q.   Yes.
13  A.   Yes, I was hoping to get out Friday.
14  Q.   If we look at the cease and desist letter, it
15  appears as though, based on the second paragraph, last
16  line says "The activity was conducted immediately
17  adjacent and north of 827 Southwest 33rd Street."
18      Do you see that?
19  A.   Yes.
20  Q.   Is that the correct address of the subject
21  property?
22  A.   I don't know.
23  Q.   Okay.  The next paragraph says, "Section 404
24  of the Clean Water Act, 33 USC Section 1344, prohibits
25  discharges of dredged or fill material into waters of



Page 165

1  the United States." Correct?
2     A.   That's correct.
3     Q.   What did you do to determine at this time
4  whether or not Mr. Sharfi's, Mr. Sharfi had discharged
5  water into waters of the United States?
6     A.   So if the Notice of Violation, it begins
7  saying that the Corps has reason to believe, if that's
8  alleged, you are responsible for discharge of fill
9  material.
10        This is a template.  This is what -- we fill
11  this thing out.  Again, I -- this there is what comes
12  along with it.
13    Q.   So at this point there was no determination as
14  to whether or not Mr. Sharfi's property was subject to
15  the waters of the United States; correct?
16        MR. ADKINS:  Objection.
17        THE WITNESS:  It was highly probable that
18  there were waters of the United States on
19  Mr. Sharfi's property.
20  BY MR. MIRON:
21    Q.   What constituted the waters of the United
22  States on Mr. Sharfi's property?
23    A.   I'm sorry, what's that?
24    Q.   How did you make that determination?
25    A.   That there were waters of the United States?

Page 166

1     Q.   Yes, sir.
2     A.   I did not make that determination.
3     Q.   Okay.  Then why include it within the letter?
4     A.   It's, again, this is an informative letter.
5  The beginning, it says that "We have reason to believe."
6        The rest of it is just informative.  It tells
7  you exactly what our job is.  And it's, again, it's
8  auto-populated.  Probably, this is what people smarter
9  than me came up with.
10    Q.   Okay.  And it's interesting, so this
11  particular draft indicates that it was signed by Jason
12  A. Kirk, PE, Colonel, US Army District Commander.
13        Do you see that?
14    A.   I don't see a signature, but yes.
15    Q.   Right.
16    A.   Just my chief, Bobby Halbert, has signing
17  authority for the colonel.
18    Q.   Okay.
19        (The document was marked Deposition Exhibit 137
20  for identification.)
21  BY MR. MIRON:
22    Q.   Is lunch here?  I'll find a good time.  Just
23  give me a few minutes.
24    A.   No worries.  Keep rolling.
25    Q.   I'm going to show you what was marked as

Page 167

1  Number 137.  It's USACE 30.
2        Do you see this document, sir?
3     A.   I do.
4     Q.   Are you familiar with it?
5     A.   Yeah, they look very similar.  Trying to
6  figure out --
7     Q.   Now you anticipated one of my questions at
8  some point.  Do you know to what degree, if any, this
9  particular document is different from the draft?
10    A.   So I believe, I believe what happened was the
11  colonel was away and acting, the acting colonel was
12  Colonel Wilson.
13        So I believe what happened was we had to
14  change the signature authority because he wasn't
15  available to sign it.
16    Q.   Okay.  So that's the first thing, is that the
17  signature for the individual signing it was different;
18  correct?
19    A.   Okay.
20    Q.   Correct?
21    A.   Yes, yes, that's the signature.
22    Q.   So are the statements that are made, the
23  statements that are contained within this cease and
24  desist letter dated April 30th of 2018, are they true
25  and correct and to the best of your knowledge?

Page 168

1     A.   I think I did my best to adequately describe
2  why we're sending this, yes.
3     Q.   Is there anything that you would have changed,
4  sitting here today?
5     A.   Well, it's not a 10-acre parcel.
6     Q.   How big is it?
7     A.   9.8, 9.56 something.
8     Q.   Other than that?
9     A.   I screwed up with a date.  Apparently there is
10  a date typo.
11    Q.   Where do you see that date typo?
12    A.   April 19th, 2:08.
13        I don't know, I'd have to read through the
14  whole thing and tell you if there's anything that
15  changed, different.
16    Q.   Okay.  So you indicated earlier that most of
17  it -- I don't want to put words in your mouth.  You
18  indicated earlier that some portions of it are fill
19  populated, meaning it's part of the form; correct?
20    A.   That's correct.
21    Q.   So which parts would you have been responsible
22  for drafting?
23    A.   It would be the information specific to the
24  site and the reason of issuance.
25    Q.   And that looks like to be the basically second



JONATHAN PEMPEK
UNITED STATES OF AMERICA V SHARFI

May 19, 2022
169–172

Page 169

1  paragraph?
2      A.  Yeah, we have regulatory division, you have to
3  put in the date.  That's first typical thing you have to
4  do, and then the project number.  Then you have the
5  address.  Of course, Mr. Sharfi's name.
6          There is some situations where it doesn't make
7  sense to -- on a form similar to this, we would remove
8  any reference to Section 10 of the Rivers and Harbors
9  Act.  And you have already -- I messed up the date, if
10  you are referencing that already.
11          But we have to put in the date, and most of
12  the second paragraph is something that I would have
13  written.
14      Q.  Okay.  So the letter states that Mr. Sharfi
15  discharged fill material at 827 Southwest 33rd Street.
16          That's not the property address; correct?
17      A.  I have no idea.
18      Q.  I'll suggest to you that the property address
19  is 8227 Southwest Martin Highway.
20      A.  Okay.
21          MR. ADKINS:  Sorry, where is that?
22          MR. MIRON:  It's in the middle, actually at
23      the second-to-last sentence of the second
24      paragraph.
25          MR. ADKINS:  Thank you.

Page 170

1          MR. MIRON:  Sure.
2  BY MR. MIRON:
3      Q.  So as of April 30th of 2018, how much of an
4  area of the wetlands on the site did you believe were
5  affected by Mr. Sharfi's actions?
6      A.  At the time, I believed all of the wetlands on
7  the site were impacted.
8      Q.  How many wetlands were there on the site?
9      A.  I hadn't come to a conclusion yet, but
10  whatever there was, I believe them to be impacted.
11      Q.  So you knew there was somewhere between zero
12  or somewhere between one square foot and 10 acres?
13      A.  I probably would not have started an
14  enforcement case if I thought it was one square foot,
15  but generally, yes.  There was, it was something between
16  nothing and the entire property.
17      Q.  To your point, you testified you wouldn't have
18  started an enforcement action if it was what I'll
19  characterize as a de minimus amount of wetlands.  So
20  what is the threshold for you?
21      A.  I don't really have a threshold.
22          One of the elements of a violation is a point
23  source and a person with a shovel that takes a shovel
24  full of beach sand and throws it into a wetland is not
25  necessarily a violation.

Page 171

1          So, you know, it's all about the elements of
2  the violation, not necessarily the quantity.  And
3  there's a lot of caveats to what makes, when you are
4  triaging these things.
5      Q.  So would you agree that you have a great deal
6  of latitude in helping determine whether or not a
7  violation has occurred?
8      A.  I, I think Bobby Halbert trusts my judgment.
9      Q.  Okay.  So the answer to my question is yes?
10          MR. ADKINS:  Asked and answered.
11          THE WITNESS:  Pardon?
12  BY MR. MIRON:
13      Q.  So the answer to my question is yes?
14      A.  I, I would say yes.
15      Q.  Okay.  In the letter you wrote that the
16  defendants are discharging fill material; is that
17  correct?
18      A.  I did write that.
19          MR. ADKINS:  Sorry, can we just see where this
20      is?  I'm trying to catch up with you.
21          MR. MIRON:  Yeah, that's okay.
22          MR. ADKINS:  I don't think this letter says
23      the defendants anywhere.
24          MR. MIRON:  Oh, is that the issue?  Okay.
25

Page 172

1  BY MR. MIRON:
2      Q.  Let's start with the first sentence.  I
3  shouldn't have said defendants.  Maybe I should have
4  said defendant, Mr. Sharfi.
5          So the letter that you wrote, particularly the
6  first line of the second paragraph says "The Corps has
7  obtained information from available sources" -- that you
8  testified to earlier --
9      A.  Yes, sir.
10      Q.  "-- that indicates fill, creating a dirt road,
11  was placed around the perimeter of a ten-acre parcel
12  containing a wetland and that vegetation within the
13  wetland was removed with heavy machinery."  Correct?
14      A.  That's correct.
15      Q.  First and foremost, the perimeter road that
16  you referred to, it runs around the entire perimeter of
17  the entire 10-acre parcel?
18      A.  It does.
19      Q.  Does the entire 10-acre parcel otherwise
20  constitute wetlands?
21      A.  No.
22      Q.  So any portion of that perimeter road that is
23  not in wetlands would not require a permit; correct?
24      A.  Correct.
25      Q.  Second line says on January 25, 2018, "Corps



JONATHAN PEMPEK
UNITED STATES OF AMERICA V SHARFI

May 19, 2022
173–176

Page 173

1 staff notified you of the requirement to acquire federal
2 and state authorization prior to discharging fill
3 material and/or wetlands."
4       Do you see that?
5    A.  Yes.
6    Q.  "On February 12, 2018, an application was
7 received by the Corps to construct a pole barn, fencing
8 and other activities."  Correct?
9    A.  That's correct.
10   Q.  "On April 19th" -- I think you meant to say
11 2018; correct?
12   A.  Yes.
13   Q.  "-- this application was eventually withdrawn
14 for the lack of response."  Correct?
15   A.  That's correct.
16   Q.  But as far as you're concerned today, you
17 understand that eventually a response was provided, just
18 wasn't timely; correct?
19   A.  Understood.  I understand that.
20   Q.  "There is no Corps permits on file for the
21 discharge of fill material or any other associated
22 activities."  Correct?
23   A.  Yeah, I did a record search.  I couldn't find
24 anything, but yes, it says that.
25   Q.  So we kind of touched on this earlier, and

Page 174

1 forgive me for going back to it again.
2       What activities on Mr. Sharfi's, what
3 activities of the defendants in the wetland on the site
4 do you believe needed a Federal Clean Water Act permit?
5    A.  Construction of the road through a wetland.
6    Q.  Is that it?
7    A.  And there was -- I don't have the photos, but
8 I believe there was some stockpiled fill that was placed
9 in an area I presumed was also a wetland.
10   Q.  Okay.  Is that it?
11   A.  I'd have to look at the photos.  There is a
12 reason, but I believe so.
13   Q.  Okay.  Did the defendants need a permit to
14 operate bulldozers in wetlands on the site?
15   A.  Depends who you ask.
16   Q.  I'm asking you.
17   A.  I generally do not tell anybody it's a
18 violation to use bulldozer and heavy equipment on a
19 wetland.
20   Q.  Do you believe that the defendants need a
21 federal permit to bring in fill material from off site?
22   A.  Depends where they discharge it, but
23 generally, no, you could bring in fill material from off
24 site.
25   Q.  Do you believe that the defendants need a

Page 175

1 federal permit for workers to dig in wetlands on the
2 site using shovels and other hand tools?
3    A.  No.
4    Q.  Do you believe that the defendants need a
5 federal permit to put down grass sod in the wetlands on
6 the site?
7    A.  Potentially.
8    Q.  Why?
9    A.  Because the, if -- without an ag exemption,
10 sod could be identified as a fill material.
11   Q.  Could be?
12   A.  I would.  I would identify it as a fill.
13   Q.  Okay.  Do you believe that the defendants need
14 a federal permit to cut down plants and trees in
15 wetlands using saws?
16   A.  The Clean Water Act specifically says -- it
17 doesn't reference cutting down the trees.  Just
18 potentially debris, mulching and other debris in a
19 wetlands.
20   Q.  So it's enough?
21   A.  Just cutting it down and moving it off site?
22 No, there is no problem with that.
23   Q.  Do you believe that the defendants need a
24 federal permit to drive a vehicle through a wetland?
25   A.  No.

Page 176

1    Q.  Do you believe that the defendants need a
2 federal permit to do any work in areas of the site that
3 are not wetlands?
4    A.  No.
5    Q.  So this particular letter, if you would bring
6 it back for me, was ultimately signed by Mr. Halbert and
7 it shows as though it was signed on April 30th at 9 --
8 excuse me, April 30, 2018 at 9:22 a.m.; correct?
9    A.  Yes.
10   Q.  Okay.  So again, I know we talked about this
11 earlier, but based upon this particular email -- excuse
12 me, letter that you ultimately delivered to Mr. Sharfi,
13 and we'll get to that in a minute, you told Mr. Sharfi
14 specifically and personally that he could be subjected
15 to criminal prosecution; correct?
16   A.  That's what it says in the letter.
17   Q.  So ultimately you are threatening Mr. Sharfi
18 with jail; correct?
19       MR. ADKINS:  Objection, argumentative,
20   misstates the letter.
21       THE WITNESS:  This is a --
22 BY MR. MIRON:
23   Q.  You -- I'm not being disrespectful.  You
24 understand what criminal prosecution means; correct?
25   A.  Again, there is a, this is a -- yes, this all



JONATHAN PEMPEK
UNITED STATES OF AMERICA V SHARFI

May 19, 2022
177–180

Page 177

1  could happen; right?  So this is a, it's an informative
2  letter.  But again, this is a template.
3      Q.   Notwithstanding the fact it's a template, and
4  I appreciate your testimony relative to that, this
5  letter clearly indicates that there are criminal
6  penalties under the Clean Water Act?
7      A.   There are.
8      Q.   And you also told him he could be fined up to
9  $52,000 a day for doing the work on his property;
10  correct?
11          MR. ADKINS:  Objection, vague.
12  BY MR. MIRON:
13      Q.   I'll be more specific.  The letter
14  specifically indicates that under the Clean Water Act,
15  you may incur civil penalties up to $52,414 per day of
16  violation; correct?
17      A.   That is, that's accurate.
18      Q.   You would agree with me that these are
19  obviously very serious statements for a federal agency
20  to make to someone; correct?
21      A.   I believe it is an informative letter to tell
22  him the consequences of potentially not adhering to
23  either the Clean Water Act or the Rivers and Harbors
24  Act.
25      Q.   So you are threatening Mr. Sharfi with

Page 178

1  criminal prosecution -- not you personally, but the
2  Corps through your actions are threatening Mr. Sharfi
3  with criminal prosecution; correct?
4          MR. ADKINS:  Objection, argumentative.  He
5      said this is an informative letter.  How many times
6      do you want to ask him?
7          MR. MIRON:  Thank you, Brandon, but I don't
8      need you to testify for him.  Just state your
9      objection and we'll move on.
10          THE WITNESS:  No, I've never considered it a
11      threatening letter.  And I understand your point
12      now; however, I always thought it was a notice.
13      And the idea is to stop, stop work, and potentially
14      start toward a resolution.
15          This is required to initiate all of our
16      enforcement actions.  And I personally, again, I
17      understand that somebody could perceive this as
18      threatening, but I always thought this was an
19      educational letter, what would happen if they did
20      not continue or if they did not, if they just
21      indiscriminately just did whatever they wanted.
22  BY MR. MIRON:
23      Q.   Do you believe that the defendants, including
24  Mr. Sharfi obviously, violated any other federal laws in
25  connection with this case other than the ones that have

Page 179

1  been brought today?
2          MR. ADKINS:  Objection.
3          THE WITNESS:  I have no idea.  I don't think
4      so, and it's not my job.
5          MR. MIRON:  Okay.  This is a good time to take
6      a break.  Let's go off the record.
7          THE VIDEOGRAPHER:  We're off the record.  The
8      time is 1:33 p.m.
9          (A lunch recess was taken.)
10          THE VIDEOGRAPHER:  We are on the record.  The
11      time is 2:09 p.m.
12  BY MR. MIRON:
13      Q.   You testified earlier that you told both
14  Mr. Sharfi and Mr. Kryzda in January of 2018 that they
15  should get a Clean Water -- excuse me, they should get a
16  Federal Clean Water Act permit from the Army Corps;
17  correct?
18      A.   I advised them that they should apply for a
19  permit.
20      Q.   Why would you tell them to apply for a permit
21  from the Army Corps if you were not sure at that time
22  whether or not they actually needed one?
23      A.   I was fairly certain that -- again, I thought
24  it was probably that the wetlands were jurisdictional.
25      Q.   But at that point you had not made a

Page 180

1  determination one way or another; correct?
2      A.   That's correct.
3      Q.   So I'll ask you the question, so why would you
4  tell them to apply for a permit from the Army Corps if
5  you had yet to make that determination at that point?
6      A.   In my job, I typically do that if I believe
7  that there is activity that's going to occur in the
8  water that's likely jurisdictional.
9          I mean alternatively, I could have said
10  nothing and then -- but I thought it was, I thought I
11  was providing public service by saying that before you
12  do anything, we should check to see if you need a
13  permit.
14          And the permit application was -- I tended to
15  further identify whether the wetlands were
16  jurisdictional or not.
17      Q.   Well, check to see is different than you need
18  a permit; do you agree?
19      A.   Yeah, I never -- I told them that they should
20  apply for a permit.
21      Q.   So there was no checking ahead of time, you
22  just took, you assumed at the time that they needed a
23  permit and suggested they apply for one?
24          MR. ADKINS:  Objection.
25          THE WITNESS:  I believed they needed to apply



JONATHAN PEMPEK
UNITED STATES OF AMERICA V SHARFI

May 19, 2022
181–184

Page 181

1  for a permit because it was highly likely the
2  waters on their property were waters of the United
3  States.
4  BY MR. MIRON:
5      Q.  What's involved in getting a permit from the
6  Army Corps under the Federal Clean Water Act?
7      A.  People just apply for a permit application.
8  It's for a standard or individual permit.  It's a $100
9  fee.  Everything else nationwide is general permits,
10  either it's free or ten bucks, I don't know.
11      So it's pretty easy.  And it's the project
12  manager's job to walk them through the process.  Each
13  process is a little bit different, I apologize.
14      Q.  That's okay.  Are you familiar enough to
15  testify as to what the obligations would be on how to
16  obtain a permit?
17      A.  Each case is a little bit different, but I
18  could probably answer some questions.
19      Q.  So number one, a property owner would need to
20  fill out an application; right?
21      A.  That's correct.
22      Q.  And then the property owner, as you suggested,
23  would have to pay an application fee; correct?
24      A.  That's to be determined last, because we don't
25  know what type of permit would be required prior to them

Page 182

1  asking.
2      Q.  So in this particular circumstance, relative
3  to this set of facts, would an application fee have been
4  necessary?
5      A.  I think this would have, because of the
6  quantity of -- it's hard to tell.  At the time, no, I
7  don't -- in hindsight, knowing what I know now, it would
8  probably be a standard permit, which would have been a
9  $100 fee.
10      Q.  Okay.  And the property owner might need to
11  hire consultants to help with the application; correct?
12      A.  You know, again, as public servants, our job
13  is supposed to try to make it as easy as possible, and
14  there are some project managers that are willing to
15  hold, you know, hand hold and try to get people past the
16  finish lines, but there are some projects that are so
17  complex that it is advantageous to get a consultant.  So
18  that would be -- a lot of times it's advised.
19      Q.  And in this particular circumstance, you are
20  aware of the fact that Mr. Sharfi did in fact hire a
21  consultant to help him with an initial permit
22  application; correct?
23      A.  I'm not aware of that.
24      Q.  Okay.  I'll show it to you later.
25      A.  Just so I know, who are you referring to as --

Page 183

1      Q.  I think it was Dana Small.
2      A.  Okay.
3      Q.  Do you recall that now that I mentioned it to
4  you?
5      A.  Yeah, but I did not know until after the fact
6  that she was hired to be his consultant.
7      Q.  And consultants obviously cost money; correct?
8      A.  Yeah.  I guess the confusion is that I was, at
9  first I was under the belief that Kevin was the
10  consultant, but then I don't think he -- I think he's
11  something other than a consultant for Mr. Sharfi.
12      So I did find out later that Dana was helping
13  him out.  Yes, they do cost money.
14      Q.  Thanks.  If the Army Corps issues a permit, it
15  can require a property owner to follow certain
16  conditions; correct?
17      A.  I'm sorry?
18      Q.  Specifically, the Army Corps could tell an
19  individual or property owner where to work, where not to
20  work on their property?
21      A.  Some of the permits are conditioned, but I
22  mean I guess there could be an area to be preserved or
23  protected where you wouldn't work, but yeah, I mean
24  anything could be conditioned any way, but that's a --
25  the applicant consultant and the Corps works to try to

Page 184

1  achieve the end resolution.
2      I mean if you're going to impact the entire
3  property, which we've had, there is not going to be a
4  condition that you can't work on a certain part of the
5  property.  So it's all case by case.
6      Q.  And the Army Corps can also require a property
7  owner to pay for wetland mitigation credits; correct?
8      A.  Can order them?
9      Q.  Yes, sir.
10      A.  No.  We, we don't order people to do it.
11      Q.  Order is not the right word.  If I used that
12  word, I apologize.
13      So the Army Corps can require a property owner
14  to pay for wetland mitigation credits, can't it?
15      A.  So in the permit decision, there is agreement
16  between the applicant and the Corps that you're going to
17  impact this amount of credits and you -- or sorry, this
18  amount, essentially you've -- there's a score that they
19  have to offset the impacts of the wetland.
20      And so they would say to do this, you could
21  either -- no, it's not always you have to, you have to
22  buy credits.  There is other avenues.  But that could
23  happen, and it just depends on how, you know, how the
24  permit application goes.  There's other times where no
25  mitigation is required.



JONATHAN PEMPEK
UNITED STATES OF AMERICA V SHARFI

May 19, 2022
185—188

Page 185

1   Q.  Do you have any indication or idea at this
2   point what one credit in a mitigation bank would cost?
3       A.  That's wildly varying, so no.
4       Q.  It's in excess of $100,000; correct?
5           MR. ADKINS:  Objection.
6   BY MR. MIRON:
7       Q.  If you know.
8       A.  The ones in this area I believe are over
9   $100,000 per credit.
10      Q.  In fact, they are over $200,000 per credit,
11  correct?
12          MR. ADKINS:  Objection.
13  BY MR. MIRON:
14      Q.  To the extent that you know.
15      A.  Well, the one that would be in the service
16  area, I believe it was, yes.
17      Q.  That's the Bluefield Ranch Wetland Mitigation
18  Bank?
19      A.  That's correct.
20      Q.  So ultimately, as much as I might have beaten
21  you up on this issue, your testimony was that you told
22  the defendants to enter the permit process when you were
23  not sure that they even needed a Federal Clean Water Act
24  permit; correct?
25          MR. ADKINS:  Objection, misstates testimony.

Page 186

1           THE WITNESS:  No, I was fairly certain they
2       would require one.  What I was not sure about was
3       we didn't do like a formal delineation or anything
4       at the time, so --
5   BY MR. MIRON:
6       Q.  So let's draw your attention back to the
7   April 26, 2018 email.  That's number 135.  It's an email
8   from yourself to Mr. Kryzda.
9           Do you see it?
10      A.  Yes.
11      Q.  So you stated in this particular email that
12  you both spoke to Mr. Sharfi as well as Mr. Kryzda and
13  told them about the need, right?  For both federal and
14  state authorization prior to starting work on
15  Mr. Sharfi's property; correct?
16      A.  Yes.
17      Q.  The defendants would only need a federal
18  permit if the wetlands were within the federal
19  jurisdiction; correct?
20      A.  That's correct.
21      Q.  You didn't say the defendants might need a
22  federal permit; correct?
23      A.  That's correct.
24      Q.  What you said up to this point is it was
25  highly probable they would need a federal permit;

Page 187

1   correct?
2       A.  That's correct.
3       Q.  So ultimately you told them they needed a
4   federal permit; correct?
5       A.  Yeah, my testimony was this was an awful
6   email -- or not awful.  It was written in haste, and I
7   probably could have done a better job.
8       Q.  So at that point, as of April 26 of 2018 you
9   determined that the wetlands on site were in fact
10  subject to the Federal Clean Water Act jurisdiction;
11  correct?
12      A.  No.
13      Q.  Okay.  So the email goes on to state that you
14  had reason to believe and does allege that you,
15  Mr. Sharfi, are responsible for the discharge of fill
16  material without required Department of -- excuse me,
17  back up.  Forgive me.
18          I'm going to draw your attention back to the
19  April 30, 2018 letter, number 137.  And you specifically
20  are telling Mr. Sharfi that you had reason to believe
21  and that you do allege that you are responsible for
22  discharge of fill material without required Department
23  of Army authorization; correct?
24      A.  That's correct.
25      Q.  And you stated that the defendants require

Page 188

1   authorization from the Army Corps to do the work on
2   site; correct?
3       A.  In this letter?
4       Q.  Yes.  It says required Department of Army
5   authorization; correct?
6       A.  We allege that they are responsible for
7   discharge.  Yes, they didn't have a permit, and we
8   believe that it was discharged into waters of the United
9   States.
10      Q.  So the defendants only needed authorization
11  from the Army Corps if the wetlands were subject to the
12  agency's permitting jurisdiction; correct?
13      A.  Yes.
14      Q.  And nowhere in the letter did you say that you
15  were not sure whether the wetlands were within the Army
16  Corps' permitting jurisdiction; did you?
17          MR. ADKINS:  Objection.
18          THE WITNESS:  No, I never said that.
19  BY MR. MIRON:
20      Q.  And nowhere in the letter did you write that
21  it was only possible that the defendants needed
22  authorization from the Army Corps; correct?
23          MR. ADKINS:  Objection.
24          THE WITNESS:  It is only possible?  What's
25      that?  I'm sorry, one more time?



JONATHAN PEMPEK
UNITED STATES OF AMERICA V SHARFI

May 19, 2022
189–192

Page 189

1  BY MR. MIRON:
2      Q.   You didn't suggest it was only possible or
3  highly probable.  You made it very clear to them that
4  they required the authorization; correct?
5      A.   No, I made it clear that I alleged that we
6  believed that this was a violation of Clean Water Act.
7      Q.   So in this letter you state that you believe
8  that the wetlands on site are part of the waters of the
9  United States; correct?
10     A.   I believe, yes, I believe that they are.
11     Q.   What are considered waters of the United
12  States?
13     A.   It depends.
14     Q.   In this particular circumstance relative to
15  these sets of facts, what are the waters of the United
16  States?
17     A.   It's waters that are influenced by the ebb and
18  flow of the tide or wetlands adjacent to Section 10
19  waters.
20          And we have -- so waters of the US defined
21  wetlands has changed over time, but generally at the
22  time it was, as long as there was a chemical connection
23  between -- chemical, physical and biological connection,
24  it was a jurisdictional water body.
25     Q.   So what steps did you take to determine

Page 190

1  whether or not the wetlands on site were in fact waters
2  of the United States prior to issuing the cease and
3  desist letter?
4      A.   Again, we used aerial imagery, flow, software
5  that shows the internet resources that show the flow of
6  water body and which way the water sheet flowed or which
7  way the water was discharged through the property.
8          And then also we had to justify there was even
9  a wetland on the property.
10     Q.   So what research did you do to make a
11  determination as to whether or not there was any
12  chemical, physical or biological connection to the
13  waters of the United States?
14     A.   There was, it appeared the wetland was
15  immediately abutting Bessey Creek.
16     Q.   Your position as you sit here today is that at
17  the time you believed that Mr. Sharfi's alleged wetland
18  abutted Bessey Creek?
19     A.   No.  So Mr. Sharfi's wetland -- so all you
20  have to you do for biological, chemical and physical is
21  show water movement from the property that under normal
22  conditions continuously flows.  And that was the extent
23  of the --
24     Q.   So what part of Mr. Sharfi's property was
25  connected, or which part of Mr. Sharfi's property showed

Page 191

1  water movement?
2      A.   There were adjacent to the property, there was
3  at least three ditches at the time, on either side and
4  one immediately north of it.
5      Q.   Okay.
6      A.   And also there was a possibility that the
7  wetland was contiguous.
8      Q.   Contiguous to what?
9      A.   To the adjacent property.
10     Q.   Which adjacent property?
11     A.   To the north.
12     Q.   So you in fact took into consideration the
13  possibility that Mr. Sharfi's wetland would be connected
14  in some way to the wetland to the north owned by
15  Countess Joy?
16     A.   Yes.
17     Q.   That's a determination that you would have
18  made prior to April 30th of 2018?
19     A.   Looking at all the facts, I also believe -- I
20  mean I had a ton of history from the site going way back
21  to my time with DEP.  Looking at historic aerials, you
22  could see a large wetland swath that covered multiple
23  parcels.
24          I don't know if I've had all of this in
25  writing, but I adequately briefed my leadership that

Page 192

1  there was a possibility that wetland flowed from the
2  property south, wetland waters flowed through the
3  property to the south of Sharfi's site one, I guess the
4  first one we talked to, through the property, through
5  the one that was impacted in 2016, through the property
6  that, the site in question, and then through
7  Mr. Goodfriend's property.
8          This was all part of the research that went
9  into trying to figure out whether this was a
10  jurisdictional water.
11     Q.   So you stated earlier that you had never
12  stepped foot on the subject site prior to what we'll get
13  to, which is May of 2018; correct?
14     A.   Uh-huh.
15     Q.   And what you're suggesting as you sit here
16  today is that you believed as of April 30th of 2018,
17  that there might be some connection between Mr. Sharfi's
18  property to the south and the subject property?
19     A.   Yes.
20     Q.   Notwithstanding the fact that you've
21  identified a number of occasions together with the
22  documents here today that that was an isolated wetland;
23  correct?
24          MR. ADKINS:  Objection.
25          THE WITNESS:  Yeah, so the only document that



Page 193

1   I would acknowledge that it was isolated was the
2   one, was the one that I told you I really didn't
3   know what I was doing.
4       That's the one, I recognize it did say
5   isolated. And at the time it probably was, because
6   we came after it was impacted. And I'm talking
7   about, you know, at DEP we had different metrics
8   looking at wetlands as well.
9   BY MR. MIRON:
10      Q.  Understood. So you determined early on with
11  your role at DEP that the property to the south was
12  isolated wetland, so then clearly that didn't function
13  into or that didn't affect your determination as to
14  whether or not Mr. Sharfi's, the subject site, was a
15  wetland; correct? That would be an incorrect statement?
16      MR. ADKINS:  Objection.
17  BY MR. MIRON:
18      Q.  That's a bad question. So thinking about it
19  now, testifying now, to the extent that you considered
20  how this property to the south affected the property to
21  the north, which is the subject property, in hindsight,
22  you would have otherwise been mistaken; correct?
23      A.  Yeah, I think, I believe now that I
24  potentially was mistaken, yes, in my original report.
25      Q.  And then you talked about water flow. So what

Page 194

1   did you consider at the time, what was the main
2   thoroughfare, for lack of a better term, where did the
3   water -- scratch that. Let me start over.
4       Where did the water flow that you referenced
5   earlier, that was part of your consideration as to
6   whether or not the property constituted waters of the
7   United States?
8       A.  Our software, we were able to use flow lines
9   and without being on site, we were able to identify
10  potential conveyances of water and also the direction of
11  the water that was flowing.
12      And at that time that was, that was enough for
13  me to adequately brief our leadership that I believed it
14  was water of the United States.
15      Q.  But at that point you had not stepped foot on
16  the property; correct?
17      A.  No, I had not. I had seen, I believe in the
18  past on these other ones I saw the cows on either side
19  of the property, in the conveyances, but prior to that,
20  no, I hadn't even stepped foot on Countess Joy or
21  Sharfi's.
22      Q.  So thank you for being candid. So what I
23  think you're referring to is you are now suggesting that
24  aerial images you've viewed now show conveyances or
25  basically a path for cows going back and forth across

Page 195

1   the Countess Joy property; is that correct?
2       A.  I don't -- no, so this is not even -- I'm
3   talking about before I sent this out, you know, and you
4   said cows?
5       Q.  I was just reiterating your testimony. Your
6   testimony is that you have now have seen pictures -- I
7   believe your testimony -- I want to be clear -- is that
8   that now you've seen images that show conveyance, you
9   used the term conveyance and cows had passed?
10      A.  Water conveyance. I'm sorry, I'm completely
11  lost.
12      MR. ADKINS:  Canal?
13      THE WITNESS:  So water conveyances. There are
14  cow trails and stuff there, but now specifically
15  water conveyance, so we could see the direction of
16  water movement in the canals. We have imagery that
17  shows that.
18      But you're asking me in hindsight, sitting
19  here now, I know that exists also because I've
20  stepped foot on the property. But also secondly, I
21  was looking at that prior to sending out the C&D.
22  So that information, it's not sitting here now I've
23  changed my opinion.
24      I've always thought there was -- before
25  sending this out, we did our due diligence to try

Page 196

1   to justify there was conveyance of water moving
2   from the alleged wetland that's water of the United
3   States to the canal in the back.
4   BY MR. MIRON:
5       Q.  What direction is that?
6       A.  It's north, from south to north.
7       Q.  Did anyone at any time indicate to you that
8   there was a dam or a plug in that conveyance?
9       A.  I believe Mr. Sharfi said he wanted to go over
10  there and clear out a plug, but yeah, I --
11      Q.  Did you ever investigate whether or not there
12  in fact there was a dam or a plug in that conveyance
13  that you just discussed?
14      A.  Ever?
15      Q.  Yes, sir.
16      A.  Yes, I have.
17      Q.  When?
18      A.  When we started doing the -- when the expert
19  report started being generated.
20      Q.  How about prior to the action being filed?
21      A.  No, it was using aerial resources.
22      Q.  Okay. So consequently then before this cease
23  and desist letter was sent out, you didn't have an
24  opportunity to investigate on the ground any potential
25  plug or obstruction in this conveyance, north and south



Page 197

1  conveyance; correct?
2  A.  Yeah, I didn't know about any plug before I
3  met with Mr. Sharfi.  And this was, this was prior to
4  the meeting.
5  Q.  Okay.  So the Army Corps of Engineers'
6  permitting authority in this case is based upon the
7  Federal Clean Water Act; correct?
8  A.  Yes, 404 of the Clean Water Act.
9  Q.  And the Clean Water Act only regulates
10  discharges into the navigable waters; correct?
11  MR. ADKINS:  Objection.
12  THE WITNESS:  The Clean Water Act regulates a
13  lot of things.  Section 404 of the Clean Water Act
14  specifically?
15  BY MR. MIRON:
16  Q.  Yes, sir.
17  A.  Regulates the discharge of fill material into
18  water of the United States.
19  Q.  Into navigable waters?
20  A.  Into water of the United States.  It doesn't
21  have to be navigable.
22  Q.  Okay.  And you would agree with me that not
23  all water -- excuse me, you would agree with me that not
24  all waters are part of the waters of the United States;
25  correct?

Page 198

1  A.  Yes.
2  Q.  The Federal Clean Water Act does not regulate
3  activities in all wetlands; does it?
4  A.  No.
5  Q.  In fact, not all the wetlands in Martin County
6  are regulated under the Clean Water Act; correct?
7  A.  I would imagine no.  I'm sure there is a ton
8  of them that are not.
9  Q.  Activities in only some wetlands need a permit
10  from the Army Corps of Engineers; correct?
11  A.  Some wetlands are not regulated.
12  Q.  Would you agree with me that the Federal Clean
13  Water Act only regulates wetlands in Florida that have a
14  significant, quote, unquote, significant nexus with
15  downstream traditional navigable waters?
16  A.  Yes.
17  Q.  And a wetland has a, quote, significant nexus,
18  end quote, if the wetland and other similarly-situated
19  wetlands significantly affect the downstream traditional
20  navigable waters; correct?
21  A.  I don't know if that definition is accurate,
22  but there's significant nexus.  I don't know if it's
23  defined on how significant the impact is downstream.
24  Q.  The flow software that you use, that you
25  testified earlier, what was the name of that software?

Page 199

1  A.  I would have to find out.  I could find out
2  for you guys, I don't remember.
3  Q.  Okay.
4  A.  We have a GIS program.
5  Q.  Does it indicate how much water flows from a
6  given wetland to a downstream water?
7  A.  It does not.  Just shows the direction.
8  Q.  Is the information from your flow software
9  contained in any of the documents that have been marked
10  as exhibits up to this point?
11  A.  No.
12  Q.  Would you agree with me that it's not enough
13  that a wetland may affect traditional navigable waters;
14  instead, the wetland must significantly affect those
15  waters; correct?
16  A.  I would not agree with that.
17  Q.  Why not?
18  A.  Significant nexus and significant impact are
19  two different things.
20  Q.  How so?
21  A.  Significant nexus is identifying biological,
22  chemical and physical interaction with two water bodies.
23  But identifying the impact that that fill has downstream
24  is generally not a practice the Corps does.  It's not
25  something the Corps generally does.

Page 200

1  Q.  Why not?
2  A.  So significant nexus identifies a wetland
3  that's potentially jurisdictional, but if you have a
4  large wetland and you are discharging it as far as
5  possible from the point, that's still a regulated
6  wetland regardless of that fill material making it down
7  to the Atlantic Ocean or some other subjective point.
8  Q.  So you're suggesting that there is no
9  obligation to represent that the wetland must
10  significantly affect those waters?
11  MR. ADKINS:  Objection.
12  THE WITNESS:  I think there has to be a nexus,
13  whether it's biological, chemical or physical,
14  between two water bodies, and one ultimately
15  leading to a navigable water body to be a
16  jurisdictional wetland.
17  However, defining the impact downstream is
18  not -- how significant an impact is doesn't either
19  make or break it as being a jurisdictional level.
20  BY MR. MIRON:
21  Q.  Prior to issuing the cease and desist letter,
22  what steps, if any, did you take to determine whether
23  the wetlands on the site have a significant nexus to
24  traditional navigable waters?
25  A.  I briefed leadership about the physical,



Page 201

1 chemical and biological impact waters of the United
2 States have.
3     Q.  What did you tell them?
4     A.  I told them there is a direct connection to
5 the canal or Bessey Creek.
6     Q.  Did you just presume as a result of your
7 belief that there was a direct connection to Bessey
8 Creek, that in fact there was in physical -- excuse me,
9 biological, chemical --
10    A.  Did I presume?  No, I used the resources
11 available to me to make that.
12    Q.  Okay.
13       (The document was marked Deposition Exhibit 138
14 for identification.)
15 BY MR. MIRON:
16    Q.  I show you what's going to be marked as Number
17 138.  I want to draw your attention to the email between
18 yourself and Mr. Sharfi, and there is copying a number
19 of different individuals dated April 30, 2018.
20       Do you see that?
21    A.  Yes.
22    Q.  Does this appear to be a true and correct copy
23 of an email you would have sent to Mr. Sharfi?
24    A.  It does.
25    Q.  And it appears as though you sent this email

Page 202

1 at 7:10 Eastern time; correct?
2     A.  Yeah.
3     Q.  Yeah.  So I'm going to show you in a minute,
4 so --
5     A.  I see 8:10 -- sorry, 10:08.
6     MR. MIRON:  So I'm going to show you -- let's
7 do this.  Let's go to number 17, please.
8       (The document was marked Deposition Exhibit 139
9 for identification.)
10 BY MR. MIRON:
11    Q.  Let me show you what we've marked as Number
12 139.  Keep the two close, please.
13       I want to show you, if you would look at the
14 first email in the chain here.  That appears to be the
15 same email that's in number 138; correct?
16       "Mr. Sharfi, the attached letter is to advise
17 you the United States Army Corps of Engineers believes
18 that you have started filling jurisdictional wetlands
19 without the benefit of a permit."
20       That email also says the exact same thing;
21 correct?
22    A.  Yeah.
23    Q.  So I know it's not a -- I'm not trying to
24 trick you.  I just want to reference to you that it's my
25 belief and understanding that the initial email that you

Page 203

1 sent to Mr. Sharfi was sent at 7:10 a.m., as represented
2 on number 139, and that the reason that this shows
3 10:08 a.m. -- I don't know.
4     A.  I don't either.
5     Q.  So my impression, it seems odd to me.  I have
6 a theory.  My theory it is it's California time versus
7 Eastern Standard Time, so let me say it this way.
8       Do you recall the time upon which you sent
9 this particular email to Mr. Sharfi?
10    A.  It was --
11    Q.  Was it first thing in the morning?
12    MR. ADKINS:  Objection.
13    THE WITNESS:  Well, it would make sense since
14 this is California time that it would be ten and he
15    got it at seven.
16 BY MR. MIRON:
17    Q.  Right, terrific.  So I couldn't otherwise
18 understand why one was 7:10 a.m., one was 10:08 a.m.; in
19 theory, they should be --
20    A.  Same time.
21    Q.  -- same exact time, but you answered the
22 question.
23       So you sent this email -- we're talking about
24 number 138 -- at 10:08 a.m. on Monday, April 30th, you
25 sent this email to Mr. Sharfi; correct?

Page 204

1     A.  Yes.
2     Q.  And this is an email where you in fact are
3 delivering a copy of the cease and desist letter dated
4 April 30th of 2018; correct?
5     A.  Correct.
6     Q.  If we look at the second and third page of
7 document Number 138, you'll see that this particular
8 document is unsigned; correct?
9     A.  Yes.
10    Q.  Okay.  And my understanding is that you
11 ultimately did receive a signed version by Mr. Halbert;
12 correct?
13    A.  I believe so, yes.
14    Q.  But you chose to send this document unsigned;
15 correct?
16    MR. ADKINS:  Objection.
17 BY MR. MIRON:
18    Q.  But you did in fact send this document before
19 it was signed by Mr. Halbert; correct?
20    MR. ADKINS:  Objection.
21    THE WITNESS:  No, I wouldn't have sent the
22    document prior to it being signed.  If I did, I had
23    two copies of it and incidentally sent the wrong
24    one out.
25



JONATHAN PEMPEK
UNITED STATES OF AMERICA V SHARFI

May 19, 2022
205–208

Page 205

1  BY MR. MIRON:
2      Q.  Okay.
3      A.  I wouldn't have sent it out prior to him
4  signing it.
5      Q.  Just to be clear, this is Bates stamp number
6  USACE 1502, 1503 and 1504; correct?
7      A.  Yes.
8      Q.  And it is your testimony as you sit here today
9  that you did or did not send out this unsigned version
10  to Mr. Sharfi?
11         MR. ADKINS:  Objection.
12         THE WITNESS:  I have no idea.  This is the
13      first time I realized that it could potentially be
14      unsigned.  What I was testifying to is I would have
15      never sent it out prior to.  So I must have sent
16      the wrong one out if that's the case.
17         MR. ADKINS:  Do we have the email that he sent
18      to Mr. Sharfi?
19         MR. MIRON:  Brandon, please let me just
20      conduct the deposition.
21         MR. ADKINS:  You are asking questions about
22      what he sent to Mr. Sharfi using an email that's
23      from Wayne Blythe, so --
24         MR. MIRON:  I'm not going to argue with you.
25      It's a document that you provided to us.  That's

Page 206

1  why I ran out the Bates numbers.
2         MR. ADKINS:  Sure, but we provided these
3      things, you know, the attachments are together with
4      the emails.  So what's the email that went to
5      Mr. Sharfi?
6         MR. MIRON:  Listen, I can't help you at this
7      point.  This is the way it was presented to us, and
8      this is the way I'll present it.
9         THE WITNESS:  If I made a mistake, it was
10      because I had two copies.  I sent the wrong one.
11      But this is the first time I'm hearing that I sent
12      them an unsigned copy, so I think, I think I did it
13      right.  We'll see.
14  BY MR. MIRON:
15      Q.  Okay.  So this is, going back to the -- this
16  is your email to Mr. Sharfi where you're communicating
17  to him that from your, from the Army Corps' perspective,
18  that he has violated the Clean Water Act; correct?
19      A.  It says, "believes you have started filling
20  jurisdictional wetlands without the benefit of a
21  permit."  That's what I wrote.
22      Q.  Okay.  So just to be clear by the timeline,
23  you testified earlier that you sent Mr. Sharfi on
24  Thursday of that week, just three days earlier or one
25  business day earlier at 5:15 p.m., you indicated to him

Page 207

1  that you were going to try to work with him to resolve
2  the issues that you alleged; correct?
3      A.  Yes.
4      Q.  And then Friday morning you sent an email to
5  your supervisor indicating that you wanted to send out a
6  cease and desist letter; correct?
7      A.  Yes.
8      Q.  And then Monday morning at ten a.m. you
9  physically sent out that cease and desist letter;
10  correct?
11      A.  Yes.
12      Q.  So ultimately you were on a mission; correct?
13         MR. ADKINS:  Objection, argumentative.
14         THE WITNESS:  I believe there is a missing
15      email in here that -- no, I -- generally, if he
16      came back and said "Listen, I made a mistake, I
17      want to resolve this," no, I would have never sent
18      the C&D out.
19         You know, after starting a formal enforcement
20      case, I don't know if I was told to go ahead and do
21      this because we need documents for our record.  We
22      need -- every enforcement case starts with either a
23      Notice of Violation or every formal action starts
24      with a Notice of Violation, so it's for our
25      records.

Page 208

1         So there was a reason why I did it and it
2      wasn't just because -- you know, I wouldn't
3      characterize it as a, you know, how you
4      characterized it.
5  BY MR. MIRON:
6      Q.  But you told Mr. Sharfi that you wanted to
7  give him an opportunity to explain his position, and at
8  this point you haven't given him the opportunity to
9  explain his position, have you?
10         MR. ADKINS:  Objection.
11         THE WITNESS:  I believe there was an email
12      between the two.
13  BY MR. MIRON:
14      Q.  What would be contained in that email?
15      A.  I thought there was email saying he absolutely
16  is not going to do any -- but I, I could be mistaken.  I
17  believe there was correspondence that said basically I'm
18  going to continue doing what I'm doing, but I don't see
19  that email here.
20      Q.  So in your mind, at that point Mr. Sharfi is a
21  flagrant violator; right?
22         MR. ADKINS:  Objection.
23  BY MR. MIRON:
24      Q.  You used that term before.  There is
25  correspondence that suggests that Mr. Sharfi is a



Page 209

1  flagrant violator; correct?
2        MR. ADKINS:  Objection, misstates the
3  documents.
4        THE WITNESS:  I don't -- what document in
5  particular?
6  BY MR. MIRON:
7        Q.  I want to know about your opinion.  At this
8  point you believe in your mind when you wrote these
9  emails and you sent the cease and desist letter that
10 Mr. Sharfi was a flagrant violator; correct?
11       MR. ADKINS:  Objection.
12       THE WITNESS:  I believe Mr. Sharfi knew about
13  a requirement to get a federal permit and he
14  continued to work despite not seeing that to the
15  end.  So I believe he had knowledge of the federal
16  program, because I reached out and wanted to make
17  sure he knew that.
18       So I think he was aware of our program and the
19  requirement to get a permit, or at least to get a
20  jurisdictional determination before he did that.
21 BY MR. MIRON:
22       Q.  And he chose not to do that; correct?
23       A.  He did.
24       Q.  At least as far as you're concerned; correct?
25       A.  I would say that's accurate.

Page 210

1        Q.  I don't want to rehash, but I can cut out some
2  of my questions.  At this point your testimony is that
3  you believe you sent out the unsigned version of the
4  document by mistake; correct?
5        MR. ADKINS:  Objection.
6        THE WITNESS:  No, I don't -- I don't think
7  I -- I don't think I did that.
8  BY MR. MIRON:
9        Q.  Okay.
10       A.  But if, if I did, if I sent an unsigned
11  copy -- you characterize my sending an unsigned copy
12  out.  You imply that I did that prior to Robert or Bobby
13  Halbert putting a signature on it, my chief.
14       And my testimony is I would never do that.  My
15  testimony is if that did occur, it was because I had two
16  copies on my computer, and I accidentally attached the
17  wrong copy, but I, I imagine I would have known by now
18  five years later if I put an unsigned copy on there.
19       Q.  Okay.  And then you also stated in your email
20  that "I look forward to helping you resolve this
21  matter."
22       What did you mean?
23       A.  I generally, there is still an option to
24  resolve this even though we sent this out, as you
25  described a threatening letter, this education letter.

Page 211

1        It's to put people on notice, to give them
2  information.  Ultimately we can still get an
3  after-the-fact permit or we could still work through
4  these issues.  It's not the end of the road.
5        Q.  Okay.  Let's draw your attention back to 139,
6  please.
7        So 139 appears to be, purports to be an email
8  from Mr. Sharfi to you copying various individuals,
9  including Mr. Halbert and Jefferson Knight on April 30th
10  of 2018 at 10:27 a.m.; correct?
11       A.  That's correct.  I'm hesitant to agree to the
12  time because now I'm not sure if it's Pacific or
13  Eastern.
14       Q.  Yeah, I know.  I think what it is, what we see
15  on this particular document is that, looks as though
16  Mr. Sharfi obtained your email at 7:10 p.m. Pacific
17  Standard Time, and then as a result of the fact that
18  it's being sent from Mr. Sharfi to you, let's presume
19  for the sake of this conversation that 10:27 is Pacific
20  Standard Time; okay?
21       A.  Okay.
22       Q.  So at this point at 7:10 a.m. would we presume
23  that it's relatively early in the morning and Mr. Sharfi
24  likely had just woken up; correct?
25       MR. ADKINS:  Objection.

Page 212

1        THE WITNESS:  I have no idea.
2  BY MR. MIRON:
3        Q.  But it was at least very early in the morning;
4  correct?
5        A.  It depends.  So if he sent it at 10:27, you
6  were assuming this is Pacific Standard Time, you said?
7        Q.  Sure.
8        A.  So I think it's about 10:30 in the morning.
9        Q.  That's when he's responding, but he got your
10  cease and desist letter where you threaten him with
11  criminal action at 7:10 a.m.; correct?
12       MR. ADKINS:  Objection, argumentative,
13  presumes knowledge.
14       THE WITNESS:  I don't know what time he
15  received it.
16  BY MR. MIRON:
17       Q.  Okay.  So Mr. Sharfi wrote, "I will respond to
18  this letter properly, but the short of it is we have
19  not!  We have planted a few trees and cleaned the vines
20  that were killing the trees!"
21       Do you see that?
22       A.  I do.
23       Q.  Would you agree with me that Mr. Sharfi seemed
24  upset in this particular email?
25       MR. ADKINS:  Objection.



Page 213

1    THE WITNESS:  No.
2  BY MR. MIRON:
3    Q.   You don't think he seemed upset?
4    A.   I don't think so, no.
5    Q.   So continuing on down in the email, Mr. Pempek
6  says, "I hope you will take me on the offer to come
7  visit the site yourself."
8        Do you see that?
9    A.   Yes.
10    Q.   And in this particular statement he's inviting
11  to you the property; correct?
12    A.   That's correct.
13    Q.   So he has received a copy of your cease and
14  desist letter where you've indicated to him the
15  possibility that there might be criminal penalties as
16  well as civil penalties equal to $52,414 per day;
17  correct?
18    A.   You're pretty good.  You have a good memory.
19  Yes, something like that.
20    Q.   And at the same time, notwithstanding that
21  letter, he is voluntarily inviting you to come to the
22  property; correct?
23    A.   Yes.
24    Q.   And you testified earlier that as it relates
25  to your action and time with the FDEP, he also invited

Page 214

1  you to the property, or at the very least, he didn't
2  preclude you from coming to the property and doing your
3  investigations; correct?
4    A.   Correct.
5        MR. ADKINS:  Objection.
6  BY MR. MIRON:
7    Q.   Do you know why -- so let's move forward just
8  for a moment.  So at some point later on, I believe it
9  was May 14 of 2018, you came to the property, you
10  scheduled a site visit and you came to the property;
11  correct?
12    A.   That's correct.
13    Q.   And prior to that, you had indicated that you
14  were provided with certain pictures and a report from
15  Gregory Vasquez at the South Florida Water Management
16  District; correct?
17    A.   I don't know if it came from Greg or the
18  project manager.  I don't remember who provided it.
19    Q.   But regardless of who sent it, it came from
20  the district; correct?
21    A.   Correct.
22    Q.   And are you aware of the circumstances that
23  surround why the district was at the property to begin
24  with?
25    A.   I do.

Page 215

1    Q.   Why?
2    A.   He submitted for a jurisdictional
3  determination.
4    Q.   He meaning Mr. Sharfi?
5    A.   Or his consultant.
6    Q.   Or Mr. Kryzda, someone on his behalf?
7    A.   Yes.
8    Q.   So ultimately am I correct that what you're
9  suggesting to me is that either Mr. Sharfi or one of his
10  consultants voluntarily asked the district to come to
11  his property to help him make a wetland determination?
12    A.   That seems like he did that.
13    Q.   Yes, okay.
14        (The document was marked Deposition Exhibit 140
15  for identification.)
16  BY MR. MIRON:
17    Q.   I'm going to show you what is going to be
18  Exhibit Number 140.  Number 140 purports to be an email.
19  So this is a chain of emails between yourself and
20  Mr. Sharfi, a continuation of the last document where
21  ultimately it appears as though you're trying to
22  coordinate a site visit; correct?
23    A.   It appears that way, yes.
24    Q.   And the top of this particular document,
25  Mr. Sharfi sends an email to you on April 30 of 2018 at

Page 216

1  1:13 p.m.  We don't know Pacific or Eastern.  He says
2  he's looking forward to showing you what we are doing.
3        Do you see that?
4    A.   I do.
5    Q.   And he says, "We are not affecting water
6  rights or anything like that."
7        Do you see that?
8    A.   Correct.
9    Q.   And he says, "Look forward to meeting you in
10  person.  I will reserve the date."  Correct?
11    A.   That's the last sentence, yes.
12    Q.   Yes, sir, okay.  And the email below April 30,
13  2018 at 8:18 a.m. from yourself, this is where you're
14  trying to coordinate a date with Mr. Sharfi; correct?
15    A.   That's correct.
16    Q.   And in this particular email you say to
17  Mr. Sharfi, "The court does not regulate the removal the
18  trees.  Just the discharge of fill material, either
19  directly or indirectly as a result of the use of heavy
20  machinery."  Correct?
21    A.   That's correct.
22    Q.   Is that a true and correct statement?
23    A.   Potentially.
24    Q.   What does that mean, potentially?
25    A.   So there's a thought that if there is some



JONATHAN PEMPEK
UNITED STATES OF AMERICA V SHARFI

May 19, 2022
217–220

Page 217

1  situations where if you are using heavy machinery to
2  remove vegetation, that the discharge associated with
3  that activity could result in fill.
4      I generally, I'm on the fence about that, but
5  I give people the benefit of the doubt most of the time.
6  But yes, the removal of trees is not -- if you cut them
7  all down at the stump and pull them out, the Corps does
8  not regulate that whatsoever.
9      (The document was marked Deposition Exhibit 141
10  for identification.)
11  BY MR. MIRON:
12      Q.   Let me show you what's going to be marked as
13  Number 141.  Do you recognize this document?
14      A.   I do.
15      Q.   What is it?
16      A.   It's the letter Kevin drafted for the colonel,
17  lieutenant colonel.
18      Q.   Yes, sir.  So on the email exchange that we
19  just talked about was April 30th of 2018.  On the same
20  very day, looks as though Mr. Kryzda on behalf of
21  Mr. Sharfi sends a letter to you, together with, I guess
22  there is another later on to the colonel; correct?
23      A.   Uh-huh, yes.
24      Q.   This is in direct response to the cease and
25  desist letter that you provided; correct?

Page 218

1      MR. ADKINS:  Objection.
2  BY MR. MIRON:
3      Q.   Did you believe at the time that this was a
4  direct response to the cease and desist letter that you
5  provided?
6      A.   I haven't read this in a while.  Can you give
7  me time to read it?
8      Q.   Go ahead.
9      A.   It would, I believe, I could be wrong, but I
10  think this is the letter he referenced that he would be
11  responding appropriately.
12      Q.   Okay.  So again, similar to Mr. Kryzda's email
13  from January of 2018, specifically I think January 10th
14  of 2018, Mr. Kryzda is writing in this particular letter
15  that Mr. Sharfi wanted to put the property into
16  agricultural use.  Correct?
17      A.   That's correct.
18      Q.   And that he also indicated again that he
19  wanted to fence the property; correct?
20      A.   So he had already fenced the property.  So
21  you're asking me if he has intentions of --
22      Q.   Yes, sir.
23      A.   I think he had already done that at this
24  point.
25      Q.   So when you visited the property on May 14,

Page 219

1  you physically had the opportunity to inspect and review
2  that the fence was in fact located around the perimeter
3  of the property; correct?
4      A.   That's correct.
5      Q.   So your April 30, 2018 letter states that
6  it's, that a permit was needed for the placement of
7  fill, creating a dirt road around the perimeter of the
8  property; correct?
9      A.   Which?  I'm sorry.
10      Q.   Your April 30th, your initial letter, meaning
11  the cease and desist letter.
12      A.   It says that we allege, yeah, so -- the way
13  you say it is more definitively than the way I said it,
14  but yes.
15      Q.   Thank you.  And Mr. Kryzda is indicating to
16  you again that minor clearing and minor filling was
17  undertaken in order to mobilize heavy equipment to build
18  a fence; correct?
19      A.   Yes.  That's what he wrote.
20      Q.   And it appears as though Mr. Kryzda's
21  reference to minor clearing and filling relative to
22  heavy equipment to build a fence is in direct response
23  to that portion of your letter where you indicate that a
24  placement of fill creating a dirt road around the
25  perimeter; correct?

Page 220

1      MR. ADKINS:  Objection.
2      THE WITNESS:  I don't know what it is a
3  reference to.  It was, when I originally spoke to
4  him and he referenced minor filling, it was not
5  associated with a dirt road.
6      But after the dirt road was constructed, it
7  appears now he's referencing a minor filling
8  associated with the road.  So that's two different
9  things.
10      (Discussion held off the record.)
11      (The document was marked Deposition Exhibit 142
12  for identification.)
13  BY MR. MIRON:
14      Q.   Let me show you what's going to be marked as
15  142.  If you can just confirm for me, have you ever seen
16  this document before?
17      A.   I believe I have.
18      Q.   And this purports to be a letter from
19  Mr. Kryzda to Timika M. Wilson, who is Lieutenant
20  Colonel of the US Army; correct?
21      A.   That's correct.
22      Q.   Is there any reason to think that this letter
23  was not ultimately delivered to Ms. Wilson?
24      A.   No.
25      Q.   I'm going to show you what's going to be --



JONATHAN PEMPEK
UNITED STATES OF AMERICA V SHARFI

May 19, 2022
221–224

Page 221

1    (Discussion held off the record.)
2       MR. HAMILTON:  Can we go off the record for a
3    second?
4       MR. MIRON:  That's okay.  We're going to mark
5    this.  It's my copy.  Since it doesn't have any
6    notes on it, I'm going to put a sticker over the
7    26A.
8    (Discussion held off the record.)
9       MR. MIRON:  I'll mark it, hand it back and
10   forth, and then we'll make a copy of it.  Okay?
11   Thanks.
12      So I want to show you what's going to be
13   marked as Number 143.
14      (The document was marked Deposition Exhibit 143
15   for identification.)
16   BY MR. MIRON:
17      Q.  It purports to be an email from yourself to
18   Bobby Halbert, copying Kelly Egan, Samantha Rice, Jerell
19   Ashworth?
20      A.  Jerilyn.
21      Q.  Jerilyn, sorry, J-e-r-i-l-y-n, dated May 4,
22   2018, at 1:25 p.m.  Here, take a look at this email and
23   tell me if you recall it and if it's a true and correct
24   copy.  Two separate questions.
25      First, do you recall it; and second, is it a

Page 222

1    true and correct copy?
2       A.  I recall it, and it looks good.
3       Q.  Okay.  Do you want to read it real quick to
4    refresh your memory and then I'll ask you questions
5    about it.  I don't want to steal it from you so you
6    don't have an opportunity to look at it.
7       A.  Okay, I read all of it.  I only need to read
8    the first thing, so --
9       Q.  You're fine.  This particular email says
10   "Bobby, attached is correspondence intended for
11   lieutenant colonel.  Is it safe to presume that the
12   attached correspondence for the lieutenant colonel was
13   the letter that Mr. Kryzda --"
14      A.  That's this one.
15      Q.  Yes, 142?
16      A.  142.
17      Q.  Yes, sir.  Is that correct?
18      A.  Yes.
19      Q.  Then it says, you said to Bobby, "I will
20   likely only have one day to gather data if anyone copied
21   on this email wants to conduct a site visit May 14th."
22      Do you see that?
23      A.  Yes.
24      Q.  Why did you send that email to Bobby?
25      A.  I sent the email so I could get this -- this

Page 223

1    had to go to lieutenant colonel, and I believe they sent
2    it to me and not her, so I forwarded it to Bobby so he
3    could forward it to her, because I thought it was the
4    appropriate way to do things for a chain of command.
5       Alternatively, I thought it was appropriate to
6    bring at least one other person to the site visit.  And
7    if I copied them as opposed to including them, maybe it
8    was a mistake, but I was asking these other, Jerilyn,
9    Samantha or Kelly, if either of them wanted to go to a
10   site visit.
11      Q.  Why did you think it was a good choice, for
12   lack of a better term, to bring someone with you?
13      A.  It's always good to bring, bring help.  It's
14   not an easy job sometimes.
15      Q.  Okay.  Is that from a pure physical
16   perspective or were some of those individuals on there
17   more experienced than you?
18      A.  I don't know more experienced.  I'm sure they
19   would say they were.  Jerilyn Ashworth, she loves
20   wetlands, and --
21      Q.  Did she go with you?
22      A.  She did not.
23      Q.  Okay.
24      A.  Kelly was a project manager.
25      Q.  Okay.  Did she go with you?

Page 224

1       A.  She did not.
2       Q.  Okay.
3       A.  So that's why I included those two.  Samantha
4    Rice, she was a more senior PM, and I wouldn't have
5    asked for this particular site visit, I wouldn't have
6    asked a junior project manager to come with me, so --
7       Q.  Why is that?
8       A.  I, from seeing the photos, I thought it was
9    going to be a little more complicated than normal site
10   visit.
11      Q.  Okay.  And that's as a result I presume
12   because of your lack of experience up to that point?
13      A.  No.  Why did I think it was -- I think
14   bringing new people to sites that are potentially
15   already impacted, there is not a whole lot of value for
16   that.  And I work in an office with all project managers
17   that do JDs and AJDs prior to, prior to any
18   disturbances, so they're not really trained in
19   alternative sites analysis or reference sites or
20   anything like that.  So I thought it was best to get one
21   of them as opposed to somebody who actually had no clue.
22      At this time I didn't have anything to do
23   with me feeling like I couldn't do the job.  It was just
24   a matter of it's always a good idea to go with two
25   people.



JONATHAN PEMPEK
UNITED STATES OF AMERICA V SHARFI

May 19, 2022
225–228

Page 225

1    Q.   So Samantha Rice ultimately went with you;
2  correct?
3    A.   She did.
4    Q.   Did you physically speak to Kelly Egan and ask
5  her to come with you?
6    A.   I don't remember.
7    Q.   But Kelly Egan was the program manager -- I
8  shouldn't say program manager.  Kelly Egan was involved
9  in some capacity with reviewing the permit application
10  that Mr. Kryzda provided; correct?
11    A.   Yes.
12    Q.   She's also the individual who sent out the
13  RAI; correct?
14    A.   She is.
15    Q.   She's also the individual who ultimately
16  rescinded the permit based upon a failure to timely
17  respond to the RAI; correct?
18    A.   No, she didn't rescind the permit.
19    Q.   She didn't?
20    A.   No.  She withdrew a permit application, but
21  you have to actually issue a permit to rescind it.
22    Q.   Thank you.  So she ultimately withdrew the
23  application based upon Mr. Sharfi's failure to timely
24  respond to the RAI; correct?
25    A.   That's correct.

Page 226

1    Q.   And she knew about all of this, all of that
2  that I just described happened before the site visit;
3  correct?
4    A.   Yes.
5    Q.   And yet she still didn't have any interest in
6  coming to the property?
7    A.   I don't remember if she had any interest or
8  Samantha was the first to respond.  I don't remember
9  why.
10    Q.   What are Samantha's general duties and
11  responsibilities?
12        MR. ADKINS:  Objection.
13  BY MR. MIRON:
14    Q.   Do you know whether or not, what Samantha
15  Rice's general duties and responsibilities are with the
16  Corps?
17    A.   Right now?
18    Q.   Yes.
19    A.   Currently, she is a section chief in Miami and
20  Antilles.
21    Q.   How about at the time?
22    A.   She was a senior project manager.
23    Q.   So she went with -- I don't know if we
24  established this already.  She went with you to the site
25  visit?

Page 227

1    A.   She did.
2    Q.   So it was just the two of you on behalf of the
3  Corps?
4    A.   It was.
5    Q.   All right.  When you conducted your site
6  inspection on May 14th of 2018, would you otherwise
7  characterize it as a limited inspection?
8    A.   Yes.
9    Q.   Would you also agree with me or not that
10  standing water was present on most areas of the site?
11    A.   I would agree there was standing water
12  present, and I, I don't know if I would -- I don't know
13  if I would characterize the entire, most water present
14  on the entire site, but I would characterize the
15  impacted area that they recently cleared as had been
16  flooded.
17    Q.   Again, thank you for your candor.  So in fact,
18  as you indicated, there was a limited inspection and you
19  only were really provided an opportunity and permission
20  to walk the perimeter of the site; correct?
21    A.   That's correct.
22    Q.   And you never made it into the center of the
23  property; correct?
24    A.   I did not.
25    Q.   Okay.  And you understand based upon your

Page 228

1  earlier testimony that the property, the site in and of
2  itself is a little less than 10 acres; correct?
3    A.   Yes.
4    Q.   I did a little math.  So 10 acres is roughly
5  653,000 square feet.  Are you aware of that?
6    A.   No, that's interesting.  Note to self.
7    Q.   And from a perimeter perspective, each side of
8  that 10-acre parcel is 660 feet.
9    A.   Okay.
10    Q.   Does that sound about right to you?
11        MR. ADKINS:  Objection.
12        THE WITNESS:  I don't know.
13  BY MR. MIRON:
14    Q.   Do you have any reason to suggest otherwise?
15    A.   No, each side was pretty far.
16    Q.   Okay.  So you would agree with me then you
17  never really had an opportunity to review or inspect the
18  center of the site; correct?
19    A.   That's accurate.
20    Q.   Let's go to 22, please.  Actually, let me go
21  back to this for a minute.  I'm going to represent to
22  you, so in this particular matter the United States of
23  America -- that sounds silly, but that's what it is --
24  United States of America in this particular piece of
25  litigation, the plaintiffs, United States of America,



Page 229

1  responded to a set of interrogatories that were
2  propounded by the plaintiff.
3       Have you ever had an opportunity -- I'm not
4  going to make it a document.  Have you ever an
5  opportunity to see that particular document or review
6  it?
7    A.  Did I sign it?
8    Q.  No.
9       MR. ADKINS:  Why don't you take a look at the
10  whole thing.
11      THE WITNESS:  I don't know if I've seen this.
12  It's probably going to take a while.
13  BY MR. MIRON:
14    Q.  No, if you haven't seen it, I'm not going to
15  ask you generalized questions about it.  I just want to
16  know if you had an opportunity to see the response.
17      MR. ADKINS:  I'd like him to see the whole
18  document, including who signed it.
19      MR. MIRON:  I'm not going to stop him from
20  looking at it.  You can do what you want with it.
21      THE WITNESS:  I may have seen it.
22      MR. ADKINS:  Just take your time.  Please look
23  at the entire document.
24      THE WITNESS:  It's going to take some time.
25      MR. ADKINS:  You don't have to read the whole

Page 230

1  thing, but I'm saying page through everything so
2  that you can become familiar with it.
3       I don't mind if you want to go off the record.
4  I'm not trying to drain your time here.
5       THE VIDEOGRAPHER:  Off the record at 3:20 p.m.
6       (Discussion held off the record.)
7       THE VIDEOGRAPHER:  We are on the record.  The
8  time is 3:21 p.m.
9  BY MR. MIRON:
10    Q.  So in the interest of time, it's no longer
11  necessary, so I apologize for making you go through that
12  process.
13    A.  No worries.
14      MR. MIRON:  All right.  Let's get back to 144.
15  I'm going to show you what's going to be marked as
16  Number 144.
17      (The document was marked Deposition Exhibit 144
18  for identification.)
19  BY MR. MIRON:
20    Q.  Tell me if you've seen that document before.
21    A.  Yes, I've seen it.
22    Q.  This purports to be -- is it an accurate
23  representation of an email between yourself and
24  Mr. Halbert?
25    A.  Yes.

Page 231

1    Q.  Dated May 16, 2018?
2    A.  Yes.
3    Q.  And so you're saying to Mr. Halbert, "Bobby,
4  attached is my MFR documenting our meeting with
5  Mr. Sharfi."
6       Do you see that?
7    A.  I do.
8    Q.  What does MFR stand for?
9    A.  Memorandum for Record.
10    Q.  Next line says, "It's very detailed,
11  purposefully."
12      Why did you tell him that it was very detailed
13  purposefully?
14    A.  So the site visit was fairly unique and
15  relatively combative.  There were some statements made
16  that I realized probably should document everything or
17  as much as I possibly could.
18      MR. MIRON:  Okay.  I'm going to show you what
19  we're going to mark as Number 145.
20      (The document was marked Deposition Exhibit 145
21  for identification.)
22  BY MR. MIRON:
23    Q.  Does Number 145 I just handed to you purport
24  to represent the MFR that you were referring to in the
25  prior email?

Page 232

1    A.  Yes.
2    Q.  Dated May 14 of 2018; correct?
3    A.  Yes.
4    Q.  If we go back to the previous document, the
5  email, the email that you sent to Mr. Halbert was dated
6  May 16; correct?
7    A.  Correct.
8    Q.  So is it safe to presume based upon the
9  referenced attachment in the previous document that you
10  would have delivered the MFR to Mr. Halbert on May 16th?
11    A.  It is, but -- yes.  I don't know if I, I don't
12  know what day May 14th was, but --
13    Q.  But at the very least, the inspection was
14  dated May 14th and you sent him the document, the MFR on
15  May 16th, two days later; correct?
16    A.  I believe so.
17    Q.  Okay.  Is there any reason to think that that
18  wasn't the case?
19    A.  No.  It's just pretty impressive if I was able
20  to get this report done the same day.
21    Q.  I thought so too.
22    A.  Yeah.
23    Q.  So the other thing that is interesting to me,
24  if you look at the last page, which is Bates-stamped
25  USACE 48, first page being 37, it looks as though it was



JONATHAN PEMPEK
UNITED STATES OF AMERICA V SHARFI

May 19, 2022
233—236

Page 233

1  electronically signed by you on May 29th of 2018.
2      Do you see that?
3    A.  I do.
4    Q.  So can you explain to me the discrepancy
5  between the date it was signed, the date of -- let me
6  just finish -- the date it was signed, which is on the
7  29th, the date on the top of the document, which is the
8  14th, and the date upon which you sent it to
9  Mr. Halbert, which is the 16th?
10   A.  Yes, I can.  I sent it to him prior to signing
11  it.
12   Q.  Got it.
13   A.  I got it back and then I signed it.
14   Q.  Got it.
15      So this document, number 145, it's a true and
16  correct copy of the memorandum of record that you
17  drafted on May 14th?
18   A.  It looks like it.
19   Q.  Okay.  And so you just indicated to me that
20  you question whether or not it was drafted the same day.
21      Do you know when it was ultimately drafted or
22  finished?
23   A.  No, I have no idea.  I know I worked on it
24  immediately after the site visit, if I did get it done
25  the same day.

Page 234

1    Q.  What time was the site visit?
2    A.  It was late in the after -- I don't recall.  I
3  think it was around noon.
4    Q.  Okay.  How long did the site visit last?
5    A.  I don't know, an hour, two hours.
6    Q.  Okay.  Would there be any draft versions of
7  this particular document?
8    A.  No.  This was a, this is the one I worked off
9  of from Word.
10   Q.  So to the extent there were any draft
11  versions, you would have saved over?
12   A.  Yes, most likely.
13   Q.  So all the statements in this memorandum are
14  true, accurate and correct?
15   A.  As far as I know, yes, unless Google lied to
16  me.
17   Q.  So I know I might be stating the obvious, but
18  so in this particular circumstance, the location
19  identifies as a 10-acre parcel northeast of 8227
20  Southwest Martin Highway, Palm City, Florida.
21      Do you see that?
22   A.  Yeah, they got it right that time.
23   Q.  That's --
24   A.  Thank you.
25   Q.  And it says under Project, "Unauthorized

Page 235

1  filling of jurisdictional wetlands."  Do you see that?
2    A.  Yes.
3    Q.  Did you write that?
4    A.  Most likely.
5    Q.  Most likely or yes?
6    A.  I would have drafted it, yes.  I don't think
7  Bobby would have changed that.
8    Q.  Well, did Bobby have any -- did Bobby
9  revise -- or let me ask two questions.
10      Did Bobby have an opportunity to review this
11  before you sent it to him?
12   A.  He did not have a chance to review it before I
13  sent it to him.  He had a chance to review it before I
14  signed it.
15   Q.  So do you know if there is anything in this
16  document that Mr. Halbert would have otherwise
17  reviewed -- or excuse me, would have otherwise revised?
18   A.  If he, he probably corrected typos or
19  something like that, but I don't recall him making any
20  significant changes.
21   Q.  Okay.  So then if he didn't make any
22  significant changes, then we can assume that everything
23  contained in this document was written by you; correct?
24   A.  Yes.
25   Q.  So based upon your establishment, the

Page 236

1  project -- excuse me.
2      Based upon the language contained within the
3  document under Project, it says "unauthorized filling of
4  jurisdictional wetlands," at that point you had already
5  decided on May 14th of 2018 that the wetlands on the
6  site were within the Army Corps' permitting
7  jurisdiction; correct?
8    A.  I believe that they were jurisdictional
9  wetlands, but it's a project.  It was giving a name to a
10  project, and it probably should say "alleged
11  unauthorized filling of jurisdictional waters," but it
12  doesn't.
13   Q.  Okay.  So then below that, there is a
14  paragraph that talks about Mr. Sharfi; correct?
15   A.  That's correct.
16   Q.  It says, "Benjamin K. Sharfi is the owner of
17  multiple properties that are adjacent to the waters of
18  the United States."
19      Do you see that?
20   A.  Yes.
21   Q.  Why did you write that?
22   A.  I'm trying to brief leadership basically on
23  who Mr. Sharfi is.  He has a significant interest in
24  many properties, whether it's the Buccaneer that we were
25  currently working on or some other properties in the



JONATHAN PEMPEK
UNITED STATES OF AMERICA V SHARFI

May 19, 2022
237–240

Page 237

1  vicinity.
2      Q.   Why is the Buccaneer relevant to whether or
3  not Mr. Sharfi allegedly filled jurisdictional wetlands?
4      A.   This has, this paragraph generally has nothing
5  to do with the project.  It was a brief about
6  Mr. Sharfi.
7      Q.   Then why include it?
8      A.   It's an internal document.  It's not supposed
9  to be shared with the public. It's just, this is a --
10     Q.   So you never intended this document to be
11  shared to the public?
12     A.   I mean it's an internal document.  It doesn't
13  matter if it's shared.  I could care less.  This is to
14  brief our leadership on who the alleged violator is.
15     Q.   Was this document used to any degree as a
16  basis for a determination as to whether or not to file
17  this particular action?
18     A.   Could have been.
19     Q.   So I'll go back to your earlier -- let's go
20  back to -- so Mr. Sharfi owns multiple properties.
21       Why is that relevant, or why did you find it
22  necessary to include that?
23     A.   I was just describing who --
24     Q.   He is?
25     A.   -- Mr. Sharfi is.  He has a bunch of

Page 238

1  interests.  We were working on the Buccaneer condo, and
2  when -- you know, it's something that, you know,
3  leadership can -- you know, this project was well known
4  with our leadership.  So it was just --
5      Q.   You said you --
6          MR. ADKINS:  Are you done with your answer?
7          THE WITNESS:  No.  It's to explain who exactly
8      the alleged violator is, because they already knew
9      the project.  They just couldn't put a face to it,
10      to Buccaneer.
11  BY MR. MIRON:
12     Q.   So you were going to paint Mr. Sharfi in the
13  most negative light as you possibly could for your
14  supervisors; correct?
15         MR. ADKINS:  Objection, argumentative.
16         THE WITNESS:  No, I think owning multiple
17      properties is a positive thing; right?
18  BY MR. MIRON:
19     Q.   Really?
20     A.   Yes.
21     Q.   All right.  So let's go back to the other
22  statement.
23       So the Buccaneer, you said you were working
24  relative to the condominiums, the Buccaneer.  That's not
25  a true and correct statement; correct?  Because the Army

Page 239

1  Corps had nothing to do with the Buccaneer at this time,
2  did it?
3          MR. ADKINS:  Objection, compound.
4          THE WITNESS:  We rescinded SPGP, which the
5      leadership knew about.
6  BY MR. MIRON:
7      Q.   That wasn't necessarily on behalf of the
8  Buccaneer, was it?
9      A.   We ended up ultimately still working on a
10  project for the Buccaneer and Sailfish Marina because of
11  the action I took.
12     Q.   Correct.  So Benjamin Sharfi is the owner of
13  the multiple properties that are adjacent to the waters
14  of the United States.
15       How did you know that?
16     A.   The Buccaneer is on the water.
17     Q.   So you were referring to -- when you say
18  multiple properties, you were referring just to the
19  Buccaneer?
20     A.   Well, there is multiple properties within the
21  Buccaneer.  It's like a condo.
22     Q.   Eighteen units of condominium?
23     A.   Yeah.
24     Q.   So you were referring essentially in that
25  statement to 18 condominium units in Palm Beach Shores?

Page 240

1      A.   I don't know if I -- I had knowledge that
2  he -- because FDEP, I knew that he had other properties,
3  but I don't know if at the time I was just acknowledging
4  the Buccaneer condo, but I did have knowledge of his
5  properties in Sewell's Point.
6      Q.   So you were aware when you were referring to
7  multiple properties, you were referring to his home in
8  Sewell's Point?
9      A.   I don't know.  I knew about it.  I think I
10  cited the Buccaneer condo.  It was just multiple
11  residents.  I think I was specifically talking about
12  that because that was in-house, but I don't know, I
13  don't know what -- I wrote this a long time ago.
14     Q.   Okay.  At that time were there any
15  investigations in any of Mr. Sharfi's other multiple
16  properties that are adjacent to waters of the United
17  States?
18     A.   No.
19     Q.   Okay.  So ultimately, why is this relevant --
20  excuse me, why is this information relevant to whether
21  the defendants needed a permit for the improvement of
22  this particular property, this site?
23     A.   This is an internal, this was needed, or it
24  was an internal document to explain who Mr. Sharfi is.
25     Q.   Next line, "He is in a legal dispute with the



JONATHAN PEMPEK
UNITED STATES OF AMERICA V SHARFI

May 19, 2022
241–244

Page 241

1  DEP and the neighboring property, the Sailfish Marina."
2       Is that a true and correct statement?
3    A.  That was what I heard from project manager at
4  DEP.
5    Q.  So did you do any independent verification to
6  determine whether or not Mr. Sharfi was in fact in a
7  legal dispute with DEP?
8    A.  I believe at the time there was -- as far as
9  research or anything, I believe at the time I read
10 something about it.
11   Q.  What did you read?
12   A.  I don't know, some -- I don't recall, but
13 there was some information about -- I don't remember
14 what it was.  I wouldn't have wrote that if I -- I
15 wouldn't have just made it up.
16   Q.  It's possible that it's incorrect?
17   A.  It's possible, yeah.
18   Q.  And you didn't do anything to determine
19 whether it was correct or not?
20   A.  I don't recall if I did.
21   Q.  So why was this line relevant, whether or not
22 Mr. Sharfi is allegedly in a legal dispute with the DEP
23 and the neighboring property, the Sailfish Marina?
24   A.  Again, this is a brief to leadership
25 explaining who Mr. Sharfi is.

Page 242

1    Q.  Okay.  Did you at any time have any ability to
2  influence whether or not Mr. Sharfi was provided with a
3  submerged land lease or an ERP permit at the Buccaneer?
4    A.  No.
5    Q.  So next line is that he is --
6    A.  Can you go back?
7    Q.  Sure.
8    A.  What was your question again?
9    Q.  That's okay.  You answered it.  You didn't
10 understand?
11   A.  No.  Well, I mean --
12   Q.  Did you have any opportunity or at any point
13 did you try to influence whether or not --
14   A.  No, I'm sorry.  I apologize, no.
15   Q.  Okay.  Next line says, "Mr. Sharfi is the
16 founder and CEO of General Micro Systems, Inc., GMS, and
17 NeshaFarm Inc."
18       Why is that relevant?
19   A.  Again, I'm briefing leadership to who he is.
20   Q.  Okay.  The next line says, "General Micro
21 Systems, Inc. currently has an $88 million contract with
22 the US Army."
23       Why is that relevant?
24   A.  That's what Google told me.  But we work for
25 the Army, but again, again, it's briefing leadership.

Page 243

1  And I wouldn't identify any of this as being a negative
2  light still, so ...
3    Q.  You wouldn't identify it as being a negative
4  light?
5    A.  No.
6    Q.  Okay.  So do you generally provide -- let me
7  ask you a different question.  How many of these
8  memorandums for record have you written in your
9  tenure -- up to this point, as of May 14, 2018, how many
10 memorandums of record had you drafted and submitted to
11 leadership relative to cases that you were working on?
12   A.  Quite a few.  I have no idea, though.
13   Q.  So in each circumstance, are you taking the
14 opportunity to explain to leadership the type of
15 individual or characterize this type of individual who
16 is the, in this circumstance, the property owner?
17       MR. ADKINS:  Objection, mischaracterizes.
18       THE WITNESS:  Yeah, generally I try to be as
19   detailed as possible so they know exactly, they
20   know as much as possible.
21       And, you know, a lot of this is just a Google,
22   but in the past I've had more detailed reports, and
23   some of them are only one page long.
24 BY MR. MIRON:
25   Q.  So you relied on Google as a basis for your

Page 244

1  information, but did you make any attempt to understand
2  whether or not the information was accurate?
3    A.  I believe some of these actually, I want to
4  say either General Micro Systems or something had their
5  own website.  So not only was it -- so I Googled it, but
6  I want to say it came from their own website.
7    Q.  Before sending the Notice of Violation, did
8  you consider Mr. Sharfi's financial ability to pay a
9  potential fine?
10   A.  No.
11   Q.  So that's not why you included this language
12 as to the fact that GMS has an $88 million contract with
13 the US Army?
14   A.  No, it was straight off Google.  I mean we
15 just copied and paste.
16   Q.  Okay.  And this information that he reportedly
17 moved from California to Florida as a promise for a more
18 favorable business environment from Governor Rick Scott,
19 why did you include that?
20   A.  Because that's what he told me.
21   Q.  That's what Mr. Sharfi told you?
22   A.  Yes, sir.
23   Q.  Why was that relevant?
24   A.  I don't know.  I should ask him why it's
25 relevant.



Page 245

1    Q.   But you chose to include it in the memo.
2    A.   Just explaining to leadership who Mr. Sharfi
3  is.
4    Q.   So I asked you once before, I'll just do it
5  one more time.  Do you always provide background about
6  property owners and their business contracts and
7  relationships with elected officials in these memorandas
8  of record?
9    A.   Sometimes.  Not always, no.
10    Q.   So in the last five that you drafted, if you
11  think back to the last five memorandums of record you've
12  drafted, did you include any discussion about the
13  property owners and their business contracts or
14  relationships with elected officials as an example?
15    A.   The last one I drafted I believe was more
16  detailed than this, but it's unique to have the alleged
17  violator with so much information on Google.
18    Q.   Okay.  So the next page, we have Site History.
19  Flip to the next page.  So the top part of this document
20  you otherwise describe the history of Mr. Sharfi's
21  purchase of nearby properties; correct?
22    A.   I have to read through it.
23    Q.   Please.
24    A.   Yes, I did.  I did a site history.  I try to
25  do adjacent parcels, the site history for the adjacent

Page 246

1  parcels.
2    Q.   It says, "Without consulting DEP, Mr. Sharfi
3  created a wetland of approximately one-third acre that
4  was fed water with a pump and culvert, interchanging
5  water with an adjacent pond."
6         Do you see that?
7    A.   Yes.
8    Q.   Is that a true and correct statement?
9    A.   I believe so.
10    Q.   Where did you obtain that information from?
11    A.   From my previous, from my knowledge on the
12  site.
13    Q.   So this is referring to the site to the south
14  that we discussed earlier; correct?
15    A.   Yes.
16    Q.   So why was that relevant?
17    A.   It's the site history.  I was trying to
18  capture all the parcels.
19    Q.   But clearly that language does not relate to
20  the site in question; correct?
21    A.   Yes, so back when I drafted this, we didn't
22  have site one, site two, site three, site four.
23         I was referring to the site as generally
24  NeshaFarms.
25    Q.   Oh.  So you were referring to the entire

Page 247

1  30-acre parcel?
2    A.   Yes.  And it's important I think to document
3  what historically what was filled and what was not to
4  give leadership adequate, and they can look at it and
5  think that all of it's filled, but that's not the case.
6    Q.   So going back to your earlier testimony, this
7  reverts back to your belief and opinion that Mr. Sharfi
8  filled wetlands on the property to the south?
9    A.   Yes, I believe he filled wetlands on the
10  property.
11    Q.   And notwithstanding the fact that the subject
12  of this particular action is not that property, you
13  chose to include that language in this report anyway?
14    A.   Yes.
15    Q.   Okay.  And why is it relevant?
16    A.   Well, this shows that in the past he filled a
17  wetland and he tried to restore it to approximately a
18  third acre wetland.
19         So it ends up, and going into the inspection
20  report, I believe I document that as part of the site
21  inspection.  So I thought it was pertinent to, to talk
22  about it as part of the site.
23    Q.   Okay.  The next line says, "Despite not
24  meeting the calculated MRAP score for appropriate
25  mitigation to offset impacts, both DEP and Martin County

Page 248

1  accepted this as sufficient compensation and closed the
2  case."
3         Do you see that?
4    A.   Yes, I do.
5    Q.   Is that an accurate statement?
6    A.   I believe, I believe it to be accurate, yes.
7    Q.   Did you work on this matter when you were at
8  FDEP?
9    A.   I helped calculate the MRAP score, yes.
10    Q.   And you understand as you sit here today that
11  neither the DEP nor Martin County ever brought an
12  enforcement against Mr. Sharfi in relation to that site
13  to the south?
14    A.   Everything is unresolved, yes.
15    Q.   In fact, the DEP in Martin County have closed
16  that case; correct?
17    A.   I have no idea.
18    Q.   But the Army Corps was not involved in that
19  matter relative to the site to the south; correct?
20    A.   They were not.
21    Q.   Next paragraph, "In December of 2017 I
22  received an anonymous complaint that Mr. Sharfi
23  purchased the subject property and has been using heavy
24  machinery in the creation of a road filling a wetland."
25         Correct?



JONATHAN PEMPEK
UNITED STATES OF AMERICA V SHARFI

May 19, 2022
249—252

Page 249

1    A.  Yes.
2    Q.  Is that a true and correct statement?
3    A.  I believe it was.  I recall, I mean this was
4  drafted a while ago.  I thought the conversation was
5  that he had heavy machinery there, but maybe they said
6  that there was a road.
7        And as mentioned earlier, most of our
8  unauthorized actions require some sort of federal
9  authorization.  And I, even to this day, I don't know if
10  that original site is federally jurisdictional, but I
11  thought it was pertinent to at least acknowledge it so
12  if we are to find a resolution, we could encompass
13  everything that could potentially be waters of the
14  United States.
15    Q.  A couple lines down says, "I called Mr. Sharfi
16  and his consultant personally to caution them that the
17  wetlands on the property are jurisdictional."
18        Do you see that?
19    A.  Yes.
20    Q.  And so in that particular line, up to that
21  point you clearly are identifying that you've told
22  Mr. Sharfi and his consultants that the wetlands on the
23  property are in fact jurisdictional; correct?
24    A.  I acknowledge that I wrote that there, but I
25  mean you could ask them.  I said I believe that they

Page 250

1  were jurisdictional.
2    Q.  And then they require a Corps permit; correct?
3    A.  I asked them to apply for a Corps permit, yes.
4    Q.  Let's move to the next page, please, under
5  Meeting.  So this first paragraph, you identify who was
6  represented at the meeting; correct?
7    A.  That's correct.
8    Q.  Representing the Water Management District was
9  Gregory Vasquez and Trisha Stone; correct?
10    A.  Yes.
11    Q.  Mr. Sharfi was there; correct?
12    A.  Yes.
13    Q.  Together with his attorney, Jefferson Knight;
14  correct?
15    A.  Yes.  He identified him as a friend, but I
16  think, I think he was also his counsel.  I think that's
17  right.
18    Q.  You put it in the memo?
19    A.  Yeah, I know, I think I was accurate by saying
20  that.
21    Q.  And his consultant assistant, Kevin Kryzda?
22    A.  Yes.
23    Q.  That would be consistent, you represented
24  earlier that you thought Mr. Kryzda was a consultant?
25    A.  Yes, Mr. Sharfi identified him as a

Page 251

1  consultant, but I think it was pretty obvious he may not
2  know a lot about wetlands.
3    Q.  What makes you say that?
4    A.  He's just, some of the coordination and stuff,
5  just -- it didn't seem like he had a wetland background.
6  Maybe he did, but --
7    Q.  No, I think that's a fair recitation.
8        Representing the Corps, Jonathan Pempek and
9  Samantha Rice, you two were the only two from the Corps;
10  right?
11    A.  That's correct.
12    Q.  And you said that, "After introductions, I
13  asked Mr. Sharfi if he plans on increasing the size of
14  the farm.  He responded that money is no issue for him,
15  and he will acquire additional properties as they become
16  available or he can pressure owners to sell."
17        Is that correct?
18    A.  If, yeah, I mean I wrote everything as quickly
19  as possible.  Everything in here is as accurate as
20  possible.
21    Q.  That was my next question.  Were you taking
22  notes at this time?
23    A.  I was intermittently taking notes, and a lot
24  of this was drafted afterwards, but I didn't have notes
25  on everything.

Page 252

1    Q.  So did you have a note on that?
2    A.  I don't recall.
3    Q.  So it's possible that this is your
4  recollection of what was said as opposed to a direct
5  quote?
6    A.  Yeah, this was as close to a direct quote as I
7  could get.
8    Q.  Okay.
9    A.  And some of these are probably going to be
10  direct quotes.  Others, it's my recollection.
11    Q.  Okay.  We'll get to them.
12        So you asked Mr. Sharfi whether he wants to
13  increase the size of the farm.  Why did you ask him
14  that?
15    A.  Because ultimately, even though we were here
16  talking about unauthorized actions, it makes sense to
17  get an idea of his development plan.  So we could
18  still -- I mean we still showed up trying, in good faith
19  trying to find a resolution.
20        There was still an option that we could give
21  him an after-the-fact permit, but it would be
22  advantageous to know the entire scope of what he wanted
23  to do to develop his ranch.
24    Q.  Did you at any time discuss with Mr. Sharfi
25  the potential for obtaining an after-the-fact permit?



JONATHAN PEMPEK
UNITED STATES OF AMERICA V SHARFI

May 19, 2022
253—256

Page 253

1    A.  Yes, I did.
2    Q.  Is that contained anywhere within this
3  particular document?
4    A.  It was -- it was right before we left.  I
5  don't know if it is or not.  I'd have to look.
6    Q.  Okay.  We'll get to that at the end.
7    A.  And he, there was one time he did say he would
8  spend hundreds of thousands of legal fees as opposed to
9  getting a permit.  I said I only want him to get a $100
10  permit.
11       So yes, I did offer a chance for him to get a
12  permit still.
13    Q.  So Mr. Sharfi said to you that money is no
14  issue.  And we're not sure if that was a quote or that
15  was just your recollection; correct?
16    A.  That's pretty accurate, though.
17    Q.  Okay.  So why did you include that?  Why was
18  that relevant to whether or not Mr. Sharfi needed a
19  permit?
20    A.  I tried to accurately document everything from
21  the site visit, and this conversation was pertinent,
22  again, because we're trying to see the development plan
23  for the ranch.
24       And in hindsight, I just wanted to document as
25  much as possible from the site visit.

Page 254

1    Q.  Why is it relevant to you, and more so, why do
2  you think it would be relevant to your superiors that
3  Mr. Sharfi has been financially successful in his life?
4    A.  I don't think it matters.
5    Q.  Okay.  Then why include it?
6       MR. ADKINS:  Objection.
7       THE WITNESS:  As far as what?  That he wants
8    to buy all the parcels?
9  BY MR. MIRON:
10    Q.  Yes.
11    A.  Well, there is two reasons.  One, a master
12  plan.  But also, you know, if he keeps -- all parcels
13  adjacent are wetland -- or sorry, majority of the
14  wetlands have significant, or parcels adjacent have
15  significant portions of wetlands.
16       If his master plan is to continue buying and
17  filling, it's problematic from a programmatic view.
18    Q.  Did you look to see at any time during your
19  investigation as to whether any of the properties
20  directly to the east of Mr. Sharfi had jurisdictional
21  wetlands on them?
22    A.  I believe it is highly likely, yes.  There is
23  wetland maps.  You could see wetlands are pretty
24  frequent through the area.
25    Q.  Did you look at any time and do any

Page 255

1  investigation as to whether any of the property owners
2  that own properties directly to the east had obtained
3  Clean Water Act permits to develop their properties?
4    A.  So Martin County generally does not issue a
5  ton of permits, because generally they, they, there is a
6  county that preserves the wetlands.  So most of the
7  development happened a long time ago, and finding those
8  records are very difficult for us.
9       But I did briefly search, and along Bessey
10  Creek there were, it looked like there were some permits
11  around landfill and along Bessey Creek.  So I briefly
12  searched.
13    Q.  Okay.
14    A.  But in the back of my mind, I also knew that
15  developing wetlands was, has been from the municipality,
16  highly restricted the last few years.
17    Q.  Okay.  What about properties directly to the
18  west?
19    A.  To the west.
20    Q.  So in my mind, there is a property directly to
21  the west of Mr. Sharfi's property which consists of a
22  number of greenhouses.
23    A.  Yeah.
24    Q.  Did you look at that property to see whether
25  or not that, those individuals who owned that property

Page 256

1  had obtained necessary permits to conduct that the work
2  that they done out there?
3    A.  I didn't find a permit, but I went back to the
4  history, and those permits had been there quite a long
5  time.
6    Q.  Okay.  So if we move on, at this point -- so
7  at some point, based upon this documentation, you
8  indicated that you, it seems as though you requested an
9  opportunity to conduct point descriptions at the subject
10  site; is that correct?
11    A.  Where do you see that?
12    Q.  First line, second paragraph, or I guess it
13  says Mr. Sharfi.
14    A.  Yeah, that's, this statement is, what I wrote
15  is correct, but your characterization is not.
16    Q.  Tell me, how was I wrong?
17    A.  I didn't request to do point descriptions.
18    Q.  Who did?
19    A.  Gregory Vasquez.
20    Q.  So Gregory Vasquez on behalf of the district
21  requested the opportunity to conduct point descriptions
22  at the subject site?
23    A.  That's correct, but so Mr. Sharfi's response
24  is nobody is going to do any work, so I assumed that was
25  all of us.  He said nobody, so --



Page 257

1    Q.   Okay.  So essentially, so at that point you
2  described what amounts to a tour; right?  Mr. Sharfi
3  took you on a tour of the farm?
4    A.   That's correct.
5    Q.   He personally gave you a tour of the farm?
6    A.   He did.  Jefferson -- yeah, Jefferson Knight
7  and Kevin were there, I believe, but it was Mr. Sharfi
8  showing us around.
9    Q.   And at this point was Samantha Rice with
10  you -- excuse me.  Scratch that.
11       Was both Samantha Rice and Gregory Vasquez
12  with you at this time?
13    A.   In the beginning of the site visit we were
14  fairly close.  We, but as the site visit went on, the
15  group got a little bit more spaced out, but I was always
16  next to Mr. Sharfi.
17    Q.   So the three of you were not together, what
18  you're suggesting is the three of you weren't together
19  the entire time, but you certainly were at the early
20  onset of the tour?
21    A.   We were even stuck in a barn together, so yes.
22    Q.   I read that.  So what you are referring to is
23  at some point it started raining so hard that you took
24  shelter in one of the barns?
25    A.   That's correct.

Page 258

1    Q.   And all this description about the tour
2  itself, to the extent that the tour encompassed anything
3  other than the subject property, then it wouldn't
4  necessarily be relevant to the, to this particular
5  action; would it?
6    A.   It's as detailed as I could possibly be.  I
7  thought I was providing a simple write-up to our chain
8  of command, but I can see how you would think it was
9  irrelevant.
10    Q.   So you said that the -- let's see, if we go to
11  the next page, second paragraph says, "The lot had an
12  unculverted crushed rock and dirt road ranging
13  approximately 15 to 25 feet wide surrounding the
14  parcel."  Correct?
15    A.   That's correct.
16    Q.   And you said, "The creation of this road was
17  later described as an emergency action required to
18  install an electric fence to protect his livestock,"
19  correct?
20    A.   That's correct.
21    Q.   I know we talked about this before, but in
22  fact there was a road going around the perimeter of the
23  site; correct?
24    A.   Yes.
25    Q.   Presumably it was used to build to install a

Page 259

1  fence; correct?
2    A.   I guess.  I don't know why he installed the
3  road.
4       MR. MIRON:  My bosses are telling me to take a
5  break.
6       THE VIDEOGRAPHER:  Off the record.  Time is
7  4:01 p.m.
8       (A recess was taken.)
9       THE VIDEOGRAPHER:  We are on the record, the
10    time is 4:15 p.m.
11  BY MR. MIRON:
12    Q.   Okay.  Going back to the memorandum for
13    record, MFR.
14    A.   MFR, yes, sir.
15    Q.   I want to go down to claims that Mr. Sharfi
16  made during the visit, including, but not limited to,
17  one, on at least five different occasions he mentioned
18  he was the owner to a billion-dollar company.
19       Do you see that?
20    A.   I do.
21    Q.   Why was that relevant?
22    A.   Just making, just noting some of the stuff he
23  said.
24    Q.   Okay.  So before I get to these particular
25  statements, on statements 1 through 12 I'm going to ask

Page 260

1  you about a couple of them.
2       Was either Gregory Vasquez or Samantha Rice
3  together with you when Mr. Sharfi made these statements?
4    A.   I am sure each of them heard some of these
5  statements, but I do not know which ones they did.  You
6  would have to ask them.
7    Q.   What makes you so sure?
8    A.   Because when some of these statements were
9  made, we were together and others we were spaced out.
10    Q.   Okay.
11    A.   Also, at the end of the site -- we'll get
12  there, but at the end of the site inspection, I think
13  Samantha Rice characterized the site inspection as one
14  of the craziest inspections she's ever been on.
15    Q.   Let's go to number six.  You said in here, you
16  identified that Mr. Sharfi stated many times in
17  different ways that I was singling him out.
18       Do you see that?
19    A.   Yes.
20    Q.   Did either Samantha Rice or Gregory Vasquez
21  hear him make that statement?
22    A.   You would have to ask them.
23    Q.   Do you know whether or not they were standing
24  next to you at the time the comment was made?
25    A.   I don't recall.



Page 261

1    Q.  Okay.  Number eight, you stated that he has
2  DEP and Martin County's approval to ignore the ongoing
3  work, because they realized that his intentions are for
4  the greater good.
5       Is that a true and correct statement?
6    A.  Yes.
7    Q.  Under that, 8A, "I called," I meaning I
8  presume you?
9    A.  Yes.
10    Q.  "-- called Martin County and they are aware of
11  the issue and they are going to continue with
12  enforcement action until being told to stand down."
13       Do you see that?
14    A.  Yes.
15    Q.  Is that an accurate and correct statement?
16    A.  Yes.
17    Q.  Okay.  When did you speak to Martin County?
18    A.  I --
19    Q.  Let me ask you a different way.
20    A.  It could have been before, even after the site
21  visit, but they were, they were aware of the violation
22  and I knew they were.
23    Q.  Okay.
24    A.  There is a --
25    Q.  Are you aware of fact that there is no

Page 262

1  enforcement action that's currently pending?
2    A.  I'm not aware of that.
3    Q.  Are you aware of the fact that there was never
4  an enforcement action that was filed by Martin County?
5    A.  I, I think, depending on who you ask, there
6  was at times an ongoing enforcement case.
7    Q.  Is there a difference between enforcement case
8  and enforcement action?
9    A.  You would have to ask Martin County.  They
10  were actively looking into the alleged wetland fill, and
11  they acknowledged that.
12    Q.  Do you know what came as a result of that, of
13  their actions?
14    A.  I do not.
15    Q.  Are you aware of the fact that Martin County
16  and the district have resolved any issues they may have
17  with Mr. Sharfi?
18    A.  I was aware they were working on it.  I don't
19  know that there was a resolution.
20    Q.  All right.  Mr. Sharfi referred to you as an
21  idiot.  Do you see that?
22    A.  Yes.
23    Q.  Did anyone hear him say that?
24    A.  Well, Mr. Sharfi -- I'm not seeing where it
25  says that, but generally he said because I couldn't

Page 263

1  recall a tiny backhoe earthmoving equipment that I was
2  an idiot.  I believe someone was close enough to hear
3  that.
4    Q.  In fact, based on my recollection of this
5  particular document, Mr. Sharfi called you an idiot or
6  stupid more than once; is that correct?
7    A.  If it's stated in here, everything is accurate
8  in here.
9    Q.  How did that make you feel?
10    A.  I -- he doesn't, he doesn't bother me.
11    Q.  Why is that?
12    A.  I've, I've seen Mr. Sharfi's demeanor in the
13  past, and he usually fights for what he wants, and I
14  kind of respect that.
15    Q.  Okay.  So the next statement, paragraph 11,
16  that "I should know by now he has a loaded gun and is
17  prepared to shoot."
18       Is that a quote or a paraphrase?
19    A.  That's a quote.
20    Q.  Mr. Sharfi specifically told you that he had a
21  loaded gun and that he was prepared to shoot?
22    A.  Yes.  Well, after reporting that people
23  thought that that was a threat, I perceived that as we
24  were going to be sitting at a deposition in five years.
25  So I, I did not take that as literally, but I figured it

Page 264

1  was still pertinent to put in here.
2    Q.  So that would be consistent with Samantha
3  Rice's testimony in the sense that you thought he was
4  being, he meant it metaphorically?
5       MR. ADKINS:  Objection.
6       THE WITNESS:  That's what I believed, but who
7  knows?
8  BY MR. MIRON:
9    Q.  So at this point you didn't -- obviously
10  threatening a federal employee is a federal action;
11  correct?
12    A.  If he said he was going to kill me, I would
13  have probably reported him, yes.
14    Q.  And I know this is an obvious statement, but
15  you didn't call the police, did you?
16    A.  No.
17    Q.  You didn't follow up with Army CID or anything
18  of that nature, did you?
19    A.  No.
20    Q.  In fact, I think the comment was more akin to
21  he had big guns.  Would that be a better representation
22  of what he said?
23       MR. ADKINS:  Objection.
24       THE WITNESS:  I don't know what big guns
25  means.



Page 265

1  BY MR. MIRON:
2      Q.  Do you have a recollection?
3      A.  I think he was just -- again, I think he wants
4  to fight for things, and that's how I perceived it.  And
5  it was right after, either right before or right after
6  he said that, you know, he was, he was going to go to
7  court, no matter what it took.  He didn't want to get a
8  permit.
9      Q.  Understood.
10     A.  So that's how I took it, is he is in this for
11  the long haul.
12        But I think other people, when they saw that,
13  they thought it was a direct threat, and that's not how
14  I perceived it at the time.
15     Q.  Okay.  Did you explain to your supervisors
16  that you didn't perceive it as a direct threat?
17     A.  Yes.
18     Q.  Who specifically did you explain that to?
19     A.  My chief, Bobby Halbert, and I don't think he
20  made it into a big deal, but no, I don't think --
21     Q.  So "Mr. Sharfi had generally rude and
22  demeaning comments and has a history of similar or more
23  or extreme behavior in speaking to DEP's leadership."
24        Is that a correct statement?
25     A.  This is, yes.

Page 266

1      Q.  Why is it relevant?
2      A.  I mean this is not the first time that -- you
3  asked me why I wasn't shocked.  It's because I've seen
4  his demeanor in the past.  Nobody else should be shocked
5  about some of the stuff he says here either, so -- and
6  this is not the first time he's acted this way.
7        Generally going to the site visit, I generally
8  thought there was a chance that this is how it would
9  turn out.
10     Q.  So it's interesting you say that, because this
11  is ultimately really the first time that you had ever
12  had an opportunity to have any direct interaction with
13  Mr. Sharfi; correct?
14        MR. ADKINS:  Objection.
15  BY MR. MIRON:
16     Q.  What part of that statement do you not agree
17  with?
18     A.  I've had interactions with him in the past.
19  He has showed up to DEP for meetings.  I've heard
20  screaming from and hearsay from other project managers
21  about his behavior.
22     Q.  Got it.  So what DEP meetings did he show up
23  to that you were present at?
24     A.  There was a settlement meeting that I was a
25  part of and I left, where I didn't actually go into the

Page 267

1  meeting, but I could hear the yelling from outside of
2  the room, and they told me what happened.
3      Q.  Okay.  So then ultimately the basis of your
4  position, the basis of your opinion comes as a result of
5  things other people have told you or things that you
6  heard through outside in another room?
7      A.  Yes, I heard yelling, and I asked two people
8  about, that were in there what it was all about, and
9  they told me what his actions were.
10     Q.  Okay.
11     A.  And in other site visits, you know, he's made
12  pretty excitable comments before, but I don't recall
13  them.  I just ignore them.  If I wouldn't have wrote
14  this down, I probably wouldn't remember that he said
15  half this stuff anyway.
16     Q.  What other site visits was he at?
17     A.  He was at the one where he was talking to John
18  Renfranz and DEP.
19     Q.  You failed to mention anything that would
20  suggest that he was excitable at that meeting when we
21  first talked about it.
22     A.  No, I told you he was passionate.  I think I
23  described it as passionate.
24     Q.  So ultimately, as far as you're concerned, it
25  goes without saying you find Mr. Sharfi is generally a

Page 268

1  rude and demeaning individual; correct?
2        MR. ADKINS:  Objection.
3  BY MR. MIRON:
4      Q.  That's what you wrote, right?
5      A.  I characterized some of the statements as rude
6  and demeaning, yes.
7      Q.  So that's an interesting point.  These are
8  statements, right?  These are not statements per se,
9  things that he said.  This is your characterization of
10  Mr. Sharfi; correct?
11        MR. ADKINS:  Objection.
12        THE WITNESS:  It's my characterization of the
13  statements that he made.
14  BY MR. MIRON:
15     Q.  Okay.  So if we go to the next page, there is
16  a section of blacked out or redacted text.
17        Do you know, without telling me specifically
18  what it is, do you know what was redacted?
19     A.  I believe it was my recommendation to office
20  of counsel.
21     Q.  Okay.  So at this point you had already, you
22  had already made a point, or at this point had you
23  already made contact with the office of counsel?
24     A.  This memo is used to brief office of counsel
25  and leadership.  And I don't know if they were aware of



JONATHAN PEMPEK
UNITED STATES OF AMERICA V SHARFI

May 19, 2022
269–272

Page 269

1  the site visit or anything prior to this, but this was
2  what this is used for.  Generally these are, again,
3  internal memos.
4      Q.  Okay.
5      A.  Just to get everybody caught up on what has
6  occurred.
7          MR. MIRON:  Okay.  So let's move to what's
8  going to be marked as Number 146.
9      (The document was marked Deposition Exhibit 146
10  for identification.)
11  BY MR. MIRON:
12      Q.  So Number 146, Document 146 purports to be,
13  appears to be an Addendum to Memorandum for Record dated
14  November 26 of 2018.  Do you see that?
15      A.  I do.
16      Q.  Did you draft this document?
17      A.  Yes, I did.
18      Q.  Was any portion of this document revised by
19  your superior or anyone else?
20      A.  I don't believe so.
21      Q.  What was the purpose of this document?
22      A.  I don't know.  There was a third complaint
23  that must have came out in between, that we received
24  between this one, between these two.
25      Q.  Okay.

Page 270

1      A.  And I, I think this is just a supplemental --
2  all it is is photos, but --
3      Q.  What makes you think there was a third
4  complaint?
5      A.  Because I'm looking at the last one.  The
6  complainant told me about the, that he recently
7  purchased another, a few parcels.  I had no idea until
8  we received the complaint.
9      Q.  You are referring to figure nine?
10      A.  Yeah, so I don't know what initiated it.  I
11  don't know if it was --
12      Q.  So let's go through it.
13      A.  I think it was just additional photos showing,
14  you know, supplemental.
15      Q.  Let's go through it real quick.  Figure one is
16  an arrow pointing to what appears to be a site to the
17  south that we described and discussed earlier; correct?
18      A.  Correct.
19      Q.  So it's not the site that is subject of this
20  action?
21      A.  Correct.
22      Q.  Figure two also says wetlands.  This is from
23  May of 2016.  So this would have been before Mr. Sharfi
24  purchased the subject site; correct?
25      A.  I believe so, yes.

Page 271

1      Q.  And figure three, again, this is consistent
2  with your testimony earlier, this is in relation to the
3  site to the south where you indicated without
4  consultation that Mr. Sharfi created a pump-fed surface
5  water --
6      A.  Consultation?
7      Q.  Yes, sir.
8      A.  What does that mean?
9      Q.  Figure 3.  I don't know, sir.  You wrote it.
10      A.  Gotcha, go ahead.
11      Q.  So again, this is a picture of a south site;
12  correct?
13      A.  Yes.
14      Q.  And it is not the subject property?
15      A.  Correct.
16      Q.  Figure four says "Knowing Mr. Sharfi's past
17  behavior."  What did you mean by that?
18      A.  Figure four.  He apparently accidentally fills
19  wetlands without understanding the requirement for
20  permits.  So I was trying to do due diligence and try to
21  help him out.
22      Q.  Excuse me one second.
23          So this says that, "Knowing Mr. Sharfi's past
24  behavior, I emailed and had a phone conversation with
25  Mr. Sharfi and his consultant, stating that he would

Page 272

1  likely need a Corps permit if he planned on altering the
2  wetlands at this property."
3          Do you see that?
4      A.  Yes.
5      Q.  And you testified earlier that you initially
6  became aware of the subject site and the allegations
7  against Mr. Sharfi as a result of an anonymous
8  complaint; correct?
9      A.  All three times, anonymous complaint.  What
10  site are we referring to?
11      Q.  The subject site.
12      A.  Yes, anonymous complaint.
13      Q.  Okay.  So you obtained an anonymous complaint
14  about the subject site, which essentially is what
15  started the entire action, but in this particular email
16  you are indicating that you became aware of the fact
17  that he purchased this property and that you presumed
18  based upon his past behavior that he was going do
19  something.
20      A.  Where are you, what are you talking about?
21      Q.  Figure four.
22      A.  You said email.  So --
23          MR. ADKINS:  Wait for a question, please.
24          THE WITNESS:  I'm sorry, go ahead.
25

ESQUIRE
DEPOSITION SOLUTIONS

JONATHAN PEMPEK
UNITED STATES OF AMERICA V SHARFI

May 19, 2022
273–276

Page 273

1  BY MR. MIRON:
2      Q.  So you originally indicated to me just now
3  again that the original complaint that came in which
4  started this entire process was an anonymous complaint
5  from December of 2017; correct?
6      A.  I believe that sounds right, yes.
7      Q.  Okay.  So it says in this figure four
8  "Mr. Sharfi purchased the outlined ten-acre parcel in
9  December of 2017."  That's under figure four.
10         Are we looking at two different documents?
11     A.  No, I don't think so.  This one?
12     Q.  178, yes.  Says "Mr. Sharfi purchased the
13  outlined ten-acre parcel in December of 2017," correct?
14     A.  Yes.
15     Q.  "From limited on-site observations, it is
16  highly likely that this parcel contained a greater
17  percentage of wetlands than uplands," correct?
18     A.  Correct.
19     Q.  "Knowing Mr. Sharfi's past behavior, I emailed
20  and had a phone conversation with Mr. Sharfi and his
21  consultant stating he would likely need a Corps permit
22  if he planned on altering the wetlands at this
23  property."
24         And what you're referring to in that
25  circumstance is the email between yourself and

Page 274

1  Mr. Kryzda and the conversation you had with Mr. Kryzda
2  and Mr. Sharfi back in January of 2018; correct?
3      A.  And conversation I had with Mr. Hook and
4  everything, yes.
5      Q.  Okay.  So did you reach out to Mr. Sharfi as a
6  result of your knowledge of his past behavior or as a
7  result of an anonymous complaint?
8      A.  So I, I received an anonymous complaint which
9  made me aware that he purchased this property and that
10  he began filling or potentially began impacting this
11  property.
12         But as I testified earlier, I waited three
13  weeks, but I used the opportunity with Mr. Hook to
14  address it, and understanding that there was a
15  possibility that Mr. Sharfi would impact these wetlands,
16  I thought it was important that I reach out to him.
17     Q.  Okay.  So you made a determination earlier on
18  that Mr. Sharfi was likely going to violate the law and
19  you wanted to talk to him about it?
20     A.  I wanted to prevent that from happening,
21  because again, didn't want to be here today.
22     Q.  Got it.  Okay, let's move to figure nine.
23         So you alluded to earlier in your testimony a
24  few minutes ago a third complaint.  So now a third
25  anonymous complaint is coming in as it relates to

Page 275

1  Mr. Sharfi and other property that he owns; correct?
2      A.  That's correct.
3      Q.  And this is in relation to 350 acres that is a
4  few miles from the subject site; correct?
5      A.  That's correct.
6      Q.  And how did you obtain this anonymous
7  complaint?
8      A.  It was a phone conversation again.
9      Q.  Again.  Did it come into your office?
10     A.  It did.
11     Q.  Was it a man or woman?
12     A.  Female.
13     Q.  Female.  Did you take any notes?
14     A.  I did not.
15     Q.  Did you identify at any point or do you know
16  at this point who the anonymous complainant was?
17     A.  I do not.
18     Q.  Was there a recording of that?
19     A.  No.
20     Q.  So is there any information that we have at
21  all to suggest who that anonymous complainant was?
22     A.  There is not.
23     Q.  Do you know the date upon which you obtained
24  that phone call?
25     A.  It had to have -- I don't recall the date, but

Page 276

1  after they -- after I received the complaint, I went on
2  the property appraiser's, and it was, it was almost
3  immediately after Mr. Sharfi purchased the property.
4      Q.  Okay.
5      A.  So it was relatively -- I mean whoever
6  received the complaint knew that he just purchased the
7  property, I imagine.
8         So they were, or whoever submitted the
9  complaint, they were on top of it, because it was right
10  at the same time.
11     Q.  What specifically did this complainant say?
12     A.  They said Mr. Benjamin Sharfi purchased
13  multiple lots and they quantified it as like over
14  300 acres.  And they said that there was equipment in
15  there again.
16     Q.  Okay.
17     A.  But, and always.
18     Q.  Is there currently an investigation relative
19  to that particular property --
20     A.  There was.
21     Q.  -- pending with the Army Corps?
22     A.  There was at the time, just using aerial, but
23  I haven't seen anything.  So no, there is no ongoing.
24     Q.  So they specifically told you, they
25  specifically told you Benjamin Sharfi?



JONATHAN PEMPEK
UNITED STATES OF AMERICA V SHARFI

May 19, 2022
277—280

Page 277

1    A.  They did.
2    Q.  How did you find this information, by going to
3  the property appraiser?
4    A.  Yes, I went to the property appraiser to
5  identify whether it was Mr. Sharfi or not.
6    Q.  And how did you do that?
7    A.  I'm sure you're getting at the fact that it's
8  in an LLC.
9    Q.  I am.  You got it.
10    A.  So I went to the LLC and it didn't make any
11  sense, so what I had to do was go to Sunbiz to see that
12  Mr. Sharfi was in charge of, or that particular LLC or
13  whatever it was.
14    Q.  So did the complainant provide you -- how did
15  the complainant describe the property?
16    A.  As a parcel number.
17    Q.  The individual complainant gave you an actual
18  parcel number?
19    A.  Yes, I wrote it down.
20    Q.  So that parcel number referenced what?
21    A.  One of those parcels.  I don't know which one.
22    Q.  And it referenced what specifically?
23    A.  It was one of -- I think there is three or
24  four parcels in here.  They referenced one and they said
25  there were parcels adjacent to that one.

Page 278

1    Q.  But it didn't haven't Mr. Sharfi's name on it;
2  right?
3    A.  No.
4    Q.  It had an LLC?
5    A.  Yes.
6    Q.  And then you went to Sunbiz to check to see
7  who was associated with that LLC?
8    A.  Yes.
9    Q.  Can you just confirm that you never found any
10  evidence of a violation on that site?
11    A.  No.  I haven't -- I looked into it briefly
12  after the complaint, but I haven't found any.
13    MR. MIRON:  Okay, Number 31.
14    (The document was marked Deposition Exhibit 147
15  for identification.)
16  BY MR. MIRON:
17    Q.  I'm going to show you what's going to be
18  marked as Exhibit Number 147.  This purports to be an
19  email from yourself to Mr. Knight dated May 14, 2018.
20    Do you see that?
21    A.  Yes.
22    Q.  Does this look like an accurate
23  representation?
24    A.  I believe so, yeah.
25    Q.  In that particular -- in the middle of that

Page 279

1  paragraph, single paragraph on the one, two, three,
2  four, five, sixth line down it says, "I was unaware of
3  any activities on the property until the Water
4  Management District sent us photographs of the recent
5  work."
6    Do you see that?
7    A.  Yes.
8    Q.  That's not a true and correct statement, is
9  it?
10    A.  Can I read the rest of it?
11    Q.  Sure.
12    A.  So it depends.  I wasn't aware of the scope of
13  the activity.  I was aware that they were clearing some
14  vegetation, but when I refer to activities, I think I
15  was more specific to significant violations of the Clean
16  Water Act.
17    Q.  Okay.  So you are aware of the fact that both
18  Mr. Sharfi and Mr. Kryzda provided you an understanding
19  early in January of what they were doing, some minor
20  clearing and filling, and you didn't constitute that as
21  activities at that time that would be in violation of
22  the Clean Water Act?
23    A.  No, I did.  What I told them was I believe, I
24  told them that filling waters of the United States
25  requires a Corps permit.

Page 280

1    But he recharacterized the filling as, you
2  know, as removing vegetation with machinery and stuff
3  like that, so -- not a massive road, 25 feet wide around
4  the property.
5    So my -- I generally stand behind the fact I
6  was unaware of what was going on and the scope of what
7  was going on until the Water Management District sent us
8  the photos.
9    MR. MIRON:  I show you what we're going to
10  mark as Number 148.
11    (The document was marked Deposition Exhibit 148
12  for identification.)
13    MR. MIRON:  This appears, purports to be an
14  email, a series of emails, the first of which --
15  let's do this.  Hold on one second.  Let's make
16  this, to save time, let's make this a composite.
17    So let me take that back.  Do we have a paper
18  clip or something.  We'll keep it together for the
19  moment so we don't waste time.
20    MR. ADKINS:  Do you mind reading the Bates
21  into the record?
22    MR. MIRON:  Not at all.  This is going to be
23  Composite Exhibit 148.
24  BY MR. MIRON:
25    Q.  It purports to be two emails, the first of



Page 281

1 which is, it's a series of emails. The first is, the
2 top Bates number USACE 985. It's from you, sir, Jon
3 Pempek, to Robert Halbert on 11/16/2018 at 11:38 a.m.
4      Do you see that?
5 A. Yes.
6 Q. All I want to understand is that this appears
7 as though you were forwarding what amounts to 20 -- I
8 think it was 20 -- let me count them again, forgive me.
9 I wasn't sure, because it looks like there may be
10 duplicates, but let's start with 15.
11      It looks as though that you are emailing 15
12 pictures to Bobby Halbert dated -- of the site, the
13 subject property, dated October 17th of 2018; is that
14 correct?
15 A. Yes, it seems that way.
16 Q. And these were flight pictures over
17 Mr. Sharfi's property that were taken by the South
18 Florida Water Management District on October 17, 2018;
19 correct?
20 A. That's correct.
21 Q. And if we go to the next email, Bates stamp
22 USACE 1473, this appears as though it is an email
23 from -- the first email in the exchange is from -- let's
24 do the middle. The middle is easiest.
25      In the middle of the page is email from

Page 282

1 Gregory Vasquez dated Friday, November 16 of 2018 to
2 you, Jon Pempek. And it appears as though he is
3 including what looks like to me to be seven pictures
4 from November 14 that were taken, that were flight
5 pictures taken on November 14th over Mr. Sharfi's
6 property; correct?
7 A. It appears that way, yes.
8      MR. MIRON: Okay, why don't we make this 149.
9      (The document was marked Deposition Exhibit 149
10 for identification.)
11 BY MR. MIRON:
12 Q. This is purports to be an email from you to
13 Mr. Sharfi and you are copying his counsel, Jefferson
14 Knight, together with other individuals from the Corps.
15 It's USACE 532. It's dated 11/28/2018.
16      In this particular email you're sending to
17 Mr. Sharfi it says, "I would like to take this
18 opportunity to inform you it is highly likely that the
19 three parcels you recently purchased immediately
20 adjacent to the turnpike in Martin County totaling
21 350 acres contain a jurisdictional wetlands increase."
22      Do you see that?
23 A. Yes.
24 Q. This is in relation, in direct response and
25 relation to the anonymous complaint that you received?

Page 283

1 A. No. I don't believe this -- I wouldn't have
2 known about this unless there was anonymous complaint;
3 however, again, we could be sitting here talking about
4 350 acres or additional parcel. So this is my effort to
5 extend the olive branch once again.
6 Q. Okay. At that point had you done any due
7 diligence to make a determination as to whether or not
8 that 350 acres contained a jurisdictional wetlands
9 increase?
10 A. I did.
11 Q. You did?
12 A. Yes.
13 Q. Okay. How did you do that?
14 A. Using the same resources. I think there was
15 a, there is actually an increase that entered the
16 property and then smaller wetlands that are immediately
17 adjacent to those increase which there is a significant
18 nexus to, but again, because there was no -- I didn't
19 see any impacts, so I didn't really give it a whole lot
20 of thought.
21      But I, I figured before I sent this email, I
22 should at least do some due diligence.
23      (The document was marked Deposition Exhibit 150
24 for identification.)
25

Page 284

1 BY MR. MIRON:
2 Q. Forgive me if I'm not looking at you. I'm not
3 trying to be rude. I'm trying to go fast.
4 A. No, you have a lot of stuff to do.
5 Q. This is going to be marked as Exhibit
6 Number 150. It's USACE 1217. This is an email from
7 you, sir, to Eric Hickman at the Department of -- Eric
8 Hickman at the DEP, and you are copying Mr. Halbert as
9 well as others from the Corps on 11/28/2018.
10      Do you see that?
11 A. Yes.
12 Q. What was the purpose of you sending this
13 email?
14 A. All of our inspection reports went missing out
15 of populous and I was trying to recover them from DEP.
16 Q. Why were those relevant to the site?
17 A. Again, to be able to quantify the adjacent
18 wetlands, we use reference sites, and understanding what
19 that wetland looked like was pertinent to the ongoing
20 case.
21      Not only that, but, you know, if it is, if
22 that property is federally regulated, there is potential
23 that it would require some sort of permit to bring it
24 into compliance with federal law.
25 Q. When you say that property, you are referring



JONATHAN PEMPEK
UNITED STATES OF AMERICA V SHARFI

May 19, 2022
285—288

Page 285

1  to the site to the south?
2      A.  Yes.
3      Q.  Okay.  So you state in here, "Mr. Sharfi
4  continues to purchase properties and fill wetlands, and
5  I am preparing to refer the case to the EPA."
6      A.  Correct.
7      Q.  At this point you made a determination as of
8  November 28, 2018 that you were going to forward the
9  case file that you have to the EPA for enforcement?
10     A.  No.
11     Q.  What is the point of you -- please explain to
12  me the statement that you are referring the case to the
13  EPA.
14     A.  I was preparing the documents in case I had
15  to.  And those, I thought that those documents were
16  pertinent, so --
17     Q.  But ultimately the case was referred to the
18  EPA; correct?
19     A.  It was, yes.
20     Q.  Okay.  And as I understand it, the EPA refused
21  to, for lack of a term, prosecute the case; correct?
22         MR. ADKINS:  Objection.
23         THE WITNESS:  They refused to accept the case.
24  BY MR. MIRON:
25     Q.  Let me state it differently.  My understanding

Page 286

1  is that the EPA refused to accept the case; is that
2  correct?
3      A.  Yes.
4      Q.  Okay.  Do you know why?
5      A.  They were going through a reorganization and
6  they didn't have the man hours, I think was their -- or
7  the people power to get the job done.
8      Q.  Okay.  But the Corps did?
9      A.  We're still here.
10     (The document was marked Deposition Exhibit 151
11  for identification.)
12  BY MR. MIRON:
13     Q.  I show you what is marked 151.  It's USACE
14  1222.  It's an email from you, sir, to Mr. Sharfi dated
15  11/30/2018.
16         In this particular circumstance, based upon
17  the first paragraph in the letter, you are notifying
18  Mr. Sharfi that you have a requirement to refer all 404
19  violations to the EPA that are flagrant in nature;
20  correct?
21     A.  Let me read it.
22     Q.  Sure.  It's the first paragraph.
23     A.  So this is a -- yeah, educational letter.
24  These are generally we have an agreement with the EPA
25  and would like us -- these are the three topics that

Page 287

1  they want.
2      Q.  So again, number one, so is this a form like
3  you described some of the other documents?
4      A.  Auto, yes, it is.
5      Q.  Auto-populate?
6      A.  They don't trust me to do anything.
7      Q.  So what part of this particular email, the top
8  half of the email did you physically draft on your own
9  as opposed to a form?
10     A.  I'm sorry, what -- the email?
11     Q.  Yes, sir.
12     A.  No, I drafted the email.
13     Q.  Okay.
14     A.  I thought you meant the referral, I apologize.
15     Q.  That's okay.  You drafted the email?
16     A.  Yeah, I drafted this email.
17     Q.  Okay.  So at this point you said that you
18  refer all 404 violations to the EPA that are flagrant in
19  nature; correct?
20     A.  I wrote that, but I mean we probably don't
21  refer all 404 violations.  We do our best, but of course
22  there is some violations that get past us, but yes, I
23  wrote that.
24     Q.  In your referral to the EPA, you indicated
25  that Mr. Sharfi's violations were in fact flagrant;

Page 288

1  correct?
2      A.  I believe so.
3      Q.  Why --
4      A.  Do you have it?
5      Q.  It's right there, next line.
6      A.  No, what I'm saying is do you have my referral
7  to the EPA?
8      Q.  Oh.  I don't know.  But let's go on with this
9  email.
10     A.  I don't know why I -- what stipulation I cited
11  to refer to them.
12     Q.  So but your email specifically says in the
13  referral it was cited that the violations are flagrant.
14         Is that a true and accurate statement?
15     A.  Oh, yes, I'm sorry, I was looking at the line
16  above it.  Yes, if that's what I said, that's what I
17  referred to.
18     Q.  And you felt as though Mr. Sharfi's actions
19  were flagrant in nature; correct?
20     A.  Correct.
21     Q.  And that they may impact the priority
22  watershed; correct?
23     A.  Yes.
24     Q.  But you didn't mention he was a repeat
25  violator.  Why is that?



JONATHAN PEMPEK
UNITED STATES OF AMERICA V SHARFI

May 19, 2022
289–292

Page 289

1  A.  I didn't feel it was appropriate, because the
2  Corps never cited the original, the original complaint
3  with DEP, so if we didn't record it, I don't think we
4  would say that he is a repeat violator.
5      Q.  That's fair, except for the last six and a
6  half hours you have testified that he's a repeat
7  violator based upon the fact that you believe that he
8  filled wetlands, state jurisdictional wetlands; correct?
9      MR. ADKINS:  Objection, argumentative.  He is
10     answering the questions.
11      THE WITNESS:  Yeah, I believe he filled a
12     wetland.  You asked me if I thought it was a
13     jurisdictional wetland to the federal government.
14      But yes, I'm just -- if you asked me if he
15     filled a wetland, I would say yes.
16      If you asked me in the previous if that
17     wetland was jurisdictional, I would say I have to
18     look into it.
19  BY MR. MIRON:
20      Q.  But as far as you're concerned, as of
21  11/30/2018, you didn't consider him to be a repeat
22  violator?
23      MR. ADKINS:  Objection.
24  BY MR. MIRON:
25      Q.  Let me ask it differently.

Page 290

1      As of 11/30/2018, did you otherwise identify
2  Mr. Sharfi as being a repeat violator?
3      A.  I could see it both ways, but for the
4  referral, no, I chose not to include that, just to give
5  Mr. Sharfi the benefit of the doubt, you know.
6      Q.  Then it says has an impact on a priority
7  watershed.
8      What is the priority watershed that Mr. Sharfi
9  allegedly impacted?
10      A.  I believe the Bessey Creek watershed is the
11  priority watershed.
12      Q.  Again, in this particular email you are
13  indicating to Mr. Sharfi that you could do one of two
14  things, or the EPA would do one of three things:  The
15  EPA would refer the case back to the Corps, which
16  obviously did happen in this circumstance; correct?
17      A.  Yes.
18      Q.  The EPA could retain the case as a civil
19  matter?
20      A.  Yes.
21      Q.  Or it could be determined that his -- excuse
22  me, or it could be determined that this violations meet
23  the criteria for a criminal case; correct?
24      A.  Yes.
25      Q.  And once again, you are reminding Mr. Sharfi

Page 291

1  that there is potential criminal implications associated
2  with his alleged actions; correct?
3      A.  Yes, that was just out of -- generally I just
4  took these out of educational documents.  So my
5  intention was not to threaten him per se.
6      Q.  You mentioned the opportunity to refer any
7  violations, any criminal allegations.
8      Did you in fact ultimately ever refer any
9  potential criminal violations to any other agency?
10      A.  No, I don't believe so.
11      Q.  Do you know whether or not there are currently
12  any open criminal pending investigations against
13  Mr. Sharfi?
14      A.  Not that I know of.
15      (The document was marked Deposition Exhibit 152
16  for identification.)
17  BY MR. MIRON:
18      Q.  I show you what's been marked as Number 152.
19  Number 152 represents as or was a spreadsheet provided
20  as through the discovery process in this particular
21  matter.
22      Have you ever seen this information before?
23      A.  I know what it is, but I haven't seen this
24  document.
25      Q.  Okay.  What is it?

Page 292

1      A.  We had an enforcement team meeting.
2      Q.  What does this spreadsheet show?
3      A.  It shows attendance for -- I don't know what
4  the dates are.  I guess these are the times people are
5  going to attend.
6      Q.  Okay.  Who created the spreadsheet?
7      A.  I loosely call it a spreadsheet.  It's just
8  a -- I don't know who created it.
9      Q.  Were you talking to the Army CID or the US
10  Attorney's Office at this time relative to Mr. Sharfi's
11  alleged violations?
12      A.  No, we did not refer a case to Army CID for
13  Mr. Sharfi.
14      Q.  What is the Army CID?
15      A.  Army Criminal Investigation Division.
16      Q.  And that goes without saying, those are
17  criminal investigators for the Department of the Army;
18  correct?
19      A.  Ironically, I believe -- yes, I think they,
20  they help us out occasionally, but they were working on
21  a project unassociated with this for us.
22      Q.  I know you might have testified to this
23  already.  Forgive me for asking again.
24      Have you ever had any communications with
25  anybody from the Army CID about the defendant's



JONATHAN PEMPEK
UNITED STATES OF AMERICA V SHARFI

May 19, 2022
293–296

Page 293

1  activities on the site?

2      A.  I don't know.  I don't think so.

3      Q.  The spreadsheet has a column for the DOJ,
4  December 3rd of 2018, and identifies Jaime Raich is.

5      Do you know who Jaime Raich is?

6      A.  No.  I know when we had this meeting there
7  were -- we didn't get to -- we planned on talking about
8  a lot of things we never got to.

9      Q.  Okay.  Have you ever had an opportunity to
10  speak to Mr. Raich?

11      A.  I don't even know who that is.

12      Q.  Okay.

13      (The document was marked Deposition Exhibit 153
14  for identification.)

15  BY MR. MIRON:

16      Q.  Let me show you what's going to be 153.

17      A.  Okay.

18      Q.  Number 153, which is Bates stamp USACE 2440,
19  represents as an email from Phillip Obenschain,
20  O-b-e-n-s-c-h-a-i-n, to you, sir, copying Brian Lawson,
21  dated 10/19/2021, re Benjamin Sharfi.  Do you see that?

22      A.  Yes.

23      Q.  Says, "Jon, thank you again for meeting with
24  us yesterday and for getting those documents together."

25      Why did you have a meeting with Phillip

Page 294

1  Obenschain?

2      A.  It was unrelated to this litigation.

3      Q.  Unrelated?

4      A.  Unrelated.

5      Q.  He says, "Can you please send us additional
6  information on Mr. Sharfi and your interactions with
7  him?"

8      Why did he ask you for additional information
9  on Mr. Sharfi and your interactions with him if this
10  meeting was about something unrelated to Mr. Sharfi?

11      A.  So this -- so I believe we were meeting for an
12  unassociated project, and I think this is while I had
13  COVID.

14      And during, when I had COVID, Mr. Sharfi was
15  asking people to come to my house and everything.

16      Was this the same time?

17      Q.  I don't know.

18      A.  So if this is the same time Sharfi was asking
19  people to expose me, find out where I lived and all that
20  stuff.

21      And I was pretty pissed off about that and I
22  don't think that's appropriate.  So I, talking to them
23  about something unrelated, I mentioned that he was doing
24  that.

25      Q.  Okay.

Page 295

1      A.  And they asked for me to get these documents,
2  and I don't believe I ever did.

3      Q.  Okay.

4      A.  I was pretty angry.  So I think this is while
5  I was sick with COVID.

6      Q.  While you were still sick with COVID?

7      A.  Yes, I believe so.

8      Q.  Understood, okay.

9      A.  So I didn't speak to them for this particular
10  issue about the case.  I spoke to him about him asking
11  people to harass me.

12      Q.  Understood.

13      MR. MIRON:  Let's take five minutes.  I think
14  I'm almost done.

15      THE VIDEOGRAPHER:  We are off the record, 5:06
16  p.m.

17      (A recess was taken.)

18      THE VIDEOGRAPHER:  We are on the record.  The
19  time is 5:16 p.m.

20      MR. MIRON:  Thank you.

21  BY MR. MIRON:

22      Q.  Mr. Pempek, I just have two last questions.
23  As I indicated to you earlier, I do not want to know
24  communications you've had with counsel.

25      Have you had any discussions internally with

Page 296

1  Mr. Halbert, your supervisors or anyone else other than
2  counsel as to any potential liability that the Corps may
3  have as a result of bringing this particular action
4  without first making a definitive determination as to
5  whether or not the court had jurisdiction over the site?

6      A.  You're going to have to dumb it down for me a
7  little bit.

8      Q.  Okay.  Have you spoken to anyone at the Corps
9  without counsel as to any potential civil liability that
10  the Corps may have for bringing this action without
11  first determining whether or not the Corps did in fact
12  have federal jurisdiction over the site?

13      MR. ADKINS:  Objection.

14      THE WITNESS:  Talking about penalties and
15  stuff like that?

16  BY MR. MIRON:

17      Q.  Yes.

18      A.  No.

19      Q.  Have you spoken to anyone at the Corps about
20  any potential personal liability that you may have or
21  any of the other members of the Corps may have as it
22  relates to bringing an action against Mr. Sharfi without
23  the proper support?

24      A.  No.

25      MR. MIRON:  Okay.  I don't think I have any



JONATHAN PEMPEK
UNITED STATES OF AMERICA V SHARFI

May 19, 2022
297–300

Page 297

1    further questions.  Thank you.
2        THE WITNESS:  Thank you.
3        MR. ADKINS:  Okay, Mr. Pempek, this is now my
4    opportunity to ask you some questions in the
5    deposition, and I promise I will keep it very
6    short.
7        So first, let me show you a document that I'm
8    marking as Exhibit 154.
9        (The document was marked Deposition Exhibit 154
10   for identification.)
11       CROSS-EXAMINATION
12   BY MR. ADKINS:
13   Q.   It's Bates stamp DEF 682 through 684, and it
14   is an email from you to Mr. Sharfi copying others on
15   April 30, 2018, at 10:08 a.m.
16       Do you see that document?
17   A.   I do.
18   Q.   Are you familiar with this document?
19   A.   I am.
20   Q.   What is this, Mr. Pempek?
21   A.   This is the letter that I was sent with the
22   Notice of Violation.
23   Q.   And there's an attachment referenced in this
24   email.  Do you see that?
25   A.   I do.

Page 298

1    Q.   What's the name of that attachment?
2    A.   Sharfi Cease and Desist.pdf.
3    Q.   Could you turn to page stamped 683?
4    A.   Yes.
5    Q.   Do you recognize this document?
6    A.   I do.
7    Q.   What is this document?
8    A.   It's an associated cease and desist.
9    Q.   What's it dated?
10   A.   April 30, 2018.
11   Q.   Can you turn to page 684?
12   A.   I can.
13   Q.   Is this document signed?
14   A.   It is.
15   Q.   Who signed this document?
16   A.   My chief for lieutenant colonel.
17   Q.   You were asked some questions at your
18   deposition about whether you sent an unsigned copy of
19   the CID to Mr. Sharfi.
20   A.   Yes.
21   Q.   Based on the documents I showed you today, did
22   you send a signed copy to Mr. Sharfi?
23   A.   It appears I did.
24   Q.   Okay.  I'd like to take you to Exhibit 145, if
25   you could turn to that in your pile.  Let me know when

Page 299

1    you have that in front of you.
2    A.   I'm good.
3    Q.   Okay.  So this is your May 14, 2018 memorandum
4    for record; right?
5    A.   Yes.
6    Q.   Counsel asked you some questions about 12
7    listed statements that appear on pages USACE 40 through
8    USACE 41.  Do you recall that?
9    A.   I do.
10   Q.   And you said that some of these bulleted items
11   were characterizations of what Mr. Sharfi said to you
12   during the May 14, 2018 site inspection.
13       Do you recall that?
14   A.   Yes.
15   Q.   What did you mean by characterization?
16   A.   Well, they weren't character -- I mean they
17   are as close to possible as direct quotes, because I
18   immediately drafted these, and they are not
19   characterizing what he said.  They are as closely and
20   accurately quoting what he said.
21   Q.   Did you try to change any of the context of
22   what Mr. Sharfi said when you wrote this down?
23   A.   I did not.
24   Q.   Did you try to change any of his words when
25   you wrote this down?

Page 300

1    A.   I did not.
2    Q.   Did you paraphrase any of these 12 statements?
3    A.   I did not.
4        MR. ADKINS:  Okay, I pass the witness.
5        MR. MIRON:  Nothing.  Nothing further.  Thank
6    you.
7        MR. ADKINS:  We would like an opportunity to
8    review the transcript.
9        THE VIDEOGRAPHER:  We are off the record.  The
10   time is 5:21 p.m.
11       MR. ADKINS:  If they do order, we'd like an
12   opportunity to read.
13       (Witness excused.)
14       (Deposition was concluded at 5:21 p.m.)
15
16
17
18
19
20
21
22
23
24
25



**Page 301**

CERTIFICATE OF OATH

1
2 THE STATE OF FLORIDA)
3 COUNTY OF PALM BEACH)
4
5       I, the undersigned authority, certify that the
6 aforementioned witness, JONATHAN PEMPEK, appeared before
7 me and was duly sworn on Thursday, May 19, 2022.
8
9       Dated this 21st day of June, 2022.
10
11
12 _____
13 RACHEL W. BRIDGE, RMR, CRR
   Notary Public - State of Florida
14 My Commission expires:  1-15-23
   My Commission No.:  GG 259377
15
16
17
18
19
20
21
22
23
24
25

**Page 303**

DEPOSITION ERRATA SHEET

1
2
3   Our Assignment No.  J8348394
4   Case Caption:   United States of America
5   vs.  Benjamin K. Sharfi
6
7       DECLARATION UNDER PENALTY OF PERJURY
8
9       I, JONATHAN PEMPEK, declare under penalty of
10 perjury that I have read the entire transcript of
11 my Deposition taken in the captioned matter
12 or the same has been read to me, and
13 the same is true and accurate, save and
14 except for changes and/or corrections, if
15 any, as indicated by me on the DEPOSITION
16 ERRATA SHEET hereof, with the understanding
17 that I offer these changes as if still under
18 oath.
19       Signed on the _____ day of
20 _____, 20___.
21
22 _____
   JONATHAN PEMPEK
23
24
25

**Page 302**

C E R T I F I C A T E

1
2 THE STATE OF FLORIDA)
3 COUNTY OF PALM BEACH)
4
5       I, Rachel W. Bridge, Registered Professional
   Reporter and Notary Public in and for the State of
6 Florida at large, do hereby certify that I was
   authorized to and did report said deposition in
7 stenotype; and that the foregoing pages are a true and
   correct transcription of my shorthand notes of said
8 deposition.
9       I further certify that said deposition was
   taken at the time and place hereinabove set forth and
10 that the taking of said deposition was commenced and
   completed as hereinabove set out.
11
       I further certify that I am not attorney or
12 counsel of any of the parties, nor am I a relative or
   employee of any attorney or counsel of party connected
13 with the action, nor am I financially interested in the
   action.
14
       The foregoing certification of this transcript
15 does not apply to any reproduction of the same by any
   means unless under the direct control and/or direction
16 of the certifying reporter.
17       Dated this 21st day of June, 2022.
18
19
20 _____
21 RACHEL W. BRIDGE, RMR, CRR
   Notary Public - State of Florida
22 My Commission expires:  1-15-23
   My Commission No.:  GG 259377
23
24
25

**Page 304**

DEPOSITION ERRATA SHEET

1
2 Page No._____Line No._____Change to:_____
3 _____
4 Reason for change:_____
5 Page No._____Line No._____Change to:_____
6 _____
7 Reason for change:_____
8 Page No._____Line No._____Change to:_____
9 _____
10 Reason for change:_____
11 Page No._____Line No._____Change to:_____
12 _____
13 Reason for change:_____
14 Page No._____Line No._____Change to:_____
15 _____
16 Reason for change:_____
17 Page No._____Line No._____Change to:_____
18 _____
19 Reason for change:_____
20 Page No._____Line No._____Change to:_____
21 _____
22 Reason for change:_____
23
24 SIGNATURE:_____DATE:_____
   JONATHAN PEMPEK
25



JONATHAN PEMPEK
UNITED STATES OF AMERICA V SHARFI

May 19, 2022
305

Page 305

```
 1              DEPOSITION ERRATA SHEET
 2    Page No._____Line No._____Change to:_____
 3    _____
 4    Reason for change:_____
 5    Page No._____Line No._____Change to:_____
 6    _____
 7    Reason for change:_____
 8    Page No._____Line No._____Change to:_____
 9    _____
10    Reason for change:_____
11    Page No._____Line No._____Change to:_____
12    _____
13    Reason for change:_____
14    Page No._____Line No._____Change to:_____
15    _____
16    Reason for change:_____
17    Page No._____Line No._____Change to:_____
18    _____
19    Reason for change:_____
20    Page No._____Line No._____Change to:_____
21    _____
22    Reason for change:_____
23
24    SIGNATURE:_____DATE:_____
              JONATHAN PEMPEK
25
```

