# EXHIBIT 16

**Page 1**

```
 1              UNITED STATES DISTRICT COURT
 2              SOUTHERN DISTRICT OF FLORIDA
 3                 FORT PIERCE DIVISION
 4
 5    UNITED STATES OF AMERICA,
 6          Plaintiff,
 7          v.              CASE NO.
                            2:21-cv-14205-KAM
 8    BENJAMIN K. SHARFI, in his
      personal and fiduciary
 9    capacity as trustee of the
      Benjamin Sharfi 2002 Trust,
10    and NESHAFARM, INC.,
11          Defendants.
12
13          VIDEOCONFERENCE DEPOSITION OF
14                 ROBERT HALBERT
15                  June 1, 2022
16                  1:06 p.m.
17
                 Fort Pierce, Florida
18
19
20
21
22
23
24
                  Lindsey Spain
25                Digital Reporter
```

**Page 2**

```
 1
         On behalf of the Plaintiff, United States of America:
 2
 3       BRANDON N. ADKINS, ESQ.
         UNITED STATES DEPARTMENT OF JUSTICE
 4       ENVIRONMENT & NATURAL RESOURCES DIVISION
         950 Pennsylvania Avenue, Northwest
 5       Washington, DC 20530
         202.616.9174
 6       202.514.8865 FAX
         brandon.adkins@usdoj.gov
 7
 8    On behalf of the Defendant, Benjamin K. Sharfi, in
      his personal and fiduciary capacity as trustee of the
 9    Benjamin Sharfi 2002 Trust, and NeshaFarm, Inc.:
10       CHRISTOPHER F. HAMILTON, ESQ.
         SHARFI HOLDINGS, INC.
11       3731 Northeast Pineapple Avenue
         2nd Floor
12       Jensen Beach, Florida 34957
         813.416.2352
13       chamilton@sharfiholding.com
14
15    Also Present:
         Joshua Miron
16       Neal McAliley
         William Moore, Army Corp of Engineers
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1              INDEX OF EXAMINATION
 2    EXAMINATION:                              PAGE
 3    Direct Examination by Mr. Hamilton          5
 4    Cross-Examination by Mr. Adkins           133
 5    Redirect Examination by Mr. Hamilton      141
 6    Recross-examination by Mr. Adkins         148
 7    Certificate of Oath                       152
 8    Certificate of Digital Reporter           153
 9    Certificate of Transcriptionist           154
10    Errata Pages                              155
11
                   INDEX TO EXHIBITS
12
      DEFENDANT'S        DESCRIPTION           PAGE
13
      Exhibit 205    Email from Jonathan Pempek   5
14                   Sharfi Meeting MFR 5/16/18
15    Exhibit 206    Jonathan Pempek's MFR       17
16    Exhibit 207    Email from Robert Halbert   33
                     RE: Sharfi Wetland 7/19/18
17
      Exhibit 208    Email from Jonathan Pempek  45
18                   NeshaFarm 11/28/18
19    Exhibit 209    Formal Referral to EPA Region 4   47
                     Letter to Jennifer Derby 11/28/18
20
      Exhibit 210    Meeting Invite from Matt Hicks   50
21                   Sharfi Referral 12/13/18
22    Exhibit 211    Email from Robert Halbert 12/14/18   51
23    Exhibit 212    EPA letter to Robert Halbert   53
                     12/20/18
24
      Exhibit 213    Email from Christopher Parker   53
25                   Sharfi 4/25/19
```

**Page 4**

```
 1    INDEX TO EXHIBITS, cont'd.
 2    Exhibit 214    Email from Robert Halbert    55
                     RE: Next Week 5/15/19
 3
      Exhibit 215    Travel Order Request         57
 4                   5/20/19 to 5/21/19
 5    Exhibit 216    Email from Jonathan Pempek   59
                     Sharfi Wetland Fill 8/15/19
 6
       Exhibit 217   Travel Order Request         61
 7                   10/15/19 and 10/18/19
 8    Exhibit 218    Email from Jonathan Pempek   71
                     RE: NeshaFarm 11/30/18
 9
      Exhibit 219    Wetland Determination Data Form   80
10                   10/15/19
11    Exhibit 220    2019 Enforcement Section Team   83
                       Meeting
12
      Exhibit 221    FY20 Enforcement Section Team   93
13                     Meeting
14    (Previously marked exhibit.)
15    Exhibit 200    Cease-and-Desist Letter      134
16    (Original exhibits retained by counsel for
      Defendant.)
17
18
19
20
21
22
23
24
25
```



ROBERT HALBERT                                          June 01, 2022
USA vs SHARFI                                                 5–8

Page 5

1          DEPOSITION OF ROBERT HALBERT
2               JUNE 1, 2022
3
4          THE REPORTER:  Okay.  We are going on the
5   record, and the time is currently 1:06 p.m. eastern
6   standard time.
7               DIRECT EXAMINATION
8   BY MR. HAMILTON:
9       Q.  All right.  Mr. Robert, we're back on
10  now.  During our lunch break, did you speak with
11  anyone about the deposition or this litigation?
12      A.  No.
13      Q.  Okay.  I'm going to share with you what
14  we'll mark as, I think we're on 205 now.  This
15  exhibit will be deposition Exhibit 205.  It's Army
16  Corps 10609.  This is an email from you -- excuse me.
17  From Mr. Pempek to you on May 16th, 2018.  And the
18  subject is Sharfi Meeting MFR, but it looks like he
19  attaches a document to that.  The MFR, is that
20  memorandum for record?
21          (Defendant's Exhibit 205 was marked for
22  identification.)
23      A.  Yes.
24      Q.  And do you recognize this email?
25      A.  Not specifically, but -- oh, now, it's --

Page 6

1       Q.  Sorry.  Mr. Pempek writes, "Bobby,
2   attached is my MFR documenting our meeting with Mr.
3   Sharfi.  It is very detailed purposefully.  We should
4   discuss this further."  Then he signs it.  Why did he
5   include that it is very detailed purposefully?  Do
6   you know?
7       A.  Not necessarily.  I mean, I can only
8   speculate as to what he was referencing, you know?
9   It, it -- so we know we had a case in which we've
10  issued a notice of violation.  He's been out on site
11  apparently at this point.  He has the MFR that is
12  including his observations.  And now, he's stating
13  that it's detailed purposely.  So I don't know
14  exactly why he used the adjective.  I mean, I, I
15  expect them, of course, to be detailed regardless.
16  So I, I don't know what his rationale was for that.
17      Q.  Okay.  That was going to be one of my
18  questions was, are all of them detailed?  In your
19  experience with Mr. Pempek to that point, were all of
20  his memorandums for record detailed?
21      A.  Yes.  For, for, for this case, they, they
22  have been detailed.
23      Q.  Did you have an opportunity -- it looks
24  like he sent this to you in a D-O-C-X form, so that
25  means a Word format.  Did you have an opportunity to

Page 7

1   read this MFR in Word format?
2       A.  I'm sure I did.
3       Q.  Did you make any edits or changes to the
4   MFR before it was finalized?
5       A.  I had opportunity to do so.  I'm not sure
6   that I did or needed to.  These MFRs are --
7   especially if they're -- if it's an initial MFR, I
8   want them to be somewhat raw and capture the project
9   manager's thoughts and specifics for their on-site
10  observations.  So he -- John may have been -- he may
11  have sent it in a Word document, but I don't -- I
12  don't typically wordsmith MFRs.  I want them to stand
13  on their own.
14      Q.  If you had made any changes to his MFR,
15  would you have saved a separate version of that and
16  then sent it back?
17      A.  Yes.  So depending on -- and I have to
18  look at the MFR.  And the site inspection MFRs don't
19  -- I don't need to sign off on them.  Again, I want
20  them to be inherent to the project managers.  If for
21  some reason he required my signature down on the
22  bottom, then I would've signed it.  I would've PDF'd
23  it and sent it back to him.
24      Q.  Are these normally transmitted to you in
25  a Word format or a PDF format once they're finished?

Page 8

1       A.  Some of the project managers send them to
2   me in a PDF.  Some of them send them to me in a -- in
3   a Word doc.
4       Q.  And for Mr. Pempek, what did he typically
5   do when an MFR was final and complete?
6       A.  I think that he sends them in Word
7   documents.  I mean, it -- typically, the process is,
8   is that, you know, I, I will -- if we're sending a
9   notice of violation, I'll brief our leadership to let
10  them know that we're sending out a, a, a letter, a, a
11  formal letter.  If I don't see there to be any issues
12  with the MFR, meaning that it's hitting the wickets,
13  so I'm not -- I don't necessarily wordsmith because,
14  again, that's an internal document.  I will PDF it
15  just to allow the, the leadership to, to know that
16  it's a finalized document.  So if it's not already a
17  PDF by the time I get it, then I generally make it a
18  PDF.
19      Q.  So, again, for Mr. Pempek, does he -- the
20  question I asked was, does he typically send them to
21  you in Word or PDF format?
22      A.  I think typically it's Word.
23      Q.  Do your project managers write an MFR for
24  every site visit they conduct?
25      A.  We are required to.



ROBERT HALBERT
USA vs SHARFI

June 01, 2022
9–12

Page 9

1    Q.   By who?
2    A.   By the deputy chief.
3    Q.   And who is that?
4    A.   His name is Dale Beter.
5    Q.   Is that the nationwide deputy chief?
6  What is his position?
7    A.   He is the deputy chief of the regulatory
8  division in Jacksonville.
9    Q.   So it's his requirement, not an Army
10 Corps requirement, that MFRs are written for every
11 site visit?
12   A.   Yes.
13   Q.   Is there a template of sections to
14 include in an MFR?
15   A.   Not for a site inspection.  But we have
16 several different MFRs.  So, for instance, on a --
17 some type of decision document on the permitting
18 side, it's, it's, it's a form letter, if you will,
19 for site inspections.  If we -- if we document by way
20 of an MFR, it's tell the story, pictures, narrative
21 as to your findings, some type of documentation to,
22 to show that a site inspection was done.
23   Q.   So is it generally left up to the PM as
24 to what is or is not included in that MFR?
25   A.   You could say that.  Yes.

Page 10

1    Q.   For site visits, to be precise.
2    A.   It's -- so at, at the time, we didn't
3  have -- didn't really have any type of template.  So
4  yes.  It was incumbent upon the project manager to
5  have good detail and composition within the MFR.  We
6  are -- we're now using technology.  We have a, a, a
7  platform that will formulate an MFR for us on our
8  behalf.  So we put in information, and it does have
9  some organized criteria in there, much of which does
10 not apply to enforcement.  So at the time this was,
11 was going on in 2018, it was somewhat up to the
12 project manager to document their findings in the
13 field.
14   Q.   So it says here that we should discuss
15 further.  Do you recall having a conversation with
16 Mr. Pempek about his statement that you should
17 discuss it further with him?
18   A.   Like I had mentioned earlier, I'm sure
19 we've had many conversations.  And I don't know
20 specifically what the conversation was after this
21 email.
22   Q.   Was a decision made at this point in time
23 to bring an enforcement action against Mr. Sharfi?
24   A.   I think at this point since we had been
25 out on-site kind of recalling the events that took

Page 11

1  place, I think we had a good idea that we were going
2  to seek legal counsel from the Army Corps of
3  Engineers.
4    Q.   Do you recall if there was anything Mr.
5  Pempek wanted to tell you that he did not include in
6  his memorandum?
7    A.   I don't recall any information that he
8  steered outside of, of what was in his MFR.  I mean,
9  to your previous question, again, that confidence
10 level was continuing to grow as we collected data.
11 So at this point, yes.  I, I felt given the fact that
12 Mr. Sharfi did not intend to apply for a permit and
13 given we had credible resources, we had been out on-
14 site on the property, from our vantage point, we had
15 given Mr. Sharfi ample opportunity to respond
16 appropriately.  We were more than likely at the
17 point, May of 2018, that we were pretty serious about
18 seeking assistance from office of counsel.
19   Q.   And so when you say seeking assistance
20 from office of counsel, what do you mean by that?
21   A.   Getting together with office of counsel,
22 briefing them on our -- on our case, and making any
23 recommendations.
24   Q.   What were your recommendations then at
25 that moment?

Page 12

1       MR. ADKINS:  Objection.  I think this
2  question is starting to merge into the substance of
3  privileged communications that Mr. Halbert had with
4  office of counsel at the Corps.
5  BY MR. HAMILTON:
6    Q.   Okay.  Let me ask this.  At this point in
7  time, Mr. Halbert, had you made a determination that
8  you were going to pursue a legal action against Mr.
9  Sharfi?
10   A.   Had I made a determination?  Yes.  I
11 would say at this point I, as the enforcement chief,
12 had made a determination.
13   Q.   Okay.  And so you would have filed a
14 lawsuit at this point in time if it were up to you
15 against Mr. Sharfi?
16   A.   Well, no because of -- you know, there
17 was obviously steps in front of us with respect to
18 coordinating with office of counsel.
19   Q.   So when you say coordinating -- and
20 again, I don't want to know what you talked about.
21 What are those steps though?
22   A.   We briefed them on the violation.  We, we
23 run down the elements of the violation.  We, we write
24 a memo supporting our case, how is it jurisdictional,
25 what were the activities that, that transpired.  In a



Page 13

1   general sense, what that does is it briefs offices of
2   counsel. If they feel that there is merit to the
3   case, then they could refer a case to the Department
4   of Justice.
5        Q.   So at this point, since Mr. Pempek had
6   conducted a site inspection -- and we'll get into his
7   memo in a moment -- were you sure that the Army Corps
8   had jurisdiction over the site at this point?
9        A.   Yeah. I would -- I would say so. I
10  mean, it, it -- again, in, in a typical sense, if I
11  don't feel it's jurisdictional then, you know, we're
12  not going to have that conversation with office of
13  counsel. I have -- you know, I've told project
14  managers in the past I don't feel it's
15  jurisdictional.
16       Q.   So what, if any, steps would have been
17  taken to confirm the Army Corps' jurisdiction at that
18  point other than the site visit?
19       A.   Can you repeat that, please?
20       Q.   Yeah.
21       MR. HAMILTON: Madam Court Reporter, can
22  you read back the question, please?
23       THE REPORTER: Yes. Give me just a
24  moment for playback. Stand by.
25       MR. HAMILTON: Sure.

Page 14

1        THE REPORTER: Okay. Stand by for
2   playback.
3        (The record was replayed.)
4        THE REPORTER: Okay. That's the end of
5   playback.
6   BY MR. HAMILTON:
7        Q.   I think I can ask the question again.
8   What actions would you have taken up to the point of
9   involving office of counsel other than the site
10  inspection by Mr. Pempek to confirm the Army Corps'
11  jurisdiction over the site?
12       A.   We'd like to have more data, but we were
13  not allowed to go through a, a definitive
14  determination as far as process while John was out on
15  the premise. That was at least what was conveyed to
16  me is that while he was out on site, he was not able
17  to -- or he was able to look around, but he wasn't
18  able to do point descriptions, dig holes, so on and
19  so forth.
20       So there was some limitation. But apart
21  from the site inspection, that, that would have been
22  -- I think I'm answering your question. That would
23  be really the only thing that I know of that we would
24  have preferred to have had is more detailed
25  information from the site inspection. But we were

Page 15

1   not authorized to do so at the time.
2        Q.   And would it be fair to say that the only
3   thing you know about the site inspection is what was
4   included in Mr. Pempek's memorandum?
5        MR. ADKINS: Objection. Vague.
6   BY MR. HAMILTON:
7        Q.   Well, let me back up and lay some
8   predicate. You weren't at the site inspection on May
9   14th, 2018, correct?
10       A.   That, that's correct.
11       Q.   And you testified that you don't recall
12  specifically any conversations -- well, let me ask
13  this. Do you recall specifically any conversations
14  you had with Mr. Pempek specifically about the May
15  14, 2018 site inspection after it was conducted?
16       A.   I don't recall specific conversations.
17  No. I'm sure we had specific conversation, but I
18  can't testify what the details of those conversations
19  were. I'm sure we probably had discussions as to
20  after the inspection occurred. He probably called me
21  and said, "Hey, these are my findings. This is what
22  I found out."
23       Q.   Do you recall anything about
24  conversations with Mr. Pempek about the site
25  inspection after the fact?

Page 16

1        A.   I recall that he was not allowed to do
2   point descriptions --
3        Q.   Is that --
4        A.   -- that it was more a, a walk around the
5   perimeter taking observations.
6        Q.   Is that because that's what he told you
7   or you read in his memo?
8        A.   I don't -- I don't know if it's in -- if
9   it's in his MFR. But I was aware that there was some
10  limitations of the site inspection. And I, I can
11  only surmise that that was based off of verbal
12  discussions with John.
13       Q.   Okay. Do you recall discussing the site
14  inspection with anyone else that was there other than
15  Mr. Pempek?
16       A.   No. No, John was the only one that I was
17  in contact with.
18       Q.   Right. So would it be fair to say that
19  anything you learned about the site inspection would
20  have come from either Mr. Pempek telling you in a
21  conversation or from statements included in his MFR?
22       A.   I would -- I would agree with that.
23       Q.   All right. I'm going to show you what
24  we'll mark as Exhibit 206, deposition 206. But I'm
25  going to just quickly run through this. I'm going to



ROBERT HALBERT
USA vs SHARFI

June 01, 2022
17–20

Page 17

1  represent to you that this is Mr. Pempek's MFR. And
2  this is Army Corps document 37 to 48. Okay. Do you
3  recognize this document, Mr. Halbert?
4      (Defendant's Exhibit 206 was marked for
5  identification.)
6      A.  I do.
7      Q.  And what is this?
8      A.  This is the MFR from John Pempek's
9  inspection.
10     Q.  And first off, I just want to go down
11 here to the bottom page, the last page. It says,
12 "Prepared by," and then it's got a digital signature
13 here of Mr. Pempek. Is that digital signature -- are
14 you able to put that into a Word document, or does it
15 need to be in a PDF? Do you know?
16     A.  That's generated from a -- well, I mean,
17 I'm -- my experience is it's based off of the PDF.
18 You can -- you, you can only do that through a PDF,
19 but I'm not a -- an IT guy.
20     Q.  Right. Me either. I think that's the
21 case, but I wanted to see if you knew. So I know he
22 sent you his MFR in Word format. So it appears, at
23 least, if that's true on the signature that, at some
24 point, he converted it to a PDF and signed it,
25 correct?

Page 18

1      A.  I, I would assume that to be true.
2      Q.  And so do you know why Mr. Pempek
3  included, for example, this background section on Mr.
4  Sharfi?
5      A.  My, my reading of this at the time, I
6  would say from, from my point of view, John Pempek
7  was establishing that there was a, a flagrant nature
8  to Mr. Sharfi. That is -- that is my understanding
9  of, of what he may have been writing into this
10 document.
11     Q.  So when you say flagrant nature, why do
12 you say that?
13     A.  Because there were -- And I, I don't know
14 because I wasn't a part. That there was either
15 imminent or potential legal processes that were going
16 on apart from enforcement, and it involved this, this
17 Buccaneer condo at the time. So, you know, my take
18 on this is we are establishing that Mr. Sharfi is
19 aware of the regulatory processes. And, you know, so
20 we're -- we, as an enforcement program with this
21 case, are somewhat establishing the flagrant nature
22 of, of Mr. Sharfi.
23     Q.  So wait a minute. The Sailfish and the
24 Buccaneer Marina you mentioned, does that have to do
25 with wetlands?

Page 19

1      A.  I -- and again, I am not privy to what
2  was going on with that. That was a, a separate issue
3  from, from compliance and enforcement, so I cannot
4  speak to any detail as to what was going on at the
5  Sailfish and the Buccaneer. I believe John Pempek
6  was aware, and that may have just been through
7  communication avenues within the Palm Beach Gardens
8  office. But I myself am not aware and did not
9  necessarily tie the two issues together.
10     Q.  So why would he include that in here if
11 there's not necessarily any bearing whatsoever on
12 whether or not there was a Clean Water Act violation?
13     A.  I can't speak to why he would have put
14 that in there.
15     MR. ADKINS: Objection. Wait. Excuse
16 me, Mr. Halbert. Objection. Lacks foundation. The
17 witness already testified he's not aware.
18 BY MR. HAMILTON:
19     Q.  Good. You can go ahead, Mr. Halbert.
20     A.  I, I can't speak to why John put that in
21 there. I can only speak to how I received that
22 information. And so I'm receiving it -- you know, I
23 knew that there were some ongoing issues apart from
24 our case. It led me to believe that Mr. Sharfi is
25 aware of the regulatory program. And, you know, if

Page 20

1  that's the case, then that would lead me to believe
2  that there is potentially a flagrant nature to the
3  actions that have taken place.
4      Q.  So it's your determination that just
5  based on the fact that he has this other legal
6  dispute with DEP, which is a different state agency,
7  that he's a flagrant violator?
8      A.  No, it doesn't have anything to do with
9  DEP.
10     MR. ADKINS: Objection. Lacks
11 foundation.
12 BY MR. HAMILTON:
13     Q.  Okay. So I'll just represent to you the
14 Buccaneer condo and what he references here has to do
15 with a permit that was issued by the DEP relating to
16 a dock expansion. It has nothing to do with the
17 wetlands. Did you ask Mr. Pempek anything about
18 this, or did you just come to that conclusion on your
19 own?
20     A.  We -- there was discussions as to the,
21 the Buccaneer Bay. There was some property disputes
22 or something like that. I didn't recall if it was
23 just a DEP-related issue or a, a court issue. But
24 again, I take away from this that there is a -- that
25 there are other experiences between regular --



ROBERT HALBERT
USA vs SHARFI

June 01, 2022
21–24

Page 21

1 regulatory program and Mr. Sharfi.  So that would
2 conclude that he is aware of the permitting process.
3     Q.  So by virtue of the fact that Mr. Sharfi
4 sought a permit for his marina, you're drawing the
5 conclusion that he must know that he needs a permit
6 for site work as it relates to a wetland?
7        MR. ADKINS:  Objection.
8 BY MR. HAMILTON:
9     Q.  You can answer.
10     A.  I, I don't -- I mean, I'm not going to
11 answer for Mr. Sharfi what he knows and what he
12 didn't know.  I mean, he -- in, in my opinion, he was
13 aware of the regulatory program.  And so there were -
14 - there were other issues that were -- that were
15 ongoing that to me reflected that, well, if he's --
16 if he's conducting activities, regardless if it's in
17 navigable waters or in a wetland, there is a federal
18 process in place that he needs to go through.
19     Q.  So never mind.  Strike that.
20        All right.  So this part here about that
21 his company has an $88 million contract with the U.S.
22 Army, do you know why Mr. Pempek included that
23 information in this MFR?
24        MR. ADKINS:  Objection.  Foundation.
25 BY MR. HAMILTON:

Page 22

1     Q.  You can answer.
2     A.  So there are -- there was -- so John
3 Pempek did make me aware that he is I guess I would
4 categorize it as a influential person.  You know, he,
5 he, he knows people.  He apparently -- John Pempek
6 shared with me that there was some relationships with
7 at the time Governor Rick Scott and that, you know,
8 that may be a problem when it comes to the -- to the,
9 the state compliance enforcement process.
10     Q.  Okay.  So --
11     A.  So he was making me aware of that.
12     Q.  So earlier, you testified you don't
13 recall having specific conversations with Mr. Pempek
14 about the site visit.  But now, you're saying you do
15 recall having a conversation about Mr. Sharfi who he
16 knew?
17     A.  We've had -- I, I've stated we've had
18 many a conversations about this.  You know, I, I can
19 sit here and I can recall, you know, from the MFR
20 and, and say, "Okay.  I remember this and I remember
21 that."  But I can't just remember every conversation
22 we had and what the details were.  So yeah.  I, I
23 will say that, that, that, you know, we -- at some
24 point when John was doing his research, he made me
25 aware that Mr. Sharfi is an influential person, he's

Page 23

1 very successful, and he has a, a relationship with,
2 with Governor Rick Scott.  So I, I, I do recall
3 speaking to that verbally with, with John Pempek.
4     Q.  So is it typical for project managers to
5 include in their MFRs background or property owner's
6 unrelated businesses?
7     A.  It wouldn't strike me as being odd.  I
8 would say no.
9     Q.  Do you know if General Microsystems
10 Incorporated is located on the site or on NeshaFarm?
11     A.  No.  I'm not aware of that.
12     Q.  If it had been, do you think Mr. Pempek
13 would have put that in his MFR?
14     A.  If it had been associated with the
15 property?
16     Q.  Yes.
17        MR. ADKINS:  Objection.  Calls for
18 speculation.
19 BY MR. HAMILTON:
20     Q.  Do you know?
21     A.  I don't know.  I, I don't know if you
22 would put it in there or not.
23     Q.  Did Mr. Pempek ever explain to you that
24 he included this dollar figure so that it would
25 demonstrate an ability to pay some sort of penalty to

Page 24

1 the Army Corps?
2     A.  Perhaps.
3     Q.  So is it typical for an enforcement
4 project manager to include information on a site
5 owner's or property owner's wealth or potential
6 wealth as it relates to being able to seek penalties
7 against that person?
8     A.  I don't know about the the, the, the
9 wealth.  I, I will state that when, when we get into
10 economic benefit that that may come up.
11     Q.  All right.  So going down here, Mr.
12 Pempek talked about the meeting that was conducted
13 and the site inspection, and then he lists a number
14 of claims that were made by Mr. Sharfi during the
15 visit.  Do you recall reviewing these when you
16 received the MFR?
17     A.  Vaguely.
18     Q.  So up here, it says the project is
19 unauthorized filling of jurisdictional wetlands.  Do
20 you see that?
21     A.  I do.
22     Q.  So at that point, it had already been
23 decided that the wetlands, if any on the site, were
24 jurisdictional in nature?
25     A.  Based on the --



ROBERT HALBERT
USA vs SHARFI

June 01, 2022
25–28

Page 25

1    MR. ADKINS:  Objection.  Foundation.
2    BY MR. HAMILTON:
3    Q.   You can answer.
4    A.   Based on the information that we had
5    available to us at the time, we felt that the area
6    was jurisdictional.
7    Q.   And just for clarity since Mr. Adkins
8    objected, when you say jurisdictional, you mean
9    within the federal government and Army Corps of
10   Engineers' jurisdiction, correct?
11   A.   That's correct.
12   Q.   Do you have any personal knowledge as to
13   the statements, if any, made -- Mr. Sharfi during the
14   May 14th, 2018 site inspection?
15   A.   The one that sticks out only became an
16   issue when we went -- were able to get back on site
17   was there was the reference to a firearm.
18   Q.   Okay.  And why does that stick out?
19   A.   Because it's a firearm and then to, to
20   what degree, you know, was that a threat.
21   Q.   So is it your understanding -- well, why
22   -- let me back up.
23       Do you know what the statement was, if
24   any, that was made about a firearm?
25   A.   I'd have to look -- I don't know if John

Page 26

1    mentioned it in the MFR.  But I, I -- it came back up
2    when we were visiting the site last fall, and we
3    wanted to ensure that there were proper security
4    measures in place.
5    Q.   So do you see here in number 11 -- is
6    this what you're referring to?
7    A.   Yes.
8    Q.   And you weren't there again to hear the
9    actual statement made, correct?
10   A.   That's correct.
11   Q.   Do you know whether he'd meant that in a
12   literal sense or a metaphorical sense?
13   A.   I don't know.
14   Q.   So did Mr. Pempek tell you that he
15   interpreted it as being in a literal sense?
16   A.   I don't recall John mentioning if it was
17   literal or not.  I know -- it, it -- I don't know if
18   this was -- there was probably a discussion, a verbal
19   discussion, after the site inspection.  And John had
20   made mention of it, I believe, on a phone
21   conversation that during inspection there was a
22   mention of a firearm.
23       And from my vantage point and based on
24   just, you know, listening to John, he didn't seem to
25   be overly concerned about it.  But, you know, again,

Page 27

1    I wasn't on the site.  That, that would be something
2    for John and perhaps the other two who were on-site
3    to, to indicate what type of motive was, was behind
4    the messaging.
5    Q.   So based on your interpretation of having
6    read this and discussed it with Mr. Pempek, you're
7    your -- is it your understanding that Mr. Sharfi
8    meant he had a loaded firearm and would use it?
9    A.   I -- based on my conversation with John
10   is he, he was made aware by Mr. Sharfi that he had
11   firearms on the premises.  I didn't believe that John
12   was -- felt like he was overly threatened by the
13   situation.  Otherwise, I think that they would have
14   left the property.  I don't know at what point Mr.
15   Sharfi indicated that, if that was at the beginning
16   of the inspection, at the end of the inspection.  And
17   it -- I mean, I don't -- I don't know much to, you
18   know, the, the backing of the statement.
19   Q.   But you do remember it.  I mean, it's the
20   one that stood out, correct?
21   A.   That is correct.
22   Q.   Would you be --
23   A.   We typically -- we typically don't -- we
24   typically do not hear -- with all of our site
25   inspections that we do, we typically don't come

Page 28

1    across somebody saying, "I have a firearm on the
2    premises."  So that, that, that obviously stands out.
3    Q.   Right.  So Mr. Pempek included this
4    because it was noteworthy and he thought it was
5    significant, correct?
6        MR. ADKINS:  Objection.  Lacks
7    foundation.  Calls for speculation.
8    BY MR. HAMILTON:
9    Q.   Do you know why he included this
10   statement, Mr. Halbert?
11   A.   No, I don't.
12   Q.   Are you aware that both Mr. Pempek and
13   Ms. Burns testified that they interpreted it as being
14   metaphorical in nature in their depositions?
15   A.   I was not aware of that.
16   Q.   So if that was the case, you would agree
17   with me that this statement here doesn't explain that
18   it's a metaphorical sense, correct?
19       MR. ADKINS:  Objection.  Calls for
20   speculation.  Misstates testimony.
21   BY MR. HAMILTON:
22   Q.   You can answer.
23   A.   I don't -- let's see.  I'm -- he's --
24   John's running down.  He's got his list of 12 here.
25   Q.   Well, let me ask this.  Would you agree



ROBERT HALBERT
USA vs SHARFI

June 01, 2022
29–32

Page 29

1  with me that there is a significant difference
2  between someone saying, you know, "I have a big gun,"
3  in the metaphorical sense that they're powerful, they
4  have lawyers, they can fight something, versus, "I
5  have a firearm, and I'm going to shoot you"?
6       A.  Yes, I would agree that there is a
7  difference.
8       Q.  Okay.  And you would agree that depending
9  on how that interpretation is provided to someone it
10  may sway their outlook on how that's received,
11  correct?
12       MR. ADKINS:  Objection.  Calls for
13  speculation.  Ambiguous.
14       THE WITNESS:  I mean --
15       MR. HAMILTON:  You can answer.
16       THE WITNESS:  -- I would agree with that.
17  I mean, it's, it's -- it would be speculative on my
18  part.  I mean, everybody have -- has life
19  experiences, and then they will take a -- they'll
20  take the messaging such as whatever it was on-site
21  differently.  If you ask somebody down the line of
22  who witnessed that, they may say something different
23  from each person who witnessed that.
24       So I can only speculate how that was
25  received on-site.  You know, Mr. Pempek has here --

Page 30

1  he's got a list of everything -- these 12 things that
2  he wrote down.  He felt that it was noteworthy, these
3  12 items, that he included that in his MFR.  So he,
4  he felt it was noteworthy regardless of, of what the
5  intention was behind the messaging.
6  BY MR. HAMILTON:
7       Q.  All right.  So you would agree with me
8  that your understanding of what was said and how it
9  was said on-site is only through the lens of what
10  information Mr. Pempek provided to you, correct?
11       A.  Correct.
12       Q.  So if someone else was on site and
13  interpreted differently and was presented to you in a
14  different fashion, it could impact your understanding
15  of how things occurred during the site visit?
16       MR. ADKINS:  Objection.  Vague.  Calls
17  for speculation.
18  BY MR. HAMILTON:
19       Q.  You can answer.
20       A.  Yeah.  I don't -- I don't know how to
21  answer that.  I mean, I, I, I don't -- again, I --
22  to, to speculate how other people receive that, I
23  mean, I don't know how many people were out on site.
24       Q.  Do you know if Samantha Burns attended
25  the site inspection?

Page 31

1       A.  I believe she did.  Yes.
2       Q.  I believe it was Samantha Rice.  Yeah.
3  Yeah.  Burns is now her married name.
4       A.  Correct.
5       Q.  Do you know if she completed the MFR?
6       A.  I don't know.  I -- given that John wrote
7  an MFR, I, I don't think she would have.  But I don't
8  know that to be a fact.
9       Q.  Would it be typical for each person from
10  the Army Corps who attended a site inspection to
11  prepare their own MFR?
12       A.  I would not say that that would be
13  typical.  Based on how I hear, you know, project
14  managers discuss, you know, particularly joint
15  inspections, somebody usually takes the lead on
16  writing an MFR.
17       Q.  And on this email in I believe it's
18  deposition Exhibit 205, Mr. Pempek doesn't include
19  Ms. Rice or Burns on this email despite her
20  attending, correct?
21       A.  Correct.  She's not cc'd on the email.
22       Q.  Do you know if he ran his MFR by her or
23  had her review it before he submitted it to you?
24       A.  I'm not aware if that occurred.
25       Q.  All right.  Going back to Exhibit 206,

Page 32

1  there's two black boxes that are on the Army Corps
2  Bates 42.  Do you know what's under these black
3  boxes?
4       A.  No.
5       Q.  Do you know why the black boxes were
6  included?
7       A.  Scroll down a little bit, please.
8       Q.  Yes, sir.  The remaining page, I'll tell
9  you, just have photos.
10       A.  No.  I don't know what -- I mean, is that
11  redacted information?
12       Q.  I'm assuming it is, but I'm just asking
13  to know if you know or not.
14       A.  I don't recall what those photos would
15  represent.
16       Q.  The boxes, you mean?
17       A.  Yes.  I --
18       Q.  Would --
19       A.  -- suspect they're, they're images, but I
20  don't know that to be true.  I don't know what the --
21  what the black boxes represent.
22       Q.  I'm sorry.  I didn't mean to keep
23  interrupting you.  Would Mr. Pempek be in a position
24  to recommend a legal action against Mr. Sharfi or
25  NeshaFarm?



ROBERT HALBERT
USA vs SHARFI

June 01, 2022
33–36

Page 33

1    A.  Yes.
2    Q.  Would that ultimately have to be approved
3  by you?
4    A.  Yes.  Sometimes I ask project managers
5  for their recommendation in particular matters.
6    Q.  All right.  Let's look at we'll mark as
7  207.  Take a quick look through that, and do you
8  recognize this email chain, Mr. Halbert?
9        (Defendant's Exhibit 207 was marked for
10  identification.)
11    A.  I do.
12    Q.  And what is your understanding of the
13  bottom email?
14        MR. ADKINS:  What's our Bates on this,
15  Counsel?
16        MR. HAMILTON:  1520.
17        THE WITNESS:  So you're asking me what
18  the, the bottom email references?
19  BY MR. HAMILTON:
20    Q.  Yes, sir.
21    A.  So John was apparently in -- he, he
22  checked in with water management district.  They gave
23  him an update as to, you know, where they were at in
24  their process.  Apparently, you know, there was
25  negotiating towards a settlement agreement.  And John

Page 34

1  was kind of giving me an update as to where the water
2  management district was with, with their enforcement
3  process.
4    Q.  Do you know if the district ever brought
5  a legal action against Mr. Sharfi or NeshaFarm?
6    A.  I know they brought a legal action.  I
7  don't know to, to what avail and what the resolution
8  was.
9    Q.  When I say legal action, I should have
10  been more clear.  Do you know if they ever filed a
11  lawsuit against Mr. Sharfi or NeshaFarm?
12    A.  I, I don't know.  I know that there was
13  state involvement with respect to Mr. Sharfi, and,
14  and that's about it.  I know John was kind of
15  following along more detail than I was.  But, you
16  know, I -- my particular interest was I didn't want
17  redundancy, if you will, or us stepping on the toes
18  of an active investigation with the water management
19  district.  So that was -- from, from my chair, that
20  was really all my interests with regards to
21  compliance and enforcement process with the water
22  management district.
23        MR. ADKINS:  Just try to remember to wait
24  for Mr. Hamilton's question.
25        MR. HAMILTON:  I mean, he's allowed to

Page 35

1  answer however he'd like.
2        MR. ADKINS:  Right.  He said, "I don't
3  know."  And then I think he was waiting for your next
4  question.
5  BY MR. HAMILTON:
6    Q.  Mr. Halbert, you would agree that the
7  State of Florida, particularly the district, has a
8  different regulatory scheme when it comes to wetlands
9  than the Army Corps of Engineers, correct?
10    A.  Correct.
11    Q.  So would you agree that there are
12  instances where the district may pursue something
13  against a property owner and the Army Corps may not?
14    A.  Am I aware of that?  Yes.
15    Q.  So if at this point in time, which was
16  July of 2018, so several months after the site visit
17  -- well, let me back up.
18        This is several months after the site
19  visit, and you've already testified that, at the time
20  the MFR was issued and the site inspection occurred,
21  you were confident that it was time to get office of
22  counsel involved, correct?
23        MR. ADKINS:  Objection.  Misstates
24  testimony.  Vague.
25  BY MR. HAMILTON:

Page 36

1    Q.  You can answer.
2    A.  Yes.  Correct.
3    Q.  So at this point, you had already decided
4  that, in your opinion, legal action against Mr.
5  Sharfi was necessary?
6        MR. ADKINS:  Objection.  Vague.
7        THE WITNESS:  That wasn't my call.
8  BY MR. HAMILTON:
9    Q.  It was not your call?
10    A.  It was not my call to have legal counsel.
11  I mean, that's, that's up to the office of counsel to
12  make that determination.  My, my part in this is to
13  brief the office of counsel and make our
14  recommendations.  But whether or not to take the
15  case, I, I believe that's up to the office of
16  counsel.
17    Q.  Okay.  But I think you testified earlier
18  that you had recommended a legal action be pursued
19  against Mr. Sharfi as of after the site inspection,
20  correct?
21    A.  I, I believe so.  Chronologically, yes.
22    Q.  So at this point, several months after
23  that, why would you be then waiting for the district
24  to handle their matter pertaining to Mr. Sharfi when
25  it's under a different regulatory scheme than the



ROBERT HALBERT
USA vs SHARFI

June 01, 2022
37–40

Page 37

1  Army Corps?
2  MR. ADKINS:  Objection.
3  MR. HAMILTON:  What's the basis?
4  THE WITNESS:  I'm not sure I understand
5  the question considering that the water management
6  district, they had their process and, and we had
7  ours.  I am not sure how it, it relates.
8  BY MR. HAMILTON:
9  Q.  Yeah.  I thought you had just testified
10  that you didn't want to get involved and essentially
11  step on the district's toes as they were undergoing
12  their process?
13  A.  That's correct.  I had not received any
14  information that would preclude us from not taking
15  any type of -- or at least continuing the enforcement
16  process that we had ongoing.
17  Q.  So were you waiting to see what happened
18  with the district before the Army Corps pursued its
19  alleged violation further?
20  A.  Not necessarily.
21  Q.  It just seems like that statement there
22  contradicts what you said earlier that you were
23  waiting and you didn't want to step on their toes.
24  MR. ADKINS:  -- the question.
25  BY MR. HAMILTON:

Page 38

1  Q.  Yeah.  Do those contradict each other?
2  A.  I don't see -- I mean, it -- you asked me
3  if I was paying attention to what the district was.
4  I was paying attention to the, the point that, you
5  know, if -- what -- their, their remedial action,
6  their resolution of the matter would either coincide
7  or conflict with, with our process.  That was what I
8  wanted to -- with this case and any other case.  If I
9  know there's another regulatory agency involved, I
10  certainly don't want to disrupt another agency's
11  investigation.
12  Q.  So that's what I'm trying to understand.
13  Did you not pursue your investigation because of
14  theirs, or were you still investigating at this time
15  alongside the district?
16  MR. ADKINS:  Objection.
17  THE WITNESS:  I'm not aware of -- I'm not
18  aware of any point in which we just stopped our
19  investigation based on what the state was doing.
20  BY MR. HAMILTON:
21  Q.  Okay.  All right.  So you say here you
22  respond to Mr. Pempek's email, and you said, "Like I
23  said, I would love to meet this guy!"  Why did you
24  send that email?
25  A.  I think Mr. Sharfi is a flamboyant person

Page 39

1  as a personality, and I meant what I said there.  I -
2  - it'd be interesting to, to meet him.
3  Q.  Had you talked to Mr. Sharfi at all up to
4  this point?
5  A.  No.
6  Q.  Had you ever emailed with Mr. Sharfi
7  directly?
8  A.  I don't recall having a direct line of
9  communication with Mr. Sharfi.  There were emails in
10  which we were both cc'd on.  I, I believe my
11  intention was to allow John Pempek to be the point of
12  contact with Mr. Sharfi.  But I don't recall at any
13  point having a one-on-one conversation either email
14  or verbally with Mr. Sharfi.
15  Q.  So your basis of understanding whether
16  Mr. Sharfi was I think you said flamboyant or not is
17  through Mr. Pempek's interactions with him?
18  A.  I would say yes.  I -- you know, I don't
19  -- I wasn't doing research on, on who Mr. Sharfi was.
20  I, I think that that would probably be accurate that
21  my knowledge of Mr. Sharfi was limited to what John
22  Pempek had, had told me.
23  Q.  Did you get to meet Mr. Sharfi after this
24  email?
25  A.  I met him last fall when we were

Page 40

1  conducting the site inspections.
2  Q.  And what interaction did you have with
3  him during that site inspection?
4  A.  I think I told him good morning.
5  Q.  And did he say anything back to you?
6  A.  I think he told me good morning back.
7  Q.  Did he act flamboyant as you described?
8  A.  Based on his body language and, and his
9  interaction with the, the inspection team, yes.  I
10  would say that.  His -- he was carrying signs, video
11  cameras, so.  So I, I would say yes.  Based on what
12  John Pempek told me, that kind of held true with what
13  I encountered during the site inspection.
14  Q.  Okay.  And so you've met him one time,
15  and you've made an assessment where you said good
16  morning to him, and yet you think that he's
17  flamboyant?
18  MR. ADKINS:  Objection.  Misstates
19  testimony.
20  BY MR. HAMILTON:
21  Q.  I mean, you understand, that's a strong
22  characterization of someone, right, to make off of
23  something that's been told to you by other people.
24  And then you've met a person one time, and they said
25  good morning to you.  You understand why I'm asking



ROBERT HALBERT
USA vs SHARFI

June 01, 2022
41–44

Page 41

1  these questions, right?
2      MR. ADKINS:  Objection.  Compound.
3  BY MR. HAMILTON:
4      Q.  You can answer.
5      A.  Not particularly.  But, you know, if
6  you're asking me what my opinion is, I'm, I'm stating
7  that, you know, regardless of what John Pempek told
8  me prior to the site inspection, you know, I met him.
9  I, I had a greeting.  But, you know, just observing
10  his nature, his personality, there was one-way
11  conversations once the media showed up as far as,
12  "Hey, here's the Army Corps of Engineers," and so on
13  and so forth, you know?  Again, my opinion kind of
14  meets the term.
15      Q.  But you had already -- and just to be
16  clear, when you actually met him, the litigation had
17  already been going for several months, correct?
18      A.  That's correct.
19      Q.  But you made this assessment now almost
20  four years ago, correct?
21      A.  No.  This was last year.
22      Q.  No.  You testified that in July of 2018
23  you said, "Like I said, I would love to meet this
24  guy."  You said that your interpretation of him was
25  flamboyant back then.  Is that correct?

Page 42

1      A.  That is correct.  Yes.  But I said --
2      Q.  You made --
3      A.  -- I'd like to meet him.
4      Q.  Right.  You said you made that
5  determination based off just what Mr. Pempek had told
6  you, correct?
7      A.  That's correct.  Yes.
8      Q.  So after the site inspection, what, if
9  anything, did the Corps do next in its enforcement
10  proceeding?
11      A.  I don't recall when we -- if it was
12  before or after the site inspection.  I, I think it
13  was after the site inspection.  Matter of fact, I'm
14  pretty sure it was.  We -- based on our MOA with the
15  EPA, we brought it to their attention.  We had some
16  informal conversations about the matter as to whether
17  or not EPA would be interested in accepting the case
18  or not.
19      Q.  Is that standard process to do that?
20      A.  For flagrant and repeat, yes.  It is.
21      Q.  Okay.  You say repeat.  What do you mean
22  by that?
23      A.  Repeat violators.
24      Q.  Had Mr. Sharfi been pursued by the Army
25  Corps before for alleged wetland violation?

Page 43

1      A.  Not to my knowledge.
2      Q.  So why are you using the word repeat?
3      A.  Because that's in our MOA.  Those are the
4  two criteria amongst a few minor other things at
5  which we are required by the MOA to refer a matter to
6  EPA.
7      Q.  Right.  So how is he a repeat violator if
8  the Army Corps had never pursued him before for a
9  wetland violation?
10      A.  We didn't consider him a repeat violator.
11  We considered him more of a flagrant violator.
12      Q.  Okay.  And what is a characterization to
13  qualify as a flagrant violator?
14      A.  Flagrant in, in that they are
15  knowledgeable of the program or, in, in this case, we
16  tried to educate Mr. Sharfi on our program.  And it
17  didn't quite work out.  So as we discussed, he was
18  familiar with the regulatory processes.  I think he
19  even asserted that in some of his emails.  And so we
20  felt that there was a -- not only was there a, a
21  flagrant nature to this situation, but considering
22  the, the amount of impact, we felt that that would be
23  something that the EPA would want to, to know about.
24      Q.  Did you personally ever visit the site
25  prior to referring the matter to the EPA?

Page 44

1      A.  I'd have to look to see when we referred
2  the matter.  I think it was the end maybe December of
3  2018.  November, December time frame.  So at that
4  point, I had not been out on Mr. -- I'm trying to --
5  I'm trying to recall the, the order of events.  I
6  don't think I had been out on -- because I'm trying
7  to interpret when I was out on Mr. Goodfellow's
8  property.  I don't think I had been out on site prior
9  to the EPA informal referral.  We had discussions.
10      Q.  When you say Goodfellow, are you
11  referring to the Countess Joy property?
12      A.  Mr. Goodfriend.  I'm sorry.  The, the
13  adjacent property to the north.
14      Q.  Yes, sir.  I'll just represent it to him
15  by Countess Joy, LLC.  Before you would refer a
16  matter to the EPA, is it typical for you to visit the
17  site yourself?
18      A.  Not necessarily, no.
19      Q.  Would you like to have visited the site
20  prior to the referral of this instance?
21      A.  Yes.
22      Q.  Did you ask to visit the site?
23      A.  Well, this was -- what? -- in the latter
24  part of 2018.  Yes, we had asked.  You know, we had -
25  - we had been out on -- Mr. Pempek had been out on



ROBERT HALBERT
USA vs SHARFI

June 01, 2022
45—48

Page 45

1  site.
2      Q.   Right.  But I'm saying for you.  You said
3  you would like to be out there.  Had you asked for a
4  follow-up inspection prior to the referral?
5      A.   I don't know if we -- I don't know if we
6  asked for a second site inspection or not.  I'd have
7  to -- I'd have to go back through the record.  Part
8  of me wants to say that there was, and, and that was
9  denied.  But I'd have to look at the record.
10     Q.   I'm going to show you what we'll mark as
11 depo Exhibit 208.  It's Army Corps 532.  Mr. Halbert,
12 do you recognize this email?
13         (Defendant's Exhibit 208 was marked for
14 identification.)
15     A.   Okay.
16     Q.   Do you recognize it?
17     A.   I can't say that I recognize it from
18 2018, but I'm, I'm aware of the email now.
19     Q.   Okay.  And you were copied on it,
20 correct?
21     A.   That's correct.
22     Q.   Who is Joshua Holmes?
23     A.   He was a -- an attorney with our office
24 of counsel.
25     Q.   Okay.  And Tori White?

Page 46

1      A.   She was the deputy chief of the
2  regulatory division.
3      Q.   So you see here where it says this is an
4  email from Mr. Pempek to Mr. Sharfi.  It says, "I
5  have reason to believe you have continued to work in
6  jurisdictional wetlands without the benefit of a
7  permit."  So again, he's reemphasizing the fact that
8  the alleged wetlands on site were jurisdictional
9  under the Army Corps' purview, correct?
10         MR. ADKINS:  Objection.  Calls for
11 speculation.
12         THE WITNESS:  Correct.
13 BY MR. HAMILTON:
14     Q.   Do you know why Mr. Pempek included this
15 statement about other property that had been acquired
16 by Mr. Sharfi?
17     A.   He was aware of other property that were
18 -- was -- that Mr. Sharfi apparently controlled.  And
19 John did bring this to my attention at some point
20 verbally that he owns other property.  And
21 considering that Mr. Sharfi did not feel there was a
22 need for him to pursue an application in waters of
23 the United States, we -- this was John's attempt to
24 educate Mr. Sharfi that, "Hey, you know, you could be
25 running into another issue if you plan on developing

Page 47

1  350 acres."
2      Q.   So when you said that Mr. Sharfi would
3  not send an application for bounds that are within
4  the waters of the United States, that's the Army
5  Corps assessment of the wetlands, right, not Mr.
6  Sharfi's?
7      A.   Of the 350 acres?
8      Q.   No.  So let's see if I can break it down
9  a little bit.  You referenced that -- strike the
10 question.
11         I'm going to show you what we'll mark as
12 Deposition 209.  Do you recognize this document, Mr.
13 Halbert?
14         (Defendant's Exhibit 209 was marked for
15 identification.)
16     A.   I do.
17     Q.   And what is this?
18     A.   This is our formal referral to EPA Region
19 4.
20     Q.   And so prior to referring -- well, let me
21 back up.  Again, why would you refer this matter to
22 the EPA?
23     A.   Based on -- well, based on our MOA,
24 again, if we find a case that we feel is flagrant or
25 repeat, the MOA requires us to forward it to the EPA.

Page 48

1  We also tried to -- before we do this, we have
2  informal conversations with the EPA before we ever
3  refer it.  They may tell us that they don't feel that
4  there's any  standing behind it, a case.  So there
5  was some informal discussions with EPA.  They felt or
6  at least I felt that they had a feeling that there
7  was enough to the, the matter that they'd like to
8  entertain looking at it certainly by their
9  leadership.
10         MR. ADKINS:  Counsel, what's the Bates
11 for deposition Exhibit 209?
12         MR. HAMILTON:  EPA 110 to 111.
13         MR. ADKINS:  Thank you, sir.
14 BY MR. HAMILTON:
15     Q.   Mr. Halbert, so is it your testimony you
16 had already had discussions with the EPA prior to
17 this letter?
18     A.   That would have been our intent.  I'm,
19 I'm almost positive we had some type of informal
20 conversations with them prior to this letter going
21 out.
22     Q.   Do you recall what you discussed with the
23 EPA?
24     A.   I -- John Pempek basically went through
25 our, our jurisdiction notes, meaning that the federal



ROBERT HALBERT
USA vs SHARFI

June 01, 2022
49–52

Page 49

1  jurisdiction of waters of the United States.  So he
2  kind of briefed EPA staff, kind of equivalent project
3  managers within EPA.  I listened in on it, and he
4  established that there was jurisdiction for the Army
5  Corps.  And my recollection is that, you know, staff
6  from EPA Region 4 concurred that there was enough
7  there that they wanted to be able to brief their
8  leadership.  So that triggered us in November of '18
9  to issue a formal letter to EPA referring the matter.
10  Q.  Okay.  So you didn't refer it to EPA
11  until approximately six months after the site
12  inspection, correct?
13  A.  Yeah.  I -- yes.
14  Q.  Why was there such a long delay?
15  A.  I, I, I don't know.  I mean, we, we've
16  got other work ongoing.  We could've -- I don't -- I
17  don't recall when we were in discussion with EPA
18  informally.  I mean, that could have been in
19  September, October.  We just never got around to
20  issuing the letter until November.  You know, John
21  Pempek has a very large area of responsibility.  You
22  know, I, I can't -- I don't know.  If you're asking
23  me what -- why the six-month delay, I'd have to look
24  back at events that were ongoing from May to
25  November.

Page 50

1  Q.  All right.  So what, if any, action did
2  the EPA ultimately take as it relates to Mr. Sharfi
3  and NeshaFarms' property?
4  A.  They reviewed the matter and referred the
5  case back to the Army Corps of Engineers.
6  Q.  I'm going to show you what we'll mark as
7  210, depo Exhibit 210, Army Corps 1466.  Mr. Pempek,
8  it appears to be a calendar invite from a Matt Hicks
9  at the EPA to you, Mr. Moore, a bunch of folks at
10  Army Corps, Mr. Pempek, and some other folks at the
11  EPA.  And it looks like a meeting on December 13th,
12  2018 for about an hour.  Do you recall this meeting?
13  (Defendant's Exhibit 210 was marked for
14  identification.)
15  A.  No.
16  Q.  Do you know what, if anything, may have
17  been discussed during a meeting like this?  I mean,
18  it's titled Sharfi referral.
19  MR. ADKINS:  Asked and answered.  He said
20  he doesn't recall it.
21  BY MR. HAMILTON:
22  Q.  So you had already sent the matter, the
23  referral letter, to EPA several weeks before this.
24  And now, you have a meeting titled Sharfi referral a
25  couple weeks after.  Is that typical that you would

Page 51

1  have a follow-up call with the EPA after referring
2  it?
3  A.  I would say so.  Yeah.  I mean, we
4  coordinate with the EPA.  We want to see a kind of --
5  keep the time clock moving.  We want to hear what
6  their thoughts are.  I, I mean, it doesn't surprise
7  me that we had some type of a follow-up meeting.
8  Q.  Do you keep any sort of calendar or
9  journal of discussions you have throughout your days?
10  A.  I do.
11  Q.  Would you have any notes on this meeting?
12  A.  I have to look.  I'd have to look back
13  through my, my notebook.
14  Q.  Okay.  All right.  So you said the EPA --
15  well, let me back up.  Show you what we'll mark as
16  Exhibit 211.  Do you recognize this email, Mr.
17  Halbert?
18  (Defendant's Exhibit 211 was marked for
19  identification.)
20  MR. ADKINS:  Is there a Bates, Counsel?
21  MR. HAMILTON:  Yeah.  1018 Army Corps.
22  THE WITNESS:  Okay.  I remember vaguely
23  sending it.
24  BY MR. HAMILTON:
25  Q.  It appears you're reaching out to someone

Page 52

1  at, is it DEP?
2  A.  That's correct.
3  Q.  Is this someone you used to work with?
4  A.  No.
5  Q.  Why are you reaching out to this person?
6  It looks like Leonadro (sic) Garcia.
7  A.  Yeah.  He's my equivalent with compliance
8  and enforcement in one of their programs with the
9  state.
10  Q.  Okay.  And why did you reach out to him?
11  A.  At this particular time, we're trying to
12  have better rapport between FDEP and, and the, the
13  Army Corps.  I had met him on two other occasions
14  where we just discussed case files.  So I, I knew
15  that he was my equivalent.  Trying to use the proper
16  chain of command.  I reached out to him and asked for
17  some assistance.
18  Q.  Would it be fair to say that you're
19  asking for basically any documents that the DEP may
20  have as it relates to Mr. Sharfi?
21  A.  Yes.  It would be fair to say that.
22  Q.  And just Mr. Sharfi, correct?  There's no
23  other people in this email that you're seeking
24  documents relating to, correct?
25  A.  This email is predicated on Mr. Sharfi.



ROBERT HALBERT
USA vs SHARFI

June 01, 2022
53–56

Page 53

1    Q.   That was after you had already referred
2   this matter to the EPA, correct?
3    A.   Yes.  This was in December.  Correct.
4    Q.   All right.  I'll show you what we'll mark
5   as 212.  And this is EPA 323.  Do you recognize this
6   email -- or this letter, Mr. Halbert?
7       (Defendant's Exhibit 212 was marked for
8   identification.)
9    A.   I, I recognize it.
10    Q.   And you would agree this is essentially
11   the EPA asking for more time to respond to your
12   referral?
13    A.   Yes.
14    Q.   And it's fair to say you all provided
15   them more time, correct?
16    A.   That is correct.
17    Q.   I'm going to show you what we'll mark as
18   213.  This is an email from Christopher Parker with
19   the EPA to you and copying Mr. Pempek.  The subject
20   is Sharfi.  It's dated Thursday, April 25th, 2019,
21   first thing in the morning.  And it says, "Please
22   find attached correspondence."  And then it attaches
23   a letter to it.  And this is EPA 500 and 501.  Do you
24   recognize this email and letter?
25       (Defendant's Exhibit 213 was marked for

Page 54

1   identification.)
2    A.   I, I recognize it.  Yes.
3    Q.   The letter is not dated to the best that
4   you can tell, correct?
5    A.   I don't see a date.
6    Q.   But would it be fair to say that the EPA
7   had made their decision not to take Mr. Sharfi's case
8   as of April 25th, 2019?
9       MR. ADKINS:  Objection.
10       THE WITNESS:  I would agree with that.
11   BY MR. HAMILTON:
12    Q.   Since there was an objection by Mr.
13   Adkins, what date do you believe the EPA rejected
14   taking Mr. Sharfi's matter?
15       MR. ADKINS:  Objection.  Misstates
16   testimony.  He said he had referred the matter back
17   before.
18   BY MR. HAMILTON:
19    Q.   Okay.  So Mr. Halbert, you referred the
20   matter to EPA.  What can the EPA do after you make a
21   referral to them?  What are the courses of action?
22    A.   They can either accept the referral or
23   they can refer it back to the Army Corps of
24   Engineers.
25    Q.   Okay.  And did they refer it back, or did

Page 55

1   they accept it in this instance?
2    A.   They referred it back to the Army Corps.
3    Q.   Okay.  And do you see this attachment
4   here that's on this email, correct?
5    A.   I do.
6    Q.   You would agree with me it says, "Sharfi
7   rejection letter scan dot P-D-F," correct?
8    A.   I would agree.
9    Q.   And this is the letter -- would you agree
10   this letter is where the Army Corps -- excuse me.
11   The EPA refers or rejects and sends the matter back
12   to the Army Corps?
13    A.   I would agree.
14    Q.   So it took about let's see, December,
15   January, February, March, April, five months for the
16   EPA to make a decision?
17    A.   Yes.
18    Q.   And I'll show you what we'll mark as 214.
19   This is an email chain between you and Mr. Pempek.
20   Do you recognize it?
21       (Defendant's Exhibit 214 was marked for
22   identification.)
23       MR. ADKINS:  Is there a Bates for this,
24   Counsel?
25       MR. HAMILTON:  Army Corps 896.

Page 56

1       THE WITNESS:  Okay.  I acknowledged the
2   email.
3   BY MR. HAMILTON:
4    Q.   So these look like they were in -- looks
5   like they were all three emails on this page were May
6   15th, 2019, right?
7    A.   Yes.
8    Q.   And are these emails between you and Mr.
9   Pempek coordinating some sort of inspection at one of
10   Mr. Sharfi's properties?
11    A.   That appears to be so.  Yes.
12    Q.   Did you ever go out to the site after the
13   EPA sent the matter back to the Army Corps?
14    A.   Yes, I did.  Well, I didn't go out on
15   Sharfi's property.
16    Q.   Did you ask to go on Mr. Sharfi's
17   property?
18    A.   Not that I'm aware of.
19    Q.   Why not?
20    A.   I think our communication had pretty much
21   been shut down at that point.
22    Q.   Would you have liked to have gone out to
23   Mr. Sharfi's property?  And when I say Mr. Sharfi's
24   property, I'm talking about the site.  I believe at
25   this point it was known by NeshaFarm.



ROBERT HALBERT
USA vs SHARFI

June 01, 2022
57—60

Page 57

1    A.  Sure.  Yes.  We would have -- we would
2   have gone out on site.
3    Q.  And did you ultimately -- I think you
4   said you visited the Countess Joy property, correct?
5    A.  That's correct.
6    Q.  Do you recall what day that was on?
7    A.  I want to say it was in October 2019.
8    Q.  I'm going to show you what we'll mark as
9   Exhibit 215.  And this appears to be a travel order
10  request from you.  And it says here, "Site visit.
11  Sharfi enforcement site visit."  Do you see that?
12       (Defendant's Exhibit 215 was marked for
13  identification.)
14    A.  I do.
15    Q.  Yeah.  And then it looks like there were
16  some dates here around May 20th, the 21st of 2019.
17  So about a week after those emails with Mr. Pempek.
18  Did you go out to a property owned by Mr. Sharfi or
19  one of his affiliates around the --
20    A.  I don't think we had time to go out on
21  the property.  If I -- if I recall correctly, I think
22  John drove by the, the entrance on the main road just
23  saying, "Hey, there -- this is where Mr. Sharfi's
24  property lies."  But we didn't go out on site.
25    Q.  Okay.  So you didn't go out to the

Page 58

1   Countess Joy property in May of 2019?
2    A.  I, I'm pretty sure that was later on,
3   like I said, I think in October.
4    Q.  Sure.  And I'll show you in a second.
5   There was a visit in October.  So I just want to make
6   sure there wasn't one in May also.
7    A.  No.  This was -- the one in October was
8   the one and only time that I -- it was on the, the
9   LLC property to the north.
10    Q.  Okay.  Yes, sir.  The Countess Joy
11  property.
12       MR. ADKINS:  Counsel, what's the
13  deposition -- or what's the Bates for deposition
14  Exhibit 215?
15       MR. HAMILTON:  Yeah.  It is 898, Army
16  Corps.  Mr. Adkins, you are like Johnny-on-the-spot
17  with the Bates numbers.
18       MR. ADKINS:  Well, with these electronic
19  or these remote deps, I'm just worried if we're going
20  back and we're saying, "Oh, was it this one or that
21  one?"  And --
22       MR. HAMILTON:  Yeah.
23       MR. ADKINS:  I'm sorry to keep bothering
24  you, but I'll --
25       MR. HAMILTON:  That's okay.

Page 59

1       MR. ADKINS:  I'll keep going.
2       MR. HAMILTON:  I'm bad about reading them
3   clearly.
4   BY MR. HAMILTON:
5    Q.  All right.  I'm going to show you an
6   exhibit here that we'll mark as 216.  And it's Army
7   Corps Bates 11165.
8       (Defendant's Exhibit 216 was marked for
9   identification.)
10       MR. HAMILTON:  See, I was on that one,
11  Mr. Adkins.
12  BY MR. HAMILTON:
13    Q.  Do you recognize this email, Mr. Halbert?
14    A.  I acknowledged the email.  So I -- yes.
15  I, I do.  I do recognize it.
16    Q.  All right.  So it appears it's an email
17  from Mr. Pempek to Andrew Kelly.  Is that the
18  district commander for Jacksonville district?
19    A.  At the time, yes.
20    Q.  At the time, yes, sir.  And this was
21  August 15th, 2019, correct?
22    A.  Yes.
23    Q.  And so it appears he's forwarding his
24  MFR, an addendum to his MFR, and the cease-and-desist
25  letter to the colonel.  And he states the Corps is --

Page 60

1   has tried extensively to bring Mr. Sharfi into
2   compliance with federal law, and he remains highly
3   recalcitrant.  Do you know what he meant by highly
4   recalcitrant?
5    A.  I -- he was being, I guess, somewhat
6   adverse to the -- the federal law with respect to
7   filling of waters of the United States.
8    Q.  Okay.  And do you know -- just correct me
9   if I'm wrong.  The only people on this email are Mr.
10  Pempek, Colonel Kelly, and you, correct?
11    A.  Correct.
12    Q.  So do you know what is in these redacted
13  parts?
14    A.  No, I don't.  No, I don't.
15    Q.  Okay.  Do you know why they're redacted?
16    A.  There was something that counsel didn't
17  want out there.
18    Q.  Right.  Yeah.
19    A.  I don't know.
20    Q.  Okay.  And there's no office of counsel
21  attorneys on this email, correct?
22    A.  No, there's not.
23    Q.  Great.  Okay.  Thank you.  Do you know
24  what was happening at this time that Mr. Pempek would
25  email the colonel?



ROBERT HALBERT
USA vs SHARFI

June 01, 2022
61–64

Page 61

1    A.  Yeah.  This is based on a site -- or a
2    visit that the colonel had with Palm Beach Garden
3    staff.  And so --
4    Q.  Okay.  And what --
5    A.  -- he was --
6    Q.  Yeah.  Go ahead.  Sorry.
7    A.  He was visiting -- he was visiting the
8    troops, so to speak.  And apparently, this case came
9    up during discussion.  And the colonel requested John
10   to send him, you know, some documentation to get him
11   up to speed on the matter.
12   Q.  Do you recall what was discussed with the
13   colonel as it relates to Mr. Sharfi's property?
14   A.  I was not in attendance.  So no, I --
15   Q.  Do you know who was in attendance?
16   A.  I -- no, I don't.  You know, the -- I
17   would presume that a majority of the staff were in
18   attendance that work in the regulatory office down
19   there.
20   Q.  All right.  Let's go to what we'll mark
21   as 217.  This is a travel order request it looks like
22   from you, and this is in October 2019.  And it says
23   Benjamin Sharfi violation as the site visit.  Is this
24   when you went on the Countess Joy property?
25        (Defendant's Exhibit 217 was marked for

Page 62

1    identification.)
2    A.  Yes.
3        MR. ADKINS:  Counsel, do we have a Bates
4    stamp for this?
5        MR. HAMILTON:  Yeah.  Army Corps 11209.
6    BY MR. HAMILTON:
7    Q.  And why did you go out to the Countess
8    Joy property in October 2019?
9    A.  I wanted John to firsthand show me the,
10   the, the connection between Mr. Sharfi's property and
11   navigable waters of the United States.
12   Q.  And when you say the connection between
13   Mr. Sharfi's property and navigable waters, what did
14   he show you?
15   A.  He showed me the point in which the
16   hydrology left Mr. Sharfi's property and entered into
17   the LLC to the north.
18   Q.  Okay.  How long did you all spend on the
19   Countess Joy property approximately?
20   A.  I'd say maybe an hour and a half, two
21   hours at the most.
22   Q.  So he showed you, you said, the hydrology
23   point?  Explain that again.  I'm sorry.
24   A.  Yeah.  The point at which the service
25   waters and the hydrology was, was exiting Mr.

Page 63

1    Sharfi's property, how, how the water was leaving his
2    property.
3    Q.  Did you see water flowing on that date?
4    A.  I'm not sure I, I can find flowing water.
5    I -- there was -- yes.  I would say there was water
6    moving north from Sharfi's property.
7    Q.  There was?  Okay.
8    A.  Yes.
9    Q.  And so where else -- so after he showed
10   you that point, what, if anything else, did you all
11   look at on the Countess Joy property?
12   A.  We looked at -- we conducted two-point
13   descriptions, soil surveys.  And we allowed the
14   lessee, Mr., Mr. DeWayne (phonetic), if you will.  He
15   showed us a little bit -- he showed us around the
16   property a little bit, gave us some insight as to
17   what his knowledge of the property was.
18   Q.  Where did you do those two-point
19   descriptions?
20   A.  We did one point description adjacent to
21   Mr. Sharfi's property, and we did the second one
22   closer to the Bessie Creek extension, Bessie, Bessie
23   Creek, if you will.
24   Q.  Are you talking about the excavated ditch
25   that runs east and west?

Page 64

1        MR. ADKINS:  Objection.  Vague.
2    BY MR. HAMILTON:
3    Q.  Yeah.  I'm sorry.  Are you aware that
4    there's a ditch that runs east and west north of Mr.
5    Sharfi's property and north of the Countess Joy
6    property?
7    A.  Yes, I -- you should call that Bessie
8    Creek.
9    Q.  I'm not going to call it Bessie Creek
10   because there's a dispute in this litigation whether
11   that is or is not Bessie Creek.  But I'm going to
12   call that the --
13   A.  Understood.
14   Q.  -- east west ditch, okay?
15   A.  Understood.
16   Q.  All right.  So where along that east west
17   ditch did you all take point two?  Do you recall?
18   A.  Point two was -- if you're looking at an
19   aerial, it would be a northwest corner of the
20   property, south of the east west canal ditch.
21   Q.  So was that along -- I can't think of the
22   road name.  Give me a second.
23   A.  Is it 84th?
24   Q.  I think it is.  Yeah.  So was that along
25   84th Avenue and basically the east west ditch?



ROBERT HALBERT
USA vs SHARFI

June 01, 2022
65–68

Page 65

1    A.   It -- yeah.  Yes.  It was in that
2  northwest corner, fairly close to 84th.  I don't know
3  exactly where we were at, but it was south of the
4  east west creek in north and, and, and west of
5  Sharfi's property.
6    Q.   Why did you take a point description --
7  those two different point descriptions?
8    A.   John wanted one close to Sharfi's
9  property to give us a, relative idea with proximity
10  what we could be experiencing on Sharfi's property,
11  what would be indicative to those soil conditions if
12  we were able to get on the site.  Then we wanted
13  somewhat of a, a more of a, a controlled sample.
14    And that's why we moved away.  Actually,
15  I believe it was at a higher area.  Because if we
16  were experiencing the same type of soil profiles in a
17  higher area, then we would have more of a, a credible
18  idea that the soils were same throughout the
19  property, from the southern extent of the LLC
20  property all the way to the north extents of the
21  property leading to the east west creek.
22    Q.   So back when you were highly confident,
23  back in May of 2018, that the Corps had jurisdiction
24  over Mr. Sharfi's property, what was your
25  understanding at that time of the route taken to

Page 66

1  reach navigable waters?
2    A.   Back in 2018?
3    Q.   Yes, sir.
4    A.   As for -- as -- and you're asking about
5  confidence level, correct?
6    Q.   I'm asking about the route --
7    A.   Oh, the route.
8    Q.   -- to obtain jurisdiction.  Yes, sir.
9    A.   The route seemed -- as far as surface
10  water goes, hydrology, that seemed to be pretty
11  evident given there was water flow on the west side
12  of Sharfi's property.  And that was continually
13  moving to the north onto the LLC property.
14    Q.   Right.  So between the northwest corner
15  of the site up to the east west ditch, what was the
16  path that the Army Corps was taking to get
17  jurisdiction?
18    A.   I think there was a couple ways that it
19  was doing it.  It was doing it through the, the man-
20  made ditch, and it was what I would call sheet flow
21  just kind of draining from Sharfi's property through
22  the LLC property, the Countess Lovejoy (sic)
23  property.  And so that's what we were looking at in
24  2019 is, is getting on the ground confirming that
25  there was -- those sheet flow and water, surface

Page 67

1  water, flowing across Countess Lovejoy property into
2  the east west creek.
3    Q.   Okay.  So prior to the October of 2019
4  visit that you and Mr. Pempek made to the Countess
5  Joy property, had you or anyone else from the Army
6  Corps visited the Countess Joy property?
7    A.   Not to my knowledge.
8    Q.   So that was the first time in October
9  2019 that the Army Corps examined what it believed to
10  be potentially the path to obtain jurisdiction over
11  Mr. Sharfi's site on the ground?
12    A.   I believe so.
13    Q.   And during that site inspection, you only
14  conducted two-point examinations or determinations?
15    A.   That's correct.
16    Q.   And is it your understanding that back in
17  May of 2018 the connection of the east west ditch
18  from Mr. Sharfi's site was through the man-made north
19  south ditch that extended on the west side of Mr.
20  Sharfi's site?
21    A.   Can you repeat that?  I'm sorry.
22    Q.   Yeah.  So are you familiar with the -- I
23  think you referred to it as a ditch on the west side
24  of the site, correct, that extends north?
25    A.   Correct.

Page 68

1    Q.   And are you aware of whether or not that
2  man-made ditch extends all the way north to the east
3  west canal?
4    A.   That particular ditch, I, I, I think --
5  I'd have -- I think so.  I think the, the ditch is
6  continuous.  I, I honestly can't -- I'd have to
7  recall, but I don't know if it -- if it's a -- if it
8  -- if it's a depression area with sheet flow running
9  across and the man-made ditch is separated from the -
10  - from the, the west ditch, if you will.  I'd have to
11  -- I'd have to look at the site again.
12    Q.   So after the October 2019 visit that you
13  and Mr. Pempek did at Countess Joy property, what, if
14  any, conclusions did you make at that time?
15    A.   I'm sorry.  You phased out just a little
16  bit.  What was that question again?
17    Q.   Yeah.  I said, after the October 2019
18  inspection you and Mr. Pempek underwent on the
19  Countess Joy property, what if any conclusions did
20  you make as it relates to this matter?
21    A.   It reinforced what -- it reinforced our
22  position that we had, had kind of taken from the
23  beginning.  So this was -- we were continuing to --
24  continuing to add data, and we knew that we were
25  preparing a memorandum to office of counsel.  And I

ESQUIRE
DEPOSITION SOLUTIONS

ROBERT HALBERT
USA vs SHARFI

June 01, 2022
69–72

Page 69

1  wanted to be able to see firsthand before, you know,
2  I particularly signed off on it that it just --
3  again, it just continued to bolster our case with,
4  with information and, and field observations.
5      Q.  So why did you not do this before
6  referring it to the EPA?
7      A.  There, there's not -- there's not
8  necessarily a, a requirement to do that.  The -- and
9  I don't -- I think -- perhaps some of the -- some of
10  the conversations between, you know, other agencies
11  maybe even in preparation from a memo to offices of
12  counsel, maybe that came to light when it didn't
13  before that, hey, we need to see if we can gain
14  access to other properties since we can't get out on
15  Mr. Sharfi's property.  So why didn't that come up
16  earlier in this process, I don't know.  I can only
17  speculate.
18      Q.  Right.  But I think you testified earlier
19  you got office of counsel or at least made the
20  determination that they should be involved in May of
21  2018, correct, after the site visit?
22      A.  Yeah.  I'm sure that, that from May 2018
23  and even into 2019 we had probably maintained some
24  type of communication.  If I'm not mistaken, there
25  may have been some, some manpower issues with respect

Page 70

1  to, you know, the case.  You know, if I'm -- I don't
2  think I'm mistaken.  I think Joshua Holmes, who we
3  spoke to earlier, I think he was -- at the time, I
4  think he was the only attorney.  So we may have been
5  -- once another attorney was assigned to the, the
6  case, we may have been able to have more coordination
7  with office of counsel.
8      Q.  Well, you were there at least in the
9  area.  You drove by it in May of 2019, right?  So
10  five months earlier?
11      A.  Yeah.  That, that was a -- that was a
12  drive-by.  I -- we didn't even get out the vehicle.
13  It was just a more for awareness purpose -- purposes
14  that we drove by.  John said, "Hey, this is -- this
15  is where the Sharfi residence lies."  That was --
16  that was all that was done at that particular time.
17      Q.  Right.  But your travel order request
18  says that it was for a Sharfi enforcement site visit,
19  right?
20      A.  That is -- yes, it does.
21      Q.  That's Exhibit, I think, 215.  All right.
22  And I think you said office of counsel and you had
23  realized you couldn't get on Mr. Sharfi's property.
24  It's odd that you couldn't get on it.  You didn't ask
25  to go back out, correct?

Page 71

1      A.  My understanding is we didn't have
2  authorization to access his property.
3      Q.  Do you know if anybody asked him again
4  for a follow-up site inspection?
5      A.  I don't know if that ever came out.
6  There was -- there was the discussion with the
7  attorneys at one point.  It got to a point where Mr.
8  -- we were not allowed to speak to Mr. Sharfi.  We
9  were only allowed to contact his, his counsel.  At
10  that point in time, it was understood that we, we no
11  longer had authorization to access his property.  I
12  don't know if we had a follow-up request through his
13  counsel to access the property nor do I -- am I aware
14  if, if Mr. Sharfi and/or his counsel approached us
15  with respect to inviting us back out.
16      Q.  Right.  Well, let me show you -- this
17  we'll mark as Exhibit 218.  This is an email from Mr.
18  Pempek to Mr. Sharfi.  It's copying you.  And this
19  was back in November of 2018, so when the matter was
20  referred from the court of the EPA initially.  I'll
21  represent Mr. Pempek is explaining the various ways
22  that this can play out.  So there was that
23  correspondence.  And then stand by one second here.
24      (Defendant's Exhibit 218 was marked for
25  identification.)

Page 72

1      MR. ADKINS:  Do we have a Bates for this,
2  Counsel?
3      MR. HAMILTON:  Yeah.  One second.
4  BY MR. HAMILTON:
5      Q.  Do you know if there was any other
6  additional follow-up after this with Mr. Sharfi from
7  the Army Corps, Mr. Halbert?
8      A.  Not to my knowledge.  I mean, it -- there
9  was -- I don't know if this is the instance or not,
10  but there was -- it was communication between Mr.
11  Pempek and Mr. Sharfi.  And it became a little
12  heated.  Counsel stepped in to try and defuse the
13  situation.  And I don't know if this is the
14  particular time, but I, I was thinking that that
15  particular time within the whole timeline was where
16  communication started breaking down between the Army
17  Corps and Mr. Sharfi.
18      Q.  Okay.  And are you aware of whether the
19  Army Corps ever notified Mr. Sharfi or his counsel
20  that the EPA declined the matter or sent it back to
21  the Army Corps?
22      A.  I am not aware of, of that.  No.  I, I
23  don't -- I'm not aware.
24      Q.  Is that typically something you would
25  notify a property owner of if it was referred back to



ROBERT HALBERT
USA vs SHARFI

June 01, 2022
73–76

Page 73

1 the Army Corps?

2     A. I'd like to be able to do that. Yes.

3     Q. Okay. Do you usually do that?

4     A. Some of the project managers were better

5 at doing it than others.

6     Q. Did Mr. Pempek usually notify folks of

7 the EPA deciding not to pursue a matter?

8       MR. ADKINS: Objection. Foundation.

9 BY MR. HAMILTON:

10     Q. Did Mr. Pempek typically, as a project

11 manager, let property owners know the EPA had

12 referred the matter back to Army Corps?

13       MR. ADKINS: Objection. Foundation.

14 BY MR. HAMILTON:

15     Q. You can answer the question.

16     A. I don't recall seeing the, the form

17 letters if he did. He could have done that through

18 email, perhaps maybe even a phone call. We do have a

19 form letter for responses from the EPA, but I don't

20 recall John sending me a form letter to review with

21 respect to notifying Mr. Sharfi of the EPA's

22 findings.

23     Q. Do you know why that is?

24     A. John's busy. That's -- it, it's a

25 manpower issue.

Page 74

1     Q. Well, I mean, he notified Mr. Sharfi of

2 the three routes of what could happen, but he never

3 closed the loop, right?

4     A. I guess not. John may -- like I said,

5 there were -- I'm struggling with the timelines

6 trying to keep this all together. But at some point

7 in all of this, there was a clear indication, at

8 least from my chair, that communications broke down

9 and we were done at that point. You know, there,

10 there was a sense that this could, you know, evolve

11 into something.

12       And, and so I don't think there was a

13 whole lot of communication from one side or the

14 other. And again, I don't know where that email when

15 John was discussing those issues with Mr. Sharfi --

16 where, where does that lie within the whole scheme of

17 the, the chronological order. John may have not felt

18 it was appropriate to add to any type of email file.

19     Q. What is your understanding of when the

20 next time is that Mr. Sharfi or his counsel was

21 contacted by anyone either from the Army Corps or on

22 behalf of the Army Corps after the referral to the

23 EPA?

24     A. Can you repeat that?

25     Q. Yeah. So we just looked at the email

Page 75

1 where Mr. Pempek, right, tells Mr. Sharfi, "Hey,

2 we've referred this to the EPA. Here's the three

3 ways it can go." You recall that, correct?

4     A. Yes.

5     Q. Do you know after that fact when the next

6 time is that either -- that someone from the Army

7 Corps or on behalf of the Army Corps, so counsel,

8 contacted either Mr. Sharfi or his counsel about this

9 matter?

10     A. No, I don't -- I don't -- I don't know of

11 any other communication. Again, depending on when

12 that email was, was sent, that could very well be the

13 last communication we had. I, I don't know.

14       MR. HAMILTON: All right. We've been

15 going a long time I just noticed. So I'm sorry.

16 Let's take a five-minute break, bio break for

17 everybody, and then we'll come back at let's just say

18 3:15 to give us an even number. Okay?

19       MR. ADKINS: Before we go, what's the

20 Bates for Defendant's 218?

21       MR. HAMILTON: You and your Bates, Mr.

22 Adkins, I'm telling you. Army Corps 1222 through

23 1224.

24       MR. ADKINS: All right. Thank you, sir.

25       MR. HAMILTON: All right. We can go off

Page 76

1 the record and come back in 3:15.

2       MR. ADKINS: Okay.

3       THE REPORTER: Okay. Then we'll go off

4 the record, and the time is currently 3:07 p.m.

5 eastern standard time.

6       (Off the record.)

7       THE REPORTER: Okay. We're going back on

8 the record, and the time is currently 3:18 p.m.

9 eastern standard time.

10 BY MR. HAMILTON:

11     Q. Okay. All right, Mr. Halbert. Before

12 the break, we were talking about the EPA -- excuse

13 me. The Corps' referral to the EPA. But then before

14 that, we were talking about your inspection in

15 October of 2019 of the Countess Joy property. Do you

16 recall that?

17     A. Yes.

18     Q. And we were discussing you had done two-

19 point determinations, one close to Mr. Sharfi's site,

20 and then one in the northwest corner of the Countess

21 Joy property. Is that accurate?

22     A. It is.

23     Q. And correct me if I'm wrong, I think you

24 had testified that the Army Corps had determined a

25 jurisdictional connection between the site and the



ROBERT HALBERT
USA vs SHARFI

June 01, 2022
77—80

Page 77

1 east west ditch by virtue of the north south ditch
2 and then also surface or sheet flow of water across
3 the Countess Joy property. Is that accurate?
4     A. Yes.
5     Q. In the northwest corner point
6 description, do you recall seeing sheet flow water at
7 that location?
8     A. No. And at that time, it was not "wet."
9     Q. So when did you make the determination
10 that there was sheet flow water across the Countess
11 Joy property?
12     A. So I'm not a hydrologist. However, the
13 idea that water is getting from point A to point B is
14 going through the -- not only that ditch. It's also
15 going through the sheet flow process of going across
16 the Countess Lovejoy property to the east west creek.
17 It's going to be predicated on, you know, any point
18 in time rainfall and numerous things that I, I'm not
19 educated on. But point being is it doesn't
20 necessarily have to be ankle deep water all the time
21 in order for water to be able to move across the
22 property entering into the east west creek.
23     Q. Okay. And I want to ask you more about
24 that.
25     A. That's --

Page 78

1     Q. But yeah. You bring a good point up.
2 Let me just clarify. You're not going to be offering
3 any, if you were called at trial, expert opinions on
4 hydrology, are you?
5     A. No.
6     Q. You're not going to be offering any
7 expert opinions on any sort of wetland science?
8     A. No.
9     Q. Okay. Are you going to be offering any
10 sort of expert opinion on the U.S. Army Corps'
11 jurisdiction over properties?
12     A. No.
13     Q. All right. Thanks. I just wanted to
14 clarify that. You said you're not a hydrologist. So
15 I figured a good time to ask. So you talked about
16 water flowing across the surface. Did you determine
17 a specific path prior to that October 2019 visit that
18 the sheet flow water flowed from Mr. Sharfi's
19 property out to the east west ditch?
20     A. I think John had kind of looked at
21 various things, looked at rainfall, aerials,
22 historical aerials. I'm sure he, he probably looked
23 at a myriad of things in order to say yes, there's
24 enough there for us to go out there and ground truth.
25 And we need to get on Countess Lovejoy's property to

Page 79

1 confirm what we know to be true.
2     Q. Did he show any of that information to
3 you prior to your in-person visit?
4     A. The information he shared with me would
5 be in the MFRs.
6     Q. So any surface sheet flow would have been
7 based on Mr. Pempek's interpretation, correct?
8     A. Yes.
9     MR. ADKINS: Objection. Vague.
10 BY MR. HAMILTON:
11     Q. Did you make any independent
12 interpretation as it relates to surface sheet flow of
13 water from the site to the east west ditch?
14     MR. ADKINS: Objection. Vague.
15     THE WITNESS: I didn't make any
16 independent determinations. I used everything that
17 was available to us, primarily John's work, his
18 research. My job was to assess with what he was
19 doing. Did it make sense? Did it follow our
20 regulations?
21 BY MR. HAMILTON:
22     Q. Okay. But let me clarify because there's
23 an objection. Did you make any -- prior to that site
24 inspection, did you make any sort of -- excuse me,
25 investigation on your own as to the path of potential

Page 80

1 water flow from the site to the east west ditch?
2     A. I didn't do anything independent. I
3 mean, everything was related to what John and I
4 discussed as far as jurisdiction.
5     Q. So you relied on Mr. Pempek's when it
6 came to that investigation?
7     A. I did.
8     Q. All right. I'm going to show you what
9 we'll mark as I think we're up to 219. Okay. Do you
10 recognize this, Mr. Halbert?
11     (Defendant's Exhibit 219 was marked for
12 identification.)
13     A. Can you blow that up just a little bit,
14 please?
15     Q. Yes, sir. How's that?
16     A. That's better. Thank you. Okay.
17     MR. ADKINS: Bates to your 219?
18     MR. HAMILTON: 544 to 546.
19 BY MR. HAMILTON:
20     Q. All right. And just to be clear, this is
21 your wetland determination data form that you
22 completed for the Countess Joy property of point two
23 to the northwest point in the October 2019 visit,
24 correct?
25     MR. ADKINS: Objection. Asked and



Page 81

1  answered.
2        THE WITNESS:  This would be -- this would
3  be documenting the field investigation that we did.
4  BY MR. HAMILTON:
5        Q.  Yes, sir.  So this form, did you fill
6  this form out?
7        A.  I did not.
8        Q.  Who filled this out?
9        A.  This was John Pempek.
10       Q.  Okay.  So it says here investigator.  It
11  has a plural in it, and it says Pempek Halbert,
12  correct?
13       A.  It does.
14       Q.  Did you provide any information for this
15  form?
16       A.  There may have been some -- there may
17  have been some notes or something that was collected
18  that John asked for.  I think he had all of the
19  information needed in order to fill out these data
20  forms.  He may have come back to me because I was
21  there.  I was helping, you know, take notes.  He may
22  have asked me for a particular piece of information
23  with regard to soils, but pretty much John did these
24  data forms on his own.  That was -- it's a
25  requirement for us, you know, that we document

Page 82

1  something like this.  So my, my messaging to John is
2  to ensure that we had our data forms filled out
3  properly.
4        Q.  Would he have filled this out at the time
5  of the visit or subsequent to it?
6        A.  He did it subsequently, you know, just to
7  try to, to keep forms neat, and he, he -- I believe
8  he went back to the office after we concluded the
9  site inspection.  And he -- I know he did some
10  research on vegetation, some of the vegetation
11  samples he took, and he filled out his data forms.
12       Q.  So he makes a comment here, "The
13  vegetation was slightly" -- oh, excuse me.  "It was
14  vastly different on the berm when compared to what
15  was hypothesized to be a continuation of a large
16  wetland that covered much of the property."  And when
17  he says property, he's referring to the Countess Joy
18  property, correct?
19       A.  I don't know.  I was not involved in the
20  -- I did not review these.  So again, my instructions
21  were to make sure that the data forms were complete.
22  So I -- this is -- I may have looked at these.  John
23  may have shared this with me, but I, I don't recall
24  much detail as far as this form.  So I can't comment
25  too much on it.

Page 83

1        Q.  Okay.  So is this perhaps the first time
2  you've looked at this in any detail?
3        A.  I can't say it's the first time I've
4  looked at it.  But I don't -- I don't recall much of
5  anything about this form if I have seen it before.
6        Q.  When it comes to that second point, was
7  there any surface water observed there?
8        A.  For the first point or second point?
9        Q.  Let's do both, actually.  So point one,
10  was there any surface water?
11       A.  There was.
12       Q.  How about point two?
13       A.  There was -- there -- we say surface
14  water.  There was no standing water.  There was
15  standing water at point one.  There was no standing
16  water at point two.
17       Q.  I'm going to show you what we'll mark as
18  220.  Some documents anyway.  Sorry.  It's not
19  wanting to open for some -- there we go.  All right.
20  And for the record, this is Bates EPA 93.  All right.
21  Take a look at this, Mr. Halbert, please.  And can
22  you tell me what this is?
23       (Defendant's Exhibit 220 was marked for
24  identification.)
25       A.  This is just my notes from our biweekly

Page 84

1  meetings.
2        Q.  Okay.  So it says 2019 enforcement
3  section team meeting, days December 3rd --
4        A.  Oh, I'm sorry.  I need to recanter a
5  little bit.  So this is an agenda for a -- an annual
6  enforcement meeting, not a -- not notes from a
7  biweekly meeting.  I apologize.
8        Q.  No problem.  And do you know who all was
9  in attendance at this meeting?
10       A.  So we had -- based on the agenda, I
11  recall that we did have EPA Region 4 attend.  We also
12  had the Army CID.  We had -- I, I believe we had an
13  attorney from EPA Region 4 also visit.  We had the
14  enforcement team as a whole.  All the project
15  managers were there.  I believe we had some of our
16  office of counsel attorneys present.  And I, I don't
17  -- can't think of anybody else right now.
18       Q.  And let me back up.  After the October
19  2019 site visit, what, if anything, did you do next
20  in terms of pursuing the matter against Mr. Sharfi?
21       A.  We finalized our, our memorandum to be
22  sent to office of counsel.
23       Q.  Do you know when that was sent?
24       A.  Not offhand, no.
25       Q.  Was it in 2019?



ROBERT HALBERT
USA vs SHARFI

June 01, 2022
85–88

Page 85

1    A.  Could have been.  I don't know because I
2  know there was -- certainly, there was drafts
3  created.  There, there was more than likely some
4  discussion with the office of counsel.  So I, I don't
5  know as far as the timeline as to when our final
6  product was issued to office of counsel.
7    Q.  Okay.  And again, I don't want to know
8  the contents because it's with the office of counsel.
9  But when did that process start?
10   A.  Well, to, to some degree, it would have
11 started prior to the October 2019 inspection.  It was
12 the October 2019 inspection that kind of concluded
13 our investigation.  So, you know, I don't know at, at
14 what day that we actually put pen to paper and
15 started our memo to counsel.  I mean, some of it had
16 elements from our previous MFRs.  So, you know, it
17 was a, a working document for, for quite some time.
18   Q.  All right.  And going back to right after
19 the initial site visit, was it your opinion that
20 either the Army Corps or the EPA should pursue
21 litigation against Mr. Sharfi or NeshaFarm?
22   A.  What was the timeline for that
23 determination?
24   Q.  Yeah.  After the initial site visit.  So
25 in May of 2018.

Page 86

1    A.  Okay.
2      MR. ADKINS:  Objection.  Asked and
3  answered.
4      MR. HAMILTON:  I don't think he -- I had
5  not asked him that specific question, Mr. Adkins.
6      THE WITNESS:  I would say no because
7  there, there was still -- in my opinion, there was
8  still a process in which could have moved forward for
9  Mr. Sharfi to, to resolve the matter.  At any point
10 in time, you know, he could have picked up the phone
11 and said, "Hey, I understand there's a process.  I'm
12 willing to do what is needed in order to fix this
13 issue."  So was there a -- an absolute determination
14 that, that we wanted to move forward with some type
15 of a legal process?  No, because I think there was --
16 there was options still on the table.
17 BY MR. HAMILTON:
18   Q.  When you referred the matter to the EPA,
19 was that still your view?
20   A.  Again, at any point in time, I think if
21 there was -- if, if there had been a reconnection of
22 communication and a, a resolve to remedy the
23 situation as it was, then we would have certainly
24 entertained those options.
25   Q.  And that remedy would be assuming that

Page 87

1  the Army Corps has jurisdiction and Mr. Sharfi gets a
2  permit, correct?
3    A.  Yes.  Yes.  If, if Mr. Sharfi said, "I'm,
4  I'm here to restore the property to its
5  preconditioned state," then we would have entertained
6  that restoration to resolve the matter.
7    Q.  So essentially, he had to, you know, play
8  ball with what the Army Corps was seeking.
9  Otherwise, the matter continued your enforcement?
10     MR. ADKINS:  Objection.  Argumentative.
11 BY MR. HAMILTON:
12   Q.  Can you answer?
13   A.  I'm not sure I understood that question.
14 Say it again.
15   Q.  Sure.  So Mr. Sharfi essentially had the
16 choice of either complying with what the Army Corps
17 wanted or he faced an enforcement proceeding and
18 litigation from the Army Corps or the EPA?
19   A.  He had -- he had the option of complying
20 with federal law and we as the Corps were here to
21 assist him with that.
22   Q.  And you would agree that this alleged
23 compliance of the federal law is all predicated on
24 the fact that the Army Corps has jurisdiction over
25 the site, correct?

Page 88

1    A.  Correct.
2    Q.  So at what point was a determination made
3  to file a lawsuit against Mr. Sharfi and NeshaFarm?
4      MR. ADKINS:  Objection.  I think this is
5  starting to venture into decisions that were made, if
6  not by counsel, in close coordination with counsel.
7  I mean, you're talking about when the decision was
8  made to file a complaint.
9  BY MR. HAMILTON:
10   Q.  Well, let me ask this.  Whose decision
11 was it to file -- or whose decision would it be to
12 file a lawsuit against Mr. Sharfi or NeshaFarm?
13     MR. ADKINS:  Objection.  Foundation.  You
14 can answer if you know.
15     THE WITNESS:  Again, I --
16 BY MR. HAMILTON:
17   Q.  All right.  Let's go back to -- is it
18 Kalea Bay?  Who made the decision ultimately -- whose
19 decision was it ultimately, in that case, to file a
20 lawsuit against the defendants?
21     MR. ADKINS:  Objection.  Foundation.
22     MR. HAMILTON:  What's the foundation you
23 think we're lacking, Brandon?
24     MR. ADKINS:  Does he have knowledge of
25 who made this decision?

Page 89

1  BY MR. HAMILTON:

2      Q.   Okay.  Well, if you know, Mr. Halbert, do
3  you know who would have made the decision to
4  ultimately file a lawsuit in an enforcement
5  proceeding?

6      A.   The enforcement program makes
7  recommendations to office of counsel.  As far as I'm
8  concerned, office of counsel makes those decisions to
9  refer a matter to the Department of Justice.

10     Q.   Okay.  So is it your understanding as the
11  chief of enforcement for the Jacksonville district
12  that the office of counsel ultimately makes the
13  decision when to file a lawsuit against a property
14  owner?

15     A.   I would say yes.

16     Q.   And that's based on your recommendations
17  as the enforcement section, correct?

18     A.   My recommendation would -- I would hope
19  have some basis in that determination.  But again,
20  the, the -- well, I can't speak to office of counsel.
21  But as far as I'm concerned, that is where the
22  decision is made to elevate a referral to Department
23  of Justice.

24     Q.   Okay.  And in relation to Mr. Sharfi in
25  the NeshaFarm case, the memorandum that was

Page 90

1  ultimately submitted to office of counsel was at the
2  very minimum -- well, strike the question.

3          I think you testified earlier that
4  essentially your investigation from the enforcement
5  side in order to prepare a memorandum to the office
6  of counsel was concluded in October of 2019?

7      A.   That would be fair.  Yes.

8      Q.   Do you know when this lawsuit was
9  ultimately filed against Mr. Sharfi and NeshaFarm?

10     A.   Sometime after October 2019.

11     Q.   Would you have any reason to doubt me if
12  I were to represent to you that it wasn't until May
13  of 2021?

14     A.   I wouldn't dispute that.

15     Q.   Okay.  All right.  So let's go back to
16  this exhibit we were looking at.  So this is the 2019
17  sounds like yearly meeting.  And down here, it says
18  case review.  And it lists Sharfi, John Pempek.  What
19  was discussed in this case review at the annual
20  meeting for the enforcement section by Mr. Pempek
21  about Mr. Sharfi's property?

22     A.   We put it on the agenda.  I mean, looking
23  back, you know, now, December of 2019, I'm not so
24  sure how much detail we would have spoke on Sharfi.
25  So I, I'm not aware of having any type of PowerPoints

Page 91

1  or anything to that degree that would have been
2  shared with a, a group setting like this.  We may
3  have -- we had already referred the matter to EPA.
4  They had already responded.  So I, I'm coming up
5  blank as to what we would have spoke to at this point
6  in, in the case review.

7      Q.   Would his MFR or Mr. Pempek's MFR, his
8  amended MFR, been shared with this group?

9      A.   No.  I -- no.  I don't -- I, I don't
10  think -- there may have been some pictures.  I don't
11  know.  But again, given the timeline of where we're
12  at right now, I would have been extremely hesitant
13  of, of sharing any detailed information on the
14  matter.

15     Q.   So this FPL, the other matters that are
16  listed here, the FPL Solar Farm, Shaun Gallagher, and
17  Garrison Cattle, LLC, Terry Wells, were those two
18  matters, either one of them, in litigation at that
19  point?

20     A.   No.  They were not at, at a -- they were
21  not in litigation.  No.

22     Q.   Did either one of those result in
23  litigation after this?

24     A.   I'm -- Garrison Cattle, I'd have to look
25  back.  That may have -- there may have been a

Page 92

1  settlement that did not include any type of federal
2  court proceedings.  We may have done that internally.
3  There -- I, I don't recall specifically how we
4  resolved the Garrison Cattle, LLC issue.  It -- but
5  it was -- they -- none of those other two were in
6  litigation.

7      Q.   So after this meeting, what, if anything
8  -- other than finalizing the memo to send to office
9  of counsel, what, if anything, did you do to continue
10  the proceeding against Mr. Sharfi and NeshaFarm?

11     A.   At this point in time in December 2019,
12  we were probably finalizing our memo to office of
13  counsel.

14     Q.   And again, do you recall whether that was
15  finalized and submitted in fiscal year 2019 or 2020?

16     A.   Again --

17     Q.   I'm sorry.  Not fiscal year.  Let me
18  rephrase that.  Was the memo to office of counsel
19  finalized in the calendar year of 2019 or 2020?  Do
20  you recall?

21     A.   I don't recall.  I -- if I speculated, it
22  would have been in 2020 calendar year.

23     Q.   I'm going to show you what we'll mark as
24  Exhibit 221.  Is that right?  Yeah.  221.  And would
25  it be fair to say that this is the agenda just like



Page 93

1   the one we just looked at but for the 2020 meeting?
2        (Defendant's Exhibit 221 was marked for
3   identification.)
4        A.   Okay.
5        Q.   And for the record, it's Army Corps 11220
6   to 11221.  Is this the agenda for the same meeting
7   that we just talked about that occurred in 2019 but
8   for the -- this one is for the 2020 meeting?
9        A.   I'm just trying to remember if we had the
10  meeting.  I may have made an agenda, and the meeting
11  may not have gone forward.  I'm trying to think if --
12  I'm trying to recall if the meeting took place, but I
13  -- okay.  So acknowledging this is an agenda item, I,
14  I'd have to verify that the -- that the meeting took
15  place.
16       Q.   Why would it have not taken place?
17       A.   Well, I'm, I'm looking at the, the agenda
18  here.  I had planned out an agenda for -- because
19  we're getting close to -- this was FY20.  I don't
20  think we had been called off from having a, a meeting
21  because of COVID.  So depending on how, you know,
22  you, you -- I'd have to look back for -- to see for
23  certain if this meeting took place.
24       Q.   Okay.  And I'll just say --
25       A.   It may have been like -- it may have been

Page 94

1   canceled or rescheduled.
2        Q.   Okay.  And I'll just say I think, you
3   know -- and Mr. Adkins, tell me if you disagree.  I
4   think the COVID pandemic started generally in March
5   of 2020.  So this would have been, you know, seven to
6   nine months after all this craziness began.  So do
7   you know if the Corps was having in-person meetings
8   around that time, December 2020?
9        A.   We, we were.
10       Q.   All right.  So let's look at here.  It's
11  on the first day -- or excuse me.  It looks like
12  Tuesday down here at case review.  It says again,
13  Antilles cases, and it says Sharfi, John Pempek.
14  What, if anything, was discussed by Mr. Pempek as it
15  relates to the Sharfi matter at this meeting assuming
16  it occurred?
17       A.   See, that -- this is why I bring up the
18  issue is, is that there -- the agenda is almost
19  identical to the last one.  So it's almost
20  interesting that I started an agenda and didn't
21  finalize it.  So, I mean, the point that I'll make is
22  that at one of these annual enforcement meetings, did
23  we talk about Sharfi?  We, we may have.  But I just
24  don't understand the idea that, that we would be
25  talking about the same agenda items year after year.

Page 95

1        So I'm kind of questioning the the,
2   agenda here if, if, if that was an actual agenda or
3   not, if that makes sense.  I may have started
4   creating it, preplanning, creating an agenda, and I
5   may not have gotten to a point where I had updated
6   the agenda from the previous year.  And again, I, I -
7   - so I can't really answer your question with respect
8   to did we actually discuss these items every single
9   year during the enforcement meeting.  I --
10       Q.   So, I mean, I'll represent to you, right,
11  there's certain things that are added to this.  For
12  example, Antilles cases was not included in the 2019
13  agenda.
14       A.   True.
15       Q.   There's more details here that were not
16  included.  And this document was produced to us, as
17  far as I can tell, in a PDF.  So not a Word document
18  where it would indicate it was perhaps a draft.  So
19  as you sit here today, you don't know whether you had
20  the 2020 enforcement section team meeting.  Is that
21  your testimony?
22       A.   Scroll down a little bit further, please.
23       Q.   Sure.  And I'm not trying to trip you up.
24  Right?  If you had the meeting, we want to know what,
25  if anything, was said about the Sharfi matter.  But

Page 96

1   if you didn't have the meeting, that's understandable
2   with COVID.  But, you know, we're just trying to get
3   to the bottom of that.
4        A.   All right.  So based on the agenda, it
5   appears that I'll -- I'd like to be able to say that,
6   yes, the, the meeting happened.  I think there's
7   enough there that I can say, yeah, that the meeting -
8   - the meeting did occur in December of 2020.  Or was
9   it 2020 or 2019?
10       Q.   It would be 2020.
11       A.   2020.
12       Q.   Yes, sir.  So do you recall anything that
13  was spoken about as it relates to Mr. Sharfi, the
14  site, or NeshaFarm at this meeting?
15       A.   I don't recall any, any discussion.
16  Again, John would have -- would have probably
17  narrated such then if it did take place.  And, and
18  again, we, we would not have been speaking to, to
19  much detail.  I think what we would be doing is using
20  that somewhat as a case example amongst the entire
21  enforcement team as to, "Hey, here's some of the
22  cases that you may come up against.  These may be
23  some of the logistical issues."  So -- but I, I, I
24  wouldn't feel confident saying that we shared every
25  detail of the, the case with the enforcement team.



ROBERT HALBERT
USA vs SHARFI

June 01, 2022
97–100

Page 97

1    Q.  Would it be safe to say that the
2  memorandum submitted to the office of counsel as to
3  Mr. Sharfi's site was well-finished and submitted by
4  December 2020?
5        MR. ADKINS:  Objection.
6        THE WITNESS:  It could have been, I mean,
7  considering the referral went forward in May of 2021.
8  BY MR. HAMILTON:
9    Q.  So it could have taken --
10    A.  I, I, I think -- I think our part -- the
11  enforcement program, our memo to counsel may have
12  been finalized at that point.  Counsel may have been
13  working on some more internal documentation in
14  preparation for a referral.  So I, I, I don't -- I
15  can't answer what was going on 20 -- or December
16  2020.
17    Q.  Okay.  So at the end of 2019, you said --
18  well, excuse me.  As of October 2019, you testified
19  that was essentially the end of your investigation.
20  You were working on the memo.  So you're saying it
21  could still be possible that over a year later the
22  memo still was not finalized and submitted?
23    A.  I'm pretty sure that enforcement had
24  submitted it to counsel.
25    Q.  Okay.

Page 98

1    A.  Our portion of referring the matter to
2  the counsel I suspect was completed.
3    Q.  So down here on this agenda, it says --
4  on Thursday, it says, "08 mission success criteria
5  and strategic targeting.  Bobby."  What is strategic
6  targeting?
7    A.  Strategic targeting is a -- is a concept
8  within our headquarters in that it gives the
9  districts throughout the nation the opportunity to
10  hone in on specific areas of their program.  So one
11  particular year, you could target let's say section
12  10 compliance and enforcement of the Rivers and
13  Harbors Act, or Section 404 of Clean Water Act
14  another year, or maybe you wanted to target linear
15  projects such as roads or bridges or, or what have
16  you.  Maybe streams.
17        So it, it gives each district throughout
18  the country flexibility on what is important to them
19  within their, their district, and then they're
20  required to perform a certain percentage of
21  inspections based on those strategic targets that the
22  districts have selected.
23    Q.  At any point between when you came on
24  board in May of 2017 with the Army Corps up until
25  this lawsuit was filed in May of 2021, was Clean

Page 99

1  Water Act 404 violations a strategic targeting
2  initiative of the Jacksonville Army Corps district?
3    A.  Every year, it's -- it was targeted.
4    Q.  Okay.  So what other initiatives were
5  targeted each of those years, if you recall?
6    A.  Well, Jacksonville district is, is so
7  diverse with respect to our regulatory program that
8  we, we select everything for strategic targeting.
9    Q.  So Clean Water Act violations under
10  section 404 were a strategic target each of the years
11  you've been at the Army Corps.  And over that time,
12  there's only been the Sharfi litigation, the Kalea
13  Bay litigation, and the D.R. Horton matter that dealt
14  with Clean Water Act violations?  Is that accurate?
15        MR. ADKINS:  Objection.  Vague.
16  BY MR. HAMILTON:
17    Q.  Let me reask the question.  Since 2017
18  when you joined the Army Corps as chief of
19  enforcement, are the only matters that were brought
20  into litigation, i.e., a case was filed in federal
21  court, for a Clean Water Act violation, the Kalea Bay
22  matter, the D.R. Horton matter, and the current
23  litigation?
24    A.  That, that sounds accurate.  I, I could
25  be forgetting one, but that, that -- as far as

Page 100

1  numbers, that sounds about right.
2    Q.  Does the Army Corps' strategic targeting
3  directive -- do they set any sort of benchmark on how
4  many notices of violation or lawsuits should be filed
5  for --
6    A.  No.
7    Q.  -- Clean Water Act violations?
8    A.  No.
9    Q.  No?
10    A.  No.
11    Q.  Since joining the Army Corps in May of
12  2017, do you know estimated how many notices of
13  violation of Clean Water Act section 404 violations
14  have been sent to property owners in the Jacksonville
15  district?
16    A.  Since when?
17    Q.  Since you joined the Army Corps.
18    A.  And you're asking me the number of how
19  many notices of violations we --
20    Q.  Yes, sir.  As they relate, yeah, to CWA
21  section 404 violations.  Ballpark.  It doesn't have
22  to be a precise number if you don't know.
23    A.  Since I've been with the Corps in '17, I,
24  I, I would say maybe 100.
25    Q.  Let me ask you.  When the cease-and-



ROBERT HALBERT
USA vs SHARFI

June 01, 2022
101–104

Page 101

1   desist letter went out, right, we talked about the
2   civil penalties.  Let me pull up the letter again
3   here.
4        MR. HAMILTON:  (phone ringing) You good?
5   You need to take it?
6        THE WITNESS:  Nope.
7        MR. HAMILTON:  Okay.
8   BY MR. HAMILTON:
9    Q.   When the cease-and-desist letter was sent
10  to Mr. Sharfi, it talks about these penalties, right,
11  that could be incurred for potential violation of the
12  federal laws.  What is your understanding of when
13  those penalties would begin if a violation was found?
14   A.   I feel that could be -- I mean, I'm not -
15  - I mean, this is somewhat arbitrary.  I guess it
16  depends on who you ask because there's -- I've heard
17  through my experience in compliance and enforcement,
18  there's been -- when does that clock start?  If
19  you're asking me for my opinion on this, I think it
20  would probably be established at the date that a
21  formal notification was given to an alleged violator.
22       To, to me, that would represent that
23  clock of, well, you know, the $52,000 per day.  If
24  you're looking for, to me, a fair and transparent
25  means of when that clock starts, I would state it

Page 102

1   would be at, at what point a, a federal agency issues
2   a notice of violation or a cease-and-desist.
3    Q.   Okay.  So to make sure I understand, in
4   this particular case, Mr. Sharfi and NeshaFarm case,
5   that would be the date of this cease-and-desist
6   letter forward?
7    A.   In my opinion, yeah.  Yes.  If somebody
8   asked me, well, when does that start, I mean, I --
9   I've never been asked that question before.  So if,
10  if somebody is looking me -- to me to make a decision
11  on when that date would start, to me, that would be
12  appropriate as to begin it at the point of the notice
13  of violation.
14   Q.   Okay.  And is there any sort of formal
15  Army Corps guidance on when it should begin?  You
16  said there was mixed interpretation.
17   A.   No.  To me, it's more of a, a legal
18  conversation than it is for me.  I would -- if -- I
19  would certainly counsel with my -- with the office of
20  counsel in order to understand what, what the -- what
21  the regulations allowed as far as penalties such as
22  that.
23   Q.   So assuming your interpretation is
24  correct for purposes of this, these violation daily
25  penalties up to $52,414 per day would have

Page 103

1   potentially begun as of April 30, 2018 for Mr. Sharfi
2   and NeshaFarm, correct?
3        MR. ADKINS:  Objection.
4        MR. HAMILTON:  What's the basis?
5        MR. ADKINS:  He said his interpretation.
6   I think he said this is his guess.  He said he
7   doesn't make legal determinations.
8        MR. HAMILTON:  Okay.  Based --
9        MR. ADKINS:  So I don't know --
10       MR. HAMILTON:  Yeah.  Sure.  Sure.
11       MR. ADKINS:  -- if you'd call it an
12  interpretation.
13       MR. HAMILTON:  Sure.
14  BY MR. HAMILTON:
15   Q.   Your understanding as the chief of
16  enforcement of the enforcement section for the
17  Jacksonville district U.S. Army Corps of Engineers,
18  is your understanding that penalties would have begun
19  as of the cease-and-desist letter in this case?
20   A.   My understanding is that I would need to
21  seek counsel or somebody within headquarters that has
22  been subject to this type of issue before.  I, I
23  mean, again, if, if I am forced to make a
24  determination, then, to me, it would fall in line
25  with when the notice of violation was issued by the

Page 104

1   Army Corps of Engineers.  So if that, that falls into
2   your 2018, the May 2018 when the notice of violation
3   is, then I guess -- I guess that would be the answer
4   then.
5    Q.   Are you aware that from the date that the
6   EPA declined and referred the matter back to the Army
7   Corps to the date the litigation was filed, over two
8   years elapsed?
9    A.   I'm aware of that.
10   Q.   Have you ever thought about how much
11  money that is based on these penalties per day?
12   A.   I'm aware of what that -- that number
13  would be very large.  Yes.
14   Q.   Yeah.  And you would agree with me that
15  there were substantial delays in bringing this
16  action, correct?
17       MR. ADKINS:  Objection.  Vague and
18  ambiguous.  Argumentative.
19  BY MR. HAMILTON:
20   Q.   Sure.  Yeah.  So would you agree with me
21  that between when the Army Corps -- excuse me.  When
22  the EPA declined and you first drove by Mr. Sharfi's
23  inspection, it was almost a month?
24   A.   So inherently, I mean, the, the, the
25  question is, is -- well, I'm not sure if there's a

ROBERT HALBERT
USA vs SHARFI

June 01, 2022
105–108

Page 105

1  question.
2      MR. ADKINS:  Well, why don't you wait for
3  the question?
4  BY MR. HAMILTON:
5      Q.  Yeah.  So well, let me ask this first.
6  Never mind.
7      So after the initial site visit of Mr.
8  Pempek back in May of 2018, no one from the Army
9  Corps visited either the site or the Countess Joy
10 property until October of 2019.  Is that correct?
11     A.  It sounds appropriate.  Yes.
12     Q.  So that's a yes?
13     A.  That would be yes.
14     Q.  Did anyone visit the property -- excuse
15 me.  The site or the Countess Joy property between
16 October of 2019 and the filing of this lawsuit in May
17 of 2021?
18     A.  Not to my knowledge.
19     Q.  And the October 2019 site inspection by
20 you and Mr. Pempek on the Countess Joy property only
21 was approximately an hour and a half to two hours in
22 length, correct?
23     A.  That's my best guesstimate.  Yes.
24     Q.  Okay.  And based on your earlier
25 testimony, the -- in your view, the enforcement

Page 106

1  section's investigation was concluded as of October
2  2019 generally.  But the lawsuit wasn't filed for
3  approximately another roughly 16 -- no.  Excuse me.
4  17 or so months?
5      MR. ADKINS:  Objection.  Vague.
6  BY MR. HAMILTON:
7      Q.  Do you know how many months are between
8  October 2019 and May 2021?
9      A.  18?
10     Q.  Okay.  Right.  Thanks.  He objected so I
11 wanted to -- sorry if that was a silly question, but.
12 So 18 months passed before a lawsuit was filed?
13     MR. ADKINS:  Objection.
14 BY MR. HAMILTON:
15     Q.  Is that accurate?
16     A.  Okay.  Okay.
17     Q.  All right.
18     A.  I mean, that's what the timeline is.
19     Q.  Why was there such a delay?
20     MR. ADKINS:  Objection.  Foundation.
21 BY MR. HAMILTON:
22     Q.  You can answer.
23     A.  Yeah.  I don't have a -- I don't have a
24 concrete answer for that.  You know, I can speculate.
25 You know, I can look back.  I can ask people.

Page 107

1  Manpower is, is, is always an issue for us.  So, like
2  I said, there was -- at some point, we only had one
3  attorney.  That may have been part of the delay.  You
4  know, I'm not going to sit here and point fingers
5  that it was anybody's intention to prolong this, this
6  process.
7      Would we have certainly have -- liked to
8  have been more efficient?  Absolutely.  But I'd have
9  to cut -- I'd have to look back to see all of the
10 events that transpired to formulate any type of idea
11 as to why the delays were what they were.
12     Q.  And you understand the reason I'm asking
13 this is because when someone receives a letter
14 threatening let's just say $50,000 per day and that
15 clock starts to tick and two years passes, that's a
16 humongous number.  Is it not?
17     A.  I would agree.  It is a large number.
18     Q.  I mean, it could be in excess of 30 or 35
19 million dollars, correct?
20     MR. ADKINS:  Objection.
21     THE WITNESS:  If that's what it
22 calculates out to, okay.
23 BY MR. HAMILTON:
24     Q.  Yeah.  Okay.  Since you've been at the
25 Army Corps, are you aware of any cases, litigation,

Page 108

1  federal cases, where the Army Corps either through
2  itself or the Department of Justice has sought
3  penalties from the date of the cease-and-desist
4  letter forward to the filing of litigation?
5      A.  No.
6      Q.  How about for the EPA?
7      A.  I'm not aware of the EPA's penalties.
8      Q.  I want to go back.  We talked early on
9  about jurisdiction and how it may change depending on
10 the change of the rule that applies -- well, federal
11 law that applies.  What is your understanding of how
12 that may change -- or what is your understanding of
13 whether the Army Corps has jurisdiction under the
14 WOTUS 2020 or the Trump rule?
15     MR. ADKINS:  Is this specific to the
16 site?
17     MR. HAMILTON:  Yes.  Correct.  To the
18 site.  Yes.
19     MR. ADKINS:  Okay.  I would just caution
20 the witness here, you can answer based on what you
21 know.  But to the extent your answer reflects
22 communications or legal advice that you've received
23 from counsel for the Corps or from the United States
24 Department of Justice, then those matters are
25 privileged.  So --



Page 109

1      THE WITNESS:  Understood.
2      MR. ADKINS:  -- to the extent you can
3  answer with that guidance, I'm happy for you to
4  answer.
5      THE WITNESS:  Mr. Hamilton, can you
6  repeat the question, please?
7  BY MR. HAMILTON:
8      Q.  Sure.  As the chief of enforcement for
9  the Jacksonville district of the U.S. Army Corps,
10 what is your understanding of how jurisdiction is
11 obtained over the site under the WOTUS 2020 or what's
12 been commonly referred to as the Trump rule?
13     MR. ADKINS:  Same guidance and
14 instruction.
15     THE WITNESS:  So my understanding is as
16 far as how it affects our jurisdiction between the
17 Navigable Waters Protection Rule and the pre-2015, is
18 that -- would that be --
19 BY MR. HAMILTON:
20     Q.  No, I'm asking -- so you testified
21 essentially that, after the site visit in 2018, it
22 was your opinion that the Army Corps had jurisdiction
23 over the site.  I'm asking, under the WOTUS rule, how
24 is that jurisdiction established.
25     MR. ADKINS:  Again, I'm instructing the

Page 110

1  witness to -- if your answer is based on privileged
2  information that you've received from counsel, I'm
3  instructing you not to answer.  To the extent you can
4  answer besides that, I'm fine.
5  BY MR. HAMILTON:
6      Q.  Let's clarify the record here.  Were you
7  having discussions with office of counsel or any
8  attorneys in May of 2018 about Mr. Sharfi's site?
9      A.  Yes.
10     Q.  When did those begin?
11     A.  I'd have to probably go back through my
12 email to see at what point I started reaching out to
13 office of counsel.  I, I would guess probably
14 sometime after the notice of violation went out.  It
15 certainly would have been corresponding with counsel
16 prior to -- well, yeah.  I, I'd have to go back to
17 email.  I could probably look through my email and
18 find out at what point we may have been reaching out
19 to counsel.
20     Q.  Were you engaged with the office of
21 counsel prior to sending the NOV or the cease-and-
22 desist letter?
23     A.  We could have been.  I'd, I'd have to
24 look.  On some of these cases, we are in contact with
25 the office of counsel prior to the notice of

Page 111

1  violation going out.  Sometimes it's after the notice
2  of violation.  Sometimes we see how EPA is going to
3  respond if there is a referral to EPA.  If they take
4  on the case, then the Army Corps is out of the -- out
5  of the loop.  So I'd have to look back in the -- to,
6  to 2018 to try to establish when it was when we
7  started discussing the matter with counsel.
8      Q.  Did you make any jurisdictional
9  determination prior to sending the cease-and-desist
10 letter?
11     MR. ADKINS:  Objection.  Vague.
12     THE WITNESS:  Yeah.  We, we would have
13 made -- it wouldn't have been a definitive
14 determination, but we made a determination.
15 Otherwise, we would not have issued a notice of
16 violation.
17 BY MR. HAMILTON:
18     Q.  Do you know if you had -- what would you
19 have to review to refresh your recollection of
20 whether -- of when you began correspondence with the
21 office of counsel as to the site?
22     A.  Probably my emails, which I know are on
23 record.  I don't know.  It, it, it would have to --
24 the best guess is it would happen sometime in 2018.
25     Q.  Is it typical to involve office of

Page 112

1  counsel prior to sending a cease-and-desist letter?
2      A.  Is it a problem?
3      Q.  Is it typical?
4      A.  Oh.  Is it typical?  Back then in 2018,
5  it would have -- we would be making some type of --
6  depending on what the issues were, if it was a, a
7  large loss of resource, if there was a lot of aquatic
8  resources that were impacted, there were hundreds of
9  structures that were being completed without, you
10 know, a permit, those, those type of cases, we would
11 have certainly brought counsel in to the -- in the
12 loop as soon as possible.  And that could have
13 occurred prior to a notice of violation being sent.
14     Q.  All right.  What is your -- sorry.  Go
15 ahead.
16     A.  It's, it's, it's not really relevant to,
17 to this.  But there's, there's processes in place
18 now, speaking typically, that when we do issue a
19 notice of violation, there's at least some
20 coordination with, with office of counsel prior to
21 that notice of violation being issued.
22     Q.  What, if any, understanding do you have
23 as the section chief for enforcement for the
24 Jacksonville district as to how jurisdiction is
25 established over the site under the 2015 Rapanos



ROBERT HALBERT
USA vs SHARFI

June 01, 2022
113–116

Page 113

1 guidance?
2     MR. ADKINS: Objection. Vague.
3     THE WITNESS: My understanding is we have
4 very broad jurisdiction under the, the Rapanos, now
5 the pre-2015 rule.
6 BY MR. HAMILTON:
7     Q.   I'm sorry. Say that again?
8     A.   We have very broad jurisdiction.
9     Q.   Now under the Rapanos rule. Is that what
10 you're saying?
11    A.   But we're going back to the -- they're
12 calling it the pre-2015, prior to going to Navigable
13 Waters Protection Rule, it was kind of considered
14 Rapanos back to the '86 regs. So in my opinion, the,
15 the -- our jurisdiction is very broad with respect to
16 the -- now the pre-2015 rule that we're under.
17    Q.   So at the time in 2018, before you sent
18 the cease-and-desist letter, what is your
19 understanding of what rule you were operating under
20 to establish jurisdiction?
21    A.   We were operating under the Rapanos.
22    Q.   Okay. And in May of 2018 when you
23 confirmed, in your opinion, that you had
24 jurisdiction, what rule were you operating under?
25    A.   We were still under Rapanos.

Page 114

1     Q.   And when this lawsuit was filed in May of
2 2021, what rule would have been in place at that
3 time? Do you know?
4     A.   Navigable Waters Protection Rule was the
5 law of the land in May of -- or well, correction.
6 May of 2021, I, I don't think that Navigable Waters
7 had been vacated yet. I'd, I'd have to -- I don't
8 know when that date was, but I believe it was in 2021
9 sometime.
10    Q.   Do you know when the shift was from the
11 Rapanos guidance to the Trump rule?
12    A.   I think it was the fall of 2020.
13    MR. HAMILTON: All right. Let me take --
14 I think I'm almost done -- five minutes and come
15 back. And we'll hopefully try to wrap up. Okay?
16    THE WITNESS: Okay.
17    THE REPORTER: Okay. Then we'll go off
18 the record, and the time is currently 4:21 p.m.
19 eastern standard time.
20    (Off the record.)
21    THE REPORTER: Okay. Then we are going
22 back on the record, and the time is currently 4:32
23 p.m. eastern standard time.
24 BY MR. HAMILTON:
25    Q.   All right, Mr. Halbert. I've got a few

Page 115

1 more questions here. We were talking about, before
2 we took a short recess, your determination of
3 jurisdiction of the time the cease-and-desist was
4 sent. How did you determine at the time the cease-
5 and-desist was sent whether or not U.S. Army Corps
6 had jurisdiction over the site?
7     A.   How did we determine? Well, we -- John
8 had done some research with respect to the geography
9 of the area. He did not -- he was not able to
10 ascertain, you know, particular vegetation, soils.
11 He could have probably come up with some idea with
12 hydrology based on rainfall, so on and so forth. So
13 we have -- we were able to establish, you know,
14 surface low from the site to the east west creek.
15    And, and so all -- given that the fact
16 that we had information from the water management
17 district, we coupled all that together to be able to
18 state that there is something there that we need to
19 investigate further. So using the Rapanos rule at
20 that particular time, we knew that we had credible
21 information that further investigation was needed.
22 And that prompted us to issue a cease-and-desist
23 letter.
24    Q.   I have a couple questions about that.
25 But first, why not do the further investigation

Page 116

1 before sending a threatening letter to a property
2 owner?
3     MR. ADKINS: Objection.
4     THE WITNESS: We would have been on board
5 with that.
6 BY MR. HAMILTON:
7     Q.   So why did you send the cease-and-desist
8 letter instead of doing the additional investigation
9 first?
10    A.   To my knowledge, we attempted to do that.
11    Q.   How so?
12    A.   We attempted to get on site.
13    Q.   Prior to sending the cease-and-desist
14 letter?
15    A.   I, I have to look back at the chronology
16 of events. But was there not -- sorry. I -- if
17 there's emails out there to, to the point that John
18 is trying to advise Mr. Sharfi on what the
19 regulations are, what the requirements are, and that
20 didn't really get us anywhere. We -- Mr. Sharfi
21 submitted an application that was later withdrawn
22 because there was no response to an REI. So I think
23 that we were eventually trying to get to a point
24 where we could work with Mr. Sharfi in an informal
25 matter, but that did not work out.



ROBERT HALBERT
USA vs SHARFI

June 01, 2022
117–120

Page 117

1    Q.   Well, you would agree with me that Mr.
2  Pempek is saying Mr. Sharfi what he thought the
3  regulations were that applied versus asking to come
4  on the site are two different things, correct?
5    A.   I think the communication was established
6  at that point that that could certainly be on the,
7  the table for addressing some type of need to, to
8  manage the situation informally.
9    Q.   Were you included on those emails where
10  Mr. Pempek told him what the regulations allegedly
11  were?
12    A.   I might have been.
13    Q.   All right.  So let me back up here.  I'm
14  going to show you -- I don't know what we marked this
15  as, but it's Army Corps 524 and 525.  We've already
16  looked at this document.  Hang on.  Remember this
17  email where you have an email from Mr. Kryzda to Mr.
18  Pempek saying, "We're going to submit an
19  application," and the very next correspondence was
20  Mr. Pempek telling Mr. Kryzda that they withdrew the
21  application and giving an opportunity to explain just
22  one day before sending the cease-and-desist?  Do you
23  remember this whole conversation?
24    A.   I do.  Yeah.
25    Q.   And nowhere in here on these lower emails

Page 118

1  when going all the way back to January, A, you're not
2  copied on these emails.  Are you?  And we've already
3  gone over this.  And I don't want to waste time doing
4  this because I only have so much time to question
5  you.  But I'll just represent to you you were not
6  copied on these emails.  The first email in this
7  chain that you're copied on was this April 26, 2018
8  email.  Okay?
9    A.   Okay.
10    Q.   Does Mr. Pempek ask for a site inspection
11  in this email?
12    A.   No.  He's asking for an application to be
13  submitted.
14    Q.   Right.  And so then the next email he
15  sent is that next Monday morning.  Mr. Pempek sends
16  him the cease-and-desist letter, right?  The cease-
17  and-desist letter also does not mention asking to
18  come on the site.  Does it?
19    A.   It asks for a response as to how Mr.
20  Sharfi is going to remediate the situation or bring
21  information to, to light that we may not have.
22    Q.   Right.  But that's not asking to come on
23  the site, correct?
24    A.   We don't specifically say, you know, our
25  -- we're not specifically asking permission to come

Page 119

1  out on site, but I think that that would be inherent
2  to some type of resolution in the matter.
3    Q.   Right.  And no less than maybe an hour
4  after the cease-and-desist letter is received, Mr.
5  Sharfi says, "I hope you will take me on the offer to
6  come visit the site yourself soon."  Does he not?
7    A.   He does.
8    Q.   And Mr. Pempek came out two weeks later
9  because he was traveling for two weeks, right, on the
10  -- so he came out on the 14th to visit the site.
11  Didn't he?
12    A.   Yes.
13    Q.   Okay.  So when you talk about you
14  established there was surface flow from the site of
15  the east west ditch, where specifically was there
16  surface flow at the time that you are saying you
17  established jurisdiction in May of 2018?
18        MR. ADKINS:  Counsel, did you say at the
19  site?
20        MR. HAMILTON:  No.  From the site to the
21  east west ditch, he testified there was surface flow.
22  And that was one of the basis for establishing
23  jurisdiction.
24  BY MR. HAMILTON:
25    Q.   Where specifically was there surface

Page 120

1  flow?
2    A.   As far as my observations, that was in
3  October of 2019 when I was on the LLC property.
4    Q.   Okay.  So what did you use for a basis to
5  establish jurisdiction in May of 2018 -- or excuse
6  me.  When you sent the cease-and-desist letter in
7  April of 2018?
8    A.   John could have used a myriad of
9  different things, such as lidar, aerial imagery,
10  rainfall.  He could have used some GIS.  There's a
11  whole -- there's many tools to at least be able to --
12  for a project manager to allude to the fact if there
13  is something here that needs to be further
14  investigated.
15    Q.   So you relied on solely Mr. Pempek's
16  determination of whether or not there was
17  jurisdiction?
18    A.   That is true.
19    Q.   And you're his supervisor, correct?
20    A.   That is correct.
21    Q.   So you didn't know independent
22  verification of whether his determination was
23  accurate and correct at that time?
24        MR. ADKINS:  Objection.
25        MR. HAMILTON:  What's the basis?

ROBERT HALBERT
USA vs SHARFI

June 01, 2022
121–124

Page 121

1      MR. ADKINS:  Define verify.
2      MR. HAMILTON:  That he didn't know --
3      MR. ADKINS:  Did he have a -- I mean --
4  BY MR. HAMILTON:
5      Q.  Sure.  So you just testified you relied
6  solely on Mr. Pempek's information to determination
7  of jurisdiction.  Did you do any independent
8  assessment of jurisdiction at that point to verify
9  the information that Mr. Pempek provided you was
10 accurate and correct?
11     A.  Prior to the cease-and-desist going out?
12 Is that --
13     Q.  Yes, sir.
14     A.  Yes.  So there was -- so, so John -- we
15 have an administrative record there.  We have
16 credible evidence from another agency that we had
17 jurisdictional wetlands that had been impacted.  We
18 needed to ascertain with further investigation to
19 what degree and how much impact was involved with
20 the, the alleged activities, so.
21     Q.  Okay.  So let's break that down.  You
22 said jurisdictional wetlands, right?  And you're
23 basing that off of photos that were provided from the
24 district that's under a different regulatory scheme
25 than the Army Corps, correct?

Page 122

1      A.  That is correct.
2      Q.  Okay.  So --
3      A.  But the photos --
4      Q.  -- how did you establish --
5      A.  The photos --
6      Q.  How did you establish, yeah --
7      A.  I'm sorry.  Go ahead.
8      Q.  -- that there was jurisdiction?  How did
9  you establish there was jurisdiction over the site
10 other than -- at the site at the time that you sent
11 the cease-and-desist letter?
12     A.  We used a myriad of tools in order to
13 ascertain whether or not there was credible evidence
14 that this area was a jurisdictional wetland.
15     Q.  Okay.  So other than looking at the
16 photos provided by the district, what did you
17 specifically do as Mr. Pempek's supervisor to verify
18 whether the U.S. Army Corps of Engineers,
19 Jacksonville district specifically, had jurisdiction
20 over the site at the time the cease-and-desist letter
21 was sent?
22     A.  Project manager would have looked at
23 lidar.  He would have looked at aerials.  He would
24 have looked at national wetland inventory maps.  He
25 would have looked at hydrology as far as data sets, a

Page 123

1  lot of desktop review because we did not have access
2  at that particular time.
3      So John Pempek's recommendation to me is
4  that I feel -- he said that, "I feel this is
5  jurisdictional wetlands that needs to be further
6  investigated."  A lot of details perhaps and I'm --
7  maybe not so much from John Pempek.  But if I'm
8  looking at a -- at a site photo and that's all I
9  have, I can ascertain whether or not there's, there's
10 black organic material, i.e., muck.  And so that
11 would give me some evidence that we may have a, a
12 hydric soil in and around the area.
13     So again, it triggers further
14 investigation needed in order to address the
15 jurisdiction.  By us sending a cease-and-desist, we
16 were saying we believe that there is something out
17 there that needs to be further investigated, and we
18 need you to be aware of the potential violation.
19     Many aspects come not from just this case
20 but other cases.  By us submitting a notice of
21 violation, a formal correspondence, that triggers us
22 to be able to properly coordinate with an alleged
23 violator and gain access to that property so that we
24 may further investigate the alleged violation.
25     Q.  Okay.  I appreciate that answer.  But

Page 124

1  that didn't answer my question.  My question was what
2  did you do as Mr. Pempek's supervisor prior to
3  sending the cease-and-desist letter to establish
4  jurisdiction or confirm the Army Corps' jurisdiction
5  over the site?
6      A.  I took his recommendation and told him to
7  draft a notice of violation.
8      Q.  Okay.  And he put that cease-and-desist
9  letter together, and it provided -- I'm sorry.  He
10 emailed Mr. Sharfi and basically gave him one
11 business day before sending the cease-and-desist
12 letter, correct?
13     MR. ADKINS:  Objection.  Vague.
14     THE WITNESS:  I wouldn't look at it that
15 way.  I would --
16 BY MR. HAMILTON:
17     Q.  Do you know why the Corps would threaten
18 significant civil and criminal penalties in a letter
19 to a property owner if they still need to do further
20 investigation to determine the merits of their claim?
21     MR. ADKINS:  Objection.  Vague.
22 Argumentative.
23 BY MR. HAMILTON:
24     Q.  You can answer.
25     A.  The, the, the rationale for pointing out



ROBERT HALBERT
USA vs SHARFI

June 01, 2022
125–128

Page 125

1  all consequences is inherent to our regulation.
2      Q.   After the site visit in May of 2018 when
3  you confirmed -- that you earlier testified that you
4  confirmed there was jurisdiction over the site, what
5  specific path connected the site to the east west
6  ditch that's north of the site for jurisdictional
7  purposes?
8      A.   The entire LLC to the north.
9      Q.   So your position is that as of May 2018,
10  after the site visit to the site, all of the Countess
11  Joy property was jurisdictional wetlands that
12  connected to the east west ditch?
13         MR. ADKINS:  Objection.  Misstates --
14         THE WITNESS:  That would be our initial -
15  - that would be our initial observation.
16  BY MR. HAMILTON:
17      Q.   Let me reask the question.  Yeah.
18  Because I got an objection.  So is it your testimony
19  that all of the Countess Joy property to the north of
20  the site, the entirety of it, acts as a connection to
21  the east/west ditch as of May 2018?
22      A.   As of October 2019.
23      Q.   Right.  So my question was --
24      A.   That would be --
25      Q.   -- was May 2018 what was the -- what was

Page 126

1  the exact path?  Not October of a year and a half
2  later.
3      A.   We had confidence that the -- that the
4  LLC property was connecting the Sharfi property to
5  the east west creek.  It was not proven at least by
6  ground truthing until October of 2019.
7      Q.   So that was over about a year and a half
8  after the initial site visit, correct?
9      A.   I think we established the 18 months.
10  Yes.
11      Q.   All right.  And so as you sit here today,
12  your earlier testimony was, of May 2018, you
13  confirmed the Army Corps had jurisdiction over the
14  site, but you can't tell me the exact path that was
15  taken from the site that connects it to the east west
16  ditch north of the site?
17         MR. ADKINS:  Objection.  Asked and
18  answered.  Misstates testimony.
19  BY MR. HAMILTON:
20      Q.   Can you tell me?
21      A.   Can I tell you the, the, the, the path?
22      Q.   Yes, sir.
23      A.   The path is that the wetlands on site --
24  on the site, the 10 acres is connected to the east
25  west creek.

Page 127

1      Q.   How?  As of May 2018, how was that
2  determined?  What was the path?
3         MR. ADKINS:  Objection.  Asked and
4  answered.
5         MR. HAMILTON:  He hasn't answered,
6  Brandon.  He said October 2019.
7  BY MR. HAMILTON:
8      Q.   So in May 2018, what was the path that
9  connected the site, the claimed wetlands on the site,
10  to the east west ditch?
11      A.   The, the wetlands on Sharfi's property
12  are inherently attached to the wetlands that go from
13  Sharfi's property through the LLC property to the
14  east west creek.
15      Q.   What do you mean inherently attached?
16      A.   It's all one wetland system, complex if
17  you will.
18      Q.   Okay.  So essentially, you determined in
19  May 2018 that essentially everything north of the
20  site up to the east west ditch was a wetland complex
21  and connected the site to the east west ditch?
22         MR. ADKINS:  Objection.  Misstates
23  testimony.
24  BY MR. HAMILTON:
25      Q.   You can answer.  Did you understand my

Page 128

1  question?
2      A.   Can you ask it again, please?
3      Q.   Sure.  Yeah.  So is it your testimony
4  that the connection from the site to the east west
5  ditch that everything in between those two was a
6  system or wetland complex?
7      A.   My testimony is the project manager was
8  telling me that he believed that there was a
9  connection from Sharfi's property to the east west
10  creek.  That's my testimony.
11      Q.   Okay.  Fine.  Thank you.  So was that in
12  a discussion with Mr. Pempek, or was that based on
13  his MFR, or both?
14      A.   He didn't have his MFR before the --
15  before the cease-and-desist.  So we used all the
16  information that we had available, you know, whether
17  that was through John's desktop review, coupled with
18  the water management district's information.  And he
19  said, "I have enough credible information here to
20  determine that further investigation is needed on
21  this site."
22      Q.   Okay.  And that was prior to the issuance
23  of the cease-and-desist, correct?
24      A.   That was whatever transpired from January
25  of 2018 until May of 2018.



ROBERT HALBERT
USA vs SHARFI

June 01, 2022
129–132

Page 129

1   Q.  Okay.  All right.  Now, after the site
2  visit, did that confirm that position, or did it
3  change at all?
4   A.  It bolstered our position.  I don't think
5  it changed our position.  Again, it was a continuing
6  effort of gaining information on the site because the
7  -- again, the site inspection did not allow us to do
8  everything that we wanted to do.  So we could not do,
9  for instance, soil surveys which was a, a component
10  to be able to definitively determine if the site was
11  jurisdictional if we go through the three criteria.
12   Q.  Did you ask to do that?  When I say you,
13  the Corps?
14   A.  I don't know if it was asked.  But based
15  on what John Pempek told me, he was not authorized to
16  dig holes on Mr. Sharfi's property.  I don't know if
17  that was a response to a request or if Mr. Sharfi
18  just said, "You're not allowed to dig holes."
19   Q.  Did Mr. Pempek go on the Countess Joy
20  property at all on the day of the Sharfi site
21  inspection?
22   A.  I'm not aware of him going on site.
23   Q.  Okay.  Is the first time to the best of
24  your knowledge that he went out to the Countess Joy
25  property when you both went October 2019?

Page 130

1   A.  I believe so.
2   Q.  All right.  To the extent that anything -
3  - well, let me back up.  You relied, at least
4  partially, on Mr. Pempek's MFR in pursuing this
5  matter.  Is that accurate?
6   MR. ADKINS:  Objection.  Asked and
7  answered.
8  BY MR. HAMILTON:
9   Q.  Okay.  To the extent anything in that MFR
10  contains false statements or false information, you
11  wouldn't want to necessarily rely on that, would you?
12   A.  I would not want to rely on false
13  information.
14   Q.  Okay.  So if the MFR contains false
15  information or inaccurate statements, you would not
16  want to rely on that document any longer, correct?
17   MR. ADKINS:  Objection.  Vague.
18   THE WITNESS:  I -- yeah.  I mean, to, to,
19  to what effect?  I mean, if, if, if John's MFR said
20  that he was threatened with a firearm and that
21  doesn't come to fruition, I would not necessarily
22  state that the MFR is no longer legit.  I would want
23  to establish that the technical aspects of the MFR
24  were -- was not sound information.
25  BY MR. HAMILTON:

Page 131

1   Q.  Okay.  If the technical aspects were not
2  accurate or were false, you would no longer want to
3  rely on those, correct?
4   MR. ADKINS:  Objection.  Vague.
5  BY MR. HAMILTON:
6   Q.  It's not meant to be a trick question.
7  It's --
8   A.  Well, to some degree, we -- so John -- I,
9  I believe John -- and I've read his material.
10  There's no reason for me to believe that everything
11  that he put in there was to -- was based on the best
12  information that we had.  So if we -- if we find that
13  there is a, a false narrative or there's incorrect
14  data in there, for the purposes of, of having a, a
15  representation of John's information on the, the
16  site, I would rather keep it in there.
17   There, there, there would have to be some
18  rationale as to why that information is, is false or
19  it's no good or it should not be included in the MFR.
20  Until we're able to establish that, I would -- I
21  would want to at least see the rationale as to why we
22  would be -- why we, we would be getting rid of the
23  credibility of the MFR.
24   Q.  Okay.  But that's his interpretation of
25  the technical -- or the information available at the

Page 132

1  time, correct?
2   A.  I would assume.
3   MR. ADKINS:  Vague.
4  BY MR. HAMILTON:
5   Q.  As we sit here today, are you aware of
6  any criminal investigations that are ongoing against
7  Mr. Sharfi or one of his affiliate companies as it
8  relates to the site or the current litigation?
9   A.  No, I'm not aware.
10   Q.  Are you aware of any plans for any
11  criminal investigations as it relates to the site or
12  Mr. Sharfi or one of his affiliated entities?
13   A.  Apart from this case?
14   Q.  Yes, sir.
15   A.  No, I'm not aware --
16   Q.  Well, this case first.  And I'm sorry.  I
17  should have clarified.  You're saying apart from the
18  current civil litigation?
19   A.  Yes.
20   Q.  Okay.  And you're not aware of any
21  outside of the current civil litigation?
22   A.  No, I'm not aware of any other civil or
23  criminal investigations ongoing.
24   Q.  Okay.  And that relates broadly to Mr.
25  Sharfi and any of the properties he owns?



ROBERT HALBERT
USA vs SHARFI

June 01, 2022
133—136

Page 133

1    A.   That -- correct.  I'm not aware of any
2  other procedures or, or criminal investigations,
3  civil investigations.
4    Q.   All right.  Is there anything I've asked
5  you today that you wish to clarify now that we've
6  been through a full day?  I know it's been a long
7  day.
8    A.   No, I wouldn't even know where to begin.
9      MR. HAMILTON:  I know it's been a long
10  day.  Trial by fire for your first full deposition.
11  But thank you for being patient, and thank you for
12  your time.  I know it was a long day.  Mr. Adkins may
13  have some questions for you, but.  And I may have
14  some follow-up if he does.  But otherwise, I'm done.
15  Thank you very much.  I'll pass the witness.
16      MR. ADKINS:  Thank you.
17      THE WITNESS:  Thank you.
18          CROSS-EXAMINATION
19  BY MR. ADKINS:
20    Q.   So Mr. Halbert, my name is Brandon
21  Adkins.  I'm a trial attorney at the Department of
22  Justice.  This is now my opportunity in the
23  deposition to ask you a few questions.  And as Mr.
24  Hamilton predicted, it's hard for me to attend
25  without opening my mouth in some way, so.  But I will

Page 134

1  try to keep it brief.
2      So you were asked this afternoon why the
3  Corps didn't do any additional work before you signed
4  the cease-and-desist letter.  Do you remember that
5  question?
6      MR. HAMILTON:  Object to form.
7  BY MR. ADKINS:
8    Q.   And so I want to show you -- I want to
9  show you a document that's been marked as Exhibit DX
10  200.  Let me share my screen here.  Okay.  And DX 200
11  has been Bates stamped US -- 30.  Do you recall
12  seeing this exhibit, Mr. Halbert?
13      (Defendant's Exhibit 200 was previously
14  marked for identification.)
15    A.   Yes, I do.
16    Q.   So in the 2nd paragraph on the body of
17  this letter -- well, I should say, this exhibit is
18  the cease-and-desist letter, correct?
19    A.   That's correct.
20    Q.   Okay.  In the body of this letter, I'm
21  going to read to you the first sentence of the second
22  paragraph.  It says the Corps has obtained
23  information from available sources that indicates
24  fill creating a dirt road was placed -- and it should
25  be placed -- around the perimeter of a 10-acre parcel

Page 135

1  containing a wetland and that vegetation within the
2  wetland was removed with heavy machinery.  Did I read
3  that correctly?
4    A.   Yes.
5    Q.   Now, you had testified that you issued
6  the C and D based on credible information that you
7  had at the time.  Do you recall that?
8    A.   Yes.
9    Q.   Was part of that credible information
10  information that indicated fill creating a dirt road
11  that was placed around the perimeter of the site and
12  vegetation within the wetland was removed with heavy
13  machinery?
14      MR. HAMILTON:  Object to form.
15      THE WITNESS:  Yes.
16  BY MR. ADKINS:
17    Q.   Okay.  So in layman's terms, would it be
18  fair to say that you had credible information that
19  there was ongoing work in wetlands at the site at the
20  time you signed the C and D?
21    A.   Yes.
22      MR. HAMILTON:  Object to form.
23  BY MR. ADKINS:
24    Q.   And so going back to the question you
25  were asked about why you didn't do additional work

Page 136

1  before issuing the C and D, would it be fair to say
2  that there was some concern with respect to this work
3  that was ongoing at the site and impacting waters of
4  the United States?
5    A.   Could you repeat that, please?
6    Q.   So I want to go back when you were asked
7  about why you didn't do additional work before
8  getting a C and D issued.  And so my question is, is
9  it fair to say you had some concern at the time or at
10  least that there was some concern at the time with
11  respect to the ongoing work in wetlands at the site
12  and the effects on waters of the United States?
13    A.   Yes.  There, there was.  If we could have
14  -- what we felt at the time, if we could have
15  eliminated or at least diminished the impacts of
16  waters to the United States, we would have wanted to
17  do that as soon as we could.
18    Q.   So I'm going to stop sharing my screen.
19  You had testified earlier today that you relied on
20  the wetland determination data forms that Mr. Pempek
21  completed when you and he were on the Countess Joy
22  property in 2019.  Do you recall that testimony?
23    A.   Yes.
24    Q.   Okay.  So did you make any observations
25  of the Countess Joy property when you were present?



ROBERT HALBERT
USA vs SHARFI

June 01, 2022
137–140

Page 137

1    A.  Yes, I did.
2    Q.  Okay.  And your observations would be
3   independent of Mr. Pempek's observations.  Is that
4   correct?
5    A.  To some degree, yes.  There were
6   technical aspects of it in which I asked Mr. Pempek
7   explain to me what we are seeing within the soil
8   profiles.  He explained to me.  So even though there
9   was some independent thinking and thought put on it,
10   I was relying on Mr. Pempek to explain what we were
11   seeing out the field.
12    Q.  If you saw water at a particular point at
13   the Countess Joy property and Mr. Pempek also saw
14   water, would it be fair to say your observation was
15   independent of Mr. Pempek's observation?
16    A.  Yes.
17    Q.  So you weren't relying on everything that
18   Mr. Pempek saw and only the things that Mr. Pempek
19   saw on the Countess Joy property.  Is that correct?
20    A.  That's correct.
21    Q.  Okay.  And then just a couple more
22   questions here.  You were asked some questions about
23   delay between when someone from the Corps was last in
24   contact with Mr. Sharfi or any of his representatives
25   and when the United States Department of Justice

Page 138

1   filed a complaint in this matter.  Do you remember
2   that conversation?
3    A.  About the employees?  I'm sorry.  What --
4    Q.  No problem.  I'll ask again.  So you were
5   asked some questions about the delay between when
6   anyone at the Corps had last had contact with Mr.
7   Sharfi or his consultants or agents and when this
8   case was finally filed.  Do you remember those
9   questions you were asked at your deposition about
10   that delay?
11    A.  Yes.
12    Q.  Okay.  And you were asked whether you
13   knew about the reasons for that delay.  Do you
14   remember that question?
15    A.  Yes, I do.
16    Q.  Are you aware of whether one of the
17   reasons for the delay between -- or any delay before
18   the complaint and this case was filed had anything to
19   do with trying to increase the amount of civil
20   penalties that the defendants may face in this case?
21    A.  The delays weren't associated with
22   anything with respect to penalties.
23    Q.  Are you aware of any instances of Mr.
24   Sharfi or his counsel or anyone working on his behalf
25   reaching out to the Corps to try to resolve the

Page 139

1   alleged violations after that last contact point we
2   saw in December 2018?
3        MR. HAMILTON:  Objection.  It was
4   November 2018, correct?
5   BY MR. ADKINS:
6    Q.  So I'll withdraw the question and ask
7   again.  Are you aware of Mr. Sharfi or any of his
8   agents or counsel reaching out to the Corps to try to
9   resolve the matters in the cease-and-desist letter at
10   any point in 2019 or after?
11    A.  No.  I'm -- I don't recall any
12   communication.  Now, as I testified earlier, if
13   memory serves me correctly, there was a, a, a point
14   in which there was communication between Mr. Sharfi
15   and Mr. Pempek to the point where Mr. Sharfi's
16   counsel became involved in responses in the email.
17   And that was kind of an indication to me that
18   communication was being shut down at that point.
19        Now, I don't recall exactly what time
20   period that, that occurred if that was in 2019 or, or
21   earlier.  But that time frame related 2019-ish, I
22   don't -- I don't believe we were in communication
23   with Mr. Sharfi or at least I don't recall.
24    Q.  I wanted to be precise.  So I'm going to
25   go back to deposition Exhibit 218, which is Bates

Page 140

1   stamped USA's 1222 through 24.  And this is a
2   November 30, 2018 email from John Pempek to Mr.
3   Sharfi and others copying you and Mr. Moore.  Do you
4   see this deposition exhibit?
5    A.  Can you blow that up a little bit,
6   please?
7    Q.  You'd like it larger?
8    A.  Please.
9    Q.  Okay.  Thanks for letting me know.  How's
10   this?
11    A.  Much better.  Thank you.
12    Q.  Okay.  So this is deposition Exhibit 218,
13   and you see it's an email from Mr. Pempek to Mr.
14   Sharfi on November 30th, 2018?
15    A.  Okay.  I --
16    Q.  Do you see that?
17    A.  I do.
18    Q.  Okay.  And you're not aware of Mr.
19   Sharfi's counsel or anyone on his behalf reaching out
20   to the Corps after November 30th, 2018, correct?
21    A.  I, I don't recall any correspondence.
22    Q.  Any telephone calls?
23    A.  Not that I'm aware of.
24    Q.  Any telegrams?
25    A.  No.



ROBERT HALBERT
USA vs SHARFI

June 01, 2022
141–144

Page 141

1    Q.  Any fax?

2    A.  I, I believe it went silent.

3    Q.  Okay.  And you would have been receptive

4  to Mr. Sharfi or someone on his behalf reaching out

5  to the Corps to try to resolve this matter.  Wouldn't

6  you?

7    A.  We would have been very receptive.

8    MR. ADKINS:  Okay.  I pass the witness.

9  Thank you.

10    MR. HAMILTON:  Yeah.  I just have like

11  two, maybe four questions, and then we'll be done,

12  hopefully.

13         REDIRECT EXAMINATION

14  BY MR. HAMILTON:

15    Q.  So Mr. Adkins showed you -- let me pull

16  it up here.  It was the cease-and-desist letter.

17  Hang on.  Let me find it.  And he asked you about

18  this idea that you would obtain information that

19  indicates fill creating a dirt road was placed around

20  the perimeter of a 10-acre parcel containing a

21  wetland and the vegetation within the wetland was

22  removed with heavy machinery.  Do you recall that?

23    A.  I recall that.  Yes.

24    Q.  Yeah.  So this information that the Corps

25  had obtained, is that from the district?

Page 142

1    A.  I believe it is.  Yes.  Referencing

2  excavators and some ground, ground movement.

3    Q.  And you would agree with me that the

4  district's interpretation of what qualifies as a

5  wetland and what the Corps qualifies as a wetland may

6  be different, correct?

7    A.  That is correct.

8    Q.  So to the extent that the statements that

9  a road was placed near or around the perimeter of a

10  parcel containing a wetland or the vegetation within

11  the wetland was removed with heavy machinery was

12  based on something said by the district.  Their

13  interpretation of what qualifies as a wetland is

14  different, right?

15    A.  It is different.  But I -- the -- I, I

16  think one of the things we're, we're not alluding to

17  in this issue is that it goes back to a picture is

18  worth a thousand words.  I mean, a, a picture is not

19  going to care if it's the state or if it's the

20  federal government establishing either a three-

21  criteria or a two-criteria jurisdiction for wetland

22  delineation.

23         So we, we had pictures there.  You know,

24  even though we're not going to make a, a definitive

25  determination on photos, we did have photos,

Page 143

1  nevertheless.  And they were able to give us some

2  indication of the surrounding environment.

3    Q.  So you were able to determine from those

4  photos that the district took documenting things for

5  their matter that the wetlands on the site were

6  federally regulated?

7    A.  Not just by the photos.  We were using

8  everything available to us to include that desktop

9  review that we were indicating before.

10    Q.  And that's all information that Mr.

11  Pempek assimilated and provided to you, correct?

12    A.  Yes.

13    Q.  Do you know how long Mr. Pempek had been

14  with the Army Corps at the time he began pursuing

15  this matter in January of 2018?

16    A.  Approximately seven or eight months.

17    Q.  All right.  I'm going to ask you about

18  the email that Mr. Adkins showed you.  I think it's

19  DX 218, right?  This says here that with the

20  referral, there's three possible scenarios.  The EPA

21  refers the case back to the Corps, the EPA retains

22  the case as a civil matter, or it could be determined

23  as violation meets criteria for a criminal case.  Do

24  you see that?

25    A.  Yes, I do.

Page 144

1    Q.  So based on this email, there's one of

2  three routes this could go is what Mr. Pempek is

3  explaining to Mr. Sharfi, correct?

4    A.  Yes.  He's attempting to explain EPA's

5  process.

6    Q.  All right.  It doesn't say -- well,

7  strike that.

8         So as far as Mr. Sharfi could be

9  concerned, he was waiting to hear which one of these

10  options was pursued, correct?

11    MR. ADKINS:  Objection.  Lacks

12  foundation.  Speculation.

13  BY MR. HAMILTON:

14    Q.  Well, I mean, there's three routes here,

15  right, Mr. Halbert?

16    A.  Right.  But I, I, I agree that it would

17  be speculating on what Mr. Sharfi's thoughts were on

18  this.  We could have certainly have followed up with,

19  you know, some, some questions to the Corps as far as

20  can you expand on what this means.  But I --

21    Q.  Okay.  So --

22    A.  -- I don't know how Mr. Sharfi took

23  those, those three options.

24    Q.  Right.  And just to be clear, to the best

25  of your knowledge, there was no finality closing the



ROBERT HALBERT
USA vs SHARFI

June 01, 2022
145–148

Page 145

1  loop as to which one of these three was ultimately
2  pursued with Mr. Sharfi, correct?
3      A.  That's correct.  It would have -- I think
4  it would be premature on the Corps' part to establish
5  what the finality of the EPA process would be.
6      Q.  Until it was concluded, correct?
7      A.  That's correct.  Yes.
8      Q.  And so the Corps never notified him that
9  the EPA had referred the case back to the Corps under
10  option one, correct?
11      A.  I don't recall doing that.  So unless
12  John did that through an email or a phone call, I'm,
13  I'm not aware of us getting back with Mr. Sharfi on
14  what the EPA's decision was.
15      Q.  So to the best of your knowledge, absent
16  that communication or some other with Mr. Sharfi
17  between this email and the final lawsuit, Mr. Sharfi
18  hadn't heard from the federal government since this
19  email, correct?
20      MR. ADKINS:  Objection.  Calls for
21  speculation.
22  BY MR. HAMILTON:
23      Q.  Do you know if anyone -- well, strike
24  that.
25      Are you aware of whether anyone contacted

Page 146

1  Mr. Sharfi or his counsel prior to filing the
2  complaint in this litigation?
3      A.  I, I'm not aware.  No.
4      Q.  So are you aware that the DOJ reached out
5  to Mr. Sharfi's counsel just prior to filing the
6  lawsuit in this case?
7      MR. ADKINS:  Objection.  Asked and
8  answered.
9  BY MR. HAMILTON:
10      Q.  That's a no?
11      A.  I, I believe there was some
12  communications.  I, I would construe it as an
13  informal attempt by DOJ to, to seek some remedial
14  action with respect to the case.
15      Q.  Are you aware that access was granted to
16  the Corps to the site prior to filing the lawsuit
17  albeit under the protection of settlement
18  communications, and it was declined by the DOJ?
19      A.  I think there was some interactions
20  between the DOJ and the attorneys.  Yes.  I --
21      Q.  Okay.  So --
22      A.  I don't know the, the specifics of, of
23  the communication.  But I do think that there was --
24  there was some request by DOJ to -- or, or
25  interactions between the two entities to gain site

Page 147

1  access.
2      Q.  And are you aware that access was
3  extended to the DOJ under an attempt to settle or
4  resolve the matter prior to lawsuit being filed, but
5  it was done so with certain protections at offer and
6  it was ultimately declined by the DOJ?
7      A.  Okay.
8      Q.  And instead the DOJ chose to file a
9  lawsuit against the defendants?
10      MR. ADKINS:  Objection.  I'm not sure --
11      THE WITNESS:  Okay.
12      MR. ADKINS:  -- what line of questioning
13  here is attempting to accomplish.  He said he doesn't
14  know.  I mean, he clearly doesn't know any of this so
15  what are we doing here?
16      MR. HAMILTON:  Right.  Well, you made the
17  point, Mr. Adkins, that Mr. Sharfi didn't reach out
18  and offer to try to resolve the matter.  And in fact,
19  he did prior to being sued.  So I'm just trying to
20  establish that.  And I don't know who else would
21  speak to that.  Mr. Halbert is the chief of
22  enforcement for the Jacksonville district.
23      THE WITNESS:  I agree.  But at this point
24  in time, the DOJ was certainly starting to take the
25  driver's seat.  So there may have been -- I

Page 148

1  acknowledge there may have been some actions between
2  the Department of Justice and Mr. Sharfi's counsel
3  that either one, I wasn't aware of, or two, I didn't
4  place enough attention on.  So with respect to the
5  site access, I acknowledge that, that you're
6  providing me that information.
7  BY MR. HAMILTON:
8      Q.  Okay.  Thank you.  Just one, I think,
9  final question.  I don't want to know why, but do you
10  know when this matter was referred to the Department
11  of Justice to be pursued against the defendants?
12      A.  I don't have a date in which the office
13  of counsel submitted that referral.
14      MR. HAMILTON:  All right.  I think that's
15  all the questions I have.  Thank you again, Mr.
16  Halbert.  I know it was a long day.  I know there
17  were times where we were probably circling around
18  each other, but I appreciate you spending time with
19  us today.  Thank you.
20      THE WITNESS:  Certainly.
21      MR. ADKINS:  I just have one more
22  question for you.  Sorry.
23      MR. HAMILTON:  Oh, sorry.  I thought we
24  were done.
25      RECROSS-EXAMINATION



ROBERT HALBERT
USA vs SHARFI

June 01, 2022
149–152

Page 149

1 BY MR. ADKINS:
2    Q.   Back to deposition Exhibit 200.  So we
3 were stuck on this 1st sentence of the 2nd paragraph.
4 The Corps has obtained information from available
5 sources that indicates fill creating a dirt road was
6 placed around the perimeter of a 10-acre parcel
7 containing a wetland and that vegetation within the
8 wetland was moved with heavy machinery.  Do you see
9 that, Mr. Halbert?
10   A.   I do.
11   Q.   Okay.  Now, I just want to be clear.
12 Your testimony is that this allegation, so to speak,
13 was based on information from the water management
14 district in addition to other work such as the
15 desktop review that Mr. Pempek performed.  Is that
16 correct?
17   A.   That is correct.
18   Q.   Okay.  And the information from the water
19 management district included photographs, right?
20   A.   That's correct.
21   Q.   Okay.  And does a photograph showing the
22 use of heavy machinery have anything to do with
23 whether or not the definition of a wetland under
24 state law is the same or different from federal law?
25   A.   It does not.

Page 150

1    Q.   What about a photograph showing the
2 removal of vegetation completely from an area that's
3 believed to be a wetland.  Does that have anything to
4 do with state law?
5    A.   I don't know if it will have anything to
6 do with state law because they do have some laws
7 pertaining to vegetation removal.  But if there's a
8 discharge of fill visible in a photo, then that photo
9 is not going to represent, you know, in my mind
10 whether that constitutes a, you know, a, a regulated
11 activity by the state or federal government.
12   Q.   And would the same be true of a photo
13 showing a road?
14   A.   So it -- I mean, I'm trying to get back
15 to the original question.  So the -- could you repeat
16 the question please about the the, the road?
17   Q.   A photo showing the construction of a
18 road that's in an area believed to be a
19 jurisdictional wetland, would it matter whether or
20 not that photo was taken by a state entity that's
21 operating under a different regulatory environment?
22   A.   It would not.  No.
23      MR. ADKINS:  No further questions.
24      MR. HAMILTON:  All right.  I think we're
25 actually done now.

Page 151

1      THE REPORTER:  Okay.  Just out of
2 curiosity before we go off the record, is this
3 witness going to read or waive?
4      MR. ADKINS:  Yes.  Thank you for
5 reminding me.  We will read.
6      THE REPORTER:  Okay.  And will there be
7 any orders of this transcript?
8      MR. HAMILTON:  We'll get back to you on
9 that one.  And can you put your email?  I think you
10 maybe did.  Or do you want me to email the other
11 court reporter?
12      THE REPORTER:  Just a moment.  So if
13 there's nothing else to be put on the record, do we
14 want to go ahead and go off the record?
15      MR. HAMILTON:  Yeah.  We can go off.
16      THE REPORTER:  Okay.  So we're going to
17 go off the record, and the time is currently 5:24
18 p.m. eastern standard time.
19      (Deposition concluded at 5:24 p.m.)
20
21
22
23
24
25

Page 152

1           CERTIFICATE OF OATH
2
3 STATE OF FLORIDA
4 COUNTY OF ST. LUCIE
5
6    I, the undersigned authority, certify that
7 ROBERT HALBERT personally appeared before me and was
8 duly sworn on June 1, 2022.
9    WITNESS my hand and official seal this 1st day
10 of June 2022.
11
12
13
       Lindsey Spain, Notary
14     Notary Commission TX/RON 13320398-7
       Commission Expires: July 9, 2025
15
16
   Type of Identification Produced: Driver's License
17
18
19
20
21
22
23
24
25



ROBERT HALBERT
USA vs SHARFI

June 01, 2022
153—156

---

## Page 153

CERTIFICATE OF DIGITAL REPORTER

I, LINDSEY SPAIN, a Digital Reporter for the State of Florida, do hereby certify:

That ROBERT HALBERT, the witness whose examination is hereinbefore set forth, was first duly sworn and that said testimony was accurately captured with annotations by me during the proceeding.

I further certify that I am not related to any of the parties to this action by blood or marriage and that I am in no way interested in the outcome of this matter.

IN WITNESS THEREOF, I have hereunto set my hand this 1st day of June, 2022.

*Lindsey Spain*

Lindsey Spain, Notary
Notary Commission TX/RON 13320398-7
Commission Expires: July 9, 2025

---

## Page 154

CERTIFICATE OF TRANSCRIPTIONIST

I, ANNE THURMOND, Legal Transcriptionist, do hereby certify:

That the foregoing is a complete and true transcription of the original digital audio recording of the testimony and proceedings captured in the above-entitled matter. As the transcriptionist, I have reviewed and transcribed the entirety of the original digital audio recording of the proceeding to ensure a verbatim record to the best of my ability.

I further certify that I am neither attorney for nor a relative or employee of any of the parties to the action; further, that I am not a relative or employee of any attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this matter.

IN WITNESS THEREOF, I have hereunto set my hand this 24th day of June, 2022.

*Anne Thurmond*

Anne Thurmond

---

## Page 155

DEPOSITION ERRATA SHEET

Our Assignment No. J8348502

Case Caption: UNITED STATES OF AMERICA v. BENJAMIN K. SHARFI, IN HIS PERSONAL AND FIDUCIARY CAPACITY AS TRUSTEE OF THE BENJAMIN SHARFI 2002 TRUST, AND NESHAFARM, INC.

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my deposition taken in the above-captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

Signed on the ____ day of _____, 20__.

_____

ROBERT HALBERT

---

## Page 156

DEPOSITION ERRATA SHEET

Page No. _____ Line No. _____ Change to: _____

_____

Reason for change: _____

Page No. _____ Line No. _____ Change to: _____

_____

Reason for change: _____

Page No. _____ Line No. _____ Change to: _____

_____

Reason for change: _____

Page No. _____ Line No. _____ Change to: _____

_____

Reason for change: _____

Page No. _____ Line No. _____ Change to: _____

_____

Reason for change: _____

Page No. _____ Line No. _____ Change to: _____

_____

Reason for change: _____

SIGNATURE: _____DATE: _____

ROBERT HALBERT

---



ROBERT HALBERT                                    June 01, 2022
USA vs SHARFI                                              157

Page 157

```
 1              DEPOSITION ERRATA SHEET
 2     Page No. _____ Line No. _____ Change to: _____
 3     _____
 4     Reason for change: _____
 5     Page No. _____ Line No. _____ Change to: _____
 6     _____
 7     Reason for change: _____
 8     Page No. _____ Line No. _____ Change to: _____
 9     _____
10     Reason for change: _____
11     Page No. _____ Line No. _____ Change to: _____
12     _____
13     Reason for change: _____
14     Page No. _____ Line No. _____ Change to: _____
15     _____
16     Reason for change: _____
17     Page No. _____ Line No. _____ Change to: _____
18     _____
19     Reason for change: _____
20     Page No. _____ Line No. _____ Change to: _____
21     _____
22     Reason for change: _____
23
24     SIGNATURE: _____DATE: _____
25              ROBERT HALBERT
```



## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    *Plaintiff*,<br><br>        v.<br><br>BENJAMIN K. SHARFI, in his personal and fiduciary capacity as trustee of the Benjamin Sharfi 2002 Trust, and NESHAFARM, INC.<br><br>                    *Defendants*. | Case No. 2:21-cv-14205-KAM |

## ERRATA FOR DEPOSITION OF ROBERT HALBERT
## (AFTERNOON SESSION ONLY)

     I, Robert Halbert, have read the transcript of my deposition taken on June 1, 2022

(afternoon session beginning at 1:06 p.m.) in the above-captioned case and, pursuant to Federal

Rule of Civil Procedure 30(e)(1), list the following changes to the transcript and the reasons for

making them:

| Page | Line | Reads | Should Read | Reasons For Change |
|------|------|-------|-------------|--------------------|
| 62 | 24 | service | surface | mistranscribed |
| 116 | 22 | REI | RAI | mistranscribed |

Executed on July 27, 2022, in Saint Johns, Florida.

HALBERT.ROBERT.JOSEPH.1185722941
Digitally signed by HALBERT.ROBERT.JOSEPH.1185722941
Date: 2022.07.27 11:35:02 -04'00'

Robert Halbert