# EXHIBIT 18

## Page 1

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF FLORIDA
 2                  FORT PIERCE DIVISION
                CASE NO.:  2:21-cv-14205-KAM
 3

 4
    UNITED STATES OF AMERICA,
 5
            Plaintiff,
 6
    -vs-
 7
    BENJAMIN K. SHARFI, in his personal
 8  and fiduciary capacity as trustee of
    The Benjamin Sharfi 2002 Trust; and
 9  NESHAFARM, INC.,
10          Defendants.
    _____/
11

12

13                      Esquire Deposition Solutions
                        Remote Proceeding
14                      Zoom Videoconference
15                      Wednesday, May 4, 2022
                        11:05 a.m.
16

17

18

19      VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF
20              LYNDON LEE, PhD
21

22      Taken remotely before Matthew J. Haas, Notary Public
23  in and for the State of Florida at Large, pursuant to Notice
24  of Taking Deposition in the above cause.
25
```

## Page 2

```
 1            A P P E A R A N C E S
 2  ON BEHALF OF THE PLAINTIFF:
 3     UNITED STATES DEPARTMENT OF JUSTICE
       ENVIRONMENT AND NATURAL RESOURCES DIVISION
 4     P.O. BOX 7611
       Washington, DC 20004
 5     Andrew.Doyle@usdoj.gov
       BY:  ANDREW J. DOYLE, ESQUIRE
 6
 7  ON BEHALF OF THE DEFENDANT:
 8     SHARFI HOLDINGS, INC.
       3690 West Gandy Boulevard
 9     Suite 422
       Tampa, Florida 33611
10     (813) 416-2352
       Chamilton@sharfiholding.com
11     BY:  CHRISTOPHER F. HAMILTON, ESQUIRE
12
    ON BEHALF OF THE DEFENDANT:
13
       CARLTON FIELDS, P.A.
14     2 Miami Central
       700 Northwest 1st Avenue
15     Suite 1200
       Miami, Florida 33136
16     (305) 530-4039
       Nmcaliley@carltonfields.com
17     BY:  THOMAS NEAL MCALILEY, ESQUIRE
18
    ALSO PRESENT:
19
       WILLIAM MOORE, ESQUIRE, Army Corps of Engineers
20     ROBERT PACHECO, Videographer
21
22
23
24
25
```

## Page 3

```
 1              I N D E X

 2
    WITNESS            EXAMINATION BY        PAGE
 3
    Lyndon Lee         Mr. McAliley          6, 332
 4                     Mr. Doyle             327

 5

 6           E X H I B I T S
 7  EXHIBITS:      DESCRIPTION:              PAGE:
 8  EXHIBIT 104 - CV of Dr. Lee             15
 9  EXHIBIT 105 - Regulatory Guidance Letter 82-02    147
10  EXHIBIT 106 - Regulatory Guidance Letter 90-07    149
11  EXHIBIT 107 - Regulatory Guidance Letter No. 05-06  150
12  EXHIBIT 108 - Excerpts from the Corps of Engineers  157
                  Wetland Delineation Manual from 1987
13

14

15

16

17

18

19

20

21

22

23

24

25
```

## Page 4

```
 1  Thereupon --
 2        THE VIDEOGRAPHER:  We are now on the
 3     video record.  Today's date is April
 4     (sic)the 4th, 2022.  The time is 11:05
 5     a.m., Eastern Standard Time.  This begins
 6     the videoconference deposition of
 7     Dr. Lyndon Lee in the matter of the United
 8     States of America, plaintiff, versus
 9     Benjamin Sharfi in his personal and
10     fiduciary capacity as trustee of the Ben
11     Sharfi 2002 Trust and Neshafarm, Inc.,
12     defendants in the United States
13     District Court, the Southern District of
14     Florida, Ft. Pierce Division, Case No.
15     2:21-cv-14205.
16        My name is Robert Pacheco.  I am
17     your remote videographer.  Your court
18     reporter today is Matt Haas, both
19     representing Esquire Deposition Solutions.
20        Would counsel please introduce
21     yourselves and your affiliation, and the
22     witness will be sworn in.
23        MR. MCALILEY:  My name is Neal
24     McAliley.  I'm with the law firm of Carlton
25     Fields.  I represent the defendants in this
```



LYNDON LEE, PHD
USA V SHARFI

May 04, 2022
5—8

Page 5

1  case, and I will be taking the deposition
2  today.
3      MR. DOYLE:  My name is Andrew Doyle.
4  I'm with the United States Department of
5  Justice, Environment and Natural Resource
6  Division.  I represent the plaintiff, The
7  United States of America.
8      MR. HAMILTON:  Good morning.  This
9  is Christopher Hamilton, here on behalf of
10  the defendants.
11      THE COURT REPORTER:  Okay.  Pursuant
12  to the COVID-19 emergency procedures for
13  the administering of oaths via remote
14  audio/video communication equipment dated
15  March 18, 2020, this deposition of LYNDON
16  LEE is being conducted remotely via Zoom
17  videoconferencing.
18      The witness is located in
19  Bellingham, Washington 98225.  My name is
20  Matthew Haas, court reporter from Esquire
21  Deposition Solutions.  I am administering
22  the oath and reporting the deposition
23  remotely by stenographic means from my
24  residence within Broward County, Florida.
25      The witness has shown a Washington

Page 6

1      driver's license and positively identified
2      to me that he is LYNDON LEE.
3          Would counsel and witness please
4      express their stipulation that this
5      deposition may take place with a remote
6      administration of the oath and remote
7      reporting of the deposition.
8      MR. MCALILEY:  Defendants agree.
9      MR. DOYLE:  The United States
10      agrees.
11          Dr. Lee, do you agree?
12      THE WITNESS:  I agree.
13      THE COURT REPORTER:  Okay.  If
14      you'll raise your right hand, Dr. Lee, I'll
15      swear you in.
16          LYNDON LEE, PhD,
17  Was duly administered the following oath:  Do you
18  solemnly swear or affirm that the testimony you
19  are about to give will be the truth, the whole
20  truth, and nothing but the truth?
21      THE WITNESS:  I do.
22      THE COURT REPORTER:  Okay.  You can
23      put your hand down, and we're good to go.
24          DIRECT EXAMINATION
25  BY MR. MCALILEY:

Page 7

1      Q.   Good morning, sir.  Could you please
2  state your name and spell your last name for the
3  record.
4      A.   Good morning.  My name is Lyndon
5  Lee; C for Charles is my middle initial; last
6  name is Lee, L-E-E.
7      Q.   Thank you, Dr. Lee.  So am I right
8  you've had your deposition taken before?
9      A.   Yes, I have.
10      Q.   So what I'd like to go through, you
11  probably already know, but I think it's probably
12  a good idea to talk at the beginning about
13  process here about how the deposition works.
14          You understand, Dr. Lee, that you've
15  just sworn an oath to tell the truth, right?
16      A.   Yes.
17      Q.   And you understand that the court
18  reporter is taking a transcript, and the
19  videographer is videotaping this deposition,
20  right?
21      A.   Yes.
22      Q.   You know, with any deposition,
23  Dr. Lee, clarity is important, as I think you
24  know.  It's important, for instance, for the
25  court reporter to be able to understand what your

Page 8

1  answers are, and so -- and one of the common
2  things that happens in depositions is that a
3  witness will answer with like a nonverbal answer,
4  like, you know, a nod of the head or an uh-huh or
5  something like that.  So I would just ask you to
6  try to remember to give verbal answers, and
7  if there's -- and if there's times when I may
8  say, "Is that a yes?"  "Is that a no?"  I'm often
9  doing that just to make sure that it's clear for
10  the record.
11          So I just wanted to say that up
12  front, because it's always a good thing for all
13  of us to remind ourselves about.  Does that --
14  does that make sense?
15      A.   Yes, yes.
16      Q.   Also, one of the challenges always
17  between -- with the lawyer and a witness is
18  avoiding talking over each other, and this is --
19  this happens if we're sitting in the same room
20  there together, but it also happens more on a
21  remote deposition, because there could be a time
22  lag sometimes in the video feed and in the audio
23  feed.
24          So I would just ask, and this is I'm
25  asking myself right now this as well, that



LYNDON LEE, PHD
USA V SHARFI

May 04, 2022
9–12

Page 9

1  we just try to avoid talking over each other,
2  take a brief pause between the time of my
3  question and your answer, and I'll try to do the
4  same thing.  Does that make sense?
5       A.   Yes.
6       Q.   I'll just say that there may be
7  times when we're not being clear or the court
8  reporter is not catching everything.  Mr. Haas,
9  our court reporter, is good about telling us when
10  he's not getting things down, so just be aware
11  that it could be if we're speaking too fast or
12  if there's a problem with the audio feed, he may
13  ask us just to repeat what we just said, and the
14  purpose of that is simply to have a clear
15  transcript.  Do you understand that?
16       A.   Yes.
17       Q.   Dr. Lee, is there anybody sitting in
18  the room there with you?
19       A.   No.
20       Q.   And what do you have on the desk in
21  front of you?
22       A.   I have my personal computer that I'm
23  using the camera and the audio on that, and then
24  just as a precaution, I have a second computer
25  backup where I loaded the electronic files for

Page 10

1  the expert report in case something fails.  Other
2  than that, just pencils and just desk
3  paraphernalia.
4       Q.   Okay.  Fair enough.  Okay.  I would
5  ask you, Dr. Lee, simply that while we're in the
6  deposition and we're doing questioning, that you
7  not communicate with anybody else, and by -- so
8  one way that it often happens is by text or by
9  email or anything like that, not counting when
10  we take breaks.  We are going to take breaks.
11  I try to take a break every hour or hour and a
12  half, and you tell me whenever you want a break,
13  but when we're doing the actual questioning,
14  I would ask that you not communicate with anybody
15  other than a communication that's on the record
16  here with all of us.  Does that seem fair?
17       A.   Yes.
18       Q.   Okay.  Well, thank you.
19            So, Dr. Lee, when is your date of
20  birth?
21       A.   July 4, 1951.
22       Q.   And what is your address?
23       A.   421 North Forest Street, Bellingham,
24  Washington 98225.
25       Q.   So you live in Washington State,

Page 11

1  right?
2       A.   I do.
3       Q.   How long have you lived there?
4       A.   I went to graduate school here for
5  three years, and then I left for six and came
6  back in 1990, so probably a total of 33, 35
7  years.
8       Q.   Where are you from originally?
9       A.   Washington, D.C. and Boston.
10       Q.   I saw that you went to Tufts, so
11  I thought you might be from the Northeast
12  somewhere.  Have you ever lived in Florida?
13       A.   No, I have not.
14       Q.   Have you ever done work in Florida
15  prior to this case?
16       A.   Yes.
17       Q.   And tell me about that.
18       A.   Starting with the early 1980s, like
19  1984 or so, there was a series of -- I was
20  working at the Savannah River Ecology Laboratory
21  for the University of Georgia, and there was a
22  series of meetings for the Association of State
23  Wetland Managers that I helped organize that took
24  place down near Orlando.
25            There were also a couple of other

Page 12

1  professional gatherings for the Society of
2  Wetland Scientists near Orlando in the mid to
3  late '80s and then early '90s.  Then I had a --
4  I changed jobs and went to the EPA headquarters
5  in D.C., and part of my job was to outreach to
6  the wetland centers in the United States, and I
7  collaborated a lot with the Center for Wetlands
8  with Dr. Ronnie Best, Dr. Mark Brown, H.T. Odum
9  down at the Center for Wetlands down in
10  Gainesville.
11            I litigated a case in the early '90s
12  out in Pensacola called U.S. versus Biden Marcus
13  which was a Clean Water Act noncompliance issue.
14  And then in collaboration with the Center for
15  Wetlands, we ran a series of training workshops
16  throughout Florida.  It was a road show of sorts
17  where we went to various water management
18  districts, and Dr. Ronnie Best and I and others
19  from the Center for Wetlands trained people on
20  how to characterize wetlands, how to delineate
21  them, how they functioned, how to manage them for
22  stormwater inputs, things like that.  That was
23  part of my outreach function from the EPA.
24            Then I collaborated a bunch with
25  Dr. Wiley Kitchens at the Florida Cooperative



LYNDON LEE, PHD                                                    May 04, 2022
USA V SHARFI                                                       13–16

Page 13

1  Fish and Wildlife Research Unit on Lake
2  Okeechobee functions.  He was characterizing mass
3  balance, nutrient imports and exports to Lake
4  Okeechobee, and modelling basically how that
5  system functions, and I was part of a group of
6  collaborators that would comment on the structure
7  approaches.
8         Other than that, that's about it.
9  I've had family in Florida for over 100 years out
10  of Gainesville and Ocala and now Miami, and
11  I spent a lot of time in Florida.  I've
12  navigated -- pretty much circumnavigated,
13  if that's possible, the entire Florida coast from
14  Cedar Key down through Marco Island, Goodland,
15  the Thousand Islands around Key West and then
16  north up to the Florida-Georgia line.  So I'm
17  quite familiar with Florida.
18       Q.   Okay.  With regard to the work you
19  did with Wiley Kitchens, when was that?
20       A.   That was ongoing.  He did -- it was
21  a long-term research project.  Wiley started to
22  look at Okeechobee, oh, in the mid-'90s, and that
23  continued until 2003 or 2004, I think.
24         And so there were several points of
25  contact where we would discuss what he was seeing

Page 14

1  and talk about it in the context of his research
2  design and where to go to next.
3       Q.   Your degrees are in ecology, right,
4  Dr. Lee?
5       A.   I have degrees in -- from Tufts and
6  the University of Montana in forest ecology and
7  subculture, correct, and then a master's from the
8  University of Montana in forest ecology, and then
9  a PhD in systems ecology and with a specialty in
10  wetlands and river science from the University of
11  Washington.
12       Q.   So your degrees are in ecology,
13  right?
14       A.   Yes, but they are from forestry
15  schools, because environmental programs didn't
16  exist when I went to school.
17       Q.   So Dr. Kitchens was doing -- you
18  said he did modelling in Lake Okeechobee mass
19  balance and nutrients.  Did you do any of the
20  analysis of mass balance or nutrients in Lake
21  Okeechobee in connection with the work of
22  Dr. Kitchens?
23       A.   No.
24       Q.   So you consulted with him on areas
25  within your expertise; is that right?

Page 15

1       A.   Yes, and I looked over patterns and
2  trends that he was identifying and we talked
3  about them in light of where his results were
4  taking him.
5         (Thereupon, Exhibit No. 104 was
6  marked for identification.)
7  BY MR. MCALILEY:
8       Q.   Okay.  What I'd like to do is show
9  you -- put up on the screen what has been -- what
10  I previously sent to your counsel, Mr. Doyle, and
11  have labeled Exhibit No. 104.  It's a copy of
12  your CV that we received in discovery.  Can you
13  see that on the screen, sir?
14       A.   Yes.
15       Q.   You can see it's a 28-page document.
16  Does this appear to be a copy of the CV that was
17  provided for this case?
18       A.   It appears to be.  That's the
19  first and second page as you scroll through it,
20  yes.
21       Q.   All right.  Is -- is this your
22  current CV?
23       A.   I tailored that to respond to the
24  rules for expert witnesses for this case, but the
25  narrative of it, if you will, is the same as my

Page 16

1  core CV.
2       Q.   And does this contain a true and
3  correct statement of your experience and
4  credentials?
5       A.   Yes.
6       Q.   And does this provide a complete
7  description of your qualifications to testify as
8  an expert in this case?
9       A.   Yes.
10       Q.   Is there anything inaccurate in
11  it to your knowledge?
12       A.   I don't think so.
13       Q.   So just to briefly touch on some of
14  the credentials, I don't need to go through the
15  whole document here, but am I right that you are
16  not a lawyer?
17       A.   I'm not a lawyer.
18       Q.   So do you claim any expertise on
19  legal subjects?
20       A.   No.
21       Q.   And you're not a hydrologist, are
22  you?
23       A.   No.
24       Q.   And you worked on a team with other
25  experts on this case; isn't that right?



LYNDON LEE, PHD
USA V SHARFI

May 04, 2022
17–20

Page 17

1    A.   That's correct.
2    Q.   And one of the other experts is
3 Dr. Wade Nutter, who is a hydrologist, right?
4    A.   Yes, yes.
5    Q.   Are you deferring to Dr. Nutter on
6 issues of hydrology?
7    A.   Yes.
8    Q.   Do you consider yourself an expert
9 on the regulatory scope of the Waters of the
10 United States as that term is used in the Clean
11 Water Act?
12    A.   Yes, I've been working with that
13 since the mid '80s. I'm quite familiar with it.
14    Q.   Okay. You're familiar, but would
15 you consider yourself an expert?
16    A.   Well, in the sense that I use and
17 apply the federal, state, and local regulations
18 on a daily basis in my job, I would be an expert.
19 Whether or not I would qualify in the eyes of the
20 Court, I'm not sure.
21    Q.   All right. Do you expect to be
22 offered as an expert in the trial of this case on
23 the regulatory scope of the Waters of the United
24 States?
25    A.   I do not.

Page 18

1    Q.   How many times have you served as an
2 expert in a case related to wetlands?
3    A.   I'm sorry, you broke up. Could you
4 please repeat that.
5    Q.   Apologies, I'm sorry, this will
6 happen, and sometimes it's my papers on my desk.
7 I learned that I can't put my papers on my
8 computer, because it interferes, so I apologize.
9        How many times have you served as an
10 expert witness in a wetlands case?
11        MR. DOYLE: Objection, vague.
12        THE WITNESS: If you mean testimony
13     in court, it's been five or six times since
14     the early '90s, I've served as an expert --
15     consulting expert to the Department of
16     Justice in 30 or so cases over the last
17     30 -- 30 years or so.
18 BY MR. MCALILEY:
19    Q.   Are all of the cases where you have
20 served as an expert witness in any capacity, are
21 they listed on your CV that I've marked as
22 Exhibit No. 104?
23    A.   Yes.
24    Q.   Okay. So if I want a complete list
25 of all the cases where you've done work as an

Page 19

1 expert witness, I would simply look at your CV,
2 right?
3    A.   Yes, sir.
4        MR. DOYLE: Objection, misstates the
5     prior question.
6 BY MR. MCALILEY:
7    Q.   And do the entries in the CV for
8 each case where you served as an expert
9 accurately describe your work in those cases?
10    A.   Yes.
11    Q.   So I counted on the CV 27 cases
12 since 1989. Does that sound about right?
13    A.   I might round it up to 30, yes, sir,
14 that's close.
15    Q.   Am I correct that in all of those
16 cases except for three of them you served as an
17 expert witness for the Department of Justice?
18    A.   I had not done that analysis, but
19 I would agree that the preponderance of the cases
20 I worked for Justice.
21    Q.   Almost -- almost all the cases
22 you're an expert for the Justice Department,
23 right?
24        MR. DOYLE: Objection, vague.
25        THE WITNESS: Almost all, yes.

Page 20

1 BY MR. MCALILEY:
2    Q.   And am I correct that you have not
3 served as an expert for a party other than the
4 Justice Department since approximately 2001?
5    A.   I have not done that analysis.
6 It was the early 2000s, put it like that.
7    Q.   So if I want to figure out the last
8 time you worked as an expert for a party other
9 than the Justice Department, I should look at
10 your CV, right?
11    A.   Yes, sir.
12    Q.   I want to go to -- I'm going to go
13 down to Page 8 of Exhibit 104, which is your
14 CV -- I'm sorry, it's Page 7. I have it up on
15 the screen. It's the section that says, "B,
16 Expert Witness Work and Testimony." Do you see
17 that on the screen?
18    A.   Yes, sir.
19    Q.   Do you need me -- do you need me to
20 zoom in at all? Can you see it all right?
21    A.   For right now I'm okay.
22    Q.   Okay. Do you see the very first
23 entry is the entry for this case, right, the
24 United States versus Sharfi?
25    A.   Yes, sir.



LYNDON LEE, PHD
USA V SHARFI

May 04, 2022
21–24

Page 21

1    Q.    And you see the -- and the first
2  sentence -- and the sentence say, quote, "Provide
3  expert services/technical team leadership in the
4  matter of U.S. versus Sharfi."  Did I read that
5  sentence right?
6    A.    Yes, sir.
7    Q.    What does it mean to provide expert
8  team leadership in this case?
9    A.    Dr. Nutter and I have been around a
10  long time, and we've done several cases all over
11  the country, and we team up to provide cohesion
12  and joint leadership to expert teams as they're
13  directed at various cases such as this one.
14    Q.    So am I right in understanding that
15  both you and Dr. Nutter are the leaders of the
16  technical team in this case for the Government?
17    A.    We try to run a very horizontal
18  organization, but we will -- we will tend to
19  guide, because we're the senior scientists.
20    Q.    Is that what you mean on your CV by
21  the phrase "technical team leadership"?
22    A.    Yes, sir.
23    Q.    Okay.  I want to go down to another
24  sentence here on the entry.  Quote, "Analyze
25  impacts in mitigation/restoration opportunities

Page 22

1  for unauthorized placement of fill in wetlands,
2  Martin County, Florida."  I'll stop reading
3  there.  Did I read that right?
4    A.    Yes, sir.
5    Q.    Does that accurately state what your
6  role is in this case?
7    A.    It's truncated.  My role in this
8  case included a couple of other activities.
9    Q.    And what are those other activities
10  that are not stated on your resume?
11    A.    To look at the changes in
12  functioning, to assess changes in functioning of
13  the wetlands that would have occurred on the
14  Sharfi property, and also I acted as sort of an
15  overall editor for development of the expert
16  report.
17    Q.    Did you do any other work in this
18  case --
19    A.    Yes.
20    Q.    -- other than what's on your CV and
21  also what you just testified to?
22    A.    Other than interacting with team
23  members as issues came up, no, sir.
24    Q.    Okay.  Thank you.  Have you ever
25  testified in a case on the subject of whether

Page 23

1  waters or wetlands in question were part of the,
2  quote, unquote, Waters of the United States?
3    A.    Yes.
4    Q.    Which cases?
5    A.    Borden Ranch, U.S. v. Borden Ranch.
6  Then we've offered opinions in the Greka Oil,
7  U.S. v. Greka Oil.  They changed their name.
8  It's CVI Cat Canyon.  Way back in the early '90s,
9  there was a case in Northern Virginia, I'm sorry
10  I can't remember the name, but the question was
11  whether or not the defendants filled in Waters of
12  the United States.  I think those are the three
13  main ones.
14    Q.    Okay.  Thank you.  What is your
15  hourly rate for testimony in this case?
16    A.    $225.
17    Q.    Is that your standard hourly rate?
18    A.    Yes, sir.
19    Q.    How much have you been paid to date
20  for your work in this case?
21    A.    About -- my personal billing has
22  been around $56,000; however, I should note that
23  I have Dr. Stewart and Dr. Rains under contract,
24  so the organization, therefore, has their payment
25  flow through my company.

Page 24

1    Q.    So what is the total payment to your
2  company from this case to date?
3    A.    I think it's around $125,000.
4    Q.    And that would represent the work by
5  yourself, Dr. Stewart, and Dr. Rains; am
6  I understanding that right?
7    A.    Collectively, yes.
8    Q.    All right.  What percentage of your
9  income in 2021 and this year that is represented
10  by your work in this case?
11    A.    Less than 10 percent.
12    Q.    What percent of your income over the
13  last five years comes from your work as an expert
14  witness for the Department of Justice?
15    A.    The pendulum swings depending on
16  which year, so I'll average over five, probably
17  in the realm of 50 percent.
18    Q.    Okay.  Thank you.  What did you do
19  to prepare for the deposition today, Dr. Lee?
20    A.    I reviewed the expert report.
21  I looked over some correspondence and email that
22  transpired as a result of our development of the
23  expert report.  I looked over my original field
24  notes, and I read the depositions of Dr. Nutter,
25  Mr. Wylie, Danna Small, and Charles -- I can't



LYNDON LEE, PHD                                          May 04, 2022
USA V SHARFI                                                 25–28

Page 25

1  remember his last name, the operations manager
2  for Mr. Sharfi.  I looked at the expert report
3  that just -- that just appeared from Dennis,
4  Dr. Dennis, and I reviewed some of the background
5  materials to prepare to answer the financials
6  that you just asked.
7        Q.   Thank you.  You said -- I want to
8  follow up on one element of this.  You said you
9  looked at correspondence or certain
10  correspondence an email related to the expert
11  report.  Can you describe what that -- what that
12  is that you looked at?
13        A.   Yes, there was email back and forth
14  among technical team members a lot about
15  logistics and how to organize the report and this
16  and that.  There was -- I led the request for
17  procurement of so-called LiDAR remote sensing
18  products with the State of Florida and the U.S.
19  Geological Survey, things like that.
20        Q.   Did you speak with anybody in
21  preparation for the deposition here today?
22        A.   Mr. Doyle and I prepared, Brandon
23  Adkins chimed in, and that's about it.
24        Q.   And how long did you speak with
25  Mr. Doyle and Mr. Adkins?

Page 26

1        A.   Mr. Adkins just an hour or so.  As
2  you know, we tried to conduct this deposition a
3  while back, so Mr. Doyle and I began the prep.
4  That was part of the day.  Then we stopped, and
5  we started again when this was scheduled.  So in
6  total I probably spoke with Mr. Doyle six hours.
7        Q.   Thank you.  Okay.  So in this case,
8  on what topics do you expect to provide -- on
9  what topics do you expect to provide expert
10  testimony?
11        A.   If you go to the table of contents
12  in the expert report, those topics where my
13  initials, LCL, are listed first, are the ones
14  wherein I basically assume primary authorship.
15  If it's second, so it will be LCL/Mike Wylie or
16  MW, I was the second or partner in that, and
17  tertiary, there were a couple of Sections I had
18  tertiary input, for example, some of the back and
19  forth between vegetation and faunal support
20  habitat functions that Dr. Rains and I put
21  together.  I think that's the best way to
22  characterize it.
23        Q.   That's very helpful.  So why don't
24  I put up the expert report here so we can mark
25  it for this deposition and look at it together.

Page 27

1  So I'm going to put up on the screen here what's
2  been previously marked as Exhibit No. 72.
3        Does this appear to be the main body
4  of the expert report that you helped prepare?
5        A.   Yes, it does.  It's the cover page.
6        Q.   Yeah, I can zoom in here a little
7  bit.
8        A.   That's helpful.  Thank you.
9        Q.   Okay.  And so just to be clear about
10  this, this is -- this is the main body of the
11  report.  I have as a separate exhibit, the
12  figures; and a separate exhibit, the tables; and
13  the appendices are separate.  This is just the
14  text.
15        So let me just start by saying to
16  the best of your knowledge, are all of your
17  opinions contained in this report?
18        A.   Yes.
19        Q.   Are there any opinions that you're
20  going to offer in this case that are not in this
21  report?
22        A.   No.
23        Q.   Okay.  All right.  So a moment ago
24  when I asked you what are you going to testify
25  about at trial, you referred me to the table of

Page 28

1  contents.  So I'm now sort of scrolling -- it can
2  get dizzying sometimes when I do it quickly to
3  get there.  So I'm on the third PDF.  It's
4  Page ii.  That's the table of contents.  Can you
5  see that there?
6        A.   Yes.
7        Q.   So am I right in understanding that
8  the topics on which you are going to provide
9  testimony at trial are those that have your
10  initials next to them?
11        A.   Yes, and in order -- if I'm listed
12  first, then I was the principal author of that
13  section.  If I'm listed second, for example,
14  under Introduction and Objectives, it's Mike
15  Wylie/Lyndon, I would be the second supporting
16  author and so on.
17        Q.   So if I want to understand what your
18  testimony is going to be in this -- at trial in
19  this case, what I need to do is just go to the
20  sections of the report where your initials are
21  next to it, either alone or along with Mr. Wylie;
22  is that right?
23        A.   Yes, sir.
24        Q.   Okay.  So there's no other sections
25  of the report which you are going to provide



LYNDON LEE, PHD
USA V SHARFI

May 04, 2022
29–32

Page 29

1  testimony on other than those that have your
2  initials next to it on the table of contents,
3  right?
4        MR. DOYLE:  Objection, vague and
5  witness previously talked about -- the
6  previous phrasing of questions were
7  expected to testify, which I think is a
8  more precise way to phrase it.
9        And let me just elaborate, because,
10  of course, the defense can ask things that
11  call into question other topics, and
12  Mr. Lee would be duty-bound to answer those
13  questions.
14        MR. MCALILEY:  Okay.  So let me --
15  BY MR. MCALILEY:
16     Q.   Dr. Lee, what I'm just trying to do,
17  I have this long report, I've got five authors
18  for it, so I'm just trying to figure out what
19  it is that you're going to testify about and what
20  you're not going to testify about, because
21  there's no point in me asking you questions about
22  things that you're not going to testify about.
23        So the subject matter of your
24  testimony at trial is contained in the sections
25  of the report that have your initials next to it,

Page 30

1  right?
2     A.   That's correct with the caveat that
3  because I looked, for example, at faunal support
4  and habitat functions of wetlands in question,
5  I had to reach into Dr. Rains' work, for example,
6  to look at the structure of vegetation and how
7  that might provide food recovery sources for
8  various animal species.
9        So I might proffer an opinion from
10  the platform of talking about faunal support
11  habitat that speaks to the structure or
12  functioning of vegetation.  That's an example.
13        A similar example could be drawn
14  from taking Dr. Nutter's hydrologic conclusions
15  and tying those to the testimony on wetland
16  functions that I would offer.
17     Q.   Are there any other ways that you
18  think that your -- that you expect to testify
19  about topics that are in sections that your
20  initials are not next to in the table of
21  contents?
22     A.   What I'm trying to say here is that
23  I would draw upon the conclusion of other team
24  members like Dr. Rains, Dr. Nutter, Dr. Stewart
25  for soils in order to input those pieces of

Page 31

1  information to the assessment of functioning and
2  changes in functioning in the wetlands in
3  question.
4     Q.   I see.  So the subject matter of
5  your testimony is in the sections of the report
6  that have your initials next to it, but you may
7  draw upon the opinions of other experts on the
8  team in the process of giving your testimony; am
9  I understanding that right?
10     A.   Yes, I would speak to that.  I'm the
11  systems ecologist, so that's my job, is to span
12  those disciplines and stitch them together to
13  look at, for example, changes in function.
14     Q.   Okay.  So am I right that you're
15  relying upon the expertise of the other experts
16  within their -- you know, within their, you, know
17  sub -- within their areas of expertise -- let me
18  rephrase that.  That wasn't a very good question.
19        So your -- on your team you have --
20  you have five people, so five people on the team,
21  right?
22     A.   Yes, sir.
23     Q.   So Dr. Nutter is the hydrologist on
24  the team, right?
25     A.   Yes.

Page 32

1     Q.   And so you're relying upon
2  Dr. Nutter's expertise in the course of
3  developing your opinions, right?
4     A.   In regard --
5     Q.   Yeah, at least with regard to
6  hydrology?
7     A.   Yes.
8     Q.   And Dr. Rains is a vegetation
9  expert; is that fair to say?
10     A.   Yes.
11     Q.   And you're relying upon Dr. Rains'
12  expertise on vegetation matters in the course of
13  developing your own opinions, correct?
14     A.   In part.  I also have a great deal
15  of experience with plant ecology.
16     Q.   And Dr. Stewart is a soil scientist;
17  is that right?
18     A.   Yes.
19     Q.   And are you relying upon
20  Dr. Stewart's opinions on soil science in
21  development of your own opinions in this case?
22     A.   In part, but I also have a great
23  deal of training in soil science.
24     Q.   And, finally, Mr. Wylie is the
25  regulatory expert on the team, right?



Page 33

1     A.   Yes, sir.

2     Q.   And are you relying upon Mr. Wylie's
3   opinions on regulatory topics in developing your
4   opinions in the case?

5     A.   Same answer.  In part, I also have a
6   good deal of experience in looking at regulatory
7   issues.

8     Q.   Would you agree with me Mr. Wylie
9   has more expertise on regulatory issues than you?

10         MR. DOYLE:  Objection, vague.

11         THE WITNESS:  I don't believe that's
12   quantifiable.

13   BY MR. MCALILEY:

14     Q.   So you don't think he has greater
15   expertise than you on regulatory issues?

16         MR. DOYLE:  Same objection.

17         THE WITNESS:  We've both been in the
18   business a long time.  He has different
19   sets of experience, and I don't think that
20   one can pair those up and then make
21   a conclusion.

22   BY MR. MCALILEY:

23     Q.   Is there anything in the expert
24   report, Dr. Lee, that you think is incorrect?

25     A.   I picked up some formatting and

Page 34

1   typographical errors and things like that, sort
2   of administrative issues, but in terms of
3   substance, no.

4     Q.   Okay.  So what I'd like to do, then,
5   my -- I'm going to go through the report now and
6   go to the sections that you're listed as one of
7   the authors, because that's going to be what
8   your -- that's the subject matter of your
9   testimony, and I think that's the most efficient
10   way to go through this.

11         So let me start by going to the very
12   first section that you are listed as an author,
13   Section I.A, introduction and objectives; is that
14   right?

15     A.   Yes.

16     Q.   Okay.  So let me scroll down there.
17   Again, I'm still on Exhibit 72.  I'm going to
18   zoom back out a little just so we can read this a
19   little better.  So can you see on the screen
20   Section I.A of the report?

21     A.   Yes, sir.

22     Q.   And so am I right this section of
23   the report simply states what the purpose of the
24   expert report is and what its objectives are?

25     A.   Yes.

Page 35

1     Q.   Okay.  What I'd like to do is turn
2   to Section I.B, Technical Team Background.  I.B
3   is not a section that you wrote; am I right about
4   that?

5     A.   I blocked it out in my role of sort
6   of general editor, I may have rearranged certain
7   sentences or something, but by and large I didn't
8   draft the whole thing.

9         MR. DOYLE:  I.B?

10         MR. MCALILEY:  I.B.

11         MR. DOYLE:  I.B is noted on the
12   table of contents.

13         MR. MCALILEY:  I'm sorry, I'm sorry,
14   you're exactly right.  I apologize, I have
15   two inches of papers on my desk.

16   BY MR. MCALILEY:

17     Q.   So I.B is a section of the report
18   you wrote, right?

19     A.   Yes.

20     Q.   Okay.  So let's just -- let me just
21   ask you a few questions about I.B.  You see where
22   it says there, quote, "The DOJ expert technical
23   team members and their roles are as follows," and
24   it lists each member of the team, and it has a
25   couple of words after each person?

Page 36

1     A.   Yes.

2     Q.   And am I right that the role of each
3   team (sic) in this case is set forth next to that
4   person's name?

5     A.   Your question said the role of each
6   team.  I think you meant the role of each
7   individual.

8     Q.   Each team member, I apologize.

9     A.   Then the answer is yes.

10     Q.   Dr. Lee, it's 11:45 in Miami, and
11   it's not 9:00 in Washington yet, but you would
12   think I was the one that was more tired, so I
13   apologize if I'm misstating things here.

14         So I see next to your name it says,
15   "Ecosystems ecology, wetlands and river science."
16   Did I read that right?

17     A.   Yes, sir.

18     Q.   Am I right that your role in this
19   case is to testify about ecosystems ecology,
20   wetlands and river science?

21     A.   In a broad sense, yes.

22     Q.   What does "ecosystems ecology" mean?

23     A.   It's a science that's applied to
24   analysis of the organization structure of
25   systems -- ecosystems, natural systems, and the



LYNDON LEE, PHD
USA V SHARFI

May 04, 2022
37—40

Page 37

1  information they contain.
2      Q.   So included in that, am I right,
3  would be developing opinions related to the
4  functions served by wetlands on the site?
5      A.   Yes.
6      Q.   Will you be testifying about the
7  delineation of wetlands on the site?  What I mean
8  by that is like the specific line where they're
9  located prior to the defendants' activities?
10     A.   Only insofar as I accepted the other
11  team members' recommendations on that delineation
12  and used it to balance the functional assessment
13  that I was asked to perform.  I was not actively
14  involved in the delineation itself.
15     Q.   Thank you.  So also on -- in Section
16  I.B next to your name it says, "Wetland and River
17  Science."  Can you tell me what that means.
18     A.   It's a subspecialty within a broader
19  context of what I call ecosystems ecology, and
20  I focus on certain types of systems, those being
21  wetlands and rivers.
22     Q.   So I see -- I see after your name,
23  the next name is Wade Nutter, and it says
24  "hydrology."  Do you see that?
25     A.   Yes, sir.

Page 38

1      Q.   So he's the -- he's the person who
2  is going to testify about hydrology, right?
3      A.   Yes, sir.
4      Q.   So I shouldn't -- I shouldn't take
5  the phrase "wetland and river science" next to
6  your name to suggest that you're going to testify
7  about hydrology; is that correct?
8      A.   Again -- again, insofar as I would
9  take Dr. Nutter's observations and conclusions
10  and wrap them into the functional assessment that
11  I was asked to perform.  I would make an opinion
12  on that, but the basis for that opinion I'm
13  relying, in terms of a hydrologic analysis, on
14  Dr. Nutter.
15     Q.   Okay.  And I see -- just to go down,
16  I see Mike Wylie's name, and next to it, it says,
17  "wetland science, regulatory."  Do you see that?
18     A.   Yes, sir.
19     Q.   What do you understand regulatory to
20  mean as his role?
21     A.   He has a great deal of experience
22  with EPA Region 6 in looking at application of
23  Clean Water Act regulations and other regulations
24  like RCRA or CERCLA, two issues that come up
25  usually in wetland systems or Waters of the

Page 39

1  United States.
2      MR. DOYLE:  Object to my own
3  witness, Region 4.
4      THE WITNESS:  Sorry, Region 6 is
5  Texas.
6      MR. MCALILEY:  Right, you beat me to
7  it, Andy.
8      MR. DOYLE:  Right, sorry.
9  BY MR. MCALILEY:
10     Q.   Okay.  But -- so -- but as stated
11  on -- in the report in Section I.B, Mr. Wylie's
12  role -- he's the person on your team who has the
13  role of providing testimony about the application
14  of regulations under the Clean Water Act of this
15  case; am I understanding that right?
16     A.   He's usually the principal there in
17  a couple of -- I'm attending as second in a
18  couple of sections as noted in the table of
19  contents.
20     Q.   Okay.  Are you, Dr. Lee, going to be
21  giving opinions as to whether waters on the site
22  are part of the Waters of the United States
23  within the meaning of the Clean Water Act?
24     A.   I don't know how this case is going
25  to organize, but that was not my primary focus in

Page 40

1  this effort.
2      Q.   Am I right that you are not the
3  author of any of the sections that directly
4  address whether the wetlands on the site are part
5  of the Waters of the United States?
6      A.   I think I was a second in supporting
7  certain of the analyses that Mr. Wylie offered as
8  the primary author.
9      Q.   Okay.  Do you understand your role,
10  though, to be on direct examination, so not
11  questions from the defense, but on direct
12  examination, to provide testimony as to whether
13  wetlands on the site are part of the Waters of
14  the U.S.?
15     A.   I don't believe I'll be asked to do
16  that.
17     Q.   Okay.  Let's keep moving down to
18  Section II.A.  This is a section of the report
19  that you wrote as well; is that correct?
20     A.   Yes, sir.
21     Q.   So this is a section that's entitled
22  Site Location.  Do you see that?
23     A.   Yes, sir.
24     Q.   So just to be clear, so we're saying
25  the same thing, when both of us say, The Site,



Page 41

1  we're referring to the 9.92 acre property that's
2  owned by the defendants, right?
3      A.   Okay.
4      Q.   Is -- the site is located
5  approximately three mines west of the Florida
6  Turnpike, right?
7      A.   Yes, sir.
8      Q.   And it's approximately two miles
9  east of Interstate 95, correct?
10      A.   Yes.
11      Q.   Now, in this Section II.A, there's a
12  reference here that the site is 0.3 miles south
13  of Bessey Creek.  Do you see that in the second
14  sentence of the first paragraph?
15      A.   Yes.
16      Q.   When you say -- now, a third of a
17  mile north of the site, there's an east/west
18  channel that has been excavated; isn't that
19  right?
20      A.   Yes.
21      Q.   Is that what you're referring to as
22  "Bessey Creek" in this section of the report?
23      A.   Yes.
24      Q.   And you've been there, haven't you?
25      A.   Yes.

Page 42

1      Q.   How many times have you been to the
2  site?
3      A.   I had one site visit in October of
4  2021.  I spent the better part of a day on the
5  Sharfi property, the site, and then I spent two
6  or three days in reference areas and basically
7  looking at the path of the Bessey Creek system as
8  it traveled east toward St. Lucie.
9      Q.   Okay.  And so you're on the site in
10  October of 2021.  When did you spend those two to
11  three days in the reference areas?
12      A.   I was on the Sharfi site, I believe,
13  on October 19, and then ensuing 2021, we were in
14  peripheral areas.
15      Q.   So it was in October of 2021; is
16  that right?
17      A.   Yes, sir.
18      Q.   Had you ever been to the site or the
19  nearby areas prior to October of 2021?
20      A.   Oh, I've been to Okeechobee, and
21  I've traversed that area.  I've never been to the
22  site.
23      Q.   Okay.  Well, so Lake Okeechobee is
24  how many miles away from the site?
25      A.   Well, 30.  I'm guessing on that.

Page 43

1      Q.   So have you -- have you ever been
2  anywhere within, let's say, a five-mile radius of
3  the site prior to October of 2021?
4      A.   Yes, because I've driven I-95 up and
5  down Florida, and I also have been east of there
6  near Stewart and west of Stuart, because there's
7  a bunch of boat facilities there that I was
8  using.
9      Q.   Okay.  So other than driving on I-95
10  and going to a boating facility near Stuart, have
11  you -- prior to October 2021, am I right that
12  you've never been within five miles of the site?
13      A.   That's fair enough.
14      Q.   Okay.  So to the extent that there's
15  statements in -- well, let me back off here.
16          Okay.  So if I look -- so you refer
17  to in Section II.A of the -- of there's this
18  channel that's a third of a mile north of the
19  site, this Bessey Creek.  So you've personally
20  seen that -- that water channel, right?
21      A.   Yes.
22      Q.   And you saw it when you were out
23  there in October of 2021?
24      A.   Yes.
25      Q.   And would you agree with me it looks

Page 44

1  like it was excavated at some point in the past?
2      A.   It's been -- my take on it is it's a
3  former natural channel, part of a dendritic
4  channel network that was channelized and
5  straightened, which was common in Florida prior
6  to World War II and then after that through the
7  '60s and '70s.
8      Q.   Hold on.  So you have no personal
9  knowledge about what happened in Florida prior to
10  World War II, right?
11      A.   I do not.  I was born in 1951.
12      Q.   Right, so when you state what's
13  common in Florida prior to World War II, that's
14  based upon what you've read or what people have
15  told you, right?
16      A.   In part.  It's also based on my
17  inspection of historic aerial photographs, U.S.
18  Geological Survey maps, other cartographic
19  products, et cetera.
20      Q.   Okay.  Let's go back to the -- the
21  channel that's north of the site.  By the way,
22  for clarity, I'm going to refer to that as the
23  east/west ditch, just so we're clear for the
24  record.
25          So when you went to the east/west



LYNDON LEE, PHD
USA V SHARFI

May 04, 2022
45–48

Page 45

1   ditch, it's pretty straight when you look at it
2   today, right?
3       A.   Yes, sir.
4       Q.   And it has a berm that's next to
5   most of it; isn't that correct?
6       A.   Yes.
7       Q.   By berm, I mean an elevated area of
8   ground that's higher than the ground elevations
9   that are further away?
10      A.   Yes, I would characterize that as
11  the berm which resulted from the sidecast fill
12  that they placed when they were straightening
13  that part of the Bessey Creek system.
14      Q.   Okay.  So when you say they
15  straightened that part of the Bessey Creek
16  system, what -- tell me what specific evidence do
17  you have that there is a natural creek that was
18  located there prior to the excavation of that, of
19  the east/west ditch?
20      A.   I looked at the chronosequence in
21  the Palm City quadrangle of the U.S. Geological
22  Survey maps at 1/24,000, a scale, and in 1948 is
23  the first one you pick up that shows a fairly
24  intact dendritic structure, wherein Section 17,
25  where the Sharfi property occurs, is in one of

Page 46

1   the headwaters of one of the fingers of that
2   dendritic system.
3           Then subsequent to that, if you look
4   at other U.S. Geological Survey maps, there's a
5   revision in 1951, I think, same picture, and then
6   there's a gap.  They didn't revise it again until
7   like 2011 or 2012 where it shows some
8   straightening of the channel systems that were
9   formerly in the location of the dendritic
10  channels.
11          And then the last revisions were
12  2021, 2022, and it shows further straightening, a
13  similar pattern for an incremental, what I'll
14  call straightening and consolidation drainage.
15      Q.   So your -- your opinions about what
16  was located at the -- where the east/west ditch
17  is today is based upon these aerial photographs
18  from the U.S. Geological Survey that you just
19  referenced?
20      A.   In part.
21      Q.   And what else, what's the other
22  basis for these opinions?
23      A.   Pardon me, could you repeat the base
24  question.
25      Q.   Yeah, what is the basis -- what is

Page 47

1   the basis for your opinion that the east/west
2   ditch is located on a prior natural channel of
3   Bessey Creek?
4       A.   A combination of the map sequence
5   that I just recited, interpretation of historic
6   aerial photos, and on-site observations.
7       Q.   What on-site observations tell you
8   what existed at the location of the east/west
9   ditch prior to its excavation?
10      A.   If you look around it, there are
11  wetlands that are adjacent to or that abut that
12  channel, and if you look at reference areas to
13  the west of Route 84, it's a complex wetlands
14  that consist of scrub/shrub and forested wetlands
15  that are open-water depressions or flats, and
16  I -- it's my opinion that that excavation and the
17  consolidation drainage that I'm talking about was
18  excavated through wetlands that would have had
19  minor channel features embedded in the flats and
20  depression matrix.
21          That was common practice throughout
22  Florida, throughout Southern Florida.  What they
23  did was dig a hole and bring the water to that
24  ditch in an attempt to convey it off site so that
25  they could grow mainly agricultural crops.

Page 48

1       Q.   And, Dr. Lee, you -- you have no
2   personal knowledge of common practices in past
3   decades in Florida, do you?
4       A.   I don't think that's an accurate
5   statement.
6       Q.   You have personal knowledge of
7   common -- okay.  Well, let me back up.
8           When was the east/west ditch
9   excavated?
10          MR. DOYLE:  Objection, vague.
11          THE WITNESS:  I don't know the exact
12      date.
13  BY MR. MCALILEY:
14      Q.   You would agree with me that the
15  east/west ditch was excavated sometime prior to
16  1948?
17      A.   I don't think so.  The U.S.
18  Geological Survey Map does not depict that.
19      Q.   So you think the east/west ditch was
20  excavated sometime after 1948?
21      A.   Based on my interpretations of the
22  U.S. Geological Survey maps, yes.
23      Q.   So when is the -- when is a date
24  that you believe the east/west ditch was
25  excavated no later than?



LYNDON LEE, PHD                                          May 04, 2022
USA V SHARFI                                                   49–52

Page 49

1      A.   As I said, there's a gap in the
2   revision of the U.S. Geological Survey maps
3   between about 2010 or '11 and 1951, and then
4   looking forward a gap between 2010 and '11 and
5   2021.  I think that ditch was put in there post
6   World War II.
7      Q.   Okay.  You have no personal
8   knowledge of any events in Florida in the 1950s,
9   do you?
10     A.   Yes, I frequently visited my family
11  there and went fishing.
12     Q.   In the 1950s?
13     A.   Yes.
14     Q.   You were born in 1951; is that
15  right?
16     A.   Yes.
17     Q.   Okay.  So basically is -- so
18  visited -- in the 1950s when you visited Florida,
19  you were a little boy, right?
20     A.   Yes.
21     Q.   Is that the basis of your testimony
22  about what normal ditch excavation practices were
23  in Florida in the 1950s?
24     A.   No, sir.
25     Q.   Okay.  So have you ever looked at

Page 50

1   the aerial photographs or USGS maps that depict
2   the site and the immediate nearby areas prior to
3   your involvement in this case?
4      A.   Yes.
5      Q.   Okay.  So when did you first get
6   involved in this case?
7      A.   I have to check my billing record on
8   that.  It was prior to June of 2021, just prior
9   to June of 2021, I believe.
10     Q.   Okay.  So prior to June of 2021 you
11  looked at the aerial photographs and USGS maps
12  that depict the site; is that right?
13     A.   No, sir.
14     Q.   So the first time you looked at
15  these aerial photographs and USGS maps that you
16  just testified was when you started working
17  on the case in and around June of 2021?
18     A.   Yes, in which case I'd like to
19  correct my answer to what I misunderstood you to
20  ask a couple of questions back.  So the first
21  time I looked at the quadrangles, aerial photos,
22  et cetera, that are pertinent to the Sharfi
23  property was after I knew where it was located
24  and we started working on this case.
25     Q.   Are you going to be testifying about

Page 51

1   hydrological conditions in the east/west ditch as
2   part of this case?
3      A.   Only insofar as they are offered to
4   me by Dr. Nutter and his conclusions and they're
5   pertinent to running the functional assessment
6   protocols that we used for the site.
7      Q.   Are you going to be testifying about
8   water quality in the east/west ditch?
9      A.   In the direct and indirect impact
10  section, we do look at degradation of water
11  quality as a result of filling activities,
12  earthwork, road construction, and consolidation
13  drainage and the effect that that has on water
14  quality exported from the site.
15     Q.   You wrote the sections of the report
16  on direct impacts, right?
17     A.   Yes, sir.
18     Q.   Or most of the sections.  You did
19  not write any of the sections of the report with
20  regard to indirect impacts, did you?
21     A.   I assisted with that.
22     Q.   Those are the -- but Mike Wylie was
23  the author of those sections on indirect impacts,
24  right?
25     A.   Yes, sir.

Page 52

1      Q.   He's the witness who is going to
2   testify about those topics, not you, right?
3      A.   I expect that would be the case.
4      Q.   Thank you.  So in the -- going back
5   to the report, Section II.A, the second -- the
6   second paragraph.  It says, "The site is bounded
7   to the northwest by drainageways that flow west
8   and north to Bessey Creek, which is located 0.3
9   miles north."
10        Do you see that sentence that I just
11  read?
12     A.   Yes, sir.
13     Q.   So when you say "drainageways," are
14  you referring to "ditches"?
15     A.   There's ditches that were excavated,
16  and then also the natural topography on the site
17  has what I'll call "swale features," that are --
18  that will convey water when water is in the
19  system but do not have defined bed and bank and
20  sediment transport processes.  So the combination
21  of those excavated ditches and the swales is what
22  I mean by drainageways.
23     Q.   Okay.  So if I look at the sentence
24  in the report, it says the site is bounded to the
25  north and west by drainageways.  So let me break



LYNDON LEE, PHD
USA V SHARFI

May 04, 2022
53–56

Page 53

1  this down.  So let's start with the west.  So on
2  the boundary, the western boundary of the site,
3  am I right that there's a ditch?
4      A.  Yes, sir.
5      Q.  And that's the ditch that's referred
6  to in your report as the north/south ditch,
7  correct?
8      A.  Yes, sir.
9      Q.  And that ditch extends from the
10  western boundary of the site northward until
11  it reaches the east/west ditch, right?
12      A.  Until it reaches the Bessey Creek
13  channel, right.
14      Q.  Right, which you're calling Bessey
15  Creek and I'm calling the east/west ditch, right?
16      A.  Yes, sir.
17      Q.  And then the sentence also says the
18  site is bounded to the north by a drainageway.
19  So am I right that this swale that you're
20  referring to is on the northern boundary of the
21  site?
22      A.  No, that's not a swale, that's an
23  excavated ditch that runs generally east/west on
24  the northern boundary of the property and it ties
25  into the north/south ditch.

Page 54

1      Q.  Okay.  So there's a small ditch
2  that's on the northern boundary of the site that
3  connects to what we just referred to as the
4  north/south ditch; is that right?
5      A.  Yes, yes.
6      Q.  Okay.  So you just testified about
7  that there is drainageways that do not have a
8  defined bed and bank, if I'm remembering that
9  correctly.  Where are those on the site or near
10  the site?
11      A.  If you go north from the site along
12  the axis of the north/south ditch, they begin to
13  occur on what is called the Countess Joy East
14  reference property, and they are just shallow
15  depressional features, I'll call them "swales,"
16  that when the soil is saturated or ponded and you
17  may get a rain event or hurricane or something,
18  those will pick up water and carry water
19  generally north and west towards the right-of-way
20  of Route 84.
21          And if you walk around the Countess
22  Joy property, for example, in the northeastern
23  corner, those same types of features occur, but
24  their flow directions are different.
25      Q.  Thank you.  Are you going to be

Page 55

1  testifying with regard to how much water flows in
2  the north/south ditch?
3      A.  No, sir.
4      Q.  Are you going to be testifying about
5  the water quality in the north/south ditch?
6      A.  Insofar as the degradation of water
7  quality is attached to the functional assessment
8  results, yes.
9      Q.  Are you going to be testifying
10  about, for instance, nutrient levels or -- let me
11  rephrase that.
12          Are you going to testify about
13  nutrient concentrations in the north/south ditch?
14      A.  No, my observations consistent with
15  the functional assessment protocols are more
16  generalized.
17      Q.  Are you going to be testifying about
18  when the north/south ditch was excavated?
19      A.  No.
20      Q.  Are you going to be testifying about
21  conditions in the location of the north/south
22  ditch before it was excavated?
23      A.  Only so far as the activities on the
24  site apparently tied in consolidation drainage
25  features that I assessed in the functional

Page 56

1  assessment to the north/south ditch via pipes or
2  shallow swales, mainly pipes, we think.
3      Q.  Okay.  Let me ask you about that
4  now.  So what pipes are you referring to?
5      A.  There's two pond features on the
6  site, one in the southwest corner and one sort of
7  in the middle of the site.  And, for example, the
8  one in the southwest corner appears to be plumbed
9  to the west, to the southwest ditch.  There's
10  also a bunch of piping and aeration mechanism in
11  the central pond, and we believe that Mr. Sharfi
12  probably has the capability to shunt water to the
13  west into the north/south ditch.
14      Q.  Okay.  So you believe that is true
15  and use the word appears.  It sounds like you
16  don't know whether those ponds are actually
17  connected to the north/south ditch?
18      A.  I saw the pipes.  I could not verify
19  the outlets into the north/south ditch.
20      Q.  So when you say you saw the pipes,
21  you saw pipes in the ponds, right?
22      A.  Correct.
23      Q.  Did you see -- did you see the place
24  where the pipes exited out into the north/south
25  ditch?



LYNDON LEE, PHD
USA V SHARFI

May 04, 2022
57–60

Page 57

1    A.   No.
2    Q.   So as far as you know those pipes go
3   somewhere else than the north/south ditch, right?
4    A.   The terrain is nearly level,
5   it wouldn't make sense for them to go pretty much
6   anywhere else, because they wouldn't flow.  So
7   it's my strong belief that they are probably
8   directed to the west.
9    Q.   But you don't actually have direct
10  evidence that those pipes connect to the
11  north/south ditch, do you?
12   A.   I do not.
13        MR. DOYLE:  Objection, vague.
14  BY MR. MCALILEY:
15   Q.   It's your supposition that they must
16  connect to the north/south ditch, but you don't
17  have any evidence of that, right?
18        MR. DOYLE:  Objection, vague.
19        THE WITNESS:  I would rephrase --
20        rephrase that and say that they probably
21        do, not must.
22  BY MR. MCALILEY:
23   Q.   Okay.  Well, so you think -- okay.
24  You think that they probably connect, but you
25  have no evidence that they do, right?

Page 58

1        MR. DOYLE:  Objection, vague.
2        THE WITNESS:  I have not observed
3        the outlet of the pipes that I observed in
4        the ponds exiting into the north/south
5        ditch.
6   BY MR. MCALILEY:
7    Q.   So you have no evidence of those
8   pipes connecting to the north/south ditch, right?
9        MR. DOYLE:  Objection, vague.
10       THE WITNESS:  I have not observed
11       the connection.
12  BY MR. MCALILEY:
13   Q.   And you didn't -- did you do any
14  test on those pipes, like a tracer test, a tracer
15  dye test, to see if the water goes to those
16  pipes?
17   A.   No, sir.
18   Q.   Did you conduct any other test to
19  see where the water in those pipes goes?
20   A.   No, sir.
21   Q.   Did you attempt to do any kind of
22  excavation on the site to sort of track the pipes
23  to see where they go?
24   A.   No, sir.
25   Q.   Did you use any kind of ground

Page 59

1   penetrating radar or some kind of device that
2   would let you follow the pipes in the ground and
3   see where they go?
4    A.   No.
5    Q.   Okay.  Back to the report, Section
6   II.A.  So I'm in the second paragraph.  It says,
7   quote -- I'll go to the second sentence.  Quote,
8   "Bessey Creek then flows east for approximately
9   seven miles where it joins the tidally influenced
10  and traditional navigable waters, TNWs, of the
11  St. Lucie River."
12       Do you see where I read that?
13   A.   Yes.
14   Q.   So the reference to seven miles,
15  is seven miles a distance from the east/west
16  ditch near the site to the point where Bessey
17  Creek is tidally influenced or is it something
18  else, do you mean something else in that
19  sentence?
20   A.   In that sentence I was speaking more
21  generally about just the straight line down the
22  channel distance between the reach of Bessey
23  Creek north of the Sharfi site to the St. Lucie
24  River.
25   Q.   I see.  So -- and how did you -- how

Page 60

1   did you measure the distance from the east/west
2   ditch near the site to the -- to the -- you know,
3   where it reaches the St. Lucie River?
4    A.   I used the measurement tool on
5   Google Earth and ESRI photo imagery that we used
6   and clicked it off.
7    Q.   There's two sentences down it says
8   quote, consequently, the tidally influenced
9   downstream reach of Bessey Creek is a TN" --
10  I assume that's supposed to be TNW?
11   A.   That's a typo, yeah.
12   Q.   Yeah -- "approximately 4.5 miles
13  downstream from the site."  Do you see where
14  I read that?
15   A.   Yes, sir.
16   Q.   So am I correct that the closest
17  place where Bessey Creek is tidally influenced is
18  four and a half miles downstream from the site?
19   A.   Approximately, yes.
20   Q.   And am I right that you calculated
21  that by using the measurement function of Google
22  Earth or ESRI?
23   A.   Yes, and we also traveled to that
24  point.  I can't remember the cross-bridge, the
25  name of the cross-bridge, but there's a bridge



LYNDON LEE, PHD
USA V SHARFI

May 04, 2022
61–64

Page 61

1 that crosses the Bessey Creek channel system at
2 approximately that point, and it's -- we observed
3 tidal influence. There's mangroves and high tide
4 marks, et cetera.
5     Q. There's also a monitoring station
6 there, right?
7     A. Upstream of that, I think, yes.
8     Q. So -- so what is -- so I'm right
9 that the closest traditionally navigable water to
10 the site is that tidally influenced downstream
11 reach of Bessey Creek?
12     A. Yes, let's call it the downstream or
13 distal end of Bessey Creek as it joins the other
14 parts of the St. Lucie River system. There's a
15 canal that intervenes and then it dumps into the
16 St. Lucie.
17     Q. Okay. Let me exit out of this and
18 show you -- go to a different exhibit, which
19 is -- okay. So I'd like to show you, Dr. Lee,
20 what's been previously marked as deposition
21 Exhibit 73.
22     Does this appear to be the figures
23 that go with this report?
24     A. Yes.
25     Q. Okay. So first of all, let me ask

Page 62

1 you about the figures and how they're -- they're
2 labeled. So I'll go here to -- I'll zoom in so
3 we can read it a little bit easier. The first
4 figure in the bottom in the legend says Figure
5 II.A.1, location of the defendants' property site
6 east of Palm City, Martin County, Florida.
7     Do you see that?
8     A. Yes.
9     Q. So am I right that the numbering
10 system for the figures matches up with the
11 section of the report that they go with?
12     A. Yes.
13     Q. So if I want to know who the -- what
14 are the figures you're going to be using, I would
15 look at the labeling system of the figures and
16 see whether they match up with the report, the
17 section of the report that you wrote, right?
18     A. Yes.
19     Q. So this is -- so the first one is --
20 well, I'll zoom back out a little bit just so we
21 can see it better.
22     Am I right that this first figure
23 basically just shows the location of the site in
24 context?
25     A. Yes.

Page 63

1     Q. Let me go to the next figure, Figure
2 II.A.2, Overview of the Site and Adjacent
3 Countess Joy East and West Reference Areas. Can
4 you see that on the screen?
5     A. Yes.
6     Q. Is this a figure that you helped put
7 together?
8     A. I did not -- in my role as sort of
9 editor, I looked over and offered formatting and
10 compositional suggestions to make it more clear,
11 but I was not the original developer of this
12 figure.
13     Q. All right. Is this a figure that
14 you would use in your testimony at trial?
15     A. It's locational, it's useful, yes.
16     Q. All right. So am I right where
17 it labels Bessey Creek, that's that excavated
18 ditch that I've been referring to as the
19 east/west ditch; is that right?
20     A. Yes, that's Bessey Creek.
21     Q. And the Countess Joy -- the east
22 Countess Joy and west Countess Joy areas, those
23 are the primary reference areas that the DOJ team
24 used in its analysis; is that right?
25     A. They were among seven or eight, but

Page 64

1 those are the two most proximate reference areas
2 to the Sharfi property.
3     Q. But those are the reference areas
4 that you did the most investigations in, right?
5     A. That's accurate, yes.
6     Q. Okay. And these are -- and how does
7 it get the name Countess Joy?
8     A. I don't know. You would have to ask
9 the landowner to the north.
10     Q. Okay. But you understand that to be
11 what the property owner calls it; is that right?
12     A. I think that's true. I think that's
13 correct.
14     Q. Okay. Let's go to Figure II.A.3,
15 Boundary Survey of the Site and Description of
16 Improvements Present, Conducted November 5, 2018,
17 and Updated November 16, 2018, and December 5,
18 2019.
19     Do you see that on the screen?
20     A. Yes.
21     Q. So where did you get this figure --
22 where is the information on this figure from?
23     A. There's a title block in the lower
24 right which identifies the engineering firm that
25 performed -- that prepared it.



LYNDON LEE, PHD
USA V SHARFI

May 04, 2022
65–68

Page 65

1    Q.   So am I right that this figure
2 basically just has information from Karner
3 Surveying on a document that you and the team
4 obtained?
5    A.   That's correct.  It's so small,
6 I can't verify the name of the engineering
7 outfit, but if that's what it says, that's what
8 it says.
9    Q.   Can you see it there now on the --
10    A.   There we go, yeah, correct.
11    Q.   Karner Survey, Inc.  So the
12 reference there in the description of your figure
13 about the improvements present on the different
14 dates, are those dates that were obtained from
15 this underlying survey, or are those dates that
16 the DOJ team came up with?
17    A.   They were obtained, I think, from
18 the underlying -- the notes in the underlying
19 survey.
20    Q.   Okay.  So let me zoom back out just
21 so we have a little bit of a big picture view of
22 it and look at the site.
23       So can you tell me when the work by
24 the defendants was done as depicted in this
25 Figure II.A.3?

Page 66

1       MR. DOYLE:  Objection, vague.
2       THE WITNESS:  As part of my work,
3    I developed a chronology of activities
4    that's a subsection of one of the
5    appendices, and what I did was line up a
6    bunch of historic aerial photos as well as
7    I could and then describe briefly in each
8    of the photos what activities I was
9    observing.  That would be the best
10    mechanism to answer your question.
11 BY MR. MCALILEY:
12    Q.   Okay.  Let me exit out of this
13 Deposition Exhibit 73, and let me go to -- put up
14 on the screen what's been previously marked as
15 deposition Exhibit 81.  Do you see that, sir, on
16 the screen?
17    A.   Yes, sir.
18    Q.   It says, Appendix 5, Chronology of
19 Activities on Site.
20    A.   Yes.
21    Q.   Is this what you were just referring
22 to?
23    A.   Yes, I prepared that appendix.
24    Q.   So if I want to know when the
25 defendants did the activities on the site that

Page 67

1 are depicted in the survey, this is where
2 I should look?
3    A.   Generally.  I don't think that
4 we would have the luck of having the photo
5 exactly jibe with when an activity occurred, but
6 the trend in time is evident in Appendix 5.
7    Q.   So I'm going to go -- I'm in this
8 appendix, and I'm going to scroll down here and
9 try to get up towards -- when did the defendants
10 purchase the property?
11    A.   I don't know.
12    Q.   Does 2017 sound right to you?
13    A.   I believe I read that.
14    Q.   Okay.  So I'm in Deposition Exhibit
15 81.  I'm on Photograph 5-7, and you see it says,
16 "2017, 51-Year regrowth of forested and
17 scrub/shrub mosaic."  Do you see that?
18    A.   Yes.
19    Q.   Would you agree that shows the site
20 before the defendants did any work on it?
21    A.   Generally speaking, yes.  There's
22 a -- there's a little landing in the south
23 central boundary that transgresses the partial
24 boundary, but that's minor.
25    Q.   Okay.  By the way, 51-year regrowth,

Page 68

1 is that -- the label for this photograph, is that
2 your label?
3    A.   Yes.
4    Q.   And so am I -- am I right in
5 assuming that this means that there is trees at
6 some point were cut down on the property at some
7 point in the past?
8    A.   That's evident in the 1966
9 photograph.  That was the first in this series
10 that we're in right now, Appendix 5.  I just did
11 the arithmetic.
12    Q.   So this property had been logged at
13 some point in the past, right?
14    A.   Yes, the 1956 photograph clearly
15 shows that it was cleared and that there was
16 likely livestock raising and some attempts at
17 agriculture.  We think given the signatures, that
18 it was probably citrus production.
19    Q.   Okay.  So the trees on the property
20 were trees that had grown up after they had been
21 cleared at some point in the past; would that be
22 fair to say?
23    A.   Correct, correct.
24    Q.   All right.  So let me go here to --
25 now I'm on figure -- Photograph 5-A, "2018,



Page 69

1  52-Year regrowth of forested and scrub/shrub
2  mosaic. Note construction of east, north, and
3  west perimeter ring road and beginning of
4  clearing and fill in the south central area."
5        Did I read the caption for this
6  correctly?
7      A.  Yes.
8      Q.  When in 2018 was this photograph
9  taken?
10     A.  I do not have the date.  I just know
11 it was 2018.
12     Q.  So am I right this represents the
13 first work on the site by the defendants other
14 than that little -- little thing in the south
15 corner -- south end of the property you pointed
16 out in the previous photograph?
17     A.  It's the first image that depicts
18 it, and the date is 2018, sometime in 2018.
19     Q.  Okay.  Now I'm going to
20 Photograph 5-9, "April" --
21     A.  Pardon me, can I interrupt.  Is it
22 possible for you to blow that up a little bit?
23     Q.  Absolutely.  Absolutely.
24     A.  That's way better.  Thank you.
25     Q.  Yeah.  No problem.  I just --

Page 70

1  sometimes I like the big view, and I'm happy --
2  if you need it bigger or smaller, just tell me.
3        Now I'm at Photograph 5-9.  It says,
4  "April 25, 2018, Mechanical clearing and road
5  construction with a 200-level trackhoe ponding
6  evident, blue arrow southwest corner."
7        Did I read that caption right?
8      A.  Yes, sir.
9      Q.  Is that a caption that you wrote?
10     A.  Yes.
11     Q.  So this is a -- you got this -- this
12 is from a document that you obtained from the
13 Army Corps of Engineers, isn't that right, or
14 who?
15     A.  It was produced by the South Florida
16 Water Management District.  It was a field
17 report, and I clipped this particular page out of
18 that report.
19     Q.  I see.  So this -- so this depicts
20 work on the southwest corner of the site?
21     A.  Yes.
22     Q.  Okay.  Let me scroll down here
23 further.  By the way, there's an arrow.  What
24 color is this arrow here?
25     A.  Blue.

Page 71

1      Q.  And what is the purpose of the
2  arrow?
3      A.  I was trying to highlight the
4  ponding in the excavated area that is, if you
5  will, in front and to the right of the trackhoe.
6      Q.  And you weren't on the site in April
7  of 2018, were you?
8      A.  I was not.
9      Q.  So as far as you don't know whether
10 it rained the day before or prior to the date
11 this photograph was taken, right?
12     A.  I do not know.
13     Q.  Okay.  If we go to the next
14 photograph, I think the next one -- let me make
15 sure I got it right.  We just looked at
16 Photograph 5-9, now I'm going to Photograph 5-10,
17 "April 25, 2018, Mechanical clearing and
18 levelling, bulldozer showing in center right of
19 photograph."
20        Did I read that right?
21     A.  Yes.
22     Q.  Is that a caption that you wrote?
23     A.  Yes.
24     Q.  So this is another photograph from
25 the Water Management District inspection on April

Page 72

1  25, 2018?
2      A.  Yes, sir.
3      Q.  What portion of the site does this
4  depict?
5      A.  I'm not sure.  I don't want to
6  speculate because I don't know the angle of the
7  photograph.
8      Q.  Okay.  All right.  Let's go to the
9  next one, Photograph 5-11, "April 25, 2018,
10 Mechanical clearing with ponding element evident
11 southwest corner of the site."
12        Did I read the caption right?
13     A.  Yes, sir.
14     Q.  And you wrote that?
15     A.  Yes.
16     Q.  And what does blue arrow depict?
17     A.  Again, I was trying to highlight
18 ponding so that it would draw your eye from the
19 caption to the ponding that's evident.
20     Q.  So, once again, this depicts
21 conditions on the southwest corner of the site?
22     A.  That's my best interpretation of the
23 direction of the perimeter road and the
24 orientation of the photograph.
25     Q.  All right.  And, once again, this is



LYNDON LEE, PHD
USA V SHARFI

May 04, 2022
73–76

Page 73

1  from that same inspection of April 28, 2018,
2  right?
3      A.    Correct.
4      Q.    Okay.  Let's go to Photograph 5-12,
5  "April 30, 2018, Southwest corner of site
6  recently sodded, view is north."
7          Did I read that correctly?
8      A.    Yes.
9      Q.    And then it says -- there's a note
10  under the caption.  It says, "Note A, ring road
11  construction around the entire parcel.  E,
12  beginning of mechanical clearing in northwest
13  corner of blue arrow."
14          Did I read that correctly?
15      A.    Yes.
16      Q.    So is this a photo that you obtained
17  or was taken by the South Florida Water
18  Management District?
19      A.    I don't know who took the
20  photograph.  That photo sequence is generally
21  available through the Martin County GIS website
22  portal, but I think Florida Water Management
23  District picked it up and incorporated it into
24  their report.
25      Q.    Okay.  So this photograph depicts

Page 74

1  the work that was done on the site as of April
2  30, 2018; is that right?
3      A.    Yes, sir.
4      Q.    I'm going to keep going down.  Go to
5  Photograph 5-13, which the caption says, "April
6  30, 2018, Southwest corner of site recently
7  sodded, view is southeast, note mechanical
8  clearing in the northwest corner of blue arrow
9  and ring road construction on western and
10  southern perimeters of site," end quote.
11          Did I read that right?
12      A.    Yes, can you scroll down a little
13  bit so I can see it further.
14      Q.    Sure.  Absolutely.
15      A.    Or you can minimize it a little bit,
16  and we can get the caption and the photo.
17      Q.    I prefer that actually so you can
18  see the whole thing as once.
19      A.    There you go.
20      Q.    There we go.  We can see it all now.
21      A.    Okay.  I'm sorry to interrupt.
22      Q.    Okay.  So this photo also shows
23  conditions on a portion of the site on April 30th
24  of 2018?
25      A.    Yes.

Page 75

1      Q.    I see in the caption you say
2  southwest corner of site recently sodded.  What
3  do you mean by "recently sodded"?
4      A.    If you creep in on that photo, you
5  can see turf that was placed in order to
6  basically establish grass and stabilize the
7  southwest corner.
8      Q.    Is putting down a grass sod a
9  regulated activity in a Waters of the United
10  States --
11          MR. DOYLE:  Objection.
12          THE WITNESS:  Pardon me?  Repeat the
13      question.
14  BY MR. MCALILEY:
15      Q.    Is the putting down of grass sod a
16  regulated activity in the Waters of the United
17  States?
18          MR. DOYLE:  Objection.
19          THE WITNESS:  It could be.  Oh, that
20      was you Andy, sorry.  It can be.
21  BY MR. MCALILEY:
22      Q.    Okay.  Do you think -- it's your
23  belief that there -- that the -- that the
24  wetlands to the site -- well, let me rephrase
25  this.

Page 76

1          It's the position of the federal --
2  of the United States in this case that all the
3  wetlands on the defendants' site were regulated
4  under the Clean Water Act, right?
5      A.    Yes.
6      Q.    So is it -- do you believe the
7  defendants needed to have a federal permit from
8  the Army Corps of Engineers under the Clean Water
9  Act in order to put down the grass sod on the
10  site as depicted in Photograph 5-13?
11      A.    Yes, because placement of that
12  material was part of a sequence of events which
13  included mechanical clearing of the forest and
14  scrub/shrub matrix that existed prior to the 2018
15  activities and subsequent earthwork,
16  redistribution of fill, we think export of some
17  fill, import of fill for the road, things like
18  that.
19          So as part of a sequence of events,
20  the placement of turf would have been a regulated
21  activity, because it created bottom elevation of
22  those wetlands and also had significant and would
23  have significant and discernible impacts on
24  patterns of water flow and circulation.
25      Q.    So if an area is part -- is



LYNDON LEE, PHD
USA V SHARFI

May 04, 2022
77—80

Page 77

1 regulated under the Clean Water Act, am I right
2 that one needs a permit to discharge, dredge, or
3 fill material?
4     A.   In most instances, that's correct.
5     Q.   So it's your testimony that the
6 putting down the grass sod constitutes the
7 discharge of dredged or fill material, am
8 I understanding you right?
9         MR. DOYLE: Objection, misstated
10     previous testimony.
11         THE WITNESS: As I stated
12     previously, that placement of sod was part
13     of a linked series of operations that
14     occurred within this portion of the site.
15     That leak series included initially
16     clearing, earthwork, import and export of
17     materials, road construction, and then
18     placement of sod.
19         So it was part of the activities
20     that went on there, and that would have
21     required a permit.
22 BY MR. MCALILEY:
23     Q.   Okay. So I'm going to break this
24 down, Dr. Lee. I'm not asking about all the
25 activities yet. I'm going to go through each

Page 78

1 activity and ask you whether you need a federal
2 permit for it. Let's do one at a time.
3         It's your belief that if the
4 defendants brought in a dump truck of soil and
5 put it on a wetland that's regulated under the
6 Clean Water Act, that would constitute the
7 discharge of dredged or fill material, right?
8         MR. DOYLE: Objection, vague.
9         THE WITNESS: That is technically a
10     discharge. There are provisions in, for
11     example, the nationwide permits, that allow
12     for road maintenance or culvert placement,
13     regular maintenance that would allow that
14     as long as you stay within the conditions
15     of the exemption, but as you stated it,
16     if I back a pickup -- a dump truck into a
17     wetland and dump it, say 10 yards of
18     material, that would constitute a
19     discharge.
20 BY MR. MCALILEY:
21     Q.   Okay. So you had -- one would need
22 a permit under the Clean Water Act to discharge a
23 dump truck of soil into a wetland that's
24 regulated under the Clean Water Act, right?
25         MR. DOYLE: Objection, asked and

Page 79

1 answered.
2         THE WITNESS: I would refer you to
3     the answer I just provided. There's
4     certain provisions in nationwides for
5     regular maintenance, et cetera, that allow
6     a discharge within the conditions of a
7     nationwide or the exemption in the case of
8     farming and civil culture in ranching.
9 BY MR. MCALILEY:
10     Q.   Dr. Lee, the nationwide are
11 nationwide permits, correct?
12     A.   Yes, sir.
13     Q.   So that's a permit, right?
14     A.   It's a Clean Water Act permit.
15     Q.   Right, so --
16     A.   It's a Clean Water Act permit that
17 was actually promulgated under the Reagan
18 administration for paperwork reduction, it's sort
19 of a shortcut permit mechanism.
20     Q.   I mean, thank you, that was very
21 informative, but that wasn't my question.
22     A.   Okay.
23     Q.   Let's get through this so we can
24 finish this at the most reasonable time as we can
25 today. I just want to confirm it's a permit,

Page 80

1 right?
2     A.   It's a permit.
3     Q.   Right, so you need a permit in order
4 to drop a dump truck of dirt into a regulated
5 wetland, right?
6     A.   I would agree with that statement
7 with the condition that, for example, under
8 Nationwide 3, you can do normal maintenance. As
9 long as you stay inside the exemption, there's no
10 real permit that one would cut.
11     Q.   Well, Nationwide 3 is a permit,
12 correct?
13     A.   Yes, and that was the intent of my
14 answer.
15     Q.   Okay. Let me go to the next
16 activity. Is it your belief that if the
17 defendants operated mechanical equipment such as
18 a bulldozer or a trackhoe, and moved soil on the
19 ground of a wetland regulated under the Clean
20 Water Act, that a permit would be required?
21         MR. DOYLE: Objection, vague,
22     hypothetical.
23         THE WITNESS: If that activity
24     resulted in either accretion of bottom
25     elevation from imported fill or



LYNDON LEE, PHD                                    May 04, 2022
USA V SHARFI                                          81–84

Page 81
1      redistribution of fill on the site, yes.
2  BY MR. MCALILEY:
3      Q.   Okay.  So let me go -- we still have
4  up on the screen here Exhibit 81.  I'm going to
5  go to Photograph 5-10, which I just asked you
6  questions about.  You can see a picture of a
7  bulldozer on this photograph, can't you?
8      A.   Yes.
9      Q.   And you testified earlier that this
10  bulldozer is located in an area that you think is
11  a wetland, right?
12     A.   Yes.
13     Q.   So did the defendants need a permit
14  to operate the bulldozer at that location?
15     A.   Well, if the bulldozer was
16  redistributing the soil that we see in the
17  foreground of the photo or if it was pushing
18  imported soil into the wetland, and then leveling
19  it or redistributing, then that would require a
20  permit.
21     Q.   Okay.  Can you tell from this
22  photograph whether that bulldozer had
23  redistributed the soil or otherwise engaged in
24  those activities you said needed a permit?
25     A.   Yes.

Page 82
1      Q.   So -- okay.  So the use of that --
2  the operation of that bulldozer in
3  Photograph 5-10 at that location, you believe,
4  needed a federal permit, right?
5      A.   Yes.
6      Q.   All right.  Okay.  We talked about
7  the heavy equipment.  If a -- if an individual
8  person goes out with a shovel and digs in a
9  wetland, and, you know, digs a hole in the
10  wetland and throws the dirt next to it on the
11  ground, does that need a federal permit under the
12  Clean Water Act?
13     A.   It depends on the size of the hole.
14  If it's like for planting a tree, no, but if it's
15  to like excavate a foundation for a building,
16  yes.
17     Q.   Okay.  And where -- can you describe
18  for me where the difference in scale is -- let me
19  rephrase that.
20         Could you explain to me the basis of
21  your answer that a person digging a hole with a
22  shovel needs a Clean Water Act permit in some
23  cases and not others?
24     A.   It's a matter of scale.  I mean,
25  if you're planting a tree, no one in their right

Page 83
1  mind would require a permit for that.  If on the
2  other hand an individual goes out and digs a
3  feature such as on the scale of a building
4  foundation or a big old ditch or something like
5  that, that usually requires a permit.
6      Q.   Does it say that anywhere in any
7  clean water regulations that an individual
8  excavating a hole beyond a certain size --
9  excavating a hole with a shovel beyond a certain
10  size needs a permit, but below a certain scale
11  does not need a permit?
12         MR. DOYLE:  Objection, vague.
13         THE WITNESS:  Not to my knowledge,
14     that's a field interpretation that one
15     would make as a matter of reasonableness in
16     looking at -- excuse me, reasonableness in
17     looking at what's going on on the site.
18  BY MR. MCALILEY:
19     Q.   You would agree with me that it's
20  not reasonable to expect a person to have to get
21  a federal permit to use a shovel to dig a hole to
22  plant a tree in a wetland, right?
23     A.   That's correct.
24     Q.   Is it -- if I have an individual
25  person who goes out in a wetland and uses a

Page 84
1  shovel and a pick and -- to pull out --
2         THE COURT REPORTER:  I'm sorry
3     counsel, I didn't hear what you said.  To
4     pull out --
5  BT MR. MCALILEY:
6      Q.   A tree by its roots, does that need
7  a federal permit under the federal Clean Water
8  Act?
9      A.   Usually not.  That's not construed
10  as mechanical clearing.
11     Q.   So am I correct, Dr. Lee, that in
12  general mechanical earthwork requires a permit,
13  but earthwork by individual people using hand
14  tools does not?
15         MR. DOYLE:  Objecting, vague.
16         THE WITNESS:  Again, I go back to
17     questions of scale.  People can perform an
18     awful lot of work, and so if the scale of
19     what people do by hand is accreting bottom
20     elevation, changing patterns of flow and
21     circulation in a significant way, then that
22     would require a permit.  If you're planting
23     a tree because you're landscaping or
24     restoring a wetland, that usually does not
25     require a permit at the federal level.



LYNDON LEE, PHD
USA V SHARFI

May 04, 2022
85–88

Page 85

1 BY MR. MCALILEY:
2    Q.   Are you familiar, Dr. Lee, with the
3 term "point source"?
4    A.   Yes.
5    Q.   What is a point source?
6    A.   It's usually -- the analogy is
7 usually made of a pipe entering a river, if the
8 pipe is conveying sewage, that would be a point
9 source of discharge of sewage to the river.
10    Q.   Do you believe that a piece of
11 mechanical equipment such as a bulldozer is a
12 point source?
13       MR. DOYLE:  Objection, vague.
14       THE WITNESS:  It's been defined as
15 such, yes.
16 BY MR. MCALILEY:
17    Q.   Is a person using a shovel a point
18 source?
19    A.   Again, matters of scale.  One hole
20 to plant a tree, probably not.  A huge ditch for
21 a foundation, probably.
22    Q.   Okay.  But -- okay.  So it's your
23 testimony that a person with a shovel can be a
24 point source if they dig a big enough hole; am
25 I understanding correctly?

Page 86

1    A.   A hole or a ditch, that's correct.
2    Q.   Okay.  All right.  Let's go back to
3 these photographs here.  I think this is where
4 we are, so let's go here to -- I'm still on
5 Deposition Exhibit No. 82, Photograph 5-18,
6 "October 17, 2018, Sod in cleared southwest
7 corner of blue arrow, more mechanical clearing
8 and earthwork in northwest corner at yellow
9 arrow, center road construction, red arrow, view
10 is south by southeast."
11       Did I read the caption right?
12    A.   Yes.
13    Q.   Did you write that?
14    A.   Yes.
15    Q.   So am I right that the photograph
16 here is obtained from the Water Management
17 District?
18    A.   Yes, my source is the South Florida
19 Water Management District.
20    Q.   Okay.  So is it -- so does this
21 photograph depict work -- in your opinion work by
22 the defendants that needed a permit in wetlands?
23    A.   Oh, yes.
24    Q.   Go down to the next photograph.
25 Photograph 5-15, "November 2018, Continued

Page 87

1 mechanical clearing in northwest corner of the
2 site, yellow area; road construction through the
3 center of the site, red arrow; and a new inner
4 ring road in the southwest corner of the site,
5 blue arrow."
6       Did I read the caption right?
7    A.   Yes, sir.
8    Q.   Did you write that?
9    A.   Yes.
10    Q.   Is this also a photograph that was
11 obtained by the South Florida Water Management
12 District?
13    A.   That's where I sourced it, yes.
14    Q.   And does this also depict activities
15 that you believe needed a permit under the Clean
16 Water Act?
17    A.   Yes.
18    Q.   The next photograph or -- well, now
19 I'm at Figure 5-2, "Karner surveying and site
20 plans dated 11-5-18?"
21       Do you see that on the screen?
22    A.   Yes.
23    Q.   Did you write that caption?
24    A.   Yes, sir.
25    Q.   What does the question mark mean?

Page 88

1    A.   I couldn't blow up the photograph
2 large enough to read the date in the lower right
3 corner, and so I was guessing based on what
4 I could see, but I wasn't absolutely sure.
5    Q.   Okay.  So I see the question mark
6 refers to the date then, right?
7    A.   Yeah, my doubt -- my doubt that
8 I was reading the lower right date that was
9 entered by the surveyor correctly.
10    Q.   Okay.  And what does this depict
11 with regard to the site work?
12    A.   It's a general snapshot of site
13 plans that basically I construe to be a target,
14 sort of the development plan for the site.
15    Q.   And I want to draw your attention to
16 two things on this survey, zooming in a little
17 bit.  So in the bottom center of the site,
18 approximately, there's an area labeled "preserve
19 area."  Do you see that?
20    A.   Yes.
21    Q.   Do you see this label appears to
22 show a fence around it?
23    A.   Yes.
24    Q.   Is that -- is that a wetland that
25 was on the site?



LYNDON LEE, PHD
USA V SHARFI

May 04, 2022
89–92

Page 89

1    A.    Yes, and portions of that still
2  exist.
3    Q.    Okay.  In fact, this whole area
4  inside the fence line shown on this survey is --
5  still exists on the site, right?
6    A.    The area exists, yeah.
7    Q.    And as far as you know, no fill was
8  put in there, correct?
9    A.    Not correct.
10    Q.    Not correct?
11    A.    Not correct.
12    Q.    All right.  So when I say -- let's
13  just be clear about it, within which area,
14  because as I look here on this, just I'm going to
15  try to show it here, there is a -- it shows
16  "preserve area" in the center portion of the site
17  and there's sort of an oval like polygon that has
18  crosshatching on it, and around it, it looks like
19  there's the outline of a fence line.  I think
20  it says "hog wire fence under it."  Do you see
21  that?
22    A.    I can see it.  I can't read it,
23  sorry.
24    Q.    Okay.  So which portions of that
25  area do you believe had the deposition of fill?

Page 90

1    A.    If you look at the -- let's call it
2  an ellipse that's labeled "preserve area,"
3  I walked that whole area, and that's a remnant of
4  a forested wetland that has been thinned and
5  simplified, and along the perimeter, along the
6  north end, there used to be a road, and there was
7  sidecast fill into the perimeter of this wetland.
8        And similar situation, although I
9  don't think there it was a road, there was
10  activity, filling activity, redistribution of
11  soils along the southern perimeter.  So the
12  effect of that earthwork was to sidecast fill
13  either north from the north or north from the
14  south edge and decrease the overall size of that
15  wetland.
16    Q.    So when you're referring to the edge
17  on the north side, I can see a road on this
18  figure that's on that -- it goes along the
19  northern side of the fence, right?
20    A.    Correct.
21    Q.    So is that where you're talking
22  about where the road was built there could have
23  been side casting material on the other side of
24  the fence?
25    A.    I stood right there, and I observed

Page 91

1  it, yes.
2    Q.    Okay.  So what you just referred to
3  as fill in this area would have been outside the
4  ellipse, the oval-like area, but then -- but
5  within the area bounded by the fence on the north
6  side; am I understanding you correctly?
7    A.    That's correct, because the
8  surveyors preserve area, that ellipse, is not --
9  not a wetland boundary.  It's just an image.
10    Q.    I see.  So -- and you also testified
11  that you saw fill in the south side also from --
12  from a road; is that correct?
13    A.    A road or an informal right-of-way.
14  It came and went in the photographs, but let's
15  call it earthwork for leveling or something.
16  I don't know what the purpose of the earthwork
17  was, but the effect of it was to sidecast fill to
18  the north into the wetland.
19    Q.    Okay.  And so we're talking about
20  the wetland here.  Is it the area that's labeled
21  as "pasture" on this figure, you see, which is
22  right below the preserve area?
23    A.    Yeah, there's a wetland boundary
24  somewhere in there.
25    Q.    Okay.

Page 92

1    A.    Let me make that clear, from the
2  existing degraded forested wetland into an area
3  which has been filled which was probably formally
4  a wetland as well.
5    Q.    Okay.  But the area of fill that
6  you're talking about, it would have been that
7  area that's labeled as "pasture" on this figure?
8    A.    And north of that.
9    Q.    And north of that.  So on the north
10  side of the hog wire fence?
11    A.    Yes.
12    Q.    Okay.  And does that fill go into
13  this -- this ellipse that's labeled "preserve
14  area"?
15    A.    I don't know.  I had no location on
16  the presence of that ellipse when I walked the
17  area.  I just know what I observed when
18  I traversed that, which was earthwork that
19  cast -- sidecast fill into the southern boundary
20  of a wetland.
21    Q.    So other than where you saw
22  earthwork resulting in the side casting of fill
23  on the -- on the south side of the preserve area
24  near the road or track that you just described
25  and then also next to the road on the north side



LYNDON LEE, PHD                                      May 04, 2022
USA V SHARFI                                         93–96

Page 93
1  of that preserve area, are you aware of any other
2  fill that was put into the area labeled as
3  "preserve area" on this figure?
4      A.   Yes.
5      Q.   Okay.  Where?
6      A.   If you look at the chronosequence of
7  photos, there is a -- I'll call it a swale
8  connection going from the northeast --
9  northwestern portion of the general area labeled
10  preserve area west and north towards the central
11  pond, and the shape of that has been manipulated
12  two or three times to manipulate the flow
13  pathway, however they were doing it, and in order
14  to accomplish that, you would have to
15  redistribute fill.
16      Q.   So in other words, they dug out some
17  kind of channel or ditch between the preserve
18  area and the pond?
19      A.   Let's call it a swale.
20      Q.   Okay.  And so the excavation of the
21  swale you believe to be the discharge of fill
22  material?
23      A.   I do, because redistribution of fill
24  within a wetland is discharge.
25      Q.   So if -- if there's a property in

Page 94
1  the wetland that's regulated under the Clean
2  Water Act, if you go in there and just
3  redistribute the soil in that area, that's a
4  regulated activity; is that fair to say?
5          MR. DOYLE:  Objection, vague.
6          THE WITNESS:  Most of the time.
7      I mean if it's a teaspoonful, no, but
8      if it's an operation for example, at the
9      scale that occurred here, by all means.
10  BY MR. MCALILEY:
11      Q.   Am I right, Dr. Lee, there's nothing
12  in the law that distinguishes between whether an
13  activity is regulated or not based upon the
14  volume of soil that's moved?
15          MR. DOYLE:  Objection, vague.
16          THE WITNESS:  There is language in
17      the nationwides which set fill limits, for
18      example, for discharge in placing a culvert
19      or conducting normal maintenance like 50
20      cubic yards or something like that.  That's
21      the only thing that I can get on the size
22      that would be toward the spirit of your
23      question.
24  BY MR. MCALILEY:
25      Q.   Okay.  So a nationwide, once again,

Page 95
1  is a permit, right?
2      A.   Yes.
3      Q.   And a nationwide permit is a general
4  permit that says you're deemed permitted if you
5  do work that's within the scope of what's
6  described in it, right?
7      A.   That's correct.
8      Q.   And you can do more activities than
9  described in the nationwide permit, you would
10  just need your own individual permit for it,
11  right?
12      A.   If the scale of the operation is
13  such that an individual is required or deemed
14  necessary, yes.
15      Q.   Okay.  So -- but your -- but you
16  would agree with me that nationwide permits are
17  issued typically for more minor activities in
18  wetlands, right?
19      A.   Well, they can be big, but,
20  generally speaking, I would rephrase that to say
21  they're either minor or they are representative
22  like normal maintenance or installation of a
23  pipeline or something like that.  Those can be
24  big.
25      Q.   All right.  But a nationwide permit

Page 96
1  is a permit, because a permit is required even
2  for the minor activities in wetlands, right?
3          MR. DOYLE:  Objection, vague.
4          THE WITNESS:  I wouldn't use the
5      word minor.  I would say "regulated
6      activities in wetlands."
7  BY MR. MCALILEY:
8      Q.   Are there nationwide permits that
9  under the label refer to minor activities?
10      A.   Yes.
11      Q.   Okay.  So nationwide permits are
12  sometimes issued for minor activities in
13  wetlands, right?
14      A.   Sometimes but not always is my
15  point.
16      Q.   Okay.  But my point is, and I just
17  want to see if you agree with me, is that the
18  reason permits are issued for those types of
19  minor activities even are regulated under the Clean
20  activities even are regulated under the Clean
21  Water Act?
22          MR. DOYLE:  Objection, vague.
23          THE WITNESS:  Could you please
24      repeat the question.
25  BY MR. MCALILEY:



LYNDON LEE, PHD
USA V SHARFI

May 04, 2022
97–100

Page 97

1    Q.   Yeah, the reason a permit is issued
2  for minor activities is because even those minor
3  activities in wetlands are regulated under the
4  Clean Water Act, right?
5         MR. DOYLE:  Objection, vague.
6         THE WITNESS:  To answer that, I'm
7     having to make several assumptions, but in
8     general, I would say yes to your question.
9  BY MR. MCALILEY:
10   Q.   Let's go back here to the figure on
11  the screen showing the preserve area.  You
12  indicated that this preserve area was thinned
13  out; is that right?
14   A.   Yes, sir.
15   Q.   Okay.  And thinning means trees were
16  taken out, plants were taken out; is that right?
17   A.   Correct.
18   Q.   Do you need a permit -- does one
19  need a permit to go in and, let's say, bring out
20  a chainsaw and cut a tree in a wetland?
21   A.   At the federal level, usually not
22  if it's done by hand.
23   Q.   Okay.  Do you know how the
24  defendants thinned out the vegetation in the
25  preserve area on the site?

Page 98

1    A.   I think it was by hand.
2    Q.   Okay.  So they didn't need a permit
3  to thin out the wetland, the preserve area on the
4  site then if it was done by hand, right?
5         MR. DOYLE:  Objection, vague.
6         THE WITNESS:  I don't think they
7     would have had -- if that's all they did,
8     they would not have had to have a federal
9     permit.  Those types of activities are
10     usually regulated at county or more local
11     levels.
12  BY MR. MCALILEY:
13   Q.   Okay.  You're not an expert on
14  Florida law or Martin County, Florida law, are
15  you?
16   A.   I am not.
17         MR. DOYLE:  Objection.
18  BY MR. MCALILEY:
19   Q.   Let me try to -- I'm going to zoom
20  back out on this figure so we can see, and we'll
21  just keep moving through these figures here.  Let
22  me zoom further out.
23         Okay.  So Photograph 5-16.
24   A.   Can you please scroll down just a
25  tad.

Page 99

1    Q.   Yes, sir.
2    A.   There you go.  Okay.
3    Q.   I'm going to read the caption, "2019
4  mechanical clearing and redistribution of fill in
5  northwest corner of the site.  Note extensive
6  ponding throughout the center of the site, yellow
7  arrow, and new inner ring road in the southwest
8  corner of the site, blue arrow."
9         Did I read that right?
10   A.   Yes, sir.
11   Q.   Did you write that caption?
12   A.   Yes.
13   Q.   And so when in 2019 was this taken?
14   A.   Not specific.  I do not know.
15   Q.   So in the -- it says in your
16  caption, "mechanical clearing and redistribution
17  of fill" -- you know, let me -- hold on, let me
18  go to focus on something else.
19         So where the yellow area is located,
20  you can see there's an area where there's less
21  vegetation than there was previously?
22   A.   Yes.
23   Q.   Am I right that you don't know how
24  the vegetation was removed from those areas in
25  the central portion of the site?

Page 100

1    A.   I got a glimpse of that in the
2  testimony of the operations manager for
3  Mr. Sharfi, Charles --
4    Q.   Mr. Berlusconi?
5    A.   Yes, thank you for that.
6  He testified that he would send crews into the
7  central parts, northwestern parts of the site and
8  clear out, thin, get rid of some weeds, things
9  like that.  So I suspect that some of the stuff
10  that we're seeing going on here was part of that.
11         The other part is that I see ponding
12  of water by the yellow arrow and surrounding the
13  yellow arrow to the west and east and south.  And
14  water will have the effect of thinning out a
15  canopy, because all plants can't survive in
16  standing water.
17   Q.   Well, my question was simply that
18  there is -- how the work was done.  So your
19  knowledge of how the -- how this area, the
20  vegetation is removed in the central portion of
21  the site is based on your reading of
22  Mr. Berlusconi's deposition transcript; is that
23  right?
24   A.   In part and in part examination of
25  photographs.



LYNDON LEE, PHD
USA V SHARFI

May 04, 2022
101–104

Page 101

1    Q.   So from this photograph, you can't
2  see any mechanical equipment in the central
3  portion of the site, right?
4    A.   Correct, not in the central portion.
5    Q.   Right.  Would you agree with me it's
6  possible that the way the vegetation had been
7  removed in this portion of the site was, you
8  know, a crew of guys with hand tools?
9    A.   When you say "this portion," do you
10  mean by the yellow arrow, please?
11    Q.   Yeah, the central portion of the
12  site around where the yellow arrow is.
13    A.   It could.
14    Q.   All right.  Let's keep going through
15  the figures here.  The next one is
16  Photograph 5-17, and the label is, quote, 2020,
17  Extensive mechanical clearing, internal road
18  construction, and new building construction
19  throughout the site.  Note pond and drainage
20  swales in the center and southwest corner of the
21  site.  North is up, end quote.
22    Did you write that?
23    A.   Yes, sir.
24    Q.   And where did you get this
25  photograph?

Page 102

1    A.   That was Martin County GIS portal
2  sourced in the small print up there.
3    Q.   When in 2020 was this taken?
4    A.   Sorry, they don't give specific
5  dates, they just give years.
6    Q.   Right.  It says, "extensive
7  mechanical clearing" in the caption.  So am I --
8  where is that referring -- is "extensive
9  mechanical clearing" referring to any specific
10  portion of this site?
11    A.   I'm speaking generally about, you
12  know, what impresses me when I look at this
13  photograph, and I would focus, because of
14  previous photographs, in the northwest corner, in
15  the southwest corner, and in the road
16  rights-of-way.  Those were bulldozed or trackhoed
17  and then bulldozed.  That's mechanical clearing.
18    Q.   Okay.  Let's go to the next
19  photograph.  Photograph 5-18.  I'll read the
20  caption, quote, 2021, more mechanical clearing,
21  rearrangement of road network, pond locations,
22  and associated drainage swales, new fencing in
23  the south half of the site and new building
24  construction in the north center of the site.
25  North is up, end quote.

Page 103

1    Did I read that right?
2    A.   Yes, sir.
3    Q.   Is this also a photograph you got
4  from Martin County?
5    A.   Yes, it's sourced.
6    Q.   And do you know -- am I right you
7  don't know exactly when in 2021 this photograph
8  was taken?
9    A.   That's correct, Martin County does
10  not provide that.
11    Q.   Would you agree with me that the
12  primary difference shown in this photograph
13  compared to the prior one is that many of the
14  trees have been cut down?
15    A.   No, that's not alone.  The road
16  network has been manipulated.  The swale
17  connection from the depressional thin wetland in
18  the southeast central portion is directed to the
19  pond.  I think there's a couple of new buildings.
20  Those things are also going on.
21    Q.   Okay.  Then on the last -- maybe
22  it's not the last.  The next photograph,
23  Photograph 5-19, quote, "November 29, 2021,
24  developed conditions."
25    Did you write that caption?

Page 104

1    A.   Yes.
2    Q.   So this is a photograph taken on
3  November 29, 2021?
4    A.   Yes, in the portal, Martin County
5  has what they call "Pictometry."  You see that on
6  the source, and that's where I got this photo.
7    Q.   Okay.  Does this represent
8  conditions on the site approximately when you
9  visited and did your site inspections?
10    A.   Approximately.  There's a lot of
11  activity on that site, small things change all
12  the time, but the basic geometry of what is out
13  there now is shown here.
14    Q.   By the way, if I look at this
15  photograph, am I right that the boundaries of the
16  site are generally depicted by the square
17  perimeter road?
18    A.   Yes.
19    Q.   So if I go to the right-hand side,
20  I see that there's -- I see the perimeter road,
21  but I also see grass to the right of the road.
22  Do you see that?
23    A.   I see grass and trees.
24    Q.   Okay.  And that's -- that's not the
25  site, that's the property to the east, correct?



LYNDON LEE, PHD
USA V SHARFI

May 04, 2022
105–108

Page 105

1    A.   I think so.  There's a fence line on
2  the eastern perimeter of that road.
3    Q.   Am I right that there's similar
4  grassy areas and areas of trees on the property
5  east of the site?
6    A.   Yeah, it's been grazed quite a lot
7  and cleared, but it's generally the same.
8    Q.   Okay.  Do you know -- do you know
9  when -- when that site was made to look the way
10  it does now?
11    A.   Sorry, what is the antecedent to
12  that?
13    Q.   Well -- okay.  Well, I'm not
14  understanding.  Let me ask it again.
15    Do you know when the property east
16  of the site was made to look the way it looks
17  today, you know, with the grass there and the
18  fences and the buildings and things like that?
19    A.   It didn't happen all at once.
20  If you look at the chronosequence of photographs,
21  it started in what appears to be the '60s,
22  there's a dwelling there with a compound, and
23  then they expand.  In the early 2000s there's
24  more activity, and they kind of increment into
25  the condition that exists today.

Page 106

1    Q.   Would you agree with me that if you
2  look at the older aerial photographs in your
3  sequence back from the 1950s, that property to
4  the east of the site looks very similar to the
5  site?
6    MR. DOYLE:  Objection, vague.
7    THE WITNESS:  No, it was cleared
8    earlier.  For example, pre-2018 this Sharfi
9    site still existed as a mosaic of forested
10    scrub/shrub, whereas the eastern parcel
11    that we're talking about had experienced a
12    great deal of clearing, grazing, housing
13    construction, things like that.
14  BY MR. MCALILEY:
15    Q.   Hold on.  I'm going back to 1966,
16  which I think is the earliest photographs in the
17  sequence.  You would agree with me that the
18  area -- the property east of the site looks
19  pretty similar to the site itself, at least in
20  that time, right?
21    A.   In '66, yeah.  The entire area was
22  clear-cut and, as we discussed, I think it was
23  grazed and there was some, what we think is
24  citrus production going on.
25    Q.   And it's your -- it's your opinion

Page 107

1  that most of what you're referring to as the
2  Countess Joy property today is a wetland, right?
3    A.   Much of it is, yes.
4    Q.   And you think that most of the site
5  here of the defendants' was a wetland at the time
6  that he purchased it, right?
7    A.   I think at least 5.97 acres of
8  it was.
9    Q.   And so you would agree with me that
10  the property to the east likely was a wetland,
11  too, at some point in the past, right?
12    MR. DOYLE:  Objection, vague.
13    THE WITNESS:  I don't know.  I don't
14    know.  I haven't looked at it.
15  BY MR. MCALILEY:
16    Q.   Okay.  You never -- you never went
17  to look at that property, right?
18    A.   I looked over the fence standing on
19  Mr. Sharfi's road, and I looked east across the
20  fence, but I never went on the property, I didn't
21  inspect it.
22    Q.   Do you know whether the property
23  owners to the east ever got a permit from the
24  Army Corps of Engineers to do work on wetlands on
25  that property?

Page 108

1    A.   No, sir.
2    Q.   How about the property immediately
3  to the west where the greenhouses are, do you
4  know whether that property owner ever got permits
5  from the U.S. Army Corps of Engineers to do work
6  in wetlands?
7    A.   No.
8    Q.   Did you ever go on the property
9  immediately to the west?
10    A.   I walked across the top of it when
11  we were on the Countess Joy East, and basically
12  just north of the northwest corner of the Sharfi
13  property, but I didn't go on it.  I didn't want
14  to trespass.
15    Q.   Did you ever -- did you ever do any
16  investigations on either the property immediately
17  west or east of the site to see whether there was
18  evidence that fill had been placed there on top
19  of wetlands in the past?
20    A.   No.
21    MR. MCALILEY:  All right.  Dr. Lee,
22    I think we got to the last photograph in
23    Deposition Exhibit No. 81, and this would
24    seem to be a logical breaking point, so
25    would you be up for a short break?



LYNDON LEE, PHD
USA V SHARFI

May 04, 2022
109–112

Page 109

1    THE WITNESS:  Sure.
2        MR. MCALILEY:  Great.  What's your
3    pleasure, five minutes?  You want to do a
4    little bit more?
5        THE WITNESS:  I would like to visit
6    the restroom, so I would like more like
7    ten.
8        MR. MCALILEY:  All right.  Ten
9    minutes.  So if it works for everybody
10    else, why don't we pick up at 1:15 Eastern.
11        MR. DOYLE:  Thank you.
12        THE VIDEOGRAPHER:  We're going off
13    video record, 11:05 a.m.
14        Did I say 11:05?  Sorry, I meant
15    1:05.
16        (Thereupon, a break was taken.)
17        THE VIDEOGRAPHER:  We are --
18    BY MR. MCALILEY:
19    Q.   Just one quick question about your
20    resume, your CV.  You listed all the cases where
21    you provided expert services to the Government in
22    wetlands cases, right?
23    A.   Yes, sir.
24    Q.   Did you ever work on the second
25    case?

Page 110

1    A.   No.
2    Q.   Just curious.  Okay.  What I'd like
3    to do is go, now, back to Deposition Exhibit 72,
4    which is the report, and I'd like to go back to
5    the next section of the report that I believe
6    that -- that you wrote.  So as I go to the next
7    section of the report, going down, it looks like
8    it's Section III.F, Faunal Support.  So let me go
9    there.  I'm sorry, maybe it's -- I'm sorry,
10    it's -- I'm sorry, it is III.F, Faunal Support.
11        Okay.  So I'm now on page -- at the
12    bottom of Page 13 of the report, Section III.F,
13    Faunal Support/Habitat Overview, Reference Areas,
14    and Site.
15        Can you see that?
16    A.   Yes, sir.
17    Q.   Is this the next section of the
18    report that you wrote?
19    A.   I believe so.
20    Q.   So let me -- am I right that you're
21    going to testify about the topics addressed in
22    this section of the report?
23    A.   Yes.
24    Q.   So let me start out with subsection
25    1, Reference Areas, and read the first sentence.

Page 111

1    It says, quote, Section I.C.2 of this expert
2    report presents the USFWS website list of faunal
3    species, e.g., mammals, bird, reptiles, and
4    insects, and plants species that have been
5    documented to occur in the vicinity of the
6    reference areas and the site, end quote.
7        Did I read that right?
8    A.   Yes, sir.
9        MR. DOYLE:  Objection.  Minor note,
10    but you said Section 1, Mr. McAliley, and
11    it says "Section II."
12        MR. MCALILEY:  I said Section -- oh,
13    when I read it, oh, you mean, Section
14    II.C.2?
15        MR. DOYLE:  Correct, you had said
16    Section I.C.2.  Obviously you meant II.C.2,
17    but I just wanted to note that.
18        MR. MCALILEY:  So maybe this is a
19    sign I should get another cup of coffee at
20    the next break, right?
21        MR. DOYLE:  I just got some, so
22    that's probably why I'm better off right
23    now.
24        THE WITNESS:  Yes.
25    BY MR. MCALILEY:

Page 112

1    Q.   Okay.  So, Dr. Lee, am I right when
2    it says here the "reference areas," that refers
3    to the reference areas identified in the report
4    where the DOJ team went and looked at conditions,
5    right?
6    A.   Yes.
7    Q.   So that would have been -- the
8    reference areas would have been the Countess Joy
9    properties and a few other locations identified
10    in the report, correct?
11    A.   Correct.
12    Q.   So when you wrote here in that first
13    sentence of Section III.F.1 talking about species
14    that have been documented to occur in the
15    vicinity of the reference areas of the site, did
16    you mean to say they have been documented in the
17    reference areas of the site or somewhere nearby?
18    A.   The former, it's in and it's in the
19    vicinity, in the general area.
20    Q.   And when you say the general area,
21    how close were those species documented to either
22    the site or the specific reference areas
23    identified in your report?
24    A.   Well, that goes to map scale and the
25    Fish & Wildlife Service map broadly, so all



LYNDON LEE, PHD
USA V SHARFI

May 04, 2022
113—116

Page 113

1  they're saying is if you take this chunk of land
2  here, the species that we've either documented or
3  where habitat is suitable for them to occur.
4      Q.   Okay.  So this section of the report
5  refers back to a prior section of the report that
6  I think was written by another member of the
7  team.  That's Section II.C.2, so let me try going
8  there.
9          So now I'm on Page 3 of the report,
10  and can you see on your screen Section II.C.2,
11  Plant and Faunal Habitat Designations?
12      A.   Yes.
13      Q.   So this is the section of the report
14  that you were referencing in the section that
15  I just read to you?
16      A.   Yes, these are the websites that you
17  visit, standard practice, to see who's in the
18  neighborhood.
19      Q.   Okay.  So when I -- so I see in
20  section -- this is II.C.2, it says, "This site is
21  listed on the USFWS website," and it gives the
22  URL.  And am I right that this URL is for species
23  listed by current range county?
24      A.   Yes.
25      Q.   So this would be species that have

Page 114

1  been identified to exist within Martin County,
2  Florida?
3      A.   Yes, but if you go into the website,
4  depending on which scale you choose to look at,
5  they subdivide the county a bit.  It's not
6  consistent, but they do it.  So they have more
7  coastal listings, and then they have more inland
8  listings.
9      Q.   So this list of species in
10  Section II.C.2 is not just a list of species
11  somewhere in Martin County, these are -- it's
12  your testimony these are species that are in
13  areas closer to the actual site?
14      A.   Species that could potentially
15  occur, correct.
16      Q.   Okay.  But -- okay.  Species that
17  could potentially occur close to the site?
18      A.   In the vicinity of.
19      Q.   Okay.  So help me understand
20  "vicinity of."  How many miles away would you
21  consider to be in the vicinity of?
22      A.   Well, the boundaries of the mapping
23  that Wildlife did is Martin County, but I think
24  they -- they have an internal bias to segregate
25  more coastal observations from more western

Page 115

1  internal county observations.
2      Q.   Okay.  So when you wrote, though,
3  "activities in the vicinity" -- I mean, I'm
4  sorry, "species in the vicinity of the site and
5  reference areas," give me the miles radius that
6  you think counts as being in the vicinity as you
7  wrote the report?
8      A.   I would take it down, for example,
9  what I saw in the listings, to the tidally
10  influenced distal downstream end of Bessey Creek,
11  and then go to that point and go west, and the
12  lists are kind of more inland to the county
13  boundary, and then from that point east into the
14  St. Lucie estuarine system, that the species
15  necessarily change because the system changes.
16      Q.   Okay.  So you think the setting of
17  the site is anywhere west of the point where the
18  upper limit of the tidal influence of Bessey
19  Creek?
20      A.   Yeah.  Again, that's vague in the
21  context of the way the Fish & Wildlife Service
22  lists their range, but that's what I see in
23  looking at them or reading between the lines.
24      Q.   And you testified earlier that the
25  closest point to the site where Bessey Creek is

Page 116

1  tidally influenced is approximately four and a
2  half files away, right?
3      A.   I think the number was IV.3, yes.
4      Q.   Okay.  You sure?
5      A.   I think it was IV.3, right.
6      Q.   All right.  So let's go through this
7  list here.  Mammals, Florida panther.  Did any
8  member of the DOJ team see a Florida panther on
9  the site or in the reference areas?
10      A.   No.
11      Q.   Do you have any evidence that a
12  Florida panther has ever been on the site?
13      A.   No.
14      Q.   How many Florida panthers live in
15  Martin County, Florida?
16      A.   I have no idea.
17      Q.   Do any breeding female panthers live
18  in Martin County?
19      A.   I'm sorry, would you repeat the
20  question.
21      Q.   Do any breeding females live in
22  Martin County?
23      A.   I don't know.
24      Q.   Isn't it true that all -- almost all
25  remaining Florida panthers live in Southwest



LYNDON LEE, PHD
USA V SHARFI

May 04, 2022
117–120

Page 117

1  Florida in a small portion of Everglades National
2  Park in southwestern Miami-Dade County?
3      A.   I think that's the locus or centra
4  to the population, but juvenile males especially
5  will range widely.
6      Q.   Okay.  Do you have any evidence that
7  the defendants' activities on the site have
8  affected Florida panthers?
9      A.   No.
10     Q.   The next mammal is the Southeastern
11  beach mouse.  Do you see that on the list?
12     A.   Yes.
13     Q.   Am I right the Southeastern beach
14  mouse lives at the beach?
15     A.   Yeah, now, that -- there's
16  indication of the bias in the list.  I mean, that
17  is nowhere near the Sharfi property.
18     Q.   Right.
19     A.   It's just a list.
20     Q.   All right.  So this is a -- so this
21  section here, Section II -- it's Section II.C.2,
22  says on it, "Here's a list of the following
23  species that could be affected by activities on
24  the site's location."
25          So would you agree with me that you

Page 118

1  have no evidence that southeastern beach mice
2  will be affected by the defendants' activities?
3      A.   That's correct.
4      Q.   By the way, I see that bears are not
5  on the list, right?
6      A.   Yeah, they should be.
7      Q.   Okay.  But they're not on this list,
8  right?
9      A.   No, they should be.
10     Q.   Did you see any evidence of bears on
11  the site?
12     A.   No.
13     Q.   To your knowledge have bears ever
14  been on the site?
15     A.   Yes.
16     Q.   And what's the basis of that, that
17  testimony?
18     A.   I spent a good deal of my career in
19  the late '70s being a chief habitat ecologist for
20  the Interagency Grizzly Team based out of
21  Missoula, Montana.  I've done a great deal of
22  work on bears, and I was curious about bears in
23  Florida, so I read up on it.
24          There's maps of historic regions.
25  They were shot out early, but they range pretty

Page 119

1  much all over Florida.
2      Q.   There are grizzly bears in Florida?
3      A.   No, no, black bears.
4      Q.   So the range of black bears covered
5  all throughout Florida; is that right?
6      A.   Mainly in the forested sections and
7  the interior.  They tended not to use coastal
8  environments, although they did.
9      Q.   Do any bears currently live within
10  ten miles of the site?
11     A.   I don't know.  I talked to the
12  mitigation bank managers, and they've got a sign
13  that's a little bit more than ten miles, but
14  bears are in the vicinity.
15     Q.   Okay.  I see on this list here on
16  Section II.C.2 there's also a list of birds
17  you've got there?
18     A.   Yes.
19     Q.   So this section lists five types of
20  birds, right?
21     A.   Yes, five.
22     Q.   Am I right that all of the birds on
23  this list are migratory birds?
24     A.   I'm not sure about the sparrow.
25     Q.   Okay.  All the other ones are

Page 120

1  migratory birds, right?
2      A.   Yes.
3      Q.   The Florida grasshopper sparrow, is
4  that an endangered species?
5      A.   I don't think so.
6      Q.   You don't know?
7      A.   I don't know.
8      Q.   Okay.  Later on in the report you
9  have a list of the birds that you actually saw on
10  the site in the reference areas, right?
11     A.   Yes, sir.
12     Q.   So I'll hold off my bird questions
13  until later then just so we can keep moving here.
14     A.   Okay.
15     Q.   Now, I see on the list of reptiles
16  in this Section II.C.2, the reptiles included --
17  include three types of sea turtles; is that
18  right?
19     A.   That's correct.
20     Q.   Would you agree that sea turtles
21  live nowhere near the site?
22     A.   Yes.
23     Q.   Do you agree with me the activities
24  on the site are unlikely to affect the sea
25  turtles?



Page 121

1    A.   Yes.
2    Q.   I see on the list on Section II.C.2
3  the insects, and there's a reference to three
4  types of butterflies.  Did any member of the DOJ
5  team see any of these types of butterflies on the
6  site?
7    A.   No.
8    Q.   Are you aware that the Miami blue
9  butterfly's range is restricted to an island in
10  the Keys?
11    A.   No, I don't think that would be
12  correct based on the documentation from Fish &
13  Wildlife, because this is geared to Martin
14  County, so I would check that.
15    Q.   Okay.  As an aside, one of my
16  partners is president of the Miami Blue Butterfly
17  Society.  It's interesting, actually.  He has
18  great photos.
19        Okay.  The plants that are on this
20  list, am I right that the plants that are listed
21  here on II.C.2 are -- are generally beach plants?
22    A.   They're more coastal, yes.
23    Q.   Right.  Do you have any -- do you
24  have any indication that the plants on this list
25  could be affected by defendants' activities?

Page 122

1    A.   They wouldn't be affected.
2    Q.   Okay.  All right.  Let me go back
3  now to the section where we were at.  I think
4  I asked you -- just asked you about Section
5  III.F.1, and now I want to go to III.F.2.
6        This is also a section that you
7  authored, right?
8    A.   Yes.
9    Q.   And this section addresses the
10  ability of the site to support faunal species; is
11  that right?
12    A.   Yes.
13    Q.   And so when you say, "faunal
14  species," am I understanding that to be, you
15  know, anything other than plants; is that right?
16    A.   Not usually.  I mean, it doesn't
17  include fungi and bacteria and usually not
18  insects.  Usually it's -- it's a replacement for
19  the archaic term of "wildlife."
20    Q.   Okay.  And it's your opinion that
21  the site no longer supports faunal species the
22  way you believe it formerly did; is that right?
23    A.   Yes.
24    Q.   Is it your opinion that the site
25  does not support any faunal species or that

Page 123

1  it just doesn't support the faunal species that
2  lived there before the defendants' activities?
3    A.   The latter.
4    Q.   So some faunal species still use the
5  site, right?
6    A.   Yes.
7    Q.   I want to turn to the first sentence
8  here in II.D.2.  It says, "Wetlands that remain
9  on site are highly degraded."  I just skipped a
10  bunch of words in the middle just to make
11  it shorter.  Do you see where I read that?
12    A.   Yes, sir.
13    Q.   So there are wetlands that still
14  remain to the site, right?
15    A.   Yes.
16    Q.   And how many acres of wetlands still
17  remain on the site today?
18        MR. DOYLE:  Objection, vague.
19        THE WITNESS:  We did not calculate
20    that.  There are -- within the 5.97 acre,
21    if you will, polygon that we mapped as
22    wetlands, there are wetlands that remain on
23    the site that are either converted over to
24    Bahia grass lawn/turf systems or there's
25    that remaining depressional wetland that's

Page 124

1    thinned that we were discussing earlier.  I
2    don't have an area for that.
3  BY MR. MCALILEY:
4    Q.   Okay.  So there's that -- there's
5  that -- that wetland to the south -- southern
6  central portion of the site that we talked about
7  before.  Am I right that on your figures you
8  sometimes refer to that as the "remnant
9  depressional wetland"?
10    A.   Yes.
11    Q.   So I may refer to that, just for
12  ease of communication here, as that.
13  Approximately how many acres is -- well, let me
14  rephrase that.
15        Have you calculated the area of that
16  remnant depressional wetland?
17    A.   Yes, we estimated it at .79 acres,
18  I believe.
19    Q.   So do you believe there's other
20  acreage of wetlands on the site today?
21    A.   Yes.
22    Q.   And what I -- and just to be very
23  clear about it, so this would be areas, when
24  I say, "areas of wetlands on the site today,"
25  I mean areas that would meet the regulatory



LYNDON LEE, PHD
USA V SHARFI

May 04, 2022
125–128

Page 125

1  definition of "wetlands" today based on
2  investigations today, not -- not whether you
3  considered them wetland in the past, and even
4  though they're filled, you still think that
5  they're wetlands.
6       So just with that clarification, are
7  there -- there are other areas on the site that
8  still meet the definition of "wetlands" in their
9  condition today, right?
10      MR. DOYLE:  Objection, vague.
11      THE WITNESS:  Yes.
12  BY MR. MCALILEY:
13      Q.   Okay.  Is -- and do you -- do you
14  have an approximate acreage of those other
15  wetlands that exist on the site today?
16      A.   No.  That's complicated by the
17  presence of buildings and fill cast associated
18  with the buildings, pond features that were inset
19  into the -- into the surfaces that were formerly
20  wetlands.  We know the remaining degraded
21  depression is .79, but we didn't map out the
22  remaining proportion of the 5.97 acres that still
23  meets wetland criteria today.
24      Q.   Of the 5.97 acres that you believe
25  were wetlands when the defendants purchased the

Page 126

1  site, do you believe that the majority of that
2  area still meets the definition of "wetlands"
3  today?
4       MR. DOYLE:  Objection, vague.
5       THE WITNESS:  I would estimate that
6       the majority of it probably does, but those
7       are completely different wetlands now as
8       compared to before.
9  BY MR. MCALILEY:
10      Q.   Okay.  I'm not getting into the
11  type, just are they wetlands or not.  So am
12  I right with the understanding that you believe
13  much of the area on the site today that is grass
14  and horses or, I guess, fence still meets the
15  definition of a "wetland"?
16      MR. DOYLE:  Objection, vague.
17      THE WITNESS:  A lot of it does.  I
18      don't know the exact area.
19  BY MR. MCALILEY:
20      Q.   And what do you mean by "degraded"?
21      A.   In the context of faunal support
22  habitat section of this report, I'm talking about
23  changes or departures from the structure and
24  composition in food and cover resources that
25  would support faunal species.  For example,

Page 127

1  horizontal complexity or vertical complexity, the
2  number of layers or the ability of the site to
3  produce food resources that would support a suite
4  of faunal species.
5       In a larger sense, speaking from an
6  ecosystems perspective, I'm talking about changes
7  or departures in function from hydrologic,
8  geochemical plant community and faunal
9  support/habitat functions that are less than what
10  that particular site could offer people, faunal
11  species, et cetera, in functioning correctly.
12      Q.   So in section -- I guess we're in
13  II.F.2, let me go to the next sentence here.
14  It says, quote, They are mostly dominated by a
15  paspalum, Bahia grass, turf/pasture plant
16  community and paddock/barnyard areas, end quote.
17      Do you see where I read that?
18      A.   Yes.
19      Q.   So is it your opinion that a turf
20  pasture community provides no habitat for faunal
21  species?
22      A.   No.
23      Q.   So that -- those areas do provide
24  habitat for faunal species, right?
25      A.   Yeah, but it's junk.

Page 128

1       Q.   What do you mean it's junk, junk
2  species?
3       A.   Junk habitat.  It's wide open, it's
4  fenced, it doesn't have any vertical or
5  horizontal structure, it provides virtually no
6  production of food for native faunal species, et
7  cetera.
8       Q.   Okay.  So a pasture on a farm
9  provides junk habitat for faunal species?
10      A.   For native faunal species, that's
11  often the case, unless there's edge-adaptive
12  opportunistic species that like open pastures.
13      Q.   Can you give me an example of an
14  edge-adaptive opportunistic species?
15      A.   A coyote.
16      Q.   Anything else?
17      A.   A cowbird.
18      Q.   I'm sorry, say that again?
19      A.   A cowbird.
20      Q.   A cowbird?
21      A.   Yeah, C-O-W-B-I-R-D.  They're nest
22  predators that live in all sorts of landscape,
23  but they often do well in open pasturelands
24  associated with cows.
25      Q.   Any other examples you can give me



LYNDON LEE, PHD
USA V SHARFI

May 04, 2022
129–132

Page 129

1  of edge-adaptive opportunistic species?
2      A.   Well, there are -- I thought there
3  were signs of either coyotes or feral dogs.  I
4  couldn't tell.  There were scat samples that
5  I observed in the vicinity, not on the site, but
6  north in Countess Joy.
7          So in addition to coyotes, feral
8  dogs would be edge adaptive.  The same with feral
9  cats, if any exist.  You have other types of
10  birds that are adaptive to the open grapples,
11  black birds, and then you move up and you can
12  look at hunting birds, raptors like owls and
13  hawks and eagles.  They are very efficient at
14  using edge in order to pick off prey.
15     Q.   So the site as it's been modified
16  could be habitat for raptors, owls, hawks, and
17  eagles?
18     A.   I don't think so.  They might pass
19  over it, but it's pretty low in productivity
20  unless they can pick off a domestic animal or
21  something.
22     Q.   Okay.  So you saw signs of coyotes
23  near the site; is that right?
24     A.   North of the site.  I saw tracks and
25  scat.  I wasn't sure if the scat was a coyote or

Page 130

1  feral dog.  That's impossible to tell given what
2  they were eating, it would have been the same
3  diet.
4      Q.   So if it was north of the site,
5  it would have been on the Countess Joy property?
6      A.   Yes, sir.
7      Q.   Would you agree with me that the
8  wetlands on the Countess Joy property also are
9  degraded from their natural condition?
10     A.   Somewhat, yes.
11     Q.   So is it your opinion that the site
12  no longer has the features necessary to support
13  wildlife that exists in the reference areas?
14     A.   I'm sorry, could you repeat that
15  question again, especially the last part.
16     Q.   I'm sorry, I apologize.  Is it your
17  opinion that the site no longer has the features
18  necessary to support wildlife that is in the
19  reference areas?
20     A.   Yes, the majority because it's
21  simplified and cleared.
22     Q.   What wildlife formerly used the site
23  that no longer uses it today?
24         MR. DOYLE:  Objection, vague.
25         THE WITNESS:  I don't have direct

Page 131

1      observation of former utilization.  I don't
2      have that benefit, but to begin with, the
3      site is fenced.  So, for example, a coyote
4      would have to climb the fence -- fences,
5      which are well done, in order to get onto
6      the site.
7          Similar, terrestrial species that
8      are ground based would have to do the same
9      thing.  So those are effectively precluded
10     unless they go under the fence or jump over
11     it.  So really the list truncates to
12     species native or nonnative that can fly in
13     and perch on whatever buildings or existing
14     structure is still there.
15  BY MR. MCALILEY:
16     Q.   So I asked you a little while ago
17  before our break about the properties located
18  immediately east and west of the site.  Do you
19  remember those questions?
20     A.   Yes, sir.
21     Q.   And you -- am I right that those
22  properties also lack the features that support
23  faunal species that exist in the reference areas?
24         MR. DOYLE:  Objection, vague.
25         THE WITNESS:  Yeah, I was going to

Page 132

1      answer to the vagueness.  Let me parse that
2      answer, please.  To the west where the
3      greenhouses are, that's really dense and
4      it's industrial, and, you know, a coyote
5      would walk through there and look for
6      something or a feral dog or cat, birds
7      would fly in and look around, but
8      effectively that's a commercial operation
9      that's not going to support wildlife.
10         The eastern parcel that you
11     addressed is different.  It's a farm, a
12     farmette, if you will, and it has some
13     forest and scrub/shrub areas, it's got some
14     open pasture, and it's more forgiving,
15     if you will, to use -- utilization by
16     several classes of native and nonnative
17     faunal species.
18  BY MR. MCALILEY:
19     Q.   So why is it more forgiving, because
20  there's no plants there?
21     A.   Yeah, and the fences aren't tight.
22  There's -- there's a mosaic of forest,
23  scrub/shrub, and pasture in addition to the
24  dwellings and building complexes, so species,
25  especially nocturnal species, would investigate



LYNDON LEE, PHD
USA V SHARFI

May 04, 2022
133–136

Page 133

1 that and use it as possible.
2    Q.   All right.  Let me go to what
3 I think is the next section for you, which is
4 Section IV.B -- I'm sorry, IV.B.2.D, which is on
5 Page 23.  So I'm on Page 23 of the report.  Can
6 you see that?
7    A.   Yes.
8    Q.   Okay.  IV.B.2.D, this is the
9 Reference Area Study Methods, Faunal
10 Support/Habitat.  So this is a section of the
11 report that you wrote, right?
12    A.   Yes, this is methods, correct?
13    Q.   Yes.
14    A.   Okay.
15    Q.   Okay.  So the -- so the second
16 sentence -- the second paragraph says, quote,
17 Field work in reference areas provided
18 opportunities to directly observe faunal species
19 using various types of habitat or observe signs,
20 e.g., tracks, nest, rugs, scat, of various
21 species in the vicinity.  In particular
22 observations of several classes of faunal species
23 and their activities in the reference areas were
24 recorded, end quote.
25        Did I read that right?

Page 134

1    A.   Yes.
2    Q.   So -- so is there a list in the
3 report of the faunal species that you all
4 observed in the reference areas?
5    A.   We have an error there.  There was
6 and yet the initial -- the efforts to assemble
7 this report in Athens at Dr. Nutter's shop, but
8 unfortunately that list did not make it into
9 the -- into the upload.  I noticed that yesterday
10 in going through the report.
11        That list was compiled by myself and
12 Mr. Wylie, Dr. Rains, and basically I went around
13 to the team members and said, look, I'm only here
14 a short time, what have you seen, and we tried to
15 capture that.  The list exists.  We made an
16 error, because we did not incorporate it in the
17 version of the expert report that's before us
18 today.
19    Q.   Can you tell me the mammals that the
20 members of the team saw in the reference areas?
21    A.   Deer, feral dogs, felines, coyotes,
22 I think that's about it.
23    Q.   How about reptiles?
24    A.   I don't think we saw small critters
25 like raccoons or things like that.  We had some

Page 135

1 signs that I thought was raccoon, but I wasn't
2 sure.
3    Q.   Okay.  How about reptiles, what
4 reptiles did you observe in the reference areas?
5    A.   I think Mr. Wylie saw a gator.
6 We certainly saw a track and slides up by the
7 sanitation facility north of the site.  I saw
8 lots of different types of frogs and -- adult and
9 juvenile, so tadpoles and stuff.  I saw a garter
10 snake, a black garter snake.  I didn't see any
11 salamanders.  That's about it.  So frogs, snakes,
12 and crocs -- I mean crocs.
13    Q.   You said crocs --
14    A.   I meant alligators, sorry.
15    Q.   Right.  Crocodiles don't live in
16 freshwater areas, right?
17    A.   No, that's not true.
18    Q.   Okay.  There's Florida crocodiles
19 that live in exclusive freshwater areas?
20    A.   Well, in Florida most of -- most of
21 the crocodiles that do exist are in salt, but
22 worldwide crocodiles do exist in freshwater and
23 do.
24    Q.   When I talk -- when I talk about
25 species, I'm not talking about species in other

Page 136

1 countries or Nile crocodiles or anything, but the
2 American crocodile that lives in Florida doesn't
3 live in freshwater or at least it doesn't live
4 exclusively in freshwater, right?
5    A.   Yeah, so I was going to say it lives
6 across that gradient from salt to
7 tidally-influenced brackish, and then they kind
8 of cut out.
9    Q.   Do any American crocodiles live in
10 Martin County, Florida?
11    A.   I don't know.
12    Q.   So you mentioned that -- you think
13 Mr. Wylie saw an alligator.  Where exactly did
14 he see the alligator?
15    A.   I think it was north in the vicinity
16 of the reference site that we had by the fishing
17 facility.
18    Q.   I see.  So the alligator was up by
19 the Martin County Landfill, that reference site?
20    A.   Yeah, and actually we were briefed
21 by the gal that let us into the property that
22 there was a large alligator in the vicinity, sort
23 of a pet, and, you know, to watch out for it, and
24 we saw evidence that he or she was certainly in
25 the neighborhood.



LYNDON LEE, PHD
USA V SHARFI

May 04, 2022
137–140

Page 137

1    Q.   Did you see any alligators in the
2  east/west ditch?
3    A.   No, I did not.
4    Q.   Did you see any in the north/south
5  ditch?
6    A.   No.
7    Q.   Okay.  You know, there's also a list
8  of birds that you all sighted that's later in the
9  report, so let me just -- I'll save that for
10  later.
11    A.   Okay.
12    Q.   How much fish?  What kind of fish
13  did you see?
14    A.   I saw some Centrarchidaes, catfish,
15  and gambusia.
16    Q.   Okay.  So where exactly did you see
17  the fish?  Were those in the east/west ditch?
18    A.   No, it was in the main stem of
19  Bessey Creek, and I saw the gambusia at 84
20  crossing of Bessey Creek to the north and west of
21  the site.  That's -- what do you call it --
22  mosquito fish, gambusia, okay, which is common.
23  I saw a sunfish flash downgradient at one of the
24  bridge crossings downstream and east of the site,
25  and in the tidal portions, I was standing on the

Page 138

1  bridge, and I think we were looking at mullet,
2  but I wasn't sure.  The water was turbulent.
3    Q.   Okay.  So let me break this thing
4  down.  I'm just trying to get a sense of a little
5  bit greater precision of where the fish were
6  sighted.  So the gambusia or mosquito fish, you
7  saw that where 84th Avenue crosses over what I'm
8  referring to as the east/west ditch?
9    A.   Yeah.
10    Q.   And then you mentioned the
11  Centrarchidaes and catfish, you said you saw at
12  the main stem of Bessey Creek?
13    A.   Yes, a Centrarchidae is a sunfish.
14  It basically flashed, I think that's what I had,
15  and a catfish was downstream at one of the road
16  crossings.
17    Q.   So when you say the main stem of
18  Bessey Creek, are you referring to the area east
19  of the Florida Turnpike further east of the site?
20    A.   No, I'm referring to what you're
21  calling the east/west ditch.  That's part of the
22  main stem system of Bessey Creek.
23    Q.   Okay.  So where -- so that east/west
24  ditch extends for several miles, right?
25    A.   Yes.

Page 139

1    Q.   So where -- where on the east/west
2  ditch did you see these fish, the sunfish?
3    A.   The sunfish flashed in the general
4  vicinity of the water treatment plant, that road
5  crossing.  I can't remember the name of it, but
6  I remember the fish.  One bridge down from that,
7  I think I saw a catfish flash, and then
8  downstream from that at the bridge crossing where
9  the mangroves occur, I saw -- I saw a mullet.
10    Q.   Okay.  So these were all locations
11  that were a few miles further east from the site,
12  right?
13    A.   Yes.
14    Q.   Okay.  And you refer to the tidal
15  portion of the creek you thought you might have
16  seen a mullet.  That would have been that
17  location that you went to where the road crossed
18  over Bessey Creek that you didn't remember the
19  name of the road?
20    A.   Yes.
21    Q.   That was the upper limit of the
22  tidal area?
23    A.   Yeah, you and Mr. Wylie discussed
24  it.  I just -- I'm old, and I can't remember the
25  name of the road, sorry.  I was standing there

Page 140

1  looking at it, and I have photos -- photos of it.
2    Q.   Okay.  Let's go to the -- let's go
3  to the -- down further here in the report.  Okay.
4  So now I'm on the bottom of Page 26.  So this is
5  the section of the report, and just to get the
6  numbering right, this is Section 4 -- let's see,
7  IV.B.3.D, Faunal Support/Habitat.  This is a
8  section that you wrote as well?
9    A.   Yes.
10    Q.   So am I right that basically this
11  section describes that you did the same things on
12  the site in terms of identifying faunal species
13  that you did in the reference areas?
14    A.   The approach is the same.  You have
15  to adapt that approach to the conditions that
16  you're actually in cleared fill versus forest and
17  scrub/shrub intact, but, generally speaking, the
18  approach is the same, yes.
19    Q.   What fauna did you see on the site
20  when you did your site visits?
21    A.   I saw birds.  There were gulls that
22  were utilizing pond margins.  I saw a duck.
23  There were various pasturing perching birds were
24  using some of the trees in the degraded remaining
25  forested area or he's got this kind of garden of



LYNDON LEE, PHD
USA V SHARFI

May 04, 2022
141-144

Page 141

1  Cypress going on that they were flooding in
2  there.
3          I watched a hawk pass over the site.
4  I think I saw a crow.  That's about it.
5      Q.   Okay.  Thank you.  So I think the
6  next section that you've written is you start to
7  get into Section IV.C.  It's in Section IV.C.  It
8  looks like you've written some of these sections
9  with Mr. Wylie.  So why don't we go to IV.C.1,
10 which is here on the screen.  I think we're on
11 Page 27.
12     A.   Okay.
13     Q.   And it's entitled, Reference
14 Materials and Procedures Related to the Clean
15 Water Act and Regulations.  Do you see that?
16     A.   Yes.
17     Q.   So am I right that this section of
18 the report simply lists the reference materials
19 and procedures that you all followed related to
20 your work?
21     A.   Yeah, these are standard background
22 documents that one would call up as you begin to
23 look at a site and look at wetlands on a site.
24     Q.   The second sentence here says,
25 quote, "To accomplish this phase of work, we

Page 142

1  considered and relied upon the following standard
2  definitions, manuals, guidance, and mapping
3  products related to the Clean Water Act and U.S.
4  Environmental Protection Agency, and USACE
5  regulations."
6          Did I read that right?
7      A.   Yes.
8      Q.   You all relied upon these materials
9  that you've listed here?
10     A.   Yes, they provide definitions,
11 protocols, et cetera.
12     Q.   And so you're a co-author of this,
13 but I assume that this section was listing, you
14 know, manuals or guidance or products that other
15 members of the team were using as well, right?
16     A.   Yes, everybody's aware of them, but
17 I think that Mr. Wylie and I probably have a
18 deeper understanding or familiarity with them.
19     Q.   Okay.  Are there any -- are there
20 any of these reference materials in particular
21 that you relied upon in developing your opinions?
22     A.   Can you scroll for me so I can see
23 the list.  Thank you.
24     Q.   I can stop if you want, I can speed
25 up.  You tell me.

Page 143

1      A.   Well, the delineation manual, of
2  course, is always in the background.
3      Q.   That's the 1987 Corps Manual
4  Wetlands --
5      A.   Yeah, Item 5.  And National Wetlands
6  Inventory, the Hydrology Graphic Database,
7  I glanced at that.  I will use the NWI maps to do
8  some of the functional assessment.
9          Can you scroll up, please.
10     Q.   Absolutely.  Scroll up or scroll
11 down?
12     A.   Oh, either way.  Definitions of the
13 Waters of the United States are always in the
14 background.  Scroll down, please.
15     Q.   Okay.
16     A.   Is 9 the last one?  Keep going.
17     Q.   Oh, it keeps going.  That's why I'm
18 asking you this way instead of asking you about
19 all of them.
20     A.   Right, right.  That old RGL, the
21 Definition of Normal Circumstances, is always in
22 the background.  The Items 11 and 12, those are
23 kind of twins, and 13.  Also Item 15, ordinary
24 watermark.  Regional supplement is in the
25 background always.  Keep scrolling, please.  Oh,

Page 144

1  I looked at Florida Land Use Cover for some of
2  the functional assessment stuff.  Dr. Rains and I
3  did that.  Keep scrolling.  That's about it.
4      Q.   Okay.  I may go back to some of
5  these reference documents as we get into your
6  sections, but just to keep moving, I'm going to
7  the next section here.
8      A.   Let me please interrupt.  I forgot
9  to mention that also playing in the background
10 are the hydric soil definitions and soil-related
11 articles that are on that list.
12     Q.   Okay.  Thank you.  Let's go to
13 section -- now we're at IV.C.2.  This is a
14 section that the table of contents of the report
15 indicates that it has Mike Wylie's initials first
16 followed by your initials.  So this is one you
17 were a secondary author on this section; am
18 I right?
19     A.   Yes, he put out the initial
20 paragraph, and in my role as sort of the general
21 editor, I worked this section over with him
22 fairly rigorously so that we got it right and
23 we're explaining our rationale, which is your
24 obligation when you choose to take an atypical
25 approach under the 1987 Corps Manual protocols.



LYNDON LEE, PHD
USA V SHARFI

May 04, 2022
145–148

Page 145

1    Q.   So are you going to be testifying at
2    the trial about the subject matter that's in this
3    section or is that going to be something that
4    Mr. Wylie is going to cover?
5        A.   If asked, I could testify to this.
6        Q.   All right.  Well, let's go through
7    it, then.  The first sentence says, quote, Based
8    upon guidance provided in the manual and regional
9    supplement and in Regulatory Guidance Letters
10   82-2, 86-9, and 90-7, wetlands that have been
11   disturbed through natural and/or anthropogenic
12   alterations of hydrology, soils, and/or
13   vegetation do not necessarily exist under normal
14   circumstances, end quote.
15            Did I read that right?
16       A.   Yes, sir.
17       Q.   So when -- in that sentence the word
18   "manual" refers to the Corps of Engineers 1987
19   Wetlands Manual?
20       A.   Yes, I think we set that protocol
21   higher in the document, so that's a convention of
22   nomenclature in the document.
23       Q.   And the regional supplement is the
24   2010 regional supplement for the manual that
25   covers the South Atlantic and Gulf Coast regions?

Page 146

1        A.   Yes, and same narrative with respect
2    to our naming conventions.  I think we called
3    it prior in the document and there you have it.
4        Q.   Can you explain to me what a
5    Regulatory Guidance letter is?
6        A.   They're spun out by the Corps, the
7    chief engineer, and they basically are guidance
8    documents that the Corps issues in order to steer
9    their field staff, operations staff, in doing
10   their job, and so stuff comes up about what is
11   normal circumstances or normal farming or what is
12   a farm pond or how do we do this, and the RGLs
13   are spun out in an attempt to address issues that
14   come up.
15            And the three before you are
16   targeted towards how to identify and consistently
17   apply an interpretation of normal circumstances.
18       Q.   When you say "regals" a minute ago,
19   I am right you're referring to R-G-Ls?
20       A.   Sorry, yes, sir.  Yes, sorry.
21       Q.   I'm saying that for Mr. Haas on the
22   record, for the transcript.
23            Okay.  So am I right that based on
24   this sentence, you relied on those three
25   Regulatory Guidance Letters in developing your

Page 147

1    opinions?
2        A.   We did.  I have to note they're
3    probably expired, but the RGLs have a track
4    history, and I've been in this business long
5    enough that I remember them, and so they serve,
6    even if they're outdated, they serve as sort of
7    an online real-time interpretation of regulatory
8    issues that are proffered by the Corps.
9        Q.   So am I right that Regulatory
10   Guidance Letters typically have a term of time
11   that they're -- that they're in effect?
12       A.   Yeah, they stipulate some sort of
13   expiration date in the headers.
14       Q.   And the expiration dates are
15   typically within a year or two of the date of the
16   document, right?
17       A.   Yeah, sometimes for five, but that's
18   about it.
19       Q.   So for instance RGL 82-2 expired in
20   December of 1984, correct?
21           MR. DOYLE:  Objection.
22           THE WITNESS:  I'm not sure when
23       it expired, I'm sorry, but that's old, '82,
24       my goodness.
25           (Thereupon, Exhibit No. 105 was

Page 148

1        marked for identification.)
2    BY MR. MCALILEY:
3        Q.   Okay.  Let's look at it.
4        A.   I lost your -- okay, you're changing
5    documents.
6        Q.   I'm showing you a document, I'm
7    going to show you what I'm going to label as
8    Exhibit No. 105.
9        A.   There you go.  Expired 12/31/84.
10       Q.   This is Regulatory Guidance Letter
11   82-02, for the record?  Dr. Lee, I'm just saying
12   this for the record.  So just for the record,
13   this is Regulatory Guidance Letter 82-02, right?
14       A.   Yes, I'm sorry, I didn't understand
15   that I was supposed to respond to that.
16       Q.   Okay.  Let me exit out of this.
17           Am I right that Regulatory Guidance
18   Letter 86-9 expired sometime in the '80s?
19       A.   Yes.
20           MR. DOYLE:  Objection, vague.
21           THE WITNESS:  I read the expiration
22       date a couple of responses back.
23   BY MR. MCALILEY:
24       Q.   Right, and Regulatory Guidance
25   Letter 90-7 expired sometime in the -- sometime



Page 149

1  in the early 1990s; isn't that right?
2       MR. DOYLE:  Same objection.
3       THE WITNESS:  That would be logical,
4   but we'd have to check the header to make
5   sure.  I know it's expired, I don't know
6   exactly when.
7  BY MR. MCALILEY:
8       Q.   I'm going to put up on the screen
9  what I'm marking as Exhibit 106.
10          (Thereupon, Exhibit No. 106  was
11     marked for identification.)
12  BY MR. MCALILEY:
13      Q.   Is this a correct copy of Regulatory
14  Guidance Letter 90-07?
15      A.   It appears to be the header for it,
16  yes, sir.
17      Q.   It's a short RGL.  It's three pages,
18  right?
19      A.   Yes.
20      Q.   Okay.  And you see it says at the
21  bottom in Paragraph 7, "This guidance expires 31
22  December 1993 unless sooner revised or
23  rescinded"?
24      A.   I see that.
25      Q.   Let me exit out of this.  Are you

Page 150

1  aware that the Army Corps of Engineers has
2  identified old expired Regulatory Guidance
3  Letters that are no longer applicable?
4       MR. DOYLE:  Objection, vague.
5       THE WITNESS:  I'm aware of it,
6   because they published the expiration
7   dates.
8  BY MR. MCALILEY:
9       Q.   Okay.  But are you aware that the
10  Army Corps of Engineers identified which old RGLs
11  can be relied upon and which should not?
12      MR. DOYLE:  Objection, vague.
13      THE WITNESS:  The OCE, the Office of
14   the Chief Engineer -- the Office of Chief
15   Engineer, OCE, has issued instructions
16   about the applicability of RGLs from time
17   to time, and then also divisions or
18   districts will offer guidance as to which
19   RGLs we should pay attention to from time
20   to time.  So it varies nationally.
21          (Thereupon, Exhibit No. 107 was
22     marked for identification.)
23  BY MR. MCALILEY:
24      Q.   I'm going to show you what I'm
25  marking as Exhibit No. 107.  Can you see

Page 151

1  Regulatory Guidance Letter No. 05-06, dated
2  7 December 2005?
3       A.   Yes, sir.
4       Q.   And you see the subject is Expired
5  Regulatory Guidance Letters?
6       A.   Yes.
7       Q.   Have you ever seen this before?
8       A.   In passing, yes.
9       Q.   Okay.  I'm going to go down here.
10  I'm going to go down to Paragraph 3-B.  It says,
11  quote, The expired RGLs that continue to be
12  generally applicable to the Corps regulatory
13  program are listed in the two-page attachment,
14  any expired RGL not listed is considered
15  inappropriate for current program execution, end
16  quote.  Do you see that?
17      A.   Yes.
18      Q.   Did I read it right?
19      A.   Yes.
20      Q.   Okay.  I just want to scroll down
21  here to the attachment.  Do you see the
22  attachment there to RGL --
23      A.   Yes.
24      Q.   Okay.  Do you see that on the list
25  RGL 82-02 is not on the list?  I'll scroll down

Page 152

1  to the years.
2       A.   Yeah, I don't see it on the list.
3       Q.   Right, and you see that RGL
4  90 -- I think it's 90-07 is not on the list?
5       A.   I can't see it on the list.  I don't
6  think I saw it.
7       Q.   We're at the top here, so it's --
8  and I'll just represent to you the earliest RGLs
9  on the list are at the top, and it goes down by
10  year.
11      A.   Okay.  Okay.
12      Q.   So you see, and I'll zoom in and
13  make it a little bit clearer, a little bigger
14  there.
15      A.   A little bigger.  Thank you.
16      Q.   In the '90s, there's no 90-07?
17      A.   That's right.
18      Q.   Right, so according to the Corps of
19  Engineers guidance, those should not be used,
20  right?
21      A.   Yes.
22      Q.   All right.  I'll get out of this
23  document and during a break, I'll send these
24  documents to you.
25          Let's go back to the report.  Do you



LYNDON LEE, PHD
USA V SHARFI

May 04, 2022
153–156

Page 153

1  see Exhibit No. 72 back on the screen, Dr. Lee?
2      A.   Yes.
3      Q.   I'm back on Section IV.C.2.  So
4  I want to go down to a sentence next to the last
5  sentence.  It says, quote, Due to the combination
6  of site disturbances and their effects on current
7  hydrologic soil and vegetation conditions on the
8  site, the DOJ technical team chose to delineate
9  wetlands using an atypical approach as
10  articulated in the manual, end quote.
11          Do you see that?
12     A.   Yes.
13     Q.   So there's a section of the 1987
14  Wetland Manual that addresses wetland
15  delineations with atypical situations, right?
16     A.   Yes.
17     Q.   And you use that atypical situations
18  section of the manual to delineate wetlands on
19  the site, right?
20     A.   Yes, it guided our approach.
21     Q.   Right.  In fact -- in fact, the 1987
22  Wetland Manual is a rule, you're required to
23  follow this for determining wetlands under the
24  Clean Water Act, aren't you?
25          MR. DOYLE:  Objection, vague.

Page 154

1          THE WITNESS:  Yes, you're required
2      to use it in addition and in combination
3      with the appropriate regional supplement.
4  BY MR. MCALILEY:
5      Q.   Okay.  What I'd like to do now is
6  I want to -- well, before I do that, let me just
7  ask you, am I right that the wetland -- 1987
8  Wetland Manual provides that the atypical
9  situations method should only be used when a
10  determination has been made that positive
11  indicators of hydrophytic vegetation, hydric
12  soils, and/or wetland hydrology cannot be found
13  due to the effects of human activities or natural
14  events?
15         MR. DOYLE:  Objection, vague.
16         THE WITNESS:  I don't know where
17     you're reading that from.  I don't have
18     that section memorized in the '87 manual.
19     The underlying logic that you put out there
20     is correct.
21  BY MR. MCALILEY:
22     Q.   Okay.  I'll just say that I was
23  reading a quote from the manual.  I'm just trying
24  to avoid creating another exhibit here which will
25  slow us down.

Page 155

1      A.   Okay.
2      Q.   So, basically, if I want to
3  understand the atypical situations section of the
4  manual, you only use those sections if positive
5  indicators of the three characteristics of a
6  wetland cannot be found due to the effects of
7  recent human activities or natural events, right?
8      A.   That's a fair statement.
9      Q.   So you and the rest of the team
10  visited the site in 2021, right?
11     A.   Yes.
12     Q.   So you were never on the site prior
13  to the fall of '21, were you?
14     A.   I was not.
15     Q.   And when you went to the site, is it
16  your testimony that the DOJ team did not find
17  positive indicators of hydrophytic vegetation,
18  hydric soils, or wetland hydrology?
19     A.   They did, however, what they saw was
20  completely different as a result of mechanical
21  clearing, earthwork, redistribution of soils,
22  import/export of soils, all the things that were
23  going on on that site, and that's a classic setup
24  that calls for an atypical situation.
25     Q.   Hold on a minute.  The manual says

Page 156

1  you only use the atypical situation section of
2  the manual if you cannot find the indicators of
3  hydrophytic vegetation, hydric soils, and/or
4  wetland hydrology, right?
5          MR. DOYLE:  Objection, best evidence
6      rule.
7          THE WITNESS:  The issue is that you
8      have to retrodict what used to occur if you
9      have significant --
10         THE COURT REPORTER:  I"m sorry,
11     Doctor, can you repeat that.
12         THE WITNESS:  The protocol is that
13     you have to retrodict conditions that used
14     to exist on sites with significant
15     perturbation, and in order to consider
16     whether or not, especially in an
17     enforcement situation, there was
18     significant disturbance to the conditions
19     so that the atypical protocol could be
20     brought up.  That's exactly what they did.
21         It's clear that a lot of work was
22     done on this site that conditions were
23     completely different and that in no way did
24     the hydric soil, did the hydrologic or
25     vegetation conditions mirror or mimic what



LYNDON LEE, PHD                                      May 04, 2022
USA V SHARFI                                         157–160

Page 157

1     used to exist on the site.  That's the
2     baseline, not what currently exists.
3  BY MR. MCALILEY:
4     Q.    Okay.  So thank you for the answer.
5  That's not quite answering my question, but let's
6  do this, let me -- let me put up experts from the
7  '87 manual.  I'm going to label this as Exhibit
8  No. 108, I think is the next number.
9           (Thereupon, Exhibit No. 108 was
10          marked for identification.)
11  BY MR. MCALILEY:
12     Q.    Can you see on your screen, Dr. Lee,
13  the cover page of the manual?
14     A.    I do.
15     Q.    Does this appear to be a copy of or
16  at least excerpts from the Corps of Engineers
17  Wetland Delineation Manual from 1987?
18     A.    It looks like the cover page, yes.
19     Q.    Okay.  I'm going to -- I'm going
20  to -- and you've looked at this manual many times
21  over your career, I assume, right?
22     A.    Yes.
23     Q.    Okay.  What I'm going to do, I'm
24  going to go -- this is -- it's not the whole
25  manual, because it's such a large document,

Page 158

1  it causes problems for my computer, so let me go
2  down here to the atypical situation section.
3  Hold on.  Before I go there, I'm on page -- it
4  looks like I'm in the preface.  This is page VII,
5  which is titled, Preface to the Original Edition.
6           Do you see that?
7     A.    Yes.
8     Q.    You see in the box there's a
9  statement, "User notes:  Use of the 1987 manual
10  to identify and delineate wetlands potentially
11  subject to regulation under Section 4.4 is now
12  mandatory."
13     A.    Yes.
14     Q.    Right, so this is consistent with
15  your testimony earlier that you have to follow
16  this manual along with the supplement in
17  determining whether an area is a wetland under
18  the Clean Water Act, right?
19     A.    Yes.
20     Q.    Okay.  Let's keep going down to --
21  this is an excerpt.  So I'm going to Section F,
22  Atypical Situation.  This is the section of the
23  manual that you and the other members of the team
24  used to delineate wetlands on the site, right?
25     A.    Yes, yes.

Page 159

1     Q.    Okay.  And I want to go to Paragraph
2  71.  Let me read this aloud, the first sentence.
3  Quote, Methods described in this section should
4  be used only when a determination has already
5  been made in Section D or E that positive
6  indicators of hydrophytic vegetation, hydric
7  soils, and/or wetland hydrology could not be
8  found due to effects of recent human activities
9  or natural events, end quote.
10          Did I read that right?
11     A.    Yes.
12     Q.    Am I right that Sections D and E are
13  the standard methods for identifying the three
14  characteristics of a wetland?
15     A.    I'm sorry, D and E of what?  What
16  are you showing me?  Oh, D and E, I see that,
17  yes, yes.
18     Q.    Okay.  So you can only use this
19  section of the manual if positive indicators of
20  hydrophytic vegetation, hydric soils, and/or
21  wetland hydrology could not be found, right?
22          MR. DOYLE:  Objection, incomplete.
23          THE WITNESS:  Well, that's what that
24          narrative says; however, on the Sharfi
25          site, we found at least two conditions.

Page 160

1  We found places that they filled that used
2  to be wetlands where there were no
3  indicators like, for example, the building
4  pads that now support stalls and barns and
5  things like that.
6           And then we found other places where
7  a lot of activity had taken place,
8  replacement of soils, replacement of
9  vegetation, clearing redistribution, where,
10  yeah, you can see hydric soils, you have a
11  wetland hydrology, the Bahia grass met the
12  wetland hydrophytic vegetation parameter,
13  but it was still atypical.
14          So if you look at the consideration
15  of how to approach delineation on the
16  Sharfi site, it would be completely
17  irresponsible to call that normal
18  circumstances.  It is atypical by
19  definition.
20  BY MR. MCALILEY:
21     Q.    Okay.  Thank you.  You answered more
22  than my question.  Let me go back to this, when
23  you went to the site for the first time, did you
24  attempt to conduct a wetland delineation under
25  the typical situation, under the typical method



LYNDON LEE, PHD
USA V SHARFI

May 04, 2022
161–164

Page 161

1  in the '87 manual?
2      MR. DOYLE:  Objection, vague.
3      THE WITNESS:  No.  First of all,
4  it wasn't my task to delineate; and second,
5  the team came to the group conclusion that
6  things were so messed up out there, that
7  it would be completely irresponsible to use
8  anything other than an atypical approach.
9  BY MR. MCALILEY:
10     Q.    You say it was not your task to
11  delineate the wetlands.  Whose task was it on
12  your team?
13     A.    Mr. Wylie led that, and he was
14  supported by Drs. Nutter for hydrology, Stewart
15  for soils, and Rains for vegetation.
16     Q.    All right.  So you're not going to
17  be testifying about the proper delineation of
18  wetlands on the site; is that right?
19     A.    I would certainly testify to the use
20  of the atypical situation.
21     Q.    Okay.
22     A.    As a member of this team, I have an
23  opinion on that.
24     Q.    Okay.  But are you going to testify
25  about here's where the line is, like here are

Page 162

1  where the wetlands are and here's where the
2  wetlands are not on the site?
3      A.    No.
4      Q.    Okay.  So let's go back to the
5  atypical situations.  Did -- so did any member of
6  the team attempt to create a delineation of
7  wetlands under the typical procedures found in
8  the '87 manual?
9      A.    No.
10     MR. DOYLE:  Objection.
11     THE WITNESS:  No, because that would
12  have been improper protocol given the
13  conditions on the site.  It would have been
14  a gross technical error.
15  BY MR. MCALILEY:
16     Q.    Okay.  Paragraph 71 says you only
17  use the atypical situations section, you know,
18  only when positive indicators of the three
19  elements could not be found.  So my question --
20  so it's your testimony that you couldn't find the
21  positive indicators of wetlands on the site when
22  you first went there?
23     MR. DOYLE:  Objection, compound,
24  incomplete recitation of the manual.
25     THE WITNESS:  I outlined at least

Page 163

1  two conditions that we observed on the
2  site.  One was wholescale conversion of
3  what used to be wetlands to uplands for
4  building foundations, et cetera.  And the
5  other was wholescale conversion of wetland
6  conditions on the site through filling,
7  grading, et cetera, that we've discussed,
8  that were in no way similar to what would
9  have existed prior to Sharfi's activities,
10  which is how you have to look at this site.
11  BY MR. MCALILEY:
12     Q.    So I asked you earlier, Dr. Lee,
13  whether you still think that most of the 5.7 --
14  I'm sorry, 5.97 acres of wetlands that you
15  believe existed on the site still have the three
16  elements, characteristics of wetlands, and
17  I believe your testimony was you believe it's
18  half or more.
19     So my question to you is this:  Is
20  there -- has anybody on the DOJ team attempted to
21  delineate the areas of the site that still meet
22  the definition of wetlands today?
23     MR. DOYLE:  Objection, vague.
24     Objection, vague.
25     THE WITNESS:  Please repeat the

Page 164

1  question.
2  BY MR. MCALILEY:
3      Q.    Yeah, has any member of the DOJ team
4  attempted to delineate the location of wetlands
5  that exist today on the site, and when I say
6  wetlands that exist today on the site, these are
7  the areas that meet all three characteristics
8  required of wetlands under the typical situations
9  or typical protocols identified in the manual?
10     A.    No, because that would be
11  inappropriate protocol given the degree of
12  disturbance out there and the fact that you have
13  a mosaic of upland and wetland that clearly was
14  developed as a result of removal of vegetation
15  mechanically, import and export of fill,
16  redistribution of fill, and consolidation
17  drainage.  All those things are significant and
18  fundamental changes in the way that site
19  operates.
20     Q.    Dr. --
21     A.    That is called an atypical trigger,
22  if you will.
23     Q.    Dr. Lee, you would agree with me
24  that there's only three types of situations that
25  can justify the use of the atypical situation



LYNDON LEE, PHD
USA V SHARFI

May 04, 2022
165–168

1  section of the manual, right?
2      MR. DOYLE:  Objection, vague.
3      THE WITNESS:  Would you outline
4    those three, please.
5  BY MR. MCALILEY:
6      Q.   Sure.  So maybe let me zoom out a
7  little bit here on Exhibit No. 108, which is the
8  excerpt of the manual.  So I'm on Page 71 of the
9  manual.  So it says -- the bottom of 71, it says,
10  quote, "This section is applicable to
11  delineations made in the following types of
12  situation; A, unauthorized activities; B, natural
13  events; and C, man induced wetlands."
14      Do you see that?
15      A.   Yes.
16      Q.   Would you agree with me that those
17  are the only three circumstances where the
18  atypical situations section of the manual may be
19  used?
20      MR. DOYLE:  Objection, vague.
21      THE WITNESS:  That's -- that's
22    correct, and we chose A.  This is an
23    unauthorized activity.
24  BY MR. MCALILEY:
25      Q.   Okay.  And so if I go to Paragraph

1  71-A, Unauthorized Activities, I want to go down
2  about halfway down into that section where it
3  says "Note."  I'll read it aloud.  Let me zoom in
4  so it's easier to read.
5      Quote, Note, this section should not
6  be used for activities that have been previously
7  authorized but those that are exempted from CE
8  regulation.  For example, this section is not
9  applicable to areas that have been drained under
10  CE authorization or did not require CE
11  authorization, period, end quote.
12      Did I read that correctly?
13      A.   I think so, yes.
14      Q.   And CE refers to Corps of Engineers?
15      A.   Yes.
16      Q.   So if wetlands were changed or
17  altered on a site and no Corps of Engineers
18  permit was required to do it, you wouldn't apply
19  the atypical situation section of the manual,
20  right?
21      A.   No, that's not what it says.
22  It says if it's unauthorized, you can use it.
23      Q.   Hold on a second.  So 71-A, doesn't
24  this indicate that if a wetland is changed by an
25  activity that did not require a permit from the

1  Corps of Engineers or is exempted from CE
2  regulation, then you do not use the atypical
3  situation section of the manual?
4      A.   That's what it says, and in the case
5  of Sharfi, that is not the condition.
6      Q.   Okay.
7      A.   It's unauthorized.
8      Q.   Did you -- what work did you do
9  prior to going on the site in the fall of 2021 to
10  determine that the site was, in fact, regulated
11  by the Corps of Engineers under the Clean Water
12  Act?
13      MR. DOYLE:  Objection, vague.
14      THE WITNESS:  We looked at the
15    landscape position in this site,
16    connections in the site to Bessey Creek,
17    connections with Bessey Creek downgradient
18    to the traditional navigable waters of the
19    St. Lucie systems and the Atlantic Ocean.
20    We looked at soil maps, National Wetlands
21    Inventory, et cetera, and we looked at the
22    pattern of disturbance and development and
23    the logic in selecting the atypical
24    approach was if we do end up delineating
25    that an atypical approach is appropriate

1    under condition A there, because so much
2    disturbance has occurred.
3  BY MR. MCALILEY:
4      Q.   What measures -- what actions did
5  you or other members of the team take to
6  determine that wetlands on the site significantly
7  affected downstream navigable waters?
8      A.   We looked at connections, we looked
9  at the condition of vegetation, soil hydrology,
10  and then we looked at the manipulation of the
11  site via earthwork, mechanical clearing, and
12  other things that we've discussed, and basically
13  looked at the site in relationship to Bessey
14  Creek system by itself alone, considered
15  it alone, and we also looked at it in combination
16  with other similarly situated wetlands that
17  occurred in that hydrologic unit for the
18  so-called study area.
19      Q.   Okay.  So if I want to look and
20  understand the analysis of the significant
21  effect, that's the section that Mr. Wylie wrote
22  in the report, right?
23      A.   That's correct.
24      Q.   Okay.  And I've already -- you've
25  read the transcript of my deposition of



LYNDON LEE, PHD
USA V SHARFI

May 04, 2022
169–172

1   Mr. Wylie, right?
2       A.   Yes.
3       Q.   Okay.  So if he's covering that, I'm
4   not going to -- I'm not going to plow that
5   ground, but that is -- you did that work before
6   you went to the site?  You did that work of
7   determining that there was -- that the site
8   significantly affected the downstream
9   traditionally navigable waters before you went to
10  the site in the fall of '21?
11      A.   No, that's not accurate.
12      Q.   Oh, so you did the work after you
13  went to the site in the fall of '21?
14      A.   We began that work when this case
15  hit our desk, and we continued it throughout -- 
16  all the way through our analysis of the site and
17  development of this expert report.
18      Q.   So am I right that you had already
19  concluded that the wetlands on the site
20  significantly affected downstream navigable
21  waters before you went to the site for your site
22  inspections in the fall of 2021?
23      A.   No.
24          MR. DOYLE:  Objection, misstates
25       character -- testimony.

1   BY MR. MCALILEY:
2       Q.   That was a question.  So the answer
3   is no, Dr. Lee?
4       A.   That's correct, the answer is no.
5       Q.   All right.  Okay.  Let's -- let me
6   exit out of this document.  Let's go back to the
7   report.  I just put it back on the screen,
8   Deposition Exhibit 72, the report.  Can you see
9   in there Section IV.C.3, Review and Refinement of
10  Prior Delineations on Site?
11      A.   Yes.
12      Q.   So, Dr. Lee, is this another section
13  of the report that Mr. Wylie was the principal
14  author and that you were an assisting author?
15      A.   I believe so, yes.
16      Q.   And is the subject matter of this
17  report something that Mr. Wylie is going to
18  testify about or are you going to testify about
19  this?
20      A.   I believe that Mr. Wylie will lead
21  the testimony on this.
22      Q.   Okay.  All right.  So I don't need
23  to be asking you about delineations by Danna
24  Small or EDC, right?
25          MR. DOYLE:  Objection, vague.

1          THE WITNESS:  I don't know what you
2       need to ask me.
3   BY MR. MCALILEY:
4       Q.   Do you expect to testify at trial
5   about -- about the findings and the accuracy of
6   the findings of the wetland delineations
7   conducted by Danna Small and EDC?
8          THE WITNESS:  Probably not.
9   BY MR. MCALILEY:
10      Q.   All right.  Thank you.  All right.
11  Let's go to the next section.  Now we're in
12  Section IV.C.4, Site Locations and Cartographic
13  GIS and LiDAR Products Used to Facilitate
14  Delineation.
15          Do you see that on the screen?
16      A.   Yes.
17      Q.   So this is the bottom of Page 29 and
18  top of Page 30.  Let me zoom out so we can see it
19  all.
20      A.   Yeah, you can't go any smaller,
21  I can't see it.
22      Q.   Here, I'll zoom back in, I'm sorry.
23      A.   I'm with you.
24      Q.   I just want you to see the whole
25  thing.  Okay.  So this is something -- this is a

1   section that you're going to testify about,
2   right?
3       A.   Yes.
4       Q.   All right.  So you reviewed LiDAR
5   datasets in developing your opinions, correct?
6       A.   Yes.
7       Q.   And where did you obtain those LiDAR
8   datasets?
9       A.   There was an existing LiDAR product
10  that was contracted by the State of Florida and a
11  consortium that included Martin County, and then
12  there was a newer one that occurred post Sharfi
13  activity that was in production that was curated
14  by the department of ecology, a Florida
15  department, and U.S. Geological Survey.
16          So there were two, before and after,
17  and they were generally curated by the same
18  organizations, Martin County is part of that
19  consortium.
20      Q.   Okay.  So to understand this, there
21  was -- when you say curated, what do you mean by
22  that?
23      A.   Produced.
24      Q.   Okay.  So the first one was prepared
25  or produced by Martin County, and the second by



LYNDON LEE, PHD                                    May 04, 2022
USA V SHARFI                                       173–176

Page 173

1  the Florida Department of Ecology, you said?
2      A.   No, the 2016 was Florida DEP and the
3  U.S. Geological Survey.  They were the
4  contracting bodies, if I'm getting that right,
5  and to get the money right, the counties pitch
6  in, so there's a consortium, but it's mainly the
7  state.
8      Q.   Okay.  If I look in this section on
9  the bottom of Page 29, the second sentence,
10  it says, quote, The 2016 and 2019 pre-released
11  LiDAR dataset were considered high resolution and
12  compliant with the U.S. Geological Survey,
13  National Geospatial Program, LiDAR-based
14  specification, Version 1.2, end quote.
15      Did I read that right?
16      A.   Yes, sir.
17      Q.   What do you mean by considered high
18  resolution and compliant with that specification?
19      A.   The specifications for LiDAR runs
20  have matured over time, so higher resolution
21  means something different in 2016 than it does in
22  2022, for example.  But USGS puts out standards
23  so that they can stitch the LiDAR that the states
24  have together and come up with greater regional
25  coverage, and the high resolution is as good as

Page 174

1  it gets.
2      Whatever the specification was for
3  the 2016 run, that was contracted by Florida DEP.
4  I don't know, though, the increment of elevation
5  they set as a standard.
6      Q.   Do you know what is the resolution
7  of these datasets, like how -- how accurate down
8  to what elevation they are?
9      A.   Well, the LAS -- the so-called LAS
10  files are what people call "metadata" that
11  support the visual product are usually within
12  inches.
13      Q.   Okay.  Okay.  So if I go down to the
14  second paragraph of this section, so I'm on
15  page -- if I -- on Page 30 it's the second
16  paragraph, this is where you talk about
17  displaying the LiDAR elevation and --
18      A.   Could you please -- sorry to
19  interrupt you.  Can you please blow it up a
20  little bit.
21      Q.   Absolutely.
22      A.   There you go.  Thank you.
23      Q.   Yeah.  So am I right that basically
24  you took the data, and you created a figure of
25  IV.d.4.1 to show the hillside comparisons of the

Page 175

1  LiDAR data?
2      A.   Yes, I worked with Mr. Greco out of
3  Dr. Nutter's shop to do that.
4      Q.   Can you just tell me what is a
5  hillside --
6      MR. DOYLE:  Hillshade?
7  BY MR. MCALILEY:
8      Q.   Hillshade comparison, what does that
9  mean?
10      A.   It's vernacular that describes the
11  various shading that you see when you actually
12  print an image of the LiDAR data that's generated
13  when they overfly.  So there's various shades of
14  gray, and that's what they mean by that.
15      Q.   Okay.  What I'd like to do is go to
16  that figure, so I'm going to exit out of the
17  report here and then go to the -- go to
18  deposition Exhibit No. 73, which is the figures.
19  Can you see that on the screen?
20      A.   That one, yes.
21      Q.   Yeah, so I'm going to scroll down
22  now.  Let me scroll down.
23      A.   Okay.  That's not LiDAR.
24      Q.   Right, I know.  Thank you.  It's --
25  let me see.  So it's IV.D -- oh, there it is.

Page 176

1  Okay.  Is this the Figure IV.D.4.1 a hillshade
2  elevation comparison of 2016 and 2019 LiDAR
3  images?
4      A.   Yes.
5      Q.   Okay.  So this is the figure that's
6  referred to in that section of the report?
7      A.   Yes.
8      Q.   So as I look at this, am I correct
9  that on the left side of this figure is the LiDAR
10  from 2016, and on the right side of the figure is
11  the LiDAR from 2019?
12      A.   That's correct.
13      Q.   Okay.  And am I also correct that
14  the -- on both of these figures, but you see
15  it in a more pronounced way in 2016, that the
16  darker colors are higher elevation?
17      A.   Yes.
18      Q.   Okay.  So there's another figure --
19  there's another LiDAR that's in Exhibit No. 81.
20  Remember, 81 is the appendix that we went through
21  earlier showing the activities on the site.  So
22  let me go to that.
23      A.   Let me clarify my previous response.
24  Of you said higher elevation.  Please go back to
25  that figure.



LYNDON LEE, PHD
USA V SHARFI

May 04, 2022
177–180

Page 177

1    Q.   Okay.  Can you see it?
2    A.   There it is.  What I should have
3  augmented my answer with is that on the left
4  side, 2016, the darker areas are laser returns
5  from what we're considering to be the canopy of
6  either trees or shrubs, so the laser thinks it's
7  higher elevation, but, in fact, it's the top of a
8  tree, because it can't see through the tree.
9        So I don't know in an area that was
10  really thick with shrubs or trees, what the
11  ground elevation necessarily was to the degree of
12  accuracy that I would on 2019 when the site was
13  cleared or north of that on the Countess Joy
14  property.  The issue was density of return of the
15  laser hits, and when you have a lot of tree
16  canopy like you do in 2016, it becomes fuzzy and
17  less accurate?
18    Q.   So you're telling me that the 2016
19  image, those bumps that are shown in the
20  hillshade elevation could really be vegetation?
21    A.   The more reddish and yellowish bumps
22  are probably vegetation.  The green patterns
23  inside are probably ground elevation, so some of
24  the 2016 hits would have been highly accurate and
25  then others bounced off the top of the tree.

Page 178

1    Q.   Okay.  Is it your testimony that the
2  trees are more dense along the western side of
3  the property than they were elsewhere on the
4  property in 2016?
5    A.   Yes, that's clear.
6    Q.   Okay.  Let's go look at that.  So by
7  the way, then, so this comparison, you would
8  agree with me, then, is not very accurate about
9  ground elevations, because the 2016 image is
10  heavily influenced by plants, but the 2019 is
11  not, right?
12    A.   Not for the entire image.  I don't
13  agree with the way that you put that.  I said
14  that when you have dense vegetation, then the
15  laser returns tend to not be as accurate, because
16  they're bouncing off vegetation, but, for
17  example, where your cursor just was down south,
18  more south, go west, north -- you're moving too
19  fast.  There, like north, north, north, now go
20  east.
21        In there, that green area, I think
22  that's probably pretty accurate, because you
23  either have wet ground or some sort of emergent
24  vegetation that the laser can see through.
25        So the point is that the accuracy of

Page 179

1  the 2016 image, as an example, varies depending
2  on the vegetation type that the laser is trying
3  to see through.
4    Q.   Okay.  Let's exit out of this and
5  let's go to Exhibit No. 81.  Okay.  I'm putting
6  up on the screen Deposition Exhibit No. 81, this
7  is Photograph 5-5, which is a 2016 aerial
8  photograph.  So this is -- this is an aerial
9  photograph of the site, I take it, in 2016,
10  right?
11    A.   Yes.
12    Q.   This is before the defendants
13  purchased the site, right?
14    A.   I believe so.
15    Q.   You would agree with me that there
16  are trees along much of the western boundary of
17  the site, right?
18    A.   Yes.
19    Q.   But you would also agree with me
20  that there are not trees -- well, at least not as
21  many trees on the southern -- the southwestern
22  portion of the site, correct?
23    A.   Not as much, that's accurate.
24    Q.   And you would also agree with me
25  that the whole western side of the site is

Page 180

1  covered with dense trees as well, right?
2        MR. DOYLE:  Objection, you're
3    pointing east, but your words were "west."
4        MR. MCALILEY:  You're right,
5    exactly.  Thank you very much, Mr. Doyle,
6    I'm misspeaking again.  Let me restate
7    that.
8  BY MR. MCALILEY:
9    Q.   So you would agree with me that the
10  entire eastern side of the site is covered with
11  dense trees, right?
12    A.   No, no, in the extreme northeastern
13  corner, there appears to be some lawn or turf or
14  something that's not long --
15    Q.   That part that appears to be
16  associated with the property to the east?
17    A.   Yeah, I can't tell -- I can't tell
18  what the property boundary is, but you see what
19  I'm seeing there.
20    Q.   You would agree with me that there's
21  a lot of trees on the eastern portion of the
22  site, right?
23    A.   Yes.
24    Q.   All right.  So the vegetation is at
25  least as dense on the eastern portion of the site



LYNDON LEE, PHD
USA V SHARFI

May 04, 2022
181–184

Page 181

1  here than on the western boundary of the site,
2  right?
3        MR. DOYLE:  Objection, vague.
4        Objection, vague.
5        THE WITNESS:  Yeah, you can't really
6     talk about stem density in a forester's
7     term using that type of photograph.  The
8     texture appears to be somewhat the same.
9     I see a great deal of difference in the
10    composition of species from the northeast
11    corner to the central west, it's a
12    different forest type.  It's different but
13    it's forested.
14  BY MR. MCALILEY:
15    Q.   I'm just going to your point earlier
16  about the LiDAR.  LiDAR is about light bouncing
17  off of things, right?
18    A.   Correct.
19    Q.   So the light is going to be
20  bouncing -- the type of trees is less important
21  for the purposes of the action of the LiDAR than
22  the density of the trees, right?
23    A.   No, it's both.
24    Q.   Okay.  So are you telling me that
25  the trees on the eastern side of the site in 2016

Page 182

1  allow LiDAR to penetrate better than the trees on
2  the western side of the site?
3    A.   I think so, because these were oaks,
4  and their canopy density -- predominantly oaks
5  and red maple, and their canopy density is
6  thinner than the cabbage palms and palmetto
7  systems that are on the west central portion of
8  the site.
9    Q.   Okay.  Now, going to -- okay.  Here
10  I'm going to Figure 5-1, 2016 Contours.  This
11  is -- this reflects LiDAR data; isn't that right?
12    A.   I don't think so.
13    Q.   Oh, what does this reflect?
14    A.   These are the Martin County
15  topographic maps that were probably built on a
16  digital elevation model that was flown, either
17  contracted by the county or USGS, I'm not sure,
18  but this is all off the Martin County website as
19  their topographic map of this site.
20    Q.   Oh, I see.  So you're the one who
21  created this figure, right?
22    A.   Yes.
23    Q.   And this is a topographic elevation
24  map that was created by Martin County, right?
25    A.   Yeah, look at the title, please.

Page 183

1    Q.   Okay.
2    A.   Scroll down -- scroll up to the
3  title.  Thank you.  I should have named that 2016
4  Topographic Contours, but that's the idea, and
5  the source is Martin County.
6    Q.   Okay.
7    A.   This is not -- I don't believe they
8  use LiDAR to develop this phase.
9    Q.   Oh, okay.  So you think this figure
10  was developed with something other than LiDAR?
11    A.   Probably a digital elevation model,
12  yes.
13    Q.   Okay.  Fair enough.  All right.
14  Let's go back to the report.
15    A.   Or I could say they may have used
16  both, because the LiDAR was available to them in
17  2016.  I don't know.
18    Q.   So you don't know, though, right?
19    A.   I don't know.  Usually topographic
20  maps like that are based off the digital
21  elevation.
22    Q.   But just you're taking a guess here
23  based upon your knowledge of generally how these
24  things are put together, it's not based upon any
25  actual knowledge of how Martin County put

Page 184

1  together that figure, right?
2    A.   I'm assuming that they used a
3  digital elevation model.
4    Q.   But you obviously think that that's
5  a reliable piece of information, because you
6  created a figure about it as part of your portion
7  of the report, right?
8    A.   It's an approximation of conditions
9  that would have existed.
10    Q.   Okay.
11    A.   It's a map.
12    Q.   Okay.  So let's go back to the
13  report here.  Before I do that, let me ask you,
14  do you want to take a break?  Do you need five
15  minutes?
16    A.   If anybody else does, I'm fine.
17        MR. MCALILEY:  I'll take a break
18     whenever people want.  I'm also just trying
19     to get this done.  I'm happy to take a
20     break, because we've been going for about
21     an hour, an hour and a half, but I'm happy
22     to keep going if you like, and I say that
23     to everyone else, depending on whether you
24     people want a break or not.
25        MR. DOYLE:  And let me ask the



LYNDON LEE, PHD
USA V SHARFI

May 04, 2022
185–188

Page 185

1    witness, if I might, when the witness would
2    like to have a lunch break. The witness's
3    stomach clock will govern that, even though
4    we're all in different time zones. That's
5    a request, not a demand.
6        THE WITNESS: I would recommend that
7    we go for like another half hour and then
8    take a lunch break. Does that work for
9    you?
10        MR. MCALILEY: That works for me.
11        THE WITNESS: Okay.
12        MR. MCALILEY: Let's keep rolling
13    then.
14    BY MR. MCALILEY:
15        Q. Okay. So I want to go back to the
16    report, and I'm now on Section IV.C.5, which is
17    entitled Characterization/Delineation of the
18    Geographic Extent of Water, Wetlands on the Site
19    Prior to Disturbance.
20        Can you see that there?
21        A. Yes.
22        Q. So this on the table of contents
23    lists Mike Wylie as the principal author and you
24    as a secondary author. Does that sound right?
25        A. That's correct.

Page 186

1        Q. So is this going to be a section
2    that's basically the subject matter of
3    Mr. Wylie's testimony?
4        A. He would be the lead on that, yes.
5        Q. And do you anticipate giving
6    testimony on direct examination in this section?
7    I'm asking the question to figure out how much
8    I need to cover in this?
9        A. If asked, I would, but I don't
10    anticipate it. Mr. Wylie was the lead.
11        Q. Okay. Would you agree with me,
12    Dr. Lee, that in Florida whether a wetland such
13    as this site is part of the Waters of the United
14    States turns on whether it has a significant
15    nexus to the downstream navigable waters?
16        MR. DOYLE: Objection, vague.
17        THE WITNESS: Not all wetlands have
18        to go through a significant nexus analysis
19        in Florida to become jurisdictional. For
20        example, if you have an estuary, it is by
21        definition waters and so on. So the
22        question is quite broad.
23    BY MR. MCALILEY:
24        Q. So putting aside wetlands that are
25    tidally influenced or that -- or that are --

Page 187

1    directly abut tidally influenced waters, would
2    you agree with me wetlands in Florida are part of
3    the Waters of the United States only if they have
4    a significant nexus to downstream traditionally
5    navigable waters?
6        MR. DOYLE: Same objection.
7        THE WITNESS: Not necessary,
8        if those wetlands abut a tributary, for
9        example, they're going to be in.
10    BY MR. MCALILEY:
11        Q. Okay. And that's -- okay. And
12    that's your opinion, right?
13        A. Yes.
14        Q. And you're not a lawyer, right?
15        A. That's correct.
16        Q. All right. And you never read the
17    11th Circuit cases on the Waters of the U.S. test
18    in Florida; is that fair to say?
19        MR. DOYLE: Objection, vague.
20        THE WITNESS: I have not read that.
21    BY MR. MCALILEY:
22        Q. Okay. Thank you. Let's go down to
23    IV.D, Assessment of Functions of Waters/Wetlands
24    Ecosystems. Do you see that on the screen?
25        A. I do.

Page 188

1        Q. And this is a section that you
2    wrote, correct?
3        A. That's correct.
4        Q. And this section describes the
5    methods by which you assess the functions of
6    wetlands on the site in reference areas,
7    correct?
8        A. Yes.
9        Q. Am I right that there's more than
10    one protocol that you could have used to assess
11    the function of wetlands on the site?
12        A. Not exactly, but there are choices
13    out there. The Uniform Mitigation Assessment
14    Method, the so-called UMAM is code in Florida, so
15    that's almost a requirement. There's a
16    predecessor to that, the so-called Rapid
17    Assessment Protocol or RAP that is now out of
18    date. That was written for Florida.
19        Then there's a national document
20    that addresses flats wetlands in the South
21    Atlantic Coastal Plain Gulf states that has a
22    paragraph in it that says it may apply in certain
23    pieces of Southern Florida, but they're not sure.
24        So I examined all three of those
25    alternatives and I went with what Florida



Page 189

1  requires, which is the UMAM, and which was the
2  most current science, assessment of science
3  document that we could use.
4      Q.   Okay.  So just for the record, so
5  you -- well, I mean, let me rephrase that.
6          You use the Uniform Mitigation
7  Assessment Method or UMAM, right?
8      A.   Correct.
9      Q.   And that was developed by the
10 Florida Department of Environment Correction
11 (sic), right?
12     A.   The Florida Department of
13 Environmental --
14     Q.   Environmental Protection?
15     A.   I thought you said "correction."
16         MR. DOYLE:  I did, too.
17         THE WITNESS:  Yeah.
18         MR. MCALILEY:  At the next break,
19 I'm getting more coffee.
20         THE WITNESS:  I hope it wasn't the
21 Department of Corrections.
22 BY MR. MCALILEY:
23     Q.   Well, that actually would be a
24 relevant word, but that's not --
25     A.   Okay.  Yeah, DEP was the master

Page 190

1  contractor, if you will.  It was actually
2  instigated by the legislature who then directed
3  DEP to do the UMAM, and the DEP turned to the
4  experts in the field, including Mark Brown, for
5  example, at the Center for Wetlands as the
6  centers of excellence or expertise to actually
7  get it done.
8      Q.   Okay.  And you said something
9  I wanted to bring out, but Florida DEP created or
10 had UMAM created, because there's a Florida
11 statute that requires it, right?
12     A.   Yes.
13     Q.   And so you're aware that in Florida
14 activities in all wetlands are regulated under
15 Florida law, right?
16     A.   Yes.
17     Q.   But you're also aware that under the
18 Clean Water Act not all wetlands are regulated,
19 right?
20         MR. DOYLE:  Objection, vague.
21         THE WITNESS:  Well, if you're using
22         wetlands in a generic sense, that's
23         correct, they could be in or out of
24         jurisdiction.
25 BY MR. MCALILEY:

Page 191

1      Q.   Right, so in Florida there are some
2  wetlands that are regulated by the State of
3  Florida that may not be regulated under the
4  federal Clean Water Act, correct?
5      A.   That's correct.
6      Q.   And so am I right that the purpose
7  that UMAM was created was to have a uniform
8  mitigation methodology to determine what amount
9  of wetland mitigation would be needed?
10     A.   Yes, they were trying to develop a
11 tool that would allow practitioners to be
12 consistent and have a consistent approach.
13     Q.   And it was -- and that -- and the
14 UMAM methodology was designed to be used for all
15 wetlands in Florida, right?
16     A.   Pretty much, yeah.
17     Q.   So UMAM could be used to score
18 wetlands that are basically connected to tidal
19 waters, saltwater wetlands, right?
20     A.   Yes.
21     Q.   And it could also be used for
22 freshwater wetlands, correct?
23     A.   Yes.
24     Q.   And it could be used for wetlands
25 that are isolated from downstream navigable

Page 192

1  waters, right?
2      A.   You mean hydrologically isolated or
3  functionally isolated or what?
4      Q.   Hydrologically isolated?
5      A.   Yes.
6      Q.   And am I right that under UMAM you
7  score it on a scale of one to ten?
8      A.   Yeah, the scaler is -- think of
9  it as a percentage from zero to one or one to
10 ten, however you want to characterize that, one
11 being a hundred percent of function and zero
12 being zero percent of function.
13     Q.   Okay.  I want to go down here to
14 Page 33 of the report, and this is part of this
15 Section V.D., and the first full paragraph on
16 Page 33 says, quote, We use the UMAM approach in
17 6 representative areas within the site, end
18 quote.
19         So you see where you wrote that?
20     A.   Yes.
21     Q.   Can I ask you what you mean by
22 "representative area"?
23     A.   Yes, I walked the entire site, and
24 then in my mind stratified it into areas that
25 were covered by buildings or that had been



LYNDON LEE, PHD
USA V SHARFI

May 04, 2022
193–196

Page 193

1  converted to lawns, where he had ornamental
2  forests or that residual wetland that we've been
3  discussing. So, you know, you partition it and
4  then you sample within those partitions.
5      Q.   Does "representative" mean
6  it displayed the average characteristics of the
7  whole?
8      A.   Of that partition, yeah. Let's just
9  for sake of an example, let's divide -- let's say
10  we have four classes of conditions out there;
11  lawn, residual wetland, buildings, and ornamental
12  forest. So we would go to the sort of center of
13  each of these classes, establish a plot, and then
14  try to characterize it.
15      So, Dr. Lee, you mentioned a few
16  times the buildings on the site. What percentage
17  of the site has a building on it now today?
18      A.   I have not done that calculation.
19      Q.   It's a very small percentage, isn't
20  it?
21      A.   I have not done the calculation.
22      Q.   So am I right that you also went out
23  and assessed locations in the reference areas as
24  part of your wetland functional assessment?
25      A.   Correct.

Page 194

1      Q.   And so there's a reference here to
2  Figure V.B.1.1. Is that a document that shows --
3  is that a figure that shows where your reference
4  plots were?
5      A.   Yes, I think that's the one --
6  that's the one that shows where all of them were
7  located in relationship to each other.
8      Q.   Right. Let me go to -- let me go to
9  the figures. Let me see if I can find that.
10      I just put up on the screen
11  Deposition Exhibit 73, and it has Figure V -- I'm
12  sorry, IV.B.1.1, I'll zoom in so you can see
13  that.
14      A.   Thank you.
15      Q.   Dr. Lee, can you see that?
16      A.   Yes, thank you.
17      Q.   Yeah, so this is the figure that
18  shows where your reference plots were located
19  both on the site and in the reference areas,
20  right?
21      A.   That's correct.
22      Q.   So I see that when I look at the
23  Countess Joy property north of the site, I see
24  that your reference plots are not uniformly
25  distributed across that area of the Countess Joy

Page 195

1  property. Why is that?
2      A.   Because I was stratifying.
3  I couldn't cover the entire property in a matrix
4  or, you know, rigid set of linear transects or
5  anything like that, so we went to representative
6  plant communities and conditions on that property
7  and sampled accordingly.
8      Q.   Okay. So those reference plots are
9  not representative of the overall Countess Joy
10  property, they're representative of some subpart
11  of the property that you identified; am
12  I understanding that right?
13      A.   I think we got it covered pretty
14  well except for that depressional system in the
15  northeast corner.
16      Q.   Okay. Well, there's the Countess
17  Joy East property, there's no reference sites in
18  most of the eastern portion part of that
19  property, right?
20      A.   Right, but the one which is in the
21  center of the property, the green dot in the
22  center of the property, there's three green dots
23  along the southern perimeter, the northernmost
24  one captured a lot of that area to the northeast,
25  except for the wetland depression, I walked all

Page 196

1  that.
2      MR. MCALILEY: Okay. So I'm at a
3  logical breaking point here, Dr. Lee, so
4  why don't we -- if you want to take a lunch
5  break, maybe this would be a good time for
6  me. How long would you like for lunch?
7      THE WITNESS: At least half an hour.
8      MR. MCALILEY: Okay. Could we plan
9  for -- how about 40 minutes, would that
10  work?
11      THE WITNESS: That's fine by me.
12  I have it at -- it's noon my time. So
13  we're talking 12:40?
14      MR. MCALILEY: 12:40. If that works
15  for everybody, why don't we break and plan
16  to pick up then.
17      MR. DOYLE: Thank you.
18      THE WITNESS: Okay. I'm going off
19  line here.
20      MR. MCALILEY: Yeah, thanks,
21  everybody.
22      THE VIDEOGRAPHER: Matt, going off
23  video record, 2:01(sic).
24      (Thereupon, a break was taken.)
25      THE VIDEOGRAPHER: We are now back



LYNDON LEE, PHD
USA V SHARFI

May 04, 2022
197—200

Page 197

1   on video record, 3:42 p.m.
2   BY MR. MCALILEY:
3       Q.   So, Dr. Lee, just picking up, I want
4   to go back to your report and go to the next
5   section of the report which I believe you wrote,
6   which is Section V.A, so let me go ahead and put
7   that up on the screen.
8            Do you see section V.A up on the
9   screen, sir?
10      A.   Yes.
11      Q.   So this section is titled, Summary
12  and Time Sequence of Mechanical Clearing, Fill
13  Import-Export, Earthwork, and Construction
14  Activities on Site.  I believe that we've
15  actually covered a lot of the ground that's in
16  here, because this is the section where you talk
17  about the sequence of activities there on the
18  site; isn't that right?
19      A.   That's correct, that the
20  chronosequence that we discussed at some length
21  this morning.
22      Q.   Right, and I'm right that you have
23  no personal knowledge yourself of this sequence
24  of events, because you weren't there when the
25  events happened, the statements in here are based

Page 198

1   upon documents you've read, maps and photographs
2   you've seen, things of that nature; is that
3   right?
4       A.   That's correct.
5       Q.   Okay.  So I just want to -- I just
6   want to focus in on the first paragraph here and
7   the second sentence.  It says, quote, To
8   summarize, in 1966 it appears that the site was
9   part of a large Palm City Farms agricultural
10  operation that focused on citrus production and
11  cattle, end quote.
12           Did I read that right?
13      A.   Yes, sir.
14      Q.   Do you believe that's a true
15  statement?
16      A.   I think so.  That's my
17  interpretation of what I'm seeing in the '66
18  photo.
19      Q.   Where did you get the name "Palm
20  City Farms"?
21      A.   It was the property parcel that
22  I was reviewing, and I was looking at -- there
23  was a history of ditching in Martin County,
24  it was black and white and had a bunch of stills
25  in it, and Palm City Farms came -- came to bear.

Page 199

1       Q.   So when did -- when did the site go
2   into citrus production and cattle originally?
3       A.   I don't know, because prior to 1966
4   the next available photo that I was able to
5   access was 1940 of the USGS -- excuse me, off the
6   Martin County site, and it was so granular,
7   I couldn't see any detail, so I don't know.
8       Q.   When you say, "citrus," do you mean
9   citrus fruits?
10      A.   Yes, sir.
11      Q.   So that would be like oranges,
12  grapefruits?
13      A.   Yeah, if they did that, or lemons,
14  limes if it was hot enough.
15      Q.   Am I right that citrus trees need
16  well-drained soils to grow?
17      A.   That's why they mound it.  That's
18  why I'm making the interpretation of citrus,
19  because for my family's properties up in Ocala,
20  I'm familiar with that, and the mounds that I've
21  seen in the 1966 photograph are pretty big, so
22  I think they had to mound up off the ambient
23  surface of the soil to elevate the planting beds.
24  I think that's what I'm seeing.
25      Q.   Okay.  But you would agree with me

Page 200

1   that citrus trees need well-drained soils to
2   live, right?
3       A.   Well, to be as productive as they
4   can be.  They can survive in somewhat poorly
5   drained -- poorly drained soil.
6       Q.   But in Florida people don't grow
7   citrus in wetlands, do they?
8       A.   Well, they probably do.
9       Q.   They do.  Okay.  Have you ever seen
10  a citrus grow in a wetland in Florida?
11      A.   No, but people in Florida grow -- do
12  everything in wetlands, so it wouldn't surprise
13  me if somebody tried it out.
14      Q.   So would you agree with me, though,
15  that the site was impacted more than 50 years
16  ago, right?
17      A.   I believe so.  What I can see
18  through the granular image from the 1940s, it was
19  farmed.
20      Q.   This wasn't a pristine, natural
21  site, was it?
22      A.   No, it was basically clear-cut in
23  1966, and since that time, the ensuing 55 years
24  or so, it's been recovering.
25      Q.   There were exotic plants on the site



LYNDON LEE, PHD
USA V SHARFI

May 04, 2022
201–204

Page 201

1 when the defendants purchased it; isn't that
2 right?
3      A.   I assume so given the reference
4 conditions due north of that on the Countess Joy
5 property, and also given testimony by Charles,
6 the operations manager for Mr. Sharfi.
7      Q.   You read the deposition of Danna
8 Small, right, the deposition transcript?
9      A.   Yes.
10      Q.   Do you remember that she talked
11 about the presence of Old World climbing fern on
12 the site?
13      A.   Yes, that's to be expected.
14      Q.   And that's an invasive exotic plant,
15 right?
16      A.   Correct.
17      Q.   And you saw invasive exotic plants
18 on the Countess Joy property; isn't that right?
19      A.   Yes, sir.
20      Q.   And when did cattle stop grazing on
21 the site?
22      A.   I don't know, because there's a gap
23 in the photo record after '66, and it's unclear
24 if cattle were sparse or vegetation was
25 recovering in the absence of cattle. I don't

Page 202

1 know.
2      Q.   And cattle are still grazing on the
3 Countess Joy property, right?
4      A.   Correct.
5      Q.   When did citrus production stop on
6 the site?
7      A.   I don't have a snapshot after the
8 '66 photo until way later, so sometime after 1966
9 and probably before the mid '70s.
10      Q.   Okay. Let's go to the next section
11 of the report. Let's go to Section V.B, which is
12 the topic Overview of the Types, Classes, and
13 Structure of Waters, Wetlands on Reference Areas
14 and by Inference on the Site Prior to
15 Construction Activities.
16      Do you see that on the screen on the
17 bottom of Page 34?
18      A.   Yes.
19      Q.   And let me zoom out just a little
20 bit so we can fit it all on the screen.
21      So this is another section that you
22 wrote, isn't that right?
23      A.   Yes, sir.
24      Q.   Okay. So -- so in this section you
25 talk about a figure that shows the waters,

Page 203

1 wetlands on the site and then the reference areas
2 that were mapped by the National Wetlands
3 Inventory; is that right?
4      A.   Yes.
5      Q.   Okay. So I'm going to go to the
6 figure, it's II.3.B. So I'm going to exit out of
7 Exhibit 72, the report, and I'm going to go to
8 Exhibit 73, the figures. One second, let me get
9 there.
10      Okay. I just put up Deposition
11 Exhibit 73, which is Figures, Figure II.B.3, do
12 you see that?
13      A.   Yes, sir.
14      Q.   So this is the figure that you
15 referred to in that section of the report?
16      A.   Yes.
17      Q.   So am I right that this figure
18 combines information from the U.S. Geological
19 Survey on a topographic map plus the National
20 Hydrography Dataset that's maintained by the
21 geological survey as well as the National
22 Wetlands Inventory map prepared by the Fish &
23 Wildlife Service?
24      A.   I think so. Did -- Tommy prepared
25 this, and I think he used the U.S. topo based and

Page 204

1 NWI and NHD.
2      Q.   Okay. And so as I look at this map
3 just to understand it, so in the lower right-hand
4 corner of this figure, Figure II.B.3, is an inset
5 that blows up the view of the area right around
6 the site, correct?
7      A.   That's correct, in Section 17 there.
8      Q.   When I -- and if I look, there's two
9 legends on this figure. The lower left-hand
10 legend shows the boundaries of the various -- of
11 the site and the Countess Joy area as well as the
12 National Hydrography Dataset symbols, right?
13      A.   Yes.
14      Q.   And in the upper right-hand corner
15 has the legend for the National Wetlands
16 Inventory wetland type, right?
17      A.   Correct.
18      Q.   Okay. So let me just go through a
19 few basics here. US Geological Survey is a
20 federal agency, right?
21      A.   Yes.
22      Q.   And it covers -- it creates
23 topographical maps that cover the entire United
24 States, right?
25      A.   Most of the United States, yes.



LYNDON LEE, PHD
USA V SHARFI

May 04, 2022
205–208

Page 205

1    Q.   They create topographical maps that
2  cover all of Florida, don't they?
3    A.   I believe so, yes.
4    Q.   And USGS maps, among other things,
5  can show wetland areas, right?
6    A.   Yes.
7    Q.   So if I look at Figure II.B.3 and,
8  for instance, if I go to -- if I go to the area
9  along the east/west ditch sort of northwest of
10  the site, I see these little plant-like symbols.
11  I can -- I'll zoom in here and see if I can make
12  it a little clearer.
13    A.   That's helpful.  Thank you.
14    Q.   Can you see that around the
15  east/west ditch closer to the Martin County
16  Landfill?
17    A.   Yeah, yeah, I got it.
18    Q.   Those are symbols for a marsh,
19  right?
20    A.   Well, it's the USGS conventional
21  mapping signal for what they consider to be wet
22  ground.  It's not a jurisdictional wetland, it's
23  not an NWI wetland, it's just what somebody at
24  USGS figured out was wet.
25    Q.   Okay.  And by the way, USGS creates

Page 206

1  these maps to be used by the Government and
2  people in the public to accurately represent
3  conditions on the ground, right?
4    MR. DOYLE:  Objection, vague.
5    MR. MCALILEY:  I'll rephrase it.
6  BY MR. MCALILEY:
7    Q.   Why did the U.S. Geological Survey
8  create these topographical maps that cover the
9  entire country, Dr. Lee?
10    A.   Well, the USGS is, in fact, a
11  service, and part of their charge is to provide
12  us maps so that we can do various things.  And so
13  the series that we're looking at, usually it's on
14  a mapping scale of 1 to 24,000.  It's called a
15  "quadrangle map," and they're used by all
16  different people in environmental areas that are
17  farming or navigating or, you know, doing what
18  they do.  They're just a tool.
19    Q.   Okay.  Am I right also, Dr. Lee,
20  that the USGS map shows other wetland features
21  which are like these oval areas that have a
22  dashed line about it?  So I'm in figure -- I'm in
23  the figure here II.B.3, the inset, and you see
24  that just to the north of the site to the right
25  there's a feature here that has a dashed line

Page 207

1  around it?
2    A.   Right, that would be a USGS attempt
3  to map the limits of a wet depression that was
4  probably ponded but not vegetated when they saw
5  it.
6    Q.   Okay.  Got it.  Am I right that the
7  USGS map does not show wetlands on the site?
8    MR. DOYLE:  Objection, vague.
9    THE WITNESS:  The USGS does not.
10  BY MR. MCALILEY:
11    Q.   Okay.  So let's go now to the
12  national --
13    A.   Let me qualify that, on a scale of 1
14  to 24,000.
15    Q.   Okay.  Have you looked at USGS maps
16  of the site at a finer scale than 1 to 24,000?
17    A.   I don't think they exist.
18    Q.   Okay.  So -- by the way, the USGS
19  map that shows the wetland on the Countess Joy
20  property, so in the upper left portion of the
21  Countess Joy property, it does not show that
22  wetland feature as being hydrologically connected
23  to anything, does it?
24    A.   Yes, and I think that's why they put
25  that dashed circle around it.  Their

Page 208

1  interpretation at that scale didn't show
2  it necessarily connecting.  That's the flaw.
3    The fact is I've been to that
4  wetland, and it's embedded in a broader matrix of
5  what used to be fine flatwoods but what was
6  cleared for agricultural grazing, so the inset
7  depression in wetlands.
8    Q.   The USGS map does not show a
9  contiguous wetland complex on the Countess Joy
10  property that connects to the site, does it?
11    A.   It does not.
12    Q.   On the 1 to 24,000 scale?
13    A.   Correct, it does not.
14    Q.   So let's go to the National
15  Hydrography Dataset.  That's a dataset that's
16  also maintained by the USGS; is that right?
17    A.   Yes.
18    Q.   Am I right that that maps linear
19  features --
20    A.   Excuse me, let me correct that.  I
21  think NOAA also has their hand in the NHD
22  maintenance.
23    Q.   Okay.  And that maps linear aquatic
24  features; is that right?
25    A.   Not limited to linear.  They map all



LYNDON LEE, PHD
USA V SHARFI

May 04, 2022
209–212

Page 209

1 sorts of water features that are usually in the
2 context of a watershed or riverine system.
3    Q.   So if I look at Figure II.B.3, I see
4 in the lower left-hand corner the legend of NHD,
5 and it has two blue lines, stream/river is a
6 darker blue line, and canal/ditch is a lighter
7 blue line, right?
8    A.   Correct.
9    Q.   Am I -- am I correct that it shows
10 that what you labeled there as Bessey Creek as a
11 canal/ditch?
12    A.   That's correct, that's their
13 interpretation.
14    Q.   And that darker blue line for
15 stream/river appears in the far right where the
16 east/west ditch connects to the historic Bessey
17 Creek over by where the Hybrid Wetland Treatment
18 Facility is, correct?
19    A.   I see it.  Yes.
20    Q.   Okay.  So let's go to the National
21 Wetlands Inventory.  This is a map created by the
22 National Fish & Wildlife Service, correct?
23    A.   Correct.
24    Q.   And they -- and the Fish & Wildlife
25 Service maps wetlands across the United States in

Page 210

1 this inventory, right?
2    A.   Correct.
3    Q.   And so -- and so the National
4 Wetlands Inventory map does show there's a
5 wetland on the site here, right?
6    A.   Correct.
7    Q.   So is that this bluish color that's
8 shown on the inset for the site that has like a
9 little tail going down south of it?
10    A.   Yeah, actually, if you zoom in on
11 the parent map of that, it's a mix.  There's two
12 polygons mapped.  One is a scrub/shrub and the
13 other is so-called palustrine forest,
14 P-A-L-U-S-T-R-I-N-E.
15    Q.   Okay.  So if I want to match up the
16 color to that National Wetlands Inventory wetland
17 type, I go to the legend in the upper right-hand
18 corner of Figure II.B.3, correct?
19    A.   Correct.
20    Q.   So this -- so this blue color for
21 freshwater forest and shrub wetland is the color
22 that's covering much of the site with a little
23 tail going down to the south; is that right?
24    A.   Yes, sir.
25    Q.   Okay.  And then green color that's

Page 211

1 around it, isn't that the green color from the
2 USGS base map?
3    A.   Yes, I agree.
4    Q.   Right, so that's -- and the USGS
5 base map, the green stands for vegetation, right?
6    A.   Yeah, they're unspecific.  It could
7 be shrubs or a forest, they just paint it green
8 because they see it.
9    Q.   So the National Wetlands Inventory
10 also shows a few wetlands on the Countess Joy
11 site to the north, doesn't it?
12    A.   Yes.
13    Q.   So it shows some of the same
14 features of the USGS map, these sort of oval
15 features that are north of the site, right?
16    A.   Correct.
17    Q.   And it also shows some wetlands that
18 are sort of northwest of the site that are
19 approximately on the boundaries -- in the
20 proximate area of the -- boundaries of the
21 location of the primary flow path identified by
22 Dr. Nutter.
23        So am I right, Dr. Lee, though, that
24 the National Wetlands Inventory does not show
25 that the Countess Joy property is mostly

Page 212

1 wetlands?
2    A.   That's correct.
3    Q.   And the Countess Joy -- and the
4 Countess Joy property, at least when you look at
5 the National Wetlands Inventory map, does not
6 have a contiguous wetland complex that connects
7 up to wetlands on the site, right?
8    A.   On the site, yes, that's correct.
9    Q.   Okay.
10    A.   But the NHD shows what you're
11 calling the north/south ditch on the west side of
12 the site going north into Bessey Creek.
13    Q.   Yeah, so -- right.  So the NHD,
14 National Hydrography Dataset, shows the
15 north/south ditch on it as that light blue line
16 that runs north/south, correct?
17    A.   Correct.
18    Q.   Okay.  Let me go to the next section
19 that you've written, which we're now jumping down
20 to Section V.C.6.E, I think that's the next
21 section.  So let me exit out of this document and
22 go back to the report.
23        So I'd like to go to Deposition
24 Exhibit No. 72, and show you Section V.C.6.E.
25 This is the section of the report that you wrote?



LYNDON LEE, PHD
USA V SHARFI

May 04, 2022
213—216

Page 213

1    A.   Yes.
2    Q.   Okay.  So this is a subject on which
3  you expect to testify at the trial?
4    A.   Well, Dr. Rains and I collaborated
5  heavily on this, because it's a combination of
6  maintenance of plant and faunal communities on
7  the site.  So she wrote portions of it, and
8  I wrote portions of it.  So here's an example
9  where I would take the faunal component of these
10  paragraphs and play editor-in-chief on sections
11  that Dr. Rains contributed, so it was a
12  collaboration.
13    Q.   Okay.  So am I right, then, that the
14  sections of this report that you would testify
15  about would not be the vegetation sections but
16  the faunal section?
17    A.   That's correct.  I relied on
18  Dr. Rains, who is a botanist, to provide us
19  information about plants, and then I picked that
20  up and integrated it into discussions of faunal
21  support habitat functions, because the plant
22  community provides the house for the animals,
23  yes?
24    Q.   Okay.  What I'd like to, then, do is
25  let me go to -- I'm just going to focus on this

Page 214

1  section of the report on the section dealing with
2  faunal issues, because I covered a lot of this,
3  I think, with Dr. Rains on Friday?
4    A.   Yes.
5    Q.   And I'm trying to be efficient with
6  our time here.
7    A.   Right.
8    Q.   Page 43, the top first full
9  paragraph talks about -- well, I'll read the
10  first sentence.  Quote, As discussed in the
11  faunal support/habitat sections of this expert
12  report, the DOJ expert team observed several
13  species of resident and migratory birds foraging
14  in the ditches transporting water to Bessey
15  Creek, in the depressional wetlands on the
16  Countess Joy east and west reference areas, and
17  on the site during the August, September, and
18  October investigations.  These species are listed
19  in the faunal support/habitat results section of
20  this expert report, end quote.
21    Did I read that right?
22    A.   Yes.
23    Q.   So I know that in kind of the
24  section coming up, you go through and identify
25  the specific species that you saw.  Is that --

Page 215

1  we're going to cover that when we get to that
2  section, right?
3    A.   Correct.
4    Q.   Okay.  So -- all right.  The next
5  sentence, quote, All of these faunal species rely
6  wholly or in part upon the food and cover
7  resources that are accessible by intact
8  connections among the site and reference areas
9  similarly situated wetlands, Bessey Creek, and
10  the downstream TNWs to the St. Lucie River, to
11  the nearshore waters of the Atlantic Ocean, end
12  quote.
13    Did I read that right?
14    A.   Yes, sir.
15    Q.   Could you explain to me how -- first
16  of all, let's break this down.  All of these
17  faunal species, is this referring to the faunal
18  species that you identified in the "later
19  results" section of the report?
20    A.   Yes.
21    Q.   So -- and so can you explain to me
22  how they all rely wholly or in part on the food
23  and cover resources that are accessible by intact
24  connections between the site and the other areas?
25    A.   The way that I try to see it is that

Page 216

1  linear or riverine features, creeks, rivers,
2  things like that, provide routes for exchange of
3  materials and all sorts of nutrients, organic
4  matter, contaminants, whatever, up and down the
5  axis of those riverine features and/or their
6  abutting wetlands.
7    What I was trying to get at here is
8  that animals like amphibians or fish or
9  carnivores that might be hunting up and down the
10  riparian corridors rely upon those intact
11  connections for their innate productivity and
12  also for cover so that they cannot get picked off
13  while they themselves are hunting.
14    So in a systems perspective, the
15  connectivity of river systems has been a subject
16  of a great deal of interest.  For example, the
17  Vannote article that I cite in the literature, it
18  talks about the river continuum context --
19  context, and they talk about the importance of
20  maintenance of connections for physical --
21  maintaining physical, chemical, and biological
22  functions in riverine systems, including
23  supporting faunal species.
24    Q.   Okay.  So let me break this down
25  into a couple of issues that I just want to



LYNDON LEE, PHD
USA V SHARFI

May 04, 2022
217–220

Page 217

1  understand.
2       So the faunal species that you
3  identified include both aquatic species and
4  nonaquatic species, correct?
5       A.   Correct.
6       Q.   For any of those species, aquatic or
7  not aquatic, do you have any evidence of any
8  individual exemplar of a faunal species, you
9  know, any individual bird, an individual animal,
10  was unable to survive as a result of the
11  defendants' activities on the site?
12      A.   No.
13      Q.   And do you have any evidence that --
14  what I mean by evidence is specific evidence on a
15  specific animal, that it was adversely affected
16  by the defendants' activities on the site?
17      A.   No.
18      Q.   So on the aquatic species --
19  I want -- I want to focus on those.  If I have a
20  fish, the way a fish would go from the St. Lucie
21  River to the site is it would have to go up
22  through a body of water; is that fair to say?
23      A.   Yes.
24      Q.   Okay.  And if the water -- if there
25  is no water route by which the fish can go up

Page 218

1  from the St. Lucie to the site, it wouldn't be
2  able to make it, right?
3       A.   Correct.
4       Q.   You would agree with me that the
5  north/south ditch is dry most of the year?
6       A.   I don't have a basis to agree or
7  disagree on that.  I would defer to Dr. Nutter.
8  I was only there for three days in October of
9  '21.
10      Q.   Fair enough.  So if I want to ask a
11  witness about what's the hydrological conditions
12  in either the north/south ditch or east/west
13  ditch, I should ask Dr. Nutter,  right?
14      A.   He's the hydrologist.
15      Q.   Fair enough.  Is there any specific
16  aquatic creature that you observed on the site or
17  on the Countess Joy property that you believe
18  could have come from the St. Lucie River?
19      MR. DOYLE:  Objection, vague.
20      THE WITNESS:  Well, the only
21      candidate, and it wasn't on the site,
22      it was by Grid 84, I talked about
23      Centrarchidae sunfish.  Now, sunfish
24      usually occupy a fairly discrete reach of a
25      river, but they can range, so that's a

Page 219

1  possible.
2  BY MR. MCALILEY:
3       Q.   You said that they typically occupy
4  a discrete reach of the river.  What do you mean
5  by that?  In other words, they stay in a certain
6  area of the river and they don't travel around
7  much?
8       A.   Yeah, that's right, their home range
9  is usually somewhat limited, but it's a mess out
10  there, so sometimes one will decide to go out and
11  go exploring.  You don't know.
12      Q.   That's a freshwater fish, right?
13      A.   That's correct.
14      Q.   That's a fish that's not tolerant of
15  salinity in the water, right?
16      A.   Well, they can occur in brackish
17  systems, but they -- towards the fresh side of
18  brackish.  They tend to prefer freshwater.
19      Q.   Okay.  And you said that they
20  typically have a narrow range.  What's a typical
21  range that a sunfish would have?  What I mean by
22  "range" is how far a sunfish would travel --
23  what's the size of an area a typical sunfish
24  would live?
25      A.   Oh, I can't say, because we talk

Page 220

1  about rivers in the context of reach lengths, but
2  rivers can be narrow or wide, therefore,
3  integration to areas is pretty hard.  They've
4  done studies, they've radio collared these fish
5  to follow them around, but they don't tend
6  generally to move, oh, more than a mile, unless
7  one gets in its head to travel further.
8       Q.   Fair enough.  Let's go to the last
9  paragraph of this section, and the paragraph is
10  really just a long sentence, so let me read it
11  aloud.  Quote --
12      A.   Yes, sorry about that.
13      Q.   I'm always working on my writing,
14  too.  I still remember my high school teacher
15  telling me to make short sentences, but I'll read
16  it.
17       Quote, The identified wetland plants
18  support that the site wetlands and the
19  interconnected and similarly situated wetlands in
20  the study area maintain the vertical and
21  horizontal structure, species diversity carbon
22  production retention and export and food and
23  cover resources for a wide range of faunal
24  species that are characteristic of habitats that
25  occur in Bessey Creek and which are connected to

Page 221

1  downstream TNWs of the St. Lucie River and to the
2  nearshore waters of the Atlantic Ocean, end
3  quote.
4        What does that mean?  Can you
5  interpret that sentence and tell me what you
6  mean.
7     A.   Yeah, first of all, I apologize for
8  not chopping it up into a couple of sentences.
9  Second, what I'm getting at is the vertical and
10  horizontal structure in productivity, if you
11  will, that is typical to the area in the
12  reference areas and what used to be on the Sharfi
13  property support a potentially wide range of
14  species, birds, mammals, aquatic and semi-aquatic
15  vertebrates and invertebrates including fish, and
16  that habitat is connected except where it's
17  interrupted by road crossings and stuff, bridges,
18  to the downstream components of Bessey Creek
19  through the tidal reaches of Bessey Creek and
20  then hence forward down to St. Lucie and the
21  Atlantic.  That's what I'm trying to say to you.
22        (Thereupon, Mr. Moore joins the
23        proceedings.)
24        MR. MCALILEY:  That's not me.  I
25        don't know who's speaking.

Page 222

1        THE WITNESS:  Yeah, I'm getting
2        feedback.
3  BY MR. MCALILEY:
4     Q.   Can you identify any aquatic species
5  that exist in the nearshore waters of the
6  Atlantic Ocean that might possibly use habitat at
7  the site or on the Countess Joy property?
8     A.   Well, at the end of the north/south
9  ditch where that drops into the Bessey Creek,
10  there's a hydrological connection there, and
11  I was looking for eels and/or lamprey, because
12  those species typically migrate long, long
13  distances, and they can integrate part of their
14  life cycles in salt and part in fresh, and it
15  would not surprise me, for example, that an eel
16  would make its way this high up or even higher in
17  the Bessey Creek system towards the landfill and
18  then go down to the brackish to saltwater
19  transition.  It's not a stretch at all.
20     Q.   Okay.  So it wouldn't surprise you,
21  but did you see any eels or lampreys?
22     A.   No, I looked, and I didn't find any.
23     Q.   Okay.  And these are eels that would
24  be saltwater eels that would live in the Atlantic
25  Ocean?

Page 223

1     A.   Well, they're -- they complete --
2  they can complete parts of their life cycle in
3  the ocean and parts of their life cycle is
4  freshwater.  It's kind of like reverse salmon.
5  For example, some eels will spawn in the ocean
6  and live in the fresh or vice versa.
7     Q.   I'm curious if a fish that spawns in
8  the fresh and lives in saltwater is an anadromous
9  fish -- what do you call --
10        MR. DOYLE:  I was thinking the same.
11        THE WITNESS:  Okay.  Here's the word
12        for the day, gentlemen, catadromous.
13        Catadromous.
14        MR. MCALILEY:  Okay.
15        THE WITNESS:  Anadromous is like a
16        salmon, catadromous is the other way.
17        MR. MCALILEY:  Okay.  You learn
18        something new every day.
19        MR. DOYLE:  That is truly something
20        I learned today, yes.
21        MR. MCALILEY:  Andy, at some future
22        case one day we'll remember when we first
23        learned that.
24        MR. DOYLE:  Exactly, where were you
25        when you learned that.

Page 224

1  BY MR. MCALILEY:
2     Q.   Okay.  Dr. Lee, other than the eels
3  and the lamprey, are there any other aquatic
4  organisms that you can think of that live in the
5  Atlantic Ocean that can possibly go up and use
6  the wetlands on the site or on the Countess Joy
7  property?
8     A.   Not in the Atlantic Ocean, but
9  it would not surprise me either that our friend
10  the catfish would live in brackish tidal portions
11  of Bessey Creek, and they have the power to go
12  wherever they want.  They typically don't, but
13  they are wide ranging.
14     Q.   And you say a catfish, but the
15  closest location was a few miles downstream?
16     A.   Downstream.
17     Q.   Right.
18     A.   But they're in the system, and
19  if they're in the system, they can go where they
20  want.
21     Q.   And obviously a catfish can't make
22  it up to the site if there's not, you know, a
23  continuous stretch of water that's deep enough
24  for it, right?
25     A.   Yeah, but I've seen them slithering



LYNDON LEE, PHD
USA V SHARFI

May 04, 2022
225–228

Page 225

1  through mud.  It's fascinating.
2      Q.   But you saw -- you saw no catfish or
3  signs of catfish near the site or the Countess
4  Joy property, right?
5      A.   That's correct.
6      Q.   Okay.  So other than -- other than
7  eels and lamprey and catfish, are there any other
8  species -- aquatic species that live, let's say,
9  in the St. Lucie River that could possibly go up
10  and use wetlands on the site?
11      A.   Not to my knowledge, but I'm not a
12  fish expert in Florida.  If we had a fish guy
13  with us, he or she might be able to help me out.
14      Q.   Okay.  Okay.  Let's keep going.
15  I think the next section that you wrote is
16  Section V.F, Faunal Support.  It's on Page 64, so
17  let me go down there.  Okay.  So I have up on the
18  screen Page 64 of the report.  This is Deposition
19  Exhibit 72.
20      Am I -- is this a section of the
21  report that you wrote about Summary of Faunal
22  Support/Habitat Conditions in Reference Area
23  Wetland and By Inference on the Site?
24      A.   Yes, it is.
25      Q.   And you're going to testify about

Page 226

1  the topics covered in this section of the report,
2  correct?
3      A.   If asked, yes.
4      Q.   So let's go to the first sentence.
5  Quote, As introduced in Section III.F above,
6  throughout the range of reference areas used to
7  develop this expert report, we are observed large
8  interconnected and complex mosaics of intact
9  mixed hardwood forests, scrub/shrub, and emergent
10  wetlands interspersed with ponded hardwood and
11  pine flatwood areas that were usually connected
12  to a larger ponded littoral or flowing water
13  features, end quote.
14      Did I read that right?
15      A.   Yes.
16      Q.   You're saying that you observed
17  large interconnected and complex mosaics of
18  wetland in the reference areas?
19      A.   Yes, the best example of that would
20  be across 84 West on the Countess Joy west
21  property.  That's a big complex that actually
22  I think you trace it to be connected to the
23  wetlands that occur to the north by the
24  sanitation facility.  It's huge.
25      Q.   Is it your opinion that wetlands on

Page 227

1  the site were interconnected to wetland off-site
2  in the reference areas before the defendants'
3  activities?
4      A.   Could you please repeat that
5  question.
6      Q.   Yes, is it your opinion that
7  wetlands on the site were interconnected with
8  wetlands off the site in the reference areas
9  before the defendants engaged in their
10  activities?
11      A.   Yes, I think I see those connections
12  in the aerial photographs, especially along the
13  access of the north/south ditch.  It's a leading
14  property in the northwest -- the site in the
15  northwest corner and then going north along the
16  axis of the north/south ditch.
17      Q.   So the connection was via the
18  north/south ditch between the wetlands on the
19  site and the off-site wetlands to the north?
20      A.   Formally through abutting wetlands
21  that were in the general area --
22      THE COURT REPORTER:  I'm sorry,
23      Doctor, can you repeat that.
24      THE WITNESS:  Okay.  Let's start
25      over.  Please repeat the question.

Page 228

1  BY MR. MCALILEY:
2      Q.   So the wetlands on the site were
3  interconnected with wetland off the site to the
4  north via the north/south ditch?
5      A.   I think so, and then prior to that,
6  before that ditch was excavated or as it was
7  being maintained, there were abutting wetlands
8  that were -- occurred on the east or west flanks
9  of the ditch, some of which are still there, some
10  of our reference sites, and I think those were
11  connected via shallow surface water connections
12  to wetlands on the Countess Joy East parcel.
13      Q.   Thank you.  So just to be clear to
14  make sure I understood, so the connection between
15  the wetlands on the site and the off-site
16  wetlands to the north, at the time the defendants
17  purchased the site were via the north/south
18  ditch.  What you just testified to prior to the
19  north/south ditch, those were connections at some
20  earlier time on the site, correct?  Am
21  I understanding that correctly?
22      A.   Yeah, but let me amend my statement
23  by saying prior to 2018, you have intact forested
24  scrub/shrub communities on the site, and portions
25  of those that were wetlands that were not located



LYNDON LEE, PHD
USA V SHARFI

May 04, 2022
229–232

Page 229

1  in a ditch, and I think those were connected to
2  wetlands to the north via surface or shallow
3  subsurface connections.
4      Q.   Okay.  There was another ditch on
5  the northern boundary of the site, right?
6      A.   Correct.
7      Q.   So you think that those connections
8  of wetlands from the site sort of through that
9  ditch on the north boundary of the cite to the
10  Countess Joy wetlands?
11      A.   Yeah, a portion of that ditch system
12  is inset in wetlands or what used to be wetlands
13  before the ditch was there.
14      Q.   Am I right that neither of the USGS
15  maps nor the National Wetlands Inventory maps
16  show wetlands extending from the site on the east
17  side of that north/south ditch into the Countess
18  Joy property?
19      A.   That's correct, on a scale of 1 to
20  24,000.
21      Q.   Did you or members of the DOJ team
22  ever delineate the boundaries of wetlands on the
23  Countess Joy property?
24      A.   No, that was not part of our
25  itinerary.

Page 230

1      Q.   So you can't point me to a specific
2  map that would show boundaries of wetlands on the
3  Countess Joy property and boundaries of wetlands
4  on the site?
5      MR. DOYLE:  Objection, compound.
6      THE WITNESS:  I've not seen a map of
7      that nature.
8  BY MR. MCALILEY:
9      Q.   Back to the report, I think I'm on
10  Page 64.  It says in that first sentence I read,
11  "Throughout the range of reference areas
12  we observed large interconnected and complex
13  mosaics of wetlands."
14      So what do you mean by "throughout
15  the range"?
16      A.   We used seven or eight reference
17  areas that were off-site, Countess Joy east and
18  west, sanitation facility wetlands, and then what
19  we call the DOT wetlands, which was inside a
20  depression surrounded by roads and stuff, and so
21  that's what I mean by a range.
22      When I do reference work, I try to
23  look at the range of wetlands that occur that are
24  similar to what we're interested in and kind of
25  bracket conditions so that we understand where

Page 231

1  the wetlands of concern fit in the broader
2  landscape.
3      Q.   So, Dr. Lee, is it your testimony
4  that the wetland at the DOT website, which is on
5  the south side of the Martin Highway, were
6  connected to wetlands, let's say, on the Countess
7  Joy property?
8      A.   No, no, they were not.
9      Q.   I see.  So in the reference there in
10  this -- on that sentence I read in the report
11  which talks about "throughout the range of
12  reference areas, we observed large interconnected
13  and complex mosaic of wetlands," you weren't
14  suggesting that all the wetlands in all the
15  different reference areas were necessarily
16  connected; am I understanding that right?
17      A.   Connected to one another or to the
18  Sharfi site?
19      Q.   No, no, to one another.
20      A.   Oh, well, not all of them.  There --
21  there are pieces -- that's a huge landscape.
22  There are pieces of it that are not connected,
23  but there are broad swaths of it that are.
24      Q.   Okay.  I want to go to the top of
25  Page 65, and this is the next paragraph.

Page 232

1  I believe it's the paragraph where you actually
2  identify the birds that you saw on the site we
3  referred to earlier today.  So I want to go
4  through this.
5      So let me read the first sentence.
6  It says, quote, "During field work to develop
7  this expert report, the DOJ expert team observed
8  several species of resident migratory birds in
9  reference areas foraging in the ditches
10  transporting water to Bessey Creek, in the
11  depressional wetlands on the Countess Joy area,
12  and on the site."
13      Let me stop there.  Did I read this
14  right so far?
15      A.   Yes, yes.
16      Q.   So what do you mean by a "resident
17  bird"?
18      A.   One that's not typically migratory.
19      Q.   Okay.  And -- all right.  And what
20  is a -- what is a "migratory bird"?
21      A.   One -- a bird that tends to complete
22  portions of their life cycle in distinctly
23  different habitats that are usually
24  geographically separated by moderate to great
25  distances.



LYNDON LEE, PHD
USA V SHARFI

May 04, 2022
233–236

Page 233

1    Q.    And you would agree with me that
2  migratory birds are protected under the Migratory
3  Bird Treaty Act, right?
4    A.    Yes.
5    Q.    And you are aware the federal
6  government maintains a list of migratory birds,
7  right?
8    A.    Yes.
9    Q.    So let's go through -- let me read
10  the next sentence, let's just try to classify our
11  birds.  "We directly observed great blue heron,
12  anhinga, American egret, red-tailed hawk, little
13  blue heron, sandhill crane, and white ibis.
14        Did I read that correctly except
15  where I left out the scientific names in Latin?
16    A.    Yes.
17    Q.    So is this the full list of birds
18  that you all on the DOJ team observed foraging in
19  ditches transporting water to Bessey Creek in
20  depressional wetlands in Countess Joy and on the
21  site?
22    A.    Yes, we observed other -- other bird
23  species, but these were the ones that were
24  directly connected to the ditches, et cetera, on
25  the site.

Page 234

1    Q.    Okay.  All the birds on this list
2  are migratory birds, right?
3    A.    Ibis kind of go both ways.  They can
4  be local or they can go long.
5    Q.    So the ibis, you're referring to the
6  white ibis?
7    A.    Correct.
8    Q.    Are you aware that the white ibis is
9  on the federal government's migratory bird list?
10    A.    It should be, but so are Canadian
11  geese, and we have geese in western Washington,
12  for example, that are resident.  They never go
13  anywhere.
14    Q.    Well, okay.  But in terms of
15  classifying the birds, then, you would agree with
16  me that all the birds on this list that you have
17  on Page 65 are classified as "migratory birds"
18  under federal law, right?
19    A.    That would be -- that would be
20  reasonable, yes.
21    Q.    Are there any other birds that you
22  observed other than the ones on this list
23  foraging in the ditches or the depressional
24  wetlands or on wetlands on the site.
25    A.    I think this list is pretty

Page 235

1  complete.
2    Q.    So the next sentence down says,
3  quote, "In Bessey Creek we observed an alligator,
4  garfish, and mullet."  I'll stop there.  Let's go
5  to the alligator first.  I think we discussed
6  this earlier.  Am I right that where you observed
7  the alligator was at the Martin County Landfill
8  site?
9    A.    There was an alligator there, and
10  there was a lot of signs, like trails that
11  they -- where they were slogging around in the
12  wet woods.  I think Mike Wylie may have seen an
13  alligator downstream in Bessey Creek.  I'm not
14  sure.
15    Q.    Okay.  But that -- but the alligator
16  that you saw in the location where you saw the
17  signs of the alligator was at that site north of
18  the landfill which is approximately two and a
19  half miles away from the site, right?
20    A.    That's correct.
21    Q.    And it sounds like it's possible
22  that Mr. Wylie saw an alligator downstream in the
23  east/west ditch and Bessey Creek east of the
24  site, but you're not sure?
25    A.    Yes, please check with him.  I'm not

Page 236

1  sure.
2    Q.    Okay.  Thank you.  I see on this
3  list it says, "We observed garfish."  Where were
4  the garfish observed?
5    A.    I didn't observe those, that was
6  input from Mr. Wylie.  You'd have to ask him.
7    Q.    I also see the reference to mullet.
8  You testified earlier that you all saw mullet at
9  where the roadway crosses over Bessey Creek east
10  of the Turnpike, which is the limited tidal
11  influence; is that right?
12    A.    Approximately limited.  It goes a
13  little upstream from that bridge, but that's a
14  convenient way to talk about it.  Yeah, I was
15  standing on that bridge looking at what I thought
16  were gar -- mullet, excuse me.
17    Q.    Yeah, so you didn't see any mullet
18  west of the Turnpike on the Bessey Creek system,
19  did you?
20    A.    I did not.
21    Q.    And I believe we talked about other
22  fish this morning.  Did you see any fish, by the
23  way, in the north/south ditch?
24    A.    I remember -- there was water in
25  that ditch, and I remember seeing gambusia,



LYNDON LEE, PHD
USA V SHARFI

May 04, 2022
237–240

Page 237

1  mosquito fish, which is typical.  They're
2  everywhere.
3      Q.   You recall seeing the gambusia where
4  84th Avenue crosses over the east/west ditch,
5  right?
6      A.   Yeah, and then I remembered also
7  standing at our reference plot north of the
8  Sharfi site, there's a deep sort of still spot
9  there, and there were a few gambusia there as
10 well.
11     Q.   And so I would find a reference to
12 that in your field notes, right?
13     A.   No, I typically don't write that
14 down.  I have a petty good memory of that, so
15 I just remember stuff.
16     Q.   Other than mosquito fish, did you
17 see any other kind of fish in the north/south
18 ditch?
19     A.   No.
20     Q.   The next sentence on Page 65 says,
21 quote, "The DOJ expert team also observed animal
22 tracks and/or scat in wetlands throughout the
23 study area including deer, coyote, and feral
24 hog."
25          Did I read that right?

Page 238

1      A.   Yes.
2      Q.   So am I right the study area refers
3  to the South Florida Water Management District
4  Basin 4?
5      A.   Yes, that was Mr. Wylie's
6  convention.
7      Q.   So this statement here about
8  observing animal tracks and/or scat in wetlands
9  throughout the study area, this is referring not
10 just to the area by the site but wetlands
11 throughout Basin 4, right?
12     A.   Yeah, for my purposes it was mainly
13 concentrated on the east and west properties, the
14 sanitation district sample point, and the DOT.
15 I did not have time to range widely throughout
16 the Basin 4 as it's called.
17     Q.   So did you go to visit any other
18 wetlands in Water Management District Basin 4
19 other than the areas that you just described, so
20 the site, the Countess Joy property, the landfill
21 reference site, and the FDOT property by Martin
22 Highway?
23     A.   We went east downstream in the
24 Bessey Creek system as far as we possibly could,
25 and there were several wetlands that we looked at

Page 239

1  along that route.
2      Q.   When you say you looked at them, is
3  it just like you're driving by in a car, and you
4  would see them out the window?
5      A.   We did that, and we also got out at
6  the road crossings where it was safe and took a
7  look at them, took some pictures, discussed what
8  they looked like, just generally laid our hand on
9  them as we were going downgradient.
10     Q.   When you say you got out, so you got
11 out of the car, and you stood by the side of the
12 road and looked at them and took photographs; am
13 I understanding you right?
14     A.   Yeah, we did not sample, we just
15 observed conditions and tried to put together the
16 flow paths for Bessey Creek.
17     Q.   Did you walk around out in those
18 wetlands?
19     A.   I did.
20     Q.   Okay.  And did you -- could you
21 point them out to me on a map if I showed you a
22 map?
23     A.   Yes.
24     Q.   Okay.  Let's go to one of the
25 figures here, then.

Page 240

1          Okay.  So I'd like to show you and
2  put up on the screen deposition Exhibit No. 73.
3  This is the figures, and so this is Figure
4  II.B.1, the South Florida Water Management
5  District Basin 4 selected as the study area.
6  This an aerial photograph that has the study area
7  shown in red.
8          So can you indicate to me where on
9  this map you went to visit wetlands other than
10 the ones you just mentioned right by the site and
11 the Countess Joy property, et cetera?
12     A.   Where --- please put your cursor on
13 the bridge that we're using to illustrate the
14 upstream and the tidal influence and let's blow
15 it up.
16     Q.   I'm not sure exactly where it's at.
17 Maybe it's this one right here, crossing the
18 creek.  I think that's Murphy Road there, which
19 is, I believe, the name of the road.
20     A.   Yeah, and there we had to --
21 downstream there was a residence and upstream
22 it was too steep, but the bridge to the west, the
23 next bridge up, I walked around that one a bunch
24 and looked at the channel and the wetland
25 conditions, and then -- where is the road that



LYNDON LEE, PHD
USA V SHARFI

May 04, 2022
241–244

Page 241

1  crosses where the treatment plant is.
2       Q.    Let me just say this for the record,
3  so I've been showing on Deposition Exhibit No. 73
4  figure -- what did I say this figure was, II.B.1.
5  I've been showing, first, the location where
6  Murphy Road crosses over Bessey Creek, and then
7  we also identified there's a bridge that's sort
8  of southwest, the next what appears to be a
9  roadway crossing over Bessey Creek, and that's
10  east of the Turnpike.
11       And now to answer your question, the
12  treatment plant, I believe that is this area in
13  here?
14       A.    Yeah, it's right in there.  So
15  we were on top of the intake.  There's an access
16  road where some equestrian facility and stuff
17  like that, and we were on top of that looking at
18  the intake structure, and I walked around down in
19  there looking at wetlands.
20       Q.    Okay.  Are there any other wetlands
21  that you looked at in the basin for the study
22  area?
23       A.    Yes, if you would move west.
24       Q.    Okay.
25       A.    So there were -- the Countess Joy

Page 242

1  West property is due west of the site, and then
2  as you drive north along 84 to get to the
3  sanitation facility, I was looking at those
4  wetlands as well, and looking at how the road was
5  constructed through those wetlands and through
6  fill, looking for culvert connections, things
7  like that, looking for fish.  So I looked at
8  those pretty hard.
9       And then when you get to the --
10  where your cursor is right now and if you go due
11  west and start to enter the facility -- yeah,
12  along that access I looked at those wetlands
13  south of your cursor.
14       Q.    So this would be if you take 84th
15  Avenue up across the east/west ditch, then
16  there's an east/west road that's in the southern
17  end of the landfill site.  It's the south side of
18  that road?
19       A.    It's the entry road to the landfill
20  site, correct.
21       Q.    Okay.
22       A.    And it was the driveway.
23       Q.    Okay.  Let me exit out of this and
24  go back to the report.  Okay.  So I'm back to
25  Deposition Exhibit 72, the report, on the top of

Page 243

1  Page 65.  So let me read the next sentence.
2  Quote, Many of the foraging bird species utilize
3  Bessey Creek as a food source and use the
4  forested buffer along Bessey Creek as resting and
5  nesting sites, end quote.
6       Did I read that right?
7       A.    Yes.
8       Q.    So are the foraging bird species
9  utilizing Bessey Creek the same ones that you
10  have identified by name in this paragraph?
11       A.    Yeah, but there's others, no doubt,
12  that I did not observe them come through either
13  their residence or migratory birds that would use
14  that riparian corridor.
15       Q.    So there is -- but this paragraph
16  identifies the bird species that you actually
17  saw, right?
18       A.    Yes.
19       Q.    So what you're saying is that to the
20  extent there's other bird species that might go
21  out there that you didn't see, they could also
22  use the same areas; am I understanding that?
23       A.    That's correct.
24       Q.    And when you say Bessey Creek, are
25  you referring here to the east/west ditch or are

Page 244

1  you also referring to the natural Bessey Creek
2  that's further east in Basin 4?
3       A.    Both, I'm referring to it as a
4  connected system, and the birds would move up and
5  down that system depending on where their cover
6  is or what time of day it is, what food was
7  available, et cetera.
8       Q.    When you were further to the
9  forested buffer along Bessey Creek, is that
10  referring to basically the trees that are along
11  the east/west ditch and other portions of the
12  creek?
13       A.    Yes, I could substitute this as the
14  riparian forest, or something like that,
15  stream-side forest.
16       Q.    Thank you.  I'll go to the last
17  sentence here on this section.  It says, quote,
18  Before site impacts, wetlands and similarly
19  situated wetlands in the study area supported a
20  variety of birds, amphibians, fish, and American
21  alligator through habitat and foot web support,
22  end quote.
23       Did I read that right?
24       A.    Yes.
25       Q.    So are the similarly situated



LYNDON LEE, PHD
USA V SHARFI

May 04, 2022
245–248

Page 245

1 wetlands in the study area those that were
2 identified by Mr. Wylie in an earlier section of
3 the report?
4     A.   Yes, and in my mind they included
5 wetlands that were abutting or upstream of
6 defined first and second order channel reaches in
7 the Bessey Creek system.
8     Q.   Okay.  But this is -- the term
9 "similarly situated" wetlands for this case is
10 defined in the report as all of the wetlands in
11 Basin 4 mapped by the National Wildlife --
12 National Wetlands Inventory, right?
13     A.   Yes, that was Mr. Wylie's
14 convention, but I looked deeper and more
15 specifically as well at wetlands that were in
16 similar landscape positions for the purposes of
17 looking at species and wildlife conditions, so
18 I agree with your statement summarizing his, but
19 I'm trying to add my perspective on that of
20 similarly situated for the purposes of
21 characterizing formal uses of these areas.
22     Q.   Dr. Lee, so are you using a
23 different definition of similarly situated
24 wetlands than Mr. Wylie?
25     A.   No, I'm just also using a deeper

Page 246

1 definition that goes straight to the functioning
2 of those areas as food and cover resources for
3 faunal species.
4     Q.   Okay.  So for purposes of this, this
5 sentence, do you mean here by "similarly situated
6 wetlands" are riparian wetlands; is that right?
7     A.   Those -- particularly I was focused
8 on abutting channels that were in the first or
9 second order channels sort of higher up in the
10 watershed.
11     Q.   Let's go to the Section here, which
12 is Section V.F.B, Faunal Support similarly after
13 clearing -- I'm sorry, let me say this better.
14 It says, quote, Summary of Faunal Support/Habitat
15 Conditions in Reference Area Wetlands and by
16 Inference on the Site After Mechanical Clearing
17 and Earthwork Activities.
18         That's a section that you wrote,
19 correct?
20     A.   Yes.
21     Q.   Am I right that you believe the
22 wetlands on the site are highly degraded?
23     A.   That's correct.
24     Q.   The site is mostly covered with
25 grass now, isn't it?

Page 247

1     A.   It's mostly -- in general, yes,
2 I would agree with that.  There's buildings,
3 there's that residual thin forest, but I think
4 the dominant plant community there is the
5 converted Bahia grass.
6     Q.   And it's your opinion that grass
7 provides little habitat, right?
8     A.   That's correct.
9     Q.   I think I asked you this before, but
10 I just want to get our calculations here --
11     A.   Excuse -- excuse the noise, the
12 mailman just arrived.
13     Q.   Do you need to take a five-minute
14 break?
15     A.   My dog was just announcing it,
16 sorry.  Let's proceed.
17     Q.   All right.  If I was home, we would
18 be interrupted by the dog nonstop all day, so...
19     A.   I told him I was taking a
20 deposition, and he understood, so he's being
21 quiet.
22     Q.   You have a smarter dog than I.
23         All right.  So the third answer says
24 theres one remaining and degraded depressional
25 wetland system south of Plot B-6.

Page 248

1     A.   Yeah, that's the one we've been
2 discussing all day.  That's how I refer to it.
3     Q.   That's the one that you measure as
4 being .79 acres?
5     A.   That's correct.
6     Q.   And the next sentence you state,
7 quote, It has been filled around most of its
8 perimeter and set up to receive untreated
9 stormwater runoff from paddock areas that are
10 adjacent to the south and east perimeters of the
11 wetland, end quote.
12         Did I read that right?
13     A.   Yes.
14     Q.   So the "it" is referring to that
15 remaining -- that remnant depressional wetland,
16 right?
17     A.   That's correct.
18     Q.   What do you mean by untreated
19 stormwater runoff?
20     A.   Well, there's paddocks that are
21 located on the eastern and along the southern
22 perimeter of that wetland, remaining wetland, and
23 especially the ones to the east, there's pipes
24 that run from the paddock area directly into the
25 wetlands.



LYNDON LEE, PHD
USA V SHARFI

May 04, 2022
249–252

Page 249

1    So when animals are in those
2  paddocks, the runoff from a rain event or
3  something like that is collected and then
4  transferred via pipe or surface flow directly
5  into that wetland. That's untreated stormwater.
6    Q.   I see. So you're referring here to
7  stormwater from nearby areas where there are
8  animals, right?
9    A.   Yeah, and I think at some point in
10 the manuscript I identify some runoff from roads,
11 but it's not much.
12   Q.   And so it's your opinion that
13 stormwater runoff into wetlands that originates
14 in areas of animals degrades the wetlands?
15   A.   It contributes to degradation,
16 particularly focused on water quality entering
17 the wetlands, which have some ability to treat
18 polluted water but not unlimited, and that's
19 degradation.
20   Q.   Well, I think I asked you this
21 before lunch, but there's cattle grazing in the
22 Countess Joy property, right?
23   A.   Correct.
24   Q.   And you can see cow pies out there
25 where cattle or cows have defecated on that

Page 250

1  property, right?
2    A.   Correct.
3    Q.   So the wetlands on the Countess Joy
4  property also receive untreated stormwater
5  runoff, right?
6    A.   Correct.
7    Q.   The next sentence -- let me see.
8  Okay. The last sentence of this paragraph says,
9  quote, "Instead remaining wetlands do not
10 effectively function to support faunal species
11 because" -- do you see where I read that
12 sentence?
13   A.   Yes, I do.
14   Q.   All right. So what follows is your
15 list of reasons why you think the wetland -- the
16 remnant depressional wetland on the site does not
17 support faunal species?
18   A.   No, what I'm trying to get at is why
19 are they degraded, and, therefore, why aren't
20 they doing as good a job as they could to support
21 faunal species, because they -- they exist on
22 imported and leveled fill, there's consolidated
23 drainage, and scroll down. That's the laundry
24 list that I put up there.
25   Q.   I see. Okay. If I go to

Page 251

1  Subparagraph B here, which is at the bottom of
2  Page 65, it say, quote, Most surface flows are
3  consolidated and directed by shallow swales to
4  constructed drop and let-catch basins, northwest
5  quadrant, or in the case of the remaining
6  depressional wetland south of B-6. Those are
7  directed to artificial ponds in the center of the
8  site or to a pipe that has been installed on the
9  southern perimeter of the depression, end quote.
10   Did I read that right?
11   A.   Yes.
12   Q.   So am I correct in understanding
13 that right now stormwater flows are direct --
14 that stormwater that's formed on the site from
15 rain is directed via shallow swales to the ponds
16 on the site or to the depressional remnant
17 wetland?
18   A.   Or both.
19   Q.   Or both?
20   A.   So it would go -- it would go
21 paddock as the generator of the stormwater
22 flowing north or west into the remnant
23 depression. Then there's a swale that goes out
24 of the northwest corner from the remnant
25 depression that is directed towards the center

Page 252

1  pond. That swale is nearly level, so we think
2  that that flow, depending on water levels could
3  go either way from the pond to the depression or
4  vice-versa, and then there's a pipe installed in
5  the southern end of the remnant depression that
6  goes south and then off property, and we don't
7  know where that goes.
8    Q.   Okay. So let me -- I just want to
9  ask you about that pipe. So I understand this,
10 then, so the pipe is installed in the remnant
11 depressional wetland that's to the south center
12 portion of the site?
13   A.   Yes, there's a gate there, and the
14 pipe is proximate to the pipe.
15   Q.   And the pipe runs south off the
16 property -- off the site, right?
17   A.   Over the -- over the -- I should say
18 under the parcel boundary, correct.
19   Q.   Right, and you don't know where
20 it goes, right?
21   A.   That's correct. It's downhill
22 south, so we can surmise it goes into one of the
23 other water features that are on Mr. Sharfi's
24 property to the south.
25   Q.   Yeah, there's ponds that are on the



LYNDON LEE, PHD
USA V SHARFI

May 04, 2022
253–256

Page 253

1 property further south, right?
2      A.   Yeah, and they are in line with the
3 direction that pipe is traveling.
4      Q.   The last sentence in Subparagraph B
5 says, quote, "There is evidence from the
6 monitoring wells that there is subsurface
7 drainage in the southeast quadrant of the site."
8      Do you see that?
9      A.   Where are you now?
10      Q.   The last sentence of this page.
11      A.   Okay.  Yes, I -- yes, I see that.
12 There's evidence.  Got it.
13      Q.   What is the evidence of the
14 monitoring wells that there's subsurface drainage
15 in the southeast quadrant of the site?
16      A.   This is Dr. Nutter's realm, but
17 he and I discussed it in the context that I was
18 looking at the southwest pond, and the water
19 levels in it didn't fit with what I felt they
20 should be given other observations that I made on
21 the site.
22      So I asked him about the behavior of
23 the well in that area, and he said that it wasn't
24 behaving due to rainfall events in responses that
25 were coherent with the incoming rainfall in

Page 254

1 comparison to other wells on the site leading him
2 to the conclusion, if I might paraphrase, that
3 there's likely subsurface drainage.
4      Q.   That's -- that's -- the east side of
5 the site is the side opposite that of the
6 north/south ditch, right?
7      A.   The east side?  Sorry, say that
8 again.
9      Q.   Right, so when we talk about the
10 southeastern quadrant of the site --
11      A.   Yes.
12      Q.   -- that's the opposite side of the
13 site from where the north/south ditch borders it,
14 right?
15      A.   That's correct, sorry.
16      Q.   Let's go down to Page 66, a
17 little paragraph, H, "This residual forest patch
18 is not connected to any intact surrounding
19 waters/wetlands or to upland forest and
20 scrub/shrub communities."
21      Do you see that language?
22      A.   Yes.
23      Q.   And that's -- that residual forest
24 patch is referring to the remnant depressional
25 wetland?

Page 255

1      A.   That's correct.
2      Q.   Okay.  So this is -- it's your
3 opinion that that wetland is not connected to any
4 intact surrounding waters or wetlands, right?
5      A.   Right, and in looking at it, excuse
6 me, in the context of faunal species uses of
7 patches of habitat, so I talk about -- excuse me.
8 I talk about habitat patches, and I look at them
9 in the context of an ability -- of an animal's
10 ability to jump or travel from one patch to the
11 other in continuity.
12      So what I'm saying here is there's
13 fence lines, there's open areas, there's
14 buildings, et cetera.  So the effect of the site
15 development has been to relatively isolate the
16 habitat patches.
17      Excuse me, I need to take a
18 one-minute break to fill up my water.
19      MR. MCALILEY:  No problem.  Why
20 don't we take five minutes.
21      THE WITNESS:  Okay.  Fair enough.
22 I'll walk away.  I'll be back in five.
23      THE VIDEOGRAPHER:  Going off video
24 record, 4:53 p.m.
25      (Thereupon, a break was taken.)

Page 256

1      THE VIDEOGRAPHER:  We are now back
2 on video record, 4:58 p.m.
3 BY MR. MCALILEY:
4      Q.   Dr. Lee, I'm going to the next
5 section which you wrote, which is Section
6 V.G.1.A.  This is Impact Assessment Direct
7 Impacts Area of the Fill.  This is the bottom of
8 Page 66.  This is a section that you wrote as
9 well, right?
10      A.   Correct.
11      Q.   So the first sentence says, quote,
12 The DOJ expert team determined that 5.97 "blank"
13 of wetlands on the site were directly impacted
14 with discharges of dredged or fill material, end
15 quote.
16      Am I right that the word "acre"
17 should be after the numbers 5.97?
18      A.   That's an error, correct.
19      Are you projecting that?  I'm not
20 seeing it.
21      Q.   My apologies.  Do you see that now?
22      A.   There you go.  Thank you.
23      Q.   I took down the exhibit when we took
24 the break, because it's easier for when I deal
25 with my computer here.  So let me read it again.



LYNDON LEE, PHD
USA V SHARFI

May 04, 2022
257—260

Page 257
1   I'm on the bottom of Page 66.  Do you see the
2   first sentence under Section V.G.1.A, it says,
3   quote, "The DOJ expert team determined that 5.97
4   of wetlands on the site were directly impacted
5   with discharges of dredged and/or fill material."
6        You sea that sentence?
7   A.   Yes, sir, and you're correct in
8   identifying the omission of the abbreviation for
9   acre, AC.
10   Q.   Okay.  So -- all right.  So you
11   believe that there were 5.97 acres of wetlands on
12   the site when the defendants purchased it; is
13   that right?
14   A.   At least, yes.
15   Q.   And am I right that the delineation
16   of wetlands on the site is a topic for
17   Mr. Wylie's testimony?
18   A.   That's correct.
19   Q.   And so -- but the team calculated
20   the area of the wetlands down to a 100th of an
21   acre; is that accurate?
22   A.   It's probably precise.  I'm not sure
23   it's accurate.  I would have rounded up, but
24   that's the number they gave me.
25   Q.   Okay.  But the conclusion of the DOJ

Page 258
1   expert team calculates the acreage of wetland
2   down to the 100th of an acre, right?
3   A.   That's right.
4   Q.   So this refers to a figure, V.C.2.1,
5   so let me go to that figure.  So I'm back here at
6   Deposition Exhibit No. 73, and you can see I have
7   Figure V.C.2.1.  Do you see that?
8   A.   Yes.
9   Q.   And so this figure shows where you
10   believe there were wetlands on the site prior to
11   the defendants' activities, right?
12   A.   That's correct.
13   Q.   And by the way, just to repeat
14   something that I think we discussed earlier today
15   but outside the context of the figure, you also
16   believe that most of the area that's shown on
17   this figure as wetlands prior to the defendants'
18   ownership of the site remain wetlands today; in
19   other words they still have the three
20   characteristics of a wetland; is that right?
21   A.   That's correct, but as I stated
22   before, they are wholly different systems because
23   of the degree of disturbances that took place.
24   Q.   Okay.  So this figure that shows the
25   delineation of wetlands the DOJ team came up with

Page 259
1   based on your site visits in 2021; is that right?
2   A.   That's correct.
3   Q.   So when you first saw the site, you
4   believe it already had been impacted, correct?
5   A.   Oh, there's no question.
6   Q.   Am I right that you believe that the
7   defendants discharged dredged and/or filled
8   material in all the wetlands on the site?
9   A.   Within the magenta polygon that's
10   shown in this figure, we think, except for small
11   areas in our residual depressional wetland in the
12   southeast corner, that the rest of it was highly
13   impacted with dredged or fill material,
14   redistribution of fill, et cetera.
15   Q.   Okay.  But the report says you
16   believe there's a discharge -- a discharge of
17   dredged -- a discharge of dredged or fill
18   material in 5.97 acres of wetland on the site.
19   Are you testifying now that is actually a
20   different number, a smaller number of acres that
21   was impacted?
22        MR. DOYLE:  Objection, misstates.
23        THE WITNESS:  The center of the
24        depression that we've been talking about in
25        the southeastern corner has been thinned,

Page 260
1        it's mowed and weed whacked, but that was
2        the only place within that magenta polygon
3        where I did not see accretion of fill or
4        redistribution of fill, although the edges
5        of that wetland, as we discussed earlier,
6        have been filled in.
7   BY MR. MCALILEY:
8   Q.   So --
9   A.   So there's a small area in that
10   depression that may not have been filled.
11   Q.   Okay.  So I want to -- I don't want
12   to go to the question of fill yet.  So you can
13   have a discharge of dredge material, and you can
14   also certainly have a discharge of fill material,
15   right?
16   A.   Not the way the definitions run in
17   the Clean Water Act.  It's dredge and fill
18   material, so -- and there's the Fill Memorandum
19   of Agreement that defines what fill is.  So here
20   what we have is a system of mechanical clearing
21   followed by excavation, import and export of
22   fill, and then redistribution of fill on the
23   site.  Most people talk about that in one bucket
24   and say that's discharge of dredge material or
25   dredge and fill material.



LYNDON LEE, PHD
USA V SHARFI

May 04, 2022
261–264

Page 261

1    Q.    So am I right, Dr. Lee, that you did
2  not see evidence of the discharge of dredge
3  and/or fill material in at least part of the
4  remnant depressional wetland on the south central
5  portion of the site?
6    A.    That's correct.  It had been
7  manipulated in different ways, but in the center
8  of it, I didn't think that they had imported fill
9  or redistributed fill.
10    Q.    And you would agree with me that
11  mowing grass or weed whacking plants does not
12  constitute the discharge of dredged or fill
13  material?
14    A.    That's correct.
15    Q.    So let's go back, then, to the
16  report here.
17    A.    Let me qualify that.  Hand mowing,
18  you can have huge mechanical mowers that
19  mechanically clear vegetation, and that would be
20  a different story.
21    Q.    Let's go back to the report.  So I'm
22  on Exhibit 72.  I'm at the bottom of Page 66.  So
23  again, back to the sentence, the DOJ expert team
24  determined that 5.97 acres of wetlands on the
25  site were directly impacted with discharges of

Page 262

1  dredged and/or fill material.
2        Am I right in understanding your
3  testimony here today that that is incorrect, that
4  there was a number less than 5.97 acres of
5  wetlands that were directly impacted with
6  discharges of dredged and/or fill material?
7    A.    I think it would be reasonable to
8  revise that number down if we were able to
9  calculate that area within the residual
10  depression that we talked about that was not
11  filled.  I'm guessing that would be an easy thing
12  to do.
13    Q.    So I want to go back here -- okay.
14  Well, maybe I don't need to go to the figure.
15        Am I right that you calculated the
16  area of the remnant depressional wetland to be
17  0.93 acres?
18    A.    Let me make sure I'm remembering
19  that correctly by referring to that figure.
20    Q.    Okay.  So let me exit out of the
21  report.  Let me go to the figures.
22        All right.  So can you see
23  Deposition Exhibit No. 73, and I have on here
24  Figure V.C.2.1?
25    A.    That's not the figure I was looking

Page 263

1  for.  There's another one that looks like it has
2  that number reported.  That one.  That one.
3    Q.    Great.  So now -- and I'll just zoom
4  in a little bit so you can see the caption there.
5  This is Figure V.G.1.B.1, Expert Team's Estimated
6  Area of Fill Within the Delineated Wetland Area.
7        "Area fill is 5.97 acres less than
8  0.79 acre of remnant depressional wetland or 5.18
9  wetland acres filled"; is that right?
10    A.    Yes, I wanted to verify that my
11  memory was correct.  It's .79 acres.
12    Q.    And this figure shows the area of
13  the remnant -- the remnant depression wetlands
14  that you think were not filled by the defendants,
15  right?
16    A.    The edges of it were.  The center
17  was not.
18    Q.    Right, so there was -- you can see
19  on this figure it shows -- it shows in the
20  crosshatching here, like diagonal lines, the
21  areas that you believe were impacted by the
22  discharge of fill material, right, across the
23  site?
24    A.    That's our best -- that's our best
25  outline of that depression.

Page 264

1    Q.    And so inside that outline of the
2  depression on this figure, those are areas
3  that -- where there was no discharge of fill
4  material to the best of your knowledge, right?
5    A.    Yeah, at that scale there's --
6  again, there's fill along the margins of that
7  depression that we probably captured with that
8  black line.
9    Q.    Okay.  So do you believe there was a
10  discharge of dredge material inside the remnant
11  depressional wetland?
12    A.    Not in the center.
13    Q.    So when you say the center, this
14  would be the area that is -- the polygon that's
15  on Figure V.G.1.B.1?
16    A.    That's correct, in the center of
17  that polygon.  So if you walked into the middle
18  of that polygon, that would be the center of it,
19  and if you start to walk to the edges along --
20  especially the southern and northern edges, there
21  were discharges of fill.
22    Q.    Hold on a second.  You just said
23  "discharges of fill."  All right.  So this figure
24  says that your estimated area of fill does not
25  include the polygon that showed as a remnant



Page 265

1  depressional wetland.  Is it your testimony now
2  that there, in fact, was the discharge of fill
3  material inside the polygon shown on Figure
4  V.G.1.B 1?
5      A.   My point is that we're dealing with
6  an exceedance of the scale of which this figure
7  is presented.  I'm not trying to change the
8  numbers.  I'm just saying on the margins,
9  if we were to walk where that black line is, we
10  would probably see discharges of fill that were
11  associated with road construction, et cetera,
12  that are on or transgressed that boundary, but
13  it's a matter of error.  It's not -- it's small.
14  I'm not changing the .79 acres of remnant
15  depression.
16      Q.   Okay.  However, when you did your
17  calculation of wetland impacts for purposes of
18  scoring for both functional impact and also for
19  mitigation, didn't you assume it impacts all 5.97
20  acres of wetlands delineated by the DOJ team?
21      A.   I did.
22      Q.   But yet this figure shows that at
23  least 0.79 acres were not impacted, were not
24  subject to discharge of dredged and fill
25  material, right?

Page 266

1      A.   That's correct.
2      Q.   So your calculations are wrong, they
3  overestimated a little bit, because they're
4  including -- they're calculating impacts to 5.97
5  acres, but it's something less, and this figure
6  indicates 5.18 acres, right?
7      A.   Right, but the reason I did that is
8  because there were discharges into some of those
9  areas, and then there was degradation of function
10  through clearing and manipulation of the
11  vegetation, mowing, et cetera.  And taken as a
12  whole, you're looking at direct, indirect,
13  cumulative, and temporal impacts, so that's why
14  I considered it that way.
15      Q.   The defendants did not need to get a
16  permit from the federal government under the
17  Clean Water Act to mow -- use hand mowers to mow
18  plants, send workers in there with saws and
19  loppers to cut down trees, or otherwise to weed
20  whack plants in the depressional wetland, right?
21      A.   That's correct.
22      Q.   Okay.  So why would they -- so why
23  should they be required to pay for off-site
24  wetland mitigation for activities that didn't
25  even require a permit from the federal

Page 267

1  government?
2      A.   Because it's part and parcel
3  embedded in the wider footprint of the impacts,
4  and there are temporal and cumulative
5  considerations that are also regulated, and
6  that's a way to basically mitigate the whole
7  impact.
8      Q.   So your requested mitigation that
9  you've identified in the report includes
10  mitigation for activities that didn't even
11  violate the Clean Water Act, right?
12      A.   In part of that property, but it's
13  so chopped up that it makes sense to make that as
14  best -- as good as it can be, and then take
15  mitigation for cumulative, temporal, and indirect
16  impacts off site.
17      Q.   A single unit of wetland mitigation
18  costs $250,000 of the Blue Field Mitigation Bank,
19  right?
20      A.   That was their current estimate,
21  yes, sir.
22      Q.   So would you agree with me that
23  mitigating 0.79 acres of impact in the remnant
24  depressional wetland, if the defendants are
25  required to do them, could cost them

Page 268

1  approximately $200,000?
2      A.   That's approximately the proportion,
3  that's right.
4      Q.   So you think that -- so you think
5  the Court should order the defendants to pay
6  approximately $200,000 to mitigate impacts that
7  weren't even regulated by the Corps of Engineers?
8      MR. DOYLE:  Objection, vague.
9      THE WITNESS:  Could you please
10      repeat the question.
11  BY MR. MCALILEY:
12      Q.   You think the Court should order the
13  defendants to pay approximately $200,000 to
14  mitigate impacts that weren't even regulated by
15  the Army Corps of Engineers?
16      MR. DOYLE:  Same objection.
17      THE WITNESS:  What I'm recommending
18      in the construct of the mitigation is that
19      the magnitude of the direct, indirect,
20      cumulative, and temporal impacts on the
21      site to the wetlands, including this
22      wetland, in its margins as -- they're big,
23      and they're sufficient to require not just
24      a one-for-one put, but basically a little
25      bit more that would account for things like



LYNDON LEE, PHD                                    May 04, 2022
USA V SHARFI                                              269–272

Page 269

1       temporal loss, cumulative impacts, et
2    cetera.
3    BY MR. MCALILEY:
4       Q.   Let me go back to the report here.
5    So I put back up Deposition Exhibit 72.  Let me
6    go down to -- let's see -- the first full
7    paragraph on Page 67.  It says, quote, Figure
8    V.G.1.B.1 shows the area of the expert team
9    wetland delineated area of the site that has had
10   fill deposited.  The area of deposited fill
11   includes the two ponds, parenthesis, Cypress Lake
12   and Peanut Lake, because they did not exist prior
13   to impact and the process of construction
14   involved excavation and moving of soil, end
15   quote.
16          Did I read that right?
17   A.   Yes, sir.
18      Q.   All right.  So this is -- the figure
19   referred to is the one we were just looking at
20   that shows the areas of site you think were
21   filled, right?
22   A.   Right.
23      Q.   So you're counting the areas of fill
24   the two ponds that exist on the site, correct?
25   A.   Yes, those ponds had moved around or

Page 270

1    they've changed shape several times through the
2    sequence of photos that I've reviewed.
3       Q.   Was the bottom elevation of those
4    ponds lower than the original bottom elevation of
5    the ground on the site before the work was done?
6    A.   I do not know.
7       Q.   Would you agree with me that it's
8    very possible that the bottom elevation of those
9    ponds is lower than the ground elevation that
10   existed on the site before the defendants'
11   activities?
12   A.   I do not know.
13      Q.   But it's possible, right?
14   A.   It's possible.
15      Q.   So you're counting as an area that's
16   filled two areas that have actually been
17   excavated deeper than existed on the site before
18   the defendants' activities?
19   A.   Yeah, but that falls into the
20   category of redistribution of fill on the site,
21   and that is a discharge.
22      Q.   Okay.  So your opinion is they
23   filled those ponds, even though the ponds are
24   excavated when you look at the site today, right?
25   A.   My opinion is the construction

Page 271

1    activity that took place to make those ponds and
2    to move them around as they have included the
3    activity of redistribution of fill in those
4    areas, and that under the Clean Water Act is
5    fill.
6       Q.   Let's go to the next section here on
7    Page 67.  This is Section V.G.1.B, Volume of
8    Fill.  Do you see that there on the screen?
9    A.   Yes.
10      Q.   This is also a section that you
11   wrote, correct?
12   A.   I believe that Dr. Stewart is
13   identified as doing that.
14      Q.   Okay.  Let me just -- I'm sorry
15   about that, let me see.
16   A.   Just double-check that.
17      Q.   You know what, you're exactly right,
18   so I will skip over this then.  I apologize.
19          Let's go down to the next section,
20   5.G.1.C, is that one of your sections?
21   A.   Yes.
22      Q.   Okay.  You're going to testify about
23   the topics that are covered in this Subsection C,
24   correct?
25   A.   Correct.

Page 272

1       Q.   So let's go to the first paragraph
2    here.  It's a numbered Paragraph 1, it's the very
3    bottom of Page 67 and continues to 68.  I'll read
4    it aloud.  Quote, "The combined direct impacts"
5    -- I'll skip over the words -- "associated with"
6    and then the list of things, "significantly
7    changed the bottom elevation of WOTUS, Waters of
8    the U.S., changed wetlands to uplands, and
9    functionally and physically isolated any
10   remaining wetlands on the site, abutting wetlands
11   on the Countess Joy East reference area, the
12   north/south ditch, the Bessey Creek ecosystem
13   including its downstream TNW reach and from TNWs
14   of the St. Lucie River, St. Lucie Inlet, and
15   nearshore waters of the Atlantic Ocean."
16          I'll stop reading there.  Did I read
17   that basically right other than I left out the
18   series of words that describe the activities?
19   A.   Yes, and I apologize for the typos
20   in that paragraph.
21      Q.   I understand, and I read through the
22   typos there, I think we can figure out what you
23   meant there.  So is this a true and correct
24   statement, Dr. Lee, that paragraph --
25   A.   Yes.



LYNDON LEE, PHD
USA V SHARFI

May 04, 2022
273–276

Page 273

1    Q.    So the site is now functionally
2 isolated from other wetlands in Bessey Creek?
3    A.    I believe so, yes.
4    Q.    And it's now physically isolated
5 from the north/south ditch, the Bessey Creek
6 ecosystem, and the downstream TNWs, right?
7    A.    No, we discussed earlier that
8 we think that those ponds are plumbed west into
9 the north/south ditch, although we could not find
10 or see the outfalls.  If there is no connection,
11 then are hydrologically isolated.  In any event,
12 they are certainly functionally isolated as a
13 result of fencing, development of the site,
14 roads, et cetera.
15    Q.    Right, so we talked about the ponds
16 and the connections to the ditch earlier, and
17 just to recap, you have no actual evidence that
18 those ponds connect to the ditch, you just can
19 guess that they might be, but you have no actual
20 evidence that they connect to the ditch?
21    A.    We did not find the connection.
22    Q.    Okay.  So let's go to the next
23 sentence here.  The next Paragraph, No. 2, it's
24 on Page 68, quote, The scale and scope of the
25 water/wetlands impact on the site are such that

Page 274

1 original conditions that would support the suite
2 of hydrologic, biogeochemical, plant community,
3 and faunal support/habitat ecosystem functions
4 are not present and not recoverable, end quote.
5        Did I read that right?
6    A.    That's correct.
7    Q.    Is that a true and correct statement
8 in your opinion?
9    A.    I believe so.
10    Q.    So it's your belief that the wetland
11 functions that existed on the site are no longer
12 present and are not recoverable, right?
13    A.    That's correct.
14    Q.    And does that include the remnant
15 depressional wetland on the site?
16    A.    Unless it's managed differently,
17 it would.  In any event, I rated it as a Point 4,
18 acknowledging that some function exists, meaning
19 I assess that it's performing at 40 percent of
20 its capacity.
21        So with that exception, the other
22 stuff on the site has been so perturbed and so
23 changed that mechanical clearing import and
24 export of fill, redistribution, conversion to
25 pasture grass, it's a change of state.  It's not

Page 275

1 a peat-based system or muck-based system any
2 longer, and you don't get that back.
3    Q.    So there's really nothing you can do
4 on the site now that can recover the wetland
5 function that existed prior to the defendants'
6 activities, that's your opinion?
7    A.    Except in our remnant depression,
8 there's some things you can do there, but the
9 question, then, is, is there environmental
10 benefit in doing it.  And as I recommended in the
11 mitigation sections of this report, I would tack
12 the boat and basically go off site and do some
13 on-site stormwater management measures, et
14 cetera, that could improve water quality
15 conditions.
16        I would manage the central
17 depression a little bit differently, but
18 basically put money where you have more upside
19 potential for environmental benefit that would
20 basically constitute a restoration.
21    Q.    Okay.  I want to go down to --
22 further down the page where -- let me see.  So
23 the bottom of the page of Page 68, the last
24 paragraph is labeled little A, and there's two
25 little A paragraphs one after the other.  I'm

Page 276

1 reading the second one here, and let me focus on
2 that.  It says, quote, "(a), Water flows
3 emanating from the paddock pasture area to the
4 east vicinity B8, are now directed piped into,
5 and flow through the remaining depression.  These
6 flows then go south through a pipe installed in
7 the southern perimeter of the wetland, or they
8 can potentially flow west to the ornamental
9 Cypress Lake, planted cypress, to the west,
10 vicinity B1, B2, via a shallow and nearly level
11 ditch/swale.
12        It is possible that flows in this
13 swale can be bidirectional if the outlet pipe in
14 the south end of the remnant depression is
15 plugged."
16        Let me just stop there.  So all this
17 language here is talking about the flows of the
18 water on the site between the paddock and pasture
19 areas and the remnant pond -- the remnant wetland
20 depression and the ponds, right?
21    A.    Yes, and this is what we were
22 discussing earlier this afternoon.
23    Q.    Okay.  The next sentence says,
24 quote, From the central Cypress Lake feature,
25 water appears to be used for irrigation or



LYNDON LEE, PHD
USA V SHARFI

May 04, 2022
277–280

Page 277
1  we think it can be shunted west or south by a
2  pipe flow or a subsurface drainage system to the
3  south and/or west and eventually to the
4  north/south ditch that flows north and into
5  Bessey Creek, end quote.
6        Did I read that right?
7    A.  Yes, sir.
8    Q.  So am I right that this is what
9  we discussed earlier that you think that there
10  may be a pipe that takes water from the Cypress
11  Lake feature to the north/south ditch, but you
12  have found no evidence of that, right?
13    A.  We've discussed that, yes.
14    Q.  But I got that right, correct?
15    A.  Yes.
16    Q.  Then it goes on.  So let's go to the
17  last sentence here on -- of this little A, now
18  I'm on Page 69, the first full paragraph on
19  Page 69.  The last thing says, quote, Hence poor
20  water quality is directed downgradient south by a
21  pipe flow or west into Bessey Creek which is
22  itself impaired, end quote.
23        Do you see where I read that?
24    A.  Yes.
25    Q.  So you're saying that the poor water

Page 278
1  quality is directed downgradient south via pipe
2  flow or west into Bessey Creek.  So let me break
3  this down.  Am I right that south via pipe flow
4  is a reference to that pipe you said was in the
5  remnant depressional wetland and goes south
6  towards ponds on other property that Mr. Sharfi
7  owns?
8    A.  Yes, we discussed that.  I said
9  it flowed under the parcel boundary and then
10  south into -- and downhill into other water
11  features.
12    Q.  And to your knowledge, those ponds
13  that are on the property south of the site are
14  not connected to Bessey Creek, right?
15    A.  I don't think they are.
16    Q.  All right.  So then I go back to the
17  sentence.  It says -- you know, "Poor" --
18  it says, "Poor water quality is directed
19  downgradient south via pipe flow or west into
20  Bessey Creek."
21        When you say west into Bessey Creek,
22  is that a reference to it could possibly go into
23  the north/south ditch, which then connects up to
24  Bessey Creek?
25    A.  That's correct.

Page 279
1    Q.  So this is what we discussed that
2  you actually have no evidence that there is any
3  pipe flow from the site to the north/south ditch,
4  right?
5    A.  That's correct, and in rereading
6  that sentence, I should have said "or west into
7  the north/south which flows into Bessey Creek" to
8  make it more clear.
9    Q.  Thank you.  That's helpful.  Okay.
10  Let me go to the next section you wrote, which
11  I think is Section V.G.3.  So now I'm on Page 71.
12  This is a section that you wrote, correct?
13    A.  Yes.
14    Q.  Now, the title of this section is
15  cumulative impacts are defined at 40 CFR
16  230.11 (G) as follows.  Could you tell me what is
17  the relevance of 40 CFR 230.11(G) to this case?
18    A.  Those are the 404B1 guidelines.
19        THE COURT REPORTER:  I'm sorry, I
20     didn't understand what you said, Doctor.
21        MR. MCALILEY:  404B1 guidelines.
22  BY MR. MCALILEY:
23    Q.  Dr. Lee, the 404B1 guidelines are
24  guidelines that govern the issuance of permits
25  by -- or under the Clean Water Act, Section 404,

Page 280
1  right?
2    A.  Correct.
3    Q.  Those are permitting guidelines,
4  aren't they?
5    A.  And they're also oversight
6  guidelines directing EPA to perform their
7  oversight role with the Corps.
8    Q.  Okay.  But those are not -- those
9  guidelines don't govern -- well, hold on.  Let me
10  rephrase this.
11        It's the plaintiff's position in
12  this case that the defendants did their activity
13  without a permit, right?
14    A.  Yes.
15    Q.  So if they didn't get a permit, why
16  do the permitting guidelines apply here?
17        MR. DOYLE:  Objection, vague.
18        THE WITNESS:  It's also the
19     plaintiff's position that they should have
20     gotten a permit, and if they had gotten a
21     permit, they would have had to paid
22     attention to direct, indirect, cumulative,
23     and temporal impacts that were potentially
24     associated with their development plans.
25  BY MR. MCALILEY:



LYNDON LEE, PHD
USA V SHARFI

May 04, 2022
281–284

Page 281

1    Q.   So this is sort of a hypothetical
2   discussion then.  If they had gotten -- if they
3   had gone to get a permit, then these guidelines
4   would have applied, and here's how it might have
5   applied to this case; am I following you right?
6    A.   Yes --
7        MR. DOYLE:  Objection, vague.
8        THE WITNESS:  In general, yes, but
9    what I'm saying is that if they had gotten
10   a permit, they would have had to have paid
11   attention to this definition of "cumulative
12   impact."
13  BY MR. MCALILEY:
14   Q.   Okay.  So let's go -- what I'd like
15  to do is go through this a little bit.  It goes
16  on for several pages here.  Let's go to the top
17  of Page 73, it's the first paragraph there, and
18  I want to read the last sentence of this
19  paragraph.
20      Quote, "These types of conditions
21  have significant impacts downstream to Bessey
22  Creek and to the TNWs of Lower Bessey Creek, the
23  St. Lucie River system, and to the nearshore TNWs
24  of the Atlantic Ocean."
25      Do you see that language?

Page 282

1    A.   Yes.
2    Q.   Did I read that right?
3    A.   Yes.
4    Q.   And are the -- are these conditions
5   referenced here the conditions on the site after
6   the defendants engaged in their activities?
7    A.   Yes.
8    Q.   So what are the significant impacts
9   downstream to Bessey Creek and to the TNWs?
10   A.   Well, in this section we're talking
11  about cumulative impacts, and so I identified
12  time and space crowded, synergistic and
13  fragmentation and middling impact, which is a
14  common way to talk about cumulative impacts, and
15  I have paragraphs associated with each of those
16  classes of community cumulative impacts that
17  describe exactly what I'm talking about.
18      Fragmentation, for example, you chop
19  the site up and isolate it.  Time crowded, you
20  impact the site in successive events of clearing
21  and earthwork, et cetera, so it doesn't have time
22  to recover.  The same sort of logic for temporal
23  impacts wherein -- excuse me, space crowded
24  impacts where you impact the site in a spatial
25  work area way with sufficient frequency so

Page 283

1   it doesn't have time to recover.
2       The idea of synergistic impacts
3   wherein, you know, two plus two doesn't
4   necessarily equal four.  If you excavate out muck
5   soils from a site, import sand and other fill
6   materials, redistribute and adjust bottom
7   elevations, consolidation drainage, all those
8   things add up to, in part, an impact which is
9   more than the sum of other parts.
10   Q.   So if I go to this section, you have
11  a list -- you identify these cumulative impacts
12  that you described, and they are -- the
13  discussion of the impacts start on Page 72 and it
14  is these -- these lettered paragraphs A through
15  D; is that right?
16   A.   Yes, sir.
17   Q.   If I look at A on Page 72, time
18  crowded impacts, am I right that these are all
19  impacts that occur to wetlands on the site?
20   A.   Yes.
21   Q.   These are not impacts that occur in
22  Bessey Creek or the downstream TNWs, correct?
23   A.   That's correct.
24   Q.   If I go to B, space crowded impacts.
25  These are all impacts on the site as well,

Page 284

1   correct?
2    A.   That's correct.
3    Q.   These are not impacts on Bessey
4   Creek or the downstream TNWs, right?
5    A.   Well, when you talk about cumulative
6   impact, you're working usually at landscape
7   scale.  So what I'm saying is that the activities
8   on the site resulted in cumulative impacts which
9   have downstream effects on water quality and
10  other degradation, maybe the timing of water
11  delivery to the Bessey Creek system.
12      So there's direct impacts on the
13  site, and the cumulative scale of impact on the
14  site, which I'm trying to characterize here, also
15  have downstream effects.
16   Q.   What I'm focused on here is the
17  downstream effects, the effects on Bessey Creek
18  and the downstream TNWs.
19   A.   Okay.
20   Q.   Am I right that nowhere in B on this
21  page do you talk about water quality or timing of
22  delivery of waters to Bessey Creek or downstream
23  TNWs?
24   A.   Okay.
25   Q.   Is that accurate?



LYNDON LEE, PHD                                    May 04, 2022
USA V SHARFI                                        285–288

Page 285

1    A.   I don't see -- I'm scanning.  Can
2  you scroll down?
3    Q.   Sure.  I'm in B right now, though.
4  I'm going paragraph by paragraph?
5    A.   Just in B, that's correct.
6    Q.   Okay.  So I go to the next one,
7  fragmentation of aquatic faunal habitat patch
8  size.  Am I right that this section primarily
9  discusses impacts on cumulative impacts on the
10  site itself?
11    A.   That's correct.
12    Q.   So which -- which -- in this
13  paragraph, which impacts relate to effects on
14  downstream waters, Bessey Creek, and the TNWs?
15    A.   Well, it says that -- in the middle
16  sentence, it says, "Current conditions on the
17  site also isolate, constrict, or eliminate
18  upstream and downstream movement pathways for
19  several processes.  Aquatic species, it has the
20  same effect on relatively small
21  riparian-dependent faunal species.
22         So changes in pattern of flow and
23  circulation have downstream effects, both
24  hydrologically, which Dr. Nutter can discuss, and
25  in terms of the movement of animals up and down

Page 286

1  the system.
2    Q.   Okay.  So I think we've covered some
3  of this before.  Have -- have you identified any
4  specific animal that previously used the site and
5  went down to the downstream TNWs that no longer
6  can do today?
7    A.   No.
8    Q.   And if we're talking about pathways
9  for aquatic creatures, that deals with the flow
10  of water, and the best person for me to ask about
11  those pathways is Dr. Nutter?
12    A.   Yes.
13    Q.   Let's go to the synergistic impacts
14  here.  So this is on the bottom of Page 72 and
15  into Page 73.  Am I right that most of the
16  synergistic impacts identified in this section of
17  the report concern impacts on the site?
18    A.   Yes, but I do discuss, for example,
19  site waters, wetlands, sediment discharges to
20  downstream waters.
21    Q.   To your knowledge there are no
22  sediment discharges to downstream waters today,
23  because you have no evidence that water from the
24  site connects to the north/south ditch or Bessey
25  Creek anymore, right?

Page 287

1         MR. DOYLE:  Objection, vague.
2         THE WITNESS:  There's drop-in
3  structures in the northwest corner that go
4  to the north ditch that runs east/west
5  along the northern property boundary, and
6  that ditch, as we discussed earlier,
7  connects to the north/south ditch, and
8  there's sediment and poor water quality
9  going into those drop-ins and then
10  ultimately into the north/south ditch.
11  BY MR. MCALILEY:
12    Q.   So it is -- it is your testimony
13  that water -- surface water from the site flows
14  from the site into the north/south ditch, at
15  least through the root of that ditch that's on
16  the northern boundary of the site?
17    A.   Yeah, it's a storm -- it receives
18  water from a stormwater system that was installed
19  in the northwest corner of the site in that
20  paddock area.  That plumbing is actually shown on
21  some of the design plans.
22    Q.   Okay.  So, Dr. Lee, I want to go
23  back to an earlier section of the report, and am
24  I right -- so I'm going to a section of the
25  report which has been written by Mr. Wylie on

Page 288

1  indirect impacts.  This is Section V -- let's
2  see, this is V.G.2.B on Page 70.  Do you see that
3  on the screen?
4    A.   I do.
5    Q.   I'm going to read you the first
6  sentence.  Quote, The site disturbances including
7  land leveling, filling, and draining wetlands had
8  disconnected the surface and subsurface flow path
9  to adjacent wetlands and waters, period, end
10  quote.
11         Is that a true and correct
12  statement, sir?
13    A.   I believe so, yes.
14    Q.   Next sentence, quote, The elevated
15  roadbeds prevent the flow of surface water to the
16  north/south ditch and the Countess Joy wetlands
17  north of the site, end quote.
18         Did I read that correctly?
19    A.   Yes.
20    Q.   Is that a true and correct
21  statement?
22    A.   I believe so.
23    Q.   Okay.  Let's go back to your
24  sections of the report.  So I want to go back to
25  this statement here at the end of the first



LYNDON LEE, PHD
USA V SHARFI

May 04, 2022
289–292

Page 289

1  paragraph on Page 73 where we started on this
2  discussion where it says -- again, I'll read it.
3      Quote, "These types of conditions
4  have significant impacts downstream to Bessey
5  Creek and the TNWs of Lower Bessey Creek, the St.
6  Lucie River system, and the nearshore TNWs of the
7  Atlantic Ocean."
8      So when I asked you -- a little
9  while ago you testified that the activities on
10  the site could affect the downstream TNWs, you
11  mentioned, through water quality and the timing
12  of delivery of water; did I hear you right?
13      A.   Those were examples I used, yes.
14      Q.   So let me start with this:  What
15  data do you have about the effects of the
16  defendants' activities on the site on those
17  downstream TNWs?
18      A.   We did not do water quality studies
19  or detailed flow studies, which would have been
20  Dr. Nutter's realm.  What I'm looking at is the
21  overall impact, cumulative impact, of that type
22  of disconnection to the quality of water that
23  would be flowing in the Bessey Creek system.
24      Q.   Okay.  So let me break this down.
25  You did not do any water quality studies of

Page 290

1  the -- related to this case, right?
2      A.   That's correct.
3      Q.   So you don't know how much -- what
4  the -- what the water quality was before the
5  defendants' activities and what's the water
6  quality after the defendants' activities, right?
7      MR. DOYLE:  Objection, vague.
8      THE WITNESS:  We have data -- are
9  you talking about on the site or in the
10  Bessey Creek system?
11  BY MR. MCALILEY:
12      Q.   Let me ask this -- let me ask this
13  differently.  You don't know what the water
14  quality was of water that went either down the
15  north/south ditch or in the east/west ditch north
16  of the site prior to the defendants' activities,
17  correct?
18      A.   We have no quantitative data for my
19  inspection of the pre-2018 aerial photos.  My
20  opinion is that it probably would have been
21  pretty good, because you have an intact matrix
22  mosaic of forest and scrub/shrub wetlands that
23  had allowed the water to pass through slowly, and
24  therefore, they were probably filtering, and
25  that's -- that tends to result in an improvement

Page 291

1  of the water quality.
2      Q.   You just used the word "probably"
3  and "maybe."  I definitely got the word
4  "probably."  It sounds like you don't know.
5  You're inferring that by looking at an aerial
6  photograph that existed prior to 2018; is that
7  right?
8      A.   And I'm applying my 45 years of
9  professional experience in wetlands and rivers
10  and looking at the functioning of an intact
11  forest and scrub/shrub mosaic of plant
12  communities treating flowing water.
13      Q.   But you can't tell me what the
14  pollutant load was in the north/south ditch in an
15  average year prior to the defendants' activities,
16  right?
17      A.   That's correct.
18      Q.   And you can't tell me what the
19  pollutant load is in the north/south ditch or
20  flowing from the defendants' property after their
21  activities, correct?
22      A.   I can't tell you the load, but I can
23  tell you what the water smells like, and that's
24  manure, and that continued toward the southern
25  end of the north/south ditch until you get to

Page 292

1  about the middle of the Countess Joy property.
2      Q.   Okay.  But, sir, you didn't smell
3  the water in the ditch, the north/south ditch,
4  prior to the defendants doing their activities,
5  did you?
6      A.   I did not.
7      Q.   All you can say is what you smelled
8  when you were out there in 2021, right?
9      A.   That's correct.
10      Q.   And there's cows defecating next to
11  that ditch in the Countess Joy property today,
12  right?
13      A.   Right, but I was standing in the
14  western perimeter of the Sharfi site when I made
15  that observation.
16      Q.   So when I say data, though, it means
17  you have -- you have no quantitative data and no
18  samples that would indicate anything about water
19  quality coming from the site before or after the
20  defendants' activities, right?
21      A.   We did not perform water quality
22  studies.
23      Q.   And you also testified you did not
24  have detailed flow studies either; isn't that
25  right?



LYNDON LEE, PHD
USA V SHARFI

May 04, 2022
293—296

Page 293

1    A.    That's correct, and I would defer to
2  Dr. Nutter on that.
3    Q.    And you actually don't have data
4  about any species of animals traveling between
5  the site and those TNWs before the defendants'
6  activities, do you?
7    A.    That's correct.
8    Q.    Can you tell me what percentage of
9  the wetland habitat near Bessey Creek was
10  represented by the site's wetlands before the
11  defendants engaged in their activities?
12    A.    Please re-ask that question.
13    Q.    Yeah, can you tell me what
14  percentage of the wetland habitat near Bessey
15  Creek was represented by the site wetlands before
16  the defendants' activities?
17        MR. DOYLE:  Objection, vague.
18        THE WITNESS:  Well, let's take some
19        raw numbers here and work with 5.97 and
20        let's round up to 6, and then the total
21        area of the Watershed 4 NWI wetlands that
22        Michael calculated, I'm drawing from memory
23        here, I cannot remember, but the proportion
24        would be 6 divided by the 1,000 or so acre
25        number that Michael came up with.

Page 294

1  BY MR. MCALILEY:
2    Q.    It was 1,064 acres.
3    A.    There you go.  There you go.  That
4  proportion, whatever that arithmetic works out.
5    Q.    Right, so would you agree with me
6  that 6 acres out of 1,064 acres is 0.5 percent?
7    A.    If you're performing that arithmetic
8  correctly.
9    Q.    Does that sound right?
10    A.    I haven't performed the arithmetic.
11    Q.    Does that sound -- order of
12  magnitude, it's less -- it's around half of a
13  percent of the total wetland habitat near Bessey
14  Creek?
15    A.    If that arithmetic is correct,
16  that's right.
17    Q.    Okay.  Let's go back to the report,
18  Page 73, next section, Temporal Impacts to Water,
19  Wetland Areas, and Functions.
20        So you wrote this section, right?
21    A.    I did.
22    Q.    So can I summarize this that -- can
23  I understand that this section summary says you
24  believe the defendants' impact should be treated
25  as permanent for purposes of UMAM scoring?

Page 295

1    A.    I'm sorry, ask that question again.
2    Q.    Yeah, I'm just trying to summarize
3  this so I can move on to the next section, which
4  is --
5    A.    I was focused on a typo in the
6  middle of the paragraph, I said EPA Region 6
7  again, and it's 4.
8    Q.    We're in EPA Region 4.
9        So this section, basically you say
10  you think the defendants' activities or the
11  impact should be treated as permanent for
12  purposes of UMAM scoring, right?
13    A.    Yes.
14    Q.    Okay.
15    A.    Or in combination, the Clean Water
16  Act guidelines also direct attention towards
17  consideration of the loss of functioning over
18  time as a type of impact that's associated with
19  the project.  So it's not just for UMAM,
20  it enters into the overall calculation of the
21  degree and significance of impact associated with
22  changes in the wetland as a result of
23  development.
24    Q.    And the guidelines you're referring
25  to, again, are the 404B1 guidelines?

Page 296

1    A.    And regional guidance that has
2  some -- some direction to field staff to look at
3  direct impacts area and volume of fill, indirect,
4  cumulative, and temporal effects.
5    Q.    Regional guidance, is this from EPA
6  Region 6?
7    A.    4.  It's national.  I said regional,
8  I meant national.  I used to teach that stuff for
9  EPA headquarters, and so there's basic protocols
10  and boxes to check as you look at a site and its
11  potential impacts.  One is direct, second is
12  indirect, there is temporal -- third is
13  cumulative, and the fourth is temporal.
14    Q.    Is that guidance you're referring to
15  listed on Pages 27 through 29 of the report where
16  you list the reference materials that were used
17  in your analysis?
18    A.    I'm not sure.  I think there's
19  characterization of the types of impacts that
20  occur.  I'm not sure that the steps that I just
21  laid out are there.
22    Q.    Okay.  So let's go to section -- the
23  next section, V.G.5, your UMAM summary.
24    A.    Okay.
25    Q.    And so I'm just going to group these



LYNDON LEE, PHD
USA V SHARFI

May 04, 2022
297–300

Page 297

1   sections here, and just first let me confirm you
2   wrote these sections, right?
3       A.   That's correct.
4       Q.   You're going to testify about your
5   UMAM scoring of the impacts at trial, right?
6       A.   That's correct.
7       Q.   And so I just understand the
8   process, you scored the wetland functions on the
9   site prior to the defendants' activities using
10  UMAM, right?
11      A.   I used the reference site that
12  was -- the 55-year-old stand due north of the
13  property to approximate what would have been
14  present on the Sharfi site prior to the
15  disturbance.  So in that way, yes, I did, I used
16  the reference.
17      Q.   And then you -- and then you scored
18  the wetland function on the site today after the
19  defendants' activities also using UMAM, right?
20      A.   That's correct, and I compared the
21  two.
22      Q.   Right, and you compared the two, the
23  pre-impact UMAM score and the post-impact UMAM
24  score, and that's how you calculated the total
25  wetland functional loss?

Page 298

1       A.   Yes, that's called the "delta."
2   That change is called "delta."
3       Q.   And your calculation of the total
4   wetland functional loss is based in part on your
5   calculation of the total wetland area on the
6   site, right?
7       A.   I stratified it, yeah.  I separated
8   out that .79 acres, and I said it wasn't a total
9   loss, but it was a great deal of functional loss,
10  and then I scored the remaining portions, the
11  arithmetic is below, for a greater functional
12  loss, places where there were buildings or places
13  where there's Bahia grass/turf mixture right now.
14      Q.   You would agree with me, Dr. Lee,
15  that if the total area of wetlands on the site
16  prior to the defendants' activities was less than
17  5.97 acres, then it -- then it would affect your
18  UMAM calculations of the functional loss, right?
19      A.   You can think of it that way, but
20  again, in trying to reach a mitigation solution
21  here, I think it's appropriate to look at the
22  site as a whole, and I weighted it -- some
23  remaining function in the depression that we've
24  been talking about and less remaining function in
25  other wetland but now significantly changed

Page 299

1   portions of the site.
2       Q.   So let's go to the next section
3   here, V.H?
4       A.   By the way, let me amend that
5   response.  Sorry to interrupt, but I also gave
6   portions outside the .79 acres that were impacted
7   and wholly turned to uplands, a nod to perform
8   some wetland function like .1, because we did not
9   tease out those portions of the Sharfi property
10  that were wholly converted to uplands from those
11  that were not -- not disturbed, which were highly
12  disturbed, but today retain some change
13  albeit wetland characteristics.  So I was lenient
14  in that calculation in giving some score to even
15  uplands within that 5.97 acre area.
16      Q.   Okay.  But, Mr. Lee -- I mean,
17  Dr. Lee, my question is very simple and basic.
18  If the -- if let's say the total area of wetlands
19  on the site wasn't 5.97 acres but was close to
20  the 3 acres, and that was the conclusion of the
21  judge, you would agree with me that your
22  calculations of wetland impacts for purposes of
23  mitigation would be less than what you
24  calculated, right?
25      A.   Yes, that's the way the arithmetic

Page 300

1   runs.
2       Q.   Okay.  Let me see.  So now I'm
3   looking -- let's go to the bottom of Page 75, and
4   then it's Section V.H 1.  This is Overview On and
5   Off-Site Compensatory Mitigation.
6       A.   Okay.
7       Q.   So this is a section that you wrote,
8   right?
9       A.   Yes.
10      Q.   Okay.  So the first sentence you
11  indicate that the -- that the wetland functions
12  are no longer present and are not recoverable; is
13  that right?
14      A.   That's correct.
15      Q.   The second sentence you say the
16  impacts have been in place --
17      A.   Excuse me, let me amend that.  I say
18  the original functions are not recoverable.
19      Q.   Okay.  That's fine.  That's fair
20  enough.  The second sentence you say, "The
21  impacts have been placed long enough to be
22  considered permanent," right?
23      A.   Yes.
24      Q.   And that's your opinion, right?
25      A.   Yes.



LYNDON LEE, PHD
USA V SHARFI

May 04, 2022
301—304

Page 301

1    Q.    Let me go down and find -- let me go
2  to the top of Page 76, that paragraph continues.
3    A.    Okay.
4    Q.    The first full sentence says, quote,
5  "Therefore it is our opinion that there are no
6  meaningful environmental benefits that could
7  result from the attempts of on-site restoration
8  of remaining turf/pasture features, end quote.
9        Did I read that right?
10   A.    Yes.
11   Q.    Is that your opinion?
12   A.    Yes, and I articulated that or tried
13  to articulate it a few minutes ago.
14   Q.    Okay.
15   A.    Basically, if you look at this site
16  as a whole, where are you going to put your
17  money?  Are you going to try to repair something
18  that's changed the state and highly degraded, or
19  do you take that money and put it somewhere with
20  more upside potential to respond to restoration.
21  That's what I'm getting at.
22   Q.    The next sentence says, quote,
23  Further, there is little upside potential to gain
24  meaningful environmental benefit from restoring
25  the remaining and highly degraded forested

Page 302

1  wetland or the ornamental Cypress Lake features,
2  end quote.
3        Do you see that?
4    A.    Yes, and same response.
5    Q.    And that's an accurate statement of
6  your opinion, right?
7    A.    Yes.
8    Q.    So there's little upside potential
9  to gain meaningful environmental benefits from
10  restoring that remnant depressional wetland,
11  right?
12   A.    That's my opinion.
13   Q.    Okay.  The last sentence or the next
14  to the last sentence of the paragraph says,
15  quote, There are, however, some on-site
16  management approaches that target improvements in
17  water quality conditions on and flowing off the
18  site and include the use of standard best
19  management practice, BMP, for stormwater, end
20  quote.
21        Do you see that sentence?
22   A.    Yes, sir.
23   Q.    So am I right, though, based upon
24  our discussion earlier here today, you can't --
25  you don't even know that there's water flowing

Page 303

1  from the site to the north/south ditch and Bessey
2  Creek today, right?
3    A.    We've been over that.  I'm highly
4  suspicious that there is, especially at
5  high-water events, but I had not seen the pipe
6  connections that we've discussed.
7    Q.    Okay.  So if other than your
8  suspicions, if there's -- if there's no evidence
9  of water flowing from the site, you would agree
10  with me that -- if there's no water flowing from
11  the site, it can't be carrying pollutants with it
12  to Bessey Creek, right?
13   A.    Correct, the effect of the
14  development, then, would be to hydrologically
15  isolate the wetlands that used to exist, which is
16  further pertubation.
17   Q.    Okay.  So I want to go now to the
18  on-site recommendations.  That's on Page 76.
19   A.    Okay.
20   Q.    The first section is Install and
21  Maintain Site-wide BMPs or Best Management
22  Practices.  This is a section you wrote, right?
23   A.    Correct.
24   Q.    So you think the defendants should
25  be required to install best management practices

Page 304

1  on the site?
2    A.    He bills himself as an organic farm,
3  it seems logical to me.
4    Q.    Well, let me -- let me go back to
5  this whole section.  Am I right that this section
6  is intended to state what you -- what the
7  plaintiff wants the Court to order defendants to
8  do on the site?
9        MR. DOYLE:  Objection, vague.
10       THE WITNESS:  Sorry, Andy.
11       MR. DOYLE:  Objection, vague is all
12  I said.
13       THE WITNESS:  Okay.  It's a
14  beginning.  This is a list of very obvious
15  moves that one can make on a small farm
16  operation that would improve water quality
17  and improve his overall attempts to run an
18  organic operation.
19  BY MR. MCALILEY:
20   Q.    So these are measures that you think
21  the Court should order the defendants to take on
22  the site, right?
23   A.    It's a first draft of those
24  measures, yes, sir.
25   Q.    So this is some of the measures, but



LYNDON LEE, PHD
USA V SHARFI

May 04, 2022
305—308

Page 305

1   this isn't even all the measures you think the
2   Court should order?
3        MR. DOYLE:  Objection, vague.
4        THE WITNESS:  I think -- I've spent
5   a limited amount of time on that site, like
6   one day, and this is what I saw.  I'm sure
7   this could be improved.
8   BY MR. MCALILEY:
9        Q.   So let me just -- let me just -- I'm
10  going to go through your recommendations here for
11  on-site activities in a minute, but what are
12  other measures you think the Court should order
13  the defendants to do on the site that are not
14  listed in this section of the report?
15       MR. DOYLE:  Objection, vague.
16       THE WITNESS:  I don't have a
17  response to that.  I did the list to the
18  best of my ability, and I think that's a
19  pretty good list.
20  BY MR. MCALILEY:
21       Q.   Okay.  So just a minute ago you said
22  these are some of the measures, but there's
23  probably more.  I'm just trying to figure out can
24  you identify the more?
25       A.   I would need more time on the site

Page 306

1   is my point.  I got a one-day look, and I was
2   doing other things.
3        Q.   Okay.  Let's go back to the best
4   management practices.  So one BMP is that the
5   perimeter road should be graded so it drains
6   inward toward the middle of the site; is that
7   right?
8        A.   Right.  Right now it's crowned or
9   flat across the cross-section, and there's an
10  opportunity to direct water inward and use a
11  grassy swale or something like that in order to
12  slow the water down and spread it out, and hence
13  get some treatment.
14       Q.   Another BMP you think the Court
15  should order the defendants to do is put swales
16  along that road; is that right?
17       A.   That was the grassy swale component
18  of my last response, yes.
19       Q.   Are there any other BMPs that you
20  can think of as you sit here today that the Court
21  should order the defendants to install on the
22  site?
23       A.   I've already responded to that.
24  I think my list is exhaustive given the time
25  I had on that site.

Page 307

1        Q.   Would you agree that these -- that
2   those two types of BMPs would provide benefit to
3   any property like the site?
4        MR. DOYLE:  Objection, vague.
5        THE WITNESS:  Would you please
6   repeat that question.
7   BY MR. MCALILEY:
8        Q.   Would you agree that those two best
9   management practices would provide benefits to
10  any property like the site?
11       MR. DOYLE:  Objection, vague.
12       THE WITNESS:  Well, that's why
13  they're called best management practices,
14  is that type of biofiltration function for
15  stormwater coming off roads or other
16  impervious areas is indeed shown in the
17  scientific literature nationwide to improve
18  water quality internal to and emanating
19  from small agricultural operations.
20  BY MR. MCALILEY:
21       Q.   Let's go to the next section here,
22  Manage Ponds.  Again, we're on Page 76.  So you
23  think the Court should order the defendants to
24  regrade the perimeters of the ponds; is that
25  right?

Page 308

1        A.   I do.  Right now they're constructed
2   kind of like golf hazards with very steep sides,
3   and there's very little opportunity for water to
4   be slowed down and filtered in the periphery of
5   the pond areas, in the lawns that surround them
6   before the water enters the pond, and I think
7   it's a really easy and cheap solution to relax
8   those slopes, slow water down, spread it out, and
9   get a little filtration, biofiltration treatment.
10       Q.   And, Dr. Lee, you also think the
11  defendants should be ordered to plant native
12  trees, shrubs, and undergrowth species in a
13  buffer area around the ponds, right?
14       A.   Yes, and the reason I do is that
15  that provides a little bit more roughness which
16  will help to settle down the kinetic energy of
17  flowing waters and slow water down and spread
18  it out.
19       Q.   And you think the Judge should order
20  the defendants not to mow any of those plants,
21  right, in that buffer area?
22       MR. DOYLE:  Objection, vague.
23       THE WITNESS:  I think they should be
24  managed.  It should be a managed buffer,
25  and so it's a question of what they choose



LYNDON LEE, PHD
USA V SHARFI

May 04, 2022
309–312

Page 309

1    to plant and, you know, the mix of
2    vegetation that's in there.
3    BY MR. MCALILEY:
4       Q.   Dr. Lee, if I look in that section,
5    it looks like it's four sentences up from the
6    bottom, you see where it says, quote, Fence the
7    buffer, preclude grazing, and do not mow the
8    buffer, end quote.
9          Do you see where I read that?
10      A.   Got it, yeah.
11      Q.   That's a statement of your opinion
12   of what the Judge should order, right?
13      A.   Yes.
14      Q.   So basically you want the Judge to
15   order the defendants to change the landscaping on
16   their property, right?
17          MR. DOYLE:  Objection, vague.
18          THE WITNESS:  My recommendation here
19          was to reconfigure the landscaping in a way
20          that it still serves a purpose as an
21          aesthetic appurtenance but also functions
22          to improve water quality by filtration.
23   BY MR. MCALILEY:
24      Q.   So the next section is separate
25   clean roof water.  This is the bottom of Page 76,

Page 310

1    the bottom (sic) of Page 77, do you see that?
2       A.   Yes, I do.
3       Q.   So you think the defendants should
4    be ordered to capture and manage roof water
5    runoff?
6       A.   I think that's quite logical for two
7    reasons.  It's free water, and you can use that
8    for stock, et cetera.  And the second thing is it
9    makes the -- the separation of the roof water is
10   cheap, you can do it with gravity, and it reduces
11   the magnitude of dirty water that you have to
12   handle on the site through other stormwater
13   management mechanisms.
14      Q.   And so basically -- so when you say
15   capture the water, am I right that you mean like
16   have a gutter, and it would go to a barrel or
17   something like that to capture the water as
18   it comes off the roof?
19      A.   A barrel or tank or some people use
20   ponds, whatever vessel would work.
21      Q.   Would you agree with me that these
22   capturing roof water would make sense for
23   buildings on any kind of farm property, not just
24   this site?
25      A.   That's why it's a best management

Page 311

1    practices, yes, sir.
2       Q.   The next session here on Page 77,
3    Section 4, Manage the Remaining Forested Wetland
4    Depression.  Do you see that?
5       A.   Yes.
6       Q.   So you think the Judge should order
7    the defendants to make changes to that wetland
8    they preserved in the south central portion of
9    the property, right?
10      A.   Yeah.
11          MR. DOYLE:  Objection, vague.
12          THE WITNESS:  There's very -- pardon
13          me?
14   BY MR. MCALILEY:
15      Q.   I'm sorry, I was starting to ask the
16   next question, but go ahead.
17      A.   Okay.  I'll just say yes.
18      Q.   Okay.  So the measures you think the
19   Judge should order the defendants to do are all
20   listed here on Page 77, right?
21          MR. DOYLE:  Objection, vague.
22          THE WITNESS:  I'm a forester, those
23          are my recommendations.  It's my business
24          to manage forests.
25   BY MR. MCALILEY:

Page 312

1       Q.   So for instance, you think the
2    defendants should be ordered to create a 50-foot
3    buffer around that remnant wetland, right?
4       A.   Correct.
5       Q.   And you think that they should be
6    prohibited from mowing any of the plants that
7    live in that buffer, right?
8       A.   Except for weed control measures,
9    yes.
10      Q.   You also think the defendants should
11   be required to plant more trees in the wetlands,
12   right?
13      A.   Yes, they thinned to a density
14   wherein it's simply an invitation for invasive
15   weeds to fill in the gaps.
16      Q.   And you also think the defendants
17   should be ordered to remove exotic plants from
18   the wetland, don't you?
19      A.   That's straight up.  Those are
20   weeds, they're invasive weeds, please remove.
21      Q.   So there are exotic plants on the
22   Countess Joy property to the north, though, fair?
23      A.   Yes.
24      Q.   Do you think the owners of the
25   Countess Joy property should be ordered to remove



LYNDON LEE, PHD
USA V SHARFI

May 04, 2022
313–316

Page 313

1    exotic plants on their property?
2           MR. DOYLE:  Objection, vague.
3           THE WITNESS:  I have no opinion on
4       that.
5    BY MR. MCALILEY:
6       Q.   Why not?
7       A.   Because they're not looking at Clean
8    Water Act violation.  They're running a ranch.
9    They probably comply with the county weed law
10   requirement for noxious weeds.  Other than that,
11   let them do what they do.
12      Q.   Most of these recommendations that
13   you have for the Judge could be implemented on
14   the other properties around the site, couldn't
15   they, and yield some environment benefit?
16      A.   I would --
17          MR. DOYLE:  Objection, vague.
18          THE WITNESS:  I would encourage
19      that, yes.
20   BY MR. MCALILEY:
21      Q.   Right, but you just want the Judge
22   to order the defendants to do it on their site,
23   correct?
24          MR. DOYLE:  Objection,
25      argumentative, vague.

Page 314

1           THE WITNESS:  That's my
2       recommendation.
3    BY MR. MCALILEY:
4       Q.   Let's go to the next section,
5    Off-Site Recommendation and Opinions.  So this is
6    the bottom of Page 77.  So you wrote this section
7    as well, right?
8       A.   I did.
9       Q.   Am I correct that this is the very
10   last section of the report?
11      A.   Yes.
12      Q.   Okay.
13          MR. DOYLE:  Objection.
14          MR. MCALILEY:  What's that?
15          MR. DOYLE:  Objection, there are
16      other words beyond this section.
17          MR. MCALILEY:  The last substantive
18      section of the report, right, Doctor?
19          MR. DOYLE:  I'll allow that.
20   BY MR. MCALILEY:
21      Q.   Okay.  So this is a section that you
22   wrote as well, Dr. Lee, right?
23      A.   Correct.
24      Q.   Okay.  So let's go to the first
25   paragraph at the bottom of Page 78.  Quote, As no

Page 315

1    on-site restoration is really feasible, we
2    recommend purchase of credits from an existing
3    mitigation bank which is within the Martin County
4    service area, for example, the Blue Field Ranch
5    Mitigation Bank is such an entity, end quote.
6           Did I read that sentence correctly?
7       A.   Yes, sir.
8       Q.   What is a wetland mitigation bank?
9       A.   I'm sorry, did you say what is a
10   wetland mitigation bank?
11      Q.   What is a wetland mitigation bank?
12      A.   Repeat the question, please.
13      Q.   What is a wetland mitigation bank?
14      A.   Thank you.  It is usually a
15   commercial or private nonprofit organization who
16   own or control land who, in advance of opening,
17   go through a series of steps articulated by the
18   State and usually by the Corps of Engineers to
19   pass thresholds for restoration of wetlands and
20   waters, and they have a mechanism for assessing
21   how much so-called credit is available on any
22   parcel of land.
23          That's a certification process, lots
24   of up front costs and reports and studies and
25   administrative procedures.  When that is

Page 316

1    complete, the Corps and the State usually will
2    certify that operation.  Then they open up for
3    business, and they offer credits usually on a
4    per-acre basis or portions of an acre to entities
5    that have mitigation debts who are unable for
6    some reason to effect mitigation on their sites.
7           Mitigation banks are identified in
8    national policy as the priority, because over the
9    years, over the past 30, 35 years, we have
10   learned that they are more reliable and sort of
11   the go-to alternative rather than having somebody
12   who is not in the business try to effect
13   ecosystem restoration.
14          So the short answer is a wetland
15   mitigation bank is a commercial or private
16   nonprofit, usually, entity that sells mitigation
17   credits to offset impacts usually somewhere else.
18      Q.   So when you --
19      A.   And that somewhere else is a service
20   area.
21      Q.   Okay.  So the Bluefield Ranch
22   Mitigation Bank is a privately-owned business,
23   right?
24      A.   Yes, it is.
25      Q.   That's a for-profit business,



LYNDON LEE, PHD
USA V SHARFI

May 04, 2022
317–320

Page 317

1 correct?
2      A.   I believe it is, yes.
3      Q.   And so when you say that the -- you
4 think the Court should order the defendants to
5 purchase credits from an existing wetland
6 mitigation bank, right?
7      A.   Correct.
8      Q.   And so -- and the nearby wetland
9 mitigation bank is the Bluefield Ranch Mitigation
10 Bank right?
11      A.   It's the closest one within this
12 service area.  I think it's the only one in this
13 service area.
14      Q.   And -- okay.  So if it's the only
15 mitigation bank in the service area, that's where
16 the defendants would have to buy their mitigation
17 credits, right?
18      A.   I think so.  I have to check if it's
19 the only one, but it's the most prominent, put
20 it that way.
21      Q.   So when you say that they should be
22 required to purchase credits from a mitigation
23 bank, you mean that they should be required to
24 pay money to that third party, the Bluefield
25 Ranch Mitigation Bank, correct?

Page 318

1      A.   Yes, that's correct.
2      Q.   By the way, you want -- you think
3 the Court should order the defendants to pay
4 money to this for-profit business, Bluefield
5 Ranch Mitigation Bank?
6      MR. DOYLE:  Objection.
7      THE WITNESS:  Yes, to settle an
8 outstanding mitigation debt that resulted
9 from development activities on the site.
10 BY MR. MCALILEY:
11      Q.   Am I right that the cost of a single
12 credit at the Bluefield Ranch Mitigation Bank is
13 $250,000 right now?
14      MR. DOYLE:  Objection, asked and
15 answered.
16      THE WITNESS:  Correct.
17 BY MR. MCALILEY:
18      Q.   And that's actually -- when did
19 you -- when did you speak with the people at the
20 Bluefield Ranch Mitigation Bank to learn the cost
21 of a credit there?
22      A.   I was doing this work right before
23 Christmas and right after Christmas, so in
24 December and January of '21, '22 respectively.
25      Q.   Am I right that the prices for

Page 319

1 credits at mitigation banks can change over time?
2      A.   Yes.
3      Q.   So it's possible by the time we get
4 there, through the effects of inflation, the cost
5 of a credit could be even more than $250,000,
6 right?
7      A.   That's correct.
8      Q.   And you think the Court should order
9 the defendants to purchase 6.14 wetland
10 mitigation credits from that mitigation bank; is
11 that right?
12      A.   Can you please scroll down so I can
13 see the arithmetic.
14      Q.   Sure thing.  I think I've got
15 it here.  Let me see.
16      A.   Yeah, I tried to summarize it.
17      Q.   And I could -- I could zoom in
18 if you want?
19      A.   No, that's fine.  Yeah, I came up
20 using the assumptions that I've laid out in the
21 arithmetic that is provided through UMAM guidance
22 to minus 6.14 credits times $250,000 per credit
23 equals.
24      Q.   Okay.  So the total number of
25 credits you think the defendants should be

Page 320

1 ordered to purchase from Bluefield Bank
2 Mitigation Bank (sic) is 6.14 credits, right?
3      A.   Yes, I've laid that logic out.
4      Q.   And we've discussed earlier
5 throughout the day that it's your opinion that
6 there were 5.97 acres of wetlands on the site
7 that were impacted, correct?
8      A.   Correct.
9      Q.   And you know that defendants
10 preserved wetlands on the site?
11      MR. DOYLE:  Objection, vague.
12 BY MR. MCALILEY:
13      Q.   You acknowledged that the defendants
14 preserved the remnant depressional wetland on the
15 site, right?
16      MR. DOYLE:  Objection, vague.
17      THE WITNESS:  I did not acknowledge
18 that they preserved it.  I said they
19 degraded it.  What we discussed was they
20 didn't fill all of it.
21 BY MR. MCALILEY:
22      Q.   Okay.  So it's your opinion that the
23 defendants should be required to purchase more
24 wetland mitigation credits than there were
25 originally wetland acres that were impacted on



LYNDON LEE, PHD
USA V SHARFI

May 04, 2022
321–324

Page 321

1   the site; isn't that correct?
2           MR. DOYLE:  Objection, misstates
3   prior testimony.
4           THE WITNESS:  In prior responses
5   I outlined consideration of direct,
6   indirect, cumulative, and temporal losses.
7   It's common, especially to account for
8   cumulative and temporal losses, to have
9   more than a one-to-one ratio for
10   replacement for mitigation.
11  BY MR. MCALILEY:
12      Q.   So the answer is yes, you think the
13  defendants should be required to purchase more
14  wetland mitigation credits than the area of
15  impact that you believe were impacted on the
16  site, right?
17      A.   Yes, yes.
18      Q.   And you calculate the total cost to
19  be paid to this for-profit business, Bluefield
20  Ranch Mitigation Bank, to be $1,535,000; is that
21  right?
22      A.   I do.
23      Q.   And am I right that you believe that
24  $1,535,000 to represent the value of the wetlands
25  on the site prior to the defendants' activities?

Page 322

1           MR. DOYLE:  Objection, vague.
2           THE WITNESS:  I think that's a
3   reasonable number.
4   BY MR. MCALILEY:
5       Q.   Are you aware that the defendants
6   purchased the site in 2017 for $300,000?
7       A.   I believe I read that somewhere,
8   yes.
9       Q.   Are you aware that there's another
10  expert for the Government, Randall Rex, who
11  testified the site is worth today, this is after
12  the wetland impacts and other improvements,
13  $651,000?
14      A.   I am not.
15          MR. DOYLE:  Objection, misstates.
16          THE WITNESS:  I did not see his
17  work.
18  BY MR. MCALILEY:
19      Q.   Okay.  Does it sound right, though,
20  that there's -- that the -- that the property has
21  been valued by a government expert at
22  approximately $650,000 today?
23          MR. DOYLE:  Objection, calls for
24  speculation.
25          THE WITNESS:  Yeah, I have no

Page 323

1       expertise in the valuation in property
2       value per se.  What I'm looking at is
3       elimination of an intact forest and
4       scrub/shrub wetland, and that's serious.
5   BY MR. MCALILEY:
6       Q.   So, Dr. Lee, you believe the Court
7   should order the defendants to pay to the wetland
8   mitigation bank $1,535,000 for impacts to
9   wetlands on a property that cost $300,000 when
10  they bought it five years ago, right?
11      A.   Yes.
12      Q.   So the cost of wetland mitigation,
13  off-site wetland mitigation here is five times
14  the value of the entire property, that's your --
15  that's your testimony?
16          MR. DOYLE:  Objection, misstates
17      what he just testified to and
18      argumentative.
19          THE WITNESS:  The property value
20      will have changed over the intervening five
21      years.  It's been developed.  Some people
22      would add values to appurtenances and
23      structures.  I have no idea what that
24      property is worth today, but these are how
25      the numbers work out in the context of

Page 324

1       direct, indirect, cumulative and temporal
2       impacts to the wetlands that did exist on
3       the property.
4   BY MR. MCALILEY:
5       Q.   Okay.  If in theory this other
6   government expert, that you say you don't know
7   what their opinions are and Mr. Doyle is
8   objecting every time I mention, were to testify
9   that the value of the property today with all of
10  these site improvements is $651,000, you would
11  agree with me that you think the defendants --
12  that the value of the wetland mitigation is more
13  than double the total value of the property,
14  right?
15      A.   I'm not apprised of the assessor's
16  conclusions relative to the value of the
17  property, and that calls for speculation.  I
18  don't know.  All I've done is present the logic
19  consistent with the UMAM approach and consistent
20  with current market prices for wetland mitigation
21  credits.
22          MR. MCALILEY:  Could we take a
23      five-minute break, and I can go through my
24      notes to see what more I need to cover.
25          THE WITNESS:  Sure.



LYNDON LEE, PHD                                    May 04, 2022
USA V SHARFI                                       325–328

Page 325

1       MR. MCALILEY:  Great.
2       THE VIDEOGRAPHER:  Going off the
3   video record, 6:19 p.m.
4       (Thereupon, a break was taken.)
5       THE VIDEOGRAPHER:  We are now back
6   on the video record, 6:22 p.m.
7   BY MR. MCALILEY:
8       Q.   So, Dr. Lee, have I now questioned
9   you about every section of the report that you've
10  been a principal author of?
11      A.   I believe we've covered it.
12      Q.   And those are the sections of the
13  report that is the basis of your testimony at
14  trial, right?
15      A.   That's correct.
16      Q.   Is there any other topics or
17  opinions that you expect to offer at trial that
18  I haven't covered today in our questioning?
19      A.   Not that I can see.
20      Q.   Okay.  Are there -- are there any
21  changes to the report that you intend to make?
22      A.   I would like -- I would like to do
23  two things.  We've observed a few typos along the
24  way today, I'd like to fix those.  And we would
25  like to offer to amend the report with a table

Page 326

1   that somehow didn't make it in there, which were
2   Ms. Wylie's list of the species that he observed
3   on the site, so like a one-pager.  If we could be
4   allowed to do that, that would be consoling for
5   me.  I don't like typos.
6       Q.   I'll leave it up -- I'll leave it up
7   to your counsel as to how he wants to proceed on
8   that, but thank you on that.
9       A.   Okay.
10      MR. MCALILEY:  So definitely I just
11  want to say thank you very much both for
12  your patience today, because I know these
13  are long days, and also for your
14  flexibility the last time we had this thing
15  scheduled, because when I -- when I
16  realized I was saying 9 a.m., that was my
17  time, not your time, and then it just meant
18  that the schedule was going to be -- I was
19  going to have a problem late in the day.
20      So I appreciate your flexibility
21  then, thank you for your patience today,
22  and I have no further questions today in
23  this deposition.
24      THE WITNESS:  Okay.  Thank you very
25  much for the whole day, it's good.

Page 327

1       MR. DOYLE:  Dr. Lee, unfortunately
2   I have a few, but I will --
3       THE WITNESS:  Okay.
4       MR. DOYLE:  You're thrilled, I can
5   tell.  I have four areas.  It shouldn't
6   take long.
7           CROSS-EXAMINATION
8   BY MR. DOYLE:
9       Q.   First regarding your testimony today
10  about the cost of mitigation credits.
11      A.   Okay.
12      Q.   My question is to what extent are
13  the costs of mitigation credits a reflection of
14  the credit market, not the value of land or
15  wetlands?
16      MR. MCALILEY:  Object to form.
17      THE WITNESS:  I think that's a
18  reasonable way to put it.  The cost of
19  mitigation credits in any state is a market
20  driven thing, and it's not necessarily tied
21  to cost of land but to the cost of up front
22  administrative setup procedures for a
23  wetland mitigation bank, actual restoration
24  activities that take place on bank lands,
25  and then taxes and management of that land

Page 328

1   as it goes forward in time.
2       MR. DOYLE:  My secondary -- if I can
3   impose upon counsel to help me with this.
4   If you can pull up, Mr. McAliley, the
5   report, Exhibit 72, and Page 65, not the
6   PDF page but the embedded Page No. 65.
7       MR. MCALILEY:  Yeah, hold on a
8   second here.
9       MR. DOYLE:  Thank you.
10      MR. MCALILEY:  Yeah, no problem.
11  All right.  I just pulled it up.  It's
12  Exhibit No. 72, and it's on Page 65.
13      MR. DOYLE:  Thank you.  Now if you
14  could maybe at the very -- there's the
15  first paragraph of that page, if we can
16  make that a little larger so Dr. Lee can
17  see it.
18      THE WITNESS:  Thank you very much.
19  BY MR. DOYLE:
20      Q.   All right.  About the middle of that
21  paragraph at the top of Page 65 of Exhibit 72,
22  which is the main body of the report, do you see
23  a reference to mullet, not the hair style, but
24  the fish?
25      A.   I do.



LYNDON LEE, PHD
USA V SHARFI

May 04, 2022
329–332

Page 329

1    Q.    All right.  Do you have any
2    knowledge about the extent to which mullet --
3    mullet may be fish that spawn in saltwater but as
4    they grow may go upstream to freshwater and find
5    suitable habitat there.
6         MR. MCALILEY:  Object to the form.
7         THE WITNESS:  I knew that they move
8         through the estuarine to brackish water to
9         the weak freshwater transition.  I don't
10        know that fish that well, and, therefore, I
11        don't know how far upgradient they would
12        move in a system such as Bessey Creek.
13        MR. DOYLE:  If I can also -- go to
14        my third area now.  If I can also ask
15        counsel to be so kind as to put up on the
16        screen Exhibit 107, which is Regulatory
17        Guidance Letter 05-06.
18        MR. MCALILEY:  I'm sorry, this is
19        05-05.
20        MR. DOYLE:  I thought it was 05-06
21        in terms of the Regulatory Guidance Letter,
22        that it's your -- I think you marked it as
23        107.
24        MR. MCALILEY:  There it is, 05-06,
25        exactly.

Page 330

1         MR. DOYLE:  Thank you.
2    BY MR. DOYLE:
3         Q.    So, Dr. Lee, you recall this
4    discussion you had about this Regulatory Guidance
5    Letter?
6         A.    Yes.
7         Q.    If we could turn to the second page
8    of this.  Thank you.  My first line of questions
9    have to do with Subsection A there.  Do you see
10   where it says, "These RGLs are helpful in
11   understanding the historical context of the
12   program," do you see that line?
13        A.    Yeah, hang on.  My computer just did
14   something.  Okay.  I'm back with you.  Please
15   re-ask the question.
16        Q.    Sure.  In Subsection A at the top,
17   do you see towards the end of A, a statement that
18   says "These RGLs are helpful in understanding the
19   historical context of our program"?
20        A.    Yes, and that is what I was alluding
21   to in my testimony to RGLs, even though they had
22   expired, we refer to them because they represent
23   the collective learning and growth of
24   understanding of how to navigate Section 404.
25   So even though a RGL may be expired, the

Page 331

1    institutional memory still exists.
2         Q.    If you can also direct your
3    attention to Subsection B on that page and the
4    first sentence there about -- which states that
5    "The expired RGLs that continue to be generally
6    applicable to the Corps' regulatory program are
7    listed in the two-page attachment."
8         Do you see that?
9         A.    Yes.
10        Q.    And if we could look, then, to that
11   attachment.
12        MR. DOYLE:  If counsel would be so
13        kind as to scroll.
14        MR. MCALILEY:  I just want the
15        credit of being so kind to be running your
16        video.
17        MR. DOYLE:  The kindness cannot
18        adequately be reflected by this dry
19        transcript.  If you can continue to scroll
20        down, counsel.
21        MR. MCALILEY:  How far down?
22   BY MR. DOYLE:
23        Q.    And, Dr. Lee, do you see a RGL
24   mentioned there that is 86-09?
25        A.    I do.

Page 332

1         Q.    What is 86-09 in terms of the title?
2         A.    "Clarification of Normal
3    Circumstances in the Wetland Definition."
4         MR. DOYLE:  All right.  And
5         finally -- this can be removed.  Another
6         kindness act I'll ask of you.
7    BY MR. DOYLE:
8         Q.    The fourth area I have doesn't
9    require an exhibit.  LC Lee & Associates, Inc.,
10   is the name of your wetland consulting firm, or
11   it may not be a wetland consulting firm, but your
12   consulting firm, right?
13        A.    We're a consulting firm, and we do
14   wetland, rivers, forestry, restoration, design,
15   and construction.
16        Q.    Does LC Lee & Associates, Inc., have
17   private sector clients?
18        A.    Oh, tons, yes.
19        MR. DOYLE:  No further questions.
20        MR. MCALILEY:  I have a few
21        questions just to follow up.
22        REDIRECT EXAMINATION
23   BY MR. MCALILEY:
24        Q.    First of all the RGLs, am I right,
25   Dr. Lee, that RGL 05-06 makes clear that any



LYNDON LEE, PHD
USA V SHARFI

May 04, 2022
333—336

Page 333

1  expired RGL not listed on that attachment to the
2  RGL is considered inappropriate for current
3  program execution; is that right?
4      MR. DOYLE: Objection, asked and
5  answered.
6      THE WITNESS: Yes, we went through
7  that earlier today, yes, sir.
8  BY MR. MCALILEY:
9  Q.   So RGL 86-9 is on the list of old
10 RGLs that are still relevant, right?
11 A.   Apparently, yes, sir.
12 Q.   But RGLs 82-2 and 90-7 are not on
13 the list of relevant expired RGLs, correct?
14     MR. DOYLE: Objection, asked and
15 answered.
16     THE WITNESS: I believe --
17     MR. DOYLE: Misstates.
18     THE WITNESS: I believe we discussed
19 that earlier, yes.
20     MR. MCALILEY: Okay. All right.
21 Thank you. I have no further questions.
22     MR. DOYLE: Neither do I.
23     MR. MCALILEY: Super. So, Dr. Lee,
24 I think we are done.
25     THE COURT REPORTER: Read or waive?

Page 334

1      THE WITNESS: I have a question for
2  the court reporter, if I may?
3      MR. DOYLE: Yes.
4      THE WITNESS: I know I used a lot of
5  words today and garbled some, slaughtered
6  others. Tell me how I can help you as you
7  wrap up your product, because it was
8  complicated.
9      THE COURT REPORTER: Why don't we go
10 off the record. Do you want to have this
11 conversation off the record, counsels?
12     THE VIDEOGRAPHER: Before we go off
13 the record, would anybody like to order the
14 transcript or video at this time?
15     MR. DOYLE: Can we do it now on the
16 record? Neal, do you have a preference
17 whether we clutter the record with that or
18 not?
19     THE COURT REPORTER: It's just hard
20 for me to write while I'm talking. That's
21 why I say that. I mean --
22     MR. MCALILEY: Yeah, I'm fine to
23 have this off the record. I'm fine to have
24 this off the record. This is simply we're
25 talking spellings and that kind of thing.

Page 335

1  I'm still not quite sure how to say
2  catadromous fish or whatever it was.
3  I look forward to seeing that myself.
4      MR. DOYLE: Yeah, I'll need a
5  spelling on that, but let's go off, and
6  then we'll deal with all that.
7      MR. MCALILEY: Yeah.
8      THE VIDEOGRAPHER: This concludes
9  today's videotaped deposition. The time is
10 6:33 p.m. Going off the record now.
11     MR. DOYLE: We'll take the
12 opportunity for a review and sign, standard
13 request. We will order with no expedition
14 the video and the stenography.
15     THE COURT REPORTER: Mr. McAliley,
16 did you need to order a copy?
17     MR. MCALILEY: Yes, I want to order
18 a copy.
19     (Thereupon, the Deposition was
20 concluded at 6:35 p.m.)
21     (Reading and signing not waived.)
22
23
24
25

Page 336

1              CERTIFICATE OF OATH
2              BY NOTARY PUBLIC
3
4  STATE OF FLORIDA
   COUNTY OF MIAMI-DADE
5
6      I, the undersigned authority, certify that
7  LYNDON LEE, PhD, remotely appeared before me and
8  was duly sworn.
9
10     WITNESS my hand and official seal this 16th day
11 of May, 2022.
12
13
14
15
16
17
18
19
20
21
22  _____
23  MATTHEW J. HAAS
    Court Reporter
24  Notary Public
    Commission No. HH87002
25  Expires:  February 8, 2025



LYNDON LEE, PHD
USA V SHARFI

May 04, 2022
337–340

Page 337

1                COURT REPORTER'S CERTIFICATE

2

3                I, Matthew J. Haas, court reporter in

4   and for the State of Florida, certify that I was

5   authorized to and did stenographically report the

6   deposition of LYNDON LEE, PhD; that a review of

7   the transcript was requested; and that the

8   transcript is a true and complete record of my

9   stenographic notes.

10

11               I further certify that I am not a

12  relative, employee, attorney or counsel of any of

13  the parties, nor am I a relative or employee of

14  any of the parties' attorney or counsel connected

15  with the action, nor am I financially interested

16  in the action.

17

18

19               Dated this 16th day of May, 2022.

20

21

22        --------------------------

23                MATTHEW J. HAAS
                  Court Reporter

24

25

Page 338

1   Reference No.: 8217855

2

3   Case:  USA V SHARFI

4

        DECLARATION UNDER PENALTY OF PERJURY

5

        I declare under penalty of perjury that

6   I have read the entire transcript of my Depo-
    sition taken in the captioned matter or the

7   same has been read to me, and the same is
    true and accurate, save and except for

8   changes and/or corrections, if any, as indi-
    cated by me on the DEPOSITION ERRATA SHEET

9   hereof, with the understanding that I offer
    these changes as if still under oath.

10

11        _____

12        Lyndon Lee, PhD

13

14        NOTARIZATION OF CHANGES

15            (If Required)

16

17  Subscribed and sworn to on the _____ day of

18

19  _____, 20_____ before me,

20

21  (Notary Sign)_____

22

23  (Print Name)              Notary Public,

24

25  in and for the State of _____

Page 339

1   Reference No.: 8217855

    Case:  USA V SHARFI

2

3   Page No._____Line No._____Change to:_____

4   _____

5   Reason for change:_____

6   Page No._____Line No._____Change to:_____

7   _____

8   Reason for change:_____

9   Page No._____Line No._____Change to:_____

10  _____

11  Reason for change:_____

12  Page No._____Line No._____Change to:_____

13  _____

14  Reason for change:_____

15  Page No._____Line No._____Change to:_____

16  _____

17  Reason for change:_____

18  Page No._____Line No._____Change to:_____

19  _____

20  Reason for change:_____

21  Page No._____Line No._____Change to:_____

22  _____

23  Reason for change:_____

24

    SIGNATURE:_____DATE:_____

25  Lyndon Lee, PhD

Page 340

1   Reference No.: 8217855

    Case:  USA V SHARFI

2

3   Page No._____Line No._____Change to:_____

4   _____

5   Reason for change:_____

6   Page No._____Line No._____Change to:_____

7   _____

8   Reason for change:_____

9   Page No._____Line No._____Change to:_____

10  _____

11  Reason for change:_____

12  Page No._____Line No._____Change to:_____

13  _____

14  Reason for change:_____

15  Page No._____Line No._____Change to:_____

16  _____

17  Reason for change:_____

18  Page No._____Line No._____Change to:_____

19  _____

20  Reason for change:_____

21  Page No._____Line No._____Change to:_____

22  _____

23  Reason for change:_____

24

    SIGNATURE:_____DATE:_____

25  Lyndon Lee, PhD



## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>*Plaintiff*,<br><br>v.<br><br>BENJAMIN K. SHARFI, in his personal and fiduciary capacity as trustee of the Benjamin Sharfi 2002 Trust, and NESHAFARM, INC.<br><br>*Defendants*. | Case No. 2:21-cv-14205-KAM |

### ERRATA FOR DEPOSITION OF LYNDON LEE

I, Lyndon Lee, Ph.D., PH, have read the transcript of my deposition taken on May 4, 2022, in the above-captioned case and, pursuant to Federal Rule of Civil Procedure 30(e)(1), list the following changes to the transcript and the reasons for making them:

| Page | Line | Reads | Should Read | Reasons For Change |
|---|---|---|---|---|
| 10 | 14 | I would ask that… | I would ask just that… | mistranscribed |
| 17 | 22 | Do you expect to be offered as an expert in the trial of this case… | Do you expect to be offered as an expert at the trial on this case… | mistranscribed |
| 18 | 7 | put my papers on my computer… | put the papers on my computer… | mistranscribed |
| 18 | 24 | Okay. So if I want a complete list… | So if I want a complete list… | mistranscribed |
| 20 | 6 | It was the early 2000s, put it like that. | It was the early 2000s, put it in that zone. | mistranscribed |
| 26 | 17 | of Sections I had tertiary input… | of Sections where I had tertiary input… | mistranscribed |
| 27 | 2 | previously marked Exhibit 72 | previously marked deposition Exhibit 72 | mistranscribed |
| 28 | 25 | sections of the report which… | sections of the report at which… | mistranscribed |
| 36 | 12 | one that was | one who was | mistranscribed |
| 37 | 5 | Yes. | Yes, sir. | mistranscribed |
| 41 | 5 | three mines west | three miles west | mistranscribed |

| Page | Line | Reads | Should Read | Reasons for Change |
|------|------|-------|-------------|--------------------|
| 43 | 6 | there near Stewart | there near Stuart | mistranscribed |
| 45 | 25 | is in one of the headwaters | is in the headwaters | mistranscribed |
| 47 | 7 | tell you what existed | tell you that what existed | mistranscribed |
| 51 | 13 | effect that that has | effect that has | mistranscribed |
| 52 | 19 | but do not | but that did not | mistranscribed |
| 53 | 24 | the northern boundary | the north boundary | mistranscribed |
| 55 | 23 | only so far | only in so far | mistranscribed |
| 58 | 8 | pipes connecting | pipes connect | mistranscribed |
| 61 | 15 | intervenes and then it | intervenes and it | mistranscribed |
| 61 | 23 | with this report | with the report | mistranscribed |
| 67 | 19 | Would you agree that shows | Would you agree with me that shows | mistranscribed |
| 67 | 23 | partial | parcel | mistranscribed |
| 68 | 14 | 1956 photograph | 1966 photograph | mistranscribed |
| 69 | 12 | right this | right that this | mistranscribed |
| 73 | 16 | this a photo | this also a photo | mistranscribed |
| 74 | 12 | Yes, can you | Yes, sir. Could you | mistranscribed |
| 75 | 4 | creep in on | crank in on | mistranscribed |
| 75 | 11 | Mr. Doyle: Objection | Mr. Doyle: Objection, vague | mistranscribed |
| 75 | 18 | Mr. Doyle: Objection | Mr. Doyle: Objection, vague | mistranscribed |
| 77 | 9-10 | Mr. Doyle: Objection, misstated previous testimony | Mr. Doyle: Objection, misstates prior testimony | Mistranscribed |
| 78 | 2 | Let's do one at a time | Let's just do each one at a time | Mistranscribed |
| 82 | 23 | cases and not | cases but not | mistranscribed |
| 83 | 4 | a big old ditch | a big long ditch | mistranscribed |
| 85 | 25 | understanding correctly | understanding you correctly | Mistranscribed |
| 86 | 7 | corner of blue arrow | corner blue arow | Mistranscribed |
| 86 | 12 | Yes. | Yes, sir. | mistranscribed |
| 89 | 18 | and around it | and then around it | mistranscribed |
| 90 | 8 | And similar situation | And a similar situation | mistranscribed |
| 90 | 9 | think there it was | think it was | mistranscribed |
| 90 | 13 | north from the | south from the north | mistranscribed |
| 95 | 21 | they are representative | they are repetitive | Mistranscribed |
| 98 | 22 | zoom further out | zoom even further out | mistranscribed |
| 102 | 3 | | And what was the date? | Not written in transcript |

| Page | Line | Reads | Should Read | Reasons for Change |
|---|---|---|---|---|
| 104 | 17 | depressional thin wetland | depressional wetland | mistranscribed |
| 116 | 3 | IV.3 | 4.3 | mistranscribed |
| 116 | 5 | IV.3 | 4.3 | mistranscribed |
| 117 | 3 | central | center | mistranscribed |
| 118 | 9 | No, they should be | Yeah, they should be | mistranscribed |
| 119 | 12 | they've got a sign | they've got sign | |
| 121 | 9-10 | in the Keys | in the Florida Keys | mistranscribed |
| 121 | 17 | | I can put you together with him sometime. | Not written in transcript |
| 121 | 21 | on II.C.2 | in Section II.C.2 | |
| 122 | 14 | that to be | that that's | mistranscribed |
| 123-124 | 25-1 | that's thinned | that was thinned | Mistranscribed |
| 125 | 17 | fill cast associated | fill associated | |
| 125 | 23 | meets wetland | makes wetland | mistranscribed |
| 126 | 23-24 | and composition in food | in composition of food | Mistranscribed |
| 128 | 11 | there's edge adaptive | they're edge adapted | mistranscribed |
| 128 | 14 | edge-adaptive | edge adapted | mistranscribed |
| 129 | 2-3 | I thought there were signs | I saw signs | Mistranscribed |
| 129 | 8 | edge adaptive | edge adapted | mistranscribed |
| 129 | 10 | adaptive | adapted | mistranscribed |
| 129 | 10 | grapples | grackles areas | mistranscribed |
| 133 | 20 | rugs | rubs | mistranscribed |
| 134 | 25 | or things | or anything | mistranscribed |
| 135 | 6 | track and slides | tracks and slides | mistranscribed |
| 136 | 16-17 | fishing facility | sanitation facility | mistranscribed |
| 137 | 14 | Centrarchidaes | Centrarchids | mistranscribed |
| 137 | 19 | at 84 | at the 84 | mistranscribed |
| 137 | 23 | downgradent | downgradient | mistranscribed |
| 138 | 2 | turbulent | turbid | mistranscribed |
| 138 | 11 | Centrarchidaes | Centrarchids | mistranscribed |
| 138 | 13 | Centrarchidaes | Centrarchids | mistranscribed |
| 138 | 18 | area | areas | mistranscribed |
| 139 | 16 | seen a mullet | seen mullet | mistranscribed |
| 140 | 23 | pasturing perching birds | Passerine perching birds that were | mistranscribed |
| 140 | 24 | trees in | trees that were in | mistranscribed |
| 142 | 7 | Yes. | Yes, sir. | mistranscribed |
| 143 | 6 | Hydrology | Hydrographic | mistranscribed |
| 143 | 23-24 | ordinary watermark | ordinary to watermark | mistranscribed |

| Page | Line | Reads | Should Read | Reasons for Change |
|------|------|-------|-------------|--------------------|
| 144 | 11 | on that list | in that list | mistranscribed |
| 144 | 23 | we're | were | |
| 145 | 8 | and regional | and the regional | mistranscribed |
| 146 | 22 | record. for the transcript | that's for the transcript | mistranscribed |
| 147 | 17 | sometimes for five | sometimes they'll run for five | mistranscribed |
| 147 | 21 | Mr. Doyle: Objection. | Mr. Doyle: Objection, vague. | mistranscribed |
| 152 | 15 | A little bigger | That's better. | mistranscribed |
| 152 | 22 | I'll get out | I'll exit out | mistranscribed |
| 153 | 3 | I'm back on | I'm back here on | mistranscribed |
| 155 | 23 | on on that | on in that | mistranscribed |
| 157 | 6 | experts | excerpts | mistranscribed |
| 157 | 24 | this is -- | this is an excerpt | mistranscribed |
| 158 | 5 | titled | entitled | mistranscribed |
| 158 | 11 | Section 4.4 | Section 404 | mistranscribed |
| 165 | 8 | excerpt | excerpts | mistranscribed |
| 167 | 17 | Downgradent | down gradient | mistranscribed |
| 168 | 10 | and then we | and we | mistranscribed |
| 168 | 21 | effect | effects | mistranscribed |
| 176 | 15 | in 2016 | on the 2016 | mistranscribed |
| 176 | 24 | Of you said | You said | mistranscribed |
| 177 | 17 | accurate? | accurate. | mistranscribed |
| 181 | 12-13 | but it's forested | but they're both forested | mistranscribed |
| 182 | 3 | these | those | mistranscribed |
| 184 | 5 | reliable piece | reliable enough piece | mistranscribed |
| 184 | 19 | get this done | get done | mistranscribed |
| 185 | 18 | Extent of water | Extent of waters | mistranscribed |
| 187 | 2 | with me wetlands | with me that wetlands | mistranscribed |
| 187 | 7 | not necessary | not necessarily | mistranscribed |
| 188 | 19 | Then there's | And then there's | mistranscribed |
| 192 | 7 | score it | score a wetland | mistranscribed |
| 193 | 6 | displayed | displays | mistranscribed |
| 193 | 24 | assessment | analysis | mistranscribed |
| 195 | 18 | portion part of that | portion of that | mistranscribed |
| 198 | 2 | was the | was on the | mistranscribed |
| 199 | 19 | in Ocala | by Ocala | mistranscribed |
| 200 | 18 | image from the 1940s | texture of the 1940s image | mistranscribed |
| 203 | 5 | So I'm going to | Why don't I go to | mistranscribed |
| 203 | 19 | topographic map | topographical maps | mistranscribed |
| 203 | 24 | Tommy | Toni | mistranscribed |

| Page | Line | Reads | Should Read | Reasons for Change |
|------|------|-------|-------------|--------------------|
| 203 | 25 | U.S. | USGS | mistranscribed |
| 204 | 21 | Yes | Yes, sir | mistranscribed |
| 205 | 17 | | Oh way over there. | mistranscribed |
| 206 | 9 | entire | whole | Not in transcript |
| 206 | 15 | all different | all sorts of different | mistranscribed |
| 208 | 5 | fine | pine | mistranscribed |
| 208 | 7 | depression in | depression is in | mistranscribed |
| 208 | 10 | connects it | connects up | mistranscribed |
| 209 | 6 | is a | is the | mistranscribed |
| 209 | 22 | National Fish & Wildlife Service, correct | U.S. Fish & Wildlife service, right | mistranscribed |
| 210 | 25 | then green | then that green | Mistranscribed |
| 216 | 1 | linear of riverine | linear riverine | mistranscribed |
| 216 | 5 | those riverine | those linear riverine | mistranscribed |
| 216 | 18-19 | context | concept | mistranscribed |
| 218 | 11 | hydrological | hydrologic | mistranscribed |
| 218 | 17 | on | in | mistranscribed |
| 218 | 22 | Grid 84 | Route 84 | mistranscribed |
| 218 | 23 | Centrarchidae | Centrarchids | mistranscribed |
| 221 | 10 | structure in productivity, if | structure, if | mistranscribed |
| 224 | 14 | say | saw | Mistranscribed |
| 225 | 7 | we are observed | we observed | mistranscribed |
| 226 | 16 | | So to understand this.. | mistranscribed |
| 226 | 20 | 84 west on | 84 and west on | Not in transcript |
| 227 | 1 | wetland | wetlands | mistranscribed |
| 227 | 13 | access | axis | mistranscribed |
| 228 | 2 | wetland | wetlands | mistranscribed |
| 228 | 9 | are still | still are | mistranscribed |
| 228 | 18 | testified to prior | testified about prior | mistranscribed |
| 229 | 7 | that those connections | that there was connections | mistranscribed |
| 229 | 8 | sort of through | sort of flowed through | mistranscribed |
| 229 | 9 | cite | site | mistranscribed |
| 231 | 4 | DOT website | DOT reference site | mistranscribed |
| 232 | 13 | read this right | read it right | mistranscribed |
| 233 | 14 | read that correctly | read that sentence correctly | mistranscribed |
| 237 | 3 | | So before lunch you said that.. | mistranscribed |
| | | | | |

| Page | Line | Reads | Should Read | Reasons for Change |
|------|------|-------|-------------|--------------------|
| 237 | 25 | | Other than skipping the Latin | Not in transcript |
| 240 | 20 | there | that | Not in transcript |
| 241 | 6 | where Murphy | where Southwest Murphy | mistranscribed |
| 241 | 16 | facility | facilities | mistranscribed |
| 242 | 5 | wetlands and through | wetlands on through | mistranscribed |
| 242 | 22 | And it was the driveway | Kind of like a driveway | mistranscribed |
| 243 | 13 | Their residence, or migratory | There, resident or migratory | mistranscribed |
| 244 | 21 | foot web support | food web support | Mistranscribed |
| 245 | 21 | formal | faunal | mistranscribed |
| 246 | 11 | the Section | the next Section | mistranscribed |
| 247 | 3 | residual thin forest | residual thinned forest | mistranscribed |
| 247 | 23 | answer | sentence | mistranscribed |
| 249 | 10 | I identify | I also identified | mistranscribed |
| 249 | 25 | defecated on | defecated in wetlands on | mistranscribed |
| 251 | 1 | which | this | mistranscribed |
| 251 | 2 | it say | it says | mistranscribed |
| 251 | 4 | constructed drop, and | constructed drop-ins and catch basins | mistranscribed |
| 251 | 24 | from the | of the | mistranscribed |
| 252 | 14 | to the pipe. | to the gate. | mistranscribed |
| 253 | 23 | well | wells | mistranscribed |
| 257 | 6 | sea that | see that | mistranscribed |
| 258 | 1 | acreage | acreages | mistranscribed |
| 259 | 21 | was | were | mistranscribed |
| 261 | 2 | dredge | dredged | mistranscribed |
| 261 | 7 | different | other | mistranscribed |
| 262 | 10 | we talked | we were talking | mistranscribed |
| 262 | 17 | 0.93 acres | 0.79 acres | mistranscribed |
| 263 | 8 | acre | acres | mistranscribed |
| 263 | 14 | were | was | mistranscribed |
| 264 | 16 | in the | I mean the | mistranscribed |
| 265 | 18 | both functional | both for functional | mistranscribed |
| 267 | 24 | are | were | mistranscribed |
| 269 | 14 | moving of soil | moving soil | mistranscribed |
| 270 | 16 | have | are | mistranscribed |
| 272 | 18 | words that | words near the front that | mistranscribed |
| 273 | 7 | No | Well | mistranscribed |
| 273 | 11 | then are | they are | mistranscribed |
| 274 | 17 | as a Point 4 | at a 0.4 | mistranscribed |

| Page | Line | Reads | Should Read | Reasons for Change |
|------|------|-------|-------------|--------------------|
| 274 | 23 | that | with | mistranscribed |
| 275 | 5 | function | functions | mistranscribed |
| 276 | 16 | all this | all of this | |
| 277 | 1 | by a | via | mistranscribed |
| 277 | 20 | downgradent | down gradient | mistranscribed |
| 278 | 1 | downgradent | down gradient | mistranscribed |
| 278 | 19 | downgradent | down gradient | mistranscribed |
| 279 | 7 | north/south which | north/south ditch which | mistranscribed |
| 282 | 13 | and middling impact | and nibbling impact | mistranscribed |
| 282 | 14 | impact | impacts | |
| 282 | 16 | classes of community cumulative | classes of cumulative | mistranscribed |
| 284 | 6 | impact | impacts | mistranscribed |
| 284 | 7 | scale. | scales. | mistranscribed |
| 284 | 13 | impact | impacts | mistranscribed |
| 284 | 15 | have | has | mistranscribed |
| 285 | 9 | discusses impacts on cumulative | discusses cumulative | mistranscribed |
| 290 | 21 | matrix mosaic | matrix or mosaic | mistranscribed |
| 293 | 24 | the | that | mistranscribed |
| 296 | 10 | and | or | mistranscribed |
| 299 | 12 | but today | but would still today | mistranscribed |
| 301 | 18 | changed the state | changed state | mistranscribed |
| 303 | 22 | section you | section that you | mistranscribed |
| 308 | 5 | in | on | mistranscribed |
| 312 | 22 | fair | aren't there | mistranscribed |
| 313 | 15 | environment | environmental | mistranscribed |
| 315 | 23 | That's a | There is | mistranscribed |
| 318 | 6 | Mr. Doyle: Objection | Mr. Doyle: Objection, vague | mistranscribed |
| 319 | 1 | at mitigation | at wetland mitigation | mistranscribed |
| 319 | 12 | Can | Could | mistranscribed |
| 320 | 9 | know that | acknowledge that | mistranscribed |
| 320 | 12 | | Please repeat that question | mistranscribed |
| 323 | 1 | valuation | evaluation | Not in transcript |
| 326 | 2 | Ms. Wylie's | Mr. Wylie's | mistranscribed |
| 327 | 9 | regarding | regards | mistranscribed |
| 328 | 1 | secondary | second area | mistranscribed |
| 329 | 3 | mullet | mullets | mistranscribed |
| 330 | 8 | line of questions | lines of question | mistranscribed |
| 332 | 6 | I'll ask of you | I'll put before you | mistranscribed |
| | | | | mistranscribed |

| | | | | Lines 11-18 on page 335 not included in Video |
|---|---|---|---|---|

Executed on June 13, 2022 in Bellingham, Washington.

_____

Lyndon C. Lee, Ph.D., SPWS