# EXHIBIT 19

**Page 1**

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF FLORIDA
 2                 FORT PIERCE DIVISION
                CASE NO.:  2:21-cv-14205-KAM
 3
 4
   UNITED STATES OF AMERICA,
 5
 6         Plaintiff,
 7  -vs-
 8  BENJAMIN K. SHARFI, in his personal
    and fiduciary capacity as trustee of
 9  The Benjamin Sharfi 2002 Trust; and
    NESHAFARM, INC.,
10
           Defendants.
11  _____/
12
13
                   Esquire Deposition Solutions
14                 Remote Proceeding
                   Zoom Videoconference
15
                   Friday, April 29, 2022
16                 10:04 a.m.
17
18
19    VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF
20           KAI COSHOW RAINS, PhD
21
22        Taken remotely before Matthew J. Haas,
23  Notary Public in and for the State of Florida at
24  Large, pursuant to Notice of Taking Deposition in
25  the above cause.
```

**Page 2**

```
 1          A P P E A R A N C E S
 2  ON BEHALF OF THE PLAINTIFF:
 3     UNITED STATES DEPARTMENT OF JUSTICE
       ENVIRONMENT AND NATURAL RESOURCES DIVISION
 4     P.O. BOX 7611
       Washington, DC 20004
 5     Andrew.Doyle@usdoj.gov
       BY:  ANDREW J. DOYLE, ESQUIRE
 6
 7  ON BEHALF OF THE DEFENDANT:
 8     SHARFI HOLDINGS, INC.
       3690 West Gandy Boulevard
 9     Suite 422
       Tampa, Florida 33611
10     (813) 416-2352
       Chamilton@sharfiholding.com
11     BY:  CHRISTOPHER F. HAMILTON, ESQUIRE
       Jmiron@sharfiholding.com
12     BY:  JOSHUA MIRON, ESQUIRE (General Counsel)
13  ON BEHALF OF THE DEFENDANT:
14     CARLTON FIELDS. P.A.
       2 Miami Central
15     700 Northwest 1st Avenue
       Suite 1200
16     Miami, Florida 33136
       (305) 530-4039
17     Nmcaliley@carltonfields.com
       BY:  THOMAS NEAL MCALILEY, ESQUIRE
18     Mzilber@carltonfields.com
       BY:  MICHAEL G. ZILBER, ESQUIRE
19
   ALSO PRESENT:
20
       WILLIAM MOORE, ESQUIRE, Army Corps of Engineers
21     JUSTIN COOMER, Videographer
22
23
24
25
```

**Page 3**

```
 1              I N D E X
 2
   WITNESS                EXAMINATION BY    PAGE
 3
   Kai Coshow Rains, Phd    Mr. McAliley      9
 4
 5
 6         E X H I B I T S
 7
 8  EXHIBITS:     DESCRIPTION:          PAGE:
 9  EXHIBIT 102 - CV of Dr. Rains             67
10  EXHIBIT 103 - Level III and IV Ecoregions 130
    of Florida Map
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1  Thereupon --
 2       THE VIDEOGRAPHER:  Good morning.
 3  We are now on the record, and the time is
 4  now 10:04 a.m., on Friday, April 29, 2022.
 5  This begins the videotaped deposition of
 6  Kai Coshow Rains, PhD, taken in the matter
 7  of United States of America versus Benjamin
 8  K. Sharfi filed in the United States
 9  District Court, Southern District of
10  Florida, Fort Pierce Division, case number
11  of which is 2:21-cv-14205-KAM.
12       The videographer today is Justin
13  Coomer.  The court reporter today is Matt
14  Haas.  We are both representing Esquire
15  Deposition Solutions.  Counsel, will you
16  please announce your name and whom you
17  represent, after which the court reporter
18  will swear in the witness.
19       MR. MCALILEY:  This is Neal McAliley
20  from the law firm of Carlton Fields.  I
21  represent the defendants in this case, and
22  I will be taking the deposition today.
23       MR. DOYLE:  My name is Andrew Doyle.
24  I'm an attorney with the United States
25  Department of Justice Environment and
```



KAI COSHOW RAINS PHD
USA V SHARFI

April 29, 2022
5–8

Page 5

1  Natural Resources Division, and I represent
2  the plaintiff, The United States of
3  America.
4       MR. HAMILTON:  Good morning, this is
5  Christopher Hamilton.  I'm here on behalf
6  of the defendants, I'm the defendants'
7  deputy general counsel, and I'm not taking
8  the deposition.
9       MR. MOORE:  This is William Moore
10  with the Army Corps of Engineers, office
11  counsel.
12       MR. MCALILEY:  Okay.  So why don't
13  we start.
14       THE COURT REPORTER:  Wait,
15  Mr. McAliley, I have to do my read-in.
16       MR. MCALILEY:  I'm sorry, I
17  apologize.  Excuse me.
18       THE COURT REPORTER:  That's okay.
19  Happens all the time.  Pursuant to the
20  COVID-19 emergency procedures for the
21  administering of oaths via remote
22  audio/video communication equipment dated
23  March 18, 2020, this deposition of KAI
24  COSHOW RAINS is being conducted remotely
25  via Zoom videoconferencing.

Page 6

1       The witness is located in
2  Tallahassee, Florida 32301.  My name is
3  Matthew Haas, court reporter from Esquire
4  Deposition Solutions.  I am administering
5  the oath and reporting the deposition
6  remotely by stenographic means from my
7  residence within Broward County, Florida.
8       The witness has shown a Florida
9  driver's license and positively identified
10  to me that she is KAI COSHOW RAINS.
11       Would counsel and witness please
12  express their stipulation that this
13  deposition may take place with a remote
14  administration of the oath and remote
15  reporting of the deposition.
16       THE WITNESS:  Yes, but I have a
17  Zoom-related question.  Is this the only
18  recording that is taking place?  So is it
19  simply the videographer and the reporter,
20  there's no other like, I don't know, other
21  recordings taking place?
22       THE VIDEOGRAPHER:  So to clarify,
23  yes, on the Zoom end it records to the
24  cloud currently, so it's recording to the
25  Zoom cloud, and then there's a program

Page 7

1  called OBS that records that as well to
2  distribute the videos if the counsel wants
3  them synced or anything like that with the
4  transcript.  So total there will be two.
5       THE WITNESS:  Okay.  So nothing on
6  cell phones or screenshots or other
7  recordings?
8       THE VIDEOGRAPHER:  No, no.
9       THE WITNESS:  Then, yes, I do.
10       MR. DOYLE:  And the United States
11  stipulates as well.
12       MR. MCALILEY:  The defendants agree.
13       Are we ready, then?  I don't want to
14  jump the gun.
15       THE COURT REPORTER:  Yeah, I just
16  have to swear in the witness.
17       MR. MCALILEY:  Okay.
18       THE COURT REPORTER:  Dr. Rains, if
19  you'll raise your right hand, I'll swear
20  you in.
21       KAI COSHOW RAINS, PhD,
22  Was duly administered the following oath:  Do you
23  solemnly swear or affirm that the testimony you
24  are about to give will be the truth, the whole
25  truth, and nothing but the truth?

Page 8

1       THE WITNESS:  I do.
2       DIRECT EXAMINATION
3  BY MR. MCALILEY:
4       Q.  Good morning, ma'am.  Could you
5  please state your name for the record and spell
6  your last name for me.
7       A.  Kai Coshow Rains, R-A-I-N-S.
8       Q.  Okay.  So, Ms. Rains -- or
9  Dr. Rains, good morning.  Thank you for being
10  here.  It's -- I just wanted to go over a few
11  sort of basic ground rules and procedures here
12  for doing a deposition like this and make sure
13  we're on the same page.
14       Have you ever had your deposition
15  taken before?
16       A.  No.
17       Q.  Okay.  So do you understand that you
18  have just sworn an oath to tell the truth?
19       A.  Yes.
20       Q.  And do you understand that we have
21  both the court reporter and a videographer taking
22  down everything that everybody says?
23       A.  Yes.
24       Q.  When we have a -- when we do a
25  deposition, one of the challenges is having a



KAI COSHOW RAINS PHD
USA V SHARFI

April 29, 2022
9–12

Page 9

1  transcript that people can read after the fact in
2  weeks or months in the future, and we can
3  understand everything in the transcript. And one
4  of the common issues that can be a problem is
5  when a witness answers a question with a
6  nonverbal response, either nodding the head or
7  shaking the head or uh-huh or huh-uh. It's
8  always interesting when you see that on a
9  transcript, what exactly does that mean.
10      So what I'd ask is that you give
11  verbal answers and, you know, yes or no or
12  whatever the answer may be, and that you also try
13  to avoid uses of, you know, like uh-huhs, that
14  kind of thing that would be sort of unclear in
15  the transcript.
16      You may -- there may be times when
17  I ask you -- I may follow up and say, so is that
18  a yes or a no. Oftentimes I'm doing that
19  just to try to make sure the transcript is clear,
20  because this is just a common issue with a
21  deposition. Does that make any sense?
22      A.   Yes.
23      Q.   Now, we are in the bold new world or
24  the brave new world of remote depositions where
25  we can do everything over Zoom, and I think it's

Page 10

1  an amazing thing that I think we're sitting all
2  over the place. Mr. Doyle, maybe you're in
3  California, I'm in Miami, you're in Tallahassee.
4  It's a great thing that we can do this from
5  wherever we're located and not have to travel,
6  but there's a few things we've got to keep in
7  mind here to have this go smoothly.
8      One is sometimes the video feed or
9  the Zoom feed can be a little slow, there can be
10  a little bit of a lag, and this is sort of normal
11  when you're using a remote platform like this,
12  but it can -- it can lead to people talking over
13  each other, and so -- and it's really hard for
14  the court reporter to write down, you know, two
15  people at once or more speaking at the same time.
16      So I would ask you that when I ask
17  you a question, you might want to just give a
18  slight pause just to make sure there's no overlap
19  in your -- in the transcript, and I will pledge
20  to you I'm going to try my best to do the same
21  thing. I'm often the offender on this, I start
22  speaking too quickly, but this is one thing
23  I think we just need to watch out for.
24      I might say -- at various points you
25  might hear me say, can you say that again, I

Page 11

1  think that was unclear, or Mr. Haas may say,
2  whoa, whoa, whoa, whoa, I couldn't get that.
3  That's what a lot of this is. It's just trying
4  to make sure that we're speaking in a way that
5  can be written down clearly. Is that making
6  sense?
7      A.   Yes.
8      Q.   Okay. Another thing is, it's
9  happened to me before, that there will be a bad
10  computer connection, and sometimes there will be,
11  you know, pixelating the screen or garbling
12  speech. If at any point you can't understand me
13  either because of a technical issue or maybe you
14  just don't understand my question, please ask me
15  to repeat it, and I'm happy to do that.
16      It may also be if you're cutting out
17  from my end, I may ask you to repeat something as
18  well, or I may even say, stop, hold on, we're
19  getting a bad connection, until we fix that, I
20  want to -- I may say that just to make sure
21  we have a clear record.
22      So this is like -- I think this is
23  modern Zoom etiquette of 2022, but I just want to
24  say that in the context of a deposition, it can
25  happen here, too, and we just need to communicate

Page 12

1  with each other about that so we're clear. Is
2  that making sense?
3      A.   Yes.
4      Q.   Okay. Is there anybody in the room
5  with you right now, Dr. Rains?
6      A.   No.
7      Q.   And do you have any materials on the
8  desk in front of you?
9      A.   I have a partial copy of the report
10  and a blank piece of paper.
11      Q.   Okay. Anything else?
12      A.   No.
13      Q.   Okay. I would just -- I think this
14  is a moot point if nobody is there with you, but
15  I would just ask that you not communicate with
16  anybody about the substance of this deposition
17  while you're in the deposition questioning. That
18  doesn't mean that at a break you can check in and
19  see how you're doing with your counsel, but
20  I would just say while in a deposition, we limit
21  communications with other -- with third persons.
22  Does that make sense?
23      A.   Yes.
24      Q.   Okay. Do you have any questions for
25  me before we start?



Page 13

1    A.   No.
2    Q.   One last thing, I try to take a
3  break about every hour to hour and a half.
4  I will confess that I sometimes get lost in the
5  moment and I lose track of time.  If at any point
6  you want a break for any reason, just to stretch
7  your legs even, please just tell us, and we'd be
8  happy to accommodate you.
9         It may be that I'll say let me
10  finish the next topic area before we take a
11  break, but please do so, because you're entitled
12  to take a break periodically during this so
13  we can get through the day.
14        Okay.  So -- so, ma'am, what is your
15  date of birth?
16    A.   January 25, 1967.
17    Q.   And what is your address?
18    A.   408 Montrose Avenue.
19    Q.   And where is that, Tallahassee?
20    A.   Temple Terrace, Florida 33617.
21    Q.   So you live in the Tampa Bay area;
22  is that right?
23    A.   Correct.
24    Q.   How long have you lived in the Tampa
25  area?

Page 14

1    A.   Since 2003, more or less.
2    Q.   And where did you live before that?
3    A.   California.
4    Q.   Have you ever done any work in
5  Martin County, Florida prior to this case?
6    A.   I'm not sure what the exact
7  boundaries of Martin County are, if Loxahatchee
8  or Port Mayaca are in Martin County.  If so, the
9  answer is yes.  Otherwise, no.
10    Q.   Okay.  So, Dr. Rains, what did you
11  do to prepare for the deposition today?
12    A.   I -- I looked through your report,
13  I reread my sections and skimmed the others.
14  I skimmed the depositions of Dr. Nutter and the
15  first portion of Ms. Small and the first portion
16  of Mr. Wylie.
17    Q.   And I'm just curious, why did you --
18    A.   Oh, and the expert reports.
19  I skimmed through the expert reports that you
20  guys prepared as well.
21    Q.   Great.  Thank you.
22    A.   I felt like I was forgetting
23  something.
24    Q.   And I'm just curious, why did you
25  just look at the first portion of Ms. Small's and

Page 15

1  Mr. Wylie's deposition transcripts?
2    A.   They're really long.  My primary
3  purpose with this was that I have never given a
4  deposition, so I wanted to get a feeling for it,
5  and I started with Dr. Nutter, because I felt
6  that was the most recent one, and worked my way
7  back.
8    Q.   Fair enough.  I'll tell you,
9  Dr. Nutter has been at this for a long time, and
10  he is -- he has very good habits in a deposition.
11  He's extremely clear.  He's just, you know --
12  anyway, you probably know him better than me, but
13  it was a pleasure for me, so it was a good one --
14  a good person to learn from.
15        Did you speak with any members of
16  the DOJ expert team in preparation for the
17  deposition today?
18    A.   You mean not including the lawyers?
19    Q.   Yeah, putting aside the lawyers.
20    A.   Huh-uh.
21    Q.   That's a no?
22    A.   I did not.
23    Q.   And did you have the opportunity to
24  speak with the DOJ lawyers before the deposition
25  today?

Page 16

1    A.   Yes, I did.
2    Q.   And how long did you speak with
3  them?
4    A.   About two and a half hours
5  yesterday.
6    Q.   Okay.
7    A.   And a couple of days before that,
8  Tuesday, maybe two hours on Tuesday.
9    Q.   Thank you.
10        MR. MCALILEY:  So, Mr. Doyle, I just
11  need -- with your co-counsel we previously
12  agreed in one of the depositions that
13  we wouldn't go into the subject matter of
14  these prep sessions with the experts and
15  the counsel, so I'm -- I'm just not going
16  to ask questions.  I'm following the
17  agreement that we had, I'm just putting
18  that on the record so you know.  I'm going
19  to move on from this topic.
20        MR. DOYLE:  Noted.
21  BY MR. MCALILEY:
22    Q.   So, Dr. Rains, am I right that
23  you've been retained by the Government to provide
24  expert testimony in this case?
25    A.   Yes.

ESQUIRE
DEPOSITION SOLUTIONS

KAI COSHOW RAINS PHD
USA V SHARFI

April 29, 2022
17—20

Page 17

1    Q.   On what topics do you expect to
2  provide expert testimony?
3    A.   Ecology, vegetation.
4    Q.   Anything else?
5    A.   No, those are the sections I wrote.
6    Q.   And, Dr. Rains, are you aware that
7  in federal court, retained experts are required
8  to prepare reports to state their opinions?
9    A.   Are you referring to something other
10  than the expert report we generated?
11    Q.   I'm referring to the report.
12    A.   Oh, okay.  Yes, I'm aware that we --
13  yes.
14    Q.   So did you prepare a report that
15  summarizes your opinions in this case?
16    A.   Yes.
17    Q.   So what I'd like to do now is I'm
18  going to put up on the screen a few documents
19  that have been identified -- listed as exhibits
20  in prior depositions and just confirm that I'm
21  looking at the right stuff here.  Let me start to
22  share my screen here.
23       So, Dr. Rains, I just put up on the
24  screen a document that's been previously marked
25  as Deposition Exhibit No. 72, which is entitled

Page 18

1  DOJ -- U.S. Department of Justice Expert Team
2  Report.  Can you see that on the screen?
3    A.   Yes.
4    Q.   Is that -- does that look like the
5  first page of the report that you wrote portions
6  of?
7    A.   Yes, it does.
8    Q.   Okay.  So is this the report that
9  contains the opinions that you're going to
10  testify about at trial?
11    A.   Yes.
12    Q.   Okay.  Let me get out of that and
13  put --
14       MR. DOYLE:  Counsel, can I ask
15    briefly a question about 72?
16       MR. MCALILEY:  Sure.
17       MR. DOYLE:  Does 72 -- is that what
18    I call the main body of the report, which
19    is Pages 1 through 86 prior to the first
20    appendices -- appendix?
21       MR. MCALILEY:  The answer is yes,
22    but I think -- let me put up the next few
23    exhibits, I'm doing this in pieces, and
24    then maybe that will make it more clear.
25    The answer is yes, but when you produced

Page 19

1    it, counsel, you produced -- there is a
2    main body of the report that's the text,
3    and actually as a PDF, it's -- it's 102
4    pages as a PDF, but the numbered pages,
5    I think you're right, is 86.
6       MR. DOYLE:  Yes, I was using -- I
7    was using the non-PDF number as pagination,
8    but yes.
9       MR. MCALILEY:  Yes, and then
10    there's -- there's separate exhibits -- I'm
11    sorry, the figures were separate, the
12    tables were separate, and photos were
13    separate.
14       MR. DOYLE:  Correct.
15       MR. MCALILEY:  So I'm going to put
16    up these and have them marked as exhibits
17    so we know what we're referring to.
18       MR. DOYLE:  Okay.  So 72 is the main
19    body.
20       MR. MCALILEY:  72 is the main body
21    of the report.
22       MR. DOYLE:  Thank you.
23  BY MR. MCALILEY:
24    Q.   Dr. Rains, I'm going to put up
25  what's previously been marked as Deposition

Page 20

1  Exhibit No. 73.  This is the figures from the DOJ
2  expert team report.  Can you see that on the
3  screen?
4    A.   Yes.
5    Q.   Does this appear to be copies of the
6  figures that go with the report?
7    A.   Yes.
8    Q.   Okay.  So I'm going to be referring
9  to these some.  Let me stop sharing this.  Right
10  now I'm going to share on the screen what's
11  previously been marked as Deposition Exhibit
12  No. 74.  These are the tables that go with the
13  report.  Can you see that on the screen?
14    A.   Yes.
15    Q.   Does this appear to be a copy of the
16  tables that go with the expert report?
17    A.   Yes.
18    Q.   Okay.  Let me stop sharing this, and
19  lastly, I would like to share on the screen
20  what's been previously marked as Deposition
21  Exhibit No. 75.  Can you see that photograph
22  there on the screen, Dr. Rains?
23    A.   Yes.
24    Q.   All right.  Does this appear to be
25  copies of the photographs that accompanied the



Page 21

1 DOJ expert team report?
2     A.   Yes.
3         Q.   Okay.  Okay.  So I just -- I wanted
4 to show these and to -- and to -- so we'd have
5 this as a reference and I can use these as
6 exhibits as appropriate.  So let me exit out of
7 this -- this document.
8         So with regard to DOJ Exhibit 72,
9 which is the main body of the report, is -- are
10 all of your opinions contained in that report?
11     A.   Yes.
12     Q.   So do you have any opinions that
13 you're going to provide at trial that are not
14 contained in that report?
15     A.   That's not the way it works, right?
16 I mean, this is -- this is the body of what
17 I present in court, right?  So, yes,
18 I understand.
19     Q.   So the sum total of your opinions
20 that you're going to offer at court are the --
21 are contained in that expert report that I've
22 marked as Deposition Exhibit 72, right?
23     A.   You've now shown me some of the
24 appendices, but not all of them.
25     Q.   Okay.

Page 22

1     A.   If you're referring to the entire
2 body of the report, and you've shown me some
3 appendices but not others, but you are
4 considering it in its full body, then yes.
5     Q.   Okay.  Let's --
6     A.   There may be -- I had contributions
7 to some of the other appendices.
8     Q.   Okay.  Let me -- let me share on the
9 screen again the deposition Exhibit 72, which is
10 the report.  Can you see that on the screen?
11     A.   Yes.
12     Q.   Okay.  So we got an enormous amount
13 of paper, I say "paper," we got it
14 electronically, and so I'm trying to sort of
15 focus in on the stuff that matters.  So this is
16 the report.  If I go down to the very last page,
17 there's a list of appendices.  Do you see that?
18 That's on the bottom, it's on Page 86.
19     A.   I see it.
20     Q.   Okay.  So what specific appendices
21 are -- do you think are important or -- well, let
22 me rephrase that.
23         What specific appendices contain
24 opinions of yours that you're going to provide at
25 trial that are not otherwise contained in the

Page 23

1 main body of the report?
2     A.   I provided contribution to
3 Appendices 3, 4, 5, 6, and 9.
4     Q.   Okay.  So 3 is what I've just
5 marked -- I think that's Exhibit No. 75, which is
6 the tables, right?
7     A.   Are you waiting for me?
8     Q.   Yes, that was a question.
9     A.   I don't know what you marked them.
10     Q.   Okay.  Well, let me go back to that.
11 So I'm going to exit out of Deposition
12 Exhibit 72, I just have to do this.  It's a
13 little bit laborious, but so we can all be on the
14 same page here.  I'm going to go to Deposition
15 Exhibit No. 74 and put that up on the screen.
16         So can you see that on the screen,
17 the tables?
18     A.   I can see the first page, yes.
19     Q.   Right, and I can scroll through all
20 of them, but it looks like these are the tables
21 that go with the report, right?
22     A.   Yes.
23     Q.   So this is Appendix 3?
24     A.   Yes.
25     Q.   So let me exit out of this document,

Page 24

1 and let's go back to the main report.  So going
2 back to Deposition Exhibit 72 again.  Dr. Rains,
3 can you see Exhibit 72 and the last page that
4 lists the appendices?
5     A.   Yes.
6     Q.   Okay.  So then in -- so you
7 testified a moment ago that you also contributed
8 to the creation or the preparation of the
9 appendix for the figures, right?
10     A.   Items within, yes.  Some yes, some
11 no.
12     Q.   I see.  We'll go through that today.
13 So am I right the figures that accompany the
14 report is what I just showed you a moment ago as
15 Deposition Exhibit No. 73?
16     A.   I didn't have a -- I didn't pay
17 attention to the numbers.  You showed me
18 Appendix 3, which is the tables, and you have --
19 I believe --
20     Q.   Why don't I exit out of it.  I want
21 to make sure we're all talking about the same
22 thing.  So I'm going to exit out of Deposition
23 Exhibit 72, the report.  Let me go back to -- go
24 back here to Exhibit No. 73.  Can you see that on
25 the screen?



KAI COSHOW RAINS PHD
USA V SHARFI

April 29, 2022
25–28

Page 25

1    A.   Yes.
2    Q.   Does this look like the figures that
3  accompany the report?
4    A.   Yes.
5    Q.   So is this -- are these the figures
6  that are Appendix 4 for your report?
7    A.   Yes.
8    Q.   Okay.  So this is what you were just
9  referring to as something that you contributed
10  to, to helping to prepare some of these figures,
11  right?
12    A.   Some of the figures, yes.
13    Q.   Okay.  Let me exit out of this
14  document again and go back to the report.  Okay.
15  Can you see Exhibit 72 on the screen, again, the
16  list of appendices?
17    A.   Yes.
18    Q.   Okay.  So you had -- so what are the
19  other appendices that you contributed to the
20  preparation of?
21    A.   There are items within Appendix 5,
22  6, and 9 that I contributed to.
23    Q.   Okay.  So Appendix 5 is the
24  photographs, correct?
25    A.   Yes.

Page 26

1    Q.   Okay.  And I just showed you
2  photographs that are labeled in the same
3  convention as sections of the report.  Do you
4  remember that?
5    A.   That was the figures, yes.
6    Q.   Yes, and that's the figures that are
7  Appendix 5, correct?
8    A.   That was Appendix 4, wasn't it?
9    Q.   I'm sorry, I misspoke.  I meant --
10  I'm talking about the photographs now.  So
11  we already talked about the tables, which is
12  Appendix 3.  We talked about the figures, which
13  is Appendix 4.  Now I'm talking about Appendix 5,
14  which is the photographs.
15    A.   Okay.
16    Q.   I showed you the photographs, which
17  is Appendix 5, a moment ago; is that right?
18    A.   Yes, I believe so.
19    Q.   Okay.  Would you like me to show
20  them to you again to make sure we're talking
21  about the same thing?
22    A.   Sure.
23    Q.   Okay.  Let me exit out of Exhibit
24  No. 72.  So, Dr. Rains, I just put on the screen
25  what has been previously marked as Deposition

Page 27

1  Exhibit No. 75.  Do you see there it's 41 pages
2  of photographs, and they're labeled with the
3  convention that matches sections of the report?
4    A.   Yes.
5    Q.   Okay.  So are these the photographs
6  that are part of Appendix 5?
7    A.   Yes.
8    Q.   Okay.  Okay.  Let me go back to
9  Exhibit No. 72 again.  Can you see Exhibit No. 72
10  again on the screen?
11    A.   Yes.
12    Q.   Okay.  So -- and so you've indicated
13  that you contributed to Appendix 3, the tables;
14  Appendix 4, the figures; Appendix 5, the
15  photographs; and the last one was Appendix 9.
16  Did I hear that right?
17    MR. DOYLE:  You missed one.
18    THE WITNESS:  You skipped over
19    Appendix 6.
20  BY MR. MCALILEY:
21    Q.   Appendix 6, so those are the wetland
22  data sheets?
23    A.   Correct.
24    Q.   Okay.  And so I'm going to find that
25  on a break, and then I'll just confirm that

Page 28

1  I know which one it is.  I don't have it ready
2  right at my fingertips here.
3    I'm just curious, how did you
4  contribute to the wetland data sheets in
5  Appendix 6?
6    A.   The wetland data sheets include a
7  portion that is the vegetation surveys.  I did
8  the vegetation surveys.
9    THE COURT REPORTER:  The vegetation
10    surveys, is that what you said?
11    THE WITNESS:  That's correct.
12    MR. DOYLE:  Yes, the witness, if you
13    can just speak up just a little.  Your
14    voice tends to trail off a bit.
15    THE WITNESS:  Okay.
16    MR. DOYLE:  Thank you.
17  BY MR. MCALILEY:
18    Q.   Okay.  So, Dr. Rains, just to make
19  sure I've got it right, you -- you contributed to
20  the wetland data sheets that are Appendix 6 by
21  preparing the portion of the sheets that relates
22  to the vegetation; is that right?
23    A.   Yes.
24    Q.   Is there any other aspect of the
25  wetland data sheets that you contributed to?



KAI COSHOW RAINS PHD
USA V SHARFI

April 29, 2022
29–32

Page 29

1    A.   No, I don't believe so.
2    Q.   All right.  Other than Appendix 6,
3   are there any other appendices that you
4   contributed to?
5    A.   Appendix 9.
6    Q.   Okay.  And Appendix 9 are the
7   functional assessment data sheets?
8    A.   Yes.
9    Q.   And how did you contribute to the
10   functional assessment data sheets?
11    A.   I took most, if not all, of the
12   photographs, and I took the screenshots that
13   serve as the maps, and as explained in the
14   report, while we were in the field, I -- there
15   were questions that I answered, not that appear
16   on the data sheets, but contributed to the
17   answers on the data sheets.
18    Q.   And am I right in understanding that
19   the questions you would have answered would have
20   all related to vegetation?
21    A.   No, no, we would all be at the site,
22   so if I would have seen an animal or --
23        THE COURT REPORTER:  I'm sorry,
24     Doctor, I'm having trouble understanding,
25     you seem to be muffled.

Page 30

1        THE WITNESS:  Let me try to -- does
2   this sound any better?
3        MR. MCALILEY:  I can say I can hear
4   you, but I understand what the court
5   reporter is saying.  It does seem a
6   little -- let me say one thing that I do
7   sometimes is I put papers on top of my
8   computer sometimes where the microphone is,
9   and that can muffle it.  I don't know
10   if you've got the report sitting on
11   something, and maybe that makes a
12   difference.
13        THE WITNESS:  No, I don't.
14        THE VIDEOGRAPHER:  Could we try one
15   thing, Doctor?  At the bottom left of your
16   screen where you see the microphone "mute,"
17   there's a little arrow next to that "mute."
18   Do you see that little arrow?  Would you
19   mind tapping that, and it will bring up a
20   list and then go to "audio settings."
21        THE WITNESS:  Uh-huh.
22        THE VIDEOGRAPHER:  Do you know --
23   and then go to audio and is your -- there's
24   a checkmark over "automatically adjust
25   microphone volume."

Page 31

1        THE WITNESS:  That is checked.
2        THE VIDEOGRAPHER:  It is checked.
3   Okay.  That would be -- and then your
4   volume level right above that, where --
5        THE WITNESS:  It's about mid-range.
6        THE VIDEOGRAPHER:  You know what,
7   would you mind unchecking "automatically
8   adjust microphone volume," and then moving
9   that a little to the right a little closer
10   to higher, and then just give us a few
11   words to see if that --
12        THE WITNESS:  How is that, does that
13   work?
14        THE VIDEOGRAPHER:  Did that --
15        THE WITNESS:  I can keep moving it.
16        THE VIDEOGRAPHER:  Did that improve
17   anything for anyone?  I'm sorry, on my end
18   I didn't hear the problem.
19        MR. MCALILEY:  I can hear the
20   witness, it's a little soft, but I can hear
21   the witness.  Mr. Haas?
22        THE COURT REPORTER:  So I can hear
23   the witness, it's just muffled, and I hear
24   everything she's saying until I interrupt
25   and say I can't.

Page 32

1   BY MR. MCALILEY:
2    Q.   Let's do this, Dr. Rains, I think
3   this is the -- this is 2022 and our world, right?
4   We have to do this.  Just ask maybe speak up a
5   little bit more, and there may be points that one
6   of us can't understand, and we'll ask you to be
7   more clear, but I think this is better than some
8   depositions I've been in, it's not as clear as
9   others, so maybe we'll just try to soldier our
10   way through this.
11        THE WITNESS:  Mr. Haas, is this
12   better?
13        THE COURT REPORTER:  Yeah, that
14   sounds better.
15        THE VIDEOGRAPHER:  I think it's
16   better.  I think it's better.
17        THE WITNESS:  Okay.  I'll leave it
18   on this setting.
19        THE COURT REPORTER:  I apologize for
20   interrupting, but if I can't understand
21   what you're saying, I'm just going to have
22   to interrupt.
23        MR. MCALILEY:  We're all doing our
24   job, right?  No problem.
25        MR. DOYLE:  Yeah, I do think she was



KAI COSHOW RAINS PHD
USA V SHARFI

April 29, 2022
33–36

Page 33

1  kind of mid-answer where we left off, so we
2  may have to back up.
3      THE COURT REPORTER:  Would you like
4  me to read back the question?
5      MR. MCALILEY:  I'll re-ask the
6  question.
7      THE COURT REPORTER:  Okay.
8  BY MR. MCALILEY:
9      Q.  So, Dr. Rains, before -- before
10  we worked on just the volume of the transmission
11  here today, I asked you what were the topics
12  which you would answer questions from other
13  members of the DOJ expert team while you were out
14  in the field, and I think you were answering that
15  question.  If you can -- if you can tell what are
16  the topics that you answered questions on?
17      A.  Whether I saw any animals, ponded
18  water, flowing water, course debris,
19  microtopographic observations, and sometimes
20  questions related to vegetation.  That's the
21  extent that I recall.
22      Q.  Okay.  So am I right that most of
23  what you described were -- you'd answer questions
24  about things you observed, it wasn't just
25  observations on vegetation but seeing animals or

Page 34

1  water or things like that?
2      A.  Correct.
3      Q.  Okay.  All right.  Okay.  Are there
4  any opinions that you're going to give in trial
5  that are not contained in your report?
6      MR. DOYLE:  Objection, vague.  Do
7  you mean to include the appendices she just
8  went through as well?
9  BY MR. MCALILEY:
10      Q.  So Dr. Rains, just to be very clear,
11  when I'm referring to the report here, I'm
12  referring to the report and what I consider to be
13  parts of the report, which includes the
14  appendices and the figures and the tables and the
15  photographs.
16      So with that understanding, what
17  I mean by "the report" here, are there any
18  opinions that you expect to offer at trial that
19  are not contained in the report?
20      A.  No.
21      Q.  And do you have any plans to amend
22  the report?
23      A.  I do not have any plans, no.
24      Q.  Okay.  Okay.  So I want to make sure
25  that -- that I understand correctly the different

Page 35

1  figures and tables and photographs and how they
2  relate to the main body of the report.
3      So am I right that the figures and
4  tables and photographs are labeled with a system
5  that matches sections of the report?
6      A.  Yes, that was the intent.
7      Q.  Okay.  So let me give an example of
8  this.  So I'm going to exit out of the main body
9  of the report, I'm going to go now to -- I'll go
10  to the figures.  So this is Deposition Exhibit
11  No. 73.  Can you see here, Dr. Rains, the
12  Exhibit 73, which is the figures?
13      A.  Yes.
14      Q.  Okay.  So if I'm looking at the
15  first page, and it says figure Roman numeral
16  II.A.1, do you see that in the lower left-hand
17  side of the first page?
18      A.  Yes.
19      Q.  Am I right that this figure
20  corresponds to Section II.A.1 of the report?
21      A.  Yes, that was the intent, I can't
22  vouch for whether every number on every figure is
23  exactly correct, but that was the -- that's how
24  it should work.
25      Q.  Okay.  And the same thing goes for

Page 36

1  the tables in the photographs, right?  They're
2  labeled in a system that's supposed to match up
3  with the body of -- the portion of the report
4  that they correspond with, right?
5      A.  Yes.
6      Q.  So if I want to ask a witness about
7  a figure, I should be asking the witness -- the
8  person who wrote the section of the report that
9  the figure corresponds with?
10      A.  Not necessarily.  Within the body of
11  the report, sometimes we would make references to
12  figures and photos that had previously been
13  referenced in a prior section of the report and
14  so they carry a different number.
15      So, for example, if I'm writing
16  Section 3 -- I don't know offhand if that's
17  correct or not, I'm not looking at the table of
18  contents -- and I wanted to make reference to the
19  location of the defendant's property, I might
20  reference II.A.1 within my section.
21      Q.  Thank you.  So to make sure
22  I understand, then, so for the figures that
23  I should be asking you about are the figures that
24  correspond to the sections of the report that you
25  wrote and figures that you otherwise referenced



KAI COSHOW RAINS PHD
USA V SHARFI

April 29, 2022
37–40

Page 37

1  in the body of the report that you wrote; do I
2  have it right?
3       A.   Yes, although, I'm aware of one
4  misnumbering in my section of the report.
5       Q.   Well, which one is it, what's the
6  misnumbering?
7       A.   If you go -- hold on.  I have to
8  look for the page.
9       Q.   You know, Dr. Rains, one thing I'll
10  offer is this, this is going to take you a little
11  while to do, so maybe at a break you can do
12  it and just point it out to me later.  If you're
13  getting close to finding it, that's fine, but I'm
14  just going to offer that, if that makes it a
15  little bit easier.
16       A.   Okay.  I'll get back to you.
17       Q.   Okay.  Thank you.  Yeah,
18  I understand it's a lot of stuff to look through,
19  so we don't need to dwell on it too long now.
20  We can come back to that.
21       Okay.  So, Dr. Rains, so there's
22  five -- five witnesses that have been retained by
23  the Government for -- to provide expert opinions
24  related to wetlands on the defendant's property;
25  is that right?

Page 38

1       A.   They're the ones listed on the front
2  page.  I believe there was five.
3       Q.   Okay.  So -- and so the five people
4  are Lyndon Lee, Wade Nutter, yourself, Scott
5  Stewart, and Michael Wylie; is that right?
6       A.   For this report, yes.
7       Q.   Okay.
8       A.   Yes.
9       Q.   So why are there five people giving
10  expert opinions on the topic related to wetlands
11  in this case, do you know?
12       MR. DOYLE:  Objection, vague.
13       THE WITNESS:  Can you tell me what
14       you're getting at, like why these five,
15       why --
16  BY MR. MCALILEY:
17       Q.   Why -- in case there's an expert who
18  gives testimony, and here there's five, there's
19  five people who wrote a report together.  I'm
20  just curious why there's five of you and not one
21  of you or a couple?
22       MR. DOYLE:  Objection.
23       THE WITNESS:  I didn't do the --
24  BY MR. MCALILEY:
25       Q.   I didn't hear the answer, ma'am.

Page 39

1       A.   Oh, I didn't do the contracting.  I
2  didn't chose the people.  I can say we all come
3  with our specialties.
4       Q.   Do you know how it was that you came
5  to become a member of this team?
6       A.   Yes, I am working with Dr. Lee, and
7  I worked with him previously on things not
8  related to eco matters, and this case is taking
9  place in Florida, and they were looking for
10  someone with experience in Florida vegetation,
11  ecology.
12       Q.   Okay.  Thank you.  So it sounds like
13  Dr. Lee and the other -- well, Dr. Lee didn't
14  have much experience with Florida, so they needed
15  somebody with some Florida expertise, am
16  I understanding that right?
17       MR. DOYLE:  Objection,
18       argumentative, misstates testimony.
19       THE WITNESS:  I'm being brought in
20       as the vegetation person, and I'm not
21       commenting whatsoever on what -- on other
22       people's expertise.  They can fill you in
23       on that.
24  BY MR. MCALILEY:
25       Q.   Okay.  So let me -- let me try to

Page 40

1  understand, then, how the expertise of the
2  different individuals fits in so I know who is
3  covering what.  You said --
4       THE COURT REPORTER:  Hold on, I'm
5       sorry, counsel, there was some background
6       noise there.
7       MR. MCALILEY:  Okay.
8       THE VIDEOGRAPHER:  May I -- counsel,
9       I do apologize, may I ask where your mic is
10       located?  It sounds like something is
11       scratching your mic, if that helps.
12       MR. MCALILEY:  I had a piece of
13       paper on my computer.  I took it off.
14       THE VIDEOGRAPHER:  Okay.  I just
15       want to let you know.  Thank you, sir.
16       MR. MCALILEY:  I'm trying to keep
17       the papers off my computer.
18       MR. DOYLE:  Yes, it sounded like a
19       mouse.
20       MR. MCALILEY:  No, it's paper.
21  BY MR. MCALILEY:
22       Q.   Dr. Rains, so I just want to
23  understand what the expertise is or the subjects
24  of expert testimony of each member of the team.
25  So you testified earlier that you're going to be



KAI COSHOW RAINS PHD
USA V SHARFI

April 29, 2022
41—44

Page 41

1   providing testimony on the topics of ecology and
2   vegetation, right?
3       A.   Yes, and particularly as they relate
4   to wetlands.
5       Q.   Okay.  Dr. Stewart is a soil
6   scientist; is that right?
7       A.   Correct.
8       Q.   So he's going to be testifying on
9   matters related to soils?
10      A.   That would be my expectation, yes.
11      Q.   And Dr. Nutter is a hydrologist,
12  right?
13      A.   Correct.
14      Q.   And he is going to be giving
15  testimony on -- related to hydrology, right?
16      A.   Again, that would be my expectation,
17  yes.
18      Q.   Okay.  And Mr. Wylie, what is his
19  area of expertise?
20      A.   Wetlands regulation, policy,
21  delineation.
22      Q.   So Mr. Wylie is going to be giving
23  testimony with regard to regulatory matters
24  related to this case, like what's the Waters of
25  the U.S., that kind of thing?

Page 42

1       A.   That's my understanding.
2       Q.   And then what is Dr. Lee's area of
3   expertise?
4       A.   Ecology, wetlands, functional
5   assessment.  I'm sure it goes beyond that.
6       Q.   Is he the lead expert on the team,
7   by the way?
8       A.   I don't know that we have a lead
9   expert.  We work very much as a team.
10      Q.   What do you -- what do you
11  understand Dr. Lee's expert testimony to cover at
12  trial?
13      A.   Functional assessment, mitigation,
14  wetland science --
15          THE COURT REPORTER:  I'm sorry,
16      Doctor, functional assessment?
17          THE WITNESS:  What did you get so
18      far?
19          THE COURT REPORTER:  That's it, just
20      the first one.
21          THE WITNESS:  Functional assessment,
22      wetland science, ecology --
23          MR. DOYLE:  You said mitigation.
24          THE WITNESS:  Mitigation, yeah,
25      functional assessment, but yes, you're

Page 43

1       right, mitigation.  And, you know, wetland
2   science is a broad category, so I'm trying
3   to remember if he worked much with Scott.
4   I don't know.  You'll have to ask him.
5   BY MR. MCALILEY:
6       Q.   Okay.  How do you understand the
7   subject matter of your testimony is going to
8   differ from the testimony of Dr. Lee?
9          MR. DOYLE:  Objection, calls for
10      speculation.
11          MR. MCALILEY:  That's not
12      speculation, counsel.  I'm trying what her
13      understanding of it is.
14          MR. DOYLE:  Well, you said
15      "testimony," and he hasn't testified yet.
16          MR. MCALILEY:  Okay.  Please, sir,
17      make your objections, don't coach your
18      witness.  I know the rules in the Southern
19      District of Florida.
20          MR. DOYLE:  You asked me for an
21      explanation, so I was responding to your
22      request.
23  BY MR. MCALILEY:
24      Q.   Dr. Rains, what is your
25  understanding of how your expert testimony is

Page 44

1   going to differ from that of Dr. Lee?
2       A.   My understanding --
3          MR. DOYLE:  Objection.
4          THE WITNESS:  -- is that we are
5      primarily responsible for the portions of
6      the report that we authored.  We are
7      secondarily responsible for those that
8      we have said that we collaborated on or
9      contributed to.
10  BY MR. MCALILEY:
11      Q.   Okay.  So I can look at the report,
12  and I can figure out who -- which expert wrote
13  which section; is that right?
14      A.   Yes.
15      Q.   And so if I go to the table of
16  contents of the report, it will have initials
17  next to it that correspond with the initials of
18  the different experts on the team; is that right?
19      A.   And that tells you who the primary
20  authors were.
21      Q.   Okay.  And so what do you mean by
22  "primary author"?
23      A.   As you know, I guess they didn't put
24  authors in the appendices.  This is a report
25  written by the team, and so we collaborated on



KAI COSHOW RAINS PHD
USA V SHARFI

April 29, 2022
45–48

Page 45

1  the sections related to our expertise, but the
2  primary author is the person who pulled
3  it altogether and stands behind that section.
4      Q.   Okay.  So am I right, then, the
5  person who is going to be testifying about the
6  topics that are contained in each section is the
7  person who is listed as the principal author?
8      A.   I've never been to trial, so I don't
9  know how that works.
10      Q.   Well, let me ask about you.  Are you
11  just going to be offering testimony at trial
12  based upon the -- on the topics that are in the
13  sections where you were the principal author?
14      A.   Or a contributing author maybe.  I
15  don't --
16      Q.   So how can I tell from looking at
17  the report which -- who are the contributing
18  authors to each section?
19      A.   Well, I know -- I know Dr. Lee
20  specifies within his section that he incorporated
21  observations made by other members of the team.
22      Q.   Okay.  Other than that, how do
23  I figure out who is a contributing author to the
24  various sections of the report?
25      A.   My contributions, say, to the

Page 46

1  wetland delineation would be identifiable because
2  within the wetland delineation section, for
3  example, are references to the wetland forms, and
4  then when you go to the wetland forms, you'll see
5  my name is on there.
6      Q.   Okay.  How else can I determine
7  whether someone is a contributing author to a
8  section of the report where another person is the
9  principal author?
10      A.   I think that would be sufficient,
11  because we referenced the data forms, and so from
12  there you should be able to figure out who would
13  have contributed information to the various
14  portions of the form -- or of the sections of the
15  report.  I guess you'd have to be more specific
16  about exactly what you're confused by and provide
17  some examples so I can help you.
18      Q.   Maybe what we need to do is I'm
19  going to have to go through each section of the
20  report and find out what you're going to be
21  testifying about.  So you understand where I'm
22  coming from, typically the expert in a case -- in
23  most cases, each expert witness prepares their
24  own report.  So if I want to figure out what an
25  expert is going to testify at trial, I look at

Page 47

1  their report, I know they wrote it.
2          In this case, the Government has
3  decided to have five people together write a
4  single document, so instead of -- and it's 86
5  pages of text and it has all these appendices, so
6  there's a bit of, you know, the bean under the
7  cup kind of thing, like who's testifying about
8  what.  And the reason why we do depositions here,
9  Dr. Rains, is we -- I'm here for the defendant.
10  I'm trying to understand what the testimony is so
11  I know how to prepare for the trial.  So that's
12  why I'm asking.  I'm just trying to figure out
13  what is it I need to ask you about.
14          So I guess what I'll do in a minute,
15  I'll start going through the report, and we'll
16  just go through each section, and I'll find out
17  whether you're going to be testifying on the
18  topics in that section, and maybe that will be
19  the simplest way to do it.  But I'm explaining to
20  you why I'm asking the questions, because it's a
21  bit of a -- it feels like a bit of a hide the
22  ball kind of thing to me, and maybe that wasn't
23  the intention, but that's how it feels, so I'm
24  just trying to figure it out, and I'm trying to
25  shorten our deposition today, too.  So rather

Page 48

1  than ask you about sections that you didn't write
2  and are not going to testify about.  So anyway --
3  so I just explained that.
4          So, Dr. Rains, then, let me ask you,
5  is it -- is it -- so all the sections of the
6  report that you were the principal author are
7  those that are identified with the initials KCR
8  on the table of contents, right?
9      A.   Correct.
10      Q.   Am I right that's the -- those are
11  the -- that encapsulates the great majority of
12  what you're going to testify about at trial, the
13  topics that are in those sections that you're a
14  principal author?
15      A.   I would expect so.
16      Q.   Okay.
17      A.   Plus the appendices if something
18  comes up in the appendices.
19      Q.   And the appendices that would be the
20  basis of testimony would be the ones that you
21  contributed to that we went over a little while
22  ago, right?
23      A.   Yes, although some of the figures
24  and the tables are uniquely called out in my
25  section.



KAI COSHOW RAINS PHD
USA V SHARFI

April 29, 2022
49–52

Page 49

1    Q.   Okay.  So the appendices that will
2  be the base of your testimony would be those that
3  you specifically referenced in the sections of
4  the report that you're the principal author and
5  those that you previously told me that you
6  contributed in your preparation.  Do I have that
7  right?
8    A.   Yes, so not the soils, not the
9  hydrology.
10    Q.   Great.  And so am I right, then,
11  that you're relying upon the expertise of other
12  members of the team in -- at least with regard to
13  where they have a different expertise than
14  yourself?
15    A.   My contributions to the report are
16  primarily vegetation and ecology.  The
17  vegetation, nobody else really had a hand in
18  unless I say as much on a data sheet.  So there
19  were times that Dr. Lee cored a tree and
20  determined the age of that tree and I noted that
21  on the data sheet.  So now I forgot your
22  question.
23    Q.   Okay.  That's helpful.  My question
24  is this:  You're not a hydrologist, right?
25    A.   Correct.

Page 50

1    Q.   So you're relying on Dr. Nutter for
2  his opinions on hydrology at least as regards to
3  this case, right?
4    MR. DOYLE:  I'll just say objection,
5    vague.
6    THE WITNESS:  The part that's vague
7    about that is you are correct, I am not --
8    yeah, if he measured groundwater or he --
9    you know, that -- that is entirely his
10    domain.  However, while I was out in the
11    field, I made observations about whether
12    there was standing water, and as an
13    ecologist, I was also making observations
14    regarding the distribution of the plant
15    communities, both of which incorporate a
16    certain level of understanding hydrology,
17    but I did not take any hydrological
18    measurements in this case.
19  BY MR. MCALILEY:
20    Q.   Do you -- do you believe you have
21  any expertise in the area of what types of waters
22  are regulated under the Clean Water Act?
23    A.   I have familiarity, but I do not
24  expect to testify on that, no.
25    Q.   Okay.  So you don't expect to

Page 51

1  testify about whether wetlands on the site are
2  part of the Waters of the United States, do
3  I have that right?
4    A.   Except for the vegetation portion of
5  a wetland determination form, but not the policy
6  portion, that would be Mr. Wylie and others.
7    Q.   Okay.  And who others, by the way,
8  than Mr. Wylie?
9    A.   Others who may have been identified
10  as authors in that section --
11    Q.   Okay.
12    A.   -- or self-identified as
13  collaborating authors.
14    Q.   Okay.  So self-identified as
15  collaborating authors, so I need to ask them in a
16  deposition whether they think they're a
17  collaborating author in a section of the report
18  that Mr. Wylie wrote?
19    A.   As you did me.
20    Q.   Okay.  So let me just make sure
21  I'm -- I'm just trying to be very specific on
22  this issue about the regulatory subjects.  So you
23  understand, don't you, that not all wetlands are
24  regulated under the federal Clean Water Act; is
25  that right?

Page 52

1    A.   Correct.
2    Q.   So you can have a wetland that meets
3  the three characteristics test for a wetland
4  under the 1987 Wetland Manual but that is not
5  regulated under the Clean Water Act, right?
6    A.   Correct.
7    Q.   So -- and what is -- do you
8  understand that wetlands are only regulated under
9  the Clean Water Act if they are deemed part of
10  the navigable waters which is defined in the
11  statute as the Waters of United States, are you
12  aware of that?
13    A.   In a broad sense, yes.
14    Q.   Okay.  So this issue about what is
15  part of the Waters of United States, that's not
16  part of your expertise, right?
17    A.   Correct.
18    Q.   Okay.  So --
19    A.   Well, let me qualify that, because
20  when one is determining if something is a Water
21  of United States and is related to the wetland
22  determination, one of the three parameters that
23  you need to satisfy is whether it's hydrophytic
24  vegetation.  So inasmuch as that is a part of the
25  determination that the site is a wetland, and,



KAI COSHOW RAINS PHD
USA V SHARFI

April 29, 2022
53–56

Page 53

1  therefore, may be considered, pending other
2  analyses, to be part of the Waters of United
3  States, I mean, that part.
4      Q.   Okay.  So, Dr. Rains, to understand
5  this right, as somebody who studies vegetation,
6  you have -- you have some expertise about whether
7  certain vegetation is part of a wetland, right?
8      A.   Correct.
9      Q.   Okay.  But your expertise does not
10  extend to whether a certain wetland is federally
11  regulated or not; is that fair to say?
12     A.   I think -- I think the reason we're
13  struggling with this is the word "expertise."
14  I suspect you are using expertise as
15  interchangeable with am I going to testify in
16  this particular case, and I'm considering
17  expertise in terms of I have lots of experience
18  with wetland delineation and -- but that was not
19  my focus in this particular case.
20     Q.   Okay.  Let me break this down.  So
21  you're not going to testify at trial in this case
22  about whether wetlands on the site are considered
23  part of the Waters of United States, you're just
24  going to testify about whether you think there's
25  wetlands on the site, where they're located,

Page 54

1  things related to that; is that fair?
2      A.   That is my expectation.
3      Q.   Okay.
4      A.   Unless there's a nuance to this
5  question that I'm not catching.
6      Q.   I'm just curious, have you ever
7  received any kind of formal training in
8  determining the scope of the Waters of United
9  States under the Clean Water Act?
10     A.   I was a professional -- yes.
11     Q.   You have.  And what -- and what is
12  your training on that?
13     A.   I was a professional wetland
14  consultant for nine years, and as part of that
15  we -- there were short courses that we took, and
16  then -- so I have field experience.  I have
17  experience writing reports on the subject.  I
18  have a lot of training in the vegetation
19  aspect, and I've published articles that are
20  related to this topic.
21     Q.   Okay.  The topic -- let me break
22  this down, first of all, while we're at it.
23  You're not a lawyer, right?
24     A.   Correct.
25     Q.   Have you ever worked in any -- at

Page 55

1  any regulatory agency before as an employee?
2      A.   No.
3      Q.   Okay.  So you've never worked at
4  EPA, for instance, right?
5      A.   No.
6      Q.   You've never worked at the U.S. Army
7  Corps of Engineers?
8      A.   No, my experience would be as a --
9  or was primarily as a wetland consultant.
10     Q.   And a wetland consultant, your job
11  would be you'd be hired by people to go out and
12  determine whether an area was a wetland that
13  might need a permit; is that right?
14     A.   Right, uh-huh.
15     Q.   And you've never testified as an
16  expert witness before in a case, right?
17     A.   No.
18     Q.   Right, so you've never been accepted
19  as an expert by a Court on the topic of what is
20  the scope of the Waters of United States before,
21  correct?
22     A.   I don't think I've been accepted as
23  an expert by a Court at any time, because I've
24  never been to court.
25     Q.   Fair enough.  Okay.  And just to

Page 56

1  close this out, so you're not going to be giving
2  opinions in this case about whether -- the
3  significance of the effects of the wetlands on
4  the site on downstream navigable waters like the
5  St. Lucie River, right?
6      A.   In the -- what you're asking me
7  is -- for example, as an ecologist, my opinions
8  regarding the potential biological interactions
9  between this site and a downstream waterway might
10  be incorporated into an overall answer -- or
11  wait.
12          I was in the field as an ecologist
13  and studied the aerial imagery as an ecologist.
14  I collected the plant data and made animal
15  observations, these observations regarding
16  microtopography, and so if it's appropriate to
17  ask me questions about how the -- those factors
18  on the site might affect the downstream locations
19  or downgradient locations, that -- that might be
20  something that would be considered my area of
21  expertise.
22     Q.   Okay.  But hold on, there's a couple
23  of -- so I'm going back and forth about what's
24  your expertise and what are you going to testify
25  at trial.  My understanding is you're a very



KAI COSHOW RAINS PHD
USA V SHARFI

April 29, 2022
57—60

Page 57

1  smart person, and you're very well educated, and
2  I'm just trying to -- you may have views about
3  all sorts of things, but what matters to me for
4  this deposition in the case is what you're going
5  to testify about at the trial in this case.  All
6  right?  So that's my question.
7          You're not going to be testifying at
8  trial in this case about -- about the effects of
9  the wetlands on the site on the St. Lucie River,
10  are you?
11      A.   If the questions has to do with
12  decomposition of organic materials, that's the
13  subject matter of my PhD.  If they have to do
14  with the vegetation, that's the subject matter of
15  my master's degree.  So I don't know if I -- and
16  I don't know how this whole process works.  So I
17  don't know who decides what I testify on, so
18  I can't answer that question.
19      Q.   Okay.  Well, so look, I'm going to
20  go through the report then, because as --
21  defendants have rights, right, in America, even
22  when the United States Government chooses to
23  bring this little lawsuit against somebody, they
24  still have rights, and one right they have is
25  they're entitled to know what witnesses who are

Page 58

1  going to testify against them are going to
2  testify about, so we take a deposition.  So I'm
3  trying to figure out what it is.
4          You've written parts of a report.
5  We're going to go through it, the report.  The
6  purpose of that is to tell us what it is you're
7  going to testify about so that I can ask you
8  questions.  So that's what I'm trying to figure
9  out what's the topic.
10          Let me do this, let me go through
11  the report, each section, and we'll cover -- I'll
12  ask you at each section whether you're going to
13  testify about the topics in that section.  Okay?
14  Maybe that's the simplest way to do this.
15          Dr. Rains, is there any -- anything
16  in the expert report that you think is incorrect?
17      A.   Is there anything in the expert
18  report that I think -- well, I've noted at least
19  one photograph labeling and -- oh, I see.
20          So I would not be able to tell you
21  if something was correct or incorrect in the soil
22  section, in the hydrology section, and since
23  I was not the primary author for the other
24  sections but simply the data I collected was used
25  in those sections, then I would need to do a more

Page 59

1  thorough reading before I can answer that
2  question.
3      Q.   So as you sit here today, you don't
4  know whether that everything is correct in the
5  report, at least as relates to the sections other
6  than soil or hydrology; am I understanding that
7  right?
8      A.   Or the sections which do not carry
9  my initials and yet they're not soils and they're
10  not hydrology, I was a contributing author to
11  those, but since I was not a primary author, I'm
12  not ready to tell you, yes, everything in there
13  is correct.
14      Q.   So you don't know.  As you sit here
15  today, you can't tell me it's all correct in the
16  sections of the report that you did not write,
17  correct?
18      A.   I would need to do a more thorough
19  reading, correct.
20      Q.   Okay.  But the sections of the
21  report where you were the principal author, is
22  everything in there correct?
23      A.   There's at least one photo number
24  which is incorrect.
25      Q.   Other than that, to your knowledge

Page 60

1  is everything in the sections you wrote correct?
2      A.   To my knowledge.
3          MR. MCALILEY:  So it's 11:16, would
4  you like to take a five-minute break at
5  this point?  I'm at a bit of a logical
6  breaking point.
7          THE WITNESS:  Sure, that would be
8  great.
9          MR. MCALILEY:  If it's okay with
10  everybody else, let's take a five-minute
11  break here.
12          THE WITNESS:  So we just stop the
13  video and come back in five minutes?
14          MR. MCALILEY:  That's what I do.
15  I turn off the video and mute and go refill
16  my coffee and stretch my legs.
17          MR. DOYLE:  Do we have to wait for
18  the videographer to say we're off record
19  and all that?
20          MR. MCALILEY:  Yes.
21          MR. DOYLE:  Hold on just a second.
22          THE VIDEOGRAPHER:  Going off --
23          MR. DOYLE:  I think that was it.
24  Thank you.  See you in five.
25          THE VIDEOGRAPHER:  Going off video



Page 61

1    record at 11:16 a.m.
2          (Thereupon, a break was taken.)
3          THE VIDEOGRAPHER:  We are now back
4    on video record at 11:23 a.m.
5  BY MR. MCALILEY:
6      Q.   Okay.  So, Dr. Rains, I want to go
7  to the report now and let me share my screen
8  again for Deposition Exhibit No. 72.  Can you see
9  that Page 1 of the expert report on your screen?
10     A.   Yes.
11     Q.   I didn't hear you that time, can you
12  say again.
13     A.   Yes, I do see it.
14     Q.   Thank you.  I saw your -- I saw your
15  lips move, but I didn't hear the noise, so
16  I wanted to make sure we could hear.
17          Okay.  So I'm on the first page of
18  the report, and we'll go down to Section 1-B,
19  technical team background.  Do you see that on
20  the screen?
21     A.   Yes.
22     Q.   Okay.  And do you see where it says
23  in the first sentence in Section 1-B, quote, "The
24  DOJ expert technical team members and their roles
25  are as follows."  Do you see that?

Page 62

1      A.   Yes.
2      Q.   And there's a -- am I right that the
3  report lists the five people who helped write
4  this report?
5      A.   Yes.
6      Q.   It lists the roles next to their
7  names?
8      A.   Yes.
9      Q.   Does the statement in the report
10  about each person's roles, is that statement
11  accurate to the best of your knowledge?
12     A.   Yes.
13     Q.   So let me -- let me just focus on
14  the entry for you.  It says next to your name,
15  "Plant ecology and systematics."  Do you see
16  that?
17     A.   Yes.
18     Q.   So those are -- your role on the DOJ
19  expert team was to provide input on plant ecology
20  and systematics; am I understanding that right?
21     A.   Yes.
22     Q.   And those are the topics on which
23  you're going to be providing expert testimony at
24  the trial in this case, right?
25     A.   I would expect so.

Page 63

1      Q.   Okay.  So let me just go through and
2  ask you exactly what you mean by some of these
3  terms.  So what -- what does "plant ecology"
4  mean?
5          Dr. Rains, did you hear my question?
6  Maybe you're thinking.
7      A.   I did.
8      Q.   Did you hear me?
9      A.   Yes.
10     Q.   Okay.  So my question was what does
11  "plant ecology" mean?
12     A.   Yes, I heard that question.  I'm
13  thinking.  So plant ecology encompasses the
14  biotic and abiotic factors that contribute to
15  maintenance of the vegetation community.
16     Q.   Okay.
17     A.   Plant ecology includes life cycles,
18  decomposition, access to nutrients, requirements
19  for maintenance of a plant community.  That's
20  what jumps to mind right now.
21     Q.   Okay.  What does "systematics" mean?
22     A.   The naming.  It's another word for
23  taxonomy.
24     Q.   Oh, so am I right then systematics
25  is the study of classification and nomenclature

Page 64

1  of organisms?
2      A.   That's correct.
3      Q.   All right.  So for the other
4  individuals on Exhibit No. 72 on section, you
5  know, 1-B with regard to their roles, I just want
6  to make sure I'm understanding you.  So what do
7  you understand the roles of Dr. Lee when it says
8  ecosystem ecology, wetland and river science?
9      A.   I would defer to Dr. Lee for that.
10     Q.   Well, I will ask him, but I'm asking
11  you now so I can help prepare.  So what do you
12  understand those roles to be, ecosystem ecology,
13  wetland and river science?
14     A.   Again, I would prefer that you ask
15  Dr. Lee that question.
16     Q.   Okay.  You don't know the answer to
17  the question about what his role is in this --
18     A.   Very -- they are very broad terms.
19  Well, that's not -- you asked me what those terms
20  mean, didn't you, or maybe I misheard the
21  question.
22     Q.   Maybe we're crossing each other or
23  misunderstanding each other.
24          What do you understand Dr. Lee's
25  roles to be insofar as testimony at trial in this



KAI COSHOW RAINS PHD

USA V SHARFI

April 29, 2022

65–68

Page 65

1  case?
2      A.    Within those terms.  Okay.
3          MR. DOYLE:  Objection, asked and
4      answered.
5  BY MR. MCALILEY:
6      Q.    You can answer, ma'am.
7      A.    So you're asking within those terms
8  what I expect his role to be?
9      Q.    Yeah.
10     A.    Okay.
11     Q.    What's he going to testify about at
12  trial.  And I'm looking at Page 1 of the report,
13  and it identifies the roles of each of those five
14  individuals.  You told me what your role is, now
15  I'm asking what his role is.  And you worked on
16  this for two years with Dr. Lee and helped write
17  a report with him, so my question is what do you
18  understand his role to be when it comes to
19  testimony at trial?
20     A.    I need to correct that statement.
21  I did not work with Dr. Lee for two years on
22  this.
23         MR. DOYLE:  Same objection as asked
24     and answered.
25  BY MR. MCALILEY:

Page 66

1      Q.    How long did you work -- ma'am,
2  Dr. Rains, how long have you been working on this
3  case?
4      A.    I believe I was retained August
5  2021.
6      Q.    Okay.  So last August?
7      A.    So last -- less than a year.
8      Q.    Okay.  All right.  So given the time
9  that you've worked with Dr. Lee and you've -- and
10  you wrote parts of the report, he wrote parts of
11  the report, what do you understand his role to be
12  at trial when it comes to testimony?
13         MR. DOYLE:  Same, asked and -- asked
14     and answered.
15         THE WITNESS:  I would expect his
16     role to be everything that he has been
17     identified as a primary author on, the
18     appendices related to those subjects, and
19     what he identifies himself as a
20     collaborating author to be.
21  BY MR. MCALILEY:
22     Q.    Thank you.  And for Dr. Stewart,
23  what do you understand his role to be when
24  it comes to testimony at trial?
25     A.    I would expect Dr. Stewart -- first

Page 67

1  off, just to keep this more brief, the answer I
2  just provided for Dr. Lee would go for the other
3  members as well.
4      Q.    Okay.
5      A.    So Dr. Nutter, Dr. Stewart, Mr. --
6      Q.    All right.  So for Dr. Stewart, you
7  would expect his role at trial with regard to
8  testimony are the topics in the sections where
9  he's the principal author, appendices that relate
10  to those sections, and any other specific matter
11  that he identifies in the sections of the report,
12  do I have that right?
13     A.    Yes, and particularly anything where
14  he has signed off on the data sheet as well.
15     Q.    All right.  Thank you.  All right.
16  Let me take Exhibit 72, and let me -- so I'm
17  putting up on the screen an exhibit that I've
18  marked as exhibit -- Deposition Exhibit No. 102.
19         (Thereupon, Exhibit No. 102 was
20     marked for identification.)
21  BY MR. MCALILEY:
22     Q.    And can you see that on the screen
23  there, Dr. Rains?
24     A.    Yes.
25     Q.    Okay.  Does this look like a copy of

Page 68

1  your resume?
2      A.    Yes.
3         MR. MCALILEY:  Okay.  And so,
4     Mr. Doyle, I think 102 is the next number
5     in the sequence; is that right?
6         MR. DOYLE:  You sent me an email.
7     I think you called it 101 in that one.  But
8     let me check here.  No, you said 102, thank
9     you.
10        MR. MCALILEY:  Mr. Haas, does
11    it sound right that 102 is the next number?
12        THE COURT REPORTER:  Correct, that's
13    what I have.
14        MR. MCALILEY:  Thank you.
15  BY MR. MCALILEY:
16     Q.    Okay.  All right.  So, Dr. Rains,
17  I got this in discovery, it was provided by the
18  Government.  Am I right this is your resume?
19     A.    Yes.
20     Q.    And is the information in your
21  resume true and correct?
22     A.    Yes.
23     Q.    And does this resume completely
24  summarize your qualifications to testify in this
25  matter?



KAI COSHOW RAINS PHD
USA V SHARFI

April 29, 2022
69–72

Page 69

1    A.   Can we scroll through it?
2    Q.   Yes, ma'am.
3    A.   Okay.  You've got to go a little
4    slower.
5    Q.   Oh, I'm sorry, yeah.  You want to --
6    A.   I assume it's the same one that's in
7    the report, so let me just call it up.
8    Q.   I think it is.  That's where I got
9    it.  If it's the wrong one, it's good for me to
10   learn that now.
11   A.   Yes, there is a couple of upcoming
12   presentations that aren't included, but that
13   looks pretty up-to-date.
14   Q.   Okay.  Thank you.  So let me just
15   briefly go through your education.  When did you
16   get your PhD from UC Davis?
17   A.   I believe it was 2004.
18   Q.   Not sure?
19   A.   No, I'm not sure of the date.
20   Q.   And your PhD is in ecology; is that
21   right?
22   A.   Yes.
23   Q.   And your master's -- your PhD thesis
24   related to decomposition of organic materials; is
25   that right?

Page 70

1    A.   Yes, sorry, I don't recall the
2    title, although that's publicly available what
3    the dissertation title was, but it was -- the
4    subject matter was acquisition of organic
5    nutrients by wetland plants -- or plants adapted
6    to wetland conditions, and -- can I say that over
7    again?  I didn't do a very good job.  It's been a
8    while since I thought about what the title is.
9        The subject matter was acquisition
10   of organic nutrients by plants, particularly as
11   needed by mycorrhizal fungi.
12   Q.   Okay.  Thank you.
13   A.   Do you need help with that,
14   Mr. Haas?
15   Q.   No, I don't need to dwell on that.
16   I just wanted to understand what the subject
17   matter was.
18       MR. DOYLE:  She was asking the court
19       reporter if he needed help spelling it.
20       THE COURT REPORTER:  It's okay,
21       we can move forward.
22       THE WITNESS:  Okay.
23   BY MR. MCALILEY:
24   Q.   So, Dr. Rains, when did you get your
25   master's of science in botany from the University

Page 71

1    of Washington?
2    A.   I believe that was 1992.
3    Q.   And what was the subject matter of
4    your master's thesis?
5    A.   It was -- it had a focus on
6    molecular biology and resistance to pathogens and
7    heat stress by plants.
8    Q.   And when did you get your bachelor's
9    in science from Oregon State?
10   A.   1990.
11   Q.   Okay.  Where are you from
12   originally?
13   A.   Oregon.
14   Q.   Where in Oregon?
15   A.   Between -- The Willamette Valley.
16   Q.   As an aside, the best job I ever
17   had, I was a summer seasonal forest ranger in the
18   Columbia Gorge in 1986.  The best job I ever had.
19       MR. DOYLE:  Oh, that's neat.
20       MR. MCALILEY:  I'll tell you about
21       that sometime.  That's how I got into
22       environmental law, frankly.
23       MR. DOYLE:  Interesting.
24   BY MR. MCALILEY:
25   Q.   Okay.  So, Dr. Rains, where are you

Page 72

1    currently employed?
2    A.   University of South Florida.
3    Q.   And how long have you been employed
4    at the University of South Florida?
5    A.   Do I --
6    Q.   I could -- I could -- Dr. Rains,
7    if I draw your attention to Exhibit No. 102 under
8    "Professional Experience," it says, "Research
9    associate professor, school of geosciences,
10   University of South Florida --
11   A.   Oh, perfect.
12   Q.   -- 2015 to present.  Does that
13   represent when you went worked at --
14   A.   That is correct.  I couldn't
15   remember if it was '15 or '16.
16   Q.   Okay.  And your title there is
17   research associate professor; is that right?
18   A.   Yes.
19   Q.   Is that a tenured professorship?
20   A.   No.
21   Q.   Is it tenure track?
22   A.   No.
23   Q.   Okay.  And how did you come to work
24   at the University of South Florida?
25   A.   I had worked there previously, you

KAI COSHOW RAINS PHD
USA V SHARFI

April 29, 2022
73–76

Page 73

1  see, in 2003, 2005 in a different role as an
2  instructor and academic advisor.
3      Q.   And so you decided to come back.
4  You liked it?  Is that how you came to arrive
5  there as a research associate professor in 2015?
6      A.   That was how I knew -- yeah.
7      Q.   Okay.
8      A.   Yeah, that was how I knew what
9  University of South Florida was all about, and
10  even in this, it says, "School of Geosciences,"
11  what happened was environmental science and
12  policy merged with two other departments and
13  became the School of Geosciences.
14      Q.   What is your area of research or
15  study at University of South Florida?
16      A.   I am in the -- I say it best on the
17  website, but properly speaking, it is wetland
18  science and mapping.
19      Q.   Anything else?
20      A.   To be honest, I feel like I'm
21  forgetting something real obvious.  Those are
22  pretty broad terms, so I guess I'll throw in
23  there ecology.
24      Q.   Okay.  I see also your resume
25  says -- has your name and has Coshow

Page 74

1  Environmental, Inc., Tampa, Florida.  What is
2  Coshow Environmental, Inc.?
3      A.   It is the name of my sciences
4  consulting firm.
5      Q.   And do you own that firm?
6      A.   I co-own it.
7      Q.   Okay.  Are you an employee of Coshow
8  Environmental, Inc.?
9      A.   I am the vice president.
10      Q.   Do you get -- when you get a
11  paycheck from it, do you get a W-2 from Coshow
12  Environmental, Inc.?
13      A.   No, no.
14      Q.   I'm curious, who is the co-owner of
15  Coshow Environmental, Inc.?
16      A.   Mark Rains.
17      Q.   Is that your husband?
18      A.   Correct.
19      Q.   And so could you just -- what is --
20  what type of work does Coshow Environmental,
21  Inc., do?
22      A.   We do wetland science, hydrology,
23  plant surveys mapping, environmental science
24  would be the broad term.
25      Q.   Am I right this is the company which

Page 75

1  you do projects which are outside the scope of
2  your employment with the University of South
3  Florida?
4      A.   Correct.
5      Q.   Okay.
6      A.   My employment, for the record, is a
7  partial employment at the University of South
8  Florida.
9      Q.   Okay.  What do you mean by "partial
10  employment"?
11      A.   For nine months, I have nine months
12  employment.  I'm not employed 12 months of the
13  year, and I'm employed at 75 percent time.
14      Q.   Okay.  I also see on your resume,
15  the third element, you worked at a place Three
16  Parameters Plus, Fairbanks, Alaska 2005 to 2014.
17  Do you see that on Exhibit 102?
18      A.   I do.
19      Q.   Tell me what your work at Three
20  Parameters Plus involved.
21      A.   The vast majority of our projects
22  were located in Alaska, so during the summer,
23  we would do field work for ground trooping,
24  aerial imagery, and performing wetland
25  determinations; and during the winters we would

Page 76

1  write up that work and do mapping and aerial
2  imagery -- right, yeah.
3      And my particular role was training
4  the seasonals, and I was also the botanist, but
5  we were a small firm, so we were involved in all
6  aspects.  I was lead botanist, but I also got
7  involved in questions related to functional
8  assessments, soils, hydrology.
9      Q.   So this -- so this is an
10  environmental consulting firm, it sounds like,
11  that you worked at and served in these roles that
12  you just described, right?
13      A.   Yes.
14      Q.   While you were working at Three
15  Parameters Plus, did you ever do any work in
16  Florida?
17      A.   Yes.
18      Q.   And was it the same type of thing,
19  mapping, that you would do or things that are
20  related?
21      A.   To -- it was a functional
22  classification of wetlands in St. Lucie County,
23  and so we were -- the various wetlands and
24  classifying them and looking for streams and
25  rivers.  We were contracted by the City of



KAI COSHOW RAINS PHD
USA V SHARFI

April 29, 2022
77—80

---

Page 77

1  St. Lucie.
2      Q.   Okay.  All right.  Am I right that
3  you never testified before in a court proceeding?
4      A.   That's correct.
5      Q.   And this is your first deposition,
6  right?
7      A.   Yes.
8      Q.   So no Court has ever accepted you as
9  an expert witness before, because you've never
10  been proffered as a witness in any case, right?
11      A.   Correct.
12      Q.   Okay.  How much are you being paid
13  per hour for your testimony in this case?
14      A.   $450 an hour.
15      Q.   Okay.  What are your total fees in
16  this matter to date?
17      A.   Off the top of my head, I don't
18  know, but I thought we reported them.  Do you --
19      Q.   I'm asking -- I don't know offhand.
20  It's not a trick question.
21      A.   Me either.
22      Q.   Is it more than $10,000?
23      A.   Yes.
24      Q.   Is it more than $20,000?
25      A.   Yes.

Page 78

1      Q.   Is it more than $30,000?
2      A.   Yes.
3      Q.   Is it more than $40,000?
4      A.   I would assume so, yeah, maybe, yes.
5      Q.   Okay.  Is it -- is it more than
6  $100,000?
7      A.   No.
8      Q.   Okay.  Do you know approximately how
9  much you've been paid to date?
10      A.   No, I don't.  I can bracket it,
11  but --
12      Q.   What's the bracket?
13      A.   60 to 80.
14      Q.   Okay.  What percentage of the total
15  income to Coshow Environmental, Inc., has come
16  from this matter since you started working on
17  it last August?
18      A.   I believe -- certainly the vast
19  majority.
20      Q.   Okay.  Thank you.  I want to go to
21  Exhibit No. 102, and I want to see -- I want to
22  go through some of your peer-reviewed
23  publications.  The first one is a paper, this is
24  on Page 1 of Exhibit No. 102, Lawlor, K.C. Rains,
25  M. Rains, S. Landry, C. Flannagan.  In Prep., and

Page 79

1  it's titled, Quantifying changes in wetland
2  distribution and drainage patterns (1850s-2004)
3  to inform conservation and restoration in an
4  agricultural landscape, St. Lucie County,
5  Florida.
6          Do you see that on your resume?
7      A.   I do.
8      Q.   Is this a paper that is going to be
9  published at some point in the future in the
10  journal of environmental management?
11      A.   That's the journal we're
12  considering, yes.
13      Q.   Okay.  Has it been authored for
14  publication?
15      A.   No, it's hasn't been authored for
16  publication yet.  It's in preparation.
17      Q.   Okay.  So where it says
18  "Environmental Management," that's just where you
19  might consider offering to publish it at, it's
20  not that they've agreed to publish this yet,
21  right?
22      A.   Correct, yes.
23      Q.   Okay.  So it may never appear in
24  Environmental Management, right?
25      A.   Right.

Page 80

1      Q.   Has the paper been written yet?
2      A.   It has -- it was drafted and then
3  we decided -- we decided to expand on a portion
4  of it, and we received funding from the EPA to
5  really delve into that portion, and now we're
6  considering -- we'll probably break the paper
7  into two manuscripts.  So this was drafted but
8  now, to tell you the truth, we're expanding it.
9      Q.   Okay.  So this paper, it sounds like
10  it's not even been written in final form yet,
11  right?
12      A.   It has been drafted.  It has not
13  been finalized.  That's why it says "in prep."
14  The same is true of the next one.
15      Q.   Okay.  Has it been peer reviewed by
16  anybody yet?
17      A.   No, no, the paper itself has not
18  been.
19      Q.   Okay.  And it's not been published
20  yet, right?
21      A.   Correct.
22      Q.   Okay.  And it says -- it says here,
23  "What is the agricultural landscape, St. Lucie
24  County, Florida.  Is St. Lucie County, Florida
25  the subject of this?

KAI COSHOW RAINS PHD
USA V SHARFI

April 29, 2022
81–84

Page 81

1      A.   Let me back you up a little bit.  It
2  has been -- the bulk of the subject matter is
3  publicly available in the form of a thesis, and
4  "agricultural landscape" is referring to -- let's
5  see.  Oh, "agricultural landscape" refers to a
6  landscape that is being used for agriculture.
7      Q.   Is that a specific location in
8  St. Lucie County?
9      A.   No.  You mean like a dot on the map?
10      Q.   Yeah, or like a part of St. Lucie
11  County, a certain location within St. Lucie
12  County?
13      A.   No.
14      Q.   You said this is a thesis.  What did
15  you mean by that?
16      A.   One of the authors, Stephanie Lawlor
17  obtained her thesis doing much of the preliminary
18  work that we're now building upon associated with
19  this.  Claire Flannagan, the last author, also
20  contributed in her thesis.
21      Q.   So these -- Ms. Lawlor and
22  Ms. Flannagan, were they students at the
23  University of South Florida?
24      A.   Yes.
25      Q.   So these were -- basically, they

Page 82

1  took parts of their PhD theses, and it's being
2  turned into an article; is that right?
3      A.   A thesis is a master's-level
4  publication.
5      Q.   I see.  So these are masters theses
6  that are being turned into an article, right?
7      A.   That formed the foundation of it.
8      Q.   Okay.
9      A.   But it's being expanded upon, and
10  the theses were completed under our guidance and
11  by our -- by members of the community.
12      Q.   Okay.  I have to ask of the next
13  one, Rains, K.C., Z. Atlas, et al.  In Prep.  The
14  Chemical Footprint of a Human Corpse.
15            What is this about?
16      A.   This harkens back to my thesis in
17  organic composition.  So in this case, I'm taking
18  my understanding of biogeochemistry and I'm
19  applying it to forensic science.
20      Q.   Okay.  All right.  Let me go down --
21  and by the way, the human corpse, is it a
22  specific corpse that's the subject of this paper
23  or just corpses in general?
24      A.   There are -- there are four that
25  are -- that the research was done around.

Page 83

1      Q.   I hope none of the corpses are
2  anywhere in Martin County, Florida; is that
3  right?
4      A.   No, further north.
5      Q.   Okay.  Okay.  Let me go down further
6  in your resume.  So it's Exhibit No. 102.  I'm on
7  Page 3 where it says, "Recent Research Funding."
8  It says -- the first one is Wetlands and Water
9  Quality:  A Multimetric Tool for Restoration
10  Prioritization in the Indian River Lagoon
11  Watershed, Florida, 2021-2024.
12            Do you see that?
13      A.   I do.
14      Q.   What is that about?
15      A.   So this builds upon the paper
16  we were just discussing or this is related to
17  that, and through --
18      Q.   Are you done or are you still
19  thinking?
20      A.   No, I was trying to think of how to
21  say it succinctly.
22            What we are doing is using our
23  understanding of wetland change and changes made
24  to the hydrology, and we're starting with a case
25  study of St. Lucie County, to build a geospatial

Page 84

1  tool that will assist with prioritization of
2  restoration opportunities, and the goal is to
3  have this tool portable or easily expandable to
4  other sections of the Indian River Lagoon
5  Watershed in the future.
6      Q.   Okay.  Your work on this is ongoing,
7  right?
8      A.   Correct.
9      Q.   So you're not done yet in building
10  the tool, right?
11      A.   Right, and that's why we kind of put
12  that manuscript on the shelf a little bit.
13      Q.   Okay.  Got it.  All right.  Okay.
14  Let me exit out of your resume here, Exhibit 102.
15            Dr. Rains, how many times have you
16  been to the site that's the subject of this case?
17      A.   I'm going to look at -- I've been to
18  the site twice.
19      Q.   Okay.
20      A.   No, I'm sorry, I'm sorry, I've been
21  to the site once.
22      Q.   Okay.  So you've been to the site
23  that's the subject of this case one time, right?
24      A.   Correct.
25      Q.   And when was that?



KAI COSHOW RAINS PHD
USA V SHARFI

April 29, 2022
85–88

Page 85

1    A.    October 18th through 19th of 2021.
2    Q.    So am I right that you were never on
3   the site before the defendant's purchased it back
4   in 2017?
5    A.    That is correct.
6    Q.    And you were never --
7        THE COURT REPORTER:  I'm sorry,
8   counsel, you broke up there.
9        MR. MCALILEY:  I'll ask it again.
10  BY MR. MCALILEY:
11   Q.    You were not on the site before the
12  defendants engaged in the activities that are the
13  subject of this case, right?
14   A.    Correct.
15   Q.    Thank you.  So it's fair to say you
16  have no personal knowledge of the site before you
17  visited in October of 2021?  What I mean by
18  "personal knowledge" is knowledge that you gained
19  by seeing things yourself, doing things yourself
20  as opposed to something that you read.
21   A.    Correct.
22   Q.    So how many times have you been in
23  the reference area?
24   A.    Twice.
25   Q.    And when were you in the reference

Page 86

1   area?
2    A.    August 23rd and 24th of 2021 and
3   October 20th and 21st of 2021.
4    Q.    When I say, "the reference area,"
5   I'm referring to the area north of the site that
6   is identified or that is called the Countess Joy
7   property on some of the figures in the report.
8   Is that your understanding what the reference
9   area is as well?
10   A.    It can be, sure.
11   Q.    Okay.  Well, what do you understand
12  the reference area to be, what specific area; is
13  it just the Countess Joy property or is it other
14  places, too?
15   A.    We included the -- there's two
16  locations south of that property and one location
17  north.
18   Q.    Okay.  So the location north of the
19  property is the Countess Joy parcel; is that
20  right?
21   A.    Oh, I'm sorry, I meant north of the
22  Countess Joy property.
23   Q.    Okay.  So walk me through this.  The
24  Countess Joy property, that's one of the
25  reference areas, right?

Page 87

1    A.    Yes.
2    Q.    Okay.  Where -- you said there's
3   another reference area that's further north; is
4   that right?
5    A.    My hesitancy with this is that the
6   terminology that is used when discussing the
7   functional assessment portion and the terminology
8   that is used maybe within the wetlands
9   delineation portions of this document are --
10  I want to make sure I don't confuse anything by
11  using the word "reference area," because right
12  now I can't remember exactly -- exactly how those
13  are used in the sections as opposed to "reference
14  system."  So there's reference system, there's
15  reference area, you know, that sort of thing.
16  I can show you a map if that would help you.
17   Q.    Is the map one of the figures in the
18  report?
19   A.    (Nodding head yes.)
20   Q.    And what figure is that, I'll put
21  it up on the screen, and I'll make sure we're
22  talking about the same thing.
23        Dr. Rains, maybe I can shortcut it,
24  in Figure IV.B.1.1?
25   A.    You got it.

Page 88

1    Q.    Location of all reference plots?
2    A.    That's it.
3    Q.    Okay.  So this figure, I'm in
4   Deposition Exhibit No. 73, indicates where the
5   reference areas are, right?
6    A.    Yes.
7    Q.    Okay.  So the primary reference area
8   is the Countess Joy property north of the site,
9   right?
10   A.    Yes.
11   Q.    And there also is a -- there's an
12  off-site plot at W-16, which is the Martin County
13  Solid Waste Facility; is that right?
14   A.    Just north of there, yeah.
15   Q.    Right, and the Martin County Solid
16  Waste Facility is a landfill, right?
17   A.    Correct.
18   Q.    And then I also see a W15 in the
19  lower left-hand corner, FDOT.  There's a
20  reference area to the south side of the Martin
21  Highway, right?
22   A.    Yes.
23   Q.    And I see further to the right,
24  there's a reference area W17 TRAINA.  This is
25  a -- this is a location south of the site near



KAI COSHOW RAINS PHD
USA V SHARFI

April 29, 2022
89–92

Page 89

1 the Martin Highway, right?
2    A.   Yes.
3        Q.   Are those all the reference areas
4 that you visited?
5    A.   Yes.
6        Q.   Okay.  So -- and so I see on this
7 Figure IV.B.1.1 various areas -- dots that show
8 reference area plots.  Do you see that in the
9 legend?
10    A.   Yes.
11        Q.   So am I right that if I see the
12 reference there to the reference area plots,
13 those are -- it looks like all those dots are in
14 the Countess Joy property, right?
15    A.   All the -- yes.
16        Q.   All right.  Did you do any other
17 investigations related to this case in the areas
18 around the site other than -- other than those in
19 the reference areas that are referenced on this
20 figure?
21    A.   Going to the publicly available
22 intersections between Bessey Creek, 84th Avenue,
23 and I think the lowest downstream I went to was
24 Murphy.
25        Q.   Is that Murphy Road?

Page 90

1    A.   Correct.
2        Q.   Okay.  So just to understand -- make
3 sure I'm understanding this right, you also went
4 where 84th Avenue crossed over the ditch that
5 you're referring to, Bessey Creek, here, and you
6 also went to the point where Murphy Road crossed
7 over Bessey Creek east of the Turnpike; am
8 I understanding that right?
9    A.   And publicly accessible locations in
10 between.
11        Q.   And where are those?
12    A.   Can I call up Google?  I'm sure it's
13 probably on the map here, but one of them is
14 called Sandhill or Sandscape.
15        Q.   So, Dr. Rains, just to simplify this
16 a little bit, so you went to locations where
17 roadways crossed the ditch north of the site that
18 you're referring to as Bessey Creek; is that fair
19 to say?
20    A.   Yes.
21        Q.   And so -- and that's just -- it's
22 like a bridge over the ditch, and you got out and
23 you looked around; am I understanding that right?
24    A.   Yes.
25        Q.   Did you do any kind of sampling or

Page 91

1 measurements at those locations?
2    A.   Sometimes we'd talk about the
3 vegetation, we noted if there were animals in the
4 vicinity, we noted the flow, yes.
5        Q.   So you basically observed conditions
6 at the site; is that fair to say?
7    A.   That's fair to say.
8        Q.   Where in the report is the report
9 about the findings about these drive-by visits
10 over the Bessey Creek and the ditches?
11    A.   The -- you were provided photos of
12 those locations.
13        Q.   Okay.  There's photographs.
14 Anything else?
15    A.   I would assume field notes.
16        Q.   Okay.  Did you take field notes?
17    A.   I don't think so, but I would have
18 to double-check.
19        Q.   You're not sure whether you took
20 field notes; is that right?
21    A.   At those -- at those sites I was
22 navigating.  I believe I saw Mr. Wylie write down
23 species, and so those would be included in his
24 field notes.
25        Q.   Okay.  Were copies of the field

Page 92

1 notes provided to the lawyers for the Government
2 in this case?
3    A.   Yes.
4        Q.   Do you know whether they've been
5 produced in this case?
6    A.   I couldn't tell you.
7        Q.   Okay.
8        MR. DOYLE:  It's my understanding
9    we did produce those.
10        MR. MCALILEY:  Okay.  I need to
11    look.
12 BY MR. MCALILEY:
13        Q.   Okay.  So let me exit out of Exhibit
14 No. 73, and let's walk through the report a
15 little bit here.  So let's just -- let's just
16 start the process here.  So I split up -- I put
17 up on the screen Deposition Exhibit No. 72, which
18 is the main body of the report.  Can you see
19 it there --
20    A.   Yes.
21        Q.   -- Dr. Rains?
22    A.   Yes.
23        Q.   Okay.  So let's just walk through
24 these.  Let's start with Section II-A, site
25 location.  You did not write this section of the



Page 93

1  report, right?
2      A.   I don't believe so.
3      Q.   Okay.  This is written by -- the
4  principal author is Dr. Lee, right?
5      A.   Correct.
6      Q.   So he's going to be the person
7  testifying about the subject matter in this
8  section, right?
9      A.   To the best of my knowledge, yes.
10     Q.   Let me ask it another way --
11     A.   It certainly won't be me.
12     Q.   Okay.  Right, that's what I'm going
13  to do, I'm going to go through all these
14  sections.  So you didn't write this section, and
15  you're not going to be testifying about the stuff
16  in this section, right?
17     A.   Correct, there's no vegetation, yes.
18     Q.   Great.  Let's go down -- now we're
19  down to II-B, "Study Area."  You didn't write
20  this section either, right?
21     A.   The principal author is Mr. Wylie.
22     Q.   Okay.  So am I right that you are
23  not going to be testifying at trial about the
24  matters set forth in this section?
25     A.   Is there vegetation information and

Page 94

1  wetland delineation form information in that
2  section?
3      Q.   You can look at it if you want.
4  I don't think so.
5          Well, let me ask you, the sections
6  you wrote about vegetation -- the sections you
7  wrote, we're going to know which those sections
8  are, right?
9      A.   Yes.
10     Q.   Okay.  So the only thing that you
11  would testify about a section that you didn't
12  write would relate to vegetation or maybe the
13  delineation of where the wetlands are; do I have
14  that right?
15     A.   And maybe the export of organics.
16  Could you list for me again what the -- the
17  vegetation -- what did you just say?
18     Q.   I'm just summarizing what you said,
19  ma'am.  So I'm trying to figure out -- so your --
20  let me just -- let me just start -- go back to
21  basics here.  Section II-B, "Study Area," was
22  written by Mr. Wylie, right?
23     A.   Yes.
24     Q.   And because he wrote it and you
25  didn't, you're not going to be testifying about

Page 95

1  the topics covered in II-B, correct?
2      A.   As long as within that section
3  he didn't incorporate my material.
4      Q.   Okay.  And your material would
5  relate to vegetation, correct?
6      A.   Uh-huh.
7      Q.   Is that a yes?
8      A.   Oh, yes, I'm sorry, it would relate
9  to vegetation, ecology, and sections of the --
10  specifically sections of the wetland
11  determination forms that list the vegetation, I
12  don't know.
13     Q.   I see.  So -- so you can provide
14  testimony about sections of the report you didn't
15  write to the extent that they incorporate
16  information on vegetation; do I have that right?
17     A.   Correct.
18     Q.   You would also, to the extent that
19  they incorporate information from the wetland
20  data forms that you contributed to on the issue
21  of vegetation; am I understanding --
22     A.   On the issue -- on the issue of
23  vegetation, yes.
24     Q.   Is there any other topic that you
25  might provide testimony on at trial that relates

Page 96

1  to a section of the report that you did not
2  write?
3      A.   If it relates to a figure that is
4  called out in my section, if somebody else
5  invoked that figure or my photographs or my table
6  or if it's a subject matter within plant ecology.
7      Q.   Okay.  Anything else?
8      A.   Not that occurs to me now.
9      Q.   Okay.  So if I look at this II-B,
10  it talks, for instance, about the size of the
11  Bessey Creek watershed.  Do you see that?
12     A.   Yes, I do.
13     Q.   You're not going to testify about
14  the scale of the Bessey Creek watershed, are you?
15     A.   The scale of the -- no.
16     Q.   Okay.  And you're not going to
17  testify about the identification of similarly
18  situated wetlands which is a term of art under
19  your --
20     A.   I know what it is.  No.
21     Q.   Okay.  All right.  This section
22  references some figures, so let me go to those
23  figures and see whether it's going to be part of
24  your testimony.  So I'm going to exit out of
25  Exhibit No. 72, and I'm going to go to Exhibit



KAI COSHOW RAINS PHD                                    April 29, 2022
USA V SHARFI                                                97-100

Page 97

1  No. 73.  Okay.  So can you see Exhibit No. 73 on
2  the screen, which is the figures?
3      A.   Yes.
4      Q.   So the first figure is Figure
5  II.A.1, which is the location of the defendant's
6  property.  This is not one of the figures you
7  prepared, right?
8      A.   Correct.
9      Q.   So this isn't going to be something
10 you're using at trial, right?
11     A.   Unless somebody asks me about the
12 location of the site.
13     Q.   Okay.
14     A.   My understanding is that I can have
15 use of maps if I need to use maps at the trial.
16     Q.   Okay.  Do you expect to use this
17 map, II.A.1?
18     A.   It would depend on what was asked of
19 me.  If it started with "Where is the site,"
20 I may reference this figure.
21     Q.   Okay.  So the second figure here,
22 II.A.2, is this a figure you helped prepare?
23     A.   No.
24     Q.   And this corresponds to Section
25 II.A.2 of the report, right?

Page 98

1      A.   That is where it was first invoked,
2  yes.
3      Q.   Right, and that's a section of the
4  report you didn't write, correct?
5      A.   II.A -- the site location, correct,
6  I did not write that section.
7      Q.   Okay.  Let me go down here a few.
8  Figure II.A.3, this is not a figure you helped
9  prepare, right?
10     A.   Correct.
11     Q.   Figure II.B.1, this is the South
12 Florida Water Management District Basin 4, so
13 it's the study area.  Do you see that?
14     A.   I do.
15     Q.   This corresponds to Section II.B of
16 the report, right?
17     A.   Yes.
18     Q.   Okay.  Did you help prepare this
19 figure?
20     A.   No.
21     Q.   Are you going to testify based on
22 this figure?
23     A.   If I'm asked about how we selected
24 reference sites or if I need something about the
25 context of the site, then I may invoke it, but

Page 99

1  no.
2      Q.   Okay.  Let's go to Figure II.B.2,
3  USGS Topographic Map and National Hydrography
4  Dataset.  Do you see that?
5      A.   Yes.
6      Q.   You didn't help prepare this figure,
7  did you?
8      A.   No.
9      Q.   And this corresponds to a section of
10 the report you didn't write, correct?
11     A.   Correct.
12     Q.   So am I right that you're not going
13 to be using this figure as the basis of your
14 testimony at trial?
15     A.   Not unless it directly relates to a
16 question I'm asked.
17     Q.   And the questions, of course, you're
18 focused on is the vegetation and the plots that
19 you looked at, right?
20     A.   Correct.
21     Q.   Let's go down to the next
22 one, Figure II.B.3.  This is the USGS Topographic
23 Map plus the National Hydrography Dataset plus
24 the National Wetlands Inventory.  Do you see
25 this?

Page 100

1      A.   I do.
2      Q.   You didn't prepare this figure, did
3  you?
4      A.   No.
5      Q.   And this corresponds to somebody
6  else's section of the report, right?
7      A.   Correct.
8      Q.   So this isn't going to be the basis
9  of your testimony at trial, right?
10     A.   The basis of my testimony at trial?
11     Q.   I'll rephrase it.  You're not going
12 to be testifying based on this figure at trial,
13 right?
14     A.   Not unless I need to invoke it to
15 answer a question.
16     Q.   Okay.  So let me exit out of here
17 and let me get back to the report.  We'll do
18 these in groups.  Hopefully, it will make it a
19 little faster.  So if I come back to the report,
20 now, Exhibit No. 72, and I want to go down
21 further, Section II.C, Zoning Critical Habitats
22 and Other Designations.
23         You didn't write this section, did
24 you?
25     A.   Zoning Critical -- Section C --



KAI COSHOW RAINS PHD
USA V SHARFI

April 29, 2022
101—104

Page 101

1  well, I wrote part of it.
2      Q.   Which section did you write?
3      A.   C.
4      Q.   I'm sorry, say again?
5      A.   Oh, wait a second. I'm sorry, I'm
6  sorry, I'm looking at the wrong portion. No,
7  I did not, you're correct.
8      Q.   All right. So section -- all right.
9  So Section II.C is -- is -- contains topics that
10  you're not going to testify about at trial,
11  because you didn't write this section, right?
12      A.   Plant and faunal habitat
13  designations, correct.
14      Q.   Okay. Thank you.
15      A.   I'm just double-checking that
16  he didn't reference any of my stuff yet.
17      Q.   Okay. Keep going down. Now we're
18  in Section III. So now I have Section III.A,
19  Landscape Context and Geomorphology. Am I right
20  that Scott Stewart wrote this section?
21      A.   Yes.
22      Q.   So you're not going to be testifying
23  at trial about the material covered in this
24  section, right?
25      A.   I don't expect to, no.

Page 102

1      Q.   Thank you. Let's keep going down
2  here to III.B, Regional and Local Climate.
3  Dr. Nutter wrote this section, right?
4      A.   The climate, yes.
5      Q.   And also the climate date and
6  climatic conditions during the study, that part
7  of III.B as well, right?
8      A.   Yes.
9      Q.   So you're not going to testify at
10  trial about the topics covered in this section,
11  correct?
12      A.   Not unless I'm asked about something
13  related and need to invoke something.
14      Q.   I don't understand that answer.
15  What do you mean?
16      A.   Well, let's say there was a question
17  related to the vegetation, and as we know what
18  vegetation might be apparent is related to the
19  climate, for example, how much rainfall
20  was received, that kind of thing. At that point
21  I would look back at this section of the report
22  to see what was known in terms of rainfall at the
23  time that I did my vegetation analysis.
24      Q.   Okay. Okay. But other than that,
25  answering a question that might, you know, have

Page 103

1  the intersection of hydrology and vegetation, you
2  don't expect to testify at trial about topics
3  covered in III.B, right?
4      A.   Correct.
5      Q.   Let's keep going down. Now we're in
6  Section III.C, Hydrology Overview. It starts at
7  the bottom of Page 7. This section was also
8  written by Dr. Nutter, right?
9      A.   We're in Section III.C. Yes,
10  Dr. Nutter.
11      Q.   So you're not going to be testifying
12  at trial about the topics covered in this section
13  of the report, right?
14      A.   No, not unless they have to do with
15  observations I made while I was on the site but
16  not -- no.
17      Q.   Okay. But you're not going to be
18  testifying about the history of drainage networks
19  near the site, right?
20      A.   I don't expect to, no.
21      Q.   Right, and you're not going to be
22  testifying about that Hybrid Wetland Treatment
23  Technology Facility, are you?
24      A.   Not unless it has to do with
25  biological connections upstream and downstream of

Page 104

1  that site.
2      Q.   Okay. Where -- where in the
3  sections of your -- of the report that you wrote
4  did you address the biological connections in the
5  Hybrid Wetland Treatment Technology Facility?
6      A.   To be honest, I'm guessing at areas
7  that the other side might go into, so I don't
8  want you to restrict me out of being able to use
9  portions of this document that we collaborated
10  on, specifically, you know, the figures that
11  I invoke in my section or the photographs
12  I invoke, the relationships that I invoke.
13      Q.   Okay. So, Dr. Rains, I understand
14  where you're coming from, but defendants have
15  rights in lawsuits, and one of their rights is
16  they're entitled to know what people are going to
17  testify against them.
18      So my question is -- I'm trying to
19  figure out what it is you're going to testify
20  about, and so that's why I'm asking. I think I'm
21  entitled to know.
22      So am I right that there's nowhere
23  in the sections of your report that you discussed
24  that Hybrid Wetland Treatment Technology
25  Facility?



KAI COSHOW RAINS PHD
USA V SHARFI

April 29, 2022
105–108

Page 105

1      MR. DOYLE:  Objection,
2  mischaracterization.
3  BY MR. MCALILEY:
4      Q.   You can answer.
5      A.   The words "Hybrid Wetland Treatment
6  Facility" do not appear in my section of the
7  report, that is absolutely correct.
8      Q.   And you don't discuss that facility
9  in your sections of the report, do you?
10     A.   I do not.
11     Q.   Okay.  So tell me, have you been to
12  that Hybrid Wetland Treatment Technology
13  Facility?
14     A.   No.
15     Q.   Do you know what the treatment
16  methods are at that facility?
17     A.   No.
18     Q.   So you don't know how it treats the
19  water, right?
20     A.   No, but I know it takes a lot of
21  water out of that creek, and I think it's
22  necessary to treat it before sending it
23  downstream.
24     Q.   In fact, it takes most of the water
25  out of that -- that east/west ditch that's north

Page 106

1  of the site that goes down to the facility,
2  right?
3      A.   Yeah, that's all taxpayer expense,
4  I'm sure.
5      Q.   Right, but it treats most of the
6  water in the east/west ditch, doesn't it?
7      A.   I -- I don't -- I don't know the
8  quantity.
9      Q.   So you don't know how much water is
10  treated in the facility, right?
11     A.   That's correct.
12     Q.   And you don't know how it treats the
13  water, right?
14     A.   The technology involved, no, I do
15  not.
16     Q.   Okay.  Is there anything else you
17  know about the Hybrid Wetland Treatment
18  Technology Facility that you might testify about
19  at trial?
20     A.   No.
21     Q.   Thank you.  Okay.  Let me go down a
22  little further in Exhibit No. 72.  So I'm going
23  down to section -- I think this is III-D, Soils
24  Overview.  Do you see that on the screen?
25     A.   I do.

Page 107

1      Q.   That's authored by Dr. Stewart,
2  right?
3      A.   Yes.
4      Q.   And you are not going to be
5  testifying at trial about the material covered in
6  this section, right?
7      A.   III-D, Soils Overview Referenced,
8  no.
9      Q.   Okay.  All right.  Let me exit out
10  of this document here, and let me just go to the
11  figures and let's catch up where we are.  So
12  I want to walk through the figures.  So I'm going
13  to go back to Exhibit 73.  Do you see that on the
14  screen, Exhibit 73, the figures?
15     A.   Yes.
16     Q.   Okay.  So I'm just going to pick up
17  on the figures that -- where we left off.  So the
18  figure on the screen is Figure II.C.3.1, FEMA
19  National Flood Hazard Flood Zones.  Do you see
20  that?
21     A.   I do.
22     Q.   So this figure relates to a section
23  of the report that you did not write, correct?
24     A.   Correct.
25     Q.   And so this isn't going to be

Page 108

1  something that you're going to use at trial in
2  your testimony, right?
3      A.   Not unless it was to illustrate a
4  point that I was making that required
5  clarification during trial.
6      Q.   Okay.  Did you discuss in any
7  portions of the report that you wrote FEMA flood
8  zones?
9      A.   Well, plants are affected by floods,
10  so I don't know where you're going to go.
11     MR. DOYLE:  I want to elaborate on
12  that point.  The witness obviously doesn't
13  know what the defense is going to ask her
14  at trial on cross-examination.
15  BY MR. MCALILEY:
16     Q.   Okay.  So -- all right.  Dr. Rains,
17  what you're saying is if I ask you a question or
18  Mr. Hamilton or somebody else on the defense side
19  asks you a question about this map, you'll answer
20  a question about it, right?
21     A.   Right, or if there was --
22  if I needed this to illustrate a point, but
23  it would be a vegetation-related point, it would
24  not be a flood-related point.
25     Q.   Okay.



KAI COSHOW RAINS PHD
USA V SHARFI

April 29, 2022
109–112

Page 109

1    A.    But I don't anticipate it.
2    Q.    Okay.  I'm going -- I'm still in
3  Exhibit 73.  Now, I have Figure III.A.1,
4  Depiction of Tree-Like or Dendritic Stream
5  Channel Pattern.  Do you see that?
6    A.    I do.
7    Q.    This relates to a section of the
8  report that you did not write; am I correct?
9    A.    Correct.
10    Q.    And so this is not going to be a
11  figure that you plan on using at the trial,
12  right?
13    A.    Not at the outset, no.
14    Q.    So when you say not at the outset,
15  it means that it may come in a defense
16  cross-examination, but it's not part of your
17  direct examination; am I understanding that
18  right?
19    A.    Correct.
20    Q.    Okay.  Let's keep going down.  All
21  right.  Now I'm at Figure III.B.2.1, Location of
22  Precipitation Stations.  Do you see that?
23    A.    I do.
24    Q.    This is not one of your figures,
25  right?

Page 110

1    A.    Correct.
2    Q.    You don't anticipate using this at
3  trial in your testimony, right?
4    A.    I don't anticipate it, no.
5    Q.    Okay.  Let's keep going down, Figure
6  III.B.3.1, Antecedent Precipitation Tool.  Do you
7  see that?
8    A.    I do.
9    Q.    This is one of Dr. Nutter's figures,
10  right?
11    A.    I would imagine so.
12    Q.    All right.  You don't know who
13  prepared this figure?
14    A.    I mean, I need to -- III.B. what?
15  III.1?
16    Q.    Yes, III.B.3.1?
17        MR. DOYLE:  It should be up on your
18      screen, too, Dr. Rains.
19        THE WITNESS:  I see it.  I did not
20      make this figure.
21  BY MR. MCALILEY:
22    Q.    And this is not a figure you plan on
23  using when you testify at trial?
24    A.    That figure tells you something
25  about the soil conditions, the amount of water

Page 111

1  available to plants at the time of our visits, so
2  I may need to make reference to this figure.
3    Q.    So you think you may be using this
4  figure at trial when you're testifying, the
5  Antecedent Precipitation Tool?
6    A.    It's a very common tool used by
7  people who study vegetation.
8    Q.    Is this referenced in any part of
9  the report that you wrote?
10    A.    That I co-authored or I'm sorry,
11  that I authored, no, but it would have been on
12  the data sheets, correct, but it may be in a
13  section that I contributed to.  I do not expect
14  to use it, no.
15    Q.    Okay.
16    A.    But if the subject came up about
17  whether these -- whether we went in typical
18  conditions, this would be...
19    Q.    All right.  By the way, you don't
20  live in the Martin County area, do you?
21    A.    No.
22    Q.    You never lived in that area of the
23  state, have you?
24    A.    No.
25    Q.    So from your own personal knowledge,

Page 112

1  you don't know what typical conditions are in
2  that part of the state, right?
3    A.    That's why the Antecedent
4  Precipitation Tool is so useful.
5    Q.    Okay.  But the answer to my question
6  is, I'm right, you have no personal knowledge
7  about what typical weather conditions are in that
8  portion of the state, right?
9    A.    That portion of the state being
10  Martin County specifically?
11    Q.    Yes.
12    A.    Beyond what a normal Floridian
13  knows, no.
14    Q.    Hold on a second.  The season -- the
15  rainfall is not uniform across the state of
16  Florida, is it?
17    A.    But we know that thunderstorms and
18  hurricanes and --
19    Q.    Okay.  My question, ma'am, rainfall
20  is not uniform across the state of Florida, is
21  it?
22    A.    That is correct.
23    Q.    So the rainfall in Miami is not
24  exactly the same as what it is in Martin County,
25  right?



KAI COSHOW RAINS PHD
USA V SHARFI

April 29, 2022
113–116

Page 113

1      A.   Correct.
2      Q.   And it's not exactly the same as
3  Tampa, is it?
4      A.   Correct.
5      Q.   All right.  Let's go to Figure
6  III.C.1.1.  I have it up on the screen.  This is
7  the location of the north/south ditch in relation
8  to other things.  This is not a figure that you
9  prepared, right?
10      A.   Correct.
11      Q.   And this relates to a section of the
12  report that you did not write; am I correct?
13      A.   III.C, correct.
14      Q.   So this is a figure that you do not
15  anticipate using in your testimony at trial; am
16  I right about that?
17      A.   If I didn't reference it in my
18  section, I don't -- I don't anticipate it.
19      Q.   Okay.  Thank you.  Let's go down
20  here to section Figure III.C.2.1.  It's entitled,
21  Map Submitted by Defendant Consultants.  Do you
22  see that?
23      A.   I do.
24      Q.   So you didn't prepare this figure,
25  did you?

Page 114

1      A.   No.
2      Q.   And this relates to a section of the
3  report that you did not write; am I correct?
4      A.   Yes.
5      Q.   So am I right that you do not
6  anticipate using this figure during your
7  testimony at trial?
8      A.   I do not anticipate it.
9      Q.   Thank you.  Okay.  I'm now showing
10  you Figure III.D.1, USDA NRCS Soil Map.  Do you
11  see that?
12      A.   Yes.
13      Q.   This is a figure that was prepared
14  in relation to a section of the report written by
15  Dr. Stewart; am I right on that?
16      A.   Yes.
17      Q.   Do you anticipate using this -- this
18  figure as part of your testimony at trial?
19      A.   Yes.
20      Q.   Okay.  Tell me how -- let's talk
21  about this figure then.  So who prepared this
22  figure?
23      A.   I believe Nutter & Associates
24  prepared those figures.
25      Q.   And who specifically at Nutter &

Page 115

1  Associates?
2      A.   I -- I don't know.
3      Q.   So you don't know specifically who
4  prepared this, just somebody at Nutter &
5  Associates?
6      A.   Yes, somebody who -- with access to
7  GIS and appropriate files and -- yeah, somebody.
8      Q.   And what does this figure show?
9      A.   It shows the different soil types
10  that have been mapped in this region.
11      Q.   Okay.  And how is this -- how is
12  this map relevant to this case?
13      A.   In this case or in my area of
14  expertise?
15      Q.   Well, let's break it down.  How is
16  it relevant to your testimony at trial?
17      A.   The distribution of plant species
18  and plant communities across a landscape is
19  driven in large part by abiotic factors including
20  soil types and hydrology, climate, you know,
21  whether it's been raining recently, and in
22  addition to how water naturally flows across the
23  site.  So I can picture using this that way.
24      Q.   Okay.  So to show that the plants
25  follow the soil; am I understanding that right?

Page 116

1      A.   That -- to show how or what is known
2  about the soil before one has firsthand knowledge
3  of exactly what they see at a site.
4      Q.   What -- when was the soil map
5  prepared, the Bates map that was used in this
6  figure?
7      A.   When was it prepared?  You mean by
8  the NRCS?
9      Q.   Yeah.
10      A.   I don't know offhand.  The last soil
11  survey I'm aware of in Martin County was in the
12  '70s, but the Florida Association of
13  Environmental Soil Scientists prepared the hydric
14  soils list after that.  You'd have to ask
15  Dr. Stewart for the exact date.
16      Q.   Am I right this shows soils in
17  developed areas of the county?
18      A.   Is shows soils in developed and
19  undeveloped in areas of the county.
20           Maybe I misheard the question.  What
21  was it?
22      Q.   This map shows groupings of soils
23  based on color, right?
24      A.   They're displayed, yes, based on
25  color.



KAI COSHOW RAINS PHD
USA V SHARFI

April 29, 2022
117–120

Page 117

1    Q.   Okay.  And those color polygons or
2  different colors are in different properties
3  regardless of whether the property has been
4  developed or not; is that fair to say?
5    A.   No.
6    Q.   No?  Okay.  Let me zoom in.  So am
7  I right --
8    A.   Oh, oh, I understand what you're
9  saying.  I got it.  Yes, in this image, I see
10  soils mapped on developed areas and undeveloped
11  areas.
12    Q.   Right, so this map is basically --
13  it shows soils regardless of the develop -- of
14  the status of a parcel as being developed or not,
15  right?
16    A.   What do you mean by regardless --
17  oh, okay, yes, they have shown soils under both
18  conditions, yes.
19    Q.   So, Dr. Rains, I will confess that
20  I'm color blind.  So I say this to people at
21  depositions, people are tired of hearing it, but
22  I'm going to ask you about some specific colors.
23    On the upper left-hand portion of
24  this figure, you see there's -- you can see the
25  Martin County Landfill.  Do you see that?

Page 118

1    A.   Yes.
2    Q.   What's this color that's right in
3  the middle of the landfill here?
4    A.   Sort of a lightish yellowish.
5    Q.   What does that correspond to in
6  terms of colors in the legend?
7    A.   Waveland and -- it's too small for
8  me to read.
9    Q.   I'll zoom in a little more
10  if it helps?
11    A.   Waveland and Lawnwood Fine Sands
12  Depressional.
13    Q.   Am I right that is a wetland
14  soil type?
15    A.   I can't tell from the name.  Soils
16  have a taxonomic hierarchy just like plants do,
17  so I would want to see the order and suborder or
18  at least have a chance to reference the Florida
19  Association of Environmental Soil Sciences hydric
20  soil list, but the map that this -- the layer
21  that this came from includes those as attributes
22  on the map.  It's common pieces of knowledge that
23  people can access.
24    The word "depressional" in there
25  would signal -- signal to me that chances are

Page 119

1  it's a wetland soil and its geomorphic position
2  as an integral feature likewise signals to me but
3  I couldn't say with certainty.
4    Q.   So these are questions that are best
5  asked of Dr. Stewart?
6    A.   Yes.
7    Q.   All right.  But this shows that
8  Waveland and Lawnwood fine sands depressional in
9  the landfill, right?
10    A.   Yes.
11    Q.   Okay.  I'm going to zoom out a
12  little bit to make it a little easier to move
13  around.  I'm going to Figure III.D.2, USDA NRCS
14  soil map units on the site.  Can you see that on
15  the screen?
16    A.   I can.
17    Q.   So this is, again, one of the
18  figures prepared in relation to Dr. Stewart's
19  portion of the report?
20    A.   Yes.
21    Q.   Are you going to use this figure at
22  trial in your testimony?
23    A.   I think so.  I prepared one like
24  it in my section.
25    Q.   Well, if you have another figure,

Page 120

1  we'll get to the other figure?
2    A.   I'm not sure.  If I didn't, then
3  yes, I do.  I certainly talk about soils
4  extensively in my section of the report.  No, I
5  don't have a specific one, so it would be that
6  one.
7    Q.   Okay.  So you intend -- so when you
8  testify, you intend to use this section, this
9  figure?
10    A.   I may need to use that figure to
11  illustrate points that I made in my section that
12  refer to plants being dependent on soil
13  conditions.  It would be to illustrate.
14    Q.   All right.  And what point would you
15  be illustrating with this figure?
16    A.   Well, is it appropriate to be asking
17  me that now?  Is that --
18    Q.   Sure, because I'm trying to
19  understand what your testimony is going to be.
20  I'm trying to prepare for trial.  That's why I'm
21  asking.
22    MR. DOYLE:  Direct.
23    THE WITNESS:  Well, I think that
24    there are specific portions of my -- well,
25    I know there are specific portions of my



KAI COSHOW RAINS PHD
USA V SHARFI

April 29, 2022
121–124

Page 121

1    report that -- I know that there's specific
2    sections of my portion of the report, and
3    by that I mean, where I'm the primary
4    author in which I discuss the gradient of
5    soil types that existed on the site.
6 BY MR. MCALILEY:
7    Q.   Okay.  And you discuss that --
8    A.   In relation to plant community
9 distribution.
10    Q.   All right.  So, Dr. Rains, as I look
11 at Figure III.D.2, what is this color on the
12 figure that sort of covers sort of the southwest?
13    A.   Bluish.
14    Q.   Bluish.  And what does that
15 correspond to in the legend?
16    A.   The Sanibel muck.
17    Q.   Sanibel muck.  Okay.  Is Sanibel
18 muck, is that a wetland soil?
19    A.   Yes.
20    Q.   Okay.  So you would assume that
21 areas that had this wetland -- this Sanibel muck,
22 a wetland soil, would be a wetland, right?
23    A.   I would.
24    Q.   Okay.  What is this -- what is this
25 to the west of the site, you can see buildings

Page 122

1 here on the next parcel, do you see that?
2    A.   Yes.
3    Q.   Those are -- what are those?
4    A.   I would assume they're greenhouses
5 for growth -- something.
6    Q.   So am I right that based on the soil
7 map, this would suggest that a portion of those
8 greenhouses are built on wetlands?
9    A.   It would suggest that they were
10 built on hydric soils at some point in the past
11 that likely supported wetlands.
12    Q.   Do you know when they were built?
13    A.   No, I don't.
14    Q.   Do you know whether they ever got a
15 permit?
16    A.   Not a clue.
17    Q.   Okay.  But just based on these soil
18 maps, it would suggest those wetland are on the
19 neighbor's property, too, right?
20    A.   Well, wetlands, there are three
21 parameters that go into wetlands.  You need to
22 have the vegetation, the hydrology, and the
23 soils.  So based on the soils map, it's a yes,
24 there were wetland soil there; however, we don't
25 know what the other two factors are.  And in

Page 123

1 addition, we don't know what their imagery was at
2 the time that they made these soils -- or soil
3 maps, but it certainly suggests that the soil
4 conditions were at one time suitable to support
5 wetlands in that corner of that property.
6    Q.   Okay.  What is this color that's --
7 that goes on the Northwest part of this site?
8    A.   Orange-ish.
9    Q.   Orange-ish.  And what does that
10 correspond to in the legend?
11    A.   That's the Holopaw.
12    Q.   Holopaw fine sands 0 to 2 percent
13 slopes?
14    A.   Yes.
15    Q.   Is that a wetland soil?
16    A.   I believe that's listed on the list
17 of hydric soils.
18    Q.   Okay.  So based on this map,
19 it would suggest that -- and that's the same
20 color, by the way, as the area immediately north
21 of the site on the Countess Joy property, right?
22    A.   Correct.
23    Q.   Okay.  So this would also suggest
24 that soil was underneath some of the greenhouses
25 next door to the west, right?

Page 124

1    A.   Yes.
2    Q.   Okay.  Is there anything else about
3 this map or this figure that's relevant to your
4 testimony?
5    A.   The fact that there are three
6 different soil types and so there were -- there
7 was a variety of abiotic conditions on the site
8 which has implications regarding how the plant
9 community has been organizing themselves.
10    Q.   So in other words, plant communities
11 would organize themselves slightly differently
12 under different soil conditions?
13    A.   Correct, yes.
14    Q.   Okay.  Anything else about this
15 figure that's relevant to your testimony?
16    A.   The way that we selected our target
17 or reference was based in part on prior soil
18 knowledge or knowledge of soils on this site
19 prior to disturbance as well as land use, land
20 cover, mapping on that site prior to disturbance.
21    Q.   Okay.  Anything else?
22    A.   Not that's occurring to me.
23       MR. MCALILEY:  Okay.  So I think
24 we're at a logical breaking point
25 if we wanted to take a short lunch break.



KAI COSHOW RAINS PHD
USA V SHARFI

April 29, 2022
125–128

Page 125

1  I don't know if you're interested in a
2  lunch break, maybe other people here on the
3  video are.  Is that -- would that make
4  sense for you, Dr. Rains?
5      THE WITNESS:  That would be great.
6      MR. MCALILEY:  Okay.  Mr. Doyle, you
7  good with that?
8      MR. DOYLE:  Yes.  I defer to the
9  witness as to what the length of time would
10  be and to you as to what length of time
11  would work but yes.
12      MR. MCALILEY:  Yeah, look, obviously
13  we're going to finish today, and I -- the
14  sooner we finish, the better, which would
15  suggest that a shorter lunch break would be
16  in order.  So I'm going to say, based on
17  past experience, maybe 40 minutes.
18      Would that be too short for you,
19  Dr. Rains?  Do you need more time than
20  that?
21      THE WITNESS:  I do not need more
22  time than that.
23      MR. MCALILEY:  Okay.  Other folks
24  on -- if we were to restart at 1:30, that
25  would be a little less than 40 minutes.

Page 126

1      Does that work?
2      THE WITNESS:  That works.
3      MR. MCALILEY:  Okay.  Why don't
4  we plan on that.  So 1:30 we'll pick back
5  up.
6      MR. DOYLE:  Okay.  Yes.
7      THE WITNESS:  Thank you.
8      THE VIDEOGRAPHER:  Going off the
9  record at 12:53 p.m.
10      (Thereupon, a break was taken.)
11      THE VIDEOGRAPHER:  We are back on
12  video record at 1:33 p.m.
13  BY MR. MCALILEY:
14      Q.   Okay.  Dr. Rains, is there anything
15  you want to clarify about your testimony from
16  prior to the lunch break?
17      A.   Yes, we had mentioned a misnumbered
18  photograph, so I found that over break.
19      Q.   Okay.  Which one is that?
20      A.   It's on Page 12.  Let me make sure
21  the page number is the same.  It's Vegetation
22  Overview Reference Areas and Site.  Let me pull
23  that up.
24      Q.   You said Page 12 of what?
25      A.   And that is Section III.D,

Page 127

1  Vegetation Overview Reference Areas and Site.
2      Q.   Okay.
3      A.   And the figure that is provided is
4  IV.D.1.A.3, it's at the very bottom of the first
5  paragraph.
6      Q.   Right.
7      A.   And the figure I was intending was
8  Figure II.B.3.
9      Q.   All right.  So in -- okay.  II.B.3.
10  And that's figure or photograph?
11      A.   Figure.
12      Q.   Figure.  All right.  So why don't
13  we -- why don't we go to that section now,
14  because if it's in that section, that's where
15  I was going to next.  That would seem to be a
16  good place to go.  So what I'd like to --
17      A.   I have one more, one more
18  clarification.
19      Q.   Okay.  All right.
20      A.   Do you recall that when you were
21  asking me what I do at USF, and I said, boy,
22  I feel like there's something very obvious I was
23  forgetting, and it came to me over lunch, which
24  is landscape ecology and application of the
25  geospatial tools to that subject.

Page 128

1      Q.   Okay.  Okay.  Thank you.
2      Okay.  So, Dr. Rains, I'm going to
3  put back up on the screen the main body of the
4  report, which is Deposition Exhibit 72, and I'm
5  putting up Section III.E, Vegetation Overview
6  Reference Areas and Site.  Do you see that on the
7  screen?
8      A.   I do.
9      Q.   So this is a section of the report
10  that you did, right?
11      A.   Yes.
12      Q.   So this is -- you're going to
13  testify at trial about the subjects that are in
14  this section of the report?
15      A.   Correct.
16      Q.   So let me just start to walk through
17  this, and the first thing is, to clarify for the
18  record, am I right what you just said was at the
19  bottom the first paragraph under III.E, there's a
20  reference to Figure IV.D.1.A.3, and that, in
21  fact, the reference should be to Figure II.B.3?
22      A.   Yes.
23      Q.   Okay.  Thank you.  All right.  So
24  let's start at the top of this section.  The
25  first sentence, and I'll read it aloud, says,



KAI COSHOW RAINS PHD
USA V SHARFI

April 29, 2022
129–132

Page 129

1  quote, "The reference areas and site are located
2  in the Eastern Florida Flatwoods ecoregion of the
3  Southern Atlantic costal plain, where the terrain
4  is generally flat and the water table shallow,"
5  and there's some citations, end quote.
6      Did I read that right?
7  A.   You did.
8  Q.   So am I right that the Eastern
9  Florida Flatwoods ecoregion covers most of the
10  East Coast of Florida?
11  A.   I would have to look at the map
12  again, but that is my memory as well.
13  Q.   So all of Martin County is in the
14  Eastern Florida Flatwoods ecoregion, right?
15  A.   I'd have to consult for reference
16  and particularly with the boundaries of Martin
17  County.
18  Q.   Okay.  Let me --
19  A.   But it is -- it is a common
20  ecoregion if that is what you're referring to.
21  Q.   Okay.  So one of your citations is
22  the Griffith 2012, right?
23  A.   Yes.
24  Q.   Okay.  So what I'd like to do now is
25  I'd like to show you an exhibit that I'm going to

Page 130

1  mark as Exhibit No. 103.
2      (Thereupon, Exhibit No. 103 was
3      marked for identification.)
4  BY MR. MCALILEY:
5  Q.   Do you see on the screen a map of
6  Florida that says, Level III and IV Ecoregions of
7  Florida?
8  A.   Yes.
9  Q.   Is this the map of Griffin 2012 that
10  you cite in your report?
11  A.   Yes.
12  Q.   Okay.  Am I right -- and I'll zoom
13  in here a little bit.
14  A.   Oh, thank you.
15  Q.   Yeah, the -- am I right that the
16  area that's labeled 75D is the Eastern Florida
17  Flatwoods ecoregion?
18  A.   Yes.
19  Q.   Okay.  So am I correct, then, that
20  all of Martin County is included in the Eastern
21  Florida Flatwoods ecoregion with the exception of
22  a tiny little sliver on the southwestern corner
23  by Lake Okeechobee?
24  A.   Agreed.
25  Q.   And all of St. Lucie County is in

Page 131

1  the Eastern Florida Flatwoods region?
2  A.   Yes.
3  Q.   All of Indian River County, too?
4  A.   Yes.
5  Q.   All of Okeechobee County as well?
6  A.   Okeechobee is to the southwest of
7  there?
8  Q.   Do you know where -- could you point
9  out Okeechobee?
10  A.   Oh, I'm sorry, I'm looking at a
11  little lake, and I thought it was your cursor.
12  Q.   No, I'm just referring to the
13  county.
14  A.   I would have to look at a county
15  boundary map.
16  Q.   So you don't know --
17  A.   I'm happy to do that if you would
18  like me to.
19  Q.   No.  You see that there's a --
20  Dr. Rains, you see there's the boundaries
21  here of Martin County?
22  A.   Yes, and St. Lucie above it.
23  Q.   This is St. Lucie County?
24  A.   Yes.
25  Q.   You see this county that's to the

Page 132

1  west of St. Lucie and Martin County?
2  A.   Yes.
3  Q.   That's Okeechobee County, isn't it?
4  A.   I'm having trouble figuring out
5  where it ends on the western portion.
6  Q.   Okay.  So you're not sure exactly
7  where Okeechobee County ends, right?
8  A.   Not relative to that figure you were
9  showing me.  I can't tell with the dotted line,
10  if there's a color difference or if that's the
11  edge.
12  Q.   I zoomed in a little bit more.  Does
13  that help?
14  A.   Yeah, that helps.
15  Q.   So all of Okeechobee County is in
16  the Eastern Florida Flatwoods ecoregion, right?
17  A.   Correct.
18  Q.   And it looks like the majority of
19  Highlands County is also in the Eastern Florida
20  Flatwoods ecoregion, right?
21  A.   Highlands is directly to the west?
22  Q.   Yes, ma'am.
23  A.   Yes, I would say more than half of
24  it, correct.
25  Q.   Okay.  Okay.  I'm going to exit out



KAI COSHOW RAINS PHD
USA V SHARFI

April 29, 2022
133–136

Page 133

1  of Exhibit 103.
2       MR. MCALILEY:  Mr. Doyle, at break
3    I'll email it to you.  Okay?
4       MR. DOYLE:  Thank you.
5  BY MR. MCALILEY:
6       Q.   I'm going back to the report here.
7  So can you see deposition Exhibit 72 up on the
8  screen, Dr. Rains?
9       A.   Yes, I do.
10      Q.   The second sentence under the first
11  paragraph says, quote, "Under these conditions,
12  small changes in topography, depth to the water
13  table, or soil structure can result in
14  significant variation in the species composition
15  and vegetation structure of plant communities,
16  end quote.
17       Did I read that right?
18      A.   You did.
19      Q.   So what do you mean by small changes
20  in topography?
21      A.   I go on to provide an example
22  towards the end of that section which is
23  accompanied with the citation if you want to keep
24  scrolling.
25      Q.   I could.  Could you just tell me

Page 134

1  what a "small change in topography" means?
2      A.   I believe the example I gave says
3  that in a three-foot difference, you can go from
4  a hydric community to a xeric community.
5      Q.   Okay.  So I'm scrolling down.  Can
6  you tell me where it says that in this section?
7       MR. DOYLE:  The section would
8       continue to the next page just so the
9       record is clear.
10  BY MR. MCALILEY:
11      Q.   Yeah, so I scrolled here to -- let's
12  see what page am I on.  On Page 13, so I can --
13  it starts on Page 12 and goes to Page 13.
14      A.   It might be in the summary section.
15      Q.   Okay.  So you don't see that
16  reference to a frequent elevation change in
17  Section III.E, right?
18       Dr. Rains?  If it's in the later
19  section you wrote, we're going to cover it there.
20  My question is simple.  Does it reference to a
21  three-foot elevation change in this section?
22       Dr. Rains?
23      A.   Go back to that section.  It's on
24  Page 56.
25      Q.   Okay.  So on page --

Page 135

1      A.   Whoa, whoa, whoa, I'm sorry, I'm
2  trying to answer you more quickly than I should.
3      Q.   Dr. Rains, can I just say we'll get
4  to future sections.  I'm working my way through
5  the report, so if we can keep moving here,
6  because I want to finish today.
7      A.   Okay.  If you want me to answer that
8  about that last question, because I thought I was
9  going to move directly to it and answer it real
10  quickly, but you need to give me the opportunity
11  to go -- to look at these full paragraphs
12  basically, but when you scroll up and down, it's
13  not giving me time to do so.
14      Q.   Dr. Rains, I'll give you all the
15  time in the world to look at it, but I don't
16  think you need to look at it for my question.  My
17  question is not what is an example of a
18  difference -- a difference in a small change of
19  topography, I'm just asking what you mean by
20  that?
21      A.   So I'm providing an example.  Small
22  changes in topography, microtopography, it could
23  mean landscape level topography from a generally
24  high location to a generally lower location or
25  it could be microtopography.

Page 136

1      Q.   So it's basically referring to land
2  elevation; is that what you're saying?
3      A.   No, not necessarily.
4      Q.   Okay.
5      A.   The term "topography" encompasses --
6  encompasses both microtopography as well as site
7  level or landscape level topography.
8      Q.   Okay.  What is -- okay.  What is --
9  tell me what the difference is between those two,
10  microtopography and landscape level topography?
11      A.   It's scale.  So microtopography
12  would -- is observed on and experienced on a much
13  smaller scale than landscape level topography.
14  So when most people think about elevation
15  changes, you know, a cross -- I mean a cross in
16  areas, they're thinking of a high point to a low
17  point, and that would be landscape level
18  topographic changes or topographic gradient.
19       However, something that is very
20  important for plant diversity is microtopography,
21  and that is changes in elevation that occur on a
22  much smaller scale.  So one of the terms you'll
23  see in here is "hummock" and "hollow."  That's an
24  example of microtopographic relief.
25      Q.   Okay.  So when you refer to changes



KAI COSHOW RAINS PHD
USA V SHARFI

April 29, 2022
137–140

Page 137

1  in topography, you're referring to the changes in
2  the land elevation?
3      A.   Yes.
4      Q.   Okay.  So when you refer to small
5  changes in topography, you're referring to small
6  changes in land elevation; do I understand that
7  right?
8      A.   That is correct.
9      Q.   Okay.  So you said that you have an
10  example that a three foot difference in land
11  elevation could mean the difference between a
12  hydric community and a xeric community, right?
13      A.   Right, which are extremes on that
14  gradient.  So it's showing you, wow, you know,
15  I'm going to see plants that are adapted for
16  having very, very little access to water compared
17  to plants that are definitely hydric.  So that is
18  a very large gradient.  You can have much more
19  subtle gradients that are much more meaningful.
20      Q.   Okay.  So a xeric community is a
21  community of plants that rely on drier
22  conditions; am I understanding that right?
23      A.   Adapted for drier conditions.
24      Q.   And a hydric community is
25  communities of plants that are adapted for being

Page 138

1  in very wet conditions, right?
2      A.   Right.
3      Q.   And is that -- it can also have
4  wetlands between the limits with hydric on one
5  side -- hydric -- xeric on one side and hydric on
6  the other, and in between that three feet, you
7  can also have wetlands in that area, too, right?
8      A.   Yes.
9      Q.   And so am I right that even
10  elevation differences that are smaller than three
11  feet can mean the difference between an area
12  being a wetland and an area being a non-wetland?
13      A.   Yes.
14      Q.   Okay.  So how small can that
15  difference be that would be the difference
16  between an area being a wetland versus a
17  non-wetland?
18      A.   Well, it would depend on the local
19  hydrology of the area, you know, if you picture
20  it like a bunch of little swimming pools, it's
21  how likely are those little swimming pools to
22  receive water, and then it would also depend on
23  the soil properties, so how porous are the soils,
24  how likely are they to retain water.
25      Q.   Well, let's just -- so let's focus

Page 139

1  in on, then, the site and the Countess Joy
2  property immediately to the north of it.  How
3  small of a difference in land elevation could be
4  the difference between a wetland and upland in
5  that area?
6      A.   That's a number that I would
7  hesitate to put a number on without doing an
8  actual survey.  I may want to say, oh, 6 inches,
9  and you find that 5.5 inches is a wetland and 6.2
10  inches is not a wetland.  But based on my
11  observations on that site, you'll see plant
12  species sort themselves out when there's just
13  microtopographic gradients that are like 4
14  inches.
15          That doesn't mean something is a
16  wetland or not a wetland, because we don't
17  normally delineate very small little areas.  What
18  this is speaking to right here is the fact that
19  significant variations in the species population
20  and vegetation structure of a plant community,
21  you know, wetland, not a wetland, can result from
22  very small changes in microtopography.
23      Q.   Okay.  I think I understand that,
24  but I guess -- so I'm just focusing in on -- I'm
25  just trying to apply these concepts to the area

Page 140

1  that's the subject of this case.
2          So you went out and you've done
3  surveys of the site and of the Countess Joy
4  property to the north, right?
5      A.   Correct.
6      Q.   And you did wetland research,
7  sampling plots that you did in the area north of
8  the site, right?
9      A.   Yes.
10      Q.   And you walked all over that area
11  north of the site, between the site and the
12  east/west ditch that's, you know, 1,600 feet
13  north, right?
14      A.   The site and the east/west ditch.
15  You mean Bessey Creek?  Is that the --
16      Q.   Well, you call it Bessey Creek, I'm
17  going to call it a ditch.
18      A.   Okay.
19      Q.   It was a linear feature that was
20  excavated that's about 1,600 feet north of the
21  site.  You've seen that part?
22      A.   I have walked where the vegetation
23  spots are illustrated on the map for sure.
24  I spent a lot of time within the flow path as
25  well, but I have not exhaustively surveyed the



KAI COSHOW RAINS PHD
USA V SHARFI

April 29, 2022
141–144

Page 141

1  site of Countess Joy.
2      Q.   Okay.  Fair enough.  So -- but am
3  I right that I'm understanding you the difference
4  as small as 4 inches of elevation can make the
5  difference in the type of plant communities that
6  are living on a spot, like in a square foot of
7  land?
8      A.   It can make a difference for the
9  plant species and their tolerance.  You take a
10  whole group of plant species and how common they
11  are that represent coverage, and that together
12  comprises your plant community.  You can have a
13  plant community with a tendency or, you know,
14  that is adapted for hydric soils and wetland
15  hydrology, which we call a wetland plant
16  community, or you can have a plant community
17  which is not, but those small microtopographic
18  differences make a difference with respect to
19  which plants you're going to find there.
20      Q.   Okay.
21      A.   Generally speaking, if you have, you
22  know, higher diversity in microtopography,
23  it will tend to line up, generally speaking, with
24  a more diverse plant community.
25      Q.   Okay.  So a four-inch difference,

Page 142

1  let's say I'm on the Countess Joy property north
2  of the site, and I'm standing in a spot and
3  there's a ten-foot square area to my right that
4  is six inches higher than a ten square foot --
5  ten-foot square area to my left, I could --
6  I could potentially see different kinds of plants
7  to the right and to the left, right?
8      A.   Can you repeat that.
9      Q.   Yeah, so if I'm standing out on the
10  Countess Joy property north of our site, and to
11  my right I have a ten square foot area that's,
12  let's say, is six inches higher in elevation than
13  a ten square foot area to my left, I can see
14  different kinds of plants to my right and to my
15  left because the difference in elevation; am
16  I understanding you right?
17      A.   Yes, you could.
18      Q.   And the type of plants that you find
19  is relevant to whether something is a wetland or
20  not, right?
21      A.   The type of plants that you find is
22  relevant, yes.
23      Q.   And so would you -- am I right,
24  Dr. Rains, then, that very small differences in
25  elevation could make the difference as to whether

Page 143

1  an area is a ten square foot area is a wetland
2  versus an upland or non-wetland?
3      A.   That would be highly unusual that
4  you would wind -- you would -- of course,
5  it isn't solely based on elevation differences,
6  however, because sometimes you'll have plants
7  that are on that higher area but are a kind of
8  plants whose roots extend much deeper, so to make
9  up for that elevational difference.
10      But if you were within a wetland and
11  you have that sort of microtopographic relief,
12  then you will wind up with species that are less
13  well adapted to the wetland conditions being on
14  those higher areas and those lower areas.
15      Q.   Okay.  So if you -- so it's --
16  it can make a difference, small differences in
17  elevation, whether it was like a little island,
18  so to speak, in a wetland.  What I mean by an
19  "island" is just an area that's maybe six inches
20  higher, let's say, a foot higher than areas
21  around it, that would make a difference between
22  that little area being a wetland versus a
23  non-wetland, right?
24      MR. DOYLE:  Objection, compound.
25      THE WITNESS:  There are features

Page 144

1      beyond the plants that go into determining
2      whether something is a wetland or not a --
3      or is not a wetland, so when I wrote this
4      here, I'm talking about plant communities
5      sorting themselves out.  I'm not talking
6      about wetland determinations.
7  BY MR. MCALILEY:
8      Q.   Okay.  So even though the plants may
9  be different, it can still be a wetland?
10      A.   It could be.  Well, no, no.  Okay.
11  Hold on.  Small changes in elevation will
12  influence the species composition, which then is
13  reflected in the plant communities.  If the whole
14  site itself is already at the dry end of the
15  gradient wet to dry, then that six inches might
16  very well make the difference between whether you
17  would go out there and determine if a plant be in
18  the higher area was an upland plant versus the
19  one on the lower area.
20      If you're in an area where
21  everything is already pretty wet, then those six
22  inches might diversify the overall plant
23  community but may not trigger whether you're in
24  wetland versus an upland.
25      Q.   So, Dr. Rains, in the Countess Joy



KAI COSHOW RAINS PHD
USA V SHARFI

April 29, 2022
145–148

Page 145

1  property north of the site, would small
2  differences in elevation like six inches or a
3  foot have significant -- cause significant
4  differences in the plant communities in the
5  species composition?
6      A.   Depending on where it was.
7      Q.   All right.  So there are some places
8  in the Countess Joy property north of the site
9  where six inches could make a difference.  That's
10  significant in the species composition, right?
11      A.   In the species composition, yes.
12  We saw -- yes, we saw hummocks and hollows, and
13  we saw species that were more prevalent, yeah,
14  that really prefer aquatic environments being in
15  the hollows as opposed to hummocks, that is
16  correct.
17      Q.   So in your report, back to the
18  first -- let me go back to that first paragraph.
19  It starts out by saying the reference areas on
20  the site.  So I just want to review the bidding
21  so we make sure what we're talking about here.
22  So the site is the 10-acre property that's the
23  subject of this case, right?
24      A.   Yes.
25      Q.   Okay.  So the reference areas, when

Page 146

1  you're talking about this here, is this primarily
2  talking about the areas in the Countess Joy
3  property north of the site?
4      A.   It would also be true of the three
5  other areas we mentioned.
6      Q.   And the three other areas were the
7  spot at the landfill and the two spots by Martin
8  Highway, right?
9      A.   North of the landfill, yes.
10      Q.   Okay.  So -- okay.  So most of the
11  places that you took samples for wetland -- for
12  vegetation in the reference areas were in the
13  Countess Joy property, right?
14      A.   Correct.
15      Q.   So I want to go -- this first
16  paragraph, go down to the third sentence.
17  It says, quote, "In reference areas, the native
18  landscape structure and" -- "the native landscape
19  structure and function support vegetation types
20  that are typical for this landscape, second
21  growth stands of pine flatwood and mixed pine and
22  hardwood forests are common."
23          Let me stop there.  Did I read that
24  right?
25      A.   You did.

Page 147

1      Q.   What do you -- what do you -- am
2  I right that the second growth stand of trees are
3  trees that have grown back after the original
4  trees were cut down?
5      A.   Yes.
6      Q.   So old growth would be as if this
7  area had never been touched, the trees.  Second
8  growth is somebody has logged out the area or cut
9  down the trees and then new trees are growing
10  now, they're younger.  Do I have that right?
11      A.   Correct.
12      Q.   Do you know whether, in fact, the
13  Countess Joy property was logged in the past?
14      A.   We cored some of the trees and found
15  out they were about 35 years old and 55 years
16  old.  They didn't seem to exceed that, and
17  I believe in a section of the report, Dr. Lee
18  wrote about the -- the time -- the historic look
19  at the area topography, which determined what
20  had -- explains what had happened to the trees.
21      Q.   Do you believe that the Countess Joy
22  property had been logged at some point in the
23  past?
24      A.   Do I believe that it had been, is
25  that what you're asking me?

Page 148

1      Q.   Uh-huh.
2      A.   Yes, I would believe so, yes.
3      Q.   Okay.  So --
4      A.   Or burned.  Something has happened
5  to the trees.
6      Q.   Okay.  It's not in a pristine
7  condition, right?
8      A.   Correct.
9      Q.   Okay.  So let's go to the next
10  sentence here on that paragraph.  Quote, Native
11  trees dominate the upper canopy though nonnative
12  species such as Brazilian pepper, punktree,
13  earleaf acacia, and Old World climbing fern are
14  not uncommon, end quote.
15          Did I read that right with the
16  exception that I left out the Latin scientific
17  names?
18      A.   Yes.
19      Q.   So the reference areas did not only
20  have native plants in them, right?
21      A.   Right.
22      Q.   And, in fact, the exotic plants are
23  not uncommon in the reference areas, correct?
24      A.   Correct.
25      Q.   In fact, it's fair to say they're



KAI COSHOW RAINS PHD
USA V SHARFI

April 29, 2022
149–152

Page 149

1  common out there, right?
2      A.   No, no, I was sort of surprised that
3  they weren't more common.
4      Q.   Okay.  But you found Brazilian
5  pepper out there, right?
6          Is that a yes?
7      A.   No, I'm -- yes, yes, and -- but
8  it wasn't common.
9      Q.   Okay.  Well, so it didn't cover the
10 whole place, right?
11     A.   Correct.
12     Q.   Right, but you found more than one
13 Brazilian pepper tree, didn't you?
14     A.   Yes.
15     Q.   Okay.  And that's an invasive exotic
16 species, isn't it?
17     A.   Yes.
18     Q.   And you also saw what you've
19 identified here as punktree; isn't that right?
20     A.   Yes.
21     Q.   Punktree is what's commonly referred
22 to in South Florida, at least where I live, is
23 Melaleuca, which is the Latin name, right?
24     A.   Yes, I was trying to come up with a
25 variant that didn't rely on the Latin name but

Page 150

1  you'll see it come up as punktree.
2      Q.   There's a fair amount of Melaleuca
3  out there in the north -- north of the site,
4  isn't there?
5      A.   I was surprised, a lot of these were
6  in localized stands, but with the Brazilian
7  pepper, you'd see some seedlings scattered about,
8  indications from --
9      Q.   And you saw Old World climbing fern
10 out there, too, didn't you?
11     A.   Yes.
12     Q.   And people often refer to that as
13 the Latin name Lygodium; isn't that right?
14     A.   Yes.
15     Q.   And that's an invasive exotic plant,
16 isn't it?
17     A.   Yes.
18     Q.   That's a plant that's really a
19 problem in Martin County, isn't it, because
20 it climbs up on the trees, and it shades out the
21 leaves, and it kills a lot of trees; isn't that
22 right?
23     A.   Yes.
24     Q.   So it's fair to say that there's
25 many exotic plants out at the reference areas,

Page 151

1  right?
2      A.   Yeah, I recorded the presence of
3  four.
4      Q.   That's four types of plants.  It's
5  obviously more than four plants, correct?
6      A.   Correct, you're right.
7      Q.   Okay.  Let me keep going.
8  It says -- I'm going to go down further, quote,
9  Forests are interspersed with patches of
10 regenerating tree species and shrubs, e.g., wax
11 myrtle, saw palmetto, and gallberry, end quote.
12         Did I read that right other than the
13 fact I skipped the Latin part?
14     A.   Yes.
15     Q.   What does it mean to be a
16 regenerating tree?
17     A.   Sapling.  It's a sapling of a tree
18 where I see the same species tree size in the
19 same vicinity.  So it's a sapling.
20     Q.   So it's just -- so what I think
21 about the word "regenerate," I think of like
22 something's been damaged, and then it's healing
23 itself or putting out a new shoot, or something
24 like that.  So you mean something --
25     A.   Oh, yeah, no, no.

Page 152

1      Q.   So the regen --
2      A.   No, we call -- in forestry we'll
3  refer to as "regen," so it's regenerating growth,
4  and it just means seedlings and saplings.
5      Q.   Okay.  So did you see any trees --
6  well, let me back up.
7          Am I right that there's cattle
8  grazing out on that property north of the site?
9      A.   Yes.
10     Q.   And cattle eat plants, right?
11     A.   Yes.
12     Q.   And they're chewing on the leaves,
13 aren't they?
14     A.   Yes.
15     Q.   All right.  And they also -- and
16 they're eating grasses out there; isn't that
17 right?
18     A.   I would assume so, yes.
19     Q.   What kind of grasses were out there
20 north of the site?
21     A.   What kind of grasses?  There was a
22 high diversity of grasses.  There were sedges,
23 juncas, and sinapis.  I provide a species list in
24 the table at the end, and that is a compilation
25 of all the plants where -- that I saw at the



KAI COSHOW RAINS PHD
USA V SHARFI

April 29, 2022
153–156

Page 153
1  specific plot areas as well as a survey which
2  I did opportunistically, so it's in no way,
3  shape, or form a complete species list of any of
4  the areas I went to.
5      Q.  Fair enough.  I'll go and look and
6  read it.
7          So did you see -- did you see signs
8  of places where cows had chewed on branches of
9  trees or even eaten leaves?
10     A.  Yes.
11     Q.  By the way, were there any fences
12  out there in the Countess Joy area that
13  restricted where the cows could go?
14     A.  Yes.
15     Q.  Did they divide up the whole
16  property or were there just fences around certain
17  spots?
18     A.  I don't recall.  I recall the main
19  fence, like a fence around the west portion and a
20  south portion, but I don't recall if there was
21  more than that.
22     Q.  There's a fence between the site and
23  the Countess Joy property, right?
24     A.  That's the one I'm referring to at
25  the south end, yes.

Page 154
1      Q.  Got it.  Okay.  And is there
2  anything that prevents cows from going into
3  wetland on the Countess Joy property, at least
4  that you saw?
5      A.  I saw -- not that I recall.
6      Q.  Did you see any cows in the wetlands
7  when you were up there, when you did your site
8  visit?
9      A.  I saw hoofprints.
10     Q.  Did you actually see cows when you
11  did your site visit?
12     A.  I feel like I saw them off in the
13  distance, but now that I think about it, maybe
14  not.  I certainly had no encounter with cows.
15     Q.  Okay.  Okay.
16     A.  No firsthand encounters, but there
17  were hoofprints.
18     Q.  Okay.  Let me go down to the next
19  paragraph.  It says, quote, There was a minimum
20  of four vegetation types on the site prior to
21  impact, but inclusions of other types may have
22  been present in transition zones between dominant
23  vegetation types.  The four prior existing
24  vegetation types identified in this report are
25  upland conifer hardwood forest, mix shrub

Page 155
1  wetland, freshwater marsh, and mixed wetland
2  forest.  End quote.
3          Did I read that right?
4      A.  You did.
5      Q.  So you write here about the
6  vegetation types on the site prior to impact.
7  You were never on the site prior to impact,
8  right?
9      A.  Correct.
10     Q.  So am I right that this is -- that
11  you are inferring what was on the site prior to
12  impact based upon aerial photographs, soil maps,
13  other maps that you got from publicly available
14  sources and also inferring what site conditions
15  were based on conditions in the reference area?
16     A.  No.  If you turn to -- can we go to
17  the results section or would you prefer I wait?
18     Q.  Let's just go through each -- I'm
19  going to get there, but I think it will be more
20  efficient if we just go through this.  Just --
21  just if we're bouncing back and forth, it always
22  takes longer.
23     A.  Okay.
24     Q.  I'm going to ask it a little
25  differently here, Dr. Rains.  Just tell me what

Page 156
1  is -- what is -- how did you determine what you
2  believe the vegetation types to be on the site
3  prior to impact?
4      A.  I'm going to try to give you a
5  complete answer, so I'm looking at my notes.
6  I reviewed the background materials, so those
7  would be represented in Section IV.A, and if you
8  would like me to, I can show you which ones
9  I looked at, and then sources of information --
10  hold on, maybe I listed it out.
11     Q.  Let me say this, Dr. Rains, I'm
12  just -- I'm just mindful of the time here.  Is
13  this covered in a later section of the report?
14     A.  Yes.
15     Q.  Let's skip this now, then.  Let's
16  keep moving.  Okay.  Let me just break down --
17  let's look at the -- I'm going to get to the
18  later section of the report.  Let's go through
19  each one of these vegetation types.  Let me start
20  with this, is there any figure that you prepared
21  that identifies on the site itself exactly where
22  each vegetation type is located?
23     A.  Let me look at this here.  Oh, yes,
24  there is.
25     Q.  Okay.



KAI COSHOW RAINS PHD
USA V SHARFI

April 29, 2022
157–160

Page 157

1    A.    Okay.  Figure V.D.3.3.
2    Q.    Okay.  Let me exit out of the main
3  report and let's go to the figures so I can see
4  it.  Okay.  I'm going to pull up on the screen
5  Exhibit 73, which is the figures, and I have --
6  is that Figure V.D.3.3?
7    A.    Correct.
8    Q.    Okay.  So this -- this shows
9  different areas of the site vegetation using
10  numerical codes, right?
11    A.    Yes.
12    Q.    And so each -- and these codes come
13  from the -- from -- is this from the South
14  Florida Water Management District land use and
15  land cover database?
16    A.    Yes.
17    Q.    And they use the Florida Land Use
18  Cover characterization system?
19    A.    It's a classification system, yes.
20    Q.    I always say FLUCCS, but there's
21  actually a full name, right?
22    A.    Yeah, yes.
23    Q.    It's based on the FLUCCS Map, right?
24    A.    Yes.
25    Q.    Okay.  And so you think the FLUCCS

Page 158

1  Map is a reliable source of information to use to
2  evaluate what the vegetation types were in
3  specific areas of the site prior to impact,
4  right?
5    A.    It is a fantastic starting point,
6  but it is absolutely not sufficient.
7    Q.    So it's not reliable to reach a
8  conclusion?
9    A.    It is not a stand-alone -- they
10  themselves report an 85 percent mapping accuracy,
11  and it is -- and they also caution you that
12  if you were going to use this for the purposes of
13  determining where wetlands are, you better go do
14  some ground trooping, you better rely on maps
15  that have been made at a smaller scale.
16    Q.    Are you relying upon the FLUCCS
17  mapping, though, for the site to identify
18  specifically where on the site the different
19  plant communities were located prior to impact?
20    A.    This was a first step.  This is not
21  all I relied upon.
22    Q.    Okay.  Do you think that the lines
23  showing the boundaries between different
24  vegetation types on the site as shown in that
25  figure are accurate?

Page 159

1    A.    At the mapping unit level that they
2  did, yes.  For the portion that is on the eastern
3  boundary, yes, for 6172 in the middle, with the
4  exception of the portion that I indicate with the
5  arrow and explain in the text below.  And the
6  4340 that's on the western section was mismapped,
7  and as I explain in the report, that is not
8  unexpected.  It's below the minimum mapping unit,
9  that little inclusion is below the minimum
10  mapping unit for the South Florida Water
11  Management District for wetlands.
12    It is also -- they have indicated
13  that it is a type that they themselves say is
14  really difficult to distinguish from what
15  we ultimately found it was based on the
16  information in Area 11 in that upper left which
17  is about 160 feet northwest of the site.
18    It's a good starting point.  It's
19  the best photo I have of the site previously, so
20  that's why it's in that report.
21    Q.    Am I right that when I look at
22  Figure V.D.3.3, which shows pre -- pre-impact
23  conditions, that the area that has been labeled
24  4340 is an area that you and the DOJ team thinks
25  is not a wetland?

Page 160

1    A.    That's a mapping unit -- that
2  minimum mapping unit is below the minimum mapping
3  unit for the South Florida Water Management
4  District and so -- for wetlands.  So they have
5  lumped it with what they're expecting to have
6  been an upland polygon adjacent.
7    Q.    Okay.
8    A.    And so if there are -- if there are
9  inclusions of uplands in that polygon or
10  inclusions of wetland in the polygon that's to
11  the far east, those were beyond -- beyond the
12  resolution, yeah.  Sorry, I'm talking in circles.
13  You might have to --
14    Q.    The DOJ team has gone out and other
15  people, it sounds like Mr. Wylie and maybe
16  Dr. Lee, have gone out and delineated a line of
17  where they think the wetlands began and ended on
18  the site, right?
19    A.    Correct.
20    Q.    Okay.  And that line, am I right,
21  treats as non-wetland most of the area that's
22  approximately shown as Area 4340 on this figure?
23    A.    The area that they treat as -- I'm
24  sorry?
25    Q.    Right, the area on Figure V.D.3.3



KAI COSHOW RAINS PHD
USA V SHARFI

April 29, 2022
161–164

Page 161

1  that is labeled 4340, am I right that roughly
2  corresponds to the area that the DOJ team thinks
3  is a non-wetland?
4      A.   On the eastern section.
5      Q.   Right.
6      A.   Yes.
7      Q.   It's labeled 4340?
8      A.   Oh, there's two polygons there
9  labeled 4340.
10     Q.   I see.  I see.  Okay.  This is the
11  confusion.  So the area on the east side of the
12  property that's labeled 4340 the team thinks is a
13  non-wetland, right?
14     A.   Yeah, or if there's inclusions of
15  wetlands in there, we've logged it as an upland.
16     Q.   Okay.  So am I right, as I look at
17  this photograph, that area of the site was the
18  most heavily wooded area of the site?
19         MR. DOYLE:  Objection, vague.
20         THE WITNESS:  So you're asking me
21  if it had more trees than other sections?
22  BY MR. MCALILEY:
23     Q.   Or more density and larger trees?
24     A.   The larger trees -- it would appear
25  so from this view.

Page 162

1      Q.   Okay.  And you were there to see
2  it yourself before -- before the defendants did
3  their activities, right?
4      A.   Correct.
5      Q.   Okay.  So if I look at the area on
6  the site on Figure V.D.3.3 that's in sort of the
7  center and the lower left, it's the area that's
8  by the number 6172, am I right that that area
9  looks like it has much fewer trees, certainly on
10  the southwestern part of the site?
11     A.   Yes.
12     Q.   And -- and if the area that's
13  labeled as 4340 on the west side of the property,
14  that appears to have more trees than the area
15  immediately to its south, right?
16     A.   Yes.
17     Q.   And you never saw that area, 4340,
18  on the west side of the property before the
19  defendants engaged in their activities; isn't
20  that right?
21     A.   That's why we prioritized going to
22  W11, 60 feet away from the site and within the
23  same mapping polygon as that 4340 on the west
24  side of the site and within the same -- same
25  canopy.

Page 163

1      Q.   Okay.  You didn't answer my
2  question.  You never saw that area on the west
3  side of the site that's labeled 4340 prior to the
4  work being done, correct?
5      A.   Correct.
6      Q.   Okay.  So would you agree with me
7  that if you wanted to see what the actual
8  conditions were like in that area, you would have
9  wanted to see it before the defendants did their
10  activities?
11         MR. DOYLE:  Objection, vague.
12         THE WITNESS:  Yes.
13  BY MR. MCALILEY:
14     Q.   Okay.  So by the way, when I go
15  further north on the -- you said the northwestern
16  part of the site, it's not quite at the corner,
17  but there is an area, I think it's also in the
18  6172 polygon, am I right that that looks fairly
19  open?  There's some trees there, but it looks
20  like there's a lot of ground with just shrubs or
21  grass or something there?
22     A.   There aren't as many tree canopies
23  visible.
24     Q.   There's still wetlands on the site
25  today that the defendants have left there; isn't

Page 164

1  that right?
2      A.   There is one, uh-huh.
3      Q.   Is it the area --
4      A.   Well, I don't know if they left
5  it or if they constructed it.
6      Q.   Well, on Figure V.D.3.3 there's an
7  arrow which I think is pink, is that right, do
8  you see that?
9      A.   I can see the arrow, yes.
10     Q.   Is it pink, by the way?
11     A.   No, it's blue.
12     Q.   I tried.  I got close.
13         That's the area of the wetland that
14  remains, right?
15     A.   That is in the area.
16     Q.   Okay.  Approximately how big is that
17  wetland that's still on the site today?
18     A.   I don't know off the top of my head.
19     Q.   More than --
20     A.   I'm sure it's in the report.
21     Q.   Is it more than an acre?
22     A.   I'm not -- I'm not going to -- I'm
23  not going to guess.
24     Q.   All right.  Let's go back to the --
25  let's go back to the main report here.  Okay.  So



KAI COSHOW RAINS PHD
USA V SHARFI

April 29, 2022
165–168

Page 165

1  I'm back on Exhibit 72.  I'm on the main report.
2  I'm on Page 12, and I read the first two
3  sentences about the four prior existing
4  vegetation types, so I want to go through them.
5  So the first type is upland conifer/hardwood
6  forest.
7        So what is a "conifer"?
8        A.   What is a "conifer"?  A "conifer" is
9  a gymnosperm.  It doesn't produce flowers in the
10  normal sense.  It produces cones.
11        Q.   So is a pine tree a conifer?
12        A.   Correct.
13        Q.   Is a pine tree a wetland tree?
14        A.   It can be.  A pine is a common term
15  for the genius pinus, and there are many species
16  within pinus, some of which are hydrophytic and
17  some not.
18        Q.   Okay.  So on this Page 12 you
19  reference earlier is typical native tree species
20  include slash pine (pinus elliottii) is the type
21  of pine you saw at the site in the reference
22  area, a slash pine?
23        A.   Yes.
24        Q.   Did you see any other kind of pines
25  out there?

Page 166

1        A.   I may have, but they weren't in the
2  plot areas.
3        Q.   So is a slash pine a plant that can
4  live in wetlands?
5        A.   Yes.
6        Q.   Is it also a plant that can live in
7  uplands?
8        A.   Yes.
9        Q.   So just because you see a slash
10  pine, you can't -- just by the existence of the
11  slash pine there, you can't tell whether it was a
12  wetland or upland, you need to know more
13  whether -- to determine whether that location was
14  a wetland or upland, fair to say?
15        A.   On the wetland plant -- on the
16  National Wetlands Plant List pinus elliottii is
17  listed as a FAC wet species, which means it is
18  predominantly found in wetlands.
19        Q.   That wasn't my question.  My
20  question is this:  If that kind -- if a slash
21  pine can live in wetlands and uplands, just by
22  seeing that you have a slash pine there, just
23  that fact alone won't tell you if that spot is a
24  wetland, right?
25        A.   Correct.

Page 167

1        Q.   Right, because there's slash pines
2  that live in uplands, too, correct?
3        A.   No, that's not the reason why.
4  If all I had is a pinus elliottii and no other
5  vegetation existed and that was all I was going
6  to write on my form, because it's a FAC wet
7  species, that's a hydrophytic vegetation
8  community.  Now, that's not necessarily wetland,
9  because you have to satisfy soils and you have to
10  satisfy hydrology.
11        Q.   Okay.  So if you see a slash pine
12  someplace, odds are it's a wetland.  You'd need
13  more information about the soils and hydrology,
14  but given that's a facultative wet species, odds
15  are that location is a wetland?
16        A.   No, odds are extremely small that
17  that's the only plant in that location, so I'd
18  probably need to figure out what the other
19  vegetation is as well.  But to answer your
20  question, if I see a slash pine and its accepted
21  indicative status on the National Wetlands Plant
22  List as FAC wet, then chances are higher that
23  that plant is in a wetland than not.
24        Q.   So if you see a slash pine, more
25  likely than not it's in a wetlands, right?

Page 168

1        MR. DOYLE:  Objection, vague.
2        THE WITNESS:  That is what the
3     indicator status would imply.
4  BY MR. MCALILEY:
5        Q.   Okay.  So as you -- as a vegetation
6  scientist, you see a slash pine, odds are greater
7  than 50 percent that's in a wetland, that spot is
8  a wetland, right?
9        MR. DOYLE:  Objection, vague,
10     misstates testimony.
11        THE WITNESS:  I think we're saying
12     this a little oddly.  I would want to look
13     up exactly how they phrased the indicator
14     status.
15  BY MR. MCALILEY:
16        Q.   I'm just asking you.  I'm not --
17  there's so many documents out there that we can
18  look at.  I'm just asking you as an expert, you
19  go out and you're trying to figure out whether
20  it's a wetland based on the plants that you see.
21  You see a slash pine, odds are greater than 50
22  percent that's a wetland, right?
23        MR. DOYLE:  Same objection, the
24     original question was slash pine alone.
25     Somehow the "alone" got dropped.





KAI COSHOW RAINS PHD
USA V SHARFI

April 29, 2022
169–172

Page 169

1    MR. MCALILEY:  Stop coaching your
2    witness, counsel.  Stop coaching the
3    witness.
4    MR. DOYLE:  Stop changing the
5    question and using the word "so."
6    MR. MCALILEY:  I've heard your
7    objection.
8    BY MR. MCALILEY:
9    Q.  So, Dr. Rains, let's go back to the
10   question.  You're a vegetation expert, you see a
11   slash pine, not knowing anything else about it,
12   odds are greater than 50 percent that that's in a
13   wetland, right?
14   A.  You're saying that incorrectly.
15       MR. DOYLE:  Objection.
16       THE WITNESS:  And if you want me to
17   continue with this line of questioning, you
18   need to give me the opportunity to look up
19   that -- the definition, because they have
20   very pointedly moved away from using
21   percentages.
22       So one thing I'll tell you is
23   there's not going to be any percentage
24   associated with different indicators
25   statuses anymore.  The other thing is

Page 170

1    I know this is being -- I know you're
2    phrasing it backwards, and I can correct
3    you really quickly if I looked it up, which
4    I have Google sitting right here, I can do
5    it if you like.
6    BY MR. MCALILEY:
7    Q.  So you can't answer my question
8    there without looking at some reference source?
9    A.  No, you're saying it wrong.
10   Q.  I'm asking you just a common sense
11   question.  I'm not a scientist, so I'm just
12   asking the best way I can, and you can't answer
13   the question without looking at some reference
14   source; is that right?
15       MR. DOYLE:  Objection,
16   argumentative, misstates testimony.
17       THE WITNESS:  You're going to have
18   to start at the beginning.  So the question
19   is if I see a single slash pine, do I think
20   I'm in wetlands?
21       MR. MCALILEY:  Yeah.
22       THE WITNESS:  There is -- I would
23   not delineate or determine whether
24   something is a wetland or not based on a
25   single species.  You look at the entire

Page 171

1    community.
2    BY MR. MCALILEY:
3    Q.  But being a slash pine would suggest
4    there's a wetland there.  You'd have to confirm
5    it, but it suggests that a wetland is there,
6    right?
7    A.  If you want to wait, I'll try to
8    remember something without looking anything up.
9        If I see a slash pine or any other
10   plant with a "FAC wet" status, then what those
11   indicator statuses are communicating to me is
12   that that plant -- is that chances are greater
13   that that plant is going to be associated with a
14   wetland when you are using the National Wetlands
15   Plant List.
16   Q.  Okay.  Thank you.  So I go back to
17   your report here on Page 12.  I'm just still
18   talking about the upland conifer/hardwood forest,
19   and I think it's the third sentence, it says,
20   "The forest consisted of second growth mixtures
21   of slash pine and hardwood such as red maple,
22   laurel oak, and cabbage palm.  Do you see where
23   that is right at the bottom of Page 12?
24   A.  Yes.
25   Q.  Okay.  So are those -- are red

Page 172

1    maple, laurel oak and cabbage palm examples of
2    hardwoods?
3    A.  Red -- oak -- no -- yes, they're --
4    yes.
5    Q.  All right.  So is red maple a
6    wetland tree?
7    A.  You would have to look at the
8    indicator status.  I don't have them all
9    memorized, especially because there are different
10   lists out there, but the red maple is a wetland
11   tree.  That one I know, but I don't want you to
12   go through every plant on the list and expect
13   that I know all the indicator statuses by heart.
14   Q.  Ma'am, I didn't ask about all the
15   plants, I just asked about that plant, so I'm not
16   going to ask you, I promise you, about every
17   plant.
18       So red maple is a wetland tree,
19   right?
20   A.  It may have a FAC status with the
21   National Wetlands Plant List.  It might be FAC
22   wet for FDEP.  I have to refer to my forms.
23   Q.  So if I see a red maple, then,
24   it could be a sign of a wetland, but it could
25   also be an upland; is that fair to say?



KAI COSHOW RAINS PHD
USA V SHARFI

April 29, 2022
173–176

Page 173

1    A.   It would depend on its status.
2    Q.   Okay.  And you don't know the status
3  of what kind of wetland plant it is as you sit
4  here today?
5    A.   No, I'm not going to say it's --
6  it's many hours into this deposition, I'm not
7  going to start guessing because it's not worth
8  it.  It's too new for me to look at my table.
9    Q.   I'm just asking if you know offhand.
10   A.   I'm not going to guess.
11   Q.   Ma'am, it's 2:30.  I want to finish
12  today, and I'm trying to get there, and my
13  questions are actually a little simpler than
14  maybe you're thinking.  So I'm just asking.
15       If you don't know as you sit here
16  today whether the red maple is a facultative
17  wetland species, just say so.  That's all I'm
18  asking for.
19       MR. DOYLE:  Objection.
20       THE WITNESS:  I -- I'm pretty sure
21    it's FAC wet per FDEP and FAC wet for
22    National Wetlands Plant List, but I would
23    have to look that up to be sure.  There are
24    many species and multiple lists.
25  BY MR. MCALILEY:

Page 174

1    Q.   How about the laurel oak, is that a
2  wetland plant?
3    A.   Are we going to go through every --
4  no, it -- I'm pretty sure it's FAC wet.
5    Q.   Okay.  Thank you.  Is -- how about
6  the cabbage palm, is that a facultative wetland
7  species?
8    A.   I'm pretty sure that one is the same
9  on both lists as FAC.
10   Q.   Okay.  So when I see this -- when
11  it's written here on Page 12 where you identify
12  the vegetation types.  The first one is upland
13  conifer/hardwood forest.  Am I right that
14  "upland" means non-wetland?
15   A.   Yes.
16   Q.   Okay.  All right.  Let's go down to
17  Page 13, and let's go to the first full
18  paragraph.  The first sentence says, quote,
19  "Currently, the microtopography at the site has
20  been altered, and the vegetation is intensively
21  managed."  And it goes on and says, "Site
22  vegetation primarily consists of a vigorous
23  carpet of Bahia grass and common lawn weeds,
24  e.g. three-flower tick trefoil, end quote.
25       Did I say that right except for

Page 175

1  skipping the Latin?
2    A.   Yes.
3    Q.   Okay.  So the site today is --
4  mostly consists of grasses and trees outside of
5  the wetland area that's been preserved; is that
6  fair to say?
7    A.   Yes.
8    Q.   And when you say that the vegetation
9  is intensively managed, what do you mean by that?
10   A.   I mean while we were there, it was
11  being mowed and something was being sprayed on
12  it.
13   Q.   Okay.  Something was being sprayed
14  on it, is that what you said?
15   A.   Correct.
16   Q.   Okay.  So basically -- so would you
17  agree that most people who have property with a
18  lawn, mow the lawn in your experience?
19   A.   It's mixed.
20   Q.   Okay.  Many people mow their lawns,
21  don't they?
22   A.   Many people mow their lawns, yes.
23   Q.   Okay.
24   A.   And some have vigorously growing
25  grass and some don't.

Page 176

1    Q.   Okay.  And you saw people spraying
2  something.  Did you know what the something was
3  that they were spraying?
4    A.   No.
5    Q.   You can get -- you can get
6  herbicides at Home Depot, can't you?
7    A.   Yes.
8    Q.   Is there any -- is there anything --
9  is it common for people to use herbicides to
10  spray weeds in their yard?
11   A.   It's apparently common enough that
12  they are sold at the store.
13   Q.   I want to go down to the second full
14  paragraph on Page 13 where you refer to the
15  depressional wetland on the south central portion
16  of the site.  It's the fourth sentence, I think,
17  says, quote, "Landscape maintenance practices and
18  activities related to animal husbandry and
19  propagation of ornamental plants have resulted in
20  excess nutrient algal growth in the wetlands,"
21  and you reference some photographs.
22       Did I read that sentence right?
23   A.   Yeah, it took me a while to find
24  where you were, but I believe you said,
25  "Landscape maintenance practices and activities



KAI COSHOW RAINS PHD
USA V SHARFI

April 29, 2022
177–180

Page 177

1  related to animal husbandry and propagation of
2  ornamental plants have resulted in excess
3  nutrient and algal growth in this wetland."
4      Q.   Right, that's the sentence I read in
5  your report, right?
6      A.   Yes.
7      Q.   Okay.  So what specific landscape
8  maintenance practices do you think have resulted
9  in excess nutrition algal growth in the wetland?
10      A.   What specifically -- if there is a
11  sort of fertilizer placed on there, that would
12  certainly result in excess nutrients.  Just the
13  fact that we have removed -- the person has
14  removed a lot of the shrubs in the prior existing
15  vegetation and now maintains that area as a
16  landscape, mowing it, keeping other things out.
17      By so doing, any water that is
18  running -- that is landing from the sky -- any
19  rain that is falling in the vicinity of that
20  wetland have a much higher chance of running
21  through the grasses quickly, carrying with them
22  any nutrients whether they are naturally
23  occurring or have been added.
24      Q.   Okay.  So by putting a lawn of grass
25  there, it basically allows nutrients to flow more

Page 178

1  in, you know, run off from the land faster, is
2  that --
3      A.   Nutrients, sediments, whatever the
4  water happens to be carrying, particularly
5  if you've also gotten rid of any microtopography,
6  so the water is going to be moving more quickly.
7      Q.   Okay.  Okay.  I want to -- let me
8  see if I can move through this report a little
9  quicker here.  Let's go to the next section of
10  the report, Dr. Rains, Section III.F, Faunal
11  Support/Habitat Overview.  Am I right this is a
12  section of the report written by Dr. Lee?
13      A.   Correct.
14      Q.   And am I right you're not going to
15  be testifying at trial about the material covered
16  in this section of the report?
17      A.   I don't expect to, huh-uh.
18      Q.   Thank you.  Let's keep moving down.
19  Now we're in Section IV, IV.A, Review of
20  Background Materials.  This is a section written
21  by Mr. Wylie, right?
22      A.   So you're in IV.A.1?  IV.A.1.
23      Q.   I'll repeat, IV.A.1 and 2 here.
24  Just to move faster, Mr. Wylie wrote all of IV.A,
25  right?

Page 179

1      A.   Yes, he did.
2      Q.   Okay.  So this is -- this is not --
3  the material that's in this section you're not
4  going to testify about other than I assume to the
5  extent that you reference one of these -- these
6  standard materials in the sections that you
7  wrote; is that right?
8      A.   This is a list of materials that
9  we used as background, and I utilized some of
10  these resources as I wrote my report and as
11  I formed my opinion.  So if that doesn't
12  interfere with the question you just asked me --
13  what exactly is the question?  Oh, whether I'm
14  going to testify to this.
15      I would certainly expect -- there
16  may be things in here that I referenced that
17  others haven't.  That list of background
18  materials includes things that I utilized.
19      Q.   Okay.  So if -- in this section a
20  reference material is mentioned, and you relied
21  upon it -- you discuss it in your section of the
22  report, right?
23      A.   Imagery from Google Earth Pro, I'm
24  not sure I did.  ESRI database, I'm not sure
25  I did.  Specifically, that would have been the

Page 180

1  base map that we were reviewing.
2      Q.   Ma'am, I'm just trying to figure out
3  whether I need to go through every paragraph in
4  this section of the report.  So if you relied
5  upon a reference material, you'd reference it in
6  the section of the report that you wrote; isn't
7  that correct?
8      A.   I would expect so, however, some of
9  these are pretty general.  For example, ESRI
10  database, I mean, as I said, I utilized tools
11  within the ESRI database to zoom in and zoom out.
12      Q.   Okay.  So you don't know whether
13  you're going to testify at trial about the
14  subject matter discussed in Section IV.A; is that
15  right?
16      A.   Correct, insomuch as this is our
17  list of background materials, and I think it's
18  pretty common for people to have.  This section,
19  the preamble, the first paragraph references
20  ecosystem functions, map, resources, and
21  I utilized map resources, so I'm represented in
22  here.
23      Q.   Okay.  So you utilized map resources
24  as part of developing your opinions, right?
25      A.   Correct.



Page 181

1      Q.   And you talk about those map
2   resources in the section of the report on
3   vegetation that you wrote, correct?
4      A.   I do.
5      Q.   Okay.  So is there anything -- so
6   basically, if I want to know what your testimony
7   is going to be about, I should focus on the
8   sections of the report you wrote, not this
9   section, right?
10     A.   That's what I would assume.
11     Q.   But would you assume?  I mean,
12   that's --
13     A.   That's what I would expect.
14     Q.   That's why I'm asking the questions,
15   to figure out what I need to know.
16     A.   I don't know what questions you're
17   going to ask me, so...
18     Q.   Putting aside -- ma'am, putting
19   aside questions that I might ask you at trial,
20   what you, in your direct testimony at trial, when
21   you go, do you expect to be talking about mapping
22   resources and your use of them other than what
23   you discussed in the sections of the report that
24   you wrote?
25     A.   Or contributed to, no.

Page 182

1      Q.   All right.  Let's keep moving.
2   Let's go to section -- okay.  Section IV.B, Study
3   Methods.  No. 1 is Overview.  That's a section
4   written by Michael Wylie, right?
5          MR. DOYLE:  B.1?
6          MR. MCALILEY:  I'm sorry, did I say
7   B.1?  IV.B.1, yes.
8          THE WITNESS:  Yes.
9   BY MR. MCALILEY:
10     Q.   Okay.  So you didn't write this
11   section, correct?
12     A.   I did not write this section; that
13   is correct.
14     Q.   So you are not going to be
15   testifying about the material covered in this
16   section other than the extent it possibly
17   references vegetation; is that fair?
18     A.   I contributed to the selection of
19   the reference areas.
20     Q.   Okay.  Other than that, you're not
21   going to testify about anything that's covered in
22   this section of the report, right?
23     A.   Well, the section of the report is
24   how we selected them.
25     Q.   Okay.  So you're going to testify at

Page 183

1   trial about how the reference areas were selected
2   based upon a section of the report written by
3   Mr. Wylie?  Am I understanding your testimony
4   right, Dr. Rains?
5      A.   We collaborated on the selection of
6   the reference sites, the whole team did or the
7   members of the team did.
8      Q.   Okay.  So you're going to testify
9   based on how the reference sites were selected?
10     A.   In the capacity of somebody who
11   contributed to this section but did not write it.
12     Q.   Are you going to be the witness who
13   is going to testify about this or is Mr. Wylie
14   going to be the witness to testify about this?
15     A.   I don't believe that's my choice.
16   Isn't it the lawyers who decide who the witnesses
17   are?
18     Q.   Okay.  Well, let me ask you a few
19   questions about this section, then.  I can -- I
20   don't know what time it is in California, but I'm
21   willing to go as long as we have to.
22          So on Page 18, second paragraph,
23   second sentence -- hold on, the first sentence,
24   quote, "Using our field observations combined
25   with extensive review of historical aerial

Page 184

1   photographs, geologic and topographic maps,
2   vegetation surveys and maps, and NRCS soil maps,
3   we determined the Countess Joy East property was
4   a close physical analog to the site before the
5   site was disturbed."
6          Did I read that sentence right?
7      A.   Uh-huh.
8      Q.   Is that a true and correct
9   statement?
10     A.   Yes.
11     Q.   Okay.  The next sentence, I'll break
12   it down into pieces, quote, For example, compared
13   to the site, the Countess Joy East property has
14   similar landscape position, end quote.
15          I'll stop there for a minute.  Did
16   I read that right?
17     A.   Yes.
18     Q.   Is that a true and correct
19   statement?
20     A.   Yes.
21     Q.   You see it next says, quote,
22   "A similar array of soil types."
23          Do you see that?
24     A.   I do.
25     Q.   Is it a true statement that the



KAI COSHOW RAINS PHD
USA V SHARFI

April 29, 2022
185–188

Page 185

1  Countess Joy East property has a similar array of
2  soil types to the site?
3      A.   It would depend on one's
4  interpretation of "array," so I would defer that
5  question to Dr. Stewart or to Mike.
6      Q.   Okay.  So are you not testifying --
7  I mean, if you're testifying about this at trial,
8  I get to ask you the questions.  So you don't
9  know the answer to that question, I have to ask
10  another witness, then?
11      MR. DOYLE:  Objection, compound.
12      THE WITNESS:  Well, the next
13      question is similar vegetation.
14  BY MR. MCALILEY:
15      Q.   I'm not asking about that yet.  I'm
16  asking about the soil types first.  If you're
17  going to own this section of the report,
18  Dr. Rains, I get to ask you questions about what
19  you're going to testify about.
20      MR. DOYLE:  Objection.
21  BY MR. MCALILEY:
22      Q.   Are you going to testify there were
23  a similar array of soil types between the
24  Countess Joy East property and the site?
25      A.   I could, but it's not my stated role

Page 186

1  or my stated expertise in this, so I mean, it's a
2  matter of looking at a map of soil types and
3  understanding the soil types, but that is
4  Scott's -- Dr. Stewart's purview.
5      Q.   So you haven't gone out to do the
6  soil analysis and comparing the Countess Joy
7  property and the site, correct?
8      A.   Well, the beginning of this is using
9  our field observations.  Mine was an extensive
10  review of aerial photos, geographic -- geologic
11  and topographic maps, vegetation survey maps, and
12  NRCS soils maps, we determined that it was close
13  to physically analog before the site was
14  disturbed.
15      I was involved in looking at the
16  vegetation surveys and maps and doing the
17  geospatial analysis that similarly involved
18  looking at the mapping types related to the soil
19  maps, and -- but your primary witness with this
20  site or with this section I would expect to be
21  the person who said they authored the section,
22  which is Mr. Wylie.
23      Q.   Okay.  Do you think it's true that
24  the Countess Joy East property has similar array
25  of soil types to the site?

Page 187

1      A.   I can answer that question if I look
2  at the soil figure.
3      Q.   I'm not -- I'm just asking a
4  question now.  Without having to go and start
5  looking at figures, just as you are here today,
6  is that your opinion?  And if you don't have an
7  opinion on that and I should ask Dr. Stewart,
8  that's fine, but...
9      A.   I think polygons prior to
10  disturbance on the site extend from the site into
11  that reference area, and so I would call it a
12  similar array of those two.  My memory is,
13  without being allowed to look at the map, that
14  the Sanibel muck is restricted to a small section
15  in the southern portion, but if we're referring
16  to the other two soil types, then yes, I would
17  say there's a similar array.
18      Q.   In that sentence it also says,
19  "There's similar vegetation between the Countess
20  Joy" property -- "Countess Joy East property and
21  the site before the site was disturbed."  Is that
22  a true statement in your opinion?
23      A.   Again, the FLUCCS mapping indicating
24  that many of the same prior existing vegetation
25  types on the site also existed on the Countess

Page 188

1  Joy property, but I can see where you're going
2  with this.  Mr. Wylie would be the person who
3  ultimately made the decision here.
4      Q.   Okay.  So -- okay.  And then --
5      A.   So I don't want to relinquish
6  ownership of the fact or responsibility for the
7  fact that I was involved in the geospatial
8  analysis and opinions that went into this, but
9  the ultimate decision rested with Mr. Wylie and
10  probably with Dr. Lee as well.
11      Q.   Okay.  And the next part of the
12  sentence says, "There's similar shared hydrologic
13  connections to Bessey Creek by a north/south
14  ditch."  Do you see that?
15      A.   I do.
16      Q.   Is that your opinion or is that
17  Dr. Nutter's opinion or based on Dr. Nutter's
18  work as a hydrologist?
19      A.   If Mr. Wylie wrote this report, then
20  he took information synthesized from Dr. Nutter
21  as well as the rest of the team and came to a
22  decision about the suitability of this reference,
23  the reference systems -- the reference systems,
24  yes.
25      Q.   So basically Dr. -- Mr. Wylie wrote



KAI COSHOW RAINS PHD
USA V SHARFI

April 29, 2022
189–192

Page 189

1  this section of the report.  The stuff that's in
2  this section of the report represents his
3  opinions, right?
4       It may be informed by the input that
5  you or other members of the team had, but these
6  are his opinions, because he wrote this section
7  of the report.  Do I have that right?
8    A.   Yes.
9       MR. MCALILEY:  Why don't -- I can
10  probably use a five-minute break here.
11  Would a break be in order, Dr. Rains?
12  Would you be all right if we took five
13  minutes?
14       THE WITNESS:  Sure.
15       MR. MCALILEY:  Okay.  Anyone else?
16  I'm ready to take a break if everyone else
17  is.
18       MR. DOYLE:  Yes.
19       THE VIDEOGRAPHER:  All right.  We are
20  going off record at 2:58 p.m.
21       (Thereupon, a break was taken.)
22       THE VIDEOGRAPHER:  We --
23  BY MR. MCALILEY:
24    Q.   Dr. Rains, I'm going to try to move
25  through this report more quickly.  So, Dr. Rains,

Page 190

1  I'm going to put back up on the screen here
2  Deposition Exhibit 72, I have up on the screen
3  IV.B.2.C.  This is the Reference Areas Study
4  Methods/Vegetation.
5       Do you see it there on the screen?
6    A.   I do.
7    Q.   This is a section of the report that
8  you wrote; isn't that right?
9    A.   Yes, it is.
10    Q.   And am I right that this section
11  describes how you went about identifying
12  vegetation in the reference area?
13    A.   And you're on IV -- come again, IV
14  --
15    Q.   Yeah, and this -- I'll --
16    A.   IV.B.C, that's where you are?
17    Q.   Yes, ma'am.  It's on the screen,
18  Page 22.
19    A.   Yeah, that was a fragment of it.
20       MR. DOYLE:  I'm on Page 21.
21       MR. MCALILEY:  I'm sorry, bottom of
22  Page 21, correct.
23       THE WITNESS:  Okay.  Yes.
24  BY MR. MCALILEY:
25    Q.   Okay.  So this section describes how

Page 191

1  you went about identifying vegetation in the
2  reference areas, right?
3    A.   After I -- yes, this is true.
4    Q.   If I were to summarize it, is this a
5  fair summary, you know, prior to the visit you
6  looked at Google Earth and vegetation maps, and
7  then also looked at plant lists, and at the site
8  you identified the plants and marked them down in
9  your notes.  Is that a summary of what you did?
10    A.   Through the field assessment, yes,
11  and then I collected some plants, and I reviewed
12  the specimens using the list of references also
13  in that section.
14    Q.   Okay.  That summarizes basically
15  your methods that you followed in analyzing
16  vegetation in the reference areas, correct?
17    A.   That's how we figured out what
18  the -- what species were growing there and then
19  that information went into the -- well, in the
20  determination forms, yes.
21    Q.   Okay.  All right.  Let's keep moving
22  down through the report, ma'am.  Subsection D,
23  Faunal Support/Habitat.  Sorry this is
24  Section IV.B.2.D, Reference Area Study Methods
25  Faunal Support/Habitat.  This is on Page 23 of

Page 192

1  your report.  Do you see it up on the screen?
2    A.   Yes.
3    Q.   This is a section that was written
4  by Dr. Lee; isn't that right?
5    A.   Correct.
6    Q.   Okay.  So this is -- the subject
7  matter in this section is the subject of his
8  testimony at trial, not yours, correct?
9    A.   Right, it may be based -- I'm sure
10  it's based in part with my species, but he did
11  the synthesis that went into writing this
12  section.
13    Q.   Okay.  Let me ask you, did you see
14  fish when you were out there on the -- in the
15  field related to this case?
16    A.   Yes.
17    Q.   That was a yes?
18    A.   Correct, yes.
19    Q.   Okay.  Where did you see fish?
20    A.   Bessey Creek.
21    Q.   And Bessey Creek, you're referring
22  to that linear aquatic feature north of the site
23  that I referred to as the north -- as the
24  east/west ditch earlier?
25    A.   Yes.



KAI COSHOW RAINS PHD
USA V SHARFI

April 29, 2022
193–196

Page 193

1    Q.    Okay.  What kind of fish did you see
2 in there?
3    A.    I don't know.
4    Q.    You saw fish, but you don't know
5 what kind of fish?
6    A.    Correct, they were jumping, but I'm
7 not a fisheries person.  I can only tell you
8 it was a fish.
9    Q.    Okay.  Did you see any fish in the
10 north/south ditch?
11    A.    North/south ditch?  I remember --
12 I was trying to remember this.  I remember seeing
13 an organism swimming around, but I can't recall
14 if it was an amphibian or it was like a little
15 salamander or -- I'm sorry, a tadpole, so I can't
16 say, I may have to look back at my field notes.
17    Q.    Do you recall --
18        THE COURT REPORTER:  I'm sorry,
19        counsel, you broke up.  Start that over for
20        me.
21        MR. MCALILEY:  I just had some
22        feedback from somebody, I'm not sure, but
23        let's -- it seems like it's better.
24 BY MR. MCALILEY:
25    Q.    Do you recall seeing any fish in

Page 194

1 wetlands either on the site or in the reference
2 area?
3    A.    I don't recall any.
4    Q.    Do you recall seeing any reptiles in
5 the north/south ditch or the ditch you're calling
6 Bessey Creek?
7    A.    Reptiles, no -- no.
8    Q.    Okay.  Let's keep moving.  So
9 if I -- I'm going to keep going in the report
10 down to Section IV.B.3.C, Site Study Methods
11 Vegetation.  Do you see it there on the screen?
12 It's on Page 24 of the report is where it starts.
13    A.    Yes.
14    Q.    So this is one of the sections of
15 the report that you wrote, correct?
16    A.    Yes.
17    Q.    So let me read you the first
18 sentence under C.1.  Quote, Naturally occurring
19 trees, shrubs, and ground cover have been
20 replaced by sod at the site, so the atypical
21 standard protocols USACE 1987 atypical conditions
22 were used to infer prior vegetation structure and
23 composition from available resources, end quote.
24        Did I read that first sentence
25 correctly?

Page 195

1    A.    You did.
2    Q.    Are you going to testify at trial
3 about the proper application of the 1987 wetland
4 manual, or is that going to be a topic of
5 Mr. Wylie?
6    A.    That would likely be Mr. Wylie.
7    Q.    Okay.  Thank you.  So when you wrote
8 here "Naturally occurring tree, shrubs, and
9 ground cover," what did you mean?
10    A.    Naturally occurring -- based on my
11 review of what was expected in the area.  The --
12 the tough thing about this was that we were
13 provided many of the documents that gave
14 firsthand accounts of the vegetation prior to
15 disturbance after we'd already been to the field,
16 so when I wrote this section, I was really
17 thinking about what I did before going to the
18 field, and I'm realizing now it's some of what
19 is methods is actually sort of addressing the
20 results.  That's when I provide the list of --
21    Q.    Am I right -- I'm just focusing on
22 that phrase "naturally occurring."  Am I right in
23 understanding what you mean is that trees,
24 shrubs, and ground cover that existed on the site
25 before the defendants engaged in their

Page 196

1 activities?
2    A.    Yes.
3    Q.    Okay.  The next sentence in this
4 paragraph says, quote, Historic and current
5 aerial imagery, documents, and photos produced
6 from previous site inspections by on-site
7 observers were reviewed and publicly available
8 map products produced by state and federal
9 agencies and list of the plant species known to
10 occur in the vicinity of the site, end quote.
11        Did I read that correctly?
12    A.    You did.
13    Q.    So I think we've covered, frankly,
14 directly or indirectly most of the items on this
15 list about materials that you reviewed, but I do
16 want to focus on where it says documents and
17 photos produced from previous site inspections by
18 on-site observers.  So who were the on-site
19 observers that you're referring to here?
20    A.    That was exactly what I was trying
21 to get you to look at before.  It's in the
22 results.  Would you want to wait until we get
23 there?
24    Q.    Can you just identify who they are
25 right now, and then we'll get to this later.



KAI COSHOW RAINS PHD
USA V SHARFI

April 29, 2022
197–200

Page 197

1    A.   I don't want to misspeak or miss one
2  of them, but it's -- let me get to it.
3  Ms. Small, South Florida Water Management
4  District, EDC.  Those were the sources of
5  information that I had regarding prior site
6  visits, and those are listed on Page 59.
7    Q.   Okay.  Did you speak with any of
8  those people yourself or is this all based on
9  documents that you read?
10   A.   It's possible that one of these was
11 John Penpack who I met in the field, or maybe
12 he works for the Corps.  I'm not sure, but, no,
13 that's the only name or that's the only person
14 that's popping into my head.  I did not speak to
15 Ms. Small nor did I recognize any other name on
16 the field forms I reviewed other than I think
17 there may have been somebody named John Penpack
18 or Penpack.
19   Q.   Okay.  So just to understand this
20 correctly, the only person that you can recall
21 speaking with yourself about things they saw on a
22 prior site inspection was Mr. Penpack?
23   A.   Correct.
24   Q.   Okay.  So you don't recall ever
25 having spoken to Danna Small, correct?

Page 198

1    A.   No.
2    Q.   And you haven't talked to anybody at
3  the South Florida Water Management District,
4  right?
5    A.   No.
6    Q.   And you haven't talked to anybody at
7  EDC, right?
8    A.   Correct.
9    Q.   Okay.  All right.  So am I -- so am
10 I correct that this section of the report you --
11 the rest of this section of the report you
12 basically describe the process by which you
13 documented vegetation on the site?
14   A.   Yes.
15   Q.   All right.  Okay.  I want to turn
16 now --
17       THE COURT REPORTER:  I'm sorry,
18       counsel, again, you had some background
19       noise.  Can you repeat that.
20       MR. MCALILEY:  I apologize.  I moved
21       the paper in the wrong spot.
22 BY MR. MCALILEY:
23   Q.   So, Dr. Rains, on the report
24 Section IV.C.1, Reference Materials and
25 Procedures Related to the Clean Water Act and

Page 199

1  Regulations.  Do you see that on the screen?
2    A.   Yeah, right, not me.
3    Q.   Right.  So this was written by
4  Mr. Wylie, right?
5    A.   Correct.
6    Q.   And you're not going to be
7  testifying at trial about procedures related to
8  the Clean Water Act and Regulations, right?
9    A.   Other than my part on wetland
10 determination -- or wetland determination forms,
11 I won't expect to, no.
12   Q.   Right.  The only thing about this
13 topic or that relates to this topic that you're
14 going to testify at trial is your work related to
15 the vegetation on the site and putting that into
16 like the wetland data forms for the determination
17 of whether you have a wetland; do I have that
18 right?
19   A.   Yes.
20   Q.   Great.  So I don't have to ask you a
21 bunch of questions about Waters of the U.S., do
22 I?
23       MR. DOYLE:  Objection, vague.
24 BY MR. MCALILEY:
25   Q.   Right?  I should skip those

Page 200

1  questions, right?
2        MR. DOYLE:  Same objection.
3  BY MR. MCALILEY:
4    Q.   You can answer, Dr. Rains.
5    A.   Are you referring to the contents of
6  Section C, is that what you're trying to ask me
7  about?
8    Q.   No, I --
9    A.   Because that's Clean Water Act or --
10 oh, wait, no.
11   Q.   Are you going to give an opinion
12 that wetlands on the site are part of the Waters
13 of United States, because there's a significant
14 effect on downstream traditional navigable waters
15 or is that --
16       MR. DOYLE:  Objection, asked and
17       answered.
18       THE WITNESS:  I believe this is what
19       we were talking about earlier with respect
20       to vegetation and organic debris and
21       potential effects on downstream waters.
22 BY MR. MCALILEY:
23   Q.   Okay.  Other than talking about
24 organic debris and vegetation, you're not giving
25 an opinion at trial about the significance of any



KAI COSHOW RAINS PHD
USA V SHARFI

April 29, 2022
201–204

Page 201

1  effects of wetlands on the site on downstream
2  waters, traditional navigable waters; is that
3  right?
4      A.   Oh, and the fish sightings.  I don't
5  expect to do anything beyond that.
6      Q.   Okay.  Let's keep going down.  So
7  now we're in Section IV.C.2, Rationale for Using
8  the Atypical Situations Portion of the Manual.
9  It's on Page 29.  Do you see that on the screen?
10     A.   I do.
11     Q.   So this was written by Mr. Wylie and
12  Dr. Lee, right?
13     A.   Correct.
14     Q.   So those are the witnesses who are
15  going to testify about the rationale of using the
16  atypical situations portion of the manual, right?
17     A.   But my figures might be invoked
18  to illustrate -- my photos might be invoked to
19  illustrate some of these, but they would be the
20  primary respondents, oh, that's probably an
21  actual term that I don't know what it means, but
22  they're the ones who wrote it, so --
23     Q.   Okay.  So they're going to testify
24  about this.  They may refer to a figure that you
25  helped prepare, but they're the ones who are

Page 202

1  going to help testify about using the atypical
2  situations section of the manual, right?
3      A.   Correct.
4      Q.   Thank you.  Okay.  Section IV.C.3,
5  which is up on the screen here, this is Page 29,
6  Review and Refinement of Prior Delineations on
7  the Site.  This is a section written by Mr. Wylie
8  and Dr. Lee, correct?
9      A.   Yes.
10     Q.   So you're not going to be testifying
11  at trial about the review of the -- and
12  refinement of prior delineations on the site, are
13  you?
14     A.   I may have something to say about
15  the vegetation from permanent -- in fact, I refer
16  to their documents in my section, but inasmuch as
17  review and refinement, I reference their
18  documents in my section --
19     Q.   Dr. Rains, I understand that you may
20  reference documents prepared by Danna Small or
21  Tobin Overdorf at EDC.  I understand that.
22     A.   As a part of their delineations.
23     Q.   Right, but you're not going to
24  testify at trial about your review of their
25  delineations and your critique of their

Page 203

1  delineations, are you?
2          MR. DOYLE:  Objection, asked and
3      answered.
4          MR. MCALILEY:  I don't think she
5      answered it.  If I'd just get an answer to
6      this, Mr. Doyle, I'd move on.
7          MR. DOYLE:  Same objection.
8          THE WITNESS:  His -- those
9      conclusions regarding the locations of the
10     wetlands -- well, I guess I would -- I
11     would be talking about their vegetation
12     observations, but not their -- the
13     methodology they used for their wetland
14     delineations.
15  BY MR. MCALILEY:
16     Q.   Okay.  That's fine.  Thank you very
17  much.  Move down.  Okay.  Section -- well, okay.
18  Let me -- hold on.  Section IV.C.4, Site
19  Locations and Cartographic Products.  It's right
20  at the bottom of Page 29.  Do you see that there
21  on the screen?
22     A.   Yes.
23     Q.   Dr. Lee wrote this section, right?
24     A.   Yes.
25     Q.   So the subject matter of this

Page 204

1  discussion of the LiDAR datasets used and
2  material that's covered in this section, Dr. Lee
3  is going to testify about this, not you, right?
4      A.   Correct.
5      Q.   Thank you.  All right.  Okay.  Now
6  the next section, IV.C.5,
7  Characterization/Delineation of the Geographic
8  Extent of Waters/Wetlands on the Site Prior to
9  Disturbance.  This section was written by Dr. Lee
10  and Mr. Wylie, right?
11     A.   For -- for -- oh, I'm sorry, yes,
12  I'm in the wrong spot on the index, yes.
13     Q.   Okay.  So the subject matter in this
14  section of the report is the subject matter of
15  their testimony, not yours, right?
16         MR. DOYLE:  Objection, vague.
17         THE WITNESS:  I would have
18     contributed to the determinations.
19  BY MR. MCALILEY:
20     Q.   Okay.  You would have contributed to
21  the determination, and your contributions and
22  technical work would have been used by Dr. Lee or
23  Mr. Wylie for their testimony at trial, right?
24     A.   Yes.
25     Q.   But you're not the witness who is



KAI COSHOW RAINS PHD
USA V SHARFI

April 29, 2022
205–208

Page 205

1  going to get up there at trial and testify about
2  here's where the proper wetland line is, are you?
3      A.  Correct.
4      Q.  Thank you.  Okay.  Dr. Rains,
5  if I go to Section IV.D, this is on Page 31.
6  This is Assessment of the Functions of
7  Waters/Wetlands Ecosystems.  Do you see that on
8  the screen?
9      A.  I do.
10      Q.  That's a section written by Dr. Lee,
11  right?
12      A.  Correct.
13      Q.  So am I right that Dr. Lee is going
14  to be the witness who is going to testify about
15  the subject matter in this section of the report?
16      A.  Yes, he pretty explicitly states
17  that he relied on our observations in the field.
18      Q.  Okay.  So he may have relied upon
19  your observations, but he's going to be the
20  witness who is going to testify at trial, right?
21      A.  That's what I would expect, yes.
22      Q.  Thank you.  Okay.  I'm now going
23  down the report.  Section V.A, this is Results,
24  Summary, and Time Sequence of Mechanical
25  Clearing, Fill Import/Export, Earthwork, and

Page 206

1  Construction Activities on the Site.
2      Do you see that?
3      A.  I do.
4      Q.  This, once again, was a section
5  written by Dr. Lee, right?
6      A.  Yes.
7      Q.  So this section represents subjects
8  that he's going to cover in his testimony, it's
9  not subject matter of your testimony, right?
10      A.  He will certainly do A, I would
11  expect.
12      Q.  That was my only question, was
13  Section A, V.A.
14      A.  Oh, okay.
15      Q.  Yeah, so you're not -- so you're not
16  going to testify about the topics covered in V.A,
17  that's Dr. Lee, correct?
18      A.  Correct.
19      Q.  Thank you.  Okay.  V.B, Overview of
20  the Types, Classes, and Structure of
21  Waters/Wetlands on Reference Areas and My
22  Inference on the Site Prior to Construction
23  Activities.
24      Do you see that on the screen?
25      A.  Yes, I do.

Page 207

1      Q.  Dr. Lee wrote this section, too,
2  right?
3      A.  Yes, he did.
4      Q.  So this is the subject matter that
5  he's going to testify about, not you, right?
6      A.  The type, classes, and structure all
7  rely on my assessment of the vegetation on the
8  reference areas and by inference on the site
9  prior to construction activities, but he would
10  have been the person on synthesize it together
11  with the hydrology and the soils and would be
12  presenting that section or defending or
13  testifying, whatever it is.
14      Q.  So you're not the witness testifying
15  about the topics in this section at trial, it's
16  Dr. Lee who is going to present the testimony,
17  right?
18      A.  That's what I would expect, yes.
19      Q.  Thank you.  Let's go down here down
20  to Page 35, Section V.C.1.  This is DOJ Expert
21  Team Determinations of the Geographic Extent of
22  the Waters of the U.S., and then one is DOJ
23  Expert Team Peer Review of Previous Delineations.
24      This is a section written by Mike
25  Wylie, right?

Page 208

1      A.  Yes.
2      Q.  Okay.
3      A.  Wait, you're doing a better job
4  following this than I am.  So you're on DOJ --
5  yes, Mike Wylie.
6      Q.  So the topics covered in this
7  section are the subject matter of his testimony,
8  not yours, right?
9      MR. DOYLE:  Objection, vague.
10      THE WITNESS:  He is the one who
11      synthesized the material, so he would be
12      the primary witness here.
13  BY MR. MCALILEY:
14      Q.  Okay.  And you don't -- you didn't
15  write this section, so you're not expecting to be
16  the one at trial to testify about the material
17  that's in Section V.C.1, right?
18      A.  Not unless you were to ask further
19  questions about vegetation components that
20  resulted in us coming up with -- with Mike coming
21  up with this opinion.
22      Q.  Okay.  All right.  Thank you.  Let's
23  keep going.  Section V.C.2, it's the bottom of
24  Page 35, the DOJ Technical Team Determination of
25  the Aerial Extent of Waters/Wetlands on the Site.



KAI COSHOW RAINS PHD
USA V SHARFI

April 29, 2022
209–212

Page 209

1          Do you see that?
2      A.   Yes.
3      Q.   It's written by Mr. Wylie as well,
4   right?
5      A.   Yes.
6      Q.   So you're not going to be the one
7   testifying at trial about the aerial extent of
8   wetlands on the site, that's going to be
9   Mr. Wylie, right?
10     A.   My same answer to the previous one
11  applies, but --
12     Q.   Okay.  So just -- and you're going
13  to testify about vegetation, the vegetation that
14  you saw, but in terms of who is going to be the
15  person who is going to say, here's where we think
16  the proper line is of the wetlands given all
17  three of the factors, that's going to be
18  Mr. Wylie, because he wrote that section of the
19  report, right?
20         MR. DOYLE:  Objection, vague.
21         THE WITNESS:  That is my
22      understanding.
23  BY MR. MCALILEY:
24     Q.   Thank you.  Let's keep going down.
25  Section V.C.3 on the top of Page 37.  I have it

Page 210

1   up on the screen, The Upstream Reach of Bessey
2   Creek Approximate to the Site is a Perennially
3   Flowing Tributary to Downstream TNWs.
4          Do you see that?
5      A.   I do.
6      Q.   This is a section written by
7   Dr. Wade Nutter, right?
8      A.   V.C.3, Dr. Nutter, yes.
9      Q.   And this section discusses matters
10  of hydrology, right?
11     A.   It also discusses NWI maps.
12     Q.   All right.  Well, Dr. Rains, are you
13  going to be testifying about the upstream reach
14  of Bessey Creek proximate to the site is a
15  perennially flowing tributary to downstream TNWs?
16     A.   I will not be testifying as to
17  whether Bessey Creek flows perennially.
18     Q.   Okay.  And you're not going to be
19  giving the hydrology opinions that are contained
20  in Section V.C.3, right?
21         I didn't hear it actually.
22     A.   Correct.
23     Q.   Okay.  Thank you.  I can see you,
24  but I didn't hear it, so -- all right.  Next
25  Section, 4.C.4, Land Uses and Impaired Water

Page 211

1   Quality in Bessey Creek.  This is at the bottom
2   of Page 37.  Do you see that?
3      A.   I do.
4      Q.   That's Mr. Wylie's section again,
5   right?
6      A.   Yes, it is.
7      Q.   Okay.  So this is -- this section
8   represents testimony of Mr. Wylie not your
9   testimony, right?
10     A.   Correct.
11     Q.   Okay.  Let's keep moving down.
12  Section IV.5. -- I'm sorry, V.C.5, The Site and
13  Countess Joy Wetland Abut the North/South Ditch.
14  This is on Page 38.  Do you see that?
15     A.   I do.
16     Q.   This is, again, a section written by
17  Mr. Wylie, right?
18     A.   Correct.
19     Q.   You're not going to be giving
20  opinions at trial about whether wetlands abut the
21  north/south ditch within the meaning of the Clean
22  Water Act, right?
23         MR. DOYLE:  Objection, vague.
24         THE WITNESS:  Inasmuch as it may
25      have to do with my contribution to the

Page 212

1      wetland determinations that we -- or my
2      observations as recorded on those forms or
3      the field notes, then I might.
4   BY MR. MCALILEY:
5      Q.   Okay.  So Mr. Wylie is the person
6   who is going to testify about this, but he may be
7   relying in part upon, you know, work that you did
8   related to vegetation; is that fair?
9      A.   Which were part of the wetland
10  determination forms, yes.
11     Q.   Okay.  But this is not -- when you
12  get up at trial in your direct examination, you
13  don't expect to be testifying about this topic in
14  a section of the report that you didn't write,
15  correct?
16         MR. DOYLE:  Objection, vague.
17         THE WITNESS:  That is not my
18      expectation, but again, I have never
19      testified.
20  BY MR. MCALILEY:
21     Q.   All right.  Let's keep going.  So
22  now we're at Section V.C.6, Significant Nexus.
23  The Site Wetlands and Similarly Situated Wetlands
24  in the Bessey Creek Watershed Have a Significant
25  Nexus to Downstream TNWs.



KAI COSHOW RAINS PHD
USA V SHARFI

April 29, 2022
213–216

Page 213

1         This is on Page 38.  Do you see that
2  on the screen?
3      A.   Yes.
4      Q.   This section was written by
5  Mr. Wylie, right?
6      A.   Yes.
7      Q.   So Mr. Wylie is going to be
8  testifying about significant nexus, not you,
9  right?
10         MR. DOYLE:  Objection, asked and
11     answered.
12         THE WITNESS:  Yeah, I've answered
13     this twice.
14  BY MR. MCALILEY:
15     Q.   So the answer is I'm right?
16         MR. DOYLE:  Objection.
17         THE WITNESS:  The answer is I've
18     answered this twice, so we can go and --
19     I'm sure I did a better job earlier.
20  BY MR. MCALILEY:
21     Q.   Well, I'm now -- this is the first
22  time I have this section of the report in front
23  of you, ma'am, so I'm asking you on this section
24  of the report.  On this -- on Page 38 where
25  it says V.C.6, the section on similar -- on

Page 214

1  significant nexus, it's written by Mr. Wylie,
2  you're not going to testify or give opinions at
3  trial that are contained in this section of the
4  report, right?
5         MR. DOYLE:  Same objection.
6         THE WITNESS:  It would depend on
7     what happens in court.  I mean, I've
8     already said that I've seen fish, that
9     organic import and export, I made
10     observations, field notes, photographs that
11     would support all this.
12  BY MR. MCALILEY:
13     Q.   Okay.  And that --
14     A.   But I would expect him to be your
15  main witness, he is the one who synthesized it.
16  It depends if there's a cross or -- I don't know.
17     Q.   Dr. Rains, I expect him to be the
18  main witness, too.  I just need to make sure
19  you're not the witness on this, too, that I don't
20  have two witnesses talking about the same subject
21  matter, and we're entitled to know what your
22  opinions are so I can ask you, take your
23  deposition.
24         So here's a section of the report
25  you didn't write.  I'm just asking, if he wrote

Page 215

1  it, he's going to testify about this stuff, not
2  you.  That's all I'm looking for.
3         MR. DOYLE:  Objection, counsel is
4     testifying, argumentative, compound.
5         MR. MCALILEY:  That's fine.
6  BY MR. MCALILEY:
7     Q.   So, Dr. Rains, are you telling me
8  you're going to testify about some of the
9  significant nexus issues here in this section of
10  the report that you didn't write?
11         MR. DOYLE:  Objection, asked and
12     answered.
13         THE WITNESS:  I don't know how this
14     works, so you saying that there's only --
15     there's only one person who provides
16     testimony for each subject is news to me.
17     If there is only one person who gives
18     testimony for each subject, then, yes,
19     I would expect the primary authors to be
20     the ones who give testimony.
21         If a situation occurs in court where
22     somebody who has firsthand observations,
23     documenting notes, photographs of this
24     stuff, and the way court works is that
25     person would normally be expected to

Page 216

1     provide some sort of testimony, then I may
2     provide some sort of testimony there, but
3     that's my caveat with this whole
4     conversation, which I know has you very,
5     very frustrated.
6         So I can identify for you who the
7     primary people are in the same way that you
8     can.  I can look through that table of
9     contents and agree with you as to who the
10     primary authors were, but I don't know how
11     going to court is organized.  So there you
12     have it.
13  BY MR. MCALILEY:
14     Q.   Okay.  I am frustrated, and I'm not
15  just frustrated at you, Dr. Rains, I'm frustrated
16  with opposing counsel, and I'll bite my tongue
17  that we have a shell game here with a report
18  written by five people, that I'm trying to find
19  out the opinions of you and what you're going to
20  testify about and not having to play a shell game
21  and figure out who else is going to testify about
22  it.
23         Let me go through specific aspects
24  of this?
25         MR. DOYLE:  Since you didn't bite



KAI COSHOW RAINS PHD
USA V SHARFI

April 29, 2022
217–220

Page 217

1    your tongue, I will dispute that
2    characterization.
3            MR. MCALILEY:  Okay.  Well, I may
4    file a motion, Andy.  I'm not going to do
5    it now.
6    BY MR. MCALILEY:
7    Q.    So let's go through this.  Let's go
8    to 6.A.  So this is C. -- 5.C.6.A, Subsurface --
9    Surface and Subsurface Water Storage and Exchange
10   Processes in Wetlands on the Site.
11           Do you see that section, Dr. Rains?
12   A.    I do.
13   Q.    You didn't write this section, did
14   you?
15   A.    No, I did not.
16   Q.    You're not a hydrologist, are you?
17   A.    No, I'm not.
18   Q.    Okay.  So what -- what opinions are
19   you going to give at trial, if any, about the
20   surface and subsurface water storage and exchange
21   processes on wetland on the site and in similarly
22   situated wetlands?
23   A.    We just answered this question.
24   Q.    We didn't.
25   A.    The word "biology" is in there, and

Page 218

1    so if the way court works is that I would -- that
2    the biological observations, the ecology, the
3    vegetation are -- if more than one person can
4    talk about this entire subject, then the
5    biological component of it may be something where
6    I wind up testifying.
7            I think really you can characterize
8    this as if there's something about the ecology
9    and the vegetation within these sections, then to
10   the best of my knowledge regarding how court
11   works, especially if I note that I collected the
12   data, you know, in the forms, then maybe I would
13   testify, but I'm sure others know better than
14   I do how that all works.
15   Q.    So, Dr. Rains, my question was
16   simpler.  What opinions are you going to offer at
17   trial about the surface and subsurface water
18   storage and exchange processes in wetlands on the
19   site and similarly situated wetlands?
20   A.    "Are important in maintaining
21   physical, chemical, and biological integrity of
22   downstream TNWs" is the remainder of that title,
23   and so an important word in there is "biological
24   integrity."
25           I was on the site looking at the

Page 219

1    vegetation, and I had the opportunity to make
2    observations regarding animals and organic matter
3    accumulations.  That would be my area of
4    expertise; however, my observations have been
5    reviewed by the author of this section, so
6    I would assume they would be the primary witness,
7    person giving testimony.
8    Q.    So you're not going to give any
9    opinions on the hydrology pieces of this -- of
10   this topic, right?
11   A.    Yes.
12   Q.    Okay.  So let me move on.  So then
13   it sounds like in Section V.C.6.A, which is the
14   hydrology piece, you're not -- it's written by
15   Mr. Wylie.  You're not going to be giving
16   testimony or opinions at trial on that piece,
17   right?
18   A.    You summarized what I said
19   incorrectly.
20   Q.    Okay.  Summarize it for me better.
21   Can I request that the court reporter simply read
22   back the answer I just gave?
23           MR. DOYLE:  You may.
24           THE WITNESS:  I would like to do so.
25           (Thereupon, the record was read as

Page 220

1    requested.)
2            THE WITNESS:  So that's my answer
3    again.
4    BY MR. MCALILEY:
5    Q.    Okay.  How much water from the site
6    flowed to the east/west ditch prior to the
7    defendant's work?
8            MR. DOYLE:  Objection, vague.
9            THE WITNESS:  How much water --
10   agreed, how much water flowed --
11   BY MR. MCALILEY:
12   Q.    Flowed from the site to Bessey Creek
13   before the defendants did their work?
14           MR. DOYLE:  Same objection, vague.
15           THE WITNESS:  And in addition,
16   that's a hydrology question, which is
17   explicitly what I told you I would not be
18   responsible for in the section.  I would
19   not be providing testimony for hydrology.
20   BY MR. MCALILEY:
21   Q.    Okay.  So you're not going to be --
22   okay.  That's fine.  This is what I thought I was
23   trying to get to this in the last few questions.
24           MR. DOYLE:  Objection, counsel
25   testifying.



KAI COSHOW RAINS PHD                                     April 29, 2022
USA V SHARFI                                              221–224

Page 221

1       MR. MCALILEY:  Okay.  I'm not
2  testifying at all, counsel.
3  BY MR. MCALILEY:
4       Q.   Let's go to Section V.C.6.B,
5  Nutrient Cycling.  Are you going to be providing
6  testimony regarding nutrient cycling and how that
7  affects the St. Lucie River and other downstream
8  traditionally navigable waters?
9       A.   Nutrient cycling is a component of
10 organic matter export.  I did not write this
11 section, however, you just asked me recently what
12 I meant by landscape maintenance influencing
13 nutrient delivery to wetlands -- to the wetland
14 on site, and I would expect to be able to give
15 similar testimony if it was asked of me.
16      Q.   Okay.  What is the limiting
17 nutrients of the aquatic ecosystem in the
18 St. Lucie estuary?
19      A.   It's nitrogen.
20      Q.   It's nitrogen?
21      A.   Nitrogen and phosphorus are the
22 contributing -- are the problems.
23      Q.   What is the -- what is the total
24 load of nitrogen from the site that flowed to
25 Bessey Creek on an annual basis prior to the

Page 222

1  defendants doing their site work?
2       A.   That is not something I would be
3  testifying on.
4       Q.   So you're not going to be testifying
5  about water quality effects on the site of the
6  downstream TNWs, right?
7       MR. DOYLE:  Objection, vague.
8       THE WITNESS:  The title of the
9       section is Nutrient Cycling and Storage and
10      Removal of Elements and Compound Processes
11      in Wetlands on the Site, and it is a
12      significant process that occurs in
13      wetlands, nutrients cycling and removal of
14      nutrients from water, and the
15      microtopographic changes that occurred on
16      that site will affect -- may affect the --
17      or have affected the delivery of water to
18      the wetlands on the site and to surrounding
19      areas, so that would be my arena.
20 BY MR. MCALILEY:
21      Q.   Okay.  How much less water from the
22 site is delivered to Bessey Creek today on an
23 annual basis compared to prior to the time the
24 defendants did their work?
25      MR. DOYLE:  Objection, vague.

Page 223

1       THE WITNESS:  That is a hydrology
2       question.  I won't be answering
3       questions regarding -- I won't be
4       testifying with respect to hydrology.
5  BY MR. MCALILEY:
6       Q.   How is the nutrient load from the
7  site to Bessey Creek changed as a result of the
8  defendant's activities?
9       MR. DOYLE:  Objection, vague.
10      THE WITNESS:  We did not measure
11      that, so what I could -- what I would be
12      able to provide would be an educated --
13 BY MR. MCALILEY:
14      Q.   Guess?
15      A.   Understanding the context in which
16 nutrient delivery increases or decreases based on
17 landscape changes, landscape level changes.  In
18 fact, that's a big reason we're doing the EPA
19 grant.  But I would not -- I would certainly not
20 be testifying as to any quantities of nutrients
21 prior to the --
22      Q.   Dr. Rains -- Dr. Rains, am I right
23 that you almost said all you can do is give an
24 educated guess about how the site activities
25 changed nutrient loading at Bessey Creek?

Page 224

1       A.   No, I was going to say "estimate,"
2  and I thought, oh, that sounds quantified as
3  well.
4       Q.   Okay.  So you can't tell me how much
5  nutrient load came from the site to Bessey Creek
6  at any time scale prior to the time the
7  defendants did the work, right?
8       A.   Right.
9       Q.   And you can't --
10      A.   Based on -- yeah.
11      Q.   And you can't tell me what the
12 nutrient load is at the site to Bessey Creek on
13 any time scale today after the defendants did the
14 work, correct?
15      A.   Correct, I can only -- right,
16 correct.
17      Q.   Right.  And you weren't involved in
18 the collection of water quality data as any part
19 of your investigations here; is that right?
20      MR. DOYLE:  Objection, vague.
21      THE WITNESS:  I took the photos --
22      I took the photos of the impacts, so I have
23      firsthand observations of algal growth in
24      water on the site.
25 BY MR. MCALILEY:



KAI COSHOW RAINS PHD
USA V SHARFI

April 29, 2022
225–228

Page 225

1    Q.    Okay.  Do you have any firsthand
2  observations of water -- of algal growth off the
3  site that you believe was caused by the
4  defendant's activities?
5    A.    No, I could not say that.  I can't
6  point to a photograph or a moment where I know
7  those activities led to that growth.
8    Q.    Okay.  Let's go back to the report.
9  I'm now on Page 41, Section V.C.6.C, Carbon
10  Production and Export Processes.  Do you see that
11  section?
12    A.    Yes.
13    Q.    This was written by Mr. Wylie,
14  right?
15    A.    Yes.
16    Q.    Is that a yes?
17    A.    Yes, I was checking.
18    Q.    Okay.  But am I right that you
19  testified earlier that you may testify about
20  carbon production and export processes?
21    A.    Processes, yes.
22    Q.    Okay.
23    A.    And -- and -- yeah.
24    Q.    What are going to be your opinions
25  with regard to carbon production and export

Page 226

1  processes at the site in relationship to the
2  downstream TNWs?
3    A.    That the carbon production has been
4  simplified, because now we're looking at an
5  ecosystem where lawn grasses and lawn weeds are
6  primarily responsible as opposed to having a
7  diversity of carbon sources.
8    Q.    And does that increase or decrease
9  carbon export to downstream TNWs?
10    A.    It changes the diversity of carbon,
11  and so it's going to affect the -- it's
12  potentially going to affect the diversity of
13  organisms that can access those nutrients.
14    Q.    You say it potentially can affect
15  the diversity of organisms, right?  It sounds
16  like you don't know whether it will affect the
17  diversity of organisms; is that right?
18    A.    I did not quantify it, no, and I did
19  not witness any direct effects.
20    Q.    Right, so you witnessed no direct
21  effects of carbon export processes resulting from
22  the defendant's work, right?
23    A.    No direct effects, no.
24    Q.    When we talked about carbon
25  production export, am I -- am I correct that this

Page 227

1  is about the production of leaf litter and wood
2  that goes from --
3    A.    Uh-huh.
4    Q.    -- into water bodies and is broken
5  down by bacteria fungi and invertebrates, and,
6  therefore, is available to downstream organisms,
7  is that what we're talking about?
8    A.    Yes.
9    Q.    Okay.
10    A.    But it has to get there.  So if you
11  give -- if you give a very simplified form, they
12  can get broken down quickly and released into --
13  dissolved nutrients as opposed to leaf particles
14  or portions of wood.
15    Q.    Did the defendant's activities
16  increase or decrease in your opinion the amount
17  of leaf litter and wood that goes to Bessey
18  Creek?
19    A.    They would decrease the amount of
20  wood, and it would change the type of leaf that
21  was being delivered.
22    Q.    Am I right that any kind of plant
23  can produce leaf litter and wood that can end up
24  in the water?
25    A.    If it's growing along a waterway and

Page 228

1  it's transported there, yes.
2    Q.    Okay.  So it doesn't -- a wetland
3  plant can produce leaf litter and wood, right?
4    A.    Correct.
5    Q.    An upland plant could also produce
6  leaf litter and wood, right?
7    A.    Correct.
8    Q.    So wetland --
9    A.    But wetland -- go ahead.
10    Q.    So wetland plants are not unique in
11  their ability to produce leaf litter and wood,
12  correct?
13    A.    Correct.
14    Q.    So how much leaf litter and wood did
15  the wetlands on the site export to Bessey Creek
16  on an annual basis prior to defendant's
17  activities?
18    A.    I cannot quantify anything, and
19  I want to go back and stress the fact that by
20  simplifying the community, the -- the breakdown
21  processes aren't as complex as there would be had
22  there been a diversity of vegetation contributed
23  to the north/south ditch and Bessey Creek, but
24  I -- I can't tell you how much standing here
25  today.



KAI COSHOW RAINS PHD
USA V SHARFI

April 29, 2022
229–232

Page 229

1     Q.    What --
2     A.    There are --
3     Q.    What percentage of the leaf litter
4  and wood that's in the east/west ditch came from
5  the site and the Countess Joy wetlands prior to
6  the defendant's activities?
7          MR. DOYLE: Objection, vague.
8  BY MR. MCALILEY:
9     Q.    You cut out a little bit as you said
10  that, what was your answer, ma'am?
11     A.    Can you repeat the question again.
12  What percentage?
13     Q.    Yeah, that's all I'm saying, I think
14  you had the coffee cup in your mouth when you
15  said it, and I couldn't hear what you said?
16     A.    Okay. Can you repeat the question.
17     Q.    Yeah. What percentage of the litter
18  and wood in the east/west ditch that you're
19  calling Bessey Creek came from the site and the
20  Countess Joy property before the defendants
21  engaged in their activities?
22          MR. DOYLE: Objection, vague.
23          THE WITNESS: That's not a question
24     I can answer.
25  BY MR. MCALILEY:

Page 230

1     Q.    And do you know what percentage of
2  the leaf litter and wood in the Bessey Creek
3  today comes from the site and the Countess Joy
4  property?
5          MR. DOYLE: Objection, vague.
6          THE WITNESS: No, I do not.
7  BY MR. MCALILEY:
8     Q.    Can you describe how much the -- the
9  change in the -- in the type of leaf litter and
10  wood that is exported from the site will change
11  the biota of the downstream waters?
12     A.    So again, you're asking for a
13  quantification. These questions would be better
14  directed to Mr. Wylie.
15     Q.    Okay. So you don't know as you sit
16  here today, correct?
17     A.    No, quantified, correct.
18     Q.    Can you identify any specific effect
19  on the downstream biota of -- you know, of the
20  St. Lucie River or the downstream portions of
21  Bessey Creek that have occurred as a result of
22  the defendant's activities?
23          MR. DOYLE: Objection, vague.
24          THE WITNESS: Can you repeat the
25     question.

Page 231

1  BY MR. MCALILEY:
2     Q.    Yeah. Can you identify any specific
3  effect on downstream biota in the downstream
4  tidal waters that have been caused as a result of
5  the defendant's activities at the site?
6          MR. DOYLE: Same objection.
7          THE WITNESS: That's a pretty big
8     question, because now you're not asking me
9     if I can quantify anything, you're asking
10     me what processes -- what -- how the
11     changes on the site may have affected the
12     biology downstream, correct?
13  BY MR. MCALILEY:
14     Q.    Sort of. Actually, I'm asking a
15  little bit more precise.
16     A.    Okay.
17     Q.    Do you have -- do you have evidence
18  of any change in downstream aquatic biota as a
19  result of the defendant's activities on the site?
20     A.    I did not collect any
21  quantifiable -- yeah -- no.
22     Q.    Okay.
23     A.    No, I can't point to a particular
24  species or point to a particular thing that
25  I know that has definitely resulted from these

Page 232

1  activities. I can only harken to...
2     Q.    Okay. Let's go on to the next
3  sentence.
4          MR. DOYLE: She's mid-sentence,
5     counsel. She's mid-sentence, "harken to."
6          MR. MCALILEY: It was -- it was a
7     10, 15-second pause. I'm sorry, I
8     apologize, I don't realize you weren't
9     done. You want to complete your sentence,
10     Dr. Rains.
11          THE WITNESS: I don't think that was
12     a 10 or 15-second pause, and, yes, that
13     would be hard for me, too, with the --
14     except an understanding of processes,
15     generally speaking, in wetlands. That
16     would be my expertise as opposed to
17     quantifications or any monitoring that has
18     taken place prior to or after the
19     disturbances on the site.
20          Knowledge regarding those sorts of
21     things would go to the primary -- would
22     come from the primary author of this
23     section.
24  BY MR. MCALILEY:
25     Q.    Okay. So just to make sure I'm

KAI COSHOW RAINS PHD
USA V SHARFI

April 29, 2022
233–236

Page 233

1 understanding, because I'd like to move on, it is
2 your opinion that in general wetlands affect the
3 downstream aquatic biota through the export of
4 carbon and -- I'm just trying to find the words
5 here -- of carbon production and dissolved
6 organic matter; is that right?
7     A.   We're on Section C, right?  Are
8 we still on Section C or D?
9     Q.   You're right.  Let me rephrase this,
10 Dr. Rains.
11         So in general, it's your opinion
12 that wetland are helpful to downstream waters,
13 because they contribute particulate and dissolved
14 organic matter; is that right?
15     A.   Correct.
16     Q.   Okay.  So you have an opinion about
17 the general effect of wetlands, but you don't
18 have evidence that these specific wetlands have a
19 significant effect or contribution of particulate
20 and dissolved organic matter to the downstream
21 waters; is that fair to say?
22     A.   I did not quantify any effects,
23 correct.
24     Q.   Okay.  Thank you.  All right.  Let's
25 go to the next section.  Now I'm in V.C.6.D,

Page 234

1 Wetland Sediment Trapping.  This is on Page 42.
2 Do you see that on the screen?
3     A.   Yes.
4     Q.   And this is written by Mr. Wylie?
5     A.   It was.
6     Q.   Are you going to be testifying about
7 wetland sediment trapping and retention in
8 relation to the site?
9     A.   Only inasmuch as I know I was the
10 person who took the photos and collected the
11 vegetation data that would be expected or that --
12 you know, depict the vegetation and collected
13 vegetation that would be expected to be involved
14 this the sediment trapping and retention in
15 wetlands on the site and on similarly situated
16 wetlands.  So only the vegetation aspects of
17 that.
18     Q.   And you're only going to testify
19 that you took the photos where you saw the
20 vegetation and the sediment, right?
21         MR. DOYLE:  Objection, misstates her
22     testimony.
23         THE WITNESS:  I don't know.  If the
24     general question is -- has to do with
25     vegetation structure and composition and

Page 235

1     those effects on wetland sediment trapping
2     and retention, then perhaps.
3 BY MR. MCALILEY:
4     Q.   Well, how much sediment is trapped
5 on the site prior to the defendant's activities?
6     A.   Again, I would not be handling
7 questions regarding content or monitoring prior
8 amounts transported prior to activities or post
9 activities.  Again, these would be
10 process-related testimony.
11     Q.   Okay.  So you're not going to
12 testify about what the sediment effects were
13 before or after the defendant's activities?
14     A.   I would not testify with respect to
15 specific sediment loads.
16     Q.   Okay.  Let's go down to the next
17 section here.  This is Section V.C.6.E,
18 Maintenance of Plants and Faunal Communities on
19 the Site and Similarly Situated Wetlands.  This
20 is a section written by Mr. Wylie as well,
21 correct?
22     A.   Yes.
23         MR. DOYLE:  Objection.
24         MR. MCALILEY:  What's your
25     objection?

Page 236

1         MR. DOYLE:  Misstates the table of
2     contents.
3         MR. MCALILEY:  Oh, okay.
4 BY MR. MCALILEY:
5     Q.   Who -- who wrote this section?
6         MR. DOYLE:  So my real objection is
7     leading question.
8         MR. MCALILEY:  It's an adverse
9     question and your expert, so I get to lead
10     all day, so that's fine.
11         THE WITNESS:  Wait, what?
12 BY MR. MCALILEY:
13     Q.   That's LCL, right?  That's written
14 by Mr. Lee, right -- or Dr. Lee?
15     A.   Could the reporter back up to
16 Mr. Doyle's comment so I can hear that.
17     Q.   Ma'am, it was an objection, and he
18 objected that I was leading you with my question.
19     A.   Oh.
20     Q.   Let me just re-ask and move forward
21 on this.  By the way, this is the first time
22 you've ever been deposed, right?
23     A.   Yes.
24     Q.   How did you know that you get to ask
25 the court reporter to read things back?



KAI COSHOW RAINS PHD
USA V SHARFI

April 29, 2022
237–240

Page 237

1    A.   Because I asked if I was allowed
2    about 30 minutes ago.
3    Q.   Okay.  So let me ask the question
4    again.  First of all, V.C.6.E, Maintenance of
5    Plants and Faunal Communities, you didn't write
6    this section, correct?
7    A.   That is correct.
8    Q.   And Dr. Lee wrote this section,
9    right?
10    A.   Correct.
11    Q.   Okay.  And I apologize for saying
12    it was Mr. Wylie.  That was my mistake.  So are
13    you going to be testifying about -- about the
14    topics in this section other than the extent to
15    which you talk about vegetation issues?
16    A.   I took many of the photos that would
17    support these statements and collected the
18    vegetation data, but Dr. Lee provided the
19    synthesis view of it, and then I think
20    we discussed previously about -- I can't --
21    Q.   Can you tell me how much the
22    defendant's activity on the site have affected
23    the downstream biological integrity of Bessey
24    Creek?
25    A.   I can tell you the ways in which the

Page 238

1    activities may have.  I cannot quantify how there
2    have been effects.  It's much like the other
3    answer I provided.  It's more a general concept,
4    not a quantification of anything.
5    Q.   Okay.  Fair enough.  So to be more
6    specific, you actually don't have any direct
7    evidence that the defendant's activities have
8    affected the biological integrity of Bessey
9    Creek?
10        MR. DOYLE:  Objection, calls for a
11    legal conclusion.
12        THE WITNESS:  I do not have any
13    direct inference that the activities
14    affected the biology downstream.  I didn't
15    conduct any before-and-after surveys.
16    BY MR. MCALILEY:
17    Q.   So you can't point me to any
18    specific piece of data or observation or evidence
19    about how the defendant's activities have
20    affected downstream biota, right?
21        MR. DOYLE:  Objection, vague.
22        THE WITNESS:  I can talk about
23    processes.  I can tell you about my
24    observations on this site, my conclusions
25    regarding what was there likely prior, how

Page 239

1    those would have contributed to the biota
2    downstream and how current conditions would
3    likely contribute differently downstream or
4    result in a different --
5        THE COURT REPORTER:  I'm sorry --
6    I'm sorry, Doctor, "would likely contribute
7    differently downstream or result in a
8    different" --
9        THE WITNESS:  Difference to the
10    biology downstream -- can you read the part
11    right before that.
12        (Thereupon, the record was read as
13    requested.)
14        THE WITNESS:  Oh, or result in a
15    difference to the biota downstream.
16    I didn't conduct any before or after
17    surveys downstream on the biota.
18    BY MR. MCALILEY:
19    Q.   You can talk -- you testified about
20    the processes, how you understand it would affect
21    the downstream waters, but you have no direct
22    evidence of any effects; is that right?
23    A.   If there had been any additional
24    analysis of that, that would go to the author of
25    this section; that is correct.

Page 240

1    Q.   All right.  Let's move on to the
2    next section.
3    A.   And that is true about all these TNW
4    things, that if the primary author has done
5    additional analysis that I'm not taking the time
6    to review right now, that those would be things
7    that I would expect them to testify on, that mine
8    would be more general processes if I was to
9    testify on any of this.
10    Q.   Okay.  Fair enough, Dr. Rains, but
11    you can't testify about an analysis that you
12    didn't do and you don't even know about, right?
13    A.   That is correct.
14    Q.   Okay.
15    A.   I can't testify on an analysis that
16    I don't know about.
17    Q.   Okay.  So in Section V.C.7 of the
18    report, it looks like this is at the bottom of
19    Page 43, Summary of WOTUS Determinations.  Am
20    I right that this was written by Mr. Wylie?
21    A.   Oh, yes.
22    Q.   Okay.  So am I right that you are
23    not going to be offering opinions at trial that
24    the wetland on the site are Waters of the United
25    States as that term is defined in the law?



KAI COSHOW RAINS PHD
USA V SHARFI

April 29, 2022
241–244

Page 241

1      MR. DOYLE:  Asked and answered.
2      THE WITNESS:  So my --
3      MR. MCALILEY:  Okay.
4      THE COURT REPORTER:  I'm sorry, I
5   didn't hear the answer.
6      THE WITNESS:  My answer to this
7   question is I will not be the one up there
8   saying these are waters -- that would be
9   presenting a synthesized body of knowledge
10   that these are Waters of United States.
11   That is the subject of this section, and
12   it was authored by Mr. Wylie.
13      MR. MCALILEY:  I think this might be
14   a good time for a break.  Do we want to
15   take a five-minute break now?
16      THE WITNESS:  Yes.
17      MR. MCALILEY:  Great.  Okay.
18      THE VIDEOGRAPHER:  Going off record
19   at 4:22 p.m.
20      (Thereupon, a break was taken.)
21      THE VIDEOGRAPHER:  We are now back
22   on record at 4:30 p.m.
23   BY MR. MCALILEY:
24   Q.    Okay.  Dr. Rains, I want to go back
25   to the report here, Deposition Exhibit 72, and

Page 242

1   I want to go to Section V.D.4, Vegetation
2   Conditions.  This is in the results section.  Can
3   you see that on the screen?
4   A.    Yes, I can.
5   Q.    Okay.  So this is a section that you
6   wrote, right?
7   A.    That is correct.
8   Q.    The main section of the report that
9   you -- that you wrote, isn't it?
10   A.    Yes.
11   Q.    Okay.  So let's go through this.
12   Let's go to 4.A.1, Physical Setting for
13   Vegetation.  The first sentence of this section
14   says, quote, All reference areas and the site are
15   located in the Eastern Florida Flatwood ecoregion
16   of the Southern Atlantic Costal Plain.  End
17   quote.
18      Did I read that right?
19   A.    Correct.
20   Q.    So am I correct that the statements
21   in this Section 4.A.1 all relate to locations
22   within the Eastern Florida Flatwoods ecoregion?
23   A.    All of the statements in there
24   characterize the area in which the site
25   it located, but the boundaries are not

Page 243

1   necessarily coincident with the Eastern Florida
2   Flatwoods ecoregion.
3   Q.    Okay.  I'm not understanding.  This
4   first section talks about the reference area and
5   the site are in the Eastern Florida Flatwoods
6   ecoregion, right?
7   A.    Uh-huh.
8   Q.    Is that a yes?
9   A.    Oh, yes, sorry.
10   Q.    The next sentence says,
11   "It experiences mild winters and extended growing
12   season."  That's referring also to the Eastern
13   Florida Flatwoods ecoregion, right?
14   A.    Yes.
15   Q.    The next sentence says, quote, "The
16   surficial geology is Pleistocene/Pliocene
17   deposits," et cetera, et cetera.  That sentence
18   also refers to the surficial geology of the
19   Eastern Florida Flatwoods ecoregion, right?
20   A.    And those -- that surficial geology
21   statement may extend beyond the borders of the
22   ecoregion or not include all of the ecoregion,
23   those are two different maps.  What they have in
24   common is that the site intersects both of those
25   maps.

Page 244

1   Q.    Okay.  It doesn't -- nowhere in
2   this -- in this sentence does it say that this is
3   a surficial -- this surficial geology does not
4   apply throughout the Eastern Florida Flatwoods
5   ecoregion, right?
6   A.    That wasn't the subject of the
7   section.  So the section is summary of vegetation
8   conditions in reference area wetlands via
9   inference on the site.
10   Q.    Okay.
11   A.    So the physical setting for the
12   vegetation within that site includes
13   intersections between, you know, climate,
14   geology, topography, and the names of each one of
15   those maps may not be exactly coincident --
16   exactly the same, however, the site intersects
17   with that area.
18      In other words, I don't know offhand
19   if the surficial geology that I described there
20   extends throughout all of the Eastern Florida
21   Flatwoods ecoregion, but I can tell you that that
22   is the surficial geology that has been found at
23   the site.
24   Q.    So if one was to read that sentence
25   and understand it to refer to the entire Eastern



KAI COSHOW RAINS PHD
USA V SHARFI

April 29, 2022
245–248

Page 245

1 Flatwoods ecoregion, that would be a
2 misunderstanding of what you wrote?
3     A.   We should stop at the citation which
4 is directly related to that, so those two
5 sentences that they're located in the Eastern
6 Florida Flatwoods ecoregion and it experiences
7 mild winters and an extended growing season are
8 supported by those references.  The next
9 reference is to Davis and Scott.  That tells me
10 something about the surficial geology mapped at
11 that site.
12     Q.   Okay.
13     A.   And then the next is Lichtler, and
14 that tells you something about the terrain, the
15 general characteristics of the terrain in this
16 region.
17     Q.   Okay.  So let's not go to the next
18 sentence yet.  Did you look at geological maps
19 for the site as part of preparing your opinions
20 in this case?
21     A.   I looked at the ones that I had
22 cited.
23     Q.   Okay.  And those maps indicate that
24 there are Pleistocene/Pliocene deposits beneath
25 the site in the reference areas; is that correct?

Page 246

1     A.   Correct.
2     Q.   Isn't it correct that there are
3 Pleistocene/Pliocene deposits underneath all of
4 Martin County?
5     A.   I would have to look back.  My focus
6 was truly on the site.
7     Q.   So you don't remember?
8          If you don't remember -- I'm just
9 asking.
10     A.   I don't.  I don't remember if the
11 entire -- I don't remember how the boundaries of
12 Martin County coincide with the surficial geology
13 map.
14     Q.   You're not a geologist, are you?
15     A.   I'm not a geologist.
16     Q.   Thank you.  Okay.  Let's go to the
17 fourth sentence.  Quote, The regional terrain is
18 flat, generally varying between 15 and 45 feet
19 elevation, and the water table is shallow,
20 Lichtler 1960, end quote.
21          Did I read that right?
22     A.   Yes.
23     Q.   So when it says the regional
24 terrain, that sentence is referring to the
25 Eastern Florida Flatwoods ecoregion, right?

Page 247

1     A.   I believe so.
2     Q.   Okay.  The next sentence --
3     A.   Certainly, the -- yeah, the terrain
4 is regional.
5     Q.   Okay.  It has the word "regional" in
6 it, so I'm assuming it's referring to the same
7 region, right?
8     A.   Yeah, that reference is really
9 focused on Martin County, and so I can't speak to
10 the entire Eastern Florida Flatwoods ecoregion as
11 we saw earlier.  It's pretty big.
12     Q.   Okay.  The next sentence, quote, The
13 combination of the flat landscape and shallow
14 water table routinely results in strong plant
15 community responses to changes in microtopography
16 depth to water tables or overall site water
17 balance," and the cite is to Araya, et al., and
18 Diamond, et al., 2021, end quote.
19          Did I read that right?
20     A.   Yes.
21     Q.   So those references are referring to
22 the entire Eastern Florida Flatwoods ecoregion or
23 to Martin County or to some other area?
24     A.   Those references are referring
25 specifically to that sentence, which is when you

Page 248

1 have a combination of a flat landscape, which
2 we've established in prior sentences this is, and
3 the shallow water table, also cited above, that
4 routinely you will see that results in strong
5 plant community responses to changes in
6 microtopography, those are concepts that are
7 covered in those references.
8     Q.   I see.  So those references are not
9 even about Florida per se, those are just general
10 references about the combination of a flat
11 landscape and a shallow water table and what that
12 results in terms of plant communities?
13     A.   I believe at least one of those was
14 a synthesis.  I would have to go back and look at
15 the -- the actual study domain, but the way
16 I intended the sentence -- or I wouldn't be
17 surprised if those citations are to plant
18 community studies that have been done possibly
19 even in microcosms, no.
20     Q.   Okay.  But those preferences, those
21 are standard references in the field that aren't
22 specific to Florida, right?
23     A.   Those are -- those are peer-reviewed
24 journal articles speaking to plant community
25 responses to changes in microtopography,



KAI COSHOW RAINS PHD
USA V SHARFI

April 29, 2022
249–252

Page 249

1  depth-to-water tables overall site balance --
2       THE COURT REPORTER:  Sorry, Doctor,
3  I didn't understand what you said.
4       THE WITNESS:  Those are
5  peer-reviewed journal articles which speak
6  to the responses of plant communities to
7  changes in the physical factors listed
8  there, microtopography, depth-to-water
9  tables, site balance, and I can't recall --
10  and I can't recall off the top of my head
11  if they took place in Florida, elsewhere,
12  or were a synthesis of many different
13  studies.
14  BY MR. MCALILEY:
15     Q.   Okay.  The next sentence --
16       THE VIDEOGRAPHER:  This is the
17  videographer speaking, I do apologize.
18  If we could keep the witness, your frame --
19  your face in the frame.
20       THE WITNESS:  I'm sorry.
21       THE VIDEOGRAPHER:  It's okay.
22  I know it's hard, we just have to keep
23  it framed up.  Thank you so much.
24       THE WITNESS:  I was actually trying
25  to get closer to the speaker on my

Page 250

1  computer.
2       MR. MCALILEY:  By the way, I think
3  the sound quality is better.  There's times
4  when it cut out and I said, what did you
5  say, but I do appreciate that.  I do think
6  the sound quality is better, so thank you.
7  BY MR. MCALILEY:
8     Q.   Okay.  Dr. Rains, the last sentence
9  of that section, quote, For example, within the
10  Flatwoods region, an increase in land elevation
11  or decline in water table elevations of three
12  feet commonly leads to abrupt changes in plant
13  species, composition, and structure, i.e., from
14  hydric to xeric community types, and the cite is
15  the USFWS MSRP 1999, end quote.
16       Do you see that last sentence?
17     A.   I do.
18     Q.   Is that the three-foot difference in
19  elevation that we were talking about earlier
20  today?
21     A.   That is.  That's the study that I
22  was referring to as an example of an extreme
23  transition in plant community type.
24     Q.   So anywhere in the Eastern Florida
25  Flatwoods region, if you have small differences

Page 251

1  in elevation, it could be the difference between
2  a wetland and an upland, right?
3     A.   Correct, yeah, so hydric to xeric,
4  correct.
5     Q.   Okay.  Let's go to the next section.
6  I think I've asked you questions about some of
7  these, so I'm just trying to go through here
8  to -- I want to go to the last sentence on the
9  bottom of Page 56.  "The current vegetation
10  reflects a prevalence of upland hydrology at the
11  site.  Both dominant species, Bahia grass and
12  three-flower tick trefoil, are intolerant of
13  saturated soils," end quote.
14       Did I read that right other than
15  skipping the Latin and the citation?
16     A.   Yes, you did.
17     Q.   Okay.  So basically, Bahia grass
18  doesn't grow in wetlands, is that basically what
19  that means?
20     A.   Its indicated status would indicate
21  it does not.
22     Q.   Right, but it's -- it's intolerant
23  of saturated soils, right?
24     A.   Correct.
25     Q.   What does "intolerant" mean,

Page 252

1  it can't handle it?
2     A.   Right, that it would have limited
3  capability of lasting for a long time in
4  saturated soils.
5     Q.   Let me go to Page 57, Subsection 3,
6  Summary of Prior Existing Vegetation on the Site.
7  Let me go to the first sentence on the top
8  paragraph of the section.  Quote, "The results of
9  the referenced area plots review indicate at
10  least four vegetation types existed on the site
11  prior to mechanical clearing and installation of
12  turfgrass:  Mixed wetland forest, mixed shrub,
13  upland mixed coniferous/hardwood and freshwater
14  marsh."
15       Did I read that right?
16     A.   Yes.
17     Q.   And I know we talked about this
18  earlier today, so I'm not going to cover
19  everything again that we've already discussed,
20  but am I right that you determined the vegetation
21  present on the site before the defendant's
22  activities based upon looking at vegetation in
23  the reference area, at least in part that's what
24  you did?
25     A.   In part.  In part.  I can see a



KAI COSHOW RAINS PHD
USA V SHARFI

April 29, 2022
253–256

Page 253

1  space between plots that I reviewed.
2      Q.    And in part you also determined this
3  based on looking at aerial photographs and
4  looking at documents from Danna Small and from
5  the water management district; is that right?
6      A.    And the water management district,
7  and prior photographs of the site, publicly
8  available imagery such as Google imagery, and the
9  results, yeah, of the reference area plots, that
10  would be correct.
11      Q.    So am I right that in part your
12  opinion about what vegetation was on the site
13  prior to the defendant's work is based on the
14  assumption that the same plants that are in the
15  reference area today were on the site back then?
16      A.    No, not completely.  I didn't just,
17  you know, take the plant list from the reference
18  sites and think that all those plants were
19  definitely there on the site itself.  I looked at
20  the results of our wetland area -- I'm sorry,
21  reference area plots together with their
22  previously mapped vegetation types as they occur
23  with FLUCCS, and that helped me -- that helped
24  inform me as to how South Florida Management
25  District, when they were putting together their

Page 254

1  vegetation maps, were interpreting the vegetation
2  that existed previously on the site.
3          And then I, in addition, looked at
4  the site photos and the documented -- the species
5  that had been documented as occurring nearby
6  others, but it would not be correct to say that
7  I just looked at the reference area plots and
8  thought that everything that's there would have
9  existed on the site.
10      Q.    The next sentence says, quote,
11  Although several invasive plant species were
12  likely present, e.g., Old World climbing fern and
13  punktree, native species were well represented
14  and diverse.  End quote.
15          Did I read that right other than the
16  Latin names of the species?
17      A.    Yes, you did.
18      Q.    So why do you say that several
19  invasive species were likely present?  Why the
20  word "likely"?
21      A.    Because these are just examples.  So
22  based on how quickly invasive species spread,
23  there may have also been Brazilian pepper, I
24  don't know, but that "e.g.," signifies that these
25  are examples, and I -- yeah.

Page 255

1      Q.    Okay.  So there are -- there are
2  invasive exotics on the Countess Joy property,
3  right?
4      A.    Correct.
5      Q.    And you've reviewed the materials
6  from Danna Small, right?
7      A.    Yes.
8      Q.    And do you recall seeing that she
9  talked about the Old World climbing fern that was
10  all over the trees on the property?
11      A.    Yes.
12      Q.    Okay.  So -- and you also recall the
13  references to Melaleuca?
14      A.    Yes, although that might have
15  been -- yes, I remember there were some.
16      Q.    So it wasn't likely that there's
17  invasive exotics, they were, in fact, present on
18  site before the site --
19      A.    Oh, I see what you mean.  Yes, there
20  were, yeah, it's the world "several."  So
21  although several invasive plant species were
22  likely present.  For example, I know about these
23  two, but there may have been others.
24      Q.    Okay.  Now I understand why they
25  were "likely."  The "likely" really modifies the

Page 256

1  word "several" as opposed to invasive?
2      A.    It does.
3      Q.    Okay.  So as far as you know, the
4  site had been logged just like the Countess Joy
5  property to the north at some time in the past;
6  would that be fair to say?
7      A.    Yes, uh-huh.
8      Q.    And this site, do you know whether
9  there's ever cattle grazing on the site?
10      A.    I don't know.
11      Q.    But there were also exotics on the
12  site, correct?
13      A.    Yes.
14      Q.    So you would agree with me that that
15  site was not a pristine area environmentally,
16  right?
17      A.    Correct, I mean if by "pristine" you
18  mean untouched by humans and cattle and -- yeah.
19      Q.    So let's go down to the next
20  paragraph.  It's the last thing that says, quote,
21  In fact the habitat value of this site is
22  considered worthy of designation as a Strategic
23  Habitat Conservation Area by the Florida Fish &
24  Wildlife Conservation Commission and the Florida
25  Natural Area Inventory, and it references a



KAI COSHOW RAINS PHD
USA V SHARFI

April 29, 2022
257—260

Page 257

1 figure, end quote, right?
2    A.    Correct.
3       Q.    Okay.  So what is a Strategic
4 Habitat Conservation Area?
5       A.    The definitions are provided in the
6 legend to that figure, and the designation as a
7 Strategic Habitat Conservation Area had to do
8 with areas on publicly -- or privately, sorry,
9 privately held lands that were being targeted for
10 inclusion in the -- or purchase for conservation,
11 and it had to do with the probability of
12 finding -- of use by -- well, this is silly, I'm
13 trying to remember it, but I've written it out
14 for you in the -- in the legend, but I believe
15 it's terrestrial mammals in the focus of that
16 designation.
17       Q.    Okay.  So I'm going to go now to
18 the -- let me see if I've got the one right.  So
19 I'm going to go -- I'm going to show you now
20 Deposition Exhibit 73, and this is the figures.
21 I'm showing you what's been previously identified
22 or what's been marked here as Figure V.D.3.1.
23 This is the figure that you referenced in the
24 report related to the Strategic Habitat
25 Conservation Area?

Page 258

1    A.    Correct.
2    Q.    Okay.  So let me make sure I'm
3 understanding what this is.  So first of all,
4 these Strategic Habitat Conservation Areas are
5 identified by the Florida Fish & Wildlife
6 Conservation Commission; is that correct?
7    A.    And the Florida Natural Areas
8 Inventory.  They take into consideration --
9 I forgot what they call it, vegetation
10 communities at risk, high value -- high value
11 vegetation communities.
12    Q.    Hold on.  Let's break this down.
13 I'm just asking you -- so these Strategic Habitat
14 Conservation Areas are designated both by the
15 Florida Fish & Wildlife Conservation Commission
16 and the Florida Natural Areas Inventory; do
17 I have that right?
18    A.    My recollection is it was a joint
19 effort to designate these.
20    Q.    Okay.
21    A.    Like it's a joint authored report.
22    Q.    The Florida Fish & Wildlife
23 Conservation Commission is a government agency,
24 right?
25    A.    Yes.

Page 259

1       Q.    Is the Florida Natural Areas
2 Inventory a government agency?
3       A.    My recollection is that they have a
4 blend of organizations.  Oh, historically they
5 did.  I know they charged for their services, but
6 I'm not -- I'm not sure.  I'm not sure exactly
7 how they're organized.
8       Q.    And am I right that you testified a
9 moment ago that this map of Strategic Habitat
10 Conservation Areas is created as a guide for the
11 agencies to potentially purchase property from
12 private property owners?
13       A.    Yes, if you scroll up, you'll --
14       Q.    Okay.  I'll ask the question again,
15 Dr. Rains.  So the Strategic Habitat Conservation
16 Area Map is created as a guide to the agencies
17 for private property that they may seek to buy;
18 am I understanding that right?
19       A.    I don't know enough about the way
20 Florida Natural Areas Inventory that -- the
21 contributing authors to that effort, to be able
22 to characterize this specifically as a government
23 endeavor.
24       Q.    Okay.
25       A.    Because FNAI is involved in either

Page 260

1 activities --
2       THE COURT REPORTER:  I'm sorry,
3    what's involved?
4       THE WITNESS:  FNAI, Florida Natural
5    Areas Inventory.
6 BY MR. MCALILEY:
7       Q.    So, Dr. Rains, what is the purpose
8 of creating this map of Strategic Habitat
9 Conservation Areas?
10       A.    To illustrate areas of habitat on
11 private lands that are essential to sustain a
12 minimum viable population for focus species, for
13 terrestrial vertebrates that are not adequately
14 protected on existing conservation lands.
15       Q.    And why does the Florida Fish and
16 Wildlife Conservation Commission create this map?
17       MR. DOYLE:  Objection, misstates the
18    testimony.
19       THE WITNESS:  They likely had many
20    reasons or it has been used in many ways.
21    I know one of the ways was to help
22    prioritize land to acquire using the
23    Florida Forever Dollars, but these maps do
24    more than simply illustrate -- or so the
25    maps represent an intersection of a bunch



KAI COSHOW RAINS PHD
USA V SHARFI

April 29, 2022
261–264

Page 261

1      of analyses that were done regarding
2      habitat type and mammal distribution that
3      highlighted areas that might be considered
4      high priority areas for purchase.
5   BY MR. MCALILEY:
6        Q.   Dr. Rains, were you involved in the
7   preparation of the Strategic Habitat Conservation
8   Areas maps?
9        A.   No, this is really going off my
10  memory of looking at map -- looking at their
11  products, so I apologize if I misrepresented
12  their efforts.
13       Q.   So your knowledge about this
14  Strategic Habitat Conservation Areas Map is just
15  based upon you using it as part of your work,
16  right?
17       A.   Yeah, I went into the metadata, so
18  it's reviewing their documentation and then
19  my report, but my eye towards compiling this into
20  a figure, my -- was not appropriately
21  characterized when you were saying this was areas
22  that they were prioritized -- never mind,
23  I scratch that, no.
24       Q.   Okay.  Dr. Rains, you've never
25  worked with the Florida Fish and Wildlife

Page 262

1   Conservation Commission; is that right?
2        A.   That's correct.
3        Q.   Have you ever worked at the Florida
4   Natural Areas Inventory?
5        A.   No.
6        Q.   Have you ever spoken to anybody at
7   either of those organizations --
8        A.   Oh, I'm sure.
9        Q.   -- about this map as it relates to
10  this area of Martin County, Florida?
11       A.   No, I have not.
12       Q.   Am I right that when you look at the
13  Strategic Habitat Conservation Areas Map,
14  it assigns different priorities to different
15  areas on the map?
16       A.   Yes.
17       Q.   It goes from Priority 1, which is
18  the highest priority, down to Priority No. 5, the
19  lowest priority, correct?
20       A.   Yes.
21       Q.   And do the colors that are used on
22  the map correspond to the priority for the
23  location?
24       A.   Yes.
25       Q.   What color is it on Figure V.D.3.1?

Page 263

1        A.   It's a yellow/beige.
2        Q.   Okay.  Am I right that that
3   yellow-beige represents a Priority 5?
4        A.   I believe you are.  I believe you
5   are, but I am not a hundred percent certain, but
6   it's a publicly available data, certainly, if you
7   want to look at it.
8        Q.   Okay.  But you said you believe you
9   are, and you left out the money word, so you
10  believe I'm correct that it's Level 5?
11       A.   Oh, yes, I'm sorry, I believe that
12  corresponds to color Priority Level 5.
13       Q.   Excellent.  Thank you.
14       A.   But there's a little piece of that
15  I'm like, oh, yeah.
16       Q.   I have that effect on people.  So --
17  so when I look at this map here in Figure
18  V.D.3.1, that map includes not only areas that
19  you believe to be wetlands, but it also includes
20  areas that you believe to be uplands, correct?
21       A.   Yes, it does.
22       Q.   So it's not just a map of wetland
23  areas, this is a map of just areas that whatever
24  people created it thought it would be important
25  for wildlife, right?

Page 264

1        A.   Yes.
2            MR. DOYLE:  Objection, misstates the
3   testimony.
4   BY MR. MCALILEY:
5        Q.   Am I right that there is -- there
6   is -- that the inclusion of a property on the
7   Strategic Habitat Conservation Areas Map imposes
8   no regulatory requirements on that property?
9        A.   To the best of my knowledge, that
10  is -- yeah, that is correct, this is --
11       Q.   To your knowledge is there anything
12  in the Clean Water Act or its regulations that
13  says that an area that is a Strategic Habitat
14  Conservation Area is regulated under the Clean
15  Water Act?
16       A.   No, no, it's very much habitat, not
17  regulatory.  It speaks to the habitat quality of
18  a site, not to the regulatory --
19       Q.   Okay.  While we're at it -- well,
20  just to try to stay organized as best I can, let
21  me -- let me go back to the report.  I put back
22  on the screen Deposition Exhibit 72, the report.
23  I'm at the bottom of Page 57, Subsection 4,
24  Results of the Review of Prior Existing
25  Vegetation as Depicted on Publicly Available Maps



KAI COSHOW RAINS PHD
USA V SHARFI

April 29, 2022
265–268

Page 265

1  and Aerial Imagery.  Do you see that there?
2      A.  I do.
3      Q.  So the first sentence says, quote,
4  The primary map product we used to characterize
5  the pre-impact vegetation structure and species
6  composition of the site was the SFWMD Land Use
7  Land Cover, LULC, 2014, 2016 Map, end quote.
8          Did I read that right?
9      A.  Yes.
10     Q.  So that is, in fact, true, that's
11  the primary map product you used to characterize
12  the pre-impact vegetation on the site?
13     A.  That was the primary map, yes.
14     Q.  So let's go to that -- let's go to
15  that figure.  Let's see.  This is the figure.  So
16  I'll share my screen again.  So I've just put up
17  Deposition Exhibit 73, and I'm showing
18  Figure IV.C.3C.1, Land Use and Cover
19  Classification System, LULC, in the Vicinity of
20  the Site.
21         Do you see that?
22     A.  I do.
23     Q.  So is this the -- is this the LULC
24  Map that was the primary map you used to
25  characterize pre-impact vegetation on the site?

Page 266

1      A.  Correct.
2      Q.  And this map was prepared by the
3  South Florida Water Management District; is that
4  right?
5      A.  Yes.
6      Q.  And their classifications shows not
7  only land cover but also land use, right?
8      A.  Yes.
9      Q.  So if I look at the -- and so
10  if I want to understand what the classifications
11  are for different land use or land covers, I look
12  at the color and the corresponding number in
13  them, and then I look in the legend and I match
14  them up; is that right?
15     A.  Yes, but I'd like to clarify this
16  was the primary map product for looking at the
17  vegetation, that NWI Map was also looked at.
18     Q.  Okay.  Did you talk about the NWI
19  Map in the report in that section?
20     A.  I don't know if I do exactly.
21     Q.  All right.
22     A.  That would be an example of one of
23  those items that's listed in the background, the
24  background section that I relied upon.
25     Q.  Let's stick with this map that

Page 267

1  I have up on the screen.  So -- and help me --
2  I'm going to zoom in some to make this a little
3  easier to read.  I recognize that there is
4  also -- there's a close-up I'm going to get to in
5  a minute, another figure in there.  If I look at
6  this, am I right that the designation 6172 on
7  this map stands for mixed wetlands/hardwoods?
8      A.  Yes.
9      Q.  All right.  Actually, I'm sorry,
10  it stands for mixed shrub.
11     A.  I was just going to say wait a
12  second.
13     Q.  You know what I did, I zoomed in too
14  much.  I couldn't see the whole thing.  Let me
15  keep the -- the legend will read better.
16         So 6172 stands for mixed shrub,
17  right?
18     A.  Yes.
19     Q.  If I look more at the Countess Joy
20  property and I look at 2110, am I right that that
21  is improved pasture?
22     A.  Yes.
23     Q.  Okay.  And that's -- that's one of
24  the biggest areas, polygons, on the Countess Joy
25  East property, right?

Page 268

1      A.  Yes.
2      Q.  And I also see there's 2120 there,
3  right; do you see that?
4      A.  Yes, yes.
5      Q.  And 2120 is unimproved pasture?
6      A.  Yes.
7      Q.  And then I see that there's 4110 in
8  a few spots here.  Am I right that 4110 stands
9  for pine flatwoods?
10     A.  Yes.
11     Q.  Then I see 6430 there's a little
12  oval -- a couple of oval shapes there.  Am
13  I right that that stands for wet prairie?
14     A.  Yes.
15     Q.  And would you agree with me there's
16  substantial overlap in the designation of
17  wetlands on this map with the NWI Map?
18     A.  That -- well, no.  In the Land Use
19  Land Cover Map, they incorporate in land use
20  whereas the NWI Map focuses in on wetlands.
21     Q.  Okay.  So if I look at this LULC Map
22  of the site and the area, which is this
23  Figure IV.C.3C.1, am I right that it does not
24  actually indicate a wetland on the site?
25     A.  On which site?



KAI COSHOW RAINS PHD
USA V SHARFI

April 29, 2022
269–272

Page 269

1    Q.   On the property, the site that's the
2  issue in this case?
3    A.   6172 is a wetland site.
4    Q.   Okay.  Am I right that if I look in
5  the Countess Joy East property, it identifies two
6  areas of wetlands, essentially, which are these
7  ovals that are marked 6430; is that right?
8    A.   That 6410 might also be on that
9  site.
10   Q.   Let's see.  So 6410 stands for what,
11  fresh water marshes, granular prairie, right?
12   A.   Correct.
13   Q.   Okay.  So there's three locations of
14  wetlands on the Countess Joy East property as
15  shown by this LULC Map, right?
16   A.   Right.
17   Q.   And this is a relatively small
18  portion of the Countess Joy East property, isn't
19  it, that's identified as wetlands according to
20  the LULC Map?
21   A.   According to the LULC Map, yes.
22   Q.   Okay.  Then let me go to another
23  map.  I'm going to zoom in a little bit just as a
24  point of comparison.  Showing you now Figure
25  II.B.3, this is a figure that includes the USGS

Page 270

1  Topographic Map, the National Hydrography Dataset
2  Streams, Canals, and Ditches, and the U.S. Fish
3  and Wildlife Service National Wetlands Inventory
4  wetlands.  Do you see that on the screen?
5    A.   Yes, and now that I have remembered
6  this map, I will clarify that since the National
7  Wetlands Inventory wetlands are represented on
8  this map.  I do call up this map in my section.
9    Q.   Great.  I didn't ask that question,
10  but thank you.
11   A.   You did previously.
12   Q.   You see this map, you see this
13  figure on the screen, right?
14   A.   Yes.
15   Q.   Okay.  And you see that the National
16  Wetlands Inventory identifies wetlands, correct?
17   A.   Yes.
18   Q.   And on the Countess Joy East
19  property, it identifies discrete area of wetlands
20  that largely overlap with the LULC Map in the
21  lower right-hand corner of Countess Joy East and
22  in these oval areas that are to the north of the
23  actual site?
24   A.   Yes.
25   Q.   Okay.  Am I right that this National

Page 271

1  Wetlands Inventory Map indicates that most of the
2  Countess Joy East property is not a wetland?
3    A.   Correct.
4    Q.   Okay.  So let me go -- there's
5  another figure here, going back to the LULC Map,
6  that's right toward the end, so let me get there.
7      So this is Figure -- still on the
8  screen, there's Figure V.D.3.2.  Do you see that
9  on the screen?
10   A.   Yes.
11   Q.   So am I right that this is a figure
12  that you created?
13   A.   Yes.
14   Q.   And this figure basically shows a
15  close-up of the -- of the LULC maps from before
16  the defendants engaged in activities to a point
17  after they engaged in activities; is that right?
18   A.   Yes.
19   Q.   Okay.  So help me read this, so
20  which is the before and which is the after as
21  I look at these four boxes?
22   A.   Second paragraph below Figure
23  V.D.3.2 states the top two images depict the site
24  during impact as it occurs, as it appears in
25  Google Earth imagery.  So those top two images

Page 272

1  are the during impacts.  The corresponding images
2  depict the site prior to the impact provided in
3  the lower two panels.
4    Q.   So this is basically a close-up of
5  the LULC for the site, right?
6    A.   Yes.
7    Q.   So let's go back to the report.  I'm
8  showing now Deposition Exhibit 72 on the screen.
9  Can you see that?
10   A.   Yes, I see it.
11   Q.   Okay.  So the bottom paragraph, the
12  first sentence says, quote, It is not unusual for
13  unmapped wetland inclusions to occur in large
14  upland polygons on SFWMD LULC Maps.  End quote.
15     Do you see where I read that?
16   A.   Yes.
17   Q.   So these LULC maps can miss wetlands
18  within areas labeled as uplands; is that your
19  testimony?
20   A.   Correct.
21   Q.   Am I right they can also miss
22  uplands in wetland areas as well?
23   A.   Yes.  It depends on the mapping,
24  yes, yes.
25   Q.   I see there's a statement at the



KAI COSHOW RAINS PHD
USA V SHARFI

April 29, 2022
273–276

Page 273

1  bottom, quote, "While the overall mapping
2  accuracy of the SFWMD LULC Map is 85 percent," do
3  you see that language at the bottom?
4      A.   Yes.
5      Q.   And it references Kostrua 2021.  Am
6  I right that's a conversation you had with this
7  person at the water management district?
8      A.   Yes, but it wasn't related to this
9  project, it was related to St. Lucie.  I couldn't
10  find the mapping accuracy in the metadata.
11      Q.   Okay.  So you -- it's your
12  understanding from the water management district
13  that when they ground trooped this map, they
14  think it as a 85 percent overall mapping
15  accuracy?
16      A.   Let me see.  The overall mapping
17  accuracy -- I'm going to say yes, but that's
18  within their stated protocol, so they themselves
19  acknowledge -- they allow for inclusions within
20  other types, and then in addition, they provide
21  an overall mapping accuracy given the permission,
22  the ability to have other inclusions within that
23  type?
24      Q.   Okay.  So, Dr. Rains, in this -- in
25  that same paragraph, that second sentence,

Page 274

1  it says, quote, "For example, we found that seven
2  of our reference sites designated at wetland
3  forest in the SFWMD LULC 2014, 2016 Map met the
4  technical criteria for wetland articulated in the
5  manual and regional supplement," and then
6  it lists those reference sites, correct?
7          Did I read that right?
8      A.   Yes.
9      Q.   So how many -- how many total
10  wetland reference sites did you sample at?
11      A.   Um --
12      Q.   And this would be in the reference
13  area, not on the site.
14      A.   Yeah, so that is provided in that
15  very -- one of the very first figures we -- 17.
16      Q.   Okay.  So 7 of the 17 sites that you
17  looked at as reference areas were wetlands, you
18  found to be wetlands when the LULC Map showed
19  them to be upland forest; am I understanding that
20  right?
21      A.   No.
22      Q.   Okay.  What am I getting wrong?
23      A.   7 of our reference sites that were
24  designated upland forest, so some of our
25  reference sites that the Land Use Land Cover map

Page 275

1  had already designated as wetlands.
2      Q.   I see.  How many -- how many wetland
3  reference sites did you -- did you sample in
4  areas designated as upland forest on the water
5  management district map?
6      A.   I would have to go back and review
7  that.
8      Q.   Can you look for me?  Can you go
9  ahead -- I'd like to know.
10      A.   Okay.  We looked at three sites that
11  were in that wetland according to FLUCCS.  Yeah,
12  so we looked at three sites that had been mapped
13  on wetlands in reference areas according to the
14  Land Use Land Cover Map which I originally called
15  FLUCCS, which is F-L-U-C-C-S.
16      Q.   Okay.  So, Dr. Rains, that means
17  that the other 14 sites were in areas that were
18  mapped as upland forest?
19      A.   Yes.
20      Q.   So 7 of the 14 sites that you
21  sampled in areas marked as upland forest you
22  determined to be wetland?
23      A.   Yes.
24      Q.   So you believe the map was wrong 50
25  percent of the time based upon at least your

Page 276

1  sample sites?
2      A.   No, a lot of our samples are -- I'm
3  not saying that I went to 7 different polygons or
4  17 different map polygons.  Sometimes we --
5  we looked at sites within a single mapping
6  polygon.
7      Q.   Okay.  But am I still right that you
8  sampled 14 sites in the reference area that had
9  been mapped by the water management district as
10  upland forest, and you determined that 7 of those
11  14 were, in fact, wetlands, right?
12      A.   I went -- we went to 17 sites, 14 of
13  which had previously been mapped within land
14  use -- within the Land Use Land Cover Map was
15  occurring in an upland type and found that all
16  but one of those were wetlands, but each -- oh,
17  go ahead.
18      Q.   My question was just this, so the 14
19  wetland reference sites you sampled in areas that
20  were --
21      A.   No, no, 17, there were 17 sites.
22      Q.   Yeah, let's break it down.  There's
23  a total of 17 wetland reference sites in the
24  reference area that you sampled, right?
25      A.   There were 17 reference sites in the



KAI COSHOW RAINS PHD
USA V SHARFI

April 29, 2022
277–280

Page 277

1  reference areas that we sampled, yes.
2      Q.    Okay.  Three of those were in areas
3  that were mapped by the water management district
4  as wetlands, correct?
5      A.    Yes.
6      Q.    14 of them were in areas that were
7  mapped by the water management district as
8  uplands, right?
9      A.    Yes.
10     Q.    And of those 14, half of them, 7
11 sites, you determined, in fact, were wetlands,
12 right?
13     A.    We determined 13 of them were
14 wetlands.
15     Q.    I'm sorry.  Okay.  I misunderstood.
16 So 13 of the 14 sites that you went to that had
17 been mapped by the water management district as
18 uplands, you determined that they were wetlands;
19 is that right?
20     A.    Yes.
21     Q.    So that map by the water management
22 district you think is way off when it comes to
23 identification of wetlands and uplands; is that
24 right?
25     A.    No, not necessarily, because many of

Page 278

1  those plots that we did were within a single
2  large polygon.  So I can comment as to the
3  accuracy of the polygons we went to, the mapping,
4  and not the entire map.  I can tell you that
5  there's a polygon up there that's mapped as
6  improved pasture that has a lot of wetland in it,
7  and that may reflect quite a bit on -- no,
8  I won't go there.
9          I'm just guessing what the South
10 Florida Water Management District -- no, my --
11 our findings do not state something regarding the
12 entire Land Use Land Cover mapping.  I can
13 comment on the ones we went to, yeah.
14     Q.    In the -- in the Countess Joy
15 property, Dr. Rains, that's where these
16 reference -- wetland reference sites were
17 located, right?
18     A.    Yes.
19     Q.    Okay.  So at least in Countess Joy
20 property, am I right that you think the water
21 management district maps are way off when
22 it comes to identification of wetlands?
23     A.    You would -- the way I would state
24 that is that they have undermapped the wetlands
25 throughout a significant portion of the property.

Page 279

1      Q.    Do you think -- do you think most of
2  the Countess Joy East property is a wetland?
3      A.    Yes, I do, based on the portion
4  I went to.  I mean, remember, there's a big
5  portion we never went to.
6      Q.    I understand.  And the National
7  Wetlands Inventory indicates that most of the
8  Countess Joy East property is an upland, right?
9      A.    Correct.
10     Q.    And the water management district
11 LULC Map indicates that most of the Countess Joy
12 East property is uplands as well, right?
13     A.    Correct.
14     Q.    Did you -- did you or the team
15 delineate the boundaries of wetlands in the
16 Countess Joy East property?
17     A.    No, we did not delineate the
18 boundaries as far as I'm aware, but that would be
19 something I would refer you to -- I would refer
20 you to Mr. Wylie on, but I don't believe seeing a
21 figure where they're actually delineated
22 individually, certainly not throughout the
23 property.
24     Q.    Okay.  Let me scroll down here to
25 your section here, because it's quite late.  I'm

Page 280

1  on the bottom of Page 63.  This is Section V.E,
2  summary of vegetation conditions.  This is a
3  section that you wrote, correct?
4      A.    Yes.
5      Q.    Okay.  And in the section you talk
6  about how the defendants cut down a lot of trees
7  on the property, on the site, right?
8      A.    You're on 64?
9          MR. DOYLE:  I'm on 63.
10         THE WITNESS:  Okay.
11         MR. DOYLE:  It starts on the bottom
12 of 63 and continues on to 64.
13         THE WITNESS:  Okay.  I got it.  So
14 summary of vegetation conditions in
15 reference area wetlands and by inference on
16 the site after -- yes, I do.
17 BY MR. MCALILEY:
18     Q.    Okay.  If I go to the top of Page
19 64, the top paragraph.  The first sentence says,
20 quote, With the exception of a few specimen
21 trees, the vegetation previously existing on this
22 site has been removed and replaced by nonnative
23 turf grass, two ponds, a depressional wetland, an
24 open grove, and small hardwood trees, end quote.
25         Did I read that right?



Page 281

1    A.   Yes.
2    Q.   Do you think it was bad that the
3  defendants cut down trees on the site?
4         MR. DOYLE:  Objection, vague.
5         THE WITNESS:  I'm here as a -- I'm
6  not here to offer my personal opinion, am
7  I?
8  BY MR. MCALILEY:
9    Q.   I'm just asking what your opinion
10  is.  I mean, I read your report, and what comes
11  across is this was bad that the trees were cut,
12  and I'm asking that, whether that's your opinion?
13        MR. DOYLE:  Same objection.
14        THE WITNESS:  Bad for what?  It was
15  probably good for the goats.
16  BY MR. MCALILEY:
17   Q.   Okay.  Was it bad for the
18  environment that the defendants cut down trees on
19  their property?
20        MR. DOYLE:  Objection, vague.
21        THE WITNESS:  Yeah, you need to
22  define what you mean by "environment."
23  BY MR. MCALILEY:
24   Q.   Is it ecologically negative that the
25  defendants cut down trees on their property?

Page 282

1    A.   The mere cutting of trees can
2  increase diversity, but like -- all right.  But
3  if we're talking about this particular site, and
4  not either burning down or removed from a site
5  elsewhere, then you would need to look at the
6  scale at which it happened and magnitude of
7  change.
8         So they absolutely impacted and
9  changed the natural community that was there in
10  the first place by removing the would-be
11  vegetation from the site.
12   Q.   Okay.  And is that an ecologically
13  negative thing?
14   A.   Naturally speaking, you have
15  variants that are -- in nature you will have
16  areas with and without trees, and trees die
17  naturally sometimes, so having a tree there and
18  not having a tree there -- bad for the
19  environment?  Which aspect of the environment?
20  Maybe that will help me.
21   Q.   I'm just asking in general.  So
22  you're an expert, you have a PhD in plant
23  ecology.  This is about trees that have been
24  removed.  I'm just asking whether you think it's
25  a bad thing or not?  It sounds like it's not a

Page 283

1  simple question -- not a simple answer.  That's
2  what I'm taking away from this, right?
3    A.   I'm just trying to figure out where
4  you're taking it or what -- what --
5    Q.   Just if you have a regular guy in
6  the street who comes to say, "Hey, is that a bad
7  thing?"  That's what I'm asking.  It's like --
8  that's all I'm asking.
9         MR. DOYLE:  Objection, vague.
10        THE WITNESS:  The magnitude of
11        impact to a site that generally comes from
12        mechanical clearing of trees is generally
13        hard for an ecosystem to recover fully
14        from, particularly to regain the level of
15        diversity that was what was there before.
16        So it's a -- the environmental
17        impact that you have is not just the
18        cutting of the trees but what happens
19        during the cutting of the trees and what
20        happens to the site after the trees are
21        cut.  Cutting a tree -- cutting trees
22        usually implies a change in land management
23        which can be very detrimental to the
24        environment whereas -- yeah.
25  BY MR. MCALILEY:

Page 284

1    Q.   Dr. Rains, in your report you talk a
2  lot about how the defendants put in nonnative
3  turf grass; isn't that right?
4    A.   I did.
5    Q.   Okay.  So was it a negative thing
6  that the defendants put in grass on the property?
7         MR. DOYLE:  Objection, vague.
8         THE WITNESS:  Yes, that would
9         decrease the amount of diversity that the
10        site could support because the turf grass
11        would wind up being or has wound up being
12        through both turf grass going in and the
13        ways it's maintained and whatnot, you wound
14        up with much -- much more of a monoculture
15        or turf grass plus some common lawn weeds.
16  BY MR. MCALILEY:
17   Q.   Okay.  So in your opinion, does the
18  defense need a federal permit to cut down trees
19  on their property?
20        MR. DOYLE:  Objection, vague.
21        THE WITNESS:  I'm not commenting on
22        the regulations having to do with this
23        case, and I'm not going to speculate on
24        whether they need permits to cut down
25        trees.



KAI COSHOW RAINS PHD
USA V SHARFI

April 29, 2022
285–288

Page 285

1  BY MR. MCALILEY:
2      Q.   Okay.  So you're not going to be --
3  you're not going to be testifying about how
4  regulations under the Clean Water Act apply to
5  this case, right?
6          MR. DOYLE:  Objection,
7      argumentative, misstates the prior answer.
8          THE WITNESS:  I'm not going to
9      comment on whether permits are required for
10     the activities on this case.
11 BY MR. MCALILEY:
12     Q.   You're not going to comment because
13 you don't have an opinion on that or you just
14 don't know?
15     A.   That's not -- I'm going to defer in
16 this case to the people who authored these
17 sections of the report that are directly related
18 to -- the photos...
19     Q.   Okay.  So you're going to defer to
20 Mr. Wylie on the application of the regulations
21 under the Clean Water Act in this case?
22         MR. DOYLE:  Objection, vague.
23 BY MR. MCALILEY:
24     Q.   Yes, no?
25     A.   Whether a permit is ultimately

Page 286

1  required or should have been required, that
2  synthesis is -- you know, I would defer to
3  Mr. Wylie.
4      Q.   Okay.  Do you think that defendants
5  need a permit to plant grass on the property?
6          MR. DOYLE:  Objection, vague.
7          THE WITNESS:  I'm not going to
8      comment on what people need permits for.
9      I'm not a regulatory specialist when it
10     comes to filing for permits.
11 BY MR. MCALILEY:
12     Q.   Okay.  So there's no portion of the
13 report that you wrote that actually discusses the
14 Clean Water Act regulations; isn't that correct?
15         MR. DOYLE:  Objection, vague.
16         THE WITNESS:  Yeah, that is really
17     vague.
18 BY MR. MCALILEY:
19     Q.   I don't think it's vague at all.
20 Let me try to be as precise as I can.  You
21 understand that there are regulations that govern
22 the scope of the Clean Water Act, right?
23     A.   Yes.
24     Q.   You don't cite any of those
25 regulations in the sections of the report that

Page 287

1  you wrote, correct?
2      A.   Correct.
3      Q.   Mr. Wylie cites those regulations in
4  the sections of the report that he wrote, right?
5      A.   Yes.
6      Q.   All right, so that's why he -- let
7  me phrase this differently.  So you are not going
8  to be offering opinions about the application of
9  those regulations under the Clean Water Act to
10 the site, right?
11     A.   The applications to the regulations,
12 correct.  The information that goes in to
13 determining whether -- that went into Mr. Wylie's
14 "synthesis" and decision regarding the context of
15 those sections, I may testify on.
16     Q.   So you're going to testify, again,
17 on the issues about vegetation that you found on
18 the site in the sections that you wrote which may
19 be relevant to those regulations, but you're not
20 going to give the ultimate opinion as to how the
21 regulations apply to the site, correct?
22         MR. DOYLE:  Objection, vague.
23         THE WITNESS:  Correct.
24 BY MR. MCALILEY:
25     Q.   Let me ask you, Dr. Rains,

Page 288

1  immediately east of the site, there's another
2  property that looks similar, that has grass, a
3  few trees, and some buildings; isn't that right?
4      A.   Yes.
5      Q.   Would you agree with me that -- did
6  you ever go on to that property immediately to
7  the east of the site?
8      A.   No, I did not.
9      Q.   Would you agree with me that
10 it looks pretty similar at a landscape scale to
11 the site today, the defendant's site today?
12         MR. DOYLE:  Objection, vague.
13         THE WITNESS:  There are buildings on
14     both sites, there are open bodies of water
15     on both sites.  There is more landscape
16     diversity on the other property where it's
17     still dense portions of forest, scattered
18     forests, maybe some shrubbery on the
19     western edge.
20 BY MR. MCALILEY:
21     Q.   It's mostly grass, though, isn't it?
22     A.   The grass is not an extent -- no,
23 there are some portions, some extensive lawns,
24 but there's also large tree canopies and woodland
25 areas as well as dense forest.  So I would say,



KAI COSHOW RAINS PHD
USA V SHARFI

April 29, 2022
289–292

Page 289

1  yes, there is grass on that property, there is
2  buildings, and there is some open water.
3      Q.   Okay.
4      A.   And it has that in common with the
5  site.
6      Q.   Dr. Rains, this is a good segue into
7  a broader subject.  Am I right that Dr. Lee is
8  the -- the portions of the report that he wrote
9  addressed the functional value of the wetland
10  that existed on the site prior to the defendant's
11  activities?
12          I'm asking you this just in gross to
13  avoid going through the remainder of the report.
14  So just in general, Dr. Lee is the person who
15  wrote the sections about assessing the functional
16  value of the wetlands on the site prior to the
17  defendant's activities, right?
18      A.   He wrote those.  Yeah, he --
19  I believe he -- yes, he largely wrote those
20  sections, everything --
21      Q.   Are you going to be testifying at
22  all about the functional value of wetlands on the
23  site prior to the defendant's activities other
24  than talking about issues specifically regarding
25  vegetation that we already discussed today?

Page 290

1      A.   And landscape level ecology and then
2  the interpretation of the mapping if it comes up,
3  but ultimately Dr. Lee is the person who
4  integrated all that and would be the primary
5  witness.
6      Q.   Are you going to testify about any
7  UMAM scores for the property?
8      A.   No, why -- not -- yeah, there were
9  vegetation observations and --
10          THE COURT REPORTER:  I'm sorry,
11      Doctor, I'm having trouble understanding
12      you again.  There were vegetation
13      observations --
14          THE WITNESS:  And animal
15      observations, and there may have been other
16      observations that went into his scoring,
17      but he's the one who did the scoring,
18      he would be the one to testify about the
19      scores that were assigned.
20  BY MR. MCALILEY:
21      Q.   And are you going to be offering any
22  testimony with regard to the amount of
23  compensatory wetland mitigation that is required?
24      A.   My testimony, if it was given, would
25  be in the form of the vegetation that was -- that

Page 291

1  the change in vegetation that we have observed --
2  "observed" is the wrong word -- that
3  we have evidenced has happened and the --
4  potentially the ability or inability of the site
5  to support similar vegetation.
6      Q.   And my question was simply --
7      A.   And that is covered in my section
8  when we talk about plant requirements to the
9  effects of abiotic factors on sustaining --
10          THE COURT REPORTER:  Abiotic factors
11      to --
12          THE WITNESS:  Sustaining or
13      maintaining plant communities.
14  BY MR. MCALILEY:
15      Q.   Dr. Rains, there's a section of the
16  report that talks about recommendations for
17  compensatory mitigation, isn't there?
18      A.   Are you referring to Section H?
19      Q.   Yes, yes, just in general.  There's
20  a section that deals with compensatory
21  mitigation, right?
22      A.   Correct.
23      Q.   Dr. Lee wrote that section, right?
24      A.   Yes.
25      Q.   You're not going to be offering

Page 292

1  opinions as to the amount of compensatory
2  mitigation that's required; am I correct?
3      A.   As long as the topic does not delve
4  into changes that have occurred with respect to
5  the vegetation on the site where my expertise
6  might be required, then I will not.
7      Q.   Are you going to provide any
8  testimony about an estimated -- estimated amount
9  of fill that occurred on the site?
10      A.   No.
11      Q.   Is that a no?
12      A.   No.  That's correct, that's a no.
13      Q.   Are you going to talk about the
14  indirect effects of the defendant's activities
15  other than what we've already talked about with
16  regard to carbon export and processes?
17          MR. DOYLE:  Objection, vague.
18          THE WITNESS:  I suspect we have
19      already mentioned any related subjects that
20      could possibly come up as part of that.
21  BY MR. MCALILEY:
22      Q.   Okay.  So just to be clear, what
23  would be your opinions about the indirect effects
24  of the defendant's activities off the site that
25  you would potentially be offering at trial?



KAI COSHOW RAINS PHD
USA V SHARFI

April 29, 2022
293–296

Page 293

1    MR. DOYLE:  Objection, vague.
2  Objection.
3    THE WITNESS:  If my observations,
4  notes, or analyses are part of the
5  testimony that is provided -- if I'm
6  requested, then I have information that
7  would be related to that -- wait, that
8  makes no sense at all, but I'm answering in
9  the same vein that I have previously.
10  BY MR. MCALILEY:
11    Q.   I don't understand that either.
12    A.   I need a break.
13    MR. MCALILEY:  Okay.  Let's take a
14  break.  Let's take a break.
15    THE WITNESS:  Okay.
16    MR. MCALILEY:  Let's keep it to five
17  minutes.  I'm trying to figure out things
18  on my end, too, because I am trying to wrap
19  it up.
20    THE WITNESS:  Sounds good.
21    THE VIDEOGRAPHER:  Going off the
22  record at 5:54 p.m.
23    (Thereupon, a break was taken.)
24    THE VIDEOGRAPHER:  We are now back
25  on record at 6:00 p.m.

Page 294

1  BY MR. MCALILEY:
2    Q.   Dr. Rains, am I correct that I've
3  asked you questions about every section of the
4  report that you, yourself, were the principal
5  author?
6    A.   That is correct.
7    Q.   And all the other sections I haven't
8  asked you about have been written by other
9  people, right?
10    A.   Yes.
11    Q.   Okay.  I just want to go through a
12  few last things.  I want to go look at some of
13  the photographs here.  I want to go to -- I want
14  to show you what's been previously marked as
15  Deposition Exhibit 75.  There's a series of
16  photographs in here which may correspond to
17  portions of your testimony.
18    So can you see on the screen here
19  Photograph III.E.1?
20    A.   Yes.
21    Q.   Is this a photograph that you're
22  going to use in your testimony?
23    A.   Yes, it could be.
24    Q.   Taken by Danna Small?
25    A.   Yes.

Page 295

1    Q.   And what does this show?
2    A.   This shows that there was -- you can
3  see in the foreground that there was obligate
4  wetland species, royal fern.  You can see
5  diversity of habitat in the background.  You can
6  see some tree structure, but I know
7  disturbance -- the land hasn't been totally
8  cleared, but I note disturbance has started in
9  this area, I believe, yeah.
10    Q.   Is this -- do you know exactly where
11  on the site this photo was taken?
12    A.   I think it was provided as part of
13  one of her wetland determination forms, so
14  I did -- or -- so -- I -- if that is true, then
15  I did when I wrote this section, but in this
16  moment I do not.
17    Q.   So Ms. Small went out and did a
18  wetland delineation in 2018 at the site, right?
19    A.   Yes.
20    Q.   And she -- and she filled out a
21  wetland assessment form that was submitted to the
22  agencies, right?
23    A.   Yes.
24    Q.   So this is a photograph that went
25  with one of those forms about her -- her wetland

Page 296

1  delineation, right?
2    A.   I honestly can't remember in this
3  moment if this was one of her incidental photos
4  or if this one actually accompanied the form.
5    Q.   Okay.  You're aware that Ms. Small
6  thinks there is approximately half the amount of
7  wetlands that the DOJ team believes existed,
8  right?
9    MR. DOYLE:  Objection,
10  mischaracterizes.
11    THE WITNESS:  Oh, that's true.
12  Not -- I know she thinks there was less,
13  but I don't know how much.
14  BY MR. MCALILEY:
15    Q.   Okay.  As far as you know, this
16  photo was taken in an area that she identified as
17  being a wetland, right?
18    A.   If it went to one of her wetland
19  delineation forms, then yes.
20    Q.   You said if it did.  You actually
21  don't know --
22    A.   Well --
23    Q.   -- whether it was identified as a
24  wetland, right?
25    A.   I just can't remember.  I can pull



KAI COSHOW RAINS PHD
USA V SHARFI

April 29, 2022
297–300

Page 297

1  it up real fast if you want me to, but --
2      Q.   You've never spoken to her, right?
3      A.   No, but -- yeah, no, I read her
4  documents.
5      Q.   Okay.
6      A.   That DLS00078.
7      Q.   Okay.  This is -- I'm now showing
8  you Deposition Exhibit 75, Photograph II.E.2.  Do
9  you see this?
10     A.   I do.
11     Q.   Is this a photograph that you took?
12     A.   I did.
13     Q.   This shows the site after the work
14  was done?
15     A.   Correct.
16     Q.   And so you're showing here that this
17  is the central area of the site that is dominated
18  by managed turf, correct?
19     A.   Yes.
20     Q.   Okay.  And what is this, what is
21  this intended to show, Dr. Rains?
22     A.   That this is now a -- largely a
23  monoculture of land, we're missing the -- or of
24  lawn.  We're missing a shrub component, ground
25  vegetation other than this managed area, the

Page 298

1  coverage is much more sparse.  So a combination
2  of what the managed area looks like and the
3  vegetation structure currently there.
4      Q.   Okay.  Let me keep moving.  Let's go
5  to Photograph III.E.3.  Is this one of the
6  photographs that you're going to be using?
7      A.   Yes.
8      Q.   Did you take this photograph?
9      A.   Yes.
10     Q.   And what does this show?
11     A.   It shows one of the remnant pines --
12  slash pine.  This one is located on the northwest
13  section of the property with damage to the crown.
14     Q.   Okay.  And what caused the damage to
15  the crown?
16     A.   I -- I cannot say exactly.
17     Q.   Does that look like vines from
18  Lygodium, L-Y-G-O-D-I-U-M, in the photograph?
19     A.   It looks to me more like Tillandsia,
20  Spanish moss.
21     Q.   Okay.
22     Q.   You're talking about right where
23  your cursor is?
24     Q.   Yeah.
25     A.   Okay.

Page 299

1      Q.   You see there's something hanging
2  off the branches of the pine tree, right?
3      A.   Yeah, I think that's Spanish moss,
4  but --
5      Q.   Is Spanish moss common on trees in
6  the Martin County area?
7      A.   Yes.
8      Q.   Let's go to Photograph 3.E.4.  Is
9  this a photograph you intend to use at trial?
10     A.   Yes.
11     Q.   And what does this show?
12     A.   It's showing damage to the trees in
13  the southeast portion in the form of cambium
14  damage.
15     Q.   So in other words, the bark has been
16  damaged?
17     A.   And the layer below the -- the layer
18  below the bark.
19     Q.   Am I right that the southeast
20  portion of the site is -- even you-all don't
21  think it's a wetland, you think it's an upland?
22     A.   It grades into an area that we have
23  designated as a wetland.  I'd have to look at the
24  two maps to remember exactly how this corresponds
25  to the wetland mapping.

Page 300

1      Q.   Okay.  Well, are these trees dead?
2      A.   No, they are not, they were not
3  dead, I don't think.
4      Q.   Okay.  Does bark grow back sometimes
5  when there's been damage to bark on a tree?
6      A.   The problem is there's damage to the
7  cambium, so the leaves are photosynthesizing and
8  exporting carbon down to the roots, but they
9  can't do so once the inner portion of the bark
10  known as the cambium has been damaged.  So that's
11  how people get rid of plants such as Brazilian
12  pepper by girdling them.  You take out that area,
13  and eventually they don't die -- they don't
14  survive.  That's the word I'm looking for.
15     Q.   Dr. Rains, as you look at this
16  photograph, do you think the defendants are
17  trying to girdle these trees and kill them?
18     A.   Intentionally, no.
19     Q.   The next photograph here, this is
20  Photograph III.E.5, Algal Growth and Surface
21  Water.  Is this one of your photographs?
22     A.   Yes.
23     Q.   What does this show?
24     A.   It shows that the depressions
25  bordering the existing depression, and so the



KAI COSHOW RAINS PHD                                   April 29, 2022
USA V SHARFI                                              301–304

Page 301

1 microdepressions there have an amount of
2 nutrients in them that is resulting in algal
3 growth.
4        Q.   Okay.  And that nutrients, you
5 think, comes from the defendant's activities on
6 the site?
7        A.   I do.
8        Q.   And what's the basis of that
9 opinion?
10       A.   Once they -- once the land has been
11 flattened, so the microtopography is gone and the
12 areas upgradient of where this photo was taken,
13 any water that falls upgradient with the
14 potential to come into this area is going to do
15 so a lot quicker than it would have if the trees,
16 tree roots, course woody debris --
17       THE COURT REPORTER:  I'm sorry, what
18 kind of debris?  I'm sorry, what kind of
19 debris did you say, Doctor?
20       THE WITNESS:  Course woody debris.
21       And so any activities -- activities
22 that are occurring upslope that are
23 resulting in an input of nutrients even
24 upslope then have a higher potential of
25 reaching this wetland.  Then in addition,

Page 302

1 of course, there's animal husbandry that's
2 happening around the area, and we have more
3 quickly degrading vegetation.  We don't
4 have as complex of litter on the site.
5       So a combination of the animals, the
6 simplification to the microtopography, the
7 new vegetation that's there isn't going to
8 inhibit water coursing across the site as
9 much, and I don't know if they fertilize,
10 but that's a very luxurious lawn, so they
11 may if they view that's there, but those --
12 yeah, something is happening that's
13 resulting in algal growth.
14 BY MR. MCALILEY:
15       Q.   So if the defendants fertilize the
16 lawn, that could be the source of nutrients
17 that's making the algae grow, right?
18       A.   Yes, that could be, yes.
19       Q.   All right.  Let's keep going,
20 Photograph III.E.6, Discolored Surface Water and
21 Algal Mat.  Is this a photograph that you took?
22       A.   Yes.
23       Q.   And am I right the purpose of this
24 photograph is to show another area of algal
25 growth that you think could be caused by the

Page 303

1 defendant's activities on the site?
2       A.   Yes, and potentially import of fine
3 particulate matter but largely the algal growth.
4       Q.   So this is actually -- just to be
5 clear, this photograph, III.E.6, is taken on the
6 site itself, correct?
7       A.   Yes.
8       Q.   And the previous photograph,
9 III.E.5, is also taken on the site itself,
10 correct?
11       A.   Yes.
12       Q.   So these examples of algae growth
13 and surface water that you saw are all located on
14 the site itself, correct?
15       A.   Yes.
16       Q.   Okay.  Keep going here.
17 Photograph III.E.7, Dead Vegetation Around Base
18 of Plants.  Is this a photograph that you took?
19       A.   Yes, so let me clarify that earlier
20 I said fine particulate matter.  What I meant was
21 fine sediment.
22       Q.   Okay.
23       A.   Yes, I took that photo.
24       Q.   Okay.  And this is a photograph of
25 the site itself, correct?

Page 304

1       A.   Yes.
2       Q.   And what is -- and what's the
3 purpose of this photograph?
4       A.   That there is dead vegetation in
5 circles around the trees and the -- everywhere
6 where you're not seeing lawn, you're seeing the
7 dead vegetation in circles around the base which
8 would be consistent with the application of
9 herbicides.
10      Q.   Okay.  This may be -- this may be
11 evidence, possibly, that the defendants used
12 herbicides to kill the weeds at the base of these
13 plants, right?
14      A.   Yes, and another example of what is
15 meant by managed turf.
16      Q.   Okay.  Photograph III.E.8 is the
17 next one.  Dense Foliage on Local Patch of
18 Pickleweed Near Site of Herbicide Application.
19 Is this a photograph that you took?
20      A.   Yes.
21      Q.   And does this show -- this is a
22 location on the site itself?
23      A.   Yes.
24      Q.   And is this another example of where
25 you think there is a sign of use of herbicides?



KAI COSHOW RAINS PHD
USA V SHARFI

April 29, 2022
305–308

Page 305

1    A.   Yes, it was very close to the
2  previous photograph.
3    Q.   Does --
4    A.   It was --
5    Q.   If -- just assuming for purposes of
6  argument that this site was -- this is a wetland,
7  that is part of the Waters of United States, does
8  a person need a federal permit to spray herbicide
9  like this?
10    MR. DOYLE:  Objection, vague.
11    THE WITNESS:  Yeah, I'm not going to
12    comment about the need for permits with
13    respect to this.
14  BY MR. MCALILEY:
15    Q.   Okay.  Well, the implication,
16  Dr. Rains, of these photographs is that this is
17  something bad the defendants did, and this case
18  it's about the defendants allegedly doing
19  activities without permits, so is this photograph
20  evidence of something bad in your mind?
21    MR. DOYLE:  Objection, vague and the
22    premise is argumentative and counsel is
23    testifying.
24  BY MR. MCALILEY:
25    Q.   You can answer.

Page 306

1    A.   This is an example of -- actually,
2  this illustrates some of the questions you were
3  asking me earlier like what did I mean by
4  "managed turf" or by "land management practices
5  in the area," and what this is demonstrating is
6  some examples of that.
7    Q.   Okay.  Let's go to the next photo.
8  Photograph III.E.9, West Shoreline of
9  Cypress-Lined Pond.  Is this one of your photos?
10    A.   Yes.
11    Q.   Is this on the site itself?
12    A.   Yes.
13    Q.   And what does -- what does this
14  photo show?
15    A.   This photo shows the distribution of
16  the planted Cypress in this location.
17    Q.   Anything else?
18    A.   The exist -- the evidence of
19  disturbance next to one of the water bodies.
20    Q.   Is there -- is there any other
21  purpose for this photograph?
22    A.   I'd have to go back to my text, I
23  don't remember exactly how I booked it.  All
24  these are booked in the text, so --
25    Q.   I'm just asking to go through it to

Page 307

1  make sure I understand it.  So next photograph,
2  III.E.10, North Shoreline of Cypress-Lined Pond.
3  This is one of your photos, too, right?
4    A.   Yes.
5    Q.   What is the purpose of this
6  photograph?
7    A.   This is showing -- this, again, is
8  showing the distribution of the planted Cypress.
9  It's another view of the shoreline.  In this case
10  you can tell that the turf grass extends all the
11  way into the water body itself.
12    Q.   Okay.  Next photo, III.E.11,
13  Manicured Turf Abruptly Meets the Water's Edge.
14  This is one of your photos, too?
15    A.   Yes.
16    Q.   And this is also on the site?
17    A.   Yes.
18    Q.   And is the purpose the same as what
19  you just described, this shows that the turf goes
20  straight to the edge of the water?
21    A.   This one, in addition, demonstrates
22  that there's -- in this location, there's no
23  potential as it is right now for a marsh-like
24  community to develop here.
25    Q.   Okay.  So it looks like we've gotten

Page 308

1  to the end for now of your photos, because the
2  rest of these photos seem to relate to other
3  witnesses or at least they correspond to other
4  sections of the report.  What I'm going to do,
5  though, is toward the end there's a last few that
6  correspond to your section of the report.  I just
7  want to cover those.
8    So I think we're now in -- let's
9  see.  I'm trying to figure out witch are your
10  photos here.  These four.  Okay.  So this one,
11  I'm now showing Photograph V.D.4.1.  It's a royal
12  fern.  Is this one of your photos?
13    A.   Yes.
14    Q.   What's the point of this photo?
15    A.   This photo is photo documentation
16  that accompanies my list of species known to
17  occur prior to the disturbance, and it also
18  happens to be an obligate species, but I think
19  the precise location of that one, I couldn't
20  determine that one.
21    Q.   Okay.  Thank you.  Let's go to the
22  next photograph, Photograph V.D.4.2.  Is this
23  another photograph taken by somebody in May of
24  2018 on the site?
25    A.   It looks like it, yes.



KAI COSHOW RAINS PHD
USA V SHARFI

April 29, 2022
309–312

Page 309

1     Q.   And the point of this is what?
2     A.   That we had epiphytic bromeliads,
3  which would be not expected to occur where
4  there's a lot of sun exposure and exposure to the
5  wind, so it's -- so this is probably a remnant.
6  So it's demonstrating it's a remnant, some of the
7  remnant trees, and that prior to complete the
8  disturbance, you can see some of the ground
9  texture as well. The micro topography isn't
10  there, but you can tell that there's a diversity
11  of substrates, rooting substrates that --
12     Q.   So is it your testimony, Dr. Rains,
13  that bromeliads of the air plants in this pine
14  here don't grow on trees that are standing out
15  away from other trees?
16     A.   I don't know what species they were,
17  but it lended support to the idea that this one
18  was a remnant, and it probably wasn't needed,
19  because it's such a large tree. Clearly, it's a
20  remnant and not planted.
21     Q.   Okay. I'll keep going here.
22  Photograph V.D.4.3, is this a photograph that you
23  took?
24     A.   And I misrepresented that one. That
25  one was also to provide photographic evidence

Page 310

1  that there were pines on the site.
2     Q.   Okay. All right. Let's go to
3  Photograph V.D.4.3. This is one of your photos?
4     A.   Yes.
5     Q.   And is the point of this photo that
6  this is an example of a red maple that had
7  cambium damage and dead branches on the side?
8     A.   Correct.
9     Q.   Okay. Next photograph, V.D.4.4, is
10  this one of your photos?
11     A.   Yes.
12     Q.   And what's the point of this photo?
13     A.   It -- it illustrates the vegetation
14  that was present at this reference plot. It's
15  common practice to take some pictures along
16  with -- to provide along with the forms
17  themselves.
18     Q.   Is that a saw palmetto in the middle
19  of the photo?
20     A.   Yeah.
21     Q.   V.D.4.5, is that another example of
22  a photograph taken of vegetation in a reference
23  plot?
24     A.   Yes.
25     Q.   This is Photograph V.D.4.6. This is

Page 311

1  sphagnum moss on the ground of reference plot
2  W11. What does this show? What's the point of
3  this photo?
4     A.   Sphagnum moss is commonly found in
5  humid conditions, so places where the soil is --
6  the soil moisture levels are elevated, and
7  it doesn't -- it -- it also grows in low nutrient
8  conditions and does better in shaded conditions.
9     Q.   Okay. Let's go down to
10  Photograph V.D.4.7. Is this another photograph
11  of vegetation in a reference plot?
12     A.   Correct.
13     Q.   And it's one of your photos, right?
14     A.   Yes.
15     Q.   And Photograph V.D.4.8, and this is
16  one of your photos, too?
17     A.   Yes.
18     Q.   And this shows a location in the --
19  in the Countess Joy East property?
20     A.   Yes.
21     Q.   And what's the purpose of this
22  photograph?
23     A.   This photograph was part of the
24  documentation of an area near a well that was
25  installed. So they were monitoring water levels,

Page 312

1  so this is a photograph of that as well as a
2  vegetation community in a freshwater marsh that
3  has not been cleared and mechanically leveled.
4     Q.   Okay. The next Photograph, V.D.4.9,
5  is this another photo of vegetation in a
6  reference plot?
7     A.   Yes.
8     Q.   Okay. Next photograph V.D.4.10,
9  this is another one of your photos, right?
10     A.   Yes.
11     Q.   And this is vegetation in another
12  one of your reference plots, right?
13     A.   Correct.
14     Q.   Photograph V.D.4.11, this is another
15  photograph of vegetation in a reference plot?
16     A.   Yes.
17     Q.   Photograph V.D.4.12, this is another
18  photograph of vegetation in a reference plot?
19     A.   Yes.
20     Q.   Photograph V.D.4.13, once again,
21  more vegetation in a reference plot?
22     A.   Yes.
23     Q.   Is that Lygodium in the upper
24  right-hand corner of the screen?
25     A.   Yes.



KAI COSHOW RAINS PHD
USA V SHARFI

April 29, 2022
313—316

Page 313

1         THE COURT REPORTER:  I'm sorry,
2  counsel, what was that?  Is that like --
3         MR. MCALILEY:  Lygodium,
4  L-Y-G-O-D-I-U-M.
5  By MR. MCALILEY:
6      Q.  Dr. Rains, that's also commonly
7  referred to as Old World climbing fern, right?
8      Is that a yes?
9      A.  I'm sorry, yes, climbing fern.
10     Q.  Photograph V.D.4.14, that's another
11  example of vegetation at a reference plot, right?
12     A.  Yes.
13     Q.  Photograph V.D.4.15 is another
14  photograph of vegetation in a reference plot?
15     A.  Yes, it is.
16     Q.  And then Photograph V.D.4.16, is
17  this one of your photographs?
18     A.  Yes.
19     Q.  What does this show?
20     A.  This is a view from the south
21  looking north at the depressional wetland feature
22  that's on the site, and it demonstrates both the
23  vegetation that's present as well as the fencing.
24     Q.  Dr. Rains, when you -- when you
25  selected the reference plots for wetland in the

Page 314

1  Countess Joy East property, did you attempt to
2  make those reference plots representative of
3  conditions across the Countess Joy East property?
4      A.  No, we were not doing a wetland
5  survey -- complete wetland survey of that area.
6      Q.  So your reference plots are not
7  representative of conditions across the Countess
8  Joy East property, right?
9      A.  Countess Joy East.  Okay.  Correct.
10     Q.  Okay.
11     A.  There are other features on that
12  property which we did not sample.
13        MR. MCALILEY:  Okay.  I think I'm
14  done, so I want to -- it's been a long day.
15  To be frank with you, I probably can ask
16  another few hours of questions, but I think
17  I'm going to call an end to this.
18        Thank you very much for your
19  patience, Dr. Rains.  I don't know whether
20  your counsel, Mr. Doyle, has questions or
21  not, but I'll turn over the witness to
22  Mr. Doyle.
23        MR. DOYLE:  I don't have questions.
24  Just we'll have a review and sign
25  opportunity for Dr. Rains similar to the

Page 315

1  witness on Wednesday of this week.  It's
2  just a note to the court reporter, but
3  otherwise, we are concluded.
4         THE VIDEOGRAPHER:  Before we go off
5  record, would anybody like video orders at
6  this moment?
7         No counsel, no video orders?
8         MR. MCALILEY:  I'm sorry, yes, video
9  order.  Transcript and the video for the
10  defendants, yes.
11        THE VIDEOGRAPHER:  And would you
12  like that video synced with the transcript?
13        MR. MCALILEY:  The answer is yes.
14        THE VIDEOGRAPHER:  Okay.  Any other
15  counsel with video orders?
16        MR. DOYLE:  We'll order the same,
17  the United States.
18        THE VIDEOGRAPHER:  Okay.  Okay.
19  This concludes today's -- today's
20  deposition of Kai Coshow Rains, PhD.  We
21  are now going off record on Friday, April
22  29, 2022, at 6:30 p.m.
23        (Thereupon, the Deposition was
24  concluded at 6:30 p.m.)
25        (Reading and signing not waived.)

Page 316

1                    CERTIFICATE OF OATH
2                    BY NOTARY PUBLIC
3
4    STATE OF FLORIDA
     COUNTY OF MIAMI-DADE
5
6        I, the undersigned authority, certify that
7    KAI COSHOW RAINS, PhD, remotely appeared before
8    me and was duly sworn.
9
10       WITNESS my hand and official seal this 10th day
11   of May, 2022.
12
13
14
15
16
17
18
19
20
21
22
23   MATTHEW J. HAAS
     Court Reporter
24   Notary Public
     Commission No. HH87002
25   Expires:  February 8, 2025



KAI COSHOW RAINS PHD
USA V SHARFI

April 29, 2022
317—320

Page 317

```
1            COURT REPORTER'S CERTIFICATE
2
3            I, Matthew J. Haas, court reporter in
4   and for the State of Florida, certify that I was
5   authorized to and did stenographically report the
6   deposition of KAI COSHOW RAINS, PhD; that a
7   review of the transcript was requested; and that
8   the transcript is a true and complete record of
9   my stenographic notes.
10
11           I further certify that I am not a
12  relative, employee, attorney or counsel of any of
13  the parties, nor am I a relative or employee of
14  any of the parties' attorney or counsel connected
15  with the action, nor am I financially interested
16  in the action.
17
18
19           Dated this 10th day of May, 2022.
20
21
22
23           MATTHEW J. HAAS
             Court Reporter
24
25
```

Page 318

```
1   Reference No.: 8156024
2
3   Case:  USA V SHARFI
4
        DECLARATION UNDER PENALTY OF PERJURY
5
        I declare under penalty of perjury that
6   I have read the entire transcript of my Depo-
    sition taken in the captioned matter or the
7   same has been read to me, and the same is
    true and accurate, save and except for
8   changes and/or corrections, if any, as indi-
    cated by me on the DEPOSITION ERRATA SHEET
9   hereof, with the understanding that I offer
    these changes as if still under oath.
10
11  _____
12      Kai Coshow Rains PhD
13
14      NOTARIZATION OF CHANGES
15           (If Required)
16
17  Subscribed and sworn to on the _____ day of
18
19  _____, 20____ before me,
20
21  (Notary Sign)_____
22
23  (Print Name)                Notary Public,
24
25  in and for the State of _____
```

Page 319

```
1   Reference No.: 8156024
    Case:  USA V SHARFI
2
3   Page No._____Line No._____Change to:_____
4   _____
5   Reason for change:_____
6   Page No._____Line No._____Change to:_____
7   _____
8   Reason for change:_____
9   Page No._____Line No._____Change to:_____
10  _____
11  Reason for change:_____
12  Page No._____Line No._____Change to:_____
13  _____
14  Reason for change:_____
15  Page No._____Line No._____Change to:_____
16  _____
17  Reason for change:_____
18  Page No._____Line No._____Change to:_____
19  _____
20  Reason for change:_____
21  Page No._____Line No._____Change to:_____
22  _____
23  Reason for change:_____
24
25  SIGNATURE:_____DATE:_____
    Kai Coshow Rains PhD
```

Page 320

```
1   Reference No.: 8156024
    Case:  USA V SHARFI
2
3   Page No._____Line No._____Change to:_____
4   _____
5   Reason for change:_____
6   Page No._____Line No._____Change to:_____
7   _____
8   Reason for change:_____
9   Page No._____Line No._____Change to:_____
10  _____
11  Reason for change:_____
12  Page No._____Line No._____Change to:_____
13  _____
14  Reason for change:_____
15  Page No._____Line No._____Change to:_____
16  _____
17  Reason for change:_____
18  Page No._____Line No._____Change to:_____
19  _____
20  Reason for change:_____
21  Page No._____Line No._____Change to:_____
22  _____
23  Reason for change:_____
24
25  SIGNATURE:_____DATE:_____
    Kai Coshow Rains PhD
```

