**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

UNITED STATES OF AMERICA,

              *Plaintiff*,

     v.

BENJAMIN K. SHARFI, in his personal
capacity, as well as in his fiduciary capacity as
trustee of the Benjamin Sharfi 2002 Trust, and
NESHAFARM, INC.,

           *Defendants*.

Case No. 2:21-cv-14205-KAM

<u>**UNITED STATES' MOTION FOR SUMMARY JUDGMENT ON LIABILITY**</u>

**REQUEST FOR ORAL ARGUMENT OR HEARING**

Pursuant to Local Rule 7.1(b)(2), the United States requests oral argument on the instant motion for summary judgment.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iv

GLOSSARY ....................................................................................................................... vii

BACKGROUND .................................................................................................................. 1

STANDARD OF REVIEW ................................................................................................... 2

ARGUMENT ....................................................................................................................... 2

I.     Defendants Violated the Clean Water Act. ................................................................ 2

     A.     Defendants are responsible "persons." ......................................................... 3

          1.     Benjamin Sharfi is a responsible "person." ....................................... 3

          2.     Defendant NeshaFarm is a responsible "person." ............................. 5

     B.     Defendants "discharged pollutants" from a "point source." ......................... 5

     C.     Defendants' discharges occurred in "waters of the United States." ...................... 7

          1.     Defendants' activities occurred in wetlands. ................................... 7

          2.     The Site's wetlands are "waters of the United States." ......................... 10

               a.     *Sackett v. EPA* ...................................................................... 10

               b.     Application of the continuous surface connection test ................ 12

II.     Defendants' Activities are Not Exempt. .................................................................. 18

CONCLUSION ................................................................................................................... 20

## TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986) ............................................................................................ 2

*Avoyelles Sportsmen's League, Inc. v. Marsh,*
   715 F.2d 897 (5th Cir. 1983) ..................................................................... 6, 7, 19

*Blue Cross and Blue Shield v. Weitz,*
   913 F.2d 1544 (11th Cir. 1990) ............................................................................ 19

*Bonner v. City of Prichard,*
   661 F.2d 1206 (11th Cir. 1981) .............................................................................. 3

*Celotex Corp. v. Catrett,*
   477 U.S. 317 (1986) .............................................................................................. 2

*Conant v. United States,*
   786 F.2d 1008 (11th Cir. 1986) ............................................................................ 19

*Ellis v. England,*
   432 F.3d 1321 (11th Cir. 2005) .............................................................................. 2

*In re Rawson Food Serv., Inc.,*
   846 F.2d 1343 (11th Cir. 1988) ............................................................................ 19

*Jones Creek Invs., LLC v. Columbia Cnty.,*
   No. 111-174, 2013 WL 1338238 (S.D. Ga. Mar. 28, 2013) .................................... 4

*Parker v. Scrap Metal Processors, Inc.,*
   386 F.3d 993 (11th Cir. 2004) ...................................................................... 2, 6, 7

*Rapanos v. United States,*
   547 U.S. 715 (2006) .......................................................... 10, 11, 12, 14, 15, 16

*S. Fla. Water Mgmt. Dist. v. Miccosukee Tribe of Indians,*
   541 U.S. 95 (2004) ................................................................................................ 6

*Sackett v. EPA,*
   598 U.S. 651 (2023) .................................................................................. 8, 12, 18

*Sierra Club v. Abston Constr. Co.,*
   620 F.2d 41 (5th Cir. 1980) ................................................................................... 3

*Timson v. Juv. & Jail Facility Mgmt. Servs., Inc.*,
   No. 07-1297, 2009 WL 10671134 (M.D. Fla. Apr. 24, 2009),
   *aff'd,* 355 F. App'x 283 (11th Cir. 2009).................................................................. 10

*United States v. Akers*,
   785 F.2d 814 (9th Cir. 1986) ........................................................................... 19

*United States v. Andrews*,
   No. 20-1300, 2023 WL 4361227 (D. Conn. June 12, 2023)................................ 15, 16

*United States v. Brace*,
   41 F.3d 117 (3d Cir. 1994)................................................................................. 3

*United States v. Cumberland Farms of Conn., Inc.*,
   647 F. Supp. 1166 (D. Mass. 1986), *aff'd,* 826 F.2d 1151 (1st Cir. 1987)................ 5

*United States v. Deaton*,
   209 F.3d 331 (4th Cir. 2000) ............................................................................. 6

*United States v. Donovan*,
   No. 96-484, 2010 WL 3614647 (D. Del. Sept. 10, 2010),
   *aff'd* 661 F,3d 174 (3d Cir. 2011) ..................................................................... 14

*United States v. Earth Scis., Inc.*,
   599 F.2d 368 (10th Cir. 1979) ............................................................................ 3

*United States v. Iverson*,
   162 F.3d 1015 (9th Cir. 1998) ............................................................................ 4

*United States v. Larkins*,
   657 F. Supp. 76 (W.D. Ky. 1987)....................................................................... 19

*United States v. M.C.C. of Fla., Inc.*,
   772 F.2d 1501 (11th Cir. 1985),
   *vacated and remanded on other grounds,* 481 U.S. 1034 (1987),
   *readopted in relevant part,* 848 F.2d 1133 (11th Cir. 1988) .................................. 6

*United States v. Mashni*,
   547 F. Supp. 3d 496 (D.S.C. 2021)..................................................................... 11

*United States v. Mlaskoch*,
   No. 10-cv-2669, 2014 WL 1281523 (D. Minn. Mar. 31, 2014) ........................ 14, 15

*United States v. Riverside Bayview Homes, Inc.*,
   474 U.S. 121 (1985).................................................................................... 7, 11

*United States v. Robison*,
   505 F.3d 1208 (11th Cir. 2007) ......................................................................... 11

*United States v. Tubbs*,
   No. 19-80553, 2019 WL 7376706 (S.D. Fla. Nov. 22, 2019) ................................................. 19

**Statutes**

33 U.S.C. § 1311 .............................................................................................................. 2, 3

33 U.S.C. § 1344 ...................................................................................................... 2, 18, 19

33 U.S.C. § 1362 ........................................................................................... 2, 3, 4, 5, 6, 7, 10

**Federal Regulations**

33 C.F.R. § 323.2 ............................................................................................................. 5, 8

33 C.F.R. § 323.4 ............................................................................................................... 19

33 C.F.R. § 328.3 ..................................................................................................... 7, 8, 10, 13

33 C.F.R. § 328.4 ......................................................................................................... 13, 16

40 C.F.R. § 232.2 ................................................................................................................ 5

**Federal Rule of Civil Procedure**

Fed. R. Civ. P. 56(a) ........................................................................................................ 1, 2

## GLOSSARY

| | |
|---|---|
| **1986 regulations** | 33 C.F.R. pt. 328 (1987), Exhibit 72 |
| **Corps** | United States Army Corps of Engineers |
| **Countess Joy Reference Area** | Property located directly north of the Site, Exhibit 7 |
| **CWA** | The Federal Water Pollution Control Act, commonly referred to as the Clean Water Act |
| **Manual** | Corps of Engineers Wetlands Delineation Manual (January 1987), Exhibit 61 |
| **NeshaFarm** | Defendant NeshaFarm, Inc. |
| **Site** | A parcel of real estate in Martin County, Florida, with Parcel Identification Number 17-38-40-000-038-00000-0 |
| **WOTUS** | waters of the United States |

Plaintiff United States of America brings this civil enforcement action against Benjamin K. Sharfi and his company NeshaFarm, Inc. in connection with their unauthorized polluting of wetlands at a 9.92-acre property in Martin County, Florida (the "Site"). Defendants violated the Clean Water Act ("CWA"), which, as relevant here, requires any person to obtain and comply with a permit before discharging dredged or fill material into waters of the United States ("WOTUS"). WOTUS includes wetlands that abut one or more relatively permanent tributaries connected to traditional navigable waters. The United States moves for summary judgment as to Defendants' liability. Fed. R. Civ. P. 56(a).

## BACKGROUND

The United States' Statement of Material Facts ("SOF") and accompanying exhibits set out the relevant facts for this motion. In summary, Defendants transformed the Site shortly after Mr. Sharfi acquired it in 2017. *E.g.*, SOF ¶¶ 2, 18–19, 30, 39–40. Defendants used heavy machinery, including bulldozers, excavators, and dump trucks, to discharge rock, sand, dirt, and dredged material in wetlands, including areas that Defendants' environmental consultant, Danna Small, determined were wetlands. *E.g., id.* ¶¶ 21, 24, 29–31, 39–40, 50, 55, 57, 59. Defendants excavated ponds, created piles of soil, knocked over trees dispersing soils, and dumped and spread sand and other fill material. *Id.* Most of the activities occurred *after* Ms. Small "strongly recommended" that unauthorized work in wetlands stop in March 2018 and *after* the U.S. Army Corps of Engineers ("Corps"), which, along with the U.S. Environmental Protection Agency, has enforcement responsibilities under the CWA, issued a cease-and-desist letter in April 2018. *Id.* ¶¶ 32, 44. Defendants never secured a CWA permit. *Id.* ¶ 60.





*2016 photograph of Site. SOF ¶ 18.*     *2021 photograph of Site. SOF ¶ 19.*

The United States retained a team of wetland scientists, including experts who specialize in hydrology (Wade Nutter, Ph.D.), wetland vegetation (Kai Coshow Rains, Ph.D.), and hydric soils (Scott Stewart, Ph.D.). The United States expert team also includes Michael M. Wylie, who formerly spent nearly thirty years implementing the CWA for EPA Region 4 (which includes Florida). The expert team analyzed flow data, aerial imagery, maps, and other relevant information. Between August and December 2021, members of the team inspected the Site over the course of five days, inspected a reference area directly north of the Site (the "Countess Joy Reference Area") over the course of six days, and inspected several other reference aquatic areas nearby. Ex. 74, at 26–27. The team collected data regarding hydrology, vegetation, and soil conditions at the Site, the Countess Joy Reference Area, and other areas, which are recorded in thirty-three Wetland Determination Data Forms. Exs. 40–41. Exhibit 16 reflects the team's delineation of wetlands on the Site at the time of Defendants' discharges. Exhibits 30–31 show approximate wetlands on the Countess Joy Reference Area that abut tributaries of traditional navigable waters and that, prior to Defendants' unauthorized discharges, continued uninterrupted northward from the Site's wetlands. Exhibit 33 reflects the delineated wetland areas on the Site that Defendants filled.

## STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "For factual issues to be considered genuine, they must have a real basis in the record." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005). "For instance, mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Id.* Where the nonmoving party fails to produce evidence sufficient to create a genuine issue of material fact, the moving party is entitled to summary judgment. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## ARGUMENT

**I.   DEFENDANTS VIOLATED THE CLEAN WATER ACT.**

To establish Defendants' liability, the United States must prove that Defendants are (1) persons responsible for (2) the discharge of any pollutant from a point source (3) to WOTUS (4) without a permit. *See* 33 U.S.C. §§ 1311(a), 1344, 1362(5), (6), (12), (14); *Parker v. Scrap*

*Metal Processors, Inc.*, 386 F.3d 993, 1008 (11th Cir. 2004). Civil liability under the CWA is strict; the United States need not prove that an unpermitted discharge was intentional, knowing, or negligent, but only that it occurred. *See United States v. Brace*, 41 F.3d 117, 122 (3d Cir. 1994); *United States v. Earth Scis., Inc.*, 599 F.2d 368, 374 (10th Cir. 1979), *cited with approval by Sierra Club v. Abston Constr. Co.*, 620 F.2d 41, 46 (5th Cir. 1980).[1] Defendants admit that they did not secure a relevant CWA permit. *See* SOF ¶ 60. The evidence establishes the remaining elements of liability.

      **A.**      **Defendants are responsible "persons."**

            **1.**      **Benjamin Sharfi is a responsible "person."**

      Mr. Sharfi is a "person" within the meaning of the CWA because he is an "individual." *See* 33 U.S.C. §§ 1311(a), 1362(5); SOF ¶ 1. He acted on behalf of the Sharfi Trust and NeshaFarm and also bears personal responsibility.

      First, Mr. Sharfi is liable in his fiduciary capacity as trustee of the Sharfi Trust. In April 2017, Mr. Sharfi, as trustee of the Sharfi Trust, acquired the Site. SOF ¶ 2. Mr. Sharfi is the sole grantor and trustee of the Sharfi Trust, a revocable trust. *Id.* ¶ 3. Mr. Sharfi has all the powers and duties provided to trustees under Florida law, including relating to environmental laws. *Id.* Mr. Sharfi is responsible for the maintenance and disposition of the Trusts' assets (including the Site), and only Mr. Sharfi may authorize Sharfi Trust business, exercise the powers of the trustee, or bind the Sharfi Trust. *Id.*

      Second, Mr. Sharfi controlled the relevant decision-making of NeshaFarm (and thus acted on its behalf) and is also personally liable as a responsible corporate officer. In January 2019, Mr. Sharfi, as trustee of the Sharfi Trust, transferred ownership of the Site to NeshaFarm. *Id.* ¶ 4. Mr. Sharfi is the chief executive officer of NeshaFarm and has been since the company was incorporated. *Id.* ¶ 6. Kevin Kryzda has been the president of NeshaFarm since late 2018 but considers himself to be the president in "title only" because NeshaFarm "is the purview of Mr. Sharfi directly. It is mostly [Mr. Sharfi's] personal property and most of the activities therein are directed by [Mr. Sharfi] personally." *Id.* ¶ 7.

      A corporate officer can be held personally liable for CWA violations where the officer has "direct responsibility or control" over the corporation's activity that is causing the

---

[1]     The Eleventh Circuit adopted Fifth Circuit decisions before October 1, 1982, as binding precedent. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

discharges. 2d Dismissal Order 10, ECF No. 32; *see also United States v. Iverson*, 162 F.3d 1015, 1025 (9th Cir. 1998); *Jones Creek Invs., LLC v. Columbia Cnty.*, No. 111-174, 2013 WL 1338238, at *14 (S.D. Ga. Mar. 28, 2013). The record supports each example the Court provided that would show Mr. Sharfi's personal liability. Dismissal Order 6, ECF No. 14.

First, Mr. Sharfi "personally participated in . . . the alleged CWA violations" by directing the unauthorized fill activities. *Id.* Mr. Sharfi, and only Mr. Sharfi, made decisions about how the Site would be improved or developed. SOF ¶ 59. Mr. Kryzda acted to effectuate Mr. Sharfi's "wishes to put this newly acquired property into agricultural use." *Id.* ¶ 20. Mr. Sharfi directed and approved the clearing and development of the Site, which continued after Mr. Sharfi transferred ownership to NeshaFarm. *E.g., id.* ¶¶ 7, 21, 25, 59. Mr. Sharfi "was out there a lot" monitoring work on the Site. *Id.* ¶ 57.

Second, Mr. Sharfi had "legal authority to access, direct or conduct . . . work at the Site which resulted in the alleged violations" and the ability to prevent that work from being performed. Dismissal Order 6. Mr. Sharfi signed an application for a CWA permit and certified that he was so authorized to direct the work on the Site. SOF ¶ 25. After the Corps ordered Mr. Sharfi to cease and desist unauthorized filling of wetlands on the Site, Mr. Sharfi vowed (consistent with his actions) to continue with his work on the Site. *Id.* ¶¶ 43–44, 51–57.

Third, Mr. Sharfi was "responsible for ensuring CWA compliance" at the Site (although he failed to do so). Dismissal Order 6. Mr. Sharfi and his agent asked the Corps for guidance regarding how to move ahead with Mr. Sharfi's "wishes" for the Site. SOF ¶¶ 20, 46. Mr. Sharfi applied for a permit but did not accurately describe what he had already done and what he intended to do in wetlands on the Site. *E.g., id.* ¶¶ 25, 34–35. After the Corps advised Mr. Sharfi to cease and desist, Mr. Sharfi invited the Corps onto the Site to observe the work he undertook and stated that he was "sensitive" to the issues and "aware of the wetland locations." *Id.* ¶ 46.

In early 2018, Mr. Sharfi hired environmental consultant Ms. Small to delineate wetlands on the Site. *Id.* ¶ 26. In March 2018, Ms. Small observed a bulldozer actively clearing wetlands on the Site. *Id.* ¶¶ 29–30. She "strongly recommended" that the work stop in wetlands and eventually quit because Defendants would not heed her advice. *Id.* ¶¶ 32, 38–39, 49.

Fourth, and for the same reasons explained above, Mr. Sharfi was "privy to or personally involved in decision-making related to [the] CWA violations." Dismissal Order 6. In addition to the facts summarized above, Mr. Sharfi said he was "aware of the wetland locations" on the Site,

and his statements and characterization of the work that he performed on the Site further demonstrate his personal knowledge of the unlawful activities. SOF ¶¶ 20, 45–46, 51. Mr. Sharfi first offered his "personal word on this issue that we will work all the way with the Corps" but later reversed himself and vowed to continue his activities "as we have all along." *Id.* ¶¶ 45, 51.

> ### 2. Defendant NeshaFarm is a responsible "person."

NeshaFarm is a "person" because it is a "corporation." 33 U.S.C. § 1362(5); SOF ¶ 5. Mr. Sharfi acquired the Site to expand NeshaFarm. SOF ¶ 8. NeshaFarm formally acquired title to the Site in January 2019. NeshaFarm operates the Site in conjunction with other adjacent NeshaFarm property. *Id.* Mr. Sharfi listed "NeshaFarm" as the applicant for a CWA permit for work on the Site, although NeshaFarm did not own the Site at that time. *Id.* ¶ 25. NeshaFarm paid for work performed on the Site. *Id.* ¶ 9. Mr. Kryzda corresponded with the Corps regarding the discharges on NeshaFarm letterhead. *Id.* ¶ 46. These facts, in addition to those summarized above (including Mr. Sharfi acting on behalf of not only himself and the trust, but also his company), demonstrate that NeshaFarm is also responsible for the discharges at the Site.

> ## B. Defendants "discharged pollutants" from a "point source."

Defendants discharged pollutants from a point source to areas of the Site that, as the United States explains *infra* Part I.C, constitute WOTUS. The CWA defines "discharge of a pollutant" to include "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12). The term "pollutant" includes "rock, sand, [and] cellar dirt . . . discharged into water." *Id.* § 1362(6). Dredged and fill material fall within the definition of "pollutant." *United States v. Cumberland Farms of Conn., Inc.*, 647 F. Supp. 1166, 1175 (D. Mass. 1986), *aff'd*, 826 F.2d 1151 (1st Cir. 1987); 40 C.F.R. § 232.2.[2] Mechanized land-clearing activities that involve the redeposit of earthen material from one location to another—either from outside

---

[2]       Under the Corps' CWA regulations, the definition of "fill material" includes "material placed in [WOTUS] where the material has the effect of: (i) Replacing any portion of a [WOTUS] with dry land; or (ii) Changing the bottom elevation of any portion of a [WOTUS]." 33 C.F.R. § 323.2(e)(1). Fill material includes "rock, sand, soil, [and] clay." *Id.* § 323.2(e)(2). The "discharge of dredged material" includes "any addition of dredged material into, including redeposit of dredged material other than incidental fallback within, the [WOTUS]." *Id.* § 323.2(d)(1). Although the term does not encompass mere mowing or other "cutting or removing of vegetation above the ground," it can reach activities that "substantially disturb[] the root system [or] involve[] mechanized pushing, dragging, or other similar activities that redeposit excavated soil material." *Id.* § 323.2(d)(2)(ii).

WOTUS into WOTUS, or from one area of WOTUS into another area of WOTUS—constitute a discharge. *See Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 923 (5th Cir. 1983); *see also United States v. M.C.C. of Fla., Inc.*, 772 F.2d 1501, 1506 (11th Cir. 1985) (redepositing of spoil dredged by a tugboat's propellers constitutes discharge of pollutant), *vacated and remanded on other grounds*, 481 U.S. 1034 (1987), *readopted in relevant part*, 848 F.2d 1133 (11th Cir. 1988). "Congress determined that plain dirt, once excavated from waters of the United States, could not be redeposited into those waters without causing harm to the environment." *United States v. Deaton*, 209 F.3d 331, 336 (4th Cir. 2000).

A "point source" is "any discernible, confined and discrete conveyance . . . from which pollutants are or may be discharged." 33 U.S.C. § 1362(14). A point source "need not be the original source of the pollutant; it need only convey the pollutant to 'navigable waters.'" *S. Fla. Water Mgmt. Dist. v. Miccosukee Tribe of Indians*, 541 U.S. 95, 105 (2004). The Eleventh Circuit instructs courts to "interpret the term 'point source' broadly." *Parker*, 386 F.3d at 1009. Mechanized equipment, such as excavators, bulldozers, and dump trucks, can constitute point sources under the CWA. *E.g.*, *id.*

As aerial imagery shows, Defendants drastically transformed the Site after Mr. Sharfi acquired it in 2017. *E.g.*, SOF ¶¶ 18–19. Defendants first deposited road rock on the Site using dump trucks, and then spread it using a roller to create the perimeter road around the Site. *Id.* ¶¶ 22–24. Mr. Sharfi's employees used a box blade attached to a tractor to grade the land to create other roads within the Site, to grade areas in the northwest quadrant of the Site, and to deepen the edges of a pond and redistribute dirt to create a bank in the southwest quadrant of the Site. *Id.* ¶¶ 52–53, 57. The operation of the box blade scraped and redistributed earthen material from one place to another. *Id.* ¶ 23.

In early 2018, contractors working at Mr. Sharfi's direction used an excavator to dredge part of a ditch that runs along the western boundary of the Site and deposited and spread the spoil material in wetlands in the southwest corner of the Site. *Id.* ¶¶ 20–21. In March 2018, Ms. Small observed a bulldozer operating in wetlands when she visited the Site. *Id.* ¶ 29. The bulldozer was clearing trees that, in her words, were "knocked over and crunched up." *Id.* Photographs she took of the Site depict piles of roots and soil in the southwest area of the Site and a track hoe. *Id.* ¶ 30. Ms. Small identified a red maple tree, which she described as a "wetland tree," among the vegetation that the bulldozer was clearing. *Id.* When Ms. Small returned to the Site a month later,

the "work being performed in the wetlands had expanded." *Id.* ¶ 38. Heavy equipment was present at the Site, and some of the "flags" she had left to demarcate her assessment of the geographic extent of wetlands on the Site were gone as a result of the work. *Id.* She took photographs of two bulldozers and a track hoe in the area she delineated as wetlands. *Id.* ¶ 39.

Further, at Mr. Sharfi's direction, Defendants excavated ponds using a box blade and excavator and deposited spoil material in wetlands on the Site. *Id.* ¶ 57. Defendants graded large areas of the Site, including wetlands that Ms. Small delineated, and then installed sod mats that consist of grass and a layer of imported earthen material. *Id.* ¶¶ 31, 40–41, 46, 54. And Defendants staged piles of fill material and graded areas in the northwest corner of the Site where there were areas of visible puddling. *Id.* ¶¶ 31, 50, 53.

The placement and spreading of road rock using dump trucks and a roller, repositing of earthen material using a box blade, land-clearing activities that involved knocking over trees and repositing piles of vegetation and dirt using a bulldozer, placement of spoil material using mechanized equipment, and placing sod and turf mats in cleared areas all constitute the discharge (including repositing) of pollutants from discrete conveyances ("point sources"). 33 U.S.C. § 1362(6); *Parker*, 386 F.3d at 1009; *Avoyelles Sportsmen's League, Inc.*, 715 F.2d at 923.

**C.   Defendants' discharges occurred in "waters of the United States."**

To establish that Defendants' activities occurred within the geographic reach of the CWA, the United States must show (1) Defendants' activities occurred in wetlands; and (2) those wetlands constitute WOTUS.

**1.   Defendants' activities occurred in wetlands.**

Defendants discharged pollutants in wetlands on the Site. "Wetlands" are "areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions." 33 C.F.R. § 328.3(b) (1987); *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 129–31, 135 (1985) (applying wetland definition). For decades, the Corps has interpreted this definition to require three environmental parameters during normal circumstances: (1) the prevalence of plant species typically adapted to saturated soil conditions; (2) the presence of hydric soils; and (3) wetland hydrology, which generally requires the area is inundated with water either permanently or periodically or the soil is

saturated to the surface at some time during the growing season of the prevalent vegetation. Ex. 61, at 9–34.

Indicators of all three parameters are, under "normal circumstances," present in wetlands. 33 C.F.R. § 328.3(b) (1987). But where, as here, unauthorized activities or other "atypical situations" have impacted the relevant area's vegetation, soils, or hydrology, the Manual sets forth adjusted methods to delineate the presence and scope of wetlands. *See* Ex. 61, at 73 ("Unauthorized discharges requiring enforcement actions may result in removal or covering of indictors of one or more wetland parameters."). The methods for atypical situations address "whether positive indicators of hydrophytic vegetation, hydric soils, and/or wetland hydrology existed prior to alteration of the area." *Id.* at 74. Indeed, "[u]nauthorized discharges into [WOTUS] do not eliminate [CWA] jurisdiction, even where such unauthorized discharges have the effect of destroying [WOTUS]." 33 C.F.R. § 323.2 (1987); *see Sackett v. EPA*, 598 U.S. 651, 679 n.16 (2023) ("[A] landowner cannot carve out wetlands from federal jurisdiction by illegally constructing a barrier on wetlands otherwise covered by the CWA.").

The United States expert team—including experts who specialize in wetland hydrology (Dr. Nutter), wetland vegetation (Dr. Rains), and hydric soils (Dr. Stewart)—examined the Site in its disturbed state (applying the "atypical situations" section of the Manual) and the Countess Joy Reference Area in its relatively undisturbed state. The team dug soil pits in representative areas. SOF ¶¶ 61–62. In nineteen locations throughout the Site and fourteen locations throughout the Countess Joy Reference Area, the team observed hydrology, vegetation, and soil conditions and recorded data on "Wetland Determination Data Forms." *Id.* ¶¶ 62, 64; Exs. 40–41 (data forms); Ex. 16 (Site locations); Ex. 12 (reference locations). The team also considered historical, technical information, including aerial imagery, maps, and public information in government databases. SOF ¶¶ 61, 64. The team's assessment, in short, is that before Defendants' activities, the Site had between five and six acres of wetlands and, further, that these wetlands did not abruptly end at the Site's boundary. *Id.* ¶¶ 63–66. Rather, at the time of Defendants' unauthorized activities, the Site's wetlands were part of a larger wetland that continues north of the Site until it reaches—and physically abuts—the upstream reach of Bessey Creek that transects the Countess Joy Reference Area. *Id.* ¶¶ 63–66, 69.

This evidence is uncontroverted. None of Defendants' experts performed a wetland delineation, whether under the Manual or otherwise. *See* Dennis Tr. 143:7–8 (Ex. 68). Similarly,

even though Defendants' experts had access to the Site and to the Countess Joy Reference Area, none prepared any Wetland Delineation Data Forms or wetland delineation maps.

Moreover, W. Michael Dennis, Ph.D., one of Defendants' retained experts, *concedes* the existence of wetlands on the Site. *See* Ex. 71, at -148 to -154. Dr. Dennis purports to dispute the scope of the Site's wetlands. He opines that Ms. Small's delineation (of about 3.55 acres of wetlands) is more "reliable" than the United States expert team's delineation (of between five and six acres of wetlands) because Ms. Small's evaluation was "conducted prior to [Defendants'] subsequent land clearing." *Id.* at -154. Dr. Dennis' opinion is unsupported.

Ms. Small's delineation did not (and cannot) account for the full scope of wetlands present on the Site before Defendants' fill activities, and so cannot support Dr. Dennis' opinion. Dr. Dennis assumed that Ms. Small "inspected the entire 9.92-acre Site." *Id.* at -152. In fact, a perimeter road had already been constructed when Ms. Small visited the Site in March 2018, and she testified that she made no attempt to assess whether wetlands had existed where the perimeter road was. SOF ¶ 33. Even more, she testified that the perimeter road *did* appear to be constructed in wetlands. *Id.* Nor did Ms. Small attempt to evaluate the Site considering the fill that Defendants had already placed in the wetlands.

As previously noted, the Manual provides methods for evaluating sites experiencing "atypical situations"—for example, when "[u]nauthorized discharges requiring enforcement actions may result in removal or covering of indicators of one or more wetland parameters"—as opposed to "normal circumstances." Ex. 61, at 73. By the time of Ms. Small's visit, Defendants had filled or were in the process of filling wetlands on the Site: in addition to the perimeter road, Ms. Small observed active earthmoving activities in wetlands. SOF ¶¶ 29–30. Because Ms. Small did not apply the methods for evaluating atypical situations, her delineation does not (and cannot) show the full extent of the wetlands on the Site *prior to disturbance*. And Ms. Small did not make any observations on the Countless Joy Reference Area, which, as explained above, supports wetlands that extend continuously northward from the Site through their abutment to the upstream reach of Bessey Creek.

The Court need not and should not assign evidentiary value to Dr. Dennis' unsupported opinion. *See Timson v. Juv. & Jail Facility Mgmt. Servs., Inc.*, No. 07-1297, 2009 WL 10671134, at *10 (M.D. Fla. Apr. 24, 2009) ("Theoretical speculations, unsupported assumptions, and conclusory allegations advanced by an expert are not entitled to any weight when raised in

opposition to a motion for summary judgment." (cleaned up)), *aff'd*, 355 F. App'x 283 (11th Cir. 2009). Regardless, for the areas she did assess, Ms. Small's delineation *corroborates* that a substantial acreage of wetlands existed at the Site before Defendants' activities. Ms. Small's three Wetland Determination Data Forms—far fewer than the United States expert team's nineteen on the Site alone, Ex. 40—do not contradict the United States expert team's delineation. SOF ¶¶ 47–48. The United States expert team's analysis found wetlands and uplands where Ms. Small did. *Id.*

Defendants' land-clearing and fill activities occurred not just in uplands but (critically here) in wetlands on the Site, too. *See supra* Part I.B. Aerial imagery confirms that Defendants' land-clearing and fill activities transformed the entire Site, including those areas delineated as wetlands by the United States expert team and those areas delineated by Defendants' prior consultant, Ms. Small. *Compare* SOF ¶¶ 18–19 *and* Exs. 36–39; SOF ¶¶ 24, 31, 52–53, 55–57, *with* Ex. 33 (United States' delineation) *and* Ex. 15 (Ms. Small's delineation).

        **2.**        **The Site's wetlands are "waters of the United States."**

The wetlands into which Defendants discharged pollutants from point sources are "waters of the United States" under the CWA, its implementing regulations, and the Supreme Court's recent decision in *Sackett*, which adopted the "relatively permanent"/"continuous surface connection" standard set forth in *Rapanos v. United States,* 547 U.S. 715, 719-57 (2006) (plurality op. of Scalia, J.). Prior to the Defendants' activities, the wetlands on the Site formed part of a larger wetland extending to the north onto the Countess Joy Reference Area. The wetlands physically abut—and have a continuous surface connection with—at least one and, indeed, three tributaries with relatively permanent flow to traditional navigable waters. Any one of these three areas of continuous surface connection suffices to establish CWA jurisdiction.

        **a.**        ***Sackett v. EPA***

The CWA does not define "waters of the United States." *See* 33 U.S.C. § 1362(7). In 1986, the Corps promulgated regulations interpreting WOTUS to include waters that have been used or are reasonably susceptible to use in interstate commerce, including all waters subject to the ebb and flow of the tide ("traditional navigable waters"); tributaries of traditional navigable waters; and wetlands adjacent to certain water bodies, including tributaries. 33 C.F.R.

§ 328.3(a)(1), (5), (7) (1987) ("1986 regulations") (Ex. 72). The 1986 regulations defined "adjacent" as "bordering, contiguous, or neighboring." *Id.* § 328.3(c).[3]

*Rapanos* involved the assertion of CWA jurisdiction under the 1986 regulations to wetlands proximate to tributaries of traditional navigable waters. Although the case produced a fractured opinion, all the Justices agreed that WOTUS include more than just traditional navigable waters, but no majority agreed on the reach of that term. In a plurality opinion, four Justices concluded that CWA regulatory authority should extend only to "relatively permanent, standing or continuously flowing bodies of water" connected to traditional navigable waters, and to "wetlands with a continuous surface connection to" such relatively permanent waters. *Rapanos*, 547 U.S. at 742. The plurality characterized *Riverside Bayview* as deferring to the Corps' inclusion of wetlands "actually abutting" traditional navigable waters; holding that the Corps "could reasonably conclude that a wetland that adjoined waters of the United States is itself a part of those waters"; and resolving an ambiguity "in favor of treating all abutting wetlands as waters." *Rapanos*, 547 U.S. at 740–42 (quoting *Riverside Bayview*, 474 U.S. at 135) (cleaned up); *see also id.* at 740. Justice Kennedy did not join the plurality opinion and instead wrote separately concurring in the judgment. Justice Kennedy concluded that wetlands are WOTUS if "either alone or in combination with similarly situated lands in the region, [they] significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.'" *Id.* at 780 (Kennedy, J., concurring). The Eleventh Circuit adopted the "significant nexus" standard set forth in Justice Kennedy's concurring opinion. *See United States v. Robison*, 505 F.3d 1208, 1221–22 (11th Cir. 2007), *overruled by Sackett*, 598 U.S. at 679–83.

In *Sackett*, the Court revisited WOTUS in the context of an assertion of CWA jurisdiction over wetlands located in proximity to a tributary of traditional navigable waters. The Court held

---

[3]     For purposes of determining Defendants' liability, the pre-2015 regulatory regime, implemented consistent with *Sackett*, governs the scope of WOTUS. EPA, Definition of "Waters of the United States": Rule Status and Litigation Update, *available at* https://www.epa.gov/ wotus/definition-waters-united-states-rule-status-and-litigation-update; *see generally United States v. Mashni*, 547 F. Supp. 3d 496, 505–06 (D.S.C. 2021). The "pre-2015 regulatory regime" refers to the definition of WOTUS in the 1986 regulations "implemented consistent with relevant case law and longstanding practice, as informed by applicable guidance, training, and experience." EPA, Pre-2015 Regulatory Regime, *available at* http://www.epa.gov/wotus/pre-2015-regulatory-regime.

that "the *Rapanos* plurality was correct: the CWA's use of 'waters' encompasses only those relatively permanent, standing or continuously flowing bodies of water forming geographical features that are described in ordinary parlance as streams, oceans, rivers, and lakes." *Sackett*, 598 U.S. at 671 (quoting *Rapanos*, 547 U.S. at 739) (cleaned up). The Court also agreed with the *Rapanos* plurality that adjacent wetlands must have "a continuous surface connection to bodies that are 'waters of the United States' in their own right, so that there is no clear demarcation between 'waters' and wetlands." *Id.* at 678 (quoting *Rapanos*, 547 U.S. at 742). And the Court rejected the "significant nexus" standard. *Id.* at 679–83. The Court decided the wetlands at issue, which were separated by a historic thirty-foot road from a tributary, were not WOTUS. 598 U.S. at 684.

In short, under *Sackett* and its adoption of the *Rapanos* plurality standard, an adjacent wetland has a "continuous surface connection" where, among other things, it abuts a jurisdictional tributary. *Id.* at 676 (CWA jurisdiction includes wetlands "contiguous" with a relatively permanent water connected to a traditional navigable water). *Sackett* effectively overruled the Eleventh Circuit's adoption of the significant nexus test in *Robison*.

> **b.    Application of the continuous surface connection test**

Here, undisputed evidence shows that the Site's wetlands are within the jurisdiction of the CWA because, prior to Defendants' unauthorized activities, they were part of a larger wetland that abuts and has a continuous surface connection to the upstream reach of Bessey Creek, a relatively permanent tributary that is connected to the tidal reach of Bessey Creek, a traditional navigable water. The Site's wetlands are within the jurisdiction of the CWA for the independent and additional reasons that they abut two other tributaries of traditional navigable waters: the N/S Ditch and the 84th Avenue roadside ditch, each of which is also a relatively permanent water and connects to the tidal reach of Bessey Creek.



Figure Wetland Map 1 – USDOJ Expert Team Determination of contiguous wetlands from the Site through Countess Joy East Reference Area to the Upstream Reach of Bessey Creek on 2021 aerial photography.

*Exhibit 30*

> **i.**    **The upstream reach of Bessey Creek is a relatively permanent tributary of traditional navigable waters.**

The upstream reach of Bessey Creek is a relatively permanent body of water that is connected to a traditional navigable water. SOF ¶ 73. Defendants do not dispute that the upstream reach of Bessey Creek acts as a tributary to traditional navigable waters. Ex. 71, at 50; *see also* SOF ¶¶ 14–15, 17. The undisputed evidence also demonstrates that the upstream reach of Bessey Creek is relatively permanent. It has bed and bank features and an ordinary high water mark.[4] *See* SOF ¶ 70. Members of the United States expert team also observed flow in the upstream reach of Bessey Creek adjoining the Countess Joy Reference Area in August, September, October, and December of 2021, *id.* ¶ 71, a period that spans from the wet season to the dry season, *see id.* ¶ 72. Moreover, data Martin County submitted with a permit application

---

[4]    The ordinary high water mark defines the lateral limit of jurisdiction in non-tidal WOTUS, provided the limit is not extended by adjacent wetlands. *See* 33 C.F.R. § 328.3(e) (1987); *id.* § 328.4(c).

for a Hybrid Wetland Treatment Technology facility located about two miles downstream from the upstream reach of Bessey Creek due north of the Site show year-round water in the upstream watershed that includes the Site. *Id.* ¶¶ 12–13. Highest flows are in June through November. *Id.* ¶ 13.

*United States v. Mlaskoch* is instructive. No. 10-cv-2669, 2014 WL 1281523 (D. Minn. Mar. 31, 2014). In that case, the court, applying the plurality test from *Rapanos*, held that two tributaries abutting the wetlands at issue were relatively permanent waters because the United States presented direct observation of flow over three months, a reasonable inference of flow in a prior month, and the presence of ordinary high water marks and beds and banks. *Id.* at *17. Here, the United States has presented even more compelling evidence: direct evidence of flow stretching from the end of the wet season through the dry season, evidence of year-round flow downstream, an ordinary high water mark, and bed and banks. SOF ¶¶ 12–13, 70–72.

Defendants cannot create a dispute of material fact regarding the relative permanence of the flow in the upstream reach of Bessey Creek. While Dr. Dennis' report points to photographs from a single day and data from the United States expert team's staff gauges, neither supports an inference that the upstream reach of Bessey Creek lacks relative permanence. Dennis Suppl. Rep. 9 (Ex. 78). Dr. Dennis took the photographs on March 10, 2022, in a month that Dr. Dennis testified is among the driest in the year. Dennis Tr. 67:6–14 (Oct. 19, 2023) (Ex. 62). Relatively permanent waters may include waters that "dry up in extraordinary circumstances" and "seasonal rivers, which contain continuous flow during some months of the year but no flow during dry months." *Rapanos*, 547 U.S. at 732 n.5. A photograph taken on a single day during the dry season thus cannot support an inference that the upstream reach of Bessey Creek is not relatively permanent. *See id.; United States v. Donovan*, No. 96-484, 2010 WL 3614647, at *4 (D. Del. Sept. 10, 2010) (defendant failed to identify a dispute of material fact by failing to present "evidence that a channel which is dry during periods without rainfall is not still a 'relatively permanent' body of water as defined in *Rapanos*"), *aff'd* 661 F.3d 174 (3d Cir. 2011).

The United States expert team's staff gauge data recorded water at or above the point where it was installed in the upstream reach of Bessey Creek. *See* SOF ¶ 70. To the extent Dr. Dennis contends the data show the upstream reach of Bessey Creek was dry at any time during the four months when the gauges were installed, he is misinterpreting the data. The gauges were not installed in the middle of the channel where the water was the deepest; as a

result, even when the data showed zero for certain periods "there was still water in the [upstream reach of Bessey Creek], more towards the center." Nutter Tr. 190:1–10 (Apr. 1, 2022) (Ex. 63). In any event, the United States expert team observed flow in the upstream reach of Bessey Creek north of the Countess Joy Reference Area in August, September, October, and December. SOF ¶ 71.

> ii.     **Prior to Defendants' discharges, the Site's wetlands were part of a large wetland that had a continuous surface connection with the upstream reach of Bessey Creek.**

The Site's wetlands were part of a larger wetland that abuts, and thus has a continuous surface connection with, the upstream reach of Bessey Creek. The first court to apply *Sackett* granted summary judgment to the United States on similar facts. *See United States v. Andrews*, No. 20-1300, 2023 WL 4361227 (D. Conn. June 12, 2023) (publication forthcoming). In *Andrews*, the defendants' wetlands were part of a larger wetland abutting a tributary of a traditional navigable water. The court held that the wetland satisfied *Sackett*'s continuous surface connection requirement based on its direct abutment to the tributary and surface flow paths linking the wetland with the tributary, thereby demonstrating a "'continuous physical connection.'" *Id.* at *10 (quoting *Rapanos*, 547 U.S. at 747, 751 n.13 (plurality)).

Here, clear evidence shows that the Site's wetlands were part of a larger wetland that continues north of the Site and abuts the upstream reach of Bessey Creek. As explained, the United States expert team delineated wetlands at the Site and completed fourteen wetland determinations on the Countess Joy Reference Area. *Supra* Part I.C.1. Thirteen of the fourteen sampled representative locations on the Countess Joy Reference Area were wetlands. Ex. 41; Ex. 12; SOF ¶ 64. Further, the team determined that the wetlands on the Countess Joy Reference Area are contiguous to the Site's wetlands (prior to Defendants' unauthorized activities) and are part of one large, contiguous wetland. *Id.* ¶¶ 65–66.

The large wetland has at least two continuous surface connections to the upstream reach of Bessey Creek. SOF ¶¶ 67–68. The connection locations are shown with two stars where the wetland touches the upstream reach of Bessey Creek in Exhibit 30 (reproduced above). At these points, no physical barriers separate the wetland and the upstream reach of Bessey Creek; rather, the wetland abuts—and therefore has a direct surface connection to—the upstream reach of Bessey Creek. *See Andrews*, 2023 WL 4361227, at *10; *Mlaskoch*, 2014 WL 1281523 at *17

("Because the affected wetlands abutted [relatively permanent] tributaries, jurisdiction under the CWA is proper."); 33 C.F.R. § 328.4(c)(2) ("When adjacent wetlands are present, the jurisdiction extends beyond the ordinary high water mark to the limit of the adjacent wetlands."). Moreover, surface water from the wetland discharges to the upstream reach of Bessey Creek, which Dr. Nutter both observed and documented during field visits in August and September 2021. SOF ¶ 69; *Andrews*, 2023 WL 4361227, at *10.

Dr. Dennis' principal criticism of the United States' evidence of continuous surface connections cannot create a genuine dispute of material fact. Dr. Dennis states that he has "not seen evidence of continuous surface water ever extending from the Sharfi wetland" to the upstream reach of Bessey Creek. Dennis Suppl. Rep. 16 (Ex. 78). But the Site's wetlands were part of *the same wetland* that abuts the upstream reach of Bessey Creek, *see* 33 C.F.R. § 328.4(c)(2), and there is no requirement that surface water be always present for an area to satisfy the hydrologic parameter of the wetland definition. *E.g.*, Ex. 61, at 9–10. Put differently, the continuous surface connection is not a standard for what must be observed throughout the extent of a wetland, nor does it define how far laterally a jurisdictional wetland extends from a covered water—it refers to the connection between the wetland and the covered water. No Supreme Court opinion analyzing the CWA's jurisdictional reach uses the phrase "continuous surface *water* connection." Rather, WOTUS include wetlands "physically abutting" relatively permanent waters connected to a traditional navigable water. *Rapanos*, 598 U.S. at 748 (plurality). And Dr. Dennis does not dispute that the wetland physically touches or abuts the upstream reach of Bessey Creek at the two locations the United States expert team identified. *see* Dennis Tr. 175:9–24 (Oct. 19, 2023) (Ex. 62).

### iii. The Site's wetlands are waters of the United States for two additional and independent reasons.

Prior to Defendants' discharges, the Site's wetlands had a continuous surface connection with the N/S Ditch and the 84th Avenue roadside ditch. Both the N/S Ditch and the 84th Avenue roadside ditch are relatively permanent waters. SOF ¶¶ 80, 91. The N/S Ditch has relatively continuous bed and bank features and an ordinary high-water mark, except in a few areas where either cattle or vehicular traffic crossed the N/S Ditch, and contains at least seasonal flow. *Id.* ¶ 75–79. Mr. Wylie observed water flowing through the entire length of the N/S Ditch in August and September of 2021. *Id.* ¶ 76. Defendants' surveyors identified water in the N/S Ditch near

16

the confluence with the upstream reach of Bessey Creek in December of 2021. *Id.* ¶ 77. And a staff gauge installed in the N/S Ditch showed water in the ditch from August through December of 2021. *Id.* ¶ 78. A map Defendants prepared and submitted to a Florida state agency even shows flow running from the Site into the N/S Ditch and from there into the upstream reach of Bessey Creek. *Id.* ¶ 79; Ex. 11.

Dr. Dennis asserts that the N/S Ditch is not a relatively permanent water because it (1) "loses its structure" at one location in the Countess Joy Reference Area where cattle have crossed the ditch and "does not appear to function as a ditch in that area" and (2) is "dry for months of the year, either in whole or in part." Dennis Suppl. Rep. 8–9 (Ex. 78). Both contentions are meritless. First, Dr. Dennis agrees that a majority of the N/S ditch has a bed and banks as well as an ordinary high water mark. Dennis Tr. 105:8–14 (Oct. 19, 2023) (Ex. 62). And Dr. Dennis observed water throughout the N/S Ditch as late as December 2021. *Id.* at 114:18–115:4. Second, as a result, Dr. Dennis only observed a "dry" portion of the N/S ditch during his March 2022 visit, an insufficient datum to rebut the United States' showing. *See supra* Part I.C.2.b.i.

The 84th Avenue roadside ditch possesses an ordinary high water mark as well as a continuous bed and banks, and, from its point of connection with the Countess Joy Reference Area wetland, contains relatively permanent flow. SOF ¶¶ 84, 87–90. Mr. Wylie observed flow in the 84th Avenue roadside ditch in August, September, and October 2021. *Id.* ¶ 90. And Dr. Nutter observed and documented surface water and surface water flow from the Countess Joy Reference Area wetland to the 84th Avenue roadside ditch over four months. *Id.* ¶ 90. Dr. Dennis' contention that the 84th Avenue roadside ditch does not qualify as a relatively permanent water is based on an observation on a single day during the dry season. Dennis Tr. 147:14–148:3 (Oct. 19, 2023) (Ex. 62). This alone does not create a genuine dispute of fact whether the ditch is a relatively permanent water. *See supra* Part I.C.2.b.i.

The large wetland of which the Site's wetlands were a part prior to Defendants' unauthorized activities have continuous surface connections with both the N/S Ditch and the 84th Avenue roadside ditch. The Site's wetlands connect to the N/S Ditch in two ways. Before Defendants' unauthorized activities, the Site's wetlands abutted the N/S Ditch in the southwestern corner of the Site. SOF ¶ 81; *see* Ex. 83 (historical aerial showing Site wetland abutting N/S Ditch). Indeed, Mr. Sharfi admitted in a permit application that the N/S Ditch 'has

been the historical surface water conveyance taking water away from the properties [including the Site], eventually leading to Bessey Creek and later to tide in the North Fork of the St. Lucie River.'" SOF ¶ 25. And the Site's wetlands were part of a larger wetland that extends northward and abuts the N/S Ditch at multiple locations in the Countess Joy Reference Area. *Id.* ¶ 82. The N/S Ditch then flows north directly into the upstream reach of Bessey Creek. *Id.* ¶ 74. Further, at the site of the cattle crossing at the N/S Ditch, some of the water leaves the ditch and flows west across the Countess Joy Reference Area and into the 84th Avenue roadside ditch, which also flows directly into the upstream reach of Bessey Creek. *Id.* ¶ 86. Therefore, the wetlands on the Site are WOTUS based on these additional (and independent) continuous surface connections.

Dr. Dennis claims upland berms isolate the Site's wetlands from the N/S Ditch and the Countess Joy Reference Area. *See* Dennis Suppl. Rep. 18 (Ex. 78). As an initial matter, Dr. Dennis is describing the *current* condition of the Site, not Site conditions *prior* to Defendants' unauthorized dredging and filling activities. Dennis Tr. 159:12–160:5 (Oct. 19, 2023) (Ex. 62). "Although a barrier separating a wetland from a [WOTUS] would ordinarily remove that wetland from federal jurisdiction, a landowner cannot carve out wetlands from federal jurisdiction by illegally constructing a barrier on wetlands otherwise covered by the CWA." *Sackett*, 598 U.S. at 679 n.16. In fact, Dr. Dennis can only speculate that "there may have been a spoil pile . . . between the ditch and the wetland" on the Site prior to Defendants' activities and *agrees* that historical imagery *before* Defendant's disturbed the Site shows a break in the berm that Dr. Dennis thought separates the Site's wetlands from the N/S Ditch. Dennis Tr. 158:25–159:2; 165:3–166:9 (Ex. 62). And while there are some berms along the N/S Ditch on the Countess Joy Reference Area, Dr. Dennis concedes there are other areas in which the wetlands continue through and abut the N/S Ditch. *See id.* at 225:7–239:18; Ex. 35 (indicating what Dr. Dennis believes are upland areas within approximate wetland United States expert team identified); *accord* Exs. 8, 14, and 19. Here, too, Dr. Dennis' unsubstantiated claims do not create a genuine dispute of material fact.

## II.     DEFENDANTS' ACTIVITIES ARE NOT EXEMPT.

CWA section 404(f)(1) exempts from the CWA's dredge-and-fill permit requirements certain "normal farming, silviculture, and ranching activities." 33 U.S.C. § 1344(f)(1)(A). Defendants assert this exemption in affirmative defense number 16. The Court should grant judgment in favor of the United States on the affirmative defense.

18

As an initial matter, Defendants mistakenly contend that their section 404(f)(1) defense is not a "true" affirmative defense. Defs.' Notice of Withdrawal 1, ECF No. 130 (withdrawing affirmative defense numbers 2, 3, 5, and 6 and contending the remainder "are not true affirmative defenses"). The exemption is not part of the United States' prima facie case; rather, Defendants carry the burden to prove their activities are exempt. *See, e.g.*, *United States v. Akers*, 785 F.2d 814, 819 (9th Cir. 1986) (citing *Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 926 (5th Cir. 1983); Rule 26(f) Conference Report 5 n.1, ECF No. 15 (stating that Defendants "hold the burden on their Affirmative Defenses"). Thus, whether Defendants' activities are exempt is a "true" affirmative defense (if evidence existed to support it). *See In re Rawson Food Serv., Inc.*, 846 F.2d 1343, 1349 (11th Cir. 1988).

Where an affirmative defense is contested, Defendants "bear[] the initial burden of showing that the affirmative defense is applicable." *United States v. Tubbs*, No. 19-80553, 2019 WL 7376706, at *2 (S.D. Fla. Nov. 22, 2019) (citing *Blue Cross and Blue Shield v. Weitz*, 913 F.2d 1544, 1552 (11th Cir. 1990)). Defendants cannot carry this burden. Exempt activities "must be part of an established (i.e., on-going) farming, silviculture, or ranching operation." 33 C.F.R. § 323.4(a)(1)(i)–(ii). The reach of the exemption is further limited by section 404(f)(2), which provides: "Any discharge of dredged or fill material into the navigable waters incidental to any activity having as its purpose bringing an area of the navigable waters into a use to which it was not previously subject, where the flow or circulation of navigable waters may be impaired or the reach of such waters be reduced, shall be required to have a permit under this section." 33 U.S.C. § 1344(f)(2); *see Conant v. United States*, 786 F.2d 1008, 1010 (11th Cir. 1986).

Here, there is no evidence that Defendants' land-clearing and fill activities were part of an "established" or "on-going" agricultural operation on the Site. To the contrary, aerial imagery shows that, before 2018, it had been decades—indeed, before Congress had enacted the CWA— since any person had done anything remotely similar on the Site. Ex. 1 (aerial imagery chronology). Until early 2018, the Site had been recovering from the cleared and grazed condition that existed in 1966. *See id.* Defendants cannot proffer evidence to the contrary. In fact, a state agency determined Defendants did not qualify for a state law agricultural exemption in part because their activities were not "normal and customary." Ex. 60, at -565. The lack of historical evidence of normal farming, silviculture, or ranching activities is fatal to Defendants' affirmative defense. *See, e.g.*, *United States v. Akers*, 785 F.2d 814, 819 (9th Cir. 1986); *United*

19

*States v. Larkins*, 657 F. Supp. 76, 85–86, n.23 (W.D. Ky. 1987). Thus, the United States is entitled to a ruling that neither CWA section 404(f) nor any other remaining affirmative defense is valid.

**CONCLUSION**

For the foregoing reasons, the Court should grant summary judgment in favor of the United States on Defendants' liability and proceed with a trial on remedy. Alternatively, if the Court does not grant the motion in full, the Court should grant the motion as to those *prima facie* elements of liability that the United States established.

Dated: November 10, 2023                     Respectfully submitted,

TODD KIM
Assistant Attorney General

*/s/ Brandon N. Adkins*
BRANDON N. ADKINS (Bar ID No. A5502752)
ANDREW J. DOYLE (FL Bar No. 84948)
JEFFREY HUGHES (Bar ID No. A5502897)
United States Department of Justice
Environment & Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044
Tel: (202) 616-9174
Fax: (202) 514-8865
Brandon.Adkins@usdoj.gov
Andrew.Doyle@usdoj.gov
Jeffrey.Hughes@usdoj.gov

MARKENZY LAPOINTE
United States Attorney

DEXTER LEE (FL Bar No. 936693)
Assistant United States Attorney
Southern District of Florida
99 N.E. 4th Street
Miami, FL 33132
Tel: (305) 961-9320
Fax: (305) 530-7679
Dexter.Lee@usdoj.gov

*Attorneys for the United States*