UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>   *Plaintiff*,<br><br>   v.<br><br>BENJAMIN K. SHARFI, in his personal capacity, as well as in his fiduciary capacity as trustee of the Benjamin Sharfi 2002 Trust, and NESHAFARM, INC.,<br><br>   *Defendants*. | Case No. 2:21-cv-14205-KAM |

**UNITED STATES' STATEMENT OF MATERIAL FACTS**

I. **DEFENDANTS**

1. Defendant Benjamin K. Sharfi is an individual. Ex. 76, ¶ 8.[1]

2. On April 24, 2017, Mr. Sharfi, as trustee of the Benjamin Sharfi 2002 Trust ("Sharfi Trust"), acquired an approximately 9.92-acre parcel of real estate in Martin County, Florida, with Parcel Identification Number 17-38-40-000-038-00000-0 (the "Site"). Ex. 42.

3. The Sharfi Trust is a revocable trust governed by Florida law. Ex. 73, ¶ 1. Mr. Sharfi is the sole grantor and trustee of the Sharfi Trust. *Id.* ¶¶ 2–3. Mr. Sharfi has all of the powers and duties provided to trustees under Florida law, including relating to environmental laws. *Id.* ¶ 4. Mr. Sharfi is responsible for the maintenance and disposition of the Trust's assets, including the Site. *Id.* ¶ 5. Only Mr. Sharfi can authorize Sharfi Trust business, exercise the powers of the trustee, or bind the Sharfi Trust. *Id.* ¶ 6.

4. On January 14, 2019, a quit claim deed was entered transferring ownership of the Site to Defendant NeshaFarm, Inc. ("NeshaFarm"). Ex. 77, ¶ 22.

5. NeshaFarm is a Florida corporation. *Id.* ¶ 15; Ex. 43 (articles of incorporation).

6. Mr. Sharfi is the chief executive officer of NeshaFarm and has been since the company was incorporated in 2016. Sharfi Tr. 21:23–22:2 (Ex. 70); Ex. 43.

7. Kevin Kryzda has been the president of NeshaFarm, Inc. (and other companies Mr. Sharfi owns) since late 2018. Kryzda Tr. 16:25–17:8; 26:20–22 (Ex. 69). Mr. Kryzda considers himself to be the president in "title only" because NeshaFarm "is the purview of Mr. Sharfi directly. It is mostly [Mr. Sharfi's] personal property and most of the activities therein are directed by [Mr. Sharfi] personally." *Id.* at 26:12–19; *see also id.* at 26:23–25.

8. Mr. Sharfi acquired the Site to expand NeshaFarm's property. *Id.* at 40:2–5.

9. NeshaFarm paid for at least some services rendered at the Site. Brown Tr. 83:6–23; 88:4–12 (Ex. 64) (dumping).

II. **THE SITE AND COUNTESS JOY REFERENCE AREA**

10. The upstream reach of Bessey Creek is a historically excavated channel that begins at the Martin County Solid Waste Transfer Station and Landfill facility ponds to the west and upstream of the Site ("upstream reach of Bessey Creek"). Wylie Suppl. Rep. 3 (Ex. 79).

11. The upstream reach of Bessey Creek runs through property located due north of the Site ("Countess Joy Reference Area"). *Id.*

---

[1] All exhibits are listed in the accompanying United States' Index to Exhibits.

12.     In 2015, the South Florida Water Management District ("SFWMD") issued a permit to Martin County to construct a Hybrid Wetland Treatment Technology ("HWTT") facility to improve Bessey Creek's water quality. Ex. 44, at -235. The HWTT facility is located approximately two miles downstream from the upstream reach of Bessey Creek that is due north of the Site. *Id.* at -255, -257; Nutter Suppl. Rep. 3 (Ex. 80); Ex. 10 (Figure III.C.1.1).

13.     Data Martin County submitted with the permit application for the upstream watershed, which included the Site and the Countess Joy Reference Area, show year-round water flow. Highest flows are in June through November. Mean daily flow is lowest in May. Ex. 34.

14.     The upstream reach of Bessey Creek flows and is connected to the downstream, tidally influenced reach of Bessey Creek. Wylie Suppl. Rep. 3–4; Nutter Suppl. Rep. 3.

15.     Bessey Creek is tidally influenced near where it crosses SW Murphy Bridge. *Id.*; Ex. 23 (Figure V.C.2.12). Bessey Creek is a traditional navigable water at this location. Wylie Suppl. Rep. 4 (Ex. 79); *accord* Ex. 71, at -155.

16.     Bessey Creek crosses SW Murphy Bridge four to six miles downstream from the upstream reach of Bessey Creek located due north of the Site. Ex. 79, at 3; Ex 71, at -155.

17.     The tidal reach of Bessey Creek continues to flow to the St. Lucie River, which then flows east and then southeast for approximately 10.9 miles to join the St. Lucie Inlet and the Atlantic Ocean, all of which are also traditional navigable waters. Wylie Suppl. Rep. 4.

18.     Photograph 5-5 of Exhibit 1 is an aerial photograph of the Site from 2016, *before* Defendants' conduct at issue.

19.     Photograph 5-19 of Exhibit 1 is an aerial photograph of the Site from 2021, *after* Defendants' conduct at issue.

### III.    DEFENDANTS' UNAUTHORIZED DISCHARGES

#### A.     Defendants' Initial Work on the Site

20.     On January 19, 2018, Mr. Kryzda emailed the Corps stating, that Mr. Sharfi "wishes to put this newly acquired property [the Site] into agricultural use." Ex. 45; Kryzda Tr. 83:8–11 (Ex. 69). Kryzda stated that "minor clearing and minor filling" were underway and requested "guidance in moving ahead with our plans." Ex. 45.

21.     In early 2018, Mr. Sharfi cleaned out a couple hundred feet of a ditch (the "N/S Ditch") that runs along the western boundary of the Site and spread the dredged spoil material in wetlands in the southwest corner of the Site. Kryzda Tr. 69:7–71:14; 84:12–20; 235:8–237:21

(Ex. 69); Ex. 58, at -246; Ex. 60, at -565. Contractors performed the work at Mr. Sharfi's direction and using an excavator, which is shown in a photograph taken in March 2018. Kryzda Tr. 84:21–85:4; 120:22–24; 121:9–122:3 (Ex. 69); Ex. 2, at -003.

22. Mr. Sharfi, by workers acting at his direction, additionally constructed a perimeter road around most of the Site. A box blade attached to a tractor was first used to grade the area for the road. Berlusconi Tr. 42:20–43:1; 51:5–52:2 (Ex. 66).

23. The dimensions of the box blade were about six feet by twenty inches. *Id.* at 50:19–23. The operator of the box blade can raise or lower the blade to grade the surface at a particular elevation. *Id.* at 50:23–51:2; 241:11–19. The operation of the box blade scrapes and thereby redistributes earthen material from one place to another. *Id.* at 241:8–25; 244:21–245:6.

24. Road rock was then deposited by dump trucks at the Site, including in the southwest area, and spread using a roller. *Id.* at 43:1–6; 59:23–60:18; Ex. 38 (indication "C").

## B.   Defendants' Permit Application and Wetland Delineation

25. On February 12, 2018, Mr. Sharfi submitted to the Corps a permit application purportedly to construct a fence, erect a "metal frame and metal roof structure," and perform other work in a ditch that runs along the western boundary of the Site. Ex. 46, at -002. Mr. Sharfi listed NeshaFarm as the "company" in the applicant field. *Id.* at -001. Mr. Sharfi stated that the ditch "has been the historical surface water conveyance taking water away from the properties [including the Site], eventually leading to Bessey Creek and later to tide in the North Fork of the St. Lucie River." *Id.* at -002. Mr. Sharfi signed the application and certified that he was authorized to direct the work on the Site. *Id.* at -003. Mr. Sharfi also expressly authorized Kryzda to act on Mr. Sharfi's behalf as his agent. *Id.* at -001.

26. In February 2018, Mr. Sharfi (by his agent Mr. Kryzda) hired an environmental consultant, Danna Small of DLS Environmental Services, Inc., to delineate the geographic extent of wetlands on the Site and obtain an informal verification of her assessment from the SFWMD, among other tasks. Ex. 47, at -165; Small Tr. 22:16–23; 23:3–9 (Ex. 65).

27. On February 23, 2018, Ms. Small advised Mr. Kryzda, "there does appear to be a wetland on the south side of the property [Site]." Ex. 47, at -165.

28. On March 9, 2018, Ms. Small visited the Site to place "flags" demarcating her assessment of the extent of wetlands on the Site. Small Tr. 38:10–18; 39:3–17 (Ex. 65).

29. During Ms. Small's March 2018 visit, a bulldozer was clearing an area that she

assessed were wetlands. *Id.* at 40:17–42:2. The bulldozer was clearing trees that, in her words, were "knocked over and crunched up." *Id.* at 42:1-2, 68:17–24.

30. Photographs Ms. Small took depict piles of roots and soil in the southwest area of the Site. Ex. 2, at -001, -002; Small Tr. 151:3–14 (Ex. 65). Ms. Small identified a red maple tree, which she described as a "wetland tree," among the vegetation that the bulldozer was clearing. *Id.* at 41:18–23; 69:8–12. One photograph depicts a track hoe. *Id.* at 70:4–11; Ex. 2, at –003.

31. This area was "always" muddy and Mr. Sharfi's employees graded the area "to get the wetness out." Berlusconi Tr. 69:16–24 (Ex. 66); Ex. 38 (indication "F"). They dumped fill using a "mini pickup truck" to "try to fill in [that] muddy area." Berlusconi Tr. 70:2–6 (Ex. 66). The fill was then spread using shovels and rakes. *Id.* at 73:25–74:10; *see also* Brown Tr. 68:9–69:3 (Ex. 64) (testifying that fill was dumped because there was "water everywhere").

32. Ms. Small testified that before she left the Site on March 9 she called Mr. Kryzda and "strongly recommended" that the work stop. Small Tr. 44:18–25 (Ex. 65).

33. Ms. Small delineated the Site "as it was at the time." *Id.* at 253:6–7. Because the perimeter road already existed when she arrived in March 2018, it was "not part of where [she] flagged." *Id.* at 190:12–18; *see also id.* at 191:15–17. At the time of her visit, however, Ms. Small "did speculate that it appeared that road had been constructed in wetlands from everything [she] could see." *Id.* at 191:3–6.

34. On March 17, 2018, the Corps wrote to Mr. Sharfi to advise that his application was incomplete. Ex. 48. The Corps stated, "While the application states the proposed project is for a fence, it appears that the proposed works may also include clearing of lands and the addition of structure [sic] in potential jurisdictional wetlands." *Id.*

35. Ms. Small agreed that the clearing activities she observed in wetlands on the Site were *not* consistent with maintaining the ditch on the western boundary of the Site or building a fence. Small Tr. 144:25–145:10 (Ex. 65).

36. On April 19, 2018, the Corps withdrew Mr. Sharfi's permit application for lack of a timely response. Ex. 53, at -030.

37. On April 25, 2018, the SFWMD visited the Site (together with Ms. Small) to verify Ms. Small's identification of the geographic extent of wetlands marked with flags. Small Tr. 118:22–24 (Ex. 65). Ms. Small advised Mr. Kryzda to be present at the inspection because she anticipated there being "[a] problem" because of the clearing of wetlands that already

4

occurred at the Site. Ex. 49, at -203; *see also* Small Tr. 102:10–23; 109:7–110:8 (Ex. 65).

38. When Ms. Small returned to the Site in April 2018 with the SFWMD, the "work being performed in the wetlands had expanded." *Id.* at 55:24–56:7. Heavy equipment was present at the Site, and multiple flags she had left the month before were gone as a result of the land-clearing activities that occurred. *Id.* at 55:24–56:2; 137:19–138:9; Ex. 51, at -256.

39. Ms. Small took photographs during the April 2018 Site visit of two bulldozers and a track hoe in the area she delineated as wetlands. Ex. 3, at -078, -079, -080; Small Tr. 122:20–23; 123:8–124:3; 124:14–127:9 (Ex. 65).

40. The SFWMD photographed the Site during its April 2018 visit and took aerial photographs on April 30. Ex. 4. The SFWMD photographs depict bulldozers and a track hoe in saturated soils at the Site. *Id.* at -014, -015, -018, -020. The SFWMD's aerial photographs from five days after the visit depict sod in the recently cleared and graded area in the southwest quadrant of the Site. *Id.* at -022.

41. Mr. Kryzda stated that the "area that was exposed was sodded to prevent erosion." Ex. 57, at -189; Ex. 58, at -246; Kryzda Tr. 201:21–202:12 (Ex. 69).

42. On April 26, 2018, the SFWMD issued an "informal jurisdictional wetland determination" under state law based on Ms. Small's assessment. Ex. 50.

**C.   Defendants' Activities After Receiving the Corps' Cease-And-Desist Letter**

43. On April 26, 2018, Mr. Kryzda wrote to Ms. Small, "I was afraid of this" and forwarded an email from the Corps stating that information showed "significant earth work [had] begun" without authorization. Ex. 52, at -178 to -179. Ms. Small responded, "this clearly sounds like they have somehow been notified of the work already done. I had hoped to avoid this correspondence." *Id.* at -178.

44. On April 30, 2018, the Corps issued a cease-and-desist letter to Mr. Sharfi. Ex. 53. The Corps stated that it "has obtained information from available sources that indicates fill, creating a dirt road, was place[d] around the perimeter of a 10-acre parcel containing a wetland, and that vegetation within the wetland was removed with heavy machinery." *Id.* at -030.

45. The same day, Mr. Sharfi responded, "[T]he short of it is we have not! We have plan[t]ed a few trees n [sic] clean the vines that were killing trees." Ex. 54, at -519. Mr. Sharfi stated, "We are very sensitive to thus [sic] issue and very much aware of the wetland locations." *Id.* Later that day, Mr. Sharfi stated, "You have my personal word on this issue that we will work

5

all the way with the Corps and any other agencies." *Id.* at -518.

46. On May 4, 2018, Mr. Kryzda sent a "reply" on NeshaFarm letterhead. Ex. 55. Mr. Kryzda stated, "Please allow me to relate to you that state [sic] Mr. Sharfi's desire for the property in question." *Id.* at -527. Mr. Kryzda stated, "Minor clearing and minor filling was [sic] undertaken in order to mobilize equipment to construct [a] fence." *Id.* Mr. Kryzda stated, "We have . . . sodded a small portion of the property to prevent further erosion but have done nothing to the ditch or other parts of the property." *Id.* Mr. Kryzda closed, "We are very sensitive to this issue and very much aware of the wetland locations." *Id.* at -528.

47. Also on May 4, Ms. Small submitted a response to the Corps' request for additional information. Ex. 56, at -098. Ms. Small submitted three Wetland Determination Data Forms for three sample locations. Small Tr. 171:10–18 (Ex. 65); Ex. 56, at -104 to -112.

48. Ms. Small determined that sample point 1 (northeastern-most sample location) was not within a wetland and that sample points 2 and 3 were within a wetland. Small Tr. 171:22–172:12 (Ex. 65); Ex. 56, at -104, -107, -110, -114. Ms. Small's sample point 1 falls outside of the U.S. expert team's wetland delineation, and Ms. Small's sample points 2 and 3 fall within it. *See* Ex. 16.

49. Ms. Small ended her professional relationship with Defendants because of her concern that activities continued at the Site regardless of her recommendations. Small Tr. 195:12–196:10 (Ex. 65). She testified that those concerns later proved to be accurate. *Id.* at 192:21–193:20; 196:9–10.

50. Aerial imagery from August 2018 shows that Defendants staged piles of fill material in the northwest corner of the Site and that clearing and grading activities occurred in that area (with visible puddling) into November 2018 and onward into 2019. Ex. 1, Photographs 5-15, 5-16; Exs. 5–6; Kryzda Tr. 223:5–224:1; 225:14–19 (Ex. 69). The activities included the use of a bulldozer. Brown Tr. 66:1–8 (Ex. 64); Ex. 37 (square indication drawn on Site map).

51. On November 28, 2018, the Corps emailed Mr. Sharfi stating that it had "reason to believe you [Mr. Sharfi] have continued work in jurisdictional wetlands without the benefit of a permit" and invited him to meet to explain his position. Ex. 59, at -534. On the same day, Mr. Sharfi responded, "BTW we never did agree that I will stop working my land! Once again you are misrepresenting the truth! As to other land I own, and will continue to purchase, I will continue to do under the LAW what I am permitted to do, as we have all along. . . . No need to

meet as far as I am concern [sic]. We have real work to do!" *Id.* at -533.

52. Mr. Sharfi thereafter created interior dirt roads within the Site (in addition to the perimeter road he earlier created) using the box blade. Berlusconi Tr. 238:15–20; 240:10–11 (Ex. 66); Ex. 39 (indicating interior roads where box blade was used); Ex. 1, Photograph 5-17.

53. An area was also graded for planting vegetation, Berlusconi Tr. 64:18–24 (Ex. 66); Ex. 38 (indication "E"), and areas in the northwestern quadrant of the Site would get muddy and were graded, too. Berlusconi Tr. 52:16–53:3; 87:10–13; Ex. 38 (indications "A" and "B").

54. Late in 2018 and continuing into 2019, Mr. Sharfi cleared additional vegetation and placed sod in the northeast and northwest quadrants of the Site. Kryzda Tr. 202:15–203:13.

55. In 2019 or 2020, a dump truck deposited sand in the northwestern quadrant of the Site that was then spread in nearby horse stables. Berlusconi Tr. 218:10–219:7 (Ex. 66); Ex. 38 (indication "R"); *see also* Brown Tr. 46:3–7 (Ex. 64); Ex. 36 (indication "D").

56. A track hoe dug, moved, and created dirt piles in several locations on the Site. Brown Tr. 53:20–24; 54:11–55:20 (Ex. 64); Ex. 37 (circle indications drawn on Site map).

57. Mr. Sharfi also authorized the excavation of ponds in 2019 or 2020. Sharfi Tr. 92:17–95:23 (Ex. 70). A tractor and box blade were used to deepen the pond in the southwest quadrant of the Site and thereby redistribute dirt to create a bank. Berlusconi Tr. 221:22–223:4 (Ex. 66); Ex. 38 (indication "F"). Mr. Sharfi "was out there a lot" monitoring the work. Berlusconi Tr. 223:19 (Ex. 66). In addition, an excavator dug out material for a different pond and deposited and spread out the material around the outside of the pond. *Id.* at 249:17–250:2; 250:14–19; Ex. 38 (indication "S").

58. The bulldozers, excavator, and tractor with a box blade that operated on the Site acted as discrete conveyances from which dredged or fill material was discharged at the Site.

59. Only Mr. Sharfi, made decisions about how the Site would be improved or developed. Kryzda Tr. 75:7–10 (Ex. 69); *see also id.* at 25:10–14; 53:18–54:3; 55:21–56:4; 61:17–18; 63:20–22; 68:9–12 (examples where Mr. Sharfi personally directed activities).

60. Defendants did not secure a permit issued under 33 U.S.C. § 1344 for the discharge of dredged or fill material into waters of the United States at the Site. Exs. 75–77, ¶ 44.

IV.   **WETLANDS ON THE SITE ARE "WATERS OF THE UNITED STATES"**

61. The U.S. expert team delineated wetlands on the Site based on the Corps of Engineers Wetlands Delineation Manual (1987) (Ex. 61) and Atlantic and Gulf Coastal Plain

7

Regional Supplement, their interpretation of standard mapping, aerial photography, remote sensing, reviews of previous delineations on the Site, field inspection reports, monitoring of Site and Countess Joy Reference Area water levels, and three field investigations of the Site and surrounding areas conducted in August, September, and October 2021. Wylie Suppl. Rep. 4 (Ex. 79); Nutter Suppl. Rep. 4–5 (Ex. 80); U.S. Exert Team Report 15–17, 23–31 (Ex. 81).

62. In nineteen locations on the Site, the U.S. expert team observed hydrology, vegetation, and soil conditions, all recorded on "Wetland Determination Data Forms." Ex. 40.

63. The U.S. expert team determined that, prior to Defendants' mechanical clearing of vegetation and associated redistributions of soils, filling, excavating, land levelling, and road and construction activities, approximately five to six acres of the Site were "wetlands," that is, inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and under normal circumstances did support, a prevalence of vegetation typically adapted for life in saturated soil conditions. Wylie Suppl. Rep. 4; U.S. Expert Team Report 35–36 (Ex. 81). Exhibit 16 reflects the U.S. expert team's Site wetland delineation.

64. In fall of 2021, the U.S. expert team conducted fourteen wetland determinations on the Countess Joy Reference Area. Ex. 41. Thirteen of the sampled points were wetlands and one sampled point was uplands (point W10). Wylie Suppl. Rep. 4–5; Ex. 12 (Figure IV.B.1.2).

65. The U.S. expert team determined that the wetlands on the Countess Joy Reference Area were contiguous to the Site's wetlands (prior to Defendants' unauthorized activities) and part of one contiguous wetland. Wylie Suppl. Rep. 5; Nutter Suppl. Rep. 5.

66. Exhibits 30 and 31 show the approximate location of contiguous wetlands from the Site through the Countess Joy Reference Area that the U.S. expert team identified.

A. **Upstream Reach of Bessey Creek**

67. The large wetland that, before Defendants' unauthorized activities, extended from the Site and through the Countess Joy Reference Area abuts the upstream reach of Bessey Creek in at least two locations at wetland data sheet locations W5 and W7. Wylie Suppl. Rep. 5–6; Ex. 41 (data forms); Ex. 12 (reference plot locations); *see also* Ex. 20–22 (sampling areas); Exs. 30, 31 (showing connection locations); Ex. 27; Ex. 28.

68. At the two locations identified in paragraph 67, no physical barriers separate the wetland and the upstream reach of Bessey Creek. Wylie Suppl. Rep. 6 (Ex. 79).

69. At these two locations, surface water from the wetland discharges to the upstream

reach of Bessey Creek, which the U.S. expert team's hydrologist, Dr. Wade Nutter observed and documented during field visits in August and September 2021. Nutter Suppl. Rep. 8–9.

70. The upstream reach of Bessey Creek has an ordinary high-water mark and bed and banks. Dennis Tr. 48:6–13 (Oct. 19, 2023) (Ex. 62); Nutter Suppl. Rep. 3 (Ex. 80).

71. Members of the U.S. expert team observed flow in the upstream reach of Bessey Creek north of the Countess Joy Reference Area in August, September, October, and December. Wylie Suppl. Rep. 3 (Ex. 79); Ex. 17–18, 26, 29; U.S. Expert Team Report 48 (Ex. 81). Staff gauge data recorded the presence of water in the upstream reach of Bessey Creek. Ex. 32.

72. August to December spans parts of the wet and dry seasons. Dennis Rep. 63–64.

73. The upstream reach of Bessey Creek is a relatively permanent water. Wylie Suppl. Rep. 3 (Ex. 79); Nutter Suppl. Rep. 3 (Ex. 80).

**B.   N/S Ditch**

74. The N/S Ditch flows northward from the Site and connects to the upstream reach of Bessey Creek. Wylie Suppl Rep. 6 (Ex. 79); Nutter Suppl. Rep. 7 (Ex. 80); Exs. 10, 17.

75. The N/S Ditch has relatively continuous bed and bank features and an ordinary high-water mark, except in a few areas where either cattle or vehicular traffic crossed the N/S Ditch. Wylie Suppl. Rep. 6 (Ex. 79); Nutter Suppl. Rep. 7 (Ex. 80); Ex. 82.

76. Mr. Wylie observed water flowing the length of the N/S ditch to the upstream reach of Bessey Creek during August and September 2021 investigations. Wylie Suppl. Rep. 6 (Ex. 79); Ex. 17 (Figure V.C.2.3); Ex. 8; Ex. 14.

77. Defendants' surveyors identified water in the N/S Ditch near the confluence with the upstream reach of Bessey Creek in December 2021. Dennis Tr. 123:23–125:4.

78. Data from a staff gauge in the N/S Ditch show about a foot of surface water at the gauge's location from mid-August through mid-December 2021. Ex. 32 (Figure V.D.1.b.1.4); Ex. 13; Dennis Tr. 129:23–130:3 (Oct. 19, 2023). Water levels at the gauge were generally at an elevation of about 22 feet during that period, which exceeds every bottom elevation of the N/S Ditch Defendants' surveyors documented as the ditch continues north from the gauge to its connection to the upstream reach of Bessey Creek. *Id.* at 133:6–11; 138:23–139:2.

79. Defendants submitted to a state agency a map showing flow running from the Site into the N/S Ditch and from there into the upstream reach of Bessey Creek. Ex. 11.

80. The N/S Ditch is a relatively permanent water. Ex. 79, at 6; Ex. 80, at 7.

81. Before Defendants' unauthorized activities, including by constructing a perimeter road around the Site, wetlands on the Site abutted the N/S Ditch where it runs along the western boundary of the Site. Wylie Suppl. Rep. 6–7; Ex. 25; Ex. 83; Ex. 1, Photograph 5-1.

82. The large, contiguous wetland, of which the Site's wetlands were a part before Defendants' unauthorized activities, abuts the N/S Ditch at several locations on the Countess Joy Reference Area. Wylie Suppl. Rep. 6–7; Nutter Suppl. Rep. 7; Ex. 8; Ex. 14; Ex. 19.

83. The present-day wetlands on the Countess Joy East Reference Area have a physical and surface water connection to the N/S ditch. Nutter Suppl. Rep. 7; Ex. 19.

C. **84th Avenue Ditch**

84. A roadside ditch runs on eastern side of SW 84th Avenue and adjoins the western side of the Countess Joy Reference Area ("84th Avenue Ditch"). Ex. 80, at 7; Ex. 79, at 7. The ditch connects to the upstream reach of Bessey Creek. Ex. 80, at 7; Ex. 18.

85. The large, contiguous wetland, of which the Site's wetlands were a part before Defendants' unauthorized activities, abuts the 84th Avenue Ditch in at least one location on the Countess Joy Reference Area. Ex. 79, at 7; Ex. 80, at 7; Ex. 24; Ex. 31.

86. At the site of the cattle crossing at the N/S Ditch, some of the water leaves the N/S ditch and flows west across the Countess Joy Reference Area and into the 84th Avenue roadside ditch where the wetland abuts the ditch. Ex. 80, at 7; Ex. 79, at 7; Ex. 31.

87. Water table monitoring data (Reference Well 7) where the Countess Joy Reference Area wetlands abut the 84th Avenue Ditch (Reference Well 7) show flow during the entire study period. Ex. 13; Ex. 80, at 7; Ex. 32.

88. The 84th Avenue Ditch exhibits relatively permanent flow to the upstream reach of Bessey Creek. Wylie Suppl. Rep. 7.

89. The 84th Avenue ditch possesses an ordinary high-water mark and continuous bed and banks, and, from its point of connection with the Countess Joy Reference Area wetland, contains relatively permanent flow. *See* Wylie Tr. 278:11–13 (Oct. 5, 2023) (Ex. 67).

90. Mr. Wylie observed flow in the 84th Avenue roadside ditch in August, September, and October 2021. *Id.* at 277:21–24. Dr. Nutter observed and documented surface water and surface water flow from the Countess Joy Reference Area wetland to the 84th Avenue roadside ditch over four months. Ex. 32 (Figure V.D.1.b.1.3).

91. The 84th Avenue ditch is a relatively permanent water. Ex. 79, at 7; Ex. 80, at 7.

10

Dated: November 10, 2023

TODD KIM
Assistant Attorney General

*/s/ Brandon N. Adkins*
BRANDON N. ADKINS (Bar ID No. A5502752)
ANDREW J. DOYLE (FL Bar No. 84948)
JEFFREY HUGHES (Bar ID No. A5502897)
United States Department of Justice
Environment & Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044
Tel: (202) 616-9174
Fax: (202) 514-8865
Brandon.Adkins@usdoj.gov
Andrew.Doyle@usdoj.gov
Jeffrey.Hughes@usdoj.gov

MARKENZY LAPOINTE
United States Attorney

DEXTER LEE (FL Bar No. 936693)
Assistant United States Attorney
Southern District of Florida
99 N.E. 4th Street
Miami, FL 33132
Tel: (305) 961-9320
Fax: (305) 530-7679
Dexter.Lee@usdoj.gov

*Attorneys for the United States*