# EXHIBIT 65

Danna Small                                     March 17, 2022

Page 1

1                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA
2                       FORT PIERCE DIVISION
3                  CASE NO. 2:21-cv-14205-KAM
4
     UNITED STATES OF AMERICA,
5
         Plaintiff,
6
     vs.
7
     BENJAMIN K. SHARFI, in his personal
8    and fiduciary capacity as trustee of
     the Benjamin Sharfi 2002 Trust, and
9    NESHAFARM, INC.,
10       Defendants.
     _____/
11
12
13                            United States Attorney's Office
                             101 South US 1
14                           Suite 3100
                             Fort Pierce, Florida
15                           Thursday, 10:21 a.m.-5:21 p.m.
                             March 17, 2022
16
17
              VIDEOTAPED DEPOSITION OF DANNA SMALL
18
19
20         Taken on Behalf of the Plaintiff before
21      Lisa Gerlach, Court Reporter, Notary Public
22      in and for the State of Florida at Large,
23      pursuant to Notice of Taking Deposition in
24      the above cause.
25   Job No. CS5105560

Danna Small                                                      March 17, 2022

Page 19

```
 1        A.  No.

 2        Q.  Do you remember who offered the course?

 3        A.  Other than -- no, I don't remember.

 4        Q.  Do you recall anything about the subject

 5   matter of the course?

 6        A.  Not really.

 7        Q.  What was your title at the Florida Department

 8   of Environmental Protection, or titles?  You spent ten

 9   years there.

10        A.  Wow.  It's been such a long time.  I left as

11   an environmental manager.  I started as an

12   environmental specialist 1.

13        Q.  Were there other titles in between?

14        A.  Environmental specialist 2.

15        Q.  Okay.  Any others?

16        A.  No.

17        Q.  What were your responsibilities as an

18   environmental manager at FDEP?

19        A.  Hire staff, train staff, review permit

20   applications that were coming in, assign permit

21   applications, review draft permits by my staff.  There

22   we go.  That covers it pretty much in a simplified

23   form.

24        Q.  When you say, "review permit applications,"

25   these are applications that members of the public are
```

Danna Small                                                    March 17, 2022

1   submitting to DEP; is that correct?

2        A.  Yes.

3        Q.  As an environmental specialist 1 and 2, what

4   were your responsibilities?

5        A.  Compliance and enforcement and permit review.

6        Q.  In either of these roles, did you conduct

7   site inspections?

8        A.  Yes.

9        Q.  In either of these roles, did you -- I'll

10  withdraw the question.

11       What kind of experience do you have in

12  delineating wetlands in terms of numbers of wetlands

13  that you've delineated since becoming an environmental

14  consultant at DLS Environmental?

15       A.  I can't recall.

16       Q.  Do you think more than 50?

17       A.  Yes.

18       Q.  More than 100?

19       A.  I'm not certain.

20       Q.  How many wetlands do you delineate on average

21  a year?

22       A.  None now.  I'm semi-retired.

23       Q.  When did you become semi-retired?

24       A.  I started attempting probably almost three

25  years ago.

1     Q.  What do you mean by "started attempting"?  I

2  think I might know the answer to this, but why don't

3  you tell me?

4     A.  Attempting to cut back the number of projects

5  and the number of clients that I deal with.

6     Q.  Okay.  Before you started attempting to

7  retire in, let's say, around 2019, about how many

8  wetland delineations would you do annually?

9     A.  I can't recall.

10     Q.  Would you do more than ten a year?

11     A.  Some years.

12     Q.  This case concerns allegations that the

13  defendants, Benjamin K. Sharfi and NeshaFarm, Inc.,

14  filled jurisdictional wetlands without a permit from

15  the United States Army Corps of Engineers in violation

16  of the federal Clean Water Act.

17          The allegations center on a parcel of real

18  estate in Martin County, Florida.  The parcel has an

19  identification number of 17-38-40-O00-38-00000-0.

20          Are you familiar with that property?

21     A.  Yes.

22          (DX Exhibit 9 was marked.)

23  BY MR. ADKINS:

24     Q.  I'm handing you a document that's been

25  identified as Exhibit DX 9.  The words "The Site"

Danya Small                                          March 17, 2022

Page 22

1    appear on the top.  It's an aerial photograph with red

2    highlighting over a portion of property.

3           Do you recognize the highlighted red area on

4    DX 9 to be the site -- excuse me -- the personal real

5    estate that I just identified on the record?

6       A.  Yes.

7       Q.  I will -- for purposes of this deposition,

8    I'll refer to that parcel of real estate as the site.

9    Okay?

10      A.  Okay.

11      Q.  Do you understand that?

12      A.  Yes.

13      Q.  So do you recognize the red highlighted

14   square on DX 9 to be the site?

15      A.  Yes.

16      Q.  How are you familiar with the site?

17      A.  I was hired by Kevin Kryzda, apparently, with

18   the consent of Mr. Sharfi, to delineate the wetlands

19   on the site and get that line confirmed by South

20   Florida Water Management District.  And then also

21   provide assistance with the preserve area management

22   plan for Martin County and any land clearing that he

23   wanted to do outside of the preserved area.

24      Q.  Are there any other ways that you can recall

25   that you've become familiar with the site other than

Danna Small                                    March 17, 2022

Page 23

 1   what you just described?

 2        A.  No.

 3        Q.  So you said you were hired by a Kevin Kryzda.

 4   Who is Kevin Kryzda?

 5        A.  He was somebody that apparently was working

 6   on behalf of Mr. Sharfi.

 7        Q.  You say "apparently."  Why do you think that?

 8        A.  He had to get approval to hire me from

 9   Mr. Sharfi.

10             MR. MCALILEY:  I'm sorry to interrupt.

11        If you could speak up just a little bit?  We

12        have somebody on the phone and he's having a

13        hard time hearing.  I'm hearing you just

14        fine, but it would help.  Thank you.

15             THE WITNESS:  Okay.

16   BY MR. ADKINS:

17        Q.  How do you know that Mr. Kryzda had to get

18   approval to hire you from Mr. Sharfi?

19        A.  It was in an email that he sent.

20        Q.  When did you first have contact with

21   Mr. Kryzda?

22        A.  Sometime in 2018.

23        Q.  How did you first have contact with

24   Mr. Kryzda?

25        A.  He contacted me.

Danna Small                                    March 17, 2022

Page 24

1      Q.   Do you know how he learned of you?

2      A.   No.

3      Q.   How did he contact you?  Was it by phone, by

4   email, some other way?

5      A.   I am going to respond based upon the review

6   of the emails that I sent, and basically it appears

7   that he initially contacted me by phone.

8      Q.   Do you have a website for DLS Environmental?

9      A.   I do.

10     Q.   Do you advertise?

11     A.   No.

12     Q.   How do you suspect he got your phone number?

13     A.   I don't know.

14     Q.   Did you ever ask him?

15     A.   Not that I recall.

16     Q.   So what did you talk about?

17     A.   Exactly what he was hiring me to do.

18     Q.   What exactly did Mr. Kryzda say he was hiring

19   you to do?

20     A.   Delineate the wetlands, file for verification

21   of that wetland line with South Florida Water

22   Management District, obtain a preserve area management

23   plan from Martin County, and address land clearing

24   that they wanted to do.

25     Q.   Do you recall anything else that you

Page 25

```
 1    discussed with Mr. Kryzda when you had this first
 2    phone call with him?
 3         A.   No.
 4         Q.   What happened next?
 5         A.   I can't recall.
 6         Q.   Well, did Mr. Kryzda hire you?
 7         A.   Oh, yes, he did.
 8         Q.   So what happened in between Mr. Kryzda
 9    calling you and when you were hired?
10         A.   What happened in between?  Typically nothing
11    happens until I'm hired.
12         Q.   Were you hired?
13         A.   Yes.
14         Q.   Did you ever visit the site?
15         A.   Yes.
16         Q.   Did you visit the site before you were hired?
17         A.   No.
18         Q.   Are you familiar with the term "desk review"?
19         A.   Yes.
20         Q.   What does that term mean to you?
21         A.   In my field, it means a review of the
22    site prior to going out there based upon aerials,
23    et cetera.
24         Q.   Did you do a desk review of the site at any
25    point?
```

Danna Small                                        March 17, 2022

```
 1        A.   I probably did a desk review when I was on
 2   the phone with him.
 3        Q.   Okay.  Do you recall anything that you
 4   observed while you were on the phone with Mr. Kryzda?
 5        A.   No.
 6        Q.   Do you recall doing a desk review at any
 7   other point of the site?
 8        A.   Not really.
 9        Q.   How frequently were you in contact with
10   Mr. Kryzda with respect to the work he asked you to
11   perform?
12        A.   I don't recall.
13        Q.   Did you have contact with him weekly,
14   monthly, yearly?
15        A.   It was more often than yearly.  It was
16   probably more often than monthly.
17        Q.   Did you receive any instructions from
18   Mr. Kryzda with respect to the wetland delineation?
19        A.   I don't understand the question.
20        Q.   Well, what was the ask?  Did Mr. Kryzda say,
21   "We want you to delineate a wetland"?
22             MR. MCALILEY:  Objection; asked and
23        answered twice.
24        A.   He asked me to delineate the wetland so we
25   could get confirmation from South Florida Water
```

Page 27

1    Management District and then provide for the preserve

2    area plan for Martin County.

3         Q.  Did Mr. Kryzda give you any indication that

4    there were parts of the site that should not be

5    delineated?

6         A.  No.

7         Q.  Did you receive any further instructions

8    other than what you just described on the record?

9         A.  Not that I recall.

10        Q.  The name Charles Berlusconi, have you heard

11   that name before?

12        A.  Not that I recall.

13        Q.  What about Chuck?

14        A.  Yes.

15        Q.  Who do you understand Chuck to be?

16        A.  I think that was the site foreman that he

17   said is on the property.

18        Q.  Did you ever have any contact with this

19   person, Chuck?

20        A.  I might have met him when I was on-site the

21   first time.  I can't recall specifically.

22        Q.  When were you first on the site?

23        A.  Based upon the review of my notes, it appears

24   it was in March of 2018.

25        Q.  We'll talk about that in depth.

Danna Small                                                        March 17, 2022

Page 35

 1   holes you dug?

 2        A.  Not really.

 3        Q.  I'll represent to you that the site is

 4   9.92 acres.  At a site that size, about how many holes

 5   do you think you would typically dig?

 6        A.  It's not relative to the size of the site.

 7   It's relative to where I see the wetland line and

 8   where there might be a transition area.  It has

 9   nothing to do with the size of the site.

10        Q.  Okay.  You reviewed documents in prep for

11   this deposition; is that right?

12        A.  Yes.

13        Q.  You reviewed the delineation that you made to

14   prepare for this site, is that correct --

15        A.  I glanced at it.

16        Q.  -- for this deposition?  In reviewing those

17   documents, are you able to ballpark about how many

18   holes you might have dug?

19        A.  It might have been six.  I really don't know.

20   It's in my site visit notes, though.

21        Q.  Okay.  Now, when you dig a hole, why don't

22   you walk me through that?  What are you doing when you

23   dig this hole?

24        A.  You're looking at the soils.

25        Q.  Okay.  How deep of a hole do you dig?

Page 36

1      A.  Should be at least 12 inches.  Preferably 16,

2  if you can get that deep.

3      Q.  Do you remember whether you had any issues

4  digging a sufficiently deep hole while you were on the

5  site?

6      A.  I make my husband do it.

7      Q.  Okay.  Did Mr. Small have any issues digging

8  a hole that was sufficiently deep?

9      A.  No.

10      Q.  Do you remember what you observed when you

11  dug these holes?

12      A.  I do not recall specifically.

13      Q.  How about locations?  Did you -- in looking

14  at the vegetation at the site, did you observe the

15  entirety of the site?

16      A.  Yes.

17      Q.  How did you do that?  Did you walk?

18      A.  Yes.

19      Q.  Did you use a vehicle at all?

20      A.  No.

21      Q.  Could you say that you walked the entirety of

22  the site?

23      A.  Yes.

24      Q.  When you dug holes, do you recall about where

25  you dug these holes on the site?

Danna Small                                    March 17, 2022

Page 37

1          A.  Not right offhand.

2          Q.  Would that information be in your notes?

3          A.  Yes.

4          Q.  We're going to look at those later.  I'm not

5     trying to give you a memory test here.  Just exploring

6     what you know before we start doing that.  Okay.  We

7     talked about observing vegetation, digging holes.

8               What else did you do?

9          A.  That's the majority of it.

10         Q.  Did you take any photos?

11         A.  Oh, yes.

12         Q.  So what are you doing when you're taking

13    photos?

14         A.  Documenting site conditions.

15         Q.  Did you take any photos when you were on the

16    site?

17         A.  Yes.

18         Q.  Anything else?

19         A.  Not that I recall.

20         Q.  Do you fill out any data forms when you

21    conduct a site inspection?

22         A.  Not on the site.

23         Q.  So you did not complete any data forms on the

24    site during the March 2018 inspection?

25         A.  Correct.

Danna Small                                              March 17, 2022

Page 38

1        Q.  Did you take any notes of your observations

2   while you were on the site in March 2018?

3        A.  Yes.

4        Q.  Did you complete any data forms based on

5   those notes?

6        A.  Yes.

7        Q.  Did you complete any data forms based on

8   anything other than your notes?

9        A.  No.

10       Q.  So we have observing vegetation, digging

11   holes, taking photos, taking notes.

12            Is there anything else that you did when you

13   inspected the site in March 2018?

14       A.  I flagged the wetland line.

15       Q.  What does that mean?

16       A.  That means, I flagged -- physically put

17   flags -- at the limits of the wetland at the time that

18   I was on the site.

19       Q.  How many flags did you put?

20       A.  I think, when I glanced at my notes this

21   morning, it referenced 27 or 29.  Something like that.

22       Q.  So to place flags on the wetland line,

23   presumably, you have to make some sort of delineation

24   while you're in the field?

25       A.  Yes.

Danna Small                                                    March 17, 2022

1        Q.   Is that what you did here?

2        A.   Yes.

3        Q.   So what was your delineation of the wetland

4    line based on?

5        A.   Soils and vegetation or any other indicators

6    that might constitute a wetland.

7        Q.   What other indicators would constitute a

8    wetland?

9        A.   You can have hydrologic indicators.  If you

10   have muck, that's an automatic wetland.  You don't

11   necessarily have vegetation when you have muck.  You

12   can have just muck.

13       Q.   Other than hydrologic indicators, muck, any

14   other indicators you can recall that would help you

15   delineate a wetland?

16       A.   For this particular site, those are the ones

17   I relied on.

18       Q.   Do you have any training in soils

19   identification?

20       A.   Yes.

21       Q.   What kind of training do you have in soils

22   identification?

23       A.   It's all related to the wetland delineation

24   training.

25       Q.   Do you recall the names of any kind of soils

Danna Small                                                March 17, 2022

Page 40

```
 1   you observed while you were on the site?
 2        A.   I believe I did identify that there was mucky
 3   mineral and muck.
 4        Q.   Any other soils?
 5        A.   Not that I recall.
 6        Q.   Did you observe any hydrologic indicators of
 7   wetlands on the site?
 8        A.   Muck is a hydrologic indicator.
 9        Q.   Any others?
10        A.   Not that I recall.
11        Q.   How about water conditions?  Was the site wet
12   when you were there?
13        A.   Some areas were damp.  Some areas were wet.
14        Q.   Okay.  When you say "wet," what do you mean?
15        A.   There could have been a little standing
16   water.
17        Q.   So in terms of conditions at the site, were
18   there any construction activities occurring in
19   March 2018 when you visited the site?
20        A.   Yes.
21        Q.   What activities did you observe?
22        A.   There was heavy equipment on the southwest
23   corner, southwest area, of the site.
24        Q.   What do you mean by heavy equipment?
25        A.   Bulldozer.
```

Danya Small                                                    March 17, 2022

Page 41

1        Q.   Was the bulldozer in operation?

2        A.   Yes.

3        Q.   What was it doing?

4        A.   Clearing an area that I had delineated that

5   fell under the wetland category.

6        Q.   So the bulldozer was operating in an area

7   that you had delineated as a wetland?

8        A.   Yes.

9        Q.   Practically, how did that work out?  If you

10  were placing flags to mark the line and a bulldozer

11  was operating, were you out there with the bulldozer

12  moving around?

13       A.   Well, I don't stand in front of him.  But,

14  yeah, I mean, I placed the flags on the wetland line.

15  So, I mean, if he's in the wetland and I'm on the

16  wetland line, he's in the wetland and I'm not

17  interfering with him.

18       Q.   When the bulldozer was operating, what was it

19  doing?  You say it was clearing.  What was it

20  clearing?

21       A.   From the vegetative debris on the site, it

22  looked like there was red maples in the vegetative

23  debris.

24       Q.   And vegetative debris, chips -- wood chips?

25       A.   No.  These were trees.  They were trees.

Danna Small                                      March 17, 2022

Page 42

1      Q.   Were they cut?

2      A.   They were crunched.

3      Q.   Was the bulldozer pushing the trees over?

4      A.   I don't specifically recall exactly what he

5    was doing at that moment, but I did see a pile of

6    vegetative debris.

7      Q.   How about with the soil -- was the bulldozer

8    moving any soil at this time?

9      A.   I can't recall.

10     Q.   Do you recall seeing any piles of soil

11   anywhere on the site?

12     A.   Yes.

13     Q.   Did you observe anyone working with those

14   piles of soil?

15     A.   Specifically those piles of soil, no.

16     Q.   Who was operating the bulldozer?

17     A.   I didn't ask.

18     Q.   Okay.  So a bulldozer was operating in an

19   area that you delineated as a wetland.

20          Did you ever tell anyone they should stop

21   activity?

22     A.   Yes.

23     Q.   Who did you tell?

24     A.   I mentioned it to Chuck, but I believe I had

25   to call Kevin, because he was no longer at the site,

Danya Small                                              March 17, 2022

Page 43

1    and I did indicate that to Kevin.

2         Q.   What exactly did you mention to Chuck?

3         A.   That there was work going on in wetlands and

4    he really should stop.

5         Q.   So when you visited the site in March 2018,

6    you told a person named Chuck, who you believe is a

7    foreman, that there was work happening in wetlands at

8    the site and they should stop; is that correct?

9         A.   Yes.

10        Q.   How about your call -- what was Chuck's

11   response to that?

12        A.   I can't recall.

13        Q.   Did he indicate whether or not that work

14   would discontinue?

15        A.   I don't specifically recall.

16        Q.   Did you have any conversations with Chuck

17   about the purpose of the work?

18        A.   No.

19        Q.   Did you have any speculation about why that

20   work was happening?

21             MR. MCALILEY:   Object to form.   You

22        shouldn't be asking her to speculate.

23        A.   No.

24   BY MR. ADKINS:

25        Q.   How about your call to Kevin; do you recall

Danya Small                                        March 17, 2022

                                                    Page 44

1    anything from that?

2         A.   Not too specifically.  I do know that I

3    called him to give him the heads up that they should

4    stop the activity.  It was in wetlands.

5         Q.   Do you recall when you called Kevin?

6         A.   I was still on the site when I called him.

7         Q.   So when you visited the site in March 2018,

8    you called Kevin Kryzda and informed him that work was

9    occurring in wetlands on the site and that work should

10   stop; is that correct?

11        MR. MCALILEY:  Object to form.  I think

12        she just answered the question and you're

13        restating some version of her answer.  Her

14        answer should stand.

15        A.   I strongly recommended that the activity

16   stop.

17   BY MR. ADKINS:

18        Q.   So, when you were on the site in March 2018,

19   you observed work occurring in an area that you

20   delineated as a wetland.  You called Kevin Kryzda

21   while you were on the site and strongly recommended

22   that that work stop; is that correct?

23        MR. MCALILEY:  Objection; asked and

24        answered.

25        A.   Yes.

Page 45

```
 1   BY MR. ADKINS:

 2        Q.  What was Mr. Kryzda's response?

 3        A.  I can't recall.

 4        Q.  Did he give any indication that that work

 5   would stop as you strongly recommended?

 6        A.  Not that I specifically recall.

 7        Q.  Did you have any other communications with

 8   anyone else regarding your recommendation that work

 9   that was occurring at the site in March 2018 should

10   stop?

11        A.  I believe it was only -- it was mainly Kevin.

12        Q.  Did you take any samples when you were on the

13   site in March 2018?

14            MR. MCALILEY:  Objection; form, asked and

15        answered.

16        A.  Define "sample."

17   BY MR. ADKINS:

18        Q.  Did you take any samples of vegetation while

19   you were on the site?

20        A.  No.

21        Q.  Did you take any samples of soil while you

22   were on the site?

23        A.  No.  I don't take it home with me.

24            (Exhibit DX 10 was marked.)

25   BY MR. ADKINS:
```

Danna Small                                                March 17, 2022

 1        Q.  Ms. Small, I handed you a document identified
 2   as DX 10.  This is an aerial image of the site.
 3            Do you recognize this image as being the
 4   site?
 5        A.  It is the site.
 6        Q.  It looks different from the time you were
 7   there; is that right?
 8        A.  Absolutely.
 9        Q.  Are you able to identify on DX 10 where you
10   observed mucky mineral soils?
11        A.  Yes.
12        Q.  Why don't you put an X everywhere on the site
13   where you observed mucky mineral soils and then put an
14   A with a circle around that, if you would?
15        A.  An A with a circle?
16        Q.  An A with a circle, yes.
17        A.  I'm going to be generic at this point because
18   it's been quite a while.  But, I mean, you don't want
19   me to cover a whole area with A's or circles.  I mean,
20   it went like -- it was an area.
21        Q.  An area where you observed mucky mineral
22   soil?
23        A.  And muck, yes.
24        Q.  And muck.  So could you give us a delineation
25   of where you observed mucky mineral soil, or muck?

Danna Small                                            March 17, 2022

Page 47

1      A.   Specifically, I don't recall a delineation of

2   that particular type of soil, because, when I do a

3   delineation, it's a wetland delineation.  Not a

4   specific soil delineation.

5      Q.   Okay.  So why don't you put an X with an A

6   and a circle around it generally of where you observed

7   mucky mineral soil or muck on the site?

8      A.   I did.

9          MR. MCALILEY:  I'm just going to object

10         to the extent you're asking her to basically

11         speculate if she doesn't remember exactly.

12         I'm going to object to guessing.

13         MR. ADKINS:  Sure.

14   BY MR. ADKINS:

15     Q.   Are there any other areas on the site, other

16   than where you've indicated with an X with an A and a

17   circle around it, where you observed mucky mineral

18   soil or muck?

19     A.   I don't recall.

20     Q.   You said you observed a little standing water

21   when you were on the site in March 2018?

22     A.   Yes.

23     Q.   Can you indicate where you observed on the

24   site a little standing water with an X and a B with a

25   circle around it, please?

Danya Small                                                    March 17, 2022

Page 52

1        Q.  Was Mr. Small with you?

2        A.  No.

3        Q.  Was Mr. Sharfi present?

4        A.  No.

5        Q.  Were any representatives of Mr. Sharfi

6   present?

7        A.  When they took them around the farm?

8        Q.  At any time during the April 2018 inspection.

9        A.  There was somebody.  I can't recall who it

10  was who took them around the farm part.

11       Q.  Was that person, who took Ms. Huffman and

12  Ms. Stone around the farm after they viewed your

13  wetland delineation, also present at other parts of

14  the inspection?

15       A.  No.

16       Q.  How did you get around the site that day?

17       A.  Walked.

18       Q.  Did you use any vehicles?

19       A.  No.

20       Q.  Okay.  What happened first during the

21  inspection?

22       A.  I'm not certain -- I don't understand the

23  question.

24       Q.  What was the purpose of the inspection?

25       A.  To verify the wetland line.

Page 53

1        Q.   Did the representatives from the Water
2   Management District verify the wetland line?
3        A.   To the best they could at that point, yes.
4        Q.   How did they do that?
5        A.   They look at my flagging and see if they have
6   any concerns with the flag locations.
7        Q.   Did they have any concerns?
8        A.   No.
9        Q.   Did they dig any holes?
10        A.   No.
11        Q.   Did they observe any wetland vegetation?
12        A.   Yes.
13        Q.   Where did they observe wetland vegetation?
14        A.   Within the wetland area that was flagged.
15        Q.   Did they observe wetland vegetation anywhere
16   else on the site?
17        A.   Not that I recall.
18        Q.   How about photographs?
19        A.   I don't know if -- are you asking, did they
20   take some?
21        Q.   Did the representatives from the Water
22   Management District take any photographs during the
23   April 2018 inspection?
24        A.   I don't recall.
25        Q.   Did you take any photographs during the

Page 54

1    April 2018 inspection?

2         A.  Yes.

3         Q.  Did you take any notes during the April 2018

4    inspection?

5         A.  No.

6         Q.  Do you recall observing the representatives

7    of the Water Management District taking any notes

8    during the April 2018 inspection?

9         A.  I don't recall.

10        Q.  When the representatives of the Water

11   Management District looked at your flagging, from

12   where were they standing when they did that?

13        A.  They were all over the site.  They don't

14   stand in one spot and look at the flag.  They were all

15   over the site.

16        Q.  Okay.  So they walked around the area that

17   you had delineated; is that right?

18        A.  Yes.

19        Q.  Did they walk around any other parts of the

20   site that were not delineated as a wetland?

21        A.  I don't recall, but, typically, they would.

22        Q.  Did you walk any portion of the site north of

23   where you delineated a wetland?

24        A.  Yes.

25        Q.  Did you walk all the way to the northern

Danna Small                                    March 17, 2022

Page 55

1    border of the site?

2          A.  With them, I can't recall.

3          Q.  But you did when you were on the site in

4    March 2018?

5          A.  Absolutely.

6          Q.  Do you recall having any conversations with

7    representatives from the Water Management District

8    during the April 2018 inspection?

9          A.  We did have conversations.  We don't walk

10   around the site silent.  So there were conversations

11   and they did identify that work was going on in

12   wetlands.

13         Q.  Do you remember specifically what

14   representatives of the Water Management District said

15   with respect to work that was going on in wetlands?

16         A.  No.

17         Q.  Do you recall about how long those

18   conversations took place?

19         A.  No.

20         Q.  Did you observe any change in conditions at

21   the site from the time you inspected in March 2018 and

22   when you inspected in April 2018?

23         A.  Yes.

24         Q.  What change in conditions did you observe?

25         A.  The work being performed in the wetlands had

Danna Small                                             March 17, 2022

Page 56

1    expanded and some of my flagging was gone as a result

2    of that work.

3         Q.   How did work that was being performed in

4    wetlands expand?

5         A.   It got bigger.

6         Q.   So it expanded in area?

7         A.   Yes.

8         Q.   So more of the area that you had delineated

9    as a wetland was being worked in from the time you had

10   visited in April 2018 to the time when you visited --

11   sorry -- when you visited in March until the time you

12   visited in April 2018; is that right?

13        A.   Yes.

14        Q.   What about the nature of that work, did it

15   change in any way?

16        A.   It looked like it was the same kind of work.

17        Q.   So I don't want to put words in your mouth.

18   Is this removing vegetation?

19        A.   Yes.  Bulldozer, vegetation gone, yes.

20        Q.   Did you notice any changes in the soil from

21   the time you visited in March 2018 to the time you

22   visited in April 2018?

23        A.   Are you asking, did I go into the areas where

24   they had cleared and checked the soil again?

25        Q.   Well, maybe not subsurface; although, if you

Page 57

1   have, I think that would be relevant to my question.

2   My question is more, did you observe any changes in

3   the soil within the area you delineated as a wetland

4   from the time you were there in March until you were

5   there in April 2018?

6        A.   No.  Other than it had been cleared and you

7   could tell heavy equipment was going through it.

8        Q.   Did you observe any additions of soil to the

9   wetland area?

10       A.   Are you asking if I observed fill?

11       Q.   By fill, will you understand it to mean

12  additions of soil?

13       A.   Yes.  That's what it usually means.  No.

14       Q.   Did you observe any changes to the elevation

15  of the soil in the area that you delineated as a

16  wetland from the time you were there in March until

17  you were there in April of 2018?

18       A.   No.

19       Q.   Was any heavy equipment present on the site

20  when you were there in April 2018?

21       A.   Yes.

22       Q.   What heavy equipment did you observe on the

23  site in April 2018?

24       A.   I believe there was a bulldozer there.

25       Q.   Did you observe any other heavy equipment on

Danna Small                                          March 17, 2022

Page 58

 1    the site in April 2018?

 2         A.   Not that I recall.

 3         Q.   Was the bulldozer in operation?

 4         A.   I can't recall.

 5         Q.   Okay.  About how long did it take the Water

 6    Management District to verify the wetland delineation

 7    that you made?

 8         A.   I don't recall.

 9         Q.   Did it take more than a couple hours?

10         A.   Not likely.

11         Q.   Do you recall when you left the site that

12    day?

13         A.   No.

14         Q.   Did you leave before lunch?

15         A.   I can't recall.

16         Q.   Did you have any other conversations with

17    anyone other than the representatives of the Water

18    Management District before you left the site that day?

19         A.   Not that I recall.

20         Q.   How were you let out of the site?

21         A.   I can't recall.

22         Q.   At any point, have you visited properties

23    that are adjacent to the site?

24         A.   No.

25         Q.   You've never visited the property that is

Danna Small                                               March 17, 2022

Page 59

1    directly north of this site; is that correct?

2         A.   Correct.

3         Q.   So you've never taken any soil samples of the

4    property that's directly north of the site; is that

5    correct?

6         A.   Correct.

7         Q.   You've never observed any hydrologic

8    conditions of the site that is directly north of the

9    site?

10        A.   I've never been to the site north of the site

11   in any way, shape, or form.

12        Q.   So that's right?

13        A.   That's right.

14        Q.   There is a ditch that runs around the western

15   boundary of the site; is that right?

16        A.   Yes.

17        Q.   Do you recall observing the conditions of

18   that ditch at any time that you were on the site?

19        A.   It had water in it.

20        Q.   So in March 2018, when you were on the site,

21   you observed that the ditch that runs along the

22   western boundary of the site had water in it; is that

23   correct?

24        A.   Yes.

25        Q.   Was there anything else that you observed in

Page 65

1   before?

2        A.  Yes, I believe it was.

3        Q.  Around the time you visited the site in

4   March 2018, were you aware of whether Mr. Sharfi or

5   NeshaFarm or any other entity had applied for a permit

6   to conduct work in wetlands on the site from the

7   United States Army Corps of Engineers?

8        A.  No.

9        Q.  Are you aware now that a permit was applied

10  for with the US Army Corps of Engineers to conduct the

11  work in wetlands on the site?

12       A.  Yes.

13       Q.  When did you first become aware of that

14  permit?

15       A.  I don't recall.

16           (DX Exhibit 12 was marked.)

17  BY MR. ADKINS:

18       Q.  Ms. Small, I handed you a document that's

19  been identified as Exhibit DX 12.  This is a series of

20  photographs with Bates identifiers DLS0000001,

21  sequentially stamped through DLS0000010.  So if my

22  math serves me, that's ten photographs.

23           Do you see this document?

24       A.  Yes.

25       Q.  Do you recognize these photographs?

Danya Small                                          March 17, 2022

Page 66

1          A.  Yes.

2          Q.  Did you take these photographs?

3          A.  Yes.

4          Q.  Do you recall when you took these

5    photographs?

6          A.  During the March site visit.

7          Q.  What do these photographs depict generally?

8          A.  They depict the site in different locations.

9          Q.  So I want you to look at each of the ten

10   photographs here and I'm going to ask you whether

11   these photographs accurately depict your observations

12   of the site when you visited in March 2018.

13          Do you want to take a moment to look through

14   these?

15          A.  Can I ask a stupid question?

16          Q.  Sure.

17          A.  If they're pictures of the site, how could

18   they not accurately represent the site at the time of

19   my site visit?

20          Q.  This probably isn't a great time to do a

21   lesson on evidentiary law.  There are reasons for some

22   of these questions.

23          A.  Okay.  Go ahead.

24          MR. MCALILEY:  I don't think it was a

25          dumb question.

Danya Small                                    March 17, 2022

Page 67

1              MR. ADKINS:  I agree with that, yeah.

2     BY MR. ADKINS:

3         Q.  Okay.  So I'm going to do them all at once

4     unless your answer is no.  All ten of these pictures,

5     do they accurately represent your observations of the

6     site in March 2018?

7         A.  Yes.

8         Q.  So let's start with the first one, which is

9     Bates 0000001.  What is this photograph depicting?

10        A.  A pile of vegetative debris in a muck area

11    with red maples in it.

12        Q.  How do you know this is in a muck area?

13        A.  I'm pretty certain this is the area that I

14    stepped near and went up to my shin in muck.

15        Q.  Okay.  So when you were visiting the site in

16    March 2018, you stepped in an area of muck that went

17    up to your shin; is that correct?

18        A.  Yes.

19        Q.  Is that area that you stepped in muck around

20    where you indicated on DX 10 with an A and a circle

21    around it?

22        A.  Not quite.

23        Q.  Are you able to indicate on DX 10 where you

24    stepped in an area of muck that went up to your shin?

25        A.  Yeah, pretty much.

Danya Small                                              March 17, 2022

Page 68

1        Q.  Can you do that with an X and a D with a

2   circle around it?

3        A.  (Complies.)

4        Q.  Okay.  Great.  Do you recall from where you

5   took the photograph that is depicted at DLS0000001?

6        A.  Specifically from where I took the

7   photograph?  I don't recall.

8        Q.  This was within an area that you had

9   delineated as a wetland on the site?

10       A.  Yes.

11       Q.  So what is this -- I'm not sure how to

12   describe it -- but a clump of roots and dirt, it looks

13   like?

14       A.  Vegetative debris.

15       Q.  Where did this dirt come from?

16       A.  It looked like it came from on-site.

17       Q.  Is this some of this debris from a tree that

18   has been knocked over?

19       A.  Crunched.

20       Q.  What's the difference between knocked over

21   and crunched?

22       A.  Knocked over seems to apply it's all in one

23   piece still.  Crunched means knocked over and crunched

24   up.

25       Q.  Did you observe any dirt from the roots of

Danya Small                                           March 17, 2022

Page 69

1    this tree being moved in this process of being

2    crunched?

3         A.  I don't recall.

4         Q.  Let's turn to picture 2.  This is DLS0000002.

5    What is this picture depicting?

6         A.  It's a close-up of the previous one to show

7    that is a red maple in the vegetative debris file.

8         Q.  Why is it relevant that this is a red maple?

9         A.  That's a wetland tree.

10        Q.  So you took a picture of this to document

11   there was a wetland tree on the site?

12        A.  Yes.

13        Q.  Do you recall where you took this picture?

14        A.  Not specifically.

15        Q.  Do you recall whether you took this picture

16   within the area that you delineated a wetland in

17   March 2018?

18        A.  Yes.

19        Q.  Is there anything else notable about this

20   picture or why you took it?

21        A.  Not really.

22        Q.  Let's turn to DLS0000003.  What is this a

23   picture of?

24        A.  The wetland area.

25        Q.  So this is a picture of the area that you

Page 70

1    delineated as a wetland in March 2018?

2         A.   This area was located within the area flagged

3    as a wetland, yes.

4         Q.   I see there's a mechanical arm in the top

5    right area of this picture.  What is that?

6         A.   I don't recall that one.

7         Q.   So you don't recall, at the time you were on

8    the site in March 2018, this mechanical device being

9    on the site?

10        A.   That looks like a track hoe.  Obviously, it

11   is on the site.  I just don't specifically recall it.

12        Q.   Right.  There are some areas that look to me,

13   looking at this picture, like standing water; is that

14   accurate?

15        A.   It's hard to say from the photo.

16        Q.   Do you recall there being standing water in

17   the areas that are depicted in this photograph?

18        A.   I can't recall specifically.

19        Q.   The soil looks roiled to me.  Would you agree

20   with that or disagree?

21        A.   Agree.

22        Q.   How did that happen?

23        A.   Looks like heavy equipment.

24        Q.   Would this be from the operation of the

25   bulldozer that you observed in March 2018?

Page 71

1          MR. MCALILEY:  Object to form.

2      A.  It's possible.

3  BY MR. ADKINS:

4      Q.  Do you know how the soil became roiled?

5      A.  Not specifically.

6      Q.  Looking at this picture, is there anything to

7  indicate that there was fill placed in the area

8  depicted in DLS0000003?

9      A.  Not that I see.

10     Q.  Let's turn to DLS0000004.  There's a man in

11 the bottom left corner.

12         Is that someone familiar to you?

13     A.  That's my husband.

14     Q.  Where is this -- do you recall where this

15 picture is, what is being depicted in this picture?

16     A.  It's a picture of the wetland area.

17     Q.  Do you recall where -- did you take this

18 picture?

19     A.  Yes.

20     Q.  Do you remember where you were standing when

21 you took this picture?

22     A.  This one, I was standing on the south road.

23     Q.  Would you be able to indicate on DX 10 where

24 you were standing when you took this picture?

25     A.  How do you want me to mark this?

Danya Small                                           March 17, 2022

                                                    Page 72

 1          Q.  Is the answer, yes, you can?

 2          A.  Oh, yes.

 3          Q.  I'll have you, please, mark on DX 10 with an

 4    X and E with a circle around it the position where you

 5    took the picture represented as DLS0000004.

 6          A.  (Complies.)

 7          Q.  Have you done that, Ms. Small?

 8          A.  Yes.

 9          Q.  Are you able to identify any wetland

10    vegetation in DLS0000004?

11          A.  Not from the photo.

12          Q.  Okay.  Let's turn to the next photograph.

13    This is DLS0000005.  What is this picture depicting?

14          A.  Still the wetland area.

15          Q.  I see that there is a mound of soil in the

16    right side of this picture.

17          Do you see that?

18          A.  Yes.

19          Q.  What is that; do you recall?

20          A.  I don't recall.

21          Q.  Is this an area where the bulldozer was

22    operating on March 2018?

23          A.  I believe it was, yes.

24          Q.  Did you observe the bulldozer pushing any

25    soil that would have created this mound in the right

Danna Small                                    March 17, 2022

1    side of the picture?

2         A.  I can't recall.

3         Q.  Are you able to identify any wetland

4    vegetation in this picture?

5         A.  It looks like the majority of it's been

6    removed already.

7         Q.  Do you recall where you were standing when

8    you took this picture?

9         A.  Not specifically.

10        Q.  Okay.  Let's turn to DLS0000006.  What is

11   this picture depicting?

12        A.  An area that was borderline as far as

13   wetlands, where the agency might think it's wetlands,

14   but I determined it was not.

15        Q.  Is there a reason why you thought it was

16   important to take this picture?

17        A.  To keep my memory fresh.

18        Q.  Why did you think that the -- I assume you

19   meant the Water Management District when you said "the

20   agency"?

21        A.  Correct.

22        Q.  Why do you think the Water Management

23   District might find this area to be a wetland?

24        A.  If I remember correctly, it had some

25   melaleuca in it.

1    for the amount of $955, and it's stamped DLS0000057.

2              Are you familiar with this document?

3         A.   Yes.

4         Q.   What is this?

5         A.   It's an invoice.

6         Q.   An invoice of what?

7         A.   An invoice of services.

8         Q.   By whom?

9         A.   By me.

10        Q.   By DLS Environmental Services?

11        A.   Yes.

12        Q.   Is this a document that you keep in your

13   business records for DLS Environmental Services?

14        A.   Yes.

15        Q.   Do you have any reason to believe that this

16   document is not an accurate representation of the

17   invoice dated 4318?

18        A.   Nope.

19        Q.   Under wetland delineation, you identified

20   site visit to flag wetland line, 3.5 hours.

21              Do you see that?

22        A.   Yes.

23        Q.   Is that 3.5 hours you spent on the site?

24        A.   Thereabouts.

25        Q.   About how much time of the 3.5 do you think

Page 100

1    you spent on the site to flag the wetland line?

2         A.   I don't recall.

3         Q.   Would this have been during your March 2018

4    visit?

5         A.   Yes.

6         Q.   Prepare and submit application to the South

7    Florida Water Management District to verify wetland

8    line, 3 hours.

9             This is for work to prepare that application

10   we looked at; is that right?

11        A.   Correct.

12        Q.   Does this include any time for attending the

13   site inspection in April?

14        A.   No.

15             (DX Exhibit 18 was marked.)

16   BY MR. ADKINS:

17        Q.   I'm handing you a document that's been marked

18   Exhibit DX 18.  This is an email from Kevin Kryzda to

19   you on April 5, 2018.  It's identified with Bates

20   stamp DLS0000200 through DLS0000203.

21             Do you recognize this document?

22        A.   Yes.

23        Q.   What is this?

24        A.   It's an email.

25        Q.   Do you recall receiving this email from

Danna Small                                                      March 17, 2022

Page 101

1    Mr. Kryzda?

2         A.   Not specifically, but...

3         Q.   Did you produce this email to the United

4    States?

5         A.   Yes.

6         Q.   Do you have any reason to believe this is not

7    an accurate representation of the email you received

8    from Mr. Kryzda on April 5, 2018?

9         A.   No.

10        Q.   In the last communication in this chain on

11   the last page, 203, you said, "Also, I received

12   notification from the South Florida Water Management

13   District that the site meeting will be 9:00 on 4/9.

14   So I assume I will contact Chuck to let us in the

15   gate."

16             Chuck, is that Chuck Berlusconi?

17        A.   Yes.

18        Q.   Do you remember having any conversations with

19   Mr. Berlusconi when you --

20        A.   I don't recall.

21        Q.   Actually, I'll withdraw the question.

22             So the next sentence, he said, "Are you

23   planning on being there?  Might not be a bad idea

24   since we are going to be dealing with a, quote, bump,

25   end quote, due to the wetland impacts which have

Danya Small                                        March 17, 2022

Page 102

1   already occurred."

2          Do you see where I'm reading?  This is on

3   page 203.  It's the paragraph that starts, "Also, I

4   received notification."

5      A.  Okay.  Yeah.

6      Q.  You were asking if Mr. Kryzda was planning on

7   being at the site inspection with the Water Management

8   District; is that right?

9      A.  Yes.

10     Q.  Why did you think it might not be a bad idea

11  for Mr. Kryzda to be there?

12     A.  For him to hear what the Water Management

13  District had to say about anything.

14     Q.  What were you anticipating?

15     A.  A problem.

16     Q.  Why is that?

17     A.  Because of the activity that already

18  occurred.

19     Q.  What do you mean by the activity that already

20  occurred?

21     A.  Some of the clearing of the wetlands that had

22  occurred that I had seen on-site when I did the first

23  site visit.

24     Q.  You had said you called Mr. Kryzda when you

25  were on the site when you saw this activity.

Danna Small                                                    March 17, 2022

Page 103

1              Did you ever get the sense that that would

2    stop, based on your strong recommendation that it

3    stop?

4              MR. MCALILEY:  Object to form.

5        A.  I don't have an opinion on that, actually.

6    BY MR. ADKINS:

7        Q.  So what did you mean by dealing with a bump

8    due to the wetland impacts.  What did you mean by

9    bump?

10             MR. MCALILEY:  Object to form; asked and

11        answered.

12       A.  That's the wetland impact.

13   BY MR. ADKINS:

14       Q.  Did you mean a bump like a bump on the head?

15       A.  No.  I meant, it could be an issue with the

16   South Florida Water Management District and how they

17   might want to handle it or address it.

18       Q.  Like a bump in the road maybe?

19       A.  Right.

20       Q.  Later in your email, you said, "I also

21   attached a proposal for assistance with the Corps

22   permitting.  These fees may come as a bit of a shock,

23   or not.  I have no idea what other charge.  But their

24   process for wetlands, et cetera, is totally different

25   and they have a form which is three pages long, which

Danna Small                                              March 17, 2022

Page 104

1    you fill out for every different location on the

2    property.  Lots and lots of paperwork associated with

3    that aspect."

4              Do you see where I'm reading?

5        A.  Yes.

6        Q.  So, their process, are you referring to the

7    United States Army Corps of Engineers?

8        A.  Yes.

9        Q.  You don't have to be embarrassed.  I know we

10   have counsel from the Corps here.  He won't take

11   offense.

12             What exactly is different about the Corps'

13   process for wetlands?

14       A.  Paperwork, paperwork, paperwork, paperwork.

15   Their form is three pages long for each plug that you

16   dig, and then you've got to make sure that you've got

17   a plug for every different representative area of the

18   site.  Whether it's uplands or wetlands, it doesn't

19   matter.  It's a ridiculous amount of paperwork.

20       Q.  You have some feelings about this paperwork,

21   it sounds like?

22       A.  Well, it's extreme.

23       Q.  So this three-page form, what did you mean by

24   that?

25       A.  It's the wetland data form that you keep

Page 105

1    referring to.

2          Q.  We're coming full circle.

3          A.  Uh-huh.

4          Q.  Okay.  How do you know this about the Corps'

5    process?

6          A.  Because I do permitting for a living.

7          Q.  So you've done some Corps permits?

8          A.  Yeah.  I try to avoid those wetland ones.

9          Q.  Why is that?

10         A.  The paperwork.

11         Q.  Have you ever received any training in

12   completing a wetland data form?

13         A.  Actually, no.

14         Q.  Have you ever received any training in how

15   the Corps identifies wetlands?

16         A.  Not specifically.

17         Q.  Do you have any reason to think that it might

18   be any different from the Water Management District?

19         A.  It is somewhat different.

20         Q.  In what ways?

21         A.  For them?  So, with the state, you only need

22   two indicators to call it a wetland.  So it's either

23   going to be soil, vegetation, and/or hydrology -- the

24   hydrologic indicator.  You only need two of those

25   items for the state.

Danna Small                                                March 17, 2022

                                                           Page 106

1              For the Corps, you have to have three of

2      those items.  But they have expanded their definition

3      of what those items -- what constitutes -- whether

4      it's wetland vegetation or other aspects -- to

5      encompass more area.  Even though you still have to

6      have three of those items, it makes it -- a lot of

7      times, they claim a much larger area.

8          Q.  And how do you have this information?

9          A.  Because I do permitting.

10         Q.  I know you have a lot of experience with it,

11     but have you ever read any books, any manuals,

12     anything like that?

13         A.  Not that I specifically recall.  I must have

14     at some point, but I don't specifically recall.  It's

15     been a long time.

16         Q.  Do you recall ever reviewing any manuals for

17     delineating wetlands?

18             MR. MCALILEY:  Object to form.

19         A.  I do recall reviewing some of the -- they

20     don't call them rules.  They call them codes or some

21     weird thing.  It's not even a code.  I do recall

22     reading some stuff like that, uh-huh.

23     BY MR. ADKINS:

24         Q.  Do you recall about when that was?

25         A.  No.

Page 107

1      Q.  In the last five, ten years?

2      A.  I can't recall.

3      Q.  At the time you delineated the wetland for

4  purposes of the Water Management District, did you

5  have any -- did you do anything to have information so

6  that you could also do a delineation for purposes of

7  the permit with the Corps?

8          MR. MCALILEY:  Object to form.

9      A.  I had my notes that were sufficient to

10  prepare the wetland data forms that would be required

11  by the Corps.

12  BY MR. ADKINS:

13      Q.  Right.  So you did eventually complete

14  wetland data forms; is that right?

15      A.  Yes.

16      Q.  You completed those based on your notes?

17      A.  Yes.

18      Q.  Had you done -- had you completed those data

19  forms at the time of this email, which is April 3,

20  2018?

21      A.  No.

22      Q.  Do you recall when you completed the data

23  forms?

24      A.  Not specifically.

25      Q.  Sometime after April 3rd?

Danna Small                                              March 17, 2022

Page 108

1        A.  Yes.

2        Q.  And before you submitted the response to the

3   request for additional information?

4        A.  Correct.

5        Q.  You had sufficient information in your notes

6   to complete wetland data forms; is that right?

7        A.  Correct.

8        Q.  You submitted three -- you said you took, you

9   think, around -- you dug about six holes?

10            MR. MCALILEY:  Object to form.

11  BY MR. ADKINS:

12       Q.  Is it fair to assume there were certain holes

13  that you dug at the site in March 2018 for which you

14  did not complete wetland data forms?

15            MR. MCALILEY:  Object to form.

16       A.  If I dug six holes and I submitted three

17  wetland data forms, then there would be either ones

18  that are redundant, so you don't need to fill out a

19  second wetland data form -- and that would typically

20  be the scenario.

21  BY MR. ADKINS:

22       Q.  Are there any other reasons why you wouldn't

23  have to complete a wetland data form?

24       A.  I don't know.  I let the Corps tell me.

25       Q.  Okay.  Do you recall in this case whether you

Danya Small                                               March 17, 2022

Page 109

1    did not complete wetland data forms for holes that you

2    dug at the site because they were redundant?

3              MR. MCALILEY:  Object to form.

4         A.  I don't recall.

5              (DX Exhibit 19 was marked.)

6    BY MR. ADKINS:

7         Q.  I'm handing you a document that's been marked

8    Exhibit DX 19.  This is an email from you to Trisha

9    Stone on April 3, 2018, at 3:27 p.m.  It's been

10   stamped DLS0000167 through 169.

11             Do you recognize this document?

12        A.  Yes.

13        Q.  What is this?

14        A.  It's an email.

15        Q.  Is this an email that you produced to the

16   United States?

17        A.  Yes.

18        Q.  Do you recall sending this email to

19   Ms. Stone?

20        A.  Once again, not specifically.

21        Q.  Okay.  Do you have any reason to believe that

22   this isn't an accurate reproduction of the email that

23   you sent to Ms. Stone on April 3, 2018?

24        A.  No.

25        Q.  So in the bottom email from Ms. Stone to you

Danna Small                                           March 17, 2022

Page 110

1    on April 3rd, Ms. Stone wrote, "Are you available to

2    conduct a joint site inspection of the two sites

3    beginning Monday, April 9th, starting at 9:00 a.m.?"

4            Is she referring to the Water Management

5    District's inspection of the site?

6        A.   Yes.

7        Q.   What was the purpose of that?

8        A.   To verify the wetland line.

9        Q.   You wrote on April 3, 2018, in the bottom

10   email on 167, "Okay.  I will notify them.  They have

11   to give us access.  It is gated.  Anticipate the owner

12   or the owner's rep will also be present for this one.

13   I doubt they will come with us to review the flagging

14   because some of it is pretty dense vines, but I think

15   they will certainly want to initially meet you."

16           Do you see where I'm reading there?

17       A.   Yes.

18       Q.   The owner or the owner's rep, who were you

19   referring to?

20       A.   Kryzda.

21       Q.   Why did you tell Stone that the owner's rep

22   might be there?

23       A.   Just to let her know, somebody else will be

24   there.

25           (DX Exhibit 20 was marked.)

Page 111

1   BY MR. ADKINS:

2       Q.  I'm handing you a document that's been marked

3   Exhibit DX 20.  This appears to be a letter from DLS

4   Environmental Services, Inc., on April 3, 2018, to

5   Benjamin Sharfi 2002 Trust, care of Kevin Kryzda, and

6   it's stamped DLS0000249 through 251.

7           Do you recognize this document?

8       A.  Yes.

9       Q.  What is this?

10      A.  It's a proposal.

11      Q.  Proposal for what?

12      A.  Assistance with the Army Corps's request for

13  additional information.

14      Q.  In the first paragraph, it says, "It is our

15  understanding that you are requesting assistance with

16  permitting maintenance on the existing ditch on the

17  west side of the property through the Army Corps of

18  Engineers (Corps)."

19          Do you see that?

20      A.  Yes.

21      Q.  So this is consistent with your understanding

22  of that.  The purpose of the project was to do

23  maintenance on the ditch; is that right?

24      A.  Correct.

25      Q.  And to build a fence?

Page 112

 1       A.   Right.

 2       Q.   Is there anything in this document that

 3  indicates one of the purposes of the project was to

 4  fill wetlands on the site?

 5       A.   Not that I can recall.

 6       Q.   If the defendants had intended to fill

 7  wetlands and you knew of that, would your letter

 8  documenting your professional services to the

 9  defendants -- would it have said anything different?

10            MR. MCALILEY:   Object to form.

11       A.   It really depends upon the circumstances.

12  BY MR. ADKINS:

13       Q.   What circumstances would it depend on?

14       A.   Every proposal is a little bit different, so

15  different municipalities, different local criteria,

16  different criteria applies.   So you're saying

17  specifically, if Martin County -- if he wanted to fill

18  wetlands in Martin County -- he wouldn't have gotten a

19  proposal from me for it.

20       Q.   Well, you know, you said that you didn't know

21  the exact location of the fence.

22       A.   Right.

23       Q.   I imagine, if the fence was a little bit

24  longer or a little bit shorter, there might not be

25  many changes in the agreement that you have --

Page 113

1              MR. MCALILEY:  Object to form.

2    BY MR. ADKINS:

3        Q.  -- to offer professional services.

4              But my question is, if the difference were

5    maintenance on the ditch or filling wetlands on the

6    site, would you have expected to write something

7    different in the agreement that you had with the

8    defendants?

9              MR. MCALILEY:  Object to form.

10       A.  That's a theoretical, and I really -- I'm

11   trying to politely say that -- because I know Martin

12   County's codes, which do not allow to fill in

13   wetlands, he would not have gotten a proposal for the

14   activities.  So the proposal -- you're giving me a

15   theoretical that wouldn't exist in my world, because I

16   already know the codes.

17   BY MR. ADKINS:

18       Q.  I see.  So the hypothetical that I'm offering

19   is difficult for you because you know the answer, and

20   the answer is, the defendants can't fill wetlands in

21   Martin County?

22             MR. MCALILEY:  Object to form.

23       A.  That is true.

24   BY MR. ADKINS:

25       Q.  And that's because of the municipal codes; is

Danna Small                                        March 17, 2022

Page 114

1    that right?

2             MR. MCALILEY:  Object to form.

3         A.   Absolutely.

4             MR. ADKINS:  Let's take a break.

5             THE VIDEOGRAPHER:  This is the end of

6         media two.  The time is 1:07.  We're going

7         off the record for a media change.

8             (Brief recess.)

9             THE VIDEOGRAPHER:  This is media number

10        three in the deposition of Danna Small.  The

11        time is 1:31 p.m.  We're back on the record.

12   BY MR. ADKINS:

13        Q.   I'd like to go back to DX20.  The first

14   paragraph that's under "Response to Corps' request for

15   additional information," it starts, "The consultant

16   has reviewed the request."  At the end of that

17   paragraph, there's a sentence that says, "If wetland

18   impacts extend beyond the limits of the existing ditch

19   or if the ditch is supporting wetland-dependent

20   species, the Corps may require mitigation."

21             What did you mean by that?

22        A.   Exactly what it says.  If there's wetland

23   impacts in the ditch where there's vegetation, the

24   Corps can require mitigation for those impacts.

25        Q.   At the time of this document, April 3, 2018,

Danna Small                                      March 17, 2022

Page 115

 1   were you aware of whether there were wetland impacts

 2   that extended beyond the ditch?

 3        A.  So, no -- I mean, yes, I was, because I did

 4   the site visit.  But this is -- since their plan was

 5   to perform maintenance on the ditch -- Martin County

 6   allows ditch maintenance.  Army Corps views it

 7   differently.  If there's vegetation in there, they

 8   consider it a wetland and not a ditch and they want

 9   mitigation.

10           So if they were planning on widening the

11   ditch or something like that, or making it more

12   functional, that sort of thing, that's what that last

13   sentence is supposed to address.

14        Q.  This might be obvious to you, but why is it

15   that the impacts that were happening within the area

16   that you delineated as a wetland on the site was not

17   mentioned in the scope of your services here?

18        A.  I wasn't requested to address it.

19           (DX Exhibit 21 was marked.)

20   BY MR. ADKINS:

21        Q.  I'm handing you what's been marked as DX 21.

22   This is an email from Kevin Kryzda to you on April 5,

23   2018, stamped DLS0000216 through 217.

24           Are you familiar with this document?

25        A.  Yes.

Danna Small                                                    March 17, 2022

                                                              Page 116

1          Q.  What is this document?

2          A.  It's an email.

3          Q.  Do you remember receiving this email from

4    Mr. Kryzda?

5          A.  Not specifically.

6          Q.  Is this an email that you produced to the

7    United States?

8          A.  Yes.

9          Q.  Do you have any reason to think that this is

10   not an accurate reproduction of the email that you

11   received from Mr. Kryzda on April 8, 2018?

12         A.  No.

13         Q.  On April 5, at the last email in this chain,

14   Mr. Kryzda said -- wrote -- "Good morning, Danna.  Is

15   it possible to delay the SFWMD visit?"

16              Do you see that?

17         A.  Yes.

18         Q.  Was he referring to the South Florida Water

19   Management District that was planned for April 9?

20         A.  Yes.

21         Q.  Do you know the reason for the delay?

22         A.  No.

23         Q.  There's a bit more to this email, it appears,

24   because, at the end of this chain, you can see that

25   Mr. Kryzda was responding to something that you wrote

Danna Small                                           March 17, 2022

Page 117

1    on April 4, 2018, if you look at the last page of the

2    document?

3           MR. MCALILEY:  April 4 or April 5?

4           MR. ADKINS:  April 5.  Excuse me.  Thank

5       you.

6       A.  Okay.

7    BY MR. ADKINS:

8       Q.  What happened to the rest of this email?

9       A.  I have no idea.

10       Q.  Did you learn later why the site visit was

11    delayed, why Mr. Kryzda asked for a delay?

12       A.  No.

13       Q.  Was it, in fact, delayed?

14       A.  Yes.

15           (DX Exhibit 22 was marked.)

16    BY MR. ADKINS:

17       Q.  I'm handing you a document that is marked

18    Exhibit DX 22.

19       A.  Maybe it wasn't delayed.  It's hard to say.

20    I think the site visit was delayed.

21       Q.  This is the Water Management District site

22    visit?

23       A.  Yes.

24       Q.  Okay.  This is DX 22, a letter from the South

25    Florida Water Management District, dated April 9,

Page 118

1    2018, to Danna Small, DLS Environmental Services,

2    Bates-stamped DLS0000039 through 40.

3            Are you familiar with this document?

4    A.   Yes.

5    Q.   What is this document?

6    A.   It's a request for additional information.

7    Q.   From?

8    A.   South Florida Water Management District.

9    Q.   Do you have any reason to believe this is not

10   an accurate reproduction of the letter that South

11   Florida Water Management District sent on April 9,

12   2018?

13   A.   No.

14   Q.   Number 2, page 039, says, "A joint site

15   inspection with district staff has been scheduled for

16   April 25, 2018, to verify the wetland boundaries at

17   the site.  Prior to the field inspection, wetland

18   boundary should be field-staked or flagged for SFWMD

19   staff verification and approval."

20           Do you see that?

21   A.   Yes.

22   Q.   The April 25, 2018 inspection, is that the

23   date when the inspection was rescheduled?

24   A.   I believe so.

25   Q.   You started to explain this earlier in your

Danna Small                                        March 17, 2022

Page 119

1    testimony, that you flag a wetland boundary and that

2    it needs to be confirmed through a survey.

3              Can you describe how that process worked with

4    respect to the site?

5              MR. MCALILEY:  Object to form.

6         A.  Exactly what are you asking for?

7    BY MR. ADKINS:

8         Q.  You said that you flagged a wetland boundary;

9    is that right?

10        A.  Correct.

11        Q.  You don't know the exact position of the

12   flags that you lay because you don't know where you

13   are when you're on the site, so those flags need to be

14   verified with a survey or documented with a survey; is

15   that right?

16             MR. MCALILEY:  Object to form.

17        A.  Located by survey.

18   BY MR. ADKINS:

19        Q.  How did that happen with respect to the

20   boundary of the wetland you identified on the site?

21        A.  I flagged the wetland line and survey comes

22   out and locates the flags.

23        Q.  Who is surveying that?

24        A.  The survey was Karner Surveying.

25        Q.  Is there anyone in particular in Karner

Page 120

1   Surveying?

2       A.   I always deal with Regina, but I don't know

3   who actually goes out there and does the fieldwork.

4       Q.   In this case, how is Karner Surveying

5   retained?

6       A.   Apparently, the property owner or somebody

7   else retained her.  I did not retain her.

8       Q.   Did you make any recommendations for who

9   should perform the survey?

10      A.   No.

11           (DX Exhibit 23 was marked.)

12  BY MR. ADKINS:

13      Q.   I'm handing you a document that's been marked

14  Exhibit DX 23.  This is another letter from the South

15  Florida Water Management District, dated April 26,

16  2018, and identified as DLS0000148 through 149.

17           Are you familiar with this letter?

18      A.   Yes.

19      Q.   What is this letter?

20      A.   It's a verification of the wetland line.

21      Q.   What does that mean?

22      A.   It means that they have reviewed the wetland

23  line flagged on-site and agreed with the location of

24  the wetland line identified.

25      Q.   When they -- by "they," do you mean the Water

Page 121

1    Management District?

2         A.  Yes.

3         Q.  So the Water Management District verified the

4    wetland line.  Would that be April 25, 2018?

5         A.  During that site visit.

6         Q.  Do you have any idea why the Water Management

7    District would issue this letter verifying the line

8    when it observed the works occurring in the area that

9    you delineated as a wetland in April?

10             MR. MCALILEY:  Object to form.

11        A.  No.

12   BY MR. ADKINS:

13        Q.  Were you surprised to see this?

14        A.  Somewhat.

15        Q.  Why is that?

16        A.  I wouldn't have anticipated it.

17        Q.  That they confirmed the delineation at all or

18   that they did it the next day?

19             MR. MCALILEY:  Object to form.

20        A.  That they went ahead and did an issuance or a

21   confirmation of the wetland line, given what they saw

22   on site.

23   BY MR. ADKINS:

24        Q.  Could you be more descript?  What did they

25   see on site that gives you some surprise that they

Danna Small                                      March 17, 2022

                                           Page 122

1    issued this?

2           MR. MCALILEY:  Object to form.

3      A.  Activities in wetlands.

4    BY MR. ADKINS:

5      Q.  What do you mean by activities?

6      A.  Equipment, clearing.

7           (DX Exhibit 24 was marked.)

8    BY MR. ADKINS:

9      Q.  Okay.  I'm handing you documents that are

10   marked Exhibit DX 24.  These are photographs

11   Bates-stamped DLS0000078 through DLS0000084.

12          Are you familiar with these photographs,

13   Ms. Small?

14     A.  Yes.

15     Q.  How are you familiar with these photographs?

16     A.  I took them.

17     Q.  Do you recall when?

18     A.  During the South Florida Water Management

19   District site visit.

20     Q.  Are these photographs you took on April 25,

21   2018, during the South Florida Water Management

22   District visit?

23     A.  Yes.

24     Q.  Is it safe to say -- well, do these

25   photographs accurately represent your observations of

Danna Small                                                    March 17, 2022

                                                              Page 123

1    the site on April 25, 2018?

2         A.  Yes.

3         Q.  So we're going to do the same thing for these

4    as we did before.  The first photograph ending in 078,

5    do you recall what area of the site is depicted in

6    this photograph?

7         A.  I don't specifically recall.

8         Q.  Can you identify any wetland vegetation in

9    this photograph?

10        A.  Yes.

11        Q.  What can you identify?

12        A.  There's a red maple in the background.  It

13   looks like there's swamp fern in some of the

14   foreground here.  And that's about all I can tell from

15   the photo.

16        Q.  Did you, at any time, observe swamp fern or

17   red maple outside of the area that you delineated as a

18   wetland on the site?

19        A.  Not that I recall.

20        Q.  Is it reasonable to assume that this

21   photograph is depicting the area that you delineated

22   as a wetland on the site?

23             MR. MCALILEY:  Object to form.

24        A.  It is reasonable to assume that this is a

25   photograph of a wetland area.

Danna Small                                          March 17, 2022

                                                      Page 124

1    BY MR. ADKINS:

2          Q.   On the site?

3          A.   Yes.

4          Q.   Do you recall why you took this picture?

5          A.   Not specifically.

6          Q.   Let's move to the next.  This is the picture

7    ending in 079.  From where did you take this picture

8    on the site?

9          A.   This would've been from the road on the south

10   side of the property; but where along that road, I

11   don't know.

12         Q.   And you would be facing north from that road?

13         A.   Correct.

14         Q.   Is the area depicted in this picture within

15   the wetland boundary that you delineated on the site?

16              MR. MCALILEY:   Object to form.

17         A.   Yes.

18   BY MR. ADKINS:

19         Q.   And did you observe heavy equipment -- let me

20   withdraw the question.

21              Do you see the heavy equipment in this

22   picture?

23         A.   Yes.

24         Q.   Did you see heavy equipment in April 2018

25   when you were on the site?

Danna Small                                     March 17, 2022

Page 125

1              MR. MCALILEY:  Objection.

2         A.  I must have since this is a picture of it.

3    BY MR. ADKINS:

4         Q.  You have testified there was a bulldozer

5    operating on the site.  Is that bulldozer depicted in

6    DLS0000079?

7         A.  Well, there's a bulldozer.  There's two of

8    them, it looks like.

9         Q.  Are either bulldozers -- do you recall

10   whether those other bulldozers or one of those

11   bulldozers was operating on the site in April 2018?

12        A.  I don't believe they were operating.

13        Q.  They were present?

14        A.  They were present.

15        Q.  There's another, I'll say, machine that says

16   "Hitachi."  It's orange.

17             Do you recall observing that on the site?

18        A.  Not specifically, no.

19        Q.  Do you know what that is?

20        A.  Looks like part of the back end of a track

21   hoe.

22        Q.  Track hoe.  What's a track hoe used for?

23        A.  Digging.

24        Q.  Can you observe any wetland vegetation in

25   this picture?

Danya Small                                          March 17, 2022

Page 126

1        A.   Yes.

2        Q.   What do you observe?

3        A.   There is red maples.

4        Q.   Where?

5        A.   Those are the trees that you see right there

6   in the photo.   Those are red maples.

7        Q.   I see you're motioning to a larger tree in

8   the top right-ish area?

9        A.   Uh-huh.

10        Q.   What else?

11        A.   That might be a swamp fern in there, but it's

12   hard to tell from this photo specifically.

13        Q.   Okay.   Let's turn to DLS0000080.   Do you know

14   from where you took this picture?

15        A.   Looks very similar to the previous one.   I

16   would say it's from about the same location.

17        Q.   So somewhere on the south road of the site?

18        A.   Correct.

19        Q.   Would you have been facing north when you

20   took this picture?

21        A.   Yes.

22        Q.   Is the area depicted in this picture within

23   the wetland boundary that you delineated on the site?

24            MR. MCALILEY:   Object to form.

25        A.   Yes.

Danna Small                                          March 17, 2022

                                                    Page 127

1    BY MR. ADKINS:

2         Q.  The heavy machinery that we see looks like

3    two bulldozers and possibly part of a -- would you say

4    it was an excavator or a loader?

5         A.  I call it a track hoe.  That's what I call

6    it.

7         Q.  Okay.  Do they appear to be the same machines

8    that we observed in DLS0000079?

9         A.  Yes.

10        Q.  There's some white material below the track

11   hoe and the bulldozer.

12             Do you see that?

13        A.  Yes.

14        Q.  Do you know what that is?

15        A.  Well, the next photo clarifies it.  It's got

16   to be the pipe you see in the next photo, the PVC

17   pipe.

18        Q.  Okay.  I assume, as with the prior photo, you

19   wouldn't be able to point to us where on the road you

20   took this picture?

21        A.  No.

22        Q.  Do you recall why you took this picture?

23        A.  Not specifically.

24        Q.  DLS0000081, do you recall from where you took

25   this picture?

Page 128

```
 1        A.   Not specifically.

 2        Q.   Given the arrangement of the piping, do you

 3   think this would've been taken from a different angle

 4   from the last picture we looked at?

 5        A.   Yes.

 6        Q.   Do you know why the piping was on the site

 7   during your site inspection?

 8        A.   No.

 9        Q.   Do you know what that piping was to be used

10   for?

11        A.   No.

12        Q.   Did you ever ask anyone what the piping was

13   for?

14        A.   No.

15        Q.   Do you know what piping like that would be

16   used for?

17        A.   No.

18        Q.   Are you aware of whether the defendants

19   installed any sort of pumps or wells at the site?

20             MR. MCALILEY:   Object to form.

21        A.   I don't know.

22   BY MR. ADKINS:

23        Q.   Are you aware of whether the defendants

24   installed any sort of irrigation systems at the site?

25        A.   I don't know.
```

Page 129

1      Q.  Are you aware of whether the defendants

2   installed any drainage systems at the site?

3      A.  I don't know.

4      Q.  There appears to be some dirt along the edge

5   of the pipes.

6          Did you observe any piles of dirt when you

7   were on the site in April 2018?

8      A.  I don't specifically recall.

9      Q.  In viewing this picture and based on your

10  observations, the dirt that is near this bulldozer and

11  along the pipes, is that soil that appears to have

12  been from the site or brought into the site?

13         MR. MCALILEY:  Object to form.

14     A.  I don't know.

15  BY MR. ADKINS:

16     Q.  Are you able to identify any wetland

17  vegetation in this picture?

18     A.  Yes.

19     Q.  What can you identify?

20     A.  Those are red maples.

21     Q.  Are those the trees to the right of the

22  bulldozer?

23     A.  Yes.

24     Q.  Anything else?

25     A.  Not from this photo.

Danna Small                                                    March 17, 2022

Page 130

1      Q.   Do you recall why you took this picture?

2      A.   Probably just to take a picture of the pipes.

3      Q.   Do they have any significance here?

4           MR. MCALILEY:   Object to form.

5      A.   Not that I can recall.

6  BY MR. ADKINS:

7      Q.   Okay.  DLS0000082, do you recall from where

8  you took this picture?

9      A.   Not specifically.  It's the same location

10  that I took this picture from though.

11      Q.   Is that 081?

12      A.   081.

13      Q.   Is that red maple that we see in this

14  picture?

15      A.   Yes.

16      Q.   That's a wetland vegetation?

17      A.   Yes.

18      Q.   Are you able to identify what this machine is

19  on the bottom right corner?

20      A.   No.

21      Q.   Do you recall why you took this picture?

22      A.   It's just a zoom-in of the other one.  I

23  don't specifically recall.

24      Q.   Does this picture represent an area within

25  the wetland boundary that you identified on the site?

Danna Small                                                          March 17, 2022

                                                          Page 134

1        A.   To document conditions in the ditch.

2             (DX Exhibit 25 was marked.)

3    BY MR. ADKINS:

4        Q.   I'm handing you a document that's been marked

5    Exhibit DX 25.  You might want to try to keep these

6    pictures together.  You're doing a great job.  We'll

7    put a paper clip on it.

8             This is an invoice dated May 19, 2018, from

9    DLS Environmental Services, Bates-stamped DLS0000058.

10            Are you familiar with this document?

11       A.   Yes.

12       Q.   What is it?

13       A.   It's an invoice.

14       Q.   What is this an invoice for?

15       A.   It says it's for the site meeting with South

16   Florida Water Management District and to prepare the

17   response for the Army Corps' request for additional

18   information.

19       Q.   Did you issue this invoice to, I guess, the

20   Benjamin Sharfi 2002 Trust?

21       A.   Yes.

22       Q.   Is this a document that you produced to the

23   United States?

24       A.   Yes.

25       Q.   Do you maintain this document in the course

Danna Small                                          March 17, 2022

                                                    Page 135

1    of your business?

2         A.  Yes.

3         Q.  Do you have any reason to believe that this

4    document is not an accurate reproduction of the

5    invoice that you submitted?

6         A.  No.

7         Q.  You recorded here, "Site meeting with SFWMD,

8    1.5 hours."

9              That's the April 25, 2018 site inspection

10   with the Water Management District?

11        A.  Correct.

12        Q.  I'd asked before about how long that

13   inspection took place.  Would it be fair to assume it

14   took around an hour and a half?

15        A.  Possibly.  Something around that time.

16        Q.  It wouldn't have taken all day?

17        A.  No.

18        Q.  Because you would have billed for more than

19   an hour and a half, I imagine?

20        A.  Yes.

21        Q.  You also billed for seven hours to prepare

22   and submit response to Army Corps request for

23   additional information; is that right?

24        A.  Yes.

25        Q.  What tasks went into that seven hours?

Danna Small                                                      March 17, 2022

Page 136

1          A.  Preparing the response to the request for

2     additional information and completing the data forms

3     and providing them a little sketch of the ditch

4     maintenance.

5          Q.  Did you do any inspections of any properties?

6          A.  No.

7          Q.  In preparing the data forms, that was based

8     on your notes that you had already taken?

9          A.  Yes.

10            (DX Exhibit 26 was marked.)

11    BY MR. ADKINS:

12         Q.  I'm now handing you a document marked DX 26.

13    This is an email from you to Karner@comcast.net,

14    copying Kevin Kryzda, April 26, 2018, Bates-stamped

15    DLS0000256 through 257.

16            Do you recall sending this email?

17         A.  Not specifically.

18         Q.  Are you familiar with this email?

19         A.  Yes.

20         Q.  And that's from your review to prepare for

21    this deposition?

22         A.  Yes.

23         Q.  You produced this document to the United

24    States; is that right?

25         A.  Yes.

Danna Small                                                    March 17, 2022

                                                               Page 137

1          Q.   Do you have any reason to believe this is not

2     an accurate representation of the email that you sent

3     to Karner@comcast.net on April 26, 2018?

4          A.   No.

5          Q.   In this email, you said, "I flagged the

6     wetland line for this property" -- oh, sorry.  We lost

7     the lights here.

8               You wrote, "I had flagged the wetland line

9     for this property in Palm City and, yesterday, SFWMD

10    verified that the flag line was acceptable, so we are

11    ready to have survey locate the flags."

12              So you're referring to the flagging -- the

13    pink flagging -- that you left on the site and then

14    the April 25 Water Management District inspection; is

15    that right?

16              MR. MCALILEY:  Object to form.

17         A.   Yes.

18    BY MR. ADKINS:

19         Q.   And you said that there were a total of 27

20    flags placed.

21              The 27 flags, would that have been the pink

22    ribbon that you tied to trees and other things on the

23    site?

24         A.   Yes.

25         Q.   You said, "Since I was first out there in

Danna Small                                                    March 17, 2022

Page 138

1      March to flag the line, some activity has occurred

2      which resulted in the removal of some of the flags."

3              Do you see that?

4          A.   Yes.

5          Q.   What did you mean by that?

6          A.   That means activities occurred that removed

7      the flags.

8          Q.   What did you mean by "some activity"?

9          A.   Some activity.  Land clearing.

10         Q.   You seem hesitant to tell me that.  Why?

11             MR. MCALILEY:  Object to form.

12         A.   It's activity -- land clearing would remove

13     the flags.

14     BY MR. ADKINS:

15         Q.   What about removing vegetation?

16         A.   That seems to be one and the same, land

17     clearing and removing vegetation.

18         Q.   Okay.  Were you surprised that some of the

19     flags were removed or were moved?

20             MR. MCALILEY:  Object to form.

21         A.   I don't recall my reaction.

22     BY MR. ADKINS:

23         Q.   How did you learn that some of your flags

24     were removed?

25         A.   When I met Water Management District out

Page 139

1    there is when I saw that some of the wetland flagging

2    was no longer there.

3        Q.  Did the Water Management District have any

4    reaction to that?

5        A.  No.

6        Q.  I should say the representatives of the Water

7    Management District who were there with you.

8            MR. MCALILEY:  Object to form; asked and

9        answered.

10       A.  No.

11   BY MR. ADKINS:

12       Q.  Did you relay to them that you had put flags

13   in positions that were no longer there?

14           MR. MCALILEY:  Object to form.

15       A.  No.

16   BY MR. ADKINS:

17       Q.  Did they find out otherwise?

18       A.  It was visible.  I mean, they don't look at

19   flag numbers.  That's not how they review a site.

20   That's for survey.  But they can look at the flagging

21   and go -- so they don't look at flag numbers.

22       Q.  So they wouldn't have been able to tell if

23   there was a missing -- if there was a gap or

24   something?

25           MR. MCALILEY:  Object to form.

Danna Small                                          March 17, 2022

                                                    Page 140

1        A.   Correct.

2   BY MR. ADKINS:

3        Q.   So you said, "Flags 2 through 9 are missing

4   as a result of the activity, but they should be pretty

5   easy to replicate, as most followed along the north

6   side of the south dirt road they had put in."

7             You said, "the activity" again.  Why didn't

8   you say land clearing or something else?

9        A.   I use the word "activity."

10       Q.   Okay.  In the attachment -- this is 257 --

11  you indicated flag 1, flag 27, and flag 10.

12            Can you explain why you did that?

13       A.   To help guide the surveyors when they're out

14  there so they have an idea of some sort of start

15  point.  Once you find one flag, because they're

16  supposed to be visible from that flag to the next

17  flag -- once you give them some idea of a start point,

18  they should be able to follow the flags around when

19  they're out on-site.  So this is just to kind of give

20  them an idea, here's a few places you can start, and

21  then follow the flags.

22       Q.   Are the flags sequentially ordered --

23  numbered in order -- it's a hard way to ask this

24  question -- but I see you have flag number 1, flag 27,

25  and then flag 10 on the bottom right.

Page 141

1            Is there a reason why the numbers jump

2      around?

3           A.   They don't on-site.

4           Q.   Okay.  So they're sequentially numbered along

5      the boundary?

6           A.   Correct.

7           Q.   So they would go counterclockwise, I imagine?

8           A.   In this particular circumstance, that's all

9      based on where I start and where I end.

10          Q.   When you said, "flags 2 through 9 are

11     missing," that would've been along the boundary of

12     this yellow dotted line, from flag 1, bending south,

13     and to the east to flag 10.  Is that right?

14          A.   Correct.

15          Q.   Do you recall where the flags appeared in

16     relation to the road that runs along the southern

17     boundary of the site?

18          A.   The flags that were along the southern

19     boundary were adjacent to the north side of the south

20     road, as indicated in the email.

21          Q.   So they weren't in the road necessarily; is

22     that right?

23          A.   That is correct.

24               (DX Exhibit 27 was marked.)

25     BY MR. ADKINS:

Danya Small                                                    March 17, 2022

Page 142

 1        Q.  I'm handing you a document that's been marked
 2   as DX 27.  This is an email from Kevin Kryzda to you,
 3   dated April 26, 2018, Bates-stamped DLS0000218.
 4            Now, this is the same chain as the last
 5   email, but this is Mr. Kryzda writing to you
 6   separately.  And he says, "I returned your call from
 7   this morning and left you a voicemail."
 8            Do you see that?
 9        A.  Yes.
10        Q.  Do you recall getting a voicemail from
11   Mr. Kryzda?
12        A.  I don't specifically recall.
13        Q.  Do you recall speaking to Mr. Kryzda about
14   the delineation, as he wrote in this email?
15        A.  Not specifically.
16        Q.  Do you have any reason -- do you have any
17   reason to believe why he would want to talk to you
18   about the delineation?
19        A.  I don't recall.
20        Q.  Did you ever talk to anyone else from
21   NeshaFarm or who represents Mr. Sharfi about the
22   delineation at the site on or after this email?
23        A.  Not that I recall.
24        Q.  How about looking at this document today, do
25   you have any reason to think why he would want to talk

Page 143

 1   about that delineation?

 2           MR. MCALILEY:   Object to form; calling

 3       for speculation.

 4       A.   I can't recall.

 5           (DX Exhibit 28 was marked.)

 6   BY MR. ADKINS:

 7       Q.   Actually, before we set aside 27, is that a

 8   document that you produced to the United States?

 9       A.   Yes.

10       Q.   Do you have any reason to believe it's not an

11   accurate depiction of the email you received from

12   Mr. Kryzda?

13       A.   No.

14       Q.   I'm now handing you a document marked DX 28.

15   Okay.  On page 180, there's an email from -- well,

16   excuse me.

17           Do you recall sending this email to

18   Mr. Kryzda?

19       A.   Not specifically.

20       Q.   You produced this document to the United

21   States?

22       A.   Yes.

23       Q.   Do you have any reason to believe this isn't

24   an accurate reproduction of the email that you sent to

25   Mr. Kryzda on April 27, 2018?

Danna Small                                                    March 17, 2022

Page 144

1        A.  No.

2        Q.  So I want to take you to the back of this

3   email, to the end.  You'll see, on January 19, 2018 --

4   this is on page 180 -- Mr. Kryzda wrote to Jonathan

5   Pempek, "The purpose of this message is to ask for

6   your guidance and the appropriate actions that may be

7   necessary to undertake minor improvements to a newly

8   acquired parcel in western Martin County."

9            Do you see that?

10       A.  Yes.

11       Q.  Now, based on the activities that you saw in

12   March and April 2018, do you think it's consistent

13   with minor improvements to the newly acquired parcel

14   that Mr. Kryzda has explained to the Corps here?

15           MR. MCALILEY:  Object to form.

16       A.  I don't know.  I don't know what he was

17   speaking of.  This was before I was hired.

18   BY MR. ADKINS:

19       Q.  Would you have described the clearing

20   activities that you observed as minor improvements?

21           MR. MCALILEY:  Object to form.

22       A.  That's a relative interpretation -- clearing

23   activities, minor.  That's a relative interpretation.

24   BY MR. ADKINS:

25       Q.  Okay.  How about building a fence and

Danna Small                                                    March 17, 2022

Page 145

1    clearing the ditch; do you think the clearing

2    activities you observed in the wetland delineation

3    area is consistent with maintaining a ditch along the

4    western border of the site and maintaining the

5    fence -- building a fence?

6              MR. MCALILEY:  Object to form.

7         A.  No.

8    BY MR. ADKINS:

9         Q.  Your answer was no?

10        A.  Correct.

11        Q.  On the first page of this document, 178,

12   Mr. Kryzda wrote to you, "I was afraid of this.  We

13   were hoping to respond to their request for additional

14   information before the expiration of the 30 days.

15   What can we do to turn this around?"

16             Do you see that?

17        A.  Yes.

18        Q.  Why do you think Mr. Kryzda was writing to

19   you that he was afraid of this?

20             MR. MCALILEY:  Object to form.

21        A.  I don't know.

22   BY MR. ADKINS:

23        Q.  Did he ever explain to you why this was an

24   issue?

25        A.  I don't recall.

                                            Page 146

 1        Q.  Sitting here today, do you think he was

 2   justified to be concerned?

 3            MR. MCALILEY:  Object to form.

 4        A.  I -- I'm not certain what you -- repeat the

 5   question, please.

 6   BY MR. ADKINS:

 7        Q.  Mr. Kryzda wrote, "I was afraid of this."

 8            My question is, sitting here today, do you

 9   think he was justified to be concerned about the email

10   he received?

11            MR. MCALILEY:  Object to form.

12        A.  I actually don't know.

13   BY MR. ADKINS:

14        Q.  Okay.  In response, you wrote to Mr. Kryzda,

15   "Maybe we need to discuss, because this clearly sounds

16   like they have somehow been notified of the work

17   already done."

18            What did you mean?

19        A.  The clearing that already occurred.

20        Q.  Why did you think they had somehow been

21   notified?

22        A.  Because the previous part of this email says,

23   "I have seen information that indicates significant

24   earthwork has begun prior to the issuance of either of

25   these permits."  So there he's referencing either of

Danna Small                                                          March 17, 2022

Page 147

1    these permits -- it implies two permits -- at the

2    subject location.

3         Q.  So you're reading from Mr. Pempek's email to

4    Mr. Kryzda; is that right?

5         A.  Yes.

6         Q.  What page is that on?

7         A.  0179.

8         Q.  Okay.  Based on your observations at the site

9    in April and March 2018, was Mr. Pempek correct that

10   significant earthwork had begun prior to the issuance

11   of a permit?

12            MR. MCALILEY:  Object to form.

13        A.  I can't assess how much earthwork occurred.

14   I mean, clearing was occurring.  There was heavy

15   equipment on the wetlands.  But how much actual

16   earthwork occurred, I have no way of knowing, because

17   I never saw the site prior to some activity occurring.

18   BY MR. ADKINS:

19        Q.  So when you wrote, "Maybe we need to discuss

20   this," what did you mean?  What did you need to

21   discuss with Mr. Kryzda?

22        A.  It looks like I'm looking to discuss about

23   the response to the Army Corps.

24        Q.  The response to the request for additional

25   information?

Page 148

1      A.   Correct.

2      Q.   You wrote, "I had hoped to avoid this

3   correspondence."

4           Is that correspondence from the Corps?

5      A.   Yes.

6      Q.   Why did you hope to avoid that?

7      A.   Well, if he started restoration or replanting

8   or something like that, then this would be a moot

9   point.

10     Q.   I guess I don't understand how that means you

11  hope to avoid the Corps' correspondence.

12     A.   I don't know exactly what you're referencing.

13  It's basically getting a letter saying -- indicates

14  significant earthwork.  Apparently -- did he have an

15  NOV at this date?  I don't even know.

16     Q.   How had you hoped to avoid this

17  correspondence?

18          MR. MCALILEY:  Object to form.

19     A.   That they were restoring or replanting or

20  saying that they were going to restore the vegetation

21  or replant the area.

22  BY MR. ADKINS:

23     Q.   Do you remember doing anything with respect

24  to your interactions with the Corps to try to avoid

25  this correspondence?

Page 149

1     A.  I did no interactions with the Corps

2  regarding this correspondence.

3     Q.  You wrote, "This seems to be going all sorts

4  of sideways and my preparation of documents for them

5  was for cleaning out the ditch and did not address

6  this."

7          So, "cleaning out the ditch," you're

8  referring to the western ditch?

9     A.  Yes.

10    Q.  And this -- you know -- you said, "and did

11 not address this."  What did you mean by "this"?

12    A.  The clearing activity.

13    Q.  The email from the Corps referred to

14 significant earthwork, as you pointed out?

15    A.  Right.

16    Q.  So when you saw that email from the Corps,

17 did you disagree that significant earthwork activities

18 took place?

19          MR. MCALILEY:  Object to form.

20    A.  I didn't give it much thought.

21 BY MR. ADKINS:

22    Q.  If you would have disagreed, do you think you

23 would have wrote, "They got this wrong"?

24          MR. MCALILEY:  Object to form.

25    A.  Not necessarily.

Page 150

1    BY MR. ADKINS:

2         Q.   Why is that?

3         A.   I don't know what the conditions were before.

4         Q.   So your next sentence is, "Also, I want you

5    to be aware that my quote for services did not include

6    any effort associated with dealing with unauthorized

7    activity in the wetlands."

8              What did you understand to be the

9    unauthorized activity in the wetlands?

10        A.   The clearing.

11        Q.   The clearing of vegetation?

12        A.   And the heavy equipment, yeah.

13        Q.   How is the clearing an unauthorized activity

14   in wetlands?

15        A.   Martin County doesn't allow it.  If they're

16   yanked out, people feel like that's, like, digging in

17   wetlands, dredging in wetlands -- almost to that

18   perspective.

19        Q.   If trees are yanked out?

20        A.   Yeah.

21        Q.   How would that -- how would that be?

22        A.   How could what be?

23        Q.   Well, how could pulling a tree out be filling

24   a wetland?

25        A.   It doesn't come out in a little bitty circle.

Danya Small                                                    March 17, 2022

Page 151

1    It comes out with this great big part of soil

2    associated with it, with the root system.

3        Q.  Right.  So if you go back to the document we

4    looked at, this is DLS0000001, DX 12.

5        A.  Yes.

6        Q.  Is that what you're describing, a root ball

7    coming out?

8        A.  I'm saying that that does contain roots,

9    yeah.

10       Q.  Right.  Anything else?

11       A.  (No response.)

12       Q.  Dirt, soil?

13       A.  Yes.  It always -- it has a root.  It's going

14   to contain dirt and soil.

15       Q.  So would you have considered this to be

16   filling?

17            MR. MCALILEY:  Object to form.

18       A.  No, I do not consider this to be filling.

19   BY MR. ADKINS:

20       Q.  Do other regulatory agencies consider it to

21   be filling?

22            MR. MCALILEY:  Object to form.

23       A.  I don't know.

24   BY MR. ADKINS:

25       Q.  In the third paragraph of your email, you

Danna Small                                    March 17, 2022

Page 152

1    said, "Any effort associated with the unauthorized

2    activity in wetlands would be considered additional

3    services on my part."

4          You said "the unauthorized activity in

5    wetlands."  Were you presuming that activity had

6    already taken place?

7      A.  At the time of this email, the activity had

8    already taken place, so that was the clearing, yes.

9      Q.  When you observed that in March and April,

10   did you consider it then to be unauthorized activity?

11         MR. MCALILEY:  Object to form.

12     A.  Yes.

13   BY MR. ADKINS:

14     Q.  But I think it's clear here.  I'll ask.  You

15   were not retained, up until this point, by the

16   defendants to deal with unauthorized activity in

17   wetlands; is that correct?

18         MR. MCALILEY:  Object to form.

19     A.  Correct.

20   BY MR. ADKINS:

21     Q.  So, after this email, did Mr. Kryzda ever ask

22   for your opinion on whether the activities, the

23   clearing activities on the site, were permissible?

24         MR. MCALILEY:  Object to form.

25     A.  Not that I recall.

Page 153

1    BY MR. ADKINS:

2         Q.  Do you recall whether, after this email

3    correspondence, you ever told Mr. Kryzda that the

4    activities on the site were not permissible?

5         A.  After this correspondence?

6         Q.  After this correspondence.

7         A.  I don't recall.

8         Q.  Before, you told him when you first saw it in

9    March 2018; is that right?

10        A.  Correct.

11        Q.  How about anyone else associated with the

12   defendants -- do you recall telling anyone else

13   associated with the defendants that the activities at

14   the site were unauthorized?

15        A.  No.

16             (DX Exhibit 29 was marked.)

17   BY MR. ADKINS:

18        Q.  I'm handing you a document that's marked

19   DX 29.  This is an email from you to Mr. Kryzda dated

20   April 30, 2018, Bates-stamped DLS0000219 through 220.

21             Do you recall sending this email?

22        A.  Not specifically.

23        Q.  You produced this document to the United

24   States?

25        A.  Yes.

Page 154

1        Q.  Do you have any reason to believe that this

2    is not an accurate reproduction of the email that you

3    sent to Mr. Kryzda on April 30, 2018?

4        A.  No.

5        Q.  On the second email on this chain, Mr. Kryzda

6    wrote, "Good morning, Danna.  Seems this situation is

7    getting more dire.  In this regard, I ask that you

8    complete the work to complete the items of the RAI of

9    April 17 as soon as possible."

10            Do you see that?

11       A.  Yes.

12       Q.  Why did Mr. Kryzda write that the situation

13   is getting more dire?

14            MR. MCALILEY:  Object to form.

15       A.  There appears to have been an attachment to

16   this.  It's referenced in the part below, where it

17   says, "The attached letter is to advise you that the

18   US Corps believes you started filling jurisdictional

19   wetlands without benefit of a permit."

20   BY MR. ADKINS:

21       Q.  Did Mr. Kryzda forward that letter to you?

22       A.  I believe he did.

23       Q.  Would that be the notice of violation from

24   the Army Corps of Engineers?

25       A.  Most likely.

Danna Small                                        March 17, 2022

                                                    Page 168

1    BY MR. ADKINS:

2         Q.  Okay.  Ms. Small, I'm handing you a document

3    that's been marked as DX 33.  This is an email from

4    you to Kelly Egan, copying Kevin Kryzda, on May 4,

5    2018.  It's Bates-stamped DLS0000098 through

6    DLS0000117.

7       Do you remember -- are you familiar with this email?

8         A.  I don't recall it specifically.

9         Q.  Did you produce this document to the United

10   States?

11        A.  Yes.

12        Q.  Do you have any reason to believe that this

13   is not an accurate representation of the email that

14   you sent to Kelly Egan, copying Kevin Kryzda, on May

15   4, 2018?

16        A.  No.

17        Q.  What were you doing in this email?

18        A.  Providing a response to the request for

19   additional information to the Corps.

20        Q.  You said, "I realize that I did not meet the

21   deactivation deadline."

22             What did you mean by that?

23        A.  In her letter, she referenced a 30-day

24   deadline.

25        Q.  Okay.  On page 1 of your letter, which is

Page 169

1    099, you're responding to question -- or request

2    from the Corps.  You wrote, "The proposed project is

3    for the following:  To perform maintenance on a

4    drainage ditch which runs along the western boundary

5    of the property, install a fence, install access

6    roads, and perform clearing for the installation of

7    pole barns for the purpose of putting the property

8    into agricultural use as is consistent with zoning of

9    the property."

10           Do you see that?

11       A.  Yes.

12       Q.  Were you aware of whether sod was placed

13   anywhere on the site?

14       A.  No.

15       Q.  In paragraph 2 on the next page, you respond

16   to request 2 -- I should say, from the Corps.  You

17   wrote, "The drainage ditch maintenance shall be

18   performed by means of a track hoe and material removed

19   from the ditch will be placed in upland areas to be

20   utilized for fill as needed for the proposed "ag"

21   uses.  Please advise if mitigation will be required

22   for this minor maintenance of the drainage ditch."

23           Do you see that?

24       A.  Yes.

25       Q.  How did you know that material would be

Page 170

1    placed in upland areas?

2         A.  Well, we tell them that they have to place

3    them in upland areas.

4         Q.  We, as in DLS Environmental Services?

5         A.  Yes.

6         Q.  So did you do that?

7         A.  They see a copy of this response, so they

8    know that they have to place material in upland areas.

9         Q.  Did you make the defendants aware in any

10   other way that they needed to place that material in

11   upland areas?

12        A.  Probably not specifically.

13        Q.  Do you recall having any conversations with

14   the defendants about where they would place material

15   from the drainage ditch?

16        A.  No.  I don't recall.

17        Q.  In response to request 4, you wrote, "A

18   wetland delineation has been performed in accordance

19   to the 1987 Wetland Delineation Manual."

20             Do you see that?

21        A.  Yes.

22        Q.  Are you familiar with the Wetland Delineation

23   Manual?

24        A.  Obviously, I pulled it out.  Do I have it

25   memorized?  No.

Danna Small                                         March 17, 2022

Page 171

 1        Q.  When is the last time you reviewed it?

 2        A.  Probably for this project.

 3        Q.  Why did you determine to use the 1987 Wetland

 4    Delineation Manual?

 5        A.  That was the manual that I found online for

 6    Army Corps wetland delineations.

 7        Q.  Did you search online specifically for this

 8    project?

 9        A.  I don't recall.

10        Q.  You wrote, "The wetland determination data

11    forms and sampling locations are included with this

12    submittal."

13            You attached those to this submittal; is that

14    right?

15        A.  Correct.

16        Q.  And those forms appear at page 104

17    through 112; is that correct?

18        A.  Yes.

19        Q.  You provided three sampling points; is that

20    right?

21        A.  Yes.

22        Q.  At sampling point 1, you determined that

23    sample area was not within a wetland; is that right?

24        A.  Correct.

25        Q.  At sampling point 2, you determined that

Danna Small                                           March 17, 2022

                                                      Page 172

1   sample area was within a wetland; is that right?

2         A.   I don't -- I mean, I would have to look at

3   each form to --

4         Q.   Sure.   Take a look at page 107.

5         A.   Yes.

6         Q.   So, yes, you determined that sampling point 2

7   was within a wetland?

8         A.   Yes.

9         Q.   And with respect to point 3, you determined

10  that sampling point 3 was within a wetland; is that

11  right?

12        A.   Yes.

13             (DX Exhibit 34 was marked.)

14  BY MR. ADKINS:

15        Q.   Ms. Small, I'm handing you a document that's

16  been marked DX 34.

17             Now, you produced your field notes to the

18  United States in response to our subpoena; right?

19        A.   Yes.

20        Q.   This document is Bates-stamped DLS261 through

21  DLS262.   Can you take a look at this -- and my

22  question is, is this an accurate representation of the

23  field notes that you made during your March 2018 visit

24  to the site?

25        A.   Yes.

Danna Small                                    March 17, 2022

                                                    Page 173

1         Q.  You also testified that you completed the

2    three wetland data forms based on your field notes; is

3    that right?

4         A.  Yes.

5         Q.  So how did you do that?

6         A.  Please clarify the question.  How did I do

7    that?

8         Q.  Well, these field notes consist of two pages;

9    one of which is almost entirely a picture and there

10   can't be more than 100 words on these two sheets.

11            How did you complete --

12        A.  There's notes within the picture.

13        Q.  Okay.  Let's look at those.  So what do these

14   notes say?

15        A.  I can hardly read them now.  I can't read

16   them that well now, but there's notes in each -- in

17   several different areas on this picture.

18            So, yeah, the data forms were based upon the

19   field notes and the information gained when we did the

20   site visit.

21        Q.  Could you identify on the page, on, I guess,

22   DLS262 the location of sampling point 1?

23        A.  I can't see it.  I can't see it on here.

24        Q.  Are you able to identify anywhere in these

25   notes places where you recorded the type of soils that

Page 174

1   were present at the sampling points?

2        A.   Oh, yeah.

3        Q.   Where?

4        A.   In my notes?

5        Q.   Yeah.

6        A.   Right here.

7        Q.   So we're at 262?

8        A.   It's 262.  "Soils in wetland, mucky mineral,

9   flag 2 to flag 3."  That would've been along the north

10  side of the south road.  Those were -- actually, no.

11  Flag 2 to flag 3 would've been in the west area up

12  here -- would've been flag 2.

13           And then it says, "Plugs, mucky mineral on

14  west side, muck on south side, strip matrix on

15  southeast side, hydrologic indicators, algolmatic

16  (phonetic)."

17       Q.   You said you had taken more -- you dug more

18  holes than you did submit wetland data for?

19       A.   I believe I did.

20       Q.   So how do you know that those notes that you

21  refer to are for sampling point 1?

22       A.   All these notes are not for one sampling

23  point.  This would've been all three of them.

24       Q.   Is there anything in the notes that would

25  differentiate the sampling points?

Danna Small                                        March 17, 2022

                                              Page 175

1        A.   Not based upon what I've written here, so

2   it's just going by memory.

3        Q.   So let's go back to DX 33.  I want to take

4   you back to page 100 on the Bates stamps.  Okay.  In

5   paragraph 4 or -- I'm sorry -- response to request 4,

6   you wrote, "An attempt was made to perform sampling in

7   the northwest area of the property; however, that

8   location is very heavily impacted with Old World

9   climbing fern and we were unable to complete a data

10  form for that location due to the inability to obtain

11  a soil sample and the fact that all vegetation is

12  covered with the Old World climbing fern."

13           Do you see that?

14       A.   Yes.

15       Q.   I had understood your testimony earlier today

16  to be that you did dig a hole in the northwest corner

17  of the site.

18           MR. MCALILEY:  Object to form.

19       A.   I don't recall specifically stating that we

20  dug a hole in the northwest part of the site.  But, if

21  we did, it was probably at the edge, because it was

22  heavily inundated with the Old World climbing fern.

23  You couldn't get anything.  You couldn't get through

24  it really.

25  BY MR. ADKINS:

Danna Small                                          March 17, 2022

Page 187

1    through 69.

2              Are you familiar with this document?

3         A.   I don't specifically recall it.

4         Q.   Did you produce this email to the United

5    States?

6         A.   Yes.

7         Q.   Do you have any reason to believe that this

8    is not an accurate reproduction of the email that you

9    sent to Karner@comcast.net on June 12, 2018?

10        A.   No.

11        Q.   Now, Karner Surveying, that was the survey

12   company; is that right?

13        A.   Correct.

14        Q.   In this email on page 67, there's an email

15   from Regina Karner to Emilie Kirkpatrick.

16             Are you familiar with who Emilie Kirkpatrick

17   is?

18        A.   No.

19        Q.   In that email, Ms. Karner wrote "Wetland

20   flagging 25 and 4 through 9 are missing.  It seems

21   that specifically 4 through 9 were near or in the

22   areas that have been cleared for the perimeter road."

23             Do you see that?

24        A.   Yes.

25        Q.   Are you able to identify where the areas that

Page 188

```
 1   have been cleared for a perimeter road are on the

 2   site?

 3           MR. MCALILEY:  Object to form.

 4       A.  The perimeter road, I assume she was

 5   referring to the one that was already there.

 6   BY MR. ADKINS:

 7       Q.  When you were at the site in April, did you

 8   observe anything that would suggest the construction

 9   of a different road?

10       A.  No.

11       Q.  What do you think happened to the wetland

12   flagging?

13       A.  I don't know.

14       Q.  You didn't go back onto the site to replace

15   the flagging; is that right?

16       A.  Correct.

17       Q.  You responded to Ms. Karner on June 11, 2018.

18   You wrote, "These locations are based upon my field

19   notes.  Since I don't have exact GPS for these points,

20   this is about the best I can provide based upon my

21   notes during the wetland flagging."

22           Do you see that?

23       A.  Yes.

24       Q.  Can we go back to your field notes and try to

25   identify how you did that?
```

Page 189

 1        A.   I don't know -- yeah.

 2        Q.   This is DX 34, your field notes.

 3        A.   Your question?

 4        Q.   Can you explain how you were able to identify

 5   the missing flaggings from your field notes?

 6        A.   There is -- it's hard to see, but I believe

 7   I've got some numbers in here.  There appears to be a

 8   number 3 right there.

 9        Q.   I see you're indicating at page 262?

10        A.   262.  And there's a number 9 here.  So that

11   helped me to kind of figure out where those flags

12   might have been.

13        Q.   Connect the dots?

14        A.   Basically, yes.

15        Q.   Okay.  The area that has been cleared for the

16   perimeter road, based on your understanding now of

17   where those missing flags were, that area that has

18   been cleared, would that have fallen within the area

19   that you determined was a wetland on the site?

20             MR. MCALILEY:  Object to form.

21        A.   Okay.  So that seems like two separate

22   questions.

23   BY MR. ADKINS:

24        Q.   Okay.  We can take them one by one.

25        A.   Okay.

Danna Small                                       March 17, 2022

Page 190

1        Q.  Ms. Karner identified an area that appeared

2   to have been cleared for a perimeter road and there

3   was a missing flag around that area.  We understand

4   that.

5             MR. MCALILEY:  Object to form.

6   BY MR. ADKINS:

7        Q.  My question then is, that area that had been

8   cleared for a perimeter road, would that have fallen

9   within the boundary of the wetland that you delineated

10  on the site?

11            MR. MCALILEY:  Object to form.

12       A.  Okay.  The perimeter road was there when I

13  did the first site visit.  I'm not going to make an

14  assessment on something that was or was not present

15  before I ever stepped foot on the site.  So that is

16  not -- to me -- I do not assess what's already there,

17  and I can't speak to what it might have been.  So the

18  perimeter road was not part of where I flagged.

19  BY MR. ADKINS:

20       Q.  Okay.  So when you delineated a wetland on

21  the site in March 2018, you did not consider one way

22  or the other whether wetlands had existed along that

23  perimeter -- under the perimeter road.  Is that right?

24            MR. MCALILEY:  Object to form.

25       A.  Incorrect.

Danya Small                                    March 17, 2022

Page 191

1   BY MR. ADKINS:

2        Q.  Okay.  Correct me.

3        A.  I did speculate that it appeared that road

4   had been constructed in wetlands from everything I

5   could see.  However, I'm not there to -- I can't tell

6   for certain, because I wasn't there beforehand.

7        Q.  Okay.

8        A.  But that wasn't where my flags were.  My

9   flags were on the north side of the perimeter road.

10       Q.  So the boundary that you were delineating,

11  you weren't considering what existed under the

12  perimeter road before it was constructed; is that

13  right?

14            MR. MCALILEY:  Object to form.

15       A.  The boundary that I was delineating were the

16  wetlands on the site at the time I did the

17  delineation.  I can't make an assumption one way or

18  another.

19  BY MR. ADKINS:

20       Q.  And the perimeter road area, you assumed

21  there were no wetlands that existed at the time of

22  your delineation; is that right?

23       A.  At the time of my site visit, there was no

24  wetlands in the perimeter road location at the time of

25  my site visit.

Danna Small                                                    March 17, 2022

                                                              Page 192

1        Q.  I think I understand.  Thank you.  Okay.

2            After your email clarifying the boundary for

3   Karner Surveying, did you do any other work for

4   defendants?

5        A.  I don't recall.

6        Q.  Did you receive any payments for work that

7   you performed after clarifying the boundary for Karner

8   Surveying?

9        A.  If I invoiced them, then I received payment.

10  If it was invoiced after that date, I don't

11  specifically recall.

12       Q.  Are you currently employed by the defendants?

13       A.  No.

14       Q.  When did your employment for them end?

15           MR. MCALILEY:  Object to form.

16  BY MR. ADKINS:

17       Q.  I'll withdraw the question.  You were never

18  employed by the defendants; is that right?  You were

19  contracted by them; is that correct?

20       A.  Correct.

21       Q.  When did your relationship with the

22  defendants end?

23       A.  I can't specifically recall.

24       Q.  Did it end in 2018?

25       A.  Yes.

Danna Small                                             March 17, 2022

Page 193

1        Q.   What was -- how did it end?

2        A.   It was an acknowledgement that I felt like

3   they were -- I couldn't keep up with them.

4        Q.   Who acknowledged that you couldn't keep up

5   with them?

6        A.   I believe I stated something along those

7   lines to Kevin.

8        Q.   What was it about them that you couldn't keep

9   up with?

10        A.   I can't keep chasing the dog down the street.

11   It's on its path and I just -- I can't keep chasing it

12   down the street.  So what I couldn't keep up with is

13   the change in the activities.

14        Q.   Could you be more descript by what you mean

15   by change in activities?

16             MR. MCALILEY:   Object to form.

17        A.   The continued work.   The continued work.

18   BY MR. ADKINS:

19        Q.   At the site?

20        A.   At the site.

21        Q.   You knew at the beginning of the relationship

22   that defendants were intending to do work at the site.

23   They had heavy machinery there when you were there in

24   March.  Certainly, you knew that work was going to

25   continue there in some respect.

Page 194

1          What was it that was happening that caused

2    you to want to end the relationship?

3          MR. MCALILEY:  Object to form.

4     A.  My crystal ball doesn't give me future

5    assumptions.  Most clients do take my recommendations

6    and typically respond appropriately in order to

7    correct anything that might be going on.  And I'm

8    typically going to give somebody the benefit of the

9    doubt to get something rolling in the right direction.

10   If I continue chasing that dog down the street, then I

11   give up.

12   BY MR. ADKINS:

13        Q.  Who is the dog in this situation?

14        A.  Well, I mean, I don't mean, like, he's a dog,

15   but the client.

16        Q.  Sure.  Who were you chasing down the street

17   in this situation?

18        A.  In my mind, the client, the person who

19   continues to do the activity.

20        Q.  Is that Mr. Sharfi?

21          MR. MCALILEY:  Object to form.

22        A.  Whoever is doing the activity on the site.

23   BY MR. ADKINS:

24        Q.  Who do you understand to be controlling

25   activity on the site?

Danna Small                                    March 17, 2022

                                              Page 195

 1            MR. MCALILEY:  Object to form.

 2       A.  My crystal ball did not tell me.  I don't

 3  know.  But I'm assuming he's got some role in that.

 4  BY MR. ADKINS:

 5       Q.  So I'm going to try to summarize what you're

 6  saying here and I'm going to get an objection from

 7  counsel, I'm sure --

 8            MR. MCALILEY:  I'll object again because

 9       this is testimony.

10            MR. ADKINS:  Sure.

11  BY MR. ADKINS:

12       Q.  So you were concerned, around the time that

13  you ended this relationship, that your clients were

14  not being receptive to recommendations you were giving

15  and you did not want to continue chasing them on those

16  recommendations.  Is that accurate?

17            MR. MCALILEY:  Object to form; putting

18       words in her mouth.

19       A.  I was concerned that activities continued

20  regardless of my recommendations and I did not get the

21  sense that it was being taken seriously.

22  BY MR. ADKINS:

23       Q.  And now, sitting here today, were those

24  concerns accurate?

25            MR. MCALILEY:  Object to form.

Danna Small                                          March 17, 2022

Page 196

1        A.   Based upon the current conditions of the

2   site, I'd have to say that, yes, they were accurate.

3   BY MR. ADKINS:

4        Q.   What is it about the current conditions of

5   the site that caused you to think -- your concerns?

6        A.   Well, it looks pretty well-developed.

7        Q.   And that development is a problem, why?

8             MR. MCALILEY:   Object to form.

9        A.   That development would appear to have

10  required -- filled in wetlands.

11             (DX Exhibit 37 was marked.)

12  BY MR. ADKINS:

13       Q.   I'm handing you a document marked DX 37.

14  This is an email from Gregory Vazquez to you on

15  April 21, 2020.  It's Bates-stamped DLS0000187

16  through 188.

17             Are you familiar with this document?

18       A.   Yes.

19       Q.   Is this an accurate reproduction of the email

20  that Mr. Vazquez sent to you on April 21, 2020?

21       A.   Yes.

22       Q.   So lower in the chain, Mr. Vazquez wrote,

23  "Greg's contact," on April 21, 2020.

24             Why did he write this email to you?

25       A.   He had requested an approximate location of

Danna Small                                    March 17, 2022

Page 197

1   where I told him I went in the muck, and so he sent me

2   his email contact.

3       Q.  Oh, when you said you were shin deep, I

4   think, in the muck?

5       A.  Yeah, yeah, uh-huh, yeah.

6       Q.  And you responded.  You said, "Here's the

7   location that I went in the muck."  And when you say,

8   "I went," you literally -- part of your body went into

9   the muck?

10      A.  Yeah.  My husband pulled me out.

11      Q.  Is that right?

12      A.  Yes, yes.

13      Q.  Did both feet go in or just one?

14      A.  One and half of the other.  And I lost one

15  boot, so he had to pull that out too.

16      Q.  Jeez.  Okay.  Did you have any other

17  conversations with Mr. Vazquez?

18      A.  No.

19      Q.  Did he give you a phone call?

20      A.  He called me to request this.

21      Q.  What did you say in response?

22      A.  I said, "I'll email you a little sketch of

23  where I went in."

24      Q.  Did Mr. Vazquez say anything about the nature

25  of why he wanted that information?

Danna Small                                          March 17, 2022

Page 198

1        A.   No.

2        Q.   Have you had any other contact with the Water

3   Management District since April 2020?

4        A.   I assume you mean regarding this site?

5        Q.   Regarding this site, of course.

6        A.   Not that I recall.

7        Q.   Had you had any contact with the Water

8   Management District between April 25, 2018 and

9   April 21, 2020?

10       A.   Not that I recall.

11       Q.   How about with the Florida Department of

12  Environmental Protection; have you had any contact

13  with them with respect to the site?

14       A.   No.

15       Q.   Martin County -- any contact with Martin

16  County with respect to the site?

17       A.   They did call me.

18       Q.   Do you recall about when that was?

19       A.   No, I do not.

20       Q.   Was it in the last year or something longer?

21       A.   It could have been longer.

22       Q.   Do you remember who from Martin County

23  contacted you?

24       A.   I actually don't.

25       Q.   Was it -- what was the nature of your

Danna Small                                    March 17, 2022

                                                    Page 199

1    contact?

2         A.  I think -- I actually can't recall

3    specifically the actual nature of the contact, except

4    they had some questions about the site.

5         Q.  Did the contact happen after April 2018?

6         A.  Yes, it did.

7         Q.  Were you still working for the defendants at

8    the time of the contact?

9         A.  No.

10        Q.  Do you recall providing any information to

11   Martin County?

12        A.  I can't recall specifically.

13        Q.  Do you recall providing information to any

14   other regulators with respect to the site?

15        A.  No.

16        Q.  Have you had any contacts with anyone else,

17   other than what we've talked about at this deposition,

18   with respect to the site?

19        A.  I don't recall.

20        Q.  This case is scheduled for trial in

21   February 2023.

22        A.  I'll be retired.  I'll be in Alaska.

23        Q.  You're approaching retirement, you said?

24        A.  February 2023, I'll be retired in Alaska.

25        Q.  Are you aware of any reason why you may be

Danya Small                                                         March 17, 2022

                                                                 Page 250

1          Q.   Do you remember you were asked questions by

2     Mr. Adkins about your field notes?

3          A.   Which question about my field notes?

4          Q.   So do you recall that he asked you whether

5     all the information that was in those wetland data

6     forms was in your field notes?

7          A.   I remember some questions similar to that,

8     yes.

9          Q.   Isn't it right, Ms. Small, that you filled

10    out those wetland data forms within a matter of a

11    couple of days of when you were out on-site with the

12    Water Management District?

13          MR. ADKINS:   Objection.

14         A.   Most likely.   It's hard for me to say for

15    certain yes or no, but considering when they were

16    submitted --

17    BY MR. MCALILEY:

18         Q.   Let's do some chronology here.   So you were

19    out on the site with the Water Management District

20    inspectors on or about April 25, 2018; right?

21         A.   Yes.

22         Q.   And you sent that letter to Kelly Egan at the

23    Corps of Engineers on May 3rd of 2018?

24         A.   Yes.

25         Q.   This is just a few days after you're sending

Page 251

```
 1   the letter; correct?

 2        A.  Yes.

 3        Q.  And the letter you sent to Ms. Egan had those

 4   wetland data sheets; right?

 5        A.  Yes.

 6        Q.  It had just been a couple of days since you

 7   were last on the site to the time that you had

 8   submitted those wetland data sheets?

 9            MR. ADKINS:  Objection.

10        A.  Yes.

11   BY MR. MCALILEY:

12        Q.  You didn't need everything written in your

13   notes for you to remember what you saw; did you?

14            MR. ADKINS:  Objection.

15        A.  Correct.

16   BY MR. MCALILEY:

17        Q.  What I think is my last question is this.  Do

18   you remember you had the questions about laying down

19   the sod on the property?  Do you remember those

20   questions?

21        A.  Yes.

22        Q.  And Mr. Adkins asked you whether putting down

23   sod needs a permit.  Do you recall that?

24        A.  Yes.

25        Q.  Do you think that the owners of that property
```

Danna Small                                    March 17, 2022

Page 252

1   needed a permit from the Army Corps of Engineers to

2   put in grass on the property?

3       A.   If those are isolated wetlands, then they

4   wouldn't need a permit from the Army Corps of

5   Engineers to do anything.

6       Q.   Does the Corps of Engineers really try to

7   control whether people put down grass in wetlands they

8   think are under their jurisdiction?

9           MR. ADKINS:  Objection.

10      A.   I don't have much experience with that.

11          MR. MCALILEY:  One moment.

12          Ma'am, I'm done, unless I have some

13          follow-up questions from the questions that

14          Mr. Adkins has.  Thank you very much for you

15          bearing with me here.

16          MR. ADKINS:  We'll be quick, but I do

17          have a few questions, so keep the mic on,

18          please.

19                    REDIRECT EXAMINATION

20   BY MR. ADKINS:

21      Q.   You testified earlier that you took the site

22   in March and April 2018 as it was and you did not

23   attempt to delineate wetlands under portions of the

24   site that had already been built upon; is that right?

25      A.   That is correct.

Danna Small                                            March 17, 2022

Page 253

1       Q.  So you made no attempt to understand or

2  delineate a wetland below the surface of the perimeter

3  road that had already existed on the site when you

4  were there in March; is that correct?

5       A.  I was not doing an after-the-fact delineation

6  on the property.  It was a delineation on the property

7  as it was at the time.

8       Q.  At that time, the perimeter road already

9  existed on-site; is that right?

10      A.  It was present.

11      Q.  So what you mean by that is that you did not

12  attempt to delineate a wetland under the perimeter

13  road when you did that in March 2018; is that right?

14      A.  Correct.

15      Q.  Would you agree, if wetlands existed under

16  that perimeter road, that they would no longer be what

17  you described as isolated wetlands on the site?

18          MR. MCALILEY:  Objection to form.

19      A.  I don't necessarily agree with what you're

20  saying.

21  BY MR. ADKINS:

22      Q.  Why is that?

23      A.  You're saying, if the road wasn't filled,

24  they wouldn't be isolated?  Is that what your

25  statement is?

Danna Small                                    March 17, 2022

Page 254

1      Q.  Well, say wetlands existed under the road,

2   before it was filled, that connected the wetlands on

3   the site that you delineated with the ditch that runs

4   along the western boundary of the site.

5           Would you still consider the site wetlands

6   that you delineated to be isolated in that moment of

7   time?

8           MR. MCALILEY:  Object to form.

9      A.  I believe I identified that I felt like these

10  were isolated wetlands until that ditch was

11  constructed, and I don't know what the ditch led to

12  off-site.  But I still look at those and say, they

13  were isolated wetlands at the time that I did the site

14  visit.  I'm unable to make a final assessment on that,

15  but I believe I spoke to -- saying, prior to that

16  ditch being constructed, they would have been

17  isolated.

18  BY MR. ADKINS:

19     Q.  So your characterization of the wetlands

20  being isolated is based on the wetlands as they

21  existed on the site at the time you performed your

22  delineation?

23          MR. MCALILEY:  Object to form.

24     A.  Okay.  The wetlands being isolated could be

25  based upon at the time that I did the site visit and

Page 255

1    did the wetland delineation.  At that time, they were

2    isolated.  I would -- based upon what I've looked at

3    here, it appears that I would make that same

4    assessment if I went back before anything was -- the

5    ditch was constructed.  So what happens in between, I

6    don't know.

7            There's no connection -- I mean, there's no

8    way to physically, visually establish a connection of

9    that ditch, because the bank was higher, to the

10   wetland via aerial or the site visit.

11   BY MR. ADKINS:

12       Q.  And do you recall what aerials that you

13   looked at to make --

14       A.  You asked this before and I couldn't recall.

15       Q.  Okay.  Now, you testified in response to one

16   of Mr. McAliley's questions that it's more difficult

17   to delineate a wetland after work has been performed.

18   Is that accurate?

19       A.  Yes.

20       Q.  Okay.  When you delineated a wetland on the

21   site, had work already been performed on the site?

22       A.  The perimeter road was present.

23       Q.  So work had already been performed on the

24   wetland site?

25           MR. MCALILEY:  Object to form.

Danna Small                                    March 17, 2022

Page 256

1        A.  Yes.  I mean, there was work in the wetlands

2    also.  I pointed that out in the southwest corner.

3    BY MR. ADKINS:

4        Q.  Okay.  Let's look at DX 12.  I want to

5    confirm a couple things with these pictures.

6    Mr. McAliley asked you some questions about

7    DLS0000007, DLS0000008, and I believe those are the

8    only two.

9            Now, I'm going to ask you to look at

10   DLS0000001.

11       A.  Yes.

12       Q.  Do you have any doubt that this is a

13   representation of the site and not some other

14   property?

15       A.  No doubt.

16       Q.  How about with respect to DLS0000002; do you

17   have any doubt this is a representation of the site

18   and not some other property?

19       A.  No doubt.

20       Q.  With respect to DLS0000003, do you have any

21   doubt that this is a representation of the site and

22   not some other property?

23       A.  No doubt.

24       Q.  With respect to DLS0000004, do you have any

25   doubt that this is a representation of the site and