# EXHIBIT 68

```
W. MICHAEL DENNIS                                        May 27, 2022
U.S.A. vs BENJAMIN K. SHARFI
```

```
              UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF FLORIDA

                              CASE NO. 2:21-cv-14205-KAM

UNITED STATES OF AMERICA,

        Plaintiff,
vs.

BENJAMIN K. SHARFI, in his personal
and fiduciary capacity as trustee of
The Benjamin Sharfi 2002 Trust, AND
NESHAFARM, INC.,

        Defendants.
_____/


                        VIA ZOOM
                 Miami, Florida 33136
             Friday, 9:01 a.m. to 5:10 P.M.
                     May 27, 2022



            DEPOSITION OF W. MICHAEL DENNIS


        Taken on behalf of the Plaintiff before
Melissa Ostolaza, Notary Public in and for the State
of Florida at Large, pursuant to Notice of Taking
Deposition in the above cause.
```

```
                                                               1
                                           800.211.DEPO (3376)
                                           EsquireSolutions.com
```

W. MICHAEL DENNIS  May 27, 2022
U.S.A. vs BENJAMIN K. SHARFI

1 perennial connection.
2 　　Q.　When you say inspections, you just mean the
3 March 10, 2022 inspection, right?
4 　　A.　Correct.
5 　　Q.　Do you have any other opinions regarding
6 Dr. Nutter's opinion, which was based in part on data
7 collected from the hydrologic wells?
8 　　A.　Those are the primary areas.
9 　　Q.　Any other nonprimary areas that you can
10 recall?
11 　　A.　No.
12 　　Q.　Did -- did you collaborate at all with
13 Dr. Negahban with respect to the substance of any
14 opinions offered by the U.S. DOJ Expert Team in this
15 case?
16 　　A.　No.
17 　　Q.　And you said that Dr. Brown had offered
18 editorial comments and suggestions to the draft of
19 your report; is that right?
20 　　A.　Yes.
21 　　Q.　Did Dr. Brown write any sentences or
22 paragraphs in your report?
23 　　A.　I don't think so.  She provided edits on
24 some of them.  If those edits turned out to be a
25 sentence here or there, it may have been, but nothing

1  beyond that.
2     Q.   I think we have kind of a vague term on --
3  I've had someone edit my work in a way that
4  completely rewrote it.
5          So what do you mean by edit?
6     A.   Yeah, I understand and appreciate that --
7  that position; I've had the same.
8          When I'm using edit here, I'm talking about
9  editing for typos, for sentences that didn't make any
10 sense, maybe a paragraph or a section that needs some
11 more clarification.  So I'm thinking about those
12 kinds of edits, which she would apprise me of and we
13 would discuss, and then I would go back and -- and
14 make the edits.
15    Q.   Okay.  Did anyone other than you write the
16 initial draft of your report?
17    A.   No.
18    Q.   Other than Dr. Negahban and Dr. Brown, have
19 you consulted with anyone else regarding -- and with
20 the exception of counsel -- have you consulted with
21 anyone else regarding your opinions in this case?
22    A.   No.
23    Q.   Does your April 8, 2022 rebuttal report
24 reflect the full scope of your opinions and the basis
25 and reasons for that in this case?

```
 1        A.   Yes.
 2        Q.   Does your April 8, 2022 rebuttal report
 3   reflect the full scope of the facts and data you
 4   considered in forming your opinions in this case?
 5        A.   Yes.
 6        Q.   Do any of your opinions in this case rely
 7   upon the opinions of the other experts that
 8   defendants have disposed?
 9        A.   I would say that the -- my April 8th report,
10   that the substance of my opinions and what I intend
11   to testify on at the hearing -- I've subsequently had
12   the benefit of reviewing depositions and -- and
13   reports of Creach and Dr. Ott, so to the extent that
14   their reports address topics that I address, then at
15   hearing, would incorporate and rely on any of their
16   opinions that were germane to my opinions and my
17   testimony.
18        Q.   Okay.  Before you served your April 8
19   rebuttal report, had you been aware in any way of the
20   opinions of Dr. Creach and Dr. Ott?
21        A.   No.
22        Q.   And I think I mean Mr. Creach and Dr. Ott.
23   I think I did that wrong, but is the answer still no?
24        A.   Still no.
25        Q.   All right.  Is there anything in your
```

W. MICHAEL DENNIS  May 27, 2022
U.S.A. vs BENJAMIN K. SHARFI

```
 1   rebuttal report that you'd like to correct?
 2        A.   There may be a typo here or there that I saw
 3   when I reviewed it, but nothing of any substance.
 4        Q.   Okay.  Did you delineate wetlands on the
 5   site?
 6        A.   I'm sorry, say it again.
 7        Q.   Did you delineate wetlands on the site?
 8        A.   No.
 9        Q.   You considered four wetland delineations at
10   the site, one conducted by Ms. Danna Small in March
11   2018, two conducted by EDC, and one conducted by the
12   U.S. expert team in this case; is that right?
13        A.   Correct.
14        Q.   Okay.  Do you know when the EDC delineations
15   were conducted?
16        A.   My recollection is in 2020, perhaps 2019,
17   but 2019 to 2020, I believe.
18        Q.   And when I asked you towards the top of this
19   deposition what sorts of materials you considered,
20   you referred to Ms. Small's delineation.  What
21   exactly of Ms. Small's work did you consider in
22   forming your opinions in this case?
23        A.   I -- I considered her -- well, in the
24   delineation that she submitted to the South Florida
25   Water Management District and had inspected in the
```

1 field by two wetland scientists from the Water
2 Management District that was conducted primarily
3 before any of the subsequent site work was done --
4 may have been a little bit of work done, but not
5 much -- in reviewing all of the wetland delineations
6 on site that had been done on site, I found her
7 delineation to be the most credible and defensible.
8     Q.   Right.  I -- yeah, we'll get there, don't
9 worry.  But I just want to understand exactly what --
10 what of Ms. Small's work that you considered.
11         So the wetland delineation, did you consider
12 any of the wetland delineation data forms that she
13 prepared in this case or for the site?
14     A.   Not specifically.
15     Q.   Generally?
16     A.   I -- I reviewed her survey wetland
17 delineation and focused primarily on -- on it.
18     Q.   And when you say the survey wetland
19 delineation, do you mean the map with the line of
20 where the wetlands exist based on her opinion?
21     A.   Yes.
22     Q.   Did you consider any of Ms. Small's notes
23 from inspections she conducted at the site?
24     A.   I don't believe so.
25     Q.   Did you consider any of the photos that

W. MICHAEL DENNIS                                       May 27, 2022
U.S.A. vs BENJAMIN K. SHARFI

1   Ms. Small took of the site?
2        A.   I -- I don't -- not specifically.  I don't
3   believe that I focused on any of the materials other
4   than materials that I was provided that she submitted
5   to the South Florida Water Management District.  So
6   to the degree that there was anything submitted in
7   that or her submittal to the Corps of Engineers, I
8   would have considered that in -- in looking at the
9   opinion.
10       Q.   Is there anything else that you remember
11  specifically that you might have considered of
12  Ms. Small's other than what she submitted to the
13  Water Management District?
14       A.   Also, I considered and had benefit of her
15  deposition when I finalized my report, so I -- I -- I
16  was informed by her deposition testimony.
17       Q.   Okay.  And her deposition -- did you review
18  any of the exhibits that she was shown at her
19  deposition?
20       A.   I can't recall.
21       Q.   Okay.  I'm showing you page 54 -- oh, excuse
22  me, what's Bates Stamped as SHARFIEXPERTS154.  I'll
23  show you the bottom page here.  And this is page 49
24  of your report if you want to turn to a copy that you
25  have.

1         So I'm going to read from your report here.
2    You state, "Given that the DLS Environmental Services
3    wetlands survey was conducted prior to the subsequent
4    land clearing, where the flag line inspected and
5    approved in the field by two South Florida Water
6    Management District reviewers, it was surveyed by a
7    professional land surveyor, I find this survey the
8    most supported by standard wetland delineation
9    practices and the most reliable for this site."
10            Did I read that correctly?
11       A.   Yes.
12       Q.   Is that an accurate statement of your
13   opinion in this case?
14       A.   Yes, it is.
15       Q.   Now, DLS Environmental Services, that's
16   Ms. Small's consulting company?
17       A.   Yes.
18       Q.   Can you please explain the basis for the
19   opinion that I just read.
20       A.   Yes.
21       Q.   Please do.
22       A.   I do and my company does wetland
23   delineations virtually every day of the week to one
24   degree or another.  And in doing wetland
25   delineations, the process always starts with, you