# EXHIBIT 69

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT PIERCE DIVISION
CASE No.: 2:21-cv-14205-KAM

UNITED STATES OF AMERICA,

      Plaintiff,

-vs-

BENJAMIN K. SHARFI, in his personal and
fiduciary capacity as trustee of the Benjamin
Sharfi 2002 Trust, and NESHAFARM, INC.,

      Defendants.
_____

REMOTE VIDEOTAPED DEPOSITION OF
KEVIN KRYZDA

Wednesday, June 8, 2022
9:07 - 5:18 p.m.

Reported By:
Wendy Beath Anderson, RDR, CRR, CRC
Notary Public, State of Florida
Esquire Deposition Services
West Palm Beach Office   Job #J8296603



KEVIN KRYZDA                                              June 08, 2022
UNITED STATES OF AMERICA vs SHARFI                              13

1        Q.   All right.  Do you have a supervisor or
2   someone you report to?
3        A.   I report directly to Mr. Sharfi.
4        Q.   Do you report to anyone else?
5        A.   I do not.
6        Q.   Do you have anyone that you supervise?
7        A.   I supervise a construction project manager and
8   the project manager on site.
9        Q.   What is the name of the construction project
10  manager you supervise?
11       A.   He's a new hire, Robbie -- Robert Walser.
12       Q.   Is that W-A-L-T-E-R?
13       A.   S-E-R.
14       Q.   Oh, Walser?
15       A.   Correct.
16       Q.   When was Mr. Walser hired?
17       A.   Roughly four weeks ago.
18       Q.   Okay.  Did you have a construction project
19  manager you supervised before hiring Mr. Walser?
20       A.   Yes.
21       Q.   What was the name of that person?
22       A.   Joseph Hawthorne -- I'm sorry, Joseph
23  Hawksworth.
24       Q.   And for how long was Joseph Hawksworth a
25  construction project manager?



1       A.   Approximately a year and a half.

2       Q.   Did you supervise a construction project

3   manager before Joseph Hawksworth?

4       A.   I did.

5       Q.   What was the name of that person?

6       A.   I'm sorry, I can't remember the name at this

7   time.

8       Q.   Do you remember a first name?

9       A.   Bill.

10      Q.   Okay.  Do you recall about how long Bill was a

11  construction project manager?

12      A.   Approximately one year.

13      Q.   Since you became the president of Sharfi

14  Holdings, have you supervised any other construction

15  project managers other than Robert Walser, Joseph

16  Hawksworth and Bill?

17      A.   No.

18      Q.   You said you supervise a project manager on

19  site.  Can you describe what you meant by that?

20      A.   We have a local construction project.  It's in

21  very close proximity to my office and there is an

22  on-site project manager running the project and the

23  trades.  I supervise him.

24      Q.   Okay.  Is the construction project at

25  NeshaFarm?



1       A.   No.

2       Q.   Okay.  Was that a no?

3       A.   It is a no.

4       Q.   Okay.  Sorry, your audio cut out for a second.

5  I just wanted to make sure I heard right.

6            Okay.  Other than the construction project

7  managers we discussed and the project manager on site,

8  do you supervise anyone else in your capacity as the

9  president of Sharfi Holdings?

10      A.   No, not directly.

11      Q.   When you were the chief information officer of

12  Sharfi Holdings from about January 2018 until late 2018,

13  what were your responsibilities?

14      A.   I was originally hired as a CIO for all of the

15  companies that Mr. Sharfi owns, including a company in

16  California, and I was responsible for implementing

17  compliance programs to meet an executive order, a

18  presidential executive order about cyber security.  I

19  was then working on technology platforms in Florida

20  trying to assemble and configure systems that would

21  support our activities in Florida.  And I was a business

22  development director attempting to find a new market for

23  a product line for products from California.

24      Q.   That's a full plate for a CIO for less than a

25  year, it sounds like.



```
 1          A.   It was.

 2          Q.   Okay.  Did you supervise anyone in your

 3   capacity as the CIO of Sharfi Holdings?

 4          A.   I supervised the IT director in California and

 5   a computer technician that reported to him in

 6   California.

 7          Q.   And to whom did you report when you were the

 8   CIO of Sharfi Holdings?

 9          A.   To Mr. Sharfi directly.

10          Q.   Did you report to anyone else during that

11   time?

12          A.   No.

13          Q.   And is it correct that you are currently the

14   president of Byte Services, Incorporated?

15          A.   Yes.

16          Q.   Okay.  When did you become the president of

17   Byte Services, Incorporated?

18          A.   By default since late 2018, but more recently

19   and more directly during the beginning of this year.

20          Q.   What do you mean by "default"?

21          A.   Well, I was president of many of Mr. Sharfi's

22   companies since 2018, but I didn't have such direct

23   relationship with Byte Services until the beginning of

24   this year.

25          Q.   Okay.  So you -- how is it that you could be
```



KEVIN KRYZDA                                          June 08, 2022
UNITED STATES OF AMERICA vs SHARFI                              17

1    the president of Byte Services by default?

2         A.   Well, my official title at the time was

3    president of Sharfi Holdings and therefore, responsible

4    for that -- in that capacity for all of the companies

5    that Mr. Sharfi holds.

6         Q.   And Byte Services, Incorporated is one of the

7    companies that Sharfi Holdings holds?

8         A.   Yes.

9         Q.   What were your responsibilities from the

10   period when you were the president by default of Byte

11   Services, Inc. until you more recently formally became

12   the president of Byte Services, Inc. this year?

13        A.   So a large majority of my responsibilities in

14   those early days were liaison with permitting and

15   regulating agencies in Martin County and in St. Lucie

16   County.  We acquired an executive air charter company as

17   well.  We were in negotiations to purchase a property

18   for an air charter base at an airport in the next

19   county.  We were negotiating with the local authorities

20   to establish relationships, leveraging my former

21   employment and contacts that I had during that time to

22   benefit some of the endeavors of the Sharfi Holdings

23   companies, and more generally, to become more involved

24   and more aware and informed about all the other

25   activities of all the other companies for which I was

1  not involved with when I first started employment.

2      Q.   When you were the president by default at Byte

3  Services, to whom did you report to?

4      A.   Mr. Sharfi.

5      Q.   And did you report to anyone else?

6      A.   No.

7      Q.   Did you supervise anyone when you were the

8  president by default of Byte Services?

9      A.   I did not.

10     Q.   Did you indirectly supervise anyone at Byte

11  Services during that period?

12     A.   I wouldn't characterize that as supervision,

13  but daily contact with employees of Byte Services at the

14  time were coordinated through me with Mr. Sharfi.

15     Q.   What were the names of those employees?

16     A.   Chuck Berlusconi and Frank Berlusconi.

17     Q.   Can you spell Frank's last name?

18     A.   B-E-R-L-U-S-C-O-N-I.

19     Q.   Oh, I think you spelled Chuck Berlusconi's

20  last name.  Can you spell the second name.  I believe

21  you said Frank?

22     A.   That's correct.  Same last name.

23     Q.   Oh, okay.  I misheard.  So Chuck Berlusconi

24  and Frank Berlusconi were Byte Services employees that

25  you interacted with while you were the president by



```
 1  default at Byte Services?
 2       A.   That's correct.
 3       Q.   Okay.  What is Frank Berlusconi's relationship
 4  to Chuck Berlusconi, if any?
 5       A.   He's his son.
 6       Q.   Okay.  Does Frank Berlusconi still work for
 7  Byte Services?
 8       A.   No.
 9       Q.   Why not?
10       A.   He was dismissed from employment in early
11  2020.
12       Q.   Do you know the reason why?
13       A.   Fraud of -- fraud in the company.
14       Q.   Did you have contact with any other employees
15  of Byte Services while you were the president by default
16  of Byte Services?
17       A.   I had contacts with several of the employees.
18  There were mechanics and laborers and horticulturists
19  and laborers, construction people.  And I had a lot of
20  interaction with those people, got to know them.
21       Q.   I don't want to go down the rabbit hole of
22  talking about all these employees, so why don't we put a
23  pin in this and I'm going to shift now to show you a
24  document on my screen.
25
```



 1           (Deposition Exhibit No. 9 was previously
 2   marked and identified for the record.)
 3   BY MR. ADKINS:
 4       Q.   So Mr. Kryzda, I'm showing you what's been
 5   previously marked as DX9, the site.  Do you see DX9 on
 6   your screen?
 7       A.   I see a red square on what appears to be a
 8   photograph.
 9       Q.   Okay.  Do you see the exhibit label at the top
10   right corner?
11       A.   I do.
12       Q.   Okay.  Does that say Exhibit DX9?
13       A.   It does.
14       Q.   Okay.  Now, do you recognize the photograph
15   that's depicted on DX9?
16       A.   I do.
17       Q.   Okay.  Is this NeshaFarm?
18       A.   It is --
19           MR. MIRON:  Objection to form.  Vague.
20           So even though I'm objecting, unless I
21       instruct you specifically not to answer, you still
22       have an obligation to respond.
23           THE WITNESS:  Understood.  Thank you.
24           This is a portion of what is known as
25       NeshaFarm.



1   BY MR. ADKINS:

2       Q.   Okay.  And you said you saw the red box that's

3   highlighted?

4       A.   Correct.

5       Q.   Okay.  This case concerns allegations that

6   Mr. Sharfi and NeshaFarm, Incorporated filled

7   jurisdictional wetlands without authorization in

8   violation of the Clean Water Act at the property that's

9   highlighted in red.

10           Do you understand that?

11      A.   I do.

12      Q.   For purposes of this deposition, I will refer

13  to the highlighted property as the site.  Will you

14  understand that?

15      A.   I do.

16      Q.   Okay.  And the property to the south of what

17  we've defined as the site is part of NeshaFarm; is that

18  correct?

19      A.   Yes.

20      Q.   The property to the west of that property is

21  also part of NeshaFarm; is that correct?

22      A.   If you mean the left, yes.

23      Q.   Yes, I do mean the left.  I'll represent to

24  you that the left side of this exhibit is west.  Is your

25  answer still yes?



KEVIN KRYZDA                                        June 08, 2022
UNITED STATES OF AMERICA vs SHARFI                        22

```
1        A.   Yes.

2        Q.   Okay.  So when I refer to NeshaFarm, I will

3   mean the three properties that we've identified as part

4   of NeshaFarm on DX9.

5             Does that make sense?

6        A.   Yes.

7        Q.   And when I refer to the site, I'm speaking

8   only of the area that's highlighted in red on DX9.

9             Do you understand that?

10       A.   Yes.

11       Q.   So I'm going to stop sharing my screen.

12            Do you recall the names of any employees who

13   did work -- excuse me.

14            Do you recall the names of any employees of

15   Byte Services, Incorporated who performed work at the

16   site?

17            MR. MIRON:  Objection; form.  Vague.

18            THE WITNESS:  I recall at least Chuck

19       Berlusconi, and I don't recall any of the other

20       people that might have been working, as many of

21       them were contracted employees or service

22       personnel, outside contracts.

23   BY MR. ADKINS:

24       Q.   So other than Chuck Berlusconi, the other

25   employees that you're familiar with who did work at the
```



KEVIN KRYZDA                                              June 08, 2022
UNITED STATES OF AMERICA vs SHARFI                                  23

1   site are contract employees?

2        A.   To the best of my recollection.

3        Q.   Okay.  Do you know whether Byte Services,

4   Incorporated had any other employees who performed work

5   at the site other than Mr. Berlusconi?

6             MR. MIRON:  Objection; form.  Vague.

7             THE WITNESS:  My recollection is that there

8         were some laborers who were performing hand labor

9         to remove some exotic vegetation on the site.  I do

10        not recall their names.

11  BY MR. ADKINS:

12       Q.   Do you recall the names of any of the

13  contracted employees who performed work at the site?

14            MR. MIRON:  Objection; form.  Vague.

15            THE WITNESS:  There was a landscape company,

16        Second Nature.  There was -- I don't recall any of

17        the other ones at the moment.

18  BY MR. ADKINS:

19       Q.   Is there anything that would help refresh your

20  recollection about what contract employees performed

21  work at the site?

22            MR. MIRON:  Objection; form.  Vague.

23            THE WITNESS:  I'm not sure.  I never saw a

24        list of them.

25



```
 1  BY MR. ADKINS:
 2       Q.   So Second Nature is a landscape company; is
 3  that right?
 4       A.   Correct.
 5       Q.   What do you understand the nature of the work
 6  to be that Second Nature performed at the site?
 7       A.   They planted some native trees on the site.
 8       Q.   Are you aware of whether Second Nature did
 9  anything else at the site other than planting native
10  trees?
11       A.   I do not.
12       Q.   I had asked whether you were aware of the
13  names of other contracted employees who performed work
14  at the site.  Are you aware of any other contractors,
15  including organizations or companies, who performed work
16  at the site?
17            MR. MIRON:  Objection; form.  Vague.
18            THE WITNESS:  Yes.  At the moment there's also
19       a sod company and there was an environmental
20       scientist who was hired later on.
21  BY MR. ADKINS:
22       Q.   What is the name of the sod company?
23       A.   Palm City Sod.
24       Q.   When was Palm City Sod hired?
25       A.   I don't recall.
```



KEVIN KRYZDA                                    June 08, 2022
UNITED STATES OF AMERICA vs SHARFI                        25

1        Q.   How do you know Palm City Sod performed work
2   at the site?
3        A.   I had seen an invoice for sod at the property
4   and there was sod brought in on some portions of the
5   site, and we do business with that company routinely.
6        Q.   Why was sod brought into some portions of the
7   site?
8        A.   I would have to defer to Mr. Sharfi.
9        Q.   Why is that?
10        A.   He directed that personally.
11        Q.   And when you say "directed that personally,"
12   what do you mean?
13        A.   He directed the purchase and the installation
14   of the sod.
15        Q.   Did Mr. Sharfi call the sod company directly?
16        A.   I don't know.  You might have to ask him.
17        Q.   Okay.  Other than the sod company and the
18   environmental scientist that was hired later, do you
19   recall the names of any other companies that performed
20   work at the site?
21        A.   I do not.
22        Q.   What was the name of the environmental
23   scientist?
24        A.   Danna Small.
25        Q.   You said you were the president of other of



1   Mr. Sharfi's companies other than Sharfi Holdings and

2   Byte Services.  Can you just list for me the names of

3   any of Mr. Sharfi's companies for which you've been an

4   executive officer at any point in time?  And I'll say

5   other than Byte Services and Sharfi Holdings, which

6   we've already discussed.

7        A.   We have an air charter company, executive air

8   charter, it's called Plus One Air, and General Micro

9   Systems East, which is a research and development

10  company contracted to do work with the California home

11  office.

12       Q.   Have you ever been an executive officer of

13  NeshaFarm, Incorporated?

14       A.   In title only.

15       Q.   What does that mean?

16       A.   It means that NeshaFarm is the purview of

17  Mr. Sharfi directly.  It is mostly his personal property

18  and most of the activities therein are directed by him

19  personally.

20       Q.   Have you ever -- well, when was the first time

21  you were the president of NeshaFarm in title?

22       A.   In late 2018.

23       Q.   Are you currently the president of NeshaFarm,

24  Incorporated?

25       A.   In title only.



1    Q.   Okay.  Who was the president of NeshaFarm in

2  title before late 2018?

3    A.   Nobody.

4    Q.   Okay.  Why is that?

5    A.   It was personally directed by Mr. Sharfi and

6  managed by him personally, and I don't know that

7  Mr. Sharfi had a need for additional resources then.

8    Q.   Why are you the president of NeshaFarm in

9  title only if this is a company that is for Mr. Sharfi's

10  personal use?

11       MR. MIRON:  Objection.  Speculation.

12       THE WITNESS:  I would defer to Mr. Sharfi.

13  BY MR. ADKINS:

14    Q.   Okay.  Well, did you ask any questions before

15  someone made you the president of NeshaFarm,

16  Incorporated?

17    A.   I asked about my responsibilities and

18  understood them at the time.

19    Q.   What did you understand your responsibilities

20  to be as president of NeshaFarm in title?

21    A.   That occasionally staff would need to conduct

22  or organize or coordinate activities with me when

23  Mr. Sharfi was either not present or out of town.

24    Q.   Did you understand that being the president in

25  title only of NeshaFarm would involve any other



 1   responsibilities?

 2        A.   I did not.

 3        Q.   Okay.  And have there been occasions where you

 4   have had to coordinate with staff when Mr. Sharfi is

 5   outside of town in connection with your -- in connection

 6   with being the president in title only of NeshaFarm?

 7        A.   More recently, yes.

 8        Q.   Could you put a year on by -- what you mean by

 9   "more recently"?

10        A.   Starting in 2020.

11        Q.   Okay.  What have been the nature of those

12   circumstances?

13        A.   Mostly repair services for infrastructure at

14   the farm, like well pumps, pool pumps, the coordination

15   of some activities like screen enclosures,

16   fertilization, water quality of the big lakes.

17        Q.   Have there been any instances where you've had

18   to coordinate with employees of NeshaFarm in connection

19   with activities at the site?

20        A.   Only to provide access to certain contractors

21   and to coordinate that -- the schedules for those.

22        Q.   How frequently have you done that?

23        A.   Prior to mid-2020 or early 2020, it was

24   infrequent, but more recently there has been more of

25   that.



KEVIN KRYZDA                                             June 08, 2022
UNITED STATES OF AMERICA vs SHARFI                                29

```
1        Q.   Do you recall the names of any of the persons
2   who needed access to the site prior to 2020?
3        A.   Yes.  Danna Small was one of them,
4   specifically.  That was a contract I was involved with.
5        Q.   Any other contractors you've had to provide
6   access to the site prior to 2020?
7        A.   Not that I recall.
8        Q.   In your capacity as the president in title
9   only of NeshaFarm, have you been involved in any
10  earthwork activities at the site?
11            MR. MIRON:  Objection; form.  Vague.
12            THE WITNESS:  No.
13  BY MR. ADKINS:
14       Q.   Have you been involved in any earthwork
15  activities at the site in any capacity?
16            MR. MIRON:  Same objection.
17            THE WITNESS:  No.
18  BY MR. ADKINS:
19       Q.   Have you been involved in any vegetation
20  removal activities at the site?
21            MR. MIRON:  Objection; form.  Vague.
22            THE WITNESS:  No.
23  BY MR. ADKINS:
24       Q.   Have you observed any earthwork activities at
25  the site?
```



1  any other discussions with Mr. Sharfi outside of

2  discussions you've had in the presence of counsel?

3       A.   Not that I recall.

4       Q.   Okay.  What do you mean when you say "not that

5  I recall"?

6       A.   I don't recall ever having conversations about

7  the site other than these consultants at the beginning

8  of 2018 that were not with counsel.

9       Q.   Okay.  And do you recall having any

10 conversations after 2018 with Mr. Sharfi concerning the

11 allegations in this case outside of counsel?

12      A.   No.

13      Q.   When's the last time you spoke to Mr. Sharfi?

14      A.   Last night.

15      Q.   Does he know you're -- does he know that you

16 are being deposed right now?

17      A.   Yes.

18      Q.   Did you discuss your deposition with

19 Mr. Sharfi at any point?

20           MR. MIRON:  Again, to the extent that these

21      are conversations you had with Mr. Sharfi outside

22      of counsel, please feel free to answer, but

23      otherwise, don't.

24           THE WITNESS:  Okay.  No, we did not discuss my

25      deposition.



```
 1   BY MR. ADKINS:
 2       Q.   Have you discussed your deposition with anyone
 3   else other than counsel?
 4       A.   No.
 5       Q.   Mr. Kryzda, who or what currently owns the
 6   parcel of property that we've defined as the site?
 7       A.   The Sharfi trust, 2002.
 8       Q.   And does -- is it your belief that the Sharfi
 9   2002 trust currently owns the site?
10       A.   That's my recollection.
11       Q.   Okay.  When did the Sharfi 2002 trust acquire
12   the site?
13       A.   I believe it was in early twenty -- I can't
14   remember.
15       Q.   Okay.  Was it in 2017; do you believe?
16           MR. MIRON:  Objection.  Asked and answered.
17           MR. ADKINS:  I haven't asked this question.
18   BY MR. ADKINS:
19       Q.   You're welcome to answer, if you can.
20       A.   I don't recollect.  I was not involved in the
21   purchase.
22       Q.   Okay.  Did -- okay.  Did the Benjamin Sharfi
23   2002 trust own the site when you became the CIO of
24   Sharfi Holdings?
25       A.   I don't know.
```



1      Q.   Okay.  When did you first become aware of the

2   existence of the site?

3           MR. MIRON:  Objection.  Vague.

4           THE WITNESS:  At the beginning of 2018,

5       shortly after my -- the beginning of my employment.

6   BY MR. ADKINS:

7      Q.   How did you become aware of the site in early

8   2018?

9      A.   Mr. Sharfi communicated to me that he was

10  interested in a site and was looking around for

11  comparables and asked me a couple of questions about

12  local regulations about fencing.

13     Q.   Do you recall when these conversations with

14  Mr. Sharfi occurred?

15     A.   Well, they would have to be in January or

16  February of 2018.

17     Q.   And you're saying it would have to be January

18  or February of 2018 because you were hired as a CIO in

19  January 2018?

20     A.   Yes.

21     Q.   Okay.  What, if anything, did you understand

22  Mr. Sharfi wished to do with the site?

23     A.   He wanted to expand the agricultural -- let me

24  restart.  He wanted to expand the property so he could

25  provide more pasture for the animals on the rest of his



KEVIN KRYZDA                                    June 08, 2022
UNITED STATES OF AMERICA vs SHARFI                      40

1  farm.

2       Q.   And so when you said he wanted to expand the

3  property, do you mean he wanted to expand NeshaFarm

4  property?

5       A.   Yes.

6       Q.   Is the site operated currently as a separate

7  farm from the rest of NeshaFarm?

8       A.   I'm sorry, could you repeat?

9       Q.   Is the site currently operated separately from

10  NeshaFarm in any way?

11       A.   Not that I'm aware of.

12       Q.   Right.  It's connected to the other NeshaFarm

13  properties, right?

14       A.   If you mean connected as an activity, yes, but

15  it's separated by a fence.

16       Q.   Okay.  Are there roads that connect the site

17  to other properties that make up NeshaFarm?

18       A.   Yes.

19       Q.   Okay.  And are there fences blockading those

20  roads?

21       A.   Yes.

22       Q.   Okay.  Are the fences open or shut while the

23  farm is in operation?

24       A.   They're usually closed.

25       Q.   Okay.  Do employees of NeshaFarm come on and



KEVIN KRYZDA                                                  June 08, 2022
UNITED STATES OF AMERICA vs SHARFI                                    41

1   off of the site?

2        A.   Yes.

3        Q.   Are there any other ways that the site is

4   separate from the rest of NeshaFarm other than a fence?

5        A.   Fences and gates, no.

6        Q.   How does one get to the site?

7        A.   Could you clarify the question?

8        Q.   So if I'm on -- you're familiar with Martin

9   Highway in Martin County?

10       A.   I am.

11       Q.   Okay.  So if I'm on Martin Highway, how would

12  I -- and I wanted to get to the site and I had

13  permission to do so, how would I get to the site?

14       A.   You would have to turn on to, I believe it's

15  eighty -- well, what would normally be 82nd Avenue.

16  It's a road that connects Martin Highway with the

17  NeshaFarm property.  And then you would have to go

18  through a gate on to the Nesha property, NeshaFarm

19  property, and traverse through the NeshaFarm property to

20  the south along roads that are internal to the property

21  to get to the site.

22       Q.   And other than expanding the property for more

23  pasture for NeshaFarm, what, if anything else, do you

24  understand Mr. Sharfi wanted to do with the site?

25            MR. MIRON:  Objection; form.  Vague.



KEVIN KRYZDA                                          June 08, 2022
UNITED STATES OF AMERICA vs SHARFI                            42

1          THE WITNESS:  Mr. Sharfi has never

2     communicated to me any other intent of the

3     property.

4   BY MR. ADKINS:

5     Q.   Is the site used to store equipment that is

6   used throughout NeshaFarm?

7     A.   Yes.

8     Q.   Okay.  Are animals that are part of NeshaFarm,

9   do they go to and from the site and other parts of

10  NeshaFarm?

11    A.   Routinely.

12    Q.   And I think you said you weren't involved in

13  any activities to research the site before it was

14  acquired; is that right?

15    A.   Could you restate the question?

16    Q.   Were you involved in any activities to

17  research the site before Mr. Sharfi acquired it?

18    A.   Just cursory investigations, looking at

19  property records of properties around, surrounding this

20  one and to learn the names of property owners from the

21  same records, and my general opinion of the site prior

22  to acquisition.

23    Q.   Okay.  So I'm going to represent to you that

24  Mr. Sharfi, on behalf of the Benjamin Sharfi 2002 trust,

25  acquired the site in April of 2017.



```
 1          A.   Okay.  Thank you.

 2          Q.   So that was about almost a year before you

 3     became the CIO of Sharfi Holdings.  Is it possible that

 4     you are recalling potential acquisition of a property

 5     other than the site?

 6          A.   No.

 7          Q.   Okay.

 8          A.   It might be that we were just doing general

 9     research of the surrounding properties.

10          Q.   Okay.  And so you weren't involved personally

11     in researching the site before April 2017; is that

12     right?

13          A.   That's correct.

14          Q.   Okay.  And have you ever seen an appraisal of

15     the site?

16          A.   No.

17          Q.   Okay.  And of the activities that you recall

18     researching the site, what did you learn?

19               MR. MIRON:  Objection.  Vague.

20               THE WITNESS:  Well, I learned about the

21          average assessed value of properties in the

22          surrounding area.  I learned of some large property

23          holdings to the north of this one that Mr. Sharfi

24          was interested in or had curiosity about.  I

25          learned about some public information available on
```



1  leave the site through the ditch along the western

2  boundary of the site?

3          MR. MIRON:  Objection.  Speculation.

4          THE WITNESS:  In 2018, no.  It was

5      undetermined.

6  BY MR. ADKINS:

7      Q.   Okay.  Why do you say it was undetermined?

8      A.   Because under rain events, the ditch didn't

9  appear to take water away from the site.  The water in

10 the ditch was still most of the time when observed.

11     Q.   Did you make those observations?

12     A.   Excuse me?

13     Q.   Did you make those observations?

14     A.   Yes.

15     Q.   Okay.  About how frequently were you on the

16 site in 2018?

17     A.   I was not on the site frequently in 2018.  I

18 was on the NeshaFarm site, which on the northern

19 property line one could observe that ditch.

20     Q.   Okay.

21     A.   One could also observe the surrounding

22 properties that this ditch serves and they were also

23 impacted by inability for water to leave the property,

24 properties.

25     Q.   On how many occasions did you observe rain



1    events where the ditch did not move -- or that the ditch

2    did not take water from the site because you did not

3    observe the ditch -- water moving in the ditch?

4        A.   Well, there were very few rain events that I

5    observed at the property, but as I recall, that year was

6    a very wet year and there was a lot of water puddled on

7    properties in the surrounding area, including the site.

8        Q.   Okay.  So on how many occasions did you

9    observe instances where there was a rain event and you

10   did not observe water flowing from the site into the

11   ditch?

12          MR. MIRON:  Objection.  Compound.

13          THE WITNESS:  So I think you have two

14      questions.  I will answer the first one, which is

15      on how many occasions did I observe a rain event on

16      the site.  The answer is none.  I was never on the

17      site during a rain event in early 2018.

18          As to the second question, did I observe water

19      flowing or not flowing, any time I was over there,

20      I was curious about the ditch and how it served the

21      site and we have always noted that the ditch rarely

22      conveys water away from the property.

23   BY MR. ADKINS:

24       Q.   And why do you believe the ditch rarely

25   conveys water from the property?



KEVIN KRYZDA                                        June 08, 2022
UNITED STATES OF AMERICA vs SHARFI                         52

1        A.   The term I'm familiar with is the ditch had

2    standing water in it, which means it doesn't move and it

3    was deeper than any other times.

4        Q.   Are there instances where you didn't observe

5    standing water in the ditch?

6        A.   No.

7        Q.   Okay.  So --

8             MR. MIRON:  Wendy, I'm going to object to the

9        form of the question as vague, please, on the last

10       question.

11            MR. ADKINS:  I don't think there was a

12       question pending.

13   BY MR. ADKINS:

14       Q.   Okay.  So you had testified that under rain

15   events the ditch didn't take water away from the site,

16   and my question is, on how many occasions did you make

17   that observation?

18       A.   We continue to make that observation to this

19   day.

20       Q.   Okay.  And when you say the ditch doesn't take

21   water from the site, do you mean surface water?

22       A.   Yes.

23       Q.   Have you done any investigation to determine

24   whether groundwater flows from the site to the ditch?

25       A.   No.



1       Q.   When was the first time you observed the site,

2  Mr. Kryzda?

3       A.   Late January or early February of 2018.

4       Q.   In late January, early February 2018, had a

5  perimeter fence been constructed around the site?

6       A.   No.

7       Q.   Do you know when that perimeter fence around

8  the site was constructed?

9            MR. MIRON:  Objection.  Vague.

10            THE WITNESS:  I'm not sure the question is

11       clear.  There was a fence on the property when the

12       property was purchased.

13  BY MR. ADKINS:

14       Q.   Okay.  Currently there is an electrified fence

15  around the western, northern and eastern boundaries of

16  the site, correct?

17       A.   Yes.

18       Q.   When was the electrified fence that currently

19  exists on the western, northern and eastern boundaries

20  of the site constructed?

21       A.   My recollection, beginning in February of

22  2018.

23       Q.   Okay.  Was the -- who constructed the fence?

24       A.   A fencing company.  I don't recall the name.

25       Q.   Do you know who paid for that work?



 1        A.    Mr. Sharfi did.

 2        Q.    Okay.  Did Mr. Sharfi authorize that work?

 3        A.    Yes.

 4        Q.    Were there any buildings on the site when you

 5   first observed it in January or February of 2018?

 6        A.    I don't recall.

 7        Q.    Are there any buildings on the site today?

 8        A.    Yes.

 9        Q.    All right.  Do you know -- well, let's start

10   with the southwest corner of the site.  What buildings

11   are in the southwest corner of the site?

12        A.    Southwest?  There is a small shelter for

13   livestock.

14        Q.    Are there any buildings on the southeast

15   corner of the site?

16        A.    There are -- there is a shelter for some pumps

17   that are used for irrigation.

18        Q.    Are there any buildings in the northeast

19   corner of the site?

20        A.    Yes, a horse -- a pole barn for livestock.

21        Q.    Are there any buildings in the northwest area

22   of the site?

23        A.    Yes, a covered arena.  The cover is a metal

24   building.

25        Q.    Is the pole barn in the northeast or the



1  northwest area of the site?

2       A.   It's in the northwest.

3       Q.   Northwest, okay.  And the covered arena is in

4  the northeast?

5       A.   That's correct.

6       Q.   Okay.  Are there any other buildings in the

7  northern area of the site?

8       A.   Yes.  There's some covered -- covering

9  structures, shelters for equipment and materials that

10 are stored on the site for use on all of the farm

11 properties.

12      Q.   What materials are stored in that covered

13 structure?

14      A.   There's wood, timber, some metal, some fill

15 and mulch.

16      Q.   What's fill?

17      A.   Excuse me?

18      Q.   What is fill?

19      A.   Earth, just loose soil that can be spread

20 around the property.

21      Q.   Did any of the buildings that you described in

22 the -- on the site exist when you first observed the

23 site around January or February 2018?

24      A.   No.

25      Q.   No, they were constructed after, right?



1        A.    Correct.

2        Q.    Okay.  Were they constructed at Mr. Sharfi's

3   direction?

4        A.    Yes.

5        Q.    Okay.  When you first observed the site in

6   January or February 2018, did any roads exist on the

7   site?

8             MR. MIRON:  Objection.  Vague.

9             THE WITNESS:  I don't know if they were called

10       roads, but there were cleared areas along the fence

11       line, presumably to maintain and erect a fence

12       prior to the purchase.

13  BY MR. ADKINS:

14       Q.    Where was the fence line that had existed

15   around the time of January or February 2018?

16             MR. MIRON:  Did you hear the question?

17             THE WITNESS:  I don't know that I heard the

18       question.

19             MR. MIRON:  Brandon, you broke up for about a

20       second.  Sorry.

21             MR. ADKINS:  Oh, thank you.  I can repeat.

22  BY MR. ADKINS:

23       Q.    Where was the fence line that existed at the

24   time you observed the site in January or February 2018?

25       A.    I would only speculate that it was on the



1    property lines.

2         Q.   And why would you be speculating?

3         A.   Because I didn't have a survey at the time of

4    the property boundaries that would identify where the

5    fence line was -- where the fence was with respect to

6    the boundary line.

7         Q.   What kind of fence was it?

8         A.   My best recollection is that it was a barbed

9    wire with metal picket fence.

10        Q.   And so you said you saw an area of -- a

11   cleared area along the fence lines.  You weren't sure if

12   you would call that a road.  Would you call it a path?

13   A trail?

14        A.   I would call it a cleared area that would

15   allow for the fence to be installed and maintained.

16        Q.   Okay.  What -- why was it -- why would you

17   consider it a cleared area?

18        A.   There was no vegetation or obstructions in

19   that area along the fence line.

20        Q.   Okay.  Was the surface elevation of the

21   cleared area any different than at other parts of the

22   site immediately near it?

23        A.   It varied.  In certain cases, yes, in others,

24   no.

25        Q.   Okay.  Did the cleared area appear to be the



KEVIN KRYZDA                                          June 08, 2022
UNITED STATES OF AMERICA vs SHARFI                              58

```
 1  result of any kind of earthen material brought to the
 2  site to create this path?
 3            MR. MIRON:  Objection.  Speculation.
 4            THE WITNESS:  Unknown.
 5  BY MR. ADKINS:
 6      Q.  Okay.  Did it appear to have been graded at
 7  all?
 8            MR. MIRON:  I'm sorry, Brandon.  I didn't hear
 9       the question.  Could you repeat it?
10            MR. ADKINS:  Sure.
11  BY MR. ADKINS:
12      Q.  Did it appear to have been graded at all?
13            MR. MIRON:  Objection.  Vague.
14            THE WITNESS:  It was hard to tell.
15  BY MR. ADKINS:
16      Q.  Do you recall at any point observing a berm
17  along the eastern portion of that ditch that runs along
18  the western boundary of the site?
19      A.  Could you repeat the question?
20      Q.  Do you recall at any point observing a berm
21  that runs along the eastern portion of the ditch that
22  runs along the western boundary of the site?
23      A.  Yes.
24      Q.  Okay.  What do you recall about that berm that
25  you observed?
```



1    A.   It looked to me like spoiled material from the

2    ditch when the ditch had been attempted to be cleared or

3    cleaned in the past.

4    Q.   About how high was the berm that you observed?

5    A.   It varied and I never measured.

6    Q.   Yeah, I suppose you probably haven't.  Was it

7    a matter of inches or feet?

8    A.   It would have been inches.

9    MR. MIRON:  Objection.  Asked and answered.

10   BY MR. ADKINS:

11   Q.   Okay.  And did you ever -- have you ever taken

12   any pictures of the site?

13   A.   Only recently.

14   Q.   Okay.  Recently being since this case was

15   filed last year?

16   A.   Well, the site is also used for social events

17   and family gatherings, and I've taken pictures of the

18   site with -- in visits with my family and others.

19   Q.   Okay.  When's the earliest picture you recall

20   taking of the site?

21   A.   I don't recall.

22   Q.   Was it within the last year?  Last two years?

23   A.   Two years.

24   Q.   There are ponds on the southwestern area of

25   the site currently; is that right?



KEVIN KRYZDA                                          June 08, 2022
UNITED STATES OF AMERICA vs SHARFI                              60

```
 1              MR. MIRON:  Objection.  Vague.
 2              THE WITNESS:  There is a watering hole on
 3        that -- in that area for livestock.
 4   BY MR. ADKINS:
 5        Q.   Okay.  I think we can do it this way.  I'm
 6   going to show you DX9 again.
 7              MR. MIRON:  Do you need a break?
 8              THE WITNESS:  Take another ten minutes?
 9              MR. MIRON:  Brandon, do you mind if we just
10        have a scheduled break at 11?
11              MR. ADKINS:  Hey, that's great.  Thanks for
12        the reminder.
13              MR. MIRON:  Yep.
14   BY MR. ADKINS:
15        Q.   Okay.  So I'm trying to zoom in here on the
16   area that we defined as the site.
17              Do you see that?
18        A.   Yes.
19        Q.   Okay.  And there are two dark areas in the
20   southwest quadrant of the site.
21              Do you see those?
22        A.   Yes.
23        Q.   Okay.  I'm going to refer to those as ponds.
24   Is that okay with you?
25        A.   Okay.
```



KEVIN KRYZDA                                      June 08, 2022
UNITED STATES OF AMERICA vs SHARFI                         61

1         Q.   Okay.  Did those two ponds exist on the site

2    when you first observed it in January or February 2018?

3         A.   No.

4         Q.   So they were created at some time after,

5    right?

6         A.   Yes.

7         Q.   Do you know when those ponds were created?

8         A.   Mid 2018 and late 2018.

9         Q.   How were they created?

10        A.   I did not observe that.

11        Q.   Do you know?

12             MR. MIRON:  Objection.  Asked and answered.

13             THE WITNESS:  No.

14   BY MR. ADKINS:

15        Q.   Do you know who created the ponds?

16        A.   No.

17        Q.   Were they created at Mr. Sharfi's direction?

18        A.   Yes.

19        Q.   Do you know whether a contractor created those

20   ponds?

21        A.   No.

22        Q.   Okay.  Since you first observed the site in

23   early 2018, have any trees been removed from the site?

24        A.   Yes.

25        Q.   When were trees removed from the site?



1    A.   I can't say specifically, but there are --

2  there is an invasive beetle that attacks pine trees and

3  the recommendation from horticulture and the Department

4  of Agriculture has been to remove the tree once it's

5  infested and remove the remains of the tree from the

6  property to prevent other trees from being infested.

7         So those are the trees that I know have been

8  taken away.

9    Q.   Okay.  So there were trees on the site --

10 there were pine trees on the site that were affected by

11 an invasive beetle that were taken away, you said?

12   A.   That's right.

13   Q.   How were they taken away?

14   A.   I did not observe.  Probably a third-party

15 contractor that put them on a truck and hauled them off.

16   Q.   Okay.  How were the trees removed from the

17 ground?

18   A.   I did not observe.  I suppose somebody saw-cut

19 them.

20   Q.   Okay.  I know you didn't observe, but do you

21 know otherwise?

22   A.   I don't know otherwise specifically for these

23 trees.  I'm familiar with procedures and methods to do

24 this.

25   Q.   Have any other trees, other than these pine



1  trees that have been affected by an invasive beetle,

2  been removed from the site?

3       A.   Yes.  Some had to be removed for the riding

4  arena.

5       Q.   It's in the northeast area of the site, right?

6       A.   Correct.

7       Q.   Any other trees removed from the site that you

8  are aware of?

9       A.   Not that I'm aware of.

10      Q.   Do you know how the other trees in the

11  northeast area of the site were removed?

12      A.   No.

13      Q.   Okay.  For any of the tree removal at the

14  site, have you ever been at the site while trees were in

15  the process of being removed?

16      A.   No.

17      Q.   Okay.  Do you know what equipment was used to

18  remove trees at the site?

19      A.   I do not.

20      Q.   Was the tree removal at the site at

21  Mr. Sharfi's direction?

22      A.   Yes.

23      Q.   Are you aware of any land-clearing activities

24  other than tree removal at the site?

25           MR. MIRON:  Objection; form.  Vague.



1          THE WITNESS:  I'm aware that some clearing was

2      done to provide more pasture, and it was carefully

3      done to preserve as many trees and native species

4      as possible.

5   BY MR. ADKINS:

6      Q.   And you've been on the site in the last year,

7   correct?

8      A.   Yes.

9      Q.   I saw you on the site once, right?

10     A.   That's correct, more than once.

11     Q.   And the site looks different today than it did

12  back in 2018, right?

13     A.   Yes.

14     Q.   Do you believe that the site was cleared in a

15  way that could preserve as many of the native species as

16  possible?

17     A.   Yes.

18     Q.   Okay.  Why do you believe that?

19     A.   Mr. Sharfi's instruction has always been to

20  preserve as much of the native species as possible, no

21  matter what size.  We have followed that instruction to

22  the best of everybody's abilities, including

23  contractors, and we've hired an environmental scientist

24  after Ms. Small to qualify the quality of the property

25  today as opposed to when it was first purchased.



 1       Q.   Are you aware of any grading activities at the
 2   site?
 3            MR. MIRON:  Objection; form.  Vague.
 4            THE WITNESS:  Could you explain grading?  What
 5       do you mean?
 6   BY MR. ADKINS:
 7       Q.   Are you aware of any activities that would
 8   level the land at the site or change the elevation of
 9   parts of the site?
10       A.   Yes.
11       Q.   What activities are you aware of?
12       A.   Well, the property had to be graded or leveled
13   to construct the foundation for the riding arena and to
14   fill the riding arena.  Some gradings had to be done to
15   create the storage area for equipment and materials.
16       Q.   Are you aware of any other grading activities
17   at the site?
18       A.   Other than to provide a road around the arena
19   and for the fence line, no.
20       Q.   What do you know about the road that runs
21   along the western, northern and eastern boundary of the
22   site?
23            MR. MIRON:  Objection.  Vague.
24            THE WITNESS:  I know that they -- that those
25       were created as part of Mr. Sharfi's original



1          intent to fence the property, do some clearing in

2          order to bring in a better fence than existed in

3          the past, and to provide ease of access to the rest

4          of the properties.

5     BY MR. ADKINS:

6          Q.   Do you know how the road was created?

7          A.   No.

8          Q.   Was fill material brought in to create the

9     road?

10              MR. MIRON:  Objection.  Vague.

11              MR. ADKINS:  What's vague about that, Counsel?

12              MR. MIRON:  What would you otherwise determine

13          as fill material?

14              MR. ADKINS:  He's used the term first in his

15          deposition and we defined it earlier.

16              MR. MIRON:  Okay.

17     BY MR. ADKINS:

18          Q.   Do you know the term fill?

19          A.   I do.

20          Q.   Okay.  Was any fill material brought in to

21     create the road along the western, northern and eastern

22     boundary of the site?

23          A.   There was.

24          Q.   When?

25          A.   In 2018.  I can't recall the exact dates.



1      Q.   Any time after 2018?

2      A.   Minor fill had been brought in; yes.

3      Q.   What do you mean by "minor fill"?

4      A.   I don't know, a few truckloads as far as I

5  know.  I was not present.  I just seen the areas where

6  fill was placed.

7      Q.   And in what areas was fill placed at the site?

8      A.   In and around the riding arena and the -- in

9  the northwest corner of the property.

10      Q.   Was -- is your testimony in and around the

11  riding arena and in the northwest corner of the

12  property?

13      A.   Yes.

14      Q.   Okay.  Why was fill brought in to the

15  northwest corner of the property?

16      A.   To create a more level area for livestock.

17      Q.   And to --

18      A.   Horses in particular.

19      Q.   I'm sorry, can you repeat that?

20      A.   Horses in particular.

21      Q.   How much fill was brought in to create the

22  road on the site in 2018?

23      A.   I don't know.

24      Q.   Do you know how the fill was delivered to the

25  site in 2018?



KEVIN KRYZDA                                    June 08, 2022
UNITED STATES OF AMERICA vs SHARFI                        68

```
 1        A.   Trucks, haul trucks.

 2        Q.   Would that be a dump truck?

 3        A.   I can't tell, a truck.

 4        Q.   Okay.  How many trucks brought fill to the

 5   site in 2018 to create a road?

 6        A.   I don't know.  I wasn't present.

 7        Q.   Do you know otherwise?

 8        A.   I do not.

 9        Q.   Okay.  And was fill brought to the site in

10   2018 to create a road on the western, northern and

11   eastern boundaries at Mr. Sharfi's direction?

12        A.   Yes.

13        Q.   Are you aware of any other instances where

14   rock, sand, dirt, earthen material was brought to the

15   site other than to create this road for the horse area

16   in the northwest area of the site and for the riding

17   arena in the northeast area of the site?

18        A.   No.

19        Q.   Are you aware of any earthen material having

20   been removed from the site at any time?

21        A.   No.

22        Q.   What about to create those ponds we looked at?

23        A.   I don't know that any material was removed

24   from the site.  I'm speculating that the material -- no,

25   I don't know that any material was removed from the
```



1   site.

2          MR. ADKINS:  Okay.  I see it's 11.  I have one

3      more line on this, if you want to continue on for

4      another few minutes?

5          MR. MIRON:  Sure, go ahead.

6   BY MR. ADKINS:

7      Q.   Okay.  What, if anything -- or has the ditch

8   that runs along the western boundary of the site ever

9   been cleaned out since you first observed it in January

10  or February 2018?

11     A.   Not to its full extent, no.

12     Q.   Has it ever been cleaned out whatsoever?

13     A.   A small portion had been cleaned out when we

14  made our application to the Army Corps to do just that,

15  and that would have been limited to the south end of

16  that ditch.

17     Q.   And was that work done before or after you

18  made an application to the Army Corps in 2018?

19     A.   It was done simultaneously.

20     Q.   What does that mean?

21     A.   At the same time of the application.

22     Q.   So at the moment you sent the application, the

23  ditch was cleared?

24     A.   Cleaning of the ditch starting at the south

25  end was done during the time that the application was



1   made.

2        Q.   Did any -- did any of the work to start

3   cleaning the south end of the ditch commence before the

4   application was sent to the Corps?

5        A.   Yes.

6        Q.   Okay.  And did any of it continue after you

7   sent an application to the Corps?

8        A.   No.

9        Q.   Okay.  And you said it was starting at the

10  south end.  Did it continue on northward?

11       A.   It only continued for a couple hundred feet.

12       Q.   Okay.  So how many feet is the western

13  boundary of the site, would you say?

14       A.   I don't know exactly.  It's a 10-acre site.

15  It's probably, if I remember my math, 660 feet long.

16       Q.   So it went up maybe a fifth of the way?

17       A.   Excuse me?

18       Q.   So the clearing of the ditch that runs along

19  the western boundary of the site proceeded about 1/5 of

20  the way from where it started northward along the

21  western boundary of the site?

22            MR. MIRON:  Objection.  Speculation.

23            THE WITNESS:  I stated that the clearing of

24       the ditch had begun on the south side and went for

25       a couple hundred feet.



KEVIN KRYZDA                                     June 08, 2022
UNITED STATES OF AMERICA vs SHARFI                        71

1    BY MR. ADKINS:

2         Q.   Why did it only go a couple hundred feet?

3         A.   Because the ditch wasn't functioning.  The

4    water wasn't moving and there was no sense in clearing

5    it to just hold water.

6         Q.   Okay.  Do you understand the term "spoil

7    material"?

8         A.   I do.

9         Q.   What was done with the spoil material from the

10   ditch when it was cleared in early 2018?

11        A.   It was placed along the bank of the southwest

12   corner.

13        Q.   Okay.  Southwest corner of the site, that is?

14        A.   Of the site, yes.

15             MR. ADKINS:  Okay.  Why don't we take a break.

16             MR. MIRON:  Great.  Thanks, Brandon.

17             THE VIDEOGRAPHER:  We are going off the

18        record, 11:03 a.m.

19             (A break was had.)

20             THE VIDEOGRAPHER:  We are back on the record,

21        11:19 a.m.

22   BY MR. ADKINS:

23        Q.   Mr. Kryzda, are you aware of any underground

24   drainage systems that exist at the site?

25        A.   No.



 1        Q.   Are you aware of any -- excuse me.  You can

 2   complete your answer.

 3        A.   I know of wells for irrigation.

 4        Q.   Okay.  What do you know of wells for

 5   irrigation at the site?

 6        A.   Well, I just know that wells have been

 7   excavated or dug or drilled, or whatever the term is, to

 8   provide water for the site.

 9        Q.   Are you aware of any underground conveyances

10   of water that exist at the site?

11             MR. MIRON:  Objection; form.  Vague.

12             THE WITNESS:  No.

13   BY MR. ADKINS:

14        Q.   Are you aware of any storm water systems that

15   are in place at the site?

16             MR. MIRON:  Objection.  Vague.

17             THE WITNESS:  I'm not sure what you mean by

18        "storm water systems."

19   BY MR. ADKINS:

20        Q.   Okay.  I can clarify.  Are you aware of any

21   systems that exist at the site that would manage the

22   flow of storm water?

23             MR. MIRON:  Objection.  Vague.

24             THE WITNESS:  I have not observed any.

25



1 | BY MR. ADKINS:

2 |     Q.   Okay.  Are you aware of whether any exist?

3 |     A.   I know there's one on the north end of the

4 | property where the storage area is.  That's the one I

5 | know of for sure.

6 |     Q.   Are there any other storm water management

7 | systems that you believe exist on the site other than

8 | the one in the northern edge of the property?

9 |         MR. MIRON:  Objection; form.  Vague.

10 |         THE WITNESS:  No.

11 | BY MR. ADKINS:

12 |     Q.   Okay.  And what do you know about the storm

13 | water management system that exists on the northern edge

14 | of the site?

15 |         MR. MIRON:  Objection; form.  Vague.

16 |         THE WITNESS:  I know that it removes water

17 |     from the roofed area of the storage facility, the

18 |     storage shed, and conveys it off site to a ditch

19 |     that's on the other side of the fence on the north

20 |     property line.

21 | BY MR. ADKINS:

22 |     Q.   Are you aware of any other grates or drains

23 | that capture storm water on the site?

24 |     A.   No.

25 |     Q.   Have you ever observed any pipes in either of



 1  the ponds that exist on the site?

 2       A.   No.

 3       Q.   Are you aware of any pipes that lead into or

 4  out of the ditch that runs along the western boundary of

 5  the site?

 6       A.   No.

 7       Q.   Do you know whether any diagrams or maps exist

 8  showing irrigation systems that exist at the site?

 9       A.   I'm not aware of any.

10       Q.   Are you aware of any maps or diagrams of the

11  site other than the Lidar maps that you referred to

12  earlier in your deposition?

13            MR. MIRON:  Objection.  Vague.

14            THE WITNESS:  The only other maps I've seen

15       are a preliminary survey from Karner as a result of

16       work from Danna Small, and then there was what's

17       called a planimetric survey of the property.  It

18       shows features on the surface, buildings, pathways,

19       ponds and the like.

20  BY MR. ADKINS:

21       Q.   What is the approximate date of the

22  planimetric survey you're aware of?

23       A.   Approximate date?  I don't recall.

24       Q.   Do you recall the approximate year of the

25  planimetric survey?



1          A.    '19, 2019.

2          Q.    Did Karner Survey create the planimetric

3    survey that you're referring to?

4          A.    Yes.

5          Q.    Was a copy ever provided to you?

6          A.    Yes.

7          Q.    Other than Mr. Sharfi, is there anyone else

8    who made decisions about how the site would be improved

9    or developed?

10         A.    Not that I know of.

11         Q.    Does NeshaFarm have any organic

12   certifications?

13         A.    I'm not aware of one.

14         Q.    Does NeshaFarm use any pesticides?

15         A.    Not to my knowledge.

16         Q.    We spoke a little bit about the property to

17   the north of the site and I'll represent to you that

18   that property's owned by an entity called Countess Joy,

19   LLC.

20               Are you familiar with Countess Joy, LLC?

21         A.    Yes.

22         Q.    Do you know -- do you know who owns Countess

23   Joy, LLC?

24         A.    The only name that I've heard is the last name

25   Goodfellow.



KEVIN KRYZDA                                              June 08, 2022
UNITED STATES OF AMERICA vs SHARFI                                   76

```
 1        Q.   Okay.

 2        A.   Other than that, no.

 3        Q.   Okay.  Have you ever had any direct

 4   communications with the owner of Countess Joy, LLC?

 5        A.   No.

 6        Q.   Okay.  Are you aware of anyone else at

 7   NeshaFarm or Sharfi Holdings having direct

 8   communications with the owner of Countess Joy, LLC?

 9        A.   I know Mr. Sharfi has had communication.

10        Q.   Okay.  What do you know of those

11   communications?

12        A.   Mr. Sharfi has attempted to speak with

13   Countess Joy or the owners of Countess Joy to clear a

14   blockage of the ditch that runs north from the site

15   through Countess Joy's property.  Those requests have

16   been denied.

17        Q.   When about did Mr. Sharfi have conversations

18   with Countess Joy's owners?

19        A.   I don't know the specifics.

20        Q.   Okay.  Well, do you recall the year that those

21   conversations took place?

22        A.   No.

23        Q.   Okay.  Do you know any other specifics about

24   those conversations other than what you've testified to?

25        A.   No.
```



1        Q.   Do you know why Countess Joy declined to allow

2   Mr. Sharfi to clear a portion of the north/south ditch

3   that runs along the western boundary of the site?

4        A.   No.

5        Q.   What was Mr. Sharfi's reaction when that

6   request was declined?

7        A.   He was disappointed.

8        Q.   Why do you think that?

9            MR. MIRON:  Objection.  Speculation.

10            THE WITNESS:  The intent of clearing the ditch

11        was to allow water in the ditch to flow as it was

12        intended.  Removing the blockage would restore that

13        flow and allow the site to drain as it was

14        intended.

15   BY MR. ADKINS:

16        Q.   Okay.  Is there anything that Mr. Sharfi said

17   or anything in his behavior that led you to believe he

18   was disappointed?

19        A.   He said so.

20        Q.   He said "I'm disappointed"?

21        A.   I'm not sure he used that term.  He was

22   disillusioned.  He was not happy with the answer, et

23   cetera.  In general, I would call that disappointment.

24        Q.   Have you ever spoken to the tenant or any

25   tenants of the property to the north of the site?



KEVIN KRYZDA                                    June 08, 2022
UNITED STATES OF AMERICA vs SHARFI                    78

```
 1        A.   Yes.
 2        Q.   Do you recall the name of the tenant you spoke
 3   to?
 4        A.   Only by first name.  I believe the name was
 5   Daryl.
 6        Q.   And when about did you speak -- well, on how
 7   many occasions have you spoken to a tenant of the
 8   property to the north of the site?
 9        A.   On one occasion.
10        Q.   When was that?
11             MR. MIRON:  Well, to the extent that was an
12        instance where I was also -- to the extent you had
13        a conversation with this individual outside of
14        counsel, again, please feel free to testify, but to
15        the extent that I was there or another lawyer was
16        there, then I'm going to instruct you not to.
17             THE WITNESS:  I've been instructed not to, no.
18             MR. ADKINS:  Okay.  Mr. Miron, it sounds like
19        this is a conversation that took place with a third
20        party.  How is this -- how is this a confidential
21        communication?
22             MR. MIRON:  That's a good question, Brandon.
23        To the extent that it was work product and I was
24        gathering information that was necessary for a
25        strategy, then that would be work product.
```



1           THE WITNESS:  With a notice of violation from

2      Martin County.

3   BY MR. ADKINS:

4      Q.    When about was that notice of violation?

5      A.    I recall it was May of 2018.

6      Q.    And what was it about the Martin County notice

7   of violation that led you to think that there was a

8   potential problem with work being conducted in wetlands

9   at the site?

10     A.    The notice of violation was clear that

11  activities were conducted in what were potential

12  wetlands that Martin County would regulate.

13     Q.    And so what, if any, actions did you take in

14  response to seeing that notice of violation?

15     A.    We contacted the county and asked to meet to

16  have further discussion about how to comply with Martin

17  County's regulations.

18     Q.    At any point did you instruct anyone to

19  discontinue work at the site?

20     A.    I did not.

21     Q.    At any point did Mr. Sharfi instruct anyone to

22  stop work at the site?

23     A.    I would have to defer to Mr. Sharfi.

24     Q.    Are you aware of whether Mr. Sharfi ever

25  instructed anyone to stop work at the site?



1    A.   No.

2    Q.   Have you been in contact with anyone from the

3  United States Army Corps of Engineers regarding the

4  potential fill of jurisdictional wetlands at the site?

5    A.   Yes.

6    Q.   When were you first in contact with someone

7  from the Army Corps of Engineers on that issue?

8    A.   My first recollection is January of 2018.

9    Q.   So I'm now sharing my screen with you,

10 Mr. Kryzda, and I'm showing you a document that has been

11 Bates-stamped DEF 703.

12         MR. ADKINS:  We're going to mark this document

13     as Deposition Exhibit 224.

14         (Deposition Exhibit No. 224 was marked and

15 identified for the record.)

16 BY MR. ADKINS:

17    Q.   This is a January 17, 2018, e-mail from you to

18 Jonathan Pempek, blind copying Ben Sharfi.

19         Do you see Deposition Exhibit 224?

20    A.   I do.

21    Q.   Okay.  Are you familiar with this document?

22    A.   Yes.

23    Q.   What is it?

24    A.   It's a memorandum to Jonathan Pempek at the

25 Army Corps from me.



1        Q.   When you say "memorandum," do you mean an

2   e-mail?

3        A.   It's an e-mail.

4        Q.   Okay.

5        A.   My apologies.

6        Q.   No, not necessary.

7             Did you write this e-mail, Mr. Kryzda?

8        A.   I did.

9        Q.   And you blind copied Mr. Sharfi; is that

10  right?

11       A.   I did.

12       Q.   Why is that?

13       A.   I had blind copied Mr. Sharfi because he had

14  asked me to send the note and get in touch -- or not

15  send a note, but to get in touch with Mr. Pempek.  I was

16  just copying him to notify him that I had done so.  Why

17  blind copy, I'm not sure.

18       Q.   Now, why did Mr. Sharfi ask you to get in

19  touch with Mr. Pempek?

20       A.   I recollect that he had a call from Mr. Pempek

21  suggesting that we needed to apply for a permit.

22       Q.   Did Mr. Sharfi tell you anything about the

23  call that he had with Mr. Pempek?

24       A.   Other than to follow up and contact

25  Mr. Pempek, no.



1      Q.   Okay.   In the second paragraph of this DX224,

2   you wrote, "By way of introduction, I work for

3   Mr. Sharfi, who spoke with you and asked me to contact

4   you.   Mr. Sharfi wishes to put this newly acquired

5   property into agricultural use."

6           Did I read that correctly?

7      A.   Yes.

8      Q.   The newly acquired property in the second

9   sentence that I read, is that referring to the site as

10  we've defined it?

11     A.   Yes.

12     Q.   And when you said "I work for Mr. Sharfi,"

13  what did you mean?

14     A.   I was in his employ.

15     Q.   And when you wrote this e-mail, were you

16  acting on Mr. Sharfi's behalf?

17     A.   Yes.

18     Q.   Further down in the second paragraph, you

19  wrote, "Thus, minor clearing and minor filling is

20  underway in order mobilize equipment to construct the

21  fence."

22          Did I read that correctly?

23     A.   You did.

24     Q.   What did you mean by "minor clearing and minor

25  filling"?



1    A.   That was in order to create an adequate

2  pathway around the property boundaries so that equipment

3  wouldn't get stuck and we would be able to move material

4  around, fence material around to erect a new fence.

5    Q.   I thought I understood that there was an area

6  around the perimeter of the site that had already been

7  cleared.  Why did you need to conduct additional

8  clearing?

9    A.   The area that had been cleared in the past was

10  not cleared sufficiently to provide for the necessary

11  equipment for the new fence.

12    Q.   What did you mean by "minor filling"?

13    A.   We would have to fill in low areas.

14    Q.   Can you just say generally, if you recall,

15  where minor filling was underway at the time you wrote

16  this e-mail?

17    A.   Generally no, but I know that material that

18  was excavated from the ditch on the west property line

19  was placed on the property and spread within the

20  property.

21    Q.   Who conducted the minor clearing and minor

22  filling that you refer to in this e-mail?

23    A.   External contractors or vendors.

24    Q.   Do you know the names of those external

25  contractors and vendors?



1     A.   I do not.

2     Q.   Was this work being conducted at Mr. Sharfi's

3  direction?

4     A.   Yes, it was.

5     Q.   Okay.  So the second to the last sentence in

6  the second paragraph is "The western boundary of this

7  property has a historical drainage ditch which provides

8  surface water drainage to this new parcel, as well as

9  other parcels in the area."

10          Did I read that correctly?

11     A.   Yes.

12     Q.   What did you mean by "historical drainage

13  ditch" in this sentence?

14     A.   I had previously described that this ditch was

15  part of a 1923 drainage district and it was

16  constructed -- manmade and constructed to drain

17  properties in the area.

18     Q.   So when you wrote -- I'm sorry, are you done

19  with your answer?

20     A.   Yes, I am.

21     Q.   Okay.  Sorry, I didn't mean to cut you off.

22  It's just, you know, the nature of the Zoom deposition.

23     A.   Mm-hmm.

24     Q.   So when you wrote "Historical drainage ditch,"

25  you were referring to the ditch that you had earlier



 1  testified to that runs along the western boundary of the

 2  site?

 3      A.   Yes.

 4      Q.   Okay.  Now, earlier in your testimony you said

 5  it was intended to drain water from the site.  In this

 6  e-mail you said it provides surface water drainage to

 7  this new parcel.  Is there a reason why there's a

 8  difference in your testimony today compared to what you

 9  wrote in January 2018?

10           MR. MIRON:  Objection.  Mischaracterizes his

11      testimony.

12           THE WITNESS:  I -- it was a careless use of

13      words.  I should have been more specific.

14  BY MR. ADKINS:

15      Q.   Around January 2018, did the ditch on the

16  western boundary of the site provide any surface water

17  drainage from the site?

18      A.   Not that we could tell.

19      Q.   What did you do to inspect it as of

20  January 2018?

21      A.   Inspect the ditch, is that what you mean?

22      Q.   Well, I can strike the question.  You said not

23  that we can tell.  What did you do to tell?

24      A.   Water in the ditch wasn't flowing, going

25  anywhere.



KEVIN KRYZDA                                      June 08, 2022
UNITED STATES OF AMERICA vs SHARFI                        87

1          Q.   So you had been the CIO for less than a couple

2     of weeks at the time you wrote this e-mail; is that

3     right?

4          A.   Yes.

5          Q.   Did anyone give you information on surface

6     water drainage that was informing the words that you

7     wrote in this e-mail?

8          A.   I had the prior experience from my stint with

9     Martin County as a surface storm water management, or

10    storm water manager.  Water resource engineer is the

11    title.

12         Q.   Okay.  Did anyone give you information about

13    whether or not the historic drainage ditch provides

14    surface water drainage from the site before you wrote

15    this e-mail?

16         A.   No.  I looked at aerial imagery.

17         Q.   Okay.  When did you look at aerial imagery?

18         A.   Shortly before I wrote this memo when we were

19    applying -- when we were trying to figure out how to go

20    about cleaning this ditch and fencing the property and

21    whether permits were needed and by what agencies.

22         Q.   Do you know whether or not you had personally

23    observed the site before you wrote this e-mail?

24         A.   Yes, I had.

25         Q.   Oh, okay.  Earlier when I asked you, before



1   you had the benefit of this document, you said you first

2   saw the site in January, late January or early

3   February 2018.  So this e-mail was January 17, 2018, and

4   your testimony is that you observed the site personally

5   before January 17, 2018; is that right?

6        A.   Yes, that's what I said.

7        Q.   Okay.

8        A.   I was mistaken.

9        Q.   Did Mr. Pempek respond to your e-mail?

10        A.   Yes.

11        Q.   What did -- how did he respond to your e-mail?

12        A.   He responded with an e-mail telling me that we

13   would have to apply for a permit and share the permit

14   form from the Army Corps.

15        Q.   Did you have any phone conversations with

16   Mr. Pempek around this time?

17        A.   I don't recall.

18        Q.   So I'm now showing you a document that we will

19   mark Deposition Exhibit 225.

20             (Deposition Exhibit No. 225 was marked and

21   identified for the record.)

22   BY MR. ADKINS:

23        Q.   This is an e-mail from you to Mr. Pempek dated

24   February 12th, 2018, and it is Bates-stamped USACE575

25   through 576.



 1  the site at the time that she visited on March 9, 2018?

 2       A.   I don't know that day.  I don't recall.

 3       Q.   Do you recall whether any land-clearing

 4  activities were occurring at the site at the time of her

 5  visit on March 2018?

 6            MR. MIRON:  Objection.  Asked and answered.

 7            THE WITNESS:  No, I don't recall.

 8            (Deposition Exhibit No. 12 was previously

 9  marked and identified for the record.)

10  BY MR. ADKINS:

11       Q.   I'm now showing you a document that's been

12  premarked DX12.  Do you see DX12 on your screen,

13  Mr. Kryzda?

14       A.   I do.

15       Q.   Okay.  So I'll represent to you that these

16  photos I'm showing you are -- were taken by Ms. Small

17  during her March 9, 2018, site inspection, okay?

18       A.   Okay.

19       Q.   Are you familiar with the -- what's depicted

20  on the first photo, which is DLS1?

21            MR. MIRON:  I'm sorry, Brandon, you cut out.

22       Could you repeat the question?

23            MR. ADKINS:  Oh, sure.  Thank you.

24  BY MR. ADKINS:

25       Q.   Are you familiar with what is depicted in this



1   first photo, DLS1?

2        A.   It looks like some vegetation was removed.

3        Q.   Okay.  Is this a picture of the site?

4        A.   It appears to be.

5        Q.   Okay.  And how are you able to identify this

6   as a picture of the site?

7        A.   There's a familiar building that's on

8   NeshaFarm property south of the site that I can

9   recognize.

10       Q.   Is the foreground depicted in this picture

11  showing the southwest area of the site?

12       A.   I can't tell.

13       Q.   Well, you know that building, the location of

14  the building in the background, right?

15       A.   Yes.

16       Q.   Okay.  And that building in the background is

17  close to the southwest corner of the site, is it not?

18       A.   It is.

19       Q.   Okay.  And this picture is taken in the

20  direction of the building in the background, correct?

21       A.   It is.

22       Q.   Okay.  And so the foreground in this picture,

23  then, is depicting the southwest portion of the site,

24  correct?

25            MR. MIRON:  Objection.  Asked and answered.



```
 1              THE WITNESS:  I can't tell the distance to the
 2         building from this picture.  All I can see is the
 3         background building and the foreground, but there's
 4         no perspective.
 5    BY MR. ADKINS:
 6         Q.   Okay.  You see the fence in the top right area
 7    of this picture?
 8         A.   I do.
 9         Q.   Is that a fence that runs along the western
10    boundary of the site?
11         A.   It is.
12         Q.   So just on the other side of that fence would
13    be the ditch that runs along the western boundary of the
14    site, correct?
15         A.   Correct.
16         Q.   So is this picture showing trees that had been
17    knocked over on the site?
18              MR. MIRON:  Objection.  Speculation.
19              THE WITNESS:  I can't tell from this whether
20         that's a tree or just brush vegetation.
21    BY MR. ADKINS:
22         Q.   Have you ever seen a scene that looks similar
23    to what's depicted in this picture at the site?
24              MR. MIRON:  Objection.  Vague.
25              THE WITNESS:  I'm not sure what you mean.
```



1    BY MR. ADKINS:

2         Q.   Well, have you ever observed the site in a

3    condition that is -- that is reflective of this picture?

4              MR. MIRON:  Objection.  Vague, irrelevant.

5              THE WITNESS:  I've only seen this picture --

6    BY MR. ADKINS:

7         Q.   So the site does not look like this to you?

8         A.   No, no, that's not what I said.  I've only

9    seen this picture representative of this location.

10        Q.   Okay.  Has the site ever looked like this to

11   you?

12        A.   Not to me.

13        Q.   I'm going to take out the second one -- or

14   excuse me.  I'm going to take you to the third picture

15   here.  This is marked DLS3.  Now, if you look in the top

16   right corner of this picture, do you see a piece of

17   machinery?

18        A.   I do.

19        Q.   Okay.  What is that?

20        A.   I don't know.  It looks like an excavation

21   equipment.

22        Q.   Are you aware of an excavation equipment ever

23   operating on the site?

24        A.   Yes, to clear the ditch.

25        Q.   Okay.  Is this in the area of the ditch?



```
 1        A.   I don't know.  It's not --

 2        Q.   Mr. Kryzda --

 3        A.   I can't tell from this picture.

 4        Q.   We just looked at the first picture.  We saw

 5   where the ditch is.  We see there's a road along it with

 6   a fence and you told me that on the other side of that

 7   fence is the ditch, right?

 8        A.   I did.

 9        Q.   Now, does that -- does that area where the

10   ditch is look anything like DLS3?

11             MR. MIRON:  Objection.  Argumentative.

12             THE WITNESS:  I can't tell from this picture

13        whether it's related or not.

14   BY MR. ADKINS:

15        Q.   Okay.  You don't see any roads in this

16   picture, right?

17        A.   I do not.

18        Q.   You don't see any electrified fences?

19        A.   I do not.

20        Q.   Is this -- the equipment that's shown in the

21   top right corner of this picture, is that familiar to

22   you at all?

23        A.   The equipment, yes, it is familiar to me.

24        Q.   Okay.  Have you ever seen that piece of

25   equipment on the site?
```



KEVIN KRYZDA                                    June 08, 2022
UNITED STATES OF AMERICA vs SHARFI              122

1        A.    Yes.

2        Q.    What was it doing?

3        A.    Excavating the ditch.

4        Q.    Have you ever seen that piece of equipment

5   doing anything other than excavating the ditch on the

6   site?

7        A.    I have not.

8        Q.    Do you -- are you aware of whether that piece

9   of equipment was used to do anything on the site other

10  than excavate a ditch?

11       A.    No.

12       Q.    You hesitated.  Is there a reason why you

13  hesitated?

14       A.    I don't know if this was used to do any land

15  clearing or not, but --

16       Q.    Are you aware whether any --

17       A.    -- some clearing was done at a future date,

18  but the only one that I know that this equipment was

19  used for was to clear the ditch.

20       Q.    Okay.  And what clearing at a future date are

21  you referring to?

22       A.    We received a notice of violation from Martin

23  County that some clearing had been done in an area of a

24  wetland or that wetlands might exist.

25       Q.    Okay.  Do you know who owns the piece of



 1  equipment that's shown in this picture?

 2      A.   No.

 3      Q.   Do you know who operate -- who was operating

 4  at any time the piece of equipment shown in this

 5  picture?

 6      A.   No.

 7      Q.   Does Byte Services own a piece of equipment

 8  that's shown in this picture?

 9      A.   The question is vague.  Byte Services owns one

10  today but did not at this time.

11      Q.   Did NeshaFarm at the time own a piece of

12  equipment similar to what's depicted in this picture?

13      A.   No.

14      Q.   So this equipment was probably rented then,

15  wouldn't you say?

16          MR. MIRON:  Objection.  Speculation.

17          THE WITNESS:  It could have been rented or the

18      service could have been rented altogether, operator

19      and equipment.

20  BY MR. ADKINS:

21      Q.   Okay.  Do you know -- do you know the names of

22  any contractors who would have offered a service of that

23  kind on the site?

24          MR. MIRON:  Objection.  Asked and answered.

25          THE WITNESS:  I had stated previously that I



KEVIN KRYZDA                                       June 08, 2022
UNITED STATES OF AMERICA vs SHARFI                        124

```
 1        don't recall the names of many of the contractors
 2        that were used.  I don't know that I ever knew
 3        them.
 4   BY MR. ADKINS:
 5        Q.   Okay.  So you referred to the Army Corps'
 6   request for additional information?
 7        A.   Yes.
 8        Q.   And Mr. Sharfi asked Ms. Small to assist in
 9   responding to the Corps' request; is that right?
10        A.   I asked.
11        Q.   You asked -- Mr. Sharfi authorized Ms. Small
12   to respond the Army Corps' request for additional
13   information; is that right?
14        A.   Yes.
15             (Deposition Exhibit No. 13 was previously
16   marked and identified for the record.)
17   BY MR. ADKINS:
18        Q.   So I'm now showing you a document that's been
19   marked DX13, which is an e-mail from you to Ms. Small on
20   March 19, 2018.
21             Do you see that?
22        A.   I do.
23        Q.   Okay.
24             MR. MIRON:  Excuse me, Brandon.  Sorry to
25        interrupt.
```



```
 1              MR. ADKINS:  Yeah.
 2              MR. MIRON:  When you think it's comfortable
 3         and appropriate, can we take lunch at 1:00?
 4              MR. ADKINS:  Yeah, I think that would be good.
 5         You want to go until 1, guys?  Is that okay for
 6         you, Mr. Kryzda?
 7              MR. MIRON:  Is that okay with you, Kevin?
 8              THE WITNESS:  Yes.  I just need to call
 9         downstairs.
10              MR. MIRON:  I've taken care of it.
11    BY MR. ADKINS:
12         Q.   Mr. Kryzda, are you familiar with this
13    document?
14              MR. MIRON:  You want him to scroll through the
15         whole thing?
16              THE WITNESS:  Yeah, could you scroll through
17         the whole thing, please?
18    BY MR. ADKINS:
19         Q.   I'm happy to.  So here's the e-mail I'm
20    showing you.
21              MR. MIRON:  Lower.  Okay.
22              THE WITNESS:  We're okay so far.
23    BY MR. ADKINS:
24         Q.   Okay.  I've reached the end.
25         A.   Okay.
```



KEVIN KRYZDA                                          June 08, 2022
UNITED STATES OF AMERICA vs SHARFI                          198

```
 1   continues."
 2           Did I read that correctly?
 3      A.   Yes.
 4      Q.   What do you understand Ms. Small to have to
 5   meant when she said "I was pretty vague on other work"?
 6           MR. MIRON:  Objection.  Speculation.
 7           THE WITNESS:  I don't know.  You would have to
 8      ask Ms. Small.
 9   BY MR. ADKINS:
10      Q.   What do you think she might have meant?
11           MR. MIRON:  Objection.  Speculation, asked and
12      answered.
13           THE WITNESS:  I can't say.  I don't know.
14   BY MR. ADKINS:
15      Q.   So do you recall whether you had an
16   understanding of what Ms. Small meant by "pretty vague
17   on other work" when she wrote this e-mail on May 7th,
18   2018?
19           MR. MIRON:  Objection.  Speculation, asked and
20      answered three times.
21           THE WITNESS:  No, I don't.
22   BY MR. ADKINS:
23      Q.   Okay.  Is it safe to say if you didn't
24   understand what she meant, you would have said I don't
25   understand what you mean?
```



1              MR. MIRON:  Objection.  Speculation.

2              THE WITNESS:  Not always, no.

3    BY MR. ADKINS:

4         Q.   Do you agree that you must have had some

5    understanding of what Ms. Small meant in her e-mail when

6    you read it?

7         A.   I don't recall.

8         Q.   So she said, "I did say it would be in uplands

9    and the whole thing might hit the brakes."

10             What did she mean by "I did say the whole

11   thing -- it would be in uplands"?

12             MR. MIRON:  Objection.  Speculation.

13             THE WITNESS:  I don't recall.

14   BY MR. ADKINS:

15        Q.   And do you know what Ms. Small might have

16   meant when she said "The whole thing might hit the

17   brakes"?

18             MR. MIRON:  Objection.  Speculation.

19             THE WITNESS:  I believe she was referring to

20        the application with the Army Corps.

21   BY MR. ADKINS:

22        Q.   Why do you believe that?

23        A.   Because this thread of e-mail relates to

24   submittals of the RAI in response to our application to

25   the Army Corps for a permit.



```
 1        Q.   Now, when she said I did say -- "was pretty
 2   vague on other work, but I did say it would be in
 3   uplands," is it accurate that other work occurring on
 4   the site was all in uplands?
 5        A.   You would have to ask Ms. Small what she meant
 6   by that.
 7        Q.   Ms. Small wrote, "It seems as though the work
 8   continues."
 9             Do you see that?
10        A.   I do.
11        Q.   What do you believe Ms. Small meant by that?
12             MR. MIRON:  Objection.  Speculation.
13             THE WITNESS:  That work on the property, on
14        the site continued to be undertaken.
15   BY MR. ADKINS:
16        Q.   Why would she write that in an e-mail to you?
17             MR. MIRON:  Objection.  Speculation.
18             THE WITNESS:  I don't know.  You would have to
19        ask her.
20   BY MR. ADKINS:
21        Q.   What work did -- do you believe Ms. Small was
22   referring to in this e-mail?
23             MR. MIRON:  Objection.  Speculation.
24             THE WITNESS:  I don't know.
25
```



KEVIN KRYZDA                                      June 08, 2022
UNITED STATES OF AMERICA vs SHARFI                          201

```
 1   BY MR. ADKINS:
 2       Q.   So it doesn't seem like you really understand
 3   anything what Ms. Small said in this e-mail, does it?
 4           MR. MIRON:  Objection.  That's argumentative.
 5   BY MR. ADKINS:
 6       Q.   You responded to it nevertheless.  I don't see
 7   any question marks in your response.  So you must have
 8   understood it then, huh?
 9           MR. MIRON:  Objection.  Argumentative.
10   BY MR. ADKINS:
11       Q.   Do you agree?
12           MR. MIRON:  Objection.  Argumentative.
13           THE WITNESS:  I don't recall.
14   BY MR. ADKINS:
15       Q.   You don't recall whether you understood
16   Ms. Small's e-mail when you responded on May 7th, 2018?
17           MR. MIRON:  Objection.  Asked and answered,
18       argumentative.
19           THE WITNESS:  I don't remember.
20   BY MR. ADKINS:
21       Q.   Okay.  So you wrote to Ms. Small the area that
22   was exposed was sodded to prevent erosion.  What did you
23   mean by that?
24       A.   There was the watering hole that had been
25   created for livestock and the banks were not stabilized,
```



KEVIN KRYZDA                                    June 08, 2022
UNITED STATES OF AMERICA vs SHARFI                        202

1   and that's where sodding occurred.

2        Q.    Sodding occurred only on the banks of the

3   watering hole?

4        A.    At the time, yes.

5        Q.    Okay.  And the watering hole, is that what I

6   had referred to earlier as a pond in the southwestern

7   corner of the site?

8        A.    Yes, we refer to that as a watering hole.

9        Q.    Okay.  There are two, I call them ponds, on

10  the site that we identified in DX9.  Is the watering

11  hole the one to the south or the one to the north?

12       A.    The one to the south.

13       Q.    What do you call the one to the north?

14       A.    It's a cypress pond.

15       Q.    Okay, thank you.  Was there any other area of

16  the site that was sodded to prevent erosion other than

17  at the banks of the watering hole?

18            MR. MIRON:  Objection.  Asked and answered.

19            THE WITNESS:  There was additional sod that

20       was placed in uplands areas in the northeast and

21       northwest quadrants.

22  BY MR. ADKINS:

23       Q.    When was that?

24       A.    In late 2018 and in 2019, early 2019.

25       Q.    Okay.  How was sod placed in the northeast and



1    northwest quadrants when that area was wooded?

2         MR. MIRON:  Objection.  Assumes facts not in

3       evidence.  It's also speculative.

4         THE WITNESS:  I don't know.  I don't remember

5       seeing a statement that that area was wooded.

6    BY MR. ADKINS:

7       Q.   Okay.

8       A.   There was a lot of vegetation and there were a

9    lot of exotics and there were trees that were infested

10   with that pine tree beetle that was removed.

11      Q.   Were areas in the northwest and northeast

12   quadrant cleared before they were sodded?

13      A.   Only of exotic material.

14      Q.   How do you know it was only of exotic

15   material?

16      A.   Well, Mr. Sharfi's instructions were clear, to

17   maintain all native species on the property to the

18   greatest extent possible, no matter how small.

19      Q.   Okay.  Do you -- other than Mr. Sharfi's

20   instructions that that happen, is there anything else --

21   any other basis you have for believing that only exotic

22   material was cleared from the northwest and northeast

23   portions of the site?

24      A.   I don't have personal basis for that.  I was

25   not on the site when it happened and I didn't make the



KEVIN KRYZDA                                           June 08, 2022
UNITED STATES OF AMERICA vs SHARFI                              204

1    decision or instruct anybody to do that.

2        Q.   Other than conveying this instruction to you,

3    have you ever observed Mr. Sharfi instruct anyone else

4    to preserve native species on the site?

5        A.   Yes.

6        Q.   Who?

7        A.   Mr. Berlusconi.

8        Q.   Anyone else?

9        A.   Any other worker that was on -- that might

10   have been on site at the time.

11       Q.   Do you have any names?

12       A.   Other than Mr. Berlusconi, no.

13       Q.   Okay.

14       A.   I wasn't very familiar with those people.

15       Q.   And do you recall any specific instances where

16   you personally observed Mr. Sharfi instruct

17   Mr. Berlusconi to preserve native species on the site?

18       A.   Yes.

19       Q.   When were those?

20       A.   They were throughout Mr. Berlusconi's

21   employment on the site and elsewhere.

22       Q.   Do you recall any specific instances where

23   Mr. Sharfi instructed employees at the site to preserve

24   native species?

25       A.   It's the same answer as the one with



1   Mr. Berlusconi.  He's always insisted on that with all

2   of his employees.

3       Q.   And do you recall any specific instances where

4   Mr. Sharfi instructed anyone not to conduct activities

5   in wetlands on the site?

6       A.   Yes.

7       Q.   When were those?

8       A.   Throughout my employment and with

9   Mr. Berlusconi at the time.

10      Q.   Okay.  Can you name one specific instance

11  where you heard Mr. Sharfi say that?

12      A.   When the property was first acquired and we

13  were starting to do the work, he instructed

14  Mr. Berlusconi and some other employees that were there

15  at the time, who are no longer employed, and myself.

16      Q.   What exactly was the instruction at that time?

17      A.   We are going to develop this property and make

18  use of it for -- to extend grazing for our farm and we

19  want to preserve as many natural vegetation and native

20  features as possible.

21      Q.   Okay.  My question was about preserving

22  wetlands.  Did Mr. Sharfi ever specifically instruct

23  anyone to preserve wetlands on the site?

24      A.   Well, when I said "features," I meant to say

25  wetlands as well.



KEVIN KRYZDA                                              June 08, 2022
UNITED STATES OF AMERICA vs SHARFI                              206

1        Q.   Okay.  And did Mr. Sharfi ever point out where

2   he believed wetlands existed on the site when he gave

3   that instruction?

4        A.   At the time we were unsure of where they would

5   be found.

6        Q.   So you continued with the work anyway?

7             MR. MIRON:  Objection.  Argumentative.

8             THE WITNESS:  The work continued.

9   BY MR. ADKINS:

10       Q.   Okay.  So back to DX35, finally you wrote in

11  your e-mail, "When we get it, we should hold on to it

12  until further notice."

13            You were referring to the survey by Karner

14  Surveying Group; is that right?

15       A.   Yes.

16       Q.   Why did you instruct Ms. Small to hold on to

17  the delineation survey until further notice?

18       A.   We were unsure of the district's

19  determination.

20       Q.   After Ms. Small responded to the Corps'

21  request for additional information, did she do any other

22  work as it relates to the site?

23       A.   No.

24       Q.   How did the contractor relationship with

25  Ms. Small end?



1  the site?

2      A.   Clearing, removal of exotics, sodding,

3  constructing a pole barn, working on riding -- a covered

4  riding arena, putting in irrigation pumps -- wells, I'm

5  sorry, and pumps.

6      Q.   Were any additional paths or roads created on

7  the site after May 14, 2018?

8      A.   Yes, around the northeast corner, around the

9  covered arena, riding arena.

10     Q.   Anywhere else on the site that you are aware

11  of?

12     A.   No.

13     Q.   When you say "clearing," what do you mean?

14     A.   Removal of exotics and dead pine trees.

15     Q.   Do you know how the exotics and dead pine

16  trees were removed at this time?

17     A.   Not specifically, no.

18     Q.   Do you know generally?

19     A.   I know there was a lot of land clearing and

20  there was some equipment.  I don't know what equipment

21  was used to remove such things.

22     Q.   What do you mean by --

23     A.   The trees had to be sawed, but other than

24  that, I don't know how else -- you know, what else was

25  done or how it was done.



KEVIN KRYZDA                                              June 08, 2022
UNITED STATES OF AMERICA vs SHARFI                              221

1          Q.   Do you know whether the -- when you say

2     "sawed," do you mean they were sawed at the base, at the

3     trunk of the tree?

4               MR. MIRON:  Objection.  Speculation.

5               THE WITNESS:  I'm just speaking from personal

6          experience.  To take a tree down it has to be sawed

7          and that's not as at the base of the tree.  It can

8          be at the base of the tree and other parts as well,

9          eventually to the base of the tree.

10    BY MR. ADKINS:

11         Q.   Are you aware of any land grading taking place

12    at the site after the May 2018 inspection?

13         A.   No.

14              (Deposition Exhibit No. 230 was identified for

15    the record.)

16    BY MR. ADKINS:

17         Q.   Okay.  I'm now showing you a document that we

18    will mark as 230.  And it has a Bates stamp

19    USACE0001189.

20              Do you see this document, Mr. Kryzda?

21         A.   I do.

22         Q.   Okay.  And there's a date stamp on the bottom

23    right corner.

24              Do you see that?

25         A.   August 21st, 2018, yes.



1       Q.   Right.  I see August 22, 2018.  Maybe I'll

2    zoom in for you.  Okay.  Do you see August 22, 2018?

3       A.   Yes.

4       Q.   Okay.

5       A.   Yes, I do.

6       Q.   Do you recognize the property that is depicted

7    in this picture?

8       A.   Well, I recognize the property on the right as

9    the neighbor to the west of the site.  So the property

10   on the left must be the site.

11      Q.   Okay.  The property to the left -- well, the

12   area of the site to the left, would that be the

13   northwest corner of the site?

14      A.   Northwest, yes.

15      Q.   Okay.  I'm going to take you in a little bit

16   closer here.  Do you see what appears to be piles along

17   the road in this image?

18      A.   I do.

19      Q.   What are those; do you know?

20           MR. MIRON:  Objection.  Speculation.

21           THE WITNESS:  I don't.  They look like piles

22      of dirt.

23   BY MR. ADKINS:

24      Q.   Were those piles of dirt present at the site

25   during the May 14, 2018, inspection?



1         A.   I don't recall.

2              (Deposition Exhibit No. 69 was previously

3    marked and identified for the record.)

4    BY MR. ADKINS:

5         Q.   Okay.  I'm now showing you a document that has

6    already been marked DX69.  It's got a Bates stamp

7    USACE0000982, and I'm going to represent to you that

8    this is a photograph that was taken on or around

9    November 14, 2018, okay?

10        A.   Okay.

11        Q.   Do you recognize the property that's depicted

12   in this image?

13             MR. MIRON:  Objection.  Vague.

14             THE WITNESS:  I recognize on the right side of

15        the photograph a property that is to the west of

16        the site and roughly the left half of the

17        photograph shows the site.

18   BY MR. ADKINS:

19        Q.   Okay.  So if you look closely at what is the

20   northwest corner of the site, do you see any of the

21   piles that you felt looked like piles of dirt that I

22   showed you DX230?

23        A.   I do not.

24        Q.   Okay.  Do you know what happened to them?

25        A.   I don't want to be fickle, but they were



KEVIN KRYZDA                                                June 08, 2022
UNITED STATES OF AMERICA vs SHARFI                                    224

1    removed or moved.

2              MR. MIRON:  He asked if you know.

3              THE WITNESS:  Oh, no, I don't know.  I'm

4        sorry.

5    BY MR. ADKINS:

6        Q.    Don't be sorry.

7              Do you see this area towards the center of the

8    site that looks like a path or maybe -- I don't want to

9    call it a road because I know there's some concern with

10   calling things roads, but is this a dirt path through

11   the center of the site here?

12             MR. MIRON:  Objection.  Speculation.

13             THE WITNESS:  That's hard to determine from

14       this view.

15   BY MR. ADKINS:

16       Q.    Okay.  I'll try to zoom in.  I'm not sure if

17   that's going to help at all.  How is this?

18             MR. MIRON:  To the extent there's a question,

19       same objection, speculative.

20   BY MR. ADKINS:

21       Q.    The question is, do you recognize -- do you

22   recognize this to be a dirt path through the center of

23   the site?

24       A.    No.  What I can -- what I can see is an area

25   that is bare.  I don't know if it's a path.



KEVIN KRYZDA                                      June 08, 2022
UNITED STATES OF AMERICA vs SHARFI                          225

```
1        Q.   Okay.

2        A.   But there's no vegetation on it.

3        Q.   Okay.  Did anything resembling this area

4   that's bare where there's no vegetation exist on the

5   site during the May 14, 2018, inspection?

6        A.   Not to my knowledge.

7        Q.   Okay.  So just focusing in on the northwest

8   corner of the site again, do you see what appears to be

9   standing water in this area?

10           MR. MIRON:  Objection.  Speculation and vague.

11           THE WITNESS:  It's an area that looks like a

12       puddle.

13   BY MR. ADKINS:

14       Q.   Okay.  Have you ever seen puddling in this

15   portion of the site in the northwest before?

16       A.   There was puddling on many areas of the site

17   because the ditch on the west property line wasn't

18   draining the property, which it was intended to do

19   originally.

20       Q.   Okay.  Do you see any areas of puddling

21   elsewhere on this aerial image?

22       A.   Not on this image.

23           (Deposition Exhibit No. 231 was identified for

24       the record.)

25
```



1   BY MR. ADKINS:

2        Q.   Okay.  I am showing you what will be marked as

3   DX231.  It's a document that has a Bates stamp

4   USACE0000535 through 536.  And this is -- do you

5   recognize this as an e-mail from Mr. Pempek to

6   Mr. Sharfi, you, Elizabeth Ross, Robert Raynes copying

7   others on November 28, 2018?

8        A.   Yes.

9        Q.   Okay.  Are you familiar with this document?

10       A.   With what, excuse me?

11       Q.   Are you familiar with this document?

12       A.   Yes.

13       Q.   Okay.  Can you describe what this document is?

14       A.   It's an e-mail from Mr. Pempek to

15   Mr. Sharfi --

16       Q.   Okay.

17       A.   -- thanking him for a response.

18       Q.   Okay.  I'm going to scroll down to the bottom

19   here.  So the original e-mail in this chain is from

20   November 28, 2018, at 7:39 eastern in the morning and

21   it's from Mr. Pempek.  The first line is "During the

22   on-site meeting on May 14, 2018, you told Samantha Rice

23   and I you would stop all work on Parcel

24   17-38-40-000-038-00000-0 until you applied for and

25   received federal authorization."



KEVIN KRYZDA                                         June 08, 2022
UNITED STATES OF AMERICA vs SHARFI                        227

1            Did I read that correctly?

2       A.   Yes.

3       Q.   Do you understand that the parcel number in

4  that sentence refers to the site?

5       A.   Yes.

6       Q.   Did Mr. Sharfi tell Samantha Rice and

7  Mr. Pempek on May 14, 2018 that he would stop all work

8  on the site until he applied for and received federal

9  authorization?

10       A.   As I said, I wasn't within earshot of

11  Mr. Pempek -- Mr. Sharfi during that meeting at all

12  times.  So no, I don't recall the specific statement.

13       Q.   So you don't remember Mr. Sharfi ever saying

14  that when you were around?

15            MR. MIRON:  Objection.  Asked and answered.

16            THE WITNESS:  No.

17  BY MR. ADKINS:

18       Q.   And you're saying that it's -- I guess you

19  weren't always within Mr. Sharfi's ear sight so -- or

20  earshot, so it's possible he might have said it when you

21  weren't within earshot?

22            MR. MIRON:  Objection.  Speculation.

23  BY MR. ADKINS:

24       Q.   Is that true?  Is that what you're saying?

25       A.   Yes.



KEVIN KRYZDA                                          June 08, 2022
UNITED STATES OF AMERICA vs SHARFI                          228

1      Q.   So the second line is "Using available

2  resources, I have reason to believe that -- I have

3  reason to believe you have continued work in

4  jurisdictional wetlands without the benefit of a

5  permit."

6           Now, I understand that you disagree whether or

7  not wetlands on the site are jurisdictional.  Is it

8  otherwise true that work continued in wetlands since the

9  May 14, 2018, site inspection?

10     A.   Yes.

11     Q.   So Mr. Sharfi responded to Mr. Knight, to you,

12 Elizabeth Ross and Robert Raynes copying Mr. Pempek and

13 he said, "We are working on the site on the upland areas

14 only."

15          Do you see that?

16     A.   I do.

17     Q.   So that's an incorrect statement, correct?

18          MR. MIRON:  Objection.  Argumentative.

19          THE WITNESS:  Well, my statement was that work

20     in wetlands continued, but I don't know that it

21     continued -- I hate to be repetitive --

22     continuously from the time of that meeting.

23     Mr. Sharfi clearly states that his continuing work

24     after that meeting would be in uplands.

25



1  several other items, like, you know, small generators,

2  solar panels, fill land for growing vegetables, et

3  cetera.

4       Q.   Okay.  Going back to the document,

5  Mr. Sharfi -- or Mr. Pempek, excuse me, wrote, "Thank

6  you for a response.  I will document this e-mail as your

7  position in place of a formal meeting."

8            Did I read that correctly?

9       A.   Yes.

10      Q.   Okay.  Was -- has Mr. Pempek's interactions up

11  through this point with yourself and Mr. Sharfi been

12  cordial?

13      A.   They started that way and I think they've

14  become businesslike.

15      Q.   Okay.  What do you mean by "businesslike"?

16      A.   Not cordial.

17      Q.   Okay.  Can you explain what you mean by that?

18      A.   I believe -- well, the relationship has turned

19  less cordial, less amicable and more, it seems,

20  judgmental.  There have been statements by Mr. Pempek,

21  presumptions of the situation and unfounded conclusions.

22      Q.   And what statements are you referring to?

23      A.   That there's jurisdictional wetlands -- Army

24  Corps of Engineers jurisdictional wetlands and that

25  there's violations of the Clean Water Act.



KEVIN KRYZDA                                     June 08, 2022
UNITED STATES OF AMERICA vs SHARFI                        233

1        Q.   Okay.  Any other statements that you perceive

2   as judgmental and drawing conclusions other than that?

3        A.   Yes.  His statement that he knows that

4   Mr. Sharfi owns other lands, it would take some effort

5   to discover what other lands Mr. Sharfi owns.

6        Q.   Okay.

7        A.   It's not a casual -- it's not casual

8   information.

9        Q.   Anything else?

10        A.   That's not a cordial act.  No, nothing else.

11        Q.   Okay.  Have you ever felt threatened by

12   Mr. Pempek?

13        A.   Not me, no.

14        Q.   Do you know anyone else who's ever felt

15   threatened by Mr. Pempek?

16             MR. MIRON:  Objection.  Vague.

17             THE WITNESS:  I can't speak for anybody else.

18   BY MR. ADKINS:

19        Q.   Okay.  The Benjamin Sharfi 2002 trust sought

20   binding determination by the Florida Department of

21   Agriculture and Consumer Services, which goes by FDACS,

22   F-D-A-C-S, regarding state law agricultural exemption;

23   is that correct?

24        A.   Yes.

25        Q.   And are you aware that FDACS inspected the



 1   site on October 25, 2018?

 2        A.   Yes.

 3        Q.   You were present at that inspection?

 4        A.   I was present to coordinate access to the

 5   property, but I was not -- I did not participate in the

 6   actual inspection.

 7        Q.   Okay.  Do you recall who was present at that

 8   inspection?

 9        A.   I do not.

10        Q.   Was Mr. Sharfi there?

11        A.   I don't remember.

12        Q.   Was Mr. Berlusconi there?

13        A.   Yes, he was.

14        Q.   Were any of Mr. Sharfi's lawyers present?

15        A.   I -- I don't recall.  I'm sorry.

16        Q.   Not a problem.  Do you recall any of the

17   conversations that occurred during that inspection?

18        A.   The conversations had to do with what the

19   intent of the investigation was and what we were hoping

20   would result from such an evaluation and inspection.

21        Q.   What do you mean by that?

22        A.   Well, we were hoping that FDACS would find in

23   our favor and grant agricultural exemption for the

24   activities that were undertaken on the site.

25        Q.   Do you recall any other conversations from the



KEVIN KRYZDA                                    June 08, 2022
UNITED STATES OF AMERICA vs SHARFI                      235

1   inspection?

2        A.   No.

3        Q.   How about after, did you discuss the

4   inspection with anyone else?

5        A.   Mr. Sharfi and I had a brief conversation

6   about we were hopeful and looking forward to a positive

7   result.

8             (Deposition Exhibit No. 232 was identified for

9   the record.)

10  BY MR. ADKINS:

11       Q.   I'm showing you a document that we will mark

12  as DX232.  And this is a document that is Bates-stamped

13  in reverse order.  So the page 1 is FDACS0000246 and

14  page 2 is FDACS000245.

15       A.   Can I see the bottom of this?

16       Q.   Yes.  I'm going to scroll through for you.

17       A.   Next page.

18       Q.   Okay.  That's --

19       A.   A little too fast.

20       Q.   Oh, I'm sorry.

21            MR. MIRON:  Brandon, can you go to the -- hold

22       it right there.

23            MR. ADKINS:  Okay.  I'll hold it until you

24       tell me you're ready.

25            MR. MIRON:  Thank you.



KEVIN KRYZDA                                    June 08, 2022
UNITED STATES OF AMERICA vs SHARFI                        236

1              THE WITNESS:  Okay.

2    BY MR. ADKINS:

3         Q.   Okay.  Are you familiar with this document?

4         A.   Yes.

5         Q.   Is this an e-mail from yourself to Vanessa

6    Bessey of the Florida Department of Agriculture and

7    Consumer Services on November 12, 2018?

8         A.   Yes.

9         Q.   Okay.  So Ms. Bessey asked four questions to

10   which you were providing responses; is that correct?

11        A.   Yes.

12        Q.   And the questions related to the Benjamin

13   Sharfi 2002 trusts, requests for binding determination;

14   is that right?

15        A.   Yes.

16        Q.   And the questions that Ms. Bessy asked were

17   related to the site; is that correct?

18        A.   Yes.

19        Q.   The fourth question that Ms. Bessy asked was

20   "Please clarify whether or not material cleaned from the

21   adjacent ditch was spread in the area referenced in 1,

22   above."

23             Do you see that?

24        A.   I do.

25        Q.   And the area referenced in 1 above is the



KEVIN KRYZDA                                          June 08, 2022
UNITED STATES OF AMERICA vs SHARFI                              237

1   southwest corner of the site; is that correct?

2        A.   That's what's stated; yes.

3        Q.   And then under Question 4 is an answer that

4   you provided, correct?

5        A.   Yes.

6        Q.   And your answer is, "Yes, material removed

7   from the ditch was spread upon the area in question

8   rather than trucking it off site"; is that correct?

9        A.   That's correct.

10       Q.   Okay.  Do you stand by that statement?

11       A.   Yes.

12       Q.   Okay.  When you were responding to

13   Ms. Bessey's e-mail, were you responding on behalf of

14   Mr. Sharfi?

15       A.   As his agent.

16       Q.   Yes, is that --

17       A.   Yes.

18       Q.   Well, let me ask again.  Were you -- when you

19   provided this response in Deposition Exhibit 232, were

20   you responding on behalf of Mr. Sharfi as his agent?

21       A.   Yes.

22       Q.   Who is -- let me stop this.  Who is Taryn

23   Kryzda?

24       A.   My significant other.

25       Q.   Okay.  Is Taryn your wife?



KEVIN KRYZDA                                          June 08, 2022
UNITED STATES OF AMERICA vs SHARFI                          238

1      A.   Yes.

2      Q.   Okay.  What does Mrs. Kryzda do?

3      A.   She's the county administrator.

4      Q.   Okay.  Have you ever discussed issues related

5  to this case with her?

6      A.   Never.

7           (Deposition Exhibit No. 233 was identified for

8  the record.)

9  BY MR. ADKINS:

10     Q.   So I'm showing you a document that we'll mark

11  as DX233, and this is a document the defendants produced

12  to us, DEF000043.

13          MR. MIRON:  Brandon, you haven't shared the

14     screen.

15          MR. ADKINS:  Oh, my gosh, I'm so sorry.  Thank

16     you.  I'm surprised that was the first time I've

17     done that.

18  BY MR. ADKINS:

19     Q.   Okay.  So I'm showing you what we will mark as

20  DX233.  It's a document that defendants produced and

21  it's Bates-stamped DEF0000043 through 46.

22          MR. MIRON:  Please go down to the bottom and

23     give him an opportunity to review it.

24          MR. ADKINS:  You bet.

25          MR. MIRON:  Thank you.



BY MR. ADKINS:

    Q.   You just let me know when you want me to
scroll down, okay?

    A.   Scroll down.  Okay.  Okay, thank you.

    Q.   Is this an e-mail that Taryn Kryzda wrote to
you on March 5, 2018?

    A.   Yes.

    Q.   Why did Mrs. Kryzda write this e-mail to you?

    A.   She was just informing me that a water use
permit had been issued.  There's no discussion.

    Q.   And what was the water use permit for?

    A.   Wells on the site.

    Q.   Okay.  Did Mrs. Kryzda have anything to do
with getting that permit issued?

    A.   No, but she's informed of all -- many permits
that are issued in Martin County.

    Q.   Okay.  So she was giving you notice that this
one issued?

    A.   She's -- yes.

    Q.   Has Mrs. Kryzda helped you or any of the
companies that you work for with permitting issues in
connection with her employment at Martin County?

    A.   Absolutely not.

    Q.   Why do you say "absolutely not"?

    A.   Because that's not something she could do, nor



1   would I ask her to do.

2       Q.   Okay.  And has Mrs. Kryzda been involved in

3   any investigations related to the site?

4       A.   Investigations?  You mean -- could you please

5   rephrase that?

6       Q.   Well, I know you had mentioned that Martin

7   County served a notice of violation.  Did Mrs. Kryzda --

8   was Mrs. Kryzda involved in anything having to do with

9   Martin County's notice of violation for activities in

10  wetlands on the site?

11      A.   Other than being aware that such a violation

12  was issued, no.

13      Q.   Okay.  By "investigations," I mean any

14  investigation into potential conduct that violates

15  Martin County ordinance or law, has Mrs. Kryzda been

16  involved in any investigations related to the site?

17      A.   Not that I'm aware of, no.

18      Q.   Okay.  I hope you'll pardon me for asking.  I

19  don't mean to pry into your personal life.  This is just

20  a document that the defendants produced to us, so I

21  wanted to make sure I asked you about it so I understand

22  it completely.

23      A.   I understand and thank you.

24      Q.   Okay.  Mr. Kryzda, what, if anything, did you

25  do to prepare for today's deposition?

