# EXHIBIT 70

# In the Matter Of:

USA vs BENJAMIN K. SHARFI

2:21-cv-14205-KAM

## BENJAMIN K. SHARFI

*June 09, 2022*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT PIERCE DIVISION
CASE No.: 2:21-cv-14205-KAM

UNITED STATES OF AMERICA,

      Plaintiff,

-vs-

BENJAMIN K. SHARFI, in his personal and
fiduciary capacity as trustee of the Benjamin
Sharfi 2002 Trust, and NESHAFARM, INC.,

      Defendants.

_____

REMOTE VIDEOTAPED DEPOSITION OF
BENJAMIN K. SHARFI

Thursday, June 9, 2022
9:06 - 5:49 p.m.

Reported By:
Wendy Beath Anderson, RDR, CRR, CRC
Notary Public, State of Florida
Esquire Deposition Services
West Palm Beach Office   Job #J8302685

BENJAMIN K. SHARFI                                    June 09, 2022
USA vs BENJAMIN K. SHARFI                                        11

1      Q.   Okay.  So over the course of the last 30

2   years, you've been deposed four or five times?

3      A.   Yes, sir.

4      Q.   What was the nature -- well, let me ask you

5   this.  Was the nature of any of those depositions an

6   environmental case?

7      A.   No, sir.

8      Q.   Okay.  Are you on any drugs or medications

9   that would affect your memory or ability to provide

10  truthful testimony today?

11     A.   No, sir.

12     Q.   Did you bring any documents with you?

13     A.   No.

14     Q.   Now, you understand this case concerns

15  allegations that you and NeshaFarm filled jurisdictional

16  wetlands without authorization in violation of the Clean

17  Water Act at a property located in Martin County,

18  correct?

19     A.   I understand that it's about that topic.

20     Q.   Right.  I appreciate you don't agree with

21  those allegations, but you understand that's what this

22  case concerns, correct?

23     A.   I understand that that's the case.

24     Q.   And the parcel of property where the alleged

25  violations took place has a parcel ID of

1   17-38-40-000-38-00000-0.  Do you understand that to be

2   the property where the alleged violations took place?

3       A.   I have no reason to disbelieve those numbers,

4   but clearly, you don't expect me to know those numbers.

5       Q.   Well, I was hoping maybe you -- have you

6   reviewed the amended complaint in this case?

7       A.   Not recently.

8       Q.   Okay.  Well, you know, just so we can be clear

9   about our terminology, I'll go ahead and show you a

10  document that I have been showing others.  Let me see if

11  I can pull this up.

12           (Deposition Exhibit No. 9 was previously

13  marked and identified for the record.)

14  BY MR. ADKINS:

15      Q.   I'm showing you a document that's previously

16  been marked DX9 and this is an aerial image of NeshaFarm

17  and other properties, correct?

18           MR. MIRON:  Objection.  Vague.

19           THE WITNESS:  Please ask your questions in

20       such fashion that it's clear and not ambiguous,

21       please.

22  BY MR. ADKINS:

23      Q.   Okay.  Do you understand the term NeshaFarm?

24      A.   It's the name of my farm.

25      Q.   Okay.  And your farm is located in Martin

BENJAMIN K. SHARFI                          June 09, 2022
USA vs BENJAMIN K. SHARFI                          13

1  County, correct?

2     A.   My farm is located in Martin County.

3     Q.   So yes?

4     A.   Yes.

5     Q.   Okay.  Is property owned -- is property of

6  your farm, NeshaFarm, depicted in DX9?

7     A.   DX9?  I'm not sure I understand.

8        MR. MIRON:  On that --

9  BY MR. ADKINS:

10     Q.   Oh, sure.  This exhibit is called DX9.  Do you

11  see that in the top right corner?

12     A.   Oh, yes, I do.

13     Q.   You see there's a red highlighted square?

14     A.   Yes, I do.

15     Q.   Is that red highlighted square the parcel of

16  property where the alleged violations in this case took

17  place?

18     A.   I'm sorry, you broke up.

19        MR. MIRON:  Yeah, Brandon, you cut out.  You

20     broke up.

21        MR. ADKINS:  Thanks for letting me know.

22  BY MR. ADKINS:

23     Q.   Is the red highlighted square the property

24  where the alleged violations took place in this case?

25     A.   Yes, sir.

BENJAMIN K. SHARFI
USA vs BENJAMIN K. SHARFI

June 09, 2022
14

1    Q.   Okay.  So I'm going to refer to that area

2  that's highlighted here as the site.  Will you

3  understand that?

4    A.   Yes, sir, the red highlight, not where you

5  have your cursor.

6    Q.   Yes, very good.  Only the red highlighted

7  square I will refer to as the site.

8    A.   We'll refer to that now as the site, correct.

9    Q.   Yes, sir.  Now, the property to the south of

10  the site and to the west of that property is part of

11  NeshaFarm, is it not?

12    A.   The property to the south is part of

13  NeshaFarm, correct.

14    Q.   Okay.  And is the property to the west of the

15  property to the south of the site also part of

16  NeshaFarm?

17    A.   The part to the south and west of the red

18  marked area is also part of NeshaFarm.

19    Q.   Very good.  So when I refer to NeshaFarm, I

20  will be referring to these three parcels that we just

21  identified, which are the site, the parcel to the south

22  of the site and then the parcel to the south and west of

23  the site.

24        Will you understand that?

25    A.   Yes, sir.

1    Q.   Okay.  Very good.  Now, are you familiar with

2   the site?

3    A.   Yes, sir.

4    Q.   When did you first become familiar with the

5   site?

6    A.   2013, '14, around that area.

7    Q.   How did you become familiar with the site in

8   2013 or '14?

9    A.   A friend of a friend recommended for me to go

10  see the southwest of the area that we described.  So for

11  sake of simplicity and not mistaking south and west and

12  north, let's just make the establishment of some terms.

13       The southwest of orange property, red

14  property, let's call that Site 1.  The one to the east

15  of it, call that Site 2, and then the one to the north

16  of it, the red marked area that you have, let's call

17  that Site 3.  Because these were three different parcels

18  acquired different times, so we don't refer to them for

19  a very long sentence and can be mistaken, let's just say

20  Site 1, Site 2 and Site 3.  Would that be okay?

21   Q.   No, it's not.  So we're going to call the red

22  area the site.  I see you've gotten up.

23       MR. MIRON:  No, it's -- it's habit.  When

24       nobody moves around the lights go off.  When he

25       was --

1          MR. ADKINS:  Energy conservation time.

2          MR. MIRON:  We'll let Chris do it.

3          MR. ADKINS:  I understand.  I thought I had

4      offended you already.

5   BY MR. ADKINS:

6      Q.   So let's refer to the property that is

7   highlighted red on DX9 as the site.  I don't want to

8   call the Property 1 and -- or Site 1 and Site 2 as

9   Site 1 and Site 2 because it could be confusing if we're

10  referring to those as Site 1, 2 and 3.  So if you will

11  allow, what you described as Site 1, can we call that

12  Property 1?

13     A.   That's fine, Property 1, Property 2 and site.

14     Q.   Yes.  Does that work for you?

15     A.   Okay.  I'm good with that.

16     Q.   That's great.  So you said a friend of a

17  friend told you about Property 1.  When is it -- when

18  was the first time you had seen the site?

19     A.   To the best of my recollections, it was around

20  2013.  Could be '14.

21     Q.   Okay.  How did you see the site in 2013 or

22  2014?

23     A.   How?

24     Q.   Yeah, how?

25     A.   With my eyes.

1    Q.   Okay.  So you were personally there?

2    A.   Yes, sir.

3    Q.   Okay.  From where did you see the site in 2013

4  or 2014?

5    A.   From where?

6    Q.   From where?

7    A.   From inside the site.

8    Q.   Okay.  So you were standing on the site in

9  2013 or 2014?

10   A.   Yes.  I went to visit it personally.

11   Q.   Okay.  How did you get there?

12   A.   With a car.

13   Q.   Okay.  Did you walk on to the site?

14   A.   I drove to the site and walked around the

15  site.

16   Q.   Okay.  And can you describe for me where you

17  parked and how you walked on to the site?

18       MR. MIRON:  Brandon, forgive me for a moment,

19    if I may.  Remember, you've already identified

20    Property 1, Property 2 and the site.  So I just

21    want to make sure your testimony is clear.

22       THE WITNESS:  Right.  I'm talking about

23    Property 1.

24       MR. MIRON:  I knew that.

25       MR. ADKINS:  Oh, okay.

1        THE WITNESS:  That's what you were talking

2    about, Property 1, if I recall.

3        MR. MIRON:  No, Brandon keeps referring to the

4    site, the red box.

5        THE WITNESS:  Oh, I'm sorry.  The site is the

6    third property.  Okay, got it.  Then I'm sorry,

7    strike that, please.

8    BY MR. ADKINS:

9    Q.   Okay.  I have an idea.  I think we'll go about

10   this a little bit of a different way and we'll establish

11   a chronology first and maybe that will help, okay?

12   A.   Okay.

13   Q.   Do you know who currently owns the site that

14   is the third property?

15   A.   I own the site.

16   Q.   Okay.  You, Mr. Sharfi, personally own the

17   site?

18   A.   It's owned through my trust.

19   Q.   And NeshaFarm, Incorporated does not own the

20   site currently?

21   A.   NeshaFarm is also owned by the -- by myself

22   and the trust.  To me, myself and the trust, since the

23   trust is mine, they're synonymous.

24       MR. MIRON:  Brandon, while you're looking for

25   something --

1        MR. ADKINS:  What's up, Josh?

2        MR. MIRON:  I'm sorry to interrupt you.  I

3    knew I would interrupt you one time.  It might as

4    well be now.

5        One of the things I forgot to mention is

6    Mr. Sharfi suffered an injury when he was -- kind

7    of a difficult catastrophic injury a little less

8    than six months ago and he's recovered.  He's fine,

9    but it just may require him a little more breaks

10    more than usual.  He's got a back problem.  The

11    injury caused him major problems to his back.  So

12    he can't sit for an extended period of time.

13        So I just want to let you know now, he may

14    need just a minute or two just to stretch out,

15    stretch out his back every 15 minutes, every half

16    hour, depending on how he feels, okay?

17        MR. ADKINS:  Understood.  Thanks for letting

18    me know.

19   BY MR. ADKINS:

20    Q.   Mr. Sharfi, I'm sorry to hear about your

21   injury.  If at any point you're uncomfortable, you want

22   to take a break, just let me know.  I'd just ask that

23   you don't take a break before completing your answer to

24   a question that's pending, but let me know and I'll find

25   a good time to take a break.  So we can take as many

1   breaks as you need, all right?

2      A.   Thank you, sir.

3         MR. MIRON:  Thanks, Brandon.

4         MR. ADKINS:  You bet.

5   BY MR. ADKINS:

6      Q.   Okay.  So Mr. Sharfi, I'm going to show you a

7   document that is entitled "Defendant Benjamin Sharfi's

8   Answer and Affirmative Defenses to Amended Complaint."

9   It's -- has a case caption of this case.  This is your

10  answer to the amended complaint.  I'm going to scroll

11  down to Paragraph 22.

12         Do you see Paragraph 22 on your screen?

13     A.   Yes, I do.

14     Q.   It says, "Admitted that on or about

15  January 14, 2019, a quit claim deed was entered

16  transferring ownership of the site from Benjamin Sharfi

17  2002 trust to NeshaFarm, Inc., otherwise denied."

18         Did I read that correctly?

19     A.   Correct.

20     Q.   Okay.  So the ownership of the site was

21  transferred by quit claim deed to NeshaFarm,

22  Incorporated on or about January 14, 2019, correct?

23     A.   As so it indicates, yes.

24     Q.   And so my question now is, is NeshaFarm,

25  Incorporated the current owner of the site?

1        A.   Yes.

2        Q.   And NeshaFarm acquired the site on or about

3    January 14, 2019, as far as you know?

4        A.   According to this document, which I have no

5    reason to not believe it, yes.

6        Q.   Okay.  Well, this is your answer to the

7    amended complaint.  Do you have reason to doubt anything

8    in your answer?

9        A.   No, sir.

10       Q.   Okay.  Now, you, as the trustee of the

11   Benjamin Sharfi 2002 trust, purchased the site on or

12   about April 24, 2017; is that correct?

13       A.   Yes, sir.

14       Q.   Are you aware of any other owners or ownership

15   interest in the site other than the Benjamin Sharfi 2002

16   trust and NeshaFarm, Incorporated?

17       A.   No, sir.

18       Q.   What is NeshaFarm, Incorporated?

19       A.   It's an incorporation of a farm.

20       Q.   Are you an executive officer of NeshaFarm,

21   Incorporated?

22       A.   Yes.

23       Q.   What is your title?

24       A.   CEO.

25       Q.   Okay.  Have you always been the CEO of

BENJAMIN K. SHARFI                                    June 09, 2022
USA vs BENJAMIN K. SHARFI                                        22

1   NeshaFarm, Incorporated?

2        A.   Since it was incorporated, yes.

3        Q.   When was NeshaFarm incorporated?

4        A.   I couldn't tell you the date.  Those would be

5   dates of record.

6        Q.   Do you recall the year in which NeshaFarm was

7   incorporated?

8        A.   No, sir.

9        Q.   Was it before or after 2017?

10       A.   I couldn't tell you that.

11       Q.   Have you held any other positions in

12   NeshaFarm, Incorporated other than CEO?

13       A.   Yes.  The fieldworker, cleaning the cow shit

14   and the horse shit and the landscape and whatever

15   requires in a farm.

16       Q.   Are there any other executive officers of

17   NeshaFarm, Incorporated?

18       A.   Not that I know, sir.

19       Q.   Are you familiar with the name Kevin Kryzda?

20       A.   Yes, sir.

21       Q.   Is Kevin Kryzda the president of NeshaFarm?

22       A.   He is the president of all my Florida-based

23   corporations, including NeshaFarm.

24       Q.   And would the president of NeshaFarm be

25   considered a corporate officer of NeshaFarm?

1    A.   Those would be a corporate legal issues which

2  I really don't get involved, but he would be the

3  president.  I don't know if that makes him an officer or

4  an employee.  That requires a legal conclusion, which

5  I'm not qualified to answer.

6    Q.   Okay.  Do you understand what a president of a

7  company is?

8    A.   Yes, I do.

9    Q.   And you're the CEO of NeshaFarm, correct?

10    A.   Yes, sir.

11    Q.   So you know who the president of NeshaFarm is,

12  right?

13    A.   I'm sorry?

14    Q.   You know who the president of NeshaFarm is,

15  correct?

16    A.   Yes.

17       MR. MIRON:  Objection.  Asked and answered.

18  BY MR. ADKINS:

19    Q.   When I asked if you knew of any other

20  corporate officers of NeshaFarm, you said you didn't

21  know.

22    A.   True.  The point being here, sir, I'm not sure

23  being a president of a corporation, that makes him an

24  officer.  That's a legal structural question which I'm

25  not sure I can answer that.

1      Q.   Okay.  You said that Mr. Kryzda is involved in

2   other Florida companies of yours.  What other companies?

3      A.   He would be included in Byte Services, Inc.

4   He would also be the president of Plus One Air.  And

5   those are primarily the two that comes to mind right

6   now.

7      Q.   For how long has Mr. Kryzda been the president

8   of NeshaFarm?

9      A.   I couldn't tell you the date, but several

10  years.

11     Q.   Did you hire him in that position?

12     A.   I'm sorry?

13     Q.   Did you hire Mr. Kryzda in that position?

14     A.   Yes, sir.

15     Q.   What are Mr. Kryzda's responsibilities as the

16  president of NeshaFarm, Inc.?

17     A.   To manage and staff the companies and deal

18  with the staffing and day-to-day issues and management

19  of the staff.

20     Q.   Does Mr. Kryzda have any other

21  responsibilities as president of NeshaFarm, Inc.?

22     A.   I believe I mentioned that he is the top man

23  responsible for all activities that occurs on the site.

24     Q.   And when you say he's the top man, what do you

25  mean?

1       A.   He's the president of NeshaFarm, Inc.

2       Q.   And so does he -- is he responsible for all

3    activities regarding NeshaFarm, Inc.?

4          MR. MIRON:  Objection.  Asked and answered.

5          THE WITNESS:  As the president of the company,

6    he's responsible for all activities that occur

7    under him.

8  BY MR. ADKINS:

9       Q.   To whom does Mr. Kryzda report as the

10   president of NeshaFarm?

11      A.   Myself.

12      Q.   Does he report -- does Mr. Kryzda report to

13   anyone other than you, Mr. Sharfi, as president of

14   NeshaFarm?

15      A.   No, sir.

16      Q.   What are Mr. Kryzda's responsibilities in

17   connection with Byte Services, Inc.?

18      A.   Same.  Responsible for the staffing and

19   management of the staff and organizational issues.

20      Q.   What kind of business is Byte Services?

21      A.   Provides construction services and

22   maintenance, property maintenance.

23      Q.   What do you mean by "construction services"?

24      A.   Construction of a variety of different

25   structures for a variety of different applications,

1  location.  There is a toolshed on the north center of

2  the site.

3      Q.   Okay.  Are the horse stalls in the northwest

4  quadrant of the site?

5      A.   The horse stalls are on the northwest quarter

6  of the site; yes.

7      Q.   Were the toolshed and the horse stalls

8  constructed at your direction?

9      A.   Yes.

10     Q.   How were the horse stalls constructed?

11     A.   Very carefully, to be able to withstand the

12 hellacious winds that we get.  The direction of the wind

13 were in consideration.  And I mean, when I say "very

14 carefully," I'm not saying this sarcastically.  Rather

15 than, again, I'm an engineer and so every engineering

16 parameter in a decision-making comes in place.

17         So wind direction, the angle, sun, wind, all

18 those topics came in place.

19     Q.   Who constructed the horse shed?

20     A.   Who constructed the what?

21     Q.   Who constructed the horse shed?

22         MR. MIRON:  Objection.  Misstates testimony.

23 I think he said, Brandon, horse stall, not shed.

24         MR. ADKINS:  Horse stall, thank you.

25         MR. MIRON:  You're welcome.

1          THE WITNESS:  I'm not sure who built the horse

2     stalls.

3   BY MR. ADKINS:

4     Q.   Do you know whether a contractor or an

5   employee of NeshaFarm?

6     A.   I don't believe that the NeshaFarm employees

7   have that kind of a talent.  So I would suspect that

8   would be outside workforce.

9     Q.   Okay.  And then with respect to the toolshed,

10  do you know who constructed the toolshed?

11    A.   Parts of it we did and then parts of it was

12  done by an outside contractor.

13    Q.   Okay.  With respect to the -- you know, I want

14  to call it a horse shed, but I'm going to say horse

15  stall so I don't trigger an objection.

16          With respect to the horse stall, that area is

17  enclosed with a smaller fence, correct?

18    A.   One more time, please.

19    Q.   I want to go back to the northwest quadrant

20  where the horse stall is located.

21    A.   Okay.

22    Q.   Okay.  The area where the horse stall exists

23  on the site is also enclosed with a small fence; is that

24  correct?

25    A.   It has a horse rail guard around the perimeter

1  so the horses do not leave the site and create damages

2  or including bodily harm to workers.

3      Q.   Okay.  Are there any materials that are on the

4  ground within that enclosure that were put there for the

5  horses?

6          MR. MIRON:  Objection.  Vague.

7          THE WITNESS:  Please explain materials.

8  BY MR. ADKINS:

9      Q.   Any earthen material, dirt, soil, anything

10  like that.

11     A.   The horse barns, as you may know -- may not

12  know -- it's a constant work and rework and more work

13  and additional work of cleaning and bringing sand, the

14  sand compresses, the wood chip compresses.  You clean.

15  So there is wood chips that is put there, sand that is

16  put there in order to make sure that the horses are kept

17  dry, hooves, and given adequate protection or they

18  develop severe diseases of foot, which basically makes

19  the horse not well.

20         So yes, there was -- all the above were put in

21  the site, in the horse stalls.

22     Q.   Other than the horse stall, the toolshed and

23  the riding arena, are there any other buildings on the

24  site that exists today?

25     A.   No buildings, other buildings exist today and

1   I would not characterize the equipment barn as a

2   building.  It's a fully exposed on all four sides and it

3   just has a tin roof to cover the equipment.  So the

4   riding arena, I would call it a structure and perhaps

5   the horse stalls I may call it a structure, building,

6   but that would be the only two buildings.

7       Q.   Would you call it an improvement?

8       A.   Would you call it what?

9       Q.   An improvement?

10          MR. MIRON:  Objection.  Vague.

11          THE WITNESS:  Would I call it improvement?

12      Yes, I would call it an improvement.

13   BY MR. ADKINS:

14      Q.   Okay.

15      A.   Improvement to the livestock and to be able to

16   do the job to keep the animals alive.

17      Q.   Okay.  Are there any ponds on the site as it

18   exists today?

19          MR. MIRON:  Objection; form.  Vague.

20          THE WITNESS:  There are two watering holes for

21      the animals.  I don't call them ponds or lakes.

22      These are made for watering holes for the

23      agricultural purposes; that their purpose is for

24      the livestock to be able to go in to drink, and

25      more importantly, to cool off during the hot summer

1      months.

2   BY MR. ADKINS:

3      Q.   Were those two watering holes, as you've

4   described them, did they exist on the site when you

5   purchased it in April 2017?

6      A.   One of them in a smaller capacity than it is

7   now was existing there where the previous owner used for

8   watering hole.  We cleaned it up and widened it up after

9   the fact; yes.

10      Q.   The two watering holes, one is shaped like a

11   peanut, correct?

12      A.   Correct.

13      Q.   And that peanut-shaped watering hole is in the

14   southwest corner of the site?

15      A.   It is in the southwest corner of the site,

16   correct.

17      Q.   The second watering hole has a ring of cypress

18   trees planted within it; is that correct?

19      A.   Correct.

20      Q.   Okay.  And that watering hole is still in the

21   southwest quadrant, but maybe closer to the center of

22   the site; is that accurate?

23      A.   Correct.

24      Q.   Okay.  The watering hole that you say existed

25   in part in 2017, are you referring to the one shaped

1  leak a peanut or the one that currently has cypress

2  trees in it?

3      A.   The one that had has cypress trees in it.

4      Q.   Okay.  And when you say it was smaller

5  capacity, what do you mean?

6      A.   It was dug very poorly and slopes of it was

7  too steep for livestock to go in.  And there has to be a

8  fairly gradual slope for the livestock to go in and out,

9  and so we tried to improve on that slightly.

10     Q.   Okay.  How did you try to improve on that?

11     A.   How what?

12     Q.   How did you try to improve on the steepness of

13  the slope?

14     A.   By cleaning it up with some handmade

15  equipment.  You can't really bring heavy machinery

16  there, but we brought some load equipment there to clean

17  that up.  Honestly, I don't know much about it because I

18  was not involved and I'm not that familiar with that

19  job.

20     Q.   Did you direct the job?

21     A.   It was recommended by my staff that we need to

22  add additional watering hole and animals were getting in

23  and couldn't get out; that they needed to improve on

24  them.  And I gave them the authorization to proceed.

25     Q.   And you said the work was done using hand

BENJAMIN K. SHARFI                                    June 09, 2022
USA vs BENJAMIN K. SHARFI                                         95

1   equipment; is that correct?

2       A.   Again, I did -- the times that I saw it,

3   mostly I saw people with hand equipment that they were

4   doing it, but I'm not sure whatever they did, I was not

5   privy to that level.

6       Q.   Okay.  Were there any instances where you saw

7   anyone using anything other than hand equipment to

8   modify the slope of the watering hole that currently has

9   cypress trees in it?

10      A.   No, sir.  In fact, at the time that this

11  project was started, I was in California and on business

12  for a very pretty long time, and when I came back a

13  month and a half or two months later, that's when I

14  first saw the actual product.

15      Q.   Do you know about when the project started and

16  ended?

17      A.   No.

18      Q.   Do you know when you were in California for

19  about a month and a half on this occasion?

20      A.   No, no.

21      Q.   Do you recall the year?

22      A.   I would say, again, with certain, around 2019

23  or '20.  I couldn't be that more precise than that.

24      Q.   Okay.  Did any other ponds or watering holes

25  exist on the site when you purchased it in April 2017,

1   other than what we've discussed -- I'm sorry.  I

2   misstated when you purchased this.  No, I didn't.  Did

3   any -- scratch the question.

4           Did any other ponds or watering holes exist on

5   the site when you purchased it other than what you've

6   described so far?

7       A.   Well, clearly, the wetlands that were there

8   when we identified where the wetland was, the first rule

9   of business before we done any of these work, that was

10  instructed to the staff that we were clearly aware that

11  we're being observed in every aspect by Mr. Pempek.  So

12  in order not to give any more reasons to witch hunt us,

13  to be very, very careful as to what they do and how they

14  do and to border the entire wetland area and all the

15  vegetation, to protect it and post signs and make sure

16  that no worker or animal or livestock in any way or form

17  can disrupt the areas of the wetland.

18      Q.   Okay.  So when you said clearly, the wetlands

19  were there, do you mean it was clear that there were

20  wetlands on the site when you purchased it in

21  April 2017?

22      A.   Yes, sir.

23      Q.   And what did you understand to be the location

24  of the wetlands when you purchased it in April 2017?

25      A.   The wetlands are very clear in definition

1  where they are.  The kind of trees and vegetations and

2  the water sitting there, and that's in the center, the

3  south center of the site, what you call.

4      Q.   Okay.  Were there any other areas on the site

5  that you believed it was clear wetlands existed?

6      A.   No, sir.

7      Q.   Okay.  And we talked at length that some trees

8  have been removed since you purchased the site in

9  April 2017, correct?

10         MR. MIRON:  Objection.  Vague.  Misstates

11     testimony.

12         THE WITNESS:  I've answered whatever questions

13     you asked, sir.

14  BY MR. ADKINS:

15     Q.   Trees have been removed from the site since

16  you purchased it in 2017, correct?

17     A.   We discussed certain type of trees was

18  removed; yes, sir.

19     Q.   And just so we're clear, those trees were

20  removed at your direction; is that right?

21     A.   No, sir.

22     Q.   Whose direction?

23     A.   The trees were removed because they were

24  diseased or they were suggested to be removed.  And my

25  direction to the staff was to make sure that we follow

BENJAMIN K. SHARFI                                    June 09, 2022
USA vs BENJAMIN K. SHARFI                                      98

1   the botanist and the environmentalist people that we

2   hired and follow their directions.

3          So it was not specifically move this tree or

4   that tree or that tree or et cetera, rather than to

5   provide the services that were required to assure a

6   healthy forest and that we do not lose additional trees

7   that can also endanger people and human falling on them.

8      Q.   You didn't provide specific direction on what

9   tree to remove and what tree to keep, right?

10     A.   Correct.

11     Q.   But you put in motion the process of removing

12   diseased trees and dead trees that we had discussed; is

13   that right?

14         MR. MIRON:  Objection.  Vague.

15         THE WITNESS:  No.  My direction was not

16     tree-specific targeted.  My directives are as to

17     what needs to be done in order to protect and

18     preserve the nature and the site and make it safe.

19         You're making it sound that I go on a

20     day-to-day, you do this, you do that, or work this

21     or move this tree or this shrub or cut this grass

22     or milk this cow.  That's not one of my roles, sir.

23     As a CEO of the company, I have a chain of command

24     to have my directions executed to the standards

25     that I like.