# EXHIBIT 78



BDA
ENVIRONMENTAL CONSULTANTS

**2021040-10.1**

**UNITED STATES V. BENJAMIN K. SHARFI AND NESHAFARM INC.**
**CASE NO. 2:21-CV-14205-KAM**

**SUPPLEMENTAL SACKETT ANALYSIS**

**TO**

**"ANALYSIS AND REBUTTAL TO U.S. DEPARTMENT OF JUSTICE**
**EXPERT TEAM REPORTS, FEBRUARY 18, 2022, AND SEPTEMBER 15, 2023"**

Prepared by:

W. Michael Dennis, Ph.D.
President
Breedlove, Dennis & Associates, Inc.
330 West Canton Avenue
Winter Park, Florida  32789

September 29, 2023

Submitted by:

W. Michael Dennis, Ph.D.
President

BREEDLOVE, DENNIS & ASSOCIATES, INC.

☑ 330 W. Canton Ave. ~ Winter Park, FL 32789-3195          ☐ 30 East Liberty St. ~ Brooksville, FL 34601-2910
Phone: 407-677-1882 ~ Fax: 407-657-7008                      Phone: 352-799-9488 ~ Fax: 352-799-9588

**TABLE OF CONTENTS**

TABLE OF EXHIBITS ........................................................................................................... ii

1.0   INTRODUCTION ...................................................................................................... 1

2.0   SACKETT DECISION ............................................................................................... 3

3.0   APPLICATION OF SACKETT DECISION TO 9.92-ACRE SHARFI SITE .............................. 4

    3.1   Extent of Traditionally Navigable Waters ......................................................... 4
    3.2   Extent of Relatively Permanent Waters ............................................................ 5

        3.2.1   Non-tidal Portions of Bessey Creek are Relatively Permanent Waters ................. 5
        3.2.2   The Manmade Ditches Identified by the DOJ Experts Are Not Relatively
                Permanent Waters ........................................................................................... 6
        3.2.3   The Primary Flow Pathway is Not a Relatively Permanent Water .................... 11

    3.3   Extent of Relevant Wetlands ......................................................................... 12

        3.3.1   Extent of Wetlands on the 9.92-acre Property ...................................... 12
        3.3.2   Extent of Wetlands on the Countess Joy Property ................................. 13

    3.4   Surface Water Connection Between the 9.92-acre Property Wetland and WOTUS ........ 16

i

SHARFIEXPERTS0002326

## TABLE OF EXHIBITS

EXHIBIT 1    9.92-ACRE SITE RELATIVE TO THE LOCATION OF THE NEAREST TRADITIONALLY NAVIGABLE WATER AT THE SW MURPHY ROAD BRIDGE

EXHIBIT 2    NATIONAL HYDROGRAPHY DATASET MAP (REBUTTAL REPORT FIG. 9)

EXHIBIT 3    HISTORICAL AERIALS

EXHIBIT 4    HISTORICAL USGS MAPS

EXHIBIT 5    EXHIBIT 5G TO THE SFWMD WATER USE STAFF REPORT

EXHIBIT 6    CREECH REBUTTAL REPORT AND ITS EXHIBITS

EXHIBIT 7    DOJ REPORT, FIGURE III.C.1.1

EXHIBIT 8    OVERVIEW FIGURE SHOWING LOCATIONS (AULT FIGURE I.1, MODIFIED)

EXHIBIT 9    DOJ REPORT, FIGURE II.B.2 (USGS AND NHD MAP OVERLAY)

EXHIBIT 10    DOJ REPORT, FIGURE II.B.3 (USGS, NHD AND NWI MAP OVERLAY)

EXHIBIT 11    MAP OF GENERAL RECLAMATION PLAN, PALM CITY DRAINAGE DISTRICT (EXHIBIT 77)

EXHIBIT 12    CREECH REPORT, EXHIBIT M

EXHIBIT 13    DOJ REPORT, FIG. V.D.1.A.3 (MAP SHOWING HISTORICAL AND CURRENT DISCHARGE POINTS)

EXHIBIT 14    DOJ REPORT, FIGURE V.D.1.A.4 (LIDAR MAP WITH PRIMARY FLOWPATH OVERLAY)

EXHIBIT 15    AERIAL VIDEOS

EXHIBIT 16    PHOTO STATION 5 (N-S DITCH WHERE IT MEETS E-W DITCH, 3-10-22)

EXHIBIT 17    PHOTO STATION 6 (E-W DITCH LOOKING WEST, 3-10-22)

EXHIBIT 18    DOJ REPORT, FIGURE V.D.1.B.1.4 (CHART OF DOJ WATER LEVEL DATA BESSEY CREEK)

EXHIBIT 19    DOJ REPORT TABLE III.C.1.1

SHARFIEXPERTS0002327

EXHIBIT 20 DOJ REPORT, FIGURE V.D.1.B.1.1 (CHARTS OF DOJ MONITORING WELLS 1-3 DATA)

EXHIBIT 21 DOJ REPORT, FIGURE V.D.1.B.1.2 (CHARTS OF DOJ MONITORING WELLS 4-6 DATA)

EXHIBIT 22 DOJ REPORT, FIGURE V.D.1.A.5 ("PERENNIAL FLOW PATHWAY")

EXHIBIT 23 DEPOSITION EXHIBIT 76

EXHIBIT 24 DANNA SMALL WETLAND DELINEATION

EXHIBIT 25 DOJ REPORT, FIGURE IV.B.1.2 (AERIAL SHOWING DOJ REFERENCE POINTS)

EXHIBIT 26 DOJ REPORT, FIGURE IV.B.2.A.1 (AERIAL SHOWING LOCATION OF DOJ GAUGES, REF WELLS)

EXHIBIT 27 NWI MAP FOR BASIN 4 (REBUTTAL REPORT FIG. 20)

EXHIBIT 28 NWI MAP FOR SITE AND COUNTESS JOY (REBUTTAL REPORT FIG. 23)

EXHIBIT 29 DOJ REPORT, FIGURE V.D.1.B.1.3 (CHART OF DOJ MONITORING WELL 7 DATA)

EXHIBIT 30 DOJ REPORT, FIGURE V.D.1.B.1.5 (CHART OF DOJ WATER LEVEL DATA ON SITE)

EXHIBIT 31 DOJ REPORT, FIGURE V.D.1.B.1.6 (CHART OF DOJ WATER LEVEL DATA ON SITE)

EXHIBIT 32 DOJ REPORT, FIGURE V.C.6.A.2 (PHOTO OF WETLAND SAMPLING POINT W1)

EXHIBIT 33 DOJ REPORT, FIGURE V.C.6.A.4 (PHOTO OF WETLAND SAMPLING POINT W17)

EXHIBIT 34 DOJ REPORT, FIGURE V.C.6.A.5 (PHOTO OF WETLAND SAMPLING POINT W15)

EXHIBIT 35 DOJ REPORT, FIGURE V.C.2.9 (PHOTO OF WETLAND SAMPLING POINT W7)

EXHIBIT 36 DOJ REPORT, FIGURE V.C.2.11 (PHOTO OF WETLAND SAMPLING POINT W6)

EXHIBIT 37 DOJ COMPOSITE OF COUNTESS JOY SITE INVESTIGATION, AUGUST 22-23, 2021

SHARFIEXPERTS0002328

EXHIBIT 38          REBUTTAL REPORT FIGURE 21

EXHIBIT 39          DOJ REPORT, FIGURE II.A.2 (AERIAL PHOTO OF SITE AND COUNTESS JOY)

EXHIBIT 40          DOJ REPORT, FIGURE V.D.1.A.1

EXHIBIT 41          DOJ REPORT, FIGURE IV.D.5.1.A

EXHIBIT 42          DEPOSITION EXHIBIT 57 (SFWMD PHOTOS)

EXHIBIT 43          DOJ REPORT, FIGURE V.D.4.1 (LIDAR 2016 AND 2019, HILLSHADE)

EXHIBIT 44          DEPOSITION EXHIBIT 24 (DANNA SMALL PHOTOS)

EXHIBIT 45          DEPOSITION EXHIBIT 196

EXHIBIT 46          DOJ REPORT, FIGURE V.C.2.3 (DOJ PHOTO E-W AND N-S DITCH CONFLUENCE)

EXHIBIT 47          DOJ REPORT, FIGURE V.C.2.5 (DOJ PHOTO N-S DITCH)

EXHIBIT 48          DOJ REPORT, FIGURE V.C.2.8 (DOJ PHOTO N-S DITCH)

EXHIBIT 49          DOJ REPORT, FIGURE V.C.3.1 (DOJ PHOTO E-W DITCH)

EXHIBIT 50          DOJ REPORT, FIGURE V.C.6.B.2 (DOJ PHOTO OF E-W DITCH CATTLE CROSSING)

EXHIBIT 51          DOJ REPORT, FIGURE V.C.6.C.3 (DOJ PHOTO E-W DITCH)

EXHIBIT 52          DEPOSITION EXHIBIT 82 (DOJ PHOTO OF E-W AND N-S DITCH INTERSECTION)

EXHIBIT 53          ELEVATION SURVEY MAP OVERALL (REBUTTAL REPORT, FIG. 16) (PLUS SURVEY DETAIL FIGURES 1-8)

EXHIBIT 54          DOJ REPORT, FIG. V.C.2.2 (DOJ PHOTO N-S DITCH LOOKING AT SITE)

EXHIBIT 55          DEPOSITION EXHIBIT 33 (DANNA SMALL, CROSS SECTION OF NORTH-SOUTH DITCH)

SHARFIEXPERTS0002329

## 1.0    INTRODUCTION

The United States of America ("United States") by the authority of the Attorney General of the United States and at the request of the Secretary of the Army, acting through the United States Army Corps of Engineers, filed a civil enforcement action under the Clean Water Act (CWA) against Benjamin K. Sharfi and NeshaFarm, Inc.  In support of the action, the United States Department of Justice, Environment and Natural Resources Division (DOJ), filed an expert team report (DOJ Report) on February 18, 2022 prepared by Lyndon C. Lee Ph.D., PWS, Wade L. Nutter, Ph.D. PH, Kai Coshow Rains, Ph.D., PWS, Scott R. Stewart, Ph.D., CPSS and Mike Wylie, M.S.

Subsequently, an Analysis and Rebuttal to U.S. Department of Justice Expert Team Report (Rebuttal Report) was prepared and submitted on April 8, 2022 by W. Michael Dennis, Ph.D.

On May 25, 2023, the Supreme Court of the United States rendered its opinion in Sackett v. Environmental Protection Agency (Sackett Decision).  Two Supplemental Expert Reports were filed by the DOJ Expert Team (Wylie Supplemental Report and Nutter Supplemental Report) on September 15, 2023 addressing the case in light of the Sackett Decision.

This September 29, 2023 Supplemental Rebuttal Report (Supplemental Rebuttal Report) applies the Sackett Decision test for determining the scope of "waters of the United States" (WOTUS) under the CWA on the 9.92-acre Sharfi property subject to this litigation; and addresses the two September 15, 2023 DOJ Supplemental Reports.

1

SHARFIEXPERTS0002330

As directed by the court, my Supplemental Rebuttal Report relies on the technical data presented in the DOJ Report, and the two DOJ Sackett Supplemental Reports, as applicable; data from my original Rebuttal Report; and other facts and data presented in the case.  No new technical data was developed for this Supplemental Rebuttal Report.

2

SHARFIEXPERTS0002331

## 2.0      SACKETT DECISION

The Supreme Court of the United States on May 25, 2023, rendered a unanimous decision in the Sackett case that a wetland on the defendants' property was not a WOTUS.  Justice Alito delivered the majority opinion determining that "waters" encompass "only those relatively permanent, standing or continuously flowing bodies of water 'forming geographical features' that are described in ordinary parlance as 'streams, oceans, rivers and lakes.'"  Sackett, 143 S. Ct. at 1336 (quoting Rapanos v. United States, 547 U.S. 715, 739 (2006)).  The Sackett Decision states that the term "waters" means "bodies of open water." Id. at 1337. Addressing wetlands, the Sackett Decision states that wetlands are only regulated when they are "waters of the United States" in their own right, in other words, they must be "part of a body of water that itself constitutes 'waters' under the CWA."  Id. at 1339. The Court held:

> "In sum, we hold that the CWA extends to only those wetlands that are 'as a practical matter indistinguishable from waters of the United States.' *Rapanos*, 547 U. S. at 755 (plurality opinion) (emphasis deleted). This requires the party asserting jurisdiction over adjacent wetlands to establish "first, that the adjacent [body of water constitutes]... 'water[s] of the United States,' (*i.e.*, a relatively permanent body of water connected to traditional interstate navigable waters); and second, that the wetland has a continuous surface connection with that water, making it difficult to determine where the 'water' ends and the 'wetland' begins."*Id.* at 742."

The Court rejected the "significant nexus" jurisdictional test taken from Justice Kennedy's opinion in Rapanos, and struck down the use of it in determining WOTUS.  The Court also indicated that the Environmental Protection Agency and U.S. Army Corps of Engineers' interpretations of the scope of WOTUS have been flawed for decades.

SHARFIEXPERTS0002332

### 3.0 APPLICATION OF SACKETT DECISION TO 9.92-ACRE SHARFI SITE

The Sackett Decision clearly identifies which "waters" qualify as WOTUS under the CWA: Traditionally Navigable Waters (TNWs), Relatively Permanent Waters (RPWs) directly connected to TNWs, and wetlands that are "indistinguishable" from those bodies of waters due to a "continuous surface connection." Further, the Sackett Decision concludes that "the CWA's use of 'waters' encompasses 'only those relatively permanent standing or continuously flowing bodies of water 'forming geographic[al] features' that are described in ordinary parlance as 'streams, oceans, rivers, and lakes.'"

This Supplemental Rebuttal Report applies the Sackett Decision test for determining WOTUS to the 9.92-acre Sharfi site. As a starting point, this Supplemental Rebuttal Report identifies the locations of the relevant waters, and then addresses whether there is the required continuous surface connection between the wetland on the 9.92-acre site and a WOTUS.

### 3.1 Extent of Traditionally Navigable Waters

The Sackett Decision affirms that traditionally navigable waters are WOTUS. Expert reports filed in this litigation agree that the closest traditionally navigable water extends from the St. Lucie Estuary to the upper reaches of the tidal influence of Bessey Creek. This extent of traditionally navigable waters has been identified as that point where Bessey Creek flows under the SW Murphy Road Bridge a distance of approximately 4.5 miles from the 9.92-acre site. Exhibit 1 shows the 9.92-acre site relative to the location of the nearest traditionally navigable water at the SW Murphy Road Bridge.

SHARFIEXPERTS0002333

## 3.2     Extent of Relatively Permanent Waters

### 3.2.1   Non-tidal Portions of Bessey Creek are Relatively Permanent Waters

The closest Relatively Permanent Water in this case is the nontidal portion of Bessey Creek which extends from the SW Murphy Road Bridge to where it meets the eastern end of the east-west Canal Ditch.  The east-west Canal Ditch meets Bessey Creek approximately at the location where SW Goldenglow Drive crosses over the ditch south of the Hybrid Wetland Treatment Technology (HWTT) facility as identified and depicted on the National Hydrography Dataset (NHD) map on Exhibit 2 (Figure 9 from the Rebuttal Report).  This location is approximately two miles away from the 9.92-acre site.  Historical aerials (Exhibit 3) and government maps (Exhibit 4) clearly show where the straight, manmade feature that is the east-west Canal Ditch ties into the natural stream feature of Bessey Creek.

The physical characteristics of the natural extent of Bessey Creek are demonstratively distinct from the manmade Canal Ditch, notwithstanding the DOJ Report describing both as "Bessey Creek."  As shown on the aerial photographs, the natural creek follows a meandering course, while the east-west Canal Ditch was excavated in straight lines.  The natural creek generally has low, sloping banks, whereas the east-west Canal Ditch is generally bordered by elevated berms constructed from sidecast material when the Canal Ditch was excavated.  The Rebuttal Report of Richard T. Creech (Creech Rebuttal Report) has a detailed discussion of the original design and construction of the ditch system of the Canal Reclamation Plan of the Palm City Drainage District.

SHARFIEXPERTS0002334

### 3.2.2   The Manmade Ditches Identified by the DOJ Experts Are Not Relatively Permanent Waters

The DOJ experts assert that there are three Relatively Permanent Waters that are closer to the 9.92-acre site.  The Wylie Supplemental Report and the Nutter Supplemental Report both identify the east-west Canal Ditch, the north-south Canal Ditch, and the 84th Avenue roadside ditch as Relatively Permanent Waters.

Dr. Nutter describes the east-west Canal Ditch as a relatively permanent body of water that "is a perennially flowing tributary of the tidal reach of Bessey Creek with a wetted bed that is approximately 15 to 20 feet wide and less than three feet deep."  Nutter Supplemental Report, p. 3.  He further bases this opinion on year-round flow estimates contained in the permit application for the HWTT facility, which used data from the SLT09 monitoring station located at the SW Murphy Road bridge approximately 1.2 miles downstream and assumed that 55% of the flow came from the branch of Bessey Creek near the HWTT facility.  Nutter Supplemental Report, Exhibit 3, SFWMD Water Use Staff Report, page 2.  Exhibit 5G to the SFWMD Water Use Staff Report (attached as Exhibit 5) shows flows during a period of record from 12/3/04 to 9/28/09, which indicates a seasonal flow pattern, not year-round flow.  Mr. Wylie concurred with Dr. Nutter that the east-west Canal Ditch is a relatively permanent body of water; and states that he observed flow during three separate investigations.  Wylie Supplemental Report, p. 3.

Dr. Nutter describes the north-south Canal Ditch as a "seasonal, relatively permanent, non-navigable tributary of the upstream reach of Bessey Creek."  Nutter Supplemental Report, p. 7.  He further declares that "based on my visual observations of the abutting wetlands features and land surface elevations, as well as the photographic evidence, the N/S Ditch has continuous flow to the upstream reach of Bessey Creek during the wet season and at other times of the year when large rain events occur."  Id.  Mr. Wylie describes the north-south Canal Ditch as "approximately 12 to 15 feet wide and varies from several inches to over a

SHARFIEXPERTS0002335

foot in depth."  Wylie Supplemental Report, p. 6.  As Dr. Nutter, he too "concluded the N/S Ditch is a relatively permanent water because it experiences seasonal flow at least three months a year and is connected to the tidal portion of Bessey Creek."  Id.

Both Dr. Nutter and Mr. Wylie also describe the roadside ditch on the eastern side of 84th Avenue as a Relatively Permanent Water.  Dr. Nutter states that the 84th Avenue roadside ditch is a "perennially flowing tributary to the upstream reach of Bessey Creek" at least from the point of connection with a wetland on the Countess Joy property down to the east-west Canal Ditch.  Nutter Supplemental Report, p. 7.  This is based on Reference Well 7 that was installed next to the roadside ditch and collected water table elevation data from September to December 2021.  Id.  Mr. Wylie agrees that the 84th Avenue roadside ditch is a Relatively Permanent Water, based on data from Reference Well 7, his visual observations in October 2021, and the presence of "a continuous bed and bank with an ordinary high water mark."  Wylie Supplemental Report, p. 7.

None of these ditches meet the test for being a Relatively Permanent Water under the Sackett Decision. First, these ditches are not "geographical features that are described in ordinary parlance as streams, ocean, rivers and lakes."  The east-west Canal Ditch and the north-south Canal Ditch are manmade drainage ditches constructed to drain nearby lands. (See, for instance, (Exhibit 6); the Creech Rebuttal Report and its exhibits; DOJ Report Exhibit III.C.1.1 (Exhibit 7); and Ault Report Figure I.1 (Exhibit 8)).  Official government maps refer to them as canals or ditches, not as natural streams or "Bessey Creek."  (See, for instance, DOJ Report Figures II.B.2 (Exhibit 9), II.B.3 (Exhibit 10); Creech Report Exhibits B (Exhibit 6), C (Exhibit 6) and M (Exhibit 12); SFWMD Drainage Basin Map (Depo. Ex. 77) (Exhibit 11)).  The 84th Avenue roadside ditch is a manmade feature built to manage stormwater next to a roadway.  In my original Rebuttal Report Section 4.2, the natural reach of Bessey Creek and the connecting ditch system is described

SHARFIEXPERTS0002336

(see pages 16 – 19).  This series of manmade ditches is shown in Exhibit 1 and the maps and figures referenced above, which illustrate the straight line features of the ditches.

The north-south Canal Ditch also does not constitute a geographical feature.  On my visits to the Countess Joy property, I observed that the north-south Canal Ditch loses its structure through the middle section of the north-south Canal Ditch, and has a higher bottom elevation compared to locations further south toward the 9.92-acre property, and does not appear to function as a ditch in that area.  This is consistent with the observations of the DOJ experts, who indicated in their original DOJ Report that the intersection point of the north-south and east-west Canal Ditches is neither a current nor historical hydrological connection or discharge point (Figure V.D.1.a.3) (Exhibit 13), and showed water from the 9.92-acre property reaching the east-west Canal Ditch via a route that excludes the northern portion of the north-south Canal Ditch (Figure V.D.1.a.4) (Exhibit 14).  I note that Dr. Nutter's Supplemental Report states that the north-south Canal Ditch "loses its structure across the slightly sloping and undulating surface" approximately halfway between the 9.92-acre property and the east-west Canal Ditch, and there are "obstruction[s] to some lower flows" closer to the east-west Canal Ditch.  Nutter Supplemental Report, p. 7.  Mr. Wylie also acknowledges in his Supplemental Report that there are areas of the north-south Canal Ditch that lack "relatively continuous bed and bank features and an ordinary high-water mark."  Wylie Supplemental Report, p. 6.

Mr. Wylie asserts that there is a historical connection between the north-south Canal Ditch and east-west Canal Ditch based on a map submitted by one of the Defendants' consultants to the Florida Department of Agriculture and Consumer Services in September 2018.  Wylie Supplemental Report, p. 6 & Ex. 11.  I was not involved in the creation of this map, there is no explanation in the attached documents for how the map was prepared, so the technical basis for showing water flowing straight up the north-south Canal Ditch to the east-west Canal Ditch is unknown.  The depiction of water flowing all the way to the east-west Canal

8

SHARFIEXPERTS0002337

Ditch across the Countess Joy property is inconsistent with my field observations on the Countess Joy property and with the elevation survey data contained in my original Rebuttal Report. Furthermore, I note that the DOJ experts did not believe the map accurately showed the flow of water from the 9.92-acre site to the east-west Canal Ditch in their original expert report (see, for example, Figures V.D.1.a.3 (Exhibit 13) and V.D.1.a.4 (Exhibit 14)), and are only now pointing to this map in their Supplemental Expert Report.

Second, the east-west Canal Ditch, north-south Canal Ditch, and the 84th Avenue roadside ditch are not relatively permanent, standing or continuously flowing bodies of water. These channels have water typically only after it rains, or for limited times of year when water levels are highest. The reach of the east-west Canal Ditch near the 9.92-acre site is dry for months of the year, as shown on photographs and videos. (See, for example, aerial videos; (Exhibit 15) and Photo Station 5 (Exhibit 16) and 6 (Exhibit 17) from the Rebuttal Report). The DOJ hydrological data shows that the east-west Canal Ditch is dry as early as October (the end of the wet season) except immediately after rainfall events. (See DOJ Expert Report Figure V.D.1.b.1.4 (Exhibit 18). Hydrological calculations for the HWTT facility two miles downstream also show very low flows in the east-west Canal Ditch at that location – median flows are less than one cubic feet per second for six months of the year and only slightly more for several other months – and aerial photography confirms that there can be water in that reach of the Canal Ditch when the reach near the 9.92-acre site is dry. (See, for example, DOJ Report Table III.C.1.1 (Exhibit 19) and video (Exhibit 15)).

The north-south Canal Ditch and the 84th Avenue roadside ditch also are dry for months of the year, either in whole or in part. This was apparent on my site visits conducted to those locations in 2021 and 2022 and can be seen on aerial photographs and videos of the area. (See, for example, aerial videos (Exhibit 15)). Even when some deeper locations in the north-south Canal Ditch and 84th Avenue roadside ditch had puddles of water, other locations on the same ditches were dry. The DOJ surface water gauge in north-

9

SHARFIEXPERTS0002338

south Canal Ditch shows water levels that are slightly above the surface at that location but are below the ground elevation of the ditch further north based on elevation surveys (see DOJ Report Figures V.D.1.b.1.1 (Exhibit 20), V.D.1.b.1.2, (Exhibit 21), V.D.1.b.1.4 (Exhibit 18), and elevation survey data in Rebuttal Report).  In their supplemental reports, Dr. Nutter and Mr. Wylie provide no flow data for either the north-south Canal Ditch or 84th Avenue roadside ditch.  The Nutter Supplemental Report acknowledges that the north-south Canal Ditch only flows "during the wet season and at other times of the year when large rain events occur" (i.e., is seasonal and/or ephemeral), Nutter Supplemental Report, p. 7, and Mr. Wylie states that the north-south Canal Ditch "experiences seasonal flow at least three months a year."  Wylie Supplemental Report, p. 6.

I acknowledge that my opinion about whether the east-west Canal Ditch is a Relatively Permanent Water has changed based on the Sackett Decision.  In the Rebuttal Report, Section 7.2.2, there was a discussion of "Relatively Permanent Non-navigable Tributaries of Traditional Navigable Waters and Wetlands with a Continuous Surface Connection with such Tributaries."  This analysis applied the Rapanos Supreme Court Decision and the Agency Regulatory 2008 Rapanos Guidance.  Justice Alito agreed with Justice Scalia's definition of Relatively Permanent Waters in the Sackett Decision, but emphasized that such waters must be open waters forming geographical features ordinarily referred to as streams, oceans, rivers and lakes, and stated that the presence of some water is not enough.  The Sackett Decision also did not adopt the 2008 Rapanos Guidance, but instead criticized it as overreaching.  On page 50 of the Rebuttal Report I stated that the east-west Canal Ditch does not have permanent standing or flowing water, at least in the reach near the 9.92-acre site.  This is based on site observations, including a lack of continuous standing or flowing water for most of its length at my site inspection of March 10, 2022.  Also, the calculations in the permit application for the HWTT facility indicate that the east-west Canal Ditch at that location does not have flow

10

SHARFIEXPERTS0002339

year round but only seasonal flow.  A video of the east-west Canal Ditch further documents that even when there is some flow at the HWTT, the east-west Canal Ditch can be dry near the 9.92-acre site (Exhibit 15). The video also shows the features of this ditch, illustrating the adjacent banks of the ditch and portion of the ditch which lack continuous standing or flowing water.  Recognizing this seasonal flow and the application of the 2008 Guidance lead to the statement in the Rebuttal Report that in this location, the east-west Canal Ditch was treated as a Relatively Permanent Water in my Rebuttal Report.  Since this opinion is not supported by the tests in the Sackett Decision, I no longer believe that the east-west Canal Ditch is a Relatively Permanent Water.

### 3.2.3   The Primary Flow Pathway is Not a Relatively Permanent Water

The DOJ Report identifies a specific "primary flow pathway" (also referred to as the "continuous flow pathway") from the 9.92-acre site to Bessey Creek.  Exhibit 22 (Figure V.D.1.a.5 of the DOJ Report) shows that pathway as running north from the site through the north-south Canal Ditch to a point approximately halfway to the east-west Canal Ditch, where it turns to the west northwest over the ground to a roadside ditch along SW 84th Avenue, and then northward to the east-west Canal Ditch.  Dr. Nutter and Mr. Wylie discuss this pathway in their supplemental reports, although neither appears to assert that it is a Relatively Permanent Water.  Wylie Supplemental Report, p. 7; Nutter Supplemental Report, p. 8.

The "primary flow pathway" is not a Relatively Permanent Water.  First, it is not a qualifying geographical feature.  The "primary flow pathway" to the northwest of the north-south Canal Ditch lacks any defined channel features, as discussed in the Rebuttal Report.  Exhibit 14 clearly demonstrates that the DOJ Expert Team Report's "primary flow pathway" does not represent a body of water forming a geographic feature, but rather is an area of pasture where DOJ experts observed surface water on one of their visits.  The Sackett

SHARFIEXPERTS0002340

Decision states that qualifying geographical features do "not include channels through which water flows intermittently or ephemerally, or channels that periodically provide drainage for rainfall."

Second, the primary flow pathway is not sufficiently wet.  The Sackett Decision states that "waters" means "bodies of open water."  The Sackett Decision states that WOTUS "does not include channels through which water flows intermittently or ephemerally, or channels that periodically provide drainage for rainfall."  Hydrological data collected by the DOJ experts shows that water is below ground surface most of the time along the "primary flow path" even late in the wet season when water levels typically are highest.  (See, for example, DOJ Report, Figures V.D.1.b.1.1 (Exhibit 20) and V.D.1.b.1.2 (Exhibit 21); Depo Ex. 76 (Exhibit 23).

### 3.3    Extent of Relevant Wetlands

### 3.3.1   Extent of Wetlands on the 9.92-acre Property

The issue in this case is whether the wetland on the 9.92-acre Sharfi site is WOTUS.  Both the DOJ Report and the Rebuttal Report identify a wetland on the 9.92-acre site, although there is disagreement between the reports on the location, size and extent of the wetland.  The Rebuttal Report documents that the only field-verified wetland determination was performed by Danna Small in spring 2018 (see Section 7.1.2 of the Rebuttal Report), who delineated the wetland before most of the site was disturbed.  The wetland delineated by Danna Small includes the only area with standing water.  As indicated in my Rebuttal Report, the DOJ wetland delineation on the 9.92-acre property is not reliable because it was conducted in 2021 after site work was done which required speculation about pre-work conditions.  The DOJ delineation also is inconsistent with official government maps such as the National Wetland Inventory and U.S. Geological Survey maps, and it is inconsistent with the SFWMD site visit that verified the wetland boundary mapped by Danna Small.

SHARFIEXPERTS0002341

### 3.3.2   Extent of Wetlands on the Countess Joy Property

The DOJ experts assert that the wetland on the 9.92-acre property is part of a larger wetland located on the Countess Joy property to the north that extends all the way to the east-west Canal Ditch.   Wylie Supplemental Report, p. 4-6; Nutter Supplemental Report, p. 5.   This is based on their assertion that the Countess Joy property is composed almost entirely of wetlands.

Even if wetlands covered most of the Countess Joy property, they are separate from the wetland on the 9.92-acre property.   The wetland on the 9.92-acre property as delineated by Danna Small does not extend to the boundary with the Countess Joy property (Exhibit 24).   The National Wetland Inventory map shows the same thing.   This means that there are uplands between the wetland on the 9.92-acre property and wetlands on the Countess Joy property, which makes those separate wetlands.

The DOJ experts did not delineate the boundaries of wetlands on the Countess Joy property as required by the 1987 Corps of Engineers Wetland Delineation Manual (Manual), but only collected data at a few selected locations which they refer to as "reference plots."  (See DOJ Report Figures IV.B.1.2 (Exhibit 25), and IV.B.2.a.1 (Exhibit 26)).  Those reference plots do not form a wetland delineated line, which the Manual requires.  The location of those reference plots is not representative of the overall Countess Joy property and avoids areas of that property closer to the east-west Canal Ditch that are uplands based on my visual inspection of soils and vegetation.  Mr. Wylie and the other DOJ experts acknowledged in their original report that the Countess Joy property has a complex wetland/upland mosaic and variable microtopography. (See, for example, DOJ Report, p. 14, 58, 68.)  The DOJ reference plots also do not include locations along the entire length of the alleged primary flow pathway, but leave out most of the central length of the pathway.  (See, for example, DOJ Report Figures IV.B.1.2 (Exhibit 25), IV.B.2.a.1 (Exhibit 26), V.D.1.a.4

13

SHARFIEXPERTS0002342

(Exhibit 14)).  This means that the reference plots do not establish that the entire Countess Joy property is a wetland, or even that there is a single wetland that extends from the boundary with the Sharfi property to the east-west Canal Ditch, because there are areas of upland higher ground that disrupt potential surface flow.

I also note that the DOJ experts' assertion that most of the Countess Joy property is a wetland is inconsistent with the U.S. Geological Survey (Exhibit 4) and National Wetland Inventory maps (Exhibit 27), (Exhibit 28)) which show pockets of wetlands on the Countess Joy property surrounded by uplands and no such wetlands bordering the 9.92-acre Sharfi property.  (See DOJ Report Figures II.B.2 (Exhibit 9) and II.B.3. (Exhibit 10)).

Mr. Wylie attempts to minimize the importance of the National Wetland Inventory maps, stating that they use a different definition of wetland than used in the CWA and are sometimes inaccurate.  Wylie Supplemental Report, p. 5.  It is correct that the National Wetland Inventory uses a slightly different classification system than the CWA, but the difference is that the National Wetland Inventory classification includes more wetlands than the CWA.  Manual, ¶ 7.  In my career I have personally mapped wetlands for the National Wetland Inventory and agree that the maps are not always precisely accurate as to the boundaries of wetlands, but they do contain relevant information.  For instance, the classification of wetlands provides information on the type and hydrologic nature of the wetland.  The National Wetland Inventory classifies the wetlands on the Countess Joy property closest to the 9.92-acre site as PEM1B or "seasonally saturated" emergent wetlands, which means that "surface water is typically absent but may occur for a few days after heavy rain and upland runoff."  Mr. Wylie is essentially claiming that the National Wetland Inventory maps of the Countess Joy property missed 90% of the wetlands there, and in my experience it would be extremely unusual that those maps would be so inaccurate.

14

SHARFIEXPERTS0002343

Mr. Wylie relies on the Natural Resource Conservation Service (NRCS) soil maps to map wetlands on the Countess Joy property to delineate the "continuous wetland" from the 9.92-acre site to the 84th Avenue Roadside ditch.  Wylie Supplemental Report, p. 5.  NRCS soil maps identify the predominant soil type in a mapping unit, but recognize that there also can be different soil components there which are not hydric.  These maps also do not show small topographical differences in an area, which means that they include areas of higher ground where historically formed hydric soils have become drained.  As applied to the Countess Joy property, the NRCS soil maps fail to show the multiple locations where there is higher ground or nonwetlands are present, such as the berms along the boundaries of the north-south and east-west Canal Ditches.  Mr. Wylie and Dr. Nutter also did not sample areas along the entire purported "primary flow path," so they have not field verified the map continuously through the area.  Note that the "continuous wetland" soils are mapped as 40 (Sanibel Muck) and 66 (Holopaw Fine Sand, 0 to 2 percent slopes).  The Sanibel Muck is mapped in the location of the Danna Small identified wetland.  The Holopaw fine sand extends well beyond the identified "continuous wetland" in areas that are clearly upland.  The NRCS Official Soil Series Description for the Holopaw Series describes the depth of the seasonal high water table as 6 to 12 inches for two to six months, and during the remainder of the year typically at a depth of 12 to 40 inches (Soil Survey Staff, Natural Resources Conservation Service, United States Department of Agriculture.   Official   Soil   Series   Descriptions.   Available   online https://soilseries.sc.egov.usda.gov/osdname.aspx. Accessed September 22, 2023.).  This description is for undrained conditions.  As detailed in the Creech Report, the entire area (including the Countess Joy property and the 9.92-acre site) was part of the governmental drainage project in the 1920s.

15

SHARFIEXPERTS0002344

### 3.4    Surface Water Connection Between the 9.92-acre Property Wetland and WOTUS

The Sackett decision states that, "the party asserting jurisdiction over adjacent wetlands [must] establish … that the wetland has a continuous surface connection with [a relatively permanent body of water connected to traditional interstate navigable waters], making it difficult to determine where the 'water' ends and the 'wetland' begins."  Webster's Dictionary defines "continuous" as "marked by uninterrupted extension in space, time or sequence."

The wetland on the 9.92-acre property is nowhere near either a Traditional Navigable Water or a Relatively Permanent Water.  The nearest Traditional Navigable Water (the limit of tidal influence on Bessey Creek) is more than four miles away.  The nearest Relatively Permanent Water (where the east-west Canal Ditch meets a branch of Bessey Creek) is two miles away.  Even the east-west Canal Ditch is more than one-quarter mile away from the wetland on the 9.92-acre property.  The wetland is not adjacent to a Relatively Permanent Water or Traditional Navigable Water and is easily distinguishable from those Traditional Navigable Water and Relatively Permanent Water based on distance alone.  See Exhibit 1.

There is no evidence of a continuous surface connection between the wetland on the 9.92-acre property and the nearest Relatively Permanent Water or even the east-west Canal Ditch.  I have not seen evidence of continuous surface water ever extending from the Sharfi wetland to the east-west Ditch.  To the contrary, the hydrological data collected by the DOJ experts in the Countess Joy property at specific reference locations show that water is typically below ground level even during the wetter part of the year, and only comes above ground surface immediately after rainfall events.  (See, for example, DOJ Report Figures IV.B.2.a.1 (Exhibit 26), V.D.1.b.1.1 (Exhibit 20), V.D.1.b.1.2 (Exhibit 21), V.D.1.b.1.3 (Exhibit 29), V.D.1.b.1.4 (Exhibit 18), V.D.1.b.1.5 (Exhibit 30), and V.D.1.b.1.6; (Exhibit 31), Depo Ex. 76 (Exhibit 23)).  This is confirmed by multiple photographs taken of the Countess Joy property showing water below

16

SHARFIEXPERTS0002345

ground surface across most of the property, even in the wet season, and no continuous expanse of open water extending to the Sharfi wetland.  (See, for example, DOJ Report Figures V.C.6.a.2 (Exhibit 32), V.C.6.a.4 (Exhibit 33), V.C.6.a.5 (Exhibit 34), V.C.2.9 (Exhibit 35), V.C.2.11 (Exhibit 36); DOJ Photos of Countess Joy Site Investigation, August 23-24, 2021 (USAEXPERTS413 et seq. (Exhibit 37)); Rebuttal Report Figure 21 (Exhibit 38)).  Aerial photographs and official maps of the area also show little to no water above the ground surface.  (See, for example, DOJ Report Figures II.A.2 (Exhibit 39), II.B.2 (Exhibit 9), II.B.3 (Exhibit 10), IV.D.1.a.1 (Exhibit 40), V.D.1.a.2 (Exhibit 43), IV.D.5.1.a (Exhibit 41); DOJ Expert Report Appendix 5; Depo Ex. 57 (SFWMD photos) (Exhibit 42 DOJ Report Fig IV.D.4.1.).

DOJ's technical theory as to the nature of the hydrological connection between the wetland on the 9.92-acre Sharfi property and the east-west Canal Ditch is inconsistent with a continuous surface connection. The DOJ experts have stated that prior to work on the 9.92-acre site, the wetland was hydrologically connected to the east-west Canal Ditch by groundwater except following rainy periods when soil becomes saturated to the surface.  (See, for example, DOJ Report, p. 9; and Nutter Supplemental Report, p. 5-6).  A groundwater connection by definition cannot be a surface connection, and even if there is surface water for part of the year, it is not continuous.

The geographic route by which the DOJ experts assert that water travels from the wetland on the 9.92-acre property is also inconsistent with a continuous surface connection to a Relatively Permanent Water.  The only identified hydrological connections between the wetland on the 9.92-acre property and traditional navigable waters are through a north-south Canal Ditch to the east-west Canal Ditch or the DOJ's "primary flow pathway" connecting to the east-west Canal Ditch.  Nutter Supplemental Report, p. 7-8; Wylie Supplemental Report, p. 4-7 and.  Since the north-south Canal Ditch and the primary flow pathway are not Relatively Permanent Waters, it is irrelevant if they are a conduit for flow from the wetland on the 9.92-

17

SHARFIEXPERTS0002346

acre property.  The Sackett Decision requires that a wetland be a part of the Relatively Permanent Water, not merely connected to it via ditches or other conduits.

Moreover, there is no continuous surface connection between the wetland on the 9.92-acre property and the north-south Canal Ditch.  As described in my Rebuttal Report, the wetland on the 9.92-acre site is separated from the north-south Canal Ditch by an upland berm.  (See, for example, DOJ Expert Report Figure IV.D.4.1 (Exhibit 43) Appendix 5, Figure 5-1).  The north-south Canal Ditch has a different bottom elevation than the 9.92-acre property.  (See, for example, Depo Ex. 24 (Danna Small photos (Exhibit 44), Depo. Ex. 196 (Danna Small cross section of north-south Canal Ditch (Exhibit 45)).  No evidence is presented that the north-south Canal Ditch had a continuous surface connection directly to the wetland on the 9.92-acre site prior to Defendants' acquisition of the property.  All of this evidence indicates that there are barriers between the wetland on the 9.92-acre property and the north-south Canal Ditch, and that the wetland is easily distinguished from the ditch.

There also is no continuous surface connection through the "primary flow pathway."  The DOJ Report identifies the "primary flow pathway" as the route by which water flows from the 9.92-acre property to the east-west Canal Ditch.  (See DOJ Expert Report Figure V.D.1.a.4 (Exhibit 14)).  As discussed in the Rebuttal Report, the "primary flow pathway" includes areas of higher elevation than the north-south Canal Ditch, which blocks flow even when water is in the Canal Ditch.  For much of the year, the primary flow path is dry pasture land with no visible surface water.  (See, for example, video (Exhibit 15)).  Hydrological data collected by DOJ experts shows that water is below ground surface most of the time along the "primary flow pathway," even during the late summer and fall when water levels typically are highest.  (See DOJ Expert Report Figures V.D.1.b.1.1 (Exhibit 20), V.D.1.b.1.2 (Exhibit 21), V.D.1.b.1.4 (Exhibit 18)).  This is consistent with the National Wetland Inventory classification of the wetlands on the Countess Joy

SHARFIEXPERTS0002347

property closest to the 9.92-acre site as "PEM1B".  This wetland classification type indicates that "surface water is typically absent".  All of this leads me to conclude that there is no continuous surface connection between the wetland on the 9.92-acre property and the east-west Canal Ditch through the "primary flow pathway."

There also are barriers between the wetland on the 9.92-acre property and the east-west Canal Ditch.  The wetland on the 9.92-acre property does not extend to the northern property line, which means there are uplands separating it from any wetland north of the property.  As indicated in my Rebuttal Report, there is a small swale-ditch along the northern property boundary that has a small berm, which creates an additional barrier to surface flow.  On the Countess Joy property itself, it is apparent that there are berms along the north-south Canal Ditch and the east-west Canal Ditch that constitute barriers between those ditches and areas to the south.  (See, for example, photos contained in Countess Joy Site Investigation (Aug. 23-24, 2021) (USAEXPERTS 413-499 (Exhibit 39); DOJ Expert Report Figures V.C.2.3 (Exhibit 46), V.C.2.5 (Exhibit 47), V.C.2.8 (Exhibit 48), V.C.3.1 (Exhibit 49), V.C.6.b.2 (Exhibit 50), V.C.6.c.3 (Exhibit 51)); Depo Ex. 82 (Exhibit 52)).  The original DOJ Report also indicated that water from the 9.92 property does not discharge to the east-west Canal Ditch via the north-south Canal Ditch due to blockages in the northern portion of the north-south Canal Ditch.  (See DOJ Expert Report Figure V.D.1.a.3 (Exhibit 13)).  The DOJ experts' new supplemental reports now assert that there can be a direct discharge from the north-south Canal Ditch to the east-west Canal Ditch, but they present no new evidence to support the changed assertion. Nutter Supplemental Report, p. 7; Wylie Supplemental Report, p. 6.  The DOJ Report fails to demonstrate the lack of upland barriers between those Canal Ditches and areas closer to the 9.92-acre property, because the DOJ experts did not delineate the boundaries of wetlands on the Countess Joy property and located their wetland reference points away from areas which could constitute barriers.

19

SHARFIEXPERTS0002348

In my Rebuttal Report, I showed the surveyed ground and ditch elevations which clearly demonstrate that there are elevational differences that prevent a continuous surface connection between the east-west Canal Ditch, the "primary flow pathway" and the wetland on the 9.92-acre site (See Rebuttal Figure 16 (Exhibit 53)).

The surveyed cross section in the Expert Rebuttal Report (Figure 16 (Exhibit 53)) clearly shows the elevational differences in the various elements of the DOJ's hydrological connection.

Finally, even assuming for the sake of argument that there were a continuous surface connection between wetlands on the 9.92-acre property and Countess Joy property with the east-west Canal Ditch, and that the east-west Canal Ditch constituted a Relatively Permanent Water, the wetlands are clearly distinguishable from the Canal Ditch. The Sackett Decision states that regulated wetlands "must be indistinguishably part of a body of water that itself constitutes 'waters' under the CWA." This means that it must be "difficult to determine where the 'water' ends and the 'wetland' begins." The areas near the east-west Canal Ditch, even if they all were wetlands, are easily distinguishable from the east-west Canal Ditch itself. They are at a higher elevation than the Canal Ditch, they are above the ordinary high water mark of the Canal Ditch, and they are visually distinct from the unvegetated area of the Canal Ditch. This can be seen in photographs taken along the Canal Ditch, as well as in aerial photographs of the broader area. (See, for example, DOJ Expert Report Figures V.C.2.2 (Exhibit 54), V.C.2.3 (Exhibit 46); Depo Ex. 33 (Exhibit 55). In addition, official government maps prepared by the U.S. Geological Survey and National Wetland Inventory readily distinguish between wetlands on the Countess Joy property and the east-west Canal Ditch. (See DOJ Expert Report Figures II.A.2 (Exhibit 39), II.B.3 (Exhibit 10)).

SHARFIEXPERTS0002349

For all of these reasons, the wetland on the 9.92-acre site is not a regulated adjacent wetland based on application of the Sackett Decision.  It is not a WOTUS.

SHARFIEXPERTS0002350