# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA,

       *Plaintiff*,

v.                                      Case No. 2:21-cv-14205-KAM

BENJAMIN K. SHARFI, in his personal and
fiduciary capacity as trustee of the Benjamin
Sharfi 2002 Trust, and NESHAFARM, INC.,

       *Defendants*.

_____/

## DEFENDANTS' COMBINED CROSS MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO THE GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT

## <u>TABLE OF CONTENTS</u>

<i>Page</i>

TABLE OF AUTHORITIES ............................................................................................ iii

INTRODUCTION ........................................................................................................... 1

FACTUAL BACKGROUND ........................................................................................... 2

    A.    The Defendants' Site ..................................................................................... 2

    B.    Bessey Creek and the Drainage Ditches ...................................................... 3

    C.    Wetlands on the Defendants' Site and the Countess Joy Property ............ 6

ARGUMENT .................................................................................................................. 11

I.    The Supreme Court Narrowed the Scope of Clean Water Act Jurisdiction in
    *Sackett,* Which is the Controlling Issue in the Case ....................................... 11

II.    The Court Should Enter Summary Judgment for Defendants and Deny the
    Government's Motion Because the Defendants' Property is Not Part of "The
    Waters of the United States" ............................................................................. 14

    A.    There Are No "Waters of the United States" Anywhere Near the
        Defendants' Site ........................................................................................ 14

        1.    The Closest Traditional Navigable Water and Relatively
            Permanent Water Are Miles Away .......................................... 14

        2.    The Drainage Ditches Closer to the Defendants' Site Are Not
            Relatively Permanent Waters ................................................... 15

            a.    Artificial Ditches Do Not Qualify as "Waters of the United
               States" ........................................................................... 15

            b.    The Drainage Ditches in this Case Lack Sufficient Water
               Flow to be Relatively Permanent .................................. 16

    B.    The Wetland on the Defendants' Site Is Not Sufficiently Connected to the
        Drainage Ditches ........................................................................................ 21

        1.    There Is No Evidence of a Continuous Surface Connection
            Between the Defendants' Wetland and Any of the Drainage
             Ditches ....................................................................................... 21

**<u>TABLE OF CONTENTS</u>**
(continued)

*Page*

a.     There Is No Surface Water Connection ............................ 21

b.     The Government's Interpretation of the "Continuous Surface Connection" Requirement is Erroneous ......................................................................... 23

2.     The Wetland is Easily Distinguishable from the Drainage Ditches .......................................................................... 25

III.     Even if *Sackett* Did Not Control the Dispositive Legal Issue in This Case, the Court Should Deny the Government's Summary Judgment Motion Because Disputed Issues of Material Fact Exist on Other Elements of the Government's Claim ............................................................................................... 25

A.     Disputed Facts Regarding the Scope of the Wetland ............................................. 26

B.     Disputed Facts Regarding the Occurrence of a "Discharge of Pollutants" .......... 28

C.     Responsibility of Defendant Benjamin Sharfi ...................................................... 32

CONCLUSION ................................................................................................................... 33

CERTIFICATE OF SERVICE ........................................................................................... 34

## **TABLE OF AUTHORITIES**

*Page*

**Cases**

*Butts v. Continental Casualty Co.*,
 357 F.3d 835 (8th Cir. 2004) ............................................................22

*Catalyst Pharmaceuticals, Inc. v. Becerra*,
 14 F.4th 1299 (11th Cir. 2021) ..........................................................32

*Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of New York*,
 273 F.3d 481 (2d Cir. 2001).............................................................29

*Foster v. Board of School Commissioners of Mobile County, Alabama*,
 872 F.2d 1563 (11th Cir. 1989) ........................................................12

*Friends of the Everglades v. South Florida Water Management District*,
 570 F.3d 1210 (11th Cir. 2008) ...................................................11, 32

*Harper v. Virginia Department of Taxation*,
 509 U.S. 86 (1993)...........................................................................12

*Hicks v. Ferrero*,
 285 F. App'x 585 (11th Cir. 2008) ....................................................25

*Los Angeles County Flood Control District v. Natural Resources Defense
 Council, Inc.*,
 568 U.S. 78 (2013).......................................................................29, 30

*Parker v. Scrap Metal Processors, Inc.*,
 386 F.3d 993 (11th Cir. 2004) ..........................................................11

*Rapanos v. United States*,
 547 U.S. 715 (2006)................................................................. *passim*

*Rivers v. Roadway Express, Inc.*,
 511 U.S. 298 (1994).........................................................................12

*Sackett v. U.S. Environmental Protection Agency*,
 598 U.S. 651 (2023)................................................................. *passim*

*Sierra Club v. Environmental Protection Agency*,
 551 F.3d 1019 (D.C. Cir. 2008) ........................................................21

**TABLE OF AUTHORITIES**
(continued)

*Page*

*Solid Waste Agency of Northern Cook County v. United States Army Corps of*
    *Engineers,*
    531 U.S. 159 (2001)............................................................................................11, 13, 16

*South Florida Water Management District v. Miccosukee Tribe,*
    541 U.S. 95 (2004)......................................................................................................29, 30

*United States v. Andrews,*
    2023 WL 4361227 (D. Conn. 2023) .................................................................................24

*United States v. Donovan,*
    2010 WL 3614647 (D. Del. 2010) ..............................................................................20, 21

*United States v. Mashni,*
    547 F. Supp. 3d 496 (D.S.C. 2021).................................................................................13

*United States v. Mlaskoch,*
    2014 WL 1281523 (D. Minn. 2014) ..........................................................................20, 21

*United States v. Plaza Health Laboratories, Inc.,*
    3 F.3d 643 (2d Cir. 1993).................................................................................................30

*United States v. Riverside Bayview Homes,*
    474 U.S. 121 (1985).........................................................................................................12

*United States v. Security Industrial Bank,*
    459 U.S. 70 (1982)...........................................................................................................13

*United States v. Stevens,*
    997 F.3d 1307 (11th Cir. 2021) .......................................................................................32

*West Virginia, et al. v. EPA,*
    Case No. 3:23-cv-32 (D.N.D. April 12, 2023)..........................................................13, 24

**Statutes**

33 U.S.C. § 1311..................................................................................................................11

33 U.S.C. § 1319..................................................................................................................32

33 U.S.C. § 1344..................................................................................................................31

## <u>TABLE OF AUTHORITIES</u>
(continued)

<u>*Page*</u>

33 U.S.C. § 1362 ..............................................................................................11, 16, 29, 30

33 U.S.C. § 1365 ..............................................................................................................11

**<u>Rules and Regulations</u>**

33 CFR § 328 ...............................................................................................................13, 20

Federal Rule of Civil Procedure 56 ..................................................................................1

**<u>Other Authorities</u>**

88 Federal Register 3004 (Jan. 18, 2023) .......................................................................24

Defendants Benjamin K. Sharfi and Neshafarm, Inc., by and through undersigned counsel, hereby file this combined Cross Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56 and Opposition Memorandum to the Government's Motion for Summary Judgment (ECF No. 150).[1]

## **INTRODUCTION**

The central question in this case is whether a wetland on the Defendants' property, located miles away from the nearest natural stream or traditional navigable water, is subject to the jurisdiction of the Clean Water Act. The Supreme Court in *Sackett v. U.S. Environmental Protection Agency,* 598 U.S. 651 (2023), provided a clear answer to this question. *Sackett* dramatically simplified the law regarding the geographic scope of the Clean Water Act and, correspondingly, federal agencies' jurisdiction over wetlands. In *Sackett*, the Supreme Court ruled that the Clean Water Act only regulates wetlands that have a continuous surface connection to certain open waters so that the two are indistinguishable, i.e., there is no clear demarcation between the wetlands and the water body. The undisputed facts in this case, like the facts in *Sackett*, establish that the wetland on the Defendants' property is nowhere near other regulated water bodies, there is no continuous surface connection to the manmade drainage ditches that the Government claims are regulated, and it is easy to distinguish the wetland from those drainage ditches.

The Government's Motion for Summary Judgment (the "Government Motion") applies the wrong legal standard to whether the Defendants' wetland is part of "the waters of the United States." It asserts that *Sackett* did not really change anything about the scope of Clean Water Act jurisdiction, claiming that the Supreme Court simply adopted the plurality opinion in *Rapanos v. United States,* 547 U.S. 715 (2006), and that this case is governed by the agencies' 1986 regulation. Not surprisingly, the Government Motion rewrites *Sackett* to fit the old regulation, stating that waters of the United States "includes wetlands that abut one or more relatively permanent tributaries connected to navigable waters." ECF No. 150, at 1.

---

[1] Local Rule 7.1(c)(2) allows twenty pages for motions and twenty pages for opposition memoranda. Defendants are combining their Opposition Memorandum to the Government's Motion and their Cross Motion into a single document to minimize the number of filings with the Court. Defendants believe this combined filing complies with Local Rule 7.1(c)(2) because it is shorter than the total pages allowed if Defendants had filed the papers separately.

That is completely wrong.  *Sackett*'s test is based on the text of the Clean Water Act itself, and the Supreme Court rejected the agencies' regulations as overreaching.  This means that the Supreme Court's ruling applies to all pending cases, including this one.  *Sackett* expanded on the *Rapanos* plurality in key respects and clarified its prior rulings.  The key terms in the Government Motion's formulation – "tributaries" and "abut" – were only used in *Sackett* to describe the Government's theory and prior cases, not the Supreme Court's holding.  The Government here also interprets key phrases in *Sackett* in ways completely inconsistent with their plain meaning – for example, asserting that a "relatively permanent water" is one where water may be ordinarily absent, and that "continuous surface connection" does not even refer to water.  Most importantly, the Government ignores a crucial part of the *Sackett* test – wetlands must be "indistinguishable" from open waters that are regulated – and does not even discuss it in the context of the facts in this case.  The Government's position is yet another example of the agencies overreaching, which was an explicit concern raised in *Sackett*, and improperly seeking to "minimize  … [the] impact" of a Supreme Court ruling.  *Sackett,* 598 U.S. at 666.

Even if the Court were to accept the Government's distortion of the *Sackett* decision, and accept the assertion that drainage ditches can be "relatively permanent waters" and there can be a "continuous surface connection" to the Defendants' wetland without the presence of surface water, the Court cannot enter summary judgment for the Government.  There are disputed issues of material fact related to the Government's theory that the wetland on the Defendants' property is part of a larger wetland on the nearby Countess Joy property, regarding whether the Defendants' activities on their property constituted regulated "discharges" of dredged and fill material, and other issues detailed below.

## FACTUAL BACKGROUND

A.     The Defendants' Site

This case concerns the Defendants' 9.92 acre parcel of property in Palm City, Florida (the "Site").   Defendants purchased the Site in 2017.  Defendants' Response to Plaintiff Statement of Facts and Statement of Facts in Support of Cross Motion for Summary Judgment ("DSOF"), ¶ 2. In 2018, they engaged in activities so that the property could be used for agricultural purposes. DSOF ¶¶ 21-23.  Those activities included clearing overgrown vegetation, evening out the ground surface, planting sod, and building roads and farm buildings. DSOF ¶¶ 52-58.  The work was done using workers with hand tools in some instances and locations, and with mechanical

equipment in other instances and locations.  DSOF ¶ 54.  Defendants fenced approximately one acre of wetlands.  DSOF ¶ 127.

Immediately north of the Site is an undeveloped property owned by Countess Joy LLC, which is used to graze cattle.  The parties refer to this property as the "Countess Joy property."

B.   Bessey Creek and the Drainage Ditches

The key issue in this case is the location of the Defendants' Site in relation to offsite waters, because that is basis for potential regulatory jurisdiction under the Clean Water Act and *Sackett*.  ***Figure 1*** shows the Site in relation to offsite waters.  DSOF ¶ 154.



**Figure 1** (Exhibit 1 to Dennis Supplemental Report; DSOF ¶ 154).

The nearest traditional navigable water is the tidally-influenced portion of Bessey Creek, which is located approximately 4½ miles away (east) from the Site at SW Murphy Road.  DSOF ¶¶ 15-16.  Bessey Creek is a natural stream that flows into the North Fork of the St. Lucie River. Upstream from the tidally-influenced reach are freshwater branches of the creek that extend inland.  DSOF ¶ 92.

Between Bessey Creek and the Defendants' Site are several manmade drainage ditches. These ditches were excavated many decades ago and have berms along at least part of their

length that appear to be sidecast material from ditch construction and/or maintenance.  DSOF ¶ 94-86, 100-101.

Approximately 1,600 feet north of the Site in the Countess Joy property is an east-west oriented drainage ditch that joins a natural branch of Bessey Creek approximately two miles to the east of the Site.  DSOF ¶ 11.  Defendants refer to this ditch as the "East-West Ditch," and the Government refers to it as the "upstream reach of Bessey Creek."

There are several smaller drainage ditches that connect to the East-West Ditch.  One of those ditches, which is oriented in a north-south direction, is on the western boundary of the Defendants' Site and runs north through the Countess Joy property to the East-West Ditch.  DSOF ¶ 74.  Both parties refer to this as the "North-South Ditch."    Approximately a quarter mile further west of the North-South Ditch is another north-south oriented ditch that is next to SW 84th Avenue and connects to the East-West Ditch in the Countess Joy property.  DSOF ¶ 84.  The parties refer to this as the "84th Avenue Roadside Ditch."  There also are multiple other north-south oriented ditches that connect to the East-West Ditch between the Defendants' Site and Bessey Creek as you move east.  DSOF ¶ 111.

The drainage ditches do not have water year-round.  The parties agree that they have seasonal flow, which means that water is present during the wet season or after a heavy rainfall, but the ditches have no water during the dry season or other dry times of the year.  DSOF ¶¶ 106, 108-109.   This is illustrated by the following three photographs of the intersection of the North-South and East-West Ditches (**Figures 2 and 3**), which show the ditches with water in August 2021 (which was a month with higher-than-average rainfall, DSOF ¶ 153, and show the ditches to be completely dry in March 2022 (which is during the dry season).  DSOF ¶¶ 155-156.



Figure V.C.2.3. N/S Ditch Confluence with Bessey Creek on Countess Joy East Reference Area . View is to the east. (Photograph source: USAEXPERTS 0000646).

**Figure 2** (Exhibit 13 to Nutter Supplemental Report, DSOF ¶ 155).



**Figure 3** (Exhibits 16-17 to Dennis Supplemental Report, DSOF ¶ 156).

An aerial video taken in April 2022 shows conditions along a route extending from the Defendants' Site to Bessey Creek and the St. Lucie River, which shows that the ditches near the Site are almost completely dry.  *See* https://carltonfields.box.com/s/dk7p4a8jimvkf7h1t52e2652nz4peol5.

The Government does not know how many months of the year any of these ditches have water flow, DSOF ¶ 107, but it appears that they run for no more than half the year.  DSOF ¶¶ 106, 108-113.  The only information regarding year-round water flow provided by the Government are estimates for 2004-2009 at a Hybrid Wetland Treatment Technology ("HWTT") facility located near the junction of the East-West Ditch and Bessey Creek two miles east of the Site, a location which has more water than the East-West Ditch near the Defendant's Site.  DSOF ¶ 92, 114.  On average, the median amount of water flow at the facility is less than one cubic foot per second for six months out of the year, and only slightly more in two additional months.  DSOF ¶ 118.  **Figure 4** is a graph that shows periods of higher flows in the wet season and after rainfall events, followed by long periods of essentially no water flow.  DSOF ¶ 157.



**Figure 4** (excerpt from Exhibit 3 to Nutter Supplemental Report, DSOF ¶ 157).

C.    <u>Wetlands on the Defendants' Site and the Countess Joy Property</u>

It is undisputed that there is a wetland on a portion of the Defendants' Site, but the parties dispute the size and location of the wetland.   Defendants believe the wetland is smaller and does

not extend to the boundary with the Countess Joy property.  The Defendants' position is based on a delineation conducted in 2018 by wetland professional Danna Small before most site work occurred.  DSOF ¶ 124.  Ms. Small's delineation was verified in the field by two wetland specialists of the South Florida Water Management District ("SFWMD").  DSOF ¶ 126.  The Government, on the other hand, asserts that the wetland covers most of the Defendants' Site and extends to the northern property boundary where it allegedly becomes part of a larger wetland to the north and extends all the way up to the East-West Ditch.  The Government's position is based on an inspection conducted in 2021 after most of the site work had taken place. DSOF ¶ 129. The Government claims that Ms. Small was unable to see undisturbed conditions due to a perimeter road, ECF No. 150, at 9, but fails to note that the area between the wetland and the northern property boundary – which is the critical area for determining whether the wetland could possibly be part of a larger wetland to the north – was untouched at the time of Ms. Small's delineation and verification by the SFWMD.  DSOF ¶ 125.

Regarding the Countess Joy property, it is undisputed that there are some wetlands there, but once again, the parties dispute the location and extent of the wetlands.   The official maps produced by the U.S. Fish and Wildlife Service for the National Wetland Inventory and U.S. Geological Survey show several pockets of disconnected wetlands that do not border the Defendants' Site.  DSOF ¶¶ 130-133.    **Figure 5** shows wetlands locations mapped by the National Wetland Inventory and the 2018 wetland delineation of the Defendants' Site produced by Ms. Small.  DSOF ¶ 158. These maps indicate that the wetland on the Defendants' Site is separate from any wetlands on the Countess Joy property.



**Figure 5** (Exhibit 28 to Dennis Supplemental Report, DSOF ¶ 158).

In this case, however, the Government asserts that wetlands cover a much larger portion of the Countess Joy Property than shown on the official maps – indeed they must do so to make their tenuous theory of jurisdiction work.  This assertion is based on the Government experts inspecting eleven discrete locations (referred to as "reference plots"), determining that wetland conditions were present at each location, and then extrapolating their results to a broader area. DSOF ¶ 64.  In making their determination, the Government's experts never delineated the boundary of the purported larger wetland area, and never followed other procedures required by the 1987 Wetland Manual for identifying wetlands, such as establishing a baseline and transects to confirm the continuity of wetland conditions.  DSOF ¶¶ 134-137. The figure on page 13 of the Government Motion shows an area of wetland on the Countess Joy property that was never

delineated and does not show the berms that block surface flow along the various ditches, yet they broadly assert the entire area is a wetland.

The wetlands on the Countess Joy property identified by the Government typically lack surface water.  DSOF ¶¶ 141-146.  The Government's experts visited the area in August, September, October and December 2021, which are among the wetter months of the year, and typically found water to be below ground surface at test pits that they excavated.  DSOF ¶ 142. **Figure 6** is a photo taken by the Government experts in August 2021, a month that had higher rainfall than normal, DSOF ¶ 153,  showing water level below ground surface in a test pit they excavated at one of the locations where they claim there is a "continuous surface connection" to the East-West Ditch.  DSOF ¶ 159.



Figure V.C.2.9. Countess Joy East Reference Area W7 wetland sampling point abutting Bessey Creek (Photograph source: USAEXPERTS 0000687).

**Figure 6** (Exhibit 16 to Wylie Supplemental Report, DSOF ¶ 159).

The Government experts also installed groundwater monitoring wells at several locations in the Countess Joy property which show that water levels from August-December 2021 were below ground surface the majority of the time.  DSOF ¶ 144-146.  **Figure 7** shows graphs of water level at monitoring wells near the location shown in Figure 6 showing that water is ordinarily below ground surface. DSOF ¶ 160.



Figure V.D.1.b.1.2.   Graphical output of Reference Area water level monitoring wells R Wells 4, 5, and 6.

**Figure 7** (Figure V.D.1.b.1.2 to original DOJ Expert Report, DSOF ¶ 160).

The Government has no evidence that surface water from the North-South Ditch ever covered the wetland on the Defendants' Site where the site work was done.  DSOF ¶ 141.  The Government also has no evidence that surface water from the East-West and 84th Avenue Roadside Ditches ever covered the wetlands in the Countess Joy Property such that there was a continuous sheet of surface water extending all the way to the Defendants' Site, as required under *Sackett*.  DSOF ¶¶ 140-141.

There is no dispute that the wetlands in the Countess Joy property are readily distinguishable from the three drainage ditches at issue in this case.  Defendants' expert, Dr. Michael Dennis, offers the opinion that the wetlands are easily distinguishable. DSOF ¶ 149.  The Government experts have offered no opinion on whether or not the ditches are distinguishable from the wetlands on the Defendants' Site or the Countess Joy property.  DSOF ¶ 150.  However, when shown photographs of locations where wetlands on the Countess Joy property allegedly have a continuous surface connection with the East-West Ditch, the Government's expert had no problem identifying the ditch (the area of open water) and the wetland (the ground next to the ditch).  *See, e.g.,* **Figure 6** above.

## ARGUMENT

### I.    The Supreme Court Narrowed the Scope of Clean Water Act Jurisdiction in *Sackett,* Which is the Controlling Issue in the Case

In a Clean Water Act case, the Government must prove that the Defendants made a "discharge," of a "pollutant," "from a point source," to "the navigable waters," without a Clean Water Act permit.  33 U.S.C. §§ 1311(a), 1362(12), 1365(a)(1)-(f); *Parker v. Scrap Metal Processors,* 386 F.3d 993, 1008 (11th Cir. 2004); *Friends of the Everglades v. SFWMD,* 570 F.3d 1210, 1216 (11th Cir. 2008).

The key element in this case is the requirement that a defendant discharge to "the navigable waters," which is defined in the statute as "the waters of the United States, including the territorial seas."  33 U.S.C. § 1362(7).  For decades, federal agencies expansively interpreted the phrase "waters of the United States" to include hundreds of millions of acres of wetlands across the country.  *Sackett,* 598 U.S. at 664-69.   When the Supreme Court issued previous rulings that the scope of Clean Water Act jurisdiction was more limited than the agencies' interpretation, *e.g., Solid Waste Agency of Northern Cook Cnty. (SWANNC) v. U.S. Army Corps of Engr's,* 531 U.S. 159 (2001), and *Rapanos v. United States,* 547 U.S. 715 (2006), the agencies issued rules and guidance that "sought to minimize … [the] impact" of these rulings.  *Sackett,* 598 U.S. at 666-67.

In *Sackett,* the Supreme Court definitively rejected the agencies' expansive view of Clean Water Act jurisdiction, and held that the statute regulates discharges to a limited class of waters and wetlands.  The Supreme Court stated that the statute regulates "bodies of open water," specifically, "those relatively permanent, standing or continuously flowing bodies of water

'forming geographic[a] features' that are described in ordinary parlance as 'streams, oceans, rivers and lakes.'" *Sackett,* 598 U.S. at 671 (quoting *Rapanos,* 547 U.S. at 739). Wetlands are only regulated if they are "indistinguishably part of a body of water that itself constitutes 'waters' under the CWA." *Id.* at 676; *see also id.* at 682 ("'adjacent' cannot include wetlands that are not part of covered 'waters'"). The party asserting jurisdiction over an adjacent wetland must establish "that the wetland has a <u>continuous surface connection</u> with that water, <u>making it difficult to determine where the 'water' ends and the 'wetland' begins</u>." *Id.* at 678-79 (emphasis added).

The Supreme Court in *Sackett* did not simply adopt the plurality opinion of Justice Scalia in *Rapanos*, but emphasized certain points in *Rapanos* and other previous Supreme Court decisions to clarify the limits on Clean Water Act jurisdiction. The *Sackett* court discussed how the term "waters" generally means "rivers, lakes and oceans," *id.* at 672 (citing *Rapanos,* 547 U.S. at 734, and *United States v. Riverside Bayview Homes*, 474 U.S. 121, 133 (1985)), and put "ditches" in the same category as "swimming pools and puddles," *id.* at 659. The *Sackett* court stated no less than seven times that a wetland is only regulated if one cannot tell the difference between the wetland and a regulated surface water. *Sackett,* 598 U.S. at 676-79, 684. Perhaps most importantly, the *Sackett* court emphasized the importance of having a simple clear test so that ordinary landowners can know whether or not their property is federally regulated. *Sackett* indicated that expansive regulation of wetlands in the vicinity of covered waters fails to provide fair notice to the average person. *Id.* at 669-71, 680-81.

The test announced in *Sackett* clearly applies to this case. "A judicial construction of a statute is an authoritative statement of what the statute meant before as well as after the decision of the case giving rise to that construction." *Rivers v. Roadway Exp., Inc.,* 511 U.S. 298, 312-13 (1994). This means that the Supreme Court's ruling "is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate [the Supreme Court's] announcement of the rule." *Harper v. Va. Dep't of Taxation,* 509 U.S. 86, 97 (1993); *see also Foster v. Bd. of School Comm'rs,* 872 F.2d 1563, 1566 (11th Cir. 1989) ("judicial decisions presumptively apply retroactively to all pending cases").

The Government's assertion that the Court should apply the U.S. Army Corps of Engineers' ("Corps") 1986 regulation to this case is simply wrong. ECF No. 150, at 11 & n.3

(citing 33 CFR § 328.3).  The U.S. Environmental Protection Agency ("EPA") applied a nearly identical regulation to the Sacketts in the underlying case that the Supreme Court reversed. *Sackett,* 598 U.S. at 662 (describing the regulations in effect at the time of the Sackett's conduct, including the language about "adjacent" wetlands).   The Supreme Court has now rejected multiple subsections of that regulation in different cases.  *See, e.g., SWANNC,* 531 U.S. at 174 (holding that 33 CFR § 328.3(a)(3), which allowed for regulation of waters that could affect interstate commerce including through use by migratory birds, exceeded agency authority under the Clean Water Act)*; Sackett,* 598 U.S. at 681-83  (rejecting definition of "adjacent" set forth in 33 CFR § 328.3(c)).   The case cited in the Government Motion, *United States v. Mashni,* 547 F. Supp. 3d 496, 505-06 (D.S.C. 2021), was decided before *Sackett* and addressed the issue of which version of the changing agencies' <u>regulations</u> should be applied in that case.  ECF No. 150 at 11 n.3.  The court in  *Mashni* decided the older regulations applied because they were in effect at the time of the defendants' conduct.  Yet, "[t]he principle that statutes [and regulations] operate only prospectively, while judicial decisions operate retrospectively, is familiar to every law student."  *United States v. Sec. Indus. Bank,* 459 U.S. 70, 79 (1982).  Moreover, as explained in the statements on the agency website cited in the Government Motion, the 1986 regulation is no longer in effect because the agencies have revised the regulation and the revised regulation has been enjoined in multiple states, including Florida.  *See West Virginia, et al. v. EPA,* Case No. 3:23-cv-32 (D.N.D. April 12, 2023).

The Court should also reject the suggestion that it apply the agencies' "longstanding practice, as informed by applicable guidance, training, and experience." ECF No. 150, at 11 n.3. This seemingly benign suggestion is the proverbial wolf of agency overreach in sheep's clothing of deference.  The Supreme Court in *Sackett* gave no deference to the agencies' interpretation of the statute, rejected the reasoning in the agencies' current regulation, and in so doing, put the burden on EPA to "provide clear evidence that it is authorized to regulate in the manner it proposes."  *Sackett,* 598 U.S. at 679.  The Supreme Court gave no credence to agency guidance, noting that past agency guidance was intended to minimize the impact of the Court's rulings in *SWANNC* and *Rapanos*.  *Id.* at 666 ("Days after our decision, the agencies issued guidance that sought to minimize *SWANNC*'s impact"), 667 ("In the decade following *Rapanos,* the EPA and the Corps issued guidance documents" that theoretically could lead to regulation of "almost all waters and wetlands across the country").  All of this indicates that the test for determining

whether a wetland is part of "the waters of the United States" is found in the Supreme Court's own words, not the agency's self-serving characterizations of those rulings.

## II.   The Court Should Enter Summary Judgment for Defendants and Deny the Government's Motion Because the Defendants' Property is Not Part of "The Waters of the United States"

The wetland on the Defendants' Site is clearly not part of "the waters of the United States."  *Sackett* holds that "the CWA extends only to those wetlands that are 'as a practical matter indistinguishable from waters of the United States.'  This requires that the party asserting jurisdiction over adjacent wetlands to establish 'first, that the adjacent [body of water constitutes] … 'water[s] of the United States,' (i.e., a relatively permanent body of water connected to traditional interstate navigable waters); and second, that the wetland has a continuous surface connection with that water, making it difficult to determine where the 'water' ends and the 'wetland begins.'"  *Sackett,* 598 U.S. at 678-79 (quoting *Rapanos,* 547 U.S. at 742, 755) (brackets in original).

The Government's evidence flunks both steps of the test.  The drainage ditches near the Defendants' Site are not relatively permanent waters subject to Clean Water Act jurisdiction, and even if they were, there is no evidence of a continuous surface connection between those ditches and the wetland on the Defendants' Site.  Most notably, the Government has no evidence whatsoever that the Defendants' wetland is indistinguishable from those drainage ditches – none of their experts offers that opinion – and in fact the wetlands and ditches in this case are readily distinguishable.  The Clean Water Act does not regulate the wetland on the Defendants' property, and it is not even a close call.

### A.   There Are No "Waters of the United States" Anywhere Near the Defendants' Site

#### 1.   The Closest Traditional Navigable Water and Relatively Permanent Water Are Miles Away

The parties agree that the closest traditional navigable water is the tidally-influenced portion of Bessey Creek, which is located approximately four-and-a-half miles away from the Defendants' Site.  DSOF ¶¶ 15-16.  The freshwater portions of Bessey Creek further upstream, which the parties agree qualify as relatively permanent waters subject to Clean Water Act jurisdiction, are no closer than two miles away from the Defendants' Site.  DSOF ¶ 92; *see* **Figure 1** above.

Waters located miles away by definition cannot be "adjacent" to the wetland on the Defendants' Site.  The Defendants' wetland is readily distinguishable from the natural stream miles away, and does not meet the test set forth in *Sackett.*

        2.    <u>The Drainage Ditches Closer to the Defendants' Site Are Not Relatively Permanent Waters</u>

        a.    <u>Artificial Ditches Do Not Qualify as "Waters of the United States"</u>

The Government claims that three drainage ditches are relatively permanent waters subject to Clean Water Act jurisdiction.  The primary such ditch is the East-West Ditch located a third of a mile north of the Defendants' property, which the Government calls the "upstream reach of Bessey Creek." DSOF ¶ 11.  The Government also claims that the North-South Ditch bordering the Defendants' Site and the 84th Avenue Roadside Ditch located a quarter of a mile away are relatively permanent waters.  DSOF ¶ 84.  None of those drainage ditches meet the definition of a relatively permanent water.

It is undisputed that these ditches are all manmade.  DSOF ¶ 93. The East-West Ditch was excavated sometime from the 1920s-1940s as part of the General Reclamation Plan of the Palm City Drainage District; the North-South Ditch was excavated sometime in the middle of the Twentieth Century to provide drainage for the nearby area; and the 84th Avenue Roadside Ditch was either excavated with the paved roadway or was a preexisting ditch similar to the North-South Ditch.  DSOF ¶ 94-96.  All three have the hallmarks of artificial ditches, as they are oriented in straight lines (unlike a sinuous natural stream) and they have berms of soil that appears to be sidecast material from the time of excavation.  DSOF ¶ 93, 100-101.

Manmade drainage ditches are not part of "the waters of the United States."  In *Sackett,* the Supreme Court clearly stated that regulated "waters" include "<u>only</u> those relatively permanent, standing or continuously flowing bodies of water 'forming geographic[al] features' <u>that are described in ordinary parlance as 'streams, oceans, rivers and lakes</u>.'" *Sackett,* 598 U.S. at 671 (quoting *Rapanos,* 547 U.S. at 739) (emphasis added).  The word "ditch" is noticeably missing from the list.   Those all are types of natural water bodies, and the holding is specific that a water body must be commonly understood ("described in ordinary parlance") to be such a natural water body in order to qualify.

It was not an accident that the Supreme Court listed only natural bodies of water.  In *Sackett*, the Court grouped "ditches" with "swimming pools and puddles" in questioning the

"outer boundaries of the Act's geographical reach," *Sackett,* 598 U.S. at 659, and cited with disapproval a lower court case deferring to the agencies' claim of jurisdiction over a ditch, *id.* at 666.  This echoes similar language in the *Rapanos* plurality opinion*,* which criticized lower courts for accepting agency claims that ditches are part of "the waters of the United States," *e.g.,* 547 U.S. at 726-27, and stated that "[i]n applying the definition to … man-made drainage ditches, ...  the Corps has stretched the term 'waters of the United States' beyond parody," *id.* at 734.  The *Rapanos* plurality opinion pointed out that the Clean Water Act defines "point source" to include "ditches," "channels" and "conduits," 33 U.S.C. § 1362(14), and stated that this "separate classification … shows that these are, by and large, *not* 'waters of the United States.'" *Id.* at 735-36.  In other words, the Court drew a distinction between natural bodies of water such as streams and rivers (which are regulated) and artificial channels such as ditches (which are not).  The only possible exception is ditches that are "continuously" or "permanently" flowing, which a footnote in *Rapanos* suggested might be regulated.  *Rapanos,* 547 U.S. at 736 & n.7.

In apparent recognition of this requirement, the Government in this case conveniently calls the East-West Ditch "the upstream reach of Bessey Creek."  The Government witnesses do this despite the fact that the government maps that they used to create their trial exhibits all identify it as a "ditch" or "canal," DSOF ¶ 97; they used a U.S. Geological Survey map for their exhibits that does not refer to the East-West Ditch as "Bessey Creek," DSOF ¶ 98; and historical maps and aerials show the East-West Ditch as merely draining into the natural Bessey Creek. DSOF ¶ 99.  The Orwellian decision to label the East-West Ditch as "Bessey Creek," when it clearly is not the creek, betrays the Government's concern that a ditch does not count.

> b.  The Drainage Ditches in this Case Lack Sufficient Water Flow to be Relatively Permanent

Even if it were not "beyond parody" to include drainage ditches among "the waters of the United States," the three ditches near the Defendants' property are not sufficiently wet to meet the definition.

*Sackett* states that "the waters of the United States" must be "relatively permanent, standing or continuously flowing bodies of water."  *Sackett,* 598 U.S. at 671.  The words used by the Supreme Court indicate that surface water needs to be present almost all the time.  The Supreme Court stated that "waters" refers to "open water."  *Id.* at 672-73 (citing *SWANNC*, 531 U.S. at 168-69).  In *Rapanos*, the plurality stated that use of the phrase "navigable waters" in the

Clean Water Act means, "at bare minimum, the ordinary presence of water." *Rapanos*¸547 U.S. at 734.   The Merriam-Webster Online Dictionary defines "ordinary" as "of a kind to be expected in the normal order of events:  Routine, Usual."  ORDINARY, MERRIAM-WEBSTER.COM.  This means that there usually needs to be open surface waters for an area to be regulated.

Other terms in *Sackett* confirm that surface water usually must be present.  "Permanent" is defined as "continuing or enduring without fundamental or marked change: Stable." PERMANENT, MERRIAM-WEBSTER.COM.  The word "relatively" means "to a relative degree or extent; somewhat."  RELATIVELY, MERRIAM-WEBSTER.COM.  "Relatively permanent" in this context plainly means that open surface water need not be there literally all the time, but it must be something close to it.  Similarly, "continuously" means "in a continuous manner: without interruption."  CONTINUOUSLY, MERRIAM-WEBSTER.COM.   All of these words used in *Sackett* indicate that the Clean Water Act only regulates bodies of open surface water that remain year-round (or very close to it).

The three drainage ditches identified by the Government do not meet this standard.   It is undisputed that the drainage ditches only have seasonal water flow.  DSOF ¶ 106, 108-109; Nutter Depo 2, 42:23-43:24 ("seasonal flow" generally means "flow during the wet season"). Seasonal flow is another name for intermittent flow.  DSOF ¶ 110.  During the rainy season or after a heavy rainfall, water flows through the ditches.  During the dry season or times with little rainfall, the ditches have no flow or can be completely dry. DSOF ¶ 106, 108-109.  The Government experts acknowledge that they do not know how many months of the year there is or is not flow.  DSOF ¶ 107.

The impermanence of the water flow in the ditches is demonstrated by the Government experts' investigations.  They only went to the Defendants' Site and Countess Joy property in August, September, October and December 2021.  These visits mostly coincided with the wetter period of the year, because the Government Motion admits that "[h]ighest flows are in June through November."  ECF No. 150, at 14.   One of the Government experts' exhibits, **Figure 8,** which shows median flows at the HWTT facility two miles downstream, DSOF ¶ 160, indicates that the months with highest flows are July through November, and that December is a transition month to the low/no flow months of the dry season.

Table III.C.1.1.   Composited historical flow in Bessey Creek at the Hybrid Water Treatment
Technology facility.

| Composited Historical Flow in Bessey Creek | | | |
|---|---|---|---|
| Month | daily max (cfs) | daily median (cfs) | daily mean (cfs) |
| 1 | 3.73 | 0.699 | 0.910 |
| 2 | 21.18 | 0.506 | 1.121 |
| 3 | 44.81 | 0.479 | 1.668 |
| 4 | 7.03 | 0.316 | 0.702 |
| 5 | 4.45 | 0.242 | 0.344 |
| 6 | 69.72 | 0.47 | 7.306 |
| 7 | 67.85 | 1.45 | 6.326 |
| 8 | 80.30 | 4.42 | 11.418 |
| 9 | 66.03 | 5.58 | 11.301 |
| 10 | 106.49 | 6.75 | 15.572 |
| 11 | 112.51 | 2.34 | 12.839 |
| 12 | 60.88 | 1.14 | 3.744 |
| **Total** | | | |

From the Permit application submitted to the SFWMD for the HWTT facility.

**Figure 8** (Exhibit 2 to Nutter Supplemental Report, DSOF ¶ 161).

Even during this wet time of year, water flow was not as robust as the Government suggests.  In the East-West Ditch, which receives whatever flow may come from the North-South Ditch and 84th Avenue Roadside Ditch, the Government experts saw water on each visit, ECF No. 150, at 13, but by November-December 2021 the water was rapidly disappearing.  DSOF ¶¶ 120-121.  Regarding the North-South Ditch, which is the drainage ditch closest to the Defendants' Site, the Government's hydrologist Dr. Wade Nutter never saw water flowing from the North-South Ditch into the East-West Ditch, and the Government's other witness Michael Wylie saw water flowing into the East-West Ditch in only two of the visits.  DSOF ¶ 119.

The Government experts never visited the Defendants' Site or the Countess Joy property in the months of January through June when the ditches are dry. DSOF ¶ 112.  However, Defendants' expert Dr. Michael Dennis saw that the ditches to be dry in March 2022, and an aerial video taken in April 2022 also show the ditches to be completely dry except for a few puddles.  DSOF ¶¶ 111, 113.

The lack of year-round water flow is confirmed by the Government's own data.  Dr. Nutter installed surface water gauges in the East-West Ditch and collected data from August-December 2021.  DSOF ¶ 120.  In November and December 2021, the gauges show surface

water dropping to the bottom of the ditch except after heavy rainfalls.  DSOF ¶ 124.  The Government tries to explain this away by saying that Dr. Nutter did not put the gauge in the middle of the ditch despite his expertise, and that he saw a small area of water flow in the middle of the ditch when the location of the gauges were dry in December 2021.  However, the fact remains that the data shows that water levels rapidly drop to nothing in the ditch when the rains stop, which is consistent with an intermittent, seasonal flow.

The Government also has data related to the HWTT facility that estimates historical flow in the East-West Ditch two miles downstream.  This portion of the ditch has more water than the portion near the Defendants' Site, because the East-West Ditch receives water from multiple other drainage ditches downstream from the Site. DSOF ¶ 114-116.  The HWTT data shows very little water flow for seven months of the year, and long periods of time when there appears to be no flow at all.  *See* **Figure 6** (graph from HWTT permit application) and **Figure 8.**

The Government claims that seasonal (or intermittent) flow is enough based on a footnote in the *Rapanos* plurality opinion, that states "the waters of the United States" does "not necessarily exclude seasonal <u>rivers</u>, which contain continuous flow during some months of the year but no flow during dry months, such as the 290-day, continuously flowing stream postulated by Justice Stevens' dissent."  ECF No. 150, at 14; *Rapanos,* 547 U.S. at 732 n.5 (emphasis added).  The description of the duration of time when the hypothetical river is flowing – 80% of the year – is very different than the amount of time the ditches in this case flow (only half the year, or less).  Moreover, the footnote clearly applies only to rivers – a natural watercourse -- not manmade drainage ditches.  When discussing artificial features, the *Rapanos* plurality opinion repeatedly stated that channels with intermittent flow are <u>not</u> part of "the waters of the United States."  *See Rapanos,* 547 U.S. at 733 ("All of these terms [such as 'streams' and 'rivers'] connote continuously present, fixed bodies of water, as opposed to ordinarily dry channels through which water occasionally or intermittently flows."), 733-34 ("'the waters of the United States' … exclude channels carrying merely intermittent or ephemeral flow"), 739 ("The phrase ['waters of the United States'] does not include channels through which water flows intermittently or ephemerally, or channels that periodically provide drainage for rainfall.").  In a separate footnote, the *Rapanos* plurality opinion states that only ditches that are "continuously" or "permanently" flowing may be regulated.  *Id.* at 736 & n.7 ("a statute that treats 'waters' separately from 'ditch[es], channel[s], tunnel[s], and conduit[s],' thereby distinguishes between

continuously flowing 'waters' and channels containing only an occasional or intermittent flow"). The ditches in this case clearly do not meet that higher standard.

The Government appears to confuse the issue of whether the <u>water</u> is relatively permanent with the issue of whether the <u>channel</u> is relatively permanent.  The Government repeatedly states that the various drainage ditches are "relatively permanent waters" because they have a bed and bank and an ordinary high-water mark.  ECF No. 150, at 13, 16-17.  Those are land, not water, features.  If the presence of those ground features is enough to make a water relatively permanent, then water could be present for a single day a year and still qualify.  This is the type of absurd logic that the Supreme Court has rejected.  *See, e.g., Rapanos,* 547 U.S. at 725 (noting that the Corps' 1986 regulations defining "tributaries" to include channels with "a perceptible 'ordinary high water mark' … extended 'the waters of the United States' to virtually any land feature over which rainwater or drainage passes and leaves a visible mark – even if only 'the presence of litter and debris.'") (quoting 33 CFR § 328.3(e) (1986)).

The Government claims that Defendants cannot create a dispute of material fact about the time water flows in the ditches by relying only on "photographs from a single day" in a month that is "among the driest of the year."  ECF No. 150, at 14.  The issue is not whether the defense can create a dispute of material fact, but whether the Government can carry its burden of proof that the ditches usually have surface water, especially a continuous connection.

The Government's own experts admit that the ditches only have seasonal flow, DSOF ¶¶ 106, 108-109, which is not enough.  Moreover, the Government understates the defense evidence.  Dr. Dennis personally observed that there was no water in the ditches when he took the photos in March 2022, DSOF, ¶ 111, so the evidence is not simply "photographs."  There is also an aerial video taken in April 2022 that shows the same dry conditions – i.e., no water. DSOF ¶ 113.  The Government's own data (discussed above) likewise confirms that there is essentially no flow for months out of the year.  Another defense expert, Richard Creech, who has lived in the Martin County area for most of his life, also testified that the ditches are typically dry for the majority of the year.  DSOF ¶ 117.

The Government cites two unpublished cases that were decided long before *Sackett* and could not have applied the updated test.  ECF No. 150, at 14 (citing *United States v. Mlaskoch,* 2014 WL 1281523 (D. Minn. 2014), and *United States v. Donovan,* 2010 WL 3614647 (D. Del. 2010)).  Both cases involved natural streams, not drainage ditches, and applied the test for

seasonal rivers. *Mlaskoch,* 2014 WL 1281523 at *16; *Donovan,* 2010 WL 3614647 at *16.   The court in *Mlaskoch* also accepted the Corps' guidance that a water can be "relatively permanent" if it has water flow for three months of the year (and cited other cases that in turn relied on agency guidance), 2014 WL 1281523 at *16, which is questionable considering *Sackett*'s criticism of the agencies' guidance.

Since the ditches in this case are not "waters of the United States," the wetland on the Defendants' Site is not adjacent to any regulated water and therefore is outside the geographic jurisdiction of the Clean Water Act.

B.   The Wetland on the Defendants' Site Is Not Sufficiently Connected to the Drainage Ditches

Even if any of the three drainage ditches were "waters of the United States," the wetland on the Defendants' Site is not.  *Sackett* provides that a wetland is only regulated if it "has a continuous surface connection with that water [of the United States], making it difficult to determine where the 'water' ends and the 'wetland' begins."  *Sackett,* 598 U.S. at 678-79 (quoting *Rapanos,* 547 U.S. at 742).  The wetland on the Defendants' Site does not have a continuous surface connection with any of those ditches, and even if it did, the wetland is readily distinguishable from the ditches.

1.   There Is No Evidence of a Continuous Surface Connection Between the Defendants' Wetland and Any of the Drainage Ditches

a.   There Is No Surface Water Connection

There is no evidence of a continuous surface connection between the wetland on the Defendants' Site and the East-West Ditch, North-South Ditch, or 84th Avenue Ditch.  The phrase "continuous surface connection" clearly refers to a surface <u>water</u> connection:  the Supreme Court has indicated that "waters of the United States" are "open waters" and wetlands are only regulated if they are "indistinguishably part of a body of water that itself constitutes 'waters' under the CWA."  *Sackett,* 598 U.S. at 676.  The word "continuous" unambiguously means uninterrupted in space, time or sequence.  CONTINUOUS, MERRIAM-WEBSTER.COM ("marked by uninterrupted extension in space, time or sequence"); CONTINUOUS, BLACK'S LAW DICTIONARY (4th ed. 1968) ("Uninterrupted; unbroken; not intermittent or occasional; so persistently repeated at short intervals as to constitute virtually an unbroken series"); *cf. Sierra Club v. EPA*, 551 F.3d 1019, 1027 (D.C. Cir. 2008) (interpreting "continuous emission reduction" requirement in Clean Air Act to require constant compliance, and vacating EPA rule

exempting major sources of air pollution from complying with standards during startups, shutdowns, and malfunctions); *Butts v. Continental Cas. Co.,* 357 F.3d 835, 839 (8th Cir. 2004) (affirming denial of disability benefits under policy requiring claimant to show that she was continuously unable to perform job functions; court interprets "continuous" to mean "uninterrupted in time; without cessation").

The Government experts admit that there is no surface water connection between the North-South Ditch and the wetland on the Defendants' Site.  None of their witnesses has testified that surface water from the North-South Ditch has ever covered the wetland on the property where they claim there were unauthorized discharges of dredged or fill material.  DSOF ¶ 114. To the contrary there was a berm between the North-South Ditch and the wetland on the Defendants' Site. DSOF ¶ 122.  The existence of the physical barrier between the wetland and the North-South Ditch severs any Clean Water Act jurisdiction over the wetland.  *Sackett,* 598 U.S. at 678 n.16 ("a barrier separating a wetland from a water of the United States would ordinary remove that wetland from federal jurisdiction").

In apparent recognition that they cannot prove a continuous surface connection between the wetland on the Defendants' Site and the North-South Ditch that borders the property, the Government asserts that wetlands a third of a mile away have a continuous surface connection to the East-West Ditch and 84th Avenue Roadside Ditch.  The Government's theory is that the wetland on the Defendants' Site is part of a larger sprawling wetland that covers much of the Countess Joy property to the north, and that portions of this wetland have a continuous surface connection to the ditches on the Countess Joy property.

Even assuming for the sake of argument that the Government's theory about the larger wetland is correct and undisputed – which it is not, as discussed below – there is no evidence of a continuous surface connection between the wetland areas in the Countess Joy property and the drainage ditches there.  First, the presence of surface water in the wetlands on the Countess Joy property is clearly not continuous in terms of time.  Surface water is present only on a temporary basis:  the Government's own monitoring data shows that water was below ground surface most of the time at every monitoring well in the Countess Joy property except the one furthest away from the Defendants' Site.  DSOF ¶ 144-146.  Second, surface water is not continuous in terms of space, because surface water never extended all the way from those ditches across the purported wetland to the Defendants' Site.  DSOF ¶ 140. Since the issue in this case is whether

the wetland on the Defendants' Site is part of the "waters of the United States," and not whether wetlands on the Countess Joy property as third of a mile away are "waters of the United States," the lack of continuous surface connection to the Defendants' Site is dispositive.

> b.  The Government's Interpretation of the "Continuous Surface Connection" Requirement is Erroneous

The Government asserts that the phrase "continuous surface connection" does not require a continuous surface water connection between a regulated water and wetland, but rather that the wetland need only abut or "touch" the water.  *E.g.* ECF No. 150, at 16.  In this case, this means that wetland soils are at the edge of the water in the various drainage ditches, even if the water in the ditches does not cover the top of those soils.  **Figure 6** is a photo of one location where the Government experts claim a wetland in the Countess Joy property has a continuous surface connection with the East-West Ditch.

The Government's theory of "continuous surface connection" is plainly wrong.  First, it is inconsistent with the logic of *Sackett* about the scope of Clean Water Act jurisdiction.  *Sackett* explains that only "open waters" are regulated, i.e., surface waters, and that wetlands are regulated only if they are part of the open waters.  *Sackett,* 598 U.S. at 671.  A wetland can only be part of a surface water if there is surface water on it; if there is no water on top of a wetland, then it cannot be an "open water."  The Government's theory allows a wetland to be regulated even if there is no surface water.

Second, the Government's theory is inconsistent with language in *Sackett* about the term "continuous," where the Court "acknowledge[d] that temporary interruptions in surface connection may sometimes occur become of phenomena like low tides or dry spells."  *Sackett,* 598 U.S. at 678.  This language only makes sense if "surface connection" refers to a surface water connection, because low tides and dry spells are times when surface water levels are lower.  A wetland is technically still present even at low tide or in a temporary drought, so there would be no need for this clarification if abutting wetland soils were sufficient for there to be a continuous surface connection.

Third, the Government's theory is inconsistent with the concept that a wetland must be indistinguishable from the open water.  One only has trouble distinguishing a water from a wetland if surface water covers both.  If a wetland lacks surface water, it is easy to distinguish it from a neighboring water, because the wetland is essentially the banks of the waterbody.  That is

demonstrated by the evidence in this case:  as discussed further below, the Government's experts were readily able to identify the East-West Ditch and the abutting wetland in their own photographs and identify specifically where the two touch.  DSOF ¶ 151.

Fourth, the Government's theory violates the underlying principle of *Sackett* that ordinary people should be able to know what is regulated by looking at it.  A continuous surface water connection allows an ordinary person to know that a wetland is a "water" subject to regulation, but a connection based on a wetland merely abutting a surface water without being inundated gives none of that fair warning that the wetland is in fact a water subject to regulation.  This is illustrated by this case, where the wetland on the Defendants' Site is nowhere near the East-West Ditch and 84th Avenue Roadside Ditch and there is no evidence of surface water ever extending from those ditches all the way to the Defendants' Site.

Fifth, the Government's theory is based on invalid guidance and regulation.  The Government's theory about "continuous surface connection" was developed years before *Sackett* was issued, and therefore cannot take into consideration the language in that decision that expanded on concepts contained in the *Rapanos* plurality decision.  The Government's theory is part of its current regulation issued in January 2023 before *Sackett* and is based on the earlier 2008 *Rapanos* Guidance.  *See* Revised Definition of "the Waters of the United States," 88 Fed. Reg. 3004, 3096 (Jan. 18, 2023).  This regulation has been enjoined in Florida, *West Virginia, et al. v. EPA,* Case No. 3:23-cv-32 (D.N.D. April 12, 2023), and the Supreme Court criticized it and the 2008 *Rapanos* Guidance, *see Sackett¸* 598 U.S. at 667, 679-83 (rejecting EPA's request "to defer to its understanding of the CWA's jurisdictional reach as set out in its most recent rule defining 'the waters of the United States'").

The district court case cited by the Government, *United States v. Andrews,* 2023 WL 4361227 (D. Conn. 2023), is entitled to little weight.  This case involved a pro se defendant who failed to present any evidence and filed lawsuits against the district court judge deciding the case.  *Id.* *6.  The district court deemed admitted all of the Government's factual assertions because the defendant did not comply with the local rules.  *Id.* *2.  The case already was briefed when the Supreme Court issued the *Sackett* decision, and the docket indicates that the district court received no briefing or argument from the parties about the implications of *Sackett* before entering summary judgment for the Government.  This is not the type of fully-litigated case that would render a persuasive precedent.

2.      <u>The Wetland is Easily Distinguishable from the Drainage Ditches</u>

The wetland on the Defendants' Site, as well as the wetland on the Countess Joy property identified by the Government, are easily distinguished from the three drainage ditches that the Government claims are "waters of the United States." *Sackett* provides that "the party asserting jurisdiction over adjacent wetlands" must establish that "the wetland has a continuous surface connection with that water, <u>making it difficult to determine where the 'water' ends and the 'wetland' begins</u>." *Sackett*, 598 U.S. at 678. The Supreme Court stated that wetlands must be indistinguishable from a wetland approximately seven times, and was the basis of the holding in the case. *Id.* at 684 ("This holding compels reversal here. The wetlands on the Sacketts' property are distinguishable from any possibly covered waters.").

The Government has completely failed to present evidence that the wetland on the Defendants' Site is indistinguishable from the three drainage ditches. None of the Defendants' experts even offers an opinion on distinguishability in their reports. DSOF ¶ 150. To the contrary, when shown their own photographs of wetlands on the Countess Joy property where they claim there is a continuous surface connection to the East-West Ditch, the Government's experts could easily identify where the ditch and the wetlands are depicted in the photographs. *See* ECF No. 151-68, at 126:13-127:9 (Michael Wylie discussing the photo that is Figure 6 above, identifying the East-West Ditch as the area with water and the wetland as the area without water); DSOF, Attachment 1 at 154:19-155:1 (Wade Nutter identifying the ditch and wetland locations in the same photo). The reason is that there is no surface water on the wetland, so the wetland is essentially the bank of the ditch and the boundary of the two is the waterline. Even if the Court were to agree with everything else in the Government's case, its failure of proof on this point is fatal to its claim.

**III.    Even if *Sackett* Did Not Control the Dispositive Legal Issue in This Case, the Court Should Deny the Government's Summary Judgment Motion Because Disputed Issues of Material Fact Exist on Other Elements of the Government's Claim**

Even if *Sackett* did not preclude the Government's claims as a matter of law, genuine disputes of material facts about the other elements of the Clean Water Act claim would prevent the Court from entering summary judgment for the Government. The Government brushed past the fact that it bears the burden of proving every element of a Clean Water Act claim, including that work occurred in wetlands *Hicks v. Ferrero,* 285 F. App'x 585, 588 (11th Cir. 2008). To obtain summary judgment, it must carry even a more difficult burden:  it must establish that no

factual dispute exists as to every element of the Clean Water Act claim.  It has failed to do so for multiple elements, even setting aside the legal defect fatal to its case.

      A.      Disputed Facts Regarding the Scope of the Wetland

The Government Motion incorrectly asserts that the location and size of wetlands on the Defendants' Site and the Countess Joy property are undisputed.  The location of wetlands is crucial to the Government's theory in this case, so even if the Court were to agree with the Government that a wetland is regulated if it merely abuts a drainage ditch, it cannot enter summary judgment for the Government until a jury decides the disputed issues of fact.

The size and location of the wetland on the Defendants' Site is the subject of factual dispute.  The parties' different positions regarding the wetland on the Defendants' Site can be seen by comparing **Figure 5** above with the figure on page 13 of the Government Motion. Defendants believe that the wetland on their property is smaller and does not extend to the northern property boundary with the Countess Joy property.  The Government claims the wetland is larger and extends to the northern property boundary, making it part of a larger wetland on the Countess Joy property.  The different positions are material to the issues in the case, because the Government's "waters of the United States" theory relies on the Site's wetland being a part of a larger wetland on the Countess Joy property that purportedly extends to the East-West Ditch and 84th Avenue Roadside Ditch a third of a mile away.  If the wetland on the Defendants' Site does not extend to the boundary with the Countess Joy property, then it simply cannot be part of a wetland that abuts the drainage ditches on the Countess Joy property thus bringing it under federal jurisdiction.

It is obviously false for the Government Motion to claim that the evidence regarding the size and location of wetlands is "uncontroverted."  ECF No. 150, at 8.  The Defendants' position is based on the only wetland delineation that was conducted before most of the work on the Site – the 2018 delineation by Danna Small that was verified in the field by employees of the SFWMD.  DSOF ¶¶ 124, 126. The Government Motion tries to obscure the accuracy of Ms. Small's delineation by claiming that some site work had begun when she visited the site in 2018, and points to the existence of a perimeter road at the Site, but fails to accurately say where or to what extent the site work impacted Ms. Small's analysis.  ECF No. 150, at 9.  However, the Government Motion ignores the fact that no site work had occurred on the boundary of the wetland delineated by Ms. Small that is closest to the Countess Joy property, which is the critical

area for determining whether the Site's wetland is separate from or a part of any wetland on the Countess Joy property.  DSOF ¶ 125.  The Government Motion also ignores that the only witness who saw the Site before any work occurred, Charles Berlusconi, testified that the perimeter road was put atop an area of higher ground that was a berm running alongside the North-South Ditch, which indicates that the wetland did not extend all the way to that ditch.  DSOF ¶ 122-123.  Defense expert Dr. Michael Dennis' opinion, that Ms. Small's delineation is more reliable, is hardly "unsupported."  ECF No. 150, at 9.  If any party's position is unsupported it is the Government, because their position is based on site visits years after work was done, which required the Government experts to speculate about conditions actually observed by Ms. Small.

The Government Motion also confuses the burden of proof.  The Government must prove where the wetland was located; the Defendants do not have to disprove that an area was a wetland.  The assertion in the Government Motion that Dr. Dennis' opinion is flawed because he did not attempt to delineate wetlands, ECF No. 150, at 8-9, incorrectly tries to shift the burden of proof to the Defendants.

Regarding the wetland on the Countess Joy property, the Government has failed to carry its burden of proof that there is a wetland that extends without interruption all the way from the Defendants' Site to the East-West Ditch, North-South Ditch, and the 84th Avenue Roadside Ditch.  The reason is that the Government experts failed to follow the legally-required procedures to identify and delineate wetlands.  As discussed in the Defendants' Motion to Exclude the Testimony of Michael Wylie, the Government is required to follow the Corps' 1987 Wetland Manual when it identifies and delineates wetlands.  The Manual establishes specific methods to be used for the identification of wetlands so that any resulting delineation is reliable.  The Government experts attempted to follow the Manual on the Defendants' Site, *see, e.g.,* ECF No. 150, at 9 (discussing the Manual method used on the Defendants' Site), but did not follow the Manual on the Countess Joy property.  In particular, the Manual required the Government experts to establish a baseline and transects across the areas suspected to be wetlands, and to delineate the wetland-nonwetland boundary, to ensure that there are no breaks in the wetland.  The Government experts did not follow those procedures, which means that they never properly confirmed that there is a single wetland in the Countess Joy property of which the wetland on the Defendants' property is a part.  This is material to the case, because if there are breaks in the

wetland, that means that any wetland on the Defendants' Site is not part of a wetland that abuts the drainage ditches on the Countess Joy property, which is the basis of the Government's theory that the Defendants' wetland is part of the "waters of the United States."

Defendants have good reason to believe that this is not a technical violation of the required procedures. Official maps issued by the U.S. Geological Survey and U.S. Fish and Wildlife Service's National Wetlands Inventory only show smaller wetlands on the Countess Joy property that do not connect with the wetland on the Defendants' property. *See* **Figure 5**, above; DSOF ¶¶ 130-131. The Countess Joy property was farmed in past years, which means that there are areas of higher ground that cross the property that could interrupt the extent of wetlands. DSOF ¶¶ 138-139. There also are berms along most of the North-South Ditch and East-West Ditch, which act as physical barriers to surface water flow, which the Government experts have left off their maps. DSOF ¶ 100-102. In short, there is a reason why the Government Motion blurs the details, because they must as it allows them to obscure the facts that undercut their theory.

The Government's identification of wetlands is deficient for another reason. The *Sackett* case holds that wetlands are only regulated under the Clean Water Act if they are indistinguishably part of a relatively-permanent open water. *Sackett,* 598 U.S. at 676. This means that the wetlands must have surface water, because only open surface waters are regulated. Yet, the Government experts relied on the definition of "wetlands" in the Corps' 1986 regulation that includes areas without surface water but that have saturated soils. In fact, many of the areas identified as wetlands by the Government experts were included because they had saturated soils, not surface water. DSOF ¶ 143. The definition relied upon by the Government's experts to identify wetlands therefore is legally flawed after *Sackett.*

The location and extent of wetlands on the Defendants' Site and the Countess Joy property is critical to the Government's theory of the case. Since there is a dispute of material fact regarding whether the wetland on the Defendants' Site is part of a single larger wetland that extends to drainage ditches in the Countess Joy property, the Court cannot enter summary judgment for the Government even if the Court were to accept their interpretation of *Sackett.*

B.      Disputed Facts Regarding the Occurrence of a "Discharge of Pollutants"

The Government Motion asserts that the Defendants engaged in the "discharge of pollutants" from "point sources" to the Site wetland, ECF No. 150, at 5-7, which the

Government needs to prove to make out a prima facie case under the Clean Water Act.  Not all the activities identified in the Government's Motion are regulated under the Clean Water Act, and there are factual disputes whether regulated activities took place in the wetland or in nonwetland areas of the Site.

Defendants acknowledge that they made Site improvements so that the property could be used for agricultural purposes.  This is not unlike what the Defendants' neighbors did with the properties, as the property immediately to the west has greenhouses built on it and the property immediately to the east has grassy pasture areas like the Defendants' Site.  DSOF ¶ 152.  The work was done over time using a combination of mechanical equipment and teams of workers using hand tools.  The Government's Motion tries to make it seem like all of the work was done using earth-moving equipment, but the Defendants dispute the details of exactly how the work was done and where.  Simply, the Government's Motion is full of sweeping assumptions that fit their narrative.

The activities identified in the Government Motion as constituting the "discharge of pollutants" can be grouped into four categories:  1) use of mechanical equipment (e.g., tractors with box blades, bulldozers) to redistribute soils on the Site; 2) having individual workers use hand tools to install grass sod, cut unwanted vegetation, and work the soil; 3) use of mechanical equipment (e.g., dump trucks) to deposit rock and soil brought from offsite; and 4) use of mechanical equipment to excavate a portion of the North-South Ditch next to the Defendants' Site.   The Government is not entitled to summary judgment on any of those categories of activities.

Even assuming for sake of argument that wetlands on the Site are part of "the waters of the United States," the redistribution of soils on the Site (the first category) do not constitute the "discharge of pollutants" regulated under the Clean Water Act.  The term "discharge of pollutant" means "any <u>addition</u> of any pollutant to navigable waters from any point source."  33 U.S.C. § 1362(12) (emphasis added).  The Supreme Court twice has ruled in the context of water transfers that there is no "addition" of pollutants if pollutants are moved within the same water body. *SFWMD v. Miccosukee Tribe,* 541 U.S. 95, 110 (2004) ("If one takes a ladle of soup from a pot, lifts it above the pot, and pours it back into the pot, one has not 'added' soup or anything else to the pot.") (quoting *Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of New York,* 273 F.3d 481, 492 (2d Cir. 2001)); *Los Angeles County Flood Control Dist. v. Natural Res.*

*Def. Council,* 568 U.S. 78, 82-83 (2013) ("Under a common understanding of the word 'add,' no pollutants are 'added' to a water body when water is merely transferred between different portions of that water body."). This means that to the extent that the Defendants simply redistributed soils and vegetation in the wetland with mechanical equipment (the first category of the Defendants' alleged discharges), no pollutants were "added" and there was no "discharge of pollutants." This is especially true in this case because there was no standing water (other than some puddles) in the wetland when the Defendants did their work: the "water" alleged in this case was hydric soils that were saturated with water below the ground. *See* DSOF ¶ 31 (witness referring to areas as "muddy"). Moving around those soils did not "add" anything to the purported "water." The old cases to the contrary cited in the Government Motion at pages 5-6 are no longer persuasive precedent because they all pre-date the Supreme Court decisions in *Miccosukee Tribe* and *Los Angeles Flood Control District.*

The second category of the Defendants' activities identified by the Government -- individual people using hand tools to cut vegetation and work the soil -- do not constitute the "discharge of pollutants." The Clean Water Act only regulates the discharge of pollutants through a "point source." 33 U.S.C. § 1362(12). The term "point source" is defined as "any discernible, confined and discrete conveyance." *Id.* § 1362(14) (emphasis added). A human being is not a "conveyance," therefore an individual person is not a "point source." *United States v. Plaza Health Labs., Inc.,* 3 F.3d 643, 646, 649 (2d Cir. 1993). To the extent that the Site was improved by individual people using hand tools (which is how most of the work was done), those activities were not subject to Clean Water Act permitting requirements.

Some of the Defendants' activities identified in the Government Motion (e.g., the placement of grass sod, ECF No. 150, at 7), do not involve the discharge of "pollutants." The term "pollutants" is defined in the Clean Water Act as "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal and agricultural waste discharged into water." 33 U.S.C. § 1362(6). On its face, grass sod does not fit the definition of "pollutant" because it is not a waste material. If putting down grass sod is the "discharge of pollutants," then that implies that Defendants also needed a federal Clean Water Act permit when they planted trees on the Site. Defendants dispute that grass is a pollutant in the context of this case, and welcome a jury's decision on this issue.

-30-

The third category of the Defendants' activities, the bringing of fill material from offsite, could constitute the "discharge of pollutants."  However, there are disputed issues of fact whether that material was placed in wetlands.  As discussed above, there is a dispute as to the size and location of wetlands on the Site, with competing delineations by Ms. Small (as verified by the SFWMD) and the Government's testifying experts.  The evidence cited in the Government's Motion does not clearly establish that offsite fill material was placed by dump trucks in the wetland boundaries identified by Ms. Small in the southwest corner of the Site. This means that the dispute over the size and location of the wetland precludes summary judgment for the Government as to whether there was a regulated "discharge of pollutants."

The last category of activities identified in the Government Motion, the use of an excavator to dredge part of the North-South Ditch, ECF No. 150, at 6, did not require a Clean Water Act permit.  The Clean Water Act exempts certain types of activities from the need for a permit in 33 U.S.C. § 1344(f).  The Government Motion addresses one such exemption, the exemption for "normal farming" activities, but there is a different exemption for "the discharge of dredged or fill material … for the purpose of … the maintenance of drainage ditches."  *Id.* § 1344(f)(1)(C).  The so-called "recapture provision" of section 1344(f)(2) does not apply, because the dredging of the North-South Ditch did not impair the flow or circulation of the ditch (if anything it improved it) and did not reduce the reach of the ditch (it returned that portion of the ditch  to its original condition).  This is important because the Government Motion has identified only one place where a wetland on the Defendants' Site arguably abuts the North-South Ditch:  a tiny spot visible on a grainy 1966 aerial photograph that is physically in the ditch, which the Government claims was a wetland.  *See* DSOF ¶ 81.  Even assuming that this spot on the old photo was a wetland, the Defendants did not need a permit to work there because the activities at that location were limited to maintenance of the drainage ditch and were exempt.

The details matter for both the liability and remedy issues in this case.  Defendants are not liable unless the Government can meet its burden that a specific regulated "discharge of pollutants' took place at a specific wetland location, yet the Government Motion provides insufficient details for the Court to make that determination.  Like in its discussion of wetlands in the Countess Joy property, the Government Motion blurs the details that are crucial for determining liability.  Even if there were "discharges of pollutants" to some portion of the Site's wetland, the extent to which that occurred affects the amount of offsite wetland mitigation

credits sought by the Government, because the Defendants should not have to purchase wetland mitigation credits based on activities for which no Clean Water Act permit was required.  The factual disputes therefore preclude the entry of summary judgment on the issue of whether there were "discharges of pollutants."

      C.    <u>Responsibility of Defendant Benjamin Sharfi</u>

The Government claims that Defendant Benjamin Sharfi is personally liable for the activities of Defendant Neshafarm, Inc., because he was a "responsible corporate officer."  ECF No. 150, at 3.  The Court previously ruled in this case that liability can extend to a "responsible corporate officer."  ECF No. 14, at 5 (Order Granting First Motion to Dismiss); ECF No. 32, at 10-11 (Order Denying Second Motion to Dismiss).  Defendants respectfully submit that this ruling was erroneous based on the plain language of the Clean Water Act.  A subsection of the Clean Water Act that authorizes <u>criminal</u> penalties, 33 U.S.C. § 1319(c)(6), provides that "[f]or purposes of this subsection, the term 'person' means in addition to the definition contained in section 1362(5), any responsible corporate officer."  *Id.* (emphasis added).  This subsection does not apply because the Government brought this case pursuant to different subsections of the Clean Water Act that allow for civil actions and civil penalties.  *See* ECF No. 21 (Amended Complaint), ¶ 4 (citing 33 U.S.C. § 1319(b) and -(d)).  No Eleventh Circuit case holds that the "responsible corporate officer" provision applies to <u>civil</u> cases.  Applying this criminal provision to civil actions violates basic principles of statutory interpretation, because it reads out of the statute the phrase "for purposes of this subsection."  *See, e.g., Catalyst Pharm., Inc. v. Becerra,* 14 F.4th 1299, 1309 (11th Cir. 2021) ("we are not allowed to add or subtract words from a statute; we cannot rewrite it") (citing *Friends of the Everglades v. SFWMD,* 570 F.3d 1210, 1224 (11th Cir. 2009)); *United States v. Stevens,* 997 F.3d 1307, 1315-16 (11th Cir. 2021) (same).  Based on the Eleventh Circuit's repeated insistence on interpreting statutes based on their plain language, Defendants believe that it would find the application of the "responsible corporate officer" doctrine in this civil case to be erroneous.

Defendants acknowledge that Defendant Benjamin Sharfi owned the Site for a period of time in his capacity as trustee for the Benjamin K. Sharfi 2002 Trust before selling it to Defendant Neshafarm, Inc.  Defendants also acknowledge that Mr. Sharfi made the decision to improve the Site in his capacity as trustee and as an officer of Neshafarm, Inc.  That said, Mr. Sharfi did not personally discharge pollutants and was not necessarily aware of all the details of

the work that was done on the Site.  However, even with these facts, Defendants respectfully submit that the Government Motion does not identify a valid legal theory on which to impose personal liability on Mr. Sharfi, as opposed to liability in his capacity as trustee of the Benjamin K. Sharfi 2002 Trust or as an officer of Neshafarm, Inc.

## **CONCLUSION**

The Defendants' Site does not contain any "waters of the United States" under the test announced in *Sackett,* therefore the Site is not regulated by the Clean Water Act such that this Court should enter summary judgment for the Defendants.  Even if the Court were to accept the Government's interpretation of *Sackett,* however, the Court cannot enter summary judgment for the Government because there are disputed issues of material fact.

Dated:  December 1, 2023                    Respectfully submitted,

/s/  *Neal McAliley*
T. Neal McAliley
Florida Bar No. 172091
nmcaliley@carltonfields.com
David A. Karp
Florida Bar No. 69226
dkarp@carltonfields.com
CARLTON FIELDS, P.A.
2 MiamiCentral
700 NW 1st Avenue, Suite 1200
Miami, Florida 33136
Tel: (305) 530-0050
Fax: (305) 530-0055
*Attorneys for Defendants*

-33-

## <u>CERTIFICATE OF SERVICE</u>

I certify that on December 1, 2023, I electronically filed the foregoing with the Clerk of

the Court using CM/ECF, which served by e-mail the following counsel of record:

Brandon N. Adkins
Bar ID A5502752
brandon.Adkins@usdoj.gov
Andrew Doyle
Fla. Bar No. 84948
andrew.Doyle@usdoj.gov
Jeffrey Hughes
Bar ID A5502897
Jeffrey.hughes@usdoj.gov
United States Department of Justice
Environment & Natural Resources Division
P.O. Box 7611
Washington, D.C. 2004
Telephone (202) 616-9174 (Adkins)
Telephone (415) 744-6469 (Doyle)
Telephone (202) 514-4427 (Hughes)

*Attorneys for Plaintiff United States of America*

Dexter Lee
Fla. Bar No. 936693
United States Attorney's Office
Southern District of Florida
99 N.E. 4th Street
Miami, Florida 33132
Telephone: (305) 931-9320
DLee@usa.doj.gov

*Attorneys for Plaintiff United States of America*

Christopher F. Hamilton
Fla. Bar No. 98527
chamilton@sharfiholding.com
Joshua D. Miron
Fla. Bar No. 644811
jmiron@sharfiholding.com
Sharfi Holdings, Inc.
3731 NE Pineapple Avenue, 2nd Floor
Jensen Beach, Florida 34957
Telephone (813) 416-2352

*Attorneys for Defendants Benjamin Sharfi as trustee and NeshaFarm, Inc.*

/s/  *T. Neal McAliley*
T. Neal McAliley