**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

UNITED STATES OF AMERICA,

    *Plaintiff*,

v.                                                                                                   Case No. 2:21-cv-14205-KAM

BENJAMIN K. SHARFI, in his personal and
fiduciary capacity as trustee of the Benjamin
Sharfi 2002 Trust, and NESHAFARM, INC.,

    *Defendants*.

_____/

**DEFENDANTS' *DAUBERT* MOTION TO EXCLUDE TESTIMONY**
**OF PLAINTIFF'S EXPERT WITNESS MICHAEL WYLIE**

    Defendants Benjamin Sharfi, in his personal and fiduciary capacity as trustee of the Benjamin Sharfi 2002 Trust, and Neshafarm, Inc., move to exclude the testimony of the Plaintiff's expert witness Michael Wylie. Mr. Wylie is the Government's expert who will testify that the wetland on the Defendants' Site is part of "the waters of the United States."

**INTRODUCTION**

    Experts allowed to testify at trial come before the jury with the imprimatur of specialized knowledge, and their opinions "can be both powerful and quite misleading because of the difficulty in evaluating [them]." *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 595 (1993)). "Indeed, no other kind of witness is free to opine about a complicated matter without any firsthand knowledge of the facts in the case, and based upon otherwise inadmissible hearsay[.]" *Id.* For this reason, "[t]he importance of *Daubert*'s gatekeeping requirement cannot be overstated[.]" *Id.* Courts must engage in an "exacting analysis" to ensure the expert based his opinion on a reliable and verifiable method, informed by the correct substantive knowledge and law. *Id.*

    The opinions of Plaintiff's expert witness Michael Wylie about the existence of wetlands regulated under the Clean Water Act, 33 U.S.C. § 1251 *et seq.*, on the Defendants' property fail the *Daubert* reliability test.

1

Mr. Wylie used an untested and unverifiable method, rather than the widely accepted methodology set out in the 1987 Wetlands Manual and 2010 Regional Supplement to the Wetland Manual (collectively, the "Wetland Manual"), to determine whether the wetlands on Defendants' property constituted "waters of the United States." The Wetland Manual establishes specific methodologies for determining the existence and location of wetlands under the Clean Water Act. Mr. Wylie admits that following the Wetland Manual is "mandatory." Yet, he failed to follow any of the methodologies for most of the area where he claims there is a single, large wetland. Specifically, Mr. Wylie admits that on the Countess Joy property he failed to establish a baseline for the wetlands, failed to create transects, and failed to delineate the wetland boundary – all required steps in the Wetlands Manual. Rather than follow the accepted method to delineate the wetland, Mr. Wylie freelanced, following certain procedures but not others. Mr. Wylie's hybrid method forces the Court to blindly trust his judgment, rather than test his opinions against a verifiable process.

This is important to the case. Mr. Wylie's opinion that the wetland on the Defendants' Site is part of "the waters of the United States" is based on his conclusion that it is part of a single wetland on the Countess Joy property that has a continuous surface connection with drainage ditches there. If there is not a single wetland that extends all the way from the Defendants' Site to those drainage ditches, i.e., if there multiple wetlands separated by areas of uplands or berms, then the wetland on the Defendants' Site cannot have a continuous surface connection to those offsite drainage ditches.

Mr. Wylie's opinion also relies an outdated understanding of the law that the Supreme Court rejected in *Sackett v. EPA*, 598 U.S. 651 (2023). Mr. Wylie testified that he determined the existence of wetlands based on the definition of "wetland" found in 33 C.F.R. 328.3(b). This definition includes areas that lack surface water and have only saturated soils (i.e., water below the ground in the soil). *Sackett* implicitly rejected that expansive reading of the Clean Water Act, holding that the statute regulates "open waters" and that wetlands only qualify as "waters of the United States" if they are "indistinguishably part of a body of water that itself constitutes 'waters' under the [Clean Water Act]." *Sackett*, 598 U.S. at 676. This means that areas that do not have surface water – i.e., they are not "open waters" – are not part of "the waters of the United States." The definition of "wetland" relied upon by Mr. Wylie includes areas without surface water, which means it is inconsistent with the *Sackett* test.

Mr. Wylie used an untested procedure and analyzed the wrong law in reaching his expert opinion that the Defendants' property contained wetlands regulated under the Clean Water Act. Because his methodology is unreliable and the legal basis for his opinions is wrong, the Court should exclude his expert testimony under Fed. R. Evid. 702 and *Daubert*.

## **BACKGROUND**

Michael Wylie is the Government witness who will offer the overall opinion that the wetland on the Defendants' Site is part of "the waters of the United States" subject to jurisdiction under the federal Clean Water Act. Mr. Wylie is a former employee of the U.S. Environmental Protection Agency who has reviewed many individual wetland determinations (i.e., determined whether wetland conditions are present at specific locations), but who delineated wetlands on a site (i.e., identified wetland boundaries) only "once or twice throughout my career." ECF No. 151-68, at 63:16-24 (Wylie Deposition).

In 2022, the year after the Government filed this lawsuit, Mr. Wylie prepared a report along with four subject-matter experts about the wetlands at issue in this case. The team set out to analyze whether the Defendants' proper ty contained wetlands and, if so, whether those wetlands constituted "waters of the United States" that are regulated under the Clean Water Act. *See* ECF No. 151-80, at 1-2 (Wylie Supplemental Report).

In developing their opinions, the team began by reviewing available literature, including soil surveys, the national wetland inventory map, and historic aerial photographs of the area. *Id.* They then conducted two on-site visits to the Defendants' property and the adjacent Countess Joy property in 2021. *Id.*



Figure II.A.2, DOJ Expert Team Report (Feb. 2022).

The map above produced by Mr. Wylie and other Government experts shows the location of the Defendants' Site in relationship to other key features. North of the Defendants' Site is the Countess Joy property, which is open land used for cattle grazing. The East-West Ditch is located approximately 1,600 feet to the north of Defendants' property line (euphemistically labelled as "Bessey Creek"). The North-South Ditch extends from the western boundary of the Defendants' Site up to the East-West Ditch. The 84th Avenue Roadside Ditch parallels the North-South Ditch, and is located approximately a quarter mile away to the west.

At the time of the Government experts' 2021 site visits, the Defendants' Site had already been put into agricultural use, which meant that Mr. Wylie and the others had to determine what conditions there looked like in early 2018 before the Defendants' site improvement activities. The Government experts installed a series of shallow ground wells and sampling locations to document the site's soils, hydrology and vegetation. *See* ECF No. 151-80 at 11. Mr. Wylie applied the "Atypical Situations" methodology from the Wetland Manual, because the Defendants' Site had

been altered.  Mr. Wylie delineated the boundaries of the wetland on the Defendants' Site and concluded that prior to site work the wetland had extended all the way to the northern property boundary that borders the Countess Joy property.  This wetland delineation is different than one prepared by local environmental professional Danna Small in 2018, which indicated that the wetland was smaller and did not extend to the northern property boundary.

On the adjacent Countess Joy property, the Government experts also installed six wells – three on the far northwest corner by the East-West Ditch, and three in the southern part of the property near the Defendants' Site.  *See* ECF No. 151-80 at 13.  Mr. Wylie also established eleven wetland reference plots in the Countess Joy property east of the 84th Avenue Roadside Ditch, where he dug small holes to examine soils, water levels, and vegetation.  Those locations were not evenly distributed across the Countess Joy property and were not oriented in lines like a transect.  Mr. Wylie testified that he used the "Routine Determinations" methodology in the Wetland Manual to evaluate wetlands in the Countess Joy property, but in fact he did not follow all of the procedures specified in the Manual for that methodology.  Specifically, he did not establish a baseline (which is a line across a presumed wetland to determine the continuity of wetland conditions), he did not establish transects (which are lines at ninety-degree angles from the baseline to evaluate the continuity of wetland conditions), and most importantly, he did not delineate the boundaries of the wetland.  This means that Mr. Wylie delineated the wetland boundaries on the Defendants' Site (a small portion of the purported wetland), but not the Countess Joy property (where most of the purported wetland is located and abuts the relevant drainage ditches).

For most of the sample locations in the Countess Joy property, the Government's experts found that water levels were below ground surface.  Mr. Wylie concluded that wetland hydrology was present because the soil was saturated with water below ground level, which is sufficient to meet the definition of "wetland" in 33 CFR § 328.3(b).

After the Supreme Court's decision in *Sackett* in May 2023, Mr. Wylie filed a supplemental expert report. ECF No. 151-80.  *Sackett* "requires that the party asserting jurisdiction over adjacent wetlands to establish 'first, that the adjacent [body of water constitutes] … 'water[s] of the United States,' (i.e., a relatively permanent body of water connected to traditional interstate navigable waters); and second, that the wetland has a continuous surface connection with that water, making it difficult to determine where the 'water' ends and the 'wetland begins.'"  *Sackett,* 598 U.S. at 678-79 (quoting *Rapanos,* 547 U.S. at 742, 755) (brackets in original).

5

Mr. Wylie's supplemental report concludes that the wetland on the Defendants' Site is part of "the waters of the United States." First, he gives the opinion that the East-West Ditch, North-South Ditch, and 84th Avenue Roadside Ditch are "waters of the United States." *Sackett* holds that the Clean Water Act's "use of 'waters' encompasses only those relatively permanent, standing or continuously flowing bodies of water forming geographic[al] features that are described in ordinary parlance as 'streams, oceans, rivers, and lakes.'" *Sackett*, 598 U.S. at 671 (internal quotations omitted). Mr. Wylie opines that the ditches are such waters because he observed that they have beds and banks, they have ordinary high-water marks, and they had water in them the four times Government experts visited the area in September-December 2021.

Second, Mr. Wylie opines that the wetland on the Defendants' Site has a continuous surface connection with those drainage ditches. Specifically, he opines that the wetland on the Defendants' Site is part of a larger wetland on the Countess Joy property that extends all the way to the East-West Ditch and 84th Avenue Roadside Ditch. Mr. Wylie opines that there is a continuous surface connection because this purported larger wetland abuts (or touches) the edge of the ditches. In other words, because wetlands abut the drainage ditches in the Countess Joy property, the wetland on the Defendants' Site has a continuous surface connection with those ditches because it is part of the same wetland, even though the point where the wetland abuts the ditches is a third of a mile away from location where the Defendants' engaged in their site improvement activities.

## ARGUMENT

Under the *Daubert* standard, district courts perform a "gatekeeping function to ensure that speculative, unreliable expert testimony does not reach the jury under the mantle of reliability[.]" *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291-92 (11th Cir. 2005) (internal quotations omitted).

To do this, courts "engage in a rigorous inquiry to determine whether: "(**1**) the expert is qualified to testify competently regarding the matters he intends to address; (**2**) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (**3**) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue." *Id.* "The party offering the expert has the burden of satisfying each of these three elements by a preponderance of the evidence." *Id.*

6

Mr. Wylie's testimony fails the second and third prong of the *Daubert* test. In forming an opinion that the Defendants' property connected through a larger, continuous wetland to the East-West Ditch, Wylie choose an unreliable methodology and deviated from a verifiable process described in the Wetlands Manual and Regional Supplement. He then compounded the error by relying on outdated and incorrect law.

**I.       Wylie's opinions should be excluded as unreliable because he failed to follow the method for delineating wetlands established in the Wetland Manual.**

The Court's inquiry into the reliability of Wylie's methodology sits at the center of the *Daubert* inquiry. The Court "should meticulously focus on the expert's principles and methodology, and not on the conclusions that they generate." *Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1305 (11th Cir. 2014) (internal citations omitted).

*Daubert* requires that the Court evaluate whether the expert's opinion "is connected to existing data only by the *ipse dixit* of the expert," rather than a sound scientific or technical basis. *Id.* And *Daubert* invites the Court "conclude that there is simply too great an analytical gap between the data and the opinion proffered" for expert testimony to be admissible. *Id.*

While the inquiry can be flexible to the facts at hand, *Daubert* "identified four factors to guide district judges in assessing the reliability of an individual expert's methodology: (**1**) whether the expert's methodology has been tested or is capable of being tested; (**2**) whether the theory or technique used by the expert has been subjected to peer review and publication; (**3**) whether there is a known or potential error rate of the methodology; and (**4**) whether the technique has been generally accepted in the relevant scientific community." *Id.*

The Defendants do not dispute that the process detailed in the Wetland Manual provide a proven methodology to determine the existence of wetlands. "The Manual is peer-reviewed, and generally accepted within the scientific community." *United States v. Lucero*, 16-CR-00107-HSG-1, 2018 WL 466503, at *3 (N.D. Cal. Jan. 18, 2018).

Mr. Wylie agreed that wetland professionals must follow the procedures in the Wetlands Manual and Regional Supplement. In his deposition, he testified that it is "mandatory" to use the Wetland Manual because "it is tried and true," and "it has been scientifically tested." ECF No. 151-68, at 60:12-61:9. "That's a methodology that we all adhere to." *Id.* For a wetland determination to be reliable, it is important to use the Manual. *See id.* at 63:1-7 ("I think it's

7

extremely important for it to have a credible report on a determination of whether a wetland - is a wetland[.]"); *see also id.* at 284:6-13.

The Wetland Manual identifies methods for determining whether a given area is a wetland for purposes of the Clean Water Act. The methods are designed to not only to confirm whether a specific location has all required characteristics of a wetland, but also to determine whether there are any breaks in the wetland (e.g., upland areas, berms) and to identify the boundary of the wetland.

Mr. Wylie testified that he followed the "Routine Determination" method in the Manual. ECF No. 151-68, at 285:12-23. Yet, when forming his opinion that the Countess Joy property contained a continuous wetland connecting the drainage ditches to the Defendants' wetland, Mr. Wylie admits that he bypassed at least four required steps in the "Routine Determination" methodology. Specifically:

➢ For areas greater than five acres, the Wetland Manual requires the examiner to establish a baseline. *See* ECF No. 151-62, Manual 55 (Step 18). Wylie did not do that. "I didn't apply a baseline," he testified. ECF No. 151-68, at 286:9-13, *see also id.* at 285:12-15.

➢ After establishing a baseline, the Wetland Manual requires the examiner to determine the required number and position of transects. Those transects allow the examiner to plot the boundary of the wetland based on verifiable data recorded at each transect. *See* ECF No. 151-62, Manual 55 (Step 19). Wylie did not do that either. "We did not establish transects because we weren't doing a delineation of the site," he testified. ECF No. 151-68, at 286:14-17.

➢ After positioning the required number of transects, the Wetland Manual requires the examiner to sample observation points along the transects. *See* ECF No. 151-62, Manual 56 (Step 20). Wylie did not do that either. He had not established transects to begin with and could not sample observation points from transects that did not exist. *See also* ECF No. 151-68, at 235:25-236:5. He did observe conditions at some sample points, but they were not oriented in lines like a transect and were not located in all of the areas of the purported wetland. ECF No. 151-68, at 152:4-12.

➢ Finally, the Wetland Manual requires the examiner to determine the boundary between the wetlands and non-wetlands, i.e., prepare a wetland delineation. *See* ECF No. 151-62, Manual 59 (Step 20f). Again, Wylie did not do that either. *See* ECF No. 151-68, at 287:6-10 ("No, sir. We did not.").

8

Mr. Wylie's deviation from the steps in the "Routine Determination" process suffer from a more foundational defect because the Wetlands Manual says that an examiner should not use the "routine" process at all for wetlands that are "the subject of likely or pending litigation." ECF No. 151-62, Manual 7-8. Instead, when litigation is pending, the examiner should use the more quantitative "Comprehensive Approach." Wylie did not use this "Comprehensive Approach," even though the Government hired him to render his opinion specifically for litigation.

The procedures skipped by Mr. Wylie directly relate to one of the central issues in the case. The Government's case rests upon the idea that there is a single, uninterrupted wetland that extends from the Defendants' Site all the way to the East-West Ditch and 84th Avenue Roadside Ditch a third of a mile away. The reason is that the Government claims that there is a continuous surface connection because the wetland abuts the ditches in the Countess Joy property, which means (according to their theory) that the Defendants' wetland also touches the ditches because it is part of the same wetland. If the Defendants' wetland is separate from the wetland in the Countess Joy property, then the touching of the ditches in the Countess Joy property cannot be imputed to the wetland on the Defendants' Site. The Wetland Manual procedures skipped by Mr. Wylie are the ones that determine whether there is a continuous wetland across the baseline and transects, as opposed to potentially disconnected spots where wetland conditions may exist. By skipping those steps, Mr. Wylie failed to confirm that there are no interruptions in wetland conditions across the areas of the purported larger wetland.

Mr. Wylie's deviation from the Wetland Manual's procedures do not merely call into question his credibility or undermine the weight of his proposed testimony. The deviation renders his methodology unreliable because the fact finder cannot evaluate his conclusions against a generally accepted method that produces data supporting an expert opinion. Mr. Wylie choose his own method, and asks the Court to take a leap between his ad hoc method and his expert opinion, based on his general expertise, rather than a "tried and true" method that can be tested.

*Daubert* specifically prohibits courts from admitting expert opinions formed not on "existing data," but on "the *ipse dixit* of the expert." *Chapman*, 766 F.3d at 1305. "The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'" *United States v. Frazier*, 387 F.3d 1244, 1261 (11th Cir. 2004). "[I]t remains a basic foundation for admissibility that '[p]roposed [expert] testimony must be supported by appropriate validation — *i.e.,* 'good grounds,' based on what is known.'" *Id.* (quoting *Daubert,* 509 U.S. at 590). *Daubert*

9

"assign[s] to the trial judge the task of ensuring that an expert's testimony . . . rests on a reliable foundation[,]" not merely his own knowledge or expertise. *Id.* (quoting *Daubert,* 509 U.S. at 597).

Courts in this Circuit regularly reject expert testimony that leaps over a gap in data between the expert's methodology and his opinions. For instance, in *Knepfle v. J-Tech Corp.*, 48 F.4th 1282, 1295-96 (11th Cir. 2022), the Eleventh Circuit affirmed the exclusion of an expert on a helmet's alleged design defect where the expert acknowledged that "experts in the field 'typically' use calipers and, sometimes, 3D scanning to measure liner compression (rather than visual inspection alone)," but asked "the fact-finder to take [] his word that 'eyeballing' the rear compression linear is a generally accepted method of determining force of impact[.]" In *Knepfle*, the expert "followed the generally accepted methodology to assess the size of the liner compression in the front portion of Knepfle's helmet but chose not to follow the same methodology for the rear of Knepfle's helmet." *Id.*

Similarly, here, Mr. Wylie choose to use part of the generally accepted methodology in the Wetland Manual but then choose not to follow other parts of the same methodology when deciding whether the Countess Joy property contained a continuous wetland connecting the East-West Ditch to the Defendants' property.

Similarly, in *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1293 (11th Cir. 2005), the Eleventh Circuit affirmed the exclusion of an expert that combined two different methodologies to conclude that defective aerial spraying of pesticide caused illness. Because the expert used two different methods to reach his conclusion, "the district court's inquiry into how he arrived at the data is not inappropriate considering that the district court is charged with evaluating an expert's methodology." *Id.*

In fact, the Eleventh Circuit has held that "[i]n evaluating the reliability of an expert's method," the district court "may properly consider whether the expert's methodology has been contrived to reach a particular result." *Rink*, 400 F.3d at 1293 n.7 (citing *Elcock v. Kmart Corp.,* 233 F.3d 734, 748 (3d Cir. 2000), where expert's "novel synthesis" of two accepted methodologies allowed the expert to "offer a subjective judgment ... in the guise of a reliable expert opinion").

Here, Mr. Wylie's failure to establish a baseline and transects to delineate the boundary of the Countess Joy wetland does not allow the factfinder to evaluate his conclusion that the wetland continuously covered the Countess Joy property. Establishing the wetland's boundary, based on sampling at transects, would have provided data from which the Court could evaluate Mr. Wylie's

conclusion. By failing to follow the methodology in the Wetland Manual, Mr. Wylie deprived the Court of a means to judge his opinions. He instead asks the Court to accept his conclusion, without data, based on his generalized knowledge that a wetland he did not delineate stretches across the entire Countless Joy property, connecting it to the Defendants' property.

The method described in the Wetland Manual would have likely produced substantial data to undermine Mr. Wylie's opinion -- which may be why Mr. Wylie did not use this method and instead created his own method. In his deposition, Mr. Wylie acknowledged that part of the Countess Joy property include an "upland area" at "higher elevations," and that berms existed between the East-West Ditch and the Countess Joy property. ECF No. 151-68, at 230:16-26, 223:4-16; *see also id.* at 286:21-24 ("We observed uplands at one point. … Also, some of the berms were higher elevation, so we assumed those were uplands."). He also testified that he never saw surface water covering the ground from the North-South Ditch to the Defendants' property. ECF No. 151-68, at 262:16-23.

Other evidence suggests that a proper wetland delineation, following the Wetland Manual, would have cast serious doubt on Wylie's opinions. Official maps issued by the U.S. Geological Survey and U.S. Fish and Wildlife Service's National Wetlands Inventory only show smaller wetlands on the Countess Joy property that do not connect with the wetland on the Defendants' property. *See* ECF No. 153, ¶¶ 130-133. The Countess Joy property was farmed in past decades, which means areas of higher ground (visible on LiDAR images) cross the property and interrupt the extent of wetlands. *Id.* ¶¶ 138-139. There also are berms along most of the North-South Ditch and East-West Ditch (which the Government's experts have left off their maps) that act as physical barriers to surface water flow.

**II.     Wylie applied the wrong law, rejected by *Sackett*, to form his expert opinion.**

Mr. Wylie supplemented his expert report after the Supreme Court's decision this summer in *Sackett*, but he still failed to follow *Sackett*'s holding about the meaning of the phrase "waters of the United States" in the Clean Water Act.

In identifying wetlands on the Defendants' Site and the Countess Joy property, Mr. Wylie relied on the U.S. Army Corps of Engineer's 1986 regulation defining the term "wetlands." ECF No. 151-68, at 45:5-8, 50:12-51:1. That regulation provides that, "[t]he term *wetlands* means those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances, do support, a prevalence of vegetation

11

typically adapted for life in saturated soil conditions." 33 C.F.R. § 328.3(b) (1986) (italics in original).

Pursuant to this definition, an area is a wetland even if surface water is rarely if ever present, because the definition includes areas that are merely "saturated by … ground water." *Id.*; ECF No. 151-68, at 52:20-53:7. On the Defendants' Site and the Countess Joy property, Mr. Wylie determined that multiple locations met the hydrology characteristic of "wetlands" merely based on the presence of saturated soils. ECF No. 151-68, at 145:12-146:4. Mr. Wylie never saw surface water cover the ground along the entire purported wetland area that he identified from the East-West Ditch to the Defendants' Site. *Id.* 146:6-18.

The inclusion of areas without surface water is inconsistent with *Sackett*. The Supreme Court held that the Clean Water Act's "use of 'waters' encompasses only those relatively permanent, standing or continuously flowing bodies of water forming geographic[al] features that are described in ordinary parlance as 'streams, oceans, rivers, and lakes." *Sackett*, 598 U.S. at 671 (internal citations and quotations omitted). *Sackett* repeatedly discussed how the term "waters" generally means "rivers, lakes and oceans," *id.* at 671, and stated that "waters" means "bodies of "open water," *id.* at 674. A wetland is only regulated if it is part of such a body of surface water. *Id.* at 676 ("adjacent wetlands … must be indistinguishably part of a body of water that itself constitutes 'waters' under the CWA").

The 1986 regulation defining "wetlands" includes areas without surface water that are not regulated under the Clean Water Act. This is not the first time that the Supreme Court has found subsections in that regulation to be erroneous. *See Solid Waste Agency of Northern Cook Cty. v. U.S. Army Corps of Engr's,* 531 U.S. 159, 174 (2001) (holding that 33 CFR § 328.3(a)(3) (1986), which allowed for regulation of waters that could affect interstate commerce including through use by migratory birds, exceeded agency authority under the Clean Water Act). Mr. Wylie's reliance on the 1986 regulatory definition of "wetlands" renders his opinion unreliable.

Mr. Wylie makes other errors in his application of the *Sackett* test, specifically in his conclusion that manmade ditches with only seasonal flow can qualify as "relatively permanent waters," and in his opinion that wetlands can have a "continuous surface connection" to a regulated water without a surface water connection. These errors are addressed in Defendants' Combined Cross Motion for Summary Judgment and Opposition to the Government's Motion for Summary Judgment, and are not repeated here to avoid redundant filings with the Court.

## **CONCLUSION**

Because Mr. Wylie applied an incorrect and outdated interpretation of the law, and failed to use the generally accepted method in the Wetland Manual in concluding that a continuous wetland covered the Countess Joy property, his opinions are unreliable. The Court should exclude Mr. Wylie's testimony from trial under Fed. R. Evid. 702 and *Daubert*.

Dated: December 1, 2023                                  Respectfully submitted,

/s/  T. Neal McAliley
T. Neal McAliley
Florida Bar No. 172091
nmcaliley@carltonfields.com
David A. Karp
Florida Bar No. 69226
dkarp@carltonfields.com
**CARLTON FIELDS, P.A.**
2 MiamiCentral
700 NW 1st Avenue, Suite 1200
Miami, Florida 33136
Telephone (305) 530-4039
Facsimile (305) 530-0055

*Attorneys for Defendants Benjamin Sharfi as trustee and NeshaFarm, Inc.*

## CERTIFICATE OF SERVICE

    I certify that on December 1, 2023, I electronically filed the foregoing with the Clerk of the Court using CM/ECF, which served by e-mail the following counsel of record:

| | |
|---|---|
| Brandon N. Adkins<br>Bar ID A5502752<br>brandon.Adkins@usdoj.gov<br>Andrew Doyle<br>Fla. Bar No. 84948<br>andrew.Doyle@usdoj.gov<br>Jeffrey Hughes<br>Bar ID A5502897<br>Jeffrey.hughes@usdoj.gov<br>United States Department of Justice<br>Environment & Natural Resources Division<br>P.O. Box 7611<br>Washington, D.C. 2004<br>Telephone (202) 616-9174 (Adkins)<br>Telephone (415) 744-6469 (Doyle)<br>Telephone (202) 514-4427 (Hughes)<br><br>Dexter Lee<br>Fla. Bar No. 936693<br>United States Attorney's Office<br>Southern District of Florida<br>99 N.E. 4th Street<br>Miami, Florida 33132<br>Telephone: (305) 931-9320<br>DLee@usa.doj.gov<br><br>*Attorneys for Plaintiff United States of America* | Christopher F. Hamilton<br>Fla. Bar No. 98527<br>chamilton@sharfiholding.com<br>Joshua D. Miron<br>Fla. Bar No. 644811<br>jmiron@sharfiholding.com<br>Sharfi Holdings, Inc.<br>3731 NE Pineapple Avenue, 2nd Floor<br>Jensen Beach, Florida 34957<br>Telephone (813) 416-2352<br><br>*Attorneys for Defendants Benjamin Sharfi as trustee and NeshaFarm, Inc.* |

                    /s/  T. Neal McAliley
                    T. Neal McAliley