**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

UNITED STATES OF AMERICA,

        *Plaintiff*,

    v.

BENJAMIN K. SHARFI, in his personal and
fiduciary capacity as trustee of the Benjamin
Sharfi 2002 Trust, and NESHAFARM, INC.,

        *Defendants*.

Case No. 2:21-cv-14205-KAM

<u>**UNITED STATES' REPLY IN SUPPORT OF UNITED STATES'
MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO
DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**</u>

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iii

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 3

STANDARD OF REVIEW .................................................................................................. 3

ARGUMENT ...................................................................................................................... 3

I.      Defendant Sharfi is Personally Liable. ..................................................................... 3

II.     Defendants Discharged "Pollutants" from a "Point Source." .................................. 4

III.    There is No Genuine Dispute that Wetlands Exist on the Site. ............................... 9

IV.     The Site's Wetlands are "Waters of the United States." ........................................ 13

        A.      The Site's Wetlands are Within the Geographic Jurisdiction of the CWA in Three Independent Ways. ................................................................................. 14

                1.      There are three continuous surface connections to relatively permanent waters via the large wetland on the Countess Joy Reference Area. ........... 15

                2.      The Site's wetlands had a continuous surface connection with the N/S Ditch on the western boundary of Defendants' Site. ................................ 21

        B.      Defendants Offer a Radical and Incorrect Interpretation of *Sackett*. .................... 21

                1.      Manmade ditches are not categorically excluded. .................................... 21

                2.      Seasonal flow is sufficient for each ditch to be "relatively permanent." .. 24

                3.      Defendants' assertion that surface water must be present across a wetland to satisfy the continuous surface connection is wrong. ............................ 27

CONCLUSION .................................................................................................................. 30

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) .................................................................................................. 3

*Avoyelles Sportsmen's League, Inc. v. Marsh*,
    715 F.2d 897 (5th Cir. 1983) ............................................................................ 5, 7, 9

*C.I.R. v. Bollinger*,
    485 U.S. 340 (1988) ................................................................................................ 26

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) .................................................................................................. 3

*Conant v. United States*,
    786 F.2d 1008 (11th Cir. 1986) ............................................................................... 7

*Driscoll v. Adams*,
    181 F.3d 1285 (11th Cir. 1999) ............................................................................. 21

*Duarte Nursery, Inc. v. U.S. Army Corps of Eng'rs*,
    No. 13-cv-2095, 2016 WL 4717986 (E.D. Cal. June 10, 2016) ................................ 4

*Ellis v. England*,
    432 F.3d 1321 (11th Cir. 2005) ............................................................................... 3

*Foster v. EPA*,
    No. 14-16744, 2019 WL 4145583 (S.D.W.V. Aug. 29, 2019) ................................ 25

*In re Rawson Food Serv., Inc.*,
    846 F.2d 1343 (11th Cir. 1988) ............................................................................... 7

*L.A. Cnty. Flood Control Dist. v. NRDC*,
    568 U.S. 78 (2013) ............................................................................................... 4, 5

*Lewis v. United States*,
    No. 18-1838, 2020 WL 4798496 (E.D. La. Aug. 18, 2020) .................................. 24

*Lewis v. United States*,
    No. 21-30163, 2023 WL 8711318 (5th Cir. Dec. 18, 2023) ............................ 14, 24

*ONRC Action v. U.S. Bureau of Reclamation*,
    No. 97-3090, 2012 WL 3526833 (D. Or. Jan. 17, 2012)
    *report and recommendation adopted,* 2012 WL 3526828 (D. Or. Aug. 14, 2012) ................. 23

*Parker v. Scrap Metal Processors, Inc.*,
   386 F.3d 993 (11th Cir. 2004) ................................................................ 3

*Rapanos v. United States*,
   547 U.S. 715 (2006) ........................................... 1, 22, 23, 25, 26, 27, 28

*Sackett v. EPA*,
   598 U.S. 651 (2023) ........................................ 1, 2, 13, 20, 21, 22, 28, 29

*San Francisco Baykeeper v. City of Sunnyvale*,
   No. 20-842, 2023 WL 8587610 n.3 (N.D. Cal. Dec. 11, 2023) ...................... 21, 22, 23, 25, 26

*S. Fla. Water Mgmt. Dist. v. Miccosukee Tribe of Indians*,
   541 U.S. 95 (2004) ................................................................................ 4, 5

*Tri-Realty Co. v. Ursinus Coll.*,
   124 F. Supp. 3d 418 (E.D. Pa. 2015) .................................................. 21

*SWANCC v. U.S. Army Corp. of Eng'rs*,
   531 U.S. 159 (2001) .......................................................................... 28, 29

*United States v. Akers*,
   785 F.2d 814 (9th Cir. 1986) ............................................................... 7

*United States v. Andrews*,
   No. 20-1300, 2023 WL 4361227 (D. Conn. June 12, 2023)....................... 29

*United States v. Bd. of Trs. of Fla. Keys Cmty. Coll.*,
   531 F. Supp. 267 (S.D. Fla. 1981) ..................................................... 4

*United States v. Bobby Wolford Trucking & Salvage, Inc.*,
   No. 18-747, 2023 WL 8528643 (W.D. Wash. Dec. 8, 2023) ................. 14, 28

*United States v. Brace*,
   41 F.3d 117 (3d Cir. 1994)................................................................... 8

*United States v. Brink*,
   795 F. Supp. 2d 565 (S.D. Tex. 2011) .............................................. 25

*United States v. Deaton*,
   209 F.3d 331 (4th Cir. 2000) ............................................................ 5

*United States v. Holland*,
   373 F. Supp. 665 (M.D. Fla. 1974) ................................................... 22

*United States v. Huebner*,
  752 F.2d 1235 (7th Cir. 1985) ................................................................. 8

*United States v. Mlaskoch*,
  No. 10-2669, 2014 WL 1281523 (D. Minn. Mar. 31, 2014) ..................... 25

*United States v. Riverside Bayview*,
  474 U.S. 121 (1985) ................................................................... 28, 29, 30

*United States v. Vierstra*,
  803 F. Supp. 2d 1166 (D. Idaho 2011) ..................................................... 21

**Statutes**

33 U.S.C. § 1311 ................................................................................... 3

33 U.S.C. § 1344 ............................................................................ 3, 5, 7, 9

33 U.S.C. § 1362 ............................................................................... 3, 5, 6

**Code of Federal Regulations**

33 C.F.R. § 323.2 .................................................................................. 20

33 C.F.R. § 323.4 ............................................................................... 8, 9

33 C.F.R. § 328.3 .............................................................................. 17, 29

33 C.F.R. § 331.2 ................................................................................. 17

**Federal Register Document**

73 Fed. Reg. 33,697 (June 13, 2008) .......................................................... 5

**Federal Rule of Civil Procedure**

Fed. R. Civ. P. 56 .................................................................................. 3

**INTRODUCTION**

In its motion for summary judgment, the United States proffered overwhelming evidence that Defendants are liable for filling wetlands on their Site in violation of the Clean Water Act ("CWA"). In fact, Defendants continued to fill wetlands even after a consultant they hired advised them to stop. In their cross-motion and opposition, Defendants primarily raise legal arguments on whether the Site's wetlands fall within the geographic scope of the CWA after *Sackett v. EPA*, 598 U.S. 651 (2023). To be covered under the CWA, the Site's wetlands must satisfy the standard first established by a plurality in *Rapanos v. United States*, 547 U.S. 715 (2006), and now adopted by a majority of the Court in *Sackett*—that the wetlands have a continuous surface connection to a relatively permanent water connected to traditional navigable waters. Facts that are not genuinely disputed satisfy this standard in several independent ways.

Wetlands do not observe property boundaries. Before Defendants' unauthorized activities, the Site's wetlands were part of a large, continuous wetland that extended from Defendants' Site across the Countess Joy Reference Area (which neighbors the Site to the north) all the way to the upstream reach of Bessey Creek (an excavated channel that Defendants call the East-West Ditch) and a roadside ditch on the eastern side of SW 84th Avenue.

Prior to Defendants' discharges, one could have walked through wetlands from the Site to the upstream reach of Bessey Creek without departing the large wetland. In fact, a team of wetlands scientists did just that. And they documented that the wetland exhibits similar hydrophytic vegetation, hydric soils, and wetland hydrology in wetland determination data forms and other recordings that confirm the continuity of the large wetland. Those facts and data are unrebutted by Defendants, whose expert does not contest the data the U.S. expert team recorded, did not complete any wetland determination data forms himself, and dug only one hole in the soil over the entirety of his work on this case on a date when there was below-average precipitation (i.e., a drought). U.S. Add'l SOF ¶¶ 182–90.

There is no dispute that the large wetland abuts both the upstream reach of Bessey Creek and the 84th Avenue roadside ditch, that both channels have at least seasonal flow, bed and

1

banks, and ordinary high-water marks, and the rise and ebb of water in the channels demonstrated by stage-recorded hydrographs, and connect to downstream traditional navigable waters. Therefore, the Site's wetlands are covered by the CWA based on either of these two continuous surface connections to relatively permanent waters.

The wetlands have other connections, too. A ditch runs along the western boundary of the Site that the parties call the North-South Ditch ("N/S Ditch"). There is no dispute that the N/S Ditch flows at least seasonally (in fact, Mr. Sharfi testified the ditch has water six to eight months of the year), exhibits generally continuous bed and bank features and an ordinary high-water mark, and connects to downstream traditional navigable waters. There is also no genuine dispute that the Site's wetlands abut the N/S Ditch—that is, they did before Defendants' unauthorized activities, including construction of a perimeter road. To be sure, there were spoil piles from when the ditch was constructed that created a berm separating the Site's wetlands from the ditch, but the berms were not continuous. And Defendants do not dispute that aerial imagery before Defendants' unauthorized activities shows the wetlands abutted the ditch in at least one location near the southwestern corner of the Site. Therefore, the Site's wetlands are covered under the CWA based on this continuous surface connection, too.

The continuous surface connection to the N/S Ditch in the southwestern corner of the Site would not require the Court to find the Site's wetlands were part of the large continuous wetland that extends onto the Countess Joy Reference Area. But that larger wetland also abuts the N/S Ditch on the Countess Joy Reference Area, which supplies yet another connection.

Defendants' arguments that the Site's wetlands are not covered under the CWA are primarily legal in nature. They invite the Court to adopt an unsupported and radical interpretation of *Sackett*. Courts that have considered the same arguments after *Sackett* have rejected them. Defendants' interpretation is also at odds with caselaw interpreting the *Rapanos* plurality, which *Sackett* adopted as "correct." 598 U.S. at 671. There is no support for Defendants' argument that *Sackett* categorically excludes manmade ditches from CWA jurisdiction; that seasonal flow is no longer sufficient for a channel to qualify as a relatively permanent water; or that *Sackett* silently

overturned the definition of "wetland" that has been in force for over four decades by requiring a "continuous surface *water* connection." In fact, that phrase does not even appear in the opinion.

The Court should grant summary judgment in favor of the United States on Defendants' liability, deny Defendants' cross-motion for summary judgment.

## BACKGROUND

The United States set out the relevant factual and statutory background in its Motion for Summary Judgment and accompanying Statement of Facts. *See* U.S. Mot. 1–2, ECF No. 150; U.S. SOF, ECF No. 151. The United States also submits with this opposition its response to Defendants' statement of material facts, cited herein as "U.S. Add'l SOF."

## STANDARD OF REVIEW

Defendants' cross-motion must be denied unless Defendants "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A material fact "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To be "genuine," the dispute "must have a real basis in the record." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005). "[M]ere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Id.*

## ARGUMENT

Overwhelming and undisputed facts in the record support a finding of summary judgment on each element of Defendants' liability—that Defendants are (1) persons responsible for (2) the discharge of any pollutant from a point source (3) to "waters of the United States" (4) without a permit. *See* 33 U.S.C. §§ 1311(a), 1344, 1362(5), (6), (12), (14); *Parker v. Scrap Metal Processors, Inc.*, 386 F.3d 993, 1008 (11th Cir. 2004); U.S. Mot. 2–3. Defendants fail to proffer record evidence to create a genuine dispute on any of these elements. *See Ellis*, 432 F.3d at 1326.

## I.  DEFENDANT SHARFI IS PERSONALLY LIABLE.

Defendants fail to support their contention that the CWA requires that Mr. Sharfi himself "personally discharge[d]" pollutants. Defs.' Cross-Mot. 32 (ECF No. 154). Civil liability under

the CWA is "predicated on either (1) performance, or (2) responsibility for or control over performance of the work, in the absence of the necessary federal permit." *United States v. Bd. of Trs. of Fla. Keys Cmty. Coll.*, 531 F. Supp. 267, 274 (S.D. Fla. 1981). That Mr. Sharfi was not operating the bulldozer that filled wetlands, for example, does not absolve him of civil liability.

Moreover, there is no dispute that Mr. Sharfi made the ultimate decisions about how the Site would be developed, U.S. SOF ¶ 59, or that NeshaFarm "is the purview of Mr. Sharfi directly," "is mostly [Mr. Sharfi's] personal property," and that "most of the activities therein are directed by [Mr. Sharfi] personally." *Id.* ¶ 7. Defendants cite no support for their vague assertion that Mr. Sharfi "was not necessarily aware of all the details." Defs.' Cross-Mot. 32. In any event, undisputed facts establish that he was aware of material details. *See, e.g.*, U.S. SOF ¶ 57.

Finally, Mr. Sharfi is personally liable for the *additional* reason that he is a "responsible corporate officer." U.S. Mot. 3–5. Defendants attempt to re-litigate the Court's prior holding. *See* Defs.' Reply in Supp. of Mot. to Dismiss 5 (ECF No. 13). The Court's holding is sound and well-supported. 2d Dismissal Order 10–11 (ECF No. 32); *see also Duarte Nursery, Inc. v. U.S. Army Corps of Eng'rs*, No. 13-cv-2095, 2016 WL 4717986, at *14–15 (E.D. Cal. June 10, 2016).

## II.    DEFENDANTS DISCHARGED "POLLUTANTS" FROM A "POINT SOURCE."

The United States established that Defendant discharged pollutants from a variety of point sources to areas of the Site that constitute "waters of the United States." *See* U.S. Mot. 5–7. Defendants' assertions to the contrary are not supported.

As a threshold matter, Defendants do not contest that some of their activities were subject to CWA regulation (assuming the "waters of the United States" element is met). *See* Defs.' Cross-Mot. 29 (stating that "*[n]ot all* [their] activities . . . are regulated" (emphasis added)).

In any event, even Defendants' limited arguments lack merit. *First*, Defendants contend that case law—including from the Eleventh Circuit—has been called into question by *South Florida Water Management District v. Miccosukee Tribe of Indians*, 541 U.S. 95 (2004), and *L.A. County Flood Control District v. NRDC*, 568 U.S. 78 (2013). Defs.' Cross-Mot. 29–30. Defendants are wrong. In *Miccosukee*, the Court held that no National Pollutant Discharge

4

Elimination System ("NPDES") permit (a permit for point source discharges of pollutants *other than* dredged or fill material) is required for a water transfer if the donating and receiving jurisdictional water bodies are not meaningfully distinct. 541 U.S. at 109, 112. In *L.A. County*, another NPDES case, the Court applied its holding in *Miccosukee* that the flow of water from one portion of a jurisdictional water body to another did not constitute an addition of a pollutant because the improved and unimproved portions were part of the same water body. 568 U.S. at 83. *Miccosukee* and *L.A. County* have no applicability or impact on the redeposit jurisprudence the United States cited. U.S. Mot. 5–6. *Miccosukee* and *L.A. County* involved equipment that moved only water, untreated, from one location to another without introducing (adding) any pollutant in the process. In other words, a pollutant in transferred water is already *in* the waters of the United States before, during, and after its movement. *See also* 73 Fed. Reg. 33697, 33701, 33703 (June 13, 2008).

Here, Defendants used heavy, earthmoving equipment to excavate, scrape, and redistribute earthen material—not water—from one location to another and during that process introduced (added) a pollutant—"dredged or fill material," 33 U.S.C. § 1344(a), or both—to waters of the United States. U.S. Mot. 6–7 (detailing ways Defendants redistributed materials). For example, the earthen and vegetative material that Defendants excavated, scraped, and dislodged from wetlands on the Site, U.S. Mot. 6–7, became "dredged spoil," a type of pollutant. 33 U.S.C. § 1362(6). When Defendants redeposited dredged spoil from one location to another in the Site's wetlands, they "*added* a pollutant where none had been before." *United States v. Deaton*, 209 F.3d 331, 335–36 (4th Cir. 2000); *see Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 923 (5th Cir. 1983) ("The word "addition," as used in the definition of the term 'discharge,' may reasonably be understood to include 'redeposit.'").

*Second*, Defendants' contention that "individual people using hand tools to cut vegetation and work the soil" is not a "discharge of pollutants" is a straw man. Defs.' Cross-Mot. 30. Defendants do not explain or cite facts for this proposition or their contention that "most of the work" on the Site was done by "people using hand tools." *Id.* And the United States does not

assert that clearing vegetation by hand alone constitutes the discharge of pollutants. Rather, mechanized equipment was used to dump and spread road rock, redeposit earthen material and vegetation, and clear the land (including by creating piles of trees). *See* U.S. Mot. 6–7.

Defendants' argument that "grass sod" is not a "pollutant" because it is not a waste material misses the mark. Defs.' Cross-Mot. 30. To be clear, the United States does not contend that "grass is a pollutant in the context of this case," as Defendants' suggest. *Id.* Defendants installed sod throughout the Site. U.S. SOF ¶¶ 40–41, 46, 54. The sod mats consisted of grass *and* a layer of imported earthen material. U.S. Add'l SOF ¶ 162. The sod mats ranged from two to four inches in depth. U.S. Add'l SOF ¶ 163. Thus, the sod mats are a "pollutant." 33 U.S.C. § 1362(6) (defining "pollutant" to include "rock, sand, [and] cellar dirt"); *see also* U.S. Mot. 5 & n.2. Not even Defendants' expert supports Defendants' argument. U.S. Add'l SOF ¶ 164.

*Third*, Defendants do not dispute that the discharge of road rock to build the perimeter road constitutes the discharge of pollutants. *See* Defs.' Cross-Mot. 31. Defendants argue instead that the road rock was placed by dump trucks in areas outside of Ms. Small's delineated wetland. There is no such dispute. Ms. Small did not analyze whether wetlands existed where Defendants had already constructed the perimeter road (and she even speculated that there were wetlands there). U.S. SOF ¶ 33. Her delineation thus does not create a dispute of fact that wetlands in the areas where the U.S. expert team's delineation and the perimeter road overlap.

Defendants ignore other activities that involved the "bringing of fill material from offsite." Defs.' Cross-Mot. 31; *see* U.S. Mot. 10; U.S. SOF ¶¶ 31, 50, 53. Defendants' attempt to dispute U.S. SOF ¶ 31 regarding the location of where Defendants' dumped fill is unavailing. Witness testimony established the locations where Defendants dumped fill, including within the area that Ms. Small delineated. *See, e.g.*, Berlusconi Tr. 69:16–70:6 (U.S. SOF Ex. 66) (fill was dumped using mini pickup truck and spread where witness marked on map an "X" and encircled "F"); U.S. SOF Ex. 38 (indication "F" in southwest corner of Site) (ECF No. 151-39).

*Fourth*, Defendants' argument that one of their many activities was exempt fails. Defs.' Cross-Mot 31. Defendants do not dispute that they dredged the N/S Ditch and dumped the spoil

material in wetlands in the southwest corner of the Site. U.S. Mot. 6 (citing U.S. SOF ¶¶ 20–21). They now argue that those activities were exempt under 33 U.S.C. § 1344(f)(1)(C). That subparagraph exempts from the CWA's dredge-and-fill permit requirements the discharge of dredged or fill material for "the maintenance of drainage ditches." 33 U.S.C. § 1344(f)(1)(C). But the reach of the exemption is further limited by a so-called "recapture" provision. *Id.* § 1344(f)(2); *see Conant v. United States*, 786 F.2d 1008, 1010 (11th Cir. 1986). The scope of section 1344 exemptions is narrowly construed to avoid adverse impacts on wetlands. *See, e.g.*, *Avoyelles Sportsmen's League*, 715 F.2d at 926. The exemption does not save Defendants here.

To begin with, the Court can set aside Defendants' argument because they failed to plead an affirmative defense that any of their activities are subject to the ditch-maintenance exemption in section 1344(f)(1)(C). *See* ECF Nos. 40–42 (affirmative defenses). Defendants were aware of their pleading obligation. After all, they had plead an affirmative defense under a separate agricultural exemption under section 1344(f)(1)(A).[1] *See, e.g.*, Sharfi Answer Affirmative Defense No. 16, ECF No. 41. Whether Defendants' activities are exempt under any subparagraph of section 1344(f)(1) is not an element of the United States' prima facie case but rather is an issue on which Defendants carry the burden of proof. *See, e.g.*, *United States v. Akers*, 785 F.2d 814, 819 (9th Cir. 1986); *see also* Defs.' Cross-Mot. 11 (listing elements); Rule 26(f) Report 5 n.1, ECF No. 15. Thus, Defendants carry the burden to plead and prove whether their activities qualify for the ditch-maintenance exemption under section 1344(f)(1)(C) and that they are not subject to the recapture provision of section 1344(f)(2). *See Akers*, 785 F.2d at 819; *In re Rawson Food Serv., Inc.*, 846 F.2d 1343, 1349 (11th Cir. 1988).

Even if an affirmative defense under the ditch-maintenance exemption were theoretically

---

[1]     In its original summary judgment motion filed before *Sackett* was decided, the United States explained that Defendants have no valid affirmative defense to liability, including under section 1344(f). *See* U.S. Mot. for Summ. J. 19–20, ECF No. 108. In response to that motion, Defendants made *no* attempt to validate any of their affirmative defenses—including under section 1344(f)—and instead stated that they would withdraw them. Defs.' Opp'n to U.S. Mot. for Summ. J. 2 (ECF No. 117). Defendants subsequently filed a Notice of Withdrawal of Affirmative Defenses (ECF No. 130).

available, Defendants' activities do not qualify. Defendants failed to proffer evidence or argument to support that their activities are maintenance of a drainage ditch, as opposed to improvement, such as by deepening it from its original condition. *See* 33 C.F.R. § 323.4(a)(3) (exemption applies to "maintenance (but not construction) of drainage ditches"). Even if their activities could be considered maintenance of a drainage ditch, Defendants' depositing the dredged material and leveling wetlands on the Site were independent activities that are not exempt. *See United States v. Brace*, 41 F.3d 117, 128 (3d Cir. 1994) ("[The landowner's] subsequent levelling at the site and spreading of the dredged material were separate, independent activities that are not subject to an exemption from the permit requirement.").

And even if Defendants could show their activities qualify, Defendants' excavation of the N/S Ditch affected the surrounding wetlands and therefore falls squarely within the recapture provision. 33 U.S.C. § 1344(f)(2). Defendants do not dispute that they deposited and spread the spoil material from the ditch in wetlands in the southwest corner of the Site. U.S. SOF ¶¶ 20–21; *see also* U.S. SOF Ex. 1 (Photographs 5-9 and 5-10). Defendants also cleared the area using a bulldozer and dumped and spread fill material, all of which had the effect of converting the wetlands in the southwest corner of the Site—including areas Ms. Small delineated as wetlands—to dry land. *See* U.S. Mot. 6–7, 10; U.S. SOF Ex. 1 (Photographs 5-5 and 5-19); U.S. SOF ¶¶ 21, 24, 29–31, 39–40.




*U.S. SOF Ex. 1 (Photograph 5-9)*          *U.S. SOF Ex. 1 (Photograph 5-10)*

In *United States v. Huebner*, the landowners used backhoes to clean and deepen ditches,

sidecast the excavated material onto wetlands, and used bulldozers to spread the discharged material. 752 F.2d 1235, 1242 (7th Cir. 1985). The court rejected that the landowners' activities were exempt under section 1344(f)(1)(C) and held that sidecasting and spreading the excavated material was subject to the recapture provision because it reduced the reach of the wetlands surrounding the ditches. *Id.* The landowners' activities constituted a discharge of dredged material onto a wetland. *Id.* Here, too, Defendants' sidecasting and spreading excavated material from the N/S Ditch had the effect of changing the use of the wetlands to pastureland and reducing the reach of the Site's wetlands. Those activities fall within the recapture provision. *See id.*; *see also Avoyelles Sportsmen's League*, 715 F.2d at 926 (holding that recapture provision applied where "[a]ll of the vegetation was cut down, the land leveled, and at least one ditch dug to increase drainage so that the property could be *changed* from a forest to a soybean field").[2]

## III.    THERE IS NO GENUINE DISPUTE THAT WETLANDS EXIST ON THE SITE.

Defendants concede that at least a 3.5-acre wetland existed on the Site based on the March 2018 delineation of Defendants' former environmental consultant Danna Small. *See* Defs.' SOF ¶ 63 (ECF No. 153). There is also no dispute that Defendants cleared and filled areas within the wetland that Ms. Small delineated. U.S. Mot. 10; Defs.' Cross-Mot. 28–32. Thus, while uncontroverted evidence shows that five to six wetland acres existed on the Site, the Court may still enter summary judgment for the United States on this issue without precisely calculating the acreage of wetlands.

Between August and December 2021, members of the U.S. expert team—including experts who specialize in wetland hydrology (Dr. Wade Nutter), wetland vegetation (Dr. Kai

---

[2]      The Corps' regulations interpreting the recapture provision are in alignment. *See* 33 C.F.R. § 323.4. "Any discharge of dredged or fill material into waters of the United States incidental to any of the activities identified in paragraphs (a)(1) through (6) of this section must have a permit if it is part of an activity whose purpose is to convert an area of the waters of the United States into a use to which it was not previously subject, where the flow or circulation of waters of the United States may be impaired or the reach of such waters reduced." *Id.* § 323.4(c). "A conversion of a section 404 wetland to a non-wetland is a change in use of an area of waters of the United States." *Id.*

Coshow Rains), and hydric soils (Dr. Scott Stewart)—inspected the Site in its disturbed state over the course of five days, inspected a reference area directly north of the Site (the "Countess Joy Reference Area") over the course of six days, and inspected several other reference aquatic areas nearby. U.S. Mot. 8. Before Defendants' land-clearing and fill activities, the Site had between five and six acres of wetlands and the wetlands were part of a larger wetland that continues north of the Site on the Countess Joy Reference Area. *Id.* By contrast, none of Defendants' experts performed a wetland delineation (or determination), or even completed a single Wetland Determination Data Form. *Id.* at 8–9.

*First*, contrary to Defendants' argument, wetlands on the Site—including the area Defendants concede are wetlands under Ms. Small's delineation—are proven to be jurisdictional even if the wetland "does not extend to the boundary with the Countess Joy property." Defs.' Cross-Mot. 26. The United States identified continuous surface connections with three different relatively permanent waters: (1) the upstream reach of Bessey Creek (what Defendants refer to as the East-West Ditch); (2) the 84th Avenue roadside ditch; and (3) the N/S Ditch. U.S. Mot. 15–18. Only the first and second connections require a finding that before Defendants' unauthorized activities the Site's wetlands were part of a larger wetland on the Countess Joy Reference Area. The third continuous surface connection with the N/S Ditch does not.

Before Defendants' unauthorized activities—including the construction of a perimeter road around the Site—the Site's wetlands abutted the N/S Ditch in at least the southwest quadrant of the Site. *See* U.S. Mot. 17–18; U.S. SOF ¶¶ 25, 81; U.S. SOF Ex. 83. Defendants cannot reasonably dispute this. Mr. Sharfi admitted in a permit application that the N/S Ditch "has been the historical surface water conveyance taking water away from the properties [including the Site], eventually leading to Bessey Creek and later to tide in the North Fork of the St. Lucie River." U.S. SOF ¶ 25. Defendant's expert Dr. Dennis agrees that historical imagery *before* Defendants' unauthorized disturbances shows that wetlands on the Site border the N/S Ditch in the southwest corner of the Site without a berm separating them. *See* U.S. Mot. 18 (citing relevant testimony). And now Defendants concede in their cross-motion that historic

aerial photography shows the Site wetland "arguably abuts" the N/S Ditch. Defs.' Cross-Mot. 31.

Defendants fail to proffer facts that would create a genuine dispute that the Site wetlands extended to and abutted the N/S Ditch *before* Defendants' unauthorized dredging and filling activities. *See* Defs.' SOF ¶ 81. Defendants' citations to Dr. Dennis' report refer to current conditions of the Site, not conditions at the time of Defendants' unauthorized activities. *See* U.S. Mot. 18. Defendants fail to explain how and where figures 5-1 and 5-2



*U.S. SOF Ex. 83 (1966 aerial image depicting Site wetlands abutting N/S Ditch)*

"show[] higher elevation areas" between the N/S Ditch and the Site wetlands. But even if that were true at some unspecified "areas" as Defendants contend, the figures at least show the Site wetlands touched the N/S Ditch without the presence of a berm in the southwest corner of the Site, as explained above and consistent with Defendants' expert's testimony. *See id.* (discussing relevant testimony). And Defendants' citation to testimony by Mr. Sharfi's former employee Charles Berlusconi that the road Defendants constructed did not raise the ground elevation and that the Site elevation was higher than the N/S Ditch is unremarkable and irrelevant to the extent of wetlands before the unauthorized activities. As Mr. Berlusconi also testified: the Site "slope[d]" down to the N/S Ditch. Berlusconi Tr. 261:13–15 (U.S. Add'l SOF Ex. 91).

*Second*, Defendants fail to proffer facts that would create a genuine dispute regarding the U.S. expert team's delineation of wetlands on the Site. Defs.' Cross-Motion 26–27. Defendants' expert Dr. Dennis did not delineate wetlands on the Site, and he did not criticize the U.S. expert team's delineation. U.S. SOF Ex. 71, at -148 to -154 (ECF No. 151-72). Rather, Dr. Dennis reviewed the U.S. expert team's and Ms. Small's delineations and opined that the delineation by Ms. Small is more "reliable." *Id.* at -154.

Ms. Small's delineation does not account for the full scope of wetlands present on the

Site before Defendants' unauthorized discharges. *See* U.S. Mot. 9. Defendants now complain that the United States did not explain "where or to what extent" work that had already commenced on the Site "impacted Ms. Small's analysis." Defs.' Cross-Mot. 26. In fact, as the United States explained and Ms. Small testified, Defendant had already started constructing a perimeter road when Ms. Small visited the Site in March 2018, and she made no attempt to assess whether wetlands had existed under the road (though she speculated that wetlands did exist there). *See* U.S. Mot. 9; U.S. SOF ¶ 33. There can be no serious dispute that Ms. Small's investigation was not complete.

The United States explained why Dr. Dennis' opinion does not create a genuine dispute of fact. U.S. Mot. 8–10. In addition to those reasons, Dr. Dennis stated he preferred Ms. Small's delineation *for its result*. He "focused primarily" on the map showing the line around the wetland that Ms. Small delineated. Dennis Tr. 144:9–145:21 (U.S. Add'l SOF Ex. 86). And he did not consider Ms. Small's notes, photographs, or the three Wetland Determination Data Forms from her inspection. *Id.* at 144:22–145:2, 162:15–17, 191:19–22; U.S. SOF ¶ 47.

Dr. Dennis admitted that Ms. Small did not complete a Wetland Determination Data Form in certain areas of the Site mapped as having "hydric" soils (area mapped number "66"), Dennis Tr. 192:4–15, 193:10–18 (U.S. Add'l SOF Ex. 86); *see* U.S. SOF Ex. 56, at -114 (ECF No. 151-57); U.S. Add'l SOF ¶ 197, notwithstanding Dr. Dennis' testimony that his purported delineation methodology would normally include field verification (or "ground-truthing") of information in publicly accessible maps. Dennis Tr. at 147:5–23 (U.S. Add'l SOF Ex. 86). That area accounts for a significant part of the Site. *See* U.S. SOF Ex. 56, at -114 (ECF No. 151-57).[3]

This last point is critical. There are no facts or data from Ms. Small's inspection

---

[3]     That work had not commenced in parts of the northwest area of the Site at the time of Ms. Small's delineation does not save Defendants. Defs.' Cross-Mot. 26–27. For one thing, the undisputed facts establish the Site wetlands abutted the North-South Ditch in the southwest corner of the Site and therefore had a continuous surface connection with a relatively permanent water before Defendants' unauthorized activities, including building the perimeter road. But even more, Ms. Small did not complete a single Wetland Determination Data form in the northwest corner of the Site. U.S. Add'l SOF ¶ 198.

regarding areas of the Site that are mapped as having hydric soils (including in the northwest quadrant) that Dr. Dennis could have relied upon. Thus, the extensive data the U.S. expert team collected regarding the essential wetland indicators of hydrology, soils, and vegetation are *wholly unrebutted by any facts*. U.S. SOF Exs. 32, 40 (ECF Nos. 151-33, 151-41).

Defendants' embrace of Ms. Small's delineation is also entirely contrary to Defendants' last-ditch argument that the U.S. expert team's wetlands determinations on the Countess Joy Reference Area are legally invalid. Defs.' Cross-Mot. 27. Defendants argue that the U.S. expert team did not follow "legally-required procedures to identify and delineate wetlands" on the Countess Joy Reference Area. *Id.* Defendants do not dispute that the U.S. expert team followed the Manual's procedures on the Site, where they delineated a wetland line. *See* U.S. SOF Ex. 16 (U.S. expert team delineation and soil assessment locations). Defendants argue that the U.S. expert team was also required to establish a baseline and transects consistent with the Manual's procedures in the areas suspected to be wetlands on the Countess Joy Reference Area. Defs.' Cross-Mot. 27. Defendants even filed a motion to exclude the testimony of Michael Wylie, who was a jurisdictional expert with nearly thirty years of experience at EPA, on this ground. ECF No. 155. As explained in the United States' opposition to that motion, the Manual requires the establishment of a baseline and transects *in a project area* (i.e., Defendants' Site); they are not required outside of the project area, such as at the neighboring Countess Joy Reference Area. Ms. Small should have—but did not—establish a baseline and transects *on the Site*. Defendants and their expert Dr. Dennis conveniently overlooked this deficiency in Ms. Small's work on the Site. Even more, Defendants do not dispute in their opposition brief that Ms. Small should have applied the methods for evaluating "atypical situations," because Defendants had filled or were in the process of filling wetlands on the Site by the time of her visit. *See* U.S. Mot. 9.

## IV.   THE SITE'S WETLANDS ARE "WATERS OF THE UNITED STATES."

There is no dispute that *Sackett* adopted the *Rapanos* plurality test of whether adjacent wetlands are covered under the CWA and controls whether the Site's wetlands here are "waters of the United States." *See* U.S. Mot. 10–12; Defs.' Cross-Mot. 12; *Sackett*, 598 U.S. at 671

("[T]he *Rapanos* plurality was correct . . . ."). But Defendants are wrong to assert that the regulations that were in effect at the time of Defendants' discharges are entirely obsolete. Defs.' Cross-Mot. 13. Rather, those regulations that are not inconsistent with *Sackett* remain in effect. *See* U.S. Mot. 11 n.3. It is a non-issue here anyway. Defendants have not pointed to any regulation on which the United States relies that was rendered null after *Sackett*. Defendants' reference to a 2023 rule that went into effect after Defendants' discharges is just another straw man. Defs.' Cross-Mot. 24. The United States did not even cite that rule in its opening brief. In fact, the United States' argument is based on a straightforward application of *Sackett*.

Defendants contend that *Sackett* also "emphasized" certain points in the *Rapanos* plurality and other Supreme Court decisions. *Id.* at 12. This is true of any Supreme Court opinion interpreting precedent. But Defendants are wrong to characterize *Sackett* as a sea change in the law. *See, e.g.*, *Lewis v. United States*, No. 21-30163, 2023 WL 8711318, at *3 (5th Cir. Dec. 18, 2023). In *Lewis*, the Fifth Circuit recently held the *Sackett* standard could not be met after the Corps conceded during initial litigation and undisputed facts demonstrated that the property at issue cannot satisfy the *Rapanos* plurality standard. *Id.* at *3; *see also id.* at *4 ("In its 2020 ruling, to repeat, the district court found, and [the Corps] conceded, that the *Rapanos* adjacency test could not be met on the undisputed facts that the court thoroughly described."); *see also United States v. Bobby Wolford Trucking & Salvage, Inc.*, No. 18-747, 2023 WL 8528643, at *2 (W.D. Wash. Dec. 8, 2023) (rejecting that *Sackett* had intervening impact on applicable law after court granted partial summary judgment under *Rapanos* plurality and significant nexus standard). Indeed, the "emphasized" points Defendants identify in their brief are based on quoted language in the *Rapanos* plurality and other cases, or are obvious dicta, as explained more fully below.

### A.    The Site's Wetlands are Within the Geographic Jurisdiction of the CWA in Three Independent Ways.

Undisputed evidence shows that the Site's wetlands are within the jurisdiction of the CWA. U.S. Mot. 12–18. There are no less than three different continuous surface connections that independently establish the Site's wetlands are covered waters. And one of those

connections does not even require the Court to find that the Site's wetlands were part of the larger wetland on the Countess Joy Reference Area.

> 1. **There are three continuous surface connections to relatively permanent waters via the large wetland on the Countess Joy Reference Area.**

Before Defendants' unauthorized activities on the Site, including construction of a perimeter road that isolated the wetlands, the Site's wetlands were part of a larger wetland that abuts and has continuous surface connections to three relatively permanent waters.

*First*, prior to Defendants' unauthorized activities, the Site's wetlands were part of a larger wetland that abuts and has a continuous surface connection to the upstream reach of Bessey Creek. *Id.* at 13–16. There is no dispute that the upstream reach of Bessey Creek has at least seasonal flow, bed and banks, a rise and ebb of its water surface, and an ordinary high-water mark, and is connected to the tidal reach of Bessey Creek, a traditional navigable water, and other downstream navigable waters. U.S. SOF ¶¶ 12–15, 17, 70, 71; U.S. Add'l SOF ¶ 171–74; Defs.' SOF ¶ 106. Thus, the undisputed facts establish the upstream reach of Bessey Creek is a relatively permanent water. U.S. Mot. 13–15. Defendants' expert Dr. Dennis even agreed the upstream reach of Bessey Creek is a relatively permanent water under the *Rapanos* plurality. Dennis 2d Tr. 8:20–9:2; 44:6–18; 44:20–45:3 (U.S. Add'l SOF Ex. 94). There is also no genuine dispute that the large wetland abuts the upstream reach of Bessey Creek at two locations on the Countess Joy Reference Area. U.S. SOF ¶¶ 67–69. Thus, the wetlands have a continuous surface connection with the upstream reach of Bessey Creek. U.S. Mot. 15–16.

*Second*, the large wetland abuts and has a continuous surface connection to the N/S Ditch on the Countess Joy Reference Area. *Id.* at 18. There is no genuine dispute that the N/S Ditch has at least seasonal flow, an ordinary high-water mark and bed and banks (except in a few areas where cattle or vehicles flattened the banks), and is connected to the upstream reach of Bessey Creek, which is connected to the tidal reach of Bessey Creek. U.S. SOF ¶¶ 74–79, 81–83; Defs.' SOF ¶ 108. Thus, the undisputed facts establish the N/S Ditch is a relatively permanent water and the large wetland abuts and therefore has a continuous surface connection to the N/S Ditch.

*Third*, the large wetland abuts and has a continuous surface connection to the 84th Avenue roadside ditch. U.S. Mot. 13–16. There is no genuine dispute the same large wetland also abuts the 84th Avenue roadside ditch, that the ditch is connected to the upstream reach of Bessey Creek, has a bed and banks and an ordinary high-water mark, and at least seasonal flow between where it abuts wetlands and its connection to the upstream reach of Bessey Creek. U.S. SOF ¶¶ 84–87, 89; Defs.' SOF ¶ 109. Thus, the wetlands have a continuous surface connection to the 84th Avenue roadside ditch, another relatively permanent water.

Defendants proffer no facts to contest that a continuous and uninterrupted wetland exists on the Countess Joy Reference Area from the northwestern boundary of the Site to the N/S Ditch, the upstream reach of Bessey Creek, or the 84th Avenue roadside ditch. U.S. Mot. 15; Defs.' SOF ¶¶ 64–65. Instead, Defendants argue the United States did not "carry its burden of proof" because, in Defendants' view, the U.S. expert team was required to establish a baseline and transects consistent with the Manual's procedures in the areas suspected to be wetlands on the Countess Joy Reference Area. Defs.' Cross-Mot. 27–28. The Manual requires the establishment of a baseline and transects *in a project area* (i.e., Defendants' Site); they are not required outside of the project area, such as at the neighboring Countess Joy Reference Area, as explained above and in the United States' opposition to Defendants' motion to exclude the testimony of Michael Wylie filed concurrently with this brief.

Prior to Defendants' discharges, one could have walked through wetlands from the Site to the upstream reach of Bessey Creek without departing the larger, contiguous wetland. Indeed, during the U.S. expert team's investigations in August, September, and October 2021, Mr. Wylie, together with Drs. Rains, Nutter, and Stewart, walked from wetlands in the southwestern area of the Countess Joy Reference Area nearest to the wetlands on the Site (before Defendants' discharges) to multiple locations where the large, contiguous wetland abuts the upstream reach of Bessey Creek, without leaving areas that the U.S. experts determined and documented satisfied the requisite criteria to be wetlands. *See* U.S. SOF Ex. 79, at-5087; U.S. Add'l SOF ¶ 165. The experts documented through wetland data sheets, field notes, and

photographs that a large, contiguous wetland exhibiting similar hydrophytic vegetation, hydric soils, and wetland hydrology at or above the ground surface extends from the Site in a northwest direction to the upstream reach of Bessey Creek and also abuts the N/S Ditch. U.S. SOF Ex. 79, at -5087; U.S. Add'l SOF ¶ 166.

That the U.S. expert team did not "delineate" a wetland line on the Countess Joy Reference Area is similarly of no consequence. *See* Defs.' SOF ¶ 64. The U.S. expert team did not produce a map with definite wetland boundaries on the Countess Joy Reference Area, as they did with respect to Defendants' Site. Wylie Tr. 105:21–106:5 (U.S. Add'l SOF Ex. 90). A wetland delineation is performed when an owner requests a jurisdictional determination or to determine whether an unauthorized discharge occurred in or outside of a wetland. *See* 33 C.F.R. § 331.2 (defining "approved jurisdictional determination" to include a "map identifying the limits of waters of the United States on a parcel"). There are no allegations of unauthorized fill on the Countess Joy Reference Area. A time-consuming delineation of the wetland boundary on that property was otherwise unnecessary to confirm the presence of continuous wetlands.

Defendants cite no authority that any law or regulatory guidance required a delineation of wetlands outside of the Site (i.e., the project area). Defs.' Cross-Mot. 27–28. Nor have they proffered evidence to dispute that a continuous wetland exists on the Countess Joy Reference Area. At most, Defendants point to National Wetlands Inventory ("NWI") maps purportedly showing a smaller disconnected wetland. *Id.* at 28.

NWI maps are a desktop resource. That they do not show a continuous wetland on the Countess Joy Reference Area is of no consequence. Defs.' Cross-Mot. 28; Defs. SOF ¶ 82. NWI maps do not establish, on their own, the presence of "wetlands" that meet the regulatory definition of the term. *See* 33 C.F.R. § 328.3(b) (1987). Rather, they must be verified by on-the-ground investigation, as Defendants' expert admits. U.S. Add'l SOF ¶ 178. Dr. Dennis did not "attempt to ground [truth] any of the NWI maps on the Countess Joy property." Dennis Tr. 154:16–18; U.S. Add'l SOF ¶¶ 179–81. And he agrees that NWI maps were never intended to show the limits of regulated wetlands. Dennis 2d Tr. 219:24–220:3 (U.S. Add'l SOF Ex. 94);

U.S. Add'l SOF ¶ 177. Here again, the facts and data that establish the presence of a large continuous wetland on the Countess Joy Reference Area are not genuinely disputed.[4]

More importantly, the U.S. expert team *did* make observations, collect data, and determine that wetlands extended from the southern border of the Countess Joy Reference Area (abutting the Site's wetlands) all the way to the upstream reach of Bessey Creek at three wetland sample points: W5, W6, and W7. U.S. SOF ¶ 64; U.S. SOF Exs. 20–22 (photographs showing abutting wetlands). Thirteen of the U.S. Team's fourteen sampled representative locations were wetlands. U.S. SOF ¶ 64; U.S. SOF Ex. 12 (map); U.S. SOF Ex. 41 (data forms). The U.S. expert team determined that in each area determined to be wetlands, there are no physical barriers disconnecting the wetland from the upstream reach of Bessey Creek. U.S. SOF Ex. 79, at -5088; U.S. Add'l SOF ¶¶ 165–66. The determinations are not disputed.

If anything, the U.S. expert team's wetland determinations confirmed the existence of wetlands in the spaces between where the NWI maps indicate there are wetlands on the Countess Joy Reference Area. The figure below shows the areas where the U.S. Expert Team collected data regarding hydrology, vegetation, and soil conditions on the Countess Joy Reference Area, which are recorded in Wetland Determination Data Forms, overlaid on the NWI map. The areas labeled W1 through W9 on the Countess Joy Reference Area (East) each met the hydrology, vegetation, and soil parameters for a wetland. *See* U.S. SOF Ex. 41 (data forms). Defendants do not dispute any of the data informing those determinations. The area labeled W10 did not meet each parameter and was therefore determined to be an upland. *Id.*

---

[4]    Defendants' attempt to create a dispute of fact using NWI maps demonstrates the contradictory nature of their positions. The NWI maps show a wetland on the Site that borders the N/S Ditch and exceeds the boundary of the wetland Ms. Small delineated. U.S. Add'l SOF ¶ 176. Yet Dr. Dennis testified the NWI map's depiction of wetlands on the Site "looked to be pretty . . . accurate." U.S. Add'l SOF ¶ 175.



Location of reference plots at the Countess Joy East and West Reference Areas and USFWS National Wetland Inventory wetlands in the vicinity of the Site and Reference Areas.

Defendants' other attempts to cast doubt on the U.S. expert team's identification of wetlands on the Countess Joy Reference Area fail. Defs.' Cross-Motion 28. Defendants speculate—as they must because they have no evidence—that areas of higher elevation "could" be uplands, *id.*, and that berms "can" interrupt surface flow. Defs.' SOF ¶ 102.

Speculation aside, Defendants' expert Dr. Dennis identified five small areas that he believes (yet has no documentary support) are uplands within the large, continuous wetland on the Countess Joy Reference Area. *See* Dennis 2d Tr. 225:7–239:18 (U.S. Add'l SOF Ex. 94); U.S. SOF Ex. 35 (indicating what Dr. Dennis believes are uplands in five circled areas). None of the areas severs the continuity of the wetland. And while there are some berms along the N/S Ditch and the upstream reach of Bessey Creek on the Countess Joy Reference Area, there are breaks in the berms. U.S. Add'l SOF ¶¶ 167–68, 170. Indeed, Defendants' expert Dr. Dennis testified that berms along the N/S Ditch "go away" on the Countess Joy Reference Area about midway between the Site and the upstream reach of Bessey Creek, Dennis 2d Tr. 103:1 (U.S. Add'l SOF Ex. 94), that there are "breaks" in the berms along the upstream reach of Bessey Creek, *id.* at 172:22, that there are no berms where the N/S Ditch intersects the upstream reach of Bessey Creek, *id.* at 83:15–18, and that he does not have an opinion or sufficient information to

19

say whether the wetlands physically touch the upstream reach of Bessey Creek at the two points the U.S. expert team identified, *id.* at 175:21–24. Simply put, the evidence is undisputed that while there are berms in areas along the N/S Ditch and the upstream reach of Bessey Creek, there are also areas where the berms do not exist or were washed away.

There is also no genuine dispute of material fact that—before Defendants' unauthorized activities—the Site's wetlands were part of the large, continuous wetland on the Countess Joy Reference Area. *See* U.S. Mot. 8, 15; U.S. SOF ¶ 65. Defs.' SOF ¶ 65. Defendants do not contest any of the facts and data demonstrating the scope and boundaries of wetlands on the Site. Rather, they contend the wetland did not extend to the property line near the Countess Joy Reference Area based on Ms. Small's delineation. *See* Defs.' SOF ¶ 65. But Ms. Small did not collect data for the northwestern quadrant of the Site, including an area that is mapped as having *hydric soils*. *See supra* Part III; U.S. SOF Ex. 56, at -114. And the data she did collect aligns with the U.S. expert team's determinations. *See supra* Part III; U.S. SOF ¶¶ 47–48.

That Ms. Small referred to wetlands on the Site as "isolated" in a letter to the Corps is unremarkable. Defs.' SOF ¶ 47. Ms. Small did not visit the Countess Joy Reference Area or analyze whether wetlands existed there. Small Tr. 58:25–59:13, 180:24–181:2, 222:14–17 (U.S. Add'l SOF Ex. 92). Ms. Small testified that she was "unable to make a final assessment" but that "I still look at those [wetlands] and say, they were isolated wetlands *at the time that I did the site visit*." *Id.* at 254:1–17 (emphasis added); U.S. Add'l SOF ¶ 195. When she visited the Site in March 2018, a perimeter road had already been constructed, and she made no attempt to assess whether wetlands had existed there previously. U.S. SOF ¶ 33; U.S. Add'l SOF ¶ 192–96. Ms. Small testified, "what happen[ed] in between, I don't know." Small Tr. at 255:5–6 (U.S. Add'l SOF Ex. 92). The evidence clearly demonstrates what happened: Defendants *isolated* wetlands by constructing a road. *See* U.S. SOF ¶¶ 22, 33. Defendants' activities, however, cannot destroy jurisdiction. *See* 33 C.F.R. § 323.2(d)(4); *see Sackett*, 598 U.S. at 678 n.16 ("[A] landowner cannot carve out wetlands from federal jurisdiction by illegally constructing a barrier on wetlands otherwise covered by the CWA.").

### 2. The Site's wetlands had a continuous surface connection with the N/S Ditch on the western boundary of Defendants' Site.

Even if the Court finds there is a genuine dispute whether the Site's wetlands were part of the large wetland on the Countess Joy Reference Area, undisputed facts demonstrate the Site's wetlands are "waters of the United States." Before Defendants' unauthorized activities, the Site's wetlands abutted, and thus had a continuous surface connection to, the N/S Ditch on the western boundary of Defendants' Site. U.S. Mot. 17; *see also supra* Part III. The Court could grant summary judgment in favor of the United States based on this connection to the N/S Ditch alone.

### B. Defendants Offer a Radical and Incorrect Interpretation of *Sackett*.

Defendants invite the Court to interpret *Sackett* far beyond what the opinion holds. Indeed, Defendants must convince the Court to adopt such a radical and untenable interpretation to prevail in this case. The Court should reject that invitation.

### 1. Manmade ditches are not categorically excluded.

Defendants argue—as they must to prevail—that under *Sackett* man-made ditches are categorically excluded from being "waters of the United States." Defs.' Cross-Mot. 15–16. No court has so held. Several courts have held just the opposite, including *after Sackett* was decided. *See, e.g.*, *San Francisco Baykeeper v. City of Sunnyvale*, No. 20-824, 2023 WL 8587610, at *5 n.3 (N.D. Cal. Dec. 11, 2023) ("The Court is unpersuaded . . . that *Sackett* calls into question whether manmade channels with continuous seasonal flows such as this can be [waters of the United States] merely because they are manmade."); *Tri-Realty Co. v. Ursinus Coll.*, 124 F. Supp. 3d 418, 468 (E.D. Pa. 2015) ("[N]umerous courts have concluded that artificial waterways may be jurisdictional waters under the CWA."); *United States v. Vierstra*, 803 F. Supp. 2d 1166, 1170–71 (D. Idaho 2011) (That canal "is man-made is of no moment. The canal is part of a tributary system connecting navigable waters upstream and downstream for six to eight months of the year. Its man-made nature makes it no less capable of carrying pollution to navigable and interstate waters."); *see also Driscoll v. Adams*, 181 F.3d 1285, 1291 (11th Cir. 1999) ("Consequently, courts have acknowledged that ditches and canals, as well as streams and creeks, can be 'waters of the United States' under § 1362(7).").

21

Defendants' argument primarily rests on quoted language in *Sackett*: "[W]e conclude that the *Rapanos* plurality was correct: the CWA's use of 'waters' encompasses 'only those relatively permanent, standing or continuously flowing bodies of water forming geographical features that are described in ordinary parlance as streams, oceans, rivers, and lakes." *Sackett*, 598 U.S. at 671 (quoting *Rapanos*, 547 U.S. at 739 (plurality)) (cleaned up). Defendants posit that the exclusion of "ditch" from this list means that only natural water bodies can be relatively permanent waters. Defs.' Cross-Mot. 15. Defendants attempt to draw additional support for their theory from the introductory paragraph of the majority opinion that asked, "How about ditches, swimming pools, and puddles?" *Sackett*, 598 U.S. at 659.

None of the statements on which Defendants rely supports that the Court was announcing a categorical exclusion of all man-made channels from CWA jurisdiction. In fact, the *Sackett* majority opinion uses the term "ditch" only three times—two of those instances were to describe the facts of other cases and one use was in the introductory paragraph describing examples of waters courts have grappled with (but without making any findings). *See San Francisco Baykeeper*, 2023 WL 8587610, at *4 n.2 (rejecting same argument). Such an exclusion would leave out artificial channels like canals and therefore lead to absurd results. *See, e.g.*, *United States v. Holland*, 373 F. Supp. 665, 673 (M.D. Fla. 1974) (non-navigable canals were jurisdictional and that "canals were man-made makes no difference"); *see also* U.S. Add'l SOF ¶ 191. If the Court intended to categorically exclude ditches, it would have said so. But it did not.

The relevant inquiry—and the reading that aligns with what the *Sackett* majority and *Rapanos* plurality actually held—is whether the water body is characterized by the ordinary presence of water. In the same sentence on which Defendants rely for their categorical exclusion of artificial channels, the *Sackett* majority referred to "relatively permanent, standing or continuously flowing bodies of water" and expressly adopted (and then quoted) the plurality test. *Sackett*, 598 U.S. at 671 ("we conclude that the *Rapanos* plurality was correct").

The *Rapanos* plurality concluded that dictionary definitions of "waters" "connote continuously present, fixed bodies of water, as opposed to ordinarily dry channels through which

water occasionally or intermittently flows." 547 U.S. at 732–33. The plurality also noted, "None of these terms encompasses transitory puddles or ephemeral flows of water." *Id.* at 733. The *Rapanos* plurality also stated, "The restriction of 'the waters of the United States' to exclude channels containing merely intermittent or ephemeral flow also accords with the commonsense understanding of the term." *Id.* at 733–74. This statement also prefaced the plurality's remark, upon which Defendants rely in their brief, that "the Corps has stretched the term 'waters of the United States' beyond parody." *Id.* at 734.

The *Rapanos* plurality did not create a categorical exclusion but rather distinguished channels, including man-made ditches, based on the ordinary presence of water. *See also id.* at 735 ("Under no rational interpretation are typically dry channels described as '*open* waters.'"). And, again, when analyzing the CWA's definition of "point source," which includes "ditch" and "channel," the *Rapanos* plurality explained those terms are "ordinarily used to describe the watercourses through which *intermittent* waters typically flow."[5] *Id.* at 736 & n.7; *see also ONRC Action v. U.S. Bureau of Reclamation*, No. 97-3090, 2012 WL 3526833, at *23 (D. Or. Jan. 17, 2012), *report and recommendation adopted*, 2012 WL 3526828 (D. Or. Aug. 14, 2012) ("[T]hat the Drain is man-made does not preclude the finding that it is also a 'tributary' and therefore a 'water of the United States.'").

This understanding is further confirmed in the proposed remand instructions in the *Rapanos* plurality. The wetlands at issue were near ditches or man-made drains that eventually emptied into traditional navigable waters. 547 U.S. at 729. On remand, the plurality proposed: "the lower courts should determine, in the first instance, whether the ditches or drains near each wetland are 'waters' in the ordinary sense of containing a relatively permanent flow." *Id.* at 757. If the plurality intended to create a categorical exclusion of ditches, the remand instruction would have been unnecessary. Thus, the language Defendants quote from *Sackett*, which was itself

---

[5] The *Rapanos* plurality's use of "intermittent" does not appear to be in a scientific sense and would not have excluded seasonal flow. 547 U.S. at 732 n.5; *see San Francisco Baykeeper*, 2023 WL 8587610, at *4.

quoting language in the *Rapanos* plurality, does not create a new categorical exclusion for man-made ditches. Defs.' Cross-Mot. 15–16.

The Fifth Circuit's recent decision in *Lewis* is in alignment. There, the court explained that the asserted jurisdictional connection included "roadside ditches" and, based on the district court's findings, held that "there is no 'continuous surface connection' between any plausible wetlands [on the subject property] and a 'relatively permanent body of water.'" 2023 WL 8711318, at *3. The district court's findings included that "the Corps never actually observed flow in the ditches at the Site" and that that documentation stated the ditches are "intermittent but not seasonal." *Lewis*, No. 18-1838, 2020 WL 4798496, at *6 (E.D. La. Aug. 18, 2020). In other words, the court found the ditches did not qualify based the ordinary presence of water.

Finally, Defendants' expert Dr. Dennis agreed the upstream reach of Bessey Creek (what Defendants call the East-West Ditch) is a relatively permanent water under the *Rapanos* plurality standard. Dennis Rep. at -158 ("[E]ven though the east-west Canal Ditch does not flow year-round or have continuous flow, it does have at least seasonal flow and is therefore treated here to be a non-navigable, relatively permanent tributary.") (ECF No. 15-72); Dennis 2d Tr. 8:20–9:2; 44:6–18; 44:20–45:3 (U.S. Add'l SOF Ex. 94).

Defendants' commentary about whether the ditch is referred to as the East-West Ditch or the upstream reach of Bessey Creek is immaterial. Defs.' Cross-Mot. 16. And even if it were, before this litigation, Defendants called the same waterbody "Bessy Creek" and indicated "stream flow" in the upstream reach of Bessey Creek and the N/S Ditch *in a document they submitted to a Florida state agency*. U.S. SOF Ex. 11 (Defendants' map) (ECF No. 151-12); *see also* ECF No. 151-45, at -260 (describing HWTT facility proposal "to provide nutrient removal for the portion of the Bessey Creek watershed upstream (or west) of Boat Ramp Avenue"). Defendants' self-serving decision to rebrand the upstream reach of Bessey Creek as the "East-West Ditch" does not change that it is a relatively permanent water under *Sackett*.

   **2.    Seasonal flow is sufficient for each ditch to be "relatively permanent."**

Courts have applied *Rapanos*' "relatively permanent" test for over fifteen years and have

consistently concluded that seasonal waterways are relatively permanent. *See, e.g.*, *Foster v. EPA*, No. 14-16744, 2019 WL 4145583, at *21 (S.D.W.V. Aug. 29, 2019); *United States v. Mlaskoch*, No. 10-2669, 2014 WL 1281523, at *16 (D. Minn. Mar. 31, 2014); *United States v. Brink*, 795 F. Supp. 2d 565, 578–79 (S.D. Tex. 2011). And decisions *after Sackett* continue to confirm that seasonal flow is sufficient. *See San Francisco Baykeeper*, 2023 WL 8587610, at *4 ("[H]aving a seasonally intermittent flow to a [waters of the United States] nonetheless qualifies as 'relatively permanent' under *Sackett* and *Rapanos*.").

These holdings flow from the *Rapanos* plurality opinion's consideration of whether the water body is characterized by the ordinary presence of water. *Rapanos*, 547 U.S. at 733–34. In particular, the plurality contrasted a "seasonal river" with a stream "whose flow is . . . 'broken, fitful,'" *Rapanos*, 547 U.S. at 732 n.5 (quoting Webster's Second dictionary) (cleaned up), or "'exist[s] only, or no longer than, a day,'" *id.* (quoting Webster's Second dictionary). Distinguishing between the two is a "[c]ommon sense" enterprise. *Id.*

The weight of case law are consistent with how the Corps and EPA have long interpreted "relatively permanent" under the *Rapanos* plurality. "The agencies will assert jurisdiction over non-navigable tributaries of traditional navigable waters that are relatively permanent where the tributaries typically flow year-round or have continuous flow at least seasonally (e.g., typically three months)." U.S. Add'l SOF Ex. 89, at 6–7 ("*Rapanos* Guidance").[6] Here, the upstream reach of Bessey Creek, the N/S Ditch, and the 84th Avenue roadside ditch are all relatively permanent as a matter of law because they are at least seasonal. *See* U.S. Mot. 13–14.

Defendants rely on dictionary definitions to assert the opposite conclusion. Defs.' Cross-Mot. 16–17. But even if it were appropriate "to parse the text of [*Sackett*] as though that were

---

[6]     The *Rapanos* Guidance addresses the tests announced by the plurality and Justice Kennedy. Defendants' expert Dr. Dennis relied on the *Rapanos* Guidance when offering an opinion whether the wetlands satisfy the plurality test. *See* U.S. SOF Ex. 71, at -154 (ECF No. 151-72). Defendants generally suggest that agency guidance issued after *Rapanos* was called into question by *Sackett*. Defs.' Cross-Mot. 13. *Sackett* did not criticize guidance regarding the plurality standard. And in any event, the guidance is consistent with case law and common sense, even if not binding or dispositive.

itself the governing statute," *C.I.R. v. Bollinger*, 485 U.S. 340, 349 (1988) (Scalia, J.), these definitions support the United States. A waterbody containing water on a seasonal basis is characterized by "the ordinary presence of water." *Rapanos*, 547 U.S. at 734. That is, it contains water "in the normal order of events" or "[r]outine[ly]." Defs.' Cross-Mot. 17. Similarly, a seasonal waterbody is at least "somewhat" permanent, i.e., relatively permanent. *Id.* 17.

Defendants' attempts to distinguish *Rapanos* fail. First, Defendants are wrong that *Rapanos* only distinguished between seasonal bodies of water that are natural and not manmade. *See supra* Part IV.B.1. Second, Defendants contend that "channels with intermittent flow are *not* part of the 'waters of the United States.'" Defs.' Cross-Mot. 19. That is not the relevant inquiry: the channels at issue here meet the relatively permanent standard under the *Rapanos* plurality as adopted by *Sackett* because they are at least seasonal. *See supra* Part IV.A.

Defendants argue that, in the upstream reach of Bessey Creek and the N/S Ditch (but not the 84th Avenue roadside ditch) the wet season flow "was not as robust as the Government suggests," Defs.' Cross-Mot. 18, but do not dispute any of these waterbodies flows during the wet season, which runs from July through December. Defs.' SOF ¶¶ 72, 106, 108, 109. Indeed, Mr. Sharfi testified that the N/S Ditch contains water six to eight months of the year and responds to the water table (thus, more than in direct response to precipitation). Sharfi Tr. 123:1–124:19 (U.S. Add'l SOF Ex. 87); U.S. Add'l SOF ¶ 169; *see San Francisco Baykeeper*, 2023 WL 8587610, at *5 (channel that flows seasonally and more than in direct response to precipitation is relatively permanent). In any event, Defendants' criticisms miss the mark.

First, Defendants claim that "water was rapidly disappearing" from the upstream reach of Bessey Creek in November and December of 2021. Defs.' Cross-Mot. 18. That flow decreased as the wet season ended and the dry season began is not unusual. And members of the United States expert team observed flow in the upstream reach of Bessey Creek north of the Countess Joy Reference Area in August, September, October, and December. U.S. SOF ¶ 71. The record also supports other percipient observations of flow in the upstream reach of Bessey Creek in the months of February (well into the dry season), May, and June. *See* Defs.' SOF ¶ 117; U.S. Add'l

SOF ¶¶ 171, 199 (alligator near SW 84th Avenue). With respect to the N/S Ditch, Defendants argue that Mr. Wylie saw water flowing in the N/S Ditch on only two visits, and Dr. Nutter never did. Defs.' Cross-Mot. 18. But the third time Mr. Wylie visited the confluence of the N/S Ditch and the upstream reach of Bessey Creek, rainfall was below normal, Wylie 2d Tr. 260:6–10; 260:20–261:2 (U.S. Add'l SOF Ex. 93), and Dr. Nutter did not see water flowing from the N/S Ditch into Bessey Creek because he never visited that location, Nutter 2d Tr. 204:18–205:5 (U.S. Add'l SOF Ex. 84) The other evidence summarized above and in the United States' opening brief overwhelmingly demonstrate continuous flow at least during the wet season.

Second, Defendants' evidence regarding the dry season is irrelevant and overstated. It is irrelevant because a relatively permanent waterbody can be seasonal. And it is overstated because (1) Defendants' expert Mr. Creech testified *not* that the upstream reach of Bessey Creek, the N/S Ditch, and 84th Avenue roadside ditch "are typically dry for the majority of the year," Defs.' Cross-Mot. 20, but rather that the upstream reach of Bessey Creek only became dry in *May*, near the end of the dry season according to Mr. Creech, Creech Tr. 203:23–204:9 (U.S. Add'l SOF Ex. 85); and (2) Defendants proffer no evidence as to the level of precipitation preceding the observations taken in March and April of 2022, *see* Defs.' Cross-Mot. 20. Thus, even if the evidence were relevant, Defendants cannot create a genuine dispute of fact.

Finally, Defendants misunderstand the import of the United States' evidence that the upstream reach of Bessey Creek, the N/S Ditch, and the 84th Avenue roadside ditch all possess a bed and bank and an ordinary high-water mark. Defs.' Cross-Mot. 20. These features are not *sufficient* conditions for a waterbody to qualify as relatively permanent, but instead provide evidence of flow, *see Rapanos* Guidance 10 (U.S. Add'l SOF Ex. 89), and that these waterbodies are geographical features, *see Rapanos*, 547 U.S. at 732–33.

### 3. Defendants' assertion that surface water must be present across a wetland to satisfy the continuous surface connection is wrong.

The Site wetlands have a continuous surface connection to the upstream reach of Bessey Creek, the N/S Ditch, and the 84th Avenue ditch because they directly abut each of those waters.

U.S. Mot. 15–18; *see Sackett*, 598 U.S. 677–79; *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 134–35 (1985). Defendants argue that the evidence proffered is legally insufficient because, they believe, there must be a "continuous surface *water* connection." Defs.' Cross-Mot. 21–24 (emphasis added). There is no support for Defendants' invented theory. In fact, the *Sackett* majority opinion never even uses the term "continuous surface water connection."

Defendants' reading appears to be based on a belief that *Sackett* clarified that "only 'open waters' are regulated." *Id.* at 23 (citing *Sackett*, 598 U.S. at 671). In fact, the page Defendants cited does not even mention "open waters," and no other part of the *Sackett* opinion makes such a broad pronouncement. To be sure, the Court determined that the ordinary meaning of "waters" typically refers to bodies of open water. *Sackett*, 598 U.S. at 672. But this was not a new development in CWA jurisprudence. The Court also explained that it has used this terminology for at least twenty years. *Id.* at 673 (explaining that *SWANCC v. U.S. Army Corp. of Eng'rs*, 531 U.S. 159 (2001) described covered "waters" as "open water").

Defendants also ignore an entire part the Court's analysis dealing with wetlands in context of "waters of the United States." *See Sackett*, 598 U.S. at 674 ("Although the ordinary meaning of 'waters' in § 1362(7) might seem to exclude all wetlands, we do not view that provision in isolation. The meaning of a word may only become evident when placed in context, and statutory context shows that some wetlands qualify as 'waters of the United States.'" (cleaned up)). The Court characterized *Riverside Bayview*: "In that case, we deferred to the Corps' decision to regulate wetlands actually abutting a navigable waterway, but we recognized the inherent difficulties of defining precise bounds to regulable waters." *Sackett*, 598 U.S. at 677 (cleaned up). And the Court agreed with the *Rapanos* plurality that "the CWA extends to only those wetlands that are as a practical matter indistinguishable from waters of the United States, such that it is difficult to determine where the 'water' ends and the 'wetland' begins." *Id.* at 678 (cleaned up). "That occurs when wetlands have 'a continuous surface connection to bodies that are "waters of the United States" in their own right, so that there is no clear demarcation between "waters" and wetlands.'" *Id.* (quoting *Rapanos*, 547 U.S. at 742)); *see also Bobby Wolford*

*Trucking*, 2023 WL 8528643, at *3 (wetlands with "unbroken surface or shallow subsurface hydrologic connection" to navigable water have requisite continuous surface connection).

Further, Defendants' reading would require this Court to hold that the definition of "wetlands" that has been in force—unchanged—for over forty years was somehow vacated by *Sackett* even though the Supreme Court did not even suggest the definition was under review. 33 C.F.R. § 328.3(b) (1987); *Riverside Bayview*, 474 U.S. at 124, 129–31, 135 (describing history of and applying wetlands definition). An area can satisfy the hydrological parameter if it is inundated or saturated by surface *or* ground water at sufficient frequency and duration. *See* 33 C.F.R. § 328.3(b); *see also* U.S. Mot. 7–8 (describing wetland parameters). Similarly, under the Manual (the same document Defendants describe as "legally-required"), wetland hydrology generally requires the area is inundated with water either permanently or periodically *or* the soil is saturated to the surface at some time during the growing season of the prevalent vegetation. U.S. SOF Ex. 61, at 9–31. But Defendants contend that *Sackett* rewrote the wetland definition without discussion. Under Defendants' reading, "[a] wetland can only be part of a surface water if there is surface water on it; if there is no water on top of a wetland, then it cannot be an 'open water.'" Defs.' Cross-Mot. 23; *see also id.* at 28 ("This means that the wetlands must have surface water, because only open surface waters are regulated.").

A continuous surface connection includes where a wetland actually abuts another covered water, as is the case at several locations here. *See Sackett*, 598 U.S. at 677–78 (citing *SWANCC* and characterizing *Riverside Bayview* as holding that Corps had "jurisdiction over wetlands that actually abutted on a navigable waterway"); *United States v. Andrews*, No. 20-1300, 2023 WL 4361227 (D. Conn. June 12, 2023) (holding that CWA extends to wetland that directly abuts a covered water) (publication forthcoming). Defendants' assertion that "[o]ne only has trouble distinguishing a water from a wetland if surface water covers both" lacks any support. Defs.' Cross-Mot. 23. It is also inconsistent with *Riverside Bayview*. There, an "area characterized by saturated soil conditions and wetland vegetation extended beyond the boundary" of the owner's property to a covered water (similar to the wetland at issue here extending into the Countess Joy

29

Reference Area). 474 U.S. at 131. The Court acknowledged the difficulty in determining where water ends and land begins: "the transition from water to solid ground is not necessarily or even typically an abrupt one. Rather, between open waters and dry land may lie shallows, marshes, mudflats, swamps, bogs—in short, a huge array of areas that are not wholly aquatic but nevertheless fall far short of being dry land." 474 U.S. at 132. *Riverside Bayview* held that CWA jurisdiction extends over wetlands that actually abut a covered water. 474 U.S. at 135. That holding is discussed in *Sackett* and remains good law. *See Sackett*, 598 U.S. at 677–78.

For this reason, Defendants are on especially weak ground in claiming that abutting wetlands must be literally indistinguishable from traditional navigable waters or their tributaries. Defs.' Cross-Mot. 25. *Sackett* does not state that the two must be indistinguishable, but explains *when* that is the case: when "wetlands have a continuous surface connection to bodies that are waters of the United States in their own right, so that there is no clear demarcation between waters and wetlands." *Sackett*, 598 U.S. at 678. This occurs, for example and as *Riverside Bayview* holds, when a wetland "actually abuts on" a covered water. 474 U.S. at 135.

Finally, even if a continuous surface *water* connection were required, the evidence establishes surface water connections between the large wetland and the upstream reach of Bessey Creek, the N/S Ditch, and the 84th Avenue roadside ditch. The U.S. expert team observed (and documented) surface water flowing directly into the upstream reach of Bessey Creek on the Countess Joy Reference Area. U.S. Add'l SOF ¶ 167. The U.S. expert team also observed surface water flow from the N/S Ditch to the 84th Avenue roadside ditch. *Id.*

## CONCLUSION

For the foregoing reasons, the Court should grant the United States' Motion for Summary Judgment, deny Defendants' Cross-Motion for Summary Judgment, and enter summary judgment in favor of the United States on Defendants' CWA liability. The Court should order the parties to submit a joint schedule to govern future proceedings regarding the remedy.

Dated: December 22, 2023

Respectfully submitted,

TODD KIM
Assistant Attorney General

*/s/ Brandon N. Adkins*
BRANDON N. ADKINS (Bar ID No. A5502752)
ANDREW J. DOYLE (FL Bar No. 84948)
JEFFREY HUGHES (Bar ID No. A5502897)
United States Department of Justice
Environment & Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044
Tel: (202) 616-9174
Fax: (202) 514-8865
Brandon.Adkins@usdoj.gov
Andrew.Doyle@usdoj.gov
Jeffrey.Hughes@usdoj.gov

MARKENZY LAPOINTE
United States Attorney

DEXTER LEE (FL Bar No. 936693)
Assistant United States Attorney
Southern District of Florida
99 N.E. 4th Street
Miami, FL 33132
Tel: (305) 961-9320
Fax: (305) 530-7679
DLee@usa.doj.gov

*Attorneys for the United States*