# EXHIBIT 86

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF FLORIDA
 2
                       CASE NO. 2:21-cv-14205-KAM
 3

 4   UNITED STATES OF AMERICA,

 5           Plaintiff,
     vs.
 6
     BENJAMIN K. SHARFI, in his personal
 7   and fiduciary capacity as trustee of
     The Benjamin Sharfi 2002 Trust, AND
 8   NESHAFARM, INC.,

 9           Defendants.

10   _____/

11
                        VIA ZOOM
12                 Miami, Florida 33136
               Friday, 9:01 a.m. to 5:10 P.M.
13                     May 27, 2022

14

15

16           DEPOSITION OF W. MICHAEL DENNIS

17

18

19           Taken on behalf of the Plaintiff before

20   Melissa Ostolaza, Notary Public in and for the State

21   of Florida at Large, pursuant to Notice of Taking

22   Deposition in the above cause.

23

24

25
```



1  with them.  And they actually shot a lot of those

2  cross-sections while I was there on the east-west

3  ditch.  So I told them, "Here's -- here's what we're

4  trying to capture and fairly represent."

5     Q.   So do you have an estimate of how many you

6  -- you personally showed them the high water line?

7     A.   Well, I would have on both the -- the

8  east-west -- both of the ditches that connect to the

9  west wetlands, at least three or four locations on

10  the north-south ditch, and at least a couple of

11  locations on the east-west ditch.

12     Q.   And then with respect to the nails that you

13  installed in woody vegetation, did you identify each

14  of the high water lines on the vegetation yourself?

15     A.   Yes.

16     Q.   So are there any other -- did you collect

17  any other data during your December 2021 visit

18  inspection of Countess Joy that we haven't discussed

19  yet?

20     A.   No.  I think we fairly -- fairly covered

21  what my mission was and the data we took on the

22  December site inspection.

23     Q.   Okay.  So the next time you were on the site

24  was March 10, 2022, correct?

25     A.   Yes.



W. MICHAEL DENNIS                                    May 27, 2022
U.S.A. vs BENJAMIN K. SHARFI                               115

1      Q.    Okay.   And did you also inspect the Countess

2  Joy property on March 10th, 2022?

3      A.    I did.

4      Q.    Okay.   So I'll try to work through these

5  together then.

6           When did you first arrive on the site or

7  Countess Joy, whatever was earlier, on March 10,

8  2022?

9      A.    Again, it was, you know, around 9:00 plus or

10  minus, on that day, and we worked pretty much all

11  day.

12      Q.    Okay.   So in other words, about an

13  eight-hour day or so?

14      A.    Yeah, more or less.

15      Q.    I suppose you'd had less daylight in March,

16  right?

17      A.    Actually, that's in December.

18      Q.    Oh, yeah, that's true.   That's a good point.

19           Okay.   So explain to me what did you do in

20  March 2022?

21      A.    In March 2022, I had the benefit of

22  receiving the team expert DOJ report, and so I

23  particularly was interested in inspecting the primary

24  flow way that was described in that.   Primary flow

25  path I guess is the right term.



1          So I again met with the surveyors and we
2    spent that day generally looking from the area of the
3    north-south ditch where that northern ditch went to
4    the western -- northwestern wetland that I described
5    earlier.  So basically, that day was spent from that
6    point looking at that ditch connected to that
7    northwestern wetland in more detail, and then in
8    walking out the primary flow path area and taking --
9    looking at that physically in the field, looking at
10   what it looked like.
11          And I was particularly interested in getting
12   typical cross-sections of that primary flow path.  So
13   that was -- that was the -- one of the main missions.
14   The other main mission was to look at -- physically
15   look at all of the ditches on the site, including the
16   ditch/swale, and looking at the entirety.  I walked
17   the entirety of the north-south ditch all the way to
18   the east-west ditch.  And I also inspected the two
19   ditches that connect west to those two wetlands that
20   I've described.  And then I walked with the survey
21   team the primary flow path all the way to 84th street
22   ditch that then went and connected to the east-west
23   ditch.
24   Q.   Did you take any water quality samples?
25   A.   No.



W. MICHAEL DENNIS                                    May 27, 2022
U.S.A. vs BENJAMIN K. SHARFI                                   117

1     Q.   Did anyone present at the inspection take

2  any water quality samples?

3     A.   No.

4     Q.   Who was -- who was present?

5     A.   I think that was myself, the survey team,

6  and Chris Hamilton, I believe.

7     Q.   We were talking about the hydroperiod nails

8  during the -- during the discussion of the December

9  inspection.  Did you install the hydroperiod nails in

10  December, or would it have been March 2022?

11     A.   I put them in in December.

12     Q.   Okay.  So did you use -- did you install any

13  hydroperiod nails in March 2022?

14     A.   No.

15     Q.   Okay.  So when you installed them in

16  December, you weren't aware at that point what the

17  continuous flow pathway that's identified in the U.S.

18  DOJ Expert Team report is?

19     A.   No.  I hadn't received that report, and I --

20  I had no knowledge of that primary flow path at that

21  time.

22     Q.   Okay.  Did you install any hydroperiod nails

23  during the March 2022 inspection?

24     A.   No.

25     Q.   Did you take any soil samples when you were



W. MICHAEL DENNIS
U.S.A. vs BENJAMIN K. SHARFI

May 27, 2022
118

1  on the Countess Joy property in March 2022?

2       A.   I dug one soil pit.  That's the one I

3  referred to when you were asking me earlier.  And

4  what we -- what we did is we followed the -- I'll

5  call it the blue line in the expert team report.

6            Do you know what I'm talking about?

7       Q.   I know what you mean.  The continuous flow

8  pathway?

9       A.   Right.  So we followed the blue line, and at

10  one point, sort of halfway between the north-south

11  ditch and th 84th street ditch, right on the blue

12  pathway, which we had downloaded into a Benza

13  (phonetic) computer system.  So we were -- you know,

14  we were pretty sure we were right on the blue line,

15  you know, plus or minus a few feet.

16            And so we stopped right on the -- on one of

17  the blue lined areas, and I dug a soil pit.  And I

18  went down about -- it was about 1.3 feet, and at that

19  point in time, I hit either a real prominent hardpan

20  or rock, but I couldn't -- I couldn't penetrate below

21  that.

22            And I was mainly looking to see whether or

23  not water would come up in that hole, so I dug the

24  hole and waited there for long enough time to where

25  if there was going to be any water coming up, I would



1  observe it.  And there was no water that came up in

2  that hole at all; it was totally dry.

3          So that's -- that's the one area that I dug

4  up a soil -- or did a soil hole pit.

5      Q.   Okay.  And it was about 1.3 feet you'd say?

6      A.   Yes.

7      Q.   How do you -- how did you measure it?

8      A.   With a pocket -- a -- a pocket rod, that's

9  what it's called.  It's a -- it's like a regular

10  measuring device that you use around your house

11  except it's measured off in tenths of a feet, and

12  surveyors sometimes use that.

13      Q.   Yeah, I've read about these.  You've got to

14  be real careful because they're in tenths of a foot,

15  not inches.

16      A.   That's right.

17      Q.   What did you use to dig the hole?

18      A.   I used a sharpshooter shovel, those narrow

19  shovels that soil scientists use.

20      Q.   Okay.  And how -- why -- why did you select

21  that point on the -- the blue line, as you said, to

22  dig a hole?

23      A.   It was in an area that I looked at and just

24  could not find any evidence of it being a flow path

25  or it being a wetland.  There was -- there was



1  nothing about the topography.  There was nothing

2  about the vegetation.  I just saw nothing right there

3  that would indicate to me it was right in the middle

4  of a perennially flowing pathway.

5          And so I said, well, I'll just -- I'm not

6  out here to do a total research of the site, but I

7  would like to see if there is any water coming up in

8  that -- in that hole.  Maybe I'm missing something.

9  Maybe there's -- maybe there's water underneath

10  there.  But, again, I went down a foot and a half.

11  The soils were dry.  No water came up in the hole.

12          So for that one point, there was not any

13  water within at least 1.3 feet of the ground surface.

14  That was in March.  It's the dry season.  Understand

15  all that, but still, for that to be a perennial flow

16  way, I would have expected water there.

17      Q.   And you said you didn't notice any

18  vegetation.

19          What do you mean by that?

20      A.   I didn't notice any wetland vegetation in

21  the place where I dug a path.  It was out in the

22  middle of a pasture area where pasture grass is that

23  were not wetland species.  General area around it

24  were pine trees, so it just did not look like a

25  wetland to me.



W. MICHAEL DENNIS                              May 27, 2022
U.S.A. vs BENJAMIN K. SHARFI                        121

1     Q.   Did you take any pictures of the hole?

2     A.   I did.

3     Q.   Okay.  And did you produce those pictures?

4     A.   I'd have to look and see.  I don't think so,

5  but I did take a picture of it.

6     Q.   Did you make any observations with respect

7  to the soils where you dug a hole?

8     A.   I did generally.  I didn't -- I didn't go

9  through the whole soil testing procedure, but they

10  were -- they were brownish-orange type soils.

11     Q.   And what did you observe generally about the

12  soils?

13     A.   The color.

14     Q.   And were you able to identify the type of

15  soil that you observed?

16     A.   No.  I didn't -- I didn't -- I didn't do any

17  soil testing.

18     Q.   Are you familiar with the alpha-alpha test?

19     A.   Yes.

20     Q.   Did you do an alpha-alpha test of the

21  excavated soil?

22     A.   No.

23     Q.   Have you done an alpha-alpha test at any

24  other part of the site or at Countess Joy?

25     A.   No.



1    Q.   Okay.  Do you have the location of where you
2  dug this hole?
3    A.   Yes.  That's -- that's in my expert report,
4  so it's -- it's got a symbol on there in the expert
5  report on one of the figures.
6    Q.   Okay.  So when you say that you were looking
7  at all the ditches on the site, did you take notes of
8  any of the observations?
9    A.   Yes.
10    Q.   Okay.  And what did you notate?
11    A.   The beginning on the site, the north-south
12  ditch on the site had standing water.  There was
13  standing water in that ditch on the west side of the
14  site.
15    Q.   Okay.
16    A.   The swale/ditch was dry and there was no
17  standing water there in it at all.
18         The water in the north-south ditch extended
19  up the north -- from the -- from the northwest
20  corner, the water extended up, oh, 100 or so feet.
21  And I had the surveyors mark the northernmost point
22  in the north-south ditch that there was standing
23  water.  So we got the survey point of that and the
24  elevation of that point, and that's in the report.
25         I walked up the rest of the entirety of the



1  north-south ditch as I was instructing the surveyors,

2  and so during that -- during that day, I walked the

3  rest of the north-south ditch and it was completely

4  dry.  There was no water in the north-south ditch

5  beyond that one point that I just mentioned.  Totally

6  dry.

7          I got all the way to the east-west ditch and

8  I went out into it, and it had no standing water.

9  The soils were wet to damp to saturated, but there

10 was not any standing flowing water in the east-west

11 ditch on that day.

12         I inspected the two other manmade ditches

13 that connect to the north-south ditch in the west

14 wetlands, the two wetlands that we've talked about.

15 Those were both totally dry.  The wetlands on the

16 site, those two west wetlands, were totally dry.

17         The primary flow path from -- from where it

18 departs that northern connecting wetland ditch and

19 starts northwest and then west, the flow path was

20 completely dry.  No standing water, no puddles, no

21 evidence of flow.  It was totally dry.

22         We got to the 84th street -- or Avenue, I

23 can never remember whether it's street or avenue --

24 ditch and it was totally dry until you got to the

25 immediate confluence with the east-west ditch.  At



1  the culvert underneath that street on the east-west

2  ditch, there was a pool of standing water.  That pool

3  of standing water did not continue and flow past that

4  immediate pool that was just there in the first less

5  than 100 feet of the road.

6          And I inspected the east-west ditch in some

7  other locations between there and the north-south

8  ditch, and it was -- it was dry.  It -- so I

9  inspected all of the ditches and the primary flow way

10  on that day, and it was all dry.

11          And the surveyors that I had -- I had the

12  surveyors do representative cross-sections of -- we'd

13  already done the north-south ditch, so we didn't do

14  anymore on that, but we did do the cross-sections of

15  the primary flow path, the blue line, and the -- and

16  the 84th street ditch.

17      Q.   When you were making these observations that

18  those ditches were dry and -- were dry, as you say,

19  did you -- did you dig any holes to see what was

20  going on underneath the ground?

21      A.   I dug the one hole that we've talked

22  about --

23      Q.   Any others?

24      A.   -- but I did not -- huh?

25      Q.   Any others?



W. MICHAEL DENNIS                                    May 27, 2022
U.S.A. vs BENJAMIN K. SHARFI                                      125

1        A.    No.

2        Q.    Okay.

3        A.    I dug no other holes.

4        Q.    Why is that?

5        A.    We had -- we had one day to gather all that

6   data, and it was not in my purpose to go out there

7   and do any kind of further analysis, other than to

8   see if I could find any evidence of this primary flow

9   path.  So I can look at the surface and -- and I --

10  there -- there were -- once -- once you get to the

11  western edge of that flow path near 84th Street, the

12  conditions change there and there were some --

13  there's more mucky soils in that location.  And it

14  looked like water would stand in -- in that -- in one

15  area there.  And there was -- there was a dug

16  roadside pit just north of that, that did have some

17  standing water in it.  That was the only water I saw

18  except for that pool that I described in the

19  east-west ditch earlier.

20        So I looked, and -- and I was primarily

21  looking to see if there was some indication that --

22  you know, it may have been dry when I was out there;

23  it was in March.  But was there an indication of

24  stained leaves or was there a bed and bank?  Was

25  there an ordinary high water line?  I looked for all



1   of those things and I did not find them.

2      Q.   And where is that that you're saying you did

3   not find them?

4      A.   On the blue line primary flow path.

5      Q.   When you were walking the ditches in the

6   flow path, did you have your sharpshooter shovel with

7   you?

8      A.   Yes.

9      Q.   About how long would it take to dig a hole

10  of approximately 1.3 feet?

11     A.   Depends on the soil, a few minutes.

12     Q.   Okay.  Just to confirm, you haven't made any

13  of your own determinations regarding the normalcy of

14  precipitation at the Countess Joy property during

15  your March 2022 inspection; is that correct?

16     A.   No.

17     Q.   Okay.  And your opinion is that over the

18  course of this period, precipitation was normal, or

19  thereabout normal?

20     A.   It was in the dry season, but I believe it

21  probably was normal.

22     Q.   Okay.  And did -- did -- how, if at all,

23  does the normalcy of precipitation influence your

24  opinions in this case?

25     A.   Well, it's certainly a factor to consider is



W. MICHAEL DENNIS                                  May 27, 2022
U.S.A. vs BENJAMIN K. SHARFI                              127

 1    what -- what was the rainfall event, the antecedent

 2    rainfall event.   That's all part of the evaluation.

 3        Q.   And so when you say it's all part of the

 4    evaluation, what do you mean?

 5        A.   Just that, it's -- it's -- Florida has a wet

 6    season and a dry season, and about 52 to 54 inches of

 7    rain distributed during the year.

 8             So the -- the information that I had

 9    reviewed on rainfall is that Florida is still

10    operating under the wet season/dry season, still

11    having near that average rainfall.  And that's

12    important to talk about average and not normal.

13    Normal -- normal is dry years and wet years.  Average

14    is a numerical number that you can actually measure

15    and calculate.  So understanding the difference

16    between average and normal is -- is a good thing.

17        Q.   So does any of the Corps' guidance make a

18    distinction between average and normal?

19        A.   The Corps data just talks about normal

20    circumstances, so I'm familiar with the term normal

21    in that context.  I'd have to go back and look at it,

22    but I believe to answer you, rainfall, too, deals

23    with averages.

24             (Thereupon, Exhibit DX193 has been marked

25          for identification.)



W. MICHAEL DENNIS                                      May 27, 2022
U.S.A. vs BENJAMIN K. SHARFI                                      128

1  BY MR. ADKINS:

2      Q.   I'm going to show you an exhibit that has

3  been marked DX193.  This is the first exhibit we've

4  looked at on Zoom, so are you able to see Exhibit

5  193?

6      A.   I am.

7      Q.   Okay.  So this exhibit is titled "Antecedent

8  Precipitation Versus Normal Range Based on NOAA's

9  Daily Global Historical Climatology Network."

10         Do you see that?

11     A.   Yes.

12     Q.   Are you familiar with what this is?

13     A.   I'm not familiar with this exhibit, but I'm

14  familiar with the tool.

15     Q.   Okay.  And what generally is this tool?

16     A.   Well, this is the Antecedent Precipitation

17  Tool Version 1.0.

18     Q.   Okay.  And you see there are -- there's a

19  box in the lower to midsection of this tool that

20  says, "Coordinates 27.1682, negative 80.3622."

21     A.   Yes.

22     Q.   Do you know what that -- what that means?

23     A.   That generally refers to the lat/long

24  coordinates.

25     Q.   Okay.  Now, I'll represent to you that that



W. MICHAEL DENNIS                                    May 27, 2022
U.S.A. vs BENJAMIN K. SHARFI                                 129

1   -- the coordinates of that box are the lat/long for

2   the site in this case, okay?

3        A.    Those are the coordinates for the site?

4        Q.    Yes, sir.

5        A.    Okay.

6        Q.    Now, based on Exhibit DX193, there was below

7   normal precipitation while you were on the Countess

8   Joy property on March 10, 2022; is that right?

9             MR. MCALILEY:   Object to form.

10            THE WITNESS:    It appears to be.

11  BY MR. ADKINS:

12       Q.    Okay.  And just to clarify, you didn't --

13  you didn't run an antecedent precipitation for your

14  March 2022 inspection before disclosing your report

15  in this case, right?

16       A.    No.

17       Q.    Now, you see there is also a box that says

18  "Drought index PDSI," and the value is mild drought.

19       A.    Yes.

20       Q.    What does that mean, or do you -- do you

21  know what that means?

22       A.    It's a determination of an analysis of

23  drought and a different characterization of it being

24  dryer than normal.

25       Q.    Okay.  So just a few wrap-up questions here



 1  on this topic, and then --

 2          MR. MCALILEY:  Can we look at that last one

 3      just one more second.

 4          MR. ADKINS:  Of course, yeah.  Do you want

 5      to take another look at it?  Okay.

 6  BY MR. ADKINS:

 7      Q.   So I'm going to put back up on the screen

 8  DX193, okay?

 9      A.   Okay.

10      Q.   Do you see it?

11      A.   Yes.

12      Q.   Okay.

13      A.   Now, I just had a second to look at it as

14  you flashed it up there.

15      Q.   Sure.

16      A.   And I'm noticing that the precipitation in

17  January and February appears to be more, or higher,

18  and then it does drop off beginning late January to

19  the 1st of March.  But then it's up in March, goes up

20  within the normal range appears to be in.  So if I'm

21  reading that right, that's what it appears to be.  So

22  I think -- I think I need to study this a little bit

23  more, but it looks like that's the pattern that

24  you're seeing there.

25      Q.   And so the area that you're observing the



1   30-day average increasing is after the March 10, 2022

2   date reflecting on this exhibit, right?

3       A.   Well, there's a straw -- you know, a clear

4   dip late February it looks like before March, and

5   then the blue line comes on up.  And then in

6   mid-March the blue line jumps up and there was a main

7   rainfall then.  So I'm just -- I'm just reading off

8   what's there because the exhibit is what it is.

9   That's fine, thank you.  Thank you.  I just needed to

10  look at that again.

11      Q.   Of course.  So, Dr. Dennis, have you

12  performed any aerial reconnaissance of the site, the

13  Countess Joy property, or any other surrounding

14  areas?

15      A.   Not specifically.  I would have observed the

16  area as -- as I flew in and out of Stuart airport,

17  but, you know, no specific aerial reconnaissance at

18  this time.

19      Q.   Were you on a commercial jet when you flew

20  in and out of Stuart?

21      A.   No.

22      Q.   Oh, okay.  So you were in a small aircraft?

23      A.   Yes.

24      Q.   Okay.  Did you -- did you fly over the site

25  when you flew in and out of Stuart?



W. MICHAEL DENNIS                                    May 27, 2022
U.S.A. vs BENJAMIN K. SHARFI                               132

1    A.    I don't -- I don't remember specifically

2  flying over it.  I just don't remember.

3    Q.    Okay.  Have you visited any other properties

4  other than the site and the Countess Joy property in

5  connection with your work in this case?

6    A.    No.

7    Q.    And have you -- well, you haven't collected

8  any data from any of the referenced properties that

9  are cited in the U.S. DOJ Expert Team report; is that

10  correct?

11    A.    No.

12        MR. ADKINS:  Okay.  Let's go off the record.

13        VIDEOGRAPHER:  Going off the video record at

14    12:56 p.m. Stand by.

15        (Thereupon, a recess was taken.)

16        (Thereupon, Exhibit DX194 was marked for

17    identification.)

18        VIDEOGRAPHER:  We're back on the video

19    record at 1:32 p.m. You may proceed.

20  BY MR. ADKINS:

21    Q.    Okay.  Welcome back from lunch.  I'm going

22  to share my screen and show you what's been marked as

23  DX194.  This is the rebuttal -- the analysis and

24  rebuttal to U.S. Department of Justice Expert Team

25  Report February 18, 2018, prepared by W. Michael



1   perennial connection.

2       Q.   When you say inspections, you just mean the

3   March 10, 2022 inspection, right?

4       A.   Correct.

5       Q.   Do you have any other opinions regarding

6   Dr. Nutter's opinion, which was based in part on data

7   collected from the hydrologic wells?

8       A.   Those are the primary areas.

9       Q.   Any other nonprimary areas that you can

10  recall?

11      A.   No.

12      Q.   Did -- did you collaborate at all with

13  Dr. Negahban with respect to the substance of any

14  opinions offered by the U.S. DOJ Expert Team in this

15  case?

16      A.   No.

17      Q.   And you said that Dr. Brown had offered

18  editorial comments and suggestions to the draft of

19  your report; is that right?

20      A.   Yes.

21      Q.   Did Dr. Brown write any sentences or

22  paragraphs in your report?

23      A.   I don't think so.  She provided edits on

24  some of them.  If those edits turned out to be a

25  sentence here or there, it may have been, but nothing



1  beyond that.

2      Q.   I think we have kind of a vague term on --

3  I've had someone edit my work in a way that

4  completely rewrote it.

5          So what do you mean by edit?

6      A.   Yeah, I understand and appreciate that --

7  that position; I've had the same.

8          When I'm using edit here, I'm talking about

9  editing for typos, for sentences that didn't make any

10 sense, maybe a paragraph or a section that needs some

11 more clarification.  So I'm thinking about those

12 kinds of edits, which she would apprise me of and we

13 would discuss, and then I would go back and -- and

14 make the edits.

15     Q.   Okay.  Did anyone other than you write the

16 initial draft of your report?

17     A.   No.

18     Q.   Other than Dr. Negahban and Dr. Brown, have

19 you consulted with anyone else regarding -- and with

20 the exception of counsel -- have you consulted with

21 anyone else regarding your opinions in this case?

22     A.   No.

23     Q.   Does your April 8, 2022 rebuttal report

24 reflect the full scope of your opinions and the basis

25 and reasons for that in this case?



1    A.    Yes.

2    Q.    Does your April 8, 2022 rebuttal report

3  reflect the full scope of the facts and data you

4  considered in forming your opinions in this case?

5    A.    Yes.

6    Q.    Do any of your opinions in this case rely

7  upon the opinions of the other experts that

8  defendants have disposed?

9    A.    I would say that the -- my April 8th report,

10  that the substance of my opinions and what I intend

11  to testify on at the hearing -- I've subsequently had

12  the benefit of reviewing depositions and -- and

13  reports of Creach and Dr. Ott, so to the extent that

14  their reports address topics that I address, then at

15  hearing, would incorporate and rely on any of their

16  opinions that were germane to my opinions and my

17  testimony.

18    Q.    Okay.  Before you served your April 8

19  rebuttal report, had you been aware in any way of the

20  opinions of Dr. Creach and Dr. Ott?

21    A.    No.

22    Q.    And I think I mean Mr. Creach and Dr. Ott.

23  I think I did that wrong, but is the answer still no?

24    A.    Still no.

25    Q.    All right.  Is there anything in your



1  rebuttal report that you'd like to correct?

2       A.   There may be a typo here or there that I saw

3  when I reviewed it, but nothing of any substance.

4       Q.   Okay.  Did you delineate wetlands on the

5  site?

6       A.   I'm sorry, say it again.

7       Q.   Did you delineate wetlands on the site?

8       A.   No.

9       Q.   You considered four wetland delineations at

10  the site, one conducted by Ms. Danna Small in March

11  2018, two conducted by EDC, and one conducted by the

12  U.S. expert team in this case; is that right?

13       A.   Correct.

14       Q.   Okay.  Do you know when the EDC delineations

15  were conducted?

16       A.   My recollection is in 2020, perhaps 2019,

17  but 2019 to 2020, I believe.

18       Q.   And when I asked you towards the top of this

19  deposition what sorts of materials you considered,

20  you referred to Ms. Small's delineation.  What

21  exactly of Ms. Small's work did you consider in

22  forming your opinions in this case?

23       A.   I -- I considered her -- well, in the

24  delineation that she submitted to the South Florida

25  Water Management District and had inspected in the



 1   field by two wetland scientists from the Water

 2   Management District that was conducted primarily

 3   before any of the subsequent site work was done --

 4   may have been a little bit of work done, but not

 5   much -- in reviewing all of the wetland delineations

 6   on site that had been done on site, I found her

 7   delineation to be the most credible and defensible.

 8        Q.   Right.  I -- yeah, we'll get there, don't

 9   worry.  But I just want to understand exactly what --

10   what of Ms. Small's work that you considered.

11             So the wetland delineation, did you consider

12   any of the wetland delineation data forms that she

13   prepared in this case or for the site?

14        A.   Not specifically.

15        Q.   Generally?

16        A.   I -- I reviewed her survey wetland

17   delineation and focused primarily on -- on it.

18        Q.   And when you say the survey wetland

19   delineation, do you mean the map with the line of

20   where the wetlands exist based on her opinion?

21        A.   Yes.

22        Q.   Did you consider any of Ms. Small's notes

23   from inspections she conducted at the site?

24        A.   I don't believe so.

25        Q.   Did you consider any of the photos that



W. MICHAEL DENNIS                                   May 27, 2022
U.S.A. vs BENJAMIN K. SHARFI                                145

1   Ms. Small took of the site?

2       A.   I -- I don't -- not specifically.  I don't

3   believe that I focused on any of the materials other

4   than materials that I was provided that she submitted

5   to the South Florida Water Management District.  So

6   to the degree that there was anything submitted in

7   that or her submittal to the Corps of Engineers, I

8   would have considered that in -- in looking at the

9   opinion.

10      Q.   Is there anything else that you remember

11  specifically that you might have considered of

12  Ms. Small's other than what she submitted to the

13  Water Management District?

14      A.   Also, I considered and had benefit of her

15  deposition when I finalized my report, so I -- I -- I

16  was informed by her deposition testimony.

17      Q.   Okay.  And her deposition -- did you review

18  any of the exhibits that she was shown at her

19  deposition?

20      A.   I can't recall.

21      Q.   Okay.  I'm showing you page 54 -- oh, excuse

22  me, what's Bates Stamped as SHARFIEXPERTS154.  I'll

23  show you the bottom page here.  And this is page 49

24  of your report if you want to turn to a copy that you

25  have.



W. MICHAEL DENNIS
U.S.A. vs BENJAMIN K. SHARFI

May 27, 2022
146

1          So I'm going to read from your report here.

2    You state, "Given that the DLS Environmental Services

3    wetlands survey was conducted prior to the subsequent

4    land clearing, where the flag line inspected and

5    approved in the field by two South Florida Water

6    Management District reviewers, it was surveyed by a

7    professional land surveyor, I find this survey the

8    most supported by standard wetland delineation

9    practices and the most reliable for this site."

10          Did I read that correctly?

11    A.    Yes.

12    Q.    Is that an accurate statement of your

13    opinion in this case?

14    A.    Yes, it is.

15    Q.    Now, DLS Environmental Services, that's

16    Ms. Small's consulting company?

17    A.    Yes.

18    Q.    Can you please explain the basis for the

19    opinion that I just read.

20    A.    Yes.

21    Q.    Please do.

22    A.    I do and my company does wetland

23    delineations virtually every day of the week to one

24    degree or another.  And in doing wetland

25    delineations, the process always starts with, you



1   know, basic mapping and soils and vegetation

2   information, and you make a certain determination

3   before you go to the field about what are wetlands

4   and what aren't.

5         The second part of our standard wetland

6   delineation practice, and I think that this is

7   standard in the industry, is then you go out in the

8   field having the benefit of the topo maps, the

9   vegetation maps, the soil maps, the historical aerial

10  photographs, current aerial photographs, and you go

11  out in the field and you apply the wetland

12  delineation methodologies.  So you either apply the

13  state methodology in Florida, if you are in delegated

14  areas, or you apply the '87 Manual and the 2010

15  Supplement if you're in Corps of Engineers retained

16  waters.

17        And so you go out in the field and ground

18  troop your preliminary further interpreted

19  jurisdictional delineation.  And you look at the

20  vegetation, you get soil tests, you look at the

21  topography, you look at indicators of hydrology, and

22  then in the field you use all of that information to

23  still verify and you flag a wetland line.

24        Once that wetland line is flagged, and we

25  often will flag it and GPS it, then we will send it



1   to the regulatory agency, either the Water Management

2   District VP or the Corps or the upper government for

3   their review.  And typically, they will say, "We want

4   to inspect your line in the field."  So they will

5   send one of their wetland scientists, or in this case

6   two of the wetland scientists, out to inspect your

7   line.

8           The wetland line is inspected.  It's either

9   accepted or not accepted.  Usually, what happens is

10  that it's inspected and there'll be a flag here or a

11  flag there that will be some discussion about.  Those

12  flags might be moved a few feet one way or another

13  until -- and the line is inspected until every one

14  comes out of the field, all the agency folks that

15  inspected the line comes out of the field and said,

16  "We have reviewed and inspected your wetland lines

17  and we've verified it."

18          At that point in time, you have an

19  approximate wetland line based on the GPS readings,

20  and -- but you do have a verified site-inspected line

21  from the agencies.  Then, we typically would go to a

22  professional land surveyor, have them go out and pick

23  up the flagged points.  They survey the flagged

24  points, bring them back and provide a survey of the

25  wetland line that is then used in the subsequent



1    permitting.

2              So in this case, it appears that Ms. Small

3    followed that procedure.  That's the procedure that

4    we would have followed.  That's the procedure we

5    follow every day and get accepted by the agencies

6    every day.  And then we move ahead with the various

7    permitting steps based on that.

8              In this instance, we had a site that had

9    essentially, as far as I could tell, one

10   investigation in any depth conducted on it prior to

11   the land clearing activities, and that was by Ms.

12   Small.  And she followed these standard practices.

13             And to me, a key in my opinion on this is

14   that it wasn't just her flagged line, but it was

15   inspected by two of the South Florida reviewers.  And

16   Bobby Conley (phonetic), from South Florida, who's an

17   experienced wetland reviewer, and her staff reviewed

18   it, and then she wrote a letter, saying, "We accept

19   your delineation."

20             So given the fact that that's the only study

21   of a wetland delineation that was done prior to the

22   land clearing in this instance, I find it more

23   credible and defensible in following typical

24   practices of wetland science and wetland delineators

25   than the others.  And the others being the one that



W. MICHAEL DENNIS                                     May 27, 2022
U.S.A. vs BENJAMIN K. SHARFI                                    150

 1  was produced, a couple of them, a couple of

 2  variations, but after some of the operations that

 3  occurred or the U.S. team expert opinion based on

 4  their review of the '87 Manual and the 2010

 5  Supplement and their opinion of where the wetland

 6  line was using the information they brought together

 7  after the fact.

 8          So in considering all of that, I find her

 9  analysis as an experienced wetland delineator in

10  Martin County being most credible.

11      Q.   You say in your report standard wetland

12  delineations practices.  Is the process that you just

13  described, doing a photo interpretation of a wetland

14  line, ground trooping it, having it agency verified,

15  and once it's verified, having a survey done of the

16  line, is that what you mean by standard wetlands

17  delineation practices?

18      A.   Yes.

19      Q.   Are there any other reasons why you find

20  Ms. Small's wetland delineation to be more reliable

21  than DEP's delineations or the U.S. Department of

22  Justice Expert Team Report -- or expert team's

23  delineation?

24      A.   Yes, to the degree that in my review of

25  their various aerial photography and data sets, which



W. MICHAEL DENNIS                                                  May 27, 2022
U.S.A. vs BENJAMIN K. SHARFI                                                151

1  I've listed and outlined in the report, there have

2  been various wetland determinations made on the site.

3  There's a National Wetland Inventory Map, there's the

4  Hydrographic Database Map, there's the State of

5  Florida Flux Map.

6          So I reviewed all those, and those all vary

7  in one degree or another, but the thing that I was

8  the most corroborative in reviewing the whole series

9  of aerial photographs that I did from historic

10  aerials to the more recent, and looking at those

11  aerial photographs and the signatures on those, I can

12  pick out certain signatures that look like, you know,

13  wetland -- the wetland upland signature break.

14          And having looked at some of the wetlands on

15  the Countess Joy side and further interpreting what

16  were -- what I believe are wetlands there, admittedly

17  not having done a wetland delineation up there, but

18  looking at certain points on the ground and the

19  historic aerials, there's a signature that shows up

20  on many of the aerial photographs that pretty much

21  follow the DLS wetland delineation that it -- it

22  illustrates that there is a wetland in the southwest

23  corner.  Depending on the aerial and the date of the

24  aerial, it may vary a little bit, but it -- this

25  delineation seems credible based on looking at those



1    various aerials and the photo interpretation and the

2    signatures of those.

3            And also, you know, the soils, you can --

4    you can have hydric soils that are present, but they

5    don't delineate to the extent of a regulated wetland.

6    So there's a distinction there that can be made

7    between hydric soils and -- and the final wetland

8    soil, based on whether they're in a drained or

9    undrained condition and other factors.  But that

10   southwest corner had mucky soils.

11           So all of those things combined seem to

12   corroborate Ms. Small's delineation.  And, again, to

13   me, the most compelling thing is that she actually

14   did that in the field before any of the land clearing

15   occurred, and had it inspected by two South Florida

16   wetland inspectors.

17       Q.   Any other reasons why you find Ms. Small's

18   delineation to be more reliable?

19       A.   No.  That's the substance of my testimony.

20       Q.   Okay.  So you referred to the NWI maps.  Can

21   you explain what those are?

22       A.   National Wetland Inventory.

23       Q.   What does an NWI map show?

24       A.   National Wetland Inventory mapping is done

25   at the national scale, at the -- at the scale of the



1  old PS.  And that's the one I testified to earlier I

2  had done some mapping for, for that process, for the

3  NWI process when I was at the Tennessee Valley

4  Authority.

5         So it is a good resource at the scale that

6  it is done and with the level of ground trooping that

7  is done to support those delineations.  But I have

8  not found it to be as reliable in Florida, for

9  instance, as some of the other databases.  So it's

10  one of the -- it's one of the sources we always look

11  at.  And sometimes it's pretty close or right on, but

12  it says on the face of it, it's not to be used as a

13  surrogate for a wetland jurisdictional delineation.

14      Q.   You use the term ground troop in your

15  report.  What does that term mean to you?

16      A.   That means going actually in the field,

17  particularly with the aerial photographs in hand, and

18  looking at the signature that you see on the aerial

19  and inspecting the ground to see what the ground

20  condition is like.  So aerial interpretation is good

21  and it can be right on, but I'm never totally

22  comfortable with it until I actually go on the ground

23  and inspect the signatures to see if what I'm further

24  interpreting is actually what's occurring on the

25  ground.



1    Q.   Have you done any ground trooping on the

2  Countess Joy property?

3    A.   We spent the morning talking about what I

4  had done out there.  So I inspected this -- that

5  property.  I looked at some areas that appeared on

6  the aerial to be wetlands and inspected those.  So to

7  that degree, yes.

8    Q.   So would you consider the work that you did

9  on the Countess Joy property to have been ground

10  trooping?

11    A.   It was ground trooping to a degree.  I did

12  not go out on that property to ground troop, you

13  know, the entire site.  But it was -- it did give --

14  it did inform me in terms of my analysis of aerial

15  photography.

16    Q.   Did you attempt to ground troop any of the

17  NWI maps on the Countess Joy property?

18    A.   No.

19    Q.   How about on the site; have you tried to

20  ground troop any of the wetlands reflected on the

21  site in the NWI maps?

22    A.   I did not go on the site or the Countess Joy

23  property with the National Wetland Inventory map in

24  hand and do the kind of ground trooping that I just

25  described.



W. MICHAEL DENNIS                                    May 27, 2022
U.S.A. vs BENJAMIN K. SHARFI                                   155

1        Q.    So is that no, you did not ground troop the

2    NWI maps on the site?

3        A.    No.

4        Q.    Okay.  So how about this hydrographic

5    database map; did you do any ground trooping of the

6    hydrographic database map?

7        A.    No.

8        Q.    And that's true, you did not do any ground

9    trooping of the hydrographic database map on the site

10   or Countess Joy?

11       A.    No.

12       Q.    Did you do any ground trooping of the

13   historic aerial photographs on the site or the

14   Countess Joy property?

15       A.    Yes.

16       Q.    Okay.  Can you explain?

17       A.    Yes.  When I had access to the site and I

18   had access to the Countess Joy property, I -- and

19   that was after I had gathered all the historic

20   aerials and had that information inhouse.  Having

21   access to those properties, then, allowed me to go

22   back and look at the historic aerial photography in a

23   more informed fashion, so there were some questions I

24   had when I was doing the first evaluation about some

25   of the photographic signatures, and I was able to



 1   clear that up and better understand those signatures

 2   once I'd been out on the properties.

 3       Q.   And can you be more specific of what you had

 4   to clear up?

 5       A.   Yeah, on the -- I'll give you one specific

 6   example.  On the site historic aerials, there's -- in

 7   the southwest corner, and if you look at the 1950

 8   vintage aerial, those earlier aerials, the southwest

 9   corner, you'll see an area sort of an hour-glass

10   shaped real dark area, and then out from that, you'll

11   see some other slightly different shading signatures.

12          And so -- and I looked at that -- those

13   different signatures there and I looked at that on

14   some of the wetlands on the Countess Joy property

15   from the historic aerials to see where those

16   signatures looked consistent and what they -- what

17   they showed.

18          So that was -- that was helpful in

19   determining some of those signatures whether or not,

20   you know, a certain signature line was definitive of

21   a wetland edge or was it another line that was --

22   another signature that was seen.  So it was helpful

23   in that regard.

24       Q.   But the example that you're describing --

25   you know, I'm just going to stop sharing my screen.



W. MICHAEL DENNIS                                      May 27, 2022
U.S.A. vs BENJAMIN K. SHARFI                                    157

1            The example that you're describing, you were

2    confirming a ground trooping, a signature that you

3    saw in a 1950s aerial photograph with what you

4    observed on the site in 2022.

5            Am I understanding correctly, or correct me

6    if I'm wrong?

7       A.   Well, the sites changed in 2022 obviously.

8       Q.   Right.

9       A.   So I was looking at in '20 -- in the

10   historic 1950s era and looking at the signatures

11   there.  I could also look at similar areas on the

12   Countess Joy property and looked at the signatures

13   there.  So it -- it gave me an indication, without

14   ground trooping it on the site, because the site had

15   already been altered, of what those signatures were

16   reflecting, so that I could go out and look at a

17   wetland area on the Countess Joy property and see

18   where the extent of the wetlands were and see where

19   that signature was that allowed me to go back to

20   the -- you know, use the same aerial and look at the

21   site and look at the signatures there and give me a

22   better indication of the wetlands then.

23            So that was, again, my -- my -- my opinion

24   still remains that the best determination of the

25   wetlands on the site was the one done by Ms. Small



 1   for all the reasons I've given.  But you asked what

 2   other -- other things that I looked at, and that's

 3   some of them.

 4        Q.   Are there any other ways that you ground

 5   troop on the site or Countess Joy aerial imagery?

 6        A.   I'm sorry, say again?

 7        Q.   Are there any other ways that you ground

 8   troop on the site or the Countess Joy property aerial

 9   photography?

10        A.   No.  Look at the aerial photographs and be

11   on the ground with the aerial photographs in hand.

12   Nothing beyond that.

13        Q.   And you referred to some soil maps.  Did you

14   do any ground trooping of any soil maps in connection

15   with this case?

16        A.   No.

17        Q.   In what ways, if any, was Ms. Small's

18   delineation consistent with the 1984 Corps Manual?

19        A.   Which year Corps Manual?  You said '60?

20        Q.   I -- you know, I think I said '84 and I

21   meant '87, so excuse me.

22        A.   Okay.  '87.  Again, Ms. Small went out

23   before a disturbance essentially had happened, found

24   the wetland line, determined it and had it inspected

25   by South Florida.  Except for -- except for certain



1  apply the normal methodologies.  If the soils have

2  been so disturbed by some type of mechanical soil

3  disturbance and you don't have the regular soil

4  profile and you can't look at that to make a

5  determination of whether it's a hydric soil or not.

6         Or if you had an area that has been

7  completely cleared and there's no vegetation there,

8  so you've got no way of knowing physically on that

9  particular day what the vegetation was.

10         Or if you've had an area where you've had a

11  hurricane, and the area has been so disturbed that

12  it's changed -- it's changed conditions and you don't

13  have the -- you know, the vegetation, the soils, the

14  hydrology to look at, those would be altered sites

15  where you would have atypical situations, and you

16  would have to exercise other forensic methods to

17  determine what the -- whether there was a wetland

18  there before and where the boundary was.

19     Q.   And why is it meaningful to differentiate

20  between a normal circumstance and an atypical

21  situation?

22     A.   You're trying to get to the truth of the

23  matter of where is there a wetland based on

24  demonstrative wetlands plants, soils, and hydrology.

25  So you don't want to make a determination based on a



W. MICHAEL DENNIS                                    May 27, 2022
U.S.A. vs BENJAMIN K. SHARFI                                  168

1  circumstance where the conditions are not, quote,

2  normal that would give you a wrong determination.

3         Likewise, you don't want to make a wrong

4  determination based on having no vegetation,

5  hydrology, and soils to look at to be able to

6  determine whether there was a wetland there before or

7  not.

8         So those are things that you look at and

9  consider.  In the everyday business of delineating

10 wetlands, you go out there and you look for

11 vegetation, soils, and hydrology.  You apply the

12 methodologies and you delineate the wetlands.

13        But occasionally, you'll come up with

14 situations where things are not, quote, normal or the

15 sites have been altered so that it's impossible to do

16 that and you have to use an atypical evaluation.

17    Q.   Would it be appropriate to use an atypical

18 evaluation where there has been the unauthorized

19 discharge of fill?

20    A.   That would be one instance where you would,

21 yes.

22    Q.   And do you consider the construction of a

23 road in a wetland to be the unauthorized discharge of

24 fill?

25        MR. MCALILEY:  Object to form.



W. MICHAEL DENNIS                                    May 27, 2022
U.S.A. vs BENJAMIN K. SHARFI                              169

```
 1          THE WITNESS:  It depends on whether that

 2      wetland is a regulated waters of the United

 3      States or not.  If it's a regulated waters of the

 4      United States and fill has been put into it

 5      without obtaining a permit, then that would be

 6      contrary to and a violation of Section 404.

 7   BY MR. ADKINS:

 8      Q.   What do you consider fill material to be in

 9   context of Section 404 and the Clean Water Act?

10      A.   Well, it can be the discharge of dredged or

11   fill material or pollutant.

12      Q.   Anything else?

13      A.   That's basically it.

14      Q.   Can woody debris be fill?

15      A.   It would depend.

16      Q.   On what?

17      A.   Where the woody debris came from and how it

18   got there.  If you had a property and you had a

19   regulated Waters of the United States wetland on it,

20   and you pull a barn down and you took all the woody

21   debris from the barn and you dumped it in the

22   wetlands, then that would probably be the discharge

23   of fill.

24          If you had that same wetland and you had an

25   extreme storm event or a hurricane and you had debris
```



W. MICHAEL DENNIS                                    May 27, 2022
U.S.A. vs BENJAMIN K. SHARFI                                170

1   scattered through the wetland, that probably would

2   not be.

3        Q.   Can sod be considered fill?

4        A.   Again, it would -- it would depend.  If you

5   had -- if you place sod in a regulated Waters of the

6   United States and that was upland sod, and it changed

7   the elevation of the bottom of the wetland so that

8   you took it out of being in a wetland condition and

9   made it in an upland condition, then -- then it could

10  be.

11       Q.   Are there any other circumstances where

12  placing sod in a wetland would be considered fill?

13       A.   I'm sure there's lots of them.  If you took

14  a pallet of fill -- or of soil -- of sod and you went

15  out and dumped it in a wetland that was a Waters of

16  the United States, then I'd consider that to be a

17  violation.

18       Q.   When conducting a wetland delineation, do

19  you consider it relevant to understand how any land

20  clearing on the site being delineated was conducted?

21       A.   Yes.

22       Q.   And do you consider it relevant to

23  understand what type of equipment was used to clear a

24  site?

25       A.   Yes.



1    Q.   Do you consider it relevant to understand

2  whether any clearing disturbed root structures?

3    A.   Yes.

4    Q.   What do you understand about the nature of

5  the earth work activities that occurred at the site

6  since defendants purchased it?

7         MR. MCALILEY:  Object to form.

8         THE WITNESS:  Based on review of aerial

9     photographs before any of the current activities

10    occurred, and looking at historic aerial over the

11    period that this was a site that had gone, you

12    know, different -- different perturbations over

13    the years, then range land that had been raised,

14    had been cleared, vegetation had grown back, so

15    you have a whole history preceding --

16    Q.   I'm just asking after the defendants

17  purchased the site, so around 2017 onward, what do

18  you understand about the nature of their earthwork

19  activities?

20        MR. MCALILEY:  Same objection.

21        THE WITNESS:  It's clear that the site was

22    cleared and that portions of the wetland in the

23    southwest corner had been either excavated or

24    filled.

25  BY MR. ADKINS:



W. MICHAEL DENNIS                               May 27, 2022
U.S.A. vs BENJAMIN K. SHARFI                              172

1      Q.   Do you have any other understanding about

2    the nature of earthwork activities at the site since

3    2017?

4      A.   It's -- it's apparent that some of the

5    areas, in addition to normal clearing perhaps, have

6    had exotic and nuisance species removed.  I think

7    that's particularly evident in the 8.79 acre wetland

8    area that was -- that's still on the site that was

9    not filled.  Looking at that area and looking at the

10   historic aerials and some of the accounts, my sense

11   is that area probably was, you know, overgrown with

12   Brazilian pepper and primrose willow, some of the

13   more common invasive wetland species.  So it appears

14   that that area has had those weed exotic species

15   removed.  And -- and the area is apparently being

16   maintained to keep those out because in my

17   inspection, I didn't find any of those in there.

18     Q.   Have you ever personally observed any exotic

19   species on the site?

20     A.   I'm sorry, you were breaking up.

21     Q.   Have you ever personally observed any exotic

22   species on the site?

23     A.   Some of the animals are.

24     Q.   How about exotic vegetation?

25     A.   No.



1    Q.   And before you were personally on the site,

2  have you seen -- or at any point in this case have

3  you ever seen any pictures of exotic species --

4  exotic vegetation on the site?

5    A.   Yes.  Some of the photos that are in the

6  record and some of the aerial photographs, you know,

7  depict particularly Japanese climbing fern being very

8  prevalent on the site.  That would be one example.

9    Q.   Have you seen any pictures of Brazilian

10  pepper on the site?

11    A.   I can't recall.

12    Q.   Have you seen any pictures of any other

13  exotic species on the site?

14    A.   I can't -- I can't specifically recall right

15  now.

16    Q.   Okay.  So other than that the area was

17  cleared, that portions of the wetlands in the

18  southwest corner were excavated or filled, and that

19  there apparently were some areas where exotic species

20  were removed, do you have any other understandings

21  about the nature of the earthwork activities at the

22  site?

23    A.   Yes.

24    Q.   Okay.  What are they?

25    A.   Well, there's some -- you know, before --



1    A.   No.

2    Q.   So I'm going to take you to page 190, line

3  6, is by Mr. Adkins.  My question then is, "That area

4  that had been cleared for a perimeter road, would

5  that have fallen within the boundary of the wetland

6  that you delineated on the site?"  Mr. Mcaliley:

7  "Object to form."  Answer:  "Okay.  The perimeter

8  road was there when I did the first site visit.  I'm

9  not going to make an assessment on something that was

10  or was not present before I ever step foot on a site.

11  So I did not -- to me, I did not assess what's

12  already there, and I can't speak to what it might

13  have been.  So the perimeter road was not part of

14  what I find."

15        Did I read that correctly?

16    A.   Yes.

17    Q.   But do you still agree that -- or do you

18  agree that a perimeter road was on the site at the

19  time of Ms. Small's delineation?

20        MR. MCALILEY:  Object to form.

21        THE WITNESS:  Yeah, this would indicate that

22     there was.  What I don't have better information

23     on is how long that perimeter road had been

24     there, and whether that was, you know, there when

25     Mr. Sharfi bought the property or not.  I just

 1     don't have any information on -- on that.

 2   BY MR. ADKINS:

 3     Q.   You looked at aerial photography of the

 4   site, correct?

 5     A.   Yes.

 6     Q.   And you looked at aerial photography from

 7   periods before when the defendant purchased the site?

 8     A.    It was all vegetated, but what -- what you

 9   -- I could not tell from that is -- is whether or not

10   there was any kind of perimeter road around the

11   parcel or some type of advanced way outer perimeter

12   road on a path or whatever.  I don't -- I don't know.

13   I didn't see a perimeter road as exists there now

14   around the entirety of the site in those -- you know,

15   the earlier aerials.

16     Q.   Do you agree that Ms. Small did not assess

17   whether wetlands existed at the perimeter road that

18   she identified because it was already there when she

19   set foot on the site?

20     A.    I'm sorry, what was the question again?

21     Q.   Do you agree that Ms. Small did not assess

22   whether wetlands existed at the perimeter road that

23   was at the site when she was there because it was

24   already there when she set foot on the site?

25     A.    Yes, that's what she testified -- she --



1  yeah, I would agree with that's what she testified to

2  in her deposition.

3      Q.   Okay.  And are you also aware that Ms. Small

4  later speculated at the time she conducted her

5  delineation that it appeared the perimeter road had

6  been constructed in wetlands?

7          MR. MCALILEY:  Object to form.

8          THE WITNESS:  If I was aware of that, I had

9      forgotten that.

10 BY MR. ADKINS:

11     Q.   Okay.  Well, let's look at page 191.

12     A.   Okay.

13     Q.   Well, we'll start at page 190, excuse me.

14 And line 20 says, Question:  "Okay.  So when you

15 delineated a wetland on the site in March 2018, you

16 did not consider one way or the other whether

17 wetlands had existed along the perimeter under the

18 perimeter road; is that right?"  Mr. Mcaliley:

19 "Objection -- object to form."  Answer:  "Incorrect."

20         Now we're on 191, line 1.  By Mr. Adkins:

21 Question:  "Okay.  Correct me."  Answer:  "I did

22 speculate that it appeared that road had been

23 constructed on wetlands from everything I could see.

24 However, I'm not there to -- I can't tell for certain

25 because I wasn't there beforehand."



W. MICHAEL DENNIS                                    May 27, 2022
U.S.A. vs BENJAMIN K. SHARFI                                      186

 1              So my question is are you aware that Ms.
 2     Small speculated at the time she conducted her
 3     delineation that it appeared the perimeter road had
 4     been constructed on wetlands?
 5              MR. MCALILEY:  I'm going to just object to
 6        form.  Whatever she said or didn't say in her
 7        deposition transcript is her testimony, and I'm
 8        not quite sure how -- I'm not sure what the
 9        question is for Ms. -- for Dr. -- for -- for
10        Dr. Dennis.
11     BY MR. ADKINS:
12        Q.   You can answer, Dr. Dennis.
13        A.   I can read her testimony there, and so I
14     accept her testimony as what her opinion or feelings
15     were at that time.
16        Q.   So don't you agree that at the time of
17     Ms. Small's delineation, normal circumstances were
18     not present at the site?
19              MR. MCALILEY:  Object to form.  Foundation.
20              THE WITNESS:  I would agree that to the
21        extent that activities had occurred on the site
22        before Ms. Small's delineation, that she
23        apparently did not take that into account in
24        terms of her evaluation, and that if -- if indeed
25        those operations had occurred, then, you know, an



W. MICHAEL DENNIS                                    May 27, 2022
U.S.A. vs BENJAMIN K. SHARFI                              187

1        evaluation of that to determine if those were --

2        were wetlands may have been appropriate.

3        BY MR. ADKINS:

4        Q.   You said earlier that you relied on Ms.

5    Small's deposition testimony to form opinions in this

6    case.  Why are you now testing what she's -- doubting

7    what she has to say here, but you accepted other

8    things?

9            MR. MCALILEY:  Objection.  Argumentative.

10       Form.

11           THE WITNESS:  Yeah, I'm -- I'm taking

12       Ms. Small's deposition as it is.  So I'm not

13       second guessing her testimony, and I'm taking the

14       information in her testimony, along with other

15       information and testimony, and evaluating that

16       and rendering my opinion.

17   BY MR. ADKINS:

18       Q.   Do you have any understanding about drains

19   or pipes that defendants installed at the site?

20       A.   I -- I really have not investigated that.

21   I've seen pipes on the site, but I've not really

22   investigated that.

23       Q.   Have you investigated these at all?

24       A.   No.

25       Q.   Okay.  And setting aside what you've



```
 1   investigated, do you have any knowledge of drains or
 2   pipes that exist at the site?
 3        A.   No. Other than observations of seeing, you
 4   know, some pipes on the site, that's as far as I can
 5   opine.
 6        Q.   Okay.  Where have you seen pipes on the
 7   site?
 8        A.   There's one that I -- one that I recall to
 9   be on the southwest corner of the site, and it seems
10   like I recall seeing a pipe coming out into the
11   north-south ditch in that location.
12        Q.   Do you know to what the pipe that you
13   observed in the southwest corner of the site is
14   connected to?
15        A.   I have no direct knowledge of that, no.
16        Q.   Do you have any indirect knowledge of it?
17        A.   No.
18        Q.   Are you aware of whether there are any
19   connections between the excavated pond in the site
20   and any other water features?
21        A.   I don't know.
22        Q.   Have you ever asked?
23        A.   No.
24        Q.   How come?
25        A.   Really wasn't germane to my opinion.
```



1          (Thereupon, Exhibit DX196 was marked for

2       identification.)

3    BY MR. ADKINS:

4       Q.   I'm showing you a document that's been

5    marked DX196.  It is Bates Stamped DLS113 through

6    117.

7          Do you see DX196, Dr. Dennis?

8       A.   Yes.

9       Q.   Okay.  Are you familiar with this document?

10      A.   I have seen the document, yes.

11      Q.   Is it a document that you considered in

12   forming your opinions in this case?

13      A.   It was part of the DLS documents that were

14   provided.

15      Q.   Okay.  Did you consider it in forming your

16   opinions in this case?

17      A.   As I sit here, I don't remember anything

18   specifically in this document that I was relying on.

19      Q.   I'm showing you page marked DLS114, soils

20   map with sample points.

21          Do you see that?  Do you recognize -- do you

22   see this, Dr. Dennis?

23      A.   Yes, I see it.

24      Q.   Okay.  Do you recognize the image that's

25   reflected on this page?



W. MICHAEL DENNIS                                    May 27, 2022
U.S.A. vs BENJAMIN K. SHARFI                              190

1      A.    Yes, I do.

2      Q.    And this image is depicting the site,

3   correct?

4      A.    Correct.

5      Q.    And overlaid with the site is a soil map; is

6   that right?

7      A.    Yes.

8      Q.    There are three stars on this map.

9            Do you see those?

10     A.    I do.

11     Q.    There is a star for sample site number 1,

12  sample site number 2, and sample site number 3,

13  right?

14     A.    Yes.

15     Q.    Okay.  And those sample sites correspond to

16  wetland determination data forms that Ms. Small

17  completed.

18           Do you understand that?

19     A.    Yes.

20     Q.    Okay.  At sample site 1, do you recall

21  whether or not Ms. Small identified a wetland?

22     A.    That sample area was not within her

23  delineated wetland boundary.

24     Q.    Okay.  And the wetland determination data

25  form, did Ms. Small identify a wetland?



W. MICHAEL DENNIS                                      May 27, 2022
U.S.A. vs BENJAMIN K. SHARFI                                    191

1      A.   I don't recall.  I'd have to go back and
2  look at the data form.
3      Q.   And how about for sample site number 2; do
4  you recall whether or not Ms. Small identified a
5  wetland in her wetland determination data form?
6      A.   Yeah, that looks to be -- oh, let me -- no.
7  I'd have to go back to the data form and see what it
8  is.
9      Q.   And sample site 3, do you recall whether or
10  not Ms. Small identified a wetland in her wetland
11  determination data form?
12      A.   Again, I'd have to look at the data forms.
13      Q.   Did you consider the data forms in forming
14  opinions in this case?
15      A.   To a degree, it was part of the data that I
16  reviewed.  With regard to Ms. Small's information,
17  the main thing I relied on was her flag inspected
18  survey wetland line.
19      Q.   And to what degree did you rely upon Ms.
20  Small's wetland determination data forms?
21      A.   Did not rely -- I did not specifically rely
22  on the data forms.
23      Q.   There are two areas in the soil map marked
24  66.
25          Do you see that?  One is in the northwest



W. MICHAEL DENNIS                                    May 27, 2022
U.S.A. vs BENJAMIN K. SHARFI                                   192

1  and one is in the southwest corner -- southeast

2  corner.

3       A.   Yes.

4       Q.   Okay.  And there's a ledging on the bottom

5  of this map that says soils, and there's a third line

6  that says, "Holopaw fine sand, 0 to 2 percent slopes

7  (66) hydric."

8            Do you see that?

9       A.   I do.

10      Q.   Based on your reading of this soil map, are

11  the areas marked 66 in the image areas that are

12  mapped Holopaw fine sand, 0 to 2 percent slopes,

13  hydric?

14      A.   It's how their soil map evidently is

15  presented.

16      Q.   Did Ms. Small take any -- are any of the

17  sample sites within an area of this map marked

18  Holopaw fine sand, 0 to 2 percent slopes, hydric?

19      A.   Within the 66 area?

20      Q.   Yes, sir.

21      A.   Based on this soil type map, it says they

22  are.

23      Q.   Okay.  Which ones?

24      A.   The two areas that you pointed out, the

25  southeast and the northwest, have 66 mapped on it.



W. MICHAEL DENNIS
U.S.A. vs BENJAMIN K. SHARFI

May 27, 2022
193

1      Q.   Oh, I think -- I apologize.  Maybe my

2   question wasn't clear.

3         My question is are any of the sample sites

4   that reflect where Ms. Small completed her wetland

5   determination data form, do any of those fall within

6   an area marked 66 on the soil map?

7      A.   It may be it's close.  They may -- yeah, I

8   think some of the southeast area does.  The northwest

9   area is not in her delineation.

10     Q.   Okay.  Now, I just want to focus on the

11  three wetland determination data forms that she

12  completed, which are notated here, as we established,

13  with red stars.

14         So are any of the areas that Ms. Small

15  completed on wetland determination data form within

16  an area marked Holopaw fine sand, 0 to 2 percent

17  slopes, hydric?

18     A.   No.

19     Q.   Are you aware of whether Ms. Small dug any

20  holes in areas that are marked in the soils map for

21  Holopaw fine sand, 0 to 2 percent slopes, hydric?

22     A.   No.  I'm not aware one way or another.

23     Q.   Do you have an opinion regarding whether

24  defendants filled wetlands on the site in violation

25  of the Clean Water Act?



W. MICHAEL DENNIS                                          May 27, 2022
U.S.A. vs BENJAMIN K. SHARFI                                        194

```
 1              MR. MCALILEY:  Object to form.
 2              THE WITNESS:  Yes.
 3    BY MR. ADKINS:
 4       Q.    What is your opinion?
 5       A.    That he did not.
 6       Q.    And what's the basis for your opinion?
 7       A.    That none of the on-site wetlands are
 8    regulated waters of the United States.
 9       Q.    Do you have an opinion on whether defendants
10    filled wetlands on the site that are not
11    jurisdictional under the Clean Water Act?
12              MR. MCALILEY:  Object to form.
13              THE WITNESS:  Yes.
14    BY MR. ADKINS:
15       Q.    What is your opinion?
16       A.    Yes, I believe that there are wetlands on
17    the site that are not waters of the United States
18    that have been filled.
19       Q.    And is the aerial extent of waters on -- of
20    wetlands on the site that you believe are not waters
21    of the United States that have been filled
22    coterminous with the wetlands that Ms. Small
23    delineated in March 2018?
24              MR. MCALILEY:  Object to form.
25              THE WITNESS:  I'm sorry, I didn't follow
```



1    that question.

2  BY MR. ADKINS:

3    Q.   Yeah, it was kind of complicated.

4       So my question is are the wetlands on the

5  site that you believe were filled, but which are not

6  waters of the United States in your view, are

7  those -- are those wetlands coterminous with the

8  wetlands that Ms. Small delineated in March 2018?

9       MR. MCALILEY:  Object to form.

10      THE WITNESS:  Yes.

11 BY MR. ADKINS:

12   Q.   Do you have any opinion on whether

13 defendants filled wetlands on the site in any other

14 areas outside of where Ms. Small delineated wetlands?

15   A.   Sorry, I'm having a hard time following your

16 question.  Say that one again.

17   Q.   No problem.

18      Do you have an opinion on whether defendants

19 filled wetlands on this site which are not

20 jurisdictional in your view under the Clean Water Act

21 that are outside of the wetlands that Ms. Small

22 delineated in March 2018?

23      MR. MCALILEY:  Object to form.

24      THE WITNESS:  No.

25 BY MR. ADKINS:



1    Q.   You don't have an opinion one way or the

2  other?

3    A.   No.  Any wetlands that were on the site that

4  were filled would have been within, in my view,

5  Ms. Small's wetland delineation area.

6    Q.   Okay.  Are you familiar with the term

7  tributary?

8    A.   Yes.

9    Q.   What is a tributary in context with the

10  Clean Water Act?

11    A.   Tributary has been variously defined, but

12  basically, it's a water -- a water conveyance.  It's

13  an area that carries water.

14    Q.   What is the basis for your understanding of

15  what a tributary is?

16    A.   Again, tributary has various rules, has been

17  variously defined, but basically, it's -- it's areas

18  that have typically considered to be areas with --

19  with continuous flow.

20    Q.   Are there any other characteristics of a

21  tributary?

22    A.   Again, based on which of the Waters of the

23  United States rule you're looking at, tributaries, if

24  they're natural tributaries, have a bed and a bank

25  and an ordinary high water line.  They're in a



W. MICHAEL DENNIS                                    May 27, 2022
U.S.A. vs BENJAMIN K. SHARFI                                   238

1      Q.    Okay.  So now, let's look at the chart and

2    try to get an idea of these colors here.  I'm going

3    to zoom in, and we see on this photograph that

4    there's an indication for Southwest Murphy Road

5    Bridge.

6          Do you see that?

7      A.    Yes.

8      Q.    All right.  And to the left, there is a --

9    what looks to be a highway.  Is that the Florida

10   Turnpike?

11     A.    Yes.

12     Q.    Okay.  And the Florida Turnpike extends

13   throughout the entirety of this image, right?

14     A.    Correct.

15     Q.    Okay.  Now, to the right of what's marked as

16   Southwest Murphy Road Bridge, do you see some

17   representations of saltwater systems?

18     A.    Yes.

19     Q.    Okay.  And do you see some representations

20   of freshwater systems in that area?

21     A.    Yes.

22     Q.    Okay.  You know, just looking at this map,

23   would you say that the areas that are highlighted

24   east of the Florida Turnpike are primarily saltwater

25   systems?



W. MICHAEL DENNIS
U.S.A. vs BENJAMIN K. SHARFI

May 27, 2022
239

1      A.    Yes.

2      Q.    Okay.  So why don't you show me exactly what

3   would be a saltwater system.  Or you can tell me over

4   the record so we can try to clarify this.

5      A.    Well, any of the -- any of the areas that

6   are colored with a legend of a blue, bright blue

7   color.

8      Q.    Okay.  So I see a spot here that's northeast

9   of Murphy Road Bridge.  Let me see if I can highlight

10  this.

11          Do you see the area that I'm highlighting

12  here?

13     A.    Yes.

14     Q.    Okay.  Would that be a saltwater system?

15     A.    That blue area, yes.

16     Q.    Okay.  Any other parts east of the Florida

17  Turnpike that would be a saltwater system?

18     A.    Well, those areas that left of the legend at

19  the bottom.

20     Q.    Sure.

21     A.    Okay.  Again, we need to -- we need to

22  distinguish that bottom color estuarine and marine

23  wetland.

24     Q.    Right.

25     A.    So that's the color we're looking for up



1  there.  So any of the areas that are mapped with that

2  would be.

3      Q.   Okay.  Do you see any other areas other than

4  what I've indicated, that area northeast of the

5  southwest Murphy Road Bridge?

6      A.   I need to go back and look at my map.  That

7  was 20?

8      Q.   Yeah, Figure 20.

9      A.   It looks like there are some other areas to

10  the northeast of that, and then there's an area east

11  of that along the river.

12      Q.   Okay.  So let me see if I can highlight some

13  more here.

14          Is this an area that you've identified as

15  saltwater?

16      A.   Yeah, I think this is that.

17      Q.   Okay.  And then this area by what I believe

18  is the Saint Lucie here that I've highlighted, is

19  this another area of saltwater estuarine?

20      A.   Yeah, in part.

21      Q.   In part?

22      A.   Yeah, and I'm not -- I'm not colorblind.  I

23  know that Leo is and he had trouble with these and --

24  but I'm -- I'm trying to discern these.  I think

25  that's right.



W. MICHAEL DENNIS                                May 27, 2022
U.S.A. vs BENJAMIN K. SHARFI                          241

1    Q.    Okay.  So these three areas that you've

2    identified as saltwater estuarine, are they all

3    downstream of where Bessey Creek becomes tidally

4    influenced?

5    A.    Yes.

6    Q.    Okay.  And do you know the acreage of the

7    saltwater estuarine areas identified in this map?

8    A.    No, I don't.

9    Q.    Okay.  Do you know the acreage of the

10   freshwater systems that are identified on the map?

11   A.    No.

12   Q.    Okay.  So I want to take you back very

13   briefly to the South Florida Water Management

14   District's verification of Ms. Small's wetland

15   delineation.

16       Do you understand or have any knowledge of

17   what the Water Management District did to verify Ms.

18   Small's wetland delineation at the site?

19   A.    My understanding is that two South Florida

20   Water Management District wetland science --

21   scientists, employees in their wetland program, came

22   out with Ms. Small and physically inspected the line

23   in the field.

24   Q.    Okay.  Are you aware of whether they took

25   any soil samples during that inspection?



W. MICHAEL DENNIS                              May 27, 2022
U.S.A. vs BENJAMIN K. SHARFI                          242

 1      A.    No, I'm not.
 2      Q.    Are you aware of whether they identified any
 3   wetland vegetation during their verification?
 4      A.    No.  Other than typically in the
 5   verification process, the regulatory inspectors look
 6   at vegetation, the soils, the hydrology.  They look
 7   for indicators of that, and they determine whether or
 8   not the flag line appears to be correct or not.
 9      Q.    But in this case, you don't know whether
10   they did that specifically; is that right?
11      A.    My understanding is they inspected and
12   approved the line in the field.  Now, exactly how
13   many -- whether they took soil samples or moved the
14   line around and the details of the site inspection
15   I'm not aware.
16      Q.    Okay.  And are you aware of whether they
17   looked for any hydrologic indicators while they
18   verified Ms. Small's wetland delineations?
19      A.    Well, that would've been one of the factors
20   that they always look at, yes.
21      Q.    Okay.  So -- but do you know in this
22   circumstance whether the Water Management District
23   scientists who went out to verify Ms. Small's line
24   did indeed verify that there were hydrologic
25   indicators at the site?



W. MICHAEL DENNIS
U.S.A. vs BENJAMIN K. SHARFI

May 27, 2022
243

1     A.    I don't know specifically whether they broke

2  it down into that and made a specific determination

3  on that.  My sense is they reviewed comprehensively

4  the line using all three factors and using the

5  wetland delineation methodology.

6     Q.    Do you know whether the Water Management

7  District employees who verified Ms. Small's wetland

8  delineation checked whether any other parts of the

9  site contained wetlands?

10     A.    My understanding is they inspected the line

11  and determined that on one side of the line, there

12  was wetlands, on the other side of the line there was

13  uplands.

14     Q.    What is that understanding based on?

15     A.    The way wetland delineation verifications

16  are carried out.

17          MR. ADKINS:  Okay.  We will pass the

18     witness.

19          MR. MCALILEY:  Thank you.  I just have a

20     couple of questions.

21                    CROSS-EXAMINATION

22  BY MR. MCALILEY:

23     Q.    Dr. Dennis, do you recall when you were

24  asked questions about whether Danna Small followed

25  the Army Corps of Engineers 1987 Wetland Manual when



 1  she did her delineation?

 2      A.   Yes.

 3      Q.   And am I right that you testified that the

 4  State of Florida has assumed the Clean Water Act,

 5  Section 404 program in many Florida waters; is that

 6  right?

 7      A.   They assumed it in Florida, and there has

 8  been a determination of the fact that that assumption

 9  will apply to delegated waters.  The Corps has

10  retained certain waters, Section 10 waters and other

11  identified waters that they would retain jurisdiction

12  over.

13      Q.   What does it mean for the State of Florida

14  to assume the Clean Water Act 404 program?

15      A.   That is in assumption that is provided for

16  in the Clean Water Act.  States can do that.  Florida

17  is only the third one, as I recall, that's done it

18  successfully.  But it's to -- basically, it's to step

19  into the shoes of the Corps and administer the

20  Section 404 program.

21           Now, Section 10 waters and other retained

22  waters can't be delegated.  So that's -- that's the

23  distinction between retained waters and delegated

24  waters.

25      Q.   Is the site that is the subject of this



W. MICHAEL DENNIS                                                       May 27, 2022
U.S.A. vs BENJAMIN K. SHARFI                                                     245

1  litigation in an area of retained waters or in an

2  area of assumed waters?

3       A.   It would be in an area of assumed waters.

4       Q.   Okay.  So am I right in understanding this

5  means that the Florida Department of Environmental

6  Protection now administers the Clean Water Act 404

7  program in the assumed waters?

8       A.   Correct.

9       Q.   When exactly did the State of Florida assume

10 permitting authority in Section 404 for those assumed

11 waters in the State of Florida?

12           MR. ADKINS:  I'm going to object on

13      foundation.  And this exceeds the scope of

14      direct.

15           MR. MCALILEY:  I disagree, so you can

16      answer.

17           THE WITNESS:  I believe that was in December

18      of 2021.

19 BY MR. MCALILEY:

20      Q.   So six months ago, or a year and a half ago?

21      A.   A year and a half ago.

22           MR. ADKINS:  Same objection.

23 BY MR. MCALILEY:

24      Q.   So year and a half.  All right.

25           In areas of Florida assumed waters, does one



1  use the 1987 Wetland Manual from the Army Corps of

2  Engineers?

3      A.    No.

4      Q.    When did the DOJ Expert Team conduct a

5  relevant delineation to the site?

6      A.    In 2021.

7      Q.    Do you have an opinion as to whether it was

8  appropriate for the DOJ team to use the '87 Corps

9  Wetland Manual when they did their delineation in

10  2021?

11     A.    Based on the MOAs and the guidance --

12         MR. ADKINS:  Objection.  Can we just have an

13     objection to this line of questioning?

14         MR. MCALILEY:  Certainly.

15         MR. ADKINS:  Thank you.

16  BY MR. MCALILEY:

17     Q.    Go ahead, Dr. Dennis.

18     A.    So based on the MOAs between the Corps EPA

19  and EP, at the time of delegation then, the State

20  methodology is to be used in all assumed waters.

21         MR. MCALILEY:  Okay.  I have no further

22     questions.  Thank you.

23         MR. ADKINS:  None from me.  Thank you very

24     much for your time, appreciate it.

25         THE WITNESS:  Thank you, sir.  You all have



| | | DEPOSITION ERRATA SHEET | |
|---|---|---|---|

| Page # | Line # | Change | Reason |
|---|---|---|---|
| 11 | 4 | wet planes to wetland floodplain | incorrect transcription |
| 14 | 10 | reflective to relative | incorrect transcription |
| 15 | 4 | UPA to EPA | " " |
| 25 | 9 | serious to series | " " |
| 26 | 22 | most of to most every other | " " |
| 29 | 5 | Plane to Plain | wrong spelling |
| 31 | 10 | Bay Leaf to Bayview | misspelled |
| 38 | 14 | Ott to Autt; Creach to Creech | misspelled |
| 39 | 14 | Derilseti to Berlusconi | misspelled |
| 43 | 19 | Creach to Creech | misspelled |
| 70 | 17 | Ott's to Autt's | misspelled |
| 71 | 11 | Ott to Autt | misspelled |
| 71 | 20 | court to corps | wrong word |
| 72 | 2 | Ott's to Autt's | misspelled |
| 73 | 10 | Ott's to Autt's | misspelled |
| 74 | 1 | chronological to climatological | wrong word |
| 79 | 2 | walk to water | wrong word |
| 96 | 14 | Ott's to Autt's | misspelled |
| 99 | 23 | instituted to in situ | wrong word |

SIGNATURE:           DATE: 14 July 2022

W. MICHAEL DENNIS     8283973

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

1   DEPOSITION ERRATA SHEET

2   Page #| Line #| Change                                    |Reason

3   163  | 24  | soiled to soil                                 | wrong word

4   118  | 12  | Benza to Avenza                                | misspelled

5   131  | 3   | straw to ?                                     | not sure of word

6   134  | 20  | pooled to pulled                               | wrong word

7   142  | 13  | Cresch to Creech                               | misspelled

8   142  | 13  | Ott to Autt                                    | misspelled

9   142  | 20  | Cresch to Creech                               | misspelled

10  142  | 20  | Ott to Autt                                    | misspelled

11  142  | 22  | Cresch to Creech                               | misspelled

12  142  | 22  | Ott to Autt                                    | misspelled

13  147  | 18  | troop to truth                                 | wrong word

14  148  | 2   | VP to DEP                                      | wrong word

15  148  | 2   | upper to local                                 | wrong word

16  149  | 16  | Bobby Conley to Barbara Conley                 | misspelled

17  150  | 14  | trooping to truthing                           | wrong word

18  151  | 5   | FLUK to FLUCFCS                                | wrong word

19  153  | 1   | old U.S. to whole US                           | incorrect transcription

20  153  | 6   | trooping to truthing                           | wrong word

21  153  | 14  | troop to truth                                 | wrong word

22

23  SIGNATURE: _____     DATE: 14 July 2022
                W. MICHAEL DENNIS        8283973

24

25


**ESQUIRE**
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

W. MICHAEL DENNIS
U.S.A. vs BENJAMIN K. SHARFI

May 27, 2022
252

```
 1                    DEPOSITION ERRATA SHEET

 2    Page #| Line #|  Change                    |Reason

 3    153  |  23   |  further to photo          |wrong word

 4    154  |   1   |  trooping to truthing      |wrong word

 5    154  |  10   |  trooping to truthing      |wrong word

 6    154  |  11   |  trooping to truthing      |wrong word

 7    154  |  12   |  troop to truth            |wrong word

 8    154  |  16   |  troop to truth            |wrong word

 9    154  |  20   |  troop to truth            |wrong word

10    154  |  24   |  trooping to troothing     |wrong word

11    155  |   1   |  troop to truth            |wrong word

12    155  |   5   |  trooping to truthing      |wrong word

13    155  |   9   |  trooping to truthing      |wrong word

14    155  |  12   |  trooping to truthing      |wrong word

15    157  |   2   |  trooping to truthing      |wrong word

16    157  |  14   |  trooping to truthing      |wrong word

17    158  |   5   |  troop to truth            |wrong word

18    158  |   8   |  troop to truth            |wrong word

19    158  |  14   |  trooping to truthing      |wrong word

20    171  |  13   |  Raised to grazed          |wrong word

21    172  |   7   |  8.79 to 0.79              |wrong Number

22

23    SIGNATURE: _____   DATE: 14 July 2022
                  W. MICHAEL DENNIS      8283973
24

25
```



```
1                    DEPOSITION ERRATA SHEET

2      Page #|  Line #|  Change                    |Reason

3       174   |    7    | bush to horse (?)         | wrong word

4       184   |   11    | Advanced way over to other (?) | wrong word

5       192   |    4    | ledging to legend         | wrong word

6       198   |    1    | hard to high              | wrong word

7       205   |   12    | pouring to pounding       | wrong word

8       216   |    3    | shore to spoil            | wrong word

9       220   |   15    | side to site             | wrong word

10      221   |   25    | border to bordering       | wrong word

11      224   |    9    | set to test              | wrong word

12      234   |   10    | scratched to ?            | wrong word

13      240   |   23    | Leo to Neal              | wrong word

14

15

16

17

18

19

20

21

22

23    SIGNATURE:                DATE: 14 July 2022
                W. MICHAEL DENNIS    8283973
24

25
```

