# EXHIBIT 93

Page 1

1                UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF FLORIDA
2                   FORT PIERCE DIVISION
3                CASE NO. 2:21-cv-14205-KAM
4

UNITED STATES OF AMERICA,
5
                      Plaintiff,
6
vs.
7
BENJAMIN R. SHARFI, in his personal
8    and fiduciary capacity as trustee of
     the Benjamin Sharfi 2002 Trust, and
9    NESHAFARM, INC.,
10                    Defendants.
     _____
11
12                       VIDEOTAPED
13             VIDEOCONFERENCE DEPOSITION OF
14                    MICHAEL M. WYLIE
15
16    DATE TAKEN:       Thursday, October 5, 2023
      TIME:             9:07 a.m. - 6:14 p.m.
17    LOCATION:         All participants attending
                        remotely
18
19
20    Taken on behalf of the Defendants before
21    Fanny R. Kerbel, Shorthand Reporter and Notary Public in
22    and for the State of Florida at Large, appearing
23    remotely, pursuant to Notice of Taking Deposition in the
24    above cause.
25

Page 57

1     A.    Abutting means touching in at least one point.

2     Q.    So that definition of abutting you've relied

3  upon in forming your opinions in this case?  Your

4  supplemental opinions in this case.

5     A.    Yes, sir.  I have.

6     Q.    So other than the portions of the 2008 Rapanos

7  guidance that deal with traditional navigable waters,

8  tributaries, and abutting portions, have you relied on

9  any other parts of the 2008 Rapanos guidance?

10    A.    No.

11    Q.    And by the way, when you say you relied on the

12 section of the 2008 Rapanos guidance dealing with

13 tributaries, what do you mean by that?

14    A.    A tributary is a body of water like a

15 geographic feature that has an ordinary high-water mark

16 up in the bank and has some degree of flow, whether it

17 flows intermittently, ephemerally or [indiscernible].

18          (Court reporter clarification.)

19          THE WITNESS:  Ephemerally or perennially.

20 BY MR. McALILEY:

21    Q.    When you say "intermittent," what do you mean

22 by that?

23    A.    Intermittent flow is seasonal flow.  It flows

24 for at least three months out of the year.

25    Q.    All right.  So that

Page 58

1   three-months-out-of-the-year flow make -- the criterion

2   you just gave, does that come from the 2008 Rapanos

3   guidance?

4       A.   It came from a guidance that describes what a

5   relatively permanent water body is.

6       Q.   So when you are determining whether a body of

7   water is a relatively permanent water, your criteria is

8   whether it flows at least three months out of the year?

9   Am I understanding that correctly?

10      A.   That's the minimum.  It could flow more.

11   Typically, if it could flow less, then it's not a

12   relatively permanent water body.

13      Q.   So that three-month criterion of flow, once

14   again, did you get that from the 2008 Rapanos guidance

15   or did you get that from somewhere else?

16      A.   I got that from the Rapanos guidance and also

17   from the Rapanos decision.  Justice Scalia talked about

18   seasonal rivers in a footnote.

19      Q.   So did Justice Scalia, in Rapanos, talk about

20   three months?

21      A.   Justice Scalia talked about seasonal rivers.

22      Q.   Okay.  So what I am just trying to get at is

23   this idea that something is seasonal if it flows for at

24   least three months out of the year.  Am I right that

25   that three-month number comes from the 2008 Rapanos

1    guidance?

2         A.    That's correct.

3         Q.    And you are relying on that in developing your

4    supplemental opinions in the case, right?

5         A.    I relied upon that and also from Justice

6    Scalia talking about seasonal rivers.

7         Q.    And Justice Scalia, again, took no part in the

8    Sackett decision, right?

9         A.    No, sir.  He did not.

10        Q.    To your knowledge, has EPA or the U.S. Army

11   Corps of Engineers issued any guidance documents

12   interpreting the Sackett decision?

13        A.    I have no knowledge of any guidance.

14        Q.    Okay.  So I just have a few more questions on

15   this list, and then let's take a break.  Let's go back

16   to Deposition Exhibit 72.  It's your original report.

17   I'm on page 27, materials you relied on.

18             So Number 5 on the list says:  "Environmental

19   laboratory, 1987.  Corps of Engineers Wetlands

20   Delineation Manual, Technical Report Y-87-1, U.S. Army

21   Engineer Waterways Experiment Station, Vicksburg,

22   Mississippi."

23             Did I read that right?

24        A.    Yes, sir.

25        Q.    So have you relied upon the 1987 Corps of

1   Engineers Wetlands Delineation Manual in forming your

2   supplemental opinions?

3          A.   Yes, sir, I did.

4          Q.   Am I right that the 1987 wetland manual is

5   supplemental by the 2010 regional supplement for the

6   Atlantic and Gulf Coast -- Coastal Plain region?

7          A.   That's correct.  Yes, sir.

8          Q.   And am I understanding it right that the 1987

9   manual still controls, except where there is differences

10  between that and the regional supplement?

11         A.   That's correct.

12         Q.   So the '87 wetland manual sets forth the

13  specific procedures to be followed in determining

14  whether an area is a wetland under the Clean Water Act;

15  is that right?

16         A.   Yes, sir.  That's correct.

17         Q.   And use of the 1987 wetland manual is

18  mandatory for determining whether something is a wetland

19  under the Clean Water Act, right?

20         A.   Except where it's superceded by the Coastal --

21  by the regional supplements, yes.

22         Q.   Why is use of the 1987 wetland manual

23  mandatory?

24              MR. ADKINS:  Objection.

25              THE WITNESS:  It's a methodology that people

1    in the Corps of Engineers, staff in the Corps of

2    Engineers and EPA and any consultants like myself

3    and the expert team utilize to define what a

4    wetland is.  Utilize the three factors.  Now the

5    factors.  They used to be called parameters.

6         So we use that because it's a tried and true

7    quintessence court and it has been scientifically

8    tested.  So that's a methodology that we all adhere

9    to.

10   BY MR. McALILEY:

11   Q.   The methodology that's set forth in the 1987

12   wetland manual is a reliable methodology for determining

13   whether something is a wetland or not?

14   A.   Except in the areas where the regional

15   supplements have refined areas that makes it -- that

16   refines what a wetland is in a regional part of the

17   United States.  And I think you could just call that the

18   regional supplements or refinement of the '87 manual.

19   Q.   And just to be clear about the regional

20   supplement, it doesn't cover everything that is in the

21   1987 manual; it simply supplements certain parts of the

22   '87 manual, right?

23   A.   No.  I think that's incorrect.  I think it

24   covers everything in it.  There is some different

25   nomenclature, but it basically -- it is a manual that we

Page 62

1    follow now outside of -- I think there is a chart on one
2    of the pages that the regional supplement shows that,
3    where the '87 manual is maintained versus that.  But
4    it's a very small part of the '87 manual that's left
5    that we follow now.
6         Q.   So there is a chart in the regional supplement
7    that says where the regional supplement has changed the
8    '87 manual.  Did I understand that correctly?
9         A.   It didn't change it.  It refined it.  So I
10   think that's a better term for it.  We are still
11   following the wetland hydrology soils and plants.  Still
12   following how we go accomplish that.  We have got a
13   better data sheet now which shows what a wetland is much
14   more robustly than the '87 manual.
15             So it's an improvement on the '87 manual
16   regionally because, frankly, wetlands, even though they
17   showed the three parameters or three features, are
18   different across the nation.
19        Q.   You use the 1987 manual as supplemented by the
20   regional supplement on a regular basis, right?
21        A.   Yes, sir, I do.
22        Q.   And you gave training to people for a long
23   time about how to use the '87 manual and the supplement,
24   right?
25        A.   Yes, sir.  I did.

Page 63

 1          Q.    And you would agree with me that use of that

 2     manual as supplemented is important for a wetland

 3     delineation to be reliable, right?

 4          A.    Yes, sir.  I think it's extremely important

 5     for it to have a credible report on a determination of

 6     whether a wetland is -- a wetland or [indiscernible]

 7     yes.

 8                 (Court reporter clarification.)

 9          A.    It is a wetland under the manual or is an

10     upland.

11          Q.    In your supplemental report, you talked about

12     how you follow the '87 manual as supplemented when you

13     delineated the wetlands on the defendants' property,

14     right?

15          A.    That's correct.

16          Q.    By the way, when you worked at EPA, how many

17     wetlands did you delineate over the course of your

18     career, ballpark number?

19          A.    Not very many.  I probably delineated a site

20     once or twice throughout my career.  I made thousands of

21     wetland determinations, which are an area that -- I

22     filled out a data sheet.  But it never was our role as

23     agency employees to perform delineations.  That was

24     usually the landowner.

25                 MR. McALILEY:  This might be a good place to

Page 64

1      take a break.  We've been going for about an hour

2      and a half.  Is it all right if we take ten minutes

3      now?

4           MR. ADKINS:  Okay with me.

5           THE VIDEOGRAPHER:  This marks the end of Media

6      Number 1.  The time is 10:35 a.m.  We are off the

7      record.

8           (Recess taken in the proceedings from 10:35

9  a.m. to 10:50 a.m., after which the following

10 proceedings were had:)

11          THE VIDEOGRAPHER:  This marks the beginning of

12     Media Number 2.  The time is 10:50 a.m.  We are on

13     the record.

14          (Thereupon, Regional Supplement to the Corps of

15 Engineers Wetland Delineation Manual:  Atlantic and Gulf

16 Coastal Plain Region was remotely introduced as

17 Deposition Exhibit 255 for Identification.)

18 BY MR. McALILEY:

19     Q.   Mr. Wylie, I just want to close out something

20 that we talked about before the break.  And I am going

21 to put up on the screen what I just marked as Deposition

22 Exhibit 255, which is the Regional Supplement to the

23 Corps of Engineers Wetland Delineation Manual:  Atlantic

24 and Gulf Coastal Plain Region.

25          Can you see that on the screen?

Page 123

1    thumbnails.

2              MR. ADKINS:  I think I am learning something

3         here too.

4              MR. McALILEY:  I know.  Really, I'm impressed.

5              THE WITNESS:  Okay.  I think it's --

6    BY MR. McALILEY:

7         Q.   Do you want to try Exhibit 16?

8         A.   No.  That's W7.  We can certainly look at that

9    one, if you like.

10        Q.   Let's do that.  We're here.  It's easy.  This

11   reference plot W7 is another place where you believe the

12   wetland comes down and touches the east-west ditch,

13   right?

14        A.   Yes, sir.

15        Q.   I'll minimize the thumbnails.  Thank you for

16   teaching me how to do that.

17             So this is -- just again, to confirm for the

18   record, this is Exhibit 16 to your supplemental report.

19   This is a photograph that was in your original report as

20   well, right?

21        A.   Yes, sir.

22        Q.   So this is a photograph -- is that you, by the

23   way, in the photo?

24        A.   No.  That's a Corps employee.

25        Q.   I couldn't tell.  That's why I was asking.

1      Am I right in understanding this that that is

2   a -- that hole in the ground is where a soil core was

3   taken out to look at the soil, right?

4      A.   That's correct.  Yes.

5      Q.   When you talk about a sampling point, the

6   sampling point is actually that hole, right?

7      A.   Yes, sir.  It's W7 wetland sampling point.

8      Q.   And this was taken in what month?

9      A.   August.

10      Q.   All right.  And who took the photo, by the

11   way?

12      A.   Yes, sir.  I am pretty sure I took this one,

13   yes.  I took most of them, I believe.  Yes.

14      Q.   Does this accurately depict the scene that day

15   in August of 2021 when you took the photograph there?

16      A.   Could you say the first part again?  I am

17   sorry.  I didn't --

18      Q.   Does this photograph accurately depict the

19   scene that day when you took that photograph in August

20   of 2021?

21      A.   Yes, sir.  It does.

22      Q.   So as I look at this photograph -- by the way,

23   the person in the photograph is holding a measuring

24   tape.  Am I right that he is measuring the number of

25   inches below the ground surface that the water table is

Page 125

1    at?

2         A.   Yes, sir, at that point in time, because the

3    water table will continue to rise in the hole until it

4    reaches equilibrium with the area around it.  So from

5    looking at that area, it probably was higher.  But at

6    that point in time, that's where we measured the wetland

7    hydrology at that point.

8         Q.   Obviously, the water table rises and falls

9    with the seasons and rainfall, right?

10        A.   Yes, sir.

11        Q.   So this is just a photograph of how far below

12   the ground was the water table on that day, at that

13   spot, right?

14        A.   That's correct.

15        Q.   And so am I right in seeing that the measuring

16   tape is showing that the water is it looks like 2 or

17   3 inches below ground level that day?

18        A.   Your eyes are better than mine.

19        Q.   Here, let me zoom in a little.

20        A.   We can always go to the data sheet and look at

21   that, if you really want to --

22        Q.   I am just looking to eyeball it here.  It

23   looks like it's --

24        A.   A couple inches.

25        Q.   A couple inches.  Okay.

Page 126

```
1            So water was below ground surface at that spot
2       on that day, right?
3            A.   At that time.
4            Q.   Right.
5            A.   At that time, when the hole was excavated and
6       the water equilibrated, and it may even continue to rise
7       higher.  Because you can see there is water on the
8       surface on the left of his shoes where there is no hole
9       there.  So when you excavate a soil pit, you remove all
10      the porosity, the soil, and then it just fills up and it
11      may continue to push up to the surface.  And that day,
12      in many places here.
13           Q.   So let's go back to the reason why we went to
14      this photograph.  So the wetland is where in this
15      photograph?
16           A.   The entire area that you're looking at is the
17      wetland that is not inundated by the upper reach of
18      Bessey Creek.
19           Q.   Okay.  So the water is the east-west ditch?
20      That's where the east-west ditch is located?
21           A.   Yes, sir.
22           Q.   And the wetland is the area that is next to
23      the ditch that is not covered in water, right?
24           A.   Yes, sir.  That's part of the larger wetland.
25      Yes.
```

Page 127

1        Q.   And so where is the exact place where the
2    wetland touches the east-west ditch?
3        A.   Well, it looks like the entire length of the
4    photograph to me.
5        Q.   Is it where, basically, the water ends and
6    then you could see the ground rising out of the water?
7    Is that the spot?
8        A.   Yes, sir.  That would be a good
9    characterization.  Yes.
10       Q.   Okay.  So when you say the wetland touches the
11   east-west ditch, it touches at the place where the soil
12   goes down to and meets the waterline in the ditch.  Am I
13   understanding you correctly?
14            MR. ADKINS:  Objection.
15            THE WITNESS:  Yes, sir.  From what we can get
16       from the -- for what I can get from the Sackett
17       opinion, it's where the water and the wetlands
18       meet, where you can't tell the difference.  So
19       that's the only guidance that we basically have.
20       There is nothing else on the street.  But from what
21       we can glean from either the Rapanos opinion that's
22       still in place or the Sackett opinion, there is a
23       paragraph.  And as far as I am concerned, this
24       certainly suffices for the Sackett opinion of
25       wetlands touching a geographic figure -- feature.

Page 128

1   BY MR. McALILEY:

2        Q.   So Mr. Wylie, I am just trying to understand

3   the words that you used in your supplemental report so I

4   can understand your opinion.  That's why I am asking

5   about the word "touching."  Remember I asked about the

6   word "abut" which you used in your report, and you said

7   abut means touch.  I asked you what touch means.  Then

8   we looked at the photos.  I am just trying to figure out

9   exactly where it touches.  That's the point of my

10  questions here.

11            So just again to be clear, at this photo, at

12  least, on this day, at this spot, the wetland touched

13  the east-west ditch at the waterline, basically, of the

14  ditch, right?

15       A.   Yes, sir.

16       Q.   And so the wetland is on the landward side of

17  waterline, and the ditch is in the water side of the

18  waterline, right, in this photograph?

19       A.   No, sir.  No, sir.  Not necessarily.  You have

20  to define where the ditch is.  Remember that we

21  discussed it had ordinary high-water mark and bed and

22  banks.  Part of the bed and banks, or even to the

23  ordinary high-water mark, it could be wetlands.  So the

24  water could be over the top of wetlands on the creek.

25            So I can't tell right now because that wasn't

1  our goal at this time.  Our goal was to show there was a

2  wetland -- a larger wetland from the site to where it

3  was deemed abutting the upper reach of Bessey Creek.

4          So I can't answer that for you because we

5  didn't do that.

6      Q.   Okay.  But in this photo -- I mean, I'm just

7  going to the photograph and I am trying to understand

8  your opinion to say it touches.

9          In this photograph, the wetland touches the

10 creek at the waterline in the picture, right?

11     A.   Yes, sir.

12     Q.   Thank you.  So let's go back up then to the

13 text, which is where we started on page 4.

14         I am now on page 4 again, the first sentence

15 in Section b.  And it says:  "Prior to defendants'

16 discharges, the" -- and let's just start with those

17 words.

18         When you say "defendants' discharges," are you

19 referring to the work the defendants did on their

20 property?

21     A.   Discharge of dredged or fill material.  Yes,

22 sir.

23     Q.   So that's the work where, like, they built the

24 road and they did the landscaping.  The things that

25 happened on the defendants' property, right?

Page 130

1    A.   Yes, sir.

2    Q.   Okay.  So it says:  "Prior to defendants'

3    discharges, the wetlands on the site were part of a

4    large wetland that continues north of the site until it

5    reaches and physically abuts, or touches, the upstream

6    reach of Bessey Creek."

7         So am I right that what you are saying here is

8    that the wetlands on the Countess Joy property

9    physically abut or touch the east-west ditch?  Is that

10   right?

11   A.   No, sir.  You're not right.  It's a larger

12   wetland.  I'm not talking property lines or anything

13   else.  We are looking at it holistically.  This is a

14   wetland that encompasses several properties, and then it

15   abuts the upper reach of Bessey Creek.

16   Q.   But the only place where the wetland touches

17   the east-west ditch is on the Countess Joy property,

18   right?

19   A.   No, sir.  It is a continuous wetland from the

20   site that goes through the flow path to where we

21   identified areas on -- two areas on the upper reach of

22   Bessey Creek.

23        It's the same wetland.  You can't make it

24   geographically different.  It's just a large wetland

25   that somebody has bought and parsed up.

Page 131

1      Q.   You would agree with me that the defendants'

2  site is approximately a third of a mile away from the

3  east-west ditch?

4      A.   Yes, sir.

5      Q.   No part of the defendants' property abuts or

6  touches the east-west ditch, right?

7      A.   No, sir.  I disagree with that.

8      Q.   Really?  So you think that some of the

9  defendants' property that's a third of a mile away from

10  the east-west ditch physically touches the ditch?

11  That's your testimony?

12      A.   No.  What I said was the defendants' property,

13  which includes wetlands, stretches across the Countess

14  Joy property, then touches the ditch.  It is one large

15  wetland.

16          Property lines I'm not looking at here.  What

17  I'm looking at is trying to show you what you asked me,

18  which is does the defendants' property touch the

19  east-west ditch, and it does because it's part of the

20  larger wetland.

21      Q.   By the way, you would agree with me that if

22  the wetland on the defendants' property was in fact a

23  separate wetland from the wetland on the Countess Joy

24  property, that the defendants' wetland would not touch

25  the east-west ditch, right?

Page 147

1          MR. ADKINS:  Do you think you will go full

2      boat, a full seven hours?

3          MR. McALILEY:  Yes.

4          MR. ADKINS:  Do you want to go off the record?

5          MR. McALILEY:  Sure.

6          THE VIDEOGRAPHER:  This marks the end of Media

7      Number 3.  The time is 1:01 p.m.  We are off the

8      record.

9          (Recess taken in the proceedings from 1:01 p.m.

10  to 1:46 p.m., after which the following proceedings were

11  had:)

12         THE VIDEOGRAPHER:  This marks the beginning of

13      Media Number 4.  The time is 1:46 p.m.  We are on

14      the record.

15  BY MR. McALILEY:

16      Q.   Okay, Mr. Wylie.  Let's go back to your report

17  and pick up where we left off.  I am going to share my

18  screen, which is Deposition Exhibit 253, which is your

19  supplemental report.

20         Can you see it there on the screen?

21      A.   Yes, sir.  I do.

22      Q.   All right.  So what I want to do is pick up

23  there on the next sentence on the bottom of page 4 where

24  it says, "During September and October 2021, the DOJ

25  expert team conducted a series of 14 wetland

Page 148

1    determinations on the adjacent Countess Joy reference

2    area.  Thirteen of the sampled points were wetlands and

3    one sampled point was uplands (point W10)."

4          Did I read that correctly?

5      A.  Yes, sir.

6      Q.  When you say here you conducted a series of

7    wetland determinations, were those the same as the

8    reference plots you referenced in your original report?

9      A.  Yes, sir.

10     Q.  So I'll use the phrase wetland -- reference

11   plots just to identify the location for ease of

12   reference.

13          So at those reference plots, you dug holes to

14   look at the soil and the water levels and examine the

15   vegetation.  Is that right?

16     A.  That's correct.

17     Q.  Did you do anything else at those plots?

18     A.  I took notes and photos.

19     Q.  And that photo that we were looking at, I

20   think it was Exhibit 16 from your supplemental report,

21   that was a photo of one of your -- of one of those

22   reference plots, right?

23     A.  Yes, sir.

24     Q.  Am I right that a figure showing the location

25   of your wetland reference plots is attached to your

Page 149

1  supplemental report as Exhibit 12?  Let me go to it, and
2  you will tell me whether I got this right.
3          So here I am on a page for Exhibit 12 of your
4  supplemental report.  I will go down.  There is a
5  figure -- I'm sorry.  Let me see if I can make it bigger
6  here.  There is a figure here from your original report,
7  Figure IV.B.1.2, location of reference plots at the
8  Countess Joy east and west reference areas.  Do you see
9  that?
10      A.   Yes.
11      Q.   Does this figure accurately show the location
12 of the wetland reference plots in the Countess Joy
13 property?
14      A.   Yes, sir.
15      Q.   So of the 14 reference plots, you would agree
16 with me that three of the reference plots are located
17 west of 84th Avenue, right?
18      A.   Yes, sir.
19      Q.   And 84th Avenue is a paved roadway, isn't it?
20      A.   Yes, sir.
21      Q.   Would you agree with me that 84th Avenue is a
22 barrier to surface flow between the Countess Joy east
23 and Countess Joy west property?
24      A.   No, sir.  There's culverts at multiple places
25 under there that take surface water from the east side

Page 150

```
 1    of the road to the west side.
 2         Q.   Did you go --
 3         A.   North -- or from the south to the north.
 4         Q.   Did you attempt to delineate wetlands on the
 5    west side of 84th Avenue?
 6         A.   No, sir.
 7         Q.   And you had identified this large wetland that
 8    you think the defendants' wetland is a part of, all of
 9    that is on the east side of 84th Avenue, right?
10         A.   Well, yes, sir.  That's a good approximation
11    of what I tried to opine on.
12         Q.   Am I right that one of the reference points in
13    the Countess Joy property east of 84th Avenue is in an
14    area that you found to be uplands?
15         A.   That's correct.
16         Q.   Is that plot W10?
17         A.   It is.
18         Q.   Sir, am I correct then that there are ten
19    wetland reference plots that you established in the
20    wetlands on the Countess Joy east property?
21         A.   Yes, sir.
22         Q.   The reference plots that you established are
23    not evenly distributed across the Countess Joy east
24    property, are they?
25         A.   No, sir.  That was the purpose in that.
```

1    Q.   And you did not establish wetland reference

2  plots along the entire line of the primary flow pathway

3  you identified, did you?

4    A.   We didn't have to.

5         MR. ADKINS:   Objection.

6         THE WITNESS:   We did not have to because the

7    vegetated community was the same.  The soils were

8    the same.  Water at the surface or saturated soils.

9    We continued to check some of the areas between

10   points if they weren't so obviously wetlands.  So

11   that's why they were -- that's why it looks random.

12   They're not.  That's where we established

13   continuity.

14  BY MR. McALILEY:

15    Q.   So your reference plots were not randomly

16  located across the Countess Joy property, were they?

17    A.   No, sir, they were not.  They were

18  investigated previous.

19         Some of our previous investigations, they

20  followed old aerials like the 1966 aerials that showed

21  low elevations.  We wanted to make sure that those low

22  elevations were actually wetlands and that the manual

23  and the supplemental manual.  We also saw flow from the

24  old '96 aerials from west to east.  We also wanted to

25  establish that -- where there's five wetland plots next

Page 152

1    to the site is.  So there was a large wetland that ran
2    from the site down to the upper reach of Bessey Creek
3    and also the 84th Avenue bridge and north-south ditch.
4        Q.    Your reference plots in the Countess Joy
5    property are not oriented in a line like a transect, are
6    they?
7        A.    No, sir.  Once again, we didn't have to.  The
8    manual allows you, once you make determinations to look
9    at community structure and what's in front of you, and
10   you could assume that those areas are exactly the same
11   that you get a wetland determination off of wetlands
12   too.
13            (Court reporter clarification.)
14            THE WITNESS:  If we made a wetland
15        determination, say, W3, and we used the area
16        between, say, W8 and W3, there is a big emergent
17        wetland there.  So that's obviously very wet.  And
18        the area to the right of the emergent wetland was
19        very wet pasture with water to the surface and the
20        vegetation was just about just the same for the
21        entire pasture area.
22            So when we are looking at vegetative
23        communities, the similar soils and hydrology and
24        other offsite characteristics, we felt very
25        comfortable in making this area a wetland -- a

Page 153

```
1        large wetland from the site to upper reach of
2        Bessey Creek.
3               (Court reporter clarification.)
4               THE WITNESS:  Emergent.
5               THE COURT REPORTER:  I know you said you
6        couldn't, but is there anything you can do about
7        the static?  It's making it really hard for me to
8        hear very well.
9               THE WITNESS:  I would have to maybe restart
10       it.  That would -- I'm very sorry.
11              THE COURT REPORTER:  It is what it is.  I'm
12       just having a hard time.
13              MR. McALILEY:  I can hear you better when you
14       get closer as well.
15  BY MR. McALILEY:
16       Q.   So Mr. Wylie, thank you for all the
17  explanation.  My questions are actually a lot simpler.
18  You're giving a lot of explanation that I am not even
19  asking for.  If it's helpful, this depo could move a lot
20  faster if we just focus on my questions here.
21              So your wetland reference plot, you did not
22  establish them at the boundary of different soil units
23  on the soil maps that you used, did you?
24       A.   Yes, sir.  W9, I think, was, you know, at
25  another soil -- it was a hydric soil -- than the Holopaw
```

Page 154

1    which was the remaining ones throughout the flow path.

2        Q.   My question was just not whether you sampled

3    more than one soil unit.  It's that you didn't sample

4    the soils at the boundary of the soil units, right?

5            MR. ADKINS:  Objection.

6            THE WITNESS:  In the first place, a map unit

7        is mapped out at a scale that, quite frankly, one

8        could not get the exact boundary.  It's the same

9        thing as the NWI charts.  It's the same thing as

10       anything else.  Things get lost in translation.

11           I think they map them at a minimum of 2 to

12       4 acres.  So they put a polygon down that says

13       Holopaw fine sand.  It would be pretty difficult to

14       get the exact boundary there.  That's why we do

15       field reconnaissance and fill out wetland data

16       sheets so we can find wetlands or not.

17   BY MR. McALILEY:

18       Q.   The answer is no, you did not attempt to take

19   wetland reference plots at the boundaries of the soil

20   units on the map, right?

21           MR. ADKINS:  Objection.

22           THE WITNESS:  I think we probably did some of

23       that in the -- on the site.  Because there was

24       three different soils there.  So we tried to get as

25       close as we could there, in spite of the work that

Page 155

1      was -- that had gone on previous to us going to the

2      site.

3  BY MR. McALILEY:

4      Q.   Mr. Wylie, let's go to Exhibit 15 of your

5  report.  Is this -- I have it up on the screen.  Is this

6  a figure that you prepared that shows the different soil

7  units on the NRCS soil map relative to the site in the

8  Countess Joy property?

9      A.   No.  I didn't prepare it.  Part of

10 Dr. Nutter's team did.

11     Q.   Are you prepared to testify about this or is

12 this something that I need to ask Dr. Nutter about?

13     A.   I can testify to the wetland areas.  The

14 soils, I would refer you to Dr. Stewart.  The plants, I

15 would refer you to Dr. Raines.  But as far as any

16 jurisdictional issues, I would respond to those.  Also,

17 rotations of all the wetland data points.

18     Q.   This is a new exhibit, right?  This was not

19 attached to your original expert report, correct?

20     A.   Yes, sir.  That's correct.

21     Q.   This was not available for me to ask Dr. Lee

22 or Dr. Raines or Dr. Stewart about at their deposition a

23 year and a half ago, correct?

24     A.   That's correct.

25     Q.   So the only two people I get to ask about this

Page 215

1          north-south ditch.  I'm sorry.  On the west side of
2          the north-south ditch.  That is the primary pathway
3          from the defendants' site, from Mr. Sharfi's site
4          to the secondary and 84th Avenue.
5               Another pathway is through the north-south
6          ditch when the water is high enough.
7     BY MR. McALILEY:
8          Q.   Am I right in this exhibit that it doesn't
9     show the north-south ditch going up to the east-west
10    ditch as either a primary or even a secondary surface
11    flow pathway?
12         A.   It's a connection.  Yes, sir.
13         Q.   So it is --
14         A.   Direct surface connection.  I think we showed
15    that in photos.
16         Q.   You would agree with me that based on this
17    exhibit, the north-south ditch itself is a tertiary
18    surface flow pathway between the defendants' site and
19    the east-west ditch, right?
20         A.   No, sir.  I can't.  You'll have to ask
21    Dr. Nutter those terms.  It's a pathway.  I don't know
22    if I can put one, two, or three on them.
23         Q.   Lastly, there is in the lower right-hand
24    legend which has a shading which I think is in blue that
25    says approximate location of contiguous wetlands from

Page 216

1    site through Countess Joy east reference area.

2            Do you see that?

3        A.   Yes, sir.

4        Q.   Is that that blue, by the way, the shading?

5        A.   Yes, sir.

6        Q.   So that is the location of this large

7    contiguous wetland that you talk about in your report

8    that includes the defendants' site, wetlands of the

9    defendants' site, and goes all the way up to the

10   east-west ditch, right?

11       A.   That's correct, and 84th Avenue.

12       Q.   So the blue shading is where the wetlands are

13   located in Countess Joy.  Am I reading that figure

14   right?

15       A.   I'm sorry.  One more time.

16       Q.   The blue shading on Exhibit 13 is where the

17   wetlands are located on the Countess Joy property,

18   right?

19       A.   That's a portion of the wetlands on the

20   Countess Joy property.  We were looking there for a

21   connection.  There is certainly wetlands to the east of

22   the blue line and also to the west.

23       Q.   So the area outside the blue shading is not

24   necessarily an upland, is it?

25       A.   No, sir.

Page 217

1      Q.   So in fact, the wetlands, you think, cover a

2   much larger area of the Countess Joy property than is

3   shown on Exhibit 13, right?

4           MR. ADKINS:  Objection.

5           THE WITNESS:  There are more wetlands on the

6       Countess Joy property than is shown in the

7       location -- the large wetland that we identified.

8       There are more.

9   BY MR. McALILEY:

10      Q.   So this figure with that shading does not show

11   the boundaries or even the approximate boundaries of

12   this large wetland that you have been talking about.  Is

13   that right?  Do I understand you right?

14      A.   It says a portion of it.  Yes, sir.

15      Q.   But it doesn't show the approximate boundaries

16   of the wetland.

17      A.   It shows the area of wetlands that Dr. Nutter,

18   Dr. Stewart, myself, and Dr. Raines felt like met the

19   community profile for the 10 wetland determinations we

20   did on the Countess Joy property.

21           We walked this entire area.  We looked at it.

22   We looked at old photos, new photos, and we dug many

23   holes.  So that is our approximation of the large

24   wetland from the site that goes in at least three or

25   four locations that we think is connected to an RPW.

Page 218

1      Q.   So the blue shading shows an approximate

2    location of the wetland on the Countess Joy property,

3    right?

4      A.   It shows the actual location of many wetlands

5    on that.   But it is an approximation of what our field

6    experience and our opinions are about wetlands on the

7    site.   Yes.

8      Q.   The legend says approximate location.   What I

9    am just trying to do is figure out where on the map is a

10   wetland and where on the map is not a wetland.

11        So if I look at the boundary of that blue

12   shading and areas that are not blue shading, is that the

13   approximate boundary of the wetland and the non-wetland

14   on the Countess Joy property?

15        MR. ADKINS:   Objection.   Asked and answered.

16        THE WITNESS:   No, sir.   Once again, we walked

17   these areas.   We knew that these areas met the

18   three factors for the wetlands.   There were

19   certainly uplands further off towards the berm

20   areas and up towards the W10 which shows uplands.

21        I mean, there are elevation changes.   But the

22   elevations that we showed on here were basically

23   less than a foot, and they all flow down towards

24   Bessey Creek, upper reach of Bessey Creek.

25        So the wetland communities were the same.   We

Page 219

1       saw water on the surface.  We saw saturated soils.

2       We utilized hydric soils criteria that we found.

3       And nothing really changed in our opinion,

4       especially elevation in these areas.

5   BY MR. McALILEY:

6       Q.   So I should not mistake the blue shading on

7   Exhibit 13 as showing the approximate delineated

8   boundaries of a wetland on the Countess Joy property,

9   right?

10      A.   I didn't hear the first part because it --

11      Q.   I should not -- it would be a mistake for me

12  to look at Exhibit 13 and to see that blue shading and

13  think that the edges of that blue shading are the

14  approximate boundaries of the wetland on Countess Joy,

15  right?

16      A.   That's correct.

17      Q.   Does this figure show that surface water

18  extends across the entire area of blue shading on

19  Countess Joy?

20      A.   No, sir.  It does not.

21      Q.   It would be a misinterpretation of Exhibit 13

22  to think that that blue shading represents an area of

23  continuous surface water, right?

24      A.   Yes, sir.  That's correct.

25      Q.   And you would agree with me that for most of

Page 220

1   the year the water is below ground -- the ground surface

2   and much of that area of blue shading on Exhibit 13,

3   right?

4           MR. ADKINS:  Objection.

5           THE WITNESS:  I really -- all I can do is

6       speculate, Mr. McAliley.  We have seen it above the

7       surface and we have seen it below the surface.

8       Below the surface of the water, below the surface

9       of the ground, more than we saw it above the

10      surface.  I have only been there three times.  I

11      don't know.

12  BY MR. McALILEY:

13      Q.  By the way, I notice the area that is shown

14  with the blue shading on Exhibit 13 includes areas where

15  there is berms next to the north-south ditch, right?

16      A.  Yes, sir.  Right behind those berms it's

17  really wet.  That's where water blows and goes.  So if

18  there is an area that comes across the berm, it's

19  possible that that could be an upland.  But we feel

20  fairly confident that the vast majority, if not all of

21  the blue lines, would be classified as a wetland.

22      Q.  It's Exhibit 13, in the blue shading, which

23  could include uplands, right?

24      A.  No, the blue shading is possible between W7

25  and W5 if that shading has bled over to an upland berm.

Page 221

1   Yes, sir.  That's possible.

2       Q.   And there are other places in the blue shading

3   where there could be pockets of uplands, right, like

4   along the high berm?

5       A.   We didn't find areas.  That's the only area I

6   see that could be a potential upland, and it could be

7   because of the way that it was drawn on there.  But

8   everything else is pretty flat.  Same wetland community

9   or whatnot.  We feel very confident that the vast

10  majority, if not all of it, is wetlands.

11      Q.   So Mr. Wylie, this figure does not show the

12  location of berms where they exist along the east-west

13  ditch, does it?

14      A.   No, sir.  It does not.

15      Q.   And it does not show the location of berms

16  that may exist along the north-south ditch, does it?

17      A.   No, sir.  It does not.

18      Q.   Let's go to the next exhibit, Exhibit 14 of

19  your supplemental report.  So again, this is Deposition

20  Exhibit 253.

21          So Exhibit 14 is the same image as Exhibit 13,

22  except for the background is a LiDAR Elevation Model.

23  Is that right?

24      A.   Yes, sir.

25      Q.   So all the entries in the legend on Exhibit 14

Page 222

1   have the same meaning as the legend on Exhibit 13,

2   right?

3        A.   Except for the approximate north wetland.  I

4   think it would have bled into the greens and the blues.

5        Q.   Exactly.  So the answers to my questions

6   regarding Exhibit 13 and the legend there also apply to

7   this exhibit as well, right?

8             MR. ADKINS:  Objection.  Vague.

9             MR. McALILEY:  Just strike that.

10   Let me just keep moving.

11   BY MR. McALILEY:

12        Q.   So let me ask you, for Exhibit 14, why did you

13   do -- why did you use LiDAR imagery as the backdrop for

14   this exhibit?

15        A.   It shows the relative elevations.  So that

16   helped us formulate the larger wetland flow path and

17   also the larger wetland because it was all basically

18   similar in elevations or lower.  So we could also see

19   that this married up pretty well with the '66 aerial and

20   other aerials because that's where the historic flow

21   paths were in or around W7 and W5.  That proved to be

22   true for connections there.

23             (Court reporter clarification.)

24             THE WITNESS:  The primary surface flow paths

25        in the larger wetland that connected the site to

Page 223

1          the upper reach of Bessey Creek 84th Avenue and the

2          north-south ditch.

3     BY MR. McALILEY:

4          Q.    So Mr. Wylie, you believe that LiDAR imagery

5     is generally accurate in showing ground elevations?

6          A.    Generally, it is accurate.  Yes, sir.

7          Q.    So the LiDAR imagery actually shows the

8     locations of berms along the ditches, doesn't it?

9          A.    Yes, sir.  And it shows breaks in berms,

10    ah-hah.  In the berms.

11         Q.    You would agree with me that this LiDAR

12    imagery shows that there is a berm along most of the

13    boundary in the east-west ditch in the Countess Joy

14    property, right?

15         A.    It shows higher elevations which I would

16    construe as berms.  Yes, sir, I would agree with you.

17         Q.    In fact, it shows, if I looked at the color

18    key in the lower left-hand legend, which is always

19    dangerous for me, it looks like the more reddish colors

20    are the highest elevation and the more of a bluish

21    colors are the lower elevations.  Am I reading that

22    right?

23         A.    Yes, sir, you are.

24         Q.    And so if I look along the berms along the

25    east-west ditch, am I right that the colors in most

Page 224

1    places are red and the east-west ditch is shown in blue?

2         A.   Yes, sir.

3         Q.   So using the elevation key in the lower

4    left-hand corner, that would suggest that the berms

5    along the east-west ditch in the Countess Joy property

6    are often 12, 13 feet above the water level, right?

7         A.   Boy, I'm sorry.  I can't go that far.  I don't

8    know.

9         Q.   If I look at the legend, the red, the top

10   elevation is 30.04 feet, that's an elevation of sea

11   level, and the blue, the bottom elevation is 17.16 feet

12   above sea level.  Am I reading that legend right?

13        A.   Yes, sir.

14        Q.   So the difference between 30 feet and 17 feet

15   is around 13 feet.  Wouldn't you agree?

16        A.   It is that.  But what you are failing to

17   recognize is trees.  If some of the trees are 10 or

18   15 feet high, sometimes LiDAR doesn't shoot through

19   trees as effectively.  So therefore, you get a higher

20   signature very similar to where the site is.  If you

21   will look at the site, you will see the orange and red

22   there.  That's vegetation.  You can also see on the

23   Countess Joy west side, you see all the orange and

24   yellow there?  That's vegetation.

25             So for me to draw linear equation, subtracting

1    the blue from the red without taking out any potential

2    error by trees, I can't do that for you.  You would have

3    to go out and just measure it in the field, which is

4    what we do as field work, not to prove up anything that

5    you would ask or we would try to prove up.

6         Q.   Are you saying this LiDAR imagery does not

7    accurately depict differences in elevation on Exhibit

8    Number 14?

9         A.   No, sir, I am not.

10        Q.   Okay.  You would agree with me that this LiDAR

11   imagery on Exhibit 14 shows that there is higher ground

12   next to much of the north-south ditch, right?

13        A.   Yes, sir.  It does give the limitations by

14   trees.  Yes, sir.

15        Q.   So when I look at Exhibit 14, I also see these

16   horizontal and vertical stripes across the Countess Joy

17   property.  Am I right that those are the remains of old

18   agricultural roads?

19        A.   Yes, sir.  That's my belief.

20        Q.   Basically, when you see the LiDAR imagery,

21   that there are stripes, it means that one stripe is

22   lower ground and one stripe is a little higher ground,

23   right?

24        A.   I'm not understanding you.  I'm not trying to

25   be difficult.  A stripe --

Page 226

1        Q.    If I look right in the middle of the Countess

2    Joy property, right where there is the box that says

3    north-south ditch, below that I see horizontal stripes.

4    Some areas are a little bit more bluish and there are

5    some areas that I think are a little bit more yellowish,

6    I think.

7            Am I right in reading this that the bluish

8    stripes are for the grounds a little lower and the other

9    colors in between is where the ground is a little

10   higher?

11       A.    Yes, sir.  That's correct.

12       Q.    And these horizontal stripes appear to go all

13   the way down to the defendants' property line at least,

14   right?

15       A.    Yes, sir.  With breaks and interruptions.

16       Q.    Basically, they are like little ridges of

17   higher ground going east-west across much of the

18   Countess Joy property between the defendants' site and

19   the east-west ditch, right?

20            MR. ADKINS:  Objection.

21            THE WITNESS:  Yes, sir.  It appears from the

22       LiDAR that it has a different signature.

23       Therefore, it could be a little higher, yes.

24   BY MR. McALILEY:

25       Q.    The next exhibit is Exhibit 15.  I think we

Page 227

1    talked about this a little bit before.  This is at the

2    bottom Figure Wetland Map 3, USDOJ expert team

3    determination of contiguous wetlands from the site

4    through Countess Joy east reference area to the upstream

5    reach of Bessey Creek on NRCS soil map units with hydric

6    rating.

7              Did I read that right?

8         A.   Yes, sir.  You did.

9         Q.   This is basically the same base map as Exhibit

10   13 with the same -- the legend entries were the same as

11   Exhibit 13.  They have the same meaning, right?

12             Let me rephrase this.  If I look at Exhibit 15

13   here, I see that there is on the lower right-hand corner

14   is a legend box.  Do you see that?

15        A.   Yes.

16        Q.   The entries in the legend box mean the same

17   thing on this exhibit as they do on Exhibits 13 and 14,

18   correct?

19        A.   Yes, sir.  That's correct.

20        Q.   So I'm not going to ask you about them again.

21             If I go to the left-hand side, there are two

22   legend boxes; the one that's a little higher up that

23   says USDOJ expert team assessment type, that legend box

24   is the same information that is on Exhibits 13 and 14,

25   right?

Page 228

1          A.    Yes, sir.

2          Q.    So whatever we discussed with regard to the

3    previous exhibits on those legend entries, the same

4    applies to this exhibit as well, right?

5          A.    That's correct.

6          Q.    So the difference between this exhibit and the

7    prior exhibits is that you have overlaid on top of it

8    the NRCS soil map units.  Is that right?

9          A.    Yes, sir.  That's correct.

10          Q.    Okay.  And then the legend in the lower left

11    is the legend for the NRCS soil map units, right?

12          A.    Yes, sir.  That's correct.

13          Q.    So if I see the Number 66 out in the middle of

14    the Countess Joy property and I go to the legend in the

15    lower left and I find 66, it says Holopaw fine sand zero

16    to 2 percent slopes, 96 percent hydric rating.  Do you

17    see where it says that?

18          A.    Yes, sir, I do.

19          Q.    So 66 means that whole area in the same color

20    is all mapped as Holopaw fine sand, right?

21          A.    Yes, sir.

22          Q.    So where did you get this NRCS soil map?

23          A.    Probably from the web soil survey online.  I

24    didn't make this, so it's Dr. Nutter's group.  Maybe ask

25     him about that question.

Page 229

1    Q.   I'll ask him.

2         Do you know how NRCS developed the soil map

3    that is depicted on Exhibit 15?

4    A.   Rudimentary, what they do is they map soils.

5    They have a survey crew that goes out and maps soils,

6    and then they take that information back and then

7    develop maps from it.

8         Now, most county soil surveys, NRCS county

9    soil surveys, are online or they are trying to get them

10   all online.  So typically, it develops from in the dirt

11   to the office to the web now.  That's my understanding

12   of how they do that.

13   Q.   Am I right that when the NRCS develops these

14   soil maps, it's not just on the ground surveys, but they

15   also use aerial photography?

16   A.   Yes, sir.  I think they use the same thing

17   everybody uses.  Aerial photography is a very valuable

18   tool for many agencies.

19   Q.   Is it fair to say they look at an aerial

20   photograph, they find areas that look similar in soils,

21   and then they send people out to check to sort of see

22   which areas are what kind of soils?  Is that basically

23   how this works?

24   A.   I really don't know that.  I'm not -- I'm

25   sorry.

Page 230

1      Q.   That's fine.  That's fine.

2           So when did the NRCS develop the soil map that

3  is depicted in Exhibit 15?

4      A.   You will have to ask Dr. Nutter.  I don't know

5  that either.

6      Q.   Do you know who specifically prepared the soil

7  map that is depicted in Exhibit 15?

8      A.   From the expert team?

9      Q.   No, no, no.  Like whoever at NRCS or whoever

10 the person was who actually went out and did the

11 technical work to develop that soil map.

12     A.   No, sir.  You could look at the soil survey

13 report and it would say who the team leader was and who

14 did it.  But I don't have that information right off the

15 top.

16     Q.   Is it your opinion that most of the area that

17 is depicted as being in map unit 66 Holopaw fine sand is

18 a wetland?

19     A.   Most of the area that is depicted as Holopaw

20 fine sand, after my extensive field work and field

21 investigations and walking all over the area, we found

22 wetlands that had -- at every location.  The only areas

23 that probably wouldn't be wetlands would be some berms

24 along upper reach of Bessey Creek and then higher

25 elevations like the upland area.

Page 231

1      So those are the areas that I feel like that's

2   the Holopaw is a pretty well mapped -- map unit by NRCS.

3      Q.   So just to be clear, you think that the area

4   that is marked in this map as the Holopaw fine sand map

5   unit roughly corresponds with the area of wetlands on

6   the Countess Joy property?

7      A.   No, sir.  Not along the creek and not along

8   elevations where they rise out of the wetland

9   elevations.  Those -- I mean, they were hydric soils at

10  one time, but then they deposited material on them from

11  excavating the creek.  And then when the elevation rises

12  higher, you can't reach a wetland status.

13     Q.   I want to draw your attention down to the

14  legend in the lower left and some of the entries there.

15  So I look at entry 38 for Floridana fine sand, and on

16  the map I see 38 is over by the 84th Avenue roadside

17  ditch.  Am I seeing that right?

18     A.   Yes, sir.

19     Q.   It says in the legend Floridana fine sand

20  frequently ponded.  What does "frequently ponded" mean?

21     A.   It means inundated.  It means a low spot that

22  water stacks up on top.  It could be because there is a

23  lot of organic material in it.  So it can percolate

24  through the sand like some of the other soil so it --

25  before it stacks up.

Page 232

1      Q.   So that would be ponded in that context means

2  the water is on the surface like -- almost like a pond,

3  would be a way to think about it.

4      A.   I don't know for how long.  I would have to

5  read the description of it.  But it could be for a month

6  or two or, you know, weeks.  I am not familiar with it.

7      Q.   But frequently ponded means frequently there

8  is water at the surface or above the surface.  Is that a

9  fair understanding of what that means?

10     A.   That's fair.  Yes.

11     Q.   When I look down at another one, number 49,

12 Riviera fine sand, it looks like there is a pocket of

13 49, instead of the middle of the Countess Joy property

14 to the -- on the east side of the property.  Do you see

15 it there?

16     A.   Yes, sir.

17     Q.   And that description in the legend says

18 "frequently ponded" as well.  Do you see that?

19     A.   Yes, sir.

20     Q.   So would you understand that to mean that that

21 soil unit is mapped as having -- there was frequently

22 water above the surface, above the ground surface at

23 that location?

24     A.   That's how it's described.  Yes, sir.  If it

25 meets that, then it's mapped right.  Yes.

Page 233

1    Q.   I notice for Holopaw fine sand, unit 66, there

2  is no reference to frequently ponded, is there?

3    A.   No, sir.

4    Q.   In fact, the description that NRCS has for the

5  Holopaw fine sand is that its typically not ponded water

6  on top of it.  Isn't that right?

7    A.   That's correct.

8    Q.   That's the sand that may be a hydric -- that

9  is a soil that may be a hydric soil because there is

10 water saturated in the soil below the ground, but it is

11 not necessarily a soil where water is above the surface

12 on a frequent basis.  Am I understanding that right?

13   A.   I think that's fair.

14   Q.   By the way, there is an area that you marked

15 on Exhibit 15 that says "upland."  It's right in the

16 color that the key says number 4, Waveland and Immokalee

17 fine sands.  Do you see where it says upland on

18 Exhibit 15?

19   A.   Yes, sir.

20   Q.   So am I right in understanding that you

21 believe that the area in this map unit of number 4 of

22 Waveland and Immokalee fine sands, 7 percent hydric

23 rating, is an area where it's uplands and not wetlands?

24   A.   Predominantly upland.  More than 90 percent.

25   Q.   So I notice that most of the east-west ditch

Page 291

1    as Deposition Exhibit 260.  This looks like a scan from

2    the Federal Register, Volume 51, starting on page 41206,

3    and it's about 55 pages.  Do you see that document on

4    your screen?

5          A.   Yes, sir.  I do.

6          Q.   So I want to take you to the citation that we

7    saw in the Rapanos guidance.  And that was at 41,217.

8    So bear with me for just one second here.

9               By the way, before I ask, are you familiar

10   with this document?

11         A.   Yes, I am.

12         Q.   Some refer to this as the preamble to the

13   Corps' 1986 regulations, right?

14         A.   Yes.  Correct.

15         Q.   In the first column, about halfway down, I am

16   going to read to you part of this entry.

17              "For clarification it should be noted that we

18   generally do not consider the following waters to be

19   waters of the United States.  However, the Corps

20   reserves the right on a case-by-case basis to determine

21   that a particular waterbody within these categories of

22   waters is a water of the United States.  EPA also has

23   the right to determine on a case-by-case basis if any of

24   these waters are 'waters of the United States.'

25              "(A)  Non-tidal drainage and irrigation

Page 292

1    ditches excavated on dry land."

2            Did I read that correctly?

3        A.   Yes, sir.

4        Q.   Now, when you were referring to your

5    experience in applying the 1986 regulations, were you in

6    part referring to this preamble language?

7            MR. McALILEY:  Object to form.

8            THE WITNESS:  Yes, sir, as part of my

9        knowledge and part of the work that I did at EPA.

10        So it was prior knowledge of what ditches

11        excavating dry land are.

12   BY MR. ADKINS:

13       Q.   And you weren't applying, at least with

14   respect to this case, the regulations enacted by the

15   Biden administration; is that correct?

16           MR. McALILEY:  Form.

17           THE WITNESS:  That's correct.  Yeah, I just --

18        what happened was, is that I had recently read

19        those, and it was in there as one of the

20        exclusions.  Yes.

21   BY MR. ADKINS:

22       Q.   And to be fair, that exclusion that is in the

23   preamble, that's not in the code of federal regulations,

24   correct?

25       A.   That's correct.

Page 293

1      Q.   Okay.  So do you recall answering some

2   questions from counsel about nomenclature of Bessey

3   Creek?

4      A.   Yes, sir.

5      Q.   And you were asked whether you were aware of

6   other people who referred to what you call the upstream

7   reach of Bessey Creek as Bessey Creek.  Do you remember

8   those questions?

9      A.   Yes, sir.  I do.

10      Q.   At the end of the day, does it matter for

11   purposes of your opinion that the site wetlands are

12   jurisdictional under the Clean Water Act, whether we

13   call the upstream reach of Bessey Creek the upstream

14   reach of Bessey Creek or the east-west ditch or

15   Tributary A or any other name?

16           MR. McALILEY:  Object to form.

17           THE WITNESS:  No, sir.  It doesn't.  I looked

18       for what forms a tributary with flow in the

19       ordinary high-water mark and bed and bank and how

20       much flows is there, and then I make a

21       determination if it flows to a TNW, and then it's

22       typically jurisdictional.

23   BY MR. ADKINS:

24      Q.   You were asked some questions about continuous

25   surface connections.  From wetlands on the Countess Joy

```
 1   reference property at the 84th Avenue ditch and at the
 2   upstream reach of Bessey Creek, what the defendants
 3   refer to as the east-west ditch at points W5 and W7.  Do
 4   you remember those questions?
 5        A.   Yes, sir.
 6        Q.   And you were asked some questions about, well,
 7   what does it mean to have a wetland that touches a water
 8   in those tributaries.  Do you remember those questions?
 9        A.   Yes, sir.
10        Q.   In your work on this case, your observations
11   in the field, your review of desktop resources, and
12   relying on your knowledge and experience, would it be
13   fair to say that the wetlands on the Countess Joy
14   property touch the 84th Avenue ditch and the upstream
15   Bessey Creek at those locations you identified at least,
16   at least, as low as the ordinary high-water mark?
17             MR. McALILEY:  Object to form.
18             THE WITNESS:  Yes, it would.
19   BY MR. ADKINS:
20        Q.   You recall being asked some questions about
21   photos that you took in your August site inspection.  Do
22   you remember those questions?
23        A.   I do.
24        Q.   And you were asked whether in certain photos
25   it looked like the groundwater was a certain number of
```

Page 295

1    inches from the surface.  Do you recall that?

2         A.   Yes, I do.

3         Q.   Now, would it be fair to say you had some

4    difficulty in making a determination just based on those

5    photos over a Zoom deposition exactly how far the

6    groundwater was from the surface?

7              MR. McALILEY:  Form.

8              THE WITNESS:  I think I had more difficulty

9         looking around the hole because they were centered

10        around the hole for that reason.  So if there were

11        surface waters when I was asked several times if

12        there were surface waters around a hole -- I took

13        multiple pictures.  I only saw one picture of the

14        hole which was focused down on that.

15             But yeah, I mean, it was within a couple of

16        inches, but everything was -- that we looked at was

17        within the upper 12.  So it's kind of

18        inconsequential.

19   BY MR. ADKINS:

20        Q.   You completed wetland determination data forms

21   for each of those reference plots, correct?

22        A.   Myself, Dr. Raines, Dr. Stewart, and

23   Dr. Nutter.  Yes.

24        Q.   Right.  So a team of experts on the DOJ expert

25   team completed those wetland determination data forms?

Page 296

1          A.    That's correct.

2          Q.    You included those as Exhibit 21 of your

3     supplemental expert report.

4          A.    That's correct.

5          Q.    Now, one of the placeholders in the hydrology

6     section of the wetland determination data form is

7     whether surface water was present.  Are you familiar

8     with that?

9          A.    Yes, I am.

10         Q.    And if you observed surface water present at a

11    location where you're completing a wetland determination

12    data form, is it your general practice to indicate on

13    that form that surface water was present?

14         A.    Yes, it was.  Or in the notes.

15         Q.    Or in the notes.

16               And would it be safe to say if you observed

17    surface water present at any of the reference plots on

18    the Countess Joy property, you would have indicated that

19    in the wetland determination data forms that are

20    included in your supplemental expert report.

21         A.    I typically do that, yes.

22         Q.    So that would be a pretty reliable source for

23    whether the team observed surface water at those

24    locations, correct?

25               MR. McALILEY:  Form.

Page 297

1          THE WITNESS:  That's correct.
2     BY MR. ADKINS:
3          Q.   I want to ask you a couple questions now about
4     the wetland delineation manual.  This was marked
5     Exhibit 259 just recently.  One second while I share my
6     screen.
7               Do you see the Wetlands Delineation Manual on
8     your screen?
9          A.   I do.
10         Q.   So this isn't the exact copy that counsel
11    showed you, defense counsel showed you, but I had a
12    copy.  So I will represent that this is the -- you know,
13    this is a copy of the Corps of Engineers Wetlands
14    Delineation Manual that was introduced as DX 259.
15              So I want to take you to page 14 here.  Before
16    I go to this, let me preface my questions here.
17              So you were asked some questions about the
18    difference in definition of a wetland between the NWI
19    definition and the Clean Water Act definition.  Do you
20    remember those questions?
21         A.   I do.
22         Q.   In your expert report, you said that there
23    were different definitions.  Is that right?
24         A.   That's correct.
25         Q.   And during your testimony, you didn't know

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

|  |  |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff*, v. BENJAMIN K. SHARFI, in his personal and fiduciary capacity as trustee of the Benjamin Sharfi 2002 Trust, and NESHAFARM, INC. *Defendants*. | Case No. 2:21-cv-14205-KAM |

## ERRATA FOR SECOND DEPOSITION OF MICHAEL M. WYLIE

I, Michael M. Wylie, have read the transcript of my second deposition taken on

October 5, 2023, in the above-captioned case and, pursuant to Federal Rule of Civil

Procedure 30(e)(1), list the following changes to the transcript and the reasons for making them:

| Page | Line | Reads | Should Read | Reasons For Change |
|---|---|---|---|---|
| 33 | 1 | filed | field | Mistranscribed |
| 46 | 13 | in | and | Mistranscribed |
| 55 | 11 | a | or | Mistranscribed |
| 98 | 16 | That's correct. | No, I worked in Martin County for EPA in the early 1990's reviewing one or two Corps' permits with Corps staff | Correction |
| 107 | 22 | flows | occurs | Mistranscribed |
| 108 | 19 | following | flowing | Mistranscribed |
| 118 | 1 | wetlands | wetlands are | Mistranscribed |
| 118 | 25 | in | and | Mistranscribed |
| 135 | 19 | water sits | watershed | Mistranscribed |
| 140 | 15 | in | and | Mistranscribed |
| 151 | 24 | '96 | '66 | Mistranscribed |
| 155 | 17 | rotations | locations | Mistranscribed |
| 187 | 10 | start | star | Mistranscribed |
| 208 | 8 | Grecko | Greco | Misspelled |
| 217 | 14 | says | shows | Mistranscribed |

| 243 | 25 | Drive | derive | Mistranscribed |
| 245 | 12 | title | tidal | Mistranscribed |
| 257 | 4 | you mean low tide | you mean, mean low tide | Mistranscribed |
| 266 | 7 | work | look | Correction |
| 268 | 12 | at historical ways | in an historical way | Mistranscribed |
| 270 | 4 | touching wetland | wetlands touching | Mistranscribed |
| 271 | 2 | [indecipherable] | our wetland | Mistranscribed |
| 281 | 1 | floating | flowing | Mistranscribed |
| 281 | 2 | down | downstream | Mistranscribed |
| 311 | 7 | reguls | RGL (Regulatory Guidance Document) | Mistranscribed |

Executed on November 13, 2023, in Roswell, Georgia.

_Michael M. Wylie_
Michael M. Wylie