EXHIBIT 94

W. Michael Dennis                                    October 19, 2023

Page 1

1                UNITED STATES DISTRICT COURT

                 SOUTHERN DISTRICT OF FLORIDA

2

                  CASE NO. 2:21-cv-14205-KAM

3

4

      UNITED STATES OF AMERICA,

5

6                        Plaintiff,

7      vs.

8

       BENJAMIN K. SHARFI, in his

9      personal and fiduciary capacity

       as trustee of the Benjamin

10     Sharfi 2002 Trust, and

       NESHAFARM, INC.,

11

12                       Defendants.

       _____/

13

14

15                       Via Zoom Videoconference

                         Winter Park, Florida

16                       Thursday, October 19, 2023

                         9:00 a.m. to 5:48 p.m.

17

18

19        VIDEOTAPED DEPOSITION OF W. MICHAEL DENNIS, Ph.D.

20

21            Taken before Marlene Gutierrez, Notary

22     Public, State of Florida at Large, pursuant to Notice

23     of Taking Deposition filed in the above cause.

24     Job No. CS6143970

25                       - - - - - -

W. Michael Dennis                                          October 19, 2023

Page 5

```
1          THE VIDEOGRAPHER:  Good morning.  We are now

2      going on the record at approximately 9:06 a.m. on

3      October 19th, 2023.  Please note that the deposition

4      is being conducted virtually.  Quality of the

5      recording depends on quality of the camera and

6      internet connection of participants.  What is seen

7      from the witness and heard on screen is what will be

8      recorded.  Audio and video recording will continue

9      to take place unless all parties agree to go off the

10     record.

11     This is media unit number 1 of the video-recorded

12     deposition of W. Michael Dennis taken in the matter

13     of United States of America versus Benjamin K.

14     Sharfi, et al.  This deposition is being conducted

15     remotely using virtual technology.

16     My name is Brian Rosenthal.  I am the videographer.

17     The court reporter is Marlene Gutierrez.  Both

18     representing Veritext.

19     Would counsel and all parties present please state

20     their appearances for the record, after which will

21     the court reporter please swear in the witness.

22          MR. ADKINS:  Good morning.  This is Brandon

23     Adkins of the United States Department of Justice,

24     representing the United States.  With me today is

25     Jeffrey Hughes, also of the United States Department
```

Page 6

1           of Justice; and William J. Moore, III, and Katherine

2           Wainwright of the United States Army Corps of

3           Engineers.

4               MR. MCALILEY:  Good morning.  This is Neal

5           McAliley of the law firm of Carlton Fields, counsel

6           for the defendants.  Also with me is Chris Hamilton,

7           who is in-house counsel for the defendants.

8               THE COURT REPORTER:  Mr. Dennis, would you

9           raise your right hand, please.

10     Thereupon --

11                      W. MICHAEL DENNIS, Ph.D.

12     was called as a witness by the Plaintiff and, having

13     been first duly sworn, and responding, "I do," was

14     examined and testified as follows:

15                      DIRECT EXAMINATION

16     BY MR. ADKINS:

17       Q   Okay.  Good morning, Dr. Dennis.  My name is

18     Brandon Adkins.  I represent the United States in this

19     matter.  We're taking this deposition remotely via

20     Zoom; is that right?

21       A   Correct.

22       Q   Do you have anyone in the room with you today?

23       A   No.

24       Q   Okay.  The only thing I ask is, because we're

25     proceeding by Zoom, that you not communicate with

W. Michael Dennis                                    October 19, 2023

1      counsel or anyone else in a way that's not being

2      recorded during today's deposition.

3           Do you understand that?

4      A    Yes, sir.

5      Q    Okay.  And you've taken an oath to tell the

6      truth today, correct?

7      A    Yes.

8      Q    Now, you recall I took your deposition in this

9      case on May 27, 2022?

10     A    I don't remember the exact date, but, yes, I

11     remember the deposition.

12     Q    And at that deposition, you testified

13     truthfully?

14     A    Yes, sir.

15     Q    Do you stand by the testimony that you gave at

16     your May 2022 deposition?

17     A    As being truthful at that time, yes.

18     Q    And did you conduct any further factual

19     investigation in this case since I took your deposition

20     on May 27, 2022?

21     A    Only -- only to the extent that I reviewed the

22     Sackett Supreme Court decision and applied those tests

23     to the data that had been previously collected.

24     Q    Okay.  So you reviewed the United States --

25     well, excuse me.  It's Sackett versus EPA, Supreme

W. Michael Dennis                                    October 19, 2023

Page 8

1    Court decision.  Is that what you're referring to?

2       A   Yes, sir.

3       Q   Okay.  Did you conduct any further factual

4    investigation since I took your deposition in May of

5    2022?

6       A   No.

7       Q   Okay.  And you prepared a rebuttal report, which

8    you served on April 8, 2023 -- or excuse me -- April 8,

9    2022, in this case, correct?

10      A   April 8, 2022, yes.

11      Q   Okay.  I'm going to share my screen with you so

12   you can see a copy of that report.

13          Okay.  I'm now sharing my screen with you and

14   showing you Exhibit 194, which is your April 8, 2022,

15   rebuttal report in this case.  Do you see that?

16      A   Yes.

17              (Plaintiff's Exhibit 194 was marked for

18              identification.)

19   BY MR. ADKINS:

20      Q   Do you stand by the opinions in your rebuttal

21   report?

22      A   I do, with one exception, which I outlined in my

23   supplemental Sackett report.

24      Q   And that one exception is that you've changed

25   your opinion with respect to whether the east-west

W. Michael Dennis                                    October 19, 2023

1    ditch is a relatively permanent water?

2         A    Correct.

3         Q    Other than that change, do you otherwise stand

4    by the opinions reflected in your April 8, 2022,

5    report?

6         A    Yes.

7         Q    Since your April 2022 rebuttal report, have you

8    testified in any other cases?

9         A    No.

10        Q    Since your April 2022 rebuttal report, have you

11   prepared any other expert reports outside of the

12   supplemental rebuttal report that you prepared in this

13   case?

14        A    Not in conjunction with any litigation, no.

15        Q    And when you say "not in conjunction with any

16   litigation," what do you mean?

17        A    I'm just clarifying that as part of our

18   day-to-day business here at Breedlove, Dennis &

19   Associates, we prepare reports.  And so we have

20   prepared a number of reports for projects since then,

21   but no expert reports relative to any pending

22   litigation.

23        Q    Very good.

24             And you prepared a supplemental rebuttal report

25   in this case, which was served on April 18th -- excuse

W. Michael Dennis                                        October 19, 2023

                                                    Page 10

1     me -- September 29, 2023, correct?

2         A    Correct.

3         Q    Okay.  Glad I got those dates right.

4              Let me show you an exhibit, which we will mark

5     as Exhibit 262.

6                   (Plaintiff's Exhibit 262 was marked for

7                   identification.)

8              MR. ADKINS:  Neal, do I have that right?

9         Mr. McAliley.

10             MR. MCALILEY:  I think that's right.

11             MR. ADKINS:  Okay.

12             MR. MCALILEY:  I think the last exhibit I used

13        was 261, so I think 262 is the next number.

14             MR. ADKINS:  Okay.  Great.

15        BY MR. ADKINS:

16        Q    Okay.  So I'm showing you, Dr. Dennis, what will

17        be marked as Exhibit 262.  And this is your

18        supplemental Sackett analysis, submitted on

19        September 29, 2023.  Do you see that?

20        A    Yes.

21        Q    Okay.  Now, this copy that I'm showing you has

22        26 pages because I removed the exhibits that were

23        attached to your report.  Okay?

24        A    Okay.

25        Q    So this isn't your complete report, because it

Page 11

1    doesn't include the exhibits that you included.  All

2    right?

3        A    Yes.

4        Q    I may refer to this throughout your deposition

5    as your second rebuttal report or second report.  Will

6    you understand that?

7        A    Yes.

8        Q    And that's because this is the second report

9    that you submitted in this case.

10       Did anyone assist you in preparing your second

11   rebuttal report?

12       A    No.  I prepared the report.  As with the first

13   report, I believe I had Dr. Lynette Brown review it for

14   editorial review.  I did discuss it with counsel.

15       Q    And who is Dr. Brown?

16       A    Dr. Lynette Brown is one of our senior

17   scientists here at Breedlove, Dennis & Associates.

18       Q    Can you spell Dr. Brown's name for the record,

19   please.

20       A    L-Y-N-E-T-T-E, I believe.

21       Q    Okay.  And then Brown like the color?

22       A    Yes.

23       Q    Okay.  Why did Dr. Brown -- excuse me.  Is it

24   Dr. Brown?

25       A    Yes.

W. Michael Dennis                                          October 19, 2023

Page 12

1        Q    Okay.  Why did Dr. Brown review your report?

2        A    I asked her to.

3        Q    Did Dr. Brown write any version or portions of

4     your report?

5        A    No.

6        Q    Did you draft the first version of your rebuttal

7     report?

8        A    Yes.

9        Q    Okay.  Did anyone other than you write any draft

10    or portion of your second rebuttal report?

11       A    No.  I received -- I received edits from

12    Dr. Brown, and I had some discussion and some comments

13    on sections of it or portions of it with counsel.

14       Q    Does your second rebuttal report reflect the

15    full scope of your opinions whether wetlands on the

16    defendants' site are regulated under the Clean Water

17    Act after the Supreme Court's decision in Sackett

18    versus EPA?

19       A    Yes.

20       Q    Does your second rebuttal report reflect the

21    full scope of the facts and data that you considered in

22    forming those opinions?

23       A    Yes.

24       Q    Is there anything in your supplemental rebuttal

25    report that you'd like to correct?

W. Michael Dennis                                    October 19, 2023

Page 41

1          Here's an ordinary high waterline.  From that video,

2          I could show -- I could tell the configuration,

3          when -- when there weren't tree cover, of where the

4          channel of Bessey Creek was, and you could see the

5          bed and the bank.  And on there, there would be a

6          mark that would indicate the ordinary high

7          waterline.

8          Now, for clarification, when we're talking about

9          ordinary high waterline, we're only talking about

10         the regulatory definition of ordinary high waterline

11         and not any sovereign land's determination of

12         ordinary high waterline.

13    BY MR. ADKINS:

14         Q   So did you or did you not identify an ordinary

15    high waterline in the naturally occurring nontidal

16    reach of Bessey Creek?

17              MR. MCALILEY:  Object to form.

18              THE WITNESS:  I've not done that, no.

19    BY MR. ADKINS:

20         Q   Okay.  So I want to move on to the east-west

21    canal ditch.  So we're clear on our terminology here,

22    the east-west canal ditch that you refer to in your

23    second report is the same water or hydrologic feature

24    that the -- that Dr. Wylie and Dr. Nutter refer as the

25    upstream reach of Bessey Creek; is that correct?

W. Michael Dennis                                    October 19, 2023

Page 42

1        A    What -- and I thought we had this clarified

2     before.  What I refer to in my report as the canal

3     ditch, east-west canal ditch, is that man-made

4     constructed portion that goes off of the natural

5     portion of Bessey Creek and extends in various straight

6     lines to the west.  And I believe that in all of the

7     DOJ reports, that's referred to as Bessey Creek.

8     Sometimes it's talked about as the excavated portion of

9     Bessey Creek.  But I think that -- that generally, the

10    two terms -- I use "canal ditch," and I believe that

11    the experts for DOJ refer to all of it as Bessey Creek.

12       Q    So my question was a little more specific.  And

13    I'm just going to show you what's been marked as

14    Exhibit 253 in a previous deposition.

15            MR. ADKINS:  I'll just state for the record, I

16        don't have the stamped version of 253, Mr. McAliley,

17        so this is Mike Wylie's report.  But it's -- it is

18        Deposition Exhibit 253.

19            MR. MCALILEY:  All right.

20                (Plaintiff's Exhibit 253 was marked for

21                identification.)

22    BY MR. ADKINS:

23       Q    Okay.  So let me take you to page 3 of the

24    report.

25            Okay.  And Mr. Wylie wrote in his report, "The

W. Michael Dennis                                          October 19, 2023

Page 43

1    northern and upstream reach of Bessey Creek, which

2    defendants refer to as the east-west ditch, is a

3    historically excavated channel that begins at the

4    Martin County solid water transfer station and landfill

5    facility ponds to the west and upstream of the site

6    ('upstream reach of Bessey Creek')."

7         Did I read that correctly?

8    A    I believe you got it right, yes.

9    Q    I was pretty close to being right.

10        Okay.  So do you agree that what you refer to as

11   the east-west canal ditch is what Mr. Wylie is

12   referring to in his supplemental report as the upstream

13   reach of Bessey Creek?

14   A    Yes, I believe so.

15   Q    Okay.  So you refer to this as the east-west --

16   I'm going to take this exhibit down.  You refer to that

17   as the east-west canal ditch.  I have a bit of a habit

18   of referring to this as the east-west ditch, just for

19   simplicity.  So if I refer to the east-west ditch at

20   today's deposition, I'm referring to what you describe

21   as the east-west canal ditch.  Okay?

22   A    That's fine.  Thanks.

23   Q    Okay.  And you agree the east-west canal ditch

24   flows directly into the naturally occurring upstream

25   reach of Bessey Creek, Dr. Dennis?

W. Michael Dennis                                    October 19, 2023

Page 44

1          A    Yes.

2          Q    Okay.  Now, your opinion before the Supreme

3     Court's decision in Sackett was that the east-west

4     canal ditch is a relatively permanent water, correct?

5               MR. MCALILEY:  Object to form.

6               THE WITNESS:  I think that my opinion was --

7          was broader.  It was more explanatory than that.  I

8          did refer to -- and this is what we had already

9          talked about on -- I believe it was page 50 of my

10         report.  I did indicate -- and it's the first

11         report -- that if you assume seasonal flow would

12         constitute a test for a relatively permanent water,

13         then I would agree that the east-west ditch is a

14         relatively permanent water.  If relatively permanent

15         water connotates more than seasonal flow, then I --

16         I don't believe -- I didn't believe then, and I

17         don't believe now, that the east-west ditch would

18         constitute a relatively permanent water.

19     BY MR. ADKINS:

20         Q    Right.  So your -- in your first report, you

21     were applying -- in this respect, you were applying

22     Justice Scalia's Rapanos plurality and the 2008 Rapanos

23     guidance, and you determined that based on those --

24     that decision and that guidance, that the east-west

25     canal ditch qualified as a relatively permanent water;

W. Michael Dennis                                              October 19, 2023

Page 45

1    is that correct?

2              MR. MCALILEY:  Object to form.

3              THE WITNESS:  That's basically correct, yes.

4    BY MR. ADKINS:

5       Q   Okay.  And your opinion now is that -- oh, well,

6    let me go back.

7              So what was -- what was the basis for your

8    opinion, applying the Rapanos plurality in the 2008

9    guidance, that the east-west canal ditch qualified as a

10   relatively permanent water?

11             MR. MCALILEY:  Object to form.

12             THE WITNESS:  I may not understand that

13        question, because I think that question was what we

14        just discussed and agreed upon.

15   BY MR. ADKINS:

16      Q   Right.  Well, I'm curious what the basis was --

17   you know, I know your opinions changed, but what was

18   the basis, when you disclosed your first report, that

19   the east-west canal ditch qualified as a relatively

20   permanent water?

21             MR. MCALILEY:  Object to form.

22             THE WITNESS:  Yeah, that's what we just talked

23        about.  And it was a combination of Scalia's opinion

24        and the 2008 guidance.

25   BY MR. ADKINS:

W. Michael Dennis                                    October 19, 2023

Page 46

1      Q   And what facts were you basing your opinion on?

2          MR. MCALILEY:  Object to form.

3          THE WITNESS:  The -- the data that was produced

4      in the treatment plant permit and analysis, which

5      had some data and model data on amount of flow.

6      Also, I was basing it on my observations of the --

7      what you call the east-west ditch, in its very

8      westerly edge, north of Countess Joy, over to the

9      84th Avenue Road.

10     BY MR. ADKINS:

11     Q   The data you're referring is from the Hybrid

12     Wetland Treatment Technology facility?

13     A   Yeah.  That's what I would've said if I could've

14     remembered it.

15     Q   Yeah, I had it written down.  I usually call it

16     the HWTT facility.  Is that a fair acronym?

17     A   That's -- that's good.  I would've written it

18     down, too, but -- I do have a pad in front of me, but I

19     don't have anything written on it.

20     Q   Okay.  Now, did you observe the conditions of

21     the east-west ditch in the vicinity of the Countess Joy

22     reference area when you inspected that area on

23     December 3, 2021, and March 10, 2022?

24         MR. MCALILEY:  Object to form.

25         THE WITNESS:  Yes.

W. Michael Dennis                                    October 19, 2023

Page 47

1    BY MR. ADKINS:

2         Q    So just focusing in -- focusing in on the

3    December 2021 inspection, what parts of the east-west

4    ditch did you observe that day?

5         A    I looked at the east-west ditch, I recall, in

6    the area where the north-south ditch that we've

7    referred to comes into that -- your east-west ditch.

8    So I looked at the ditch there, and then for a little

9    bit east and west of that point.

10        Q    And when you say "a little bit," are we talking

11   10, 15 feet, or something more?

12        A    Probably something more.

13        Q    About how far did you go east and west of the

14   confluence of the north-south ditch and the east-west

15   ditch?

16        A    I didn't measure it, but my recollection is

17   it would've been probably less than a hundred yards in

18   either direction.

19        Q    Okay.  So you did not observe the entirety of

20   the east-west ditch that runs along the Countess Joy

21   reference property?

22        A    No, not on that December date.

23        Q    Right.  Thank you.  Yeah, we're just talking

24   about the December inspection right now.

25             And the portions of the east-west ditch that you

W. Michael Dennis                                    October 19, 2023

Page 48

1     observed in December 2021 had water in the east-west

2     ditch, correct?

3              MR. MCALILEY:  Object to form.

4              THE WITNESS:  Yes, it had some water.

5     BY MR. ADKINS:

6        Q    Okay.  So now let's -- well, let me say, did you

7     observe an ordinary high watermark in the east-west

8     ditch?

9        A    Yes.

10       Q    Okay.  And in the east-west ditch, during your

11    December inspection, you observed an ordinary -- excuse

12    me -- a bed and bank, correct?

13       A    Yes.

14       Q    Okay.  So let's turn to your March 10, 2022,

15    inspection.  What portions, if any, of the east-west

16    ditch did you observe in March 2022?

17       A    I observed the east-west ditch from 84th Avenue

18    all the way past the north-south ditch, and on --

19    probably another hundred or so yards east of that.  So

20    I walked the southern bank, the southern area of that

21    east-west ditch, and I looked at it in various places

22    where I could walk down to the edge of it and I could

23    look up and down it.  So at that -- at that time, I

24    viewed the entirety of it, from 84th Avenue to a ways

25    past the north-south ditch.

W. Michael Dennis                                    October 19, 2023

                                                     Page 80

1    determine the normalcy of precipitation on the dates

2    that you reviewed Google Earth imagery to inform your

3    opinion that the east-west canal ditch is dry for

4    months of the year?

5            MR. MCALILEY:  Object to form.

6            THE WITNESS:  No.

7    BY MR. ADKINS:

8        Q   Okay.  Other than this helicopter video, is

9    there any other -- are there any other facts or data

10   that you didn't rely upon in your first rebuttal report

11   that you are now relying upon in your second rebuttal

12   report?

13       A   Other than the Sackett decision, which we've

14   talked about.

15       Q   Any facts or data?

16       A   Oh, no.

17       Q   Okay.  So, Dr. Dennis, I'm showing what we'll

18   mark as Exhibit 265.

19               (Plaintiff's Exhibit 265 was marked for

20               identification.)

21   BY MR. ADKINS:

22       Q   This is Exhibit 16 from your second rebuttal

23   report.  Do you see that on your screen?

24       A   Yes.

25       Q   Okay.  The reason -- I'm going to break out some

W. Michael Dennis                                    October 19, 2023

Page 81

1    of your exhibits from your report, because some were

2    quite lengthy and it would just slow my computer down

3    if I tried to do that.  So you'll have to bear with me

4    on that for a little bit.

5           So this Exhibit 263 is photo station 5; is that

6    correct?

7       A   Correct.

8               (Plaintiff's Exhibit 263 was marked for

9               identification.)

10   BY MR. ADKINS:

11      Q   Now, you took this photo during your second

12   inspection of the Countess Joy property on March 10,

13   2022, correct?

14      A   Correct.

15      Q   Can you describe for me where the north-south

16   ditch is in this photograph.

17      A   I'm standing in it and shooting the photo toward

18   the east-west ditch.

19      Q   Okay.  And can we see the east-west ditch in

20   this photograph?

21      A   In the -- the upper part of the photograph, you

22   see sort of a greener area.  That's the east-west

23   ditch.

24      Q   Okay.  So I see an area in the foreground

25   that -- that looks a little muddy, and then I see an

W. Michael Dennis                                          October 19, 2023

Page 82

1    area toward the top of the photograph, but maybe in the

2    middle of the photo -- of the picture, that looks a

3    little wet, and then an area in the background that is

4    also green.  Is the area that's the east-west ditch --

5    is that the muddy area toward the mid portion of the

6    photo?

7        A    Yes.

8        Q    Okay.  And so this photograph would've been

9    looking northward, correct?

10       A    Correct.

11       Q    Okay.  And just so I'm aware, we're not able to

12   see conditions in the east-west ditch east of this

13   intersection with the north-south ditch, based on this

14   photograph?

15       A    No.

16       Q    Are you able to identify any berms in this

17   photograph?

18       A    Any berms?

19       Q    Yes, sir.

20       A    Yes.

21       Q    Okay.  And where do you see a berm in this

22   photograph?

23       A    If you'll look toward the top of the

24   photograph -- put your cursor -- there's a -- there's

25   one, a berm there.

W. Michael Dennis                                      October 19, 2023

Page 83

1     Q    Okay.

2     A    And then there's a low area with a path, cow

3   path, going up through it.  And then on the other side

4   of that, there's another berm.

5     Q    Okay.  Over in this area?

6     A    Yeah.

7     Q    So this would be on the northern boundary of the

8   east-west canal ditch.  You identified a berm that

9   seems to be separated by a cow path in the middle; is

10  that correct?

11    A    Correct.

12    Q    Okay.  And in the -- do you see any other berms

13  in this photograph?

14    A    No.

15    Q    Okay.  And would you agree with me, the area

16  where the north-south ditch intersects with the

17  east-west ditch, there is no berm in that area?

18    A    There's not, no.

19    Q    Okay.  I'm doing this as smoothly as I can, but

20  I'll say Mr. McAliley has really set the standard for

21  dealing with exhibits at these virtual depositions.

22         Okay.  So I'm now showing you what I'll mark as

23  Deposition Exhibit 266.

24              (Plaintiff's Exhibit 266 was marked for

25              identification.)

W. Michael Dennis                                                October 19, 2023

Page 84

 1    BY MR. ADKINS:

 2        Q    And this is Exhibit 17 of your second rebuttal

 3    report.  Do you see that?

 4        A    Yes.

 5        Q    Okay.  And so we're looking at what you

 6    described as photo station 6; is that correct?

 7        A    Yes.

 8        Q    Okay.  I'll try to make this -- okay.  We can

 9    see the full photo now.

10             And you took this photo, Dr. Dennis, during your

11    March 10, 2022, inspection of the Countess Joy

12    reference area?

13        A    Correct.

14        Q    And is the north-south ditch depicted in this

15    photograph?

16        A    No.

17        Q    Okay.  The caption says this is a photo of the

18    east-west canal ditch looking west, from an area where

19    the north-south canal ditch enters the east-west canal

20    ditch.  Do you see that?

21        A    Yes.

22        Q    Where would the north-south ditch be in relation

23    to one of the edges of this photograph?

24        A    Well, I was standing in the middle of the

25    east-west ditch looking west, so if I put my left hand

W. Michael Dennis                                    October 19, 2023

Page 85

1    out, arm out, and pointed south, that would be pointing

2    to the north-south ditch.

3        Q    Got it.  Okay.

4             And so this photo doesn't show conditions in the

5    east-west ditch east of its connection with the

6    north-south ditch?

7        A    No.

8        Q    And just so I know, the east-west is the ditch

9    that is -- you know, takes up most of the photograph?

10       A    Yes.

11       Q    Okay.  Okay.  So other than the two photos we

12   just looked at, Deposition Exhibits 265 and 266, are

13   there any other -- are there any other -- excuse me.

14   Let me rephrase the question.

15            Other than the helicopter video and these two

16   photographs, Deposition Exhibits 265 and 266, do you

17   have any other data supporting your opinion that the

18   east-west ditch is dry for months of the year?

19            MR. MCALILEY:  Object to form.

20            THE WITNESS:  Only that that I've already

21        testified to earlier this morning.

22   BY MR. ADKINS:

23       Q    Okay.  So going back to your report -- I think

24   we're on page 9 still -- you had cited Exhibit 15,

25   which is the helicopter video, and Exhibits 16 and 17,

W. Michael Dennis                                    October 19, 2023

Page 86

1    which are the two photos that we just looked at.  So

2    what -- what other facts or data are you relying upon

3    for your opinion that the east-west canal ditch is dry

4    for months of the year?

5              MR. MCALILEY:  Object to form.

6              THE WITNESS:  Those -- those facts and data

7         that we have reviewed earlier this morning in this

8         deposition.

9    BY MR. ADKINS:

10        Q    Can you be more specific.

11             MR. MCALILEY:  Object to form.

12             THE WITNESS:  Yes, I can be repetitive.

13        In analyzing the east-west canal ditch, I reviewed

14        the information that was presented in the original

15        DOJ report, which provided descriptions of it, and

16        also information on location of well data in

17        proximity to it.  I looked at the treatment plant

18        data and looked at what the flow rates were in those

19        applications and reports.  I based my opinion on

20        earlier observations of the east-west ditch in

21        December of 2022.  I also looked at a series of

22        aerial photographs, which have been produced in this

23        matter.  I reviewed reports from Dr. Ott and from

24        Mr. Creech, where they talked to one degree or

25        another about ditches and flows.  I reviewed the

W. Michael Dennis                                    October 19, 2023

Page 100

1    that suggests that -- that in applying the Sackett

2    decision, one must look at all of those factors

3    together.

4         The fact that this is a man-made ditch, I think

5    unquestionably put in to drain the land, and was not

6    put in as an area to capture or have, you know,

7    regular, continuous relatively permanent water -- it

8    was put in to drain the land.  So that, in and of

9    itself, suggests that the ditch was not -- and does not

10   have the characteristics of a relatively permanent

11   water.

12   Q   So when you were -- well, I'll withdraw the

13   question.

14        So you also say in your report that the

15   north-south ditch does not constitute a geographical

16   feature; is that correct?

17   A   Not a geographical feature in the sense of a

18   natural geographical feature.

19   Q   Okay.  So, again, that's a reference to whether

20   or not the north-south ditch is a man-made ditch?

21   A   Yes.

22   Q   Okay.  And you -- okay.  So do you agree --

23   well, let's do this a different way.

24        I want to go back to your report, and I'm going

25   to take you to -- this is page 8 of your second

W. Michael Dennis                                              October 19, 2023

                                                              Page 101

1      rebuttal report.  So you say -- you wrote, "On my

2      visits to the Countess Joy property, I observed that

3      the north-south canal ditch loses its structure through

4      the middle section of the north-south canal ditch and

5      has a higher bottom elevation compared to locations

6      further south toward the 9.92-acre property, and does

7      not appear to function as a ditch in that area."

8           Did I read that correctly?

9      A    Yes.

10     Q    Okay.  And so this is in the paragraph of your

11     report discussing why the north-south canal ditch does

12     not constitute a geographic feature, right?

13     A    Yes.

14     Q    Okay.  And this -- I mean, the second sentence,

15     which I just read, that starts "on my visits," that has

16     nothing to do with whether or not the north-south ditch

17     is man-made?

18          MR. MCALILEY:  Object to form.

19     BY MR. ADKINS:

20     Q    Is that right?

21     A    The geographic feature does not address whether

22     it's man-made or not?

23     Q    Well, I guess -- I'll back up for a second.

24          When I asked what you meant by the -- that the

25     north-south ditch does not constitute a geographical

W. Michael Dennis                                    October 19, 2023

Page 102

1    feature, I understood your response to be referring

2    back to the man-made nature of the ditch.  But your

3    report seems to suggest there's something else that you

4    mean by "geographic feature," because you're talking

5    about how the north-south ditch loses its structure

6    through the middle section of it.

7        A    Right.

8        Q    Do you see that?

9        A    Yes.

10       Q    Okay.  So what do you mean when you say the

11   north-south ditch does not constitute a geographical

12   feature?

13       A    It does not constitute a natural geographical

14   feature as is suggested in Alito's words.

15       Q    Okay.  And so in this second sentence that I've

16   highlighted, "loses its structure," can you explain

17   what you mean.

18       A    Yeah.  If you -- if you start on the north-south

19   ditch, adjacent to the 9.92-acre site, what I observed,

20   it is a well-maintained ditch, and then if you walk

21   north on that ditch, it becomes shallower as you go --

22   as you go north.  And then about midway between the

23   9.92-acre site and the east-west canal ditch, the

24   berms -- and what I would believe were spoil piles, on

25   either side or sometimes both sides of the north-south

W. Michael Dennis                                    October 19, 2023

Page 103

1    ditch, for lack of a better word, sort of go away.

2    They -- they're not prominent anymore.  Still maybe a

3    little berm, but they're not as prominent.

4            And that's an area, in the middle, where -- if

5    you look at historic aerials over time, two things have

6    happened.  One is, there's a field road, a pasture

7    road, that goes from the eastern side of the

8    north-south ditch on Countess Joy to -- in a

9    southwesterly direction, to the southwest part of

10   Countess Joy.  So there's an area that, looks like, is

11   a field road.  And in that section, the integrity of

12   the north-south ditch breaks down.

13           Also, there's a section in the middle where the

14   berms pretty much are all gone and it's flattened out,

15   and it is an area where cattle, over the years, have

16   gone back and forth, the north-south ditch.  So in

17   those places, and in that middle section, the -- you

18   know, the integrity of the ditch, as a well-defined,

19   well-constructed conduit, sort of break down.

20           And then as you get further north of those two

21   places in the center, then, again, you have more of

22   the -- what looks like a well-constructed ditch, with

23   spoil piles, berms, on either side of it.

24      Q    So in the areas where -- these two areas that

25   you're describing, where the north-south ditch has lost

W. Michael Dennis                                    October 19, 2023

Page 104

1    its structure -- or loses its structure, were you able

2    to identify an ordinary high watermark?

3         A    In the cattle crossing area?  Probably not.

4         Q    And what about the old farm road area?

5         A    I'm not sure.  I'd have to go back and look at

6    that.  That was not as -- not as flat as the cow

7    crossing area was.

8         Q    Okay.  And in those two areas where the

9    north-south ditch has -- loses its structure, would you

10   say that it has a defined bed and bank?

11        A    It's stretching that definition in the cow

12   crossing area.

13        Q    And how about in the area where the old farm

14   road crossed?

15        A    It's still got some -- probably some bed and

16   bank characteristics there.

17        Q    Okay.  And then -- so, you know, reversing that,

18   the other areas of the north-south ditch, and not

19   including those two areas you've described where the

20   north-south ditch loses its structure, does the

21   north-south ditch have an ordinary high watermark?

22        A    Yes.  I can identify, and I had identified, I

23   believe, the point along the bank of the ditch where

24   the water, in the wet season, would get up to.  And you

25   have a change in the character of the bed and bank in

W. Michael Dennis                                    October 19, 2023

1    that place.  So to that degree, yes, I could -- I could

2    identify a mark where in the wet season water would get

3    up to, most of the time, and create a mark.

4       Q    And in those areas of the north-south ditch,

5    excluding where it loses its structure, the north-south

6    ditch has a defined bed and bank, correct?

7       A    Yes.

8       Q    And would you agree that a majority of the

9    north-south ditch has a defined bed and bank?

10      A    I think so.

11      Q    And do you agree that a majority of the

12   north-south ditch has an ordinary high water?

13      A    It has that mark that I described, of where the

14   water would get to seasonally in the ditch, yes.

15      Q    Okay.  So going back to your report, you say

16   that the north-south ditch has a higher bottom

17   elevation compared to locations further south toward

18   the 9.92-acre property.  How does that impact your

19   opinion that the north-south ditch does not constitute

20   a geographical feature?

21      A    That really doesn't address the geographical

22   feature comment.

23      Q    Okay.  What -- how is it relevant at all to your

24   opinion whether the north-south ditch is a relatively

25   permanent water?

W. Michael Dennis                                    October 19, 2023

                                                    Page 106

1        A    Well, to the degree that there's different

2    elevations in the ditch, that would suggest that when

3    the ditch is drying up from, you know, perhaps seasonal

4    flow, wet season conditions, that the areas that were

5    lower would have water, maybe standing water in it.

6    And then you may have a higher area in the bottom of

7    the ditch, and then that would -- that would break the

8    flow.

9         So if you had a -- if you had a ditch with a

10   uniform bottom, then when the water came up or went

11   down, it would be uniform throughout that ditch

12   section, recognizing there is some fall to the land.  I

13   mean, the ditches were put in to drain, so there's some

14   fall to the land with that ditch.  But if you had high

15   spots in the middle of the ditch, that would serve to

16   further break up the amount of time when the water

17   would be available to continuously flow.

18       Q    So there are times where the higher bottom

19   elevation in portions of the north-south ditch could

20   impede flow?

21       A    Yes.

22       Q    And at what -- when you say "higher bottom

23   elevation," what are we talking?  Are we talking about

24   feet?  inches?

25       A    I presented cross-sections of those in my

W. Michael Dennis                                    October 19, 2023

Page 169

1    right?

2           MR. MCALILEY:  Object to form.

3           THE WITNESS:  Well, it's -- it's -- it's more

4       evident in some places than others, but it looks

5       like it's -- put your cursor back down there.  Just

6       a little bit south.  Right in there, that's the one

7       area that -- you know, it's got some light in there,

8       like the area north of that that I'm looking at.  So

9       it's -- you know, that's the one area we've been

10      talking about that's not as clear one way or

11      another.

12   BY MR. ADKINS:

13      Q    Okay.  So we'll go down to photo 3-5.  And

14   looking at photo 3-5 -- 5-3 -- excuse me -- do you --

15   can you observe a berm in this photo?

16      A    Yeah, that -- look to the west of that black

17   line.  See that white line?

18      Q    Uh-huh.

19      A    That appears to be a continuous berm along

20   there.

21      Q    Okay.  And is this berm that you're observing

22   here -- is this on the west side or the east side of

23   the north-south ditch?

24      A    That's on the west side.

25      Q    Okay.  And so there's no berm -- you're not

W. Michael Dennis                                    October 19, 2023

1      seeing a similar berm on the east side of the

2      north-south ditch, correct?

3          A    No.  It's on the west side of the black line.

4          Q    Right.

5              And this light feature that you're calling a

6      berm is on the west side of the north-south ditch?

7              MR. MCALILEY:  Object to form.

8              THE WITNESS:  Scroll north a little bit.

9          With the vegetation that's there -- yeah, go north a

10         little bit more, if you can.  It goes off.  Okay.

11         It's really hard to pick up the -- the north-south

12         ditch.  It's under the trees and the brush, I

13         believe, on this.

14         So if the northwest -- if the north -- see, the

15         north-south ditch doesn't show on this, in that

16         southwest corner.

17     BY MR. ADKINS:

18         Q    Okay.  Let's look at photograph 5-4.  Can you

19     observe any berms along the north-south ditch in this

20     photo?

21             MR. MCALILEY:  Object to form.

22             THE WITNESS:  No.  It's all vegetated, and I

23         can't -- I can't discern whether there's a berm

24         there or not.

25     BY MR. ADKINS:

W. Michael Dennis                                    October 19, 2023

Page 171

1       Q   So you can't see a berm from the depressional

2    feature on the defendants' site and -- separating the

3    depressional feature on the defendants' site and the

4    north-south ditch, correct?

5           MR. MCALILEY:  Object to form.

6           THE WITNESS:  Well, I'm not -- on this photo,

7        I'm not even picking up the north-south ditch

8        clearly.

9        What's the date of this aerial?

10   BY MR. ADKINS:

11       Q   This one is labeled 2014.

12       A   2014.  Well, the ditch is there, but I would be

13   hard-pressed to see it.

14       Q   And that's because the vegetation is making it

15   difficult to observe the ditch?

16       A   Yes.

17          MR. MCALILEY:  Object to form.

18   BY MR. ADKINS:

19       Q   Okay.  Would you agree the vegetation is also

20   making it difficult to observe whether there's a berm

21   present?

22       A   Yes.

23       Q   Okay.  All right.  I think there's one more.

24   Yes, 2016.  We're looking at photograph 5-5.

25          Are you able to make out a berm in

W. Michael Dennis                                    October 19, 2023

Page 172

1    photograph 5-5?

2         A    There, I can pick up areas of the ditch, I

3    believe, and there's vegetation to the east of it.  I

4    can't tell from this aerial whether there's a berm

5    there or not.

6              Scroll down to the south part, the south corner.

7              Same thing.  I can't tell -- I can't tell from

8    this whether there is or isn't.

9         Q    Okay.  So let's move back to your report,

10   Exhibit 262.  I'm on page 20.  I've highlighted another

11   sentence here, and I'll read it for you.

12             "The areas near the east-west canal ditch, even

13   if it they all were wetlands, are easily

14   distinguishable from the east-west canal ditch itself."

15             Did I read that correctly?

16        A    Yes.

17        Q    And what -- what is -- can you explain what you

18   mean by this.

19        A    Yeah.  This goes to the point that I was making

20   earlier.  The east-west canal ditch has berms along it,

21   spoil banks, a berm across it.  It's not contiguous.

22   There are some breaks in it.  And then there's the

23   question of whether the wetlands that were identified

24   in the supplemental Sackett reports by DOJ -- whether

25   those wetlands are connected to that east-west canal

W. Michael Dennis                                          October 19, 2023

Page 173

1    ditch.

2         And this goes to the point I was making earlier.

3    The pasture area -- and if those are, indeed,

4    wetlands -- the elevation of those is up, you know,

5    higher than the east-west ditch and what would be the

6    ordinary high waterline in the east-west ditch.  So

7    even if -- even if the east-west ditch were an RPW and

8    even if all the areas that are identified as wetlands

9    were wetlands on the Countess Joy property, the

10   elevational difference between those is such that, one,

11   that the wetlands may not have surface water, they may

12   be high water table, high enough and close enough to

13   the surface to meet the wetland definition but not have

14   surface water, or certainly not continuous surface

15   water.  So there would be a difference in elevation.

16   And you, again, are required to have a continuous

17   surface connection between the RPW and the wetland so

18   you can't tell them apart.

19        Now, I can -- I've been out there, and I can

20   tell the difference between the east-west canal ditch

21   and the area south of it.  It's not -- it's not the

22   same.  And so I don't think that Sackett says that if

23   you have a wetland -- however it's determined, surface

24   water or groundwater -- and it's not indistinguishable

25   from the RPW water, then, again -- it's an opinion I've

W. Michael Dennis                                    October 19, 2023

Page 174

1    already stated.  I don't believe that Sackett says that

2    that is a water of the United States.

3        Q    So you don't disagree that wetlands on the

4    Countess Joy property abut or touch the east-west ditch

5    at the two points that the U.S. DOJ expert team

6    identified?

7            MR. MCALILEY:  Object to form.

8            THE WITNESS:  The two points that the circles

9        are around on that one -- on one of the exhibits.

10   BY MR. ADKINS:

11       Q    Well, you're aware that the U.S. DOJ expert team

12   identified two areas where wetlands on the Countess Joy

13   property abut the east-west ditch, right?

14       A    I'm thinking of a map that would reflect that,

15   yes.

16       Q    Okay.  And you don't dispute that those wetlands

17   touch the east-west canal ditch, right?

18           MR. MCALILEY:  Object to form.

19           THE WITNESS:  I've not -- I've not seen -- I've

20       seen reports that water could come from the area

21       that's identified as wetlands on Countess Joy and

22       those two places, and there are breaks in the spoil

23       berm.  And I am aware of the statement that water

24       connects then to the east-west ditch through those.

25       I am not sure -- you may be right, but I'm not sure

W. Michael Dennis                                    October 19, 2023

Page 175

1          that I've seen data that would indicate that the

2          wetlands would go down through those points and

3          would be wetlands all the way.  Because those were

4          old spoil berm areas.  So I'm not -- I'm not trying

5          to be picky.  I'm just saying that I'm -- I haven't

6          seen that level of detail to be absolutely sure.  It

7          may, but I'm not sure.

8     BY MR. ADKINS:

9          Q    Okay.  You know, I'm trying to separate out the

10    aspect of your opinion where you say there's got to be

11    a continuous surface water connection, from just

12    whether the wetlands abut or touch, physically touch.

13    And so my question really is -- you know, I know your

14    opinion that, yes, they're not jurisdictional because

15    there's no continuous surface water connection, but do

16    you at least agree that at the two points the U.S.

17    expert team identified on the Countess Joy site, there

18    are wetlands that physically touch the east-west canal

19    ditch?

20          MR. MCALILEY:  Object to form.

21          THE WITNESS:  Actually, I don't have a -- don't

22    have an opinion on that one way or another.  I don't

23    have enough information to definitively tell you yes

24    or no on that.

25    BY MR. ADKINS:

W. Michael Dennis                                    October 19, 2023

Page 176

1      Q   Okay.  And then the other connection that the

2   U.S. DOJ expert team shows is a connection between the

3   wetlands on the Countess Joy reference site and the

4   84th Avenue ditch.  Do you have enough information to

5   render an opinion on whether the wetlands physically

6   touch the 84th Avenue ditch at that point?

7      A   I believe they do, based on -- based on my

8   March 2022 site inspection.

9      Q   And so this -- this aspect that the wetlands

10  must be indistinguishably part of the body of water

11  that itself constitutes water under the Clean Water

12  Act, do you view that as an additional requirement

13  under the continuous surface connection test?

14          MR. MCALILEY:  Object to form.

15          THE WITNESS:  Repeat that.  I thought you were

16      going one way, and then you went another.  Say it --

17      give me the question again.

18  BY MR. ADKINS:

19      Q   Well, I don't want to do that, no.  So let me

20  see if I can keep you with you.

21          So I'm looking at your report here and the first

22  sentence says, "Finally, even assuming for the sake of

23  argument that there were a continuous surface

24  connection between wetlands on the 9.92-acre property

25  and Countess Joy property with the east-west canal

W. Michael Dennis                                    October 19, 2023

Page 177

1    ditch, and that the east-west canal ditch constituted a

2    relatively permanent water, the wetlands are clearly

3    distinguishable from the canal ditch."

4          So as I read that sentence, it strikes me that

5    you view this clearly distinguishable concept as an

6    additional requirement.  Is that fair?

7          MR. MCALILEY:  Object to form.

8          THE WITNESS:  I require it as a requirement.

9       It's not an additional requirement.  It's a

10      requirement under Alito's opinion in Sackett.

11   BY MR. ADKINS:

12   Q    Okay.  So the wetlands have to have a continuous

13   surface connection with an RPW, and they must be

14   clearly distinguishable from the canal ditch?

15         MR. MCALILEY:  Object to form.

16   BY MR. ADKINS:

17   Q    Let me withdraw the question, because I screwed

18   up.

19         So the wetlands have to have a continuous

20   surface connection with the RPW, and they must -- the

21   wetlands must also be clearly distinguishable from that

22   RPW?

23         MR. MCALILEY:  Object to form.

24         THE WITNESS:  I think -- I think what it says

25      is for the wetland to be a water of the United

W. Michael Dennis                                October 19, 2023

Page 178

1          States, it must be indistinguishable between the RPW

2          or the TNW, traditionally navigable water, and the

3          wetland.

4     BY MR. ADKINS:

5          Q   And so if the wetlands physically touch the RPW,

6     that's not enough, in your view; they must also be

7     clearly distinguishable?

8          A   Correct.

9          Q   Okay.  I think I'm ready for a break here.  You

10    want to go off?

11         A   When do you want to be back?

12         Q   Five minutes.

13             THE VIDEOGRAPHER:  Off the record at 2:52 p.m.

14                 (A break was taken from 2:52 p.m. to

15                 3:02 p.m.)

16             THE VIDEOGRAPHER:  So the time is 3:02 p.m.

17         This begins media unit number 5, and we are back on

18         the record.

19         And I just want to make a correction.  At the

20         beginning of the previous media unit, I announced it

21         as 3.  It was actually 4.  So a minor correction to

22         that.

23         You may proceed.  Sorry.

24    BY MR. ADKINS:

25         Q   Okay.  So before the break, I was reminded that

W. Michael Dennis                                    October 19, 2023

Page 201

1    none -- none of that is absolutely definitive of what

2    the wetlands are.  And that was -- that was my point,

3    is that there's conflicting information, there's

4    incomplete information, and if the assertion is going

5    to be made that there's a continuous, one large wetland

6    between the 9.92-acre site and the east-west ditch, I

7    think there's more work that needs to be done.

8                 (Plaintiff's Exhibit 274 was marked for

9                 identification.)

10   BY MR. ADKINS:

11       Q    Okay.  So let me show you what I've marked as

12   Exhibit 274.  This is Exhibit 10 to your report, your

13   second rebuttal report.  Do you see that on your

14   screen?

15       A    I do.

16       Q    Okay.  So this is the USGS topographic map, with

17   the National Hydrography Dataset and the NWI wetlands

18   mapped on top.  Do you see that?

19       A    Yes.

20       Q    Okay.  And I just want to focus in on this

21   blown-up section showing the Countess Joy property.

22   And there's an area of light blue that's indicated

23   "freshwater emergent wetland" on the west side of the

24   north-south ditch on that property.  Do you see that?

25       A    Yes.

W. Michael Dennis                                    October 19, 2023

Page 202

1          Q    Okay.  Do you -- did you -- do you disagree with

2     the identification of NWI wetlands on the site in that

3     area?

4               MR. MCALILEY:  Object to form.

5               THE WITNESS:  In part, I do.  I think that

6          they -- they generally have wetlands identified

7          where they are.  I think that they probably -- there

8          are probably wetlands that aren't identified that --

9          that could be identified on there.  So I think, in

10         general, the National Wetlands Inventory maps are

11         picking up wetlands that are consistent with my

12         photo interpretation of the aerials and my site

13         inspections, but I would not use the National

14         Wetlands Inventory map as a delineated regulatory

15         wetland jurisdictional line.

16    BY MR. ADKINS:

17         Q    And just so I understand, is it your view that

18    the NWI wetlands might be underrepresentative of the

19    true amount of wetlands on the Countess Joy reference

20    property?

21              MR. MCALILEY:  Object to form.

22              THE WITNESS:  They -- they may be, in certain

23         areas, but I don't think -- I don't know the degree

24         of underrepresentation.

25    BY MR. ADKINS:

W. Michael Dennis                                    October 19, 2023

Page 203

1      Q   And what areas do you have in mind?

2          MR. MCALILEY:  Object to form.

3          THE WITNESS:  The -- I think the wetland -- the

4      wetlands lines are a little different in the lower

5      lobe of that elbow-shaped wetland, and maybe in the

6      northern portion of that in the elbow.  And so

7      there's -- there's definitely wetlands in the area

8      mapped, but I'm -- I don't think that that boundary

9      is exactly what I would map as the wetland

10     boundaries.  So I would -- I would probably adjust

11     that some.

12  BY MR. ADKINS:

13     Q   In adjusting it, would you -- do you think there

14  should be a break in any of those boundaries so there's

15  two complexes, or just still kind of one -- one wetland

16  complex?

17         MR. MCALILEY:  Object to form.

18         THE WITNESS:  Yeah, I think that there -- there

19     may -- I would look to see if there's not a break

20     between -- between the lower part of that northern

21     wetland and the -- what I refer to as sort of the

22     elbow up there.  I think some of that -- there may

23     be a break in that area.

24  BY MR. ADKINS:

25     Q   Okay.  But, generally, you think the wetlands

W. Michael Dennis                                    October 19, 2023

Page 204

1    that NWI identified on Countess Joy are, in fact,

2    wetlands today?

3           MR. MCALILEY:  Object to form.

4           THE WITNESS:  With the modifications and

5        caveats that I've testified to.

6    BY MR. ADKINS:

7        Q   Okay.  And then how about the wetland that's

8    represented on the defendants' site?  Is that an

9    accurate representation of the wetland that existed

10   before the impacts in this case?

11       A   That looks to be pretty -- pretty accurate.  And

12   I base that on -- on the Small wetland survey and

13   delineation, and looking at historical aerials and the

14   signatures.  That looks to be -- looks to be fairly

15   representative.

16              (Plaintiff's Exhibit 275 was marked for

17              identification.)

18   BY MR. ADKINS:

19       Q   Okay.  All right.  So I want to show you what

20   I've marked Deposition Exhibit 275.

21           Okay.  So this is -- this is a figure showing

22   the NWI wetlands on top of the U.S. DOJ expert team

23   reference plots.

24           Do you see Exhibit 275 on your screen?

25       A   I do.

W. Michael Dennis                                    October 19, 2023

Page 205

1       Q    Okay.  So in the area north of the site, we see

2    reference W1, W2, W4, W11, and W9.  Do you see those?

3       A    Yes.

4       Q    And those are generally in areas where NWI did

5    not identify wetlands, right?

6       A    Yes.

7       Q    Okay.  And then in -- if you go farther north

8    and to the west, there's an area identified as W3.  Do

9    you see that?

10       A    Yes.

11       Q    Okay.  And that's a reference plot that the U.S.

12    DOJ expert team took, also not in an area that NWI

13    identified as a wetland, right?

14       A    Correct.

15       Q    Okay.  And then if we go up, we have W8.  That

16    reference plot falls within the area that NWI

17    identified as a wetland, right?

18       A    Yes.

19       Q    And then W5, W6, and W7, those three reference

20    plots are outside of the area that NWI identified as a

21    wetland, right?

22       A    Correct.

23       Q    Okay.  So if we were to take the wetlands that

24    the U.S. DOJ expert team identified and compare it to

25    the NWI wetlands, your view isn't that the U.S. DOJ

W. Michael Dennis                                      October 19, 2023

Page 206

1    expert team thinks NWI missed 90 percent of the

2    wetlands on the site, right?

3         MR. MCALILEY:  Object to form.  There's no

4       foundation for this exhibit, by the way.

5         THE WITNESS:  Would you please reask the

6       question.

7    BY MR. ADKINS:

8    Q   So looking at the NWI wetlands on top of the

9    reference plots, your view is not that the U.S. DOJ

10   expert team thinks NWI missed 90 percent of the

11   wetlands on the Countess Joy wetland -- on the Countess

12   Joy site, right?

13        MR. MCALILEY:  Object to form.

14        THE WITNESS:  So you're asking whether, looking

15      at this, the DOJ experts believed that 90 percent of

16      them were missed?  Is that the question?

17   BY MR. ADKINS:

18   Q   Well, you wrote in your report that you think

19   that the DOJ expert team -- that the result of the DOJ

20   expert team's analysis is that NWI must have missed

21   90 percent of the wetlands on the Countess Joy

22   reference site and that's just not -- that's not

23   believable, in your view.  So looking at the overlay of

24   these reference plots with the NWI wetlands, wouldn't

25   you agree that the DOJ expert team isn't saying that

W. Michael Dennis                                October 19, 2023

Page 207

1     NWI missed 90 percent of the wetlands?

2          MR. MCALILEY:  Object to form.

3          THE WITNESS:  I don't know whether they're

4     saying that based on this map and these points or

5     not.

6  BY MR. ADKINS:

7     Q   Okay.  And so let's talk about some of the gaps

8  in the reference areas that you were describing.  You

9  said there was one north of W3.

10    A   Yes.

11    Q   And in that area, and on its way to W8, you see

12 there's an area that was mapped wetland by NWI?

13    A   Right.

14    Q   And do you still believe that's a gap in the

15 reference areas that the DOJ expert team took?

16    A   I think I was referring to -- I think I was

17 referring to the area north of W3 but east of what's

18 mapped as NWI wetland.

19    Q   Okay.

20    A   I believe it does fall within the blue shaded

21 area.

22    Q   Okay.  So let me ask it this way:  If you were

23 to accept that the areas that the DOJ expert team

24 determined were wetlands, based on those reference

25 plots, and marry that up with the NWI wetlands,

W. Michael Dennis                                    October 19, 2023

Page 216

1    used as wetland delineation maps.  It says so on the

2    documentation of them.  But they are a database and a

3    data source that anyone in this field, in my

4    experience, anyway, would always pretty much pull those

5    out and look at them, if you're looking at an area or a

6    piece of property that you have no other information

7    on.

8        Q   Do you agree that farmed wetlands, mowed and

9    grazed wetlands, and significantly drained wetlands are

10   difficult to photointerpret?

11           MR. MCALILEY:  Object to form.

12           THE WITNESS:  Yes, along with the difficulty

13       about whether or not, even if you're on the ground,

14       they're a regulated wetland.  They're difficult

15       sites.

16   BY MR. ADKINS:

17       Q   Okay.  So we're going to go to page 4 here, and

18   I'll read another paragraph.

19           "Studies have reported significant omissions of

20   wetlands from NWI maps when compared to field

21   delineations in North Carolina, New York, Virginia, and

22   Washington.  The latter study erroneously reported

23   significant omissions on NWI maps that were later found

24   to be the result of a digitizing error by the

25   researchers.  Forested wetlands, small wetlands, and

W. Michael Dennis                                          October 19, 2023

Page 217

1    narrow (linear) wetlands tend to be the major sources

2    of omissions.  Also, the fact that NWI maps, by design,

3    do not show many farmed wetlands in most of the country

4    also leads to a significant underestimate of the amount

5    of wetland in agricultural regions, with the Pothole

6    Region being a major exception."

7          Do you see that?

8      A    I do.

9      Q    Do you agree with the text from the study that I

10   just read?

11         MR. MCALILEY:  Object to form.

12         THE WITNESS:  I've not -- I've not reviewed the

13        studies that are referenced there, so I'm taking

14        that at face value.

15   BY MR. ADKINS:

16     Q    Do you agree that NWI maps, by design, do not

17   show many farmed wetlands in most of the country?

18         MR. MCALILEY:  Object to form.

19         THE WITNESS:  I don't -- they -- in parts of

20        the country, they may not.  I don't -- I don't

21        believe that's necessarily by design.  I think it's

22        just the difficulty in looking at a pasture area and

23        determining whether or not it's an open pasture, a

24        wet pasture, or a wetland pasture.

25   BY MR. ADKINS:

Page 218

1      Q    Okay.  So later on the same page, it says, "Maps

2    produced by photointerpretation will never be as

3    accurate as a detailed on-the-ground delineation."

4         Do you agree with that?

5      A    As a general proposition, yes.

6      Q    Okay.  "For other types" -- I'm reading again

7    from the paper.  "For other types in different

8    situations, such as certain evergreen forested

9    wetlands, drier-end wetlands in relatively flat

10   landscapes, and significantly drained wetlands, it does

11   not work well and the boundaries are more generalized."

12        And so "it" is referring to NWI maps, right?

13     A    Okay.

14        MR. MCALILEY:  Object to form.

15   BY MR. ADKINS:

16     Q    Okay.  And do you agree with that sentence,

17   Dr. Dennis?

18        MR. MCALILEY:  Object to form.

19   BY MR. ADKINS:

20     Q    Yeah, you know what.  I'll withdraw the

21   question, because I'm looking at the sentence above.

22   And why don't I just give you a second to read that

23   whole paragraph, because I think "it" in that sentence

24   is actually referring to photointerpretation and I said

25   it was referring to NWI.

W. Michael Dennis                                           October 19, 2023

                                                       Page 219

1        A    Okay.

2        Q    So give yourself a second.  And I'll just ask

3    the question again.  Does that last sentence that I

4    read, "for other types" -- do you agree with that

5    statement?

6        A    All right.  I've got to try to -- okay.  Now

7    I've moved everybody over so I can see the paragraph.

8            I would -- I would agree with him that as a

9    general proposition, ground-truth wetland

10   interpretations are more accurate than

11   photointerpretations.  We always begin with a

12   photointerpretation, and then we ground-truth it.

13           I agree with it that photointerpretation -- that

14   this is not to say that photo interpretation cannot

15   produce accurate boundaries.  I agree with that.  I've

16   seen some very accurate photo interpretation of wetland

17   boundaries in maps.

18           And, yes, it does cost less than field

19   delineations, which are more time-consuming than the

20   photointerpretation.  And I also agree that for some

21   types of wetlands and certain types of landscapes, that

22   they lend themselves more to a definitive, accurate

23   determination of a wetland than in other areas.

24       Q    So going further down, it says, "The NWI maps

25   were never intended to show the limits of regulated

W. Michael Dennis                                October 19, 2023

Page 220

1    wetlands."

2          Do you agree with that?

3     A   Yes.

4     Q   Okay.  So I want to show you what I'll mark as

5    Deposition Exhibit 277.

6              (Plaintiff's Exhibit 277 was marked for

7              identification.)

8    BY MR. ADKINS:

9     Q   And it's got a Bates stamp Sharfi Experts 1365.

10         Are you familiar with this photo, Dr. Dennis?

11    A   Does it have a label on it?

12    Q   No label, other than the Bates stamp.

13    A   I'm not sure.  I've looked at a number of soil

14   profiles, and I'm not -- I'm not sure.

15    Q   So this was a photograph that was produced to

16   the United States in this case, and I'm curious whether

17   this is a photo of the soil pit that you excavated on

18   the Countess Joy reference site.

19    A   I don't know.

20             (Plaintiff's Exhibit 278 was marked for

21             identification.)

22   BY MR. ADKINS:

23    Q   Okay.  So I'm going to show you what's been

24   marked as DX 278.  This is another photo of what I

25   think is the same soil pit.

W. Michael Dennis                                    October 19, 2023

Page 221

1          Are you familiar with this photo?

2      A    I'm not sure.  It could be the soil pit that I

3   dug.

4      Q    Okay.  And if we wanted to find out whether or

5   not this was the picture of the soil pit that you dug,

6   how could we do that?

7      A    Give me those photos and see if I can go back

8   through my files and records and identify it.

9      Q    Okay.  Is that something that you have access to

10  now?

11     A    Yeah.

12     Q    Okay.  So let me ask you a couple of questions

13  about what we see in this photo, and then I think that

14  would be helpful if we could do that.  Because this --

15  this photo was produced to us after your deposition, so

16  we weren't able to ask about this at your first

17  deposition.

18     A    Okay.  Just to be clear, I do have access, but

19  that would mean I'd have to go retrieve the files and

20  find it.  So I don't have immediate access to be able

21  to go find them and identify it.  So given enough time,

22  I can do that, but I can't -- I don't want to mislead

23  you.  I don't have it in this room or handy to do that.

24     Q    Okay.  I think I understand.  So it's not

25  something that you could do during today's deposition?

Page 222

1        A    Not unless we extend past seven hours.

2        Q    No, we don't want to do that.  No.  I don't

3    think anyone wants us to be here past seven hours.

4             Okay.  So let me ask you some questions about

5    this.  So you -- just looking at this picture -- and

6    we're at Exhibit 277 -- you can't tell, just looking at

7    this picture, whether or not this is the soil pit that

8    you excavated in this case?

9        A    No, I can't definitively say that one way or

10   another.

11       Q    Now, I suppose you haven't -- you didn't -- you

12   didn't excavate any other soil pits, and I presume you

13   wouldn't have taken any pictures of excavated soil pits

14   other than the one that you did, right?

15            MR. MCALILEY:  Object to form.

16            THE WITNESS:  Yeah.  I only -- I only dug one

17       soil pit.

18   BY MR. ADKINS:

19       Q    Okay.  Now, are you able to identify any of the

20   vegetation on the ground around this pit?

21       A    Can you blow it up some.

22       Q    Sure can.

23       A    I'm not sure I can tell you what species that is

24   from that photo.

25       Q    Can you tell me what genus it is?

W. Michael Dennis                                    October 19, 2023

Page 223

1        A    No, I can't tell you what genus it is either.

2        Q    Well, you know, I thought it was a fair

3    question.  You're a Ph.D. botanist, right?

4        A    It's a very fair question.

5        Q    Okay.

6        A    And I would like to tell you that I could, but

7    I'm not sure --

8        Q    I would've been impressed.

9             So I'm going to show you Exhibit 278.

10       A    But sitting here under oath, I couldn't tell you

11   that.

12       Q    Okay.  So are you familiar with carpet grass?

13       A    Yes.

14       Q    Do you think the vegetation shown around the

15   soil pit in Exhibit 278 looks like carpet grass to you?

16       A    It might be.  I would -- again, I can't tell for

17   sure from this photograph.

18       Q    Okay.  What would you need to see in this

19   photograph to identify carpet grass?  Is it the

20   clarity?

21       A    Well, it's -- no.  The clarity, I think, is

22   okay.  It's the maturity of it.  It's a vegetative --

23   in a vegetative state, and there are a number of

24   species that look similar to this.  So I would want to

25   look pretty carefully at this before I testified under

W. Michael Dennis                                    October 19, 2023

Page 224

1    oath what it was.

2         Q    Okay.  And is it -- I understand that there are

3    two varieties of carpet grass, a common carpet grass

4    and then the big carpet grass.  I think it's axonopus

5    fissifolius and axonopus furcatus.  Have you heard of

6    those names?

7              MR. MCALILEY:  Object to form.

8              THE WITNESS:  I have.

9    BY MR. ADKINS:

10        Q    Okay.  Now, in your hesitation to identify the

11   vegetation in this photograph, is it because you can't

12   determine whether it's one or the other of those two,

13   or is it more broad than that?

14        A    It's more broad than that.

15        Q    Okay.  Can you narrow it down to a few plants

16   that you think it might be?

17        A    I'm not going to speculate on that right now

18   from this one photograph.

19        Q    Okay.  Okay.  Shall we take a break?

20        A    That would be good.

21        Q    Okay.

22        A    What time you want to be back?

23        Q    Five minutes.

24        A    Okay.

25             THE VIDEOGRAPHER:  Off the record at 4:13 p.m.

W. Michael Dennis                                          October 19, 2023

Page 225

```
 1                    (A break was taken from 4:13 p.m. to

 2               4:24 p.m.)

 3          THE VIDEOGRAPHER:  The time is approximately

 4     4:24 p.m.  This begins media unit number 6, and we

 5     are back on the record.

 6   BY MR. ADKINS:

 7     Q   Okay.  So I want to go back to Exhibit 253.

 8   This is Mr. Wylie's supplemental expert report, and

 9   we're looking at Exhibit 13 of that report.

10          Do you see that on your screen?

11     A   Yes.

12     Q   Okay.  So you had testified and you state in

13   your report that there are areas of uplands that impede

14   the surface flow in the area that the U.S. DOJ expert

15   team identified as a wetland; is that right?

16     A   Yes.

17     Q   Can you identify for us on this map where those

18   upland areas are.

19     A   Well, one area that stands out is right where

20   the flowway goes left, west from the north-south ditch.

21     Q   Okay.  So --

22     A   Go to the flowway.

23     Q   Right here?

24     A   Yeah.  No.

25     Q   Okay.
```

W. Michael Dennis                                    October 19, 2023

Page 226

1          A     There you go.   Right there.

2          Q     Okay.

3          A     That flowway -- that flowway is going across an

4     east-west ditch.   That east-west ditch has some spoil

5     piles on it.   It also has some cattle trails that cross

6     it.   But in general, that ditch drains that wetland to

7     the west.   And the typical flow of water would be from

8     that wetland east, through that ditch to the

9     north-south ditch.   So I'm having some question about

10    how water is continuously flowing in that direction,

11    when the ditch was put in, presumably, to drain that

12    wetland and the ditch drains to the east and not the

13    west.

14         Q     Okay.   And so I'm going to --

15         A     So that's --

16         Q     Oh, sorry.

17         A     So that's -- that's one -- one area.

18         Q     Let me just stop you for a second.   I want to

19    annotate on this document where you're identifying

20    so it's clear for the record.

21               And so -- can you see my cursor, Dr. Dennis?

22         A     I can.

23         Q     Okay.   Should I move up, down, left, right?

24    Where are you talking here?

25         A     Right on the flowway.

W. Michael Dennis                                      October 19, 2023

Page 227

1       Q    Right here?

2       A    Yeah, right -- the -- in the description of the

3   primary flowway, it says, if I remember it correctly,

4   that it precedes north up the north-south ditch, and

5   then to the west, through that area which is a ditch,

6   and then it goes on the rest of the way.

7            So that's -- that is an area that I'm puzzled by

8   of why that water is flowing in that direction, when

9   the ditches and the cross-sections of those ditches and

10  the wetlands and the hydroperiod in the wetlands all

11  would indicate the water flows back to the east, to the

12  north-south ditch.

13      Q    Okay.  And so my question is what areas of

14  uplands are within the area that the DOJ expert team --

15  the approximate wetland area that the DOJ expert team

16  identified.  And so one area of upland, in your view,

17  is this area here?

18      A    Yes.

19      Q    Okay.  So I'm going to try to draw my best

20  circle here.  Is that about accurate?

21      A    Yes.

22      Q    We can change it.  So you tell me.

23      A    No.  You were correct when you said that's about

24  accurate.

25      Q    Okay.

W. Michael Dennis                                    October 19, 2023

Page 228

1          A    So it's good enough.

2          Q    Okay.  So this area where I drew kind of a

3     reddish circle on the primary flow path, that's an area

4     that you believe is uplands on the Countess Joy

5     reference area?

6          A    There's a wetland to the west of that, and the

7     ditch connects to that wetland.  But the areas, I

8     believe, that the ditch went through were uplands.

9          Q    Okay.  So I'm going to label this one 1.

10              And what is your basis for believing that the

11    area marked 1 is an upland?

12         A    Basically, it's an area of pine, as I recall,

13    pine and maybe cabbage palm, saw palmetto, some other

14    shrubs there; and the soils by inspection, not by soil

15    pits, sandy soils and -- that's one area.

16         Q    Okay.  And so your observations that the area

17    had pine, cabbage palm -- or saw palmetto and cabbage

18    palm, areas of sandy soil, did you document that in any

19    way during your inspection?

20         A    I may have -- I may have taken some notes on it.

21    I may not.  I don't recall.

22         Q    Okay.  Would it refresh your recollection to

23    look at your notes?

24         A    Let's see.  That would've been from the -- do

25    you have notes from my March site inspection?

W. Michael Dennis                                          October 19, 2023

Page 229

1     Q    Well, I think I do.  Let me see.

2     A    Yeah, there you go.

3     Q    Yeah.

4          Okay.  So before we look at these, we need to --

5     we need to preserve the notation that we met -- that we

6     made on the last exhibit.  So just hang on with me one

7     second here.

8          Okay.  All right.  We've lost our annotation, so

9     we're just going to have to -- I'm back on Exhibit 253.

10    I'm going to mark the same area, the 1.

11         Okay.  So I've just marked again on Exhibit 253

12    the area that you identified as an upland, with a

13    number 1.  Do you see that?

14    A    Yes.

15    Q    Okay.

16         MR. ADKINS:  So this should now be saved as a

17    PDF somewhere.  I'm not sure if the court reporter

18    has access to that, or maybe someone at Veritext

19    does.

20         MR. MCALILEY:  I'm not following you, Brandon.

21    What do you mean?

22         MR. ADKINS:  So after I saved, it says that

23    it's been saved as a PDF.  I think it's saved

24    somewhere in the Zoom conference.

25         MR. MCALILEY:  I would assume that that means

W. Michael Dennis                                    October 19, 2023

Page 230

1          it's saved in your computer.

2     BY MR. ADKINS:

3         Q    Okay.  Well, that was not working, but I want to

4     go back to your notes so we can try to nail this down

5     first.

6                    (Plaintiff's Exhibit 279 was marked for

7                    identification.)

8     BY MR. ADKINS:

9         Q    Okay.  So I'm showing you what I marked as

10    Exhibit 279, Dr. Dennis.  And these appear to be your

11    site inspection notes from March 10, 2022.  Do you see

12    those?

13        A    Yes, I do.  Thank you.

14        Q    Okay.  So I'll let you page through these.  Just

15    let me know how you want me to scroll, but the question

16    is whether you documented the soil and vegetation

17    conditions of that area that you identified as an

18    upland --

19        A    Okay.

20        Q    -- on the Countess Joy reference area.

21             MR. MCALILEY:  Object to form.

22             THE WITNESS:  Yeah, I'm preceding from the

23    northwest corner, making notes on whether the

24    ditches were wet or dry.

25    And keep going.  Okay.  Keep going.  Keep going.

W. Michael Dennis                                    October 19, 2023

Page 231

1          All right.  All right.  Keep going.  Okay.  Keep

2          going.  Okay.  That's the soil pit.  All right.

3          Keep going.  Okay.  Keep going.  Keep going.  Keep

4          going.  Keep going.

5      BY MR. ADKINS:

6          Q    That's the end.

7          A    Okay.  No, I didn't have any notes on vegetation

8      along that ditch.

9          Q    Okay.  And this exhibit, these are your notes

10     from your March 2022 site inspection of the Countess

11     Joy reference area?

12         A    Yes.

13         Q    Okay.  So by coincidence, I think I found the

14     screenshot that I took of our exhibit that we were

15     making.  So can you see that on your screen,

16     Exhibit DX 253, with the number 1 written on it?

17         A    I see what you circled and a number 1.

18         Q    Okay.  Yeah.  Well, this was the exhibit that we

19     were working on.  And apparently, I took a screenshot,

20     and that's how it's saved.  I'm afraid there's not a

21     great way to do this on Zoom, at least that I'm aware

22     of.

23         A    Okay.

24         Q    So in looking back at this -- at Exhibit 253,

25     are there any other areas within the area that the DOJ

W. Michael Dennis                                              October 19, 2023

Page 232

1    expert team identified as the approximate wetland area

2    that you believe are uplands?

3        A    That's a different question than the one I was

4    answering.

5        Q    Okay.

6        A    So you want to change the question?

7        Q    So my -- you know, when I was asking you -- you

8    know, this area that we circled and wrote number 1, I

9    understood that to be an area that you believe is an

10   upland but within the approximate wetland area that the

11   U.S. DOJ team identified.  Is that not accurate?

12       A    The question you asked me, that I was answering,

13   was, Could you show me areas that would impede flow in

14   that primary flowway?  And that was the first one I

15   gave you.

16       Q    Okay.  And do you agree or disagree that that

17   area is also an upland?

18       A    I believe -- I believe, along that -- along that

19   ditch, yes.

20       Q    Okay.  So the area circled with the number 1

21   next to it is, in your view, an upland, correct?

22       A    It's a ditch with upland spoil banks, and some

23   of that area where your 1 is, I believe is upland also.

24       Q    Are there any other areas within the approximate

25   wetland that the U.S. DOJ team identified here that are

W. Michael Dennis                                          October 19, 2023

Page 233

1     uplands, in your view?

2          A    We're going back over that question that you

3     asked me a couple of hours ago, then.

4          Q    Okay.  And so are there upland areas within this

5     approximate wetland area?

6          A    I would suggest the same ones that I was

7     pointing out before.

8          Q    Okay.  And where are those?

9          A    There's -- if you go -- I think there are upland

10    areas -- do you see where the -- the green crosses

11    south of your number 1 area?

12         Q    Yes.

13         A    All right.  If you look east of the north-south

14    canal, just east of that, and you see some -- what look

15    like the lines running east-west --

16         Q    Okay.  In this area here?

17         A    In that area, yeah.

18              So I think that's an area of prior agricultural

19    planting.  So in answer -- trying to answer both of

20    your questions, those -- those agricultural lines,

21    furrows, high and low areas -- those are areas that

22    would tend to impede the surface flow of water, or

23    direct or redirect the surface flow of water.  And I

24    believe that there's portions of that area that are --

25    that would be upland.

W. Michael Dennis                                    October 19, 2023

Page 234

1      Q   Okay.  And so in this general vicinity here?

2      A   Yes.

3      Q   Okay.  So I'm going to circle that, and I'm

4   going to put a 2 inside the circle.  Okay?

5      A   Okay.

6          And then come down --

7      Q   Before we move to the next one, I want to know

8   the basis for why you believe this is an upland here.

9      A   Well, it was an old agricultural area.  It had

10  been planted.  My recollection of that area was that it

11  was, you know, now an upland pasture area.  And it

12  did -- by inspection, did not look to be a wetland.

13     Q   When you say "didn't look to be a wetland," I

14  mean, what do you mean it didn't look to be a wetland?

15     A   By inspection, looking at the vegetation, soils,

16  hydrologic indicators, it did not appear to be a

17  wetland.

18     Q   Okay.  You didn't take a soil pit there, though?

19     A   No.  I thought we determined I only took one

20  spoil pit.  No, I did not.

21     Q   And did you record what vegetation you observed

22  in that area?

23     A   No.  We just went through my field notes.  So if

24  I didn't -- if I didn't have any field notes on that

25  there, then I don't think I have any field note data on

W. Michael Dennis                                          October 19, 2023

Page 235

1    that.

2        Q    And no field note data on the hydrology at that

3    location?

4        A    No.

5        Q    Okay.   Okay.   So let's move on to the next area

6    that you believe is an upland within the approximate

7    wetland area the U.S. DOJ team identified.

8        A    All right.   Come back across the north-south

9    ditch --

10       Q    Okay.

11       A    -- just south of that green.

12       Q    Yup.

13       A    And you see there's a -- there's a straight line

14   east-west across that?

15       Q    Right here?

16       A    Yeah.   I think that's a ditch feature that would

17   probably impede flow also.   So if you draw a circle

18   around that area, that general area -- not just that.

19   Just in general that area.

20       Q    Okay.   So just this area here, then?

21       A    Yeah.

22       Q    Okay.   Let me try to reverse that, then.

23       A    I think there's uplands in there.

24       Q    Is that about right?

25       A    That'll be fine.

W. Michael Dennis                                    October 19, 2023

Page 236

1        Q    Okay.  So we'll say this is number 3.   Oh, that
2    was a bad 3.  I'm going to redo that.
3        A    We can tell what it is.
4        Q    Okay.  So I drew a circle around that area and
5    marked it number 3.
6             And what's your basis for believing that area is
7    an upland?
8        A    The same thing.  By inspection, it did not
9    appear to have the requisite wetland vegetation, soils,
10   and hydrology.
11       Q    And you didn't record any data regarding the
12   soils, vegetation, or hydrology at that area?
13       A    No.
14       Q    Okay.  Any other areas that you believe are
15   uplands within the approximate wetland area that the
16   U.S. DOJ team identified?
17       A    Yeah.  Go north of your number 1.
18       Q    Okay.
19       A    And northwest.  So just -- a little bit to the
20   east of that.  Just inside the blue area, I think
21   there's -- well, no.  Come up a little bit further
22   north.
23            Yeah.  Do a circle in that area.
24       Q    Right here?
25       A    Yeah.  I'm not delineating anything.  I'm just

W. Michael Dennis                                          October 19, 2023

Page 237

1      trying to look at an area.

2          Q    Yup, I understand.

3               How's that?

4          A    That's fine.

5          Q    Okay.  I'm going to circle that, and I'm going

6      to put a 4 to the right of it.

7          A    Okay.

8          Q    Okay.  And that's -- the area that I circled and

9      put a 4 next to is approximately where you believe

10     there was an upland within the area that the U.S. DOJ

11     team identified as an approximate wetland area; is that

12     right?

13         A    Yes.

14         Q    Okay.  And what was your basis for that, sir?

15         A    By inspection, it did not appear to have

16     vegetation, soils, and hydrology to meet the wetland

17     definition.

18         Q    And, again, you didn't record your -- any data

19     regarding the soils, vegetation, or hydrology at that

20     area?

21         A    No.

22         Q    Okay.  Okay.  Any other areas?

23         A    Yeah.  I think the other one I pointed out --

24     look in the northwest corner.

25         Q    Uh-huh.

W. Michael Dennis                                    October 19, 2023

Page 238

1      A    And I'm not sure -- the blue gets fuzzy on my

2    screen here.  I pointed out that northwest corner.  I'm

3    not sure whether or not the area I was thinking about

4    was in or out of the blue.  But just do a big -- do a

5    big circle that's -- and you can include a little bit

6    of the blue area, yeah.

7      Q    Okay.  Right here?

8      A    Well, come up a little bit.

9      Q    Okay.

10     A    Yeah, that'd be good.

11     Q    Right here.  Okay.

12     A    Yeah.

13     Q    Ah, where did it go?

14          Okay.  So I drew a circle.  Is that

15   approximately what you had in mind?

16     A    Yes.

17     Q    Okay.  I'll put a 5 inside that circle.

18     A    That'll be fine.

19     Q    Okay.  So the area I circled with a 5 inside

20   is another area that you believe are uplands, and

21   partially within the approximate wetlands that the U.S.

22   DOJ team identified; is that right?

23     A    Correct.

24     Q    Okay.  And what was your basis for

25   determining -- or for believing that's an upland?

W. Michael Dennis                                    October 19, 2023

Page 239

1        A    Again, by inspection, it didn't appear to have

2    the requisite vegetation, soils, and hydrology.

3        Q    Okay.   And did you record your observations of

4    soils, vegetation, or hydrology at that area?

5        A    No.

6        Q    Okay.   Any other areas?

7        A    Those are the ones I think that I had identified

8    for you earlier, or generally those areas.   So, you

9    know, if I studied it more, there might be, but those

10   are the ones I was thinking about.

11       Q    Okay.   So I guess there's four areas we

12   identified here.   These are four areas that you believe

13   are uplands and are within the approximate wetland that

14   the U.S. DOJ team identified in the Countess Joy

15   reference property, correct?

16       A    Yeah.   I think we've got five circled.

17       Q    Okay.   Did I say four?

18       A    Yes, you did.

19       Q    Okay.   I'm sorry.   There are five here, yes.

20            Okay.   I'm going to try to save this again.

21            Okay.   I think we got it.

22            Okay.   I want to talk to you a little bit about

23   the Karner survey.   Do you know whether the surveyors

24   used a base station when they conducted the survey?

25       A    I don't recall.   I don't recall whether they

W. Michael Dennis                                          October 19, 2023

Page 240

1    went off of a base station or if they already had a

2    reference point, a reference point to work off of.  My

3    recollection is that they were working off of a known

4    benchmark, but I'm not absolutely sure of that.

5        Q   Are you aware of any reference benchmarks in the

6    area?

7        A   I'm personally not, but in talking with them,

8    they were -- you know, they were experienced surveyors

9    and were familiar with the area.  So that's why I say

10   they may have been working off of a benchmark.

11       Q   Okay.  And so if we wanted to find out whether

12   they were using a benchmark, we'd have to ask Karner?

13       A   Yes.

14       Q   You don't know?

15       A   I don't -- I don't know.

16       Q   Okay.  Do you know if they used a GPS receiver

17   at all in their survey?

18       A   I believe they did.

19       Q   Do you know what model?

20       A   No.

21       Q   Do you know what age?

22       A   No.

23       Q   Okay.  Are you familiar with the term "real-time

24   kinematic positioning"?

25       A   Yes.

W. Michael Dennis                                    October 19, 2023

Page 241

1       Q    And was -- I'll refer to that as RTK.  Will you

2    understand that?

3       A    Okay.

4       Q    Was RTK positioning used in connection with the

5    surveys of the Countess Joy property?

6       A    I do not know.

7       Q    Was any methodology used to ensure the accuracy

8    or the precision of that survey?

9       A    The -- I believe so.  And I base that on the

10   instructions that we provided to them, that we wanted

11   them to follow, you know, standard survey methodologies

12   practices, quality control.  And I presume that they

13   did.

14      Q    But you don't know what methodology they used?

15      A    No.

16      Q    Okay.  Do you know whether they confirmed the

17   precision of the survey?

18      A    No.  Again, the directions that were provided,

19   which I assume they followed, were to follow recognized

20   survey industry standards and methodologies for

21   accurate surveying.

22      Q    What are recognized survey standards in the

23   industry?

24      A    Well, I'm not a professional land surveyor, but,

25   in general, my understanding is that there are survey

W. Michael Dennis                                    October 19, 2023

Page 242

1    standards that surveyors follow.  It has to do with the

2    establishment and -- and verification of a benchmark

3    that they would work off of and tie all the survey in.

4    And at the end of the day, they close out their survey

5    so that they start at a certain -- this is just an

6    example of one procedure.  They start at a particular

7    point, locate it, vertically, horizontally, which we

8    ask them to do, and then at the end of the day, they

9    would come back and close their survey on that -- on

10   that benchmark, or at that location, to determine that

11   their survey closed and was it accurate within whatever

12   the survey standard for accuracy was in that situation.

13       Q   Okay.  And that's industry standard, in your

14   view?

15            MR. MCALILEY:  Object to form.

16            THE WITNESS:  Having worked with surveyors, I

17       know that that's one of the things they do.  They

18       also perform a number of other checks, which I'm not

19       familiar with.  Again, I'm not a professional land

20       surveyor.

21   BY MR. ADKINS:

22       Q   Did you -- did you ever ask Karner what they did

23   to verify the accuracy or precision of their survey?

24       A   I did not -- no, I did not ask them specific

25   details of how they verified their survey.

W. Michael Dennis                                                    October 19, 2023

Page 271

1                              ERRATA SHEET

2       RE   : USA v. Sharfi, et al

        DEPO OF:  W. Michael Dennis

3       TAKEN  : October 19, 2023

        ASSG#  : 6143970

4       DO NOT WRITE ON TRANSCRIPT, ENTER ANY CHANGES HERE

        Page   #  |  Line   #  |  Change      |  Reason

5          16      |    11      | OTT to AULT | spelling

6          36      |    14      | OTT to AULT | spelling

7          86      |    23      | OTT to AULT | spelling

8          88      |    20      | grass to graphs | wrong word

9          90      |    14      | 2023 should be 2021 | wrong year

10         98      |    20      | 2022 to 2021 | wrong year

11         98      |    21      | 2022 to 2021 | wrong year

12         98      |    22      | 2023 to 2022 | wrong year

13        141      |    8       | 34 should be 84 | wrong number

14        144      |    1       | 34 should be 84 | wrong number

15        149      |    25      | 34 should be 84 | wrong number

16        217      |    23      | open should be upload | wrong word

        State of Florida  )        _____

17      County of          )    Notary Public

18      Under penalties of perjury, I declare that I have read

        my deposition transcript, and it is true and correct

19      subject to any changes in form or substance entered

        here.

20

        20 Nov 2023                 _____

21      Date                       Signature

22

23

24

25      ob No. CS6143970

W. Michael Dennis                                    October 19, 2023

Page 271

```
 1                          ERRATA SHEET

 2      RE  : USA v. Sharfi, et al

        DEPO OF:  W. Michael Dennis

 3      TAKEN  : October 19, 2023

        ASSG#  : 6143970

 4      DO NOT WRITE ON TRANSCRIPT, ENTER ANY CHANGES HERE

        Page  #  |  Line  #  |  Change     |  Reason
```

| Page # | Line # | Change | Reason |
|---|---|---|---|
| 5   | 245 | 12 | Shay to shape | Wrong word |
| 6   | 245 | 13 | shay to shape | wrong word. |
| 7   | 245 | 15 | shay to shape | wrong word. |
| 8   | 250 | 11 | The witness to Mr. McAlik I do st think that was my answer |
| 9   | 260 | 6  | RAIN to RUNNING | wrong word |
| 10  |   |   |   |   |
| 11  |   |   |   |   |
| 12  |   |   |   |   |
| 13  |   |   |   |   |
| 14  |   |   |   |   |
| 15  |   |   |   |   |
| 16  |   |   |   |   |

```
        State of Florida    )    _____

17      County of           )    Notary Public

18      Under penalties of perjury, I declare that I have read

        my deposition transcript, and it is true and correct

19      subject to any changes in form or substance entered

        here.

20
        20 Nov 2023                    [signature]

21      Date                    Signature

22

23

24

25      ob No. CS6143970
```

W. Michael Dennis                                       October 19, 2023

Page 270

```
1                 EXCEPT FOR ANY CORRECTIONS

2                 MADE ON THE ERRATA SHEET BY ME,

3                 I CERTIFY THIS IS A TRUE AND

4                 ACCURATE TRANSCRIPT.  FURTHER

5                 DEPONENT SAYETH NOT.

6

7      W. Michael Dennis

8      WITNESS' NAME

9

10     STATE OF FLORIDA      )

11                           )   SS:

12     COUNTY OF MIAMI-DADE)

13

14         Sworn and subscribed to before me this 22nd day

15     of November 2023.

16     PERSONALLY KNOW_____ OR I.D.

17     D520-933-47-205-0

18     _____

19         Notary Public in and for the State of Florida at

20     Large.

21     My commission expires: July 20, 2025

22

23

24

25     Job No. CS6143970
```

DEBRA A. JESTER
Commission # HH 067241
Expires February 22, 2025
Bonded Thru Troy Fain Insurance 800-385-7019