**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

UNITED STATES OF AMERICA,

              *Plaintiff,*

      v.

BENJAMIN K. SHARFI, in his personal and
fiduciary capacity as trustee of the Benjamin
Sharfi 2002 Trust, and NESHAFARM, INC.,

           *Defendants.*

Case No. 2:21-cv-14205-KAM

Hon. Kenneth A. Marra

<u>**UNITED STATES' OBJECTIONS TO MAGISTRATE JUDGE'S REPORT AND**</u>
<u>**RECOMMENDATIONS ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**</u>

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... iii

GLOSSARY ............................................................................................................................... v

INTRODUCTION ...................................................................................................................... 1

BACKGROUND ......................................................................................................................... 1

      A.     The Clean Water Act................................................................................................. 1

      B.     Factual Background ................................................................................................. 4

STANDARDS OF REVIEW ....................................................................................................... 5

ARGUMENT .............................................................................................................................. 5

I.     The Magistrate Judge Erroneously Concluded that Manmade Ditches Are Categorically Excluded. ..................................................................................................................... 6

II.    The Magistrate Judge Erroneously Concluded that the Ditches At Issue Are not Relatively Permanent Waters. ........................................................................................ 11

      A.     The Ditches Have At Least Seasonal Flow. ......................................................... 11

      B.     The Ditches Are Relatively Permanent As a Matter of Law Because They Are At Least Seasonal. ................................................................................................... 12

III.    The Magistrate Judge Erroneously Found No Evidence of a Continuous Surface Connection. ..................................................................................................................... 14

CONCLUSION........................................................................................................................... 20

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ...................................................................................................5

*Driscoll v. Adams*,
181 F.3d 1285 (11th Cir. 1999)...................................................................................9

*Ellis v. England*,
432 F.3d 1321 (11th Cir. 2005)..............................................................................5, 12

*Lewis v. United States*,
88 F.4th 1073 (5th Cir. 2023) ....................................................................................8

*Lewis v. United States*,
No. 18-1838, 2020 WL 4798496 (E.D. La. Aug. 18, 2020)....................................10

*ONRC Action v. U.S. Bureau of Reclamation*,
No. 97-3090, 2012 WL 3526833 (D. Or. Jan. 17, 2012), *report and recommendation
adopted*, 2012 WL 3526828 (D. Or. Aug. 14, 2012) ...............................................9

*Parker v. Scrap Metal Processors, Inc.*,
386 F.3d 993 (11th Cir. 2004) ...................................................................................1

*Rapanos v. United States*,
547 U.S. 715 (2006) ..........................................................2, 3, 7, 8, 10, 12, 13, 16

*Sackett v. EPA*,
598 U.S. 651 (2023) ...........................................1, 3, 6, 8, 9, 16, 17, 19, 20

*San Francisco Baykeeper v. City of Sunnyvale*,
No. 20-824, 2023 WL 8587610 (N.D. Cal. Dec. 11, 2023) .........................8, 9, 13

*Tri-Realty Co. v. Ursinus Coll.*,
124 F. Supp. 3d 418 (E.D. Pa. 2015)..........................................................................9

*United States v. Andrews*,
677 F. Supp. 3d 74 (D. Conn. 2023) .........................................................................16

*United States v. Bobby Wolford Trucking & Salvage, Inc.*,
No. 18-747, 2023 WL 8528643 (W.D. Wash. Dec. 8, 2023) ..................................8

*United States v. Donovan*,
No. 96-484, 2010 WL 3614647 (D. Del. Sept. 10, 2010),
*aff'd,* 661 F.3d 174 (3d Cir. 2011) ..........................................................................13

*United States v. Holland*,
  373 F. Supp. 665 (M.D. Fla. 1974) ......................................................................10

*United States v. Mlaskhoch*,
  No. 10-cv-2669, 2014 WL 1281523 (D. Minn. Mar. 31, 2014) ............................13

*United States v. Riverside Bayview Homes, Inc.*,
  474 U.S. 121 (1985) ......................................................................... 1, 16, 17, 18

*United States v. Robison*,
  505 F.3d 1208 (11th Cir. 2007)..............................................................................3

*United States v. Valentine*,
  No. 22-CV-512-M, 2024 WL 4379735 (E.D.N.C. Sept. 27, 2024).................17, 18

*United States v. Vierstra*,
  803 F. Supp. 2d 1166 (D. Idaho 2011) ................................................................10

*White v. EPA*,
  No. 23-001-BO, 2024 WL 3049581 (E.D.N.C. June 18, 2024) ............................18

**Statutes**

28 U.S.C. § 636 ................................................................................................................5

33 U.S.C. § 1311 ..............................................................................................................1

33 U.S.C. § 1344 ........................................................................................................1, 10

33 U.S.C. § 1362 ..............................................................................................................1

**Regulations**

33 C.F.R. § 328.3 .................................................................................................1, 13, 17

33 C.F.R. § 328.4 ..............................................................................................................8

**Federal and Local Rules**

Fed. R. Civ. P. 56 ..............................................................................................................5

Fed. R. Civ. P. 72 ..............................................................................................................5

Local Magistrate Judge R. 4(b)..........................................................................................5

## GLOSSARY

| | |
|---|---|
| **Corps** | United States Army Corps of Engineers |
| **Countess Joy Reference Area** | Property located directly north of the Site (ECF No. 151-8) |
| **CWA** | The Federal Water Pollution Control Act, often called the Clean Water Act |
| **Defs.' SOF** | Defendants' Combined Response to Plaintiff's Statement of Material Facts and Statement of Material Facts (ECF No. 153) |
| **R&R** | Report and Recommendations (ECF No. 184) |
| **Site** | A parcel of real estate in Martin County, Florida, with Parcel Identification No. 17-38-40-000-038-00000-0 |
| **U.S. Add'l SOF** | United States' Combined Response to Defendants' Statement of Material Facts and Statement of Additional Facts (ECF No. 159) |
| **U.S. Mot.** | United States' Motion for Summary Judgment on Liability (ECF No. 150) |
| **U.S. Reply** | United States' Reply in Support of United States' Motion for Summary Judgment and Opposition to Defendants' Cross-Motion for Summary Judgment (ECF No. 158) |
| **U.S. SOF** | United States' Statement of Material Facts (ECF No. 151) |

## INTRODUCTION

The United States proffered overwhelming evidence that wetlands into which Defendants discharged pollutants without a permit are "waters of the United States" under the test set out in *Sackett v. EPA*, 598 U.S. 651 (2023). The wetlands physically touch multiple ditches that carry water continuously in the wet season (and during the dry season, too) and that connect to downstream traditional navigable waters. The Magistrate Judge disregarded this evidence based on erroneous legal conclusions about whether manmade ditches can be covered under the Clean Water Act ("CWA"), whether seasonal water flow is sufficient to make a waterbody a "relatively permanent water," and whether a continuous surface *water* connection—a phrase the Magistrate Judge admits the Supreme Court did not use—is required for an adjacent wetland to be covered. Adoption of the Magistrate Judge's report on any of these issues would conflict with the Supreme Court's holdings and decades of lower court interpretations of those holdings, with which the Magistrate Judge did not engage. The Court should reject the report, find that the wetlands Defendants filled are covered by the CWA, and proceed to the remaining elements of Defendants' liability that have already been briefed.

## BACKGROUND

### A.    The Clean Water Act

To establish Defendants' liability, the United States must prove that Defendants discharged any pollutant from a point source to waters of the United States without a permit. *See* 33 U.S.C. §§ 1311(a), 1344, 1362(5), (6), (12), (14); *Parker v. Scrap Metal Processors, Inc.*, 386 F.3d 993, 1008 (11th Cir. 2004). The Magistrate Judge recommended disposition based on a finding that the wetlands on Defendants' Site, as defined in the United States' motion for summary judgment, are not "waters of the United States."

The CWA does not define "waters of the United States." *See* 33 U.S.C. § 1362(7). In 1986, the U.S. Army Corps of Engineers ("Corps") promulgated regulations interpreting the phrase to include waters that have been used or are reasonably susceptible to use in interstate commerce, including all waters subject to the ebb and flow of the tide ("traditional navigable

waters"); tributaries of traditional navigable waters; and wetlands adjacent to certain water bodies, including tributaries. 33 C.F.R. § 328.3(a)(1), (5), (7) (1987) (ECF No. 151-73). The 1986 regulations defined "adjacent" as "bordering, contiguous, or neighboring." *Id.* § 328.3(c).

"Wetlands" are "areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions." 33 C.F.R. § 328.3(b) (1987); *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 129–31, 135 (1985) (applying wetland definition). For decades, the Corps has interpreted this definition to require three environmental parameters during normal circumstances: (1) the prevalence of plant species typically adapted to saturated soil conditions; (2) the presence of hydric soils; and (3) wetland hydrology, which generally requires the area is inundated with surface or ground water either permanently or periodically or the soil is saturated to the surface at some time during the growing season of the prevalent vegetation. ECF No. 151-62, at 9–34.

*Rapanos v. United States*, 547 U.S. 715 (2006), involved the assertion of CWA jurisdiction under the 1986 regulations to wetlands near tributaries of traditional navigable waters. Although the case produced a fractured opinion, all the Justices agreed that "waters of the United States" include more than just traditional navigable waters, but no majority agreed on the reach of that term. In a plurality opinion, four Justices concluded that CWA regulatory authority should extend only to "relatively permanent, standing or continuously flowing bodies of water" connected to traditional navigable waters, and to "wetlands with a continuous surface connection to" such relatively permanent waters. *Rapanos*, 547 U.S. at 742. The plurality characterized *Riverside Bayview* as deferring to the Corps' inclusion of wetlands "actually abutting" traditional navigable waters; holding that the Corps "could reasonably conclude that a wetland that adjoined waters of the United States is itself a part of those waters"; and resolving an ambiguity "in favor of treating all abutting wetlands as waters." *Rapanos*, 547 U.S. at 740–42 (quoting *Riverside Bayview*, 474 U.S. at 135) (cleaned up); *see also id.* at 740. Justice Kennedy did not join the plurality opinion and instead wrote separately concurring in the judgment.

Justice Kennedy concluded that wetlands are "waters of the United States" if "either alone or in combination with similarly situated lands in the region, [they] significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.'" *Id.* at 780 (Kennedy, J., concurring). The Eleventh Circuit adopted the "significant nexus" standard in Justice Kennedy's concurring opinion. *See United States v. Robison*, 505 F.3d 1208, 1221–22 (11th Cir. 2007), *overruled by Sackett*, 598 U.S. at 679–83.

In *Sackett*, the Court revisited "waters of the United States" in the context of an assertion of CWA jurisdiction over wetlands that were separated by a historic thirty-foot road from a tributary of traditional navigable waters. The Court held that "the *Rapanos* plurality was correct: the CWA's use of 'waters' encompasses only those relatively permanent, standing or continuously flowing bodies of water forming geographical features that are described in ordinary parlance as streams, oceans, rivers, and lakes." *Sackett*, 598 U.S. at 671 (quoting *Rapanos*, 547 U.S. at 739) (cleaned up); *see also id.* at 678 (covered waters include relatively permanent waters "'connected to'" traditional navigable waters (quoting *Rapanos*, 547 U.S. at 742)). The Court also agreed with the *Rapanos* plurality that adjacent wetlands must have "a continuous surface connection to bodies that are 'waters of the United States' in their own right, so that there is no clear demarcation between 'waters' and wetlands." *Id.* at 678 (quoting *Rapanos*, 547 U.S. at 742). The Court discussed favorably its conclusion in *Riverside Bayview* that "the Corps could reasonably determine that wetlands 'adjoining bodies of water' were part of those waters." *Id.* at 677–78. And the Court rejected the "significant nexus" standard. *Id.* at 679–83. The Court decided the wetlands at issue in *Sackett* were not "waters of the United States." 598 U.S. at 684.

In short, under *Sackett* and its adoption of the *Rapanos* plurality standard without modification, an adjacent wetland has a "continuous surface connection" where, among other things, it abuts a jurisdictional tributary. *Id.* at 676 (CWA jurisdiction includes wetlands "contiguous" with a relatively permanent water connected to a traditional navigable water.).

*Sackett* effectively overruled the Eleventh Circuit's adoption of the significant nexus test in *Robison*. The regulatory definition of wetlands remains unchanged.

**B.    Factual Background**

The United States' Statement of Material Facts ("U.S. SOF"), ECF No. 151, and accompanying exhibits set out the relevant facts. In summary, Defendants transformed the Site shortly after Mr. Sharfi acquired it in 2017. *E.g.*, U.S. SOF ¶¶ 2, 18–19, 30, 39–40. Defendants used heavy machinery, including bulldozers, excavators, and dump trucks, to discharge rock, sand, dirt, and dredged material in wetlands, including areas that Defendants' environmental consultant, Danna Small, determined were wetlands. *E.g.*, *id.* ¶¶ 21, 24, 29–31, 39–40, 50, 55, 57, 59. Defendants excavated ponds, created piles of soil, knocked over trees dispersing soils, and dumped and spread sand and other fill material. *Id.* Most of the activities occurred *after* Ms. Small "strongly recommended" that unauthorized work in wetlands stop in March 2018 and *after* the Corps issued a cease-and-desist letter in April 2018. *Id.* ¶¶ 32, 44. Defendants never secured a CWA permit. *Id.* ¶ 60.

   

*2016 photograph of Site. U.S. SOF ¶ 18.*    *2021 photograph of Site. U.S. SOF ¶ 19.*

The United States retained a team of wetland scientists, including experts who specialize in hydrology, wetland vegetation, and hydric soils. The expert team analyzed flow data, aerial imagery, maps, and other relevant information. Between August and December 2021, members of the team inspected the Site over five days, inspected a wetlands reference area directly north of the Site ("Countess Joy Reference Area") over six days, and inspected several other reference

wetland areas nearby. ECF No. 151-75, at 26–27. The team collected data regarding hydrology, vegetation, and soil conditions at the Site, the Countess Joy Reference Area, and other areas, which are recorded in thirty-three Wetland Determination Data Forms. ECF Nos. 151-41 & -42. The team delineated wetlands on the Site at the time of Defendants' discharges. *See* ECF No. 151-17 (showing delineated wetlands); ECF No. 151-34 (showing filled areas). Exhibits 30–31 show approximate wetlands on the Countess Joy Reference Area that abut tributaries of traditional navigable waters and that, before Defendants' unauthorized discharges, continued uninterrupted northward from the Site's wetlands. ECF No. 151-31 & -32.

## STANDARDS OF REVIEW

A party may file written objections to specific portions of a magistrate judge's proposed findings and recommendations. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2); Local Magistrate Judge R. 4(b). This Court must determine de novo any part of a magistrate judge's disposition that has been properly objected to. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3); Local Magistrate Judge R. 4(b). In resolving objections, the Court may accept, reject, or modify the recommended disposition, receive more evidence, or return the matter to the magistrate judge with instructions. *Id*.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "For factual issues to be considered genuine, they must have a real basis in the record." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005).

## ARGUMENT

Before Defendants' unauthorized activities, the Site's wetlands were part of a larger wetland that abuts three manmade ditches—the N/S Ditch, 84th Avenue Ditch, and upstream reach of Bessey Creek (what Defendants call the East-West Ditch). U.S. Mot. 12–18; U.S. Reply 14–20. Each of those ditches is a relatively permanent water. *Id.* And the wetlands have

continuous surface connections to them in several locations where they abut—that is, physically touch—the waters in the ditches before Defendants' unauthorized activities. *Id.*; *see, e.g.*, ECF Nos. 151-9, -21, -25, -28, -29 (photographs showing large wetland extending to and touching waters of ditches at multiple locations). The Site's wetlands also abutted the N/S Ditch at the southwest corner of the Site before Defendants' unauthorized activities, which is another, independent basis for jurisdiction. U.S. Mot. 17–18; U.S. Reply 21; ECF No. 151-84. The Magistrate Judge disregarded this evidence based on erroneous applications of law.

## I.    THE MAGISTRATE JUDGE ERRONEOUSLY CONCLUDED THAT MANMADE DITCHES ARE CATEGORICALLY EXCLUDED.

The Magistrate Judge erroneously concluded that the three ditches at issue are not covered by the CWA because they are manmade, rather than naturally occurring. R&R 25 ("First, the ditches are not geographical features ordinarily described as streams, oceans, rivers, or lakes."). The Magistrate Judge's conclusion purports to rest on quoted language in *Sackett*: "[W]e conclude that the *Rapanos* plurality was correct: the CWA's use of 'waters' encompasses 'only those relatively permanent, standing or continuously flowing bodies of water forming geographical features that are described in ordinary parlance as streams, oceans, rivers, and lakes." *Sackett*, 598 U.S. at 671 (quoting *Rapanos*, 547 U.S. at 739 (plurality)) (cleaned up); *see id.* R&R 23–24 (concluding that statements in *Rapanos* plurality "suggest" a categorical exclusion). The root of the error is a mistaken interpretation of the *Rapanos* plurality.

The *Rapanos* plurality did not create a categorical exclusion but rather distinguished jurisdictional from non-jurisdictional channels (including manmade ditches) based on whether the channels contain relatively permanent flow. *See, e.g.*, 547 U.S. at 735 ("Under no rational interpretation are typically dry channels described as '*open* waters.'"). For example, although the plurality presumed that storm drains and "dry ditches" are not jurisdictional, 547 U.S. at 752, it also acknowledged that when ditches, channels, and conduits hold water "permanently as well as intermittently," they are often called rivers, creeks, or streams. *Id.* at 736 n.7.

The Magistrate Judge incorrectly stated that the *Rapanos* "plurality concluded that ditches and drains that eventually empty into traditional navigable waters were not [waters of the United States]." R&R 18. In fact, the *Rapanos* plurality remanded with instructions to determine whether the ditches at issue carried water with sufficient regularity to be covered. *See* U.S. Reply 23–24. The wetlands at issue in *Rapanos* were near ditches or manmade drains that eventually emptied into traditional navigable waters. R&R 17 (citing *Rapanos*, 547 U.S. at 729). On remand, the plurality proposed: "the lower courts should determine, in the first instance, whether the ditches or drains near each wetland are 'waters' *in the ordinary sense of containing a relatively permanent flow*." 547 U.S. at 757 (emphasis added). If the plurality intended to create (or "suggest," R&R 24) a categorical exclusion of manmade ditches, the instruction would have been unnecessary. If anything, the plurality's remand demonstrates that ditches *can* constitute relatively permanent waters depending on the sufficiency and regularity of their flow.

Nor does the *Rapanos* plurality's analysis of the CWA's definition of "point source" support the Magistrate Judge's interpretation. R&R 24. The plurality's analysis centered on the frequency of flow, not simply whether a channel is manmade versus naturally occurring. As the plurality explained, the CWA defines "point source"—a distinct term from "navigable waters"— to include "ditches," "channels," and "conduits." 547 U.S. at 735–36. The plurality concluded, "The separate classification of 'ditch[es], channel[s], and conduit[s]'—which are terms ordinarily used to describe the watercourses through which *intermittent* waters typically flow— shows that these are, by and large, not 'waters of the United States.'" *Id.* (emphasis in original); *see also id.* at 752 (presuming that storm drains and "dry ditches" are not jurisdictional). But the Magistrate Judge omitted the emphasized phrase in the middle of the sentence that contained the *Rapanos* plurality's reasoning—that is, terms like "ditch" and "channel" ordinarily describe *intermittent* waters. *Id.* at 736. And the *Rapanos* plurality's use of "intermittent" was not in a scientific sense and would not have excluded seasonal flow.[1]

---

[1] Wetland scientists sometimes use the terms "intermittent" and "seasonal" interchangeably. The *Rapanos* plurality did not employ "scientifically precise" definitions nor

The Magistrate Judge's misreading of the *Rapanos* plurality to exclude manmade channels is also contradicted by Defendants' own expert. Dr. Michael Dennis agreed the upstream reach of Bessey Creek (what Defendants call the East-West Ditch) is a relatively permanent water under the standard in the *Rapanos* plurality. Dennis Rep. at -158 ("[E]ven though the east-west Canal Ditch does not flow year-round or have continuous flow, it does have at least seasonal flow and is therefore treated here to be a non-navigable, relatively permanent tributary.") (ECF No. 151-72); Dennis 2d Tr. 8:20–9:2; 44:6–18; 44:20–45:3 (ECF No. 159-12); *see* U.S. Reply 24. Defendants' expert's opinion also supports judgment for the United States. And the Magistrate Judge offered no reason to conclude otherwise.

Nor did the *Sackett* majority categorically exclude manmade channels from coverage under the Act. *Sackett*, 598 U.S. at 671 (quoting Black's Law Dictionary 1426 (5th ed. 1979) stating that "water" "*may* designate a body of water, such as a river, a lake, or an ocean" (emphasis added)); *id.* at 672 ("[T]he definition [of "navigable waters"] *principally* refers to bodies of navigable water like rivers, lakes, and oceans" (emphasis added)).

Indeed, post-*Sackett* cases recognize that the Court adopted the *Rapanos* plurality standard without modification. *See United States v. Bobby Wolford Trucking & Salvage, Inc.*, No. 18-747, 2023 WL 8528643, at *2 (W.D. Wash. Dec. 8, 2023) (rejecting that *Sackett* had intervening impact on applicable law after court granted partial summary judgment under, *inter alia*, *Rapanos* plurality); *cf. Lewis v. United States*, 88 F.4th 1073, 1078 (5th Cir. 2023) (holding that *Sackett* standard could not be met when government had conceded during initial litigation that the property cannot satisfy the *Rapanos* plurality standard).

---

use the term "intermittent" synonymously with seasonal flow. *Rapanos*, 547 U.S. at 732 n.5; *see San Francisco Baykeeper v. City of Sunnyvale*, No. 20-824, 2023 WL 8587610, at *4 (N.D. Cal. Dec. 11, 2023) ("When read in context with the other evidence presented, it is clear that the creeks here flow intermittently in the sense that they flow seasonally, whereby they contain a continuous flow during some months and no flow during dry months, and more than in direct response to precipitation, which *Rapanos* explicitly does not exclude from the definition of [waters of the United States].").

The only *Sackett*-specific text the Magistrate Judge relied on for the exclusion of manmade channels is dicta from an introductory paragraph of the decision that asked, rhetorically, "How about ditches, swimming pools, and puddles?" *Sackett*, 598 U.S. at 659; *see* R&R 23. But the Court did not answer that question by announcing a categorical rule excluding manmade channels. After all, the Court reversed the Ninth Circuit's judgment in that case because of the lack of a continuous surface connection (the second element of the jurisdictional test for adjacent wetlands), not because any channels at issue were manmade. 598 U.S. at 684. The Court did not evaluate the jurisdictional status of other potential waters at issue.[2]

The Magistrate Judge's recommendation also conflicts with the weight of precedent both before and after the *Rapanos* and *Sackett* decisions—none of which the Magistrate Judge analyzed in the report.[3] Courts have resoundingly rejected the categorical exclusion of manmade channels. *See, e.g.*, *Driscoll v. Adams*, 181 F.3d 1285, 1291 (11th Cir. 1999) ("Consequently, courts have acknowledged that ditches and canals, as well as streams and creeks, can be 'waters of the United States' under § 1362(7)."); *San Francisco Baykeeper*, 2023 WL 8587610, at *5 n.3 ("The Court is unpersuaded . . . that *Sackett* calls into question whether manmade channels with continuous seasonal flows such as this can be [waters of the United States] merely because they are manmade."); *Tri-Realty Co. v. Ursinus Coll.*, 124 F. Supp. 3d 418, 468 (E.D. Pa. 2015) ("[N]umerous courts have concluded that artificial waterways may be jurisdictional waters under the CWA."); *ONRC Action v. U.S. Bureau of Reclamation*, No. 97-3090, 2012 WL 3526833, at *23 (D. Or. Jan. 17, 2012), *report and recommendation adopted*, 2012 WL 3526828 (D. Or.

---

[2]     Moreover, *Sackett* used the term "ditch" only three times, all about waters at issue in other cases. *See San Francisco Baykeeper*, 2023 WL 8587610, at *4 n.2 (rejecting same argument Defendants raise here).

[3]     The Magistrate Judge appears to have justified ignoring these decisions as "pre-*Sackett* authority and agency guidance." R&R 22 n.10. But the report offered no basis to distinguish other decisions and agency guidance that conflict with the report and were interpreting the *Rapanos* plurality that *Sackett* adopted wholesale. And the report conflicts with cited post-*Sackett* authority, too. The Magistrate Judge's remaining commentary regarding what regulations were in effect during the conduct in this case is immaterial. As the United States explained, *Sackett* controls whether the Site's wetlands are "waters of the United States." U.S. Reply 13.

Aug. 14, 2012) ("[T]hat the Drain is man-made does not preclude the finding that it is also a 'tributary' and therefore a 'water of the United States.'"); *United States v. Vierstra*, 803 F. Supp. 2d 1166, 1170–71 (D. Idaho 2011) (That the canal "is man-made is of no moment. The canal is part of a tributary system connecting navigable waters upstream and downstream for six to eight months of the year. Its man-made nature makes it no less capable of carrying pollution to navigable and interstate waters."); *United States v. Holland*, 373 F. Supp. 665, 673 (M.D. Fla. 1974) (non-navigable canals were jurisdictional and that "canals were man-made makes no difference").

The Fifth Circuit's decision in *Lewis v. United States*, 88 F.4th 1073 (5th Cir. 2023), is not to the contrary. There, the court explained that the asserted jurisdictional connection included "roadside ditches" and, based on the district court's findings, held that "there is no 'continuous surface connection' between any plausible wetlands [on the subject property] and a 'relatively permanent body of water.'" *Id.* at 1078. The district court's findings included that "the Corps never actually observed flow in the ditches at the [S]ite" and that that documentation stated the ditches are "intermittent but not seasonal." *Lewis v. United States*, No. 18-1838, 2020 WL 4798496, at *6 (E.D. La. Aug. 18, 2020). In other words, the court found the ditches did not qualify *based on a lack of relatively permanent flow of water*, not because they were manmade.

Finally, the Magistrate Judge's recommendation is contrary to the text of the CWA, which generally and conditionally exempts the discharge of dredged or fill material "for the purpose of construction or maintenance of . . . irrigation ditches" or "the maintenance of drainage ditches." 33 U.S.C. § 1344(f)(1)(C). There would be no need for such a permitting exemption if the Act regarded all ditches to be non-jurisdictional.

The relevant inquiry is thus whether the water body is "waters" "in the ordinary sense of containing a relatively permanent flow." *Rapanos*, 547 U.S. at 757. As explained in the following part, the ditches here are relatively permanent waters because each has at least seasonal flow.

## II.   THE MAGISTRATE JUDGE ERRONEOUSLY CONCLUDED THAT THE DITCHES AT ISSUE ARE NOT RELATIVELY PERMANENT WATERS.

The Magistrate Judge erroneously concluded that, even if manmade channels are covered, the three ditches lack sufficient flow to be relatively permanent waters. R&R 26 ("Second, and perhaps more importantly, the ditches are not relatively permanent, standing, or continuously flowing bodies of water."). In doing so, the Magistrate Judge committed two errors. First, the report mischaracterizes the evidence of flow in the ditches as having "at most seasonal water flow," when undisputed facts show that the ditches have *at least* seasonal flow because they flow in the dry season, too. *Id.* at 26. The report also fails to address that the ditches have beds and banks and ordinary high-water marks, which are other indicators of relatively permanent flow. Second, even if the ditches have only seasonal flow, which Defendants do not dispute, the report mistakenly concludes that seasonal flow is insufficient. *Id.* at 27–28. This second error is in contravention to the weight of precedent applying the *Rapanos* plurality and *Sackett*, none of which the Magistrate Judge addressed.

### A.   The Ditches Have At Least Seasonal Flow.

Defendants do not dispute that the three ditches flow during the wet season, which runs from July through December. Defs.' SOF ¶¶ 72, 106, 108, 109. Uncontroverted evidence in the form of percipient observations, data collected in the ditches near the Site, and data downstream of the Site all demonstrate that the ditches carry water continuously in the wet season and during parts of the dry season, too. *See, e.g.*, U.S. Mot. 13–18; U.S. Reply 15–16; U.S. SOF ¶¶ 12–13, 71, 72, 76–79, 90; U.S. Add'l SOF ¶¶ 169, 171, 173, 199; Defs.' SOF ¶ 117; ECF No. 151-18 (N/S Ditch flowing into upstream reach of Bessey Creek); ECF No. 151-19 (84th Avenue ditch flowing into upstream reach of Bessey Creek); ECF No. 151-83 (N/S Ditch flowing near Site); ECF No. 159-14 (alligator swimming in waters of upstream reach of Bessey Creek).

The Magistrate Judge's determination that the ditches have "at most" seasonal flow was inferred from select evidence that parts of the upstream reach (or the other ditches) had no or only little flow sometimes during the dry season. R&R 26. The inference is logically unsound. Such evidence does not demonstrate that the ditch flows "at most" during the wet season. It

means only that the upstream reach of Bessey Creek does not flow during parts of the dry season. And overwhelming evidence summarized above (including testimony by one of the Defendants and their expert) demonstrates that the ditches flow during months in the dry season, too. And by concluding that the ditches have "at most" seasonal flow (which is contradicted by the record), the Magistrate Judge improperly drew inferences in favor of Defendants. *See Ellis*, 432 F.3d at 1325. Adopting the report and recommendations would thus be error.

Anyway, a water need not flow every month to qualify. As explained below, because the ditches at issue flow (at least) seasonally—a fact that is not disputed and requires no inference in favor of any party—each is a relatively permanent water as a matter of law.

**B.      The Ditches Are Relatively Permanent As a Matter of Law Because They Are At Least Seasonal.**

The Magistrate Judge erred in concluding that the ditches at issue "are, at most, 'intermittent' or 'ephemeral' ditches or channels with seasonal flow." R&R 27. To be sure, the *Rapanos* plurality states that "waters of the United States" do not include "channels containing merely intermittent or ephemeral flow." 547 U.S. at 733–34; *see also id.* at 739 ("The phrase does not include channels through which water flows intermittently or ephemerally, or channels that periodically provide drainage for rainfall."). But the plurality clarified, "By describing 'waters' as 'relatively permanent,' we do not necessarily exclude streams, rivers, or lakes that might dry up in extraordinary circumstances, such as drought. We *also* do not necessarily exclude *seasonal* rivers, which contain continuous flow during some months of the year but no flow during dry months." 547 U.S. at 733 n.5 (emphasis added). The Magistrate Judge incorrectly conflated the terms "intermittent" and "ephemeral" with "seasonal."

Waters that flow seasonally are covered under the *Rapanos* plurality. After all, the plurality contrasted a "seasonal river," for which jurisdiction may be established, with a stream "whose flow is . . . 'broken, fitful,'" *Rapanos*, 547 U.S. at 732 n.5 (quoting Webster's Second dictionary) (cleaned up), or "'exist[s] only, or no longer than, a day,'" *id.* (quoting Webster's

Second dictionary). Distinguishing between the two is a "[c]ommon sense" enterprise. *Id.*; *see supra* note 1.

*United States v. Mlaskoch* is instructive. No. 10-cv-2669, 2014 WL 1281523 (D. Minn. Mar. 31, 2014). In that case, the court, applying the plurality test from *Rapanos*, held that two tributaries abutting the wetlands at issue were relatively permanent waters because the United States presented direct observation of flow over three months, a reasonable inference of flow in a prior month, and the presence of ordinary high-water marks and beds and banks. *Id.* at *17.

The United States proffered even more compelling evidence here: direct evidence in the form of percipient observations of flow stretching from the end of the wet season through the dry season, hydrological data collected in the ditches, evidence of year-round flow downstream, ordinary high-water marks, and bed and banks.[4] *See* U.S. Mot. 13–18; U.S. Reply 15–16. And evidence of one of the ditches being dry on occasions during the dry season does not defeat summary judgment for the United States. *See Rapanos*, 547 U.S. at 733 n.5; *United States v. Donovan*, No. 96-484, 2010 WL 3614647, at *4 (D. Del. Sept. 10, 2010) (defendant failed to identify a dispute of material fact by failing to present "evidence that a channel which is dry during periods without rainfall is not still a 'relatively permanent' body of water as defined in Rapanos"), *aff'd*, 661 F.3d 174 (3d Cir. 2011); U.S. Mot. 14.

Further, Mr. Sharfi himself testified that he observed water in the N/S Ditch, which runs along the border of the Site, six to eight months of the year and carries water in response to changes in ground water elevation (thus, more than in direct response to precipitation). Sharfi Tr. 123:1–124:19 (ECF No. 159-5); U.S. Add'l SOF ¶ 169; *see San Francisco Baykeeper*, 2023 WL

---

[4]      The ordinary high-water mark defines the lateral limit of jurisdiction in non-tidal waters of the United States, provided the limit is not extended by adjacent wetlands. *See* 33 C.F.R. § 328.3(e) (1987); *id.* § 328.4(c). The existence of beds and banks and ordinary high-water marks are physical indicators, and more evidence, of flow, *see* Rapanos Guidance 10 (ECF No. 159-7), and that these waterbodies are geographical features, *see Rapanos*, 547 U.S. at 732–33.

8587610, at *5 (channel that flows seasonally and more than in direct response to precipitation is relatively permanent).

Finally, Defendants' expert Dr. Dennis agreed the upstream reach of Bessey Creek (what Defendants call the East-West Ditch) is a relatively permanent water under the *Rapanos* plurality standard. Dennis Rep. at -158 ("[E]ven though the east-west Canal Ditch does not flow year-round or have continuous flow, it does have at least seasonal flow and is therefore treated here to be a non-navigable, relatively permanent tributary.") (ECF No. 151-72); Dennis 2d Tr. 8:20–9:2; 44:6–18; 44:20–45:3 (ECF No. 159-12).

*    *    *

Because the ditches flow at least seasonally, each is a relatively permanent water connected to the traditional navigable waters of Bessey Creek. The first prong of the *Sackett* test for adjacent wetlands is satisfied as a matter of law.

### III. THE MAGISTRATE JUDGE ERRONEOUSLY FOUND NO EVIDENCE OF A CONTINUOUS SURFACE CONNECTION.

The United States proffered evidence that the Site's wetlands abut (that is, physically touch) each of the three ditches in several locations. Each location is an independent continuous surface connection. Prior to Defendants' unauthorized activities, the Site's wetlands were part of a large wetland that extends onto the Countess Joy Reference Area and abuts the N/S Ditch, the upstream reach of Bessey Creek (or East-West Ditch), and the 84th Avenue roadside ditch. U.S. Mot. 15–18 (discussing evidence); U.S. Reply 15–16 (same).



*ECF No. 151-84 (1966 aerial image depicting Site wetlands abutting N/S Ditch)*

Moreover, regardless of the established fact that the Site's wetlands extended beyond the boundary of the Site through the Countess Joy Reference Area, the Site's wetlands abutted the N/S Ditch on Defendants' own property (before Defendants unlawfully constructed the perimeter road that isolated those wetlands). U.S. Mot. 15–18; U.S. Reply 10–11, 21; ECF No. 151-84 (reproduced above); *see Sackett*, 598 U.S. at 678 n.16 ("[A] landowner cannot carve out wetlands from federal jurisdiction by illegally constructing a barrier on wetlands otherwise covered by the CWA.").[5]

The Magistrate Judge suggested that the National Wetlands Inventory ("NWI") map is an "objective" source that does not show one contiguous wetland. R&R 28. NWI maps are a desktop resource that even Defendants' expert admitted must be verified by on-the-ground investigation (which Defendants did not do, and the U.S. expert team did). *See* U.S. Reply 17.

The Magistrate Judge did not address this issue or that the U.S. expert team's wetland determinations confirmed the existence of wetlands *in the spaces within and between* where the NWI maps indicate there are wetlands on the Countess Joy Reference



Location of reference plots at the Countess Joy East and West Reference Areas and USFWS National Wetland Inventory wetlands in the vicinity of the Site and Reference Areas.

---

[5]     In analyzing the manmade nature of the ditches, the Magistrate Judge noted that the ditches at issue have "discontinuous earthen berms of soil along their sides that can function as physical barriers to surface flow where they are present." R&R 25. While that is true of parts of two of the ditches (the N/S Ditch and upstream reach of Bessey Creek), whether the berms impede surface flow is irrelevant to whether the ditches are relatively permanent waters. And the continuous surface connections the United States identified are in locations where berms do not exist or have been washed away. *See* U.S. Reply 2, 10–11, 19–20. In those locations, there is nothing physically separating the wetlands from the waters in the ditches.

Area (most importantly, wetland reference plots labeled W1–W9 and W11), as shown above and explained in the United States' briefing. *See* U.S. Reply 17–19.

And even if the wetlands on the NWI map are taken at face value, as the Magistrate Judge seemed to posit, the map shows a large wetland on the Site *that abuts the N/S Ditch* (see above), which runs along the western boundary of the Site and connects to the upstream reach of Bessey Creek, all of which further supports granting summary judgment for the United States.

The first court to apply *Sackett* granted summary judgment to the United States on similar facts. *See United States v. Andrews*, 677 F. Supp. 3d 74 (D. Conn. 2023). In *Andrews*, the defendants' wetlands were part of a larger wetland abutting a tributary of a traditional navigable water. The court held that the wetland satisfied *Sackett*'s continuous surface connection requirement based on its abutment to the tributary and surface flow paths linking the wetland with the tributary, thereby demonstrating a "'continuous physical connection.'" *Id.* at 88 (quoting *Rapanos*, 547 U.S. at 747, 751 n.13 (plurality)).

The Magistrate Judge determined none of the proffered evidence was sufficient because a continuous surface *water* connection—a phrase the *Sackett* majority never used—is required. *Id.* at 29–30. *Sackett* instead refers to a "continuous surface connection." *See, e.g.*, 598 U.S. at 678 (quoting *Rapanos*, 547 U.S. at 742). Further, the Magistrate Judge ignored that the *Rapanos* plurality opinion, which *Sackett* adopts, repeatedly describes the requirement as a physical one. *See Rapanos*, 547 U.S. at 751 n.13 (referring to "our physical-connection requirement"); *id.* at 747 (referring to "a wetland's *physical connection* to covered waters"); *id.* at 755 (describing wetlands with a "physical connection" to covered waters "as a practical matter *indistinguishable*" from covered waters).

The absence of a continuous surface *water* connection requirement aligns with the reality—recognized by the Supreme Court in *Riverside Bayview* (which *Sackett* follows)—that surface water need not be present for wetlands to exist. Wetlands are "semi-aquatic," 598 U.S. at 677 (citing *Riverside Bayview*, 474 U.S. at 132), and might lack water at their surface. Under the longstanding regulatory definition of wetlands that the Supreme Court applied in *Riverside*

*Bayview* (which is substantively identical to the current definition), wetlands are "inundated or saturated by surface or ground water at a frequency and duration sufficient to support . . . a prevalence of vegetation typically adapted for life in saturated soil conditions." 33 C.F.R. § 328.3(b) (1987); *see Riverside Bayview*, 474 U.S. at 135 ("[W]etlands adjacent to lakes, rivers, streams, and other bodies of water may function as integral parts of the aquatic environment even when the moisture creating the wetlands does not find its source in the adjacent bodies of water."); *Sackett*, 598 U.S. at 677 (acknowledging that wetlands are "semi-aquatic"); *accord* Corps of Eng'rs Wetlands Delineation Manual 9–31 (explaining that wetland hydrology generally requires water inundation *or* soil saturation for certain periods) (ECF No. 151-62). In other words, an area can satisfy the hydrological parameter of being a wetland if it is inundated or saturated by surface *or* ground water at sufficient frequency and duration. Adopting the Magistrate Judge's report and thus interpreting *Sackett* to require a continuous surface *water* connection would effectively rewrite the definition of "wetlands"—a definition *Sackett* did not purport to address—under the guise of construing the modifier "adjacent." The Court should reject that effort. *United States v. Valentine*, No. 22-CV-512-M, 2024 WL 4379735, at *4 (E.D.N.C. Sept. 27, 2024) (rejecting contention that adjacent wetlands must have a "continuous (aquatic) surface connection" with covered water).

The Magistrate Judge constructed the requirement of a "continuous surface *water* connection" based on the discussion of indistinguishability in *Sackett*. R&R 30. But indistinguishability is not a separate requirement that must be given meaning on top of proving a continuous surface connection. Rather, *Sackett* explains when "wetlands" and "waters" are practically indistinguishable: "*that occurs when* wetlands have a continuous surface connection to bodies that are waters of the United States in their own right, so that there is no clear demarcation between waters and wetlands." *Sackett*, 598 U.S. at 678 (emphasis added) (cleaned up). As the italicized language demonstrates, that wetlands are "as a practical matter indistinguishable" from adjacent "waters of the United States" is a conclusion that the

continuous-surface-connection requirement produces. It is not a separate, standalone requirement.

No court has adopted the Magistrate Judge's reading. In fact, the two courts to squarely address the issue *after Sackett* found just the opposite. *See White v. EPA*, No. 24-00013-BO, 2024 WL 3049581, at *10 (E.D.N.C. June 18, 2024); *Valentine*, No. 22-CV-512-M, 2024 WL 4379735, at *4 ("[The *Rapanos* plurality and *Sackett*] make clear that a continuous surface connection is the quality that renders a wetland practically indistinguishable from a water of the United States."). The *White* court accurately summarized what *Sackett* requires: "The continuous surface connection powers the test." *White*, 2024 WL 3049581, at *10; *see also id.* (stating that wetlands with a continuous surface connection to "waters of the United States" are themselves "waters of the United States" "*because* that continuous surface connection renders the wetland practically indistinguishable from the jurisdictional water to which it is connected"); *id.* ("[W]hether using the phrasing from either *Rapanos* or *Sackett*, the [Supreme] Court has stated in no uncertain terms that the consequence of a 'continuous surface connection' with a covered water is indistinguishability with that water."); *id.* at 12 ("The thing that makes a wetland practically indistinguishable from an adjacent 'water[] of the United States' is the presence of a continuous surface connection.").

The Magistrate Judge's report conflicts with *Riverside Bayview*, which informed *Sackett*'s adoption of the continuous surface connection standard. In *Riverside Bayview*, an "area characterized by saturated soil conditions and wetland vegetation extended beyond the boundary" of the owner's property to a covered water (similar to the wetland at issue extending into the Countess Joy Reference Area). 474 U.S. at 131. The Court acknowledged the difficulty in determining where water ends and land begins: "the transition from water to solid ground is not necessarily or even typically an abrupt one. Rather, between open waters and dry land may lie shallows, marshes, mudflats, swamps, bogs—in short, a huge array of areas that are not wholly aquatic but nevertheless fall far short of being dry land." 474 U.S. at 132. *Riverside Bayview* held that CWA jurisdiction extends over wetlands that actually abut a covered water.

474 U.S. at 135. That holding is discussed in *Sackett* and remains good law. *See Sackett*, 598 U.S. at 677–78.

The Magistrate Judge also found support in *Sackett*'s acknowledgment "that temporary interruptions in surface connection may sometimes occur because of phenomena like low tides or dry spells." *Id.* This acknowledgment makes sense, the Magistrate Judge reasoned, only "if the surface connection is through water because low tides and dry spells occur when a tide of water goes out temporarily or there is a temporary dry spell causing the waters to recede from the surface of the wetland." R&R 31. The Magistrate Judge's reading is flawed because a continuous surface *water* connection is unnecessary to the Court's reasoning. For example, a dry spell could result in an abutting wetland drying out and taking on upland characteristics; and low tides could result in water within a stream receding and thereby breaking the physical connection with an adjacent wetland. None of these possibilities requires that the wetlands be inundated by surface water to be covered.

Finally, even if a continuous surface *water* connection were required, the Magistrate Judge considered only one of several connections and overlooked evidence the United States proffered that would preclude entry of summary judgment for Defendants even under that flawed standard. *See* R&R 29; *see* U.S. Reply 30. The evidence establishes several surface water connections between the large wetland and the upstream reach of Bessey Creek, the N/S Ditch, and the 84th Avenue roadside ditch. The U.S. expert team observed (and documented) surface water flowing directly from the large wetland into the upstream reach of Bessey Creek on the Countess Joy Reference Area in two locations. U.S. Add'l SOF ¶ 167. The U.S. expert team also observed and documented surface water flow into the 84th Avenue roadside ditch. *Id.*; *e.g.*, ECF No. 151-25 (photograph).

And the Site's wetlands had a continuous surface water connection with the N/S Ditch in the southwestern quadrant of the Site before Defendant constructed the perimeter road that isolated those wetlands. *See Sackett*, 598 U.S. at 678 n.16. In fact, Mr. Sharfi even admitted that the N/S Ditch "has been the historical surface water conveyance taking water away from the

properties [including the Site], eventually leading to Bessey Creek and later to tide in the North Fork of the St. Lucie River." U.S. SOF ¶ 25.[6] Thus, at a minimum, the Court should not grant summary judgment on this issue.

*      *      *

The outer bounds of what constitutes a continuous surface connection will be crystallized as the courts decide cases after *Sackett*. But this case is not close to those bounds. Where, as here, a wetland actually abuts another covered water (i.e., there is no physical barrier between the wetland and the covered water), the continuous surface connection test is easily satisfied. *See Sackett*, 598 U.S. at 677–78 (citing *SWANCC* and characterizing *Riverside Bayview* as holding that Corps had "jurisdiction over wetlands that actually abutted on a navigable waterway"); *Andrews*, 677 F. Supp. 3d at 87–88 (holding that CWA extends to wetland that directly abuts a covered water).

## CONCLUSION

For all these reasons, the Court should reverse the Magistrate Judge's report and recommendations and grant summary judgment for the United States on the issue of whether the Site's wetlands are "waters of the United States." The Court should then determine the remaining elements of Defendants' liability and grant summary judgment for the United States on those remaining elements. The Court should order the parties to submit a joint schedule to govern future proceedings regarding the remedy.

---

[6]     The Magistrate Judge's commentary that a label for "Bessey Creek" is "misleading" is immaterial. R&R 29. The United States has never disputed that the upstream reach of Bessey Creek (the East-West Ditch), the N/S Ditch, or the 84th Avenue roadside ditch are manmade. Whether the ditch is called the East-West Ditch or the upstream reach of Bessey Creek is immaterial anyway. And even if it were relevant, before this litigation, Defendants called the same waterbody "Bessy [sic] Creek" and pointed to "stream flow" in the upstream reach of Bessey Creek and the N/S Ditch in their own document submitted to a Florida state agency. ECF No. 151-12 (Defendants' map); *see also* ECF No. 151-45, at -260 (describing HWTT facility proposal "to provide nutrient removal for the portion of the Bessey Creek watershed upstream (or west) of Boat Ramp Avenue").

Dated: October 7, 2024

Respectfully submitted,

TODD KIM
Assistant Attorney General

*/s/ Brandon N. Adkins*
BRANDON N. ADKINS (Bar ID No. A5502752)
ANDREW J. DOYLE (FL Bar No. 84948)
JEFFREY HUGHES (Bar ID No. A5502897)
United States Department of Justice
Environment & Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044
Tel: (202) 616-9174
Fax: (202) 514-8865
Brandon.Adkins@usdoj.gov
Andrew.Doyle@usdoj.gov
Jeffrey.Hughes@usdoj.gov

MARKENZY LAPOINTE
United States Attorney

DEXTER LEE (FL Bar No. 936693)
Assistant United States Attorney
Southern District of Florida
99 N.E. 4th Street
Miami, FL 33132
Tel: (305) 961-9320
Fax: (305) 530-7679
Dexter.Lee@usdoj.gov

*Attorneys for the United States*