UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA,

    *Plaintiff*,

v.                                                                                            Case No. 2:21-cv-14205-KAM

BENJAMIN K. SHARFI, in his personal and
fiduciary capacity as trustee of the Benjamin
Sharfi 2002 Trust, and NESHAFARM, INC.,

    *Defendants*.

_____/

**DEFENDANTS' RESPONSE TO THE UNITED STATES' OBJECTION TO MAGISTRATE JUDGE'S REPORT AND RECOMMENDATIONS ON CROSS-MOTIONS FOR SUMMARY JUDGMENT (ECF No. 186)**

Defendants Benjamin K. Sharfi and Neshafarm, Inc. respectfully request that the Court adopt the well-reasoned Omnibus Report and Recommendation on Cross Motions for Summary Judgment (ECF No. 184) (the "Report").

**INTRODUCTION**

Magistrate Judge Maynard clearly put in a great deal of work – reviewing the briefs, voluminous evidentiary record, and cases, and holding a two-and-a-half-hour hearing – to decide this case of first impression in this Court.  She correctly recognized that the Supreme Court's seminal decision last year in *Sackett v. EPA*, 598 U.S. 651 (2023), transformed the scope of the federal government's jurisdiction to regulate wetlands under the Clean Water Act.  She then applied the undisputed facts in a highly technical record to the new law created by *Sackett*.

The Government, by contrast, tries as hard as possible to minimize the impact of *Sackett* and, as a result, relies heavily on obsolete cases issued before *Sackett* that apply old law.  The

1

United States' Objection to the Magistrate Judge's Report and Recommendations on Cross-Motions for Summary Judgment (ECF No. 186) (the "Objection") is based entirely on an erroneous and outdated understanding of the law.  It incorrectly assumes that the law regarding the regulation of wetlands has not changed since the 1980s, relying on a 39-year-old case, *United States v. Riverside Bayview Homes,* 474 U.S. 121 (1985), and citing to a 1986 regulation that no longer is in effect.  *See* ECF No. 186, at 1-2, 16-18.  It ignores the reality that the Supreme Court has twice clarified its *Riverside Bayview* ruling in *Sackett* and *Rapanos v. United States*, 547 U.S. 715 (2006), and severely criticized the old regulation and the federal agencies' guidance based on it. *See* ECF No. 184, at 22 n.10.  In *Sackett,* the Supreme Court recounted at length how federal agencies for years have sought to minimize the effects of the Supreme Court's rulings regarding wetlands. *See Sackett,* 598 U.S. at 666-67. The Government in its Objection is no different.  The Objection misinterprets *Sackett* and would read out of the opinion repeated statements that a wetland must be indistinguishable from a regulated water.  The Objection also erroneously asserts that *Sackett* did little more than adopt the plurality opinion in *Rapanos,* when in fact *Sackett* clarified several issues including the nature of regulated surface waters and the meaning of the "continuous surface connection" requirement under the Clean Water Act.

Contrary to the assertion in the Objection, the Report disregarded none of the Government's purportedly "overwhelming" evidence. ECF No. 186, at 1.  The Report provided a balanced review of the evidentiary record and applied the undisputed facts to the new law. The Magistrate Judge simply determined that the evidence offered by the Government does not satisfy the new test announced in *Sackett*.  The Objection is long on rhetoric but fails to acknowledge that the Magistrate Judge expressly considered all of its arguments and rejected them as lacking merit.

## **ARGUMENT**

*Sackett* sets forth the new test for determining whether wetlands can be regulated as "waters of the United States" under the Clean Water Act. *Sackett* also clarified – but did not merely adopt, as the Objection claims – the plurality opinion in *Rapanos*. As quoted in the Report, *Sackett* holds that "the CWA extends only to those wetlands that are 'as a practical matter indistinguishable from waters of the United States.'" *Sackett,* 598 U.S. at 678 (quoting *Rapanos,* 547 U.S. at 755 (plurality opinion)). "This requires the party asserting jurisdiction over adjacent wetlands to establish '***first***, that the adjacent [body of water constitutes] … 'water[s] of the United States,' (i.e., a relatively permanent body of water connected to traditional interstate navigable waters); and ***second***, that the wetland has a continuous surface connection with that water, making it difficult to determine where the 'water' ends and the 'wetland' begins.'" *Id.* (quoting *Rapanos*, 547 U.S. at 742) (emphasis added).

As explained below, the Magistrate Judge correctly determined that the manmade drainage ditches near the Defendants' site do not qualify as "waters of the United States," and that there is no continuous surface connection between those ditches and the wetland on the Defendants' site.

**I.      The Magistrate Judge Correctly Determined that the Manmade Drainage Ditches Are Not "Waters of the United States"**

The first part of the *Sackett* test is that a regulated wetland must be connected to a body of water that constitutes a "water of the United States." *Sackett,* 598 U.S. at 678. The Report found that the closest natural stream is approximately two miles away and determined that the manmade drainage ditches closer to the Defendants' site are not "waters of the United States" because they are not natural streams and they only have intermittent, seasonal water flow. ECF No. 184, at 25-26.

3

The Objection asserts that there is no categorical exclusion for manmade ditches. ECF No. 186, at 6-8. This is a rhetorical strawman because the Magistrate Judge did not assert that there is such a categorial exclusion. The Report quoted language from *Sackett* that regulated waters include "only those relatively permanent, standing or continuously flowing bodies of water 'forming geographic[al] features' that are described in ordinary parlance as 'streams, oceans, rivers and lakes.'" ECF No. 184, at 23 (quoting *Sackett*, 598 U.S. at 671). Those are natural bodies of water. The Report also quoted numerous statements in *Rapanos* that manmade ditches generally are not "waters of the United States." *Id.* at 23-24 (quoting *Rapanos* that "[i]n applying the definition to … man-made drainage ditches … the Corps has stretched the term [WOTUS] beyond parody"), 27 ("the *Rapanos* plurality states more than once that channels with intermittent flow are not WOTUS") (citing passages from *Rapanos*). However, the Report noted that manmade ditches <u>may</u> be "waters of the United States" if they have a permanent or continuous flow (as opposed to intermittent flow) of water. *Id.* at 24 (citing *Rapanos,* 547 U.S. at 736 n.7 ("On its only natural reading, [the Clean Water Act] … distinguishes between continuously flowing 'waters' and channels containing only an occasional or intermittent flow.'")). The Report therefore establishes no categorical rule and follows the plain language of *Rapanos*. It is true that some older cases generally treated ditches the same as natural streams, but these cases are no longer good law. *See Rapanos,* 547 U.S. at 726-27 (criticizing lower court decisions holding that ditches are jurisdictional "tributaries").

The Government implicitly recognizes that the manmade nature of the ditches near the Defendants' site is a problem for its case, because it euphemistically refers to the East-West Ditch as "the upstream reach of Bessey Creek." ECF No. 184, at 6 n.4. There is no reason to do this other than to imply that the ditch is actually a natural stream. Contrary to the assertion in the

4

Objection, Defendants in this litigation have never called the ditch a creek. The Report accurately points out that it is "misleading" for the Government to call the ditch "Bessey Creek." *Id.* at 29. The Objection asserts that this is "immaterial," ECF No. 186, at 20 n.6, but attempting to mislead the Court is never immaterial.

The Objection asserts that ditches are regulated if they are "seasonally" wet. ECF No. 186, at 11-13. But as pointed out in the Report, this is based on a footnote in *Rapanos* that refers to "seasonal <u>rivers</u>," not ditches, ECF No. 184, at 27 (emphasis added), and the Objection has no response. *Rapanos* distinguishes between natural streams and manmade channels, and contains multiple statements that manmade channels are not regulated if they are only intermittently wet. *See, e.g.,* ECF No. 184, at 23-24 (quoting language); *Rapanos,* 547 U.S. at 733-34 (stating that 'the waters of the United States' … exclude[s] channels containing merely intermittent or ephemeral flow"). There also is a separate footnote that states manmade channels are regulated only if they "permanently" or "continuously" flow. *Rapanos,* 547 U.S. at 736 n.7. Nowhere does the Objection address this distinction between the different amounts of flow required for natural streams and manmade channels. The case cited by the Objection on this point, *United States v. Mlaskoch,* 2014 WL 1281523 (D. Minn. March 31, 2014), is entirely distinguishable because it involved natural streams, *id.* at *8-10, which is why the court there cited the "seasonal rivers" language from *Rapanos, id.* at *16-17.

Next, the Objection claims that "seasonal" flow is different than "intermittent" flow, and "the *Rapanos* plurality's use of 'intermittent' was not in a scientific sense and would not have excluded seasonal flow." ECF No. 186 at 7 & n.1. It cites no authority for this claim. To the contrary, the Objection cites a case that conflated the concepts of seasonal and intermittent flow. *See id.* n. 1 (quoting language in *San Francisco Baykeeper v. City of Sunnyvale,* 2023 WL

5

8587610, at *4 (N.D. Cal. Dec. 11, 2023), that "the creeks here flow intermittently in the sense that they flow seasonally")). Moreover, the Objection admits that "[w]etland scientists sometimes use the terms 'intermittent' and 'seasonal' interchangeably," *id.,* and the Government's own expert in this case testified that the terms mean the same thing. ECF No. 151-68 (Deposition of Michael Wylie (Oct. 4, 2023), at 57:21-24 ("Q: When you say 'intermittent,' what do you mean by that? A: <u>Intermittent flow is seasonal flow</u>. It flows for at least three months out of the year.") (emphasis added), 250:11-14 ("Q: And an intermittent tributary is one that flows seasonally, right? A: Yes, sir. It flows via rainfall and augmented by groundwater to some extent.")). Even the federal agencies defined "intermittent" to include "seasonal" flow in their various regulations defining "the waters of the United States." *See* Final Rule, The Navigable Waters Protection Rule: Definition of 'Waters of the United States,' 85 Fed. Reg. 22250, 22275 (April 21, 2020) ("The term 'intermittent' in the final rule means surface water flowing continuously during certain times of year and more than in direct response to precipitation (e.g., <u>seasonally</u> when the groundwater table is elevated or when snowpack melts.") (emphasis added); Final Rule, Revised Definition of 'Waters of the United States,' 88 Fed. Reg. 3004, 3085 (Jan. 18, 2023) ("many definitions of intermittent incorporate 'seasonal' flow").

The Magistrate Judge correctly determined that the evidence is undisputed that the manmade ditches near the Defendants' site have water in wet times and lack flow during dry times, i.e., they have intermittent, seasonal flow. ECF No. 184, at 7, 26. The Objection cherry-picks some evidence that water was spotted in the ditches during months nominally in the dry season, but ignores other evidence referenced in the Report that the same ditches are bone dry for months out of the year. ECF No. 184, at 26-27. Mr. Sharfi's statement that there is water in the North-South Ditch in months when it rains and there is no water in the ditch in months when it

does not rain is consistent with an intermittent, seasonal flow. *See* ECF No. 159-5, at 123:1-124:19. The presence of an ordinary high-water mark in the ditches – which is a mark or line of flotsam on the side of the ditch – simply shows that water was present at some point in time, not that the water flows all the time. *Rapanos,* 547 U.S. at 725. The Objection also ignores the Government's own data from the HWTT facility two miles away (where there is more water) which shows almost no flow for six months of the year, and some years where there was no flow even in the wet season. *See* ECF No. 154, at 6, 17-18 (reproducing graphs from the Government's evidence showing seasonal flow at the HWTT facility).

Finally, the Objection twice claims that Defendants' expert Dr. Michael Dennis agreed that one of the ditches is a "relatively permanent water." ECF No. 186, at 8, 14. What the Objection does not tell the Court is that <u>Dr. Dennis changed his opinion</u> after the Supreme Court clarified the law in *Sackett*. *See, e.g.,* ECF No. 165-1 at 4, Tr. 8:20-9:2 (Q: "[Y]ou've changed your opinion with respect to whether the east-west ditch is a relatively permanent water? A: Correct."); ECF No. 165-1 at 16, Tr. 56:8-11 (Government counsel asking the witness "What about the *Sackett* decision . . . has now changed your view that the east-west ditch is no longer a relatively permanent water?"); ECF No. 151-79, at 10-11. This selective statement of the record should make the Court question all of the sweeping factual claims made in the Objection.

The cases cited in the Objection on this issue at ECF No. 186 pages 9-10 are not persuasive. Two of the cases, *Driscoll v. Adams,* 181 F.3d 1285, 1291 (11th Cir. 1999), and *United States v. Holland,* 373 F. Supp. 665, 673 (M.D. Fla. 1974), pre-date *Rapanos* and are the type of cases criticized by the Supreme Court for treating ditches as "waters of the United States." Other cases cited in the Objection precede *Sackett* and cannot take into account that decision. *See Tri-Realty Co. v. Ursinus Coll.,* 124 F. Supp. 3d 418 (E.D. Pa. 2015); *ONRC*

*Action v. U.S. Bureau of Reclamation,* 2012 WL 3526833 (D. Or. Jan. 17, 2012); *United States v. Vierstra,* 803 F. Supp.2d 1166 (D. Id. 2011); *United States v. Donovan,* 2010 WL 3614647 (D. Del. Sept. 10, 2010).  Once again, the Objection incorrectly assumes that *Sackett* did not change the law regarding the scope of the "waters of the United States."

The post-*Sackett* cases cited in the Objection do not demonstrate that the Magistrate Judge erred in determining that manmade ditches are regulated differently than natural streams. The one circuit court case cited at ECF No. 186 page 10, *Lewis v. United States,* 88 F.4th 1073 (5th Cir. 2023), supports the Report's conclusions–not the Government's arguments.  In that case, the U.S. Army Corps of Engineers claimed that the wetlands were regulated because they were near "roadside ditches" which connected to a small tributary and then to a relatively permanent creek several miles away.  *Id.* at 1077.  (These facts are roughly analogous to the facts in this case.)  The Fifth Circuit stated that:

> "As photographs of the property depict, there is no 'continuous surface connection' between any plausible wetlands on the Lewis tracts and a 'relatively permanent body of water connected to traditional interstate waters.' [*Sackett,* 598 U.S. at 1341.]  Recall the nearest relatively permanent body of water is removed miles away from the Lewis property by roadside ditches, a culvert, and a non-relatively permanent tributary.  In sum, it is not difficult to determine where the 'water' ends and any 'wetlands' on the Lewis's property begin – there is simply no connection whatsoever.  There is no factual basis as a matter of law for federal Clean Water Act regulation of these tracts."

*Id.* at 1078.  Far from supporting the Government's position, this case indicates that "roadside ditches" are not qualifying "waters of the United States" for purposes of determining whether there is a "continuous surface connection."

The district court case cited in the Objection on the topic of ditches also is not persuasive. In *San Francisco Baykeeper v. City of Sunnyvale,* 2023 WL 8587610 (N.D. Cal. Dec. 11, 2023), the district court determined that intermittently flowing channels are regulated based on the "seasonal rivers" language in *Rapanos* (discussed above) but did not address the separate

8

discussion in *Rapanos* that manmade channels must have continuous or permanent water flow. *See id.* *4 (citing *Rapanos*, 547 U.S. at 732 n.5, but not addressing distinguishing language in note 7).

The Magistrate Judge's conclusions about the manmade ditches near the Defendants' site are based on the words used in *Sackett* and *Rapanos*. Those intermittent, seasonal ditches do not qualify as "waters of the United States," therefore, the Report correctly concluded that the Government cannot meet the first part of the *Sackett* test.

**II.     The Magistrate Judge Correctly Determined That There is No Continuous Surface Connection Between the Defendants' Wetland and the Drainage Ditches**

The second part of the *Sackett* test is that a wetland must have a continuous surface connection to a "water of the United States" that makes it difficult to determine where the water ends and the wetland begins. *Sackett,* 598 U.S. at 678. The Report concluded that the wetland on the Defendants' site lacks a continuous surface connection with a "water of the United States," because even if the manmade ditches near the site were regulated waters, there is no evidence of surface water extending from the ditches over the wetland. ECF No. 184, at 29-30. The Report concluded that the presence of surface water is required based on the fact that *Sackett* requires that a wetland be indistinguishable from a regulated water; *Sackett* states that it must be obvious to landowners what areas are regulated as "waters of the United States" to avoid due process concerns; and language in *Sackett* about tides and dry spells clearly indicate that a "continuous surface connection" requires the presence of surface water. *Id.* at 30-31.

The Objection claims that the presence of surface water is not required, and that a wetland soils need only touch (or abut) a qualifying water based on *Riverside Bayview*. ECF No. 186, at 16, 18. This ignores the fact that the Supreme Court in two subsequent cases has rejected the Government's interpretation of *Riverside Bayview*. The Court clarified in *Sackett* and

9

*Rapanos* that wetlands are regulated only if there is a continuous surface connection that makes a wetland and regulated water indistinguishable.  Both *Sackett* and *Rapanos* discussed *Riverside Bayview* and interpreted the older case to mean that wetlands are regulated when they are indistinguishable from a regulated water.  *See Rapanos,* 547 U.S. at 724-25 (characterizing *Riverside Bayview* as deferring to the Corps' determination that the "the Corps must necessarily choose some point at which water ends and land begins"), 741 n.10 (discussing language in *Riverside Bayview* about "the inherent difficulties of defining precise bounds to regulable waters" and "the repeated reference [in *Riverside Bayview*] to the difficulty of determining where waters end and wetlands begin");  *Sackett,* 598 U.S. at 665, 677 (discussing *Riverside Bayview* and suggesting that the Court had "deferred to the Corps" determination that the wetland and water were hard to distinguish).  The *Rapanos* plurality also stated that "[w]etlands with only an <u>intermittent</u>, physically remote <u>hydrologic connection</u> to 'waters of the United States' do not implicate the boundary-drawing problem of *Riverside Bayview,* and thus lack the necessary connection to covered waters," which further distinguishes the earlier case and indicates that a continuous water connection is required. *Rapanos,* 547 U.S. at 742 (emphasis added).  Nowhere in *Sackett* did the Supreme Court use the formulation proposed by the Objection about "abutting wetlands" being regulated.  It would be strange indeed if the Court followed the Government's interpretation of a four-decade old case and ignored the clear language in the Supreme Court's decision last year.

The Objection next claims that the "indistinguishability" language in *Sackett* merely describes a wetland that abuts a regulated water and is not a separate requirement.  ECF No. 186, at 16-18.  As an initial matter, the Report did not state that a separate showing of indistinguishability is required, but rather that the indistinguishability requirement defines what

10

is meant by a "continuous surface connection." Moreover, the concept of indistinguishability cannot just be ignored, as suggested by the Government, because the Supreme Court said over and over in *Sackett* that wetlands are only regulated if they are indistinguishable from regulated waters. Specifically --

> "[B]ecause the adjacent wetlands in [33 CFR] § 1344(g)(1) are 'include[ed]' within 'the waters of the United States,' these wetlands must qualify as 'waters of the United States' in their own right. In other words, they must be indistinguishably part of a body of water that itself constitutes 'waters' under the CWA." *Sackett,* 598 U.S. at 676.

* * *

> "If § 1344(g)(1) were read to mean that the CWA applies to wetlands that are not indistinguishably part of otherwise covered 'waters of the United States,' … it would effectively amend and substantially broaden § 1362(7) to define 'navigable waters' as 'waters of the United States *and adjacent wetlands*.'" *Sackett,* 598 U.S. 677 (italics in original; internal reference omitted).

* * *

> "In *Rapanos,* the plurality spelled out clearly when adjacent wetlands are part of covered waters. It explained that 'waters' may fairly be read to include only those wetlands that are 'as a practical matter indistinguishable from waters of the United States,' such that it is 'difficult to determine where the 'water' ends and the 'wetland' begins. That occurs when wetlands have 'a continuous surface connection to bodies that are 'waters of the United States' in their own right, so that there is no clear demarcation between 'waters' and wetlands." *Sackett,* 598 U.S. at 678 (internal citations omitted).

* * *

> "In sum, we hold that the CWA extends to only those wetlands that are 'as a practical matter indistinguishable from waters of the United States.' This requires the party asserting jurisdiction over adjacent wetlands to establish … that the wetland has a continuous surface connection with that water, making it difficult to determine where the 'water' ends and the 'wetland' begins.'" *Sackett,* 598 U.S. 678-79 (internal citations omitted).

* * *

> "In sum, we hold that the CWA extends to only those 'wetlands with a continuous surface connection to bodies that are 'waters of the United States' in their own right,' so that they are 'indistinguishable' from those waters. This holding compels reversal here. The wetlands on the Sacketts' property are distinguishable from any possibly covered waters." *Sackett,* 598 U.S. at 684.

If the Objection were right, then all of this language – including the holding itself – is surplusage. The language in *Sackett* that a wetland and water must be indistinguishable "as a practical matter" is hardly descriptive, but instead directs courts to determine whether waters and wetlands are actually hard to tell apart. Moreover, the Objection relies upon just one of the formulations in *Sackett* about indistinguishability (the language on page 678 "that [it] occurs" when there is a continuous surface connection), when the other formulations admit of no such contorted interpretation (e.g., "no clear demarcation," "difficult to determine where the 'water' ends and the 'wetland' begins").

The Objection's claim that wetlands are inherently and always indistinguishable from abutting waterbodies is belied by the evidence in this case. None of the Government's experts even opined that the Defendants' wetland was indistinguishable from the drainage ditches. *See* ECF No. 153 ¶ 150 (pointing out that the Government experts failed to offer an opinion that the wetland is indistinguishable from the ditches); ECF No. 159, ¶ 150 (Government response purporting to dispute the fact because its experts asserted that the wetland abuts the ditches); ECF No. 166, at 2 n.1 (Defendants' Reply, pointing out that the Government's evidence does not controvert the fact and therefore the fact should be deemed admitted). The Report also includes a photograph of where a wetland on the property north of the Defendants' site abutted one of the ditches, in which it is not "difficult to determine where the 'water' ends and the 'wetland' begins." ECF No. 184, at 29-30 (quoting *Sackett,* 598 U.S. at 678-79).



Figure V.C.2.9. Countess Joy East Reference Area W7 wetland sampling point abutting Bessey Creek (Photograph source: USAEXPERTS 0000687).

The Government's own experts could readily identify in the photograph the boundary between the ditch and wetland (i.e., the ditch is the area with open water and the wetland is the bank of the ditch). *See, e.g.,* ECF No. 153-1, at 153:17-156:22 (deposition of Dr. Wade Nutter). The Objection's assertion that all wetlands are inherently indistinguishable from abutting waterways asks the Court to suspend disbelief and to distrust one's own eyes.

      The Magistrate Judge is correct that the language in *Sackett* about tides and dry spells resolves any doubt that a surface connection refers to the presence of surface water. *See* ECF No. 184, at 30-31 (quoting *Sackett's* statement that "temporary interruptions in surface connection may sometimes occur because of phenomena like low tides or dry spells"). The Objection offers completely strained interpretations of this language in an attempt to explain it away. First, it claims that dry spells could turn wetlands into non-wetlands, ECF No. 186, at 19,

13

but *Sackett* talks about "<u>temporary</u> interruptions in surface connection" and an area needs wetland hydrology for only "<u>some</u> time during the growing season" (which is year-round in South Florida) to remain a wetland, ECF No. 151-62, at 40 46 (Wetland Manual).  Perhaps a multi-year drought could convert a wetland to an upland, but a "temporary dry spell" cannot according to the agencies' own manual.  Next, the Objection claims that "low tides could result in water in a stream receding and thereby breaking the physical connection with an adjacent wetland," ECF No. 156, at 19, but that seems to admit that there needs to be surface water connection for a wetland to be regulated, and it also runs counter to the Objection's arguments based on the "seasonal river" language in *Rapanos*.  Tides are about changes in the level of surface water, so the reference to tides interrupting "surface connections" clearly indicates that the Supreme Court is talking about surface water connections.

The Objection has nothing to say about the Report's point that its interpretation is consistent with due process.  The Supreme Court in *Sackett* raised "serious vagueness concerns in light of the CWA's criminal penalties" and indicated that the broad assertions of jurisdiction over wetlands "provides little notice to landowners of their obligations under the CWA." *Sackett,* 598 U.S. at 680-81.  Regulating a wetland simply because a portion of it abuts a manmade ditch on another property a third of a mile away (which is the Government's primary theory in this case) provides no such notice.  The Report correctly stated that "[r]equiring a continuous surface connection that renders the wetlands and federally regulated waters indistinguishable enables landowners such as Defendants to know and understand when and if wetlands on their land are subject to federal CWA regulation."  ECF No. 184, at 31 n.12.

Other courts have reached the same conclusion as the Report on the "continuous surface connection" issue.  In *Glynn Environmental Coalition, Inc. v. Sea Island Acquisition LLC,* 2024

WL 1088585 (S.D. Ga. March 1, 2024), *appeal pending,* Case No. 24-10710 (11th Cir. March 7, 2024), the district court dismissed a complaint that alleged that a defendant had filled jurisdictional wetlands without a permit because "nothing in or attached to the amended complaint indicates Dunbar Creek [the closest regulated water] ever has a surface connection with the Subject Property, even when the tides change," and "Plaintiffs failed to allege facts indicating the Subject Property is adjacent to Dunbar Creek and has such a continuous surface connection to it that it is 'indistinguishable' from it." *Id.* at \*5. Those rulings indicate both that there needs to be a surface water connection and the wetland in fact must be indistinguishable from a regulated water.

The district court in *United States v. Ace Black Ranches LLP,* 2024 WL 4008545 (D. Id. Aug. 29, 2024), dismissed a complaint alleging that the defendant discharged fill into wetlands in violation of the Clean Water Act. The district court found that the complaint did not "specify that the wetlands have a continuous surface connection with the River to be considered indistinguishable from the River," *id.* \*6, and further stated that "the Government still needs to connect any wetlands it believes Ace Black Ranches has polluted with the River via a <u>sufficient surface-water connection</u>." *Id.* at \*8 n.2 (emphasis added). This decision is entirely consistent with the Report's determination that a "continuous surface connection" requires the presence of surface water.

None of the lower court cases cited in the Objection on this point indicate that the Report is incorrect. *United States v. Andrews*, 677 F.Supp.3d 74 (D. Conn. 2023), was a case involving pro se defendants who failed to present any evidence in response to the Government's motion for summary judgment and filed lawsuits against the judge presiding over the case. *Id.* at 82-83. The case was briefed prior to *Sackett* and the docket indicates that the district court received no

15

briefing or argument from the parties about the implications of *Sackett* before entering summary judgment for the Government. *See Andrews*, Case No. 3:20-cv-1300 (D. Conn. June 12, 2024). This is not the kind of fully-litigated case would render a persuasive precedent.

*United States v. Valentine,* 2024 WL 4379735 (E.D.N.C. Sept. 27, 2024), was not a ruling on the overall merits of the case after consideration of evidence, but instead is a ruling on a motion for judgment on the pleadings. In that decision, the district court ruled that the Government need not separately allege both that there is a "continuous surface connection" and that a wetland and water are "practically indistinguishable," because "those phrases mean the same thing." *Id.* at *1. The district court also ruled that the complaint need not specifically allege an "aquatic" continuous surface connection because *Sackett* "did not purport to impose any 'hypertechnical, code-pleading regime' on litigants." *Id.* at *4 (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009)). This ruling hardly goes to the substance of the issues currently before the Court, but rather focuses on pleading issues not present here.

The decision in *White v. EPA*, __ F.Supp.3d __, 2024 WL 3049581 (E.D.N.C. June 18, 2024), *appeal pending,* Case No. 24-1635 (4th Cir. July 11, 2024), is not to the contrary, either. In that case, the plaintiff challenged the agencies' regulation defining "waters of the United States" that uses the "continuous surface connection" language from *Sackett* but does not contain a separate requirement that a wetland be indistinguishable from a water. *Id.* at *1. The district court denied a motion for preliminary injunction on grounds that there is no separate requirement that a wetland be indistinguishable. *Id.* at *10. However, the district court did not say what constitutes a "continuous surface connection," and presumably that could mean the continuous presence of surface water between a wetland and a water. This means that the ruling in *White* could be entirely consistent with the Report.

16

Finally, in apparent recognition that its legal arguments are inconsistent with *Sackett,* the Objection claims that "the evidence establishes several surface water connections between the large wetland and the [drainage ditches]." ECF No. 186, at 19.  This takes liberties with the record.  It is undisputed that "[t]he Government experts never saw surface water cover the ground along the entire pathway from the East-West Ditch uninterrupted to the Defendants' Site," "[t]he Government experts never saw surface water from the North-South Ditch cover the ground all the way to the wetlands on the Defendants' Site," and "[t]he Government's hydrology expert witness, Dr. Wade Nutter, did not see a continuous flow of surface water from wetlands in the Countess Joy property to the East West Ditch and 84th Avenue Roadside Ditch over the period of time he collected data." *Compare* ECF No. 153, ¶¶ 140-141 (Defendant's Statement of Material Facts) *with* ECF No. 159, ¶¶ 140-141 (Government's Response that these facts are undisputed).  As pointed out in the Defendants' Cross Motion for Summary Judgment, the Government's own monitoring well data shows that there was almost never water above the ground in the wetlands during the period of investigation.  *See* ECF No. 154, at 9-10.  The Objection points only to a statement that on two of their four visits, the Government's experts saw surface water flowing from wetlands north of the Defendants' site into the ditches, ECF No. 186, at 19 (citing ECF No. 159, ¶ 167), but that is hardly a <u>continuous</u> surface connection such that <u>the wetland on the Defendants' site is indistinguishable</u> from the ditches.

The Objection also asserts that "the Site's wetlands had a continuous surface water connection with the N/S Ditch in the southwestern quadrant of the Site before Defendant constructed the perimeter road that isolated those wetlands." ECF No. 186, at 19.  The Objection provides no citation in support of this statement.  The Government's experts never saw surface water from the North-South Ditch extending to the wetland on the Defendants' Site.  *See* ECF

No. ECF No. 153, ¶ 141; ECF No. 159, ¶ 141. The 1966 aerial photograph shown on page 14 of the Objection does not show any surface water connection between the North-South Ditch and the wetland on the Defendants' site, and frankly does not even clearly show that the wetland abutted the ditch. *See* ECF No. 166, at 8 (Defendants' Reply in Support of Cross Motion for Summary Judgment). The Government is grasping at straws when it cites a grainy aerial photograph taken a half century before the Defendants even purchased the site, which does not even appear to show water.[1]

## CONCLUSION

The evidence is undisputed that the Defendants' wetland is two miles away from the nearest natural stream. The manmade drainage ditches closer to the site have water in them only during times of year when it rains and have no water in drier times of year. There is no evidence that surface water from the ditches ever extends over the wetland on the Defendants' site, much less that it does so continuously. The Report properly concluded that these facts do not meet the test established in *Sackett*. Magistrate Judge Maynard did an outstanding job analyzing the new Supreme Court test and applying it to the undisputed facts in this case. The Court should adopt the Report and enter judgment for the Defendants.

---

[1] Much of the Objection on this point is based on the Government's theory that a continuous surface connection exists if wetland soils simply abut a ditch. Even if the Court were to adopt the Government's theory, there are factual disputes that would prevent entry of summary judgment for the Government. The Objection states that "wetlands physically abut multiple ditches" because the wetland on the Defendants' site is "part of a larger wetland" on the property to the north. ECF No. 186, at 1, 5-6, 14. The Objection fails to acknowledge that these are disputed facts, because there is substantial evidence that the Defendants' wetland is isolated from other wetlands to the north. The Report accurately summarizes the dispute regarding these facts, *see* ECF No. 184 at 12-13, 28, but the Objection either ignores the contrary evidence or argues that the Government's evidence is entitled to more weight. *See, e.g.,* ECF No. 186, at 15 (arguing over National Wetland Inventory maps that contradict the Government's theory). Similarly, the Objection asserts that the wetland on the Defendants' site abutted the North-South Ditch, *id.* at 6, 14-15, but ignores the contrary evidence on that issue, *see* ECF No. 166, at 7-8. The Government simply has blinders on regarding both the law and the evidence.

| | |
|---|---|
| Date: October 21, 2024 | Respectfully submitted,<br><br>/s/ *Neal McAliley*<br>T. Neal McAliley<br>Florida Bar No. 172091<br>nmcaliley@carltonfields.com<br>David A. Karp<br>Florida Bar No. 69226<br>dkarp@carltonfields.com<br>**CARLTON FIELDS, P.A.**<br>2 MiamiCentral<br>700 NW 1st Avenue, Suite 1200<br>Miami, Florida 33136<br>Telephone (305) 530-4039<br>Facsimile (305) 530-0055<br><br>*Attorneys for Defendants Benjamin Sharfi as trustee and NeshaFarm, Inc.* |

## CERTIFICATE OF SERVICE

I certify that on October 21, 2024, I electronically filed the foregoing with the Clerk of the Court using CM/ECF, which served by e-mail the following counsel of record:

Brandon N. Adkins
Bar ID A5502752
brandon.adkins@usdoj.gov
Andrew Doyle
Fla. Bar No. 84948
andrew.doyle@usdoj.gov
Jeffrey Hughes
Bar ID A5502897
jeffrey.hughes@usdoj.gov
United States Department of Justice
Environment & Natural Resources Division
P.O. Box 7611
Washington, D.C. 2004
Telephone (202) 616-9174 (Adkins)
Telephone (415) 744-6469 (Doyle)
Telephone (202) 514-4427 (Hughes)

Dexter Lee
Fla. Bar No. 936693
United States Attorney's Office
Southern District of Florida
99 N.E. 4th Street
Miami, Florida 33132
Telephone: (305) 931-9320
DLee@usa.doj.gov

*Attorneys for Plaintiff United States of America*

Christopher F. Hamilton
Fla. Bar No. 98527
chamilton@sharfiholding.com
Joshua D. Miron
Fla. Bar No. 644811
jmiron@sharfiholding.com
Sharfi Holdings, Inc.
3731 NE Pineapple Avenue, 2nd Floor
Jensen Beach, Florida 34957
Telephone (813) 416-2352

*Attorneys for Defendants Benjamin Sharfi as trustee and NeshaFarm, Inc.*

                                                             /s/ *Neal McAliley*

137670756.#